IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:19-cv-02074-G |
| ACKERMAN MCQUEEN, INC., MERCURY GROUP, INC., HENRY MARTIN, AND JESSE GREENBERG, | § § § § § | |
| Defendant. | § § | |

**DEFENDANT ACKERMAN MCQUEEN, INC.'S ORIGINAL ANSWER, COUNTERCLAIM AND THIRD PARTY COMPLAINT AGAINST WAYNE LAPIERRE**

**TO THE HONORABLE A. JOE FISH, SENIOR UNITED STATES DISTRICT JUDGE:**

Subject to and without waiving Defendants' pending Motion to Dismiss, Comes Now Ackerman McQueen, Inc. ("AMc"), named as one of the Defendants in the above numbered and styled case and files this its Original Answer to Plaintiff's Original Complaint ("Complaint"), its Counterclaim and Third Party Complaint, respectfully responding as follows:

**I.**

**RESPONSE TO "PRELIMINARY STATEMENT"**

1.     For decades, the NRA trusted its former advertising agency and communications firm, AMc, to shape and disseminate public communications on its behalf in order to advance the interests of the NRA and its members. During that time, the NRA believed AMc was a valued partner to the NRA and, by extension, the millions of law-abiding gun owners who depend upon the NRA for its Second Amendment Advocacy.

**ANSWER:**     AMc admits that the parties had a long-standing relationship, but denies that it rose to the level of fiduciaries.

2.     Unfortunately, the NRA has recently discovered that AMc betrayed the trust placed in the agency on numerous levels.  Not only did AMc abuse the NRA by regularly overcharging and falsifying invoices, it is now known that defendants (along with others) conspired to mislead the NRA leadership regarding the performance of its signature service – NRATV.  As a result, the NRA and AMc are now embroiled in lawsuits pending in Virginia state court.[1]

**ANSWER:**     AMc denies the entirety of paragraph 2 of the Complaint.

3.     Notwithstanding the termination of the parties' written agreement, AMc continues to improperly make reference, directly and indirectly, to the NRA on Ackerman's website.  Those references are unauthorized and falsely suggest that the NRA continues to be an AMc client and endorser of AMc's services in connection with NRATV when, in fact, the NRA terminated NRATV because of its failure to achieve the objectives for which it was begun.

**ANSWER:**     AMc denies the assertion in paragraph 3 of the Complaint that it falsely suggests that the NRA continues as its client and endorser regarding NRATV.

4.     Similarly, the Ackerman website includes references to other failed client representations – to give the false impression that all of the featured campaigns were successful. Many of these campaigns, which cost clients tens of millions of dollars were shut down because of their ineffectiveness, costliness, and Ackerman's reluctance to provide performance data in accordance with its client obligations.

---

[1] *See National Rifle Association of America v. Ackerman McQueen, Inc. and Mercury Group, Inc.,* Civil Case No. CL19001757 (Alexandria, Va.) (filed 4/12/2019); *National Rifle Association of America v. Ackerman McQueen, Inc. and Mercury Group Inc.,* Civil Case No. CL19002067 (Alexandria, Va.) (filed 5/22/2019); *National Rifle Association of America v. Ackerman McQueen, Inc.,* Civil Case No. CL19002886 (Alexandria, Va.) (filed 9/5/2019).

2

**ANSWER:**    AMc denies the allegations of paragraph 4 and particularly to the suggestion that its website contains references to "other failed" relationships or that campaigns were "shut down".

5.    Accordingly, the NRA brings this action to enjoin AMc from continuing to falsely associate itself in public as a services provider for the NRA.  In addition, the NRA brings this action to enjoin any further use of its brand or its property by defendants.  Finally, the NRA seeks damages, disgorgement, and other relief to which it is entitled for AMc's continuing and improper actions.

**ANSWER:**    AMc admits that the NRA seeks injunctive relief as set out in paragraph 5. AMc denies that the NRA is entitled to such relief, or to damages, to undefined "disgorgement" or "other relief".

## II.

## PARTIES

### A.    <u>Plaintiff</u>

6.    Plaintiff NRA is a not-for-profit corporation organized under the laws of the State of New York with its principal place of business located in Fairfax, Virginia.  The NRA is America's leading provider of gun-safety and marksmanship education for civilians and law enforcement.  It is also the foremost defender of the Second Amendment of the United States constitution.  A 501(c)(4) tax-exempt organization, the NRA has over five million members, hundreds of thousands of donors, and many millions more who support its legendary advocacy.

4828-7933-8659\6

**ANSWER:**   AMc admits those portions of paragraph 6 that are factual in nature.  AMc cam neither admit nor deny the self-laudatory opinions expressed therein and therefore denies same.[2]

**B.**   **Defendants**

7.   Defendant Ackerman is a for-profit business corporation organized under the laws of the State of Oklahoma with its principal place of business located in Oklahoma City, Oklahoma. Ackerman is an advertising and public relations agency that counted the NRA as its largest client for more than thirty years.  Ackerman maintains a principal office in Dallas, Texas, out of which the NRA's account was serviced.  In particular, that office is located at 1717 McKinney Avenue, Suite 1800, Dallas, Texas 75202.

**ANSWER:**   AMc admits the allegations of paragraph 7.

8.   Defendant Mercury is a for-profit business corporation organized under the laws of the State of Oklahoma with its principal place of business located in Alexandria, Virginia. Mercury is a wholly-owned subsidiary of Ackerman and specializes in public communications strategy, including on behalf of advocacy groups such as the NRA.  At all relevant times, Ackerman acted on behalf of both itself and Mercury pursuant to the "Services Agreement" (defined below) between Ackerman and the NRA.  Mercury maintains a principal office in Dallas, Texas, from which it serviced the NRA's account.  In particular, that office is located at the same address as Ackerman's Dallas office – 1717 McKinney Avenue, Suite 1800, Dallas, Texas 75202.

---

[2] It should be noted that the reference to hundreds of thousands of donors creates a misleading impression. See Class Action brought by a major NRA donor as class representative, on behalf of others similarly situated, casting serious doubt on these and other self-congratulatory offerings by the NRA. Case No. 3:19-cv-00679, styled *David Dell' Aquila* v. *Wayne LaPierre, the National Rifle Ass'n and the NRA Foundation*, in the Middle District of Tennessee; See also https://www.thedailybeast.com/national.rifle.association.fundraising.letter.we.could.shutter (reporting on $55 million reduction in annual donations 2015-2017).

**ANSWER:** AMc admits that Mercury Group, Inc. is its subsidiary, located in Alexandria, Virginia, and provides active public communications strategy. AMc denies that the Mercury Group, Inc. maintains a principal office in Dallas, Texas and denies that at all times relevant to this lawsuit, AMc acted on its behalf and on behalf of the Mercury Group, Inc.[3]

9.     Defendant Martin is an individual who resides in Dallas County, Texas. He has served as Ackerman's Chief Creative Officer since 2010. He personally participated in the conduct which forms the basis of this suit.

**ANSWER:** AMc admits the allegations in the first sentence of paragraph 9, denying the allegations in the last two sentences.

10.     Defendant Greenberg is an individual who resides in Dallas County, Texas. He has served as Ackerman's Chief Strategy Officer since June 2016. He personally participated in the conduct which forms the basis of this suit.

**ANSWER:** AMc admits the allegations in the first two sentences of paragraph 10, denying remaining allegations.

### III.

### JURISDICTION AND VENUE

11.     The Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338, and 1367 because this is a civil action involving claims arising under the laws of the United States.

**ANSWER:** AMc admits the allegations in paragraph 11.

---

[3] The Mercury Group, Inc. and the two individual defendants have filed their Motion to Dismiss pursuant to Fed. R. Civ. Pro. 12(b).

5

12.     Venue is proper in this Court pursuant to 28 U.S.C § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

**ANSWER:**     AMc admits the allegations in paragraph 12.

## IV.

## FACTUAL BACKGROUND

**A.     For Decades, the NRA Relied on AMc to Perform Public Affairs Services on Its Behalf.**

13.     The NRA and AMc worked together since the 1980's. Over that time, the NRA placed significant trust and confidence in AMc to perform relations and strategic marketing services, media planning and placement, and management of digital media and websites. Importantly, the operation of NRATV, a digital-media platform, was managed by AMc. So closely identified were AMc and the NRA that NRATV was frequently perceived by the public as the "voice" of the NRA.

**ANSWER:**     The first and third sentences of paragraph 13 are admitted. AMc is unable to admit or deny the truth of the allegations in the second and fourth sentences, since those are matters of opinion.

**B.     The NRA and Ackerman Enter Into, And Then Terminate, The Services Agreement.**

14.     Since at least 1999, AMc's work on behalf of the NRA was governed by successive incarnations of the Services Agreement, which specified the types of work that AMc performed for the NRA. The NRA and Ackerman entered into the current Services Agreement effective as of April 30, 2017, and last amended it effective as of May 6, 2018.

**ANSWER:**     AMc admits the allegations in paragraph 14.

4828-7933-8659\6

15.     By letter dated June 25, 2019, the NRA terminated the Services Agreement effective "immediately."  Notably, Ackerman also purported to terminate the Services Agreement by letter dated June 27, 2019, effective "immediately."

**ANSWER:**    AMc admits the allegations in paragraph 15, noting that prior to June 27, AMc terminated the Services Agreement under a provision calling for 90 days' notice rather than immediate.

**C.      The Services Agreement Provides That the NRA is The Owner of All Creative Works and Intellectual Property Previously Developed and Used by AMc.**

16.     Section VI of the Services Agreement is entitled "Ownership of Products."  In particular, it provides that "[a]ll creative works developed by AMc in fulfilling its obligations under this Services Agreement . . . shall be the property of the NRA."  It continues:  "All other, and further, intellectual property . . . created or developed by AMc in fulfilling its obligations under this Services Agreement, are NRA's sole and exclusive property, and AMc does hereby assign all right, title and interest in same to NRA … ."

**ANSWER:**    AMc admits that the document speaks for itself.  AMc denies that the NRA owns all of AMc's creative designs and property.

17.     Section VI of the Services Agreement also requires AMc to transfer and assign to the NRA the ownership of the copyright to all creative works developed by AMc for the NRA if those works are not otherwise encompassed by the Copyright Act.

**ANSWER:**    AMc admits that the document speaks for itself but denies that the NRA owns all of the AMc's creative works.

18.     In addition, the NRA separately owns numerous copyrights, including the "NRA" and "National Rifle Association."

7

**ANSWER:**   AMc admits the allegations in paragraph 18 in part, but is unable to admit

or deny the assertion that "the NRA owns numerous copyrights. . .".

**D.   Despite the Termination of The Services Agreement, AMc Continues to Prominently Reference the NRA and NRATV on Ackerman's Website.**

19.   Despite the termination of the Services Agreement, Ackerman continues to make

references, directly and indirectly, to the NRA and NRATV on its website.  Attached hereto as

Exhibit A are depictions of those NRA references on Ackerman's website as of August 29, 2019.

**ANSWER:**   AMc admits the allegations in paragraph 19, and asserts fair use as its defense.

20.   Specifically, Ackerman's website, directly and indirectly, references the NRA and

NRATV, as follows:

- on the homepage, in describing who it is and what it does, Ackerman mentions its work with a "gun rights organization" and states that it "built media companies on behalf of ... the Second Amendment to the Constitution."

- on a page entitled "Our Media Evolution," the website provides a timeline of Ackerman's projects for its clients, and also contains videos and photos relating to NRATV;

- on a page entitled "Our Team," a photo appears with the caption "NRA Life of Duty," and

- on pages entitled "Gallery" and "Clients," a total of fifteen different references to the NRA and NRATV appear, which are a greater number of references than to any other AMc client.

**ANSWER:**   AMc admits the allegations in paragraph 20, as of the date of filing of the

Complaint.

21.   Not only are the references on Ackerman's website to the NRA and NRATV

unauthorized in light of the termination of the Services Agreement, but those references are also

improper because they falsely suggest to the public that the NRA remains an AMc client and

endorses the services provided by AMc.   To the contrary, the NRA is no longer an AMc client and does not endorse AMc's services.

**ANSWER:**   AMc denies the allegations in paragraph 21, except admitting that the NRA is now a former client.

22.   For example, Ackerman's website falsely proclaims that NRATV is the "world's most comprehensive video coverage of freedom-related news, events and culture," which creates the misimpression that NRATV was a successful endeavor that the NRA endorses.   In actuality, the NRA recently concluded, despite years of false reporting from defendants, that NRATV was a failed endeavor under any appropriate performance metric.   In fact, on or about June 25, 2019, the NRA suspended the "live TV" programming of NRATV.

**ANSWER:**   AMc denies the allegations in paragraph 22 except for the final sentence, which AMc admits.

23.   Ackerman's website also prominently features photos and references to the NRA with greater frequency than any other AMc client.   That prominent display of the NRA on Ackerman's website wrongly suggests to the public that the NRA endorses the services that AMc provides and that the NRA is current AMc client, neither of which is true.

**ANSWER:**   AMc admits the first sentence of paragraph 23, in that of 45 photos, 15 involve or refer to NRA.  AMc denies the remaining allegations in paragraph 23.

4828-7933-8659\6

V.

**CLAIMS FOR RELIEF**

**A.     Count One: False Representation of Facts Under 15 U.S.C. §1125(a)**

24.     The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

**ANSWER:**     AMc can neither admit nor deny, as the "preceding paragraphs" are not specifically enumerated.

25.     By intentionally maintaining numerous references to, and images of, the NRA and NRATV on its website, Ackerman is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of the NRA with AMc, or as to the NRA's approval of the services or commercial activities by AMc, in violation of 15 U.S.C. § 1125(a).

**ANSWER:**     AMc denies the allegations in paragraph 25.

26.     AMc is involved in interstate commerce.

**ANSWER:**     AMc admits the allegations in paragraph 26.

27.     Mercury, Martin, and Greenberg directly participated in, or are at least the moving force behind, Ackerman's website continuing to falsely suggest that the NRA remains an AMc client and endorses the services provided by AMc, including NRATV.

**ANSWER:**     AMc denies the allegations in paragraph 27.

28.     The foregoing misconduct is without any legal justification and constitutes a knowing and willful violation of applicable law, including 15 U.S.C. § 1125(a).

**ANSWER:**     AMc denies the allegations in paragraph 28 and denies that Plaintiff has standing under the cited statute.

10

29.     Such misconduct must be preliminarily and permanently enjoined, and the NRA should be awarded damages or disgorgement in an amount to be proven at trial.

**ANSWER:**     AMc denies the allegations in paragraph 29.

30.     As a result of such misconduct, the NRA has been required to retain the undersigned counsel to prosecute the claims herein.  Pursuant to 15 U.S.C. § 1117, the NRA seeks to recover its attorneys' fees and costs incurred in this action.

**ANSWER:**     AMc admits the Brewer firm has filed the instant lawsuit.  AMc denies that the NRA is entitled to recover attorneys' fees and costs.

**B.      Count Two: Copyright Infringement Under 17 U.S.C. § 101 *et. seq.***

31.     The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

**ANSWER:**     AMc denies, as the "preceding paragraphs" are not defined.

32.     The NRA owns numerous copyrights, including for "NRA" and "National Rifle Association."  In addition, the NRA owns or is the assignee of the copyright to all creative works developed for the NRA by AMc pursuant to the Services Agreement.

**ANSWER:**     AMc admits in part, is without sufficient knowledge to admit or deny as to "numerous copyrights", and therefore denies.

33.     AMc's unauthorized and continued publication of the NRA's copyrighted works constitute unlawful copyright infringement.

**ANSWER:**     AMc denies the allegations in paragraph 33.

11

34.     The NRA is entitled to preliminary and permanent injunctive relief requiring AMc to immediately and forever remove from Ackerman's website and return all the NRA's copyrighted works.

**ANSWER:**     AMc denies the allegations in paragraph 34.

35.     In addition, the NRA is entitled to an award of actual damages and disgorgement of AMc's profits, or statutory damages, for AMc's infringing use and publication of the NRA's copyrighted works in an amount to be proven at trial.

**ANSWER:**     AMc denies the allegations in paragraph 35.

36.     Pursuant to 17 U.S.C. § 505, the NRA is also entitled to recover its attorneys' fees and costs incurred in this action.

**ANSWER:**     AMc denies the allegations in paragraph 36.

**C.     Count Three: Conversion**

37.     The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

**ANSWER:**     AMc can neither admit nor deny, as "preceding paragraphs" remain undefined in paragraph 37.

38.     The NRA is the exclusive owner of, and holds all right, title, and interest to, all creative works and intellectual property developed and used by AMc in fulfilling its obligations to the NRA under the Services Agreement.

**ANSWER:**     AMc can neither admit nor deny the allegations in paragraph 38 as the document cited speaks for itself.

39.     Despite the NRA's demands (see, for example, Exhibit B), AMc has refused to remove from Ackerman's website and return all such creative works and intellectual property. As a result, AMc unlawfully and without authorization continues to exercise control over the NRA's valuable creative works and intellectual property.

**ANSWER:**     AMc denies the allegations in paragraph 39.

40.     Defendants' unauthorized use and publication of the NRA's creative works and intellectual property constitute intentional acts causing substantial interference with the NRA's property rights, to the detriment of the NRA.

**ANSWER:**     AMc denies the allegations in paragraph 40.

41.     The NRA is entitled to preliminary and permanent injunctive relief requiring defendants to immediately and forever remove from Ackerman's website and return the NRA's creative works and intellectual property.

**ANSWER:**     AMc denies the allegations in paragraph 41.

42.     In addition, the NRA is entitled to an award of damages, including punitive damages, attributable to defendants' wrongful refusal to return its valuable creative works and intellectual property in an amount to be proven at trial.

**ANSWER:**     AMc denies the allegations in paragraph 42.

## VI.

## DEMAND FOR JURY TRIAL

43.     The NRA hereby demands a trial by jury on all issues of fact to which it is entitled to a jury trial in this action.

**ANSWER:**   The demand set forth in paragraph 43 reflects an entitlement afforded to all parties, and is not susceptible to admission or denial.

## VII

## PRAYER

44.   For all the foregoing reasons, the NRA requests that this court enter judgment in its favor and award it the following relief against AMc, Martin and Greenberg.

  a.   preliminary and permanent injunctive relief prohibiting AMc, Martin, Greenberg, and each of their agents, servants and employees, and those persons in active concert or participation with any of them, from: (1) showing any references to the NRA on Ackerman's website and in any other form of media; (2) using or displaying any logos or symbols affiliated with the NRA in connection with advertising, distribution, or display for sale of any product or service associated with AMc; (3) making in any manner whatsoever any statement or representation, or performing any act, likely to lead members of the public to believe that AMc is in any manner, currently directly or indirectly, associated, affiliated, connected with, authorized or approved by the NRA; and (4) taking any action, directly or indirectly, in any form or manner whatsoever that is likely to tarnish or disparage the business reputation of the NRA;

  b.   damages or disgorgement in any amount to be proven at trial;

  c.   costs of court;

  d.   reasonable and necessary attorneys' fees;

  e.   pre-judgment and post-judgment interest at the highest lawful rate; and

  f.   such other relief, at law or in equity, to which it may be justly entitled.

**ANSWER:**   AMc denies that the NRA is entitled to recover against Defendants and denies that the NRA is entitled to any of the relief sought in subparagraphs a through f.

## VIII.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense
### (Authorization)

45.     Plaintiff has authorized, through writing, verbally and through its actions, the displaying of NRA, any of its trademarks, and its name and that of NRATV on AMc's website.

### Second Affirmative Defense
### (Fair Use)

46.     AMc's display of any information related to NRA or NRATV constitutes fair use, both descriptive and nominative, as those terms are used by Supreme Court and 5th Circuit authority.

### Third Affirmative Defense
### (Justification)

47.     AMc is justified in its use of materials allegedly converted.

### Fourth Affirmative Defense
### (Conditions Precedent)

48.     NRA has failed to satisfy conditions precedent to its entitlement to recoup any of its alleged intellectual property.

### Fifth Affirmative Defense
### (Mitigation)

49.     NRA's damages, if any, are self-inflicted and in any event NRA has failed to mitigate its damages, if any exist.

4828-7933-8659\6

### Sixth Affirmative Defense
### (Unclean Hands)

50.     NRA is not entitled to any relief herein, particularly equitable relief, in that it comes into court with unclean hands.

### Seventh Affirmative Defense
### (Waiver)

51.     NRA has waived any entitlement to complain about the presence of its name or any reference to NRA or NRATV by virtue of its long-standing approval and acquiescence therein.

### Eighth Affirmative Defense
### (Estoppel; Mootness)

52.     NRA, by its conduct and actions and words is estopped from complaining about the matters made the basis of their lawsuit.  Instead, AMc has for years displayed its NRA connection on its website with NRA concurrence.  After the NRA raised an objection – and then, only to serve as a false pretense for this lawsuit – AMc began the process of "de-Stalinizing" its website, adding the word "legacy" to references to the NRA thus confirming that its use of the term "NRA" or "NRATV" constitutes legally permissible fair use.  AMc's website is in all respects correct, accurate and truthful and it will continue to be.[4]

### Ninth Affirmative Defense
### (Ratification)

53.     NRA has ratified actions taken by AMc in connection with its website.

---

[4]  That this assertion – indeed this lawsuit – is a gross overstatement is demonstrated by the fact that Plaintiff's own law firm (formerly Bickel & Brewer) itself a client of Counter Plaintiff, has been featured on AMc's website for several years, without complaint.

**Tenth Affirmative Defense**
**(No Standing)**

54.　　NRA lacks standing to pursue claims under the Lanham Act, 15 USC § 1125(a).

**Eleventh Affirmative Defense**
**(No Showing of Registration)**

55.　　Plaintiff has failed to allege copyright registration, a condition precedent to its ability to prevail on Count Two.

## I.

## COUNTERCLAIM AND THIRD PARTY COMPLAINT

Becoming Actor, AMc ("Counter-Plaintiff") brings this Counterclaim against the NRA as Counter-Defendant, and its Third Party Complaint against Wayne LaPierre ("LaPierre"), Executive Vice President of the NRA, in his individual capacity.

## II.

## PARTIES

1.  Counter-Plaintiff has appeared herein by contemporaneously filing this Answer, counterclaim and Third Party Complaint.

2.  Counter-Defendant has appeared herein and is before the Court for all purposes.

3.  Third Party Defendant Wayne LaPierre is a resident of the State of Virginia who may be served with citation at his place of business, 11250 Waples Mill Rd., Fairfax, Virginia 22030.

## III.

## JURISDICTION AND VENUE

4.  This Court has personal and subject matter jurisdiction concerning Third Party Defendant LaPierre pursuant to 28 USC 1332(a) and the amount in controversy exceeds $75,000. In addition, the counterclaims asserted herein include compulsory and permissive actions. Venue is proper in the Northern District of Texas, Dallas Division.

4828-7933-8659\6

## IV.

## PRELIMINARY STATEMENT

**A.      Counterclaim.**

1.      Despite its seemingly benign veneer, the instant case is driven by Counter-Defendant's and LaPierre's sinister and intentional efforts to destroy AMc's business.  Counter-Defendant's lawsuit invites – indeed, mandates – an inquiry into the NRA's and LaPierre's conduct.  It makes relevant an examination of the real reasons behind termination of the parties' operating agreement (the "Services Agreement," as amended) and an examination of the creation, operation and unquestioned success of NRATV (a digital network dedicated to the advancement of 2nd Amendment issues), that lays bare the falsity of the NRA's "failed endeavor" contention.

2.      Two events have combined to cause the NRA to switch from friend to foe: (1) the advent of the law firm of Brewer, Attorneys and Counselors, and its principal Bill Brewer ("Brewer") whose ascendency within the NRA has resulted in the NRA embarking on a reckless and self-destructive path, in the process taking down numerous other important service providers and individual NRA leaders and others with it; and (2) AMc's refusal, including a series of events in 2018 to acquiesce in the financial adventurism and organizational mismanagement of NRA's leader, LaPierre.  This combination of events has found malicious voice in this, the fourth frivolous lawsuit launched against AMc as well as in lawsuits against Andrew Cuomo, Governor of New York and New York's Chief Insurance Regulator; another unfounded lawsuit against Lt. Col. Oliver North ("North") the NRA's one-time President, for having the temerity to demand an audit of Brewer's $97,000.00 per day legal bills (totaling over $24 million for just over one year's activity); and has led to the voluntary resignation of several NRA board members who wanted no part of fiduciary risks being taken; and the enforced ouster of officials and attorneys accused of

19

allegedly "conspiring" to oust LaPierre from his position.[5]

3.      The facts supporting this Counterclaim makes clear that it is AMc which has been victimized by the machinations of the NRA, LaPierre and others, and not as portrayed by Counter-Defendants.

**B.      Third Party Action**

4.      The NRA's case also opens the door to an exposition of the fraudulent conduct of LaPierre, (particularly as it relates to NRATV) his profligate misuse of NRA members' dues, for personal and family benefit, his flaunting of non-profit corporation law, and the reckless abandon with which he and his enabler Brewer have run roughshod over the NRA Board of Directors as well as the NRA Foundation Board of Directors in multiple respects (including failure to obtain prior board approval for his lawsuits against AMc and firing the Board's counsel). It also calls for scrutiny of his personal exposure for libelous statements against AMc, his interference with Third Party NRA Contracts and the fraud he has perpetrated on AMc, particularly with respect to NRATV. All of these areas of inquiry will reveal that what is at the root of Counter Defendant's and LaPierre's effort to scapegoat AMc is the plan to deflect attention from their own misdeeds and to inflict maximum damage on Counter-Plaintiffs. It is LaPierre, with Brewer's assistance, whose artifice has caused AMc serious damage, for which he must pay.

5.      This Counterclaim and Third Party Complaint seek to not only restore AMc's reputation; they also seek to hold accountable the NRA and LaPierre, whose dictatorial actions have neutered the NRA as a political force while inflicting serious collateral damage on AMc.

---

[5] See, e.g., news articles describing this recent frenetic activity and Brewer's role:  Non Profit News Quarterly, (https://nonprofitquarterly.org/why-someone-should-make-the-NRA-into-a-tv-series; Washington Post, https://www.washingtonpost.com/politics/how-a-hard-charging-attorney-helped-fuel-a-civil-war-inside-the-NRA); https://www.nytimes.com/2019/08/22/us/politics/nra-guns-wayne-lapierre.html

4828-7933-8659\6

## III.

## BACKGROUND FACTS

**A.    Decades of Harmony Coincide With the Emergence of LaPierre.**

6.      For almost four decades AMc served the NRA expertly, helping the gun rights organization navigate troubled political and societal waters as its principal communication strategist and crisis manager.  The beginning of the relationship followed NRA management's decision to completely outsource its public relations work to AMc.  AMc effectively crafted the NRA message and burnished its image as the most visible Second Amendment advocacy group in the United States.

7.      LaPierre, a one-time Democratic legislative aide, began his NRA career in 1977 as a lobbyist.  Described in news reports as "reserved" and "awkward"[6] he was seemingly ill-suited to head what many describe as a strident advocacy group.  Aside from his mild personality, AMc personnel found him to be uncomfortable with AMc-developed branding programs such as "NRA Life of Duty", a program created to tell stories about those who woke up every day to the necessity to protect and defend the United States, domestically and abroad.  He often exhibited defensiveness, stemming no doubt from his lack of military service and multiple deferments obtained during the Vietnam conflict.

8.      In the wake of the tragedy at Sandy Hook in 2012, LaPierre sought to hide from public scrutiny and to cease being the only voice of the organization.  He turned to AMc, which created the commentator program for that purpose.  Within a short period of time, AMc – at

---

[6] E.g., https://www.thetrace.org/features/nra.financial.misconduct.ackerman.mcqueen.

LaPierre's request and with his approval – hired or contracted with several nationally recognized talents whose job it was to deliver hard-hitting commentary on 2nd Amendment and American freedom issues. This marked the beginning of LaPierre's personal involvement in assessing and approving salaries and capabilities of those talents since the fees were passed through to the NRA.

9.      LaPierre tasked AMc to develop programs that would broaden NRA's reach. To that end, AMc developed the theme "Stand and Fight", which became the banner brand for the NRA.[7] The tough messaging which became an NRA hallmark was created under LaPierre's direction. Separately, he created with his membership recruitment firm the 1994 direct mailer line, "jack-booted thugs". LaPierre routinely urged AMc to give him "more gasoline", knowing that this kind of advocacy would create notoriety for the NRA . . . and would also enhance his personal brand.

10.      Despite his desire for more concepts that would appeal to a broader audience, the NRA experienced funding problems in 2014, causing LaPierre and the NRA Treasurer, Woody Phillips, to travel to Dallas to announce a budget cut for AMc during calendar year 2015.[8] With the figurative stroke of a pen, LaPierre cut significant funding for NRA Life of Duty, in the process neutering a money-making, profitable program as well as funding for additional sponsored programming. When confronted about the decision to cut programs that had active sponsors, LaPierre responded "Fake it", i.e., make it appear that the NRA Life of Duty program and others remained robust despite the significant funding loss. AMc of course refused this edict.

---

[7]  The NRA continues its use today.

[8]  Curiously, what was cut were costs associated with NRA video channels; left untouched were many of LaPierre's and other NRA officials' out-of-pocket expenditures.

22

**B.** **Agreed Protocols, Now Conveniently Ignored, are Developed.**

11.     During this multi-decade relationship, the parties developed working arrangements, such as negotiating annual budgets covering a variety of tasks. LaPierre and Phillips controlled the process, operating with full knowledge of line items. As projects were initiated, invoices would issue and payment would follow without complaint. LaPierre participated in those negotiations and approved each annual budget. The process was simple: stay within the budget. The NRA itself well understood that keeping hourly time records as the basis of billing was not the contractual measure of payment, and that strategy and creative value are determined by outcome rather than by how much time was spent; hence, the annual budgeting process developed by the parties. The type of detail was claimed by the NRA to be missing was what went into construction of each year's budget.

12.     These working arrangements were set in place at the direction of LaPierre, with input from his AMc counterpart, Angus McQueen ("Angus"), long-time AMc CEO. The entities' senior officers, Woody Phillips (NRA) and/or Bill Winkler and Melanie Montgomery (AMc) were involved in the negotiations and oversaw budgetary compliance, invoicing and payment issues.

13.     All of these functions and many more were followed steadfastly and without disagreement for many years as the relationship grew. Budgets would be set for specific work, AMc sent an invoice, AMc did the work, and the NRA paid the amount budgeted for the invoiced task. The relationship between the organizations was harmonious and mutually beneficial as both parties grew into leaders in their respective spaces. Never in their long history did either party express mistrust of the other side's financial dealings.

4828-7933-8659\6

**C.      NRA Asks AMc to Front Activities; LaPierre's Passion for Secrecy.**

14.     One of the defining characteristics of the NRA/AMc relationship was the frequency with which LaPierre and others acting at his direction asked AMc to "front" activities and expenses for the NRA.   For example, AMc would engage third parties to perform work for the NRA at LaPierre's (and other NRA officials') request, would pay for the work performed by the third party(ies), and would then submit an invoice for reimbursement by the NRA.   These expense reimbursements – as opposed to charges for work done by AMc – amounted to several millions of dollars annually.[9]   LaPierre's rationale for running these expenses through AMc:  it was necessary for security and "discretion" reasons.

15.     LaPierre, beset by paranoia or a passion for secrecy or both, adopted a dictatorial, micro management style.  He demonstrated an obsession with privacy, distancing himself from the public eye and exhibiting terror at the thought of public scrutiny.  At the same time, he was heavily involved in the formulation of policy and protocols for dealing with third parties, including vendors like AMc.  Even NRATV, suddenly now the scourge of Counter-Defendant, was created and expanded at the sole direction of LaPierre.  Not only did he sign off on every performance metric of NRATV, he also made numerous presentations to his Board in support of NRATV which presentations were from all appearances favorably received.   Indeed, one board member observed "If you took a poll of most board members, they'll tell you they like NRATV."[10]  His past actions regarding NRATV baldly contradict the NRA's current stance.

---

[9]  Press reports influenced by the NRA have falsely and incorrectly asserted that the NRA "paid" AMc $40 million annually, when in fact over one-half of that amount was a reimbursement for monies actually advanced on the NRA's behalf by AMc.

[10] http://www.wsj.com/articles/nra.files.suit.against.ad.agency.in.rift.with.key.partner

4828-7933-8659\6

16.     LaPierre made two things quite clear: (a) he was the only person with ultimate authority to speak for the NRA and direct the AMc relationship on behalf of the NRA, unless he specifically designated someone in writing to perform that task; (b) any expenses he incurred, either personally or through AMc, were legitimate NRA expenses, and therefore subject to reimbursement to AMc. Those broad representations regarding the legitimacy of his expenses, repeatedly made by LaPierre, were false.

**D.     The Services Agreement.**

17.     Over the course of years, the parties formalized their working arrangements, embodying their protocols in a so-called "Services Agreement", the first of which was entered into in 1999. The latest version was updated in 2017 and amended in 2018 to confirm the protocol for the hiring, compensation and reimbursements due to AMc under employment agreements involving Lt. Col. Oliver North ("North") and Dana Loesch ("Loesch"). Both of these individuals, at the NRA's request, were formally employed by AMc as "talents" for NRATV, the ambitious digital broadcast network created, staffed and administered in its most recent form (at NRA request) by AMc.

18.     Importantly, the 2018 Amendment contains two provisions expressly designed to protect AMc in the event of expiration or termination of that agreement: the first required Counter-Defendant to secure and post a $3,000,000.00 letter of credit for AMc's benefit to secure payment of outstanding invoices over 30 days old. The second was the acknowledgement that "all non-cancellable" contracts entered into between AMc and third parties for the benefit of the NRA [including the North and Loesch contracts] (referred to therein as the "AMc Third Party NRA Contracts") were the obligation of the NRA to pay the "compensation payable" under the Third

25

Party NRA Contracts. Because Counter-Defendant has intentionally flaunted these obligations, AMc is seeking redress by way of counterclaim in the Virginia courts.

19.     The 2018 Amendment was significant for other reasons as well: as noted herein in greater detail, LaPierre on multiple occasions lauded the work being done by AMc on NRATV, including during a meeting in Dallas on October 11, 2018. Starting that meeting and continuing over the next two months, LaPierre approved NRATV for the 2019 budget year, included within which was Dan Bongino's $1.5 million contract (which Mr. Bongino ultimately turned down). As he had done in May 2018 when the Amendment was signed, he voiced his continuing support for AMc's (and the commentators') work. These statements – like the written commitment to reimburse North's and Loesch's salaries – were false, were known by LaPierre to be false and were relied upon by AMc, resulting in damages incurred by Counter-Plaintiff.

**E.     NRATV: LaPierre's Brainchild.**

20.     NRATV, now assailed by Counter Defendant as an "abject failure" and a "failed endeavor" has been anything but. Officially launched as a full network production featuring gun-related topics, political commentary and other NRA-friendly topics, it had its actual beginnings in the early 1990's.

21.     The network's earliest iteration featured a spokesperson, Ginny Simone, providing monthly reports on VHS for the NRA Board of Directors. That evolved into Ginny Simone Special Report Video Magazines in 1996, then expanded as follows:

> 2000:  NRA Live Launch
>
> 2004:  NRA News Launch, including the debut of "Cam & Co.", the NRA's first talk show host
>
> 2010:  NRA Life of Duty Network Launch

26

2012:  NRA Women Network Launch

2014:  NRA Freestyle Network Launch

2015:  Super Channel Launch under NRA News

2016:  NRATV Official Launch

22.     Throughout NRATV's evolution, AMc developed and administered the network's content (subject to NRA approval); hired its high-profile talent (at NRA's request with salary and other costs reimbursed and payment "guaranteed" by the NRA); and was featured by the NRA to its members and directors as one of its proudest and most successful projects. Each annual budget increased the agreed-upon amounts dedicated by the organization to what became its proprietary flagship. Each budget also received board approval.

23.     Indeed, LaPierre, during his frequent visits to Dallas and other locations to meet with AMc personnel and discuss NRATV analytics, repeatedly told AMc personnel how well the network was performing and that the NRA would continue its support, financially and otherwise. AMc now has learned that those representations were false.

24.     NRATV also became the medium through which Counter-Defendant's most robust fund-raising took place. Thus, the notion that NRATV was a failed endeavor has only lately emerged as one more contrived, after-the-fact rationale for the NRA's assault on its longtime vendor.

**F.     NRATV As A "Super Channel" with Political Clout.**

25.     Throughout 2015, AMc worked to create both the "Super Channel" and "Freedom's Safest Place", a newly-created campaign developed by AMc to offset the loss of earlier profitable

27

programs. The so-called "Super Channel" would be streamed online and "Freedom's Safest Place" would be on the "Super Channel" as well as air on national television.

26.     When Donald Trump became the clear Republican presidential nominee front-runner heading into the NRA convention in 2016, it became clear that the NRA needed to support his campaign, given the alignment between his base and the NRA's base. LaPierre bristled at the thought of openly supporting Trump so early. He continued his cynicism regarding Trump during the entire presidential election, noting on multiple occasions that he didn't believe Trump could win. In the fall of 2016, LaPierre approved new live programming to launch under the new brand NRATV that he believed would be crucial during what he anticipated would be a Hillary Clinton presidency.

27.     Despite LaPierre's negativity regarding Trump's candidacy, the NRA with the advantage of Mr. Chris Cox's relationships, placed their support behind Donald Trump. Freedom's Safest Place ads had become an impressive success for the organization. They were routinely used to solicit high donor donations and aired throughout the 2016 election. When Donald Trump became President, Mr. LaPierre routinely referred to the Trump presidency as the "Trump slump" and opted to use Freedom's Safest Place to continue to solicit donations throughout 2017 while keeping the ads running on Fox News.

28.     In the successful deployment of broad messaging about freedom that resonated with the NRA's constituency, LaPierre sought to increase NRATV's live presence. He personally courted Dana Loesch to join the channel full-time, including dinner with her in Dallas the night that she officially decided to join NRATV. Her show launched in 2018 right after the tragedy in Parkland, Florida.

28

29.     The aftermath of Parkland was challenging. Dana Loesch appeared on the CNN Town Hall instead of LaPierre and he routinely confirmed that her appearance was a huge success, helping the NRA to raise millions of dollars. What's more, NRATV was going live multiple times throughout the day with messaging intended to counter the narrative coming from gun control groups. In one monetization test (that similar to 2014 which was quickly abandoned for unknown reasons) NRATV was able to generate almost $500k in a matter of some 35 days, the bulk of which occurred over a ten-day period.

The following graphic illustrates the successful fund-raising effort:



30.     In the wake of Parkland, the NRA was becoming more and more publically vilified. Much of the executive leadership became paranoid about impending investigations. Swirling in

the political atmosphere were questions about the Russia investigation and NRA's involvement due to a trip, paid for in part by the NRA, taken by board members and other affiliates in 2015. (This was the same year as the cash crunch during which LaPierre kept his personal expenditures intact). Tension mounted.  Threats took the form of "forensic accounting teams taking over whole floors in New York City to bury the NRA" and "the loss of all the organization's insurance".  In a meeting in Dallas in April, 2018, Josh Powell, NRA Chief of Staff, heatedly threatened Revan McQueen, curiously suggesting that Counter Plaintiff, not the NRA, was the party in trouble, before storming out of the room.   In retrospect, that ominous threat foretold how extensively NRA's and LaPierre's plan to scapegoat AMc had spread within the organization.[11]

## G.      LaPierre's Efforts to Calm Stormy Seas.

31.      Seeking to stabilize his rudderless ship, LaPierre personally recruited Oliver North to join NRATV and become the next president of the organization. (Oliver North had been doing pro bono work for the NRA ever since the launch of NRA Life of Duty. He was also one of the most effective voices in the Freedom's Safest Place campaign.) Everything culminated at the 2018 Dallas Annual Meetings where AMc representatives had multiple meetings with Woody Phillips, Steve Hart (then general counsel to the NRA Board) and LaPierre to discuss North's contract as well as the announcement of his presidency.

32.      In 2018, AMc began to have serious concerns about the NRA organization's direction. First was the Carry Guard debacle. AMc had been hired to provide public relations branding and public product rollout of mainly the Carry Guard training program. It was the NRA's responsibility, led by Josh Powell, to manage the insurance portion of the program. On multiple occasions it became clear how mismanaged the entire program had become.  For example, Powell

---

[11]  At AMc's insistence, Powell was removed from contact with AMc employees because of a sexual harassment claim lodged against him by an AMc employee.

4828-7933-8659\6

tried to convince the NRA to acquire USCCA, the leading competitor in the space, and he kept referring to Carry Guard as nothing but an insurance scheme. AMc firmly rejected the notion that this program was only about insurance and did not want to have anything to do with a "scheme." This created the first visible signs of schism in the relationship, with Powell upset that AMc would not follow his direction.

33.    The next issue that started to unfold was the Russia investigation of the NRA. Initially, the NRA asked an experienced AMc contractor to lead the internal investigation into exactly what happened. But quickly, she was stonewalled. NRA officials even implied that they were more concerned with hiding the facts of the investigation instead of bringing the entire story to light in order to fix any issues that existed. AMc wanted nothing to do with those at the NRA that were not committed to protecting the brand and more importantly, the members' interests above their own. This, too was a precursor to the priority placed on the personal protection of LaPierre and others and the whitewash effort the organization is stridently pursuing yet today.

34.    It is against this backdrop that the NRA still needed AMc to do its increasingly important job of managing the public-facing brand, while they scrambled to protect themselves from what appears to the outside world to be a massive case of mismanagement. AMc's disagreement with the Carry Guard program management and issues such as how the Russia investigation was handled became additional "grist for the mill" of retaliation led by LaPierre and implemented by Brewer.

## H.    The Brewer Influence.

35.    Beginning spring of 2018, AMc learned that the NRA had hired Brewer. The retention of Brewer was baffling given his prior support of anti-gun proponents including Beto O'Rourke (a proponent of gun confiscation) and Brewer's familial relationship with Angus (at that

time, Brewer's father-in-law) and Revan McQueen (brother-in-law).[12]   It also foretold an

onslaught of "scorched earth" tactics.[13]   Since his entry onto the scene, Brewer and his firm, with

the approval of LaPierre, has filed no less than eight lawsuits, four of which (including the instant

case) are directed against AMc.   Three of the cases against AMc now reside in state court in the

City of Alexandria, Virginia, and among other claims involve mutual charges of breach of the

Services Agreement.[14]

36.   In addition, Brewer has filed suit against the Governor of New York, Andrew

Cuomo and its chief insurance regulator; the Lockton Companies, which designed Carry Guard

insurance, which has been found to be in violation of New York and at least one other state's laws;

North, in the Supreme Court of New York; and most recently, a lawsuit against the City of San

Francisco.   Various sources have reported that the Brewer firm over the course of approximately

one year has billed the NRA $24 million for over just one year (a number that has since grown)

translating to (according to one report) some $97,000.00 per day.[15]

I.   **Ouster of AMc:  The Plan is Formalized**

37.   Although Brewer's engagement letter has not yet been the subject of discovery, it

has been discussed in press reports and quoted in certain NRA official correspondence.  An exhibit

to North's Answer and Counterclaim in the NRA/North case reveals the startling truth that Brewer

was retained by LaPierre to oversee and prosecute AMc, among others:

---

[12]   Recognizing the deeply personal information involved, and to obviate any exploitation of the family relationship, AMc raised this conflict and ultimately had Brewer replaced as direct AMc contact.

[13]   https://www.washingtonpost.com/politics/how.a.hard.charging.lawyer.helped.fuel.a.civil.war

[14]   See footnote 1.

[15]   See, e.g., **Exhibit "A"**; http://www.washingtonpost.com/politics/nascar.owner.resigns-from-NRA-board.

"The Brewer firm's engagement letter is vague regarding the scope of work that Brewer is performing for the NRA. The letter simply says the Brewer firm is performing legal services (quoting from the engagement letter) 'in connection with <u>litigation and strategic needs arising from the termination or potential termination</u> <u>of key corporate relationships by contract counterparties in response to political</u> <u>pressure</u>.' (Emphasis added). (See Exhibit "A" attached hereto and incorporated by reference, also appended as an exhibit to North's Answer and Counterclaim in the NRA/North lawsuit).[16]

38.     A fair reading of this excerpt from Brewer's engagement letter reveals a dramatic truth, never shared with AMc and in fact guarded with top-secret ferocity by LaPierre and Brewer: Brewer was hired to assist in terminating, including through litigation, AMc's long-tenured relationship with the NRA. This discovery has helped explain Counter-Defendant's abrupt change in attitude towards AMc, and Counter-Defendant's chameleon-like change from friend to foe.

39.     It reveals another truth as well: LaPierre was intent on severing ties with Counter-Plaintiff as early as the spring of 2018, no doubt because AMc had begun to question directives received from the NRA, the adversarial nature of NRA demands, and AMc's unwillingness to accommodate some of those demands. These included AMc's refusal to participate in LaPierre's plea for donations from members under the false guise of a "shutdown". Unbeknownst to AMc, LaPierre was already plotting litigation against AMc in September 2018, consistent with that express objective in the Brewer engagement letter.

---

[16] See **Exhibit "A"**, p. 2.

33

40.     LaPierre's actions during the entirety of 2018 and into 2019, wherein he repeatedly told AMc personnel that NRATV would continue to be funded, that the NRA would continue to reimburse AMc for its expense advances, and that the NRA was intent on working through issues raised by the Brewer firm were false statements of fact.   LaPierre and others within the organization knew such statements to be false when made.   AMc relied upon these repeated assurances and continued to make financial commitments (including the North Contract) in reliance thereon.

**J.      Brewer supplants AMc in its Work for the NRA.**

41.     Over the course of several months beginning with Brewer's retention and consistent with the recently publicized engagement letter, the NRA took an increasingly aggressive stance against its long-time vendor, first insisting on information that had never been a source of controversy in the past; insisting on documents that had never been required in the parties' dealings; requiring justification for its pricing, which had always been subsumed in budgets annually approved by the NRA and LaPierre; demanding interviews of AMc personnel; and conducting three separate audits (one of which lasted over one week) purportedly under auspices of the Services Agreement.

42.     LaPierre set about to intentionally destroy the relationship between the parties, not only through the conduct of vexatious litigious activity but to oust AMc in favor of the Brewer firm's public relations/crisis management advocacy.   Brewer has now supplanted AMc as the NRA's PR lead communication strategist.

**K.      The Analytics Gambit - Another Pretext for Termination.**

43.     Newly-formulated complaints by the NRA, characterizing NRATV as "failed endeavor", also qualify as a "made for litigation" stalking horse.   Central to NRATV operations

34

were its analytics, (essentially, viewship numbers).  As set forth in greater detail in AMc's third party action against LaPierre, periodic reports containing detailed analytics were regularly provided to LaPierre during the period 2016 (year of launch) through May 13, 2019, a month after the NRA filed its first lawsuit against AMc (which in part complained falsely about non-receipt of NRATV analytics).  LaPierre personally approved the development of custom analytics.

44.      LaPierre personally attended meetings to be briefed on NRATV analytics on the following occasions: October 24, 2017; November 28, 2017; January 3, 2018; February 1 and 19, 2018; April 11, 2018; September 4, 2018; October 11 and 23, 2018; November 28, 2018; December 5, 2018 and January 18, 2019.  During each visit, AMc personnel shared in-depth analyses of viewship analytics that were three levels deep.  LaPierre openly lauded AMc's performance.  That too was false, because three days after his last scheduled visit regarding analytics on April 9, 2019 (when LaPierre abruptly and unexpectedly  "had to leave" before the presentation could be made) Counter-Defendant filed its first lawsuit against AMc.  Among other things, Counter Defendant alleged that AMc had refused to provide the NRA with NRATV analytics – the very subject of the April 9 meeting!

## L.    The Onslaught Goes Public.

45.      The NRA, with Brewer at the helm, has moved from a non-profit gun-rights organization to a serial litigant.  Its waste of different courts' limited docket space has ranged from a glorified discovery dispute (Virginia suit number one, which begat a discovery rabbit trail trying to find the culprit who made off with a "secret" powerpoint recklessly left by a Brewer employee with a non-NRA official) to three additional lawsuits in different jurisdictions covering at least some of the same alleged acts (Virginia suit number three and Count Three in the instant action).

35

46.     Each of these litigations portrays the NRA as a victim. Each has been filed without any attempt at a good faith "meet and confer" negotiation; and each has been accompanied by carefully orchestrated leaks and false self-serving press releases.

**M.     Disparaging Remarks Turn Libelous.**

47.     Consistent with his "lawyer as public advocate" for his client, Brewer, with the approval of LaPierre and assistance from other NRA personnel, has become the *de facto* NRA spokesman and has fashioned a narrative that has brought AMc into disrepute. Contemporaneous with the filing of NRA lawsuits against AMc, Brewer and other NRA representatives have frequently attempted to spin the NRA message as one in which it is faultless and AMc is a rogue entity, bent on frustrating the NRA's legitimate efforts at obtaining disclosure. All of this is but a transparent attempt to deflect attention from the NRA's own shortcomings and to wreak havoc within an organization (at that, his own-in laws' organization) that the Brewer firm now competes with.

48.     Examples abound where NRA representatives, including Brewer, have disparaged AMc, portrayed it as a miscreant, divulged its confidential information and run roughshod over AMc's rights and entitlements. The most damaging of these public comments have been press reports quoting LaPierre accusing AMc of "extortion". This false accusation of criminal wrongdoing has been repeated by other NRA representatives. In the process, AMc's purported role has moved from that of being North's alleged facilitator to the one performing the act of extortion.[17]

---

[17] The following are examples of the many claims of AMc's alleged wrongdoing spoken by NRA representatives: https://www.washington.post.com/politics/documents-show-nra-discussions-to-purchse-luxury-mansion (AMc as "wrongdoer;) civil.war (Brewer in discussin aMc, accused it of trying to purge NRA of LaPierre by "extortion", him Wall Street Journal, April 27, 2019 "Extortion Allegation Riles Top NRA Ranks" (citing LaPierre's claim of extortion in letter to NRA Board); https://www.washington.post.com/news/2019/sep/10/who's-behind-attacks-

4828-7933-8659\6

49.     LaPierre personally concocted the extortion story.  In a letter to the NRA Board on Thursday, April 25, 2019, LaPierre recounted a phone call from Lt. Col. North to LaPierre's assistant Millie Hallow in which North allegedly made threats that were couched (according to LaPierre's letter) "in the parlance of extortionists, as an offer I can't refuse.  I refused it."

50.     LaPierre also asserted that AMc "appears to have responded indirectly by trying to oust me."  LaPierre's assertion concerning AMc's purported involvement, since then repeated, is patently false.  In fact, Counter Plaintiff, in the face of repeated demands by Counter-Defendant for backup on LaPierre charges that the NRA had reimbursed, did not have backup for LaPierre wardrobe charges, apartment rent charges for an NRA intern previously approved by LaPierre, and a number of LaPierre private aircraft and other transportation, hotel and Landini Brothers (popular Washington restaurant) charges.  To obtain such backup, AMc had sent letters to several sources (including LaPierre himself) asking for such records to permit a response to NRA demands.

51.     "Extortion", under Virginia statute § 18.2-59 ("Extortion of money, property or pecuniary benefit") defines the offense as including "threaten [ing] injury to the character, person or property of another . . ." and can be punishable by up to 10 years in prison.  Code 1950, §18.1-184; 2010, Chapter 298.  Making such a reckless accusation, false as it is, is a clear example of the malice shown by LaPierre and the NRA towards AMc.

---

national-rifle-association.  "Behind the latest attack is a former NRA contractor".  "The contractor refused [a financial review]; the contractor . . . delivered an ultimatum in the form of this threat . . ..;
https://www.washingtonpost.com/politics/how.a.hard.charging.lawyer.helped.fund.a.civil.war; and Wall Street Journal article, April 27, 2019 @http://wsj.extortion.allegation.riles.top.nra.ranks;
http://www.washingtonpost.com/politicsnra.shakes.up.legal.team.amid.intensifying.civil.war/2019/08/22/72fa460a-c52d-11e9-b5e4-54aa56d5b7cestory.html

**N.**     **One-Sided Services Agreement.**

52.     Each of the actions brought by the NRA, including the instant case, either directly involves or tangentially implicates the Services Agreement and the respective rights and obligations of the NRA and AMc.  In fact, the first two Virginia cases are centered on alleged breaches of that agreement by AMc.  AMc has counterclaimed in Virginia alleging that it is the NRA, not AMc, that is in breach of that Services Agreement.

53.     AMc has no intention of attempting to raise those same breach claims currently playing out in Virginia in this case, in spite of NRA doing precisely that with respect to the newest Virginia lawsuit (lawsuit number three) filed on September 5, 2019 by the NRA (see, conversion claim lodged in that case compared with the same conversion claim urged in this case).  What is appropriate, however, is consideration by this court of the question whether, by its many actions, including several lawsuits filed against AMc, the NRA has waived its rights to continue to insist on the viability of one particular provision of that agreement:  the confidentiality section (§ IV., p. 6, Services Agreement).

54.     The confidentiality portion of the Services Agreement has been featured not only in the Virginia litigation; it has also been waived by the disclosure of confidential information belonging to AMc and by disclosure of its own purportedly confidential information.  For example, it was the NRA which disclosed the existence and content of the AMc agreement with Lt. Col. North, confidential to both AMc and Counter-Defendant.  Please see New York Times article dated March 11, 2019 citing to the North Agreement.  LaPierre has admitted that he authorized the Brewer firm to communicate with the New York Times.  When AMc complained and demanded a retraction NRA counsel took the absurd position that confidentiality applied only to AMc.  Under

38

that theory, the NRA can divulge AMc's confidential material with impunity; AMc has no reciprocal right.

55.     Additionally, Counter Defendant has liberally quoted from the Services Agreement, including in the instant case.  Having previously taken the position that the Services Agreement itself is confidential, it cannot now hope to preserve that status.[18]

56.     If this is truly a proper reading of the agreement, then and under those circumstances AMc is entitled to a declaration that such provision has been waived by the conduct of the NRA.  Alternatively, it qualifies as an unconscionable agreement under the provisions of Virginia § 8.2-302, which provides in pertinent part:

> "If the Court finds as a matter of law the contract or any clause thereof to have been unconscionable at the time made, the court may refuse to enforce the contract, or to ignore the unconscionable provision, or it may limit its application in order to avoid as unconscionable result."  Code of Virginia § 8.2-302.

57.     As dependent as Counter-Defendant is on certain provisions of the Services Agreement, it conveniently overlooks its obligation to pay a "fair and equitable termination fee", recognizing the "inevitable severances and other reasonable costs" associated with termination, and the concurrent requirement to negotiate such costs in good faith (Services Agreement, §§ E and F).  Here, the NRA has done the exact opposite.

**O.    Counter-Defendant and Third Party Defendant Destroys AMc's Third Party NRA Contracts.**

58.     At the NRA's bidding, AMc entered into employment agreements with two well known personalities, Lt. Col. Oliver North ("North") and Dana Loesch ("Loesch").  They and at

---

[18] See, recently filed Verified Petition by the Office of the Attorney General for the State of New York, Index No. 451825/2019, in the Supreme Court of the State of New York, County of New York on September 30, 2019; in addition, the NRA maintains a website, www.nralegalfacts.org where it publicizes pleadings, briefs and articles about its various lawsuits, including those involving AMc.

39

least one other talent, at the request of the NRA, were formally employed by AMc.  NRA's responsibility for their compensation was made clear in the amendment to the Services Agreement that occurred in 2018.  As previously noted, under that amendment, the NRA took responsibility for reimbursing AMc for the cost associated with the NRATV talents.  Counter-Defendant also effectively "guaranteed" its Third Party NRA Contract obligations by committing, among other things, to provide a $3,000,000.00 letter of credit to backstop those commitments.[19]

59.     Until the NRA began its campaign of belligerence against AMc, the reimbursement system worked as well as the other expense reimbursement activity had progressed over the years.  Indeed, even as the NRA ramped up its campaign of harassment against AMc, it continued to observe its obligations to AMc and, by third party beneficiary extension, to the talents.

60.     LaPierre injected himself personally into the recruitment of North.  He negotiated his deal, and despite his current denials, he was intimately involved in all material aspects thereof.  His turnaround efforts to oust North as President of the NRA demonstrate his intent to interfere with North's Contract and damage AMc in the process.

61.     When the NRA precipitously initiated its litigation campaign against AMc, leading to the eventual shutdown of NRATV at the end of June 2019, the NRA used the opportunity to cease reimbursement for the compensation of the Third Party NRA contracts.  This, despite its

---

[19] See, Amendment to Services Agreement, §§ 2,3.

4828-7933-8659\6

clear obligation to reimbursement AMc for "fronting" the salaries and benefits for North, Loesch and the other talent.

62.     The result of the NRA's cutting off of funds, quite naturally, left AMc in a position where it was unable to manage the compensation requirements of the Third Party NRA Contracts. One of those talents has now threatened to sue AMc for discontinuing that person's compensation.

63.     The NRA and LaPierre not only knew of the third party contracts, they expressly approved each of them and acknowledged their existence and the NRA's obligations to pay for those contracts in the 2018 Services Agreement Amendment.  In the face of that knowledge and acknowledgement, the NRA has now steadfastly refused to honor its obligation at the urging of and with the approval of LaPierre, in the process tortiously interfering with those third party contracts.

## P.     A Compendium of Missteps.

64.     Many events have led to the rupture of this once-thriving relationship.  Most have been chronicled in press reports: the Brewer factor; LaPierre's lavish wardrobe expenditures; LaPierre's (and his wife Susan's) extravagant trips and vacations paid for with NRA members' dues; the LaPierre family's use of AMc personnel as personal valets; attempted purchase of a Texas mansion, foiled by AMc's reluctance to see it through; sexual harassment charges against LaPierre's Chief of Staff Josh Powell, to name the most prominent.  These were by no means the exclusive causes of the termination.

65.     Indeed, other factors, some subtle and nuanced, others palpable and obvious, have contributed:

> • NRA's suspicious behavior relating to federal and state investigations;

41

- AMc's putting a stop to incurring expenses for LaPierre that were personal in nature;

- The "Russia trip" and LaPierre's and the NRA's dishonest treatment of that issue;

- LaPierre's preoccupation with possible criminal charges and a "dissolution resolution";

- NRA tolerating sexual harassment committed by a high-ranking member of its management;

- Orchestrated leaks of confidential information, purposely painting AMc in an unfavorable light;

- Clear lack of board oversight; and

- Deliberate purging of right-minded NRA directors, officers and attorneys.

66.    In the span of two short years, the NRA, with LaPierre leading the charge, has destroyed or attempted to destroy what was built over decades. In doing so, it has caused massive personnel disruptions, enormous expenses, loss of economic opportunity, loss of profits and reputational harm that may be irreparable, or at least will take enormous time and effort to repair.

67.    Through its counterclaim and Third Party Complaint, AMc seeks to begin the rebuilding process.

## CAUSES OF ACTION

### Count One
### (Libel *Per Se – NRA and LaPierre*)

68.    The allegations of fact set forth in paragraphs 1 through 67 are incorporated as though copied verbatim herein.

69.    As set forth hereinabove, NRA representatives have repeatedly intentionally and falsely defamed AMc, a private figure, by accusing Counter Plaintiff of the criminal act of extortion. Counter Defendant has published this accusation as fact and has done so publicly. Thus

42

publication has been to third persons.  Counter Defendant is not a member of the print, broadcast or electronic media.

70.    Counter Defendant has identified AMc directly by name and the accusations of commission of a criminal act are *per se* defamatory.  Such accusations have been unambiguous and have held Counter Plaintiff up to calumny and public ridicule.

71.    The subject matter of Counter Defendant's false factual assertion is a decidedly private matter, despite Counter-Defendant's attempts to alter its status to that of a matter of public concern.

72.    Counter Plaintiff has suffered injury as a direct result of Counter Defendant's false statements in amounts as yet undetermined, but estimated to exceed $40 million, for which Counter Plaintiff seeks recovery.

### Count Two
### (Tortious Interference with Contract – NRA and LaPierre)

73.    The allegations of fact set forth in paragraphs 1 through 67 are incorporated as though copied verbatim herein.

74.    The NRA, intentionally and with full knowledge of their existence, has tortiously interfered with AMc's employment agreements with NRATV talents, including those of North and Loesh.  Each such contract is valid, having been entered into at the behest of and approved by the NRA.  Each such contract denominated in the Services Agreement "Third Party NRA Contract".

75.    Counter Defendant has refused its contractual commitment to reimburse AMc for the costs associated with the Third Party NRA Contracts, thus preventing AMc from funding salaries and costs associated therewith.

76.    Counter Defendant's refusal to reimburse AMc has caused said contracts to lapse

4828-7933-8659\6

due to non-payment, thereby proximately caused injury to AMc and to the talents affected who themselves are third party beneficiaries of the Services Agreement.

77.     Counter Defendant's actions constitute tortious interference with contract, and have proximately caused AMc financial harm in precise amounts yet to be determined for which AMc now sues.

### Count Three
### (Declaratory Judgment – NRA)
### (28 USC §2201 *et. seq.*)

78.     The allegations of fact set forth in paragraphs 1 through 67 are incorporated as though copied verbatim herein.

79.     Counter Plaintiff seeks a declaration that, by its actions, Counter Defendant has waived and/or is estopped from claiming that the confidentiality provision of the Services Agreement applies only to AMc.  Holding AMc to such one-sided interpretation prevents AMc from freely and fully responding to allegations made by Counter Defendant.

80.     Counter Defendant has taken the position that the referenced contractual provision is one-sided, and binding only on AMc.  Counter Plaintiff has joined issue on that point and a real and justiciable controversy regarding this issue exists, and AMc seeks a declaration that Counter Defendants has waived such provision, or by its action it is estopped from enforcing it.

81.     Alternatively, Counter Plaintiff seeks a declaration by this Honorable Court that the confidentiality provision of the Services Agreement is unconscionable under Code of Virginia § 8.2-302 as interpreted by Counter Defendant.

82.     Counter Plaintiff is entitled to, and seeks, its reasonable and necessary attorney's fees incurred in the prosecution of this claim.

## Count Four
### (Fraud – LaPierre)

83.     The allegations of fact set forth in paragraphs 1 through 67 are incorporated as though copied verbatim herein.

84.     Statements of fact made to AMc personnel by LaPierre on the dates specified hereinabove, and those made repeatedly throughout the duration of the parties' relationship, but particularly during the four (4) years leading up to the filing of this lawsuit, concerning NRATV's performance analytics, commentators, and the Third Party NRA Contracts were false, were known by LaPierre to be false, were made with intent to deceive AMc and to lure it into exposing itself to financial obligations, were relied upon by AMc to its detriment, and as a result of which AMc has suffered damages in excess of $40,000,000 for which it now sues.

### JURY DEMAND

85.     AMc demands trial by jury on all contested issues of fact.

### CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, AMc, as Counter Plaintiff and Third Party Plaintiff, prays that upon hearing, AMc be awarded judgment for damages as prayed for herein, pre- and post-judgment interest, attorney's fees and costs, and such other relief to which it may show itself entitled.

Dated: October 1, 2019

Respectfully submitted,

_____

Jay J. Madrid, Esq.
Texas Bar No. 12802000
madrid.jay@dorsey.com
Douglas S. Lang, Esq.
Texas Bar No. 11895500
lang.doug@dorsey.com
J. Brian Vanderwoude, Esq.
Texas Bar No. 24047558
vanderwoude.brian@dorsey.com
Christina M. Carroll, Esq.
Texas Bar No. 24092868
carroll.christina@dorsey.com
**DORSEY & WHITNEY LLP**
300 Crescent Court, Suite 400
Dallas, Texas 75201
(214) 981-9900 Phone
(214) 981-9901 Facsimile

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2019, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

_____

One of Counsel

46

NATIONAL RIFLE ASSOCIATION OF AMERICA
**OFFICE OF THE PRESIDENT**
11250 WAPLES MILL ROAD
FAIRFAX, VIRGINIA 22030

*CONFIDENTIAL*



John Frazer
Secretary & General Counsel, National Rifle Association of America

Charles Cotton
Chairman of the Audit Committee, National Rifle Association of America

April 18, 2019

Dear John and Charles:

As indicated in previous correspondence, we and others continue to be deeply concerned about the extraordinary legal fees the NRA has incurred with Brewer Attorneys & Counselors. The amount appears to be approximately $24 million over a 13-month period, ███████████████

Because of the extraordinary size of the Brewer firm's invoices, our NRA Board Counsel advised us ███████████████████████████████████████████████████

To that end, we have asked several times over the past two months for NRA management to retain an outside, independent review of the Brewer firm's invoices. Thus far there has been no action.

███████████████████████████████████████████████████████████
████████████████████████████████████████ —our Board Counsel
has urged us to ███████████████████████████████████████
█████████████████████████████████

Further, in separate meetings we had with Mr. Brewer on 15 and 20 March 2019, ███████
███████████████████████████████████████████████████████████

There are seven reasons why the NRA must engage an independent, outside expert to review the Brewer invoices immediately.

*(703) 267-1040*
*(703) 267-3936 fax*

1

**Exhibit "A"**

*First,* the Brewer firm's invoices appear to be excessive on their face.

The Brewer invoices are draining NRA cash at mindboggling speed.

Based on information provided to us over a month ago by our Secretary & General Counsel, the first 12 invoices the NRA received from the Brewer firm were for these amounts:

| Date | Brewer Firm Invoice |
| --- | --- |
| March 2018 | $ 25,000.00 |
| April 2018 | $ 1,011,184.04 |
| May 2018 | $ 1,409,622.82 |
| June 2018 | $ 1,730,571.18 |
| July 2018 | $ 1,839,535.17 |
| August 2018 | $ 1,839,743.68 |
| September 2018 | $ 1,883,351.80 |
| October 2018 | $ 1,892,735.45 |
| November 2018 | $ 2,043,746.51 |
| December 2018 | $ 1,847,898.88 |
| January 2019 | $ 1,887,452.55 |
| February 2019 | $ 1,849,610.20 |
| TOTAL: | $ 19,260,452.28 |

Invoices of this size for 12 months of work appear to be excessive and pose an existential threat to the financial stability of the NRA. This is a fiscal emergency, yet we have been unable to get management to engage an outside, independent review to ensure these bills are necessary and reasonable.

More alarming still, are the most recent figures provided in the table below by our Treasurer & Chief Financial Officer. His data indicates the Brewer firm's invoices for 1st Quarter 2019 total more than $8.8 million—over $2.9 million per month—or $97,787 per day, seven days a week, every day of every month.

Invoices of this extraordinary magnitude deserve immediate attention, oversight, and a careful, competent and unbiased examination. $97,000 + a day is a stunning amount of money for any organization to pay. It cries out for an outside, independent review.

Brewer Attorneys & Counselors Paid & Owed 2018 & 1st Q 2019



*Second*, the secrecy surrounding the Brewer firm's invoices is alarming.

We, and others, have made multiple requests and recommendations for an outside, independent review of the Brewer firm's invoices. All these requests have been denied. The secrecy surrounding these large invoices causes suspicion and raises questions.

On the advice of our Board Counsel ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ we have made the following requests regarding the Brewer invoices:

- February 25, 2019, President North asked our General Counsel/Secretary to be shown the Brewer invoices. He told President North he had been instructed not to show the invoices.

- February 26, 2019, President North, 1st VP Richard Childress and 2nd VP Carolyn Meadows, wrote to the Executive Vice President requesting the Brewer firm's invoices. The request was denied.

- On March 22, 2019, President North, 1st VP Richard Childress and 2nd VP Carolyn Meadows, wrote to the Audit Committee requesting that the Audit Committee retain and oversee an outside, independent review of the Brewer invoices. As yet, there is no response.

- On March 31, 2019, President North wrote to our Executive Vice President asking that he order an outside, independent review of the Brewer invoices. He refused.

- On April 8, 2019, President North wrote to our Executive Vice President urging him to end this controversy by ordering an outside, independent review of the Brewer firm's invoices. He again refused.

In Q1 2019 the NRA paid the Brewer firm more than $2.9 million per month. The fact that these billings are being shielded from review by an outside, independent auditor is alarming. If the bills are reasonable and properly documented, why the refusal to conduct an independent review?

*Third*, the Brewer firm's engagement letter is inconsistent with industry standards.

The NRA's March 2018 engagement letter with the Brewer firm is inconsistent with industry standards. There are several problems with the engagement letter, all to the disadvantage of the NRA, including:

- The Brewer firm's engagement letter is vague regarding the scope of work that Brewer is performing for the NRA. The letter simply says the Brewer firm is performing legal services '███████████████████████████████████████████████████████

  ████████████████████████████████████████' It appears that the Brewer firm has far exceeded this scope—without proper written documentation. As we understand it, the standard in the legal profession is to require engagement letters for each separate matter, and to adequately document the scope of work that will be performed on each matter.

- The Brewer firm's engagement letter states it is charging the NRA "on an hourly basis" at "its usual and customary rates." But the NRA is a not-for-profit entity. Paying "rack rates" to the Brewer firm makes no sense. Law firms usually reduce rates when representing non-profits. Why no reduction for the NRA?

- The Brewer firm's engagement letter states the firm "requires payment of all expenses associated with this representation, including both in-house and third-party disbursements. In-house charges for support services may exceed the actual cost of providing such services." The letter identifies messenger costs, work processing charges, and telecommunications as examples. It makes no sense for the client of a law firm to pay surcharges on "in-house charges."

- The Brewer firm's engagement letter states the firm uses "I & A International, a company which is owned by partners of the Firm, to provide document abstracting." These costs apparently get passed along (at a surcharge?) to the NRA, but are they commercially reasonable? Have we looked at the market rate for such services?

- The Brewer firm's engagement letter says Texas law will apply, and that if we have a dispute with Brewer we must resolve it through arbitration where the loser pays all attorney fees. These provisions are not in the NRA's interests. Indeed, they are unusual and harmful to the NRA. Texas law? No Virginia-based non-profit should agree to that. Arbitration? That denies the leverage the NRA needs to compel honest and ethical legal services. Loser pays? This is a concept from English law—and is not used in America.

It is obvious that in addition to the high fees and secrecy surrounding the Brewer firm's invoices, we apparently have lax oversight regarding our engagement of the Brewer firm and the scope of what the Brewer firm should be doing, how they are billing us and the rates they are charging. These matters are key elements of our fiduciary duty and must be addressed by an outside, independent review.

The Brewer firm's March 2018 engagement letter should be discarded and re-written. If the Brewer firm does not agree to standard terms, a non-profit discount, detailed billing guidelines used by all properly managed corporations and non-profits (explained below), and adequate scope documentation for each matter on which the Brewer firm is working, then the entire engagement agreement should be terminated.

*Fourth*, **NRA's oversight of the Brewer firm is totally inconsistent with industry standards.**

Our oversight of the Brewer firm is wholly inadequate. As we understand it, our NRA is failing to properly oversee the Brewer firm in multiple ways. For example:

- The NRA has failed to require the Brewer firm to adhere to "billing guidelines." These are standard in the both the non-profit and for-profit corporate world. There are samples on the internet. The American Bar Association provides guidance on this topic. Billing guidelines help organizations control the costs of outside counsel. The NRA should implement such billing guidelines immediately and direct the Brewer firm to follow them. They should be part of each separate retainer agreement.

- We have failed to secure a discount on Brewer's "high" hourly rates. Why do we allow the Brewer firm to charge such high rates? NRA outside counsel at Morgan Lewis wrote a memo to the NRA last month stating that:



  It should be noted that not all of the Brewer firm's work is "high-stakes corporate litigation." First, NRA is a non-profit association, rather than a corporation. Second, some of the matters the Brewer firm apparently handles are uncomplicated, routine matters such as vendor contracts that were not properly managed in years past and responding to Congressional letters.

- Thus far, we have failed to require any outside, independent review of the Brewer invoices. There are services that perform this function—and we easily could find an outside expert to perform the function at very little cost. Morgan Lewis opined ▮▮

*Fifth*, **judges in cases in which the Brewer firm has been involved have determined that Mr. Brewer has engaged in improper unethical conduct and a Federal Judge in Virginia ejected him from representing the NRA in litigation.**

Mr. Brewer was found by a Federal District Judge in Virginia to have misled the court, an offense that led the court to eject Mr. Brewer from participating in a case for the NRA. In that case, after a special hearing to determine why Mr. Brewer failed to disclose his prior disciplinary problem in Texas, the Judge in the U.S. District Court for the Eastern District of Virginia decided on September 13, 2018 to revoke his standing to participate in the case. The Virginia federal court stated:

> "[T]he Court of Appeals [in Texas] went on to affirm the findings of Judge Reyes that Mr. Brewer's actions were not a negligent act, or a mistake, or the result of poor judgment, but they were in **bad faith, unprofessional, and unethical, highly prejudicial to the fair trial of an impartial jury.**
>
> And, of course, we're talking about this push poll that Mr. Brewer admitted he had reviewed and approved before it was used by the polling company. Disrespectful to the judicial system. Threatening the integrity of the judicial system. Incompatible with a fair trial. The poll was designed to improperly influence the jury pool. And that the conduct impacted the right of a trial by impartial jurors. And that it was intentional and in bad faith. And that the quote, "it is undisputed that the trial Court's ability to impanel an impartial jury and to try a case before unintimidated witnesses are core functions of the Court."
>
> Had I known about these opinions, notwithstanding that there is further appeals ongoing, I wouldn't have signed the pro hac vice form and would not have admitted Mr. Brewer to the Eastern District of Virginia. They are very serious allegations. They are findings of bad faith that go to the core of a fair and impartial rendering of a jury verdict. And now having reviewed them—and I realize that the NRA will be inconvenienced and, if necessary, there might have to be some adjustment to the discovery process ongoing—but **I find that Mr. Brewer's pro hac vice admission should be revoked and that he should not be admitted to proceed further in this case.**"

Transcript, NRA v. Lockton, Case No. 18-639, September 13, 2018, page 16–17 (emphasis added).

Indeed, the Texas court sanctioned Mr. Brewer on January 22, 2016, writing:

> "[T]he manner in which Mr. Brewer has responded to the sanctions
> motions and allegations therein is concerning to this Court. Mr.
> Brewer's demeanor was nonchalant and uncaring. Additionally,
> Mr. Brewer was repeatedly evasive in answering questions when
> he was on the witness stand. This Court sustained multiple
> objections for non-responsiveness, instructed Mr. Brewer to
> answer the questions being asked of him by counsel, and before
> taking more aggressive steps, this Court took a recess during Mr.
> Brewer's examination seeking the assistance of Mr. Brewer's
> attorney. The Court asked Mr. Pridmore [Mr. Brewer's attorney]
> to step outside the courtroom and advise Mr. Brewer to follow the
> Court's instructions and be responsive to questions being asked of
> him. It was the desire and hope of this Court to highlight to Mr.
> Brewer that the matter at hand was of extreme importance and with
> potentially grave consequences. . . . **The Court finds Mr.
> Brewer's actions were not merely a negligent act, a mistake or
> the result of poor judgment, and Mr. Brewer's explanation
> that he bears clean hands . . . is insulting to this Court. The
> Court further finds Mr. Brewer's attempt to avoid
> responsibility and accountability for his conduct to be at the
> very least unpersuasive and at the worst in bad faith,
> unprofessional, and unethical.**"

Ruling from Judge Reyes, Teel v. Titeflex, Case No. 2012-504 (Lubbock, TX), January 22,
2016, pages 1–2 (emphasis added). As the Virginia federal court noted, the Texas Court of
Appeals affirmed Judge Reyes's sanction of Mr. Brewer.

The NRA cannot ignore such findings. We understand that the ethical problem Mr. Brewer has
in Texas is on appeal to the Texas Supreme Court. But the fact is, his honesty and ethics have
been questioned by courts in Texas and Virginia. This record adds to the urgency of the requests
that the NRA immediately conduct an outside, independent review of the millions in fees the
Brewer firm has charged to the NRA, . . . fees which appear to be excessive . . . and fees which
appear to have been paid at a rate of more than $97,000 per day in Q1 2019.

*Sixth*, **Mr. Brewer has been actively trying to stop an outside, independent review of his
firm's invoices.**

It is even more stunning to learn that Mr. Brewer has personally been actively working to stop an
outside, independent review of his own invoices. Certainly the Brewer firm has a conflict of
interest regarding the review of its own bills when it works to resist an outside, independent review
of its own bills.

*Seventh*, the NRA Board of Directors has a fiduciary duty to oversee massive expenditures of NRA funds.

The NRA is a non-profit registered in New York. It is regulated by the New York Attorney General. The New York Attorney General has published guidance on the financial management of non-profits. We must follow this guidance and the laws governing non-profits in the State of New York. Multiple guidance memoranda from the New York Attorney General can be found at www.charitiesnys.com. One particularly relevant piece of guidance is titled:

"INTERNAL CONTROLS AND FINANCIAL ACCOUNTABILITY FOR NOT-FOR-PROFIT BOARDS." It states:

> "A primary responsibility of a nonprofit's board of directors
> is to ensure that the organization is accountable for its
> Programs and finances to its contributors, members, the public
> and government regulators."

To fulfill our directors' fiduciary duties and responsibilities as stewards of our non-profit organization, we must insist on full disclosure, proper oversight, and an outside, independent review. If we do not, we are bound by our fiduciary duties to do what is right—and to push further for review and oversight of these extraordinary, multi-million-dollar expenditures. This is a matter of conscience for both of us.

We want to be clear that we raise concerns about the Brewer firm's multi-million-dollar fees for only one reason: it is our fiduciary duty to make sure the NRA responsibly uses the funds it raises from members and the public. We fully support the compliance work the Brewer firm has performed for the NRA. We fully support and expect 100% compliance with all rules, regulations and laws applicable to non-profits. But this includes compliance in all NRA contractual relationships with vendors, including the Brewer firm. If the NRA Audit Committee fails to order an outside, independent review, then the NRA Board of Directors, in fulfillment of its fiduciary duty, should do so.

### Conclusion

The decision to permit an outside, independent review of the Brewer legal fees should not be difficult. In fact, it is a "no-brainer" when one considers the totality of current circumstances:

Over the last 13 months Brewer has billed the NRA approximately $24,000,000, more than $18.5 million ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. His retainer agreement is flawed, inconsistent with standards in the industry, and contains provisions clearly harmful to the NRA.

The bills he submitted are not subject to customary "billing guidelines" used by non-profits and public corporations. He provides no discount from his "normal" billing rates to NRA. He provides no budget of costs going forward. And the "scope" of his work is vague and does not include the projects for which he is billing the NRA.

Despite repeated requests to fulfill our Board of Directors' fiduciary responsibilities by conducting an outside, independent review of the Brewer firm's billing details, our efforts have been unsuccessful. Based on his 1st Quarter 2019 invoices, each day going forward will require the NRA to expend almost $100,000 with the Brewer firm.

Lastly, all of the above should be considered in the context that the lawyer whose bills are in question has had encounters with Judges who have taken action against him, finding ethical lapses in a Texas court and a false statement to a Federal Judge in Virginia, the result of which was that Mr. Brewer was ejected from the Virginia proceeding and prohibited from continuing to represent NRA in the ongoing litigation filed there.

For all the reasons above, and as we have articulated orally and in previous correspondence, we should retain an outside, independent reviewer of the Brewer firm's billings prior to our Board of Directors meeting on 29 April in Indianapolis. Failing that, we plan to address the points above to our Board in person, so they are aware of their fiduciary duties, our efforts to protect this organization and its members, and let our Board Members decide how they want to proceed.

Charles, hopefully, the agenda for your Audit Committee meeting on Sunday, 28 April will permit including this document for discussion under "new business" in executive session. If that is not possible, please advise and we will plan to introduce this letter during our Board of Directors meeting on 29 April 2019.

John, please pass a copy of this document as OFFICIAL CORRESPONDENCE to our Executive Vice President/CEO and inform him that if the Audit Committee takes a pass on retaining the services of an outside, independent reviewer acceptable to us, then it is our intention to seek approval for such a review of these massive expenditures from the Board Members in attendance.

Semper Fidelis,


Oliver North
NRA President

Richard Childress
NRA 1st Vice President


**"SEMPER FIDELIS" IS MORE THAN A SLOGAN FOR U.S. MARINES.
"ALWAYS FAITHFUL" IS A WAY OF LIFE**