**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | |
| **Plaintiff and Counter-Defendant** | |
| **and** | |
| **Wayne LaPierre,** | |
| **Third-Party Defendant,** | |
| **v.** | **Civil Action No. 3:19-cv-02074-G** |
| **ACKERMAN MCQUEEN, INC.,** | |
| **Defendant and Counter-Plaintiff,** | |
| **and** | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, AND JESSEE GREENBERG** | |
| **Defendants** | |

**PLAINTIFF THE NATIONAL RIFLE ASSOCIATION OF AMERICA'S ANSWER TO
DEFENDANT ACKERMAN MCQUEEN, INC.'S COUNTERCLAIM**

Plaintiff National Rifle Association of America (the "NRA") files its Original Answer to

Defendant's Counterclaim (*see* ECF No. 12) as follows:[1]

---

[1] Mr. Wayne LaPierre has not appeared in this action and has not been served with process. The NRA is not responding on his behalf.

# I.

## COUNTERCLAIM AND THIRD-PARTY COMPLAINT

Becoming Actor, AMc ("Counter-Plaintiff") brings this Counterclaim against the NRA as Counter-Defendant, and its Third-Party Complaint against Wayne LaPierre ("LaPierre"), Executive Vice President of the NRA, in his individual capacity.

**RESPONSE:**  None required.

# II.

## PARTIES

1.     Counter-Plaintiff has appeared herein by contemporaneously filing this Answer, counterclaim and Third-Party Complaint.

**RESPONSE:**  The NRA admits the allegations in paragraph 1.

2.     Counter-Defendant has appeared herein and is before the Court for all purposes.

**RESPONSE:**  The NRA admits that it has appeared in this case, but denies it is "before the Court for all purposes."

3.     Third Party Defendant Wayne LaPierre is a resident of the State of Virginia who may be served with citation at his place of business, 11250 Waples Mill Rd., Fairfax, Virginia 22030.

**RESPONSE:**  The NRA admits that Mr. LaPierre is a resident of the State of Virginia and that his place of business is located at the specified address.  The remaining allegations of paragraph 3 are denied.

2

## III.

## JURISDICTION AND VENUE

4.      This Court has personal and subject matter jurisdiction concerning Third Party

Defendant LaPierre pursuant to 28 USC 1332(a) and the amount in controversy exceeds $75,000.

In addition, the counterclaims asserted herein include compulsory and permissive actions.  Venue

is proper in the Northern District of Texas, Dallas Division.

**RESPONSE**:  The NRA admits that venue is proper in this district.  The remaining allegations in

paragraph 4 are statements or conclusions of law to which no response is required, or allegations

about which the NRA lacks knowledge or information sufficient to form a belief as to their truth,

and the NRA, therefore, denies them.

## IV.

## PRELIMINARY STATEMENT

A.      **Counterclaim.**

1.      Despite its seemingly benign veneer, the instant case is driven by Counter-

Defendant's and LaPierre's sinister and intentional efforts to destroy AMc's business. Counter-

Defendant's lawsuit invites – indeed, mandates – an inquiry into the NRA's and LaPierre's

conduct.  It makes relevant an examination of the real reasons behind termination of the parties'

operating agreement (the "Services Agreement," as amended) and an examination of the creation,

operation and unquestioned success of NRATV (a digital network dedicated to the advancement

of 2nd Amendment issues), that lays bare the falsity of the NRA's "failed endeavor" contention.

**RESPONSE:**  The NRA denies the allegations in paragraph 1, but notes that, as asserted in the

First Amended Complaint in greater detail (filed contemporaneously herewith), AMc and its

3

representatives have since at least 2016 engaged in an overarching and interconnected scheme that, among other things, fraudulently induced the NRA into agreeing to launching, and then expanding, the failed digital media platform known as NRATV by making knowingly misleading statements (accompanied by the creation of out-of-context and deceptive "viewership statistics") concerning the platform's actual and potential financial viability and performance.

2.      Two events have combined to cause the NRA to switch from friend to foe:  (1) the advent of the law firm of Brewer, Attorneys and Counselors, and its principal Bill Brewer ("Brewer") whose ascendency within the NRA has resulted in the NRA embarking on a reckless and self-destructive path, in the process taking down numerous other important service providers and individual NRA leaders and others with it; and (2) AMc's refusal, including a series of events in 2018 to acquiesce in the financial adventurism and organizational mismanagement of NRA's leader, LaPierre.  This combination of events has found malicious voice in this, the fourth frivolous lawsuit launched against AMc as well as in lawsuits against Andrew Cuomo, Governor of New York and New York's Chief Insurance Regulator; another unfounded lawsuit against Lt. Col. Oliver North ("North") the NRA's one-time President, for having the temerity to demand an audit of Brewer's $97,000.00 per day legal bills (totaling over $24 million for just over one year's activity); and has led to the voluntary resignation of several NRA board members who wanted no part of fiduciary risks being taken; and the enforced ouster of officials and attorneys accused of allegedly "conspiring" to oust LaPierre from his position.[2]

_____

[2] *See, e.g.*, news articles describing this recent frenetic activity and Brewer's role: Non-Profit News Quarterly,   (https://nonprofitquarterly.org/why-someone-should-make-the-NRA-into-a-tv-series; Washington   Post,   https: //www.washingtonpost.com/politics/how-a-hard-charging-attorney-helped.fuel-a-civil-war-inside-the-NRA);   https://www.nytimes.com/2019/08/22/us/politics/nra-guns-wayne-lapierre.html.

**RESPONSE:**  The NRA denies the allegations in the first sentence. The NRA admits that it has filed meritorious lawsuits against (i) Defendant AMc; (ii) Andrew Cuomo and the New York State Department of Financial Services for civil rights violations that survived a motion to dismiss and now remains in the discovery phase of the case; and (iii) Mr. Oliver North, a case in which the NRA recently prevailed. The NRA denies the remaining allegations in paragraph 2.

3.      The facts supporting this Counterclaim makes clear that it is AMc which has been victimized by the machinations of the NRA, LaPierre and others, and not as portrayed by Counter-Defendants.

**RESPONSE:**  The NRA denies the allegations in paragraph 3.

**B.      Third Party Action**

4.      The NRA's case also opens the door to an exposition of the fraudulent conduct of LaPierre, (particularly as it relates to NRATV) his profligate misuse of NRA members' dues, for personal and family benefit, his flaunting of non-profit corporation law, and the reckless abandon with which he and his enabler Brewer have run roughshod over the NRA Board of Directors as well as the NRA Foundation Board of Directors in multiple respects (including failure to obtain prior board approval for his lawsuits against AMc and firing the Board's counsel).  It also calls for scrutiny of his personal exposure for libelous statements against AMc, his interference with Third Party NRA Contracts and the fraud he has perpetrated on AMc, particularly with respect to NRATV.  All of these areas of inquiry will reveal that what is at the root of Counter Defendant's and LaPierre's effort to scapegoat AMc is the plan to deflect attention from their own misdeeds and to inflict maximum damage on Counter-Plaintiffs.  It is LaPierre, with Brewer's assistance, whose artifice has caused AMc serious damage, for which he must pay.

**RESPONSE:**  The NRA denies the allegations in paragraph 4.

5.     This Counterclaim and Third-Party Complaint seek to not only restore AMc's reputation; they also seek to hold accountable the NRA and LaPierre, whose dictatorial actions have neutered the NRA as a political force while inflicting serious collateral damage on AMc.

**RESPONSE:**  The NRA states it lacks knowledge or information sufficient to form a belief about the truth of the allegation about AMc's motives in filing the Counterclaim and Third-Party Complaint in this case and otherwise denies the remaining allegations in paragraph 5.

## BACKGROUND FACTS

**C.**     **Decades of Harmony Coincide With the Emergence of LaPierre.**

6.     For almost four decades AMc served the NRA expertly, helping the gun rights organization navigate troubled political and societal waters as its principal communication strategist and crisis manager.  The beginning of the relationship followed NRA management's decision to completely outsource its public relations work to AMc.  AMc effectively crafted the NRA message and burnished its image as the most visible Second Amendment advocacy group in the United States.

**RESPONSE:**  The NRA admits that for almost four decades AMc served as a communication strategist and crisis manager for the NRA but denies the remaining allegations in the first sentence. The NRA denies the allegations contained in the second sentence.  The NRA admits that it is the most visible Second Amendment advocacy group in the United States but denies the remaining allegations in paragraph 6.

7.      LaPierre, a one-time Democratic legislative aide, began his NRA career in 1977 as a lobbyist.  Described in news reports as "reserved" and "awkward"[3] he was seemingly ill-suited to head what many describe as a strident advocacy group.  Aside from his mild personality, AMc personnel found him to be uncomfortable with AMc-developed branding programs such as "NRA Life of Duty", a program created to tell stories about those who woke up every day to the necessity to protect and defend the United States, domestically and abroad.  He often exhibited defensiveness, stemming no doubt from his lack of military service and multiple deferments obtained during the Vietnam conflict.

**RESPONSE:**  The NRA admits that Mr. LaPierre is employed by the NRA since 1977.  The NRA denies the remaining allegations in paragraph 7.

8.      In the wake of the tragedy at Sandy Hook in 2012, LaPierre sought to hide from public scrutiny and to cease being the only voice of the organization.  He turned to AMc, which created the commentator program for that purpose.  Within a short period of time, AMc – at LaPierre's request and with his approval – hired or contracted with several nationally recognized talents whose job it was to deliver hard-hitting commentary on 2nd Amendment and American freedom issues.  This marked the beginning of LaPierre's personal involvement in assessing and approving salaries and capabilities of those talents since the fees were passed through to the NRA.

**RESPONSE:**  The NRA denies the allegations in paragraph 8.

9.      LaPierre tasked AMc to develop programs that would broaden NRA's reach.  To that end, AMc developed the theme "Stand and Fight", which became the banner brand for the

_____

[3] E.g., https://www.thetrace.org/features/nra.financial.misconduct.ackerman,mcqueen.

NRA.[4]  The tough messaging which became an NRA hallmark was created under LaPierre's direction.  Separately, he created with his membership recruitment firm the 1994 direct mailer line, "jack-booted thugs".  LaPierre routinely urged AMc to give him "more gasoline", knowing that this kind of advocacy would create notoriety for the NRA . . . and would also enhance his personal brand

**RESPONSE:**  The NRA denies the allegations in the first sentence of paragraph 9, except it admits that during Mr. LaPierre's tenure as Executive Vice President and Chief Executive Officer of the NRA, the NRA engaged AMc to help educate the public about the NRA's Second Amendment mission.  The NRA denies the remaining allegations in paragraph 9.

10.     Despite his desire for more concepts that would appeal to a broader audience, the NRA experienced funding problems in 2014, causing LaPierre and the NRA Treasurer, Woody Phillips, to travel to Dallas to announce a budget cut for AMc during calendar year 2015.[5]  With the figurative stroke of a pen, LaPierre cut significant funding for NRA Life of Duty, in the process neutering a money-making, profitable program as well as funding for additional sponsored programming.  When confronted about the decision to cut programs that had active sponsors, LaPierre responded "Fake it", i.e., make it appear that the NRA Life of Duty program and others remained robust despite the significant funding loss.  AMc of course refused this edict.

**RESPONSE:**  The NRA denies the allegations in paragraph 10 and footnote 4.

---

[4] The NRA continues its use today.

[5] Curiously, what was cut were costs associated with NRA video channels; left untouched were many of LaPierre's and other NRA officials' out-of-pocket expenditures.

D.    **Agreed Protocols, Now Conveniently Ignored, are Developed.**

11.    During this multi-decade relationship, the parties developed working arrangements, such as negotiating annual budgets covering a variety of tasks.  LaPierre and Phillips controlled the process, operating with full knowledge of line items.  As projects were initiated, invoices would issue and payment would follow without complaint.  LaPierre participated in those negotiations and approved each annual budget. The process was simple: stay within the budget. The NRA itself well understood that keeping hourly time records as the basis of billing was not the contractual measure of payment, and that strategy and creative value are determined by outcome rather than by how much time was spent; hence, the annual budgeting process developed by the parties.  The type of detail was claimed by the NRA to be missing was what went into construction of each year's budget.

**RESPONSE:**    The NRA admits there was a "multi-decade relationship" with AMc, which involved the negotiation of budgets, but otherwise denies the allegations in paragraph 11.

12.    These working arrangements were set in place at the direction of LaPierre, with input from his AMc counterpart, Angus McQueen ("Angus"), long-time AMc CEO.  The entities' senior officers, Woody Phillips (NRA) and/or Bill Winkler and Melanie Montgomery (AMc) were involved in the negotiations and oversaw budgetary compliance, invoicing and payment issues.

**RESPONSE:**  The NRA denies the allegations in paragraph 12.

13.    All of these functions and many more were followed steadfastly and without disagreement for many years as the relationship grew.  Budgets would be set for specific work, AMc sent an invoice, AMc did the work, and the NRA paid the amount budgeted for the invoiced

task.  The relationship between the organizations was harmonious and mutually beneficial as both parties grew into leaders in their respective spaces.  Never in their long history did either party express mistrust of the other side's financial dealings.

**RESPONSE:**  The NRA denies the allegations in paragraph 13.

### E.      NRA Asks AMc to Front Activities; LaPierre's Passion for Secrecy.

14.      One of the defining characteristics of the NRA/AMc relationship was the frequency with which LaPierre and others acting at his direction asked AMc to "front" activities and expenses for the NRA.  For example, AMc would engage third parties to perform work for the NRA at LaPierre's (and other NRA officials') request, would pay for the work performed by the third party(ies), and would then submit an invoice for reimbursement by the NRA.  These expense reimbursements – as opposed to charges for work done by AMc – amounted to several millions of dollars annually.[6]  LaPierre's rationale for running these expenses through AMc:  it was necessary for security and "discretion" reasons.

**RESPONSE:**  The NRA denies the allegations in paragraph 14.

15.      LaPierre, beset by paranoia or a passion for secrecy or both, adopted a dictatorial, micro management style.  He demonstrated an obsession with privacy, distancing himself from the public eye and exhibiting terror at the thought of public scrutiny.  At the same time, he was heavily involved in the formulation of policy and protocols for dealing with third parties, including vendors like AMc.  Even NRATV, suddenly now the scourge of Counter-Defendant, was created

---

[6] Press reports influenced by the NRA have falsely and incorrectly asserted that the NRA "paid" AMc $40 million annually, when in fact over one-half of that amount was a reimbursement for monies actually advanced on the NRA's behalf by AMc.

and expanded at the sole direction of LaPierre.  Not only did he sign off on every performance metric of NRATV, he also made numerous presentations to his Board in support of NRATV which presentations were from all appearances favorably received.  Indeed, one board member observed "If you took a poll of most board members, they'll tell you they like NRATV."[7]  His past actions regarding NRATV baldly contradict the NRA's current stance.

**RESPONSE:**  The NRA denies the allegations in paragraph 15.

16.     LaPierre made two things quite clear:  (a) he was the only person with ultimate authority to speak for the NRA and direct the AMc relationship on behalf of the NRA, unless he specifically designated someone in writing to perform that task; (b) any expenses he incurred, either personally or through AMc, were legitimate NRA expenses, and therefore subject to reimbursement to AMc.  Those broad representations regarding the legitimacy of his expenses, repeatedly made by LaPierre, were false.

**RESPONSE:**  The NRA denies the allegations in paragraph 16.

**F.     The Services Agreement.**

17.     Over the course of years, the parties formalized their working arrangements, embodying their protocols in a so-called "Services Agreement", the first of which was entered into in 1999.  The latest version was updated in 2017 and amended in 2018 to confirm the protocol for the hiring, compensation and reimbursements due to AMc under employment agreements involving Lt. Col. Oliver North ("North") and Dana Loesch ("Loesch").  Both of these individuals, at the NRA's request, were formally employed by AMc as "talents" for NRATV, the ambitious

_____

[7] http://www.wsj.com/articles/ma.files.suit.against.ad.agency.in.rift.with.key.partner

digital broadcast network created, staffed and administered in its most recent form (at NRA request) by AMc.

**RESPONSE:**  The NRA admits that the parties entered into a Services Agreement in 1999 and 2017, and that the 2017 Services Agreement was amended in 2018, but otherwise denies the allegations in paragraph 17.

18.    Importantly, the 2018 Amendment contains two provisions expressly designed to protect AMc in the event of expiration or termination of that agreement: the first required Counter Defendant to secure and post a $3,000,000.00 letter of credit for AMc's benefit to secure payment of outstanding invoices over 30 days old.  The second was the acknowledgement that "all  non-cancellable" contracts entered into between AMc and third parties for the benefit of the NRA [including the North and Loesch contracts] (referred to therein as the "AMc Third Party NRA Contracts") were the obligation of the NRA to pay the "compensation payable" under the Third Party NRA Contracts.  Because Counter-Defendant has intentionally flaunted these obligations, AMc is seeking redress by way of counterclaim in the Virginia courts.

**RESPONSE:**  The NRA states that the Amendment speaks for itself, but denies the remaining allegations in paragraph 18.

19.    The 2018 Amendment was significant for other reasons as well: as noted herein in greater detail, LaPierre on multiple occasions lauded the work being done by AMc on NRATV, including during a meeting in Dallas on October 11, 2018.  Starting that meeting and continuing over the next two months, LaPierre approved NRATV for the 2019 budget year, included within which was Dan Bongino's $1.5 million contract (which Mr. Bongino ultimately turned down).  As he had done in May 2018 when the Amendment was signed, he voiced his continuing support for

AMc's (and the commentators') work.   These statements – like the written commitment to reimburse North's and Loesch's salaries – were false, were known by LaPierre to be false and were relied upon by AMc, resulting in damages incurred by Counter-Plaintiff.

**RESPONSE:**  The NRA denies the allegations in paragraph 19.

**G.     NRATV:  LaPierre's Brainchild.**

20.     NRATV, now assailed by Counter Defendant as an "abject failure" and a "failed endeavor" has been anything but.  Officially launched as a full network production featuring gun related topics, political commentary and other NRA-friendly topics, it had its actual beginnings in the early 1990's.

**RESPONSE:**  The NRA admits that NRATV was, in the end, an "abject failure" and a "failed endeavor," and denies the remaining allegations in paragraph 20.

21.     The network's earliest iteration featured a spokesperson, Ginny Simone, providing monthly reports on VHS for the NRA Board of Directors.  That evolved into Ginny Simone Special Report Video Magazines in 1996, then expanded as follows:

2000:  NRA Live Launch

2004:  NRA News Launch, including the debut of "Cam & Co.", the NRA's first talk show host

2010   NRA Life of Duty Network Launch

2012:  NRA Women Network Launch

2014:   NRA Freestyle Network Launch

2015:   Super Channel Launch under NRA News

2016:   NRATV Official Launch

**RESPONSE:**   The NRA admits that NRALive.com was accessible online in 2000, that NRA News launched in 2004, that the NRA Life of Duty Network was accessible online in 2010, that the NRA Women Network was accessible online in 2012, that the NRA Freestyle Network was accessible online in 2014, and that NRATV launched in 2016.   The NRA lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies them.

22.   Throughout NRATV's evolution, AMc developed and administered the network's content (subject to NRA approval); hired its high-profile talent (at NRA's request with salary and other costs reimbursed and payment "guaranteed" by the NRA); and was featured by the NRA to its members and directors as one of its proudest and most successful projects.   Each annual budget increased the agreed-upon amounts dedicated by the organization to what became its proprietary flagship.   Each budget also received board approval.

**RESPONSE:**   The NRA admits that AMc developed and administered NRATV's content including hiring talent, and denies the remaining allegations in paragraph 22.

23.   Indeed, LaPierre, during his frequent visits to Dallas and other locations to meet with AMc personnel and discuss NRA TV analytics, repeatedly told AMc personnel how well the network was performing, and that the NRA would continue its support, financially and otherwise. AMc now has learned that those representations were false.

14

**RESPONSE:**  The NRA denies the allegations in paragraph 23.

24.     NRATV also became the medium through which Counter-Defendant's most robust fund-raising took place.   Thus, the notion that NRATV was a failed endeavor has only lately emerged as one more contrived, after-the-fact rationale for the NRA's assault on its longtime vendor.

**RESPONSE:**  The NRA denies the allegations in paragraph 24.

**H.     NRATV As A "Super Channel" with Political Clout.**

25.     Throughout 2015, AMc worked to create both the "Super Channel" and "Freedom's Safest Place", a newly-created campaign developed by AMc to offset the loss of earlier profitable programs.  The so-called "Super Channel" would be streamed online and "Freedom's Safest Place" would be on the "Super Channel" as well as air on national television.

**RESPONSE:**  The NRA lacks knowledge or information sufficient to form a belief about the truth of the allegations and therefore denies them.

26.     When Donald Trump became the clear Republican presidential nominee frontrunner heading into the NRA convention in 2016, it became clear that the NRA needed to support his campaign, given the alignment between his base and the NRA's base.  LaPierre bristled at the thought of openly supporting Trump so early.  He continued his cynicism regarding Trump during the entire presidential election, noting on multiple occasions that he didn't believe Trump could win.  In the fall of 2016, LaPierre approved new live programming to launch under the new brand NRATV that he believed would be crucial during what he anticipated would be a Hillary Clinton presidency.

**RESPONSE:**  The NRA denies the allegations in paragraph 26.

27.     Despite LaPierre's negativity regarding Trump's candidacy, the NRA with the advantage of Mr. Chris Cox's relationships, placed their support behind Donald Trump. Freedom's Safest Place ads had become an impressive success for the organization.  They were routinely used to solicit high donor donations and aired throughout the 2016 election.  When Donald Trump became President, Mr. LaPierre routinely referred to the Trump presidency as the "Trump slump" and opted to use Freedom's Safest Place to continue to solicit donations throughout 2017 while keeping the ads running on Fox News.

**RESPONSE:**   The NRA admits that it supported President Trump in the 2016 Presidential election, but otherwise denies the allegations in the first sentence.  The NRA admits that it ran "Freedom's Safest Place" advertisements around this time period, but denies the remaining allegations in the second sentence.  The NRA denies the allegations in the third and fourth sentences.

28.     In the successful deployment of broad messaging about freedom that resonated with the NRA's constituency, LaPierre sought to increase NRATV's live presence.  He personally courted Dana Loesch to join the channel full-time, including dinner with her in Dallas the night that she officially decided to join NRATV.  Her show launched in 2018 right after the tragedy in Parkland, Florida.

**RESPONSE:**  The NRA denies the allegations in paragraph 28.

29.     The aftermath of Parkland was challenging.  Dana Loesch appeared on the CNN Town Hall instead of LaPierre and he routinely confirmed that her appearance was a huge success,

helping the NRA to raise millions of dollars.  What's more, NRATV was going live multiple times throughout the day with messaging intended to counter the narrative coming from gun control groups.  In one monetization test (that similar to 2014 which was quickly abandoned for unknown reasons) NRATV was able to generate almost $500k in a matter of some 35 days, the bulk of which occurred over a ten-day period.

The following graphic illustrates the successful fund-raising effort:



**RESPONSE:**  The NRA admits the allegation in the first sentence.  The NRA denies the remaining allegations in paragraph 29.

30.     In the wake of Parkland, the NRA was becoming more and more publicly vilified.  Much of the executive leadership became paranoid about impending investigations.  Swirling in the political atmosphere were questions about the Russia investigation and NRA's involvement due to a trip, paid for in part by the NRA, taken by board members and other affiliates in 2015.  (This was the same year as the cash crunch during which LaPierre kept his personal expenditures intact).  Tension mounted.  Threats took the form of "forensic accounting teams taking over whole floors in New York City to bury the NRA" and "the loss of all the organization's insurance".   In a meeting in Dallas in April, 2018, Josh Powell, NRA Chief of Staff, heatedly threatened Revan McQueen, curiously suggesting that Counter Plaintiff, not the NRA, was the party in trouble, before storming out of the room.   In retrospect, that ominous threat foretold how extensively NRA's and LaPierre's plan to scapegoat AMc had spread within the organization.[8]

**RESPONSE:**  The NRA denies the allegations in paragraph 30.

I.      **LaPierre's Efforts To Calm Stormy Seas.**

31.     Seeking to stabilize his rudderless ship, LaPierre personally recruited Oliver North to join NRATV and become the next president of the organization.  (Oliver North had been doing pro bono work for the NRA ever since the launch of NRA Life of Duty.  He was also one of the most effective voices in the Freedom's Safest Place campaign.)  Everything culminated at the 2018 Dallas Annual Meetings where AMc representatives had multiple meetings with Woody Phillips, Steve Hart (then general counsel to the NRA Board) and LaPierre to discuss North's contract as well as the announcement of his presidency.

---

[8] At AMc's insistence, Powell was removed from contact with AMc employees because of a sexual harassment claim lodged against him by an AMc employee.

18

**RESPONSE:** The NRA admits that LaPierre has had certain meetings with Oliver North, but denies the remaining allegations in paragraph 31.

32.     In 2018, AMc began to have serious concerns about the NRA organization's direction.  First was the Carry Guard debacle.  AMc had been hired to provide public relations branding and public product rollout of mainly the Carry Guard training program.  It was the NRA's responsibility, led by Josh Powell, to manage the insurance portion of the program.  On multiple occasions it became clear how mismanaged the entire program had become.  For example, Powell tried to convince the NRA to acquire USCCA, the leading competitor in the space, and he kept referring to Carry Guard as nothing but an insurance scheme.  AMc firmly rejected the notion that this program was only about insurance and did not want to have anything to do with a "scheme." This created the first visible signs of schism in the relationship, with Powell upset that AMc would not follow his direction.

**RESPONSE:**  The NRA admits that AMc was hired to provide certain services in connection with Carry Guard, but denies the remaining allegations in paragraph 32.

33.     The next issue that started to unfold was the Russia investigation of the NRA. Initially, the NRA asked an experienced AMc contractor to lead the internal investigation into exactly what happened.  But quickly, she was stonewalled.  NRA officials even implied that they were more concerned with hiding the facts of the investigation instead of bringing the entire story to light in order to fix any issues that existed.  AMc wanted nothing to do with those at the NRA that were not committed to protecting the brand and more importantly, the members' interests above their own.  This, too was a precursor to the priority placed on the personal protection of LaPierre and others and the whitewash effort the organization is stridently pursuing yet today.

**RESPONSE:**  The NRA denies the allegations in paragraph 33.

34.     It is against this backdrop that the NRA still needed AMc to do its increasingly important job of managing the public-facing brand, while they scrambled to protect themselves from what appears to the outside world to be a massive case of mismanagement. AMc's disagreement with the Carry Guard program management and issues such as how the Russia investigation was handled became additional "grist for the mill" of retaliation led by LaPierre and implemented by Brewer.

**RESPONSE:**  The NRA denies the allegations in paragraph 34.

## J.     The Brewer Influence

35.     Beginning spring of 2018, AMc learned that the NRA had hired Brewer.  The retention of Brewer was baffling given his prior support of anti-gun proponents including Beto O'Rourke (a proponent of gun confiscation) and Brewer's familial relationship with Angus (at that time, Brewer's father-in-law) and Revan McQueen (brother-in-law).[9]  It also foretold an onslaught of "scorched earth" tactics.[10]  Since his entry onto the scene, Brewer and his firm, with the approval of LaPierre, has filed no less than eight lawsuits, four of which (including the instant case) are directed against AMc.  Three of the cases against AMc now reside in state court in the City of

---

[9] Recognizing the deeply personal information involved, and to obviate any exploitation of the family relationship, AMc raised this conflict and ultimately had Brewer replaced as direct AMc contact.

[10] https://www.washingtonpost.com/politics/how.a.hard.charging.lawyer.helped.fuel.a.civil.war

Alexandria, Virginia, and among other claims involve mutual charges of breach of the Services Agreement.[11]

**RESPONSE:**  The NRA lacks knowledge or information sufficient to form a belief about the truth of the allegations in the first sentence and, therefore, denies them.  The NRA denies the allegations in the second sentence. The NRA admits that it has filed lawsuits, including a successful lawsuit against Mr. North (referred to above) and a civil rights lawsuit against the City of San Francisco for violations of the First Amendment.  The three lawsuits against AMc relating to its breach of the Services Agreement have been consolidated into a single proceeding in state court in Virginia. The NRA denies the remaining allegations in the third, fourth, and fifth sentences.

36.     In addition, Brewer has filed suit against the Governor of New York, Andrew Cuomo and its chief insurance regulator; the Lockton Companies, which designed Carry Guard insurance, which has been found to be in violation of New York and at least one other state's laws; North, in the Supreme Court of New York; and most recently, a lawsuit against the City of San Francisco. Various sources have reported that the Brewer firm over the course of approximately one year has billed the NRA $24 million for over just one year (a number that has since grown) translating to (according to one report) some $97,000.00 per day.[12]

---

[11] *See* footnote 1.  *See National Rifle Association of America v. Ackerman McQueen, Inc. and Mercury Group, Inc.*, Civil Case No. CL19001757 (Alexandria, Va.) (filed 4/12/2019); *National Rifle Association of America v. Ackerman McQueen, Inc. and Mercury Group Inc.*, Civil Case No. CL19002067 (Alexandria, Va.) (filed 5/22/2019); *National Rifle Association of America v. Ackerman McQueen, Inc.*, Civil Case No. CL19002886 (Alexandria, Va.) (filed 9/5/2019).

[12] *See, e.g.*, Exhibit "A"; http://www.washingtonpost.com/politics/nascar.owner.resigns-from-NRA-board.

**RESPONSE:**  The NRA admits that it filed suit against the governor of New York and related state entities, and separately, against the City of San Francisco, on First Amendment grounds.  The NRA admits that it filed suit against the Lockton Companies.  The NRA admits that it filed suit against North.  The NRA denies the remaining allegations in paragraph 36.

**K.**     **Ouster of AMc: The Plan is Formalized**

37.     Although Brewer's engagement letter has not yet been the subject of discovery, it has been discussed in press reports and quoted in certain NRA official correspondence.  An exhibit to North's Answer and Counterclaim in the NRA/North case reveals the startling truth that Brewer was retained by LaPierre to oversee and prosecute AMc, among others:

> "The Brewer firm's engagement letter is vague regarding the scope of work that Brewer is performing for the NRA.  The letter simply says the Brewer firm is performing legal services (quoting from the engagement letter) 'in connection with <u>litigation and strategic needs arising from the termination or potential termination of key corporate relationships by contract counterparties in response to political pressure</u>.'  (Emphasis added).  (See Exhibit "A" attached hereto and incorporated by reference, also appended as an exhibit to North's Answer and Counterclaim in the NRA/North lawsuit).[13]

**RESPONSE:**  The referenced document speaks for itself.   The NRA denies the remaining allegations in paragraph 37.

---

[13] *See* Exhibit "A", p. 2.

38.     A fair reading of this excerpt from Brewer's engagement letter reveals a dramatic truth, never shared with AMc and in fact guarded with top-secret ferocity by LaPierre and Brewer: Brewer was hired to assist in terminating, including through litigation, AMc's long-tenured relationship with the NRA.  This discovery has helped explain Counter-Defendant's abrupt change in attitude towards AMc, and Counter-Defendant's chameleon-like change from friend to foe.

**RESPONSE:**  The NRA denies the allegation in paragraph 38.

39.     It reveals another truth as well:  LaPierre was intent on severing ties with Counter-Plaintiff as early as the spring of 2018, no doubt because AMc had begun to question directives received from the NRA, the adversarial nature of NRA demands, and AMc's unwillingness to accommodate some of those demands.  These included AMc's refusal to participate in LaPierre's plea for donations from members under the false guise of a "shutdown".  Unbeknownst to AMc, LaPierre was already plotting litigation against AMc in September 2018, consistent with that express objective in the Brewer engagement letter.

**RESPONSE:**  The NRA denies the allegations in paragraph 39.

40.     LaPierre's actions during the entirety of 2018 and into 2019, wherein he repeatedly told AMc personnel that NRATV would continue to be funded, that the NRA would continue to reimburse AMc for its expense advances, and that the NRA was intent on working through issues raised by the Brewer firm were false statements of fact.   LaPierre and others within the organization knew such statements to be false when made.  AMc relied upon these repeated assurances and continued to make financial commitments (including the North Contract) in reliance thereon.

**RESPONSE:**  The NRA denies the allegations in paragraph 40.

**L.**     **Brewer supplants AMc in its Work for the NRA.**

41.     Over the course of several months beginning with Brewer's retention and consistent with the recently publicized engagement letter, the NRA took an increasingly aggressive stance against its long-time vendor, first insisting on information that had never been a source of controversy in the past; insisting on documents that had never been required in the parties' dealings; requiring justification for its pricing, which had always been subsumed in budgets annually approved by the NRA and LaPierre; demanding interviews of AMc personnel; and conducting three separate audits (one of which lasted over one week) purportedly under auspices of the Services Agreement.

**RESPONSE:**  The NRA denies the allegations in paragraph 41.

42.     LaPierre set about to intentionally destroy the relationship between the parties, not only through the conduct of vexatious litigious activity but to oust AMc in favor of the Brewer firm's public relations/crisis management advocacy. Brewer has now supplanted AMc as the NRA's PR lead communication strategist.

**RESPONSE:**  The NRA denies the allegations in paragraph 42.

**M.**     **The Analytics Gambit - Another Pretext for Termination**.

43.     Newly-formulated complaints by the NRA, characterizing NRATV as "failed endeavor", also qualify as a "made for litigation" stalking horse.  Central to NRATV operations were its analytics, (essentially, viewship numbers).  As set forth in greater detail in AMc's third

party action against LaPierre, periodic reports containing detailed analytics were regularly provided to LaPierre during the period 2016 (year of launch) through May 13, 2019, a month after the NRA filed its first lawsuit against AMc (which in part complained falsely about non-receipt of NRA TV analytics).  LaPierre personally approved the development of custom analytics.

**RESPONSE:**   The NRA denies the allegations in the first sentence. The NRA admits that viewership numbers are an important tool for analyzing digital media generally and NRATV, but denies the remaining allegations in the second sentence.  The NRA admits that AMc provided it periodic reports containing what purported to be some form of "viewership numbers" and related "analytics," but denies the remaining allegations in the third sentence.  The NRA denies the allegation in the last sentence.

44.     LaPierre personally attended meetings to be briefed on NRA TV analytics on the following occasions:  October 24, 2017; November 28, 2017; January 3, 2018; February 1 and 19, 2018; April 11, 2018; September 4, 2018; October 11 and 23, 2018; November 28, 2018; December 5, 2018 and January 18, 2019.  During each visit, AMc personnel shared in-depth analyses of viewship analytics that were three levels deep.  LaPierre openly lauded AMc's performance.  That too was false, because three days after his last scheduled visit regarding analytics on April 9, 2019 (when LaPierre abruptly and unexpectedly "had to leave" before the presentation could be made) Counter-Defendant filed its first lawsuit against AMc.  Among other things, Counter Defendant alleged that AMc had refused to provide the NRA with NRA TV analytics - the very subject of the April 9 meeting!

**RESPONSE:**   The NRA admits that LaPierre met with AMc personnel on the dates identified. The NRA admits that at these meetings AMc representatives touted the performance of NRATV

and presented forms of "viewership numbers" and related "analytics." The NRA denies the remaining allegations in paragraph 44.

## N.    The Onslaught Goes Public.

45.    The NRA, with Brewer at the helm, has moved from a non-profit gun-rights organization to a serial litigant. Its waste of different courts' limited docket space has ranged from a glorified discovery dispute (Virginia suit number one, which begat a discovery rabbit trail trying to find the culprit who made off with a "secret" PowerPoint recklessly left by a Brewer employee with a non-NRA official) to three additional lawsuits in different jurisdictions covering at least some of the same alleged acts (Virginia suit number three and Count Three in the instant action).

**RESPONSE:** The NRA denies the allegations in paragraph 45.

46.    Each of these litigations portrays the NRA as a victim. Each has been filed without any attempt at a good faith "meet and confer" negotiation; and each has been accompanied by carefully orchestrated leaks and false self-serving press releases.

**RESPONSE:** The NRA denies the allegations in paragraph 46.

## O.    Disparaging Remarks Turn Libelous

47.    Consistent with his "lawyer as public advocate" for his client, Brewer, with the approval of LaPierre and assistance from other NRA personnel, has become the de facto NRA spokesman and has fashioned a narrative that has brought AMc into disrepute. Contemporaneous with the filing of NRA lawsuits against AMc, Brewer and other NRA representatives have frequently attempted to spin the NRA message as one in which it is faultless and AMc is a rogue

entity, bent on frustrating the NRA's legitimate efforts at obtaining disclosure.  All of this is but a transparent attempt to deflect attention from the NRA's own shortcomings and to wreak havoc within an organization (at that, his own-in laws' organization) that the Brewer firm now competes with.

**RESPONSE:**  The NRA denies the allegations in paragraph 47.

48.     Examples abound where NRA representatives, including Brewer, have disparaged AMc, portrayed it as a miscreant, divulged its confidential information and run roughshod over AMc's rights and entitlements.  The most damaging of these public comments have been press reports quoting LaPierre accusing AMc of "extortion".   This false accusation of criminal wrongdoing has been repeated by other NRA representatives.  In the process, AMc's purported role as moved from that of being North's alleged facilitator to the one performing the act of extortion.[14]

**RESPONSE:**  The NRA denies the allegations in paragraph 48.

49.     LaPierre personally concocted the extortion story. In a letter to the NRA Board on Thursday, April 25, 2019, LaPierre recounted a phone call from Lt. Col. North to LaPierre's

---

[14] The following are examples of the many claims of AMc's alleged wrongdoing spoken by NRA representatives:  https://www.washington.post.com/politics/documents-show-nra-discussions -to-purchase-luxury-mansion (AMc as "wrongdoer;) civil.war (Brewer in discussion aMc, accused it of trying to purse NRA of LaPierre by "extortion", him Wall Street Journal, April 27, 2019 "Extortion Allegation Riles Top NRA Ranks" (citing LaPierre's claim of extortion in letter to NRA Board);     https://www.washington.post.com/news/2019/sep/10/who's-behind-attacks-national-rifle-accociation.  "Behind the latest attack is a former NRA contractor".  "The contractor refused [a financial review]; the contractor . . . delivered an ultimatum in the form of this threat . . ..; https://www.washingtonpost.com/politics/how.a.hard.charging.lawyer.helped.fund.a.civil.war; and Wall Street Journal article, April 27. 2019 @http://wsj.extortion.allegation.riles.top.nra.ranks; http://www.washingtonpost.com/politicsnra.shakes.up.legal.team.amid.intensifying.civil.war/2019/08/22/72fa460a-c52d-11e9-b5e4-54aa56d5b7cestory.html

assistant Millie Hallow in which North allegedly made threats that were couched (according to LaPierre's letter) "in the parlance of extortionists, as an offer I can't refuse.  I refused it."

**RESPONSE:** The NRA denies the allegations in the first sentence.  The NRA admits that a letter from Mr. LaPierre was sent to the NRA Board on Thursday, April 25, 2019, that recounted the attempt at extortion undertaken by Mr. North, and states that the document speaks for itself.

50.    LaPierre also asserted that AMc "appears to have responded indirectly by trying to oust me."  LaPierre's assertion concerning AMc's purported involvement, since then repeated, is patently false.  In fact, Counter Plaintiff, in the face of repeated demands by Counter-Defendant for backup on LaPierre charges that the NRA had reimbursed, did not have backup for LaPierre wardrobe charges, apartment rent charges for an NRA intern previously approved by LaPierre, and a number of LaPierre private aircraft and other transportation, hotel and Landini Brothers (popular Washington restaurant) charges.  To obtain such backup, AMc had sent letters to several sources (including LaPierre himself) asking for such records to permit a response to NRA demands.

**RESPONSE:** The NRA states that to the extent the first sentence characterizes or quotes from a letter from Mr. LaPierre, no response is required because the letter speak for itself.  The NRA denies the remaining allegations in paragraph 50.

51.    "Extortion", under Virginia statute § 18.2-59 ("Extortion of money, property or pecuniary benefit") defines the offense as including "threaten [ing] injury to the character, person or property of another . .. " and can be punishable by up to 10 years in prison. Code 1950, § 18.1-184; 2010, Chapter 298. Making such a reckless accusation, false as it is, is a clear example of the malice shown by LaPierre and the NRA towards AMc.

**RESPONSE:** The NRA admits that AMc appears to be quoting from and citing to certain provisions of the law of the Commonwealth of Virginia concerning the crime of extortion; the statutes speak for themselves. The NRA denies the remaining allegations in paragraph 51.

P.      **One-Sided Services Agreement.**

52.     Each of the actions brought by the NRA, including the instant case, either directly involves or tangentially implicates the Services Agreement and the respective rights and obligations of the NRA and AMc. In fact, the first two Virginia cases are centered on alleged breaches of that agreement by AMc. AMc has counterclaimed in Virginia alleging that it is the NRA, not AMc, that is in breach of that Services Agreement.

**RESPONSE:** The NRA admits that at least some of the actions it has filed "either directly involves or tangentially implicates the Services Agreement and the respective rights and obligations of the NRA and AMc," but denies the remaining allegations in the first sentence. The NRA admits that the first two state-court cases in Virginia assert claims for breaches of the Services Agreement, but denies the remaining allegations in the second sentence. The NRA admits that in the Virginia case AMc has counterclaimed for breach of the Services Agreement, but denies the remaining allegations in the last sentence.

53.     AMc has no intention of attempting to raise those same breach claims currently playing out in Virginia in this case, in spite of NRA doing precisely that with respect to the newest Virginia lawsuit (lawsuit number three) filed on September 5, 2019 by the NRA (see, conversion claim lodged in that case compared with the same conversion claim urged in this case). What is appropriate, however, is consideration by this court of the question whether, by its many actions, including several lawsuits filed against AMc, the NRA has waived its rights to continue to insist

29

on the viability of one particular provision of that agreement: the confidentiality section (§ IV., p.6, Services Agreement).

**RESPONSE:**  The NRA lacks knowledge or information sufficient to form a belief as to the truth of the allegation regarding AMc's intentions in this case, and denies the remaining allegations in the first sentence.  The NRA denies the allegations in the second sentence.

54.     The confidentiality portion of the Services Agreement has been featured not only in the Virginia litigation; it has also been waived by the disclosure of confidential information belonging to AMc and by disclosure of its own purportedly confidential information.  For example, it was the NRA which disclosed the existence and content of the AMc agreement with Lt. Col. North, confidential to both AMc and Counter-Defendant.  Please see New York Times article dated March 11, 2019 citing to the North Agreement.  LaPierre has admitted that he authorized the Brewer firm to communicate with the New York Times.  When AMc complained and demanded a retraction NRA counsel took the absurd position that confidentiality applied only to AMc.  Under that theory, the NRA can divulge AMc's confidential material with impunity; AMc has no reciprocal right.

**RESPONSE:**  The NRA denies the allegations in paragraph 54.

55.     Additionally, Counter Defendant has liberally quoted from the Services Agreement, including in the instant case.  Having previously taken the position that the Services Agreement itself is confidential, it cannot now hope to preserve that status.[15]

---

[15] See, recently filed Verified Petition by the Office of the Attorney General for the State of New York, Index No. 451825/2019, in the Supreme Court of the State of New York, County of New York on September 30, 2019; in addition, the NRA maintains a website, www.nralegalfacts.org

**RESPONSE:**  The NRA denies the allegations in paragraph 55.

56.     If this is truly a proper reading of the agreement, then and under those circumstances AMc is entitled to a declaration that such provision has been waived by the conduct of the NRA.  Alternatively, it qualifies as an unconscionable agreement under the provisions of Virginia § 8 .2-302, which provides in pertinent part:

> "If the Court finds as a matter of law the contract or any clause thereof to have been unconscionable at the time made, the court may refuse to enforce the contract, or to ignore the unconscionable provision, or it may limit its application in order to avoid as unconscionable result." Code of Virginia§ 8.2-302.

**RESPONSE:**  The NRA denies the allegations in paragraph 56.

57.     As dependent as Counter-Defendant is on certain provisions of the Services Agreement, it conveniently overlooks its obligation to pay a "fair and equitable termination fee", recognizing the "inevitable severances and other reasonable costs" associated with termination, and the concurrent requirement to negotiate such costs in good faith (Services Agreement, §§ E and F).  Here, the NRA has done the exact opposite.

**RESPONSE:**  The NRA denies the allegations in paragraph 57.

---

where it publicizes pleadings, briefs and articles about its various lawsuits, including those involving AMc.

**Q.      Counter-Defendant and Third-Party Defendant Destroys AMc's Third Party NRA Contracts.**

58.      At the NRA's bidding, AMc entered into employment agreements with two well-known personalities, Lt. Col. Oliver North ("North") and Dana Loesch ("Loesch").  They and at least one other talent, at the request of the NRA, were formally employed by AMc.  NRA's responsibility for their compensation was made clear in the amendment to the Services Agreement that occurred in 2018.  As previously noted, under that amendment, the NRA took responsibility for reimbursing AMc for the cost associated with the NRATV talents.  Counter-Defendant also effectively "guaranteed" its Third-Party NRA Contract obligations by committing, among other things, to provide a $3,000,000.00 letter of credit to backstop those commitments.[16]

**RESPONSE:**   The NRA directs the Court to the referenced documents, which speak for themselves.  The NRA denies the remaining allegations in paragraph 58.

59.      Until the NRA began its campaign of belligerence against AMc, the reimbursement system worked as well as the other expense reimbursement activity had progressed over the years.  Indeed, even as the NRA ramped up its campaign of harassment against AMc, it continued to observe its obligations to AMc and, by third party beneficiary extension, to the talents.

**RESPONSE:**   The NRA denies the allegations in paragraph 59.

60.      LaPierre injected himself personally into the recruitment of North.  He negotiated his deal, and despite his current denials, he was intimately involved in all material aspects thereof.

---

[16] See, Amendment to Services Agreement, §§ 2, 3.

His turnaround efforts to oust North as President of the NRA demonstrate his intent to interfere with North's Contract and damage AMc in the process.

**RESPONSE:**   The NRA admits that Mr. LaPierre met with Mr. North to encourage him to consider becoming the President of the NRA, but denies the remaining allegations in the first and second sentences.  The NRA denies the allegations in the third sentence.

61.     When the NRA precipitously initiated its litigation campaign against AMc, leading to the eventual shutdown of NRA TV at the end of June 2019, the NRA used the opportunity to cease reimbursement for the compensation of the Third-Party NRA contracts.  This, despite its clear obligation to reimbursement AMc for "fronting" the salaries and benefits for North, Loesch and the other talent.

**RESPONSE:**   The NRA admits that it terminated the NRATV service in June of 2019, but denies the remaining allegations in paragraph 61.

62.     The result of the NRA's cutting off of funds, quite naturally, left AMc in a position where it was unable to manage the compensation requirements of the Third-Party NRA Contracts.  One of those talents has now threatened to sue AMc for discontinuing that person's compensation.

**RESPONSE:**   The NRA lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 62 and, therefore, denies them.

63.     The NRA and LaPierre not only knew of the third-party contracts, they expressly approved each of them and acknowledged their existence and the NRA's obligations to pay for those contracts in the 2018 Services Agreement Amendment.  In the face of that knowledge and acknowledgement, the NRA has now steadfastly refused to honor its obligation at the urging of

and with the approval of LaPierre, in the process tortiously interfering with those third party contracts.

**RESPONSE:**  The NRA denies the allegations of paragraph 63.

**R.**   **A Compendium of Missteps.**

64.    Many events have led to the rupture of this once-thriving relationship. Most have been chronicled in press reports: the Brewer factor; LaPierre's lavish wardrobe expenditures; LaPierre's (and his wife Susan's) extravagant trips and vacations paid for with NRA members' dues; the LaPierre family's use of AMc personnel as personal valets; attempted purchase of a Texas mansion, foiled by AMc's reluctance to see it through; sexual harassment charges against LaPierre's Chief of Staff Josh Powell, to name the most prominent.  These were by no means the exclusive causes of the termination.

**RESPONSE:**  The NRA denies the allegations in paragraph 64.

65.    Indeed, other factors, some subtle and nuanced, others palpable and obvious, have contributed:

• NRA's suspicious behavior relating to federal and state investigations;

• AMc's putting a stop to incurring expenses for LaPierre that were personal in nature;

• The "Russia trip" and LaPierre's and the NRA's dishonest treatment of that issue;

• LaPierre's preoccupation with possible criminal charges and a "dissolution resolution";

• NRA tolerating sexual harassment committed by a high-ranking member of its management;

• Orchestrated leaks of confidential information, purposely painting AMc in an unfavorable light;

• Clear lack of board oversight; and

• Deliberate purging of right-minded NRA directors, officers and attorneys.

**RESPONSE:**  The NRA denies the allegations in paragraph 65.

66.      In the span of two short years, the NRA, with LaPierre leading the charge, has destroyed or attempted to destroy what was built over decades.  In doing so, it has caused massive personnel disruptions, enormous expenses, loss of economic opportunity, loss of profits and reputational harm that may be irreparable, or at least will take enormous time and effort to repair.

**RESPONSE:**  The NRA denies the allegations in paragraph 66.

67.      Through its counterclaim and Third-Party Complaint, AMc seeks to begin the rebuilding process.

**RESPONSE:**  The NRA denies the allegations in paragraph 67.

## CAUSES OF ACTION

### Count One
### (Libel *Per Se* – NRA and LaPierre)

68.      The allegations of fact set forth in paragraphs 1 through 67 are incorporated as though copied verbatim herein.

**RESPONSE:**  The NRA incorporates its responses to paragraphs 1 through 67 as though copied verbatim herein.

69.     As set forth hereinabove, NRA representatives have repeatedly intentionally and falsely defamed AMc, a private figure, by accusing Counter Plaintiff of the criminal act of extortion.  Counter Defendant has published this accusation as fact and has done so publicly.  Thus, publication has been to third persons.  Counter Defendant is not a member of the print, broadcast or electronic media.

**RESPONSE:**  The NRA denies the allegations in paragraph 69.

70.     Counter Defendant has identified AMc directly by name and the accusations of commission of a criminal act are per se defamatory.  Such accusations have been unambiguous and have held Counter Plaintiff up to calumny and public ridicule.

**RESPONSE:**  The NRA denies the allegations in paragraph 70.

71.     The subject matter of Counter Defendant's false factual assertion is a decidedly private matter, despite Counter-Defendant's attempts to alter its status to that of a matter of public concern.

**RESPONSE:**  The NRA denies the allegations in paragraph 71.

72.     Counter Plaintiff has suffered injury as a direct result of Counter Defendant's false statements in amounts as yet undetermined, but estimated to exceed $40 million, for which Counter Plaintiff seeks recovery.

**RESPONSE:**  The NRA lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 72 and, therefore, denies them.

**Count Two**
**(Tortious Interference with Contract – NRA and LaPierre)**

73.     The allegations of fact set forth in paragraphs 1 through 67 are incorporated as though copied verbatim herein.

**RESPONSE:**  The NRA incorporates its responses to paragraphs 1 through 67 as though copied verbatim herein.

74.     The NRA, intentionally and with full knowledge of their existence, has tortuously interfered with AMc's employment agreements with NRATV talents, including those of North and Loesh.  Each such contract is valid, having been entered into at the behest of and approved by the NRA.  Each such contract denominated in the Services Agreement "Third Party NRA Contract".

**RESPONSE:**  The NRA denies the allegations in paragraph 74.

75.     Counter Defendant has refused its contractual commitment to reimburse AMc for the costs associated with the Third-Party NRA Contracts, thus preventing AMc from funding salaries and costs associated therewith.

**RESPONSE:** The NRA denies the allegations in paragraph 75.

76.     Counter Defendant's refusal to reimburse AMc has caused said contracts to lapse due to non-payment, thereby proximately caused injury to AMc and to the talents affected who themselves are third party beneficiaries of the Services Agreement.

**RESPONSE:**  The NRA lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 76 and, therefore, denies them.

77.     Counter Defendant's actions constitute tortious interference with contract and have proximately caused AMc financial harm in precise amounts yet to be determined for which AMc now sues.

**RESPONSE:**  The NRA denies the allegations in paragraph 77.

### Count Three
### (Declaratory Judgment - NRA)
### (28 USC §2201 *et seq.)*

78.     The allegations of fact set forth in paragraphs 1 through 67 are incorporated as though copied verbatim herein.

**RESPONSE:**  The NRA incorporates its responses to paragraphs 1 through 67 as though copied verbatim herein; otherwise denied.

79.     Counter Plaintiff seeks a declaration that, by its actions, Counter Defendant has waived and/or is estopped from claiming that the confidentiality provision of the Services Agreement applies only to AMc.  Holding AMc to such one-sided interpretation prevents AMc from freely and fully responding to allegations made by Counter Defendant.

**RESPONSE**:  The NRA admits that it appears that Counter-Plaintiff seeks a declaration that, by its actions, the NRA has waived and/or is estopped from claiming that the confidentiality provision of the Services Agreement applies only to AMc.  The NRA denies the allegations in the second sentence of paragraph 79.

80.     Counter Defendant has taken the position that the referenced contractual provision is one-sided, and binding only on AMc. Counter Plaintiff has joined issue on that point and a real

and justiciable controversy [exists] regarding this issue exists, and AMc seeks a declaration that Counter Defendants has waived such provision, or by its action it is estopped from enforcing it.

**RESPONSE**:  The NRA directs the Court to the referenced contract, which speaks for itself, and denies the remaining allegations in the first sentence.   The NRA admits that it appears that "AMc seeks a declaration that [the NRA] has waived such provision, or by its action it is estopped from enforcing it," but denies the remaining allegations in the second sentence of paragraph 80.

81.     Alternatively, Counter Plaintiff seeks a declaration by this Honorable Court that the confidentiality provision of the Services Agreement is unconscionable under Code of Virginia §8.2-302 as interpreted by Counter Defendant.

**RESPONSE:**  The NRA admits that AMc appears to seek a declaration from the Court concerning the confidentiality provision of the Services Agreement; directs the Court to the referenced Services Agreement and the Code of Virginia §8.2-302, which speak for themselves; and otherwise denies the allegations in paragraph 81.

82.     Counter Plaintiff is entitled to, and seeks, its reasonable and necessary attorney's fees incurred in the prosecution of this claim.

**RESPONSE:**  The NRA denies the allegations in paragraph 82.

**Count Four**
**(Fraud — LaPierre)**

83.     The allegations of fact set forth in paragraphs 1 through 67 are incorporated as though copied verbatim herein.

**RESPONSE:**  The NRA incorporates its responses to paragraphs 1 through 67 as though copied verbatim herein.

84.    Statements of fact made to AMc personnel by LaPierre on the dates specified hereinabove, and those made repeatedly throughout the duration of the parties' relationship, but particularly during the four (4) years leading up to the filing of this lawsuit, concerning NRATV's performance analytics, commentators, and the Third Party NRA Contracts were false, were known by LaPierre to be false, were made with intent to deceive AMc and to lure it into exposing itself to financial obligations, were relied upon by AMc to its detriment, and as a result of which AMc has suffered damages in excess of $40,000,000 for which it now sues.

**RESPONSE:**  The NRA denies the allegations in paragraph 84.

85.    AMc demands trial by jury on all contested issues of fact.

**RESPONSE:**  The NRA declines to address Counter-Plaintiffs' legal demand in paragraph 85, which is not susceptible to admission or denial.

## CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, AMc, as Counter Plaintiff and Third-Party Plaintiff, prays that upon hearing, AMc be awarded judgment for damages as prayed for herein, pre- and post-judgment interest, attorney's fees and costs, and such other relief to which it may show itself entitled.

**RESPONSE:**  The NRA denies that Counter-Plaintiff is entitled to recover against the NRA, and denies that Counter-Plaintiff is entitled to any of the relief sought.  The NRA states that it is entitled to attorney's fees, as alleged in the First Amended Complaint, pursuant to 15 U.S.C. §§ 1117, 1125

(Lanham Act claims); 17 U.S.C. § 505 (copyright infringement claims); and Tex. Civ. Prac. & Rem. Code § 38.001(8) (alternative breach of contract claims); in addition, the NRA consents to the adjudication of attorney's fees concerning the entire action for the benefit of the prevailing party by consent.

## AFFIRMATIVE DEFENSES TO COUNTERCLAIMS
## AND THIRD-PARTY COMPLAINT

### As to All Counts

**AFFIRMATIVE DEFENSE NO. 1** (Failure to State a Claim for Relief)

1.      The Counterclaims fail to state a claim for relief.

**AFFIRMATIVE DEFENSE NO. 2** (Doctrine of Fraud)

2.      The Counterclaims are barred by the doctrine of fraud.

**AFFIRMATIVE DEFENSE NO. 3** (Promissory Estoppel)

3.      The Counterclaims are barred by the doctrine of promissory estoppel.

**AFFIRMATIVE DEFENSE NO. 4** (Recoupment)

4.      The Counterclaims are barred by the doctrine of recoupment.

**AFFIRMATIVE DEFENSE NO. 5** (Setoff)

5.      The Counterclaims are barred by the doctrine of setoff.

**AFFIRMATIVE DEFENSE NO. 6** (Fault)

6.      The Counterclaims are barred by AMc's fault.

**AFFIRMATIVE DEFENSE NO. 7** (Mitigation)

7.      Counter-Plaintiff's damages, if any, are self-inflicted, and in any event Counter-Plaintiff has not mitigated its damages, if they exist.

**AFFIRMATIVE DEFENSE NO. 8** (Unclean Hands)

8.      Counter-Plaintiff comes to court with unclean hands, and therefore its claims for equitable relief are barred.

**Count One**
**(Libel *Per Se*)**

**AFFIRMATIVE DEFENSE NO. 1** (Public Person)

9.      Counter-Plaintiff is not a "private person", and in any event has waived its argument that it is a "private person" by thrusting itself to the forefront of a controversy of general and public interest.

**AFFIRMATIVE DEFENSE NO. 2** (Truth)

10.      The challenged statements are true.

**AFFIRMATIVE DEFENSE NO. 3** (Substantial Truth)

11.      The challenged statements are substantially true.

**AFFIRMATIVE DEFENSE NO. 4** (Opinion)

12.      The challenged statements represent opinion.

**AFFIRMATIVE DEFENSE NO. 5** (Public Interest)

13.     The challenged statements concern a matter of public interest and were made without malice.

**AFFIRMATIVE DEFENSE NO. 6** (No Actual Harm)

14.     The challenged statements have caused no actual harm to Counter-Plaintiff.

**AFFIRMATIVE DEFENSE NO. 7** (Absolute Privilege for Attorney Communications Prior or Attendant to Judicial Proceeding)

15.     To the extent Counter-Plaintiff challenges statements made by an attorney for the NRA, the challenged statements enjoy absolute privilege because they were made preliminary to or in connection with judicial proceedings.

**AFFIRMATIVE DEFENSE NO. 8** (Qualified Privilege: Interest of Recipients)

16.     The challenged statements were made to inform persons possessing an interest in the information.

**AFFIRMATIVE DEFENSE NO. 9** (Qualified Privilege: Interest of Third Party)

17.     The challenged statements were made in whole or in part for the protection of the interests of a third party.

**AFFIRMATIVE DEFENSE NO. 10** (Qualified Privilege: Employer Communications)

18.     The challenged statements were made to inform an employment decision.

**Count Two**
**(Tortious Interference with Contract))**

**AFFIRMATIVE DEFENSE NO. 1** (Justification)

19.     Counter-Plaintiffs' claim for tortious interference is barred by the doctrine of justification.

**AFFIRMATIVE DEFENSE NO. 2** (Justification)

20.     Counter-Defendant the NRA possesses good-faith belief in its legal right to interfere with contract.

**AFFIRMATIVE DEFENSE NO. 3** (Privilege)

21.     Counter-Plaintiff's claim for tortious interference is barred by the doctrine of privilege.

**AFFIRMATIVE DEFENSE NO. 4** (Privilege)

22.     Counter-Defendant the NRA possesses an equal or superior interest to Counter-Plaintiff in the subject of the contract.

**AFFIRMATIVE DEFENSE NO. 5** (Doctrine of Immunity)

23.     Counter-Plaintiff's claim for tortious interference is barred by the doctrine of immunity.

**AFFIRMATIVE DEFENSE NO. 6** (Contribution)

24.     Counter-Plaintiff's claim for tortious interference is barred by Counter-Plaintiff's own acts or omissions which caused or contributed to its alleged injuries.

**Count Three**
**(Declaratory Judgment)**
**(28 USC §2201 *et seq.*)**

**AFFIRMATIVE DEFENSE NO. 1** (Article III Standing)

25.     There is no justiciable case or controversy between the parties, at the time of the filing of the Counterclaims and Third-Party complaint, concerning whether the Services Agreement contains a confidentiality provision that runs in favor of AMc and, therefore, AMc lacks Article III standing to pursue, and the Court lacks jurisdiction to hear, AMc's claim for Declaratory Judgment.

**AFFIRMATIVE DEFENSE NO. 2** (Article III Standing)

26.     There is no justiciable case or controversy between the parties, at the time of the filing of the Counterclaims and Third-Party complaint, concerning whether the confidentiality agreement in the Services Agreement has been waived and/or is unconscionable and, therefore, AMc lacks Article III standing to pursue, and the Court lacks jurisdiction to hear, AMc's claim for Declaratory Judgment.

**AFFIRMATIVE DEFENSE NO. 3** (Article III Standing)

27.     AMc lacks Article III standing to seek any relief other than a declaratory judgment that the NRA is bound by a confidentiality provision in the parties' contract.

**AFFIRMATIVE DEFENSE NO. 4** (Article III Standing)

46

28.     There is no justiciable case or controversy between the parties, at the time of the filing of the Counterclaims and Third-Party Complaint, as to whether AMc is bound by the confidentiality provision of the contract.  AMc therefore lacks Article III standing to pursue, and this Court lacks jurisdiction to grant, AMc's request for a declaratory judgment that the confidentiality provision of the contract is *not* binding on AMc.

**AFFIRMATIVE DEFENSE NO. 5** (Impossibility of Waiver)

29.     Counter-Plaintiff's claim for a declaratory judgment that the NRA has waived the confidentiality provision in the Services Agreement is barred because it is not possible to waive a contractual confidentiality provision through conduct as a matter of law.

**AFFIRMATIVE DEFENSE NO. 6** (Doctrine of Litigation Privilege)

30.     Counter-Plaintiffs' counterclaim for a declaratory judgment that the NRA has waived the confidentiality provision in the Services Agreement is barred based on the doctrine of litigation privilege.

**AFFIRMATIVE DEFENSE NO. 7** (Counter-Plaintiff's Conduct)

31.     Counter-Plaintiff's counterclaim for declaratory judgment is barred on account of its own its tortious conduct and/or its own breaches of the Services Agreement, including breaches of its obligations under the confidentiality provision.

**AFFIRMATIVE DEFENSE NO. 8** (Inadequate Pleading)

32.     Counter-Plaintiffs' counterclaim for a declaratory judgment that the confidentiality provision is unconscionable is barred because it makes no allegation, and there is

47

no factual basis to support an allegation, that at the time of the contract there was gross disparity in value exchanged between the parties such that oppressive influences affected the agreement to the extent that the process was unfair.

Respectfully submitted,


 /s/ Michael J. Collins
William A. Brewer III (TX Bar No.02967035)
Michael J. Collins (TX Bar No. 00785493)
Jason C. McKenney (TX Bar No. 24070245)
BREWER, ATTORNEYS & COUNSELORS
1717 Main Street, Suite 5900
Dallas, Texas 75201
Telephone: (214) 653-4000
Facsimile: (214) 653-1015

*Counsel for Plaintiff and Counter-Defendant
National Rifle Association of America*


## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above was served on all counsel of record via the Court's electronic notification system in accordance with the Federal Rules of Civil Procedure on the 25th day of October, 2019.


 /s/ Michael J. Collins
Michael J. Collins