**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** § | |
| § | |
| § | |
| **Plaintiff and Counter-Defendant,** § | |
| § | |
| **and** § | |
| § | |
| **WAYNE LAPIERRE,** § | |
| § | |
| **Third-Party Defendant,** § | |
| § | **Civil Action No. 3:19-cv-02074-G** |
| **v.** § | |
| § | |
| **ACKERMAN MCQUEEN, INC.,** § | |
| § | |
| **Defendant and Counter-Plaintiff,** § | |
| § | |
| **and** § | |
| § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, AND JESSE GREENBERG,** § | |
| § | |
| § | |
| **Defendants.** § | |
| § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff the National Rifle Association of America (the "NRA" or the "Association") files this First Amended Complaint against defendants Ackerman McQueen, Inc. ("Ackerman"), Mercury Group, Inc. ("Mercury" and, together with Ackerman, "AMc"), Henry Martin ("Martin"), William Winkler ("Winkler"), Melanie Montgomery ("Montgomery"), and Jesse Greenberg ("Greenberg," together with Martin, Winkler, Montgomery and AMc, the "Defendants"), on personal knowledge as to its own actions and on information and belief as to all other matters, as follows:

# I.

## PRELIMINARY STATEMENT

The NRA adds these additional allegations and claims in order to expose a stunning pattern of corruption, fraud, and retaliation by Defendants that continues to come to light.  Since the NRA terminated its relationship with AMc last Spring, newly unearthed text messages, emails, and interviews with former AMc employees, customers, and others have made two things abundantly clear: *First*, AMc exploited decades of trust and confidence in order to siphon assets from the NRA, lining the agency's pockets at the expense of its client and in violation of the law.  *Second*, AMc went to outrageous lengths to conceal and sustain its fraud, deploying scorched-earth tactics against anyone who dared to scrutinize its conduct.  When the NRA's CEO, Wayne LaPierre, threw his weight behind efforts to gain transparency into AMc's business practices, the agency tried to oust him from the NRA in a desperate final salvo.  That scheme failed.  AMc now faces a long-overdue reckoning.

Until recently, the NRA could never have predicted that it would find itself at odds with its longtime advisor and vendor.  Since at least the 1980s, the NRA relied on AMc as its agent to develop messaging, place advertising, and assist it in times of crisis.  AMc's pugnacious messaging, reflected in its work with former NRA president Charlton Heston, favorably impressed NRA stakeholders.  However, by 2017, the NRA was paying tens of millions to AMc annually, and many within the Association had grown suspicious that its experiment with a branded digital media platform was not working.  The experiment had begun at the inducement of AMc in 2016 and with the intent to foster NRA membership growth, generate revenue and donations, and create a forum for singularly promoting the NRA's viewpoint on Second Amendment issues.  This became known as NRATV.

As AMc's bills grew ever larger, NRATV's messaging strayed from the Second Amendment to themes which some NRA leaders found distasteful and racist.[1] One particularly damaging segment featured children's cartoon characters adorned in Ku Klux Klan hoods. Unfortunately, attempts by the NRA to "rein in" AMc and its messaging were met with responses from AMc that ranged from evasive to hostile. At the same time, when NRA executives sought performance metrics for NRATV, AMc contrived a pretext to demand that each interlocutor be sidelined or fired. Simultaneously, in closed-door meetings with Mr. LaPierre (which AMc insisted remain "confidential"), the agency presented fabricated and inflated sponsorship and viewership claims. The simple request for the number of "unique visitors" to the site was not answered, despite multiple attempts by Mr. LaPierre and other NRA executives. In fact, AMc's representations to the NRA leadership regarding the viewership for the digital platform it created, presented, and administered were, by 2017, intentionally (and wildly) misleading. Tellingly, when NRATV finally shut down in June 2019, no one missed it: not a single sponsor or viewer even called, confirming what at least some NRA executives suspected—the site had limited visibility and was failing the accomplish any of its goals.

Sadly, it is also now known that AMc's abuse of the trust placed in the agency neither began nor ended with NRATV. Since commencing its investigation into AMc's alleged abuses, the NRA has acquired documents and information indicating that AMc fraudulently double-billed the NRA (and perhaps other clients) for professional time and equipment needs, among other things. For example, during 2018, AMc billed the NRA for time spent by one of its highest-paid

---

[1] *See, e.g.*, Danny Hakim, *Incendiary N.R.A. Videos Find New Critics: N.R.A. Leaders*, THE NEW YORK TIMES (Mar. 11, 2019), https://www.nytimes.com/2019/03/11/us/nra-video-streaming-nratv.html.

employees, Lt. Col. Oliver North ("North"), for filming an NRATV documentary series. However, very little filming took place—because North was negligent in his contractual duties, as he focused time and energy in 2018 attempting to derail the NRA's inquiries into AMc's business and billing practices. Those attempts culminated in an extortion threat delivered during the NRA's Annual Meeting in April 2019, when AMc, via North, demanded that unless Mr. LaPierre immediately withdrew the pending lawsuit against it and resigned from office, AMc would publicize portions of confidential documents misleadingly curated to cause maximum reputational harm to the NRA. After Mr. LaPierre rebuffed AMc's threat and reported it to the entire Board of Directors of the NRA in an open letter, one of the agency's co-conspirators lamented privately: "[h]e is kicking our side's ass," and stated that Mr. LaPierre's challengers would benefit from "leak[ing] AMc's info." Immediately, in stark violation of its contractual and fiduciary duties, AMc proceeded to "leak" the threatened documents. To this day, AMc continues to breach its nondisclosure obligations and wage false, punitive reputational attacks against the NRA and Mr. LaPierre. Considering the multi-faceted scheme perpetrated on the NRA, it is beyond doubt that AMc and the other Defendants believe they are above the law.

Notwithstanding the termination of the parties' Services Agreement, AMc and the other Defendants continue to improperly refer, directly and indirectly, to the NRA on AMc's website and to use the NRA's intellectual property rights. Those references and use of associated intellectual property rights are not only unauthorized and unlicensed, but also falsely suggest that the NRA endorses AMc's services in connection with NRATV, which it does not.

AMc's website also includes references to other failed client representations—to create the false impression that *all* of the featured campaigns were successful, including NRATV. Many of these campaigns, which cost clients tens of millions of dollars, were shut down because of their

ineffectiveness, costliness, and Defendants' reluctance to provide specific performance data in accordance with its obligations.  Accordingly, the NRA brings claims to enjoin AMc and the other Defendants from continuing to falsely make claims in public regarding their services to the NRA. In addition, the NRA brings this action to enjoin any further infringing and unauthorized or unlicensed use of its brand or its copyrights on the part of AMc.

Finally, the NRA seeks to redress AMc's breaches, and subdue AMc's ongoing bad acts, so that it can close this regrettable chapter of its history.

## II.

## PARTIES AND RELEVANT NON-PARTIES

### A.    Plaintiff And Counter-Defendant The NRA

1.    Plaintiff the NRA is a not-for-profit corporation organized under the laws of the State of New York with its principal place of business located in Fairfax, Virginia.  The NRA is America's leading provider of gun-safety and marksmanship education for civilians and law enforcement.  It is also the foremost defender of the Second Amendment of the United States Constitution.  A 501(c)(4) tax-exempt organization, the NRA has approximately five million members, hundreds of thousands of donors, and many millions more who support its legendary advocacy.

2.    The NRA is the Counter-Defendant to the Counterclaims and Third-Party Claims filed by AMc on October 1, 2019.

B.      **Defendants**

3.      Ackerman is a for-profit business corporation organized under the laws of the State of Oklahoma with its principal place of business located in Oklahoma City, Oklahoma.[2]  It admits that is an advertising and public relations agency that counted the NRA as its largest client for more than thirty years.[3]  Ackerman maintains a principal office in Dallas, Texas, out of which the NRA's account was serviced.  That office is located at 1717 McKinney Avenue, Suite 1800, Dallas, Texas 75202.  Ackerman is a Defendant in the original action filed by the NRA on August 30, 2019, as well as a Defendant to the additional causes of action asserted in this First Amended Complaint.  It is also a Counterclaimant and Third-Party Plaintiff in connection with the Counterclaims and Third-Party Claims it filed on October 1, 2019.

4.      Defendant Mercury is a for-profit business corporation organized under the laws of the State of Oklahoma with its principal place of business located in Alexandria, Virginia. Mercury is a wholly-owned subsidiary of Ackerman and specializes in public communications strategy, including on behalf of advocacy groups such as the NRA.  Mercury was a party to the Services Agreement (defined below) with the NRA.  Mercury maintains a principal office in Dallas, Texas, from which it serviced the NRA's account.  In particular, that office is located at the same address as Ackerman's Dallas office—1717 McKinney Avenue, Suite 1800, Dallas, Texas 75202.  Mercury engaged in all the wrongful conduct detailed in this amended complaint.

5.      Defendant Winkler resides in Edmond, Oklahoma. Winkler is affiliated with business entities located in this District, including DJ Investments LLC, which operates in this District under the assumed name of 3905 Amherst Ave UPT, LLC and owned property at 3905

---

[2]  ECF No. 12 at p. 4 (Answer to ¶ 7).

[3]  ECF No. 12 at p. 4 (Answer to ¶ 7).

Amherst Ave Dallas (University Park), Texas 75225, and WBB Investments LLC, a Texas limited liability company.  During the relevant time period, Winkler served in the senior leadership of Ackerman as Chief Financial Officer.  He is also a certified public accountant.  During the relevant time period, Winkler and other senior AMc officers and employees travelled to this District for meetings with NRA officials at Ackerman's Dallas offices and/or other locations within this District.  These activities are relevant to the claims asserted herein because they concerned, among other things, AMc's billing practices and representations about NRATV's performance and viewership.  Winkler engaged in wrongful conduct detailed in this amended complaint.

6.     Defendant Montgomery resides in Dallas County, Texas with her place of business located at Ackerman's Dallas, Texas offices.  During the relevant time period, Montgomery held several roles, including the Executive Vice President/Management Supervisor, and, as stated on Ackerman's website, has "work[ed] on the [NRA] account."[4]  Montgomery engaged in wrongful conduct detailed in this amended complaint.

7.     Defendant Martin is an individual who resides in Dallas County, Texas.  Martin has served as Ackerman's Chief Creative Officer since 2010.  During the relevant time period, Martin participated in the conduct which forms the basis of this suit, including, but not limited to, his participation and work in connection with the NRATV website and digital platform.

8.     Defendant Greenberg is an individual who resides in Dallas County, Texas.  During the relevant time period, Greenberg served as Ackerman's Chief Strategy Officer.  Greenberg participated in the conduct which forms the basis of this suit, including, but not limited to, his participation and work in connection with the NRATV website and digital platform.

---

[4] *See Melanie Montgomery Bio*, https://www.am.com/our-team/?id=melanie-montgomery.

C.    **Unnamed, Non-Party Co-Conspirators And Relevant Non-Parties.**

9.     Dan Boren is an individual who is an executive of the Chickasaw Nation and not an employee of AMc.  Mr. Boren entered into an agreement, combination, and/or conspiracy with the Defendants for the purpose of carrying out the fraudulent behavior, the attempt to de-railing the resulting NRA investigation, and the attempt to extort Mr. LaPierre and the NRA alleged herein.  In addition, there exists a small group comprising former vendors, professionals, and consultants of the NRA whose economic incentives, like AMc's, were challenged by the NRA investigation and, like Mr. Boren, joined the agreement, combination, and/or conspiracy.

10.    Oliver North is an individual who resides in South Carolina and/or the Commonwealth of Virginia.  Mr. North is a former president of the NRA. Unbeknownst to the NRA until recently, North is also a full-time employee of Ackerman.

## III.

## JURISDICTION AND VENUE

11.    The Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338, because this is a civil action involving claims arising under the laws of the United States.

12.    The Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367, because the state law claims are sufficiently related to the other claims in the action subject to original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

13.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.  As stated above, during the relevant time period, NRA senior officers and employees would regularly travel to this

District to hold meetings with Defendants. These meetings are relevant to claims asserted herein and concerned Defendants billing practices and NRATV. Defendant AMc has also admitted that it maintains a principal office in Dallas, Texas, out of which the NRA's account was serviced.[5] Three Individual Defendants work out of that office, which also doubles as a corporate office for Defendant Mercury.

## IV.

## FACTUAL BACKGROUND

### A. For Decades, The NRA Relied On Ackerman To Perform Public Affairs Services Requiring A High Level of Trust.

14. The NRA and AMc worked closely together for more than 30 years. In 2017 alone, the NRA paid more than $40 million to AMc. Over that decades-long relationship, the NRA reposed extensive trust and confidence in AMc to perform a wide range of services, including public relations and strategic marketing; planning and placement of media; management of digital media and websites; and the management of NRATV, a digital-media platform frequently perceived by the public as the "voice" of the NRA.[6] By its nature, this work was publicly and politically sensitive and required the NRA to entrust AMc with confidential (and often privileged) information.

15. AMc's work on behalf of the NRA was governed by successive incarnations of a Services Agreement containing detailed specifications for how various types of work performed

---

[5] ECF No. 12 at p. 4 (Answer to ¶ 7).

[6] *See, e.g.*, Jeremy W. Peters & Katie Benner, *Where The N.R.A. Speaks First and loudest*, THE NEW YORK TIMES (Feb. 21, 2018), https://www.nytimes.co m/2018 /02/21/us/politics/nratv-nra-news-media-operation.html.

by Ackerman should be budgeted and billed. Each Services Agreement provided that certain categories of services, such as Owned Media and Internet Services, would be compensated with an agreed annual fee, while other services were required to be invoiced on an *ad hoc* basis based on estimates furnished by AMc and approved by the NRA.  Consistent with the sensitive nature of AMc's services, the Services Agreement strictly limits[7] use and disclosure by AMc, and its individual employees (who were themselves fiduciaries of the NRA), of information acquired during AMc's work on behalf of the NRA.

16.     Specifically, Section IV of the Services Agreement provides that AMc "shall not disclose, directly or indirectly, to any third party, any ... data, materials or information ... made known to AMc as a result of AMc's providing [contracted-for services] . . . without the prior express written permission of [the] NRA."[8]  AMc may use the NRA's confidential information "only for the limited purpose of providing its [s]ervices to the NRA,"[9] and AMc "warrants and agrees to prevent disclosure of Confidential Information by its employees, agents, successors, assigns and subcontractors."[10]

17.     Notably, AMc served as the NRA's agent for several purposes pursuant to the Services Agreement and as a consequence of the trust and confidence placed in AMc by the Association. Therefore, AMc owed fiduciary duties to the NRA. For example, the Services Agreement provided for AMc to act "on [the] NRA's behalf," and subject to the NRA's control,

---

[7] AMc's confidentiality obligations survive termination of the 2017 version of the Services Agreement.  *See* Services Agreement § X.E.

[8] *Id.* at § IV.A.I.

[9] *Id.* at § IV.A.3.

[10] *Id.* at § IV.A.4.

with respect to purchasing, planning, and placement of media[11]—activities that required the NRA to entrust AMc with nonpublic information about its communication strategy.  In its capacity as the NRA's agent, AMc was required to demonstrate "the same high standard of good faith and loyalty" to the NRA as would be "required ... of an attorney to his client."  Indeed, owing to the parties' decades of close collaboration, their relationship of trust and confidence existed prior to, and apart from, the execution of the Services Agreement. AMc's common-law duties of loyalty were further codified and buttressed by contractual confidentiality provisions.

18.     AMc monthly invoiced the NRA for a wide variety of expenses.  Consistent with the substantial scope and dollar value of the services rendered by AMc for the NRA, the Services Agreement contained detailed guidelines identifying categories of expenses that could be invoiced to the NRA, and conditions for their reimbursement.  For example, hotel and meal expenses were required to be authorized in writing, in advance, by the NRA.  Over the parties' decades-long course of dealing, underlying receipts and other support for AMc's expenses were not transmitted to the NRA alongside AMc's invoices but, rather, were supposedly maintained at AMc's offices. This practice was followed at AMc's suggestion, in order to ensure that AMc's work pertaining to matters such as donor development, strategic planning, and legal items remained confidential.

19.     Of course, the NRA was *repeatedly* assured that appropriate documentation was retained by AMc and could be audited anytime at the NRA's request. Indeed, AMc offered elaborate assurances not only that its recordkeeping was secure and accurate, but that AMc was the *most* secure repository for travel itineraries and other documents raising potential security issues.  It is now known that these representations were false when made, with a specific intent to

---

[11] *Id.* at §§ I.C, II.B. I.

induce the NRA to maintain or increase its reliance on AMc.  The NRA has only recently discovered that for years *no one* kept or maintained reasonable documentation that would justify or support the accuracy of the sums of money AMc represented it was owed in the billing statements it sent to the NRA.

20.     Given its responsibilities, AMc took an active role in shaping the public image of the NRA's principals and executives, including Mr. LaPierre.  Based on AMc's advice, and subject to billing procedures AMc recommended and established, Mr. LaPierre, over a fifteen-year period, incurred wardrobe and related expenses for countless television appearances, filming of commercials, and other outward-facing brand-development activities. The majority of those activities were specifically directed, choreographed and produced by AMc.  As such, expenses were initiated at AMc's direction and records relating thereto were to be maintained by AMc. Of course, AMc should not have incurred (let alone sought reimbursement for) any expenses which it believed inappropriate.

**B.     Branded News—The Growth of NRATV.**

21.     During the late 1990s, under the leadership of its then-president, AMc decided to radically alter its business from that of a traditional ad agency to a creator and broadcaster of original media content.  AMc saw the growth of digital networks as an opportunity for large entities to craft and advance their own brand messaging through television production.  It saw the content-production business as lucrative, exciting, and cutting-edge, but did not consider or care whether its clients would actually benefit from such services.    If AMc could hawk "television-style production" at a profit, it would do so—and it did.

22.     AMc touted its new business philosophy as follows:

EVERY BUSINESS AND INDIVIDUAL HAS THE ABILITY TO
BECOME A MEDIA COMPANY

> If you have an audience that cares about what you have to say, you can create and distribute content with complete autonomy. No one else should capture or distribute those stories better than you. And in this era of communication, it has never been more affordable or efficient for you to begin.

23.     Of course, fundamental to AMc's optimism about its "new" direction was its belief that it could convince its largest client, the NRA, to "buy into" the concept. Thus, in the early 2000s, AMc set out to induce the NRA to finance the creation of its own branded news platform. Plying the NRA with glowing prognostications about the lucrative benefits of "owned media," AMc persuaded the NRA to launch its initial digital-video platform known as "NRA News" in 2004. The NRA had long relied on AMc to place advertising via traditional media, including conventional television channels. To AMc, the funds remitted to real media outlets were funds available for the Association "to invest" in building studios and other assets from which AMc might profit. NRA News was the beginning of that effort.

24.     The annual budget for NRA News quickly, substantially climbed, from $1.6 million in 2004 to $4.594 million by 2014. For example, from 2004 through 2014, there was some evidence that NRA News was attracting the viewership AMc promised: even late at night, live programs with call-in components seemed to be generating promising call volume. AMc generated glossy, confidential PowerPoint presentations—which it would display for the NRA during meetings but would refuse to provide "in writing"—that claimed that NRA News generated tens of millions of valuable engagements and views.

25.     Based on the reported success of NRA News, the NRA agreed to experiment with an expanded version of the platform. Beginning in 2016, AMc CEO Angus McQueen ("McQueen") began lobbying Mr. LaPierre with glowing projections about the benefits of expanded programming on an NRA-branded digital platform. Seeking to induce Mr. LaPierre to

substantially increase the NRA's investment in the media segment to over $10 million dollars, McQueen seized on the rise of digital media and persuasively claimed that developing such a digital platform was simply "part of being a 21st century company" and that "we can't let the status quo continue."  Emphasizing the need to act quickly, McQueen stated that the "NRA needs to lead change in the marketplace" and "not become a follower."  Tying his themes together, McQueen asserted that the NRA "must put its message in all delivery systems," including the expanded digital platform.

26.     Highlighting the concept's financial viability, McQueen pressed that "we must vastly modernize the entire economic under-performance of [the] NRA."  Ultimately, he pointedly emphasized that the "NRA needs to find new ways to make money" and that the digital platform concept presented "a good opportunity to generate revenue."  Indeed, Defendants assured the NRA that its substantial investment would "pay for itself" in short order, via a combination of "soft" and "hard" monetization, including paid commercial sponsorships for live programs.  In fact, AMc assured the NRA that based on its experiences for other clients that this substantial investment would "pay for itself" within three years max.  In reliance on these representations, the digital platform was launched in 2016 under the brand NRATV.

27.     Although the creative content generated for NRATV constituted work for hire for copyright purposes (and was owned by the NRA), NRATV was managed and controlled—its talent hired and supervised, and its programming scripted—by AMc.  From the outset, NRATV was expensive, costing more than $12 million in its first year.  However, AMc claimed that the largest subset of this expense, which pertained to live programming, was "the key" to the success of the platform.  Having served the NRA for decades, AMc knew what its client desired in the digital media space: (1) outreach to new potential members (especially of a younger generational

14

cohort), (2) a self-sustaining platform, and (3) a vehicle to advance its mission and Second Amendment advocacy.  AMc represented that NRATV would be built and managed to serve these purposes.

28.     Within NRATV's first year, AMc falsely reported that the platform generated millions of "engagements" and views. Noting the NRA's keen interest in the platform's viewership and sponsorship figures, AMc promised to bring consulting a firm, Performance Improvement Partners ("PIP"), to provide "data analytics and insights" tracking NRATV's performance.  In the interim, AMc purported to update the NRA regularly on NRATV's metrics.  During meetings held on the following dates, at the following locations, AMc staff—generally consisting of Nader Tavangar, Peter Farrel, Revan McQueen, and Defendants—delivered PowerPoint presentations boasting that NRATV consistently generated millions of views, including "completed" and "engaged" views:

| Meeting Date | Meeting Location |
|---|---|
| October 24, 2017 | Teleconference/Polycom |
| November 28, 2017 | Mercury Group Offices |
| January 3, 2018 | Ackerman Offices (Dallas, Texas) |
| February 1, 2018 | Las Vegas, Nevada |
| February 19, 2018 | Ackerman Offices (Dallas, Texas) |
| April 11, 2018 | Ackerman Offices (Dallas, Texas) |
| September 4, 2018 | Teleconference/Polycom |
| October 11, 2018 | Ackerman Offices (Dallas, Texas) |
| October 23, 2018 | Teleconference/Polycom |
| October 30, 2018 | Ackerman Offices (Dallas, Texas) |
| November 28, 2018 | Teleconference/Polycom |
| December 5, 2018 | Teleconference/Polycom |
| January 18, 2019 | Ackerman Offices (Dallas, Texas) |

29.     In these closed-door meetings (which Ackerman insisted upon, ostensibly for reasons of "confidentiality"),[12] with Mr. LaPierre and sometimes others from the NRA leadership in attendance, Defendant Montgomery and others made purposely inflated sponsorship and viewership claims now known to be false in order to induce the NRA to continue investing millions upon millions in NRATV and, by extension, AMc.   In each of the thirteen meetings listed in the above chart, Defendants led the NRA to believe that NRATV's viewership numbered in the millions and that Defendants were generating many millions of dollars in value for the NRA. They did so not with facts or evidence but through a carefully coordinated scheme to present misleading, out-of-context, and conjured-up statistics for the consumption of the NRA leadership.

30.     Of course, viewership is the *raison d'etre* of digital advertising and content creation. By creating attention-catching content, digital creators and their marketing firms aim to develop a base of loyal viewers who will eventually support the organizations who create it.  This, in turn, attracts advertisers and sponsors for the programming or other digital content, which pay based on the number of *unique* "eyeballs" or "click-throughs" provided by the content.  As digital marketing has become increasingly important for businesses and non-profits alike, an entire industry has arisen which collects, aggregates, analyzes, and presents viewership data.  That data— which can be so granular as to identify *distinct individual viewers* of digital media—can provide valuable insight to organizations seeking to develop their brand and win the loyalty of the viewing public. However, due to content creators' heavy reliance on these digital metrics, inaccuracies can be consequential and damning. [13]

---

[12] This was despite the fact that the NRA owned the NRATV platform and associated data.

[13] For example, Facebook recently paid $40 million to settle a lawsuit by advertisers who alleged that it inflated view counts for certain videos—pleading that they relied extensively and

31.     Over the course of more than thirteen meetings and countless emails, Defendants systematically misrepresented and overstated the viewership performance of NRATV.  In response to the consistent inquiries of NRA leadership generally, and Mr. LaPierre specifically, Defendants fabricated or massaged data in an intentionally misleading fashion to falsely suggest a robust, growing viewership for NRATV. In reality, AMc knew—based on underlying, unvarnished, fulsome metrics that it intentionally withheld from the NRA—that NRATV was an abject failure.

32.     AMc's contrived, cherry-picked figures misrepresented NRATV's viewership data in at least two respects.

33.     *First,* the figures presented by Defendants fraudulently misrepresented or omitted the number of distinct viewers of NRATV content.  It is fundamental that the nominal quantity of "clicks," or "views," achieved by particular digital content is of minimal informative value, including because each "click" or "view" does not necessarily represent a unique user.  For example, a user's web browser might automatically refresh a video or a page at routine intervals, simulating hundreds or thousands of views; less egregiously, a single user might intentionally click on a piece of content multiple times—which is favorable, but not as valuable as clicks from several separate viewers.  Accordingly, responsible media companies disaggregate their total click figures and discern, using data provided by Google and other analytics services, the total number of distinct users.  AMc declined to do that.  Instead of providing an accurate account of the number of distinct users—a number which AMc knew would raise the alarm that NRATV was failing— AMc provided only aggregate data, thereby creating the false impression that NRATV had

detrimentally on Facebook's false figures.  David Paul Morris, *Facebook to Pay $40 Million to Settle Advertiser Lawsuit Over Inflated Video Views*, TIME (Oct. 8, 2019), http://time.com/5694910/facebook-settle-advertiser-lawsuit-videos/.

substantially more unique viewers than it actually did.  That false representation was intended to induce the NRA to continue its investment in NRATV and, by extension, AMc.

34.     *Second*, the figures presented by Defendants fraudulently inflated NRATV's viewership figures by failing to rigorously differentiate between genuine views and merely incidental ones.  Genuine views represent instances in which a user encounters content and then volitionally interacts with it in some way—rather than immediately navigating elsewhere.  Merely incidental views, by contrast, are "views" which occur only because an individual user happens to scroll past NRATV content on a webpage.  The importance of this distinction is obvious. While genuine viewers represent those who actually watch NRATV content and thus are exposed to the NRA's messaging and ideas, merely incidental viewers are not.  Although AMc occasionally purported to distinguish total views from "engaged" views, its calculations overrepresented the number of "engaged" views.

35.     The presentation made by senior corporate executives of AMc to the NRA leadership in October 11, 2018 (one of the meetings identified in the chart) is illustrative of the agency's efforts to hoodwink the NRA through tortured, fraudulent statistics and misleading generalizations about the platform's performance.  Just as they had done in previous meetings, AMc produced a glossy PowerPoint presentation which purported to, in the words of Defendant Montgomery, present "all things NRATV," including its "analytics." It did nothing of the kind. Rather than candidly discuss NRATV's disastrous performance, known internally to Defendants, Defendant Montgomery falsely touted its success.  For example, the presentation asserted that NRATV was "the strongest media outlet covering the Second Amendment," and that NRATV had seen "tremendous increase[s] in [the] time spent on the site."  Each of these representations was accompanied by a bevy of out-of-context and misleading statistics.  Not once did Defendant

18

Montgomery or any other Ackerman employee disclose the crucial actual and unique viewership data that would contradict her misleading statements about the performance of NRATV. Among the outrageous representations made was that the total viewership of NRATV, in a mere eight months, had received over *two-hundred million views*, thereby suggesting that NRATV content had reached two-thirds of the United States. This representation, like the many others made during the course of AMc's meetings with NRA executives regarding NRATV, was fraudulent and false—and AMc knew it.

36. Apparently not content to hide from the NRA the platform's actual viewership figures, Defendants also concocted a series of "valuations" which had no basis in reality. For example, in Q3 2018, representatives from the NRA and AMc, including Defendants Montgomery, Martin, and Greenberg, held a meeting to discuss the valuation of NRATV. At the meeting, Defendants touted a proprietary "AM Conservative Approach" formula, which it insisted provided a conservative estimate of the Earned Media Value (EMV) generated by NRATV in excess of $13 million. Adopting a separate, less-conservative formula, Defendants represented that NRATV should actually be valued at $45 million annually, a figure justified by citing "total views" of NRATV content. In addition to being based on "total view" figures that Defendants knew to be misleading for the reasons discussed above, the more fundamental problem with these "valuations" is that they have no basis in fact. Rather, by presenting these valuations and contending they are based on a proprietary formula, Defendants intentionally deceived the NRA into believing that its substantial investment in NRATV was generating outstanding returns when, in fact, the primary beneficiary of the initiative were the Defendants.

37. Further illustrating the slipshod and dishonest approach to valuation, in a meeting held on October 11, 2018, at AMc's offices in Dallas, Texas, and in correspondence dated May

13, 2019, Defendant Montgomery made representations that purported to calculate the value of the NRA's digital media presence. Using a formula based solely on the "cost to get . . . published"— that is, the cost to AMc—Montgomery presented a valuation based, not on the value the NRA received, but on putative costs incurred by AMc. In doing so, Montgomery effectively represented on behalf of Defendants that, in paying AMc to conduct digital media operations, the NRA was receiving substantial value on its investment. That representation was not based upon any reliable measure of the benefit the NRA received due to its digital media presence; the sole measure of the "value" used by AMc was its own profitability.[14]

## C.      Troubled Waters: The Demise of NRATV.

38.      By 2017, the annual budget for NRATV grew to over $20 million annually—a number that was viewed by NRA leadership as unsustainable without tangible proof that the platform would soon monetize itself. As described above, the Association began, in 2017, to press AMc for actual, reliable proof that the platform was reaching its projected objectives or deliverables—membership growth, actual unique viewership information, and/or signs that others (*e.g.,* advertisers or sponsors) would invest in the platform.

39.      At the same time, the leadership of the NRA—especially Mr. LaPierre—began to question whether the messaging associated with NRATV's live programming actually served as a benefit to the Association's mission. As NRATV often became viewed as a dystopian cultural rant that deterred membership growth, NRA leadership requested greater directional control and coordination over the content of NRATV programming.

---

[14] To inflate the NRATV bills sent to the Association, it is now known that AMc senior executives hired a plethora of friends, family, and significant others for positions at NRATV for which they lacked the requisite qualifications and experience.

40. As these factors coalesced, the ownership at AMc—fearing the loss of its most important income-producing activity—became increasingly secretive, hostile and determined to "protect" its "economics" with the NRA.

41. In what has turned out to be an unfortunate "public reveal" of AMc, it is now known that NRATV was, by the dawn of 2018, a reflection of what AMc itself had become—an economic burden to the NRA. Infected by a bizarre sense of entitlement, by 2018, the leadership of AMc seemed to believe that it was "entitled" to an unfettered flow of tens of millions of dollars from the NRA—whether or not it actually served the best interests of its client. Although the agency had, undeniably, provided benefits to the Association for many years, by 2018 it is now known that AMc was riddled with corruption, driven by the greed of its leadership and determined to entrench its "cash flow" from the NRA.

42. As the trial in this matter will reveal, the NRA was victimized by its most trusted vendor. And in many ways, the unravelling of NRATV provides useful insight into the demise of AMc.

43. Importantly, AMc had reason to know that even its most conservative projections for NRATV were fanciful. By 2016, when NRATV debuted, another AMc client had already agreed to experiment with the "owned media" concept—and it was an unmitigated failure. The American Clean Skies Foundation ("ACSF"), an energy-industry advocacy group, hired AMc in 2008, and was promptly sold a bill of goods similar to the one pitched by AMc to the NRA, including an "owned media" digital-video channel. ACSF's ensuing experience with AMc, and the resulting "Clean Skies TV" product, was so disastrous that ACSF's former general counsel contacted the NRA and offered assistance with this lawsuit, noting: "I'm pleased to see [AMc] get called on their practices finally." After ACSF's reasonable requests for information about Clean

Skies TV's budgets and operations went unanswered, ACSF fired AMc in 2009.  Even as it made elaborate representations to the NRA that digital video "owned media" was the future of public relations, and that the steep costs associated with NRATV would easily be recouped, AMc concealed the failure of Clean Skies TV.

44.     On. May 13, 2019, AMc finally responded in writing to the latest of numerous requests for unique live viewership figures for NRATV.  Incredibly, AMc's response still did not disclose unique viewers for NRATV platforms.  Instead, an accompanying letter from Defendant Montgomery disclaimed years of assurances regarding the monetization potential of NRATV.   In the most direct response offered by AMc to date regarding the NRA's requests for unique-viewer data, Montgomery simply stated: "[L]ive production is in place for several reasons, *not one of which was to accumulate massive live viewership numbers*."  Of course, this is nonsense: since 2016, AMc touted NRATV's purported viewership numbers as a primary driver of its claimed valuation.  Of course, there was no other logical reason for the NRA to invest in NRATV than to gain large viewership numbers, without them, none of the stated goals of increased membership and sponsors would be possible. And it did not. It was all a hoax.

45.     Ultimately, facing a "wind-down" of its services and cessation of payments from the NRA, AMc finally admitted that the NRA "could conceivably stop the live stream component of NRATV without significantly affecting the network's viewership performance[.]"   In other words, the most expensive component of NRATV (and thus the most profitable for AMc) was generating de minimis value, if any, with respect to primary metric of interest to the NRA: viewership.

46.     During 2019, *The New York Times* reportedly reported on an independent assessment of NRATV's unique viewership figures.  That assessment determined that NRATV's "web traffic was miniscule, with 49,000 unique visitors in January [2019]"[15]—compared to the millions of visitors claimed by AMc.  It is now known that those paltry numbers—stunningly small when compared to AMc's representations regarding viewership—are overstated.  In fact, when the Association shut down NRATV in June 2016, not a single reaction emerged.

**D.     The NRA's Transparency Efforts and Ackerman's Response.**

47.     In recent years, the State of New York amended its Not-for-Profit Corporation Law (the "NPCL") to clarify requirements for director independence and the ratification of related-party contracts, among other items. After updating its internal policies and controls to reflect these amendments, the NRA undertook to strengthen its procedures for documentation and verification of compliance by vendors with their contracts. Beginning in August 2018, the NRA sent letters to more than a hundred vendors—including AMc—that set forth updated invoice-support requirements and provided detailed guidance regarding, for example, expense reimbursement procedures.

48.     Simultaneously, as the NRA's now-former Treasurer and CFO prepared to retire and the NRA leadership ranks shifted, multiple employees began to voice recommendations regarding opportunities for improvement at the NRA.  Combined with the NRA's compliance efforts, numerous employees came forward with complaints about AMc.

49.     Specifically, the NRA was compelled to investigate multiple concerns about AMc:

---

[15] Danny Hakim, *N.R.A. Shuts Down Production of NRATV, and Its No. 2 Official Resigns*, THE NEW YORK TIMES (June 25, 2019), https://www.nytimes.com/2019/06/25/us/nra-nratv-ackerman-mcqueen.html.

- "Out of pocket" expenses that lacked meaningful documentation of NRA approvals, receipts, or other support, despite the requirements set forth in the Services Agreement;

- Immense growth in AMc's annual budgets, coupled with a lack of transparency regarding how the budgets were calculated or whether AMc adhered to them;

- Lack of transparency regarding AMc's compliance with its contractual obligation to ensure that services were provided at "fair market value";

- Concerns that AMc was invoicing the NRA for the entire salaries attributable to NRA-Dedicated Personnel, despite certain NRA-Dedicated Personnel allocating substantial time to *non*-NRA clients; and

- Refusal by AMc to provide data "in writing" (such as unique visitors, viewership numbers, clickthrough rates, or related performance metrics) that enable the NRA to analyze the return on its substantial investment since 2016 in NRATV.[16]

50.     Consistent with the broad scope and critical nature of the services performed by AMc for the NRA, the NRA bargained for transparency into AMc's files, books and records pursuant to the Services Agreement. Both the previous Services Agreement and the current iteration incorporate Records-Examination Clauses that require AMc to open its files for the NRA's inspection upon reasonable notice. The full text of the Records-Examination Clause in the Services Agreement appears below:

| Services Agreement |
| --- |
| • Dated April 30, 2017 (as amended May 6, 2018) |
| • Between the NRA and "AMc" (defined to include both Ackerman and Mercury) |

---

[16] In addition, certain NRA stakeholders were also concerned that NRATV's messaging—on topics far afield of the Second Amendment---deviated from the NRA's core mission and values.

> **VIII.  EXAMINATION OF RECORDS**
>
> During the term of this Services Agreement, AMc authorizes NRA, upon reasonable notice, to examine AMc and Mercury's files, books and records, with respect to matters covered under this Services Agreement.

51.     During early- and mid-2018, the NRA sought information from AMc pursuant to the Records-Examination Clause on a common-interest basis to advance parties' mutual interests relating to an ongoing lawsuit. However, after the NRA began to request access to records that would shed light on concerns regarding AMc's business and accounting practices, AMc became evasive and even hostile.

52.     In August 2018, within days after the NRA announced that it would now require supporting documentation to be transmitted contemporaneously with vendor invoices, a media outlet quoted "an anonymous source at Ackerman McQueen"[17]–creating serious concerns about AMc's compliance with its confidentiality obligations.

53.     On August 27, 2018, Defendant Winkler sent a letter to the NRA which purported to comply with the NRA's request for a more comprehensive audit of Ackerman's expense records. The letter pointedly identified several categories of items, some relating to travel and entertainment, which it warned would be encompassed in a full production of those records— perhaps believing that the threat of such disclosure would dampen the NRA's demands for transparency. However, the NRA was undeterred, and insisted upon reviewing and verifying details of expenses incurred.

---

[17] Dylan Matthews, *The National Rifle Association, America's most powerful lobby, claims it's in financial crisis. What?*, VOX (Aug. 3, 2018, 4:50pm), https://www.vox.co m/2018/8/3/17648960/nra-national-rifle-association-companies-support-boycott-new-york lawsuit.

54.     In September 2018, for the first time in the parties' decades-long course of dealing, AMc demanded that its outside counsel supervise any document review conducted under the Records-Examination Clause, then demanded payment of outside counsel's legal fees as a precondition for delivery of video footage it produced and for which AMc had already invoiced the NRA. During a telephone call on September 19, 2018, after AMc's counsel insisted that the NRA pay AMc's legal fees without any insight into why the fees were incurred, the NRA's counsel observed that AMc's posture seemed more consistent with an adverse than a common-interest relationship. AMc's counsel then made a startling statement: "Ackerman views the relationship as adverse."

55.     Around the same time, an NRA executive asked AMc for a copy of an audit purportedly conducted by PIP, one of the independent digital-analytics vendors purportedly retained by AMc, regarding the value of NRATV.  Departing sharply from prior conversations, AMc cursorily informed the executive that no audit had been performed, and no copies of any documents would be provided.  Rather than audit AMc's reported viewership metrics, AMc explained that PIP had "worked with" AMc to create a purported "dashboard" of digital analytics; AMc promised it would "go through all of that" during an upcoming live meeting.

56.     Thereafter, AMc strenuously resisted the NRA's efforts to enforce the Services Agreement, including by embarking on a campaign to "kill the messenger" when the NRA continued to seek access to documents or proposed reductions in AMc's budget.  At first, AMc scapegoated the NRA's outside counsel—refusing to interface with counsel.  Then, over ensuing months, AMc also refused to respond to basic information requests from NRA executives. After the NRA retained a third-party forensic accounting firm to interface with AMc in an effort to appease AMc and gain its compliance in January 2019, AMc indicated it would cooperate.

Unfortunately, that pledge of cooperation was short-lived, as AMc purported to forbid the accountants from disclosing simple, material information to the NRA—including copies of annual budgets against which AMc was invoicing. When the NRA's General Counsel sought additional information in follow-up to the forensic audit, AMc ignored his letters.

57.     As AMc continued to stonewall the NRA's requests for documents and tensions between the parties rose, the NRA was contacted with increasing frequency by journalists acting on purported "leaks" relating to matters on which AMc had worked.  The contents of these "leaks" reflected a malicious, out-of-context use of the NRA's confidential information, with an apparent intent to damage the NRA.

58.     To resolve its concerns regarding these disclosures, on May 6, 2019, the NRA requested that several key AMc employees execute sworn declarations attesting that they had not violated their confidentiality obligations under the Services Agreement. The NRA tailored its request narrowly—seeking declarations only from senior executives who had exposure to the information at issue—and demanded simply that these executives affirm they had complied, and would continue to comply, with their clear legal duties.  To the NRA's dismay, AMc flatly refused to provide any cooperation or assurances whatsoever.

**E.     Among the Records Unlawfully Withheld By AMc: A Major Related-Party Contract.**

59.     Non-party North is a veteran of the United States Marine Corps and the Reagan Administration.  North is also a member of the NRA Board of Directors.  During May 2018, the NRA announced that North was slated to serve as its next President—a largely ceremonial but high-profile position famously occupied by Charlton Heston during the late 1990s.  As Col. North prepared to assume the presidency of the NRA, he separately discussed a potential engagement by AMc as the host of an NRATV documentary series.  On May 6, 2018, the NRA and AMc amended the Services Agreement (such amendment, the "May 2018 Amendment") to affirm that any

contract between AMc and North would be considered an AMc-Third Party NRA Contract, for which outstanding compensation would be owed by the NRA to AMc if the Services Agreement was terminated.  Importantly, the amendment treated North as a third-party contractor—but not, necessarily, an employee—of AMc.

60.    North and AMc assured the NRA that North's profile and "brand" would be actively leveraged to elicit sponsorships for the documentary series.  This was of material interest because during recent years, the NRA had spent substantial sums on NRATV based on AMc's advice and representations regarding achievable benefits of an owned-media platform.  However, measured against any of the desired outcomes, the returns on the NRA's investment in NRATV were non-existent.  Accordingly, if the North documentary series attracted sponsorships or sparked viewership and membership growth, then the costs associated with NRATV could be defrayed.

61.    New York law requires that the NRA Board of Directors, or an authorized committee thereof, review and approve "any transaction, agreement, or any other arrangement in which [a director or officer of the NRA] has a financial interest and in which the [NRA or an affiliate] is a participant."[18]  Guidance published by the New York Attorney General notes that a board of directors may define additional restrictions on transactions giving rise to potential conflicts of interest;[19] and, consistent with best practices, the NRA's Conflict of Interest Policy requires disclosure of contracts between NRA leadership and vendors, like AMc, that receive funds from the NRA.

---

[18] *See* N.Y. N-PCL § 715.

[19] *Conflicts of Interest Policies Under the Not-for-Profit Corporation Law*, CHARITIES BUREAU,   N.Y.   STATE   OFFICE   OF   THE   ATTORNEY   GENERAL   (2018), https://www.charitiesnys.com/pdfs/Charities_Conflict_of_Interest.pdf, at 3.

62.     Aware that North entered into a contract with AMc (the "North Contract"), the NRA, with the cooperation and authority of the Audit Committee, diligently sought to comply with its obligations concerning analysis and approval of the North Contract.  During September 2018, the Audit Committee of the NRA Board of Directors (the "Audit Committee") reviewed a purported summary of the material terms of the North Contract and ratified the relationship pursuant to New York law—subject to carefully drawn provisos designed to avoid any conflicts of interest.

63.     At the time Audit Committee ratified North's continued service as an NRA director and President given his relationship with AMc, it was assured that the NRA's counsel would review the North Contract in full.  But that turned out to be false, at least for the duration of 2018, as AMc continued to refuse to provide the North Contract pursuant to the Records-Examination Clause.  Meanwhile, North indicated via counsel that he could only disclose a copy of the contract to the NRA subject to AMc's consent.  This back-and-forth persisted for nearly six months.

64.     Eventually, in February 2019, AMc acceded to a brief, circumscribed, "live" review of the North Contract (but no retention of any copies) by the General Counsel of the NRA.  This review raised concerns about whether the previous summary of the North Contract which was provided to the Audit Committee had been complete and accurate.  Among other things, the NRA's brief, limited review of the North Contract—along with other information disclosed for the first time by North—gave rise to questions regarding: (i) whether North was a third-party contractor of AMc or, conversely, a full-time employee with fiduciary duties to AMc that supersede his duties to the NRA; (ii) whether the previously disclosed costs borne by the NRA in connection with the North Contract were complete and accurate; and (iii) whether the contract imposed obligations on North that prevent him from communicating fully and honestly with other NRA fiduciaries about

AMc.  Against the backdrop of escalating concerns about AMc's compliance with the Services Agreement and applicable law, the NRA became determined to resolve these issues.

65.     By separate letters dated March 25 and 26, 2019, the NRA's General Counsel again sought visibility regarding the North Contract and related business arrangements, as well as copies of other material business records pursuant to the Services Agreement.  Specifically, the NRA requested:

- A chance to conduct a follow-up review of the North Contract (the NRA's General Counsel even volunteered to conduct the review at AMc's attorney's offices, for AMc's convenience);

- Information about any additional costs relating to AMc's engagement of North, to the extent that such costs were being "passed through" to the NRA;

- Copies of any additional AMc-Third Party NRA Contracts currently in existence;

- Information about which AMc personnel purportedly constituted "NRA-Dedicated Personnel," such that their salaries or severance were alleged to be reimbursable by the NRA, and business records sufficient to show whether these personnel were in fact dedicated to NRA projects; and

- Copies of the annual budget documents provided to the NRA's forensic accountants.

66.     The NRA made clear that it sought the above information "in whatever form [wa]s most convenient" for AMc and hoped to obtain access to ordinary-course business records as contemplated under the Records-Examination Clause.  Although AMc immediately acknowledged receipt of the letters and promised to respond substantively, it did not.

67.     Meanwhile, the NRA began to suspect that the information it previously received regarding the North Contract was misleading.  The May 2018 Amendment classified North as a third-party contractor of AMc—but in actuality, the North Contract treated him as a full-time employee, with legal duties to Ackerman that superseded his duties to the NRA.  Moreover, AMc originally advised the NRA that it had contracted North to host "[t]welve feature-length episodes" of a digital documentary series, to be produced "during each 12 months of a three-year [a]greement," commencing during or about May 2018.  Yet by April 22, 2019—eleven months into North's engagement—only three episodes were available, and none were "feature-length."

68.     On April 11, 2019, North finally disclosed a copy of his contract to the NRA—even as AMc continued to rebuff the NRA's requests for material information about the contract.  AMc has also withheld documentation regarding sponsorships secured for the North documentary series, and the NRA has no evidence that any substantial sponsorships exist. Viewed in light of the series' production shortfalls, these facts have troubling implications.  The NRA agreed to shoulder a specific financial burden in connection with a specific digital-media project—not to allow its President to be compensated by a for-profit advertising agency for performing generic leadership functions.  Importantly, the NRA's Bylaws do not provide for the President to receive a salary.

69.     In the wake of these developments, the NRA again requested that AMc allow it to examine business records that would shed light on "what, exactly, [the NRA] is paying for—and what it is getting."  AMc never responded.

F.      **The NRA Takes Legal Action, AMc And North Respond With Illegal Extortion.**

70.     On April 12, 2019, having exhausted its good faith efforts to access key records pursuant to the Services Agreement, the NRA filed a narrowly tailored action in Virginia State court seeking specific performance by AMc of its obligation to share relevant records with the NRA.  In retaliation, rather than provide the requested records directly to the NRA (as the NRA

had sought for months), AMc conspired with others to disseminate select, out-of-context portions of those records—many obsolete or dated—to a subset of the NRA  Board  of Directors,  in order to sow  false impressions regarding the NRA's spending and lend support for a possible executive coup.

71.     On April 22, 2019, days before the NRA's Annual Meeting of Members, Defendant Winkler  doubled  down  on  the  tactic  he  previewed  in  his  August  27,  2018  letter.[20]  In communications to select NRA executives, he referenced and excerpted certain expense records which had previously been withheld from the NRA. Importantly, Winkler did not contend—nor does the NRA believe—that any of the referenced expenses were improper.[21] Nonetheless, they were obviously selected by Defendants to foster salacious, misleading impressions of the NRA's spending practices. Winkler's letters carried an implicit threat, made explicit in a subsequent series of telephone calls: If the NRA failed to withdraw its lawsuit seeking access to AMc's records, AMc would publicize portions of those records tailored to cause maximum reputational damage to the leadership of the NRA. In other words, the agency would deploy a smear campaign with malicious intent to damage the NRA.

72.     On April 24, 2019, AMc caused its employee, North, to telephone an aide of Mr. LaPierre and relay the contents of yet another letter that AMc purportedly planned to disseminate. North emphasized that the letter would be "bad" for Mr. LaPierre and the NRA, and he described a laundry list of allegations the letter would contain: an unfavorable (and untrue) depiction of the

---

[20] *See* discussion *supra* at ¶ 53.

[21] Indeed, if Winkler or anyone at AMc had believed the expenses were improper, then AMc's fiduciary obligations required it to inform the NRA of suspected accounting improprieties. Instead, for more than a decade, AMc invoiced the NRA for the expenses without any such comment.

NRA's finances; sexual harassment accusations against an NRA staff member; and, as previewed in Defendant Winkler's letters, excerpts of wardrobe, travel, and entertainment expenses paid by AMc and then invoiced by it to the Association over the years.

73.     Tellingly, several categories of information referenced by North consisted of the same information the NRA had tried, but failed, to elicit from AMc under the Record-Examination Clause.  After withholding this information for more than six months in an attempt to stonewall the NRA's compliance efforts, AMc now threatened to strategically, selectively publicize the information in a manner calculated to cause harm to Mr. LaPierre and the Association. North stated that AMc would forbear from publicizing the "bad" letter if Mr. LaPierre agreed to withdraw the NRA's lawsuit seeking access to AMc's records, resign immediately from the NRA, and support North's continued tenure as NRA President.  If Mr. LaPierre cooperated, North indicated that he could "negotiate with" Ackerman co-founder Angus McQueen to secure an "excellent retirement" for Mr. LaPierre.

74.     The NRA does not take kindly to threats, and neither did Mr. LaPierre. Rather than accede to AMc's extortion, Mr. LaPierre wrote a letter to the NRA's Board of Directors that gave a transparent account of AMc's threat and concluded "so long as I have your confidence . . . I will not back down." As became widely publicized, Mr. LaPierre prevailed—and AMc's coup attempt failed.

**G.     Extortion's Aftermath:   Documents Vindicate the NRA's Concerns, And AMc Continues Its Attacks.**

75.     The NRA hoped that in the wake of these events, AMc would resume faithfully serving the NRA as the parties' contract and Virginia law required. Unfortunately, the NRA continued to receive media inquiries that strongly suggest there are misleading, defamatory "leaks" emanating from AMc. In other words, the NRA believes that AMc is now delivering on its

extortion threat. Tellingly, much of the information "leaked" by AMc concerns travel, wardrobe, and other expenses incurred in connection with AMc projects, based on AMc's advice, or on trips with itineraries crafted by AMc. Although it disseminates select portions of these records in an effort to convey misleading impressions about spending activities by the NRA's leadership, AMc knows full well that these particular expenses were proper because it was deeply involved in their occurrence.

76.     Discovery has corroborated one of the NRA's worst fears about AMc's billing practices—specifically, that AMc was double-billing multiple clients for the same work, or simply billing the NRA for time logged by its employees on non-NRA projects.  Dan Boren, an executive of Ackerman's second-largest client, the Chickasaw Nation, admitted by email dated April 15, 2019: "I bet Ackerman is in trouble on this one.  They can't produce the backup to the invoices and were allocating full salary to these employees that may have been working on our [Chickasaw Nation's] accounts."

77.     The NRA is informed and believes that AMc has fraudulently billed it, and perhaps other clients, for equipment as well as personnel.  Over the duration of the Services Agreement, AMc billed the NRA for at least $2.7 million in fixed assets consisting of audiovisual equipment and the like.

78.  Defendants' campaign of attempted coercion and intimidation of the NRA and Mr. LaPierre rose its ugly head again in the days before the NRA Board of Directors meeting in September 2019.  For the purpose of intimidating and undermining the leadership of the NRA, as well as potentially laying the ground work for a second attempted coup, on September 13, 2019, Defendants issued a corporate "press release" to the general public—but in fact intended for consumption by the members of the NRA Board of Directors—that attempted to cast doubt on the

judgment of the NRA's  leadership and to re-position Defendants as "the good guys."  In reality, this so-called "press release" was nothing more than a gaggle of lies, including the following misrepresentations:

- "Ackerman McQueen cooperated with every single audit NRA requested";

- "Ackerman McQueen never overcharged the NRA and retains records of all the work to prove it";

- "Every expense incurred on behalf of the [NRA] was directed by the NRA at the highest level, always with personal knowledge and approval of Wayne LaPierre;" and

- Outside counsel for the NRA "pursues . . . frivolous lawsuits" against AMc "for PR purposes and to serve as a distraction from the failure of NRA executives and its board to properly fulfill its oversight duties."

79.     The pattern of attempted extortion, coercion, and intimidation (oftentimes based on outright falsehoods) undertaken for the purpose of shuttering the NRA's legitimate and ongoing investigation into Defendants' fraudulent activities and ousting the current NRA leadership dedicated to enhanced compliance is clear as day.  No reasonable basis exists for the NRA to believe this campaign will stop in the foreseeable future and abate resorting to criminal malfeasance that risks harming not only the NRA, but Defendants' other clients as well.  The NRA brings this action to discover the full extent of AMc's breaches and frauds, recover its documents and property, and attain compensation for the damage it has sustained.

**H.     The Services Agreement Provides That The NRA Is The Owner Of All Creative Works And Intellectual Property Previously Developed And Used By AMc.**

80.     As noted above, the NRA and AMc worked together since the 1980s. Over that time, the NRA placed significant trust and confidence in AMc to perform public relations and

strategic marketing services, media planning and placement, and management of digital media and websites, including the management of NRATV.   Since at least 1999, AMc's work on behalf of the NRA was governed by successive incarnations of the Services Agreement, which specified the types of work that AMc performed for the NRA.

81.    Section VI of the Services Agreement is entitled "Ownership of Products."   In particular, it provides "[a]ll creative works developed by AMc in fulfilling its obligations under this Services Agreement . . . shall be the property of the NRA."   It continues: "All other, and further, intellectual property . . .   created or developed by AMc in fulfilling its obligations under this Services Agreement, are NRA's sole and exclusive property, and AMc does hereby assign all right, title and interest in same to NRA . . . ."

82.    Section VI of the Services Agreement also requires AMc to transfer and assign to the NRA the ownership of the copyright to all creative works developed by AMc for the NRA if those works are not otherwise encompassed by the Copyright Act.

83.    In addition, the NRA separately owns numerous copyrights, including for "NRA" and "National Rifle Association."

**I.    Despite The Termination Of The Services Agreement, Defendants Continue To Prominently Reference The NRA And NRATV On AMc's Website.**

84.    By letter dated June 25, 2019, the NRA terminated the Services Agreement effective "immediately."   Notably, AMc also purported to terminate the agreement by letter dated June 27, 2019, effective "immediately."

85.    Despite the termination of the Services Agreement, continued and/or continue to make unauthorized and unlicensed references, directly and indirectly, to the NRA and NRATV on its website, and continued and/or continue to make unlicensed and unauthorized use of the NRA's intellectual property rights.   Attached hereto as Exhibits A and C are depictions of those NRA

references and associated intellectual property rights on AMc's website as of August 29, 2019 and, for additional graphics added since that date, as of October 17, 2019, respectively.

86.     Specifically, AMc's website, directly and indirectly, references in an unauthorized an unlicensed manner the NRA and/or NRATV and uses its associated intellectual property rights, as follows:

- On the homepage, in describing who it is and what it does, AMc mentions its work with a "gun rights organization" and states that it "built media companies on behalf of … the Second Amendment to the Constitution";

- On a page entitled "Our Media Evolution," the website provides a timeline of AMc's projects for its clients, and also contains videos and photos relating to NRA TV;

- On a page entitled "Our Team," a photo appears with the caption "NRA Life of Duty," which was part of what Ackerman touts in its Counterclaims/Third Party Complaint as a "robust," "money-making, [and] profitable" advertising and branding campaign;[22] and

- On pages entitled "Gallery" and "Clients," a total of fifteen different references to the NRA and NRATV appear, which represents a greater number of references compared to any other AMc client.

87.     The portions of the AMc website submitted by Defendants in the Appendix supporting their Motion to Dismiss support this conclusion.

_____

[22] ECF No. 10 ¶¶ 7, 11.

88.     The references on AMc's website to the NRA and NRATV and the use of closely associated intellectual property are unauthorized in light of the termination of the Services Agreement and unlicensed generally.  In addition, the multitude of such references and related intellectual property, alone and taken together, foster consumer and customer confusion insofar as they falsely suggest to the public that the NRA remains an AMc client and endorses the services provided by AMc.  To the contrary, the NRA is not an AMc client and does not endorse AMc's services.

89.     For example, AMc's website falsely proclaims that NRATV is the "world's most comprehensive video coverage of freedom-related news, events and culture," which creates the misimpression that NRATV was a successful endeavor that the NRA endorses.  In actuality, the NRA recently concluded, despite years of false reporting and subterfuge from Defendants, that NRATV was a failed endeavor under any appropriate performance metric.  In fact, on or about June 25, 2019, the NRA suspended the "live TV" programming of NRATV.

90.     AMc's website also prominently features unauthorized and unlicensed NRA-owned photos and references to the NRA with greater frequency than any other AMc client.  That prominent display of the NRA and its associated intellectual property on AMc's website provides a strong inference that wrongly suggests to the public—and creates consumer and customer confusion—that the NRA presently endorses the services that AMc provides and that the NRA is currently AMc client, neither of which is true.  The fact that in the *past* AMc and the NRA had a commercial relationship does not alter, and ultimately has no bearing on, this conclusion.

91.     Defendants now contend that "the current version of AMc's website includes the word 'legacy' in connection with references to the 'NRA,'" and appear to imply that the NRA's

false association claim under the Lanham Act is somehow "moot," to use Defendants' words.[23] As shown in the Appendix submitted by Defendants in connection with their Motion to Dismiss,[24] the meaning and implication of the word "legacy" in the context used is, at best, ambiguous, compounds confusion, and far from clearly demonstrates that the NRA is no longer a client of AMc. For example, rather than expressly specifying a separate webpage or portion of thereof for "Legacy Clients," Defendants merely slapped the word "legacy" in the bottom right-hand corner of the NRA's graphics, without providing any further context. For these reasons, the use of the "legacy" verbiage does not save Defendants from having created a knowingly false portrayal that the NRA continues to remain an AMc client. To the contrary, the slap-dash and belated "fix" only amplifies the problem more.

92.     In any event, even assuming that the word "legacy" was appended to the bottom right-hand corner of the NRA graphics on or about October 1, 2019, and that one magic word could somehow "moot" any false association claims after that date, the word does not "moot" the NRA's false association claims arising *before* that date.[25]   That is, the false association and resulting public confusion manufactured by Defendants, undertaken for the purpose of gaining customers and increasing profits in the wake of losing its largest client, the NRA, began well before "legacy" was oddly shoehorned into the NRA's graphics.

93.     Nor does Defendants' transparent attempt to short-circuit NRA's false association Lanham Act claim impact the NRA's other false association theory. The supposedly talismanic

---

[23] ECF No. 10 ¶ 25.

[24] ECF No. 11 ¶ 5.

[25] ECF No. 10 ¶ 4. Tellingly, Defendants do not state in their Motion to Dismiss the precise date the word "legacy" was buried in the bottom right-hand corner of the NRA's graphics.

words of "legacy" and "moot" have no bearing on the NRA's claim that AMc's and Individual Defendants Martin's and Greenberg's unlicensed use of NRA intellectual property associated with NRATV on its website creates the false impression and attendant consumer and customer confusion that the NRA endorses, sponsors, and/or approves of NRATV, when in fact it does not. That theory does not turn at all on whether Ackerman has at some belated and unidentified point in time jammed the word "legacy" in the bottom corner of NRA graphics and intellectual property, because the NRA could, or could not, endorse, sponsor, and/or approve of NRATV either before *or* after it ceased being a client.  Nor do the supposed magic words impact either the NRA's copyright infringement claims and alternative claim for conversion.

**V.**

**CLAIMS FOR RELIEF**

**A.    Count One: Claims For False Association Under The Lanham Act, 15 U.S.C. § 1125(a)(1)(A) (Against All Defendants).**

94.    The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

95.    By intentionally maintaining numerous references to, and images of, the NRA and NRATV on AMc's website, Defendants are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of the NRA with AMc, or as to the NRA's approval of the services or commercial activities by Defendants, in violation 15 U.S.C. § 1125(a)(1)(A).

96.    Defendants are involved in interstate commerce.

97.    Defendants directly participated in, or are at least the moving force behind, AMc's website continuing to provide or otherwise create the false impression that the NRA (1) remains

or continued to be an AMc client after the termination of the Services Agreement and (2) endorses the services provided by AMc, in particular NRATV.

98.     The foregoing misconduct is without any legal justification and constitutes a knowing and willful violation of applicable law, including 15 U.S.C. § 1125(a)(1)(A).

99.     The NRA falls within the zone of interests protected by the Lanham Act, a lenient and flexible standard where doubts are resolved in favor of the plaintiff.  The NRA's interests are sufficiently related to the interests protected under 15 U.S.C. §§ 1125(a)(1)(A) and 1127 because Defendants used words, statements, and reproductions of the NRA's intellectual property in an unauthorized and unlicensed manner to create a false association between the NRA and AMc as to whether the NRA (1) remains or continues to be an AMc client and (2) endorses or approves of the services provided by AMc—in particular NRATV.  The NRA is suing not as a deceived consumer or as a direct competitor to Defendants, but as a person engaged in commerce within the control of Congress whose commercial position has suffered economic and/or reputational injury proximately caused by Defendants' false associations outlined above and their acts of unfair competition.  These interests plainly fall within the zone of interests protected by the Lanham Act, in keeping with the Supreme Court's holding that "most of enumerated" purposes of the Act "are relevant to false association cases." *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014).

100.    The NRA has been injured and has suffered damages by the unauthorized and unlicensed words, statements, and/or use of NRA intellectual property that created the false impression of association with AMc and the false endorsement of AMc's services.  Defendants placed their own financial interest in acquiring new customers and gaining additional profits through engaging in deceptive conduct, at a time when it had lost its largest client, the NRA.  It

41

did so at the expense of the NRA's lawful right to restrict and to limit the use of its name and related intellectual property rights in a non-misleading manner, thereby diminishing their value and causing financial injury to the NRA, including lost royalties, both presently and in the future. In addition, Defendants' Lanham Act violations. caused and/or will likely cause the NRA to suffer reputational harm and the loss of goodwill.   Accordingly, the NRA has suffered injuries that negatively impact its ability to compete in the marketplace.

101.    Such bad faith misconduct should be preliminarily and permanently enjoined, (even absent proof of damages), and the NRA should be awarded damages and/or equitable relief, including but not limited to forfeiture and disgorgement in the form of returning the ill-gotten revenues and/or profits earned by Defendants as a result of their violation(s) of 15 U.S.C. § 1125(a)(1)(A), in an amount to be proven at trial. *See, e.g.*, §§ 1116-1117.

102.    In addition, as a result of such misconduct, the NRA has been required to retain the undersigned counsel to prosecute the claims herein.  Pursuant to 15 U.S.C. § 1117, the NRA seeks to recover its attorneys' fees and costs incurred in this action.

**B.    Count Two: Copyright Infringement Under 17 U.S.C. § 101 *et seq.* (Against All Defendants).**

103.    The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

104.    The NRA owns numerous copyrights, including for "NRA" and "National Rifle Association."  In addition, the NRA owns or is the assignee of the copyright to all creative works developed for the NRA by AMc pursuant to the Services Agreement, some of which are present on AMc's website and can be found in Amended Exhibit A attached hereto.

105.    Defendants directly participated in, or are at least the moving force behind, AMc's website continuing to use and publish unauthorized and unlicensed copyrighted works owned by the NRA.

106.    Defendants' unauthorized and unlicensed continued publication of the NRA's copyrighted works constitute unlawful copyright infringement.

107.    The NRA is entitled to preliminary and permanent injunctive relief requiring Defendants to immediately and forever remove from their website and return all the NRA's copyrighted works.  This remedy is necessary to return and restore to the NRA the legal right to decide for itself whether and, if so, how to license, restrict, or otherwise limit the dissemination of its copyrighted material in commerce.

108.    In addition, the NRA is entitled to an award of actual damages and forfeiture and disgorgement of Defendants' ill-gotten revenues and/or profits, unpaid royalties, and/or statutory damages, for their infringing use and publication of the NRA's copyrighted works in an amount to be proven at trial.

109.    Pursuant to 17 U.S.C. § 505, the NRA is also entitled to recover its attorneys' fees and costs incurred in this action.

**C.    Count Three: Conversion (Against All Defendants).**

110.    The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

111.    In the alternative to its claims for false association under the Lanham Act and infringement under the Copyright Act, the NRA asserts the cause of action of conversion.

112.    The NRA is the exclusive owner of, and holds all right, title, and interest to, all creative works and intellectual property developed and used by AMc in fulfilling its obligations to the NRA under the Services Agreement.

43

113.    Despite the NRA's demands (see, for example, Exhibit B), Defendants have refused to remove from its website and return all such creative works and intellectual property.  As a result, Defendants unlawfully and without authorization continue to exercise control and dominion over the NRA's valuable creative works and intellectual property.

114.    Defendants' unauthorized use and publication of the NRA's creative works and intellectual property constitute intentional acts causing substantial interference, if not outright destruction, of the NRA's valuable property rights, to the detriment and harm of the NRA.

115.    In addition, the NRA is entitled to an award of damages, including damages for the full value of the stolen property and punitive damages, attributable to defendants' wrongful refusal to return its valuable creative works and intellectual property in an amount to be proven at trial.

116.    The tort of conversion is not pre-empted by the Copyright Act.  The rights that the copyright owner—here, the NRA—seeks to enforce under the common law doctrine of conversion are *not* equivalent to or the same as the rights sought or provided pursuant to the Copyright Act.  Here, the NRA seeks the ***total value*** of the intellectual property "converted," property that will never return.

117.    In contrast, in conjunction with its claim for copyright infringement the NRA seeks the effective return to the copyright holder of all the property rights inherent in copyright, specifically the right to control the use of the copyrighted material, the right to obtain payment of royalties in exchange for its use, or other damages to compensate the copyright holder for the diminution of and infringement on its rights.  Put differently, the principal features of relief for copyright infringement represent: (1) an injunction prohibiting further use of the property, (2) effective return of the property to the copyright holder, and (3) compensation for the lost royalties and/or the diminution in value associated with the unauthorized use.

118.    *None* of those remedies apply to the relief afforded and sought by the NRA with respect to its claim of conversion. In sharp contrast, the law of conversion in the context of remedies provides that the tortfeasor (1) keeps and uses the subject property for his/her own benefit, (2) does not to return the converted property to its rightful owner, and (3) pays damages for the total loss of value for the property, and *not* to pay for the *diminution or loss* of the property's value (as is the case for copyright infringement).  In short, the elements and remedies associated with a claim for federal copyright infringement and for common law conversion are *not* equivalent or substantially the same and serve two very different purposes, thereby precluding any notion that the Copyright Act could pre-empt the NRA's alternative claim for conversion.

**D.    Count Four: Fraud (Against All Defendants).**

119.    The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

120.    As alleged above, Defendants have engaged in an overarching scheme to defraud and extort plaintiff NRA, thereby causing it harm and putting it (and other AMc clients) at imminent risk of harm.  Accordingly, Defendants are liable for their misleading representations and/or non-disclosure of material facts.

121.    Beginning in at least 2016 and continuing through 2018 Defendants, in connection with the "annual budgeting process,"[26] described by Ackerman, Defendants—and in particular Defendants Winkler and Montgomery, as well as former CEO Angus McQueen—represented on multiple occasions that appropriate back-up documentation was retained by AMc for purposes of justifying and substantiating their billing statements and that such documentation could be audited

---

[26] ECF No. 12, at p. 23 ¶ 11.

at the NRA's request.  Defendants—in particular, Defendants Winkler and Montgomery—and McQueen likewise represented that their record-keeping was accurate.  These representations were made with the specific intent to have the NRA maintain or increase the annual budget for Ackerman and were made over the course of this "annual budgeting process," which occurred in the fourth quarter of the preceding budgetary year (i.e., the process for the 2017 budget would have occurred in Q4 2016).

122.    These representations were false when made, with a specific intent to induce the NRA to maintain or increase the annual budget for Ackerman.  As the NRA later discovered, for years *no one* at AMc kept or maintained reasonable documentation that would justify or support the accuracy of the sums of money AMc represented it was owed in the billing statements it sent to the NRA.  In addition, absent such record-keeping, a complete audit could not occur.  For these reasons, AMc's record-keeping was not accurate, contrary to Defendants' representations.

123.    McQueen and Defendants Winkler and Montgomery held senior executive positions at AMc and, as Ackerman admits, were specifically responsible for "budgetary compliance, invoicing, and payments" to the NRA.[27]  Accordingly, there is more than ample reason to believe that they must have known about, or consciously disregarded, the gross failure to maintain reasonable backup and supporting document in connection with their billing practices.

124.    These representations were material and reasonably and justifiably relied upon insofar as the NRA would never have agreed to a budget, much less the same or a greater budget, had the it known the complete truth.

---

[27] ECF No. 12, at p. 23 ¶ 12.

46

125.    Defendants also failed to disclose certain facts to the NRA during the "annual budgeting process."   In particular, they knowingly failed to disclose the fact that AMc often double-billed multiple clients for the same work, or simply billed the NRA for time logged by employees supposedly "dedicated" the NRA account for work they performed on non-NRA projects.  As Dan Boren, an executive of Ackerman's second-largest client, the Chickasaw Nation, revealed by email dated April 15, 2019: "I bet Ackerman is in trouble on this one.  They can't produce the backup to the invoices and were allocating full salary to these employees that may have been working on our [Chickasaw Nation's] accounts."  Defendants also failed to disclose that AMc had fraudulently billed the NRA, and perhaps other clients, for equipment in addition to personnel.  By failing to disclose these facts, Defendants intended to induce the NRA to maintain or increase the amounts NRA paid to Defendants.

126.    Defendants had a duty to disclose these facts because (1) they were fiduciaries of the NRA, as was AMc, in light of the (a) contractual language in the Services Agreement appointing it the agent of the NRA for purposes of public relations and advertising and/or (b) the longstanding relationship of trust and confidence in which the NRA relied on AMc that was separate and apart from the Services Agreement and (2) they had the obligation not to tell "half-truths."

127.    Defendants knew that the NRA was ignorant of these facts and did not have an equal opportunity to discovery the facts.

128.    Defendants Winkler and Montgomery held senior executive positions at AMc and, as Ackerman admits, were specifically responsible for "budgetary compliance, invoicing, and

payments" with respect to the NRA account.[28]  Therefore, there is more than a reasonable basis to believe that they knew about, consciously disregarded, the practice of overbilling with regards to personnel and equipment.   Accordingly, the false representations were made knowingly or recklessly and without knowledge of the truth.  For similar reasons, they knew that the information that they did not disclose to the NRA and were deliberately silent when they had a duty to speak.

129.   These false representations and/or fraudulent non-disclosures were material and actually, reasonably, and justifiably relied on upon the NRA.  As a result, the NRA has suffered injury and damages, in an amount to be proven at trial.  Had it known the complete truth, the NRA would never have agreed to an annual budget, much less the same or a greater budget, would have terminated AMc as its agent, and would have ceased conducting business with the agency.

130.   ***Fraudulent Billing.***  Beginning in at least 2016 and continuing through 2019, Defendants and AMc-employee Nader Tavangar would on at least a monthly basis (and sometimes more often) issue and send billing statements and invoices to their NRA counterparts representing that the NRA owed AMc certain amounts of money.  Given the fraudulent nature of the annual budgeting process, it should come as no surprise that many of the emailed billing statements were not only inaccurate, but false and misleading. These representations were made with the specific intent to have the NRA pay the amounts it purportedly owed.

131.   The billing statements were misleading in three principal respects.   First, Defendants caused sham bills to be sent that purported to seek payment for services that were never provided to the NRA.  Second, they caused bills to be sent to the NRA which sought to seek

---

[28] ECF No. 12, at p. 23 ¶ 12.

reimbursements in excess of the actual cost to AMc. Third, they caused bills to be sent to the NRA that were wholly unsubstantiated by any receipt or document, or any other shred of evidence.

132.   As an example, on September 17, 2018, Defendants emailed NRA Chief Financial Officer ("CFO") and Treasurer Craig Spray three "production invoices for [the month]"  Upon review of the vague, cursory, and unsubstantiated invoices, Spray responded and advised Defendants that they may not be following "best practices/compliance requirements," where "typically [a] three-way match process for processing a vendor invoice is required."  As explained to Defendants, the objective of "an audit compliant process" is "to ensure" that a vendor's request for payment "is complete and accurate" and "to highlight any discrepancies" in the supporting documentation.  At the time, Spray found Defendants' slip-shod billing practices concerning.  And for good reason.  Absent necessary backup documentation, a vendor has no factual basis to justify requesting the amounts of money provided on the billing statement or invoice.

133.   Defendants had a duty to disclose these facts because (1) they were fiduciaries of the NRA, as was AMc, in light of the (a) contractual language in the Services Agreement appointing it the agent of the NRA for purposes of public relations and advertising and/or (b) the longstanding relationship of trust and confidence in which the NRA relied on AMc that was separate and apart from the Services Agreement  and (2) they had the obligation not to tell "half-truths."

134.   Defendants knew the NRA was ignorant of these facts and did not have an equal opportunity to discovery the facts.

135.   Defendants and AMc employee Tavangar were responsible for the routine generation and transmission of fraudulent billing statements to the NRA and Defendants Winkler and Montgomery were specifically responsible for "budgetary compliance, invoicing, and

payments" with respect to the NRA account.[29]  Therefore, there is more than a reasonable basis to believe that they knew, or consciously disregarded, the truth, particularly with respect to the issuance of fraudulent billing statements and invoices that were wholly unsubstantiated due to the lack of back-up documentation.  Accordingly, the false representations were made knowingly or recklessly and without knowledge of the truth.  For similar reasons, Defendant knew the information that they did not disclose to the NRA and remained deliberately silent when they had a duty to speak.

136.    These false representations and/or fraudulent non-disclosures have caused the NRA to suffer injury and damages, in an amount to be proven at trial.  Had it known the complete truth, the NRA would never have agreed to pay the billing statements and invoices, would have terminated AMc as its agent, and would have ceased conducting business with the agency.  For these reasons, these representations and/or non-disclosures were material and actually, reasonably, and justifiably relied upon by the NRA.

137.    ***NRATV Fraudulent Misstatements and Non-Disclosures.***  Beginning in at least 2016 and continuing through 2019 Defendants—including but not limited to Defendants Montgomery, Martin, and Greenberg—made various fraudulent statements and/or failed to disclose material information in connection with NRATV.  Among other things, as alleged herein, Defendants in early 2016 made multiple representations to the NRA that the proposed  "owned media" digital platform known as NRATV presented "a good opportunity to generate revenue" and that developing and launching such a platform would "pay for itself," including paid commercial sponsorships for live programs.  In addition, at the thirteen specific meetings and in

---

[29] ECF No. 12, at p. 23 ¶ 12.

other communications to the NRA identified above, including communications made on May 13, 2019 and late October 2018, Defendants touted NRATV's performance and represented that the platform had certain valuations and generated millions of engagements and views.   These statements were made for the purpose of inducing the NRA to expand its investment in NRATV, to the benefit of AMc.

138.   These representations and omissions were false and misleading for multiple reasons.  First, the NRATV digital platform did not generate revenue and was never going to pay for itself, as demonstrated by the dismal viewership and sponsorship numbers that it generated in reality, consistent with the previous failure of a similar project with The American Clean Skies Foundation, a fact that Defendants did not disclose.   In addition, Defendants' repeated representations that the NRATV platform generated millions of viewers and touting of the platform's performance and valuation were in fact based on out-of-context statistics predicated on, among other things, aggregate viewership numbers that failed to differentiate between genuine views and merely incidental ones and counted all of the views from an individual, rather than the distinct number of viewers of NRATV content.  At no point did Defendants disclose that their purported viewership numbers were not based on actual data of the number of unique and genuine viewers.   Moreover, Defendants' inconsistent and contradictory viewership statistics and statements on the purpose of viewership numbers and the actual numbers themselves demonstrate the falsity of the statements.

139.   Defendants knew about failure of the similar digital platform that AMc had developed and operated for The American Clean Skies Foundation and, therefore, also knew that embarking upon a similar venture for the NRA would not present a good opportunity for revenue generation or pay for itself.  Defendants understood that their development (in particular, their

creation by Defendant Greenberg) and subsequent touting of NRATV viewership performance and valuations was not based on actual data comprising *unique* views, and likewise understood such data is readily available from third-party vendors given that Defendants hold themselves out as ostensible experts in digital marketing and advertising.  Therefore, there is more than a reasonable basis to believe that Defendants knew, or consciously disregarded, the truth about these matters.  Accordingly, the false representations were made knowingly or recklessly and without knowledge of the truth.

140.    Defendants had a duty to disclose these facts because (1) they were fiduciaries of the NRA, as was AMc, in light of the (a) contractual language in the Services Agreement appointing it the agent of the NRA for purposes of public relations and advertising and/or (b) the longstanding relationship of trust and confidence in which the NRA relied on AMc that was separate and apart from the Services Agreement  and (2) had the obligation not to tell "half-truths."

141.    Defendants knew that the NRA was unaware of these facts and did not have an equal opportunity to discovery the facts.

142.    The false representations and/or fraudulent non-disclosures have caused the NRA to suffer injury and damage, in an amount to be proven at trial.  Had it known the complete truth about NRATV, the NRA would never have invested a dollar in the project, and would have terminated AMc as its agent, and ceased conducting business with the agency.  For these reasons, these representations and/or non-disclosures were material and were actually, reasonably, and justifiably relied upon by the NRA.

**E.**    **Count Five:  Breaches of Fiduciary Duties (Against All Defendants).**

143.    The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

144.     Over the course of more than thirty years of close collaboration (including decades that precluded the Services Agreement), the NRA reposed extensive trust and confidence in, and relied upon, AMc.  Defendants, therefore, owed fiduciary duties to put the NRA's interests first when rendering services to the NRA.

145.     In addition, AMc incurred fiduciary duties to the NRA when it acted as the NRA's agent pursuant to multiple provisions of the Services Agreement.  For example, on the NRA's behalf and subject to the NRA's control, AMc entered into contracts and arrangements for the purchase, planning, and placement of media—activities that required AMc to be entrusted with sensitive confidential information pertaining to the NRA.

146.     Given their high-ranking positions at AMc and the importance of the NRA as its biggest client, Defendants were aware of the Services Agreement and understood the substance of its provisions and, therefore, served as agents and fiduciaries too.

147.     Because they acted in a fiduciary capacity, Defendants had a duty of loyalty to the NRA which forbade it from misusing the NRA's confidential information—especially with the malicious intent to damage the NRA.

148.     Furthermore, because they acted in a fiduciary capacity, Defendants had a duty of candor and to disclose all material facts to the NRA regarding the advice and services it provided. Defendants breached their fiduciary duties when they failed to disclose material facts to the NRA, including but not limited to failing to disclose in the following instances:

- Facts regarding AMc's billing and invoicing practices—for example by failing to disclose that appropriate support documentation was not retained by AMc and could not be audited by NRA at any time;

- Facts regarding NRATV performance, by withholding crucial performance metrics like "unique" and "genuine" individualized viewership data, and relatedly failing to disclose material facts regarding the inaccurate valuation of NRATV;

- Facts regarding the prior and failed "owned-media" project, Clean Skies TV.

- Fact that AMc often double-billed multiple clients for the same work, or simply billed the NRA for time logged by employees who were supposed to be fully "dedicated" to the NRA;

- Facts that AMc used equipment, billed to the NRA, for other clients' projects;

- Fact that bills emailed and mailed to the NRA contained inaccurate and false information, for example, bills seeking reimbursement for services that were never performed, that were in excess of the actual costs to AMc, and that were wholly unsubstantiated by supporting documentation; and

- Facts regarding the North Contract—for example including the fact that North had legal duties to AMc that superseded those he had to the NRA while NRA President, and the failure to comply with the digital documentary series requirements.

149.    In addition, Defendants as fiduciaries of the NRA had a duty of fair, honest dealing and a duty to act with integrity of the strictest kind.  Defendants breached these fiduciary duties when they engaged in the following conduct:

- Attempt to obstruct or to stop an investigation of Ackerman and its billing practices and NRATV by the NRA, including by repeatedly and flatly refusing to respond to legitimate and basic information requests from NRA executives;

- The first attempt of extortion undertaken by Defendant Winkler on August 27, 2018, which amounted to a violation of the criminal laws.[30]

- The second attempt of extortion undertaken by Defendant Winkler on April 22, 2019, which amounted to a violation of the criminal laws.[31]

- The attempted extortion undertaken by Oliver North on April 24, 2019, which amounted to a violation of the criminal laws.[32]

150.   As a direct and proximate cause of Defendants' breaches of their fiduciary duties, the NRA has suffered injury and incurred damages in an amount to be proven at trial.

151.   The NRA also seeks forfeiture and disgorgement of all amounts wrongfully obtained by Defendant on account of their breaches of their fiduciary duties, including, without limitation, all fees paid by the NRA to AMc since the date such breaches began, and at minimum forfeiture and disgorgement of any ill-gotten gain.

## F.   Count Six: Conspiracy (Against All Defendants).

152.   Each Defendant was a member of a combination or conspiracy involving two or more persons, one of whom, Dan Boren, was an individual not employed by Defendants.

153.   The object of the combination or conspiracy was to commit the fraudulent behavior, the attempts to de-railing the resulting NRA investigation, and the attempts to extort Mr. LaPierre

---

[30] Tex. Penal Code §§ 15.01, 31.01, 31.03; Va. Code Ann. §§ 18.2-26, 18.2-28, 18.2-59; Ok. Stat. Ann. §§ 1481-83, 1486.

[31] Tex. Penal Code §§ 15.01, 31.01, 31.03; Va. Code Ann. §§ 18.2-26, 18.2-28, 18.2-59; Ok. Stat. Ann. §§ 1481-83, 1486; In. Code §§ 35-45-2-1, 35-43-4-2, 35-43-4-2.

[32] Tex. Penal Code §§ 15.01, 31.01, 31.03; Va. Code Ann. §§ 18.2-26, 18.2-28, 18.2-59; Ok. Stat. Ann. §§ 1481-83, 1486; In. Code §§ 35-45-2-1, 35-43-4-2, 35-43-4-2.

and the NRA alleged herein.  The members of the combination or conspiracy had a meeting of the minds concerning the object of the combination or conspiracy or the course action.

154.    One of the members committed an unlawful and overt act to further the object or course of action, including but not limited to the Defendants' fraudulent acts described in Count Four and the breaches of fiduciary duty described in Count Five.

155.    The NRA has suffered injury and sustained damages as a result of the conspiracy, in an amount to be proven at trial.

**G.    Count Seven: Breach of Fiduciary Duty of Loyalty (Against All Defendants).**

156.    In the alternative, the NRA asserts the claims for breach of fiduciary duty and breach of contract that are currently at issue in the Virginia state court litigation ("the Virginia Claims").   Through the filing of its Counterclaim and Third-Party Complaint, *see* ECF No. 12, however, Ackerman has broadened this dispute to encompass a host of subject matters not directly raised in the Original Complaint.  Ackerman broadly contends that the NRA's original claims in this action "mandate[ ] . . . an inquiry into the NRA's and LaPierre's conduct" allegedly comprising "sinister and intentional efforts to destroy AMc's business" and "makes relevant an examination of the real reasons behind termination of the parties' [Services Agreement] . . . and an examination of the creation, operation and [allegedly] unquestioned success of NRATV."[33]   According to Ackerman, this "mandate[d]" inquiry includes the three allegedly "frivolous" lawsuits comprising the Virginia Claims.[34]  Based on Ackerman's logic, the NRA's Virginia Claims likely arise out of the same transactions or occurrences that are the subject matters of Ackerman's Counterclaim and Third-Party Complaint, and it is likely that the Virginian Claims would be considered compulsory

---

[33] ECF No. 12 p. 19, ¶ 1.

[34] *Id.* at p. 19 ¶ 2, pp. 31-32 ¶ 35.

counterclaims to this action.  In short, the Virginia Claims have been put at issue by Ackerman's Counterclaim and Third-Party Complaint

157.    The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

158.    Over the course of more than thirty years of close collaboration (including decades that precluded the Services Agreement), the NRA reposed extensive trust and confidence in, and relied upon, AMc.  Defendants, therefore, owed fiduciary duties to put the NRA's interests first when rendering services to the NRA.

159.    In addition, AMc incurred fiduciary duties to the NRA when it acted as the NRA's agent pursuant to multiple provisions of the Services Agreement.  For example, on the NRA's behalf and subject to the NRA's control, AMc entered into contracts and arrangements for the purchase, planning, and placement of media—activities that required AMc to be entrusted with sensitive confidential information pertaining to the NRA.

160.    Given their high-ranking positions at AMc and the importance of the NRA as its biggest client, Defendants were aware of the Services Agreement and understood the substance of its provisions and, therefore, served as agents and fiduciaries too.

161.    Because they acted in a fiduciary capacity, Defendants had a duty of loyalty to the NRA which forbade it from misusing the NRA's confidential information—especially with the malicious intent to damage the NRA.  Defendants breached this duty on multiple occasions AMc breached its fiduciary duty when it conspired to effect an out-of-context, partial disclosure of certain NRA confidential information to (i) a handpicked group of outside directors of the NRA., as well as (ii) the news media as part of its attempted extortion plot and to end the NRA's

investigation into AMc for the malicious purpose of smearing the NRA's reputation and facilitating its ultimately foiled coup plot.

162.     As a direct and proximate cause of Defendants' breaches of their fiduciary duties, the NRA has suffered injury and incurred damages in an amount to be proven at trial.

163.     The NRA also seeks forfeiture and disgorgement of all amounts wrongfully obtained by Defendants on account of their breaches of their fiduciary duties, including, without limitation, all fees paid by the NRA to AMc since the date such breaches began, and at minimum forfeiture and disgorgement of any ill-gotten gain.

164.     The NRA also seeks injunctive relief to prevent future disclosures of the NRA's confidential information.

**H.**     **Count Eight:  Breach of Contract (Against Defendants AMc).**

165.     The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

166.     For the reasons explained in paragraph ___, supra, in the alternative, the NRA asserts this breach of contract claim that is also part of Virginia Claims.

167.     The Services Agreement is a legally enforceable contract, and the NRA has performed all of its obligations under the Services Agreement.

168.     ***The  Records-Inspection  Clause***.  The  Records-Examination  Clause  is unambiguous.  The NRA has performed all of its obligations under the Services Agreement, including its obligation to provide reasonable notice pursuant to the Records-Examination Clause.

169.     Ackerman and Mercury have breached the Records-Examination Clause of the Services Agreement. Specifically, Ackerman-acting at all times on behalf of both itself and Mercury, pursuant to the Services Agreement-has repeatedly failed or refused to permit the NRA

to examine specified categories of books and records with respect to matters covered under the Services Agreement.

170.    There is no adequate remedy at law for AMc's refusal to permit examination of records (whether they reside at Ackerman or Mercury) pursuant to the Services Agreement.  The information sought by the NRA pursuant to the Records-Examination Clause resides uniquely within the possession of Ackerman and/or Mercury, and cannot be acquired by the NRA on the open market for any sum of money.

171.    The nature of the obligation imposed by the Records-Examination Clause makes specific performance equitable and practical because the Court need only order AMc to furnish to the NRA: (i) copies of any AMc-Third Party NRA Contracts, including the North Contract; and (ii) business records, in whatever form they were generated in the ordinary course of AMc's business, which are sufficient to convey the information sought by the NRA as described in the paragraphs above.

172.    Defendants' breaches of the Services Agreement have damaged—and threaten to imminently, irreparably harm—the NRA's legitimate operational interests as a not-for-profit organization. By denying the NRA access to basic information regarding the nature of the services being performed, the putative budgets for these services, and the material terms of third-party contracts for which the NRA is purportedly liable, Defendants have jeopardized the NRA's ability to steward its funds in pursuit of its public mission. Moreover, AMc's continued and baseless refusal to disclose material information relating to the North Contract threatens to impede the NRA's corporate governance.

173.    By reason of the foregoing, the NRA requests that this Court order specific performance by Defendants of their obligations pursuant to the Records-Examination Clause of the Services Agreement.

174.    *The Confidentiality Clause.*  Defendants have breached the provisions of Section IV of the Services Agreement by directly or indirectly disclosing, to third parties, information made known to AMc as a result of AMc's providing Services (as defined under the Services Agreement).

175.    Defendants' breaches have damaged the NRA. Among other things, the NRA has incurred significant reputational damage, and professional fees, as a result of Defendants' bad faith, out-of-context "leaks" to reporters. For example, the NRA's attorneys and public affairs professionals have spent extensive hours fielding inquiries from journalists in an effort to correct the misleading impressions sown by AMc.

176.    Defendants' breaches are escalating, and there can be little doubt that if its collaborator of multiple decades continues to maliciously disseminate its confidential information, the NRA will be irreparably harmed. The NRA is entitled to injunctive relief to avert or minimize this inseparable harm.

177.    Moreover, AMc's breaches are material—by seeking to destroy the NRA's reputation, AMc has destroyed the purpose of the parties' contract. Accordingly, the NRA is entitled to damages based on all of its remaining rights to performance under the Services Agreement.

178.    *The Return-of-Property Clause.*  The provisions of Section XI.E. of the Services Agreement are unambiguous and bind "AMc" (defined to include both Ackerman and Mercury).

179.     The NRA seeks possession of its property, fixed assets, materials, documents, and confidential information as defined in the Services Agreement.

180.     Both the NRA and AMc have provided notice of the immediate termination of the Services Agreement; thus, the NRA has an immediate right to possession of the NRA's property.

181.     The NRA's property is capable of identification. The NRA's property is defined in the Services Agreement and the NRA provided a partial list of its property in AMc's possession in the NRA's letter dated July 22, 2019, to AMc.

182.     In its July 22 letter, the NRA provided values for some of its fixed assets in AMc's possession. In addition, the NRA's confidential information and materials provided to AMc during their contractual relationship have monetary value.

183.     AMc is in possession of the NRA's Property and has wrongfully refused to return the NRA's Property.

184.     AMc has breached the provisions of Section XI.E. of the Services Agreement by failing to provide the immediate return of the NRA's Property.

185.     AMc has also breached the implied covenant of good faith and fair dealing ignoring the NRA's repeated requests to return the NRA's Property.

186.     AMc's breaches have damaged the NRA in an amount to be proven at trial

187.     Moreover, AMc's breaches are material. Accordingly, the NRA is entitled to damages based on all of its remaining rights to performance under the Services Agreement.

## VI.

## <u>DEMAND FOR JURY TRIAL</u>

188.     The NRA hereby demands a trial by jury on all issues of fact to which it is entitled to a jury trial in this action.

## VII.

## PRAYER

189.    For all the foregoing reasons, the NRA requests that the Court enter judgment in its favor and award it the following relief against AMc and the other Defendants:

      a.    Preliminary and permanent injunctive relief prohibiting Defendants, and each of their agents, servants and employees, and those persons in active concert or participation with any of them, from in an unauthorized and unlicensed manner: (1) showing any references to the NRA on AMc's website and in any other form of media; (2) using or displaying any logos or symbols affiliated with the NRA in connection with advertising, distribution, or display for sale of any product or service associated with AMc; (3) making in any manner whatsoever any statement or representation, or performing any act, likely to lead members of the public to believe that AMc is in any manner, currently directly or indirectly, associated, affiliated, connected with, authorized or approved by the NRA; and (4) taking any action, directly or indirectly, in any form or manner whatsoever that is likely to tarnish or disparage the business reputation of the NRA;

      b.    Compensatory damages for injuries sustained as a result of Defendants' wrongful conduct, in at least the amount of $40 million.

      c.    Punitive or exemplary damages in an amount to be determined at trial;

      d.    Forfeiture and disgorgement in an amount to be determined by the Court;

      e.    Costs of court;

      f.    Reasonable and necessary attorneys' fees;

g.      Pre-judgment and post-judgment interest at the highest lawful rate; and

h.      Such other relief, at law or in equity, to which it may be justly entitled.

190.    In the alternative, the NRA requests judgment in its favor against Defendants with respect to the following concerning the breach of the Return-of-Property Clause in the Services Agreement:

a.      Ordering that the NRA has proven its ownership rights and that AMc shall return the NRA's property immediately;

b.      Granting a pre-trial seizure of NRA property in the possession of AMc;

c.      Ordering the sheriff or other proper officer to seize NRA property and deliver the same to the NRA *pendente lite* under circumstances deemed appropriate;

d.      Granting NRA preliminary and permanent injunctive relief;

e.      Alternatively, granting NRA specific performance of the return of the NRA's Property or compensatory damages for a material, total breach of contract;

f.      Granting NRA punitive or exemplary damages; and

g.      Granting such other and further relief as the Court deems just and proper.

191.    In the alternative, the NRA requests judgment in its favor against Defendants with respect to the following concerning the breach of the Confidentiality Clause in the Services Agreement and the breach of the fiduciary duty of loyalty:

a.      Granting it preliminary and permanent injunctive relief, as well as other equitable relief such as disgorgement or forfeiture;

     b.      Granting it compensatory damages for material, total breach of contract, and breach of the fiduciary duty of loyalty, totaling $40 million;

     c.      Granting it punitive or exemplary damages; and

     d.      Granting such other and further relief as the Court deems just and proper.

192.    In the alternative, the NRA requests judgment in its favor against Defendants with respect to the following on the breach of the Records-Examination Clause in the Services Agreement:

     a.      A judgment against each of Ackerman and Mercury for breach of contract;

     b.      An award of specific performance to the NRA requiring that:

          a.      AMc furnish copies of all AMc-Third Party NRA Contracts to the NRA within three (3) business days of the entry of such order; and

          b.      Within ten (10) business days of the entry of such order, AMc furnish to the NRA:

               i.      Copies of annual budgets for the years 2016-2018, which AMc alleges were approved by the NRA and were previously provided to the NRA's forensic accountants;

              ii.      A list of all current NRA-Dedicated Personnel (as defined in the NRA's letter correspondence) and, for each such employee, copies of business records sufficient to show the amount or percentage of the employee's time that was dedicated to NRA projects during the period from January 1, 2018, to present;

iii.    Copies business of records sufficient to show the extent of any costs invoiced to the NRA or the NRA Foundation, during the period from January 1, 2018, to April 1, 2019, which costs were incurred by reason of:

1.    The production of the NRATV documentary series "American Heroes;" or

2.    Cash or non-cash compensation to North or North-related Staff; or

3.    Office space of other perquisites provided to North or North-related Staff; and

4.    Whether each item was billed specifically to the NRA, the NRA Foundation, or both entities; and

c.    Copies of business records (if any) reflecting North's availability to film American Heroes, any modifications to the American Heroes production schedule during the period from May 2018 to present, and the reasons for those modifications; and

d.    Such other and further relief to which the NRA may be entitled at law or in equity.

Dated:  October 25, 2019                    Respectfully submitted,

                                        **BREWER, ATTORNEYS &**
                                        **COUNSELORS**


By: */s/ Michael J. Collins*
     Michael J. Collins
     State Bar No. 00785493
     mjc@brewerattorneys.com
     Jason C. McKenney
     State Bar No. 24070245
     jcm@brewerattorneys.com
     1717 Main Street, Suite 5900
     Dallas, Texas 75201
     Telephone: (214) 653-4000
     Facsimile: (214) 653-1015

     **ATTORNEYS FOR PLAINTIFF THE**
     **NATIONAL RIFLE ASSOCIATION OF**
     **AMERICA**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served upon counsel of record in the above cause via ECF in accordance with the Federal Rules of Civil Procedure and the Local Rules on this 25th day of October 2019.

*/s/ Michael J. Collins*
Michael J. Collins

4829-7050-8971.4

# Exhibit A

The following images were obtained from the Homepage of the Ackerman McQueen website.[1]

Perhaps their vision motivated future peers to take control. Today, our leading voice for *motivation* comes from a shoe brand. *Independence* is owned by a computer company. *Extreme adventure* is presented by an energy drink. *Freedom* is the territory of a gun rights organization.

That's the one we created.

The best brands have always understood that the key to retaining influence was to control the narrative. But what they haven't always controlled was the means in which to distribute it.

This is where Ackerman McQueen's modern story begins.

## WE HAVE FOUND OURSELVES AT ODDS WITH MANY IN OUR INDUSTRY.

Those who crave mass impressions, viral videos or short-term results have never understood the lasting value of this type of media investment. Those who believe in this concept see it as the most efficient and unique means by which to build influence over time.

As we waited for the media industry to catch up, we honed our craft. We built media companies on behalf of theme parks, indigenous cultures, personal legacies, the Second Amendment to the Constitution and more. Each of these endeavors didn't grow their influence through full-page spreads, social media posts or TV spots alone. They recognized that there was white space in a narrative that they could control with years-long dedication to owned storytelling.

---

[1] Ackerman McQueen website, *Homepage*, https://www.am.com/ (last visited: Aug. 29, 2019).

The following images were obtained from the Ackerman Website webpage entitled "Our Media Evolution"[2]:



2016

# NRATV

*Broadcasting Second Amendment-related programming in live streaming HD, 24 hours a day, 7 days a week.*

NRATV offers the world's most comprehensive video coverage of freedom-related news, events and culture. No one else in the news media can match NRATV's authority, expertise and perspective on Second Amendment issues.

The NRATV network is comprised of four channels — NRA News presented by Ruger, NRA Women presented by Smith & Wesson, NRA Country and NRA Hunting — and features nearly three dozen original shows that include 20+ hours of live news and commentary, as well as investigative reports, lifestyle pieces, profiles and more. Every episode of every show is available on demand.

NRATV is available online, on Apple TV and Roku, and through Google Chromecast or Amazon Fire TV.

---

[2] Ackerman McQueen website, *Our Media Evolution*, https://www.am.com/projects/nratv-project/ (last visited: Aug. 29, 2019).

The following image was obtained from the page entitled "Our Team" on the Ackerman McQueen website[3]:



The following images were obtained from the page entitled "Gallery" on the Ackerman McQueen website[4]:

 

---

[3] Ackerman McQueen website, *Our Team*, https://www.am.com/our-team/ (last visited: Aug. 29, 2019).

[4] Ackerman McQueen website, *Gallery*, https://www.am.com/gallery/ (last visited: Aug. 29, 2019).  These images also appear on the Ackerman Website under the "Clients" tab within the "Gallery" page.



























# Exhibit B

OFFICE OF THE EXECUTIVE VICE PRESIDENT

11250 WAPLES MILL ROAD
FAIRFAX, VIRGINIA 22030



August 27, 2019

**<u>Via Email</u>**

Revan McQueen
Ackerman McQueen, Inc.
1601 Northwest Expressway, STE 1100
Oklahoma City, OK 73118

Re:  National Rifle Association of America / Ackerman McQueen, Inc. and Mercury Group, Inc.

Dear Revan:

On behalf of the National Rifle Association of America (the "NRA"), I am writing to you in your capacity as the Chief Executive Officer of Ackerman McQueen, Inc. ("Ackerman") and its wholly-owned subsidiary Mercury Group, Inc. (together, "Ackerman").

We have recently discovered that on its website, Ackerman continues to make reference to the NRA.  Not only is Ackerman's use of the NRA brand itself unauthorized and inappropriate, but its use is creating confusion in the marketplace for two reasons. First, as you know, the relationship between Ackerman and the NRA terminated. Second, Ackerman's use of the NRA brand is employed to create the false impression that the services rendered by Ackerman generally (and specifically in connection with NRATV) are endorsed by the Association.

We hereby demand that Ackerman immediately remove all references, direct and indirect, to the NRA and its intellectual property, (including NRATV) from its website and from any other form of media which makes reference to the NRA. As you know, Ackerman was terminated based, in part, upon the NRA's recent determination that significant cause exists to believe that Ackerman took money under false pretenses. In addition, it now appears that Ackerman was, for a significant period of time, actively misleading the Association's leadership regarding the performance of NRATV. Despite the now obvious fact that the digital network built and run by Ackerman was an abject failure, your website creates the false impression Ackerman's work on the "Second Amendment to the Constitution" and "Second Amendment issues" is endorsed by its former client – the NRA. Nothing could be further from the truth.

*(703) 267-1050*
*(703) 267-3989 fax*

Furthermore, in the "Gallery Section" of the Ackerman website, no entity is more prominently featured or named with greater frequency than the NRA. The site states that "with client approval, we can discuss the work [featured on the site] in more detail…" We demand to know if the agency has discussed its representation of the NRA with any of its current or potential clients since the NRA terminated the agency. For the avoidance of doubt, we do not grant Ackerman permission to discuss its work on behalf of the NRA nor do we endorse the work performed by the agency.

Ackerman's continued references to the NRA and its use of intellectual property owned by the NRA must cease immediately. Please contact the undersigned by the close of business tomorrow (Wednesday August 28, 2019) with your agreement to correct the blatant misuse of the NRA's assets – and the misleading impression that the NRA endorses the work performed by the agency in its behalf.

We appreciate your attention to this important matter.

Sincerely,

Andrew Arulanandam
National Rifle Association of America

cc: David Schertler

# Exhibit C

The following images were obtained from the Ackerman Website webpage entitled "Our Media Evolution"[1]













[1] Ackerman McQueen website, *Our Media Evolution*, https://www.am.com/projects/nra-news-project/ and ohttps://www.am.com/projects/nratv-project/ (last visited: October 17, 2019)













