## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| **Plaintiff and Counter-Defendant,** | § § | |
| **and** | § § | |
| **WAYNE LAPIERRE,** | § § | |
| **Third-Party Defendant,** | § § | |
| **v.** | § § | **Case No. 3:19-cv-02074-G** |
| **ACKERMAN MCQUEEN, INC.,** | § § | |
| **Defendant and Counter-Plaintiff,** | § § | |
| **and** | § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, AND JESSE GREENBERG,** | § § § § § | |
| **Defendants.** | § | |

## DEFENDANTS' AMENDED ANSWER
## AND DEFENDANT/COUNTER-PLAINTIFF ACKERMAN MCQUEEN, INC.'S
## AMENDED COUNTERCLAIM AND THIRD-PARTY COMPLAINT

Subject to and without waiving Defendants' pending Motion to Dismiss (Doc. 38), come

now Ackerman McQueen, Inc. ("*AMc*"), Mercury Group, Inc. ("*Mercury*"), Henry Martin

("*Martin*"), William Winkler ("*Winkler*"), Melanie Montgomery ("*Montgomery*"), and Jesse

Greenberg ("*Greenberg*") (collectively, "*Defendants*"), and file this, their *Amended Answer to

Plaintiff's First Amended Complaint* (the "*Complaint*") and *Counter-Plaintiff AMc's Amended

Counterclaim* (the "*Counterclaim*") and *Amended Third-Party Complaint* against Wayne LaPierre

("*LaPierre*") ("*Third-Party Complaint*") and respectfully show the Court as follows:

## I.      RESPONSE TO "PRELIMINARY STATEMENT"

The NRA adds these additional allegations and claims in order to expose a stunning pattern of corruption, fraud, and retaliation by Defendants that continues to come to light.  Since the NRA terminated its relationship with AMc last Spring, newly unearthed text messages, emails, and interviews with former AMc employees, customers, and others have made two things abundantly clear: *First*, AMc exploited decades of trust and confidence in order to siphon assets from the NRA, lining the agency's pockets at the expense of its client and in violation of the law. *Second*, AMc went to outrageous lengths to conceal and sustain its fraud, deploying scorched-earth tactics against anyone who dared to scrutinize its conduct. When the NRA's CEO, Wayne LaPierre, threw his weight behind efforts to gain transparency into AMc's business practices, the agency tried to oust him from the NRA in a desperate final salvo. That scheme failed. AMc now faces a long-overdue reckoning.

> **ANSWER:  Defendants deny the entirety of the first unnumbered paragraph of the Amended Complaint's Preliminary Statement.  Although Defendants admit that the relationship has indeed terminated, it was AMc who initially terminated the Services Agreement with the NRA.**

Until recently, the NRA could never have predicted that it would find itself at odds with its longtime advisor and vendor. Since at least the 1980s, the NRA relied on AMc as its agent to develop messaging, place advertising, and assist it in times of crisis. AMc's pugnacious messaging, reflected in its work with former NRA president Charlton Heston, favorably impressed NRA stakeholders. However, by 2017, the NRA was paying tens of millions to AMc annually, and many within the Association had grown suspicious that its experiment with a branded digital media platform was not working. The experiment had begun at the inducement of AMc in 2016 and with the intent to foster NRA membership growth, generate revenue and donations, and create a forum

for singularly promoting the NRA's viewpoint on Second Amendment issues. This became known as NRATV.

> **ANSWER:   Defendants admit that, until recently, the parties have had a favorable longstanding business relationship since the 1980s. Defendants lack knowledge or information sufficient to admit or deny what the NRA "could have predicted" or of what conduct it had "grown suspicious." Defendants specifically deny the remaining factual allegations in the second unnumbered paragraph of the Amended Complaint's Preliminary Statement.**

As AMc's bills grew ever larger, NRATV's messaging strayed from the Second Amendment to themes which some NRA leaders found distasteful and racist. One particularly damaging segment featured children's cartoon characters adorned in Ku Klux Klan hoods. Unfortunately, attempts by the NRA to "rein in" AMc and its messaging were met with responses from AMc that ranged from evasive to hostile. At the same time, when NRA executives sought performance metrics for NRATV, AMc contrived a pretext to demand that each interlocutor be sidelined or fired. Simultaneously, in closed-door meetings with Mr. LaPierre (which AMc insisted remain "confidential"), the agency presented fabricated and inflated sponsorship and viewership claims. The simple request for the number of "unique visitors" to the site was not answered, despite multiple attempts by Mr. LaPierre and other NRA executives. In fact, AMc's representations to the NRA leadership regarding the viewership for the digital platform it created, presented, and administered were, by 2017, intentionally (and wildly) misleading. Tellingly, when NRATV finally shut down in June 2019, no one missed it: not a single sponsor or viewer even called, confirming what at least some NRA executives suspected—the site had limited visibility and was failing the accomplish any of its goals.

> **ANSWER:  Defendants deny the entirety of the third unnumbered paragraph of the Amended Complaint's Preliminary Statement.**

Sadly, it is also now known that AMc's abuse of the trust placed in the agency neither began nor ended with NRATV. Since commencing its investigation into AMc's alleged abuses,

the NRA has acquired documents and information indicating that AMc fraudulently double-billed the NRA (and perhaps other clients) for professional time and equipment needs, among other things.  For example, during 2018, AMc billed the NRA for time spent by one of its highest-paid employees, Lt. Col. Oliver North ("North"), for filming an NRATV documentary series.  However, very little filming took place—because North was negligent in his contractual duties, as he focused time and energy in 2018 attempting to derail the NRA's inquiries into AMc's business and billing practices.  Those attempts culminated in an extortion threat delivered during the NRA's Annual Meeting in April 2019, when AMc, via North, demanded that unless Mr. LaPierre immediately withdrew the pending lawsuit against it and resigned from office, AMc would publicize portions of confidential documents misleadingly curated to cause maximum reputational harm to the NRA.  After Mr. LaPierre rebuffed AMc's threat and reported it to the entire Board of Directors of the NRA in an open letter, one of the agency's co-conspirators lamented privately: "[h]e is kicking our side's ass," and stated that Mr. LaPierre's challengers would benefit from "leak[ing] AMc's info."  Immediately, in stark violation of its contractual and fiduciary duties, AMc proceeded to "leak" the threatened documents.  To this day, AMc continues to breach its nondisclosure obligations and wage false, punitive reputational attacks against the NRA and Mr. LaPierre.  Considering the multi-faceted scheme perpetrated on the NRA, it is beyond doubt that AMc and the other Defendants believe they are above the law.

> **ANSWER: Defendants deny the entirety of the fourth unnumbered paragraph of the Amended Complaint's Preliminary Statement.**

Notwithstanding the termination of the parties' Services Agreement, AMc and the other Defendants continue to improperly refer, directly and indirectly, to the NRA on AMc's website and to use the NRA's intellectual property rights.  Those references and use of associated intellectual property rights are not only unauthorized and unlicensed, but also falsely suggest that

the NRA endorses AMc's services in connection with NRATV, which it does not.

> **ANSWER:   Defendants admit that the parties' Services Agreement has terminated, but specifically deny that AMc "improperly" references the NRA on its website in any manner, engages in any "unauthorized" or "unlicensed" use of NRA intellectual property, or "falsely suggest[s]" NRA's endorsement of AMc's services.**

AMc's website also includes references to other failed client representations—to create the false impression that *all* of the featured campaigns were successful, including NRATV. Many of these campaigns, which cost clients tens of millions of dollars, were shut down because of their ineffectiveness, costliness, and Defendants' reluctance to provide specific performance data in accordance with its obligations.  Accordingly, the NRA brings claims to enjoin AMc and the other Defendants from continuing to falsely make claims in public regarding their services to the NRA. In addition, the NRA brings this action to enjoin any further infringing and unauthorized or unlicensed use of its brand or its copyrights on the part of AMc.

> **ANSWER:   Defendants deny all factual allegations within the sixth unnumbered paragraph of the Amended Complaint's Preliminary Statement, particularly the suggestion that its website contains references to "other failed" relationships or that campaigns were "shut down."  Defendants admit that the NRA seeks injunctive relief in the present action, but denies that they have engaged in any infringement, false claims, or other improper conduct that would entitle the NRA to such relief.   Defendants deny that the NRA is entitled to any of the relief sought in the Amended Complaint.**

Finally, the NRA seeks to redress AMc's breaches, and subdue AMc's ongoing bad acts, so that it can close this regrettable chapter of its history.

> **ANSWER:  While Defendants agree that the events forming the basis of this lawsuit are indeed "regrettable," Defendants specifically deny any "breaches" or "bad acts" that would entitle the NRA to the relief it seeks, and deny that the NRA is entitled to any of the relief sought in the Amended Complaint.**

## II.      PARTIES AND RELEVANT NON-PARTIES

### A.    Plaintiff and Counter-Defendant the NRA

1.      Plaintiff the NRA is a not-for-profit corporation organized under the laws of the

State of New York with its principal place of business located in Fairfax, Virginia. The NRA is America's leading provider of gun-safety and marksmanship education for civilians and law enforcement. It is also the foremost defender of the Second Amendment of the United States Constitution. A 501(c)(4) tax-exempt organization, the NRA has approximately five million members, hundreds of thousands of donors, and many millions more who support its legendary advocacy.

> **ANSWER:  Defendants admit those portions of paragraph 1 that are factual in nature.  Defendants can neither admit nor deny the self-laudatory opinions expressed therein and therefore deny same.**[1]

2.      The NRA is the Counter-Defendant to the Counterclaims and Third-Party Claims filed by AMc on October 1, 2019.

> **ANSWER:  Defendants admit the allegations in paragraph 2.**

**B.      Defendants**

3.      Ackerman is a for-profit business corporation organized under the laws of the State of Oklahoma with its principal place of business located in Oklahoma City, Oklahoma. It admits that is an advertising and public relations agency that counted the NRA as its largest client for more than thirty years. Ackerman maintains a principal office in Dallas, Texas, out of which the NRA's account was serviced. That office is located at 1717 McKinney Avenue, Suite 1800, Dallas, Texas 75202. Ackerman is a Defendant in the original action filed by the NRA on August 30, 2019, as well as a Defendant to the additional causes of action asserted in this First Amended Complaint. It is also a Counterclaimant and Third-Party Plaintiff in connection with the

---

[1] It should be noted that the reference to hundreds of thousands of donors creates a misleading impression.  *See* Class Action brought by a major NRA donor as class representative, on behalf of others similarly situated, casting serious doubt on these and other self-congratulatory offerings by the NRA.  Case No. 3:19-cv-00679, styled *David Dell Aquila v. Wayne LaPierre, the National Rifle Ass'n, and the NRA Foundation*, in the Middle District of Tennessee; *see also* https://www.thedailybeast.com/national-rifle-association-fundraising-letter-we-could-shutter-very-soon   (reporting on $55 million reduction in annual donations 2015-2017).

Counterclaims and Third-Party Claims it filed on October 1, 2019.

> **ANSWER:  Defendants admit the allegations in the first, fifth, and sixth sentences of paragraph 3.  Defendants deny that the NRA was AMc's "largest client for more than thirty years." Defendants also deny that the NRA was "serviced" exclusively out of AMc's Dallas office, and instead was serviced from several other AMc offices in addition.  Finally, Plaintiff alleges the incorrect address for AMc's Dallas office.**

4.      Defendant Mercury is a for-profit business corporation organized under the laws of the State of Oklahoma with its principal place of business located in Alexandria, Virginia. Mercury is a wholly-owned subsidiary of Ackerman and specializes in public communications strategy, including on behalf of advocacy groups such as the NRA. Mercury was a party to the Services Agreement (defined below) with the NRA. Mercury maintains a principal office in Dallas, Texas, from which it serviced the NRA's account. In particular, that office is located at the same address as Ackerman's Dallas office—1717 McKinney Avenue, Suite 1800, Dallas, Texas 75202. Mercury engaged in all the wrongful conduct detailed in this amended complaint.

> **ANSWER:  Defendants admit that Mercury is AMc's subsidiary, that it is located in Alexandria, Virginia, that it provides active public communications strategy, and that as AMc's subsidiary, it was a party to the Services Agreement with the NRA.  Defendants deny that Mercury maintains any type of corporate office in Dallas, Texas, and denies that the corporate address listed for AMc is correct.  Defendants further deny that Mercury has engaged in any "wrongful conduct," either in connection with its performance under the Services Agreement or otherwise.**

5.      Defendant Winkler resides in Edmond, Oklahoma. Winkler is affiliated with business entities located in this District, including DJ Investments LLC, which operates in this District under the assumed name of 3905 Amherst Ave UPT, LLC and owned property at 3905 Amherst Ave Dallas (University Park), Texas 75225, and WBB Investments LLC, a Texas limited liability company. During the relevant time period, Winkler served in the senior leadership of Ackerman as Chief Financial Officer.  He is also a certified public accountant.  During the relevant time period, Winkler and other senior AMc officers and employees travelled to this District for

meetings with NRA officials at Ackerman's Dallas offices and/or other locations within this District.  These activities are relevant to the claims asserted herein because they concerned, among other things, AMc's billing practices and representations about NRATV's performance and viewership.  Winkler engaged in wrongful conduct detailed in this amended complaint.

> **ANSWER:  Defendants deny that Winkler is affiliated with any entity called 3905 Amherst Ave UPT, LLC, and further deny that Winkler ever traveled to the Dallas office of AMc to discuss "AMc's billing practices" or "representations about NRATV's performance and viewership."  Defendants deny that Winkler engaged in any wrongful conduct.  Defendants admit the remaining allegations in paragraph 5.**

6.      Defendant Montgomery resides in Dallas County, Texas with her place of business located at Ackerman's Dallas, Texas offices. During the relevant time period, Montgomery held several roles, including the Executive Vice President/Management Supervisor, and, as stated on Ackerman's website, has "work[ed] on the [NRA] account." Montgomery engaged in wrongful conduct detailed in this amended complaint.

> **ANSWER:   Defendants admits the allegations in the first two sentences paragraph 6, denying the remaining allegations.**

7.      Defendant Martin is an individual who resides in Dallas County, Texas.  Martin has served as Ackerman's Chief Creative Officer since 2010. During the relevant time period, Martin participated in the conduct which forms the basis of this suit, including, but not limited to, his participation and work in connection with the NRATV website and digital platform.

> **ANSWER:  Defendants admit the allegations in the first sentence of paragraph 7, denying the remaining allegations.**

8.      Defendant Greenberg is an individual who resides in Dallas County, Texas.  During the relevant time period, Greenberg served as Ackerman's Chief Strategy Officer. Greenberg participated in the conduct which forms the basis of this suit, including, but not limited to, his participation and work in connection with the NRATV website and digital platform.

**ANSWER:  Defendants admit the allegations in the first two sentences of paragraph 8, denying the remaining allegations.**

C.     **Unnamed, Non-Party Co-Conspirators and Relevant Non-Parties**

9.     Dan Boren is an individual who is an executive of the Chickasaw Nation and not an employee of AMc. Mr. Boren entered into an agreement, combination, and/or conspiracy with the Defendants for the purpose of carrying out the fraudulent behavior, the attempt to de-railing the resulting NRA investigation, and the attempt to extort Mr. LaPierre and the NRA alleged herein. In addition, there exists a small group comprising former vendors, professionals, and consultants of the NRA whose economic incentives, like AMc's, were challenged by the NRA investigation and, like Mr. Boren, joined the agreement, combination, and/or conspiracy.

**ANSWER:  Defendants admit that Dan Boren is not an employee of AMc and deny the remaining allegations in paragraph 9.**

10.     Oliver North is an individual who resides in South Carolina and/or the Commonwealth of Virginia. Mr. North is a former president of the NRA. Unbeknownst to the NRA until recently, North is also a full-time employee of Ackerman.

**ANSWER:  Defendants admit the allegations in the first two sentences of paragraph 10, denying the remaining allegations.**

## III.     JURISDICTION AND VENUE

11.     The Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338, because this is a civil action involving claims arising under the laws of the United States.

**ANSWER:  Defendants admit the allegations in paragraph 11.**

12.     The Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367, because the state law claims are sufficiently related to the other claims in the action subject to original jurisdiction that they form part of the same case or

controversy under Article III of the United States Constitution.

> **ANSWER:** Defendants admit the allegations in paragraph 12.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District. As stated above, during the relevant time period, NRA senior officers and employees would regularly travel to this District to hold meetings with Defendants. These meetings are relevant to claims asserted herein and concerned Defendants billing practices and NRATV. Defendant AMc has also admitted that it maintains a principal office in Dallas, Texas, out of which the NRA's account was serviced. Three Individual Defendants work out of that office, which also doubles as a corporate office for Defendant Mercury.

> **ANSWER:** Defendants admit the allegations in paragraph 13, except to deny any suggestion or implication that Mercury maintains a principal office or any type of corporate presence in Dallas County, Texas.

## IV.     FACTUAL BACKGROUND

### A.     For Decades, The NRA Relied On Ackerman To Perform Public Affairs Services Requiring A High Level of Trust

14.     The NRA and AMc worked closely together for more than 30 years. In 2017 alone, the NRA paid more than $40 million to AMc. Over that decades-long relationship, the NRA reposed extensive trust and confidence in AMc to perform a wide range of services, including public relations and strategic marketing; planning and placement of media; management of digital media and websites; and the management of NRATV, a digital-media platform frequently perceived by the public as the "voice" of the NRA. By its nature, this work was publicly and politically sensitive and required the NRA to entrust AMc with confidential (and often privileged) information.

> **ANSWER:** Defendants admit that AMc performed a wide range of services for the NRA during the parties' multi-decade business relationship, but lack

**knowledge as to the level of trust and confidence "reposed" in AMc during that time. Defendants deny that the NRA paid "more than $40 million" to AMc, to the extent that such allegation implies that the sums paid were for services actually rendered by AMc. Defendants deny that AMc was entrusted with "privileged" information as part of its performance under the Services Agreement.**

15.     AMc's work on behalf of the NRA was governed by successive incarnations of a Services Agreement containing detailed specifications for how various types of work performed by Ackerman should be budgeted and billed. Each Services Agreement provided that certain categories of services, such as Owned Media and Internet Services, would be compensated with an agreed annual fee, while other services were required to be invoiced on an *ad hoc* basis based on estimates furnished by AMc and approved by the NRA.  Consistent with the sensitive nature of AMc's services, the Services Agreement strictly limits use and disclosure by AMc, and its individual employees (who were themselves fiduciaries of the NRA), of information acquired during AMc's work on behalf of the NRA.

**ANSWER:  Defendants admit the allegations of paragraph 15 and that the Services Agreement speaks for itself, except that Defendants deny the legal conclusion that AMc or any of its individual employees were fiduciaries of the NRA.**

16.     Specifically, Section IV of the Services Agreement provides that AMc "shall not disclose, directly or indirectly, to any third party, any ... data, materials or information ... made known to AMc as a result of AMc's providing [contracted-for services] . . . without the prior express written permission of [the] NRA." AMc may use the NRA's confidential information "only for the limited purpose of providing its [s]ervices to the NRA," and AMc "warrants and agrees to prevent disclosure of Confidential Information by its employees, agents, successors, assigns and subcontractors."

**ANSWER:  Defendants admit that the referenced Services Agreement speaks for itself.**

17.     Notably, AMc served as the NRA's agent for several purposes pursuant to the Services Agreement and as a consequence of the trust and confidence placed in AMc by the Association. Therefore, AMc owed fiduciary duties to the NRA. For example, the Services Agreement provided for AMc to act "on [the] NRA's behalf," and subject to the NRA's control, with respect to purchasing, planning, and placement of media—activities that required the NRA to entrust AMc with nonpublic information about its communication strategy. In its capacity as the NRA's agent, AMc was required to demonstrate "the same high standard of good faith and loyalty" to the NRA as would be "required ... of an attorney to his client." Indeed, owing to the parties' decades of close collaboration, their relationship of trust and confidence existed prior to, and apart from, the execution of the Services Agreement. AMc's common-law duties of loyalty were further codified and buttressed by contractual confidentiality provisions.

**ANSWER:  Defendants lack knowledge sufficient to admit or deny the NRA's level of "trust and confidence" in AMc, and therefore deny same.  Defendants specifically dispute and deny the legal conclusion that AMc or any of its employees were agents or fiduciaries of the NRA at any point during the parties' business relationship.**

18.     AMc monthly invoiced the NRA for a wide variety of expenses. Consistent with the substantial scope and dollar value of the services rendered by AMc for the NRA, the Services Agreement contained detailed guidelines identifying categories of expenses that could be invoiced to the NRA, and conditions for their reimbursement. For example, hotel and meal expenses were required to be authorized in writing, in advance, by the NRA. Over the parties' decades-long course of dealing, underlying receipts and other support for AMc's expenses were not transmitted to the NRA alongside AMc's invoices but, rather, were supposedly maintained at AMc's offices. This practice was followed at AMc's suggestion, in order to ensure that AMc's work pertaining to matters such as donor development, strategic planning, and legal items remained confidential.

**ANSWER:  Defendants admit the allegations in the first sentence of paragraph**

18, denying the remaining allegations.

19.     Of course, the NRA was *repeatedly* assured that appropriate documentation was retained by AMc and could be audited anytime at the NRA's request. Indeed, AMc offered elaborate assurances not only that its recordkeeping was secure and accurate, but that AMc was the *most* secure repository for travel itineraries and other documents raising potential security issues.  It is now known that these representations were false when made, with a specific intent to induce the NRA to maintain or increase its reliance on AMc. The NRA has only recently discovered that for years *no one* kept or maintained reasonable documentation that would justify or support the accuracy of the sums of money AMc represented it was owed in the billing statements it sent to the NRA.

**ANSWER:  Defendants deny the allegations in paragraph 19.**

20.     Given its responsibilities, AMc took an active role in shaping the public image of the NRA's principals and executives, including Mr. LaPierre.  Based on AMc's advice, and subject to billing procedures AMc recommended and established, Mr. LaPierre, over a fifteen-year period, incurred wardrobe and related expenses for countless television appearances, filming of commercials, and other outward-facing brand-development activities. The majority of those activities were specifically directed, choreographed and produced by AMc. As such, expenses were initiated at AMc's direction and records relating thereto were to be maintained by AMc. Of course, AMc should not have incurred (let alone sought reimbursement for) any expenses which it believed inappropriate.

**ANSWER:  Defendants deny the allegations of paragraph 20, except to admit that AMc took an active role in shaping the public image of LaPierre.**

B.     Branded News—The Growth of NRATV

21.     During the late 1990s, under the leadership of its then-president, AMc decided to

radically alter its business from that of a traditional ad agency to a creator and broadcaster of original media content. AMc saw the growth of digital networks as an opportunity for large entities to craft and advance their own brand messaging through television production. It saw the content-production business as lucrative, exciting, and cutting-edge, but did not consider or care whether its clients would actually benefit from such services. If AMc could hawk "television-style production" at a profit, it would do so—and it did.

**ANSWER:** Defendants deny the allegations in paragraph 21.

22.     AMc touted its new business philosophy as follows:

EVERY BUSINESS AND INDIVIDUAL HAS THE ABILITY TO BECOME A MEDIA COMPANY

If you have an audience that cares about what you have to say, you can create and distribute content with complete autonomy. No one else should capture or distribute those stories better than you. And in this era of communication, it has never been more affordable or efficient for you to begin.

**ANSWER:** Defendants admit that the quoted language in paragraph 22 can be found on AMc's website. Defendants deny its characterization as a "new business philosophy" but respond that it is simply describing one of the many types of services offered by AMc.

23.     Of course, fundamental to AMc's optimism about its "new" direction was its belief that it could convince its largest client, the NRA, to "buy into" the concept. Thus, in the early 2000s, AMc set out to induce the NRA to finance the creation of its own branded news platform. Plying the NRA with glowing prognostications about the lucrative benefits of "owned media," AMc persuaded the NRA to launch its initial digital-video platform known as "NRA News" in 2004. The NRA had long relied on AMc to place advertising via traditional media, including conventional television channels. To AMc, the funds remitted to real media outlets were funds available for the Association "to invest" in building studios and other assets from which AMc might profit. NRA News was the beginning of that effort.

**ANSWER:  Defendants deny the allegations in paragraph 23, except to admit that AMc did indeed, at various times, "place advertising via traditional media, including conventional television channels," for the NRA.**

24.    The annual budget for NRA News quickly, substantially climbed, from $1.6 million in 2004 to $4.594 million by 2014. For example, from 2004 through 2014, there was some evidence that NRA News was attracting the viewership AMc promised: even late at night, live programs with call-in components seemed to be generating promising call volume. AMc generated glossy, confidential PowerPoint presentations—which it would display for the NRA during meetings but would refuse to provide "in writing"—that claimed that NRA News generated tens of millions of valuable engagements and views.

**ANSWER:  Defendants deny the allegations in paragraph 24.**

25.    Based on the reported success of NRA News, the NRA agreed to experiment with an expanded version of the platform. Beginning in 2016, AMc CEO Angus McQueen ("**McQueen**") began lobbying Mr. LaPierre with glowing projections about the benefits of expanded programming on an NRA-branded digital platform.  Seeking to induce Mr. LaPierre to substantially increase the NRA's investment in the media segment to over $10 million dollars, McQueen seized on the rise of digital media and persuasively claimed that developing such a digital platform was simply "part of being a 21st century company" and that "we can't let the status quo continue."  Emphasizing the need to act quickly, McQueen stated that the "NRA needs to lead change in the marketplace" and "not become a follower." Tying his themes together, McQueen asserted that the NRA "must put its message in all delivery systems," including the expanded digital platform.

**ANSWER: Defendants deny the allegations in paragraph 25.**

26.    Highlighting the concept's financial viability, McQueen pressed that "we must vastly modernize the entire economic under-performance of [the] NRA."  Ultimately, he pointedly

emphasized that the "NRA needs to find new ways to make money" and that the digital platform concept presented "a good opportunity to generate revenue." Indeed, Defendants assured the NRA that its substantial investment would "pay for itself" in short order, via a combination of "soft" and "hard" monetization, including paid commercial sponsorships for live programs. In fact, AMc assured the NRA that based on its experiences for other clients that this substantial investment would "pay for itself" within three years max. In reliance on these representations, the digital platform was launched in 2016 under the brand NRATV.

**ANSWER:  Defendants deny the allegations in paragraph 26.**

27.     Although the creative content generated for NRATV constituted work for hire for copyright purposes (and was owned by the NRA), NRATV was managed and controlled—its talent hired and supervised, and its programming scripted—by AMc. From the outset, NRATV was expensive, costing more than $12 million in its first year. However, AMc claimed that the largest subset of this expense, which pertained to live programming, was "the key" to the success of the platform. Having served the NRA for decades, AMc knew what its client desired in the digital media space: (1) outreach to new potential members (especially of a younger generational cohort), (2) a self-sustaining platform, and (3) a vehicle to advance its mission and Second Amendment advocacy.  AMc represented that NRATV would be built and managed to serve these purposes.

**ANSWER:  Defendants deny the factual allegations and legal conclusions in paragraph 27, except to admit that AMc hired and supervised talent and programming for NRATV.**

28.     Within NRATV's first year, AMc falsely reported that the platform generated millions of "engagements" and views. Noting the NRA's keen interest in the platform's viewership and sponsorship figures, AMc promised to bring consulting a firm, Performance Improvement Partners ("PIP"), to provide "data analytics and insights" tracking NRATV's performance. In the

interim, AMc purported to update the NRA regularly on NRATV's metrics.  During meetings held on the following dates, at the following locations, AMc staff—generally consisting of Nader Tavangar, Peter Farrel, Revan McQueen, and Defendants—delivered PowerPoint presentations boasting that NRATV consistently generated millions of views, including "completed" and "engaged" views:

| Meeting Date | Meeting Location |
|---|---|
| October 24, 2017 | Teleconference/Polycom |
| November 28, 2017 | Mercury Group Offices |
| January 3, 2018 | Ackerman Offices (Dallas, Texas) |
| February 1, 2018 | Las Vegas, Nevada |
| February 19, 2018 | Ackerman Offices (Dallas, Texas) |
| April 11, 2018 | Ackerman Offices (Dallas, Texas) |
| September 4, 2018 | Teleconference/Polycom |
| October 11, 2018 | Ackerman Offices (Dallas, Texas) |
| October 23, 2018 | Teleconference/Polycom |
| October 30, 2018 | Ackerman Offices (Dallas, Texas) |
| November 28, 2018 | Teleconference/Polycom |
| December 5, 2018 | Teleconference/Polycom |
| January 18, 2019 | Ackerman Offices (Dallas, Texas) |

**ANSWER:  Defendants deny the factual allegations in paragraph 28, except to admit that the referenced meetings did occur.**

29.     In these closed-door meetings (which Ackerman insisted upon, ostensibly for reasons of "confidentiality"), with Mr. LaPierre and sometimes others from the NRA leadership in attendance, Defendant Montgomery and others made purposely inflated sponsorship and viewership claims now known to be false in order to induce the NRA to continue investing millions upon millions in NRATV and, by extension, AMc. In each of the thirteen meetings listed in the above chart, Defendants led the NRA to believe that NRATV's viewership numbered in the millions and that Defendants were generating many millions of dollars in value for the NRA. They

did so not with facts or evidence but through a carefully coordinated scheme to present misleading, out-of-context, and conjured-up statistics for the consumption of the NRA leadership.

**ANSWER:  Defendants deny the allegations in paragraph 29.**

30.     Of course, viewership is the *raison d'etre* of digital advertising and content creation. By creating attention-catching content, digital creators and their marketing firms aim to develop a base of loyal viewers who will eventually support the organizations who create it. This, in turn, attracts advertisers and sponsors for the programming or other digital content, which pay based on the number of *unique* "eyeballs" or "click-throughs" provided by the content. As digital marketing has become increasingly important for businesses and non-profits alike, an entire industry has arisen which collects, aggregates, analyzes, and presents viewership data.  That data— which can be so granular as to identify *distinct individual viewers* of digital media—can provide valuable insight to organizations seeking to develop their brand and win the loyalty of the viewing public. However, due to content creators' heavy reliance on these digital metrics, inaccuracies can be consequential and damning.

**ANSWER:  Defendants deny the allegations in paragraph 30.**

31.     Over the course of more than thirteen meetings and countless emails, Defendants systematically misrepresented and overstated the viewership performance of NRATV.  In response to the consistent inquiries of NRA leadership generally, and Mr. LaPierre specifically, Defendants fabricated or massaged data in an intentionally misleading fashion to falsely suggest a robust, growing viewership for NRATV. In reality, AMc knew—based on underlying, unvarnished, fulsome metrics that it intentionally withheld from the NRA—that NRATV was an abject failure.

**ANSWER:  Defendants deny the allegations in paragraph 31.**

32.     AMc's contrived, cherry-picked figures misrepresented NRATV's viewership data in at least two respects.

**ANSWER:  Defendants deny the allegations in paragraph 32.**

33.      *First*, the figures presented by Defendants fraudulently misrepresented or  omitted the number of distinct viewers of NRATV content. It is fundamental that the nominal quantity of "clicks," or "views," achieved by particular digital content is of minimal informative value, including because each "click" or "view" does not necessarily represent a unique user. For example, a user's web browser might automatically refresh a video or a page at routine intervals, simulating hundreds or thousands of views; less egregiously, a single user might intentionally click on a piece of content multiple times—which is favorable, but not as valuable as clicks from several separate viewers.  Accordingly, responsible media companies disaggregate their total click figures and discern, using data provided by Google and other analytics services, the total number of distinct users. AMc declined to do that. Instead of providing an accurate account of the number of distinct users—a number which AMc knew would raise the alarm that NRATV was failing— AMc provided only aggregate data, thereby creating the false impression that NRATV had substantially more unique viewers than it actually did. That false representation was intended to induce the NRA to continue its investment in NRATV and, by extension, AMc.

**ANSWER:  Defendants deny the allegations in paragraph 33.**

34.      *Second*, the figures presented by Defendants fraudulently inflated NRATV's viewership figures by failing to rigorously differentiate between genuine views and merely incidental ones. Genuine views represent instances in which a user encounters content and then volitionally interacts with it in some way—rather than immediately navigating elsewhere. Merely incidental views, by contrast, are "views" which occur only because an individual user happens to scroll past NRATV content on a webpage. The importance of this distinction is obvious. While genuine viewers represent those who actually watch NRATV content and thus are exposed to the NRA's messaging and ideas, merely incidental viewers are not. Although AMc occasionally

purported to distinguish total views from "engaged" views, its calculations overrepresented the number of "engaged" views.

**ANSWER:** **Defendants deny the allegations in paragraph 34.**

35.     The presentation made by senior corporate executives of AMc to the NRA leadership in October 11, 2018 (one of the meetings identified in the chart) is illustrative of the agency's efforts to hoodwink the NRA through tortured, fraudulent statistics and misleading generalizations about the platform's performance. Just as they had done in previous meetings, AMc produced a glossy PowerPoint presentation which purported to, in the words of Defendant Montgomery, present "all things NRATV," including its "analytics." It did nothing of the kind. Rather than candidly discuss NRATV's disastrous performance, known internally to Defendants, Defendant Montgomery falsely touted its success. For example, the presentation asserted that NRATV was "the strongest media outlet covering the Second Amendment," and that NRATV had seen "tremendous increase[s] in [the] time spent on the site." Each of these representations was accompanied by a bevy of out-of-context and misleading statistics. Not once did Defendant Montgomery or any other Ackerman employee disclose the crucial actual and unique viewership data that would contradict her misleading statements about the performance of NRATV. Among the outrageous representations made was that the total viewership of NRATV, in a mere eight months, had received over *two-hundred million views*, thereby suggesting that NRATV content had reached two-thirds of the United States.  This representation, like the many others made during the course of AMc's meetings with NRA executives regarding NRATV, was fraudulent and false—and AMc knew it.

**ANSWER:** **Defendants deny the allegations in paragraph 35, except to admit that a meeting did occur on October 11, 2018.  Defendants deny that any such presentation was given at this meeting.**

36.     Apparently not content to hide from the NRA the platform's actual viewership

figures, Defendants also concocted a series of "valuations" which had no basis in reality. For example, in Q3 2018, representatives from the NRA and AMc, including Defendants Montgomery, Martin, and Greenberg, held a meeting to discuss the valuation of NRATV. At the meeting, Defendants touted a proprietary "AM Conservative Approach" formula, which it insisted provided a conservative estimate of the Earned Media Value (EMV) generated by NRATV in excess of $13 million. Adopting a separate, less-conservative formula, Defendants represented that NRATV should actually be valued at $45 million annually, a figure justified by citing "total views" of NRATV content. In addition to being based on "total view" figures that Defendants knew to be misleading for the reasons discussed above, the more fundamental problem with these "valuations" is that they have no basis in fact. Rather, by presenting these valuations and contending they are based on a proprietary formula, Defendants intentionally deceived the NRA into believing that its substantial investment in NRATV was generating outstanding returns when, in fact, the primary beneficiary of the initiative were the Defendants.

**ANSWER:  Defendants deny the allegations in paragraph 36.**

37.      Further illustrating the slipshod and dishonest approach to valuation, in a meeting held on October 11, 2018, at AMc's offices in Dallas, Texas, and in correspondence dated May 13, 2019, Defendant Montgomery made representations that purported to calculate the value of the NRA's digital media presence. Using a formula based solely on the "cost to get . . . published"— that is, the cost to AMc—Montgomery presented a valuation based, not on the value the NRA received, but on putative costs incurred by AMc.  In doing so, Montgomery effectively represented on behalf of Defendants that, in paying AMc to conduct digital media operations, the NRA was receiving substantial value on its investment. That representation was not based upon any reliable measure of the benefit the NRA received due to its digital media presence; the sole measure of the "value" used by AMc was its own profitability.

**ANSWER:  Defendants deny the allegations in paragraph 37, except to admit that a meeting did occur on October 11, 2018.**

## C.      Troubled Waters: The Demise of NRATV

38.      By 2017, the annual budget for NRATV grew to over $20 million annually—a number that was viewed by NRA leadership as unsustainable without tangible proof that the platform would soon monetize itself.  As described above, the Association began, in 2017, to press AMc for actual, reliable proof that the platform was reaching its projected objectives or deliverables—membership growth, actual unique viewership information, and/or signs that others (*e.g.,* advertisers or sponsors) would invest in the platform.

**ANSWER:  Defendants deny the allegations in paragraph 38.**

39.      At the same time, the leadership of the NRA—especially Mr. LaPierre—began to question whether the messaging associated with NRATV's live programming actually served as a benefit to the Association's mission. As NRATV often became viewed as a dystopian cultural rant that deterred membership growth, NRA leadership requested greater directional control and coordination over the content of NRATV programming.

**ANSWER: Defendants deny the allegations in paragraph 39. To the extent that NRATV became viewed as a "dystopian cultural rant," responsibility for the "deterred membership growth," if any, is due to the acts and omissions of Plaintiff NRA and Third-Party Defendant LaPierre, himself.**

40.      As these factors coalesced, the ownership at AMc—fearing the loss of its most important income-producing activity—became increasingly secretive, hostile and determined to "protect" its "economics" with the NRA.

**ANSWER:  Defendants deny the allegations in paragraph 40.**

41.      In what has turned out to be an unfortunate "public reveal" of AMc, it is now known that NRATV was, by the dawn of 2018, a reflection of what AMc itself had become—an economic burden to the NRA. Infected by a bizarre sense of entitlement, by 2018, the leadership of AMc

seemed to believe that it was "entitled" to an unfettered flow of tens of millions of dollars from the NRA—whether or not it actually served the best interests of its client. Although the agency had, undeniably, provided benefits to the Association for many years, by 2018 it is now known that AMc was riddled with corruption, driven by the greed of its leadership and determined to entrench its "cash flow" from the NRA.

 **ANSWER:  Defendants deny the allegations in paragraph 41.**

 42. As the trial in this matter will reveal, the NRA was victimized by its most trusted vendor. And in many ways, the unravelling of NRATV provides useful insight into the demise of AMc.

 **ANSWER:  Defendants lack the knowledge to admit or deny whether AMc was Plaintiff's "most trusted vendor," and therefore deny same.  Defendants deny the remaining allegations in paragraph 42.**

 43. Importantly, AMc had reason to know that even its most conservative projections for NRATV were fanciful. By 2016, when NRATV debuted, another AMc client had already agreed to experiment with the "owned media" concept—and it was an unmitigated failure. The American Clean Skies Foundation ("ACSF"), an energy-industry advocacy group, hired AMc in 2008, and was promptly sold a bill of goods similar to the one pitched by AMc to the NRA, including an "owned media" digital-video channel. ACSF's ensuing experience with AMc, and the resulting "Clean Skies TV" product, was so disastrous that ACSF's former general counsel contacted the NRA and offered assistance with this lawsuit, noting: "I'm pleased to see [AMc] get called on their practices finally." After ACSF's reasonable requests for information about  Clean Skies TV's budgets and operations went unanswered, ACSF fired AMc in 2009. Even as it made elaborate representations to the NRA that digital video "owned media" was the future of public relations, and that the steep costs associated with NRATV would easily be recouped, AMc concealed the failure of Clean Skies TV.

**ANSWER:** **Defendants deny the allegations in paragraph 43.**

44.     On. May 13, 2019, AMc finally responded in writing to the latest of numerous requests for unique live viewership figures for NRATV. Incredibly, AMc's response still did not disclose unique viewers for NRATV platforms. Instead, an accompanying letter from Defendant Montgomery disclaimed years of assurances regarding the monetization potential of NRATV. In the most direct response offered by AMc to date regarding the NRA's requests for unique-viewer data, Montgomery simply stated: "[L]ive production is in place for several reasons, *not one of which was to accumulate massive live viewership numbers*." Of course, this is nonsense: since 2016, AMc touted NRATV's purported viewership numbers as a primary driver of its claimed valuation. Of course, there was no other logical reason for the NRA to invest in NRATV than to gain large viewership numbers, without them, none of the stated goals of increased membership and sponsors would be possible. And it did not. It was all a hoax.

**ANSWER:** **Defendants deny the allegations in paragraph 44.**

45.     Ultimately, facing a "wind-down" of its services and cessation of payments from the NRA, AMc finally admitted that the NRA "could conceivably stop the live stream component of NRATV without significantly affecting the network's viewership performance[.]" In other words, the most expensive component of NRATV (and thus the most profitable for AMc) was generating de minimis value, if any, with respect to primary metric of interest to the NRA: viewership.

**ANSWER:** **Defendants deny the allegations in paragraph 45.**

46.     During 2019, *The New York Times* reportedly reported on an independent assessment of NRATV's unique viewership figures. That assessment determined that NRATV's "web traffic was miniscule, with 49,000 unique visitors in January [2019]"—compared to the millions of visitors claimed by AMc.  It is now known that those paltry numbers—stunningly small

when compared to AMc's representations regarding viewership—are overstated.  In fact, when the Association shut down NRATV in June 2016, not a single reaction emerged.

**ANSWER:  Defendants deny the allegations in paragraph 46, except to admit that the referenced article was published.**

**D.**      **The NRA's Transparency Efforts and Ackerman's Response**

47.      In recent years, the State of New York amended its Not-for-Profit Corporation Law (the "NPCL") to clarify requirements for director independence and the ratification of related-party contracts, among other items. After updating its internal policies and controls to reflect these amendments, the NRA undertook to strengthen its procedures for documentation and verification of compliance by vendors with their contracts. Beginning in August 2018, the NRA sent letters to more than a hundred vendors—including AMc—that set forth updated invoice-support requirements and provided detailed guidance regarding, for example, expense reimbursement procedures.

**ANSWER:   Defendants lack knowledge to admit or deny the allegations contained within paragraph 47, including any changes to New York law, the updating of NRA internal policies and controls, or whether the NRA sent letters to other vendors besides AMc. Defendants admit that AMc received a letter like the one described in paragraph 47 but deny that it provided the "detailed guidance" Plaintiff alleges.**

48.      Simultaneously, as the NRA's now-former Treasurer and CFO prepared to retire and the NRA leadership ranks shifted, multiple employees began to voice recommendations regarding opportunities for improvement at the NRA. Combined with the NRA's compliance efforts, numerous employees came forward with complaints about AMc.

**ANSWER:  Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 48.**

49.      Specifically, the NRA was compelled to investigate multiple concerns about AMc:

- "Out of pocket" expenses that lacked meaningful documentation of NRA

approvals, receipts, or other support, despite the requirements set forth in the Services Agreement;

- Immense growth in AMc's annual budgets, coupled with a lack of transparency regarding how the budgets were calculated or whether AMc adhered to them;

- Lack of transparency regarding AMc's compliance with its contractual obligation to ensure that services were provided at "fair market value";

- Concerns that AMc was invoicing the NRA for the entire salaries attributable to NRA-Dedicated Personnel, despite certain NRA-Dedicated Personnel allocating substantial time to *non*-NRA clients; and

- Refusal by AMc to provide data "in writing" (such as unique visitors, viewership numbers, click through rates, or related performance metrics) that enable the NRA to analyze the return on its substantial investment since 2016 in NRATV.

**ANSWER:  Defendants lack knowledge sufficient to admit or deny what the NRA felt "compelled" to do.  Defendants deny the allegations and implications in paragraph 49.**

50.    Consistent with the broad scope and critical nature of the services performed by AMc for the NRA, the NRA bargained for transparency into AMc's files, books and records pursuant to the Services Agreement. Both the previous Services Agreement and the current iteration incorporate Records-Examination Clauses that require AMc to open its files for the NRA's inspection upon reasonable notice. The full text of the Records-Examination Clause in the Services Agreement appears below:

> **Services Agreement**
> - Dated April 30, 2017 (as amended May 6, 2018)
> - Between the NRA and "AMc" (defined to include both Ackerman and Mercury)

> **VIII. EXAMINATION OF RECORDS**
> During the term of this Services Agreement, AMc authorizes NRA, upon reasonable notice, to examine AMc and Mercury's files, books and records, with respect to matters covered under this Services Agreement.

**ANSWER: Defendants deny the allegations contained in paragraph 50, except to admit that the most recent Services Agreement contained the quoted clause.**

51.     During early- and mid-2018, the NRA sought information from AMc pursuant to the Records-Examination Clause on a common-interest basis to advance parties' mutual interests relating to an ongoing lawsuit. However, after the NRA began to request access to records that would shed light on concerns regarding AMc's business and accounting practices, AMc became evasive and even hostile.

**ANSWER:  Defendants deny the allegations in paragraph 51.**

52.     In August 2018, within days after the NRA announced that it would now require supporting documentation to be transmitted contemporaneously with vendor invoices, a media outlet quoted "an anonymous source at Ackerman McQueen" [footnote omitted] –creating serious concerns about AMc's compliance with its confidentiality obligations.

**ANSWER:  Defendants cannot admit or deny whether the NRA experienced "serious concerns" about anything, and therefore deny same.  Defendants deny all other allegations in paragraph 52.**

53.     On August 27, 2018, Defendant Winkler sent a letter to the NRA which purported to comply with the NRA's request for a more comprehensive audit of Ackerman's expense records. The letter pointedly identified several categories of items, some relating to travel and entertainment, which it warned would be encompassed in a full production of those records— perhaps believing that the threat of such disclosure would dampen the NRA's demands for transparency. However, the NRA was undeterred, and insisted upon reviewing and verifying details of expenses incurred.

**ANSWER:  Defendants lack knowledge sufficient to admit or deny whether**

the NRA was "undeterred" in the manner it describes, and therefore deny same.  Defendants admit that Winkler sent a letter to the NRA on the referenced date, but deny all other factual allegations and implications in paragraph 53.

54.      In September 2018, for the first time in the parties' decades-long course of dealing, AMc demanded that its outside counsel supervise any document review conducted under the Records-Examination Clause, then demanded payment of outside counsel's legal fees as a precondition for delivery of video footage it produced and for which AMc had already invoiced the NRA. During a telephone call on September 19, 2018, after AMc's counsel insisted that the NRA pay AMc's legal fees without any insight into why the fees were incurred, the NRA's counsel observed that AMc's posture seemed more consistent with an adverse than a common-interest relationship. AMc's counsel then made a startling statement: "Ackerman views the relationship as adverse."

**ANSWER:  Defendants deny the allegations in paragraph 54.**

55.      Around the same time, an NRA executive asked AMc for a copy of an audit purportedly conducted by PIP, one of the independent digital-analytics vendors purportedly retained by AMc, regarding the value of NRATV. Departing sharply from prior conversations, AMc cursorily informed the executive that no audit had been performed, and no copies of any documents would be provided. Rather than audit AMc's reported viewership metrics, AMc explained that PIP had "worked with" AMc to create a purported "dashboard" of digital analytics; AMc promised it would "go through all of that" during an upcoming live meeting.

**ANSWER:  Defendants deny the allegations in paragraph 55.**

56.      Thereafter, AMc strenuously resisted the NRA's efforts to enforce the Services Agreement, including by embarking on a campaign to "kill the messenger" when the NRA continued to seek access to documents or proposed reductions in AMc's budget. At first, AMc

scapegoated the NRA's outside counsel—refusing to interface with counsel. Then, over ensuing months, AMc also refused to respond to basic information requests from NRA executives. After the NRA retained a third-party forensic accounting firm to interface with AMc in an effort to appease AMc and gain its compliance in January 2019, AMc indicated it would cooperate. Unfortunately, that pledge of cooperation was short-lived, as AMc purported to forbid the accountants from disclosing simple, material information to the NRA—including copies of annual budgets against which AMc was invoicing. When the NRA's General Counsel sought additional information in follow-up to the forensic audit, AMc ignored his letters.

**ANSWER:** **Defendants deny the allegations in paragraph 56.**

57.     As AMc continued to stonewall the NRA's requests for documents and tensions between the parties rose, the NRA was contacted with increasing frequency by journalists acting on purported "leaks" relating to matters on which AMc had worked.  The contents of these "leaks" reflected a malicious, out-of-context use of the NRA's confidential information, with an apparent intent to damage the NRA.

**ANSWER:** **Defendants lack sufficient knowledge to admit or deny whether Plaintiff was contacted by journalists, and therefore deny same.  Defendants deny the remaining allegations in paragraph 57.**

58.     To resolve its concerns regarding these disclosures, on May 6, 2019, the NRA requested that several key AMc employees execute sworn declarations attesting that they had not violated their confidentiality obligations under the Services Agreement. The NRA tailored its request narrowly—seeking declarations only from senior executives who had exposure to the information at issue—and demanded simply that these executives affirm they had complied, and would continue to comply, with their clear legal duties.  To the NRA's dismay, AMc flatly refused to provide any cooperation or assurances whatsoever.

**ANSWER:** **Defendants admit that a request for certain onerous and**

unreasonable "sworn declarations" was made on the referenced date, but deny
the remaining allegations in paragraph 58.

E.      **Among the Records Unlawfully Withheld By AMc: A Major Related-Party Contract**

59.     Non-party North is a veteran of the United States Marine Corps and the Reagan
Administration. North is also a member of the NRA Board of Directors. During May 2018, the
NRA announced that North was slated to serve as its next President—a largely ceremonial but
high-profile position famously occupied by Charlton Heston during the late 1990s. As Col. North
prepared to assume the presidency of the NRA, he separately discussed a potential engagement by
AMc as the host of an NRATV documentary series.  On May 6, 2018, the NRA and AMc amended
the Services Agreement (such amendment, the "May 2018 Amendment") to affirm that any
contract between AMc and North would be considered an AMc-Third Party NRA Contract, for
which outstanding compensation would be owed by the NRA to AMc if the Services Agreement
was terminated. Importantly, the amendment treated North as a third-party contractor—but not,
necessarily, an employee—of AMc.

> **ANSWER:**  Defendants admit the first three sentences of paragraph 39. With
> regard to the fourth sentence, Defendants deny that North "separately
> discussed" the engagement with AMc as the details of his engagement were
> personally negotiated by Wayne LaPierre and Woody Phillips.  Defendants
> neither admit nor deny the allegations in the fifth sentence, which purport to
> interpret a legal document that best speaks for itself.  Defendants deny the
> remaining allegations and legal conclusion in paragraph 59.

60.     North and AMc assured the NRA that North's profile and "brand" would be
actively leveraged to elicit sponsorships for the documentary series. This was of material interest
because during recent years, the NRA had spent substantial sums on NRATV based on AMc's
advice and representations regarding achievable benefits of an owned-media platform. However,
measured against any of the desired outcomes, the returns on the NRA's investment in NRATV
were non-existent.  Accordingly, if the North documentary series attracted sponsorships or sparked

viewership and membership growth, then the costs associated with NRATV could be defrayed.

**ANSWER:  Defendants deny the allegations in paragraph 60.**

61.    New York law requires that the NRA Board of Directors, or an authorized committee thereof, review and approve "any transaction, agreement, or any other arrangement in which [a director or officer of the NRA] has a financial interest and in which the [NRA or an affiliate] is a participant." Guidance published by the New York Attorney General notes that a board of directors may define additional restrictions on transactions giving rise to potential conflicts of interest; and, consistent with best practices, the NRA's Conflict of Interest Policy requires disclosure of contracts between NRA leadership and vendors, like AMc, that receive funds from the NRA.

> **ANSWER:  Defendants neither admit nor deny the legal conclusions contained within the first and second sentences of paragraph 61, which require no response.  Defendants lack knowledge sufficient to admit or deny allegations regarding the NRA's internal policies regarding disclosure of contracts, and therefore deny same.**

62.    Aware that North entered into a contract with AMc (the "North Contract"), the NRA, with the cooperation and authority of the Audit Committee, diligently sought to comply with its obligations concerning analysis and approval of the North Contract. During September 2018, the Audit Committee of the NRA Board of Directors (the "Audit Committee") reviewed a purported summary of the material terms of the North Contract and ratified the relationship pursuant to New York law—subject to carefully drawn provisos designed to avoid any conflicts of interest.

> **ANSWER:  Defendants admit that Colonel North entered into a contract with AMc and that the NRA Audit Committee reviewed, approved, and ratified that contract.  Defendants are without sufficient information to admit or deny the remaining allegations in paragraph 62, and therefore deny same.**

63.    At the time Audit Committee ratified North's continued service as an NRA director

and President given his relationship with AMc, it was assured that the NRA's counsel would review the North Contract in full. But that turned out to be false, at least for the duration of 2018, as AMc continued to refuse to provide the North Contract pursuant to the Records-Examination Clause. Meanwhile, North indicated via counsel that he could only disclose a copy of the contract to the NRA subject to AMc's consent.  This back-and-forth persisted for nearly six months.

**ANSWER:  Defendants deny the allegations in paragraph 63.**

64.      Eventually, in February 2019, AMc acceded to a brief, circumscribed, "live" review of the North Contract (but no retention of any copies) by the General Counsel of the NRA. This review raised concerns about whether the previous summary of the North Contract which was provided to the Audit Committee had been complete and accurate.  Among other things, the NRA's brief, limited review of the North Contract—along with other information disclosed for the first time by North—gave rise to questions regarding: (i) whether North was a third-party contractor of AMc or, conversely, a full-time employee with fiduciary duties to AMc that supersede his duties to the NRA; (ii) whether the previously disclosed costs borne by the NRA in connection with the North Contract were complete and accurate; and (iii) whether the contract imposed obligations on North that prevent him from communicating fully and honestly with other NRA fiduciaries about AMc. Against the backdrop of escalating concerns about AMc's compliance with the Services Agreement and applicable law, the NRA became determined to resolve these issues.

**ANSWER:  Defendants deny the allegations in paragraph 64, except to admit that the NRA's General Counsel indeed reviewed the North Contract.**

65.      By separate letters dated March 25 and 26, 2019, the NRA's General Counsel again sought visibility regarding the North Contract and related business arrangements, as well as copies of other material business records pursuant to the Services Agreement. Specifically, the NRA requested:

- A chance to conduct a follow-up review of the North Contract (the NRA's General Counsel even volunteered to conduct the review at AMc's attorney's offices, for AMc's convenience);

- Information about any additional costs relating to AMc's engagement of North, to the extent that such costs were being "passed through" to the NRA;

- Copies of any additional AMc-Third Party NRA Contracts currently in existence;

- Information about which AMc personnel purportedly constituted "NRA-Dedicated Personnel," such that their salaries or severance were alleged to be reimbursable by the NRA, and business records sufficient to show whether these personnel were in fact dedicated to NRA projects; and

- Copies of the annual budget documents provided to the NRA's forensic accountants.

**ANSWER:  Defendants admit that AMc received letters from the NRA's General Counsel on the alleged dates requesting certain information related to the North Contract. Defendants deny the purported characterization and validity of those letters and respond that the documents best speak for themselves.**

66.    The NRA made clear that it sought the above information "in whatever form [wa]s most convenient" for AMc and hoped to obtain access to ordinary-course business records as contemplated under the Records-Examination Clause.  Although AMc immediately acknowledged receipt of the letters and promised to respond substantively, it did not.

**ANSWER: Defendants admit that they received letters from the NRA General Counsel and acknowledge receipt of same.  Defendants deny the remaining allegations in paragraph 66.**

67.    Meanwhile, the NRA began to suspect that the information it previously received regarding the North Contract was misleading. The May 2018 Amendment classified North as a

third-party contractor of AMc—but in actuality, the North Contract treated him as a full-time employee, with legal duties to Ackerman that superseded his duties to the NRA. Moreover, AMc originally advised the NRA that it had contracted North to host "[t]welve feature-length episodes" of a digital documentary series, to be produced "during each 12 months of a three-year [a]greement," commencing during or about May 2018. Yet by April 22, 2019—eleven months into North's engagement—only three episodes were available, and none were "feature-length."

> **ANSWER:** Defendants deny the allegations in paragraph 67, except to admit that three episodes were available by April 22, 2019.[2] Defendants assert that any fault for the length or timing of production of these episodes lies with Plaintiff NRA and Third-Party Defendant Wayne LaPierre.

68.     On April 11, 2019, North finally disclosed a copy of his contract to the NRA—even as AMc continued to rebuff the NRA's requests for material information about the contract. AMc has also withheld documentation regarding sponsorships secured for the North documentary series, and the NRA has no evidence that any substantial sponsorships exist. Viewed in light of the series' production shortfalls, these facts have troubling implications. The NRA agreed to shoulder a specific financial burden in connection with a specific digital-media project—not to allow its President to be compensated by a for-profit advertising agency for performing generic leadership functions. Importantly, the NRA's Bylaws do not provide for the President to receive a salary.

> **ANSWER:** Defendants deny the allegations in paragraph 68, except to admit that North disclosed his contract to the NRA.

69.     In the wake of these developments, the NRA again requested that AMc allow it to examine business records that would shed light on "what, exactly, [the NRA] is paying for—and what it is getting." AMc never responded.

> **ANSWER:** Defendants deny the allegations in paragraph 69.

---

[2] A date chosen by Plaintiff for obvious tactical reasons as the *fourth* episode was released the very next day, April 23, 2019.

**F.**     <u>The NRA Takes Legal Action, AMc and North Response With Illegal Extortion</u>

70.     On April 12, 2019, having exhausted its good faith efforts to access key records pursuant to the Services Agreement, the NRA filed a narrowly tailored action in Virginia State court seeking specific performance by AMc of its obligation to share relevant records with the NRA. In retaliation, rather than provide the requested records directly to the NRA (as the NRA had sought for months), AMc conspired with others to disseminate select, out-of-context portions of those records—many obsolete or dated—to a subset of the NRA Board of Directors, in order to sow false impressions regarding the NRA's spending and lend support for a possible executive coup.

> **ANSWER:** **Defendants deny the allegations in paragraph 70, except to admit that the NRA filed an action in Virginia seeking to obtain a document it already had in its possession.**

71.     On April 22, 2019, days before the NRA's Annual Meeting of Members, Defendant Winkler doubled down on the tactic he previewed in his August 27, 2018 letter. In communications to select NRA executives, he referenced and excerpted certain expense records which had previously been withheld from the NRA. Importantly, Winkler did not contend—nor does the NRA believe—that any of the referenced expenses were improper. Nonetheless, they were obviously selected by Defendants to foster salacious, misleading impressions of the NRA's spending practices. Winkler's letters carried an implicit threat, made explicit in a subsequent series of telephone calls: If the NRA failed to withdraw its lawsuit seeking access to AMc's records, AMc would publicize portions of those records tailored to cause maximum reputational damage to the leadership of the NRA. In other words, the agency would deploy a smear campaign with malicious intent to damage the NRA.

> **ANSWER:** **Defendants deny the allegations in paragraph 71.**

72.     On April 24, 2019, AMc caused its employee, North, to telephone an aide of Mr.

LaPierre and relay the contents of yet another letter that AMc purportedly planned to disseminate. North emphasized that the letter would be "bad" for Mr. LaPierre and the NRA, and he described a laundry list of allegations the letter would contain: an unfavorable (and untrue) depiction of the NRA's finances; sexual harassment accusations against an NRA staff member; and, as previewed in Defendant Winkler's letters, excerpts of wardrobe, travel, and entertainment expenses paid by AMc and then invoiced by it to the Association over the years.

**ANSWER:** **Defendants deny the allegations in paragraph 72.**

73.     Tellingly, several categories of information referenced by North consisted of the same information the NRA had tried, but failed, to elicit from AMc under the Record-Examination Clause. After withholding this information for more than six months in an attempt to stonewall the NRA's compliance efforts, AMc now threatened to strategically, selectively publicize the information in a manner calculated to cause harm to Mr. LaPierre and the Association. North stated that AMc would forbear from publicizing the "bad" letter if Mr. LaPierre agreed to withdraw the NRA's lawsuit seeking access to AMc's records, resign immediately from the NRA, and support North's continued tenure as NRA President. If Mr. LaPierre cooperated, North indicated that he could "negotiate with" Ackerman co-founder Angus McQueen to secure an "excellent retirement" for Mr. LaPierre.

**ANSWER:** **Defendants lack knowledge sufficient to admit or deny communications between North and the NRA, and therefore deny same. Defendants deny the remaining allegations in paragraph 73.**

74.     The NRA does not take kindly to threats, and neither did Mr. LaPierre. Rather than accede to AMc's extortion, Mr. LaPierre wrote a letter to the NRA's Board of Directors that gave a transparent account of AMc's threat and concluded "so long as I have your confidence . . .  I will not back down." As became widely publicized, Mr. LaPierre prevailed—and AMc's coup attempt failed.

> **ANSWER:** Defendants lack knowledge sufficient to admit or deny the contents of a letter from LaPierre to the NRA, or whether the NRA "does not take kindly to threats," and therefore deny same. Defendants deny the remaining allegations in paragraph 74.

G.   **Extortion's Aftermath: Documents Vindicate the NRA's Concerns, And AMc Continues Its Attacks.**

75.   The NRA hoped that in the wake of these events, AMc would resume faithfully serving the NRA as the parties' contract and Virginia law required. Unfortunately, the NRA continued to receive media inquiries that strongly suggest there are misleading, defamatory "leaks" emanating from AMc.  In other words, the NRA believes that AMc is now delivering on its extortion threat. Tellingly, much of the information "leaked" by AMc concerns travel, wardrobe, and other expenses incurred in connection with AMc projects, based on AMc's advice, or on trips with itineraries crafted by AMc. Although it disseminates select portions of these records in an effort to convey misleading impressions about spending activities by the NRA's leadership, AMc knows full well that these particular expenses were proper because it was deeply involved in their occurrence.

> **ANSWER:** Defendants lack knowledge sufficient to admit or deny what the NRA "hoped" or what it now "believes," and therefore deny same. Defendants deny the remaining allegations in paragraph 75.

76.   Discovery has corroborated one of the NRA's worst fears about AMc's billing practices—specifically, that AMc was double-billing multiple clients for the same work, or simply billing the NRA for time logged by its employees on non-NRA projects.  Dan Boren, an executive of Ackerman's second-largest client, the Chickasaw Nation, admitted by email dated April 15, 2019: "I bet Ackerman is in trouble on this one. They can't produce the backup to the invoices and were allocating full salary to these employees that may have been working on our [Chickasaw Nation's] accounts."

> **ANSWER:** Defendants lack knowledge sufficient to admit or deny admit or

**deny communications between Boren and the NRA, and therefore deny same. Defendants deny the remaining allegations in paragraph 76.**

77.     The NRA is informed and believes that AMc has fraudulently billed it, and perhaps other clients, for equipment as well as personnel. Over the duration of the Services Agreement, AMc billed the NRA for at least $2.7 million in fixed assets consisting of audiovisual equipment and the like.

**ANSWER:  Defendants deny the allegations in paragraph 77.**

78.     Defendants' campaign of attempted coercion and intimidation of the NRA and Mr. LaPierre rose its ugly head again in the days before the NRA Board of Directors meeting in September 2019. For the purpose of intimidating and undermining the leadership of the NRA, as well as potentially laying the ground work for a second attempted coup, on September 13, 2019, Defendants issued a corporate "press release" to the general public—but in fact intended for consumption by the members of the NRA Board of Directors—that attempted to cast doubt on the judgment of the NRA's leadership and to re-position Defendants as "the good guys." In reality, this so-called "press release" was nothing more than a gaggle of lies, including the following misrepresentations:

- "Ackerman McQueen cooperated with every single audit NRA requested";

- "Ackerman McQueen never overcharged the NRA and retains records of all the work to prove it";

- "Every expense incurred on behalf of the [NRA] was directed by the NRA at the highest level, always with personal knowledge and approval of Wayne LaPierre;" and

- Outside counsel for the NRA "pursues . . . frivolous lawsuits" against AMc "for PR purposes and to serve as a distraction from the failure of NRA executives and

its board to properly fulfill its oversight duties."

**ANSWER:  Defendants admit that AMc issued a press release on the alleged date containing the quoted language alleged in paragraph 78.  Defendants deny all other allegations in paragraph 78.**

79.     The pattern of attempted extortion, coercion, and intimidation (oftentimes based on outright falsehoods) undertaken for the purpose of shuttering the NRA's legitimate and ongoing investigation into Defendants' fraudulent activities and ousting the current NRA leadership dedicated to enhanced compliance is clear as day. No reasonable basis exists for the NRA to believe this campaign will stop in the foreseeable future and abate resorting to criminal malfeasance that risks harming not only the NRA, but Defendants' other clients as well.  The NRA brings this action to discover the full extent of AMc's breaches and frauds, recover its documents and property, and attain compensation for the damage it has sustained.

**ANSWER:  Defendants lack knowledge sufficient to admit or deny allegations as to what the NRA believes, and therefore deny same.  Defendants deny the remaining factual allegations in paragraph 79 and further deny that the NRA is entitled to documents, compensation, or any other relief it seeks.**

H.    **The Services Agreement Provides That The NRA Is The Owner Of All Creative Works And Intellectual Property Previously Developed And Used By AMc.**

80.     As noted above, the NRA and AMc worked together since the 1980s. Over that time, the NRA placed significant trust and confidence in AMc to perform public relations and strategic marketing services, media planning and placement, and management of digital media and websites, including the management of NRATV. Since at least 1999, AMc's work on behalf of the NRA was governed by successive incarnations of the Services Agreement, which specified the types of work that AMc performed for the NRA.

**ANSWER:    Defendants admit to the longstanding business relationship between AMc and the NRA and that the variety of services performed by AMc for the NRA have been governed by various Services Agreements, which have evolved through time to reflect the changing objectives and scope of services sought by the NRA.  Defendants lack sufficient knowledge to admit or deny**

whether the NRA placed "significant trust and confidence" in AMc, and therefore deny same.

81.     Section VI of the Services Agreement is entitled "Ownership of Products." In particular, it provides "[a]ll creative works developed by AMc in fulfilling its obligations under this Services Agreement . . . shall be the property of the NRA." It continues: "All other, and further, intellectual property . . . created or developed by AMc in fulfilling its obligations under this Services Agreement, are NRA's sole and exclusive property, and AMc does hereby assign all right, title and interest in same to NRA . . . ."

**ANSWER:  Defendants admit that the document speaks for itself.  Defendants deny the remaining allegations in paragraph 81.**

82.     Section VI of the Services Agreement also requires AMc to transfer and assign to the NRA the ownership of the copyright to all creative works developed by AMc for the NRA if those works are not otherwise encompassed by the Copyright Act.

**ANSWER:  Defendants admit that the document speaks for itself.  Defendants deny the remaining allegations in paragraph 82.**

83.     In addition, the NRA separately owns numerous copyrights, including for "NRA" and "National Rifle Association."

**ANSWER:  Defendants cannot admit or deny the allegations in paragraph 83, and therefore deny same.**

**I.     Despite The Termination Of The Services Agreement, Defendants Continue To Prominently Reference The NRA And NRATV On AMc's Website.**

84.     By letter dated June 25, 2019, the NRA terminated the Services Agreement effective "immediately." Notably, AMc also purported to terminate the agreement by letter dated June 27, 2019, effective "immediately."

**ANSWER:  Defendants admit the allegations in paragraph 84 but respond that, prior to the alleged dates, AMc gave contractual notice of termination under the Services Agreement to the NRA on May 29, 2019.**

85.     Despite the termination of the Services Agreement, continued and/or continue to make unauthorized and unlicensed references, directly and indirectly, to the NRA and NRATV on its website, and continued and/or continue to make unlicensed and unauthorized use of the NRA's intellectual property rights. Attached hereto as Exhibits A and C are depictions of those NRA references and associated intellectual property rights on AMc's website as of August 29, 2019 and, for additional graphics added since that date, as of October 17, 2019, respectively.

**ANSWER:   Defendants admit that AMc's website identifies the NRA as a "legacy" client.   Defendants deny all other factual allegations and legal conclusions in paragraph 85 and assert the defense of fair use.**

86.     Specifically, AMc's website, directly and indirectly, references in an unauthorized an unlicensed manner the NRA and/or NRATV and uses its associated intellectual property rights, as follows:

- On the homepage, in describing who it is and what it does, AMc mentions its work with a "gun rights organization" and states that it "built media companies on behalf of … the Second Amendment to the Constitution";

- On a page entitled "Our Media Evolution," the website provides a timeline of AMc's projects for its clients, and also contains videos and photos relating to NRA TV;

- On a page entitled "Our Team," a photo appears with the caption "NRA Life of Duty," which was part of what Ackerman touts in its Counterclaims/Third Party Complaint as a "robust," "money-making, [and] profitable" advertising and branding campaign; and

- On pages entitled "Gallery" and "Clients," a total of fifteen different references to the NRA and NRATV appear, which represents a greater number of references

compared to any other AMc client.

**ANSWER:  Defendants admit that Plaintiff's allegations include quoted language from AMc's website.  Defendants deny the remaining allegations in paragraph 86 and assert the defense of fair use.**

87.     The portions of the AMc website submitted by Defendants in the Appendix supporting their Motion to Dismiss support this conclusion.

**ANSWER:  Defendants admit that Plaintiff included text and images from AMc's website and that they speak for themselves, but deny that any of the text and images support any wrongdoing on the part of Defendants.**

88.     The references on AMc's website to the NRA and NRATV and the use of closely associated intellectual property are unauthorized in light of the termination of the Services Agreement and unlicensed generally. In addition, the multitude of such references and related intellectual property, alone and taken together, foster consumer and customer confusion insofar as they falsely suggest to the public that the NRA remains an AMc client and endorses the services provided by AMc. To the contrary, the NRA is not an AMc client and does not endorse AMc's services.

**ANSWER:  Defendants deny the factual allegations and legal conclusions in paragraph 88.**

89.     For example, AMc's website falsely proclaims that NRATV is the "world's most comprehensive video coverage of freedom-related news, events and culture," which creates the misimpression that NRATV was a successful endeavor that the NRA endorses. In actuality, the NRA recently concluded, despite years of false reporting and subterfuge from Defendants, that NRATV was a failed endeavor under any appropriate performance metric. In fact, on or about June 25, 2019, the NRA suspended the "live TV" programming of NRATV.

**ANSWER:  Defendants deny the allegations in paragraph 89.**

90.     AMc's website also prominently features unauthorized and unlicensed NRA-

owned photos and references to the NRA with greater frequency than any other AMc client. That

prominent display of the NRA and its associated intellectual property on AMc's website provides

a strong inference that wrongly suggests to the public—and creates consumer and customer

confusion—that the NRA presently endorses the services that AMc provides and that the NRA is

currently AMc client, neither of which is true. The fact that in the *past* AMc and the NRA had a

commercial relationship does not alter, and ultimately has no bearing on, this conclusion.

> **ANSWER:  Defendants deny the factual allegations and legal conclusions in paragraph 90.**

91.     Defendants now contend that "the current version of AMc's website includes the

word 'legacy' in connection with references to the 'NRA,'" and appear to imply that the  NRA's

false association claim under the Lanham Act is somehow "moot," to use Defendants' words. As

shown in the Appendix submitted by Defendants in connection with their Motion to Dismiss, the

meaning and implication of the word "legacy" in the context used is, at best, ambiguous,

compounds confusion, and far from clearly demonstrates that the NRA is no longer a client of

AMc. For example, rather than expressly specifying a separate webpage or portion of thereof for

"Legacy Clients," Defendants merely slapped the word "legacy" in the bottom right-hand corner

of the NRA's graphics, without providing any further context. For these reasons, the use of the

"legacy" verbiage does not save Defendants from having created a knowingly false portrayal that

the NRA continues to remain an AMc client.  To the contrary, the slap-dash and belated "fix" only

amplifies the problem more.

> **ANSWER:  Defendants admit that AMc's website now identifies the NRA as a "legacy" client and that Plaintiff's Lanham Act claim is indeed "moot." Defendants deny all other factual allegations and legal conclusions in paragraph 91.**

92.     In any event, even assuming that the word "legacy" was appended to the bottom

right-hand corner of the NRA graphics on or about October 1, 2019, and that one magic word

could somehow "moot" any false association claims after that date, the word does not "moot" the NRA's false association claims arising *before* that date. That is, the false association and resulting public confusion manufactured by Defendants, undertaken for the purpose of gaining customers and increasing profits in the wake of losing its largest client, the NRA, began well before "legacy" was oddly shoehorned into the NRA's graphics.

**ANSWER: Defendants deny all factual allegations and legal conclusions in paragraph 92.**

93.      Nor does Defendants' transparent attempt to short-circuit NRA's false association Lanham Act claim impact the NRA's other false association theory.  The supposedly talismanic words of "legacy" and "moot" have no bearing on the NRA's claim that AMc's and Individual Defendants Martin's and Greenberg's unlicensed use of NRA intellectual property associated with NRATV on its website creates the false impression and attendant consumer and customer confusion that the NRA endorses, sponsors, and/or approves of NRATV, when in fact it does not. That theory does not turn at all on whether Ackerman has at some belated and unidentified point in time jammed the word "legacy" in the bottom corner of NRA graphics and intellectual property, because the NRA could, or could not, endorse, sponsor, and/or approve of NRATV either before *or* after it ceased being a client. Nor do the supposed magic words impact either the NRA's copyright infringement claims and alternative claim for conversion.

**ANSWER:  Defendants deny the factual allegations and legal conclusions in paragraph 93.**

## V.      CLAIMS FOR RELIEF

### A.      Count One: Claims For False Association Under The Lanham Act, 15 U.S.C. § 1125(a)(1)(A) (Against All Defendants)

94.      The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

**ANSWER:   Defendants can neither admit nor deny as the "preceding paragraphs" are not specifically enumerated.**

95.   By intentionally maintaining numerous references to, and images of, the NRA and NRATV on AMc's website, Defendants are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of the NRA with AMc, or as to the NRA's approval of the services or commercial activities by Defendants, in violation 15 U.S.C. § 1125(a)(1)(A).

**ANSWER:  Defendants deny the allegations in paragraph 95.**

96.   Defendants are involved in interstate commerce.

**ANSWER:  Defendants admit the allegations in paragraph 96.**

97.   Defendants directly participated in, or are at least the moving force behind, AMc's website continuing to provide or otherwise create the false impression that the NRA (1)  remains or continued to be an AMc client after the termination of the Services Agreement and (2) endorses the services provided by AMc, in particular NRATV.

**ANSWER:  Defendants deny the allegations in paragraph 97.**

98.   The foregoing misconduct is without any legal justification and constitutes a knowing and willful violation of applicable law, including 15 U.S.C. § 1125(a)(1)(A).

**ANSWER:   Defendants deny the allegations in paragraph 98 and deny that Plaintiff has standing under the cited statute.**

99.   The NRA falls within the zone of interests protected by the Lanham Act, a lenient and flexible standard where doubts are resolved in favor of the plaintiff. The NRA's interests are sufficiently related to the interests protected under 15 U.S.C. §§ 1125(a)(1)(A) and 1127 because Defendants used words, statements, and reproductions of the NRA's intellectual property in an unauthorized and unlicensed manner to create a false association between the NRA and AMc as to whether the NRA (1) remains or continues to be an AMc client and (2) endorses or approves of

the services provided by AMc—in particular NRATV. The NRA is suing not as a deceived consumer or as a direct competitor to Defendants, but as a person engaged in commerce within the control of Congress whose commercial position has suffered economic and/or reputational injury proximately caused by Defendants' false associations outlined above and their acts of unfair competition. These interests plainly fall within the zone of interests protected by the Lanham Act, in keeping with the Supreme Court's holding that "most of enumerated" purposes of the Act "are relevant to false association cases." *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014).

**ANSWER:  Defendants deny the factual allegations and legal conclusions in paragraph 99.**

100.    The NRA has been injured and has suffered damages by the unauthorized and unlicensed words, statements, and/or use of NRA intellectual property that created the false impression of association with AMc and the false endorsement of AMc's services. Defendants placed their own financial interest in acquiring new customers and gaining additional profits through engaging in deceptive conduct, at a time when it had lost its largest client, the NRA.    It did so at the expense of the NRA's lawful right to restrict and to limit the use of its name and related intellectual property rights in a non-misleading manner, thereby diminishing their value and causing financial injury to the NRA, including lost royalties, both presently and in the future. In addition, Defendants' Lanham Act violations caused and/or will likely cause the NRA to suffer reputational harm and the loss of goodwill. Accordingly, the NRA has suffered injuries that negatively impact its ability to compete in the marketplace.

**ANSWER:  Defendants deny the allegations in paragraph 100.**

101.    Such bad faith misconduct should be preliminarily and permanently enjoined, (even absent proof of damages), and the NRA should be awarded damages and/or equitable relief,

including but not limited to forfeiture and disgorgement in the form of returning the ill-gotten revenues and/or profits earned by Defendants as a result of their violation(s) of 15 U.S.C. § 1125(a)(1)(A), in an amount to be proven at trial.  *See, e.g.*, §§ 1116-1117.

**ANSWER:  Defendants deny the allegations in paragraph 101 and deny that the NRA is entitled to equitable relief or damages.**

102.    In addition, as a result of such misconduct, the NRA has been required to retain the undersigned counsel to prosecute the claims herein.  Pursuant to 15 U.S.C. § 1117, the NRA seeks to recover its attorneys' fees and costs incurred in this action.

**ANSWER:  Defendants admit that the Brewer firm has filed the instant lawsuit.  Defendants deny that the NRA is entitled to recover attorney's fees and costs, or any other relief.**

B.    **Count Two: Copyright Infringement Under 17 U.S.C. § 101 *et seq.* (Against All Defendants)**

103.    The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

**ANSWER:  Defendants can neither admit nor deny as the "preceding paragraphs" are not specifically enumerated.**

104.    The NRA owns numerous copyrights, including for "NRA" and "National Rifle Association." In addition, the NRA owns or is the assignee of the copyright to all creative works developed for the NRA by AMc pursuant to the Services Agreement, some of which are present on AMc's website and can be found in Amended Exhibit A attached hereto.

**ANSWER:  Defendants deny the allegations in paragraph 104.**

105.    Defendants directly participated in, or are at least the moving force behind, AMc's website continuing to use and publish unauthorized and unlicensed copyrighted works owned by the NRA.

**ANSWER:  Defendants admit that AMc continues to make fair use of the images displayed on its website related to the NRA but deny the allegation that**

such use is "unauthorized" or "unlicensed."

106.    Defendants' unauthorized and unlicensed continued publication of the NRA's copyrighted works constitute unlawful copyright infringement.

**ANSWER:  Defendants deny the allegations in paragraph 106.**

107.    The NRA is entitled to preliminary and permanent injunctive relief requiring Defendants to immediately and forever remove from their website and return all the NRA's copyrighted works. This remedy is necessary to return and restore to the NRA the legal right to decide for itself whether and, if so, how to license, restrict, or otherwise limit the dissemination of its copyrighted material in commerce.

**ANSWER:  Defendants deny the allegations in paragraph 107.**

108.    In addition, the NRA is entitled to an award of actual damages and forfeiture and disgorgement of Defendants' ill-gotten revenues and/or profits, unpaid royalties, and/or statutory damages, for their infringing use and publication of the NRA's copyrighted works in an amount to be proven at trial.

**ANSWER:  Defendants deny the allegations in paragraph 108.**

109.    Pursuant to 17 U.S.C. § 505, the NRA is also entitled to recover its attorneys' fees and costs incurred in this action.

**ANSWER:  Defendants deny the allegations in paragraph 109.**

C.    **Count Three: Conversion (Against All Defendants)**

110.    The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

**ANSWER:   Defendants can neither admit nor deny as the "preceding paragraphs" are not specifically enumerated.**

111.    In the alternative to its claims for false association under the Lanham Act and

infringement under the Copyright Act, the NRA asserts the cause of action of conversion.

**ANSWER:  Defendants admit that Plaintiff has brought these alternative claims for relief, but deny that Plaintiff is entitled to any relief it seeks.**

112.    The NRA is the exclusive owner of, and holds all right, title, and interest to, all creative works and intellectual property developed and used by AMc in fulfilling its obligations to the NRA under the Services Agreement.

**ANSWER:  Defendants deny that the NRA owns all of AMc's creative works. Defendants further deny the factual and legal allegations in paragraph 112, except that Defendants are unable to admit or deny the allegations construing the Services Agreement, as the document speaks for itself.**

113.    Despite the NRA's demands (see, for example, Exhibit B), Defendants have refused to remove from its website and return all such creative works and intellectual property.  As a result, Defendants unlawfully and without authorization continue to exercise control and dominion over the NRA's valuable creative works and intellectual property.

**ANSWER:  Defendants deny the allegations in paragraph 113.**

114.    Defendants' unauthorized use and publication of the NRA's creative works and intellectual property constitute intentional acts causing substantial interference, if not outright destruction, of the NRA's valuable property rights, to the detriment and harm of the NRA.

**ANSWER:  Defendants deny the allegations in paragraph 114.**

115.    In addition, the NRA is entitled to an award of damages, including damages for the full value of the stolen property and punitive damages, attributable to defendants' wrongful refusal to return its valuable creative works and intellectual property in an amount to be proven at trial.

**ANSWER:  Defendants deny the allegations in paragraph 115 and deny that the NRA is entitled to the relief it seeks.**

116.    The tort of conversion is not pre-empted by the Copyright Act. The rights that the copyright owner—here, the NRA—seeks to enforce under the common law doctrine of conversion

are *not* equivalent to or the same as the rights sought or provided pursuant to the Copyright Act. Here, the NRA seeks the ***total value*** of the intellectual property "converted," property that will never return.

**ANSWER:** **Defendants deny the factual allegations and legal conclusions in paragraph 116.**

117.    In contrast, in conjunction with its claim for copyright infringement the NRA seeks the effective return to the copyright holder of all the property rights inherent in copyright, specifically the right to control the use of the copyrighted material, the right to obtain payment of royalties in exchange for its use, or other damages to compensate the copyright holder for the diminution of and infringement on its rights. Put differently, the principal features of relief for copyright infringement represent: (1) an injunction prohibiting further use of the property, (2) effective return of the property to the copyright holder, and (3) compensation for the lost royalties and/or the diminution in value associated with the unauthorized use.

**ANSWER:** **Defendants admit that the NRA is seeking the relief stated in the first sentence of paragraph 117 (with regard to its claims of copyright infringement), but deny that it is entitled to such relief. The balance of the paragraph contains legal conclusions not requiring a response.**

118.    ***None*** of those remedies apply to the relief afforded and sought by the NRA with respect to its claim of conversion. In sharp contrast, the law of conversion in the context of remedies provides that the tortfeasor (1) keeps and uses the subject property for his/her own benefit, (2) does not to return the converted property to its rightful owner, and (3) pays damages for the total loss of value for the property, and *not* to pay for the *diminution or loss* of the property's value (as is the case for copyright infringement). In short, the elements and remedies associated with a claim for federal copyright infringement and for common law conversion are *not* equivalent or substantially the same and serve two very different purposes, thereby precluding any notion that the Copyright Act could pre-empt the NRA's alternative claim for conversion.

---

> **ANSWER:  Defendants deny that Plaintiff has accurately stated the law of conversion under any cognizable legal standard and likewise deny the improper legal conclusions drawn therefrom.**

D.    **Count Four: Fraud (Against All Defendants)**

119.    The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

> **ANSWER: Defendants can neither admit nor deny as the "preceding paragraphs" are not specifically enumerated.**

120.    As alleged above, Defendants have engaged in an overarching scheme to defraud and extort plaintiff NRA, thereby causing it harm and putting it (and other AMc clients) at imminent risk of harm. Accordingly, Defendants are liable for their misleading representations and/or non-disclosure of material facts.

> **ANSWER:  Defendants deny the allegations in paragraph 120.**

121.    Beginning in at least 2016 and continuing through 2018 Defendants, in connection with the "annual budgeting process," described by Ackerman, Defendants—and in particular Defendants Winkler and Montgomery, as well as former CEO Angus McQueen—represented on multiple occasions that appropriate back-up documentation was retained by AMc for purposes of justifying and substantiating their billing statements and that such documentation could be audited at the NRA's request. Defendants—in particular, Defendants Winkler and Montgomery—and McQueen likewise represented that their record-keeping was accurate.  These representations were made with the specific intent to have the NRA maintain or increase the annual budget for Ackerman and were made over the course of this "annual budgeting process," which occurred in the fourth quarter of the preceding budgetary year (i.e., the process for the 2017 budget would have occurred in Q4 2016).

> **ANSWER:  Defendants deny the allegations in paragraph 121, except to admit that representations were made to the NRA regarding the accuracy of AMc's**

**recordkeeping.**

122.    These representations were false when made, with a specific intent to induce the NRA to maintain or increase the annual budget for Ackerman. As the NRA later discovered, for years ***no one*** at AMc kept or maintained reasonable documentation that would justify or support the accuracy of the sums of money AMc represented it was owed in the billing statements it sent to the NRA. In addition, absent such record-keeping, a complete audit could not occur. For these reasons, AMc's record-keeping was not accurate, contrary to Defendants' representations.

> **ANSWER:  Defendants deny the allegations in paragraph 122.**

123.    McQueen and Defendants Winkler and Montgomery held senior executive positions at AMc and, as Ackerman admits, were specifically responsible for "budgetary compliance, invoicing, and payments" to the NRA. Accordingly, there is more than ample reason to believe that they must have known about, or consciously disregarded, the gross failure to maintain reasonable backup and supporting document in connection with their billing practices.

> **ANSWER:  Defendants admit the first sentence relating to the responsibilities of Defendants Winkler and Montgomery. Defendants deny the remaining allegations in paragraph 123.**

124.    These representations were material and reasonably and justifiably relied upon insofar as the NRA would never have agreed to a budget, much less the same or a greater budget, had the it known the complete truth.

> **ANSWER:  Defendants deny the allegations in paragraph 124.**

125.    Defendants also failed to disclose certain facts to the NRA during the "annual budgeting process." In particular, they knowingly failed to disclose the fact that AMc often double-billed multiple clients for the same work, or simply billed the NRA for time logged by employees supposedly "dedicated" the NRA account for work they performed on non-NRA projects.  As Dan Boren, an executive of Ackerman's second-largest client, the Chickasaw Nation, revealed by email

dated April 15, 2019: "I bet Ackerman is in trouble on this one. They can't produce the backup to the invoices and were allocating full salary to these employees that may have been working on our [Chickasaw Nation's] accounts." Defendants also failed to disclose that AMc had fraudulently billed the NRA, and perhaps other clients, for equipment in addition to personnel. By failing to disclose these facts, Defendants intended to induce the NRA to maintain or increase the amounts NRA paid to Defendants.

**ANSWER:  Defendants deny the allegations in paragraph 125.**

126.    Defendants had a duty to disclose these facts because (1) they were fiduciaries of the NRA, as was AMc, in light of the (a) contractual language in the Services Agreement appointing it the agent of the NRA for purposes of public relations and advertising and/or (b) the longstanding relationship of trust and confidence in which the NRA relied on AMc that was separate and apart from the Services Agreement and (2) they had the obligation not to tell "half-truths."

**ANSWER:  Defendants deny the factual allegations and legal conclusions in paragraph 126.**

127.    Defendants knew that the NRA was ignorant of these facts and did not have an equal opportunity to discovery the facts.

**ANSWER:  Defendants deny the allegations in paragraph 127.**

128.    Defendants Winkler and Montgomery held senior executive positions at AMc and, as Ackerman admits, were specifically responsible for "budgetary compliance, invoicing, and payments" with respect to the NRA account. Therefore, there is more than a reasonable basis to believe that they knew about, consciously disregarded, the practice of overbilling with regards to personnel and equipment. Accordingly, the false representations were made knowingly or recklessly and without knowledge of the truth. For similar reasons, they knew that the information

that they did not disclose to the NRA and were deliberately silent when they had a duty to speak.

**ANSWER: Defendants admit the first sentence relating to the responsibilities of Defendants Winkler and Montgomery. Defendants deny the remaining allegations in paragraph 128.**

129.    These false representations and/or fraudulent non-disclosures were material and actually, reasonably, and justifiably relied on upon the NRA. As a result, the NRA has suffered injury and damages, in an amount to be proven at trial.  Had it known the complete truth, the NRA would never have agreed to an annual budget, much less the same or a greater budget, would have terminated AMc as its agent, and would have ceased conducting business with the agency.

**ANSWER: Defendants deny the allegations in paragraph 129.**

130.    *Fraudulent Billing.* Beginning in at least 2016 and continuing through 2019, Defendants and AMc-employee Nader Tavangar would on at least a monthly basis (and sometimes more often) issue and send billing statements and invoices to their NRA counterparts representing that the NRA owed AMc certain amounts of money. Given the fraudulent nature of the annual budgeting process, it should come as no surprise that many of the emailed billing statements were not only inaccurate, but false and misleading. These representations were made with the specific intent to have the NRA pay the amounts it purportedly owed.

**ANSWER: Defendants admit that AMc sent invoices to the NRA during this time but deny the remaining allegations in paragraph 130.**

131.    The billing statements were misleading in three principal respects. First, Defendants caused sham bills to be sent that purported to seek payment for services that were never provided to the NRA.  Second, they caused bills to be sent to the NRA which sought to seek reimbursements in excess of the actual cost to AMc. Third, they caused bills to be sent to the NRA that were wholly unsubstantiated by any receipt or document, or any other shred of evidence.

**ANSWER: Defendants deny the allegations in paragraph 131.**

132.    As an example, on September 17, 2018, Defendants emailed NRA Chief Financial Officer ("CFO") and Treasurer Craig Spray three "production invoices for [the month]" Upon review of the vague, cursory, and unsubstantiated invoices, Spray responded and advised Defendants that they may not be following "best practices/compliance requirements," where "typically [a] three-way match process for processing a vendor invoice is required." As explained to Defendants, the objective of "an audit compliant process" is "to ensure" that a vendor's request for payment "is complete and accurate" and "to highlight any discrepancies" in the supporting documentation. At the time, Spray found Defendants' slip-shod billing practices concerning. And for good reason. Absent necessary backup documentation, a vendor has no factual basis to justify requesting the amounts of money provided on the billing statement or invoice.

**ANSWER:**    **Defendants admit that the referenced invoices and communications were exchanged, but deny the remaining allegations and inferences in paragraph 132, especially any implication that Spray was somehow alluding to well-established billing guidelines, which did not exist at that time.[3]**

133.    Defendants had a duty to disclose these facts because (1) they were fiduciaries of the NRA, as was AMc, in light of the (a) contractual language in the Services Agreement appointing it the agent of the NRA for purposes of public relations and advertising and/or (b) the longstanding relationship of trust and confidence in which the NRA relied on AMc that was separate and apart from the Services Agreement and (2) they had the obligation not to tell "half-truths."

**ANSWER:  Defendants deny the allegations in paragraph 133.**

134.    Defendants knew the NRA was ignorant of these facts and did not have an equal opportunity to discovery the facts.

---

[3] In fact, rather than referencing any established NRA billing guideline, Spray's out-of-context comment was simply a suggestion based on billing requirements from his former work in the furniture-delivery business.

**ANSWER:**  Defendants deny the allegations in paragraph 134.

135.    Defendants and AMc employee Tavangar were responsible for the routine generation and transmission of fraudulent billing statements to the NRA and Defendants Winkler and Montgomery were specifically responsible for "budgetary compliance, invoicing,  and payments" with respect to the NRA account. Therefore, there is more than a reasonable basis to believe that they knew, or consciously disregarded, the truth, particularly with respect to the issuance of fraudulent billing statements and invoices that were wholly unsubstantiated due to the lack of back-up documentation. Accordingly, the false representations were made knowingly or recklessly and without knowledge of the truth. For similar reasons, Defendant knew the information that they did not disclose to the NRA and remained deliberately silent when they had a duty to speak.

**ANSWER:**  Defendants admit the first sentence relating to the responsibilities of Defendants Winkler and Montgomery.  Defendants deny the remaining allegations in paragraph 135.

136.    These false representations and/or fraudulent non-disclosures have caused the NRA to suffer injury and damages, in an amount to be proven at trial. Had it known the complete truth, the NRA would never have agreed to pay the billing statements and invoices, would have terminated AMc as its agent, and would have ceased conducting business with the agency. For these reasons, these representations and/or non-disclosures were material and actually, reasonably, and justifiably relied upon by the NRA.

**ANSWER:**  Defendants deny the allegations in paragraph 136.

137.    ***NRATV Fraudulent Misstatements and Non-Disclosures.*** Beginning in at least 2016 and continuing through 2019 Defendants—including but not limited to Defendants Montgomery, Martin, and Greenberg—made various fraudulent statements and/or failed to disclose material information in connection with NRATV. Among other things, as alleged herein,

Defendants in early 2016 made multiple representations to the NRA that the proposed "owned media" digital platform known as NRATV presented "a good opportunity to generate revenue" and that developing and launching such a platform would "pay for itself," including paid commercial sponsorships for live programs.  In addition, at the thirteen specific meetings and  in other communications to the NRA identified above, including communications made on May 13, 2019 and late October 2018, Defendants touted NRATV's performance and represented that the platform had certain valuations and generated millions of engagements and views. These statements were made for the purpose of inducing the NRA to expand its investment in NRATV, to the benefit of AMc.

**ANSWER:  Defendants deny the allegations in paragraph 137.**

138.   These representations and omissions were false and misleading for multiple reasons. First, the NRATV digital platform did not generate revenue and was never going to pay for itself, as demonstrated by the dismal viewership and sponsorship numbers that it generated in reality, consistent with the previous failure of a similar project with The American Clean Skies Foundation, a fact that Defendants did not disclose. In addition, Defendants' repeated representations that the NRATV platform generated millions of viewers and touting of the platform's performance and valuation were in fact based on out-of-context statistics predicated on, among other things, aggregate viewership numbers that failed to differentiate between genuine views and merely incidental ones and counted all of the views from an individual, rather than the distinct number of viewers of NRATV content. At no point did Defendants disclose that their purported viewership numbers were not based on actual data of the number of unique and genuine viewers. Moreover, Defendants' inconsistent and contradictory viewership statistics and statements on the purpose of viewership numbers and the actual numbers themselves demonstrate the falsity of the statements.

**ANSWER:  Defendants deny the allegations in paragraph 138.**

139.    Defendants knew about failure of the similar digital platform that AMc had developed and operated for The American Clean Skies Foundation and, therefore, also knew that embarking upon a similar venture for the NRA would not present a good opportunity for revenue generation or pay for itself. Defendants understood that their development (in particular, their creation by Defendant Greenberg) and subsequent touting of NRATV viewership performance and valuations was not based on actual data comprising *unique* views, and likewise understood such data is readily available from third-party vendors given that Defendants hold themselves out as ostensible experts in digital marketing and advertising. Therefore, there is more than a reasonable basis to believe that Defendants knew, or consciously disregarded, the truth about these matters. Accordingly, the false representations were made knowingly or recklessly and without knowledge of the truth.

**ANSWER:  Defendants deny the allegations in paragraph 139.**

140.    Defendants had a duty to disclose these facts because (1) they were fiduciaries of the NRA, as was AMc, in light of the (a) contractual language in the Services Agreement appointing it the agent of the NRA for purposes of public relations and advertising and/or (b) the longstanding relationship of trust and confidence in which the NRA relied on AMc that was separate and apart from the Services Agreement  and (2) had the obligation not to tell "half-truths."

**ANSWER:  Defendants deny the allegations in paragraph 140.**

141.    Defendants knew that the NRA was unaware of these facts and did not have an equal opportunity to discovery the facts.

**ANSWER:  Defendants deny the allegations in paragraph 141.**

142.    The false representations and/or fraudulent non-disclosures have caused the NRA to suffer injury and damage, in an amount to be proven at trial. Had it known the complete truth

about NRATV, the NRA would never have invested a dollar in the project, and would have terminated AMc as its agent, and ceased conducting business with the agency. For these reasons, these representations and/or non-disclosures were material and were actually, reasonably, and justifiably relied upon by the NRA.

> **ANSWER:  Defendants deny the allegations in paragraph 142.**

**E.      Count Five: Breaches of Fiduciary Duties (Against All Defendants)**

143.     The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

> **ANSWER:  Defendants can neither admit nor deny as the "preceding paragraphs" are not specifically enumerated.**

144.     Over the course of more than thirty years of close collaboration (including decades that precluded the Services Agreement), the NRA reposed extensive trust and confidence in, and relied upon, AMc. Defendants, therefore, owed fiduciary duties to put the NRA's interests first when rendering services to the NRA.

> **ANSWER:   Defendants admit to the longstanding business relationship between the parties, but deny the legal conclusion that AMc or any of its employees were fiduciaries of the NRA at any time.   Defendants can neither admit nor deny what level of "trust and confidence" the NRA "reposed" in AMc, and therefore deny same.**

145.     In addition, AMc incurred fiduciary duties to the NRA when it acted as the NRA's agent pursuant to multiple provisions of the Services Agreement. For example, on the NRA's behalf and subject to the NRA's control, AMc entered into contracts and arrangements for the purchase, planning, and placement of media—activities that required AMc to be entrusted with sensitive confidential information pertaining to the NRA.

> **ANSWER:   Defendants admit that AMc acted on behalf of the NRA in performing its duties under the Services Agreement but deny the remaining factual allegations and legal conclusions in paragraph 145.**

146.    Given their high-ranking positions at AMc and the importance of the NRA as its biggest client, Defendants were aware of the Services Agreement and understood the substance of its provisions and, therefore, served as agents and fiduciaries too.

**ANSWER:  Defendants deny the allegations in paragraph 146.**

147.    Because they acted in a fiduciary capacity, Defendants had a duty of loyalty to the NRA which forbade it from misusing the NRA's confidential information—especially with the malicious intent to damage the NRA.

**ANSWER:  Defendants deny the allegations in paragraph 147.**

148.    Furthermore, because they acted in a fiduciary capacity, Defendants had a duty of candor and to disclose all material facts to the NRA regarding the advice and services it provided. Defendants breached their fiduciary duties when they failed to disclose material facts to the NRA, including but not limited to failing to disclose in the following instances:

- Facts regarding AMc's billing and invoicing practices—for example by failing to disclose that appropriate support documentation was not retained by AMc and could not be audited by NRA at any time;

- Facts regarding NRATV performance, by withholding crucial performance metrics like "unique" and "genuine" individualized viewership data, and relatedly failing to disclose material facts regarding the inaccurate valuation of NRATV;

- Facts regarding the prior and failed "owned-media" project, Clean Skies TV.

- Fact that AMc often double-billed multiple clients for the same work, or simply billed the NRA for time logged by employees who were supposed to be fully "dedicated" to the NRA;

- Facts that AMc used equipment, billed to the NRA, for other clients' projects;

- Fact that bills emailed and mailed to the NRA contained inaccurate and false information, for example, bills seeking reimbursement for services that were never performed, that were in excess of the actual costs to AMc, and that were wholly unsubstantiated by supporting documentation; and

- Facts regarding the North Contract—for example including the fact that North had legal duties to AMc that superseded those he had to the NRA while NRA President, and the failure to comply with the digital documentary series requirements.

**ANSWER: Defendants deny the allegations in paragraph 148.**

149.   In addition, Defendants as fiduciaries of the NRA had a duty of fair, honest dealing and a duty to act with integrity of the strictest kind. Defendants breached these fiduciary duties when they engaged in the following conduct:

- Attempt to obstruct or to stop an investigation of Ackerman and its billing practices and NRATV by the NRA, including by repeatedly and flatly refusing to respond to legitimate and basic information requests from NRA executives;

- The first attempt of extortion undertaken by Defendant Winkler on August 27, 2018, which amounted to a violation of the criminal laws.

- The second attempt of extortion undertaken by Defendant Winkler on April 22, 2019, which amounted to a violation of the criminal laws.

- The attempted extortion undertaken by Oliver North on April 24, 2019, which amounted to a violation of the criminal laws.

**ANSWER:  Defendants deny the allegations in paragraph 149.**

150.   As a direct and proximate cause of Defendants' breaches of their fiduciary duties, the NRA has suffered injury and incurred damages in an amount to be proven at trial.

**ANSWER:** **Defendants deny the allegations in paragraph 150.**

151.     The NRA also seeks forfeiture and disgorgement of all amounts wrongfully obtained by Defendant on account of their breaches of their fiduciary duties, including, without limitation, all fees paid by the NRA to AMc since the date such breaches began, and at minimum forfeiture and disgorgement of any ill-gotten gain.

**ANSWER:**  **Defendants deny the allegations in paragraph 151.**

**F.**     **Count Six: Conspiracy (Against All Defendants)**

152.     Each Defendant was a member of a combination or conspiracy involving two or more persons, one of whom, Dan Boren, was an individual not employed by Defendants.

**ANSWER:**  **Defendants deny the allegations in paragraph 152.**

153.     The object of the combination or conspiracy was to commit the fraudulent behavior, the attempts to de-railing the resulting NRA investigation, and the attempts to extort Mr. LaPierre and the NRA alleged herein. The members of the combination or conspiracy had a meeting of the minds concerning the object of the combination or conspiracy or the course action.

**ANSWER:** **Defendants deny the allegations in paragraph 153.**

154.     One of the members committed an unlawful and overt act to further the object or course of action, including but not limited to the Defendants' fraudulent acts described in Count Four and the breaches of fiduciary duty described in Count Five.

**ANSWER:**  **Defendants deny the allegations in paragraph 154.**

155.     The NRA has suffered injury and sustained damages as a result of the conspiracy, in an amount to be proven at trial.

**ANSWER:**  **Defendants deny the allegations in paragraph 155.**

**G.**     **Count Seven: Breach of Fiduciary Duty of Loyalty (Against All Defendants)**

156.     In the alternative, the NRA asserts the claims for breach of fiduciary duty and

breach of contract that are currently at issue in the Virginia state court litigation ("the Virginia

Claims"). Through the filing of its Counterclaim and Third-Party Complaint, *see* ECF No. 12,

however, Ackerman has broadened this dispute to encompass a host of subject matters not directly

raised in the Original Complaint. Ackerman broadly contends that the NRA's original claims in

this action "mandate[ ] . . . an inquiry into the NRA's and LaPierre's conduct" allegedly comprising

"sinister and intentional efforts to destroy AMc's business" and "makes relevant an examination

of the real reasons behind termination of the parties' [Services Agreement] . . . and an examination

of the creation, operation and [allegedly] unquestioned success of NRATV." According to

Ackerman, this "mandate[d]" inquiry includes the three allegedly "frivolous" lawsuits comprising

the Virginia Claims. Based on Ackerman's logic, the NRA's Virginia Claims likely arise out of

the same transactions or occurrences that are the subject matters of Ackerman's Counterclaim and

Third-Party Complaint, and it is likely that the Virginian Claims would be considered compulsory

counterclaims to this action. In short, the Virginia Claims have been put at issue by Ackerman's

Counterclaim and Third-Party Complaint.

> **ANSWER:   Defendants admit that, prior to filing the instant lawsuit and
> Plaintiff's Amended Complaint, Plaintiff filed actions in Virginia state court
> involving similar or identical claims.   Defendants admit that Defendants'
> Answer, Counterclaim, and Third-Party Claim speak for themselves.**

157.   The NRA incorporates the allegations in the preceding paragraphs as if fully set

forth herein.

> **ANSWER:   Defendants can neither admit nor deny as the "preceding
> paragraphs" are not specifically enumerated.**

158.   Over the course of more than thirty years of close collaboration (including decades

that precluded the Services Agreement), the NRA reposed extensive trust and confidence in, and

relied upon, AMc. Defendants, therefore, owed fiduciary duties to put the NRA's interests first

when rendering services to the NRA.

**ANSWER:   Defendants admit to the longstanding business relationship
between the parties, but deny the legal conclusion that AMc or any of its
employees were fiduciaries of the NRA at any time.  Defendants can neither
admit nor deny what level of "trust and confidence" the NRA "reposed" in
AMc, and therefore deny same.**

159.     In addition, AMc incurred fiduciary duties to the NRA when it acted as the NRA's

agent pursuant to multiple provisions of the Services Agreement. For example, on the NRA's

behalf and subject to the NRA's control, AMc entered into contracts and arrangements for the

purchase, planning, and placement of media—activities that required AMc to be entrusted with

sensitive confidential information pertaining to the NRA.

**ANSWER:  Defendants deny the allegations in paragraph 159.**

160.     Given their high-ranking positions at AMc and the importance of the NRA as its

biggest client, Defendants were aware of the Services Agreement and understood the substance of

its provisions and, therefore, served as agents and fiduciaries too.

**ANSWER:  Defendants deny the allegations in paragraph 160.**

161.     Because they acted in a fiduciary capacity, Defendants had a duty of loyalty to the

NRA which forbade it from misusing the NRA's confidential information—especially with the

malicious intent to damage the NRA. Defendants breached this duty on multiple occasions AMc

breached its fiduciary duty when it conspired to effect an out-of-context, partial disclosure of

certain NRA confidential information to (i) a handpicked group of outside directors of the NRA.,

as well as (ii) the news media as part of its attempted extortion plot and to end the NRA's

investigation into AMc for the malicious purpose of smearing the NRA's reputation and

facilitating its ultimately foiled coup plot.

**ANSWER:  Defendants deny the allegations in paragraph 161.**

162.     As a direct and proximate cause of Defendants' breaches of their fiduciary duties,

the NRA has suffered injury and incurred damages in an amount to be proven at trial.

**ANSWER:** **Defendants deny the allegations in paragraph 162.**

163.    The NRA also seeks forfeiture and disgorgement of all amounts wrongfully obtained by Defendants on account of their breaches of their fiduciary duties, including, without limitation, all fees paid by the NRA to AMc since the date such breaches began, and at minimum forfeiture and disgorgement of any ill-gotten gain.

> **ANSWER:** **Defendants deny the allegations in paragraph 163 or that Plaintiff is entitled to the relief sought.**

164.    The NRA also seeks injunctive relief to prevent future disclosures of the NRA's confidential information.

> **ANSWER:** **Defendants deny the allegations in paragraph 164 or that Plaintiff is entitled to the relief sought.**

**H.    Count Eight: Breach of Contract (Against Defendants AMc)**

165.    The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

> **ANSWER:** **Defendants can neither admit nor deny as the "preceding paragraphs" are not specifically enumerated.**

166.    For the reasons explained in paragraph ___, supra, in the alternative, the NRA asserts this breach of contract claim that is also part of Virginia Claims.

> **ANSWER:** **Defendants can neither admit nor deny as the referenced paragraph is not specifically enumerated.**

167.    The Services Agreement is a legally enforceable contract, and the NRA has performed all of its obligations under the Services Agreement.

> **ANSWER:** **Defendants neither admit nor deny the allegation regarding the enforceability of the Services Agreement, which is a legal conclusion requiring no response.   Defendants deny that the NRA has performed all of its obligations under the Services Agreement, including its failure to pay all outstanding invoices due and owing to AMc and its failure to post a $3 million bond as required under the Services Agreement.**

168.   *The Records-Inspection Clause*.   The Records-Examination Clause   is unambiguous. The NRA has performed all of its obligations under the Services Agreement, including its obligation to provide reasonable notice pursuant to the Records-Examination Clause.

**ANSWER:  Defendants deny the allegations in paragraph 168.**

169.   Ackerman and Mercury have breached the Records-Examination Clause of the Services Agreement. Specifically, Ackerman-acting at all times on behalf of both itself and Mercury, pursuant to the Services Agreement-has repeatedly failed or refused to permit the NRA to examine specified categories of books and records with respect to matters covered under the Services Agreement.

**ANSWER:  Defendants deny the allegations in paragraph 169.**

170.   There is no adequate remedy at law for AMc's refusal to permit examination of records (whether they reside at Ackerman or Mercury) pursuant to the Services Agreement. The information sought by the NRA pursuant to the Records-Examination Clause resides uniquely within the possession of Ackerman and/or Mercury, and cannot be acquired by the NRA on the open market for any sum of money.

**ANSWER:  Defendants deny the allegations in paragraph 170.**

171.   The nature of the obligation imposed by the Records-Examination Clause makes specific performance equitable and practical because the Court need only order AMc to furnish to the NRA: (i) copies of any AMc-Third Party NRA Contracts, including the North Contract; and (ii) business records, in whatever form they were generated in the ordinary course of AMc's business, which are sufficient to convey the information sought by the NRA as described in the paragraphs above.

**ANSWER:  Defendants deny the allegations in paragraph 171 and deny that the NRA is entitled to the relief it seeks, particularly with regard to the North Contract, which it already has in its possession.**

172.    Defendants' breaches of the Services Agreement have damaged—and threaten to imminently, irreparably harm—the NRA's legitimate operational interests as a not-for-profit organization. By denying the NRA access to basic information regarding the nature of the services being performed, the putative budgets for these services, and the material terms of third-party contracts for which the NRA is purportedly liable, Defendants have jeopardized the NRA's ability to steward its funds in pursuit of its public mission. Moreover, AMc's continued and baseless refusal to disclose material information relating to the North Contract threatens to impede the NRA's corporate governance.

**ANSWER:  Defendants deny the allegations in paragraph 172.**

173.    By reason of the foregoing, the NRA requests that this Court order specific performance by Defendants of their obligations pursuant to the Records-Examination Clause of the Services Agreement.

**ANSWER:  Defendants deny that Plaintiff is entitled to the relief it seeks in paragraph 173.**

174.    *The Confidentiality Clause.* Defendants have breached the provisions of Section IV of the Services Agreement by directly or indirectly disclosing, to third parties, information made known to AMc as a result of AMc's providing Services (as defined under the Services Agreement).

**ANSWER:  Defendants deny the allegations in paragraph 174.**

175.    Defendants' breaches have damaged the NRA. Among other things, the NRA has incurred significant reputational damage, and professional fees, as a result of Defendants' bad faith, out-of-context "leaks" to reporters. For example, the NRA's attorneys and public affairs professionals have spent extensive hours fielding inquiries from journalists in an effort to correct the misleading impressions sown by AMc.

**ANSWER:** **Defendants deny the allegations in paragraph 175.**

176.    Defendants' breaches are escalating, and there can be little doubt that if its collaborator of multiple decades continues to maliciously disseminate its confidential information, the NRA will be irreparably harmed. The NRA is entitled to injunctive relief to avert or minimize this inseparable harm.

**ANSWER:** **Defendants deny the allegations in paragraph 176 or that the NRA is entitled to the relief it seeks.**

177.    Moreover, AMc's breaches are material—by seeking to destroy the NRA's reputation, AMc has destroyed the purpose of the parties' contract. Accordingly, the NRA is entitled to damages based on all of its remaining rights to performance under the Services Agreement.

**ANSWER:** **Defendants deny the allegations in paragraph 177.**

178.    *The Return-of-Property Clause.* The provisions of Section XI.E. of the Services Agreement are unambiguous and bind "AMc" (defined to include both Ackerman and Mercury).

**ANSWER:** **Defendants deny the allegations and legal conclusions in paragraph 178.**

179.    The NRA seeks possession of its property, fixed assets, materials, documents, and confidential information as defined in the Services Agreement.

**ANSWER:** **Defendants admit that Plaintiff is asking for this relief.**

180.    Both the NRA and AMc have provided notice of the immediate termination of the Services Agreement; thus, the NRA has an immediate right to possession of the NRA's property.

**ANSWER:** **Defendants admit that the Services Agreement has terminated, but deny that Plaintiff is entitled to the relief it requests in paragraph 180.**

181.    The NRA's property is capable of identification. The NRA's property is defined in the Services Agreement and the NRA provided a partial list of its property in AMc's possession

in the NRA's letter dated July 22, 2019, to AMc.

> **ANSWER:** Defendants admit the allegations in paragraph 181 but respond that AMc is prohibited from providing from providing the requested items pending the investigation of the NRA by the New York Attorney General's office and that all documents and information must be held by AMc for the duration of the investigation.

182.    In its July 22 letter, the NRA provided values for some of its fixed assets in AMc's possession. In addition, the NRA's confidential information and materials provided to AMc during their contractual relationship have monetary value.

> **ANSWER:** Defendants admit that AMc received a letter with the referenced date, but deny the remaining allegations in paragraph 182.

183.    AMc is in possession of the NRA's Property and has wrongfully refused to return the NRA's Property.

> **ANSWER:** Defendants deny the allegations in paragraph 183.

184.    AMc has breached the provisions of Section XI.E. of the Services Agreement by failing to provide the immediate return of the NRA's Property.

> **ANSWER:** Defendants deny the allegations in paragraph 184.

185.    AMc has also breached the implied covenant of good faith and fair dealing ignoring the NRA's repeated requests to return the NRA's Property.

> **ANSWER:** Defendants deny the allegations in paragraph 185.

186.    AMc's breaches have damaged the NRA in an amount to be proven at trial.

> **ANSWER:** Defendants deny the allegations in paragraph 186.

187.    Moreover, AMc's breaches are material. Accordingly, the NRA is entitled to damages based on all of its remaining rights to performance under the Services Agreement.

> **ANSWER:** Defendants deny the allegations in paragraph 187 and further deny that Plaintiff is entitled to the relief requested.

## VI.        DEMAND FOR JURY TRIAL

188.    The NRA hereby demands a trial by jury on all issues of fact to which it is entitled

to a jury trial in this action.

> **ANSWER:  The demand set forth in paragraph 188 reflects an entitlement
> afforded to all parties and is not susceptible to admission or denial.**

## VII.       PRAYER

189.    For all the foregoing reasons, the NRA requests that the Court enter judgment in its

favor and award it the following relief against AMc and the other Defendants:

a.      Preliminary and permanent injunctive relief prohibiting Defendants, and

each of their agents, servants and employees, and those persons in active

concert or participation with any of them, from in an unauthorized and

unlicensed manner: (1) showing any references to the NRA on AMc's

website and in any other form of media; (2) using or displaying any logos

or symbols affiliated with the NRA in connection with advertising,

distribution, or display for sale of any product or service associated with

AMc; (3) making in any manner whatsoever any statement or

representation, or performing any act, likely to lead members of the public

to believe that AMc is in any manner, currently directly or indirectly,

associated, affiliated, connected with, authorized or approved by the NRA;

and (4) taking any action, directly or indirectly, in any form or manner

whatsoever that is likely to tarnish or disparage the business reputation of

the NRA;

b.      Compensatory damages for injuries sustained as a result of Defendants'

wrongful conduct, in at least the amount of $40 million.

c. Punitive or exemplary damages in an amount to be determined at trial;

d. Forfeiture and disgorgement in an amount to be determined by the Court;

e. Costs of court;

f. Reasonable and necessary attorneys' fees;

g. Pre-judgment and post-judgment interest at the highest lawful rate; and

h. Such other relief, at law or in equity, to which it may be justly entitled.

**ANSWER:  Defendants deny that the NRA is entitled to recover against Defendants and deny that the NRA is entitled to any of the relief sought in subparagraphs a through h of paragraph 189.**

190. In the alternative, the NRA requests judgment in its favor against Defendants with respect to the following concerning the breach of the Return-of-Property Clause in the Services Agreement:

a. Ordering that the NRA has proven its ownership rights and that AMc shall return the NRA's property immediately;

b. Granting a pre-trial seizure of NRA property in the possession of AMc;

c. Ordering the sheriff or other proper officer to seize NRA property and deliver the same to the NRA *pendente lite* under circumstances deemed appropriate;

d. Granting NRA preliminary and permanent injunctive relief;

e. Alternatively, granting NRA specific performance of the return of the NRA's Property or compensatory damages for a material, total breach of contract;

f. Granting NRA punitive or exemplary damages; and

g. Granting such other and further relief as the Court deems just and proper.

**ANSWER:  Defendants deny that the NRA is entitled to recover against**

**Defendants and deny that the NRA is entitled to any of the relief sought in subparagraphs a through g of paragraph 190.**

191.    In the alternative, the NRA requests judgment in its favor against Defendants with respect to the following concerning the breach of the Confidentiality Clause in the Services Agreement and the breach of the fiduciary duty of loyalty:

    a.    Granting it preliminary and permanent injunctive relief, as well as other equitable relief such as disgorgement or forfeiture;

    b.    Granting it compensatory damages for material, total breach of contract, and breach of the fiduciary duty of loyalty, totaling $40 million;

    c.    Granting it punitive or exemplary damages; and

    d.    Granting such other and further relief as the Court deems just and proper.

**<u>ANSWER:</u>  Defendants deny that the NRA is entitled to recover against Defendants and deny that the NRA is entitled to any of the relief sought in subparagraphs a through d of paragraph 191.**

192.    In the alternative, the NRA requests judgment in its favor against Defendants with respect to the following on the breach of the Records-Examination Clause in the Services Agreement:

    a.    A judgment against each of Ackerman and Mercury for breach of contract;

    b.    An award of specific performance to the NRA requiring that:

        a.    AMc furnish copies of all AMc-Third Party NRA Contracts to the NRA within three (3) business days of the entry of such order; and

        b.    Within ten (10) business days of the entry of such order, AMc furnish to the NRA:

            i.    Copies of annual budgets for the years 2016-2018, which AMc alleges were approved by the NRA and were

previously provided to the NRA's forensic accountants;

ii.    A list of all current NRA-Dedicated Personnel (as defined in the NRA's letter correspondence) and, for each such employee, copies of business records sufficient to show the amount or percentage of the employee's time that was dedicated to NRA projects during the period from January 1, 2018, to present;

iii.    Copies business of records sufficient to show the extent of any costs invoiced to the NRA or the NRA Foundation, during the period from January 1, 2018, to April 1, 2019, which costs were incurred by reason of:

1.    The production of the NRATV documentary series "American Heroes;" or

2.    Cash or non-cash compensation to North or North-related Staff; or

3.    Office space of other perquisites provided to North or North-related Staff; and

4.    Whether each item was billed specifically to the NRA, the NRA Foundation, or both entities; and

c.    Copies of business records (if any) reflecting North's availability to film American Heroes, any modifications to the American Heroes production schedule during the period from May 2018 to present, and the reasons for those modifications; and

d.      Such other and further relief to which the NRA may be entitled at law or in

equity.

**ANSWER:   Defendants deny that the NRA is entitled to recover against Defendants and deny that the NRA is entitled to any of the relief sought in subparagraphs a through d of paragraph 192.**

## VIII.   AFFIRMATIVE DEFENSES

### First Affirmative Defense
### (Authorization)

193.    Plaintiff has authorized, through writing, verbally and through its actions, the

displaying of NRA, any of its trademarks, and its name and that of NRATV on AMc's website.

### Second Affirmative Defense
### (Fair Use)

194.    AMc's display of any information related to the NRA or NRATV constitutes fair

use, both descriptive and nominative, as those terms are used by Supreme Court and 5th Circuit

authority.

### Third Affirmative Defense
### (Justification)

195.    AMc is justified in its use of materials allegedly converted.

### Fourth Affirmative Defense
### (Conditions Precedent)

196.    The NRA has failed to satisfy conditions precedent to its entitlement to recoup any

of its alleged intellectual property.

### Fifth Affirmative Defense
### (Mitigation)

197.    The NRA's damages, if any, are self-inflicted and, in any event, the NRA has failed

to mitigate its damages, if any exist.

### Sixth Affirmative Defense
### (Unclean Hands)

198.   The NRA is not entitled to any relief herein, particularly equitable relief because it comes into court with unclean hands.

### Seventh Affirmative Defense
### (Waiver)

199.   The NRA has waived any entitlement to complain about the presence of its name or any reference to the NRA or NRATV by virtue of its long-standing approval and acquiescence therein.

### Eighth Affirmative Defense
### (Estoppel; Mootness)

200.   The NRA, by its conduct and actions and words, is estopped from complaining about the matters made the basis of its lawsuit.  For years, AMc has displayed its NRA connection on its website with NRA concurrence.  After the NRA raised an objection—and then, only to serve as its false pretense for bringing this lawsuit—AMc added the word "legacy" to references to the NRA, thus confirming that its use of the term "NRA" or "NRATV" constitutes legally permissible fair use.  AMc's website is, in all respects, correct, accurate, and truthful.[4]

### Ninth Affirmative Defense
### (Truth)

201.   The NRA cannot show any *falsehood* to support its claim for false association or false endorsement because it is undisputed that the NRA is a former client of AMc.

### Tenth Affirmative Defense
### (Ratification)

---

[4] That this assertion – indeed this lawsuit – is a gross overstatement is demonstrated by the fact that the NRA's own law firm (formerly Bickel & Brewer) itself a client of AMc, has been featured on AMc's website for several years, without complaint.

202.    The NRA has ratified actions taken by AMc in connection with its website.

## Eleventh Affirmative Defense
### (No Standing)

203.    The NRA lacks standing to pursue claims under either the Lanham Act, 15 USC § 1125(a), or under the copyright laws of 17 USC § 101, *et seq.*

## Twelfth Affirmative Defense
### (Plaintiff's Fault)

204.    The NRA's own actions and omissions caused or contributed to its injury.

## Thirteenth Affirmative Defense
### (Fraud)

205.    The NRA, by and through the conduct of its Executive Vice President, Wayne LaPierre, made false representations to AMc regarding the nature of monies paid by AMc and used by LaPierre for his own personal benefit.  To the extent that any expense presented by AMc to the NRA lacks proper supporting documentation, it is exclusively due to the affirmative conduct of LaPierre himself and his false representations, specifically, that every expense he instructed AMc to incur was a legitimate charge for the NRA's benefit.  Although numerous members of the NRA board of directors knew about LaPierre's gross mismanagement of NRA member funds, his actions were tacitly approved and thereby ratified by the NRA's board of directors—at least those members who were willing to look the other way.  Those board members who questioned the propriety of LaPierre's spending were branded as "co-conspirators" and swiftly removed from the board.  Now surrounded by an assembly of yes-men, LaPierre continues to indulge in unmitigated use of NRA member funds as his own personal piggy bank.

## AMENDED COUNTERCLAIM AND THIRD-PARTY COMPLAINT

## I.      PRELIMINARY STATEMENT

**A.      Amended Counterclaim.**

1.      Beneath its benign veneer, the instant case is driven by the intentional efforts of LaPierre and current NRA board members to destroy AMc's business in a desperate attempt to deflect attention from the NRA's gross financial mismanagement at the hands of LaPierre, the longtime Executive Vice President and *de facto* leader of the NRA.  The NRA's lawsuit invites— or rather, necessitates—inquiry into the conduct of LaPierre and other NRA board members.  The NRA's victim narrative will not withstand fact-based scrutiny of the real reasons why the parties' operating agreement (the "***Services Agreement***," as amended)[5] was terminated, or any meaningful examination of the creation, operation, and unquestioned success of NRATV (a digital network dedicated to the advancement of Second Amendment issues), and any allegation that NRATV was somehow a "failed endeavor."

2.      Despite the parties' decades-long relationship, two events combined to cause the NRA to switch from friend to foe: (1) the advent of the law firm of Brewer, Attorneys and Counselors (the "***Brewer Firm***"), and its principal Bill Brewer ("***Brewer***") (son-in-law and brother-in-law to the principals and owners of AMc), whose ascendency within the NRA has caused the NRA to embark on a reckless and self-destructive path, in the process taking down important service providers, longtime legal counsel, and dedicated NRA leaders who had been powerful Second Amendment advocates; and (2) AMc's refusal to cover up or acquiesce in the financial adventurism and organizational mismanagement of the NRA's rogue leader, LaPierre.

3.      This action—the *fourth* frivolous lawsuit launched by the NRA against AMc in the

---

[5] *See* Ex. A (Services Agreement); Ex. B (Amendment No. 1 to Services Agreement).

last six months—is simply more of LaPierre and Brewer's frivolous litigation tactics, inflammatory public-relations maneuvers, and wasteful misuse of NRA resources. And AMc is in good company. Under Brewer's influence since at least early 2018, the NRA has brought lawsuits against (1) Andrew Cuomo, the Governor of New York and New York's Chief Insurance Regulator; (2) the Lockton Companies; (3) Lt. Col. Oliver North ("*North*"), the NRA's one-time President; (4) Letitia James, the New York Attorney General; and (5) the City of San Francisco. These lawsuits have resulted in the voluntary resignation of several NRA board members who were unwilling to watch LaPierre ignore his fiduciary duties to the NRA or to be labeled a "co-conspirator" for publically questioning his actions.[6]

4.    Now forcing AMc to defend itself on yet a fourth front, LaPierre and Brewer, enabled by the remaining NRA board members, appear intent on extorting their desired outcome through a cocktail of vexatious litigation, Rambo-style media exploits, and strong-arm coercion tactics. In sharp contrast to Plaintiff's Amended Complaint, the facts supporting this Amended Counterclaim show that AMc has been victimized by the machinations of LaPierre and Brewer—not the other way around.

**B.    Third Party Action**

5.    The NRA's lawsuit requires, in defense, an exposition of the fraudulent conduct of LaPierre; his profligate misuse of NRA funds for personal and family benefit; his flaunting of non-profit corporation law; and the reckless abandon with which he and his enabler Brewer have run roughshod over the NRA Board of Directors and the NRA Foundation Board of Directors in multiple respects (including failure to obtain prior board approval for his lawsuits against AMc

---

[6] *See e.g.*, news articles describing this recent frenetic activity and Brewer's role: Non Profit News Quarterly, (https://nonprofitquarterly.org/why-someone-should-make-the-NRA-into-a-tv-series; Washington Post, https://www.washingtonpost.com/politics/how-a-hard-charging-attorney-helped.fuel-a-civil-war-inside-the-NRA); https://www.nytimes.com/2019/08/22/us/politics/nra-guns-wayne-lapierre.html.

and firing the Board's general counsel).

6.     Brewer was an odd but convenient choice for leading a scorched-earth attack on AMc.  Being related to AMc executives, he could be expected to trade personal information about his father-in-law, Angus McQueen, which indeed occurred on at least one occasion 2018 when Brewer was interviewing AMc employees.  Now deceased, Mr. McQueen was, at the time, fighting cancer and needing the full support, as well as the discretion, of his family.  Instead, Brewer partnered with LaPierre in an attempt to scapegoat someone who would be unable to properly defend himself.

7.     LaPierre will also be exposed individually for libelous statements against AMc, his intentional interference with third-party NRA contracts, and the fraud he has perpetrated on AMc, particularly with respect to NRATV.  This lawsuit will reveal that the true driving force behind LaPierre's plan to scapegoat AMc is to not only deflect attention from his own wrongdoing, but also to inflict maximum damage on AMc in retribution for its "disloyalty," apparently defined by LaPierre as an unwillingness to follow him blindly.  It is LaPierre, with Brewer's assistance, whose artifice has caused AMc serious business and reputational injury, for which he must now be held accountable.

8.     This Amended Counterclaim and Third-Party Complaint seek to not only restore AMc's reputation, but to hold the NRA and LaPierre accountable for their reckless actions and the profound collateral damage inflicted upon AMc as a result.

## II.     PARTIES

9.     Counter-Plaintiff has appeared herein by contemporaneously filing this Amended Answer, Amended Counterclaim, and Third-Party Counterclaim against Wayne LaPierre, individually.

10.     Counter-Defendant has appeared herein and is before the Court for all purposes.

11.     Third Party Defendant Wayne LaPierre is a resident of the State of Virginia who may be served with citation at his place of business, 11250 Waples Mill Rd., Fairfax, Virginia 22030.

## III.     JURISDICTION AND VENUE

12.     The counterclaims asserted herein include compulsory and permissive actions. Venue is proper in the Northern District of Texas, Dallas Division.

## IV.     BACKGROUND FACTS

**A.     Decades of Harmony Coincide with the Emergence of LaPierre.**

13.     For nearly four decades, AMc expertly served the NRA, helping the gun rights organization navigate troubled political and societal waters as its principal communication strategist and crisis manager.  The beginning of the relationship followed NRA management's decision to completely outsource its public relations work to AMc.  AMc effectively crafted the NRA message and burnished its image as the most visible Second Amendment advocacy group in the United States.

14.     LaPierre, a one-time Democratic legislative aide, began his NRA career in 1977 as a lobbyist.  Described in news reports as "reserved" and "awkward,"[7] he was seemingly ill-suited to head what many describe as a strident advocacy group.  Aside from his mild personality, AMc personnel found him to be uncomfortable with AMc-developed branding programs such as "NRA Life of Duty," a program created to tell stories about American military and law enforcement professionals who defend the United States domestically and abroad.  LaPierre often exhibited defensiveness, possibly stemming from his lack of military service and multiple deferments

---

[7] *See e.g.*, https://www.thetrace.org/features/nra.financial.misconduct.ackerman.mcqueen.

obtained during the Vietnam conflict.  Even today, LaPierre knows little about guns or how to actually use them.

15.     In the wake of the tragedy at Sandy Hook in 2012, LaPierre personally sought to avoid public scrutiny[8] and to cease being the only voice of the organization.  He turned to AMc, which created the commentator program for that purpose.  Within a short period of time, AMc—at LaPierre's request and with his approval—hired or contracted with several nationally recognized talents whose job was to deliver hard-hitting commentary on Second Amendment and American freedom issues.  This marked the beginning of LaPierre's personal involvement in assessing and approving salaries and capabilities of those talents as, ultimately, those fees would be passed through to the NRA.

16.     LaPierre also tasked AMc to develop programs that would broaden NRA's reach. To that end, AMc developed the theme "Stand and Fight," which became the banner brand for the NRA.  The NRA continues to use the theme today.

17.     By contrast, certain offensive messaging, which disgraced the NRA was created by other vendors at LaPierre's direction.   For example, in 1994, LaPierre and his membership-recruitment firm (not AMc) created the now infamous direct-mailer line, "jack-booted thugs." LaPierre routinely urged AMc to give him "more gasoline," knowing that this kind of incendiary advocacy would create notoriety for the NRA . . . and, of course, enhance his personal brand.  AMc refused all directives that, in its professional opinion, would bring harm to the NRA brand.

18.     Despite AMc's efforts to appeal to a broader audience, LaPierre's polarizing rhetoric appeared to be taking its toll. In 2014, the NRA experienced funding problems, causing LaPierre and the NRA Treasurer, Woody Phillips ("*Phillips*"), to travel to Dallas to announce a

---

[8] LaPierre flew to the Bahamas during this time to avoid having to comment on Sandy Hook.

budget cut for AMc during calendar year 2015.[9]  With the figurative stroke of a pen, LaPierre cut funding for NRA Life of Duty, in the process neutering a valuable, patriotic, and profitable program as well as funding for additional sponsored programming.  When confronted about the decision to cut programs that had active sponsors, LaPierre directed AMc to "fake it," *i.e.*, make it appear that the NRA Life of Duty program and others remained robust despite the significant funding loss.  AMc refused the edict to "fake it," and instead came up with creative alternative concepts that would serve the NRA members with a smaller budget.

**B.    Agreed Protocols, Now Conveniently Ignored, Are Developed.**

19.    During this multi-decade relationship, the parties developed working arrangements, such as negotiating annual budgets covering a variety of tasks.  LaPierre and Phillips controlled the process, operating with full knowledge of line items.  As projects were initiated, invoices would issue, and payment would follow without complaint.  LaPierre participated in those negotiations and approved each annual budget.  The NRA itself well understood that keeping hourly time records as the basis of billing was not the contractual measure of payment—AMc was paid for its *results*.  Reflecting the understanding that strategy and creative value are determined by outcome rather than an amount of time spent, the annual budget developed and agreed upon by the parties was results-based in nature and determined by the fair market value[10] of each proposed objective. The type of time-based detail that the NRA now claims to be missing had simply never been

---

[9] Curiously, the costs cut were associated with NRA video channels; left untouched were many of LaPierre's and other NRA officials' out-of-pocket expenditures.

[10] AMc invoicing for services rendered consists primarily of "Fair Market Value" for services such as video programming production for NRATV, video support, Freedom's Safest Place production, Annual Meetings event planning/coordination/execution, and America's First Freedom print magazine production (all of which are listed on the 2019 Approved Budget).  Some additional services AMc provided consisted of specific talent/personnel, employed by AMc specifically on NRA's behalf.  These personnel were identified individually to NRA, along with their salary, a specified overhead factor for each, and a profit factor for each which concluded with a total for each employee. These transparent and approved salary allocations were the basis of the billing for what NRA refers to as "virtual employees," not the amount of time and/or hours these employee spent working.  Any services rendered outside of the annual approved budget were approved by Woody Phillips (and later, Craig Spray).

required.

20.     LaPierre, with input from AMc CEO, Angus McQueen ("*Angus*"), directed that these working arrangements be set in place.  The entities' senior officers, Phillips (NRA) and Winkler and/or Montgomery (AMc) were involved in the negotiations and oversaw budgetary, invoicing, and payment issues.

21.     The parties abided by these protocols steadfastly and without disagreement for many years as the relationship grew.  Budgets would be set for specific work, AMc sent an invoice, the NRA paid the amount budgeted for the invoiced task, and AMc completed the objective.  The relationship between the organizations was harmonious and mutually beneficial, as both parties grew into leaders in their respective spaces.  Given the transparency and fairness of the annual budgeting process, never in their long history did either party express mistrust of the other side's financial dealings—until political pressure on LaPierre began mounting, that is.

**C.     NRA Asks AMc to Front Activities; LaPierre's Passion for Secrecy.**

22.     One of the defining characteristics of the NRA/AMc relationship was the frequency with which LaPierre and others acting at his direction asked AMc to "front" activities and expenses for the NRA.  For example, AMc would engage third parties to perform work for the NRA at LaPierre and other NRA officials' request, pay for the work performed by those third party(ies), and then submit an invoice for reimbursement by the NRA.  These expense reimbursements (as opposed to charges for work actually performed by AMc) amounted to several millions of dollars annually.[11]  LaPierre's rationale for running these expenses through AMc: it was necessary for security and "discretion" reasons.  In fact, on many occasions, he told AMc that he didn't trust his

---

[11] Press reports influenced by the NRA have incorrectly asserted that the NRA "paid" AMc $40 million in 2017. In fact, a substantial amount of the 2017 budget was spent on expensive national broadcast advertising and talent AMc retained for NRA projects at the NRA's request, specifically, at the request of LaPierre.

own accounting department within the NRA.

23.     LaPierre, beset by apparent paranoia and a passion for secrecy, adopted a dictatorial, micromanagement style.  He began displaying an obsession with privacy, distancing himself from the public eye and exhibiting panic at the thought of public scrutiny.  At the same time, he was heavily involved in the formulation of policy and protocols for dealing with third parties, including vendors like AMc.  Even NRATV, now the scourge of the NRA, was created and expanded at the sole direction of LaPierre.  Not only did he sign off on every performance metric of NRATV, he extolled the success of NRATV in public speeches and made numerous presentations to the Board of Directors in support of NRATV, which seem to have been favorably received.  One board member observed, "If you took a poll of most board members, they'll tell you they like NRATV."[12]

24.     LaPierre repeatedly made two things clear: (1) he was the only person with ultimate authority to speak for the NRA and direct the AMc relationship on behalf of the NRA, unless he specifically designated someone in writing to perform that task; and (2) any expenses he incurred, whether personally or through AMc, were legitimate NRA expenses, and therefore subject to reimbursement to AMc.  As AMc has now learned, LaPierre's broad representations regarding the legitimacy of his expenses were often false.

**D.     The Services Agreement.**

25.     Over the course of years, the parties formalized their working arrangements, embodying their protocols in a "Services Agreement," the first of which they executed in 1999. The latest version was updated in 2017[13] and amended in 2018[14] to confirm the protocol for the

---

[12] http://www.wsj.com/articles/nra.files.suit.against.ad.agency.in.rift.with.key.partner.
[13] Ex. A.
[14] Ex. B.

hiring, compensation, and reimbursements due to AMc under employment agreements involving North and Dana Loesch ("**Loesch**").  At the NRA's request, through LaPierre, AMc formally employed both of these individuals as "talents" for NRATV, the ambitious digital broadcast network created, staffed, and administered in its most recent form (at LaPierre's request) by AMc.

26.     The Services Agreement also contained other key clauses related to the duties imposed upon AMc to maintain the confidentiality of the NRA's sensitive information, a provision designating the sole NRA authority for communicating with and issuing directives to AMc, and numerous other substantive provisions, which the NRA's Amended Complaint has now placed at issue.

### i.     Termination and Reimbursement Provisions.

27.     The 2018 Amendment contains two provisions expressly designed to protect AMc in the event of its expiration or termination of that agreement.  *First*, the NRA was required to secure and post a $3,000,000.00 letter of credit for AMc's benefit to secure payment of outstanding invoices over 30 days old.[15]  *Second*, "all non-cancellable" contracts entered into between AMc and third parties for the benefit of the NRA, including the North and Loesch contracts (referred to therein as the "**AMc Third Party NRA Contracts**"), obligated the NRA to pay the "compensation payable" under the Third Party NRA Contracts.[16]

28.     The 2018 Amendment was significant for other reasons as well.  As described herein, LaPierre on multiple occasions lauded AMc's work on NRATV, including during a meeting in Dallas on October 11, 2018.  Starting at that meeting and continuing over the next two months, LaPierre approved NRATV for the 2019 budget year, including Dan Bongino's $1.5 million contract (which Mr. Bongino ultimately turned down).  As he had done in May 2018 when

---

[15] Ex. B ¶ 2.
[16] Ex. B ¶ 3.

the 2018 Amendment was signed, LaPierre voiced his continuing support for AMc's work and the performance of commentators like North and Loesch. These statements, like the written commitment to reimburse AMc for North and Loesch's salaries, were false, were known by LaPierre to be false when made, and were relied upon by AMc, resulting in damages.

29.    Under the 2017 Services Agreement and the 2018 Amendment, the NRA has the contractual ability to terminate the Agreement at any time with 90-days' notice.  The termination of the Services Agreement triggers Sections XI.B, D, E, and/or F, under which the NRA will owe AMc termination payments, which are currently estimated to approach thirty-five million ($35,000,000) in severance payments and other termination fees.

### ii.    Authorized Contacts.

30.    Additionally, Section IX of the Services Agreement provides as follows:

> AMc is authorized to act upon written communications received from the NRA Executive Vice President or his designee. He or his designee are the ***only persons*** within NRA who have the actual authority to issue such communications.[17]

31.    At all relevant times, LaPierre was (and remains) the NRA Executive Vice President.  As the Executive Vice President, only LaPierre or his designee could demand that AMc provide access to any information or documents to anyone, including the NRA itself.

32.    Pursuant to Section IX of the Services Agreement imposed by the NRA, AMc could act only if it received a "written communication" from LaPierre or his designee.  By like token, only LaPierre could designate persons "within NRA" who have the actual authority to issue directives to AMc relative to the request for, or release of, documents.  For this reason, certain document demands from other sources purporting to act on behalf of the NRA were unauthorized and therefore invalid under the Services Agreement.

---

[17] Ex. A, Section IX (emphasis added).

**E.      NRATV: LaPierre's Brainchild.**

33.      NRATV, now assailed by the NRA as an "abject failure" and a "failed endeavor," has been anything but.  Officially launched as a full network production featuring gun-related topics, political commentary, and other NRA-friendly topics, it had its actual beginnings in the early 1990's.

34.      The network's earliest iteration featured a spokesperson, Ginny Simone, providing monthly reports on VHS for the NRA Board of Directors.  That evolved into Ginny Simone Special Report Video Magazines in 1996, then expanded as follows:

> 2000:  NRA Live Launch
>
> 2004:  NRA News Launch, including the debut of "Cam & Co.," the NRA's first talk show host
>
> 2010:  NRA Life of Duty Network Launch
>
> 2012:  NRA Women Network Launch
>
> 2014:  NRA Freestyle Network Launch
>
> 2015:  Super Channel Launch under NRA News
>
> 2016:  NRATV Official Launch

35.      Throughout NRATV's evolution, AMc developed and administered the network's content (subject to NRA approval) and hired its high-profile talent (at NRA's request with salary and other costs reimbursed and payment "guaranteed" by the NRA).  NRATV was featured by the NRA to its members and directors as one of its proudest and most successful projects.  Each annual budget increased the agreed-upon amounts dedicated by the organization to what became its proprietary flagship.  Each budget also received board approval.

36.      Indeed, LaPierre, during his frequent visits to Dallas and other locations to meet with AMc personnel and discuss NRATV analytics from 2016 to 2018, repeatedly told AMc

personnel how well the network was performing and that the NRA would continue its support, financially and otherwise.

**F.      NRATV as a "Super Channel" with Political Clout.**

37.     Throughout 2015, AMc worked to create both the "Super Channel" and "Freedom's Safest Place."  The so-called "Super Channel" would be streamed online, and "Freedom's Safest Place" would be on the "Super Channel" and on national television.

38.     When Donald Trump ("***Trump***") became the Republican presidential nominee front-runner heading into the NRA convention in 2016, it became clear that the NRA needed to support his campaign, given the alignment between his base and the NRA's base.  LaPierre bristled at the thought of openly supporting Trump so early.  He continued his cynicism regarding Trump during the entire presidential election, noting on multiple occasions that he did not believe Trump could win.  In the fall of 2016, LaPierre approved new live programming to launch under the new brand NRATV that he believed would be crucial during what he anticipated would be a Hillary Clinton presidency.

39.     Despite LaPierre's negativity regarding Trump's candidacy, the NRA, with the advantage of Chris Cox's[18] relationships, placed their support behind Trump.  Freedom's Safest Place ads had become an impressive success for the organization.  They were routinely used to solicit high donor donations, and they aired throughout the 2016 election.  Once Trump became President, LaPierre routinely referred to the Trump presidency as the "Trump slump"[19] and opted to use Freedom's Safest Place to continue to solicit donations throughout 2017 and into 2018 while keeping the ads running on Fox News.

---

[18] Former Executive Director of NRA Institute for Legislative Action and Chief Lobbyist.
[19] The "Trump slump" is LaPierre's reference to the decrease in NRA membership revenue caused by the lack of a "common enemy," "threat," or other fear-based drivers of NRA membership.

40.     In the successful deployment of broad messaging about freedom that resonated with the NRA's constituency, LaPierre sought to increase NRATV's live presence.  He personally courted Loesch to join the channel full-time.  Her show launched in 2018 right after the tragedy in Parkland, Florida.

41.     Loesch appeared on the CNN Town Hall instead of LaPierre, and he routinely confirmed that her appearance was a huge success, helping the NRA to raise millions of dollars. What's more, NRATV was going live multiple times throughout the day with messaging intended to counter the narrative coming from gun control groups.  In one monetization effort, NRATV was able to generate almost $500,000 in a matter of some 35 days, the bulk of which occurred over a ten-day period.

The following graphic illustrates the successful fund-raising effort:



### G.    LaPierre Fails to Calm Stormy Seas.

42.    In the wake of Parkland, the NRA was becoming more and more publically vilified. Much of the executive leadership became extremely agitated about impending investigations. Tension mounted.   Threats took the form of "forensic accounting teams taking over whole floors in New York City to bury the NRA" and "the loss of all the organization's insurance."

43.    Seeking to stabilize his rudderless ship, and with repeated resignation threats from Pete Brownell,[20] LaPierre personally recruited North to become the next president of the organization and appear on NRATV.  North had been doing pro bono work for the NRA ever since the launch of NRA Life of Duty.  North was also one of the most effective voices in the Freedom's Safest Place campaign.  Everything culminated at the 2018 Dallas Annual Meetings where AMc representatives had multiple meetings with Phillips,[21] Steve Hart,[22] and LaPierre to discuss North's contract as well as the announcement of his presidency.  Amidst the mounting political pressure, the North presidency provided the NRA with much needed stability and increased public respect.

44.    Despite North's short-lived stabilizing effect, AMc began to have serious concerns about the NRA's direction under LaPierre's leadership. First was the Carry Guard debacle. Originally an admirable concept intended to fill a gap in the NRA's portfolio of member services, Carry Guard was designed to provide concealed-carry insurance and firearms training for its subscribers.  AMc was hired to develop the training component and to provide public-relations and branding services for the program.[23]  However, it was the NRA's responsibility, led by Josh Powell ("*Powell*"),[24] to develop and administer the entire Carry Guard program, including the

---

[20] President of NRA Board of Directors at that time.
[21] Treasurer of NRA at that time.
[22] General Counsel of NRA Board of Directors at that time.
[23] AMc engaged multiple third-party contractors consisting of elite special operations personnel to develop training programs that the NRA believed it could not do on its own.
[24] At AMc's insistence, Powell was eventually removed from contact with AMc employees due to his sexual harassment of an AMc employee.

insurance portion.

45.     On multiple occasions, the program's mismanagement was made obvious.  For example, Powell tried to convince the NRA to acquire USCCA, the leading competitor in the space, going so far as to enter into negotiations with the USCCA president entirely without approval from the NRA Board.  Powell appeared to be freelancing—a prospect that, from AMc's perspective, boded poorly for the ultimate success of the project.  Moreover, in meetings with AMc, Powell seemed generally dismissive of the training component of the program and kept referring to Carry Guard as nothing but an "insurance scheme."  AMc, however, wanted nothing to do with a "scheme."  As Powell pressed forcefully to launch a premature program, AMc expressed reservations about promoting anything that the NRA would be unable to deliver as promised.  This created the first visible signs of schism in the relationship, with Powell upset that AMc would not follow his direction.

46.     The next issue that started to unfold was the Russia investigation by the NRA. Initially, the NRA asked an experienced contractor, Elaine Lammert,[25] to lead the internal investigation.  But quickly, she was stonewalled.  NRA officials even implied that they were more concerned with hiding the facts of the investigation than with bringing the entire story to light. AMc wanted nothing to do with those at the NRA who were trying to stifle the truth.  The extent to which the NRA was willing to prioritize the personal protection of LaPierre and other members of the Board—a whitewash effort the organization is stridently pursuing even today—was becoming evident to AMc.

47.     It is against this backdrop of chaos that the NRA still needed AMc to do its increasingly important job of managing the public-facing brand, while the NRA scrambled to

---

[25] Former Deputy General Counsel for the FBI.

protect itself from what appeared to the outside world to be a massive case of mismanagement. AMc's disagreement with the NRA's rollout and administration of the Carry Guard program and issues such as AMc's vocal objection over how the Russia investigation was handled became additional "grist for the mill" of retaliation led by LaPierre.

## H.    The NRA: Wayne's World.

48.    From its founding in 1871, the NRA grew to become a respected and powerful voice for Second Amendment rights in America.  Then came Wayne LaPierre.  Now built on the unstable foundation of LaPierre's personality, today's NRA bears little resemblance to its earlier incarnations.  As the lawsuits against AMc and others have continued to unfold, it has become clear that LaPierre himself is his first priority, as opposed to the Second Amendment.

### i.    Personal Spending: Party On.

49.    Throughout his tenure with the NRA, LaPierre has routinely used third-party vendors like AMc to conceal his penchant for personal spending, seemingly with the NRA's blessing.  By establishing an annual line-item budget for pass-through expenses, he created a veritable black hole for unchecked spending that, in turn, appeared to be a legitimate vendor expense for purposes of NRA records.

50.    AMc has discovered that some of LaPierre's out-of-pocket expenses reimbursed to AMc by the NRA, which were both requested and approved by LaPierre, appear to be personal in nature: a $5,000 monthly rental for an apartment to be used by a female NRA intern; a retainer for a travel agent who was facilitating personal travel for LaPierre and his family; and the use of an AMc credit card by LaPierre and other NRA employees for LaPierre's personal benefit.  In theory, the backup documentation for many of these charges should still be in LaPierre's possession.

51.    AMc first became suspicious of LaPierre's misuse of funds when AMc was asked

to facilitate and help structure the financing of a personal home for LaPierre and his wife. Ostensibly for "safety" reasons, LaPierre began looking for a home where he would be better protected than his current residence. As the search expanded, LaPierre passed over numerous safe housing options in favor of a $6 million mansion with no greater safety benefits. At that point, AMc refused to continue participating in the house transaction.

52.     Upon information and belief, other vendors are being protected who are willing to hide LaPierre's spending. AMc became a target only after refusing to allow for these pass-through line-items in the parties' most recent annual budget. Indeed, other service providers and board members who challenged LaPierre's use of funds have now also been pushed out and attacked by the NRA as "co-conspirators."

53.     LaPierre has also structured certain "back-scratching" relationships to siphon money to pet projects that the NRA would otherwise be prohibited from contributing to. Upon information and belief, the NRA makes charitable contributions to a third-party charity, who in turn donates that money to Youth for Tomorrow, an organization for which LaPierre's wife, Susan LaPierre, acted as President.

**ii.     "Funny Money": Filling the Coffers.**

54.     In order to continue supporting LaPierre's spending habits, the NRA had to continue fundraising successfully. To artificially boost these efforts, LaPierre intentionally misled members using fear-based promotions designed to drive donations. For example, the NRA's recent plea for donations to fight Andrew Cuomo (citing the danger of losing its insurance), or claims that the NRA was "going out of business," were intentionally misleading to drive donation and membership dollars. AMc likewise refused to be a part of any promotion or publicity stunt that was misleading to NRA members.

55.     LaPierre also boosted NRA revenue through the creation of shell programs that the NRA never had any intention or meaningful ability to execute (or execute competently).  Examples of these programs include Carry Guard and School Shield.[26]  By appealing to members' hearts or promising benefits that were never delivered, the NRA raised millions of dollars of "funny money"—LaPierre's affectionate term for brand sponsorship funds.

### iii.     Wasteful Litigation: The Best Defense Is A Good Offense.

56.     Sometime in early 2018, LaPierre became preoccupied with going to jail, a fact that alarmed AMc given the frequency with which he reiterated this concern.  This is approximately the time when Brewer and his law firm entered the picture.  In a clear effort to deflect attention from the potential discovery of LaPierre's pervasive misuse of member funds, LaPierre and Brewer initiated numerous lawsuits around the country—each making its own media splash and presenting an opportunity for LaPierre to paint the NRA as an innocent victim of someone else (which, as a bonus, also drives donation dollars).  LaPierre and Brewer actually agreed upon this specific plan, as shown in an excerpt from the Brewer Fee Agreement, where Brewer was hired to perform services—

> —in connection with litigation and strategic needs arising from **the termination or potential termination of key corporate relationships by contract counterparties in response to political pressure**.[27]

57.     As the lawsuits exploded, so did legal fees payable to the Brewer Firm.

---

[26] School Shield was developed in the wake of the Sandy Hook tragedy in 2012.  The goal was to provide schools, through grants from the NRA, with threat assessments to determine the school's vulnerability, prepare a plan to make schools more secure, and help locate qualified armed safety officials.  Although this program raised millions of dollars, it was little more than a media stunt.  By the end of 2014, School Shield had issued a paltry five (5) grants.  After North became President in 2018, he demanded that the NRA "make it real."

[27] Ex. C (April 18, 2019 Correspondence from North to NRA Board of Directors) (emphasis added).

### iv.     Wayne's Way or the Highway.

58.     Throughout the last year, the NRA has seen the exodus of once-devoted board members, legal counsel, chief lobbyist, North (the Board's President), and longtime vendor, AMc—each dedicated to defending the Second Amendment, each unwilling to blindly follow LaPierre, and each attacked as "conspiring" against LaPierre.  It has become clear to many within the NRA that LaPierre does not truly care if board member are devoted to the Second Amendment—he cares if they are devoted to *him*.

## I.     Litigation Abuse.

59.     Beginning spring of 2018, AMc learned that the NRA had hired Brewer.  The retention of Brewer was baffling given his long history of supporting anti-gun proponents and members of the Democratic Party, including Beto O'Rourke (a proponent of gun confiscation), Hillary Clinton, and Barack Obama.  It was even more puzzling in light of Brewer's familial relationship with Angus McQueen (Brewer's father-in-law) and Revan McQueen (brother-in-law).[28]  It also began an onslaught of "scorched earth" tactics.[29]  Since his entry onto the scene, Brewer and his firm, with the approval of LaPierre, has filed no less than eight lawsuits, four of which (including the instant case) are directed against AMc.  Three of the cases against AMc now reside in state court in the City of Alexandria, Virginia, and among other claims involve mutual charges of breach of the Services Agreement.  The fee agreement between Brewer and LaPierre, supposedly on behalf of the NRA, predicted litigation in precisely this manner.

60.     In addition, Brewer has filed suit against the Governor of New York, Andrew Cuomo, and its chief insurance regulator; the Lockton Companies, designer of Carry Guard

---

[28] Recognizing the deeply personal information involved, and to obviate any exploitation of the family relationship, AMc raised this conflict and ultimately had Brewer replaced as direct AMc contact.

[29] https://www.washingtonpost.com/politics/how.a.hard.charging.lawyer.helped.fuel.a.civil.war.

insurance, which has now been found to be in violation of New York and at least one other state's laws; Col. North, in the Supreme Court of New York; New York Attorney General, Letitia James; and a lawsuit against the City of San Francisco.

61.     When Brewer entered the scene in early 2018, Brewer entered the scene offering the NRA legal services while vying for the public relations work then being handled by AMc. Brewer is now using his hallmark (yet ethically questionable) "Rambo tactics" to target his family's business.

62.     In addition to his "truth neutral"[30] legal services, Brewer promotes his law firm as one that also offers public-relations services in house.  Contemporaneous with Brewer's attacks on his in-laws' public relations firm, Brewer published a legal article advocating that public relations services should be performed by law firms (instead of firms like AMc):

> As many clients realize, crafting a public narrative can no longer fall solely under the purview of public relations agencies or a corporation's in-house communications department.
>
> According to recent press reports, the legal community has awakened to the "new" normal: issues and crisis management should be a fundamental component of any high-stakes advocacy plan. There are many advantages for clients when that function is managed by law firms.[31]

63.     According to numerous reports, over the course of approximately one year, the Brewer Firm has billed the NRA $24 million (a number that has since grown), translating to (according to one report) some $97,000 per day.[32]

**J.     Ouster of AMc:  The Plan is Formalized**

64.     It appears that LaPierre set out on the course to eliminate AMc as a principal vendor

---

[30] *See* https://www.texastribune.org/2019/09/19/dallas-lawyer-william-brewer-iii-helped-fuel-civil-war-inside-nra/.

[31] *See* Excerpts from William A. Brewer III, Advocacy as Art: Lawyers Must Engage in Issues and Crisis Management, TEXAS LAWYER (May 6, 2019).

[32] *See e.g.*, http://www.washingtonpost.com/politics/nascar.owner.resigns-from-NRA-board.

to the NRA sometime in early 2018.  Brewer and the Brewer Firm have actively assisted LaPierre in that endeavor.  Indeed, comments made by LaPierre to AMc officials reveal that LaPierre believes he is simply acting as, what LaPierre has characterized, "a pawn in Brewer's game of chess."

65.     As stated, the Brewer Fee Agreement, dated March 2018, summarizes the services to be rendered for the NRA: "**litigation and strategic needs arising from the termination . . . of key corporate relationships . . . in response to political pressure**."[33]   A fair reading of this excerpt reveals a dramatic truth never shared with AMc and in fact guarded by LaPierre and Brewer: Brewer was hired to assist in terminating, including via litigation, AMc's long-tenured relationship with the NRA, well before any allegations of misconduct existed.  This discovery has helped explain the NRA's abrupt change in attitude towards AMc, and its chameleon-like change from friend to foe.

66.     The Brewer Firm's Fee Agreement reveals another truth as well:  LaPierre was intent on severing ties with AMc as early as the spring of 2018, no doubt because AMc had begun to question directives received from LaPierre, along with the adversarial nature of his demands, and because of AMc's unwillingness to accommodate some of those demands—long before most of the acts underlying the NRA's claim against AMc.  These included AMc's refusal to participate in LaPierre's plea for donations from members under the false guise of a "shutdown."[34] Unbeknownst to AMc, LaPierre was already plotting litigation against AMc in September 2018, consistent with that express objective in the Brewer Fee Agreement.

67.     LaPierre's actions during the entirety of 2018 and into 2019, wherein he repeatedly

---

[33] Ex. C (emphasis added).
[34] Ex. D (March 4, 2019 NRA Notice of Shutdown).  Not only did the NRA not shutdown, but despite whatever financial woes LaPierre may have concocted, recent NRA tax filings reveal that LaPierre's compensation actually *increased* in 2018 by 55% to $2.2 million.

represented to AMc personnel that: (1) NRATV would continue to be funded; (2) the NRA would continue to reimburse AMc for its third-party contracts; and (3) the NRA was committed to working through issues raised by the Brewer Firm, were false statements of fact.  LaPierre and others within the organization knew such statements to be false when made.  AMc relied upon these repeated assurances and continued to make financial commitments (including the North Contract) in reliance thereon.

**K.    Brewer Supplants AMc in its Work for the NRA.**

68.    Over the course of several months, beginning with Brewer's retention and consistent with the recently publicized engagement letter, the NRA took an increasingly aggressive stance against its long-time vendor, first insisting on information that had never been a source of controversy in the past; insisting on documents that had never been required in the parties' dealings; demanding justification for its pricing, which had long-since been preapproved in annual budgets by the NRA and LaPierre; demanding interviews of AMc personnel; and conducting three separate audits (one of which lasted longer than one week), purportedly under auspices of the Services Agreement.

69.    LaPierre set out to destroy the NRA's relationship with AMc by using vexatious litigation in order to oust AMc in favor of the Brewer Firm's public-relations/crisis-management advocacy. Indeed, the Brewer Firm has now supplanted AMc as the NRA's public relations lead communication strategist.  According to LaPierre, Brewer, his new PR manager, is going to "keep him out of jail" as the pressure on the NRA has continued to mount under demands for greater transparency into the NRA's financial management.

**L.    Smoke and Mirrors: Pretexts for Termination.**

70.    Throughout its cavalcade of litigation, the NRA has spun several false narratives in

a bad-faith attempt to create the appearance of a valid reason for terminating the Services Agreement, thereby escaping the contractual consequences of termination.

71.     Paragraph XI.C of the Services Agreement speaks to these consequences:

> This Services Agreement may be terminated by NRA immediately upon written notice if: (1) **AMc fails to diligently and in good faith perform any of its obligations contemplated hereunder; (2) AMc breaches any term, promise or covenant hereunder** . . .[35] If NRA so terminates the Services Agreement, **NRA shall have no obligation to make payments** except that NRA shall, pursuant to Section III [that section dealing with ordinary course or special assignment payments] reimburse AMc for expenses incurred up to the date of said notice of termination. (Emphasis added).

72.     Thus, by creating the false appearance of one of these breach events, the NRA stood to avoid the many millions of dollars it would otherwise owe—and in fact owes—to AMc in the form of severance and cancellation fees, as well as an unliquidated "Termination Fee" described in Section XI.F of the Services Agreement.[36]

73.     Once AMc was chosen to become the NRA's "fall guy" in its impending media and legal debacle, the Services Agreement with AMc would of course need to be terminated, thus requiring a false pretext for both termination and subsequent litigation.  The NRA quickly began weaving narratives that AMc had failed to perform "its obligations under the contract" or had breached one or more "term, promise or covenant" under the Services Agreement. The following subparagraphs describe these false narratives in greater detail.

**i.     The "Amendments" to New York Not-for-Profit Law.**

74.     As a preliminary matter, the Amended Complaint asserts that changes in New York

---

[35] Other breach/default events not relevant to the current action have been omitted.

[36] "In consideration of the dedication of a substantial number of personnel and resources to provide the services under this Agreement (and the necessity to maintain such staffing levels and resource allocations to enable AMc to continue to provide such services upon any renewals hereof), the NRA agrees to pay AMc a fair and equitable termination fee to compensate it for the inevitable severances and other reasonable costs incurred in conjunction with such expiration or termination.  Such termination fees shall be negotiated in good faith by the parties and paid to AMc no later than the last day of this Agreement." Ex. A, Section XI.F (Services Agreement).

nonprofit laws were the motivation for the NRA's requests for documents and audits of AMc's financial records.[37] This argument is a red herring: the "recent" changes in the rules occurred in 2014, and those changes did not alter the longstanding requirement that the NRA's Board carefully consider related-party contracts as a non-profit incorporated in New York State.

75.     Effective July 1, 2014, the New York Non-Profit Revitalization Act amended the N-PCL, including the provisions governing related-party transactions and conflict of interest policies.  Further amendments to those provisions were made in 2015 and 2016.  However, New York law has contained specific rules regarding related-party transactions, which rules have been in place since at least 1970.

76.     NRA's compliance (or lack thereof) with the related-party-transaction rules rests squarely on the NRA itself.

77.     AMc has complied with all of the NRA's properly authorized requests to review AMc's books and records.  AMc in no way has impaired the NRA's ability to fulfill its duties with respect to its own related-party transactions or any other duty required under New York law.

**ii.     The Document Demand.**

78.     Beginning in May 2018, AMc began receiving "demands" for various documents by persons purporting to be acting on behalf of the NRA.  However, the NRA often failed to abide by the contractual requirement to communicate directives to AMc through Executive Vice President (LaPierre) or his formally declared designee as required by Section IX of the Services Agreement.  In response to document demands, AMc repeatedly responded that the NRA was not following the requirements of the Services Agreement and that the demands issued to AMc were improper and ineffective.

---

[37] Amended Complaint ¶ 47.

79.     Moreover, the NRA has historically conducted annual audits of its vendors.  AMc has openly provided NRA access to financial and other information (including pricing) to NRA accountants and officers, including the Treasurer, Chief Financial Officer, and Board Legal Counsel, on an annual basis.  These true audits have been conducted almost yearly without complaint or adverse findings by the NRA for more than twenty-five years.  However, on several occasions, LaPierre would specifically instruct AMc not to disclose certain information to certain auditors, such as Rick Tedrick in the NRA accounting department.  Naturally, directives like this presented a conflict for AMc, who both desired to comply with the Services Agreement and with the auditors.

80.     NRA had three to six auditors in AMc's Oklahoma City office reviewing AMc files, records, and documents for approximately nine (9) days in February 2019.  Another auditor examined the records of AMc in November 2018 for an entire day.  These audits were preceded by another "audit" in September 2018 by the Brewer Firm, a process AMc complied with in good faith.

81.     At no time did the auditors claim to AMc that documents were withheld from review.  It is AMc's understanding that even LaPierre himself does not believe any documents requested by the auditors/examiners were deliberately withheld by AMc.

82.     John Frazer ("*Frazer*"), the NRA's general counsel, twice expressed his gratitude for AMc's compliance with the NRA audit: first, in an email on March 4, 2019, and again on March 25, 2019.  Frazer also characterized the NRA audit of AMc as "productive" in a letter to AMc counsel on March 14, 2019.

83.     AMc has complied with every authorized demand for examination of its documents, and the NRA's allegations to the contrary are nothing but an attempt to manufacture

the appearance of a contractual breach.

### iii.    The Confidentiality Provision.

84.    The NRA has also made unsubstantiated and ambiguous claims of "leaks" to the press by AMc, or someone acting on its behalf.  The NRA's claims are replete with words like "malicious" and "defamatory" but otherwise thin in substance, whether with respect to the content of the leak, the identity of the person who may have been the leak, or any damage sustained by the NRA as a result.

85.    In one recent Virginia lawsuit, the NRA alleged identical confidentiality breaches against AMc.  After conducting discovery and multiple depositions, the NRA has yet to adduce any evidence of this supposed breach.

86.    On the other hand, just as plausibly, a well-timed "leak" by someone associated with the NRA might also be helpful in creating the appearance of a contractual breach, generating media attention, shifting focus away from LaPierre and other NRA board members, and supporting a parade of vexatious and abusive litigation against its chosen scapegoat—precisely the job Brewer was hired to do.

### iv.    The Analytics Gambit.

87.    Newly-formulated complaints by the NRA, characterizing NRATV as a "failed endeavor," also qualify as a "made for litigation" stalking horse.  Analytics were central to NRATV operations (essentially, viewership numbers).  As set forth in greater detail in AMc's third-party action against LaPierre, periodic reports containing detailed analytics were regularly provided to LaPierre during the period 2016 (year of launch) through May 13, 2019, one month after the NRA filed its first lawsuit against AMc (which in part complained falsely about non-receipt of NRATV analytics).  LaPierre personally approved the development of a customized

dashboard, which accumulated data from all platforms running NRATV content. He also sent NRA employee, Todd Grable, to review AMc's analytics and methodology, which were approved as a result of that meeting. Furthermore, AMc invited LaPierre on numerous occasions that, if he was ever concerned about the analytics, he was welcome to have a third-party company, such as Deloitte Digital or Accenture, audit and report on AMc's practices as well.

88.     LaPierre personally attended meetings to be briefed on NRATV analytics on the following occasions: October 24, 2017; November 28, 2017; January 3, 2018; February 1 and 19, 2018; April 11, 2018; September 4, 2018; October 11[38] and 23, 2018; November 28, 2018; December 5, 2018; and January 18, 2019. During each visit, AMc personnel shared in-depth analyses of viewership analytics that were three levels deep. LaPierre openly lauded AMc's performance. That too was false, because three days after his last scheduled visit regarding analytics on April 9, 2019 (when LaPierre abruptly and unexpectedly "had to leave" before the presentation could be made), the NRA filed its first lawsuit against AMc. Among other things, the NRA alleged that AMc had refused to provide the NRA with NRATV analytics – the very subject of the April 9 meeting!

**M.     The Onslaught Goes Public.**

    **i.     The NRA Discloses AMc's Proprietary Information.**

89.     On March 11, 2019, the New York Times ran an article in which the author revealed the existence of the North Contract and certain features thereof, including AMc's involvement with North.[39] The article misrepresented the facts and disparaged AMc. The New York Times article attributed certain factual assertions to Brewer as the source speaking on behalf of the NRA.

90.     Later, LaPierre, in a writing to the NRA Board, confirmed his authorization given

---

[38] Although a presentation was prepared for this meeting, it was not actually made that day.
[39] *See* https://www.nytimes.com/2019/03/11/us/nra-video-streaming-nratv.html.

to Brewer to communicate with the New York Times.

91.     The NRA's deliberately false statements to the media regarding AMc's confidential information represented a change in the parties' relationship as well as the fundamental protocol for dealing with the parties' confidential information that had been in existence and honored for decades.

92.     AMc immediately expressed its strong objection to the NRA's false statements, doing so by letter to NRA General Counsel, Frazer, on March 12, 2019.

93.     Frazer's March 14, 2019 response did not deny that the NRA had leaked the information to the New York Times.  Instead, Frazer for the first time asserted the NRA's position that only AMc, and not the NRA, had restrictions on the use of a party's confidential information. The NRA claimed it could disclose AMc's information with impunity while AMc was contractually prohibited from any reciprocal freedom to use NRA information.

94.     The exchange of correspondence signaled NRA's claim that it could deliberately misuse AMc's confidential information and thereby violate NRA's duty of good faith and fair dealing inherent within the terms of the Services Agreement.

95.     Current and prospective clients, financial institutions, and insurance providers have begun questioning AMc employees in light of the New York Times article, this Lawsuit, and consequent media reports.

### ii.     Litigation as a Spectator Sport.

96.     The NRA, with Brewer at the helm, has moved from a non-profit gun-rights organization to a serial litigant.  The NRA's waste of courts' limited docket space has ranged from a glorified discovery dispute to three additional lawsuits in different jurisdictions covering similar

sets of factual and legal allegations.  In fact, between the one Texas and three Virginia actions,[40] all of the NRA's factual and legal claims are currently being litigated in at least two lawsuits.

97.     Each of these suits portrays the NRA as a victim, each has been filed without any attempt at a good faith "meet and confer" negotiation, and each has been accompanied by carefully orchestrated leaks and false self-serving press releases.  In fact, the Defendants in this lawsuit first learned that they were sued from news reports in advance of being served.  The repetitive and persistent nature of these filings merely underscores the fact that the NRA (and its counsel) have no real interest in resolution, but a protracted public spectacle.

### iii.     Disparaging Remarks Turn Libelous.

98.     Consistent with his approach of "lawyer as public advocate" for his client,[41] Brewer, with the approval of LaPierre and assistance from other NRA personnel, has become the *de facto* NRA spokesman and has fashioned a narrative that has brought AMc into disrepute. Contemporaneous with the filing of the NRA's lawsuits against AMc, Brewer and other NRA representatives have frequently attempted to spin the NRA message as one in which it is faultless and AMc is a rogue entity, bent on frustrating the NRA's legitimate efforts at obtaining disclosure.

99.     All of this is a transparent attempt to transfer attention from LaPierre's mismanagement of the NRA and possible civil and criminal exposure, and to wreak havoc within an organization that the Brewer Firm now directly competes with.  Examples abound where NRA representatives, including Brewer, have disparaged AMc, portrayed it as a miscreant, divulged its

---

[40] *National Rifle Association of America v. Ackerman McQueen, Inc. and Mercury Group, Inc.*, Civil Case No. CL19001757, pending in the Circuit Court for the City of Alexandria, Virginia (filed on April 12, 2019); *National Rifle Association of America v. Ackerman McQueen, Inc. and Mercury Group, Inc.*, Civil Case No. CL19002067, pending in the Circuit Court for the City of Alexandria, Virginia (filed on May 22, 2019); *National Rifle Association of America v. Ackerman McQueen, Inc. and Mercury Group, Inc.*, Civil Case No. CL19002886, pending in the Circuit Court for the City of Alexandria, Virginia (filed on September 5, 2019).
[41] *See* Excerpts from William A. Brewer III, Advocacy as Art: Lawyers Must Engage in Issues and Crisis Management, Texas Lawyer (May 6, 2019).

confidential information, and trampled over AMc's rights and entitlements.

100.    The most damaging of these public comments have been press reports quoting LaPierre accusing AMc of "extortion," which Brewer and others have parroted in the media.  This false accusation of criminal wrongdoing has been repeated by other NRA representatives.  In the process, AMc's purported role has moved from that of being North's alleged facilitator to the one performing the act of extortion.[42]

101.    LaPierre also asserted that AMc "appears to have responded indirectly by trying to oust me."  LaPierre's assertion concerning AMc's purported involvement, since then repeated, is false.  In fact, AMc faced repeated demands by the NRA for backup on LaPierre's charges that the NRA had reimbursed, such as apartment rent for an NRA intern previously approved by LaPierre, and a number of LaPierre private aircraft and other transportation, hotel, and Landini Brothers (popular Alexandria, Virginia restaurant) charges.  To obtain such backup, AMc sent letters to several sources (including LaPierre himself) asking for such records to enable AMc to respond to NRA demands.

102.    "Extortion," under Virginia statute § 18.2-59 ("Extortion of money, property or pecuniary benefit") defines the offense as including "threaten[ing] injury to the character, person or property of another . . ." and can be punishable by up to 10 years in prison.  Code 1950, §18.1-184; 2010, Chapter 298.  Making such a reckless accusation, false as it is, is a clear example of the

---

[42] The following are examples of the many claims of AMc's alleged wrongdoing spoken by NRA representatives: https://www.washingtonpost.com/politics/documents-show-nra-discussions-to-purchse-luxury-mansion  (AMc as "wrongdoer;) civil.war (Brewer in discussin aMc, accused it of trying to purge NRA of LaPierre by "extortion," him Wall Street Journal, April 27, 2019 "Extortion Allegation Riles Top NRA Ranks" (citing LaPierre's claim of extortion in letter to NRA Board); https://www.washington.post.com/news/2019/sep/10/who's-behind-attacks- national-rifle-association.  "Behind the latest attack is a former NRA contractor".  "The contractor refused [a financial review]; the contractor . . . delivered an ultimatum in the form of this threat . . ..; https://www.washingtonpost.com/politics/how.a.hard.charging.lawyer.helped.fund.a.civil.war;  and Wall Street Journal article, April 27, 2019 @http://wsj.extortion.allegation.riles.top.nra.ranks; http://www.washingtonpost.com/politicsnra.shakes.up.legal.team.amid.intensifying.civil.war/2019/08/22/72fa460a-c52d-11e9-b5e4-54aa56d5b7cestory.html

malice shown by LaPierre and the NRA towards AMc.

### N.     One-Sided Services Agreement.

103.     Each of the actions brought by the NRA, including the instant case, either directly involves or tangentially implicates the Services Agreement and the respective rights and obligations of the NRA and AMc.  In fact, the first two Virginia cases are centered on alleged breaches of that agreement by AMc.  AMc has counterclaimed in Virginia alleging that it is the NRA, not AMc, that is in breach of that Services Agreement.

104.     It is now appropriate for this Court to consider whether, by its many actions, including several lawsuits filed against AMc, the NRA has waived its rights to continue to insist on the viability of one particular provision of that agreement:  the confidentiality section.[43]

105.     The NRA featured the confidentiality section of the Services Agreement not only in the Virginia litigation, but it also waived the provision by its disclosure of confidential information belonging to AMc and by disclosure of its own purportedly confidential information.  For example, it was the NRA that disclosed the existence and content of the AMc agreement with North, confidential to both AMc and the NRA.[44]  LaPierre admitted that he authorized the Brewer Firm to communicate with the New York Times.  When AMc complained and demanded a retraction, NRA counsel took the absurd position that confidentiality applied only to AMc.  Under that theory, the NRA can divulge AMc's confidential material with impunity; AMc has no reciprocal right.

106.     Additionally, the NRA has liberally quoted from the Services Agreement, including in the instant case.  Having previously taken the position that the Services Agreement itself is confidential, it cannot now hope to preserve that status.

---

[43] Ex. A, Section IV.
[44] *See* https://www.nytimes.com/2019/03/11/us/nra-video-streaming-nratv.html.

107.    If this is truly a proper reading of the Services Agreement, then under those circumstances, AMc is entitled to a declaration that such provision has been waived by the conduct of the NRA.  Alternatively, it qualifies as an unconscionable agreement under the provisions of Virginia § 8.2-302, which provides in pertinent part:

> If the Court finds as a matter of law the contract or any clause thereof to have been unconscionable at the time made, the court may refuse to enforce the contract, or to ignore the unconscionable provision, or it may limit its application in order to avoid as unconscionable result. Code of Virginia § 8.2-302.[45]

108.    As dependent as the NRA is on certain provisions of the Services Agreement, it conveniently overlooks its obligation to pay a "fair and equitable termination fee," recognizing the "inevitable severances and other reasonable costs" associated with termination, and the concurrent requirement to negotiate such costs in good faith.[46]

## O.    The NRA and LaPierre Destroy AMc's Third Party NRA Contracts.

109.    At the NRA's bidding, AMc entered into employment agreements with two well-known personalities, North and Loesch.  They, and at least one other talent, at the request of the NRA, were formally employed by AMc.  The 2018 Amendment to the Services Agreement made clear the NRA's responsibility for their compensation.  As previously noted, under that amendment, the NRA took responsibility for reimbursing AMc for the cost associated with the NRATV talents.  The NRA also effectively "guaranteed" its Third Party NRA Contract obligations by committing, among other things, to provide a $3 million letter of credit to backstop those commitments.[47]

110.    Until the NRA began its campaign of belligerence against AMc, the reimbursement

---

[45] Pursuant to Section XII.A of the Services Agreement, all disputes "arising thereunder shall be governed by and construed solely under the laws of the Commonwealth of Virginia, or if applicable by federal law."  *See* Ex. A.
[46] *See* Ex. A, Sections XI.E-F.
[47] *See* Ex. B, Section 2, 3.

system worked as well as it always had throughout the years, including reimbursement for third-party contracts.  Indeed, even as the NRA ramped up its campaign of harassment against AMc, it continued to observe its obligations to AMc and, by third party beneficiary extension, to the talents.

111.    LaPierre injected himself personally into the recruitment of North.  He negotiated the North Contract, and despite his current denials, he was intimately involved in all material aspects thereof, including the designation of North as an "employee" instead of a "contractor." LaPierre's turnaround efforts to oust North as President of the NRA demonstrate his intent to interfere with the North Contract and damage AMc in the process.

112.    When the NRA precipitously initiated its litigation campaign against AMc, leading to the eventual shutdown of NRATV at the end of June 2019, the NRA used the opportunity to cease reimbursement for the compensation of the Third Party NRA Contracts.  This, despite its clear obligation to reimburse AMc for "fronting" the salaries and benefits for North, Loesch, and the other talent.

113.     The result of the NRA's cutting off of funds, quite naturally, left AMc in the untenable position where it was unable to manage the compensation requirements of the Third Party NRA Contracts.  One of those talents has now initiated legal proceedings against AMc for discontinuing that person's compensation.

114.    The NRA and LaPierre not only knew of the Third Party Contracts, they expressly approved each of them and acknowledged their existence and the NRA's obligations to pay for those contracts in the 2018 Services Agreement Amendment.  In the face of that knowledge and acknowledgement, the NRA has now steadfastly refused to honor its obligation at the urging of and with the approval of LaPierre, in the process tortiously interfering with those third party contracts.

P.      **A Compendium of Missteps.**

115.    Many events have led to the rupture of this once-thriving relationship.  Most have

been chronicled in press reports: Brewer; LaPierre's lavish wardrobe expenditures; LaPierre's (and

his wife Susan's) extravagant trips and vacations paid for with NRA funds; the LaPierre family's

use of AMc personnel as personal valets; LaPierre's attempted purchase of a Texas mansion, foiled

by AMc's reluctance to see it through; and sexual harassment charges against LaPierre's Chief of

Staff Powell, to name the most prominent.  These were by no means the exclusive causes of the

termination.

116.    Indeed, other factors have contributed:

- The NRA's suspicious behavior relating to federal and state investigations;

- AMc's cessation of LaPierre's (or other on his behalf) incursion expenses that were personal in nature;

- The "Russia trip" and LaPierre's and the NRA's dishonest treatment of that issue;

- LaPierre's preoccupation with possible criminal charges and a "dissolution resolution";

- The NRA tolerating sexual harassment committed by a high-ranking member of its management;

- Orchestrated leaks of confidential information, purposely painting AMc in an unfavorable light;

- Clear lack of board oversight; and

- Deliberate purging of right-minded NRA directors, officers, and attorneys.

117.    In the span of two short years, the NRA, with LaPierre leading the charge, has

destroyed or attempted to destroy what was built over decades.  The NRA has experienced massive

personnel disruptions, enormous expenses, loss of economic opportunity, loss of profits, and

reputational harm that may be irreparable, or at least will take enormous time and effort to repair.

118.   Through this Counterclaim and Third-Party Complaint, AMc seeks to begin the rebuilding process.

## V.   CAUSES OF ACTION

### Count One
### (Libel *Per Se* – *NRA and LaPierre*)

119.   The allegations of fact set forth in paragraphs 1 through 118 are incorporated as though copied verbatim herein.

120.   As set forth hereinabove, NRA representatives, including LaPierre, have repeatedly intentionally and falsely defamed AMc, a private figure, by accusing AMc of the criminal act of extortion.  The NRA has published this accusation as fact and has done so publicly.  The NRA is not a member of the print, broadcast, or electronic media.

121.   LaPierre and other members of NRA leadership have identified AMc directly by name, and the accusations of commission of a criminal act are per se defamatory.  Such accusations are unambiguous and have held AMc up to calumny and public ridicule.

122.   The subject matter of these false factual assertion is a decidedly private matter, despite the NRA's attempts to alter its status to that of a matter of public concern.

123.   AMc has suffered injury as a direct result of these false statements in amounts as yet undetermined, but estimated to exceed $40 million, for which AMc seeks recovery.

124.   Due to the intentional, malicious nature of the NRA and LaPierre's conduct, AMc also seeks exemplary damages in this matter in an amount to be determined at trial.

### Count Two
### (Tortious Interference with Contract – *NRA and LaPierre*)

125.   The allegations of fact set forth in paragraphs 1 through 124 are incorporated as though copied verbatim herein.

126.   The NRA, and LaPierre, individually, intentionally and with full knowledge of their

existence, has tortiously interfered with AMc's employment agreements with NRATV talents, including those of North and Loesh.  Each such contract is valid, having been entered into at the behest of, and approved by, the NRA.  Each such contract is denominated in the Services Agreement as a "Third Party NRA Contract."

127.    The NRA has refused its contractual commitment to reimburse AMc for the costs associated with the Third Party NRA Contracts, thus preventing AMc from funding salaries and costs associated therewith.

128.    The NRA's refusal to reimburse AMc has caused said contracts to lapse due to non-payment, thereby proximately causing injury to AMc and to the talents affected who themselves are third party beneficiaries of the Services Agreement.

129.    The NRA's actions constitute tortious interference with contract, and have proximately caused AMc financial harm in precise amounts yet to be determined, for which AMc now sues.

**Count Three**
**(Declaratory Judgment – *NRA*)**
**(28 USC §2201 *et. seq.*)**

130.    The allegations of fact set forth in paragraphs 1 through 129 are incorporated as though copied verbatim herein.

131.    AMc seeks a declaration that, by its actions, the NRA has waived and/or is estopped from claiming that the confidentiality provision of the Services Agreement applies only to AMc. Holding AMc to such one-sided interpretation prevents AMc from freely and fully responding to allegations made by the NRA.

132.    The NRA has taken the position that the referenced contractual provision is one-sided and binding only on AMc.  AMc disagrees with the NRA's position, and a real and justiciable

controversy regarding this issue exists.  AMc seeks a declaration that the NRA has waived such provision, or by its action it is estopped from enforcing it.

133.     Alternatively, AMc seeks a declaration by this Honorable Court that the confidentiality provision of the Services Agreement is unconscionable under Code of Virginia § 8.2-302 as interpreted by the NRA.

134.     AMc is entitled to, and seeks, its reasonable and necessary attorney's fees incurred in the prosecution of this claim.

### Count Four
### (Fraud – *LaPierre*)

135.     The allegations of fact set forth in paragraphs 1 through 134 are incorporated as though copied verbatim herein.

136.     Statements of fact made to AMc personnel by LaPierre on the dates specified hereinabove, and those made repeatedly throughout the duration of the parties' relationship, but particularly during the four (4) years leading up to the filing of this lawsuit, concerning NRATV's performance analytics, commentators, and the Third Party NRA Contracts, were false, were known by LaPierre to be false, were made with intent to deceive AMc and to lure it into exposing itself to financial obligations, were relied upon by AMc to its detriment, and, as a result, AMc has suffered damages in excess of $40 million for which it now sues.

137.     Due to the intentional, malicious nature of the NRA and LaPierre's conduct, AMc also seeks exemplary damages in this matter in an amount to be determined at trial.

### Count Five
### (Breach of Contract – *NRA*)

138.     The allegations contained in paragraphs 1 through 137 are incorporated as though copied verbatim herein.

139.    Under the 2018 Amendment to the Services Agreement, the NRA is required to

make timely payments in response to invoices received from AMc. The Amendment states:

> NRA acknowledges that its failure to pay such an invoice within 30
> days will cause substantial financial damage to AMc. Accordingly,
> if at any time NRA fails to timely pay the invoice, NRA agrees that
> it shall post a $3,000,000 letter of credit (the "LOC") for the benefit
> of AMc. The LOC shall continue in existence for the term of the
> Agreement and shall be maintained at $3,000,000 at all times.

140.    The NRA has failed to make timely payments on AMc's invoices. Specifically, the

NRA failed to pay the following fee service invoices within the 30-day time period required by

the Services Agreement:

> Invoice 158196 for $451,201.63 dated June 1, 2018
> Invoice 158197 for $894,075.80 dated June 1, 2018
> Invoice 158198 for $299,297.00 dated June 1, 2018
> Invoice 158174 for $190,443.00 dated June 1, 2018
> Invoice 159037 for $190,443.00 dated July 1, 2018
> Invoice 159056 for $451,201.63 dated July 1, 2018
> Invoice 159057 for $894,075.80 dated July 1, 2018
> Invoice 159058 for $299,297.00 dated July 1, 2018

141.    The NRA's failure to make these eight fee payments within the contractually

required 30-day period after the invoice date caused substantial damage to AMc.

**Breach of NRA's Obligations to Pay for Services Rendered During Litigation.**

142.    Following the NRA's first lawsuit in Virginia, the NRA continued to request

services from AMc, AMc performed those services, but the NRA has failed and refused to pay the

monthly invoices submitted by AMc.

143.    On Tuesday, April 30, 2019, Nader Tavangar, EVP/Managing Director of Mercury

sent the May Monthly Fee invoices (dated May 1, 2019) to the NRA (Treasurer Craig Spray, Rick

Tedrick, Lisa Supemaugh, and Duane Reno) via email, as per normal course of business.

144.    Craig Spray is the NRA Treasurer with responsibility for receiving and paying the

AMc invoices.

145.     The invoices that were dated May 1, 2019 and emailed on April 30, 2019 contained eight invoices to the NRA totaling $1,696,466.95 and three invoices to the NRA Foundation totaling $375,000. The NRA Foundation paid its $375,000 invoice without question. The NRA failed to pay any portion of its invoices totaling $1,696,466.95.

146.     These eleven invoices are accurately summarized in the chart below:

| Invoice Number | Job Number | Job Title | Invoice Amount |
|---|---|---|---|
| **NRA** | | | |
| 166339 | 19-MG/NR-001 | Strategic Management | $258,613.17 |
| 166340 | 19-NR-001 | Talent Fee | $680,355.45 |
| 166341 | 19-NR-002 | NRATV Programming C4 | $185,416.67 |
| 166342 | 19-NR-003 | Monthly Video Support C4 | $104,166.67 |
| 166343 | 19-NR-004 | Support Staff Fee | $200,702.50 |
| 166344 | 19-NR-005 | Online/Digital Management Fee | $107,212.50 |
| 166345 | 19-NR-006 | Business Intelligence/Data Resources/Analytics | $35,416.66 |
| 166346 | 19-NRAF-002 | A1F 8/19 ISSUE | $124,583.33 |
| **Total** | | | **$1,696,466.95** |
| **NRA Foundation** | | | |
| 166347 | 19-NRF-001 | NRATV Programming C3 | $250,000.00 |
| 166348 | 19-NRF-002 | Monthly Video Support C3 | $62,500.00 |
| 166349 | 19-NRF-003 | FSP Production Ongoing C3 | $62,500.00 |
| **Total** | | | **$375,000.00** |

147.     These monthly, annualized fee invoices are sent every month per the approved 2019 budget.

148.     Per the Services Agreement, Section III.E provides the following relevant requirements:

> All sums payable to AMc under this Services Agreement shall be payable to AMc's corporate headquarters in Oklahoma City, Oklahoma within 30 days of the invoice date . . . NRA shall notify AMc of any questions concerning any invoices within 10 business days after receipt.

149.     Consistent with the NRA's practice in all prior months of the year, AMc did not receive any questions or concerns regarding such invoices during the 10 business days following the NRA's receipt of the invoices.

150.     The NRA failed to pay the eight invoices issued to it on May 1, 2019 within the required 30-day time period.

151.     As of June 3, 2019, AMc had not received payment from the NRA for the $1,696,466.95 in monthly fee invoices.

152.     On June 3, 2019, AMc's Chief Financial Officer, Winkler, personally called and emailed NRA Treasurer Craig Spray regarding this missed payment.  Spray did not return the email message or call.

153.     On the afternoon of June 3, 2019, Melanie Montgomery, EVP/Management Supervisor at AMc, called Spray leaving a detailed voicemail reminding him the past due invoices covered May fees for April services which were never questioned.  Spray did not return her call.

154.     On June 4, 2019, AMc's Chief Financial Officer sent by email a letter addressing the now past due invoices and demanded that the NRA pay the $1,696,466.95 and post the $3 million Letter of Credit, as required under the Services Agreement.

155.     On June 5, 2019, AMc received a letter from NRA's designee, Andrew Arulanandam, with a copy to LaPierre, Spray, and Frazer stating that the NRA declines to post the Letter of Credit.

156.     Rather than pay the invoices or post a Letter of Credit, the NRA began a series of correspondences wherein they sought to belatedly request additional and irrelevant information about the invoices, long after the ten-day period for questioning the invoices had expired, as provided in Section III.E of the Services Agreement.

**Supplemental Claim for Breach of the NRA's Obligation to Pay Invoices for Services Prior to Termination.**

157.    AMc issued additional invoices for work performed up to the date of termination of the Services Agreement and those invoices remain past due and unpaid, as shown in the table below:

| Invoice Number | Invoice Date | Job Number | Job Title | Invoice Amount |
|---|---|---|---|---|
| **NRA** | | | | |
| 166104 | 4/15/2019 | 18-NR-296 | '19 *A/M* Travel | $1,935.08 |
| 166106 | 4/15/2019 | 19-NR-049 | '20 *A/M* Logo | $10,000.00 |
| 166107 | 4/15/2019 | 19-NR-051 | '19 *A/M* Radio | $5,488.25 |
| 166108 | 4/15/2019 | 19-NR-062 | Publications Google Ad Manager Website Staging & Integration | $5,500.00 |
| 166109 | 4/15/2019 | NR-LEGAL | Legal Fees | $81,810.84 |
| 166110 | 4/15/2019 | NR-TRAV | Travel Expenses | $13,725.51 |
| 166339 | 5/1/2019 | 19-MG/NR-001 | Strategic Management | $258,613.17 |
| 166340 | 5/1/2019 | 19-NR-001 | Talent Fee | $680,355.45 |
| 166341 | 5/1/2019 | 19-NR-002 | NRA TV Programming C4 | $185,416.67 |
| 166342 | 5/1/2019 | 19-NR-003 | Monthly Video Support C4 | $104,166.67 |
| | | | | |
| 166343 | 5/1/2019 | 19-NR-004 | Support Staff Fee | $200,702.50 |
| 166344 | 5/1/2019 | 19-NR-005 | Online/Digital Management Fee | $107,212.50 |
| 166345 | 5/1/2019 | 19-NR-006 | Business Intelligence/Data Resources/Analytics | $35,416.66 |
| 166346 | 5/1/2019 | 19-NRAF-002 | AIF ISSUE | $124,583.33 |
| 166804 | 5/17/2019 | 18-NR-431 | '19 *A/M* Signage -Mechanical | $22,235.89 |
| 166805 | 5/17/2019 | 19-NR-010 | Fundraising Consulting State Registrations | $230.00 |
| 166806 | 5/17/2019 | 19-NR-045 | '19 *A/M* Backstage Signage | $1,009.75 |
| 166807 | 5/17/2019 | 19-NR-051 | '19 *A/M* Radio | $14.81 |
| 166808 | 5/17/2019 | 19-NR-056 | '19 *A/M* Media Kit Premium | $1,422.16 |
| 166809 | 5/17/2019 | NR-TRAV | Travel Expenses | $3,401.82 |
| 167007 | 5/17/2019 | 18-NR-296 | '19 *A/M* Travel | $21,936.68 |
| 167037 | 6/1/2019 | 19-MG/NR-001 | Strategic Management | $258,613.17 |
| 167038 | 6/1/2019 | 19-NR-001 | Talent Fee | $680,355.45 |
| 167039 | 6/1/2019 | 19-NR-002 | NRA TV Programming C4 | $185,416.67 |
| 167040 | 6/1/2019 | 19-NR-003 | Monthly Video Support C4 | $104,166.67 |

| 167041 | 6/1/2019 | 19-NR-004 | Support Staff Fee | $200,702.50 |
|---|---|---|---|---|
| 167042 | 6/1/2019 | 19-NR-005 | Online/Digital Management Fee | $107,212.50 |
| 167043 | 6/1/2019 | 19-NR-006 | Business Intelligence/Data Resources/ Analytics | $35,416.66 |
| 167044 | 6/1/2019 | 19-NRAF-003 | AIF ISSUE | $124,583.33 |
| 167453 | 6/12/2019 | 18-NR-296 | '19 *A/M* Travel | $24.77 |
| 167454 | 6/12/2019 | 18-NR-431 | '19 *A/M* Signage - Mechanical | $33,572.64 |
| 167455 | 6/12/2019 | 18-NR-441 | '19 *A/M* Photography | $18,350.00 |
| 167456 | 6/12/2019 | 18-NR-443 | '19 *A/M* NRA TV Set Production | $1,352.98 |
| 167457 | 6/12/2019 | 18-NR-445 | '19 *A/M* Podium Signage | $10,588.50 |
| 167458 | 6/12/2019 | 19-NR-031 | '19 *A/M* GROF Presentation | $650.00 |
| 167448 | 6/12/2019 | 19-NRM-001 | '19 *A/M* Digital Media | $7,915.03 |
| 167449 | 6/12/2019 | 19-NR-029 | '19 *A/M* Media | ($13,689.50) |
| 168015 | 7/9/2019 | 19-NR-010 | Fundraising Consulting State Registrations | $204.98 |
| 169524 | 9/30/2019 | NR-LEGAL | Legal Fees | $264,008.09 |
| **Total** | | | | **$3,884,622.18** |
| **NRA Foundation** | | | | |
| 167045 | 6/1/2019 | 19-NRF-001 | NRATV Programming C3 | $250,000.00 |
| 167046 | 6/1/2019 | 19-NRF-002 | Monthly Video Support C3 | $62,500.00 |
| 167047 | 6/1/2019 | 19-NRF- FSP | Production Ongoing C3 | $62,500.00 |
| **Total** | | | | **$375,000.00** |
| **Total A/R** | | | | **$3,995,614.09** |

158.    The NRA has failed and refused to pay those invoices. Such failure is another breach of contract by the NRA.

**Supplemental Claim for the NRA's Breach of Indemnification Clause of the Services Agreement.**

159.    Section V.B.1 of the Services Agreement also requires the NRA to indemnify and reimburse AMc for any expenses it may incur that arise from a government agency seeking equitable or other relief against the NRA or that relate to actions that AMc has taken at the direction of the NRA.

160.    The NRA has been the subject of various government inquiries that have imposed costs and expenses on AMc to produce records, negotiate with government investigators, seek

waivers of confidentiality from the NRA, and generally cooperate to the extent that the NRA allows AMc to cooperate.

161.    AMc's expenses relating to the government inquiries continue to grow as government focus on the NRA becomes more intense, and the NRA's resistance to such investigations becomes more adversarial.  The full amount of such indemnification damages will be presented at trial.

162.    The NRA's refusal to pay indemnification expenses relating to government investigations constitutes an additional breach of the Services Agreement.

**Breach of NRA's Obligation to Post a $3 Million Letter of Credit.**

163.    The 2018 Agreement expressly provided for a remedy to avoid substantial harm to AMc in the event that the NRA is delinquent in paying AMc's invoices.

164.    Per the 2018 Amendment, Section II.E, provides the following relevant requirement:

> NRA acknowledges that its failure to pay such an invoice within 30 days will cause substantial financial damage to AMc. Accordingly, if at any time NRA fails to timely pay the invoice, NRA agrees that it shall post a $3,000,000 letter of credit for the benefit of AMc.

165.    The NRA failed to comply with the contract requirement that it "shall" post a $3 million LOC for the benefit of AMc in the event that it is late on a single payment of fees.

**Breach of NRA's Obligation to Pay Invoices Timely**

166.    Section V, Billing and Payment, contains the following Subsection E:

> All sums payable to AMC under this Services Agreement shall be payable at AMc's corporate headquarters in Oklahoma City, Oklahoma within 30 days of the invoice date. Any amounts not received by AMc within 60 days from the date of the invoice shall bear interest at the rate of 1.0 percent per month from the date of the invoice until paid.

167.    In addition to the late payment of fees listed, supra, the NRA routinely was substantially late with respect to reimbursing AMc for other expenses.  For example, the NRA took 133 days to pay for the cost of CG Magazine '18, Issue 5 invoiced for $269,000. The NRA also delayed 133 days before paying $90,000 for Website Unification.

168.    The NRA was late in paying at least 80 separate invoices issued by AMc during the second half of 2018.

169.    Pursuant to the terms of Section V.E, the NRA owes AMc interest at the rate of 1 percent per month on all late paid invoices.  Despite the contractual requirement to pay interest, the NRA has failed to pay any such interest and such failure is a material breach of the Services Agreement.

170.    Based on the contractual rate of 1 percent per month, the NRA owes AMc an amount in excess of $38,000 in unpaid interest that it has failed to pay with respect to invoices issued during 2018, and an amount that continues to accrue.

171.    During 2019, the NRA was late and still has not paid invoices for AMc services prior to the termination of the Services Agreement.  Interest on such unpaid invoices continues to accrue while the invoices are unpaid.  AMc will present evidence of pre-judgment interest at trial with respect to all unpaid invoices.

172.    Under the Services Agreement, if the "NRA fails to diligently and in good faith perform any of its obligations," AMc may terminate the Services Agreement.  The NRA has failed to perform its payment obligations with diligence and good faith, and it has failed to fulfill the contractual obligations to post a $3 million letter of credit and pay interest on late payments.

**Obligation to Pay Costs to Return NRA Property.**

173.    Section XI.E of the Services Agreement mandates that "All charges for

accumulating [any and all NRA property] shall be approved and paid in advance of receipt by the NRA."

174.    AMc worked diligently to catalogue and define the "NRA's property, materials, documents, Confidential Information, etc. that may be in AMc's possession." AMc reported that the digital files alone exceed 1.7 petabytes (one petabyte is one million gigabytes).

175.    AMC issued an invoice for the accumulation charges for physical and digital assets of the NRA. The NRA has failed to pay the $1.5 million invoiced amount that is the prerequisite for the return of the NRA property and has therefore breached Section XI.E of the Services Agreement.

**Breach of Obligation to Pay a Termination Fee**

176.    AMc terminated the Services Agreement pursuant to the 90-day notice provision on May 29, 2019 and began to prepare for the orderly wrap up of services it was performing for the NRA, including identifying NRA assets and preparing for the downsizing of its workforce.

177.    Section XI.F of the Services Agreement provides as follows:

> In consideration of the dedication of a substantial number of personnel and resources to provide the services under the Agreement (and the necessity to maintain such staffing levels and resource allocations to enable AMc to continue to provide such services upon any renewals hereof), the NRA agrees to pay AMc a fair and equitable termination fee to compensate it for the inevitable severances and other reasonable costs incurred in conjunction with such expiration or termination. Such termination fees shall be negotiated in good faith by the parties and paid to AMc no later than the last day of this Agreement.

178.    The NRA failed and refused to engage in any good faith negotiations required under the Services Agreement to wrap up the relationship between AMc and the NRA. Such failure is another breach by the NRA of the Services Agreement.

179.    The NRA failed to pay any termination fee and is in breach of this provision of the

Services Agreement.

180.    The NRA was obligated to pay this termination fee no later than the last day of the Services Agreement.

181.    The NRA breached its payment obligations under the Services Agreement long before any alleged breach by AMc articulated by the NRA in its Amended Complaint.

182.    The breaches that occurred have caused AMc to incur damages, the amount of which are not yet fully calculated.

183.    The breaches by the NRA are material as that term is defined under the Code of Virginia, § 59-1-507.1.

184.    AMc, on its behalf and on behalf of its subsidiary Mercury Group, seeks recovery of contract damages and severance remedies in the amount not less than $50 million and such other relief as this Court deems just.

## VI.    JURY DEMAND

185.    AMc demands a trial by jury on all contested issues of fact.

## VII.    CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, AMc, as Counter-Plaintiff and Third-Party Plaintiff, prays that upon hearing, it be awarded judgment for damages as prayed for herein, pre- and post-judgment interest, attorney's fees and costs, and such other relief to which it may be entitled.

Dated: November 15, 2019.

Respectfully submitted,

*/s/ G. Michael Gruber*
**Jay J. Madrid, Esq.**
Texas Bar No. 12802000
madrid.jay@dorsey.com
**G. Michael Gruber, Esq.**
Texas Bar No. 08555400
gruber.mike@dorsey.com
**J. Brian Vanderwoude, Esq.**
Texas Bar No. 24047558
vanderwoude.brian@dorsey.com
**Brian E. Mason, Esq.**
Texas Bar No. 24079906
mason.brian@dorsey.com

**DORSEY & WHITNEY LLP**
300 Crescent Court, Suite 400
Dallas, Texas 75201
(214) 981-9900 Phone
(214) 981-9901 Facsimile

**ATTORNEYS FOR DEFENDANT/COUNTER-PLAINTIFF ACKERMAN MCQUEEN, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2019, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

*/s/ G. Michael Gruber*
G. MICHAEL GRUBER

## SERVICES AGREEMENT

**THIS AGREEMENT**, made this 30th day of April, 2017, by and between the National Rifle Association of America (hereinafter referred to as "**NRA**"), A New York Not-For-Profit Corporation, located at 11250 Waples Mill Road, Fairfax, Virginia 22030, and Ackerman McQueen, Inc., an Oklahoma corporation, and its wholly owned subsidiary, Mercury Group Inc., an Oklahoma corporation, (hereinafter collectively referred to as "**AMc**"), whose principal office is located in Oklahoma at 1100 The Tower, 1601 N.W. Expressway, Oklahoma City, Oklahoma 73118.

## W I T N E S S E T H :

**WHEREAS**, AMc is in the business of providing comprehensive communications services including public relations, crisis management, strategic marketing, advertising and creative, as well as owned media and internet services, and warrants and represents that it possesses the capability, necessary personnel, political strength, equipment and other related items to perform such services; and,

**WHEREAS**, NRA is a Membership Organization and desires to retain AMc as a nonexclusive source for services described herein for NRA upon the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants set forth herein, the parties hereto agree as follows:

I.    **SERVICES**

    A.    **Public Relations/Crisis Management /Strategic Marketing Services**

Services include a combination of generating earned media, responsive public relations, crisis management and strategic thinking to promote a positive image of the NRA as described below:

- Public relations advice and counsel, including crisis management.

- Ongoing media relations -- solicitation and placement of features in national, regional and local media; liaison with print and broadcast news media on a daily basis for unsolicited inquiries; ongoing media training for NRA officials; Editorial Board meetings; features for outdoor publications.

- Specialized public relations writing services (news releases, columns, editorials), and distribution of same as required (e.g. via wire service or individual contact).

- Research and information retrieval as necessary for NRA issues management at NRA's request and approval.

- Coordination, scheduling and on-site assistance when necessary for NRA officials' speeches and personal appearances.

1

# EXHIBIT A

- Coordination with internal NRA public relations staff in the Executive Office, General Operations and Institute for Legislative Action.

- Development of proactive earned media in national and regional media as it relates to NRA officials' appearances at special events (i.e. National Gun Shows, YHEC, Annual Meetings, etc.).

- Coordination and scheduling appearances for NRA officials and commentators; including on-site assistance (where necessary).

- Develop, produce, and place op-ed pieces for national and regional media coinciding with Special Events and NRA Officials' appearances.

- Advise and counsel with NRA Officials on strategic issues to provoke public debate and frame NRA's point-of-view for the general public.

- Speechwriting services (pivotal speeches for major events are discussed in "Advertising/Creative Services" Section).

- Management of Talent/Spokespersons for NRATV.

- Production and staffing for NRATV.

**B.**    **Advertising/Creative Services**

The services described below (with the exception of "Media Planning and Placement" which is addressed separately as a subcategory of this Section) will be provided to NRA on a project ("**Job**") basis based on the fair market value of the work as determined by NRA and AMc. When reasonable time is available, cost estimates will be submitted for approval by NRA prior to the initiation of the Job.

- Speechwriting services for NRA dignitaries to be delivered at major events (includes background research, interviews with NRA Officials/Speaker, drafts and rehearsals if appropriate).

- Conceive, copywrite, design and produce local, regional, and national print and broadcast advertising and other appropriate forms of communication to present NRA's message.

- Original photography services and film processing (on location and/or in AMc's photo studio).

- Audio/Visual and Event Management services (i.e. Annual Meetings).

- Video Taping, Editing and Production.

- Music composition and arrangement and audio production.

- Primary Research services (quantitative and qualitative).

2

**C.**   **Media Planning and Placement Services**

Detail of AMc's compensation for Media Services are provided in the "Compensation" Section. Services rendered for such are:

- With NRA's approval, plan and order by written contract or insertion order the print space, radio and television time, or other media to be used for advertising, always endeavoring to secure the best available rates. AMc shall remain solely liable for payment, to the extent NRA has paid AMc.

- Incorporate the advertising in the required form and forward it to media with proper instructions for fulfillment of the contract or insertion order.

- Diligently check and verify broadcasts, insertions, displays, or other means used to carry the message to ensure proper fulfillment of all media purchases made by AMc on NRA's behalf.

- For direct response paid media advertising (i.e. Infomercial), provide ongoing analysis and ROI to determine most effective media markets, dayparts, and stations on a time sensitive basis for redirection or concentration of funds as evaluation indicates.

- Carefully audit invoices and make timely payment to media and suppliers for space and time purchased by AMc on NRA's behalf.

**D.**   **Owned Media Services**

- Full-time online broadcasting services for NRATV.

- Support services for NRATV provided by AMc Interactive include daily creation of graphics, flash animation for daily stories and synchronization to audio/video.

- Ongoing technical support service, unification, and advice for NRAHQ site (e.g. Answer to questions on service provider issues and simple "how-tos"). Application development or re-working requiring complex execution to be estimated on a project basis for NRA approval in advance of work performance.

- Full time marketing services to promote NRATV as well as on-site promotion of NRA programs, activities, and current events.

- Production of America's First Freedom Magazine.

**E.**   **Digital Systems Operations Support**

- Technology consulting including third party solutions, cloud consulting and reviewing IS efforts.

- Reliability engineering and monitoring including performance monitoring, emergency response and overall efficiency.

3

- Resource and capacity planning for large scale hardware and software migration initiatives.

- System and database administration, maintenance, updating, monitoring and troubleshooting.

## II.   COMPENSATION

### A.   Public Relations/Political Strategy/Strategic Marketing Services

1.   During the term of this Agreement, for ongoing Public Relations, Political Strategy and Strategic Marketing, NRA will pay AMc a fee as mutually agreed upon each year.

### B.   Advertising/Creative/Media Planning and Placement Services

1.   During the term of this Agreement, for ongoing study of NRA's business, including account service, creative development and other support functions in connection with the day-to-day administration and operation of NRA's account, NRA will pay AMc 15% commission of the gross media expenditure, or a 17.65% mark-up of the net media billing, for all media researched, planned, placed and administered by AMc on NRA's behalf.

2.   For collateral advertising services and products purchased on NRA's behalf from external suppliers (such as separations, engravings, typography, printing, etc.), by a 15% commission if offered, or a 17.65% mark-up of net billing. Estimates of the cost of external services and products are prepared, when reasonable time is available, for approval in advance and are subject to no more than a +/-10% variance provided AMc is authorized to proceed with production within thirty (30) days of the date the estimate is presented. Client changes in job specifications usually will result in the preparation and submission of a revised estimate; however, NRA agrees to assume financial responsibility for all changes specified by NRA then executed by AMc with NRA's knowledge.

3.   For art concepts, design layout, photography and film processing, copywriting, music composition and arrangement, audio and video production, etc., by cost quotations submitted for approval in advance, when reasonable time is available, or at the comprehensive art, storyboard, demo music, etc. stage. These quotations are based on the fair market value of the work as determined by AMc, and take into consideration, among other things, the hourly rates of the personnel assigned to the project and the required to complete the job. Written estimates are subject to no more than a +/- 10% variance provided they are approved by NRA and AMc is expressly authorized to proceed with production within thirty (30) days of the date the estimate is presented. Client changes in job specifications will

4

usually result in a revised estimate; however, NRA agrees to assume financial responsibility for all changes specified by NRA , then executed by AMc with NRA's knowledge.

**C.** <u>**Owned Media and Internet Services**</u>

During the term of this agreement, AMc will provide owned media and online broadcasting and website management, hosting and creation of NRATV, as well as full time marketing services. NRA will pay AMc a fee as mutually agreed upon each year.

**D.** <u>**Digital Systems Operations Support**</u>

During the term of this agreement, AMc will provide digital systems operations support. NRA will pay AMc a fee as mutually agreed upon each year.

**E.** <u>**Other Projects**</u>

If AMc undertakes, at NRA's request, additional or special assignments, not included within the services described in this project, the charges made by AMc will be agreed-upon in advance whenever possible. If no specific agreement was made, AMc will charge NRA a fair market price for the work performed.

## III. BILLING AND PAYMENT

A. Mailing and express charges, long distance telephone calls, photocopies, deliveries, sales taxes and reasonable out-of-town travel including transportation, meals and lodging, etc. on NRA's express behalf, shall be billed at AMc's cost. All out-of town travel expenses shall require prior written approval in accordance with written procedures established by the NRA Executive Vice President or his designee. Payment of travel expenses not approved in advance may result in denial of reimbursement. Expenses not listed above shall be considered to be normal business expenses of AMc and not billable to NRA unless specifically authorized in writing by the NRA Executive Vice president or his designee.

B. All sales, use and similar taxes and all import, export and foreign taxes imposed by all applicable governmental authorities shall be billed to NRA at the amount imposed by such governmental authorities. AMc shall not be obligated to contest the applicability of any such taxes to the transactions performed pursuant to this Services Agreement.

C. Fees shall be billed on or before the 5th of each month. This billing shall include costs specified in paragraph III A.

D. Special assignments not included in this Agreement which cannot reasonably be included under the monthly fee must be approved in accordance with written procedures established by the NRA Executive Vice President or his designee, and the charges made by AMc shall be agreed upon in advance, where reasonable.

5

otherwise such charges shall be not greater than the usual and customary charges for such services or expenses in the industry.

E.    All sums payable to AMc under this Services Agreement shall be payable at AMc's corporate headquarters in Oklahoma City, Oklahoma within 30 days of the invoice date. Any amounts not received by AMc within 60 days from the date of the invoice shall bear interest at the rate of 1.0% per month from the date of the invoice until paid. NRA shall notify AMc of any questions concerning any invoices within 10 business days after receipt.

## IV.    CONFIDENTIALITY

A.    <u>AMc</u>

1.    AMc shall not disclose, directly or indirectly, to any third party any NRA membership data or mailing lists, any materials or information relating thereto, or any other data, materials or information coming to the knowledge of AMc, supplied to AMc by NRA, or otherwise made known to AMc as a result of AMc's providing Services (hereinafter collectively, referred to as the "**Confidential Information**"), without the prior express written permission of NRA.   This Services Agreement shall control AMc's providing fulfillment services to NRA.

2.    AMc shall not make or cause to have made any copies of any NRA Confidential Information without the prior express written authorization of NRA.

3.    AMc may use such Confidential Information only for the limited purpose of providing its Services to NRA.

4.    AMc may disclose such Confidential Information to AMc's employees but only to the extent necessary to provide its Services.   AMc warrants and agrees to prevent disclosure of Confidential Information by its employees, agents, successors, assigns and subcontractors.

B.    AMc, its employees and agents, shall comply with any and all security arrangements imposed by NRA respecting access to Confidential Information.

C.    AMc acknowledges NRA's exclusive right, title and interest in the Confidential Information, and shall not at any time do or cause to be done any act or thing contesting or in any way impairing or tending to impair any part of such right, title or interest.

D.    AMc shall cease and desist from any and all use of the Confidential Information, and AMc shall promptly return to NRA, in a manner satisfactory to NRA, any and all Confidential Information, upon the earlier to occur of the following: the completion or termination of the Services Agreement.

6

## V.   INDEMNIFICATION/INSURANCE

### A.   **AMc**

1.   AMc agrees to indemnify, defend and hold harmless NRA from and against any loss, liability and expenses including attorney's fees which NRA shall become obligated to pay in respect to: (a) materials prepared by AMc on behalf of NRA which gives rise to any claims pertaining to libel, slander, defamation, infringement of copyright, title or slogan, or privacy or invasion of rights of privacy; or (b) the public relations services and related activities of any person engaged by AMc as a spokesperson in connection with NRA and its purposes, objectives and activities ("**Spokesperson**") pursuant to the direction or supervision of AMc. Insurance coverage for the foregoing indemnification obligations shall be maintained by AMc.

2.   NRA agrees to give AMc prompt notice of such claims and to permit AMc, through AMc's insurance carrier and/or counsel of AMc's choice, to control the defense or settlement thereof.  However, NRA reserves the right to participate in the defense of any such claim through NRA's own counsel and at NRA's own expense.

3.   AMc shall take reasonable precautions to safeguard NRA's property entrusted to AMc's custody or control, but in the absence of negligence on AMc's part or willful disregard of NRA's property rights, AMc shall not be held responsible for any loss, damage, destruction, or unauthorized use by others of any such property.

4.   AMc shall not be liable to NRA by reason of default of suppliers of materials and services, owners of media, or other persons not AMc employees or contractors unless supplier(s) is under control of AMc or AMc should have reasonably anticipated default.

### B.   **NRA**

1.   NRA agrees to indemnify, defend and hold harmless AMc, and its directors, officers, employees, agents, contractors and representatives (collectively, the "**AMc Indemnified Parties**," such directors, officers, employees, agents, contractors and representatives being hereby deemed third party beneficiaries of this indemnity provision), from and against any and all claims, demands, causes of action, suits, liabilities, losses, damages settlements, judgments, and expenses (including attorney's fees), arising from (1) any data, materials, or service performance claims furnished to any AMc Indemnified Party by NRA, or approved by NRA, from which a AMc Indemnified Party prepared any publicity materials or public relations materials, or which were used by a AMc Indemnified Party in the production of advertising which was approved by NRA; (2) any claim, action or proceeding by any person(s), entity(ies), the United States of

America, any state(s), county(ies), or municipality(ies), or any department, agency, board, bureau, commission, attorney general, or other instrumentality(ies) or political subdivision(s) of any of the foregoing, seeking (a) damages (whether actual, exemplary, or both), reimbursement or other compensation for any alleged injury(ies), death(s), or private or public losses, damages or costs related to one or more incidents of violence committed with firearms, or (b) an injunction or other equitable relief with respect to the activities of a AMc Indemnified Party performed on behalf of NRA pursuant to this Agreement or otherwise requested or approved by NRA; or (3) the public relations services and related activities of any Spokesperson pursuant to the direction or supervision of NRA. Insurance coverage for the foregoing indemnification obligations shall be maintained by NRA.

2.     AMc agrees to give NRA prompt notice of any matter covered by NRA's indemnity set forth above and to permit NRA, through NRA's insurance carrier and/or counsel of NRA's choice, to control the defense or settlement thereof. However, AMc and the other AMc Indemnified Parties reserve the right to participate in the defense of any such claim through the AMc Indemnified Parties' own counsel and at the AMc Indemnified Parties' own expense.

C.     NRA shall reserve the right, in NRA's best interest, to modify, reject, cancel, or stop any and all plans, schedule, and work in progress. In such event AMc shall immediately take proper and responsible action to carry out such instruction; NRA, however, agrees to assume AMc's liability for agreed upon commitments and to reimburse AMc for losses AMc may derive therefrom, and to pay AMc for all internal and external expenses incurred on NRA's behalf with NRA's authorization and to pay AMc charges relating thereto in accordance with the provisions of this Services Agreement.

## VI.   OWNERSHIP OF PRODUCTS

All creative works developed by AMc in fulfilling its obligations under this Services Agreement shall constitute works made for hire, and shall be the property of NRA. In the event that such works should not be "works made for hire," as such works are defined at 17 U.S.C. § 101, then AMc transfers and assigns to NRA the ownership of all copyright in such works. In the event that AMc should employ a subcontractor, AMc shall arrange for the transfer of such intellectual property to NRA. All other, and further, intellectual property and mailing lists, under any definition, whether common law or statutory, created or developed by AMc in fulfilling its obligations under this Services Agreement, are NRA's sole and exclusive property, and AMc does hereby assign all right, title and interest in same to NRA to the extent that AMc has such rights to assign and transfer. In no event shall AMc be deemed to be assigning or transferring greater rights than it has acquired from any supplier or contractor from who it may have acquired certain elements of the material prepared for NRA.

**VII.  NO COMPETITION**

For the duration of this Service Agreement, AMc shall not represent any other entity in public relations services directly competitive with NRA without NRA's prior written approval.

**VIII.  EXAMINATION OF RECORDS**

During the term of this Services Agreement, AMc authorizes NRA, upon reasonable notice, to examine AMc and Mercury's files, books, and records, with respect to matters covered under this Services Agreement.

**IX.  AUTHORIZED CONTACTS**

AMc is authorized to act upon written communications received from the NRA Executive Vice President or his designee. He or his designee are the only persons within NRA who have the actual authority to issue such communications.

**X.  MISCELLANEOUS**

A.  Severability. If any provision of this Services Agreement shall be held to be void or unenforceable for any reason, the remaining terms and provisions hereof shall not be affected thereby.

B.  Binding Effect; Agents. The provisions of this Services Agreement shall inure to the benefit of and bind the heirs, legal representatives, successors and assigns of the parties hereto. In performing the Services described above and in taking any action necessarily incident thereto, AMc may utilize the services of AMc's employees and/or such agents or independent contractors approved by NRA as AMc deems appropriate.

C.  Section Headings. Section headings contained in this Services Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation thereof.

D.  Integrated Agreement. This Services Agreement, together with any Exhibits hereto, constitute the entire agreement between NRA and AMc relating to the matters covered by this Services Agreement at the time of its signing. This Services Agreement supersedes all prior agreements, including letter agreements and memoranda of understanding.

E.  Survival. The terms, covenants, and conditions of Section IV and Section V shall survive the termination or expiration of this Services Agreement.

**XI.  TERMINATION**

A.  This Services Agreement shall become effective upon the execution hereof.

B.   This Services Agreement shall continue in full force and effect for an initial period of eight (8) months ending 12-31-2017. After the initial period of eight (8) months, NRA or AMc may at their sole and exclusive discretion, terminate this Services Agreement, without any cause whatsoever, upon ninety (90) days written notice. Without such written notice, it is the intention of the parties that the Services Agreement will automatically renew. Any written notice to cancel this Contract shall be effective ninety (90) days from the date the Party giving notice to cancel tenders such written notice to the other Party. In the event of said termination, all further obligations of each party to perform shall cease, except as otherwise specifically provided in this Services Agreement. In said case NRA shall, pursuant to Section III, reimburse AMc for expenses incurred on NRA's behalf up to the date of termination.

C.   This Services Agreement may be terminated by NRA immediately upon written notice if: (1) AMc fails to diligently and in good faith perform any of its obligations contemplated hereunder; (2) AMc breaches any term, promise or covenant hereunder; (3) AMc files for bankruptcy; (4) there occurs any assignment for the benefit of creditors or the placement of any of AMc's assets in the hands of a trustee or receiver; (5) AMc becomes insolvent or bankrupt; (6) AMc is dissolved. If NRA so terminates this Services Agreement, NRA shall have no obligation to make payments except that NRA shall, pursuant to Section III, reimburse AMc for expenses incurred up to the date of said notice of termination.

D.   This Services Agreement may be terminated by AMc immediately upon written notice if (1) NRA fails to diligently and in good faith perform any of its obligations contemplated hereunder; (2) NRA breaches any term, promise or covenant hereunder; (3) NRA files for bankruptcy; (4) there occurs any assignment for the benefit of creditors or the placement of any of NRA's assets in the hands of a trustee or receiver; (5) NRA becomes insolvent or bankrupt; or, (6) NRA is dissolved.

E.   Upon the expiration or termination of this Services Agreement, AMc shall immediately return to NRA, to such place and in such manner as NRA may specify, any and all of NRA's property, materials, documents, Confidential Information, etc., that may be in AMc's possession. All charges for accumulating said materials shall be approved and paid in advance of receipt by the NRA. For all non-cancellable contracts entered into between AMc and third parties for the benefit of the NRA (herein "**AMc-Third Party NRA Contracts**"), the NRA agrees to pay AMc upon such expiration or termination the balance of the compensation payable under such AMc-Third Party NRA Contracts as of the date of expiration or termination so that AMc can fulfill its obligations under said Contracts after expiration or termination. If any AMc-Third Party NRA Contract(s) are cancelable upon payment of a fee and the NRA requests that such Contract(s) be cancelled, the NRA agrees to pay AMc the cancellation fees payable under such Contracts as a condition of AMc cancelling such Contract(s).

F.   In consideration of the dedication of a substantial number of personnel and resources to provide the services under this Agreement (and the necessity to

maintain such staffing levels and resource allocations to enable AMc to continue to provide such services upon any renewals hereof), the NRA agrees to pay AMc a fair and equitable termination fee to compensate it for the inevitable severances and other reasonable costs incurred in conjunction with such expiration or termination. Such termination fees shall be negotiated in good faith by the parties and paid to AMc no later than the last day of this Agreement.

G.     The terms, covenants, and conditions of Section IV and Section V shall survive the termination or expiration of this Services Agreement.

## XII.    GOVERNING LAW AND CONSENT TO JURISDICTION, VENUE, AND SERVICE

A.     This Services Agreement and any disputes arising thereunder shall be governed by and construed solely under the laws of the Commonwealth of Virginia, or, if applicable by federal law.

B.     AMc consents and agrees that all legal proceedings relating to the subject matter of this Services Agreement shall be maintained exclusively in courts sitting within the City of Alexandria or the County or Fairfax, Commonwealth of Virginia, and AMc hereby consents and agrees that jurisdiction and venue for such proceedings shall lie exclusively with such courts. AMc furthermore consents to the exercise of personal jurisdiction by said courts over AMc.

IN WITNESS WHEREOF, and intending to be legally bound hereby, and further intending to bind their employees, agents, successors and assigns, the parties have executed this Services Agreement the day and date above written.

**National Rifle Association (NRA)**                    **Ackerman McQueen, Inc.**

_Allan D. Cors, President_                              _Melanie Montgomery_
Print Name/Title                                        Print Name/Title   _EVP_

11

(A)

## AMENDMENT NO. 1 TO SERVICES AGREEMENT

This Amendment No. 1 to Services Agreement (this "Amendment") is dated as of May _____ 6 _____, 2018, and is entered into by and between the National Rifle Association of America ("NRA") and Ackerman McQueen, Inc. ("AMc").

### WITNESSETH:

**WHEREAS**, NRA and AMc are parties to that certain Services Agreement (the "Services Agreement") dated April 30, 2017; and;

**WHEREAS**, NRA and AMc desire to amend the Services Agreement;

**NOW, THEREFORE**, in consideration of the mutual promises and covenants set forth herein, the parties hereto agree as follows:

1.  Defined Terms.  All initial capitalized terms used herein but not defined herein shall have the meanings set forth in the Services Agreement.

2.  Amendment of Paragraph III E.  Paragraph III E of the Services Agreement is hereby amended to add the following provisions at the beginning of paragraph III E:

    All service fee billing under this Services Agreement for talent and employees who work through AMc for NRA and its affiliates, including, but not limited to, Dana Loesch and _____, shall be invoiced by AMc no later than the fifth day of each calendar month, which invoice shall be payable by NRA to AMc at AMc's corporate headquarters in Oklahoma City, Oklahoma within 30 days of the invoice date. NRA acknowledges that its failure to pay such an invoice within 30 days will cause substantial financial damage to AMc. Accordingly, if at any time NRA fails to timely pay the invoice, NRA agrees that it shall post a $3,000,000 letter of credit (the "LOC") for the benefit of AMc. The LOC shall continue in existence for the term of the Agreement and shall be maintained at $3,000,000 at all times. The LOC may only be drawn upon to pay in full invoices for service fee billings outstanding more than 30 days.

3.  Amendment of Paragraph XI E.  Paragraph XI E shall be amended and restated in its entirety to read as follows:

    Upon the expiration or termination of this Services Agreement, AMc shall immediately return to NRA, to such place and in such manner as NRA may specify, any and all of NRA's property, materials, documents, Confidential Information, etc., that may be in AMc's possession. All charges for accumulating said materials shall be approved and paid in advance of receipt by the NRA. For all non-cancellable contracts entered into between AMc and third parties for the benefit of the NRA (herein "**AMc-Third Party NRA Contracts**"), the NRA agrees to pay AMc upon such expiration or termination the balance of the compensation payable under such AMc-Third Party NRA Contracts

# EXHIBIT B

(including, but not limited to, the AMc-Third Party NRA Contracts with Dana Loesch and _Oliver North_ ) as of the date of expiration or termination so that AMc can fulfill its obligations under said Contracts after expiration or termination. If any AMc-Third Party NRA Contract(s) are cancellable upon payment of a fee and the NRA requests that such Contract(s) be cancelled, the NRA agrees to pay AMc the cancellation fees payable under such Contracts as a condition of AMc cancelling such Contract(s).

4.   Integrated Agreement.  This Amendment and the Service Agreement, and the Exhibits thereto, constitute the entire agreement between NRA and AMc relating to the matters covered hereto and thereto.

5.   Miscellaneous.  Paragraphs X and XII of the Services Agreement are hereby incorporated by reference as if set forth in full in this Amendment.

6.   Effect.  In the event of a conflict between this Amendment and the Services Agreement, the provisions of this Amendment shall control. To the extent not amended by this Amendment, all of the provisions of the Services Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, and intending to be legally bound hereby, and further intending to bind their employees, agents, successors and assigns, the parties have executed this Amendment the day and date above written.

**National Rifle Association of America (NRA)**          **Ackerman McQueen, Inc.**

_____          _____

Wilson H. Phillips Jr          Pete R. Brownell
Print Name/Title   TREASURER          Print Name/Title

ATTEST          ATTEST:

4826-9804-1444\1                          2

NATIONAL RIFLE ASSOCIATION OF AMERICA

**OFFICE OF THE PRESIDENT**
11250 WAPLES MILL ROAD
FAIRFAX, VIRGINIA 22030

*CONFIDENTIAL*



John Frazer
Secretary & General Counsel, National Rifle Association of America

Charles Cotton
Chairman of the Audit Committee, National Rifle Association of America

April 18, 2019

Dear John and Charles:

As indicated in previous correspondence, we and others continue to be deeply concerned about the extraordinary legal fees the NRA has incurred with Brewer Attorneys & Counselors. The amount appears to be approximately $24 million over a 13-month period, ███████████████

Because of the extraordinary size of the Brewer firm's invoices. our NRA Board Counsel advised us ████████████████████████████████████████████

To that end. we have asked several times over the past two months for NRA management to retain an outside, independent review of the Brewer firm's invoices. Thus far there has been no action.

███████████████████████████████████████████████ —our Board Counsel
has urged us to ██████████████████████████████████

Further, in separate meetings we had with Mr. Brewer on 15 and 20 March 2019, ███████████
█████████████████████████████████████████████

There are seven reasons why the NRA must engage an independent, outside expert to review the Brewer invoices immediately.

*(703) 267-1040*
*(703) 267-3936 fax*

# EXHIBIT C

*First*, the Brewer firm's invoices appear to be excessive on their face.

The Brewer invoices are draining NRA cash at mindboggling speed.

Based on information provided to us over a month ago by our Secretary & General Counsel, the first 12 invoices the NRA received from the Brewer firm were for these amounts:

| Date | Brewer Firm Invoice |
|---|---|
| March 2018 | $ 25,000.00 |
| April 2018 | $ 1,011,184.04 |
| May 2018 | $ 1,409,622.82 |
| June 2018 | $ 1,730,571.18 |
| July 2018 | $ 1,839,535.17 |
| August 2018 | $ 1,839,743.68 |
| September 2018 | $ 1,883,351.80 |
| October 2018 | $ 1,892,735.45 |
| November 2018 | $ 2,043,746.51 |
| December 2018 | $ 1,847,898.88 |
| January 2019 | $ 1,887,452.55 |
| February 2019 | $ 1,849,610.20 |
| TOTAL: | $ 19,260,452.28 |

Invoices of this size for 12 months of work appear to be excessive and pose an existential threat to the financial stability of the NRA. This is a fiscal emergency, yet we have been unable to get management to engage an outside, independent review to ensure these bills are necessary and reasonable.

More alarming still, are the most recent figures provided in the table below by our Treasurer & Chief Financial Officer. His data indicates the Brewer firm's invoices for 1st Quarter 2019 total more than $8.8 million—over $2.9 million per month—or $97,787 per day, seven days a week, every day of every month.

Invoices of this extraordinary magnitude deserve immediate attention, oversight, and a careful, competent and unbiased examination. $97,000 + a day is a stunning amount of money for any organization to pay. It cries out for an outside, independent review.

Brewer Attorneys & Counselors Paid & Owed 2018 & 1st Q 2019



*Second*, the secrecy surrounding the Brewer firm's invoices is alarming.

We, and others, have made multiple requests and recommendations for an outside, independent review of the Brewer firm's invoices. All these requests have been denied. The secrecy surrounding these large invoices causes suspicion and raises questions.

On the advice of our Board Counsel [redacted] we have made the following requests regarding the Brewer invoices:

- February 25, 2019, President North asked our General Counsel/Secretary to be shown the Brewer invoices. He told President North he had been instructed not to show the invoices.

- February 26, 2019, President North, 1st VP Richard Childress and 2nd VP Carolyn Meadows, wrote to the Executive Vice President requesting the Brewer firm's invoices. The request was denied.

- On March 22, 2019, President North, 1st VP Richard Childress and 2nd VP Carolyn Meadows, wrote to the Audit Committee requesting that the Audit Committee retain and oversee an outside, independent review of the Brewer invoices. As yet, there is no response.

- On March 31, 2019, President North wrote to our Executive Vice President asking that he order an outside, independent review of the Brewer invoices. He refused.

- On April 8, 2019, President North wrote to our Executive Vice President urging him to end this controversy by ordering an outside, independent review of the Brewer firm's invoices. He again refused.

3

In Q1 2019 the NRA paid the Brewer firm more than $2.9 million per month. The fact that these billings are being shielded from review by an outside, independent auditor is alarming. If the bills are reasonable and properly documented, why the refusal to conduct an independent review?

***Third*, the Brewer firm's engagement letter is inconsistent with industry standards.**

The NRA's March 2018 engagement letter with the Brewer firm is inconsistent with industry standards. There are several problems with the engagement letter, all to the disadvantage of the NRA, including:

* The Brewer firm's engagement letter is vague regarding the scope of work that Brewer is performing for the NRA. The letter simply says the Brewer firm is performing legal services "███████████████████████████████████████ ███████████████████████████" It appears that the Brewer firm has far exceeded this scope—without proper written documentation. As we understand it, the standard in the legal profession is to require engagement letters for each separate matter, and to adequately document the scope of work that will be performed on each matter.

* The Brewer firm's engagement letter states it is charging the NRA "on an hourly basis" at "its usual and customary rates." But the NRA is a not-for-profit entity. Paying "rack rates" to the Brewer firm makes no sense. Law firms usually reduce rates when representing non-profits. Why no reduction for the NRA?

* The Brewer firm's engagement letter states the firm "requires payment of all expenses associated with this representation, including both in-house and third-party disbursements. In-house charges for support services may exceed the actual cost of providing such services." The letter identifies messenger costs, work processing charges, and telecommunications as examples. It makes no sense for the client of a law firm to pay surcharges on "in-house charges."

* The Brewer firm's engagement letter states the firm uses "I & A International, a company which is owned by partners of the Firm, to provide document abstracting." These costs apparently get passed along (at a surcharge?) to the NRA, but are they commercially reasonable? Have we looked at the market rate for such services?

* The Brewer firm's engagement letter says Texas law will apply, and that if we have a dispute with Brewer we must resolve it through arbitration where the loser pays all attorney fees. These provisions are not in the NRA's interests. Indeed, they are unusual and harmful to the NRA. Texas law? No Virginia-based non-profit should agree to that. Arbitration? That denies the leverage the NRA needs to compel honest and ethical legal services. Loser pays? This is a concept from English law—and is not used in America.

It is obvious that in addition to the high fees and secrecy surrounding the Brewer firm's invoices, we apparently have lax oversight regarding our engagement of the Brewer firm and the scope of what the Brewer firm should be doing, how they are billing us and the rates they are charging. These matters are key elements of our fiduciary duty and must be addressed by an outside, independent review.

The Brewer firm's March 2018 engagement letter should be discarded and re-written. If the Brewer firm does not agree to standard terms, a non-profit discount, detailed billing guidelines used by all properly managed corporations and non-profits (explained below), and adequate scope documentation for each matter on which the Brewer firm is working, then the entire engagement agreement should be terminated.

*Fourth*, **NRA's oversight of the Brewer firm is totally inconsistent with industry standards.**

Our oversight of the Brewer firm is wholly inadequate. As we understand it, our NRA is failing to properly oversee the Brewer firm in multiple ways. For example:

- The NRA has failed to require the Brewer firm to adhere to "billing guidelines." These are standard in the both the non-profit and for-profit corporate world. There are samples on the internet. The American Bar Association provides guidance on this topic. Billing guidelines help organizations control the costs of outside counsel. The NRA should implement such billing guidelines immediately and direct the Brewer firm to follow them. They should be part of each separate retainer agreement.

- We have failed to secure a discount on Brewer's "high" hourly rates. Why do we allow the Brewer firm to charge such high rates? NRA outside counsel at Morgan Lewis wrote a memo to the NRA last month stating that:



  It should be noted that not all of the Brewer firm's work is "high-stakes corporate litigation." First, NRA is a non-profit association, rather than a corporation. Second, some of the matters the Brewer firm apparently handles are uncomplicated, routine matters such as vendor contracts that were not properly managed in years past and responding to Congressional letters.

- Thus far, we have failed to require any outside, independent review of the Brewer invoices. There are services that perform this function—and we easily could find an outside expert to perform the function at very little cost. Morgan Lewis opined ▮

***Fifth*, judges in cases in which the Brewer firm has been involved have determined that Mr. Brewer has engaged in improper unethical conduct and a Federal Judge in Virginia ejected him from representing the NRA in litigation.**

Mr. Brewer was found by a Federal District Judge in Virginia to have misled the court, an offense that led the court to eject Mr. Brewer from participating in a case for the NRA. In that case, after a special hearing to determine why Mr. Brewer failed to disclose his prior disciplinary problem in Texas, the Judge in the U.S. District Court for the Eastern District of Virginia decided on September 13, 2018 to revoke his standing to participate in the case. The Virginia federal court stated:

> "[T]he Court of Appeals [in Texas] went on to affirm the findings of Judge Reyes that Mr. Brewer's actions were not a negligent act, or a mistake, or the result of poor judgment, but they were in **bad faith, unprofessional, and unethical, highly prejudicial to the fair trial of an impartial jury.**
>
> And, of course, we're talking about this push poll that Mr. Brewer admitted he had reviewed and approved before it was used by the polling company. Disrespectful to the judicial system. Threatening the integrity of the judicial system. Incompatible with a fair trial. The poll was designed to improperly influence the jury pool. And that the conduct impacted the right of a trial by impartial jurors. And that it was intentional and in bad faith. And that the quote, "it is undisputed that the trial Court's ability to impanel an impartial jury and to try a case before unintimidated witnesses are core functions of the Court."
>
> Had I known about these opinions, notwithstanding that there is further appeals ongoing, I wouldn't have signed the pro hac vice form and would not have admitted Mr. Brewer to the Eastern District of Virginia. They are very serious allegations. They are findings of bad faith that go to the core of a fair and impartial rendering of a jury verdict. And now having reviewed them—and I realize that the NRA will be inconvenienced and, if necessary, there might have to be some adjustment to the discovery process ongoing—but **I find that Mr. Brewer's pro hac vice admission should be revoked and that he should not be admitted to proceed further in this case.**"

Transcript, NRA v. Lockton, Case No. 18-639, September 13, 2018, page 16–17 (emphasis added).

Indeed, the Texas court sanctioned Mr. Brewer on January 22, 2016, writing:

> "[T]he manner in which Mr. Brewer has responded to the sanctions
> motions and allegations therein is concerning to this Court. Mr.
> Brewer's demeanor was nonchalant and uncaring. Additionally,
> Mr. Brewer was repeatedly evasive in answering questions when
> he was on the witness stand. This Court sustained multiple
> objections for non-responsiveness, instructed Mr. Brewer to
> answer the questions being asked of him by counsel, and before
> taking more aggressive steps, this Court took a recess during Mr.
> Brewer's examination seeking the assistance of Mr. Brewer's
> attorney. The Court asked Mr. Pridmore [Mr. Brewer's attorney]
> to step outside the courtroom and advise Mr. Brewer to follow the
> Court's instructions and be responsive to questions being asked of
> him. It was the desire and hope of this Court to highlight to Mr.
> Brewer that the matter at hand was of extreme importance and with
> potentially grave consequences. . . . **The Court finds Mr.**
> **Brewer's actions were not merely a negligent act, a mistake or**
> **the result of poor judgment, and Mr. Brewer's explanation**
> **that he bears clean hands . . . is insulting to this Court. The**
> **Court further finds Mr. Brewer's attempt to avoid**
> **responsibility and accountability for his conduct to be at the**
> **very least unpersuasive and at the worst in bad faith,**
> **unprofessional, and unethical.**"

Ruling from Judge Reyes, Teel v. Titeflex, Case No. 2012-504 (Lubbock, TX), January 22,
2016, pages 1–2 (emphasis added). As the Virginia federal court noted, the Texas Court of
Appeals affirmed Judge Reyes's sanction of Mr. Brewer.

The NRA cannot ignore such findings. We understand that the ethical problem Mr. Brewer has
in Texas is on appeal to the Texas Supreme Court. But the fact is, his honesty and ethics have
been questioned by courts in Texas and Virginia. This record adds to the urgency of the requests
that the NRA immediately conduct an outside, independent review of the millions in fees the
Brewer firm has charged to the NRA, . . . fees which appear to be excessive . . . and fees which
appear to have been paid at a rate of more than $97,000 per day in Q1 2019.

*Sixth*, **Mr. Brewer has been actively trying to stop an outside, independent review of his**
**firm's invoices.**

It is even more stunning to learn that Mr. Brewer has personally been actively working to stop an
outside, independent review of his own invoices. Certainly the Brewer firm has a conflict of
interest regarding the review of its own bills when it works to resist an outside, independent review
of its own bills.

*Seventh*, the NRA Board of Directors has a fiduciary duty to oversee massive expenditures of NRA funds.

The NRA is a non-profit registered in New York. It is regulated by the New York Attorney General. The New York Attorney General has published guidance on the financial management of non-profits. We must follow this guidance and the laws governing non-profits in the State of New York. Multiple guidance memoranda from the New York Attorney General can be found at www.charitiesnys.com. One particularly relevant piece of guidance is titled:

"INTERNAL CONTROLS AND FINANCIAL ACCOUNTABILITY FOR NOT-FOR-PROFIT BOARDS." It states:

> "A primary responsibility of a nonprofit's board of directors
> is to ensure that the organization is accountable for its
> Programs and finances to its contributors, members, the public
> and government regulators."

To fulfill our directors' fiduciary duties and responsibilities as stewards of our non-profit organization, we must insist on full disclosure, proper oversight, and an outside, independent review. If we do not, we are bound by our fiduciary duties to do what is right—and to push further for review and oversight of these extraordinary, multi-million-dollar expenditures. This is a matter of conscience for both of us.

We want to be clear that we raise concerns about the Brewer firm's multi-million-dollar fees for only one reason: it is our fiduciary duty to make sure the NRA responsibly uses the funds it raises from members and the public. We fully support the compliance work the Brewer firm has performed for the NRA. We fully support and expect 100% compliance with all rules, regulations and laws applicable to non-profits. But this includes compliance in all NRA contractual relationships with vendors, including the Brewer firm. If the NRA Audit Committee fails to order an outside, independent review, then the NRA Board of Directors, in fulfillment of its fiduciary duty, should do so.

### Conclusion

The decision to permit an outside, independent review of the Brewer legal fees should not be difficult. In fact, it is a "no-brainer" when one considers the totality of current circumstances:

Over the last 13 months Brewer has billed the NRA approximately $24,000,000, more than $18.5 million ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. His retainer agreement is flawed, inconsistent with standards in the industry, and contains provisions clearly harmful to the NRA.

The bills he submitted are not subject to customary "billing guidelines" used by non-profits and public corporations. He provides no discount from his "normal" billing rates to NRA. He provides no budget of costs going forward. And the "scope" of his work is vague and does not include the projects for which he is billing the NRA.

8

Despite repeated requests to fulfill our Board of Directors' fiduciary responsibilities by conducting an outside, independent review of the Brewer firm's billing details, our efforts have been unsuccessful. Based on his 1st Quarter 2019 invoices, each day going forward will require the NRA to expend almost $100,000 with the Brewer firm.

Lastly, all of the above should be considered in the context that the lawyer whose bills are in question has had encounters with Judges who have taken action against him, finding ethical lapses in a Texas court and a false statement to a Federal Judge in Virginia, the result of which was that Mr. Brewer was ejected from the Virginia proceeding and prohibited from continuing to represent NRA in the ongoing litigation filed there.

For all the reasons above, and as we have articulated orally and in previous correspondence, we should retain an outside, independent reviewer of the Brewer firm's billings prior to our Board of Directors meeting on 29 April in Indianapolis. Failing that, we plan to address the points above to our Board in person, so they are aware of their fiduciary duties, our efforts to protect this organization and its members, and let our Board Members decide how they want to proceed.

Charles, hopefully, the agenda for your Audit Committee meeting on Sunday, 28 April will permit including this document for discussion under "new business" in executive session. If that is not possible, please advise and we will plan to introduce this letter during our Board of Directors meeting on 29 April 2019.

John, please pass a copy of this document as OFFICIAL CORRESPONDENCE to our Executive Vice President/CEO and inform him that if the Audit Committee takes a pass on retaining the services of an outside, independent reviewer acceptable to us, then it is our intention to seek approval for such a review of these massive expenditures from the Board Members in attendance.

Semper Fidelis,


Oliver North                                    Richard Childress
NRA President                                   NRA 1st Vice President


**"SEMPER FIDELIS" IS MORE THAN A SLOGAN FOR U.S. MARINES.**
**"ALWAYS FAITHFUL" IS A WAY OF LIFE**

**NRA** | National Rifle Association of America
11250 Waples Mill Road • Fairfax, Virginia 22030 • NRA.org

**Wayne LaPierre**
Executive Vice President

NATIONAL RIFLE ASSOCIATION
# NOTICE OF SHUTDOWN

March 4, 2019



In my forty years here at the NRA, I never thought I'd have to write you a letter like this.

But right now we're facing an attack that's unprecedented not just in the history of the NRA, but in the entire history of our country.

**And if this attack succeeds, NRA will be forced to <u>shut down forever.</u>**

The fact is, gun haters have tried for decades to destroy your gun rights at the ballot box, in the courts, in the state legislatures and in Congress. But time and time again, they've fallen short – because the NRA and our members like you have always stood in their way.

**But now, gun-hating New York Governor Andrew Cuomo has unveiled a <u>nuclear option</u> to – in his own words – "put the NRA out of business."**

Cuomo has sent a clear and chilling message to every bank and insurance company in the United States that <u>they'd better think twice</u> before doing business with the NRA.

And he's backing up his words with a clear threat to every major financial institution in America: That those who refuse to sever ties with NRA will find themselves in the crosshairs of New York government agents – <u>to be harassed, hassled and persecuted into submission.</u>

With a $168 billion state budget, Cuomo knows that his army of New York state regulators can make life miserable for virtually any financial institution in the country.

And he knows that, without a bank account, NRA can't continue to operate. We can't write checks. We can't accept membership dues or contributions. And we can't pay our employees or even our electric bill.

And let me be clear. Cuomo's tactics are <u>already</u> working.

One by one, more and more banks and insurance companies across the country are knuckling under to Cuomo's threat – and telling NRA they won't do business with us – because they don't want to be targeted and crushed by Cuomo's strong-arm tactics and the vast

(over, please)

# EXHIBIT D

– 2 –

power of thousands of New York bureaucrats.

And very soon, unless we can force Cuomo to break off this attack, <u>NRA will have no choice but to cease operations after 147 years of fighting for freedom.</u>

> **You and I have seen how the power of government has been used in China and Cuba and North Korea to stamp out opposing views and silence political opponents.**
>
> **But <u>never in my life</u> did I think we'd see these tactics brazenly and openly deployed by government officials, <u>right here in the United States,</u> to destroy people and organizations they disagree with.**

Even organizations and publications that don't usually agree with the NRA – like the American Civil Liberties Union and the *New Republic* – have publicly slammed Cuomo's tactics as a blatant attack on the First Amendment and a clear and present danger to American freedom.

But in the end, the only people who can defend NRA from this lethal assault are you and me and our fellow members.

<u>And today I'm asking you to join me in fighting for the continued existence of this great Association by making an emergency contribution of $27, $52, $100, $250, $500 or any other amount you can afford.</u>

To halt Governor Cuomo's blacklist and blackmail tactics, we've filed suit in U.S. District Court – *National Rifle Association v. Andrew Cuomo* – asking the court to <u>immediately and permanently</u> shut down Cuomo's campaign to destroy the NRA.

There's no question in my mind that this is the most important First Amendment legal case of our lifetimes – to decide whether government officials in America have the right to silence and shut down organizations that have opposing political views.

And given the fact that the very existence of your NRA is at stake, it's <u>by far</u> the most important Second Amendment case in the history of the United States of America. Because without the NRA, no one in this country will be allowed to keep their guns except <u>government officials</u> and <u>criminals.</u>

Fighting side by side over the years, you and I and the NRA have done more to advance freedom's cause – and protect the lives of law-abiding citizens – than any other membership organization in American history.

For 25 years, every time gun-hating members of Congress have tried to move forward with freedom-killing legislation in the House and Senate, we've stood like a brick wall – never allowing a single major "gun control" bill to be signed into law.

We've enacted Right-to-Carry in more than forty states. We've passed dozens of "stand your ground" laws to strengthen your right to self-defense, along with laws to ban government

(next page, please)

gun confiscations in times of emergency.

We blocked the extension of the Clinton Gun Ban. We prohibited baseless lawsuits that would have bankrupted every firearm manufacturer in America. We won the *Heller* and *McDonald* Supreme Court decisions affirming your individual Right to Keep and Bear Arms for the first time.

And we defeated Hillary Clinton and her Disarm America agenda – while at the same time paving the way for Justices Neil Gorsuch and Brett Kavanaugh to be nominated and confirmed to the U.S. Supreme Court.

### But the minute the NRA is wiped off the political map – and closes its doors for the last time – our nation's first and last line of defense for the Second Amendment will be gone forever.

Our legislative offices just steps from the U.S. Capitol will be shut down – and your voice will fall completely silent on Capitol Hill.

Pro-Second Amendment candidates won't stand a chance at election time against Michael Bloomberg's billions and the unchecked power of the gun-hating media – and a full anti-gun takeover of Congress and the White House will be virtually guaranteed.

Shooting ranges and hunting clubs across the country that depend on NRA for their insurance needs will be shuttered and sold.

Mom and pop gun stores across the country will see their bank accounts closed and have no choice but to go out of business – as Governor Cuomo rolls out his blackmail tactics to every corner of America's hunting and shooting industry.

### This is not a drill. This is the very definition of government tyranny, and exactly what our Founding Fathers warned against.

This is a fight for the continued existence of the NRA and the continued existence of the Second Amendment as we know it.

This is a fight for the Right-to-Carry permit in your pocket that you're sure to lose if and when NRA goes out of business.

This is a fight for the guns in your safe that are certain to be banned and confiscated if NRA is forced to shut down.

And this is a fight for your God-given right to protect your life and your loved ones against violent criminals – who will still have their illegal guns long after law-abiding citizens like you have been stripped of your rights and your freedom.

### This is an all-hands-on-deck moment. The Second Amendment cannot survive without the NRA, and the NRA cannot survive without your help right now.

And that's why I'm counting on you to make an immediate contribution of \$27, \$52,

(over, please)

– 4 –

$100, $250, or even $500 or more today.

Your dollars today will help keep the NRA in operation while we undertake the biggest, most important, and by far the most expensive lawsuit in our history.

Your dollars today can help fuel our legislative advocacy in Congress and the state legislatures while we battle in court for NRA's survival.

And your dollars today can help us fight back against the gun-ban lobby's 24/7 lies and fake news – while at the same time fighting this life-or-death court battle for the continued existence of the NRA.

**In all my years with the NRA, I've never counted on your help more.**

**PLEASE – don't let me down.**

Let's not allow Governor Cuomo to destroy this time-honored organization that's done so much for freedom's cause. Let's not allow Governor Cuomo to destroy our right to peaceably join together under the NRA banner to fight for the Constitutional rights we cherish.

And let's not allow Governor Cuomo to turn this nation into a place like Communist China or Cuba where leftist politicians can weaponize the power of government to shut down any organization or voice they disagree with.

If we win this battle, we can score the biggest legal victory in history for the NRA, for the First Amendment, for the Second Amendment, and for every freedom we cherish.

But if we lose, the NRA will be out of business, law-abiding gun owners across this nation will be disarmed, and American freedom as we know it will be gone.

Your contribution today of $27, $52, $100, or even more can and will help make the difference. Please let me hear from you today.

Sincerely,

Wayne LaPierre
Executive Vice President

P.S.    This effort to close down NRA through brute-force government intimidation tactics is unprecedented in American history. It's a doomsday scenario for our guns and our freedom. I'm counting on your financial support to keep us in operation while we fight in the courts to prevent a total NRA shutdown.

Please return the enclosed reply with your contribution immediately. Or, visit *NRA.org/saveNRA* or call 1-844-SAVE-NRA (728-3672) to make your contribution online or by phone. And thank you for standing with me at this critical moment for freedom.

# STOP THE NRA SHUTDOWN!



**NRA** | National Rifle Association of America
11250 Waples Mill Road • Fairfax, Virginia 22030 • NRA.org

To contribute online:
NRA.org/saveNRA

To contribute by phone:
1-844-SAVE-NRA (728-3672)

# URGENT MEMBER REPLY
## to Wayne LaPierre, Executive Vice President

Dear Wayne,

☐ You can count on me to do everything I can to save the NRA from this vicious, freedom-killing attack by New York Governor Andrew Cuomo. To stop this crusade to destroy the NRA and disarm America, I'm enclosing the most generous contribution I can, in the amount of:

☐ $27    ☐ $52    ☐ $100    ☐ $250    ☐ $500    ☐ Other: $_____

☐ Check enclosed, payable to NRA

☐ Please charge my:  ☐ VISA  ☐ [MasterCard]  ☐ [American Express]  ☐ DISCOVER         Amount to charge: $_____

Card No.: ☐☐☐☐ - ☐☐☐☐ - ☐☐☐☐ - ☐☐☐☐    Expiration Date: _____ / _____
                                                                    Mo.           Yr.

Signature: _____    Email: _____

Contributions, gifts or membership dues made or paid to the National Rifle Association of America are not refundable or transferable and are not deductible as charitable contributions for Federal income tax purposes.