IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, <br><br>    Plaintiff and Counter-Defendant, <br><br> and <br><br> WAYNE LAPIERRE, <br><br>    Third-Party Defendant, <br><br> v. <br><br> ACKERMAN MCQUEEN, INC., <br><br>    Defendant and Counter-Plaintiff, <br><br> and <br><br> MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, AND JESSEE GREENBERG <br><br>    Defendants. | Civil Action No. 3:19-cv-02074-G |

<u>**THIRD-PARTY DEFENDANT WAYNE LAPIERRE'S ANSWER TO DEFENDANT ACKERMAN MCQUEEN'S THIRD-PARTY COMPLINT**</u>

Third-Party Defendant Mr. Wayne LaPierre files his Answer to Defendant Ackerman McQueen's Third-Party Complaint (*see* ECF No. 31) and states as follows.

## I.    <u>PRELIMINARY STATEMENT</u>

A.    <u>Amended Counterclaim.</u>

1.    Beneath its benign veneer, the instant case is driven by the intentional efforts of LaPierre and current NRA board members to destroy AMc's business in a desperate attempt to deflect attention from the NRA's gross financial mismanagement at the hands of LaPierre, the longtime Executive Vice President and *de facto* leader of the NRA. The NRA's lawsuit invites—

1

or rather, necessitates—inquiry into the conduct of LaPierre and other NRA board members. The NRA's victim narrative will not withstand fact-based scrutiny of the real reasons why the parties' operating agreement (the "**Services Agreement**," as amended)[1] was terminated, or any meaningful examination of the creation, operation, and unquestioned success of NRATV (a digital network dedicated to the advancement of Second Amendment issues), and any allegation that NRATV was somehow a "failed endeavor."

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

2.       Despite the parties' decades-long relationship, two events combined to cause the NRA to switch from friend to foe: (1) the advent of the law firm of Brewer, Attorneys and Counselors (the "**Brewer Firm**"), and its principal Bill Brewer ("**Brewer**") (son-in-law and brother-in-law to the principals and owners of AMc), whose ascendency within the NRA has caused the NRA to embark on a reckless and self-destructive path, in the process taking down important service providers, longtime legal counsel, and dedicated NRA leaders who had been powerful Second Amendment advocates; and (2) AMc's refusal to cover up or acquiesce in the financial adventurism and organizational mismanagement of the NRA's rogue leader, LaPierre.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

3.       This action-the fourth frivolous lawsuit launched by the NRA against AMc in the last six months-is simply more of LaPierre and Brewer's frivolous litigation tactics, inflammatory public-relations maneuvers, and wasteful misuse of NRA resources.  And AMc is in good company.  Under Brewer's influence since at least early 2018, the NRA has brought lawsuits against (1) Andrew Cuomo, the Governor of New York and New York's Chief Insurance Regulator; (2) the Lockton Companies; (3) Lt. Col. Oliver North ("**North**"), the

---

[1] *See* Ex. A (Services Agreement); Ex. B (Amendment No. 1 to Services Agreement).

NRA's one-time President; (4) Letitia James, the New York Attorney General; and (5) the City of San Francisco. These lawsuits have resulted in the voluntary resignation of several NRA board members who were unwilling to watch LaPierre ignore his fiduciary duties to the NRA or to be labeled a "co- conspirator" for publically (sic) questioning his actions.[2]

**RESPONSE:** Mr. LaPierre denies the allegations in the first and second sentences. Mr. LaPierre admits that the NRA has filed meritorious lawsuits against (i) Defendant AMc; (ii) Andrew Cuomo and the New York State Department of Financial Services for civil rights violations that survived a motion to dismiss and now remains in the discovery phase of the case; (iii) the Lockton Companies; (iv) Mr. Oliver North, a case in which the NRA recently prevailed, (v) the New York Attorney General; and (vi) the City of San Francisco, a case that has since been resolved. Mr. LaPierre denies the remaining allegations in this paragraph.

4.      Now forcing AMc to defend itself on yet a fourth front, LaPierre and Brewer, enabled by the remaining NRA board members, appear intent on extorting their desired outcome through a cocktail of vexatious litigation, Rambo-style media exploits, and strong-arm coercion tactics. In sharp contrast to Plaintiff's Amended Complaint, the facts supporting this Amended Counterclaim show that AMc has been victimized by the machinations of LaPierre and Brewer— not the other way around.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

**B.      Third Party Action**

5.      The NRA's lawsuit requires, in defense, an exposition of the fraudulent conduct of LaPierre; his profligate misuse of NRA funds for personal and family benefit; his flaunting of

---

[2] *See e.g.*, news articles describing this recent frenetic activity and Brewer's role: Non Profit News Quarterly, (https://nonprofitquarterly.org/why-someone-should-make-the-NRA-into-a-tv-series; Washington Post, https://www.washingtonpost.com/politics/how-a-hard-charging-attorney-helped.fuel-a-civil-war-inside-the-NRA); https://www.nytimes.com/2019/08/22/us/politics/nra-guns-wayne-lapierre.html.

non- profit corporation law; and the reckless abandon with which he and his enabler Brewer have run roughshod over the NRA Board of Directors and the NRA Foundation Board of Directors in multiple respects (including failure to obtain prior board approval for his lawsuits against AMc and firing the Board's general counsel).

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

6.      Brewer was an odd but convenient choice for leading a scorched-earth attack on AMc. Being related to AMc executives, he could be expected to trade personal information about his father-in-law, Angus McQueen, which indeed occurred on at least one occasion 2018 when Brewer was interviewing AMc employees.   Now deceased, Mr. McQueen was, at the time, fighting cancer and needing the full support, as well as the discretion, of his family.   Instead, Brewer partnered with LaPierre in an attempt to scapegoat someone who would be unable to properly defend himself.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

7.      LaPierre will also be exposed individually for libelous statements against AMc, his intentional interference with third-party NRA contracts, and the fraud he has perpetrated on AMc, particularly with respect to NRATV.   This lawsuit will reveal that the true driving force behind LaPierre's plan to scapegoat AMc is to not only deflect attention from his own wrongdoing, but also to inflict maximum damage on AMc in retribution for its "disloyalty," apparently defined by LaPierre as an unwillingness to follow him blindly.   It is LaPierre, with Brewer's assistance, whose artifice has caused AMc serious business and reputational injury, for which he must now be held accountable.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

8.      This Amended Counterclaim and Third-Party Complaint seek to not only restore AMc's reputation, but to hold the NRA and LaPierre accountable for their reckless actions and the profound collateral damage inflicted upon AMc as a result.

**RESPONSE:** Mr. LaPierre states that it lacks knowledge or information sufficient to form a belief about the truth of the allegation about AMc's motives in filing the Amended Counterclaim and Third-Party Complaint in this case and, therefore, denies the allegation and also denies the remaining allegations in this paragraph.

## II.   PARTIES

9.      Counter-Plaintiff has appeared herein by contemporaneously filing this Amended Answer, Amended Counterclaim, and Third-Party Counterclaim against Wayne LaPierre, individually.

**RESPONSE:** No response is required.

10.     Counter-Defendant has appeared herein and is before the Court for all purposes.

**RESPONSE:** Mr. LaPierre admits that the NRA has appeared in this case, but denies it is "before the Court for all purposes."

11.     Third Party Defendant Wayne LaPierre is a resident of the State of Virginia who may be served with citation at his place of business, 11250 Waples Mill Rd., Fairfax, Virginia 22030.

**RESPONSE:** Mr. LaPierre admits that he is a resident of the State of Virginia and that his place of business is located at the specified address. The remaining allegations in this paragraph are denied.

### III.   JURISDICTION AND VENUE

12.     The counterclaims asserted herein include compulsory and permissive actions. Venue is proper in the Northern District of Texas, Dallas Division.

**RESPONSE:** Mr. LaPierre admits that venue is proper in this district. The remaining allegations in this paragraph are statements or conclusions of law to which no response is required.

### IV.   BACKGROUND FACTS

**A.    Decades of Harmony Coincide with the Emergence of LaPierre.**

13.     For nearly four decades, AMc expertly served the NRA, helping the gun rights organization navigate troubled political and societal waters as its principal communication strategist and crisis manager.  The beginning of the relationship followed NRA management's decision to completely outsource its public relations work to AMc.  AMc effectively crafted the NRA message and burnished its image as the most visible Second Amendment advocacy group in the United States.

**RESPONSE:** Mr. LaPierre admits that for nearly four decades AMc served as the communication strategist and crisis manager for the NRA but denies the remaining allegations in the first sentence. Mr. LaPierre denies the allegations contained in the second sentence.  Mr. LaPierre admits that the NRA is the most visible Second Amendment advocacy group in the United States but denies the remaining allegations in this paragraph.

14.     LaPierre, a one-time Democratic legislative aide, began his NRA career in 1977 as a lobbyist. Described in news reports as "reserved" and "awkward,"[3] he was seemingly ill-suited to head what many describe as a strident advocacy group.  Aside from his mild personality, AMc personnel found him to be uncomfortable with AMc-developed branding

---

[3] *See e.g.*, https://www.thetrace.org/features/nra.financial.misconduct.ackerman.mcqueen.

programs such as "NRA Life of Duty," a program created to tell stories about American military and law enforcement professionals who defend the United States domestically and abroad. LaPierre often exhibited defensiveness, possibly stemming from his lack of military service and multiple deferments obtained during the Vietnam conflict.   Even today, LaPierre knows little about guns or how to actually use them.

**RESPONSE:** Mr. LaPierre admits that he is employed by the NRA since 1977. Mr. LaPierre denies the remaining allegations in this paragraph.

15.     In the wake of the tragedy at Sandy Hook in 2012, LaPierre personally sought to avoid public scrutiny[4] and to cease being the only voice of the organization.   He turned to AMc, which created the commentator program for that purpose.   Within a short period of time, AMc— at LaPierre's request and with his approval—hired or contracted with several nationally recognized talents whose job was to deliver hard-hitting commentary on Second Amendment and American freedom issues.   This marked the beginning of LaPierre's personal involvement in assessing and approving salaries and capabilities of those talents as, ultimately, those fees would be passed through to the NRA.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

16.     LaPierre also tasked AMc to develop programs that would broaden NRA's reach. To that end, AMc developed the theme "Stand and Fight," which became the banner brand for the NRA. The NRA continues to use the theme today.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph, except Mr. LaPierre admits that during his tenure as Executive Vice President and Chief Executive Officer of the NRA, the NRA engaged AMc to help educate the public about the NRA's Second Amendment mission.

---

[4] LaPierre flew to the Bahamas during this time to avoid having to comment on Sandy Hook.

17.     By contrast, certain offensive messaging which disgraced the NRA was created by other vendors at LaPierre's direction.  For example, in 1994, LaPierre and his membership-recruitment firm (not AMc) created the now infamous direct-mailer line, "jack-booted thugs." LaPierre routinely urged AMc to give him "more gasoline," knowing that this kind of incendiary advocacy would create notoriety for the NRA . . . and, of course, enhance his personal brand. AMc refused all directives that, in its professional opinion, would bring harm to the NRA brand.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

18.     Despite AMc's efforts to appeal to a broader audience, LaPierre's polarizing rhetoric appeared to be taking its toll. In 2014, the NRA experienced funding problems, causing LaPierre and the NRA Treasurer, Woody Phillips ("***Phillips***"), to travel to Dallas to announce a budget cut for AMc during calendar year 2015.[5]  With the figurative stroke of a pen, LaPierre cut funding for NRA Life of Duty, in the process neutering a valuable, patriotic, and profitable program as well as funding for additional sponsored programming.  When confronted about the decision to cut programs that had active sponsors, LaPierre directed AMc to "fake it," *i.e.*, make it appear that the NRA Life of Duty program and others remained robust despite the significant funding loss.  AMc refused the edict to "fake it," and instead came up with creative alternative concepts that would serve the NRA members with a smaller budget.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph and footnote 6.

**B.      Agreed Protocols, Now Conveniently Ignored, Are Developed.**

19.     During  this  multi-decade  relationship,  the  parties  developed  working arrangements, such as negotiating annual budgets covering a variety of tasks.  LaPierre and Phillips controlled the process, operating with full knowledge of line items.  As projects were

---

[5] Curiously, the costs cut were associated with NRA video channels; left untouched were many of LaPierre's and other NRA officials' out-of-pocket expenditures.

initiated, invoices would issue, and payment would follow without complaint. LaPierre participated in those negotiations and approved each annual budget. The NRA itself well understood that keeping hourly time records as the basis of billing was not the contractual measure of payment—AMc was paid for its results. Reflecting the understanding that strategy and creative value are determined by outcome rather than an amount of time spent, the annual budget developed and agreed upon by the parties was results-based in nature and determined by the fair market value[6] of each proposed objective. The type of time-based detail that the NRA now claims to be missing had simply never been required.

**RESPONSE:** Mr. LaPierre admits that there was a "multi-decade relationship" with AMc, but otherwise denies the allegations in this paragraph and in footnote 7.

20. LaPierre, with input from AMc CEO, Angus McQueen ("***Angus***"), directed that these working arrangements be set in place. The entities' senior officers, Phillips (NRA) and Winkler and/or Montgomery (AMc) were involved in the negotiations and oversaw budgetary, invoicing, and payment issues.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

21. The parties abided by these protocols steadfastly and without disagreement for many years as the relationship grew. Budgets would be set for specific work, AMc sent an invoice, the NRA paid the amount budgeted for the invoiced task, and AMc completed the objective. The relationship between the organizations was harmonious and mutually beneficial,

---

[6] AMc invoicing for services rendered consists primarily of "Fair Market Value" for services such as video programming production for NRATV, video support, Freedom's Safest Place production, Annual Meetings event planning/coordination/execution, and America's First Freedom print magazine production (all of which are listed on the 2019 Approved Budget). Some additional services AMc provided consisted of specific talent/personnel, employed by AMc specifically on NRA's behalf. These personnel were identified individually to NRA, along with their salary, a specified overhead factor for each, and a profit factor for each which concluded with a total for each employee. These transparent and approved salary allocations were the basis of the billing for what NRA refers to as "virtual employees," not the amount of time and/or hours these employees spent working. Any services rendered outside of the annual approved budget were approved by Woody Phillips (and later, Craig Spray).

as both parties grew into leaders in their respective spaces.  Given the transparency and fairness

of the annual budgeting process, never in their long history did either party express mistrust of

the other side's financial dealings—until political pressure on LaPierre began mounting, that is.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

C.       **NRA Asks AMc to Front Activities; LaPierre's Passion for Secrecy.**

22.    One of the defining characteristics of the NRA/AMc relationship was the

frequency with which LaPierre and others acting at his direction asked AMc to "front" activities

and expenses for the NRA.  For example, AMc would engage third parties to perform work for

the NRA at LaPierre and other NRA officials' request, pay for the work performed by those third

party(ies), and then submit an invoice for reimbursement by the NRA.   These expense

reimbursements (as opposed to charges for work actually performed by AMc) amounted to

several millions of dollars annually.[7] LaPierre's rationale for running these expenses through

AMc:  it was necessary for security and "discretion" reasons.  In fact, on many occasions, he told

AMc that he didn't trust his own accounting department within the NRA.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

23.    LaPierre, beset by apparent paranoia and a passion for secrecy, adopted a

dictatorial, micromanagement style.  He began displaying an obsession with privacy, distancing

himself from the public eye and exhibiting panic at the thought of public scrutiny. A t the same

time, he was heavily involved in the formulation of policy and protocols for dealing with third

parties, including vendors like AMc.  Even NRATV, now the scourge of the NRA, was created

and expanded at the sole direction of LaPierre.  Not only did he sign off on every performance

metric of NRATV, he extolled the success of NRATV in public speeches and made numerous

---

[7] Press reports influenced by the NRA have incorrectly asserted that the NRA "paid" AMc $40 million in 2017.  In fact, a substantial amount of the 2017 budget was spent on expensive national broadcast advertising and talent AMc retained for NRA projects at the NRA's request, specifically, at the request of LaPierre.

presentations to the Board of Directors in support of NRATV, which seem to have been favorably received.  One board member observed, "If you took a poll of most board members, they'll tell you they like NRATV."[8]

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

24.     LaPierre repeatedly made two things clear:  (1) he was the only person with ultimate authority to speak for the NRA and direct the AMc relationship on behalf of the NRA, unless he specifically designated someone in writing to perform that task; and (2) any expenses he incurred, whether personally or through AMc, were legitimate NRA expenses, and therefore subject to reimbursement to AMc.  As AMc has now learned, LaPierre's broad representations regarding the legitimacy of his expenses were often false.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

D.     **The Services Agreement.**

25.     Over the course of years, the parties formalized their working arrangements, embodying their protocols in a "Services Agreement," the first of which they executed in 1999. The latest version was updated in 2017[9] and amended in 2018[10] to confirm the protocol for the hiring, compensation, and reimbursements due to AMc under employment agreements involving North and Dana Loesch ("*Loesch*").  At the NRA's request, through LaPierre, AMc formally employed both of these individuals as "talents" for NRATV, the ambitious digital broadcast network created, staffed, and administered in its most recent form (at LaPierre's request) by AMc.

---

[8] http://www.wsj.com/articles/nra.files.suit.against.ad.agency.in.rift.with.key.partner.

[9] Ex. A.

[10] Ex. B.

**RESPONSE:** Mr. LaPierre admits that the parties entered into a Services Agreement in 1999 and 2017, and that the 2017 Services Agreement was amended in 2018, but otherwise denies the allegations in this paragraph.

26.     The Services Agreement also contained other key clauses related to the duties imposed upon AMc to maintain the confidentiality of the NRA's sensitive information, a provision designating the sole NRA authority for communicating with and issuing directives to AMc, and numerous other substantive provisions, which the NRA's Amended Complaint has now placed at issue.

**RESPONSE:** Mr. LaPierre states that the Services Agreement is a document that speaks for itself, and otherwise denies the allegations in this paragraph.

  **i.   Termination and Reimbursement Provisions.**

27.     The 2018 Amendment contains two provisions expressly designed to protect AMc in the event of its expiration or termination of that agreement.  *First*, the NRA was required to secure and post a $3,000,000.00 letter of credit for AMc's benefit to secure payment of outstanding invoices over 30 days old.[11]  *Second*, "all non-cancellable" contracts entered into between AMc and third parties for the benefit of the NRA, including the North and Loesch contracts (referred to therein as the "*AMc Third Party NRA Contracts*"), obligated the NRA to pay the "compensation payable" under the Third Party NRA Contracts.[12]

**RESPONSE:** Mr. LaPierre states that the 2018 Amendment is a document that speaks for itself, and otherwise denies the allegations in this paragraph.

28.     The 2018 Amendment was significant for other reasons as well.  As described herein, LaPierre on multiple occasions lauded AMc's work on NRATV, including during a

---

[11] Ex. B ¶ 2.

[12] Ex. B ¶ 3.

meeting in Dallas on October 11, 2018.  Starting at that meeting and continuing over the next two months, LaPierre approved NRATV for the 2019 budget year, including Dan Bongino's $1.5 million contract (which Mr. Bongino ultimately turned down).  As he had done in May 2018 when the 2018 Amendment was signed, LaPierre voiced his continuing support for AMc's work and the performance of commentators like North and Loesch.  These statements, like the written commitment to reimburse AMc for North and Loesch's salaries, were false, were known by LaPierre to be false when made, and were relied upon by AMc, resulting in damages.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

29.     Under the 2017 Services Agreement and the 2018 Amendment, the NRA has the contractual ability to terminate the Agreement at any time with 90-days' notice.  The termination of the Services Agreement triggers Sections XI.B, D, E, and/or F, under which the NRA will owe AMc termination payments, which are currently estimated to approach thirty-five million ($35,000,000) in severance payments and other termination fees.

**RESPONSE:** The NRA/Mr. LaPierre states that the referenced documents speak for themselves, and otherwise denies the allegations in this paragraph.

### ii.  **Authorized Contacts.**

30.     Additionally, Section IX of the Services Agreement provides as follows:

> AMc is authorized to act upon written communications received from the NRA Executive Vice President or his designee.  He or his designee are the ***only persons*** within NRA who have the actual authority to issue such communications.[13]

**RESPONSE:** Mr. LaPierre states that the Services Agreement is a document that speaks for itself, and otherwise denies the allegations in this paragraph.

---

[13] Ex. A, Section IX (emphasis added).

31.     At all relevant times, LaPierre was (and remains) the NRA Executive Vice President.  As the Executive Vice President, only LaPierre or his designee could demand that AMc provide access to any information or documents to anyone, including the NRA itself.

**RESPONSE:** Mr. LaPierre admits that Mr. LaPierre is the NRA Executive Vice President. Mr. LaPierre denies the remaining allegations in this paragraph.

32.     Pursuant to Section IX of the Services Agreement imposed by the NRA, AMc could act only if it received a "written communication" from LaPierre or his designee.  By like token, only LaPierre could designate persons "within NRA" who have the actual authority to issue directives to AMc relative to the request for, or release of, documents.  For this reason, certain document demands from other sources purporting to act on behalf of the NRA were unauthorized and therefore invalid under the Services Agreement.

**RESPONSE:** Mr. La Pierre states that the Services Agreement is a document that speaks for itself and otherwise denies the remaining allegations in this paragraph.

**E.     NRATV:  LaPierre's Brainchild.**

33.     NRATV, now assailed by the NRA as an "abject failure" and a "failed endeavor," has been anything but.  Officially launched as a full network production featuring gun-related topics, political commentary, and other NRA-friendly topics, it had its actual beginnings in the early 1990's.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

34.     The network's earliest iteration featured a spokesperson, Ginny Simone, providing monthly reports on VHS for the NRA Board of Directors.  That evolved into Ginny Simone Special Report Video Magazines in 1996, then expanded as follows:

2000:  NRA Live Launch

2004:   NRA News Launch, including the debut of "Cam & Co.," the NRA's first talk show   host

2010:  NRA Life of Duty Network Launch

2012: NRA Women Network Launch

2014:  NRA Freestyle Network Launch

2015:  Super Channel Launch under NRA News

2016:  NRATV Official Launch

**RESPONSE:** Mr. LaPierre admits that NRALive.com was accessible online in 2000, that NRA News launched in 2004, that the NRA Life of Duty Network was accessible online in 2010, that the NRA Women Network was accessible online in 2012, that the NRA Freestyle Network was accessible online in 2014, and that NRATV launched in 2016.  Mr. LaPierre lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies them.

35.    Throughout NRATV's evolution, AMc developed and administered the network's content (subject to NRA approval) and hired its high-profile talent (at NRA's request with salary and other costs reimbursed and payment "guaranteed" by the NRA).  NRATV was featured by the NRA to its members and directors as one of its proudest and most successful projects.  Each annual budget increased the agreed-upon amounts dedicated by the organization to what became its proprietary flagship.  Each budget also received board approval.

**RESPONSE:** Mr. LaPierre admits that AMc developed and administered NRATV's content including hiring talent but otherwise denies the remaining allegations in this paragraph.

36.    Indeed, LaPierre, during his frequent visits to Dallas and other locations to meet with AMc personnel and discuss NRATV analytics from 2016 to 2018, repeatedly told AMc

personnel how well the network was performing and that the NRA would continue its support, financially and otherwise.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

F.    **NRATV as a "Super Channel" with Political Clout.**

37.    Throughout 2015, AMc worked to create both the "Super Channel" and "Freedom's Safest Place."   The so-called "Super Channel" would be streamed online, and "Freedom's Safest Place" would be on the "Super Channel" and on national television.

**RESPONSE:** Mr. LaPierre lacks knowledge or information sufficient to form a belief about the truth of the allegations and therefore denies them.

38.    When Donald Trump ("***Trump***") became the Republican presidential nominee front-runner heading into the NRA convention in 2016, it became clear that the NRA needed to support his campaign, given the alignment between his base and the NRA's base.   LaPierre bristled at the thought of openly supporting Trump so early.   He continued his cynicism regarding Trump during the entire presidential election, noting on multiple occasions that he did not believe Trump could win.   In the fall of 2016, LaPierre approved new live programming to launch under the new brand NRATV that he believed would be crucial during what he anticipated would be a Hillary Clinton presidency.

**RESPONSE:** Mr. LaPierre admits that the NRA supported President Trump's presidential campaign. Mr. LaPierre denies the remaining allegations in this paragraph.

39.    Despite LaPierre's negativity regarding Trump's candidacy, the NRA, with the advantage of Chris Cox's[14] relationships, placed their support behind Trump.  Freedom's Safest Place ads had become an impressive success for the organization.   They were routinely used to

---

[14] Former Executive Director of NRA Institute for Legislative Action and Chief Lobbyist.

solicit high donor donations, and they aired throughout the 2016 election. Once Trump became President, LaPierre routinely referred to the Trump presidency as the "Trump slump"[15] and opted to use Freedom's Safest Place to continue to solicit donations throughout 2017 and into 2018 while keeping the ads running on Fox News.

**RESPONSE:** Mr. LaPierre admits that the NRA supported President Trump in the 2016 Presidential election, but otherwise denies the allegations in the first sentence. Mr. LaPierre admits that the NRA ran "Freedom's Safest Place" advertisements around this time period but denies the remaining allegations in the second sentence. Mr. LaPierre denies the allegations in the third and fourth sentences.

40. In the successful deployment of broad messaging about freedom that resonated with the NRA's constituency, LaPierre sought to increase NRATV's live presence. He personally courted Loesch to join the channel full-time. Her show launched in 2018 right after the tragedy in Parkland, Florida.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

41. Loesch appeared on the CNN Town Hall instead of LaPierre, and he routinely confirmed that her appearance was a huge success, helping the NRA to raise millions of dollars. What's more, NRATV was going live multiple times throughout the day with messaging intended to counter the narrative coming from gun control groups. In one monetization effort, NRATV was able to generate almost $500,000 in a matter of some 35 days, the bulk of which occurred over a ten-day period.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

---

[15] The "Trump slump" is LaPierre's reference to the decrease in NRA membership revenue caused by the lack of a "common enemy," "threat," or other fear-based drivers of NRA membership.

The following graphic illustrates the successful fund-raising effort:



**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

**G.** **LaPierre Fails to Calm Stormy Seas.**

42. In the wake of Parkland, the NRA was becoming more and more publicly (sic) vilified. Much of the executive leadership became extremely agitated about impending investigations. Tension mounted. Threats took the form of "forensic accounting teams taking over whole floors in New York City to bury the NRA" and "the loss of all the organization's insurance."

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

43.     Seeking to stabilize his rudderless ship, and with repeated resignation threats from Pete Brownell,[16] LaPierre personally recruited North to become the next president of the organization and appear on NRATV.  North had been doing pro bono work for the NRA ever since the launch of NRA Life of Duty.  North was also one of the most effective voices in the Freedom's Safest Place campaign.  Everything culminated at the 2018 Dallas Annual Meetings where AMc representatives had multiple meetings with Phillips,[17] Steve Hart,[18] and LaPierre to discuss North's contract as well as the announcement of his presidency.  Amidst the mounting political pressure, the North presidency provided the NRA with much needed stability and increased public respect.

**RESPONSE:** Mr. La Pierre admits that Mr. LaPierre had certain meetings with Oliver North, but denies the remaining allegations in this paragraph.

44.     Despite North's short-lived stabilizing effect, AMc began to have serious concerns about the NRA's direction under LaPierre's leadership.  First was the Carry Guard debacle.  Originally an admirable concept intended to fill a gap in the NRA's portfolio of member services, Carry Guard was designed to provide concealed-carry insurance and firearms training for its subscribers.  AMc was hired to develop the training component and to provide public-relations and branding services for the program.[19]  However, it was the NRA's responsibility, led by Josh Powell ("***Powell***"),[20] to develop and administer the entire Carry Guard program, including the insurance portion.

---

[16] President of NRA Board of Directors at that time.

[17] Treasurer of NR at that time.

[18] General Counsel of NRA Board of Directors at that time.

[19] AMc engaged multiple third-party contractors consisting of elite special operations personnel to develop training programs that the NRA believed it could not do on its own.

[20] At AMc's insistence, Powell was eventually removed from contact with AMc employees due to his sexual harassment of an AMc employee.

**RESPONSE:** Mr. LaPierre admits that the Carry Guard program was designed to provide concealed-carry insurance and firearms training for its subscribers. Mr. La Pierre denies the remaining allegations in this paragraph.

45.     On multiple occasions, the program's mismanagement was made obvious.  For example, Powell tried to convince the NRA to acquire USCCA, the leading competitor in the space, going so far as to enter into negotiations with the USCCA president entirely without approval from the NRA Board.  Powell appeared to be freelancing—a prospect that, from AMc's perspective, boded poorly for the ultimate success of the project.  Moreover, in meetings with AMc, Powell seemed generally dismissive of the training component of the program and kept referring to Carry Guard as nothing but an "insurance scheme."  AMc, however, wanted nothing to do with a "scheme."  As Powell pressed forcefully to launch a premature program, AMc expressed reservations about promoting anything that the NRA would be unable to deliver as promised.  This created the first visible signs of schism in the relationship, with Powell upset that AMc would not follow his direction.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

46.     The next issue that started to unfold was the Russia investigation by the NRA.  Initially, the NRA asked an experienced contractor, Elaine Lammert,[21] to lead the internal investigation.   But quickly, she was stonewalled. NRA officials even implied that they were more concerned with hiding the facts of the investigation than with bringing the entire story to light.  AMc wanted nothing to do with those at the NRA who were trying to stifle the truth.  The extent to which the NRA was willing to prioritize the personal protection of LaPierre and other

---

[21] Former Deputy General Counsel for the FBI.

members of the Board—a whitewash effort the organization is stridently pursuing even today—was becoming evident to AMc.

**RESPONSE:** Mr. La Pierre denies the allegations in this paragraph.

47.     It is against this backdrop of chaos that the NRA still needed AMc to do its increasingly important job of managing the public-facing brand, while the NRA scrambled to protect itself from what appeared to the outside world to be a massive case of mismanagement. AMc's disagreement with the NRA's rollout and administration of the Carry Guard program and issues such as AMc's vocal objection over how the Russia investigation was handled became additional "grist for the mill" of retaliation led by LaPierre.

**RESPONSE:** Mr. LaPierre denies the allegation in this paragraph.

**H.      The NRA:  Wayne's World.**

48.     From its founding in 1871, the NRA grew to become a respected and powerful voice for Second Amendment rights in America.  Then came Wayne LaPierre.  Now built on the unstable foundation of LaPierre's personality, today's NRA bears little resemblance to its earlier incarnations.  As the lawsuits against AMc and others have continued to unfold, it has become clear that LaPierre himself is his first priority, as opposed to the Second Amendment.

**RESPONSE:** Mr. LaPierre admits the allegations contained in the first sentence of this paragraph. Mr. LaPierre denies the remaining allegations in this paragraph.

**i.      Personal Spending:  Party On.**

49.     Throughout his tenure with the NRA, LaPierre has routinely used third-party vendors like AMc to conceal his penchant for personal spending, seemingly with the NRA's blessing.  By establishing an annual line-item budget for pass-through expenses, he created a veritable black hole for unchecked spending that, in turn, appeared to be a legitimate vendor expense for purposes of NRA records.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

50.     AMc has discovered that some of LaPierre's out-of-pocket expenses reimbursed to AMc by the NRA, which were both requested and approved by LaPierre, appear to be personal in nature: a $5,000 monthly rental for an apartment to be used by a female NRA intern; a retainer for a travel agent who was facilitating personal travel for LaPierre and his family; and the use of an AMc credit card by LaPierre and other NRA employees for LaPierre's personal benefit. In theory, the backup documentation for many of these charges should still be in LaPierre's possession.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

51.     AMc first became suspicious of LaPierre's misuse of funds when AMc was asked to facilitate and help structure the financing of a personal home for LaPierre and his wife. Ostensibly for "safety" reasons, LaPierre began looking for a home where he would be better protected than his current residence. As the search expanded, LaPierre passed over numerous safe housing options in favor of a $6 million mansion with no greater safety benefits. At that point, AMc refused to continue participating in the house transaction.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

52.     Upon information and belief, other vendors are being protected who are willing to hide LaPierre's spending. AMc became a target only after refusing to allow for these pass-through line-items in the parties' most recent annual budget. Indeed, other service providers and board members who challenged LaPierre's use of funds have now also been pushed out and attacked by the NRA as "co-conspirators."

**RESPONSE:** Mr. La Pierre denies the allegations in this paragraph.

22

53.    LaPierre has also structured certain "back-scratching" relationships to siphon money to pet projects that the NRA would otherwise be prohibited from contributing to.  Upon information and belief, the NRA makes charitable contributions to a third-party charity, who in turn donates that money to Youth for Tomorrow, an organization for which LaPierre's wife, Susan LaPierre, acted as President.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

    **ii.**    **"Funny Money":  Filling the Coffers.**

54.    In order to continue supporting LaPierre's spending habits, the NRA had to continue fundraising successfully.  To artificially boost these efforts, LaPierre intentionally misled members using fear-based promotions designed to drive donations.  For example, the NRA's recent plea for donations to fight Andrew Cuomo (citing the danger of losing its insurance), or claims that the NRA was "going out of business," were intentionally misleading to drive donation and membership dollars.  AMc likewise refused to be a part of any promotion or publicity stunt that was misleading to NRA members.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

55.    LaPierre also boosted NRA revenue through the creation of shell programs that the NRA never had any intention or meaningful ability to execute (or execute competently).  Examples of these programs include Carry Guard and School Shield.[22]  By appealing to members' hearts or promising benefits that were never delivered, the NRA raised millions of dollars of "funny money"—LaPierre's affectionate term for brand sponsorship funds.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

---

[22] School Shield was developed in the wake of the Sandy Hook tragedy in 2012.  The goal was to provide schools, through grants from the NRA, with threat assessments to determine the school's vulnerability, prepare a plan to make schools more secure, and help locate qualified armed safety officials.  Although this program raised millions of dollars, it was little more than a media stunt.  By the end of 2014, School Shield had issued a paltry five (5) grants.  After North became President in 2018, he demanded that the NRA "make it real."

### iii.   **Wasteful Litigation: The Best Defense Is a Good Offense.**

56.     Sometime in early 2018, LaPierre became preoccupied with going to jail, a fact that alarmed AMc given the frequency with which he reiterated this concern.   This is approximately the time when Brewer and his law firm entered the picture.   In a clear effort to deflect attention from the potential discovery of LaPierre's pervasive misuse of member funds, LaPierre and Brewer initiated numerous lawsuits around the country—each making its own media splash and presenting an opportunity for LaPierre to paint the NRA as an innocent victim of someone else (which, as a bonus, also drives donation dollars).   LaPierre and Brewer actually agreed upon this specific plan, as shown in an excerpt from the Brewer Fee Agreement, where Brewer was hired to perform services—

> —in connection with litigation and strategic needs arising from the termination or potential termination of key corporate relationships by contract counterparties in response to political pressure.[23]

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

57.     As the lawsuits exploded, so did legal fees payable to the Brewer Firm.

**RESPONSE:** Mr. LaPierre admits it pays legal fees to the Brewer firm, but otherwise denies the allegations and characterizations in this paragraph.

### iv.   **Wayne's Way or the Highway.**

58.     Throughout the last year, the NRA has seen the exodus of once-devoted board members, legal counsel, chief lobbyist, North (the Board's President), and longtime vendor, AMc—each dedicated to defending the Second Amendment, each unwilling to blindly follow LaPierre, and each attacked as "conspiring" against LaPierre.   It has become clear to many

---

[23] Ex. C (April 18, 2019 Correspondence from North to NRA Board of Directors) (emphasis added).

within the NRA that LaPierre does not truly care if board member are devoted to the Second Amendment—he cares if they are devoted to *him*.

**RESPONSE:** Mr. LaPierre admits that the persons and entities mentioned above are no longer employed by or associated with the NRA. Mr. LaPierre denies the remaining allegations in this paragraph.

**I.      Litigation Abuse.**

59.     Beginning spring of 2018, AMc learned that the NRA had hired Brewer.  The retention of Brewer was baffling given his long history of supporting anti-gun proponents and members of the Democratic Party, including Beto O'Rourke (a proponent of gun confiscation), Hillary Clinton, and Barack Obama.  It was even more puzzling in light of Brewer's familial relationship with Angus McQueen (Brewer's father-in-law) and Revan McQueen (brother-in-law).[24]  It also began an onslaught of "scorched earth" tactics.[25]  Since his entry onto the scene, Brewer and his firm, with the approval of LaPierre, has filed no less than eight lawsuits, four of which (including the instant case) are directed against AMc.  Three of the cases against AMc now reside in state court in the City of Alexandria, Virginia, and among other claims involve mutual charges of breach of the Services Agreement.  The fee agreement between Brewer and LaPierre, supposedly on behalf of the NRA, predicted litigation in precisely this manner.

**RESPONSE:** Mr. LaPierre admits that Angus McQueen and Revan McQueen are Brewer's in-laws. As mentioned above, Mr. LaPierre admits that the NRA has filed several lawsuits, including the three lawsuits against AMc relating to its breach of the Services Agreement, among

---

[24] Recognizing the deeply personal information involved, and to obviate any exploitation of the family relationship, AMc raised this conflict and ultimately had Brewer replaced as direct AMc contact.

[25] https://www.washingtonpost.com/politics/how.a.hard.charging.lawyer.helped.fuel.a.civil.war.

other things, which have been consolidated into a single proceeding in state court in Virginia. Mr. LaPierre denies the remaining allegations in this paragraph and in footnote 25 and 26.

60.     In addition, Brewer has filed suit against the Governor of New York, Andrew Cuomo, and its chief insurance regulator; the Lockton Companies, designer of Carry Guard insurance, which has now been found to be in violation of New York and at least one other state's laws; Col. North, in the Supreme Court of New York; New York Attorney General, Letitia James; and a lawsuit against the City of San Francisco.

**RESPONSE:** Mr. LaPierre admits that the NRA filed suit against the Governor of New York and related state entities, and separately, against the City of San Francisco, on First Amendment grounds. Mr. LaPierre admits that the NRA filed suit against the Lockton Companies. Mr. LaPierre admits that the NRA filed suit against North. Mr. LaPierre admits that the NRA filed a lawsuit against the New York Attorney General. Mr. LaPierre denies the remaining allegations in this paragraph.

61.     When Brewer entered the scene in early 2018, Brewer entered the scene offering the NRA legal services while vying for the public relations work then being handled by AMc. Brewer is now using his hallmark (yet ethically questionable) "Rambo tactics" to target his family's business.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

62.     In addition to his "truth neutral"[26] legal services, Brewer promotes his law firm as one that also offers public-relations services in house.  Contemporaneous with Brewer's attacks on his in-laws' public relations firm, Brewer published a legal article advocating that public relations services should be performed by law firms (instead of firms like AMc):

---

[26]    *See*   https://www.texastribune.org/2019/09/19/dallas-lawyer-william-brewer-iii-helped-fuel-civil-war-inside-nra/.

As many clients realize, crafting a public narrative can no longer fall solely under the purview of public relations agencies or a corporation's in-house communications department.

> According to recent press reports, the legal community has awakened to the "new" normal: issues and crisis management should be a fundamental component of any high-stakes advocacy plan. There are many advantages for clients when that function is managed by law firms.[27]

**RESPONSE:** Mr. La Pierre denies the allegations in this paragraph but admits that footnotes 27 and 28 refer to published materials.

63.     According to numerous reports, over the course of approximately one year, the Brewer Firm has billed the NRA $24 million (a number that has since grown), translating to (according to one report) some $97,000 per day.[28]

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

**J.      Ouster of AMc:  The Plan is Formalized**

64.     It appears that LaPierre set out on the course to eliminate AMc as a principal vendor to the NRA sometime in early 2018.  Brewer and the Brewer Firm have actively assisted LaPierre in that endeavor.  Indeed, comments made by LaPierre to AMc officials reveal that LaPierre believes he is simply acting as, what LaPierre has characterized, "a pawn in Brewer's game of chess."

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

65.     As stated, the Brewer Fee Agreement, dated March 2018, summarizes the services to be rendered for the NRA:  "**litigation and strategic needs arising from the termination . . .**

---

[27] *See* Excerpts from William A. Brewer III, Advocacy as Art: Lawyers Must Engage in Issues and Crisis Management, TEXAS LAWYER (May 6, 2019).

[28] *See e.g.*, http://www.washingtonpost.com/politics/nascar.owner.resigns-from-NRA-board.

of key corporate relationships . . . in response to political pressure."[29]  A fair reading of this excerpt reveals a dramatic truth never shared with AMc and in fact guarded by LaPierre and Brewer:  Brewer was hired to assist in terminating, including via litigation, AMc's long-tenured relationship with the NRA, well before any allegations of misconduct existed.  This discovery has helped explain the NRA's abrupt change in attitude towards AMc, and its chameleon-like change from friend to foe.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph and refers Defendants to its response to paragraph 56.

66.     The Brewer Firm's Fee Agreement reveals another truth as well:  LaPierre was intent on severing ties with AMc as early as the spring of 2018, no doubt because AMc had begun to question directives received from LaPierre, along with the adversarial nature of his demands, and because of AMc's unwillingness to accommodate some of those demands—long before most of the acts underlying the NRA's claim against AMc.  These included AMc's refusal to participate in LaPierre's plea for donations from members under the false guise of a "shutdown."[30]  Unbeknownst to AMc, LaPierre was already plotting litigation against AMc in September 2018, consistent with that express objective in the Brewer Fee Agreement.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph and in footnote 31 and refers Defendants to its response to paragraph 56.

67.     LaPierre's actions during the entirety of 2018 and into 2019, wherein he repeatedly represented to AMc personnel that:  (1) NRATV would continue to be funded; (2) the NRA would continue to reimburse AMc for its third-party contracts; and (3) the NRA was

---

[29] Ex. C (emphasis added).

[30] Ex. D (March 4, 2019 NRA Notice of Shutdown). Not only did the NRA not shutdown, but despite whatever financial woes LaPierre may have concocted, recent NRA tax filings reveal that LaPierre's compensation actually increased in 2018 by 55% to $2.2 million.

committed to working through issues raised by the Brewer Firm, were false statements of fact. LaPierre and others within the organization knew such statements to be false when made.  AMc relied upon these repeated assurances and continued to make financial commitments (including the North Contract) in reliance thereon.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

**K.     Brewer Supplants AMc in its Work for the NRA.**

68.     Over the course of several months, beginning with Brewer's retention and consistent with the recently publicized engagement letter, the NRA took an increasingly aggressive stance against its long-time vendor, first insisting on information that had never been a source of controversy in the past; insisting on documents that had never been required in the parties' dealings; demanding justification for its pricing, which had long-since been preapproved in annual budgets by the NRA and LaPierre; demanding interviews of AMc personnel; and conducting three separate audits (one of which lasted longer than one week), purportedly under auspices of the Services Agreement.

**RESPONSE:** Mr. La Pierre admits that the Association conducted an investigation into the propriety of the AMc's business practices, as alleged in the First Amended Complaint. Mr. LaPierre denies the remaining allegations and mischaracterizations in this paragraph.

69.     LaPierre set out to destroy the NRA's relationship with AMc by using vexatious litigation in order to oust AMc in favor of the Brewer Firm's public-relations/crisis-management advocacy. Indeed, the Brewer Firm has now supplanted AMc as the NRA's public relations lead communication strategist.  According to LaPierre, Brewer, his new PR manager, is going to "keep him out of jail" as the pressure on the NRA has continued to mount under demands for greater transparency into the NRA's financial management.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

L.      **Smoke and Mirrors:  Pretexts for Termination.**

70.     Throughout its cavalcade of litigation, the NRA has spun several false narratives in a bad-faith attempt to create the appearance of a valid reason for terminating the Services Agreement, thereby escaping the contractual consequences of termination.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

71.     Paragraph XI.C of the Services Agreement speaks to these consequences:

> This Services Agreement may be terminated by NRA immediately upon written notice if: (1) **AMc fails to diligently and in good faith perform any of its obligations contemplated hereunder; (2) AMc breaches any term, promise or covenant hereunder** . . .[31]  If NRA so terminates the Services Agreement, **NRA shall have no obligation to make payments** except that NRA shall, pursuant to Section III [that section dealing with ordinary course or special assignment payments] reimburse AMc for expenses incurred up to the date of said notice of termination. (Emphasis added).

**RESPONSE:** The Services Agreement is a document that speaks for itself. Mr. LaPierre denies the remaining allegations in this paragraph and in footnote 32.

72.     Thus, by creating the false appearance of one of these breach events, the NRA stood to avoid the many millions of dollars it would otherwise owe—and in fact owes—to AMc in the form of severance and cancellation fees, as well as an unliquidated "Termination Fee" described in Section XI.F of the Services Agreement.[32]

**RESPONSE:** The Services Agreement is a document that speaks for itself. Mr. LaPierre denies the remaining allegations in this paragraph.

---

[31] Other breach/default events not relevant to the current action have been omitted.

[32] "In consideration of the dedication of a substantial number of personnel and resources to provide the services under this Agreement (and the necessity to maintain such staffing levels and resource allocations to enable AMc to continue to provide such services upon any renewals hereof), the NRA agrees to pay AMc a fair and equitable termination fee to compensate it for the inevitable severances and other reasonable costs incurred in conjunction with such expiration or termination.  Such termination fees shall be negotiated in good faith by the parties and paid to AMc no later than the last day of this Agreement."  Ex. A, Section XI.F (Services Agreement).

73.     Once AMc was chosen to become the NRA's "fall guy" in its impending media and legal debacle, the Services Agreement with AMc would of course need to be terminated, thus requiring a false pretext for both termination and subsequent litigation.  The NRA quickly began weaving narratives that AMc had failed to perform "its obligations under the contract" or had breached one or more "term, promise or covenant" under the Services Agreement.  The following subparagraphs describe these false narratives in greater detail.

**RESPONSE:** The Services Agreement is a document that speaks for itself.  Mr. LaPierre denies the remaining allegations in this paragraph.

### i.     The "Amendments" to New York Not-for-Profit Law.

74.     As a preliminary matter, the Amended Complaint asserts that changes in New York nonprofit laws were the motivation for the NRA's requests for documents and audits of AMc's financial records.[33]  This argument is a red herring: the "recent" changes in the rules occurred in 2014, and those changes did not alter the longstanding requirement that the NRA's Board carefully consider related-party contracts as a non-profit incorporated in New York State.

**RESPONSE:** Mr. LaPierre states that Defendants mischaracterize the First Amended Complaint and therefore denies that allegation. Mr. LaPierre also denies the remaining allegations, which purport to be a statement of the law of New York and associated legal conclusions to which no response is required.

75.     Effective July 1, 2014, the New York Non-Profit Revitalization Act amended the N-PCL, including the provisions governing related-party transactions and conflict of interest policies.  Further amendments to those provisions were made in 2015 and 2016.  However,

---

[33] Amended Complaint ¶ 47.

New York law has contained specific rules regarding related-party transactions, which rules have been in place since at least 1970.

**RESPONSE:** Mr. LaPierre admits the allegations in the first and second sentences of this paragraph. Mr. LaPierre also states that no response is required as to the third sentence of this paragraph, as it contains a legal conclusion.

76.     NRA's compliance (or lack thereof) with the related-party-transaction rules rests squarely on the NRA itself.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph allegation.

77.     AMc has complied with all of the NRA's properly authorized requests to review AMc's books and records.  AMc in no way has impaired the NRA's ability to fulfill its duties with respect to its own related-party transactions or any other duty required under New York law.

**RESPONSE:** Mr. La Pierre denies the allegations in this paragraph.

### ii.     **The Document Demand.**

78.     Beginning in May 2018, AMc began receiving "demands" for various documents by persons purporting to be acting on behalf of the NRA.  However, the NRA often failed to abide by the contractual requirement to communicate directives to AMc through Executive Vice President (LaPierre) or his formally declared designee as required by Section IX of the Services Agreement.  In response to document demands, AMc repeatedly responded that the NRA was not following the requirements of the Services Agreement and that the demands issued to AMc were improper and ineffective.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

79.     Moreover, the NRA has historically conducted annual audits of its vendors. AMc has openly provided NRA access to financial and other information (including pricing) to NRA

accountants and officers, including the Treasurer, Chief Financial Officer, and Board Legal Counsel, on an annual basis. These true audits have been conducted almost yearly without complaint or adverse findings by the NRA for more than twenty-five years. However, on several occasions, LaPierre would specifically instruct AMc not to disclose certain information to certain auditors, such as Rick Tedrick in the NRA accounting department. Naturally, directives like this presented a conflict for AMc, who both desired to comply with the Services Agreement and with the auditors.

**RESPONSE:** Mr. LaPierre admits that it has conducted annual examinations of its vendors. Mr. LaPierre denies the remaining factual allegations of this paragraph.

80.     NRA had three to six auditors in AMc's Oklahoma City office reviewing AMc files, records, and documents for approximately nine (9) days in February 2019. Another auditor examined the records of AMc in November 2018 for an entire day. These audits were preceded by another "audit" in September 2018 by the Brewer Firm, a process AMc complied with in good faith.

**RESPONSE:** Mr. LaPierre admits that individuals reviewed AMc files, records, and documents and that these efforts were part of its ongoing investigation of AMc, which undertook efforts to obstruct and delay, and otherwise acted unreasonably, as alleged in the First Amended Complaint.

81.     At no time did the auditors claim to AMc that documents were withheld from review. It is AMc's understanding that even LaPierre himself does not believe any documents requested by the auditors/examiners were deliberately withheld by AMc.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph and notes it is difficult to determine if documents that you have a reasonable basis to believe exist are in fact being

withheld by AMc when AMc assures you they are not and they are best situated to know if they are in possession of such documents or if they do not exist given that they control the documents.

82.     John Frazer ("*Frazer*"), the NRA's general counsel, twice expressed his gratitude for AMc's compliance with the NRA audit:  first, in an email on March 4, 2019, and again on March 25, 2019.  Frazer also characterized the NRA audit of AMc as "productive" in a letter to AMc counsel on March 14, 2019.

**RESPONSE:** Mr. LaPierre states that he lacks sufficient information or belief as to the truth of these allegations and, therefore denies them.

83.     AMc has complied with every authorized demand for examination of its documents, and the NRA's allegations to the contrary are nothing but an attempt to manufacture the appearance of a contractual breach.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

**iii.     The Confidentiality Provision.**

84.     The NRA has also made unsubstantiated and ambiguous claims of "leaks" to the press by AMc, or someone acting on its behalf.  The NRA's claims are replete with words like "malicious" and "defamatory" but otherwise thin in substance, whether with respect to the content of the leak, the identity of the person who may have been the leak, or any damage sustained by the NRA as a result.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

85.     In one recent Virginia lawsuit, the NRA alleged identical confidentiality breaches against AMc.  After conducting discovery and multiple depositions, the NRA has yet to adduce any evidence of this supposed breach.

**RESPONSE:** Mr. LaPierre states that he lacks sufficient information or belief as to the truth of these allegations and, therefore denies them.

86.     On the other hand, just as plausibly, a well-timed "leak" by someone associated with the NRA might also be helpful in creating the appearance of a contractual breach, generating media attention, shifting focus away from LaPierre and other NRA board members, and supporting a parade of vexatious and abusive litigation against its chosen scapegoat-precisely the job Brewer was hired to do.

**RESPONSE:** Mr. La Pierre denies the allegations in this paragraph.

### iv.     The Analytics Gambit.

87.     Newly-formulated complaints by the NRA, characterizing NRATV as a "failed endeavor," also qualify as a "made for litigation" stalking horse.   Analytics were central to NRATV operations (essentially, viewership numbers).   As set forth in greater detail in AMc's third-party action against LaPierre, periodic reports containing detailed analytics were regularly provided to LaPierre during the period 2016 (year of launch) through May 13, 2019, one month after the NRA filed its first lawsuit against AMc (which in part complained falsely about non-receipt of NRATV analytics).   LaPierre personally approved the development of a customized dashboard, which accumulated data from all platforms running NRATV content.   He also sent NRA employee, Todd Grable, to review AMc's analytics and methodology, which were approved as a result of that meeting.   Furthermore, AMc invited LaPierre on numerous occasions that, if he was ever concerned about the analytics, he was welcome to have a third-party company, such as Deloitte Digital or Accenture, audit and report on AMc's practices as well.

**RESPONSE:** Mr. LaPierre admits NRATV was a failed endeavor, but denies the allegations in the first sentence. Mr. LaPierre admits that viewership numbers are an important tool for analyzing digital media generally and NRATV, specifically, but denies the remaining allegations in the second sentence. Mr. LaPierre admits that AMc provided periodic reports containing what purported to be some form of "viewership numbers" and related "analytics," but denies the

remaining allegations in the third sentence. To the extent these were "approved" by any NRA representative, that approval was the result of the presentation of misleading and fraudulent viewership analytics and accompanying statement and, therefore, would be void.  Mr. LaPierre denies the remaining allegations in this paragraph.

88.     LaPierre personally attended meetings to be briefed on NRATV analytics on the following occasions:  October 24, 2017; November 28, 2017; January 3, 2018; February 1 and 19, 2018; April 11, 2018; September 4, 2018; October 11[34] and 23, 2018; November 28, 2018; December 5, 2018; and January 18, 2019.  During each visit, AMc personnel shared in-depth analyses of viewership analytics that were three levels deep. LaPierre openly lauded AMc's performance.  That too was false, because three days after his last scheduled visit regarding analytics on April 9, 2019 (when LaPierre abruptly and unexpectedly "had to leave" before the presentation could be made), the NRA filed its first lawsuit against AMc.  Among other things, the NRA alleged that AMc had refused to provide the NRA with NRATV analytics – the very subject of the April 9 meeting!

**RESPONSE:** Mr. LaPierre admits that he met with AMc personnel on the dates identified.  Mr. LaPierre admits that at these meetings, representatives touted in a misleading manner the performance of NRATV and presented forms of "viewership numbers" and related "analytics." Mr. LaPierre notes those presentations omitted information on unique viewership numbers that was requested by the NRA.  Mr. LaPierre denies the remaining allegations in this paragraph.

**M.**     **The Onslaught Goes Public.**

      **i.**     **The NRA Discloses AMc's Proprietary Information.**

---

[34] Although a presentation was prepared for this meeting, it was not actually made that day.

89.     On March 11, 2019, the New York Times ran an article in which the author revealed the existence of the North Contract and certain features thereof, including AMc's involvement with North.[35] The article misrepresented the facts and disparaged AMc. The New York Times article attributed certain factual assertions to Brewer as the source speaking on behalf of the NRA.

**RESPONSE:**  Mr. LaPierre admits that The New York Times ran an article in which the North contract with Ackerman was disclosed, and that certain assertions were attributed to Brewer as the source, as identified in footnote 36.  Mr. LaPierre denies the remaining factual allegations in this paragraph.

90.     Later, LaPierre, in a writing to the NRA Board, confirmed his authorization given to Brewer to the New York Times.

**RESPONSE:** The referenced writing is a document which speaks for itself. No response is required.

91.     The NRA's deliberately false statements to the media regarding AMc's confidential information represented a change in the parties' relationship as well as the fundamental protocol for dealing with the parties' confidential information that had been in existence and honored for decades.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

92.     AMc immediately expressed its strong objection to the NRA's false statements, doing so by letter to NRA General Counsel, Frazer, on March 12, 2019.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.  The referenced documents speak for themselves.

---

[35] *See* https://www.nytimes.com/2019/03/11/us/nra-video-streaming-nratv.html.

93.     Frazer's March 14, 2019 response did not deny that the NRA had leaked the information to the New York Times.  Instead, Frazer for the first time asserted the NRA's position that only AMc, and not the NRA, had restrictions on the use of a party's confidential information. The NRA claimed it could disclose AMc's information with impunity while AMc was contractually prohibited from any reciprocal freedom to use NRA information.

**RESPONSE:** Mr. LaPierre states that the referenced document speaks for itself and denies the remaining allegations in this paragraph.

94.     The exchange of correspondence signaled NRA's claim that it could deliberately misuse AMc's confidential information and thereby violate NRA's duty of good faith and fair dealing inherent within the terms of the Services Agreement.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.  The allegations contain legal conclusions to which no response is warranted and for which Mr. LaPierre lack sufficient information.

95.     Current and prospective clients, financial institutions, and insurance providers have begun questioning AMc employees in light of the New York Times article, this Lawsuit, and consequent media reports.

**RESPONSE:** Mr. LaPierre lacks sufficient information to admit or deny the allegations in this paragraph and therefore denies them.

ii.     **Litigation as a Spectator Sport.**

96.     The NRA, with Brewer at the helm, has moved from a non-profit gun-rights organization to a serial litigant.  The NRA's waste of courts' limited docket space has ranged from a glorified discovery dispute to three additional lawsuits in different jurisdictions covering similar

sets of factual and legal allegations. In fact, between the one Texas and three Virginia actions,[36] all of the NRA's factual and legal claims are currently being litigated in at least two lawsuits.

**RESPONSE:**  Mr. LaPierre denies the allegations in this paragraph.

97.     Each of these suits portrays the NRA as a victim, each has been filed without any attempt at a good faith "meet and confer" negotiation, and each has been accompanied by carefully orchestrated leaks and false self-serving press releases. In fact, the Defendants in this lawsuit first learned that they were sued from news reports in advance of being served. The repetitive and persistent nature of these filings merely underscores the fact that the NRA (and its counsel) have no real interest in resolution, but a protracted public spectacle.

**RESPONSE:** Mr. LaPierre denies the allegations in the first sentence. Mr. LaPierre lacks information and belief to admit or deny the remaining allegations and therefore denies them.

### iii.    Disparaging Remarks Turn Libelous.

98.     Consistent with his approach of "lawyer as public advocate" for his client,[37] Brewer, with the approval of LaPierre and assistance from other NRA personnel, has become the *de facto* NRA spokesman and has fashioned a narrative that has brought AMc into disrepute. Contemporaneous with the filing of the NRA's lawsuits against AMc, Brewer and other NRA representatives have frequently attempted to spin the NRA message as one in which it is faultless and AMc is a rogue entity, bent on frustrating the NRA's legitimate efforts at obtaining disclosure.

---

[36] *National Rifle Association of America v. Ackerman McQueen, Inc. and Mercury Group, Inc.*, Civil Case No. CL19001757, pending in the Circuit Court for the City of Alexandria, Virginia (filed on April 12, 2019); *National Rifle Association of America v. Ackerman McQueen, Inc. and Mercury Group, Inc.*, Civil Case No. CL19002067, pending in the Circuit Court for the City of Alexandria, Virginia (filed on May 22, 2019); *National Rifle Association of America v. Ackerman McQueen, Inc. and Mercury Group, Inc.*, Civil Case No. CL19002886, pending in the Circuit Court for the City of Alexandria, Virginia (filed on September 5, 2019).

[37] *See* Excerpts from William A. Brewer III, Advocacy as Art: Lawyers Must Engage in Issues and Crisis Management, TEXAS LAWYER (May 6, 2019).

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph, except that it admits that AMc "frustrate[d] the NRA's legitimate efforts at obtaining disclosure."

99.     All of this is a transparent attempt to transfer attention from LaPierre's mismanagement of the NRA and possible civil and criminal exposure, and to wreak havoc within an organization that the Brewer Firm now directly competes with. Examples abound where NRA representatives, including Brewer, have disparaged AMc, portrayed it as a miscreant, divulged its confidential information, and trampled over AMc's rights and entitlements.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

100.    The most damaging of these public comments have been press reports quoting LaPierre accusing AMc of "extortion," which Brewer and others have parroted in the media. This false accusation of criminal wrongdoing has been repeated by other NRA representatives. In the process, AMc's purported role has moved from that of being North's alleged facilitator to the one performing the act of extortion.[38]

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph, except to admit that Mr. Oliver North, an AMc employee, did in fact attempt to extort Mr. LaPierre, which is a criminal act.

---

[38] The following are examples of the many claims of AMc's alleged wrongdoing spoken by NRA representatives:   https://www.washington.post.com/politics/documents-show-nra-discussions-to-purchase-luxury-mansion (AMc as "wrongdoer;) civil.war (Brewer in discussin aMc, accused it of trying to purge NRA of LaPierre by "extortion," him Wall Street Journal, April 27, 2019 "Extortion Allegation Riles Top NRA Ranks" (citing LaPierre's claim of extortion in letter to NRA Board); https://www.washington.post.com/news/2019/sep/10/who's-behind-the-attacks-national-rifle-association. "Behind the latest attack is a former NRA contractor". "The contractor refused [a financial review]; the contractor … delivered an ultimatum in the form of this threat https://www.washingtonpost.com/politics/how.a.hard.charging.lawyer.helped.fund.a.civil.war; and Wall Street Journal article, April 27, 2019 http://wsj.extortion.allegation.riles.top.nra.ranks ; http://www.washingtonpost.com/politicsnra.shakes.up.legal.team.amid.intensifying.civil.war/2019/08/22/72fa460a- c52d-11e9-b5e4-54aa56d5b7cestory.html.

101.     LaPierre also asserted that AMc "appears to have responded indirectly by trying to oust me." LaPierre's assertion concerning AMc's purported involvement, since then repeated, is false.  In fact, AMc faced repeated demands by the NRA for backup on LaPierre's charges that the NRA had reimbursed, such as apartment rent for an NRA intern previously approved by LaPierre, and a number of LaPierre private aircraft and other transportation, hotel, and Landini Brothers (popular Alexandria, Virginia restaurant) charges. To obtain such backup, AMc sent letters to several sources (including LaPierre himself) asking for such records to enable AMc to respond to NRA demands.

**RESPONSE:** Mr. LaPierre denies the allegations insofar as they are not property attributed to him and therefore do not suggest that Mr. LaPierre made the alleged statements in the first two sentences.  Mr. LaPierre denies the remaining allegations in this paragraph.

102.     "Extortion," under Virginia statute § 18.2-59 ("Extortion of money, property or pecuniary benefit") defines the offense as including "threaten[ing] injury to the character, person or property of another . . ." and can be punishable by up to 10 years in prison. Code 1950, §18.1-184; 2010, Chapter 298.  Making such a reckless accusation, false as it is, is a clear example of the malice shown by LaPierre and the NRA towards AMc.

**RESPONSE:** The referenced Virginia statute is a legal document that speaks for itself. Mr. LaPierre denies the remaining allegations in this paragraph and refers Defendants to the response to paragraph 100.

**N.     One-Sided Services Agreement.**

103.     Each of the actions brought by the NRA, including the instant case, either directly involves or tangentially implicates the Services Agreement and the respective rights and obligations of the NRA and AMc. In fact, the first two Virginia cases are centered on alleged

breaches of that agreement by AMc. AMc has counterclaimed in Virginia alleging that it is the NRA, not AMc, that is in breach of that Services Agreement.

**RESPONSE:** Mr. La Pierre denies the allegations in this paragraph. The referenced documents and the claims asserted in the various cases speak for themselves.

104.    It is now appropriate for this Court to consider whether, by its many actions, including several lawsuits filed against AMc, the NRA has waived its rights to continue to insist on the viability of one particular provision of that agreement: the confidentiality section.[39]

**RESPONSE:** This paragraph states a legal conclusion, to which no response is required. Mr. LaPierre denies the remaining allegations in this paragraph.

105.    The NRA featured the confidentiality section of the Services Agreement not only in the Virginia litigation, but it also waived the provision by its disclosure of confidential information belonging to AMc and by disclosure of its own purportedly confidential information. For example, it was the NRA that disclosed the existence and content of the AMc agreement with North, confidential to both AMc and the NRA.[40] LaPierre admitted that he authorized the Brewer Firm to communicate with the New York Times. When AMc complained and demanded a retraction, NRA counsel took the absurd position that confidentiality applied only to AMc. Under that theory, the NRA can divulge AMc's confidential material with impunity; AMc has no reciprocal right.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph. Mr. LaPierre also refers to the response to paragraph 93.

---

[39] Ex. A, Section IV.

[40] *See* https://www.nytimes.com/2019/03/11/us/nra-video-streaming-nratv.html.

106.    Additionally, the NRA has liberally quoted from the Services Agreement, including in the instant case. Having previously taken the position that the Services Agreement itself is confidential, it cannot now hope to preserve that status.

**RESPONSE:** This paragraph states a legal conclusion, to which no response is required. Mr. LaPierre denies the remaining allegations in this paragraph.

107.    If this is truly a proper reading of the Services Agreement, then under those circumstances, AMc is entitled to a declaration that such provision has been waived by the conduct of the NRA. Alternatively, it qualifies as an unconscionable agreement under the provisions of Virginia § 8.2-302, which provides in pertinent part:

> If the Court finds as a matter of law the contract or any clause thereof to have been unconscionable at the time made, the court may refuse to enforce the contract, or to ignore the unconscionable provision, or it may limit its application in order to avoid as unconscionable result. Code of Virginia § 8.2-302.[41]

**RESPONSE:** Mr. LaPierre denies the allegations in the first and second sentences of this paragraph, and notes that they state a legal conclusion to which no response is required. The cited Virginia statute is a document which speaks for itself. In addition, Mr. LaPierre lacks sufficient information and belief to admit or deny the remaining allegations and therefore denies them.

108.    As dependent as the NRA is on certain provisions of the Services Agreement, it conveniently overlooks its obligation to pay a "fair and equitable termination fee," recognizing the "inevitable severances and other reasonable costs" associated with termination, and the concurrent requirement to negotiate such costs in good faith.[42]

---

[41] Pursuant to Section XII.A of the Services Agreement, all disputes "arising thereunder shall be governed by and construed solely under the laws of the Commonwealth of Virginia, or if applicable by federal law." *See* Ex. A.

[42] *See* Ex. A, Sections XI.E-F.

43

**RESPONSE:** The Services Agreement is a document which speaks for itself. Mr. LaPierre denies the remaining allegations in this paragraph, and notes that they represent legal conclusions for which no response is required.

**O.     The NRA and LaPierre Destroy AMc's Third Party NRA Contracts.**

109.     At the NRA's bidding, AMc entered into employment agreements with two well-known personalities, North and Loesch. They, and at least one other talent, at the request of the NRA, were formally employed by AMc. The 2018 Amendment to the Services Agreement made clear the NRA's responsibility for their compensation. As previously noted, under that amendment, the NRA took responsibility for reimbursing AMc for the cost associated with the NRATV talents. The NRA also effectively "guaranteed" its Third-Party NRA Contract obligations by committing, among other things, to provide a $3 million letter of credit to backstop those commitments.[43]

**RESPONSE:** Mr. La Pierre admits that AMc entered into employment agreements with North and Loesch, but otherwise denies the remaining allegations in the first sentence of this paragraph. Mr. LaPierre admits that North and Loesch were formally employed by AMc, but otherwise denies the remaining allegations in the second sentence of this paragraph. The Services Agreement is a document which speaks for itself, and Mr. LaPierre denies the allegations in the third sentence of this paragraph. Mr. LaPierre denies the remaining allegations in this paragraph.

110.     Until the NRA began its campaign of belligerence against AMc, the reimbursement system worked as well as it always had throughout the years, including reimbursement for third-party contracts. Indeed, even as the NRA ramped up its campaign of harassment against AMc, it continued to observe its obligations to AMc and, by third party beneficiary extension, to the talents.

---

[43] *See* Ex. B, Section 2, 3.

**RESPONSE:** Mr. LaPierre denies the allegations in the first sentence of this paragraph. Mr. LaPierre denies the allegations in the second sentence of this paragraph and notes that it states a legal conclusion to which no response is required.

111.    LaPierre injected himself personally into the recruitment of North. He negotiated the North Contract, and despite his current denials, he was intimately involved in all material aspects thereof, including the designation of North as an "employee" instead of a "contractor." LaPierre's turnaround efforts to oust North as President of the NRA demonstrate his intent to interfere with the North Contract and damage AMc in the process.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

112.    When the NRA precipitously initiated its litigation campaign against AMc, leading to the eventual shutdown of NRATV at the end of June 2019, the NRA used the opportunity to cease reimbursement for the compensation of the Third Party NRA Contracts. This, despite its clear obligation to reimburse AMc for "fronting" the salaries and benefits for North, Loesch, and the other talent.

**RESPONSE:** Mr. LaPierre admits that NRATV shutdown at the end of June 2019. Mr. LaPierre denies the allegations in this paragraph.

113.    The result of the NRA's cutting off of funds, quite naturally, left AMc in the untenable position where it was unable to manage the compensation requirements of the Third Party NRA Contracts. One of those talents has now initiated legal proceedings against AMc for discontinuing that person's compensation.

**RESPONSE:** Mr. LaPierre lacks sufficient information to admit or deny the allegations in this paragraph and, therefore, denies them.

114.    The NRA and LaPierre not only knew of the Third Party Contracts, they expressly approved each of them and acknowledged their existence and the NRA's obligations to pay for

those contracts in the 2018 Services Agreement Amendment. In the face of that knowledge and acknowledgement, the NRA has now steadfastly refused to honor its obligation at the urging of and with the approval of LaPierre, in the process tortiously interfering with those third party contracts.

**RESPONSE:** Mr. LaPierre admits that the NRA knew of the Third Party Contracts. Mr. LaPierre denies the remaining allegations in this paragraph and notes that it states legal conclusions to which no response is required.

**P.     A Compendium of Missteps.**

115.    Many events have led to the rupture of this once-thriving relationship. Most have been chronicled in press reports: Brewer; LaPierre's lavish wardrobe expenditures; LaPierre's (and his wife Susan's) extravagant trips and vacations paid for with NRA funds; the LaPierre family's use of AMc personnel as personal valets; LaPierre's attempted purchase of a Texas mansion, foiled by AMc's reluctance to see it through; and sexual harassment charges against LaPierre's Chief of Staff Powell, to name the most prominent. These were by no means the exclusive causes of the termination.

**RESPONSE:** Mr. La Pierre denies the allegations in this paragraph. The referenced press reports are documents which speak for themselves.

116.    Indeed, other factors have contributed:

- The NRA's suspicious behavior relating to federal and state investigations;

- AMc's cessation of LaPierre's (or other on his behalf) incursion expenses that were personal in nature;

- The "Russia trip" and LaPierre's and the NRA's dishonest treatment of that issue;

- LaPierre's preoccupation with possible criminal charges and a "dissolution resolution";

- The NRA tolerating sexual harassment committed by a high-ranking member of its management;

- Orchestrated leaks of confidential information, purposely painting AMc in an unfavorable light;

- Clear lack of board oversight; and

- Deliberate purging of right-minded NRA directors, officers, and attorneys.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

117.    In the span of two short years, the NRA, with LaPierre leading the charge, has destroyed or attempted to destroy what was built over decades.  The NRA has experienced massive personnel disruptions, enormous expenses, loss of economic opportunity, loss of profits, and reputational harm that may be irreparable, or at least will take enormous time and effort to repair.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

118.    Through this Counterclaim and Third-Party Complaint, AMc seeks to begin the rebuilding process.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

## V.    CAUSES OF ACTION

### Count One
### (Libel Per Se – NRA and LaPierre)

47

119.    The allegations of fact set forth in paragraphs 1 through 118 are incorporated as though copied verbatim herein.

**RESPONSE:**  Mr. LaPierre incorporates his responses to paragraphs 1 through 118 as though copied verbatim herein.

120.    As set forth hereinabove, NRA representatives, including LaPierre, have repeatedly intentionally and falsely defamed AMc, a private figure, by accusing AMc of the criminal act of extortion. The NRA has published this accusation as fact and has done so publicly. The NRA is not a member of the print, broadcast, or electronic media.

**RESPONSE:**  Mr. LaPierre denies the allegations in this paragraph.

121.    LaPierre and other members of NRA leadership have identified AMc directly by name, and the accusations of commission of a criminal act are per se defamatory. Such accusations are unambiguous and have held AMc up to calumny and public ridicule.

**RESPONSE:**  Mr. LaPierre denies the allegations in this paragraph.

122.    The subject matter of these false factual assertion is a decidedly private matter, despite the NRA's attempts to alter its status to that of a matter of public concern.

**RESPONSE:**  Mr. LaPierre denies the allegations in this paragraph.

123.    AMc has suffered injury as a direct result of these false statements in amounts as yet undetermined, but estimated to exceed $40 million, for which AMc seeks recovery.

**RESPONSE:**  Mr. LaPierre denies the allegations in this paragraph.

124.    Due to the intentional, malicious nature of the NRA and LaPierre's conduct, AMc also seeks exemplary damages in this matter in an amount to be determined at trial.

**RESPONSE:**  Mr. LaPierre denies the allegations in this paragraph.

**Count Two**
**(Tortious Interference with Contract – NRA and LaPierre)**

125.     The allegations of fact set forth in paragraphs 1 through 124 are incorporated as though copied verbatim herein.

**RESPONSE:**  Mr. LaPierre incorporates his responses to paragraphs 1 through 124 as though copied verbatim herein.

126.     The NRA, and LaPierre, individually, intentionally and with full knowledge of their existence, has tortiously interfered with AMc's employment agreements with NRATV talents, including those of North and Loesh. Each such contract is valid, having been entered into at the behest of, and approved by, the NRA. Each such contract is denominated in the Services Agreement as a "Third Party NRA Contract."

**RESPONSE:**  Mr. LaPierre denies the allegations in this paragraph.

127.     The NRA has refused its contractual commitment to reimburse AMc for the costs associated with the Third Party NRA Contracts, thus preventing AMc from funding salaries and costs associated therewith.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

128.     The NRA's refusal to reimburse AMc has caused said contracts to lapse due to nonpayment, thereby proximately causing injury to AMc and to the talents affected who themselves are third party beneficiaries of the Services Agreement.

**RESPONSE:** Mr. LaPierre lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and, therefore, denies them.

129.     The NRA's actions constitute tortious interference with contract, and have proximately caused AMc financial harm in precise amounts yet to be determined, for which AMc now sues.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

**Count Three**

**(Declaratory Judgment – NRA)**
**(28 USC §2201 et. seq.)**

130.    The allegations of fact set forth in paragraphs 1 through 129 are incorporated as though copied verbatim herein.

**RESPONSE:** Mr. LaPierre incorporates his responses to paragraphs 1 through 129 as though copied verbatim herein. However, a response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

131.    AMc seeks a declaration that, by its actions, the NRA has waived and/or is estopped from claiming that the confidentiality provision of the Services Agreement applies only to AMc. Holding AMc to such one-sided interpretation prevents AMc from freely and fully responding to allegations made by the NRA.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

132.    The NRA has taken the position that the referenced contractual provision is one sided and binding only on AMc. AMc disagrees with the NRA's position, and a real and justiciable controversy regarding this issue exists. AMc seeks a declaration that the NRA has waived such provision, or by its action it is estopped from enforcing it.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

133.    Alternatively, AMc seeks a declaration by this Honorable Court that the confidentiality provision of the Services Agreement is unconscionable under Code of Virginia §8.2-302 as interpreted by the NRA.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

134.    AMc is entitled to, and seeks, its reasonable and necessary attorney's fees incurred in the prosecution of this claim.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

## Count Four
### (Fraud – LaPierre)

135.    The allegations of fact set forth in paragraphs 1 through 134 are incorporated as though copied verbatim herein.

**RESPONSE:** Mr. LaPierre incorporates his responses to paragraphs 1 through 134 as though copied verbatim herein.

136.    Statements of fact made to AMc personnel by LaPierre on the dates specified hereinabove, and those made repeatedly throughout the duration of the parties' relationship, but particularly during the four (4) years leading up to the filing of this lawsuit, concerning NRATV's performance analytics, commentators, and the Third Party NRA Contracts, were false, were known by LaPierre to be false, were made with intent to deceive AMc and to lure it into exposing itself to financial obligations, were relied upon by AMc to its detriment, and, as a result, AMc has suffered damages in excess of $40 million for which it now sues.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph.

137.    Due to the intentional, malicious nature of the NRA and LaPierre's conduct, AMc also seeks exemplary damages in this matter in an amount to be determined at trial.

**RESPONSE:** Mr. LaPierre denies the allegations in this paragraph and declines to address AMc's legal demand in this paragraph, which is not susceptible to admission or denial.

## Count Five
### (Breach of Contract – NRA)

138.    The allegations contained in paragraphs 1 through 137 are incorporated as though copied verbatim herein.

**RESPONSE:** Mr. LaPierre incorporates his responses to paragraphs 1 through 137 as though copied verbatim herein. However, a response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

139.    Under the 2018 Amendment to the Services Agreement, the NRA is required to make timely payments in response to invoices received from AMc. The Amendment states:

> NRA acknowledges that its failure to pay such an invoice within 30 days will cause substantial financial damage to AMc. Accordingly, if at any time NRA fails to timely pay the invoice, NRA agrees that it shall post a $3,000,000 letter of credit (the "LOC") for the benefit of AMc. The LOC shall continue in existence for the term of the Agreement and shall be maintained at $3,000,000 at all times.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

140.    The NRA has failed to make timely payments on AMc's invoices. Specifically, the NRA failed to pay the following fee service invoices within the 30-day time period required by the Services Agreement:

> Invoice 158196 for $451,201.63 dated June 1, 2018
> Invoice 158197 for $894,075.80 dated June 1, 2018
> Invoice 158198 for $299,297.00 dated June 1, 2018
> Invoice 158174 for $190,443.00 dated June 1, 2018
> Invoice 159037 for $190,443.00 dated July 1, 2018
> Invoice 159056 for $451,201.63 dated July 1, 2018
> Invoice 159057 for $894,075.80 dated July 1, 2018
> Invoice 159058 for $299,297.00 dated July 1, 2018

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

141.    The NRA's failure to make these eight fee payments within the contractually required 30-day period after the invoice date caused substantial damage to AMc.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

**Breach of NRA's Obligations to Pay for Services Rendered During Litigation.**

142.    Following the NRA's first lawsuit in Virginia, the NRA continued to request services from AMc, AMc performed those services, but the NRA has failed and refused to pay the monthly invoices submitted by AMc.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

143.    On Tuesday, April 30, 2019, Nader Tavangar, EVP/Managing Director of Mercury sent the May Monthly Fee invoices (dated May 1, 2019) to the NRA (Treasurer Craig Spray, Rick Tedrick, Lisa Supemaugh, and Duane Reno) via email, as per normal course of business.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

144.    Craig Spray is the NRA Treasurer with responsibility for receiving and paying the AMc invoices.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

145.    The invoices that were dated May 1, 2019 and emailed on April 30, 2019 contained eight invoices to the NRA totaling $1,696,466.95 and three invoices to the NRA

Foundation totaling $375,000. The NRA Foundation paid its $375,000 invoice without question. The NRA failed to pay any portion of its invoices totaling $1,696,466.95.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

146.    These eleven invoices are accurately summarized in the chart below:

| Invoice Number | Job Number | Job Title | Invoice Amount |
|---|---|---|---|
| **NRA** | | | |
| 166339 | 19-MG/NR-001 | Strategic Management | $258,613.17 |
| 166340 | 19-NR-001 | Talent Fee | $680,355.45 |
| 166341 | 19-NR-002 | NRATV Programming C4 | $185,416.67 |
| 166342 | 19-NR-003 | Monthly Video Support C4 | $104,166.67 |
| 166343 | 19-NR-004 | Support Staff Fee | $200,702.50 |
| 166344 | 19-NR-005 | Online/Digital Management Fee | $107,212.50 |
| 166345 | 19-NR-006 | Business Intelligence/Data Resources/Analytics | $35,416.66 |
| 166346 | 19-NRAF-002 | A1F 8/19 ISSUE | $124,583.33 |
| **Total** | | | **$1,696,466.95** |
| **NRA Foundation** | | | |
| 166347 | 19-NRF-001 | NRATV Programming C3 | $250,000.00 |
| 166348 | 19-NRF-002 | Monthly Video Support C3 | $62,500.00 |
| 166349 | 19-NRF-003 | FSP Production Ongoing C3 | $62,500.00 |
| **Total** | | | **$375,000.00** |

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

147.    These monthly, annualized fee invoices are sent every month per the approved 2019 budget.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

148.    Per the Services Agreement, Section III.E provides the following relevant requirements:

> All sums payable to AMc under this Services Agreement shall be payable to AMc's corporate headquarters in Oklahoma City, Oklahoma within 30 days of the invoice date . . . NRA shall notify AMc of any questions concerning any invoices within 10 business days after receipt.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

149.    Consistent with the NRA's practice in all prior months of the year, AMc did not receive any questions or concerns regarding such invoices during the 10 business days following the NRA's receipt of the invoices.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

150.    The NRA failed to pay the eight invoices issued to it on May 1, 2019 within the required 30-day time period.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

151.    As of June 3, 2019, AMc had not received payment from the NRA for the $1,696,466.95 in monthly fee invoices.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

152.    On June 3, 2019, AMc's Chief Financial Officer, Winkler, personally called and emailed NRA Treasurer Craig Spray regarding this missed payment. Spray did not return the email message or call.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

153.    On the afternoon of June 3, 2019, Melanie Montgomery, EVP/Management Supervisor at AMc, called Spray leaving a detailed voicemail reminding him the past due invoices covered May fees for April services which were never questioned. Spray did not return her call.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

154.    On June 4, 2019, AMc's Chief Financial Officer sent by email a letter addressing the now past due invoices and demanded that the NRA pay the $1,696,466.95 and post the $3 million Letter of Credit, as required under the Services Agreement.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

155.    On June 5, 2019, AMc received a letter from NRA's designee, Andrew Arulanandam, with a copy to LaPierre, Spray, and Frazer stating that the NRA declines to post the Letter of Credit.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

156.    Rather than pay the invoices or post a Letter of Credit, the NRA began a series of correspondences wherein they sought to belatedly request additional and irrelevant information about the invoices, long after the ten-day period for questioning the invoices had expired, as provided in Section III.E of the Services Agreement.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

**Supplemental Claim for Breach of the NRA's Obligation to Pay Invoices for Services Prior to Termination.**

157.   AMc issued additional invoices for work performed up to the date of termination of the Services Agreement and those invoices remain past due and unpaid, as shown in the table below:

| Invoice Number | Invoice Date | Job Number | Job Title | Invoice Amount |
|---|---|---|---|---|
| **NRA** | | | | |
| 166104 | 4/15/2019 | 18-NR-296 | '19 *A/M* Travel | $1,935.08 |
| 166106 | 4/15/2019 | 19-NR-049 | '20 *A/M* Logo | $10,000.00 |
| 166107 | 4/15/2019 | 19-NR-051 | '19 *A/M* Radio | $5,488.25 |
| 166108 | 4/15/2019 | 19-NR-062 | Publications Google Ad Manager Website Staging & Integration | $5,500.00 |
| 166109 | 4/15/2019 | NR-LEGAL | Legal Fees | $81,810.84 |
| 166110 | 4/15/2019 | NR-TRAV | Travel Expenses | $13,725.51 |
| 166339 | 5/1/2019 | 19-MG/NR-001 | Strategic Management | $258,613.17 |
| 166340 | 5/1/2019 | 19-NR-001 | Talent Fee | $680,355.45 |
| 166341 | 5/1/2019 | 19-NR-002 | NRA TV Programming C4 | $185,416.67 |
| 166342 | 5/1/2019 | 19-NR-003 | Monthly Video Support C4 | $104,166.67 |
| | | | | |
| 166343 | 5/1/2019 | 19-NR-004 | Support Staff Fee | $200,702.50 |
| 166344 | 5/1/2019 | 19-NR-005 | Online/Digital Management Fee | $107,212.50 |
| 166345 | 5/1/2019 | 19-NR-006 | Business Intelligence/Data Resources/Analytics | $35,416.66 |
| 166346 | 5/1/2019 | 19-NRAF-002 | AIF ISSUE | $124,583.33 |
| 166804 | 5/17/2019 | 18-NR-431 | '19 *A/M* Signage -Mechanical | $22,235.89 |
| 166805 | 5/17/2019 | 19-NR-010 | Fundraising Consulting State Registrations | $230.00 |
| 166806 | 5/17/2019 | 19-NR-045 | '19 *A/M* Backstage Signage | $1,009.75 |
| 166807 | 5/17/2019 | 19-NR-051 | '19 *A/M* Radio | $14.81 |
| 166808 | 5/17/2019 | 19-NR-056 | '19 *A/M* Media Kit Premium | $1,422.16 |
| 166809 | 5/17/2019 | NR-TRAV | Travel Expenses | $3,401.82 |
| 167007 | 5/17/2019 | 18-NR-296 | '19 *A/M* Travel | $21,936.68 |

| Invoice Number | Invoice Date | Job Number | Job Title | Invoice Amount |
|---|---|---|---|---|
| **NRA** | | | | |
| 167037 | 6/1/2019 | 19-MG/NR-001 | Strategic Management | $258,613.17 |
| 167038 | 6/1/2019 | 19-NR-001 | Talent Fee | $680,355.45 |
| 167039 | 6/1/2019 | 19-NR-002 | NRA TV Programming C4 | $185,416.67 |
| 167040 | 6/1/2019 | 19-NR-003 | Monthly Video Support C4 | $104,166.67 |
| 167041 | 6/1/2019 | 19-NR-004 | Support Staff Fee | $200,702.50 |
| 167042 | 6/1/2019 | 19-NR-005 | Online/Digital Management Fee | $107,212.50 |
| 167043 | 6/1/2019 | 19-NR-006 | Business Intelligence/Data Resources/Analytics | $35, 416.66 |
| 167044 | 6/1/2019 | 19-NRAF-003 | AIF ISSUE | $124,583.33 |
| 167453 | 6/12/2019 | 18-NR-296 | '19 *A/M* Travel | $24.77 |
| 167454 | 6/12/2019 | 18-NR-431 | '19 *A/M* Signage - Mechanical | $33,572.64 |
| 167455 | 6/12/2019 | 18-NR-441 | '19 *A/M* Photography | $18,350.00 |
| 167456 | 6/12/2019 | 18-NR-443 | '19 *A/M* NRA TV Set Production | $1,352.98 |
| 167457 | 6/12/2019 | 18-NR-445 | '19 *A/M* Podium Signage | $10,588.50 |
| 167458 | 6/12/2019 | 19-NR-031 | '19 *A/M* GROF Presentation | $650.00 |
| 167448 | 6/12/2019 | 19-NRM-001 | '19 *A/M* Digital Media | $7,915.03 |
| 167449 | 6/12/2019 | 19-NR-029 | '19 *A/M* Media | ($13,689.50) |
| 168015 | 7/9/2019 | 19-NR-010 | Fundraising Consulting State Registrations | $204.98 |
| 169524 | 9/30/2019 | NR-LEGAL | Legal Fees | $264,008.09 |
| **Total** | | | | **$3,884,622.18** |
| **NRA Foundation** | | | | |
| 167045 | 6/1/2019 | 19-NRF-001 | NRATV Programming C3 | $250,000.00 |
| 167046 | 6/1/2019 | 19-NRF-002 | Monthly Video Support C3 | $62,500.00 |
| 167047 | 6/1/2019 | 19-NRF- FSP | Production Ongoing C3 | $62,500.00 |
| **Total** | | | | **$375,000.00** |
| **Total A/R** | | | | **$3,995,614.09** |

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

158.    The NRA has failed and refused to pay those invoices. Such failure is another breach of contract by the NRA.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

**Supplemental Claim for the NRA's Breach of Indemnification Clause of the Services Agreement.**

159.    Section V.B.1 of the Services Agreement also requires the NRA to indemnify and reimburse AMc for any expenses it may incur that arise from a government agency seeking equitable or other relief against the NRA or that relate to actions that AMc has taken at the direction of the NRA.

**RESPONSE:**  A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

160.    The NRA has been the subject of various government inquiries that have imposed costs and expenses on AMc to produce records, negotiate with government investigators, seek waivers of confidentiality from the NRA, and generally cooperate to the extent that the NRA allows AMc to cooperate.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

161.    AMc's expenses relating to the government inquiries continue to grow as government focus on the NRA becomes more intense, and the NRA's resistance to such investigations becomes more adversarial. The full amount of such indemnification damages will be presented at trial.

**RESPONSE:**A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

162.    The NRA's refusal to pay indemnification expenses relating to government investigations constitutes an additional breach of the Services Agreement. Breach of NRA's Obligation to Post a $3 Million Letter of Credit.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

163.    The 2018 Agreement expressly provided for a remedy to avoid substantial harm to AMc in the event that the NRA is delinquent in paying AMc's invoices.

**RESPONSE:**  The NRA denies the allegations in this paragraph. The Services Agreement is a document which speaks for itself.

164.    Per the 2018 Amendment, Section II.E, provides the following relevant requirement:

> NRA acknowledges that its failure to pay such an invoice within 30 days will cause substantial financial damage to AMc. Accordingly, if at any time NRA fails to timely pay the invoice, NRA agrees that it shall post a $3,000,000 letter of credit for the benefit of AMc.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

165.    The NRA failed to comply with the contract requirement that it "shall" post a $3 million LOC for the benefit of AMc in the event that it is late on a single payment of fees.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

**Breach of NRA's Obligation to Pay Invoices Timely**

166.    Section V, Billing and Payment, contains the following Subsection E:

> All sums payable to AMC under this Services Agreement shall be payable at AMc's corporate headquarters in Oklahoma City, Oklahoma within 30 days of the invoice date. Any amounts not

received by AMc within 60 days from the date of the invoice shall
bear interest at the rate of 1.0 percent per month from the date of
the invoice until paid.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's

Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

167.    In addition to the late payment of fees listed, supra, the NRA routinely was

substantially late with respect to reimbursing AMc for other expenses. For example, the NRA

took 133 days to pay for the cost of CG Magazine '18, Issue 5 invoiced for $269,000. The NRA

also delayed 133 days before paying $90,000 for Website Unification.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's

Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

168.    The NRA was late in paying at least 80 separate invoices issued by AMc during

the second half of 2018.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's

Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

169.    Pursuant to the terms of Section V.E, the NRA owes AMc interest at the rate of 1

percent per month on all late paid invoices. Despite the contractual requirement to pay interest,

the NRA has failed to pay any such interest and such failure is a material breach of the Services

Agreement.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's

Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

170.    Based on the contractual rate of 1 percent per month, the NRA owes AMc an

amount in excess of $38,000 in unpaid interest that it has failed to pay with respect to invoices

issued during 2018, and an amount that continues to accrue.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

171.    During 2019, the NRA was late and still has not paid invoices for AMc services prior to the termination of the Services Agreement. Interest on such unpaid invoices continues to accrue while the invoices are unpaid. AMc will present evidence of pre-judgment interest at trial with respect to all unpaid invoices.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

172.    Under the Services Agreement, if the "NRA fails to diligently and in good faith perform any of its obligations," AMc may terminate the Services Agreement. The NRA has failed to perform its payment obligations with diligence and good faith, and it has failed to fulfill the contractual obligations to post a $3 million letter of credit and pay interest on late payments.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

**Obligation to Pay Costs to Return NRA Property.**

173.    Section XI.E of the Services Agreement mandates that "All charges for accumulating [any and all NRA property] shall be approved and paid in advance of receipt by the NRA."

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

174.    AMc worked diligently to catalogue and define the "NRA's property, materials, documents, Confidential Information, etc. that may be in AMc's possession." AMc reported that the digital files alone exceed 1.7 petabytes (one petabyte is one million gigabytes).

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

175.     AMc issued an invoice for the accumulation charges for physical and digital assets of the NRA. The NRA has failed to pay the $1.5 million invoiced amount that is the prerequisite for the return of the NRA property and has therefore breached Section XI.E of the Services Agreement.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

**Breach of Obligation to Pay a Termination Fee**

176.     AMc terminated the Services Agreement pursuant to the 90-day notice provision on May 29, 2019 and began to prepare for the orderly wrap up of services it was performing for the NRA, including identifying NRA assets and preparing for the downsizing of its workforce.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

177.     Section XI.F of the Services Agreement provides as follows:

> In consideration of the dedication of a substantial number of personnel and resources to provide the services under the Agreement (and the necessity to maintain such staffing levels and resource allocations to enable AMc to continue to provide such services upon any renewals hereof), the NRA agrees to pay AMc a fair and equitable termination fee to compensate it for the inevitable severances and other reasonable costs incurred in conjunction with such expiration or termination. Such termination fees shall be negotiated in good faith by the parties and paid to AMc no later than the last day of this Agreement.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

178.    The NRA failed and refused to engage in any good faith negotiations required under the Services Agreement to wrap up the relationship between AMc and the NRA. Such failure is another breach by the NRA of the Services Agreement.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

179.    The NRA failed to pay any termination fee and is in breach of this provision of the Services Agreement.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

180.    The NRA was obligated to pay this termination fee no later than the last day of the Services Agreement.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

181.     The NRA breached its payment obligations under the Services Agreement long before any alleged breach by AMc articulated by the NRA in its Amended Complaint.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

182.    The breaches that occurred have caused AMc to incur damages, the amount of which are not yet fully calculated.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

183.    The breaches by the NRA are material as that term is defined under the Code of Virginia, § 59-1-507.1.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

184.    AMc, on its behalf and on behalf of its subsidiary Mercury Group, seeks recovery of contract damages and severance remedies in the amount not less than $50 million and such other relief as this Court deems just.

**RESPONSE:** A response to these allegations is more appropriately addressed in the NRA's Answers to Defendants' Amended Counterclaims and Third-Party Complaint.

## VI.    JURY DEMAND

185.    AMc demands a trial by jury on all contested issues of fact.

**RESPONSE:**  Mr. LaPierre also demands a trial by jury.

## VII.    CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, AMc, as Counter-Plaintiff and Third-Party Plaintiff, prays that upon hearing, it be awarded judgment for damages as prayed for herein, pre- and post-judgment interest, attorney's fees and costs, and such other relief to which it may be entitled.

**RESPONSE:** Mr. LaPierre denies that AMc is entitled to recover against the NRA, and denies that AMc is entitled to any of the relief sought.

### AFFIRMATIVE DEFENSES TO COUNTERCLAIMS
### AND THIRD-PARTY COMPLAINT

### As to All Counts

### AFFIRMATIVE DEFENSE NO. 1
(Failure to State a Claim for Relief)

1.    The Counterclaims fail to state a claim for relief.

### AFFIRMATIVE DEFENSE NO. 2

(Doctrine of Fraud)

2.      The Counterclaims are barred by the doctrine of fraud.

### AFFIRMATIVE DEFENSE NO. 3
(Promissory Estoppel)

3.      The Counterclaims are barred by the doctrine of promissory estoppel.

### AFFIRMATIVE DEFENSE NO. 4
(Recoupment)

4.      The Counterclaims are barred by the doctrine of recoupment.

### AFFIRMATIVE DEFENSE NO. 5
(Setoff)

5.      The Counterclaims are barred by the doctrine of setoff.

### AFFIRMATIVE DEFENSE NO. 6
(Fault)

6.      The Counterclaims are barred by AMc's fault.

### AFFIRMATIVE DEFENSE NO. 7
(Mitigation)

7.      Counter-Plaintiff's damages, if any, are self-inflicted, and in any event Counter-Plaintiff has not mitigated its damages, if they exist.

### AFFIRMATIVE DEFENSE NO. 8
(Unclean Hands)

8.      Counter-Plaintiff comes to court with unclean hands, and therefore its claims for equitable relief are barred.

### Count One
(Libel *Per Se* – NRA and LaPierre)

### AFFIRMATIVE DEFENSE NO. 1
(Public Person)

1.      Counter-Plaintiff is not a "private person", and in any event has waived its argument that it is a "private person" by thrusting itself to the forefront of a controversy of general and public interest.

### AFFIRMATIVE DEFENSE NO. 2
(Truth)

2.      The challenged statements are true.

### AFFIRMATIVE DEFENSE NO. 3
(Substantial Truth)

3.      The challenged statements are substantially true.

### AFFIRMATIVE DEFENSE NO. 4
(Opinion)

4.      The challenged statements represent opinion.

### AFFIRMATIVE DEFENSE NO. 5
(Public Interest)

5.      The challenged statements concern a matter of public interest and were made without malice.

### AFFIRMATIVE DEFENSE NO. 6
(No Actual Harm)

6.      The challenged statements have caused no actual harm to Counter-Plaintiff.

### AFFIRMATIVE DEFENSE NO. 7
(Absolute Privilege for Attorney Communications Prior or Attendant to Judicial Proceeding)

7.      To the extent Counter-Plaintiff challenges statements made by an attorney for the NRA, the challenged statements enjoy absolute privilege because they were made preliminary to or in connection with judicial proceedings.

### AFFIRMATIVE DEFENSE NO. 8
(Qualified Privilege: Interest of Recipients)

8.      The challenged statements were made to inform persons possessing an interest in the information.

### AFFIRMATIVE DEFENSE NO. 9
(Qualified Privilege: Interest of Third Party)

9.      The challenged statements were made in whole or in part for the protection of the interests of a third party.

### AFFIRMATIVE DEFENSE NO. 10
(Qualified Privilege: Employer Communications)

10.     The challenged statements were made to inform an employment decision.

### Count Two

### (Tortious Interference with Contract – NRA and LaPierre)

### AFFIRMATIVE DEFENSE NO. 1
(Justification)

1.      Counter-Plaintiffs' claim for tortious interference is barred by the doctrine of justification.

### AFFIRMATIVE DEFENSE NO. 2
(Justification)

2.      Counter-Defendant the NRA possesses good-faith belief in its legal right to interfere with contract.

### AFFIRMATIVE DEFENSE NO. 3
(Privilege)

3.      Counter-Plaintiff's claim for tortious interference is barred by the doctrine of privilege.

### AFFIRMATIVE DEFENSE NO. 4
(Privilege)

4.     Counter-Defendant the NRA possesses an equal or superior interest to Counter-Plaintiff in the subject of the contract.

## AFFIRMATIVE DEFENSE NO. 5
(Doctrine of Immunity)

5.     Counter-Plaintiff's claim for tortious interference is barred by the doctrine of immunity.

## AFFIRMATIVE DEFENSE NO. 6
(Contribution)

6.     Counter-Plaintiff's claim for tortious interference is barred by Counter-Plaintiff's own acts or omissions which caused or contributed to its alleged injuries.

## Count Three
**(Declaratory Judgment – NRA)**
**(28 USC §2201 *et seq.*)**

Affirmative defenses against Count Three are more appropriately addressed in the NRA's Amended Answer to Defendants' Amended Counterclaims and Third Party Complaint.

## Count Four
**(Fraud – LaPierre)**

## AFFIRMATIVE DEFENSE NO. 1
(Opinion)

1.     The allegedly actionable statements were opinions that Mr. LaPierre held at the time he made the statement.

## AFFIRMATIVE DEFENSE NO. 2
(Ambiguity and Lack of Precision)

2.     The alleged statements are ambiguous and vague and not suspectable for an evaluation of whether they were fraudulent.

## AFFIRMATIVE DEFENSE NO. 3
(Truth)

3.      The allegedly actionable statements were true when made.

## AFFIRMATIVE DEFENSE NO. 4
(Promise of Future Performance)

4.      At the time he made the statements of promises of future performance, Mr. LaPierre intended to perform the promise.

## AFFIRMATIVE DEFENSE NO. 5
(No Mens Rea)

5.      Mr. LaPierre lacked any culpable mens rea at the time he made the allegedly actionable statements.

## AFFIRMATIVE DEFENSE NO. 6
(Failure to Rely on Statements)

6.      AMc did not rely or reasonably rely on any alleged misstatement.

## AFFIRMATIVE DEFENSE NO. 7
(No Injury or Damage)

7.      The allegedly actionable statement did not cause injury or damage to AMc alone or in combination.

## AFFIRMATIVE DEFENSE NO. 8
(Contributory Injury)

8.      AMc's own acts and omissions contributed  to AMc's alleged injury, as outlined in the First Amended Complaint, and therefore AMc is fully or proportionally responsible for any alleged injury or damages.

## AFFIRMATIVE DEFENSE NO. 9
(Contributory Injury)

9.      The statute of frauds bars AMc's attempt to allege fraud arising from statements that were arguably unenforceable oral agreements.

**Count Five**
**(Breach of Contract – NRA)**

Affirmative defenses against Count Five are more appropriately addressed in the NRA's

Amended Answer to Defendants' Amended Counterclaims and Third Party Complaint.


 _/s/ Michael J. Collins_
Michael J. Collins (TX Bar No. 00785493)
Jason C. McKenney (TX Bar No. 24070245)
BREWER, ATTORNEYS & COUNSELORS
1717 Main Street, Suite 5900
Dallas, Texas 75201
Telephone: (214) 653-4000
Facsimile: (214) 653-1015

*Counsel for Third-Party Plaintiff Wayne LaPierre*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above was served on all counsel of record via

the Court's electronic notification system in accordance with the Federal Rules of Civil

Procedure on the 23rd day of December 2019.


 _/s/ Michael J. Collins_
Michael J. Collins

4847-3308-6895.1
2277-09

71