**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | §<br>§<br>§ |
| **Plaintiff and Counter-Defendant,** | §<br>§ |
| **and** | §<br>§ |
| **WAYNE LAPIERRE,** | §<br>§ |
| **Third-Party Defendant,** | §<br>§ |
| **v.** | §  **Civil Action No. 3:19-cv-02074-G**<br>§ |
| **ACKERMAN MCQUEEN, INC.,** | §<br>§ |
| **Defendant and Counter-Plaintiff,** | §<br>§ |
| **and** | §<br>§ |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, AND JESSE GREENBERG,** | §<br>§<br>§<br>§ |
| **Defendants.** | §<br>§ |

## THE NRA'S RESPONSE TO DJ INVESTMENTS' MOTION TO QUASH

Plaintiff National Rifle Association of America (the "NRA") files this Response to Non-Party DJ Investments, LLC's ("DJ" or "DJ Investments") Motion to Quash (the "Motion") as follows:

# I.
# INTRODUCTION

On November 7, 2019, the NRA served a subpoena duces tecum upon Brandon Winkler, an agent and member of DJ Investments.  In that subpoena—whose return date was November 25—the NRA propounded ten requests for production which sought information necessary to rebut scandalous, false, and misleading allegations made by Ackerman McQueen, Inc. ("Ackerman") in its counterclaim.  Mere days before DJ was due to respond, DJ's counsel conferred with counsel for the NRA and sought an extension.  That extension was granted and the NRA permitted DJ an additional nine days—until December 4—to respond to the subpoena.  Rather than responding, DJ filed the Motion.  In the Motion, DJ makes a series of arguments which purport to demonstrate that the NRA's subpoena is unduly burdensome and ought to be quashed.  Those arguments fail.

The NRA's requests for production are relevant and necessary to rebut the false, scandalous, and misleading allegations put forth by Ackerman McQueen in its counterclaim.  The NRA propounded those requests in a manner that conformed with all formalities and afforded DJ a reasonable opportunity to respond.  That DJ declined to do so is its fault alone.  The Motion should be denied.

# II.
# THE SUBPOENA SEEKS RELEVANT INFORMATION.

In its Motion and in its objections to the NRA's requests, DJ Investments asserts that the information the NRA seeks is irrelevant.  *See* Motion at 2, 3, 4, and 8; *see generally* DJ's Objections to the NRA's Subpoena.   That contention is wrong for two principal reasons.  First, DJ's motion paints a misleading picture of its relationship to Ackerman McQueen and to the underlying suit.  Second, the information the NRA seeks is necessary to rebut a series of false, misleading, and highly inflammatory allegations Ackerman made in its counterclaim.

2

A.      **Governing Legal Standard**

"When a subpoena is issued as a discovery device, relevance . . . is measured according to the standard of Federal Rule of Civil Procedure 26(b)(1)." *Booth v. City of Dallas*, 312 F.R.D 427, 430 (N.D. Tex. 2015) (quoting *Williams v. City of Dallas*, 178 F.R.D. 103, 110 (N.D. Tex. 1998) (internal alterations omitted). Under Rule 26, the NRA need only demonstrate that the information sought bears some "relevan[ce] to the subject matter involved in the pending action." That standard "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Southwest Hide Co. v. Goldston*, 127 F.R.D. 481, 483 (N.D. Tex. 1989) (quoting *Oppenheimer Fund v. Sanders*, 437 U.S. 340, 351 (1978)). "The term 'relevant' should be interpreted 'very broadly' to mean matter relevant to anything *which is or may become an issue in the litigation*." *Id.* "[R]elevance is broadly defined in the context of discovery." *Wyatt v. Kaplan*, 686 F.2d 276, 284 (5th Cir. 1982). "A discovery request is not overly broad or irrelevant if the information sought appears to be reasonably calculated to lead to the discovery of admissible evidence." *Smith v. Energy Development Corp.*, Case No. CIV.A. 96–3910., 1997 WL 198059 at *2 (E.D. La. April 22, 1997). Measured against the permissive standards of Rule 26, the NRA's subpoena seeks relevant, material information concerning matters which are or may become issues in this litigation.

B.      **DJ Investments is an Instrumentality of Ackerman McQueen Whose Members are Either Defendants, Witnesses, or Key Participants in the Facts at Issue in this Case**.

The information sought by the subpoena concerns the conduct of an entity that, as public records indicate, is an instrumentality of three defendants in this action (Ackerman McQueen, Jesse Greenberg, and William Winkler), is owned by an individual (Revan McQueen) whom the First Amended Complaint plausibly alleges engaged in fraudulent misconduct, and has, as its

3

agent, an individual (Brandon Winkler) who is likely to be a witness in this case.  Were these facts

not enough, the information sought by the NRA is plainly relevant as it is necessary to rebut  series

Ackerman McQueen's scandalous, false, and profoundly misleading accusations.

**C.**  **The Information Sought is Relevant because the NRA Requires it to Rebut a Series of Salacious, False, and Improper Allegations Made in Ackerman McQueen's Counterclaim.**

In its First Amended Complaint, the NRA plausibly alleged the existence of a systematic

pattern of fraud, deceit, and extortion perpetrated by Ackerman, its highest-ranking executives,

and its wholly-owned subsidiary, Mercury Group.  In response to those allegations, Ackerman

McQueen unleashed a deluge of false and inflammatory allegations against the NRA and Mr.

LaPierre.   Beginning with the very first paragraph of Ackerman's counterclaim—in which it

alleges that the NRA's claims constitute an "attempt to deflect attention from the NRA's gross

financial mismanagement at the hands of LaPierre"—Ackerman paints a false and misleading

picture of the NRA and Mr. LaPierre's conduct.  Ackerman McQueen's Counterclaim and Third-

Party Complaint at ¶ 1.  Among its many scandalous and false allegations are the following:

that,"[t]hroughout his tenure with the NRA, LaPierre has routinely used third-party vendors like

AMc to conceal his penchant for personal spending"; that LaPierre engaged in "fraudulent

conduct"; that LaPierre engaged in "profligate misuse of NRA funds for personal and family

benefit," that LaPierre was "beset by paranoia," that "LaPierre set out to destroy the NRA's

relationship with AMc," and that LaPierre was more concerned with "enhanc[ing] his personal

brand" than benefiting the NRA.  *Id.* at ¶¶ 5, 17, 23, 49, and 69.  Though these are but a sample of

the many improper and false allegations leveled by Ackerman, one specific allegation is of

particular importance to DJ's Motion.  In paragraph 51 of its Counterclaim, Ackerman directly

puts the conduct of itself and DJ at issue:

> AMc first became suspicious of LaPierre's misuse of funds when AMc was asked to facilitate and help structure the financing of a personal home for LaPierre and his wife. Ostensibly for "safety" reasons, LaPierre began looking for a home where he would be better protected than his current residence. As the search expanded, LaPierre passed over numerous safe housing options in favor of a $6 million mansion with no greater safety benefits. At that point, AMc refused to continue participating in the house transaction.

As with the rest of Ackerman's false and improper allegations, the NRA denies this allegation unequivocally. Having made it, Ackerman and its associates cannot invoke this Court's authority to shield their conduct from scrutiny. Rather, having specifically put its and DJ's conduct at issue with respect to the housing transaction, Ackerman has opened the door to discovery concerning DJ's conduct. The NRA believes that the allegations contained in paragraph 51 give rise to three distinct issues of fact; because those issues of fact were offered by Ackerman in support of its false allegations against the NRA and Mr. LaPierre, the NRA is entitled to seek such discovery as is necessary to address them.

The first issue of fact is whether Ackerman is telling the truth when it states that it was "asked to facilitate and help structure the financing of a personal home for LaPierre and his wife"— that is, was Ackerman's participation in the transaction at the NRA's request or at Ackerman's own insistence? The second issue of fact is whether Ackerman is telling the truth when it states that "LaPierre passed over numerous safe housing options in favor of a $6 million mansion with no greater safety benefits." Id. at ¶ 51. Because Ackerman made that accusation as part of its attempts to redirect scrutiny from its own misconduct and to make false allegations about the NRA and Mr. LaPierre, the NRA is entitled to take such discovery as is necessary to rebut it. The third issue of fact is whether Ackerman is telling the truth when it states that "AMc refused to continue participating in the house transaction" on the grounds of Mr. LaPierre's desire for an opulent home.

Because Ackerman made that allegation in support of its general attack upon the NRA and Mr. LaPierre, the NRA is entitled to take discovery to test the veracity of that assertion.

DJ's position in its Motion is flatly inconsistent with Ackerman's knowing and deliberate choice to inject a series of scandalous allegations about Mr. LaPierre into this case.   Because the Federal Rules of Civil Procedure require that a party not include "immaterial, impertinent, or scandalous matter" in its pleadings, this Court must *presume* the relevance of the allegations Ackerman made concerning the LaPierre home unless and until Ackerman disavows and agrees to strike those allegations.   Were Ackerman to do so, the NRA would be willing to engage in good faith discussions concerning narrowing the scope of the subpoenas at issue.   But until that point, Ackerman and its associates cannot lob allegations without scrutiny; the NRA must be able to seek such information as is necessary to expose Ackerman's half-truths and outright falsehoods.   That is exactly the information the subpoena seeks.

### III.
### THE NRA AFFORDED DJ A REASONABLE TIME IN WHICH TO RESPOND

**A.     After Multiple Diligent Efforts, The NRA Serves Its Subpoena On DJ On November 7, 2019, Thereby Affording DJ Seventeen Days In Which To Respond.**

On November 1, 2019, the NRA issued a subpoena to DJ Investments with a return date of November 18, 2019.[1]   That subpoena was to be served upon DJ's registered agent—and a defendant in this litigation—Jesse Greenberg. Ex. A, p. 1.  On November 4, a process server was dispatched to 1717 McKinney Street, Suite 1800 in Dallas Texas—Ackerman McQueen's Dallas office and DJ's registered place of business.  *Id.* at p. 2.  At 2:20 p.m., service was attempted on Greenberg but was rebuffed; a security officer working the premises informed the process server

---

[1] A true and accurate copy of the subpoena and an accompanying proof of due diligence is attached to this Response as Exhibit A.  ("Ex. A").

that he was not aware of any DJ Investments at that address. *Id.* In a further attempt to effectuate service, contact was made with Ackerman personnel located in Suite 1800. *Ibid.* In response to the security guard and the process server's inquiry, Ackerman employees represented that no Jesse Greenberg worked for Ackerman and that they were unaware of any entity by the name of DJ Investments. *Ibid.* Thereafter, the NRA attempted service upon Mr. Greenberg at 3902 Fairfax Avenue in Dallas, Texas.[2] After two days of attempts, Mr. Greenberg contacted the process server and stated that he was out of the country until January 2020. Ex. B, p. 2.

Recognizing the futility of serving Greenberg, the NRA explored its alternatives and settled upon serving Brandon Winkler, an agent of DJ Investments.[3] Ex. C, p. 1. On November 7, 2019, the NRA issued a second subpoena to be served upon Mr. Winkler at 1601 NW Expressway Suite in Oklahoma City. *Ibid.* The return date of this second subpoena was November 25, 2019. *Ibid.* That same day, a process server was dispatched and, at 3:37 p.m., service was effectuated upon Mr. Winkler. *Id.*, p. 2. Thus, as of the date of service on November 7, DJ Investments had eighteen days in which to collect and produce the requested documents. It declined to do so. Instead, mere days before the subpoena's return date, counsel for DJ Investments contacted counsel for the NRA and requested an extension. After good faith consideration of DJ's request, the NRA agreed to offer an extension until December 4, 2019. Thus, as a consequence of the NRA's diligent efforts at service and willingness to afford DJ additional time in which to comply, DJ had twenty-seven days—nearly an entire month—in which to compile and produce the requested documents.

---

[2] A true and accurate copy of the subpoena and accompanying proof of due diligence is attached to this Response as Exhibit B ("Ex. B").

[3] A true and accurate copy of the subpoena and accompanying proof of service is attached to this Response as Exhibit C ("Ex. C").

**B.**      **Twenty-Seven Days Is A Reasonable Period Of Time In Which To Expect Compliance With A Subpoena.**

In its Motion, DJ complains that twenty-seven days is too little to respond to the NRA's requests for production.  Invoking Federal Rule of Civil Procedure 45, DJ contends that the NRA failed to "allow a reasonable time" to comply with its requests for production.  That argument is fundamentally mistaken as a matter of fact and of law.

*First,* DJ's argument rests upon the false premise that service was only effectuated on November 21, 2019, thereby permitting it a mere four days in which to respond to the NRA's requests.  As an initial matter, DJ's factual assertion concerning the date of service is wholly without substantiation and thus ought to be rejected on that basis alone.  Moreover, as described above, service was actually effectuated on Brandon Winkler on November 7, 2019, thereby permitting DJ 18 days in which to respond by the initial response date and, after the NRA's generous grant of an additional 9 days, twenty-seven days—nearly an entire month—in which to respond.

*Second,* the law is clear that twenty-seven days is a reasonable period of time in which to respond.  Because Rule 45 does not afford a clear definition of what constitutes a "reasonable" period of time in which to respond, courts considering motions to quash engage in a fact-sensitive inquiry.  In conducting that inquiry, most courts have concluded that time periods shorter than twenty-seven days can be reasonable.  *See, e.g.*, *Biological Processors of Alabama, Inc. v. North Georgia Environmental Services, Inc.*, Case No. 09–3673 2009, WL 1663102 at *2 (E.D. La. 2009); *Freeport McMoran Sulpher, LLC v. Mike Mullen Energy Equipment Resource, Inc.*, Case No. Civ.A.03–1496, 2004 WL 595236 at *9 (E.D. La. 2004) ("On its face, [a] 14-day time period cannot be held to be unreasonable.  Rather, the reasonableness of the time allowed for compliance

seems to be judged depending on the underlying circumstances."); *Abbott v. Graves*, Case No. 07-0454, 2008 WL 11353749 at *6 (E.D. La. 2008) (holding that "a subpoena may have a return date of less than 14 days, provided that the notice is reasonable"); *Scott v. Southern Electric Supply Company, Inc.* Case No. 3:13CV119-SA-SAA, 2013 WL 12411044 *3 (N.D. Miss. 2013) (holding that "although the circumstances in this case were unusual, in this District, the general rule is that there must a minimum of 7 days between service of a subpoena and the date it is returnable"); *Ramirez v. Abreo*, Case No. 5:09-CV-190-C, 2010 WL 11565408 at *2 (N.D. Tex. Mar. 1, 2010). That the Court should not quash the NRA's subpoena is further evidenced by the relevant legal standard: DJ Investments bears the burden of demonstrating unreasonableness; it cannot merely assert it in an unsubstantiated and conclusory fashion.  *See Ruelas v. Western Truck and Trailer Maintenance, Inc.*, Case No. 18-CV-02-DC-DF, 2019 WL 659022 at *1 (W.D. Tex. Feb. 14, 2019) ("The party moving to quash or modify the subpoena bears the burden of proof.") (citing *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 817-18 (5th Cir. 2004)).  Far from meeting that burden, DJ has offered only unsubstantiated, vague, and conclusory allegations concerning why it could not have complied in the time provided.   Such allegations are patently insufficient to permit the quashing of a subpoena seeking material information.

## IV.
## THE NRA'S SUBPOENAS ARE NOT OTHERWISE DEFICIENCT

In addition to its arguments concerning the subpoena's relevance and the time afforded to respond to it, DJ also argues that the subpoenas ought to be quashed because they impose an undue burden, because they seek production of privileged or other protected matters, and because they seek the production of confidential commercial information.  These arguments are without merit.

A.    **The NRA's Subpoenas Do Not Impose An Undue Burden.**

DJ asserts that the subpoenas impose an undue burden and thus ought to be quashed.  In

*Wiwa v. Royal Dutch Petroleum Co.*, the Fifth Circuit articulated the standards governing whether

a subpoena presents an undue burden:

> To determine whether [a] subpoena present an undue burden, [courts] consider the
> following factors: the relevance of the information requested, the need of the party
> for the documents, the breadth of the document request, the time period covered by
> the request, the particularity with which the party describes the requested
> documents, and the burden imposed.  Further, if the person to whom the document
> request is made is a non-party, the court may also consider the expense and
> inconvenience to the non-party.

392 F.3d 812, 818 (5th Cir. 2004).  DJ Investments bears the burden of demonstrating that the

NRA's requests are unduly burdensome.   *Id.* Here, the NRA has already demonstrated the

relevance of the documents sought.  The subpoenas seek the production of an instrumentality of a

defendant (Ackerman McQueen) operated by two defendants (Greenberg and William Winkler),

owned in part by a non-party co-conspirator (Revan McQueen) and which maintains a potential

witness (Brandon Winkler) as its agent.  The NRA has substantial need of the documents sought

because they are necessary to rebut Ackerman McQueen's false allegations concerning Mr.

LaPierre and the NRA's conduct in the house purchase transaction.   DJ's arguments with respect

to the other elements of the undue burden analysis are similarly unavailing.

Turning first to the issue of the time period covered by the subpoenas, the NRA's subpoena

does not cover an unreasonably large time period.  As DJ itself knows, that entity was only created

in 2015 such that the subpoena, rather than seeking documents created across an unlimited period

of time, is limited to the relatively recent past.  A time span of four years—especially when, as

demonstrated below, the universe of records sought is fairly narrow—cannot be unduly

burdensome or unreasonable in these circumstances. And to the extent the court believes the lack

of time period specified is problematic, the court should modify rather than quash the subpoena. *See Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004) ("Generally, modification of a subpoena is preferable to quashing it outright.").

Turning next to the question of the breadth of the document request and the burden that breadth imposes upon DJ, DJ's insistence that the NRA's "voluminous"[4] requests will impose an undue burden cannot stand up to scrutiny.  First, as DJ has repeatedly emphasized, DJ is a small entity which engaged in only two real estate transaction, one of which was never consummated. It cannot be the case that the universe of documents concerning only two transactions over the course of three years is so expansive as to present an undue burden.[5]  Similarly, the number of custodians from which documents and records are sought appears to be fairly narrow.  As public records demonstrate, DJ had only five members—Greenberg, William Winkler, Revan McQueen, Brandon Winkler, and the Angus McQueen trust.[6]  In neither the Winkler Declaration nor its brief does DJ point to any other "executive[], employee[], director[], manager[]," or "agent[]" whose documents would have to be collected in order to comply with the subpoena.  Thus, it appears that, at most, the subpoena would require five individuals or entities—two of whom are named defendants in this action—to produce any records concerning one of two transactions conducted within the last three years.  Whatever burden that might impose—and the NRA doubts that it gives rise to more than the most trivial burden—is far outweighed by the importance of the information the NRA seeks. *See Dimitric v. Texas Workforce Com'n*, Case No.  G-07-0247, 2008 WL 2630089 at *1 (S.D. Tex. June 30, 2008) (stating that, in evaluating whether a subpoena imposes an undue

---

[4] Motion at p. 10.

[5] See Declaration of William Winkler in Support of DJ Investments, LLC's Motion to Quash Subpoena ¶¶ 3, 9, and 13.

[6] A document filed with the State of Texas lists the members of DJ Investments.  A true and accurate copy of that document is attached to this Response as Exhibit D.

burden, a court must "balance the interests served by demanding compliance with the subpoena against the interests furthered by quashing it") (quoting 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2463 (2d ed.1995)).

Alongside its formulaic recitation of the documents and records sought by the subpoena, DJ also rests its overbreadth argument on a series of purportedly "facially overbroad" definitions. Motion at p. 8 ("The NRA's definitions are facially overbroad."). Among the words that DJ objects to are "document," "record," "refer," "relate to," "you," and "your." But the NRA's use of those terms gives those terms no greater breadth than they bear in ordinary English usage. Indeed, the NRA's use of those terms is no broader—and, in fact, in some respects, is narrower— than Ackerman McQueen's use of the same or closely related terms. That DJ's quarrel is not with the NRA but with the English language itself is demonstrated by reference to major dictionaries:

| Word | The NRA's "Overbroad" Definition | Ackerman McQueen's Definitions[7] | Canonical Definition |
|---|---|---|---|
| "Refer or relate to" | "[C]oncerning, relating to, reflecting, referring to, having a relationship to, pertaining to, identifying, containing, pertinent to, setting forth, showing, disclosing, describing, explaining, summarizing, evidencing, or constituting, directly or | The term "concerning" should be understood to refer to constituting, relating to, referring to, describing, evidencing, showing, demonstrating, analyzing, reflecting, constituting, containing, embodying, setting forth, identifying, stating, dealing with, supporting, contradicting, or is in any | **Refer[8]** 1. to have relation or connection; 2. to think of, regard, or classify within a general group or category; 3. to explain in terms of a general cause. **Relate[9]** |

---

[7] Each of these definitions has its origin in a subpoena that Ackerman propounded to non-party Forensic Risk Alliance in an action pending before the Virginia courts. A copy of that subpoena is attached to this response as Exhibit E.

[8] "Refer," Merriam-Webster Online Dictionary. https://www.merriam-webster.com/dictionary/refer (Dec. 15, 2019).

[9] "Relate," Merriam-Webster Online Dictionary https://www.merriam-webster.com/dictionary/relate (Dec. 15, 2019).

| | | | |
|---|---|---|---|
| | indirectly, in whole or in part, or to be otherwise factually, legally, or logically connected to the subject matter of the particular Request." | manner whatsoever pertinent to that subject." <br><br> "Relate, related to, relating, or relating to refers to any act, work, meeting, oral or written communication, or document, referring, directly or indirectly, in any way to the described facts, or evidencing, directly or indirectly, such facts. | 1. to show or establish logical or causal connection between <br> 2. to have relationship or connection <br> 3. to have or establish a relationship |
| "Document" and "Record" | "all writings of any sort . . . includ[ing] . . . all original and non-identical copies . . . and all . . . drafts of the following items": "agreements, communications, correspondence, letters, telegrams, cables, telexes, memoranda, records, books, journals, summaries of records or papers, minutes, cables, telexes, memoranda, records, books, journals, summaries of records or papers, minutes, calendars, affidavits, recordings (video or audio), electronic mail, text messages, memoranda of telephone calls, conversations, telephone calls, meetings, contracts, | "Document shall have the broadest meaning possible and should be understood to include any written, printed, typed, and visually, aurally, or electronically reproduced material of any kind, whether or not privileged, including, but not limited to, electronic mail, computer files, source code, back up media, and databases; files and file folders; text messages; social media messages, communications, or posts (including but not limited to Facebook, Facebook Messenger, Instagram, Slack, Twitter, Apple messaging, WhatsApp, WeChat, and Jabber) books and their contents, whether printed or recorded or reproduced by hand or any other mechanical process; and all other tangible | **Document**[10] <br><br> 1. an original or official paper relied on as the basis, proof, or support of something; <br> 2. something (such as a photograph or a recording) that serves as evidence or proof; <br> 3. a writing conveying information; <br> 4. a material substance (such as a coin or stone) having on it a representation of thoughts by means of some conventional mark or symbol; <br> 5. in its most extended sense, including any writing, book, or |

---

[10]"Document," Merriam-Webster Online Dictionary. https://www.merriam-webster.com/dictionary/document (Dec. 15, 2019).

13

| | | |
|---|---|---|
| | notes, marginal comments appearing on or affixed to any document, day timers, date books, messages, letters of credit, invoices, statements of account, financial statements, receipts, promissory notes, security agreements, deeds of trust, instruments purporting to grant or evidencing any security interest or lien, loan agreements, projections, working papers, securities, ledgers, cancelled checks and bank drafts (front and back), check stub receipts, and other data, documents, paper, or writings of whatever description including, but not limited to, any data or information which is electronically recorded or shared, contained in any computer, mobile device, or other information retrievable device or that otherwise can be obtained or translated through detection devices or other means into any reasonably useable or recordable format, including any material meeting the definition | manifestations of communications whether or not claimed to be privileged, confidential, or personal; namely, communications, including intra-company communications, correspondence, telegrams, memoranda, summaries or records of telephone conversations, summaries or records of personal conversations, diaries, forecasts, statistical statements, plans, specifications, data sheets, drawings, graphs, flow charts, prototypes and tangible things, evaluation boards, photographs, films, pictures, and videotapes; minutes or record of meetings, including directors' meetings, minutes, or records of conference; expressions of statements or policy; lists of persons attending meetings or conferences; reports and/or summaries of interviews or investigation; opinions or reports of consultants' patent appraisals; opinions of counsel; agreements; records, reports, or summaries of negotiations; brochures, pamphlets, advertisements, circulars, trade letters, packing materials and notices, press | other instrument conveying information; any material substance having on it a representation of the thoughts of men by means of any species of conventional mark or symbol.[11]<br><br>**Record**[12]<br>1. an account in writing or the like preserving the memory or knowledge of facts or events;<br>2. information or knowledge preserved in writing or the like;<br>3. a report, list, or aggregate of actions or achievements;<br>4. something that recalls or relates past events. |

---

[11] "Document," Webster's New International Dictionary (1932).

[12] "Record," Merriam-Webster Online Dictionary.  https://www.merriam-webster.com/dictionary/record (Dec. 15, 2019).

|  | of "document" provided in the Federal Rules of Civil Procedure." | releases; litigation files and databases;  and any drafts or revisions of any document and any notes or comments appearing on any document, whether preliminary or marginal. A comment or notation appearing on any document, and not a part of the original document, is considered a separate document within the meaning of the term.  A draft or non-identical copy is a separate document within the meaning of the term. |  |
| --- | --- | --- | --- |
| "You" or "Yours" | the person or entity summoned in the attached subpoena, including all present and former agents, employees, representatives, advisors, officers, task force officers, attorneys, consultants, investigators, individuals, and entities acting on behalf of, or pursuant to, the direction of such person or entity | The term "you" or "your" . . . includes all agents, officers, directors, partners, associates, members, managers, owners, shareholders, employees, staff members, attorneys, consultants, representatives, subsidiaries thereof, and any others acting on [your] behalf. | 1. the one or ones being addressed — used as the pronoun of the second person singular or plural in any grammatical relation except that of a possessive; 2.  of or relating to you or yourself or yourselves especially as possessor or possessors |

The chart above demonstrates two things.  First, it demonstrates that the NRA's use of terms in its requests for production is no broader than the meaning of those terms as recognized by canonical dictionaries.  Second, it demonstrates that, however broad the NRA's requests may be, Ackerman McQueen's requests have been considerably broader.  DJ's argument that the NRA's use of terms is too broad cannot be taken seriously and should be rejected.

In sum, DJ cannot meet its burden of establishing the overbreadth of the NRA's requests. Moreover, DJ's arguments concerning the breadth of the subpoena fail on all accounts.  DJ cannot show that the subpoenas seek anything more than documents from five people concerning two transactions over three years.  Such a request is not unduly burdensome.

**B.      The NRA's Subpoenas Do Not Impermissibly Seek Privileged Information**

DJ asserts that the NRA's subpoenas are "improper to the extent they seek privileged attorney-client communications between DJ Investments or WBB Investments and their attorneys." DJ is mistaken.

### a.      DJ cannot invoke WBB's privilege

DJ argues that requests 4-7 are improper to the extent they seek attorney-client communications between WBB and its attorneys.  This argument is frivolous.  As DJ itself concedes, the NRA "now removed DJ Investments . . . and the NRA now solely controls WBB Investments."  It is a basic principle of the law governing attorney-client privilege that "the attorney-client privilege is . . . held by the client." *In re Grand Jury Proceedings*, 43 F.3d 966, 972 (5th Cir. 1994).  With respect to communications between WBB and its counsel, WBB is the client and thus the only party entitled to invoke the attorney-client privilege; because the NRA controls WBB, it holds the privilege and thus may permissibly seek documents concerning correspondence between WBB and its counsel.

### b.      DJ Investments and the NRA were Joint Clients

DJ also argues that requests 4-7 are improper because they seek communications between DJ and its counsel.  Requests # 4,5, 6, and 7 all concern documents related to the formation and creation of WBB, a project in which DJ concedes that it and the NRA were joint participants.  *See* Def. Mot.  at 3 ("The NRA owned a 99 percent interest in WBB Investments and DJ Investments owned the remaining 1 percent interest.  Had the transaction been completed, DJ would have been

16

tasked with managing the property for LaPierre and the NRA."). The NRA and DJ Investments were thus joint clients with respect to all communications with counsel related to the WBB-DJ house transactions. It is a well-established principle of law that, where litigation arises between two parties that were jointly represented, communication by one or the other party with joint counsel are not protected from discovery by the attorney-client privilege. *See, e.g., In re Mirant Corp.*, 326 B.R. 646 (Bankr. N.D. Tex. 2005); *E.F. Hutton & Co. v. Brown*, 305 F. Supp, 371, 393 (S.D. Tex. 1969) ("Information imparted to the common attorney relating to the subject of the joint representation is imparted for the mutual benefit of the joint clients and is therefore not privileged against any of them."); *Official Comm. of Unsecured Creditors v. Fleet Retail Fin. Group*, 285 B.R. 601, 649 (D. Del. 2002) ("Generally, where the same lawyer jointly represents two clients with respect to the same matter, the clients have no expectation that their confidences . . . will remain secret from each other.").

## C.     The Subpoenas Do Not Impermissibly Seek Confidential Commercial Information

DJ argues that the subpoenas "request an abundance of confidential commercial information." It also objects to the NRA's request for tax returns. Again, it must be emphasized that a party seeking to quash or modify a subpoena bears the burden of persuasion. DJ's arguments are short, perfunctory, vague, and conclusory with respect to these issues. They ought to be disregarded for that reason. With respect to the one issue which DJ addresses with specificity— the issue of DJ's tax returns—the NRA is willing to engage in good faith discussions to try to reach a consensual resolution.

## D.     Conclusion

In sum, the NRA's requests are not unduly broad, they do not improperly seek privileged information, and any concerns about confidential commercial information can be obviated by a

protective order.  Accordingly, the NRA's requests for production are proper.  The NRA now turns to and rebuts DJ's specific objections to each request.

**V.**
**DJ'S SPECIFIC OBJECTIONS TO THE NRA'S REQUESTS ARE WITHOUT MERIT**

### A.   **Request 1: DJ's Actual And Potential Purchases**

The NRA's First Request for Production seeks the production of "[a]ll documents and records that refer to or relate to [DJ Investment's] actual or potential purchases, sales, or holdings of real property or any other type of property."   The information the NRA seeks is relevant for two reasons.  First, Request 1 is intended to adduce evidence concerning the WBB Investments transaction, including all internal deliberations at DJ investments concerning the transaction.  This evidence will cast light on the veracity of Ackerman's allegation that the transaction was proposed by the NRA and LaPierre, that LaPierre declined to purchase several homes (a fact that Ackerman uses to make false insinuations about Mr. LaPierre's motives) and on whether Ackerman's contention that it walked away from the transaction is accurate.  Moreover, DJ's arguments and objections with respect to this request are vague, conclusory, and without substantiation and should be ignored.

### B.   **Request No. 2: DJ's Communications With, Regarding, Or On Behalf Of The NRA**

The NRA's second Request for Production seeks "[a]ll documents and records that refer or relate to communications with or on behalf of the National Rifle Association of America ("NRA"), or an agent, director, employee, officer, representative of the NRA, or an individual purporting to act on behalf of the NRA."  The information sought by this request is directly relevant to the false, salacious, and misleading allegations Ackerman McQueen made concerning the NRA and Mr. LaPierre's participation in a contemplated purchase of a home for Mr. LaPierre.  By seeking the documents and records that refer to communication with or on behalf of the NRA, the

request will gain insight into internal DJ deliberations concerning communications with the NRA along with internal DJ deliberations concerning communications to make on the NRA's behalf. Information about these deliberations and discussions will allow the NRA to examine the factual basis for Ackerman's claims that it was asked by the NRA to participate in the purchase of the home, that Mr. LaPierre passed over several homes in favor of an opulent mansion (an allegation Ackerman deploys in service of its conspiracy theory about Mr. LaPierre and the NRA's motives), and the veracity of Ackerman's claim that it walked away from the transaction.  While DJ argues that "to the extent any documents response to Request 2 . . . are relevant, those are already in the NRA's possession, custody, or control," that allegation is vague, conclusory, and without substantiation.

## C.    Request No. 3: DJ's Corporate Information

Request number three seeks "[d]ocuments and records sufficient to show . . . [DJ's] corporate structure, [DJ's] Articles of Incorporation and corporate bylaws, the identity of each of [DJ's] investors or members, the identity of each subsidiary, parent, sibling, and affiliated entity, and the names of each of [DJ's] executives, employees, directors, managers or agents." DJ's arguments and objections with respect to Request No. 3 are vague, conclusory, without substantiation, and thus ought to be ignored.  Moreover, the documents sought are relevant to rebutting Ackerman's claims concerning Ackerman and DJ's participation in the housing transaction and, because they constitute routine documents to be filed at the incorporation of an entity, easily accessible to DJ; thus, their collection and production imposes no undue burden.

## D.    Request No. 4: WBB's Formation

Request No. 4 seeks "[a]ll documents and records that refer or relate to the formation, creation, drafting, development, and execution of the Company Agreement of WBB Investments, LLC, dated May 11, 2018."  These documents are relevant and necessary to disprove Ackerman's

factual assertions concerning their and DJ's conduct with respect to the purchase of the LaPierre. To the extent that DJ's objection to this request is founded upon the protections of the attorney-client privilege, the NRA believes that no such privilege is applicable either because DJ cannot invoke the privilege of WBB or because, for those communications between DJ and its counsel concerning the LaPierre house transaction, the NRA and DJ were commonly-represented such that the privilege does not bar disclosure. With respect to DJ's arguments that Request No. 4 imposes an undue burden, such arguments are vague, conclusory, without substantiation, and thus ought to be ignored.

E.   **Request No. 5:  Engagement Letters**

Request No. 5 seek the production of "[a]ll engagement and retention letters with any attorney concerning the formation, creation, drafting, development, and execution of the Company Agreement of WBB Investments, LLC, dated May 11, 2018." In response to this request, DJ offers vague, conclusory, and unsubstantiated objections to the effect that this information is irrelevant and that its compilation and production will impose an undue burden. The document and information sought by Request No. 5 are relevant to Ackerman's claims concerning it and DJ's conduct with respect to the LaPierre house transaction. DJ's arguments concerning the burden imposed by compliance should be ignored on account of their conclusory nature. To the extent DJ's objection to Request No. 5 rests upon the protections of the attorney-client privilege, that privilege is inapplicable. First, engagement and retention letters are generally held not to be subject to the attorney-client privilege. *See, e.g., In re Independent Services Organizations*, Case No. Civ.A. MDL–1021, 1999 WL 450906 at *2 (D. Kan. May 24, 1999) ("Correspondence and fee arrangements disclosing consultation with an attorney and payment of the attorney's generally are not protected."); *Beanal v. Freeport-McMoRan, Inc.*, Case No. 96-1474, 1996 WL 251839 at *1 (E.D. La. May 10, 1996) (ordering the production of an engagement letter); *Newmarkets*

*Partners, LLC v. Sal. Oppenheim Jr. & Cie. S.C.A.*, 258 F.R.D. 95, 101 (S.D.N.Y. 2009) (holding that engagement letters and fee arrangements are not protected by privilege).  Second, to the extent any privilege exists, it does not shield production of correspondence between DJ and its attorneys because the NRA was a joint client with respect to the house transaction.

F.   **Request 6: Documents Referring or Relating to Engagement Letters**

Request No. 5 seeks the production of "[a]ll documents that refer or relate to any such engagement or retention letter relevant to Request No. 5." Request No. 6 is proper for the same reason that Request No. 5 is proper except for the fact that Request No. 6 seeks additional relevant information because it will give rise to the discovery of evidence concerning DJ's internal deliberations concerning the retention of counsel with respect to the house transaction and thereby permit the NRA to test the veracity of Ackerman's assertions concerning it and DJ's conduct in that transaction.  DJ's invocation of the attorney-client privilege with respect to Request No. 6 is inappropriate for the same reasons the privilege is inapplicable to Request No. 5.  With respect to DJ's arguments that Request No. 6 imposes an undue burden, such arguments are vague, conclusory, without substantiation, and thus ought to be ignored.

G.   **Request No. 7: Documents Concerning Meetings And Communications Concerning The Company Agreement Of WBB.**

Request No. 7 seeks the production of "[a]ll documents concerning meetings and communications involving the actual or potential members, managers, or investors with respect to the Company Agreement of WBB Investments, LLC, dated May 11, 2018." These documents are material and relevant because they will afford the NRA insight into the discussions and communications of the members of DJ Investments with respect to the contemplated LaPierre house transaction.  Such information will allow the NRA to test the veracity of Ackerman's assertions concerning it and DJ's conduct as it relates to that transaction.   DJ's invocation of the

21

attorney-client privilege with respect to this Request is improper for the same reasons as its invocation with respect to Request No. 5 is improper.  With respect to DJ's arguments that Request No. 6 imposes an undue burden, such arguments are vague, conclusory, without substantiation, and thus ought to be ignored.

**H.      Request No. 8: Documents Concerning DJ's Transactions.**

Request No. 8 seeks production of "documents and records sufficient to show Your transactions between January 1, 2016, and the present, in which You purchased, sold, traded, leased, borrowed, collateralized, gifted, accepted or auctioned any property or asset, and the counterparty or counterparties to each such transaction." While DJ's assertions of burden with respect to this request are—as with respect to all of DJ's reference to burden—vague, conclusory, and without substantiation, DJ's position with respect to Request No. 8 is particularly difficult to reconcile with its repeated insistence concerning the limited amount of business conducted by DJ. It cannot be the case that documents and records relating to the conduct of five people with respect to only two transactions—one of which was not even consummated—are so extensive such that their collection and production would impose an undue burden upon DJ.  Moreover, such records are clearly relevant in that they will allow the NRA to test the veracity of Ackerman's assertions concerning it and DJ's conduct with respect to the LaPierre house transaction.

**I.      Request No. 9: Documents Concerning the Intent of DJ's Transactions.**

Request No. 9 seeks production of "documents referring to the purpose or intent of the transaction[s]" considered or entered into by DJ Investments.  This request is proper for the same reasons that Request No. 8 is proper.  DJ's arguments that this request imposes an undue burden are vague, conclusory, without substantiation, and thus ought to be ignored.

**J.**      **Request No. 10: Documents Concerning DJ's Financial Condition.**

Request No. 10 seeks production of "[a]ll documents and records that refer or relate to your financial condition, including, but not limited to, balance sheets, income statements, cash flow statements, and tax returns created between January 1, 2016, and the present." This request seeks information that is relevant to Ackerman's contentions regarding it and DJ's conduct with respect to the LaPierre house transaction. In particular, details of DJ's financial condition will make clear the extent to which it operated as an instrumentality of Ackerman, whether it received any funds from the NRA or Ackerman, whether it had substantial expertise in the real estate market so as to make more likely that Ackerman suggested its participation in the house transaction, and other matters relevant to Ackerman and DJ's conduct with respect to that transaction. DJ's arguments that this request imposes an undue burden are vague, conclusory, without substantiation, and thus ought to be ignored.

**VI.**
**CONCLUSION**

For all the aforementioned reasons, DJ's Motion should be denied.

23

Dated:  December 24, 2019

Respectfully submitted,

**BREWER, ATTORNEYS & COUNSELORS**

By: */s/ Michael J. Collins*
    Michael J. Collins, Esq.
    State Bar No. 00785493
    mjc@brewerattorneys.com
    Jason C. McKenney, Esq.
    State Bar No. 24070245
    jcm@brewerattorneys.com
    1717 Main Street, Suite 5900
    Dallas, Texas 75201
    Telephone:  (214) 653-4000
    Facsimile:  (214) 653-1015

**ATTORNEYS FOR PLAINTIFF THE NATIONAL RIFLE ASSOCIATION OF AMERICA**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was electronically served via the Court's electronic case filing system upon all counsel of record on this 24th day of December 2019.

*/s/ Michael J. Collins*
Michael J. Collins

4830-9273-2591.2
2277-09