**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| *Plaintiff and Counter-Defendant,* | § § | |
| **and** | § § | |
| **WAYNE LAPIERRE,** | § § § | |
| *Third-Party Defendant,* | § § | |
| **v.** | § § | **Case No. 3:19-cv-02074-G** |
| **ACKERMAN MCQUEEN, INC.,** | § § § | |
| *Defendant and Counter-Plaintiff,* | § § | |
| **and** | § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, AND JESSE GREENBERG,** | § § § § | |
| *Defendants.* | § | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION TO COMPEL**

## TABLE OF CONTENTS

I.      SUMMARY ...............................................................................................................1

II.     BACKGROUND FACTS .........................................................................................2

        A.      The NRA Hires Brewer Who Attacks His Family—AMc. ....................................2

        B.      Brewer Repeatedly Audits AMc without Issue. ..................................................3

        C.      Brewer Continues to Poach AMc's 40-Year Relationship. ....................................4

        D.      Brewer Exceeded His Authority, Terminating the AMc Contract to Protect
                Himself...............................................................................................................5

        E.      Litigation History and Status of Discovery ............................................................7

        F.      A Pattern and Practice of Discovery Tactics. ........................................................9

III.    ARGUMENTS & AUTHORITIES ........................................................................10

        A.      The NRA's Discovery Is Overbroad and Unduly Burdensome...........................11

                1.      The request for "all" documents is a grossly overbroad fishing
                        expedition.................................................................................................11

                2.      The phrase "relating to" over-broadens the discovery requests.................11

                3.      The sheer volume of two million pieces of information
                        demonstrates the abuse. ...........................................................................13

                4.      The temporal scope is unduly broad and burdensome..............................13

                5.      The requests are duplicative and require production in two forums..........14

                6.      The NRA failed to carry its burden of demonstrating relevance and
                        need for the documents beyond what Defendants already agreed to
                        produce......................................................................................................15

        B.      Brewer's Status as Competitor Hampers the Discovery Process..........................22

        C.      There Is No Prejudice, No Need to Rush, and No Purpose in Compelling. ..........23

        D.      Sanctions Are Improper Against AMc. ................................................................24

IV.     PRAYER...................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Beasley v. First Am. Real Estate Info. Servs.*, No. 3-04-CV-1059-B, 2005 U.S. Dist. LEXIS 34030 (N.D. Tex. Apr. 27, 2005).............................................................................. 14

*Drechsel v. Liberty Mut. Ins. Co.*, No. 3:14-cv-162-M-BN, 2015 U.S. Dist. LEXIS 151409 (N.D. Tex. Nov. 9, 2015) ...................................................................................... 14

*Gondola v. USMD PPM, LLC*, 223 F. Supp. 3d 575 (N.D. Tex. 2016) ................................. 10, 11

*Leamon v. KBR, Inc.*, No. H-10-0253, 2010 U.S. Dist. LEXIS 156015 (S.D. Tex. Nov. 9, 2010) ................................................................................................................... 13

*Nerium SkinCare, Inc. v. Olson*, No. 3:16-cv-1217-B, 2017 U.S. Dist. LEXIS 7986 (N.D. Tex. Jan. 20, 2017)........................................................................................................ 11

*Petroleum Wholesale, Inc. v. Marshall*, 751 S.W.2d 295 (Tex. App.—Dallas 1988, no pet.)..... 23

*Samsung Elecs. Am. Inc. v. Yang Kun "Michael" Chung*, 325 F.R.D 587 (N.D. Tex. 2017)10, 11, 15

*StoneEagle Servs. v. Gillman*, No. 3:11-cv-2408-P, 2013 U.S. Dist. LEXIS 194350 (N.D. Tex. Dec. 23, 2013).................................................................................................... 11

**Rules**

Fed. R. Civ. P. 26 ................................................................................................................... 11

FED. R. CIV. P. 34 ................................................................................................................... 24

FED. R. CIV. P. 37 ................................................................................................................... 25

Ackerman McQueen, Inc. ("*AMc*"), Mercury Group, Inc. ("*Mercury Group*"), Henry Martin ("*Martin*"), William Winkler ("*Winkler*"), Melanie Montgomery ("*Montgomery*"), and Jesse Greenberg ("*Greenberg*") (collectively, "*Defendants*") file this *Response to Plaintiff's Motion to Compel* (the "*Response*" to the "*Motion*"), and respectfully show as follows:

## I.   SUMMARY

Since April 2019, the National Rifle Association of America ("*NRA*"), with its counsel, William A. Brewer III ("*Brewer*") and Brewer Attorneys & Counselors (the "*Brewer Firm*"), has spearheaded a flurry of frivolous and pre-textual lawsuits in Virginia and Texas to destroy a 40-year business relationship with AMc and to deflect attention from their own tortious conduct.  As part of their ploy, they are engaging in discovery malfeasance, both in this case and the *three* lawsuits pending in Virginia.  Indeed, in this case alone, the NRA has propounded more than 400 discovery requests (more than 600 across the four NRA-AMc cases), which replicate the more than 220 discovery requests in the other three lawsuits in Virginia (now consolidated into one), and has issued more than 20 subpoenas to AMc clients and vendors for the same information—all while refusing to produce its own documents and lodging the same objections it complains of here.

In an effort to respond to and seek protection from these abusive discovery tactics, Defendants have collected more than two million pieces of data, reviewed hundreds of thousands of documents, and spent hundreds of thousands of dollars gathering, reviewing, and preparing responsive documents for production.  As part of that process, Defendants have produced thousands of responsive documents (tens of thousands of pages) in the Virginia lawsuits, which mirror the claims and defenses before this Court.

Despite these productions and the additional documents Defendants are preparing for production, some of Plaintiff's requests seek confidential and highly confidential documents.

Thus, all parties agree that a protective order is appropriate and necessary in this case.  However, the exact terms of the protective order are in dispute because of the complication that Brewer and the Brewer Firm are now direct competitors of AMc, and Brewer is a key actor and principal witness in this case.

The court in the Virginia lawsuits already recognized this conflict—given that Brewer and his public relations ("*PR*") unit has already poached substantial portions of the NRA's PR work from Defendants—and walled-off Brewer and members of his PR unit from the highly confidential documents.  Here, Defendants contend that the same or substantially similar protective order in the Virginia lawsuits (with its multi-tier categories of confidential materials) is required before Defendants can produce certain categories of documents.  Otherwise, Brewer and his firm will use this case to circumvent the Virginia protective order to obtain highly confidential, competitive information to severely prejudice AMc—especially true of customer and financial information.  Consequently, Defendants respectfully request that the Court deny Plaintiff's Motion in its entirety and enter the attached protective order (**Exhibit A**)—virtually identical to the one the NRA agreed to in Virginia—prohibiting Brewer and the PR unit at the Brewer Firm from obtaining, reviewing, or otherwise using materials designated as highly confidential.

## II.   BACKGROUND FACTS

### A.   The NRA Hires Brewer Who Attacks His Family—AMc.

1.   In March 2018, Wayne LaPierre ("*LaPierre*") hired Brewer and his firm to represent the NRA in potential litigation against the NRA's vendors, like AMc.[1]   Shortly thereafter, the NRA General Counsel notified AMc of the engagement.  But AMc was already familiar with Brewer and his firm as the son-in-law of the late Angus McQueen, patriarch and son

---

[1] Ex. B-1 at DB_0026.

of a founder of AMc, and the brother-in-law of Revan McQueen, current CEO of AMc.  Brewer was also an AMc client.  Yet his relationship with them was toxic, given his stated disdain for and disrespect of the McQueen family and his outspoken dislike for AMc's relationship with the NRA because of his own criticisms of the NRA and the Second Amendment.

2.      AMc was also familiar with the Brewer Firm's internal PR and crisis management group, including Travis Carter, Brewer's non-attorney Managing Director of Public Affairs. Indeed, Brewer promotes his law firm as one offering PR services in-house (many of the same services AMc provided to the NRA for over 30 years).  Within weeks of the March 2018 engagement, Brewer and his PR team began taking over AMc's business by drafting press releases for the NRA, something AMc had been solely responsible for doing on behalf of the NRA for 30 years, without input or disclosure to AMc.[2]  In fact, Brewer became the one who was ultimately making decisions relating to content on the NRA's website managed by AMc.

**B.      Brewer Repeatedly Audits AMc without Issue.**

3.      While taking over AMc's PR work for the NRA's PR, Brewer simultaneously demanded information from AMc and caused the NRA take an increasingly aggressive stance against its long-time vendor—insisting on information that had never been a source of controversy in the past; insisting on documents that had never been required in the parties' dealings; demanding justification for its billing, which had long-since been preapproved in annual budgets by the NRA and its Executive Vice President and de facto leader, LaPierre; demanding interviews of AMc personnel; and conducting three separate audits in short succession, purportedly under auspices of the Services Agreement that had governed the NRA and AMc's relationship for decades.  These

---

[2] *See* Ex. B-2; Ex. B-3.

audits were odd, given that the NRA previously engaged in an audit of AMc virtually every year for the past thirty years—with no issue ever arising nor any complaint being voiced.

4.        The justifications for the requests were the May 2018 government lawsuits Brewer filed on behalf of the NRA, even though the NRA already had the requested information.[3]  The requests became more antagonistic and abrasive, expanding in scope beyond that purported need (*e.g.*, information about NRATV, part of the subject of this Motion).[4]

## C.    Brewer Continues to Poach AMc's 40-Year Relationship.

5.        As Brewer became more entrenched with the NRA, he deployed numerous tactics to convince the NRA, LaPierre, and the Board that he and his firm were the only PR and crisis management team for the NRA.  For example, on January 5, 2019, the PR unit gave a detailed presentation to the NRA's Public Affairs Committee about protecting and advancing the NRA's reputational interests, repeatedly referencing the "court of public opinion" and promoting the NRA's narrative through the media.[5]  In many respects, the Brewer Firm is a PR firm masquerading as a law firm to try cases in the "court of public opinion," not the courtroom.  His firm even attempted to hire away AMc employees to do the NRA's PR work.  AMc learned additional facts about Brewer's de facto take-over of the NRA, or at least its senior management:

- The NRA consolidated its PR division in July 2019 after Brewer terminated the Services Agreement with AMc;[6]

- The Brewer Firm is now drafting and approving the NRA's press releases and statements to the media;[7]

---

[3] *See* ECF 1, *National Rifle Association of America v. Andrew Cuomo, et al*, Case No. 1:18-cv-566, in the United States District Court for the Southern District of New York; ECF 1, *National Rifle Association of America v. Lockton Affinity Series of Lockton Affinity, LLC, et al*, Case No. 1:18-cv-639, in the United States District Court for the Eastern District of Virginia. *See also* Ex. B-4-B-7.
[4] *See, i.e.,* Ex. B-8.
[5] Ex. B-9.
[6] Ex. B-10 at 31:18-32:23.
[7] *Id.* at 28:1-20; 95:11-96:21.

- When media outlets, including the New York Times, approach the NRA for comments on the NRA's litigation with AMc, NRA officials are conferring with the Brewer Firm's PR group, which is helping them draft the responses;[8]

- NRA, through Brewer, is claiming privilege over communications between NRA PR representatives and the Brewer Firm PR representatives;[9]

- NRA's PR head has been communicating with Brewer's PR head, Travis Carter, several times per week since April 2019;[10] and

- Brewer interacts with the NRA's PR head and assists him with his job.[11]

6.      Indeed, after hearing argument from counsel regarding Brewer's PR competition against AMc, the Virginia court walled-off Brewer and the PR unit from all information designated highly-confidential by AMc.[12]  But Brewer's power has now extended to directing the underlying business and legal operations.

## D.      Brewer Exceeded His Authority, Terminating the AMc Contract to Protect Himself.

7.      In Spring 2018, LaPierre convinced Lieutenant Colonel Oliver North ("*Col. North*") to leave his paid position at Fox and become the next NRA President and an employee of AMc by hosting a television show on NRATV.[13]  The NRA agreed to compensate AMc for Col. North by reimbursing AMc for his work.[14]  The NRA did not, directly or indirectly, compensate Col. North for his work as NRA President (a non-compensated position).  As in several other arrangements, AMc employed Col. North for the convenience of the NRA and at its request.

8.      While touring the country for fundraising efforts, various NRA members, board of director members, and donors asked Col. North about Brewer's representation of the NRA,

---

[8] *Id.* at 48:2-50:9; 59:23-60:10.
[9] *Id.* at 48:2-50:16.
[10] *Id.* at 61:7-62:10.
[11] *Id.* at 65:2-66:25.
[12] Ex. B-11 at 41:6-42:22; Ex. B-12.
[13] Ex. B-13 at 180:6-14.
[14] Ex. B-14 at 122:11-16.

including his exorbitant fees when the NRA was hurting for member donations.[15]  Col. North was

unable to answer those concerns because the NRA (LaPierre) stonewalled his efforts to obtain the

relevant information.[16]  But to honor his fiduciary duties as Board President, Col. North called a

meeting with fellow Board members to discuss what actions to take concerning the issues, not just

about Brewer's fees (approximately $1.5 million monthly), but how and why he was selected as

counsel; whether he disclosed his Texas ethical reprimand, especially considering that issue was

"carried over" into a separate NRA Virginia federal lawsuit; and whether he disclosed his personal

conflict based on familial ties to Angus McQueen (the late AMc co-CEO) and his family.[17]

9.     Over the course of the next few months, more information about Brewer and his

internal dealings with the NRA surfaced, including:

- "Brewer obstructed the work of NRA accountants and vastly exacerbated the organization's financial woes as he charged it hefty legal fees," created duplicative billing, and "interfer[ed] with accounts payable to prioritize paying himself immediately" before other vendors who had been providing services without pay for months.[18]

- Brewer tried "to intimidate, deceive and silence NRA staff who were processing his bills…"[19]

- Everything inside the NRA was being taken over by Brewer without the required approval, including Brewer taking over the Russia investigation with Congress that nearly resulted in Chris Cox, the former President of the ILA and one-time heir to LaPierre, quitting.[20]

- Brewer was manufacturing conflicts within the NRA and instructing high-ranking NRA officials that they could not speak with certain individuals until approved by Brewer.[21]

---

[15] Ex. B-13 at 108:19-109:25; 123:24-124:23.
[16] *Id.* at 126:18-128:14, 152:9-153:16, 169:13-22, 200:20-201:20, 204:20-206:6, 245:12-16.
[17] *Id.* at 141:3-12; 128:4-130:25.
[18] Ex. B-15 (Shawn Shinneman, *ProPublica Says Attorney Bill Brewer Keeps Burn Books*, D MAGAZINE (July 31, 2019), https://www.dmagazine.com/frontburner/2019/07/propublica-says-attorney-bill-brewer-keeps-burn-books/).
[19] *Id.*
[20] Ex. B-13 at 153:17-154:14.
[21] *Id.* at 164:10-15.

- Although Brewer expressed concerns about the NRA's internal leaks to the media, he was the one leaking information to the press.[22]

10.     As a result of those inquiries and meetings, Col. North asked for an audit of Brewer's fees and engagement letter.[23]  Although he was initially told the requested documents would be made available, LaPierre backtracked and changed his mind.[24]  In retaliation, Brewer accused Col. North and AMc of intentionally withholding Col. North's AMc contract—which the NRA negotiated and of which both Brewer and the NRA had first-hand knowledge: Brewer was at the NRA audit committee meeting where the contract was discussed and approved.[25] Ultimately, Brewer sued AMc to deflect attention from himself and to terminate Col. North's contract (technically, an AMc employee) in retaliation for him questioning Brewer's fees.

**E.     Litigation History and Status of Discovery.**

11.     The NRA filed a pre-textual lawsuit against AMc in Virginia in April 2019 for alleged failure to comply with audit requests and not turning over certain information, including Col. North's contract.[26]  Apparently *nobody* at the NRA authorized the filing of the lawsuit.  In fact, the NRA's General Counsel, the NRA's General Counsel to the Board, the NRA's then-current President, and the NRA's President of the Audit Committee did not even know the lawsuit against AMc was being filed.   LaPierre confirmed the pretext for the AMc lawsuit in an April 2019 letter where he admitted that "[t]he NRA and I have a common legal interests in the litigation against Ackerman McQueen which crystallized before the September [2018] Board meeting and colored the discussion that day."[27]   But the basis for the Virginia lawsuit given just two weeks earlier was AMc's alleged failure to turn over documents as part of numerous audits, none of which

---

[22] *Id.* at 170:8-171:20.
[23] *Id.* at 169:13-172:1.
[24] *Id.* at 126:18-127:11.
[25] *Id.* at 160:12-162:5, 166:7-21; 146:16-147:13; 159:11-22.
[26] Ex. B-16 (Original Complaint, *NRA v. AMc, et al.*, Superior Court of Virginia, Cause CL19001757).
[27] Ex. B-17.

had even occurred before the September 5-10, 2018 board meetings.  Stated differently, Brewer had prepared litigation against AMc about noncompliance with audits before the audits occurred, and was acting on his own accord and for his own agenda.

12.     The NRA sued AMc again in Virginia in May 2019 for breach of fiduciary duty and breach of contract a second time (confidentiality), relating to allegations of "leaks" and a false and defamatory extortion narrative.[28]   The NRA then sued AMc in this Court in September 2019 for intellectual property claims, breach of contract *a third time* (for failure to comply with audit requests and to turn over certain information, including the Col. North contract), and fraud.  The NRA filed a fourth lawsuit against AMc for a third time in Virginia in September 2019 for return of property.[29]  The NRA incorporated here the claims in the Virginia lawsuits.[30]

13.     To-date, the NRA has served more than 600 discovery requests between the two forums: three rounds of discovery on November 5 and 20, and December 12, 2019 in this lawsuit; another round in Virginia on January 29, 2020; and another set in this matter on February 3, 2020 (108 additional requests for production).  The NRA also issued more than 20 subpoenas to third parties, including AMc current and former clients (ten on January 8, 2020 and eleven on January 24, 2020).  Defendants have filed motions to quash in federal courts in three different states.[31]

14.     In the Virginia lawsuits, the court was apprised of Brewer and his PR unit's role with the NRA, their conflicts with AMc, and the need to protect AMc's highly confidential materials.[32]  As a result, the Virginia court entered a two-tier protective order that specifically prohibits Brewer and the PR unit at the Brewer Firm from accessing, viewing, or otherwise using

---

[28] Ex. B-18 (Original Complaint, *NRA v. AMc, et al.*, Superior Court of Virginia, Cause CL19002067).
[29] Ex. B-19 (Original Complaint, *NRA v. AMc, et al.*, Superior Court of Virginia, Cause CL19002886).
[30] *See* ECF 018 ¶¶ 156, 166.
[31] *See Ackerman McQueen, Inc., et al. v. NRA, et al.*, Miscellaneous Case No. MC-20-1-HE (W.D. OK); *Ackerman McQueen, Inc., et al. v. NRA, et al.*, Miscellaneous Case No. 1:20-MC-149-LY (W.D. TX); *Ackerman McQueen, Inc., et al. v. NRA, et al.*, Miscellaneous Case No. 1:20-MC-0006 (E.D. VA).
[32] Ex. B-20.

AMc's highly confidential documents.[33]  Indeed, counsel for the NRA in the Virginia lawsuits even "proposed a protective order that would prohibit the PR unit employees from having access to any of the discovery designated 'highly confidential,'" which ultimately includes Brewer.[34]

15.    Yet in this case, the NRA wants to change the protective order language to allow Brewer and his PR unit to access AMc's highly confidential information (*e.g.*, competitive business documents showing how AMc set budgets, project management detail, client lists, and how AMc develops and bills for special projects, amongst other information).[35]

**F.    A Pattern and Practice of Discovery Tactics.**

16.    Brewer's tactics are not unusual, though shocking to other members of the Bar.  He is infamous for his "Rambo justice," extending back to the 1990's.[36]  In one case, Brewer "filed a blitz attack of six lawsuits," "putting a public relations company on retainer to keep the case in the headlines."[37]  He is also well-known for providing copies of deposition transcripts to the media *the same day* they are taken, and calling journalists for "exclusives" before allegations are filed.[38]  His other practices include billing a case "to death" by assigning ten or so lawyers to one matter

---

[33] Ex. B-12 ("HIGHLY CONFIDENTIAL information may not be disclosed or disseminated to William A Brewer or to personnel within Brewer, Attorneys and Counselors who are members of the Public Relations Unit of the firm, including Travis Carter, Andrea Burnett, Katherine Unmuth, Holly Heidemanns, and Lea Gamino-Blum, unless and until relief is obtained from the Court.").

[34] *See* Ex. B-11 at 18:10-18; 26:5-27:22; 38:4-9; 42:4-12.

[35] *See* Ex. B-21.

[36] Ex. B-22 (Carol D. Leonnig and Tom Hamburger, *How a Hard-Charging Lawyer Helped Fuel a Civil War Inside the NRA,* WASHINGTON POST (Sept. 9, 2018), https://www.washingtonpost.com/politics/how-a-hard-charging-lawyer-helped-fuel-a-civil-war-inside-the-nra/2019/09/18/9ae0a01e-a986-11e9-a3a6-ab670962db05_story.html) ("Bickel & Brewer's hardball methods drew criticism from the traditional Texas bar.  Depositions were drawn out for days, as Brewer's clients claimed they couldn't say for certain what their names were, where they were born or what they owned, records show.  Judges complained about overly combative practices that seemed aimed at wearing down the court and opposing counsel.  Fellow lawyers called them "Rambo tactics" – a term Brewer embraced."); Ex. B-23 (*The Gunslingers*, D Magazine (Apr. 1998)) [https://www.dmagazine.com/publications/d-magazine/1998/april/the-gunslingers/] (For example, a 1998 news article quoted Brewer who described his practice as "truth neutral," meaning "it doesn't matter whether clients are right or wrong, only that the lawyers aggressively pursue their interests.").

[37] *Id.*

[38] Ex. B-24 (Mark Donald, *Rambo Justice,* DALLAS OBSERVER (March 19, 1998), https://www.dallasobserver.com/news/rambo-justice-6402157).

while he vets each decision,[39] which explains how Brewer and his small law firm generated more

than $45 million in less than two years for this one client.[40]  It is with those Rambo tactics that

Brewer is attempting to gain highly sensitive, competitive information about AMc.

### III.      ARGUMENTS & AUTHORITIES

17.     "A court can – and must – limit proposed discovery that it determines is not

proportional to the needs of the case."  *Gondola v. USMD PPM, LLC*, 223 F. Supp. 3d 575, 579

(N.D. Tex. 2016).  To prevail on a motion to compel, the movant

> must specifically and individually identify each discovery request in dispute and
> specifically, as to each request, identify the nature and basis of the dispute,
> including, for example, explaining … how a response or answer is deficient or
> incomplete, and ask the Court for specific relief as to each request; and must include
> a concise discussion of the facts and authority that support the motion as to each
> discovery request in dispute.

*Samsung Elecs. Am. Inc. v. Yang Kun "Michael" Chung*, 325 F.R.D 587, 594 (N.D. Tex. 2017).

18.     The movant also must show:

> many or all of the proportionality factors, including the importance of the issues at
> stake in the action, the amount in controversy, the parties' relative access to relevant
> information, the parties' resources, and the importance of the discovery in resolving
> the issues.

*Gondola*, 223 F. Supp. 3d at 580.  The party seeking discovery also must comply with the

proportionality mandates under the federal rules, and must certify that each discovery request is

"not interposed to any improper purpose, such as to harass, cause unnecessary delay, or needlessly

increase the cost of litigation" and is "neither unreasonable nor unduly burdensome or expensive."

*Id.*  A violation of that certification will support sanctions.  *Id.*; *Samsung* 325 F.R.D. at 594.

---

[39] *Id.*
[40] *Id.* (describing Brewer and his firm as "a pariah within the local legal community, accused of pushing the ethical
envelope, running up the costs of litigation, and destroying the gentility of the Dallas Bar," by "delaying tactics in
these cases—piling on paperwork, wallet-whipping the other side, being obnoxious to opposing counsel, bogging
down a case in procedure so it would rarely get heard on the merits.").

A.      **The NRA's Discovery Is Overbroad and Unduly Burdensome.**

      1.      <u>The request for "all" documents is a grossly overbroad fishing expedition.</u>

19.      Under federal law, a request for production of "all" or "any and all" documents is improper and contrary to the proportionality mandate in Federal Rule of Civil Procedure 26(b)(1). *See Nerium SkinCare, Inc. v. Olson*, No. 3:16-cv-1217-B, 2017 U.S. Dist. LEXIS 7986, at *22-23 (N.D. Tex. Jan. 20, 2017) (finding request for "all documents" overbroad and ultimately narrowing the scope); *Gondola*, 223 F. Supp. 3d at 586 (N.D. Tex. 2016) (sustaining objection that "all documents" was an overbroad "blockbuster" request).

20.      Every request except five (76 of 81 requests) seeks <u>*all*</u> documents relating to various topics, including each request at issue in this Motion, except Nos. 51 and 64. Defendants asserted this objection to each Request, where applicable, as required. According to Fifth Circuit law, those requests are overbroad and improper. Defendants' responses reasonably narrow the scope to documents relevant to this dispute. The law requires a court to limit discovery "to that which is proportional" even without an objection to the "all documents" language. *See Nerium*, 2017 U.S. Dist. LEXIS 7986, at *22-23. Whether the NRA did or did not "literally" intend to receive all documents is irrelevant and supports Defendants' narrowed responses as an admission that "all documents" is beyond the scope and need for this lawsuit. *See* Mot. at 17. For those reasons, Defendants' objections are proper and the requests should be narrowed.

      2.      <u>The phrase "relating to" over-broadens the discovery requests.</u>

21.      Additionally, in certain situations in this district, the phrase "relating to" may render a request overbroad. *See StoneEagle Servs. v. Gillman*, No. 3:11-cv-2408-P, 2013 U.S. Dist. LEXIS 194350, at *24 (N.D. Tex. Dec. 23, 2013) (ruling the category of requested documents was broad and not readily known). Adding to the overbreadth of all but eight requests (73 of 81), the

NRA seeks not only the central responsive documents, but "all" documents "relating to" or "concerning" the particular subject matter.  For instance, the NRA complains about No. 46:

> "All documents referring or relating to efforts to procure, secure, contract with, or to use a third-party vendor (e.g., Google Analytics) that would facilitate, assist in, or otherwise perform work related to the development, generation, creation, provision, and/or presentation of viewership numbers, metrics, or analytics related to NRATV."  (emphasis added).

22.     Considering the NRA and AMc had a 40 *plus*-year-long relationship, requests that "relate to" certain topics will capture hundreds of thousands of documents—as has been proven by the more than two million documents collected and hundreds of thousands reviewed *so far*.  In the example above, the request seeks more than merely documents that evidence or reflect Google Analytics (or analytics from other vendors) for NRATV; it seeks *all* documents *referring or relating to* the underlying efforts made to procure that relationship.  In other words, without knowing whether such documents exist, consider this hypothetical:  The NRA was concerned about NRA Live that began in 2000 because viewership metrics were not readily available.  Those concerns underlie the reasons for pursuing Google Analytics on the new platform NRATV 16 years later.  Those documents now span 20 years and impact more than 10 custodians.

23.     Such language renders the requests facially (and practically) overbroad. Defendants made this objection to each relevant request.  In response, Defendants stated which documents they would produce in a good-faith effort to limit the request to matters relevant to this lawsuit (specifically to the third-party vendors and NRATV).  The NRA has failed to demonstrate how that reasonable limitation is improper.  Conversely, Defendants have shown that such requests are grossly overbroad, unduly burdensome, and unnecessary in proportion to the needs of the case.

**3.      The sheer volume of two million pieces of information demonstrates the abuse.**

24.      In responding to the NRA's many and voluminous requests, Defendants have collected data from 28 custodians, totaling more than 2.5 million documents.[41]   Defendants reviewed 85,000 documents before the filing of this action.[42]   Since then, Defendants have reviewed hundreds of thousands of those documents by hiring, on daily average, *30 contract attorneys* to review in a matter of weeks what would otherwise take a legal team months to complete.[43]   To date, as part of its document collection, review, and production, AMc has incurred expenses well over $250,000.[44]

25.      Defendants have produced more than 18,000 documents in Virginia (approximately 60,000 pages), including documents at issue here.   For example, AMc produced documents relating to NRATV, analytics, and billing records, including more than 10,000 pages of time sheets, third-party invoices, and documents concerning the creation of NRATV.[45]

**4.      The temporal scope is unduly broad and burdensome.**

26.      The NRA contends that Defendants should be required to produce documents back to January 1, 2015.   While Defendants have agreed to produce certain documents within this time period, applying that criteria to all of the NRA's requests is grossly overbroad and unduly burdensome.   *See Leamon v. KBR, Inc.*, No. H-10-0253, 2010 U.S. Dist. LEXIS 156015, at *5 (S.D. Tex. Nov. 9, 2010) ("The temporal scope of discovery must be broad enough to allow the parties to find evidence but not so broad as to be overly burdensome.").   For example, the NRA requests all invoices and back up documentation over a four-year period.   Although Defendants have no objection to producing the invoices, the requests encompass the production of hundreds

---

[41] Ex. B ¶ 2.
[42] *Id.*
[43] *Id.*
[44] *Id.*
[45] *Id.* ¶ 3.

of thousands of documents given the parties' intimate relationship over decades.  Moreover, the NRA already has the backup documentation from the prior audits they conducted each year.

27.    Further, the liability period based upon the First Amended Complaint largely concerns acts and events that occurred in the fall 2018 and 2019.  The only cases Defendants found that suggest the "temporal scope of discovery" should be extended "before and after" the "liability period" involve employment discrimination and retaliation, none at issue here.  *See Drechsel v. Liberty Mut. Ins. Co.*, No. 3:14-cv-162-M-BN, 2015 U.S. Dist. LEXIS 151409 (N.D. Tex. Nov. 9, 2015); *Beasley v. First Am. Real Estate Info. Servs.*, No. 3-04-CV-1059-B, 2005 U.S. Dist. LEXIS 34030 (N.D. Tex. Apr. 27, 2005).  Extending the scope of discovery there makes sense, as those issues involve environments of discrimination proven over time by circumstantial evidence (*i.e.*, racial comments that stack up over years, repeated incidents of inappropriate touching, etc.).  No similar issue is at play in this case necessitating the extension of the discovery period.

## 5.    The requests are duplicative and require production in two forums.

28.    Additionally troublesome is that the NRA has created the fictitious "need" for this Motion by battling AMc in two forums over the same dispute with two different confidentiality restrictions.  As this Court is well aware, the NRA filed three lawsuits in Virginia (now consolidated into one) and this Texas federal action.  The subject matter of the two suits is essentially identical and designed by the NRA to financially ruin AMc through litigation expense without ever reaching trial—a common Brewer tactic.[46]

29.    By pursuing the same lawsuit in two forums, the NRA has created substantial document production complications for AMc, requiring AMc to restructure its strategy to avoid

---

[46] *See* Ex. B-25 ("Additionally, AMc has been aware of the potential that these allegations may be raised because (1) the discovery requests on these topics were received in June and July; (2) before the cases were consolidated, the second and third actions contained allegations of NRATV misconduct; and; (3) ***these new allegations are already contained in the Texas action***.") (emphasis added).

duplicative reviews and a waste of the parties' resources, a concern the NRA—with its unlimited budget—clearly does not share.  And the NRA's refusal to agree with Defendants on employing that same protective order in Texas further evidences Brewer waging a war of attrition.

30.     The NRA opposes using the Virginia protective order in this Texas lawsuit so that Brewer and his PR unit may access AMc's most sensitive information.  However, it was the NRA that *offered* to restrict the PR unit (which includes Brewer) in opposition to what they claimed was an effort to disqualify Brewer.  Now the NRA is attempting to backpedal from its own position in a different forum while representing in court that the two protective orders are "essentially" the same.  Therefore, it is disingenuous for the NRA to complain of Defendants' "failure to produce" "quickly enough" when the NRA is tying Defendants' hands.

### 6.     <u>The NRA failed to carry its burden of demonstrating relevance and need for the documents beyond what Defendants already agreed to produce.</u>

31.     Beyond the repetitive nature of the requests, which itself is harassing, so too is the subject matter—to which Defendants objected, where applicable, while explaining the documents to be produced if such production is to be limited.  The NRA's burden for its Motion is to:

> specifically and individually identify each discovery request in dispute and specifically, as to each request, identify the nature and basis of the dispute, including, for example, explaining … how a response or answer is deficient or incomplete, and ask the Court for specific relief as to each request; and must include a concise discussion of the facts and authority that support the motion as to each discovery request in dispute.

*Samsung*, 325 F.R.D at 594.  The NRA only raises issues with Request Nos. 1, 2, 4, 5, 17, 31, 32, 34, 35, 36, 37, 41, 42, 43, 46, 47, 48, 49, 51, 56, and 64.  Therefore, Defendants respond to those arguments.  The NRA has waived argument concerning the remainder of the requests.

### a.     <u>*The NRATV Requests (31, 32, 34-37, 41-43, 46-49, 51)*</u>

32.     NRATV is a full network production featuring gun-related topics, political commentary, and other NRA-friendly topics, which LaPierre dreamed up in the 1990's.  NRATV

is simply a name and platform change in 2016 from what the NRA already had in place beginning with monthly VHS reports.  The purpose for NRATV was to control the narrative about the NRA and Second Amendment rights so that the NRA could avoid *reacting* to negative public events (like school shootings) and instead *proactively* advocate for the Second Amendment.

33.     NRATV was hosted online with pre-recorded and "live" streaming segments so viewers could watch at any time from any place.  Because NRATV was not a traditional media source (*e.g.*, a 60-minute news segment), it did not have commercials to fund programming (to further distance the NRA from the control and restriction of traditional news media).  Accordingly, NRATV funding came from supporters who underwrote the portions of the platform—not specific "commercials," shows, or segments.  Additionally, because NRATV was hosted exclusively online, viewers could access it across a multitude of forums (mobile devices, iPads, Facebook, YouTube, the NRA website, OTT devices, etc.).  This multiplicity of access was one of the many highlights of the platform.  But because of those various entry points, viewership analytics differ from, say, one single website.  Instead of tracking "unique viewership," whether person A is watching NRATV content across multiple platforms or devices (impossible to decipher), the parties agreed to track total, engaged, and completed views. Thus, the requested "unique viewership" analytics requested by the NRA do not exist.

34.     Request Nos. 31, 32:  These requests seek documents relating to the creation, development, and launch of NRATV, which launched back in the 1990s.  Thus, these requests greatly exceed the scope proposed by the NRA.  The only responsive documents within this scope relate to the name and platform change of NRATV in 2016, which Defendants have agreed to produce. To the extent the NRA only seeks, as alleged in the Motion, documents relating to representations or knowledge concerning financial viability, financing NRATV, or likelihood of

success, those are all captured by other requests discussed herein—to which Defendants already stated they would produce responsive documents. The NRA has not shown what documents it seeks to compel through this overbroad request that are not already being produced.

35. Request No. 34: The NRA made the same argument for this request as it did for Request No. 31. Defendants already agreed to produce responsive documents to Request No. 33, which encompasses this request. The NRA has not shown what Defendants are refusing to produce, or how any objection is improper.

36. Request Nos. 35, 36: These requests seek information related to the "financial performance" or "financial valuation" of NRATV. Defendants objected to those phrases as vague because NRATV was valued in terms of controlling the NRA's narrative (incalculable value) and in terms of the services provided (valued in the annual budget and invoices), not in terms of a typical website tracking viewership metrics for later sale to a third-party hoping to gain from the viewers as consumers. Therefore, it is unclear what type of financial information the NRA is seeking, or if it even exists.

37. Request No. 37: As with Request Nos. 35 and 36, the only difference here is the phrase "commercial sponsorships." That phrase makes the request unanswerable here because, as described, NRATV is not like a mainstream network (think: NBC) that runs sitcoms or news segments with intermittent sponsorships by companies wanting to advertise their brands. The only "sponsorships" are *donors* who support the entire platform without advertising for their brand. Thus, no such documents exist. The NRA has not responded to that objection or otherwise argued how the other objections are unsupported.

38. Request No. 41: "All documents referring or relating to The American Clean Skies' "Clean Skies TV" project, produced or otherwise managed by Defendants." If the NRA's

representation is true that it seeks the requested information to show "Defendants had reason to know that even its most conservation projections for NRATV were fanciful," such information would be produced with the many other requests concerning NRATV and mental impressions, projections, representations, and the like.  That purpose does not warrant the NRA's intrusive digging into other AMc's other clients especially from a business relationship that ended in 2010, involving a digital platform much different from NRATV.  To the contrary, requesting such information exposes the NRA's attempt to find character evidence or "prior bad acts" that it can use in violation of the rules of evidence and/or Brewer's attempts to obtain competitive information about current and former clients for his own economic gain.  The NRA has failed to explain how responsive documents to the other requests on NRATV are insufficient to show Defendants' knowledge about NRATV.

39.     Request Nos. 42, 43: "All documents referring or relating to information on viewership or viewership analytics for The American Clean Skies' "Clean Skies TV" project" (No. 42) and "relating to the actual or contemplated basis for the ultimate cancellation" of the show (No. 43).  The NRA incorporated the same argument as for Request No. 41 without showing how these requested documents are any more necessary or reasonably tailored for this case.  The NRA also failed to demonstrate, as it argued in its Motion, that these requests (Nos. 41-43) are "narrow." In fact, the requests as phrased include *all* documents *relating* to cancellation/viewership could include *all* documents ever created for Clean Skies TV.  Even if the subject matter is related— which it is not—there is *no* basis or reasonable argument for the NRA to be entitled to *all* documents concerning another client just to prove that Defendants knew NRATV would be a failure.  These requests are grossly overbroad and harassing.

40.     Request No. 46:  Defendants agreed to produce responsive documents concerning third-party vendors and NRATV as requested (*i.e.*, those who "perform[ed] work related to the development, generation, creation, provision, and/or presentation of viewership numbers, metrics, or analytics related to NRATV").  But *all* documents *relating to* any effort to use a third-party vendor for NRATV analytics is overbroad, such as a conversation with a vendor that ultimately did not materialize and maybe did not even reference NRATV.  The NRA has not shown how production of documents for vendors who actually worked on NRATV analytics is insufficient.

41.     Request No. 47:  Because the NRA incorporated its arguments for Request No. 46, it is unclear what issue it takes with Defendants' response that they will produce responsive documents concerning viewership analytics.  The NRA failed to meet its burden for this Motion. Defendants' objections as to "all documents" and "relating to" are appropriate, as is their limitation to a reasonable timeframe, considering (as objected to), "a complete response to this Request would include volumes of documents and communications, spanning more than two decades."

42.     Request Nos. 48 and 49:  The NRA incorporated its arguments for Request Nos. 46 and 48.  At no point does the NRA define "unique viewership" (neither in the definitions to the requests nor in the Motion).  Defendants specifically objected to that phrase as vague and ambiguous.  Such is the case because, as described earlier, the parties did not use that terminology when analyzing viewership for NRATV.  The NRA has not provided Defendants with enough information to even conduct a review of the kind of viewership metric it requests; the documents do not exist.  Regardless, for the type of metrics that were actually provided and discussed between the parties, Defendants have already agreed to produce those documents.

43.     Request No. 51:  Despite this request being duplicative of two others (Nos. 33 and 36), as raised in the objections, Defendants already responded that they would produce responsive

documents (without subject matter limitation).  Notably, the NRA does not dispute Defendants'

response to No. 33, which governs Defendants' agreed production.  Its only concern is timing.

        b.     *The Billing Requests (17, 56, 64)*

44.    Request No. 17:  Defendants objected to "all documents" and "relating to,"

including that the request is overbroad and unduly burdensome.  As phrased, the request seeks

documents that tangentially touch backup documentation or other materials that support billing

statements, which necessarily includes *all* of the work performed in the billing cycle *and* before.

The request is not narrowly tailored.  Regardless, Defendants have already produced thousands of

pages of billing records.  Additionally, considering that the backup documentation is the work

itself, the NRA has those documents spanning years outside of the scope of discovery.

45.    Request No. 56:  The request for documents about Col. North himself being

"insurance" or an "insurance contract" is seemingly random and ambiguous without reference to

any background context.  The Motion provides little more.  Nevertheless, despite lacking

knowledge about such reference of "insurance," Defendants have undertaken to conduct a

reasonable search to determine whether any responsive documents exist.  None have been found.

46.    Request No. 64:

    Documents referring or relating to the reaction of Defendants upon learning that
    the NRA sued AMc in Virginia State court on April 12, 2019 and/or any actual or
    contemplated response by Defendants for the filing of the lawsuit.

The request on its face seeks information protected by attorney-client privilege and work product

doctrine.  If the request is actually meant to discover facts about the alleged "attempt [to] remov[e]

the NRA leadership later that month" (the extortion coup), *see* Mot. at 15, the proper request is for

documents about that event.  In that case, because the event did not occur, no responsive documents

exist.  But the *reaction to a lawsuit*—and especially "any actual or contemplated *response*" to that

lawsuit—is the very privileged and work product documents the law protects.  Defendants struggle

to determine what other documents or communications would fall outside of that scope, and the NRA has failed to describe any. The NRA also fails to rebut the argument that such request is imposed merely for harassment or that it is entitled to the privileged information.

c.    *The Intellectual Property Requests (1, 2, 4, 5)*

47.    Request No. 1:

> All documents referring or relating to the design and composition of AMc's website (www.am.com), including but not limited to, all documents describing, providing insight to, or otherwise concerning Defendants' actual or contemplated decision to include references to the NRA and/or use the NRA's intellectual property and copyrights on the website (including, but not limited to, the graphics and images depicted in Exhibits A and C of Plaintiff's First Amended Complaint).

Request Nos. 1, 2, and 4 are substantially similar—and flawed for the same reasons. Defendants quote No. 1 above for illustration purposes. Defendants objected to "all documents," "relating to," and on the basis of vagueness and intrusion into privilege. Plaintiff's allegations about AMc's website relate to its claims under the Lanham Act and for copyright infringement and conversion.[47] The facts underlying these claims relate to the post-termination of the Services Agreement between the NRA and AMc. Thus, documents about decisions on website design unrelated to references to the NRA have no bearing on this case or the parties other than Defendants in operating AMc business. Documents "relating to" the website design include even more unrelated documents like invoices for a design firm, if any, or strategy sessions about color schemes and wording. That phrase also encompasses documents protected by work product and attorney-client privilege concerning the NRA's "website design" allegations.

48.    Because of these issues, it was necessary for Defendants to narrow the time of the request, the only issue the NRA raises. It is reasonable to narrow the date range to the time of the allegedly wrongful conduct (at termination of the Services Agreement when the alleged "use"

---

[47] ECF 018 ¶¶ 84-118.

became infringing and which allegedly ended after Defendants changed language on the AMc website).  Documents outside of that timeframe have no relation to any issue in this lawsuit.  The attempt to glean such information is intrusive, harassing, and apparently only an effort to receive AMc's proprietary documents that Brewer can use for his own PR work.

49.    As for Request No. 2, if the NRA's actual purpose for the request is to obtain "information sufficient to identify the individual involved," documents that *reflect* the information would be sufficient.  It is unnecessary and grossly intrusive to require Defendants to produce *all* documents about a number of individuals that "identify" them as involved in the decision-making on the website.  For example, there could exist one email that lists the names of employees involved in the website as compared to the hundreds of emails exchanged between those individuals about the website.

50.    As for Request No. 4, Defendants have already agreed to produce responsive documents to the relevant time period at issue after the termination of the Services Agreement.

51.    Request No. 5: "All documents referring or relating to any communications between Defendants and any potential client of AMc regarding the NRA, since June 25, 2019."  Defendants objected to "all documents," "relating to," and on the basis of harassment.  Whether AMc had a discussion with a client about the NRA is not related to use of NRA intellectual property on the website generally.  Regardless, the request is not tailored as in the Motion.  As phrased, the request would encapsulate, for instance, documents for actual services rendered for a client if that client ever had a communication with AMc "regarding the NRA" since June 25, 2019.

**B.    Brewer's Status as Competitor Hampers the Discovery Process.**

52.    Even further, as the Virginia court recognized, Brewer's status as a competitor to AMc is a problematic barrier to effective discovery.  Although all parties agree that *the NRA* and AMc are not in competition—the one being a Second Amendment advocacy organization and the

other being a public relations firm—it is clear that *Brewer and his firm* are in direct competition with AMc.  Regardless of *how* Brewer got the NRA public relations and crisis management business (in actuality, by causing the NRA to sue his in-laws), it is undisputed that his firm is providing those same services to the NRA as did AMc.  Brewer wants to destroy AMc as a competitor while having the added benefit of financially ruining his in-laws.  This litigation process has proven that Brewer will abuse information he receives about AMc's clients (*see* the 20 *plus* subpoenas to AMc clients).

53.     Typically in a situation with competitively sensitive information (such as trade secrets or business pricing), the parties will include an "attorneys' eyes only" designation to prohibit dissemination to those with a competitive interest who could abuse the discovery process for economic gain.  No such protection is possible here because (a) the attorney of the "attorneys' eyes only" restriction *is* the person with a competitive interest who *is* abusing the discovery process for economic gain; (b) the NRA has not agreed to a protective order anyway; and (c) treating Brewer differently from his firm is futile because, as the person leading the lawsuits in both forums, he will see and be required to use such information to properly represent his client—which is the very reason the NRA is asking to remove the Highly Confidential designation.  Moreover, "[t]he facts available" to determine the efficacy of any such "Chinese wall" exist "entirely internally within" the firm.[48]  The Chinese wall does not reduce the risk of disclosure because Defendants and the Court have no way of knowing whether a breach occurred.[49]

## C.     There Is No Prejudice, No Need to Rush, and No Purpose in Compelling.

54.     Lastly, there is no prejudice by Defendants' production, no need to rush, and no purpose in compelling Defendants to do what they are already doing.  The NRA cannot file four

---

[48] *Petroleum Wholesale, Inc. v. Marshall*, 751 S.W.2d 295, 301 (Tex. App.—Dallas 1988, no pet.).
[49] *Id.*

lawsuits, issue more than 600 discovery requests, serve more than 20 subpoenas (in this forum and in the last two months, alone), and then rush the very process it slowed down by its abusive tactics.

55.     What the NRA clearly appreciates, but conveniently ignores when for its benefit, is that responding to discovery requests covering a wide variety of topics spanning a decades-long relationship in a highly publicized case like this takes time.   Indeed, despite responding to AMc's First Set of Production, the NRA has only provided 19 documents and indicated to AMc's counsel that there is a "decent chance" it could get some production out "in the near-ish term."

56.      Further, as noted earlier, in addition to being required to respond to the more than 600 discovery requests, Defendants also have been forced to protect their rights and legal interests by filing motions to quash in various jurisdictions,[50] which detracts from the time available to review and produce the requested documents.  For example, one of the NRA's subpoenas asks a vendor for AMc's *access credentials* so that the NRA can gain access to AMc's data account.  That is like asking a bank for your bank account log-in credentials rather than the bank statements, *i.e.*, grossly intrusive, harassing, and a disreputable abuse of the discovery process.  There is no prejudice to the NRA when Defendants are engaging in the requisite good faith effort to respond to its voluminous discovery while ensuring they protect their own interests.  That takes time.  Moreover, the federal rules allow production at a reasonable time as specified in the response, not just when the requesting party demands it.  *See* FED. R. CIV. P. 34(b)(2)(B).

**D.      Sanctions Are Improper Against AMc.**

57.     Even if this Motion is granted, sanctions are improper against Defendants because their objections and pending production are substantially justified based on law in this district; based on the millions of documents collected, of which hundreds of thousands have been reviewed;

---

[50] *See* FN 31.

and based on the overbroad and unduly burdensome tactics the NRA has deployed through its discovery efforts.  *See* FED. R. CIV. P. 37(a)(5)(A) ("But the court ***must not*** order this payment if … (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust.") (emphasis added).  Awarding attorneys' fees or other sanctions to the NRA would be unjust and only further burden Defendants in the throes of expending significant time and financial resources across these many forums in responding to the NRA's discovery.

## IV.      PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendants respectfully request this Court deny Plaintiff's Motion; enter the protective order attached hereto as **Exhibit A** to prohibit Brewer and the public relations unit of the Brewer Firm from accessing information designated "highly confidential"; and grant Defendants any and all such other and further relief at law or in equity to which they may be justly entitled.

Dated: February 12, 2020.

Respectfully submitted,

*/s/ G. Michael Gruber*
**Jay J. Madrid, Esq.**
Texas Bar No. 12802000
madrid.jay@dorsey.com
**G. Michael Gruber, Esq.**
Texas Bar No. 08555400
gruber.mike@dorsey.com
**J. Brian Vanderwoude, Esq.**
Texas Bar No. 24047558
vanderwoude.brian@dorsey.com
**Brian E. Mason, Esq.**
Texas Bar No. 24079906
mason.brian@dorsey.com
**DORSEY & WHITNEY LLP**
300 Crescent Court, Suite 400
Dallas, Texas 75201
(214) 981-9900 Phone
(214) 981-9901 Facsimile

**ATTORNEYS FOR DEFENDANTS
ACKERMAN MCQUEEN, INC., MERCURY
GROUP, INC., HENRY MARTIN, JESSE
GREENBERG, WILLIAM WINKLER, AND
MELANIE MONTGOMERY**

## CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2020, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

*/s/ G. Michael Gruber*
G. Michael Gruber, Esq.

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § | |
| | § | |
| | § | |
| **Plaintiff and Counter-Defendant** | § | |
| | § | |
| **and** | § | |
| | § | |
| **WAYNE LAPIERRE,** | § | |
| | § | |
| **Third-Party Defendant,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:19-cv-02074-G** |
| | § | |
| **ACKERMAN MCQUEEN, INC.,** | § | |
| | § | |
| **Defendant and Counter-Plaintiff,** | § | |
| | § | |
| **and** | § | |
| | § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG,** | § | |
| | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

**[PROPOSED] PROTECTIVE ORDER**

1.    **PURPOSES AND SCOPE**

1.1    Disclosure and discovery activity in this Action are likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this Action (as defined below) may be warranted. Accordingly, the Parties hereby stipulate to and petition the Court to enter the following Stipulated Protective Order (the "***Order***").

1.2     The purpose of this Order is to facilitate the production of discovery material, facilitate the prompt resolution of disputes over confidentiality and privilege, protect material to be kept confidential and/or privileged, and ensure that protection is afforded only to material entitled to such treatment, pursuant to the Court's inherent authority, its authority under the applicable Rules, the judicial opinions interpreting such Rules, and any other applicable law. Except as otherwise stated in this Order, a Party shall produce, in response to a valid discovery request, otherwise discoverable information in its possession, custody or control that is Confidential or Highly Confidential, and such information shall be handled in accordance with the procedures set forth herein.

1.3     This Order and all subsequent Protective Orders shall be binding on all Parties and their counsel in the above-captioned litigation and any other persons or entities who become bound by this Order.

1.4     The Parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles.  The Parties further acknowledge, as set forth in Section 12.3 below, that this Order does not entitle them to file confidential information under seal.

## 2.     <u>DEFINITIONS</u>

The following definitions apply for purposes of this Order:

2.1     <u>Action</u>:  The lawsuit captioned above *National Rifle Association of America, et al. v. Ackerman McQueen, Inc.*, *et al.*, Civil Action No. 3:19-cv-02074-G (N.D. Tex).

2.2     <u>Challenging Party</u>:  A Party or Non-Party that challenges the designation of information or items under this Order.

2

2.3    <u>Confidential Information</u>:  Discovery Material (regardless of how it is generated, stored, or maintained) or tangible things that qualify for protection under the Federal Rules of Civil Procedure and applicable precedent.

2.4    <u>Counsel</u>:  Outside Counsel of Record, In-House Counsel, or counsel retained for the purpose of advising, prosecuting, defending, or attempting to settle this Action.

2.5    <u>Designating Party</u>:  A Party or Non-Party that designates documents, information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL" or "PRIVILEGED" or "HIGHLY CONFIDENTIAL."

2.6    <u>Discovery Material</u>:  All items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, answers to interrogatories, documents, responses to requests for admissions, tangible things, and informal exchanges of information), that are produced or generated in connection with any discovery in this Action, whether formally or informally.

2.7    <u>Expert</u>:  A person retained by a Party or its Counsel to serve as an expert witness or consultant or technical advisor in this Action (as well as his or her employees and support staff).

2.8    <u>Highly Confidential Information</u>:  Discovery Material that meets the definition of "Confidential Information" and which the Designating Party reasonably believes to be information reflecting non-public technical research, pricing and business strategy documents concerning a particular product or service, financial statements reflecting sales data, margin data, cost and expense data, human resources or personnel files, and/or profit and loss data, sales information relating to specific customers or classes of customers, non-public research, provided that the nonpublic information is actually secret because it is neither known to, nor readily ascertainable by, another person or entity that can obtain economic value from the disclosure or use of such

3

information, the Designating Party has taken reasonable measures to maintain the secrecy of that information and the Designating Party derives independent economic value and a competitive advantage from the secrecy of that information, including, as the case may be, containing information where production of the materials on a confidential or non-confidential basis would nonetheless likely cause substantial harm.  Nothing herein precludes any Party from seeking additional protections not currently contemplated by this Order to be applied to any particular document or category of documents, including Highly Confidential Information.

2.9     <u>In-House Counsel</u>:  Attorneys who are employees of a Party to this Action.  In House Counsel does not include Outside Counsel of Record or any other outside counsel.

2.10    <u>Non-Party</u>:  Any natural person, partnership, corporation, association, or other legal entity not named as a Party to this Action, and their counsel.

2.11    <u>Outside Counsel of Record</u>:  Attorneys who are not employees of a Party to this Action but have been retained to represent or advise a Party to this Action and have appeared in this Action on behalf of that Party or are affiliated with a law firm which has appeared on behalf of that Party.

2.12    <u>Party</u>:  Any party to this Action.

2.13    <u>Privileged Material</u>:  Discovery Material protected from disclosure under the attorney-client privilege, work product doctrine, or any other privilege, immunity or protection afforded or recognized by the Rules, including any such privilege or protection under applicable U.S. or foreign law, regulation or statute.

2.14    <u>Producing Party</u>:  A Party or Non-Party that produces Discovery Material in this Action.

4

2.15   <u>Professional Vendors</u>:  Persons or entities that provide litigation support services (*e.g.*, photocopying, videotaping, graphic support services, coding, translating, preparing exhibits or demonstrations, document review, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

2.16   <u>Protected Material</u>:   Any  Discovery  Material  that  is  designated  as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL."

2.17   <u>Receiving Party</u>:  A Party that receives Discovery Material from a Producing Party.

2.18   <u>Virginia Action</u>: The consolidated lawsuits captioned *National Rifle Association of America v. Ackerman McQueen, Inc., et al.*, Case Nos. CL19002067, CL19001757, and CL19002886, pending before the Circuit Court for the City of Alexandria, Virginia.

**3.    <u>SCOPE</u>**

3.1     The protections conferred by this Order apply to Protected Material (as defined above) and also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, translations, or compilations of Protected Material; and (3) any oral, written, or electronic communications, testimony or presentations, including for purposes of settlement, by Parties or their Counsel that might reveal Protected Material.  However, the protections conferred by this Order do not cover information that is in the public domain at the time of disclosure to a Receiving Party or becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order.

3.2     This Order and its protections apply for pre-trial purposes only.  The Parties will meet and confer at the appropriate time regarding any use of Protected Material at trial, which use shall be governed by a separate agreement or order.

4.      **DURATION**

4.1     Even after final disposition of this Action, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing or a court order otherwise directs.  Final disposition shall be deemed to be the later of (1) dismissal of all claims and defenses in this action, with or without prejudice; or (2) final judgment herein after the completion and exhaustion of all appeals, rehearings, remands, trials, or reviews of this action, including the time limits for filing any motions or applications for extension of time pursuant to applicable law.

5.      **DESIGNATING PROTECTED MATERIAL**

5.1     Manner and Timing of Designations.  Except as otherwise provided in this Order (see, *e.g.*, Section 5.2.4 below), or as otherwise stipulated or ordered, Discovery Material that qualifies for protection under this Order must be clearly so designated at the time the material is disclosed or produced.  The Parties shall make Confidential and Highly Confidential designations in good faith to ensure that only those documents or testimony that merit Confidential or Highly Confidential treatment are so designated.  Either designation may be withdrawn by the Designating Party.  If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection, the Designating Party must promptly notify all other Parties that it is withdrawing the mistaken designation.

5.2     Designation in conformity with this Order requires the following:

5.2.1     *Marking*.  All or any part of a document, discovery response, or pleading disclosed, produced, or filed by a Producing Party may be designated Confidential or Highly Confidential by marking the appropriate legend ("CONFIDENTIAL" or "HIGHLY CONFIDENTIAL") on the face of the document and each page so designated.  With respect to tangible items, the appropriate legend shall be marked on the face of the tangible item, if practicable, or by written notice to the Receiving Party at the time of disclosure, production, or filing that such tangible item is Confidential or Highly Confidential or contains such information. With respect to documents produced in native format, the Electronically Stored Information Protocol, or ESI Protocol, to be entered in this Action shall govern the form and method for marking such documents as Confidential or Highly Confidential.

5.2.2     A Receiving Party shall exercise good faith efforts to ensure that any copies, print-outs of natively produced documents or data, excerpts, summaries, or compilations include a confidentiality legend that matches the confidentiality designation the Designating Party applied to the document, discovery response, transcript, or pleading.

5.2.3     *Timing*.  Except as otherwise provided herein, documents and other objects must be designated before disclosure or production.  In the event that a Producing Party designates some or all of a witness's deposition or other pre-trial testimony (or related exhibits) Confidential or Highly Confidential, such  designation may be made on the record of the deposition or hearing or within thirty (30) calendar days after receipt of the final transcript of such deposition or hearing.  The specific page and line designations over which confidentiality is claimed must be provided to counsel for the Parties within thirty (30) calendar days of receipt of the transcript in final form from the court reporter except counsel may agree to extend such period.  Deposition or

7

pre-trial testimony shall be treated as Highly Confidential pending the deadline or, if applicable, extended deadline for designation.  After the expiration of that period, the transcript shall be treated only as actually designated.

      5.2.4    For information produced in some form other than documentary and for any other tangible items, the Producing Party shall affix in a prominent place on the exterior of the container or containers in which the information or item is stored the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL."  If the Protected Material is produced in an electronic form with a load file, the Designating Party shall note that there is Protected Material in the load file.  If only a portion or portions of the information or item warrant protection, the Producing Party, to the extent practicable, shall identify the protected portion(s).

      5.2.5    *Inadvertent Failures to Designate*.  Accidental or inadvertent disclosure of Protected Material—including Protected Material inadvertently disclosed by failure to redact as set forth in Section 11—does not waive the confidential status of such information or any privilege or other protection attached thereto.  In the event that Protected Material is inadvertently disclosed without appropriate designations, any Party or Non-Party may thereafter reasonably assert a claim or designation of confidentiality, and the Producing Party shall promptly provide replacement media.  Thereafter, the Receiving Party must promptly return the original information and all copies of the same to the Producing Party, or destroy the original information and all copies, and make no use of such information.  In the event that Protected Material is inadvertently disclosed to any person and such disclosure is not permitted by the terms of this Order, the Party making the inadvertent disclosure shall promptly notify the Producing Party of such inadvertent disclosure within ten (10) calendar days of learning of it and will make all reasonable efforts to ensure the

original and all copies of inadvertently disclosed information are not used and are promptly returned or destroyed.

## 6.    CHALLENGING CONFIDENTIALITY DESIGNATIONS

6.1    <u>Timing of Challenges</u>.  A challenge to a designation of confidentiality may be made at any time.  Unless a prompt challenge to a Designating Party's confidentiality designation is necessary to avoid foreseeable, substantial unfairness, unnecessary economic burdens, or a significant disruption or delay of the litigation, a Party does not waive its right to challenge a confidentiality designation by electing not to mount it a challenge promptly after the confidentiality designation is made.

6.2    <u>Form of Challenge</u>.  The Challenging Party shall object to the propriety of the designation of specific material as Confidential or Highly Confidential by providing written notice to the Designating Party of each designation it is challenging and describing the basis for each challenge.  To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the challenge to confidentiality is being made in accordance with this specific Section of this Order.  The Designating Party or its counsel shall thereafter, within fourteen (14) calendar days, respond to such challenge in writing by either: (i) agreeing to remove the designation; or (ii) stating the reasons for such designation.  Counsel may agree to reasonable extensions.

6.3    <u>Meet and Confer</u>.  If the Challenging Party continues to dispute the designation(s) at issue, it shall notify the Designating Party in writing within seven (7) calendar days thereafter. Counsel may agree to reasonable extensions.  The Parties shall attempt to resolve each challenge in good faith by conferring directly (in voice-to-voice dialogue; other forms of communication are not sufficient).  A Challenging Party may proceed to the next stage of the challenge process only

if it has engaged in this meet-and-confer process first or establishes that the Designating Party is unwilling to participate in the meet-and-confer process in a timely manner.

6.4     Judicial Intervention.   If the Parties cannot resolve a challenge without court intervention, the Challenging Party may move the Court for an order withdrawing the designation as to the specific designations on which the Challenging Party and the Designating.  Party could not agree, within fourteen (14) calendar days of the Parties agreeing that the meet-and-confer process will not resolve their dispute.  Each such motion must be accompanied by a competent declaration affirming that the movant has complied with the meet-and-confer requirements imposed in the preceding Section.

6.5     The burden of persuasion in any such challenge proceeding shall be on the Designating Party.  While a challenge is pending, all Parties shall continue to afford the material in question the level of protection to which it is entitled under the Designating Party's designation until the Court orders otherwise.

6.6     If a Designating Party or the Court identifies or determines that material that had been designated as Protected Material should no longer be so designated, that material will no longer be subject to the restrictions designated herein for the treatment of Protected.

**7.     ACCESS TO AND USE OF PROTECTED MATERIAL**

7.1     Basic Principles.   A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in this Action only for prosecuting, defending, or attempting to settle this Action, including any appeal(s), so long as such use is permitted herein. In addition, the parties may use in the Virginia Action any Protected Material that is disclosed or produced in this Action, which shall receive the same protections as set forth in this Order absent a court order otherwise. Subject to the foregoing, Protected Material may be disclosed only to the

categories of persons and under the conditions described in this Order.  After the final disposition of the Action, a Receiving Party must comply with the provisions of Section 13 below (FINAL DISPOSITION).  Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

   7.1.1 Except as otherwise provided in this Order, Counsel in this Action and any of their agents shall be prohibited from sharing with anybody any Protected Material, or any information derived from or based on any Protected Material, in connection with any investigation, proceeding, or contemplated proceeding.

  7.2 <u>Restrictions on Use of Confidential Information</u>.  Unless otherwise ordered by the Court, permitted in writing by the Designating Party, or used in the Virginia Action, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to:

   7.2.1 the Receiving Party's Counsel (including their employees and support staff);

   7.2.2 the officers, directors, and employees of the Receiving Party to whom disclosure is reasonably necessary for this Action;

   7.2.3 experts retained by the Receiving Party or the Receiving Party's Counsel to whom disclosure is reasonably necessary for this Action;

   7.2.4 the Court and its personnel, and any appellate court or other court (and their personnel) before which the Parties appear in this Action;

   7.2.5 special masters or discovery referees appointed by the Court;

   7.2.6 mediators and their staff;

7.2.7      court reporters and their staff, professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this Action;

7.2.8      potential or actual witnesses in the Action to whom disclosure is reasonably necessary, unless otherwise agreed by the Designating Party or ordered by the Court;

7.2.9      the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information; and

7.2.10    any other person to whom the Designating Party, in writing, authorizes disclosure.

7.2.11    Any person or entity who receives information designated CONFIDENTIAL pursuant to this Protective Order shall (1) agree to be bound by the terms of this Protective Order and (2) execute the document attached hereto as Exhibit "l."

7.3 <u>Restrictions on Use of Highly Confidential Information</u>.

Unless otherwise provided for herein, information designated Highly Confidential by either party shall not be disclosed.  However, notwithstanding the above, information designated in good faith as "HIGHLY CONFIDENTIAL" may be disclosed to counsel for the NRA, AMc, Mercury Group, Henry Martin, William Winkler, Melanie Montgomery, and/or Jesse Greenberg and each of their respective employees or representatives who (1) agree to be bound by the terms of this Protective Order and (2) execute the document attached hereto as Exhibit "1"; provided, however, that such any representative shall not discuss, disclose, summarize, describe, characterize, or otherwise communicate or make available such information to any person or entity prohibited by this Protective Order from accessing HIGHLY CONFIDENTIAL information and/or documents.  Similarly, information designated HIGHLY CONFIDENTIAL may be shared with experts and Court personnel, provided that the disclosing party obtains written assurance that

12

such experts will protect the confidentiality of the information and that the Court personnel will keep such information under seal.

HIGHLY CONFIDENTIAL information may not be disclosed or disseminated to William A. Brewer, III or to personnel within Brewer, Attorneys and Counselors who are members of the Public Relations Unit of the firm, including Travis Carter, Andrea Burnett, Katherine Unmuth, Holly Heidemanns, and Lea Gamino-Blum, unless and until relief is obtained from the Court.

## 8.   PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION

8.1   If a Party is served with a subpoena or a court order issued in other litigation that compels disclosure of any Protected Material, that Party must:

8.1.1   promptly notify in writing the Designating Party unless prohibited by law from doing so.  Such notification shall include a copy of the subpoena or court order;

8.1.2   promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Order.  Such notification shall include a copy of this Order; and

8.1.3   cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.

8.2   If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any Protected Material before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission.  The Designating Party shall bear the burden and expense of seeking protection of its Protected Material, and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this Action to disobey a lawful directive from another court.

13

**9.      A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS ACTION**

9.1     The terms of this Order are applicable to Protected Material produced by a Non-Party in this Action.  Such information produced by Non-Parties in connection with this Action is protected by the remedies and relief provided by this Order.  Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

**10.     UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL**

10.1     If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures; (b) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order; and (c) make all reasonable efforts to retrieve all unauthorized copies of the Protected Material.

**11.     REDACTIONS ALLOWED**

11.1     Any Producing Party may redact from Discovery Material matter that the Producing Party claims is Privileged Material.  The Producing Party shall ensure that the redaction is obvious to the Receiving Party and specify the basis for the redaction as appropriate.  Where a document consists of more than one page, at least each page on which information has been redacted shall be so marked.  If counsel for the Producing Party agrees or if the Court orders that Discovery Material initially redacted shall not be subject to redaction or shall receive alternative treatment, and the Discovery Material is subsequently produced in unredacted form, then that unredacted Discovery Material shall continue to receive the protections and treatment afforded to documents bearing the confidentiality designation assigned to it by the Producing Party.

14

11.2     The right to challenge and process for challenging the designation of redactions shall be the same as the right to challenge and process for challenging the designation of Confidential Information and Highly Confidential Information as set forth in Section 6.

11.3     Nothing herein precludes any Party from seeking the other Parties' consent or an order allowing the Party to redact nonresponsive matter from otherwise responsive documents on a case-by-case basis.

## 12.     **MISCELLANEOUS**

12.1     <u>Right to Further Relief</u>.  Nothing in this Order abridges the right of any person to seek its modification by the Court in the future.  Any Party, entity, or person covered by this Order may at any time apply to the Court for relief from any provision of this Order.  Subject to the agreement of the Parties or an order of the Court, other entities or persons may be included in this Order by acceding to its provisions in a writing served upon counsel for the Parties, with such writings to be filed with the Court if so directed.

12.2     <u>Right to Assert Other Objections</u>.  By stipulating to the entry of this Order, no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Order.  Similarly, no Party waives any right to object on any ground to use as evidence any of the material covered by this Order.

12.3     <u>Filing Protected Material</u>.  Without written permission from the Designating Party or a court order secured after appropriate notice to all interested persons, a Party may not file in the public record in this Action any Protected Material.  A Party that seeks to file under seal any Protected Material must do so pursuant to the local rules.

12.4    Hearings and Appeals

12.4.1.    In the event that a Receiving Party intends to utilize Protected Material during a pre-trial hearing, such Receiving Party shall provide written notice no less than three (3) calendar days prior to the hearing, to the Producing Party and/or the Designating Party, except that shorter notice may be provided if the Receiving Party could not reasonably anticipate the need to use the document at the hearing three (3) calendar days in advance, in which event notice shall be given immediately upon identification of that need.  The use of such Protected Material during the pre-trial hearing shall be determined by agreement of the relevant Parties or by Order of the Court.

12.4.2.    In the event that any Protected Material is used in any court proceeding in this Action or any appeal in connection with this Action, except for the use of Protected Material during trial, the manner of which shall be determined pursuant to Section 3.2, such Protected Material shall not lose its protected status through such use.  Counsel shall comply with all applicable local rules and shall confer on such procedures that are necessary to protect the confidentiality of any documents, information, and transcripts used in the course of any court proceedings, including petitioning the Court to close the courtroom.

12.5    Reservations. Entering into, agreeing to or complying with the provisions of this Order shall not:  (1) operate as admission that any particular material contains Protected Material; or (2) prejudice any right to seek a determination by the Court (a) whether particular material should be produced, or (b) if produced, whether such material should be subject to the provisions of this Order.

13.     **<u>FINAL DISPOSITION</u>**

13.1     Within ninety (90) calendar days after the final disposition of this Action, as defined in Section 4, each Receiving Party, including its employees, attorneys, consultants, and experts, must use commercially reasonable efforts to destroy or return to the Producing Party all Protected Material, exception (1) backup tapes or other disaster recovery systems that are routinely deleted or written over in accordance with an established routine system maintenance practice, or (2) documents that must be preserved as federal records or in compliance with other statutory, regulatory or legal authorities.  As used in this Section, "all Protected Material" includes all originals, copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of the Protected Material.  Whether the Protected Material is returned or destroyed, upon request of the Producing Party, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 90-day deadline that (1) states that commercially reasonable efforts have been made to assure that all Protected Material has been returned or destroyed, and (2) affirms that the Receiving Party has not retained any originals, copies, abstracts, compilations, summaries, or any other format reproducing or capturing any of the Protected Material.  Notwithstanding this provisions, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product (including all emails attaching or referring to Protected Materials), and consultant and expert work product, even if such materials contain Protected Material.  Any such archival copies that contain or constituted Protected Material remain subject to this Order as set forth in Section 4 (DURATION).

17

IT SO ORDERED.

DATED: _____     _____

                                                                    The Honorable Joe Fish

**EXHIBIT 1 TO PROTECTIVE ORDER**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § | |
| | § | |
| | § | |
| **Plaintiff and Counter-Defendant** | § | |
| | § | |
| **and** | § | |
| | § | |
| **WAYNE LAPIERRE,** | § | |
| | § | |
| **Third-Party Defendant,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:19-cv-02074-G** |
| | § | |
| **ACKERMAN MCQUEEN, INC.,** | § | |
| | § | |
| **Defendant and Counter-Plaintiff,** | § | |
| | § | |
| **and** | § | |
| | § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG,** | § | |
| | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

**ACKNOWLEDGEMENT OF AND
AGREEMENT TO BE BOUND BY PROTECTIVE ORDER**

I, understand, state that:

I have reviewed the Protective Order in this matter.

I hereby agree to be bound by and comply with the terms of the Protective Order.


DATED this _____ date of, _____, _____


_____
(Typed or Printed Name)


_____
(Signature)

20

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

NATIONAL RIFLE ASSOCIATION OF §
AMERICA, §
§
    *Plaintiff and Counter-Defendant,* §
§
**and** §
§
**WAYNE LAPIERRE,** §
§
    *Third-Party Defendant,* §
§
**v.** §          **Case No. 3:19-cv-02074-G**
§
**ACKERMAN MCQUEEN, INC.,** §
§
    *Defendant and Counter-Plaintiff,* §
§
**and** §
§
**MERCURY GROUP, INC., HENRY** §
**MARTIN, WILLIAM WINKLER,** §
**MELANIE MONTGOMERY, AND JESSE** §
**GREENBERG,** §
§
    *Defendants.* §

## DECLARATION OF BRIAN E. MASON

Pursuant to 28 U.S.C. § 1746, I, Brian E. Mason, hereby declare as follows:

1.      My name is Brian E. Mason. I am over eighteen years of age. I have never been convicted of a felony or misdemeanor involving moral turpitude. I am fully competent to make this declaration. I am a lawyer at Dorsey & Whitney, LLP ("***Dorsey***") and counsel of record for Ackerman McQueen, Inc. ("***AMc***"), Mercury Group, Inc. ("***Mercury***"), Henry Martin ("***Martin***"), William Winkler ("***Winkler***"), Melanie Montgomery ("***Montgomery***"), and Jesse Greenberg ("***Greenberg***") (collectively, "***Defendants***") in the above-captioned matter (the "***Texas Lawsuit***").

**DECLARATION OF BRIAN E. MASON**                                            **PAGE 1**

I am also admitted pro hac vice representing AMc and Mercury Group in the following lawsuits in Virginia: *National Rifle Association of America v. Ackerman McQueen, Inc., et al.*, Case Nos. CL19002067, CL19001757, and CL19002886, pending before the Circuit Court for the City of Alexandria, Virginia (collectively, the "***Virginia Lawsuits***"). I have personal knowledge of the facts set forth in this declaration and acknowledge them to be true and correct.

2.      In responding to the NRA's many and voluminous requests in the Texas Lawsuit and the Virginia Lawsuits, Defendants have collected data from 28 custodians, totaling more than 2.5 million documents. Defendants reviewed 85,000 documents before the filing of the Texas Lawsuit. Since then, Defendants have reviewed hundreds of thousands of those documents by hiring, on daily average, *30 contract attorneys* to review in a matter of weeks what would otherwise take a legal team months to complete. To date, as part of its document collection, review, and production, AMc has incurred expenses well over $250,000.

3.      AMc and Mercury have produced more than 18,000 documents in the Virginia Lawsuits (approximately 60,000 pages), including documents at issue in the Texas Lawsuit. For example, AMc has produced documents relating to NRATV, analytics, and billing records, including more than 10,000 pages of time sheets, third-party invoices, and documents concerning the creation of NRATV.

4.      Attached hereto as **Exhibit B-1** is a true and correct copy of the NRA's Report of the Audit Committee dated April 29, 2019 (filed under seal).

5.      Attached hereto as **Exhibit B-2** is a true and correct copy of an email dated August 6, 2018 from Travis Carter to Andrew Arulanandam (filed under seal).

6.      Attached hereto as **Exhibit B-3** is a true and correct copy of an email dated April 13, 2018 from William A. Brewer III to Angus McQueen (filed under seal).

2

7.      Attached hereto as **Exhibit B-4** is a true and correct copy of an email dated April 10, 2018 from William A. Brewer III to Jay Madrid (filed under seal).

8.      Attached hereto as **Exhibit B-5** is a true and correct copy of an email dated May 4, 2018 from William A. Brewer III to Jay Madrid (filed under seal).

9.      Attached hereto as **Exhibit B-6** is a true and correct copy of correspondence dated July 13, 2018 from Jay Madrid to William A. Brewer III (filed under seal).

10.     Attached hereto as **Exhibit B-7** is a true and correct copy of correspondence dated August 22, 2018 from Steve Ryan to William A. Brewer III (filed under seal).

11.     Attached hereto as **Exhibit B-8** is a true and correct copy of correspondence dated December 21, 2018 from Sarah Rogers to Jay Madrid (filed under seal).

12.     Attached hereto as **Exhibit B-9** is a true and correct copy of the January 5, 2019 Executive Briefing PowerPoint Presentation (filed under seal).

13.     Attached hereto as **Exhibit B-10** is a true and correct copy of excerpts from the deposition of ███████████, dated October 2, 2019 (filed under seal).

14.     Attached hereto as **Exhibit B-11** is a true and correct copy of the hearing transcript dated August 28, 2018, *NRA v. AMc, et al.*, Superior Court of Virginia, Cause CL19001757 and CL19002067.

15.     Attached hereto as **Exhibit B-12** is a true and correct copy of the Protective Order entered October 3, 2019 in *NRA v. AMc, et al.*, Superior Court of Virginia, Cause CL19001757 and CL19002067.

16.     Attached hereto as **Exhibit B-13** is a true and correct copy of excerpts from the deposition of ███████████, dated December 18, 2019 (filed under seal).

3

17.     Attached hereto as **Exhibit B-14** is a true and correct copy of excerpts from the deposition of ▮▮▮▮▮, dated September 24, 2019 (filed under seal).

18.     Attached hereto as **Exhibit B-15** is a true and correct copy of Shawn Shinneman, *ProPublica Says Attorney Bill Brewer Keeps Burn Books*, D MAGAZINE (July 31, 2019), https://www.dmagazine.com/frontburner/2019/07/propublica-says-attorney-bill-brewer-keeps-burn-books/).

19.     Attached hereto as **Exhibit B-16** is a true and correct copy of the Original Complaint, *NRA v. AMc, et al.*, Superior Court of Virginia, Cause CL19001757.

20.     Attached hereto as **Exhibit B-17** is a true and correct copy of correspondence dated April 22, 2019 from Wayne LaPierre to Mark Dyscio (filed under seal).

21.     Attached hereto as **Exhibit B-18** is a true and correct copy of the Original Complaint, *NRA v. AMc, et al.*, Superior Court of Virginia, Cause CL19002067.

22.     Attached hereto as **Exhibit B-19** is a true and correct copy of the Original Complaint, *NRA v. AMc, et al.*, Superior Court of Virginia, Cause 19002886.

23.     Attached hereto as **Exhibit B-20** is a true and correct copy of Ackerman McQueen's Memorandum in Support of Motion for Protective Order, dated August 14, 2019, *NRA v. AMc, et al.*, Superior Court of Virginia, Cause CL19001757 and CL19002067.

24.     Attached hereto as **Exhibit B-21** is a true and correct copy of email correspondence between counsel for Plaintiff and Defendants, dated February 3, 2020 with attachments.

25.     Attached hereto as **Exhibit B-22** is a true and correct copy of Carol D. Leonnig and Tom Hamburger, *How a Hard-Charging Lawyer Helped Fuel a Civil War Inside the NRA*, WASHINGTON POST (Sept. 9, 2018), https://www.washingtonpost.com/politics/how-a-hard-

charging-lawyer-helped-fuel-a-civil-war-inside-the-nra/2019/09/18/9ae0a01e-a986-11e9-a3a6-
ab670962db05_story.html.

26. Attached hereto as **Exhibit B-23** is a true and correct copy of *The Gunslingers,* D
MAGAZINE (Apr. 1998), https://www.dmagazine.com/publications/d-magazine/1998/april/the-
gunslingers/.

27. Attached hereto as **Exhibit B-24** is a true and correct copy of Mark Donald, *Rambo
Justice,* DALLAS OBSERVER (March 19, 1998), https://www.dallasobserver.com/news/rambo-
justice-6402157.

28. Attached hereto as **Exhibit B-25** is a true and correct copy of Plaintiff's Motion for
Leave to File a Consolidated Amended Complaint, dated January 30, 2020, *NRA v. AMc, et al.,*
Superior Court of Virginia, Cause CL19001757 and CL19002067 (filed under seal).

I declare under penalty of perjury and in accordance with 28 U.S.C. § 1746 that the
foregoing is true and correct.

Executed this 12th day of February, 2020.

Brian E. Mason

5

# EXHIBIT B-1

# *CONFIDENTIAL*

# *FILED UNDER SEAL*

# EXHIBIT B-2

## *CONFIDENTIAL*

## *FILED UNDER SEAL*

# EXHIBIT B-3

# *CONFIDENTIAL*

# *FILED UNDER SEAL*

# EXHIBIT B-4

# *CONFIDENTIAL*
# *FILED UNDER SEAL*

# EXHIBIT B-5

# *CONFIDENTIAL*

# *FILED UNDER SEAL*

# EXHIBIT B-6

# *CONFIDENTIAL*

# *FILED UNDER SEAL*

# EXHIBIT B-7

# *CONFIDENTIAL*

# *FILED UNDER SEAL*

# EXHIBIT B-8

# *CONFIDENTIAL*

# *FILED UNDER SEAL*

# EXHIBIT B-9

# *CONFIDENTIAL*

# *FILED UNDER SEAL*

# EXHIBIT B-10

# *CONFIDENTIAL*

# *FILED UNDER SEAL*

# EXHIBIT B-11

# In the Matter of:

## NRA
## v.
## Akerman McQueen

# Hearing

August 28, 2019



Phone: 703-837-0076
Fax: 703-837-8118
Toll Free: 877-837-0077

1010 Cameron Street
Alexandria, VA 22310
transcript@casamo.com

```
 1   COMMONWEALTH OF VIRGINIA

 2   IN THE ALEXANDRIA CIRCUIT COURT

 3   ------------------------------------

 4   NATIONAL RIFLE ASSOCIATION OF AMERICA,

 5                        Plaintiff,

 6            -vs-              Case Nos. CL 19001757
                                              and
 7                                        CL 19002067

 8   ACKERMAN MCQUEEN, INC.

 9   and

10   MERCURY GROUP, INC.

11                        Defendants.

12   ------------------------------------

13              HEARING in the above-entitled matter,

14         held in Alexandria Circuit Court in

15         Alexandria, Virginia, on August 28, 2019,

16         before the HON. NOLAN DAWKINS, Presiding

17         Circuit Court Judge.

18

19

20

21   Reported by:

22   Jacqueline N. Hagen
```

```
 1                    A P P E A R A N C E S
 2

 3    ON BEHALF OF PLAINTIFF:

 4          BRIGLIA HUNDLEY, P.C.
                 1921 Gallows Road
 5               Suite 750
                 Tysons Corner, Virginia 22182
 6          BY:  JAMES W. HUNDLEY, Esq.
                 jhundley@brigliahundley.com
 7               (703) 883-0204
            AND: ROBERT H. COX, Esq.
 8               rcox@brigliahundley.com
                 (703) 883-0880
 9
            BREWER ATTORNEYS & COUNSELORS
10               1717 Main Street
                 Suite 5900
11               Dallas, Texas 75201
            BY:   MICHAEL J. COLLINS, Esq.
12               mjc@brewerattorneys.com
                 (214) 653-4875
13
      ON BEHALF OF DEFENDANT:
14
            SCHERTLER & ONORATO, LLP
15               901 New York Avenue, N.W.
                 Suite 500
16               Washington, DC 20001
            BY:  DAVID DICKIESON, Esq.
17               ddickieson@schertlerlaw.com
            AND: JOSEPH A. GONZÁLEZ, Esq.
18

19

20

21

22
```

```
 1              P R O C E E D I N G S

 2              (Whereupon the proceedings commenced at

 3         11:20 a.m.)

 4              MR. HUNDLEY:  Good morning, your Honor.

 5              THE COURT:  Good morning.

 6              MR. HUNDLEY:  Jim Hundley on behalf of

 7         the National Rifle Association of America.

 8         This is Michael Collins.

 9              MR. DICKIESON:  Good morning, your

10         Honor.  David Dickieson and Jose Gonzalez on

11         behalf of Ackerman McQueen and the Mercury

12         Group.

13              THE COURT:  All right.  Let's see.

14              MR. HUNDLEY:  Your Honor, there's --

15         there's one that there's an Agreed Order,

16         motion to amend our answers.  I just hand up

17         the Agreed Order to resolve that matter.

18              THE COURT:  All right.

19              MR. HUNDLEY:  Your Honor, I call -- your

20         law clerk had suggested that the Court might

21         find useful a transcript from the earlier pro

22         hac vice motion that's cited in the
```

```
 1              pleadings.  The Court had -- so I'm happy to
 2              hand that up to the law clerk so the Court
 3              can refer to that, if you desire.
 4                   THE COURT:  Yes, sir.
 5                   MR. DICKIESON:  Good morning, your
 6              Honor.  I think it might be useful for me to
 7              provide an update from the last time we were
 8              here back in June.  As you will recall that
 9              we asked for a preliminary injunction based
10              on the fact that the NRA had not posted a $3
11              million letter of credit to allow us to --
12              allow Ackerman McQueen to continue doing
13              work, and we asked for a preliminary
14              injunction to force that so that people
15              wouldn't have to be laid off and terminated
16              because of this contract.  The Court heard
17              arguments but said it didn't have sufficient
18              time to go through all of the evidence, and
19              we set it for a special, full-day hearing,
20              the quickest date possible.  And what
21              happened was that in that intervening time,
22              the NRA stopped paying invoices and
```

1          terminated a contract in an immediate

2          fashion, and that forced 50 people to be

3          furloughed and laid off and terminated.  The

4          Alexandria office is being closed, and the --

5          the whole point for the preliminary

6          injunction hearing was no longer relevant

7          because you could not preserve the status quo

8          at that point.  And so we canceled the

9          hearing on the preliminary injunction, and

10         we've been moving forward with discovery in

11         the case ever since then.

12             The NRA has taken three depositions in

13         three different states.  But now, one of the

14         things they're seeking to do is block

15         Ackerman McQueen from taking any depositions

16         of NRA members.  So there are two remaining

17         matters, apart from the consent motion:

18         AMC's motion for protective order seeking to

19         protect information from being disclosed to a

20         competitor that resides within the firm of --

21         of Brewer that Mr. Collins is -- is a partner

22         at.  And then there's NRA's motion for

```
 1              protective order and to quash the -- the --

 2              the depositions that are being asked for by

 3              AMC.

 4                  Now, let me suggest the following

 5              organization for moving forward with what is

 6              going to be a 25-minute hearing.  First, we

 7              -- I think we should deal with the NRA's

 8              motion that involves a simple interpretation

 9              of Rule 4.1(c) and Rule 4.1(d), and -- and

10              the application of those two subsections of

11              Rule 4.1.  I think that's a fairly

12              straightforward issue, and we can deal with

13              that fairly quickly.  Then -- then we can

14              deal with AMC's motion that involves a unique

15              and novel issue that's not covered by any

16              rule:  Whether or not a law firm that has a

17              public relations unit that is in direct

18              competition with my client should have access

19              to the confidential data that's been turned

20              over in discovery.

21                  We think there's no rule that covers

22              that because most law firms don't do a public
```

 1          relations work and don't compete against the

 2          firms that they're suing.  So we think that's

 3          going to take some -- a little more time, and

 4          we would ask that the Court follow that

 5          organization.

 6               So I'll turn it over to Mr. Hundley on

 7          the -- his motion for protective order on the

 8          depositions.

 9               THE COURT:  Yes, sir.

10               MR. HUNDLEY:  That's fine, your Honor.

11          I think the two motions, really, are just

12          sort of intertwined, and -- and at the heart

13          of both motions is our dispute over what an

14          appropriate protective order should look like

15          in this case.  We filed the motion to quash

16          or stay the depositions that they noticed of

17          the NRA party -- party witnesses because we

18          were unable to reach an agreement with them

19          about the protective order and the production

20          of discovery that would -- that we've already

21          asked for.

22               So their objection to our motion to --

1          what we're really asking the Court to do is

2          simply order the discovery in a way that's

3          fair and equitable.  This isn't a situation

4          which, you know -- 4.1(d)(1) is what they

5          cite.  The purpose of that rule is to prevent

6          the parties from simply refusing to produce

7          discovery, and that freezes the litigation,

8          and that's not what's happening here at all,

9          your Honor.

10             The discovery is ongoing in this case.

11         The NRA has produced voluminous discovery and

12         is continuing to produce discovery.  We've

13         taken three depositions already.  We've got

14         other non-party depositions that are -- that

15         -- working with the witnesses to schedule,

16         and those can go forward.

17             And -- and this is the crucial point

18         that they sort of ignore in their objection

19         to our motion -- we have propounded discovery

20         to them, two separate rounds of it, which

21         they've not complied with.  One of them is

22         past due.  The first one is past due.  The

 1          second round, we discussed with them an

 2          extension and agreed to an extension.  They

 3          refuse to produce any documents, highly

 4          classified or otherwise, until this

 5          protective order is resolved.  And we've had

 6          negotiations with them, and we've suggested,

 7          "Well, why can't you just produce the

 8          non-highly classified documents?"  And

 9          they've declined to enter into those types of

10          accommodations.

11              So we would submit to the Court -- what

12          we're asking the Court to do -- and we think

13          it's fair.  It's reasonable.  It's equitable

14          -- regarding these depositions is to first

15          require AMC to comply with the discovery that

16          we propounded.  This isn't a situation where

17          we're saying, "We don't want to take any

18          depositions until we finish our written

19          discovery and get it to you."  That's not

20          what happened.  It's -- it's out there, and

21          it's due.

22              And so we simply are asking the Court to

```
 1              say, "You produce your discovery," and then
 2              -- and they've indicated they can do that
 3              quickly.  Once there's a protective order in
 4              place, they can do that quickly, within, I
 5              think, a week is what Mr. Dickieson
 6              indicated.  And within a week after that,
 7              we're perfectly willing to let these
 8              depositions go forward.  But we submit we're
 9              entitled to this discovery that we've asked
10              for, and is due to be produced, before these
11              depositions go forward.  We're not -- we
12              don't think that request to the Court
13              violates the rule that they cited, 4.1(d)(1).
14                   THE COURT:  It sounds like we don't have
15              a problem; is that correct?  We don't have a
16              problem; is that correct?
17                   MR. HUNDLEY:  Well, the problem is we --
18                   THE COURT:  The problem is they haven't
19              complied with the discovery.  That's - that's
20              what I heard.
21                   MR. HUNDLEY:  And the reason they're not
22              complying with discovery is because there's
```

```
 1              not a protective order in place, and they're

 2              refusing to do it until there is a protective

 3              order in place.  So we're here today, and we

 4              said, "Okay, let's get the protective order

 5              issue resolved."  So we're here today to do

 6              that.

 7                   THE COURT:  Why don't we pass the

 8              protective order?  Let's move on.

 9                   MR. HUNDLEY:  All right.

10                   THE COURT:  Let's pass the protective

11              order.  What do you want?

12                   MR. HUNDLEY:  For the protective order?

13                   THE COURT:  Yes.

14                   MR. HUNDLEY:  We certainly have no

15              objection to a general protective order that

16              protects highly confidential information in

17              litigation.  We're -- all the parties are

18              very familiar with those.  They're asking for

19              -- it's paragraph 7.3 of the proposed

20              protective order they're submitted to us.

21              They're asking for a protective order that

22              does something very unique and onerous.
```

```
 1          They're asking that the NRA's co-counsel, Mr.
 2          Collins, as well as all of the legal
 3          professionals that work at the Brewer Law
 4          Firm, be excluded from looking at that
 5          discovery.  And they based that argument
 6          simply on bald, unsupported statements that
 7          can't be supported, that the Brewer Law Firm
 8          is a competitor of AMC.
 9              The Brewer Law Firm is not a competitor
10          of AMC, and they don't present any evidence
11          to show that it is.  They -- they cite to
12          their own arguments in the motion, the pro
13          hac vice motion previously that the Court
14          overruled.  Their objection's been granted.
15          That's not evidence that -- that the Brewer
16          Law Firm is a competitor.  They cite to
17          quotes by William Brewer, the -- the attorney
18          -- one of the attorneys in the Brewer Law
19          Firm, that he made to the media on behalf of
20          the NRA, but they don't say what those are.
21          In any event, they're hearsay.  That's not
22          evidence.
```

```
 1              For a protective order of this level of
 2         restriction -- and it's really just a
 3         back-door disqualification of the Brewer Law
 4         Firm, that the Court's already refused to
 5         grant -- they granted the pro hac vice
 6         motion.  The Court's granted the pro hac vice
 7         motion.  They bear the heavy burden of
 8         showing good cause, and they simply -- they
 9         haven't done it because they can't do it.
10         The evidence, quite frankly, would be that --
11         the evidence quite frankly is that while the
12         Brewer Law Firm has a public relations unit
13         that employs four people, those four people
14         provide public relations services for clients
15         who are involved in litigation that the
16         Brewer Law Firm is handling.
17              The Brewer Law Firm is a boutique
18         litigation firm that handles high-profile
19         cases where the media is often involved, and
20         so they do have a public relations unit that
21         deals solely with litigation matters.
22         They're a law firm.  AMC is not a law firm.
```

```
 1              AMC does not do litigation work.  AMC is a

 2              marketing firm.  The Brewer Law Firm does not

 3              engage in any of the type of work that the --

 4              that a marketing and advertising firm like

 5              AMC engages in.  It's apples to oranges.

 6                   The -- AMC, on behalf of the NRA, was

 7              running NRA TV.  They were representing

 8              employees of the NRA, such as Oliver North,

 9              in their media capacity, helping them to get

10              on TV to arrange -- to arrange those types of

11              engagements for them.  The Brewer Law Firm

12              doesn't do any of that.  They're not equipped

13              to do any of that.  I mean, the fact that

14              AMC, as a result of the termination of their

15              relationship with the NRA, had to hire 50

16              employees proves that the Brewer Law Firm is

17              not a competitor for this business.  There's

18              no way that the four people in the public

19              relations firm of the Brewer Law Firm, the

20              public relations unit of the Brewer Law Firm,

21              could do the work of 50 people who are

22              working exclusively for the NRA.  And they
```

```
 1              haven't presented any evidence to show that

 2              they're doing any of that work.  They're not.

 3              They're not a competitor.

 4                   Your Honor, even if they were arguably a

 5              competitor, which they're not, it's, in fact

 6              -- it wasn't the NRA that terminated the

 7              contract.  It was AMC that terminated the

 8              contract with the NRA.  And so once they did

 9              that, they lost any standing to complain

10              about anybody being a competitor for the

11              NRA's business because they've turned it

12              down.  They're turned it away.  They've

13              terminated the relationship.  So they really

14              don't have any standing to make that

15              argument, to begin with.

16                   THE COURT:  Tell me what is -- what is

17              Mr. Collins' relationship with the public

18              relations portion of the -- of the -- of the

19              -- the Brewer law -- the Brewer Firm?

20                   MR. HUNDLEY:  Mr. Collins is here to

21              answer that question, but I think it's fair

22              to say he has --he doesn't work with the
```

 1              public relations.

 2                   MR. COLLINS:  Right.  The public

 3              relations is part -- is not a separate

 4              entity.

 5                   THE COURT:  It is not?

 6                   MR. COLLINS:  No.  We are a general

 7              partnership.  I am one of two equity

 8              partners.  Then we have four people, you

 9              know, public relations, crisis management,

10              for the legal matters we're handling on

11              behalf of clients.  They assist us with --

12              there needs to be a press release that we

13              need to send out about what happened in court

14              yesterday related to litigation, not anything

15              to do with a new product for a client,

16              anything about the scope of what AMC was

17              doing.

18                   It's all in connection with litigation

19              that our clients are involved in, and we're

20              representing them in the that, and I say,

21              generally, we are just a litigation firm.  We

22              don't have a real estate department,

1          corporate department, tax department.  We are

2          a litigation firm.  And part of litigation is

3          dealing with statements made out in the world

4          about that litigation that have to be made at

5          some time in response, a lot of times, to

6          what was said by the other side.

7               THE COURT:  Okay.  In your role as the

8          litigation portion of the firm, would you be

9          -- would you have access to proprietary

10         information that relates to -- or

11         confidential information that relates to the

12         other party in this case?

13              MR. COLLINS:  I would have it in my role

14         as an attorney, yes.

15              THE COURT:  Attorney, yes.  That's

16         right.

17              MR. COLLINS:  Yes, absolutely I would

18         have access to it, just like they would have

19         of our clients.  So yes, I certainly would,

20         and that's where our point is:  The attorney

21         who's been admitted to practice on behalf of

22         his client is entitled to access to

```
 1              everything.
 2                   THE COURT:  And would that information
 3              be shared with the public relations portion
 4              of that -- of the Brewer Firm?
 5                   MR. COLLINS:  In connection with the
 6              litigation itself, I don't think so, your
 7              Honor.  No.  Now, if they --
 8                   MR. HUNDLEY:  Your Honor -- I'm sorry.
 9                   MR. COLLINS:  No, please.
10                   MR. HUNDLEY:  I just want to -- we've
11              proposed a protective order that would
12              prohibit the public relations unit employees
13              from having access to any of the discovery
14              designated "highly confidential."  We don't
15              object to that.
16                   THE COURT:  What's the problem with
17              that?
18                   MR. HUNDLEY:  They won't accept it.
19                   MR. DICKIESON:  Your -- your Honor, the
20              person who is most involved in public
21              relations, the person who is most dealing
22              with the press, is William Brewer.  William
```

1          Brewer is an attorney.  He's not one of the

2          four people in the unit.  The unit reports to

3          him.  He is the one who is the leading face.

4              We -- the last time we were here, the

5          Court spoke about creating a wall, and -- and

6          the wall -- walling off Mr. Collins from the

7          other members of his firm, particularly Mr.

8          Brewer, is something that we could -- we

9          could live with.  That's something that they

10          would not accept.  Even though Mr. Brewer is

11          not admitted pro hac vice in this case, and

12          even though Mr. Brewer cannot be admitted pro

13          hac vice in this case based on sanctions he

14          received in the Eastern District of Virginia,

15          that we are not -- we are not ready to share

16          information with Mr. Brewer that he can then

17          exploit.

18              And for a little background, your Honor,

19          Mr. Brewer is the brother-in-law of the CEO

20          of Ackerman McQueen and the son-in-law of the

21          recently deceased -- and this is another

22          development since the last hearing.  Angus

 1            McQueen died in the last month, and he was

 2            one of the -- he was the co-CEO of the

 3            business.  He is the father-in-law of Mr.

 4            Brewer.  So there's a Shakespearean tragedy

 5            that's taking place here of a family dispute,

 6            and the Ackerman McQueen people do not want

 7            to share their -- their confidential,

 8            proprietary information with the

 9            brother-in-law who was building up a public

10            relations business.  He's written an article

11            that we submitted to the Court in a prior

12            pleading about how you use public relations

13            in litigation, and he is, as -- as Mr.

14            Collins admitted in his statement just a

15            second ago, they do crisis management.

16                 That's exactly what Ackerman McQueen

17            does.  In the wake of -- of a mass shooting,

18            it's Mr. Brewer out front doing crisis

19            management for NRA, and he's billing them

20            what Ackerman McQueen used to bill for crisis

21            management in the wake of a mass shooting.

22            And so to say that they don't compete or that

1           because they're too small they can't compete,

2           they can still chew away at pieces, and

3           they're trying to hire people to take on new

4           roles, and the NRA is trying to hire away

5           Ackerman McQueen people to do the work that

6           Ackerman McQueen used to do under contract.

7                So there is active competition between

8           these parties.  There's crisis management

9           that overlaps between the parties, and we

10          think it's vital that this Court recognize

11          that Mr. Brewer is the head of the public

12          relations unit.  He's not just an attorney.

13          And then they've got these four people that

14          do something entirely different.  So that's

15          why we wouldn't agree to just walling off the

16          four people in the public relations unit.

17               MR. COLLINS:  When I used the words

18          "crisis management," it's not general crisis

19          management.  We don't represent any third

20          party, any client, unrelated to the specific

21          litigation we're working on with them, and

22          all it is is -- for example, your Honor, if a

1          decision comes out -- I think there's press

2          here today in this courtroom.  No problem

3          with that; it's an open courtroom.  But

4          they're only dealing with those type of

5          issues in connection with the litigation and

6          just limited to issues arising directly in

7          the litigation:  "What happened here today?

8          A reporter called and has a question.  What

9          happened today?"  So something like attorneys

10         would answer themselves.

11              MR. DICKIESON:  If I could respond, your

12         Honor.  We've asked in our discovery requests

13         for information about what Brewer Law Firm is

14         doing for the NRA, and they've refused to

15         answer those questions.  And so how can we

16         present evidence of what they're doing when

17         they refuse to give us that information?

18              So one of the things that -- that we are

19         trying to do is we are trying to take

20         discovery.  They've taken their three

21         depositions, three different states.  We

22         haven't been able to take any depositions.

Hearing                                              8/28/2019

```
 1              There was supposed to be a deposition

 2          yesterday that, because of this motions

 3          hearing, we were not allowed to take.  So we

 4          are being blocked from discovery.

 5              Rule 4.1(d) makes it very clear that

 6          they cannot dictate the order that we take

 7          discovery, and so we are trying to move

 8          forward, take the discovery that we're

 9          entitled to take, and they can't say -- well

10          first of all, I want the Court to recognize

11          we are not late on any discovery.  We have

12          complied timely with all the discovery

13          requests, and we have answered the request to

14          produce documents.  We've answered the

15          interrogatories, and we -- in our request to

16          produce document responses, we have said

17          objections, and then we will produce

18          documents, notwithstanding such objections,

19          as soon as the protective order is entered.

20              We're not late on any of that, and we

21          filed a motion for protective order, and --

22          and that's -- as soon as that's decided, we
```

24

Hearing                                                        8/28/2019

1              are ready to start rolling out documents by

2              this Friday, and -- and that's something that

3              I think is ignored when they say that we are

4              somehow deficient in our discovery responses.

5                   But because we have the right to ask NRA

6              employees what's in their mind, not "What did

7              you learn when you looked at AMC's

8              documents?" -- that's not what we're going to

9              ask them in -- in discovery depositions.

10             We're going to say, "What did you know?  And

11             when did you know it?  And why did you take

12             the action you took?"  Not, "What did you

13             learn from looking at the documents we

14             produced last week?"

15                   So they can't dictate what we're going

16             to do in the order of our discovery, and

17             that's what Rule 4.1(d)(1) states.  It's very

18             clear.  Rule 4.1(c) is also clear, and it

19             says they can get their protective order only

20             if they show oppression and -- and things

21             that they don't show when they say, "We can't

22             prepare our NRA employees for their

1            depositions."  That's not oppression.  That's

2            not undue expense that 4.1(c) is involving.

3                   So, therefore, we think that we're

4            entitled to move forward with our depositions

5            without regard to their not having received

6            documents they're going to receive anyway.

7            But they're trying to dictate how we go about

8            our discovery, and they can't do that.

9                   THE COURT:  Yes, sir.

10                  MR. HUNDLEY:  I guess just to -- that,

11           again, I mean, if there's a violation of

12           4.1(d), it's being caused by AMC.  Even Mr.

13           Dickieson just admitted their response was,

14           "We're not going to respond -- we're not

15           going to produce until we have the protective

16           order."  We're entitled to our discovery.

17           We're just asking the Court to -- to -- to

18           allow us to get the discovery we've asked for

19           before committing these depositions to go

20           forward.  I mean, Mr. Dickieson says, "We

21           don't want to ask them any questions."  We

22           don't know that.  We don't know what -- we

```
 1          have no idea what highly confidential

 2          discovery is that -- that they're seeking

 3          this protection order for.  They haven't

 4          given us any hint as to what it might be.

 5              So we're just simply asking the Court to

 6          equitably order the discovery in this case in

 7          a way that isn't going to affect the trial

 8          schedule, isn't going to do anything.  It's

 9          not going to slow it down.  So, again, I

10          think that request is very reasonable.

11              As -- as far as the protective order

12          that they're proposing, your Honor, they're

13          not -- they're seeking to -- the motion seeks

14          to exclude Mr. Collins, who's been admitted

15          as pro hac vice in this case.  He's an

16          officer of the Court, therefore, and a

17          licensed member of the Texas Bar and the New

18          York Bar in good standing.  And they're

19          seeking to exclude all of the legal

20          professionals at the Brewer Law Firm who can

21          be -- who will be working on this case.  The

22          NRA is entitled to have the full services of
```

```
 1              that law firm.  That's their counsel.

 2              They're entitled to that.  There's nothing

 3              before the Court, other than their sort of

 4              unfounded suspicions, that these lawyers and

 5              these legal professionals will not abide by

 6              the protective order of this Court.

 7                  They will be bound by it.  They will not

 8              be able to use any highly confidential

 9              discovery in any manner that does not comport

10              lawfully with the Court's order.  If they do,

11              this Court will know what to do about it.

12              But there's no evidence before the Court that

13              they won't do that, and that includes Mr.

14              Brewer.  There is not an ethical requirement

15              that he be walled off.  This is not -- this

16              is not a Rule 1.10 professional conduct

17              violation where he's got a conflict because

18              he's previously represented AMC and now

19              they're adverse.  It's not that situation.

20                  This is a situation under Rule 3.7

21              where, potentially, if he were an advocate in

22              this case, he might be a witness for the NRA.
```

```
 1              There's actually no conflict because the

 2              conflict under Rule 3.7 only arises when the

 3              testimony of the lawyer would be adverse to

 4              his client, and it won't -- it wouldn't be,

 5              and it will not be in this case.

 6                   Nevertheless, out of an abundance of

 7              caution, we have not sought Mr. Brewer's pro

 8              hac vice admission in this case, and so we

 9              fully, above and beyond the requirements of

10              -- of the law, actually dealt with the

11              ethical concerns that he potentially being a

12              witness have raised.  Even if there were a

13              conflict, even if his testimony was

14              potentially adverse to the NRA, which it's

15              not, but even if it were, the ethical

16              considerations are still clear.  He can

17              participate in preparing the case.  He simply

18              can't be an advocate at trial.  And we've

19              cited US v. Perry, as well as other cases,

20              which -- which make that distinction.

21                   This is not the case where he has --

22              where he's got a clear conflict under
```

```
 1            Rule 1.10, where, first, it'd have to be the

 2            consent of all parties that he -- that --

 3            that the law firm remain in the case, and

 4            then the attorney with the conflict has to be

 5            walled off.  This is a different situation

 6            and the ethical concerns are different, and

 7            we've properly addressed them.  So there's no

 8            reason why he can't help prepare the case

 9            under the constraints --

10                 THE COURT:  Even -- even if he's privy

11            to certain proprietary information that he

12            gained as a result of his prior

13            representation, can he -- can he -- can he

14            participate in preparing the case and use

15            information that he gained as his role

16            representing the NRA or anyone else?

17                 MR. HUNDLEY:  He's never represented

18            AMC.  So he doesn't have any of their

19            proprietary information I -- to the best of

20            my knowledge --

21                 THE COURT:  Is that correct?  All right.

22            Okay.
```

```
 1              MR. HUNDLEY:  So the question is --

 2              THE COURT:  But he is --

 3              MR. HUNDLEY:  -- if they produce it, can

 4         he be trusted to only use it in accordance

 5         with this Court's protective order?

 6              THE COURT:  That's correct.

 7              MR. HUNDLEY:  And that -- there's

 8         absolutely no evidence before the Court that

 9         he can't be.

10              THE COURT:  All right.

11              MR. HUNDLEY:  There's not.

12              THE COURT:  All right.  So now, as I

13         understand it, we have competing protective

14         orders; is that correct?  Or we only have one

15         which has a clause in it that walls off the

16         Brewer Firm?

17              MR. HUNDLEY:  We're simply -- yeah,

18         we're asking the Court today to craft

19         paragraph 7.3, yeah.  I think at this point,

20         there's one other issue.  They've asked that

21         the NRA -- that -- that we designate, on

22         behalf of the NRA, one corporate
```

1            representative who would be allowed to look

2            at the highly confidential information.  What

3            we would ask the Court to do is, one, allow

4            the NRA's general counsel, John Frazier,

5            who's here today, to look at the highly

6            confidential information as well as one

7            designated corporate representative.  And I

8            don't believe they object to that.

9                 THE COURT:  Any objection to that?

10                MR. DICKIESON:  No, your Honor.  The

11           only -- the only request we would have is

12           that any discovery designated by the NRA as

13           highly confidential be treated in the same

14           manner by the AMC -- by AMC, that they only

15           -- that they designate one person on their

16           side to look at it.  So we're just asking for

17           an equitable order that applies equally to

18           both people.

19                THE COURT:  Any objection to that?

20                MR. DICKIESON:  Yes, your Honor, because

21           it's not a parallel situation.  We're -- our

22           concern is not -- is not the lawyer as

```
 1              witness provision that -- that Mr. Hundley is

 2              talking about.  Our objection is that this is

 3              -- Mr. Brewer's law firm is a direct

 4              competitor with AMC.  There's no one at AMC

 5              who is a direct competitor with anyone at the

 6              NRA.  So there's no reason to limit AMC's

 7              staff, who has been working with the NRA for

 8              decades, from looking at documents that are

 9              turned over in discovery that aid us in the

10              preparation of our case.

11                   So there's -- there's no competitive

12              advantage that -- that AMC gets by looking at

13              those documents.  While, on the other hand,

14              there is a competitive advantage that the

15              Brewer Law Firm gets if -- if they happen to

16              -- to get that information and our -- our

17              intent in limiting it to one or two designees

18              of the -- of the NRA is because Mr. Brewer is

19              so involved with the NRA's representation

20              that he is going to have discussions with all

21              these people at the NRA.  There's been press

22              reports about how Mr. Brewer is actually
```

 1              dictating to the accounting staff about how

 2              to -- how to take actions and who's going to

 3              be paid first and who's going to be paid

 4              second.

 5                   So we're very concerned about multiple

 6              people at the NRA and their communications

 7              with the Brewer Law Firm where they have no

 8              concerns about the AMC that has been doing

 9              NRA business for decades and knows a lot of

10              the confidential information there to begin

11              with.

12                   THE COURT:  So what you're suggesting is

13              limited number of representatives from NRA

14              but unlimited with regard to Ackerman

15              McQueen?

16                   MR. DICKIESON:  Well, not necessarily

17              unlimited, but everybody who's going to be

18              looking at it is going to be -- have to be

19              advised to be aware of -- and they can even

20              send a form that they have to sign saying

21              that "We're being allowed to look at these

22              documents and we don't -- we won't disclose

Hearing                                          8/28/2019

```
 1              to anyone outside of the -- the privilege of

 2              this protective order," if they want to do it

 3              that way --

 4                   THE COURT:  Any objection to that?

 5                   MR. DICKIESON:  -- but --

 6                   MR. HUNDLEY:  I'm not -- I'm not sure I

 7              fully grasp what he's -- what he's

 8              suggesting.  I'm sorry, your Honor.  I just

 9              think the -- I think whatever order we craft

10              should be equitable --

11                   THE COURT:  It sounds like -- it sounds

12              like what you're suggesting is a separate

13              document every time someone looks at a

14              document from the opposing counsel or the

15              other party; is that correct?

16                   MR. DICKIESON:  Right.  There's a

17              standard practice in cases with a lot of

18              confidential information where you've got

19              different people reviewing it that these

20              people have to sign something saying that

21              they won't disclose it, or they're -- they'll

22              abide by the terms of the protective order.
```

 1            MR. HUNDLEY:  Yes, they have to.  Anyone

 2      who looks at highly confidential discovery in

 3      this case has to be bound by the protective

 4      order, and they can sign an affirmation that

 5      they've reviewed it and --

 6            THE COURT:  What's your objection?

 7            MR. HUNDLEY:  To that?  None.

 8            THE COURT:  None.  No objection.

 9            MR. HUNDLEY:  But it goes both ways.  I

10      mean, anyone at Ackerman McQueen who -- who

11      looks at highly confidential information

12      that's designated by the NRA would have to do

13      the same.  They're objecting to that.  I

14      don't quite understand their argument.

15      They're saying that we're not -- the NRA and

16      AMC don't compete with each other.  So I

17      don't understand why the competition between

18      the parties is an issue.

19            We just want the -- the whole purpose of

20      limiting the access to the highly

21      confidential information is you're balancing

22      the need to protect that information versus

1          the need to prepare your case.  And so if

2          we're going to limit our ability to prepare

3          the case in order to protect their

4          confidential information, they should do the

5          same, and that's all we're saying.

6               THE COURT:  Why shouldn't you do the

7          same?  And I think, from what I understand

8          he's saying, is that you don't think you have

9          to because you already have that information

10         based on your prior -- your prior

11         relationship with the NRA.  Is that what

12         you're saying?

13              MR. DICKIESON:  Yes, and the fact that

14         they're --

15              THE COURT:  So why is there a problem?

16              MR. DICKIESON:  There's no competitive

17         advantage that we get by looking at it

18         whereas if -- if -- we've already seen that

19         the Brewer Law Firm and the NRA have used

20         another client, another major client of

21         Ackerman McQueen, the Chickasaw Nation, and

22         used a document by one of the directors of

1              the Chickasaw Nation in the case, and we --

2              we're afraid that they will go and they'll

3              get into our documents, and they'll look more

4              -- for more information about the Chickasaw

5              Nation and start to take competitive --

6              anti-competitive action to take that client

7              away from us.  We're very concerned about

8              that.  We're not trying to take clients away

9              from the NRA.  There's -- there's nothing

10             we're trying to do there.  So it's not a

11             parallel situation.

12                  THE COURT:  Let's -- let's cut to the

13             point that what's -- what will apply with

14             regard to confidential information with

15             regard to NRA and Ackerman McQueen will be --

16             so whatever that he -- whatever your -- your

17             client or representatives from Ackerman

18             McQueen view as confidential, they'll have --

19             they will have to sign a document protecting

20             confidentiality, as well as the NRA.  So

21             both.

22                  MR. DICKIESON:  That's fine, your Honor.

```
 1                 THE COURT:  All right.

 2                 MR. DICKIESON:  And what about the

 3         limitations on the Brewer Law Firm?

 4                 MR. HUNDLEY:  That's -- that's the real

 5         issue, I think, as to who at the Brewer Law

 6         Firm should be allowed to view the highly --

 7         the highly confidential discovery.  Our

 8         position is we'll wall off from the public

 9         relations unit.  We don't object to that, but

10         any lawyer or legal professional at the

11         Brewer Law Firm -- there's no evidence that

12         those professionals will not abide by this

13         Court's order.  There's no evidence of that,

14         and so they should be allowed to look at it

15         and be bound by it and be required to follow

16         it, and that's -- that's our position.

17                 We should -- it shouldn't just be -- I

18         mean, not only should it be Mr. Collins,

19         who's been admitted in this case, but his

20         associate, his legal assistant.  We don't

21         know what the discovery is going to look

22         like.  It could be tremendously voluminous.
```

```
 1          It may require a lot of people to organize it

 2          and review it.  They'll all be bound by that

 3          order.

 4               MR. DICKIESON:  Your Honor, we don't

 5          have any problem with a wall between Mr.

 6          Bennett and the rest of the firm, and in that

 7          time, Mr. Bennett's side of the wall, his

 8          associate, and his legal assistant.  What

 9          we're concerned about is the public relations

10          unit that is run by Mr. Brewer, and that --

11          that's in a different office.  That's in New

12          York, and Mr. Brewer is in New York.  I don't

13          know where all the public relations people

14          are.

15               THE COURT:  Does Mr. Brewer practice

16          law?

17               MR. HUNDLEY:  He does.

18               THE COURT:  And will Mr. Brewer have any

19          involvement with this case?

20               MR. HUNDLEY:  He does.

21               MR. DICKIESON:  And they -- they admit

22          that in their -- their response, that he is
```

 1              actually involved in the strategy

 2              discussions.  He's the main driving force in

 3              this case, your Honor, but he's not pro hac

 4              vice because he's got problems with other

 5              courts where he has been sanctioned by a

 6              court in Texas, and he was denied pro hac

 7              vice status by the Eastern District of

 8              Virginia.  So that's why he's not here in

 9              this case now.

10                  MR. HUNDLEY:  That's actually not why

11              he's not here, your Honor.  He's not here out

12              of our ethical concern that he might be a

13              witness, and so rather than move him pro hac

14              vice and -- and deal with that, we took the

15              prudent course of not admitting him pro hac

16              vice, but he still is ethically allowed to

17              participate in the preparation of this case.

18              He's not a member of the trial team.  So his

19              involvement is less, but he's allowed to

20              participate.

21                  THE COURT:  But why?  Tell me why?  Why?

22              Why should he?

```
 1          MR. HUNDLEY:  Because he's been working

 2      with the NRA for 30 years, I think.  I'm

 3      sorry, but -- but he has -- he's intimately

 4      familiar with the NRA and the workings -- in

 5      their dealing with Ackerman McQueen.

 6          MR. DICKIESON:  He's been working with

 7      them for about a year and a half, is my

 8      understanding, and he knows the -- Ackerman

 9      McQueen because, as I say, he's the

10      brother-in-law of the CEO and the son-in-law

11      of the former co-CEO of Ackerman McQueen, and

12      his -- his wife -- well, his wife is the

13      daughter and sister of them.  So he is in a

14      family dispute trying to take over the

15      Ackerman McQueen PR business, and he's right

16      in the thick of things.  He's had all of

17      sorts of problems with the -- the Eastern

18      District of Virginia, which they have not

19      denied, in sanction and that was up held in

20      Texas for $173,000 for unethical behavior

21      there.

22          THE COURT:  We will agree that Mr.
```

Hearing                                                              8/28/2019

```
 1              Collins is a very competent attorney in this
 2              matter.  Would you not?
 3                   MR. COLLINS:  I hope so.
 4                   THE COURT:  I hope so.  I hope so, and
 5              I'm going to -- I'm going to grant the
 6              protective order with regard to Mr. Brewer,
 7              and if you believe that, at some point, that
 8              that has an impact on your ability to
 9              litigate this case, then you can come back to
10              this Court and ask the Court to reconsider.
11              But, at this stage, Mr. Brewer will be walled
12              off from any -- any involvement in the case.
13                   MR. DICKIESON:  And the PR unit, as
14              well, your Honor?
15                   THE COURT:  And the PR unit.  That's
16              correct.
17                   MR. HUNDLEY:  And well, just so we're
18              clear, he'll be walled off from the highly
19              confidential --
20                   THE COURT:  That's correct, highly
21              confidential.  That's right.  Absolutely,
22              absolutely.
```

```
 1              MR. HUNDLEY:  Discovery, that's

 2         designated by --

 3              THE COURT:  That's right.  Which then

 4         leads us to -- the next issue is -- with

 5         regard to the ongoing discovery, we have

 6         depositions that have -- have to be held; is

 7         that correct?

 8              MR. DICKIESON:  Yes, your Honor.

 9              THE COURT:  And with regard to this

10         protective order, that revolves that issue.

11         Does it not?

12              MR. DICKIESON:  We were supposed to have

13         a deposition tomorrow.

14              THE COURT:  Yeah.

15              MR. DICKIESON:  I don't think that

16         anyone is going to be ready for that because

17         we had to wait for the results of today, but

18         we -- we don't want any restriction with them

19         dictating when we can take a deposition of

20         whom, and that's what Rule 1 -- 4.1(d)

21         says --

22              THE COURT:  Let's -- let's make that
```

1            clear.  There won't be any restrictions.

2            You're going to follow the rules, and I don't

3            think that you're going to have any

4            discretion in terms of what you would -- the

5            rules say what they say.

6                 MR. DICKIESON:  Thank you, your Honor.

7                 THE COURT:  All right.  Yes, sir?

8                 MR. HUNDLEY:  Well, again, your Honor, I

9            mean, we're asking the Court to enter an

10           order requiring them to -- now that they've

11           got their protective order --

12                THE COURT:  They have to -- well, no

13           question.  You've got to -- you've got to

14           provide your discovery.  From what I

15           understand, you've not provided anything yet;

16           is that correct?

17                MR. DICKIESON:  No, your Honor.  We --

18           we've fully responded to interrogatories.  We

19           -- we've responded to the document request,

20           but we said we're not turning things over

21           that are confidential until the protective

22           order is in place.

```
 1              THE COURT:  Well, that's been resolved.

 2              MR. HUNDLEY:  Right.

 3              MR. DICKIESON:  And so we've already --

 4         my understanding is as of Friday, we're going

 5         to start the rolling process of turning

 6         things over, and we'll have a lot of

 7         documents for them to look at.

 8              THE COURT:  They will comply.  Do you

 9         want a deadline, Counsel?

10              MR. DICKIESON:  Your Honor, I --

11              MR. HUNDLEY:  If they can comply within

12         one week, we can begin scheduling the

13         depositions they're seeking the week after

14         that.

15              MR. DICKIESON:  Your Honor, I would -- I

16         would object.  That's a -- that's a subject

17         for motion to compel, to put a deadline on

18         us.  I think we're acting in good faith.

19         We've not been late with anything, and -- and

20         I think we're going to continue to be acting

21         in accordance with the rules, but I don't

22         think we should be -- have a motion to compel
```

```
 1          decided on the basis of no briefs and -- and

 2          nothing -- nothing for us to argue on.

 3               THE COURT:  Yes, sir.

 4               MR. HUNDLEY:  Well, your Honor, we

 5          didn't file -- we didn't with file a motion

 6          to compel because, one, I know the Court

 7          greatly disfavors those.  And the issue

 8          holding up the discovery, as I understood

 9          it --

10               THE COURT:  Is the protective order.

11               MR. HUNDLEY:  -- was the protective

12          order.

13               THE COURT:  And that --

14               MR. HUNDLEY:  So with that -- so we were

15          simply waiting for that to be resolved.  My

16          understanding was they could then produce the

17          discovery very quickly.  We're simply asking

18          for the Court to give us a chance to see that

19          discovery before these party depositions take

20          place so that we're properly prepared, and I

21          think we're entitled to ask the Court too.

22          It's equitable.  We've propounded the
```

1              discovery, and -- and we've litigated the

2              issues, and so we should have that benefit

3              before these witnesses take place.  We're not

4              violating Rule 4.1(d) by doing that, by

5              making that request to this Court.

6                   THE COURT:  So when do you think you

7              would be prepared to provide the discovery?

8                   MR. DICKIESON:  They've asked for a

9              massive amount of documents.  We're going to

10             start rolling production of it.  My

11             understanding is this Friday, there's going

12             to be, you know, in excess of 1,500

13             documents, 1,500 documents provided, and --

14             and there's going to be discovery all the way

15             in the next few months.  The trial is not

16             until April.  Documents are going to be

17             discovered and found, and it's a process.  I

18             don't want to have an order compelling us to

19             do anything when there's been no motion to

20             compel, and there's no reason for a motion to

21             compel because we're not late.

22                   THE COURT:  But you have an ongoing

```
 1              obligation to provide discovery.  So once you
 2              get started, then anything else that comes up
 3              than you simply need to provide the
 4              discovery.  That's -- that's pretty simple.
 5              Is it not?
 6                   MR. DICKIESON:  Yes, it is, but this is
 7              -- this is a huge business, and they've got
 8              to look at every cranny.  They're finding
 9              documents.  They're turning it over as they
10              find them, but there's a lot of documents
11              they've requested.  And so to put a timeline
12              that we have to have all of our documents
13              within a week, I don't think that's going to
14              be workable.
15                   THE COURT:  I think that's unfair to say
16              "all of the documents."  I'm not going to
17              have all the documents.  The discovery will
18              begin within 30 days, and it will be an
19              ongoing obligation to continue discovery as
20              deemed appropriate.
21                   MR. DICKIESON:  Discovery has already
22              begun.  We don't need a 30-day window.
```

```
 1              THE COURT:  Okay.  Well, that's --
 2         that's -- 10 days.
 3              MR. DICKIESON:  We're turning over
 4         documents as they are available.  We have to
 5         have them marked as confidential and things
 6         like that.  That's the process that's between
 7         now and Friday, but we will -- we just -- our
 8         point is that this is not a motion to compel.
 9         They can't compel us to produce things on
10         this -- on this hearing.
11              THE COURT:  You're correct.
12              MR. DICKIESON:  And so I don't want an
13         order saying we -- we got to do something as
14         a result of this hearing.
15              MR. HUNDLEY:  Your Honor, the issue is,
16         I mean, we're asking the Court to tell -- to
17         -- to -- well, what we're really asking the
18         Court to do is to set the deposition schedule
19         for the four witnesses that they've noticed
20         at this point.  One was -- one was noticed
21         for yesterday.  One was noticed for tomorrow.
22         Mr. Dickieson agrees that's just not doable,
```

```
 1            but there are two for next week, Wayne --
 2            Wayne LaPierre and one other individual whose
 3            name escapes me at the moment.  They're not
 4            available next week, right?  They're going to
 5            be in Alaska for the International Rifle
 6            Association.  They'll be preparing -- they
 7            have a -- they'll be preparing for the
 8            National Rifle Association conference, which
 9            is the following week in Alaska.
10                 THE COURT:  So when will they be
11            available?
12                 MR. COLLINS:  Your Honor, we can give
13            them dates.
14                 THE COURT:  Say again?
15                 MR. COLLINS:  We can get them dates
16            probably a couple of weeks right after that,
17            and we'll -- we will check and we'll get back
18            to them.
19                 THE COURT:  Okay.  Is that agreeable?
20                 MR. DICKIESON:  One caveat, your Honor,
21            and that is that we know that the -- with
22            respect to Wayne LaPierre's deposition,
```

```
 1              they're going to try their best to postpone

 2              and postpone and postpone him.  This Notice

 3              of Deposition has been out there for three

 4              weeks, and we haven't heard anything that's

 5              he's not available.  This is the first we've

 6              heard that, and -- and so I think that what's

 7              going to happen is that there's going to be a

 8              number of reasons -- and they haven't -- they

 9              haven't mentioned that they haven't turned

10              over the documents.  They were talking about

11              rolling production into January of next year

12              for their document production.

13                  And -- and so we're in the same

14              situation.  These are issues outside of the

15              motions of -- we just want -- we just want to

16              make sure they're not dictating to us when we

17              schedule our depositions.  And I appreciate

18              your Honor's help trying to get a schedule in

19              a couple of weeks, but I don't know if that's

20              going to happen, but we want to move forward

21              with the September 5th date for Mr.

22              LaPierre's deposition.
```

```
 1                 THE COURT:  And he's unavailable because

 2            he's at a conference; is that correct?

 3                 MR. COLLINS:  It's the Board of

 4            Directors meeting the following week.  So he

 5            spends the week beforehand getting ready for

 6            it to -- I guess if we got some documents on

 7            Friday, we're not going to get others.  So we

 8            still couldn't properly prepare, but we'll

 9            have them out there in a couple of weeks, and

10            what we'll agree to, your Honor --

11                 THE COURT:  So tell me when he will be

12            available for a deposition?

13                 MR. COLLINS:  I can check, your Honor,

14            right afterwards, but, let's say, certainly

15            in the next -- end of September, early

16            October.

17                 THE COURT:  No.  Let's -- let's do --

18            he's got a Board meeting on the 5th?  Did you

19            say the 5th of September?

20                 MR. COLLINS:  No.

21                 MR. HUNDLEY:  At the Court's indulgence.

22                 (Whereupon the parties spoke briefly
```

```
 1                among themselves.)

 2                     MR. HUNDLEY:  Your Honor, it's the --

 3                the conference will be, I believe, the 11th

 4                to the 14th of September.  My understanding

 5                is that he could be available the week of the

 6                23rd.

 7                     THE COURT:  Any objection to the 23rd?

 8                     MR. DICKIESON:  It sounds like he's

 9                available on the 5th, your Honor.  The whole

10                notion he's got to go to Alaska to prepare

11                for a conference for a week before doesn't

12                sound -- and they haven't given us notice of

13                that in the prior three weeks.

14                     MR. HUNDLEY:  I mean, we don't have Mr.

15                LaPierre here to confirm with him his

16                availability, either.  So he -- but --

17                     MR. DICKIESON:  My -- my colleague says

18                we'll -- we'll accept the week of the 23rd.

19                     THE COURT:  Week of the 23rd.  Done.

20                Yes, sir.  What's next?

21                     MR. DICKIESON:  I think that's it, your

22                Honor.
```

```
 1              MR. HUNDLEY:  Well, there are three

 2         other individuals that you noticed.  I mean,

 3         can we just work -- negotiate with -- amongst

 4         ourselves to confer and pick dates for them?

 5              THE COURT:  I think you all can solve

 6         that.

 7              MR. DICKIESON:  Yes.

 8              THE COURT:  You can -- and we have the

 9         order?  Or have you prepared the order?  Or

10         are we --

11              MR. DICKIESON:  We'll have -- we'll have

12         to go back to the office and prepare it to

13         resubmit it, your Honor.

14              THE COURT:  Thank you.  Thank you.

15              MR. HUNDLEY:  Thank you, your Honor.

16

17              (Whereupon the proceedings concluded at

18         12:03 p.m.)

19

20

21

22
```

```
 1

 2                      REPORTER CERTIFICATE

 3

 4          I, JACQUELINE N. HAGEN, Court Reporter and Notary

 5    Public, certify that the foregoing is a true and correct

 6    transcript of my shorthand notes so taken;

 7          I further certify that I am not a relative or

 8    employee of any attorney or of any of the parties not

 9    financially interested in this action.

10

11                      _____

12                      Jacqueline N. Hagen

13

14    Dated:  September 4, 2019

15

16

17

18

19

20

21

22
```

# EXHIBIT B-12

VIRGINIA:

## IN THE CIRCUIT COURT FOR THE CITY OF ALEXANDRIA

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Nos. CL19001757; |
| | ) | CL19002067 |
| ACKERMAN MCQUEEN, INC., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MERCURY GROUP, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## PROTECTIVE ORDER

1.      **PURPOSES AND SCOPE**

1.1      Disclosure and discovery activity in this Action are likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this Action may be warranted.  Accordingly, the Parties hereby stipulate to and petition the Court to enter the following Stipulated Protective Order (the "Order").

1.2      The purpose of this Order is to facilitate the production of discovery material, facilitate the prompt resolution of disputes over confidentiality and privilege, protect material to be kept confidential and/or privileged, and ensure that protection is afforded only to material entitled to such treatment, pursuant to the Court's inherent authority, its authority under the applicable Rules, the judicial opinions interpreting such Rules, and any other applicable law.  Except as otherwise stated in this Order, a Party shall produce, in response

1

to a valid discovery request, otherwise discoverable information in its possession, custody or control that is Confidential or Highly Confidential, and such information shall be handled in accordance with the procedures set forth herein.

1.3   This Order and all subsequent Protective Orders shall be binding on all Parties and their counsel in lawsuits entitled *NRA v. AMc, et al.* filed in the Circuit Court for the City of Alexandria with case Nos. CL19001757 and CL19002067 and any other persons or entities who become bound by this Order.

1.4   The Parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles. The Parties further acknowledge, as set forth in Section 12.3 below, that this Order does not entitle them to file confidential information under seal.

2.   **DEFINITIONS**

The following definitions apply for purposes of this Order:

2.1   Action: The lawsuits entitled *NRA v. AMc, et al.* filed in the Circuit Court for the City of Alexandria with case Nos. CL19001757 and CL19002067.

2.2   Challenging Party: a Party or Non-Party that challenges the designation of information or items under this Order.

2.3   Confidential Information: Discovery Material (regardless of how it is generated, stored, or maintained) or tangible things that qualify for protection under Rule 4.1(c) of the Rules of the Supreme Court of Virginia.

2

2.4     Counsel: Outside Counsel of Record, In-House Counsel, or counsel retained
for the purpose of advising, prosecuting, defending, or attempting to settle this Action.

2.5     Designating Party: a Party or Non-Party that designates documents,
information or items that it produces in disclosures or in responses to discovery as
"CONFIDENTIAL" or "HIGHLY CONFIDENTIAL."

2.6     Discovery Material: all items or information, regardless of the medium or
manner in which it is generated, stored, or maintained (including, among other things,
testimony, transcripts, answers to interrogatories, documents, responses to requests for
admissions, tangible things, and informal exchanges of information), that are produced or
generated in connection with any discovery in this Action, whether formally or informally.

2.7     Expert: a person retained by a Party or its Counsel to serve as an expert witness
or consultant or technical advisor in this Action (as well as his or her employees and support
staff).

2.8     Highly Confidential Information: Discovery Material that meets the definition
of "Confidential Information" and which the Designating Party reasonably believes to be
information reflecting non-public technical research, pricing and business strategy
documents concerning a particular product or service, financial statements reflecting sales
data, margin data, cost and expense data, human resources or personnel files, and/or profit
and loss data, sales information relating to specific customers or classes of customers, non-
public research, provided that the nonpublic information is actually secret because it is
neither known to, nor readily ascertainable by, another person or entity that can obtain
economic value from the disclosure or use of such information, the Designating Party has
taken reasonable measures to maintain the secrecy of that information and the Designating

3

Party derives independent economic value and a competitive advantage from the secrecy of that information, including, as the case may be, containing information where production of the materials on a confidential or non-confidential basis would nonetheless likely cause substantial harm.. Nothing herein precludes any Party from seeking additional protections not currently contemplated by this Order to be applied to any particular document or category of documents, including Highly Confidential Information.

2.9 In-House Counsel: attorneys who are employees of a Party to this Action. In-House Counsel does not include Outside Counsel of Record or any other outside counsel.

2.10 Non-Party: any natural person, partnership, corporation, association, or other legal entity not named as a Party to this Action, and their counsel.

2.11 Outside Counsel of Record: attorneys who are not employees of a Party to this Action but have been retained to represent or advise a Party to this Action and have appeared in this Action on behalf of that Party or are affiliated with a law firm which has appeared on behalf of that Party.

2.12 Party: any party to this Action.

2.13 Privileged Material: Discovery Material protected from disclosure under the attorney-client privilege, work product doctrine, or any other privilege or protection afforded or recognized by the Rules, including any such privilege or protection under applicable U.S. or foreign law, regulation or statute.

2.14 Producing Party: a Party or Non-Party that produces Discovery Material in this Action.

2.15 Professional Vendors: persons or entities that provide litigation support services (e.g., photocopying, videotaping, graphic support services, coding, translating, preparing

4

exhibits or demonstrations, document review, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

2.16 <u>Protected Material</u>: any Discovery Material that is designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL."

2.17 <u>Receiving Party</u>: a Party that receives Discovery Material from a Producing Party.

3. **SCOPE**

3.1 The protections conferred by this Order apply to Protected Material (as defined above) and also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, translations, or compilations of Protected Material; and (3) any oral, written, or electronic communications, testimony or presentations, including for purposes of settlement, by Parties or their Counsel that might reveal Protected Material. However, the protections conferred by this Order do not cover information that is in the public domain at the time of disclosure to a Receiving Party or becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order.

3.2 This Order and its protections apply for pre-trial purposes only. The Parties will meet and confer at the appropriate time regarding any use of Protected Material at trial, which use shall be governed by a separate agreement or order.

4. **DURATION**

4.1 Even after final disposition of this Action, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing or a court order otherwise directs. Final disposition shall be deemed to be the later

5

of (1) dismissal of all claims and defenses in this action, with or without prejudice; or (2) final judgment herein after the completion and exhaustion of all appeals, rehearings, remands, trials, or reviews of this action, including the time limits for filing any motions or applications for extension of time pursuant to applicable law.

5.    **DESIGNATING PROTECTED MATERIAL**

5.1    Manner and Timing of Designations. Except as otherwise provided in this Order (*see, e.g.*, Section 5.2.4 below), or as otherwise stipulated or ordered, Discovery Material that qualifies for protection under this Order must be clearly so designated at the time the material is disclosed or produced. The Parties shall make Confidential and Highly Confidential designations in good faith to ensure that only those documents or testimony that merit Confidential or Highly Confidential treatments are so designated. Either designation may be withdrawn by the Designating Party. If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection, the Designating Party must promptly notify all other Parties that it is withdrawing the mistaken designation.

5.2    Designation in conformity with this Order requires the following:

5.2.1 *Marking*. All or any part of a document, discovery response, or pleading disclosed, produced, or filed by a Producing Party may be designated Confidential or Highly Confidential by marking the appropriate legend ("CONFIDENTIAL" or "HIGHLY CONFIDENTIAL") on the face of the document and each page so designated. With respect to tangible items, the appropriate legend shall be marked on the face of the tangible item, if practicable, or by written notice to the Receiving Party at the time of disclosure, production or filing that such tangible item is Confidential or Highly Confidential or contains such

6

information. With respect to documents produced in native format, the Electronically Stored Information Protocol, or ESI Protocol, to be entered in this Action shall govern the form and method for marking such documents as Confidential or Highly Confidential.

5.2.2 A Receiving Party shall exercise good faith efforts to ensure that any copies, print-outs of natively produced documents or data, excerpts, summaries, or compilations include a confidentiality legend that matches the confidentiality designation the Designating Party applied to the document, discovery response, transcript, or pleading.

5.2.3 *Timing.* Except as otherwise provided herein and documents that have already been produced, documents and other objects must be designated before disclosure or production. In the event that a Producing Party designates some or all of a witness's deposition or other pre-trial testimony (or related exhibits) Confidential or Highly Confidential, such designation may be made on the record of the deposition or hearing or within thirty (30) calendar days after receipt of the final transcript of such deposition or hearing. The specific page and line designations over which confidentiality is claimed must be provided to counsel for the Parties within thirty (30) calendar days of receipt of the transcript in final form from the court reporter except counsel may agree to extend such period. Deposition or pre-trial testimony shall be treated as Highly Confidential pending the deadline or, if applicable, extended deadline for designation. After the expiration of that period, the transcript shall be treated only as actually designated.

5.2.4 For information produced in some form other than documentary and for any other tangible items, the Producing Party shall affix in a prominent place on the exterior of the container or containers in which the information or item is stored the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL." If the Protected Material is

7

produced in an electronic form with a load file, the Designating Party shall note that there is Protected Material in the load file. If only a portion or portions of the information or item warrant protection, the Producing Party, to the extent practicable, shall identify the protected portion(s).

     5.3   Inadvertent Failures to Designate. Accidental or inadvertent disclosure of Protected Material—including Protected Material inadvertently disclosed by failure to redact as set forth in Section 11—does not waive the confidential status of such information or any privilege or other protection attached thereto. In the event that Protected Material is inadvertently disclosed without appropriate designations, any Party or Non-Party may thereafter reasonably assert a claim or designation of confidentiality, and the Producing Party shall promptly provide replacement media. Thereafter, the Receiving Party must promptly return the original information and all copies of the same to the Producing Party, or destroy the original information and all copies, and make no use of such information. In the event that Protected Material is inadvertently disclosed to any person and such disclosure is not permitted by the terms of this Order, the Party making the inadvertent disclosure shall promptly notify the Producing Party of such inadvertent disclosure within 10 calendar days of learning of it and will make all reasonable efforts to ensure the original and all copies of inadvertently disclosed information are not used and are promptly returned or destroyed.

## 6.   CHALLENGING CONFIDENTIALITY DESIGNATIONS

     6.1   Timing of Challenges. A challenge to a designation of confidentiality may be made at any time. Unless a prompt challenge to a Designating Party's confidentiality designation is necessary to avoid foreseeable, substantial unfairness, unnecessary economic burdens, or a significant disruption or delay of the litigation, a Party does not waive its right

8

to challenge a confidentiality designation by electing not to mount a challenge promptly after the confidentiality designation is made.

6.2 Form of Challenges. The Challenging Party shall object to the propriety of the designation of specific material as Confidential or Highly Confidential by providing written notice to the Designating Party of each designation it is challenging and describing the basis for each challenge. To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the challenge to confidentiality is being made in accordance with this specific Section of this Order. The Designating Party or its counsel shall thereafter, within fourteen (14) calendar days, respond to such challenge in writing by either: (i) agreeing to remove the designation; or (ii) stating the reasons for such designation. Counsel may agree to reasonable extensions.

6.3 Meet and Confer. If the Challenging Party continues to dispute the designation(s) at issue, it shall notify the Designating Party in writing within seven (7) calendar days thereafter. Counsel may agree to reasonable extensions. The Parties shall attempt to resolve each challenge in good faith by conferring directly (in voice-to-voice dialogue; other forms of communication are not sufficient). A Challenging Party may proceed to the next stage of the challenge process only if it has engaged in this meet-and-confer process first or establishes that the Designating Party is unwilling to participate in the meet-and-confer process in a timely manner.

6.4 Judicial Intervention. If the Parties cannot resolve a challenge without court intervention, the Challenging Party may move the Court for an order withdrawing the designation as to the specific designations on which the Challenging Party and the Designating Party could not agree, within fourteen (14) calendar days of the Parties agreeing

9

that the meet-and-confer process will not resolve their dispute. Each such motion must be accompanied by a competent declaration affirming that the movant has complied with the meet-and-confer requirements imposed in the preceding Section.

6.5     The burden of persuasion in any such challenge proceeding shall be on the Designating Party. While a challenge is pending, all Parties shall continue to afford the material in question the level of protection to which it is entitled under the Designating Party's designation until the Court orders otherwise.

6.6     If a Designating Party or the Court identifies or determines that material that had been designated as Protected Material should no longer be so designated, that material will no longer be subject to the restrictions designated herein for the treatment of Protected Material.

7.     **ACCESS TO AND USE OF PROTECTED MATERIAL**

7.1     Basic Principles. A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in this Action only for prosecuting, defending, or attempting to settle this Action, including any appeal(s), so long as such use is permitted herein. Any Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. After the final disposition of the Action, a Receiving Party must comply with the provisions of Section 13 below (FINAL DISPOSITION). Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

7.1.1 Except as otherwise provided in this Order, Counsel in this Action and any of their agents shall be prohibited from sharing with anybody any Protected Material, or

10

any information derived from or based on any Protected Material, in connection with any investigation, proceeding, or contemplated proceeding.

      7.2     <u>Restrictions on Use of Confidential Information</u>. Unless otherwise ordered by the Court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to:

      7.2.1 the Receiving Party's Counsel (including their employees and support staff);

      7.2.2 the officers, directors, and employees of the Receiving Party to whom disclosure is reasonably necessary for this Action;

      7.2.3 Experts retained by the Receiving Party or the Receiving Party's Counsel to whom disclosure is reasonably necessary for this Action;

      7.2.4 the Court and its personnel, and any appellate court or other court (and their personnel) before which the Parties appear in this Action;

      7.2.5 special masters or discovery referees appointed by the Court;

      7.2.6 mediators and their staff;

      7.2.7 court reporters and their staff, professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this Action;

      7.2.8 potential or actual witnesses in the Action to whom disclosure is reasonably necessary, unless otherwise agreed by the Designating Party or ordered by the Court;

      7.2.9 the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information; and

7.2.10 any other person to whom the Designating Party, in writing, authorizes disclosure.

7.2.11 any person or entity who receives information designated CONFIDENTIAL pursuant to this Protective Order shall (1) agree to be bound by the terms of this Protective Order and (2) execute the document attached hereto as Exhibit "1."

7.3    Restrictions on Use of Highly Confidential Information.

Unless otherwise provided for herein, information designated Highly Confidential by either party shall not be disclosed. However, notwithstanding the above, information designated in good faith as "HIGHLY CONFFIDENTIAL" may be disclosed to counsel for the NRA, AMc, and/or Mercury Group and each of their respective employees or representatives who (1) agree to be bound by the terms of this Protective Order and (2) execute the document attached hereto as Exhibit "1"; provided, however, that such any representative shall not discuss, disclose, summarize, describe, characterize, or otherwise communicate or make available such information to any person or entity prohibited by this Protective Order from accessing HIGHLY CONFIDENTIAL information and/or documents. Similarly, information designated HIGHLY CONFIDENTIAL may be shared with experts and Court personnel, provided that the disclosing party obtains written assurance that such experts will protect the confidentiality of the information and that the Court personnel will keep such information under seal.

HIGHLY CONFIDENTIAL information may not be disclosed or disseminated to William A. Brewer or to personnel within Brewer, Attorneys and Counselors who are members of the Public Relations Unit of the firm, including Travis Carter, Andrea Burnett,

12

Katherine Unmuth, Holly Heidemanns, and Lea Gamino-Blum, unless and until relief is obtained from the Court.

## 8.   PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION

8.1   If a Party is served with a subpoena or a court order issued in other litigation that compels disclosure of any Protected Material, that Party must:

8.1.1 promptly notify in writing the Designating Party unless prohibited by law from doing so.  Such notification shall include a copy of the subpoena or court order;

8.1.2 promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Order.  Such notification shall include a copy of this Order; and

8.1.3 cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.

8.2   If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any Protected Material before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission.  The Designating Party shall bear the burden and expense of seeking protection of its Protected Material, and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this Action to disobey a lawful directive from another court.

## 9.   A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS ACTION

9.1   The terms of this Order are applicable to Protected Material produced by a Non-Party in this Action.  Such information produced by Non-Parties in connection with

13

this Action is protected by the remedies and relief provided by this Order. Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

10. **UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL**

10.1 If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures; (b) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order; and (c) make all reasonable efforts to retrieve all unauthorized copies of the Protected Material.

11. **REDACTIONS ALLOWED**

11.1 Any Producing Party may redact from Discovery Material matter that the Producing Party claims is Privileged Material. The Producing Party shall ensure that the redaction is obvious to the Receiving Party and specify the basis for the redaction as appropriate. Where a document consists of more than one page, at least each page on which information has been redacted shall be so marked. If counsel for the Producing Party agrees or if the Court orders that Discovery Material initially redacted shall not be subject to redaction or shall receive alternative treatment, and the Discovery Material is subsequently produced in unredacted form, then that unredacted Discovery Material shall continue to receive the protections and treatment afforded to documents bearing the confidentiality designation assigned to it by the Producing Party.

14

11.2 The right to challenge and process for challenging the designation of redactions shall be the same as the right to challenge and process for challenging the designation of Confidential Information and Highly Confidential Information as set forth in Section 6.

11.3 Nothing herein precludes any Party from seeking the other Parties' consent or an order allowing the Party to redact nonresponsive matter from otherwise responsive documents on a case-by-case basis.

## 12. **MISCELLANEOUS**

12.1 Right to Further Relief. Nothing in this Order abridges the right of any person to seek its modification by the Court in the future. Any Party, entity or person covered by this Order may at any time apply to the Court for relief from any provision of this Order. Subject to the agreement of the Parties or an order of the Court, other entities or persons may be included in this Order by acceding to its provisions in a writing served upon counsel for the Parties, with such writings to be filed with the Court if so directed.

12.2 Right to Assert Other Objections. By stipulating to the entry of this Order, no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Order. Similarly, no Party waives any right to object on any ground to use as evidence any of the material covered by this Order.

12.3 Filing Protected Material. Without written permission from the Designating Party or a court order secured after appropriate notice to all interested persons, a Party may not file in the public record in this Action any Protected Material. A Party that seeks to file under seal any Protected Material must do so pursuant to the local rules.

12.4 Hearings and Appeals

12.4.1 In the event that a Receiving Party intends to utilize Protected Material during a pre-trial hearing, such Receiving Party shall provide written notice no less than three (3) calendar days prior to the hearing, to the Producing Party and/or the Designating Party, except that shorter notice may be provided if the Receiving Party could not reasonably anticipate the need to use the document at the hearing three (3) calendar days in advance, in which event notice shall be given immediately upon identification of that need. The use of such Protected Material during the pre-trial hearing shall be determined by agreement of the relevant Parties or by Order of the Court.

12.4.2 In the event that any Protected Material is used in any court proceeding in this Action or any appeal in connection with this Action, except for the use of Protected Material during trial, the manner of which shall be determined pursuant to Section 3.2, such Protected Material shall not lose its protected status through such use. Counsel shall comply with all applicable local rules and shall confer on such procedures that are necessary to protect the confidentiality of any documents, information, and transcripts used in the course of any court proceedings, including petitioning the Court to close the courtroom.

12.5 Reservations. Entering into, agreeing to or complying with the provisions of this Order shall not: (1) operate as admission that any particular material contains Protected Material; or (2) prejudice any right to seek a determination by the Court (a) whether particular material should be produced, or (b) if produced, whether such material should be subject to the provisions of this Order.

13.  **FINAL DISPOSITION**

13.1 Within ninety (90) calendar days after the final disposition of this Action, as defined in Section 4, each Receiving Party, including its employees, attorneys, consultants

16

and experts, must use commercially reasonable efforts to destroy or return to the Producing Party all Protected Material, except (1) backup tapes or other disaster recovery systems that are routinely deleted or written over in accordance with an established routine system maintenance practice, or (2) documents that must be preserved as federal records or in compliance with other statutory, regulatory or legal authorities. As used in this Section, "all Protected Material" includes all originals, copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of the Protected Material. Whether the Protected Material is returned or destroyed, upon request of the Producing Party, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 90-day deadline that (1) states that commercially reasonable efforts have been made to assure that all Protected Material has been returned or destroyed, and (2) affirms that the Receiving Party has not retained any originals, copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits. expert reports, attorney work product (including all emails attaching or referring to Protected Materials), and consultant and expert work product, even if such materials contain Protected Material. Any such archival copies that contain or constitute Protected Material remain subject to this Order as set forth in Section 4 (DURATION).

**IT IS SO ORDERED.**

DATED: October 8, 2019

Alexandria Circuit Court Judge

17

SEEN *AND AGREED*

DATED: _September 23, 2019_ _[signature]_
_____
Attorney for Plaintiff
Robert H. Cox
VA Bar 33118

DATED: _____ _[signature]_
_____
Attorney for Defendant
DAVID H. DICKIESON
VA BAR 31268

4820-5217-3221.1

18

## EXHIBIT 1 TO PROTECTIVE ORDER

**VIRGINIA:**

## IN THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA

**NATIONAL RIFLE ASSOCIATION OF
AMERICA,**

　　　**Plaintiff,**

v.

**ACKERMAN MCQUEEN, INC.**

　　**And**

**MERCURY GROUP, INC.**

　　　**Defendants.**

**Case Nos. CL19001757,
CL19002067**

## ACKNOWLEDGEMENT OF AND AGREEMENT TO BE BOUND BY PROTECTIVE ORDER

　　　I, the undersigned, state that:

　　　I have reviewed the Protective Order in this matter.

　　　I hereby agree to be bound by and comply with the terms of the Protective Order.


DATED this _____ day of , _____, _____


_____
(Typed or Printed Name)


_____
(Signature)

# EXHIBIT B-13

# *CONFIDENTIAL*

# *FILED UNDER SEAL*

# EXHIBIT B-14


# *CONFIDENTIAL*

# *FILED UNDER SEAL*

# EXHIBIT B-15

# ProPublica Says Attorney Bill Brewer Keeps Burn Books

**D** **dmagazine.com**/frontburner/2019/07/propublica-says-attorney-bill-brewer-keeps-burn-books

July 31, 2019



You may be aware that cutthroat Dallas attorney Bill Brewer provides outside counsel to the NRA. As such, he's sometimes the one out in front of reporters defending the NRA from claims of, say, self-dealing. That happened <u>as recently as May</u>. He's everywhere in this April <u>*New Yorker* slice</u> on the organization's inner dysfunction and money problems, as well.

But now comes this <u>combined ProPublica, The Trace, and *New Yorker* exposé</u> on Brewer's own tactics within the organization. A former NRA treasury type accuses him in a letter obtained by the publications of intimidating staff into paying his firm crazy cash—$24 million over 13 months, or $97,000 a day. It contains one fun detail, the type that's fun in a temporarily-distract-you-from-the-soulless-organization-he-stands-with kind of a way. To do so, he, according to this former senior employee named Emily Cummins, compiled "burn books." They were "filled with personal information that he could use against individuals."

> "Cummins accuses Brewer of trying to intimidate, deceive and silence NRA staff who were processing his bills while some accountants were growing increasingly troubled by the organization's mismanagement, exorbitant spending and questionable deals involving conflicts of interest. Former Brewer colleagues as well as written correspondence obtained by ProPublica broadly supported her claims."

Her own words:

> "I witnessed what appeared to be unrealistic and duplicative billing from Bill Brewer," Cummins wrote. "I witnessed that Bill Brewer himself created a 2018 cash flow crunch by interfering with accounts payable to prioritize paying himself immediately versus other NRA vendors that had been providing goods or services for months without payment, also jeopardizing the NRA's biweekly staff payroll."

Brewer's firm denies those allegations and says the fees are standard.

But burn books? Like in *Mean Girls?*

# EXHIBIT B-16

4/12/19

**V I R G I N I A:**

IN THE CIRCUIT COURT FOR THE
CITY OF ALEXANDRIA

| | |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| ACKERMAN MCQUEEN, INC., | ) |
| | ) |
| and | ) |
| | ) |
| MERCURY GROUP, INC. | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

Civil Case No. CL19001757

**COMPLAINT**

COMES NOW the Plaintiff, the National Rifle Association of America (the "NRA"), and files this Complaint against Defendants Ackerman McQueen, Inc. ("Ackerman") and Mercury Group, Inc. ("Mercury" and, collectively with Ackerman, "AMc"), based on personal information as to its own actions and on information and belief as to all other matters, as follows:

**PRELIMINARY STATEMENT**

The NRA seeks specific performance of an unambiguous books-and-records inspection right contained in a longstanding contract with one of its most important third-party vendors: the advertising agency Ackerman McQueen.

The NRA and Ackerman have collaborated fruitfully for decades. Together, the parties crafted iconic, impactful Second Amendment messaging that featured Charlton Heston ("from my cold, dead hands") and other important constitutional rights advocates. The impasse between them which gives rise to this lawsuit is simple, and baffling: the NRA requested access to material, readily available records that Ackerman and Mercury are contractually obligated to provide. Defendants refused to provide them.

For the better part of a year, the NRA has negotiated with AMc and appeased its demands in an effort to coax compliance with the parties' contract. However, the NRA's patience has run out. Confronting escalating concerns about AMc's activities and accounting practices, the NRA seeks access to basic business records—including *budgets purportedly approved by the NRA*, copies of *material contracts for which the NRA is purportedly liable*, and *readily available performance data*—all to inform the judgment of its fiduciaries. The NRA has an undisputed contractual right to examine these documents. Indeed, its contract with AMc entitles the NRA, upon "reasonable notice," to examine any and all "files, books, and records" of both Ackerman and Mercury which pertain to matters covered by the parties' contract. Since July 2018, the NRA has provided more-than-reasonable notice of its desire to view key items. In some instances, AMc has affected partial compliance with the NRA's requests—in other cases, it has rebuffed or baldly ignored the NRA's letters. This situation cannot continue.

There is no adequate remedy at law which would compensate the NRA for the risks and burdens posed by AMc's concealment of material business records. Fortunately, there is a straightforward remedy at equity: specific performance by Ackerman and Mercury of their obligation to furnish documents. This is the relief the NRA seeks.

## PARTIES

1.      Plaintiff NRA is a not-for-profit corporation organized under the laws of the State of New York with its principal place of business located in Fairfax, Virginia. The NRA is America's leading provider of gun-safety and marksmanship education for civilians and law enforcement. It is also the foremost defender of the Second Amendment of the United States Constitution.  A 501(c)(4) tax-exempt organization, the NRA has over five million members— and its programs reach many millions more.

2.      Defendant Ackerman is a nonresident for-profit business corporation organized under the laws of the State of Oklahoma with its principal place of business in Oklahoma City, Oklahoma. Ackerman is an advertising and public relations agency that has counted the NRA among its largest clients for more than thirty years.

3.      Defendant Mercury Group, Inc. ("Mercury" and, collectively with Ackerman pursuant to the Services Agreement, "AMc") is a nonresident for-profit business corporation organized under the laws of the State of Oklahoma with its principal place of business in Alexandria, Virginia. Mercury is a wholly owned subsidiary of Ackerman which specializes in public-communications strategy, including on behalf of advocacy groups such as the NRA. At all relevant times, Ackerman has acted on behalf of both itself and Mercury pursuant to the Services Agreement (defined below) between Ackerman and the NRA.

## RELEVANT NONPARTIES

4.      The NRA Foundation, Inc. (the "NRA Foundation") is a 501(c)(3) tax-exempt organization that raises tax-deductible contributions in support of a wide range of firearm-related public interest activities of the NRA and other organizations that defend and foster the Second

Amendment rights of law-abiding Americans. Over the course of its contractual relationship with the NRA, Ackerman has occasionally performed services for the benefit of the NRA Foundation and issued corresponding invoices to the NRA Foundation. Because of its 501(c)(3) designation, the NRA Foundation is permitted to engage in, and fund, a narrower range of activities and communications than the NRA.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over the NRA's claims in this matter as the claims are subject to a court of general jurisdiction.

6.      This Court has jurisdiction over Ackerman and Mercury pursuant to Virginia Code § 8.01-328.1 because Ackerman and Mercury have both transacted business in the Commonwealth of Virginia and contracted to supply services in the Commonwealth of Virginia.

7.      Venue is proper in this Court pursuant to Virginia Code § 8.01-262 because Mercury's principle place of business is located in Alexandria, there exists a practical nexus to this forum, and/or a part of this cause of action arose in Alexandria.

8.      Additionally, jurisdiction and venue are proper in this Court because Ackerman and Mercury have both contractually consented with the NRA to exclusive jurisdiction and venue of courts sitting within Virginia and waived any objection to venue in Alexandria, Virginia regarding the matters presented herein.

## FACTUAL BACKGROUND

### A.      For More Than Thirty Years, the NRA Has Relied on AMc to Provide Public-Affairs Advice and Services Under Carefully Negotiated Contracts.

9.      For decades, AMc and the NRA have collaborated closely regarding public affairs and messaging. Over that time, the NRA vested extensive trust and confidence in AMc, relying

upon the agency to perform work including: public relations and strategic marketing; planning and placement of media; management of digital media and websites; and, the operation of NRATV, a digital-media platform managed by AMc but frequently perceived by the public as the "voice" of the NRA.[1]

10.     Since at least 1999, AMc's work on behalf of the NRA has been governed by successive incarnations of a Services Agreement containing detailed specifications for how various types of work performed by AMc for the NRA should be budgeted and billed. The Services Agreement between the NRA and AMc dated May 1, 1999 (the "Previous Services Agreement") as well as the current, operative Services Agreement dated April 30, 2017 (as amended May 6, 2018, the "Services Agreement") provide that certain categories of services, such as Owned Media and Internet Services, are compensated with an agreed annual fee, while others are required to be invoiced on an *ad hoc* basis based on estimates furnished by AMc and approved by the NRA.

11.     Both the Previous Services Agreement and the current Services Agreement have obligated AMc to adjust its pricing based on the "fair market value" or "fair market price" of the services performed. For example, the Previous Services Agreement contained the straightforward assurance by AMc, "we will charge you a fair market price for the work performed." Similarly, the Previous Services Agreement and the current Services Agreement require AMc to provide cost quotations for art concepts, design layouts, and similar items "based on the fair market price of the work as determined by AMc."

12.     Anticipating that AMc would, from time to time, incur out-of-pocket expenses in the course of its work, but mindful of the NRA's mandate to steward its funds in the interest of its

---

[1] *See, e.g.*, Jeremy W. Peters & Katie Benner, *Where The N.R.A. Speaks First and Loudest*, THE NEW YORK TIMES, February 21, 2018. https://www.nytimes.com/2018/02/21/us/politics/nratv-nra-news-media-operation.html.

public mission, the parties bargained for an expense-reimbursement protocol whereby travel and related expenses incurred by AMc could be paid by the NRA—but only upon prior written approval from the NRA in accordance with the NRA's expense-reimbursement procedures.

13.     The NRA's collaboration with AMc has generated important, iconic Second Amendment advocacy. In recent years, the trust and confidence it placed in AMc led the NRA to invest in an expanding suite of services which were—according to AMc's assurances—fairly priced. For example, the NRA agreed to experiment with an "owned media company," NRATV, a concept fervently pitched by AMc. By 2017, the NRA's aggregate payments to Ackerman and Mercury totaled nearly $40 million annually.

14.     As the scope of AMc's work for the NRA grew, AMc represented to the NRA that it was required to hire a substantial number of personnel, as well as incur obligations to third-party contractors, for the exclusive purpose of servicing the NRA's account. Accordingly, when the parties renegotiated a new services agreement in 2017, AMc insisted upon—and the NRA agreed to provide—certain financial assurances in the event that the NRA terminated the Services Agreement. Among other things, upon the NRA's termination, the Services Agreement requires that the NRA compensate AMc for outstanding liabilities to both third-party contractors and employees. Specifically, the NRA must: (i) pay AMc the balance of any compensation owed under "non-cancellable contracts entered into between AMc and third parties for the benefit of the NRA" (as defined under the Services Agreement, the "AMc-Third Party NRA Contracts"); and (ii) pay AMc a termination fee to cover severance payments owed to AMc employees who are "dedicat[ed] . . . . to provide services [to the NRA]" and need to be laid off if the Services Agreement is terminated (the "NRA-Dedicated Personnel").

**B.     The NRA Bargained for Transparent Insight Into AMc's Books and Records.**

15.     The NRA bargained for transparency into AMc's files, books and records to ensure that the NRA, a not-for-profit, could appropriately monitor the use of its funds. Both the Previous Services Agreement and the current Services Agreement incorporate records-examination clauses that require AMc to open its files for the NRA's inspection upon reasonable notice. The full text of the Records-Examination Clause in the Services Agreement appears below:



**VIII.  EXAMINATION OF RECORDS**
During the term of this Services Agreement, AMc authorizes NRA, upon reasonable notice, to examine AMc and Mercury's files, books and records, with respect to matters covered under this Services Agreement.

16.     For years, the NRA conducted annual audits of certain AMc files pursuant to the Records-Examination Clause. Frequently, the audited records consisted of "samples" assembled in advance by AMc. During 2018, the NRA sought to expand its insight into AMc's activities and its spending—including full access to certain categories of records rather than sample subsets gathered by AMc. Surprisingly and unfortunately, that effort ignited the parties' current dispute.

**C.     In Response to Concerns From NRA Employees and Stakeholders, the NRA Attempts to Exercise Its Contractual Record-Examination Right—But Is Rebuffed.**

17.     In late 2016, the State of New York amended its Not-for-Profit Corporation Law (the "NPCL") to clarify requirements for director independence and the ratification of related-party contracts, among other items. After updating its internal policies and controls to comply with the New York amendments, the NRA decided to strengthen its procedures for documentation and verification of compliance with vendor contracts. Beginning in August 2018, the NRA sent letters to hundreds of vendors—including AMc—that set forth updated invoice-support

requirements and provided detailed guidance regarding, for example, expense reimbursement procedures.

18.     During the course of this process, the NRA developed concerns that AMc's expenses and activities required closer oversight.  Specific concerns that the NRA sought to investigate included:

- "Out of pocket" expenses that lacked meaningful documentation of NRA approvals, receipts, or other support, despite the requirements set forth in the Services Agreement;

- Lack of transparency regarding AMc's annual budgets under the Services Agreement, as well as its adherence to those budgets;

- Lack of transparency regarding "fair market value" determinations;

- Concerns that AMc was invoicing the NRA for the entire salaries attributable to NRA-Dedicated Personnel, despite certain NRA-Dedicated Personnel allocating substantial time to non-NRA clients;

- Refusal to provide certain requested data "in writing" (such as unique visitors, viewership numbers, clickthrough rates, or related performance metrics) that enable the NRA analyze the return on its investment in NRATV.[2]

19.     During early- and mid-2018, the NRA sought information from AMc pursuant to the Records-Examination Clause on a common-interest basis to advance the parties' mutual interests in connection with an ongoing lawsuit.  However, after the NRA began to request access to records that would shed light on the above topics, AMc's responses became evasive and hostile. In fact, in September 2018, for the first time in the parties' decades-long course of dealing, AMc demanded that its outside counsel supervise any document review conducted under the Records-Examination Clause, then demanded payment of outside counsel's legal fees as a precondition for delivery of video footage for which AMc had already invoiced the NRA.  During a telephone call

---

[2] In addition, certain NRA stakeholders were also concerned that NRATV's messaging—on topics far afield of the Second Amendment—deviated from the NRA's core mission and values.

on September 19, 2018, after AMc's counsel insisted that the NRA pay AMc's legal fees without any insight into why the fees had been incurred, the NRA's counsel observed that AMc's posture seemed more consistent with an adverse than a common-interest relationship. AMc's counsel replied: "Ackerman views the relationship as adverse."

20.     Thereafter, AMc strenuously resisted the NRA's efforts to enforce the Services Agreement, including embarking on a campaign to "kill the messenger" when the NRA sought access to documents or proposed reductions in AMc's budget. At first, AMc scapegoated the NRA's outside counsel. However, over ensuing months, AMc also refused to respond to basic information requests from NRA executives. After the NRA retained a third-party forensic accounting firm to interface with AMc in an effort to appease AMc and gain its compliance in January 2019, AMc indicated it would cooperate. Unfortunately, that pledge of cooperation was short-lived as AMc forbid the accountants from disclosing simple, material information to the NRA—including copies of annual budgets that the NRA allegedly approved. When the NRA's General Counsel sought additional information in follow-up to the forensic audit, AMc ignored his letters.

## D.   AMc Is Concealing Material Information From the NRA, Including a Large Related-Party Contract.

21.     The NRA brings this action not only because AMc has flagrantly disregarded its contractual obligations, but because the NRA has recently grown concerned that the records AMc is withholding include information material to the NRA's not-for-profit governance and its stewardship of its members' donations.

22.     Lieutenant Colonel Oliver North (Ret.) ("Col. North") is a veteran of the United States Marine Corps and the Reagan administration, a longstanding advocate for the Second Amendment, and a member of the NRA Board of Directors. During May 2018, the NRA

announced that Col. North was slated to serve as its next President—a largely ceremonial but high-profile position famously occupied by Charlton Heston during the late 1990s. As Col. North prepared to assume the presidency of the NRA, he separately discussed a potential engagement by AMc as the host of an NRATV documentary series. On May 6, 2018, the NRA and AMc amended the Services Agreement to affirm that any contract between AMc and Col. North would be considered an AMc-Third Party NRA Contract, for which outstanding compensation would be owed by the NRA to AMc if the Services Agreement was terminated. Importantly, the amendment treated Col. North as a third-party contractor—but not, necessarily, an employee—of AMc.

23.     New York law requires that the NRA Board of Directors, or an authorized committee thereof, review and approve "any transaction, agreement, or any other arrangement in which [a director or officer of the NRA] has a financial interest and in which the [NRA or an affiliate] is a participant."[3]  Guidance published by the New York Attorney General notes that a board of directors may define additional restrictions on transactions giving rise to potential conflicts of interest;[4] and, consistent with best practices, the NRA's Conflict of Interest Policy requires disclosure of contracts between NRA leadership and vendors, like AMc, that receive funds from the NRA.

24.     Aware that Col. North entered into a contract with AMc (the "North Contract"), the NRA diligently sought to comply with its obligations concerning analysis and approval of the North Contract. During September 2018, the Audit Committee of the NRA Board of Directors (the "Audit Committee") reviewed a purported summary of the material terms of the North

---

[3] *See* N.Y. N-PCL § 715.

[4] *Conflicts of Interest Policies Under the Not-for-Profit Corporation Law*, CHARITIES BUREAU, N.Y. STATE OFFICE OF THE ATTORNEY GENERAL (2018), https://www.charitiesnys.com/pdfs/Charities_Conflict_of_Interest.pdf, at 3.

Contract and ratified the relationship pursuant to New York law—subject to carefully drawn provisos designed to avoid any conflicts of interest.

25.    At the time it ratified Col. North's continued service as an NRA director and President given his relationship with AMc, the Audit Committee was assured that the NRA's counsel would review the North Contract in full.  But thereafter, AMc continued to refuse to provide the North Contract pursuant to the Records-Examination Clause.  Meanwhile, Col. North indicated via counsel that he could only disclose a copy of the contract to the NRA subject to AMc's consent.  This back-and-forth persisted for nearly six months.

26.    Eventually, in February 2019, AMc acceded to a brief, circumscribed, "live" review of the North Contract (but no retention of any copies) by the General Counsel of the NRA.  This review raised concerns about whether the previous summary of the North Contract which was provided to the Audit Committee had been complete and accurate.  Among other things, the NRA's brief, limited review of the North Contract gave rise to questions regarding: (i) whether Col. North was a third-party contractor of AMc or, conversely, a full-time employee with fiduciary duties to AMc that supersede his duties to the NRA; (ii) whether the previously disclosed costs borne by the NRA in connection with the North Contract were complete and accurate; and (iii) whether the contract imposed obligations on Col. North that prevent him from communicating fully and honestly with other NRA fiduciaries about AMc.  Against the backdrop of escalating concerns about AMc's compliance with the Services Agreement and applicable law, the NRA became determined to resolve these issues.

27.    By letters dated March 25-26, 2019, the NRA's General Counsel again sought visibility regarding the North Contract and other material business records pursuant to the Services Agreement.  Specifically, the NRA requested:

- Information about any additional costs relating to AMc's engagement of Col. North, to the extent that such costs were being "passed through" to the NRA;

- Copies of any additional AMc-Third Party NRA Contracts currently in existence;

- Information about which AMc personnel purportedly constituted "NRA-Dedicated Personnel," such that their salaries or severance were alleged to be reimbursable by the NRA, and business records sufficient to show whether these personnel were in fact dedicated to NRA projects; and

- Copies of the annual budget documents provided to the NRA's forensic accountants.

28.     The NRA made clear that it sought the above information "in whatever form [wa]s most convenient" for AMc and hoped to obtain access to ordinary-course business records as contemplated under the Records-Examination Clause.  AMc immediately acknowledged receipt of the letters and promised to respond.  AMc has not done so.  Put simply, the NRA is at the end of its rope.

E.     **AMc's Disregard of Its Contractual Obligations Will Continue to Damage the NRA.**

29.     AMc's breach of the Services Agreement has damaged—and threatens to imminently and irreparably harm—the NRA's legitimate operational interests as a not-for-profit organization. By denying the NRA access to basic information regarding the nature of the services being performed, the putative budgets for these services, and the material terms of third-party contracts for which the NRA is purportedly liable, AMc is interfering with the NRA's ability to steward its funds in pursuit of its public mission.   Moreover, AMc's baseless refusal to permit a fulsome review of the North Contract threatens to impede the NRA's corporate governance process.

30.     If the NRA is denied access to material business records regarding its largest vendor relationship—records which it specifically bargained to access, under the Services Agreement— the NRA's fiduciaries will be forced either to exercise their business judgment based on

incomplete information or defer resolution of pressing matters.  There is no adequate remedy at law for the risks that would arise in either scenario.  The NRA is America's oldest civil rights organization and an advocate for millions of law-abiding gun owners.  Its compliance with not-for-profit law cannot be permitted to be held hostage by a recalcitrant advertising agency.

## DEMAND FOR JURY TRIAL

31.     Plaintiff hereby demands a trial by jury regarding all issues of fact in this case.

## FIRST CAUSE OF ACTION

### BREACH OF CONTRACT AND REQUEST FOR SPECIFIC PERFORMANCE
### (Against All Defendants)

31.     Plaintiff incorporates by reference and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

32.     The Services Agreement is a legally enforceable contract.   The Records-Examination Clause is unambiguous.

33.     The NRA has performed all of its obligations under the Services Agreement, including its obligation to provide reasonable notice pursuant to the Records-Examination Clause.

34.     Ackerman and Mercury have breached the Records-Examination Clause of the Services Agreement.  Specifically, Ackerman—acting at all times on behalf of both itself and Mercury, pursuant to the Services Agreement—has repeatedly failed or refused to permit the NRA to examine specified categories of books and records with respect to matters covered under the Services Agreement.

35.     There is no adequate remedy at law for AMc's refusal to permit examination of records (whether they reside at Ackerman or Mercury) pursuant to the Services Agreement.  The information sought by the NRA pursuant to the Records-Examination Clause resides uniquely

within the possession of Ackerman and/or Mercury, and cannot be acquired by the NRA on the open market for any sum of money.

36.    The nature of the obligation imposed by the Records-Examination Clause makes specific performance equitable and practical because the Court need only order AMc to furnish to the NRA: (i) copies of any AMc-Third Party NRA Contracts; and (ii) business records, in whatever form they were generated in the ordinary course of AMc's business, which are sufficient to convey the information sought by the NRA as described in Paragraph 27 hereof.

37.    Defendants' breaches of the Services Agreement have damaged—and threaten to imminently, irreparably harm—the NRA's legitimate operational interests as a not-for-profit organization. By denying the NRA access to basic information regarding the nature of the services being performed, the putative budgets for these services, and the material terms of third-party contracts for which the NRA is purportedly liable, Defendants have jeopardized the NRA's ability to steward its funds in pursuit of its public mission.   Moreover, AMc's continued and baseless refusal to permit a fulsome review of the North Contract threatens to impede the NRA's corporate governance.

38.    By reason of the foregoing, the NRA requests that this Court order specific performance by Defendants of their obligations pursuant to the Records-Examination Clause of the Services Agreement.

## REQUEST FOR RELIEF

Wherefore, for all the foregoing reasons, Plaintiff requests relief as follows:

    a.    A judgment against each of Ackerman and Mercury for breach of contract;

    b.    An award of specific performance to the NRA requiring that:

a. AMc furnish copies of all AMc-Third Party NRA Contracts to the NRA within three (3) business days of the entry of such order; and

b. Within ten (10) business days of the entry of such order, AMc furnish to the NRA:

    i.    Copies of annual budgets for the years 2016-2018, which AMc alleges were approved by the NRA and were previously provided to the NRA's forensic accountants;

    ii.    A list of all current NRA-Dedicated Personnel (as defined in the NRA's letter correspondence) and, for each such employee, copies of business records sufficient to show the amount or percentage of the employee's time that was dedicated to NRA projects during the period from January 1, 2018, to present;

    iii.    Copies business of records sufficient to show the extent of any costs invoiced to the NRA or the NRA Foundation, during the period from January 1, 2018, to April 1, 2019, which costs were incurred by reason of:

        (1) The production of the NRATV documentary series "American Heroes;" or

        (2) Cash or non-cash compensation to Col. North or North-related Staff; or

        (3) Office space or other perquisites provided to Col. North or North-related Staff; and

        (4) Whether each item was billed specifically to the NRA, the NRA Foundation, or both entities; and

c.   Such other and further relief to which the NRA may be entitled at law or in equity.

Respectfully submitted,

James W. Hundley (VA Bar No. 30723)
Robert H. Cox (VA Bar No. 33118)
Amy L. Bradley (VA Bar No. 80155)
BRIGLIA HUNDLEY, P.C.
1921 Gallows Road, Suite 750
Tysons Corner, VA 22182
jhundley@brigliahundley.com
rcox@brigliahundley.com
abradley@brigliahundley.com
Phone: 703-883-0880
Fax: 703-883-0899

**ATTORNEYS FOR THE NATIONAL RIFLE ASSOCIATION**

# EXHIBIT B-17

## *CONFIDENTIAL*
## *FILED UNDER SEAL*

# EXHIBIT B-18

VIRGINIA:

IN THE CIRCUIT COURT FOR THE

CITY OF ALEXANDRIA

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Case No. CL19002067 |
| | ) | |
| | ) | |
| ACKERMAN MCQUEEN, INC., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MERCURY GROUP, INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

**PLAINTIFF'S COMPLAINT AND JURY DEMAND**

Plaintiff the National Rifle Association of America (the "NRA") files this Complaint and

Jury Demand against Defendants Ackerman McQueen, Inc. ("Ackerman") and Mercury Group,

Inc. ("Mercury" and, collectively with Ackerman, "AMc"), based on personal information as to

its own actions and on information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

After collaborating for more than thirty years, the NRA finds itself at odds with its advertising agency and communications firm, AMc. Already embroiled in a separate lawsuit[1] arising from AMc's refusal to furnish agreed business records, the NRA files this action to redress additional, increasingly brazen breaches of duties owed by AMc to the NRA. Over the past year, even as it withheld important documents and information from the NRA, AMc readily shared snippets of confidential and proprietary materials with hostile third parties, including the news media—in a series of sordid, out-of-context "leaks" engineered by AMc to harm its client.

Defendants' actions are especially egregious because communications with the media and the public are AMc's purported area of expertise. For decades, the NRA trusted AMc to shape and disseminate authorized public communications on its behalf, in order to advance the interests of the NRA and its members. During that time, AMc became a valued asset to the NRA and, by extension, the millions of law-abiding gun owners who depend upon the NRA for its Second Amendment advocacy. As part of their professional obligations, AMc and its employees were required to engage with the news media only with the NRA's full consent, operate with complete transparency, and work in alignment with the NRA's leadership team to craft its communications strategy. Of course, these expectations are fundamentals upon which clients and their public relations advisors operate. Trust and loyalty are necessary elements of any such relationship.

Unfortunately, in a remarkable, material breach of that trust, AMc undertook a campaign to tarnish and ultimately destroy the public image of the NRA and its senior leadership. Motivated to avoid scrutiny of their own business activities, a handful of faithless fiduciaries within (and

---

[1] *See National Rifle Association of America v. Ackerman McQueen, Inc. and Mercury Group. Inc.,* Civil Case No. CL19001757 (Alexandria, Va.).

without) AMc conspired to conceal important information, "kill" any "messenger" who tried to unearth that information, and ultimately wrest control of the NRA by fomenting a (failed) executive coup. The conspiracy led by AMc had a malicious, singular purpose: to derail inquiries by the NRA into AMc's business and accounting practices. When the NRA ignored AMc's initial, veiled threats and reiterated its demands for transparency, the agency and its co-conspirators fired escalating salvos that culminated in an extortion threat delivered by an AMc employee, Lt. Col. Oliver North (Ret.), days before the NRA's Annual Meeting of Members.  North's directive to NRA CEO Wayne LaPierre was simple: withdraw the NRA's then-pending lawsuit against AMc, resign immediately from the NRA, and support AMc's chosen leadership slate for the NRA—or be publicly smeared.

As became widely reported, AMc's attempt to seize control of the NRA brutally failed.[2] Thereafter the NRA hoped that AMc and its co-conspirators would abandon their illegal conduct and resume faithfully serving the NRA.  Instead, Defendants began to deliver on AMc's extortion threats. In apparent "off-the-record" exchanges with reporters from multiple media outlets, AMc— and others with whom it conspired—cynically leaked selected portions of confidential business records that were curated to convey a misleading, dire picture of the NRA's finances, operations, and expense-accounting practices.  The bitter, insidious irony is that the records leaked by AMc contain some of the same information the NRA had persistently requested from AMc over the course of many months, in an effort to strengthen its own internal controls.  When AMc realized it could not hide the information demanded by the Association forever, it maliciously and

---

[2] *See, e.g.*, Danny Hakim, *Wayne LaPierre Prevails in Fierce Battle for the N.R.A.* THE NEW YORK TIMES (Apr. 29, 2019), https://www.nytimes.com/2019/04/29/us/nra-wayne-lapierre-oliver-north.html; Mark Maremont, *New York Attorney General Probes NRA as Oliver North Exits as President*, THE WALL STREET JOURNAL (Apr. 27, 2019, 7:30pm), https://www.wsj.com/articles/oliver-north-out-as-nra-president-11556376506

selectively publicized a subset of its records in a manner designed to suggest improprieties which AMc knew had not actually occurred.

Consistent with its longstanding trust and reliance on AMc, and hopeful that the leaks were executed by rogue employees without the knowledge of AMc's leadership, the NRA sought AMc's help securing sworn declarations from employees who had access to the leaked information— affirming individually that they were not responsible for any unauthorized disclosures. In this way, the NRA sought to narrow the list of individuals potentially responsible for the leaks, as well as stem ongoing confidentiality violations. Unfortunately, AMc's response to the overture came in the form of a terse missive from outside counsel—refusing any cooperation. Although AMc explicitly "warrant[ed] and agree[d] to prevent disclosure of Confidential Information by its employees" under its contract with the NRA, the agency flatly refused to ask any of its employees to affirm they had honored their confidentiality obligations.

For years, the NRA trusted and depended upon AMc to deliver core, critical services. The NRA never expected it would be forced to sue one of its closest collaborators. At this juncture, however, the NRA has no choice. AMc's ongoing violations of its contractual and fiduciary duties are malicious, material, and must be redressed.

## PARTIES AND RELEVANT NONPARTIES

1.      Plaintiff NRA is a not-for-profit corporation organized under the laws of the State of New York with its principal place of business located in Fairfax, Virginia. The NRA is America's leading provider of gun-safety and marksmanship education for civilians and law enforcement. It is also the foremost defender of the Second Amendment of the United States Constitution. A 501(c)(4) tax-exempt organization, the NRA has over five million members— and its programs reach many millions more.

2.      Defendant Ackerman is a nonresident for-profit business corporation organized under the laws of the State of Oklahoma with its principal place of business in Oklahoma City, Oklahoma.  Ackerman is an advertising and public relations agency that has counted the NRA among its largest clients for more than thirty years.

3.      Defendant Mercury is a nonresident for-profit business corporation organized under the laws of the State of Oklahoma with its principal place of business in Alexandria, Virginia.  Mercury is a wholly owned subsidiary of Ackerman which specializes in public-communications strategy, including on behalf of advocacy groups such as the NRA.  At all relevant times, Ackerman acted on behalf of both itself and Mercury pursuant to the Services Agreement (defined below) between Ackerman and the NRA.

4.      Nonparty Lt. Col. Oliver L. North (Ret.) ("North") is a resident of the State of Virginia and a former president of the NRA. Unbeknownst to the NRA until recently, North is also a full-time employee of Ackerman.

5.      Nonparty William Winkler ("Winkler") is a resident of the State of Oklahoma and the chief financial officer of Ackerman.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over Ackerman and Mercury pursuant to Virginia Code § 8.01-328.1 because each of Ackerman and Mercury has transacted business in the Commonwealth of Virginia and contracted to supply services in the Commonwealth of Virginia.

7.      Venue is proper in this Court because the cause of action set forth herein arose from the transaction of business in Alexandria, Virginia.

8.      Additionally, jurisdiction and venue are proper in this court because Ackerman and Mercury have expressly consented to the exclusive jurisdiction and venue of courts sitting in

Alexandria or Fairfax County, Virginia regarding the matters presented herein in the Services Agreement dated April 30, 2017 (as amended May 6, 2018) (the "Services Agreement").

## FACTUAL BACKGROUND

**A.    For Decades, the NRA Relied on Ackerman To Perform Public Affairs Services Requiring a High Level of Trust.**

9.    The NRA and AMc have worked closely together since the 1980s.  Over that time, the NRA has reposed extensive trust and confidence in AMc to perform services including public relations and strategic marketing; planning and placement of media; management of digital media and websites; and the operation of NRATV, a digital-media platform managed by AMc but frequently perceived by the public as the "voice" of the NRA.[3] By its nature, this work is publicly and politically sensitive, and requires the NRA to entrust AMc with confidential (and sometimes privileged) information.

10.    Since at least 1999, AMc's work on behalf of the NRA has been governed by successive incarnations of a Services Agreement containing detailed specifications for how various types of work performed by Ackerman for the NRA should be budgeted and billed.  The Services Agreement between the NRA and AMc dated May 1, 1999 (the "Previous Services Agreement") as well as the current, operative Services Agreement provide that certain categories of services, such as Owned Media and Internet Services, are compensated with an agreed annual fee, while others are required to be invoiced on an *ad hoc* basis based on estimates furnished by AMc and approved by the NRA. Consistent with the sensitive nature of AMc's services, the Services Agreement strictly limits use and disclosure by AMc, and its individual employees (who are

---

[3] *See, e.g.*, Jeremy W. Peters & Katie Benner, *Where The N.R.A. Speaks First and Loudest*, THE NEW YORK TIMES, February 21, 2018, https://www.nytimes.com/2018/02/21/us/politics/nratv-nra-news-media-operation.html.

themselves fiduciaries of the NRA), of information acquired during AMc's work on behalf of the NRA.

11.     Specifically, Section IV of the Services Agreement provides that AMc "shall not disclose, directly or indirectly, to any third party, any . . . data, materials or information . . . made known to AMc as a result of AMc's providing [contracted-for services] . . . without the prior express written permission of [the] NRA."[4]  AMc may use the NRA's confidential information "only for the limited purpose of providing its [s]ervices to the NRA,"[5] and AMc "warrants and agrees to prevent disclosure of Confidential Information by its employees, agents, successors, assigns and subcontractors."[6]

12.     Notably, AMc serves as the NRA's agent for several purposes pursuant to the Services Agreement, and, therefore, owes fiduciary duties to the NRA.  For example, the Services Agreement provides explicitly that AMc may act "on [the] NRA's behalf," and subject to the NRA's control, with respect to purchasing, planning, and placement of media[7]—activities that require the NRA to entrust AMc with nonpublic information about its communication strategy.  In its capacity as the NRA's agent, AMc must demonstrate "the same high standard of good faith and loyalty" to the NRA as would be "required . . . of an attorney to his client."[8]  Indeed, owing to the parties' decades of close collaboration, their special relationship of trust and confidence existed prior to, and apart from, the execution of the Services Agreement. The confidentiality provisions of the Services Agreement are, therefore, backstopped and strengthened by common-law and

---

[4] Services Agreement § IV.A.1.

[5] Services Agreement § IV.A.3.

[6] Services Agreement § IV.A.4.

[7] Services Agreement §§ I.C, II.B.1.

[8] See, e.g., Nicholson v. Shockey, 192 Va. 270, 270 (1951).

contractual fiduciary duties which forbid any misuse or misappropriation of the NRA's information.

13.     Consistent with the substantial scope and dollar value of the services rendered by AMc for the NRA, AMc invoices the NRA for a wide variety of expenses.  The Services Agreement contains detailed guidelines identifying categories of expenses that can be invoiced to the NRA, and conditions for their reimbursement—for example, hotel and meal expenses must be specifically authorized in writing by the NRA. Over the parties' decades-long course of dealing, underlying receipts and other support for AMc's expenses were not transmitted contemporaneously with AMc's monthly invoices.  However, the NRA was repeatedly assured that appropriate documentation was retained by AMc, and could be audited at the NRA's request. Indeed, the NRA's senior leadership understood that field audits of AMc's expense records were regularly conducted precisely for that purpose.

14.     Given its responsibilities, AMc took an active role in shaping the public image of the NRA's principals and executives, including CEO Wayne LaPierre.  Based on AMc's advice, and subject to billing procedures AMc set up, LaPierre over a fifteen year period incurred wardrobe and related expenses for countless television appearances, filming of commercials, and other outward-facing brand-development activities.  Those activities were specifically directed, choreographed and produced by AMc.  Records of the wardrobe expenses, which were initiated at AMc's direction, were maintained by AMc.  Of course, AMc should not have incurred (let alone sought reimbursement for) any expenses which it believed inappropriate.

B.     **Troubled Waters: the NRA's Compliance Efforts and Ackerman's Response.**

15.     In recent years, the State of New York amended its Not-for-Profit Corporation Law (the "NPCL") to clarify requirements for director independence and the ratification of related-party contracts, among other items.  After updating its internal policies and controls to reflect these

amendments, the NRA undertook to strengthen its procedures for documentation and verification of compliance by vendors with their contracts. Beginning in August 2018, the NRA sent letters to more than a hundred vendors—including AMc—that set forth updated invoice-support requirements and provided detailed guidance regarding, for example, expense reimbursement procedures.

16.     During the course of this process, the NRA became aware of concerns raised by multiple employees, executives, and board members that AMc's expenses and activities required greater oversight. In sum, there were concerns that Ackerman and Mercury were regularly taking advantage of their favored position and the numerous roles they played for the NRA. As a result, the Association sought to investigate several specific concerns:

- "Out of pocket" expenses that lacked meaningful documentation of NRA approvals, receipts, or other support, despite the requirements set forth in the Services Agreement;

- Lack of transparency regarding AMc's annual budgets under the Services Agreement, as well as adherence to those budgets;

- Lack of transparency regarding AMc's compliance with their obligation to insure that their services are provided at "fair market value";

- Concerns that AMc was invoicing the NRA for the entire salaries attributable to NRA-Dedicated Personnel, despite certain NRA-Dedicated Personnel allocating substantial time to non-NRA clients;

- Refusal by AMc to provide any data "in writing" (such as viewership numbers, clickthrough rates, or related performance metrics) that enable the NRA to analyze the return on its substantial investment since 2016 in NRATV.[9]

17.     Consistent with the broad scope and critical nature of the services performed by AMc for the NRA, the NRA bargained for transparency into AMc's files, books and records

---

[9] In addition, certain NRA stakeholders were also concerned that NRATV's messaging—on topics far afield of the Second Amendment—deviated from the NRA's core mission and values.

pursuant to the Services Agreement.  Both the Previous Services Agreement and the current

Services Agreement incorporate records-examination clauses that require AMc to open its files for

the NRA's inspection upon reasonable notice.  The full text of the Records-Examination Clause in

the Services Agreement appears below:

---

**Services Agreement**
- Dated April 30, 2017 (as amended May 6, 2018)
- Between the NRA and "AMc" (defined to include both Ackerman and Mercury)

**VIII. EXAMINATION OF RECORDS**

During the term of this Services Agreement, AMc authorizes NRA, upon reasonable notice, to examine AMc and Mercury's files, books and records, with respect to matters covered under this Services Agreement.

---

18.     During early- and mid-2018, the NRA sought information from AMc pursuant to

the Records-Examination Clause on a common-interest basis to advance parties' mutual interests

relating to an ongoing lawsuit.  However, after the NRA began to request access to records that

would shed light on concerns regarding AMc's business and accounting practices, AMc's

responses became evasive and hostile.

19.     In August 2018, within days after the NRA announced that it would now require

supporting documentation to be transmitted contemporaneously with vendor invoices, a media

outlet hostile to the NRA quoted "an anonymous source at Ackerman McQueen"[10]—creating

serious concerns about AMc's compliance with its confidentiality obligations.  When another

outlet described the same source as a former (rather than a current) AMc employee,[11] the NRA's

---

[10] Dylan Matthews, *The National Rifle Association, America's most powerful lobby, claims it's in financial crisis. What?*, VOX (Aug. 3, 2018, 4:50pm), https://www.vox.com/2018/8/3/17648960/nra-national-rifle-association-companies-support-boycott-new-york-lawsuit

[11] Alex Yablon & Mike Spies, *In Court Papers, NRA Stresses Financial Pressures and Says It May Have to Shut Down NRATV*, THE TRACE (Aug. 1, 2018), https://www.thetrace.org/rounds/nra-carry-guard-insurance-new-york-lawsuit/

trust in its longtime collaborator dissuaded it from requiring an immediate and full scale investigation. Unfortunately, it now appears that such a complete accounting is required.

20.     On August 27, 2018, Winkler sent a letter to the NRA which purported to comply with the NRA's request for a more comprehensive audit of Ackerman's expense records. The letter pointedly identified several categories of items, some relating to travel and entertainment, which it warned would be encompassed in a full production of those records—perhaps believing that the threat of such disclosure would dampen the NRA's demands for transparency. However, the NRA was undeterred, and insisted upon reviewing and verifying details of expenses incurred.

21.     In September 2018, for the first time in the parties' decades-long course of dealing, AMc demanded that its outside counsel supervise any document review conducted under the Records-Examination Clause, then demanded payment of outside counsel's legal fees as a precondition for delivery of video footage it produced and for which AMc had already invoiced the NRA. During a telephone call on September 19, 2018, after AMc's counsel insisted that the NRA pay AMc's legal fees without any insight into why the fees were incurred, the NRA's counsel observed that AMc's posture seemed more consistent with an adverse than a common-interest relationship. AMc's counsel then made a startling statement: "AMc views the relationship as adverse."

22.     Thereafter, AMc strenuously resisted the NRA's efforts to enforce the Services Agreement, including by embarking on a campaign to "kill the messenger" when the NRA continued to seek access to documents or proposed reductions in AMc's budget. At first, AMc scapegoated the NRA's outside counsel. However, over ensuing months, AMc also refused to respond to basic information requests from NRA executives.   After the NRA retained a third-party forensic accounting firm to interface with AMc in an effort to appease AMc and gain its

compliance in January 2019, AMc indicated it would cooperate.  Unfortunately, that pledge of cooperation was short-lived, as AMc purported to forbid the accountants from disclosing simple, material information to the NRA—including copies of annual budgets against which AMc was invoicing.  When the NRA's General Counsel sought additional information in follow-up to the forensic audit, AMc ignored his letters.

23.     As AMc continued to stonewall the NRA's requests for documents and tensions between the parties rose, the NRA was contacted with increasing frequency by journalists acting on purported "leaks" relating to matters on which AMc had worked.  The contents of these "leaks" reflected a malicious, out-of-context use of the NRA's confidential information, with an apparent intent to damage the NRA.  Indeed, the NRA was advised by multiple confidential sources that leaks were emanating from AMc.

## C.     When The NRA Sought Assurances That Ackerman Was Complying With Its Confidentiality Obligations, Ackerman Rebuffed the NRA.

24.     On April 12, 2019, having exhausted its good faith efforts to access key records pursuant to the Services Agreement, the NRA filed a narrowly tailored action in this Court seeking specific performance by AMc of its obligation to share relevant records with the NRA. In retaliation, rather than provide the requested records directly to the NRA (as the NRA had sought for months), AMc conspired with others to disseminate select, out-of-context portions of those records—many obsolete or dated—to a subset of the NRA Board of Directors, in order to sow false impressions regarding the NRA's spending and lend support for a possible executive coup..

25.     On April 22, 2019, days before the NRA's Annual Meeting of Members, Winkler doubled down on the tactic he previewed in his August 27, 2018 letter.  In letters to select NRA executives, Winkler referenced and excerpted certain expense records which had previously been withheld from the NRA.  Importantly, Winkler did not contend—nor does the NRA believe—that

any of the referenced expenses were improper.[12]  Nonetheless, they were obviously selected by

Defendants to foster salacious, misleading impressions of the NRA's spending practices.

Winkler's letters carried an implicit threat, made explicit in a subsequent series of telephone calls:

If the NRA failed to withdraw its lawsuit seeking access to AMc's records, AMc would publicize

portions of those records tailored to cause maximum reputational damage to the leadership of the

NRA.

26.     On April 24, 2019, AMc caused its employee, North, to telephone an aide of NRA

CEO Wayne LaPierre ("LaPierre") and relay the contents of yet another letter that AMc

purportedly planned to disseminate.  North emphasized that the letter would be "bad" for LaPierre

and the NRA, and he described a laundry list of allegations the letter would contain: an unfavorable

(and untrue) depiction of the NRA's finances; sexual harassment accusations against an NRA staff

member; and, as previewed in Winkler's letters, excerpts of wardrobe, travel, and entertainment

expenses paid by AMc and then invoiced by it to the Association over the years.

27.     Tellingly, several categories of information referenced by North consisted of the

same information the NRA had tried, but failed, to elicit from AMc under the parties' contractual

record-inspection clause.  After withholding this information for more than six months in an

attempt to stonewall the NRA's compliance efforts, AMc now threatened to strategically,

selectively publicize the information in a manner calculated to cause harm to LaPierre and the

Association.  North stated that AMc would forbear from publicizing the "bad" letter if LaPierre

agreed to withdraw the NRA's lawsuit seeking access to AMc's records, resign immediately from

the NRA, and support North's continued tenure as NRA President.  If LaPierre cooperated, North

---

[12] Indeed, if Winkler or anyone at AMc had believed the expenses were improper, then AMc's fiduciary obligations required it to inform the NRA of suspected accounting improprieties.  Instead, for more than a decade, AMc invoiced the NRA for the expenses without any such comment.

indicated that he could "negotiate with" Ackerman co-founder Angus McQueen to secure an "excellent retirement" for LaPierre.

28.   The NRA does not take kindly to threats—and neither did LaPierre. Rather than accede to AMc's extortion, LaPierre wrote a letter to the NRA's Board of Directors that gave a transparent account of AMc's threat and concluded "so long as I have your confidence . . . I will not back down." As became widely publicized, LaPierre prevailed—and AMc's coup attempt failed. AMc's employee, North, is no longer an officer of the NRA.

29.   The NRA hoped that in the wake of these events, AMc would resume faithfully serving the NRA as the parties' contract and Virginia law require. Unfortunately, the NRA continues to receive media inquiries that strongly suggest there are misleading, defamatory "leaks" emanating from AMc. Simply put, the NRA believes that AMc is now delivering on its extortion threat. Tellingly, much of the information "leaked" by AMc concerns travel, wardrobe, and other expenses incurred in connection with AMc projects, based on AMc's advice, or on trips with itineraries crafted by AMc. Although it disseminates select portions of these records in an effort to convey misleading impressions about spending activities by the NRA's leadership, AMc knows full well that these particular expenses were proper—because it was deeply involved in their incurrence.

30.   Examples of media outlets to whom AMc directly or indirectly disclosed the NRA's confidential information include The New York Times, The Wall Street Journal, The Daily Beast, and Rolling Stone.

31.   To resolve its concerns regarding these disclosures, on May 6, 2019, the NRA requested that several key AMc employees execute sworn declarations attesting that they had not violated their confidentiality obligations under the Services Agreement. The NRA tailored its

request narrowly—seeking declarations only from senior executives who had exposure to the information at issue—and demanded simply that these executives affirm they had complied, and would continue to comply, with their clear legal duties.

32.     To the NRA's dismay, AMc flatly refused to provide any cooperation or assurances whatsoever.  The NRA brings this action to discover the full extent of AMc's breaches, enjoin those breaches, and recover compensation for the damage it has sustained.

## FIRST CAUSE OF ACTION

### BREACH OF CONTRACT
### (Against Ackerman and Mercury)

33.     Plaintiff incorporates by reference and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

34.     The Services Agreement is a legally enforceable contract.  The confidentiality provisions of Section IV of the Services Agreement are unambiguous, and bind "AMc" (defined to include both Ackerman and Mercury).

35.     The NRA has performed all of its obligations under the Services Agreement.

36.     Defendants have breached the provisions of Section IV of the Services Agreement by directly or indirectly disclosing, to third parties, information made known to AMc as a result of AMc's providing Services (as defined under the Services Agreement).

37.     Defendants also breached the implied covenant of good faith and fair dealing by conspiring with, and causing, North to issue an extortion threat to the NRA.

38.     Defendants' breaches have damaged the NRA.  Among other things, the NRA has incurred significant reputational damage, and professional fees, as a result of Defendants' bad-faith, out-of-context "leaks" to reporters.  For example, the NRA's attorneys and public affairs

professionals have spent extensive hours fielding inquiries from journalists in an effort to correct the misleading impressions sown by AMc.

39.     Defendants' breaches are escalating, and there can be little doubt that if its collaborator of multiple decades continues to maliciously disseminate its confidential information, the NRA will be irreparably harmed. The NRA is entitled to injunctive relief to avert or minimize this irreparable harm.

40.     Moreover, AMc's breaches are material—by seeking to destroy the NRA's reputation, AMc has destroyed the purpose of the parties' contract. Accordingly, the NRA is entitled to damages based on all of its remaining rights to performance under the Services Agreement.[13]

## SECOND CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY
### (Against Ackerman and Mercury)

41.     Plaintiff incorporates by reference and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

42.     Over the course of more than thirty years of close collaboration (including decades that preceded the Services Agreement), the NRA reposed extensive trust and confidence in both Ackerman and Mercury. Defendants therefore incurred a common-law fiduciary duty to put the NRA's interests first when rendering services to the NRA, including pursuant to the Services Agreement.

43.     In addition, AMc incurred fiduciary duties to the NRA when it acted as the NRA's agent pursuant to multiple provisions of the Services Agreement. For example, on the NRA's

---

[13] *See* Restatement (Second) of Contracts § 236 (1981).

behalf and subject to the NRA's control, AMc entered into contracts and arrangements for the purchase, planning, and placement of media—activities that required AMc to be entrusted with sensitive confidential information pertaining to the NRA.

44.     Because it acted in a fiduciary capacity, AMc had a duty of loyalty to the NRA which forbade it from misusing the NRA's confidential information—especially with the malicious intent to damage the NRA.

45.     Furthermore, because it acted in a fiduciary capacity, AMc had a duty to disclose all material facts to the NRA regarding the advice and services it provided.

46.     AMc breached its fiduciary duty when it conspired to effect an out-of-context, partial disclosure of certain NRA confidential information to (i) a handpicked group of outside directors of the NRA, as well as (ii) the news media.

47.     AMc further breached its fiduciary duty by withholding material information from the NRA, including information concerning expense records and the performance of NRATV.

48.     Ackerman further breached its fiduciary duties of loyalty and fair dealing by conspiring with and causing its employee, North, to relay an extortion threat to the NRA on April 24, 2019.

49.     As a direct and proximate result of AMc's breaches, the NRA has incurred damages, including professional fees expended to redress the consequences of AMc's "leaks." AMc's breaches are escalating, and there can be little doubt that if its collaborator of multiple decades continues to maliciously disseminate its confidential information, the NRA will be irreparably harmed.  The NRA is entitled to injunctive relief to avert or minimize this irreparable harm.

50.     The NRA furthermore seeks disgorgement of any amounts wrongfully obtained by Defendants on account of their breaches of their fiduciary duties including, without limitation, all fees paid by the NRA to Ackerman and Mercury since the date such breaches began—which the NRA believes occurred no later than August 3, 2018.

## DEMAND FOR JURY TRIAL

51.     Plaintiff hereby demands a trial by jury on all issues of fact to which it is entitled to a jury trial in this cause.

## REQUEST FOR RELIEF

Wherefore, for all the forgoing reasons, Plaintiff requests judgment in its favor against AMc:

a.  Granting it preliminary and permanent injunctive relief;

b.  Granting it compensatory damages for material, total breach of contract and breach of fiduciary duty totaling $40 million;

c.  Granting it punitive or exemplary damages; and

d.  Granting such other and further relief as the Court deems just and proper.

Respectfully submitted,

James W. Hundley (VA Bar No. 30723)
Robert H. Cox (VA Bar No. 33118)
Amy L. Bradley (VA Bar No. 80155)
BRIGLIA HUNDLEY, P.C.
1921 Gallows Road, Suite 750
Tysons Corner, VA 22182
jhundley@brigliahundley.com
rcox@brigliahundley.com
abradley@brigliahundley.com
Phone: 703-883-0880
Facsimile: 703-883-0899

# EXHIBIT B-19

VIRGINIA:

IN THE CIRCUIT COURT FOR THE
CITY OF ALEXANDRIA

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | Civil Case No. 19002886 |
| ACKERMAN MCQUEEN, INC., | ) ) | |
| and | ) ) | |
| MERCURY GROUP, INC. | ) ) | |
| Defendants. | ) ) ) | |

## PLAINTIFF'S COMPLAINT AND JURY DEMAND

Plaintiff National Rifle Association of America ("NRA") files this Complaint and Jury

Demand against Defendants Ackerman McQueen, Inc. ("Ackerman") and Mercury Group, Inc.

("Mercury" and, together with Ackerman, "AMc"), based on personal information as to its own

actions and on information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

After collaborating for decades, the NRA finds itself at odds with its advertising and communications firm, AMc. The NRA commenced a separate lawsuit[1] arising from AMc's refusal to furnish agreed business records and another lawsuit to redress additional, increasingly brazen breaches of duties owed by AMc to the NRA. (Those cases have been consolidated.).[2] Over the past year, even as it withheld important documents and information from the NRA, AMc readily shared confidential and proprietary materials with hostile third parties, including the news media, in a series of sordid, out-of-context "leaks" engineered by AMc to harm its client.

AMc's work for the NRA is governed by a Services Agreement. After the filing of the lawsuits, the NRA, in May and June 2019, made repeated requests to AMc for the return of its property, materials, documents, and Confidential Information as provided for under Section XI.E. of the Services Agreement. The NRA reiterated its willingness to pay, in advance, for the accumulation and return of its property and requested that AMc promptly disclose any associated costs. However, AMc has refused to return the NRA's property.

## PARTIES

1.     Plaintiff NRA is a not-for-profit corporation organized under the laws of the State of New York with its principal place of business located in Fairfax, Virginia. The NRA is America's leading provider of gun-safety and marksmanship education for civilians and law enforcement. It is also the foremost defender of the Second Amendment of the United States

---

[1] *See National Rifle Association of America v. Ackerman McQueen, Inc. and Mercury Group. Inc.,* Civil Case No. CL19001757, 19002067 (Va. Cir. Ct., Alex.) (Consolidated).

[2] *See National Rifle Association of America v. Ackerman McQueen, Inc. and Mercury Group. Inc.,* Civil Case No. CL19002067 (VA. Cir. Ct., Alex.).

Constitution. A 501(c)(4) tax-exempt organization, the NRA has over five million members, and its programs reach many millions more.

2.      Defendant Ackerman is a nonresident, for-profit business corporation organized under the laws of the State of Oklahoma with its principal place of business in Oklahoma City, Oklahoma.  Ackerman is an advertising and public relations agency that has counted the NRA among its largest clients for more than thirty years.

3.      Defendant Mercury is a nonresident, for-profit business corporation organized under the laws of the State of Oklahoma with its principal place of business in Alexandria, Virginia. Mercury is a wholly-owned subsidiary of Ackerman and specializes in public-communications strategy, including on behalf of advocacy groups such as the NRA.

4.      At all relevant times, Ackerman and Mercury acted pursuant to the Services Agreement (defined below) between Ackerman and the NRA.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over Ackerman and Mercury pursuant to Virginia Code § 8.01-328.1 because both Ackerman and Mercury have transacted business in the Commonwealth of Virginia and contracted to supply services in the Commonwealth of Virginia.

6.      Venue is proper in this Court because the cause of action set forth herein arose from the transaction of business in Alexandria, Virginia.

7.      Additionally, jurisdiction and venue are proper in this Court because Ackerman and Mercury have expressly consented to the exclusive jurisdiction and venue of courts sitting in Alexandria or Fairfax County, Virginia regarding the matters presented herein in the Services Agreement dated April 30, 2017 (as amended May 6, 2018) (the "Services Agreement") (attached as Ex. A).

## FACTUAL BACKGROUND

A.   **For Decades, the NRA Relied on AMc to Perform Public Affairs Services and Provided NRA Property and Materials to AMc.**

8.      The NRA and AMc have worked closely together since the 1980s. Over that time, the NRA placed trust and confidence in AMc to perform services including: public relations and strategic marketing; planning and placement of media; management of digital media and websites; and the operation of NRATV, a digital-media platform managed by AMc but frequently perceived by the public as the "voice" of the NRA.[3] By its nature, this work was publicly and politically sensitive and required the NRA to entrust AMc with confidential (and sometimes privileged) information.

9.      Since at least 1999, AMc's work on behalf of the NRA has been governed by successive incarnations of a Services Agreement containing detailed specifications for how various types of work performed by AMc for the NRA should be budgeted and billed.  The Services Agreement between the NRA and AMc dated May 1, 1999 (the "Previous Services Agreement" attached as Ex. B) as well as the current, operative Services Agreement dated April 30, 2017 (as amended May 6, 2018) provide that certain categories of services, such as Owned Media and Internet Services, are compensated with an agreed annual fee while others are required to be invoiced on an *ad hoc* basis based on estimates furnished by AMc and approved by the NRA.

10.     Under the Services Agreement, the NRA provided its property, materials, documents, and confidential information to AMc solely to allow AMc to provide services to the NRA. Section XI.E. of the Services Agreement required that "[u]pon the expiration or termination of this Services Agreement, AMc shall immediately return to the NRA, to such place and in such

---

[3] *See, e.g.*, Jeremy W. Peters & Katie Benner, *Where The N.R.A. Speaks First and Loudest*, THE NEW YORK TIMES, February 21, 2018, https://www.nytimes.com/2018/02/21/us/politics/nratv-nra-news-media-operation.html.

manner as NRA may specify, any and all of the NRA's property, materials, documents, Confidential Information, etc., that may be in AMc's possession." Section XI.E. also provides that the NRA will pay AMc in advance for "all charges for accumulating said materials."

**B.     In Repeated Communications, the NRA Requested that AMc Return NRA Property, Materials, and Confidential Information. AMc has Refused.**

11.     Since May 2019, pursuant to Section XI.E. of the Services Agreement, the NRA has repeatedly requested return of its property, materials, and confidential information ("NRA's Property") from AMc.  In addition, the NRA has made repeated requests for an advance price quote from AMc for the expected cost of accumulating the NRA's Property so that the NRA can advance the costs to AMc. AMc has refused to return the NRA's Property or to provide an estimate for the costs of accumulating and transmitting the NRA's Property.

12.     On May 29, 2019, Revan McQueen, CEO of Ackerman, sent a letter to the NRA, entitled "Notice of Termination of the Services Agreement," notifying the NRA that AMc would be terminating the Services Agreement in 90 days under Section XI.B. of the Services Agreement. See Letter dated May 29, 2019, from Revan McQueen to Andrew Arulanandam (attached as Ex. C). In the letter AMc states:

> This Notice of Termination initiates a process under Section XI, Subsections E and F of the Services Agreement to wind up the relationship between the parties. Pursuant to Subsection E, <u>AMc will prepare to return to the NRA any and all of NRA's property, materials, documents and confidential information in AMc's possession.</u>

Id. at p. 4 (emphasis added).

13.     On June 25, 2019, pursuant to section XI.D. of the Services Agreement, the NRA sent a letter to AMc providing written notice of the NRA's immediate termination of all business with AMc based on AMc's prior material breaches of the Services Agreement.  See Letter dated June 25, 2019, from Andrew Arulanandam to Revan McQueen (attached as Ex. D).  The NRA

"demand[ed] immediate delivery of all materials encompassed by Section XI.E. of the Services

Agreement, including all Confidential Information (as defined by the Services Agreement)." The

NRA further stated that it "will pay for accumulation of these materials and reiterates its previous

requests for an advance price quote to this end." Id.

      14.    On June 27, 2019, AMc's outside counsel, David Schertler, sent a letter responding

to the NRA's June 25, 2019 letter. See Letter dated June 27, 2019, from David Schertler to Andrew

Arulanandam (attached as Ex. E). In the letter, counsel for AMc states that AMc is immediately

terminating the Services Agreement. In addition, counsel for AMc states:

> With respect to your demand of immediate delivery of all Confidential Information
> under Section XI, Paragraph E of the Services Agreement, such delivery is
> conditioned upon approval and payment in advance by the NRA of "all charges for
> accumulating said materials." We will provide the NRA with the costs of
> accumulating these materials and will expect to receive payment of those costs prior
> to the delivery of any materials encompassed by this provision.

Id. at p. 2. AMc does not state when it will return the NRA's Property or when it will provide the

costs of accumulating and returning the NRA's Property.

      15.    On June 28, 2019, the NRA responded to AMc counsel's letter dated June 27, 2019,

by repeating its request for return of the NRA's Property and a budget for the transmittal of the

NRA's Property. See Letter dated June 28, 2019, from Andrew Arulanandam to David Schertler

(attached as Ex. F). The letter states, in part:

> The discussion in your letter concerning payment for transmittal of materials
> pursuant to Section XI.E. of the Services Agreement also retraces ground well-trod
> in prior letters (most recently my letter dated June 25, 2019). The NRA has
> repeatedly requested a budget for transmittal of these materials. Please provide one.
> Please also be prepared to explain the basis for the asserted cost. Based on all that
> has transpired and come to light in recent months, the NRA will not accept AMc's
> unsupported invoices at face value.

Id. at p. 2.

16.     The NRA received no response from AMc to its June 28 letter. Despite repeated requests, AMc failed to return the NRA's Property and failed to provide a budget for the costs.

17.     In a letter dated July 22, 2019, counsel for the NRA sent a "follow-up to multiple previous requests concerning AMc's contractual obligation to surrender the NRA's property and Confidential Information." See Letter dated July 22, 2019, from Michael Collins to David Schertler (attached at Ex. G). In the July 22 letter, the NRA states, in part:

> **Return of the NRA's Property, Material, Documents, and Confidential Information.** As you know, Section XI.E. of the Services Agreement required that AMc "return to the NRA, to such place and in such manner as NRA may specify, any and all of the NRA's property, materials, documents, Confidential Information, etc., that may be in AMC's possession." Furthermore, AMc must return these items "immediately" upon expiration or termination of the Services Agreement. In repeated communications throughout May and June, the NRA emphasized its urgent need for these materials, reiterated its willingness to pay up front for their accumulation, and requested that AMc promptly disclose any associated costs so the parties could proceed. By letter dated June 27, 2019, AMc finally agreed to provide those costs to the NRA. Please let us know when we can expect to receive them.

Id. at p. 1.

18.     The NRA attached to the July 22 letter a list of fixed assets for which it had been invoiced by AMc and stated its expectation that these assets be returned with all of its other property, materials, documents, and confidential information. See Ex. G.  These items include, but are not limited to, audio visual equipment, cameras, monitors, tripods, microphones, adaptors, cables, software, power supplies, batteries, pedestals, recording and playout servers, storage modules, and computers.  The list includes values for each of the fixed assets.

19.     On August 5, 2019, counsel for AMc responded to the NRA's July 22 letter taking the position, for the first time, that AMc will not return the NRA's Property and will not provide the charges for accumulating the NRA's Property until "the NRA comes into compliance with all of its obligations under the Services Agreement" by curing all of its purported breaches of other

provisions of the Services Agreement which are the subject of AMc's counterclaims in separate lawsuits. <u>See</u> Letter dated August 5, 2019 from David Schertler to Michael Collins (attached as Ex. H).

20.     On August 9, 2019, counsel for the NRA responded to counsel for AMc's August 5 letter. <u>See</u> Letter dated August 9, 2019, from Michael Collins to David Schertler (attached as Ex. I). The NRA stated that it has not breached the Services Agreement and that the NRA owes nothing to AMc other than costs associate with gathering and returning the NRA's Property. The NRA further stated:

> Pursuant to section XI.D., Ackerman is entitled to terminate immediately upon sending written notice for certain grounds, including if the NRA breached the Services Agreement.  Nonetheless, section XI.E. still requires Ackerman to immediately return the NRA's property even if the termination was based on alleged breaches by the NRA.  Thus, Ackerman would have no basis to delay returning the NRA's property until the NRA pays whatever amounts Ackerman seeks unrelated to the costs associated with accumulating the NRA's property.

<u>Id</u>. at pp. 1-2.

21.     In the August 9 letter, the NRA repeated its demand that AMc "immediately return all of the NRA's books, records, documents, Confidential Information, and other personal property. As stated before, the NRA will reimburse AMc for its reasonable costs in accordance with Section IX.E. once Ackerman provides an accounting of those costs." <u>Id.</u> at p. 2.

22.     The NRA has not breached the Services Agreement.

23.     AMc committed prior material breaches of the Services Agreement.

24.     Regardless of whether the NRA has breached the Services Agreement (it has not), Section XI.E. requires AMc to immediately return the NRA's Property upon termination of the Services Agreement, including if the NRA breached the Services Agreement.

25.     The NRA's property, fixed assets, materials, documents, and confidential information are valuable property of the NRA.

26.     The NRA has a legal and contractual right to the immediate return of its Property.

27.     The NRA has repeatedly requested the return of the NRA's Property.  AMc has possession of the NRA's Property.

28.     Despite repeated NRA requests, AMc is wrongfully refusing to return the NRA's Property.

## FIRST CAUSE OF ACTION

### DETINUE (CIVIL CLAIM FOR SPECIFIC PERSONAL PROPERTY)
### (Against Ackerman and Mercury)

29.     Plaintiff incorporates by reference and realleges each and every allegation in paragraphs 1 - 28 as if fully set forth herein.

30.     The Services Agreement is a legally enforceable contract.  The provisions of Section XI.E. of the Services Agreement are unambiguous and bind "AMc" (defined to include both Ackerman and Mercury).

31.     The NRA seeks possession of its property, fixed assets, materials, documents, and confidential information as defined in the Services Agreement.

32.     Both the NRA and AMc have provided notice of the immediate termination of the Services Agreement; thus, the NRA has an immediate right to possession of the NRA's Property.

33.     The NRA's Property is capable of identification. The NRA's Property is defined in the Services Agreement and the NRA provided a partial list of its property in AMc's possession in the NRA's letter dated July 22, 2019, to AMc.

34.     In its July 22 letter, the NRA provided values for some of its fixed assets in AMc's possession. In addition, the NRA's confidential information and materials provided to AMc during their contractual relationship have monetary value.

35.     AMc is in possession of the NRA's Property and has wrongfully refused to return the NRA's Property.

36.     Pursuant to Va. Code §§ 8.01-114 and 8.01-534, the NRA will seek pretrial seizure of its personal property wrongfully withheld from it by AMc through petition to this Court. Grounds exist for a pre-trial seizure pursuant to Va. Code § 8.01-534.

37.     The NRA seeks possession of its Property and damages resulting from the unjust detention of its Property by AMc. For any NRA Property that cannot be returned due to damage or loss, the NRA seeks the value of that Property.

## SECOND CAUSE OF ACTION

### ALTERNATIVE CLAIM FOR CONVERSION
### (Against Ackerman and Mercury)

38.     Plaintiff incorporates by reference and realleges each and every allegation in paragraphs 1 - 37 as if fully set forth herein.

39.     The NRA has a right to immediate possession of its Property.

40.     AMc has wrongfully exercised or assumed authority over the Property, depriving the NRA of possession.

41.     The NRA has repeatedly demanded that AMc return its Property. AMc has refused the NRA's requests.

42.     The NRA had a right to immediate possession of its Property as of AMc's notice of termination of the Services Agreement on May 29, 2019. See Ex. A.

43.     The NRA seeks damages for AMc's conversion of its Property.

## THIRD CAUSE OF ACTION

## ALTERNATIVE CLAIM FOR BREACH OF CONTRACT
### (Against Ackerman and Mercury)

44.     Plaintiff incorporates by reference and realleges each and every allegation in paragraphs 1 - 43 as if fully set forth herein.

45.     The Services Agreement is a legally enforceable contract.

46.     The NRA has performed all of its obligations under the Services Agreement.

47.     AMc has breached the provisions of Section XI.E. of the Services Agreement by failing to provide the immediate return of the NRA's Property.

48.     AMc has also breached the implied covenant of good faith and fair dealing by ignoring the NRA's repeated requests to return the NRA's Property.

49.     AMc's breaches have damaged the NRA.

50.     Moreover, AMc's breaches are material. Accordingly, the NRA is entitled to damages based on all of its remaining rights to performance under the Services Agreement.[4]

## DEMAND FOR JURY TRIAL

The NRA hereby demands a trial by jury on all issues of fact to which it is entitled to a jury trial in this cause.

## REQUEST FOR RELIEF

WHEREFORE, for all the forgoing reasons, the NRA requests judgment in its favor against AMc:

---

[4] *See* Restatement (Second) of Contracts § 236 (1981).

a. Ordering that the NRA has proven its ownership rights and that AMc shall return the NRA's Property immediately;

b. Granting a pre-trial seizure of NRA Property in the possession of AMc;

c. Ordering the sheriff or other proper officer to seize NRA Property and deliver the same to the NRA *pendente lite* under circumstances deemed appropriate;

d. Granting NRA preliminary and permanent injunctive relief;

e. Alternatively, granting NRA compensatory damages for any NRA Property converted by AMc;

f. Alternatively, granting NRA specific performance of the return of the NRA's Property or compensatory damages for a material, total breach of contract;

g. Granting NRA punitive or exemplary damages; and

h. Granting such other and further relief as the Court deems just and proper.

Respectfully submitted,

NATIONAL RIFLE ASSOCIATION OF
AMERICA

James W. Hundley (VA Bar No. 30723)
Robert H. Cox (VA Bar No. 33118)
Amy L. Bradley (VA Bar No. 80155)
BRIGLIA HUNDLEY, P.C.
1921 Gallows Road, Suite 750
Tysons Corner, Virginia 22182
jhundley@brigliahundley.com
rcox@brigliahundley.com
abradley@brigliahundley.com
Phone:  703-883-0880
Facsimile:  703-883-0899

# Exhibit A

## SERVICES AGREEMENT

**THIS AGREEMENT**, made this 30th day of April, 2017, by and between the National Rifle Association of America (hereinafter referred to as "**NRA**"). A New York Not-For-Profit Corporation, located at 11250 Waples Mill Road, Fairfax, Virginia 22030, and Ackerman McQueen, Inc., an Oklahoma corporation, and its wholly owned subsidiary, Mercury Group Inc., an Oklahoma corporation, (hereinafter collectively referred to as "**AMc**"), whose principal office is located in Oklahoma at 1100 The Tower, 1601 N.W. Expressway, Oklahoma City, Oklahoma 73118.

## W I T N E S S E T H :

**WHEREAS**, AMc is in the business of providing comprehensive communications services including public relations, crisis management, strategic marketing, advertising and creative, as well as owned media and internet services, and warrants and represents that it possesses the capability, necessary personnel, political strength, equipment and other related items to perform such services; and,

**WHEREAS**, NRA is a Membership Organization and desires to retain AMc as a nonexclusive source for services described herein for NRA upon the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants set forth herein, the parties hereto agree as follows:

I.    **SERVICES**

A.    **Public Relations/Crisis Management /Strategic Marketing Services**

Services include a combination of generating earned media, responsive public relations, crisis management and strategic thinking to promote a positive image of the NRA as described below:

- Public relations advice and counsel, including crisis management.

- Ongoing media relations -- solicitation and placement of features in national, regional and local media; liaison with print and broadcast news media on a daily basis for unsolicited inquiries; ongoing media training for NRA officials; Editorial Board meetings; features for outdoor publications.

- Specialized public relations writing services (news releases, columns, editorials), and distribution of same as required (e.g. via wire service or individual contact).

- Research and information retrieval as necessary for NRA issues management at NRA's request and approval.

- Coordination, scheduling and on-site assistance when necessary for NRA officials' speeches and personal appearances.

1

- Coordination with internal NRA public relations staff in the Executive Office, General Operations and Institute for Legislative Action.

- Development of proactive earned media in national and regional media as it relates to NRA officials' appearances at special events (i.e. National Gun Shows, YHEC, Annual Meetings, etc.).

- Coordination and scheduling appearances for NRA officials and commentators; including on-site assistance (where necessary).

- Develop, produce, and place op-ed pieces for national and regional media coinciding with Special Events and NRA Officials' appearances.

- Advise and counsel with NRA Officials on strategic issues to provoke public debate and frame NRA's point-of-view for the general public.

- Speechwriting services (pivotal speeches for major events are discussed in "Advertising/Creative Services" Section).

- Management of Talent/Spokespersons for NRATV.

- Production and staffing for NRATV.

**B.   Advertising/Creative Services**

The services described below (with the exception of "Media Planning and Placement" which is addressed separately as a subcategory of this Section) will be provided to NRA on a project ("**Job**") basis based on the fair market value of the work as determined by NRA and AMc. When reasonable time is available, cost estimates will be submitted for approval by NRA prior to the initiation of the Job.

- Speechwriting services for NRA dignitaries to be delivered at major events (includes background research, interviews with NRA Officials/Speaker, drafts and rehearsals if appropriate).

- Conceive, copywrite, design and produce local, regional, and national print and broadcast advertising and other appropriate forms of communication to present NRA's message.

- Original photography services and film processing (on location and/or in AMc's photo studio).

- Audio/Visual and Event Management services (i.e. Annual Meetings).

- Video Taping, Editing and Production.

- Music composition and arrangement and audio production.

- Primary Research services (quantitative and qualitative).

C.   **Media Planning and Placement Services**

Detail of AMc's compensation for Media Services are provided in the "Compensation" Section. Services rendered for such are:

- With NRA's approval, plan and order by written contract or insertion order the print space, radio and television time, or other media to be used for advertising, always endeavoring to secure the best available rates. AMc shall remain solely liable for payment, to the extent NRA has paid AMc.

- Incorporate the advertising in the required form and forward it to media with proper instructions for fulfillment of the contract or insertion order.

- Diligently check and verify broadcasts, insertions, displays, or other means used to carry the message to ensure proper fulfillment of all media purchases made by AMc on NRA's behalf.

- For direct response paid media advertising (i.e. Infomercial), provide ongoing analysis and ROI to determine most effective media markets, dayparts, and stations on a time sensitive basis for redirection or concentration of funds as evaluation indicates.

- Carefully audit invoices and make timely payment to media and suppliers for space and time purchased by AMc on NRA's behalf.

D.   **Owned Media Services**

- Full-time online broadcasting services for NRATV.

- Support services for NRATV provided by AMc Interactive include daily creation of graphics, flash animation for daily stories and synchronization to audio/video.

- Ongoing technical support service, unification, and advice for NRAHQ site (e.g. Answer to questions on service provider issues and simple "how-tos"). Application development or re-working requiring complex execution to be estimated on a project basis for NRA approval in advance of work performance.

- Full time marketing services to promote NRATV as well as on-site promotion of NRA programs, activities, and current events.

- Production of America's First Freedom Magazine.

E.   **Digital Systems Operations Support**

- Technology consulting including third party solutions, cloud consulting and reviewing IS efforts.

- Reliability engineering and monitoring including performance monitoring, emergency response and overall efficiency.

3

- Resource and capacity planning for large scale hardware and software migration initiatives.

- System and database administration, maintenance, updating, monitoring and troubleshooting.


## II.   COMPENSATION

### A.   Public Relations/Political Strategy/Strategic Marketing Services

1.   During the term of this Agreement, for ongoing Public Relations, Political Strategy and Strategic Marketing, NRA will pay AMc a fee as mutually agreed upon each year.

### B.   Advertising/Creative/Media Planning and Placement Services

1.   During the term of this Agreement, for ongoing study of NRA's business, including account service, creative development and other support functions in connection with the day-to-day administration and operation of NRA's account, NRA will pay AMc 15% commission of the gross media expenditure, or a 17.65% mark-up of the net media billing, for all media researched, planned, placed and administered by AMc on NRA's behalf.

2.   For collateral advertising services and products purchased on NRA's behalf from external suppliers (such as separations, engravings, typography, printing, etc.), by a 15% commission if offered, or a 17.65% mark-up of net billing. Estimates of the cost of external services and products are prepared, when reasonable time is available, for approval in advance and are subject to no more than a +/-10% variance provided AMc is authorized to proceed with production within thirty (30) days of the date the estimate is presented. Client changes in job specifications usually will result in the preparation and submission of a revised estimate; however, NRA agrees to assume financial responsibility for all changes specified by NRA then executed by AMc with NRA's knowledge.

3.   For art concepts, design layout, photography and film processing, copywriting, music composition and arrangement, audio and video production, etc., by cost quotations submitted for approval in advance, when reasonable time is available, or at the comprehensive art, storyboard, demo music, etc. stage. These quotations are based on the fair market value of the work as determined by AMc, and take into consideration, among other things, the hourly rates of the personnel assigned to the project and the required to complete the job. Written estimates are subject to no more than a +/- 10% variance provided they are approved by NRA and AMc is expressly authorized to proceed with production within thirty (30) days of the date the estimate is presented. Client changes in job specifications will

4

usually result in a revised estimate; however, NRA agrees to assume financial responsibility for all changes specified by NRA , then executed by AMc with NRA's knowledge.

**C.**     **Owned Media and Internet Services**

During the term of this agreement, AMc will provide owned media and online broadcasting and website management, hosting and creation of NRATV, as well as full time marketing services. NRA will pay AMc a fee as mutually agreed upon each year.

**D.**     **Digital Systems Operations Support**

During the term of this agreement, AMc will provide digital systems operations support. NRA will pay AMc a fee as mutually agreed upon each year.

**E.**     **Other Projects**

If AMc undertakes, at NRA's request, additional or special assignments, not included within the services described in this project, the charges made by AMc will be agreed-upon in advance whenever possible. If no specific agreement was made, AMc will charge NRA a fair market price for the work performed.

**III.    BILLING AND PAYMENT**

A.     Mailing and express charges, long distance telephone calls, photocopies, deliveries, sales taxes and reasonable out-of-town travel including transportation, meals and lodging, etc. on NRA's express behalf, shall be billed at AMc's cost. All out of town travel expenses shall require prior written approval in accordance with written procedures established by the NRA Executive Vice President or his designee. Payment of travel expenses not approved in advance may result in denial of reimbursement. Expenses not listed above shall be considered to be normal business expenses of AMc and not billable to NRA unless specifically authorized in writing by the NRA Executive Vice president or his designee.

B.     All sales, use and similar taxes and all import, export and foreign taxes imposed by all applicable governmental authorities shall be billed to NRA at the amount imposed by such governmental authorities. AMc shall not be obligated to contest the applicability of any such taxes to the transactions performed pursuant to this Services Agreement.

C.     Fees shall be billed on or before the 5th of each month. This billing shall include costs specified in paragraph III A.

D.     Special assignments not included in this Agreement which cannot reasonably be included under the monthly fee must be approved in accordance with written procedures established by the NRA Executive Vice President or his designee, and the charges made by AMc shall be agreed upon in advance, where reasonable,

5

otherwise such charges shall be not greater than the usual and customary charges for such services or expenses in the industry.

E.   All sums payable to AMc under this Services Agreement shall be payable at AMc's corporate headquarters in Oklahoma City, Oklahoma within 30 days of the invoice date. Any amounts not received by AMc within 60 days from the date of the invoice shall bear interest at the rate of 1.0% per month from the date of the invoice until paid. NRA shall notify AMc of any questions concerning any invoices within 10 business days after receipt.

## IV.   CONFIDENTIALITY

A.   **AMc**

1.   AMc shall not disclose, directly or indirectly, to any third party any NRA membership data or mailing lists, any materials or information relating thereto, or any other data, materials or information coming to the knowledge of AMc, supplied to AMc by NRA, or otherwise made known to AMc as a result of AMc's providing Services (hereinafter collectively, referred to as the "**Confidential Information**"), without the prior express written permission of NRA.   This Services Agreement shall control AMc's providing fulfillment services to NRA.

2.   AMc shall not make or cause to have made any copies of any NRA Confidential Information without the prior express written authorization of NRA.

3.   AMc may use such Confidential Information only for the limited purpose of providing its Services to NRA.

4.   AMc may disclose such Confidential Information to AMc's employees but only to the extent necessary to provide its Services.   AMc warrants and agrees to prevent disclosure of Confidential Information by its employees, agents, successors, assigns and subcontractors.

B.   AMc, its employees and agents, shall comply with any and all security arrangements imposed by NRA respecting access to Confidential Information.

C.   AMc acknowledges NRA's exclusive right, title and interest in the Confidential Information, and shall not at any time do or cause to be done any act or thing contesting or in any way impairing or tending to impair any part of such right, title or interest.

D.   AMc shall cease and desist from any and all use of the Confidential Information, and AMc shall promptly return to NRA, in a manner satisfactory to NRA, any and all Confidential Information, upon the earlier to occur of the following: the completion or termination of the Services Agreement.

6

## V.   INDEMNIFICATION/INSURANCE

### A.   **AMc**

1.   AMc agrees to indemnify, defend and hold harmless NRA from and against any loss, liability and expenses including attorney's fees which NRA shall become obligated to pay in respect to: (a) materials prepared by AMc on behalf of NRA which gives rise to any claims pertaining to libel, slander, defamation, infringement of copyright, title or slogan, or privacy or invasion of rights of privacy; or (b) the public relations services and related activities of any person engaged by AMc as a spokesperson in connection with NRA and its purposes, objectives and activities ("**Spokesperson**") pursuant to the direction or supervision of AMc.  Insurance coverage for the foregoing indemnification obligations shall be maintained by AMc.

2.   NRA agrees to give AMc prompt notice of such claims and to permit AMc, through AMc's insurance carrier and/or counsel of AMc's choice, to control the defense or settlement thereof.  However, NRA reserves the right to participate in the defense of any such claim through NRA's own counsel and at NRA's own expense.

3.   AMc shall take reasonable precautions to safeguard NRA's property entrusted to AMc's custody or control, but in the absence of negligence on AMc's part or willful disregard of NRA's property rights, AMc shall not be held responsible for any loss, damage, destruction, or unauthorized use by others of any such property.

4.   AMc shall not be liable to NRA by reason of default of suppliers of materials and services, owners of media, or other persons not AMc employees or contractors unless supplier(s) is under control of AMc or AMc should have reasonably anticipated default.

### B.   **NRA**

1.   NRA agrees to indemnify, defend and hold harmless AMc, and its directors, officers, employees, agents, contractors and representatives (collectively, the "**AMc Indemnified Parties**," such directors, officers, employees, agents, contractors and representatives being hereby deemed third party beneficiaries of this indemnity provision), from and against any and all claims, demands, causes of action, suits, liabilities, losses, damages settlements, judgments, and expenses (including attorney's fees), arising from (1) any data, materials, or service performance claims furnished to any AMc Indemnified Party by NRA, or approved by NRA, from which a AMc Indemnified Party prepared any publicity materials or public relations materials, or which were used by a AMc Indemnified Party in the production of advertising which was approved by NRA; (2) any claim, action or proceeding by any person(s), entity(ies), the United States of

7

America, any state(s), county(ies), or municipality(ies), or any department, agency, board, bureau, commission, attorney general, or other instrumentality(ies) or political subdivision(s) of any of the foregoing, seeking (a) damages (whether actual, exemplary, or both), reimbursement or other compensation for any alleged injury(ies), death(s), or private or public losses, damages or costs related to one or more incidents of violence committed with firearms, or (b) an injunction or other equitable relief with respect to the activities of a AMc Indemnified Party performed on behalf of NRA pursuant to this Agreement or otherwise requested or approved by NRA; or (3) the public relations services and related activities of any Spokesperson pursuant to the direction or supervision of NRA. Insurance coverage for the foregoing indemnification obligations shall be maintained by NRA.

2.    AMc agrees to give NRA prompt notice of any matter covered by NRA's indemnity set forth above and to permit NRA, through NRA's insurance carrier and/or counsel of NRA's choice, to control the defense or settlement thereof. However, AMc and the other AMc Indemnified Parties reserve the right to participate in the defense of any such claim through the AMc Indemnified Parties' own counsel and at the AMc Indemnified Parties' own expense.

C.    NRA shall reserve the right, in NRA's best interest, to modify, reject, cancel, or stop any and all plans, schedule, and work in progress. In such event AMc shall immediately take proper and responsible action to carry out such instruction; NRA, however, agrees to assume AMc's liability for agreed upon commitments and to reimburse AMc for losses AMc may derive therefrom, and to pay AMc for all internal and external expenses incurred on NRA's behalf with NRA's authorization and to pay AMc charges relating thereto in accordance with the provisions of this Services Agreement.

## VI.    OWNERSHIP OF PRODUCTS

All creative works developed by AMc in fulfilling its obligations under this Services Agreement shall constitute works made for hire, and shall be the property of NRA. In the event that such works should not be "works made for hire," as such works are defined at 17 U.S.C. § 101, then AMc transfers and assigns to NRA the ownership of all copyright in such works. In the event that AMc should employ a subcontractor, AMc shall arrange for the transfer of such intellectual property to NRA. All other, and further, intellectual property and mailing lists, under any definition, whether common law or statutory, created or developed by AMc in fulfilling its obligations under this Services Agreement, are NRA's sole and exclusive property, and AMc does hereby assign all right, title and interest in same to NRA to the extent that AMc has such rights to assign and transfer. In no event shall AMc be deemed to be assigning or transferring greater rights than it has acquired from any supplier or contractor from who it may have acquired certain elements of the material prepared for NRA.

8

VII.   **NO COMPETITION**

For the duration of this Service Agreement, AMc shall not represent any other entity in public relations services directly competitive with NRA without NRA's prior written approval.

VIII.   **EXAMINATION OF RECORDS**

During the term of this Services Agreement, AMc authorizes NRA, upon reasonable notice, to examine AMc and Mercury's files, books, and records, with respect to matters covered under this Services Agreement.

IX.   **AUTHORIZED CONTACTS**

AMc is authorized to act upon written communications received from the NRA Executive Vice President or his designee. He or his designee are the only persons within NRA who have the actual authority to issue such communications.

X.   **MISCELLANEOUS**

A.   Severability. If any provision of this Services Agreement shall be held to be void or unenforceable for any reason, the remaining terms and provisions hereof shall not be affected thereby.

B.   Binding Effect; Agents. The provisions of this Services Agreement shall inure to the benefit of and bind the heirs, legal representatives, successors and assigns of the parties hereto. In performing the Services described above and in taking any action necessarily incident thereto, AMc may utilize the services of AMc's employees and/or such agents or independent contractors approved by NRA as AMc deems appropriate.

C.   Section Headings. Section headings contained in this Services Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation thereof.

D.   Integrated Agreement. This Services Agreement, together with any Exhibits hereto, constitute the entire agreement between NRA and AMc relating to the matters covered by this Services Agreement at the time of its signing. This Services Agreement supersedes all prior agreements, including letter agreements and memoranda of understanding.

E.   Survival. The terms, covenants, and conditions of Section IV and Section V shall survive the termination or expiration of this Services Agreement.

XI.   **TERMINATION**

A.   This Services Agreement shall become effective upon the execution hereof.

B.     This Services Agreement shall continue in full force and effect for an initial period of eight (8) months ending 12-31-2017. After the initial period of eight (8) months, NRA or AMc may at their sole and exclusive discretion, terminate this Services Agreement, without any cause whatsoever, upon ninety (90) days written notice. Without such written notice, it is the intention of the parties that the Services Agreement will automatically renew. Any written notice to cancel this Contract shall be effective ninety (90) days from the date the Party giving notice to cancel tenders such written notice to the other Party. In the event of said termination, all further obligations of each party to perform shall cease, except as otherwise specifically provided in this Services Agreement. In said case NRA shall, pursuant to Section III, reimburse AMc for expenses incurred on NRA's behalf up to the date of termination.

C.     This Services Agreement may be terminated by NRA immediately upon written notice if: (1) AMc fails to diligently and in good faith perform any of its obligations contemplated hereunder; (2) AMc breaches any term, promise or covenant hereunder; (3) AMc files for bankruptcy; (4) there occurs any assignment for the benefit of creditors or the placement of any of AMc's assets in the hands of a trustee or receiver; (5) AMc becomes insolvent or bankrupt; (6) AMc is dissolved. If NRA so terminates this Services Agreement, NRA shall have no obligation to make payments except that NRA shall, pursuant to Section III, reimburse AMc for expenses incurred up to the date of said notice of termination.

D.     This Services Agreement may be terminated by AMc immediately upon written notice if (1) NRA fails to diligently and in good faith perform any of its obligations contemplated hereunder; (2) NRA breaches any term, promise or covenant hereunder; (3) NRA files for bankruptcy; (4) there occurs any assignment for the benefit of creditors or the placement of any of NRA's assets in the hands of a trustee or receiver; (5) NRA becomes insolvent or bankrupt; or, (6) NRA is dissolved.

E.     Upon the expiration or termination of this Services Agreement, AMc shall immediately return to NRA, to such place and in such manner as NRA may specify, any and all of NRA's property, materials, documents, Confidential Information, etc., that may be in AMc's possession. All charges for accumulating said materials shall be approved and paid in advance of receipt by the NRA. For all non-cancellable contracts entered into between AMc and third parties for the benefit of the NRA (herein "**AMc-Third Party NRA Contracts**"), the NRA agrees to pay AMc upon such expiration or termination the balance of the compensation payable under such AMc-Third Party NRA Contracts as of the date of expiration or termination so that AMc can fulfill its obligations under said Contracts after expiration or termination. If any AMc-Third Party NRA Contract(s) are cancelable upon payment of a fee and the NRA requests that such Contract(s) be cancelled, the NRA agrees to pay AMc the cancellation fees payable under such Contracts as a condition of AMc cancelling such Contract(s).

F.     In consideration of the dedication of a substantial number of personnel and resources to provide the services under this Agreement (and the necessity to

maintain such staffing levels and resource allocations to enable AMc to continue to provide such services upon any renewals hereof), the NRA agrees to pay AMc a fair and equitable termination fee to compensate it for the inevitable severances and other reasonable costs incurred in conjunction with such expiration or termination. Such termination fees shall be negotiated in good faith by the parties and paid to AMc no later than the last day of this Agreement.

G.    The terms, covenants, and conditions of Section IV and Section V shall survive the termination or expiration of this Services Agreement.

## XII.    GOVERNING LAW AND CONSENT TO JURISDICTION, VENUE, AND SERVICE

A.    This Services Agreement and any disputes arising thereunder shall be governed by and construed solely under the laws of the Commonwealth of Virginia, or, if applicable by federal law.

B.    AMc consents and agrees that all legal proceedings relating to the subject matter of this Services Agreement shall be maintained exclusively in courts sitting within the City of Alexandria or the County or Fairfax, Commonwealth of Virginia, and AMc hereby consents and agrees that jurisdiction and venue for such proceedings shall lie exclusively with such courts. AMc furthermore consents to the exercise of personal jurisdiction by said courts over AMc.

IN WITNESS WHEREOF, and intending to be legally bound hereby, and further intending to bind their employees, agents, successors and assigns, the parties have executed this Services Agreement the day and date above written.

**National Rifle Association (NRA)**                    **Ackerman McQueen, Inc.**

_A.D.Cors_                                              _Melanie Montgomery_

Allan D. Cors, President                                 Melanie Montgomery
Print Name/Title                                         Print Name/Title
                                                                    EVP

11

## AMENDMENT NO. 1 TO SERVICES AGREEMENT

This Amendment No. 1 to Services Agreement (this "Amendment") is dated as of May _____, 2018, and is entered into by and between the National Rifle Association of America ("NRA") and Ackerman McQueen, Inc. ("AMc").

### WITNESSETH:

**WHEREAS**, NRA and AMc are parties to that certain Services Agreement (the "Services Agreement") dated April 30, 2017; and;

**WHEREAS**, NRA and AMc desire to amend the Services Agreement;

**NOW, THEREFORE**, in consideration of the mutual promises and covenants set forth herein, the parties hereto agree as follows:

1.   Defined Terms. All initial capitalized terms used herein but not defined herein shall have the meanings set forth in the Services Agreement.

2.   Amendment of Paragraph III E. Paragraph III E of the Services Agreement is hereby amended to add the following provisions at the beginning of paragraph III E:

> All service fee billing under this Services Agreement for talent and employees who work through AMc for NRA and its affiliates, including, but not limited to, Dana Loesch and _____, shall be invoiced by AMc no later than the fifth day of each calendar month, which invoice shall be payable by NRA to AMc at AMc's corporate headquarters in Oklahoma City, Oklahoma within 30 days of the invoice date. NRA acknowledges that its failure to pay such an invoice within 30 days will cause substantial financial damage to AMc. Accordingly, if at any time NRA fails to timely pay the invoice, NRA agrees that it shall post a $3,000,000 letter of credit (the "LOC") for the benefit of AMc. The LOC shall continue in existence for the term of the Agreement and shall be maintained at $3,000,000 at all times. The LOC may only be drawn upon to pay in full invoices for service fee billings outstanding more than 30 days.

3.   Amendment of Paragraph XI E. Paragraph XI E shall be amended and restated in its entirety to read as follows:

> Upon the expiration or termination of this Services Agreement, AMc shall immediately return to NRA, to such place and in such manner as NRA may specify, any and all of NRA's property, materials, documents, Confidential Information, etc., that may be in AMc's possession. All charges for accumulating said materials shall be approved and paid in advance of receipt by the NRA. For all non-cancellable contracts entered into between AMc and third parties for the benefit of the NRA (herein "**AMc-Third Party NRA Contracts**"), the NRA agrees to pay AMc upon such expiration or termination the balance of the compensation payable under such AMc-Third Party NRA Contracts

(including, but not limited to, the AMc-Third Party NRA Contracts with Dana Loesch and _Oliver North_ ) as of the date of expiration or termination so that AMc can fulfill its obligations under said Contracts after expiration or termination. If any AMc-Third Party NRA Contract(s) are cancellable upon payment of a fee and the NRA requests that such Contract(s) be cancelled, the NRA agrees to pay AMc the cancellation fees payable under such Contracts as a condition of AMc cancelling such Contract(s).

4.   Integrated Agreement.  This Amendment and the Service Agreement, and the Exhibits thereto, constitute the entire agreement between NRA and AMc relating to the matters covered hereto and thereto.

5.   Miscellaneous.  Paragraphs X and XII of the Services Agreement are hereby incorporated by reference as if set forth in full in this Amendment.

6.   Effect.  In the event of a conflict between this Amendment and the Services Agreement, the provisions of this Amendment shall control. To the extent not amended by this Amendment, all of the provisions of the Services Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, and intending to be legally bound hereby, and further intending to bind their employees, agents, successors and assigns, the parties have executed this Amendment the day and date above written.

**National Rifle Association of America (NRA)**

Print Name/Title _Wilson H. Phillips Jr._ _TREASURER_

**Ackerman McQueen, Inc.**

Print Name/Title _Pete R. Brownell_

ATTEST:

ATTEST: _Carolyn D. Meadows_

4826-9804-1444\1

2

# Exhibit B

## SERVICES AGREEMENT

**THIS AGREEMENT,** made this 1st day of May, 1999, by and between the National Rifle Association of America (hereinafter referred to as "**NRA**"), A New York Not-For-Profit Corporation, located at 11250 Waples Mill Road, Fairfax, Virginia 22030, and Ackerman McQueen, Inc., an Oklahoma corporation, and its wholly owned subsidiary, Mercury Group Inc., an Oklahoma corporation, (hereinafter collectively referred to as "**AMc**"), whose principal office is located in Oklahoma at 1100 The Tower, 1601 N.W. Expressway, Oklahoma City, Oklahoma 73118.

## W I T N E S S E T H:

**WHEREAS,** AMc is in the business of providing public relations, strategic marketing, advertising, creative, direct marketing and internet services and warrants and represents that it possesses the capability, necessary personnel, political strength, equipment and other related items to perform such services; and,

**WHEREAS,** NRA is a Membership Organization and desires to retain AMc as a nonexclusive source for services described herein for NRA upon the terms and conditions hereinafter set forth.

**NOW, THEREFORE,** in consideration of the mutual promises and covenants set forth herein, the parties hereto agree as follows:

## I.    SERVICES

### A.    Public Relations/Political Strategy/Strategic Marketing Services

Services include a combination of generating earned media, responsive public relations, political consultation and strategic thinking to promote a positive image of the NRA as described below:  (These services are provided as part of the monthly fee as described in the "**Compensation**" Section.)

- Public relations advice and counsel, including crisis management

- Ongoing media relations -- solicitation and placement of features in national, regional and local media; liaison with print and broadcast news media on a daily basis for unsolicited inquiries; ongoing media training for NRA officials; Editorial Board meetings; features for outdoor publications.

- Specialized public relations writing services (news releases, columns, editorials), and distribution of same as required (e.g. Via wire service or individual contact).

- Research and information retrieval as necessary for NRA issues management at NRA's request and approval.

- Coordination, scheduling and on-site assistance when necessary for NRA officials' speeches and personal appearances.

- Coordination with internal NRA public relations staff in the Executive Office, General Operations and Institute for Legislative Action.

- Development of proactive earned media in national and regional media as it relates to NRA officials' appearances at special events (i.e. National Gun Shows, Camp Perry, YHEC, National Police Shooting Championships, Annual Meetings, etc.).

- Coordination and scheduling appearances for NRA officials and celebrities; including on-site assistance (where necessary).

- Develop, produce and place op-ed pieces for national and regional media coinciding with Special Events and NRA Officials' appearances.

- Development of relations with and liaison with celebrities, opinion leaders, and lawmakers to further NRA issues in a positive manner.

- Advise and counsel with NRA Officials on strategic issues to provoke public debate and frame NRA's point-of-view for the general public.

- Advice and counsel on political issues as they relate to the Second Amendment and NRA's political agenda.   Research into and development of new political strategies.

- Limited speechwriting services (pivotal speeches for major events are discussed in "Advertising/Creative Services" Section).

- Assistance in the production and coordination of NRA Radio Show.

**B.    Advertising/Creative Services**

The services described below (with the exception of "Media Planning and Placement" which is addressed separately as a subcategory of this Section) will be provided to NRA on a project ("**Job**") basis based on the fair market value of the work as determined by AMc and take into consideration, among other things, the hourly rates of the personnel assigned to the Job and the time required to complete the Job. When reasonable time is available, cost estimates will be submitted for approval by NRA prior to the initiation of the Job.

- Speechwriting services for NRA dignitaries to be delivered at major events (includes background research, interviews with NRA Officials/Speaker, drafts and rehearsals if appropriate).

- Conceive, copywrite, design and produce local, regional and national print and broadcast advertising and other appropriate forms of communication to present NRA's message.

- Original photography services and film processing (on location and/or in AMc's photo studio).

- Audio/Visual and Event Management services (i.e. Annual Meetings).

- Video Taping, Editing and Production.

- Music composition and arrangement and audio production.

- Primary Research services (quantitative and qualitative).

## Media Planning and Placement Services

Detail of AMc's compensation for Media Services are provided in the "Compensation" Section. Services rendered for such are:

- With NRA's approval, plan and order by written contract or insertion order the print space, radio and television time, or other media to be used for advertising, always endeavoring to secure the best available rates. AMc shall remain solely liable for payment, to the extent NRA has paid AMc.

- Incorporate the advertising in the required form and forward it to media with proper instructions for fulfillment of the contract or insertion order.

- Diligently check and verify broadcasts, insertions, displays, or other means used to carry the message to ensure proper fulfillment of all media purchases made by AMc on NRA's behalf.

- For direct response paid media advertising (i.e. Infomercial), provide ongoing analysis and ROI to determine most effective media markets, dayparts, and stations on a time sensitive basis for redirection or concentration of funds as evaluation indicates.

- Carefully audit invoices and make timely payment to media and suppliers for space and time purchased by AMc on NRA's behalf.

C.   **New Media/Internet Services**

- Full-time webcasting for ongoing NRA news program, nraLIVE. Involves creation, writing, conducting interviews (on location and via telephone) as well as on-camera host talent for daily programming. Production services include all audio and video components for daily stories (shooting, recording, editing and rendering QuickTime movies and conversion into "Real Player" format for uploading on WWW server) and creation and maintenance of "crawler" information

- Support services for nraLIVE provided by AMc New Media include daily creation of graphics, flash animation for daily stories and synchronization to audio/video.

- Ongoing technical support service and advice for NRAHQ site (e.g. Answer to questions on service provider issues and simple "how-tos"). Application development or re-working requiring complex execution to be estimated on a project basis for NRA approval in advance of work performance.

- Full time marketing services to promote NRA internet sites as well as on-site promotion of NRA programs, activities and current events. New Media marketing director is responsible for integrating all NRA marketing to contain and promote the URLs as well as an **aggressive search engine placement program** that also will entail ongoing creation of pages that are optimized for individual engines. Exploration and execution of site links with other gun and hunting related URLs. Additional marketing efforts will utilize traditional news outlets to create further awareness for NRA sites.

II.   **COMPENSATION**

A.   **Public Relations/Political Strategy/Strategic Marketing Services**

1.   During the term of this Agreement, for ongoing Public Relations, Political Strategy and Strategic Marketing, NRA will pay AMc a professional service fee of $89,000 per month.

B.   **Advertising/Creative/Media Planning and Placement Services**

1.   During the term of this Agreement, for ongoing study of your business, including account service, creative development and other support functions in connection with the day-to-day administration and operation of your account, NRA will pay AMc 15% commission of the gross media expenditure, or a 17.65% mark-up of the net media billing, for all media researched, planned, placed and administered by AMc on NRA's behalf.

4

For any outdoor media researched, planned, placed and administered by AMc on your behalf, the agency will be compensated by a 16.67% commission of the gross expenditure, or a 20% mark-up of the net billing.

2.  For collateral advertising services and products purchased on your behalf from external suppliers (such as separations, engravings, typography, printing, etc.), by a 15% commission if offered, or a 17.65% mark-up of net billing.  Estimates of the cost of external services and products are prepared, when reasonable time is available, for approval in advance and are subject to no more then a +/-10% variance provided we are authorized to proceed with production within thirty (30) days of the date the estimate is presented.  Client changes in job specifications usually will result in the preparation and submission of a revised estimate; however, you agree to assume financial responsibility for all changes specified by you, then executed by us with your knowledge.

3.  For art concepts, design layout, photography and film processing, copywriting, music composition and arrangement, audio and video production, etc., by cost quotations submitted for approval in advance, when reasonable time is available, or at the comprehensive art, storyboard, demo music, etc. stage.  These quotations are based on the fair market value of the work as determined by AMc, and take into consideration, among other things, the hourly rates of the personnel assigned to the project and the required to complete the job.  Written estimates are subject to no more than a +/- 10% variance provided they are approved by you are we are expressly authorized to proceed with production within thirty (30) days of the date the estimate is presented. Client changes in job specifications will usually result in a revised estimate; however, you agree to assume financial responsibility for all changes specified by you, then executed by us with your knowledge.

C.  **Internet Services**

During the term of this agreement, for ongoing website management, hosting and creation of nraLIVE, as well as full time marketing services, NRA will pay AMc a professional service fee of $66,600.00 per month.

D.  **Other Projects**

If we undertake, at your request, additional or special assignments, not included within the services described in this project, the charges made by us will be agreed-upon in advance whenever possible.  If no specific

agreement was made, we will charge you a fair market price for the work performed.

## III.   BILLING AND PAYMENT

A.   Mailing and express charges, long distance telephone calls, photocopies, deliveries, sales taxes and reasonable out-of-town travel including transportation, meals and lodging, etc. on NRA's express behalf, shall be billed at AMc's cost. All out of town travel expenses shall require prior written approval in accordance with written procedures established by the NRA Executive Vice President or his designee.   Payment of travel expenses not approved in advance may result in denial of reimbursement. Expenses not listed above shall be considered to be normal business expenses of AMc and not billable to NRA unless specifically authorized in writing by the NRA Executive Vice president or his designee.

B.   All sales, use and similar taxes and all import, export and foreign taxes imposed by all applicable governmental authorities shall be billed to NRA at the amount imposed by such governmental authorities. AMc shall not be obligated to contest the applicability of any such taxes to the transactions performed pursuant to this Services Agreement.

C.   Fees shall be billed on or before the 5th of each month.  This billing shall include costs specified in paragraph III A.

D.   Special assignments not included in this Agreement which cannot reasonably be included under the monthly fee must be approved in accordance with written procedures established by the NRA Executive Vice President or his designee, and the charges made by AMc shall be agreed upon in advance, where reasonable, otherwise such charges shall be not greater than the usual and customary charges for such services or expenses in the industry.

E.   All sums payable to AMc under this Services Agreement (except for travel and entertainment, Media and Broadcast Production addressed in Section III.F shall be payable at AMc's corporate headquarters in Oklahoma City, Oklahoma within 30 days of the invoice date.  Any amounts not received by AMc within 60 days from the date of the invoice shall bear interest at the rate of 1.0% per month from the date of the invoice until paid.  NRA shall notify AMc of any questions concerning any invoices within 10 business days after receipt.

F.   All sums payable to AMc for travel and entertainment, Media expenditures and Broadcast Production shall be payable at AMc's corporate headquarters in Oklahoma City, Oklahoma within three (3) business days of the invoice date, unless for political advertising, which shall be due upon receipt.

## IV.   CONFIDENTIALITY

A.   1. AMc shall not disclose, directly or indirectly, to any third party any NRA membership data or mailing lists, any materials or information relating thereto, or any other data, materials or information coming to the knowledge of AMc, supplied to AMc by NRA, or otherwise made known to AMc as a result of AMc's providing Services (hereinafter collectively, referred to as the "**Confidential Information**"), without the prior express written permission of NRA.   This Services Agreement shall control AMc's providing fulfillment services to NRA.

2. AMc shall not make or cause to have made any copies of any NRA Confidential Information without the prior express written authorization of NRA.

3. AMc may use such Confidential Information only for the limited purpose of providing its Services to NRA.

4. AMc may disclose such Confidential Information to AMc's employees but only to the extent necessary to provide its Services.   AMc warrants and agrees to prevent disclosure of Confidential Information by its employees agents, successors, assigns and subcontractors.

B.   AMc, its employees and agents, shall comply with any and all security arrangements imposed by NRA respecting access to Confidential Information.

C.   AMc acknowledges NRA's exclusive right, title and interest in the Confidential Information, and shall not at any time do or cause to be done any act or thing contesting or in any way impairing or tending to impair any part of such right, title or interest.

D.   AMc shall cease and desist from any and all use of the Confidential Information, and AMc shall promptly return to NRA, in a manner satisfactory to NRA, any and all Confidential Information, upon the earlier to occur of the following:   the completion or termination of the Services Agreement.

## V.   INDEMNIFICATION/INSURANCE

A.   1. AMc agrees to indemnify, defend and hold harmless NRA from and against any loss, liability and expenses including attorney's fees which NRA shall become obligated to pay in respect to materials prepared by AMc on behalf of NRA which gives rise to any claims pertaining to libel, slander, defamation, infringement of copyright, title or slogan, or privacy or invasion of rights of privacy, insurance coverage for which shall be maintained by AMc.   AMc's liability under this indemnity and hold harmless agreement is limited to $2,000,000 or any greater

7

amount which may be recoverable under AMc's insurance policies. This indemnity and hold harmless does not cover any fines or penalties. AMc agrees to furnish NRA with a certificate of insurance reflecting $2,000,000 in coverage for the defined liability.

2. NRA agrees to give AMc prompt notice of such claims and to permit AMc, through AMc's insurance carrier and/or counsel of AMc's choice, to control the defense or settlement thereof. However, NRA reserves the right to participate in the defense of any such claim through NRA's own counsel and at NRA's own expense.

3. AMc shall take reasonable precautions to safeguard NRA's property entrusted to AMc's custody or control, but in the absence of negligence on AMc's part or willful disregard of NRA's property rights, AMc shall not be held responsible for any loss, damage, destruction or unauthorized use by others of any such property.

4. AMc shall not be liable to NRA by reason of default of suppliers of materials and services, owners of media, or other persons not AMc employees or contractors unless supplier(s) is under control of AMc or AMc should have reasonably anticipated default.

B.   1. NRA agrees to indemnify, defend and hold harmless AMc, and its directors, officers, employees, agents, contractors and representatives (collectively, the "**AMc Indemnified Parties**," such directors, officers, employees, agents, contractors and representatives being hereby deemed third party beneficiaries of this indemnity provision), from and against any and all claims, demands, causes of action, suits, liabilities, losses, damages settlements, judgments, and expenses (including attorneys' fees), arising from (1) any data, materials, or service performance claims furnished to any AMc Indemnified Party by NRA, or approved by NRA, from which a AMc Indemnified Party prepared any publicity materials or public relations materials, or which were used by a AMc Indemnified Party in the production of advertising which was approved by NRA, or (2) any claim, action or proceeding by any person(s), entity(ies), the United States of America, any state(s), county(ies), or municipality(ies), or any department, agency, board, bureau, commission, attorney general, or other instrumentality(ies) or political subdivision(s) of any of the foregoing, seeking (a) damages (whether actual, exemplary, or both), reimbursement or other compensation for any alleged injury(ies), death(s), or private or public losses, damages or costs related to one or more incidents of violence committed with firearms, or (b) an injunction or other equitable relief with respect to the activities of a AMc Indemnified Party performed on behalf of NRA pursuant to this Agreement or otherwise requested or approved by NRA. NRA agrees to furnish AMc with a certificate of insurance reflecting not less than $5,000,000 in coverage for the foregoing.

2. AMc agrees to give NRA prompt notice of any matter covered by NRA's indemnity set forth above and to permit NRA, through NRA's insurance carrier and/or counsel of NRA's choice, to control the defense or settlement thereof.  However, AMc and the other AMc Indemnified Parties reserve the right to participate in the defense of any such claim through the AMc Indemnified Parties' own counsel and at the AMc Indemnified Parties' own expense.

C.   1.   NRA shall reserve the right, in NRA's best interest, to modify, reject, cancel or stop any and all plans, schedule, and work in progress.  In such event AMc shall immediately take proper and responsible action to carry out such instruction; NRA, however, agrees to assume AMc's liability for agreed upon commitments and to reimburse AMc for losses AMc may derive therefrom, and to pay AMc for all internal and external expenses incurred on NRA's behalf with NRA's authorization and to pay AMc charges relating thereto in accordance with the provisions of this Services Agreement.

## VI.   OWNERSHIP OF PRODUCTS

All creative works developed by AMc in fulfilling its obligations under this Services Agreement shall constitute works made for hire, and shall be the property of NRA.  In the event that such works should not be "works made for hire," as such works are defined at 17 U.S.C. § 101, then AMc transfers and assigns to NRA the ownership of all copyright in such works.  In the event that AMc should employ a subcontractor, AMc shall arrange for the transfer of such intellectual property to NRA.  All other, and further, intellectual property and mailing lists, under any definition, whether common law or statutory, created or developed by AMc in fulfilling its obligations under this Services Agreement, are NRA's sole and exclusive property, and AMc does hereby assign all right, title and interest in same to NRA to the extent that AMc has such rights to assign and transfer.  In no event shall AMc be deemed to be assigning or transferring greater rights than it has acquired from any supplier or contractor from who it may have acquired certain elements of the material prepared for NRA.

## VII.   NO COMPETITION

For the duration of this Service Agreement, AMc shall not represent any other entity in public relations services directly competitive with NRA without NRA's prior written approval.

## VIII.   EXAMINATION OF RECORDS

During the term of this Services Agreement, AMc authorizes NRA, upon reasonable notice, to examine Mercury's files, books, and records, with respect to matters covered under this Services Agreement.

### IX.   AUTHORIZED CONTACTS

AMc is authorized to act upon written communications received from the NRA Executive Vice President or his designee. He or his designee are the only persons within NRA who have the actual authority to issue such communications.

### X.   MISCELLANEOUS

1. Severability. If any provision of this Services Agreement shall be held to be void or unenforceable for any reason, the remaining terms and provisions hereof shall not be affected thereby.

2. Binding Effect: Agents. The provisions of this Services Agreement shall inure to the benefit of and bind the heirs, legal representatives, successors and assigns of the parties hereto. In performing the Services described above and in taking any action necessarily incident thereto, AMc may utilize the services of AMc's employees and/or such agents or independent contractors approved by NRA as AMc deems appropriate.

3. Section Headings. Section headings contained in this Services Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation thereof.

4. Integrated Agreement. This Services Agreement, together with any Exhibits hereto, constitute the entire agreement between NRA and AMc relating to the matters covered by this Services Agreement at the time of its signing. There are no contemporaneous agreements, understandings, restrictions, warranties, or representations with respect to the services to be performed other than as set forth at this time. This Services Agreement supersedes all prior agreements, including letter agreements and memoranda of understanding.

5. Survival. The terms, covenants, and conditions of Section IV and Section V shall survive the termination or expiration of this Services Agreement.

### XI.   TERMINATION

A. This Services Agreement shall become effective upon the execution hereof.

B. This Services Agreement shall continue in full force and effect for an initial period of eight (8) months ending 12/31/99. After the initial period of eight (8) months, NRA or AMc may at their sole and exclusive discretion, terminate this Services Agreement, without any cause whatsoever, upon ninety (90) days written notice. Without such written notice, it is the intention of the parties that the Services Agreement will automatically renew. Any written notice to cancel this Contract shall be effective ninety

(90) days from the date the Party giving notice to cancel tenders such written notice to the other Party. In the event of said termination, all further obligations of each party to perform shall cease, except as otherwise specifically provided in this Services Agreement. In said case NRA shall, pursuant to Section III, reimburse AMc for expenses incurred on NRA's behalf up to the date of termination.

C.   This Services Agreement may be terminated by NRA immediately upon written notice if: (1) AMc fails to diligently and in good faith perform any of its obligations contemplated hereunder; (2) AMc breaches any term, promise or covenant hereunder; (3) AMc files for bankruptcy; (4) there occurs any assignment for the benefit of creditors or the placement of any of AMc's assets in the hands of a trustee or receiver; (5) AMc becomes insolvent or bankrupt; (6) AMc is dissolved.  If NRA so terminates this Services Agreement, NRA shall have no obligation to make payments except that NRA shall, pursuant to Section III, reimburse AMc for expenses incurred up to the date of said notice of termination.

D.   This Services Agreement may be terminated by AMc immediately upon written notice if (1) NRA fails to diligently and in good faith perform any of its obligations contemplated hereunder; (2) NRA breaches any term, promise or covenant hereunder; (3) NRA files for bankruptcy; (4) there occurs any assignment for the benefit of creditors or the placement of any of NRA's assets in the hands of a trustee or receiver; (5) NRA becomes insolvent or bankrupt; or, (6) NRA is dissolved.

E.   Upon the expiration or termination of this Services Agreement, AMc shall immediately return to NRA, to such place and in such manner as NRA may specify, any and all of NRA's property, materials, documents, Confidential Information, etc., that may be in AMc's possession.  All charges for accumulating said materials shall be approved and paid in advance of receipt by the NRA.

F.   The terms, covenants, and conditions of Section IV and Section V shall survive the termination or expiration of this Services Agreement.

## XII.   GOVERNING LAW AND CONSENT TO JURISDICTION, VENUE AND SERVICE

A.   This Services Agreement and any disputes arising thereunder shall be governed by and construed solely under the laws of the Commonwealth of Virginia, or, if applicable by federal law.

B.   AMc consents and agrees that all legal proceedings relating to the subject matter of this Services Agreement shall be maintained exclusively in courts sitting within the City of Alexandria or the County or Fairfax,

Commonwealth of Virginia, and AMc hereby consents and agrees that jurisdiction and venue for such proceedings shall lie exclusively with such courts. AMc furthermore consents to the exercise of personal jurisdiction by said courts over AMc.

**IN WITNESS WHEREOF,** and intending to be legally bound hereby, and further intending to bind their employees, agents, successors and assigns, the parties have executed this Services Agreement the day and date above written.

NATIONAL RIFLE ASSOCIATION ("NRA")

_____ (Signature)

WAYNE LAPIERRE (Print Name)

EXECUTIVE VICE PRESIDENT (Title)
Executive Vice President

ACKERMAN MCQUEEN, INC. ("AMc")

_____ (Signature)

W. F. Winkler (Print Name)

Chief Financial Officer (Print Title)

12

# Exhibit C

## BY ELECTRONIC AND FIRST-CLASS MAIL

May 29, 2019

Andrew Arulanandam
National Rifle Association
11250 Waples Mill Road
Fairfax, Virginia  22030

Re: *Notice of Termination of the Services Agreement*

Dear Andrew:

We received your May 24, 2019 email directing Ackerman McQueen ("AMc") to cease activities relating to six broadly-described services that AMc provides to the NRA under the existing Services Agreement (executed on April 30, 2017 as amended on May 6, 2018) (the "Services Agreement") between the two parties. Your email message also seeks our input on how to shut down the "live TV" portion of the NRATV platform over the next 60 days.

Your May 24, 2019 email notification, in conjunction with other actions by the NRA, constitutes another misguided step toward the constructive termination of the Services Agreement. At the same time, your email implies that the NRA seeks to have AMc continue to provide other services to the NRA. However, just days before your email, the NRA filed a civil lawsuit against AMc asking for a judgment declaring that AMc receive no further compensation for any work it performed after August 3, 2018. Specifically, in that lawsuit, the NRA "seeks disgorgement of any amounts wrongfully obtained by Defendants on account of their breaches of their fiduciary duties, including without limitation, all fees paid by the NRA to Ackerman and Mercury since the date such breaches began – which the NRA believes began no later than August 3, 2018." Thus, the NRA is demanding that AMc pay back any fees the NRA has paid to AMc since August 3, 2018.  This raises the obvious question of whether, in taking such a position in legal proceedings initiated by the NRA, the NRA intends to pay AMc for future work done by AMc in accordance with the Services Agreement.

Your May 24, 2019 email is the latest in a series of operational directions to AMc that are inconsistent with the NRA's legal actions against AMc. Moreover, because of the NRA's legal position in its lawsuit that the NRA should not have to pay AMc for services provided after August 3, 2018, AMc believes that the NRA has breached the explicit and implied terms, promises and covenants of the Services Agreement and is no longer performing its obligations diligently and in good faith.

The NRA has, in essence, constructively terminated the Services Agreement by engaging in a series of conflicting and disingenuous actions that have purposely destroyed AMc's ability

to maintain a working relationship with the NRA and fulfill the obligations of the Services Agreement,[1] including the following:

1.  On April 12, 2019, the NRA filed a lawsuit against AMc seeking access to four categories of documents. The lawsuit was filed without any warning or notice to AMc and without any notice or declaration to AMc that it was not in compliance with those provisions of the Services Agreement. The publicly-filed law suit was disclosed to the press before it was served on AMc, and generated considerable negative publicity that has harmed AMc.

2.  On April 24, 2019, the NRA filed a Motion for Leave to Amend the Complaint, in which it asserted new allegations against both AMc and AMc's employee, Lt. Col. Oliver North, who at that time also served as President of the NRA. As you know, Lt. Col. North was a valuable connection between the NRA and AMc, and the NRA took affirmative steps to sever that connection. Further, by damaging Lt. Col. North's reputation and misrepresenting the work he has done for AMc, the NRA interfered with his ability to properly perform the work that the NRA ordered from AMc.

3.  On May 9, 2019, the NRA directed AMc to suspend all work and costs associated with the production of "American Heroes" – a major project for which AMc has incurred substantial costs at the prior direction of the NRA. The NRA provided no reason for the suspension and AMc was not given any opportunity to provide any input into the decision.

4.  On May 21, 2019, the NRA filed a second law suit against AMc asserting that AMc had breached its fiduciary duty to the NRA and seeking the return of all payments made to AMc since August 3, 2018. Yet, because the NRA has not terminated the Services Agreement, AMc is placed in the untenable position of remaining obligated to provide services to the NRA while the NRA alleges it should not have to pay any fees for AMc's services after August 3, 2018.

5.  On May 22, 2019, AMc was compelled to file its compulsory counterclaims in response to the first lawsuit. In those counterclaims, AMc alleges that the NRA is in breach of the Services Agreement and that the NRA filed its lawsuit as a pretext that would permit the NRA to transfer all services provided by AMc to a competing public relations firm without paying AMc the compensation required under Section XI.F of the Services Agreement.

6.  On May 23, 2019, NRA filed an "Emergency Motion" asserting that AMc's employees had engaged in "theft" from the NRA and requesting permission from the Court to stay the case and allow for discovery into the alleged theft. Again, AMc did not learn of this

---

[1]   This letter focuses on the recent grounds for termination, but AMc does not waive nor excuse the prior retaliatory actions initiated in 2018 by the NRA in response to AMc's efforts to protect the interests of NRA's members from irresponsible actions sought by the NRA and its leadership.

motion from the NRA's counsel, but rather learned of this motion from reporters who were given advance notice of it.

7. On May 24, 2019, as indicated above, you provided notice directing AMc to "streamline" the services it was to provide to the NRA. Again, there was no notice provided to AMc prior to this streamlining notice, nor was there any request from AMc as to how most effectively and efficiently streamline its ongoing services to the NRA. Moreover, your notice was written as if you were unaware and in complete disregard of the legal actions that the NRA has taken against AMc and its employees.

8. The May 24, 2019 notice also suggested continued reductions in AMc's services to the NRA over the next 60 days without any clear guidance on the magnitude or nature of those reductions, showing a clear lack of understanding of this business relationship and the type of work performed under the services agreement.

9. Lastly, we note that the Service Agreement specifically contemplates that the relationship between the NRA and AMc would be directed by officials at the highest levels of both organizations, and throughout the course of the NRA's relationship with AMc, this has been the case. The Services Agreement itself requires AMc to take direction from the Executive Vice President of the NRA or his specific designee, and no one else, when dealing with the NRA. However, since the NRA initiated these legal actions and work reductions, Wayne LaPierre has severed all communications with AMc, making it impossible to work through any disagreements or concerns between the parties.

In sum, the NRA's actions have made the relationship envisioned by the Services Agreement untenable and unworkable. The NRA's actions have also frustrated the purposes of the Services Agreement. As articulated in AMc's counterclaim, the NRA has breached the Services Agreement in several material ways, including a breach of its payment obligations and a breach of the duty of good faith and fair dealing. The NRA is no longer performing its obligations with diligence and good faith, but has instead sought permission from the Court to suspend all payment obligations with a return of funds paid since August 3, 2018. These actions by the NRA provide clear justification for AMc to terminate under Section XI, Subsection D of the Services Agreement, which states that: "This Services Agreement may be terminated by AMc immediately upon written notice if (1) the NRA fails to diligently and in good faith  perform any of its obligations contemplated hereunder [or] (2) NRA breaches any term, promise or covenant hereunder . . ."

Nonetheless, the Services Agreement (Section XI.B.) also provides that either the NRA or AMc have the right to terminate the Services Agreement upon 90-days' notice. Given the long-term relationship between the NRA and AMc, AMc believes that the termination provisions under Subsection B are best suited to winding down the business relationship between the parties under the Services Agreement and allowing for a 90-day transition period. Under a termination occasioned by either Subsections B or D of Section XI of the Services Agreement, the NRA is liable to AMc for compensation required under Section XI, Subsections E (as amended) and F of the Services Agreement.

This Notice of Termination initiates a process under Section XI, Subsections E and F of the Services Agreement to wind up the relationship between the parties. Pursuant to Subsection E, AMc will prepare to return to the NRA any and all of NRA's property, materials, documents, and confidential information in AMc's possession. The Amendment to the Services Agreement states that: "All charges for accumulating said materials shall be approved and paid in advance of receipt by the NRA." Subsection F requires the NRA to pay AMc a fair and equitable termination fee to compensate it for the severance and other reasonable costs AMc will incur as a result of the termination of the Service Agreement. AMc is preparing detailed invoices for such termination fees and will be prepared to negotiate the termination of the Services Agreement in "good faith" as required by Subsection F.

If you have any questions, please contact our attorneys, David Schertler and David H. Dickieson, at 202-628-4199.

Sincerely,

Revan McQueen
Chief Executive Officer

cc:     John Frazer, Esq.
        Wayne LaPierre
        Craig Spray

# Exhibit D

NATIONAL RIFLE ASSOCIATION OF AMERICA
11250 WAPLES MILL ROAD
FAIRFAX, VIRGINIA 22030



June 25, 2019

Revan McQueen
1601 Northwest Expressway, STE 1100
Oklahoma City, OK 73118

Revan:

Pursuant to Section XI.C of the Services Agreement, this communication serves as written notice of the NRA's immediate termination of all business with Ackerman McQueen, Inc. ("Ackerman") and the Mercury Group, Inc. ("Mercury and, together with Ackerman, "AMc"). The grounds for termination are numerous, are partially set forth in two current lawsuits filed by the NRA against AMc, and constitute prior material breaches of the Services Agreement. AMc has also breached multiple common-law duties to the NRA and perpetrated intentional torts against the NRA. That AMc has recently purported to bar good-faith communication between businesspeople provides yet another ground for termination, and underscores why the relationship cannot viably continue.

The NRA demands immediate delivery of all materials encompassed by Section XI.E of the Services Agreement, including all Confidential Information (as defined by the Services Agreement). The NRA will pay for accumulation of these materials, and reiterates its previous requests for an advance price quote to this end.

Nothing in the Services Agreement, or the law of any applicable jurisdiction, provides for any transfer or assignment to AMc of any right, title, or interest in works made for hire pursuant to Section VI of the Services Agreement. Accordingly, if AMc damages or converts the NRA's property, or if the NRA perceives an imminent risk of the same, the NRA will pursue legal recourse.

The NRA regrets that a longstanding, formerly productive relationship comes to an end in this fashion. However, given the circumstances, this action must be taken in the best interests of the Association and our members.

Sincerely,

Andrew Arulanandam

# Exhibit E



SCHERTLER & ONORATO, L.L.P.

June 27, 2019

***VIA ELECTRONIC and FIRST CLASS MAIL***

Andrew Arulanandam
National Rifle Association of America
11250 Waples Mill Road
Fairfax, Virginia  22030

Dear Mr. Arulanandam:

We are in receipt of your correspondence of June 25, 2019, purporting to serve as written notice of the NRA's immediate termination of all business with Ackerman McQueen and the Mercury Group (hereinafter "AMc") pursuant to Section XI, Paragraph C of the April 30, 2017 Services Agreement between the NRA and AMc.

Your correspondence fails to set forth with any specificity the basis on which you claim to invoke the termination provisions of Section XI, Paragraph C. As you know, that provision sets forth six (6) different preconditions, at least one of which must be met before the NRA may terminate immediately the Services Agreement. Simply stated, the NRA has no basis on which it may terminate immediately the Services Agreement under Section XI, Paragraph C. None of the preconditions listed in that paragraph has been met. As a consequence, the NRA cannot invoke the immediate termination provisions of Section XI, Paragraph C.

Conversely, AMc has numerous grounds on which it may terminate immediately the Services Agreement under the provisions of Section XI, Paragraph D. Those provisions allow AMc to terminate the Services Agreement immediately if "(1) NRA fails to diligently and in good faith perform any of its obligations contemplated [under the Agreement]" or "(2) NRA breaches any term, promise or covenant [under the Agreement]." Through its conduct, the NRA has triggered both of these conditions for termination in numerous ways, some of which are set forth in our counterclaims in the NRA's lawsuits against AMc and in our past correspondence with the NRA. Most obviously, the NRA has (1) failed to pay invoices that AMc has submitted to the NRA in accordance with the provisions of Section III, Paragraph E of the Agreement, and (2) failed to establish a $3,000,000 Letter of Credit as required by the May 6, 2018 Amendment No. 1 to the Services Agreement. AMc therefore provides written notice through this letter that it is immediately terminating the Services Agreement under Section XI, Paragraph D. Our immediate termination of the Agreement triggers several contractual obligations on the part of the NRA.[1]

---

[1] As you know, on May 29, 2019, AMc provided 90-day written notice under Section XI, Paragraph B to terminate the Services Agreement so as to provide for an orderly and efficient transition. Now, the NRA, without proper cause or basis under the Services Agreement, wrongfully claims it has grounds to immediately terminate that Agreement. Since our 90-day notice on May 29, 2019, however, the NRA has continued to engage in material and egregious breaches of the Services Agreement, as described above, which necessitates and justifies AMc's immediate termination.

Andrew Arulanandam
June 27, 2019
Page 2

First, the NRA remains legally obligated to pay AMc's May 1, 2019 and June 1, 2019 invoices for services that AMc provided to the NRA during May and June of this year. We have repeatedly demanded payment of the now overdue May 1, 2019, invoice and again demand immediate payment of both of these invoices.

Second, Section XI, Paragraph E of the Services Agreement (as amended by the May 6, 2018 Amendment) states that upon termination of the Services Agreement by AMc:

> For all non-cancellable contracts entered into between AMc and third parties for the benefit of the NRA (herein "**AMc-Third Party NRA Contracts**"), the NRA agrees to pay AMc upon such expiration or termination the balance of the compensation payable under such AMc-Third Party NRA Contracts (including, but not limited to, the AMc-Third Party NRA Contracts with Dana Loesch and Oliver North) as of the date of expiration or termination so that AMc can fulfill its obligations under said Contracts after expiration or termination.

Pursuant to this provision, and as a consequence of AMc's immediate termination of the Services Agreement, AMc demands that the NRA pay AMc the balance of the compensation payable under all AMc-Third Party NRA Contracts. To be specific, the amount payable to AMc by the NRA under these AMc-Third Party NRA Contracts is **$7,094,238**.

Finally, Section XI, Paragraph F of the Services Agreement states:

> In consideration of the dedication of a substantial number of personnel and resources to provide the services under this Agreement (and the necessity to maintain such staffing levels and resource allocations to enable AMc to continue to provide such services upon renewals hereof), the NRA agrees to pay AMc a fair and equitable termination fee to compensate it for the inevitable severances and other reasonable costs incurred in conjunction with such expiration or terminations. Such termination fees shall be negotiated in good faith by the parties and paid to AMc no later than the last day of this Agreement.

AMc is in the process of calculating a fair and equitable termination fee under this provision. By way of this letter, AMc requests that appropriate representatives of the NRA, as required by the Services Agreement, agree to engage in a good faith negotiation to establish the termination fees that the NRA owes to AMc under the Services Agreement.

With respect to your demand of immediate delivery of all Confidential Information under Section XI, Paragraph E of the Services Agreement, such delivery is conditioned upon approval and payment in advance by the NRA of "all charges for accumulating said materials." We will provide the NRA with the costs of accumulating these materials and will expect to receive payment of those costs prior to the delivery of any materials encompassed by this provision.

Andrew Arulanandam
June 27, 2019
Page 3


We are willing to discuss all of these outstanding matters with the appropriate representatives of the NRA in an effort to come to a mutually acceptable resolution.


Sincerely,

David Schertler


cc:    Revan McQueen
       John Frazer
       Craig Spray
       Wayne LaPierre
       James W. Hundley

# Exhibit F

June 28, 2019


**BY  EMAIL**

David Schertler
Schertler & Onorato, L.L.P.
901 New York Avenue, NW, Suite 500
Washington, DC  20001

**Re:  Ackerman McQueen / Invoices and Termination**

Counsel:

On behalf of the National Rifle Association of America (the "NRA"), I write in response to your letter dated June 27, 2019.  The parties are engaged in litigation regarding the subject matter of this correspondence and Ackerman[1]intentionally terminated any communication among business people (instead channeling all letters through outside counsel).  For these reasons, and because the parties' business relationship has ended, I expect that this will be my final letter to your client.

Your contention that my previous letter "fails to set forth with specificity" the basis for invoking Section XI, Paragraph C of the Services Agreement is frivolous—and irrelevant. Section XI prescribes no formal requirements for the NRA's written notice of termination. But even if the NRA were required to allege with particularity its grounds for termination, the NRA has already done so—in two lawsuits against your client. Although the NRA was hopeful that an orderly wind-down could be accomplished (notwithstanding AMc's prior material breaches of the Services Agreement, and the consequent discharge of the NRA's prospective contractual obligations), AMc's conduct made such a course impossible.  When the NRA requested basic, easily accessible information that would allow the parties to coordinate a wind-down plan, AMc evaded.  AMc ignored or rejected all ETAs, schedules, and deadlines that the NRA put forth, failed to respond with any alternate proposals, and, even now, continues to perpetrate misleading, malicious media leaks in direct violation of its contractual, fiduciary, and common law duties.  AMc refused to correspond with the NRA's General Counsel (because he was not the NRA's contractual designee), then refused to correspond with me (the contractual designee) on the ground that communications should go through counsel.  At the end of the day, it is obvious that continued engagement with AMc only provides your client an extended platform for

---

[1] Ackerman" shall refer to Ackerman McQueen, Inc. (collectively with Mercury Group, Inc., "AMc").

bad-faith obstruction and gamesmanship.  Therefore, based on AMc's numerous prior breaches, the NRA invoked Section IV.C and severed ties.  This action is final and nonnegotiable.

Regarding the purportedly outstanding invoices, AMc-Third Party NRA Contracts, and severance arrangements, it suffices to say that the Association has for some considerable time sought insight into these items.  In any event, AMc owes the NRA many tens of millions of dollars for damages and like amounts in disgorgement amounts.

The discussion in your letter concerning payment for transmittal of materials pursuant to Section XI.E of the Services Agreement also retraces ground well-trod in prior letters (most recently my letter dated June 25, 2019).  The NRA has repeatedly requested a budget for transmittal of these materials.  Please provide one.  Please also be prepared to explain the basis for the asserted cost.  Based on all that has transpired and come to light in recent months, the NRA will not accept AMc's unsupported invoices at face value.

Future correspondence should be directed to Michael Collins of Brewer, Attorneys & Counselors, whom I have copied on this communication.

Sincerely,

Andrew Arulanandam

Cc:     Revan McQueen
        John Frazer
        Craig Spray
        Wayne LaPierre
        James W. Hundley
        Michael Collins

4836-9373-1227, v. 1

# Exhibit G

DALLAS | NEW YORK

# BREWER
### ATTORNEYS & COUNSELORS

July 22, 2019

**BY E-MAIL**
David Schertler
Schertler & Onorato, L.L.P.
901 New York Avenue, NW, Suite 500
Washington, DC 20001

**Re: AMc / NRA**

Counsel,

I write on behalf of the National Rifle Association of America (the "NRA"), in follow-up to multiple previous requests concerning AMc's[1] contractual obligation to surrender the NRA's property and Confidential Information.

**NRA Women Instagram Account.** Without notifying the NRA or attaining its consent, AMc appears to have changed the password to the @NRAWomen Instagram account. If this was done intentionally, it is a clear further breach of Services Agreement § IV, and likewise constitutes misappropriation and conversion of intellectual property owned by the NRA pursuant to Services Agreement § VI. The NRA requests that AMc promptly surrender the password.

**Return of the NRA's Property, Material, Documents, and Confidential Information.** As you know, Section XI.E of the Services Agreement required that AMc "return to the NRA, to such place and in such manner as NRA may specify, any and all of the NRA's property, materials, documents, Confidential Information, etc., that may be in AMc's possession." Furthermore, AMc must return these items "immediately" upon expiration or termination of the Services Agreement. In repeated communications throughout May and June, the NRA emphasized its urgent need for these materials, reiterated its willingness to pay upfront for their accumulation, and requested that AMc promptly disclose any associated costs so the parties could proceed. By letter dated June 27, 2019, AMc finally agreed to provide those costs to the NRA. Please let us know when we can expect to receive them.

**NRA Fixed Assets.** To assist with the foregoing effort, the NRA provides the attached list of fixed assets for which it has been invoiced, and which it expects will be returned. Of course, these assets constitute only a partial list of "property, materials, documents, [and] Confidential Information" which AMc must return to the NRA.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed in the Services Agreement dated April 30, 2017 (as amended May 6, 2018, the "Services Agreement").

B R E W E R

July 22, 2019
Page 2

Sincerely,

Michael J. Collins



National Rifle Association of America
Supplier Services Transition-Fixed Asset Listing
Updated: 6/24/19

*as of May 2019*

| Asset # | System ID | INV DATE | IN-SRV DATE | DIVISION | OPERATION | LOCATION | DESCRIPTION | QTY | ACQ VALUE | NET BV |
|---|---|---|---|---|---|---|---|---|---|---|
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Ross Synergy 100 MD switcher w/ MediaCache & Redundant Power | 1 | 38,188.85 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | AJA FS-1 Universal HD/SD Audio/Video Frame Synchronizer and Converter | 1 | 3,574.80 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | AJA HD-SD/SDI to HDMI video and audio converter | 1 | 444.04 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | AJA HD10AMA HD/SD 4 channel analog audio embedder/deembedder | 1 | 1,066.13 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | AJA DWP Power Supply | 1 | 71.67 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Tecnec HDMI to HDMI 33 foot cable | 1 | 53.96 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Panasonic TC-26LX85 26" LCD monitor w/ HDMI (studio program) | 1 | 728.40 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Chief JHS-US ceiling mount for LCD | 1 | 93.43 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Evertz HD5054SQ1V PRO-HD/HD Video Delay / Time Shift Processor | 1 | 16,760.23 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Evertz QT-16 HSV router | 1 | 8,994.32 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Evertz QT-16x6-AA Analog audio router | 1 | 3,497.78 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Evertz AK-0008 16 way XLR breakout panel, male | 2 | 1,104.54 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Evertz AK-0008 16 way XLR breakout panel, female | 2 | 1,104.54 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Evertz CP-3200A router control panel | 1 | 1,745.82 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Evertz CP-XND-1 VF local control panel | 1 | 736.37 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Evertz 7751SRG-HD HD-SD: black signal generator | 1 | 2,396.53 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Evertz 7735COM A-D converter (video only) | 1 | 1,894.85 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Evertz 7711UC-HD+3RU HD Upconverter w/noise reduction | 1 | 8,231.00 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Evertz 7700DA3-AES+3RU HD/SD 3G distribution amplifier | 10 | 10,011.28 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Evertz 7700ADA7 Analog video distribution amplifier | 1 | 540.00 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Evertz 7800FR +78P MultiFrame w/ 15 slots | 3 | 6,313.06 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Evertz 7700FC frame controller card | 3 | 3,492.72 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Evertz 7728ACC-AA-3RU quad analog audio to dual AE converter | 1 | 1,058.40 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Panasonic MT-ADP-405 adapter plate to use pan tilt on pedestal | 1 | 2,017.44 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | BDL Autoscript 15" LFT high brightness on camera prompter | 1 | 750.60 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Panasonic AK-HC 1500 HD Camera | 1 | 19,939.06 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Panasonic AW-PS510AN Power Supply | 1 | 704.70 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Panasonic CAE-HRPCAT DB-1616 RJ-45 adapter for camera to CCU connection | 1 | 70.69 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Panasonic CAE-HRPCAT DB-15HD RJ-45 adapter for camera to CCU connection | 1 | 70.69 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Canon CJ-20A3X7S HD lens | 1 | 9,942.47 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Panasonic AW-PH405 pan tilt head | 1 | 9,209.94 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Panasonic MT-ADP-405 adapter plate to use pan tilt on pedestal | 1 | 282.75 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | BDL Autoscript 15" LFT high brightness on camera prompter | 1 | 4,100.94 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | BDL Autoscript New + TallyPlus Light Assembly | 1 | 538.31 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Miller Precision (II head) | 1 | 1,256.05 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | BDL Autoscript WinPlus News IV Prompt Software | 1 | 4,105.18 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | BDL Autoscript SCB smart combine: box | 1 | 1,182.96 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | BDL Autoscript HC-1 opto hand controller | 1 | 634.85 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | BDL Autoscript PSU-HR power supplies for the controllers | 1 | 263.18 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Kino Flo HD-SDV composite video 3A | 1 | 197.03 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Newzen RH526 5.1" LCD monitor | 1 | 238.35 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Devicom DTM desktop monitor tripod | 1 | 26.85 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | HP dc2400 desktop computer | 1 | 650.39 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | HP L1945w 19" wide screen LCD monitor | 1 | 212.16 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Panasonic AW-HE100 robotic camera | 3 | 25,032.19 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Panasonic AW-RP655 camera controller | 2 | 5,872.50 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Panasonic AW-PS510AN Power Supply | 1 | 4,221.82 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Bogen 351NVB black lightweight pro tripod | 2 | 699.84 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Bogen 3146N fluid head controller | 2 | 601.76 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Bogen 114MW Quick release plate | 2 | 654.52 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Bogen 3577 quick release adapter assembly | 2 | 178.83 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Omneon MediaDeck w/ 2 channels playback plus record and 1 year warranty | 1 | 117.71 | |
| 2681 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | HP L1945w 19" wide screen LCD monitor | 1 | 38,958.28 | |
| 2681 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | HP L1945w 19" wide screen LCD monitor | 1 | 212.15 | |
| 2681 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Panasonic AJ-HD1400 DVCPro HD video deck | 1 | 23,274.00 | |
| 2681 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Panasonic AJ-PCD30 P2 drive | 1 | 2,125.68 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Panasonic AJ-P2C032RG 32GB memory card | 6 | 9,707.04 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Panasonic AG-HVX200 HD tapeless camcorder w/ lens | 2 | 11,479.84 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Anton Bauer Elp2 battery | 2 | 401.71 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Anton Bauer Elp2 battery & charger kits | 2 | 699.54 | |



**National Rifle Association of America**
**Supplier Services Transition-Fixed Asset Listing**
Updated: 6/24/19

as of May 2019

| Asset # | System ID | INV DATE | IN-SRV DATE | DIVISION | OPERATION | LOCATION | DESCRIPTION | QTY | ACQ VALUE | NET BV |
|---|---|---|---|---|---|---|---|---|---|---|
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Anton Bauer PA-ADF-6-PZ power cable | 2 | 147.27 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Anton Bauer ElgbtZ On Camera Light Kit | 2 | 274.90 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Anton Bauer LS/LL 10 5 and 10 watt spare bulbs for ElightZ | 2 | 43.20 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Miller D5-20 (850) tripod w/ head | 2 | 3,591.00 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Porta Brace CTC-2 traveler camera case | 2 | 578.15 | 578.15 |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Sennheiser Evolution G3 Wireless Mic Kit | 2 | 1,352.15 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Rycote Hole Shoe Extension / Extender for wireless mic kit | 2 | 53.89 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Electro Voice RE50B microphone | 2 | 361.52 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Electro Voice 379 mic Windscreen | 2 | 29.55 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Digital Rapids StreamZHD Encoder appliance | 2 | 72,641.40 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Digital Rapids AVC (H 264) Live Streaming Codec | 3 | 3,626.40 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | AJA DWP Power Supply | 2 | 2,660.85 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Digital Rapids StreamZHD Encoder appliance | 3 | 71.67 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Digital Rapids AVC (H 264) Live Streaming Codec | 3 | 48,127.60 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | APC Smart-Ups SUA3000xU 2U 3000VA battery backup for the studio control room | 1 | 2,019.60 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Videotek VTM-4100FHQ HD/SD waveform/vectorscope w/console | 2 | 2,797.20 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | HP LP2465 24" LCD monitor | 2 | 8,831.16 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Sony VCK (495x10)-45" LCD TV monitor w/HDMI (Evertz VIP displays) | 2 | 14,257.05 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Chief MTRU mid-size tilting flat panel wall mount | 2 | 715.15 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Cables to Go VGA cables 50' | 2 | 3,553.84 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | AJA 15 HD-SD/SDI to HDMI video and audio converter | 2 | 329.31 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | AJA DWP Power Supply | 2 | 114.44 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Panasonic TH-42PZ80-42 plasma monitor w/HDMI (studio-control room w/window) | 1 | 447.13 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Chief MTRU mid-size tilting flat panel wall mount | 2 | 36.08 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Tecnec HDMI to HDMI 33 foot cable | 1 | 1,248.60 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Allen and Heath GL2400-24 audio mixer | 2 | 115.45 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Sony KCM-779 lavalier mics | 4 | 54.35 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | ESE ES-188NVP Master Clock | 2 | 2,281.29 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | ESE ES-993U Power Rack | 1 | 1,450.96 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Supplemental lighting for new larger studio | 1 | 2,409.72 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Apple Final Cut Pro Workstation w/ monitors and speakers | 1 | 701.40 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | AJA IOHD Portable 10 bit HD/SD editing interface | 1 | 10,950.00 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | AJA Kona Lite video capture interface card | 1 | 11,146.97 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Avocent Switchview 1000 3 port KVM w/ cable kits | 1 | 3,156.20 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Middle/Atlantic WMRK-4226V rack with casters, rear rails and power distribution | 1 | 1,660.27 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | TBC 6 bay console (furniture) | 1 | 401.07 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Anchor Desk | 1 | 2,463.77 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Backdrops and movable panels | 1 | 15,570.00 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Cabling and connectors | 1 | 12,880.00 | |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Ross Master Control MC1 Switcher (Ross Gear) | 1 | 56,000.00 | 10,800.00 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Ross MC-1 redundant power supply | 1 | 8,697.00 | 4,493.45 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | ESE HE-488E Timecode Generator | 1 | 559.00 | 288.82 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Ross LG-A 8700A Analog Utility DA w/R2L rear module | 4 | 3,400.00 | 1,756.67 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Ross LG-A 8801 Dual R2 Reclocking DA 1/4 w/ R2 rear module | 2 | 309.00 | 159.65 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Ross UDC-862SA Format Converter w/ R2 rear module | 4 | 6,828.00 | 3,527.80 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Ross MUX8258-4C 3G-SDI Analog Audio Embedder w/ R2C rear module | 2 | 2,998.00 | 1,548.97 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Ross Carbonite Multimedia Chassis w/ 2ME HD Switcher | 1 | 27,135.00 | 14,019.75 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Ross Carbonite Black 2 Panel | 1 | 17,080.00 | 8,824.67 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Ross Carbonite redundant power supply | 1 | 613.00 | 337.38 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Ross System Commissioning | 1 | 1,625.00 | 839.58 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Ross System Training | 1 | 1,625.00 | 839.58 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Ross Tech Training | 1 | 2,500.00 | 1,291.67 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Blackmagic Design SmartView 4k monitor | 1 | 1,880.00 | 971.33 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Blackmagic Design SmartScope Duo 4K | 1 | 940.00 | 485.67 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | LG 49inHE600 49" 4k UHD LED TV | 4 | 3,188.00 | 1,647.13 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Sanus LT25 Sling flat panel TV wall mount | 4 | 680.00 | 351.33 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | AJA Hi5-Plus HD-SDI to HDMI Converter | 4 | 790.00 | 408.17 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Blackmagic Design MultiView 16 | 1 | 2,840.00 | 1,467.33 |



**National Rifle Association of America**
**Supplier Services Transition-Fixed Asset Listing**
Updated: 6/24/19

*as of May 2019

| Asset # | System ID | INV DATE | IN-SRV DATE | DIVISION | LOCATION | OPERATION | DESCRIPTION | QTY | ACQ VALUE | NET BV |
|---|---|---|---|---|---|---|---|---|---|---|
| 4595 | 4994 | 12/15/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Blackmagic Design Microconverter HDMI to SDI | 18 | 1,530.00 | 796.50 |
| 4595 | 4994 | 12/15/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Blackmagic Design Mini Converter 6G SDI to HDMI 4k | 2 | 590.00 | 304.83 |
| 4595 | 4994 | 12/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Tripplite 1280-004 4 port USB charging station | 6 | 168.00 | 86.80 |
| 4595 | 4994 | 12/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Tripplite 1050-006 Micro USB cables 6' | 18 | 99.00 | 51.15 |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Tripplite B118-002-UHD HDMI 1x2 Splitters | 4 | 192.00 | 99.20 |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Tools on Air recording server | 1 | 12,978.00 | 6,705.30 |
| 4595 | 4994 | 12/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Tools on Air JustPlay automated playout server (redundant) | 1 | 22,086.00 | 11,411.10 |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Tools on Air JustLive clip player and graphics system (redundant) | 1 | 23,686.00 | 12,237.77 |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Tools on Air JustStore 48TB storage sytem | 1 | 23,900.00 | 12,348.33 |
| 4595 | 4994 | 12/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Brocade 6450-24 network switches and SFP+ modules | 2 | 4,000.00 | 2,066.67 |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Apple iMac 21.5" w/3.3 GHz i7, 8GB RAM, 1TB Fusion HD (TOA control) | 2 | 3,600.00 | 1,860.00 |
| 4595 | 4994 | 8/15/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | AJA Ki Pro Ultra | 2 | 7,670.40 | 3,963.04 |
| 4595 | 4994 | 8/15/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | AJA Ki Pro 512GB SSD storage module | 2 | 3,820.00 | 1,973.67 |
| 4595 | 4994 | 8/15/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | AJA KiStor Dock | 1 | 340.00 | 175.67 |
| 4595 | 4994 | 8/15/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Fujitsu IP-9200 Encoders (1080p issues) | 2 | 18,133.34 | 9,368.89 |
| 4595 | 4994 | 12/15/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Fujitsu IP-920E Decoders (1080p issues) | 2 | 9,915.34 | 5,152.89 |
| 4595 | 4994 | 12/15/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Fujitsu Ultra Low Latency License | 2 | 1,066.66 | 551.12 |
| 4595 | 4994 | 12/15/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Ross LDC-8625A Format Converter w/ -R2 rear module | 1 | 6,998.00 | 3,615.63 |
| 4595 | 4994 | 12/15/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Teradek Cube 255 remote encoder | 1 | 1,480.00 | 764.67 |
| 4595 | 4994 | 12/15/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Teradek Slice Encoder | 1 | 1,990.00 | 1,028.17 |
| 4595 | 4994 | 12/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Panasonic AW-HE120 HD Remote Camera Controller | 1 | 4,000.00 | 2,066.67 |
| 4595 | 4994 | 12/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Panasonic AW-HE130 HD PTZ cameras | 3 | 24,300.00 | 12,555.00 |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Miller Pedestal 30 | 3 | 3,849.00 | 1,988.66 |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Panasonic AG-AC160A AVCCAM camcorder | 1 | 3,695.00 | 1,909.08 |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Ikan Gravity Titan Lib RSS Gyro Stabilizer | 1 | 4,499.00 | 2,324.48 |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Teradek Bolt Pro 300 wireless transmitter | 1 | 2,400.00 | 1,240.00 |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Prompter People Robo Prompter | 1 | 3,460.00 | 1,786.67 |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | TVPrompt-Pro Teleprompter software | 1 | 1,899.00 | 981.15 |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | TVPrompt-Pro Controller Hardware | 1 | 599.00 | 309.48 |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Teleprompter computer | 1 | 1,200.00 | 620.00 |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | ESE ES-970U Master Clock Display | 1 | 1,068.00 | 551.80 |
| 4595 | 4994 | 12/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Allen and Heath 16 channel Digital Audio Mixer | 1 | 1,771.66 | 915.02 |
| 4595 | 4994 | 12/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | JBL Control 2P powered speakers (pair) | 1 | 190.00 | 98.17 |
| 4595 | 4994 | 12/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Lectrosonics VRM Venue Receiver Master | 3 | 4,197.00 | 2,168.45 |
| 4595 | 4994 | 12/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Lectrosonics VRT Tracking Receiver Module (Block 24) | 1 | 1,379.00 | 712.48 |
| 4595 | 4994 | 12/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Lectrosonics ALP500 Antenna | 1 | 1,650.00 | 852.50 |
| 4595 | 4994 | 12/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Sanken COS-11D R-BK-TA4FX Wireless La Mics | 1 | 424.00 | 219.07 |
| 4595 | 4994 | 12/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Lectrosonics wireless PSFM Transmitter (Block 21) | 1 | 1,170.00 | 604.50 |
| 4595 | 4994 | 12/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Lectrosonics IFBR1A UHF Belt-Pack Receiver (Block 21) | 1 | 845.00 | 436.58 |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Telex CS-12 IFB Earpiece Kit w/ 1/8" connectors | 1 | 1,090.00 | 563.17 |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Sanken COS-11D Wired Lav Mics | 1 | 142.00 | 73.37 |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Telos HX1 telephone interface | 2 | 1,300.00 | 720.75 |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Impact 2.0" end jaw vice grip | 1 | 690.00 | 356.50 |
| 4595 | 4994 | 12/15/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Ikan IB500-v2 LED studio light w/ touch screen dimming & yoke mount | 10 | 440.00 | 227.33 |
| 4595 | 4994 | 12/15/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Apple iMac 27" Retina 4.0 GHz Core i7 w/ 32GB RAM, 2TB Fusion HD & R9 M395X | 10 | 3,880.00 | 2,004.67 |
| 4595 | 4994 | 12/15/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | AJA IO 4K | 1 | 3,400.00 | 1,756.67 |
| 4595 | 4994 | 12/15/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Apple Final Cut Pro X | 1 | 1,645.00 | 849.92 |
| 4595 | 4994 | 12/15/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Avid Media Composer | 1 | 300.00 | 155.00 |
| 4595 | 4994 | 12/15/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Apple Mac Mini | 4 | 1,149.00 | 593.65 |
| 4595 | 4994 | 12/15/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | MacAlly MKEYECOMB 103 key USB keyboard & 3 button USB optical mouse | 4 | 5,000.00 | 2,583.33 |
| 4595 | 4994 | 12/15/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Middle Atlantic BGR-4538URD Rack w/below options | 1 | 30.00 | 15.50 |
| 4595 | 4994 | 12/15/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Middle Atlantic BGR-15P9 Solid Top Panel | 1 | 35.00 | 18.08 |
| 4595 | 4994 | 12/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Apple TV, Roku, Amazon Fire | 1 | 450.00 | 232.50 |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Tendaik Slice Encoder Systems | 2 | 5,980.00 | 3,089.67 |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Middle Atlantic PD-1415C Power Strip | 2 | 1,983.81 | 1,024.97 |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | APC Smart-Ups SMT3000RM2U 3000VA battery backup for the equipment rack | 1 | 1,049.00 | 541.98 |

5

National Rifle Association of America
Supplier Services Transition-Fixed Asset Listing
Updated: 6/24/19



*as of May 2019

| Asset # | System ID | INV DATE | IN-SRV DATE | DIVISION | LOCATION | OPERATION | DESCRIPTION | QTY | ACQ VALUE | NET BV |
|---|---|---|---|---|---|---|---|---|---|---|
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | APC Smart-Ups SMT3000 3000VA battery backup for the studio control room | 1 | 1,085.00 | 560.58 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Graphics and sound absorption for set walls | 1 | 4,000.00 | 2,066.67 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Studio construction (ceiling removal, light grid, electrical) | 0 |  | - |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Cabling, connectors and Misc. | 1 | 5,000.00 | 2,583.33 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Cabling for Theater | 1 | 2,500.00 | 1,291.67 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Blackburn's 2 Channel Video Server w/ 4 x 1TB Drivers | 1 | 15,529.00 | 8,135.86 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | XPression Studio - Dual (SW+HW) | 1 | 45,674.00 | 24,155.72 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | XPression Gateway (SW+HW)-Control System for MOS, NLE, and Template Builder | 1 | 19,283.00 | 10,177.14 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | DataLinq Server Option | 1 | 5,074.00 | 2,677.94 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | XPression MOS Plug-in (SW Only) -Floating License | 5 | 2,535.00 | 1,337.92 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | XPression NLE Plug-in (SW Only) -Floating License | 1 | 507.00 | 267.58 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | XPression Project Server (SW+HW)-Central server- 1 RU server and software | 1 | 14,208.00 | 7,498.67 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Xpression Rundown Controller (SW Only) |  |  | - |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Inception News Express Edition - System Bundle, Inception New Express Edition, 10 User Licenses, 100 Social Media Publication Licenses | 1 | 34,599.00 | 18,471.69 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Inception - Server Hardware (Software Preloaded)-PowerEdge R330, 16GB RDIMM, 1333 MT/s, Low Volt, Dual Rank, x4 Date Width | 1 |  |  |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Inception News Express Edition - Software - Preloaded | 1 |  |  |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Inception - MOS Device for Cuel-Single MOS device license for use with the included CueScript Cuel MOS Interpreter software | 1 |  |  |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Inception - Concurrent User Licenses | 10 |  |  |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Inception - Social MediaAccount User Licenses | 100 |  |  |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Inception - User Defined Columns Plugin | 1 |  |  |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Inception - Assignment Manager Plugin | 1 |  |  |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Inception - Contact Manager Plugin | 1 |  |  |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Inception - Timing and Production Cues Plugin | 1 |  |  |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Inception - Social MediaPlaylists Plugin | 1 |  |  |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Inception - Social MediaPosting Plugin | 1 |  |  |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Inception - Cuel MOS Teleprompter Software | 1 |  |  |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Streamline Pay Edition Software (10 Concurrent User Licenses) | 1 | 19,999.00 | 10,555.03 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Streamline - Concurrent User Licenses | 10 |  |  |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Streamline - Video Proxy Encoder | 1 |  |  |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Streamline - Playout Software | 1 |  |  |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Streamline - Server Hardware (Software Preloaded) - 1 RU server platform running Windows Server 2012 64-bit. | 1 |  |  |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Black-Box 3 MVE Live Production Switcher w/ 36 Input and 35 Ouput Chassis | 1 | 31,136.00 | 16,429.72 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Serial to Midi Converter | 1 | 37.56 | 19.82 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | LX-161U TItle Code Remote Display | 1 | 590.00 | 311.39 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | 1RU Digital Patchbay | 1 | 640.20 | 337.88 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Attero Extend E3 PVE | 1 | 630.00 | 332.50 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Avenger E390 TVMP yoke to stand adapter | 1 | 55.40 | 29.24 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | 1 foot 75 Ohm Patch Cable for patchbay | 6 | 102.00 | 53.83 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | 8in SC-SC ST-II OPTI-CORE Multimode PVC Fiber Optic Cable-Orange | 2 | 42.00 | 22.17 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Multi zone controller w/ RF remote & WiFi (LD5F-RGBW6-MZ) | 1 | 3,510.00 | 1,852.50 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Mean well LED switching power supply (SE-100-24) | 2 | 5,600.00 | 2,955.56 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Ross Analog Video DA | 2 | 179.94 | 94.97 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Livell UL200 portable field recorders | 1 | 9,080.00 | 4,792.22 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Genaray Spectrol ED Essential 240 Bi-Color LED light kit | 4 | 436.00 | 230.11 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | ETC Source-4 LED Series 2 Lustr w/ shutter barrel black | 2 | 560.00 | 295.56 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | ETC Source-4 14degree lens tube for Source-4 19 degree, black | 2 | 353.90 | 186.77 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | ETC enhanced definition lens tube for Source-4 26 degree, black | 2 | 69.80 | 36.84 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | ETC 4DDRS drop-in iris for Source-4 light | 2 | 69.80 | 36.84 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | LED light strips with RGBW SMD LED's (NFLS-RGBW200x4-24v) | 3 | 309.00 | 163.08 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Genaray Spectrol MS-702 Communications main station | 1 | 870.00 | 459.17 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Clearcom RS-702 2 channel beltpacks | 3 | 1,160.00 | 612.22 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Clearcom EF-701M 4-wire interface w/ call | 1 | 760.00 | 401.11 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Clearcom CC-110-X4 single ear headset | 3 | 705.00 | 372.08 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Clearcom YC-36 beltpack adapter | 2 | 570.00 | 300.83 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control |  |  | 150.00 | 79.17 |



**National Rifle Association of America**
**Supplier Services Transition-Fixed Asset Listing**
**Updated: 6/24/19**

as of May 2019

| Asset # | System ID | INV DATE | IN-SRV DATE | DIVISION | LOCATION | OPERATION | DESCRIPTION | QTY | ACQ VALUE | NET BV |
|---|---|---|---|---|---|---|---|---|---|---|
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Clearcom IC-25-2P intercom cable 25' | 2 | 238.00 | 125.61 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Hosa 32' XLR audio cables | 2 | 16.26 | 8.58 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Hosa 5' 1/8" to XLR cable | 2 | 8.40 | 4.43 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | TM TV custom cable DB15 to dual XLR | 1 | 30.00 | 15.83 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Acer Travelmate notebook for NRATV studio teleprompter | 1 | 339.49 | 179.16 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | GeFen Pro-Series DVI-D to VGA converter for Ross servers | 1 | 33.98 | 17.93 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | SelfCord carpet cord cover for studio | 2 | 57.98 | 30.60 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | AJA HELO H.264 streaming appliance for NRATV studio | 2 | 1,295.00 | 683.47 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Logitech C930e webcam for NRAHQ Skype | 1 | 99.98 | 52.77 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | innovGear mic boom arm for NRAHQ Skype | 1 | 16.99 | 8.97 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Blue Yeti USB Microphone for NRAHQ Skype | 1 | 129.00 | 68.08 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Tax | 1 | 11.80 | 6.23 |
| 4701 | 5300 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Apple Compressor 4.3 software | 1 | 99.98 | 52.77 |
| 4701 | 5300 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Fusion 8.5 for Mac | 5 | 399.95 | 211.08 |
| 4701 | 5300 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Windows 10 Pro OS | 3 | 599.97 | 316.75 |
| 4701 | 5300 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Windows 10 Pro OS | 2 | 399.98 | 211.20 |
| 4701 | 5300 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Teradek Slice Encoder Systems (NRANews @ MXG Office) | 2 | 5,980.00 | 3,156.11 |
| 4701 | 5300 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Quicklink TX Multi-SDI B. HDMI Skype interface (NRANews @ MXG Office) | 1 | 3,995.00 | 2,108.47 |
| 4701 | 5300 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Gra-Vue Monitoring Appliance | 3 | 579.95 | 306.08 |
| 4701 | 5300 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Sennheiser microphone | 4 | 224.90 | 118.70 |
| 4701 | 5300 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Galvanized Pipe for Hanging Lights | 1 | 129.95 | 68.22 |
| 4701 | 5300 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | MPS Safety Cables | 2 | 100.00 | 52.78 |
| 4701 | 5300 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | VMWare Software | 1 | 79.99 | 42.22 |
| 4701 | 5300 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Ear Buds and Mount Pro | 1 | 75.71 | 39.96 |
| 4701 | 5300 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Power Cords for Servers | 1 | 66.44 | 35.07 |
| 4701 | 5300 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Rundown Creator (Monthly Subscription) | 3 | 60.00 | 30.08 |
| 4701 | 5300 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Mini SDI Cable | 1 | 57.00 | 30.08 |
| 4701 | 5300 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Lee Filter | 1 | 166.00 | 87.61 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Apple Mac Mini (NRA HQ & ILA Federal buildings) | 1 | 1,298.00 | 685.06 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | PreSonus SP-CTHLD 2x2 Bi-C/C LED (ILA Federal building) | 1 | 179.94 | 94.97 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Onhp US JB Earphones (NRA HQ & ILA Federal building) | 2 | 88.10 | 46.50 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | APC 6-Outlet Green Ups (ILA Federal building) | 2 | 37.99 | 20.05 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Pearstone Ultra Thin HDMI Cable - 3' (NRA HQ & ILA Federal building) | 2 | 21.54 | 11.37 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Magewell US$ 3.0 Dongle 1CH (NRA HQ building) | 1 | 293.02 | 154.65 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | HP Backlit Monitor (NRA HQ & ILA Federal building) | 1 | 203.32 | 107.31 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Blue Pro 3-Capsule USB Mic (ILA Federal building) | 1 | 129.99 | 68.61 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Logitech Webcam - USB 2.0 (ILA Federal building) | 1 | 109.95 | 58.03 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | PSA-1 Studio Arm (ILA Federal building) | 1 | 97.02 | 51.21 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Maxell USB2 Slim Keyboard & Mouse (NRA HQ & ILA Federal building) | 32 | 78.30 | 41.33 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Canare 12CH09 Ultra Slim Cable (NRA HQ building) | 1 | 28.37 | 14.97 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Pearstone Ultra Thin HDMI Cable - 1.5' (ILA Federal building) | 1 | 18.61 | 9.82 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Hi-Speed HDMI Ethernet (ILA Federal building) | 2 | 16.65 | 8.79 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Williams WCA Ext. Cord (NRA HQ & ILA building) | 1 | 22.92 | 12.10 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Watson 15 VAC Power Extension (ILA Federal building) | 1 | 9.75 | 5.15 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Comprehensive Cable - CAT6 (NRA HQ & ILA building) | 1 | 8.70 | 4.59 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Comprehensive Cable - USB (NRA HQ building) | 1 | 7.34 | 3.87 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Pearstone USB Cable (ILA Federal building) | 1 | 4.89 | 2.58 |
| 4703 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Middle Atlantic BGR-4538RD Rack w/ level feet, front door and top panel | 1 | 1,634.04 | 862.41 |
| 4703 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Eaton 9PX 6,000VA high capacity battery backup system | 1 | 10,335.60 | 5,454.90 |
| 4703 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Gra-Vue MIO DA-AUD AES to Analog Audio Converter | 1 | 269.95 | 142.47 |
| 4703 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | AJA OpenGear Dual 3x1 SD-SDI Distribution Amplifier | 1 | 539.00 | 284.47 |
| 4703 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | DJI Osmo Mobile gimbal and Plantronics Voyager Bluetooth earpiece | 1 | 464.96 | 245.40 |
| 4703 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | ESE LX-161U Clock Remote Display | 1 | 660.00 | 348.33 |
| 4703 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | LiveU Remote Interview feed stream encoders and decoder | 1 | 30,000.00 | 15,833.33 |
| 4703 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Brocade 6450-24 network switches and SFP+ modules | 1 | 1,500.00 | 791.67 |
| 4703 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Yamaha DM1000VCM audio console w/ automation | 1 | 16,832.66 | 8,883.90 |
| 4703 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Ross Carbonite Black Plus Chassis upgrade | 1 | 7,000.00 | 3,694.72 |
| 4703 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Ross Blackstorm video server | 1 | 16,529.00 | 8,723.64 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Ross Xpression Graphics system w/MOS | 1 | 82,207.00 | 43,387.03 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Ross Inception Newsroom management system | 1 | 34,999.00 | 18,471.69 |

National Rifle Association of America
Supplier Services Transition-Fixed Asset Listing
Updated: 6/24/19



*as of May 2019*

| Asset # | System ID | INV DATE | IN-SRV DATE | DIVISION | LOCATION | OPERATION | DESCRIPTION | QTY | ACQ VALUE | NET BV |
|---|---|---|---|---|---|---|---|---|---|---|
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Ross Streamline Asset Management System (BlackStorm only) | 1 | 19,999.00 | 10,555.03 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | KVM and extender for new servers | 1 | 3,663.00 | 1,901.58 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Impact 40" extension grip arm (black) | 6 | 197.70 | 104.34 |
| 4013 | 4412 | 10/6/2014 | 10/15/2014 | Executive VP | 203 N Union St # 510, Alexandria, VA 22314 | NRA News.com | Sony Alpha a7S DSLR | 2 | 4,996.00 | - |
| 4013 | 4412 | 10/6/2014 | 10/15/2014 | Executive VP | 203 N Union St # 510, Alexandria, VA 22314 | NRA News.com | Sony NP-FW50 lithium ion rechargeable batteries | 4 | 191.80 | - |
| 4013 | 4412 | 10/6/2014 | 10/15/2014 | Executive VP | 203 N Union St # 510, Alexandria, VA 22314 | NRA News.com | Sony XLR-K1M adapter & microphone kit | 1 | 1,596.00 | - |
| 4013 | 4412 | 10/6/2014 | 10/16/2014 | Executive VP | 203 N Union St # 510, Alexandria, VA 22314 | NRA News.com | Sony 32GB SDHC SD memory cards | 6 | 69.96 | - |
| 4013 | 4412 | 10/6/2014 | 10/16/2014 | Executive VP | 203 N Union St # 510, Alexandria, VA 22314 | NRA News.com | Metabones Canon EF to Sony NEX camera lens mount adapter | 2 | 748.00 | - |
| 4013 | 4412 | 10/6/2014 | 10/16/2014 | Executive VP | 203 N Union St # 510, Alexandria, VA 22314 | NRA News.com | Canon EF 16-35mm f/2.8L II USM lens | 1 | 1,699.00 | - |
| 4013 | 4412 | 10/6/2014 | 10/16/2014 | Executive VP | 203 N Union St # 510, Alexandria, VA 22314 | NRA News.com | Canon EF 70-200mm f/2.8L USM lens | 1 | 1,449.00 | - |
| 4013 | 4412 | 10/6/2014 | 10/16/2014 | Executive VP | 203 N Union St # 510, Alexandria, VA 22314 | NRA News.com | Canon EF 24-70mm f/2.8L II USM lens | 1 | 2,299.00 | - |
| 4013 | 4412 | 10/6/2014 | 10/16/2014 | Executive VP | 203 N Union St # 510, Alexandria, VA 22314 | NRA News.com | Benro A2473FS6 S6 Tripod w/head | 2 | 600.00 | - |
| 4013 | 4412 | 10/6/2014 | 10/16/2014 | Executive VP | 203 N Union St # 510, Alexandria, VA 22314 | NRA News.com | Edelkrone 31.5" SliderPlus V2 large | 1 | 1,399.90 | - |
| 4013 | 4412 | 10/6/2014 | 10/16/2014 | Executive VP | 203 N Union St # 510, Alexandria, VA 22314 | NRA News.com | Atomos Shogun 4K HDMI/12G-SDI Recorder and 7" Monitor and battery | 1 | 2,354.00 | - |
| 4013 | 4412 | 10/6/2014 | 10/16/2014 | Executive VP | 203 N Union St # 510, Alexandria, VA 22314 | NRA News.com | HP Pro X2s Zebra Core i5 w/ 4GB RAM, 500GB HD & Win 7 Pro | 1 | 1,200.00 | - |
| 4013 | 4412 | 10/6/2014 | 10/16/2014 | Executive VP | 203 N Union St # 510, Alexandria, VA 22314 | NRA News.com | Apple Mac Pro 3.5GHz 6 Core w/ 16GB RAM & 1TB Flash Drive | 1 | 14,997.00 | - |
| 4013 | 4412 | 10/6/2014 | 10/16/2014 | Executive VP | 203 N Union St # 510, Alexandria, VA 22314 | NRA News.com | Apple Wireless Keyboard & Mouse | 3 | 391.80 | - |
| 4013 | 4412 | 10/6/2014 | 10/16/2014 | Executive VP | 203 N Union St # 510, Alexandria, VA 22314 | NRA News.com | BlackMagic Design: UltraStudio Express | 1 | 1,410.75 | - |
| 4013 | 4412 | 10/6/2014 | 10/16/2014 | Executive VP | 203 N Union St # 510, Alexandria, VA 22314 | NRA News.com | Apple Final Cut Pro X | 3 | 897.00 | - |
| 4013 | 4412 | 10/6/2014 | 10/16/2014 | Executive VP | 203 N Union St # 510, Alexandria, VA 22314 | NRA News.com | ATT LCD monitor & wall mount for MultiView in new switcher | 3 | 800.00 | - |
| 3744 | 4143 | 10/18/2013 | 10/18/2013 | Executive VP | Las Vegas, Nevada | Exhibit Booth | Full Exhibit Booth (E&E ExhibitSolutions), plus | 1 | 967,205.00 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/RA Studio | Ross Video Crossover Solo HD Switcher | 1 | 8,143.52 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/RA Studio | HP EliteDisplay E271i 27" LCD Monitor | 2 | 345.60 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | Black Magic CONVMBSH SDH| to HDMI converter | 2 | 302.40 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | Sony PXW-X70 | 1 | 638.92 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | Sony FA50A AD7 LED TV | 1 | 675.16 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | Chief MFC/JB mobile cart | 2 | 22,248.00 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | Fujitsu IP-920E Encoders | 2 | 79.52 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | Fujitsu IP-920D Decoders | 2 | 11,880.00 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | Black Magic CONVMSYNC sync generator | 1 | 302.40 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | Black Magic CONVMSDIDA SDI distribution amplifier | 1 | 302.40 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | Panasonic AW-RP50 Remote Camera Controller | 2 | 2,149.20 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | Panasonic AW-HE120K HD PTZ Cameras | 3 | 27,233.60 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | Manfrotto 028B black aluminum studio pro tripod w/geared column | 3 | 1,149.20 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | Manfrotto 181B Dolly for tripod | 3 | 939.60 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | APC Smart-Ups SUA3000XLT/43U 3000VA battery backup for the studio control room | 2 | 2,529.68 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | Mackie 1642-VLZ4 audio mixer | 1 | 79.62 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | JBL Control 2P powered speakers | 1 | 225.77 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | PreSonus ACP88 8 channel compressor / gate | 1 | 972.00 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | Lectrosonics wireless mic systems | 3 | 9,760.00 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | Lectrosonics wireless IFB systems | 3 | 9,458.68 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | Telos One telephone interface | 1 | 804.60 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | DMX LED Dimmer system | 1 | 216.00 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | Studio LED lights | 14 | 9,172.00 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | C clamps for lights | 14 | 1,209.60 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | Chimera Video Plus 1 Triolet Lightbank Kit Small # 8000 | 2 | 1,325.33 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | Apple Macbook Pro Retina notebook | 2 | 2,846.92 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | Apple iMac 27" 3.5GHz Core i7 w/8GB RAM & 1TB HD | 1 | 2,374.92 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | G-Tech G-Raid w/Thunderbolt 8TB drive | 1 | 1,090.00 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | AJA IO XT | 1 | 1,620.00 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | Apple Final Cut Pro X | 1 | 324.00 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | Cisco ASA5505 Firewall | 1 | 864.00 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | Cisco 3560 24TS switch | 1 | 1,305.00 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | Middle Atlantic U1 Rack shelves | 3 | 103.68 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | Anchor Desk | 1 | 5,850.00 | - |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | NRA Studio | Backdrops and movable panels for set | 1 | 16,650.00 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Ross HD Switcher Carbonite 2 panel w/ Carbonite Plus 24 input chassis | 1 | 35,429.40 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Sony NEX-FS700 Cinema camera | 1 | 8,235.25 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Metabones Canon EF lens to Sony NEX adapter | 1 | 649.50 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Blackmagic Design HyperDeck Studio Pro 2 | 1 | 2,052.42 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | SanDisk Extreme II internal SSD 480GB | 10 | 463.31 | - |

6

National Rifle Association of America
Supplier Services Transition-Fixed Asset Listing
Updated: 6/24/19

 NRA

as of May 2019

| Asset # | System ID | INV DATE | IN-SRV DATE | DIVISION | LOCATION | OPERATION | DESCRIPTION | QTY | ACQ VALUE | NET BV |
|---|---|---|---|---|---|---|---|---|---|---|
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Blackmagic Design Cinema Camera w/EF Mount | 4 | 2,159.59 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Canon EF 16-35mm f/2.8L II USM lens | 1 | 1,839.17 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Canon EF 24-70mm f/2.8L II USM lens | 3 | 2,380.42 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Canon EF 28-300mm f/3.5-5.6L IS USM lens | 1 | 2,633.72 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | RedRockMicro DSLR Cinema Bundle w/ Follow Focus | 5 | 1,948.50 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Canon Rebel cameras | 3 | 541.25 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Prompter People Flex iPad Teleprompter | 3 | 648.42 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Miller 1514 Solo DV20 carbon filter tripod system w/ DS-20 fluid head | 4 | 1,931.18 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Miller 394 Solo 75 Dolly for DV20 tripod | 4 | 507.69 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Kathrerina Doorway Dolly w/ head | 1 | 5,953.75 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | CamMate T15 Travel Series Crane w/ Dolly | 1 | 8,460.00 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Mackie 1642-VLZ4 audio mixer | 1 | 756.67 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | BeyerDynamic DT250 Headphones | 2 | 189.44 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | PreSonus ACP88 8 channel compressor / gate | 1 | 974.25 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Lectrosonics UCR401 wireless mic receiver | 6 | 1,407.25 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Lectrosonics UM400a wireless mic transmitter | 6 | 1,380.19 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Sanken COS11D lavalier mics | 6 | 411.35 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Rode NTG-2 Shotgun Mics with boom poles and stand | 2 | 1,082.50 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Sharp LC-80LE650U 80" LED TV | 3 | 3,572.25 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Chef PWM1US swing arm mounts | 2 | 351.81 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Sharp LC-60LE650U 60" LED TV | 1 | 1,299.00 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Chef MFCUB mobile cart | 2 | 540.17 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Apple Mac Pro computer | 1 | 4,871.25 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | HP LA2006x 24" LED monitor | 3 | 297.69 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | G-Tech G-RAID w/ Thunderbolt 8TB drive | 1 | 757.63 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Apple Thunderbolt Cable | 1 | 40.10 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | AJA IO XT | 1 | 1,623.75 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Avid Media Composer 7 | 1 | 1,081.42 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | JVC DT-E15L4 15" Production monitor | 2 | 1,623.75 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Teco YK1 telephone interface | 1 | 806.46 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Fujitsu IP-920E Encoders | 1 | 11,349.19 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Fujitsu IP-920E Decoders | 1 | 5,953.75 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Cisco 3560-24TS switch | 1 | 497.95 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Cable, Connectors, etc. | 1 | 6,495.00 | - |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Studio props for sets and recording sessions | 1 | 32,826.28 | - |
| | | | | | | | **Totals** | | 2,690,457.16 | 415,330.37 |

# Exhibit H



SCHERTLER & ONORATO, L.L.P.

August 5, 2019

***VIA ELECTRONIC MAIL AND FIRST CLASS MAIL***

Michael J. Collins
Brewer Attorneys & Counselors
750 Lexington Avenue
14th Floor
New York, New York   10022

RE: ***National Rifle Association of America v. Ackerman McQueen, Inc.***, CL19001757

Dear Michael:

I am writing in response to your correspondence of July 22, 2019.  In that letter, you raised three issues.  Our positions on those issues are set forth below.

First, with respect to the "NRA Women Instagram Account," we provided you with a response by email on Tuesday, July 23, 2019.

Second, you reference Section XI. E. of the Services Agreement and request "return to the NRA, to such place and in such manner as NRA may specify, any and all of the NRA's property, materials, documents, Confidential Information, etc., that may be in AMc's possession."  As you note, the Services Agreement conditions such delivery upon approval and payment in advance by the NRA of "all charges for accumulating said materials."

What we find remarkable about your request is that the NRA is insisting that AMc abide by the terms of a contract that the NRA has refused to honor.  As you know, the NRA is in material breach of the Services Agreement because it has refused to pay invoices that AMc has submitted to the NRA in accordance with the provisions of Section III, Paragraph E of the Agreement and also has refused to establish a $3,000,000 Letter of Credit as required by the May 6, 2018 Amendment No. 1 to the Services Agreement.  These breaches are the grounds on which AMc immediately terminated the Services Agreement under Section XI, Paragraph D.  The NRA has also failed to abide by a number of additional contractual obligations that were triggered by AMc's immediate termination of the Agreement.  These obligations were brought to the NRA's attention in our June 27, 2019 letter to Andrew Arulanandam.

Furthermore, Section XI, Paragraph F of the Services Agreement states:

In consideration of the dedication of a substantial number of personnel and resources to provide the services under this Agreement (and the necessity to maintain such staffing levels and resource allocations to enable AMc to continue to provide such services upon renewals hereof), the NRA agrees to pay AMc a fair and equitable termination fee to compensate it for the inevitable severances and other reasonable costs incurred in conjunction with such expiration or terminations.

Such termination fees shall be negotiated in good faith by the parties and paid to AMc no later than the last day of this Agreement.

We have repeatedly asked the NRA to engage in a good faith negotiation to establish the termination fees that the NRA owes to AMc under the Services Agreement as this Paragraph requires. The NRA has refused to do so and has breached the Agreement in this regard as well.

As soon as the NRA comes into compliance with all of its obligations under the Services Agreement, AMc will begin the process of returning to the NRA "any and all of the NRA's property," conditioned upon the NRA paying in advance "all charges for accumulating said materials." Please let us know when you expect the NRA to cure its breaches.

As always, if you have any questions regarding this matter, please feel free to contact me.

Sincerely,

David Schertler

cc: James W. Hundley, Esq.
    Robert H. Cox, Esq.

# Exhibit I

DALLAS | NEW YORK

# BREWER
## ATTORNEYS & COUNSELORS

August 9, 2019

**VIA EMAIL**

David Schertler
Schertler & Onorato, LLP
901 New York Avenue, NW Suite 500
Washington, D.C. 20001

> Re: *National Rifle Association of America v. Ackerman McQueen, et al.*, Case No.
> CL19001757 and CL19002067, in the Circuit Court for the City of Alexandria

Dear David:

We received your letter dated August 5, 2019, in which you purport to respond to our letter dated July 22, 2019.

Of course, we disagree with your position that the National Rifle Association of America (the "NRA") breached any of the terms or provisions of the Services Agreement or Amendment No. 1 to the Services Agreement. In any event, you ignore that your client Ackerman McQueen, Inc. ("Ackerman") committed prior material breaches of the Services Agreement, thereby relieving the NRA of any obligations to perform under the parties' agreement.

As you know, Ackerman purported to terminate the Services Agreement on May 29, 2019, pursuant to XI.B. of the Services Agreement and again on June 27, 2019, pursuant to section XI.D. Termination pursuant to section XI.D. is effective immediately upon written notice.

Pursuant to section XI.E. of the Services Agreement, Ackerman should have returned the NRA's books, records, documents, Confidential Information, and other personal property immediately after June 27, 2019. To date, Ackerman has failed to do so. As you know, the NRA has repeatedly demanded that Ackerman comply with section XI.E. These requests include written requests made pursuant to letters dated June 11, 2019, June 25, 2019, June 28, 2019, and July 22, 2019.

We acknowledge that XI.E. states that the NRA shall pay the costs associated with "accumulating said materials." By letter dated June 25, 2019, the NRA informed Ackerman that the "NRA will pay for accumulation of these materials, and reiterates its previous requests for an advance price to this end." In addition, by letter dated July 22, 2019, the NRA once again requested that Ackerman promptly disclose the costs of associated with accumulating the NRA's property. Furthermore, by letter dated June 28, 2019, the NRA again stated that the "NRA has repeatedly requested a budget for transmittal of these materials. Please provide one." As of the

# BREWER

**Mr. David Schertler**
August 9, 2019
Page 2

date of your August 5 letter, Ackerman has still not complied with its obligation to disclose the cost associated with accumulating the NRA's property.

By letter dated June 27, 2019, you agreed to "provide the NRA with the costs of accumulating these materials . . . ." By email dated July 23, 2019, you promised the NRA that it would provide a detailed response to the NRA's letter dated July 22, 2019, but you did not respond until Monday, August 5, 2019.   Your letter dated August 5, 2019, however, does not disclose the costs associated with accumulating the NRA's materials.  Accordingly, as of today, Ackerman has not complied its obligation to disclose the costs associated with accumulating the NRA's property.

In your letter dated August 5, 2019, you appear to be taking the position that the NRA breached the Services Agreement and that the NRA must pay to Ackerman all amounts it seeks before it will comply with its obligations under section XI.E.  If this is your position, please let us know because such a position would be meritless.  First, the NRA has not breached the parties' agreement and the NRA owes nothing to Ackerman except for the costs associated with gathering its property.  Second, your position would be based on a misreading of section XI. Pursuant to section XI.D., Ackerman is entitled to terminate immediately upon sending written notice for certain grounds, including if the NRA breached the Services Agreement.  Nonetheless, section XI.E. still requires Ackerman to immediately return the NRA's property even if the termination was based on alleged breaches by the NRA.  Thus, Ackerman would have no basis to delay returning the NRA's property until the NRA pays whatever amounts Ackerman seeks unrelated to the costs associated with accumulating the NRA's property.

Once again, on behalf of the NRA, we hereby demand that pursuant to section XI.E. of the Services Agreement, Ackerman immediately return all of the NRA's books, records, documents, Confidential Information, and other personal property.  As stated before, the NRA will reimburse Ackerman for its reasonable costs in accordance with section XI.E. once Ackerman provides an accounting of those costs.

We appreciate your attention to these important matters.  If you have any questions, please let me know.

Sincerely,



Michael J. Collins

# EXHIBIT B-20

**V I R G I N I A :**

## IN THE CIRCUIT COURT FOR THE CITY OF ALEXANDRIA

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case Nos. CL19001757;** |
| | ) | **CL19002067** |
| **ACKERMAN MCQUEEN, INC.,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **MERCURY GROUP, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM IN SUPPORT OF
## MOTION FOR PROTECTIVE ORDER

The Defendants have sought to reach an agreement on the scope of the protective order necessary for the production of confidential information in this consolidated litigation. The parties have agreed that "Disclosure and discovery activity in this Action are likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this Action may be warranted." Proposed Protective Order, p. 1. Consequently, counsel for the parties have reached an agreement with respect to all aspects of the concurrently-filed Protective Order except one clause discussed in this Memorandum.

Defendants seek to ensure that their proprietary and confidential information does not fall into the hands of a competing public relations business, especially a business that is in direct competition with the Defendants' businesses for work for the NRA. An ordinary Protective Order would routinely ensure that such proprietary information would not be

1

disclosed to a competing business. However, because Plaintiff has retained the law firm of Brewer, Attorneys and Counselors, ("Brewer law firm") and this Court has approved the *pro hac vice* participation of Michael Collins of the Brewer law firm – over the objection of the Defendants, Michael Collins and members of his law firm will have access to proprietary information of Ackerman McQueen and the Mercury Group. This would not typically be problematic, except that the Brewer law firm also has a "Public Relations Unit" that not only directly competes with the Defendants in the field of Public Relations, but the Brewer unit has already poached substantial portions of the NRA Public Relations Work from the Defendants.

As stated during the June 12 *pro hac vice* hearing: "They have an in-house public relations unit in the firm that is siphoning away business from Ackerman McQueen for the NRA work, and that's -- that's, a key factor in this case, what's happening to the work that's being taken away from AMc." June 12 Transcript, p. 15. Therefore, if documents are produced by the Defendants that are deemed confidential, or even designated "Attorneys Eyes Only," Plaintiff's counsel has insisted that anyone at the Brewer law firm is still entitled to see such documents, since Michael Collins of the Brewer law firm is counsel for the NRA in this case.

At the hearing addressing the *pro hac vice* application of Michael Collins on June 12, 2019, this Court expressed the common sense views that a virtual wall could be constructed between Attorney Collins and the rest of the Brewer law firm:

(i)     THE COURT: Is there a wall? You know, the old -- the old -- the old saying? It's "I'm going to put up a wall." I'm not going to use the first part, but I'm going to put -- saying that I'm going to put up a wall. You know what the old saying is -- is that -- that's a little racist to say, to use the entire term but -- the entire term, but he's going to put up a wall, and Mr. Brewer -- I mean, Mr.

2

> Collins will never have access to any information that relates to the NRA? Is that correct?
> June 12 Transcript, p. 16, 17.

Secondly, the NRA's attorney, Robert Cox argued the following that is now untrue:

> We dispute the allegations in the counterclaim that somehow the -- the firm is benefitting financially from -- from media relations. They have a staff of four people. They cannot undertake the work that Ackerman performs for the NRA as a media relations department that they use strictly for pending cases. So we dispute the factual allegations that Mr. Collins would be financially benefitting from any diversion of -- of marketing from business from Ackerman. June 12, Transcript p.

The Defendants' Services Agreement has now been terminated, approximately 50 employees of Ackerman McQueen and Mercury Group have been terminated or furloughed. Some of the public relations and crisis response work has been absorbed by William Brewer and his staff in the Public Relations Unit of his law firm. William Brewer himself appears to be leading the NRA public relations effort during the crisis response days following the mass shootings in El Paso and Dayton and has been quoted in many publications since those events.

The concerns that Defendants had when they objected to the *pro hac vice* motions filed by two attorneys of the Brewer law firm have proven true. William Brewer's litigation strategy was to end AMc's contract with the NRA and pick up the public relations work for his own law firm. Michael Collins is a partner in that law firm who not only benefits from the profits earned by the public relations work done for the NRA, but has failed to construct any "wall" between himself and the other persons in his law firm who are in direct competition with the Defendants.

Defendants' counsel has proposed that certain proprietary documents may be turned over to NRA's counsel at Briglia & Hundley, but that such sensitive documents be screened from any person at the Brewer law firm, to ensure that Brewer and his public relations unit

are not misusing the information to the competitive disadvantage of the Defendants. NRA's counsel has objected to this screening – making the Defendants all the more concerned about how their proprietary information will be protected from being used by a competitor. This Court granted the *pro hac vice* motion for Mr. Collins, but it was made clear at the hearing that the Defendants could return to the Court if the participation of Mr. Collins created problems in the case. As stated by NRA's attorney Cox: "if someone has got a disqualification issue, they can raise it. And yes, we'll take it seriously, your Honor. If they've got grounds for us and they explain those grounds for us, we'll take them very seriously." Michael Collins at June 12 hearing.

Unfortunately, at the first sign that Mr. Collins partnership with the Brewer law firm could create a problem, NRA's attorneys have not been willing to address the need for any restrictions on Mr. Collins access to proprietary documents that could aid his law firm's competition with Ackerman McQueen. The issue has been further elevated in importance when the NRA failed to provide responsive documents to discovery requests that sought information about the Brewer law firm's public relations work for the NRA.[1]

---

[1]   Specifically, the NRA has failed to provide documents in response to the following document production requests that specifically target the public relations work that the Brewer law firm is doing for the NRA:

> 3. All documents relating or referring to any public relations work performed by any entity owned by William Brewer and performed on behalf of the NRA.

> 4. All documents relating or referring to discussions between William Brewer and any employee of the NRA that pertain to payment for public relations services.

4

It is inequitable for the Brewer law firm to refuse to disclose the work that its public

relations unit is doing for the NRA and at the same time to allow the Brewer law firm

unfettered access to the proprietary information of its competitors at Ackerman McQueen.

The clause that is at issue in the Protective Order is Section 7.3.

7.      **ACCESS TO AND USE OF PROTECTED MATERIAL**
* * * *
        7.3     NRA's Restrictions on Use of Highly Confidential Information.
Unless otherwise ordered by the Court or permitted in writing by Counsel for AMc
and Mercury Group, Lead Counsel for the NRA (Briglia Hundley, P.C.) may
disclose any information or item designated "HIGHLY CONFIDENTIAL" by
Defendants only to the law firm Briglia Hundley, P.C.  Information or items
designated "HIGHLY CONFIDENTIAL" may, however, be provided to one
representative of the NRA who is responsible for making decisions concerning the
Action, to the extent deemed necessary by the NRA's counsel of record for the
purpose of assisting in the prosecution, defense, or attempted settlement of the
Action; provided, however, that such representative shall not discuss, disclose,
summarize, describe, characterize, or otherwise communicate or make available
such Discovery Material to any person or entity other than the law firm Briglia
Hundley, P.C. The representative selected by the NRA shall make this affirmation
in writing and shall be subject to the approval of AMc and Mercury Group, which
approval shall not unreasonably be withheld.


Defendants maintain that this clause is necessary to limit certain confidential information

to designated Virginia counsel for the NRA, and to preclude access by anyone affiliated with the

Brewer law firm and its public relations unit.


August 14, 2019                                    Respectfully submitted,

                                                    /s/  David H. Dickieson
                                                   David H. Dickieson (DC Bar #321778)
                                                   SCHERTLER & ONORATO, LLP
                                                   901 New York Avenue, NW, Suite 500W
                                                   Washington, DC 20001
                                                   (202) 628-4199
                                                   Facsimile: 202-628-4177

                                                   *Counsel for all Defendants*

CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2019, the foregoing pleading was served via electronic

mail on the following counsel:

> James W. Hundley
> Robert H. Cox
> BRIGLIA HUNDLEY, PC
> 1921 Gallows Road, Suite 750
> Tysons Corner, VA  22182
> jhundley@brigliahundley.com
> rcox@brigliahundley.com

_____ /s/ David H. Dickieson_____
David H. Dickieson.

6

# EXHIBIT B-21

| From: | Jason McKenney |
|---|---|
| To: | Mason, Brian; Madrid, Jay |
| Cc: | Michael Collins |
| Subject: | Fwd: Draft [Proposed] Protective order - N.D. Dallas |
| Date: | Monday, February 3, 2020 7:11:04 PM |
| Attachments: | image001.png |
| | ATT00001.htm |
| | 4833-8448-2483 v.2 Draft Dallas Protective Order.docx |
| | ATT00002.htm |

Jay and Brian,

I suspect y'all have the attached proposed PO for the N.D. Tex. case already, but wanted to pass it along regardless. Please let us know your thoughts.

Regards,
Jason


Begin forwarded message:


**From:** Beth Landes <bal@brewerattorneys.com>
**Date:** February 3, 2020 at 6:05:48 PM CST
**To:** "David H. Dickieson" <DDickieson@schertlerlaw.com>, David Schertler <DSchertler@schertlerlaw.com>, Joseph Gonzalez <JGonzalez@schertlerlaw.com>, Paola Pinto <ppinto@schertlerlaw.com>
**Cc:** Michael Collins <MJC@BrewerAttorneys.com>, Jason McKenney <jcm@brewerattorneys.com>, Claudia Colon Garcia-Moliner <cvm@brewerattorneys.com>, "Robert H. Cox" <rcox@brigliahundley.com>, Jim Hundley <jhundley@brigliahundley.com>
**Subject: Draft [Proposed] Protective order - N.D. Dallas**


Counsel,

Pursuant to the meet and confer discussion of last Thursday, January 30, 2020, I am attaching a draft proposed protective order for the litigation pending in N.D. Dallas. We will be happy to discuss any questions or concerns. If a protective order is agreed by the parties and entered by the Court in N.D. Dallas, we are amenable to modifying the Virginia Protective Order for purposes of permitting cross-use of discovery materials in the two jurisdictions.

Regards,
Beth


Beth A. Landes | Associate
Brewer, Attorneys & Counselors

750 Lexington Avenue, Fl. 14
New York, NY 10022
Office: 212.489.1400
Direct: 212.224.8806
Mobile: 301.535.0524
bal@brewerattorneys.com | www.brewerattorneys.com

Draft document for consideration by counsel. Neither party is bound by any of the terms proposed herein unless and until such terms are incorporated into a final draft that is signed by the parties and entered by the Court.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § |
| **Plaintiff and Counter-Defendant** | § § |
| **and** | § § |
| **WAYNE LAPIERRE,** | § § § |
| **Third-Party Defendant,** | § § |
| **v.** | § **Civil Action No. 3:19-cv-02074-G** |
| **ACKERMAN MCQUEEN, INC.,** | § § § |
| **Defendant and Counter-Plaintiff,** | § § |
| **and** | § § |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG,** | § § § § § |
| **Defendants.** | § § |

**DRAFT [PROPOSED] PROTECTIVE ORDER**

1.  **PURPOSES AND SCOPE**

    1.1     Disclosure and discovery activity in this Action are likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this Action (as defined below) may be warranted. Accordingly, the Parties hereby stipulate to and petition the Court to enter the following Stipulated Protective Order (the "Order").

1.2     The purpose of this Order is to facilitate the production of discovery material, facilitate the prompt resolution of disputes over confidentiality and privilege, protect material to be kept confidential and/or privileged, and ensure that protection is afforded only to material entitled to such treatment, pursuant to the Court's inherent authority, its authority under the applicable Rules, the judicial opinions interpreting such Rules, and any other applicable law. Except as otherwise stated in this Order, a Party shall produce, in response to a valid discovery request, otherwise discoverable information in its possession, custody or control that is Confidential or Highly Confidential, and such information shall be handled in accordance with the procedures set forth herein.

1.3     This Order and all subsequent Protective Orders shall be binding on all Parties and their counsel in the above-captioned litigation and any other persons or entities who become bound by this Order.

1.4     The Parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the information or items that are entitled to confidential treatment under the applicable legal principles.

## 2.      **DEFINITIONS**

The following definitions apply for purposes of this Order:

2.1     Action:  The lawsuit captioned above *National Rifle Association of America, et al. v. Ackerman McQueen, Inc.*, *et al.*, Civil Action No. 3:19-cv-02074-G (N.D. Tex).

2.2     Challenging Party:  A Party or Non-Party that challenges the designation of information or items under this Order.

2

2.3     Confidential Information:   Discovery Material (regardless of how it is generated, stored, or maintained) or tangible things that qualify for protection under the Federal Rules of Civil Procedure and applicable precedent.

2.4     Counsel:  Outside Counsel of Record, In-House Counsel, or counsel retained for the purpose of advising, prosecuting, defending, or attempting to settle this Action.

2.5     Designating Party:  A Party or Non-Party that designates documents, information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL" or "PRIVILEGED."  Documents designated "Highly Confidential" for purposes of the Virginia Action shall be treated as "Confidential" for purposes of this Action.

2.6     Discovery Material:  All items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, answers to interrogatories, documents, responses to requests for admissions, tangible things, and informal exchanges of information), that are produced or generated in connection with any discovery in this Action, whether formally or informally.

2.7     Expert:  A person retained by a Party or its Counsel to serve as an expert witness or consultant or technical advisor in this Action (as well as his or her employees and support staff).

2.8     In-House Counsel:  Attorneys who are employees of a Party to this Action.  In House Counsel does not include Outside Counsel of Record or any other outside counsel.

2.9     Non-Party:  Any natural person, partnership, corporation, association, or other legal entity not named as a Party to this Action, and their counsel.

2.10    Outside Counsel of Record:  Attorneys who are not employees of a Party to this Action but have been retained to represent or advise a Party to this Action and have

3

appeared in this Action on behalf of that Party or are affiliated with a law firm which has appeared on behalf of that Party.

     2.11   <u>Party</u>:  Any party to this Action.

     2.12   <u>Privileged Material</u>:  Discovery Material protected from disclosure under the attorney-client privilege, work product doctrine, or any other privilege, immunity or protection afforded or recognized by the Rules, including any such privilege or protection under applicable U.S. or foreign law, regulation or statute.

     2.13   <u>Producing Party</u>:  A Party or Non-Party that produces Discovery Material in this Action.

     2.14   <u>Professional Vendors</u>:  Persons or entities that provide litigation support services (*e.g.*, photocopying, videotaping, graphic support services, coding, translating, preparing exhibits or demonstrations, document review, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

     2.15   <u>Protected Material</u>:  Any Discovery Material that is designated as "CONFIDENTIAL."

     2.16   <u>Receiving Party</u>:  A Party that receives Discovery Material from a Producing Party.

     2.17   <u>Virginia Action</u>:  The consolidated lawsuits captioned *National Rifle Association of America v. Ackerman McQueen, Inc.*, *et al.*, Case Nos. CL19002067, CL19001757, and [###], pending before the Circuit Court for the City of Alexandria, Virginia.

3.      **SCOPE**

3.1     The protections conferred by this Order apply to Protected Material (as defined above) and also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, translations, or compilations of Protected Material; and (3) any oral, written, or electronic communications, testimony or presentations, including for purposes of settlement, by Parties or their Counsel that might reveal Protected Material.   However, the protections conferred by this Order do not cover information that is in the public domain at the time of disclosure to a Receiving Party or becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order.

4.      **DURATION**

4.1     Even after final disposition of this Action, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing or a court order otherwise directs. Final disposition shall be deemed to be the later of ( 1) dismissal of all claims and defenses in this action, with or without prejudice; or (2) final judgment herein after the completion and exhaustion of all appeals, rehearings, remands, trials, or reviews of this action, including the time limits for filing any motions or applications for extension of time pursuant to applicable law.

5.      **DESIGNATING PROTECTED MATERIAL**

5.1     <u>Manner and Timing of Designations</u>.  Except as otherwise provided in this Order (see, *e.g.*, <mark>Section 5.2.4 below</mark>), or as otherwise stipulated or ordered, Discovery Material that qualifies for protection W1der this Order must be clearly so designated at the time the material is disclosed or produced.  The Parties shall make Confidential designations in good faith to ensure that only those documents or testimony that merit Confidential treatment are so designated.

Either designation may be withdrawn by the Designating Party.  If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection, the Designating Party must promptly notify all other Parties that it is withdrawing the mistaken designation.

      5.2    <u>Designation inconformity with this Order requires the following</u>:

      5.2.1    *Marking*.  All or any part of a document, discovery response, or pleading disclosed, produced, or filed by a Producing Party may be designated Confidential or by marking the appropriate legend ("CONFIDENTIAL") on the face of the document and each page so designated.  With respect to tangible items, the appropriate legend shall be marked on the face of the tangible item, if practicable, or by written notice to the Receiving Party at the time of disclosure, production or filing that such tangible item is Confidential or contains such information.  With respect to documents produced in native format, the Electronically Stored Information Protocol, or ESI Protocol, to be entered in this Action shall govern the form and method for marking such documents as Confidential.

      5.2.2    A Receiving Party shall exercise good faith efforts to ensure that any copies, print-outs of natively produced documents or data, excerpts, summaries, or compilations include a confidentiality legend that matches the confidentiality designation the Designating Party applied to the document, discovery response, transcript, or pleading.

      5.2.3    *Timing*.  Except as otherwise provided herein, documents and other objects must be designated before disclosure or production.  In the event that a Producing Party designates some or all of a witness's deposition or other pre-trial testimony (or related exhibits) Confidential, such  designation may be made on the record of the deposition or hearing or within thirty (30) calendar days after receipt of the final transcript of such deposition or hearing.  The

specific page and line designations over which confidentiality is claimed must be provided to counsel for the Parties within thirty (30) calendar days of receipt of the transcript in final form from the court reporter except counsel may agree to extend such period.  Deposition or pre-trial testimony shall be treated as Confidential pending the deadline or, if applicable, extended deadline for designation.  After the expiration of that period, the transcript shall be treated only as actually designated.

5.2.4     For information produced in some form other than documentary and for any other tangible items, the Producing Party shall affix in a prominent place on the exterior of the container or containers in which the info1mation or item is stored the legend "CONFIDENTIAL."  If the Protected Material is produced in an electronic form with a load file, the Designating Party shall note that there is Protected Material in the load file.  If only a portion or portions of the information or item warrant protection, the Producing Party, to the extent practicable, shall identify the protected portion(s).

5.2.5     Inadvertent Failures to Designate.  Accidental or inadvertent disclosure of Protected Material—including Protected Material inadvertently disclosed by failure to redact as set forth in Section 11—does not waive the confidential status of such information or any privilege or other protection attached thereto.   In the event that Protected Material is inadvertently disclosed without appropriate designations, any Party or Non-Party may thereafter reasonably assert a claim or designation of confidentiality, and the Producing Party shall promptly provide replacement media.  Thereafter, the Receiving Party must promptly return the original information and all copies of the same to the Producing Party, or destroy the original information and all copies, and make no use of such information.  In the event that Protected Material is inadvertently disclosed to any person and such disclosure is not permitted by the

terms of this Order, the Party making the inadvertent disclosure shall promptly notify the Producing Party of such inadvertent disclosure within ten (10) calendar days of learning of it and will make all reasonable efforts to ensure the original and all copies of inadvertently disclosed information are not used and are promptly returned or destroyed.

6.     **CHALLENGING CONFIDENTIALITY DESIGNATIONS**

6.1     <u>Timing of Challenges</u>.  A challenge to a designation of confidentiality may be made at any time.   Unless a prompt challenge to a Designating Party's confidentiality designation is necessary to avoid foreseeable, substantial unfairness, unnecessary economic burdens, or a significant disruption or delay of the litigation, a Party does not waive its right to challenge a confidentiality designation by electing not to mount it a challenge promptly after the confidentiality designation is made.

6.2     <u>Form of Challenge</u>.  The Challenging Party shall object to the propriety of the designation of specific material as Confidential by providing written notice to the Designating Party of each designation it is challenging and describing the basis for each challenge.  To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the challenge to confidentiality is being made in accordance with this specific Section of this Order. The Designating Party or its counsel shall thereafter, within fourteen (14) calendar days, respond to such challenge in writing by either: (i) agreeing to remove the designation; or (ii) stating the reasons for such designation.  Counsel may agree to reasonable extensions.

6.3     <u>Meet and Confer</u>.  If the Challenging Party continues to dispute the designation(s) at issue, it shall notify the Designating Party in writing within seven (7) calendar days thereafter. Counsel may agree to reasonable extensions.  The Parties shall attempt to resolve each challenge in good faith by conferring directly (in voice-to-voice dialogue; other forms of communication

8

are not sufficient).  A Challenging Party may proceed to the next stage of the challenge process only if it has engaged in this meet-and confer process first or establishes that the Designating Party is unwilling to participate in the meet-and-confer process in a timely manner.

6.4     Judicial Intervention.   If the Parties cannot resolve a challenge without court intervention, the Challenging Party may move the Court for an order withdrawing the designation as to the specific designations on which the Challenging Party and the Designating. Party could not agree, within fourteen (14) calendar days of the Parties agreeing that the meet-and-confer process will not resolve their dispute.  Each such motion must be accompanied by a competent declaration affirming that the movant has complied with the meet-and-confer requirements imposed in the preceding Section.

6.5     The burden of persuasion in any such challenge proceeding shall be on the Designating Party.  While a challenge is pending, all Parties shall continue to afford the material in question the level of protection to which it is entitled under the Designating Party's designation until the Court orders otherwise.

6.6     If a Designating Party or the Court identifies or determines that material that had been designated as Protected Material should no longer be so designated, that material will no longer be subject to the restrictions designated herein for the treatment of Protected.

7.     **ACCESS TO AND USE OF PROTECTED MATERIAL**

7.1     Basic Principles.  A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in this Action only for prosecuting, defending, or attempting to settle this Action, including any appeal(s), so long as such use is permitted herein. In addition, the parties may use Protected Material that is disclosed or produced in this Action in the Virginia, and the level of protection afforded to those materials shall be deemed to have the

9

same protections in the Virginia Action.  Subject to the foregoing, Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. After the final disposition of the Action, a Receiving Party must comply with the provisions of Section 15 below (FINAL DISPOSITION).  Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

7.1.1    Except as otherwise provided in this Order, Counsel in this Action and any of their agents shall be prohibited from sharing with anybody any Protected Material, or any information derived from or based on any Protected Material, in connection with any investigation, proceeding, or contemplated proceeding.

7.2    <u>Restrictions on Use of Confidential Information</u>.  Unless otherwise ordered by the Court, permitted in writing by the Designating Party, or used in the Virginia Action, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to:

7.2.1    the Receiving Party's Counsel (including their employees and support staff);

7.2.2    the officers, directors, and employees of the Receiving Party to whom disclosure is reasonably necessary for this Action;

7.2.3    experts retained by the Receiving Party or the Receiving Party's Counsel to whom disclosure is reasonably necessary for this Action;

7.2.4    the Court and its personnel, and any appellate court or other court (and their personnel) before which the Parties appear in this Action;

7.2.5    special masters or discovery referees appointed by the Court;

7.2.6    mediators and their staff;

10

      7.2.7    court reporters and their staff, professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this Action;

      7.2.8    potential or actual witnesses in the Action to whom disclosure is reasonably necessary, unless otherwise agreed by the Designating Party or ordered by the Court;

      7.2.9    the author or recipient of a document containing.the information or a custodian or other person who otherwise possessed or knew the information; and

      7.2.10    any other person to whom the Designating Party, in writing, authorizes disclosure.

      7.2.11    Other than Counsel any person or entity who receives information designated CONFIDENTIAL pursuant to this Protective Order shall (1) agree to be bound by the terms of this Protective Order and (2) execute the document attached hereto as Exhibit "l ."

## 8.    PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION

    8.1    If a Party is served with a subpoena or a court order issued in other litigation that compels disclosure of any Protected Material, that Party must:

      8.1.1    promptly notify in writing the Designating Party unless prohibited by law from doing so. Such notification shall include a copy of the subpoena or court order;

      8.1.2    promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Order.  Such notification shall include a copy of this Order; and

      8.1.3    cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.

11

8.2    If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any Protected Material before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission.   The Designating Party shall bear the burden and expense of seeking protection of its Protected Material, and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this Action to disobey a lawful directive from another court.

## 9.    A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS ACTION

9.1    The terms of this Order are applicable to Protected Material produced by a Non-Party in this Action.   Such information produced by Non-Parties in connection with this Action is protected by the remedies and relief provided by this Order.   Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

## 10.    UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

10.1    If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures; (b) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order; and (c) make all reasonable efforts to retrieve all unauthorized copies of the Protected Material.

## 11.    REDACTIONS ALLOWED

11.1    Any Producing Party may redact from Discovery Material matter that the Producing Party claims is Privileged Material.   The Producing Party shall ensure that the

12

redaction is obvious to the Receiving Party and specify the basis for the redaction as appropriate. Where a document consists of more than one page, at least each page on which information has been redacted shall be so marked.  If counsel for the Producing Party agrees or if the Court orders that Discovery Material initially redacted shall not be subject to redaction or shall receive alternative treatment, and the Discovery Material is subsequently produced in unredacted form, then that unredacted Discovery Material shall continue to receive the protections and treatment afforded to documents bearing the confidentiality designation assigned to it by the Producing Party.

      11.2    The right to challenge and process for challenging the designation of redactions shall be the same as the right to challenge and process for challenging the designation of Confidential information as set forth in Section 6.

      11.3    Nothing herein precludes any Party from seeking the other Parties' consent or an order allowing the Party to redact nonresponsive matter from otherwise responsive documents on a case-by-case basis.

**12.**     <u>**CLAWBACK OF PROTECTED MATERIAL**</u>

      12.1    <u>Production Not a Waiver.</u>  It is the intent of the Parties to assert and preserve all information subject to a claim of protection from discovery or disclosure, in full or part, by the attorney-client privilege, the attorney work product doctrine, and/or any other additional privilege, immunity, or protection, including, but not limited to, the joint defense or common interest doctrines, or applicable laws and regulations (together, "Privileged Material").  The production or disclosure of any Discovery Material in the Litigation or any other proceeding, that the Producing Party subsequently designates "Privileged Material," shall not be deemed to effect a waiver of any privilege, immunity or protection with respect to the Privileged Material, the

13

subject matter of the Privileged Material, or the right to object to the production or disclosure of the Privileged Material in this Litigation or in any other proceeding.   This Order shall be interpreted to provide the maximum protection allowed.

      12.2   <u>Clawback Procedure.</u>   If Discovery Material is designated "Privileged Material" subsequent to its production, the Party claiming the privilege, immunity or protection (together "Privilege") shall follow the procedure set forth in the applicable rules.   For any such materials, any Party opposing the assertion of a privilege, immunity or protection, shall not assert as a ground for opposing such an assertion that the Producing Party waived any privilege, immunity or protection because of inadvertent production in this Litigation.

## 13.   **CHALLENGING PRIVILEGE DESIGNATIONS**

      13.1   <u>Timing of Challenges</u>.   A challenge to a designation of Discovery Material as "Privileged Material" may be made at any time.   Unless a prompt challenge to a Designating Party's designation of "Privileged Material" is necessary to avoid foreseeable, substantial unfairness, unnecessary economic burdens, or a significant disruption or delay of the litigation, a Party does not waive its right to challenge a designation of "Privileged Material" by electing not to mount a challenge promptly after such designation is made.

      13.2   <u>Form of Challenge</u>.   The Challenging Party shall object to the propriety of the designation of specific material as "Privileged Material" by providing written notice to the Designating Party of each designation it is challenging and describing the basis for each challenge.   To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the challenge to the claim of Privilege s being made in accordance with this specific Section of this Order.   The Party that has designated the "Privileged Material" as such, or its counsel, shall thereafter, within fourteen (14) calendar days, respond to such challenge in writing

by either: (i) agreeing to remove the designation of "Privileged Material"; or (ii) stating the reasons for such designation.  Counsel may agree to reasonable extensions.

13.3    <u>Meet and Confer</u>.  If the Challenging Party continues to dispute the designation(s) at issue, it shall notify the Designating Party in writing within seven (7) calendar days thereafter. Counsel may agree to reasonable extensions.  The Parties shall attempt to resolve each challenge in good faith by conferring directly (in voice-to-voice dialogue; other forms of communication are not sufficient).  A Challenging Party may proceed to the next stage of the challenge process only if it has engaged in this meet-and confer process first or establishes that the Designating Party is unwilling to participate in the meet-and-confer process in a timely manner.

13.4    <u>Judicial Intervention</u>.  If the Parties cannot resolve a challenge without court intervention, the Challenging Party may move the Court for an order to compel the designating Party to withdraw the designation of "Privileged Material" as to the specific designations of Privilege on which the Parties cannot agree, within fourteen (14) calendar days of the Parties agreeing that the meet-and-confer process will not resolve their dispute.  Each such motion must be accompanied by a competent declaration affirming that the movant has complied with the meet-and-confer requirements imposed in this Section 13.

13.5    The burden of persuasion in any such challenge proceeding shall be on the Designating Party.  While a challenge is pending, all Parties shall continue to afford the material in question the level of protection to which it is entitled under the Designating Party's "Privilege" designation unless and until the Court orders otherwise.

13.6    If a Designating Party or the Court identifies or determines that material that had been designated as Privileged Material should no longer be so designated, that material will no longer be subject to the restrictions designated herein for the treatment of Privileged Material.

15

14.    <u>**MISCELLANEOUS**</u>

14.1    <u>Right to Further Relief</u>.  Nothing in this Order abridges the right of any person to seek its modification by the Court in the future.  Any Party, entity or person covered by this Order may at any time apply to the Court for relief from any provision of this Order.  Subject to the agreement of the Parties or an order of the Court, other entities or persons may be included in this Order by acceding to its provisions in a writing served upon counsel for the Parties, with such writings to be filed with the Court if so directed.

14.2    <u>Right to Assert Other Objections</u>.  By stipulating to the entry of this Order, no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Order.  Similarly, no Party waives any right to object on any ground to use as evidence any of the material covered by this Order.

14.3    <u>Filing Protected Material</u>.  Without written permission from the Designating Party or a court order secured after appropriate notice to all interested persons, a Party may not file in the public record in this Action any Protected Material.  A Party that seeks to file under seal any Protected Material must do so pursuant to the local rules.

14.4    <u>Hearings and Appeals</u>

14.4.1  In the event that a Receiving Party intends to utilize Protected Material during a pre-trial hearing, such Receiving Party shall provide written notice no less than three (3) calendar days prior to the hearing, to the Producing Party and/or the Designating Party, except that shorter notice may be provided if the Receiving Party could not reasonably anticipate the need to use the document at the hearing three (3) calendar days in advance, in which event notice shall be given immediately upon identification of that need.  The use of such Protected Material

16

during the pre-trial hearing shall be determined by agreement of the relevant Parties or by Order of the Court.

14.4.2  In the event that any Protected Material is used in any court proceeding in this Action or any appeal in connection with this Action, except for the use of Protected Material during trial, the manner of which shall be determined pursuant to Section 3.2, such Protected Material shall not lose its protected status through such use.  Counsel shall comply with all applicable local rules and shall confer on such procedures that are necessary to protect the confidentiality of any documents, information, and transcripts used in the course of any court proceedings, including petitioning the Court to close the courtroom.

14.5   Reservations. Entering into, agreeing to or complying with the provisions of this Order shall not:   (1) operate as admission that any particular material contains Protected Material; or (2) prejudice any right to seek a determination by the Court (a) whether particular material should be produced, or (b) if produced, whether such material should be subject to the provisions of this Order.

## 15.   **FINAL DISPOSITION**

15.1     Within ninety (90) calendar days after the final disposition of this Action, as defined in Section 4, each Receiving Party, including its employees, attorneys, consultants and experts, muse use commercially reasonable efforts to destroy or return to the Producing Party all Protected Material, except (1) backup tapes or other disaster recovery systems that are routinely deleted or written over in accordance with an established routine system maintenance practice, or (2) documents that must be preserved as federal records or in compliance with t1ther statutory, regulatory or legal authorities.   As used in this Section, "all Protected Material'" includes all originals, copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of the Protected Material.   Whether the Protected Material is returned or destroyed, upon request of the Producing Party, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 90-day deadline that (1) states that commercially reasonable efforts have been made to assure that all Protected Material has been returned or destroyed, and (2) affirms that the Receiving Party has not retained any originals, copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected Material.   Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial. deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits. expert reports, attorney work product (including all emails attaching or referring to Protected Materials), and consultant and expert work product, even if such materials contain Protected Material.   Any such archival copies that contain or constitute Protected Material remain subject to this Order as set forth in Section 4 (DURATION).

IT SO ORDERED.

DATED: _____          _____
                                          The Honorable Joe Fish


SEEN AND AGREED

DATED: _____          _____
                                          Attorney for Plaintiff


DATED: _____          _____
                                          Attorney for Third-Party Defendant


DATED: _____          _____
                                          Attorney for Defendants

19

EXHIBIT 1 TO PROTECTIVE ORDER

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| **Plaintiff and Counter-Defendant** | § § | |
| **and** | § § | |
| **WAYNE LAPIERRE,** | § § | |
| **Third-Party Defendant,** | § § | |
| **v.** | § § | **Civil Action No. 3:19-cv-02074-G** |
| **ACKERMAN MCQUEEN, INC.,** | § § | |
| **Defendant and Counter-Plaintiff,** | § § | |
| **and** | § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG,** | § § § | |
| **Defendants.** | § § | |

**ACKNOWLEDGEMENT OF AND**
**AGREEMENT TO BE BOUND BY PROTECTIVE ORDER**

I, understand, state that:

I have reviewed the Protective Order in this matter.

I hereby agree to be bound by and comply with the terms of the Protective Order.


DATED this _____ date of, _____, _____


_____
(Typed or Printed Name)


_____
(Signature)


2277-09
4833-8448-2483, v. 2

21

# EXHIBIT B-22

# How a hard-charging lawyer helped fuel a civil war inside the NRA

washingtonpost.com/politics/how-a-hard-charging-lawyer-helped-fuel-a-civil-war-inside-the-

By Carol D. Leonnig and Tom Hamburger

The ugly public fight has led to an exodus of high-level officials and warring accusations of financial impropriety. At the center of the fray is Brewer, a brash lawyer who has drawn ethics complaints and has a reputation for escalating disputes into pricey legal battles.

Several NRA veterans accuse Brewer of instigating an almost Shakespearean feud to protect his bottom line and growing influence. According to internal board correspondence, his small law firm billed $24 million in fees in 13 months — leading top NRA board members to demand early this year that the organization stop paying until they could review the bills.

AD

But LaPierre sided with Brewer, saying that the lawyer's bills were appropriate and that he was bringing long-overdue scrutiny to the nonprofit group's workings.

"The NRA has full confidence in Bill Brewer and his law firm," LaPierre said in a statement. "The firm is creative, dedicated, and effective — and is helping to protect and advance the NRA's interests in multiple venues."

Brewer said he came under attack once he began examining lucrative financial deals inside the organization that he thought posed conflicts of interest. His firm said those complaining about its bills have a misinformed view of its work but declined to elaborate.

"Questions regarding our fees — which arose almost one year after we were hired — came only after people, who long supported our firm's work, themselves came under scrutiny for their conduct," Brewer said in a wide-ranging interview last week, sitting in his suite on the 59th floor of his Dallas office with soaring views of the city.

AD

Today, after helping to jettison NRA president Oliver North, rival lawyers and other key NRA lieutenants, Brewer counsels LaPierre on some of the group's most important decisions, including legal strategy, management and public relations, said multiple people familiar with his role.

Those who have been pushed out shared a common concern: that Brewer ran up excessive fees and then cemented his role by overstating claims about the organization's legal

jeopardy and the potential conflicts of his critics, according to the people and internal documents.

With Brewer's backing, LaPierre this spring turned against Ackerman McQueen, the marketing firm that had been the NRA's image maker for more than three decades — a company run by Brewer's own father-in-law and brother-in-law.

"Mr. Brewer is orchestrating a purge of every person who disagrees with his flawed strategy," Ackerman McQueen said in a statement.

AD

Brewer rejected that. "The truth is, a handful of faithless fiduciaries tried to 'purge' the NRA of its elected leadership by extorting Wayne LaPierre," he said. "They failed."

Brewer, whose eponymous law firm also has an office in New York, has a history of confrontational and high-priced legal fights, according to former employees and lawyers who encountered him in cases and a review of thousands of pages of court records.

Ted Lyon, a personal injury lawyer in Dallas who has battled Brewer in the past, said he was shocked that Brewer had "convinced the NRA that he was some type of star litigator."

In 2016, a Texas judge sanctioned Brewer, finding that he took actions that could have improperly tainted a jury pool. The court found Brewer's attempts "to avoid responsibility and accountability for his conduct to be at the very least unpersuasive and at the worst in bad faith, unprofessional, and unethical," the judge wrote.

AD

Four lawyers' associations filed a friend-of-the-court argument in August in favor of the punishment.

Citing the sanctity of the promise of a fair trial, the legal groups said they "can imagine nothing . . . more poisonous to this ancient ideal than William A. Brewer III's behavior."

Brewer, who has appealed, says his firm represents "our clients ethically but zealously." He said he is disappointed that his peers have lined up against him.

But, he added, "it's not the first time we've stood alone."

## An unusual choice

Brewer, 67, does not have the typical profile of a lawyer for the NRA, one of President Trump's staunchest allies. Campaign filings show that he has donated to numerous Democrats, including Barack Obama, Hillary Clinton and Beto O'Rourke.

But in March 2018, the NRA was dealing with a challenge by New York state officials to its Carry Guard insurance, which provides coverage to firearms owners who shoot someone and claim self-defense. The state Financial Services Department found that the NRA had illegally marketed what critics call "murder insurance." Insurers, facing millions in state fines, demand that the organization cover the penalty.

AD

The NRA wanted a lawyer with ties to New York Democrats. Steve Hart, the NRA board's lawyer, enlisted Brewer, according to people familiar with his involvement. Hart did not respond to a request for comment.

When New York officials warned financial institutions and insurers that a relationship with the NRA could harm their corporate reputations and jeopardize public safety, Brewer urged the NRA to sue the state, arguing that state officials were targeting an advocacy group whose views differed from their own.

From there, Brewer pressed to take on other matters, said people familiar with internal discussions. That included the organization's response to a broader threat: At the time, Letitia James, the leading candidate to become the New York state attorney general, was campaigning on a pledge to investigate the NRA's nonprofit status amid reports of financial irregularities.

AD

Brewer said he recommended to LaPierre that he prepare by auditing the group's spending and vendor contracts, including those of Ackerman McQueen, its largest. For 38 years, the Oklahoma City-based advertising agency had served as a powerful adjunct to the NRA, promoting the group's combative, no-compromise stance on gun rights.

The inquiry put him on a collision course with his father-in-law, Angus McQueen, who founded the firm. McQueen — a larger-than-life figure like Brewer, and of his generation— died in July. Brewer said he did not view the matter as a conflict of interest.

Brewer said people within the NRA began raising questions about Ackerman's billing and its hiring of the group's officials, such as North. North had a multimillion-dollar contract to host a series produced by the firm, documents show.

AD

A lawyer for North declined to comment.

The McQueens grew suspicious of Brewer's questions and worried that he sought to take over some of the firm's public relations business, according to people familiar with their views.

In a statement, Ackerman McQueen accused Brewer of "pursuing a personal vendetta against his own family and their business." The firm said it has cooperated with every audit requested by the NRA and never overcharged the group, adding that LaPierre approved all expenses.

The company alleges that Brewer went after Ackerman McQueen "to serve as a distraction from the failure of NRA executives and its board to properly fulfill its oversight duties."

Current NRA officials rejected that, saying the audit was part of a move to increase oversight. Brewer's firm said that the focus on Ackerman was not personal and that the agency stonewalled requests for information. And the firm dismissed as absurd the idea that it was trying to steal the public relations business.

AD

"The NRA pursued documents from several major vendors, not just Ackerman. But Ackerman, singularly, resisted," Sarah Rogers, a partner in the Brewer firm, said in a statement.

The audit set off a bitter legal fight, fracturing the alliance between the NRA and its longtime marketing agency. It also exposed lavish spending by LaPierre that flowed through Ackerman McQueen, such as hundreds of thousands of dollars in charges at a Beverly Hills clothing boutique and on foreign travel, invoices show. The NRA has defended the expenditures as necessary.

## 'Rambo tactics'

Brewer first made a splash in Dallas legal circles in the 1980s, when he co-founded a boutique litigation firm that offered big salaries and imported the brash tactics of Brewer's native New York to Texas.

Bickel & Brewer's hardball methods drew criticism from the traditional Texas bar.

Depositions were drawn out for days, as Brewer's clients claimed they couldn't say for certain what their names were, where they were born or what they owned, records show. Judges complained about overly combative practices that seemed aimed at wearing down the court and opposing counsel.

Fellow lawyers called them "Rambo tactics" — a term Brewer embraced.

"We don't believe we should earn our living from being nice to other lawyers," Brewer told the Texas Lawyer in a 1988 article that described his firm as the poster child for "scorched-earth" litigation.

With Brewer and other lawyers deploying such maneuvers, the state bar sought to rein them in, and in 1989, the Texas Supreme Court adopted a new code threatening to penalize lawyers "who perceive that they are retained to win at all costs without regard to fundamental principles of justice."

Friends say Brewer ruffled feathers because he challenged Texas's insular legal industry.

He "would do all that was within the bounds of ethics to advance the cause of his client — and the cause of justice," said John Sexton, a former president of New York University and dean of its law school.

Some clients, too, praised Brewer's approach.

"I've worked with Bill for decades for two reasons: He delivers time and time again, and exemplifies the highest of ethical standards," said Howard Meyers, the head of a global lead manufacturing company that hired Brewer to fend off bondholders in a multibillion-dollar bankruptcy fight.

But some former associates said Brewer sought to maximize fees at the expense of clients.

In interviews, 10 former employees said the Brewer firm pushed lawyers to generate big bills and encouraged "make-work" tasks.

"Bill was an excellent lawyer from a strategy and content standpoint," said one lawyer who left the firm in the 1990s and, like others, spoke on the condition of anonymity out of fear of retribution. But, the lawyer said, "we would do work that I considered clerical work" to meet the billing goals. "You can always find something more to do. It was a lot more expensive for the client."

Michael J. Collins, a partner in Brewer's firm, called that "a misinformed view of the way we manage the firm and its professionals," adding that "all time charged to client matters is scrutinized internally for accuracy, transparency, and value."

Brewer said his fees reflect the value of what he provides clients.

"Frankly, I'm disappointed some don't always see the utility in the way in which we go through the process," he said. "That's generally not the clients."

## Methods under scrutiny

At times, Brewer's process has led to eye-popping totals.

Over the years, his firm was paid $80 million for a wide variety of matters by the Wyly brothers, Texas entrepreneurs who made billions in computers, energy and retail, according to a family adviser.

When the brothers came under federal investigation for the use of offshore tax havens, Brewer urged them to fight the allegations, even as other wealthy figures settled similar cases by paying negotiated fines, according to people involved in the case and news reports at the time.

The Securities and Exchange Commission ultimately charged the Wylys with fraudulently hiding half a billion dollars.

After the death of Charles Wyly in 2011, the family parted ways with Brewer. The brothers were ordered to pay $198 million for tax fraud and Sam Wyly filed for bankruptcy protection. In 2016, he and his brother's estate were ordered to pay $1.1 billion in back taxes and penalties.

A spokesman for the Wylys declined to comment, citing a pending federal settlement agreement.

Brewer defended his work for the family. "I thought we successfully represented the Wylys," he said. "Some things turned out badly for them after I was no longer in charge."

Brewer's methods also drew scrutiny in a 2014 case in which he represented Titeflex, a pipe manufacturer that had been sued by the family of a young man who died in a house fire.

Texas state Judge Ruben Reyes found that Brewer's firm hired pollsters to conduct a telephone "push poll" that provided misleading information to people involved in the case and could have tainted the trial.

"The Court finds Mr. Brewer's conduct disrespectful to the judicial system," the judge wrote in 2016, adding that it "falls in the category of misconduct which is highly prejudicial and inimical to a fair trial by an impartial jury."

The judge ordered Brewer to attend 10 hours of remedial ethics classes and pay a $130,000 fine.

Brewer and a fellow lawyer who worked on the case said they were conducting a neutral survey to prepare for trial, not a push poll. Brewer's lawyer, citing experts in survey research, argued that Brewer was using a widely accepted litigation tool.

Brewer appealed the decision, which was upheld and increased to $177,000. His second appeal is set to be heard by the Texas Supreme Court next month.

"I just think he was wrong," Brewer said of the judge, adding that he is optimistic that the sanction will be reversed.

Titeflex ended up settling the case with the family and homeowners. Internally, company officials complained that Brewer delivered an unsatisfactory outcome while charging steep fees, according to three people familiar with the concerns.

Lyon, who represented the family that sued Titeflex, said Brewer would "send four lawyers to a deposition that one lawyer could easily handle." A Titeflex official and the Brewer firm declined to comment on its fees.

In another case, a Texas court disqualified Brewer from a suit in which he represented an heir to the Texas billionaire H.L. Hunt suing his father, because Brewer was found to have represented the father. Brewer said in court papers that opposing counsel tried to push him out for "tactical" reasons, adding that his work helped resolve the case.

In September 2018, Brewer was reprimanded by a federal judge in Virginia after he did not disclose the Texas court sanction to a federal court in Virginia as he represented the NRA in a lawsuit with an insurance broker.

"These are very serious allegations," U.S. District Judge Liam O'Grady told Brewer before ejecting him from the case. "They're findings of bad faith."

Brewer told The Washington Post that he believed he disclosed what was necessary, noting that the matter is under appeal.

After he was removed, the NRA settled the case for undisclosed terms in November 2018, court records show.

## 'Draining NRA cash'

Late last year, NRA budget officers began warning about staggering legal bills from Brewer's firm, according to people familiar with the communications. Since March 2018, his firm's fees had routinely topped $1.5 million a month, according to internal documents.

In a Feb. 26 letter, North and board vice presidents Richard Childress and Carolyn Meadows told LaPierre that they believed Brewer's retainer agreement was not properly executed and demanded that the NRA cease payments to him until they could discuss the matter.

"We have a fiduciary duty that needs to be urgently addressed, with you and if you wish, Mr. Brewer," the three wrote in their letter, the contents of which were described to The Post.

Brewer moved quickly to demonstrate his value to the organization.

In internal presentations, the lawyer warned of impending legal threats that he said he was uniquely equipped to address, according to people familiar with the meetings.

He said the NRA could face significant criminal liability in an ongoing investigation of Russian gun activist Maria Butina, who had cultivated ties to the NRA, the people said, as well as exposure in congressional inquiries into Russian connections to the group.

Brewer, who is not a criminal lawyer, asserted in one March meeting that North could be implicated, according to one of the people.

Federal prosecutors had already told NRA lawyers that the organization and its officers were not under criminal investigation, according to the people familiar with the conversations.

Others familiar with Brewer's presentations said they greatly inflated the legal risk, with one former prosecutor warning other NRA advisers that Brewer was a "charlatan."

Brendan Sullivan, a longtime white-collar defense lawyer representing North, later called Brewer's presentation something "a fifth grader might have put together," according to people who heard his reaction. Sullivan declined to comment.

Brewer declined to address the substance of his meetings, saying they were privileged. But he said he did not think the other NRA lawyers addressed the legal and reputational risks the group faced, adding that they were "assuming away all of the problems that needed to be confronted."

In March, North pushed the NRA to hire an outside auditor to examine Brewer's bills, internal correspondence shows.

But LaPierre emailed Brewer to tell him to ignore the request, according to a message read to The Post.

"My office, not any member of the board, has the authority to hire and oversee legal counsel," the NRA chief wrote in the email. "Your engagement is valid, is vital to the survival of the NRA and is well known to the entire board. Please keep up the good work and disregard this and other missives you may receive."

LaPierre had been warning North to stop inquiring about the legal bills, saying he had a conflict of interest because of his financial relationship with Ackerman McQueen, according to internal documents. But North kept up the pressure. "The Brewer invoices are draining NRA cash at a mindboggling speed," he and Childress wrote in an April letter to NRA officials obtained by The Post.

That month, the fight burst into the open.

On April 12, Brewer sued Ackerman McQueen on the NRA's behalf, accusing the firm of concealing how it was spending money under its $40 million contract. The suit also questioned the propriety of North's contract with NRA-TV and Ackerman McQueen, which North said LaPierre had authorized.

Then LaPierre took on North directly. On the eve of the organization's convention in Indianapolis, he publicly released a letter to the board in which he <u>claimed</u> that the NRA president had tried to extort him by threatening to release a "devastating account" of the group's financial status if LaPierre did not resign and drop the suit against Ackerman McQueen. LaPierre urged nominating committee members not to support North for another term, board members told their colleagues.

North was <u>forced to relinquish his post</u> as president. As he did so, he warned that the NRA was in "a clear crisis."

In court filings this summer, the former NRA president said that he was blocked by Brewer when he sought to learn more about the group's finances.

"Each time that North raised concerns about potential financial misconduct and tried to retain professionals to correct any wrongdoing, North's efforts were thwarted by LaPierre and Brewer," his lawyers wrote.

Meadows, North's successor, has defended Brewer in statements issued by his firm, saying her previous concerns have been assuaged.

"Bill and his team operate with openness and transparency," Meadows said in a statement, adding: "I have never worked with an outside law firm that is more on call, attentive and positively in tune to the needs of their client."

The NRA is now locked in legal battles on multiple fronts. Amid the turmoil, seven board members <u>have resigned</u> and some of the group's top strategists and advisers have been pushed out, including Christopher Cox, an NRA lobbyist whom LaPierre long described as his heir apparent. The NRA chief has accused Cox of conspiring with North, a charge Cox denies.

Last month brought a new defenestration — this time of lawyers. LaPierre announced that the NRA was <u>severing relations</u> with Charles Cooper, its longtime Second Amendment defender. Michael Volkov, its outside lawyer who had been handling the Russia investigation, also resigned.

In a statement released by Brewer's firm, the NRA chief accused the lawyers of being part of the conspiracy against him.

Cooper, who had represented the NRA for the past three decades, said he had always been loyal to the group, "not to any individual officers or directors of the organization." Volkov declined to comment.

Meanwhile, the New York attorney general has issued subpoenas seeking records of LaPierre's jet-setting lifestyle, including his efforts to buy a $6 million mansion with NRA money, and has sought information about why some of his spending was kept a secret from the NRA board, according to people familiar with the requests.

Meadows said in a statement that the NRA has offered to cooperate with the inquiry and called the claims of misspending "baseless allegations."

In late August, New York investigators spent a day interviewing North. Among their questions, according to people familiar with the matter, were queries about Brewer's fees and growing role in the NRA.

Beth Reinhard, Anu Narayanswamy and Alice Crites contributed to this report

# EXHIBIT B-23

# THE GUNSLINGERS

dmagazine.com/publications/d-magazine/1998/april/the-gunslingers

ALTHOUGH LOTS OF LAWYERS ARE WAXING SLEEK ON THE steady diet of corruption scandai at the Dallas Public Schools, the firm of Bickel & Brewer so far has tast-ed nothing but ashes. Not only did John Bickel and Bill Brewer reportedly lose hundreds of thousands I of dollars representing Matthew Harden, but their offer of a campaign contribution to school board member Don Venable, allegedly in return for his help in Harden's lawsuit against board president Kathleen Leos, has attracted the district attorney's unwanted interest in their operations.

"If you're a Rambo firm looking for big bucks, you're going to lake big risks," observes Dallas criminal lawyer Frank Jackson. "Apparently in this case that didn't work out."

Bill Brewer and John Bickel went into practice in the early '80s with the intention of practicing "New York-style law," says Brewer, which he defines as "truth neutral"-it doesn't matter whether clients are right or wrong, only that the lawyers aggressively pursue their interests. In the years since, they've became known for scorched earth tactics that leave opponents reeling-and for their look-alike styles. Bickel and Brewer not only look alike, they are about the same height (short), dress in simitar styles, and drive matching Porsche Carreras.

In the Harden case, Bickel & Brewer filed a blitz attack of six lawsuits-against two private detective firms; Yvonne Gonzalez; Kathleen Leos, Jose Plata, and Robert Hinkle; the school board and the district as a whole-amending their petitions frequently with titillating language, hiring transcribers to churn out deposition transcripts to give to the press the next day, and putting a public relations company on retainer to keep the case in the headlines.

In October, Bickel & Brewer offered to settle the case against Gonzalez for $750,000. Gonzalez's camp insisted that if the board agreed, certain conditions should be attached: that the money would be paid out over time; Harden would sign an affidavit saying he had not committed fraud or theft; and that he would relinquish the money if he was indicted or received immunity for his testimony against others. Bickel & Brewer and the board came to no agreement. Ultimately, Harden's lawyers secured Gonzalez's resignation, but no money changed hands.

Four months and thousands of their own dollars later, they settled the Leos and school district lawsuits for$600,000, without the onerous restrictions. Harden had to agree to cooperate fully with the investigations, not to file any more litigation against DISD. and not to re-apply for a job at DISD.

1/3

In [he Leos lawsuits, Bickel & Brewer represented Harden on a contingency basis, so they will probably receive some portion of the settlement-but far less than they put into it.

Their mistake may have been to mis-measure their client.

Bill Brewer says that after Harden came to his Highland Park home in late July to first discuss his legal options, Brewer was certain of Harden's rectitude. "If he got into a credibility fight with someone," Brewer says, "he'd win."

But Bickel & Brewer declined to make Harden available for depositions, in which his testimony would have been sworn. His lawyers say that's because confidential documents had surfaced in the case, and it would have been unfair for Harden to be questioned under oath about them.

Others assumed that Harden had a lot that he didn't care to discuss under a possible penalty of perjury if he lied. "He would have been caught no matter what version of the story he told," said Mike Gruber, who represented school board president Kathleen Leos in Harden's $10 million damage suit against her.

A second miscue was to target the unflappable Leos. Harden's suits, which alleged, among other acts, both slander and invasion of privacy, demeaned Leos as "an apparent stooge 'for the powers that be ' " and accused her of a lead role in a corrupt conspiracy to get rid of their client, "a beacon of service" to the school district.

If the charges were meant to rattle her, they didn't work. Though with few resources of her own-"her house would fit in Matthew's living room" said sister board member Lynda McDow-Leos was unruffled by the frontal assault on her integrity.

"It's just politics." she often said with a smile.

Instead of folding, Leos went to Gruber, whose investigation on her behalf generated unwelcome news for Harden and his lawyers. Gruber uncovered information about cash payments by Harden to his builder. Gruber also included in the case record the allegation that Harden and his friend, Michael Henderson, had each received a S1 million kickback in connection with a DISD contract, which the press picked up.

A source close to the mediation says thai Bickel & Brewer had racked up SI million in expenses and billable hours. They are likely to recover only a portion of the $600,000 Harden received last month in return for dropping all litigation and resigning his position.

In the Venable matter, Don Venable says he refused their offer of financial support but accepted the help of five junior lawyers who showed up in their Lexuses in Pleasant Grove to work for him on election day. (Bickel says that any suggestion that they offered Venable help in return for his vote is "ridiculous" and that the lawyers in his office simply care about

good government.) And, after his election, Venable did vote with the majority to remove Leos from her position as board president. Venable now says that he believes Leos did nothing wrong, but he voted to remove her as president because the board was "ungovernable" and out of control.

Now, with the Harden lawsuits settled, Bickel & Brewer can only wait and see how seriously the DA questions their dealings with Venable.



Newsletter

Keep me up to date on the latest happenings and all that *D Magazine* has to offer.

# EXHIBIT B-24



# Rambo Justice

**MARK DONALD** | **MARCH 19, 1998** | **4:00AM**

This is where the plot was hatched--or so the story goes. Not in some smoke-filled room at City Hall where politicos broker deals that placate rather than please, not on the top floor of some downtown bank building where law firms send buttoned-down lawyers to fight for the status quo, not at some breakfast club where "business leaders" peddle influence like smoked fish at a deli.

The first legal salvos of the Revolution on Ross--the coup d'etat that toppled a school district superintendent, some of her cabinet, and a school trustee president, that pitted blacks against browns in dueling conspiracy theories, that scandalized a school district in a manner never thought possible, even for DISD--were fired from a shabby South Dallas legal clinic.

The law office looks drab, sitting as it does in a strip center at the intersection of Martin Luther King Boulevard and Atlanta, neighboring Black Jack Pizza, the Four Torch Club, and Graham's Barber Shop No. 6, INC. A brown corrugated metal awning, dented in spots, frames what is little more than a concrete and brick slab otherwise known as "The Storefront."

Inside its glass doors, the furniture is sparse: general issue receptionist desk, office chairs, and sofa--hand-me-downs all. The phone rings occasionally, not much activity really, just a pleasant woman named Natalie fielding calls for lawyers who have yet to arrive. Her litany is the same: We don't do criminal cases, family law cases, no traffic tickets either. The civil cases that we do take are handled on a pro bono basis, according to the client's ability to pay. Accepted for representation are evictions, employment discrimination, the kinds of petty business disputes minorities must often forgo because the money is gone, no attorney wants to handle it, or the case is a dog.

At first blush, there is no hint to the power of this place, no suggestion that this is anything but a cluster of poverty lawyers dispensing social justice to the black community at bargain prices. But carefully arrayed on a narrow wooden coffee table are a handful of marketing brochures instructing would-be clients about the lawyers with whom they are dealing: Bickel & Brewer Storefront, PLLC is the newest innovation of Bickel & Brewer, the most aggressive high-powered litigation firm in the world.

This is the same Bickel and Brewer who were once branded the bad boys of the Dallas Bar--high-priced, high-profile Rambo lawyers whose scorched-earth litigation style is credited by some as forever changing the way the Dallas legal establishment practices law. Driven by the boundless energy and raw chutzpah of its co-founder Bill Brewer, the "litigation boutique" became a pariah within the local legal community, accused of pushing the ethical envelope, running up the costs of litigation, and destroying the gentility of the Dallas Bar. But among the Fortune 500 clients they sought to woo, the firm built a solid reputation as a passionate advocate that would zealously represent their rights--willing to "leave no stone unturned," as they claimed, and do whatever it took to win--and win big.

So in 1995, when Bickel & Brewer decided to open up its storefront operation, catering to the city's disenfranchised, many--including the city's disenfranchised-- were skeptical. Were their motives as altruistic as they claimed? Was this a noble attempt to try to make a difference, acknowledging the law's obligation to guarantee justice for all? Had the callous Rambo boys, notorious for charging huge fees for big-ticket corporate clients, suddenly grown a heart?

Even their harshest critics were willing to give Bickel and Brewer the benefit of the doubt, allowing their good work in this African-American community to speak for itself. But in August 1997, when the Storefront began to represent Matthew Harden, DISD's chief financial officer, against then-Superintendent Yvonne Gonzalez, in one of the most incendiary cases of political intrigue this city has ever witnessed, their motives as well as their tactics were called into question.

Why would the Bickel & Brewer Storefront take on Matthew Harden for free--a man who earned more than $117,000 a year? Was the Storefront more a front for the political ambitions of Bill Brewer and John Bickel than it was a public service catering to the needs of the poor? Did the firm's Rambo approach to representing Harden help fuel a vicious racial conflict between blacks and Latinos? Was the threat of hardball litigation against Yvonne Gonzalez, Kathleen Leos, and others merely a ruse to obfuscate the truth about who was really to blame for DISD's financial debacle? Or were Bickel and Brewer just doing what they had always done, practicing law and life on the edge, zealously representing their client, fighting the good fight the only way they knew how: to the death?

It doesn't matter who you are--there's a seduction that goes on with Bill Brewer. He draws you in, pumps you up, convinces you with a confidence beyond certainty that together, you can destroy the enemy. That is, if he ever shows up. It's a passive-aggressive dance he does, making appointments, canceling them, apologizing through weary secretaries that he had to fly to New York on business or that he's at the mercy of a visitation schedule from hell. He clearly gives you the feeling that his time is more valuable than yours, particularly after he tells you that he bills out at $500 an hour, one of the highest rates of any lawyer in the city.

It's hard to feel neutral about Bill Brewer. A former lawyer with his firm who requested that he not be identified puts it succinctly: "He's a fascinating guy who at one time I loved dearly and hated strongly--and pretty much in the same moment." Embodying many contradictions, he is a family man with three failed marriages, although he acknowledges only two of them; a Republican who harbors Democratic values; a man obsessed with appearances who acts as if it doesn't matter what others think; a not-so-great Gatsby who craves status and wealth and importance and then provokes the very people who can give it to him.

"He was a middle-class kid living near a rich community, and by virtue of his talent and good looks and drive, got access to the country-club way of life," says a former legal associate. "On the one hand, he wants it more than anyone else. On the other hand, he is repulsed by it."

As I drive up to his Highland Park home, his green Jaguar sits in his circular driveway, and I have no reason to think he won't be home as scheduled--except that he is not. After a 30-minute wait, I try his door again, and this time, he answers. His oldest son is sick, he tells me--an ear infection--and he had to pick him up from school. He seems every bit the concerned parent--his kids mean everything to him, his family everything--if he could just get past his divorce, which has lasted almost as long as his marriage.

And how are my sons, he asks me, parent-to-parent. Is the little one sleeping? The big one still giving you headaches?

I know his game. He wants to disarm me emotionally, lure me to his side so I'll connect with his humanity, soften any criticism I might harbor against him. The guy is nothing if not PR savvy.

At 46, William A. Brewer III is as dramatic as he is charismatic--a onetime theater major at St. John's University, he knows how to milk a moment. He looks as if he is living life in a Ralph Lauren ad: Weejuns without socks, chinos without a belt, a navy blazer without a tie. His red-blonde hair, fair skin, and chiseled features conjure up visions of a less-rugged Robert Redford, a comparison he is loath to deny. His voice is Sly Stallone-deep--irrefutable evidence of a New York accent that marks him geographically as well as emotionally. He has built his life and legal career on being a downright chauvinist about his hometown.

Born in Long Island to a large Irish-Italian family, he heaps weighty superlatives on all things New York. The Catholic school he attended was "first-class throughout." He studied debate under a "master," drama under the "god of the voice-over." During law school (Union College in Albany, a "great pedestrian law school"), he clerked for a judge who was "not only the best, but also the most honest judge" in the state. In 1978, after a successful law-school career that included summers being a lifeguard at an exclusive country club and an advanced law degree at New York University, he got a job with the phone company, trying to fend off the breakup of the Ma Bell monopoly. "I went to the largest corporation in the history of the world to the largest legal department in the history of the world to work on the largest cases in the history of the world." It was here that he gained his thirst for the big case.

Brewer is vague about why he moved to Dallas in 1981, but court records show he received a divorce here about the same time. He got a job with Kolodey and Thomas, then a small Dallas firm that was working on a big case. He joined the firm's trial team, which successfully represented clothing manufacturer Farah Jeans in a case that would take on major Texas banks and become a landmark decision in lender liability law.

Though still a baby lawyer, he had grand visions of developing the firm into a commercial litigation powerhouse--but its named partner, Tom Thomas, didn't share his views. In 1982, Brewer either quit or got fired--depending on who's telling the story. A second job at the firm of Glast and Miller resulted in a similar fate after only a few months. "Since I left Bell, I was adamant that I didn't want to take small cases, losers, or just be fixing traffic tickets for some corporate client's son," says Brewer. "I was becoming almost strident in my articulation of how we needed to build a firm...on the back of zealous advocacy."

Although Brewer toyed with returning to New York, he had made definite inroads among the Dallas social set. "When I came to Dallas, I networked at the Park Cities right away," he says. "It was obvious to me that the deb scene was the real focus of Dallas society, and I made it a point to become an escort." Although his Republican credentials were flimsy at best, he also got involved in the Dallas County Young Republicans. "Look, when you go to a community, you figure out how to join that community...when I was living in New York, I figured out how to network the East Side...When I was at NYU, I joined the Jewish Defense League."

The way Bill Brewer networked his way to John Bickel has become law-firm legend. Recently fired and at a party prior to the annual heart ball fundraiser, Brewer met a woman who was proudly sporting a large tennis trophy and "mouthing off," he says, about her tennis prowess. "I took up the challenge for all men and said I could beat her left-handed." Some verbal sparring ensued, and she told Brewer that he reminded her of another "egomaniacal red-headed" lawyer, John Bickel, who was forming his own firm and enlisting new attorneys.

Slightly older than Brewer and married, Bickel seemed more of a by-the-book lawyer. A West Point graduate and decorated army officer, he exuded a credibility that Brewer admits he sometimes lacks. Bickel's credibility "is not rooted in ego and flash and persona...in a trial lawyer, that's a gift," Brewer says. Bickel had been a litigator with an old-guard Dallas law firm, Thompson & Knight, but was driven to start his own practice by a somewhat irreverent entrepreneurial streak that he could no longer deny. "When I was at West Point, I had a couple of unauthorized money-making endeavors," Bickel remembers fondly. "I sold women's panties with 'Beat Navy' on the back. It went over like gangbusters."

They seemed the perfect complement to each other: Brewer, the outspoken dreamer with enough hubris to take on the world; Bickel, the plainspoken pragmatist with enough gumption to take on Brewer. From their first lunch together, they hit it off and became each other's most ardent fans. Some say Bickel was mesmerized by Brewer, a Rasputin who turned the head of a stand-up guy. But others found them uncannily similar. "John had a grand plan, but Bill had bigger dreams," says former law partner Hal Marshall. "John just bought into Bill's dreams."

At first, the pair were part of a larger start-up firm, but after a few months, they broke away, wanting to build the firm at a faster pace than the other partners. In March 1984, they formed Bickel & Brewer--not a full-service law firm with corporate planners and real estate lawyers, but a litigation boutique, the first of its kind in the city--run by a couple of Young Turks who stood ready to make some money and raise some hell.

Bickel and Brewer hit the ground running, leasing an entire floor at the Trammell Crow Center--two lawyers renting 25,000 square feet with little more than a fistful of moxie. A line of credit from Texas Commerce Bank helped some, but building a law firm overnight was no easy task. In the hunt for the big case, they declared themselves the "baddest" lawyers in town, brazenly telling any corporate bigwig who would listen that they were not going to do things the old way--their aggressive approach would be different from the white-gloves civility of the "good ol' boy" downtown legal establishment. "New York firms did not respect their cousins in the Dallas bar," says Brewer. "They thought they were lazy; they thought they were slothful; they thought they were stupid."

Not surprisingly, their approach didn't endear them to the big downtown firms, who, Brewer claims, blacklisted them for not playing ball, erasing any chance of referrals. "The reputation they are developing, whether deserved or not, is that they're behaving in a fashion that is not the Dallas way," Chip Babcock of the local firm of Jackson, Walker told the American Bar Association Journal in 1989. "Dallas lawyers are gentlemen to each other. These two act like New York lawyers."

High praise, thought Brewer, whose marketing pitch included selling Bickel & Brewer as one of the few "New York-quality" firms in Texas. That meant B&B would stay open 24 hours a day, seven days a week. That meant it would search nationally for its new recruits, ensuring quality by enticing blue-chip law students with salaries that were the highest of any law firm in the country. It also meant adopting a hardboiled, take-no-prisoners litigation style that was antithetical to the way Dallas practiced law.

Brewer, who claims he has always been lucky, found himself in the right place in the late '80s as the S&L crisis turned the city into a hotbed of "big ticket litigation." With real estate prices plummeting, developers turned to litigation to save themselves--or at least buy enough time until the market turned around.

B&B drew fierce criticism for its delaying tactics in these cases--piling on paperwork, wallet-whipping the other side, being obnoxious to opposing counsel, bogging down a case in procedure so it would rarely get heard on the merits. The firm was accused of dumbing down its clients for depositions: In preparation, clients were told to repeat each question to themselves, says one former associate, taking their time before answering. During these pauses, they were to run through a list of preferred responses: yes, no, I don't know, I don't recall. Clients were also told that they had the right to be asked a proper question--nothing vague or ambiguous. B&B lawyers would show them a dictionary, pointing to all the different meanings, for example, that could be attached to the word "do."

Two-day depositions would drag on for two weeks as B&B clients would claim they didn't understand the words "earn," "rely," "where," and "when."

"By the time they got to the deposition, they were reticent robots," says the associate. "Witnesses were told to tell the truth, but we broke down their perception of everyday conversation."

This tactic not only invoked the wrath of several judges, but grabbed the attention of the press, who labeled Bickel and Brewer the Rambo boys, cultivating a mythology around their sharp practices that still lasts to this day: Bill Brewer, getting into a jury box, flirting with a female juror, and causing a mistrial; B&B lawyers coaching their witness to spill coffee on legal documents when things got too heated; Bill Brewer demanding that a deposition be scheduled for 6 a.m., then arriving 30 minutes late. Bickel and Brewer became the poster boys for an aggressive '80s litigation style that was, in truth, sweeping the country as law schools graduated more lawyers than ever before, and the increased competition made the entire profession more cutthroat.

Of course, few in Dallas played it meaner than Bickel & Brewer. Under the ethical battle cry of "zealous advocacy," a Bickel and Brewer lawyer was expected never to ask for an extension or give one, to fight every motion, to turn over every rock. Opposing counsel wants to go on vacation--too bad. He misses a filing deadline--tough luck. Cutting some slack to a brother lawyer--not this firm. Winning was the only option; losing was not only unacceptable, but could destroy the reputation of the firm.

Some lawyers refused to get involved in cases if Bickel & Brewer was on the other side. Others felt they had no choice but to play hardball back. "We went through a couple of years of orchestrated assault on this law firm," says Brewer. "Every time I set a deposition, I got noticed for eight at the same time."

The firm became whipping boys for the kind of cultural backlash that made lawyers the butt of jokes. They were referred to as "Bickel and Skewer," "Bicker and Brew." Even U.S. District Judge Jerry Buchmeyer got into the act, taking a shot at the pair when he wrote a skit during Bar None, a 1989 production of the Dallas Bar Association, which contained these lyrics:

When Bickel and Brewer do their thing.
Decent folk catch hell...catch hell
When Bickel and Brewer play lawyer
We all do things that smell.
'Cause the Rambo crap
Is the only thing little minds understand.

Nevertheless, the Rambo boys seemed to bask in the limelight. "The biggest offense would have been if the press had stopped writing about them," says a former B&B associate. "They thrived on it--whether good or bad." Brewer admits he has at different times employed a public relations agency to promote his firm. One of their more flippant self-promotions entailed adopting snakes at the Dallas Zoo as part of its Adopt-a-Pet program. Snakes and lawyers seemed a natural union, particularly with journalists, who pounced on the promotion. The story made the Wall Street Journal and brought new business to the firm. At various times, Motorola, American Petrofina, Prentiss Properties, Trammell Crow, and Budget Rent-a-Car lined up to play hardball.

Yet their mean-streets persona meant nothing if they couldn't deliver the goods. "I liked going in there and kicking people's butts," says former partner Hal Marshall. "But that only happened because we knew the law better, knew the facts better, and had these great strategies going." Rather than take in 100 cases, the firm limited itself to, say, 30, and then worked them to death. Ten lawyers might be assigned to the same case with either Bickel or Brewer vetting each decision.

Brewer was clearly the rainmaker for the firm, bringing in most of the business himself. "He would make commitments to his clients other lawyers don't like to make," says a former lawyer with the firm. "But Bill Brewer is without fear. He will take any risk. He never gave them guarantees, but he came close." When he delivered on his promise, says the lawyer, "it would invigorate his client to go even further."

Brewer was also the big-picture guy, the chess player who could think three to four moves ahead and come up with solutions--whether inside the courtroom or out. In 1991, when Jerry Jones wanted to sell alcohol in Texas Stadium, he turned to Bickel & Brewer, who, if they hadn't negotiated an out-of-court settlement, stood ready to lobby the legislature to pass a law that would allow the sale of liquor in all stadiums across the state.

"[Bill] has the uncanny ability to think outside the box," says another former associate. "He is also a good writer, very creative." The firm's pleadings were known for their storytelling style; dramatic to the point of being hyperbolic, they grabbed the attention of their intended audience--judge, jury, the press--much more so than the archaic legalese that most lawyers still clung to.

But the idea man was, at times, amazingly undisciplined, and needed an implementer to keep him grounded. He found it in John Bickel, a litigator who had the experience of a hundred trials under his belt, and oozed a genuineness in the courtroom that enabled juries to empathize with his side of the case. Brewer, on the other hand, came across as too slick, too cocky, too New York, particularly for Texas juries.

Bickel & Brewer built on its early successes, opening small satellite offices in New York, Chicago, and Washington, trying to create the appearance of a national law firm almost overnight. But created as well was a corporate culture that was almost as notorious as their litigation tactics. The firm gained a reputation as a sweatshop, working lawyers and secretaries until after midnight for weeks at a stretch. "It was expected that you worked nights and weekends," says one former paralegal. "The pay was great, but since you didn't have a life, there was no time to spend it."

Not surprisingly, turnover was incredibly high, particularly during those early years. "The firm was built for attrition," says one legal headhunter. "It is difficult to make partner, and since Bickel and Brewer kept all the clients for themselves, they don't let you build your own practice."

"I used to walk in and say, 'Who quit today?' and someone would throw out a name," says another ex-paralegal. "At least one lawyer a month would leave." Of course if you pay $97,000 for a first-year associate, as the firm did just last year, any one lawyer becomes easily replaceable.

Because of the intensity of the work, the long hours, the addiction to winning, an esprit de corps developed among those who remained. With Brewer being such a preppy, he organized a Bickel & Brewer rowing team and a Bickel & Brewer jogging team. Yet other firm members were just biding their time until their student loans were paid off, or saving their money in what was referred to as their "fuck you fund."

Still, with partner meetings in the Hamptons, firm meetings in Boca Raton, limos waiting at La Guardia to drive associates to the firm's Manhattan apartment, it was a heady affair, working at B&B. Money flowed in from the staggering legal fees that were charged. Bickel and Brewer were among the top-grossing lawyers in the state.

As the pair's wealth accumulated, their relationship grew almost pathological in its symbiosis: They bought matching white Porsches. They dressed alike in the office: suspenders, tie, no jacket, and out of the office, polo shirt, raised collar, khakis. They seemed to prefer their own company, isolating themselves after they moved in 1990 to their posh Bank One offices in an area secretaries referred to as "the kingdom."

Despite being the firm you love to hate, Bickel & Brewer were masters at cultivating relationships, particularly among the local judiciary. Just last year, the firm was accused of cultivating state District Judge John Marshall a little too closely. In a story first reported in the Dallas Observer, Judge Marshall faced accusations that he had shown partiality toward a B&B client by granting nearly a $1 million summary judgment in its favor. While the case was pending, Marshall was alleged to have accepted a limo ride to B&B's luxury suite at a Cowboys game, and his court clerk received an expensive watch as a graduation present from a B&B paralegal-- admitting as much under oath. Eyebrows were also raised when that same paralegal, Suzanna Proctor, purchased the judge's sailboat (which had been on the market for a year) and allegedly had some private meetings with Marshall about the pending case.

Bickel declares that charges of influence-peddling were "much ado about nothing," that they were motivated by a vindictive lawyer, out to get Bickel over an old "fee dispute." And yet Judge Marshall found it necessary to recuse himself, and a visiting judge vacated the summary judgment. B&B is currently appealing that decision.

Although they never took on political cases of the magnitude of, say, a Matthew Harden, throughout their history, they remained politically active in Republican circles. (They were, however, big boosters of Democrat Ann Richards in her unsuccessful race against George W. Bush.) Bickel and Brewer would personally interview candidates, actively supporting several with $5,000 to $10,000 contributions, playing the role of kingmaker with considerable aplomb. One judge whom they opposed was Adolph Canales, who, in 1994, ran for re-election against ex-B&B partner Hal Marshall. Not only was Canales unpopular with the local bar, he had also ruled against B&B in an important case, and many believed the pair had fielded Hal Marshall in retaliation. "There was a perception out there that I was the Bickel & Brewer candidate," says Marshall. "But it was always my intention to disqualify myself from ruling on their cases." Marshall, however, never got the chance. He lost despite a $20,000 contribution from his old firm.

As the firm grew in power and prestige, it began to rethink its outsider image. Although it was too irreverent to become part of the establishment, there was a noticeable lessening of irascibility. Perhaps it was the enactment of bar association civility creeds that pledged lawyers to refrain from the kinds of bulldog practices that were blamed on attorneys like Bickel and Brewer. Perhaps it was corporate America putting a pencil to hardball litigation and figuring it just wasn't worth it.

Or perhaps it was indicative of a more mature Bill Brewer, who had himself become the target of a hardball divorce that has dragged on for more than two and a half years. Although Brewer refuses to comment about it, court records speak volumes-- seven to be exact--each file bulging with documents that chart a divorce so acrimonious that no family court judge wanted to hear it. Several bailed out, possibly worried that an unfavorable ruling against Brewer could land them an opponent come election time. Brewer's estranged wife, April, is represented by pit bull Chris Weil, an obstreperous cuss whose legal pontifications can go on for hours at a blast. Brewer himself has retained four lawyers, the most notorious of whom is Frank Finn, the aging warrior of Thompson & Knight's litigation team, whose own senior partners pay him deference by referring to him as "Mr. Finn."

Much of the battle has focused on discovery abuse by the attorneys, motions for sanctions, and other Rambo-oriented tactics. Yet to be decided are the merits of a bitter custody dispute that has April Brewer challenging Bill's fitness as a parent and contending that his uncompromising need to win colors his judgment, even where his own children are concerned. In court papers, she maintains that he is unfaithful, that he is not the active father he claims to be; rather, being overly concerned with appearances, he only wants to give the impression of being head of a large family. Why else would he suggest to third wife April, contrary to her wishes, that his second wife become the godmother of their child? Although Bill claimed he was doing it to build the relationship between the children of both his marriages, a court-appointed psychologist found Bill's view of the family "unusual and unrealistic." Citing Bill's other failed marriages and relationships, the psychologist believed that "while Bill clearly loves his children, many of his important life choices seem to belie the family values he expressed."

Whatever Bickel and Brewer's reasoning, by 1995, the pair appeared to be reining in their Rambo selves--and showing more heart than mouth.

In November 1995, when white-bread Bickel & Brewer, infamous for its high fees and rowing team, announced it was going into the pro bono business and opening up a storefront in South Dallas, there was one question on the minds of many lawyers: What's in it for them? These guys weren't in the habit of offering free legal advice. There had to be some hidden agenda, some way for them to make a buck out of this somehow.

Or maybe it was another one of their PR ploys, a way to shore up their tattered Rambo image and gain some nice-guy kudos. They got a "thumbs up" from The Dallas Morning News for their efforts; the City Council honored the firm for broadening access to legal representation in South Dallas; and Mayor Ron Kirk, who along with Judge John Marshall participated in opening-day ceremonies at the Storefront, was thrilled by the prospect that its presence might promote more development in the southern sector.

If the legal establishment was skeptical, the black community was openly hostile. "They're in the neighborhood to get money, not to give to the community," Daisy Joe of Black Citizens for Justice, Law and Order told the Dallas Examiner. They had no historic commitment to the area; all their talk about wanting to make a difference and giving back to the community was just a couple of white guys trying to make themselves feel better about making all that money.

Case 3:19-cv-02074-G   Document 51   Filed 02/12/20   Page 319 of 332   PageID 1319

County Commissioner John Wiley Price was dubious as well, until he invited Bickel and Brewer on his radio show to debate the topic. "There was a feeling," says Brewer, "that we were presumptuous to think our service was needed when there were minority law firms in the southern sector providing legal services already." As usual, the pair acquitted themselves well: The Storefront would not be competing for the bread-and-butter cases of most black lawyers; it was there to fill a need, to handle small-business litigation in a high-powered manner that most lawyers from the neighborhood didn't have the ability to wage. As far as making money off the community, any profits realized by the Storefront (fees were based on the client's ability to pay) would be plowed back into a charitable trust, for the benefit of worthy causes in the minority community. Price came away mollified, even friendly, and Bickel and Brewer began to feel welcome.

After the initial burst of publicity, the Storefront settled in to tend to the needs of its clientele. An occasional do-gooder story might surface in the press: how the Storefront helped 81-year-old Willie Edwards get his insurance check; how the Storefront was suing Seattle Supersonics basketball star Gary Payton for back child support; how the Storefront was sponsoring a Judicial Lecture Series, each month bringing a different judge to speak to the minority community about truth, justice, and the American way. But eventually the publicity and goodwill generated from the opening of the Storefront had pretty much played itself out--that is, until the ascendancy of Dr. Yvonne Gonzalez to superintendent of the Dallas Independent School District in January 1997.

The way Bill Brewer likes to tell it: All last summer, the Storefront had been besieged by calls from black former DISD employees who had been summarily terminated by a Stalinist superintendent who was running the district like a "gulag." Black educators were her targets mostly, denied their jobs without due process, dismissed for some contrivance that seemed to be known in the press almost before it was known to them. Her actions were payback, some suspected, for a conspiracy instigated by black leaders such as John Wiley Price and local NAACP President Lee Alcorn, who she believed had been trying to topple her regime from the day she took office. But anyone who wouldn't support her, says Brewer--whether white, brown, or black--was marked for expulsion.

Taking her on would be no easy task. Gonzalez was a walking billboard for political correctness. The first woman superintendent, the first Hispanic superintendent--she was a cause celebre in the Latino communities, which had always felt locked out of the corridors of DISD power. Enormously charismatic, she immediately became the darling of the media, and her steely-eyed stance on district waste and fraud endeared her to downtown business types with a vested interest in keeping school taxes low. Finally someone would be getting to the bottom of what everyone had suspected for years: The district was rife with corruption. By April 1997, she had called in the FBI and launched her own internal investigations, which would extend to overtime fraud, contract rigging, kickback schemes. Most of the problems stemmed from the district's management division, an area under the control of chief financial officer Matthew Harden. But she also used these investigations as a pretext--Brewer claims--to rid herself of the enemies in her midst.

Dr. Shirley Ison-Newsome, an African-American, had been chief of staff under Gonzalez's predecessor, Chad Woolery, sharing power with Gonzalez, who was then deputy superintendent. There was no love lost between the two women, and Gonzalez, after becoming superintendent, demoted Ison-Newsome twice, busting her down to high school principal last June and ignoring the protests of black leaders and trustees.

Within a week, new allegations arose against Ison-Newsome, suggesting she had deviated from district policy by authorizing that two $3,000 bathrooms be built in and around her offices. Dubbed "Pottygate" by the media, Gonzalez instituted disciplinary proceedings against Ison-Newsome, who later sued the district for defamation.

The Storefront agreed to represent Ison-Newsome pro bono--a mystery to many who believed that a woman making $96,000 a year could afford her own counsel. There seemed a decided political flavoring to the decision--Ison-Newsome was referred by another Storefront client, former Townview Magnet executive principal Ora Lee Watson, who, according to John Bickel, was referred by John Wiley Price.

In the process of evaluating her case, says Brewer, they "looked at whether there was statistical as well as anecdotal evidence that would support a consistent pattern of discrimination of black people at DISD." Given the large number of blacks at the highest levels of the administration, "it was a hard case to prove." But when Ison-Newsome convinced Harden to sign an affidavit on her behalf, that pattern, Brewer says, began to fall into place.

At 42, Harden is soft-spoken, respectful, almost boyishly innocent--only his closely cropped beard lends authority to his appearance. He is not a political man and recoils at the notion that he is any kind of symbol for African-Americans. When he came to Bill Brewer's home in late August, he told a chilling tale of how he himself had become the target of Yvonne Gonzalez's paranoia. What's more, he had tapes--lots of them--that he had recorded surreptitiously, and that helped substantiate much of what he said.

When Gonzalez was deputy superintendent and married, Harden claims, she made sexual advances toward him, though he refuses to say whether he ever succumbed to them. A source close to Harden, however, confirms that he has detailed two sexual encounters with Gonzalez, the first taking place in a DISD office, the second in a hotel room where he resisted her overtures and left. Gonzalez, through her attorney, declined to be interviewed for this story.

Despite this rejection, Harden continued his working relationship with Gonzalez. But his loyalty was put to the test last July 31, he says, when she asked him to lie for her during a news conference about her office renovations, which had cost $90,000--not the $12,000 she had told the media. Harden says he did as he was asked and said the superintendent had no knowledge of their cost. "After the press conference was over," Harden claims, "I went back to her office and told her I would never lie for her again."

Ten days later, he found a tracking device on his car. Someone had been tailing him for reasons that were not clear to him. The next day, he informed Gonzalez of what he had found. To Harden's surprise, she held a press conference that evening, claiming she had found evidence of at least five tracking devices on DISD cars, and a security firm she had hired believed her own office had been bugged. But no amount of subterfuge or surveillance would deter her from her crime-busting ways. By August, the DISD investigation had already netted 13 federal indictments, all involving personnel in Harden's management division.

By August 20, Harden says, word had gotten back to him. The superintendent wanted him gone. She was in possession of certain investigative reports, he was told, that held him accountable for many of the district's financial improprieties. Harden began carrying around a hidden recorder, secretly taping top administrators--Gonzalez and her special counsel Marcos Ronquillo, assistant superintendents Robert Payton and Robby Collins--about their intentions. Harden claims he had no intention of being forced out--which is what brought him to Bill Brewer's house in the first place.

Quietly, the Storefront filed its first Harden lawsuit, using it more as a tool to discover who placed the tracking device on Harden's car. When depositions revealed that the individual responsible for trailing Harden was Yvonne Gonzalez herself, Bickel & Brewer was ready to strike.

On September 8, Harden committed his first public act of defiance. He signed an affidavit supporting Shirley Ison-Newsome, swearing under oath that Gonzalez, in essence, manufactured the scandal over the Ison-Newsome restroom construction to avoid media scrutiny on her own office-renovation boondoggle.

On September 12, Bickel & Brewer struck again, this time suing Yvonne Gonzalez individually (coincidentally, in Judge Marshall's court) and alleging invasion of privacy, slander, and perhaps most damaging of all, sexual harassment. The media seized upon these pleadings, which read like a dime-store novel: "[Harden] was tired of having Gonzalez whisper lewd comments into his ear during important meetings." Harden, the hero of the tale, was painted in the most glowing of terms: "...there was no evidence that Harden was anything other than the best CFO DISD ever had." The villainess, on the other hand, was evil incarnate: "Unfortunately, the more Harden resisted, unbeknownst to Harden, the more obsessed Gonzalez became."

Gonzalez came out sad but swinging, denying all accusations and claiming that Harden "has been the subject of an ongoing internal investigation for several weeks now." But she wouldn't disclose the nature of the investigation, although she said she would issue a full report the following week.

On September 15, Bickel & Brewer amended its pleadings, this time attaching exhibits to prove their claims: transcriptions of taped conversations discussing Gonzalez's determination to rid the district of three employees despite there being no evidence of any wrongdoing. And more damning still, sexually suggestive notes purportedly written by Gonzalez corroborated that she was either infatuated with Harden or downright delusional about their relationship.

Yet Brewer says he was surprised that the media wrote so copiously about the sexual harassment claims. Coming from a sophisticated media hound, that seems highly doubtful, particularly as Harden never filed a claim for sexual harassment with the Equal Employment Opportunity Commission--a requirement before filing a sexual harassment lawsuit. "Frankly, if we wanted to turn this into a People magazine story, there was a lot of stuff we could have put in," he says. "We put in stuff that was fairly light...but clearly evidence that was really just a signal to Gonzalez and her lawyers that Matthew saved the stuff she sent him."

Gonzalez must have gotten the message, because that same evening, Brewer received a call from her attorney, Dan Hartsfield: The superintendent was interested in talking settlement. The following day, she agreed to resign.

Despite its pro bono status, Bickel & Brewer had waged a blitzkrieg attack against Gonzalez, putting as many as 10 lawyers on the case, working deep into the night, researching the law, slanting the facts--as if the future of the firm were riding on the result. Typical of B&B strategy, the firm had hired a PR agency--Temerlin McClain--to handle the barrage of media requests. At B&B's downtown offices, a local press corps hungrily awaited copies of depositions that were often released the same day they were taken. As each new set of Harden's allegations was about to be filed, calls were placed to local journalists offering them exclusives, informing them that they could come to the courthouse and be the first to get their hands on the pleadings.

Case 3:19-cv-02074-G    Document 51    Filed 02/12/20    Page 324 of 332    PageID 1324

Without setting foot in a courtroom, without presenting a shred of testimony, Bickel & Brewer had created a climate that produced a favorable outcome for Harden. For its $20,000 fee, Temerlin McClain would help Bickel & Brewer try the case right where they wanted it: in the court of public opinion.

The Rambo boys were at it again.

The lawsuit and the superintendent's ostensible resignation further polarized an already divided city: Harden became the champion of many African-Americans, and Gonzalez could do no wrong in the eyes of her Latino supporters. Each side saw conspirators lurking behind every corner, a woolly cabal scheming to advance one minority's agenda at the expense of the other. Each side had its boosters on the board of trustees: Board President Kathleen Leos led the pro-Gonzalez forces; the three black trustees--Hollis Brashear, Ron Price, and Yvonne Ewell--led the anti-Gonzalez charge, with an unlikely assist from Anglo member John Dodd, who was new to the board.

Bickel & Brewer thought it had a clean kill for their client--the resignation in exchange for the tapes and notes Harden had accumulated--but the firm got outsmarted when Gonzalez only tendered her resignation and reportedly began lobbying the board not to accept it. "The settlement agreement only said she would 'submit her resignation,'" says her attorney, Dan Hartsfield. It didn't say she would actually quit.

"Our agreement was that she resign, and instead she tenders her resignation," complains Brewer. "Look, it was a play on words."

Case 3:19-cv-02074-G   Document 51   Filed 02/12/20   Page 325 of 332   PageID 1325

On September 17, while the school board met to consider her resignation, hundreds of Hispanics gathered outside, shouting and waving placards that read, "If Gonzalez Goes, Harden Goes," and "The Investigations Must Continue." Inside, in a seven-hour session, trustees heard special counsel Marcos Ronquillo present the results of his internal investigation into abuses by "district staffers" regarding maintenance contracts for DISD buildings. No one would comment about whether Harden was a target of that investigation, although the contracts all stemmed from his department. According to sources who spoke with The Dallas Morning News, Gonzalez had hoped these findings would convince board members "to keep her on." The board voted in a split decision, primarily along racial lines, to delay accepting her resignation for 30 days--"a cooling-off period"--so that all charges might be considered.

Bickel & Brewer, however, needed no cooling-off period. The firm amended its lawsuit, suing Gonzalez for $10 million despite earlier assertions that Harden's case was about social justice, not money. And they began to take a flurry of depositions-- not in the Harden vs. Gonzalez case, but in Harden vs. SIS, the security company that placed the tracking device on Harden's car. B&B's hardball strategy worked brilliantly: Because Gonzalez was not a party to the SIS lawsuit, her lawyers didn't have the right to be present during depositions and cross-examine witnesses. The depositions that were taken were friendly affairs laced with opinion and speculation that was quite damaging to the school district. Because a gag order was only in place in the Gonzalez case, B&B could release transcripts of the SIS depositions and continue to try its case in the press.

Bickel handled the deposition of SIS vice president Larry Steging, who testified that Freda Jinks, administrative assistant to Gonzalez, had hired his company to trail Harden because of suspicions he was leaking information to the press. Steging had no direct contact with Gonzalez, but believed Jinks was acting for her boss.

Bickel then began pursuing Jinks to take her deposition, which is what he says
smoked her out and drove her into the arms of the U.S. attorney. "She realized she had
big problems," he says. Bigger than anyone even at Bickel & Brewer realized. Freda
Jinks told federal authorities that she had assisted Gonzalez in picking out $16,000
worth of bedroom and office furniture that was paid for with public money. By the
first week in October, Gonzalez had negotiated a plea bargain, and the school board
had accepted her resignation--much to the humiliation of the entire city. Despite the
bedroom furniture and the tracking device and the office renovations and the sexual
harassment charges, there still remained nagging questions about Matthew Harden:
Was he really dirty after all? And if he wasn't, how could the "best CFO in the history
of DISD" be so blind that he didn't notice what was happening on his own watch?

Finally, Harden had gotten what he said he wanted--a district free of a vindictive
woman who had ruined the careers of so many people, a chance for the city to heal--
but that didn't silence the Xerox machines at Bickel & Brewer. The firm kept alive the
SIS case and kept deposing school board members, old and new: Bill Keever, John
Dodd, Ron Price. SIS's lawyer didn't even bother to show up anymore, since it was
clear from the questioning that B&B was gunning for bigger game. Trustees Kathleen
Leos and Jose Plata and Gonzalez communications director and close ally Robert
Hinkle were all targeted to be sued. "We believed that there were still individuals in
the power structure that were intent on seeing that Matthew Harden got fired," John
Bickel says.

Others took a darker view. "Bickel & Brewer's lawsuits stopped the school board from
investigating Harden," says Leos' attorney Mike Gruber. "Anyone who wanted to
investigate what he was doing was attacked."

Gruber claims that's what happened to Marcos Ronquillo, the special counsel in charge of the internal investigation. Harden had long maintained that he had tape recordings of Ronquillo doing Gonzalez's bidding by trying to usher him out the door. His attempts to do so would have been the basis for any legal action against him. But on November 3, Ronquillo issued a carefully worded press release that seemed to exonerate Harden of "any illegal or unethical act." Gruber claims that his own investigation revealed that on October 18, Ronquillo had his change of heart after he went to the offices of Bickel & Brewer, where he was threatened "with litigation and harm to his political and economic future." Four days after the press release, B&B sued Leos, Hinkle, and Plata, alleging a conspiracy of grand proportions to terminate Matthew Harden. Noticeably absent from the lawsuit was Marcos Ronquillo.

By suing school board president Kathleen Leos, B&B took on Mike Gruber, a tenacious fireplug of an attorney who says he was irresistibly drawn into the fray by the prospect of tangling with the pair. "I was not going into a pit with a rabid dog without a club," says Gruber. "As far as I was concerned, they were the forces of evil." Gruber had to play catch-up fast. He wasn't present during any of the SIS depositions and began re-deposing several of the key players--Robby Collins and Freda Jinks among them.

In December, Harden sued the entire school district and its trustees, this time in federal court, this time playing the race card, by alleging that DISD directed its wrath at Harden in part "because he is black." Although U.S. Attorney Paul Coggins had briefed the school trustees about the scope of his criminal investigation--saying that it now included kickback schemes and contract rigging--no one had yet to lay a glove on Matthew Harden.

Gruber took his first swing in early December, when he filed a motion for sanctions against Harden, the Storefront, and Bickel & Brewer. "Harden has used this litigation to avoid scrutiny of his own behavior," alleged the Leos motion, which asked for the court to impose sanctions against Harden and his attorneys for $500,000. "The evidence will show that Harden's sole purpose in keeping his position at DISD is to protect himself and his past actions from scrutiny, specifically with regard to certain vendor contracts, in which he and his cronies have a personal and financial interest."

Later filings spelled out the extent of his alleged self-dealing. Harden had a "history of making payments of large amounts of sums in cash"--cash that the pleadings suggest had come from $1 million in kickbacks involving maintenance contracts on 20 DISD buildings for graffiti-resistant paint. Harden adamantly denied receiving any kickbacks, and Bickel & Brewer amended their pleadings, alleging a new slander. Gruber, in these same pleadings, turned the spotlight on Bickel & Brewer, unconvinced the firm was handling the case pro bono and demanding they reveal who was truly funding Harden's litigation.

If it wasn't the vendors trying to protect themselves as well as Harden, then what was in it for Bickel & Brewer? Certainly Bickel and Brewer's prestige in the African-American community had been enhanced dramatically, and like its judicial lecture series, the Storefront seemed to be bridging a gap by unleashing the forces of a major downtown law firm behind a matter of minority concern. But whether this was bridge-building or empire-building depends on whom you ask. Ask Don Venable, ex-government watchdog and the latest school board trustee, and he will insist it's the latter.

Late last fall, Venable was running for the school board against Jesse Diaz, a Hispanic and supporter of Kathleen Leos. According to Venable, he received a phone call from Bill Brewer, who asked him to visit their downtown offices. Once there, says Venable, "they wanted to know what kind of money I needed to get elected." Venable believed they were trying to broker a political solution to their lawsuits, lining up a board that "would do their will." If they forged an alliance with Venable, he could be the fifth vote necessary to oust Leos from her presidency, or to settle the lawsuit on terms favorable to Harden. Although Venable didn't take their money, he did take their help: Five lawyers from their firm helped him campaign, he says. But he also received the endorsement of John Wiley Price, whom Venable had sued during his watchdog days. "Brewer suggested that he got John Wiley Price to support me," Venable says.

Although Venable spearheaded the overthrow of Leos once he got on the board, he says he parted ways with Bickel & Brewer over the merits of their lawsuit. Unpredictable as ever, he then joined forces with Leos, and in January, told The Dallas Morning News about B&B's attempts to recruit him. Latino grassroots organization LULAC ran with the story and filed a complaint with the Dallas district attorney requesting an investigation of the firm. "We also believe," said Gehrig Saldana, president of LULAC Council 4496, "that due to their alleged involvement through bribery attempts and influence peddling, [Bickel and Brewer] may have denied the Latino community a second Latino on the Dallas public school board."

Bickel categorically denies the bribery allegations, saying he and Brewer did no more than they usually do, cultivating relationships, trying to decide whether they should support Venable, just like they have dozens of other candidates over the years. The DA's office conducted an investigation, interviewing Bickel, Brewer, and Venable, and concluded that no criminal offense had occurred.

Meanwhile, Mike Gruber was bearing down hard in his defense of Leos, fighting a bitter pre-trial war of attrition that never seemed to get at the truth. Gruber repeatedly tried to depose Harden, but Bickel and Brewer fiercely resisted his attempts. Instead, they attacked Gruber, claiming he had gone Rambo, leaking defamatory information to the press about Harden, information that Leos had improperly secured from Ronquillo in his capacity as special counsel. The resulting newspaper accounts, at a minimum, raised questions about Harden's competency, based as they were on internal audits that showed massive improprieties in his department regarding contracts for weatherstripping, roofing, and painting.

Before subjecting their client to a deposition, Bickel & Brewer wanted Gruber and Ronquillo to be deposed first, claiming Harden should, in fairness, have the right to the same information as Leos. Ronquillo then entered the lawsuit, claiming that his attorney-client relationship protected him from discovery as well. Gruber then filed a motion for sanctions against Ronquillo, alleging he had taken inconsistent positions with regard to any wrongful conduct by Harden.

The entire legal quagmire was set for a hearing on February 4 in Judge Gary Hall's court, but Hall would hear none of it. Instead, he referred the case with all its sideshow issues to a mediator who might be able to work all the cases toward settlement.

"Let's give peace a chance," Gruber recalls Bickel telling him. Within a week, all sides had struck an agreement. In exchange for his resignation, the district agreed to settle all claims with Harden for $600,000. Leos would bear none of that cost individually.

For a man who had never lost his job, whose most culpable grievance was against a convicted felon, who had managed by either luck or design to shut down any internal investigation into his on-the-job misfeasance, Matthew Harden had fared remarkably well. And his lawyers, Bickel and Brewer, did what they said they would: represented their client as zealously as they knew how. "I thank God every day that I was blessed enough to find them," Harden says.

But will divine intervention help with the FBI? Although Brewer has been told Harden is not considered a target of its anti-corruption campaign, there is talk among sources close to the investigation that suggests otherwise. When asked at a social gathering if Harden was just incompetent or a crook, one assistant U.S. attorney replied: "Oh, I think he is a lot more than just incompetent, but whether it can ever be proven is another thing."

What the payoff was for the Rambo boys, Bill Brewer and John Bickel, may be just as difficult to prove. For a seven-month period, they dedicated their law firm to Matthew Harden, recouping nothing but their expenses, and essentially donating $500,000-$600,000 of billable time to what they perceived was a noble cause. Certainly there is a selfless part of them that believes in social justice, that wants to make a difference, but there's also an irreverent part that enjoys--as one of their friends put it--"pissing on the leg of the establishment." Then there's the self-aggrandizing part--the part that craves recognition and power and political stroke, and picks its fights accordingly. "It's obvious that these guys want to be the new movers and shakers in the city," says Mike Gruber.

That Bickel and Brewer can deliver minority voters to a particular candidate because of the Harden case seems downright speculative, and yet, in the mind of Bill Brewer, doctor of his own spin, this may not be too far-fetched. "For the first time in all the years I have been doing this [practicing law]," Brewer says, "elected officials are asking us, 'Who should I meet with in Oak Cliff? Who should I talk to in South Dallas?' That is huge in my mind."

And if current demographic trends in Dallas County hold true, if the minority population becomes the majority population within the next several years, few will be better positioned politically than Bickel and Brewer. Already a proven friend to high-profile African-Americans, the pair has, post-Harden, begun repairing its image with Hispanics. Despite the LULAC complaint, Bill Brewer says unabashedly, the Storefront now plans on assisting Latinos with their legal problems. "John and I have already had meetings with people in the Hispanic Chamber...We are talking to them about class actions, representing people in the Hispanic community against various economic practices of certain corporations."

Call it cultivating relationships or just business as usual--it's just one more way "the most aggressive, high-powered law firm in the world" is trying to make a difference. Whatever that difference may be.

RELATED TOPICS:    **NEWS**      **LONGFORM**

Use of this website constitutes acceptance of our terms of use, our cookies policy, and our privacy policy

©2020 Dallas Observer, LP. All rights reserved.

CALIFORNIA RESIDENTS: California Privacy Policy | California Collection Notice | Do Not Sell My Info

# EXHIBIT B-25

# *CONFIDENTIAL*

# *FILED UNDER SEAL*