IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § § § | |
| *Plaintiff and Counter-Defendant*, | § § | |
| and | § § | |
| WAYNE LAPIERRE, | § § § | |
| *Third-Party Defendant*, | § § | |
| v. | § § | Case No. 3:19-cv-02074-G |
| ACKERMAN MCQUEEN, INC., | § § § | |
| *Defendant and Counter-Plaintiff*, | § § | |
| and | § § | |
| MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, AND JESSE GREENBERG, | § § § § § | |
| *Defendants*. | § | |

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL
PLAINTIFF'S DOCUMENT PRODUCTION AND MOTION FOR SANCTIONS**

## <u>TABLE OF CONTENTS</u>

I.     SUMMARY ..........................................................................................................1

II.    BACKGROUND FACTS ....................................................................................2

       A.     Litigation History..................................................................................2

       B.     The NRA's Bad-Faith Discovery Effort ................................................3

III.   ARGUMENTS AND AUTHORITIES.................................................................4

       A.     Legal Standard. .....................................................................................4

       B.     Proper Procedure for Claiming Privilege...............................................6

              1.     The attorney-client and work-product privileges.........................6

              2.     Production of a privilege log.......................................................7

       C.     The NRA refused to produce documents central to its claims and defenses. ..........8

              1.     The Brewer Firm........................................................................8

              2.     Conspiracy – RFP 85 ................................................................15

              3.     False "Independent Audit of AMc" – RFPs 47, 101 .................16

              4.     Leaks to Media – RFPs  22, 27, 28, 58, 86...............................17

              5.     Sloan – RFP 31 ........................................................................18

              6.     Powell – RFP 54 ......................................................................19

       D.     The NRA improperly asserts boilerplate objections and privileges. .....................20

              1.     The Court should overrule the NRA's relevance objections. ...................20

              2.     The Court should overrule the NRA's objections as to scope.................21

              3.     Virginia Protective Order – RFPs 12, 13, 16, 17, 27, 51, 55, 56, 57, 58, 67, 70, 71, 72, 85, 101...............................21

              4.     The NRA must produce a privilege log. .....................................21

       E.     The NRA withheld documents that should be readily accessible.........................22

       F.     Defendants' are entitled to sanctions. ...................................................24

IV.    PRAYER ................................................................................................................24

# TABLE OF AUTHORITIES

**Cases**

*Areizaga v. ADW Corp.*, 314 F.R.D. 42 (N.D. Tex. 2016) ............................................................ 8

*Chandler v. Phx. Servs.*, No. 7:19-cv-00014-O, 2020 U.S. Dist. LEXIS 15702 (N.D. Tex. Jan. 30, 2020) ...................................................................................................... 7, 11, 20

*Columbia Data Prod., Inc. v. Autonomy Corp.*, 2012 WL 18 6212898 (D. Mass. Dec. 12, 2012) ...................................................................................................................................... 16

*Curtis v. Metro. Life Ins. Co.*, No. 3:15-CV-2328-B, 2016 WL 687164 (N.D. Tex. Feb 19, 2016) ................................................................................................................................ 5, 21

*Fisher v. United States*, 425 U.S. 391 (1976) ............................................................................. 6

*Harding v. Cty. of Dall.*, Civil Action No. 3:15-CV-0131-D, 2016 U.S. Dist. LEXIS 177937 (N.D. Tex. Dec. 23, 2016) ...................................................................................... 6, 15

*Heller v. City of Dallas*, 303 F.R.D. 466 (N.D. Tex. 2014) ....................................................... 5, 21

*Hill v. Hunt*, 2008 U.S. Dist. LEXIS 68925, 2008 WL 4108120 (N.D. Tex. Sept. 4, 2008) ....... 12

*In re Grand Jury Subpoena*, 419 F.3d 329 (5th Cir. 2005) .......................................................... 7

*In re Grand Jury Subpoena*, 913 F.2d 1118 (5th Cir. 1990) ...................................................... 12

*In re LTV Sec. Litig.*, 89 F.R.D. 595 (N.D. Tex. 1981) ............................................................. 10

*In re Santa Fe Int'l Corp.*, 272 F.3d 705 (5th Cir. 2001) ............................................................ 8

*Jeanbaptiste v. Wells Fargo Bank, N.A.*, No. 3:14-CV-0264-K (BH), 2014 U.S. Dist. LEXIS 167478 (N.D. Tex. Nov. 4, 2014) ......................................................................... 12

*McKinney/Pearl Rest. Partners, L.P. v. Metro. Life Ins. Co.*, 322 F.R.D. 235 (N.D. Tex. 2016).. 5

*McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482 (5th Cir. 1990) ........... 5, 21

*Merrill v. Waffle House, Inc.*, 227 F.R.D. 467 (N.D. Tex. 2005) ....................................... 5, 18, 21

*Navigant Consulting, Inc. v. Wilkinson*, 220 F.R.D. 467 (N.D. Tex. 2004) ............................ 6, 16

*SEC v. Brady*, 238 F.R.D. 429 (N.D. Tex. 2006) ......................................................................... 6

*Stonehenge/Fasa-Tex., JDC, L.P. v. Miller*, No. Civ. A. 3:94-CV-0912-G, 1998 U.S. Dist. LEXIS 18569, 1998 WL 826880 (N.D. Tex. Nov.23, 1998) ................................................ 12

*United States v. El Paso Co.*, 682 F.2d 530 (5th Cir. 1982) .................................................... 7, 22

*Weatherly v. Pershing LLC*, No. 3:14-CV-366-N-BG, 2015 U.S. Dist. LEXIS 187422 (N.D. Tex. Oct. 16, 2015) ............................................................................................ 7, 20, 22, 25

*Wirtz v. Fowler*, 372 F.2d 315 (5th Cir. 1966) ............................................................ 10

**Statutes**

FED. R. CIV. P. 26 ...................................................................................................... *passim*

FED. R. CIV. P. 34 ........................................................................................................ 5, 21

FED. R. CIV. P. 37 ............................................................................................................ 5

Ackerman McQueen, Inc. ("**AMc**"), Mercury Group, Inc. ("**Mercury Group**"), Henry Martin ("**Martin**"), William Winkler ("**Winkler**"), Melanie Montgomery ("**Montgomery**"), and Jesse Greenberg ("**Greenberg**") (collectively, "**Defendants**") file this *Brief in Support of their Motion to Compel Plaintiff's Document Production and Motion for Sanctions* (the "**Motion**"), and respectfully show as follows:

## I.    SUMMARY

Defendants bring this Motion to address the National Rifle Association of America's ("**NRA**" or "**Plaintiff**") refusal to comply with its discovery obligations.  Despite serving responses to Defendants' requests for production, the NRA's responses are riddled with boilerplate and conclusory objections, and refusals to produce documents relating to the most basic issues in this litigation (*i.e.*, documents relating to the claims that they assert against Defendants in this case). More egregious is the fact that the NRA has produced a mere 17 documents to date in response to Defendants' requests for production.  This despite the fact that the NRA has had numerous documents in its possession, custody, and control since filing its last live pleading in October 2019. In addition, the NRA has repeatedly attempted to shirk its obligations to produce responsive documents by claiming that certain documents are privileged, while simultaneously relying on that same evidence to support its claims, impermissibly using the privilege as both sword and shield. Requests for a privilege log have been ignored.  Based on the NRA's failure to comply with its discovery obligations and the Federal Rules of Civil Procedure, AMc respectfully asks the Court to grant this Motion to Compel in its entirety, overrule the NRA's objections, compel the production of documents, and award Defendants appropriate sanctions for having to bring this Motion as a result of the NRA's blatant refusal to comply with its discovery obligations.

## II.    BACKGROUND FACTS

### A.  Litigation History

This Motion arises out of a series of lawsuits the NRA filed against its longtime public-relations firm, AMc, based in large part of the parties' contract (the "***Services Agreement***").   In addition to this action, the NRA has brought three separate lawsuits in Virginia, which have now been consolidated into a single action (the "***Virginia Action***").[1]

Through its attorney William A. Brewer, III ("***Brewer***") and his law firm, the Brewer Attorneys and Counselors (the "***Brewer Firm***"), the NRA brought the instant action against AMc in Texas (the "***Texas Action***"), replicating the same claims from the Virginia Action and including additional causes of action for conversion, fraud, breach-of-fiduciary-duty, and conspiracy,[2] along with claims for copyright and trademark infringement.   AMc filed a counterclaim for libel, tortious interference, fraud, and breach-of-contract.[3]   Both parties are seeking damages in excess of $50 million.

Beginning with its retention of the Brewer Firm, the NRA implemented a nationwide misinformation strategy premised upon meritless lawsuits.[4]   These filings spin novellas of deceit, extortion, and victimization with no basis in fact.   AMc is Brewer's latest target.

---

[1] *National Rifle Association of America v. Ackerman McQueen, Inc., et al.*, Civil Case No. CL19001757, pending in the Circuit Court for the City of Alexandria, Virginia (filed on April 12, 2019); *National Rifle Association of America v. Ackerman McQueen, Inc., et al.*, Civil Case No. CL19002067, pending in the Circuit Court for the City of Alexandria, Virginia (filed on May 22, 2019); *National Rifle Association of America v. Ackerman McQueen, Inc., et al.*, Civil Case No. CL19002886, pending in the Circuit Court for the City of Alexandria, Virginia (filed on September 5, 2019).

[2] These claims are now part of the Virginia Action since the NRA's filing of its amended complaint on February 6, 2020.   In fact, in the NRA's *Motion for Leave to File a Consolidated and Amended Complaint*, it represented to the Virginia court that "these new allegations are already contained in the Texas action."

[3] *See* ECF 31 at pp. 77-122.

[4] Under Brewer's influence since at least early 2018, the NRA has brought lawsuits against (1) Andrew Cuomo, the Governor of New York and New York's Chief Insurance Regulator; (2) the Lockton Companies; (3) Lt. Col. Oliver North; (4) Letitia James, the New York Attorney General; and (5) the City of San Francisco.

Brewer is the son-in-law of Angus McQueen, the late CEO of AMc, and the brother-in-law of Revan McQueen, AMc's current CEO.  Brewer himself has independent reasons for inventing legal claims against AMc, including two decades of personal animus against the McQueen patriarch, and an economic interest in supplanting AMc with his own firm's public-relations services.  Brewer not only has access to decades of family history, he has collateral access to communications with McQueen family members, which, aside from clear ethical implications, hopelessly blurs the lines between the professional and the personal interests at stake in this lawsuit.

## B.  The NRA's Bad-Faith Discovery Effort

On December 20, 2019, AMc served its Requests for Production on the NRA.[5]  The NRA served its Objections and Responses[6] on January 21, 2020.  Two days later, on January 23, 2020, the NRA served a mere 17 documents in response to AMc's requests.

On February 3, 2020, counsel for AMc attempted to confer with counsel for the NRA about its deficient discovery objections, responses, and document production.  As part of that conference, AMc inquired into the status of the NRA's document production, including when additional documents would be produced.  In response, counsel for the NRA stated only that the NRA was still "evaluating" and "analyzing" what documents might be responsive, and forecasted a "*decent chance*" of producing documents in the "*near-ish*" future.  Not only was this response noncommittal and evasive, it is entirely inconsistent with the NRA's obligations under the Federal Rules of Civil Procedure.

---

[5] *See* Ex. A-1 [APP 5-32], Defendant/Counter-Plaintiff Ackerman McQueen, Inc.'s First Requests for Production to Plaintiff/Counter-Defendant.
[6] *See* Ex. A-2 [APP 33-108], Plaintiff/Counter-Defendant's Objections and Responses to Defendant/Counter-Plaintiff Ackerman McQueen, Inc.'s First Requests for Production.

When pressed regarding whether the NRA had even identified the relevant custodians for undertaking its document search, counsel for the NRA replied that no custodians had yet been identified.  Defendants' counsel also inquired as to the status of a privilege log for the 63 requests for which the NRA had asserted attorney-client or work-product privilege.  However, counsel for NRA indicated that the only responses that would be included in the privilege log were those that *did not* also include other objections, such as relevance.  In the words of NRA counsel, "*What's the point*?"—apparently maintaining that any documents that the NRA unilaterally deemed irrelevant or objectionable could be anonymously withheld from production.

The NRA's position on both objections and assertions of privilege is improper and completely contrary to the Federal Rules.  Moreover, unlike AMc's extensive and costly document-review efforts,[7] it is clear that the NRA has not even begun to conduct a good-faith effort to produce any additional documents.  Through this Motion, AMc asks the Court to overrule Plaintiff's unfounded and boilerplate objections, compel a full and complete production of documents, and order that Plaintiff provide a comprehensive privilege log.

### III.    ARGUMENTS AND AUTHORITIES

#### A.  Legal Standard.

A party may obtain discovery of "any non-privileged matter that is relevant" to the claims or defenses in a lawsuit *and* "proportional to the needs of the case."  FED. R. CIV. P. 26(b)(1). Proportionality takes into account:

> the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

*Id.*  Such information "need not be admissible in evidence to be discoverable."  *Id.*

---

[7] *See* ECF 51 at ¶¶ 24-25 (describing AMc's discovery efforts to date).

The requesting party may move to compel production from another party who has failed to produce documents requested under Federal Rule of Civil Procedure 34. *See* FED. R. CIV. P. 37(a)(3)(B)(iv). An evasive or incomplete response is treated as a failure to respond. FED. R. CIV. P. 37(a)(4).

The party resisting discovery must show specifically how each discovery request is not relevant or otherwise objectionable. *See McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990); *McKinney/Pearl Rest. Partners, L.P. v. Metro. Life Ins. Co.*, 322 F.R.D. 235, 242 (N.D. Tex. 2016) ("A party resisting discovery must show how the requested discovery was overly broad, burdensome, or oppressive by submitting affidavits or offering evidence revealing the nature of the burden."). If the responding party does not make that showing, "he waives the objection." *Curtis v. Metro. Life Ins. Co.*, No. 3:15-CV-2328-B, 2016 WL 687164, at *2 (N.D. Tex. Feb 19, 2016). Further, "[u]nless it is clear that the information sought can have no possible bearing on the claim or defense of a party, the request for discovery should be allowed." *Merrill v. Waffle House, Inc.*, 227 F.R.D. 467, 470 (N.D. Tex. 2005).

As clarified in *Heller v. City of Dallas*, the responding party "must fully answer" each discovery request "to the full extent that it is not objectionable," including an affirmative explanation of "what portion of an interrogatory or document request is objectionable and the subject of the answer or response," as well as "whether any responsive information or documents have been withheld." 303 F.R.D. 466, 485 (N.D. Tex. 2014); FED. R. CIV. P. 34(b)(2)(C) (requiring that an objection asserted in response to a request for production "must state whether any responsive materials are being withheld on the basis of that objection.").

**B. Proper Procedure for Claiming Privilege.**

Plaintiff asserts the attorney-client and work-product privileges in response to many of Defendants' requests for production. But that assertion of privilege carries specific requirements with which the NRA must comply.

### 1.    <u>The attorney-client and work-product privileges</u>

Courts generally construe the attorney-client privilege narrowly because "assertion of privileges inhibits the search for truth." *Navigant Consulting, Inc. v. Wilkinson*, 220 F.R.D. 467, 473 (N.D. Tex. 2004) (Kaplan, J.). The attorney-client privilege protects from disclosure communications between a client and his attorney "made in confidence for the purpose of obtaining legal advice." *Harding v. Cty. of Dall.*, Civil Action No. 3:15-CV-0131-D, 2016 U.S. Dist. LEXIS 177937, at *26 (N.D. Tex. Dec. 23, 2016). The privilege protects "only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege." *Id.* (citing *Fisher v. United States*, 425 U.S. 391, 403 (1976)). Hence, the privilege does not protect documents and other communications simply because they result from an attorney-client relationship. *See Navigant*, 220 F.R.D. at 473.

The work product privilege applies only to documents and tangible things prepared in anticipation of litigation or for trial. *See* FED. R. CIV. P. 26(b)(2)(A). This privilege may be overcome when the party seeking discovery can show that it has "substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." *SEC v. Brady*, 238 F.R.D. 429, 442 (N.D. Tex. 2006).

Because these privileges are not absolute, they also may be waived in certain circumstances. For instance, "offensive use" of the attorney-client or work-product privilege may result in a waiver of the privilege. *Navigant*, 220 F.R.D. at 478. An "offensive use" occurs when

(1) the party asserting the privilege seeks affirmative relief; (2) the information, if believed by the trier of fact, would probably be outcome determinative; and (3) disclosure of the privileged communication is the only means of obtaining the evidence.  *Id.*  And of course, a communication that is made in furtherance of a crime or a fraud forfeits any protection otherwise provided by privilege.  *Chandler v. Phx. Servs.*, No. 7:19-cv-00014-O, 2020 U.S. Dist. LEXIS 15702, at *5 (N.D. Tex. Jan. 30, 2020) (citing *In re Grand Jury Subpoena*, 419 F.3d 329, 335 (5th Cir. 2005)).

### 2.      Production of a privilege log

"A blanket assertion of privilege is unacceptable; the party asserting a privilege should prepare a privilege log that provides the requesting party with enough information to test the merits of the privilege claim."  *Weatherly v. Pershing LLC*, No. 3:14-CV-366-N-BG, 2015 U.S. Dist. LEXIS 187422, at *8-9 (N.D. Tex. Oct. 16, 2015) (citations omitted); *United States v. El Paso Co.*, 682 F.2d 530, 539 (5th Cir. 1982) ("[T]he attorney-client privilege may not be tossed as a blanket over an undifferentiated group of documents. The privilege must be specifically asserted with respect to particular documents.").  The purpose of the privilege log is "to enable opposing parties and the court to determine whether each element of the asserted privilege is satisfied." *Weatherly*, 2015 U.S. Dist. LEXIS 187422, at *9 (citations omitted).  Thus, a privilege log should include "the document's date of creation, author, title or caption, addressee and each recipient, and general purpose for creation, as well as the particular privilege relied upon" to generally satisfy Rule 26.  *Id*.

Indeed, this well-settled proposition is based on the express requirements of Rule 26, which mandates that a party withholding information on the basis of a privilege must "expressly make the claim[] *and* describe the nature of the documents, communications, or tangible things not produced or disclosed."  FED. R. CIV. P. 26(b)(5)(A) (emphasis added).

The party asserting privilege "bears the burden of demonstrating its applicability," *In re Santa Fe Int'l Corp.*, 272 F.3d 705, 710 (5th Cir. 2001).  In accord, the Northern District of Texas has held that "to support [] assertions of work-product protection or attorney-client privilege [and] withholding certain documents or ESI from production, Plaintiff **must describe the withheld information**, documents, or ESI by submitting to Defendant's counsel a 'privilege log' that complies with Federal Rule of Civil Procedure 26(b)(5)(A)."  *Areizaga v. ADW Corp.*, 314 F.R.D. 428, 439-40 (N.D. Tex. 2016) (emphasis added).

## C.  The NRA refused to produce documents central to its claims and defenses.

The NRA freely makes damaging accusations about AMc in its court filings, which it promptly offers to the media for mass consumption and maximum publicity.[8]  Yet the NRA has refused to produce documents to support these claims.

### 1.  The Brewer Firm

As discussed above, the introduction of Brewer and his firm presents a twist on traditional litigation.  Based on the evidence developed to date, it is undisputed that this litigation, along with the litigation against AMc and Mercury in Virginia, was developed by a resentful son-in-law and business competitor acting in that capacity.  Indeed, numerous high ranking NRA officials did not even have knowledge of the initiation of the litigation against AMc.[9]   In Virginia, the court acknowledged the competitive nature of the Brewer Firm with AMc and entered a customized two-tiered Protective Order to keep Brewer and his firm's PR wing walled off from AMc's confidential business information.[10]   Even Brewer's co-counsel has acknowledged that he may be a fact

---

[8] AMc incorporates all factual allegations from its Amended Complaint (ECF 31) and its Response to the NRA's Motion to Compel (ECF 51) into this Motion as if set forth herein.
[9] *See* Ex. A-3 at 284:1-18 [APP 180]; 295:9-17 [APP 183]; Ex. A-4 at 273:16-274:9 [APP 299].
[10] *See* Ex. A-5 [APP 329-347], Protective Order in Virginia Action.

witness.[11]   Under the facts of this case, AMc asks the Court to compel responses to the following requests or, alternatively, a full and complete privilege log so AMc and the Court may properly assess the merits of each privilege claim.

      *a.*    ***The Brewer Firm's retention – RFPs 4, 6, 7, 8, 9, 12, 13, 16, 17, 23, 44, 79***

These requests seek documents related to the NRA's original retention of Brewer and the Brewer Firm, the reason(s) for the retention, along with the development of the relationship thereafter, especially with regard to the NRA, Brewer, and Wayne LaPierre's ("***LaPierre***") original intentions for terminating the relationship with AMc.[12]   In response to each of these RFPs, the NRA asserts that this information is either irrelevant or that it is protected by attorney-client privilege, and has refused to produce any documents.[13]

RFPs 4, 6, 9, 12, 16, 17, and 79 seek documents related to the Brewer Firm's original engagement with the NRA, the initial scope of work, and whether the NRA followed proper procedures for retaining what is now its largest vendor.  Indeed, it is undisputed that the Brewer Firm was not properly vetted or approved according to NRA policies and procedures.[14]  Moreover, former NRA President Lieutenant Colonel Oliver North ("***Col. North***") became NRA president shortly after Brewer was retained, and he began asking questions about Brewer's retention after hearing numerous concerns from his NRA constituents.[15]   Because Col. North challenged Brewer's retention and payments, Brewer (through the NRA) targeted Col. North for removal through false claims of extortion, citing AMc as North's co-conspirator.[16]  AMc is entitled to

---

[11] *See* Ex A-6, Hr'g Tr. at 27:20-22, 40:11-13 [APP 375, 388].
[12] *See* ECF 31 at 94 (¶ 56).
[13] *See* Ex. A-2 at RFP 4, 6, 7, 8, 9, 12, 13, 16, 17, 23, 44, 79 [APP 37, 38-40, 41-44, 46-47, 56, 74-75].
[14] *See* Ex. A-7 at 168:5-170:7, 172:10-174:19 [APP 4476-448]; Ex A-8 at 259:14-262:5 [APP 540-541]; Ex. A-4 at 185:11-21 [APP 277].
[15] *See* Ex. A-7 at 128:15-130:7 [APP 436-437].
[16] *See*  Ex. A-7 at 169:13-172:9, 182:14-183:14, 203:24-207:4, 208:1-20, 209:7-210:22, 211:1-16, 212:18-22 [APP 447, 450, 455-457]; *see also* ECF 18 at ¶¶ 152-155.

discover the basis of these extortion and conspiracy charges, which originate from the Brewer Firm's retention.

Notably, courts consider information concerning the factual circumstances surrounding the attorney-client relationship to be distinct from privileged communications. *See Wirtz v. Fowler*, 372 F.2d 315, 332 n.36 (5th Cir. 1966); *In re LTV Sec. Litig.*, 89 F.R.D. 595, 603 (N.D. Tex. 1981). This Court has held that the attorney-client privilege does not encompass the "external trappings" of the attorney-client relationship, such matters as the terms and conditions of an attorney's employment, the purpose for which an attorney has been engaged, and the steps which an attorney took or intended to take in discharging his obligation. *In re LTV*, 89 F.R.D. at 603. These requests fall squarely within these permissible categories of documents and should be produced.

Similarly, RFPs 7, 8, 13, 23, and 44 seek documents related to Brewer's rapid takeover of all NRA legal matters. From the single purpose for which he was ostensibly hired,[17] Brewer's scope creeped steadily until he had effectively assumed control over the NRA.[18] Actions taken by Brewer were contrary to the NRA's business goals and created a direct conflict of interest given his animus towards the McQueen family and AMc.[19] These requests are similarly related to the "external trappings" of the NRA's relationship with the Brewer Firm and therefore discoverable in this matter. *See In re LTV*, 89 F.R.D. at 603.

Moreover, the Brewer Firm itself appears to have been the orchestrator of the false extortion and conspiracy narratives.[20] By creating and disseminating these false narratives, Brewer was able to oust Col. North, terminate his contract, disgrace AMc, and steal the NRA's PR

---

[17] *See* ECF 31 at 94 (¶ 56).
[18] *See* Ex. A-3 at 284:1-18; 295:9-17 [APP 180-183]; Ex. A-4 at 273:16-274:9 [APP 299].
[19] *See* Ex. A-3 at 107:10-108:2, 186:18-188:22, 235:16-236:12, 381:18-382:15 [APP 136, 156, 168, 205]; Ex. A-4 at 374:7-375:5 [APP 324].
[20] *See* Ex. A-8 192:1-201:14 [APP 523-526]; Ex. A-9 at 205:19-208:9 [APP 623].

business in one fell swoop.  As a result, the communications between Brewer or the Brewer Firm and any person at the NRA, including LaPierre, which AMc seeks in RFPs 9 and 79, fall within the crime-fraud exception to the attorney-client privilege and are discoverable. *See Chandler*, 2020 U.S. Dist. LEXIS 15702, at *5.

### b.  *Brewer's attorney's fees – RFPs 5, 39, 40, 42, 43*

These requests seek documents and communications related to the Brewer Firm's invoices to the NRA and compensation the Brewer Firm received from settlement of the Lockton Lawsuit.[21] In response, the NRA objected that these requests are irrelevant and protected by attorney-client privilege and refused to produce any responsive documents.

The Brewer Firm's engagement and attorneys' fees are at the heart of this case.  In response to numerous individuals within the NRA questioning the validity of the Brewer Firm's engagement, their exorbitant attorneys' fees, and their conflicts of interests, Brewer and the Brewer Firm have facilitated the termination and suspension of numerous high-ranking NRA officials, and more importantly, created the false extortion narrative, discussed above, to deflect attention from Brewer and LaPierre's financial mismanagement of the NRA.[22]  RFPs 39 and 40 seek documents related to internal questions raised by former NRA President Col. North and another NRA accounting employee regarding the validity of Brewer's billing practices.

Additionally, with regard to RFP 5, which seeks the Brewer Firm's attorney fees, the NRA has included "reasonable and necessary attorney fees" in its claim for damages.[23]  Therefore, Brewer's invoices, including the dollar amount of the services rendered and the invoice detail,

---

[21] *National Rifle Association of America v. Lockton Affinity Series of Lockton Affinity, LLC, et al*, Case No. 1:18-cv-639, in the United States District Court for the Eastern District of Virginia (the "***Lockton Lawsuit***").
[22] *See* Ex. A-3 at 314:12-315:7, 341:9-342:1 [APP 188, 195]; ECF 31 at 77 (¶ 1), 94 (¶ 56).
[23] *See* ECF 18 at ¶ 189(f).

along with related communications between the NRA and the Brewer Firm, are relevant to determining whether such fees were "reasonable and necessary" as alleged.

The NRA has objected to producing any documents in response to these requests on the grounds that this information is "irrelevant" (RFPs 39, 40, 42, 43) and protected by attorney-client privilege (RFP 5). However, under the unique facts of this case, the background of the Lockton settlement, along with the NRA's internal criticism and suspicions of the Brewer Firm, is highly relevant to establishing that Col. North's concerns about Brewer were meritorious and that AMc was not engaged in an alleged coup. Moreover, the Northern District and Fifth Circuit have long held that the attorney-client privilege does not generally extend to matters involving payment of attorney fees. *See Jeanbaptiste v. Wells Fargo Bank, N.A.*, No. 3:14-CV-0264-K (BH), 2014 U.S. Dist. LEXIS 167478, at *7-8 (N.D. Tex. Nov. 4, 2014).[24] With regard to RFP 5, the invoices should be produced in their entirety, with sufficient detail to determine the type of task performed and the amount billed.

### c.   *Knowledge of Angus McQueen's cancer – RFPs 1, 2, 3, 10, 90, 91*

These requests seek documents between the Brewer Firm and the NRA concerning the illness and passing of Angus McQueen. RFP 10 seeks internal communications regarding any conflicts of interest related to Brewer's retention (which also relates to North's investigation). Similarly, RFPs 90 and 91 seek communications between Brewer, the Brewer Firm, and the NRA and any members of the McQueen and Brewer families.

---

[24] The Fifth Circuit has "long recognized the general rule that matters involving the payment of [attorney's] fees . . . are not generally privileged." *In re Grand Jury Subpoena*, 913 F.2d 1118, 1123 (5th Cir. 1990). Such "matters" naturally include attorney's fees invoices. *See, e.g., Hill v. Hunt*, 2008 U.S. Dist. LEXIS 68925, 2008 WL 4108120, at *7 (N.D. Tex. Sept. 4, 2008) ("Ordinarily, invoices for legal fees are not privileged."); *Stonehenge/Fasa-Tex., JDC, L.P. v. Miller*, No. Civ. A. 3:94-CV-0912-G, 1998 U.S. Dist. LEXIS 18569, 1998 WL 826880, at *2 (N.D. Tex. Nov.23, 1998) (holding that the "invoices for legal **fees**" were not protected by either the attorney-client privilege or the work product doctrine because they were "merely a byproduct of the fact of the representation"). Only when attorney's fees invoices contain "confidential" client [*8] information may a privilege be invoked. *See Hill*, 2008 U.S. Dist. LEXIS 68925, 2008 WL 4108120, at *7.

In response, the NRA has objected that these requests are both irrelevant and "harassing." Yet, the Brewer Firm, on behalf of the NRA, has engaged in deeply personal and calculated attacks on the McQueen family in a manner that itself could only be labeled as harassing—with escalating demands, threats of indictment, lawsuits, media posts, and more lawsuits, at times that strategically coordinated with Angus's medical treatment, his final family events, his declining health, and ultimately the period of grief following his death.[25]  On multiple occasions, Brewer even used family members as back-channels to communicate his threats and demands.

The NRA's decision to retain Brewer suggests that the two intentionally targeted AMc for termination long before the NRA represented its dissatisfaction with AMc.  These documents and communications are discoverable and relevant, both to AMc's defense against the NRA's claims for fraud, and to AMc's affirmative claims of fraud and tortious interference.

### d.   *Brewer taking over AMc's business – RFPs 7, 11, 64, 65, 87, 88, 89*

These requests seek documents and information related to the Brewer Firm's assumption of public-relations work for the NRA in place of AMc.[26]  The Brewer Firm asserted that all of this information is protected by attorney-client privilege or otherwise irrelevant and has refused to produce any documents.

However, the circumstances of this litigation require discovery into these communications. Even ignoring the fact that Brewer is a member of the McQueen family, the Brewer Firm is also a competitor of AMc in the public-relations and crisis-management market—another atypical litigation scenario.  It is undisputed that shortly after entering the scene, Brewer and the Brewer Firm began to take over public relations for the NRA, including draft press releases, something

---

[25] *See* ECF 31 at 100-102 (¶¶ 78-83), 103-106 (¶¶ 89-102); ECF 51 at 3 (¶¶ 3-4).
[26] *See* ECF 31 at 98 (¶¶ 68-69); ECF 51 at 4 (¶¶ 5-6).

AMc had handled for the NRA for forty years.[27]   Communications between the Brewer Firm, Brewer, or Travis Carter ("**Carter**") (Managing Director of Public Affairs at the Brewer Firm) and the NRA or the NRA Foundation (sought in RFPs 7, 11, 64, 65, and 87) are relevant to determining how early the Brewer Firm began performing these competitive services for the NRA, what each party's understanding was as to the scope and progression of those services in favor of Brewer over AMc, and the narrative to support termination.[28]   Likewise, communications with the media by the Brewer Firm or Carter (RFPs 88 and 89) show intent to replace AMc's services in favor of the Brewer Firm, and relate to the NRA's alleged coup theory[29] and Defendants' libel claim.[30]   A decision to replace AMc would not only require termination of the Services Agreement, but also costly termination fees.[31]   Thus, the NRA had a clear financial motive for inventing reasons to terminate the Services Agreement for-cause, thus avoiding millions of dollars in payments and fees.[32]

Of course, communications with the media (RFPs 88 and 89) are also part of the Brewer Firm's stated goal of trying its clients' cases in the "court of public opinion."   Indeed, Brewer himself has been repeatedly quoted by news outlets across the country about the NRA's litigation against Defendants, including false and defamatory statements where he accuses AMc of engaging in the alleged extortion of LaPierre.   Thus, these communications are doubly relevant to AMc's claims for defamation and business disparagement resulting from the numerous false statements that the NRA, through Brewer, gave to the media.

---

[27] *See* ECF 51 at 4 (¶¶ 5-6); Ex. A-4 at 153:7-22 [APP 269]; Ex. A-8 at 319:13-19 [APP 555].
[28] *See* ECF 31 at 98 (¶¶ 68-69); ECF 51 at 4 (¶¶ 5-6).
[29] *See* ECF 18 at ¶¶ 9, 70, 74, 76, 78, 125, 152-155, 161.
[30] See ECF 31 at 111 (¶¶ 119-124).
[31] *See* ECF 31 at 98-99 (¶¶ 70-73), 113-22 (¶¶ 138-184).
[32] *See id.*

Moreover, the communications sought are not privileged.  Despite the NRA's blanket assertions, not all of these communications could possibly be considered "communications from the client to the attorney made in confidence for the purpose of obtaining legal advice" or "prepared in anticipation of litigation," in particular the communications solely concerning public-relations needs and not "legal advice."  *See Harding*, 2016 U.S. Dist. LEXIS 177937, at *26; FED. R. CIV. P. 26(b)(2)(A).  In fact, in the NRA's litigation with the New York Attorney General,[33] the NRA sought to prevent discovery of certain information under the "public relations" extension of the attorney-client privilege.  The New York court held that, "[t]he NRA cannot use its publicist as a sword and a shield, for public outreach when it feels so inclined, and in other instances, remained tucked away from public view."[34]  These requests are directly relevant to AMc's defenses against the NRA's claims of fraud, breach of fiduciary duty, and breach of contract, as well as AMc's affirmative claims of libel, fraud, and tortious interference.[35]  AMc asks that, just as the New York court held, this Court compel production of all documents that are not clearly privileged and a full and complete privilege log for all documents withheld based upon this privilege.

## 2.    Conspiracy – RFP 85

This RFP seeks documents related to Plaintiff's claims that AMc, Col. North, and others conspired with NRA Board member Dan Boren to "extort" LaPierre into resigning from his position at the NRA and leak information about the NRA to the press.  In response, the NRA objected that these documents were "irrelevant," yet it devotes eleven paragraphs of its Amended Complaint describing the alleged "coup" conspiracy and other claims related to Dan Boren.[36]  It

---

[33] *State of New York v. Ackerman McQueen and the National Rifle Association of America, Inc.*, No. 451825/2019, pending in the Supreme Court of the State of New York, County of New York.
[34] *See* Ex. A-10 [APP 626-638], Order (J. Crane) (Feb. 24, 2019).
[35] *See* ECF 31 at 51-69 (¶¶ 199-187), 111-113 (¶¶ 119-137).
[36] *See* ECF 18 at ¶¶ 9, 70, 74, 76, 78, 125, 152-155, 161.

is nonsensical for the NRA to make such specific allegations and then hide behind relevance objections. Plaintiff's objections to these responses should be overruled for AMc to conduct thorough discovery into the merits of Plaintiff's conspiracy claim.

### 3.   False "Independent Audit of AMc" – RFPs 47, 101

In its Amended Complaint, the NRA alleges that AMc failed to comply with records requests and audits of its books and records.[37] Indeed, this was the alleged basis for the first rogue lawsuit filed by Brewer on behalf of the NRA April 2019. RFPs 47 and 101 seek documents and communications related to the NRA's retention of a company called Forensic Risk Alliance ("**FRA**") to audit AMc's books and records—the *third* audit conducted in a 6-month period.[38]

Under the offensive-use doctrine, Plaintiff cannot make allegations about AMc's noncompliance with NRA audits and then withhold the very documents that would disprove those allegations behind the wall of privilege. *See Navigant*, 220 F.R.D. at 478. Here, the factors for offensive use are clear: the NRA is the party seeking affirmative relief, these documents would prove or disprove these allegations—and be outcome determinative, and disclosure of this information is the only meaningful way of obtaining the evidence. *See id.*[39]

These communications go to the heart of whether this audit was based on legitimate means, or whether it was simply an attempt to scrounge up some "dirt" that might be useful in terminating the Services Agreement and taking AMc's business with the NRA. In fact, contrary to the NRA's representation that the FRA audit would be an "independent audit"—without Brewer or his firm's involvement—one member of the FRA audit team, Susan Dillon, was a 16-year employee of the

---

[37] *See* ECF 18 at 23-27 (¶¶ 47-58).
[38] *See* ECF 31 at 98 (¶ 68).
[39] *See also Columbia Data Prod., Inc. v. Autonomy Corp.*, 2012 WL 18 6212898 at *18 (D. Mass. Dec. 12, 2012) (holding that the attorney-client privilege did not apply because there was no evidence that auditors were necessary or highly useful in facilitating legal advice).

Brewer Firm, further suggesting that this was far from an "independent audit" and instead another rogue request by Brewer and the Brewer Firm.

The NRA also objects to these requests arguing that these documents are already "in AMc's possession" following a subpoena to FRA. However, in response to this subpoena, FRA has withheld more than *1,200 documents* on the basis of attorney-client privilege.[40]  The NRA and/or its attorneys are also in possession of these communications and should be compelled to produce them to prevent the offensive use of these documents.

### 4.   Leaks to Media – RFPs  22, 27, 28, 58, 86

In similar fashion, Plaintiff has put allegations of media leaks directly at issue in its pleadings by accusing AMc of leaking the NRA's confidential information to the press.[41]  To conduct discovery regarding these allegations, RFP 27 seeks documents related to the NRA's internal communications about such leaks by AMc.  Yet the NRA refuses to produce the supporting documents based on unfounded objections or claims of privilege.  Similarly, RFP 58 seeks communications regarding a *specific* leak allegation made by the NRA.[42]  In response, the NRA claims that this information is "irrelevant."  Likewise, AMc has made a claim for libel against the NRA.[43]

Thus, communications between the NRA, Brewer, or a member of his firm with the media (RFPs 22, 28, and 86) are directly relevant to determining the nature and intent of the statements provided to the press regarding AMc.  Similarly, these communications would also reveal whether Brewer or someone at the NRA—*rather* than AMc—was the source of the NRA's alleged media

---

[40] *See* Ex. A-11 [APP 639-675], FRA Privilege Log.
[41] *See* ECF 18 at ¶¶ 57, 75, 174-177.
[42] *See* Ex. A-12 at 234:21-237:12 [APP 735-736].
[43] See ECF 31 at 111 (¶¶ 119-124).

leaks, thereby making these communications doubly relevant to AMc's affirmative claims as well as its defenses.

In response to both of these requests, the NRA somehow maintains that these communications are both irrelevant and protected by attorney-client and work-product privileges. As stated above, the NRA bears the burden to show why these communications "have no possible bearing" on the claims in this case.  *See Merrill*, 227 F.R.D at 470.  Plus, communications with the media declare the NRA's intention to disclose information publicly.  The NRA's claims of privilege should be overruled.

### 5.    <u>Sloan – RFP 31</u>

The NRA has alleged that its digital media platform NRATV, which AMc produced and managed for the NRA, was a financial failure.[44]  But because fundraising was never the intended purpose of NRATV, it was not until 2018 that the NRA began seeking additional ways to monetize this platform.[45]  AMc obliged with numerous ideas.

However, one of the NRA's fundraising vendors, Gurney Sloan ("***Sloan***"), became jealous of AMc's monetization efforts and believed that AMc was encroaching on his "territory."  Due to Sloan's influence, the NRA instructed AMc to back off certain fundraising activities.  The NRA now cites sluggish fundraising efforts as one reason for NRATV's supposed "failure," even though any such declines were self-inflicted through Sloan's influence.

AMc has requested communications between the NRA and Sloan from January 1, 2018 to the present.  The NRA objects that this information is "irrelevant" and further that communications between the NRA and a third-party fundraising vendor are somehow protected by attorney-client

---

[44] *See* ECF 18 at ¶ 43.
[45] *See* ECF 18 at ¶ 44; ECF 31 at 88 (¶¶ 37-41).

and work-product privileges.  Plaintiff's objections are without merit, should be overruled, and Plaintiff should be compelled to produce these responsive and relevant documents.

### 6.   <u>Powell – RFP 54</u>

Joshua Powell ("**Powell**") is the former Chief of Staff for Wayne LaPierre who played a central, antagonistic role in the events leading up to the dispute between AMc and the NRA.  As part of his role with the NRA, Powell was in charge of developing and overseeing the NRA's failed concealed-carry insurance initiative, Carry Guard.  In late 2017, just a few months before Brewer was retained, Powell told AMc: "*Carry Guard is going to fail, and it's going to be all AMc's fault*"—even though AMc had nothing to do with developing or implementing the insurance portion of the program.  As the months went by, AMc began suspecting that Powell's threat had actually foreshadowed a plan to scapegoat AMc for the NRA's legal and political troubles that began with Carry Guard.  Powell had also sexually harassed an employee of AMc and, as a result, AMc requested that Powell be removed from all dealings with AMc.[46]  Thus, Powell had an additional motive for replacing AMc's services with the Brewer Firm in apparent retaliation.

Further, Powell has a checkered legal history of business flops, unpaid debts, and judgments, so that information relating to his background, credibility, and the NRA's knowledge of this information is relevant evidence in this litigation.[47]

Based on discovery to date, Powell played a critical role in developing the false narrative that is currently bearing out through this lawsuit and being publicized in the media.[48]  RFP 54 seeks documents between Powell and Brewer that would shed light on Powell's involvement in these events.  The NRA objected that such communications are protected by privilege, and further

---

[46] *See* Ex. A-12 at 109:2-17 [APP 704].
[47] Mike Spies and John Cook, *A Top NRA Executive's Trail of Business Flops and Unpaid Debt,* THE TRACE (Oct. 1, 2018), https://www.thetrace.org/2018/10/nra-josh-powell/.
[48] *See* Ex. A-9 at 206:9-208:19 [APP 623].

that the request is overly broad, unduly burdensome, and irrelevant.  However, the nature of Powell's antagonistic history with AMc indicates that some of Powell's communications may fall within the crime-fraud exception to privilege.  *See Chandler*, 2020 U.S. Dist. LEXIS 15702, at *5. The NRA bears the burden to show how such communications are irrelevant or otherwise objectionable in its response.  With respect to claims of privilege, AMc asks the Court to compel production of documents that do not clearly fall within a privileged category and communications with Powell made in furtherance of a crime or fraud, along with a full and complete privilege log that complies with the *Weatherly* factors, to allow meaningful assessment of the merits of the privilege claims.

**D.  The NRA improperly asserts boilerplate objections and privileges.**

It is clear from NRA counsel's stated position ("*What's the point?*") that it has no intention of clarifying its objections or producing a privilege log for any request where a privilege claim accompanies some other objection.  Not only is the NRA's stance improper under the Federal Rules of Civil Procedure and this Court's own precedent, but it represents an obvious effort to obfuscate the discovery process and conceal relevant information. In addition to the specific requests discussed above, AMc asks the Court to overrule Plaintiff's boilerplate objections and assertions of privilege if the NRA fails to carry its burden for each asserted objection and privilege.

**1.    <u>The Court should overrule the NRA's relevance objections.</u>**

The NRA has asserted that 66 of AMc's requests[49] are irrelevant to the claims and defenses in this lawsuit.  As the party resisting discovery, the NRA must argue in support of its objection in its response to this Motion or waive its objection to the request.  *See Curtis*, 2016 WL 687164, at *2.  With regard to its relevance objections, the NRA bears the burden to show specifically how

---

[49] Ex. A-2 at RFP 1-13, 18-19, 22-23, 28-31, 35-36, 39-40, 42-44, 49, 51-54, 57-78, 81- 84, 86, 88-91, 94, 97 [APP 36-42, 44-45, 46, 48-50, 51-53, 54, 55-56, 59, 60-63, 64-74, 75-77, 78-80, 81-83].

each of the requests is irrelevant.  *See McLeod*, 894 F.2d at 1485.  AMc asks the Court to overrule Plaintiff's relevance objections to all 66 of these requests absent a clear showing that they could have "no possible bearing" on the parties' claims or defenses.  *See Merrill*, 227 F.R.D. at 470.

> 2.    **The Court should overrule the NRA's objections as to scope.**

The NRA also asserted that 21 requests are overbroad and unduly burdensome.[50]  As the party resisting discovery, the NRA must show how the requested discovery is overly broad and unduly burdensome or else it waives the objections.  *See McLeod*, 894 F.2d at 1485; *Curtis*, 2016 WL 687164, at *2.  AMc further asks the Court to compel the NRA to amend its Objections and Responses to affirmatively state "whether any responsive materials are being withheld" on the basis of those objections.  *See* FED. R. CIV. P. 34(b)(2)(C); *Heller*, 303 F.R.D at 485.

> 3.    **Virginia Protective Order – RFPs 12, 13, 16, 17, 27, 51, 55, 56, 57, 58, 67, 70, 71, 72, 85, 101**

The NRA refused to produce any documents in response to these requests claiming that the requests themselves violated the Protective Order[51] entered in the Virginia Action.  AMc disagrees. However, since the date of the RFP responses, the Virginia court ordered[52] that discovery in the Virginia Action could be used in the Texas Action, thus rendering the NRA's objections moot. AMc asks the Court to overrule the NRA's objections and compel them to produce responsive documents.

> 4.    **The NRA must produce a privilege log.**

Contrary to counsel for the NRA's assertions, the NRA is required to produce a privilege log for each and every one of the 63 requests for which the NRA asserts privilege.  *See* FED. R.

---

[50] Ex. A-2 at RFP 11, 25, 33, 35-37, 41, 45-48, 50, 51, 53, 54, 61-63, 77, 82, 86, 147, 148 [APP 41, 47-48, 50--53, 55, 57-59, 60-63, 66-67, 74, 75-76, 78, 98-99].
[51] *See* Ex. A-5 [APP 329-347], Protective Order in Virginia Action.
[52] See Ex. A-13 [APP 761-763], Order (J. Dawkins) (Feb. 21, 2020).

C<small>IV</small>. P. 26(b)(5)(A).  Moreover, the privilege must be specifically asserted with respect to the particular documents that the NRA seeks to protect, not "tossed as a blanket" over whole categories of documents as the NRA appears to have done.  *See El Paso Co.*, 682 F.2d at 539.  As they currently stand, Plaintiff's privilege objections provide no information for AMc or the Court to meaningfully assess the merits of the privilege claim.  *See Weatherly*, 2015 U.S. Dist. LEXIS 187422, at *8-9 (identifying the key information to be included in a privilege log).  Accordingly, to ensure that the NRA provides sufficient information to assess the merits of its privilege assertions, AMc asks the Court to hold the NRA to the same standard it set out in *Weatherly* and to compel the NRA to produce a complete privilege log for all claims of privilege that are not otherwise overruled by this Court pursuant to this Motion.

**E.  The NRA withheld documents that should be readily accessible.**

Finally, the NRA failed to produce documents that it directly referenced in its Amended Complaint.  Indeed, the NRA made certain brazen allegations that were so detailed and specific, it appeared as though the referenced documents might have been sitting right next to the drafter.  For example, the NRA has refused to provide any documents relating to the following requests, that specifically ask for documents cited or relied upon in Plaintiff's Amended Complaint:

- <u>RFP 103</u>: The first paragraph of the Amended Complaint's Preliminary Statement claims that the NRA is in possession of "***newly unearthed text messages, emails, and interviews***" that supposedly show evidence of AMc's bad acts.[53]

- <u>RFP 109</u>: The fourth paragraph of the Amended Complaint's Preliminary Statement claims that the NRA has "***acquired documents and information***" showing evidence of fraud.[54]

- <u>RFP 110</u>: The fourth paragraph of the Amended Complaint's Preliminary Statement references an "***open letter***" from an alleged "***co-conspirator***" of AMc.[55]

---

[53] *See* ECF 18 at 2.
[54] *See* ECF 18 at 3.
[55] *See* ECF 18 at 4.

- <u>RFP 112</u>: The sixth paragraph of the Amended Complaint's Preliminary Statement boldly claims that "***many***" digital media campaigns of other AMc clients "***were shut down because of their ineffectiveness, costliness***," and lack of "***specific performance data***."[56]

- <u>RFP 138</u>: Paragraph 76 of the Amended Complaint states that "***discovery has corroborated one of the NRA's worst fears***" about AMc.[57]  To make this claim so confidently, this "discovery" must certainly have included documents of some kind.

In total, RPFs 103-139 seek production of the documents the NRA relied upon in making the specific and damaging allegations contained within its Amended Complaint.  Moreover, AMc has sued the NRA for libel, as NRA representatives have parroted the same allegations to the media.  Thus, it is critical to understand what documents the NRA was relying on <u>at the time the allegations were made</u> to understand whether any of these allegations was made in good faith.

Finally, the NRA has failed to produce documents responsive to requests for which it asserted no objections, including RFPs 14, 15, 20, 24, 26, 95, and 96. [58]  Specifically with respect to RFP 20, which seeks LaPierre's personal handwritten notes from meetings with AMc, the NRA was asked to produce these documents to counsel in the Virginia Action on June 6, 2019—more than eight months ago,[59] and it is undisputed that the Brewer Firm has these notes in their possession.[60]  In January, the NRA finally produced about 200 pages of notes in the Virginia Action, which represents only a tiny fraction of the notes in its possession. The NRA presents no justification for failing to produce the remaining documents in response to these requests.

Although the NRA has indicated that it will produce documents in the "*near-ish*" future, the failure to produce documents that appear to be readily at hand is inexcusable.  AMc asks the Court to compel production of these documents immediately.  Otherwise, the failure to produce

---

[56] *See* ECF 18 at 4-5.
[57] *See* ECF 18 at 51.
[58] Each of these responses invoked the NRA's general objections but did not enumerate any specific objection to these particular requests.
[59] *See* Ex. A-14 at 4-6 [APP 767-769].
[60] *See* Ex. A-12 at 50:1-22 [APP 689].

only confirms that the NRA's Amended Complaint is nothing but a tabloid-style article written for media consumption that was never meant to be a good-faith legal filing.  AMc further asks that, if the NRA does not produce the documents in their entirety within the time ordered by the Court, the Court strike each referenced allegation from the NRA's Amended Complaint.

## F.  Defendants' are entitled to sanctions.

Given Plaintiff's blatant refusal to comply with their discovery obligations, including boilerplate and nonsensical objections, Defendants respectfully requests that the Court sanction Plaintiff and award Defendants reasonable attorneys' fees and costs in connection with this Motion.

## IV.     PRAYER

Defendants ask the Court to set this Motion for hearing in conjunction with the hearing on Plaintiff's Motion to Compel and, after the hearing, issue an Order with the following relief:

1.      Overrule objections based on the Virginia Protective Order: **RFPs 12, 13, 16, 17, 27, 51, 55, 56, 57, 58, 67, 70, 71, 72, 85, 101;**

2.      Overrule relevance objections to **RFPs 1-13, 18-19, 22-23, 28-31, 35-36, 39-40, 42-44, 49, 51-54, 57-78, 81-84, 86, 88-91, 94, 97**;

3.      Overrule objections as to scope or burden for **RFPs 11, 25, 33, 35-37, 41, 45-48, 50, 51, 53, 54, 61-63, 77, 82, 86, 147, 148**;

4.      Compel the NRA to produce a privilege log for each of the responses for which Plaintiff asserts attorney-client, work product, or other privilege, to include the following information for each document:

    a.      The document's date of creation;

    b.      The document's author;

    c.      The document's title or caption;

    d.      The addressee and each recipient;

    e.      The general purpose for creation of the document; and

f.   The particular privilege relied upon, as set forth in *Weatherly v. Pershing LLC*, No. 3:14-CV-366-N-BG, 2015 U.S. Dist. LEXIS 187422, at *9 (N.D. Tex. Oct. 16, 2015).

5.   Compel the NRA to amend its responses to affirmatively state whether any responsive material has been withheld pursuant to any objections;

6.   Compel complete production of documents within 10 days of the date of this Court's Order; and

7.   Compel the NRA to produce within 15 days of the date of this Court's Order a list of custodians and search terms used to conduct the review necessary to perform the production.

Dated: February 26, 2020                   Respectfully submitted,

                                            */s/ G. Michael Gruber*
                                            **Jay J. Madrid, Esq.**
                                            Texas Bar No. 12802000
                                            madrid.jay@dorsey.com
                                            **G. Michael Gruber, Esq.**
                                            Texas Bar No. 08555400
                                            gruber.mike@dorsey.com
                                            **J. Brian Vanderwoude, Esq.**
                                            Texas Bar No. 24047558
                                            vanderwoude.brian@dorsey.com
                                            **Brian E. Mason, Esq.**
                                            Texas Bar No. 24079906
                                            mason.brian@dorsey.com
                                            **DORSEY & WHITNEY LLP**
                                            300 Crescent Court, Suite 400
                                            Dallas, Texas 75201
                                            (214) 981-9900 Phone
                                            (214) 981-9901 Facsimile

                                            **ATTORNEYS FOR DEFENDANTS
                                            ACKERMAN MCQUEEN, INC., MERCURY
                                            GROUP, INC., HENRY MARTIN, JESSE
                                            GREENBERG, WILLIAM WINKLER, AND
                                            MELANIE MONTGOMERY**

## CERTIFICATE OF SERVICE

  I hereby certify that on February 26, 2020, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

          */s/ G. Michael Gruber*
          G. Michael Gruber, Esq.