**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| **Plaintiff and Counter-Defendant** | § § § | |
| **and** | § § | |
| **WAYNE LAPIERRE,** | § § § | |
| **Third-Party Defendant,** | § § § | **Civil Action No. 3:19-cv-02074-G** |
| **v.** | § § § | |
| **ACKERMAN MCQUEEN, INC.,** | § § § | |
| **Defendant and Counter-Plaintiff,** | § § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG,** | § § § § § | |
| **Defendants.** | § § § | |

**APPENDIX IN SUPPORT OF DEFENDANTS' MOTION TO DISQUALIFY**
**PLAINTIFF'S COUNSEL (WILLIAM A. BREWER, III & THE BREWER FIRM)**

Defendants, Ackerman McQueen, Inc., Mercury Group, Inc., Henry Martin, William Winkler, Melanie Montgomery, and Jesse Greenberg, offer the following evidence in support of *Defendants' Motion to Disqualify Plaintiff's Counsel (William A. Brewer, III & The Brewer Firm)* (ECF 78):

| EX | DESCRIPTION | APPX |
|---|---|---|
| A | Declaration of Brian E. Mason, dated March 30, 2020 | APP0001-APP0010 |

| A-1. | Hearing transcript dated June 26, 2019, *NRA v. AMc, et al.*, Superior Court of Virginia, Cause CL19001757 and CL19002067. | APP0011-APP0056 |
| A-2. | Deposition of ▮▮▮▮▮▮, dated February 4, 2020 (filed under seal). | APP0057-APP0177 |
| A-3. | Deposition of ▮▮▮▮▮▮, dated December 18, 2019 (filed under seal). | APP0178-APP0248 |
| A-4. | Correspondence dated March 31, 2019 from Col. Oliver North to Wayne LaPierre (filed under seal). | APP0249-APP0253 |
| A-5. | Correspondence dated April 8, 2019 from Col. Oliver North to Wayne LaPierre (filed under seal). | APP0254-APP0257 |
| A-6. | Deposition of ▮▮▮▮▮▮, dated January 16, 2020 (filed under seal). | APP0258-APP0356 |
| A-7. | William A. Brewer III, *Advocacy as Art: Lawyers Must Engage in Issues and Crisis Management,* TEXAS LAWYER (May 6, 2019), https://www.law.com/texaslawyer/2019/05/06/advocacy-as-art-lawyers-must-engage-in-issues-and-crisis-management/?slreturn=20200013141434. | APP0357-APP0361 |
| A-8. | Email dated April 5, 2018 from Travis Carter to Andrew Arulanandam. | APP0362-APP0364 |
| A-9. | Email dated April 13, 2018 from William ("Bill") Brewer to Angus McQueen. | APP0365-APP0367 |
| A-10. | Email dated June 15, 2018 from Josh Powell to Lacey (Duffy) Cremer. | APP0368-APP0371 |
| A-11. | Email dated August 6, 2018 from Travis Carter to Andrew Arulanandam. | APP0372-APP0375 |
| A-12. | Email dated August 17, 2018 from Travis Carter to Andrew Arulanandam. | APP0376-APP0378 |
| A-13. | Deposition of Andrew ▮▮▮▮▮▮, dated October 2, 2019 (filed under seal). | APP0379-APP0440 |
| A-14. | Services Agreement, dated April 30, 2017 (filed under seal). | APP0441-APP0451 |
| A-15. | Beth Reinhard, *NRA Boosted Executive Pay While Cutting Key Program Funding, Filing Shows*, WASHINGTON POST (Nov. 26, 2019), https://www.washingtonpost.com/investigations/nra-boosted- | APP0452-APP0454 |

| | | |
|---|---|---|
| | executive-pay-while-cutting-funding-for-key-programs-filing-shows/2019/11/26/da4f3f60-0c61-11ea-a49f-9066f51640f6_story.html. | |
| A-16. | Correspondence from Col. Oliver North to Wayne LaPierre, dated March 31, 2019 (filed under seal). | APP0455-APP0459 |
| A-17. | Email dated March 28, 2018 from John Frazer to Melanie Montgomery. | APP0460 |
| A-18. | Email dated April 3, 2018 from William A. Brewer III to Melanie Montgomery. | APP0461 |
| A-19. | NRA's Report of the Audit Committee dated April 29, 2019 (filed under seal). | APP0462-APP0476 |
| A-20. | Correspondence from Col. Oliver North to William Brewer III, dated March 22, 2019 (filed under seal). | APP0477-APP0478 |
| A-21. | Memorandum to the NRA Audit Committee, dated March 22, 2019 (filed under seal). | APP0479-APP0480 |
| A-22. | Correspondence from Col. Oliver North to John Frazer and Charles Cotton, dated April 18, 2019 (filed under seal). | APP0481-APP0489 |
| A-23. | Report of the Audit Committee, dated September 8-9, 2018 (filed under seal). | APP0490-APP0496 |
| A-24. | Betsey Swan, *NRA Ekes Out Minor Legal Victories Amid TV, Leadership Chaos,* THE DAILY BEAST (June 26, 2019), https://www.thedailybeast.com/nra-scores-minor-victories-in-messy-legal-battle-with-ackerman-mcqueen. | APP0497-APP0498 |
| A-25. | Mark Maremont, *NRA Files Suit Against Ad Agency in Rift with Key Partner,* WALL ST. J. (Apr. 15, 2019), https://www.wsj.com/articles/nra-files-suit-against-ad-agency-in-rift-with-key-partner-11555320601. | APP0499-APP0502 |
| A-26. | Stephen Gutowski, Opinion, *Chaos at the NRA,* WASHINGTON EXAMINER (June 20, 2019), https://www.washingtonexaminer.com/opinion/chaos-at-the-nra. | APP0503-APP0509 |
| A-27. | Shawn Shinneman, *ProPublica Says Attorney Bill Brewer Keeps Burn Books,* D MAGAZINE (July 31, 2019), https://www.dmagazine.com/frontburner/2019/07/propublica-says-attorney-bill-brewer-keeps-burn-books/). | APP0510-APP0511 |
| A-28. | Deposition of ▮▮▮▮▮▮, dated January 29, 2020 (filed under seal). | APP0512-APP0607 |

| A-29. | Correspondence dated March 22, 2019 from Col. Oliver North, Michael Childress, and Carolyn Meadows to William A. Brewer III (filed under seal). | APP0608-APP0609 |
|---|---|---|
| A-30. | Original Complaint, *NRA v. AMc, et al.*, Superior Court of Virginia, Cause CL19001757. | APP0610-APP0625 |
| A-31. | *NRA's Ad Agency Just Ended Its 38-Year Relationship With The Gun Group*, AD AGE (May 29, 2019), https://adage.com/article/agency-news/nras-ad-agency-just-ended-its-38-year-relationship-gun-group/2174471. | APP0626 |
| A-32. | Correspondence dated April 25, 2019 from Wayne LaPierre to Members of the NRA Board (filed under seal). | APP0627-APP0629 |
| A-33. | Deposition of ⬛⬛⬛, dated January 10, 2020 (filed under seal). | APP0630-APP0684 |
| A-34. | Email dated April 24, 2019 from Millie Hallow to Col. Oliver North (filed under seal). | APP0685 |
| A-35. | Carolyn Meadows NRA Board Meeting Remarks, dated April 29, 2019 (filed under seal). | APP0686-APP0690 |
| A-36. | Mark Maremont, *NRA's Wayne LaPierre Says He Is Being Extorted, Pressured to Resign*, WALL ST. J. (April 26, 2019), https://www.wsj.com/articles/nras-wayne-lapierre-says-he-is-being-extorted-pressured-to-resign-11556314763. | APP0691-APP0694 |
| A-37. | Deposition of ⬛⬛⬛, dated February 7, 2020 (filed under seal). | APP0695-APP0782 |
| A-38. | Email dated April 10, 2018 from William A. Brewer III to Jay Madrid. | APP0783-APP0784 |
| A-39. | Email dated May 4, 2018 from William A. Brewer III to Jay Madrid. | APP0785-APP0790 |
| A-40. | Correspondence dated July 13, 2018 from Jay Madrid to William A. Brewer III. | APP0791 |
| A-41. | Correspondence dated December 21, 2018 from Sarah Rogers to Jay Madrid. | APP0792-APP0793 |
| A-42. | Correspondence from William Winkler to Woody Phillips, dated September 4, 2018 (filed under seal). | APP0794-APP0795 |
| A-43. | Correspondence dated January 4, 2019 from Jay Madrid to Steve Hart (filed under seal). | APP0796-APP0800 |

| A-44. | Correspondence dated April 22, 2019 from Wayne LaPierre to Mark Dyscio (filed under seal). | APP0801 |
|---|---|---|
| A-45. | Correspondence dated August 22, 2018 from Steve Ryan to William A. Brewer III. | APP0802-APP0804 |
| A-46. | Email dated January 4, 2019 from Jay Madrid to Sarah Rogers. | APP0805-APP0806 |
| A-47. | Susan Dillon's LinkedIn Profile (last visited January 3, 2020). | APP0807 |
| A-48. | Screenshot of the Brewer Firm leadership (last visited January 7, 2020). | APP0808 |
| A-49. | Email dated March 11, 2019 from Stephen Ryan to John Frazer (filed under seal). | APP0809 |
| A-50. | Danny Hakim, *Incendiary N.R.A. Videos Find New Critics: N.R.A. Leaders*, N.Y. TIMES (Mar. 11, 2019), https://www.nytimes.com/2019/03/11/us/nra-video-streaming-nratv.html. | APP0810-APP0814 |
| A-51. | Message from Wayne LaPierre dated March 11, 2019 (filed under seal). | APP0815-APP0816 |
| A-52. | Steve Lackmeyer, *NRA to End Advertising Contract, Continue Litigation*, THE DAILY OKLAHOMAN (June 3, 2019). | APP0817-APP0818 |
| A-53. | Original Complaint, *NRA v. AMc, et al.*, Superior Court of Virginia, Cause CL19002067. | APP0819-APP0837 |
| A-54. | David Voreacos & Neil Weinberg, *Oliver North Claims That the NRA's Leader Defamed Him*, BLOOMBERG (July 11, 2019), https://www.bloomberg.com/news/articles/2019-07-11/oliver-north-seeks-nra-legal-fees-claims-gun-group-defamed-him. | APP0838-APP0840 |
| A-55. | Original Complaint, *NRA v. AMc, et al.*, Superior Court of Virginia, Cause 19002886. | APP0841-APP0910 |
| A-56. | Mike Spies, *New Documents Raise Ethical and Billing Concerns About the NRA's Outside Counsel*, PRO PUBLICA (July 30, 2019), https://www.propublica.org/article/william-brewer-new-documents-raise-ethical-billing-concerns-about-nra-outside-counsel. | APP0911-APP0917 |
| A-57. | Carol D. Leonnig and Tom Hamburger, *How a Hard-Charging Lawyer Helped Fuel a Civil War Inside the NRA*, WASHINGTON POST (Sept. 9, 2018), https://www.washingtonpost.com/politics/how-a-hard-charging-lawyer-helped-fuel-a-civil-war-inside-the-nra/2019/09/18/9ae0a01e-a986-11e9-a3a6-ab670962db05_story.html. | APP0918-APP0927 |

| A-58. | Hearing transcript dated August 28, 2019, *NRA v. AMc, et al.*, Superior Court of Virginia, Cause CL19001757 and CL19002067. | APP0928-APP0983 |
|---|---|---|
| A-59. | *Gunslingers,* D MAGAZINE (Apr. 1998), https://www.dmagazine.com/publications/d-magazine/1998/april/the-gunslingers/. | APP0984-APP0986 |
| A-60. | Mark Donald, *Rambo Justice,* DALLAS OBSERVER (March 19, 1998), https://www.dallasobserver.com/news/rambo-justice-6402157. | APP0987-APP1013 |
| A-61. | William A. Brewer III & Francis B. Majorie, *One Year after Dondi: Time to Get Back to Litigating?* 17 Pepp. L. Rev. 4, 845-46 (1990). | APP1014-APP1032 |
| A-62. | Deposition of ▮▮▮▮▮▮, dated September 24, 2019 (filed under seal). | APP1033-APP1117 |
| A-63. | Correspondence dated June 25, 2019 from Andrew Arulanandam to Revan McQueen (filed under seal). | APP1118 |
| A-64. | Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Protective Order, dated August 26, 2018, *NRA v. AMc, et al.*, Superior Court of Virginia, Cause No. CL19001757, CL19002067. | APP1119-APP1129 |
| A-65. | NRA Board of Directors Meeting presentation dated, January 4, 2019 (filed under seal). | APP1130-APP1162 |
| A-66. | Asher Stockler, *The National Rifle Association is Laying Off Staff, Cutting Salaries and Reducing Hours Amid COVID-19 Outbreak,* NEWSWEEK (Mar. 23, 2020), https://www.newsweek.com/national-rifle-association-covid-19-wayne-lapierre-1493853. | APP1163-APP1167 |
| A-67. | Emily Cummins Memorandum, dated July 15, 2019 (filed under seal). | APP1168 |
| B | Affidavit of Revan McQueen, dated March 30, 2020. | APP1169-APP1180 |
| C | Ruling dated January 22, 2016, *Ken Teel, et al v. Titeflex, et al;* 72nd District Court of Lubbock County, Texas; Cause No. 2012-504,105. | APP1181-APP1184 |
| D | Transcript of Hearing on Pro Hac Vice Matters, dated September 13, 2018, *NRA v. Lockton Affinity Series of Lockton Affinity, LLC, et al.*, United States District Court, Eastern District of Virginia Court of Virginia, Cause No. 1:18-cv-00639. | APP1185-APP1202 |

Dated: March 30, 2020

Respectfully submitted,

*/s/ G. Michael Gruber*

**G. Michael Gruber, Esq.**
Texas Bar No. 08555400
gruber.mike@dorsey.com
**Jay J. Madrid, Esq.**
Texas Bar No. 12802000
madrid.jay@dorsey.com
**J. Brian Vanderwoude, Esq.**
Texas Bar No. 24047558
vanderwoude.brian@dorsey.com
**Brian E. Mason, Esq.**
Texas Bar No. 24079906
mason.brian@dorsey.com

**DORSEY & WHITNEY LLP**
300 Crescent Court, Suite 400
Dallas, Texas 75201
(214) 981-9900 Phone
(214) 981-9901 Facsimile

**ATTORNEYS FOR DEFENDANTS**


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was electronically served via the Court's electronic case filing system upon all counsel of record on this 30th day of March 2020:

*G. Michael Gruber*
G. Michael Gruber

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § § § |
|      **Plaintiff and Counter-Defendant** | § § |
| **and** | § § |
| WAYNE LAPIERRE, | § § |
|      **Third-Party Defendant,** | § **Civil Action No. 3:19-cv-02074-G** § |
| **v.** | § § |
| ACKERMAN MCQUEEN, INC., | § § § |
|      **Defendant and Counter-Plaintiff,** | § § |
| MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG, | § § § § § |
|      **Defendants.** | § § |

<u>**DECLARATION OF BRIAN E. MASON**</u>

Pursuant to 28 U.S.C. § 1746, I, Brian E. Mason, hereby declare as follows:

1.     My name is Brian E. Mason. I am over eighteen years of age. I have never been convicted of a felony or misdemeanor involving moral turpitude. I am fully competent to make this declaration. I am a lawyer at Dorsey & Whitney, LLP ("***Dorsey***") and counsel of record for Ackerman McQueen, Inc. ("***AMc***"), Mercury Group, Inc. ("***Mercury***"), Henry Martin ("***Martin***"), William Winkler ("***Winkler***"), Melanie Montgomery ("***Montgomery***"), and Jesse Greenberg ("***Greenberg***") (collectively, "***Defendants***") in the above-captioned matter (the "***Texas Lawsuit***"). I am also admitted pro hac vice representing AMc and Mercury Group in the following lawsuits

in Virginia: *National Rifle Association of America v. Ackerman McQueen, Inc.*, *et al.*, Case Nos. CL19002067, CL19001757, and CL19002886, pending before the Circuit Court for the City of Alexandria, Virginia (collectively, the "***Virginia Lawsuits***").  I have personal knowledge of the facts set forth in this declaration and acknowledge them to be true and correct.

2.       Attached hereto as **Exhibit A-1** is a true and correct copy of the hearing transcript dated June 26, 2019, *NRA v. AMc, et al.*, Superior Court of Virginia, Cause CL19001757 and CL19002067

3.       Attached hereto as **Exhibit A-2** is a true and correct copy of the deposition of ███ ███████, dated February 4, 2020 (filed under seal).

4.       Attached hereto as **Exhibit A-3** is a true and correct copy of the deposition of ████ ████████, dated December 18, 2019 (filed under seal).

5.       Attached hereto as **Exhibit A-4** is a true and correct copy of correspondence dated March 31, 2019 from Oliver North to Wayne LaPierre (filed under seal).

6.       Attached hereto as **Exhibit A-5** is a true and correct copy of correspondence dated April 8, 2019 from Oliver North to Wayne LaPierre (filed under seal).

7.       Attached hereto as **Exhibit A-6** is a true and correct copy of the deposition of ████ ██████, dated January 16, 2020 (filed under seal).

8.       Attached hereto as **Exhibit A-7** is a true and correct copy of William A. Brewer III, *Advocacy as Art: Lawyers Must Engage in Issues and Crisis Management,* TEXAS LAWYER (May 6, 2019), https://www.law.com/texaslawyer/2019/05/06/advocacy-as-art-lawyers-must-engage-in-issues-and-crisis-management/?slreturn=20200013141434.

9.       Attached hereto as **Exhibit A-8** is a true and correct copy of an email dated April 5, 2018 from Travis Carter to Andrew Arulanandam.

10.     Attached hereto as **Exhibit A-9** is a true and correct copy of an email dated April 13, 2018 from William ("Bill") Brewer to Angus McQueen.

11.     Attached hereto as **Exhibit A-10** is a true and correct copy of an email dated June 15, 2018 from Josh Powell to Lacey (Duffy) Cremer.

12.     Attached hereto as **Exhibit A-11** is a true and correct copy of an email dated August 6, 2018 from Travis Carter to Andrew Arulanandam.

13.     Attached hereto as **Exhibit A-12** is a true and correct copy of an email dated August 17, 2018 from Travis Carter to Andrew Arulanandam.

14.     Attached hereto as **Exhibit A-13** is a true and correct copy of the deposition of ▬▬▬▬▬, dated October 2, 2019 (filed under seal).

15.     Attached hereto as **Exhibit A-14** is a true and correct copy of the Services Agreement, dated April 30, 2017 (filed under seal).

16.     Attached hereto as **Exhibit A-15** is a true and correct copy of Beth Reinhard, NRA Boosted Executive Pay While Cutting Key Program Funding, Filing Shows, WASHINGTON POST (Nov. 26, 2019), https://www.washingtonpost.com/investigations/nra-boosted-executive-pay-while-cutting-funding-for-key-programs-filing-shows/2019/11/26/da4f3f60-0c61-11ea-a49f-9066f51640f6_story.html.

17.     Attached hereto as **Exhibit A-16** is a true and correct copy of a letter from Col. Oliver North to Wayne LaPierre, dated March 31, 2019 (filed under seal).

18.     Attached hereto as **Exhibit A-17** is a true and correct copy of an email dated March 28, 2018 from John Frazer to Melanie Montgomery.

19.     Attached hereto as **Exhibit A-18** is a true and correct copy of an email dated April 3, 2018 from William A. Brewer, III to Melanie Montgomery.

20.     Attached hereto as **Exhibit A-19** is a true and correct copy of the NRA's Report of the Audit Committee dated April 29, 2019 (filed under seal).

21.     Attached hereto as **Exhibit A-20** is a true and correct copy of a letter from Col. Oliver North to William Brewer, dated March 22, 2019 (filed under seal).

22.     Attached hereto as **Exhibit A-21** is a true and correct copy of a memorandum to the NRA Audit Committee, dated March 22, 2019 (filed under seal).

23.     Attached hereto as **Exhibit A-22** is a true and correct copy of a letter from Oliver North to John Frazer and Charles Cotton, dated April 18, 2019 (filed under seal).

24.     Attached hereto as **Exhibit A-23** is a true and correct copy of the Report of the Audit Committee, dated September 8-9, 2018 (filed under seal).

25.     Attached hereto as **Exhibit A-24** is a true and correct copy of Betsey Swan, *NRA Ekes Out Minor Legal Victories Amid TV, Leadership Chaos,* THE DAILY BEAST (June 26, 2019), https://www.thedailybeast.com/nra-scores-minor-victories-in-messy-legal-battle-with-ackerman-mcqueen.

26.     Attached hereto as **Exhibit A-25** is a true and correct copy of Mark Maremont, *NRA Files Suit Against Ad Agency in Rift with Key Partner,* WALL ST. J. (Apr. 15, 2019), https://www.wsj.com/articles/nra-files-suit-against-ad-agency-in-rift-with-key-partner-11555320601.

27.     Attached hereto as **Exhibit A-26** is a true and correct copy of Stephen Gutowski, Opinion, *Chaos at the NRA,* WASHINGTON EXAMINER (June 20, 2019), https://www.washingtonexaminer.com/opinion/chaos-at-the-nra.

28.     Attached hereto as **Exhibit A-27** is a true and correct copy of Shawn Shinneman, *ProPublica Says Attorney Bill Brewer Keeps Burn Books*, D MAGAZINE (July 31, 2019),

https://www.dmagazine.com/frontburner/2019/07/propublica-says-attorney-bill-brewer-keeps-burn-books/).

29.      Attached hereto as **Exhibit A-28** is a true and correct copy of the deposition of ███████████████, dated January 29, 2020 (filed under seal).

30.      Attached hereto as **Exhibit A-29** is a true and correct copy of correspondence dated March 22, 2019 from Oliver North, Michael Childress, and Carolyn Meadows to William A. Brewer, III (filed under seal).

31.      Attached hereto as **Exhibit A-30** is a true and correct copy of the Original Complaint, *NRA v. AMc, et al.*, Superior Court of Virginia, Cause CL19001757.

32.      Attached hereto as **Exhibit A-31** is a true and correct copy of *The NRA's Ad Agency Just Ended Its 38-Year Relationship With The Gun Group,* AD AGE (May 29, 2019), https://adage.com/article/agency-news/nras-ad-agency-just-ended-its-38-year-relationship-gun-group/2174471.

33.      Attached hereto as **Exhibit A-32** is a true and correct copy of correspondence dated April 25, 2019 from Wayne LaPierre to Members of the NRA Board (filed under seal).

34.      Attached hereto as **Exhibit A-33** is a true and correct copy of the deposition of ██████████, dated January 10, 2020 (filed under seal).

35.      Attached hereto as **Exhibit A-34** is a true and correct copy of an email dated April 24, 2019 from Millie Hallow to Oliver North (filed under seal).

36.      Attached hereto as **Exhibit A-35** is a true and correct copy of Carolyn Meadows NRA Board Meeting Remarks, dated April 29, 2019 (filed under seal).

37.      Attached hereto as **Exhibit A-36** is a true and correct copy of Mark Maremont, *NRA's Wayne LaPierre Says He Is Being Extorted, Pressured to Resign*, WALL ST. J. (April 26,

2019), https://www.wsj.com/articles/nras-wayne-lapierre-says-he-is-being-extorted-pressured-to-resign-11556314763.

38.     Attached hereto as **Exhibit A-37** is a true and correct copy of the deposition of ████████, dated February 7, 2020 (filed under seal).

39.     Attached hereto as **Exhibit A-38** is a true and correct copy of an email dated April 10, 2018 from Brewer to Jay Madrid.

40.     Attached hereto as **Exhibit A-39** is a true and correct copy of an email dated May 4, 2018 from Brewer to Jay Madrid.

41.     Attached hereto as **Exhibit A-40** is a true and correct copy of correspondence dated July 13, 2018 from Jay Madrid to Brewer.

42.     Attached hereto as **Exhibit A-41** is a true and correct copy of correspondence dated December 21, 2018 from Sarah Rogers to Jay Madrid.

43.     Attached hereto as **Exhibit A-42** is a true and correct copy of a letter from William Winkler to Woody Phillips, dated September 4, 2018 (filed under seal).

44.     Attached hereto as **Exhibit A-43** is a true and correct copy of correspondence dated January 4, 2019 from Jay Madrid to Steve Hart (filed under seal).

45.     Attached hereto as **Exhibit A-44** is a true and correct copy of correspondence dated April 22, 2019 from Wayne LaPierre to Mark Dyscio (filed under seal).

46.     Attached hereto as **Exhibit A-45** is a true and correct copy of correspondence dated August 22, 2018 from Steve Ryan to Brewer.

47.     Attached hereto as **Exhibit A-46** is a true and correct copy of an email dated January 4, 2019 from Jay Madrid to Sarah Rogers.

48.     Attached hereto as **Exhibit A-47** is a true and correct copy of Susan Dillon's LinkedIn Profile (last visited January 3, 2020).

49.     Attached hereto as **Exhibit A-48** is a true and correct copy of screenshot of the Brewer Firm leadership (last visited January 7, 2020).

50.     Attached hereto as **Exhibit A-49** is a true and correct copy of an email dated March 11, 2019 from Stephen Ryan to John Frazer (filed under seal).

51.     Attached hereto as **Exhibit A-50** is a true and correct copy of Danny Hakim, *Incendiary N.R.A. Videos Find New Critics: N.R.A. Leaders,* N.Y. TIMES (Mar. 11, 2019), https://www.nytimes.com/2019/03/11/us/nra-video-streaming-nratv.html.

52.     Attached hereto as **Exhibit A-51** is a true and correct copy of message from Wayne LaPierre dated March 11, 2019 (filed under seal).

53.     Attached hereto as **Exhibit A-52** is a true and correct copy of Steve Lackmeyer, *NRA to End Advertising Contract, Continue Litigation*, THE DAILY OKLAHOMAN (June 3, 2019).

54.     Attached hereto as **Exhibit A-53** is a true and correct copy of the Original Complaint, *NRA v. AMc, et al.*, Superior Court of Virginia, Cause CL19002067.

55.     Attached hereto as **Exhibit A-54** is a true and correct copy of David Voreacos & Neil Weinberg, *Oliver North Claims That the NRA's Leader Defamed Him*, BLOOMBERG (July 11, 2019),   https://www.bloomberg.com/news/articles/2019-07-11/oliver-north-seeks-nra-legal-fees-claims-gun-group-defamed-him.

56.     Attached hereto as **Exhibit A-55** is a true and correct copy of the Original Complaint, *NRA v. AMc, et al.*, Superior Court of Virginia, Cause 19002886.

57.     Attached hereto as **Exhibit A-56** is a true and correct copy of Mike Spies, *New Documents Raise Ethical and Billing Concerns About the NRA's Outside Counsel,* PRO PUBLICA

(July 30, 2019), https://www.propublica.org/article/william-brewer-new-documents-raise-ethical-billing-concerns-about-nra-outside-counsel.

58.      Attached hereto as **Exhibit A-57** is a true and correct copy of Carol D. Leonnig and Tom Hamburger, *How a Hard-Charging Lawyer Helped Fuel a Civil War Inside the NRA,* WASHINGTON POST (Sept. 9, 2018), https://www.washingtonpost.com/politics/how-a-hard-charging-lawyer-helped-fuel-a-civil-war-inside-the-nra/2019/09/18/9ae0a01e-a986-11e9-a3a6-ab670962db05_story.html.

59.      Attached hereto as **Exhibit A-58** is a true and correct copy of the hearing transcript dated August 28, 2019, *NRA v. AMc, et al.*, Superior Court of Virginia, Cause CL19001757 and CL19002067.

60.      Attached hereto as **Exhibit A-59** is a true and correct copy of *The Gunslingers,* D MAGAZINE (Apr. 1998), https://www.dmagazine.com/publications/d-magazine/1998/april/the-gunslingers/.

61.      Attached hereto as **Exhibit A-60** is a true and correct copy of Mark Donald, *Rambo Justice,* DALLAS OBSERVER (March 19, 1998), https://www.dallasobserver.com/news/rambo-justice-6402157.

62.      Attached hereto as **Exhibit A-61** is a true and correct copy of William A. Brewer, III & Francis B. Majorie, *One Year after Dondi: Time to Get Back to Litigating?* 17 Pepp. L. Rev. 4, 845-46 (1990).

63.      Attached hereto as **Exhibit A-62** is a true and correct copy of the deposition of ███████████, dated September 24, 2019 (filed under seal).

64.      Attached hereto as **Exhibit A-63** is a true and correct copy of correspondence dated June 25, 2019 from Andrew Arulanandam to Revan McQueen (filed under seal).

65.     Attached hereto as **Exhibit A-64** is a true and correct copy of Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Protective Order, dated August 26, 2018, *NRA v. AMc, et al.*, Superior Court of Virginia, Cause No. CL19001757, CL19002067.

66.     Attached hereto as **Exhibit A-65** is a true and correct copy of the NRA Board of Directors Meeting presentation dated, January 4, 2019 (filed under seal).

67.     Attached hereto as **Exhibit A-66** is a true and correct copy of Asher Stockler, *The National Rifle Association is Laying Off Staff, Cutting Salaries and Reducing Hours Amid COVID-19 Outbreak,* NEWSWEEK (Mar. 23, 2020), https://www.newsweek.com/national-rifle-association-covid-19-wayne-lapierre-1493853.

68.     Attached hereto as **Exhibit A-67** is a true and correct copy of a memorandum dated July 15, 2019 (filed under seal).

I declare under penalty of perjury and in accordance with 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this _____ day of March, 2020.

_____
Brian E. Mason

# EXHIBIT A-1

# In the Matter of:

## National Rifle Association of America
## v.
## Ackerman McQueen, Inc.
## &
## Mercury Group, Inc.

## Motion

June 26, 2019



Phone: 703-837-0076
Fax: 703-837-8118
Toll Free: 877-837-0077

1010 Cameron Street
Alexandria, VA 22310
transcript@casamo.com

APP000011

```
 1   COMMONWEALTH OF VIRGINIA

 2   IN THE ALEXANDRIA CIRCUIT COURT

 3   ------------------------------------

 4   NATIONAL RIFLE ASSOCIATION OF AMERICA,

 5                          Plaintiff,

 6            -vs-                   Case Nos. CL 19001757
                                                and
 7                                            CL 19002067

 8   ACKERMAN MCQUEEN, INC.

 9   and

10   MERCURY GROUP, INC.

11                          Defendants.

12   ------------------------------------

13               HEARING in the above-entitled matter,

14            held in Alexandria Circuit Court in

15            Alexandria, Virginia on June 26, 2019, before

16            the HON. NOLAN DAWKINS, Presiding Circuit

17            Court Judge.

18

19

20

21   Reported by:

22   Jacqueline N. Hagen
```

```
 1                      A P P E A R A N C E S

 2

 3   ON BEHALF OF PLAINTIFF:

 4          BRIGLIA HUNDLEY, P.C.
                 1921 Gallows Road
 5               Suite 750
                 Tysons Corner, Virginia 22182
 6          BY:  ROBERT H. COX.  Esq.
                 rcox@brigliahundley.com
 7               (703) 883-0880

 8          BREWER ATTORNEYS & COUNSELORS
                 1717 Main Street
 9               Suite 5900
                 Dallas, Texas 75201
10          BY:  MICHAEL J. COLLINS
                 mjc@brewerattorneys.com
11               (214) 653-4875

12   ON BEHALF OF DEFENDANT:

13          SCHERTLER & ONORATO, LLP
                 901 New York Avenue, N.W.
14               Suite 500
                 Washington, DC 20001
15          BY:  DAVID DICKIESON, Esq.
                 ddickieson@schertlerlaw.com
16
       ALSO PRESENT:
17
            ACKERMAN MCQUEEN, INC. and MERCURY GROUP, INC.
18               1601 Northwest Expressway
                 Suite 1100
19               Oklahoma City, Oklahoma 73118
            BY:  BILL WINKLER
20               (703) 299-9470

21

22
```

```
 1                    P R O C E E D I N G S

 2              (Whereupon the proceedings began at

 3         10:57 a.m. )

 4              MR. COX:  Your Honor, Bob Cox

 5         representing the National Rifle Association.

 6              THE COURT:  Okay.

 7              MR. COX:  And with me is Michael

 8         Collins, who's the subject of the motion for

 9         pro hac vice.  It's one of the motions that's

10         contested today.

11              THE COURT:  Again, let the record

12         reflect this is the matter of Commonwealth

13         vs. Ackerman McQueen, Inc., and Mercury Inc.

14         The matter comes on cross motion for pro hac

15         vice; is that correct?

16              MR. DICKIESON:  There's a number of

17         other motions, your Honor.  There's a motion

18         for preliminary injunction.

19              THE COURT:  That's not going to happen,

20         sir.  It just can't.  I can't do that.  I

21         don't understand how it's possible that I can

22         do a preliminary injunction in this matter in
```

```
 1              30 minutes.  It can't happen.

 2              MR. DICKIESON:  Your Honor, if I

 3         could --

 4              THE COURT:  Can't happen.

 5              MR. DICKIESON:  If I could address the

 6         Court on that issue, that -- this is a matter

 7         that there's going to be 40 five to 60

 8         employees laid off within the week if we

 9         cannot get the relief that we're requesting

10         the Court.  We've asked the supervisor of the

11         -- the court schedule if we could get one

12         specially set later this week or even early

13         next week.  Nothing is available until after

14         the Fourth of July when these people will be

15         furloughed, terminated, and their -- their

16         lives will be disrupted.  The AMc, Ackerman

17         McQueen business will -- will suffer good

18         will, harm, and substantial loss of the

19         employees that it needs.  So that's why we --

20         we talked with the law clerk, the -- the

21         Court's law clerk, and we said we'd take

22         whatever time we got.  We --
```

1          THE COURT:  That's him.

2          MR. DICKIESON:  We'll take whatever the

3      time the Court will give us, but this is the

4      most important issue that needs to be

5      addressed today.  The other issues can wait

6      until another day, but we need to deal with

7      the irreparable harm that will befall AMc

8      within the week.  That's why we have -- I

9      have with me the CFO of AMc, who came here

10     from Oklahoma City.  He's prepared -- he's

11     submitted a declaration.  He's prepared to

12     testify, if necessary.  But we understand

13     that the Court is not going to have

14     evidentiary hearing on this, but he's here to

15     provide me with the information about the

16     irreparable harm that will befall to AMc if

17     we cannot get this matter relief from the

18     Court today.

19          So we'd ask that the 30 minutes be

20     devoted to the preliminary injunction.  If we

21     don't finish, then we'll set it for some

22     matter, but we believe that we need the

1          relief this week for this matter.

2              MR. COX:  Your Honor, our position,

3          first, that we would like to find out today

4          whether Mr. Collins is in or out of the case,

5          also to determine whether the Brewer firm is

6          or in out of the case, potentially.  We'd

7          like that motion heard first.  We -- we've --

8          Mr. Dickieson and I have communicated with

9          the clerk.  Our position is that we don't

10         believe that there is sufficient time for a

11         preliminary injunction hearing and -- but we

12         think that the -- if the Court is willing to

13         entertain this motion today, that we feel

14         that they're -- they have not met their

15         burden as a matter of law to prove the

16         relief.  This is a mandatory preliminary

17         injunction.

18             And, secondly, if the Court is not

19         inclined to rule in favor, we think it's

20         appropriate for an evidentiary hearing, and

21         that should be set down for a date certain

22         that would give the parties time to issue

|    |                                                      |
|----|------------------------------------------------------|
| 1  | some limited written discovery, just getting         |
| 2  | factual information.  They have a declaration        |
| 3  | they've submitted, no documents, no financial        |
| 4  | statements, no back-up about the financial           |
| 5  | and irreparable harm here.  We feel we should        |
| 6  | conduct limited written discovery and take           |
| 7  | two to three depositions.                            |
| 8  | THE COURT:  And I understand that the                |
| 9  | alleged irreparable harm is that you're going        |
| 10 | to lose -- you're going to lose 40 employees;        |
| 11 | is that correct?                                     |
| 12 | MR. DICKIESON:  45 to 60 employees                   |
| 13 | within the week, your Honor.                         |
| 14 | THE COURT:  But that means they won't                |
| 15 | get paid.  You won't lose them.                      |
| 16 | MR. DICKIESON:  Your Honor, they're                  |
| 17 | going to be looking for other work.                  |
| 18 | THE COURT:  That may be so, but that's               |
| 19 | speculative, at best.  But I just don't know         |
| 20 | how I can do it.  I don't have to do it -- I         |
| 21 | don't have to do it today, based on what I --        |
| 22 | what I read so far, and let me -- let me             |

| | |
|---|---|
| 1 | advise counsel, too.  I'm going to -- I'm |
| 2 | going to probably give you a little more than |
| 3 | 30 minutes.  I'm going to give everyone, |
| 4 | since we got outside counsel, a copy of the |
| 5 | local rules since I've been -- we've been |
| 6 | receiving -- receiving documents as early -- |
| 7 | as late as yesterday for the Court's |
| 8 | consideration, and that's just not the |
| 9 | appropriate way to do it in this court. |
| 10 | Can I just hand each of you a copy of |
| 11 | the local rules so you know what the |
| 12 | timelines are in the future with regard to |
| 13 | filing the pleadings? |
| 14 | MR. DICKIESON:  Thank you. |
| 15 | MR. COX:  Thank you, your Honor. |
| 16 | THE COURT:  All right.  Now, with regard |
| 17 | to Mr. Cox, I hear -- I hear the motion.  As |
| 18 | I understand it, the motion is that Mr. |
| 19 | Collins is associated with Mr. Brewer; is |
| 20 | that correct? |
| 21 | MR. COX:  He is partner with the Brewer |
| 22 | firm.  He's in the Dallas office, not in the |

```
 1            New York office.

 2                 THE COURT:  And Mr. Collins is willing

 3            to, essentially, expose himself to the

 4            potential for malpractice and other claims

 5            that may result if -- if, in fact, he is

 6            associated to the extent that he has inside

 7            knowledge as it relates to the plaintiff.  It

 8            seems to me that's -- that's a major risk

 9            he's taking, you know.  You're saying that --

10            that partner A can be here, and partner B can

11            be on the other side.  You can't serve two

12            masters.  How's that's possible?

13                 MR. COX:  Your Honor, under Rule 3.7(c),

14            the allegation here is that Mr. Brewer is a

15            potential witness.

16                 THE COURT:  A potential witness, that's

17            right.

18                 MR. COX:  And so because the fact that

19            Mr. Brewer is a witness doesn't impute

20            disqualification under Rule 1.10 or

21            Rule 3.7(c) to the entire firm.  So our

22            position is the fact that Mr. Brewer might be
```

```
 1            a witnesses in this case -- only that 3.7

 2            would impute disqualification to the firm is

 3            if there's an actual conflict of interest

 4            under Rule 1.7 or Rule 1.9, and our position

 5            is that is that there's no actual conflict of

 6            interest here.

 7                 First, there's a matter of law.  We

 8            dispute the allegations in the counterclaim

 9            that somehow the -- the firm is benefiting

10            financially from -- from media relations.

11            They have a staff of four people.  They

12            cannot undertake the work that Ackerman

13            performs for the NRA as a media relations

14            department that they use strictly for pending

15            cases.  So we dispute the factual allegations

16            that Mr. Collins would be financially

17            benefitting from any diversion of -- of

18            marketing from business from Ackerman.

19                 And our position is that all they've

20            alleged is that Mr. Brewer, right now, is a

21            potential witness in the case.  At that

22            point, under my reading of the -- the case
```

1          law, there's not much in Virginia, your

2          Honor.  We've cited to some Fourth Circuit

3          and EDVA law that that's not enough to

4          disqualify the firm.

5               Our feeling is that on a motion for

6          pro hac vice, the Court is looking primarily

7          at the fitness and character of the attorney,

8          and this is more appropriate for a motion for

9          disqualification.  If they discover facts

10         during the course of the discovery or they

11         take Mr. Brewer's deposition and there does

12         appear to be an actual conflict under

13         Rule 1.7 and 1.9, I think, at that point, it

14         would be appropriate for a motion to

15         disqualify or, on our own, we may withdraw.

16         If there becomes an actual ethical conflict

17         here, at that point, the Brewer firm will

18         consider withdrawing.

19              THE COURT:  Yes, sir.

20              MR. DICKIESON:  Your Honor, it's not our

21         position that Mr. Brewer is going to be the

22         only witness in that firm, but that the other

| 1 | partners in the firm are also going to be |
|---|---|
| 2 | witnesses.  They're intricately linked. |
| 3 | They're billing $20-some million a year for |
| 4 | the NRA for litigation strategies when we |
| 5 | have an abuse of process as a counterclaim, |
| 6 | and, therefore, we believe that Mr. Collins |
| 7 | will be a key witness in the case.  And that |
| 8 | not only disqualifies him as for counsel, but |
| 9 | we believe he will have evidence -- he will |
| 10 | testify contrary to the interests of the NRA, |
| 11 | and that disqualifies not only him, but the |
| 12 | entire firm. |
| 13 | THE COURT:  Is Mr. Brewer still |
| 14 | associated with the firm with NRA? |
| 15 | MR. DICKIESON:  Mr. Brewer is the -- the |
| 16 | founding and -- it's called Brewer Attorneys |
| 17 | and Associates or something. |
| 18 | MR. COLLINS:  That's incorrect. |
| 19 | MR. DICKIESON:  Attorneys and |
| 20 | Counselors.  So yes, he's still associated |
| 21 | with the firm.  He's still counsel for the |
| 22 | NRA, as well. |

Motion

```
 1              THE COURT:  Somebody explain to me how

 2         you can -- how can you represent both sides?

 3         I'm -- I guess I'm -- I'm not following this.

 4         Yes, sir?

 5              MR. COX:  Your Honor --

 6              THE COURT:  And I recognize that for

 7         purposes of the pro hac vice, that -- that I

 8         think that I'm limited to what the rules

 9         require, but I'm -- but that's -- that's

10         expanded further.  How -- how does one

11         represent both sides of -- of the action?

12              MR. COX:  Well, I guess, your Honor,

13         it's our position Mr. Brewer is not

14         representing both sides of the action.  He's

15         not seeking to be litigation counsel or trial

16         counsel in this case.  He's -- he is a

17         partner in the Brewer law firm, but my

18         reading of the ethical rules and obligations

19         are that just because he may be a witness

20         does not disqualify the firm again.  And then

21         I, I guess -- there's no actual conflict

22         that's been demonstrated at this point.  I
```

```
 1            mean, the only conflict -- 1.9 deals with

 2            former clients.  1.7 deals with an actual

 3            client.  So the only conflict would be if it

 4            was demonstrated Mr. Brewer was going to be

 5            called as a witness and testified adversely

 6            to the National Rifle Association.

 7                 And at this point, I -- I -- Mr. Brewer

 8            has not identified that he would have

 9            information that would be in conflict with

10            the NRA's positions in this litigation, and,

11            your Honor, if you want to hear from Mr.

12            Collins, Mr. Collins has not had a direct

13            role in the dispute between the NRA and

14            Ackerman with regard to invoices and the

15            factual matter.

16                 So I don't know where Mr. Dickieson is

17            coming from that he's a factual witness in

18            this case, and -- and Mr. Brewer and his firm

19            has never represented Ackerman or Mercury

20            Group, and so I don't see how they're on both

21            sides.  They've always represented the

22            National Rifle Association.
```

```
 1          MR. DICKIESON:  Your Honor, my client is

 2          reminding me that the Brewer law firm is

 3          actual a client of Ackerman McQueen and has

 4          been a long-term client of the firm.  But

 5          it's not just that they are witnesses in this

 6          case.  They financially benefit.  They have

 7          an in-house public relations unit in the firm

 8          that is siphoning away business from Ackerman

 9          McQueen for the NRA work, and that's --

10          that's a key factor in this case, what's

11          happening to the work that's being taken away

12          from AMc.

13              This is about abuse of process.  This is

14          a small law firm, Brewer and Associates and

15          Counselors.  There's not that many attorneys

16          there.  I assume -- I think he's the number

17          two person there.  To say he knows nothing

18          about the $21 million that the NRA is -- is

19          -- is billing -- that he's billing the NRA is

20          not believable.

21              THE COURT:  And not withstanding the

22          potential conflict that exists if he
```

1          continues to represent the NRA, Mr. Brewer

2          does, or the Brewer firm.

3              MR. DICKIESON:  The Brewer firm does.

4              THE COURT:  Is that correct?

5              MR. COX:  Your Honor, yes, yes, they do.

6          Not in this case, I mean, the Brewer firm

7          would be representing -- or Mr. Collins would

8          be coming in as litigation counsel.  But,

9          yes, the NRA is a client of the Brewer firm,

10         but again --

11             THE COURT:  Does Mr. Collins have,

12         necessarily, information that is provided to

13         the Brewer firm that would be a detriment to

14         the NRA?

15             MR. COX:  Your Honor --

16             THE COURT:  Is there a wall?  You know,

17         the old -- the old -- the old saying?  It's

18         "I'm going to put up a wall."  I'm not going

19         to use the first part, but I'm going to put

20         -- saying that I'm going to put up a wall.

21         You know what the old saying is -- is that --

22         that's a little racist to say, to use the

1              entire term but -- the entire term, but he's

2              going to put up a wall, and Mr. Brewer -- I

3              mean, Mr. Collins will never have access to

4              any information that relates to the NRA?  Is

5              that correct?  We have --

6                   MR. DICKIESON:  I think you mean AMc, my

7              client, AMc.

8                   THE COURT:  AMc.  I'm sorry.  Yes.

9                   MR. COX:  I mean, Mr. Collins is in a

10             different office.  He's in the Dallas office.

11             Mr. Brewer is in the New York office, and I'm

12             -- I'm not disputing it's a small firm.

13             Sixty lawyers --

14                  THE COURT:  This is the 21st century.

15                  MR. COX:  Yeah, and -- and -- but, you

16             know, I can -- if the Court wants to hear

17             from Mr. Collins about that, I'm unfamiliar

18             with what exact work the -- the Ackerman

19             group does for the Brewer law firm.

20                  THE COURT:  Yes, Mr. Collins.

21                  MR. COLLINS:  Yes, your Honor.  I,

22             obviously, represent the NRA in connection

 1            with this case and a number of matters.  I

 2            myself am not the client contact.  I've

 3            actually never had a substantive discussion

 4            with any client representative from the NRA.

 5            I've never done any work for Ackerman

 6            McQueen.

 7                Now, I think it is correct they had done

 8            some website service and things for the

 9            firm -- Ackerman McQueen has -- but we've

10            never done any legal work, to my

11            understanding.  I know I've never done any

12            legal work for Ackerman McQueen, ever.  So,

13            your Honor, as far as being on both sides,

14            I'm not on both sides.  The firm is not on

15            both sides.  I'm not aware of any unique

16            knowledge I have with respect to any claims

17            or defenses they are serving other than what

18            litigation counsel would have that -- like

19            Mr. Cox has.

20                I've never spoken, I don't think, to any

21            employee of Ackerman Mercury group.  Maybe

22            years ago about the work they were doing for

```
 1                the firm, but nothing to do with this matter,

 2                your Honor, against Ackerman McQueen and

 3                Mercury Group.  So also, your Honor, whatever

 4                knowledge I would have, I wouldn't be the one

 5                with the most unique knowledge.  At least,

 6                that's my understanding.  One of the elements

 7                of 3.7 is --

 8                     THE COURT:  But isn't the case if he has

 9                any knowledge, that could -- that could

10                potentially be a conflict?

11                     MR. COLLINS:  Well, it could be a

12                conflict with the NRA, your Honor?  Or a

13                conflict with them?

14                     THE COURT:  I would say with both.

15                     MR. COLLINS:  Okay.  Well, your Honor,

16                with respect to them, the attorney always

17                gains knowledge during the case.  I'm not

18                sure of any unique knowledge I have outside

19                of this case, at all.  With respect to the

20                NRA, your Honor, the issue is -- for the

21                attorney is the attorney's always going to

22                know something.  So what the Court said is
```

```
 1            since we want to be careful because

 2            disqualifications and related-type

 3            proceedings could be used as a key to motive

 4            that, unless the attorney is essential to the

 5            case, it's a fact they can't get otherwise,

 6            you don't lock out the attorney.

 7                 And, your Honor, at least I know in

 8            Texas and in many other jurisdictions -- I

 9            don't know if it's any different in Virginia

10            -- that the attorney -- if it's a bench

11            trial, the attorney could still do this whole

12            case.  If it's a jury trial, they could do

13            the case up to the jury trial.  This Court is

14            sophisticated enough to know the difference

15            between attorney testimony and other

16            testimony and not to be unduly swayed.  It's

17            only when a jury gets involved that we're

18            concerned.  And my understanding, your Honor,

19            is the NRA knows all about the potential

20            conflict and has no problem, whatsoever.

21                 So you put all those things together,

22            your Honor, I'm just not sure if this even
```

```
 1              gets close to 3.7.  And as far as me being a

 2              witness, they can speculate.  We had the same

 3              issue that their attorneys are trying to

 4              pro hac about whether they're involved in the

 5              underlying facts, you know.  We just think

 6              the best way is for both sides to get

 7              admitted, and then, if someone has got a

 8              disqualification issue, they can raise it.

 9              And yes, we'll take it seriously, your Honor.

10              If they've got grounds for us and they

11              explain those grounds for us, we'll take them

12              very seriously.  But, as I say, your Honor,

13              pretty much the rule is until you actually

14              hold a jury trial, that attorney can take the

15              depositions, can do the hearings before the

16              judge.  And I'll answer any other questions

17              you may have, your Honor.

18                   THE COURT:  The motion is granted.  The

19              motion is granted.

20                   MR. COX:  Okay.  Thank you, your Honor.

21                   THE COURT:  What's that?

22                   MR. DICKIESON:  Your Honor?  There was a
```

```
 1              pro hac vice motion for the attorneys on our

 2              side that was not contested.

 3                   THE COURT:  That was -- that was by

 4              consent?

 5                   MR. DICKIESON:  Right.  Yes, sir.

 6                   THE COURT:  That, likewise, is granted.

 7                   MR. DICKIESON:  And the motion to

 8              consolidate is --

 9                   THE COURT:  That motion is granted.

10                   MR. DICKIESON:  All right.  So that

11              leaves us getting to the heart of the matter

12              of preliminary injunction.  If I could begin

13              on that, your Honor, in the time we have

14              left?

15                   THE COURT:  I'll allow you 15 minutes.

16                   MR. DICKIESON:  All right.  What we are

17              witnessing here, your Honor, is the implosion

18              of the NRA.  Let me -- let me correct this.

19              It's not an implosion.  It's an explosion

20              because it's not simply harming the NRA, it's

21              harming those people that are in proximity to

22              the NRA.  And AMc happens to be one of those
```

```
 1              people in the proximity that is now being

 2              harmed by the NRA's actions.  They have

 3              stopped making payments on millions of

 4              dollars of invoices that they routinely paid

 5              for 38 years to AMc.

 6                   THE COURT:  Let me -- that's a

 7              collection matter.  As I understand it, this

 8              is a breach of contract, collection.  I think

 9              there's an issue with past due accounts

10              and --

11                   MR. DICKIESON:  Abuse of process.

12                   THE COURT:  Abuse of process.  That's

13              right.

14                   MR. DICKIESON:  Counterclaim.

15                   THE COURT:  So -- so to a much higher

16              sense, this is a collection matter.  You --

17              you -- you haven't been paid, and want to be

18              paid.  So you come to court and you ask the

19              Court to rule against one party or the other

20              to be -- to be paid; is that correct?

21                   MR. DICKIESON:  Yes, your Honor, but

22              what we're also trying to do is enforce the
```

1          contract.  And the Court has the equitable

2          power to enforce the contract, and here,

3          where there's an irreparable injury, 40 five

4          to 60 employees who will be forced to be

5          terminated or furloughed if the NRA does not

6          follow through on their obligations, which is

7          clear in -- in the contract that they have to

8          pay the invoices within 30 days.  If they

9          don't pay within 30 days, they have to post a

10         $3 million letter of credit.

11              They haven't paid within 30 days.  They

12         haven't posted a letter of credit.  This

13         Court has the power to enforce that contract.

14         Now, what they responded with on Monday was a

15         rather pedestrian brief that says, "Well, we

16         -- we have the likelihood of success on our

17         side because there's issues that they

18         breached first."  But the likelihood of

19         success -- when you look at this issue, they

20         have the invoices.  They have 10 days to

21         contest the invoices.  They didn't contest

22         them within 10 days.  They have 30 days to

```
 1              pay them.  It's all written out there.  It's

 2              all clear.  They can't contest those facts.

 3              They have to post a $3 million letter of

 4              credit in that situation.  This Court has the

 5              power to prevent the irreparable harm that's

 6              about to fall to AMc.

 7                   Now, what we are seeing -- they filed a

 8              breach -- as I say, a rather pedestrian brief

 9              -- on Monday laying out the -- the four

10              elements.  What they didn't tell the Court

11              and what they didn't tell us on Monday is

12              that on Tuesday, they're sending out a notice

13              to terminate the entire contract.  And he

14              hasn't mentioned that yet.  It wasn't

15              mentioned in the brief, and we think that

16              what this is is that we have already issued a

17              90-day notice to wind down the contract and

18              orderly end this relationship that has turned

19              sour.  That's the logical, rational,

20              reasonable business thing to do.  The day

21              before -- the night before, 7 o'clock last

22              night, we get a letter that says, "We are
```

1          terminating the contract entirely.  We're not

2          paying anything more."

3              THE COURT:  And that contract amounts to

4          $40 million a year; is that correct?

5              MR. DICKIESON:  I think the last year

6          that that was the total amount that was paid

7          but that -- a number of that goes to

8          expenses, for example, paying talent, such as

9          Oliver North, who's paid several million

10         dollars a year for his role in the NRA TV,

11         which is produced and managed by Ackerman

12         McQueen.  Ackerman McQueen has served as the

13         voice of the NRA for -- for decades, and they

14         are intertwined in the NRA business.  So what

15         -- what the situation is here:  We have a

16         very complex relationship that has to be

17         pulled apart, and what they did last night

18         was saying "Take an axe and just cut it right

19         in half, and don't worry about any of the

20         consequences."

21             Now, we don't think that notice is valid

22         because before they can terminate, they got

| 1 | to pay everything that they owe, but they |
|---|---|
| 2 | haven't done that.  So we're still in a |
| 3 | situation where we're trying to do a 90-day |
| 4 | termination period, gradually and with, as it |
| 5 | says in the contract, good faith |
| 6 | negotiations.  They're not interested in good |
| 7 | faith negotiations.  They're interested in, |
| 8 | before this hearing, disrupting the process |
| 9 | by saying, "We're terminating." |
| 10 | THE COURT:  But correct me if I'm wrong. |
| 11 | The invoice that we're talking about is a |
| 12 | $1.6 million invoice; is it not? |
| 13 | MR. DICKIESON:  That's the -- the sum of |
| 14 | the -- these eight invoices. |
| 15 | THE COURT:  But the -- the -- the credit |
| 16 | would be 1.6 million? |
| 17 | MR. DICKIESON:  Correct. |
| 18 | THE COURT:  And if you lose a |
| 19 | $40 million contract, you're going to lose |
| 20 | those 65 clients -- 65 employees, anyway, |
| 21 | aren't you? |
| 22 | MR. DICKIESON:  They're going to be |

```
 1            transitioned away, not -- not severed

 2            immediately, your Honor, and that's -- that's

 3            when you -- when you talk about people's

 4            lives and whether or not you give them 90

 5            days to transition or to transition tomorrow,

 6            that's -- that's -- that's a concrete harm.

 7            This Court deals with harms that are much

 8            less significant than that and --

 9                 THE COURT:  This is more about the 1.6

10            as opposed to the 40 million?

11                 MR. DICKIESON:  1.6 plus we've been

12            required to do work since that May 1st

13            invoice was issued, and I believe that

14            there's another equivalent amount that's

15            already due since that last invoice.

16                 THE COURT:  All right.  Yes, sir.

17                 MR. DICKIESON:  And that's why the $3

18            million letter of credit is the logical thing

19            that this Court can do within its equitable

20            powers to enforce the $3 million letter of

21            credit to be issued.

22                 THE COURT:  Yes, sir.
```

| | |
|---|---|
| 1 | MR. DICKIESON:  So I have more stuff, |
| 2 | but I'll let them respond to that argument at |
| 3 | this point. |
| 4 | THE COURT:  I'm still not understanding |
| 5 | how I can do this without setting for |
| 6 | testimony. |
| 7 | MR. DICKIESON:  Your Honor, we provided |
| 8 | a declaration for the Court that lays out the |
| 9 | irreparable injury.  We've provided the |
| 10 | services agreement where the terms are |
| 11 | concrete and clear that the -- if you don't |
| 12 | pay within 30 days, you must post the $3 |
| 13 | million letter of credit.  All we're asking |
| 14 | is that -- that one clause be enforced. |
| 15 | THE COURT:  Okay.  All right.  Yes, sir. |
| 16 | MR. COX:  Thank you, your Honor.  I just |
| 17 | want to note that -- and I won't go into |
| 18 | detail because we have a shorter period |
| 19 | amount of time, but the grant of interim |
| 20 | injunctive relief is an extraordinary remedy |
| 21 | involving a very far-reaching power of this |
| 22 | Court.  And the standard is ever higher for |

Motion                                                    6/26/2019

1                preliminary mandatory injunction relief, is

2                what they're seeking here.  They're not

3                seeking to have the NRA restrained or stopped

4                from some activity.  They're asking them

5                actually to take steps and put up a line of

6                credit in this case.  So just -- we cited

7                these in our brief, and in Ray v. Microsoft

8                (phonetic), Tiffany v. Forbes, those have

9                established that there is a higher, clear,

10               and convincing probability standard that they

11               need to meet as to irreparable harm,

12               substantial likelihood of success, and the

13               two other standards.

14                    Again, the Court has correctly noted

15               that this is a breach of contract case.  And

16               as many courts have held, including the

17               Supreme Court in Samson v. Murray, mere

18               injuries, however substantial, in terms of

19               money, time, and energy necessarily expended

20               in the absence of a stay are not enough.  The

21               possibility that adequate compensatory or

22               other corrective relief will be available at

 1            a later date in the ordinary course of the

 2            litigation weighs heavily against a claim of

 3            irreparable harm.  We think this is the exact

 4            case here, your Honor.

 5                 As your Honor has pointed out in

 6            questions with Mr. Dickieson, what we're

 7            talking about here is that they've already

 8            sent us a letter of termination on May 29th.

 9            They're terminating the contract.  Now,

10            they've said that "We're going to do it over

11            a 90-day period," but what they're here

12            arguing is that they are entitled to

13            preliminary injunctive relief because they're

14            going to have to lay off employees or start

15            furloughing employees within the next week,

16            as opposed to 60 days from now, which they're

17            still -- the Court correctly pointed out

18            they're still going to have to do.

19                 So either way, they are going to have to

20            furlough these employees.  And I would

21            submit, your Honor, and you pointed to this,

22            that the declaration submitted by Mr. Winkler

1              doesn't provide an adequate evidentiary

2              record for the Court to rule on this motion.

3              We pointed out to several instances where the

4              conclusory statements of law as to whether

5              the NRA has breached the contract and, in

6              addition, they have all of the financial

7              information.  They have not set forth either

8              in their -- in Mr. Winkler's declaration or

9              in the brief what steps they've taken to

10             mitigate the damages.

11                 I mean, this is $1.6 million that's in

12             dispute.  I will note for the Court, your

13             Honor, that we haven't said we're not going

14             to pay the invoices.  The NRA has sent

15             multiple letters and emails to the Ackerman

16             firm asking for evidence and details.  In

17             addition, Mr. Winkler and in their brief --

18                 THE COURT:  That's what I'm saying.  It

19             renders this matter moot.  If you're going to

20             pay it, doesn't it render this matter moot?

21                 MR. COX:  Yes, your Honor.

22                 THE COURT:  All right.  Go ahead.  I'm

1          listening.

2               MR. COX:  So -- and they haven't

3          indicated, your Honor, that what this

4          $1.6 million -- they -- they get $4 million

5          dollars a year from the NRA alone.  It -- it

6          seems strange per duly for this court that

7          $1.6 million, which may be going to

8          celebrities, such as Colonel North's

9          contract, Dana Loesch's contracts, and

10         others.  They haven't broken down whether

11         this is actual salaries for line employees

12         they're going to have to furlough verus money

13         they're going to have to pay out to people,

14         celebrities, they have contracts with.

15              So I don't think that they -- they could

16         have submitted financial statements in

17         support of their declaration, and they

18         haven't.  I think that if the Court as a --

19         as a basis for today's hearing, I don't think

20         they've set a legal -- they haven't met the

21         legal standard for proving irreparable harm

22         in this instance.  But even as the Court has

1           noted, I don't think that they have adequate

2           evidentiary support, and we would need to

3           proceed with an evidentiary hearing at a date

4           certain.  I think this is something the Court

5           could set very soon, later in July or the

6           first week of August.  Give us an opportunity

7           to, perhaps, take Mr. Winkler's deposition,

8           obtain some additional financial information

9           to see whether -- what their support is for

10          the irreparable harm.  I think there's an

11          insufficient record as it stands before the

12          Court.

13               And as to the letter that was sent last

14          night, I became aware of a letter last night

15          around 7.  I mean, that's why I didn't have

16          it in our brief that we filed on Monday.  But

17          I believe that the NRA is taking the position

18          that Ackerman has already said they're

19          terminating the contract, and they sent that

20          letter of termination on May the 29th, and

21          the NRA has stated, "Well, at this point, we

22          -- we agree.  Let's -- we're terminating it,

1              but rather than this wind-down period, let's

2              terminate it at this point."

3                  Again, I think that there are numerous

4              questions of fact about their financial

5              condition, also about how much cash they need

6              to make their obligations that just aren't

7              known, and what steps, if any, they've taken

8              to mitigate or find other sources.  Perhaps,

9              they have a line of credit already that they

10             can borrow on to pay employees.  I know my

11             law firm does.  Thank you, your Honor.

12                 MR. DICKIESON:  Your Honor, we have a

13             copy of the termination letter that we

14             received last night, if I can hand it up to

15             the Court to submit it as Exhibit A for us.

16                 (Whereupon Exhibit A was submitted for

17             evidence.)

18                 MR. DICKIESON:  And for the record, we

19             received that after 7 o'clock Eastern time

20             last night.  Obviously, it was intended to be

21             issued prior to this hearing because they

22             don't want to pay the -- what -- their

```
 1            obligations.  They want to delay it.  They

 2            want to postpone the payment.  They want --

 3            until after the damage is done.  That's part

 4            of the abuse of process that we're alleging

 5            in this case, that they want to take legal

 6            actions, use the process of this Court, to

 7            harm Ackerman McQueen.

 8                 THE COURT:  I just don't know how it's

 9            feasible for me to grant your motion for

10            injunction in this matter without the benefit

11            of an evidentiary hearing.  However, I think

12            that the real, great important factor is that

13            I think in with regards to the injunction

14            you've got -- you have to establish

15            irreparable harm, and I'm hearing that you've

16            got a firm that has historically had income

17            of million -- $40 million, and they're

18            potentially going to be unable, currently, to

19            collect 1.6 million on this account.  And

20            that 1.6 million will ultimately result in, I

21            guess, a harm to the -- to the company

22            because of the failure in ability to pay
```

1          salaries; is that correct?

2              MR. DICKIESON:  Yes, your Honor, and the

3          $40 million reflects the prior year.  But

4          there's also been some effort in the

5          intervening months to wind down, which is why

6          1.6 million for the last month is not one-

7          twelfth of the 40 million.  The parties have

8          been working to reduce the scope of services,

9          but this is not like we've got a stockpile of

10         some $40 million we can live off of for the

11         time being.

12             THE COURT:  But I assume this is not the

13         only client?

14             MR. DICKIESON:  It's not, but it's

15         approximately 35 percent of the business,

16         35 percent of the employees of the firm.

17             THE COURT:  All right.  Counsel, I'm --

18         I'm -- at this stage, unwilling to grant your

19         motion, but I'll say this is that if you

20         desire an evidentiary hearing, I will grant

21         you to get a date certain, and we can hear

22         matters at a later date, and you can put in

```
 1              evidence in support of your -- your -- your

 2              request for an injunction.  However, I

 3              understand that you have 65 employees that

 4              may be either out of work or being -- work

 5              without pay, but that's not something I can

 6              deal with at this time.  I believe that this

 7              is a breach of contract case, a collection

 8              case, and I guess, at some point, issues

 9              regarding third party contracts.  But, still,

10              it remains a contract case.  We can go to

11              chambers and get a date.  So at this time,

12              I'm preliminary denying the motion for

13              injunction without prejudice.

14                   MR. DICKIESON:  Thank you, your Honor.

15                   THE COURT:  All right.  Do you all have

16              orders?

17                   MR. COX:  For the denial of the motion

18              for preliminary injunction, your Honor?

19                   THE COURT:  Yes.

20                   MR. COX:  I didn't bring one with me for

21              that.

22                   THE COURT:  And that's without
```

```
 1              prejudice?

 2                   MR. COX:  Yes, your Honor, but I can

 3              draft an order and submit it to Mr. Dickieson

 4              and get it to the Court.

 5                   THE COURT:  And we have all the

 6              necessary documents with regards to the

 7              pro hac vice; is that correct?

 8                   MR. COX:  Yes, your Honor.

 9                   MR. DICKIESON:  Yes, sir.

10                   MR. COX:  Your Honor, one -- one other

11              -- two -- two questions.  One is we were

12              before the Court two weeks ago on a motion to

13              seal, and your Honor ruled on that motion.

14              And we have a prepared order that just allows

15              for filing of a revised answer on behalf of

16              Ackerman.  I believe Mr. Dickieson has signed

17              off on that order.  We would just like to

18              pass it up for the Court's signature.

19                   THE COURT:  Okay.

20                   MR. DICKIESON:  Yes, your Honor, we

21              defer to them on their selection.

22                   THE COURT:  All right.
```

```
 1              MR. COX:  And then -- oh, do you have

 2         the original order?  I gave it to you, but I

 3         have Jim's -- Jim's signature if you want to

 4         sign it.  That's it.  Thank you.  The only

 5         one, I believe, and this is -- I'll take this

 6         down and file it with the clerk, and then

 7         your Honor, one final, just -- I had two

 8         questions, one related to the pro hac vice --

 9         and this came from a discussion Mr. Dickieson

10         and I had.  Now that Mr. Collins is admitted

11         in the case, is the court's procedurally -- I

12         know that I have to be present with Mr.

13         Collin any time for a court hearing.  Is he

14         able to conduct depositions without local

15         counsel being present?  Or does the local

16         counsel need to be present for depositions

17         that --

18              THE COURT:  I would prefer local counsel

19         be present.

20              MR. COX:  Prefer -- present?

21              THE COURT:  Yes.

22              MR. COX:  And then for the evidentiary
```

```
1              hearing that -- that Mr. Dickieson and I are

2              heading down, do I raise issues with regard

3              to -- I had indicated to the Court that we

4              would like to take limited discovery,

5              including Mr. Winkler's deposition and some

6              limited document requests.  Is that something

7              we raise with the calendar control when we go

8              downstairs?

9                   THE COURT:  Yes.

10                  MR. COX:  Thank you, your Honor.

11                  MR. DICKIESON:  One last matter, your

12             Honor.  I wanted to let you know that we have

13             two of the pro hac vice attorneys on our side

14             that have been admitted.  Mr. David Schertler

15             and Mr. Joseph González are in the courtroom.

16                  UNIDENTIFIED ATTORNEY:  Good morning,

17             your Honor.

18                  THE COURT:  Welcome.  Welcome.

19                  UNIDENTIFIED ATTORNEY:  Thank you, sir.

20                  THE COURT:  Do we have any idea when we

21             are likely to try this matter?  And I guess

22             my question is how many days do you think
```

```
 1              you're going to need to try it,

 2              approximately?

 3                  MR. DICKIESON:  Your Honor, my position

 4              is that the parties are obligated under the

 5              contract to have good faith effort to try to

 6              resolve this.  I think we should try

 7              mediation first.

 8                  THE COURT:  Okay.  All right.

 9                  MR. DICKIESON:  And I think that's the

10              appropriate way to go before we start trying

11              to schedule an expedited trial.

12                  THE COURT:  All right.

13                  MR. COX:  Your Honor, just so you have

14              our position, we think that it's -- we think

15              it's, by estimate, a five to six-day trial.

16                  THE COURT:  Okay.

17                  MR. COX:  And we're prepared, if your

18              Honor would like us to, to go -- I was

19              waiting to receive a notice to come to

20              calendar control to set a schedule, but if

21              your Honor would like us to come in on a

22              return date --
```

```
1              THE COURT:  No.

2              MR. COX:  -- and set it, we can do it.

3         We're -- we're moving forward with discovery.

4              THE COURT:  Do it at your pleasure.

5              MR. COX:  Thank you, your Honor.

6              THE COURT:  Again, I strongly urge you

7         to familiarize yourself with the local rules

8         with regards to pleadings and everything.

9         You -- you worked my law clerk to death in

10        the last -- how -- how many days?

11             THE CLERK:  I would say around seven.

12             THE COURT:  Seven.  Okay.  Give him a

13        break, okay?

14             MR. COX:  Your Honor -- your Honor, I

15        apologize, and I just -- perhaps it was

16        unfamiliarity.  I didn't realize that I

17        wasn't permitted a reply brief.  So that's --

18        I apologize for submitting that.  One other

19        thing.  I -- I did -- I do have an order with

20        regard to Mr. Collins --

21             THE COURT:  How many times are you going

22        to say "one other thing"?
```

```
 1              MR. COX:  I'm sorry.  But I did -- I do

 2         have the order.  I don't -- now that these

 3         matters are consolidated, I don't know

 4         whether you need two orders or just the one.

 5              THE COURT:  Why don't we do two to be

 6         safe?

 7              MR. COX:  Okay.

 8              THE COURT:  Okay.

 9              MR. COX:  Thank you.

10              THE COURT:  All right.  Thank you,

11         gentlemen.

12              MR. COX:  Thank you, your Honor.

13

14              (Whereupon the proceedings concluded at

15         11:36 a.m.)

16

17

18

19

20

21

22
```

```
 1                    REPORTER CERTIFICATE

 2

 3   I, JACQUELINE N. HAGEN, Court Reporter and Notary Public,

 4   certify:

 5   That the foregoing proceedings were taken before me at

 6   the time and place herein set forth, at which time the

 7   witness was put under oath for me;

 8   That the testimony of the witness and all objections made

 9   at the time of the examination were recorded

10   stenographically by me and were thereafter transcribed;

11   That the foregoing is a true and correct transcript of my

12   shorthand notes so taken;

13   I further certify that I am not a relative or employee of

14   any attorney or of any of the parties not financially

15   interested in this action.

16

17

18

19                  _____

20                       JACQUELINE N. HAGEN

21

22   Dated:  June 26, 2019
```

# EXHIBIT A-2
# FILED
# UNDER
# SEAL

# EXHIBIT A-3
# FILED
# UNDER
# SEAL

# EXHIBIT A-4
# FILED
# UNDER
# SEAL

# EXHIBIT A-5
# FILED
# UNDER
# SEAL

# EXHIBIT A-6
# FILED
# UNDER
# SEAL

# EXHIBIT A-7

# TEXAS LAWYER

**NOT FOR REPRINT**

🖶 Click to print or Select '**Print**' in your browser menu to print this document.

Page printed from: *https://www.law.com/texaslawyer/2019/05/06/advocacy-as-art-lawyers-must-engage-in-issues-and-crisis-management/*

# Advocacy as Art: Lawyers Must Engage in Issues and Crisis Management

When public relations is stitched into the fabric of the advocacy, the practice can efficiently influence and improve the development of each case or crisis.

By **William A. Brewer III** | May 06, 2019



**Crisis management**

In today's world of high-stakes litigation, it is not often that the need for effective advocacy is confined to the courtroom. It typically requires advocacy in the court of public opinion.

It is no surprise that businesses, public interest groups and leading entrepreneurs increasingly look to law firms to create multi-dimensional, multi-layered strategies that advocate for them in the public square. Many law firms engineer carefully crafted plans to advance their clients' interests and protect their most valued asset, their brand.

APP000357

The regulatory arena, legislative environment and news media are all touchstones of effective advocacy in bet-the-business litigation, working in coordination with one another to help clients achieve successful outcomes.

As many clients realize, crafting a public narrative can no longer fall solely under the purview of public relations agencies or a corporation's in-house communications department.

According to recent press reports, the legal community has awakened to the "new" normal:  issues and crisis management should be a fundamental component of any high-stakes advocacy plan. There are many advantages for clients when that function is managed by law firms.

The fusion of legal and communications resources can produce more compelling, effective advocacy—enabling clients to favorably posture themselves, mitigate reputational damage and have a voice in the telling of the stories that define them.

What's more, lawyers who manage issues and crisis management are able to help clients gain strategic advantages in their advocacy and recognize improvements in operational efficiencies, including cost-savings.

When communications professionals are deployed within law firms, the resources are more quickly and readily available. They are unencumbered by the drag of expensive "ramp up" periods often required by PR firms—which often renders the messaging "late" and diminishes its effectiveness.

There is also an inherent advantage in having law, media and politics all directed under the umbrella of the attorney-client relationship. The advocacy can be coordinated and responsive— working in alignment with a client's legal objectives, elements of which might not be fully appreciated by a siloed PR firm.

**Seeing the Vision**

APP000358

A handful of law firms that were early entrants in the world of crisis management practices—specialized work groups that help clients navigate the media landscape, engage in the regulatory arena and advocate in public forums.

In 2001, we launched our practice group—after outsourcing certain elements of the public relations function during much of our firm's formative years. We often explain that we made the decision because we were driven to do so by the demands of our commercial litigation practice.

In short, we realized that the most significant cases on our docket not only generated media attention, but invited regulatory scrutiny, sparked shareholder inquiries, and were a catalyst for stakeholder engagement. Our clients facing the "all-or-nothing" proposition of bet-the-business litigation often turned to us to navigate them through treacherous waters of news cycle advocacy.

The truth is many CEOs and GCs of major Lone Star corporations—or those from companies with a significant footprint in Texas—know that effective issues and crisis management is key to advancing their interests, managing exposure and positioning their companies for success. They appreciate the importance of public opinion in shaping outcomes, including litigation.

## More Than a Call Center

Effective crisis management is about more than media relations. It centers on the ability to assess and manage a client's most critical elements of public exposure. How do clients protect and advance their position, posture themselves for success, and protect their reputational interests? The answer lies in courtroom and public advocacy that works in concert, not conflict.

Public relations is about more than press engagement. It involves projecting your external voice as a gateway into informing *and influencing* key audiences. That includes customers, employees, shareholders and other influencers who can impact long-term success.

APP000359

The aim of the lawyers who operate in high-profile cases is to provide advocacy in all forums.

Advocacy is made more successful by ensuring the legal strategy and messaging are consistent. Crisis experts should manage the *immediate* issue or concern but with a *forward-looking* vision that helps clients anticipate challenges, leverage long-term opportunities and protect against reputational harm. They need to see the forest *and* the trees.

With this in mind, we employ former news reporters, crisis experts and lobbyists to help understand the landscapes in which our clients are involved. These professionals can provide strategic counsel not only in connection with high-profile litigation, but also in anticipating and responding to a wide range of reputational concerns.

They understand that the news cycle is in perpetual motion—with websites and social media driving the need for "rapid response" advocacy that is best understood by those who have firsthand experience confronting its demands.

## From Competitive *Advantage* to Competitive *Necessity*

Having crisis communications skill sets in-house provides law firms with invaluable expertise, perspective, and insight into the analysis of each client's circumstances.

When public relations is stitched into the fabric of the advocacy, the practice can efficiently influence *and improve* the development of each case or crisis.

Put another way, law firms that operate as issues and crisis managers offer an added level of advocacy—one that is uniquely creative, responsive and influential.

What was once a competitive advantage for firms and their clients is quickly becoming a competitive necessity, as valuable as any other weapon in the attorney's arsenal.

*William A. Brewer III is managing partner at Brewer, Attorneys & Counselors, with offices in Dallas. His practice operates at the intersection of law, business and communications. In 2001, Brewer pioneered the development of an Issues & Crisis Management group that specializes in managing reputational issues for a broad range of clients.*

---

**Copyright 2019. ALM Media Properties, LLC. All rights reserved.**

APP000361

# EXHIBIT A-8

Guard. OK with you?

"It appears the Governor has launched yet another crusade against the NRA to fuel his political ambitions," says William A. Brewer III, partner at Brewer, Attorneys & Counselors and lead counsel for the NRA. "When you get past the political rhetoric and public grandstanding, the inconvenient truth for the Governor is that Carry Guard is a valued product – a program that provides insurance to law-abiding citizens who use a gun for self-protection. The insurance is sold in all states except New York."

Brewer continued, "In any event, the Governor's current campaign against the NRA extends far beyond Carry Guard. His scorched earth tactics are designed to prohibit the NRA from having access to insurance and banking services – simply because he disagrees with the political viewpoint of this law-abiding organization. Suffice it to say, the NRA will continue to vigorously defend itself, advocate for the Second Amendment, and fight to protect the Constitutional freedoms of all Americans."

Travis J. Carter
Managing Director, Public Affairs
Brewer, Attorneys & Counselors
1717 Main Street, Suite 5900
Dallas, Texas 75201
Office: 214.653.4856 | Fax: 214.653.1015
tcarter@brewerattorneys.com | www.brewerattorneys.com

_____

**From:** Angus McQueen <angus-mcqueen@am.com>
**Date:** April 5, 2018 at 1:21:50 PM CDT
**To:** Revan McQueen <Revan-McQueen@am.com>
**Subject:** Fwd: **NRA.ORG** Media Inquiry Request from Zachary Warmbrodt at Politico

Begin forwarded message:

**From:** "Arulanandam, Andrew" <AArulanandam@nrahq.org>
**Date:** April 5, 2018 at 12:11:32 PM CDT
**To:** Angus McQueen <angus-mcqueen@am.com>
**Subject:** Fwd: **NRA.ORG** Media Inquiry Request from Zachary Warmbrodt at Politico

Angus,

Wayne said he's fine with the statement as written and would be grateful for your edits, thoughts and opinion on if you think it ought to come from NRA or Brewer from an institutional standpoint.

AA

Sent from my iPhone

Begin forwarded message:

**From:** Travis Carter <tcarter@brewerattorneys.com>
**Date:** April 5, 2018 at 9:08:34 AM EDT
**To:** "Arulanandam, Andrew" <AArulanandam@nrahq.org>
**Cc:** "jshart@wms-jen.com" <jshart@wms-jen.com>, "joshuapowell@protonmail.ch" <joshuapowell@protonmail.ch>, Tony Makris <anthony-makris@am.com>, "William Brewer" <WAB@brewerattorneys.com>
**Subject:** RE: **NRA.ORG** Media Inquiry Request from Zachary Warmbrodt at Politico

Andrew:

I look forward to discussing the inquiry. We believe this is an opportunity to comment not only on Citigroup, but to address the broader efforts of those (such as Everytown) who are now calling on the entire financial services industry to take action? As such, we're sharing these comments for the team's input and review.

**NRA Draft Statement**

The NRA views the announcement by Citigroup as another self-aggrandizing proclamation by an eastern "elite" that will do nothing for our schools or communities. The actions of Citigroup and others will interfere with the rights of law-abiding citizens and hard-working businesses for the sake of generating headlines. Our message to Wall Street is clear:  you don't speak for the American people and you do not have a right to interfere with rights secured by the Second Amendment.

As if the announcement by Citigroup is not bad enough, public interest groups are now beginning to pile on – asking the "financial services elite" to adopt policies that are unlawful, decidedly un-American, and detrimental to our nation's free market system.

\# \# \#

Thank you,
Travis

Travis J. Carter
Managing Director, Public Affairs
Brewer, Attorneys & Counselors
1717 Main Street, Suite 5900
Dallas, Texas 75201
Office: 214.653.4856 | Fax: 214.653.1015
tcarter@brewerattorneys.com | www.brewerattorneys.com



**From:** NRA Media <media@nrahq.org>
**Date:** April 4, 2018 at 4:55:15 PM EDT
**To:** <AArulanandam@nrahq.org>, <JBaker@nrahq.org>, <bgodstrey@nrahq.org>, <cmortensen@nrahq.org>, <ahunter@nrahq.org>, <ldalseide@nrahq.org>, <nwaugh@nrahq.org>, <aniblock@nrahq.org>, <jbrown@nrahq.org>, <mbetts@nrahq.org>
**Subject:** **NRA.ORG** Media Inquiry Request from Zachary Warmbrodt at Politico
**Reply-To:** <media@nrahq.org>



Zachary Warmbrodt from Politico has submitted a Media Inquiry form.

## MEDIA INQUIRY INFORMATION

**Name:** Zachary Warmbrodt

**Outlet:** Politico

**State:** Virginia

**Email:** zwarmbrodt@politico.com

**Phone:** 7036478557

**Deadline:** 05/04/18

**Subject:** Citigroup gun policy

**Comment:** Hello, Can you comment on Citigroup's new policy of restricting its

retail clients' firearms sales? Are you urging Congress or the administration to take any action in response? Thank you. Zachary Warmbrodt Reporter POLITICOPro O: (703) 647-8557 M: (972) 342-6394 zwarmbrodt@politico.com



© 2016 National Rifle Association of America, 11250 Waples Mill Road, Fairfax, VA 22030.

# EXHIBIT A-9

| | |
|---|---|
| **From:** | Angus McQueen |
| **To:** | Revan McQueen; Henry Martin; Nader Tavangar; Bill Powers; Melanie Montgomery |
| **Subject:** | Fwd: NRA Communications: Insurance Developments in New York |
| **Date:** | Saturday, April 14, 2018 5:50:21 AM |

Begin forwarded message:

> **From:** William Brewer <WAB@brewerattorneys.com>
> **Date:** April 13, 2018 at 9:04:13 PM CDT
> **To:** "Angus-mcqueen@am.com" <Angus-mcqueen@am.com>
> **Cc:** "jshart@wms-jen.com" <jshart@wms-jen.com>, "john.frazer@nrahq.org" <john.frazer@nrahq.org>
> **Subject: NRA Communications: Insurance Developments in New York**

Angus,

We agree with John and Steve that news of the **insurance cancellations and non-renewals** in New York will likely generate calls to the NRA and, potentially, media inquiries. Here are suggested statements for our members, the news media, and the board.

In terms of the immediate impact to customers, it is our understanding that Carry Guard and self-defense insureds will be given at least 90 days' notice of cancellation and ArmsCare policyholders, instructors, gun clubs, etc. that are impacted will be given 45 days' notice prior to non-renewal. We are attempting to confirm these particulars with counsel for Lockton.

Please let me know your thoughts on the messaging below.

Thanks,

Bill

**Communications for NRA Members – to be Used in Response to Member Inquiries**

APP000365

We understand notices are being sent to certain gun owners advising them that certain lines of insurance offered in New York by Lockton Affinity will **be cancelled or not renewed**. We regret any inconvenience. If you have specific coverage questions, the contact information for Lockton Affinity – the administrator of your insurance coverage – is as follows. They can be reached at 877-672-3006, option 3 or via email at nrainsurance@locktonaffinity.com.

Although we believe you will be able to obtain insurance coverage elsewhere, please know that we are concerned about this development. Any limits on the availability of insurance interferes with the ability of people to exercise their Second Amendment rights. Such actions unduly burden the free market system and impact law-abiding members of the NRA. The resolve of the NRA will only grow stronger in the face of these developments. Thank you in advance for your understanding and unwavering support.

**Media Statement (If Necessary)**

"We understand notices are being sent to policyholders advising them that certain lines of insurance offered to gun owners by certain brokers will **be cancelled or not renewed**. Although these policyholders can likely obtain insurance coverage elsewhere, that is not the point. Any limits on the availability of this insurance interferes with the ability of people to exercise their Second Amendment rights. Such actions unduly burden the free market system and impact the law-abiding members of the NRA. The resolve of the NRA will only grow stronger in the face of these developments."

**Board Member Note**

**Confidential**

On Thursday, April 12, we were advised by Lockton Affinity, LLC (Lockton) that the company is sending **notices of cancellation or nonrenewals** to New York policyholders of certain insurance products offered to NRA members and gun owners.

APP000366

Presumably, Lockton (the administrator of these products, such as Carry Guard) has taken this action in connection with inquiries issued by the New York State Department of Financial Services (DFS) about whether certain products are in compliance with New York insurance regulations. We are contacting Lockton and its attorneys, and seek to confirm exactly which insurance coverages are impacted by these announcements.

Naturally, we are taking active measures to protect the NRA's legal, business and reputational interests in connection with the DFS inquiry and these various insurance offerings. We are also collecting insurance information to share with key stakeholders such as gun clubs, ranges, and instructors to help them obtain insurance coverage affected by Lockton's announcement.

In terms of communication, we are advising our members and supporters that we believe any limits on the availability of insurance interferes with the ability of people to exercise their Second Amendment rights. Such actions unduly burden the free market system and impact the law-abiding members of the NRA. The resolve of the NRA will grow stronger in the face of these developments. We will provide additional information as it becomes available.

# EXHIBIT A-10

**Subject:** Re: Carry Guard - affidavit state checkboxes
**Date:** Friday, June 15, 2018 at 4:28:35 PM Pacific Daylight Time
**From:** Powell, Josh
**To:** Lacey (Duffy) Cremer
**CC:** Steve Hart, Frazer, John, William Brewer

Lacey,

The change is approved.

Thanks!

josh


On Jun 15, 2018, at 10:02 AM, William Brewer <WAB@brewerattorneys.com> wrote:

Josh –

We have no objection to the change below that Lockton proposes making to its site.

Best,
Bill

On Jun 15, 2018, at 9:11 AM, Powell, Josh <JPowell@nrahq.org> wrote:

Guys,

Can we approve this?

-Josh

Begin forwarded message:

**From:** "Lacey (Duffy) Cremer" <lacey-cremer@am.com>
**Subject: Fwd: Carry Guard - affidavit state checkboxes**
**Date:** June 14, 2018 at 2:56:35 PM GMT-5
**To:** "mdavis@locktonaffinity.com" <mdavis@locktonaffinity.com>,
"smartin@locktonaffinity.com" <smartin@locktonaffinity.com>,
"JPowell@nrahq.org" <JPowell@nrahq.org>
**Cc:** Grant Spofford <grant-spofford@am.com>, Tom Richardson
<tom-richardson@am.com>

Good afternoon. Grant forwarded me the below email. We have requested; but,
not yet been given approval from NRA, to move forward with these edits.

I have added Josh Powell of NRA here, as well, who will advise re approval.

Thanks,
Lacey

APP000368

Lacey (Duffy) Cremer
*SVP / Account Supervisor*

**ACKERMAN McQUEEN**
1717 McKinney Avenue, STE 1800
Dallas, TX 75202 | (214) 217-2500
lacey-cremer@am.com | www.am.com

<AM-Logo-58x17_3b61f41a-ad78-4c8e-a6ba-
32a6d8fa3bb1.png>

**From:** "Davis, Melissa"
<MDavis@locktonaffinity.com>

---

**Date:** Tuesday, June 12, 2018 at 2:45 PM
**To:** Grant Spofford <grant-
spofford@am.com>
**Cc:** Tom Richardson <tom-
richardson@am.com>, Scott Martin
<SMartin@locktonaffinity.com>
**Subject:** RE: Carry Guard - affidavit state
checkboxes

Sure! To clarify, in the Affidavit block in the
buy flow (right after billing address) Arkansas
has different language currently stating that
the checkbox counts as a signature. We need
to update the content to match the content
shown for Ohio. Should be a pretty quick
change if you can fit it in. Screenshots below.

**Ohio current (correct)**
<image001.png>

**Arkansas current (needs to change to
above language in the Ohio screenshot)**

<image002.png>

**Melissa Davis**
**Supervisor, Program and Project
Management**
X7567

---

**From:** Grant Spofford <grant-
spofford@am.com>
**Sent:** Tuesday, June 12, 2018 2:23 PM
**To:** Davis, Melissa

<MDavis@locktonaffinity.com>
**Cc:** Tom Richardson <tom-richardson@am.com>; Martin, Scott <SMartin@locktonaffinity.com>
**Subject:** Re: Carry Guard - affidavit state checkboxes

Hi Melissa,

Are you needing us to do something for you? We're not sure what you mean by "update Arkansas to be a docusign state".

Can you elaborate?

Thanks,
Grant


Grant Spofford
*EVP / Digital Producers*
**A C K E R M A N   M c Q U E E N**
1717 McKinney Avenue, STE 1800
Dallas, TX 75202 | (214) 217-2500
grant-spofford@am.com | www.am.com

<image003.png>

---

**From:** "Davis, Melissa" <MDavis@locktonaffinity.com>
**Date:** Tuesday, June 12, 2018 at 11:45 AM
**To:** Tom Richardson <tom-richardson@am.com>, Grant Spofford <grant-spofford@am.com>
**Cc:** Scott Martin <SMartin@locktonaffinity.com>
**Subject:** Carry Guard - affidavit state checkboxes

Tom-
We are removing the ability to "checkbox sign" an affidavit to increase efficiency on renewals. Can you please update Arkansas to be a docusign state in pre-prod? We plan on deploying this Thursday to production. Will that be possible for you? So sorry for the late notice on this. We forgot to loop you in.

Thanks!

**Melissa Davis**
**Supervisor, Program and Project Management**

**Lockton Affinity, LLC**
10895 Lowell Avenue, Suite 300
Overland Park, KS 66210
Tel: 913.652.7567
Fax: 913.652.4567
E-mail: mdavis@locktonaffinity.com

<image004.jpg>

<image001.png>

<image002.png>

<image003.png>

<image004.jpg>

<image001.png>

<image003.png>

# EXHIBIT A-11

"What I'm trying to point out is they could still be involved -- even if we did this -- in the secondary market," said Luneau, a Democrat. "Some of our intent is to do business with who is best for the state of Louisiana from a financial perspective with these bonds because we're talking about a lot of money here."

Other state officials took Bank of America and Citigroup to task on Thursday over the gun policies, delivering a simple message: Stick to banking.

"Do you realize how important the second amendment is to the people of Louisiana?" Blake Miguez, a Republican member of Louisiana's House of Representatives, asked Citigroup's Brandee McHale, the company's head of corporate citizenship.

# # #

Travis J. Carter
Managing Director, Public Affairs
Brewer, Attorneys & Counselors
1717 Main Street, Suite 5900
Dallas, Texas 75201
Office: 214.653.4856 | Fax: 214.653.1015
tcarter@brewerattorneys.com | www.brewerattorneys.com

_____

**From:** Tony Makris <Anthony-makris@am.com>
**Date:** August 6, 2018 at 2:16:49 PM CDT
**To:** Revan McQueen <Revan-McQueen@am.com>, Melanie Montgomery <Melanie-Montgomery@am.com>, Henry Martin <henry-martin@am.com>, Angus McQueen <angus-mcqueen@am.com>
**Subject: Fwd: Statement**

after i beat them for not including us, they included us.... we should respond  to andrew

Sent from my iPhone

Begin forwarded message:

**From:** joshuapowell@protonmail.ch
**Date:** August 6, 2018 at 2:37:54 PM EDT
**To:** Anthony Makris <Anthony-makris@am.com>, Andrew Arulanandam <AArulanandam@nrahq.org>
**Subject: FW: Statement**
**Reply-To:** joshuapowell@protonmail.ch

Tony, Take a look.

-Josh

Sent from ProtonMail, encrypted email based in Switzerland.

Sent with ProtonMail Secure Email.

------- Original Message -------
On August 6, 2018 2:28 PM, Arulanandam, Andrew <AArulanandam@nrahq.org> wrote:


**From:** Travis Carter [mailto:tcarter@brewerattorneys.com]
**Sent:** Monday, August 06, 2018 2:24 PM
**To:** Arulanandam, Andrew
**Subject:** Statement

Andrew,

Here is our suggested statement on the letter issued by Governor Cuomo urging other states to drop Carry

Guard. OK with you?

"It appears the Governor has launched yet another crusade against the NRA to fuel his political ambitions," says William A. Brewer III, partner at Brewer, Attorneys & Counselors and lead counsel for the NRA. "When you get past the political rhetoric and public grandstanding, the inconvenient truth for the Governor is that Carry Guard is a valued product – a program that provides insurance to law-abiding citizens who use a gun for self-protection. The insurance is sold in all states except New York."

Brewer continued, "In any event, the Governor's current campaign against the NRA extends far beyond Carry Guard. His scorched earth tactics are designed to prohibit the NRA from having access to insurance and banking services – simply because he disagrees with the political viewpoint of this law-abiding organization. Suffice it to say, the NRA will continue to vigorously defend itself, advocate for the Second Amendment, and fight to protect the Constitutional freedoms of all Americans."

Travis J. Carter
Managing Director, Public Affairs
Brewer, Attorneys & Counselors
1717 Main Street, Suite 5900
Dallas, Texas 75201
Office: 214.653.4856 | Fax: 214.653.1015
tcarter@brewerattorneys.com | www.brewerattorneys.com

_____

**From:** Angus McQueen <angus-mcqueen@am.com>
**Date:** April 5, 2018 at 1:21:50 PM CDT
**To:** Revan McQueen <Revan-McQueen@am.com>
**Subject:** Fwd: **NRA.ORG** Media Inquiry Request from Zachary Warmbrodt at Politico

Begin forwarded message:

**From:** "Arulanandam, Andrew" <AArulanandam@nrahq.org>
**Date:** April 5, 2018 at 12:11:32 PM CDT
**To:** Angus McQueen <angus-mcqueen@am.com>
**Subject:** Fwd: **NRA.ORG** Media Inquiry Request from Zachary Warmbrodt at Politico

Angus,

Wayne said he's fine with the statement as written and would be grateful for your edits, thoughts and opinion on if you think it ought to come from NRA or Brewer from an institutional standpoint.

AA

Sent from my iPhone

Begin forwarded message:

**From:** Travis Carter <tcarter@brewerattorneys.com>
**Date:** April 5, 2018 at 9:08:34 AM EDT
**To:** "Arulanandam, Andrew" <AArulanandam@nrahq.org>
**Cc:** "jshart@wms-jen.com" <jshart@wms-jen.com>, "joshuapowell@protonmail.ch" <joshuapowell@protonmail.ch>, Tony Makris <anthony-makris@am.com>, "William Brewer" <WAB@brewerattorneys.com>
**Subject:** RE: **NRA.ORG** Media Inquiry Request from Zachary Warmbrodt at Politico

Andrew:

I look forward to discussing the inquiry. We believe this is an opportunity to comment not only on Citigroup, but to address the broader efforts of those (such as Everytown) who are now calling on the entire financial services industry to take action? As such, we're sharing these comments for the team's input and review.

**NRA Draft Statement**

The NRA views the announcement by Citigroup as another self-aggrandizing proclamation by an eastern "elite" that will do nothing for our schools or communities. The actions of Citigroup and others will interfere with the rights of law-abiding citizens and hard-working businesses for the sake of generating headlines. Our message to Wall Street is clear:  you don't speak for the American people and you do not have a right to interfere with rights secured by the Second Amendment.

As if the announcement by Citigroup is not bad enough, public interest groups are now beginning to pile on – asking the "financial services elite" to adopt policies that are unlawful, decidedly un-American, and detrimental to our nation's free market system.

# # #

Thank you,
Travis

Travis J. Carter
Managing Director, Public Affairs
Brewer, Attorneys & Counselors
1717 Main Street, Suite 5900
Dallas, Texas 75201
Office: 214.653.4856 | Fax: 214.653.1015
tcarter@brewerattorneys.com | www.brewerattorneys.com



**From:** NRA Media <media@nrahq.org>
**Date:** April 4, 2018 at 4:55:15 PM EDT
**To:** <AArulanandam@nrahq.org>, <JBaker@nrahq.org>, <bgodstrey@nrahq.org>, <cmortensen@nrahq.org>, <ahunter@nrahq.org>, <ldalseide@nrahq.org>, <nwaugh@nrahq.org>, <aniblock@nrahq.org>, <jbrown@nrahq.org>, <mbetts@nrahq.org>
**Subject:** **NRA.ORG** Media Inquiry Request from Zachary Warmbrodt at Politico
**Reply-To:** <media@nrahq.org>



Zachary Warmbrodt from Politico has submitted a Media Inquiry form.

## MEDIA INQUIRY INFORMATION

**Name:** Zachary Warmbrodt

**Outlet:** Politico

**State:** Virginia

**Email:** zwarmbrodt@politico.com

**Phone:** 7036478557

**Deadline:** 05/04/18

**Subject:** Citigroup gun policy

**Comment:** Hello, Can you comment on Citigroup's new policy of restricting its

retail clients' firearms sales? Are you urging Congress or the administration to take any action in response? Thank you. Zachary Warmbrodt Reporter POLITICOPro O: (703) 647-8557 M: (972) 342-6394 zwarmbrodt@politico.com



© 2016 National Rifle Association of America, 11250 Waples Mill Road, Fairfax, VA 22030.

# EXHIBIT A-12

Brewer, Attorneys & Counselors
1717 Main Street, Ste. 5900
Dallas, TX 75201
Direct: 214.653.4856
Fax: 214.653.1015
E-mail: tcarter@brewerattorneys.com

_____

**From:** Melanie Montgomery <Melanie-Montgomery@am.com>
**Date:** August 21, 2018 at 4:50:50 PM CDT
**To:** Revan McQueen <Revan-McQueen@am.com>
**Subject: Fwd: NRATV/Louisiana News**

Per our discussion.


Begin forwarded message:

**From:** Henry Martin <henry-martin@am.com>
**Date:** August 17, 2018 at 5:07:02 PM CDT
**To:** Nader Tavangar <nader-tavangar@am.com>, Melanie Montgomery <Melanie-Montgomery@am.com>, "Lacey (Duffy) Cremer" <lacey-cremer@am.com>
**Cc:** Patrick Kobler <patrick-kobler@NRATV.com>
**Subject: Re: NRATV/Louisiana News**

Received and disseminated, thanks

**From:** Nader Tavangar <nader-tavangar@am.com>
**Date:** Friday, August 17, 2018 at 5:02 PM
**To:** Henry Martin <henry-martin@am.com>, Melanie Montgomery <Melanie-Montgomery@am.com>, "Lacey (Duffy) Cremer" <lacey-cremer@am.com>
**Cc:** Patrick Kobler <patrick-kobler@NRATV.com>
**Subject:** NRATV/Louisiana News


NT

_____

**From:** Baker, Jennifer <jennifer.baker@nrahq.org>
**Sent:** Friday, August 17, 2018 5:21 PM
**To:** Nader Tavangar
**Subject:** Fwd: Louisiana News




Sent from my iPhone

Begin forwarded message:

**From:** Travis Carter <tcarter@brewerattorneys.com>
**Date:** August 17, 2018 at 4:11:58 PM CDT
**To:** "Arulanandam, Andrew" <AArulanandam@nrahq.org>, "Baker, Jennifer" <Jennifer.Baker@nrahq.org>
**Subject: Louisiana News**

Andrew, Jennifer:

I am sure you all are aware of this news. Just writing to confirm that the NRA and its representatives should not be commenting publicly about this issue. Can you both assist in making sure we refrain from commenting via social media and NRA TV?

Please let me know if you would like to discuss, and thanks in advance for your assistance.

Best,
Travis

**"Louisiana Bans Bank of America, Citi from Bond Sale Over Gun Policies"**
Bloomberg, August 17, 2018

Louisiana is using the bond market to stick up for the Second Amendment.

The state's bond commission voted 7 to 6 Thursday to ban Bank of America Corp. and Citigroup Inc. from working on its upcoming debt sale because of the banks' "restrictive gun policies," the state treasury said in a statement. Bank of America and Citigroup are the two top-ranked underwriters of long-term municipal debt, according to data compiled by Bloomberg.

"I personally believe the policies of these banks are an infringement on the rights of Louisiana citizens," Treasurer John Schroder said in a statement. "As a veteran and former member of law enforcement, I take the Second Amendment very seriously."

The ban is the latest example of how corporate America has been drawn into the nation's polarizing debate over gun control. Earlier this year, Chicago Mayor Rahm Emanuel proposed using the city's business to push for stricter gun controls by limiting work with Wall Street firms that didn't cut ties with companies that sold firearms to people under the age of 21 or dealt in high-capacity magazines.

The decision by Louisiana comes after Bank of America in April said it would stop making new loans to companies that make military-style rifles for civilian use. At the time, the bank said at least 150 of its employees had been affected by gun violence over the years. Bill Halldin, a spokesman for Bank of America, declined to comment.

Citigroup was the first major banking institution to set restrictions on the firearm industry in March, when it announced plans to prohibit retailers that are customers of the bank from offering bump stocks or selling guns to people who haven't passed a background check or are younger than 21. The restrictions applied to companies that rely on the bank for store credit cards, lending and other services.

"Citi adopted this policy because we believe it is a positive and balanced step to promote gun safety without undermining free markets or Second Amendment rights," spokesman Scott Helfman said in an emailed statement. "It is disappointing that the taxpayers of Louisiana will be deprived from competitive bidding for necessary public works because the process has been politicized."

Second Amendment

During 90 minutes of deliberations during a state bond commission meeting on Thursday, Louisiana legislators discussed the merits of the ban. The state said it received solicitations from 19 banks interested in underwriting the $600 million sale of so-called Garvee bonds, which would finance interstate improvements and tunnel replacements.

The exclusion won't be a major hit to Bank of America or Citigroup, which together underwrote about $110 billion of municipal bonds last year, about 27 percent of those that were issued, according to data compiled by Bloomberg.

Louisiana state senator Jay Luneau voiced concern that the state would no longer get the best rate on the bond sale if it were to exclude the biggest underwriters. Luneau also asked the commission whether the state would also prohibit the bank awarded the bond deal from re-selling some of the debt to Bank of America and Citigroup on the secondary market.

"What I'm trying to point out is they could still be involved -- even if we did this -- in the secondary market," said Luneau, a Democrat. "Some of our intent is to do business with who is best for the state of Louisiana from a financial perspective with these bonds because we're talking about a lot of money here."

Other state officials took Bank of America and Citigroup to task on Thursday over the gun policies, delivering a simple message: Stick to banking.

"Do you realize how important the second amendment is to the people of Louisiana?" Blake Miguez, a Republican member of Louisiana's House of Representatives, asked Citigroup's Brandee McHale, the company's head of corporate citizenship.

# # #

Travis J. Carter
Managing Director, Public Affairs
Brewer, Attorneys & Counselors
1717 Main Street, Suite 5900
Dallas, Texas 75201
Office: 214.653.4856 | Fax: 214.653.1015
tcarter@brewerattorneys.com | www.brewerattorneys.com

_____

**From:** Tony Makris <Anthony-makris@am.com>
**Date:** August 6, 2018 at 2:16:49 PM CDT
**To:** Revan McQueen <Revan-McQueen@am.com>, Melanie Montgomery <Melanie-Montgomery@am.com>, Henry Martin <henry-martin@am.com>, Angus McQueen <angus-mcqueen@am.com>
**Subject: Fwd: Statement**

after i beat them for not including us, they included us.... we should respond  to andrew

Sent from my iPhone

Begin forwarded message:

**From:** joshuapowell@protonmail.ch
**Date:** August 6, 2018 at 2:37:54 PM EDT
**To:** Anthony Makris <Anthony-makris@am.com>, Andrew Arulanandam <AArulanandam@nrahq.org>
**Subject: FW: Statement**
**Reply-To:** joshuapowell@protonmail.ch

Tony, Take a look.

-Josh

Sent from ProtonMail, encrypted email based in Switzerland.

Sent with ProtonMail Secure Email.

------- Original Message -------
On August 6, 2018 2:28 PM, Arulanandam, Andrew <AArulanandam@nrahq.org> wrote:


**From:** Travis Carter [mailto:tcarter@brewerattorneys.com]
**Sent:** Monday, August 06, 2018 2:24 PM
**To:** Arulanandam, Andrew
**Subject:** Statement

Andrew,

Here is our suggested statement on the letter issued by Governor Cuomo urging other states to drop Carry

APP000378

# EXHIBIT A-13
# FILED
# UNDER SEAL

# EXHIBIT A-14
# FILED
# UNDER SEAL

# EXHIBIT A-15

## *NRA boosted executive pay while cutting key program funding, filing shows*

Washingtonpost.com

November 27, 2019 Wednesday 3:45 AM EST

Copyright 2019 The Washington Post All Rights Reserved

**washingtonpost.com**

**Section:** A section; Pg. A04

**Length:** 1360 words

**Byline:** Beth Reinhard

# Body

Compensation for top officials at the National Rifle Association surged by 41 percent last year, according to a new tax filing, as the nation's largest pro-gun organization sharply reduced spending on programs central to its mission.

 The jump from 2017 to 2018 for the NRA's officers, directors and highly paid employees included a 57 percent increase for chief executive Wayne LaPierre that boosted his overall compensation to $2.15 million.

The filing also shows perks for top officials that are typically associated with the corporate world, including charter and first-class travel with companions as well as dues for health or social clubs. Those costs were not detailed, though the NRA filing says housing expenses were provided for five people.

During that same period, NRA spending plunged 22 percent for education and training, 61 percent for hunter services and 51 percent for field services, which includes organizing volunteers, fundraising for shooting sports and promoting the NRA at gun shows and other events, according to a previously released audit.

NRA officials said the raises resulted from a periodic analysis by a committee of board members. In response to questions about the program cuts, spokesman Andrew Arulanandam said the NRA 'eliminated costly advertising' in a number of program areas.

'Priority number one is investing in the projects and services that best serve our members and protect their Second Amendment freedoms,' Arulanandam said.

The pay hikes, coupled with program cuts, feed into a line of attack coming from some board members and firearms enthusiasts: that NRA leaders are putting their own financial interest above those of dues-paying members.

 'Money flowing away from programs and into executives' pockets is causing many longtime members to join the ranks of American gun owners who have lost faith in the NRA, especially its leadership,' said Rob Pincus, a firearms instructor and NRA lifetime member who is leading a petition drive to overhaul the group's board.

According to the tax filing, legal fees more than tripled in 2018, to more than $25 million. For the first time, the tax filing lists the Texas law firm of William Brewer III as one of its most highly compensated contractors, receiving $13.8 million. Brewer has become one of LaPierre's most trusted advisers despite his lack of experience in Second Amendment litigation. NRA officials stand by Brewer.

'We make no apologies for doubling down on the investment required to confront our enemies and unprecedented attacks on our members in 2018,' Arulanandam said.

The new tax filing helps fill in the financial picture of the NRA at the end of a tumultuous year for the gun lobby.

The drama began at the annual convention in April, when board president Oliver North was ousted after accusing LaPierre of overspending on legal fees. That clash was followed by leaks showing LaPierre spending hundreds of thousands of dollars on clothing and luxury travel. A court battle escalated between the NRA and its longtime public relations agency, Ackerman McQueen, while the Democratic attorneys general of New York and Washington, D.C. launched investigations into the tax-exempt group's spending.

NRA officials have disputed North's claims and said the clothes and travel were necessary for media appearances and fundraising. Eight of the 76 members of the board have resigned since the spring, some in protest of LaPierre's leadership, while others have rallied behind the longtime chief executive as a powerful spokesman for gun rights.

To address concerns, LaPierre summoned members of the 'Golden Ring of Freedom' " donors who have given at least $1 million " to huddle at the Virginia headquarters last month, according to attendees.

'The meeting was scheduled so he could explain to us what was really going on " the truth,' said Florida real estate developer John Rumpel, who said he has given about $2.8 million to the NRA. 'I left without feeling suspicious about anything.'

More than two dozen of the donors " easily spotted at conventions in their custom-made gold jackets " were told that the NRA had conducted a line-by-line review of the budget and would emerge stronger than ever from the lawsuits and investigations, attendees said. LaPierre also disputed reports that he and his wife wanted the NRA to buy them a $6 million home in a gated golf community because of security concerns, saying that the real estate deal was Ackerman McQueen's idea.

Ackerman McQueen has said it was alarmed when LaPierre sought the agency's assistance with the real estate transaction.

NRA officials declined to discuss the Oct. 15 gathering with its top donors, which has not been previously reported.

'Mr. LaPierre meets regularly with NRA donors, grass-roots supporters and other stakeholders,' Arulanandam said. 'As he has done for years, he confronts false allegations about the NRA head-on, and speaks about our mission in the 2020 election cycle.'

Donors said LaPierre told them a harrowing story about a false 911 call that sent the police to his Virginia home in the middle of the night in 2013. He was ordered to come out with his hands up, Rumpel said.

'I've offered him any and all of the five homes I own and my plane to move him around,' he said. 'He has to travel around incognito.'

Another major donor who attended the meeting, Pat Hogan, chief executive of an Illinois-based auction house for antique firearms, also said he was worried about LaPierre's safety. 'The amount of abuse that Wayne takes " I would suggest he's not paid enough, even with that increase,' he said.

But Hogan added that the NRA had turned over too much money and control to Ackerman McQueen, and that he regretted the departure in June of this year of the NRA's chief political strategist, Chris Cox. The NRA has accused Cox in a lawsuit of being part of a 'conspiracy' with North, which Cox has denied.

In 2018, Cox was among several top executives who received double-digit-percent increases in pay, according to the filing. He received nearly $1.4 million in compensation from the NRA and related entities, a 17 percent hike from the previous year. Twelve top officials received six-figure compensation packages, including two who left the NRA in 2016. Wilson Phillips, who served as treasurer through mid-September 2018, got $948,769 in compensation that year, up 34 percent.

Neither Cox nor Phillips responded to requests for comment.

According to the tax filings, charter travel was used 'on occasions when travel logistics or security concerns precluded other available options.' LaPierre's travel has come under scrutiny following revelations that about $250,000 was spent on his trips to locations such as Italy, Budapest and the Bahamas in recent years.

Members of the NRA's board are not paid for overseeing the organization's finances. But North, then the board's president, received $1.38 million from Ackerman McQueen in 2018. Under that arrangement " the details of which the NRA has claimed were kept secret from the board " North appeared on NRATV, a platform that espoused gun rights.

North has said LaPierre authorized the contract and declined through his attorney to comment on the tax filing that showed the pay increases. Experts on nonprofit organizations say that board members who receive money from the one they oversee or its vendors can face conflicts of interest. The tax filings show another 11 board members were paid a total of more than $617,000 from the NRA, which has defended such payments as going toward services and membership recruitment.

In a year in which LaPierre weathered calls for his resignation, his base salary rose from $1.2 million in 2017 to $1.3 million in 2018; his bonus tripled to $455,000; and 'other reportable compensation' climbed from about $45,000 to more than $427,000, the filing shows. La Pierre also received an additional $73,793 in 'retirement and other deferred compensation' and 'nontaxable benefits' from the NRA and related entities.

NRA officials said LaPierre's contributions are instrumental to the organization's success.

*beth.reinhard@washpost.com*

Carol D. Leonnig and Julie Tate contributed to this report.

**Load-Date:** November 27, 2019

---

End of Document

# EXHIBIT A-16
# FILED
# UNDER SEAL

# EXHIBIT A-17

**Subject:** Attorney Bill Brewer -- information requests
**Date:** Wednesday, March 28, 2018 at 2:36:03 AM Pacific Daylight Time
**From:** Frazer, John
**To:** Melanie Montgomery, Lacey (Duffy) Cremer
**CC:** William Brewer

Melanie and Lacey,

Please note that we have engaged William Brewer and his law firm to assist the NRA with ongoing investigations by state regulators, including the New York State Department of Financial Services (DFS). As you may know, the DFS is making inquiries into the NRA Carry Guard program and, in particular, some of the marketing activities involved in promoting the program. Please cooperate with any information requests from Bill's law firm (Brewer Attorneys & Counselors) and provide any documents, electronic communications, or other materials, as requested.

Thanks in advance for your assistance.

Regards,

John Frazer
Secretary and General Counsel
National Rifle Association of America
11250 Waples Mill Rd.
Fairfax, VA  22030
(703) 267-1254
john.frazer@nrahq.org

This e-mail and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this e-mail in error, please notify the sender immediately, delete the message from your computer, and do not disseminate, distribute or copy it.

# EXHIBIT A-18

| | |
|---|---|
| **From:** | William Brewer |
| **To:** | melanie-montgomery@am.com |
| **Subject:** | Follow-up: Information Request |
| **Date:** | Tuesday, April 3, 2018 4:33:31 PM |

Melanie,

I understand you may have been out of the office last week. Therefore, I am writing as follow-up to my calls and hoping we can connect at your earliest convenience. John Frazer sent you a note, dated March 28, 2018, that explained the purpose of my outreach.

Hope all is well and thanks in advance for your attention to this.

Best,
Bill

APP000461

# EXHIBIT A-19
# FILED
# UNDER SEAL

# EXHIBIT A-20
# FILED
# UNDER SEAL

# EXHIBIT A-21
# FILED
# UNDER SEAL

# EXHIBIT A-22
# FILED
# UNDER SEAL

# EXHIBIT A-23
# FILED
# UNDER SEAL

# EXHIBIT A-24

# NRA Scores Minor Victories in Messy Legal Battle With Ackerman McQueen

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

thedailybeast.com/nra-scores-minor-victories-in-messy-legal-battle-with-ackerman-mcqueen

June 26, 2019

After months of drama and discord, the National Rifle Association notched two small victories in court on Wednesday.

Just minutes before news broke that the group's top lobbyist had resigned, Judge Nolan Dawkins in circuit court in Alexandria, Virginia, ruled that the NRA does not immediately have to pay its former ad firm $1.6 million.

Advertisement

The firm, Ackerman McQueen, had previously asked the judge to issue a preliminary injunction ordering the NRA to pay the money it owes, claiming dozens of its employees could lose their income without it. Those employees worked for NRATV, the often-controversial internet channel Ackerman McQueen ran for the NRA.

The hearing was the latest salvo in a months-long cage match between the NRA and Ackerman McQueen in which millions of dollars are at stake. The court battle has pried open the doors of the NRA, a notably press-shy organization that spent years trying to circumvent mainstream media attention by running conservative counterprogramming on NRATV. But allegations of opaque billing practices and legal tomfoolery have pitted the NRA against Ackerman McQueen, which used to run its programming. Coupled with other financial problems, the fight indicates the NRA's future may be fraught.

Ackerman McQueen, which had represented the NRA for almost four decades, has said in court filings that dozens of its employees could be laid off or furloughed if the NRA doesn't pay the firm the $1.6 million.

In a motion filed last week, the firm asked the judge to move fast. But in court Wednesday, the judge said he didn't have enough time allotted that day to hear out both sides' arguments over the money. So, at least for now, the NRA doesn't have to pay.

David Dickieson, who represents Ackerman McQueen, said in court that the gun group's internal struggle has collateral damage.

"What we are witnessing here is the implosion of the NRA," he said. "Let me correct that: It's not the implosion, it's the explosion."

The judge also let a Dallas-based lawyer for the NRA's outside law firm, Brewer Attorneys

1/2

APP000497

and Counselors, waive in to represent the gun group in its case against Ackerman. The relationship between the firm, the NRA, and Ackerman McQueen is an odd one: Bill Brewer, the head of the law firm, is the brother-in-law of Ackerman McQueen's CEO, Revan McQueen.

Lawyers for the ad firm have alleged that Brewer is using the NRA's legal fight with the ad firm to steal its business and take over public affairs for the gun group. On top of that, lawyers for both the NRA and Ackerman McQueen said in court that Brewer could be a witness in litigation between the NRA and the ad firm. The ad firm's lawyer argued this should have kept the other lawyer from Brewer's firm, Mike Collins, from representing the NRA. But the judge didn't bite, and Collins will take part in the case.

The night before the hearing, the NRA abruptly announced it was ending its contract with the ad firm.

So we learn from *The New York Times* that Donald Trump chose the most extreme option the military presented to him and decided to take out Qassem Soleimani. "Top Pentagon officials," the paper reports, "were stunned."

I'd love to know who these people were and why they were stunned. People in public positions, I've learned over the years, have an amazing capacity for self-delusion and false reassurance, from the German ministers who thought bringing Hitler into the government would make him behave more responsibly, to these generals, to a thousand other clowns in between.

And now Donald Trump and the chairman of the Joint Chiefs of Staff want us to believe that the threat to the United States was imminent? Without giving us any details? I don't know about Gen. Mark Milley's relationship to the truth up to now, but we sure know about Trump's, and it tells us—this is an unsurprising but nevertheless sad thing to say—that we'd be idiots not to assume that the president of the United States is lying.

# EXHIBIT A-25

wsj.com

# NRA Files Suit Against Ad Agency in Rift With Key Partner

*Mark Maremont*

8-10 minutes

---

The National Rifle Association filed a lawsuit accusing its longtime advertising agency Ackerman McQueen Inc. of refusing to comply with demands to justify its billings, an extraordinary public break with the gun-rights group's largest outside partner.

The lawsuit, filed late Friday, comes amid an unusual battle unfolding behind the scenes at the NRA's 76-member board, which some say pits a small group of pro-Ackerman McQueen directors against other board members and an outside NRA attorney.

The dispute in part is about how the NRA, with an annual budget of more than $300 million, is spending money during a period when its finances have been tight. The NRA ran at a deficit in its two most recently reported years.

Oklahoma City-based Ackerman McQueen has been the NRA's ad agency since the 1980s and has been widely credited with helping to transform the NRA from a grass-roots operation to a powerful national advocacy group. In recent years the ad firm has also produced the organization's NRATV, a video outlet that mainly focuses on conservative and pro-gun rights commentary.

NRA filings show it paid Ackerman McQueen $42.6 million in 2017, the most recent year available, making it by far the group's largest vendor.

The lawsuit is "frivolous, inaccurate and intended to cause harm to the reputation of our company," Ackerman McQueen said in a statement. "We will defend our position and performance aggressively and look forward to continuing to serve the NRA's membership."

An Ackerman McQueen spokeswoman added that an NRA-hired forensic auditing firm spent three weeks reviewing the firm's records and was "given every single thing they requested."

In the lawsuit, filed in Circuit Court in Alexandria, Va., the NRA said Ackerman McQueen was obliged to provide access to records underlying its bills. But since the middle of 2018, it said the NRA's requests for such documents had been met with partial compliance or "rebuffed or baldly ignored...This situation cannot continue."

The NRA is concerned the ad firm may be overcharging for certain items, the lawsuit said, such as invoicing for the full salaries of Ackerman McQueen employees who were "allocating substantial

**APP000499**

Case 3:19-cv-02074-G-BK   Document 80   Filed 03/30/20   Page 120 of 486   PageID 4501

time to non-NRA clients."

The NRA also alleged it hadn't received complete information about an NRATV contract between Ackerman McQueen and retired Lt. Col. Oliver North, the Iran-Contra figure who became NRA president in May 2018.

Though the NRA president's post is largely ceremonial, the lawsuit said, Mr. North was hired last year by Ackerman McQueen to host a documentary program on NRATV—"Oliver North's American Heroes."

As a nonprofit, the NRA said it must approve and disclose its top officials' pay. The NRA initially agreed to reimburse the ad firm for costs related to Mr. North's TV contract, but when the organization later sought contract details, Ackerman McQueen balked and Mr. North for months wouldn't provide documents without the ad firm's approval, the NRA alleged.

Attempts to reach Mr. North through his assistant and his attorneys were unsuccessful.



William A. Brewer III, an outside NRA lawyer spearheading the lawsuit. Photo: Brandon Thibodeaux for The Wall Street Journal

APP000500

"It's stunning that a trusted partner for all these years is just refusing to cooperate," said William A. Brewer III, an outside NRA lawyer. He said Ackerman McQueen is the only vendor resisting the NRA's push for such records.

Some NRA board members have publicly raised questions about whether the NRA should cut back spending on Ackerman McQueen's NRATV platform, concerned that much of its content reflects conservative political views not directly related to the group's core Second Amendment message.

The NRA said in the lawsuit it had sought information on how well NRATV was faring, but claimed Ackerman McQueen refused to provide the NRA with certain requested data in writing, such as unique visitors, "that enable the NRA [to] analyze the return on its investment in NRATV."

The Ackerman McQueen spokeswoman said, "The NRA has had consistent access to any document regarding NRATV analytics."

In a Shakespearean twist, the outside NRA lawyer spearheading the lawsuit, Mr. Brewer, is related to Ackerman McQueen's two top officials, who are his brother-in-law and father-in-law.

Ackerman McQueen said it told the NRA three months ago that the family relationship meant that Mr. Brewer had an "irreconcilable conflict of interest" and that he had "demonstrated, in words and deeds, his animus" for the company and those family members.

The pro-Ackerman board faction also is blaming some of the discord on Mr. Brewer, whose firm, Brewer Attorneys & Counselors, started working for the NRA last year and has since become a major NRA vendor, according to people familiar with the matter.

Mr. Brewer's firm is representing the NRA in federal litigation against New York Gov. Andrew Cuomo and other New York state officials. The NRA accuses New York of violating its First Amendment rights by warning financial-services firms regulated by the state to avoid doing business with the gun-rights group. The defendants deny the allegations.

The pro-Ackerman McQueen faction, which people said includes Mr. North, has circulated complaints inside the NRA board that Mr. Brewer's firm is charging unusually high fees—about $1.2 million a month by some internal estimates—and is justifying those in part by exaggerating the risks that New York officials pose to the group, according to the people familiar with the matter.

"I've never seen this much agitation on the board," said Todd Rathner, an NRA board member for 20 years, who said he thinks the dissidents are attacking Mr. Brewer as a way to undermine NRA CEO Wayne LaPierre and "I'm disgusted by it."

Mr. LaPierre backed Mr. Brewer in a statement released through an NRA spokesman, saying: "I am proud of the essential work the Brewer legal team is doing for the NRA." He added that all of the

APP000501

law firm's invoices are closely reviewed by the NRA's legal and finance departments.

Mr. Brewer defended his fees in an interview, saying "we're a premium law firm, we make no bones about that." He also said his firm is doing work for the NRA well beyond the New York litigation. Among its tasks, he said, is helping the NRA respond to numerous congressional demands for records related to its dealings with Russia.

As for Mr. Brewer's family relationships, his law firm in a statement said that has "no bearing whatsoever on the NRA's litigation strategy," calling that argument a red herring.

Tom King, an NRA board member who heads a New York state gun organization, said he backs Mr. Brewer's legal effort in New York: "However much money it takes is well spent, because it's for the survival of the NRA."

Mr. King, speaking before the lawsuit was filed, said Ackerman McQueen has long been "very important to the NRA" and he expects the subject of the firm's budget to come up at the group's annual meeting later this month. As for the ad firm's NRATV content, Mr. King said, "If you took a poll of most board members, they'll tell you they like NRATV."



The dispute in part is about how the NRA is spending money during a period when its finances have been tight. Photo: Tom Pennington/Getty Images

**Write to** Mark Maremont at mark.maremont@wsj.com

APP000502

# EXHIBIT A-26

1/6/2020        Chaos at the NRA

**Case 3:19-cv-02074-G-BK  Document 80  Filed 03/30/20  Page 124 of 486  PageID 4505**

# Chaos at the NRA

by Stephen Gutowski | June 20, 2019 11:00 PM

The National Rifle Association has ousted its president and first vice president, watched an open revolt from some members on the floor of its annual meeting, sued and been sued by its top contractor, suspended its top lobbyist, and had its leadership publicly hurl accusations of financial impropriety at one another, while facing congressional inquiries and an investigation by an exceedingly hostile attorney general.

All in 2019. And the turmoil, unlike any the powerful gun rights lobby has faced in its nearly 150-year history, isn't over.

It all appears to have started in January when, according to the Wall Street Journal, the NRA's top outside counsel, William Brewer, gave a presentation to board members about concerns that newly-elected New York Attorney General Letitia James, a Democrat, would investigate and try to break up the gun rights group. James was openly hostile toward it during her campaign and referred to it as a "terrorist organization" in an interview with Ebony magazine.

With a looming threat of investigation by the NRA's charter state, some in its leadership began to scrutinize its business relationship with Ackerman McQueen, its largest contractor, that accounted for $40 million of NRA spending in 2017. Ackerman and the NRA had enjoyed a decadeslong relationship. Ackerman was reportedly responsible for not only creating and running NRATV but also developing its most iconic commercials and messaging. Top executives Angus and Revan McQueen are Brewer's father-in-law and brother-in-law, respectively.

The group was behind everything from the "I am the NRA" ads, NRA chief executive Wayne LaPierre's declaration that "the only thing that can stop a bad guy with a gun is a good guy with a gun," and Charlton Heston's famous ultimatum that the only way anyone would take his guns would be "from my cold, dead hands." It also runs one of the NRA's magazines, America's 1st Freedom, and provides logistics for its massive annual meetings and leadership forum.

Much of what the average person knows about the NRA was created by Ackerman.

Yet Ackerman had been a point of internal controversy for years. The last major leadership fight at the NRA, in the 1990s, involved complaints about the company's influence over strategy and also about its billing practices. Its messaging has also clashed with efforts by the

**APP000503**

group's lobbying arm, the Institute for Legislative Action. According to the New Yorker, Ackerman's aggressive ad campaign against President Barack Obama in 2012 after a school shooting nearly ruptured the NRA's relationship with key congressional Democrats.

The new scrutiny precipitated a legal fight. The NRA, through Brewer's law firm, filed suit against Ackerman, seeking details of its billing practices and, in particular, information on its contract with the man who was NRA president at the time, Oliver North. The NRA accused Ackerman of hiding crucial details about North's pay and demanded the company turn over documents. Ackerman claimed it gave the NRA's auditors full access to its records.

In April, with North and Ackerman McQueen on one side of this fight and LaPierre and Brewer on the other, everyone headed to Indianapolis for the NRA's annual meeting. That's when the internal struggle blew past the point of no return. As the massive meeting was underway, news broke that North and LaPierre had traded dueling letters to the NRA's board of directors, accusing one another of various forms of financial impropriety and unethical behavior.

LaPierre accused North of attempting to extort him into resigning by threatening to release damaging information. North countered by announcing the formation of a crisis committee tasked with investigating accusations of mismanagement and self-dealing by LaPierre and others that had begun being reported in newspapers and magazines. It all came to a head when LaPierre refused to resign and North flew home the night before he was set to preside over the members' meeting.

As a few thousand NRA members with voting privileges gathered to receive reports on the state of the organization from leadership and vote on their own resolutions to the board, usually a rah-rah sort of affair, North's seat was empty, and the session began with ally and NRA First Vice President Richard Childress reading a scathing letter from the former Marine colonel to the membership, repeating accusations against LaPierre, but also effectively announcing his resignation. After stirring speeches from a number of NRA officials, the meeting devolved into a shouting match as some members, including firearms instructor and gun rights activist Rob Pincus, attempted to forward what was effectively a motion of no confidence in LaPierre, audit committee members, and other leaders. Board members meanwhile attempted to end debate and adjourn the meeting. The no-confidence resolution was eventually referred to the board for further consideration.

When the board convened at the end of the annual meeting, it referred the no-confidence resolution to the audit committee and ethics committee, which will effectively decide whether audit committee members and others should be forced to resign at the next board meeting, Sept. 13. Most of the board's 9 1/2-hour meeting was spent behind closed doors in an executive session. It's not clear what, if any, decisions were made about the accusations of impropriety exchanged by North and LaPierre.

**APP000504**

One act that did seem to take place in private session — it certainly didn't occur in public — was the election of NRA leadership. Results were leaked to the New York Times: LaPierre was reelected. North and Childress were removed from their leadership positions.

"National Rifle Association Executive Vice President/CEO Wayne LaPierre was re-elected unanimously and unopposed by the NRA Board of Directors at their meeting in Indianapolis, Ind., April 29, 2019," NRA leadership later said in a post on American Rifleman's website. "Carolyn Meadows was elected NRA President."

This was disputed by board member Allen West. "The new slate of officers for the National Rifle Association was decided upon, and nominated by, the NRA Board of Directors nominating committee," West said in a post on his personal website. "There were no nominations from the floor when these names were put forth. With no opposing nominations, the vote was done by acclamation, not roll call vote. This is similar to passing a piece of legislation by voice vote."

Two weeks later, West publicly said he does not support LaPierre's continued leadership, and he called on him to resign. He had already urged this in private.

"Prior to the NRAAM in Indianapolis I sent an email to Wayne LaPierre's managing director, Millie Hallow, expressing my sentiment that Wayne LaPierre resign immediately," he said in another statement on his website. "I also drafted a memo entitled 'Resolution of Concerns.' Both of these statements are known to the NRA board.

"I do not support Wayne LaPierre continuing as the EVP/CEO of the NRA. The vote in Indianapolis was by acclamation, not roll call vote. There is a cabal of cronyism operating within the NRA and that exists within the Board of Directors. It must cease, and I do not care if I draw their angst. My duty and responsibility is to the Members of the National Rifle Association, and my oath, since July 31, 1982, has been to the Constitution of the United States, not to any political party, person, or cabal."

Meadows, First Vice President Charles Cotton, and Second Vice President retired Lt. Col. Willes Lee responded in a statement to the Washington Free Beacon, defending LaPierre and accusing West of lying.

"It is unfortunate that certain board members have resorted to making false and misleading public statements about proceedings of the NRA board of directors," the joint statement said. "As those board members know, we are not at liberty to discuss the particulars of the board of directors meeting that occurred in executive session on April 29. However, every board member was afforded the opportunity to speak openly about any issues of concern to them. To suggest otherwise is dishonorable."

**APP000505**

West further accused leadership of "maliciously, recklessly and purposefully put[ting] me, and uninformed board members, in legal jeopardy" by not informing them of accusations of financial mismanagement.

"The recent statements by Charles Cotton and Carolyn Meadows that are appearing in the Wall Street Journal, and now other news outlets, are outright lies," West said. "I have never been told, advised, informed or consulted about any of these details mentioned in the WSJ, and who knows how much more despicable spending of members' money."

Fellow NRA board member Timothy Knight echoed West's comments about being kept in the dark on his Facebook page. "I certainly did not know all those things being leaked nor do I believe that the whole Board was aware," he said. He later also called for LaPierre to resign.

Meadows, Cotton, and Lee responded by reiterating that LaPierre was "unanimously" reelected and board members were briefed on the controversies and have access to further resources to keep themselves apprised of the legal situation. They further accused board members who have criticized leadership of being part of an anti-LaPierre putsch.

"It occurs to us that board members 'voicing' concern may have been part of a failed attempt to oust Wayne LaPierre as CEO and Executive Vice President of the NRA prior to the board meeting in Indianapolis," the three NRA officials said. "In fact, we were all warned that a scorched earth campaign would ensue unless Wayne moved to withdraw the NRA's lawsuit against Ackerman McQueen and walked away from the NRA. Wayne chose the principled path — and did neither. He will continue to press for full transparency from all vendors, even the ones that employ Col. North and others."

As the fight between West and NRA leadership unfolded, the letter North sent to the board detailing accusations of excessive personal spending by LaPierre as well as another detailing his concerns over legal fees paid to Brewer's law firm leaked online. It included memos from Ackerman McQueen outlining some of the spending the company said it had been directed to do on LaPierre's travel and clothing over the years.

In one memo, Ackerman said it paid out nearly $275,000 over a 13-year period at Ermenegildo Zegna in Beverly Hills, a high-end suit store, on behalf of LaPierre. That includes a $39,435 trip on May 11, 2004, and a $39,000 trip on Sept. 22, 2015.

In the other memo, the company alleged it spent over $265,000 on airfare and limo rentals for LaPierre and was later reimbursed by the NRA. It claimed to have spent $17,600 on airfare for a trip between Washington, D.C., and New York; $47,025 on a trip between South Africa, Los Angeles, and Reno, Nev.; $7,075 on a second leg between Reno and Los Angeles; plus $40,345 for airfare from Reno back to Washington. Those four visits were all part of a 10-day, $112,045 trip between Jan. 17 and Jan. 27, 2013, according to the letter.

**APP000506**

The second Ackerman memo also lists $13,804.84 worth of rent for May through August 2016 for Megan Allen, who was an intern at the NRA during that time and is now a gift planning associate. The letter lists rent for the apartment at $5,346 per month. It also asks LaPierre to explain his "business relationship with Ms. Allen."

Another letter from North and Childress to the NRA's general counsel and audit committee requested that an "independent, outside expert" review fees paid to Brewer's law firm. They said the NRA had already spent $24 million on legal fees at the firm in the previous 13 months, nearly $100,000 per day at some points.

The pair described Brewer's fees as excessive and "draining NRA cash at mindboggling speeds." They went on to say the fees were a "fiscal emergency" that could "pose an existential threat to the financial stability of the NRA."

Cotton responded to complaints about Brewer's fees with a statement saying, "The memo on the Brewer firm's legal fees is inaccurate — it reflects a misinformed view of the firm, its billings, and its advocacy for the NRA." Brewer's firm has said its fees, which appear well beyond what the NRA has paid for past legal representation, are justified by the firm's expertise.

The leak of the memos set off a new round of lawsuits. In late May, the Daily Beast reported NRA leadership doubled down on its previous suit against Ackerman by having Brewer file a second one, this time over the leaks themselves and asking for $50 million in damages instead of mere document production. Ackerman hit back with its own $50 million counterclaim. The company then moved to end its decadeslong relationship with the NRA.

For now, NRATV and other Ackerman projects continue to operate as normal, but the future of some of NRA's best-known personalities, hosts such as Cam Edwards, Grant Stinchfield, and Dana Loesch, remains unclear.

It hasn't all been bad news for the NRA. More than 80,000 people attended the annual meeting, which featured speeches from leading Republican representatives, and President Trump spoke there for the third year in a row. Additionally, membership dues and donations reportedly rebounded in 2018. Dues grew over $42 million, or 33%, while donations climbed by over $32 million, which is a 24% increase. Dues in 2018 were even above the levels seen during the 2016 election.

The NRA also announced at the annual meeting that it now has 5.5 million dues-paying members, which was described as an all-time record. NRA support remained broad in 2018, and its supporters continued giving. But the NRA remained in the red and saw a 374% jump in administrative legal fees, while cutting training and education by 23% and dramatically curtailing election spending.

APP000507

Case 3:19-cv-02074-G-BK   Document 80   Filed 03/30/20   Page 129 of 486   PageID 4510

Brewer's law firm is now working through depositions in the second suit against Ackerman, after issuing subpoenas for North, two of its board members, and Rob Pincus.

As the legal battle with Ackerman plays out, it's sure to inform a legal battle with New York's hostile attorney general, which poses an existential threat to the NRA and unknown consequences for gun rights supporters. An increasingly hostile Democratic Party is not only passing sweeping gun control bills out of the statehouses and the federal chamber it controls, but it's now fielding serious primary contenders pushing some of the strictest gun control proposals in a race to challenge the NRA's top ally, Trump. It's also facing a battle over Trump's call to ban firearms suppressors.

And, for now at least, it seems it'll have to face those challenges without the man who has headed its lobbying efforts for the last 17 years: Chris Cox. He and his chief of staff, Scott Christman, were suspended by NRA leadership after being accused of participating in the effort to oust LaPierre, according to reports from the New York Times and Bloomberg News. Cox has denied any involvement, but his future with the organization and where the group's Institute for Legislative Action will go from here is unclear.

Some, including Pincus, argue that the NRA won't be able to take on these challenges unless it dumps both Ackerman and LaPierre. "Wayne has now become the front man for a dysfunctional, dare I say 'corrupt' (at least in the moral sense, if not legally), regime," he wrote in AmmoLand. "They enriched themselves and their friends at great expense to the gun community and the cause of gun rights. They stopped lobbying and became professional panderers ... fundraisers focused on the most potentially lucrative segment of American Gun Owners. *Nothing more*."

He continued, "Now, that the alliance between Wayne LaPierre & Ackerman McQueen is falling apart, they are at each other's throats, and Wayne is desperately trying to appear to be on the high ground while AM tries to manipulate the outcome to protect their cash cow."

He has called on members to stop donating unless changes are made in leadership and the way the board works.

On the opposite side, NRA President Carolyn Meadows and a group of former presidents insisted in a recent letter that the organization is on sound financial footing, prepared to deal with legal challenges, and united behind LaPierre.

"Perhaps looking for a way to counter the narrative about a stronger, more unified NRA, questions have now conveniently surfaced about our financial situation and our standing in the regulatory arena. There also have been frequent attacks on Wayne's personal character," they said. "Our financial house is in order — we aren't going away. We have full confidence in the NRA's accounting practices and commitment to good governance."

**APP000508**

Case 3:19-cv-02074-G-BK   Document 80   Filed 03/30/20   Page 130 of 486   PageID 4511

The NRA officials said all of the attention on the recent chaos is overblown and is being used by the group's opponents to put them in a bad light.

"Our adversaries will not divide us and any further discussion about the so-called 'demise of the NRA' is only meant to distract us from our mission," they said.

Unfortunately for all involved, and gun rights supporters at large, it will be months before we know what will come of the Ackerman lawsuits, the New York investigation, and how those ordeals will affect the NRA's ability to spend money in elections or on lobbying. What *is* clear, however, is just how much is at stake.

*Stephen Gutowski is a staff writer at the Washington Free Beacon and widely cited expert on firearms policy and politics.*

APP000509

# EXHIBIT A-27

## ProPublica Says Attorney Bill Brewer Keeps Burn Books

**D** dmagazine.com/frontburner/2019/07/propublica-says-attorney-bill-brewer-keeps-burn-books

July 31,
2019



You may be aware that cutthroat Dallas attorney Bill Brewer provides outside counsel to the NRA. As such, he's sometimes the one out in front of reporters defending the NRA from claims of, say, self-dealing. That happened <u>as recently as May</u>. He's everywhere in this April <u>*New Yorker* slice</u> on the organization's inner dysfunction and money problems, as well.

But now comes this <u>combined ProPublica, The Trace, and *New Yorker* exposé</u> on Brewer's own tactics within the organization. A former NRA treasury type accuses him in a letter obtained by the publications of intimidating staff into paying his firm crazy cash—$24 million over 13 months, or $97,000 a day. It contains one fun detail, the type that's fun in a temporarily-distract-you-from-the-soulless-organization-he-stands-with kind of a way. To do so, he, according to this former senior employee named Emily Cummins, compiled "burn books." They were "filled with personal information that he could use against individuals."

APP000510

> "Cummins accuses Brewer of trying to intimidate, deceive and silence NRA staff who were processing his bills while some accountants were growing increasingly troubled by the organization's mismanagement, exorbitant spending and questionable deals involving conflicts of interest. Former Brewer colleagues as well as written correspondence obtained by ProPublica broadly supported her claims."

Her own words:

> "I witnessed what appeared to be unrealistic and duplicative billing from Bill Brewer," Cummins wrote. "I witnessed that Bill Brewer himself created a 2018 cash flow crunch by interfering with accounts payable to prioritize paying himself immediately versus other NRA vendors that had been providing goods or services for months without payment, also jeopardizing the NRA's biweekly staff payroll."

Brewer's firm denies those allegations and says the fees are standard.

But burn books? Like in *Mean Girls?*

APP000511

# EXHIBIT A-28
# FILED
# UNDER SEAL

# EXHIBIT A-29
# FILED
# UNDER SEAL

# EXHIBIT A-30

4/12/19

**V I R G I N I A:**

## IN THE CIRCUIT COURT FOR THE
## CITY OF ALEXANDRIA

| | |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Civil Case No. CL19001757 |
| ACKERMAN MCQUEEN, INC., | ) ) ) |
| and | ) ) |
| MERCURY GROUP, INC. | ) ) |
| Defendants. | ) ) ) ) |

## COMPLAINT

COMES NOW the Plaintiff, the National Rifle Association of America (the "NRA"), and files this Complaint against Defendants Ackerman McQueen, Inc. ("Ackerman") and Mercury Group, Inc. ("Mercury" and, collectively with Ackerman, "AMc"), based on personal information as to its own actions and on information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

The NRA seeks specific performance of an unambiguous books-and-records inspection right contained in a longstanding contract with one of its most important third-party vendors: the advertising agency Ackerman McQueen.

APP000610

The NRA and Ackerman have collaborated fruitfully for decades. Together, the parties crafted iconic, impactful Second Amendment messaging that featured Charlton Heston ("from my cold, dead hands") and other important constitutional rights advocates. The impasse between them which gives rise to this lawsuit is simple, and baffling: the NRA requested access to material, readily available records that Ackerman and Mercury are contractually obligated to provide. Defendants refused to provide them.

For the better part of a year, the NRA has negotiated with AMc and appeased its demands in an effort to coax compliance with the parties' contract. However, the NRA's patience has run out. Confronting escalating concerns about AMc's activities and accounting practices, the NRA seeks access to basic business records—including *budgets purportedly approved by the NRA*, copies of *material contracts for which the NRA is purportedly liable*, and *readily available performance data*—all to inform the judgment of its fiduciaries. The NRA has an undisputed contractual right to examine these documents. Indeed, its contract with AMc entitles the NRA, upon "reasonable notice," to examine any and all "files, books, and records" of both Ackerman and Mercury which pertain to matters covered by the parties' contract. Since July 2018, the NRA has provided more-than-reasonable notice of its desire to view key items. In some instances, AMc has affected partial compliance with the NRA's requests—in other cases, it has rebuffed or baldly ignored the NRA's letters. This situation cannot continue.

There is no adequate remedy at law which would compensate the NRA for the risks and burdens posed by AMc's concealment of material business records. Fortunately, there is a straightforward remedy at equity: specific performance by Ackerman and Mercury of their obligation to furnish documents. This is the relief the NRA seeks.

APP000611

## PARTIES

1.      Plaintiff NRA is a not-for-profit corporation organized under the laws of the State of New York with its principal place of business located in Fairfax, Virginia. The NRA is America's leading provider of gun-safety and marksmanship education for civilians and law enforcement. It is also the foremost defender of the Second Amendment of the United States Constitution. A 501(c)(4) tax-exempt organization, the NRA has over five million members—and its programs reach many millions more.

2.      Defendant Ackerman is a nonresident for-profit business corporation organized under the laws of the State of Oklahoma with its principal place of business in Oklahoma City, Oklahoma. Ackerman is an advertising and public relations agency that has counted the NRA among its largest clients for more than thirty years.

3.      Defendant Mercury Group, Inc. ("Mercury" and, collectively with Ackerman pursuant to the Services Agreement, "AMc") is a nonresident for-profit business corporation organized under the laws of the State of Oklahoma with its principal place of business in Alexandria, Virginia. Mercury is a wholly owned subsidiary of Ackerman which specializes in public-communications strategy, including on behalf of advocacy groups such as the NRA. At all relevant times, Ackerman has acted on behalf of both itself and Mercury pursuant to the Services Agreement (defined below) between Ackerman and the NRA.

## RELEVANT NONPARTIES

4.      The NRA Foundation, Inc. (the "NRA Foundation") is a 501(c)(3) tax-exempt organization that raises tax-deductible contributions in support of a wide range of firearm-related public interest activities of the NRA and other organizations that defend and foster the Second

APP000612

Amendment rights of law-abiding Americans. Over the course of its contractual relationship with the NRA, Ackerman has occasionally performed services for the benefit of the NRA Foundation and issued corresponding invoices to the NRA Foundation. Because of its 501(c)(3) designation, the NRA Foundation is permitted to engage in, and fund, a narrower range of activities and communications than the NRA.

## JURISDICTION AND VENUE

5.  The Court has jurisdiction over the NRA's claims in this matter as the claims are subject to a court of general jurisdiction.

6.  This Court has jurisdiction over Ackerman and Mercury pursuant to Virginia Code § 8.01-328.1 because Ackerman and Mercury have both transacted business in the Commonwealth of Virginia and contracted to supply services in the Commonwealth of Virginia.

7.  Venue is proper in this Court pursuant to Virginia Code § 8.01-262 because Mercury's principle place of business is located in Alexandria, there exists a practical nexus to this forum, and/or a part of this cause of action arose in Alexandria.

8.  Additionally, jurisdiction and venue are proper in this Court because Ackerman and Mercury have both contractually consented with the NRA to exclusive jurisdiction and venue of courts sitting within Virginia and waived any objection to venue in Alexandria, Virginia regarding the matters presented herein.

## FACTUAL BACKGROUND

## A.  For More Than Thirty Years, the NRA Has Relied on AMc to Provide Public-Affairs Advice and Services Under Carefully Negotiated Contracts.

9.  For decades, AMc and the NRA have collaborated closely regarding public affairs and messaging. Over that time, the NRA vested extensive trust and confidence in AMc, relying

APP000613

upon the agency to perform work including: public relations and strategic marketing; planning and placement of media; management of digital media and websites; and, the operation of NRATV, a digital-media platform managed by AMc but frequently perceived by the public as the "voice" of the NRA.[1]

10.    Since at least 1999, AMc's work on behalf of the NRA has been governed by successive incarnations of a Services Agreement containing detailed specifications for how various types of work performed by AMc for the NRA should be budgeted and billed. The Services Agreement between the NRA and AMc dated May 1, 1999 (the "Previous Services Agreement") as well as the current, operative Services Agreement dated April 30, 2017 (as amended May 6, 2018, the "Services Agreement") provide that certain categories of services, such as Owned Media and Internet Services, are compensated with an agreed annual fee, while others are required to be invoiced on an *ad hoc* basis based on estimates furnished by AMc and approved by the NRA.

11.    Both the Previous Services Agreement and the current Services Agreement have obligated AMc to adjust its pricing based on the "fair market value" or "fair market price" of the services performed. For example, the Previous Services Agreement contained the straightforward assurance by AMc, "we will charge you a fair market price for the work performed." Similarly, the Previous Services Agreement and the current Services Agreement require AMc to provide cost quotations for art concepts, design layouts, and similar items "based on the fair market price of the work as determined by AMc."

12.    Anticipating that AMc would, from time to time, incur out-of-pocket expenses in the course of its work, but mindful of the NRA's mandate to steward its funds in the interest of its

---

[1] *See, e.g.,* Jeremy W. Peters & Katie Benner, *Where The N.R.A. Speaks First and Loudest,* THE NEW YORK TIMES, February 21, 2018. https://www.nytimes.com/2018/02/21/us/politics/nratv-nra-news-media-operation.html.

APP000614

public mission, the parties bargained for an expense-reimbursement protocol whereby travel and related expenses incurred by AMc could be paid by the NRA—but only upon prior written approval from the NRA in accordance with the NRA's expense-reimbursement procedures.

13.     The NRA's collaboration with AMc has generated important, iconic Second Amendment advocacy. In recent years, the trust and confidence it placed in AMc led the NRA to invest in an expanding suite of services which were—according to AMc's assurances—fairly priced. For example, the NRA agreed to experiment with an "owned media company," NRATV, a concept fervently pitched by AMc. By 2017, the NRA's aggregate payments to Ackerman and Mercury totaled nearly $40 million annually.

14.     As the scope of AMc's work for the NRA grew, AMc represented to the NRA that it was required to hire a substantial number of personnel, as well as incur obligations to third-party contractors, for the exclusive purpose of servicing the NRA's account. Accordingly, when the parties renegotiated a new services agreement in 2017, AMc insisted upon—and the NRA agreed to provide—certain financial assurances in the event that the NRA terminated the Services Agreement. Among other things, upon the NRA's termination, the Services Agreement requires that the NRA compensate AMc for outstanding liabilities to both third-party contractors and employees. Specifically, the NRA must: (i) pay AMc the balance of any compensation owed under "non-cancellable contracts entered into between AMc and third parties for the benefit of the NRA" (as defined under the Services Agreement, the "AMc-Third Party NRA Contracts"); and (ii) pay AMc a termination fee to cover severance payments owed to AMc employees who are "dedicat[ed] . . . . to provide services [to the NRA]" and need to be laid off if the Services Agreement is terminated (the "NRA-Dedicated Personnel").

APP000615

**B.      The NRA Bargained for Transparent Insight Into AMc's Books and Records.**

15.      The NRA bargained for transparency into AMc's files, books and records to ensure

that the NRA, a not-for-profit, could appropriately monitor the use of its funds.  Both the Previous

Services Agreement and the current Services Agreement incorporate records-examination clauses

that require AMc to open its files for the NRA's inspection upon reasonable notice.  The full text

of the Records-Examination Clause in the Services Agreement appears below:



**VIII. EXAMINATION OF RECORDS**
During the term of this Services Agreement, AMc authorizes NRA, upon reasonable notice,
to examine AMc and Mercury's files, books and records, with respect to matters covered
under this Services Agreement.

16.      For years, the NRA conducted annual audits of certain AMc files pursuant to the

Records-Examination Clause.  Frequently, the audited records consisted of "samples" assembled

in advance by AMc.  During 2018, the NRA sought to expand its insight into AMc's activities and

its spending—including full access to certain categories of records rather than sample subsets

gathered by AMc  Surprisingly and unfortunately, that effort ignited the parties' current dispute.

**C.      In Response to Concerns From NRA Employees and Stakeholders, the NRA Attempts
           to Exercise Its Contractual Record-Examination Right—But Is Rebuffed.**

17.      In late 2016, the State of New York amended its Not-for-Profit Corporation Law

(the "NPCL") to clarify requirements for director independence and the ratification of related-

party contracts, among other items.  After updating its internal policies and controls to comply

with the New York amendments, the NRA decided to strengthen its procedures for documentation

and verification of compliance with vendor contracts. Beginning in August 2018, the NRA sent

letters to hundreds of vendors—including AMc—that set forth updated invoice-support

APP000616

requirements and provided detailed guidance regarding, for example, expense reimbursement procedures.

18.    During the course of this process, the NRA developed concerns that AMc's expenses and activities required closer oversight. Specific concerns that the NRA sought to investigate included:

- "Out of pocket" expenses that lacked meaningful documentation of NRA approvals, receipts, or other support, despite the requirements set forth in the Services Agreement;

- Lack of transparency regarding AMc's annual budgets under the Services Agreement, as well as its adherence to those budgets;

- Lack of transparency regarding "fair market value" determinations;

- Concerns that AMc was invoicing the NRA for the entire salaries attributable to NRA-Dedicated Personnel, despite certain NRA-Dedicated Personnel allocating substantial time to non-NRA clients;

- Refusal to provide certain requested data "in writing" (such as unique visitors, viewership numbers, clickthrough rates, or related performance metrics) that enable the NRA analyze the return on its investment in NRATV.[2]

19.    During early- and mid-2018, the NRA sought information from AMc pursuant to the Records-Examination Clause on a common-interest basis to advance the parties' mutual interests in connection with an ongoing lawsuit. However, after the NRA began to request access to records that would shed light on the above topics, AMc's responses became evasive and hostile. In fact, in September 2018, for the first time in the parties' decades-long course of dealing, AMc demanded that its outside counsel supervise any document review conducted under the Records-Examination Clause, then demanded payment of outside counsel's legal fees as a precondition for delivery of video footage for which AMc had already invoiced the NRA. During a telephone call

---

[2] In addition, certain NRA stakeholders were also concerned that NRATV's messaging—on topics far afield of the Second Amendment—deviated from the NRA's core mission and values.

APP000617

on September 19, 2018, after AMc's counsel insisted that the NRA pay AMc's legal fees without any insight into why the fees had been incurred, the NRA's counsel observed that AMc's posture seemed more consistent with an adverse than a common-interest relationship.  AMc's counsel replied: "Ackerman views the relationship as adverse."

20.     Thereafter, AMc strenuously resisted the NRA's efforts to enforce the Services Agreement, including embarking on a campaign to "kill the messenger" when the NRA sought access to documents or proposed reductions in AMc's budget.  At first, AMc scapegoated the NRA's outside counsel.  However, over ensuing months, AMc also refused to respond to basic information requests from NRA executives.  After the NRA retained a third-party forensic accounting firm to interface with AMc in an effort to appease AMc and gain its compliance in January 2019, AMc indicated it would cooperate.  Unfortunately, that pledge of cooperation was short-lived as AMc forbid the accountants from disclosing simple, material information to the NRA—including copies of annual budgets that the NRA allegedly approved  When the NRA's General Counsel sought additional information in follow-up to the forensic audit, AMc ignored his letters.

**D.     AMc Is Concealing Material Information From the NRA, Including a Large Related-Party Contract.**

21.     The NRA brings this action not only because AMc has flagrantly disregarded its contractual obligations, but because the NRA has recently grown concerned that the records AMc is withholding include information material to the NRA's not-for-profit governance and its stewardship of its members' donations.

22.     Lieutenant Colonel Oliver North (Ret.) ("Col  North") is a veteran of the United States Marine Corps and the Reagan administration, a longstanding advocate for the Second Amendment, and a member of the NRA Board of Directors.  During May 2018, the NRA

APP000618

announced that Col. North was slated to serve as its next President—a largely ceremonial but high-profile position famously occupied by Charlton Heston during the late 1990s. As Col. North prepared to assume the presidency of the NRA, he separately discussed a potential engagement by AMc as the host of an NRATV documentary series. On May 6, 2018, the NRA and AMc amended the Services Agreement to affirm that any contract between AMc and Col. North would be considered an AMc-Third Party NRA Contract, for which outstanding compensation would be owed by the NRA to AMc if the Services Agreement was terminated. Importantly, the amendment treated Col. North as a third-party contractor—but not, necessarily, an employee—of AMc.

23.     New York law requires that the NRA Board of Directors, or an authorized committee thereof, review and approve "any transaction, agreement, or any other arrangement in which [a director or officer of the NRA] has a financial interest and in which the [NRA or an affiliate] is a participant."[3] Guidance published by the New York Attorney General notes that a board of directors may define additional restrictions on transactions giving rise to potential conflicts of interest;[4] and, consistent with best practices, the NRA's Conflict of Interest Policy requires disclosure of contracts between NRA leadership and vendors, like AMc, that receive funds from the NRA.

24.     Aware that Col. North entered into a contract with AMc (the "North Contract"), the NRA diligently sought to comply with its obligations concerning analysis and approval of the North Contract. During September 2018, the Audit Committee of the NRA Board of Directors (the "Audit Committee") reviewed a purported summary of the material terms of the North

---

[3] See N.Y. N-PCL § 715.

[4] Conflicts of Interest Policies Under the Not-for-Profit Corporation Law, CHARITIES BUREAU, N.Y. STATE OFFICE OF THE ATTORNEY GENERAL (2018), https://www.charitiesnys.com/pdfs/Charities_Conflict_of_Interest.pdf, at 3.

APP000619

Contract and ratified the relationship pursuant to New York law—subject to carefully drawn provisos designed to avoid any conflicts of interest.

25.     At the time it ratified Col. North's continued service as an NRA director and President given his relationship with AMc, the Audit Committee was assured that the NRA's counsel would review the North Contract in full.  But thereafter, AMc continued to refuse to provide the North Contract pursuant to the Records-Examination Clause.  Meanwhile, Col. North indicated via counsel that he could only disclose a copy of the contract to the NRA subject to AMc's consent.  This back-and-forth persisted for nearly six months.

26.     Eventually, in February 2019, AMc acceded to a brief, circumscribed, "live" review of the North Contract (but no retention of any copies) by the General Counsel of the NRA.  This review raised concerns about whether the previous summary of the North Contract which was provided to the Audit Committee had been complete and accurate.  Among other things, the NRA's brief, limited review of the North Contract gave rise to questions regarding: (i) whether Col. North was a third-party contractor of AMc or, conversely, a full-time employee with fiduciary duties to AMc that supersede his duties to the NRA; (ii) whether the previously disclosed costs borne by the NRA in connection with the North Contract were complete and accurate; and (iii) whether the contract imposed obligations on Col. North that prevent him from communicating fully and honestly with other NRA fiduciaries about AMc.  Against the backdrop of escalating concerns about AMc's compliance with the Services Agreement and applicable law, the NRA became determined to resolve these issues.

27.     By letters dated March 25-26, 2019, the NRA's General Counsel again sought visibility regarding the North Contract and other material business records pursuant to the Services Agreement.  Specifically, the NRA requested:

APP000620

- Information about any additional costs relating to AMc's engagement of Col. North, to the extent that such costs were being "passed through" to the NRA;

- Copies of any additional AMc-Third Party NRA Contracts currently in existence;

- Information about which AMc personnel purportedly constituted "NRA-Dedicated Personnel," such that their salaries or severance were alleged to be reimbursable by the NRA, and business records sufficient to show whether these personnel were in fact dedicated to NRA projects; and

- Copies of the annual budget documents provided to the NRA's forensic accountants.

28.    The NRA made clear that it sought the above information "in whatever form [wa]s most convenient" for AMc and hoped to obtain access to ordinary-course business records as contemplated under the Records-Examination Clause.  AMc immediately acknowledged receipt of the letters and promised to respond.  AMc has not done so.  Put simply, the NRA is at the end of its rope.

E.    **AMc's Disregard of Its Contractual Obligations Will Continue to Damage the NRA.**

29.    AMc's breach of the Services Agreement has damaged—and threatens to imminently and irreparably harm—the NRA's legitimate operational interests as a not-for-profit organization. By denying the NRA access to basic information regarding the nature of the services being performed, the putative budgets for these services, and the material terms of third-party contracts for which the NRA is purportedly liable, AMc is interfering with the NRA's ability to steward its funds in pursuit of its public mission.  Moreover, AMc's baseless refusal to permit a fulsome review of the North Contract threatens to impede the NRA's corporate governance process.

30.    If the NRA is denied access to material business records regarding its largest vendor relationship—records which it specifically bargained to access, under the Services Agreement— the NRA's fiduciaries will be forced either to exercise their business judgment based on

APP000621

incomplete information or defer resolution of pressing matters. There is no adequate remedy at law for the risks that would arise in either scenario. The NRA is America's oldest civil rights organization and an advocate for millions of law-abiding gun owners. Its compliance with not-for-profit law cannot be permitted to be held hostage by a recalcitrant advertising agency.

### DEMAND FOR JURY TRIAL

31.     Plaintiff hereby demands a trial by jury regarding all issues of fact in this case.

### FIRST CAUSE OF ACTION

### BREACH OF CONTRACT AND REQUEST FOR SPECIFIC PERFORMANCE
### (Against All Defendants)

31.     Plaintiff incorporates by reference and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

32.     The Services Agreement is a legally enforceable contract. The Records-Examination Clause is unambiguous.

33.     The NRA has performed all of its obligations under the Services Agreement, including its obligation to provide reasonable notice pursuant to the Records-Examination Clause.

34.     Ackerman and Mercury have breached the Records-Examination Clause of the Services Agreement. Specifically, Ackerman—acting at all times on behalf of both itself and Mercury, pursuant to the Services Agreement—has repeatedly failed or refused to permit the NRA to examine specified categories of books and records with respect to matters covered under the Services Agreement.

35.     There is no adequate remedy at law for AMc's refusal to permit examination of records (whether they reside at Ackerman or Mercury) pursuant to the Services Agreement. The information sought by the NRA pursuant to the Records-Examination Clause resides uniquely

APP000622

within the possession of Ackerman and/or Mercury, and cannot be acquired by the NRA on the open market for any sum of money.

36.     The nature of the obligation imposed by the Records-Examination Clause makes specific performance equitable and practical because the Court need only order AMc to furnish to the NRA: (i) copies of any AMc-Third Party NRA Contracts; and (ii) business records, in whatever form they were generated in the ordinary course of AMc's business, which are sufficient to convey the information sought by the NRA as described in Paragraph 27 hereof.

37.     Defendants' breaches of the Services Agreement have damaged—and threaten to imminently, irreparably harm—the NRA's legitimate operational interests as a not-for-profit organization. By denying the NRA access to basic information regarding the nature of the services being performed, the putative budgets for these services, and the material terms of third-party contracts for which the NRA is purportedly liable, Defendants have jeopardized the NRA's ability to steward its funds in pursuit of its public mission.   Moreover, AMc's continued and baseless refusal to permit a fulsome review of the North Contract threatens to impede the NRA's corporate governance.

38.     By reason of the foregoing, the NRA requests that this Court order specific performance by Defendants of their obligations pursuant to the Records-Examination Clause of the Services Agreement.

## REQUEST FOR RELIEF

Wherefore, for all the foregoing reasons, Plaintiff requests relief as follows:

a.     A judgment against each of Ackerman and Mercury for breach of contract;

b.     An award of specific performance to the NRA requiring that:

APP000623

a.  AMc furnish copies of all AMc-Third Party NRA Contracts to the NRA within three (3) business days of the entry of such order; and

b.  Within ten (10) business days of the entry of such order, AMc furnish to the NRA:

    i.  Copies of annual budgets for the years 2016-2018, which AMc alleges were approved by the NRA and were previously provided to the NRA's forensic accountants;

    ii.  A list of all current NRA-Dedicated Personnel (as defined in the NRA's letter correspondence) and, for each such employee, copies of business records sufficient to show the amount or percentage of the employee's time that was dedicated to NRA projects during the period from January 1, 2018, to present;

    iii.  Copies business of records sufficient to show the extent of any costs invoiced to the NRA or the NRA Foundation, during the period from January 1, 2018, to April 1, 2019, which costs were incurred by reason of:

        (1) The production of the NRATV documentary series "American Heroes;" or

        (2) Cash or non-cash compensation to Col. North or North-related Staff; or

        (3) Office space or other perquisites provided to Col. North or North-related Staff; and

        (4) Whether each item was billed specifically to the NRA, the NRA Foundation, or both entities; and

APP000624

c.   Such other and further relief to which the NRA may be entitled at law or in equity.

Respectfully submitted,

James W. Hundley (VA Bar No. 30723)
Robert H. Cox (VA Bar No. 33118)
Amy L. Bradley (VA Bar No. 80155)
BRIGLIA HUNDLEY, P.C.
1921 Gallows Road, Suite 750
Tysons Corner, VA 22182
jhundley@brigliahundley.com
rcox@brigliahundley.com
abradley@brigliahundley.com
Phone: 703-883-0880
Fax: 703-883-0899

**ATTORNEYS FOR THE NATIONAL RIFLE ASSOCIATION**

APP000625

# EXHIBIT A-31

- Polls
  - Mobile Apps
  - Subscribe to the Global Advisors newsletters
- Media
- Contact
  - Contact form
  - Contact details
  - Visit us

- Strategy | Management | Global Advisors
- Breaking business news
- The NRA's ad agency just ended its 38-year relationship with the gun group

# The NRA's ad agency just ended its 38-year relationship with the gun group

Advertising Age 29 May 2019 Breaking business news 0 Comments

The National Rifle Association's longtime advertising and public relations firm ended its relationship with the group amid a legal battle that has cast a harsh light on spending and governance at the gun-rights lobby.

The firm, Ackerman McQueen Inc., said Wednesday that it would cease working with the NRA after 38 years because "the NRA's chaos led us to lose faith" in the group.

The breakup comes after the NRA sued Ackerman McQueen in April, claiming it refused to provide details of its employment contract with Oliver North, who also served as the unpaid NRA president. North had previously raised questions about spending by the NRA's executive vice president and chief executive officer, Wayne LaPierre. North was then ousted during the NRA's annual meeting. The ad agency has denied withholding information about North's contract and counter-sued.

"We were attacked in frivolous lawsuits and defamed with made-up stories that were then cowardly peddled to the media," the Oklahoma City firm said in a written statement. "The intent was to make us afraid. We will never fear the truth."

Ackerman McQueen added: "The turmoil the NRA faces today was self-inflicted. It could have been avoided. We deeply regret that it wasn't."

It wasn't immediately clear how the termination of the firm's service agreement will affect the operation of NRATV, which it produced to promote gun rights and other conservative causes. The NRA paid the firm and a subsidiary nearly $40 million for its work in 2017, according to court filings.

"It is not surprising that Ackerman now attempts to escape the consequences of its own conduct," William A. Brewer III, a lawyer for the NRA, said in a statement. "When confronted with inquiries about its services and billing records, Ackerman not only failed to cooperate—it sponsored a failed coup attempt to unseat Wayne LaPierre. The NRA alleges that Ackerman not only attempted to derail an investigation into its conduct, but unleashed a smear campaign against any who dared to hold the agency accountable."

NRA spokesman Andrew Arulanandam said the group would begin shifting its communications work. "We have an opportunity to elevate our brand, communicate with a broader community of gun owners and press the advantage in the upcoming 2020 elections," he said in a statement.

Before the announcement on Wednesday, the ad agency continued to work for the NRA even as the parties battled in state court in Alexandria, Virginia. Last week, the NRA filed an emergency motion to halt litigation after accusing an Ackerman McQueen employee of stealing a PowerPoint presentation detailing its courtroom strategy. Ackerman McQueen's statement was reported earlier by the Wall Street Journal.
–*Bloomberg News*

Read the full article here.
*This content was originally published by Advertising Age. Original publishers retain all rights. It appears here for a limited time before automated archiving. By*

## Share this:

- Facebook

APP000626

# EXHIBIT A-32
# FILED
# UNDER SEAL

# EXHIBIT A-33
# FILED
# UNDER SEAL

# EXHIBIT A-34
# FILED
# UNDER SEAL

# EXHIBIT A-35
# FILED
# UNDER SEAL

# EXHIBIT A-36

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/nras-wayne-lapierre-says-he-is-being-extorted-pressured-to-resign-11556314763

U.S.

# NRA's Wayne LaPierre Says He Is Being Extorted, Pressured to Resign

Group's longtime leader says Oliver North, president of the NRA, wants him out



Wayne LaPierre, who spoke Friday at an annual meeting of the National Rifle Association, has been at the top of the organization for three decades. **PHOTO:** DANIEL ACKER/BLOOMBERG NEWS

*By Mark Maremont*

April 26, 2019 5:39 pm ET

Longtime National Rifle Association leader Wayne LaPierre has told the group's board he is being extorted and pressured to resign by the organization's president, Oliver North, over allegations of financial improprieties, in a battle stirring up one of the nation's most powerful nonprofit political groups.

In a letter sent to NRA board members late Thursday afternoon, Mr. LaPierre, the group's CEO and executive vice president, said he refused the demand. Instead he called on board members to "see this for what it is: a threat meant to intimidate and divide us."

Mr. North sent his own letter to the board late Thursday evening, in which he said his actions were for the good of the NRA and that he was forming a crisis committee to examine financial matters inside the organization, according to people familiar with its contents.

**APP000691**

Case 3:19-cv-02074-G-BK   Document 80   Filed 03/30/20   Page 161 of 486   PageID 4542

READ THE LETTER

- • "Dear Members of the Board:..."

Mr. North previously had sent a longer letter to the board's executive committee detailing new allegations of financial improprieties involving more than $200,000 of wardrobe purchases by Mr. LaPierre that were charged to a vendor, according to the people. One of those people described Mr. LaPierre's letter as an "angry reaction" to Mr. North's longer letter.

The behind-the-scenes brawl is taking place amid the gun-rights group's big annual meeting, at which President Trump spoke Friday.

Insiders say matters will come to a head by Monday, when the NRA's full 76-member board is set to meet.

The fight stems in part from a dispute between the NRA and its longtime advertising firm, Ackerman McQueen Inc., which resulted in a lawsuit filed by the NRA earlier this month. In the suit, the group claimed Ackerman McQueen had refused to provide records justifying its billings. Ackerman McQueen has called the lawsuit "frivolous" and "inaccurate."

One of the NRA's claims was that for months it had been stymied in attempts to get details of the ad firm's contract with Mr. North, a former Marine Corps officer and Iran-Contra figure who hosts a documentary program on NRATV produced by Ackerman McQueen.

According to Mr. LaPierre's letter to board members, which the The Wall Street Journal has reviewed, Mr. North called an NRA senior staffer Wednesday to convey a message to the NRA chief. In the call, according to the letter, Mr. North said that unless Mr. LaPierre resigned, Ackerman McQueen was prepared to send a letter to the NRA board that would be "bad for me, two other members of my executive team and the Association."

SHARE YOUR THOUGHTS

Is the NRA in need of a new leadership or is the status quo better for its advocacy of Second Amendment rights? Join the conversation below.

The letter, Mr. LaPierre wrote the board, "would contain a devastating account of our financial status, sexual harassment charges against a staff member, accusations of wardrobe expenses and excessive staff travel expenses."

Mr. LaPierre added that after the call "others informed me that I needed to withdraw the NRA lawsuit against [Ackerman McQueen] or be smeared."

APP000692

A spokesman for Ackerman McQueen said it would have no comment.

William A. Brewer III, an outside attorney for the NRA, said, "many of the issues raised by Col. North have been the subject of review and investigation by the NRA since early last year. In our view, the items involving Mr. LaPierre may reflect a misinformed view of his and the NRA's commitment to good governance."

As for the wardrobe costs, NRA second Vice President Carolyn Meadows said the expenses dated back 15 years and "a wardrobe allowance is not that extraordinary" for the NRA chief, who has "participated in literally thousands of speeches and hundreds of television appearances during that time."

The letter also claims that Mr. North told the NRA staffer the letter wouldn't be sent if Mr. LaPierre promptly resigned. If Mr. LaPierre supported Mr. North's continued tenure as NRA president, the letter claimed, Mr. North stated he could negotiate an "excellent retirement" package for the NRA chief.

Mr. LaPierre wrote that the threat was couched, "in the parlance of extortionists, as an offer I couldn't refuse. I refused it."

In the letter, Mr. LaPierre said Mr. North was paid "millions of dollars annually" by Ackerman McQueen, for a dozen episodes of his series, "Oliver North's American Heroes." But only three episodes have been delivered thus far, Mr. LaPierre wrote, and the NRA has demanded to know what it is paying for "in light of these production shortfalls."

Ackerman McQueen "appears to have responded indirectly by trying to oust me," Mr. LaPierre wrote.

The dispute pits two high-profile conservative figures against each other. Mr. LaPierre has headed the NRA for close to 30 years. During his tenure, the group shifted from being a grass-roots organization to a nationally powerful advocacy organization with strong political sway when it comes to its core gun-rights message.

Mr. North is a conservative folk hero from his tenure in the 1980s on the National Security Council and his role in the Iran-Contra scandal. He became NRA president a year ago as the group searched for a higher-profile figure as its finances sagged after Mr. Trump's election eased concerns about more gun regulations under another Democratic administration.

APP000693

The NRA president must stand for reelection every year, but in recent years most presidents have served for two years. Mr. North's first term is scheduled to end Monday.

*—Zusha Elinson contributed to this article.*

**Write to** Mark Maremont at mark.maremont@wsj.com

*Appeared in the April 27, 2019, print edition as 'Extortion Allegation Riles Top NRA Ranks.'*

Copyright © 2020 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

APP000694

# EXHIBIT A-37
# FILED
# UNDER SEAL

# EXHIBIT A-38

**Madrid, Jay**

| | |
|---|---|
| **From:** | William Brewer <WAB@brewerattorneys.com> |
| **Sent:** | Thursday, April 12, 2018 9:42 PM |
| **To:** | Madrid, Jay |
| **Subject:** | Re: Ackerman |

Jay,

Please give me a call.
(214) 704-3674

Best,
Bill

On Apr 10, 2018, at 10:11 AM, William Brewer <WAB@brewerattorneys.com> wrote:

Jay –

Please let us know how to best coordinate obtaining copies of the following information.  Initially, we'd like to concentrate on matters involving the Carry Guard program.

We're happy to discuss any of these categories if it would be helpful:

1. Communications and notes of meetings with Lockton regarding the Carry Guard program development;

2. Documents/communications reflecting Lockton and/or insurance carrier review or approval of website or other marketing or promotional materials (e.g., signage, emails, mailings, brochures, fliers, etc.) regarding Carry Guard, or any other insurance related matters involving NRA;

3. Communications regarding any changes or revision, or need to change or revise any promotional materials or marketing approach involving insurance matters;

4. Communications and any notes regarding meetings with Lockton in November and December 2017, regarding the Carry Guard program;

5. Communications or documents regarding any insurance regulatory compliance matters involving NRA insurance programs;

6. All correspondence with any individuals at Lockton, or with any insurance carrier, regarding any NRA insurance-related program;

7. Any statistical, marketing, or other tracking report reflecting inquiries about, or sales of, Carry Guard insurance policies.  In addition, any reports regarding website traffic involving Carry Guard, or other NRA insurance program information;

1

APP000783

8. Documents involving any marketing, promotion, or solicitation of NRA membership regarding any NRA insurance program;

9. Documentation reflecting costs incurred by NRA in connection with implementation and roll-out of the Carry Guard program; and

10. Any documents reflecting guidance, instruction or approval by Lockton concerning any insurance program marketing.

Thanks again for your help.

Best,
Bill

**From:** William Brewer
**Sent:** Wednesday, April 4, 2018 7:30 AM
**To:** madrid.jay@dorsey.com
**Cc:** melanie@am.com
**Subject:** Re: Ackerman

Jay, Please call my cell at your earliest convenience. In the meantime, I'll get you a list of the material we need.
Good luck in trial.
Best,
Bill

**From:** madrid.jay@dorsey.com <madrid.jay@dorsey.com>
**Sent:** Wednesday, April 4, 2018 8:07:59 AM
**To:** William Brewer
**Cc:** melanie@AM.com
**Subject:** Ackerman

Good morning Bill. I hope you received my recent message . I have been asked to assist AM in the NRA matter and will be happy to discuss your needs. I'm in trial this week but can respond to e mails and take calls in the evening. Otherwise I'll return to office next week and will be happy to assist. Regards,
Jay

Sent from my iPhone

APP000784

# EXHIBIT A-39

| From: | William Brewer |
|---|---|
| Sent: | Monday, July 2, 2018 9:26 AM CDT |
| To: | Madrid, Jay |
| Subject: | Re: On behalf of Jay Madrid |

Jay,

I am following up regarding our document requests to Ackerman McQueen, dated April 10, 2018, and May 4, 2018. As you know, the case will move swiftly, so we need to gather and analyze the information quickly.

1. We have not located all of the email attachments for the documents that you previously sent to us. Is there someone that we can speak to reconcile this issue?
2. We previously identified additional custodians (listed below) copied on many of the Ackerman documents. Have the relevant mail boxes been reviewed?
3. We also need additional information regarding Ackerman McQueen invoices regarding the insurance program. We can schedule a call with you and the person(s) most knowledgeable about the invoices.
4. We are also interested in obtaining documents reflecting your agreements, invoices and checks to third party vendors in connection with the NRA insurance program.
5. Please also send documents regarding your marketing plans, budgets and approvals for work associated with the NRA insurance programs.

Please let me know if you have any questions.

Best,
Bill

---

**From:** madrid.jay@dorsey.com <madrid.jay@dorsey.com>
**Sent:** Monday, May 14, 2018 4:45 PM
**To:** William Brewer
**Subject:** RE: On behalf of Jay Madrid

Bill: I met with the Ackerman folks and have a better understanding of their individual roles as well as what part other "custodians" may have played vis-a-vis Lockton and your client. First, as to those you identified as custodians, Eric Wang and Tricia Parker are no longer with the company. Second, each of those you mentioned have (such as Melanie) were passive copy recipients. Abygail Thompson (not Johnson) is a secretary. They were nonetheless asked to review their mail boxes to see what if any contact they had directly with Lockton re: Carry Guard – which is the only insurance program with which AMc had involvement with Lockton or NRA—and the search turned up only duplicates of what we produced.

     Regarding attachments, I am assured that whenever an e-mail contained an attachment it too was produced. They should be sequentially numbered, and all among the items produced, even if out of order. I will have someone go through ours to verify.

     Regarding interviews, I have no objection to making folks available for an unsworn discussion – the less formality, the better—but I'll need to schedule those next week, as I am out of town in depositions Wed-Fri. this week. The ones who matter are Lacey Cremer, Grant Spofford and Eric Van Horn. Lacey is available and I'm waiting to confirm with the other two.

     Let me know if next week works for you. Many thanks

**Jay J. Madrid, Esq.**
**Board Certified, Civil Trial Law**
**Texas Board of Legal Specialization**



DORSEY & WHITNEY LLP
300 Crescent Ct, Suite 400 | Dallas, TX 75201
P: 214-981-9932  F: 214-292-9667  C: 214-683-7087
WWW.DORSEY.COM :: DALLAS :: BIO :: V-CARD

CONFIDENTIAL COMMUNICATION
*E-mails from this firm normally contain confidential and privileged material, and are for the sole use of the intended recipient. Use or distribution by an unintended recipient is prohibited, and may be a violation of law. If you believe that you received this e-mail in error, please do not read this e-mail or any attached items.  Please delete the e-mail and all attachments, including any copies thereof, and inform the sender that you have deleted the e-mail, all attachments and any copies thereof. Thank you.*

---

**From:** William Brewer [mailto:WAB@brewerattorneys.com]
**Sent:** Friday, May 4, 2018 10:09 PM
**To:** Madrid, Jay <madrid.jay@dorsey.com>
**Subject:** Re: On behalf of Jay Madrid

Jay,

     While reviewing the documents received from Ackerman, we noted that many documents contained attachments, images, links, etc., that were either not attached or were not accessible to us.  I have provided a list of such items below (referenced by page number of the pdf's you sent us).  Please supplement Ackerman's production with these items.  If we can help in anyway, let me know.

     We also noted that there custodians copied on many of the Ackerman documents, in addition to Lacey Duffy, Eric Van Horn, and Grant Spofford.  Please let me know if you ahve searched the files of the following custodians:  Melanie Montgomery; Peter Farrell; Henry Martin; Tom Richardson; Abygail Johnson; Jesse Greenberg; Eric Wang; and Trisha Parker.

APP000786

Please contact me if you have any questions.  Thanks!

Best,
Bill

**List of Additional Items**

**1ˢᵗ PDF from AM**

**May 4, 2017 (pg 4)** – CCI videos attached to email from Duffy to Steve Eginoire ("Eginoire") et al.

**January 9, 11, 12, 2018 (pgs 12-13)** – Aftermath Ad Landing Pages attached to emails from Grant Spofford ("Spofford") to Eginoire et al.

**January 11, 15, 2018 (pgs 18-19)** – CG Ad Banners and Landing Pages referred to in emails from Spofford to Eginoire.

**2ⁿᵈ PDF from AM**

**May 15, 2017 (pg 36)** – CG Updated Policies (Individual with Specimen Watermark, Notice of Insurance with Specimen Watermark, and Policy No. 1 with Specimen Watermark) attached to email from Hewitt to Duffy et al.

**May 26, 2017 (pg 30)** – CG Dev Site, Membership Updates attached to email from Duffy to Eginoire et al.

**June 14, 2017 (pgs 21, 23)** – In Person Firearms Training Courses, Range Training Agreement, and Gear List, Schedule for Level One, attached to email from Duffy.

**July 19, 2017 (pg 12)** – Screen capture and screen shot of webpage for NCG – Gold Plus Launch attached to email from Duffy.

**September 2, 2017 (pg 6)** – Development Site that includes Chubb changes attached to email from Van Horn to Jeff Hewitt ("Hewitt") et al.

**December 11, 2017 (pg 4)** – NCG Bifurcated Site attached to email from Spofford to Duffy et al.

**December 15, 2017 (pg 3)** – NCG Bifurcated Site attached to email from Spofford to Duffy et al.

**3ʳᵈ PDF from AM**

**April 24, 2017 (pg 8)** – CG Site Footer Updates as "were outlined in the spreadsheet you sent via slack," per email string between Spofford and Scott Martin ("Martin").

**April 27, 2017 (pg 11)** – CG Script Changes and Call Center Error Messages attached to email from Melissa Davis ("Davis") to Spofford et al.

**May 9, 2017 (pg 12)** – CG Membership Pages – Updated Copy re CG Website attached to email from Spofford to Martin et al.

**June 7, 2017 (pg 13)** – Image attached to Weekly Tech Call email from Davis to Spofford et al.

**June 15, 2017 (pg 18)** – Image and Document re Final Clean Copy for Recurring Billing for e-

check update, attached to email from Davis to Spofford et al.

**July 7, 2017 (pg 20)** – Images re Pricing for Gold Plus attached to email from Davis to Spofford et al.

**July 12, 2017 (pg 23)** – Images and Gold Plus Wording document attached to email from Davis to Spofford et al.

---

**From:** William Brewer
**Sent:** Wednesday, May 2, 2018 12:10 PM
**To:** madrid.jay@dorsey.com
**Subject:** Re: On behalf of Jay Madrid

Thanks Jay.   We have the agreement.  We may have some additional requests - for example accessing historical website content that was prepared for third-party review.   We'll put together a list for you.

On May 2, 2018, at 9:14 AM, "madrid.jay@dorsey.com" <madrid.jay@dorsey.com> wrote:

> Bill: My apologies for the delay in responding. I was tied up in Phoenix for the last few days and am behind in everything. I will check, but I am led to believe that what we provided covered the waterfront on the subject matter described. There may be some outlier materials that cover unrelated topics, but I will check. I have turned up the Services Agreement between Ackerman McQ and your client, which I'm happy to provide if you do not have a copy. Regards, Jay

**Jay J. Madrid, Esq.**
**Board Certified, Civil Trial Law**
**Texas Board of Legal Specialization**



DORSEY & WHITNEY LLP
300 Crescent Ct, Suite 400 | Dallas, TX 75201
P: 214-981-9932  F: 214-292-9667  C: 214-683-7087
WWW.DORSEY.COM :: DALLAS :: BIO :: V-CARD

CONFIDENTIAL COMMUNICATION
*E-mails from this firm normally contain confidential and privileged material, and are for the sole use of the intended recipient. Use or distribution by an unintended recipient is prohibited, and may be a violation of law. If you believe that you received this e-mail in error, please do not read this e-mail or any attached items.  Please delete the e-mail and all attachments, including any copies thereof, and inform the sender that you have deleted  the e-mail, all attachments and any copies thereof. Thank you.*

**From:** William Brewer [mailto:WAB@brewerattorneys.com]
**Sent:** Friday, April 27, 2018 1:00 PM

**To:** Madrid, Jay <madrid.jay@dorsey.com>
**Subject:** Re: On behalf of Jay Madrid

Jay -

Thanks for the documents you sent.  In your note, you state you were sending what had been located as of the time of your letter.  I'm following up to see when we might expect to receive the additional materials.

Thanks again for your help.

Best,
Bill

---

**From:** haydon.jean@dorsey.com [mailto:haydon.jean@dorsey.com]
**Sent:** Friday, April 20, 2018 3:00 PM
**To:** William Brewer <WAB@brewerattorneys.com>
**Cc:** madrid.jay@dorsey.com
**Subject:** On behalf of Jay Madrid

Mr. Brewer,

Attached please find correspondence and exhibits from Mr. Madrid for your review.

Thank you

**Jean Haydon,** Legal Assistant
**Jay J. Madrid, Esq. and Brian Vanderwoude, Esq.**
<image003.png>

DORSEY & WHITNEY LLP
300 Crescent Ct, Suite 400 | Dallas, TX 75201
**P:** 214-981-9940  **F:** 214-981-9901

CONFIDENTIAL COMMUNICATION
*E-mails from this firm normally contain confidential and privileged material, and are for the sole use of the intended recipient. Use or distribution by an unintended recipient is prohibited, and may be a violation of law. If you believe that you received this e-mail in error, please do not read this e-mail or any attached items.  Please delete the e-mail and all attachments, including any copies thereof, and inform the sender that you have deleted  the e-mail, all attachments and any copies thereof. Thank you.*

Please help reduce paper and ink usage. Print only if necessary.

APP000790

# EXHIBIT A-40


**DORSEY**
always ahead

Jay J. Madrid, Esq.
Direct Dial: 214-981- 9932
Email:  madrid.jay@dorsey.com

Board Certified, Civil Trial Law
Texas Board of Legal Specialization

July 13, 2018

*Via Federal Express*

Bill Brewer, Esq.
Brewer Attorneys & Counselors
750 Lexington Avenue
14th Floor
New York, NY 10022

         Re:    NRA/Lockton

Dear Bill:

        As mentioned in my recent message, accompanying this letter are additional materials pertaining to the Carry Guard program that the personnel at Ackerman McQueen have gathered. Ackerman personnel conducted an extensive ingathering and these documents, combined with those previously produced, constitute the universe of materials pertinent to the NRA lawsuit against Lockton.

        It is important to note that all of these materials are in the possession of the NRA, and the person within your client's organization who knows what each represents is Mr. Josh Powell. As you will note from the correspondence and many of the marketing plans provided herewith, Mr. Powell was instrumental in the design, approval and implementation phase of many of the plans.

        I trust this will be of assistance to the NRA in its Lockton litigation. This completes the work that was requested.

                                Yours very truly,

                                Jay J. Madrid

JJM:jh

Enclosures

4813-8855-5117\1

Dorsey & Whitney LLP | 300 Crescent Court | Suite 400 | Dallas, TX | 75201 | T 214.981.9900 | F 214.981.9901 | dorsey.com

# EXHIBIT A-41

DALLAS | NEW YORK

# BREWER
## ATTORNEYS & COUNSELORS

December 21, 2018

**BY FIRST CLASS MAIL AND E-MAIL**

Jay Madrid
Dorsey & Whitney LLP
300 Crescent Court, Suite 400
Dallas, Texas 75201

### Re: Request For Additional Materials

Dear Jay,

Further to recent discussions proceeding from the NRA's exercise of its contractual record-inspection right under Section VIII of the Services Agreement between the National Rifle Association of America (the "NRA") and Ackerman dated April 30, 2017, as amended May 6, 2018 (the "Services Agreement"), we write on behalf of the NRA to identify areas of additional inquiry. We are happy to confer with your firm, or with Ackerman directly, to determine the most efficient way for the NRA to obtain visibility in these areas. We do not wish to disrupt Ackerman's business operations. However, the NRA is contractually entitled to view business records in these categories; moreover, a deeper understanding of Ackerman's practices and support for its invoicing in each of the below areas will advance the parties' common legal interests.

Specifically, the NRA wishes to gain visibility regarding the following:

- Backup for out-of-pocket expenses Ackerman billed to the NRA for the last three years;

- The list of "talent and employees who work through [Ackerman] for NRA and its affiliates" (Services Agreement § III.E) and, for each employee: (1) the compensation paid to the employee by Ackerman; (2) the mark-up, if any, applied by Ackerman when it passes through such costs to the NRA; and (3) whether the employee performs work for non-NRA clients of Ackerman and, if so, the approximate percentage of the employee's time spent servicing the NRA;

- "Fair market value" and similar analyses conducted by Ackerman pursuant to the following Services Agreement provisions:

**APP000792**

BREWER

December 21, 2018
Page 2

- o     Section I.B (advertising/creative services provided on a project basis "based on the fair market value of the work as determined by NRA and [Ackerman]");

- o     Section II.B.3 (for art concepts, design layout, and similar services, Ackerman must submit cost quotations "based on the fair market value of the work as determined by [Ackerman]");

- o     Section II.E (with regard to special projects, absent specific agreed pricing, Ackerman will charge NRA "a fair market price for the work performed"); and

- o     Section III.D (where special-assignment fees cannot be agreed upon in advance, Ackerman will charge an amount "not greater than the usual and customary charges for such services or expenses in the industry.").

- With respect to any service for which Ackerman asserts it invoiced the NRA at "fair market value," NRA requires visibility regarding prices charged by Ackerman to perform the same services for non-NRA clients—or, in the alternative, a representation by Ackerman that the NRA receives pricing for services which is as favorable, or more favorable, than the prices offered by Ackerman to other clients.

- For the past three years (*i.e.*, since 2015), the NRA requests access to invoices, executed contracts, or analogous records of prices paid for third-party media buys, along with records sufficient to show any mark-up applied when the costs of media buys were passed along to the NRA.

We look forward to working with Ackerman to obtain the requested documents.

Sincerely

Sarah B. Rogers

# EXHIBIT A-42
# FILED
# UNDER SEAL

# EXHIBIT A-43
# FILED
# UNDER SEAL

# EXHIBIT A-44
# FILED
# UNDER SEAL

# EXHIBIT A-45

# McDermott
# Will & Emery

Boston  Brussels  Chicago  Dallas  Düsseldorf  Frankfurt  Houston  London  Los Angeles  Miami
Milan  Munich  New York  Orange County  Paris  San Francisco  Seoul  Silicon Valley  Washington, DC

Strategic alliance with MWE China Law Offices (Shanghai)

Stephen Ryan
Attorney at Law
sryan@mwe.com
+1 202 756 8333

August 22, 2018

BY EMAIL AND U.S. MAIL

William A. Brewer, III
Brewer, Attorneys & Counselors
1717 Main Street
Suite #5900
Dallas, TX  75201

Dear Mr. Brewer:

McDermott Will & Emery has been engaged to represent Ackerman McQueen, and to assist the
Dorsey law firm with regard to any and all NRA requirements with respect to two NRA litigation
matters - the first in the Federal court in New York and second, in the Eastern District of
Virginia, as well as any changes in the NRA-Ackerman contract and procedures. As NRA
chooses to adopt any new system of required documentation requested from Ackerman,
Ackerman will comply with NRA's commercially reasonable requirements.

The past multi-decade business relationship between the NRA and Ackerman has been
extraordinarily useful to the NRA in crisis communications and many related public relations
management issues. At its most senior levels, NRA leadership has had detailed understanding of
not only the budgeting process, but also the management of a very complex set of deliverables
that include fundraising strategy, crisis communication, media company development and
management, public relations management, event transformation, coordination and design, as
well as many projects that specifically address the NRA's continued need to transform itself
from a gun rights organization to a freedom organization among countless other projects. The
history of this relationship should be respected for its complexity and unparalleled success that
can only be determined by the strength of the NRA brand today as opposed to where it was
decades ago. The positive and cooperative multi-decade impact that Ackerman McQueen has
had on every communication objective the NRA has pursued is substantial.

The NRA-Ackerman relationship is premised on NRA's contractual rights to evaluate its own
needs in budgeting and directing Ackerman's activities, and NRA auditing detailed expenditures
Ackerman is directed to undertake for the NRA. The NRA-Ackerman budgeting process gives
the NRA greater control than any retrospective review after the funds are expended on third
party vendors and Ackerman activity.

It is my understanding that in the two litigation matters where you are acting for NRA,
Ackerman has provided your firm (and NRA) every document you have represented is needed

McDermott
Will&Emery

William H. Brewer
August 22, 2018
Page 2

for the litigations now underway. In fact, Ackerman chose to provide documents that might prove helpful that went beyond the scope of the requests. The backup materials you have demanded regarding invoices relating to the CarryGuard program have been provided to Mr. Powell and other NRA personnel. There were also numerous contemporaneous phone conversations and meetings that clearly outlined the work that would be done, the progress that was being made, and the NRA client approvals that were received. Requesting the creation of new documents that did not previously exist such as creating invoices in the form of hours worked on the project and scope changes that were repeatedly made by the NRA client is not possible.

Ackerman believes the manner in which the NRA-Ackerman agreement has been managed for decades is totally consistent with Federal IRS law, regulations and practice. The contract procedures do not impinge or violate any IRS or State Department of Revenue (DOR) requirements it is aware of, and nothing has been specifically brought to its attention. Ackerman sees no basis for concern that the past or amended directions for managing the NRA-Ackerman contract will adversely impact NRA's venerable New York state non-profit charter. The NRA fully knows that Ackerman maintains complete files of all expenses incurred with third parties on behalf of the NRA consistent with IRS guidelines and regulations. This documentation is routinely utilized in audits by senior NRA officials and authorized staff.

In the near future, NRA-Ackerman documentation may be subject to new congressional, state attorney general or third party plaintiff lawyer litigation subpoenas. Therefore, NRA may wish to proceed with caution in creating paper trails the New York State DOR, or other state DORs may pour over and publish for political purposes. Come November, the political climate could be very different than today if the U.S. House of Representatives, or less likely, the Senate changes hands. Creating excessive contractual documentation transmitted to NRA on a regular basis may not serve NRA's management needs, as the aforementioned third parties will be all too happy to have access to such detailed billing information. Any documentation that exceeds NRA's needs for contract management creates additional concerns for NRA legal management, and threatens NRA's other competing needs. However, the ability to comply requires precision in the description. Any direction to change the NRA-Ackerman contractual requirements for documentation at the very time NRA is engaged in litigation with a State in two courts where such exchanges of correspondence or documentation may be demanded and obtained in discovery by the State of New York in the two ongoing matters seems an unlikely course of action to buttress NRA's litigation positions. Demanding any such billing procedure changes and documentation at this time, or retrospectively, is worthy of careful consideration. But Ackerman will do its best to follow any additional NRA requirements for changes to the NRA-Ackerman contract.

APP000803

McDermott
Will & Emery

William H. Brewer
August 22, 2018
Page 3

Your personal views regarding the NRA-Ackerman business relationships that you have expressed to NRA personnel as well as the Dorsey firm, which was subsequently reported to Ackerman, have been exceptionally critical. Your comments and views are not consistent with the contemporaneous communications of NRA leadership and staff to Ackerman. Since Ackerman is, and has been a represented party, you are requested to contact Ackerman through me, other members of my firm you meet, or a member of the Dorsey firm, Ms. Gina Betts, if I cannot be immediately reached. We look forward to maintaining the NRA-Ackerman relationship through this period.

Sincerely,

Stephen M. Ryan
Attorney for Ackerman McQueen

cc: Gina Betts, Esquire

APP000804

# EXHIBIT A-46

**Madrid, Jay**

| | |
|---|---|
| **From:** | Madrid, Jay |
| **Sent:** | Friday, January 4, 2019 3:50 PM |
| **To:** | Sarah Rogers |
| **Subject:** | Re: NRA / Ackerman McQueen |

Sarah: My marching orders are to communicate only with Steve Hart and my office will be sending Ackerman's response to him.

Sent from my iPhone

On Jan 4, 2019, at 11:48 AM, Sarah Rogers <sbr@BrewerAttorneys.com> wrote:

> Jay,
>
> Happy New Year.  Do you have a few minutes to discuss, perhaps early next week?
>
> ---
>
> **From:** Sarah Rogers
> **Sent:** Friday, December 21, 2018 5:35 PM
> **To:** madrid.jay@dorsey.com
> **Subject:** Re: NRA / Ackerman McQueen
>
> Jay,
>
> Thanks for the quick response.  In case this was unclear below -- we don't intend to burden anyone over Christmas.  Happy to confer at your convenience after the holidays.
>
> ---
>
> **From:** madrid.jay@dorsey.com <madrid.jay@dorsey.com>
> **Sent:** Friday, December 21, 2018 3:58 PM
> **To:** Sarah Rogers
> **Subject:** Re: NRA / Ackerman McQueen
>
> Sarah: I am out of the office in a deposition and wanted to give you an initial reaction to your letter, which I'm of course forwarding to the client. While I must await client input for an official response I share the following obvious points: 1) this is the worst time possible to raise the issues addressed in your letter. I am out all next week and I'm certain the same will be true of Ackerman personnel; 2) On the " merits" your requests in my view are unwarranted and burdensome. While
> I of course will defer to the client my initial reaction is that what you are now asking for goes far beyond a reasonable reading of the Services Agreement especially in light of the voluminous productions previously made.  I will nonetheless send on to AM and formally respond once everyone on our side has a chance to review and digest. We will not be able to answer your letter until after the holidays.  Jay

APP000805

Sent from my iPhone

On Dec 21, 2018, at 1:21 PM, Sarah Rogers <sbr@BrewerAttorneys.com> wrote:

Jay,

Please see the attached correspondence. Of course, I am happy to confer after the holidays.

Regards,
Sarah

<2018.12.21_Letter to J. Madrid 4836-5445-0564 v.1.pdf>

APP000806

# EXHIBIT A-47

# Susan Dillon

Senior Director at Forensic Risk Alliance
Dallas, Texas

## Contact

www.linkedin.com/in/susancdillon
(LinkedIn)

## Top Skills

Legal Research
Litigation
Commercial Litigation

## Certifications

Certified in Financial Forensics
Certified Public Accountant
Certified Information Technology
Professional

## Experience

**Forensic Risk Alliance**
Senior Director
November 2018 - Present
Dallas/Fort Worth Area

**Brewer, Attorneys & Counselors**
Director of Consulting
November 2001 - November 2018 (17 years 1 month)

**Kemper**
Vice President, Director of Finance, Commercial Compensation
Specialty Operation
1999 - 2001 (2 years)

**TIG Holdings, Inc.**
Assistant Vice President, Accounting and Administrative Officer
Workers' Compensation
1995 - 1999 (4 years)

**PricewaterhouseCoopers**
Auditor
1991 - 1995 (4 years)

_____

## Education

Southern Methodist University - Cox School of Business

APP000807

# EXHIBIT A-48

APP000808



https://www.brewerattorneys.com/leadership

Leadership — Brewer

File   Edit   View   Favorites   Tools   Help

Precision Discovery   Ringtail   DISCO   TRCP   Lexis   Ct Records   Chrome River   Flowtrack   Mimecast   ND   Remote Access   Resource Sched

Search...

PUBLIC AFFAIRS


TRAVIS J. CARTER Managing Director...

CONSULTING


SUSAN B. DILLON Consulting Director


ANDREW G. AFFA Consulting Director

MATTHEW HARRISON Consulting...

INVESTIGATIONS





# EXHIBIT A-49
# FILED
# UNDER SEAL

# EXHIBIT A-50

U.S.

*The New York Times*

# *Incendiary N.R.A. Videos Find New Critics: N.R.A. Leaders*

**By Danny Hakim**

March 11, 2019

The flash point was Thomas the Tank Engine.

Last September, the National Rifle Association's famously combative spokeswoman, Dana Loesch, provoked widespread outrage when she took to the gun group's streaming service to mock ethnic diversity on the popular children's program "Thomas & Friends," portraying the show's talking trains in Ku Klux Klan hoods. Now, growing unease over the site's inflammatory rhetoric, and whether it has strayed too far from the N.R.A.'s core gun-rights mission, has put its future in doubt.

The site, NRATV, is a central part of the organization's messaging apparatus. Since its creation in 2016, it has adopted an increasingly apocalyptic, hard-right tone, warning of race wars, describing Barack Obama as a "fresh-faced flower-child president," calling for a march on the Federal Bureau of Investigation and comparing journalists to rodents.

In recent weeks, in a rare airing of internal debate at the N.R.A., two prominent board members expressed concerns about NRATV to The New York Times. Their statements were released through the N.R.A. itself, amid what was described as an internal review of NRATV and its future.

"Since the founding of NRATV, some, including myself and other board members, have questioned the value of it," Marion Hammer, the group's most formidable lobbyist and a key adviser to its chief executive, Wayne LaPierre, said in a statement. "Wayne has told me and others that NRATV is being constantly evaluated — to make sure it works in the best interest of the organization and provides an appropriate return on investment."

The reassessment underscores a debate within the N.R.A. over how broad its activism should be. And it comes as the organization faces a storm of challenges, including a series of mass shootings that has created a new generation of gun-control activists.

Congressional investigations into the N.R.A.'s possible Russia ties were energized after Maria Butina, a suspected Russian agent, pleaded guilty in December to using the N.R.A. in a political influence operation. And the organization, incorporated in New York, may have a potent foe in Letitia James, the state's recently elected attorney general, who has vowed to investigate the N.R.A.'s tax-exempt status.

As falling membership dues put the N.R.A. under further strain, board members have also expressed concern about the size of payments to the ad firm that produces NRATV, Ackerman McQueen. The firm and its affiliates pocketed $40 million from the N.R.A. in 2017; billings directly to Ackerman have increased nearly 50 percent since 2015. One prominent host, Dan Bongino, left amid cutbacks at NRATV, but he said the site had tried to retain him.

Ackerman, a partner to the gun group since the "I'm the N.R.A." campaign of the 1980s, runs the NRATV Twitter account, has done polling work for the organization and revamped its gun safety program for children. It has also been credited with a slick makeover of Mr. LaPierre — who, in the words of one former N.R.A. lobbyist, previously resembled an "introverted chess champion."

Mr. LaPierre's wife, Susan, has worked for an Ackerman subsidiary, and there has come to be a revolving door between the two companies, with many employees having worked by turns for both NRATV and Ackerman.

APP000810

U.S.



Dana Loesch, an N.R.A. spokeswoman, mocked ethnic diversity on the children's program "Thomas & Friends," portraying the show's talking trains in Ku Klux Klan hoods.

Oliver L. North, the N.R.A. president, has a contract with Ackerman, though the N.R.A. would not disclose its size. As part of the relationship, Mr. North, a former Fox News pundit, hosts media programming and special events, like the show "American Heroes," which recently began airing on NRATV.

The N.R.A., a nonprofit, has also directed $18 million since 2010 to a private company jointly owned by executives of Ackerman and the N.R.A., according to records and interviews.

"It is clear to me that NRATV is an experiment and Wayne is evaluating the future of the enterprise," Willes K. Lee, a board member who leads the N.R.A. Outreach Committee, said in a statement to The Times.

After the Thomas the Tank Engine video, he said, Mr. LaPierre appeared "livid and embarrassed" in a meeting with the outreach group. "He apologized to the entire committee and spent hours listening to our concerns."

## 'Red Meat for the Hard Right'

Ms. Loesch has emerged as NRATV's most visible host, deriding gun-control advocates as "tragedy-dry-humping whores" and vowing to combat the left with what she called the "clenched fist of truth" — a body part that the comedian John Oliver said was located "a little past the bent elbow of nonsense." In one video, she warned The Times, "We're coming for you"; in another, she threatened to burn a copy of the newspaper.

Chuck Holton, an NRATV correspondent, attributed terrorist activity in Europe to "the broader problem of multiculturalism and socialism" and to "gender-bending." He also claimed that left-wing groups, the billionaire George Soros and the Venezuelan government were trying "to influence the 2018 midterms by sending Honduran migrants north in the thousands."

Grant Stinchfield, a host, claimed that "all radicalized terrorists are Muslims," overlooking mass shooters like Dylann Roof, who killed nine black churchgoers in Charleston, S.C., in 2015.

Such far-ranging commentary has raised questions among some N.R.A. members about the scope of the organization's messaging.

"The N.R.A. shouldn't be putting this out," said Jeff Knox, an N.R.A. member who runs the Firearms Coalition, a smaller advocacy organization. "It's not gun rights; it's red meat for the hard right."

**APP000811**

4/1/2019

*The New York Times*



Ackerman McQueen's headquarters in Oklahoma City, Okla.  Nick Oxford for The New York Times

Mr. Knox's father, Neal, was an N.R.A. board member who played a leading role in an effort to fire Ackerman in the 1990s amid discontent over its growing influence. A faction loyal to Mr. LaPierre ultimately prevailed, leading to a purge of the board and allowing the two organizations to become more deeply intertwined.

"Why are we getting so involved in left-right politics instead of sticking close to our issue, the Second Amendment?" the younger Mr. Knox asked.

Ackerman declined to comment, but in a recent interview in The Oklahoman, Revan McQueen, the firm's chief executive, said his company's approach was evolving from pure advertising to a "philosophy of branded news." As Ackerman's website puts it, "Every brand must be its own media company."

To that end, the firm has created video networks for the Chickasaw Nation and the Integris health care system of Oklahoma, though their content is relatively benign. A recent episode of ChickasawTV, for example, featured a visit to an art gallery. Over on NRATV, a host was calling liberalism "a mental disorder."

Beyond NRATV, the N.R.A. backed Ackerman's performance.

"When Ackerman McQueen began working with the N.R.A., the association was little more than a fledgling grass-roots operation," Andrew Arulanandam, an N.R.A. spokesman, said in a statement.

"The N.R.A. is now the most effective advocacy organization of its kind," he said, adding that the firm had created "a national platform for the N.R.A." and that it was "an important partner."

## Taxing Questions

During the N.R.A. power struggle in the 1990s, a board member filed a complaint with the Federal Election Commission, claiming that an N.R.A. contract with an Ackerman subsidiary "was done without any 'request for proposals'; any bidding process; and no competitive bidding."

The commission decided in a 6-0 vote not to take action, but criticisms have persisted.

"The N.R.A. is willing to play fast and loose with tax regulations," said Marcus S. Owens, a partner at Loeb & Loeb who served for a decade as director of the Exempt Organizations Division of the Internal Revenue Service.

APP000812

Ms. James, the New York attorney general, presents a new threat. Last year, she told Ebony magazine that the N.R.A. held itself "out as a charitable organization" but was actually "a terrorist organization."

*The New York Times*



The N.R.A. is reassessing its streaming service as it faces mounting political pressure and other challenges. Letitia James, New York's attorney general, has promised to investigate the gun group's tax-exempt status.  Stephanie Keith for The New York Times

William A. Brewer III, the N.R.A.'s outside counsel, said Ms. James had given no indication when she was a candidate that "the N.R.A. had done anything improper," adding that she had instead promised "a taxpayer-funded fishing expedition."

A number of transactions could draw scrutiny. Since 2010, the N.R.A. has paid $18 million to a company that produces "Under Wild Skies," a hunting show on NRATV. Tyler Schropp, the N.R.A.'s advancement director, came to the organization in 2010 from Ackerman, and had a stake in the production company until at least 2017, but "no longer holds any interest," Mr. Brewer said.

Federal rules restrict transactions that confer economic benefits on key executives of tax-exempt organizations.

Mr. Brewer described Mr. Schropp's stake as "a minuscule interest" that the N.R.A. found not to be objectionable. Payments related to "Under Wild Skies" emerged only recently in N.R.A. tax filings.

Other issues unrelated to Ackerman could also surface. The N.R.A. has transferred more than $100 million since 2012 from an affiliated charity that also lent the N.R.A. $5 million in 2017. Donations to the charity, the N.R.A. Foundation, are tax-deductible, while those to the N.R.A. are not.

"If you're doing a program that's charitable, you run it through the charity," said David G. Samuels, a partner at Duval & Stachenfeld who served in the charities bureau of the New York Attorney General's Office, which oversees tax-exempt organizations. Such practices raise "red flags," he said.

Like some nonprofits, the N.R.A. has been lucrative for its top executives. Mr. LaPierre's compensation rose from less than $200,000 in the mid-1990s to nearly $1.5 million in 2017. It spiked to more than $5 million in 2015, largely because of a retirement plan payout.

A review of public records found that the N.R.A., which has about 550 employees, has disclosed that 41 employees, contractors, vendors or consultants have relevant family relationships to others connected to the organization, including a "niece-in-law" of Mr. LaPierre who was hired as a consultant.

"The N.R.A. strives to comply with all applicable regulations," Mr. Brewer said, adding that the organization has a "conflict-of interest-policy"

APP000813

and that "vendor agreements are reviewed and approved" by the board's audit committee when appropriate.

**The New York Times**

With New York regulators circling, it's no surprise that the state's politicians have become fodder for NRATV — particularly the governor, Andrew M. Cuomo, whose administration is already engaged in a legal fight with the gun group. Recently, the site even targeted Albany, describing it as "Graft City."

Whatever happens to NRATV, few expect the N.R.A. to become much less combative. Mr. LaPierre, in a speech this month, described the organization's approach as "full-contact advocacy," adding, "We are going to fight back against anyone who attempts to silence us."

*Correction: March 11, 2019*
*An earlier version of this article referred imprecisely to Dan Bongino's separation from NRATV. While he left the video streaming service amid a round of layoffs, it is unclear whether his job was among those eliminated.*

Susan C. Beachy and Jack Begg contributed research.

A version of this article appears in print on March 12, 2019, on Page A1 of the New York edition with the headline: What Is Making N.R.A. Cringe? Its Own Videos

READ 494 COMMENTS

E  E  E

APP000814

# EXHIBIT A-51
# FILED
# UNDER SEAL

# EXHIBIT A-52

iQ media News Article

**iQ media**



The Daily Oklahoman (Oklahoma City, OK) | 6/3/2019 11:18:43 PM GMT

# NRA to end advertising contract, continue litigation

By Steve Lackmeyer Business writer slackmeyer@oklahoman.com

At a time when the once cozy relationship between Oklahoma City-based Ackerman McQueen and the National Rifle Association has turned toxic, the two sides are in agreement it's time to end a 38-year relationship that included legendary campaigns and creation of NRATV.Revan McQueen, CEO of Ackerman McQueen, announced Wednesday the city's largest and oldest advertising agency is seeking to terminate its contract with the NRA after a series of lawsuits, countersuits, allegations of blackmail and misspending.The NRA responds they're ready to move on as well - but that won't end the war where millions in damages are being sought by each side.William Brewer III, attorney for the NRA and also brother-in-law of Revan McQueen, said litigation will continue."Given the scrutiny it is facing in multiple lawsuits, it is not surprising that Ackerman now attempts to escape the consequences of its own conduct," said Brewer, partner at Dallas-based Brewer, Attorneys & Counselors. "The NRA believes that when confronted with inquiries about its services and billing records, Ackerman not only failed to cooperate - it sponsored a failed coup attempt to unseat Wayne LaPierre."Those allegations were first aired at the April NRA convention in which LaPierre announced he was warned Ackerman McQueen would send a letter to board members detailing "a devastating account" of the NRA's finances, sexual harassment charges, accusations of wardrobe expenses and excessive staff travel expenses if LaPierre did not resign.LaPierre did not resign, but Oliver North, an employee of Ackerman McQueen and then president at the NRA who was accused of delivering the threats, resigned instead.Just two weeks later, documents were posted online and published by the Wall Street Journal that alleged LaPierre billed more than $542,000 in travel, shopping and rent to Ackerman McQueen.

Those billings included $39,000 for one day of shopping at a Beverly Hills clothing boutique, $18,300 for a car and driver in Europe, a Christmas vacation in the Bahamas and $13,800 in rent for a New York City apartment for a female summer intern.Brewer said the NRA alleges Ackerman not only attempted to derail

APP000817

investigation into Ackerman, but launched a smear campaign against any who dare to hold the agency accountable."Although today's announcement by Ackerman is welcome news, it does not resolve the NRA's legal actions against Ackerman," Brewer said. "The association will pursue its legal rights and hold Ackerman accountable for any damage it caused the association. The agency was a longstanding vendor of the NRA. But like any other vendor, it will be held accountable - in the best interest of all NRA members."Andrew Arulanandam, managing director of NRA Public Affairs, confirmed the NRA is ready to take back control of its communications after decades of ceding that responsibility to Ackerman McQueen."The NRA can now begin transitioning various communications functions," Arulanandam said. "The NRA is eager to return the focus of its messaging to our core mission - the Second Amendment and our steadfast fight to protect America's constitutional freedoms."

---

Copyright 2019 The Daily Oklahoman, All Rights Reserved | LexisNexis Terms & Conditions

APP000818

# EXHIBIT A-53

V I R G I N I A:

### IN THE CIRCUIT COURT FOR THE
### CITY OF ALEXANDRIA

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Case No. *CL19002067* |
| | ) | |
| ACKERMAN MCQUEEN, INC., | ) | |
| and | ) | |
| MERCURY GROUP, INC. | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

### PLAINTIFF'S COMPLAINT AND JURY DEMAND

Plaintiff the National Rifle Association of America (the "NRA") files this Complaint and

Jury Demand against Defendants Ackerman McQueen, Inc. ("Ackerman") and Mercury Group,

Inc. ("Mercury" and, collectively with Ackerman, "AMc"), based on personal information as to

its own actions and on information and belief as to all other matters, as follows:

APP000819

## PRELIMINARY STATEMENT

After collaborating for more than thirty years, the NRA finds itself at odds with its advertising agency and communications firm, AMc. Already embroiled in a separate lawsuit[1] arising from AMc's refusal to furnish agreed business records, the NRA files this action to redress additional, increasingly brazen breaches of duties owed by AMc to the NRA. Over the past year, even as it withheld important documents and information from the NRA, AMc readily shared snippets of confidential and proprietary materials with hostile third parties, including the news media—in a series of sordid, out-of-context "leaks" engineered by AMc to harm its client.

Defendants' actions are especially egregious because communications with the media and the public are AMc's purported area of expertise. For decades, the NRA trusted AMc to shape and disseminate authorized public communications on its behalf, in order to advance the interests of the NRA and its members. During that time, AMc became a valued asset to the NRA and, by extension, the millions of law-abiding gun owners who depend upon the NRA for its Second Amendment advocacy. As part of their professional obligations, AMc and its employees were required to engage with the news media only with the NRA's full consent, operate with complete transparency, and work in alignment with the NRA's leadership team to craft its communications strategy. Of course, these expectations are fundamentals upon which clients and their public relations advisors operate. Trust and loyalty are necessary elements of any such relationship.

Unfortunately, in a remarkable, material breach of that trust, AMc undertook a campaign to tarnish and ultimately destroy the public image of the NRA and its senior leadership. Motivated to avoid scrutiny of their own business activities, a handful of faithless fiduciaries within (and

---

[1] *See National Rifle Association of America v. Ackerman McQueen, Inc. and Mercury Group. Inc.,* Civil Case No. CL19001757 (Alexandria, Va.).

**APP000820**

without) AMc conspired to conceal important information, "kill" any "messenger" who tried to unearth that information, and ultimately wrest control of the NRA by fomenting a (failed) executive coup. The conspiracy led by AMc had a malicious, singular purpose: to derail inquiries by the NRA into AMc's business and accounting practices. When the NRA ignored AMc's initial, veiled threats and reiterated its demands for transparency, the agency and its co-conspirators fired escalating salvos that culminated in an extortion threat delivered by an AMc employee, Lt. Col. Oliver North (Ret.), days before the NRA's Annual Meeting of Members.  North's directive to NRA CEO Wayne LaPierre was simple: withdraw the NRA's then-pending lawsuit against AMc, resign immediately from the NRA, and support AMc's chosen leadership slate for the NRA—or be publicly smeared.

As became widely reported, AMc's attempt to seize control of the NRA brutally failed.[2] Thereafter the NRA hoped that AMc and its co-conspirators would abandon their illegal conduct and resume faithfully serving the NRA.  Instead, Defendants began to deliver on AMc's extortion threats. In apparent "off-the-record" exchanges with reporters from multiple media outlets, AMc— and others with whom it conspired—cynically leaked selected portions of confidential business records that were curated to convey a misleading, dire picture of the NRA's finances, operations, and expense-accounting practices.  The bitter, insidious irony is that the records leaked by AMc contain some of the same information the NRA had persistently requested from AMc over the course of many months, in an effort to strengthen its own internal controls.  When AMc realized it could not hide the information demanded by the Association forever, it maliciously and

---

[2] *See, e.g.*, Danny Hakim, *Wayne LaPierre Prevails in Fierce Battle for the N.R.A.* THE NEW YORK TIMES (Apr. 29, 2019),  https://www.nytimes.com/2019/04/29/us/nra-wayne-lapierre-oliver-north.html; Mark Maremont, *New York Attorney General Probes NRA as Oliver North Exits as President*, THE WALL STREET JOURNAL (Apr. 27, 2019, 7:30pm), https://www.wsj.com/articles/oliver-north-out-as-nra-president-11556376506

APP000821

selectively publicized a subset of its records in a manner designed to suggest improprieties which AMc knew had not actually occurred.

Consistent with its longstanding trust and reliance on AMc, and hopeful that the leaks were executed by rogue employees without the knowledge of AMc's leadership, the NRA sought AMc's help securing sworn declarations from employees who had access to the leaked information—affirming individually that they were not responsible for any unauthorized disclosures. In this way, the NRA sought to narrow the list of individuals potentially responsible for the leaks, as well as stem ongoing confidentiality violations. Unfortunately, AMc's response to the overture came in the form of a terse missive from outside counsel—refusing any cooperation. Although AMc explicitly "warrant[ed] and agree[d] to prevent disclosure of Confidential Information by its employees" under its contract with the NRA, the agency flatly refused to ask any of its employees to affirm they had honored their confidentiality obligations.

For years, the NRA trusted and depended upon AMc to deliver core, critical services. The NRA never expected it would be forced to sue one of its closest collaborators. At this juncture, however, the NRA has no choice. AMc's ongoing violations of its contractual and fiduciary duties are malicious, material, and must be redressed.

## PARTIES AND RELEVANT NONPARTIES

1.      Plaintiff NRA is a not-for-profit corporation organized under the laws of the State of New York with its principal place of business located in Fairfax, Virginia. The NRA is America's leading provider of gun-safety and marksmanship education for civilians and law enforcement. It is also the foremost defender of the Second Amendment of the United States Constitution. A 501(c)(4) tax-exempt organization, the NRA has over five million members—and its programs reach many millions more.

APP000822

2. Defendant Ackerman is a nonresident for-profit business corporation organized under the laws of the State of Oklahoma with its principal place of business in Oklahoma City, Oklahoma. Ackerman is an advertising and public relations agency that has counted the NRA among its largest clients for more than thirty years.

3. Defendant Mercury is a nonresident for-profit business corporation organized under the laws of the State of Oklahoma with its principal place of business in Alexandria, Virginia. Mercury is a wholly owned subsidiary of Ackerman which specializes in public-communications strategy, including on behalf of advocacy groups such as the NRA. At all relevant times, Ackerman acted on behalf of both itself and Mercury pursuant to the Services Agreement (defined below) between Ackerman and the NRA.

4. Nonparty Lt. Col. Oliver L. North (Ret.) ("North") is a resident of the State of Virginia and a former president of the NRA. Unbeknownst to the NRA until recently, North is also a full-time employee of Ackerman.

5. Nonparty William Winkler ("Winkler") is a resident of the State of Oklahoma and the chief financial officer of Ackerman.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over Ackerman and Mercury pursuant to Virginia Code § 8.01-328.1 because each of Ackerman and Mercury has transacted business in the Commonwealth of Virginia and contracted to supply services in the Commonwealth of Virginia.

7. Venue is proper in this Court because the cause of action set forth herein arose from the transaction of business in Alexandria, Virginia.

8. Additionally, jurisdiction and venue are proper in this court because Ackerman and Mercury have expressly consented to the exclusive jurisdiction and venue of courts sitting in

APP000823

Alexandria or Fairfax County, Virginia regarding the matters presented herein in the Services Agreement dated April 30, 2017 (as amended May 6, 2018) (the "Services Agreement").

## FACTUAL BACKGROUND

### A.    For Decades, the NRA Relied on Ackerman To Perform Public Affairs Services Requiring a High Level of Trust.

9.    The NRA and AMc have worked closely together since the 1980s.  Over that time, the NRA has reposed extensive trust and confidence in AMc to perform services including public relations and strategic marketing; planning and placement of media; management of digital media and websites; and the operation of NRATV, a digital-media platform managed by AMc but frequently perceived by the public as the "voice" of the NRA.[3] By its nature, this work is publicly and politically sensitive, and requires the NRA to entrust AMc with confidential (and sometimes privileged) information.

10.    Since at least 1999, AMc's work on behalf of the NRA has been governed by successive incarnations of a Services Agreement containing detailed specifications for how various types of work performed by Ackerman for the NRA should be budgeted and billed.  The Services Agreement between the NRA and AMc dated May 1, 1999 (the "Previous Services Agreement") as well as the current, operative Services Agreement provide that certain categories of services, such as Owned Media and Internet Services, are compensated with an agreed annual fee, while others are required to be invoiced on an *ad hoc* basis based on estimates furnished by AMc and approved by the NRA. Consistent with the sensitive nature of AMc's services, the Services Agreement strictly limits use and disclosure by AMc, and its individual employees (who are

---

[3] *See, e.g.*, Jeremy W. Peters & Katie Benner, *Where The N.R.A. Speaks First and Loudest*, THE NEW YORK TIMES, February 21, 2018, https://www.nytimes.com/2018/02/21/us/politics/nratv-nra-news-media-operation.html.

APP000824

themselves fiduciaries of the NRA), of information acquired during AMc's work on behalf of the NRA.

11.     Specifically, Section IV of the Services Agreement provides that AMc "shall not disclose, directly or indirectly, to any third party, any . . . data, materials or information . . . made known to AMc as a result of AMc's providing [contracted-for services] . . . without the prior express written permission of [the] NRA."[4]  AMc may use the NRA's confidential information "only for the limited purpose of providing its [s]ervices to the NRA,"[5] and AMc "warrants and agrees to prevent disclosure of Confidential Information by its employees, agents, successors, assigns and subcontractors."[6]

12.     Notably, AMc serves as the NRA's agent for several purposes pursuant to the Services Agreement, and, therefore, owes fiduciary duties to the NRA.  For example, the Services Agreement provides explicitly that AMc may act "on [the] NRA's behalf," and subject to the NRA's control, with respect to purchasing, planning, and placement of media[7]—activities that require the NRA to entrust AMc with nonpublic information about its communication strategy.  In its capacity as the NRA's agent, AMc must demonstrate "the same high standard of good faith and loyalty" to the NRA as would be "required . . . of an attorney to his client."[8]  Indeed, owing to the parties' decades of close collaboration, their special relationship of trust and confidence existed prior to, and apart from, the execution of the Services Agreement. The confidentiality provisions of the Services Agreement are, therefore, backstopped and strengthened by common-law and

---

[4] Services Agreement § IV.A.1.

[5] Services Agreement § IV.A.3.

[6] Services Agreement § IV.A.4.

[7] Services Agreement §§ I.C, II.B.1.

[8] See, e.g., Nicholson v. Shockey, 192 Va. 270, 270 (1951).

APP000825

contractual fiduciary duties which forbid any misuse or misappropriation of the NRA's information.

13.     Consistent with the substantial scope and dollar value of the services rendered by AMc for the NRA, AMc invoices the NRA for a wide variety of expenses.   The Services Agreement contains detailed guidelines identifying categories of expenses that can be invoiced to the NRA, and conditions for their reimbursement—for example, hotel and meal expenses must be specifically authorized in writing by the NRA. Over the parties' decades-long course of dealing, underlying receipts and other support for AMc's expenses were not transmitted contemporaneously with AMc's monthly invoices.   However, the NRA was repeatedly assured that appropriate documentation was retained by AMc, and could be audited at the NRA's request. Indeed, the NRA's senior leadership understood that field audits of AMc's expense records were regularly conducted precisely for that purpose.

14.     Given its responsibilities, AMc took an active role in shaping the public image of the NRA's principals and executives, including CEO Wayne LaPierre.   Based on AMc's advice, and subject to billing procedures AMc set up, LaPierre over a fifteen year period incurred wardrobe and related expenses for countless television appearances, filming of commercials, and other outward-facing brand-development activities.   Those activities were specifically directed, choreographed and produced by AMc.   Records of the wardrobe expenses, which were initiated at AMc's direction, were maintained by AMc.   Of course, AMc should not have incurred (let alone sought reimbursement for) any expenses which it believed inappropriate.

## B.     Troubled Waters: the NRA's Compliance Efforts and Ackerman's Response.

15.     In recent years, the State of New York amended its Not-for-Profit Corporation Law (the "NPCL") to clarify requirements for director independence and the ratification of related-party contracts, among other items.   After updating its internal policies and controls to reflect these

APP000826

amendments, the NRA undertook to strengthen its procedures for documentation and verification of compliance by vendors with their contracts. Beginning in August 2018, the NRA sent letters to more than a hundred vendors—including AMc—that set forth updated invoice-support requirements and provided detailed guidance regarding, for example, expense reimbursement procedures.

16.     During the course of this process, the NRA became aware of concerns raised by multiple employees, executives, and board members that AMc's expenses and activities required greater oversight. In sum, there were concerns that Ackerman and Mercury were regularly taking advantage of their favored position and the numerous roles they played for the NRA. As a result, the Association sought to investigate several specific concerns:

- "Out of pocket" expenses that lacked meaningful documentation of NRA approvals, receipts, or other support, despite the requirements set forth in the Services Agreement;

- Lack of transparency regarding AMc's annual budgets under the Services Agreement, as well as adherence to those budgets;

- Lack of transparency regarding AMc's compliance with their obligation to insure that their services are provided at "fair market value";

- Concerns that AMc was invoicing the NRA for the entire salaries attributable to NRA-Dedicated Personnel, despite certain NRA-Dedicated Personnel allocating substantial time to non-NRA clients;

- Refusal by AMc to provide any data "in writing" (such as viewership numbers, clickthrough rates, or related performance metrics) that enable the NRA to analyze the return on its substantial investment since 2016 in NRATV.[9]

17.     Consistent with the broad scope and critical nature of the services performed by AMc for the NRA, the NRA bargained for transparency into AMc's files, books and records

---

[9] In addition, certain NRA stakeholders were also concerned that NRATV's messaging—on topics far afield of the Second Amendment—deviated from the NRA's core mission and values.

APP000827

pursuant to the Services Agreement.   Both the Previous Services Agreement and the current

Services Agreement incorporate records-examination clauses that require AMc to open its files for

the NRA's inspection upon reasonable notice.   The full text of the Records-Examination Clause in

the Services Agreement appears below:

> **Services Agreement**
> - Dated April 30, 2017 (as amended May 6, 2018)
> - Between the NRA and "AMc" (defined to include both Ackerman and Mercury)
>
> **VIII. EXAMINATION OF RECORDS**
> During the term of this Services Agreement, AMc authorizes NRA, upon reasonable notice, to examine AMc and Mercury's files, books and records, with respect to matters covered under this Services Agreement.

18.   During early- and mid-2018, the NRA sought information from AMc pursuant to

the Records-Examination Clause on a common-interest basis to advance parties' mutual interests

relating to an ongoing lawsuit.   However, after the NRA began to request access to records that

would shed light on concerns regarding AMc's business and accounting practices, AMc's

responses became evasive and hostile.

19.   In August 2018, within days after the NRA announced that it would now require

supporting documentation to be transmitted contemporaneously with vendor invoices, a media

outlet hostile to the NRA quoted "an anonymous source at Ackerman McQueen"[10]—creating

serious concerns about AMc's compliance with its confidentiality obligations.   When another

outlet described the same source as a former (rather than a current) AMc employee,[11] the NRA's

---

[10] Dylan Matthews, *The National Rifle Association, America's most powerful lobby, claims it's in financial crisis. What?*, Vox (Aug. 3, 2018, 4:50pm), https://www.vox.com/2018/8/3/17648960/nra-national-rifle-association-companies-support-boycott-new-york-lawsuit

[11] Alex Yablon & Mike Spies, *In Court Papers, NRA Stresses Financial Pressures and Says It May Have to Shut Down NRATV*, The Trace (Aug. 1, 2018), https://www.thetrace.org/rounds/nra-carry-guard-insurance-new-york-lawsuit/

APP000828

trust in its longtime collaborator dissuaded it from requiring an immediate and full scale investigation. Unfortunately, it now appears that such a complete accounting is required.

20.    On August 27, 2018, Winkler sent a letter to the NRA which purported to comply with the NRA's request for a more comprehensive audit of Ackerman's expense records. The letter pointedly identified several categories of items, some relating to travel and entertainment, which it warned would be encompassed in a full production of those records—perhaps believing that the threat of such disclosure would dampen the NRA's demands for transparency. However, the NRA was undeterred, and insisted upon reviewing and verifying details of expenses incurred.

21.    In September 2018, for the first time in the parties' decades-long course of dealing, AMc demanded that its outside counsel supervise any document review conducted under the Records-Examination Clause, then demanded payment of outside counsel's legal fees as a precondition for delivery of video footage it produced and for which AMc had already invoiced the NRA. During a telephone call on September 19, 2018, after AMc's counsel insisted that the NRA pay AMc's legal fees without any insight into why the fees were incurred, the NRA's counsel observed that AMc's posture seemed more consistent with an adverse than a common-interest relationship. AMc's counsel then made a startling statement: "AMc views the relationship as adverse."

22.    Thereafter, AMc strenuously resisted the NRA's efforts to enforce the Services Agreement, including by embarking on a campaign to "kill the messenger" when the NRA continued to seek access to documents or proposed reductions in AMc's budget. At first, AMc scapegoated the NRA's outside counsel. However, over ensuing months, AMc also refused to respond to basic information requests from NRA executives. After the NRA retained a third-party forensic accounting firm to interface with AMc in an effort to appease AMc and gain its

APP000829

compliance in January 2019, AMc indicated it would cooperate.  Unfortunately, that pledge of cooperation was short-lived, as AMc purported to forbid the accountants from disclosing simple, material information to the NRA—including copies of annual budgets against which AMc was invoicing.  When the NRA's General Counsel sought additional information in follow-up to the forensic audit, AMc ignored his letters.

23.     As AMc continued to stonewall the NRA's requests for documents and tensions between the parties rose, the NRA was contacted with increasing frequency by journalists acting on purported "leaks" relating to matters on which AMc had worked.  The contents of these "leaks" reflected a malicious, out-of-context use of the NRA's confidential information, with an apparent intent to damage the NRA.  Indeed, the NRA was advised by multiple confidential sources that leaks were emanating from AMc.

## C.     When The NRA Sought Assurances That Ackerman Was Complying With Its Confidentiality Obligations, Ackerman Rebuffed the NRA.

24.     On April 12, 2019, having exhausted its good faith efforts to access key records pursuant to the Services Agreement, the NRA filed a narrowly tailored action in this Court seeking specific performance by AMc of its obligation to share relevant records with the NRA.  In retaliation, rather than provide the requested records directly to the NRA (as the NRA had sought for months), AMc conspired with others to disseminate select, out-of-context portions of those records—many obsolete or dated—to a subset of the NRA Board of Directors, in order to sow false impressions regarding the NRA's spending and lend support for a possible executive coup..

25.     On April 22, 2019, days before the NRA's Annual Meeting of Members, Winkler doubled down on the tactic he previewed in his August 27, 2018 letter.  In letters to select NRA executives, Winkler referenced and excerpted certain expense records which had previously been withheld from the NRA.  Importantly, Winkler did not contend—nor does the NRA believe—that

APP000830

any of the referenced expenses were improper.[12]  Nonetheless, they were obviously selected by Defendants to foster salacious, misleading impressions of the NRA's spending practices. Winkler's letters carried an implicit threat, made explicit in a subsequent series of telephone calls: If the NRA failed to withdraw its lawsuit seeking access to AMc's records, AMc would publicize portions of those records tailored to cause maximum reputational damage to the leadership of the NRA.

26.     On April 24, 2019, AMc caused its employee, North, to telephone an aide of NRA CEO Wayne LaPierre ("LaPierre") and relay the contents of yet another letter that AMc purportedly planned to disseminate.  North emphasized that the letter would be "bad" for LaPierre and the NRA, and he described a laundry list of allegations the letter would contain: an unfavorable (and untrue) depiction of the NRA's finances; sexual harassment accusations against an NRA staff member; and, as previewed in Winkler's letters, excerpts of wardrobe, travel, and entertainment expenses paid by AMc and then invoiced by it to the Association over the years.

27.     Tellingly, several categories of information referenced by North consisted of the same information the NRA had tried, but failed, to elicit from AMc under the parties' contractual record-inspection clause.  After withholding this information for more than six months in an attempt to stonewall the NRA's compliance efforts, AMc now threatened to strategically, selectively publicize the information in a manner calculated to cause harm to LaPierre and the Association.  North stated that AMc would forbear from publicizing the "bad" letter if LaPierre agreed to withdraw the NRA's lawsuit seeking access to AMc's records, resign immediately from the NRA, and support North's continued tenure as NRA President.  If LaPierre cooperated, North

---

[12] Indeed, if Winkler or anyone at AMc had believed the expenses were improper, then AMc's fiduciary obligations required it to inform the NRA of suspected accounting improprieties.  Instead, for more than a decade, AMc invoiced the NRA for the expenses without any such comment.

APP000831

indicated that he could "negotiate with" Ackerman co-founder Angus McQueen to secure an "excellent retirement" for LaPierre.

28.     The NRA does not take kindly to threats—and neither did LaPierre.  Rather than accede to AMc's extortion, LaPierre wrote a letter to the NRA's Board of Directors that gave a transparent account of AMc's threat and concluded "so long as I have your confidence . . . I will not back down." As became widely publicized, LaPierre prevailed—and AMc's coup attempt failed. AMc's employee, North, is no longer an officer of the NRA.

29.     The NRA hoped that in the wake of these events, AMc would resume faithfully serving the NRA as the parties' contract and Virginia law require.  Unfortunately, the NRA continues to receive media inquiries that strongly suggest there are misleading, defamatory "leaks" emanating from AMc.  Simply put, the NRA believes that AMc is now delivering on its extortion threat.  Tellingly, much of the information "leaked" by AMc concerns travel, wardrobe, and other expenses incurred in connection with AMc projects, based on AMc's advice, or on trips with itineraries crafted by AMc.  Although it disseminates select portions of these records in an effort to convey misleading impressions about spending activities by the NRA's leadership, AMc knows full well that these particular expenses were proper—because it was deeply involved in their incurrence.

30.     Examples of media outlets to whom AMc directly or indirectly disclosed the NRA's confidential information include The New York Times, The Wall Street Journal, The Daily Beast, and Rolling Stone.

31.     To resolve its concerns regarding these disclosures, on May 6, 2019, the NRA requested that several key AMc employees execute sworn declarations attesting that they had not violated their confidentiality obligations under the Services Agreement.  The NRA tailored its

request narrowly—seeking declarations only from senior executives who had exposure to the information at issue—and demanded simply that these executives affirm they had complied, and would continue to comply, with their clear legal duties.

32.     To the NRA's dismay, AMc flatly refused to provide any cooperation or assurances whatsoever.  The NRA brings this action to discover the full extent of AMc's breaches, enjoin those breaches, and recover compensation for the damage it has sustained.

## FIRST CAUSE OF ACTION

### BREACH OF CONTRACT
### (Against Ackerman and Mercury)

33.     Plaintiff incorporates by reference and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

34.     The Services Agreement is a legally enforceable contract.  The confidentiality provisions of Section IV of the Services Agreement are unambiguous, and bind "AMc" (defined to include both Ackerman and Mercury).

35.     The NRA has performed all of its obligations under the Services Agreement.

36.     Defendants have breached the provisions of Section IV of the Services Agreement by directly or indirectly disclosing, to third parties, information made known to AMc as a result of AMc's providing Services (as defined under the Services Agreement).

37.     Defendants also breached the implied covenant of good faith and fair dealing by conspiring with, and causing, North to issue an extortion threat to the NRA.

38.     Defendants' breaches have damaged the NRA.  Among other things, the NRA has incurred significant reputational damage, and professional fees, as a result of Defendants' bad-faith, out-of-context "leaks" to reporters.  For example, the NRA's attorneys and public affairs

APP000833

professionals have spent extensive hours fielding inquiries from journalists in an effort to correct the misleading impressions sown by AMc.

39.     Defendants' breaches are escalating, and there can be little doubt that if its collaborator of multiple decades continues to maliciously disseminate its confidential information, the NRA will be irreparably harmed.  The NRA is entitled to injunctive relief to avert or minimize this irreparable harm.

40.     Moreover, AMc's breaches are material—by seeking to destroy the NRA's reputation, AMc has destroyed the purpose of the parties' contract.  Accordingly, the NRA is entitled to damages based on all of its remaining rights to performance under the Services Agreement.[13]

## SECOND CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY
### (Against Ackerman and Mercury)

41.     Plaintiff incorporates by reference and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

42.     Over the course of more than thirty years of close collaboration (including decades that preceded the Services Agreement), the NRA reposed extensive trust and confidence in both Ackerman and Mercury.  Defendants therefore incurred a common-law fiduciary duty to put the NRA's interests first when rendering services to the NRA, including pursuant to the Services Agreement.

43.     In addition, AMc incurred fiduciary duties to the NRA when it acted as the NRA's agent pursuant to multiple provisions of the Services Agreement.  For example, on the NRA's

---

[13] *See* Restatement (Second) of Contracts § 236 (1981).

APP000834

behalf and subject to the NRA's control, AMc entered into contracts and arrangements for the purchase, planning, and placement of media—activities that required AMc to be entrusted with sensitive confidential information pertaining to the NRA.

44.     Because it acted in a fiduciary capacity, AMc had a duty of loyalty to the NRA which forbade it from misusing the NRA's confidential information—especially with the malicious intent to damage the NRA.

45.     Furthermore, because it acted in a fiduciary capacity, AMc had a duty to disclose all material facts to the NRA regarding the advice and services it provided.

46.     AMc breached its fiduciary duty when it conspired to effect an out-of-context, partial disclosure of certain NRA confidential information to (i) a handpicked group of outside directors of the NRA, as well as (ii) the news media.

47.     AMc further breached its fiduciary duty by withholding material information from the NRA, including information concerning expense records and the performance of NRATV.

48.     Ackerman further breached its fiduciary duties of loyalty and fair dealing by conspiring with and causing its employee, North, to relay an extortion threat to the NRA on April 24, 2019.

49.     As a direct and proximate result of AMc's breaches, the NRA has incurred damages, including professional fees expended to redress the consequences of AMc's "leaks." AMc's breaches are escalating, and there can be little doubt that if its collaborator of multiple decades continues to maliciously disseminate its confidential information, the NRA will be irreparably harmed.  The NRA is entitled to injunctive relief to avert or minimize this irreparable harm.

**APP000835**

50.     The NRA furthermore seeks disgorgement of any amounts wrongfully obtained by Defendants on account of their breaches of their fiduciary duties including, without limitation, all fees paid by the NRA to Ackerman and Mercury since the date such breaches began—which the NRA believes occurred no later than August 3, 2018.

## DEMAND FOR JURY TRIAL

51.     Plaintiff hereby demands a trial by jury on all issues of fact to which it is entitled to a jury trial in this cause.

APP000836

## REQUEST FOR RELIEF

Wherefore, for all the forgoing reasons, Plaintiff requests judgment in its favor against AMc:

a. Granting it preliminary and permanent injunctive relief;

b. Granting it compensatory damages for material, total breach of contract and breach of fiduciary duty totaling $40 million;

c. Granting it punitive or exemplary damages; and

d. Granting such other and further relief as the Court deems just and proper.

Respectfully submitted,

James W. Hundley (VA Bar No. 30723)
Robert H. Cox (VA Bar No. 33118)
Amy L. Bradley (VA Bar No. 80155)
BRIGLIA HUNDLEY, P.C.
1921 Gallows Road, Suite 750
Tysons Corner, VA 22182
jhundley@brigliahundley.com
rcox@brigliahundley.com
abradley@brigliahundley.com
Phone: 703-883-0880
Facsimile: 703-883-0899

APP000837

# EXHIBIT A-54

Politics

# Oliver North Claims That the NRA's Leader Defamed Him

By David Voreacos and Neil Weinberg
July 11, 2019, 2:43 PM CDT
*Updated on July 11, 2019, 4:31 PM CDT*

▶ North says LaPierre retailated over mismanagement claims

▶ Filing comes amid NRA internal strife, financial turmoil



Guns in America

Former National Rifle Association President Oliver North accused the group's leader, Wayne LaPierre, of defaming him, forcing him out of the gun rights group and retaliating after North raised questions about lavish spending and financial mismanagement.

In a court filing Thursday, North said the NRA falsely accused him of fomenting a failed "coup" to get LaPierre, once a "long-term, close personal friend," to step down. Instead, North lost the power struggle and resigned in April after saying he had quietly tried to protect the NRA and its mission.

Case 3:19-cv-02074-G-BK   Document 80   Filed 03/30/20   Page 227 of 486   PageID 4608

LaPierre, aided by the NRA's outside counsel, William Brewer, has since used adverse publicity to "undermine North and his efforts to address allegations of financial misconduct at the NRA," according to the filing.

North is responding to an NRA lawsuit filed last month in New York state court in which the gun group claims he's not entitled to legal fees. North says the NRA's bylaws require the association to cover fees stemming from a May 3 inquiry by the Senate Finance Committee and any other queries he may receive from law enforcement or investigative bodies about the gun rights group.

The NRA has been in turmoil since North left his unpaid presidency. It suspended its chief lobbyist, Chris Cox, after accusing him of joining North and the NRA's former advertising and public relations firm, Ackerman McQueen Inc., in the failed coup. Cox has left the association, and Ackerman McQueen cut ties after LaPierre accused it of breach of contract.

Earlier: NRA's Embattled Top Lobbyist Chris Cox Resigns After Two Decades

New York Attorney General Letitia James is investigating the NRA's finances. The group claims in a lawsuit that the state illegally discouraged banks and insurers from doing business with it. The NRA also sued Ackerman McQueen, which produced the now-defunct NRATV. The advertising firm countersued.

North said he objected in April to LaPierre receiving hundreds of thousands of dollars in clothing, private jet travel, and other personal benefits paid by Ackerman McQueen. He also sought an independent review of Brewer's law firm, which North said was billing the NRA $2.9 million a month in fees.

Ackerman McQueen hired North in 2018 after he left Fox News, when LaPierre "urged and convinced" him to take on the new role. However, Ackerman McQueen has been "unable to pay" North since late June. The NRA's lawsuit against Ackerman McQueen "appears to be motivated by Brewer's long-simmering animosity toward his current in-laws, who run Ackerman McQueen," according to North's filing.

"The NRA views this as a misguided attempt to deflect from reality -- Col. North played a central role in an extortion scheme that caused the issues for which he now seeks indemnification," Brewer, the outside NRA attorney said in an email. "The NRA will not look the other way when it

**APP000839**

Case 3:19-cv-02074-G-BK   Document 80   Filed 03/30/20   Page 228 of 486   PageID 4609

appears that crimes against the association have been committed by people motivated by their own self-interests."

*(Updates with details of lawsuit and NRA attorney's response.)*

---

Terms of Service Do Not Sell My Info (California)Trademarks Privacy Policy
©2020 Bloomberg L.P. All Rights Reserved
Careers Made in NYC Advertise Ad Choices     Contact Us Help

APP000840

# EXHIBIT A-55

V I R G I N I A:

## IN THE CIRCUIT COURT FOR THE
### CITY OF ALEXANDRIA

| | |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| ACKERMAN MCQUEEN, INC., | ) |
| | ) |
| and | ) |
| | ) |
| MERCURY GROUP, INC. | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

Civil Case No. 19002886

## PLAINTIFF'S COMPLAINT AND JURY DEMAND

Plaintiff National Rifle Association of America ("NRA") files this Complaint and Jury

Demand against Defendants Ackerman McQueen, Inc. ("Ackerman") and Mercury Group, Inc.

("Mercury" and, together with Ackerman, "AMc"), based on personal information as to its own

actions and on information and belief as to all other matters, as follows:

FILED
CLERK OF COURTS
CITY OF ALEXANDRIA
2019 SEP -5 PM 4: 6
EDWARD SEMONIAN, CLERK
BY
DEPUTY CLERK

APP000841

## PRELIMINARY STATEMENT

After collaborating for decades, the NRA finds itself at odds with its advertising and communications firm, AMc. The NRA commenced a separate lawsuit[1] arising from AMc's refusal to furnish agreed business records and another lawsuit to redress additional, increasingly brazen breaches of duties owed by AMc to the NRA. (Those cases have been consolidated.).[2] Over the past year, even as it withheld important documents and information from the NRA, AMc readily shared confidential and proprietary materials with hostile third parties, including the news media, in a series of sordid, out-of-context "leaks" engineered by AMc to harm its client.

AMc's work for the NRA is governed by a Services Agreement. After the filing of the lawsuits, the NRA, in May and June 2019, made repeated requests to AMc for the return of its property, materials, documents, and Confidential Information as provided for under Section XI.E. of the Services Agreement. The NRA reiterated its willingness to pay, in advance, for the accumulation and return of its property and requested that AMc promptly disclose any associated costs. However, AMc has refused to return the NRA's property.

## PARTIES

1.      Plaintiff NRA is a not-for-profit corporation organized under the laws of the State of New York with its principal place of business located in Fairfax, Virginia. The NRA is America's leading provider of gun-safety and marksmanship education for civilians and law enforcement. It is also the foremost defender of the Second Amendment of the United States

---

[1] *See National Rifle Association of America v. Ackerman McQueen, Inc. and Mercury Group. Inc.,* Civil Case No. CL19001757, 19002067 (Va. Cir. Ct., Alex.) (Consolidated).

[2] *See National Rifle Association of America v. Ackerman McQueen, Inc. and Mercury Group. Inc.,* Civil Case No. CL19002067 (VA. Cir. Ct., Alex.).

APP000842

Constitution. A 501(c)(4) tax-exempt organization, the NRA has over five million members, and its programs reach many millions more.

2.      Defendant Ackerman is a nonresident, for-profit business corporation organized under the laws of the State of Oklahoma with its principal place of business in Oklahoma City, Oklahoma.  Ackerman is an advertising and public relations agency that has counted the NRA among its largest clients for more than thirty years.

3.      Defendant Mercury is a nonresident, for-profit business corporation organized under the laws of the State of Oklahoma with its principal place of business in Alexandria, Virginia. Mercury is a wholly-owned subsidiary of Ackerman and specializes in public-communications strategy, including on behalf of advocacy groups such as the NRA.

4.      At all relevant times, Ackerman and Mercury acted pursuant to the Services Agreement (defined below) between Ackerman and the NRA.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over Ackerman and Mercury pursuant to Virginia Code § 8.01-328.1 because both Ackerman and Mercury have transacted business in the Commonwealth of Virginia and contracted to supply services in the Commonwealth of Virginia.

6.      Venue is proper in this Court because the cause of action set forth herein arose from the transaction of business in Alexandria, Virginia.

7.      Additionally, jurisdiction and venue are proper in this Court because Ackerman and Mercury have expressly consented to the exclusive jurisdiction and venue of courts sitting in Alexandria or Fairfax County, Virginia regarding the matters presented herein in the Services Agreement dated April 30, 2017 (as amended May 6, 2018) (the "Services Agreement") (attached as Ex. A).

APP000843

## FACTUAL BACKGROUND

A.   **For Decades, the NRA Relied on AMc to Perform Public Affairs Services and Provided NRA Property and Materials to AMc.**

8.      The NRA and AMc have worked closely together since the 1980s. Over that time, the NRA placed trust and confidence in AMc to perform services including: public relations and strategic marketing; planning and placement of media; management of digital media and websites; and the operation of NRATV, a digital-media platform managed by AMc but frequently perceived by the public as the "voice" of the NRA.[3] By its nature, this work was publicly and politically sensitive and required the NRA to entrust AMc with confidential (and sometimes privileged) information.

9.      Since at least 1999, AMc's work on behalf of the NRA has been governed by successive incarnations of a Services Agreement containing detailed specifications for how various types of work performed by AMc for the NRA should be budgeted and billed.  The Services Agreement between the NRA and AMc dated May 1, 1999 (the "Previous Services Agreement" attached as Ex. B) as well as the current, operative Services Agreement dated April 30, 2017 (as amended May 6, 2018) provide that certain categories of services, such as Owned Media and Internet Services, are compensated with an agreed annual fee while others are required to be invoiced on an *ad hoc* basis based on estimates furnished by AMc and approved by the NRA.

10.      Under the Services Agreement, the NRA provided its property, materials, documents, and confidential information to AMc solely to allow AMc to provide services to the NRA. Section XI.E. of the Services Agreement required that "[u]pon the expiration or termination of this Services Agreement, AMc shall immediately return to the NRA, to such place and in such

---

[3] *See, e.g.*, Jeremy W. Peters & Katie Benner, *Where The N.R.A. Speaks First and Loudest*, THE NEW YORK TIMES, February 21, 2018, https://www.nytimes.com/2018/02/21/us/politics/nratv-nra-news-media-operation.html.

APP000844

manner as NRA may specify, any and all of the NRA's property, materials, documents, Confidential Information, etc., that may be in AMc's possession." Section XI.E. also provides that the NRA will pay AMc in advance for "all charges for accumulating said materials."

**B.**    **In Repeated Communications, the NRA Requested that AMc Return NRA Property, Materials, and Confidential Information. AMc has Refused.**

11.    Since May 2019, pursuant to Section XI.E. of the Services Agreement, the NRA has repeatedly requested return of its property, materials, and confidential information ("NRA's Property") from AMc.  In addition, the NRA has made repeated requests for an advance price quote from AMc for the expected cost of accumulating the NRA's Property so that the NRA can advance the costs to AMc. AMc has refused to return the NRA's Property or to provide an estimate for the costs of accumulating and transmitting the NRA's Property.

12.    On May 29, 2019, Revan McQueen, CEO of Ackerman, sent a letter to the NRA, entitled "Notice of Termination of the Services Agreement," notifying the NRA that AMc would be terminating the Services Agreement in 90 days under Section XI.B. of the Services Agreement. See Letter dated May 29, 2019, from Revan McQueen to Andrew Arulanandam (attached as Ex. C). In the letter AMc states:

> This Notice of Termination initiates a process under Section XI, Subsections E and F of the Services Agreement to wind up the relationship between the parties. Pursuant to Subsection E, <u>AMc will prepare to return to the NRA any and all of NRA's property, materials, documents and confidential information in AMc's possession.</u>

<u>Id</u>. at p. 4 (emphasis added).

13.    On June 25, 2019, pursuant to section XI.D. of the Services Agreement, the NRA sent a letter to AMc providing written notice of the NRA's immediate termination of all business with AMc based on AMc's prior material breaches of the Services Agreement. See Letter dated June 25, 2019, from Andrew Arulanandam to Revan McQueen (attached as Ex. D).  The NRA

APP000845

"demand[ed] immediate delivery of all materials encompassed by Section XI.E. of the Services Agreement, including all Confidential Information (as defined by the Services Agreement)." The NRA further stated that it "will pay for accumulation of these materials and reiterates its previous requests for an advance price quote to this end." Id.

14.     On June 27, 2019, AMc's outside counsel, David Schertler, sent a letter responding to the NRA's June 25, 2019 letter. See Letter dated June 27, 2019, from David Schertler to Andrew Arulanandam (attached as Ex. E). In the letter, counsel for AMc states that AMc is immediately terminating the Services Agreement. In addition, counsel for AMc states:

> With respect to your demand of immediate delivery of all Confidential Information under Section XI, Paragraph E of the Services Agreement, such delivery is conditioned upon approval and payment in advance by the NRA of "all charges for accumulating said materials." We will provide the NRA with the costs of accumulating these materials and will expect to receive payment of those costs prior to the delivery of any materials encompassed by this provision.

Id. at p. 2. AMc does not state when it will return the NRA's Property or when it will provide the costs of accumulating and returning the NRA's Property.

15.     On June 28, 2019, the NRA responded to AMc counsel's letter dated June 27, 2019, by repeating its request for return of the NRA's Property and a budget for the transmittal of the NRA's Property.  See Letter dated June 28, 2019, from Andrew Arulanandam to David Schertler (attached as Ex. F). The letter states, in part:

> The discussion in your letter concerning payment for transmittal of materials pursuant to Section XI.E. of the Services Agreement also retraces ground well-trod in prior letters (most recently my letter dated June 25, 2019). The NRA has repeatedly requested a budget for transmittal of these materials. Please provide one. Please also be prepared to explain the basis for the asserted cost. Based on all that has transpired and come to light in recent months, the NRA will not accept AMc's unsupported invoices at face value.

Id. at p. 2.

**APP000846**

16.     The NRA received no response from AMc to its June 28 letter. Despite repeated requests, AMc failed to return the NRA's Property and failed to provide a budget for the costs.

17.     In a letter dated July 22, 2019, counsel for the NRA sent a "follow-up to multiple previous requests concerning AMc's contractual obligation to surrender the NRA's property and Confidential Information." See Letter dated July 22, 2019, from Michael Collins to David Schertler (attached at Ex. G). In the July 22 letter, the NRA states, in part:

> **Return of the NRA's Property, Material, Documents, and Confidential Information.** As you know, Section XI.E. of the Services Agreement required that AMc "return to the NRA, to such place and in such manner as NRA may specify, any and all of the NRA's property, materials, documents, Confidential Information, etc., that may be in AMC's possession." Furthermore, AMc must return these items "immediately" upon expiration or termination of the Services Agreement. In repeated communications throughout May and June, the NRA emphasized its urgent need for these materials, reiterated its willingness to pay up front for their accumulation, and requested that AMc promptly disclose any associated costs so the parties could proceed. By letter dated June 27, 2019, AMc finally agreed to provide those costs to the NRA. Please let us know when we can expect to receive them.

Id. at p. 1.

18.     The NRA attached to the July 22 letter a list of fixed assets for which it had been invoiced by AMc and stated its expectation that these assets be returned with all of its other property, materials, documents, and confidential information. See Ex. G.  These items include, but are not limited to, audio visual equipment, cameras, monitors, tripods, microphones, adaptors, cables, software, power supplies, batteries, pedestals, recording and playout servers, storage modules, and computers.  The list includes values for each of the fixed assets.

19.     On August 5, 2019, counsel for AMc responded to the NRA's July 22 letter taking the position, for the first time, that AMc will not return the NRA's Property and will not provide the charges for accumulating the NRA's Property until "the NRA comes into compliance with all of its obligations under the Services Agreement" by curing all of its purported breaches of other

APP000847

provisions of the Services Agreement which are the subject of AMc's counterclaims in separate lawsuits. <u>See</u> Letter dated August 5, 2019 from David Schertler to Michael Collins (attached as Ex. H).

      20.    On August 9, 2019, counsel for the NRA responded to counsel for AMc's August 5 letter. <u>See</u> Letter dated August 9, 2019, from Michael Collins to David Schertler (attached as Ex. I). The NRA stated that it has not breached the Services Agreement and that the NRA owes nothing to AMc other than costs associate with gathering and returning the NRA's Property. The NRA further stated:

> Pursuant to section XI.D., Ackerman is entitled to terminate immediately upon sending written notice for certain grounds, including if the NRA breached the Services Agreement. Nonetheless, section XI.E. still requires Ackerman to immediately return the NRA's property even if the termination was based on alleged breaches by the NRA. Thus, Ackerman would have no basis to delay returning the NRA's property until the NRA pays whatever amounts Ackerman seeks unrelated to the costs associated with accumulating the NRA's property.

<u>Id</u>. at pp. 1-2.

      21.    In the August 9 letter, the NRA repeated its demand that AMc "immediately return all of the NRA's books, records, documents, Confidential Information, and other personal property. As stated before, the NRA will reimburse AMc for its reasonable costs in accordance with Section IX.E. once Ackerman provides an accounting of those costs." <u>Id.</u> at p. 2.

      22.    The NRA has not breached the Services Agreement.

      23.    AMc committed prior material breaches of the Services Agreement.

      24.    Regardless of whether the NRA has breached the Services Agreement (it has not), Section XI.E. requires AMc to immediately return the NRA's Property upon termination of the Services Agreement, including if the NRA breached the Services Agreement.

APP000848

25.     The NRA's property, fixed assets, materials, documents, and confidential information are valuable property of the NRA.

26.     The NRA has a legal and contractual right to the immediate return of its Property.

27.     The NRA has repeatedly requested the return of the NRA's Property.  AMc has possession of the NRA's Property.

28.     Despite repeated NRA requests, AMc is wrongfully refusing to return the NRA's Property.

## FIRST CAUSE OF ACTION

### DETINUE (CIVIL CLAIM FOR SPECIFIC PERSONAL PROPERTY)
### (Against Ackerman and Mercury)

29.     Plaintiff incorporates by reference and realleges each and every allegation in paragraphs 1 - 28 as if fully set forth herein.

30.     The Services Agreement is a legally enforceable contract.  The provisions of Section XI.E. of the Services Agreement are unambiguous and bind "AMc" (defined to include both Ackerman and Mercury).

31.     The NRA seeks possession of its property, fixed assets, materials, documents, and confidential information as defined in the Services Agreement.

32.     Both the NRA and AMc have provided notice of the immediate termination of the Services Agreement; thus, the NRA has an immediate right to possession of the NRA's Property.

33.     The NRA's Property is capable of identification. The NRA's Property is defined in the Services Agreement and the NRA provided a partial list of its property in AMc's possession in the NRA's letter dated July 22, 2019, to AMc.

APP000849

34.     In its July 22 letter, the NRA provided values for some of its fixed assets in AMc's possession. In addition, the NRA's confidential information and materials provided to AMc during their contractual relationship have monetary value.

35.     AMc is in possession of the NRA's Property and has wrongfully refused to return the NRA's Property.

36.     Pursuant to Va. Code §§ 8.01-114 and 8.01-534, the NRA will seek pretrial seizure of its personal property wrongfully withheld from it by AMc through petition to this Court. Grounds exist for a pre-trial seizure pursuant to Va. Code § 8.01-534.

37.     The NRA seeks possession of its Property and damages resulting from the unjust detention of its Property by AMc. For any NRA Property that cannot be returned due to damage or loss, the NRA seeks the value of that Property.

## SECOND CAUSE OF ACTION

### ALTERNATIVE CLAIM FOR CONVERSION
### (Against Ackerman and Mercury)

38.     Plaintiff incorporates by reference and realleges each and every allegation in paragraphs 1 - 37 as if fully set forth herein.

39.     The NRA has a right to immediate possession of its Property.

40.     AMc has wrongfully exercised or assumed authority over the Property, depriving the NRA of possession.

41.     The NRA has repeatedly demanded that AMc return its Property. AMc has refused the NRA's requests.

42.     The NRA had a right to immediate possession of its Property as of AMc's notice of termination of the Services Agreement on May 29, 2019. See Ex. A.

APP000850

43.    The NRA seeks damages for AMc's conversion of its Property.

## THIRD CAUSE OF ACTION

### ALTERNATIVE CLAIM FOR BREACH OF CONTRACT
### (Against Ackerman and Mercury)

44.    Plaintiff incorporates by reference and realleges each and every allegation in paragraphs 1 - 43 as if fully set forth herein.

45.    The Services Agreement is a legally enforceable contract.

46.    The NRA has performed all of its obligations under the Services Agreement.

47.    AMc has breached the provisions of Section XI.E. of the Services Agreement by failing to provide the immediate return of the NRA's Property.

48.    AMc has also breached the implied covenant of good faith and fair dealing by ignoring the NRA's repeated requests to return the NRA's Property.

49.    AMc's breaches have damaged the NRA.

50.    Moreover, AMc's breaches are material. Accordingly, the NRA is entitled to damages based on all of its remaining rights to performance under the Services Agreement.[4]

## DEMAND FOR JURY TRIAL

The NRA hereby demands a trial by jury on all issues of fact to which it is entitled to a jury trial in this cause.

## REQUEST FOR RELIEF

WHEREFORE, for all the forgoing reasons, the NRA requests judgment in its favor against AMc:

---

[4] *See* Restatement (Second) of Contracts § 236 (1981).

APP000851

a. Ordering that the NRA has proven its ownership rights and that AMc shall return the NRA's Property immediately;

b. Granting a pre-trial seizure of NRA Property in the possession of AMc;

c. Ordering the sheriff or other proper officer to seize NRA Property and deliver the same to the NRA *pendente lite* under circumstances deemed appropriate;

d. Granting NRA preliminary and permanent injunctive relief;

e. Alternatively, granting NRA compensatory damages for any NRA Property converted by AMc;

f. Alternatively, granting NRA specific performance of the return of the NRA's Property or compensatory damages for a material, total breach of contract;

g. Granting NRA punitive or exemplary damages; and

h. Granting such other and further relief as the Court deems just and proper.

APP000852

Respectfully submitted,

NATIONAL RIFLE ASSOCIATION OF
AMERICA

James W. Hundley (VA Bar No. 30723)
Robert H. Cox (VA Bar No. 33118)
Amy L. Bradley (VA Bar No. 80155)
BRIGLIA HUNDLEY, P.C.
1921 Gallows Road, Suite 750
Tysons Corner, Virginia 22182
jhundley@brigliahundley.com
rcox@brigliahundley.com
abradley@brigliahundley.com
Phone:  703-883-0880
Facsimile:  703-883-0899

APP000853

# Exhibit A

APP000854

## SERVICES AGREEMENT

**THIS AGREEMENT**, made this 30th day of April, 2017, by and between the National Rifle Association of America (hereinafter referred to as "**NRA**"). A New York Not-For-Profit Corporation, located at 11250 Waples Mill Road, Fairfax, Virginia 22030, and Ackerman McQueen, Inc., an Oklahoma corporation, and its wholly owned subsidiary, Mercury Group Inc., an Oklahoma corporation, (hereinafter collectively referred to as "**AMc**"), whose principal office is located in Oklahoma at 1100 The Tower, 1601 N.W. Expressway, Oklahoma City, Oklahoma 73118.

### W I T N E S S E T H :

**WHEREAS**, AMc is in the business of providing comprehensive communications services including public relations, crisis management, strategic marketing, advertising and creative, as well as owned media and internet services, and warrants and represents that it possesses the capability, necessary personnel, political strength, equipment and other related items to perform such services; and,

**WHEREAS**, NRA is a Membership Organization and desires to retain AMc as a nonexclusive source for services described herein for NRA upon the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants set forth herein, the parties hereto agree as follows:

I.   **SERVICES**

A.   **Public Relations/Crisis Management /Strategic Marketing Services**

Services include a combination of generating earned media, responsive public relations, crisis management and strategic thinking to promote a positive image of the NRA as described below:

- Public relations advice and counsel, including crisis management.

- Ongoing media relations -- solicitation and placement of features in national, regional and local media; liaison with print and broadcast news media on a daily basis for unsolicited inquiries; ongoing media training for NRA officials; Editorial Board meetings; features for outdoor publications.

- Specialized public relations writing services (news releases, columns, editorials), and distribution of same as required (e.g. via wire service or individual contact).

- Research and information retrieval as necessary for NRA issues management at NRA's request and approval.

- Coordination, scheduling and on-site assistance when necessary for NRA officials' speeches and personal appearances.

1

- Coordination with internal NRA public relations staff in the Executive Office, General Operations and Institute for Legislative Action.

- Development of proactive earned media in national and regional media as it relates to NRA officials' appearances at special events (i.e. National Gun Shows, YHEC, Annual Meetings, etc.).

- Coordination and scheduling appearances for NRA officials and commentators; including on-site assistance (where necessary).

- Develop, produce, and place op-ed pieces for national and regional media coinciding with Special Events and NRA Officials' appearances.

- Advise and counsel with NRA Officials on strategic issues to provoke public debate and frame NRA's point-of-view for the general public.

- Speechwriting services (pivotal speeches for major events are discussed in "Advertising/Creative Services" Section).

- Management of Talent/Spokespersons for NRATV.

- Production and staffing for NRATV.

**B.**   **Advertising/Creative Services**

The services described below (with the exception of "Media Planning and Placement" which is addressed separately as a subcategory of this Section) will be provided to NRA on a project ("**Job**") basis based on the fair market value of the work as determined by NRA and AMc. When reasonable time is available, cost estimates will be submitted for approval by NRA prior to the initiation of the Job.

- Speechwriting services for NRA dignitaries to be delivered at major events (includes background research, interviews with NRA Officials/Speaker, drafts and rehearsals if appropriate).

- Conceive, copywrite, design and produce local, regional, and national print and broadcast advertising and other appropriate forms of communication to present NRA's message.

- Original photography services and film processing (on location and/or in AMc's photo studio).

- Audio/Visual and Event Management services (i.e. Annual Meetings).

- Video Taping, Editing and Production.

- Music composition and arrangement and audio production.

- Primary Research services (quantitative and qualitative).

APP000856

C.  **Media Planning and Placement Services**

    Detail of AMc's compensation for Media Services are provided in the "Compensation" Section. Services rendered for such are:

- With NRA's approval, plan and order by written contract or insertion order the print space, radio and television time, or other media to be used for advertising, always endeavoring to secure the best available rates. AMc shall remain solely liable for payment, to the extent NRA has paid AMc.

- Incorporate the advertising in the required form and forward it to media with proper instructions for fulfillment of the contract or insertion order.

- Diligently check and verify broadcasts, insertions, displays, or other means used to carry the message to ensure proper fulfillment of all media purchases made by AMc on NRA's behalf.

- For direct response paid media advertising (i.e. Infomercial), provide ongoing analysis and ROI to determine most effective media markets, dayparts, and stations on a time sensitive basis for redirection or concentration of funds as evaluation indicates.

- Carefully audit invoices and make timely payment to media and suppliers for space and time purchased by AMc on NRA's behalf.

D.  **Owned Media Services**

- Full-time online broadcasting services for NRATV.

- Support services for NRATV provided by AMc Interactive include daily creation of graphics, flash animation for daily stories and synchronization to audio/video.

- Ongoing technical support service, unification, and advice for NRAHQ site (e.g. Answer to questions on service provider issues and simple "how-tos"). Application development or re-working requiring complex execution to be estimated on a project basis for NRA approval in advance of work performance.

- Full time marketing services to promote NRATV as well as on-site promotion of NRA programs, activities, and current events.

- Production of America's First Freedom Magazine.

E.  **Digital Systems Operations Support**

- Technology consulting including third party solutions, cloud consulting and reviewing IS efforts.

- Reliability engineering and monitoring including performance monitoring, emergency response and overall efficiency.

- Resource and capacity planning for large scale hardware and software migration initiatives.

- System and database administration, maintenance, updating, monitoring and troubleshooting.

## II.   COMPENSATION

### A.   <u>Public Relations/Political Strategy/Strategic Marketing Services</u>

1.   During the term of this Agreement, for ongoing Public Relations, Political Strategy and Strategic Marketing, NRA will pay AMc a fee as mutually agreed upon each year.

### B.   <u>Advertising/Creative/Media Planning and Placement Services</u>

1.   During the term of this Agreement, for ongoing study of NRA's business, including account service, creative development and other support functions in connection with the day-to-day administration and operation of NRA's account, NRA will pay AMc 15% commission of the gross media expenditure, or a 17.65% mark-up of the net media billing, for all media researched, planned, placed and administered by AMc on NRA's behalf.

2.   For collateral advertising services and products purchased on NRA's behalf from external suppliers (such as separations, engravings, typography, printing, etc.), by a 15% commission if offered, or a 17.65% mark-up of net billing. Estimates of the cost of external services and products are prepared, when reasonable time is available, for approval in advance and are subject to no more than a +/-10% variance provided AMc is authorized to proceed with production within thirty (30) days of the date the estimate is presented. Client changes in job specifications usually will result in the preparation and submission of a revised estimate; however, NRA agrees to assume financial responsibility for all changes specified by NRA then executed by AMc with NRA's knowledge.

3.   For art concepts, design layout, photography and film processing, copywriting, music composition and arrangement, audio and video production, etc., by cost quotations submitted for approval in advance, when reasonable time is available, or at the comprehensive art, storyboard, demo music, etc. stage. These quotations are based on the fair market value of the work as determined by AMc, and take into consideration, among other things, the hourly rates of the personnel assigned to the project and the required to complete the job. Written estimates are subject to no more than a +/- 10% variance provided they are approved by NRA and AMc is expressly authorized to proceed with production within thirty (30) days of the date the estimate is presented. Client changes in job specifications will

4

usually result in a revised estimate; however, NRA agrees to assume financial responsibility for all changes specified by NRA , then executed by AMc with NRA's knowledge.

### C.   Owned Media and Internet Services

During the term of this agreement, AMc will provide owned media and online broadcasting and website management, hosting and creation of NRATV, as well as full time marketing services. NRA will pay AMc a fee as mutually agreed upon each year.

### D.   Digital Systems Operations Support

During the term of this agreement, AMc will provide digital systems operations support. NRA will pay AMc a fee as mutually agreed upon each year.

### E.   Other Projects

If AMc undertakes, at NRA's request, additional or special assignments, not included within the services described in this project, the charges made by AMc will be agreed-upon in advance whenever possible. If no specific agreement was made, AMc will charge NRA a fair market price for the work performed.

## III.   BILLING AND PAYMENT

A.   Mailing and express charges, long distance telephone calls, photocopies, deliveries, sales taxes and reasonable out-of-town travel including transportation, meals and lodging, etc. on NRA's express behalf, shall be billed at AMc's cost. All out of town travel expenses shall require prior written approval in accordance with written procedures established by the NRA Executive Vice President or his designee. Payment of travel expenses not approved in advance may result in denial of reimbursement. Expenses not listed above shall be considered to be normal business expenses of AMc and not billable to NRA unless specifically authorized in writing by the NRA Executive Vice president or his designee.

B.   All sales, use and similar taxes and all import, export and foreign taxes imposed by all applicable governmental authorities shall be billed to NRA at the amount imposed by such governmental authorities. AMc shall not be obligated to contest the applicability of any such taxes to the transactions performed pursuant to this Services Agreement.

C.   Fees shall be billed on or before the 5th of each month. This billing shall include costs specified in paragraph III A.

D.   Special assignments not included in this Agreement which cannot reasonably be included under the monthly fee must be approved in accordance with written procedures established by the NRA Executive Vice President or his designee, and the charges made by AMc shall be agreed upon in advance, where reasonable,

otherwise such charges shall be not greater than the usual and customary charges for such services or expenses in the industry.

E.    All sums payable to AMc under this Services Agreement shall be payable at AMc's corporate headquarters in Oklahoma City, Oklahoma within 30 days of the invoice date. Any amounts not received by AMc within 60 days from the date of the invoice shall bear interest at the rate of 1.0% per month from the date of the invoice until paid. NRA shall notify AMc of any questions concerning any invoices within 10 business days after receipt.

## IV.    CONFIDENTIALITY

A.    **AMc**

1.    AMc shall not disclose, directly or indirectly, to any third party any NRA membership data or mailing lists, any materials or information relating thereto, or any other data, materials or information coming to the knowledge of AMc, supplied to AMc by NRA, or otherwise made known to AMc as a result of AMc's providing Services (hereinafter collectively, referred to as the "**Confidential Information**"), without the prior express written permission of NRA.    This Services Agreement shall control AMc's providing fulfillment services to NRA.

2.    AMc shall not make or cause to have made any copies of any NRA Confidential Information without the prior express written authorization of NRA.

3.    AMc may use such Confidential Information only for the limited purpose of providing its Services to NRA.

4.    AMc may disclose such Confidential Information to AMc's employees but only to the extent necessary to provide its Services.    AMc warrants and agrees to prevent disclosure of Confidential Information by its employees, agents, successors, assigns and subcontractors.

B.    AMc, its employees and agents, shall comply with any and all security arrangements imposed by NRA respecting access to Confidential Information.

C.    AMc acknowledges NRA's exclusive right, title and interest in the Confidential Information, and shall not at any time do or cause to be done any act or thing contesting or in any way impairing or tending to impair any part of such right, title or interest.

D.    AMc shall cease and desist from any and all use of the Confidential Information, and AMc shall promptly return to NRA, in a manner satisfactory to NRA, any and all Confidential Information, upon the earlier to occur of the following: the completion or termination of the Services Agreement.

**APP000860**

V.   **INDEMNIFICATION/INSURANCE**

A.   **AMc**

1.   AMc agrees to indemnify, defend and hold harmless NRA from and against any loss, liability and expenses including attorney's fees which NRA shall become obligated to pay in respect to: (a) materials prepared by AMc on behalf of NRA which gives rise to any claims pertaining to libel, slander, defamation, infringement of copyright, title or slogan, or privacy or invasion of rights of privacy; or (b) the public relations services and related activities of any person engaged by AMc as a spokesperson in connection with NRA and its purposes, objectives and activities ("**Spokesperson**") pursuant to the direction or supervision of AMc. Insurance coverage for the foregoing indemnification obligations shall be maintained by AMc.

2.   NRA agrees to give AMc prompt notice of such claims and to permit AMc, through AMc's insurance carrier and/or counsel of AMc's choice, to control the defense or settlement thereof. However, NRA reserves the right to participate in the defense of any such claim through NRA's own counsel and at NRA's own expense.

3.   AMc shall take reasonable precautions to safeguard NRA's property entrusted to AMc's custody or control, but in the absence of negligence on AMc's part or willful disregard of NRA's property rights, AMc shall not be held responsible for any loss, damage, destruction, or unauthorized use by others of any such property.

4.   AMc shall not be liable to NRA by reason of default of suppliers of materials and services, owners of media, or other persons not AMc employees or contractors unless supplier(s) is under control of AMc or AMc should have reasonably anticipated default.

B.   **NRA**

1.   NRA agrees to indemnify, defend and hold harmless AMc, and its directors, officers, employees, agents, contractors and representatives (collectively, the "**AMc Indemnified Parties**," such directors, officers, employees, agents, contractors and representatives being hereby deemed third party beneficiaries of this indemnity provision), from and against any and all claims, demands, causes of action, suits, liabilities, losses, damages settlements, judgments, and expenses (including attorney's fees), arising from (1) any data, materials, or service performance claims furnished to any AMc Indemnified Party by NRA, or approved by NRA, from which a AMc Indemnified Party prepared any publicity materials or public relations materials, or which were used by a AMc Indemnified Party in the production of advertising which was approved by NRA; (2) any claim, action or proceeding by any person(s), entity(ies), the United States of

America, any state(s), county(ies), or municipality(ies), or any department, agency, board, bureau, commission, attorney general, or other instrumentality(ies) or political subdivision(s) of any of the foregoing, seeking (a) damages (whether actual, exemplary, or both), reimbursement or other compensation for any alleged injury(ies), death(s), or private or public losses, damages or costs related to one or more incidents of violence committed with firearms, or (b) an injunction or other equitable relief with respect to the activities of a AMc Indemnified Party performed on behalf of NRA pursuant to this Agreement or otherwise requested or approved by NRA; or (3) the public relations services and related activities of any Spokesperson pursuant to the direction or supervision of NRA. Insurance coverage for the foregoing indemnification obligations shall be maintained by NRA.

2.     AMc agrees to give NRA prompt notice of any matter covered by NRA's indemnity set forth above and to permit NRA, through NRA's insurance carrier and/or counsel of NRA's choice, to control the defense or settlement thereof. However, AMc and the other AMc Indemnified Parties reserve the right to participate in the defense of any such claim through the AMc Indemnified Parties' own counsel and at the AMc Indemnified Parties' own expense.

C.     NRA shall reserve the right, in NRA's best interest, to modify, reject, cancel, or stop any and all plans, schedule, and work in progress. In such event AMc shall immediately take proper and responsible action to carry out such instruction; NRA, however, agrees to assume AMc's liability for agreed upon commitments and to reimburse AMc for losses AMc may derive therefrom, and to pay AMc for all internal and external expenses incurred on NRA's behalf with NRA's authorization and to pay AMc charges relating thereto in accordance with the provisions of this Services Agreement.

## VI.   OWNERSHIP OF PRODUCTS

All creative works developed by AMc in fulfilling its obligations under this Services Agreement shall constitute works made for hire, and shall be the property of NRA. In the event that such works should not be "works made for hire," as such works are defined at 17 U.S.C. § 101, then AMc transfers and assigns to NRA the ownership of all copyright in such works. In the event that AMc should employ a subcontractor, AMc shall arrange for the transfer of such intellectual property to NRA. All other, and further, intellectual property and mailing lists, under any definition, whether common law or statutory, created or developed by AMc in fulfilling its obligations under this Services Agreement, are NRA's sole and exclusive property, and AMc does hereby assign all right, title and interest in same to NRA to the extent that AMc has such rights to assign and transfer. In no event shall AMc be deemed to be assigning or transferring greater rights than it has acquired from any supplier or contractor from who it may have acquired certain elements of the material prepared for NRA.

## VII.   NO COMPETITION

For the duration of this Service Agreement, AMc shall not represent any other entity in public relations services directly competitive with NRA without NRA's prior written approval.

## VIII.   EXAMINATION OF RECORDS

During the term of this Services Agreement, AMc authorizes NRA, upon reasonable notice, to examine AMc and Mercury's files, books, and records, with respect to matters covered under this Services Agreement.

## IX.   AUTHORIZED CONTACTS

AMc is authorized to act upon written communications received from the NRA Executive Vice President or his designee. He or his designee are the only persons within NRA who have the actual authority to issue such communications.

## X.   MISCELLANEOUS

A.   Severability. If any provision of this Services Agreement shall be held to be void or unenforceable for any reason, the remaining terms and provisions hereof shall not be affected thereby.

B.   Binding Effect; Agents. The provisions of this Services Agreement shall inure to the benefit of and bind the heirs, legal representatives, successors and assigns of the parties hereto. In performing the Services described above and in taking any action necessarily incident thereto, AMc may utilize the services of AMc's employees and/or such agents or independent contractors approved by NRA as AMc deems appropriate.

C.   Section Headings. Section headings contained in this Services Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation thereof.

D.   Integrated Agreement. This Services Agreement, together with any Exhibits hereto, constitute the entire agreement between NRA and AMc relating to the matters covered by this Services Agreement at the time of its signing. This Services Agreement supersedes all prior agreements, including letter agreements and memoranda of understanding.

E.   Survival. The terms, covenants, and conditions of Section IV and Section V shall survive the termination or expiration of this Services Agreement.

## XI.   TERMINATION

A.   This Services Agreement shall become effective upon the execution hereof.

**APP000863**

B.   This Services Agreement shall continue in full force and effect for an initial period of eight (8) months ending 12-31-2017. After the initial period of eight (8) months, NRA or AMc may at their sole and exclusive discretion, terminate this Services Agreement, without any cause whatsoever, upon ninety (90) days written notice. Without such written notice, it is the intention of the parties that the Services Agreement will automatically renew.   Any written notice to cancel this Contract shall be effective ninety (90) days from the date the Party giving notice to cancel tenders such written notice to the other Party. In the event of said termination, all further obligations of each party to perform shall cease, except as otherwise specifically provided in this Services Agreement. In said case NRA shall, pursuant to Section III, reimburse AMc for expenses incurred on NRA's behalf up to the date of termination.

C.   This Services Agreement may be terminated by NRA immediately upon written notice if: (1) AMc fails to diligently and in good faith perform any of its obligations contemplated hereunder; (2) AMc breaches any term, promise or covenant hereunder; (3) AMc files for bankruptcy; (4) there occurs any assignment for the benefit of creditors or the placement of any of AMc's assets in the hands of a trustee or receiver; (5) AMc becomes insolvent or bankrupt; (6) AMc is dissolved. If NRA so terminates this Services Agreement, NRA shall have no obligation to make payments except that NRA shall, pursuant to Section III, reimburse AMc for expenses incurred up to the date of said notice of termination.

D.   This Services Agreement may be terminated by AMc immediately upon written notice if (1) NRA fails to diligently and in good faith perform any of its obligations contemplated hereunder; (2) NRA breaches any term, promise or covenant hereunder; (3) NRA files for bankruptcy; (4) there occurs any assignment for the benefit of creditors or the placement of any of NRA's assets in the hands of a trustee or receiver; (5) NRA becomes insolvent or bankrupt; or, (6) NRA is dissolved.

E.   Upon the expiration or termination of this Services Agreement, AMc shall immediately return to NRA, to such place and in such manner as NRA may specify, any and all of NRA's property, materials, documents, Confidential Information, etc., that may be in AMc's possession. All charges for accumulating said materials shall be approved and paid in advance of receipt by the NRA.   For all non-cancellable contracts entered into between AMc and third parties for the benefit of the NRA (herein "**AMc-Third Party NRA Contracts**"), the NRA agrees to pay AMc upon such expiration or termination the balance of the compensation payable under such AMc-Third Party NRA Contracts as of the date of expiration or termination so that AMc can fulfill its obligations under said Contracts after expiration or termination. If any AMc-Third Party NRA Contract(s) are cancelable upon payment of a fee and the NRA requests that such Contract(s) be cancelled, the NRA agrees to pay AMc the cancellation fees payable under such Contracts as a condition of AMc cancelling such Contract(s).

F.   In consideration of the dedication of a substantial number of personnel and resources to provide the services under this Agreement (and the necessity to

maintain such staffing levels and resource allocations to enable AMc to continue to provide such services upon any renewals hereof), the NRA agrees to pay AMc a fair and equitable termination fee to compensate it for the inevitable severances and other reasonable costs incurred in conjunction with such expiration or termination. Such termination fees shall be negotiated in good faith by the parties and paid to AMc no later than the last day of this Agreement.

G. The terms, covenants, and conditions of Section IV and Section V shall survive the termination or expiration of this Services Agreement.

## XII. GOVERNING LAW AND CONSENT TO JURISDICTION, VENUE, AND SERVICE

A. This Services Agreement and any disputes arising thereunder shall be governed by and construed solely under the laws of the Commonwealth of Virginia, or, if applicable by federal law.

B. AMc consents and agrees that all legal proceedings relating to the subject matter of this Services Agreement shall be maintained exclusively in courts sitting within the City of Alexandria or the County or Fairfax, Commonwealth of Virginia, and AMc hereby consents and agrees that jurisdiction and venue for such proceedings shall lie exclusively with such courts. AMc furthermore consents to the exercise of personal jurisdiction by said courts over AMc.

IN WITNESS WHEREOF, and intending to be legally bound hereby, and further intending to bind their employees, agents, successors and assigns, the parties have executed this Services Agreement the day and date above written.

**National Rifle Association (NRA)**                    **Ackerman McQueen, Inc.**

_Allan D. Cors, President_                    _Melanie Montgomery_
Print Name/Title                              Print Name/Title
                                              _Melanie Montgomery_
                                              _EVP_

## AMENDMENT NO. 1 TO SERVICES AGREEMENT

This Amendment No. 1 to Services Agreement (this "Amendment") is dated as of May ____ 6 ____, 2018, and is entered into by and between the National Rifle Association of America ("NRA") and Ackerman McQueen, Inc. ("AMc").

### WITNESSETH:

**WHEREAS**, NRA and AMc are parties to that certain Services Agreement (the "Services Agreement") dated April 30, 2017; and;

**WHEREAS**, NRA and AMc desire to amend the Services Agreement;

**NOW, THEREFORE**, in consideration of the mutual promises and covenants set forth herein, the parties hereto agree as follows:

1.  Defined Terms. All initial capitalized terms used herein but not defined herein shall have the meanings set forth in the Services Agreement.

2.  Amendment of Paragraph III E. Paragraph III E of the Services Agreement is hereby amended to add the following provisions at the beginning of paragraph III E:

    All service fee billing under this Services Agreement for talent and employees who work through AMc for NRA and its affiliates, including, but not limited to, Dana Loesch and _____, shall be invoiced by AMc no later than the fifth day of each calendar month, which invoice shall be payable by NRA to AMc at AMc's corporate headquarters in Oklahoma City, Oklahoma within 30 days of the invoice date. NRA acknowledges that its failure to pay such an invoice within 30 days will cause substantial financial damage to AMc. Accordingly, if at any time NRA fails to timely pay the invoice, NRA agrees that it shall post a $3,000,000 letter of credit (the "LOC") for the benefit of AMc. The LOC shall continue in existence for the term of the Agreement and shall be maintained at $3,000,000 at all times. The LOC may only be drawn upon to pay in full invoices for service fee billings outstanding more than 30 days.

3.  Amendment of Paragraph XI E. Paragraph XI E shall be amended and restated in its entirety to read as follows:

    Upon the expiration or termination of this Services Agreement, AMc shall immediately return to NRA, to such place and in such manner as NRA may specify, any and all of NRA's property, materials, documents, Confidential Information, etc., that may be in AMc's possession. All charges for accumulating said materials shall be approved and paid in advance of receipt by the NRA. For all non-cancellable contracts entered into between AMc and third parties for the benefit of the NRA (herein "**AMc-Third Party NRA Contracts**"), the NRA agrees to pay AMc upon such expiration or termination the balance of the compensation payable under such AMc-Third Party NRA Contracts

APP000866

(including, but not limited to, the AMc-Third Party NRA Contracts with Dana Loesch and _OLIVER NORTH_ ) as of the date of expiration or termination so that AMc can fulfill its obligations under said Contracts after expiration or termination. If any AMc-Third Party NRA Contract(s) are cancellable upon payment of a fee and the NRA requests that such Contract(s) be cancelled, the NRA agrees to pay AMc the cancellation fees payable under such Contracts as a condition of AMc cancelling such Contract(s).

4. Integrated Agreement. This Amendment and the Service Agreement, and the Exhibits thereto, constitute the entire agreement between NRA and AMc relating to the matters covered hereto and thereto.

5. Miscellaneous. Paragraphs X and XII of the Services Agreement are hereby incorporated by reference as if set forth in full in this Amendment.

6. Effect. In the event of a conflict between this Amendment and the Services Agreement, the provisions of this Amendment shall control. To the extent not amended by this Amendment, all of the provisions of the Services Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, and intending to be legally bound hereby, and further intending to bind their employees, agents, successors and assigns, the parties have executed this Amendment the day and date above written.

**National Rifle Association of America (NRA)**                **Ackerman McQueen, Inc.**

_Wilson H. Phillips Jr._                                          _Pete R. Brownell_
Print Name/Title    TREASURER                                    Print Name/Title

ATTEST                                                            ATTEST:

4826-9804-1444\1

# Exhibit B

APP000868

<u>SERVICES AGREEMENT</u>

**THIS AGREEMENT**, made this 1st day of May, 1999, by and between the National Rifle Association of America (hereinafter referred to as **"NRA"**), A New York Not-For-Profit Corporation, located at 11250 Waples Mill Road, Fairfax, Virginia 22030, and Ackerman McQueen, Inc., an Oklahoma corporation, and its wholly owned subsidiary, Mercury Group Inc., an Oklahoma corporation, (hereinafter collectively referred to as **"AMc"**), whose principal office is located in Oklahoma at 1100 The Tower, 1601 N.W. Expressway, Oklahoma City, Oklahoma 73118.

**W I T N E S S E T H:**

**WHEREAS,** AMc is in the business of providing public relations, strategic marketing, advertising, creative, direct marketing and internet services and warrants and represents that it possesses the capability, necessary personnel, political strength, equipment and other related items to perform such services; and,

**WHEREAS,** NRA is a Membership Organization and desires to retain AMc as a nonexclusive source for services described herein for NRA upon the terms and conditions hereinafter set forth.

**NOW, THEREFORE,** in consideration of the mutual promises and covenants set forth herein, the parties hereto agree as follows:

I.  **SERVICES**

    A.  <u>**Public Relations/Political Strategy/Strategic Marketing Services**</u>

        Services include a combination of generating earned media, responsive public relations, political consultation and strategic thinking to promote a positive image of the NRA as described below: (These services are provided as part of the monthly fee as described in the **"Compensation"** Section.)

        • Public relations advice and counsel, including crisis management

        • Ongoing media relations -- solicitation and placement of features in national, regional and local media; liaison with print and broadcast news media on a daily basis for unsolicited inquiries; ongoing media training for NRA officials; Editorial Board meetings; features for outdoor publications.

        • Specialized public relations writing services (news releases, columns, editorials), and distribution of same as required (e.g. Via wire service or individual contact).

**APP000869**

- Research and information retrieval as necessary for NRA issues management at NRA's request and approval.

- Coordination, scheduling and on-site assistance when necessary for NRA officials' speeches and personal appearances.

- Coordination with internal NRA public relations staff in the Executive Office, General Operations and Institute for Legislative Action.

- Development of proactive earned media in national and regional media as it relates to NRA officials' appearances at special events (i.e. National Gun Shows, Camp Perry, YHEC, National Police Shooting Championships, Annual Meetings, etc.).

- Coordination and scheduling appearances for NRA officials and celebrities; including on-site assistance (where necessary).

- Develop, produce and place op-ed pieces for national and regional media coinciding with Special Events and NRA Officials' appearances.

- Development of relations with and liaison with celebrities, opinion leaders, and lawmakers to further NRA issues in a positive manner.

- Advise and counsel with NRA Officials on strategic issues to provoke public debate and frame NRA's point-of-view for the general public.

- Advice and counsel on political issues as they relate to the Second Amendment and NRA's political agenda.   Research into and development of new political strategies.

- Limited speechwriting services (pivotal speeches for major events are discussed in "Advertising/Creative Services" Section).

- Assistance in the production and coordination of NRA Radio Show

**B.**    **Advertising/Creative Services**

The services described below (with the exception of "Media Planning and Placement" which is addressed separately as a subcategory of this Section) will be provided to NRA on a project ("**Job**") basis based on the fair market value of the work as determined by AMc and take into consideration, among other things, the hourly rates of the personnel assigned to the Job and the time required to complete the Job. When reasonable time is available, cost estimates will be submitted for approval by NRA prior to the initiation of the Job.

2

APP000870

- Speechwriting services for NRA dignitaries to be delivered at major events (includes background research, interviews with NRA Officials/Speaker, drafts and rehearsals if appropriate).

- Conceive, copywrite, design and produce local, regional and national print and broadcast advertising and other appropriate forms of communication to present NRA's message.

- Original photography services and film processing (on location and/or in AMc's photo studio).

- Audio/Visual and Event Management services (i.e. Annual Meetings).

- Video Taping, Editing and Production.

- Music composition and arrangement and audio production.

- Primary Research services (quantitative and qualitative).

## Media Planning and Placement Services

Detail of AMc's compensation for Media Services are provided in the "Compensation" Section. Services rendered for such are:

- With NRA's approval, plan and order by written contract or insertion order the print space, radio and television time, or other media to be used for advertising, always endeavoring to secure the best available rates. AMc shall remain solely liable for payment, to the extent NRA has paid AMc.

- Incorporate the advertising in the required form and forward it to media with proper instructions for fulfillment of the contract or insertion order.

- Diligently check and verify broadcasts, insertions, displays, or other means used to carry the message to ensure proper fulfillment of all media purchases made by AMc on NRA's behalf.

- For direct response paid media advertising (i.e. Infomercial), provide ongoing analysis and ROI to determine most effective media markets, dayparts, and stations on a time sensitive basis for redirection or concentration of funds as evaluation indicates.

- Carefully audit invoices and make timely payment to media and suppliers for space and time purchased by AMc on NRA's behalf.

3

APP000871

C.    New Media/Internet Services

- Full-time webcasting for ongoing NRA news program, nraLIVE. Involves creation, writing, conducting interviews (on location and via telephone) as well as on-camera host talent for daily programming. Production services include all audio and video components for daily stories (shooting, recording, editing and rendering QuickTime movies and conversion into "Real Player" format for uploading on WWW server) and creation and maintenance of "crawler" information

- Support services for nraLIVE provided by AMc New Media include daily creation of graphics, flash animation for daily stories and synchronization to audio/video.

- Ongoing technical support service and advice for NRAHQ site (e.g. Answer to questions on service provider issues and simple "how-tos"). Application development or re-working requiring complex execution to be estimated on a project basis for NRA approval in advance of work performance.

- Full time marketing services to promote NRA internet sites as well as on-site promotion of NRA programs, activities and current events. New Media marketing director is responsible for integrating all NRA marketing to contain and promote the URLs as well as an **aggressive search engine placement program** that also will entail ongoing creation of pages that are optimized for individual engines. Exploration and execution of site links with other gun and hunting related URLs. Additional marketing efforts will utilize traditional news outlets to create further awareness for NRA sites.

II.    COMPENSATION

A.    Public Relations/Political Strategy/Strategic Marketing Services

1.    During the term of this Agreement, for ongoing Public Relations, Political Strategy and Strategic Marketing, NRA will pay AMc a professional service fee of $89,000 per month.

B.    Advertising/Creative/Media Planning and Placement Services

1.    During the term of this Agreement, for ongoing study of your business, including account service, creative development and other support functions in connection with the day-to-day administration and operation of your account, NRA will pay AMc 15% commission of the gross media expenditure, or a 17.65% mark-up of the net media billing, for all media researched, planned, placed and administered by AMc on NRA's behalf.

APP000872

For any outdoor media researched, planned, placed and administered by AMc on your behalf, the agency will be compensated by a 16.67% commission of the gross expenditure, or a 20% mark-up of the net billing.

2. For collateral advertising services and products purchased on your behalf from external suppliers (such as separations, engravings, typography, printing, etc.), by a 15% commission if offered, or a 17.65% mark-up of net billing. Estimates of the cost of external services and products are prepared, when reasonable time is available, for approval in advance and are subject to no more then a +/-10% variance provided we are authorized to proceed with production within thirty (30) days of the date the estimate is presented. Client changes in job specifications usually will result in the preparation and submission of a revised estimate; however, you agree to assume financial responsibility for all changes specified by you, then executed by us with your knowledge.

3. For art concepts, design layout, photography and film processing, copywriting, music composition and arrangement, audio and video production, etc., by cost quotations submitted for approval in advance, when reasonable time is available, or at the comprehensive art, storyboard, demo music, etc. stage. These quotations are based on the fair market value of the work as determined by AMc, and take into consideration, among other things, the hourly rates of the personnel assigned to the project and the required to complete the job. Written estimates are subject to no more than a +/- 10% variance provided they are approved by you are we are expressly authorized to proceed with production within thirty (30) days of the date the estimate is presented. Client changes in job specifications will usually result in a revised estimate; however, you agree to assume financial responsibility for all changes specified by you, then executed by us with your knowledge.

C.   **Internet Services**

During the term of this agreement, for ongoing website management, hosting and creation of nraLIVE, as well as full time marketing services, NRA will pay AMc a professional service fee of $66,600.00 per month.

D.   **Other Projects**

If we undertake, at your request, additional or special assignments, not included within the services described in this project, the charges made by us will be agreed-upon in advance whenever possible. If no specific

APP000873

agreement was made, we will charge you a fair market price for the work performed.

## III.   BILLING AND PAYMENT

A.   Mailing and express charges, long distance telephone calls, photocopies, deliveries, sales taxes and reasonable out-of-town travel including transportation, meals and lodging, etc. on NRA's express behalf, shall be billed at AMc's cost. All out of town travel expenses shall require prior written approval in accordance with written procedures established by the NRA Executive Vice President or his designee.   Payment of travel expenses not approved in advance may result in denial of reimbursement. Expenses not listed above shall be considered to be normal business expenses of AMc and not billable to NRA unless specifically authorized in writing by the NRA Executive Vice president or his designee.

B.   All sales, use and similar taxes and all import, export and foreign taxes imposed by all applicable governmental authorities shall be billed to NRA at the amount imposed by such governmental authorities. AMc shall not be obligated to contest the applicability of any such taxes to the transactions performed pursuant to this Services Agreement.

C.   Fees shall be billed on or before the 5th of each month. This billing shall include costs specified in paragraph III A.

D.   Special assignments not included in this Agreement which cannot reasonably be included under the monthly fee must be approved in accordance with written procedures established by the NRA Executive Vice President or his designee, and the charges made by AMc shall be agreed upon in advance, where reasonable, otherwise such charges shall be not greater than the usual and customary charges for such services or expenses in the industry.

E.   All sums payable to AMc under this Services Agreement (except for travel and entertainment, Media and Broadcast Production addressed in Section III.F shall be payable at AMc's corporate headquarters in Oklahoma City, Oklahoma within 30 days of the invoice date.   Any amounts not received by AMc within 60 days from the date of the invoice shall bear interest at the rate of 1.0% per month from the date of the invoice until paid.  NRA shall notify AMc of any questions concerning any invoices within 10 business days after receipt.

F.   All sums payable to AMc for travel and entertainment, Media expenditures and Broadcast Production shall be payable at AMc's corporate headquarters in Oklahoma City, Oklahoma within three (3) business days of the invoice date, unless for political advertising, which shall be due upon receipt.

APP000874

## IV.    CONFIDENTIALITY

A.    1. AMc shall not disclose, directly or indirectly, to any third party any NRA membership data or mailing lists, any materials or information relating thereto, or any other data, materials or information coming to the knowledge of AMc, supplied to AMc by NRA, or otherwise made known to AMc as a result of AMc's providing Services (hereinafter collectively, referred to as the "**Confidential Information**"), without the prior express written permission of NRA.    This Services Agreement shall control AMc's providing fulfillment services to NRA.

2. AMc shall not make or cause to have made any copies of any NRA Confidential Information without the prior express written authorization of NRA.

3. AMc may use such Confidential Information only for the limited purpose of providing its Services to NRA.

4. AMc may disclose such Confidential Information to AMc's employees but only to the extent necessary to provide its Services.    AMc warrants and agrees to prevent disclosure of Confidential Information by its employees agents, successors, assigns and subcontractors.

B.    AMc, its employees and agents, shall comply with any and all security arrangements imposed by NRA respecting access to Confidential Information.

C.    AMc acknowledges NRA's exclusive right, title and interest in the Confidential Information, and shall not at any time do or cause to be done any act or thing contesting or in any way impairing or tending to impair any part of such right, title or interest.

D.    AMc shall cease and desist from any and all use of the Confidential Information, and AMc shall promptly return to NRA, in a manner satisfactory to NRA, any and all Confidential Information, upon the earlier to occur of the following:  the completion or termination of the Services Agreement.

## V.    INDEMNIFICATION/INSURANCE

A.    1. AMc agrees to indemnify, defend and hold harmless NRA from and against any loss, liability and expenses including attorney's fees which NRA shall become obligated to pay in respect to materials prepared by AMc on behalf of NRA which gives rise to any claims pertaining to libel, slander, defamation, infringement of copyright, title or slogan, or privacy or invasion of rights of privacy, insurance coverage for which shall be maintained by AMc.  AMc's liability under this indemnity and hold harmless agreement is limited to $2,000,000 or any greater

7

amount which may be recoverable under AMc's insurance policies. This indemnity and hold harmless does not cover any fines or penalties. AMc agrees to furnish NRA with a certificate of insurance reflecting $2,000,000 in coverage for the defined liability.

2. NRA agrees to give AMc prompt notice of such claims and to permit AMc, through AMc's insurance carrier and/or counsel of AMc's choice, to control the defense or settlement thereof. However, NRA reserves the right to participate in the defense of any such claim through NRA's own counsel and at NRA's own expense.

3. AMc shall take reasonable precautions to safeguard NRA's property entrusted to AMc's custody or control, but in the absence of negligence on AMc's part or willful disregard of NRA's property rights, AMc shall not be held responsible for any loss, damage, destruction or unauthorized use by others of any such property.

4. AMc shall not be liable to NRA by reason of default of suppliers of materials and services, owners of media, or other persons not AMc employees or contractors unless supplier(s) is under control of AMc or AMc should have reasonably anticipated default.

B.   1. NRA agrees to indemnify, defend and hold harmless AMc, and its directors, officers, employees, agents, contractors and representatives (collectively, the "**AMc Indemnified Parties**," such directors, officers, employees, agents, contractors and representatives being hereby deemed third party beneficiaries of this indemnity provision), from and against any and all claims, demands, causes of action, suits, liabilities, losses, damages settlements, judgments, and expenses (including attorneys' fees), arising from (1) any data, materials, or service performance claims furnished to any AMc Indemnified Party by NRA, or approved by NRA, from which a AMc Indemnified Party prepared any publicity materials or public relations materials, or which were used by a AMc Indemnified Party in the production of advertising which was approved by NRA, or (2) any claim, action or proceeding by any person(s), entity(ies), the United States of America, any state(s), county(ies), or municipality(ies), or any department, agency, board, bureau, commission, attorney general, or other instrumentality(ies) or political subdivision(s) of any of the foregoing, seeking (a) damages (whether actual, exemplary, or both), reimbursement or other compensation for any alleged injury(ies), death(s), or private or public losses, damages or costs related to one or more incidents of violence committed with firearms, or (b) an injunction or other equitable relief with respect to the activities of a AMc Indemnified Party performed on behalf of NRA pursuant to this Agreement or otherwise requested or approved by NRA. NRA agrees to furnish AMc with a certificate of insurance reflecting not less than $5,000,000 in coverage for the foregoing.

APP000876

2.  AMc agrees to give NRA prompt notice of any matter covered by NRA's indemnity set forth above and to permit NRA, through NRA's insurance carrier and/or counsel of NRA's choice, to control the defense or settlement thereof.  However, AMc and the other AMc Indemnified Parties reserve the right to participate in the defense of any such claim through the AMc Indemnified Parties' own counsel and at the AMc Indemnified Parties' own expense.

C.  1.  NRA shall reserve the right, in NRA's best interest, to modify, reject, cancel or stop any and all plans, schedule, and work in progress.  In such event AMc shall immediately take proper and responsible action to carry out such instruction; NRA, however, agrees to assume AMc's liability for agreed upon commitments and to reimburse AMc for losses AMc may derive therefrom, and to pay AMc for all internal and external expenses incurred on NRA's behalf with NRA's authorization and to pay AMc charges relating thereto in accordance with the provisions of this Services Agreement.

## VI.   OWNERSHIP OF PRODUCTS

All creative works developed by AMc in fulfilling its obligations under this Services Agreement shall constitute works made for hire, and shall be the property of NRA.  In the event that such works should not be "works made for hire," as such works are defined at 17 U.S.C. § 101, then AMc transfers and assigns to NRA the ownership of all copyright in such works.  In the event that AMc should employ a subcontractor, AMc shall arrange for the transfer of such intellectual property to NRA.  All other, and further, intellectual property and mailing lists, under any definition, whether common law or statutory, created or developed by AMc in fulfilling its obligations under this Services Agreement, are NRA's sole and exclusive property, and AMc does hereby assign all right, title and interest in same to NRA to the extent that AMc has such rights to assign and transfer.  In no event shall AMc be deemed to be assigning or transferring greater rights than it has acquired from any supplier or contractor from who it may have acquired certain elements of the material prepared for NRA.

## VII.   NO COMPETITION

For the duration of this Service Agreement, AMc shall not represent any other entity in public relations services directly competitive with NRA without NRA's prior written approval.

## VIII.   EXAMINATION OF RECORDS

During the term of this Services Agreement, AMc authorizes NRA, upon reasonable notice, to examine Mercury's files, books, and records, with respect to matters covered under this Services Agreement.

9

APP000877

## IX.   AUTHORIZED CONTACTS

AMc is authorized to act upon written communications received from the NRA Executive Vice President or his designee. He or his designee are the only persons within NRA who have the actual authority to issue such communications.

## X.   MISCELLANEOUS

1.   Severability. If any provision of this Services Agreement shall be held to be void or unenforceable for any reason, the remaining terms and provisions hereof shall not be affected thereby.

2.   Binding Effect: Agents. The provisions of this Services Agreement shall inure to the benefit of and bind the heirs, legal representatives, successors and assigns of the parties hereto. In performing the Services described above and in taking any action necessarily incident thereto, AMc may utilize the services of AMc's employees and/or such agents or independent contractors approved by NRA as AMc deems appropriate.

3.   Section Headings. Section headings contained in this Services Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation thereof.

4.   Integrated Agreement. This Services Agreement, together with any Exhibits hereto, constitute the entire agreement between NRA and AMc relating to the matters covered by this Services Agreement at the time of its signing. There are no contemporaneous agreements, understandings, restrictions, warranties, or representations with respect to the services to be performed other than as set forth at this time. This Services Agreement supersedes all prior agreements, including letter agreements and memoranda of understanding.

5.   Survival. The terms, covenants, and conditions of Section IV and Section V shall survive the termination or expiration of this Services Agreement.

## XI.   TERMINATION

A.   This Services Agreement shall become effective upon the execution hereof.

B.   This Services Agreement shall continue in full force and effect for an initial period of eight (8) months ending 12/31/99. After the initial period of eight (8) months, NRA or AMc may at their sole and exclusive discretion, terminate this Services Agreement, without any cause whatsoever, upon ninety (90) days written notice. Without such written notice, it is the intention of the parties that the Services Agreement will automatically renew. Any written notice to cancel this Contract shall be effective ninety

APP000878

(90) days from the date the Party giving notice to cancel tenders such written notice to the other Party. In the event of said termination, all further obligations of each party to perform shall cease, except as otherwise specifically provided in this Services Agreement. In said case NRA shall, pursuant to Section III, reimburse AMc for expenses incurred on NRA's behalf up to the date of termination.

C.   This Services Agreement may be terminated by NRA immediately upon written notice if: (1) AMc fails to diligently and in good faith perform any of its obligations contemplated hereunder; (2) AMc breaches any term, promise or covenant hereunder; (3) AMc files for bankruptcy; (4) there occurs any assignment for the benefit of creditors or the placement of any of AMc's assets in the hands of a trustee or receiver; (5) AMc becomes insolvent or bankrupt; (6) AMc is dissolved. If NRA so terminates this Services Agreement, NRA shall have no obligation to make payments except that NRA shall, pursuant to Section III, reimburse AMc for expenses incurred up to the date of said notice of termination.

D.   This Services Agreement may be terminated by AMc immediately upon written notice if (1) NRA fails to diligently and in good faith perform any of its obligations contemplated hereunder; (2) NRA breaches any term, promise or covenant hereunder; (3) NRA files for bankruptcy; (4) there occurs any assignment for the benefit of creditors or the placement of any of NRA's assets in the hands of a trustee or receiver; (5) NRA becomes insolvent or bankrupt; or, (6) NRA is dissolved.

E.   Upon the expiration or termination of this Services Agreement, AMc shall immediately return to NRA, to such place and in such manner as NRA may specify, any and all of NRA's property, materials, documents, Confidential Information, etc., that may be in AMc's possession. All charges for accumulating said materials shall be approved and paid in advance of receipt by the NRA.

F.   The terms, covenants, and conditions of Section IV and Section V shall survive the termination or expiration of this Services Agreement.

## XII.   GOVERNING LAW AND CONSENT TO JURISDICTION, VENUE AND SERVICE

A.   This Services Agreement and any disputes arising thereunder shall be governed by and construed solely under the laws of the Commonwealth of Virginia, or, if applicable by federal law.

B.   AMc consents and agrees that all legal proceedings relating to the subject matter of this Services Agreement shall be maintained exclusively in courts sitting within the City of Alexandria or the County or Fairfax,

APP000879

Commonwealth of Virginia, and AMc hereby consents and agrees that jurisdiction and venue for such proceedings shall lie exclusively with such courts. AMc furthermore consents to the exercise of personal jurisdiction by said courts over AMc.

**IN WITNESS WHEREOF,** and intending to be legally bound hereby, and further intending to bind their employees, agents, successors and assigns, the parties have executed this Services Agreement the day and date above written.

NATIONAL RIFLE ASSOCIATION
("NRA")

_____ (Signature)

_WAYNE LAPIERRE_ (Print Name)

_EXECUTIVE VICE PRESIDENT_ (Title)
Executive Vice President

ACKERMAN MCQUEEN, INC.
("AMc")

_____ (Signature)

_W. F. Winkler_ (Print Name)

_Chief Financial Officer_ (Title)

12

APP000880

# Exhibit C

APP000881

_**BY ELECTRONIC AND FIRST-CLASS MAIL**_

May 29, 2019

Andrew Arulanandam
National Rifle Association
11250 Waples Mill Road
Fairfax, Virginia  22030

      Re: _Notice of Termination of the Services Agreement_

Dear Andrew:

      We received your May 24, 2019 email directing Ackerman McQueen ("AMc") to cease activities relating to six broadly-described services that AMc provides to the NRA under the existing Services Agreement (executed on April 30, 2017 as amended on May 6, 2018) (the "Services Agreement") between the two parties. Your email message also seeks our input on how to shut down the "live TV" portion of the NRATV platform over the next 60 days.

      Your May 24, 2019 email notification, in conjunction with other actions by the NRA, constitutes another misguided step toward the constructive termination of the Services Agreement. At the same time, your email implies that the NRA seeks to have AMc continue to provide other services to the NRA. However, just days before your email, the NRA filed a civil lawsuit against AMc asking for a judgment declaring that AMc receive no further compensation for any work it performed after August 3, 2018. Specifically, in that lawsuit, the NRA "seeks disgorgement of any amounts wrongfully obtained by Defendants on account of their breaches of their fiduciary duties, including without limitation, all fees paid by the NRA to Ackerman and Mercury since the date such breaches began – which the NRA believes began no later than August 3, 2018." Thus, the NRA is demanding that AMc pay back any fees the NRA has paid to AMc since August 3, 2018.  This raises the obvious question of whether, in taking such a position in legal proceedings initiated by the NRA, the NRA intends to pay AMc for future work done by AMc in accordance with the Services Agreement.

      Your May 24, 2019 email is the latest in a series of operational directions to AMc that are inconsistent with the NRA's legal actions against AMc. Moreover, because of the NRA's legal position in its lawsuit that the NRA should not have to pay AMc for services provided after August 3, 2018, AMc believes that the NRA has breached the explicit and implied terms, promises and covenants of the Services Agreement and is no longer performing its obligations diligently and in good faith.

      The NRA has, in essence, constructively terminated the Services Agreement by engaging in a series of conflicting and disingenuous actions that have purposely destroyed AMc's ability

to maintain a working relationship with the NRA and fulfill the obligations of the Services Agreement,[1] including the following:

1. On April 12, 2019, the NRA filed a lawsuit against AMc seeking access to four categories of documents. The lawsuit was filed without any warning or notice to AMc and without any notice or declaration to AMc that it was not in compliance with those provisions of the Services Agreement. The publicly-filed law suit was disclosed to the press before it was served on AMc, and generated considerable negative publicity that has harmed AMc.

2. On April 24, 2019, the NRA filed a Motion for Leave to Amend the Complaint, in which it asserted new allegations against both AMc and AMc's employee, Lt. Col. Oliver North, who at that time also served as President of the NRA. As you know, Lt. Col. North was a valuable connection between the NRA and AMc, and the NRA took affirmative steps to sever that connection. Further, by damaging Lt. Col. North's reputation and misrepresenting the work he has done for AMc, the NRA interfered with his ability to properly perform the work that the NRA ordered from AMc.

3. On May 9, 2019, the NRA directed AMc to suspend all work and costs associated with the production of "American Heroes" – a major project for which AMc has incurred substantial costs at the prior direction of the NRA. The NRA provided no reason for the suspension and AMc was not given any opportunity to provide any input into the decision.

4. On May 21, 2019, the NRA filed a second law suit against AMc asserting that AMc had breached its fiduciary duty to the NRA and seeking the return of all payments made to AMc since August 3, 2018. Yet, because the NRA has not terminated the Services Agreement, AMc is placed in the untenable position of remaining obligated to provide services to the NRA while the NRA alleges it should not have to pay any fees for AMc's services after August 3, 2018.

5. On May 22, 2019, AMc was compelled to file its compulsory counterclaims in response to the first lawsuit. In those counterclaims, AMc alleges that the NRA is in breach of the Services Agreement and that the NRA filed its lawsuit as a pretext that would permit the NRA to transfer all services provided by AMc to a competing public relations firm without paying AMc the compensation required under Section XI.F of the Services Agreement.

6. On May 23, 2019, NRA filed an "Emergency Motion" asserting that AMc's employees had engaged in "theft" from the NRA and requesting permission from the Court to stay the case and allow for discovery into the alleged theft. Again, AMc did not learn of this

---

[1]    This letter focuses on the recent grounds for termination, but AMc does not waive nor excuse the prior retaliatory actions initiated in 2018 by the NRA in response to AMc's efforts to protect the interests of NRA's members from irresponsible actions sought by the NRA and its leadership.

**APP000883**

motion from the NRA's counsel, but rather learned of this motion from reporters who were given advance notice of it.

7. On May 24, 2019, as indicated above, you provided notice directing AMc to "streamline" the services it was to provide to the NRA. Again, there was no notice provided to AMc prior to this streamlining notice, nor was there any request from AMc as to how most effectively and efficiently streamline its ongoing services to the NRA. Moreover, your notice was written as if you were unaware and in complete disregard of the legal actions that the NRA has taken against AMc and its employees.

8. The May 24, 2019 notice also suggested continued reductions in AMc's services to the NRA over the next 60 days without any clear guidance on the magnitude or nature of those reductions, showing a clear lack of understanding of this business relationship and the type of work performed under the services agreement.

9. Lastly, we note that the Service Agreement specifically contemplates that the relationship between the NRA and AMc would be directed by officials at the highest levels of both organizations, and throughout the course of the NRA's relationship with AMc, this has been the case. The Services Agreement itself requires AMc to take direction from the Executive Vice President of the NRA or his specific designee, and no one else, when dealing with the NRA. However, since the NRA initiated these legal actions and work reductions, Wayne LaPierre has severed all communications with AMc, making it impossible to work through any disagreements or concerns between the parties.

In sum, the NRA's actions have made the relationship envisioned by the Services Agreement untenable and unworkable. The NRA's actions have also frustrated the purposes of the Services Agreement. As articulated in AMc's counterclaim, the NRA has breached the Services Agreement in several material ways, including a breach of its payment obligations and a breach of the duty of good faith and fair dealing. The NRA is no longer performing its obligations with diligence and good faith, but has instead sought permission from the Court to suspend all payment obligations with a return of funds paid since August 3, 2018. These actions by the NRA provide clear justification for AMc to terminate under Section XI, Subsection D of the Services Agreement, which states that: "This Services Agreement may be terminated by AMc immediately upon written notice if (1) the NRA fails to diligently and in good faith  perform any of its obligations contemplated hereunder [or] (2) NRA breaches any term, promise or covenant hereunder . . ."

Nonetheless, the Services Agreement (Section XI.B.) also provides that either the NRA or AMc have the right to terminate the Services Agreement upon 90-days' notice. Given the long-term relationship between the NRA and AMc, AMc believes that the termination provisions under Subsection B are best suited to winding down the business relationship between the parties under the Services Agreement and allowing for a 90-day transition period. Under a termination occasioned by either Subsections B or D of Section XI of the Services Agreement, the NRA is liable to AMc for compensation required under Section XI, Subsections E (as amended) and F of the Services Agreement.

APP000884

This Notice of Termination initiates a process under Section XI, Subsections E and F of the Services Agreement to wind up the relationship between the parties. Pursuant to Subsection E, AMc will prepare to return to the NRA any and all of NRA's property, materials, documents, and confidential information in AMc's possession. The Amendment to the Services Agreement states that: "All charges for accumulating said materials shall be approved and paid in advance of receipt by the NRA." Subsection F requires the NRA to pay AMc a fair and equitable termination fee to compensate it for the severance and other reasonable costs AMc will incur as a result of the termination of the Service Agreement. AMc is preparing detailed invoices for such termination fees and will be prepared to negotiate the termination of the Services Agreement in "good faith" as required by Subsection F.

If you have any questions, please contact our attorneys, David Schertler and David H. Dickieson, at 202-628-4199.

Sincerely,

Revan McQueen
Chief Executive Officer

cc:    John Frazer, Esq.
       Wayne LaPierre
       Craig Spray

**APP000885**

# Exhibit D

NATIONAL RIFLE ASSOCIATION OF AMERICA
11250 WAPLES MILL ROAD
FAIRFAX, VIRGINIA 22030



June 25, 2019

Revan McQueen
1601 Northwest Expressway, STE 1100
Oklahoma City, OK 73118

Revan:

Pursuant to Section XI.C of the Services Agreement, this communication serves as written notice of the NRA's immediate termination of all business with Ackerman McQueen, Inc. ("Ackerman") and the Mercury Group, Inc. ("Mercury and, together with Ackerman, "AMc"). The grounds for termination are numerous, are partially set forth in two current lawsuits filed by the NRA against AMc, and constitute prior material breaches of the Services Agreement. AMc has also breached multiple common-law duties to the NRA and perpetrated intentional torts against the NRA. That AMc has recently purported to bar good-faith communication between businesspeople provides yet another ground for termination, and underscores why the relationship cannot viably continue.

The NRA demands immediate delivery of all materials encompassed by Section XI.E of the Services Agreement, including all Confidential Information (as defined by the Services Agreement). The NRA will pay for accumulation of these materials, and reiterates its previous requests for an advance price quote to this end.

Nothing in the Services Agreement, or the law of any applicable jurisdiction, provides for any transfer or assignment to AMc of any right, title, or interest in works made for hire pursuant to Section VI of the Services Agreement. Accordingly, if AMc damages or converts the NRA's property, or if the NRA perceives an imminent risk of the same, the NRA will pursue legal recourse.

The NRA regrets that a longstanding, formerly productive relationship comes to an end in this fashion. However, given the circumstances, this action must be taken in the best interests of the Association and our members.

Sincerely,

Andrew Arulanandam

**APP000887**

# Exhibit E

APP000888



SCHERTLER & ONORATO, L.L.P.

June 27, 2019

***VIA ELECTRONIC and FIRST CLASS MAIL***

Andrew Arulanandam
National Rifle Association of America
11250 Waples Mill Road
Fairfax, Virginia  22030

Dear Mr. Arulanandam:

We are in receipt of your correspondence of June 25, 2019, purporting to serve as written notice of the NRA's immediate termination of all business with Ackerman McQueen and the Mercury Group (hereinafter "AMc") pursuant to Section XI, Paragraph C of the April 30, 2017 Services Agreement between the NRA and AMc.

Your correspondence fails to set forth with any specificity the basis on which you claim to invoke the termination provisions of Section XI, Paragraph C. As you know, that provision sets forth six (6) different preconditions, at least one of which must be met before the NRA may terminate immediately the Services Agreement. Simply stated, the NRA has no basis on which it may terminate immediately the Services Agreement under Section XI, Paragraph C. None of the preconditions listed in that paragraph has been met. As a consequence, the NRA cannot invoke the immediate termination provisions of Section XI, Paragraph C.

Conversely, AMc has numerous grounds on which it may terminate immediately the Services Agreement under the provisions of Section XI, Paragraph D. Those provisions allow AMc to terminate the Services Agreement immediately if "(1) NRA fails to diligently and in good faith perform any of its obligations contemplated [under the Agreement]" or "(2) NRA breaches any term, promise or covenant [under the Agreement]." Through its conduct, the NRA has triggered both of these conditions for termination in numerous ways, some of which are set forth in our counterclaims in the NRA's lawsuits against AMc and in our past correspondence with the NRA. Most obviously, the NRA has (1) failed to pay invoices that AMc has submitted to the NRA in accordance with the provisions of Section III, Paragraph E of the Agreement, and (2) failed to establish a $3,000,000 Letter of Credit as required by the May 6, 2018 Amendment No. 1 to the Services Agreement. AMc therefore provides written notice through this letter that it is immediately terminating the Services Agreement under Section XI, Paragraph D. Our immediate termination of the Agreement triggers several contractual obligations on the part of the NRA.[1]

---

[1] As you know, on May 29, 2019, AMc provided 90-day written notice under Section XI, Paragraph B to terminate the Services Agreement so as to provide for an orderly and efficient transition. Now, the NRA, without proper cause or basis under the Services Agreement, wrongfully claims it has grounds to immediately terminate that Agreement. Since our 90-day notice on May 29, 2019, however, the NRA has continued to engage in material and egregious breaches of the Services Agreement, as described above, which necessitates and justifies AMc's immediate termination.

ATTORNEYS AT LAW    901 New York Avenue, NW    202.628.4199
Suite 500    202.628.4177 *fax*
Washington, D.C. 20001    www.schertlerlaw.com

APP000889

Andrew Arulanandam
June 27, 2019
Page 2

First, the NRA remains legally obligated to pay AMc's May 1, 2019 and June 1, 2019 invoices for services that AMc provided to the NRA during May and June of this year. We have repeatedly demanded payment of the now overdue May 1, 2019, invoice and again demand immediate payment of both of these invoices.

Second, Section XI, Paragraph E of the Services Agreement (as amended by the May 6, 2018 Amendment) states that upon termination of the Services Agreement by AMc:

> For all non-cancellable contracts entered into between AMc and third parties for the benefit of the NRA (herein "**AMc-Third Party NRA Contracts**"), the NRA agrees to pay AMc upon such expiration or termination the balance of the compensation payable under such AMc-Third Party NRA Contracts (including, but not limited to, the AMc-Third Party NRA Contracts with Dana Loesch and Oliver North) as of the date of expiration or termination so that AMc can fulfill its obligations under said Contracts after expiration or termination.

Pursuant to this provision, and as a consequence of AMc's immediate termination of the Services Agreement, AMc demands that the NRA pay AMc the balance of the compensation payable under all AMc-Third Party NRA Contracts. To be specific, the amount payable to AMc by the NRA under these AMc-Third Party NRA Contracts is **$7,094,238**.

Finally, Section XI, Paragraph F of the Services Agreement states:

> In consideration of the dedication of a substantial number of personnel and resources to provide the services under this Agreement (and the necessity to maintain such staffing levels and resource allocations to enable AMc to continue to provide such services upon renewals hereof), the NRA agrees to pay AMc a fair and equitable termination fee to compensate it for the inevitable severances and other reasonable costs incurred in conjunction with such expiration or terminations. Such termination fees shall be negotiated in good faith by the parties and paid to AMc no later than the last day of this Agreement.

AMc is in the process of calculating a fair and equitable termination fee under this provision. By way of this letter, AMc requests that appropriate representatives of the NRA, as required by the Services Agreement, agree to engage in a good faith negotiation to establish the termination fees that the NRA owes to AMc under the Services Agreement.

With respect to your demand of immediate delivery of all Confidential Information under Section XI, Paragraph E of the Services Agreement, such delivery is conditioned upon approval and payment in advance by the NRA of "all charges for accumulating said materials." We will provide the NRA with the costs of accumulating these materials and will expect to receive payment of those costs prior to the delivery of any materials encompassed by this provision.

Andrew Arulanandam
June 27, 2019
Page 3


We are willing to discuss all of these outstanding matters with the appropriate representatives of the NRA in an effort to come to a mutually acceptable resolution.

Sincerely,

David Schertler

cc:    Revan McQueen
       John Frazer
       Craig Spray
       Wayne LaPierre
       James W. Hundley

APP000891

# Exhibit F

APP000892

June 28, 2019

<u>BY EMAIL</u>

David Schertler
Schertler & Onorato, L.L.P.
901 New York Avenue, NW, Suite 500
Washington, DC 20001

Re: **Ackerman McQueen / Invoices and Termination**

Counsel:

On behalf of the National Rifle Association of America (the "NRA"), l write in response to your letter dated June 27, 2019.  The parties are engaged in litigation regarding the subject matter of this correspondence and Ackerman[1] intentionally terminated any communication among business people (instead channeling all letters through outside counsel).  For these reasons, and because the parties' business relationship has ended, I expect that this will be my final letter to your client.

Your contention that my previous letter "fails to set forth with specificity" the basis for invoking Section XI, Paragraph C of the Services Agreement is frivolous—and irrelevant. Section XI prescribes no formal requirements for the NRA's written notice of termination. But even if the NRA were required to allege with particularity its grounds for termination, the NRA has already done so—in two lawsuits against your client. Although the NRA was hopeful that an orderly wind-down could be accomplished (notwithstanding AMc's prior material breaches of the Services Agreement, and the consequent discharge of the NRA's prospective contractual obligations), AMc's conduct made such a course impossible.  When the NRA requested basic, easily accessible information that would allow the parties to coordinate a wind-down plan, AMc evaded.  AMc ignored or rejected all ETAs, schedules, and deadlines that the NRA put forth, failed to respond with any alternate proposals, and, even now, continues to perpetrate misleading, malicious media leaks in direct violation of its contractual, fiduciary, and common law duties.  AMc refused to correspond with the NRA's General Counsel (because he was not the NRA's contractual designee), then refused to correspond with me (the contractual designee) on the ground that communications should go through counsel.  At the end of the day, it is obvious that continued engagement with AMc only provides your client an extended platform for

---

[1] Ackerman" shall refer to Ackerman McQueen, Inc. (collectively with Mercury Group, Inc., "AMc").

bad-faith obstruction and gamesmanship. Therefore, based on AMc's numerous prior breaches, the NRA invoked Section IV.C and severed ties. This action is final and nonnegotiable.

Regarding the purportedly outstanding invoices, AMc-Third Party NRA Contracts, and severance arrangements, it suffices to say that the Association has for some considerable time sought insight into these items. In any event, AMc owes the NRA many tens of millions of dollars for damages and like amounts in disgorgement amounts.

The discussion in your letter concerning payment for transmittal of materials pursuant to Section XI.E of the Services Agreement also retraces ground well-trod in prior letters (most recently my letter dated June 25, 2019). The NRA has repeatedly requested a budget for transmittal of these materials. Please provide one. Please also be prepared to explain the basis for the asserted cost. Based on all that has transpired and come to light in recent months, the NRA will not accept AMc's unsupported invoices at face value.

Future correspondence should be directed to Michael Collins of Brewer, Attorneys & Counselors, whom I have copied on this communication.

Sincerely,

Andrew Arulanandam

Cc:    Revan McQueen
       John Frazer
       Craig Spray
       Wayne LaPierre
       James W. Hundley
       Michael Collins

4836-9373-1227, v. 1

APP000894

# Exhibit G

APP000895

DALLAS | NEW YORK

# BREWER
## ATTORNEYS & COUNSELORS

July 22, 2019

**BY E-MAIL**
David Schertler
Schertler & Onorato, L.L.P.
901 New York Avenue, NW, Suite 500
Washington, DC 20001

**Re: AMc / NRA**

Counsel,

I write on behalf of the National Rifle Association of America (the "NRA"), in follow-up to multiple previous requests concerning AMc's[1] contractual obligation to surrender the NRA's property and Confidential Information.

**NRA Women Instagram Account.** Without notifying the NRA or attaining its consent, AMc appears to have changed the password to the @NRAWomen Instagram account. If this was done intentionally, it is a clear further breach of Services Agreement § IV, and likewise constitutes misappropriation and conversion of intellectual property owned by the NRA pursuant to Services Agreement § VI. The NRA requests that AMc promptly surrender the password.

**Return of the NRA's Property, Material, Documents, and Confidential Information.** As you know, Section XI.E of the Services Agreement required that AMc "return to the NRA, to such place and in such manner as NRA may specify, any and all of the NRA's property, materials, documents, Confidential Information, etc., that may be in AMc's possession." Furthermore, AMc must return these items "immediately" upon expiration or termination of the Services Agreement.   In repeated communications throughout May and June, the NRA emphasized its urgent need for these materials, reiterated its willingness to pay upfront for their accumulation, and requested that AMc promptly disclose any associated costs so the parties could proceed.  By letter dated June 27, 2019, AMc finally agreed to provide those costs to the NRA.  Please let us know when we can expect to receive them.

**NRA Fixed Assets.** To assist with the foregoing effort, the NRA provides the attached list of fixed assets for which it has been invoiced, and which it expects will be returned. Of course, these assets constitute only a partial list of "property, materials, documents, [and] Confidential Information" which AMc must return to the NRA.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed in the Services Agreement dated April 30, 2017 (as amended May 6, 2018, the "Services Agreement").

**APP000896**

# B R E W E R

July 22, 2019
Page 2

Sincerely,

Michael J. Collins

APP000897

National Rifle Association of America
Supplier Services Transition-Fixed Asset Listing
Updated: 6/24/19



NRA

*as of May 2019*

| Asset # | System ID | INV DATE | IN-SRV DATE | DIVISION | OPERATION | LOCATION | DESCRIPTION | QTY | ACQ VALUE | NET BV |
|---|---|---|---|---|---|---|---|---|---|---|
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Ross Synergy 100 HD switcher w/ MediaCache & Redundant Power | 1 | 36,188.85 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | AJA FS-1 Universal HD/SD Audio/Video Frame Synchronizer and Converter | 1 | 3,574.80 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | AJA HD-SDI/SDI to HDMI video and audio converter | | 444.04 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | AJA HD10AMA HD/SD 4 channel analog audio embedder/deembedder | 1 | 1,066.13 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | AJA DWP Power Supply | 1 | 71.67 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Tecnec HDMI to HDMI 33 foot cable | | 53.96 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Panasonic TC-26LX85 26" LCD monitor w/ HDMI (studio program) | 1 | 728.40 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Chief JHS-US ceiling mount for LCD | | 93.43 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Evertz HD5050+SDV-PRO-HD60 Video Delay / Time Shift Processor | 1 | 16,760.23 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Evertz QT-1 VSE Multi-viewer router | 1 | 8,994.32 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Evertz AT-16I6+A Analog audio router | 1 | 3,497.78 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Evertz AK-0008 16 way XLR breakout panel, male | 2 | 1,104.54 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Evertz AK-0008 16 way XLR breakout panel, female | 2 | 1,104.54 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Evertz CF-3200A router control panel | 1 | 1,745.82 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Evertz CP-2400 LP local control panel | | 736.37 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Evertz 7751SRG-HD HD-SDI: black signal generator | 2 | 2,396.53 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Evertz 7736CDM A-D converter (video only) | | 1,894.85 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Evertz 7711UC-HD+3RU HD Upconverter w/noise reduction | 1 | 8,233.00 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Evertz 7700DA7-HD+3RU HD/SD SDI distribution amplifier | 10 | 10,011.28 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Evertz 7700ADA7 Analog video distribution amplifier | 1 | 540.00 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Evertz 7800FR +79P MultiFrame w/ 15 slots | 2 | 6,313.06 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Evertz 7700FC frame controller card | | 3,492.72 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Evertz 7728ADC-A4-3RU quad analog audio to dual AE converter | 1 | 1,058.40 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Evertz 7720AD2-A4-B+3RU dual AES to quad analog audio converter w/2 bal AES | | 2,017.44 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | EEE LX-221 NTSC Black Burst generator | 1 | 750.60 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Panasonic AK-HC 1500 HD Camera | 3 | 19,939.06 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Panasonic AW-PS510AN Power Supply | | 704.70 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Panasonic CAC-HRPCAT DB-1616 RJ-45 adapter for camera to CCU connection | 2 | 70.69 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Panasonic CAE-HRPCAT DB-15HD RJ-45 adapter for camera to CCU connection | 2 | 70.69 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Canon OJ-20X8.5xTS HD lens | 2 | 9,942.47 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Panasonic AW-PH405 pan tilt head | | 9,609.94 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Panasonic MT-ADP-405 adapter plate to use pan tilt on pedestal | 2 | 282.75 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | BDL Autoscript 15" LFT high brightness on camera prompter | 2 | 4,100.94 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | BDL Autoscript New + TallyPlus Light Assembly | | 538.31 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Miller ProDolly (studio head) | 1 | 1,256.05 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | BDL Autoscript WinPlus News IV Prompt Software | | 4,105.18 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | BDL Autoscript SCB smart combine: box | | 1,182.96 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | BDL Autoscript HC-1 opto hand controller | | 634.85 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | BDL Autoscript PSU-HR power supplies for the controllers | 2 | 263.18 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Kramer VM-50V composite video 3A | | 197.03 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Devicom PRO16.5 LCD monitor | | 238.35 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Devicom DTM desktop monitor tripod | | 26.85 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | HP dx2400 desktop computer | | 650.39 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | HP L1945w 19" wide screen LCD monitor | 2 | 212.16 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Panasonic AW-HE120 robotic camera | 3 | 25,032.19 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Panasonic AW-PS510AN Power Supply | | 5,872.50 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Panasonic AW-RP655 camera controller | | 4,221.82 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Panasonic AW-PS510AN Power Supply | | 699.84 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Bogen 3516VB black lightweight pro tripod | 6 | 601.76 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Bogen 3246N tripod | | 654.52 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Bogen 3571 quick release plate | | 178.83 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Bogen 577 quick release adapter assembly | 2 | 177.71 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Omneon MediaDeck w/ 2 channels payback plus record and 1 year warranty | 1 | 38,558.28 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | HP L1945w 19" wide screen LCD monitor | 2 | 212.15 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Panasonic AJ-HD1400 DVCPro HD video deck | 2 | 23,274.00 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Panasonic AJ-PCD35 P2 drive | | 2,125.88 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Panasonic AJ-P2C016RG 32GB memory card | 6 | 9,707.04 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Panasonic AG-HVX200 HD tapeless camcorder w/ lens | 2 | 11,479.84 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Anton Bauer Elip2 battery | 2 | 401.71 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St #510, Alexandria, VA 22314 | Anton Bauer Elip2 battery & charger kits | 2 | 699.54 | |



National Rifle Association of America
Supplier Services Transition-Fixed Asset Listing
Updated: 6/24/19

*as of May 2019*

| Asset # | System ID | INV DATE | IN-SRV DATE | DIVISION | OPERATION | LOCATION | DESCRIPTION | QTY | ACQ VALUE | NET BV |
|---|---|---|---|---|---|---|---|---|---|---|
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Anton Bauer PA-ADF-6-PZ power cable | 2 | 147.27 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Anton Bauer ElipbiZ On Camera Light Kit | 2 | 274.90 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Anton Bauer LS/LL 10 5 and 10 watt spare bulbs for ElightZ | 2 | 43.20 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Miller DS-20 (850) tripod w/ head | 2 | 3,591.00 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Porta Brace CTC-2 traveler camera case | 2 | 578.15 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Sennheiser Evolution G2 Wireless Mic Kit | 2 | 1,352.15 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Ryocde Hose Shoe Extension / Extender for wireless mic kit | 2 | 53.89 | |
| 2663 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Electro Voice RE50B microphone | 2 | 361.52 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Electro Voice 379 mic Windscreen | 2 | 29.55 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Digital Rapids StreamZHD Encoder appliance | 2 | 72,641.40 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Digital Rapids AVC (H 264) Live Streaming Codec | 2 | 3,029.40 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | AJA HD10AVA analog composite video and audio to HD/SD SDI | 2 | 2,660.85 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | AJA DWP Power Supply | 2 | 71.67 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Digital Rapids StreamZHD Encoder appliance | 2 | 48,127.60 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Digital Rapids AVC (H 264) Live Streaming Codec | 2 | 2,019.60 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | APC Smart-Ups SUA3000xU 2U 3000VA battery backup for the studio control room | 2 | 2,797.20 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Videotek VTM-4100PKG HD/SD waveform/vectorscope w/console | 2 | 8,931.16 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Evertz 7767V/FA16-DUO-HB16 input multi/viewer w/dual outputs | 2 | 14,257.05 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | HP LP2465 24" LCD monitor | 2 | 715.15 | |
| 2661 | 3077 | 12/23/2008 | 10/15/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Sony KDL-46XBR2 46" LCD TV monitor w/HDMI (Evertz VIP displays) | 2 | 3,553.84 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Chief MTR02 mid size tilting flat panel wall mount | 2 | 929.31 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Cables to Go VGA cables 50' | 2 | 114.44 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | AJA 15 HD-SD/SD to HDMI video and audio converter | 2 | 447.13 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | AJA DWP Power Supply | 2 | 36.08 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Panasonic TH-42PZ80U 42' plasma monitor w/HDMI (studio-control room window) | 2 | 1,248.60 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Chief MTR02 mid size tilting flat panel wall mount | 2 | 115.45 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Tecmec HDMI to HDMI 33 foot cable | 2 | 54.35 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Allen and Health GL2400-24 audio mixer | 2 | 2,281.29 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Sony ECM-77B lavalier mics | 2 | 1,450.96 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | ESE ES-188VHP Master Clock | 2 | 2,409.72 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | ESE ES-992U timcode | 2 | 701.40 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Supplemental lighting for new larger studio | 2 | 10,950.00 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Apple Final Cut Pro Workstation w/ monitors and speakers | 2 | 11,146.97 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | AJA IO HD Portable 10 bit HD/SD editing interface | 2 | 3,156.20 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | AJA Kona Lite video capture interface card | 2 | 1,660.27 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Avonet 5-Rack 2000 5 port KVM w/ cable kits | 2 | 401.07 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Middle/Atlantic WARK-4120V rack with casters, rear rails and power distribution | 2 | 2,463.71 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | TRC 8 bay console (furniture) | 1 | 15,570.00 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Anchor Desk | 1 | 12,880.00 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Backdrops and movable panels | 1 | 56,000.00 | |
| 2661 | 3077 | 12/23/2008 | 10/25/2009 | Public Relations | NRA News.com | 201 N Union St # 510, Alexandria, VA 22314 | Cabling and copper/fiber runs | 1 | 10,800.00 | |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Ross MC-1 NRA Network MCS Switcher (Ross Gear) | 1 | 8,697.00 | 4,493.45 |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Ross MC-1 redundant power supply | 1 | 559.00 | 288.82 |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | ESE HE-488E Timecode Generator | 1 | 3,400.00 | 1,756.67 |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Ross UDA-8705A Analog Utility DA w/-82L rear module | 1 | 309.00 | 159.65 |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Ross 16A-8803 Dual R2 Reclocking DA 16 x 16 w/-82 rear module | 1 | 798.00 | |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Ross UDC-8625A Format Converter w/-82 rear module | 1 | 6,828.00 | 3,527.80 |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Ross MUX8258 4C 3G-SDI Analog Audio Embedder w/-R2C rear module | 1 | 2,998.00 | 1,548.97 |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Ross Carbonite Multimedia Chassis w/ 2ME HD Switcher | 1 | 27,135.00 | 14,019.75 |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Ross Carbonite Black 2 Panel | 1 | 17,080.00 | 8,824.67 |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Ross Carbonite redundant power supply | 1 | 613.00 | 337.38 |
| 4595 | 4994 | 8/16/2016 | 8/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Ross System Commissioning | 1 | 1,625.00 | 839.58 |
| 4595 | 4595 | 12/16/2016 | 8/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Ross System Training | 1 | 1,625.00 | 839.58 |
| 4595 | 4595 | 12/16/2016 | 8/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Ross Tech Travel | 1 | 2,500.00 | 1,291.67 |
| 4595 | 4595 | 12/16/2016 | 8/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Blackmagic Design SmartView 4k monitor | 1 | 1,880.00 | 971.33 |
| 4595 | 4595 | 12/16/2016 | 8/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Blackmagic Design SmartScope Duo 4K | 1 | 340.00 | |
| 4595 | 4595 | 12/16/2016 | 8/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | LG 49UH650O 49" 4k UHD LED TV | 1 | 3,188.00 | 1,647.33 |
| 4595 | 4595 | 12/16/2016 | 8/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Sanus LT25 Sling flat panel TV wall mount | 1 | 680.00 | 351.33 |
| 4595 | 4595 | 12/16/2016 | 8/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | AJA Hi5-Plus HD-SDI to HDMI Converter | 4 | 790.00 | 408.17 |
| 4595 | 4595 | 12/16/2016 | 8/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Blackmagic Design MultiView 16 | 1 | 2,940.00 | 1,467.33 |

National Rifle Association of America
Supplier Services Transition-Fixed Asset Listing
Updated: 6/24/19

 NRA

*as of May 2019

| Asset # | System ID | INV DATE | IN-SRV DATE | DIVISION | OPERATION | LOCATION | DESCRIPTION | QTY | ACQ VALUE | NET BV |
|---|---|---|---|---|---|---|---|---|---|---|
| 4595 | 4994 | 8/16/2016 | 12/15/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Blackmagic Design Microconverter HDMI to SDI | 18 | 1,530.00 | 796.50 |
| 4595 | 4994 | 8/16/2016 | 12/15/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Blackmagic Design Mini Converter 6G SDI to HDMI 4k | 2 | 590.00 | 304.83 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Tripplite 1280-004 4 port USB charging station | 6 | 168.00 | 86.80 |
| 4595 | 4994 | 8/16/2016 | 12/14/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Tripplite 1050-006 Micro USB cables 6' | 18 | 99.00 | 51.15 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Tripplite B118-002-UHD HDMI 1x2 Splitters | 4 | 192.00 | 99.20 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Tools on Air JustPlay automated playout server | 1 | 12,976.00 | 6,705.30 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Tools on Air JustPlay automated playout server (redundant) | 1 | 22,086.00 | 11,411.10 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Tools on Air JustLive clip player and graphics system (redundant) | 1 | 23,686.00 | 12,237.77 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Tools on Air JustStore 48TB storage sytem | 1 | 23,900.00 | 12,348.33 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Brocade 6450-24 network switches and SFP+ modules | 2 | 4,000.00 | 2,066.67 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Apple iMac 21.5" w/3.5 GHz i7, 8GB RAM, 1TB Fusion (TDA control) | 2 | 3,600.00 | 1,860.00 |
| 4595 | 4994 | 8/16/2016 | 12/15/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | AJA Ki Pro Ultra | 2 | 7,670.40 | 3,963.04 |
| 4595 | 4994 | 8/16/2016 | 12/15/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | AJA Ki Pro 512GB SSD storage module | 1 | 3,820.00 | 1,973.67 |
| 4595 | 4994 | 8/16/2016 | 12/15/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | AJA KiStor Dock | 1 | 340.00 | 175.67 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Fujitsu i7-920X Encoders (1080p issues) | 2 | 18,133.34 | 9,368.89 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Fujitsu i7-920X Encoders (1080p issues) | 1 | 9,911.34 | 5,121.89 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Fujitsu Ultra Low Latency License | 1 | 1,066.66 | 551.11 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Ross LDC-8625A Format Converter w/ -R2 rear module | 1 | 6,998.00 | 3,615.63 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Teradek Cube 255 remote encoder | 1 | 1,480.00 | 764.67 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Teradek Slice Encoder | 1 | 1,990.00 | 1,028.17 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Panasonic AW-HE120 HD remote Camera Controller | 1 | 4,300.00 | 2,066.67 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Panasonic AW-HE130 HD PTZ cameras | 3 | 24,300.00 | 12,555.00 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Miller Pedestal 30 | 3 | 3,849.00 | 1,988.65 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Panasonic AG-AC160A AVCCAM camcorder | 3 | 3,695.00 | 1,909.08 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Ikan Gravity Tilta tilt PTZ Gyro Stabilizer | 1 | 4,499.00 | 2,324.48 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Teradek Bolt Pro 300 receiver/transmitter | 1 | 2,400.00 | 1,240.00 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Prompter People Robo Prompter | 1 | 3,860.00 | 1,755.67 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | TVPromb-Pro Teleprompter software | 1 | 1,899.00 | 981.15 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | TVPromb-Pro Controller Hardware | 1 | 599.00 | 309.48 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Teleprompter computer | 1 | 1,200.00 | 620.00 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | EIZO EV-FlexScan Monitor Display | 1 | 1,068.00 | 551.80 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Allen and Heath 16 channel Digital Audio Mixer | 1 | 1,771.00 | 915.02 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | JBL Control 2P powered speakers (pair) | 1 | 190.00 | 98.17 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Lectrosonics SMQV Super Miniature Wireless Transmitters | 3 | 4,197.00 | 2,168.45 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Lectrosonics VRM Venue Receiver Master | 1 | 1,379.00 | 712.48 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Lectrosonics VRT Tracking Receiver Module (Block 24) | 3 | 1,650.00 | 852.50 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Lectrosonics ALP500 Antenna | 1 | 424.00 | 219.07 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Sanken CCS-11D R-M-TA4FX Wireless La Mics | 3 | 1,170.00 | 604.50 |
| 4595 | 4994 | 8/16/2016 | 12/15/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Lectrosonics wireless PB3-4 Transmitter (Block 21) | 1 | 845.00 | 436.58 |
| 4595 | 4994 | 8/16/2016 | 12/15/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Lectrosonics IFB R1A UHF Belt-Pack Receiver (Block 21) | 2 | 1,090.00 | 563.17 |
| 4595 | 4994 | 8/16/2016 | 12/15/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Telex CCS-18 Earpiece kit w/1/8" connectors | 2 | 142.00 | 73.37 |
| 4595 | 4994 | 8/16/2016 | 12/15/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Sanken COS-11 Wired Lav Mics | 2 | 1,300.00 | 720.75 |
| 4595 | 4994 | 8/16/2016 | 12/15/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Telos RX1 telephone interface | 1 | 690.00 | 356.50 |
| 4595 | 4994 | 8/16/2016 | 12/15/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Impact 2.0" end jaw vise grip | 10 | 440.00 | 227.33 |
| 4595 | 4994 | 8/16/2016 | 12/15/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Ikan ID5000 v2 LED studio light w/ touch screen dimming & yoke mount | 10 | 3,880.00 | 2,064.67 |
| 4595 | 4994 | 8/16/2016 | 12/15/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Apple iMac 27" Retina 4.0 GHz Core i7 w/ 32GB RAM, 2TB Fusion HQ & R9 M395X | 1 | 3,400.00 | 1,756.67 |
| 4595 | 4994 | 8/16/2016 | 12/15/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | AJA IO 4K | 1 | 1,645.00 | 849.92 |
| 4595 | 4994 | 8/16/2016 | 12/15/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Apple Final Cut Pro X | 1 | 300.00 | 155.00 |
| 4595 | 4994 | 8/16/2016 | 12/15/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Avid Media Composer | 1 | 1,149.00 | 593.65 |
| 4595 | 4994 | 8/16/2016 | 12/15/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Apple Mac Mini | 4 | 5,000.00 | 2,583.33 |
| 4595 | 4994 | 8/16/2016 | 12/15/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | MacAlly MKEYE COMBO 103 key USB keyboard & 3 button USB optical mouse | 1 | 30.00 | 15.50 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | MiddleAtlantic RM2-ASA 4 port USB Switch | 1 | 35.00 | 18.08 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Apple TV, Roku, Amazon Fire | 1 | 450.00 | 232.50 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Teradek Slice Encoder Systems | 1 | 5,980.00 | 3,089.67 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | MiddleAtlantic BGR-4538LRD Rack w/below options | 1 | 1,983.81 | 1,024.97 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | MiddleAtlantic BGR-SFPS Solid Top Panel | | | |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | MiddleAtlantic PFD-ASA Curved Plexi Door | | | |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | MiddleAtlantic U1 Rack shelves | | | |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | MiddleAtlantic PD-1415C Power Strip | | | |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | APC Smart-Ups SMT3000RMJ2U 3000VA battery backup for the equipment rack | 1 | 1,049.00 | 541.98 |

3

National Rifle Association of America
Supplier Services Transition-Fixed Asset Listing
Updated: 6/24/19



*As of May 2019

| Asset # | System ID | INV DATE | IN-SERV DATE | DIVISION | OPERATION | LOCATION | DESCRIPTION | QTY | ACQ VALUE | NET BV |
|---|---|---|---|---|---|---|---|---|---|---|
| 4595 | 4994 | 8/16/2016 | 12/15/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | APC Smart-Ups SMT3000 3000VA battery backup for the studio control room | 1 | 1,085.00 | 560.58 |
| 4595 | 4994 | 8/16/2016 | 12/15/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Graphics and sound absorption for set walls | 1 | 4,000.00 | 2,066.67 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Studio construction (ceiling removal, light grid, electrical) | 1 | 5,000.00 | 2,583.33 |
| 4595 | 4994 | 8/24/2016 | 12/24/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Cabling, connectors and Misc | 1 | 2,500.00 | 1,291.67 |
| 4595 | 4994 | 8/16/2016 | 12/16/2016 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Cabling for Theater | 1 | 15,529.86 | 8,155.86 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Blackburm 2 Channel Video Server w/ 4 x 1TB Drivers | 1 | 45,674.00 | 24,105.72 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | XPression Studio - Dual (SW+HW) | 1 | 19,283.00 | 10,177.14 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | XPression Gateway (SW+HW)-Control System for MOS, NLE, and Template Builder | 1 | 5,074.00 | 2,677.94 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | DataLinq Server Option | 1 | 2,535.00 | 1,337.92 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | XPression MOS Plug-in (SW Only) -Floating License | 5 | 507.00 | 267.58 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | XPression NLE Plug-In (SW Only) -Floating License | 5 | | |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | XPression Project Server (SW+HW)-Central server-1 RU server and software | 1 | 14,268.00 | 7,498.67 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Xpression Rundown Controller (SW Only) | 1 | | |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Inception News Express Edition - System Bundle, Inception New Express Edition, 10 User Licenses, 100 Social Media Publication Licenses | 1 | 34,599.00 | 18,471.69 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Inception - Server Hardware (Software Preloaded)-PowerEdge R330, 16GB RDIMM, 1333 MT/s, Low Volt, Dual Rank, x4 Date Width | 1 | | |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Inception News Express Edition - Software - Preloaded | 1 | | |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Inception - MOS Device for Cuel!-Single MOS device license for use with the included Cuel! or Cuel! MOS Interpreter software | 1 | | |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Inception - Concurrent User Licenses | 10 | | |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Inception - Social Media/Account User Licenses | 100 | | |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Inception - User Defined Columns Plugin | 1 | | |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Inception - Assignment Manager Plugin | 1 | | |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Inception - Contact Manager Plugin | 1 | | |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Inception - Timing and Production Cues Plugin | 1 | | |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Inception - Social Media Plugin | 1 | | |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Inception - Social Media/Playlists Plugin | 1 | | |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Inception - Cuel! MOS Teleprompter Software | 1 | | |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Streamline - Pay Edition Software (10 Concurrent User Licenses) | 1 | | |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Streamline - Concurrent User Licenses | 10 | | |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Streamline - Video Proxy Encoder | 1 | | |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Streamline - Playout Software | 1 | | |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Streamline - Server Hardware (Software Preloaded) - 1 RU server platform running Windows Server 2012 64-bit. | 1 | 19,999.00 | 10,555.03 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Blackburm Blade Video 3 M/E Live Production Switcher w/ 36 Input and 25 Quad Chassis | 1 | 31,130.00 | 16,425.72 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Serial to MIdi Converter | 1 | 5,737.25 | 327.25 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | UX-16 U TI ink Code Remote Display | 1 | 640.20 | 337.88 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | 1RU Digital Patchbay | 1 | 630.00 | 332.50 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | 1 foot 75 Ohm Patch Cable for patchbay | 6 | 102.00 | 53.83 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | 20m SC-SC OM3 Duplex Premium PVC Fiber Optic Cable-Orange | 1 | 42.00 | 22.17 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Live1 U.U200 1u 1x8 mount MMH Server - two SDI outputs | 1 | 3,510.00 | 1,842.50 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Live1 U.U200 portable field recorders | 12 | 5,600.00 | 2,955.56 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Genuray SpectroLED Essential 240 Bi-Color LED light kit | 1 | 179.94 | 94.97 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | ETC Source-4 LED series 2 Lustr w/ shutter barrel black | 4 | 9,080.00 | 4,792.22 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Atlhan Enbon Anson - 15Up-6 | 1 | 37.56 | 19.82 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | ETC enhanced definition lens tube for Source-4 19 degree, black | 4 | 580.00 | 311.39 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | ETC enhanced definition lens tube for Source-4 26 degree, black | 4 | 436.00 | 230.11 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Aweeger E393 TVMP yoke to stand adapter | 1 | 55.40 | 29.24 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | ETC 460RS drop-/n iris for Source-4 light | 1 | 560.00 | 295.56 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | LED light strips with RGBW SMD LED's (RE18W200v4-24v) | 2 | 353.90 | 189.95 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Mult-zone controller w/ RF remote & WiFi (LD5f-RGBW6+MZ) | 2 | 69.80 | 36.84 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Mean well LED switching power supply (SE-100-24) | 2 | 69.80 | 36.84 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Ross Analog Video DA | 1 | 309.00 | 163.08 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Decimator MD-HK HDMI to SDI cross converter | 3 | 870.00 | 459.17 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Clearcom MS-702 Communications main station | 1 | 1,160.00 | 612.22 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Clearcom RS-702 2 channel beltpacks | 2 | 760.00 | 401.11 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Clearcom EF-701M 4-wire interface w/ call | 3 | 765.00 | 372.08 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Clearcom CC-110-X4 single ear headset | 3 | 570.00 | 300.83 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | NRATV NRA Network Master Control | 1717 McKinney Ave, Dallas, TX 75202 | Clearcom YC-36 beltpack adapter | 2 | 150.00 | 79.17 |

4



National Rifle Association of America
Supplier Services Transition-Fixed Asset Listing
Updated: 6/24/19

| Asset # | System ID | INV DATE | IN-SERV DATE | DIVISION | LOCATION | OPERATION | DESCRIPTION | QTY | ACQ VALUE | NET BV *As of May 2019 |
|---|---|---|---|---|---|---|---|---|---|---|
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Clearcom IC-26-2P intercom cable 25' | 2 | 238.00 | 175.61 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Hosa 10' XLR audio cables | 2 | 16.26 | 8.58 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Hosa 5' 1/8" to XLR cable | | 8.40 | 4.43 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | TM TV custom cable DB15 to dual XLR | 1 | 30.00 | 15.83 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Acer Travelmate notebook for NRATV studio teleprompter | 1 | 339.49 | 179.18 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | GeFere Pro-Series DVI-D to VGA converter for Ross servers | 2 | 33.98 | 17.93 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | SefCord carpet cord cover for studio | 2 | 57.98 | 30.60 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | AJA HELO H.264 streaming appliance for NRATV studio | 2 | 1,295.00 | 683.47 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Logitech C930e webcam for NRAHQ Skype | 1 | 99.98 | 52.77 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | InnoGear mic boom arm for NRAHQ Skype | 1 | 16.99 | 8.97 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Blue Yeti USB Microphone for NRAHQ Skype | 1 | 129.00 | 68.08 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Tax | | 11.80 | 6.23 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Apple Compressor 4.3 software | 1 | 99.98 | 52.77 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Fusion 8.5 for Mac | 1 | 399.95 | 211.08 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Windows 10 Pro OS | 2 | 599.97 | 316.69 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Windows 10 Pro OS | 1 | 399.98 | 211.10 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Teradek Slice Encoder Systems (NRANews @ IMG Office) | 2 | 5,980.00 | 3,156.11 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Quicklink TX Multi-SDI & rHDMI Skype interface (NRANews @ IMG Office) | 1 | 3,995.00 | 2,108.47 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Gra-Vue Monitoring Appliance | 5 | 579.95 | 306.08 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Sennheiser wireless | 5 | 224.90 | 118.70 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Galvanized Pipe for Hanging Lights | 2 | 129.95 | 68.22 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | MPS Gallery Cables | 2 | 100.00 | 52.78 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | VMWare Software | 1 | 79.99 | 42.22 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Ear Buds and Mount Pro | 1 | 75.71 | 39.96 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Power Cords for Servers | 3 | 66.44 | 35.07 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Rundown Creator (Monthly Subscription) | 1 | 60.00 | 31.67 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Mini SDI Cable | 1 | 57.00 | 30.08 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Lee Filter | 3 | 166.00 | 87.61 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Apple Mac Mini (NRA HQ & ILA Federal buildings) | 1 | 1,298.00 | 685.06 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Generay SPOTLED 2x2 Bi-Color LED (ILA Federal building) | 1 | 179.94 | 94.97 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Ortp 2x High Earphones (NRA HQ & ILA Federal building) | 2 | 88.10 | 46.50 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | APC 6-Outlet Green Ups (ILA Federal building) | 1 | 37.99 | 20.05 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Pearstone Ultra Thin HDMI Cable – 3' (NRA HQ & ILA Federal building) | 2 | 21.54 | 11.37 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Magewell USB 3.0 Dongle 1CH (NRA HQ building) | 1 | 293.02 | 154.65 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | HP Backlit Monitor (NRA HQ & ILA Federal building) | 2 | 203.32 | 107.31 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Blue Pro 3 Capsule USB Mic (ILA Federal building) | 1 | 129.99 | 68.61 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Logitech Webcam – USB 2.0 (ILA Federal building) | 3 | 169.95 | 58.23 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | PSA-1 Studio Arm (ILA Federal building) | 2 | 97.02 | 51.21 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Morally USB2 Slim Keyboard & Mouse (NRA HQ & ILA Federal building) | 32 | 78.30 | 41.33 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Carane L2 CHD Ultra Slim Cable (NRA HQ building) | 2 | 28.37 | 14.97 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Pearstone Ultra Thin HDMI Cable – 1.5' (ILA Federal building) | 1 | 18.61 | 9.82 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Hi-Speed HDMI Ethernet (ILA Federal building) | 1 | 16.65 | 8.79 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Williams WCA Est. Cord (NRA HQ & ILA building) | 1 | 22.92 | 12.10 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Watson 15 VAC Power Extension (ILA Federal building) | 1 | 9.75 | 5.15 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Comprehensive Cable – CAT6 (NRA HQ & ILA building) | 1 | 8.70 | 4.59 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Comprehensive Cable – USB (NRA HQ building) | 1 | 7.34 | 3.87 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Comprehensive USB Cable (ILA Federal building) | 1 | 4.89 | 2.58 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Middle Atlantic BGR-4538&BD Rack w/ level feet, front door and top panel | 1 | 1,634.04 | 862.41 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Eaton 9PX 6,000VA high capacity battery backup system | 1 | 10,335.60 | 5,454.90 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Gra-Vue MIO DA-AUD AES to Analog Audio Converter | 2 | 269.95 | 142.47 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | AJA OpenGear Dual 3G-SDI Distribution Amplifier | 1 | 539.00 | 284.47 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | DJI Osmo Mobile gimbal and Plantronics Voyager bluetooth earpiece | 1 | 464.96 | 245.40 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | ESE LX-161U Clock Remote Display | 1 | 660.00 | 348.33 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | LiveU Remote interview feed stream encoders and decoder | 1 | 30,000.00 | 15,833.33 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Brocade 6450-24 network switches and SFP+ modules | 1 | 1,500.00 | 791.67 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Yamaha DM1000VCM audio console w/ automation | 1 | 16,832.66 | 8,883.90 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Ross Carbonite Black Plus Chassis upgrade | 1 | 7,010.00 | 3,699.72 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Ross Blackstorm video server | 1 | 16,529.00 | 8,723.64 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Ross Inception Graphics system w/MOS | 1 | 82,207.00 | 43,387.03 |
| 4701 | 5100 | 3/31/2017 | 12/16/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Ross Inception Newsroom management system | 1 | 34,999.00 | 18,471.69 |

5



National Rifle Association of America
Supplier Services Transition-Fixed Asset Listing
Updated: 6/24/19

| | | | | | | | | | As of May 2019 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | ACQ VALUE | NET BV |
| | | | | | | | | | 19,999.00 | 10,555.03 |
| | | | | | | | | | 3,603.00 | 1,901.58 |
| | | | | | | | | | 197.70 | 104.34 |

| Asset # | System ID | INV DATE | IN-SRV DATE | DIVISION | LOCATION | OPERATION | DESCRIPTION | QTY | ACQ VALUE | NET BV |
|---|---|---|---|---|---|---|---|---|---|---|
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Ross Streamline Asset Management System (BlackStorm only) | 1 | 19,999.00 | 10,555.03 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | KVM and extender for new servers | 1 | 3,603.00 | 1,901.58 |
| 4701 | 5100 | 3/31/2017 | 12/15/2017 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Impact 40" extension grip arm (black) | 6 | 197.70 | 104.34 |
| 4013 | 4412 | 10/6/2014 | 10/15/2014 | Executive VP | 203 N Union St #510, Alexandria, VA 22314 | NRA News.com | Sony Alpha a7S DSLR | 1 | 4,996.00 | |
| 4013 | 4412 | 10/6/2014 | 10/15/2014 | Executive VP | 203 N Union St #510, Alexandria, VA 22314 | NRA News.com | Sony NP-FW50 lithium ion rechargeable batteries | 4 | 191.80 | |
| 4013 | 4412 | 10/6/2014 | 10/15/2014 | Executive VP | 203 N Union St #510, Alexandria, VA 22314 | NRA News.com | Sony XLR-K1M adapter & microphone kit | 1 | 1,596.00 | |
| 4013 | 4412 | 10/6/2014 | 10/16/2014 | Executive VP | 203 N Union St #510, Alexandria, VA 22314 | NRA News.com | Sony 32GB SDHC SD memory cards | 2 | 69.96 | |
| 4013 | 4412 | 10/6/2014 | 10/16/2014 | Executive VP | 203 N Union St #510, Alexandria, VA 22314 | NRA News.com | Metabones Canon EF to Sony NEX camera lens mount adapter | 2 | 748.00 | |
| 4013 | 4412 | 10/6/2014 | 10/16/2014 | Executive VP | 203 N Union St #510, Alexandria, VA 22314 | NRA News.com | Canon EF 16-35mm f/2.8L II USM lens | 1 | 1,699.00 | |
| 4013 | 4412 | 10/6/2014 | 10/16/2014 | Executive VP | 203 N Union St #510, Alexandria, VA 22314 | NRA News.com | Canon EF 70-200mm f/2.8L II USM lens | 1 | 1,449.00 | |
| 4013 | 4412 | 10/6/2014 | 10/16/2014 | Executive VP | 203 N Union St #510, Alexandria, VA 22314 | NRA News.com | Canon EF 24-70mm f/2.8L II USM lens | 1 | 2,299.00 | |
| 4013 | 4412 | 10/6/2014 | 10/16/2014 | Executive VP | 203 N Union St #510, Alexandria, VA 22314 | NRA News.com | Benro A2473FS6 S6 Tripod w/head | 1 | 600.00 | |
| 4013 | 4412 | 10/6/2014 | 10/16/2014 | Executive VP | 203 N Union St #510, Alexandria, VA 22314 | NRA News.com | Edelkrone 31.5" SliderPlus V2 large | 1 | 1,399.90 | |
| 4013 | 4412 | 10/6/2014 | 10/16/2014 | Executive VP | 203 N Union St #510, Alexandria, VA 22314 | NRA News.com | Atomos Shogun 4K HDMI/12G-SDI Recorder and 7" Monitor and battery | 1 | 2,354.00 | |
| 4013 | 4412 | 10/6/2014 | 10/16/2014 | Executive VP | 203 N Union St #510, Alexandria, VA 22314 | NRA News.com | HP Pro 3500 3.20GHz Core i5 w/ 4GB RAM, 500GB HD & Win 7 Pro | 1 | 1,200.00 | |
| 4013 | 4412 | 10/6/2014 | 10/16/2014 | Executive VP | 203 N Union St #510, Alexandria, VA 22314 | NRA News.com | Apple Mac Pro 3.5GHz 6 Core w/ 16GB RAM & 1TB Flash Drive | 3 | 14,997.00 | |
| 4013 | 4412 | 10/6/2014 | 10/16/2014 | Executive VP | 203 N Union St #510, Alexandria, VA 22314 | NRA News.com | Apple Wireless Keyboard & Mouse | 3 | 391.80 | |
| 4013 | 4412 | 10/6/2014 | 10/16/2014 | Executive VP | 203 N Union St #510, Alexandria, VA 22314 | NRA News.com | BlackMagic Design UltraStudio Express | 3 | 1,410.75 | |
| 4013 | 4412 | 10/6/2014 | 10/16/2014 | Executive VP | 203 N Union St #510, Alexandria, VA 22314 | NRA News.com | Apple Final Cut Pro X | 3 | 897.00 | |
| 4013 | 4412 | 10/6/2014 | 10/16/2014 | Executive VP | 203 N Union St #510, Alexandria, VA 22314 | NRA News.com | AT*T LCD monitor & wall mount for MultiView in new switcher | 1 | 800.00 | |
| 3744 | 4143 | 10/18/2013 | 12/16/2013 | E&E Exhibits | Las Vegas, Nevada | Exhibit Booth. | Full Exhibit Booth (E&E ExhibitSolutions), plus | 1 | 967,205.00 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | Ross Video Crossover Solo HD Switcher | 1 | 8,143.52 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | HP EliteDisplay E271i 27" LCD Monitor | 3 | 345.60 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | Black Magic CONVMBSH SDI to HDMI converter | 3 | 302.40 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | Sony PXW52 40" LED TV | 2 | 658.92 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | Chief MFCUB mobile cart | 2 | 675.16 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | Fujitsu IP-920E Encoders | 2 | 22,248.00 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | Fujitsu IP-9020 Decoders | 2 | 11,880.00 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | Black Magic CONVMSYNC sync generator | 1 | 302.40 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | Black Magic CONVMSDIDA SDI distribution amplifier | 1 | 302.40 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | Panasonic AW-RP50 Remote Camera Controller | 2 | 2,149.20 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | Panasonic AW-HE120K HD PTZ Cameras | 3 | 27,233.60 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | Manfrotto 028B black aluminum studio pro tripod w/geared column | 3 | 1,149.20 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | Manfrotto 181B Dolly for tripod | 3 | 939.60 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | APC SmartUps SUA3000XLT432U 3000VA battery backup for the studio control room | 3 | 2,529.68 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | Mackie 1640i VLZ4 audio mixer | 1 | 79.62 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | JBL Control 2P powered speakers | 1 | 225.72 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | PreSonus ACP88 8 channel compressor / gate | 1 | 972.00 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | Lectrosonics wireless mic systems | 3 | 9,760.00 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | Lectrosonics wireless IFB systems | 3 | 9,458.68 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | Telos Phone interface | 1 | 804.60 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | DMX LED Dimmer system | 1 | 216.00 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | Studio LED lights | 14 | 9,172.00 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | C clamps for lights | 14 | 1,209.60 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | Chimera Video Plus 1 Tricolt Lightbank Kit Small #8000 | 2 | 1,325.33 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | Apple MacBook Pro Retina notebook | 2 | 2,846.92 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | Apple iMac 27" 3.5GHz Core i7 w/8GB RAM & 1TB HD | 2 | 2,374.92 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | G-Tech G-Raid w/Thunderbolt 8TB drive | 1 | 1,090.00 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | AJA IO XT | 1 | 1,620.00 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | Apple Final Cut Pro X | 2 | 324.00 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | Cisco ASA5505 Firewall | 1 | 864.00 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | Cisco 3560-24TS switch | 1 | 1,105.00 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | Middle/Atlantic U1 Rack shelves | 1 | 103.68 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | Anchor Desk | 1 | 5,850.00 | |
| 3696 | 4095 | 12/17/2013 | 12/16/2013 | Executive VP | Farmville, VA | N/A Studio | Backdrops and movable panels for set | 1 | 16,650.00 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Ross HD Switcher Carbonite 2 panel w/Carbonite Plus 24 input chassis | 1 | 35,429.40 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Sony NEX-FS700 Cinema camera | 1 | 8,835.25 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Metabones Canon EF lens to Sony NEX adapter | 1 | 849.50 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Blackmagic Design HyperDeck Studio Pro 2 | 1 | 2,052.42 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | SanDisk Extreme II internal SSD 480GB | 10 | 463.31 | |

6



National Rifle Association of America
Supplier Services Transition-Fixed Asset Listing
Updated: 6/24/19

NRA

as of May 2019

| Asset # | System ID | INV DATE | IN-SRV DATE | DIVISION | LOCATION | OPERATION | DESCRIPTION | QTY | ACQ VALUE | NET BV |
|---|---|---|---|---|---|---|---|---|---|---|
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Blackmagic Design Cinema Camera w/EF Mount | 4 | 2,159.59 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Canon EF 16-35mm f/2.8L II USM lens | 1 | 1,839.17 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Canon EF 24-70mm f/2.8L II USM lens | 3 | 2,380.42 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Canon EF 28-300mm f/3.5-5.6L IS USM lens | 1 | 2,633.72 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | RedRockMicro DSLR Cinema Bundle w/ Follow Focus | 5 | 1,948.50 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Canon Rebel cameras | 3 | 541.25 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Prompter People Flex iPad Teleprompter | 3 | 648.42 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Miller 1514 Solo DV20 carbon filter tripod system w/ DS-20 fluid head | 4 | 1,931.18 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Miller 394 Solo 75 Dolly for DV20 tripod | 4 | 507.69 | |
| 3768 | 4167 | 3/4/2014 | 3/15/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Matthews Doorway Dolly w/ head | 1 | 5,953.75 | |
| 3768 | 4167 | 3/4/2014 | 3/15/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | CamMate T15 Travel Series Crane w/ Dolly | 1 | 8,460.00 | |
| 3768 | 4167 | 3/4/2014 | 3/15/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Mackie 1642-VLZ4 audio mixer | 1 | 756.67 | |
| 3768 | 4167 | 3/4/2014 | 3/15/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | BeyerDynamic DT250 Headphones | 2 | 189.44 | |
| 3768 | 4167 | 3/4/2014 | 3/15/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Pelican AC768 8 channel compressor / gate | 1 | 974.25 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Lectrosonics UCR401 wireless mic receiver | 6 | 1,407.25 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Lectrosonics UM400a wireless mic transmitter | 6 | 1,380.19 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Sanken COS11D lavalier mics | 6 | 411.35 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Rode NTG-2 Shotgun Mics with boom poles and stand | 2 | 1,082.50 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Sharp LC-80LE650U 80" LED TV | 3 | 3,572.25 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Chef PMRU8 swing arm mounts | 2 | 351.81 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Sharp LC-60LE650U 60" LED TV | 2 | 1,299.00 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Chef MFCU8 mobile cart | 2 | 540.17 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Apple Mac Pro computer | 2 | 4,871.25 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | HP LA2505x 24"LED monitor | 2 | 297.69 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | G-Tech G-Raid w/Thunderbolt 8TB drive | 2 | 757.63 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Apple Thunderbolt Cable | 1 | 40.10 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | AJA IO XT | 1 | 1,623.75 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Avid Media Composer 7 | 1 | 1,081.42 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | JVC DT-E15L4 15" Production monitor | 2 | 1,623.75 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Teci MX1 telephone interface | 1 | 806.46 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Fujitsu IP-920E Encoders | 1 | 11,149.75 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Fujitsu IP-920E Decoders | 1 | 5,953.75 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Cisco 3560-24TS switch | 1 | 497.95 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Cable, Connectors, etc. | 1 | 6,495.00 | |
| 3768 | 4167 | 3/4/2014 | 3/16/2014 | Executive VP | 1717 McKinney Ave, Dallas, TX 75202 | NRATV NRA Network Master Control | Studio props for sets and recording sessions | 1 | 32,826.28 | |
| | | | | | | | **Totals** | | 2,690,457.16 | 415,230.37 |

# Exhibit H

APP000905



SCHERTLER & ONORATO, L.L.P.

August 5, 2019

***VIA ELECTRONIC MAIL AND FIRST CLASS MAIL***

Michael J. Collins
Brewer Attorneys & Counselors
750 Lexington Avenue
14th Floor
New York, New York   10022

RE: ***National Rifle Association of America v. Ackerman McQueen, Inc.***, CL19001757

Dear Michael:

I am writing in response to your correspondence of July 22, 2019.  In that letter, you raised three issues.  Our positions on those issues are set forth below.

First, with respect to the "NRA Women Instagram Account," we provided you with a response by email on Tuesday, July 23, 2019.

Second, you reference Section XI. E. of the Services Agreement and request "return to the NRA, to such place and in such manner as NRA may specify, any and all of the NRA's property, materials, documents, Confidential Information, etc., that may be in AMc's possession."  As you note, the Services Agreement conditions such delivery upon approval and payment in advance by the NRA of "all charges for accumulating said materials."

What we find remarkable about your request is that the NRA is insisting that AMc abide by the terms of a contract that the NRA has refused to honor.  As you know, the NRA is in material breach of the Services Agreement because it has refused to pay invoices that AMc has submitted to the NRA in accordance with the provisions of Section III, Paragraph E of the Agreement and also has refused to establish a $3,000,000 Letter of Credit as required by the May 6, 2018 Amendment No. 1 to the Services Agreement.  These breaches are the grounds on which AMc immediately terminated the Services Agreement under Section XI, Paragraph D.  The NRA has also failed to abide by a number of additional contractual obligations that were triggered by AMc's immediate termination of the Agreement.  These obligations were brought to the NRA's attention in our June 27, 2019 letter to Andrew Arulanandam.

Furthermore, Section XI, Paragraph F of the Services Agreement states:

In consideration of the dedication of a substantial number of personnel and resources to provide the services under this Agreement (and the necessity to maintain such staffing levels and resource allocations to enable AMc to continue to provide such services upon renewals hereof), the NRA agrees to pay AMc a fair and equitable termination fee to compensate it for the inevitable severances and other reasonable costs incurred in conjunction with such expiration or terminations.

ATTORNEYS AT LAW    901 New York Avenue, NW    202.628.4199
Suite 500                      202.628.4177 *fax*
Washington, D.C. 20001    www.schertlerlaw.com

**APP000906**

Such termination fees shall be negotiated in good faith by the parties and paid to AMc no later than the last day of this Agreement.

We have repeatedly asked the NRA to engage in a good faith negotiation to establish the termination fees that the NRA owes to AMc under the Services Agreement as this Paragraph requires. The NRA has refused to do so and has breached the Agreement in this regard as well.

As soon as the NRA comes into compliance with all of its obligations under the Services Agreement, AMc will begin the process of returning to the NRA "any and all of the NRA's property," conditioned upon the NRA paying in advance "all charges for accumulating said materials." Please let us know when you expect the NRA to cure its breaches.

As always, if you have any questions regarding this matter, please feel free to contact me.

Sincerely,

David Schertler

cc: James W. Hundley, Esq.
    Robert H. Cox, Esq.

**APP000907**

# Exhibit I

APP000908

DALLAS | NEW YORK

# BREWER
ATTORNEYS & COUNSELORS

August 9, 2019

**VIA EMAIL**

David Schertler
Schertler & Onorato, LLP
901 New York Avenue, NW Suite 500
Washington, D.C. 20001

   Re:  *National Rifle Association of America v. Ackerman McQueen, et al.*, Case No.
      CL19001757 and CL19002067, in the Circuit Court for the City of Alexandria

Dear David:

   We received your letter dated August 5, 2019, in which you purport to respond to our letter dated July 22, 2019.

   Of course, we disagree with your position that the National Rifle Association of America (the "NRA") breached any of the terms or provisions of the Services Agreement or Amendment No. 1 to the Services Agreement. In any event, you ignore that your client Ackerman McQueen, Inc. ("Ackerman") committed prior material breaches of the Services Agreement, thereby relieving the NRA of any obligations to perform under the parties' agreement.

   As you know, Ackerman purported to terminate the Services Agreement on May 29, 2019, pursuant to XI.B. of the Services Agreement and again on June 27, 2019, pursuant to section XI.D. Termination pursuant to section XI.D. is effective immediately upon written notice.

   Pursuant to section XI.E. of the Services Agreement, Ackerman should have returned the NRA's books, records, documents, Confidential Information, and other personal property immediately after June 27, 2019. To date, Ackerman has failed to do so. As you know, the NRA has repeatedly demanded that Ackerman comply with section XI.E. These requests include written requests made pursuant to letters dated June 11, 2019, June 25, 2019, June 28, 2019, and July 22, 2019.

   We acknowledge that XI.E. states that the NRA shall pay the costs associated with "accumulating said materials." By letter dated June 25, 2019, the NRA informed Ackerman that the "NRA will pay for accumulation of these materials, and reiterates its previous requests for an advance price to this end." In addition, by letter dated July 22, 2019, the NRA once again requested that Ackerman promptly disclose the costs of associated with accumulating the NRA's property. Furthermore, by letter dated June 28, 2019, the NRA again stated that the "NRA has repeatedly requested a budget for transmittal of these materials. Please provide one." As of the

**APP000909**

# BREWER

**Mr. David Schertler**
August 9, 2019
Page 2

date of your August 5 letter, Ackerman has still not complied with its obligation to disclose the cost associated with accumulating the NRA's property.

By letter dated June 27, 2019, you agreed to "provide the NRA with the costs of accumulating these materials . . . ." By email dated July 23, 2019, you promised the NRA that it would provide a detailed response to the NRA's letter dated July 22, 2019, but you did not respond until Monday, August 5, 2019.   Your letter dated August 5, 2019, however, does not disclose the costs associated with accumulating the NRA's materials.  Accordingly, as of today, Ackerman has not complied its obligation to disclose the costs associated with accumulating the NRA's property.

In your letter dated August 5, 2019, you appear to be taking the position that the NRA breached the Services Agreement and that the NRA must pay to Ackerman all amounts it seeks before it will comply with its obligations under section XI.E.  If this is your position, please let us know because such a position would be meritless.  First, the NRA has not breached the parties' agreement and the NRA owes nothing to Ackerman except for the costs associated with gathering its property.  Second, your position would be based on a misreading of section XI. Pursuant to section XI.D., Ackerman is entitled to terminate immediately upon sending written notice for certain grounds, including if the NRA breached the Services Agreement.  Nonetheless, section XI.E. still requires Ackerman to immediately return the NRA's property even if the termination was based on alleged breaches by the NRA.  Thus, Ackerman would have no basis to delay returning the NRA's property until the NRA pays whatever amounts Ackerman seeks unrelated to the costs associated with accumulating the NRA's property.

Once again, on behalf of the NRA, we hereby demand that pursuant to section XI.E. of the Services Agreement, Ackerman immediately return all of the NRA's books, records, documents, Confidential Information, and other personal property.  As stated before, the NRA will reimburse Ackerman for its reasonable costs in accordance with section XI.E. once Ackerman provides an accounting of those costs.

We appreciate your attention to these important matters.  If you have any questions, please let me know.

Sincerely,



Michael J. Collins

4841-0141-3535.2
2277-09

**APP000910**

# EXHIBIT A-56

# New Documents Raise Ethical and Billing Concerns About the NRA's Outside Counsel

**propublica.org**/article/william-brewer-new-documents-raise-ethical-billing-concerns-about-nra-outside-

by Mike
Spies

July 30,
2019



William A. Brewer III, the National Rifle Association's outside counsel, in his office in Dallas. (Shane Kislack)

ProPublica is a nonprofit newsroom that investigates abuses of power. Sign up for ProPublica's Big Story newsletter to receive stories like this one in your inbox as soon as they are published.

This article is published in partnership with The Trace and The New Yorker. Get the best of The New Yorker, in your inbox. Sign up now.

In 2018, accountants for the National Rifle Association began cataloging for its board of directors questionable financial arrangements that had led to millions of dollars in payments to a group of top executives and consultants. The NRA was experiencing cash flow problems, and the accountants were trying to address what they believed to be serious financial mismanagement.

For a year and a half, the NRA has employed an outside counsel, William A. Brewer III, who represents the organization in high-profile legal disputes and is also deeply involved in internal decision-making. The accountants believed the financial dealings they had found could jeopardize the organization's nonprofit standing with regulators. Yet, according to a former senior official in the NRA's treasurer's office, Brewer tried to thwart their efforts to draw attention to the problematic payments.

APP000911

The former senior employee, Emily Cummins, who worked for 12 years in the NRA's treasurer's office, quietly resigned in November as the group's internal strife escalated. Cummins, in a written statement that began circulating this month among NRA leaders, including at least one board member, alleges that Brewer obstructed the work of NRA accountants and vastly exacerbated the organization's financial woes as he charged it hefty legal fees. Cummins confirmed that she had produced the statement, which was obtained by ProPublica, but declined to provide any additional comments. Brewer's firm said its work was justified and of the highest quality.

The statement lays out a list of allegations regarding Brewer's legal work and his treatment of NRA staff as questions surfaced about his law firm's billings, which totaled $24 million over a 13-month period. In the first quarter of 2019, Brewer's firm charged over $97,000 per day, according to internal NRA documents posted anonymously online.

Cummins accuses Brewer of trying to intimidate, deceive and silence NRA staff who were processing his bills while some accountants were growing increasingly troubled by the organization's mismanagement, exorbitant spending and questionable deals involving conflicts of interest. Former Brewer colleagues as well as written correspondence obtained by ProPublica broadly supported her claims.

Cummins wrote in her statement that Brewer "intimidated NRA staff and threatened our professional livelihoods." She alleged that he used pressure tactics with staffers "to keep them acquiescent," compiling what she called "burn books" filled with personal information that he could use against individuals.

"I witnessed what appeared to be unrealistic and duplicative billing from Bill Brewer," Cummins wrote. "I witnessed that Bill Brewer himself created a 2018 cash flow crunch by interfering with accounts payable to prioritize paying himself immediately versus other NRA vendors that had been providing goods or services for months without payment, also jeopardizing the NRA's biweekly staff payroll."

In a lengthy response to Cummins' account, the Brewer law firm and the NRA defended Brewer's work and called his legal fees standard. The Brewer firm pointed to an NRA email it said Cummins wrote in August 2018 praising the firm. "They are good lawyers and seem to be good people as well," it said.

Svetlana M. Eisenberg, a Brewer partner, told ProPublica that "the notion that our research team compiles opposition research, or 'burn books,' regarding clients or their employees is simply not true."

Craig Spray, the NRA's chief financial officer, said the NRA is "current on all its vendor payments."

Brewer has been a central behind-the-scenes force in the internal struggle that broke out

between the NRA's top executive Wayne LaPierre and ousted president Oliver North. LaPierre has entrusted the future of his organization to Brewer, and in a statement this week said the organization has "full confidence in Bill Brewer and his law firm."

As the gun group has fractured, Brewer's firm has been a key player in a series of expensive lawsuits against former business partners, government officials and North, in certain cases seeking damages worth tens of millions of dollars.



Banners at the NRA's annual convention in April 2019 show the organization's executives, from left, Wayne LaPierre, Chris Cox and Oliver North, who was pushed out at the convention in a leadership struggle with LaPierre. Cox resigned in June. (Jeremy Hogan/SOPA Images/LightRocket via Getty Images)

For the last three decades, the NRA has been one of the most influential special interest groups in the country. Without an infusion of cash, and a return to relative stability, it could find itself on the sidelines of the 2020 election, a dramatic difference from 2016. That year, campaign finance records show the organization spent over $30 million to help elect Donald Trump, more than any other special interest group.

Internal NRA documents previously obtained by The Trace and The New Yorker described expenses and questionable transactions and business arrangements involving top executives, favored vendors and consultants. Through Brewer, the NRA said it had "serious concerns about the accuracy" of the reporting but would not comment on "privileged communications or personnel matters." Attorneys general in New York and Washington, D.C., have opened inquiries into whether the NRA violated its charitable status by providing excessive financial benefits to its executives and supporters. The D.C. attorney general's office declined to comment on its inquiry beyond an initial statement, and the New York office did not respond to requests for comment.

APP000913

This month, four NRA board members publicly called for an "independent review of the millions of dollars in payments to Brewer, Attorneys & Counselors for legal fees." But other NRA senior officials continue to defend the group. Carolyn Meadows, the NRA's president, told ProPublica, "I have never worked with an outside law firm that is more on call, attentive and positively in tune to the needs of their client." Charles Cotton, the NRA's first vice president and chairman of the audit committee, added that Cummins' allegations "reflect a misinformed view of the Brewer firm, its billings, and its advocacy for the NRA."

Brewer's NRA legal strategy suffered a setback in May, in a First Amendment case against a New York state financial regulator. A judge ruled that the NRA could collect no damages from defendants in their official capacities, even if it prevailed.

Brewer's firm has offices in Dallas and New York, and has represented celebrities like 50 Cent and major corporations such as 3M, which ultimately settled an environmental suit for $850 million in 2018. Starting in the mid-'80s, he gained a reputation for pioneering unusually aggressive legal tactics, which could yield successful outcomes for corporate clients.

But the tactics caused others to question the firm's conduct. In 1998, the Dallas Observer ran a lengthy story on Brewer, describing his firm, then called Bickel & Brewer, as "a pariah within the local legal community, accused of pushing the ethical envelope, running up the costs of litigation, and destroying the gentility of the Dallas Bar." Brewer, a native New Yorker, characterized his firm's approach to litigation at the time as "zealous advocacy," marketing his practice to potential clients as "New York-quality."

"Bill's representation of the NRA is a classic example of 'servicing the client to death,'" Hal Marshall, a former Bickel & Brewer partner, told ProPublica. "We tried to leave no stone unturned in our cases, and it often yielded great results. On the other hand the bills were hefty."

In 2016, Brewer was fined over $133,000 for attempting to influence potential jurors and witnesses in a Texas case. He denied any impropriety and has appealed the ruling, raising the total to $177,000, which the Texas Supreme Court will hear arguments on soon. In 2018, a judge found that Brewer had failed to disclose the Texas fine in an NRA suit against an insurance broker in Virginia. After the omission was reported by The Trace, a judge threw Brewer off the case.

In addition to Cummins' statement, ProPublica obtained text messages and email composed by former Brewer employees in March 2018 that alleged unethical behavior by the firm. Four former Brewer colleagues — three of whom were abruptly fired over the last two years — described a pattern of disregard for ethical billing and conduct. The texts and email were sent just before the NRA began to heavily invest its dwindling resources in litigation by the firm.

APP000914

Early in March, an attorney who had worked as a Brewer associate sent an email to another New York City-based law firm. The firm worked for a hedge fund that was locked in a legal fight against Eco-Bat, a lead production company represented by Brewer's firm. "A number of attorneys have recently left Brewer, concerned about the firm's ethics violations," it said.

It went on to say that a Brewer attorney believed he had been fired "for refusal to violate ethical rules." The attorney thought he had identified a disqualifiable conflict of interest involving an attorney on his team, the email said. When the Brewer lawyer "confirmed his initial analysis," the email said, "he was told to drop the matter and terminated the following Monday."

Sarah Rogers, a partner at the Brewer firm, dismissed the emails and told ProPublica, "We cannot discuss this matter, except to note that the former associate's claims are false and have already been rejected by an arbitrator." Eco-Bat's chairman and CEO, Howard M. Meyers, praised Brewer's work and said that the litigation was "a stunning, multibillion-dollar achievement." He added: "I've been Bill's friend and client for decades. I have never witnessed, nor would I expect, anything less than the highest ethical standards from Bill and his firm."

Travis Carter, a spokesman for the Brewer firm, told ProPublica, "All time charged to client matters is scrutinized internally for accuracy, transparency and value."

Subscribe to the Big Story newsletter.

Later that spring, Brewer brought a lawsuit on behalf of the NRA against New York Gov. Andrew Cuomo, the New York Department of Financial Services and the regulator's then top official, Maria Vullo. The New York officials had released statements advising those doing business with the NRA in New York to assess the potential reputational risks of maintaining ties to the gun group. The suit accused the New York officials of engaging in a thinly veiled conspiracy to destroy the organization, costing it "tens of millions of dollars in damages."

LaPierre touted the lawsuit in a speech at the 2019 Conservative Political Action Conference. "In real time right before your very eyes, we, the National Rifle Association, on behalf of all Americans, are fighting perhaps the most important piece of First Amendment constitutional advocacy in the history of our country," he said.

The lawsuit, which was seeking to recover the money the NRA had supposedly lost as a result of the New York officials' actions, became the centerpiece of an urgent fundraising campaign. On an NRA webpage soliciting donations, the text said, "Please give as generously as you can — and help win this life-or-death legal battle for the survival of the NRA and freedom."

Over the last four months, the Brewer firm has also been involved in legal actions against once-sacred NRA allies. The NRA recently sued Ackerman McQueen, its public relations firm

for more than three decades. Ackerman shaped the NRA's image, and, through productions like NRATV, placed it at the vanguard of the culture wars. Ackerman has historically been the NRA's most costly vendor — in 2017, the firm was paid more than $40 million. In a lawsuit in Virginia state court, the gun group accused Ackerman of engaging in deceptive billing practices, and leaking damaging documents that show LaPierre using the firm's funds for lavish travel and custom suits.

Another Brewer suit, filed in New York, is against Oliver North, who spent a tumultuous year serving as the NRA's president until he was pushed out in April, at the organization's annual convention. During the meeting, a leadership struggle unfolded between North and LaPierre, who alleged that North threatened to release damaging information in order to extort him into resigning. In its suit, the NRA claims that the former president engaged in a "failed coup attempt," absolving it of having to cover North's legal fees in connection with NRA-related litigation. The suit also, in an unrelated aside, accuses Chris Cox, the NRA's longtime top lobbyist, of taking part in the alleged scheme to overthrow LaPierre. Cox, who was beloved by many NRA staff and viewed as the natural successor to LaPierre, resigned in June. Before North stepped down, he was seeking to audit Brewer's billings.

Ackerman, North and Cox have steadfastly denied the NRA's allegations. In May, Ackerman filed a defamation suit against the organization, asking for $50 million in damages. That same month, the judge in the New York case, Thomas J. McAvoy, dismissed the organization's recovery claims; it would get no damages from Cuomo or Vullo in their official capacities or the DFS. The NRA is still pursuing its First Amendment claims.

During the summer of 2018, Cummins and her fellow accountants took care to document their work. A variety of NRA vendors, including Ackerman McQueen, were receiving what some accountants considered unjustified payments, and an array of NRA officials and contractors had been involved in what the accountants saw as expense abuses and questionable deals not initially approved by the board's audit committee.

According to Cummins' statement, Brewer misled the NRA's board and "used information gathered by NRA staff to fit different purposes and to frame a different story to the board of directors." It also says that Brewer "effectively silenced NRA staff who uncovered issues needing board of directors attention," and "influenced members of the board" by "selectively withholding information relevant to their decision making."

Rogers, the Brewer partner, dismissed Cummins' statement and said it "may reflect a radical misunderstanding of certain work my firm performed." Cotton, the NRA's first vice president, said, "I am not aware of any concerns that would preclude the firm from representing the NRA, period."

APP000916

Cummins concluded her statement by saying that, while still an NRA employee, she tried to sound an alarm regarding the NRA's legal representation, writing, "I raised concerns about Bill Brewer internally and with the board audit committee." According to Cummins, she was ignored.

**Update, Aug. 2, 2019:** Three of the four NRA board members who called for an independent review of the law firm billings of outside counsel William A. Brewer III resigned on Aug. 1, two days after this article was published. In their resignation letter, they said their "confidence in the NRA's leadership has been shattered."

APP000917

# EXHIBIT A-57

# How a hard-charging lawyer helped fuel a civil war inside the NRA

**wp** washingtonpost.com/politics/how-a-hard-charging-lawyer-helped-fuel-a-civil-war-inside-the-

By Carol D. Leonnig and Tom Hamburger

The ugly public fight has led to an exodus of high-level officials and warring accusations of financial impropriety. At the center of the fray is Brewer, a brash lawyer who has drawn ethics complaints and has a reputation for escalating disputes into pricey legal battles.

Several NRA veterans accuse Brewer of instigating an almost Shakespearean feud to protect his bottom line and growing influence. According to internal board correspondence, his small law firm billed $24 million in fees in 13 months — leading top NRA board members to demand early this year that the organization stop paying until they could review the bills.

AD

But LaPierre sided with Brewer, saying that the lawyer's bills were appropriate and that he was bringing long-overdue scrutiny to the nonprofit group's workings.

"The NRA has full confidence in Bill Brewer and his law firm," LaPierre said in a statement. "The firm is creative, dedicated, and effective — and is helping to protect and advance the NRA's interests in multiple venues."

Brewer said he came under attack once he began examining lucrative financial deals inside the organization that he thought posed conflicts of interest. His firm said those complaining about its bills have a misinformed view of its work but declined to elaborate.

"Questions regarding our fees — which arose almost one year after we were hired — came only after people, who long supported our firm's work, themselves came under scrutiny for their conduct," Brewer said in a wide-ranging interview last week, sitting in his suite on the 59th floor of his Dallas office with soaring views of the city.

AD

Today, after helping to jettison NRA president Oliver North, rival lawyers and other key NRA lieutenants, Brewer counsels LaPierre on some of the group's most important decisions, including legal strategy, management and public relations, said multiple people familiar with his role.

Those who have been pushed out shared a common concern: that Brewer ran up excessive fees and then cemented his role by overstating claims about the organization's legal

jeopardy and the potential conflicts of his critics, according to the people and internal documents.

With Brewer's backing, LaPierre this spring turned against Ackerman McQueen, the marketing firm that had been the NRA's image maker for more than three decades — a company run by Brewer's own father-in-law and brother-in-law.

"Mr. Brewer is orchestrating a purge of every person who disagrees with his flawed strategy," Ackerman McQueen said in a statement.

AD

Brewer rejected that. "The truth is, a handful of faithless fiduciaries tried to 'purge' the NRA of its elected leadership by extorting Wayne LaPierre," he said. "They failed."

Brewer, whose eponymous law firm also has an office in New York, has a history of confrontational and high-priced legal fights, according to former employees and lawyers who encountered him in cases and a review of thousands of pages of court records.

Ted Lyon, a personal injury lawyer in Dallas who has battled Brewer in the past, said he was shocked that Brewer had "convinced the NRA that he was some type of star litigator."

In 2016, a Texas judge sanctioned Brewer, finding that he took actions that could have improperly tainted a jury pool. The court found Brewer's attempts "to avoid responsibility and accountability for his conduct to be at the very least unpersuasive and at the worst in bad faith, unprofessional, and unethical," the judge wrote.

AD

Four lawyers' associations filed a friend-of-the-court argument in August in favor of the punishment.

Citing the sanctity of the promise of a fair trial, the legal groups said they "can imagine nothing . . . more poisonous to this ancient ideal than William A. Brewer III's behavior."

Brewer, who has appealed, says his firm represents "our clients ethically but zealously." He said he is disappointed that his peers have lined up against him.

But, he added, "it's not the first time we've stood alone."

## An unusual choice

Brewer, 67, does not have the typical profile of a lawyer for the NRA, one of President Trump's staunchest allies. Campaign filings show that he has donated to numerous Democrats, including Barack Obama, Hillary Clinton and Beto O'Rourke.

APP000919

But in March 2018, the NRA was dealing with a challenge by New York state officials to its Carry Guard insurance, which provides coverage to firearms owners who shoot someone and claim self-defense. The state Financial Services Department found that the NRA had illegally marketed what critics call "murder insurance." Insurers, facing millions in state fines, demand that the organization cover the penalty.

AD

The NRA wanted a lawyer with ties to New York Democrats. Steve Hart, the NRA board's lawyer, enlisted Brewer, according to people familiar with his involvement. Hart did not respond to a request for comment.

When New York officials warned financial institutions and insurers that a relationship with the NRA could harm their corporate reputations and jeopardize public safety, Brewer urged the NRA to sue the state, arguing that state officials were targeting an advocacy group whose views differed from their own.

From there, Brewer pressed to take on other matters, said people familiar with internal discussions. That included the organization's response to a broader threat: At the time, Letitia James, the leading candidate to become the New York state attorney general, was campaigning on a pledge to investigate the NRA's nonprofit status amid reports of financial irregularities.

AD

Brewer said he recommended to LaPierre that he prepare by auditing the group's spending and vendor contracts, including those of Ackerman McQueen, its largest. For 38 years, the Oklahoma City-based advertising agency had served as a powerful adjunct to the NRA, promoting the group's combative, no-compromise stance on gun rights.

The inquiry put him on a collision course with his father-in-law, Angus McQueen, who founded the firm. McQueen — a larger-than-life figure like Brewer, and of his generation— died in July. Brewer said he did not view the matter as a conflict of interest.

Brewer said people within the NRA began raising questions about Ackerman's billing and its hiring of the group's officials, such as North. North had a multimillion-dollar contract to host a series produced by the firm, documents show.

AD

A lawyer for North declined to comment.

The McQueens grew suspicious of Brewer's questions and worried that he sought to take over some of the firm's public relations business, according to people familiar with their views.

In a statement, Ackerman McQueen accused Brewer of "pursuing a personal vendetta against his own family and their business." The firm said it has cooperated with every audit requested by the NRA and never overcharged the group, adding that LaPierre approved all expenses.

The company alleges that Brewer went after Ackerman McQueen "to serve as a distraction from the failure of NRA executives and its board to properly fulfill its oversight duties."

Current NRA officials rejected that, saying the audit was part of a move to increase oversight. Brewer's firm said that the focus on Ackerman was not personal and that the agency stonewalled requests for information. And the firm dismissed as absurd the idea that it was trying to steal the public relations business.

AD

"The NRA pursued documents from several major vendors, not just Ackerman. But Ackerman, singularly, resisted," Sarah Rogers, a partner in the Brewer firm, said in a statement.

The audit set off a bitter legal fight, fracturing the alliance between the NRA and its longtime marketing agency. It also exposed lavish spending by LaPierre that flowed through Ackerman McQueen, such as hundreds of thousands of dollars in charges at a Beverly Hills clothing boutique and on foreign travel, invoices show. The NRA has defended the expenditures as necessary.

## 'Rambo tactics'

Brewer first made a splash in Dallas legal circles in the 1980s, when he co-founded a boutique litigation firm that offered big salaries and imported the brash tactics of Brewer's native New York to Texas.

Bickel & Brewer's hardball methods drew criticism from the traditional Texas bar.

Depositions were drawn out for days, as Brewer's clients claimed they couldn't say for certain what their names were, where they were born or what they owned, records show. Judges complained about overly combative practices that seemed aimed at wearing down the court and opposing counsel.

Fellow lawyers called them "Rambo tactics" — a term Brewer embraced.

APP000921

"We don't believe we should earn our living from being nice to other lawyers," Brewer told the Texas Lawyer in a 1988 article that described his firm as the poster child for "scorched-earth" litigation.

With Brewer and other lawyers deploying such maneuvers, the state bar sought to rein them in, and in 1989, the Texas Supreme Court adopted a new code threatening to penalize lawyers "who perceive that they are retained to win at all costs without regard to fundamental principles of justice."

Friends say Brewer ruffled feathers because he challenged Texas's insular legal industry.

He "would do all that was within the bounds of ethics to advance the cause of his client — and the cause of justice," said John Sexton, a former president of New York University and dean of its law school.

Some clients, too, praised Brewer's approach.

"I've worked with Bill for decades for two reasons: He delivers time and time again, and exemplifies the highest of ethical standards," said Howard Meyers, the head of a global lead manufacturing company that hired Brewer to fend off bondholders in a multibillion-dollar bankruptcy fight.

But some former associates said Brewer sought to maximize fees at the expense of clients.

In interviews, 10 former employees said the Brewer firm pushed lawyers to generate big bills and encouraged "make-work" tasks.

"Bill was an excellent lawyer from a strategy and content standpoint," said one lawyer who left the firm in the 1990s and, like others, spoke on the condition of anonymity out of fear of retribution. But, the lawyer said, "we would do work that I considered clerical work" to meet the billing goals. "You can always find something more to do. It was a lot more expensive for the client."

Michael J. Collins, a partner in Brewer's firm, called that "a misinformed view of the way we manage the firm and its professionals," adding that "all time charged to client matters is scrutinized internally for accuracy, transparency, and value."

Brewer said his fees reflect the value of what he provides clients.

"Frankly, I'm disappointed some don't always see the utility in the way in which we go through the process," he said. "That's generally not the clients."

## Methods under scrutiny

**APP000922**

At times, Brewer's process has led to eye-popping totals.

Over the years, his firm was paid $80 million for a wide variety of matters by the Wyly brothers, Texas entrepreneurs who made billions in computers, energy and retail, according to a family adviser.

When the brothers came under federal investigation for the use of offshore tax havens, Brewer urged them to fight the allegations, even as other wealthy figures settled similar cases by paying negotiated fines, according to people involved in the case and news reports at the time.

The Securities and Exchange Commission ultimately charged the Wylys with fraudulently hiding half a billion dollars.

After the death of Charles Wyly in 2011, the family parted ways with Brewer. The brothers were ordered to pay $198 million for tax fraud and Sam Wyly filed for bankruptcy protection. In 2016, he and his brother's estate were ordered to pay $1.1 billion in back taxes and penalties.

A spokesman for the Wylys declined to comment, citing a pending federal settlement agreement.

Brewer defended his work for the family. "I thought we successfully represented the Wylys," he said. "Some things turned out badly for them after I was no longer in charge."

Brewer's methods also drew scrutiny in a 2014 case in which he represented Titeflex, a pipe manufacturer that had been sued by the family of a young man who died in a house fire.

Texas state Judge Ruben Reyes found that Brewer's firm hired pollsters to conduct a telephone "push poll" that provided misleading information to people involved in the case and could have tainted the trial.

"The Court finds Mr. Brewer's conduct disrespectful to the judicial system," the judge wrote in 2016, adding that it "falls in the category of misconduct which is highly prejudicial and inimical to a fair trial by an impartial jury."

The judge ordered Brewer to attend 10 hours of remedial ethics classes and pay a $130,000 fine.

Brewer and a fellow lawyer who worked on the case said they were conducting a neutral survey to prepare for trial, not a push poll. Brewer's lawyer, citing experts in survey research, argued that Brewer was using a widely accepted litigation tool.

Brewer appealed the decision, which was upheld and increased to $177,000. His second appeal is set to be heard by the Texas Supreme Court next month.

APP000923

"I just think he was wrong," Brewer said of the judge, adding that he is optimistic that the sanction will be reversed.

Titeflex ended up settling the case with the family and homeowners. Internally, company officials complained that Brewer delivered an unsatisfactory outcome while charging steep fees, according to three people familiar with the concerns.

Lyon, who represented the family that sued Titeflex, said Brewer would "send four lawyers to a deposition that one lawyer could easily handle." A Titeflex official and the Brewer firm declined to comment on its fees.

In another case, a Texas court disqualified Brewer from a suit in which he represented an heir to the Texas billionaire H.L. Hunt suing his father, because Brewer was found to have represented the father. Brewer said in court papers that opposing counsel tried to push him out for "tactical" reasons, adding that his work helped resolve the case.

In September 2018, Brewer was reprimanded by a federal judge in Virginia after he did not disclose the Texas court sanction to a federal court in Virginia as he represented the NRA in a lawsuit with an insurance broker.

"These are very serious allegations," U.S. District Judge Liam O'Grady told Brewer before ejecting him from the case. "They're findings of bad faith."

Brewer told The Washington Post that he believed he disclosed what was necessary, noting that the matter is under appeal.

After he was removed, the NRA settled the case for undisclosed terms in November 2018, court records show.

## 'Draining NRA cash'

Late last year, NRA budget officers began warning about staggering legal bills from Brewer's firm, according to people familiar with the communications. Since March 2018, his firm's fees had routinely topped $1.5 million a month, according to internal documents.

In a Feb. 26 letter, North and board vice presidents Richard Childress and Carolyn Meadows told LaPierre that they believed Brewer's retainer agreement was not properly executed and demanded that the NRA cease payments to him until they could discuss the matter.

"We have a fiduciary duty that needs to be urgently addressed, with you and if you wish, Mr. Brewer," the three wrote in their letter, the contents of which were described to The Post.

Brewer moved quickly to demonstrate his value to the organization.

APP000924

In internal presentations, the lawyer warned of impending legal threats that he said he was uniquely equipped to address, according to people familiar with the meetings.

He said the NRA could face significant criminal liability in an ongoing investigation of Russian gun activist Maria Butina, who had cultivated ties to the NRA, the people said, as well as exposure in congressional inquiries into Russian connections to the group.

Brewer, who is not a criminal lawyer, asserted in one March meeting that North could be implicated, according to one of the people.

Federal prosecutors had already told NRA lawyers that the organization and its officers were not under criminal investigation, according to the people familiar with the conversations.

Others familiar with Brewer's presentations said they greatly inflated the legal risk, with one former prosecutor warning other NRA advisers that Brewer was a "charlatan."

Brendan Sullivan, a longtime white-collar defense lawyer representing North, later called Brewer's presentation something "a fifth grader might have put together," according to people who heard his reaction. Sullivan declined to comment.

Brewer declined to address the substance of his meetings, saying they were privileged. But he said he did not think the other NRA lawyers addressed the legal and reputational risks the group faced, adding that they were "assuming away all of the problems that needed to be confronted."

In March, North pushed the NRA to hire an outside auditor to examine Brewer's bills, internal correspondence shows.

But LaPierre emailed Brewer to tell him to ignore the request, according to a message read to The Post.

"My office, not any member of the board, has the authority to hire and oversee legal counsel," the NRA chief wrote in the email. "Your engagement is valid, is vital to the survival of the NRA and is well known to the entire board. Please keep up the good work and disregard this and other missives you may receive."

LaPierre had been warning North to stop inquiring about the legal bills, saying he had a conflict of interest because of his financial relationship with Ackerman McQueen, according to internal documents. But North kept up the pressure. "The Brewer invoices are draining NRA cash at a mindboggling speed," he and Childress wrote in an April letter to NRA officials obtained by The Post.

That month, the fight burst into the open.

APP000925

On April 12, Brewer sued Ackerman McQueen on the NRA's behalf, accusing the firm of concealing how it was spending money under its $40 million contract. The suit also questioned the propriety of North's contract with NRA-TV and Ackerman McQueen, which North said LaPierre had authorized.

Then LaPierre took on North directly. On the eve of the organization's convention in Indianapolis, he publicly released a letter to the board in which he claimed that the NRA president had tried to extort him by threatening to release a "devastating account" of the group's financial status if LaPierre did not resign and drop the suit against Ackerman McQueen. LaPierre urged nominating committee members not to support North for another term, board members told their colleagues.

North was forced to relinquish his post as president. As he did so, he warned that the NRA was in "a clear crisis."

In court filings this summer, the former NRA president said that he was blocked by Brewer when he sought to learn more about the group's finances.

"Each time that North raised concerns about potential financial misconduct and tried to retain professionals to correct any wrongdoing, North's efforts were thwarted by LaPierre and Brewer," his lawyers wrote.

Meadows, North's successor, has defended Brewer in statements issued by his firm, saying her previous concerns have been assuaged.

"Bill and his team operate with openness and transparency," Meadows said in a statement, adding: "I have never worked with an outside law firm that is more on call, attentive and positively in tune to the needs of their client."

The NRA is now locked in legal battles on multiple fronts. Amid the turmoil, seven board members have resigned and some of the group's top strategists and advisers have been pushed out, including Christopher Cox, an NRA lobbyist whom LaPierre long described as his heir apparent. The NRA chief has accused Cox of conspiring with North, a charge Cox denies.

Last month brought a new defenestration — this time of lawyers. LaPierre announced that the NRA was severing relations with Charles Cooper, its longtime Second Amendment defender. Michael Volkov, its outside lawyer who had been handling the Russia investigation, also resigned.

In a statement released by Brewer's firm, the NRA chief accused the lawyers of being part of the conspiracy against him.

9/10

APP000926

Cooper, who had represented the NRA for the past three decades, said he had always been loyal to the group, "not to any individual officers or directors of the organization." Volkov declined to comment.

Meanwhile, the New York attorney general has issued subpoenas seeking records of LaPierre's jet-setting lifestyle, including his efforts to buy a $6 million mansion with NRA money, and has sought information about why some of his spending was kept a secret from the NRA board, according to people familiar with the requests.

Meadows said in a statement that the NRA has offered to cooperate with the inquiry and called the claims of misspending "baseless allegations."

In late August, New York investigators spent a day interviewing North. Among their questions, according to people familiar with the matter, were queries about Brewer's fees and growing role in the NRA.

Beth Reinhard, Anu Narayanswamy and Alice Crites contributed to this report

APP000927

# EXHIBIT A-58

# In the Matter of:

## NRA
v.
## Akerman McQueen

# Hearing

August 28, 2019



Phone: 703-837-0076
Fax: 703-837-8118
Toll Free: 877-837-0077

1010 Cameron Street
Alexandria, VA 22310
transcript@casamo.com

```
 1   COMMONWEALTH OF VIRGINIA

 2   IN THE ALEXANDRIA CIRCUIT COURT

 3   -------------------------------------

 4   NATIONAL RIFLE ASSOCIATION OF AMERICA,

 5                          Plaintiff,

 6            -vs-              Case Nos. CL 19001757
                                              and
 7                                        CL 19002067

 8   ACKERMAN MCQUEEN, INC.

 9   and

10   MERCURY GROUP, INC.

11                          Defendants.

12   -------------------------------------

13                  HEARING in the above-entitled matter,

14              held in Alexandria Circuit Court in

15              Alexandria, Virginia, on August 28, 2019,

16              before the HON. NOLAN DAWKINS, Presiding

17              Circuit Court Judge.

18

19

20

21   Reported by:

22   Jacqueline N. Hagen
```

```
 1                    A P P E A R A N C E S

 2

 3   ON BEHALF OF PLAINTIFF:

 4          BRIGLIA HUNDLEY, P.C.
                 1921 Gallows Road
 5               Suite 750
                 Tysons Corner, Virginia 22182
 6          BY:  JAMES W. HUNDLEY, Esq.
                 jhundley@brigliahundley.com
 7               (703) 883-0204
            AND: ROBERT H. COX, Esq.
 8               rcox@brigliahundley.com
                 (703) 883-0880
 9
            BREWER ATTORNEYS & COUNSELORS
10               1717 Main Street
                 Suite 5900
11               Dallas, Texas 75201
            BY:   MICHAEL J. COLLINS, Esq.
12               mjc@brewerattorneys.com
                 (214) 653-4875
13
     ON BEHALF OF DEFENDANT:
14
            SCHERTLER & ONORATO, LLP
15               901 New York Avenue, N.W.
                 Suite 500
16               Washington, DC 20001
            BY:  DAVID DICKIESON, Esq.
17               ddickieson@schertlerlaw.com
            AND: JOSEPH A. GONZÁLEZ, Esq.
18

19

20

21

22
```

```
 1              P R O C E E D I N G S

 2              (Whereupon the proceedings commenced at

 3         11:20 a.m.)

 4              MR. HUNDLEY:  Good morning, your Honor.

 5              THE COURT:  Good morning.

 6              MR. HUNDLEY:  Jim Hundley on behalf of

 7         the National Rifle Association of America.

 8         This is Michael Collins.

 9              MR. DICKIESON:  Good morning, your

10         Honor.  David Dickieson and Jose Gonzalez on

11         behalf of Ackerman McQueen and the Mercury

12         Group.

13              THE COURT:  All right.  Let's see.

14              MR. HUNDLEY:  Your Honor, there's --

15         there's one that there's an Agreed Order,

16         motion to amend our answers.  I just hand up

17         the Agreed Order to resolve that matter.

18              THE COURT:  All right.

19              MR. HUNDLEY:  Your Honor, I call -- your

20         law clerk had suggested that the Court might

21         find useful a transcript from the earlier pro

22         hac vice motion that's cited in the
```

 1          pleadings.  The Court had -- so I'm happy to

 2          hand that up to the law clerk so the Court

 3          can refer to that, if you desire.

 4              THE COURT:  Yes, sir.

 5              MR. DICKIESON:  Good morning, your

 6          Honor.  I think it might be useful for me to

 7          provide an update from the last time we were

 8          here back in June.  As you will recall that

 9          we asked for a preliminary injunction based

10          on the fact that the NRA had not posted a $3

11          million letter of credit to allow us to --

12          allow Ackerman McQueen to continue doing

13          work, and we asked for a preliminary

14          injunction to force that so that people

15          wouldn't have to be laid off and terminated

16          because of this contract.  The Court heard

17          arguments but said it didn't have sufficient

18          time to go through all of the evidence, and

19          we set it for a special, full-day hearing,

20          the quickest date possible.  And what

21          happened was that in that intervening time,

22          the NRA stopped paying invoices and

```
 1          terminated a contract in an immediate

 2          fashion, and that forced 50 people to be

 3          furloughed and laid off and terminated.  The

 4          Alexandria office is being closed, and the --

 5          the whole point for the preliminary

 6          injunction hearing was no longer relevant

 7          because you could not preserve the status quo

 8          at that point.  And so we canceled the

 9          hearing on the preliminary injunction, and

10          we've been moving forward with discovery in

11          the case ever since then.

12              The NRA has taken three depositions in

13          three different states.  But now, one of the

14          things they're seeking to do is block

15          Ackerman McQueen from taking any depositions

16          of NRA members.  So there are two remaining

17          matters, apart from the consent motion:

18          AMC's motion for protective order seeking to

19          protect information from being disclosed to a

20          competitor that resides within the firm of --

21          of Brewer that Mr. Collins is -- is a partner

22          at.  And then there's NRA's motion for
```

```
1          protective order and to quash the -- the --

2          the depositions that are being asked for by

3          AMC.

4               Now, let me suggest the following

5          organization for moving forward with what is

6          going to be a 25-minute hearing.  First, we

7          -- I think we should deal with the NRA's

8          motion that involves a simple interpretation

9          of Rule 4.1(c) and Rule 4.1(d), and -- and

10         the application of those two subsections of

11         Rule 4.1.  I think that's a fairly

12         straightforward issue, and we can deal with

13         that fairly quickly.  Then -- then we can

14         deal with AMC's motion that involves a unique

15         and novel issue that's not covered by any

16         rule:  Whether or not a law firm that has a

17         public relations unit that is in direct

18         competition with my client should have access

19         to the confidential data that's been turned

20         over in discovery.

21              We think there's no rule that covers

22         that because most law firms don't do a public
```

1          relations work and don't compete against the

2          firms that they're suing.  So we think that's

3          going to take some -- a little more time, and

4          we would ask that the Court follow that

5          organization.

6               So I'll turn it over to Mr. Hundley on

7          the -- his motion for protective order on the

8          depositions.

9               THE COURT:  Yes, sir.

10               MR. HUNDLEY:  That's fine, your Honor.

11          I think the two motions, really, are just

12          sort of intertwined, and -- and at the heart

13          of both motions is our dispute over what an

14          appropriate protective order should look like

15          in this case.  We filed the motion to quash

16          or stay the depositions that they noticed of

17          the NRA party -- party witnesses because we

18          were unable to reach an agreement with them

19          about the protective order and the production

20          of discovery that would -- that we've already

21          asked for.

22               So their objection to our motion to --

 1        what we're really asking the Court to do is

 2        simply order the discovery in a way that's

 3        fair and equitable.  This isn't a situation

 4        which, you know -- 4.1(d)(1) is what they

 5        cite.  The purpose of that rule is to prevent

 6        the parties from simply refusing to produce

 7        discovery, and that freezes the litigation,

 8        and that's not what's happening here at all,

 9        your Honor.

10            The discovery is ongoing in this case.

11        The NRA has produced voluminous discovery and

12        is continuing to produce discovery.  We've

13        taken three depositions already.  We've got

14        other non-party depositions that are -- that

15        -- working with the witnesses to schedule,

16        and those can go forward.

17            And -- and this is the crucial point

18        that they sort of ignore in their objection

19        to our motion -- we have propounded discovery

20        to them, two separate rounds of it, which

21        they've not complied with.  One of them is

22        past due.  The first one is past due.  The

1          second round, we discussed with them an

2          extension and agreed to an extension.  They

3          refuse to produce any documents, highly

4          classified or otherwise, until this

5          protective order is resolved.  And we've had

6          negotiations with them, and we've suggested,

7          "Well, why can't you just produce the

8          non-highly classified documents?"  And

9          they've declined to enter into those types of

10         accommodations.

11              So we would submit to the Court -- what

12         we're asking the Court to do -- and we think

13         it's fair.  It's reasonable.  It's equitable

14         -- regarding these depositions is to first

15         require AMC to comply with the discovery that

16         we propounded.  This isn't a situation where

17         we're saying, "We don't want to take any

18         depositions until we finish our written

19         discovery and get it to you."  That's not

20         what happened.  It's -- it's out there, and

21         it's due.

22              And so we simply are asking the Court to

1           say, "You produce your discovery," and then

2           -- and they've indicated they can do that

3           quickly.  Once there's a protective order in

4           place, they can do that quickly, within, I

5           think, a week is what Mr. Dickieson

6           indicated.  And within a week after that,

7           we're perfectly willing to let these

8           depositions go forward.  But we submit we're

9           entitled to this discovery that we've asked

10          for, and is due to be produced, before these

11          depositions go forward.  We're not -- we

12          don't think that request to the Court

13          violates the rule that they cited, 4.1(d)(1).

14              THE COURT:  It sounds like we don't have

15          a problem; is that correct?  We don't have a

16          problem; is that correct?

17              MR. HUNDLEY:  Well, the problem is we --

18              THE COURT:  The problem is they haven't

19          complied with the discovery.  That's - that's

20          what I heard.

21              MR. HUNDLEY:  And the reason they're not

22          complying with discovery is because there's

```
 1            not a protective order in place, and they're

 2            refusing to do it until there is a protective

 3            order in place.  So we're here today, and we

 4            said, "Okay, let's get the protective order

 5            issue resolved."  So we're here today to do

 6            that.

 7                 THE COURT:  Why don't we pass the

 8            protective order?  Let's move on.

 9                 MR. HUNDLEY:  All right.

10                 THE COURT:  Let's pass the protective

11            order.  What do you want?

12                 MR. HUNDLEY:  For the protective order?

13                 THE COURT:  Yes.

14                 MR. HUNDLEY:  We certainly have no

15            objection to a general protective order that

16            protects highly confidential information in

17            litigation.  We're -- all the parties are

18            very familiar with those.  They're asking for

19            -- it's paragraph 7.3 of the proposed

20            protective order they're submitted to us.

21            They're asking for a protective order that

22            does something very unique and onerous.
```

```
 1          They're asking that the NRA's co-counsel, Mr.

 2          Collins, as well as all of the legal

 3          professionals that work at the Brewer Law

 4          Firm, be excluded from looking at that

 5          discovery.  And they based that argument

 6          simply on bald, unsupported statements that

 7          can't be supported, that the Brewer Law Firm

 8          is a competitor of AMC.

 9              The Brewer Law Firm is not a competitor

10          of AMC, and they don't present any evidence

11          to show that it is.  They -- they cite to

12          their own arguments in the motion, the pro

13          hac vice motion previously that the Court

14          overruled.  Their objection's been granted.

15          That's not evidence that -- that the Brewer

16          Law Firm is a competitor.  They cite to

17          quotes by William Brewer, the -- the attorney

18          -- one of the attorneys in the Brewer Law

19          Firm, that he made to the media on behalf of

20          the NRA, but they don't say what those are.

21          In any event, they're hearsay.  That's not

22          evidence.
```

 1              For a protective order of this level of

 2         restriction -- and it's really just a

 3         back-door disqualification of the Brewer Law

 4         Firm, that the Court's already refused to

 5         grant -- they granted the pro hac vice

 6         motion.  The Court's granted the pro hac vice

 7         motion.  They bear the heavy burden of

 8         showing good cause, and they simply -- they

 9         haven't done it because they can't do it.

10         The evidence, quite frankly, would be that --

11         the evidence quite frankly is that while the

12         Brewer Law Firm has a public relations unit

13         that employs four people, those four people

14         provide public relations services for clients

15         who are involved in litigation that the

16         Brewer Law Firm is handling.

17              The Brewer Law Firm is a boutique

18         litigation firm that handles high-profile

19         cases where the media is often involved, and

20         so they do have a public relations unit that

21         deals solely with litigation matters.

22         They're a law firm.  AMC is not a law firm.

1          AMC does not do litigation work.  AMC is a

2          marketing firm.  The Brewer Law Firm does not

3          engage in any of the type of work that the --

4          that a marketing and advertising firm like

5          AMC engages in.  It's apples to oranges.

6              The -- AMC, on behalf of the NRA, was

7          running NRA TV.  They were representing

8          employees of the NRA, such as Oliver North,

9          in their media capacity, helping them to get

10         on TV to arrange -- to arrange those types of

11         engagements for them.  The Brewer Law Firm

12         doesn't do any of that.  They're not equipped

13         to do any of that.  I mean, the fact that

14         AMC, as a result of the termination of their

15         relationship with the NRA, had to hire 50

16         employees proves that the Brewer Law Firm is

17         not a competitor for this business.  There's

18         no way that the four people in the public

19         relations firm of the Brewer Law Firm, the

20         public relations unit of the Brewer Law Firm,

21         could do the work of 50 people who are

22         working exclusively for the NRA.  And they

 1              haven't presented any evidence to show that

 2              they're doing any of that work.  They're not.

 3              They're not a competitor.

 4                   Your Honor, even if they were arguably a

 5              competitor, which they're not, it's, in fact

 6              -- it wasn't the NRA that terminated the

 7              contract.  It was AMC that terminated the

 8              contract with the NRA.  And so once they did

 9              that, they lost any standing to complain

10              about anybody being a competitor for the

11              NRA's business because they've turned it

12              down.  They're turned it away.  They've

13              terminated the relationship.  So they really

14              don't have any standing to make that

15              argument, to begin with.

16                   THE COURT:  Tell me what is -- what is

17              Mr. Collins' relationship with the public

18              relations portion of the -- of the -- of the

19              -- the Brewer law -- the Brewer Firm?

20                   MR. HUNDLEY:  Mr. Collins is here to

21              answer that question, but I think it's fair

22              to say he has --he doesn't work with the

APP000943

1          public relations.

2                MR. COLLINS:  Right.  The public

3          relations is part -- is not a separate

4          entity.

5                THE COURT:  It is not?

6                MR. COLLINS:  No.  We are a general

7          partnership.  I am one of two equity

8          partners.  Then we have four people, you

9          know, public relations, crisis management,

10         for the legal matters we're handling on

11         behalf of clients.  They assist us with --

12         there needs to be a press release that we

13         need to send out about what happened in court

14         yesterday related to litigation, not anything

15         to do with a new product for a client,

16         anything about the scope of what AMC was

17         doing.

18              It's all in connection with litigation

19         that our clients are involved in, and we're

20         representing them in the that, and I say,

21         generally, we are just a litigation firm.  We

22         don't have a real estate department,

```
 1              corporate department, tax department.  We are

 2              a litigation firm.  And part of litigation is

 3              dealing with statements made out in the world

 4              about that litigation that have to be made at

 5              some time in response, a lot of times, to

 6              what was said by the other side.

 7                   THE COURT:  Okay.  In your role as the

 8              litigation portion of the firm, would you be

 9              -- would you have access to proprietary

10              information that relates to -- or

11              confidential information that relates to the

12              other party in this case?

13                   MR. COLLINS:  I would have it in my role

14              as an attorney, yes.

15                   THE COURT:  Attorney, yes.  That's

16              right.

17                   MR. COLLINS:  Yes, absolutely I would

18              have access to it, just like they would have

19              of our clients.  So yes, I certainly would,

20              and that's where our point is:  The attorney

21              who's been admitted to practice on behalf of

22              his client is entitled to access to
```

```
 1              everything.

 2                   THE COURT:  And would that information

 3              be shared with the public relations portion

 4              of that -- of the Brewer Firm?

 5                   MR. COLLINS:  In connection with the

 6              litigation itself, I don't think so, your

 7              Honor.  No.  Now, if they --

 8                   MR. HUNDLEY:  Your Honor -- I'm sorry.

 9                   MR. COLLINS:  No, please.

10                   MR. HUNDLEY:  I just want to -- we've

11              proposed a protective order that would

12              prohibit the public relations unit employees

13              from having access to any of the discovery

14              designated "highly confidential."  We don't

15              object to that.

16                   THE COURT:  What's the problem with

17              that?

18                   MR. HUNDLEY:  They won't accept it.

19                   MR. DICKIESON:  Your -- your Honor, the

20              person who is most involved in public

21              relations, the person who is most dealing

22              with the press, is William Brewer.  William
```

1        Brewer is an attorney.  He's not one of the

2        four people in the unit.  The unit reports to

3        him.  He is the one who is the leading face.

4            We -- the last time we were here, the

5        Court spoke about creating a wall, and -- and

6        the wall -- walling off Mr. Collins from the

7        other members of his firm, particularly Mr.

8        Brewer, is something that we could -- we

9        could live with.  That's something that they

10        would not accept.  Even though Mr. Brewer is

11        not admitted pro hac vice in this case, and

12        even though Mr. Brewer cannot be admitted pro

13        hac vice in this case based on sanctions he

14        received in the Eastern District of Virginia,

15        that we are not -- we are not ready to share

16        information with Mr. Brewer that he can then

17        exploit.

18            And for a little background, your Honor,

19        Mr. Brewer is the brother-in-law of the CEO

20        of Ackerman McQueen and the son-in-law of the

21        recently deceased -- and this is another

22        development since the last hearing.  Angus

1        McQueen died in the last month, and he was

2        one of the -- he was the co-CEO of the

3        business.  He is the father-in-law of Mr.

4        Brewer.  So there's a Shakespearean tragedy

5        that's taking place here of a family dispute,

6        and the Ackerman McQueen people do not want

7        to share their -- their confidential,

8        proprietary information with the

9        brother-in-law who was building up a public

10        relations business.  He's written an article

11        that we submitted to the Court in a prior

12        pleading about how you use public relations

13        in litigation, and he is, as -- as Mr.

14        Collins admitted in his statement just a

15        second ago, they do crisis management.

16            That's exactly what Ackerman McQueen

17        does.  In the wake of -- of a mass shooting,

18        it's Mr. Brewer out front doing crisis

19        management for NRA, and he's billing them

20        what Ackerman McQueen used to bill for crisis

21        management in the wake of a mass shooting.

22        And so to say that they don't compete or that

1          because they're too small they can't compete,

2          they can still chew away at pieces, and

3          they're trying to hire people to take on new

4          roles, and the NRA is trying to hire away

5          Ackerman McQueen people to do the work that

6          Ackerman McQueen used to do under contract.

7               So there is active competition between

8          these parties.  There's crisis management

9          that overlaps between the parties, and we

10         think it's vital that this Court recognize

11         that Mr. Brewer is the head of the public

12         relations unit.  He's not just an attorney.

13         And then they've got these four people that

14         do something entirely different.  So that's

15         why we wouldn't agree to just walling off the

16         four people in the public relations unit.

17              MR. COLLINS:  When I used the words

18         "crisis management," it's not general crisis

19         management.  We don't represent any third

20         party, any client, unrelated to the specific

21         litigation we're working on with them, and

22         all it is is -- for example, your Honor, if a

| | |
|---|---|
| 1 | decision comes out -- I think there's press |
| 2 | here today in this courtroom.  No problem |
| 3 | with that; it's an open courtroom.  But |
| 4 | they're only dealing with those type of |
| 5 | issues in connection with the litigation and |
| 6 | just limited to issues arising directly in |
| 7 | the litigation:  "What happened here today? |
| 8 | A reporter called and has a question.  What |
| 9 | happened today?"  So something like attorneys |
| 10 | would answer themselves. |
| 11 | MR. DICKIESON:  If I could respond, your |
| 12 | Honor.  We've asked in our discovery requests |
| 13 | for information about what Brewer Law Firm is |
| 14 | doing for the NRA, and they've refused to |
| 15 | answer those questions.  And so how can we |
| 16 | present evidence of what they're doing when |
| 17 | they refuse to give us that information? |
| 18 | So one of the things that -- that we are |
| 19 | trying to do is we are trying to take |
| 20 | discovery.  They've taken their three |
| 21 | depositions, three different states.  We |
| 22 | haven't been able to take any depositions. |

```
 1              There was supposed to be a deposition

 2              yesterday that, because of this motions

 3              hearing, we were not allowed to take.  So we

 4              are being blocked from discovery.

 5                   Rule 4.1(d) makes it very clear that

 6              they cannot dictate the order that we take

 7              discovery, and so we are trying to move

 8              forward, take the discovery that we're

 9              entitled to take, and they can't say -- well

10              first of all, I want the Court to recognize

11              we are not late on any discovery.  We have

12              complied timely with all the discovery

13              requests, and we have answered the request to

14              produce documents.  We've answered the

15              interrogatories, and we -- in our request to

16              produce document responses, we have said

17              objections, and then we will produce

18              documents, notwithstanding such objections,

19              as soon as the protective order is entered.

20                   We're not late on any of that, and we

21              filed a motion for protective order, and --

22              and that's -- as soon as that's decided, we
```

1             are ready to start rolling out documents by

2             this Friday, and -- and that's something that

3             I think is ignored when they say that we are

4             somehow deficient in our discovery responses.

5                 But because we have the right to ask NRA

6             employees what's in their mind, not "What did

7             you learn when you looked at AMC's

8             documents?" -- that's not what we're going to

9             ask them in -- in discovery depositions.

10            We're going to say, "What did you know?  And

11            when did you know it?  And why did you take

12            the action you took?"  Not, "What did you

13            learn from looking at the documents we

14            produced last week?"

15                So they can't dictate what we're going

16            to do in the order of our discovery, and

17            that's what Rule 4.1(d)(1) states.  It's very

18            clear.  Rule 4.1(c) is also clear, and it

19            says they can get their protective order only

20            if they show oppression and -- and things

21            that they don't show when they say, "We can't

22            prepare our NRA employees for their

 1          depositions."  That's not oppression.  That's

 2          not undue expense that 4.1(c) is involving.

 3               So, therefore, we think that we're

 4          entitled to move forward with our depositions

 5          without regard to their not having received

 6          documents they're going to receive anyway.

 7          But they're trying to dictate how we go about

 8          our discovery, and they can't do that.

 9               THE COURT:  Yes, sir.

10               MR. HUNDLEY:  I guess just to -- that,

11          again, I mean, if there's a violation of

12          4.1(d), it's being caused by AMC.  Even Mr.

13          Dickieson just admitted their response was,

14          "We're not going to respond -- we're not

15          going to produce until we have the protective

16          order."  We're entitled to our discovery.

17          We're just asking the Court to -- to -- to

18          allow us to get the discovery we've asked for

19          before committing these depositions to go

20          forward.  I mean, Mr. Dickieson says, "We

21          don't want to ask them any questions."  We

22          don't know that.  We don't know what -- we

```
 1              have no idea what highly confidential

 2              discovery is that -- that they're seeking

 3              this protection order for.  They haven't

 4              given us any hint as to what it might be.

 5                  So we're just simply asking the Court to

 6              equitably order the discovery in this case in

 7              a way that isn't going to affect the trial

 8              schedule, isn't going to do anything.  It's

 9              not going to slow it down.  So, again, I

10              think that request is very reasonable.

11                  As -- as far as the protective order

12              that they're proposing, your Honor, they're

13              not -- they're seeking to -- the motion seeks

14              to exclude Mr. Collins, who's been admitted

15              as pro hac vice in this case.  He's an

16              officer of the Court, therefore, and a

17              licensed member of the Texas Bar and the New

18              York Bar in good standing.  And they're

19              seeking to exclude all of the legal

20              professionals at the Brewer Law Firm who can

21              be -- who will be working on this case.  The

22              NRA is entitled to have the full services of
```

1            that law firm.  That's their counsel.

2            They're entitled to that.  There's nothing

3            before the Court, other than their sort of

4            unfounded suspicions, that these lawyers and

5            these legal professionals will not abide by

6            the protective order of this Court.

7                 They will be bound by it.  They will not

8            be able to use any highly confidential

9            discovery in any manner that does not comport

10           lawfully with the Court's order.  If they do,

11           this Court will know what to do about it.

12           But there's no evidence before the Court that

13           they won't do that, and that includes Mr.

14           Brewer.  There is not an ethical requirement

15           that he be walled off.  This is not -- this

16           is not a Rule 1.10 professional conduct

17           violation where he's got a conflict because

18           he's previously represented AMC and now

19           they're adverse.  It's not that situation.

20                This is a situation under Rule 3.7

21           where, potentially, if he were an advocate in

22           this case, he might be a witness for the NRA.

```
 1              There's actually no conflict because the

 2              conflict under Rule 3.7 only arises when the

 3              testimony of the lawyer would be adverse to

 4              his client, and it won't -- it wouldn't be,

 5              and it will not be in this case.

 6                   Nevertheless, out of an abundance of

 7              caution, we have not sought Mr. Brewer's pro

 8              hac vice admission in this case, and so we

 9              fully, above and beyond the requirements of

10              -- of the law, actually dealt with the

11              ethical concerns that he potentially being a

12              witness have raised.  Even if there were a

13              conflict, even if his testimony was

14              potentially adverse to the NRA, which it's

15              not, but even if it were, the ethical

16              considerations are still clear.  He can

17              participate in preparing the case.  He simply

18              can't be an advocate at trial.  And we've

19              cited US v. Perry, as well as other cases,

20              which -- which make that distinction.

21                   This is not the case where he has --

22              where he's got a clear conflict under
```

1        Rule 1.10, where, first, it'd have to be the

2        consent of all parties that he -- that --

3        that the law firm remain in the case, and

4        then the attorney with the conflict has to be

5        walled off.  This is a different situation

6        and the ethical concerns are different, and

7        we've properly addressed them.  So there's no

8        reason why he can't help prepare the case

9        under the constraints --

10            THE COURT:  Even -- even if he's privy

11        to certain proprietary information that he

12        gained as a result of his prior

13        representation, can he -- can he -- can he

14        participate in preparing the case and use

15        information that he gained as his role

16        representing the NRA or anyone else?

17            MR. HUNDLEY:  He's never represented

18        AMC.  So he doesn't have any of their

19        proprietary information I -- to the best of

20        my knowledge --

21            THE COURT:  Is that correct?  All right.

22        Okay.

```
 1              MR. HUNDLEY:  So the question is --
 2              THE COURT:  But he is --
 3              MR. HUNDLEY:  -- if they produce it, can
 4         he be trusted to only use it in accordance
 5         with this Court's protective order?
 6              THE COURT:  That's correct.
 7              MR. HUNDLEY:  And that -- there's
 8         absolutely no evidence before the Court that
 9         he can't be.
10              THE COURT:  All right.
11              MR. HUNDLEY:  There's not.
12              THE COURT:  All right.  So now, as I
13         understand it, we have competing protective
14         orders; is that correct?  Or we only have one
15         which has a clause in it that walls off the
16         Brewer Firm?
17              MR. HUNDLEY:  We're simply -- yeah,
18         we're asking the Court today to craft
19         paragraph 7.3, yeah.  I think at this point,
20         there's one other issue.  They've asked that
21         the NRA -- that -- that we designate, on
22         behalf of the NRA, one corporate
```

| | |
|---|---|
| 1 | representative who would be allowed to look |
| 2 | at the highly confidential information.  What |
| 3 | we would ask the Court to do is, one, allow |
| 4 | the NRA's general counsel, John Frazier, |
| 5 | who's here today, to look at the highly |
| 6 | confidential information as well as one |
| 7 | designated corporate representative.  And I |
| 8 | don't believe they object to that. |
| 9 | THE COURT:  Any objection to that? |
| 10 | MR. DICKIESON:  No, your Honor.  The |
| 11 | only -- the only request we would have is |
| 12 | that any discovery designated by the NRA as |
| 13 | highly confidential be treated in the same |
| 14 | manner by the AMC -- by AMC, that they only |
| 15 | -- that they designate one person on their |
| 16 | side to look at it.  So we're just asking for |
| 17 | an equitable order that applies equally to |
| 18 | both people. |
| 19 | THE COURT:  Any objection to that? |
| 20 | MR. DICKIESON:  Yes, your Honor, because |
| 21 | it's not a parallel situation.  We're -- our |
| 22 | concern is not -- is not the lawyer as |

 1          witness provision that -- that Mr. Hundley is

 2          talking about.  Our objection is that this is

 3          -- Mr. Brewer's law firm is a direct

 4          competitor with AMC.  There's no one at AMC

 5          who is a direct competitor with anyone at the

 6          NRA.  So there's no reason to limit AMC's

 7          staff, who has been working with the NRA for

 8          decades, from looking at documents that are

 9          turned over in discovery that aid us in the

10          preparation of our case.

11               So there's -- there's no competitive

12          advantage that -- that AMC gets by looking at

13          those documents.  While, on the other hand,

14          there is a competitive advantage that the

15          Brewer Law Firm gets if -- if they happen to

16          -- to get that information and our -- our

17          intent in limiting it to one or two designees

18          of the -- of the NRA is because Mr. Brewer is

19          so involved with the NRA's representation

20          that he is going to have discussions with all

21          these people at the NRA.  There's been press

22          reports about how Mr. Brewer is actually

1        dictating to the accounting staff about how

2        to -- how to take actions and who's going to

3        be paid first and who's going to be paid

4        second.

5             So we're very concerned about multiple

6        people at the NRA and their communications

7        with the Brewer Law Firm where they have no

8        concerns about the AMC that has been doing

9        NRA business for decades and knows a lot of

10       the confidential information there to begin

11       with.

12            THE COURT:  So what you're suggesting is

13       limited number of representatives from NRA

14       but unlimited with regard to Ackerman

15       McQueen?

16            MR. DICKIESON:  Well, not necessarily

17       unlimited, but everybody who's going to be

18       looking at it is going to be -- have to be

19       advised to be aware of -- and they can even

20       send a form that they have to sign saying

21       that "We're being allowed to look at these

22       documents and we don't -- we won't disclose

 1              to anyone outside of the -- the privilege of

 2              this protective order," if they want to do it

 3              that way --

 4                   THE COURT:  Any objection to that?

 5                   MR. DICKIESON:  -- but --

 6                   MR. HUNDLEY:  I'm not -- I'm not sure I

 7              fully grasp what he's -- what he's

 8              suggesting.  I'm sorry, your Honor.  I just

 9              think the -- I think whatever order we craft

10              should be equitable --

11                   THE COURT:  It sounds like -- it sounds

12              like what you're suggesting is a separate

13              document every time someone looks at a

14              document from the opposing counsel or the

15              other party; is that correct?

16                   MR. DICKIESON:  Right.  There's a

17              standard practice in cases with a lot of

18              confidential information where you've got

19              different people reviewing it that these

20              people have to sign something saying that

21              they won't disclose it, or they're -- they'll

22              abide by the terms of the protective order.

```
 1              MR. HUNDLEY:  Yes, they have to.  Anyone

 2        who looks at highly confidential discovery in

 3        this case has to be bound by the protective

 4        order, and they can sign an affirmation that

 5        they've reviewed it and --

 6              THE COURT:  What's your objection?

 7              MR. HUNDLEY:  To that?  None.

 8              THE COURT:  None.  No objection.

 9              MR. HUNDLEY:  But it goes both ways.  I

10        mean, anyone at Ackerman McQueen who -- who

11        looks at highly confidential information

12        that's designated by the NRA would have to do

13        the same.  They're objecting to that.  I

14        don't quite understand their argument.

15        They're saying that we're not -- the NRA and

16        AMC don't compete with each other.  So I

17        don't understand why the competition between

18        the parties is an issue.

19              We just want the -- the whole purpose of

20        limiting the access to the highly

21        confidential information is you're balancing

22        the need to protect that information versus
```

1          the need to prepare your case.  And so if

2          we're going to limit our ability to prepare

3          the case in order to protect their

4          confidential information, they should do the

5          same, and that's all we're saying.

6              THE COURT:  Why shouldn't you do the

7          same?  And I think, from what I understand

8          he's saying, is that you don't think you have

9          to because you already have that information

10         based on your prior -- your prior

11         relationship with the NRA.  Is that what

12         you're saying?

13             MR. DICKIESON:  Yes, and the fact that

14         they're --

15             THE COURT:  So why is there a problem?

16             MR. DICKIESON:  There's no competitive

17         advantage that we get by looking at it

18         whereas if -- if -- we've already seen that

19         the Brewer Law Firm and the NRA have used

20         another client, another major client of

21         Ackerman McQueen, the Chickasaw Nation, and

22         used a document by one of the directors of

```
 1              the Chickasaw Nation in the case, and we --
 2              we're afraid that they will go and they'll
 3              get into our documents, and they'll look more
 4              -- for more information about the Chickasaw
 5              Nation and start to take competitive --
 6              anti-competitive action to take that client
 7              away from us.  We're very concerned about
 8              that.  We're not trying to take clients away
 9              from the NRA.  There's -- there's nothing
10              we're trying to do there.  So it's not a
11              parallel situation.
12                  THE COURT:  Let's -- let's cut to the
13              point that what's -- what will apply with
14              regard to confidential information with
15              regard to NRA and Ackerman McQueen will be --
16              so whatever that he -- whatever your -- your
17              client or representatives from Ackerman
18              McQueen view as confidential, they'll have --
19              they will have to sign a document protecting
20              confidentiality, as well as the NRA.  So
21              both.
22                  MR. DICKIESON:  That's fine, your Honor.
```

APP000965

```
 1                    THE COURT:  All right.

 2                    MR. DICKIESON:  And what about the

 3              limitations on the Brewer Law Firm?

 4                    MR. HUNDLEY:  That's -- that's the real

 5              issue, I think, as to who at the Brewer Law

 6              Firm should be allowed to view the highly --

 7              the highly confidential discovery.  Our

 8              position is we'll wall off from the public

 9              relations unit.  We don't object to that, but

10              any lawyer or legal professional at the

11              Brewer Law Firm -- there's no evidence that

12              those professionals will not abide by this

13              Court's order.  There's no evidence of that,

14              and so they should be allowed to look at it

15              and be bound by it and be required to follow

16              it, and that's -- that's our position.

17                    We should -- it shouldn't just be -- I

18              mean, not only should it be Mr. Collins,

19              who's been admitted in this case, but his

20              associate, his legal assistant.  We don't

21              know what the discovery is going to look

22              like.  It could be tremendously voluminous.
```

1          It may require a lot of people to organize it

2          and review it.  They'll all be bound by that

3          order.

4               MR. DICKIESON:  Your Honor, we don't

5          have any problem with a wall between Mr.

6          Bennett and the rest of the firm, and in that

7          time, Mr. Bennett's side of the wall, his

8          associate, and his legal assistant.  What

9          we're concerned about is the public relations

10         unit that is run by Mr. Brewer, and that --

11         that's in a different office.  That's in New

12         York, and Mr. Brewer is in New York.  I don't

13         know where all the public relations people

14         are.

15              THE COURT:  Does Mr. Brewer practice

16         law?

17              MR. HUNDLEY:  He does.

18              THE COURT:  And will Mr. Brewer have any

19         involvement with this case?

20              MR. HUNDLEY:  He does.

21              MR. DICKIESON:  And they -- they admit

22         that in their -- their response, that he is

```
 1              actually involved in the strategy
 2              discussions.  He's the main driving force in
 3              this case, your Honor, but he's not pro hac
 4              vice because he's got problems with other
 5              courts where he has been sanctioned by a
 6              court in Texas, and he was denied pro hac
 7              vice status by the Eastern District of
 8              Virginia.  So that's why he's not here in
 9              this case now.
10                   MR. HUNDLEY:  That's actually not why
11              he's not here, your Honor.  He's not here out
12              of our ethical concern that he might be a
13              witness, and so rather than move him pro hac
14              vice and -- and deal with that, we took the
15              prudent course of not admitting him pro hac
16              vice, but he still is ethically allowed to
17              participate in the preparation of this case.
18              He's not a member of the trial team.  So his
19              involvement is less, but he's allowed to
20              participate.
21                   THE COURT:  But why?  Tell me why?  Why?
22              Why should he?
```

```
 1              MR. HUNDLEY:  Because he's been working

 2         with the NRA for 30 years, I think.  I'm

 3         sorry, but -- but he has -- he's intimately

 4         familiar with the NRA and the workings -- in

 5         their dealing with Ackerman McQueen.

 6              MR. DICKIESON:  He's been working with

 7         them for about a year and a half, is my

 8         understanding, and he knows the -- Ackerman

 9         McQueen because, as I say, he's the

10         brother-in-law of the CEO and the son-in-law

11         of the former co-CEO of Ackerman McQueen, and

12         his -- his wife -- well, his wife is the

13         daughter and sister of them.  So he is in a

14         family dispute trying to take over the

15         Ackerman McQueen PR business, and he's right

16         in the thick of things.  He's had all of

17         sorts of problems with the -- the Eastern

18         District of Virginia, which they have not

19         denied, in sanction and that was up held in

20         Texas for $173,000 for unethical behavior

21         there.

22              THE COURT:  We will agree that Mr.
```

```
 1              Collins is a very competent attorney in this

 2              matter.  Would you not?

 3                   MR. COLLINS:  I hope so.

 4                   THE COURT:  I hope so.  I hope so, and

 5              I'm going to -- I'm going to grant the

 6              protective order with regard to Mr. Brewer,

 7              and if you believe that, at some point, that

 8              that has an impact on your ability to

 9              litigate this case, then you can come back to

10              this Court and ask the Court to reconsider.

11              But, at this stage, Mr. Brewer will be walled

12              off from any -- any involvement in the case.

13                   MR. DICKIESON:  And the PR unit, as

14              well, your Honor?

15                   THE COURT:  And the PR unit.  That's

16              correct.

17                   MR. HUNDLEY:  And well, just so we're

18              clear, he'll be walled off from the highly

19              confidential --

20                   THE COURT:  That's correct, highly

21              confidential.  That's right.  Absolutely,

22              absolutely.
```

```
 1              MR. HUNDLEY:  Discovery, that's
 2         designated by --
 3              THE COURT:  That's right.  Which then
 4         leads us to -- the next issue is -- with
 5         regard to the ongoing discovery, we have
 6         depositions that have -- have to be held; is
 7         that correct?
 8              MR. DICKIESON:  Yes, your Honor.
 9              THE COURT:  And with regard to this
10         protective order, that revolves that issue.
11         Does it not?
12              MR. DICKIESON:  We were supposed to have
13         a deposition tomorrow.
14              THE COURT:  Yeah.
15              MR. DICKIESON:  I don't think that
16         anyone is going to be ready for that because
17         we had to wait for the results of today, but
18         we -- we don't want any restriction with them
19         dictating when we can take a deposition of
20         whom, and that's what Rule 1 -- 4.1(d)
21         says --
22              THE COURT:  Let's -- let's make that
```

APP000971

1          clear.  There won't be any restrictions.

2          You're going to follow the rules, and I don't

3          think that you're going to have any

4          discretion in terms of what you would -- the

5          rules say what they say.

6               MR. DICKIESON:  Thank you, your Honor.

7               THE COURT:  All right.  Yes, sir?

8               MR. HUNDLEY:  Well, again, your Honor, I

9          mean, we're asking the Court to enter an

10          order requiring them to -- now that they've

11          got their protective order --

12               THE COURT:  They have to -- well, no

13          question.  You've got to -- you've got to

14          provide your discovery.  From what I

15          understand, you've not provided anything yet;

16          is that correct?

17               MR. DICKIESON:  No, your Honor.  We --

18          we've fully responded to interrogatories.  We

19          -- we've responded to the document request,

20          but we said we're not turning things over

21          that are confidential until the protective

22          order is in place.

```
 1                THE COURT:  Well, that's been resolved.

 2                MR. HUNDLEY:  Right.

 3                MR. DICKIESON:  And so we've already --

 4           my understanding is as of Friday, we're going

 5           to start the rolling process of turning

 6           things over, and we'll have a lot of

 7           documents for them to look at.

 8                THE COURT:  They will comply.  Do you

 9           want a deadline, Counsel?

10                MR. DICKIESON:  Your Honor, I --

11                MR. HUNDLEY:  If they can comply within

12           one week, we can begin scheduling the

13           depositions they're seeking the week after

14           that.

15                MR. DICKIESON:  Your Honor, I would -- I

16           would object.  That's a -- that's a subject

17           for motion to compel, to put a deadline on

18           us.  I think we're acting in good faith.

19           We've not been late with anything, and -- and

20           I think we're going to continue to be acting

21           in accordance with the rules, but I don't

22           think we should be -- have a motion to compel
```

```
 1              decided on the basis of no briefs and -- and

 2              nothing -- nothing for us to argue on.

 3                   THE COURT:  Yes, sir.

 4                   MR. HUNDLEY:  Well, your Honor, we

 5              didn't file -- we didn't with file a motion

 6              to compel because, one, I know the Court

 7              greatly disfavors those.  And the issue

 8              holding up the discovery, as I understood

 9              it --

10                   THE COURT:  Is the protective order.

11                   MR. HUNDLEY:  -- was the protective

12              order.

13                   THE COURT:  And that --

14                   MR. HUNDLEY:  So with that -- so we were

15              simply waiting for that to be resolved.  My

16              understanding was they could then produce the

17              discovery very quickly.  We're simply asking

18              for the Court to give us a chance to see that

19              discovery before these party depositions take

20              place so that we're properly prepared, and I

21              think we're entitled to ask the Court too.

22              It's equitable.  We've propounded the
```

1           discovery, and -- and we've litigated the

2           issues, and so we should have that benefit

3           before these witnesses take place.  We're not

4           violating Rule 4.1(d) by doing that, by

5           making that request to this Court.

6                THE COURT:  So when do you think you

7           would be prepared to provide the discovery?

8                MR. DICKIESON:  They've asked for a

9           massive amount of documents.  We're going to

10          start rolling production of it.  My

11          understanding is this Friday, there's going

12          to be, you know, in excess of 1,500

13          documents, 1,500 documents provided, and --

14          and there's going to be discovery all the way

15          in the next few months.  The trial is not

16          until April.  Documents are going to be

17          discovered and found, and it's a process.  I

18          don't want to have an order compelling us to

19          do anything when there's been no motion to

20          compel, and there's no reason for a motion to

21          compel because we're not late.

22               THE COURT:  But you have an ongoing

Hearing                                        8/28/2019

```
 1          obligation to provide discovery.  So once you

 2          get started, then anything else that comes up

 3          than you simply need to provide the

 4          discovery.  That's -- that's pretty simple.

 5          Is it not?

 6               MR. DICKIESON:  Yes, it is, but this is

 7          -- this is a huge business, and they've got

 8          to look at every cranny.  They're finding

 9          documents.  They're turning it over as they

10          find them, but there's a lot of documents

11          they've requested.  And so to put a timeline

12          that we have to have all of our documents

13          within a week, I don't think that's going to

14          be workable.

15               THE COURT:  I think that's unfair to say

16          "all of the documents."  I'm not going to

17          have all the documents.  The discovery will

18          begin within 30 days, and it will be an

19          ongoing obligation to continue discovery as

20          deemed appropriate.

21               MR. DICKIESON:  Discovery has already

22          begun.  We don't need a 30-day window.
```

 1              THE COURT:  Okay.  Well, that's --

 2          that's -- 10 days.

 3              MR. DICKIESON:  We're turning over

 4          documents as they are available.  We have to

 5          have them marked as confidential and things

 6          like that.  That's the process that's between

 7          now and Friday, but we will -- we just -- our

 8          point is that this is not a motion to compel.

 9          They can't compel us to produce things on

10          this -- on this hearing.

11              THE COURT:  You're correct.

12              MR. DICKIESON:  And so I don't want an

13          order saying we -- we got to do something as

14          a result of this hearing.

15              MR. HUNDLEY:  Your Honor, the issue is,

16          I mean, we're asking the Court to tell -- to

17          -- to -- well, what we're really asking the

18          Court to do is to set the deposition schedule

19          for the four witnesses that they've noticed

20          at this point.  One was -- one was noticed

21          for yesterday.  One was noticed for tomorrow.

22          Mr. Dickieson agrees that's just not doable,

Hearing                                           8/28/2019

```
 1              but there are two for next week, Wayne --

 2              Wayne LaPierre and one other individual whose

 3              name escapes me at the moment.  They're not

 4              available next week, right?  They're going to

 5              be in Alaska for the International Rifle

 6              Association.  They'll be preparing -- they

 7              have a -- they'll be preparing for the

 8              National Rifle Association conference, which

 9              is the following week in Alaska.

10                   THE COURT:  So when will they be

11              available?

12                   MR. COLLINS:  Your Honor, we can give

13              them dates.

14                   THE COURT:  Say again?

15                   MR. COLLINS:  We can get them dates

16              probably a couple of weeks right after that,

17              and we'll -- we will check and we'll get back

18              to them.

19                   THE COURT:  Okay.  Is that agreeable?

20                   MR. DICKIESON:  One caveat, your Honor,

21              and that is that we know that the -- with

22              respect to Wayne LaPierre's deposition,
```

```
 1              they're going to try their best to postpone

 2              and postpone and postpone him.  This Notice

 3              of Deposition has been out there for three

 4              weeks, and we haven't heard anything that's

 5              he's not available.  This is the first we've

 6              heard that, and -- and so I think that what's

 7              going to happen is that there's going to be a

 8              number of reasons -- and they haven't -- they

 9              haven't mentioned that they haven't turned

10              over the documents.  They were talking about

11              rolling production into January of next year

12              for their document production.

13                   And -- and so we're in the same

14              situation.  These are issues outside of the

15              motions of -- we just want -- we just want to

16              make sure they're not dictating to us when we

17              schedule our depositions.  And I appreciate

18              your Honor's help trying to get a schedule in

19              a couple of weeks, but I don't know if that's

20              going to happen, but we want to move forward

21              with the September 5th date for Mr.

22              LaPierre's deposition.
```

1          THE COURT:  And he's unavailable because

2       he's at a conference; is that correct?

3          MR. COLLINS:  It's the Board of

4       Directors meeting the following week.  So he

5       spends the week beforehand getting ready for

6       it to -- I guess if we got some documents on

7       Friday, we're not going to get others.  So we

8       still couldn't properly prepare, but we'll

9       have them out there in a couple of weeks, and

10      what we'll agree to, your Honor --

11         THE COURT:  So tell me when he will be

12      available for a deposition?

13         MR. COLLINS:  I can check, your Honor,

14      right afterwards, but, let's say, certainly

15      in the next -- end of September, early

16      October.

17         THE COURT:  No.  Let's -- let's do --

18      he's got a Board meeting on the 5th?  Did you

19      say the 5th of September?

20         MR. COLLINS:  No.

21         MR. HUNDLEY:  At the Court's indulgence.

22         (Whereupon the parties spoke briefly

 1          among themselves.)

 2               MR. HUNDLEY:  Your Honor, it's the --

 3          the conference will be, I believe, the 11th

 4          to the 14th of September.  My understanding

 5          is that he could be available the week of the

 6          23rd.

 7               THE COURT:  Any objection to the 23rd?

 8               MR. DICKIESON:  It sounds like he's

 9          available on the 5th, your Honor.  The whole

10          notion he's got to go to Alaska to prepare

11          for a conference for a week before doesn't

12          sound -- and they haven't given us notice of

13          that in the prior three weeks.

14               MR. HUNDLEY:  I mean, we don't have Mr.

15          LaPierre here to confirm with him his

16          availability, either.  So he -- but --

17               MR. DICKIESON:  My -- my colleague says

18          we'll -- we'll accept the week of the 23rd.

19               THE COURT:  Week of the 23rd.  Done.

20          Yes, sir.  What's next?

21               MR. DICKIESON:  I think that's it, your

22          Honor.

```
 1              MR. HUNDLEY:  Well, there are three

 2         other individuals that you noticed.  I mean,

 3         can we just work -- negotiate with -- amongst

 4         ourselves to confer and pick dates for them?

 5              THE COURT:  I think you all can solve

 6         that.

 7              MR. DICKIESON:  Yes.

 8              THE COURT:  You can -- and we have the

 9         order?  Or have you prepared the order?  Or

10         are we --

11              MR. DICKIESON:  We'll have -- we'll have

12         to go back to the office and prepare it to

13         resubmit it, your Honor.

14              THE COURT:  Thank you.  Thank you.

15              MR. HUNDLEY:  Thank you, your Honor.

16

17              (Whereupon the proceedings concluded at

18         12:03 p.m.)

19

20

21

22
```

```
 1

 2                     REPORTER CERTIFICATE

 3

 4        I, JACQUELINE N. HAGEN, Court Reporter and Notary

 5   Public, certify that the foregoing is a true and correct

 6   transcript of my shorthand notes so taken;

 7        I further certify that I am not a relative or

 8   employee of any attorney or of any of the parties not

 9   financially interested in this action.

10

11                    _____

12                    Jacqueline N. Hagen

13

14   Dated:  September 4, 2019

15

16

17

18

19

20

21

22
```

# EXHIBIT A-59

# THE GUNSLINGERS
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**D** **dmagazine.com**/publications/d-magazine/1998/april/the-gunslingers

ALTHOUGH LOTS OF LAWYERS ARE WAXING SLEEK ON THE steady diet of corruption scandai at the Dallas Public Schools, the firm of Bickel & Brewer so far has tast-ed nothing but ashes. Not only did John Bickel and Bill Brewer reportedly lose hundreds of thousands l of dollars representing Matthew Harden, but their offer of a campaign contribution to school board member Don Venable, allegedly in return for his help in Harden's lawsuit against board president Kathleen Leos, has attracted the district attorney's unwanted interest in their operations.

"If you're a Rambo firm looking for big bucks, you're going to lake big risks," observes Dallas criminal lawyer Frank Jackson. "Apparently in this case that didn't work out."

Bill Brewer and John Bickel went into practice in the early '80s with the intention of practicing "New York-style law," says Brewer, which he defines as "truth neutral"-it doesn't matter whether clients are right or wrong, only that the lawyers aggressively pursue their interests. In the years since, they've became known for scorched earth tactics that leave opponents reeling-and for their look-alike styles. Bickel and Brewer not only look alike, they are about the same height (short), dress in simitar styles, and drive matching Porsche Carreras.

In the Harden case, Bickel & Brewer filed a blitz attack of six lawsuits-against two private detective firms; Yvonne Gonzalez; Kathleen Leos, Jose Plata, and Robert Hinkle; the school board and the district as a whole-amending their petitions frequently with titillating language, hiring transcribers to churn out deposition transcripts to give to the press the next day, and putting a public relations company on retainer to keep the case in the headlines.

In October, Bickel & Brewer offered to settle the case against Gonzalez for $750,000. Gonzalez's camp insisted that if the board agreed, certain conditions should be attached: that the money would be paid out over time; Harden would sign an affidavit saying he had not committed fraud or theft; and that he would relinquish the money if he was indicted or received immunity for his testimony against others. Bickel & Brewer and the board came to no agreement. Ultimately, Harden's lawyers secured Gonzalez's resignation, but no money changed hands.

Four months and thousands of their own dollars later, they settled the Leos and school district lawsuits for$600,000, without the onerous restrictions. Harden had to agree to cooperate fully with the investigations, not to file any more litigation against DISD. and not to re-apply for a job at DISD.

**APP000984**

In [he Leos lawsuits, Bickel & Brewer represented Harden on a contingency basis, so they will probably receive some portion of the settlement-but far less than they put into it.

Their mistake may have been to mis-measure their client.

Bill Brewer says that after Harden came to his Highland Park home in late July to first discuss his legal options, Brewer was certain of Harden's rectitude. "If he got into a credibility fight with someone," Brewer says, "he'd win."

But Bickel & Brewer declined to make Harden available for depositions, in which his testimony would have been sworn. His lawyers say that's because confidential documents had surfaced in the case, and it would have been unfair for Harden to be questioned under oath about them.

Others assumed that Harden had a lot that he didn't care to discuss under a possible penalty of perjury if he lied. "He would have been caught no matter what version of the story he told," said Mike Gruber, who represented school board president Kathleen Leos in Harden's $10 million damage suit against her.

A second miscue was to target the unflappable Leos. Harden's suits, which alleged, among other acts, both slander and invasion of privacy, demeaned Leos as "an apparent stooge 'for the powers that be ' " and accused her of a lead role in a corrupt conspiracy to get rid of their client, "a beacon of service" to the school district.

If the charges were meant to rattle her, they didn't work. Though with few resources of her own-"her house would fit in Matthew's living room" said sister board member Lynda McDow-Leos was unruffled by the frontal assault on her integrity.

"It's just politics." she often said with a smile.

Instead of folding, Leos went to Gruber, whose investigation on her behalf generated unwelcome news for Harden and his lawyers. Gruber uncovered information about cash payments by Harden to his builder. Gruber also included in the case record the allegation that Harden and his friend, Michael Henderson, had each received a S1 million kickback in connection with a DISD contract, which the press picked up.

A source close to the mediation says thai Bickel & Brewer had racked up SI million in expenses and billable hours. They are likely to recover only a portion of the $600,000 Harden received last month in return for dropping all litigation and resigning his position.

In the Venable matter, Don Venable says he refused their offer of financial support but accepted the help of five junior lawyers who showed up in their Lexuses in Pleasant Grove to work for him on election day. (Bickel says that any suggestion that they offered Venable help in return for his vote is "ridiculous" and that the lawyers in his office simply care about

APP000985

good government.) And, after his election, Venable did vote with the majority to remove Leos from her position as board president. Venable now says that he believes Leos did nothing wrong, but he voted to remove her as president because the board was "ungovernable" and out of control.

Now, with the Harden lawsuits settled, Bickel & Brewer can only wait and see how seriously the DA questions their dealings with Venable.



Newsletter

Keep me up to date on the latest happenings and all that *D Magazine* has to offer.

APP000986

# EXHIBIT A-60



# Rambo Justice

**MARK DONALD** | **MARCH 19, 1998** | **4:00AM**

This is where the plot was hatched--or so the story goes. Not in some smoke-filled room at City Hall where politicos broker deals that placate rather than please, not on the top floor of some downtown bank building where law firms send buttoned-down lawyers to fight for the status quo, not at some breakfast club where "business leaders" peddle influence like smoked fish at a deli.

The first legal salvos of the Revolution on Ross--the coup d'etat that toppled a school district superintendent, some of her cabinet, and a school trustee president, that pitted blacks against browns in dueling conspiracy theories, that scandalized a school district in a manner never thought possible, even for DISD--were fired from a shabby South Dallas legal clinic.

The law office looks drab, sitting as it does in a strip center at the intersection of Martin Luther King Boulevard and Atlanta, neighboring Black Jack Pizza, the Four Torch Club, and Graham's Barber Shop No. 6, INC. A brown corrugated metal awning, dented in spots, frames what is little more than a concrete and brick slab otherwise known as "The Storefront."

Inside its glass doors, the furniture is sparse: general issue receptionist desk, office chairs, and sofa--hand-me-downs all. The phone rings occasionally, not much activity really, just a pleasant woman named Natalie fielding calls for lawyers who have yet to arrive. Her litany is the same: We don't do criminal cases, family law cases, no traffic tickets either. The civil cases that we do take are handled on a pro bono basis, according to the client's ability to pay. Accepted for representation are evictions, employment discrimination, the kinds of petty business disputes minorities must often forgo because the money is gone, no attorney wants to handle it, or the case is a dog.

**APP000987**

Case 3:19-cv-02074-G-BK   Document 80   Filed 03/30/20   Page 382 of 486   PageID 4763

At first blush, there is no hint to the power of this place, no suggestion that this is anything but a cluster of poverty lawyers dispensing social justice to the black community at bargain prices. But carefully arrayed on a narrow wooden coffee table are a handful of marketing brochures instructing would-be clients about the lawyers with whom they are dealing: Bickel & Brewer Storefront, PLLC is the newest innovation of Bickel & Brewer, the most aggressive high-powered litigation firm in the world.

This is the same Bickel and Brewer who were once branded the bad boys of the Dallas Bar--high-priced, high-profile Rambo lawyers whose scorched-earth litigation style is credited by some as forever changing the way the Dallas legal establishment practices law. Driven by the boundless energy and raw chutzpah of its co-founder Bill Brewer, the "litigation boutique" became a pariah within the local legal community, accused of pushing the ethical envelope, running up the costs of litigation, and destroying the gentility of the Dallas Bar. But among the Fortune 500 clients they sought to woo, the firm built a solid reputation as a passionate advocate that would zealously represent their rights--willing to "leave no stone unturned," as they claimed, and do whatever it took to win--and win big.

So in 1995, when Bickel & Brewer decided to open up its storefront operation, catering to the city's disenfranchised, many--including the city's disenfranchised-- were skeptical. Were their motives as altruistic as they claimed? Was this a noble attempt to try to make a difference, acknowledging the law's obligation to guarantee justice for all? Had the callous Rambo boys, notorious for charging huge fees for big-ticket corporate clients, suddenly grown a heart?

Even their harshest critics were willing to give Bickel and Brewer the benefit of the doubt, allowing their good work in this African-American community to speak for itself. But in August 1997, when the Storefront began to represent Matthew Harden, DISD's chief financial officer, against then-Superintendent Yvonne Gonzalez, in one of the most incendiary cases of political intrigue this city has ever witnessed, their motives as well as their tactics were called into question.

APP000988

Case 3:19-cv-02074-G-BK   Document 80   Filed 03/30/20   Page 383 of 486   PageID 4764

Why would the Bickel & Brewer Storefront take on Matthew Harden for free--a man who earned more than $117,000 a year? Was the Storefront more a front for the political ambitions of Bill Brewer and John Bickel than it was a public service catering to the needs of the poor? Did the firm's Rambo approach to representing Harden help fuel a vicious racial conflict between blacks and Latinos? Was the threat of hardball litigation against Yvonne Gonzalez, Kathleen Leos, and others merely a ruse to obfuscate the truth about who was really to blame for DISD's financial debacle? Or were Bickel and Brewer just doing what they had always done, practicing law and life on the edge, zealously representing their client, fighting the good fight the only way they knew how: to the death?

It doesn't matter who you are--there's a seduction that goes on with Bill Brewer. He draws you in, pumps you up, convinces you with a confidence beyond certainty that together, you can destroy the enemy. That is, if he ever shows up. It's a passive-aggressive dance he does, making appointments, canceling them, apologizing through weary secretaries that he had to fly to New York on business or that he's at the mercy of a visitation schedule from hell. He clearly gives you the feeling that his time is more valuable than yours, particularly after he tells you that he bills out at $500 an hour, one of the highest rates of any lawyer in the city.

It's hard to feel neutral about Bill Brewer. A former lawyer with his firm who requested that he not be identified puts it succinctly: "He's a fascinating guy who at one time I loved dearly and hated strongly--and pretty much in the same moment." Embodying many contradictions, he is a family man with three failed marriages, although he acknowledges only two of them; a Republican who harbors Democratic values; a man obsessed with appearances who acts as if it doesn't matter what others think; a not-so-great Gatsby who craves status and wealth and importance and then provokes the very people who can give it to him.

APP000989

Case 3:19-cv-02074-G-BK   Document 80   Filed 03/30/20   Page 384 of 486   PageID 4765

"He was a middle-class kid living near a rich community, and by virtue of his talent and good looks and drive, got access to the country-club way of life," says a former legal associate. "On the one hand, he wants it more than anyone else. On the other hand, he is repulsed by it."

As I drive up to his Highland Park home, his green Jaguar sits in his circular driveway, and I have no reason to think he won't be home as scheduled--except that he is not. After a 30-minute wait, I try his door again, and this time, he answers. His oldest son is sick, he tells me--an ear infection--and he had to pick him up from school. He seems every bit the concerned parent--his kids mean everything to him, his family everything--if he could just get past his divorce, which has lasted almost as long as his marriage.

And how are my sons, he asks me, parent-to-parent. Is the little one sleeping? The big one still giving you headaches?

I know his game. He wants to disarm me emotionally, lure me to his side so I'll connect with his humanity, soften any criticism I might harbor against him. The guy is nothing if not PR savvy.

At 46, William A. Brewer III is as dramatic as he is charismatic--a onetime theater major at St. John's University, he knows how to milk a moment. He looks as if he is living life in a Ralph Lauren ad: Weejuns without socks, chinos without a belt, a navy blazer without a tie. His red-blonde hair, fair skin, and chiseled features conjure up visions of a less-rugged Robert Redford, a comparison he is loath to deny. His voice is Sly Stallone-deep--irrefutable evidence of a New York accent that marks him geographically as well as emotionally. He has built his life and legal career on being a downright chauvinist about his hometown.

APP000990

Born in Long Island to a large Irish-Italian family, he heaps weighty superlatives on all things New York. The Catholic school he attended was "first-class throughout." He studied debate under a "master," drama under the "god of the voice-over." During law school (Union College in Albany, a "great pedestrian law school"), he clerked for a judge who was "not only the best, but also the most honest judge" in the state. In 1978, after a successful law-school career that included summers being a lifeguard at an exclusive country club and an advanced law degree at New York University, he got a job with the phone company, trying to fend off the breakup of the Ma Bell monopoly. "I went to the largest corporation in the history of the world to the largest legal department in the history of the world to work on the largest cases in the history of the world." It was here that he gained his thirst for the big case.

Brewer is vague about why he moved to Dallas in 1981, but court records show he received a divorce here about the same time. He got a job with Kolodey and Thomas, then a small Dallas firm that was working on a big case. He joined the firm's trial team, which successfully represented clothing manufacturer Farah Jeans in a case that would take on major Texas banks and become a landmark decision in lender liability law.

Though still a baby lawyer, he had grand visions of developing the firm into a commercial litigation powerhouse--but its named partner, Tom Thomas, didn't share his views. In 1982, Brewer either quit or got fired--depending on who's telling the story. A second job at the firm of Glast and Miller resulted in a similar fate after only a few months. "Since I left Bell, I was adamant that I didn't want to take small cases, losers, or just be fixing traffic tickets for some corporate client's son," says Brewer. "I was becoming almost strident in my articulation of how we needed to build a firm...on the back of zealous advocacy."

**APP000991**

Although Brewer toyed with returning to New York, he had made definite inroads among the Dallas social set. "When I came to Dallas, I networked at the Park Cities right away," he says. "It was obvious to me that the deb scene was the real focus of Dallas society, and I made it a point to become an escort." Although his Republican credentials were flimsy at best, he also got involved in the Dallas County Young Republicans. "Look, when you go to a community, you figure out how to join that community...when I was living in New York, I figured out how to network the East Side...When I was at NYU, I joined the Jewish Defense League."

The way Bill Brewer networked his way to John Bickel has become law-firm legend. Recently fired and at a party prior to the annual heart ball fundraiser, Brewer met a woman who was proudly sporting a large tennis trophy and "mouthing off," he says, about her tennis prowess. "I took up the challenge for all men and said I could beat her left-handed." Some verbal sparring ensued, and she told Brewer that he reminded her of another "egomaniacal red-headed" lawyer, John Bickel, who was forming his own firm and enlisting new attorneys.

Slightly older than Brewer and married, Bickel seemed more of a by-the-book lawyer. A West Point graduate and decorated army officer, he exuded a credibility that Brewer admits he sometimes lacks. Bickel's credibility "is not rooted in ego and flash and persona...in a trial lawyer, that's a gift," Brewer says. Bickel had been a litigator with an old-guard Dallas law firm, Thompson & Knight, but was driven to start his own practice by a somewhat irreverent entrepreneurial streak that he could no longer deny. "When I was at West Point, I had a couple of unauthorized money-making endeavors," Bickel remembers fondly. "I sold women's panties with 'Beat Navy' on the back. It went over like gangbusters."

They seemed the perfect complement to each other: Brewer, the outspoken dreamer with enough hubris to take on the world; Bickel, the plainspoken pragmatist with enough gumption to take on Brewer. From their first lunch together, they hit it off and became each other's most ardent fans. Some say Bickel was mesmerized by Brewer, a Rasputin who turned the head of a stand-up guy. But others found them uncannily similar. "John had a grand plan, but Bill had bigger dreams," says former law partner Hal Marshall. "John just bought into Bill's dreams."

APP000992

Case 3:19-cv-02074-G-BK   Document 80   Filed 03/30/20   Page 387 of 486   PageID 4768

At first, the pair were part of a larger start-up firm, but after a few months, they broke away, wanting to build the firm at a faster pace than the other partners. In March 1984, they formed Bickel & Brewer--not a full-service law firm with corporate planners and real estate lawyers, but a litigation boutique, the first of its kind in the city--run by a couple of Young Turks who stood ready to make some money and raise some hell.

Bickel and Brewer hit the ground running, leasing an entire floor at the Trammell Crow Center--two lawyers renting 25,000 square feet with little more than a fistful of moxie. A line of credit from Texas Commerce Bank helped some, but building a law firm overnight was no easy task. In the hunt for the big case, they declared themselves the "baddest" lawyers in town, brazenly telling any corporate bigwig who would listen that they were not going to do things the old way--their aggressive approach would be different from the white-gloves civility of the "good ol' boy" downtown legal establishment. "New York firms did not respect their cousins in the Dallas bar," says Brewer. "They thought they were lazy; they thought they were slothful; they thought they were stupid."

Not surprisingly, their approach didn't endear them to the big downtown firms, who, Brewer claims, blacklisted them for not playing ball, erasing any chance of referrals. "The reputation they are developing, whether deserved or not, is that they're behaving in a fashion that is not the Dallas way," Chip Babcock of the local firm of Jackson, Walker told the American Bar Association Journal in 1989. "Dallas lawyers are gentlemen to each other. These two act like New York lawyers."

High praise, thought Brewer, whose marketing pitch included selling Bickel & Brewer as one of the few "New York-quality" firms in Texas. That meant B&B would stay open 24 hours a day, seven days a week. That meant it would search nationally for its new recruits, ensuring quality by enticing blue-chip law students with salaries that were the highest of any law firm in the country. It also meant adopting a hardboiled, take-no-prisoners litigation style that was antithetical to the way Dallas practiced law.

Brewer, who claims he has always been lucky, found himself in the right place in the late '80s as the S&L crisis turned the city into a hotbed of "big ticket litigation." With real estate prices plummeting, developers turned to litigation to save themselves--or at least buy enough time until the market turned around.

B&B drew fierce criticism for its delaying tactics in these cases--piling on paperwork, wallet-whipping the other side, being obnoxious to opposing counsel, bogging down a case in procedure so it would rarely get heard on the merits. The firm was accused of dumbing down its clients for depositions: In preparation, clients were told to repeat each question to themselves, says one former associate, taking their time before answering. During these pauses, they were to run through a list of preferred responses: yes, no, I don't know, I don't recall. Clients were also told that they had the right to be asked a proper question--nothing vague or ambiguous. B&B lawyers would show them a dictionary, pointing to all the different meanings, for example, that could be attached to the word "do."

Two-day depositions would drag on for two weeks as B&B clients would claim they didn't understand the words "earn," "rely," "where," and "when."

"By the time they got to the deposition, they were reticent robots," says the associate. "Witnesses were told to tell the truth, but we broke down their perception of everyday conversation."

This tactic not only invoked the wrath of several judges, but grabbed the attention of the press, who labeled Bickel and Brewer the Rambo boys, cultivating a mythology around their sharp practices that still lasts to this day: Bill Brewer, getting into a jury box, flirting with a female juror, and causing a mistrial; B&B lawyers coaching their witness to spill coffee on legal documents when things got too heated; Bill Brewer demanding that a deposition be scheduled for 6 a.m., then arriving 30 minutes late. Bickel and Brewer became the poster boys for an aggressive '80s litigation style that was, in truth, sweeping the country as law schools graduated more lawyers than ever before, and the increased competition made the entire profession more cutthroat.

Of course, few in Dallas played it meaner than Bickel & Brewer. Under the ethical battle cry of "zealous advocacy," a Bickel and Brewer lawyer was expected never to ask for an extension or give one, to fight every motion, to turn over every rock. Opposing counsel wants to go on vacation--too bad. He misses a filing deadline-- tough luck. Cutting some slack to a brother lawyer--not this firm. Winning was the only option; losing was not only unacceptable, but could destroy the reputation of the firm.

**APP000994**

Some lawyers refused to get involved in cases if Bickel & Brewer was on the other side. Others felt they had no choice but to play hardball back. "We went through a couple of years of orchestrated assault on this law firm," says Brewer. "Every time I set a deposition, I got noticed for eight at the same time."

The firm became whipping boys for the kind of cultural backlash that made lawyers the butt of jokes. They were referred to as "Bickel and Skewer," "Bicker and Brew." Even U.S. District Judge Jerry Buchmeyer got into the act, taking a shot at the pair when he wrote a skit during Bar None, a 1989 production of the Dallas Bar Association, which contained these lyrics:

When Bickel and Brewer do their thing.
Decent folk catch hell...catch hell
When Bickel and Brewer play lawyer
We all do things that smell.
'Cause the Rambo crap
Is the only thing little minds understand.

Nevertheless, the Rambo boys seemed to bask in the limelight. "The biggest offense would have been if the press had stopped writing about them," says a former B&B associate. "They thrived on it--whether good or bad." Brewer admits he has at different times employed a public relations agency to promote his firm. One of their more flippant self-promotions entailed adopting snakes at the Dallas Zoo as part of its Adopt-a-Pet program. Snakes and lawyers seemed a natural union, particularly with journalists, who pounced on the promotion. The story made the Wall Street Journal and brought new business to the firm. At various times, Motorola, American Petrofina, Prentiss Properties, Trammell Crow, and Budget Rent-a-Car lined up to play hardball.

Yet their mean-streets persona meant nothing if they couldn't deliver the goods. "I liked going in there and kicking people's butts," says former partner Hal Marshall. "But that only happened because we knew the law better, knew the facts better, and had these great strategies going." Rather than take in 100 cases, the firm limited itself to, say, 30, and then worked them to death. Ten lawyers might be assigned to the same case with either Bickel or Brewer vetting each decision.

**APP000995**

Brewer was clearly the rainmaker for the firm, bringing in most of the business himself. "He would make commitments to his clients other lawyers don't like to make," says a former lawyer with the firm. "But Bill Brewer is without fear. He will take any risk. He never gave them guarantees, but he came close." When he delivered on his promise, says the lawyer, "it would invigorate his client to go even further."

Brewer was also the big-picture guy, the chess player who could think three to four moves ahead and come up with solutions--whether inside the courtroom or out. In 1991, when Jerry Jones wanted to sell alcohol in Texas Stadium, he turned to Bickel & Brewer, who, if they hadn't negotiated an out-of-court settlement, stood ready to lobby the legislature to pass a law that would allow the sale of liquor in all stadiums across the state.

"[Bill] has the uncanny ability to think outside the box," says another former associate. "He is also a good writer, very creative." The firm's pleadings were known for their storytelling style; dramatic to the point of being hyperbolic, they grabbed the attention of their intended audience--judge, jury, the press--much more so than the archaic legalese that most lawyers still clung to.

But the idea man was, at times, amazingly undisciplined, and needed an implementer to keep him grounded. He found it in John Bickel, a litigator who had the experience of a hundred trials under his belt, and oozed a genuineness in the courtroom that enabled juries to empathize with his side of the case. Brewer, on the other hand, came across as too slick, too cocky, too New York, particularly for Texas juries.

Bickel & Brewer built on its early successes, opening small satellite offices in New York, Chicago, and Washington, trying to create the appearance of a national law firm almost overnight. But created as well was a corporate culture that was almost as notorious as their litigation tactics. The firm gained a reputation as a sweatshop, working lawyers and secretaries until after midnight for weeks at a stretch. "It was expected that you worked nights and weekends," says one former paralegal. "The pay was great, but since you didn't have a life, there was no time to spend it."

**APP000996**

Case 3:19-cv-02074-G-BK    Document 80    Filed 03/30/20    Page 391 of 486    PageID 4772

Not surprisingly, turnover was incredibly high, particularly during those early years. "The firm was built for attrition," says one legal headhunter. "It is difficult to make partner, and since Bickel and Brewer kept all the clients for themselves, they don't let you build your own practice."

"I used to walk in and say, 'Who quit today?' and someone would throw out a name," says another ex-paralegal. "At least one lawyer a month would leave." Of course if you pay $97,000 for a first-year associate, as the firm did just last year, any one lawyer becomes easily replaceable.

Because of the intensity of the work, the long hours, the addiction to winning, an esprit de corps developed among those who remained. With Brewer being such a preppy, he organized a Bickel & Brewer rowing team and a Bickel & Brewer jogging team. Yet other firm members were just biding their time until their student loans were paid off, or saving their money in what was referred to as their "fuck you fund."

Still, with partner meetings in the Hamptons, firm meetings in Boca Raton, limos waiting at La Guardia to drive associates to the firm's Manhattan apartment, it was a heady affair, working at B&B. Money flowed in from the staggering legal fees that were charged. Bickel and Brewer were among the top-grossing lawyers in the state.

As the pair's wealth accumulated, their relationship grew almost pathological in its symbiosis: They bought matching white Porsches. They dressed alike in the office: suspenders, tie, no jacket, and out of the office, polo shirt, raised collar, khakis. They seemed to prefer their own company, isolating themselves after they moved in 1990 to their posh Bank One offices in an area secretaries referred to as "the kingdom."

**APP000997**

Despite being the firm you love to hate, Bickel & Brewer were masters at cultivating relationships, particularly among the local judiciary. Just last year, the firm was accused of cultivating state District Judge John Marshall a little too closely. In a story first reported in the Dallas Observer, Judge Marshall faced accusations that he had shown partiality toward a B&B client by granting nearly a $1 million summary judgment in its favor. While the case was pending, Marshall was alleged to have accepted a limo ride to B&B's luxury suite at a Cowboys game, and his court clerk received an expensive watch as a graduation present from a B&B paralegal-- admitting as much under oath. Eyebrows were also raised when that same paralegal, Suzanna Proctor, purchased the judge's sailboat (which had been on the market for a year) and allegedly had some private meetings with Marshall about the pending case.

Bickel declares that charges of influence-peddling were "much ado about nothing," that they were motivated by a vindictive lawyer, out to get Bickel over an old "fee dispute." And yet Judge Marshall found it necessary to recuse himself, and a visiting judge vacated the summary judgment. B&B is currently appealing that decision.

Although they never took on political cases of the magnitude of, say, a Matthew Harden, throughout their history, they remained politically active in Republican circles. (They were, however, big boosters of Democrat Ann Richards in her unsuccessful race against George W. Bush.) Bickel and Brewer would personally interview candidates, actively supporting several with $5,000 to $10,000 contributions, playing the role of kingmaker with considerable aplomb. One judge whom they opposed was Adolph Canales, who, in 1994, ran for re-election against ex- B&B partner Hal Marshall. Not only was Canales unpopular with the local bar, he had also ruled against B&B in an important case, and many believed the pair had fielded Hal Marshall in retaliation. "There was a perception out there that I was the Bickel & Brewer candidate," says Marshall. "But it was always my intention to disqualify myself from ruling on their cases." Marshall, however, never got the chance. He lost despite a $20,000 contribution from his old firm.

As the firm grew in power and prestige, it began to rethink its outsider image. Although it was too irreverent to become part of the establishment, there was a noticeable lessening of irascibility. Perhaps it was the enactment of bar association civility creeds that pledged lawyers to refrain from the kinds of bulldog practices that were blamed on attorneys like Bickel and Brewer. Perhaps it was corporate America putting a pencil to hardball litigation and figuring it just wasn't worth it.

Or perhaps it was indicative of a more mature Bill Brewer, who had himself become the target of a hardball divorce that has dragged on for more than two and a half years. Although Brewer refuses to comment about it, court records speak volumes-- seven to be exact--each file bulging with documents that chart a divorce so acrimonious that no family court judge wanted to hear it. Several bailed out, possibly worried that an unfavorable ruling against Brewer could land them an opponent come election time. Brewer's estranged wife, April, is represented by pit bull Chris Weil, an obstreperous cuss whose legal pontifications can go on for hours at a blast. Brewer himself has retained four lawyers, the most notorious of whom is Frank Finn, the aging warrior of Thompson & Knight's litigation team, whose own senior partners pay him deference by referring to him as "Mr. Finn."

Much of the battle has focused on discovery abuse by the attorneys, motions for sanctions, and other Rambo-oriented tactics. Yet to be decided are the merits of a bitter custody dispute that has April Brewer challenging Bill's fitness as a parent and contending that his uncompromising need to win colors his judgment, even where his own children are concerned. In court papers, she maintains that he is unfaithful, that he is not the active father he claims to be; rather, being overly concerned with appearances, he only wants to give the impression of being head of a large family. Why else would he suggest to third wife April, contrary to her wishes, that his second wife become the godmother of their child? Although Bill claimed he was doing it to build the relationship between the children of both his marriages, a court-appointed psychologist found Bill's view of the family "unusual and unrealistic." Citing Bill's other failed marriages and relationships, the psychologist believed that "while Bill clearly loves his children, many of his important life choices seem to belie the family values he expressed."

**APP000999**

Case 3:19-cv-02074-G-BK    Document 80    Filed 03/30/20    Page 394 of 486    PageID 4775

Whatever Bickel and Brewer's reasoning, by 1995, the pair appeared to be reining in their Rambo selves--and showing more heart than mouth.

In November 1995, when white-bread Bickel & Brewer, infamous for its high fees and rowing team, announced it was going into the pro bono business and opening up a storefront in South Dallas, there was one question on the minds of many lawyers: What's in it for them? These guys weren't in the habit of offering free legal advice. There had to be some hidden agenda, some way for them to make a buck out of this somehow.

Or maybe it was another one of their PR ploys, a way to shore up their tattered Rambo image and gain some nice-guy kudos. They got a "thumbs up" from The Dallas Morning News for their efforts; the City Council honored the firm for broadening access to legal representation in South Dallas; and Mayor Ron Kirk, who along with Judge John Marshall participated in opening-day ceremonies at the Storefront, was thrilled by the prospect that its presence might promote more development in the southern sector.

If the legal establishment was skeptical, the black community was openly hostile. "They're in the neighborhood to get money, not to give to the community," Daisy Joe of Black Citizens for Justice, Law and Order told the Dallas Examiner. They had no historic commitment to the area; all their talk about wanting to make a difference and giving back to the community was just a couple of white guys trying to make themselves feel better about making all that money.

APP001000

County Commissioner John Wiley Price was dubious as well, until he invited Bickel and Brewer on his radio show to debate the topic. "There was a feeling," says Brewer, "that we were presumptuous to think our service was needed when there were minority law firms in the southern sector providing legal services already." As usual, the pair acquitted themselves well: The Storefront would not be competing for the bread-and-butter cases of most black lawyers; it was there to fill a need, to handle small-business litigation in a high-powered manner that most lawyers from the neighborhood didn't have the ability to wage. As far as making money off the community, any profits realized by the Storefront (fees were based on the client's ability to pay) would be plowed back into a charitable trust, for the benefit of worthy causes in the minority community. Price came away mollified, even friendly, and Bickel and Brewer began to feel welcome.

After the initial burst of publicity, the Storefront settled in to tend to the needs of its clientele. An occasional do-gooder story might surface in the press: how the Storefront helped 81-year-old Willie Edwards get his insurance check; how the Storefront was suing Seattle Supersonics basketball star Gary Payton for back child support; how the Storefront was sponsoring a Judicial Lecture Series, each month bringing a different judge to speak to the minority community about truth, justice, and the American way. But eventually the publicity and goodwill generated from the opening of the Storefront had pretty much played itself out--that is, until the ascendancy of Dr. Yvonne Gonzalez to superintendent of the Dallas Independent School District in January 1997.

The way Bill Brewer likes to tell it: All last summer, the Storefront had been besieged by calls from black former DISD employees who had been summarily terminated by a Stalinist superintendent who was running the district like a "gulag." Black educators were her targets mostly, denied their jobs without due process, dismissed for some contrivance that seemed to be known in the press almost before it was known to them. Her actions were payback, some suspected, for a conspiracy instigated by black leaders such as John Wiley Price and local NAACP President Lee Alcorn, who she believed had been trying to topple her regime from the day she took office. But anyone who wouldn't support her, says Brewer--whether white, brown, or black--was marked for expulsion.

Taking her on would be no easy task. Gonzalez was a walking billboard for political correctness. The first woman superintendent, the first Hispanic superintendent--she was a cause celebre in the Latino communities, which had always felt locked out of the corridors of DISD power. Enormously charismatic, she immediately became the darling of the media, and her steely-eyed stance on district waste and fraud endeared her to downtown business types with a vested interest in keeping school taxes low. Finally someone would be getting to the bottom of what everyone had suspected for years: The district was rife with corruption. By April 1997, she had called in the FBI and launched her own internal investigations, which would extend to overtime fraud, contract rigging, kickback schemes. Most of the problems stemmed from the district's management division, an area under the control of chief financial officer Matthew Harden. But she also used these investigations as a pretext--Brewer claims--to rid herself of the enemies in her midst.

Dr. Shirley Ison-Newsome, an African-American, had been chief of staff under Gonzalez's predecessor, Chad Woolery, sharing power with Gonzalez, who was then deputy superintendent. There was no love lost between the two women, and Gonzalez, after becoming superintendent, demoted Ison-Newsome twice, busting her down to high school principal last June and ignoring the protests of black leaders and trustees.

Within a week, new allegations arose against Ison-Newsome, suggesting she had deviated from district policy by authorizing that two $3,000 bathrooms be built in and around her offices. Dubbed "Pottygate" by the media, Gonzalez instituted disciplinary proceedings against Ison-Newsome, who later sued the district for defamation.

The Storefront agreed to represent Ison-Newsome pro bono--a mystery to many who believed that a woman making $96,000 a year could afford her own counsel. There seemed a decided political flavoring to the decision--Ison-Newsome was referred by another Storefront client, former Townview Magnet executive principal Ora Lee Watson, who, according to John Bickel, was referred by John Wiley Price.

**APP001002**

In the process of evaluating her case, says Brewer, they "looked at whether there was statistical as well as anecdotal evidence that would support a consistent pattern of discrimination of black people at DISD." Given the large number of blacks at the highest levels of the administration, "it was a hard case to prove." But when Ison-Newsome convinced Harden to sign an affidavit on her behalf, that pattern, Brewer says, began to fall into place.

At 42, Harden is soft-spoken, respectful, almost boyishly innocent--only his closely cropped beard lends authority to his appearance. He is not a political man and recoils at the notion that he is any kind of symbol for African-Americans. When he came to Bill Brewer's home in late August, he told a chilling tale of how he himself had become the target of Yvonne Gonzalez's paranoia. What's more, he had tapes--lots of them--that he had recorded surreptitiously, and that helped substantiate much of what he said.

When Gonzalez was deputy superintendent and married, Harden claims, she made sexual advances toward him, though he refuses to say whether he ever succumbed to them. A source close to Harden, however, confirms that he has detailed two sexual encounters with Gonzalez, the first taking place in a DISD office, the second in a hotel room where he resisted her overtures and left. Gonzalez, through her attorney, declined to be interviewed for this story.

Despite this rejection, Harden continued his working relationship with Gonzalez. But his loyalty was put to the test last July 31, he says, when she asked him to lie for her during a news conference about her office renovations, which had cost $90,000--not the $12,000 she had told the media. Harden says he did as he was asked and said the superintendent had no knowledge of their cost. "After the press conference was over," Harden claims, "I went back to her office and told her I would never lie for her again."

**APP001003**

Ten days later, he found a tracking device on his car. Someone had been tailing him for reasons that were not clear to him. The next day, he informed Gonzalez of what he had found. To Harden's surprise, she held a press conference that evening, claiming she had found evidence of at least five tracking devices on DISD cars, and a security firm she had hired believed her own office had been bugged. But no amount of subterfuge or surveillance would deter her from her crime-busting ways. By August, the DISD investigation had already netted 13 federal indictments, all involving personnel in Harden's management division.

By August 20, Harden says, word had gotten back to him. The superintendent wanted him gone. She was in possession of certain investigative reports, he was told, that held him accountable for many of the district's financial improprieties. Harden began carrying around a hidden recorder, secretly taping top administrators--Gonzalez and her special counsel Marcos Ronquillo, assistant superintendents Robert Payton and Robby Collins--about their intentions. Harden claims he had no intention of being forced out--which is what brought him to Bill Brewer's house in the first place.

Quietly, the Storefront filed its first Harden lawsuit, using it more as a tool to discover who placed the tracking device on Harden's car. When depositions revealed that the individual responsible for trailing Harden was Yvonne Gonzalez herself, Bickel & Brewer was ready to strike.

On September 8, Harden committed his first public act of defiance. He signed an affidavit supporting Shirley Ison-Newsome, swearing under oath that Gonzalez, in essence, manufactured the scandal over the Ison-Newsome restroom construction to avoid media scrutiny on her own office-renovation boondoggle.

On September 12, Bickel & Brewer struck again, this time suing Yvonne Gonzalez individually (coincidentally, in Judge Marshall's court) and alleging invasion of privacy, slander, and perhaps most damaging of all, sexual harassment. The media seized upon these pleadings, which read like a dime-store novel: "[Harden] was tired of having Gonzalez whisper lewd comments into his ear during important meetings." Harden, the hero of the tale, was painted in the most glowing of terms: "...there was no evidence that Harden was anything other than the best CFO DISD ever had." The villainess, on the other hand, was evil incarnate: "Unfortunately, the more Harden resisted, unbeknownst to Harden, the more obsessed Gonzalez became."

Gonzalez came out sad but swinging, denying all accusations and claiming that Harden "has been the subject of an ongoing internal investigation for several weeks now." But she wouldn't disclose the nature of the investigation, although she said she would issue a full report the following week.

On September 15, Bickel & Brewer amended its pleadings, this time attaching exhibits to prove their claims: transcriptions of taped conversations discussing Gonzalez's determination to rid the district of three employees despite there being no evidence of any wrongdoing. And more damning still, sexually suggestive notes purportedly written by Gonzalez corroborated that she was either infatuated with Harden or downright delusional about their relationship.

Yet Brewer says he was surprised that the media wrote so copiously about the sexual harassment claims. Coming from a sophisticated media hound, that seems highly doubtful, particularly as Harden never filed a claim for sexual harassment with the Equal Employment Opportunity Commission--a requirement before filing a sexual harassment lawsuit. "Frankly, if we wanted to turn this into a People magazine story, there was a lot of stuff we could have put in," he says. "We put in stuff that was fairly light...but clearly evidence that was really just a signal to Gonzalez and her lawyers that Matthew saved the stuff she sent him."

Gonzalez must have gotten the message, because that same evening, Brewer received a call from her attorney, Dan Hartsfield: The superintendent was interested in talking settlement. The following day, she agreed to resign.

Despite its pro bono status, Bickel & Brewer had waged a blitzkrieg attack against Gonzalez, putting as many as 10 lawyers on the case, working deep into the night, researching the law, slanting the facts--as if the future of the firm were riding on the result. Typical of B&B strategy, the firm had hired a PR agency--Temerlin McClain--to handle the barrage of media requests. At B&B's downtown offices, a local press corps hungrily awaited copies of depositions that were often released the same day they were taken. As each new set of Harden's allegations was about to be filed, calls were placed to local journalists offering them exclusives, informing them that they could come to the courthouse and be the first to get their hands on the pleadings.

Without setting foot in a courtroom, without presenting a shred of testimony, Bickel & Brewer had created a climate that produced a favorable outcome for Harden. For its $20,000 fee, Temerlin McClain would help Bickel & Brewer try the case right where they wanted it: in the court of public opinion.

The Rambo boys were at it again.

The lawsuit and the superintendent's ostensible resignation further polarized an already divided city: Harden became the champion of many African-Americans, and Gonzalez could do no wrong in the eyes of her Latino supporters. Each side saw conspirators lurking behind every corner, a woolly cabal scheming to advance one minority's agenda at the expense of the other. Each side had its boosters on the board of trustees: Board President Kathleen Leos led the pro-Gonzalez forces; the three black trustees--Hollis Brashear, Ron Price, and Yvonne Ewell--led the anti-Gonzalez charge, with an unlikely assist from Anglo member John Dodd, who was new to the board.

Bickel & Brewer thought it had a clean kill for their client--the resignation in exchange for the tapes and notes Harden had accumulated--but the firm got outsmarted when Gonzalez only tendered her resignation and reportedly began lobbying the board not to accept it. "The settlement agreement only said she would 'submit her resignation,'" says her attorney, Dan Hartsfield. It didn't say she would actually quit.

"Our agreement was that she resign, and instead she tenders her resignation," complains Brewer. "Look, it was a play on words."

APP001006

Case 3:19-cv-02074-G-BK   Document 80   Filed 03/30/20   Page 401 of 486   PageID 4782

On September 17, while the school board met to consider her resignation, hundreds of Hispanics gathered outside, shouting and waving placards that read, "If Gonzalez Goes, Harden Goes," and "The Investigations Must Continue." Inside, in a seven-hour session, trustees heard special counsel Marcos Ronquillo present the results of his internal investigation into abuses by "district staffers" regarding maintenance contracts for DISD buildings. No one would comment about whether Harden was a target of that investigation, although the contracts all stemmed from his department. According to sources who spoke with The Dallas Morning News, Gonzalez had hoped these findings would convince board members "to keep her on." The board voted in a split decision, primarily along racial lines, to delay accepting her resignation for 30 days--"a cooling-off period"--so that all charges might be considered.

Bickel & Brewer, however, needed no cooling-off period. The firm amended its lawsuit, suing Gonzalez for $10 million despite earlier assertions that Harden's case was about social justice, not money. And they began to take a flurry of depositions-- not in the Harden vs. Gonzalez case, but in Harden vs. SIS, the security company that placed the tracking device on Harden's car. B&B's hardball strategy worked brilliantly: Because Gonzalez was not a party to the SIS lawsuit, her lawyers didn't have the right to be present during depositions and cross-examine witnesses. The depositions that were taken were friendly affairs laced with opinion and speculation that was quite damaging to the school district. Because a gag order was only in place in the Gonzalez case, B&B could release transcripts of the SIS depositions and continue to try its case in the press.

Bickel handled the deposition of SIS vice president Larry Steging, who testified that Freda Jinks, administrative assistant to Gonzalez, had hired his company to trail Harden because of suspicions he was leaking information to the press. Steging had no direct contact with Gonzalez, but believed Jinks was acting for her boss.

APP001007

Case 3:19-cv-02074-G-BK   Document 80   Filed 03/30/20   Page 402 of 486   PageID 4783

Bickel then began pursuing Jinks to take her deposition, which is what he says smoked her out and drove her into the arms of the U.S. attorney. "She realized she had big problems," he says. Bigger than anyone even at Bickel & Brewer realized. Freda Jinks told federal authorities that she had assisted Gonzalez in picking out $16,000 worth of bedroom and office furniture that was paid for with public money. By the first week in October, Gonzalez had negotiated a plea bargain, and the school board had accepted her resignation--much to the humiliation of the entire city. Despite the bedroom furniture and the tracking device and the office renovations and the sexual harassment charges, there still remained nagging questions about Matthew Harden: Was he really dirty after all? And if he wasn't, how could the "best CFO in the history of DISD" be so blind that he didn't notice what was happening on his own watch?

Finally, Harden had gotten what he said he wanted--a district free of a vindictive woman who had ruined the careers of so many people, a chance for the city to heal--but that didn't silence the Xerox machines at Bickel & Brewer. The firm kept alive the SIS case and kept deposing school board members, old and new: Bill Keever, John Dodd, Ron Price. SIS's lawyer didn't even bother to show up anymore, since it was clear from the questioning that B&B was gunning for bigger game. Trustees Kathleen Leos and Jose Plata and Gonzalez communications director and close ally Robert Hinkle were all targeted to be sued. "We believed that there were still individuals in the power structure that were intent on seeing that Matthew Harden got fired," John Bickel says.

Others took a darker view. "Bickel & Brewer's lawsuits stopped the school board from investigating Harden," says Leos' attorney Mike Gruber. "Anyone who wanted to investigate what he was doing was attacked."

Gruber claims that's what happened to Marcos Ronquillo, the special counsel in charge of the internal investigation. Harden had long maintained that he had tape recordings of Ronquillo doing Gonzalez's bidding by trying to usher him out the door. His attempts to do so would have been the basis for any legal action against him. But on November 3, Ronquillo issued a carefully worded press release that seemed to exonerate Harden of "any illegal or unethical act." Gruber claims that his own investigation revealed that on October 18, Ronquillo had his change of heart after he went to the offices of Bickel & Brewer, where he was threatened "with litigation and harm to his political and economic future." Four days after the press release, B&B sued Leos, Hinkle, and Plata, alleging a conspiracy of grand proportions to terminate Matthew Harden. Noticeably absent from the lawsuit was Marcos Ronquillo.

By suing school board president Kathleen Leos, B&B took on Mike Gruber, a tenacious fireplug of an attorney who says he was irresistibly drawn into the fray by the prospect of tangling with the pair. "I was not going into a pit with a rabid dog without a club," says Gruber. "As far as I was concerned, they were the forces of evil." Gruber had to play catch-up fast. He wasn't present during any of the SIS depositions and began re-deposing several of the key players--Robby Collins and Freda Jinks among them.

In December, Harden sued the entire school district and its trustees, this time in federal court, this time playing the race card, by alleging that DISD directed its wrath at Harden in part "because he is black." Although U.S. Attorney Paul Coggins had briefed the school trustees about the scope of his criminal investigation--saying that it now included kickback schemes and contract rigging--no one had yet to lay a glove on Matthew Harden.

Gruber took his first swing in early December, when he filed a motion for sanctions against Harden, the Storefront, and Bickel & Brewer. "Harden has used this litigation to avoid scrutiny of his own behavior," alleged the Leos motion, which asked for the court to impose sanctions against Harden and his attorneys for $500,000. "The evidence will show that Harden's sole purpose in keeping his position at DISD is to protect himself and his past actions from scrutiny, specifically with regard to certain vendor contracts, in which he and his cronies have a personal and financial interest."

Later filings spelled out the extent of his alleged self-dealing. Harden had a "history of making payments of large amounts of sums in cash"--cash that the pleadings suggest had come from $1 million in kickbacks involving maintenance contracts on 20 DISD buildings for graffiti-resistant paint. Harden adamantly denied receiving any kickbacks, and Bickel & Brewer amended their pleadings, alleging a new slander. Gruber, in these same pleadings, turned the spotlight on Bickel & Brewer, unconvinced the firm was handling the case pro bono and demanding they reveal who was truly funding Harden's litigation.

If it wasn't the vendors trying to protect themselves as well as Harden, then what was in it for Bickel & Brewer? Certainly Bickel and Brewer's prestige in the African-American community had been enhanced dramatically, and like its judicial lecture series, the Storefront seemed to be bridging a gap by unleashing the forces of a major downtown law firm behind a matter of minority concern. But whether this was bridge-building or empire-building depends on whom you ask. Ask Don Venable, ex-government watchdog and the latest school board trustee, and he will insist it's the latter.

Late last fall, Venable was running for the school board against Jesse Diaz, a Hispanic and supporter of Kathleen Leos. According to Venable, he received a phone call from Bill Brewer, who asked him to visit their downtown offices. Once there, says Venable, "they wanted to know what kind of money I needed to get elected." Venable believed they were trying to broker a political solution to their lawsuits, lining up a board that "would do their will." If they forged an alliance with Venable, he could be the fifth vote necessary to oust Leos from her presidency, or to settle the lawsuit on terms favorable to Harden. Although Venable didn't take their money, he did take their help: Five lawyers from their firm helped him campaign, he says. But he also received the endorsement of John Wiley Price, whom Venable had sued during his watchdog days. "Brewer suggested that he got John Wiley Price to support me," Venable says.

APP001010

Although Venable spearheaded the overthrow of Leos once he got on the board, he says he parted ways with Bickel & Brewer over the merits of their lawsuit. Unpredictable as ever, he then joined forces with Leos, and in January, told The Dallas Morning News about B&B's attempts to recruit him. Latino grassroots organization LULAC ran with the story and filed a complaint with the Dallas district attorney requesting an investigation of the firm. "We also believe," said Gehrig Saldana, president of LULAC Council 4496, "that due to their alleged involvement through bribery attempts and influence peddling, [Bickel and Brewer] may have denied the Latino community a second Latino on the Dallas public school board."

Bickel categorically denies the bribery allegations, saying he and Brewer did no more than they usually do, cultivating relationships, trying to decide whether they should support Venable, just like they have dozens of other candidates over the years. The DA's office conducted an investigation, interviewing Bickel, Brewer, and Venable, and concluded that no criminal offense had occurred.

Meanwhile, Mike Gruber was bearing down hard in his defense of Leos, fighting a bitter pre-trial war of attrition that never seemed to get at the truth. Gruber repeatedly tried to depose Harden, but Bickel and Brewer fiercely resisted his attempts. Instead, they attacked Gruber, claiming he had gone Rambo, leaking defamatory information to the press about Harden, information that Leos had improperly secured from Ronquillo in his capacity as special counsel. The resulting newspaper accounts, at a minimum, raised questions about Harden's competency, based as they were on internal audits that showed massive improprieties in his department regarding contracts for weatherstripping, roofing, and painting.

Before subjecting their client to a deposition, Bickel & Brewer wanted Gruber and Ronquillo to be deposed first, claiming Harden should, in fairness, have the right to the same information as Leos. Ronquillo then entered the lawsuit, claiming that his attorney-client relationship protected him from discovery as well. Gruber then filed a motion for sanctions against Ronquillo, alleging he had taken inconsistent positions with regard to any wrongful conduct by Harden.

APP001011

Case 3:19-cv-02074-G-BK   Document 80   Filed 03/30/20   Page 406 of 486   PageID 4787

The entire legal quagmire was set for a hearing on February 4 in Judge Gary Hall's court, but Hall would hear none of it. Instead, he referred the case with all its sideshow issues to a mediator who might be able to work all the cases toward settlement.

"Let's give peace a chance," Gruber recalls Bickel telling him. Within a week, all sides had struck an agreement. In exchange for his resignation, the district agreed to settle all claims with Harden for $600,000. Leos would bear none of that cost individually.

For a man who had never lost his job, whose most culpable grievance was against a convicted felon, who had managed by either luck or design to shut down any internal investigation into his on-the-job misfeasance, Matthew Harden had fared remarkably well. And his lawyers, Bickel and Brewer, did what they said they would: represented their client as zealously as they knew how. "I thank God every day that I was blessed enough to find them," Harden says.

But will divine intervention help with the FBI? Although Brewer has been told Harden is not considered a target of its anti-corruption campaign, there is talk among sources close to the investigation that suggests otherwise. When asked at a social gathering if Harden was just incompetent or a crook, one assistant U.S. attorney replied: "Oh, I think he is a lot more than just incompetent, but whether it can ever be proven is another thing."

What the payoff was for the Rambo boys, Bill Brewer and John Bickel, may be just as difficult to prove. For a seven-month period, they dedicated their law firm to Matthew Harden, recouping nothing but their expenses, and essentially donating $500,000-$600,000 of billable time to what they perceived was a noble cause. Certainly there is a selfless part of them that believes in social justice, that wants to make a difference, but there's also an irreverent part that enjoys--as one of their friends put it--"pissing on the leg of the establishment." Then there's the self-aggrandizing part--the part that craves recognition and power and political stroke, and picks its fights accordingly. "It's obvious that these guys want to be the new movers and shakers in the city," says Mike Gruber.

**APP001012**

Case 3:19-cv-02074-G-BK    Document 80    Filed 03/30/20    Page 407 of 486    PageID 4788

That Bickel and Brewer can deliver minority voters to a particular candidate because of the Harden case seems downright speculative, and yet, in the mind of Bill Brewer, doctor of his own spin, this may not be too far-fetched. "For the first time in all the years I have been doing this [practicing law]," Brewer says, "elected officials are asking us, 'Who should I meet with in Oak Cliff? Who should I talk to in South Dallas?' That is huge in my mind."

And if current demographic trends in Dallas County hold true, if the minority population becomes the majority population within the next several years, few will be better positioned politically than Bickel and Brewer. Already a proven friend to high-profile African-Americans, the pair has, post-Harden, begun repairing its image with Hispanics. Despite the LULAC complaint, Bill Brewer says unabashedly, the Storefront now plans on assisting Latinos with their legal problems. "John and I have already had meetings with people in the Hispanic Chamber...We are talking to them about class actions, representing people in the Hispanic community against various economic practices of certain corporations."

Call it cultivating relationships or just business as usual--it's just one more way "the most aggressive, high-powered law firm in the world" is trying to make a difference. Whatever that difference may be.

RELATED TOPICS:      NEWS      LONGFORM

Use of this website constitutes acceptance of our terms of use, our cookies policy, and our privacy policy

©2020 Dallas Observer, LP. All rights reserved.

CALIFORNIA RESIDENTS: California Privacy Policy | California Collection Notice | Do Not Sell My Info

**APP001013**

# EXHIBIT A-61

## Pepperdine Law Review

Volume 17 | Issue 4    Article 1

5-15-1990

# One Year after Dondi: Time to Get Back to Litigating?

William A. Brewer III

Francis B. Majorie

Follow this and additional works at: http://digitalcommons.pepperdine.edu/plr

Part of the Courts Commons, Ethics and Professional Responsibility Commons, Jurisprudence Commons, Law and Society Commons, Legal Profession Commons, and the Litigation Commons

### Recommended Citation

William A. Brewer III and Francis B. Majorie *One Year after Dondi: Time to Get Back to Litigating?*, 17 Pepp. L. Rev. 4 (1990)
Available at: http://digitalcommons.pepperdine.edu/plr/vol17/iss4/1

This Article is brought to you for free and open access by the School of Law at Pepperdine Digital Commons. It has been accepted for inclusion in Pepperdine Law Review by an authorized administrator of Pepperdine Digital Commons. For more information, please contact Kevin.Miller3@pepperdine.edu.

APP001014

# One Year After *Dondi*: Time to Get Back to Litigating?

### William A. Brewer III and Francis B. Majorie*

*In the immediately preceding issue, the* Pepperdine Law Review *proudly published an article by The Honorable Thomas M. Reavley, Judge, United States Court of Appeals for the Fifth Circuit, entitled* Rambo Litigators: Pitting Aggressive Tactics Against Legal Ethics. *See* 17 PEPPERDINE L. REV. 637 (1990). *The Review is now honored to offer a view of the propriety of aggressive litigation tactics by presenting the following article, which is offered in response to Judge Reavley's. With the publication of these two articles, as well as Judge Reavley's brief response which follows, the* Pepperdine Law Review *hopes to contribute to the ongoing process of discovering the dimensions of effective advocacy and representation within ethical limitations. The Review expresses its appreciation to William Brewer III and Francis Majorie, as well as to Judge Reavley, for their contributions to this effort.*

—*Eds.*

## I. INTRODUCTION

In recent years, bar associations between California and New York, as well as those from Oregon to Texas, have either adopted or proposed codes of "courtesy" and "civility" which tell litigators how they should behave in their offices, their conference rooms, and the courtroom.[1] Galvanized by the plethora of articles decrying "hardball" litigation tactics and the "Rambo" litigators who employ them,[2] the

---

* Mr. Brewer is admitted to practice in the states of New York and Texas and several federal courts, including the Northern District of Texas and the United States Court of Appeals for the Fifth Circuit. Mr. Majorie is admitted to practice in the states of New York and Connecticut and several federal courts, including the Northern District of Texas and the Fifth Circuit. Mr. Brewer is a partner in the Dallas office of the national litigation firm of Bickel and Brewer. Mr. Majorie is a partner in the firm of Majorie and Associates.

1. For example, the Dallas Bar Association adopted *Guidelines of Professional Courtesy* and a *Lawyer's Creed*, and the American College of Trial Lawyers adopted a Code of Trial Conduct. Other bar associations have adopted similar codes of "civility" or "courtesy." *See, e.g.,* BEVERLY HILLS BAR ASS'N, A LAWYER'S CODE OF PROFESSIONALISM; COLORADO BAR ASS'N, A LAWYER'S PRINCIPLES OF PROFESSIONALISM; L.A. COUNTY BAR ASS'N, LITIGATION GUIDELINES (proposed April 28, 1989) [hereinafter LOS ANGELES GUIDELINES]; LOUISVILLE BAR ASS'N, CREED OF PROFESSIONALISM.

2. *See, e.g.,* Baird, *Bedside Manners and Desktop Distractions,* 13 LITIGATION 33

833

APP001015

"courtesy codes" emanate from a perception that the bar has become less personalized and more hostile, that the courts have become overburdened by a flood of litigation, and that the cost of resolving disputes is beyond the reach of many members of our society.[3] We are told that the cause of these "ills" is the zealous advocate who forgets that the duty owed to a client is somehow circumscribed by a "broader" duty to society as a whole.[4]

To many, the significance of the courtesy codes was heightened on July 14, 1988, when an en banc panel of the United States District Court for the Northern District of Texas jointly decided *Dondi Properties Corporation v. Commerce Savings & Loan Association*[5] and an otherwise unrelated case, *Knight v. Protective Life Insurance Company*.[6] The *Dondi Properties* case arose out of a plaintiff's alleged failure to answer interrogatories, failure to comply with court orders concerning discovery, misrepresentation of facts to the court, and withholding of documents.[7] Similarly, the *Knight* case involved a plaintiff's refusal to consent to the filing of a reply brief after it had been filed in violation of local rules.[8]

Both cases, now known collectively as the *Dondi* opinion, stand for much more than their procedural histories imply. Each was used by the Northern District to establish sua sponte "standards of litigation conduct to be observed in civil actions litigated in the Northern District of Texas."[9] Because each can be found in the Federal Rules Decisions, *Dondi* has thrust the power of the United States into a debate which has important connotations for the continued strength of our system of law.[10]

This article examines the assumptions and conclusions of *Dondi*

---

(Winter 1987); Brown, *Narcissism, Manners, and Morals: Can Grace and Collegiality be Salvaged?* 13 LITIGATION 17 (Winter 1987); Committee on Federal Courts, *A Proposed Code of Litigation Conduct,* 43 REC. A. B. N.Y. 738 (1988) [hereinafter *New York Code*]; Goldberg, *Playing Hardball,* A.B.A. J., July 1987, at 48; Penegar, *The Five Pillars of Professionalism,* 49 U. PITT. L. REV. 307 (1988); Policzer, *Some Guidelines for Zealous Representation,* 13 LITIGATION 43 (Winter 1987); Sayler, *Rambo Litigation, Why Hardball Tactics Don't Work,* A.B.A. J., Mar. 1, 1988, at 79; Solovy & Byman, *Hardball Discovery,* 15 LITIGATION 8 (Fall, 1988); Miner, *Lawyers Owe One Another,* Nat'l L.J., Dec. 19, 1988, at 13; *see also In re Snyder,* 472 U.S. 634 (1985) (reversing the six-month suspension of a lawyer from practice before the Eighth Circuit Court of Appeals on the ground that a single incident of rudeness or lack of professional courtesy does not support a finding of contemptuous conduct, a finding that the lawyer is not presently fit to practice law in the federal courts, or suspension for "conduct unbecoming a member of the bar").

   3. *See infra* notes 51-84 and accompanying text.

   4. *Id.*

   5. 121 F.R.D. 284 (N.D. Tex. 1988) (en banc).

   6. *Id.*

   7. *See infra* notes 27-40 and accompanying text.

   8. *See infra* notes 41-50 and accompanying text.

   9. *Dondi,* 121 F.R.D. at 286.

   10. *See infra* notes 51-64 and accompanying text.

APP001016

*One Year After* Dondi
PEPPERDINE LAW REVIEW

and related commentaries. Section II describes the cases giving rise to the opinion in *Dondi* and suggests that *Dondi*'s adoption of a courtesy code was premised upon four unsubstantiated assumptions: the bar has become less civil and professional in the recent past; litigators' decreased civility and increased commercialism cause needless delays in the litigation of cases; lawyers' assumed lack of courtesy and growing "law as a business" perspective have unduly increased the costs of resolving disputes; and lawyers' hardball tactics are responsible for the profession's low esteem in society.[11] Section III then examines each of these assumptions and concludes that they are without empirical verification and, in all likelihood, false.[12]

Section IV of the article assumes, *arguendo*, that hardball tactics are responsible for the ills identified in *Dondi*, and examines whether those abuses will be eradicated by *Dondi*-like decisions or codes of conduct.[13] Section V in turn discusses the harms that might be caused by the adoption of courtesy codes as authoritative rules of professional behavior.[14] The article concludes that the codes divert attention from the real causes of delayed dockets, costly litigation, and negative public perspectives about our profession.[15] The article also concludes that the codes may exacerbate the ills which they intend to allay by confusing the role of the advocate with opposing counsel, the judge, and the jury.[16] In the end, the effects of *Dondi* and codes of courtesy may sacrifice clients' rights, chill social and legal change, and irreparably undermine our system of laws.

## II.  THE *DONDI* OPINION: AN EXERCISE IN JUDICIAL LEGISLATION?

The *Dondi* opinion was rendered on July 14, 1988, by an en banc panel of the eleven judges sitting in the United States District Court for the Northern District of Texas.[17] The panel was convened at the request of a single, unidentified judge[18] in what the court itself conceded was an "unusual" procedure.[19] The two motions at issue in *Dondi* arose out of serious allegations of wrongdoing in discovery

---

11. *See infra* notes 17-64 and accompanying text.
12. *See infra* notes 65-84 and accompanying text.
13. *See infra* notes 85-98 and accompanying text.
14. *See infra* notes 99-107 and accompanying text.
15. *See id.*
16. *See id.*
17. Dondi Properties Corp. v. Commerce Sav. & Loan Ass'n, 121 F.R.D. 284, 284-85 (N.D. Tex. 1988) (en banc).
18. *Id.* at 286.
19. *Id.* at 286 n.3.

APP001017

(the *Dondi Properties* case)[20] and the allegation that a plaintiff improperly refused to consent to the filing of a reply brief (the *Knight* case).[21] Curiously, those motions were *not* resolved by the panel, but were left instead to the individual judge and magistrate before whom they originally were pending.[22] Both cases, however, were utilized by the panel as vehicles to promulgate a code of conduct designed to "end" what the court called "patterns of behavior that forebode ill for our system of justice."[23]

## A.  What Dondi *Meant to the Litigants*

*Dondi Properties* arose out of the multi-million dollar failure of Vernon Savings and Loan Association and contained claims under RICO, the Texas Fraudulent Transfer Act, federal regulations prohibiting affiliate transactions, and common-law claims for fraud, negligent misrepresentation, usury, and civil conspiracy.[24] *Knight* arose out of an alleged refusal to pay the plaintiff the proceeds of a life insurance policy and violations of the Texas Insurance Code, the Texas Deceptive Trade Practices Act, and the common law.[25] The parties in both cases were represented by counsel from some of the largest and best-known law firms in Dallas.[26]

### 1.  The Holdings in *Dondi Properties*

*Dondi Properties* involved several motions for sanctions seeking dismissal of the plaintiffs' case. The motions were based upon two arguments: the plaintiffs had not complied with the court's orders regarding discovery; and the plaintiffs' counsel had improperly contacted the representative of an opposing party without first identifying himself as the plaintiffs' lawyer.[27] The motions were resolved by Magistrate Sanderson, to whom they originally had been

---

20.  *See id.* at 289-91; *infra* notes 27-40 and accompanying text.

21.  *See Dondi*, 121 F.R.D. at 291-92; *infra* notes 41-50 and accompanying text.

22.  *Dondi*, 121 F.R.D. at 286 n.4.

23.  *Id.* at 286.

24.  *Id.* at 285.

25.  *Id.*

26.  The plaintiff in *Dondi Properties*, for example, was represented by Dallas and Washington, D.C. lawyers from Arter, Hadden & Witts, a law firm which listed 26 Dallas lawyers in the 1988 edition of Martindale-Hubbell. *Id.* at 284-85; VI MARTINDALE-HUBBELL LAW DIRECTORY 2236B (1988) [hereinafter MARTINDALE-HUBBELL]. The defendants in *Dondi Properties* were in turn represented by Figari & Davenport; Jackson, Walker, Winstead, Cantwell & Miller; Davis, Meadows, Owens, Collier & Zachry; Weil & Renneker P.C.; and Randall L. Freedman. Each of these firms respectively listed 12, 107, 19, and 3 attorneys in 1988. *Dondi*, 121 F.R.D. at 284-85; MARTINDALE-HUBBELL, *supra*, at 2308B, 2359B, 2293B, 2513B. Similarly, the plaintiff in *Knight* was represented by Figari & Davenport, and the defendants were represented by Thompson & Knight, a firm which then had 179 lawyers. *Dondi*, 121 F.R.D. at 284-85; MARTINDALE-HUBBELL, *supra*, at 2489B.

27.  *Dondi*, 121 F.R.D. at 290.

836

*One Year After* Dondi

referred.[28]   Magistrate Sanderson denied the motions in all respects.[29]

### a. *The Alleged Violations of the Court's Discovery Orders*

First, Magistrate Sanderson found that there was "no showing of intentional or willful conduct on the part of plaintiffs or their counsel" with respect to the alleged violations of the court's discovery orders.[30] The Magistrate also chastised the defendants for characterizing the plaintiffs' conduct as being in bad faith and in defiance of the court's prior orders.[31] Specifically, Magistrate Sanderson stated that the defendants' accusations added "much heat but little light to the court's task of deciding discovery disputes."[32]

Magistrate Sanderson also noted that the parties' disputes revealed "an inadequate utilization" of the pre-motion conference requirement imposed by the court's local rules.[33] In the Magistrate's view, premotion conferences serve the useful purpose of resolving disputes without court intervention or at least of ensuring that disputes will be narrowed and focused before resolution by motion.[34] In denying the motions, Magistrate Sanderson noted that discovery controversies "may well be resolved, or appreciably narrowed, following further communications among counsel."[35]

### b. *The Alleged Improper Contact With a Party Witness*

Magistrate Sanderson also denied the defendants' motion for sanctions against plaintiffs' counsel.[36] He noted that the defendants did not seek to disqualify plaintiffs' counsel and did not show that they had been prejudiced by the lawyers' communication with the witness.[37] Magistrate Sanderson also noted that, while the client bears the cost of a motion for sanctions in the litigation, the attorney him-

---

28. *Id.* at 289-91.

29. *See infra* notes 30-40 and accompanying text.

30. *Dondi,* 121 F.R.D. at 289.

31. *Id.*

32. *Id.*

33. *Id.* The Local Rules provide, in pertinent part: "Before filing a motion, counsel for a moving party shall confer with the counsel of all parties affected by the requested relief to determine whether or not the contemplated motion will be opposed." N.D. TEX. R. 5.1.

34. *Dondi,* 121 F.R.D. at 289.

35. *Id.* at 290.

36. *Id.* at 290-91.

37. *Id.* at 290.

APP001019

self bears the cost of defending a grievance procedure.[38] Thus, the motion for sanctions was denied without prejudice to its renewal before a grievance committee.[39] He also ordered that neither defendants' nor plaintiffs' counsel could "charge their clients for any time or expenses incurred" relating to the motion for sanctions.[40]

### 2.   The Holding in *Knight*

*Knight* involved a motion to strike a reply brief which the defendant filed without leave of court in violation of the court's local rules.[41] The motion was ruled upon by Judge Fitzwater of the District Court.[42] The Judge began his analysis by noting that the "standards adopted by the court attempt to satisfy the goals of reducing litigation costs and expediting the resolution of civil actions."[43] Judge Fitzwater also specifically noted that the defendant "clearly violated a Local Rule" by filing the reply without permission and that "the determination of whether to permit a reply is discretionary with each judge."[44] Nonetheless, Judge Fitzwater denied the plaintiffs' motion to strike.[45]

Like the holding in *Dondi Properties*, the holding in *Knight* cannot be explained by a principled discussion of the conduct of counsel. According to Judge Fitzwater, counsel for both parties had acted unreasonably: defendants' counsel "failed to cooperate because he did not ask him to agree to the filing of a reply";[46] and plaintiffs' counsel "did not cooperate in connection with the filing of the reply brief," thereby causing increased legal fees and an unnecessary expenditure of judicial time.[47] Curiously, Judge Fitzwater did not enforce the conference requirement heralded in Magistrate Sanderson's earlier decision in *Dondi Properties* by striking the improper, unconferenced reply. Rather, he concluded that it is a "well-established principle" that the "party with the burden on a particular matter will normally be permitted to open and close the briefing."[48] Thus, despite the clear-cut requirements of the local rule requiring court approval for the filing of a reply, and the defendant's failure to confer, Judge Fitzwater permitted the reply to be filed[49] and concluded that it "should

---

38. *Id.*
39. *Id.* at 291.
40. *Id.*
41. *Id.*
42. *Id.* at 286 n.4.
43. *Id.* at 291.
44. *Id.*
45. *Id.*
46. *Id.*
47. *Id.*
48. *Id.*
49. *Id.*

APP001020

*One Year After* Dondi
                                        PEPPERDINE LAW REVIEW

. . . be rare that a party who opposes a motion will object to the movant's filing a reply."[50]

## B.  What Dondi Means to the Bar

### 1.  The Court Posits the "Problem"

The holdings in *Dondi Properties* and *Knight* were said by the en banc panel of the court to be made in accordance with certain standards of conduct the court *adopted* in a pseudo-legislative move in the beginning of its opinion.[51] Despite the fact that the judicial branch is "charged with the responsibility for deciding cases and controversies and for administering justice,"[52] the panel was determined to deal with "a problem that, though of relatively recent origin, is so pernicious that it threatens to delay the administration of justice and to place litigation beyond the financial reach of litigants."[53]

The problem identified by the court is the "unnecessary contention and sharp practices between lawyers."[54] According to the court, judges and magistrates are asked "with alarming frequency" to "devote substantial attention to refereeing abusive litigation tactics that range from benign incivility to outright obstruction."[55] The court also noted that those matters "do not advance the resolution of the merits of the case" and do not promote justice because "the costs of litigation are fueled unnecessarily to the point of being prohibitive."[56]

Yet, despite its length, the *Dondi* opinion does not delineate the litigation tactics it viewed as unnecessarily contentious, sharp, or abusive. Rather, the court noted:

> As judges and former practitioners from varied backgrounds and levels of experience, we *judicially know* that litigation was conducted today in a manner far different from years past. Whether the increased size of the bar has decreased collegiality, or the legal profession has become only a business, where experienced lawyers have ceased to teach new lawyers the standards to be observed, or because of other factors not readily categorized, we observe *patterns of behavior* that forebode ill for our system of justice.[57]

---

50. *Id.* at 291-92.

51. *Id.* at 286.

52. *Id.*

53. *Id.*

54. *Id.*

55. *Id.*

56. *Id.*

57. *Id.* (emphasis added).

APP001021

## 2.   The Court Legislates a "Solution"

Despite its failure to delineate specifically the behavior which it identified as the "problem," the court adopted a detailed "solution" in the form of a Code of Professional Courtesy.[58]  The court found the Dallas Bar Association's recently adopted *Guidelines of Professional Courtesy* and *Lawyer's Creed* to be "both sensible and pertinent to the problems" at hand.[59]  In tandem with failing to explain why the rules were sensible, the court provided no reasoning to suggest how the new standards would alleviate the problems identified.[60]  Nevertheless, the court concluded that every attorney appearing in civil actions in the Northern District of Texas must observe the following:[61]

- Lawyers owe both a "primary duty to the client" and a "broader duty to the judicial system that serves both attorney and client";
- A lawyer owes a duty to opposing counsel to be courteous and to "cooperate";
- Lawyers "shall always treat adverse witnesses . . . with fairness and due consideration";
- Lawyers "should not use any form of discovery, or the scheduling of discovery" to "harass opposing counsel or their client";
- Lawyers "will not arbitrarily or unreasonably withhold consent" to a "just request for cooperation . . . or scheduling accommodation"; and
- "[M]embers of the Bar will adhere to a higher standard of conduct which judges, lawyers, clients and the public may rightfully expect," and will recognize that "[e]ffective advocacy does not require antagonistic or obnoxious behavior . . . ."[62]

Unfortunately, the court did not provide any specific content or definition for words and phrases such as courtesy, civility, or obnoxious behavior.  Although the court emphasized that it did not "invite satellite litigation" similar to Rule 11, it stressed that "malfeasant counsel can expect that their conduct will prompt an appropriate response from the court, including the range of sanctions the Fifth Circuit suggests in a Rule 11 context."[63]  Thus, the court warned "those litigators who persist in viewing themselves solely as combatants, or who perceive that they are retained to win at all costs without regard to fundamental principles of justice" that they "will find that their conduct does not square with the practices we expect of them."[64]

---

58. *Id.* at 287; *see also*, Reavley, *Rambo Litigators: Pitting Aggressive Tactics Against Legal Ethics*, 17 PEPPERDINE L. REV. 637 (1990).

59. *Dondi*, 121 F.R.D. at 287.

60. *Id.*

61. *Id.*

62. *Id.*

63. *Id.* at 288. The Fifth Circuit has suggested a range of sanctions under Rule 11: "a warm friendly discussion on the record, a hard-nosed reprimand in open court, compulsory legal education, monetary sanctions, or other measures appropriate to the circumstances." Thomas v. Capital Sec. Serv., 836 F.2d 866, 878 (5th Cir. 1988).

64. *Dondi*, 121 F.R.D. at 288.

840

### III.   QUESTIONING THE PREMISE: IS THERE A CIVILITY CRISIS?

*Dondi* stems from the assumption that many of the problems facing our courts are caused by the emergence of a civility crisis at the bar. Such an assumption has been fostered by a number of commentators who have written about "Rambo" or "hardball" litigation tactics.[65] Unfortunately, like the court in *Dondi*, many of the commentators simply have assumed that "the level of civility among lawyers is not what it should be . . . ."[66] In addition, they assume that the lack of civility increases the costs of litigation, over-crowds dockets, and denigrates our profession's esteem in society.[67] In this section, we examine these assumptions and conclude that they are by no means without doubt.

#### A.   *Are Lawyers Truly Less Civil Today?*

Despite the recent spark of interest, there is no real proof that the bar is any less civil today than it was in the past. In fact, every generation of lawyers seems to delight in taking up the cudgels against incivility. For example, the *Albany Law Journal* wrote of the *Bad Lawyers* in 1887—ninety-nine years before *Dondi*.[68] And in 1904, an

---

65. *See, e.g., id.* at 286 ("Our system of justice can ill-afford to devote scarce resources to supervising matters that do not advance the resolution of the merits of a case; nor can justice long remain available to deserving litigants if the costs of litigation are fueled unnecessarily to the point of being prohibitive.").

66. *See New York Code, supra* note 2, at 739. The Committee Report acknowledges that "some will challenge" the conclusion that civility among lawyers has declined. *Id.* However, other commentators, and the *Dondi* opinion itself, simply assume that the profession is in a state of crisis. *See, e.g., Dondi,* 121 F.R.D. at 286 ("As judges and practitioners from varied backgrounds and levels of experience, we judicially know that litigation is conducted today in a manner far different from years past."); LOS ANGELES GUIDELINES, *supra* note 1, at 1 ("Many believe that relations between lawyers have so declined that our profession nears a crisis—one that not only implicates how we deal with each other but threatens our usefulness to society, the ability of our clients to bear the cost of our work and the essential values that mark us as professionals."); *Brown, supra* note 2, at 55 (asking and briefly answering the question, "What can be done with reason and practicality to salvage the traditional grace and collegiality of the American bar?"); *Sayler, supra* note 2, at 79 ("Between spitball and slow-pitch softball exists an approach to trial advocacy warranting urgent attention because it is pernicious and on the rise."); *Miner, supra* note 2, at 14 ("[T]here is a civility crisis of major proportions involving the bar.").

67. *Dondi,* 121 F.R.D. at 288 ("Effective Advocacy does not require antagonistic or obnoxious behavior and members of the Bar will adhere to the higher standard of conduct which . . . the public may rightfully expect.").

68. *See* The Argonaut, *The Bad Lawyers,* 36 ALB. L.J. 140 (1887). What was a "Bad Lawyer" ninety-nine years ago? Apparently, he was a lot like today's "Rambo" litigator:

   Once at the bar, he makes his way by bluster and cheek. What he lacks in

841

article entitled *Some Types of Lawyers* complained of the intimidation practices of bluffers.[69] Indeed, the literature over the past 100 years is replete with complaints by older, more "seasoned" members of the bar about the manner in which their younger, more aggressive adversaries are upsetting the apple cart.[70] That is not surprising, because our adversary system necessarily pits lawyer against lawyer in a win or lose dialectic before a panel of our peers.[71]

### B. Is Law Becoming Less of a Profession and More of a Business?

The concern that the law has become a business, rather than a profession, also has plagued our predecessors. Lawyers in ancient Rome and Egypt suffered this criticism.[72] Almost eighty years ago, in 1912, an article in the *Yale Law Journal* bemoaned that:

> It is an easy matter for a young lawyer who starts out with the pursuit of law as a practice rather than a profession, who has always in mind fees and money as a first consideration, to slip into bad practices and little by little develop into a genuine shyster.[73]

In 1906, another article complained that: "Eminent and well-esteemed counsel . . . unhesitatingly point out certain prevailing tendencies [in the bar] which they regard as detrimental."[74] The tendencies?

---

learning he makes up in impudence; if he lacks moral character, the law affords him the opportunity to practice rascality; if he is personally dishonest, he knows enough to hide his criminal practices; not only have the qualification, learning, industry of students, and personal character of students been lost sight of, but the whole moral plane of the profession has been depressed till [sic] there is no crime so dreadful that it cannot find men at the bar willing to consult in its perpetration. There is no crime so palpable, open and defiant of law that there is not a struggle among the members of the profession to defend the criminal. If there is money in a case, however notorious or bad, how many attorneys are there at the bar of San Francisco who will not find some excuse for accepting a retainer?

*Id.*

69. *See* Hopper, *Some Types of Lawyers*, 66 ALB. L.J. 51 (1904).

70. *See, e.g.*, Sayler, *supra* note 2, at 79.

71. No one would call Abraham Lincoln a "Rambo" litigator by today's definition. Yet, Lincoln reportedly provided the following advice to trial lawyers of his day: "When you have the facts, pound the facts. When you have the law, pound the law. When you have neither, pound the table."

72. *See* Davis, *Lawyers vs. The Rest of Mankind*, 58 ALB. L.J. 265 (1898) (noting that "attack upon the advocate is not by any means modern . . . [and that], the ancient Egyptians expressly forbade advocates to plead in their courts, on the grounds that 'they darkened the administration of the laws.' "); Hopper, *Lawyers of Ancient Rome*, 66 ALB. L.J. 248, 249 (1904) (discussing Roman lawyers and noting that the "legalizing of fees was a sad blow to those who worshipped the old ideals, and complaint was made that the profession had degenerated into a love of pelf [sic] and that persons of the lower rank sometimes assumed the profession, and advocates made a shameful trade of their function by fomenting lawsuits, and lived upon the spoils of their fellow citizens").

73. Cockrill, *The Shyster Lawyer*, 21 YALE L.J. 383, 386 (1912).

74. Chamberlayne, *The Soul of the Profession*, GREEN BAG, June 1906, at 396.

842

APP001024

- The "basic evil of commercialism";[75]
- The "far too frequent opinion [that] it is the primary duty of a lawyer to be 'smart' ";[76]
- The absence of a feeling that the lawyer is "in any degree responsible that the counterbalancing truth should be heard at all";[77] and
- The pursuit of a client's goals while overlooking that the lawyer serves "as an officer of the court" and shares "with the judge the responsibilities, honors, and privileges of a ministrant at the shrine of justice."[78]

However, there is no real evidence that recent changes in the bar have caused an increase in commercialism or that commercialism causes lawyers to be less civil today than in times past.[79]

## C.   Are Lawyers Any Less Loved Today?

It has become popular in some circles to suggest that, not only are hardball litigators clogging our courthouses, they are engaging in conduct which holds the "profession" up to public scorn. However, there is substantial evidence that lawyers have been and always will be in a love/hate relationship with their clients and the public. Once again, the literature is replete with attacks upon the scruples and esteem of lawyers.[80] Empirical studies also confirm that lawyers have suffered low regard for quite some time.[81]

In addition, life in the information age may distort the magnitude of our own declining sense of worth. As one lawyer noted in 1908 (well before the *American Lawyer* hit the streets):

> In these days of perfecting (or is it perfection?) printing presses and other mechanical agencies for the diffusion of ready-made intelligence, we may think that attacks on lawyers are more numerous and more venomous than ever before. But that is not the case. So far as the number of attacks is con-

---

75. *Id.* at 396; *cf.* Platt, *The Decadence of Law as a Profession and Its Growth as a Business*, 12 YALE L.J. 441, 441 (1903) (stating that for "nearly a decade . . . the legal profession has been searching for an adequate explanation and understanding of why the volume of legal business grew steadily less for the individual practitioner despite the rapid and healthy upward movement in all classes of commercial pursuits").

76. Chamberlayne, *supra* note 74, at 398.

77. *Id.* at 399.

78. *Id.* at 400.

79. *See, e.g., In re* Snyder, 472 U.S. 634, 647 (1985) (noting that "[a]ll persons involved in the judicial process—judges, litigants, witnesses, and court officers—owe a duty of courtesy to all other participants"). *Contra* Reavley, *supra* note 58, at 643-46.

80. *See* Denovan, *The Lawyers of Dickens*, 5 CANADIAN L. REV. 296, 297 (1906).
> From the days of Chaucer, [lawyers] were a favorite subject of satire. The literature of the Commonwealth is peculiarly rich in this, and points to almost a universal belief that wearers of the ermine and gentlemen of the long robe would practice any sort of fraud or extortion for the sake of personal advantage.

*Id.*

81. *See, e.g.,* Bradway, *A National Bar Survey*, 16 B.U.L. REV. 662 (1936).

843

APP001025

cerned, we must remember that the *New York Journal*, for instance, reaches more people than were reached in the olden days by the town crier or the village scold. As to the malignity of the present-day attacks, we may rest assured that lawyers were long ago accused of every misdeed known at the time; and from what sacred and profane writings tell us of the tricks and manners of the ancients, we may comfort ourselves with the assurance that it would puzzle the ingenuity of moderns to invent crimes more unlovely than those known in the "good old days."[82]

## D. When Were the Good Ol' Days, Anyway?

It may then be that the profession is no more at a crisis point of incivility or commercialism today than 100 or 1000 years ago. Certainly, the notion deserves more proof than the "judicial knowledge" of the courts, as in *Dondi*,[83] or the reminiscences of the establishment bar. Indeed, the following quote from a 1906 article entitled *The Imaginary Decadence of the Modern Bar* could have been written today:

> We hear much nowadays from mournful critics who lament the decadence, the corruption, the commercialism of the modern bar, and long for a return of the good old days when all judges were honest, and all lawyers were simple but learned folk, free from guile, bent only on guiding the faltering steps of their fellow men along the rugged path of lawful living.
> But when were those good old days?[84]

## IV.  QUESTIONING THE SOLUTION: DO COURTESY CODES HELP?

The *Dondi* court and the several bar associations that have promulgated codes of courtesy have justified having done so in the belief that they would: (a) decrease the cost of litigation;[85] (b) alleviate crowded dockets;[86] and (c) increase the esteem of lawyers in society.[87] But are courtesy codes an appropriate response to these alleged problems? In this section, we explain why we think they are not.

## A. Remedies Already Exist for Curbing Litigation Abuses

Courtesy codes are adopted to curb litigation excesses and thereby control the costs of bringing or defending claims. But numerous

---

82. Myers, *The Damnation of the Modern Bar*, 12 L. NOTES 48 (1908).

83. *See* Dondi Properties Corp. v. Commerce Sav. & Loan Ass'n, 121 F.R.D. 284, 286 (N.D. Tex. 1988) (en banc).

84. J.C.M., *The Imaginary Decadence of the Modern Bar*, 9 L. NOTES 211 (1906); *see* Vance, *Is the Legal Profession Losing its Influence in the Community?*, 91 CENT. L.J. 77 (1920) (taking "little stock in the talk that we so often hear to the effect that the lawyers of this day do not occupy the position in the community which they had in the good old days of the heroic or that judges are not now honored in the same manner as they were in the days past").

85. *See Dondi*, 121 F.R.D. at 286 (stating that "justice delayed, and justice obtained at excessive cost, is often justice denied").

86. *Id.*

87. *New York Code, supra* note 2 at 739.

844

channels already exist to accomplish that goal. As *Dondi* recognized, the Federal Rules of Civil Procedure and the United States Code already provide the court and opposing parties with remedies for improper or abusive discovery tactics.[88] Abuses can also be curbed by shifting attorneys' fees to the losing party—a rule which, in Texas at least, applies to all contract actions and therefore many of the commercial disputes which gave rise to the *Dondi* opinion.[89]

Abuses also can be controlled by litigating the "Rambo" issue before the jury.[90] In most jurisdictions, a litigant must show that his fees are reasonable.[91] Proof of this element can—and should—involve the need to resort to so-called "hardball" tactics.

If, in fact, a party has taken his abusive tactics from the boardroom to the courtroom, that accusation can be established in court and itself presents an inference that the claims have merit. If, on the other hand, a jury cannot be convinced that the tactics were unreasonable, they do not raise the problems cited by *Dondi* and the commentators and should not be the subject of a *Dondi*-like solution.

## B.  Hardball Tactics Will Stop If They Are Not Effective Representation

There is no proof that "Rambo" litigators delay their cases or un-

---

88.  *See, e.g.,* 28 U.S.C. § 1927 (empowering court with the ability to tax attorneys with costs and attorney's fees resulting from unreasonable and vexatious multiplication of proceedings); FED. R. CIV. P. 11 (granting court the power to impose sanctions upon parties who sign pleadings, motions, or other documents, the purpose of which is to "harass or to cause unnecessary delay or needless increase in the cost of litigation"); *id.* at 37 (authorizing sanctions for attorneys and represented parties in violation of court rules and orders).

89.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 (Vernon 1986) (providing for "recovery of reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract").

90.  *See* Nguyen Ngoc Giao v. Smith & Lamm, P.C., 714 S.W.2d 144 (Tex. Ct. App. 1986), which states:

> Factors to be considered in determining the reasonableness of attorney's fees include: (1) the time and labor involved; (2) the nature and complexities of the case; (3) the amount of money or the value of the property or interest involved; (4) the extent of the responsibilities assumed by the attorney; (5) whether other employment is lost by the attorney because of the undertaking; (6) the benefits resulting to the client from the services; (7) the contingency or certainty of compensation; and (8) whether the employment is casual or for an established or constant client.

*Id.* at 148-49.

91.  *See generally* Annotation, *Necessity of Introducing Evidence to Show Reasonableness of Attorneys' Fees Where Promissory Note Provides for Such Fees*, 18 A.L.R. 3D 733 (1968).

845

duly increase costs through unnecessary motions. To the contrary, the modern day hardball, self-styled Rambo litigators push their cases hard and pride themselves in doing so.[92] The simple truth is that hardball litigators recognize that commercial clients do not litigate in a vacuum and generally want a result which is quick, certain, and successful.[93] These factors are not linear, and are balanced against each other as the needs of each case and client dictate. The factors also are balanced at numerous times in a lawsuit and may be weighed differently depending upon the nature and style of the proceedings. In short, an effective commercial litigator already considers the needs of his client and the burdens on the system when litigating the case.[94] Courtesy codes are therefore superfluous to effective advocacy.

## C.  The Codes of Courtesy Have Not Had Any Apparent Effect

Finally, the adoption of courtesy codes has not had any apparent beneficial effect on trial dockets. The number of civil cases filed by private citizens in federal courts has not declined over the past few years.[95] Nor does it appear that cases have been litigated with any more speed; the median age of a case from commencement to resolu-

92. *See Goldberg, supra* note 2, at 48-52. Monroe Freedman, a legal ethics professor at Hofstra, notes: "Hardball is playing with a baseball, not a softball; . . . [it] implies a high level of professionalism . . . it doesn't mean spitball or sleazeball." *Id.* at 49. Barry Montgomery, a personal injury trial attorney, notes: "A lot of people misconstrue hardball to mean we will do everything we can to keep the other side from getting the information . . . . [w]e will obfuscate the facts, we will delay, we will make it as costly as possible for the opposition. That's not hardball." *Id.* at 48. Lindsey Lerman Miller agrees that "hardball" is played most often "not for sport but to give the client " 'a clear advantage.' " *Id.* at 50. Raoul Felder, of the firm Raoul L. Felder in New York, says: "[Y]ou are obligated to go right to the limits of zealous advocacy for your clients . . . hardball isn't bullying—it's a surgeon operating with a scalpel." Goldberg & Hengstler, *Hardball is . . .*, A.B.A. J., July 1987, at 52. Gloria Allred says: "Hardball means being ready, willing and able to do whatever can legally be done to protect your client's rights—including preparation for trial." *Id.*

93. When a hardball litigator institutes a lawsuit for his client, he is ready to do whatever legally can be done to pursue and protect the client's rights. *See id.* at 52 (citing Gloria Allred). If he operates within the rules, not agreeing to needless time extensions or extra filings, he saves his client money. And when he uses "hardball" tactics to jockey for position prior to trial, then he has put his client in the best position to win at trial or to settle for a greater amount than he might otherwise. *See id.* at 50 (Lindsey Lerman Miller speaking about giving her client "a clear advantage").

94. *See* Morgan, *Duties of Bar and Bench*, 5 L. NOTES 29, 31 (1901) (stating that "codes of ethics are of little practical value . . . . To an upright lawyer they are unnecessary; and formal adoption of them, by way of a code, will not prevent their infraction by a lawyer who is not upright.").

95. In 1987, private civil suits filed in the federal courts increased two percent, from 162,998 to 166,960. *See* ANNUAL REPORT OF THE DIRECTOR OF THE ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS (1987) [hereinafter 1987 REPORT]. The same was true in 1988. *See* ANNUAL REPORT OF THE DIRECTOR OF THE ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS (1988) [hereinafter 1988 REPORT].

846

APP001028

tion is eight months.[96] Neither statistic is surprising. Many of the rules of courtesy suggested by *Dondi* involve accommodations to lawyers' schedules and conflicts.[97] Thus, at best, the codes are neutral and, at worst, actually promote delays in the resolution of cases.[98]

The experience in the Northern District of Texas also supports this conclusion. Although *Dondi* suggested that it did not invite satellite motions, it has spawned a new type of satellite practice: making the other side appear unreasonable. Time and money now is often spent by lawyers in all types of cases in efforts to show that their adversaries are taking technically correct but unfair and unreasonable positions. Thus, the imposed requirement of civility often raises the stakes yet another notch—with no apparent effect on the docket or the number of motions which need resolution.

## V. QUESTIONING THE SOLUTION: DO COURTESY CODES ACTUALLY HURT THE PROFESSION?

### A. *The Codes Divert Our Attention From the Real Issues*

Like any panacea, courtesy codes may actually hurt rather than help efforts to decrease litigation costs, increase the speed in which cases are resolved, and improve the stature of our profession. Crowded dockets should be addressed through more judges, specialized courts for simple and complex cases, and other means—not the policing of lawyers. Similarly, the spiraling costs of litigation should be rectified by adoption of the English rule (loser pays fees) and other mechanisms for making litigation more cost effective (such as Alternative Dispute Resolution)—not rules which tie the hands of

---

96. In fact, in 1987, eleven percent *fewer* suits were terminated than the year before. *See* 1987 REPORT, *supra* note 95. Moreover, although a rise in civil terminations occurred in 1988, that year was "highlighted by increases in dispositions of asbestos products liability cases and several social security disability insurance cases." 1988 REPORT, *supra* note 95. "The median time from filing to disposition, excluding land condemnation cases, prisoner petitions, and deportation reviews, remained constant at eight months from 1987 to 1988." *Id.*

97. For example, the *Dondi* court promoted agreements about extensions of time for deadlines. *See* Dondi Properties Corp. v. Commerce Sav. & Loan Ass'n, 121 F.R.D. 284, 294 (N.D. Tex. 1988) (en banc) (excerpt from the Dallas Bar Association Guidelines of Professional Courtesy). It is hard to see how an obligation to agree will promote faster adjudication of cases, especially when a danger exists that the requested party may be branded as uncooperative if he does not agree.

98. Indeed, under the guise of promoting courtesy and expedition of cases, the *Dondi* court allowed a reply brief to stand that had been filed by the defendant without the court's permission in admitted violation of two local rules of the court. Nonetheless, the court ruled that the plaintiff had improperly failed to "cooperate" with opposing counsel by moving to strike. *Id.* at 291-92.

847

APP001029

counsel in the courtroom. Indeed, in our opinion, low public esteem for lawyers stems primarily from a belief that lawyers are not responsive to the needs of their clients—not that they are too aggressive on their clients' behalf. Thus, the bar should be more concerned that its members engage in a careful analysis of crowded dockets, a study of the pros and cons of the common-law system, and a honing of their own skills as lawyers. In short, continuing legal education, not civility, should be the focus of our profession.

## B.   The Codes Also Threaten the Role of the Advocate in our System of Justice

The codes of courtesy also have a more subtle, but potentially devastating, effect on the bar and the public. Our present code of ethics requires lawyers to zealously represent the interests of their clients.[99] That means that a lawyer must use every available means of winning at his disposal.[100] The obligation of zealous representation

> [i]s the heart of the adversary process. Each attorney, as an advocate, asks for and seeks that which in his judgment is best for his client, within the bounds authoritatively established. The advocate does not decide what is just in this case—he would be usurping the function of the judge and jury—he asks for and seeks for his client that which he is entitled to under the law. He can do no less and properly represent the client.[101]

Thus, as Professor Dershowitz (a self-styled "hardball" trial lawyer) has noted, if a lawyer is not prohibited by the canons of ethics from utilizing a tactic or strategy, they *require* that he do so.[102]

The *Dondi* opinion and the anti-hardball commentaries threaten to emasculate the single-minded purpose of the advocate and stall crea-

---

99.  Ethical Canon 7-1 provides that:

The duty of a lawyer, both to his client and to the legal system, is to represent his client zealously within the bounds of the law, which includes Disciplinary Rules and enforceable professional regulations. The professional responsibility of a lawyer derives from his membership in a profession which has the duty of assisting members of the public to secure and protect available legal rights and benefits. In our government of laws and not of men, each member of our society is entitled to have his conduct judged and regulated in accordance with the law; to seek any lawful objective through legally permissible means; and to present for adjudication any lawful claim, issue, or defense.

MODEL CODE OF PROFESSIONAL RESPONSIBILITY EC 7-1 (1981); *see* Schlosser v. Trapoli, 609 S.W.2d 255, 258 (Tex. Ct. App. 1980) (lawyer filed suit but had not taken any other action in the three and a half years before the court's dismissal of the case).

100.  This also was true almost 100 years ago. *See* Morgan, *supra* note 94, at 31.

In order to further or protect the interests of his client, counsel must resort to legal tactics. He may consider it advisable to carry his client's cause into court, even when he has no intention of forcing it to a trial. After the cause is in court, he may adopt a course of action, with a view to coercing the adverse party into a proper consideration of the subject of the controversy; in short he must manage his case, and manage it according to his own best judgment.

*Id.*

101.  *See* MODEL CODE OF PROFESSIONAL RESPONSIBILITY EC 7-1 (1981); *Penegar, supra* note 2, at 338.

102.  *See Goldberg, supra* note 2, at 48.

848

APP001030

*One Year After* Dondi
PEPPERDINE LAW REVIEW

tivity and effective advocacy.[103] If, as *Dondi* suggests, a "client has no right to demand that counsel abuse the opposite party or indulge in offensive conduct,"[104] is it permissible for an advocate to call a witness a "liar" (or even to imply that such is the case)? If, according to *Dondi*, members of the bar must consent to a "just request for cooperation,"[105] should a litigator agree not to press a valid motion because his colleague missed a filing deadline? Just how should a lawyer accommodate the two "duties" identified in *Dondi*: is the "broader" duty to the system as a whole a trump of the apparently "narrower" duty to the client? And just what does that broader duty "to the system" entail?

The answers to these questions, though clear under the codes of ethics and the rules of procedure, become hopelessly vague and difficult to apply if "courtesy" to one's colleagues and the other litigants is elevated to a duty.[106] Certainly, the lawyers who brought *Brown v. Board of Education*[107] were uninterested in the conventional "wisdom" that separate was equal and that the facts would prove that point. Were the lawyers who used "Brandeis-briefs" to sustain the validity of congressional delegations of power to administrative agen-

---

103. At least one commentator has openly admitted this possibility by noting that "[s]cholars are not convinced that adversarial litigation yields a more pure form of justice than other dispute resolution methods." *Sayler, supra* note 2, at 80.

104. Dondi Properties Corp. v. Commerce Sav. & Loan Ass'n, 121 F.R.D. 284, 288 (N.D. Tex. 1988) (en banc) (quoting The Dallas Bar Association's professional courtesy guidelines).

105. *Id.*

106. The following passage reveals that there are no firm guidelines for the limits of advocacy other than the lawyer's "judgment":

> We must in some way train out of our young man the excessive combat spirit. It is true that all legal procedure is, in a sense, a survival of the old ordeal of trial by battle. Human ingenuity has never devised any other way. It is difficult to protect a client with a good case and a poor lawyer from the merciless clutches of a capable lawyer with a poor case. There is no basic equality in human capacities and we must continue to allow for these differences in ability. But we can stress among our members the necessity of rendering service to the client and repressing the lawyer's individual love of a fight. Litigious lawyers gratify their vanity by excessive displays of combativeness, but the client seldom ever reaps any reward from the fray. A well trained lawyer, who considers carefully his clients' rights, should be the slowest man on earth to bring on a battle, the outcome of which, unless he is a fool or a knave, he knows must be uncertain.

Simms, *Speed in the Administration of Justice*, 16 A.B.A. J. 290, 291 (1930); *cf.* Goldberg, *supra* note 2, at 48. Don Reuben, chief counsel for the *Chicago Tribune* and the Archdiocese of Chicago, notes, "[h]ardball is consistent with fair play . . . . It does not mean being a jerk . . . . You don't litigate just to litigate. If you do you're a fool." *Id.*

107. 349 U.S. 294 (1955).

849

APP001031

cies "Rambo" litigators? They were certainly "antagonistic" and, at times, even "obnoxious" in pressing their cases. Is it appropriate to attempt to curb these "tactics" through judicial mandates of courtesy?

We do not think so. Litigation of complex commercial cases is time-consuming because it is a battle of perspectives, not just of "facts." The promissory note case presented by the bank is a joint venture case by the "borrower." Questions of good faith and bad faith over a long-term relationship are answered bit by bit, not in one-hour depositions in which the questions are directly put and the bad faith is openly admitted. In the end, as in every case, the jury is asked to determine which version of events is more likely, not more conformable to fact. The advocate should be able to work within these restrictions without second-guessing or being second-guessed. Thus, the ultimate problem with the courtesy codes is that they may chill effective advocacy and make the law so uncertain that it is of no use to the litigant. They should be abolished.

850

# EXHIBIT A-62
# FILED
# UNDER SEAL

# EXHIBIT A-63
# FILED
# UNDER SEAL

# EXHIBIT A-64

8-26-19

VIRGINIA:

## IN THE CIRCUIT COURT FOR THE
## CITY OF ALEXANDRIA

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Case No. CL19001757** |
| | ) | **CL19002067** |
| | ) | |
| ACKERMAN MCQUEEN, INC., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MERCURY GROUP, INC., | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |
| | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTION FOR PROTECTIVE ORDER

Plaintiff National Rifle Association of America (the "NRA"), by counsel and pursuant to Rule 4:1 of the Rules of the Supreme Court of Virginia, submits this memorandum of law in opposition to the Motion for Protective Order filed by Defendants Ackerman McQueen, Inc. and Mercury Group, Inc. (together, "AMc" or "Defendants").

In support thereof, the NRA states as follows:

## I.      BACKGROUND

These consolidated matters arise from disputes between the NRA and Defendants. On June 29, 2019, the NRA propounded its First Set of Requests for Production of Documents and its First Set of Interrogatories. The NRA propounded its Second Set of Requests for Production of Documents and its Second Set of Interrogatories on August 1, 2019. To date, AMc has not

**APP001119**

produced a single document or answered any interrogatory in response to the NRA's discovery requests. In contrast, the NRA has responded to all 43 of the interrogatories propounded by AMc, (even though they exceed the 30 interrogatories limit under Va. Sup. Ct. R. 4:8), has produced approximately 25,000 documents totaling approximately 48,000 pages, and is in the process of producing additional documents.

On August 14, 2019, AMc filed a motion seeking a protective order that would prevent Michael J. Collins, Esq., an attorney with Brewer Attorneys and Counselors ("BAC") who has been admitted in this case *pro hac vice*, and all other BAC attorneys and employees from accessing documents designated buy AMc as "Highly Confidential." The NRA objects to this proposed restriction. See paragraph 7.3, AMc's proposed protective order .  AMc has refused to produce any documents responsive to the NRA's discovery requests until the protective order issue is resolved.

Mr. Collins was admitted *pro hac vice* over the objections of AMc.  He is actively engaged as counsel in this litigation, including appearing at court hearings and taking and defending depositions of witnesses.  In addition, Mr. Collins is being assisted by other attorneys and employees at BAC.  AMc's proposed restriction will deny the NRA its right to be represented by the counsel of its choosing.  Through a backdoor restriction, AMc is essentially seeking to disqualify BAC in this matter. However, AMc has not filed a motion to disqualify BAC, has not asserted any claims against BAC, and to date, has not sought to depose any lawyer at BAC.

In addition, paragraph 7.3 of Defendants' proposed protective order provides that documents marked as "Highly Confidential" by the Defendants may be viewed only by "one representative of the NRA who is responsible for making decisions concerning the Action. . ." Defendants' proposed protective order does not contain the same limitation on Defendants for

Page 2

documents marked as "Highly Confidential" by the NRA. No reasonable justification for this difference exists, yet the Defendants refuse to equitably amend the proposed order.

## II.   ARGUMENT

### A. Michael Collins Has Been Admitted *Pro Hac Vice* and Should Be Permitted to View All Documents and Information Produced By AMc.

Through their motion for protective order, AMc seeks to resurrect the same arguments made in its opposition to the NRA's motion for *pro hac vice* admission of Mr. Collins. The Court has already considered and rejected those arguments and admitted Mr. Collins as counsel in this litigation. To date, Mr. Collins has conducted and defended depositions and appeared at hearings in this matter. He is a full and equal member of the NRA's litigation team. As admitted counsel, Mr. Collins should be permitted to view all the discovery produced by AMc in this matter. If Mr. Collins is unable to view documents designated "Highly Confidential," his ability to participate in this litigation will be severely limited. For example, he will not be able to conduct or participate in the depositions of AMc party witnesses, prepare and defend NRA party witnesses for their depositions, or draft or respond to pleadings that cite to or include "Highly Confidential" documents.

"[T]he proponent of the privilege of confidentiality bears the burden of proof and must seek protection." McDonald v. Suggs, No. 5:07-CV-339-D, 2009 WL 864759, at *3 (E.D.N.C. March 30, 2009). Here, AMc bears the heavy burden of proving that it is entitled to the extraordinary, if not unprecedented, protections it seeks. See Webb v. Green Tree Servicing LLC, 283 F.R.D. 276, 278 (D. Md. 2012) (party moving for a protective order bears the burden of establishing good cause); Medlin v. Andrew, 113 F.R.D. 650, 653 (M.D.N.C. 1987) (burden of demonstrating good cause is a heavy one). AMc has not cited any authority for the relief it seeks. In addition, AMc has made only conclusory statements, unsupported by facts, about its suspicions

APP001121

that a unit within BAC "competes" with AMc.   AMc Memorandum in Support of Motion for Protective Order ("AMc Mem. Supp.") at p. 2. "In order to establish good cause, a proponent may not rely upon 'stereotyped and conclusory statements,' but must present a 'particular and specific demonstration of fact,' as to why a protective order should issue." Small v. Ramsey, 280 F.R.D. 264, 269 (N.D. W.Va. 2012) (quoting 8A Charles Alan Wright et al., Fed. Prac. & Proc. Civ. § 2035 (2d ed. 1994). See also Baron Fin. Corp. v. Natanzon, 240 F.R.D. 200, 202 (d. Md. 2006) (same). Thus, the motion must be denied because AMc has not satisfied their demanding burden.

AMc's sole argument for the paragraph 7.3 restriction is that BAC has a four person "Public Relation Unit" that "competes" with AMc and "has already poached substantial portions of the NRA Public Relations Work from the Defendants." AMc Mem. Supp. at p. 2. However, AMc has offered no evidence that the BAC Public Relations Unit actually competes with AMc. Its arguments are specious and do not comport with reality. For example, AMc asserts that it has terminated or furloughed approximately 50 employees as a result of BAC's activities. Thus, AMc would have this Court believe that four employees in the BAC Public Relations Unit is now doing the work of 50 AMc employees who worked exclusively on NRA matters. In fact, the four employees in the BAC Public Relations Unit only issue press releases and respond to media inquiries in connection with BAC clients. The Public Relations Unit does not operate any media outlets such as NRATV, it does not represent celebrities such as Oliver North or Dana Loesch, and it does not book or otherwise promote media appearances on behalf of the NRA or any other client. In sum, the BAC Public Relations Unit does not – indeed cannot - provide the breath and scope of services that AMc has provided to the NRA. No evidence to the contrary exists.

It must also be noted that AMc has terminated its relationship with the NRA in letters dated May 29, 2019 and June 27, 2019. Thus, even if BAC had the capacity to compete with AMc (it

**APP001122**

does not), there can be no competition between AMc and BAC (or anyone else) for the NRA's business because AMc has abandoned the NRA as a client.

Finally, Mr. Collins does not work in the BAC Public Relations Unit. Thus, even if BAC's Public Relations Unit was an AMc competitor, the Court could craft a protective order prohibiting any "Highly Confidential" information from being provided to the Unit. AMc has rejected this reasonable alternative on the apparent grounds that Mr. Collins' position as a partner in BAC – as opposed to his position as an attorney and officer of this Court – renders him incapable of abiding by the terms of a court-issued protective order. AMc has provided no basis to support such an assertion. Indeed, under AMc's theory, a law firm could not represent a client against another law firm because the two law firms are competitors. The Court should craft a protective order that provides Mr. Collins with access to all discovery in this matter so that he can provide his client with the complete and zealous legal representation to which it is entitled.

### B. All BAC Professionals Should Be Permitted Access to AMc Materials.

AMc offers no legal examples of any protective orders where a court has excluded a law firm and all of its professionals from viewing documents but not disqualified the firm as counsel. AMc is not moving to disqualify BAC attorneys because of any actual conflict of interest. They have no evidence of an actual conflict of interest between BAC attorneys and the NRA. Instead, through a backdoor protective order restriction, AMc is seeking to disqualify BAC based on an assertion that William Brewer <u>may</u> be a witness in this case.

While it is true that Virginia Rule of Professional Conduct 3.7[1] prohibits, in certain circumstances, a lawyer from acting as an advocate in adversarial proceedings in which the lawyer

---

[1] RULE 3.7. Lawyer As Witness. —

APP001123

is likely to be a witness, the scope of the rule's application is not nearly as broad as the Defendants assert. The fact that a lawyer in a firm may be disqualified from serving as an advocate under Rule 3.7 does not impute disqualification to an entire firm. Imputed disqualifications are governed by Rule 1:10 of the Virginia Rules of Professional Conduct. This rule states that "[w]hile lawyers are associated in a firm, none of them shall represent a client when. . . one of them practicing alone would be prohibited from doing so by Rules 1.6 [Confidentiality of Information], 1.7 [Conflict of Interest: General Rule], 1.9 [Conflict of Interest: Former Client], or 2.10(e) [Third Party Neutral]." Rule 3.7(c) does not impute disqualification to an entire firm: "A lawyer may act as advocate in an adversarial proceeding in which another lawyer in the lawyer's firm is likely to be called as witness unless precluded from doing so by Rule 1.7 or 1.9.").

AMc argues that BAC attorneys, including Michael Collins, should be restricted from viewing "Highly Confidential" documents because they stand to benefit personally from the litigation. AMc Mem. Supp. at p. 3. AMc cites no Rule of Professional Conduct or other legal authority to support this as a valid basis for restricting any BAC attorney from viewing these documents. No authority exists because the logic of the objection is preposterous. Taken on its face, the Defendant's argument would prohibit lawyers from charging fees.

---

(a) A lawyer shall not act as an advocate in an adversarial proceeding in which the lawyer is likely to be a necessary witness except where:

    (1) the testimony relates to an uncontested issue;

    (2) the testimony relates to the nature and value of legal services rendered in the case; or

    (3) disqualification of the lawyer would work substantial hardship on the client.

(b) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that the lawyer may be called as a witness other than on behalf of the client, the lawyer may continue the representation until it is apparent that the testimony is or may be prejudicial to the client.

(c) A lawyer may act as advocate in an adversarial proceeding in which another lawyer in the lawyer's firm is likely to be called as witness unless precluded from doing so by Rule 1.7 or 1.9.

APP001124

Mr. Brewer recognizes that he is a potential witness in this matter. Although his testimony will not be prejudicial to the NRA and therefore not disqualify him under Rule 3:7,[2] Mr. Brewer has exercised reasonable caution and refrained from seeking to be admitted *pro hac vice*. This decision does not preclude Mr. Brewer from assisting in the preparation of the case or even from assisting at trial in a non-advocacy role. See United States v. Perry, 30 F. Supp. 3d 514 (E.D.Va. 2014). See also Droste v. Julien, 477 F.3d 1030, 1035 (8th Cir. 2007) ("'In most jurisdictions, a lawyer who is likely to be a necessary witness may still represent a client in the pretrial stage.'"); Culebras Enterprises Corp. v. Rivera-Rios, 846 F.2d 94, 99-101 (1st Cir. 1988) ("The question is whether the prohibition against acting as 'advocate at trial' should be read as broadly prohibiting the rendition of case-related out-of-court services prior to trial. We think not."); Anderson Producing Inc. v. Koch, 929 S.W.2d 416, 422 (Tex. 1996) (Rule 3.08, which is the Texas version of Rule 3.7, prohibits a testifying lawyer only from "acting as an advocate before a tribunal, not from engaging in pretrial, out-of-court matters, such as preparing and signing pleadings, planning trial strategies, and pursuing settlement negotiations."). See generally DC Bar Ethics Opinion 228: Lawyer-Witness Preparation in Pre-Trial Proceeding, dcbar.org ("Although precluded from acting as trial counsel, a lawyer who is likely to be a necessary witness at trial ethically may assist substitute counsel in both pre-trial matters and trial preparation and may continue him/herself to represent the party in most pre-trial proceedings."); ABA Informal Op. 89-1529 (Oct. 89-1529). ("A lawyer who anticipates testifying as a witness on a contested issue at a trial may represent a party in discovery and other pre-trial proceedings provided the client consents after consultation

---

[2] See, e.g., Personalized Mass Media Corp. v. Weather Channel, Inc., 899 F. Supp. 239 (E.D.Va. 1995) (The moving party bears the substantial burden of demonstrating specifically how and as to what issues in the action the prejudice exists or is likely to occur); Adelman v. Kernbach, 43 Va. Cir. 544 (1997) (The mere assertion that the attorney's testimony will be prejudicial to his client in insufficient; the moving party must state how the testimony will be prejudicial).

APP001125

and the lawyer reasonably believes that the representation will not be adversely affected by the lawyer's own interest in the expected testimony."). None of the prohibitions in these rules are at issue in this case.

Mr. Brewer has properly limited his involvement in this case to comport with these ethical concerns. He participates in meetings and telephone calls with client representatives and with other BAC attorneys and employees working on the case. He provides his experience and familiarity with the NRA to help the NRA's trial attorneys provide the NRA with the best possible representation in this case.

Finally, AMc suggests that the Court require BAC to construct an ethical wall between Mr. Brewer and any of the other BAC attorneys working on this case. While, as AMc notes, the Court inquired about whether Mr. Collins intended to put up a wall between him and Mr. Brewer, AMc ignores the exchange that occurred between Mr. Collins and the Court in which Mr. Collins explained that case law permits Mr. Brewer to be actively involved in the case, right up to jury trial, including taking depositions and arguing at court hearings. *See* Transcript of Hearing held on June 26, 2019, at 19-21. Immediately following this exchange, the Court granted the NRA's motion for admission of Mr. Collins *pro hac vice*.

The exchange between the Court and Mr. Collins is as follows:

THE COURT: But isn't the case if he has any knowledge, that could – that could potentially be a conflict?

MR. COLLINS: Well, it could be a conflict with the NRA, your Honor? Or a conflict with them?

THE COURT: I would say with both.

MR. COLLINS: Okay. Well, your Honor, with respect to them, the attorney always gains knowledge during the case. I'm not sure of any unique knowledge I have outside of this case, at all. With respect to the NRA, your Honor, the issue is -- for the attorney is the attorney's always going to know something. So what the

APP001126

Court said is since we want to be careful because disqualifications and related-type proceedings could be used as a key to motive that, unless the attorney is essential to the case, it's a fact they can't get otherwise, you don't lock out the attorney. And, your Honor, at least I know in Texas and in many other jurisdictions -- I don't know if it's any different in Virginia -- that the attorney -- if it's a bench trial, the attorney could still do this whole case. If it's a jury trial, they could do the case up to the jury trial. This Court is sophisticated enough to know the difference between attorney testimony and other testimony and not to be unduly swayed. It's only when a jury gets involved that we're concerned. And my understanding, your Honor, is the NRA knows all about the potential conflict and has no problem, whatsoever. So you put all those things together, your Honor, I'm just not sure if this even gets close to 3.7. And as far as me being a witness, they can speculate. We had the same issue that their attorneys are trying to pro hac about whether they're involved in the underlying facts, you know. We just think the best way is for both sides to get admitted, and then, if someone has got a disqualification issue, they can raise it. And yes, we'll take it seriously, your Honor. If they've got grounds for us and they explain those grounds for us, we'll take them very seriously. But, as I say, your Honor, pretty much the rule is until you actually hold a jury trial, that attorney can take the depositions, can do the hearings before the judge. And I'll answer any other questions you may have, your Honor.

THE COURT: The motion is granted. The motion is granted.

*Id.*

BAC attorneys and other employees have worked with Mr. Collins in the representation of the NRA in a non-advocate role in this case. However, only Mr. Collins has participated in Court hearings and depositions because he is the only BAC attorney admitted *pro hac vice*. The Court should reject AMc's proposed restriction of "Highly Confidential" materials to be viewed solely by Briglia Hundley attorneys. Such a restriction unreasonably infringes upon the NRA's right to be represented by counsel of its choosing.

In addition, the NRA objects to section 7.3 because it provides that only one representative from the NRA may look at "Highly Confidential" documents without incorporating the same limitation for AMc's representatives .

APP001127

WHEREFORE the NRA respectfully requests that this Honorable Court deny AMc's Motion for Protective Order, reject AMc's Proposed Protective Order to the extent it includes Paragraph 7.3, and grant the NRA all other appropriate relief.

August 26, 2019

Respectfully submitted,

James W. Hundley (VA Bar No. 30723)
Robert H. Cox (VA Bar No. 33118)
Amy L. Bradley (VA Bar No. 80155)
BRIGLIA HUNDLEY, P.C.
1921 Gallows Road, Suite 750
Tysons Corner, Virginia 22182
jhundley@brigliahundley.com
rcox@brigliahundley.com
abradley@brigliahundley.com
Phone:  703-883-0880
Fax:  703-883-0899

**ATTORNEYS FOR THE NATIONAL RIFLE ASSOCIATION**

APP001128

## CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2019, I caused the foregoing Plaintiff's Memora.

of Law in Opposition to Defendants' Motion for Protective Order to be served via email and fir.

class mail to the following:

David Schertler
David Dickieson
Schertler & Onorato, LLP
901 New York Avenue, N.W., Suite 500
Washington, D.C. 20001
dschertler@schertlerlaw.com

*Counsel for the Defendants*

_____
James W. Hundley (VA Bar No. 30723)
Robert H. Cox (VA Bar No. 33118)

APP001129

# EXHIBIT A-65
# FILED
# UNDER SEAL

# EXHIBIT A-66

# The National Rifle Association is Laying Off Staff, Cutting Salaries and Reducing Hours Amid COVID-19 Outbreak

 **newsweek.com**/national-rifle-association-covid-19-wayne-lapierre-1493853

Asher Stockler, Peter Roff

March 23, 2020

The National Rifle Association (NRA) is laying off employees and reducing salaries across the board in the largest personnel shake-up since the non-profit organization ousted its president at the annual meeting of members in 2019.

In a note that was distributed via email to the board of directors and executive council Monday afternoon, CEO Wayne LaPierre announced that his organization "faces extraordinary challenges resulting from COVID-19" and must institute several workforce adjustments, including "the elimination of certain positions," imposing a four-day workweek for hourly employees and 20 percent pay reductions across the board "while maintaining current workloads."

The email, relayed to the board by the NRA's general counsel, John Frazer, was obtained by *Newsweek*.

In response to a request for comment about whether LaPierre himself would be subject to the belt-tightening, the organization's outside counsel, Brewer, Attorneys and Counselors, said in a statement that "salary adjustments announced today apply to all levels of the organization."



Ads by scrollerads.com



"In addition, some senior staff members are voluntarily taking deeper cuts," the statement added.

Wayne LaPierre, NRA vice president and CEO, speaks to guests at the NRA-ILA Leadership Forum at the 148th NRA Annual Meetings & Exhibits on April 26, 2019, in Indianapolis, Indiana. Scott Olson/Getty

LaPierre's compensation rose by 57 percent in 2018, the most recent year for which tax filings are available, to $2.15 million.

APP001163

Though LaPierre cited the COVID-19 outbreak as the chief reason for the personnel changes, the announcement comes during an undeniable cash-crunch at the gun-rights



group. Tax filings show that in 2018, the NRA's net assets declined by nearly $9 million to $16 million, their lowest levels in six years.

It was not immediately clear how the COVID-19 outbreak would impact the NRA's bottom line. In 2018, contributions, transfers, gifts, grants and member dues comprised around 80 percent of the organization's revenues.

The NRA was recently forced to announce that its annual meeting of members, set to take place in Nashville, Tennessee, in mid-April, would no longer be able to convene.

"We sincerely regret the need for this action," the group said in an earlier statement. "We were ultimately guided by our responsibility to help ensure the safety and well-being of our NRA members, guests, and surrounding community."

On Monday, LaPierre struck a similar tone, acknowledging that his organization had to "address immediate financial challenges and... plan for long-term impacts to ensure the viability of our organization."

"Unfortunately, these changes will necessitate the elimination of certain positions on either a temporary or, in some cases, permanent basis," he added.

APP001164

The staffing reductions will be effective Sunday and schedules were adjusted to ensure "the maintenance of benefits eligibility" for hourly employees.

"Although we are unable to predict how long these pay-related adjustments will remain in effect, or the long-term financial impacts of COVID-19, they are intended to be temporary," LaPierre's note continued, further encouraging affected employees to "contact any germane state or federal agency to determine eligibility for any additional aid."

Laid off NRA employees will be among the hundreds of thousands of Americans in recent weeks who have suddenly found themselves in one of the worst economic contractions in U.S. history. The Department of Labor reported that in mid-March, unemployment claims spiked to 281,000, the highest level since 2017.

Monday's statement from the Brewer firm noted that the COVID-19 epidemic and its accompanying nationwide lockdown have "caused a major disruption to our fundraising activities."

"Based on state or local restrictions and guidance from public health authorities, we have been forced to cancel all Friends of NRA banquets across the country, other planned events, special programs, gun shows, recruitment stations, and various other streams of expected income," the statement added.

APP001165



The booth of the National Rifle Association of America is seen at the annual Conservative Political Action Conference at Gaylord National Resort & Convention Center February 26, 2020, in National Harbor, Maryland. Alex Wong/Getty

The coronavirus outbreak represents just the latest fiscal crisis for the NRA, whose flagging finances amid an ethics and governance scandal have required the organization to take steps to shore up its balance sheet. The Trace has reported, for example, that free coffee was eliminated at the group's headquarters in Fairfax, Virginia.

The NRA and its charitable foundation are currently being investigated by the attorneys general for New York and the District of Columbia over alleged violations of their tax-exempt status, which requires that no insider derive a personal benefit from non-profit assets.

Critics have accused the NRA of engaging in profligate spending, a claim that was bolstered by the organization's former president, Lt. Col. Oliver North, who has fallen out with the NRA, as has its former public relations firm, Ackerman McQueen.

The three have since become entangled in a legal morass spanning multiple states, with accusations of deception and betrayal playing out in various lawsuits. North wrote in a letter during the final days of his tenure as president that invoices from the Brewer firm, the NRA's outside counsel, were "draining NRA cash at mindboggling speed."

APP001166

During the first quarter of 2019, the firm was being paid nearly $100,000 per day for its legal services. Brewer's defenders have noted that the NRA's voluminous litigation has racked up significant wins, including against the cities of Los Angeles and San Francisco for policies targeting gun-rights supporters.

Turnover at the NRA in recent months has jeopardized its ability to remain among the country's most politically influential organizations; and the fact that 2020 is an election year will only amplify the consequences of Monday's announcement. The NRA spent a record $55 million on the 2016 presidential election, $30 million of which went to supporting then-candidate Donald Trump.

Eight directors on the group's board have resigned since last May.

During a period of months in the fall of 2019, after a pair of especially gruesome mass shootings, the NRA was put on the defensive, pressured to demonstrate its continued political leverage during a time when many gun-rights supporters have become disaffected with the group. There appear to have been some moderate successes: *The New York Times* reported that the group secured concessions from Trump in a private phone call just as talk of new gun controls on Capitol Hill appeared viable for the first time in years.

But questions remain about whether the group can retain its unrivaled political influence in Congress, where a sitting U.S. representative, Don Young (R-AK), also serves on the NRA's board. Top officials at the NRA's Institute for Legislative Action (NRA-ILA), its lobbying arm and connection to Washington D.C., departed last year. One of them, Chris Cox, the division's former top lobbyist, was mentioned in a lawsuit against North, where he was accused of participating in a conspiracy to oust LaPierre.

David Lehman, NRA-ILA's general counsel who had been filling in for Cox amid the staffing deficit, left in August.

"Over the years, we've weathered more tough times than most," LaPierre concluded in his note Monday. "But we will rise from this stronger and well positioned to lead the fight to protect our Second Amendment, the First Amendment, and all our constitutional freedoms during the crucial upcoming elections and for years to come."

APP001167

# EXHIBIT A-67
# FILED
# UNDER SEAL

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § <br> § <br> § |
|     **Plaintiff and Counter-Defendant** | § <br> § |
| **and** | § <br> § |
| WAYNE LAPIERRE, | § <br> §   **Civil Action No. 3:19-cv-02074-G** |
|     **Third-Party Defendant,** | § <br> § |
| v. | § <br> § |
| ACKERMAN MCQUEEN, INC., | § <br> § |
|     **Defendant and Counter-Plaintiff,** | § <br> § |
| MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG, | § <br> § <br> § <br> § <br> § |
|     **Defendants.** | § <br> § |

## <u>DECLARATION OF REVAN MCQUEEN</u>

Pursuant to 28 U.S.C. § 1746, I, Revan McQueen, hereby declare as follows:

1.      My name is Revan McQueen.  I am over the age of 18 years and of sound mind.  I have never been convicted of a felony or a crime of moral turpitude.  I am the Chief Executive Officer of Ackerman McQueen, Inc. ("***AMc***").  The facts stated herein are true and correct, and based on my personal knowledge in my capacity as CEO of AMc.

2.      I am the son of Angus McQueen ("***Angus***"), who was the CEO of AMc from 1987 to 2019.  In 2009, at the age of 22, I went to work for AMc as Associate Creative Director.  I then advanced to the positions of Creative Director and, thereafter, Executive Vice President.  In 2017,

I became the co-CEO of AMc along with Angus, a position I jointly held with him until his death on July 16, 2019.

3.      Since the 1980's, AMc has provided the NRA with various services relating to public relations, crisis management, and strategic marketing.  In particular, these services include but are not limited to the following:

- Public relations advice and counsel;

- Crisis management and assisting in crafting messaging related to litigation and regulatory issues, such as the Supreme Court case *District of Columbia v. Heller*, 554 U.S. 570 (2008), and several regulatory issues with the Bureau of Alcohol, Tobacco, Firearms and Explosives and the Department of Justice;

- Ongoing media relations;

- Image building and brand management;

- Media communications and strategy, including where to appear, when to appear, and what to say;

- Crisis communications and strategy, including relating to numerous mass shootings, legislative efforts, and election efforts;

- Specialized public relations writing services and distribution of same as required;

- Research and information retrieval as necessary for NRA issues management at NRA's request and approval;

- Coordination, scheduling and on-site assistance when necessary for NRA officials' speeches and personal appearances;

- Coordination with internal NRA public relations staff in the Executive Office, General Operations and Institute for Legislative Action;

- Development of proactive earned media in national and regional media as it relates to NRA officials' appearances at special events (i.e. National Gun Shows, YHEC, Annual Meetings, etc.);

- Coordination and scheduling appearances for NRA officials and commentators; including on-site assistance (where necessary);

- Development, production, and placement of op-ed pieces for national and regional media coinciding with Special Events and NRA Officials' appearances;

- Advisory and counseling of NRA Officials on strategic issues to provoke public debate and frame NRA's point-of-view for the general public;

- Speechwriting services;

- Management of Talent/Spokespersons for NRATV; and

- Production and staffing for NRATV.

4.      The parties' business relationship was governed by evolving iterations of an agreement over the years, the most recent of which was executed on April 30, 2017, and subsequently amended (the "***Services Agreement***").

5.      I have known William (Bill) Brewer III ("***Brewer***") since the period before October of 2000. When I was 13 years old, Brewer married my sister, Skye McQueen Brewer.

6.      The McQueen family is a small and tight-knit family.  Brewer has been involved in—and has been permitted intimate personal knowledge—of our family's affairs, both personal and business, for over two decades.

7.      I have personal knowledge that Brewer's relationship with Angus was strained at times and have personally witnessed numerous instances of disrespectful conduct from Brewer toward Angus.

8.      I have personal knowledge that Brewer is the owner of a law firm (the Brewer Firm) with offices in Dallas, Texas and New York, New York.  AMc has performed marketing services for the Brewer Firm and before that the Bickel & Brewer firm.  AMc conducted interviews of many of their attorneys, including Michael Collins, counsel for the NRA in this matter.  I know of zero issues with the work we conducted, proof of which was that Brewer hired AMc to brand the new Brewer Firm after Bickel & Brewer ceased to exist.  Until as recently as December 2019, AMc maintained the Brewer Firm's website.

9.      I am also aware of Brewer voicing frequent professional criticisms about AMc's work with the NRA. I don't believe Brewer to be and certainly have not known him to be a supporter of the Second Amendment. Brewer, on more than one occasion, would pass judgment on the billing structure of AMc, saying the company could "make more money if it billed hourly."

10.     I am aware of a rift between Brewer and Tony Makris, the President of the Mercury Group, Inc.  Mr. Makris formally resigned Brewer's business because of Brewer's conduct.

11.     I am also aware that Brewer has publicly held forth the theory that law firms are better suited than communication firms like AMc to perform public relations services for their clients, a theory he debated with me and Angus on numerous occasions.  I am aware that Brewer has a public relations practice within his law firm in apparent accordance with that philosophy, a fact further confirmed by team members of the Brewer Firm that specialize in public relations.

12.     The first time I became aware that Brewer had been hired by the NRA was in 2018 when AMc started receiving PR emails from Travis Carter. John Frazer ("*Frazer*") also informed AMc via email that Brewer had been retained to represent the NRA in a lawsuit against the Lockton Affinity Series of Lockton Affinity, LLC ("*Lockton*") related to the NRA's "Carry Guard" initiative and asked AMc to comply with any requests for information related to Carry Guard. Carry Guard was a short-lived program that offered training and insurance for the use of firearms in self-defense.  It is my understanding that the insurance portion, which AMc had no part in structuring from a business standpoint, was ultimately found to be illegal in several states. AMc agreed to participate with Brewer's investigation.

13.     Angus always directed everyone to comply with all formal directives from the NRA. Among many examples of cooperation and assistance, I am aware that Brewer was allowed

to interview multiple AMc employees. During that interview, it is my understanding that he went

into a targeted and unrelated (to Carry Guard) line of questioning about Angus specifically.

14.     On June 1, 2018, Angus's lung cancer was discovered during a routine physical.

15.     From that point on, as the Carry Guard investigation progressed, Brewer began

taking actions and exhibiting behavior that appeared to be unrelated to Carry Guard and

increasingly aggressive toward AMc.  Wayne LaPierre ("*LaPierre*") informed Angus that Brewer

had criticized AMc's speechwriting services with regard to a speech LaPierre directed, as was

standard practice, AMc to write for Conservative Political Action Conference earlier that year.

16.     I was made aware that LaPierre told Angus and others at AMc on more than one

occasion during phone calls and in-person discussion throughout the summer of 2018 that "Brewer

was going to keep him out of jail."  During conversations between AMc representatives and

LaPierre, when AMc expressed concern about Brewer's strange involvement and his increasing

antagonism toward AMc, it is my understanding LaPierre stated that he felt like he was "in a box,"

that Brewer was "crazy," and that LaPierre felt like he was "just a pawn on Brewer's chess board."

17.     Brewer's interference with AMc's NRA-related business increased significantly

after Angus became ill.  On July 2, 2018, Brewer sent an email on behalf of the NRA to AMc's

attorney seeking additional documents and claiming that certain documents had been withheld

from previous NRA requests for productions.

18.     In July 2018, Brewer, on behalf of the NRA, filed an Amended Complaint in the

lawsuit against Governor Andrew Cuomo and others in the Northern District of New York: *NRA

v. Cuomo, et al.*, Case No: 18-cv-00566, United States District Court for the Northern District of

New York.  In the Amended Complaint, false statements were made regarding NRATV and its

alleged difficulty in securing media liability coverage.  In response, AMc's counsel wrote a letter

to Brewer dated August 7, 2018 outlining the specific false statements made in the Amended Complaint and requesting that Brewer and the NRA take the appropriate steps to correct the misstatements.

19.     Then, on August 8, 2018, AMc received a letter from NRA Treasurer Woody Phillips ("*Phillips*") demanding unrestricted access to all of AMc's books and records—which appeared to be far beyond the scope of the Carry Guard investigation.  An AMc representative then contacted Phillips to ask about the letter.  During the telephone call, Phillips confirmed that Brewer drafted the letter and that it was put in front of him to execute.

20.     Throughout the rest of August 2018, Brewer continued to insist AMc was withholding information and refusing to provide copies of documents, which AMc was not required to do under the Services Agreement with the NRA.  His letters and communications to AMc's attorneys became increasingly inaccurate, adversarial and incorrectly claimed that AMc was actively breaching its obligations under the Services Agreement.  Angus and I both found this distressing because we knew that AMc had fully complied with every request in good faith.

21.     In September 2018, members of the Brewer Firm conducted an on-site review at AMc of AMc records authorized for NRA personnel pursuant to the Services Agreement, but which was unlike any other review the NRA had ever conducted.  The Brewer Firm representatives, led by Susan Dillon, initially refused to identify themselves and refused to answer questions about the purpose of the review.  While every prior review involved NRA reports or other financial statements that needed to be reconciled in some way, the Brewer Firm representatives seemed to request volumes of AMc NRA-related material with no stated or identifiable objective.  Following the review, it is my understanding that no one from the NRA or the Brewer Firm followed up to identify any additional information that was missing or needed.

At that point, AMc concluded the NRA and the Brewer Firm had gotten whatever information they needed.

22.     It is my understanding that LaPierre, who was AMc's only designee at this time pursuant to the Services Agreement, directed AMc executives not to let Brewer have copies of anything because he feared the information would be leaked to hurt him. At this point, upon information and belief, based on our employees' interactions with Josh Powell ("***Powell***") (LaPierre's Chief of Staff), Brewer was working directly for Powell. This seemed to fit the narrative that LaPierre was "in a box."  On more than one occasion, Powell told multiple people at AMc that he wished he could take control of the organization.  One specific comment Powell made to multiple AMc employees was that he wished he could "put Wayne into a coma." It is my understanding that Brewer and Powell were very close, based in part on Powell talking to AMc representatives about how his relationship with Brewer extended past professional to personal interactions.  Powell would often brag to people about his knowledge of the law that Brewer taught him. On one occasion, it is my understanding, that Powell told an AMc executive that Brewer was threatening to "have people at AMc indicted" by the Federal Bureau of Investigation under RICO (Racketeer Influenced and Corrupt Organizations Act.)

23.     Furthering Brewer's increased threatening behavior and validating Powell's independent account, shortly after the initial Brewer Firm review, Angus learned from LaPierre that Brewer was threatening to have Angus indicted for unidentified misdeeds associated with AMc's work for the NRA.  This deeply upset Angus who had loved and served the NRA for most of his career.

24.     Disgusted by Brewer's and Powell's threatening behavior, Angus and I, along with a handful of other AMc executives (three of whom became named parties in the Texas litigation

and one who is in separate litigation with the NRA), met with LaPierre and Craig Spray on October 11, 2018 in Dallas, Texas to discuss Brewer and Powell as well as other matters of business. This meeting was part of a larger conference to discuss whether AMc would continue to provide any services at all for the NRA the following year.  We extensively discussed Brewer's connection to the McQueen family, how inappropriate and aggressive Brewer's conduct had become, and that we felt it was inappropriate for him to continue to represent the NRA in any manner related to AMc. We also discussed Powell's threatening behavior toward AMc as well as his alleged sexual harassment of one of our employees.

25.     I was prepared to resign the business at that meeting but LaPierre and Craig Spray assured the company that things were changing.  LaPierre repeatedly asked us during the meeting to "stick with him."  After this meeting, LaPierre promised to me via phone that AMc would not have to deal with Powell, Brewer or his firm anymore, and that any future review of AMc's documents would be conducted by independent parties, not Brewer or his law firm.  And in accordance with LaPierre's promise to keep Brewer away from AMc, in November 2018, an independent on site audit of AMc was conducted by NRA counsel Cooper & Kirk without issue.

26.     Despite this brief respite from Brewer's harassment, Brewer resurfaced a few weeks later in December 2018.  Brewer knew Angus was in the process of undergoing painful radiation and chemotherapy treatment after surgery had been ruled out as an option to treat his cancer.  Angus was home for what would likely be—and was in fact—his final Christmas with his family.  On December 21, 2018, the Brewer Firm sent another letter requesting more confidential information about AMc's business, such as information about other clients, which is proprietary to AMc and not authorized in the Services Agreement.  Prior to this time, the NRA had never requested any information about AMc's other clients, including how AMc negotiated agreements.

27.     In January 2019, in a meeting with AMc, LaPierre defended Brewer and told AMc that Brewer would be writing the upcoming Conservative Political Action Conference speech. LaPierre also said that he was sending Brewer to The New York Times to threaten to sue them for a story they were writing about Russia issues, of which AMc had no knowledge and LaPierre told AMc that we "don't know what we don't know."

28.     Shortly after that meeting, Danny Hakim of the New York Times started contacting AMc about a story he was writing about AMc's involvement with NRATV.

29.     In February 2019, AMc underwent yet another onsite review at the NRA's request, which according to the NRA's representations, would be done by an independent firm unrelated to the Brewer Firm.  The review was conducted by a company called Forensic Risk Alliance ("**FRA**") and lasted on site for a total of nine days.  While still unusual, AMc did not withhold or fail to provide any document requested by FRA.  As with the two previous reviews, FRA did not follow up or request any additional information post-review.  Therefore, AMc assumed the review was complete. We now know that Susan Dillon, the woman who led the first audit for Brewer, had left the Brewer firm some time in 2018 and joined FRA.

30.     In early April 2019, Angus communicated to his family that he was gaining strength and was hopeful that his health was improving.  On April 12, 2019, Brewer filed his first lawsuit against AMc in Virginia, alleging that AMc had somehow failed to comply with the string of audits it had undergone during the prior six months and that it was actively concealing information from the NRA.

31.     During that time, April 2019, Brewer threatened to have me and Angus indicted by the Department of Justice, which was communicated to me through a member of our family.

Brewer was also quoted in numerous media articles attacking AMc for its alleged failure to comply with the NRA's record requests.

32.     By early May 2019, Angus was severely ill, starting to cough up blood and show signs that the cancer was progressing.  It is my understanding that Brewer was well aware of all of this.  In mid-May 2019, Angus was hospitalized.

33.     While family was traveling to visit Angus in the hospital, Brewer filed his second lawsuit against AMc in Virginia.  This lawsuit not only falsely claimed that AMc had been a part of some plot to extort and overthrow LaPierre, but that it was actively leaking confidential information to the media about the NRA.

34.     Throughout the remainder of May, June, and July 2019, Brewer was repeatedly quoted in the media discussing AMc's attempts to "derail" the NRA's investigations and AMc's sponsorship of the "failed coup" attempts along with Oliver North and others.[1]

35.     On July 11, 2019, as Angus was in hospice care and his family was traveling to see him, he read Brewer's quote in a Bloomberg article, accusing AMc of committing crimes against the NRA.[2]  Distraught from reading the words of his son-in-law libeling him as a criminal, Angus looked at me and told me to protect our family from Brewer who he believed would stop at nothing to attempt to destroy his family.  Less than one week later, on July 16, 2019, Angus passed away.

36.     Since the date the NRA's first lawsuit was filed against AMc on April 12, 2019, I have personal knowledge that Brewer, using family members as channels, has attempted to communicate with me to influence AMc's litigation positions and strategy.  For example, when Brewer knew that AMc was represented by counsel, he tried to direct me to "break privilege" with my own attorneys so he could tell me "how to get out of this."   In addition to his threat of

---

[1] *See* **Appendix A** attached to AMc's Motion to Disqualify.
[2] *See id*.

indictment in April 2019, through these channels, I have learned that, despite the fact that Brewer and his PR unit have supposedly been limited to certain information in the Virginia lawsuits against AMc, Brewer is still managing and overseeing "every aspect" of those cases.  Based on this knowledge, I have no reason to believe *any* of the highly confidential information AMc has produced in the Virginia lawsuits to the NRA has actually been withheld from Brewer as ordered.

37.    Oddly, Brewer has now undertaken the representation of Grant Stinchfield ("***Stinchfield***")—a former AMc employee and NRATV program host who filed an affidavit on behalf of the NRA.  Not only did Stinchfield's affidavit contain false statements regarding AMc, but it was promptly leaked to the media.  AMc responded with a suit against Stinchfield for libel, which is a companion case to this cause of action.[3] It is my understanding that Stinchfield agreed to sit down with our attorneys to discuss editing his affidavit for accuracy. He abruptly canceled that meeting and Brewer filed his answer.

38.    The Answer that Brewer filed, along with Ian Shaw who is a young man that I remember sharing dinner with our family and surely benefitted from hearing business that was discussed, on behalf of Stinchfield demonstrates Brewer's animus toward AMc. Either out of ignorance—or because he hopes the court won't actually research his citations—Brewer cites several articles to support the Stinchfield Answer that are actually favorable to AMc. Brewer blatantly misrepresents the circumstances of some of AMc's past client relationships, about which he had knowledge as they happened because of his family connection.  Further, one of the claims made in the Answer does not apply to AMc at all, which, in my opinion, clearly shows that Brewer was willing to hurt AMc's business and Angus's legacy with anything he could invent. This is also evident, in my opinion, by how quickly Brewer filed the amended response that oddly deleted a

---

[3] *Ackerman McQueen, Inc. v. Stinchfield*, N. Dist. Tex, No. 3:19-cv-03016-x (Dec. 12, 2019).

libelous quote, falsely attributed to Angus, included in the first filing. This filing appears to be a manipulation of Stinchfield and it is clear that Brewer simply used it as a way to continue his personal attack on Angus.  It is my belief that Brewer is only representing Stinchfield pro bono to seize the opportunity to destroy Angus's honor and legacy as well as his business competitor, AMc, with a twisted revisionist history and the false attribution of quotes to a man who can no longer speak for himself.

39.    As the brother-in-law of Brewer, I believe that it is profoundly unfair and highly prejudicial for AMc to have to litigate this matter against Brewer and his firm.  His intimate knowledge of our family allows the Brewer Firm to engage in sending messages to me using family members instead of communicating through my attorneys. Brewer had detailed knowledge of Angus's cancer treatment and used that information to time his litigation and media attacks.  He denied our family uninterrupted time with our father during his final year of life and damaged some of the last moments between Angus and his family.  As the CEO of AMc, who is the party in this litigation and directs litigation strategy, I am often forced to consider the implications of AMc's actions which may impact my sister and her children, whom I care about deeply.

40.    I declare under penalty of perjury that the foregoing is true and correct.


Executed this 30th day of March, 2020.

_____
Revan McQueen

# EXHIBIT C

Filed 1/22/2016 2:40:09 PM
Barbara Sucsy
District Clerk
Lubbock County, Texas



RHR

**RUBEN G. REYES**
District Judge

**STATE OF TEXAS**
**72ND JUDICIAL DISTRICT OF TEXAS**
(Lubbock County Courthouse – Third Floor)
P.O. Box 10536
Lubbock, Texas 79408-3536
(806) 775-1023 Telephone
(806) 775-7996 Fax

**REBECCA DUVAL**
Official Court Reporter

**JUDY P. HALFORD**
Court Coordinator

January 22, 2016

Via e-file

Marquette Wolfe
Ted B. Lyon & Associates, PC
18601 LBJ Freeway, Ste. 525
Mesquite, TX 75150

Via e-file

Timothy T. Pridmore
R. Michael McCauley, Jr.
McWhorter, Cobb & Johnson, LLP
P.O. Box 2547
Lubbock, TX 79408-1499

Re:    Cause No. 2012-504,105; *Ken Teel, et al v. Titeflex, et al*; 72nd District Court of Lubbock
County, Texas; Re:  Ruling on Sanctions Motions

Dear Mr. Wolfe & Mr. Pridmore:

The Court makes the following ruling with regard to the Sanctions Motions referenced as numbers
50-54 on the Court's Motion List.  The Court takes into consideration the motions, argument and
briefing of counsel as well as the evidence presented – including but not limited to the conflicting
testimony and credibility of the witnesses.

The Court grants the Motions for Sanctions only as they relate to William Brewer III.  It should be
noted that the manner in which Mr. Brewer has responded to the sanctions motions and allegations
therein is concerning to this Court.  Mr. Brewer's demeanor was nonchalant and uncaring.
Additionally, Mr. Brewer was repeatedly evasive in answering questions when he was on the witness
stand.  This Court sustained multiple objections for non-responsiveness, instructed Mr. Brewer to
answer the questions being asked of him by counsel, and before taking more aggressive steps, this
Court took a recess during Mr. Brewer's examination seeking the assistance of Mr. Brewer's
attorney.  The Court asked Mr. Pridmore to step outside the courtroom and advise Mr. Brewer to
follow the Court's instructions and be responsive to questions being asked of him.  It was the desire
and hope of this Court to highlight to Mr. Brewer that the matter at hand was of extreme importance
with potentially grave consequences.



EXHIBIT

A

Page two
Letter to Wolfe & Pridmore
Letter dated January 22, 2016

The Court wishes to highlight in this letter some of the evidence which serves as the basis its ruling. Mr. Brewer admits instructing and guiding the pollster on the purpose and composition of the poll, i.e. the customer told the retailer what the customer desired. Additionally, evidence revealed the pollster contacted parties and attorney-represented, as well as unrepresented, witnesses involved with the pending litigation. Review of the database (Exhibit 4) further revealed family of this Judge as well as the Judge's staff being on the database call list. John Grace, assistant city attorney, testified his review of city employees/officials being contacted by the pollster led him to the conclusion the poll was "targeting" city employees/officials associated with the pending litigation.

Mr. Brewer testified he is the person who manages, directs and oversees all Bickel & Brewer operations including but not limited to all lawyers, non-lawyer employees and consultants. Mr. Brewer admits he, and members of his staff, reviewed and approved the poll questions. Testimony of Bickel & Brewer staff corroborated Mr. Brewer. After reviewing questions in the poll, the Court finds several questions were designed to influence or alter the opinion or attitude of the person being polled – some questions being tantamount to commitment opinions.

The Court finds Mr. Brewer's actions were not merely a negligent act, a mistake or the result of poor judgment, and Mr. Brewer's explanation that he bears clean hands because the poll was a blind study conducted by a third party vendor is insulting to this Court. The Court further finds Mr. Brewer's attempt to avoid responsibility and accountability for his conduct to be at the very least unpersuasive and at the worst in bad faith, unprofessional and unethical.

The Court finds Mr. Brewer's conduct disrespectful to the judicial system and threatening to the integrity of the judicial system. Mr. Brewer's conduct falls in the category of misconduct which is highly prejudicial and inimical to a fair trial by an impartial jury.

The Court is mindful of Mr. Pridmore's letter of June 4, 2015 which included "several standing orders . . . related to surveys." What is instructive of these standing orders from Chief Judge Ron Clark, Judge Rodney Gilstrap, Judge Leonard Davis and Judge Michael Schneider is that these orders actually serve as an excellent blueprint for the manner by which a proper survey/poll should be conducted. While Judge Gilstrap "discourages the parties from conducting . . . studies in which any mock jurors or similar participants reside in the division where the case is pending" IF a study is to be conducted, specific procedures are to be followed by counsel – none of which were followed in the matter pending before this Court. Judge Clark mandates a minimum of one (1) month notice to the Court prior to pre-trial conference as to the commission of any study AND said notice "shall include a brief description of the study's methodology" – again such was not done in the case pending before this Court. Common to all four (4) standing orders is the requirement that the name and address of each participant in the study be retained by counsel and supplied to the Court – again not done herein. This Court is further mindful of the legal authority cited in the briefing by all counsel, including but not limited to the *Primrose* case – noting first that *Primrose* involved a mock trial and not a poll and further that the safeguards taken by counsel in the *Primrose* case were not undertaken here.

Page three
Letter to Wolfe & Pridmore
Letter dated January 22, 2016

In awarding the amounts below the court additionally finds:

1. Mr. Brewer's conduct taken in its entirety is an abusive litigation practice that harms the integrity of the justice system and the jury trial process;

2. Mr. Brewer's conduct was designed to improperly influence a jury pool and or venire panel via the dissemination of information without regard to it truthfulness or accuracy;

3. The net effect of Mr. Brewer's conduct was to impact the rights of parties to a trial by an impartial jury of their peers;

4. Mr. Brewer's conduct negatively affected the due process and seventh (7th) amendment protection due to the litigants in the case before the Court;

5. The conduct of Mr. Brewer includes the actions of those under his authority, direction as well as those acting as his agents;

6. The database of names from the pool included in part court personnel, their spouses, City Council and their spouses, City Managers, witnesses and their spouses, designated third parties and their spouses without regard to these individuals being represented by counsel or not;

7. The polling efforts were not random nor merely coincidental;

8. Mr. Brewer's failure to provide a list of parties and witnesses whom should not be contacted was grossly negligent and his attempt to avoid responsibility by deferring such responsibility to a third party vendor hired by his firm is conduct unbecoming an officer of the court;

9. The polling questions were not an appropriate and legitimate pre-trial preparation tool;

10. The conduct of Br. Brewer was intentional and in bad faith and abusive of the legal system and the judicial process specifically.

Accordingly, the Court finds the following sanctions to be just and not unconstitutionally excessive and no more severe than necessary to accomplish a legitimate end – namely, deterrence, punishment and compliance.

Attorney's fees are awarded as follows:

Defendant Lennox -- Attorney fees $29,500.00 plus expenses $3,500.00;
    If appealed to Court of Appeals: $5,000.00 plus $2,800.00 for oral argument plus $1,000.00
        for expenses;
    If appealed to Supreme Court:  $5,000.00 plus $2,500.00 for oral argument plus $1,000.00
        for expenses.

Page four
Letter to Wolfe & Pridmore
Letter dated January 22, 2016

Defendant Turner & Witt -- Attorney fees $11,032.00 plus expenses $1,919.76;
     If appealed to Court of Appeals:  $1,400.00 plus $1,120.00 for oral argument;
     If appealed to Supreme Court:  $2,800.00 plus $1,120.00 for oral argument plus $750.00 for
        expenses.

Defendant Strong Custom Builders -- Attorney fees $8,170.00 plus expenses $554.83;
     If appealed to Court of Appeals:  $2,000.00 plus $1,000.00 for oral argument.

Defendant Thermo Dynamic -- Attorney fees $16,038.00 plus expenses $3,738.68;
     If appealed to Court of Appeals:  $4,125.00 plus $2,475.00 for oral argument.

Subrogee State Farm -- Attorney fees $27,312.00;
     If appealed to Court of Appeals:  $2,500.00 plus $2,500.00 for oral argument.

Plaintiffs Teel and Rushing -- Attorney fees $31,650.00;
     If appealed to Court of Appeals:  $2,500.00 plus $2,000.00 for oral argument.

The Court further orders Mr. Brewer to successfully complete ten (10) additional hours of ethics
CLE and file certificates reflecting successful completion of such no later than December 31, 2016.

As there seemed to be some question in the briefing about the burden of proof standard, the Court
bases its ruling on a preponderance of the evidence standard but would also say the ruling is equally
supported by an elevated clear and convincing standard.

This ruling is limited to the specifics of the sanction motions presented to the Court – meaning that
the Court is not commenting on the broader issue of lawyers utilizing polling, focus groups or mock
trials; but rather this ruling speaks only to the poll used my Mr. Brewer and the manner of its
implementation and utilization in the case before the Court.

Copy of this letter is being mailed to the State Bar of Texas Chief Disciplinary Counsel's Office for
any action that office may wish to consider, if any, regarding Mr. Brewer.

Sincerely,

Ruben G. Reyes
Presiding Judge
72nd District Court
Lubbock/Crosby Co.

RGR/jh

Cc:    Attorneys for Teel, et al v. Titeflex, et al – via e-file

# EXHIBIT D

Case 1:18-cv-00639-LO-JFA   Document 36   Filed 09/17/18   Page 1 of 18 PageID# 193
Case 3:19-cv-02074-G-BK   Document 80   Filed 03/30/20   Page 469 of 486   PageID 4850

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


```
------------------------------:
                              :
NATIONAL RIFLE ASSOCIATION    :
OF AMERICA,                    :
               Plaintiff,     :
                              :
    -vs-                      :    Case No. 1:18-cv-639
                              :
                              :
LOCKTON AFFINITY SERIES OF    :
LOCKTON AFFINITY, LLC, et al.,:
               Defendants.    :
                              :
------------------------------:
```



HEARING ON PRO HAC VICE MATTERS


September 13, 2018


Before:  Liam O'Grady, USDC Judge

APPEARANCES:

James W. Hundley, Robert H. Cox, and William A. Brewer, III,
Counsel for the Plaintiff

Bernard J. DiMuro and Stacey R. Harris, Counsel for Mr. Brewer

Case 1:18-cv-00639-LO-JFA   Document 36   Filed 09/17/18   Page 2 of 18 PageID# 194
Case 3:19-cv-02074-G-BK   Document 80   Filed 03/30/20   Page 470 of 486   PageID 4851

2

1          THE CLERK:  The Court calls case 1:18-cv-639,

2    National Rifle Association of America versus Lockton Affinity

3    Series of Lockton Affinity, LLC, et al.

4          May I have the appearances, please, first for the

5    plaintiff.

6          MR. HUNDLEY:  Good morning, Your Honor.  Jim Hundley

7    here on behalf of the National Rifle Association.  With me is

8    Bob Cox, also counsel for the National Rifle Association.

9          Also present is Bill Brewer, who has been admitted in

10   the case on a pro hac vice matter which is under further review

11   today.

12         THE COURT:  All right, good morning.

13         MR. HUNDLEY:  Good morning, Your Honor.

14         MR. COX:  Good morning, Your Honor.

15         MR. DiMURO:  Good morning, Your Honor.  Ben DiMuro

16   and Stacey Rose Harris appearing specially on behalf of Mr.

17   Brewer.

18         And I also note that John Frazier, general counsel to

19   the NRA, is present in the courtroom.  He is an admitted member

20   of the Bar.  I just wanted to note his appearance.

21         THE COURT:  All right.  Good morning to each of you.

22         All right.  I ordered this hearing in response to

23   information received about Mr. Brewer's findings in Texas

24   against him, a finding by a trial judge and then a Court of

25   Appeals that he had acted unethically and in bad faith in a

Case 1:18-cv-00639-LO-JFA   Document 36   Filed 09/17/18   Page 3 of 18 PageID# 195
Case 3:19-cv-02074-G-BK   Document 80   Filed 03/30/20   Page 471 of 486   PageID 4852

3

1    prior litigation.

2            And as we all know, the pro hac vice statement

3    requires an applicant to state that "I have not been

4    reprimanded in any court, nor has there been any action in any

5    court pertaining to my conduct or fitness as a member of the

6    Bar."

7            And in reviewing the District Court and the Appellate

8    Court's written orders, I found it necessary to have our

9    hearing today.

10           I would also note that Mr. Cox in vouching for Mr.

11   Brewer's good standing stated that, as a member of the court,

12   that he knew the applicant personally, said that the applicant

13   possessed all the qualifications required for admission to the

14   Bar of this court, "that I have examined the applicant's

15   personal statement.  I affirm that his personal and

16   professional character and standing are good, and petition the

17   court to admit the applicant pro hac vice."  And that certainly

18   is an area that I believe deserves some attention this morning

19   as well.

20           So let's discuss Mr. Brewer first.  Mr. DiMuro,

21   what's Mr. Brewer's position on the accuracy of the statement

22   that he signed?

23           MR. DiMURO:  We would -- I don't know how you want to

24   proceed, but Mr. Brewer is prepared to explain to the Court his

25   thought processes and why he signed it.  And he can do it at

1    the podium.  I might have a few additional questions for him

2    that is more appropriate for a give and take, and then a

3    handful of exhibits.

4              THE COURT:  All right.

5              MR. DiMURO:  But I will go ahead and have Mr. Brewer

6    explain himself.

7              THE COURT:  Sure.  Mr. Brewer, please come to the

8    podium, sir.

9              MR. BREWER:  Good morning, Your Honor.  Thank you for

10   the opportunity to address the Court.  I am sorry to be a

11   burden to the Court on this.

12             The matter that the Court referred to is on appeal to

13   the Texas Supreme Court.  It was my thinking when I filled out

14   the application that -- and by the way, thank you for admitting

15   me provisionally to appear before you as a representative and

16   advocate for the NRA.

17             But it was my thinking when I filled that application

18   out that it was -- didn't refer to pending matters, but frankly

19   to final matters.  Because I know that the matter is not final

20   because it is on appeal.  And, frankly, since then I have been

21   encouraged that the Supreme Court has done what courts -- what

22   I believed strongly the court would do, not only grant a

23   hearing on it, but actually set it down for oral argument.

24   Because I felt strongly that it was important for me to pursue

25   that matter.

Case 1:18-cv-00639-LO-JFA   Document 36   Filed 09/17/18   Page 5 of 18 PageID# 197
Case 3:19-cv-02074-G-BK   Document 80   Filed 03/30/20   Page 473 of 486   PageID 4854

5

1          But because it was not a final matter, I didn't think

2    it was called for.  Now, obviously, no advocate -- and I have

3    been -- had the pleasure to be an advocate for clients for

4    38 years now.  No advocate, no one in my firm ever hears me say

5    anything other than that it is privilege to appear in a court

6    like this on behalf of a client.  I take very seriously my

7    responsibilities as an officer of the court.

8          And so, candor is the issue of the day, and my

9    opportunity to convince you that I will be candid and deserve

10   the privilege to appear in your court.  I can tell you that it

11   was no attempt on my part to --

12         THE COURT:  Well, did you not read the statement?

13         MR. BREWER:  I did read it.  I did read it, Your

14   Honor.  I thought it referred to -- what I thought was called

15   for was final --

16         THE COURT:  "Nor has there been any action in any

17   court pertaining to my conduct or fitness as a member of the

18   Bar."

19         How could you read that any other way than requiring

20   you to notify the court if there had been any action in any

21   court?

22         MR. BREWER:  Your Honor, looking back on it now, and

23   I can tell perhaps I made a mistake, but I regularly fill out

24   applications for pro hac admission in other courts.  I been

25   instructed by my counsel, my appellate counsel, to be careful

Case 1:18-cv-00639-LO-JFA   Document 36   Filed 09/17/18   Page 6 of 18 PageID# 198
Case 3:19-cv-02074-G-BK   Document 80   Filed 03/30/20   Page 474 of 486   PageID 4855

6

1    about the fact that this was a non-final or suspended matter

2    while it was on appeal.

3            In fact, I have filled out other pro hacs in other

4    courts where they requested information about any pending

5    matters, and disclosed the existence of the situation in

6    Lubbock.

7            THE COURT:  This was meant to be even broader to make

8    sure that it captures any action in any court.

9            MR. BREWER:  Your Honor, I honestly -- candor is the

10   issue of the day, and to be -- you have asked me the most

11   important question, what was I thinking when I filled it out.

12   Clearly, no -- it's a very celebrated, high-profile matter back

13   in Texas.  Any amount of search around me would reveal that

14   it's quite celebrated, as is the fact now that the Supreme

15   Court has accepted argument on it.

16           The fact is, it was certainly no attempt on my part

17   to mislead.  I simply thought, given that it was inquiring into

18   any reprimand, well, I haven't been reprimanded.  There is

19   pending an order of a court from a District Court, Judge Reyes

20   out of Lubbock, that is being reviewed and was in the appellate

21   process.

22           So, candidly, I wish I had a more satisfactory

23   answer.  Frankly, I wish I had filled it out separately, done

24   something different because no one wants to be at the podium

25   making this explanation as I am doing today, Your Honor.

Case 1:18-cv-00639-LO-JFA   Document 36   Filed 09/17/18   Page 7 of 18 PageID# 199
Case 3:19-cv-02074-G-BK   Document 80   Filed 03/30/20   Page 475 of 486   PageID 4856

7

1          But life is a growing, learning process, as we tell

2     our children.  Right?  And I wish I could hit the button, go

3     back, rethink it.  But at the time, to be completely candid

4     with Your Honor, as I will always be in your court, I thought

5     it didn't -- as I told Your Honor, in other applications for

6     pro hac admission where it said "pending matters," I disclosed

7     it, I have disclosed it.

8          But in this matter I thought it was referring to a

9     reprimand.  Well, I haven't been reprimanded.  In fact, the

10    reprimand has been suspended while it's on appeal.

11         And so, that was my thinking when I filled it out.

12         THE COURT:  Okay.  Did you tell Mr. Cox about the

13    action by Judge Reyes or the Appeals Court?

14         MR. BREWER:  I did not.

15         THE COURT:  Okay.  All right.  Thank you, sir.

16         MR. DiMURO:  May I just ask a few questions, Your

17    Honor?

18         THE COURT:  Yes, go ahead, Mr. DiMuro.

19         MR. BREWER:  Your Honor, should I stand here you or

20    go to my chair --

21         THE COURT:  You can go -- well, no, I need to make

22    sure we get your answers on the recorder.  So please stay

23    there.

24         MR. DiMURO:  I will be quick, Your Honor.

25         In Texas, the Supreme Court does not have -- it is

1     not a mandatory appeal to the Supreme Court; is that correct?

2                 MR. BREWER:  It is not.

3                 MR. DiMURO:  Is it discretionary to the Supreme Court

4     to accept an appeal?

5                 MR. BREWER:  Yes, it is.

6                 MR. DiMURO:  Exhibit 1, is that the letter from the

7     Supreme Court noting that they are taking the appeal and they

8     want briefing on the merits?

9                 MR. BREWER:  Yes, it is.

10                MR. DiMURO:  And this is the appeal from Judge Reyes'

11    decision, right?

12                THE COURT:  From the Appellate Court?

13                MR. DiMURO:  Yes, sir.  Is that right?

14                MR. BREWER:  Yes, it is.

15                MR. DiMURO:  All right.  Did you apply for pro hac

16    vice admission in the Circuit Court of the First Circuit for

17    the State of Hawaii in or about May of 2017?

18                MR. BREWER:  Yes, I did.

19                MR. DiMURO:  Is that Exhibit 2?

20                MR. BREWER:  Exhibit 2 is that application.

21                MR. DiMURO:  What does it disclose about the Lubbock

22    decision?

23                MR. BREWER:  It discloses that there is a pending

24    matter related to Lubbock.

25                MR. DiMURO:  And is your affidavit attached to your

Case 1:18-cv-00639-LO-JFA   Document 36   Filed 09/17/18   Page 9 of 18 PageID# 201
Case 3:19-cv-02074-G-BK   Document 80   Filed 03/30/20   Page 477 of 486   PageID 4858

9

1    local counsel's petition?

2              MR. BREWER:  That is my affidavit.

3              MR. DiMURO:  And paragraph 6 of your affidavit to the

4    court of Hawaii, would you read paragraph 6, please.

5              MR. BREWER:  "I have never been disciplined by any

6    jurisdiction in which I am admitted to practice.  I am

7    currently the subject of a grievance filed with the State Bar

8    of Texas.  The grievance was filed by a party to a lawsuit in

9    which I represented the opposing party.  The grievance

10   proceeding is stayed pending the outcome of judicial

11   proceedings."

12             MR. DiMURO:  Is Exhibit 3 the rules of the Hawaii

13   court system for purposes of disclosing -- making disclosures

14   for pro hac vice issues?

15             MR. BREWER:  Yes, it is.

16             MR. DiMURO:  And what disclosure did they require and

17   what you were answering by way of Exhibit 2?

18             MR. BREWER:  Well, (c), (2)(c) I believe it is, "any

19   and all disciplinary proceedings in which the applicant was

20   disciplined, any pending disciplinary proceedings against the

21   applicant, or a statement, if applicable, that the applicant

22   has never been the subject of any disciplinary proceeding."

23             MR. DiMURO:  Okay.  Did the court in Hawaii ask for

24   further disclosure on the Lubbock issue or that grievance?

25             MR. BREWER:  Yes, the court did.

Case 1:18-cv-00639-LO-JFA   Document 36   Filed 09/17/18   Page 10 of 18 PageID# 202
Case 3:19-cv-02074-G-BK   Document 80   Filed 03/30/20   Page 478 of 486   PageID 4859

10

1          MR. DiMURO:  And is Exhibit 4 the supplemental

2    submission?

3          MR. BREWER:  Yes, it is.

4          MR. DiMURO:  Does Exhibit 4 contain your supplemental

5    declaration concerning the Lubbock decision?

6          MR. BREWER:  Yes, it does.

7          MR. DiMURO:  All right.  And did the court ultimately

8    grant your pro hac vice request in Hawaii?

9          MR. BREWER:  Yes, the court did.

10          MR. DiMURO:  And is that Exhibit 5?

11          MR. BREWER:  Yes, Exhibit 5 is the order granting the

12    admission.

13          MR. DiMURO:  And to your knowledge, are all these

14    exhibits, 2 through 5, public records in the State of Hawaii?

15          MR. BREWER:  Yes, they are.

16          MR. DiMURO:  Do you have any reason not to disclose

17    and keep secret the Lubbock decision?

18          MR. BREWER:  No.

19          MR. DiMURO:  You represent the NRA in this matter.

20    Do you represent them in other matters?

21          MR. BREWER:  Yes, I do.

22          MR. DiMURO:  This matter, I believe, procedurally is

23    somewhere in the middle of discovery?

24          MR. BREWER:  Yes, this matter is in discovery, Your

25    Honor.

Case 1:18-cv-00639-LO-JFA  Document 36  Filed 09/17/18  Page 11 of 18 PageID# 203
Case 3:19-cv-02074-G-BK  Document 80  Filed 03/30/20  Page 479 of 486  PageID 4860

11

1        MR. DiMURO:  And the client would request that you

2    remain as counsel of record?

3        MR. BREWER:  Yes.

4        MR. DiMURO:  What assurances can you give the Court

5    in terms of your efforts to be candid in ongoing proceedings?

6        MR. BREWER:  Your Honor, as I have already stated to

7    you, this is bad day, one that I have not had before in

8    38 years, and I sorely want to avoid ever again.

9        I take very seriously, as does every lawyer and

10   professional who works in my law firm, the admonition to be

11   honorable, candid, and completely accurate with our client's

12   business as we are advocates in courts.

13       I was very pleased and looking forward to appearing

14   as an advocate for the NRA in your court, was pleased when you

15   granted my pro hac application, and hope you will take my words

16   sincerely that I very much take seriously my obligation to the

17   court as an officer of the court.

18       THE COURT:  All right.  Thank you, sir.

19       Mr. DiMuro, anything further?

20       MR. DiMURO:  No, sir.

21       THE COURT:  All right.  Have a seat.

22       Mr. Cox --

23       MR. COX:  Yes, Your Honor.

24       THE COURT:  What investigation did you do before you

25   signed this pro hac vice admission?  Did you do anything that

Case 1:18-cv-00639-LO-JFA   Document 36   Filed 09/17/18   Page 12 of 18 PageID# 204
Case 3:19-cv-02074-G-BK   Document 80   Filed 03/30/20   Page 480 of 486   PageID 4861

12

1    you were required to do in the written statement?

2              MR. COX:  Yes, Your Honor.  I would like to start,

3    just by way of introduction or background, this is the first

4    time that I have been counsel for the NRA and the first time

5    that I have worked with the Brewer firm, and I did submit a

6    responsive document pleading a couple days ago.

7              So, Your Honor, when I first was -- had been retained

8    in this matter, I did forward on the Local Rules of this court

9    on to the Brewer firm, on to my contact there in terms of when

10   I received them and advised them that lawyers at the firm

11   needed to review the Local Rules before submitting a pro hac

12   vice application.

13             In terms of what I did in terms of an investigation

14   before I submitted the original application, I had reviewed the

15   Web site of the Brewer firm, looked at Mr. Brewer's bio, looked

16   at his court admissions.

17             I had one conversation with a partner of Mr. Brewer's

18   in which I had received his application and then that specific

19   partner's.  I asked whether there were any issues, and was

20   advised there were.

21             And then I reviewed Mr. Brewer's statement and

22   affirmation, examined that, and also the listing of all of his

23   court admissions that is submitted on the back of the pro hac

24   vice application.

25             So that's the extent of the investigation that I did,

Case 1:18-cv-00639-LO-JFA   Document 36   Filed 09/17/18   Page 13 of 18 PageID# 205
Case 3:19-cv-02074-G-BK   Document 80   Filed 03/30/20   Page 481 of 486   PageID 4862

13

1    Your Honor.  And then the first time I learned of the existence

2    of this disciplinary proceeding was a few hours before the

3    Court issued its ruling on August 14.

4              THE COURT:  I notice on -- so you didn't uncover

5    anything about the Texas ethics probe?

6              MR. COX:  No, I didn't, Your Honor.  But I wasn't

7    specifically searching for it, I wasn't aware of it's

8    existence.

9              THE COURT:  And you didn't have any conversation with

10   Mr. Brewer personally prior to signing the form?

11             MR. COX:  No, I didn't, Your Honor.  I talked to one

12   of -- a couple of his partners.

13             THE COURT:  All right.  Thank you, Mr. Cox.

14             All right.  Anything else?

15             MR. DiMURO:  Nothing else, Your Honor.  I would have

16   a few remarks.

17             THE COURT:  Go ahead.

18             MR. DiMURO:  Thank you.  Well, my remarks probably

19   can't rise any higher than how you take Mr. Brewer's comments.

20   I believe he's been quite candid with Your Honor this morning

21   about his thought process.  Whether or not it was flawed at the

22   time of signing it is for Your Honor's consideration.

23             However, I don't think he was in bad faith or had a

24   specific intent to mislead the Court.  The Lubbock decision, as

25   he has testified, is generally known.  I suspect there are

Case 1:18-cv-00639-LO-JFA  Document 36  Filed 09/17/18  Page 14 of 18 PageID# 206
Case 3:19-cv-02074-G-BK  Document 80  Filed 03/30/20  Page 482 of 486  PageID 4863

14

1    members of the press here.  In fact, I know of at least one

2    e-mail inquiry by a member of the press.  So it's a high

3    profile matter.  And as I have shown you -- and I would move

4    Exhibits 1 through 5 into evidence.

5              THE COURT:  Yes, they will be admitted.

6              MR. DiMURO:  Thank you.  As those exhibits show, it

7    was openly disclosed in a Hawaii case where the question was

8    very specific about pending disciplinary procedures.

9              I was surprised to find that there is actually a

10   decision out of the District Court of South Carolina quoting

11   Fourth Circuit law on pro hac vice admissions.  I had never run

12   across that.  It's In re Ronald Jefferson Davis, Debtor.  It's

13   a bankruptcy decision, 2012 WL3782548.

14             May I pass it up, Your Honor?

15             THE COURT:  I have it.  It's an order on motion to

16   revoke pro hac vice admission.

17             MR. DiMURO:  Then I will save you from pointing out

18   the pertinent language.  Maybe I shouldn't have been so

19   surprised to see the decision.

20             THE COURT:  Well, it's a little different.  It's not

21   on all fours with us here, but it is as close as I could find

22   as well.

23             MR. DiMURO:  Yes, sir.  The case is in the middle of

24   proceedings.  I don't know what level of discovery has been

25   undertaken.  But the NRA is here, I think Mr. Frazier would

Case 1:18-cv-00639-LO-JFA   Document 36   Filed 09/17/18   Page 15 of 18 PageID# 207
Case 3:19-cv-02074-G-BK   Document 80   Filed 03/30/20   Page 483 of 486   PageID 4864

15

1    confirm they would prefer to have Mr. Brewer and his firm stay

2    on as lead counsel in this matter.

3           And as the Davis case suggests, if revocation is

4    within the realm of possibility, it should be analyzed under

5    the rules for disqualifying actual members of the Bar.  And

6    those standards are actual conflicts or misuse of confidential

7    information, or something that goes -- things that go to the

8    integrity of the system.

9           Mr. Brewer has an unblemished career disciplinary-

10   wise otherwise.  And we would ask that Your Honor consider the

11   fact of his comments, his candor, his sincere efforts to

12   explain what happened.  And he could have diverted it to

13   somebody else who may have filled out the form or said it's

14   okay.  He didn't do that.  He certainly hasn't done anything in

15   this court in terms of discovery or litigation efforts that

16   should cause the Court any concern.

17          And absent any bad faith or intentional misconduct, I

18   would ask you to consider actually the real cost in terms of

19   time, money, anxiety, emotion, attorney's fees to get to this

20   point as exacting a just and fair resolution of this matter.

21          Thank you.

22          THE COURT:  All right.  Well, I think the language is

23   very clear and requires that any action in any court pertaining

24   to conduct or fitness as a member of the Bar has to be

25   identified.  And it wasn't here.

Case 1:18-cv-00639-LO-JFA  Document 36  Filed 09/17/18  Page 16 of 18 PageID# 208
Case 3:19-cv-02074-G-BK  Document 80  Filed 03/30/20  Page 484 of 486  PageID 4865

16

1          So, Mr. DiMuro, when you talk about the conduct and

2     the consideration the Court gives to admitting an attorney from

3     a different jurisdiction, I agree with you, you're looking at

4     fitness, the reasons why you would admit or you wouldn't admit

5     foreign attorneys into our court here.

6          And issues that go to the core of whether somebody

7     should be admitted were all addressed in the -- not only Judge

8     Reyes' decision, but explicitly in the Court of Appeals' three

9     judge opinion that was handed down on March 26 of 2018.

10         And Mr. Brewer has been very candid this morning.

11    Obviously, Judge Reyes didn't find that he was being candid

12    with the Court in the hearings back in 2016 and indicated that

13    he was anything but.  But, you know, that may have been just an

14    attorney and judge got sideways, and that happens.

15         But the Court of Appeals went on to affirm the

16    findings of Judge Reyes that Mr. Brewer's actions were not a

17    negligent act, or a mistake, or the result of poor judgment,

18    but they were in bad faith, unprofessional, and unethical,

19    highly prejudicial to the fair trial of an impartial jury.

20         And, of course, we're talking about this push poll

21    that Mr. Brewer admitted he had reviewed and approved before it

22    was used by the polling company.

23         Disrespectful to the judicial system.  Threatening

24    the integrity of the judicial system.  Incompatible with a fair

25    trial.  The poll was designed to improperly influence the jury

Case 1:18-cv-00639-LO-JFA   Document 36   Filed 09/17/18   Page 17 of 18 PageID# 209
Case 3:19-cv-02074-G-BK   Document 80   Filed 03/30/20   Page 485 of 486   PageID 4866

17

1    pool.  And that the conduct impacted the right of a trial by

2    impartial jurors.  And that it was intentional and in bad

3    faith.

4           And that the quote, "it is undisputed that the trial

5    Court's ability to impanel an impartial jury and to try a case

6    before unintimidated witnesses are core functions of the

7    Court."

8           Had I known about these opinions, notwithstanding

9    that there is further appeals ongoing, I wouldn't have signed

10   the pro hac vice form and would not have admitted Mr. Brewer to

11   the Eastern District of Virginia.

12          They are very serious allegations.  They are findings

13   of bad faith that go to the core of a fair and impartial

14   rendering of a jury verdict.

15          And now having reviewed them -- and I realize that

16   the NRA will be inconvenienced and, if necessary, there might

17   have to be some adjustment to the discovery process ongoing,

18   but I find that Mr. Brewer's pro hac vice admission should be

19   revoked and that he should not be admitted to proceed further

20   in this case.

21          I'm concerned about -- was concerned about Mr. Cox's

22   signature, but I find that he was unaware of the pending -- of

23   the findings of the ethical misconduct in Texas.  That he had

24   done a reasonable inquiry.  And that it was up to Mr. Brewer or

25   his firm members to convey to Mr. Cox the pending matter.

18

1          So I am going to issue an order revoking your pro hac

2     vice, sir.

3          All right.  Thank you, counsel.

4          MR. COX:  Thank you, Your Honor.

5          MR. DiMURO:  Thank you, Your Honor.

6     ------------------------------------------------
                        HEARING CONCLUDED

7

8

9

10

11

12

13

14

15

16

17

18

19          I certify that the foregoing is a true and

20     accurate transcription of my stenographic notes.

21

22

23                    _____
                        /s/  Norman B. Linnell

24                    Norman B. Linnell, RPR, CM, VCE, FCRR

25

APP001202