**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § <br> § <br> § |
| **Plaintiff and Counter-Defendant** | § <br> § |
| **and** | § <br> § |
| **WAYNE LAPIERRE,** | § <br> § **Civil Action No. 3:19-cv-02074-G** |
| **Third-Party Defendant,** | § <br> § |
| **v.** | § <br> § |
| **ACKERMAN MCQUEEN, INC.,** | § <br> § |
| **Defendant and Counter-Plaintiff,** | § <br> § |
| **and** | § <br> § |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG,** | § <br> § <br> § <br> § |
| **Defendants.** | § |

**PLAINTIFF THE NATIONAL RIFLE ASSOCIATION OF AMERICA'S**
**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO**
<u>**DISQUALIFY PLAINTIFF'S COUNSEL**</u>

**BREWER, ATTORNEYS & COUNSELORS**

Michael J. Collins, Esq.  (TX Bar No. 00785493)
mjc@brewerattorneys.com
Alessandra P. Allegretto, Esq. (TX Bar No. 24109575)
apa@brewerattorneys.com
1717 Main Street, Suite 5900
Dallas, Texas 75201
Telephone: (214) 653-4000
Facsimile: (214) 653-1015

**ATTORNEYS FOR PLAINTIFF AND COUNTER-DEFENDANT NATIONAL RIFLE ASSOCIATION OF AMERICA AND WAYNE LAPIERRE**

## **TABLE OF CONTENTS**

I.     PRELIMINARY STATEMENT ................................................................1

II.    FACTUAL BACKGROUND ................................................................2

    A.    Far From Being "Manufactured" By Brewer, The NRA's Grievances Against AMc Originated Before Brewer's Retention...............................2

    B.    There Was No Animosity Displayed By AMc Toward Brewer—Until The NRA Questioned AMc's Bills. ......................................................4

    C.    To Deflect Scrutiny From Its Misconduct, AMc Repeatedly Sought to Scapegoat and Sideline Those Who Inquired About Its Billing, Including BAC. ...............................................................................5

    D.    After A Failed Extortion Attempt Alienated Its Largest Client, AMc Resorted to Bad-Faith Litigation Tactics, Of Which The Motion Is The Latest Example.....................................................................6

III.    ARGUMENTS ................................................................................8

    A.    Standard for Disqualification. ......................................................8

    B.    AMc Cannot Show A Personal Conflict Under Texas Rule 1.06(b)(2) Or Model Rule 1.7(a)(2). ...........................................................11

        1.    AMc's allegations are unsupported by credible evidence, let alone a preponderance of the evidence...............................................11

        2.    None of the circumstances alleged by AMc would "adversely limit" Brewer's representation of the NRA.........................................13

        3.    Even if a conflict existed under Texas Rule 1.06 or Model Rule 1.7, the NRA's consent resolves the conflict.....................................15

        4.    AMc lacks standing to allege a conflict under Texas Rule 1.06 or Model Rule 1.7.................................................................16

        5.    AMc has waived any conflict objection......................................17

    C.    The "Lawyer-Witness" Rule Does Not Disqualify Brewer Or BAC. ..................19

        1.    AMc cannot show that Brewer's testimony is "necessary" to establish an essential fact on behalf of" the NRA......................................19

        2.    AMc cannot show that Brewer will be compelled to give testimony adverse to the NRA. ...........................................................21

        3.    Even if Brewer were a necessary or adverse fact witness, he would only be barred from acting as an advocate before the trier of fact— not from signing pleadings or directing the NRA's litigation strategy..........................................................................22

        4.    Lawyer-Witness disqualification would not impute to BAC...................22

D.    The Rules Governing "Trial Publicity" Have No Application Here. ....................23

E.    AMc's Other Disqualification Allegations Fail. ......................................................24

1.    Texas Rule 4.01 and Model Rule 4.1 (Truthfulness in Statements to Others)....................................................................................................24

2.    Texas Rule 4.02 and Mode Rule 4.2 (Communication with Represented Persons). ..............................................................................25

3.    Texas Rule 4.04 and Model Rule 4.4 (Respect for Rights of Third Persons)...................................................................................................25

IV.    CONCLUSION........................................................................................................25

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Pages(s)**

*Am. Sterilizer Co. v. Surgikos Inc.*,
  No. CIV.A. 4-89-238-Y, 1992 WL 332102, at *6 (N.D. Tex. June 12, 1992) ......................17

*Anderson Producing Inc. v. Koch Oil Co.*,
  929 S.W.2d 416 (Tex. 1996)............................................................................................14, 21

*In re Appeal of Infotechnology, Inc.*,
  582 A.2d 215 (Del. 1990) .......................................................................................................9

*Areizaga v. ADW Corp.*,
  No. 3:14-CV-2899-P, 2015 WL 13567554 (N.D. Tex. May 19, 2015)................................16

*Batiste v. Texas*,
  No. H-15-1258, 2017 WL 1160513 (S.D. Tex. Mar. 29, 2017) .............................................14

*Breiner v. Takao*,
  835 P.2d 637 (Hawaii 1992) .................................................................................................23

*Buck v. Palmer*,
  381 S.W.3d 525, 528 (Tex. 2012) ........................................................................................17

*Centerboard Sec., LLC v. Benefuel, Inc.*,
  Civil Action No. 3:15-cv-2611-G, 2016 WL 3126238 (N.D. Tex. June 3,
  2016) ...............................................................................................................................8, 9, 16

*In re Chu*,
  134 S.W.3d 459 (Tex. App.—Waco 2004) .......................................................................6, 19

*Clemens v. McNamee*,
  Case No. 4:08-CV-00471, 2008 WL 1969315 (S.D. Tex. 2008) ...........................................16

*Colyer v. Smith*,
  50 F. Supp. 2d 966 (C.D. Cal. 1999) ......................................................................................9

*Diggs v. Diggs*,
  No. 14-11-00854-CV, 2013 WL 3580424 (Tex. App.—Houston [14th Dist.] July
  11, 2013, no pet.) ..................................................................................................................17

*In re Dresser Industries*,
  972 F.2d 540 (5th Cir. 1992) ..................................................................................................8

*Evans v. Artek Sys. Corp*,
  715 F.2d 788 (2d Cir. 1983) ...................................................................................................9

*FDIC v. U.S. Fire Ins. Co.,*
    50 F.3d 1304 (5th Cir. 1995) .............................................................8, 10, 22

*In re Frost,*
    744 F.3d 384 (5th Cir. 2014). ...................................................................19

*Galderma Labs., L.P. v. Actavis Mid Atl. LLC,*
    927 F.Supp.2d 390 (N.D. Tex 2013) ............................................................8

*Gen. Elec. Co. v. Mitsubishi Heavy Indus., Ltd.,*
    No. 3:10-CV-276-F, 2011 WL 13201855 (N.D. Tex. Sept. 12, 2011)..................10

*Horaist v. Doctor's Hosp. of Opelousas,*
    255 F.3d 261 (5th Cir 2001). ...............................................................19, 21

*Javorski v. Nationwide Mut. Ins. Co.,*
    No. 4:08-CV-00471, 2008 WL 1969315 (S.D. Tex. 2008)................................20

*In re Kyle Fin. Grp., LLC,*
    562 S.W.3d 795 (Tex. App.— Houston [14th District] 2018, no. pet.) ...............17

*May v. Crofts,*
    868 S.W.2d 397 (Tex. App. 1993) .............................................................18

*In re Murrin Brothers 1885, Ltd,*
    No. 18-0737, 2019 WL 6971663 (Tex. Dec. 20, 2019)..................................10

*Nebraska Press Assn. v. Stuart,*
    427 U.S. 539 (1976).............................................................................23

*NCNB Texas Nat'l Bank v. Coker,*
    765 S.W.2d 398 (Tex. 1989)....................................................................9

*Olguin v. Jungman,*
    931 S.W.2d 607 (Tex. App. —San Antonio 1996)........................................27

*Pendergest-Holt v. Certain Underwriters at Lloyd's of London,*
    No. CV H-09-3712, 2010 WL 11661414 (S.D. Tex. July 30, 2010) ...................17

*In re ProEducation Int'l, Inc.,*
    587 F.3d 296, 299 (5th Cir. 2009) ..............................................................8

*Richardson-Merrell, Inc. v. Koller,*
    472 U.S. 424 (1985)...............................................................................9

*Roberts v. River City Care Center,*
    No. SA-13-CA-670-FB (HJB), 2013 WL 12394408 (W.D. Tex. Dec. 12,
    2013) .................................................................................................9

*In re Sanders,*
   153 S.W.3d 54 (Tex. 2004)................................................................................9, 19

*Schwartz v. Jefferson,*
   930 S.W.2d 957 (Tex. App.—Houston [14th Dist.] 1996)....................................19

*In re Slusser,*
   136 S.W.3d 245 (Tex. App. —San Antonio 2004)................................................19

*Sec. & Exch. Comm'n v. Christian Stanley, Inc.,*
   No. CV117147GHKMANX, 2012 WL 13012479 (C.D. Cal. June 4, 2012) ........24

*Spears v. Fourth Circuit Court of Appeals,*
   97 S.W.2d 654 (Tex. 1990)..........................................................................9, 17, 19

*Vaughan v. Walther,*
   875 S.W.2d 690, 690-91 (Tex. 1994) ..................................................................17

*Wilson v. State,*
   854 S.W.2d 270 (Tex. App. 1993) .......................................................................23

*In re Yarn Processing Patent Validity Litig.,*
   530 F.2d 83, 88 (5th Cir. 1976). ..........................................................................16

**Other Authorities**

Federal R. Civ. Pro. 11........................................................................................9

ABA Model Rule 1.7 ............................................................................... *passim*

ABA Model Rule 3.6 ......................................................................................22, 23

ABA Model Rule 3.7 .......................................................................................22

ABA Model Rule 4.1 .......................................................................................24

ABA Model Rule 4.2 .......................................................................................24

ABA Model Rule 4.4 .......................................................................................24

ABA Informal Op. 89-1529 (Oct. 20, 1989). ....................................................22

Tex. Disciplinary R. Prof. Conduct 1.06 ............................................... *passim*

Tex. Disciplinary R. Prof. Conduct 3.07 ...........................................................23

Tex. Disciplinary R. Prof. Conduct 3.08 ............................................... *passim*

Tex. Disciplinary R. Prof. Conduct 4.01 ............................................... *passim*

Tex. Disciplinary R. Prof. Conduct 4.04 .........................................................................36, 37, 38

RESTATEMENT (3D) OF THE LAW GOVERNING LAWYERS § 108 ......................................................8

RESTATEMENT (3D) OF THE LAW GOVERNING LAWYERS § 109 ....................................................23

RESTATEMENT (3D) OF THE LAW GOVERNING LAWYERS § 125 ....................................................15

Keith Swisher, THE PRACTICE AND THEORY OF LAWYER DISQUALIFICATION, 27
      Geo. J. Legal Ethics 71, 92-93 (2014) ...................................................................................9

David Hricik & Jae Ellis, MOTIONS TO DISQUALIFY IN TEXAS STATE AND
      FEDERAL COURT LITIGATION, 74 TEX. B.J. 466, 467 (2011) ...............................................17

The National Rifle Association of America (the "NRA"), by and through its undersigned counsel, hereby submits this Memorandum of Law in Opposition to Defendants' Motion to Disqualify Plaintiff's Counsel (William A. Brewer III ("Brewer") and Brewer, Attorneys & Counselors ("BAC")) (such motion, the "Motion").

## I.
## <u>PRELIMINARY STATEMENT</u>

An "abusive disqualification motion" filed for "tactical" reasons is a "deeply disturbing phenomenon" that dishonors the first principle of our adversary system: parties get to choose their own advocates.[1] Defendants' motion, made available to the media in unredacted form,[2] contains "a scattershot of vague and irrelevant allegations"[3] salted with personal smears,[4] yet fails to plead—let alone prove[5]—any valid ground for disqualification.[6] Although Defendants waited

---

[1] *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 441 (1985) (Brennan, J., concurring).

[2] Although Defendants are free to publicize their court filings in redacted form (or subject to other appropriate measures safeguarding confidential and sealed content), Defendants did not do so here- in direct violation of a court order. Instead, Defendants knowingly (or at minimum, with gross recklessness) applied illusory "redactions" that caused sealed text to remain readily legible, then made the brief available to the public. Reporters, coincidentally or not, immediately detected and reported on the Motion's "redacted" contents.  The NRA reserves all rights and remedies, to seek sanctions and otherwise, in connection with this misconduct. *See* Declaration of Travis Carter at ¶ 44, attached as Ex. 44 to the Collins Decl.

[3] *See* Declaration of James M. McCormack at p. 12, attached as Ex. 47 to the Collins Decl.

[4] *Id.* at ¶ 29 ("Overall, Defendants' disqualification motion is a mishmash of undeveloped or shoddily developed theories and claims, coupled with reputational smears.").

[5] Defendants carry the burden on the Motion, and must establish grounds for disqualification by a preponderance of admissible evidence. *See* discussion *infra* at section III. (A) and (B).

[6] *See* Ex. 47 at ¶ 29 ("Defendants make no real effort to support their allegations with admissible evidence, and even less explain how the same allegations, if proven, would provide grounds for disqualification under any theory recognized in the Fifth Circuit."); *See* Declaration of Nancy J. Moore ("Moore Decl.") at ¶ 35, attached as Ex. 50 to the Collins Decl. ("For the reasons set forth above, it is my professional opinion that the evidence cited in support of the Defendants' Motion to Disqualify the Plaintiff's Lawyer is insufficient to establish that either Brewer or other members of the Brewer Law Firm are violating their ethical obligations."); *See* Declaration of Richard E. Flamm ("Flamm Decl."), at ¶ 10, attached as Ex. 51 to the Collins Decl. ("The third opinion I formed is that, even if defendants had been able to show that Mr. Brewer ran afoul of one or more ethical rules, they have not shown that disqualification would be an appropriate remedy for that violation; and, in my opinion, it would not.").

seven months to make the Motion (an obvious tactical delay that amounts to waiver),[7] none of its arguments are new.  For nearly two years, Defendants have desperately scapegoated others, including NRA executives and NRA outside counsel, in an effort to deflect scrutiny from their increasingly apparent fraud.  Several of the attacks advanced in the Motion were rejected explicitly by a Virginia court,[8] and all fail on their merits here.

The Motion makes a number of lurid, unsupported and irrelevant allegations about counsel's personal and family life.  In the interest of decorum and in light of space limitations, this opposition focuses on matters legally relevant to the instant case.

## II.
## FACTUAL BACKGROUND

**A.**    **Far From Being "Manufactured" By Brewer, The NRA's Grievances Against AMc Originated Before Brewer's Retention.**

During early 2018, a regulatory investigation of a membership program known as Carry Guard, in which AMc was prominently involved, inspired the NRA to strengthen its oversight of third-party vendors.[9]  Professionals in the NRA's accounting and controls functions compared notes and recommended that several vendors be examined further—first and foremost, AMc.[10]  By

---

[7] *See* discussion *infra* at section III.(B)(5); *see also* Ex. 51 at ¶ 10. ("Upon completing my review of these documents, as well as the legal precedents, I formed four opinions.  The first is that defendants have not shown that they filed their motion in a timely fashion; and, because this is so, the Court would be warranted in denying it on that basis, without considering it on its merits.").

[8] In a Virginia lawsuit bearing many similarities to this one and is stayed to avoid inconsistent adjudications, Defendants attempted to obstruct the *pro hac vice* admission of BAC attorneys by arguing, *inter alia*, that Brewer is a fact witness and BAC is a business competitor of AMc. *See* AMc's Opposition to Plaintiff's Motion for *Pro Hac Vice* Admission of Brewer Attorneys at ¶ 2-3, attached as Ex. 19 to the Collins Decl. The Virginia court rejected these arguments in their entirety.  *See* June 26, 2019 Hearing Transcript, pp. 11-21, attached as Ex. 21 to the Collins Decl. Defendants also attempted to argue, as they attempt to argue here, that the NRA's lawsuit against them is illegitimate or unauthorized. *See* ECF 105 at  ¶ 43; *see also* Defendants' Memorandum in Support of Plea in Bar, p. 2, attached as Ex. 27 to the Collins Decl. This claim was dismissed immediately by the Virginia court. *See* Order Denying Plea in Bar, attached as Ex. 28 to the Collins Decl.

[9] *See* Declaration of Wayne LaPierre ("LaPierre Decl.") at ¶ 8-9, attached as Ex. 48 to the Collins Decl.

[10] *See* Declaration of Michael Erstling ("Erstling Decl.") at ¶ 8, attached as Ex. 41 to the Collins Decl.

the time BAC was retained to handle unrelated litigation and regulatory matters in early 2018,[11] at least one NRA accountant had decided that AMc "deserved to be fired" due to, among other things, "systemic[] obfuscate[ion] and block[ing]" of details underlying opaque, six-figure invoices issued to the NRA.[12]  These concerns were presented at a July 2018 meeting of the Audit Committee of the NRA Board of Directors, where multiple employees spoke out against AMc.[13]  The NRA-AMc relationship was a valuable and longstanding one,[14] and the NRA had not yet decided to sue AMc—but the Audit Committee Chairman, Charles Cotton, knew that further scrutiny of AMc was appropriate, and would have ordered such scrutiny regardless of input from any counsel.[15]

In response to the concerns of its employees in the accounting office, the NRA requested access to AMc business records that it was contractually entitled to inspect pursuant to the parties' Services Agreement dated April 30, 2017 (as amended May 6, 2018, the "Services Agreement").[16]  Ominously, AMc told the NRA's CEO, Wayne LaPierre, that he should not want to see these documents, because anything transmitted to the NRA could be subpoenaed by regulators.[17]  Disconcerted by this, the NRA pressed on: if AMc had documents likely to trigger a government subpoena, the NRA wanted to know about them.[18]  Simultaneously, the NRA's newly hired Chief

---

[11] *Id.* at ¶ 11.

[12] *Id.* at ¶¶ 6, 9.

[13] *Id.* at ¶ 8; *See also* Declaration of Charles Cotton at ¶ 5, attached as Ex. 42 to the Collins Decl.

[14] *See* Ex. 48 at ¶ 4.

[15] *See* Ex. 41 at ¶¶ 5-6.

[16] The Motion insists, without evidence, that the NRA's audits and record-inspection requests were "faked" by BAC, which is patently false.  *See* Declaration of John Frazer ("Frazer Decl.") at ¶ attached as Ex. 45 to the Collins Decl.

[17] *See* Ex. 56 at ¶ 10. By letter from its counsel, AMc, issued a hedged version of the same warning, intoning that "excessive contractual documentation transmitted to the NRA" would "not serve the NRA's management needs," because "third parties will be all too happy to have access to such detailed billing information." *See* Letter from Stephen Ryan to William A. Brewer III, dated August 22, 2018, attached as Ex. 6 to the Collins Decl.

[18] *See* Ex. 56 at ¶ 10.

3

Financial Officer, Craig Spray, began to examine: (i) viewership metrics for NRATV, the expensive digital-video platform AMc administered; and (ii) the cost-effectiveness of certain items in AMc's $40 million-plus annual budget.[19] None of these efforts were contrived or concocted by Brewer, who had only recently been retained.  Instead, all reflected efforts by NRA fiduciaries to diligently oversee the NRA's largest vendor.

**B.     There Was No Animosity Displayed By AMc Toward Brewer—Until The NRA Questioned AMc's Bills.**

Although the tenor of counsel's relationship with his father-in-law is entirely irrelevant to a disqualification motion,[20] AMc's contentions about the Brewer-McQueen relationship[21] are false.  For example, Brewer attempted to refer business to AMc on multiple occasions, and hired AMc to design his firm's own website.[22] Offensively, Defendants now suggest that Brewer exploited his father-in-law's 2018 cancer diagnosis to damage AMc. Belying AMc's claim that there was a "personal history of animosity" in the family, AMc made no objection when LaPierre discussed BAC's retention with him early on,[23] and AMc executives met with BAC attorneys during Spring 2018 to discuss Carry Guard.[24]  AMc did not protest BAC's involvement until the NRA began asking questions about AMc's bills—at which point one of AMc's agents, Lt. Col. Oliver North, contrived a pretext to "audit" BAC's investigation of AMc (an effort arrested in its tracks due to North's obvious conflict of interest).[25]  BAC was neither the first nor the last NRA fiduciary to be targeted by AMc in this manner.

---

[19] *See* Declaration of Craig Spray ("Spray Decl.") at ¶ 5, attached as Exhibit 52 to the Collins Decl.;

[20] *See* Ex. 47 at ¶ 23. ("Despite Defendants' efforts to turn it into one, this is not a family-law case.").

[21] *See* Declaration of Ian Shaw at ¶¶ 7-10, dated April 30, 2020, attached as Ex. 43 to the Collins Decl.

[22] *See* Ex. 49 at ¶ 4.

[23] *See* Ex. 48 at ¶ 11.

[24] *Id.* at ¶¶ 8-12.

[25] *See* ECF 105 ¶ 7.

4

**C.     To Deflect Scrutiny From Its Misconduct, AMc Repeatedly Sought to Scapegoat and Sideline Those Who Inquired About Its Billing, Including BAC.**

Before setting its sights on BAC, AMc attempted to ostracize and discredit another NRA fiduciary, Craig Spray, who asked some of the same questions about AMc's business which are now at the center of this lawsuit.  Hired in March 2018 as Chief Financial Officer to replace the NRA's soon-to-retire Treasurer, Spray previously served as the Chief Financial Officer of a large publicly traded company.[26]  "Before spending any time with Bill Brewer, [Spray] knew that executives, personnel, and Board members [of the NRA] expressed serious concerns about [AMc]," and met with AMc during June 2018 to better understand its business.[27]  Spray approached the meeting with a congenial tone aimed at "relationship building,"[28] but when he asked anodyne questions about NRATV viewership metrics, AMc executives responded with outrage and profanities[29] and demanded that Spray be fired.[30]  Eventually, AMc turned on LaPierre, telling him he was "dead to [the agency]" if he dared to scrutinize any portion of AMc's $40 million budget.[31]  During the same period, AMc began alleging that Brewer's marriage created a "conflict" which ought to prohibit BAC from asking questions about AMc's bills.  Of course, AMc also ignored and refused record requests from the NRA's General Counsel, John Frazer, who had no alleged conflict.[32]

---

[26] *See* Ex. 52 at ¶¶ 2-5.

[27] *Id.* at ¶ 5.

[28] *Id.*

[29] *Id.* at ¶¶ 5-6.

[30] *See* Ex. 48 at ¶ 12.

[31] *Id.* at ¶ 13.

[32] *See* Ex. 45 at ¶ 7.

**D.      After A Failed Extortion Attempt Alienated Its Largest Client, AMc Resorted to Bad-Faith Litigation Tactics, Of Which The Motion Is The Latest Example.**

By April 2019, the NRA had spent nearly a year attempting to get to the bottom of its employees' reported concerns without detonating an important vendor relationship.  But these attempts failed: AMc rebuffed oversight efforts by the NRA's CEO, CFO, in-house counsel, and outside counsel.  Therefore, the NRA was forced to go to court to enforce its rights.  On April 12, 2020, the NRA sued for specific performance of its books-and-records inspection right.[33]  The response by AMc was explosive.  Days before the NRA's 2019 Annual Meeting of Members, two AMc emissaries approached LaPierre with a corrupt ultimatum: drop the lawsuit and resign, or AMc would publicize purportedly-damaging documents it had concealed from the NRA all year.[34]  If LaPierre acceded, he was promised an "excellent retirement."[35]  Two attorneys who were present as the ultimatum was reported to LaPierre by those who received it (neither of whom were affiliated with BAC) called this conduct by its name: extortion.[36]  LaPierre immediately rejected the offer and disclosed AMc's backroom overture to the entire Board of Directors, who decided to retain him as CEO.[37]  The NRA-AMc relationship formally terminated soon after.

As the NRA finally began to obtain insight into the activities AMc had concealed, and as AMc pursued a scorched-earth retaliation campaign against its former client, the litigation between

---

[33] *See* Ex. 48 at ¶ 15.

[34] *Id.* at ¶ 18.

[35] *Id.*

[36] *Id.* at ¶ 19; *see also* Letter from Wayne LaPierre to the NRA Board of Directors, dated April 25, 2019, attached as Ex. 13 to the Collins Decl; *see* Mark Maremont, *NRA's Wayne LaPierre Says He Is Being Extorted, Pressured to Resign*, The Wall Street Journal, dated April 26, 2019, attached as Ex. 14 to the Collins Decl.; Deposition Excerpt of Millie Hallow, dated January 10, 2020, attached as Ex. 31 to the Collins Decl.; Call Notes, Exhibit 15 to the Deposition of Millie Hallow, dated January 10, 2020, attached as Ex. 32 to the Collins Decl.; Deposition Excerpt of Carolyn Meadows, dated January 29, 2020, attached as Ex. 33 to the Collins Decl.; Call Notes, Exhibit 10 to the Deposition of Carolyn Meadows, dated January 29, 2020, attached as Ex. 34 to the Collins Decl.

[37] *See* Ex. 48 at ¶ 20.

the parties expanded to encompass the numerous claims pleaded here, including fraud, conspiracy, breach of fiduciary duty, breach of contract, conversion, and more. Before this action commenced on August 30, 2019, the primary venue for such claims was the Circuit Court of Alexandria, Virginia. In that litigation, AMc made many of the same groundless arguments made in the Motion: it asserted that BAC was its business competitor;[38] that BAC attorneys should be barred from the case because Brewer was a fact witness,[39] and because of familial animus;[40] and, that the NRA's litigation against it was somehow illegitimate or unauthorized.[41] All of these arguments failed.[42]

In an effort to facilitate the progress of that litigation, the NRA stipulated to a protective order that prevented Brewer, individually, from reviewing documents which AMc designated as highly competitively sensitive, an arrangement that the Virginia court predicted would need to be revisited.[43] Unfortunately, AMc weaponized the protective-order arrangement by applying blanket "Highly Confidential" designations to documents containing no proprietary or sensitive content.[44] The NRA has recently discovered that during the course of these events, AMc's counsel

---

[38] *See* Ex. 21 at p. 15; *see also* Declaration of Andrew Arulanandam at ¶¶ 4-8, dated May 1, 2020, attached as Ex. 46 to the Collins Decl.

[39] *Id.* at pp. 11-12.

[40] *See* Ex. 27 at p. 7.

[41] *Id.* at p. 2.

[42] Contrary to AMc's misrepresentation in the Motion, the Virginia court ***did not*** acknowledge any business-competitive relationship between BAC and AMc. *See* Ex. 21 at pp. 11-12. In a June 26, 2019, hearing on a motion for the *pro hac vice* admission of Brewer attorneys, the Virginia Court never acknowledged any conflict. Rather, in evaluating whether to admit a Texas attorney, to practice in the Virginia action, AMc argued that a conflict prevented admission. Specifically, AMc stated that Brewer's Public Relations unit was competing with AMc. Counsel for BAC clarified that the Public Relations unit, "[has] a staff of four people. They cannot undertake the work that Ackerman performs for the NRA as a media relations department that they use strictly for pending cases." A Brewer attorney went on to further clarify, "we've never done any legal work [for Ackerman]…The firm is not on both sides." No further comment, or ruling on conflicts or disqualification ever took place.

[43] *See* Defendants' Response to Plaintiff's Motion to Compel, ECF 51, at ¶ 15.

[44] *Id.; see also* ECF 105 ("The NRA's Reply in Support of its Motion for an Alternative Protective Order for the Parties") at p. 5 ("Defendants consistently abused the two-tier protective order by marking non-confidential

7

secretly possessed at least one stolen privileged document, which they appear to have consulted to inform their discovery strategy.[45] Moreover, when it filed this Motion, AMc failed to properly redacted sealed contents and, the sealed material became available to reporters.[46] In sum, although the litigation between the parties has been rife with sanctionable and disqualifying conduct, neither the NRA nor its counsel are the source of such conduct.

## III.
## ARGUMENTS

### A.    Standard for Disqualification.

In the Fifth Circuit, motions to disqualify are governed by federal common law,[47] which looks primarily—although not exclusively—to the district court's local rules.[48] Attorneys practicing in the Northern District of Texas are also subject to the Texas Disciplinary Rules of Professional Conduct, and the American Bar Association's ("ABA") Model Rules of Professional Conduct. The ABA rules serve as the "national standards to consider in reviewing motions to

---

documents with the "Highly Confidential" designation, thus requiring the NRA to subject such documents to different review and storage protocols than the rest of Defendants' production. Defendants stamped thousands of documents "Highly Confidential," including plane tickets and news articles.").

[45] *See* ECF 106 ("Motion to Disqualify Dorsey & Whitney"); *see also* ECF 107at p. 13 ("Dorsey's conduct can aptly be described as grossly unethical, and clearly warrants disqualification based on settled authority. Dorsey took possession of an obviously privileged presentation from its client outside the ordinary course of discovery.").

[46] *See* Ex. 49 at ¶¶ 36-39.

[47] *In re American Airlines, Inc.*, 972 F.2d 605, 610 (5th Cir. 1992) (holding, "[a]s we confirmed in *Dresser*, "[m]otions to disqualify are substantive motions affecting the rights of the parties and are determined by applying standards developed under federal law."); *see also In re Dresser Industries*, 972 F.2d 540, 543 (5th Cir.1992); *Centerboard Sec., LLC v. Benefuel, Inc.*, No. 3:15-cv-2611-G, 2016 WL 3126238, at *1 (N.D. Tex. June 3, 2016) ("Disqualification cases are guided by state and national ethical standards adopted by the Fifth Circuit.") (Fish, J.); *see also Galderma Labs., L.P. v. Actavis Mid Atl. LLC*, 927 F. Supp. 2d 390, 394 (N.D. Tex. 2013) ("[i]n the Fifth Circuit, the source for the standards of the profession has been the canons of ethics developed by the American Bar Association.  Additionally, consideration of the Texas Disciplinary Rules of Professional Conduct is also necessary, because they govern attorneys practicing in Texas generally.  The Court also considers, when applicable, local rules promulgated by the local court itself.") (citations omitted).

[48] *See In re ProEducation Int'l, Inc.,* 587 F.3d 296, 299 (5th Cir. 2009) ("When considering motions to disqualify, courts should first look to "the local rules promulgated by the local court itself.").

disqualify."[49]  The Court may consider the applicable provisions of the Restatement (Third) of the Law Governing Lawyers.[50]  Courts applying these authorities recognize that disqualification is a severe remedy, which can be ordered only if the movant proves, by a preponderance of admissible evidence,[51] that "compelling reasons" exist[52]—an evidentiary burden which courts describe as "heavy"[53] and "extraordinary."[54] Unsurprisingly, this burden cannot be met by mere allegations of unethical conduct,[55] or based on a showing of the remote possibility of some ethical violation.[56]

---

[49] *Id.* at 299 ("The Fifth Circuit has recognized the ABA Model Rules of Professional Conduct (Model Rules) as the national standards to consider in reviewing motions to disqualify.").

[50] *See* Restatement (3d) of The Law Governing Lawyers § 108. *See also In re Dresser Industries*, 972 F.2d 540, 544 (5th Cir.1992) ("We turn, then, to the current national standards of legal ethics to first consider whether this dual representation amounts to impropriety. Neither the ABA Model Rules of Professional Conduct nor the Code of Professional Responsibility allows an attorney to bring a suit against a client without its consent. This position is also taken by the American Law Institute in its drafts of the Restatement of the Law Governing Lawyers. *See genrally FDIC v. U.S. Fire Ins. Co.,* 50 F.3d 1304, 1314 (5th Cir. 1995) (applying priniciples listed in the Restatement in evaluting whether disqualification is warranted where conflict of interest exists.).

[51] See *NCNB Texas Nat'l Bank v. Coker*, 765 S.W.2d 398, 400 (Tex. 1989) ("The evidence must preponderate in favor of the motion.").

[52] *See Roberts v. River City Care Ctr.*, Case No. SA-13-CA-670-FB, 2013 WL 12394408 at *1 (W.D. Tex. 2013) (Because a party is presumptively entitled to the counsel of its choice, disqualification of counsel may be ordered only if "compelling reasons" exist.").

[53] *Id.* (The burden has been variously described as a "heavy" or "extraordinary" one.  *See Evans v. Artek Sys. Corp.*, 715 F.2d 788, 794 (2d Cir. 1983) ("heavy burden")).

[54] *Id.*

[55] *In re Sanders*, 153 S.W.3d 54, 57 (Tex. 2004) (quoting *Spears v. Fourth Court of Appeals*, 797 S.W.2d 654, 656 (Tex. 1990) ("Thus, '[m]ere allegations of unethical conduct or evidence showing a remote possibility of a violation of the disciplinary rules will not suffice' to merit disqualification.").

[56] *See Colyer v. Smith*, 50 F. Supp. 2d 966, 971 (C.D. Cal. 1999) ("Recognizing the potential abuses of the [ethical rules] in litigation ... the burden of proof must be on the nonclient litigant to prove by clear and convincing evidence (1) the existence of a conflict and (2) to demonstrate how the conflict will prejudice the fairness of the proceedings" (quoting *In re Appeal of Infotechnology, Inc.*, 582 A.2d 215, 221 (Del. 1990) (cited in Keith Swisher, THE PRACTICE AND THEORY OF LAWYER DISQUALIFICATION, 27 Geo. J. Legal Ethics 71, 92-93 (2014)).

Nor can broad, conclusory assertions suffice.[57]    Disqualification motions brought for tactical reasons are highly improper,[58] and can result in sanctions.[59]

Importantly, even if the movant musters compelling, admissible proof that an ethical violation occurred, the disqualification inquiry does not end there. Instead, the court must engage in an interest-balancing analysis to determine whether allowing counsel to continue in the case would create an appearance of impropriety that outweighs the interests served by the lawyer's participation.[60]  Additionally, even if an ethical violation is established, disqualification can only be granted if the movant shows that it will suffer material, unfair prejudice absent such a severe remedy.[61]

---

[57] *In re Sanders*, 153 S.W.3d 54, 57 (Tex. 2004) (quoting *Spears v. Fourth Court of Appeals*, 797 S.W.2d 654, 656 (Tex. 1990) ("Thus, "[m]ere allegations of unethical conduct or evidence showing a remote possibility of a violation of the disciplinary rules will not suffice" to merit disqualification.").

[58] *In re American Airlines,* Inc., 972 F.2d at 611 ("We recognize of course that disqualification motions may be used as 'procedural weapons' to advance purely tactical purposes."); *Centerboard Sec., LLC v. Benefuel, Inc.*, No. 3:15-cv-2611-G, 2016 WL 3126238, at *1 (N.D. Tex. June 3, 2016) ("The court must give careful consideration to motions to disqualify because of the potential for abuse.") (Fish, J.); *see also Richardson-Merrell, Inc. v. Koller,* 472 U.S. 424 (1984) (stating "A fundamental premise of the adversary system is that individuals have the right to retain the attorney of their choice to represent their interests in judicial proceedings…the tactical use of attorney-misconduct disqualification motions is a deeply disturbing phenomenon in modern civil litigation.  When a trial court mistakenly disqualifies a party's counsel as the result of an abusive disqualification motion, the court in essence permits the party's opponent to dictate his choice of counsel…result is in serious tension with the premises of our adversary system.")  (Brennan, J. concurring).

[59] *See* FRCP R. 11(b)(1) ("By presenting to the court a pleading, written motion, or other paper--whether by signing, filing, submitting, or later advocating it--an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation.").

[60] *See FDIC v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1314 (5th Cir. 1995) (The Fifth Circuit considers the following public policy factors in deciding whether disqualification is appropriate: "whether a conflict has (1) the appearance of impropriety in general, or (2) a possibility that a specific impropriety will occur, and (3) the likelihood of public suspicion from the impropriety outweighs any social interests which will be served by the lawyer's continued participation in the case.").

[61] *Gen. Elec. Co. v. Mitsubishi Heavy Indus., Ltd.*, No. 3:10-CV-276-F, 2011 WL 13201855, at *9 (N.D. Tex. Sept. 12, 2011) (In evaluating prejudice that may result from disqualification, "[t]he Court holds this consideration to be of paramount importance, as the Fifth Circuit has repeatedly stressed that courts considering disqualification motions should do so with "meticulous deference" to the rights of the litigant."); *Landmark Graphics Corp. v. Seismic Micro Technology, Inc.*, Nos. H-05-2618, H-06-1790, 2007 WL 735007 (S.D. Texas) (disqualification denied after movant failed to make a sufficient showing of prejudice); *see also In re Murrin Brothers* 1885, Ltd., No. 18-0737,

**B.     AMc Cannot Show A Personal Conflict Under Texas Rule 1.06(b)(2) Or Model Rule 1.7(a)(2).**

The first ground for disqualification alleged in the Motion consists of a cluster of purported conflicts, based on fabricated accusations of business and familial animus, which supposedly disqualify Brewer and BAC under Rule 1.06(b)(2) of the Texas Disciplinary Rules of Professional Conduct and Rule 1.7(a)(2) of the ABA Model Rules.[62]   In sum, AMc alleges that Brewer: (i) "manufactured" the disputes being litigated here;[63] (ii) stands to profit from this lawsuit, because BAC is a business competitor of AMc[64] (it is not)[65] and because BAC earns legal fees;[66] and (iii) must be conflicted because he is related by marriage to the sister of an officer of one of the Defendants, and there is "animosity" in the family.[67]   In an effort to transmute these grievances into disqualifying conflicts, AMc cites rules that prevent a lawyer from taking on a representation "adversely limited"[68] by his personal interests or those of another client.  AMc's argument fails on multiple levels.

**1.     AMc's allegations are unsupported by credible evidence, let alone a preponderance of the evidence.**

AMc asserts that Brewer must have "interests adverse to the NRA or Mr. LaPierre" because he is the "principal actor" who "manufactured" the dispute underlying this case.[69] However, as

---

2019 WL 6971663 at *3 (Tex. Dec. 20, 2019) ("[e]ven if a violation of the disciplinary rules is established, the party requesting disqualification must also show it will suffer prejudice if disqualification is not granted.").

[62] *See* ECF 105 at ¶ 37.

[63] *Id.* at ¶ 37, 43.

[64] *Id.* at ¶ 39.

[65] *See* Ex. 49 at ¶ 9.

[66] *See* ECF 105 at ¶ 41.

[67] *Id.* at ¶ 40, 42.

[68] *See* Texas Disciplinary R. Prof. Conduct 1.06(b)(2).

[69] *See* ECF 105 at ¶ 41.

attested by the NRA's CEO,[70] CFO,[71] and accountant,[72] the concerns that led to litigation between the NRA and AMc predated BAC's involvement. Multiple NRA employee whistleblowers approached the Audit Committee of the NRA Board of Directors in July 2018 reporting, among other things, that AMc "systemically obfuscated and blocked" inquiries about its opaque six-figure invoices.  One whistleblower testified that AMc "deserved to be fired," which he believes would have occurred with or without Brewer.[73]  Charles Cotton, one of the committee members who heard the whistleblowers' complaints, agrees that aggressive scrutiny of AMc would have been appropriate regardless of what Brewer advised.[74]  Although removed from the day-to-day process of budget and invoice review, CEO Wayne LaPierre recalled years of complaints about AMc, which he attributed to the personality of the late Angus McQueen.[75]  LaPierre's doubts about AMc's messaging approach germinated before he met or heard of Brewer, owing to extremist messages emanating from platforms like NRATV.[76] LaPierre finally abandoned any hope of mending the relationship after AMc orchestrated an extortion attempt against him, which Brewer did not "concoct."[77]

Against this mountain of evidence, AMc relies principally on deposition testimony from a discontented former NRA attorney, fired by the NRA (and supplanted in part by BAC), who

---

[70] *See* Ex. 52 at ¶ 2.

[71] *Id.*

[72] *See* Ex. 41 at ¶ 6.

[73] *Id.* at ¶ 9; *see also* Declaration of Grant Stinchfield at ¶ 3, dated April 30, 2020, attached as Ex. 44 to the Collins Decl.

[74] *See* Ex. 42 at ¶ 5.

[75] *See* Ex. 48 at ¶ 5.

[76] *See* Ex. 48 at fn. 26.

[77] *See* Ex. 48 at ¶ 9.

accused Brewer of "manufactur[ing] and concoct[ing] conflicts" which resulted in that attorney

being "conflicted out" of certain work—which is very different from accusing Brewer of

concocting **substantive** conflicts between the NRA and AMc.[78]   In support of its stunning

accusation that Brewer "fak[ed] audits and document demands," AMc cites nothing at all.[79]   Even

if AMc could establish that Brewer witnessed or participated in relevant conversations, this would

make him, at most, a potential fact witness[80]—not a "tortfeasor" who "faked" his client's justified

concerns about billing fraud and extortion.

AMc's contentions regarding familial conflicts are equally unpersuasive.  AMc cites no

case, and counsel are aware of no case, where a relation by marriage to an officer of an opposing

party disqualified an attorney—let alone his entire firm.  AMc is unable to identify any privileged

or proprietary information that Brewer acquired over holidays or family dinners.  Moreover, as

discussed below, even if AMc could show that Brewer instigated the NRA's lawsuit, harbored

animus against his in-laws, and stood to profit if the NRA won its case, none of these showings

would establish a conflict under the cited rules.

### 2.   None of the circumstances alleged by AMc would "adversely limit" Brewer's representation of the NRA.

Texas Rule 1.06 and its approximate counterpart, ABA Model Rule 1.7, seek first and

foremost to ensure counsel's "loyalty to [the] client."[81] Although both rules focus primarily on

---

[78] *See* ECF 105 at ¶ 37 (citing APP000219).

[79] *Id.* at ¶ 43.

[80] Although a lawyer's status as a fact witness may limit his representation in certain circumstances  (AMc's arguments to this effect are addressed *infra* at section III. (C)), fact-witness status certainly does not create a *per se* conflict—if it did, the witness-advocate prohibition would be considerably broader. *See* Ex. 50 at ¶ 24.; see also Ex. 47 at ¶ 26.

[81] *See* Texas Disciplinary R. Prof. Cond. 1.06, cmts. 1, 2. AMc relies specifically on subpart 1.06(b)(2), which seeks to ensure that "[t]he lawyer's own interests…not be permitted to have adverse effect on representation of a client."). *Id.* at cmt. 5.

13

attorneys who represent two opposing clients at once,[82] it is noted that a "lawyer's or law firm's own interests" may also be disqualifying if they "adversely limit[]" the lawyer's representation of his client.[83] For example, a lawyer who is incentivized to "refer[] clients to an enterprise in which the lawyer has an undisclosed interest" may be conflicted, because his business interest may oppose the client's interest in getting the best price.[84] Similarly, if Brewer's affection or loyalty toward his in-laws inhibited zealous advocacy on behalf of the NRA, Texas Rule 1.06(b)(2) might be relevant. But here, AMc alleges the exact opposite: that Brewer's familial "animosity" makes him a too-zealous advocate for the NRA in its litigation against AMc.[85] No basis exists under Texas Rule 1.06, Model Rule 1.7, or otherwise, to disqualify a lawyer who harbors animus toward an opposing party. Indeed, some degree of contentiousness is inherent in the adversary system, where lawyers serve as fiduciaries and advocates for opposing clients who may be bitterly at odds with one another.

Likewise, even if Brewer stood to profit from winning this lawsuit—whether because BAC seeks to "compete" with AMc, or because victory would allow Brewer to collect additional fees— such an incentive would hardly inhibit loyal, zealous advocacy. In the abstract, any lawyer with a contingency-fee agreement also has a personal interest in maximizing and collecting his or her fees. Likewise, a lawyer paid hourly might have an interest in taking a time-intensive approach to the case. Court and commentators have recognized that such interests do not create disqualifying

---

[82] *See* Ex. 50 at ¶ 16.

[83] *See* Texas Disciplinary R. Prof. Cond. 1.06(b)(2); *see also* Model Rule 1.7.

[84] *See* Texas Disciplinary R. Prof. Cond. 1.06, cmt. 5.

[85] *See* ECF 105 at ¶ 23; Although AMc also alleges that one of its non-attorney principals, Revan McQueen, could be "hamper[ed] . . . [in his] ability to zealously advocate for his own company because of his concerns for family," these professed "concerns" are belied by McQueen's inflammatory, hostile conduct toward Brewer. *See* Ex. 48 at ¶ 9. Moreover, nothing in the Texas Rules or Model Rules provides a basis to disqualify counsel on the ground that an opposing litigant hesitates to face him.

conflicts of interest under Texas Rule 1.06(b)(2) or ABA Model Rule 1.7(a)(2),[86] and AMc's conclusory insistence otherwise cannot satisfy its burden.[87]

Similarly, even if AMc continues to muddle this proceeding with false, tactical, red-herring allegations that reference Brewer individually, Brewer's involvement as a fact witness would not create a conflict unless it caused Brewer and the NRA to take inconsistent positions on relevant facts.[88]  This has never occurred, nor is there any evidence it will occur.

3. **Even if a conflict existed under Texas Rule 1.06 or Model Rule 1.7, the NRA's consent resolves the conflict.**

Even if AMc could show that one or more of Brewer's personal interests impeded his representation of the NRA, Section 125 ("A Lawyer's Personal Interest Affecting the Representation of a Client") of the Restatement (Third) of the Law Governing Lawyers emphasizes that disqualification "is ordinarily not a relevant remedy[,] because the harm is suffered by the lawyer's client who may terminate the lawyer at any time."[89]  If the client determines in retrospect that he has been harmed, he may sue for malpractice or claw back fees he has paid.[90]  Not surprisingly, duties under Texas Rule 1.06 and Model Rule 1.7 which guard against harm to the client can be discharged by the consent of the client.  Specifically, the Texas prohibition on representations "adversely limited" by a lawyer's own interests disappears if the affected client(s)

---

[86] *See Anderson Producing Inc. v. Koch Oil Co.*, 929 S.W.2d 416 (Tex. 1996).

[87] *See Batiste v. Texas*, Civil Action No. H-15-1258, 2017 WL 1160513, at *2 (S.D. Tex. Mar. 29, 2017) ("The pleadings do not demonstrate a conflict of interest in which 'an attorney's personal interests prevent her from advancing her client's best arguments.'") (quoting *Clark v. Davis*, No. 14-70034, 2017 WL 955257, at *6 (5th Cir. Mar. 10, 2017)).

[88] *See* Ex. 50 at ¶ 13.

[89] *See* Restatement (3d) of The Law Governing Lawyers § 125. The Restatement's commentary on concurrent conflicts, and their dischargeability via client consent, is "indicative of the national consensus on this issue." *See also F.D.I.C. v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1314 (5th Cir. 1995).

[90] *See* Restatement (3d) of The Law Governing Lawyers § 125.

give informed consent.[91]  Likewise, ABA Model Rule 1.7 provides that "[n]otwithstanding the existence of a concurrent conflict of interest," a lawyer may represent a client with the client's informed consent.[92]  Although such consent need not be in writing,[93] the NRA's General Counsel has dispelled any doubt about the NRA's consent by furnishing a written declaration here—stating that Brewer's relationship with his in-laws was well known and understood, that the NRA had ample opportunity to seek advice from other counsel regarding BAC's engagement, and that the NRA chose to retain BAC with full awareness of the risks and disadvantages alleged by AMc.[94]  This alone should dispose of AMc's arguments under Texas Rule 1.06 and Model Rule 1.7.

### 4.   AMc lacks standing to allege a conflict under Texas Rule 1.06 or Model Rule 1.7.

Both Texas and Fifth Circuit case law are clear that as a general rule, "non-clients have no standing to bring a motion to disqualify the other side's counsel,"[95] unless the movant was formerly represented by the same counsel.[96]  Exceptions to this rule are recognized only in the rarest

---

[91] *See* Texas Disciplinary R. Prof. Cond. 1.06(b) (providing that the conflict rule cited by AMc applies only "except to the extent permitted by paragraph (c)"); *Id.* at 1.06(c) (providing that a lawyer may represent a client notwithstanding a conflicting personal interest if the lawyer reasonably believes the representation will not be materially affected, and if each affected or potentially affected client consents after full disclosure).

[92] *See* ABA Model Rule 1.7(b).  The rule also contains certain exceptions and conditions not relevant here—for example, Brewer's representation of the NRA is not prohibited by law (1.7(b)(2)), and does not involve the assertion of a claim by one client against another client represented by the lawyer in the same proceeding before a tribunal. Rule 1.7(b)(3)).

[93] *See* Texas Disciplinary R. Prof. Cond. 1.06, cmt 8.

[94] *See* Ex. 45 at ¶ 4-6.

[95] *See Areizaga v. ADW Corp.*, No. 3:14-CV-2899-P, 2015 WL 13567554, at *4 (N.D. Tex. May 19, 2015).

[96] *Clemens v. McNamee*, Case No. 4:08-CV-00471, 2008 WL 1969315, at *1 (S.D. Tex. 2008) (Finding Defendant lacked standing to move for the disqualification of Plaintiff's attorney on basis that attorney never represented Defendant); *In re Yarn Processing Patent Validity Litigation*, 530 F.2d 83, 88-89 (5th Cir. 1976) ("As a general rule, courts do not disqualify an attorney on the grounds of conflict of interest unless the former client moves for disqualification"); *see also In re Yarn Processing Patent Validity Litig.*, 530 F.2d 83, 89 (5th Cir. 1976) ("[a] former client seeking to disqualify an attorney who appears on behalf of his adversary need only to show that the matters embraced within the pending suit are substantially related to the matters or cause of action wherein the attorney previously represented him.").  For the avoidance of doubt, neither Brewer nor BAC has ever represented AMc. *See* Ex. 21 at p. 14.

instances of "manifest and glaring" injustice—*e.g.*, where a lawyer switches sides during a lawsuit.[97] Indeed, each and every case within this Circuit where the "manifest and glaring" standard was successfully invoked has involved a lawyer's misuse of his former client's confidences.[98] AMc cannot come close to alleging comparable facts here. Motions, like this one, to disqualify opposing counsel are "viewed with great caution" because they "can be misused as a technique for harassment."[99] This Court should not indulge AMc's gamesmanship.

### 5.   **AMc has waived any conflict objection.**

Courts in the Fifth Circuit recognize that a motion to disqualify must be made with reasonable promptness after a party discovers the facts which form the basis of the motion.[100] Undue delay waives even an otherwise-valid ground for disqualification,[101] indeed, such delay often signals an improper tactical motivation.[102] Under Texas and federal precedent, delays of six months or more can amount to waiver.[103] Although this case was not commenced until August 30,

---

[97] *See Clemens*, Case No. 4:08-CV-0047, 2008 WL 1969315 at **8-10.

[98] *See Centerboard Sec., LLC v. Benefuel, Inc.*, No. 3:15-cv-2611-G, 2016 WL 3126238, at *1 (N.D. Tex. June 3, 2016 ("However, there are a few "narrow exceptions," such as if there is an "unethical change in sides...[that is] manifest and glaring.") (quoting *Clemens v. McNamee*, No. 4:08-CV-00471, 2008 WL 1969315 at *3 (S.D. Tex. May 6, 2008)).

[99] *See Clemens v. McNamee*, Case No. 4:08-CV-00471, 2008 WL 1969315, at *6 (S.D. Tex. May 6, 2008).

[100] *See Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, No. CV H-09-3712, 2010 WL 11661414, at *6 (S.D. Tex. July 30, 2010) ("A motion to disqualify should be made with reasonable promptness after a party discovers the facts which lead to the motion" (quoting *Jackson v. J.C. Penney Co.*, 521 F. Supp. 1032, 1034-35 (N.D. Ga. 198)).

[101] *Id* at 690 ("A party who fails to file its motion to disqualify opposing counsel in a timely manner waives the complaint."); *see also See Am. Sterilizer Co. v. Surgikos Inc.*, No. CIV.A. 4-89-238-Y, 1992 WL 332102, at *6 (N.D. Tex. June 12, 1992) (Noting that Surgikos did not file its motion for disqualification until nearly a year after first raising questions regarding potential conflict, and where approximately eight months passed from a stay in discovery without a single word from Surgikos's counsel about the need for disqualification).

[102] *See Spears v. Fourth Court of Appeals*, 797 S.W.2d 654, 656 (Tex.1990) ("[C]ourts must adhere to an exacting standard when considering motions to disqualify counsel so as to discourage their use as a dilatory trial tactic.").

[103] *See, e.g., Buck v. Palmer*, 381 S.W.3d 525, 528 (Tex. 2012) (waiver based on seven-month delay; "We have held that a delay of even less time waives a motion to disqualify."); *In re Kyle Fin. Grp., LLC*, 562 S.W.3d 795 at 798 (Tex. App.— Houston [14th District] 2018, no. pet.) ("Under binding precedent, unexplained delays of six months or more may result in waiver as a matter of law."); *Diggs v. Diggs*, No. 14-11-00854-CV, 2013 WL 3580424

17

2019, it recapitulates claims and issues that overlap closely with (and in many instances are identical to) those in a Virginia lawsuit filed in early 2019.[104] Moreover, even before the Virginia case was filed, the NRA and AMc engaged in extensive letter correspondence where AMc expounded at length on its animus against BAC and its refusal to deal with the firm. Accordingly, none of the "conflicts" alleged in the Motion are being alleged for the first time. Indeed, AMc made the same exact allegations before the Virginia court, in a failed gambit to obstruct *pro hac vice* admission of BAC attorneys.[105] But curiously, at no point during the Virginia lawsuit did AMc move to disqualify BAC. Indeed, after the case at bar was filed, AMc waited ***seven months*** to bring its motion.[106] As set forth at greater length in Exhibit 4, AMc has railed against BAC's representation of the NRA on the same tiresome grounds for nearly a year, and lodged its disqualification motion at this time for tactical reasons—not to avert purported prejudice. Even if any of AMc's conflict arguments had merit, they would properly be deemed waived.

---

at *22-23 (Tex. App.—Houston [14th Dist.] July 11, 2013, no pet.) (six-month delay; disqualification waived). The Texas Supreme Court has held that a state "trial court abuse[s] its discretion" by allowing disqualification after the moving party fails "to take any action until six and a half months." *Vaughan v. Walther*, 875 S.W.2d 690, 690-91 (Tex. 1994) (per curiam); *see also* David Hricik & Jae Ellis, *Motions to Disqualify in Texas State and Federal Court Litigation*, 74 TEX. B.J. 466, 467 (2011) ("In *Enstar Petroleum Co. v. Mancias*, the court found waiver where the motion for disqualification came four months after the movant learned of the conflict. Since that decision, it has been a safe rule for attorneys to assume that a Texas court will find a delay of four months or longer constitutes a waiver.") (internal citations omitted).

[104] *See NRA v. AMc, et al.,* Circuit Court of Virginia for the City of Alexandria, Cause CL19001757, now consolidated with *NRA v. AMc, et al*., Circuit Court of Virginia for the City of Alexandria, Cause CL19002067, and *NRA v. AMc, et al*., Circuit Court of Virginia for the City of Alexandria, Cause CL19002886 (collectively, the "Virginia Lawsuits"). Indeed, the Virginia court ruled that the claims and defenses in this case, and that one, were so similar as to require a stay of the Virginia proceedings pending adjudication of this matter. *See* Order Granting Motion to Stay in Virginia Lawsuits, attached as Ex. 37 to the Collins Decl.

[105] *See* Ex. 21 at pp. 9-15; *see also* Waiver Chart, attached as Ex. 53 to the Collins Decl.

[106] *See* ECF 1 (The NRA's Original Complaint), filed August 30, 2019; see also ECF 78 (Motion to Disqualify), filed March 30, 2020.

C.    **The "Lawyer-Witness" Rule Does Not Disqualify Brewer Or BAC.**

The so-called "lawyer-witness" rule, which restricts the involvement of trial counsel who are necessary witnesses for, or likely witnesses against, their own clients, "should not be used as a tactical weapon to deprive the opposing party of the right to be represented by the lawyer of his or her choice, because reducing the rule to such use would subvert its purpose."[107]  AMc misuses the rule in precisely this manner.   Each of AMc's allegations in support of its "lawyer-witness" objection adheres to roughly the same pattern: complaints about AMc's misconduct, which were voiced by NRA leadership in letter correspondence, media interviews, and sworn declarations, were actually "faked" by the NRA's lawyers; therefore, the NRA's lawyers are essential, irreplaceable fact witnesses, whose testimony must be presumed to be adverse to the NRA.[108]  AMc's claims have no basis in admissible evidence, nor Texas or Fifth Circuit law.

1.    **AMc cannot show that Brewer's testimony is "necessary" to establish an essential fact on behalf of" the NRA.**

AMc relies on Texas Rule 3.08, which provides that a lawyer may not act "as an advocate before a tribunal" if: (i) his testimony may be "necessary to establish an essential fact on behalf of the lawyer's client," or (ii) he "will be compelled to furnish testimony that will be substantially adverse to" his client.[109]  Importantly, the "necessary . . .essential fact" prong of this inquiry only looks to the client's (here, the NRA's) claims.   The mere fact that a moving party desires to call opposing counsel as witness does not make counsel's testimony "necessary,"[110] nor can the movant

---

[107] *May v. Crofts*, 868 S.W.2d 397, 399 (Tex. App. 1993).

[108] *See* ECF 105 at ¶¶ 45-51.

[109] Texas Disciplinary R. Prof. Cond. 3.08; *see* ECF 105 at ¶¶ 45-51 (basing AMc's "lawyer-witness" disqualification argument on Texas Rule 3.08).

[110] *See Spears*, 797 S.W.2d at 658; *In re Slusser*, 136 S.W.3d 245, 248 (Tex. App. —San Antonio 2004, orig. proceeding); A.M., 974 S.W.2d at 864; *Olguin v. Jungman*, 931 S.W.2d 607, 611 (Tex. App. —San Antonio 1996, no writ); *see also Schwartz v. Jefferson*, 930 S.W.2d 957, 960 (Tex. App.—Houston [14th Dist.] 1996,

satisfy its burden by citing speculative or contingent circumstances under which opposing counsel's testimony may arguably become relevant.[111] Instead, AMc must specify precisely which facts Brewer's testimony is "necessary" to establish, and why those facts are "essential" to the NRA's claims.[112]

AMc does not, and cannot, meet this burden. Stripped of their *ad hominem* vitriol, AMc's allegations boil down as follows: Brewer drafted, or helped to draft, letters signed by the NRA that requested audits of records[113] and disputed AMc's performance under its contract;[114] communicating with reporters at the behest of the NRA, Brewer made statements unfavorable to AMc;[115] and, Brewer persuaded the NRA that a message delivered by AMc constituted extortion.[116] Even if true, none of these facts would be "essential" to the NRA's claims, or AMc's defenses: if AMc breached its contract, it is legally irrelevant whether counsel helped his client detect the breach or helped draft a letter giving notice of it. Moreover, AMc fails to identify any subject matter on which Brewer would be the ***only*** witness competent to testify.  Instead, it admits that "high-ranking officials from the NRA" could testify about the same topics.[117]  Crucially, the

---

orig. proceeding) (noting that the moving party may not disqualify an attorney "by unnecessarily calling that attorney as a witness").

[111] *In re Sanders*, 153 S.W.3d 54, 58 (Tex. 2004) (orig. proceeding); *In re Chu*, 134 S.W.3d 459, 464-65 (Tex. App.—Waco 2004, orig. proceeding) (A "necessary" witness is one who really is necessary.); *see In re A.M.*, 974 S.W.2d 857, 864 (Tex. App.—San Antonio 1998, orig. proceeding). ("[T]here must be a genuine need for the attorney's testimony...."). For instance, an attorney is not a "necessary" witness if the moving party can acquire the same testimony or evidence from other sources. *See also Horaist v. Doctor's Hosp.*, 255 F.3d 261, 267 (5th Cir. 2001) (holding that an attorney is not a necessary witness if "his testimony is cumulative").

[112] *In re Frost*, 744 F.3d 384, 387 (5th Cir. 2014).

[113] *See* ECF 105 at ¶¶ 21-26.

[114] *Id.* at ¶ 27.

[115] *Id.* at ¶ 50.

[116] *Id.*

[117] *See* Texas Disciplinary Rules of Professional Conduct, Rule 3.08(a).

NRA, not AMc, has standing to determine what evidence is "necessary" to its claims and what witnesses it wishes to call—a determination that is premature at this stage.[118]  AMc certainly cannot demonstrate that Brewer is a necessary witness for the NRA, and therefore cannot show grounds for disqualification under Texas Rule 3.08(a).

> ### 2.     __AMc cannot show that Brewer will be compelled to give testimony adverse to the NRA.__

To invoke the lawyer-witness rule based on testimony it anticipates it will offer regarding *its own* claims (as distinguished from the NRA's claims), AMc must rely on Texas Rule 3.08(b), which is triggered where a lawyer furnishes testimony "substantially adverse to the lawyer's client."[119] Without evidence or explanation, AMc insists that Brewer will surely "shift[] blame to, and distance[] himself from, the NRA and LaPierre," making his testimony adverse to the NRA.[120] If litigants could disqualify opposing counsel by offensively and groundlessly prognosticating that counsel might become a fact witness and might "blame" his client for alleged wrongs, the justice system would fall into disorder.  Importantly, AMc fails to identify any disputed topic where Brewer's testimony, or interests, would be expected to contradict the testimony or interests of the NRA.[121]  For example, it alleges that "libelous" media statements purportedly made by Brewer were made at the direction of the NRA.[122] And although AMc brandishes missives and hearsay

---

[118] Even if AMc's lawyer-witness arguments were meritorious they would be, at best, premature.  *See, e.g.*, *Javorski v. Nationwide Mut. Ins. Co.*, Civil Action No. 3:06-CV-1071, 2006 WL 3242112, at p. 9 (M.D. Pa. Nov. 6, 2006) ("However, the rules addressing attorney as witness contemplate a determination of the need for disqualification at the time of a trial—an event scheduled in this case May 2007.  We will entertain disqualification at the time of trial if Defendant again raises the issue.").

[119] *See* Texas Disciplinary Rules of Professional Conduct, Rule 3.08(b).

[120] *See* ECF 105 at ¶ 46.

[121] Moreover, even if AMc could demonstrate that Brewer will give fact testimony prejudicing the NRA, AMc would lack standing to disqualify Brewer or BAC on this basis.  *See Horaist v. Doctor's Hosp. of Opelousas*, 255 F.3d 261, 267 (5th Cir 2001). ("In addition, when the attorney's participation as both lawyer and witness stands to prejudice only his own client, the opposing attorney should have no say in the matter.").

[122] *See* ECF 105 at ¶ 18.

from individuals formerly associated with the NRA (such as Steve Hart), the NRA's current litigation posture, and the sworn testimony of NRA officers, are far better indicia of the NRA's legal interests.  AMc's arguments under Texas Rule 3.08(b) are utterly without merit and should be rejected.

**3.**      **Even if Brewer were a necessary or adverse fact witness, he would only be barred from acting as an advocate before the trier of fact—not from signing pleadings or directing the NRA's litigation strategy.**

A lawyer slated to serve as an essential or prejudicial fact witness may participate in the "preparation of a matter for presentation to a tribunal,"[123] and is constrained only from delivering oral arguments or other courtroom advocacy which may confuse a trier of fact.[124]  Although AMc has not established by a preponderance of the evidence that Brewer will provide testimony necessary to an essential element of the NRA's claim or prejudicial to the NRA, even if AMc could make this showing, Brewer's involvement in this matter would be wholly consistent with Texas Rule 3.08 and similar ABA guidance.[125]

**4.**      **Lawyer-Witness disqualification would not impute to BAC.**

Assuming *arguendo* this Court were to disqualify Brewer or otherwise prohibit him from acting as an advocate at trial, this disqualification should not be imputed to BAC.[126]   The Fifth Circuit has held that "[d]epriving a party of the right to be represented by the attorney of his

---

[123] *See* Texas Disciplinary Rules of Professional Conduct, Rule 3.08, cmt. 8.

[124] *See Anderson Producing Inc. v. Koch Oil Co.*, 929 S.W.2d 416, 422 (Tex. 1996) (lawyer-witness may engage in pre-trial out of court matters, such as preparing and signing pleadings, planning trial strategy, and pursuing settlement negotiations).

[125] *See, e.g.*, ABA Informal Opinion 89-1529 ("A lawyer who anticipates testifying as a witness on a contested issue at trial may represent a party in discovery and other pre-trial proceedings provided the client consents after consultation and the lawyer reasonably believes that the representation will not be adversely affected by the lawyer's own interest in the expected testimony."). The NRA is fully apprised of these matters and has consented to be represented by Brewer and BAC.  *See* Ex. 45 at ¶ 4.

[126] ABA Model Rule 3.7, cmt. 7.

22

or her choice is a penalty that must not be imposed without careful consideration."[127] Moreover, out of an abundance of caution, BAC has satisfied the requirements of Model Rule 3.7 and Texas Rule 3.8 by obtaining informed consent from the NRA for continued representation from both Brewer and BAC.[128]  Here, disqualification of BAC would be a "a penalty disproportionate to the potential harm at issue," and would only unfairly punish the NRA.[129]

**D.**     **The Rules Governing "Trial Publicity" Have No Application Here.**

AMc next contends that, because Brewer has issued statements to the media in response to hostile publicity (much of it instigated by AMc), Brewer must be disqualified under Texas Rule 3.7 and Model Rule 3.6.   These rules prohibit extrajudicial statements by counsel which imminently, materially prejudice fact-finding in a judicial proceeding.[130]  "[E]ven pervasive, adverse publicity does not inevitably lead to a fair trial,"[131] so the burden under these rules is high: AMc must prove by a preponderance of the evidence that Brewer's statements to the press pose a "serious and imminent threat" or a "clear and present danger" of prejudicing fact-finding in this case. [132]  AMc offers no evidence to meet its burden, except to deride Brewer's official, authorized responses to media inquiries as "leaking," a characterization with no legal valence.[133]

---

[127] *FDIC*, 50 F.3d at 1313.

[128] *See* Ex. 45 at ¶ 4; *see also* Ex. 48 at ¶ 15.

[129] *FDIC*, 50 F.3d at 1317 (Even if disqualification of "one or two attorneys" was warranted, "disqualification of the entire LMHT & B firm would be a penalty disproportionate to the potential harm at issue," and "work such a substantial hardship on the FDIC that their cause would be unfairly injured.").

[130] *See* Texas Rule 3.06 (prohibiting "an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter"); Model Rule 3.6 (prohibiting a statement which has "an imminent and materially prejudicial effect on the fact-finding process").

[131] *See Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 554 (1976).

[132] *See, e.g., Breiner v. Takao*, 835 P.2d 637, 641-42 (Hawaii 1992).

[133] *See* ECF 105 at ¶ 18. Laughably, AMc even accuses Brewer of "leaking" authorized, pre-prepared media statements from NRA Board members responding to negative press about a racist cartoon AMc published. *See* ECF 105 at ¶ 58; *see also* Ex. 49 at ¶ 36-39. AMc insists, falsely, that Brewer "was not responding to negative publicity—

In fact, because this case is in its early stages—no scheduling order has been entered, and no trial date set—it is highly unlikely that any media statement would "prejudice[e] a juror or influenc[e] or intimidat[e] a prospective witness."[134] And even if excessive publicity did occur, AMc points to no Texas or Fifth Circuit authority showing that disqualification, rather than a *voir dire* of the jury pool, would be the appropriate remedy.[135]

**E.    AMc's Other Disqualification Allegations Fail.**

Finally, AMc alleges a laundry list of additional disqualification grounds for which it provides scant evidentiary support or none at all.   None of the rules AMc cites countenance disqualification.

**1.    Texas Rule 4.01 and Model Rule 4.1 (Truthfulness in Statements to Others).**

AMc fails to demonstrate by a preponderance of admissible evidence that Brewer or BAC made any false statements to others.   Importantly, AMc relies on allegations of untruthfulness

---

he *created it*" (Motion at para. 59), but AMc's unsupported, bad-faith assertions do not constitute admissible evidence. In actual fact, the vast majority of BAC's media-relations efforts, including in connection with the March 11, 2019, *New York Times* article AMc cites, consisted of defensive responses to hostile press coverage regarding NRA legal matters. *See* Ex. 49 at ¶ 40-48. NRA counsel have the First Amendment right, as well as the ethical obligation, to protect the NRA from prejudicial publicity initiated by others, including by offering on-record comments. *See, e.g.*, ABA Model Rule 3.6(c) ("[A] lawyer may make a statement that a reasonable lawyer would believe is required to protect a client from the substantial undue prejudicial effect of recent publicity not initiated by the lawyer or the lawyer's client"); Restatement (Third) of the Law Governing Lawyers § 109 (a "lawyer may in any event make a statement that is reasonably necessary to mitigate the impact on the lawyer's client of substantial, undue, and prejudicial publicity recently initiated by one other than the lawyer or the lawyer's client."); Texas Rule 3.07, cmt 2 (trial-publicity constraints are "subordinate to [constitutional] rights," including the right to free speech).

[134] *See* Restatement (Third) of the Law of Governing Lawyers § 109(1) (2000); *see also McPherson v. State*, 274 Ga. 444, 447, 553 S.E.2d 569, 574 (2001) (although they allegedly violated a gag order, district attorney's statements were temporally "too far removed from the time of trial to possibly taint the jury pool," disfavoring disqualification).

[135] *See, e.g.*, *Wilson v. State*, 854 S.W.2d 270, 275 (Tex. App. 1993) (suggesting that change-of-venue would have been the appropriate remedy for improper trial publicity) declined to follow on other grounds by *Byrd v. State*, 499 S.W.3d 443, 449 (Tex. Crim. App. 2016); *Sec. & Exch. Comm'n v. Christian Stanley, Inc.*, No. CV117147GHKMANX, 2012 WL 13012479, at *2 (C.D. Cal. June 4, 2012) (applying comparable California ethical rule and holding: "Defendants cites no authority—nor did we find any—supporting the proposition that a suitable remedy for a violation of Rule 5-120 is disqualification, rather than an appropriate voir dire of the jury pool.").

contained in a sanctions opinion from ***another, unrelated case***—an opinion that was ***unanimously reversed by the Texas Supreme Court***.[136]

**2.** **Texas Rule 4.02 and Mode Rule 4.2 (Communication with Represented Persons).**

Without a shred of admissible evidence, AMc alleges that Brewer "uses family members to communicate with" AMc principals.[137] The sole support for this accusation consists of vague, unattributed hearsay in Revan McQueen's declaration, which fails to specify which "family members" claimed to convey "messages" from Brewer, or when.

**3.** **Texas Rule 4.04 and Model Rule 4.4 (Respect for Rights of Third Persons).**

AMc does not explain its basis for invoking these rules, much less muster evidence of violations.  To the extent that this allegation references the purported transmittal of secret messages through unnamed McQueen family members, as discussed above, the "evidence" adduced by AMc is both noncredible and inadmissible.

**IV.**

**CONCLUSION**

For all the reasons stated above, the NRA respectfully requests the Court deny Defendants' Motion to Disqualify Plaintiff's Counsel. Finally, Plaintiffs also seek an award of attorney's fees and other expenses related to this Motion pursuant to Rule 11 of the Federal Rules of Civil Procedure, 28 U.S.C. §1927, and the Court's inherent powers.

---

[136] *See* Sanction reversal, *Brewer v. Lennox Hearth Products, LLC, et al.*, No. 18-0426, Court of Appeals for the Seventh District (Apr. 24, 2020), attached as Ex. 40 to the Collins Decl.

[137] *See* ECF 105 at ¶ 30.

Dated:  May 4, 2020

Respectfully submitted,

**COBB MARTINEZ WOODWARD PLLC**

By: */s/ Daniel D. Tostrud*
    DANIEL D. TOSTRUD
    Texas Bar No. 20146160
    WILLIAM D. COBB, JR.
    Texas Bar No. 04444150
    MATTHEW E. LAST
    Texas Bar No. 24054910

1700 Pacific Avenue, Suite 3100
Dallas, Texas 75201
(214) 220-5200
(214) 220-5299 fax
dtostrud@cobbmartinez.com
wcobb@cobbmartinez.com
mlast@cobbmartinez.com

**ATTORNEYS FOR NON-PARTIES
WILLIAM A. BREWER III AND
BREWER, ATTORNEYS &
COUNSELORS**

**BREWER, ATTORNEYS & COUNSELORS**

By:   */s/ Michael J. Collins*
    Michael J. Collins, Esq.
    State Bar No. 00785493
    mjc@brewerattorneys.com
    Alessandra P. Allegretto, Esq.
    State Bar No. 24109575
    apa@brewerattorneys.com

1717 Main Street, Suite 5900
Dallas, Texas 75201
Telephone: (214) 653-4000
Facsimile: (214) 653-1015

**ATTORNEYS FOR THE PLAINTIFF
AND COUNTER-DEFENDANT
NATIONAL RIFLE ASSOCIATION
OF AMERICA AND WAYNE
LAPIERRE**

By:   */s/ Linda S. Eads*
    Professor Emerita, Linda S. Eads
    State Bar No. 13908300
    leads@smu.mail.edu

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was electronically served via the Court's electronic case filing system upon all counsel of record on this 4th day of May 2020.

*/s/ Michael J. Collins*
Michael J. Collins

27