## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § § § | |
| **Plaintiff and Counter-Defendant** | § § | |
| and | § § § | |
| WAYNE LAPIERRE, | § § | |
| | § | Civil Action No. 3:19-cv-02074-G |
| **Third-Party Defendant,** | § § | |
| v. | § § | |
| ACKERMAN MCQUEEN, INC., | § § | |
| **Defendant and Counter-Plaintiff,** | § § | |
| and | § § | |
| MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG, | § § § § § | |
| **Defendants.** | § | |

**APPENDIX IN SUPPORT OF PLAINTIFF NATIONAL RIFLE ASSOCIATION OF AMERICA'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISQUALIFY PLAINTIFF'S COUNSEL (WILLIAM A. BREWER III <u>AND BREWER ATTORNEYS & COUNSELORS)</u>**

**BREWER, ATTORNEYS & COUNSELORS**

Michael J. Collins, Esq.  (TX Bar No. 00785493)
mjc@brewerattorneys.com
Alessandra Allegretto (TX Bar No. 24109575)
apa@brewerattorneys.com
1717 Main Street, Suite 5900
Dallas, Texas 75201
Telephone: (214) 653-4000
Facsimile: (214) 653-1015

**ATTORNEYS FOR PLAINTIFF AND COUNTER-DEFENDANT NATIONAL RIFLE ASSOCIATION OF AMERICA**

Plaintiff/Counter-Defendant National Rifle Association of America, ("NRA") offers the

following evidence in support of their Response in Opposition to Defendants' Motion to Disqualify

Plaintiff's Counsel (William A. Brewer III and Brewer Attorneys & Counselors):

| EXHIBIT | DESCRIPTION | PAGE NO. |
|---|---|---|
| | Declaration of Michael J. Collins, dated May 4, 2020 | **APPENDIX001-009** |
| **1.** | Alter, Charlotte, At the NRA's TV Network, Guns Are a Weapon in the Culture Wars, Time, available at: https://time.com/5027071/nras-tv-network-guns-are-weapon-in-culture-wars/, dated November 16, 2017 | **APPENDIX010-014** |
| **2.** | Bradley, Laura, *What the F—k is NRATV? Let John Oliver Explain*, Vanity Fair, available at: vanityfair.com/Hollywood/2018/03/john-oliver-nra-tv-review-last-week-tonight, dated March 5, 2018 | **APPENDIX015-017** |
| **3.** | Folkenflik, David, *NRATV Strays Seemingly Far From Gun Ownership*, NPR, available at: https://www.npr.org/2018/05/07/609180 824/nratv-strays-seemingly-far-afield-from-gun-ownership, dated May 7, 2018 | **APPENDIX018-022** |
| **4.** | Public Statement from Brewer Attorneys & Counselors ("BAC"), *The NRA Sues New York Governor Andrew Cuomo, New York State Department of Financial Services Over Alleged Attack on First Amendment Rights*, dated May 11, 2018 | **APPENDIX023-025** |
| **5.** | Parker, James, *Live-Streaming the Apocalypse With NRATV*, The Atlantic, available at: https://www.theatlantic.com/magazine/archive/2018/06/nratv-live-streaming-the-apocalypse/559139/, dated June 2018 | **APPENDIX026-032** |
| **6.** | Letter from Stephen Ryan to William A. Brewer III, dated August 22, 2018 | **APPENDIX033-036** |
| **7.** | Melas, Chloe, *NRA TV Depicts Thomas & Friends in KKK Hoods*, CNN, available at: https://www.cnn.com/2018/09/13/entertainment/thomas-the-tank-engine-nra-kkk-trnd/index.html, dated September 14, 2018 | **APPENDIX037-040** |
| **8.** | CPAC Speech of Wayne LaPierre, dated March 2, 2019 | **APPENDIX041-050** |
| **9.** | Hakim, Danny, *Incendiary N.R.A. Videos Find New Critics: N.R.A. Leaders*, The New York Times, available at: https://www.nytimes.com/2019/03/11 /us/nra-video-streaming-nratv.html, dated March 11, 2019 | **APPENDIX051-054** |
| **10.** | Letter from Jay Madrid to John Frazer, dated March 12, 2019 | **APPENDIX055-059** |
| **11.** | Packel, Dan, *Meet the Lawyers Who Clean Up Clients' Worst Messes*, The American Lawyer, dated March 28, 2019, available | **APPENDIX060-071** |

| EXHIBIT | DESCRIPTION | PAGE NO. |
|---|---|---|
| | at: https://www.law.com/americanlawyer/2019/03/28/meet-the-lawyers-who-clean-up-clients-worstmesses/ | |
| 12. | Public statement from Ackerman McQueen, Inc. ("AMc"), dated April 15, 2019 | **APPENDIX072-073** |
| 13. | Letter from Wayne LaPierre to the NRA Board of Directors, dated April 25, 2019 | **APPENDIX074-077** |
| 14. | Maremont, Mark, *NRA's Wayne LaPierre Says He Is Being Extorted, Pressured to Resign*, The Wall Street Journal, dated April 26, 2019, available at: https://www.wsj.com/articles/nras-wayne-lapierre-says-he-is-being-extorte d-pressured-to-resign-11556314763 | **APPENDIX078-082** |
| 15. | Brewer, William A. III, *Advocacy as Art: Lawyers Must Engage in Issues and Crisis Management*, Texas Lawyer, dated May 6, 2019, available at: https://www.law.com/texaslawyer/2019/05/06/advocacy-as-art-lawyers-must-engage-in-issues-andcrisis-management | **APPENDIX083-088** |
| 16. | McQueen, Revan electronic biography, available on May 16, 2019, https://www.am.com/our-team/?id=revan-mcqueen as obtained from Internet Archive_https://web.archive.org/web/20190516125304/https://www.am.com/our-team/?id=revan-mcqueen | **APPENDIX089-090** |
| 17. | Weinberg, Neil, *Ad Firm Cuts Ties With NRA, Says 'Chaos Led Us To Lose Faith' After 38 Years*, Bloomberg, Public statement from AMc, available at: https://www.bloomberg.com/news/articles/2019-05-29/nra-s-longtime-ad-agency-severs-ties-as-legal-battle-escalates | **APPENDIX091-093** |
| 18. | Emails from Dan Boren, dated May 30, 2019, from *NRA v. AMc, et al*., Circuit Court of Virginia for the City of Alexandria, Cause CL19001757, and *NRA v. AMc, et al*., Circuit Court of Virginia for the City of Alexandria, Cause CL19002067, included in Exhibit A to Plaintiff's Responses and Objections to Defendant Ackerman McQueen Inc's First Set of Interrogatories, which were included in Exhibit A to Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Compel Production of Documents, filed in the Virginia Lawsuits | **APPENDIX094-114** |
| 19. | AMc's Opposition to Plaintiff's Motion for Pro Hac Vice Admission of Brewer Attorneys, filed in Cause No. CL19001757 and CL19002067, in the Circuit Court of Virginia for the City of Alexandria, dated June 24, 2019 | **APPENDIX115-120** |
| 20. | Public statement from AMc, dated June 26, 2019 | **APPENDIX121-122** |
| 21. | Transcript of Hearing, dated June 26, 2019, from NRA v. AMc, et al., Circuit Court of Virginia for the City of Alexandria, Cause CL19001757, now consolidated with NRA v. AMc, et al., | **APPENDIX123-137** |

| EXHIBIT | DESCRIPTION | PAGE NO. |
|---|---|---|
| | Circuit Court of Virginia for the City of Alexandria, Cause CL19002067 | |
| 22. | Public statement from AMc, dated July 3, 2019 | **APPENDIX138-139** |
| 23. | Kovensky, Josh, *Jilted NRATV Firm Accuses Gun Group of 'Hurting As Many People As Possible,'* Talking Points Memo, available at: talkingpointsmemo.com/muckracker/nratv-severance-ackerman-mcqueen, dated July 3, 2019 | **APPENDIX140-143** |
| 24. | Lackmeyer, Steve, *Ackerman McQueen Accuses NRA of Threatening Employees,* The Oklahoman available at: https://oklahoman.com/article/56 35424/ackerman-mcqueen-accuses-nra-of-threatening-employees, dated July 4, 2019 | **APPENDIX144-146** |
| 25. | Public statement from AMc, dated August 30, 2019 | **APPENDIX147-148** |
| 26. | Public statement from AMc, dated September 13, 2019 | **APPENDIX149-150** |
| 27. | Memorandum in Support of Defendants' Plea in Bar, filed in NRA v. AMc, et al., Circuit Court of Virginia for the City of Alexandria, Cause CL19001757, and NRA v. AMc, et al., Circuit Court of Virginia for the City of Alexandria, Cause CL19002067, dated September 24, 2019 | **APPENDIX151-161** |
| 28. | Order Denying Defendants' Plea in Bar, filed in NRA v. AMc, et al., Cause CL19001757, in the Circuit Court of Virginia for the City of Alexandria, dated October 8, 2019 | **APPENDIX162-164** |
| 29. | Gutowski, Stephen, Staff Writer, Washington Free Beacon, Twitter, available at: https://twitter.com/StephenGutowski/status/11888840122422190 09, dated October 28, 2019 | **APPENDIX165-168** |
| 30. | Stockler, Asher, NRATV Creator Threatens 'Legal Action' Against Former Host Over 'Fabrications,' Newsweek, available at: https://www.ne wsweek.com/nratv-ackerman-mcqueen-nra-guns-1477939, dated December 18, 2019 | **APPENDIX169-174** |
| 31. | Excerpt of Deposition Transcript of ████████, dated January 10, 2020, in *NRA v. AMc, et al.*, Circuit Court of Virginia for the City of Alexandria, Cause CL19001757, and NRA v. AMc, et al., Circuit Court of Virginia for the City of Alexandria, Cause CL19002067 | **APPENDIX175** |
| 32. | ████████, Exhibit 15 to the Deposition of ████████ dated January 10, 2020 in *NRA v. AMc, et al.*, Circuit Court of Virginia for the City of Alexandria, Cause CL19001757, and NRA v. AMc, et al., Circuit Court of Virginia for the City of Alexandria, Cause CL19002067 | **APPENDIX176** |
| 33. | Excerpt of Deposition Transcript of ████████, dated January 29, 2020, in *NRA v. AMc, et al.*, Circuit Court of | **APPENDIX177** |

3

| EXHIBIT | DESCRIPTION | PAGE NO. |
|---|---|---|
| | Virginia for the City of Alexandria, Cause CL19001757, and NRA v. AMc, et al., Circuit Court of Virginia for the City of Alexandria, Cause CL19002067 | |
| 34. | ███████, Exhibit 10 to the Deposition of ████████████, dated January 29, 2020 in *NRA v. AMc, et al.*, Circuit Court of Virginia for the City of Alexandria, Cause CL19001757, and NRA v. AMc, et al., Circuit Court of Virginia for the City of Alexandria, Cause CL19002067 | **APPENDIX178** |
| 35. | Maremont, Mark, *NRA Fails to Stop Former Ad Agency From Cooperating With New York Probe*, available at: https://www.wsj.com/articles/nra-fails-to-stop-former-ad-agency-from-cooperating-with-new-york-probe-11582575899, dated February 24, 2020 | **APPENDIX179-182** |
| 36. | Declaration of Travis Carter, dated March 4, 2020 | **APPENDIX183-186** |
| 37. | Order Granting Defendants' Motion to Stay Proceedings from NRA v. AMc, et al., Circuit Court of Virginia for the City of Alexandria, Cause CL19001757, now consolidated with NRA v. AMc, et al., Circuit Court of Virginia for the City of Alexandria, Cause CL19002067, and NRA v. AMc, et al., Circuit Court of Virginia for the City of Alexandria, Cause CL19002886 (collectively, the "Virginia Lawsuits"), dated March 18, 2020 | **APPENDIX187-190** |
| 38. | Declaration of Andrew Arulanandam, dated April 14, 2020 | **APPENDIX191-195** |
| 39. | Stockler, Asher, *Longtime NRA Attorney Says Group's Own Lawyer Embarked On 'Highly Destructive Path,' Court Documents Show*, Newsweek, available at: https://www.newsweek.com/national-rifle-association-lawsuit-1498670, dated April 17, 2020 | **APPENDIX196-200** |
| 40. | Sanction reversal, Brewer v. Lennox Hearth Products, LLC, et al., No. 18-0426, Court of Appeals for the Seventh District, dated April 24, 2020, | **APPENDIX201-260** |
| 41. | Declaration of Michael Erstling, dated April 29, 2020 | **APPENDIX261-265** |
| 42. | Declaration of Charles Cotton dated April 30, 2020 | **APPENDIX266-269** |
| 43. | Declaration of Ian Shaw, dated April 30, 2020 | **APPENDIX270-273** |
| 44. | Declaration of Grant Stinchfield, dated April 30, 2020 | **APPENDIX274-278** |
| 45. | Declaration of John Frazer, dated May 1, 2020 | **APPENDIX279-286** |
| 46. | Declaration of Andrew Arulanandam, dated May 1, 2020 | **APPENDIX286-290** |

| EXHIBIT | DESCRIPTION | PAGE NO. |
|---|---|---|
| **47.** | Declaration of James McCormack, dated May 3, 2020 | **APPENDIX291-317** |
| **48.** | Declaration of Wayne LaPierre, dated May 3, 2020 | **APPENDIX318-326** |
| **49.** | Declaration of Travis Carter, dated May 4, 2020 | **APPENDIX327-340** |
| **50.** | Declaration of Nancy Moore, dated May 4, 2020 | **APPENDIX341-362** |
| **51.** | Declaration of Richard Flamm, dated May 4, 2020 | **APPENDIX363-423** |
| **52.** | Declaration of Craig Spray, dated May 4, 2020 | **APPENDIX424-428** |
| **53.** | Chart summarizing AMc's waiver, dated May 4, 2020 | **APPENDIX429-433** |
| **54.** | Brewer, Attorneys & Counselors Public Relations Unit electronic biographies (Travis Carter, Andrea Sadberry, and Katherine Leal Unmuth), available at: https://www.brewerattorneys.com/team-1 | **APPENDIX434-437** |
| **55.** | Crisis Law and Strategy Group Overview, Quinn Emmanuel Urquhart & Sullivan, LLP, available at: https://www.quinnemanuel.com/the-firm/news-events/announcement-quinn-emanuel-launches-crisis-law-strategy/ | **APPENDIX438-448** |
| **56.** | Crisis Management Overview, Akin Gump Strauss Hauer & Feld, LLP, available at: https://www.akingump.com/en/experience/practices/litigation/crisis-management.html | **APPENDIX449-451** |
| **57.** | Defendants Answer, Plea in Bar, and Counterclaim, filed in CL19001757, in the Circuit Court for the City of Alexandria, dated May 23, 2019 | **APPENDIX452-502** |

Dated: May 4, 2020                Respectfully submitted,


**BREWER, ATTORNEYS & COUNSELORS**


By:      */s/ Michael J. Collins*
         Michael J. Collins, Esq.
         State Bar No. 00785493
         mjc@brewerattorneys.com
         Alessandra Allegretto
         State Bar No. 24109575
         1717 Main Street, Suite 5900
         Dallas, Texas 75201

Telephone: (214) 653-4000
Facsimile: (214) 653-1015

**ATTORNEYS FOR PLAINTIFF AND
COUNTER-DEFENDANT NATIONAL RIFLE
ASSOCIATION OF AMERICA**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was electronically

served via the Court's electronic case filing system upon all counsel of record on this 4th day of

May 2020.

*/s/ Michael J. Collins*
Michael J. Collins

4845-4957-5611, v. 1

6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § |
| **Plaintiff and Counter-Defendant,** | § § |
| **and** | § § |
| **WAYNE LAPIERRE,** | § § |
| **Third-Party Defendant,** | § § |
| **v.** | § **Civil Action No. 3:19-cv-02074-G** |
| | § § |
| **ACKERMAN MCQUEEN, INC.,** | § § |
| **Defendant and Counter-Plaintiff,** | § § |
| **and** | § § |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG,** | § § § § |
| **Defendants.** | § § |

**DECLARATION OF MICHAEL J. COLLINS IN SUPPORT OF PLAINTIFF
NATIONAL RIFLE ASSOCIATION OF AMERICA'S OPPOSITION TO
DEFENDANTS' MOTION TO DISQUALIFY PLAINTIFF'S COUNSEL**

I, MICHAEL J. COLLINS, declare under penalty of perjury pursuant to 28 U.S.C. § 1746,

that the following is true and correct:

1. I respectfully submit this declaration in support of Plaintiff National Rifle

Association of America's Opposition to Defendants' Motion To Disqualify Plaintiff's Counsel

(the "Motion").

Appendix001

2.      I am a partner with the law firm Brewer, Attorneys & Counselors ("BAC").

3.      I serve as counsel of record for the National Rifle Association of America (the "NRA") in the above-captioned action (the "Action").

4.      William A. Brewer III will not appear as an advocate at the jury trial of this matter.

5.      I am fully competent and qualified in all respects to make this Declaration.  The facts stated herein are true and correct, and unless otherwise qualified, are within my personal knowledge.

6.      As counsel for the NRA, I have reviewed pleadings, and other documents related to this Action, and I am familiar with, and have personal knowledge of, the facts and circumstances of this case, unless otherwise stated herein.

7.      Attached to this declaration are true and correct copies of the following documents:

a.   Alter, Charlotte, *At the NRA's TV Network, Guns Are a Weapon in the Culture Wars*, Time, available at: https://time.com/5027071/nras-tv-network-guns-are-weapon-in-culture-wars/, dated November 16, 2017, attached as **Exhibit 1.**

b.   Bradley, Laura, "What the F—k is NRATV?" Let John Oliver Explain, Vanity Fair, available at: vanityfair.com/Hollywood/2018/03/john-oliver-nra-tv-review-last-week-tonight, dated March 5, 2018, attached as **Exhibit 2.**

c.   Folkenflik, David, *NRATV Strays Seemingly Far From Gun Ownership*, NPR, available at: https://www.npr.org/2018/05/07/609180   824/nratv-strays-seemingly-far-afield-from-gun-ownership, dated May 7, 2018, attached as **Exhibit 3.**

Appendix002

d. Public Statement from BAC, *The NRA Sues New York Governor Andrew Cuomo, New York State Department of Financial Services Over Alleged Attack on First Amendment Rights*, dated May 11, 2018, attached as **Exhibit 4.**

e. Parker, James, *Live-Streaming the Apocalypse With NRATV*, The Atlantic, available at: https://www.theatlantic.com/magazine/archive/2018/06/nratv-live-streaming-the-apocalypse/559139/, dated June 2018, attached as **Exhibit 5.**

f. Letter from Stephen Ryan to William A. Brewer III, dated August 22, 2018, attached as **Exhibit 6.**

g. Melas, Chloe, *NRA TV Depicts Thomas & Friends in KKK Hoods,* CNN, available at: https://www.cnn.com/2018/09/13/entertainment/thomas-the-tank-engine-nra-kkk-trnd/index.html, dated September 14, 2018, attached as **Exhibit 7.**

h. CPAC Speech of Wayne LaPierre, dated March 2, 2019, attached as **Exhibit 8.**

i. Hakim, Danny, *Incendiary N.R.A. Videos Find New Critics: N.R.A. Leaders*, The New York Times, available at: https://www.nytimes.com/2019/03/11/us/nra-video-streaming-nratv.html, dated March 11, 2019, attached as **Exhibit 9.**

j. Letter from Jay Madrid to John Frazer, dated March 12, 2019, attached as **Exhibit 10.**

k. Packel, Dan, *Meet the Lawyers Who Clean Up Clients' Worst Messes*, The American Lawyer, dated March 28, 2019, available at:

3

https://www.law.com/americanlawyer/2019/03/28/meet-the-lawyers-who-clean-up-clients-worstmesses/, attached as **Exhibit 11.**

l.  Public statement from Ackerman McQueen, Inc. ("AMc"), dated April 15, 2019, attached as **Exhibit 12.**

m. Letter from Wayne LaPierre to the NRA Board of Directors, dated April 25, 2019, attached as **Exhibit 13.**

n.  Mark Maremont, *NRA's Wayne LaPierre Says He Is Being Extorted, Pressured to Resign*, The Wall Street Journal, dated April 26, 2019, available at: https://www.wsj.com/articles/nras-wayne-lapierre-says-he-is-being-extorte d-pressured-to-resign-11556314763, attached as **Exhibit 14.**

o.  Brewer, William A. III, *Advocacy as Art: Lawyers Must Engage in Issues and Crisis Management*, Texas Lawyer, dated May 6, 2019, available at: https://www.law.com/texaslawyer/2019/05/06/advocacy-as-art-lawyers-must-engage-in-issues-andcrisis-management, attached as **Exhibit 15.**

p.  Revan McQueen electronic biography, available on May 16, 2019, https://www.am.com/our-team/?id=revan-mcqueen as obtained from Internet Archive_https://web.archive.org/web/20190516125304/https://www.am.com/our-team/?id=revan-mcqueen, attached as **Exhibit 16.**

q.  Weinberg, Neil, *Ad Firm Cuts Ties With NRA, Says 'Chaos Led Us To Lose Faith' After 38 Years*, Bloomberg, Public statement from AMc, available at: https://www.bloomberg.com/news/articles/2019-05-29/nra-s-longtime-ad-agency-severs-ties-as-legal-battle-escalates, dated May 29, 2019, attached as **Exhibit 17.**

Appendix004

r.  Emails from Dan Boren, dated May 30, 2019, from *NRA v. AMc, et al.,* Circuit Court of Virginia for the City of Alexandria, Cause CL19001757, and *NRA v. AMc, et al*., Circuit Court of Virginia for the City of Alexandria, Cause CL19002067, included in Exhibit A to Plaintiff's Responses and Objections to Defendant Ackerman McQueen Inc's First Set of Interrogatories, which were included in Exhibit A to Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Compel Production of Documents, filed in the Virginia Lawsuits, attached as **Exhibit 18.**

s.  AMc's Opposition to Plaintiff's Motion for *Pro Hac Vice* Admission of Brewer Attorneys, filed in Cause No. CL19001757 and CL19002067, in the Circuit Court of Virginia for the City of Alexandria, dated June 24, 2019, attached as **Exhibit 19.**

t.  Public statement from AMc, dated June 26, 2019, attached as **Exhibit 20**.

u.  Transcript of Hearing, dated June 26, 2019, from *NRA v. AMc, et al.,* Circuit Court of Virginia for the City of Alexandria, Cause CL19001757, and *NRA v. AMc, et al*., Circuit Court of Virginia for the City of Alexandria, Cause CL19002067, attached as **Exhibit 21.**

v.  Public statement from AMc, dated July 3, 2019, attached as **Exhibit 22**.

w.  Kovensky, Josh, *Jilted NRATV Firm Accuses Gun Group of 'Hurting As Many People As Possible*,' Talking Points Memo, available at: talkingpointsmemo.com/muckracker/nratv-severance-ackerman-mcqueen, dated July 3, 2019, attached as **Exhibit 23.**

5

x.  Lackmeyer, Steve, *Ackerman McQueen Accuses NRA of Threatening Employees*, The Oklahoman available at: https://oklahoman.com/article/56 35424/ackerman-mcqueen-accuses-nra-of-threatening-employees, dated July 4, 2019, attached as **Exhibit 24.**

y.  Public statement from AMc, dated August 30, 2019, attached as **Exhibit 25**.

z.  Public statement from AMc, dated September 13, 2019, attached as **Exhibit 26.**

aa. Memorandum in Support of Defendants' Plea in Bar, filed in *NRA v. AMc, et al.,* Circuit Court of Virginia for the City of Alexandria, Cause CL19001757, and *NRA v. AMc, et al*., Circuit Court of Virginia for the City of Alexandria, Cause CL19002067, and *NRA v. AMc, et al*., Circuit Court of Virginia for the City of Alexandria, Cause CL19002886 (collectively, the "Virginia Lawsuits"), attached as **Exhibit 27.**

bb. Order Denying Defendants' Plea in Bar**,** filed in *NRA v. AMc, et al.,* Cause CL19001757, in the Circuit Court of Virginia for the City of Alexandria, dated October 8, 2019, attached as **Exhibit 28.**

cc. Gutowski, Stephen, Staff Writer, Washington Free Beacon, Twitter, available at: https://twitter.com/StephenGutowski/status/1188884012242219009, dated October 28, 2019, attached as **Exhibit 29**.

dd. Stockler, Asher, *NRATV Creator Threatens 'Legal Action' Against Former Host Over 'Fabrications*,' Newsweek, available at: https://www.ne wsweek.com/nratv-ackerman-mcqueen-nra-guns-1477939, dated December 18, 2019, attached as **Exhibit 30.**

6

ee. Deposition Excerpt of ███████ in the Virginia Lawsuits, dated January 10, 2020, attached as **Exhibit 31.**

ff. ███████, Exhibit █ to the Deposition of ███████ in the Virginia Lawsuits, dated January 10, 2020, attached as **Exhibit 32.**

gg. Deposition Excerpt of ███████ in the Virginia Lawsuits, dated January 29, 2020, attached as **Exhibit 33.**

hh. ███████ Exhibit █ to the Deposition of ███████ in the Virginia Lawsuits, dated January 29, 2020, attached as **Exhibit 34.**

ii. Maremont, Mark, *NRA Fails to Stop Former Ad Agency From Cooperating With New York Probe*, available at: https://www.wsj.com/articles/nra-fails-to-stop-former-ad-agency-from-cooperating-with-new-york-probe-11582575899, dated February 24, 2020, attached as **Exhibit 35**.

jj. Declaration of Travis Carter, dated March 4, 2020, attached as **Exhibit 36.**

kk. Order Granting Defendants' Motion to Stay Proceedings in the Virginia Lawsuits, dated March 18, 2020, attached as **Exhibit 37.**

ll. Declaration of Andrew Arulanandam, dated April 14, 2020, attached as **Exhibit 38.**

mm. Stockler, Asher, *Longtime NRA Attorney Says Group's Own Lawyer Embarked On 'Highly Destructive Path,' Court Documents Show*, Newsweek, available at: https://www.newsweek.com/national-rifle-association-lawsuit-1498670, dated April 17, 2020, attached as **Exhibit 39.**

7

nn. Sanction reversal, *Brewer v. Lennox Hearth Products, LLC, et al.*, No. 18-0426, Court of Appeals for the Seventh District, dated April 24, 2020, attached as **Exhibit 40**.

oo. Declaration of Michael Erstling, dated April 29, 2020, attached as **Exhibit 41.**

pp. Declaration of Charles Cotton dated April 30, 2020, attached as **Exhibit 42.**

qq. Declaration of Ian Shaw, dated April 30, 2020, attached as **Exhibit 43.**

rr. Declaration of Grant Stinchfield, dated April 30, 2020, attached as **Exhibit 44.**

ss. Declaration of John Frazer, dated May 1, 2020, attached as **Exhibit 45.**

tt. Declaration of Andrew Arulanandam, dated May 1, 2020, attached as **Exhibit 46.**

uu. Declaration of James McCormack, dated May 3, 2020, attached as **Exhibit 47.**

vv. Declaration of Wayne LaPierre, dated May 3, 2020, attached as **Exhibit 48.**

ww. Declaration of Travis Carter, dated May 4, 2020, attached as **Exhibit 49.**

xx. Declaration of Nancy Moore, dated May 4, 2020, attached as **Exhibit 50**.

yy. Declaration of Richard Flamm, dated May 4, 2020, attached as **Exhibit 51**.

zz. Declaration of Craig Spray, dated May 4, 2020, attached as **Exhibit 52.**

aaa. Chart summarizing AMc's waiver, dated May 4, 2020, attached as **Exhibit 53.**

bbb. Brewer, Attorneys & Counselors Public Relations Unit electronic biographies (Travis Carter, Andrea Sadberry, and Katherine Leal Unmuth), available at: https://www.brewerattorneys.com/team-1, attached as **Exhibit 54.**

ccc. Crisis Law and Strategy Group Overview, Quinn Emmanuel Urquhart & Sullivan, LLP, available at: https://www.quinnemanuel.com/the-firm/news-

Appendix008

events/announcement-quinn-emanuel-launches-crisis-law-strategy/,   attached

as **Exhibit 55.**

ddd.   Crisis Management Overview, Akin Gump Strauss Hauer & Feld, LLP,

available   at:   https://www.akingump.com/en/experience/practices/litigatio

n/crisis-management.html, attached as **Exhibit 56.**

eee.   Defendants Answer, Plea in Bar, and Counterclaim, filed in CL19001757,

in the Circuit Court for the City of Alexandria, dated May 23, 2019, attached as

**Exhibit 57.**

8.     I declare under penalty of perjury that the foregoing is true and correct.


Executed this 4th day of May 2020.

                    _____/s/ Michael J. Collins_____
                         MICHAEL J. COLLINS

9

Appendix009

# EXHIBIT 1

# TIME

# At the NRA's TV Network, Guns Are a Weapon in the Culture Wars



NRA CEO Wayne LaPierre speaks at the Conservative Political Action Conference in Oxon Hill, Md., on Feb. 24   Mark Peterson—Redux for TIME

BY **CHARLOTTE ALTER**

NOVEMBER 16, 2017 6:21 AM EST

E ight concerned Americans sit around a coffee table and talk about entertainment. One says he stopped paying for cable when everything started "turning left." Another is upset that his young daughter watches reality shows about teen pregnancy. "There's a war for our culture," says Tim

Appendix011

Clemente, a former counterterrorism expert turned TV producer. "And it's led by Hollywood."

No one mentions guns, but they don't have to. The coffee klatch was sponsored by Sig Sauer firearms, and the discussion took place in front of the National Rifle Association logo. This is a scene from Defending Our America, Season 2, Episode 5, a production of NRATV. Launched in late 2016, the online television platform of the powerful gun-rights lobby comprises two live news channels and 34 taped shows, all sponsored by gunmakers.

The NRA's primary tool of influence remains campaign spending: it shelled out more than $54 million to help lift President Donald Trump and pro-gun-rights lawmakers during the 2016 election cycle, according to the Center for Responsive Politics. But it has long sought to spread its message through media as well. Its magazine, the American Rifleman, dates to 1923, and in 2004 the group started its own news company focused mostly on radio broadcasts. Now, with NRATV, it is trying to use viral video segments and shareable online content to sway ordinary Americans.

The goal appears to be to encourage a sense of shared identity around gun ownership. (The NRA declined multiple requests to comment.) As NRATV's programming suggests, that identity has become about more than just personal protection, hunting or marksmanship. In an increasingly polarized America, a firearm is a symbol of its owner's cultural values. "They don't always talk about gun issues," says Robert Spitzer, an NRA member and professor at SUNY Cortland who has written five books about gun policy. "It's about beliefs and how people view the world."

If NRATV is devoted to defining the gun owner's identity, its programming does so in some unexpected ways. Sure, its segments are anti–Black Lives Matter, pro-cop, antimedia and pro-Trump. And, yes, they've picked fights with the Women's March and the New York Times. But NRATV also features more welcoming content, such as stories of teenage girls gaining confidence through shooting and a middle-aged couple whose marriage is strengthened by a shared passion for hunting. In one episode, NRATV's Colion Noir explores

Appendix012

which gun would work best against the zombies in the AMC series The Walking Dead.

NRATV also makes an effort to bring more women, minorities and LGBTQ people into the fold, often borrowing the language of the left. After the Pulse nightclub shooting in Orlando, NRATV urged LGBTQ Americans to arm themselves against hate crimes. Commentator Dana Loesch hailed firearms training as a form of feminism, suggesting that armed self-defense is "what real empowerment looks like." When Black Lives Matter criticized the NRA for failing to defend the gun rights of Philando Castile, a black man killed by a Minnesota police officer during a 2016 traffic stop, Noir, who is African American, argued that tighter gun laws would lead cops to "lock up even more black men" and perpetuate mass incarceration. "The NRA isn't the one telling me I shouldn't own guns because I'm black–white liberal politicians are," says Noir in a July video. "That, my friends, is white supremacy."

The overriding message is that the NRA identity is under attack. There's a tone of simmering indignation and a sense of persecution that curdles into hostility toward government, media and other cultural institutions. "Their hateful defiance of [Trump's] legitimacy is an insult to each of us," Loesch says in one video. "But the ultimate insult is that they think we're so stupid that we'll let them get away with it."

The same attention to populist resentments helped lift the President into office, a powerful sense that it's us against them. "They're mimicking the messaging content of Trump support, of Breitbart and of Steve Bannon," says Spitzer. "They're adapting themselves to the culture-war text of the moment."

*This appears in the November 27, 2017 issue of TIME.*

---

## MOST POPULAR ON TIME

**1** This Japanese Island Became a Coronavirus Warning to the World

Appendix013

**2** Tyson Foods Warns of Food Supply Shortage

**3** Mayor: Puerto Rico Hasn't Received Stimulus Money

---

## Get our Politics Newsletter.

Sign up to receive the day's most important political stories from Washington and beyond.

Enter your email address

SIGN UP NOW

You can unsubscribe at any time. By signing up you are agreeing to our Terms of Use and Privacy Policy

---

**WRITE TO CHARLOTTE ALTER AT CHARLOTTE.ALTER@TIME.COM.**



# EXHIBIT 2

Appendix015

## "What the F--k Is NRATV?" Let John Oliver Explain

--------------------------------------------------------------

🌐 vanityfair.com/hollywood/2018/03/john-oliver-nra-tv-review-last-week-tonight

Laura Bradle, y



Watch Video At: https://youtu.be/LEcbagW4O-s

"The N.R.A.," **John Oliver** said as he opened *Last Week Tonight*'s long segment Sunday night, is like "a group that feels about guns the way the rest of us feel about Nutella: a little is good, more is better, and you can tell me it's bad for me all you like, but you will pry it from my cold, dead hands." As the fallout from the school shooting in Parkland, Florida, continues, Oliver noted, more and more brands have been dropping their partnerships with the National Rifle Association—but one exception has been NRATV, a channel that remains available to stream on digital platforms including Roku and Apple TV.

"With all of the discussion this week of boycotting NRATV, we thought it might be worth answering the question, 'What the fuck is that?'" Oliver said. "Because the truth is you may have actually seen tiny bits of its programming without even realizing it."

A few clips from NRATV have gone viral in recent years—including one in which **Dana Loesch** warns viewers, "They use their media to assassinate real news. They use their schools to teach children that their president is another Hitler. The only way we stop this—the only way save our country and our freedom—is to fight this violence of lies with the clenched fist of truth."

To Oliver, this hub is basically "Fox News on a much lower budget." But as he noted, NRATV does offer a wide variety of programming, including no fewer than *three* "*Antiques Roadshow* knockoffs" in which the participants "get progressively more and more aroused by the guns they're holding." And

not all of the content is aimed at gun bros, either; the N.R.A. is making "a big push for women," Oliver said, with series like *Love at First Shot,* "a kind of QVC for firearms" intended to make women more comfortable with the idea of owning and firing guns.

Another regular fixture of NRATV? Unsurprisingly, there's a lot of hunting-focused content—but perhaps not the kind anyone would expect. "While the visuals are predictable beauty shots of nature," Oliver said, "the voice-over takes a different path . . . less *Planet Earth* and more 'deranged letter from a serial killer.'"

"The final defining characteristic of the network," Oliver said, "is painting a bleak vision of America, with threats around every single corner and one solution." As proof, he rolled a clip in which various talking heads from the network painted a terrifying picture of "today's America," noting, "They're using the same techniques as an infomercial there: Is human traffic getting you down? Do you have ISIS sympathizers in those hard-to-reach places? Are you tired of getting 9/11-ed? There's got to be a better way! Try the AR-15, available at way too many stores near you." That infomercial-like approach makes sense, Oliver said, since many NRATV series are, no surprise, sponsored by gun brands.

As Oliver wrapped up, he left viewers with one final thought: "The answer to the question 'What the fuck is NRATV?' is it's just a vessel to sell America guns. That's pretty much it. Does it work? It's honestly hard to say; they won't reveal their ratings, so it's plausible that no one is watching this . . . NRATV might actually be the dumbest, most transparent thing that it does. Think about it this way: if the N.R.A. is a ferocious bear charging at you, NRATV is that bear's ridiculous hat. Is it eye-catching? Sure it is. Is it perversely entertaining? Absolutely. Is it the main thing you should be worried about? Probably not. Because the real truth here is, hat or no hat, it is imperative that everyone keep their eyes on that fucking bear."

# EXHIBIT 3





PLAYLIST

**npr**    DONATE

NATIONAL

# NRATV Strays Seemingly Far Afield From Gun Ownership

May 7, 2018 · 4:34 PM ET
Heard on All Things Considered



**3-Minute Listen**

PLAYLIST    Download
Transcript

National Rifle Association members did not have to travel to Dallas to keep up with activities at the recent annual convention. They could go online and tune in to NRATV for a live stream. NRATV isn't just for the convention. It's available to anyone with an internet connection, providing a steady pro-gun message, whether viewers belong to the NRA or not.

MARY LOUISE KELLY, HOST:

Members of the National Rifle Association didn't have to go to Dallas to keep up with the group's annual convention over the weekend. They could get the information they needed by going online and watching NRATV, which provides its stream for free. As NPR's David Folkenflik reports, NRATV programming ranges far beyond guns - a quick heads-up that his report includes some sound of gunfire.

DAVID FOLKENFLIK, BYLINE: NRATV started in 2014 with a focus on guns. I mean, of course it would. For example, whenever there's a mass shooting, NRATV pushes back against critics of easy gun ownership. Here's Grant Stinchfield.

(SOUNDBITE OF TV SHOW, "STINCHFIELD")

GRANT STINCHFIELD: At every step of the way, gun laws were instituted. In some cases, they were used. And they didn't work.

FOLKENFLIK: Entertainment programming includes a reality show sponsored by the gun manufacturing consortium SIG Sauer.

(SOUNDBITE OF TV SHOW, "EMPOWER THE PEOPLE")

KIMBERLY CORBAN: Just over a week ago, I walked into the SIG Academy for the first time. I was a confident gun owner.

(SOUNDBITE OF GUNFIRE)

CORBAN: But I'd never done any sort of serious training. And let's just say it showed.

FOLKENFLIK: "Empower The People" features a rape victim named Kimberly Corban.

(SOUNDBITE OF TV SHOW, "EMPOWER THE PEOPLE")

CORBAN: Drop your gun.

FOLKENFLIK: In this, Corban heads inside a staged site.

(SOUNDBITE OF TV SHOW, "EMPOWER THE PEOPLE")

CORBAN: Anybody else inside?

(SOUNDBITE OF GUNFIRE)

UNIDENTIFIED PERSON: All right, go ahead. Holster. What did you see here?

CORBAN: A dude with a gun.

UNIDENTIFIED PERSON: Right. You killed Jethro for drinking a beer.

Appendix020

FOLKENFLIK: The programming is consistent and all in the same direction. Shannon Watts is founder of the gun control advocacy group Moms Demand Action. Watts has campaigned for streaming services, including Apple, Amazon, Google and Roku, to drop NRATV without success.

SHANNON WATTS: NRATV is the media arm of the gun lobby. It's trying to pit Americans against one another to ultimately further the gun lobby's agenda of guns anywhere for anyone, no questions asked.

FOLKENFLIK: NRA officials did not return several calls or emails seeking comment. A frequent NRA guest and substitute host also did not materialize for a promised interview. NRATV is a gun enthusiast's dream come true.

NICOLE HEMMER: It started off as a single-issue media outlet promoting gun rights messaging to the millions of NRA members across the country.

FOLKENFLIK: Nicole Hemmer is a professor at the University of Virginia's Miller Center who has written widely on the history of conservative media. She says NRATV is evolving.

HEMMER: It has taken a turn to become a pretty pugilistic or militaristic partisan outlet in the sense that it's anti-immigrant, pro-policing, anti-Muslim in some cases, anti-black in other cases.

FOLKENFLIK: So programming that's not explicitly about guns at all, such as this from Grant Stinchfield on President Trump's shadowy enemies.

(SOUNDBITE OF TV SHOW, "STINCHFIELD")

STINCHFIELD: Our government is no longer ours. It's theirs. And while our president is trying to take it back in the name of the people, he faces the real resistance, the deep state.

FOLKENFLIK: Nicole Hemmer says the NRA is seeking to unite conservatives who are not gun right absolutists with other Republicans in the Trump era.

HEMMER: Support for Trump has become a kind of litmus test for the base. Loyalty or support for Trump has become kind of a route to power, a route to access.

FOLKENFLIK: Part of what's built into NRATV is a constant attack on the media and popular culture, as in this viral ad from NRATV's Dana Loesch.

(SOUNDBITE OF POLITICAL AD, "THE VIOLENCE OF LIES")

DANA LOESCH: They use their schools to teach children that their president is another Hitler. They use their movie stars and singers and comedy shows and award shows to repeat their narrative over and over again.

FOLKENFLIK: Earlier this afternoon, the NRA named retired Lieutenant Colonel Oliver North as its new president. North is known for his role in the Reagan White House as a national security aide and in the Iran-Contra scandal. He became a conservative radio star and a recurring figure on Fox News - another blurring of the lines between the NRA and the conservative media. David Folkenflik, NPR News.

*Copyright © 2018 NPR. All rights reserved. Visit our website terms of use and permissions pages at www.npr.org for further information.*

*NPR transcripts are created on a rush deadline by Verb8tm, Inc., an NPR contractor, and produced using a proprietary transcription process developed with NPR. This text may not be in its final form and may be updated or revised in the future. Accuracy and availability may vary. The authoritative record of NPR's programming is the audio record.*

# Sign Up For The NPR Daily Newsletter

Catch up on the latest headlines and unique NPR stories, sent every weekday.

What's your email?

SUBSCRIBE

By subscribing, you agree to NPR's terms of use and privacy policy. NPR may share your name and email address with your NPR station. See Details. This site is protected by reCAPTCHA and the Google Privacy

Appendix022

# EXHIBIT 4

Appendix023

# BREWER
## Attorneys & Counselors

*NEWS*
*For Immediate Release*

### The NRA Sues New York Governor Andrew Cuomo, New York State Department of Financial Services Over Alleged Attack on First Amendment Rights

**New York, NY…May 11, 2018** – The National Rifle Association of America ("NRA") today announced that it filed a lawsuit against the New York State Department of Financial Services ("DFS"), New York Governor Andrew Cuomo, and DFS Superintendent Maria T. Vullo alleging violations of the NRA's First Amendment rights.

Filed on May 11, 2018, in the United States District Court for the Northern District of New York, the lawsuit claims that Cuomo, Vullo, and DFS engaged in a "campaign of selective prosecution, backroom exhortations, and public threats" designed to coerce banks and insurance companies to withhold services from the NRA.  The NRA argues that such tactics vastly overstep DFS's regulatory mandate, and seek to suppress the speech of Second Amendment supporters and retaliate against the NRA and others for their political advocacy. The lawsuit seeks millions of dollars in damages to redress harms inflicted by the DFS campaign.

"Political differences aside, our client believes the tactics employed by these public officials are aimed to deprive the NRA of its First Amendment right to speak freely about gun-related issues and in defense of the Second Amendment," says William A. Brewer III, partner at Brewer, Attorneys & Counselors and counsel to the NRA. "We believe these actions are outside the authority of DFS and fail to honor the principles which require public officials to protect the constitutional rights of all citizens."

Among other things, the lawsuit cites a pair of "guidance" letters issued on April 19, 2018, by the DFS to the CEOs of banks and insurance companies doing business in New York.  Styled as regulatory "risk management" advisories, the letters encourage institutions to "take prompt actions" to manage "reputational risk" posed by dealings with "gun promotion organizations." The same day, Cuomo issued a press release in which Vullo directly urged "all insurance companies and banks doing business in New York" to "discontinue[] their arrangements with the NRA."

The lawsuit claims that the "guidance" letters were accompanied by back-channel communications and targeted enforcement actions, which further reinforced the Cuomo administration's message that it is bad business in New York to do business with the NRA.

The lawsuit explains that the DFS mandate – preceded by an "investigation" orchestrated by gun-control activists into insurance programs sponsored by the NRA – has already caused several insurance companies to sever relationships with the NRA and to plan to cancel the insurance policies of law-abiding New York consumers. According to the complaint, the directive of Cuomo and Vullo has had its intended effect – to advance Cuomo's longstanding opposition to gun-rights supporters and to distort insurance markets in the service of a political agenda.

The lawsuit says, "As a direct result of this coercion, multiple firms have succumbed to Defendants' demands and entered into consent orders with DFS that compel them to terminate longstanding, beneficial business relationships with the NRA both in New York and elsewhere. Tellingly, several provisions in the orders bear no relation to any ostensible regulatory infraction. Instead, the orders prohibit lawful commercial speech for no reason other than that it carries the NRA brand."

On May 2, 2018 and May 7, 2018, Lockton Companies, LLC and Chubb Ltd., respectively, announced they will pay millions of dollars in fines to DFS and cease doing business with the NRA – for no other reason than many of the insurance programs with which they are associated carry the NRA brand. On May 9, 2018, Lloyd's of London announced that it is directing insurance underwriters to terminate any existing partnerships [with the NRA].

The lawsuit explains that these outcomes are the culmination of years of political activism by Cuomo against the NRA and gun rights organizations. As recently as April 20, 2018, Cuomo called the NRA an "extremist organization" and urged New York companies "to revisit their ties to the NRA and consider their reputations…"

In the face of such attacks, the NRA continues to educate the public about the Second Amendment, defend the NRA and its members against political and media attacks, and galvanize participation in the political process. The NRA claims that in response, Cuomo and DFS are taking actions to silence the organization.

Citing the Supreme Court's landmark *Bantam Books, Inc. v. Sullivan* case, the lawsuit argues that "viewpoint discrimination applied through 'threat[s] of invoking legal sanctions and other means of coercion, persuasion, and intimidation' violates the Constitution where, as here, such measures chill protected First Amendment activities."

<div align="center"># # #</div>

**About the NRA:**
Established in 1871, the National Rifle Association is America's oldest civil rights and sportsmen's group. Five million members strong, NRA continues its mission to uphold Second Amendment rights and is the leader in firearm education and training for law-abiding gun owners, law enforcement and the military. Visit www.nra.org.

**About Brewer, Attorneys & Counselors:**
Founded in 1984, Brewer, Attorneys & Counselors has earned a reputation as one of the most successful law firms in the United States practicing exclusively in the field of complex commercial litigation and dispute resolution. With offices in New York and Dallas, the Brewer firm represents a wide spectrum of industry leaders – from entrepreneurs to Fortune 500 corporations – facing the most challenging of legal issues. Visit the firm at www.brewerattorneys.com.

**Media Contact:**
Travis J. Carter on behalf of Brewer, Attorneys & Counselors and the NRA
Phone: 214-653-4856
E-mail: tcarter@brewerattorneys.com

# EXHIBIT 5

<span style="color:red">CULTURE</span>

# Live-Streaming the Apocalypse With NRATV

The online-streaming service of the National Rifle Association is part lifestyle channel, part gun-lobby orifice—and it wants to make you buy firearms.

**JAMES PARKER**  **JUNE 2018 ISSUE**



JESSE LENZ

Appendix027

NRATV, THE ONLINE STREAMING SERVICE of the National Rifle Association, first impinged upon me in July of last year. There she was one morning, on my computer screen: a dark-haired woman giving off a blue-white afterlife aura, against a black background, chanting a strange and vehement rosary of disdain: "They use their media to assassinate real news. They use their schools to teach children that their president is another Hitler." The invective accelerated. Scurrying violins were heard, electro doom-clangs. "They use their movie stars and singers and comedy shows and award shows to repeat their narrative over and over again." Then a fast-cut, black-and-white montage of societal crisis: broken glass, street scuffles, someone bleeding. "All to make them march. Make them protest. Make them scream *racism* and *sexism* and *xenophobia* and *homophobia*." *They*, *they*, *they*; *them*, *them*, *them*. Scorn on her lips, scorn flaming in the hollows of her throat. "To smash windows, burn cars, shut down interstates and airports, bully and terrorize the law-abiding … The *only* way we stop this, the *only* way we save our country and our freedom, is to fight this *violence* of lies with the clenched *fist* of *truth*." This was pure brimstone. Less a diatribe, or an oratorical flight, than "an invitation"—as the novelist Mary Gaitskill once described the voice of Axl Rose—"to step into an electrical stream of pure aggression." And who was this swaying, sneering, smolderingly glamorous woman? She looked like the villainess on a daytime soap—the one who steals the baby or pretends to have multiple personalities. "I'm the National Rifle Association of America. And I'm freedom's safest place."

That was Dana Loesch, an NRA national spokesperson and currently the raven-winged avatar of NRATV. Launched in 2016 as an expansionist reboot of NRA News, NRATV is a free, very well-designed, and smoothly navigable video-streaming website sponsored mainly by gun and ammunition manufacturers—Mossberg, Smith & Wesson, Sig Sauer. It offers a spectrum of programming that runs from harmless and hobbyistic gun-nuttery at one end to face-melting propaganda at the other. Fifty percent lifestyle channel, 50 percent gun-lobby orifice, 100 percent tone poem to the radical insecurity of modern American life, it aims to make you purchase firearms.

In the days after the March for Our Lives in Washington, D.C.—at which Samantha Fuentes, a survivor of the school shooting in Parkland, Florida, made the event's most eloquent and incontestable statement by throwing up in the middle of a poem named "Enough!"—I spent a little time watching NRATV. Loesch is all

Appendix028

over it, either monologizing savagely to the camera or nodding in vituperative agreement with her fellow members of the NRATV commentariat. It's a heavy crew, doing heavy work: Grant Stinchfield, Cam Edwards, Colion Noir, and others, all squinting into the cultural headwinds, all facing down the storm of indecency, all rebutting, rebutting, reframing, and rebutting. Are they entirely wrong all the time? Of course not. I watched the ex–Secret Service big mouth Dan Bongino, for example, rather neatly pop a momentary liberal outrage-bubble over Sean Hannity's use of the phrase *civil war*. "This country is headed towards a civil war in terms of two sides that are just hating each other," Hannity had said on his god-awful radio show, prompting the usual howls. In rebuttal, Bongino offered a montage of talking heads from CNN and MSNBC, all blandly characterizing the current scene as a blah-blah "civil war." Touché, Dan Bongino: When Hannity says it, it's incitement; when Carl Bernstein says it, it's … sociology.

I STARTED MY FORAY GENTLY, with a show called *NRA Gun Gurus:* a white-gloved Jim Supica, from the NRA National Sporting Arms Museum, telling the story of the turn-of-the-century lawman Bass Reeves, "a master tracker, a deadly good shot, and one of the first African-American U.S. deputy marshals west of the Mississippi." This is educational stuff: Reeves worked for "Hanging Judge" Isaac Parker out of Fort Smith, Arkansas—Rooster Cogburn territory, if I'm not mistaken. Reeves liked his six-gun, Supica said, but in the clutch he preferred his Winchester, which fired an "authoritative, fight-stopping cartridge."

Next: Dom Raso's *Media + Lab*. Raso is a pumped and affable ex-seal with a rattling verbal style. "Now that I'm out," he puffs in the show's intro, "I get tons of people asking me all the time about their favorite TV shows and movies, what's realistic and what isn't. Well, there's only one way to find out." Excellent premise: Worn down by the queries of barstool yappers and armchair Chuck Norrises, Raso and his martial-arts bros patiently, blow for blow and clip for clip, refight and reality-test famous action moments. "That scene was completely BS," he opines on some big blowout in *The Rock*. Then he turns, brightening, to a sequence from *The Bourne Legacy* in which Jeremy Renner nimbly immobilizes three security guards at a dodgy pharmaceutical plant in Manila. (Verdict: "It was awesome, to show you that position is everything.")

Feeling somewhat adrift, I took in a few episodes of the first season of *Defending Our America*. Now, this was more like it. Sort of an NRA version of *The View*: a

Appendix029

group of men—law enforcement, former intelligence—gathered around a table in somebody's basement or bunker to discuss, in grave, late-night voices, the imminent collapse of everything and the woeful unpreparedness of everybody. Zombies go unmentioned, but gangs, predators, and "criminal elements" are gruffly pondered. "If it decides to go sideways, you have to be able to take care of yourself," says Tom (khaki shirt and trapper's beard). "When the shit hits the fan, I'm going with my family," says Jerry (buzz cut and boxer's nose). Sober noddings around the table, grimaces of assent—these are good guys, tough guys, useful guys, *dads*; in almost any kind of sideways-going situation, you'd want these guys around. And far be it from me to scoff at an apocalyptic intuition. You hear that thin rending note in the air, that doomsday thrill? Me too. It's the poetry of Trump-time. The grid will fall; the router will stop blinking; the membrane of manners will dissolve. Pandemonium in the Amtrak quiet car. But come on. There's something indulgent, even weirdly complacent, in the basement catastrophism of these dudes. This must be what the author Djuna Barnes meant when she wrote that Americans are a "fierce sadistic race crouching behind radiators."

If you want a shortcut to the heart of NRATV, to the mystical, infernal core of the whole operation, click on the NRA Hunting channel and watch *Trust the Hunter in Your Blood*, a series of … I don't know what to call these. Sermons? Visions? Ads?

One-minute spots, at any rate, featuring wilderness vistas, stirring music, and some truly trippy spoken word. "Only one project embraces death as the absolute that it is," breathes a voice like crawling lava, as the camera soars above cliffs and forests. "Only one project confronts the absurdity by its very nature." He means hunting, I think. Good to be a hunter in the fresh air. Bad to be an "anti-hunter." Bad to be too civilized. That geologic voice again: "Contrived emotions flood from their air-conditioned, glass-paneled, Wi-Fi-enabled habitats." (Slight problem: If your habitat isn't Wi-Fi enabled, you can't watch NRATV.)

Who writes this stuff? I posed the question to a friend of mine. "Ah," he said dismissively, "the same bunch of potheads who write everything else." He was only speculating, but I envisioned it all. I saw the NRATV writers' room—no true believers in there, just the usual gamers, bearded weirdies, post-ideological PowerBar nibblers in the usual atmosphere of molecular lassitude and fitful static, dankly high-fiving when an especially bananas line pops out: "Your humanity is not a disease to be cured by the manufactured guilt of the nonsense-stricken tortured souls among us, or a perversion to be purged from your DNA." Yeah!

Appendix030

True belief exists, no doubt, over at NRATV. Right alongside true cynicism. Because this is how you sell guns—with that old song, that American standard. You know how it goes: It's a paranoid's lullaby. Above us are the elites with their champagne and free jazz; below us, the suppurating underclass. Also terrorists, sex traffickers, drug cartels, and shiftless migrants. It works, this song. It makes teenage girls throw up in the middle of poems.

*This article appears in the June 2018 print edition with the headline "Live-Streaming the Apocalypse."*

*We want to hear what you think about this article. Submit a letter to the editor or write to letters@theatlantic.com.*

## RELATED VIDEO

When Gun Owners Become Hypocritical Hippies



## Make your inbox more interesting.

Appendix031

Each weekday evening, get an overview of the day's biggest news, along with fascinating ideas, images, and people. See more newsletters

Enter your email                                                        Sign Up

# Ideas that matter. Since 1857.

Subscribe and support 162 years of independent journalism. For less than $1 a week.

**SUBSCRIBE ❯**

**ABOUT**

**CONTACT**

**PODCASTS**

**SUBSCRIPTION**

**FOLLOW**

Privacy Policy     Do Not Sell My Personal Information     Advertising Guidelines     Terms Conditions     Responsible Disclosure     Site Map

TheAtlantic.com Copyright (c) 2020 by The Atlantic Monthly Group. All Rights Reserved.

Appendix032

# EXHIBIT 6

Appendix033

# McDermott
# Will & Emery

Boston  Brussels  Chicago  Dallas  Düsseldorf  Frankfurt  Houston  London  Los Angeles  Miami
Milan  Munich  New York  Orange County  Paris  San Francisco  Seoul  Silicon Valley  Washington, DC

Strategic alliance with MWE China Law Offices (Shanghai)

Stephen Ryan
Attorney at Law
sryan@mwe.com
+1 202 756 8333

August 22, 2018

BY EMAIL AND U.S. MAIL

William A. Brewer, III
Brewer, Attorneys & Counselors
1717 Main Street
Suite #5900
Dallas, TX  75201

Dear Mr. Brewer:

McDermott Will & Emery has been engaged to represent Ackerman McQueen, and to assist the Dorsey law firm with regard to any and all NRA requirements with respect to two NRA litigation matters - the first in the Federal court in New York and second, in the Eastern District of Virginia, as well as any changes in the NRA-Ackerman contract and procedures. As NRA chooses to adopt any new system of required documentation requested from Ackerman, Ackerman will comply with NRA's commercially reasonable requirements.

The past multi-decade business relationship between the NRA and Ackerman has been extraordinarily useful to the NRA in crisis communications and many related public relations management issues. At its most senior levels, NRA leadership has had detailed understanding of not only the budgeting process, but also the management of a very complex set of deliverables that include fundraising strategy, crisis communication, media company development and management, public relations management, event transformation, coordination and design, as well as many projects that specifically address the NRA's continued need to transform itself from a gun rights organization to a freedom organization among countless other projects. The history of this relationship should be respected for its complexity and unparalleled success that can only be determined by the strength of the NRA brand today as opposed to where it was decades ago. The positive and cooperative multi-decade impact that Ackerman McQueen has had on every communication objective the NRA has pursued is substantial.

The NRA-Ackerman relationship is premised on NRA's contractual rights to evaluate its own needs in budgeting and directing Ackerman's activities, and NRA auditing detailed expenditures Ackerman is directed to undertake for the NRA. The NRA-Ackerman budgeting process gives the NRA greater control than any retrospective review after the funds are expended on third party vendors and Ackerman activity.

It is my understanding that in the two litigation matters where you are acting for NRA, Ackerman has provided your firm (and NRA) every document you have represented is needed

McDermott
Will&Emery

William H. Brewer
August 22, 2018
Page 2

for the litigations now underway. In fact, Ackerman chose to provide documents that might prove helpful that went beyond the scope of the requests. The backup materials you have demanded regarding invoices relating to the CarryGuard program have been provided to Mr. Powell and other NRA personnel. There were also numerous contemporaneous phone conversations and meetings that clearly outlined the work that would be done, the progress that was being made, and the NRA client approvals that were received. Requesting the creation of new documents that did not previously exist such as creating invoices in the form of hours worked on the project and scope changes that were repeatedly made by the NRA client is not possible.

Ackerman believes the manner in which the NRA-Ackerman agreement has been managed for decades is totally consistent with Federal IRS law, regulations and practice. The contract procedures do not impinge or violate any IRS or State Department of Revenue (DOR) requirements it is aware of, and nothing has been specifically brought to its attention. Ackerman sees no basis for concern that the past or amended directions for managing the NRA-Ackerman contract will adversely impact NRA's venerable New York state non-profit charter. The NRA fully knows that Ackerman maintains complete files of all expenses incurred with third parties on behalf of the NRA consistent with IRS guidelines and regulations. This documentation is routinely utilized in audits by senior NRA officials and authorized staff.

In the near future, NRA-Ackerman documentation may be subject to new congressional, state attorney general or third party plaintiff lawyer litigation subpoenas. Therefore, NRA may wish to proceed with caution in creating paper trails the New York State DOR, or other state DORs may pour over and publish for political purposes.  Come November, the political climate could be very different than today if the U.S. House of Representatives, or less likely, the Senate changes hands. Creating excessive contractual documentation transmitted to NRA on a regular basis may not serve NRA's management needs, as the aforementioned third parties will be all too happy to have access to such detailed billing information. Any documentation that exceeds NRA's needs for contract management creates additional concerns for NRA legal management, and threatens NRA's other competing needs. However, the ability to comply requires precision in the description. Any direction to change the NRA-Ackerman contractual requirements for documentation at the very time NRA is engaged in litigation with a State in two courts where such exchanges of correspondence or documentation may be demanded and obtained in discovery by the State of New York in the two ongoing matters seems an unlikely course of action to buttress NRA's litigation positions. Demanding any such billing procedure changes and documentation at this time, or retrospectively, is worthy of careful consideration. But Ackerman will do its best to follow any additional NRA requirements for changes to the NRA-Ackerman contract.

McDermott
Will & Emery

William H. Brewer
August 22, 2018
Page 3

Your personal views regarding the NRA-Ackerman business relationships that you have expressed to NRA personnel as well as the Dorsey firm, which was subsequently reported to Ackerman, have been exceptionally critical. Your comments and views are not consistent with the contemporaneous communications of NRA leadership and staff to Ackerman. Since Ackerman is, and has been a represented party, you are requested to contact Ackerman through me, other members of my firm you meet, or a member of the Dorsey firm, Ms. Gina Betts, if I cannot be immediately reached. We look forward to maintaining the NRA-Ackerman relationship through this period.

Sincerely,

Stephen M. Ryan
Attorney for Ackerman McQueen

cc:  Gina Betts, Esquire

# EXHIBIT 7

Appendix037

NRA TV depicts 'Thomas & Friends' characters in KKK hoods - CNN

**CNN** | entertainment

● LIVE TV  

NRA TV depicts 'Thomas & Friends' characters in KKK hoods

By **Chloe Melas**, CNN

◷ Updated 9:32 AM ET, Fri September 14, 2018



*Source: CNN*

**NRATV host slammed over KKK reference** 02:07

**(CNN)** — The NRA is going after the long-time animated children's television show "Thomas & Friends."

NRA TV host Dana Loesch appeared on the association's TV show, "Relentless" and slammed "Thomas & Friends" for partnering with the United Nations to increase diversity on the program.

Last month the show introduced two new female characters, one of which was painted with an African-inspired face and is voiced by actress Yvonne Grundy, who is originally from Kenya.

The UN's website says the UN partnered with the animated series to "teach children the importance of taking part in the global efforts to end poverty, providing girls and boys with the same opportunities, and of course doing so while protecting our planet."

Loesch slammed the iconic "Thomas & Friends" characters and then showed them on screen wearing Ku Klux Klan hoods while on flaming train tracks.

Appendix038

NRA TV depicts 'Thomas & Friends' characters in KKK hoods - CNN

  

● **LIVE TV**



# Good News Is More Important Than Ever.

Subscribe to CNN's The Good Stuff, a weekly newsletter bringing you the most fascinating, uplifting and inspiring stories from around the world. It will brighten your inbox every Saturday morning.

<div style="border: 1px solid red; text-align: center;">Sign Up</div>

**No, thanks**

By subscribing, you agree to our Privacy Policy

Related: Donations to the NRA tripled after the Parkland shooting

"This is horrible," Loesch said of the show's additions. "That's where it gets really strange to me. Am I to understand this entire time that Thomas and his trains were white? Because they all have gray faces. How do you bring ethnic diversity? I mean, they had to paint what I guess they thought was some sort of African pattern on the side of Nia's engine."

After the images aired, Mattel, the owner of the "Thomas The Tank Engine" brand, announced in a statement, "We are not associated with images that promote hate and denounce any images of our brands that are being used to convey a message not in line with the values of the company."

"Thomas The Tank Engine" was created by the Rev. W. Awdry and was a book series. The story was turned into a TV series in 1984 and made its American debut on PBS in 1989.

CNN has reached out to the NRA for comment.

Search CNN...

US

World

Politics

Appendix039

NRA TV depicts 'Thomas & Friends' characters in KKK hoods - CNN

 entertainment   ● LIVE TV

Opinion

Health

Entertainment

Tech

Style

Travel

Sports

Videos

Coupons

More



**FOLLOW CNN ENTERTAINMENT**

  

Terms of Use   Privacy Policy   Do Not Sell My Personal Information   AdChoices   About Us   CNN Studio Tours

CNN Store   Newsletters   Transcripts   License Footage   CNN Newsource   Sitemap

© 2020 Cable News Network.  Turner Broadcasting System, Inc.  All Rights Reserved.

CNN Sans ™ & © 2016 Cable News Network.

Appendix040

# EXHIBIT 8

Appendix041



Good morning special guests and CPAC attendees and all Americans who share in the hope and promise of our great nation, which we celebrate here today.

As CEO and Executive Vice President of the National Rifle Association, I have the privilege of directing one of the oldest and most successful advocacy groups in the world. At the NRA, we are dedicated to protecting your constitutional rights, promoting our most cherished values and carrying the torch for the freedoms that define the greatness of America.

The NRA has grown to almost five-and-a-half million members— the most in our history. And we represent the interests of an estimated 100 million gun owners.

Our members come from every walk of life. They represent people of every race, religion, gender, profession and political persuasion. And that diversity gives rise today to our plans for the future growth of the Association and inspires us to embrace a more inclusive vision of ourselves.

The NRA is 148 years old. An advocacy group built upon the strongest of foundations, the principles of our Founding Fathers.

Our nation was founded by people in pursuit of liberty. That's why the Declaration of Independence is the first document of the U.S. legal code.

In their great wisdom, the fathers of this nation saw the need to protect our God-given liberties—fundamental freedoms—from being trampled by despots, dictators and demagogues, and from intrusion by the government they founded.

And so, they left us with a list of our most cherished freedoms—the Bill of Rights, the first 10 amendments to our Constitution. And in our First and Second Amendments, our founders gave us two freedoms that historically belonged ONLY to the upper class.

They gave us the freedom to speak freely, boldly and honestly. And they gave us the freedom to bear arms in defense of ourselves, our families and our nation.

When I started at the NRA more than 40 years ago, we certainly faced opposition. To be sure, we engaged in full contact advocacy with those who challenged our point of view and we debated issues of importance to our nation with all of our might.

As opponents in debates over important issues, the NRA often shared a seat at the table with those who opposed our values—even with those opposed to the Second Amendment freedoms for which we stand. The debates were tough. They were spirited. And they were defined by committed and unwavering voices.

Political differences aside, there was recognition that the NRA and advocacy groups of every kind are entitled to their voice in the discussion on matters that speak to our safety, security and ideals.

Appendix043

Boy, what a difference a couple of decades make! Today, we at the NRA awaken each morning to new challenges, to threats against our organization heated and vile, political rhetoric and new forms of opposition that violate the spirit and letter of the very freedoms our republic was founded to protect.

Today, many of our adversaries seek to challenge not only our opinions, but our very right to express them. Rather than compete in the marketplace of ideas, they want to rig the competition or foreclose it altogether.

Let me share an example. New York Governor Andrew Cuomo hates the NRA. He hates the freedoms for which we stand. And he's not shy about saying so. If you agree with our positions, the governor of New York says you have "no place"—that's a direct quote—"no place" in his state.

No matter how much he'd like to, New York's governor can't just expel gun owners from the state. He can't just ban the NRA. That would overtly violate the Constitution.

So instead, Governor Cuomo decided to covertly violate the Constitution by using his power over Wall Street to starve the NRA of funds. At the governor's direction, New York's banking regulator sent letters to the CEOs of every bank and every insurance company doing business in the state.

The letters urged those institutions to blacklist Second Amendment groups, especially the NRA. To deny us bank accounts. To block NRA members from purchasing affinity insurance, including health insurance for their families.

3

Appendix044

To prevent us from purchasing ads on the airwaves. To suffocate Second Amendment speech by choking off the funds that make speech possible. That's Governor Cuomo's goal.

To achieve it, the governor didn't just threaten companies, he acted. New York started to punish companies that did business with the NRA. The state imposed multi-million-dollar penalties and forced several of our business partners to abandon us.

Let me say that again. The state imposed multi-million-dollar penalties and forced several of our business partners to abandon us.

Just imagine the national outcry if the governor of a red state did the same thing to Planned Parenthood, PETA or the Sierra Club. If a Republican governor forced businesses to blacklist those groups based on the viewpoint of their speech, the media would be going nuts.

Fleets of constitutional scholars would descend from every political persuasion. Every prestige newspaper would proclaim a grave threat to the First Amendment. And you know what? They'd be right.

Governor Cuomo would be wrong to try to censor Planned Parenthood, just like he's wrong to censor the NRA. It's morally wrong. It's legally wrong. And that type of coercion and oppression of free speech is downright anti-American.

As Governor Cuomo would soon discover, attempting to silence the voices of our five-and-a-half million NRA members won't be tolerated. In New York, the NRA did what patriots have always done in the face of tyranny. We fought back.

Appendix045

We took the governor to federal court under the First Amendment of the United States Constitution. And in a great victory for principle over partisanship, the American Civil Liberties Union joined our cause. They stood shoulder-to-shoulder with the NRA and I'm incredibly proud to have them as a partner in this fight.

The court has already upheld the NRA's freedom-of-speech claims against Governor Cuomo. And let me tell you, I can't wait for our organization to get them in front of a jury. I believe that Americans still keep faith with the Constitution, even when politicians don't.

Against the backdrop of all this, the governor and his henchmen appear to have gone even a step further. New York's new attorney general— the chosen candidate of Governor Cuomo—vowed to attack the NRA as a pillar of her campaign platform.

Even before day one in office and without a shred of evidence that we've done anything wrong, the attorney general publicly labeled the NRA a "criminal enterprise" like MS-13 or the mafia. She promised a fishing expedition into the NRA's files, at taxpayer expense, to see if she could find any crimes to substantiate her slander.

In other words, she promised to fulfill a vision quest that is little more than a rank political vendetta. Contriving a criminal investigation to target a political opponent is the act of a third-world petty tyrant, not a distinguished public servant. And the America I know doesn't tolerate such an abuse of power.

Here's what's going on. In real time, before your very eyes, we are fighting perhaps the most important piece of First Amendment constitutional advocacy in the history of our country. This case will decide whether or

Appendix046

not government can be weaponized against you if your opinion differs from theirs.

True to this independent spirit, Americans have begun to notice Governor Cuomo's attack on the First Amendment. And they don't like what they see.

Appendix047

A *Wall Street Journal* columnist observes that the NRA getting its day in court is "welcome news for those helping to restrain the power of government." He commented that, "there is enormous interest for all Americans in making sure that a politician like Mr. Cuomo … cannot abuse his authority to silence law-abiding citizens with whom he disagrees."

Closer to home for the governor, a columnist from the state capital of Albany wrote that the governor "has essentially weaponized the state's regulatory authorities" to go after the NRA, calling his conduct "tyrannical."

And political voices from the "right" and the "left?" From the *National Review* all the all the way to the *New Republic* have defended NRA's free speech rights.

It is no surprise that the message from the courtroom is echoed in the court of public opinion. Our case is being discussed in law schools right now—it's that critical to our fundamental right to speak.

Let me say it again. In our First and Second Amendments, our Founders gave us two freedoms that historically belonged only to the upper class. They gave us the freedom to speak freely, boldly and honestly. And they gave us the freedom to bear arms in defense of ourselves, our families and our liberty.

These rights are the cornerstone of our foundation as a free society. From the start, they made Americans different from the serfs and subjects of the old world. And centuries later, these rights continue to make America not just different, but better, than other countries.

Appendix048

For the NRA, freedom of speech is as essential as any other liberty. Because you can't advocate effectively for our Second Amendment freedoms without the right to speak out against its enemies.

No public official can weaponize the power of government to attack organizations simply because they have a different political point of view. Many believe that Barry Goldwater got it right when he said that extremism in the defense of liberty is no VICE.

But what we're seeing today is extremism that's hostile to liberty. These extremists want to revoke your freedom of speech, your freedom of assembly and your freedom of association if you hold views the elites don't like.

And leftist pundits aren't the only ones who feel this way. The oligarchs of Silicon Valley want progressive speech amplified and conservative speech suppressed.

A whistleblower at Google leaked a PowerPoint presentation last year titled, "The Good Censor." The document claims that Google—which is one of the world's most powerful monopolies—has "shifted away" from the "American tradition" of free speech.

It says Google shifted toward the quote "European tradition" of censorship. And wouldn't you know it, in the European tradition, Google began to censor firearms instructional videos this year.

Just like the Second Amendment, the First Amendment must be defended absolutely, against all incursions, without compromise.

Appendix049

And just like the Second Amendment, we should aim to exercise our First Amendment rights responsibly. Not by censoring others, but by lifting up our own voices. By speaking out with dignity, purpose and courage in a way that honors the founders' gift to us. More, better speech—that's the way to fix America.

George Washington said, "If the freedom of speech is taken away, then dumb and silent we may be led like sheep to the slaughter." My friends, rest assured, the NRA will never let that happen.

There is a great saying: adversity doesn't build character, it reveals it. I can tell you that in times like this, the character and identity of the NRA will reveal itself in the most visible of ways.

We will fight back against anyone who attempts to silence us. Understand this, we will advocate, as loudly and boldly as ever, for our First and Second Amendment freedoms.

My call today is for each one of us to embrace and respect the constitutional freedoms that are afforded to all of us. This is our moment of truth.

To our members, I thank you for standing with us and holding tightly to the freedoms for which we stand. To those of you just learning of our cause, I invite you to become part of the future of the NRA, inspired by the constant belief in the spirit of America.

Come join the NRA—the unabashed, unapologetic fighter for the freedoms that have always made America the greatest nation on earth. America, the home of the free and the land of the brave.

God Bless all of you and God bless the United States of America.

Appendix050

# EXHIBIT 9

Appendix051

## Incendiary N.R.A. Videos Find New Critics: N.R.A. Leaders

**By Danny Hakim**

March 11, 2019

The flash point was Thomas the Tank Engine.

Last September, the National Rifle Association's famously combative spokeswoman, Dana Loesch, provoked widespread outrage when she took to the gun group's streaming service to mock ethnic diversity on the popular children's program "Thomas & Friends," portraying the show's talking trains in Ku Klux Klan hoods. Now, growing unease over the site's inflammatory rhetoric, and whether it has strayed too far from the N.R.A.'s core gun-rights mission, has put its future in doubt.

The site, NRATV, is a central part of the organization's messaging apparatus. Since its creation in 2016, it has adopted an increasingly apocalyptic, hard-right tone, warning of race wars, describing Barack Obama as a "fresh-faced flower-child president," calling for a march on the Federal Bureau of Investigation and comparing journalists to rodents.

In recent weeks, in a rare airing of internal debate at the N.R.A., two prominent board members expressed concerns about NRATV to The New York Times. Their statements were released through the N.R.A. itself, amid what was described as an internal review of NRATV and its future.

"Since the founding of NRATV, some, including myself and other board members, have questioned the value of it," Marion Hammer, the group's most formidable lobbyist and a key adviser to its chief executive, Wayne LaPierre, said in a statement. "Wayne has told me and others that NRATV is being constantly evaluated — to make sure it works in the best interest of the organization and provides an appropriate return on investment."

The reassessment underscores a debate within the N.R.A. over how broad its activism should be. And it comes as the organization faces a storm of challenges, including a series of mass shootings that has created a new generation of gun-control activists.

Congressional investigations into the N.R.A.'s possible Russia ties were energized after Maria Butina, a suspected Russian agent, pleaded guilty in December to using the N.R.A. in a political influence operation. And the organization, incorporated in New York, may have a potent foe in Letitia James, the state's recently elected attorney general, who has vowed to investigate the N.R.A.'s tax-exempt status.

As falling membership dues put the N.R.A. under further strain, board members have also expressed concern about the size of payments to the ad firm that produces NRATV, Ackerman McQueen. The firm and its affiliates pocketed $40 million from the N.R.A. in 2017; billings directly to Ackerman have increased nearly 50 percent since 2015. One prominent host, Dan Bongino, left amid cutbacks at NRATV, but he said the site had tried to retain him.

Ackerman, a partner to the gun group since the "I'm the N.R.A." campaign of the 1980s, runs the NRATV Twitter account, has done polling work for the organization and revamped its gun safety program for children. It has also been credited with a slick makeover of Mr. LaPierre — who, in the words of one former N.R.A. lobbyist, previously resembled an "introverted chess champion."

Mr. LaPierre's wife, Susan, has worked for an Ackerman subsidiary, and there has come to be a revolving door between the two companies, with many employees having worked by turns for both NRATV and Ackerman.

Oliver L. North, the N.R.A. president, has a contract with Ackerman, though the N.R.A. would not disclose its size. As part of the relationship, Mr. North, a former Fox News pundit, hosts media programming and special events, like the show "American Heroes," which recently began airing on NRATV.

The N.R.A., a nonprofit, has also directed $18 million since 2010 to a private company jointly owned by executives of Ackerman and the N.R.A., according to records and interviews.

"It is clear to me that NRATV is an experiment and Wayne is evaluating the future of the enterprise," Willes K. Lee, a board member who leads the N.R.A. Outreach Committee, said in a statement to The Times.

After the Thomas the Tank Engine video, he said, Mr. LaPierre appeared "livid and embarrassed" in a meeting with the outreach group. "He apologized to the entire committee and spent hours listening to our concerns."

## 'Red Meat for the Hard Right'

Ms. Loesch has emerged as NRATV's most visible host, deriding gun-control advocates as "tragedy dry-humping whores" and vowing to combat the left with what she called the "clenched fist of truth" — a body part that the comedian John Oliver said was located "a little past the bent elbow of nonsense." In one video, she warned The Times, "We're coming for you"; in another, she threatened to burn a copy of the newspaper.

Chuck Holton, an NRATV correspondent, attributed terrorist activity in Europe to "the broader problem of multiculturalism and socialism" and to "gender-bending." He also claimed that left-wing groups, the billionaire George Soros and the Venezuelan government were trying "to influence the 2018 midterms by sending Honduran migrants north in the thousands."

Grant Stinchfield, a host, claimed that "all radicalized terrorists are Muslims," overlooking mass shooters like Dylann Roof, who killed nine black churchgoers in Charleston, S.C., in 2015.

Such far-ranging commentary has raised questions among some N.R.A. members about the scope of the organization's messaging.

"The N.R.A. shouldn't be putting this out," said Jeff Knox, an N.R.A. member who runs the Firearms Coalition, a smaller advocacy organization. "It's not gun rights; it's red meat for the hard right."

Mr. Knox's father, Neal, was an N.R.A. board member who played a leading role in an effort to fire Ackerman in the 1990s amid discontent over its growing influence. A faction loyal to Mr. LaPierre ultimately prevailed, leading to a purge of the board and allowing the two organizations to become more deeply intertwined.

"Why are we getting so involved in left-right politics instead of sticking close to our issue, the Second Amendment?" the younger Mr. Knox asked.

Ackerman declined to comment, but in a recent interview in The Oklahoman, Revan McQueen, the firm's chief executive, said his company's approach was evolving from pure advertising to a "philosophy of branded news." As Ackerman's website puts it, "Every brand must be its own media company."

To that end, the firm has created video networks for the Chickasaw Nation and the Integris health care system of Oklahoma, though their content is relatively benign. A recent episode of ChickasawTV, for example, featured a visit to an art gallery. Over on NRATV, a host was calling liberalism "a mental disorder."

Beyond NRATV, the N.R.A. backed Ackerman's performance.

"When Ackerman McQueen began working with the N.R.A., the association was little more than a fledgling grass-roots operation," Andrew Arulanandam, an N.R.A. spokesman, said in a statement.

"The N.R.A. is now the most effective advocacy organization of its kind," he said, adding that the firm had created "a national platform for the N.R.A." and that it was "an important partner."

## Taxing Questions

During the N.R.A. power struggle in the 1990s, a board member filed a complaint with the Federal Election Commission, claiming that an N.R.A. contract with an Ackerman subsidiary "was done without any 'request for proposals'; any bidding process; and no competitive bidding."

The commission decided in a 6-0 vote not to take action, but criticisms have persisted.

"The N.R.A. is willing to play fast and loose with tax regulations," said Marcus S. Owens, a partner at Loeb & Loeb who served for a decade as director of the Exempt Organizations Division of the Internal Revenue Service.

Ms. James, the New York attorney general, presents a new threat. Last year, she told Ebony magazine that the N.R.A. held itself "out as a charitable organization" but was actually "a terrorist organization."

William A. Brewer III, the N.R.A.'s outside counsel, said Ms. James had given no indication when she was a candidate that "the N.R.A. had done anything improper," adding that she had instead promised "a taxpayer-funded fishing expedition."

A number of transactions could draw scrutiny. Since 2010, the N.R.A. has paid $18 million to a company that produces "Under Wild Skies," a hunting show on NRATV. Tyler Schropp, the N.R.A.'s advancement director, came to the organization in 2010 from Ackerman, and had a stake in the production company until at least 2017, but "no longer holds any interest," Mr. Brewer said.

Federal rules restrict transactions that confer economic benefits on key executives of tax-exempt organizations.

Mr. Brewer described Mr. Schropp's stake as "a minuscule interest" that the N.R.A. found not to be objectionable. Payments related to "Under Wild Skies" emerged only recently in N.R.A. tax filings.

Other issues unrelated to Ackerman could also surface. The N.R.A. has transferred more than $100 million since 2012 from an affiliated charity that also lent the N.R.A. $5 million in 2017. Donations to the charity, the N.R.A. Foundation, are tax-deductible, while those to the N.R.A. are not.

"If you're doing a program that's charitable, you run it through the charity," said David G. Samuels, a partner at Duval & Stachenfeld who served in the charities bureau of the New York Attorney General's Office, which oversees tax-exempt organizations. Such practices raise "red flags," he said.

Like some nonprofits, the N.R.A. has been lucrative for its top executives. Mr. LaPierre's compensation rose from less than $200,000 in the mid-1990s to nearly $1.5 million in 2017. It spiked to more than $5 million in 2015, largely because of a retirement plan payout.

A review of public records found that the N.R.A., which has about 550 employees, has disclosed that 41 employees, contractors, vendors or consultants have relevant family relationships to others connected to the organization, including a "niece-in-law" of Mr. LaPierre who was hired as a consultant.

"The N.R.A. strives to comply with all applicable regulations," Mr. Brewer said, adding that the organization has a "conflict-of interest-policy" and that "vendor agreements are reviewed and approved" by the board's audit committee when appropriate.

With New York regulators circling, it's no surprise that the state's politicians have become fodder for NRATV — particularly the governor, Andrew M. Cuomo, whose administration is already engaged in a legal fight with the gun group. Recently, the site even targeted Albany, describing it as "Graft City."

Whatever happens to NRATV, few expect the N.R.A. to become much less combative. Mr. LaPierre, in a speech this month, described the organization's approach as "full-contact advocacy," adding, "We are going to fight back against anyone who attempts to silence us."

# EXHIBIT 10

Appendix055

**》 DORSEY**
always ahead

Jay J. Madrid, Esq.
Of Counsel
214-981-9932 – Direct Dial

Board Certified, Civil Trial Law
Texas Board of Legal Specialization

March 12, 2019

*Via E-mail: john.frazer@nrahq.org*
John Frazer, Esq.
General Counsel
National Rifle Association of America
11250 Waples Mill Road
Fairfax, Virginia  22030

      Re:   New York Times Article, Monday March 11, 2019

Dear Mr. Frazer:

I direct this letter to you in your capacity as General Counsel to the National Rifle Association ("NRA"). As you are aware, my firm, along with Stephen Ryan of the McDermott Will & Emery LLP firm, represents Ackerman McQueen ("AMc") in its recent dealings with the NRA.

I informed you on January 4th, 2019 that my client would have no more dealings with Brewer Attorneys and Counselors ("Brewer"). Over the past few weeks it has become clear that Brewer has been relying upon information provided by NRA persons and entities, including the FRA firm and you, to interact with and conduct reviews of AMc.

As I have advised NRA in the past, AMc has encountered a growing number of disputes with the demands made and positions taken by the NRA. These disputes have coincided with the emergence of the Brewer firm as the NRA's lead outside counsel and, it appears, its official spokesman.

The latest and most serious episode bringing harm to my client is Mr. Brewer's role in a New York Times article published March 11. We confirmed yesterday from Mr. Hakim that the NRA's primary provider of information to Mr. Hakim was Mr. Brewer. We have begun to receive inquiries from employees and the press and we anticipate inquiries from clients, vendors and financial institutions. The article focused on NRA TV, the entity managed on behalf of the NRA by AMc. The article contains a number of factual errors, which are likely due to the source of NRA information, Mr. Brewer. Aside from those factual inaccuracies, the article reveals a much more troubling and fundamental issue, that dealing with the leakage of and unauthorized use of confidential information that has been gained by NRA representatives from AMc. An example is the reference to the contract with

Appendix056

Lt. Colonel Oliver North, which appears for the first time in the article. This is the first time that information has been reported and comes less than two weeks after you were permitted to review the contract. It comes less than a week after Mr. Hakim asked AMc about the North contract. The existence of the contract and Lt. Colonel North's relationship with AMc is one of the many items that the NRA well understood was to be kept in strictest confidence. We learned yesterday, twice from Mr. Hakim, that the NRA source of information regarding two Board members who allegedly had critical remarks about NRA TV were provided to the New York Times by Mr. Brewer. A judge or jury would likely view such disclosures as constituting clear intent to disrupt and irreparably harm AMc's contract with the NRA.

Equally disturbing is the fact that Wayne LaPierre, NRA EVP/CEO, has purportedly acknowledged that he authorized Mr. Brewer to communicate with the New York Times, which is in direct contradiction of my January 4th letter, and the assurances we subsequently received that Mr. Brewer's conflict of interest with regard to AMc was understood by NRA leadership .

The NYT article also quotes two NRA Board members, Marion Hammer and Willes K. Lee. The implication created of Ms. Hammer's and Mr. Lee's comments is that they don't really like NRA TV and that they had knowledge that they were participating with this article. AMc has been told by one of these Board members that it was the NRA itself that asked for a comment from him, not the New York Times. He further stated he did not know he was providing comments to The New York Times and that he would not have done so, and that he is a supporter of NRA TV.

Mr. LaPierre's statement to the board states that "an article in the New York Times confirmed what our outside counsel has advised for the past year: the New York State Attorney General is investigating the NRA." No such confirmation appears anywhere in the article. Instead the article is filled with inappropriate disclosures of confidential information about AMc and it is riddled with innuendo implying AMc is failing to perform while reaping the financial benefits of the role they play. Given Mr. LaPierre's purported written admission that he authorized Brewer to speak with Danny Hakim, the only conclusion to be drawn is that the NRA is using AMc as a scapegoat, thereby deflecting attention from itself. Mr. LaPierre's statement to the Board that his intent is to do "whatever we must to defend the NRA" translates to casting AMc and its management and oversight of NRA TV as a pariah threatening the financial health of the organization.

The damaging content provided by the NRA to the New York Times was selectively reported to craft a story that conveniently omitted the following:

- The truth about the AMc budget, the structuring of contracts and the increase in billings from 2015 to 2017. This specifically

2

Appendix057

relates to the sentence in the story that "the firm AMc pocketed $40 million from the N.R.A in 2017." The implication here is false.

- The truth about Mr. Lapierre's role in the North contract in the face of the incomplete and illegal disclosure in the article after it was reviewed by John Frazer.

- The truth about Brewer's relationship with AMc and why he is an unreliable, conflicted source on any subject regarding AMc.

- The truth about the successful fundraising and monetization efforts connected to NRA TV.

- The truth about Mr. LaPierre's brand and his decades long approval of and association with "incendiary" messages.

- The truth about AMc's efforts to promote outreach to diverse communities and the client requested changes to diverse personnel and the decision by NRA to shut down specific outreach programs dealing with minorities, military and police.

- The truth about the history and diversity of NRA TV in light of the incomplete way it was reported by only mentioning Dana, Chuck and Grant, but failing to mention the diversity of its current staff, including Colion Noir.

- The truth that NRA TV originated in 1997 and debuted on a digital platform in 2004.

- The truth about NRA TV's "Return on Investment" as addressed by Ms. Hammer and the precise measurement methods spearheaded by AMc.

- The truth about the NRA's budget cutbacks and their impact on negotiations with talent like Dan Bongino and others. Cutbacks at NRA may have been generated by the $1.8m average monthly fees of the Brewer firm and the approximately $19m paid to that firm with millions more that we have been told are on the horizon.

- The truth about the outreach committee's failing to ever once reach out to NRA TV to discuss his concerns or to reach out to

NRA TV to discuss the many ways in which the channel is tackling issues of diversity.

- The truth about Thomas the Tank Engine video and the truth about the aftermath. The last substantive press report on this segment was from a "mom blog" on September 22, 2018. If this segment is so damaging to the NRA, why would the NRA take it to the New York Times ensuring that it is going to be brought up all over again? It would seem that more damage was intentionally sought. To be clear, the New York Times had previously reported on this segment on September 12, 2018.

- The truth about Under Wild Skies and the NRA's agreement with that company that had nothing to do with AMc.

- The truth about Susan LaPierre's Employment with AMc, including the years she worked there and the projects on which she worked.

The New York Times article seriously damaged AMc's reputation and potentially its ability to service its clients effectively, maintain critical banking relationships, vendor relationships, employee confidence in their future and much more potential, harmful consequence. The negative effect to AMc's ability to generate new business is undeniable. The article casts AMc in an extremely unfavorable light, with selective, incorrect and out-of-context statements that demand retraction or at the very least, correction and completion. Accordingly, on behalf of AMc, demand is hereby made that NRA immediately retract the references made throughout the article to AMc or alternatively, correct the statements and negative implications made about AMc therein. If the NRA refuses or fails to do so, AMc will have no alternative but to undertake corrective action by assuring that facts are accurately reported.

I invite any questions you may have and Mr. Ryan and myself are prepared to discuss these matters more fully in person at your convenience.

Yours very truly,

Jay Madrid

cc: Steve Hart (jstevenhart@gmail.com)
Steve Ryan (sryan@mwe.com)

# EXHIBIT 11

Appendix060

# THE AMERICAN LAWYER

**NOT FOR REPRINT**

🖨 Click to print or Select '**Print**' in your browser menu to print this document.

Page printed from: *https://www.law.com/americanlawyer/2019/03/28/meet-the-lawyers-who-clean-up-clients-worst-messes/*

# Meet the Lawyers Who Clean Up Clients' Worst Messes

Crisis management lawyers are ready to do the dirty work when clients need it most.

By Dan Packel | March 28, 2019

When litigator Karen Dunn started to think about joining Boies Schiller Flexner in 2013, the rising star ran into a minor sticking point with firm co-founder Jonathan Schiller. After a career that involved stops as communications director for Sen. Hillary Clinton, associate counsel to President Barack Obama and assistant U.S. attorney in the Eastern District of Virginia, she wanted to do two things in private practice: try cases and put out fires.



**Karen Dunn, partner with Boies Schiller Flexner, left, and Jamie Gorelick, partner with Wilmer Cutler Pickering Hale and Dorr, in Washington, D.C. Photo: Diego M. Radzinschi/ALM.**

When Dunn told other firms that she wanted to specialize in crisis management, many had no idea what she meant. Even after she explained that she wanted to handle the types of multifaceted legal problems

that put companies and individuals squarely in the public eye, some still struggled to understand.

Not so at Boies Schiller, where she met a welcome response from Schiller: "Of course, this is what we've been doing for years." But when Dunn suggested that the firm label the work crisis management and list it on its website, Schiller was skeptical.

"People don't like to think that they're in crisis," he told Dunn.

Ultimately, Schiller conceded. Clearly, Dunn's lengthy resume helped her bargaining position.  And, in the years since, his perspective has changed, she reports. Now, clients are telling him, "I'm so glad you have crisis management, because we have a crisis that needs to be solved," she says.

Dunn has another shorthand label for the work she does—work that, in recent years, has included defending Uber against a lawsuit over its driverless car technology while it faced multiple federal investigations and intense media spotlight, and advising the owner of Washington, D.C.'s Comet Ping Pong on how to talk to the press the night a North Carolina man walked into the restaurant and fired off three rounds with a semi-automatic rifle in response to a debunked internet conspiracy theory.

"I sometimes think of this as the 'big mess' practice," Dunn says. As in, "this is just going to be a big mess."

"She stole that phrase from me!" interjects Dunn's close friend Jamie Gorelick, seated across from her at a window-lit conference table at Boies Schiller's D.C. offices. The pair can't remember the first time they met, but Gorelick recalls hearing from her own longtime friend and protégé Merrick Garland about Dunn's promise as his clerk on the Court of Appeals for the D.C. Circuit.

"People say to me, 'What is your practice?'" continues Gorelick, the co-chair of the crisis management and strategic response group at Wilmer Cutler Pickering Hale and Dorr and the former deputy U.S. attorney general in the Clinton administration. "I say, 'Well,

if I could put 'big messes' on my business card, I would.'"

---

No law firm is printing out "big mess" business cards, but more and more are adding the concept to their roster. To do so, they're zeroing in on attorneys like Gorelick and Dunn who have gained invaluable experience in the upper echelons of the federal government to complement their skills as litigators.

When Debevoise & Plimpton announced in early 2017 that Mary Jo White was returning to the firm after chairing the U.S. Securities and Exchange Commission, the firm said crisis management would be part of her brief. In January, Willkie Farr & Gallagher hired Dunn's former Boies Schiller colleague Michael Gottlieb, who also spent time in the Obama White House counsel's office, to helm its new crisis management practice. Quinn Emanuel Urquhart & Sullivan launched its own crisis management practice in September 2017 with Crystal Nix-Hines, a former litigator at the firm who had left to serve as U.S. ambassador to the United Nations Educational, Scientific and Cultural Organization. And earlier that year, Morrison & Foerster brought on John Carlin, previously the top official for national security at the U.S. Department of Justice, for its new global risk and crisis management practice.

Credit the 24-hour news cycle and the ubiquity of social media for pushing firms in a new direction. Dunn says her work on behalf of Uber is a prime example of the change.

"I'm not sure that 10 or 20 years ago a case like that would have had, on an almost daily basis, a new difficulty to deal with," she says. "Maybe on a weekly basis, or maybe it would have evolved over time. This felt much more frequent and much more acute."

Gorelick says the foundation for her work was laid by a lawyer who was born in 1917 and served as White House counsel for both Jimmy Carter and Bill Clinton: Lloyd Cutler, a co-founder of the predecessor to Wilmer in 1962. When Gorelick joined the firm, in 2003, after her time at the DOJ and later Fannie Mae, she wanted to follow Cutler's lead in handling existential crises for businesses and individuals.

"It didn't have the name of crisis management, but if you look at what he did and a good part of what the firm did, it was handling these issues that traverse the branches of government," she says.

Gorelick inherited Cutler's practice, gave it a name and has led it ever since.

Her client list includes companies with sizable legal teams that have nonetheless been set up by the political climate for their "time in the barrel," as she calls it. That's recently involved preparing leaders of tech giants Google and Facebook for congressional investigations. She also handled BP's legal response to the 2010 Deepwater Horizon oil spill and, more recently, the response from Columbia Gas of Massachusetts, whose gas distribution system suffered an overpressurization event, prompting a series of explosions across a 45-mile stretch of pipeline.

In addition to addressing the resulting physical injuries, which included one death, and the economic damage dealt to 30,000 residents displaced from their homes, Columbia Gas also had to respond to concerned local, state and federal politicians making inquiries on behalf of their constituents. The utility faced two federal regulators and a state regulator. Congress held a field hearing, and the U.S. Attorney's Office made an inquiry. And every step was closely covered by the press.

"That's a lot to say grace over, particularly for a company which is very well run but has no standing army," Gorelick says. "And that's where we try to be of help."

Plenty of other times, the work stays under wraps due to the sensitivity of a matter. Asked about the first time they worked together on a shared project, both attorneys laughed.

"It's very interesting," Gorelick says, "but it's not something we can discuss."

While both Gorelick and Dunn have ties to the two most recent Democratic administrations, the field of crisis management includes accomplished names from both parties. Gorelick relies on the judgment of her practice vice chair, Reginald Brown, a special assistant and associate White House counsel to George W. Bush, to anticipate how figures on the other side of the aisle will respond.



And Gibson, Dunn & Crutcher's Ted Olson, who served as solicitor general for Bush, identifies his work in Tallahassee, Florida, facing off against David Boies in the 2000 presidential election recount, as one of the earliest crises he handled. Prior to his time in the Bush administration, Olson handled a few other client matters that required an immediate, multidisciplinary response, including a petroleum industry disaster. They helped plant the seed for launching a crisis management practice at Gibson Dunn after he returned in 2004.

"I knew I was an appellate lawyer, but I also thought we, as a major firm, needed to be practicing law in the 21st century," he says.

**Ted Olson of Gibson, Dunn & Crutcher in Washington, D.C. Photo: Diego M. Radzinschi/ALM.**

That meant harnessing experts across the firm's practices to spring into action in the event of emergencies and to prepare clients for contingencies.

Reed Brodsky, the former Southern District of New York prosecutor who now co-chairs Gibson Dunn's crisis management practice, points to the importance of companies having a game plan: which employees are involved, from managers to the general counsel's office; who coordinates; which outside advisers and vendors are to be brought in.

"If you have that lined up, it makes it a lot easier than if the company is scrambling," he says. "That will lead to mistakes and problems."

Regardless of how a firm prepares, the job requires attorneys to adapt to rapidly changing conditions. And their pre-existing political commitments, whether they spent time in a Republican or Democratic administration, are going to be irrelevant in that moment.

"It's triage," Olson says, "and you have to have the right doctor standing by with the right instruments and the right procedures and the right experience to deal with someone who's bleeding to death, and that's your client."

Gorelick and Dunn insist that crisis management, as they conceive it, can't be done outside of Washington.

"You have to have the underlying regulatory expertise. You have to have deep familiarity with Capitol Hill. You have to understand the news cycle, for issues that are in public policy. And you have to be able to surge—you really do need a substantial number of people who have had that sort of government experience," Gorelick says. "If you don't have those things, you're unlikely to be able to do this. You could be a fabulous litigator, and not be able to do this. You could be a fabulous regulatory lawyer and not be able to do this."

That hasn't stopped traditional Wall Street firms, including Debevoise, Willkie, Sullivan & Cromwell and Simpson Thacher & Bartlett, from advertising their crisis capabilities. Some of this work clearly corresponds with the increased demand from companies and institutions touched by the #MeToo movement. And it covers terrain that also falls under the ambit of internal investigations. Witness how the NFL, Ohio State University and CBS all turned to White and Debevoise to lead investigations after they were blemished in the public eye: the NFL, by inappropriate sexual and racial comments by a

former franchise owner; OSU, by the head football coach's handling of domestic violence accusations against a top assistant; and CBS, by the sexual misconduct allegations against former CEO Les Moonves.

No company or institution wants to be in any of those predicaments. But an internal investigation alone doesn't necessarily make for a full-scale, hair-on-fire big mess.

Dunn has had time to think about what turns a matter into a crisis that needs to be managed.

"At the heart of it, there is generally some sort of big legal problem, and that can be litigation, but it doesn't have to be, and the outgrowth can be something that is government-facing, like a governmental inquiry that requires high-level executives at a company to have to go before Congress or regulators," she says. "Another facet could be media scrutiny or public outcry of some variety."

And time is of the essence, Gorelick adds.

"That time intensity can be driven by a congressional hearing, a subpoena, or by a story that pops up in a major news outlet," she says, "but whatever it is, it's something that really puts pressure on the company or the individual not to handle it as business as usual."

Olson emphasizes that synergies among regulatory agencies, the press and the plaintiffs bar mean that more and more of these matters have the ability to snowball.

"I pick up the Wall Street Journal or The New York Times every day and see one of these problems," he says. And yet Gibson Dunn, where he has sat on the executive committee for years, has come to a different conclusion on the question of geography. While Olson remains a Beltway stalwart, the leadership of the firm's crisis practice is now in the hands of Brodsky in New York and another former federal prosecutor, Debra Wong Yang in Los Angeles.

Neither Boies Schiller, Wilmer nor Gibson Dunn can take credit for being the first large firm to pin the label "crisis management" on a practice. That likely goes to Patton Boggs, the D.C. firm that had already helped to invent the modern lobbying practice. In the early 2000s, after former White House special counsel Lanny Davis (https://www.law.com/americanlawyer/2019/03/28/for-lanny-davis-silence-is-not-an-option-when-crisis-hits/) returned to the firm where he spent the first two decades of his career, his work gradually evolved into guiding business leaders in how to respond publicly to emergencies. Then, in 2003, Davis and several colleagues moved the practice to Orrick Herrington & Sutcliffe under the label "crisis communications."

Davis is now at his own firm, alongside two partners who worked with him at those earlier Big Law stops. Meanwhile, Orrick and Squire Patton Boggs have both wiped the slate clean: neither firm now highlights its crisis management capabilities, at least not under the banner of a standalone practice.

That might owe to an emerging distinction between the work Davis pioneered and the multiple hats worn by attorneys like Gorelick, Dunn and Olson, who continue to spend ample time either in the courtroom, directing businesses' and individuals' responses to regulators, or both. For large firms, it makes sense to go beyond communications and to build—or attempt to build—a crisis practice that takes advantage of the expertise of other attorneys already on the roster.

Gorelick, for example, leans on colleagues in Wilmer's financial institutions regulatory practice, its energy and environmental practice, its tech practice, and its privacy practice. It only works if there's an integrated team.

"We're preparing a telecom company executive right now for a hearing," she says. "Knowing and understanding the telecom, privacy, antitrust and national security underlying issues makes you more efficient and also much more effective at figuring out what the questions are and what the answers should be."

But that shouldn't undersell the importance of media savvy. Experience dealing with the press is critical, not just for advising clients on how to respond to reporters, but also for suggesting how they should speak to regulators, Congress and, yes, juries.

"The communications skills that I got even before I knew I wanted to become a lawyer are so embedded that it helps me communicate to people, whether it's on a jury or whether I'm preparing an executive to testify for anybody watching on a TV at home," says Dunn, who spoke to the media on a near-constant basis when handling communications for Clinton before starting law school.

Part of that work involves disabusing clients of their notions of what will fly.

"You just have to be in a position to say, 'I don't think that works and this is why. Here's what will work and why,'" says Gorelick, who emphasizes that as deputy attorney general she spent half of her time on substantive legal questions and the other half sorting out their intergovernmental and public affairs ramifications. "Unless you've done that … you can't really persuade a client to do the thing that will be most helpful to them."

Olson comes to a similar conclusion.

"If you have to tell a company that their CEO is not very good on television and should stay away from it," he says, "you have to have someone who's knowledgeable and mature and respected enough that they will listen to you. People who are at the top of major companies have substantial egos—otherwise, they wouldn't get there. They have an instinct to react the way their judgment tells them to react."

---

If social media has rendered an already fragmented media landscape even more complex, amplifying the intensity of a crisis through its infinite stream of news, it's also provided clients with a new tool.

In 2018, Dunn represented The Wing, a feminist co-working space, in response to an anti-discrimination investigation from the New York City Commission on Human Rights.

The traditional side of the response involved interviews with the commission. But after the press reported on the investigation, the company was able to quickly orchestrate a social media campaign on its own behalf.

"We were able to mobilize the most incredible outpouring of membership support I have ever seen over social media, which had an enormous effect on the public perception of the wisdom of such an inquiry—whether or not that's where the city ought to be putting its human rights resources at that time," Dunn says.

Gorelick often likens the position of clients in crisis to landing a plane.

"You're in flight, you have a decision to make," she says. "You generally do not have time to look up the manual, consult broadly, turn the plane around, do a bunch of loops. You have to land the plane."

In that analogy, social media is just another instrument in the cockpit. But regardless of which levers the crisis manager elects to pull, time is of the essence, and there's no room for worrying about the prospect of being second-guessed.

"For many lawyers, that's a very uncomfortable place," Gorelick says.

Dunn agrees with the analogy, with an addition: "You have to remain calm."

"You can't land the plane if you are not calm!" Gorelick inserts.

"In this circumstance, are we air traffic control?" Dunn asks, putting a spotlight on a crucial ambiguity in her friend's initial formulation: Whose hands are on the controls? The lawyer or the client?

"No," Gorelick answers. "You're the pilot!"

*Email: dpackel@alm.com*

**Read More:**

For Lanny Davis, Silence Is Not an Option When Crisis Hits (https://www.law.com/americanlawyer/2019/03/28/for-lanny-davis-silence-is-not-an-option-when-crisis-hits/)

Lifetime Achiever: Jamie Gorelick, Wilmer Cutler Pickering Hale and Dorr (https://www.law.com/americanlawyer/2018/08/22/lifetime-achiever-jamie-gorelick-wilmer-cutler-pickering-hale-and-dorr/)

---

Copyright 2019. ALM Media Properties, LLC. All rights reserved.

# EXHIBIT 12

Appendix072

**AM**

Statement from Ackerman McQueen
April 15, 2019

During a three-week review, an NRA forensic auditing firm received every single piece of information they [the NRA] requested.

Further, the NRA has had consistent access to any and all documents regarding NRATV analytics.

Despite the representation set forth in their lawsuit, the NRA had the personnel contract they claim AM withheld last week before they filed their lawsuit. It was provided by the Williams & Connolly law firm. The transfer occurred as a result of a process for delivery of such highly confidential information.

This flagrant misrepresentation, along with other false claims, serve as the foundation of malicious intent exemplified by this lawsuit.

Months ago, legal counsel informed the NRA that "Mr. Brewer himself has an irreconcilable conflict of interest. Mr. Brewer is the son-in-law of Angus McQueen and brother-in-law of Ackerman McQueen's CEO, Revan McQueen. Mr. Brewer has demonstrated, in words and deeds, his animus for Ackerman McQueen and these family members and that animus pervades the Brewer firm's dealings with Ackerman McQueen, whether dealing directly with Ackerman McQueen or through other members of his firm."

Ackerman McQueen has served the NRA and its members with great pride and dedication for the last 38 years. The NRA's action is frivolous, inaccurate and intended to cause harm to the reputation of our company and the future of that 38-year relationship.

This lawsuit affects not only Ackerman McQueen, but the members of the organization whose dedication to the Second Amendment is shared equally with the defendants in this case. Much like we have done for the NRA and the Second Amendment over the past 38 years, we too will defend our position and performance aggressively.

# EXHIBIT 13

Appendix074

NATIONAL RIFLE ASSOCIATION OF AMERICA
11250 WAPLES MILL ROAD
FAIRFAX, VIRGINIA 22030



**WAYNE LAPIERRE**
*Executive Vice President*

April 25, 2019

Dear Members of the Board:

Leaders in every walk of life must often choose: between what is true, and what is polite; between what is convenient, and what is right.  I believe each of you made that choice when you joined the NRA Board.  Despite a political climate that maligns our founding freedoms, you elected to walk the principled path and not the popular one.

Yesterday evening, I was forced to confront one of those defining choices—styled, in the parlance of extortionists, as an offer I couldn't refuse.  I refused it.  Delivered by a member of our Board on behalf of his employer, the exhortation was simple: resign or there will be destructive allegations made against me and the NRA. Alarmed and disgusted, I refused the offer. This letter explains why.

As you know, the NRA has over this past year taken steps to strengthen its efforts to document and verify compliance by our vendors with our purchasing practices and their contracts.  As stated in a pending lawsuit, we've met extraordinary resistance from one vendor: Ackerman McQueen (AM).  As most of you know, I've been a proponent of AM in the past—because they are capable of doing high quality work.  But as I've discovered, AM is capable of something much different.

Yesterday (April 24, 2019) at approximately 2:58 p.m. EST, Col. North placed a telephone call to Millie Hallow, one of my most senior staff members. Millie returned the call and took notes, the substance of which appears below.

Col. North stated that the purpose of the call was to relay the contents of a letter drafted by AM.  According to Col. North, he had been advised by Dan Boren—a member of our Board and an employee of AM's client—that unless I resigned as the Executive Vice President of the Association, Ackerman would transmit this allegedly damaging letter to the entire NRA Board. According to Col. North, the letter was "bad" for me, two other members of my executive team, and the Association.

*(703) 267-1020*
*(703) 267-3989 fax*
*wlapierre@nrahq.org*

Members of the Board
Page 2
April 25, 2019

I believe the purpose of the letter was to humiliate me, discredit our Association, and raise appearances of impropriety that hurt our members and the Second Amendment.  The letter would contain a devastating account of our financial status, sexual harassment charges against a staff member, accusations of wardrobe expenses and excessive staff travel expenses.

**But then, Col. North explained that the letter would not be sent —if I were to promptly resign as your Executive Vice President.  And, if I supported Col. North's continued tenure as President, he stated that he could "negotiate" an "excellent retirement" for me.**

**After Col. North concluded his telephone call with Millie, others informed me that I needed to withdraw the NRA lawsuit against AM or be smeared.**

In my almost 40-year relationship with AM, never—not once—did the agency make these allegations against me or the NRA.  They are conveniently making them now—only as they face scrutiny in a Virginia court and the prospect of having to comply with our demand for books and records.

Some of these items involve accounting and record-keeping for related-party transactions, a suite of issues to which the NRA has devoted extensive attention in the past year.  This is a subject about which our outside counsel has presented to the board and which I take seriously. Of course, this is why transparent access to Ackerman's records is so important.  I hope that whatever else comes of these events, the NRA will finally have full access to the information we are entitled to.

All of this is painful for me. I will not judge Col. North, but must report what many of you already know:  he has contractual and financial loyalties to AM.  Last year, he entered into an employment agreement with the agency that pays him millions of dollars annually, supposedly in exchange for hosting an NRATV documentary series, "American Heroes."  AM bargained to deliver twelve feature-length episodes of American Heroes within the series' first year.  That period expires next month, and AM has delivered only three episodes (the latest is a mere 11 minutes in length).  The NRA wrote a recent letter demanding to know what, exactly it is paying for—and what it is getting—in light of these production shortfalls.  AM did not respond directly, but appears to have responded indirectly by trying to oust me.

Members of the Board
Page 3
April 25, 2019


      Ultimately, this letter is not about AM, or about Col. North, or Dan Boren.  This is about you and me.  When I became your Executive Vice President, I took an oath to defend the freedoms for which the NRA stands, against all adversaries and threats.  It is regrettable that threats now emanate from our fiduciaries and friends.  But so long as I have your confidence—an honor that humbles me, daily—I will not back down.  Serving this Association has been the greatest honor of my life, and not one I'm willing to forfeit in exchange for a backroom retirement deal.

      I believe our Board and devoted members will see this for what it is:  a threat meant to intimidate and divide us.  I choose to stand and fight, and hope to bring 5 million members with me.

               Sincerely,

               Wayne LaPierre
               NRA Executive Vice President

# EXHIBIT 14

Appendix078

# THE WALL STREET JOURNAL.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/nras-wayne-lapierre-says-he-is-being-extorted-pressured-to-resign-11556314763

U.S.

# NRA's Wayne LaPierre Says He Is Being Extorted, Pressured to Resign

Group's longtime leader says Oliver North, president of the NRA, wants him out



Wayne LaPierre, who spoke Friday at an annual meeting of the National Rifle Association, has been at the top of the organization for three decades.
**PHOTO:** DANIEL ACKER/BLOOMBERG NEWS

*By* _Mark Maremont_

April 26, 2019 5:39 pm ET

Longtime National Rifle Association leader Wayne LaPierre has told the group's board he is being extorted and pressured to resign by the organization's president, Oliver North, over allegations of financial improprieties, in a battle stirring up one of the nation's most powerful nonprofit political groups.

In a letter sent to NRA board members late Thursday afternoon, Mr. LaPierre, the group's CEO and executive vice president, said he refused the demand. Instead he called on board members to "see this for what it is: a threat meant to intimidate and divide us."

Appendix079

READ THE LETTER

- "Dear Members of the Board:…"

Mr. North sent his own letter to the board late Thursday evening, in which he said his actions were for the good of the NRA and that he was forming a crisis committee to examine financial matters inside the organization, according to people familiar with its contents.

Advertisement

Mr. North previously had sent a longer letter to the board's executive committee detailing new allegations of financial improprieties involving more than $200,000 of wardrobe purchases by Mr. LaPierre that were charged to a vendor, according to the people. One of those people described Mr. LaPierre's letter as an "angry reaction" to Mr. North's longer letter.

The behind-the-scenes brawl is taking place amid the gun-rights group's big annual meeting, at which President Trump spoke Friday.

Insiders say matters will come to a head by Monday, when the NRA's full 76-member board is set to meet.

The fight stems in part from a dispute between the NRA and its longtime advertising firm, Ackerman McQueen Inc., which resulted in a lawsuit filed by the NRA earlier this month. In the suit, the group claimed Ackerman McQueen had refused to provide records justifying its billings. Ackerman McQueen has called the lawsuit "frivolous" and "inaccurate."

One of the NRA's claims was that for months it had been stymied in attempts to get details of the ad firm's contract with Mr. North, a former Marine Corps officer and Iran-Contra figure who hosts a documentary program on NRATV produced by Ackerman McQueen.

Appendix080

According to Mr. LaPierre's letter to board members, which the The Wall Street Journal has reviewed, Mr. North called an NRA senior staffer Wednesday to convey a message to the NRA chief. In the call, according to the letter, Mr. North said that unless Mr. LaPierre resigned, Ackerman McQueen was prepared to send a letter to the NRA board that would be "bad for me, two other members of my executive team and the Association."

SHARE YOUR THOUGHTS

Is the NRA in need of a new leadership or is the status quo better for its advocacy of Second Amendment rights? Join the conversation below.

The letter, Mr. LaPierre wrote the board, "would contain a devastating account of our financial status, sexual harassment charges against a staff member, accusations of wardrobe expenses and excessive staff travel expenses."

Mr. LaPierre added that after the call "others informed me that I needed to withdraw the NRA lawsuit against [Ackerman McQueen] or be smeared."

A spokesman for Ackerman McQueen said it would have no comment.

William A. Brewer III, an outside attorney for the NRA, said, "many of the issues raised by Col. North have been the subject of review and investigation by the NRA since early last year. In our view, the items involving Mr. LaPierre may reflect a misinformed view of his and the NRA's commitment to good governance."

As for the wardrobe costs, NRA second Vice President Carolyn Meadows said the expenses dated back 15 years and "a wardrobe allowance is not that extraordinary" for the NRA chief, who has "participated in literally thousands of speeches and hundreds of television appearances during that time."

The letter also claims that Mr. North told the NRA staffer the letter wouldn't be sent if Mr. LaPierre promptly resigned. If Mr. LaPierre supported Mr. North's continued tenure as NRA president, the letter claimed, Mr. North stated he could negotiate an "excellent retirement" package for the NRA chief.

Mr. LaPierre wrote that the threat was couched, "in the parlance of extortionists, as an offer I couldn't refuse. I refused it."

In the letter, Mr. LaPierre said Mr. North was paid "millions of dollars annually" by Ackerman McQueen, for a dozen episodes of his series, "Oliver North's American Heroes." But only three

Appendix081

episodes have been delivered thus far, Mr. LaPierre wrote, and the NRA has demanded to know what it is paying for "in light of these production shortfalls."

Ackerman McQueen "appears to have responded indirectly by trying to oust me," Mr. LaPierre wrote.

The dispute pits two high-profile conservative figures against each other. Mr. LaPierre has headed the NRA for close to 30 years. During his tenure, the group shifted from being a grass-roots organization to a nationally powerful advocacy organization with strong political sway when it comes to its core gun-rights message.

Mr. North is a conservative folk hero from his tenure in the 1980s on the National Security Council and his role in the Iran-Contra scandal. He became NRA president a year ago as the group searched for a higher-profile figure as its finances sagged after Mr. Trump's election eased concerns about more gun regulations under another Democratic administration.

Advertisement



The NRA president must stand for reelection every year, but in recent years most presidents have served for two years. Mr. North's first term is scheduled to end Monday.

*—Zusha Elinson contributed to this article.*

**Write to** Mark Maremont at <u>mark.maremont@wsj.com</u>

*Appeared in the April 27, 2019, print edition as 'Extortion Allegation Riles Top NRA Ranks.'*

Copyright © 2020 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

Appendix082

# EXHIBIT 15

Appendix083

# Texas Lawyer

**NOT FOR REPRINT**

🖶 Click to print or Select '**Print**' in your browser menu to print this document.

Page printed from: *https://www.law.com/texaslawyer/2019/05/06/advocacy-as-art-lawyers-must-engage-in-issues-and-crisis-management/*

# Advocacy as Art: Lawyers Must Engage in Issues and Crisis Management

When public relations is stitched into the fabric of the advocacy, the practice can efficiently influence and improve the development of each case or crisis.

By **William A. Brewer III** | May 06, 2019



**Crisis management**

In today's world of high-stakes litigation, it is not often that the need for effective advocacy is confined to the courtroom. It typically requires advocacy in the court of public opinion.

It is no surprise that businesses, public interest groups and leading entrepreneurs increasingly look to law firms to create multi-dimensional, multi-layered strategies that advocate for them in the public square. Many law firms engineer carefully crafted plans to advance their clients' interests and protect their most valued asset, their brand.

The regulatory arena, legislative environment and news media are all touchstones of effective advocacy in bet-the-business litigation, working in coordination with one another to help clients achieve successful outcomes.

As many clients realize, crafting a public narrative can no longer fall solely under the purview of public relations agencies or a corporation's in-house communications department.

According to recent press reports, the legal community has awakened to the "new" normal:  issues and crisis management should be a fundamental component of any high-stakes advocacy plan. There are many advantages for clients when that function is managed by law firms.

The fusion of legal and communications resources can produce more compelling, effective advocacy—enabling clients to favorably posture themselves, mitigate reputational damage and have a voice in the telling of the stories that define them.

What's more, lawyers who manage issues and crisis management are able to help clients gain strategic advantages in their advocacy and recognize improvements in operational efficiencies, including cost-savings.

When communications professionals are deployed within law firms, the resources are more quickly and readily available. They are unencumbered by the drag of expensive "ramp up" periods often required by PR firms—which often renders the messaging "late" and diminishes its effectiveness.

There is also an inherent advantage in having law, media and politics all directed under the umbrella of the attorney-client relationship. The advocacy can be coordinated and responsive— working in alignment with a client's legal objectives, elements of which might not be fully appreciated by a siloed PR firm.

**Seeing the Vision**

A handful of law firms that were early entrants in the world of crisis management practices—specialized work groups that help clients navigate the media landscape, engage in the regulatory arena and advocate in public forums.

In 2001, we launched our practice group—after outsourcing certain elements of the public relations function during much of our firm's formative years. We often explain that we made the decision because we were driven to do so by the demands of our commercial litigation practice.

In short, we realized that the most significant cases on our docket not only generated media attention, but invited regulatory scrutiny, sparked shareholder inquiries, and were a catalyst for stakeholder engagement. Our clients facing the "all-or-nothing" proposition of bet-the-business litigation often turned to us to navigate them through treacherous waters of news cycle advocacy.

The truth is many CEOs and GCs of major Lone Star corporations—or those from companies with a significant footprint in Texas—know that effective issues and crisis management is key to advancing their interests, managing exposure and positioning their companies for success. They appreciate the importance of public opinion in shaping outcomes, including litigation.

## More Than a Call Center

Effective crisis management is about more than media relations. It centers on the ability to assess and manage a client's most critical elements of public exposure. How do clients protect and advance their position, posture themselves for success, and protect their reputational interests? The answer lies in courtroom and public advocacy that works in concert, not conflict.

Public relations is about more than press engagement. It involves projecting your external voice as a gateway into informing *and influencing* key audiences. That includes customers, employees, shareholders and other influencers who can impact long-term success.

The aim of the lawyers who operate in high-profile cases is to provide advocacy in all forums.

Advocacy is made more successful by ensuring the legal strategy and messaging are consistent. Crisis experts should manage the *immediate* issue or concern but with a *forward-looking* vision that helps clients anticipate challenges, leverage long-term opportunities and protect against reputational harm. They need to see the forest *and* the trees.

With this in mind, we employ former news reporters, crisis experts and lobbyists to help understand the landscapes in which our clients are involved. These professionals can provide strategic counsel not only in connection with high-profile litigation, but also in anticipating and responding to a wide range of reputational concerns.

They understand that the news cycle is in perpetual motion—with websites and social media driving the need for "rapid response" advocacy that is best understood by those who have firsthand experience confronting its demands.

## From Competitive *Advantage* to Competitive *Necessity*

Having crisis communications skill sets in-house provides law firms with invaluable expertise, perspective, and insight into the analysis of each client's circumstances.

When public relations is stitched into the fabric of the advocacy, the practice can efficiently influence *and improve* the development of each case or crisis.

Put another way, law firms that operate as issues and crisis managers offer an added level of advocacy—one that is uniquely creative, responsive and influential.

What was once a competitive advantage for firms and their clients is quickly becoming a competitive necessity, as valuable as any other weapon in the attorney's arsenal.

*William A. Brewer III is managing partner at Brewer, Attorneys & Counselors, with offices in Dallas. His practice operates at the intersection of law, business and communications. In 2001, Brewer pioneered the development of an Issues & Crisis Management group that specializes in managing reputational issues for a broad range of clients.*

Copyright 2019. ALM Media Properties, LLC. All rights reserved.

# EXHIBIT 16

Appendix089

  

**ANGUS MCQUEEN**

**BILL WINKLER**

Joined in 2007

# REVAN MCQUEEN

*Chief Executive Officer*

Revan grew up watching this company thrive in a fast-paced, ever-evolving industry. He developed a passion for the family business, and after earning his degree at New York University, he returned to Oklahoma and quickly threw himself into every aspect of the company's operation.

A creatively-trained mind with extensive experience in journalism and music, he has worked in nearly every department in the agency, gaining first-hand knowledge of talent, needs and development. He was named Chief Executive Officer in 2017 and is focused on the successful diversification of the business to meet the changing demands of the media marketplace.

Revan helps lead the growth of clients' media footprints and works with many talented individuals to build industry-leading internal capabilities all structured to support the successful scaling of premium video products. He is also now pursuing a transition of the agency to become a media company in and of itself.

# EXHIBIT 17

Appendix091

Politics

# Ad Firm Cuts Ties With NRA, Says 'Chaos Led Us to Lose Faith' After 38 Years

By Neil Weinberg and David Voreacos
May 29, 2019, 2:44 PM CDT
*Updated on May 29, 2019, 3:48 PM CDT*

▶ Ackerman McQueen move leaves questions about future of NRATV

▶ Gun-rights group had used PR firm for nearly four decades

The National Rifle Association's longtime advertising and public relations firm ended its relationship with the group amid a legal battle that has cast a harsh light on spending and governance at the gun-rights lobby.

The firm, Ackerman McQueen Inc., said Wednesday that it would cease working with the NRA after 38 years because "the NRA's chaos led us to lose faith" in the group.

The breakup comes after the NRA sued Ackerman McQueen in April, claiming it refused to provide details of its employment contract with Oliver North, who also served as the unpaid NRA president. North had previously raised questions about spending by the NRA's executive vice president and chief executive officer, Wayne LaPierre. North was then ousted during the NRA's annual meeting. The ad agency has denied withholding information about North's contract and counter-sued.

"We were attacked in frivolous lawsuits and defamed with made-up stories that were then cowardly peddled to the media," the Oklahoma City firm said in a written statement. "The intent was to make us afraid. We will never fear the truth."

Previously: NRA Says Ad Firm Stole Its Legal Secrets as Duel Escalates

Ackerman McQueen added: "The turmoil the NRA faces today was self-inflicted. It could have been avoided. We deeply regret that it wasn't."

It wasn't immediately clear how the termination of the firm's service agreement will affect the operation of NRATV, which it produced to promote gun rights and other conservative causes. The NRA paid the firm and a subsidiary nearly $40 million for its work in 2017, according to court filings.

"It is not surprising that Ackerman now attempts to escape the consequences of its own conduct," William A. Brewer III, a lawyer for the NRA, said in a statement. "When confronted with inquiries about its services and billing records, Ackerman not only failed to cooperate -- it sponsored a failed coup attempt to unseat Wayne LaPierre. The NRA alleges that Ackerman not only attempted to derail an investigation into its conduct, but unleashed a smear campaign against any who dared to hold the agency accountable."

NRA spokesman Andrew Arulanandam said the group would begin shifting its communications work. "We have an opportunity to elevate our brand, communicate with a broader community of gun owners and press the advantage in the upcoming 2020 elections," he said in a statement.

Before the announcement on Wednesday, the ad agency continued to work for the NRA even as the parties battled in state court in Alexandria, Virginia. Last week, the NRA filed an emergency motion to halt litigation after accusing an Ackerman McQueen employee of stealing a PowerPoint presentation detailing its courtroom strategy. Ackerman McQueen's statement was reported earlier by the Wall Street Journal.

*(Updates with NRA statement.)*

**In this article**

0117133D
**ACKERMAN MCQUEEN INC**
Private Company

Terms of Service
Trademarks Privacy Policy
©2019 Bloomberg L.P. All Rights Reserved
Careers Made in NYC Advertise Ad Choices   Contact Us Help

# EXHIBIT 18

Appendix094

Ɔmail

Dan Boren <dan.boren1@gmail.com>

## vd: NRA lawsuit against Ackerman McQueen [CONFIDENTIAL]

**Dan Boren** <Dan.Boren@chickasaw.net>                                                    Thu, May 30, 2019 at 12:36 PM
To: "danboren1@gmail.com" <danboren1@gmail.com>

Hon. Dan Boren
President
Corporate Development
Chickasaw Nation
Department of Commerce
4001 N. Lincoln Blvd.
Oklahoma City, OK 73105
405-767-8921
Dan.Boren@Chickasaw.net<mailto:Dan.Boren@Chickasaw.net>

Begin forwarded message:

From: Dan Boren <Dan.Boren@chickasaw.net<mailto:Dan.Boren@chickasaw.net>>
Date: April 15, 2019 at 8:35:29 PM CDT
To: BILL LANCE <Bill.Lance@chickasaw.net<mailto:Bill.Lance@chickasaw.net>>
Subject: Fwd: NRA lawsuit against Ackerman McQueen [CONFIDENTIAL]

I reread this again. I bet Ackerman is in trouble on this one. They can't produce the backup to the invoices and were
allocating full salary to these employees that may have been working on our accounts

Hon. Dan Boren
President
Corporate Development
Chickasaw Nation
Department of Commerce
4001 N. Lincoln Blvd.
Oklahoma City, OK 73105
405-767-8921
Dan.Boren@Chickasaw.net<mailto:Dan.Boren@Chickasaw.net>

Begin forwarded message:

From: "Frazer, John" <John.Frazer@nrahq.org<mailto:John.Frazer@nrahq.org>>
Date: April 15, 2019 at 10:11:42 AM CDT
To: "Frazer, John" <John.Frazer@nrahq.org<mailto:John.Frazer@nrahq.org>>
Subject: NRA lawsuit against Ackerman McQueen [CONFIDENTIAL]

Dear Board and Executive Council members:

Please see Wayne LaPierre's note below regarding the attached complaint filed this past Friday. Beneath Wayne's
note is a Wall Street Journal article that appeared online today.

Sincerely,

John Frazer
Secretary and General Counsel
National Rifle Association of America
11250 Waples Mill Rd.

DB_0216

Fairfax, VA  22030
(703) 267-1254
john.frazer@nrahq.org<mailto:john.frazer@nrahq.org>

This e-mail and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed, and may be privileged.  If you have received this e-mail in error, please notify the sender immediately, delete the message from your computer, and do not disseminate, distribute, or copy it.

Dear NRA Board of Directors:

Today, an article in The Wall Street Journal reported on a business dispute between the NRA and one of our vendors, Ackerman McQueen. Ackerman has been a longtime partner and valued advisor to the NRA. And, although we appreciate the many years of successful partnership we have shared with Ackerman, this action was necessary because of a failure to comply with multiple requests for documents and information relating to its work for our Association. We hope to get this matter resolved in the best interest of all parties involved.

As most of you know, the NRA requested that all of our vendors commit to providing detailed reports and records relating to their work for our organization. This is part of the NRA's Compliance Review Process and our determination to adopt best practices in the areas of accounting and governance.

Today's reporting also touched upon other concerns, including efforts undertaken by the Office of the Executive Vice President to protect the NRA's legal, regulatory and reputational interests. As was reported, I have supported the work of the firm Brewer, Attorneys & Counselors, to represent our interests on several related fronts. Centralizing these services allows us to gain strategic advantages, operational efficiencies, recognize cost savings, and improve our advocacy on these many fronts.

I look forward to working closely with all of our vendors – in advertising, marketing, and other areas – to maximize their value to our Association. I also look forward to continuing my work with all of you – our board of directors.

Our goal is to ensure we are doing everything possible to protect our Second Amendment, further the interests of the NRA, drive brand awareness and membership, and operate in full compliance with all applicable regulations. The NRA will also continue our advocacy at every level – and we will not make any apologies for that.  Our members and our mission come first - always.

Wayne

https://www.wsj.com/articles/nra-files-suit-against-ad-agency-in-rift-with-key-partner-11555320601
NRA Files Suit Against Ad Agency in Rift With Key Partner
Gun-rights group accuses Ackerman McQueen of refusing to comply with requests to justify its billings
By
Mark Maremont
April 15, 2019 5:30 a.m. ET
The National Rifle Association filed a lawsuit accusing its longtime advertising agency Ackerman McQueen Inc. of refusing to comply with demands to justify its billings, an extraordinary public break with the gun-rights group's largest outside partner.
The lawsuit, filed late Friday, comes amid an unusual battle unfolding behind the scenes at the NRA's 76-member board, which some say pits a small group of pro-Ackerman McQueen directors against other board members and an outside NRA attorney.
The dispute in part is about how the NRA, with an annual budget of more than $300 million, is spending money during a period when its finances have been tight. The NRA ran at a deficit in its two most recently reported years.
Oklahoma City-based Ackerman McQueen has been the NRA's ad agency since the 1980s and has been widely credited with helping to transform the NRA from a grass-roots operation to a powerful national advocacy group. In recent years the ad firm has also produced the organization's NRATV<https://www.nratv.com/?mod=article_inline>, a video outlet that mainly focuses on conservative and pro-gun rights commentary.
NRA filings show it paid Ackerman McQueen $42.6 million in 2017, the most recent year available, making it by far the group's largest vendor.
The lawsuit is "frivolous, inaccurate and intended to cause harm to the reputation of our company," Ackerman

DB_0217

McQueen said in a statement. "We will defend our position and performance aggressively and look forward to continuing to serve the NRA's membership."

An Ackerman McQueen spokeswoman added that an NRA-hired forensic auditing firm spent three weeks reviewing the firm's records and was "given every single thing they requested."

In the lawsuit, filed in Circuit Court in Alexandria, Va., the NRA said Ackerman McQueen was obliged to provide access to records underlying its bills. But since the middle of 2018, it said the NRA's requests for such documents had been met with partial compliance or "rebuffed or baldly ignored...This situation cannot continue."

The NRA is concerned the ad firm may be overcharging for certain items, the lawsuit said, such as invoicing for the full salaries of Ackerman McQueen employees who were "allocating substantial time to non-NRA clients."

The NRA also alleged it hadn't received complete information about an NRATV contract between Ackerman McQueen and retired Lt. Col. Oliver North, the Iran-Contra figure who became NRA president in May 2018.

Though the NRA president's post is largely ceremonial, the lawsuit said, Mr. North was hired last year by Ackerman McQueen to host a documentary program on NRATV—"Oliver North's American Heroes."

As a nonprofit, the NRA said it must approve and disclose its top officials' pay. The NRA initially agreed to reimburse the ad firm for costs related to Mr. North's TV contract, but when the organization later sought contract details, Ackerman McQueen balked and Mr. North for months wouldn't provide documents without the ad firm's approval, the NRA alleged.

Attempts to reach Mr. North through his assistant and his attorneys were unsuccessful.

"It's stunning that a trusted partner for all these years is just refusing to cooperate," said William A. Brewer III, an outside NRA lawyer. He said Ackerman McQueen is the only vendor resisting the NRA's push for such records. Some NRA board members have publicly raised questions<https://www.nytimes.com/2019/03/11/us/nra-video-streaming-nratv.html?mod=article_inline> about whether the NRA should cut back spending on Ackerman McQueen's NRATV platform, concerned that much of its content reflects conservative political views not directly related to the group's core Second Amendment message.

The NRA said in the lawsuit it had sought information on how well NRATV was faring, but claimed Ackerman McQueen refused to provide the NRA with certain requested data in writing, such as unique visitors, "that enable the NRA [to] analyze the return on its investment in NRATV."

The Ackerman McQueen spokeswoman said, "The NRA has had consistent access to any document regarding NRATV analytics."

In a Shakespearean twist, the outside NRA lawyer spearheading the lawsuit, Mr. Brewer, is related to Ackerman McQueen's two top officials, who are his brother-in-law and father-in-law.

Ackerman McQueen said it told the NRA three months ago that the family relationship meant that Mr. Brewer had an "irreconcilable conflict of interest" and that he had "demonstrated, in words and deeds, his animus" for the company and those family members.

The pro-Ackerman board faction also is blaming some of the discord on Mr. Brewer, whose firm, Brewer Attorneys & Counselors, started working for the NRA last year and has since become a major NRA vendor, according to people familiar with the matter.

Mr. Brewer's firm is representing the NRA in federal litigation against New York Gov. Andrew Cuomo and other New York state officials. The NRA accuses New York of violating its First Amendment rights<https://www.wsj.com/articles/nra-sues-new-york-after-insurance-crackdown-15260753737?mod=article_inline> by warning financial-services firms regulated by the state to avoid doing business<https://www.wsj.com/articles/new-york-bans-nra-insurance-program-and-fines-broker-1525273379?mod=article_inline&mcd=article_inline> with the gun-rights group. The defendants deny the allegations.

The pro-Ackerman McQueen faction, which people said includes Mr. North, has circulated complaints inside the NRA board that Mr. Brewer's firm is charging unusually high fees—about $1.2 million a month by some internal estimates—and is justifying those in part by exaggerating the risks that New York officials pose to the group, according to the people familiar with the matter.

"I've never seen this much agitation on the board," said Todd Rathner, an NRA board member for 20 years, who said he thinks the dissidents are attacking Mr. Brewer as a way to undermine NRA CEO Wayne LaPierre and "I'm disgusted by it."

Mr. LaPierre backed Mr. Brewer in a statement released through an NRA spokesman, saying: "I am proud of the essential work the Brewer legal team is doing for the NRA." He added that all of the law firm's invoices are closely reviewed by the NRA's legal and finance departments.

Mr. Brewer defended his fees in an interview, saying "we're a premium law firm, we make no bones about that." He also said his firm is doing work for the NRA well beyond the New York litigation. Among its tasks, he said, is helping the NRA respond to numerous congressional demands for records related to its dealings with Russia<https://www.wsj.com/articles/maria-butina-pleads-guilty-to-conspiracy-to-influence-u-s-politics-11544719313?mod=article_inline>.

As for Mr. Brewer's family relationships, his law firm in a statement said that has "no bearing whatsoever on the NRA's litigation strategy," calling that argument a red herring.

Tom King, an NRA board member who heads a New York state gun organization, said he backs Mr. Brewer's legal

DB_0218

effort in New York: "However much money it takes is well spent, because it's for the survival of the NRA."
Mr. King, speaking before the lawsuit was filed, said Ackerman McQueen has long been "very important to the NRA"
and he expects the subject of the firm's budget to come up at the group's annual meeting later this month. As for the
ad firm's NRATV content, Mr. King said, "If you took a poll of most board members, they'll tell you they like NRATV."

---

**2 attachments**

 **2157_001.pdf**
725K

 **ATT00001.htm**
1K

DB_0219

**VIRGINIA:**

### IN THE CIRCUIT COURT FOR THE
### CITY OF ALEXANDRIA

| | |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Case No. CL19001757 |
| | ) |
| ACKERMAN MCQUEEN, INC., | ) |
| | ) |
| and | ) |
| | ) |
| MERCURY GROUP, INC. | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

### COMPLAINT

COMES NOW the Plaintiff, the National Rifle Association of America (the "NRA"), and files this Complaint against Defendants Ackerman McQueen, Inc. ("Ackerman") and Mercury Group, Inc. ("Mercury" and, collectively with Ackerman, "AMc"), based on personal information as to its own actions and on information and belief as to all other matters, as follows:

### PRELIMINARY STATEMENT

The NRA seeks specific performance of an unambiguous books-and-records inspection right contained in a longstanding contract with one of its most important third-party vendors: the advertising agency Ackerman McQueen.

DB_0220

Appendix099

The NRA and Ackerman have collaborated fruitfully for decades. Together, the parties crafted iconic, impactful Second Amendment messaging that featured Charlton Heston ("from my cold, dead hands") and other important constitutional rights advocates. The impasse between them which gives rise to this lawsuit is simple, and baffling: the NRA requested access to material, readily available records that Ackerman and Mercury are contractually obligated to provide. Defendants refused to provide them.

For the better part of a year, the NRA has negotiated with AMc and appeased its demands in an effort to coax compliance with the parties' contract. However, the NRA's patience has run out. Confronting escalating concerns about AMc's activities and accounting practices, the NRA seeks access to basic business records—including *budgets purportedly approved by the NRA*, copies of *material contracts for which the NRA is purportedly liable*, and *readily available performance data*—all to inform the judgment of its fiduciaries. The NRA has an undisputed contractual right to examine these documents. Indeed, its contract with AMc entitles the NRA, upon "reasonable notice," to examine any and all "files, books, and records" of both Ackerman and Mercury which pertain to matters covered by the parties' contract. Since July 2018, the NRA has provided more-than-reasonable notice of its desire to view key items. In some instances, AMc has affected partial compliance with the NRA's requests—in other cases, it has rebuffed or baldly ignored the NRA's letters. This situation cannot continue.

There is no adequate remedy at law which would compensate the NRA for the risks and burdens posed by AMc's concealment of material business records. Fortunately, there is a straightforward remedy at equity: specific performance by Ackerman and Mercury of their obligation to furnish documents. This is the relief the NRA seeks.

DB_0221

## PARTIES

1.      Plaintiff NRA is a not-for-profit corporation organized under the laws of the State of New York with its principal place of business located in Fairfax, Virginia. The NRA is America's leading provider of gun-safety and marksmanship education for civilians and law enforcement. It is also the foremost defender of the Second Amendment of the United States Constitution. A 501(c)(4) tax-exempt organization, the NRA has over five million members—and its programs reach many millions more.

2.      Defendant Ackerman is a nonresident for-profit business corporation organized under the laws of the State of Oklahoma with its principal place of business in Oklahoma City, Oklahoma. Ackerman is an advertising and public relations agency that has counted the NRA among its largest clients for more than thirty years.

3.      Defendant Mercury Group, Inc. ("Mercury" and, collectively with Ackerman pursuant to the Services Agreement, "AMc") is a nonresident for-profit business corporation organized under the laws of the State of Oklahoma with its principal place of business in Alexandria, Virginia. Mercury is a wholly owned subsidiary of Ackerman which specializes in public-communications strategy, including on behalf of advocacy groups such as the NRA. At all relevant times, Ackerman has acted on behalf of both itself and Mercury pursuant to the Services Agreement (defined below) between Ackerman and the NRA.

## RELEVANT NONPARTIES

4.      The NRA Foundation, Inc. (the "NRA Foundation") is a 501(c)(3) tax-exempt organization that raises tax-deductible contributions in support of a wide range of firearm-related public interest activities of the NRA and other organizations that defend and foster the Second

Page 3

DB_0222

Appendix101

Amendment rights of law-abiding Americans. Over the course of its contractual relationship with the NRA, Ackerman has occasionally performed services for the benefit of the NRA Foundation and issued corresponding invoices to the NRA Foundation. Because of its 501(c)(3) designation, the NRA Foundation is permitted to engage in, and fund, a narrower range of activities and communications than the NRA.

## JURISDICTION AND VENUE

5.     The Court has jurisdiction over the NRA's claims in this matter as the claims are subject to a court of general jurisdiction.

6.     This Court has jurisdiction over Ackerman and Mercury pursuant to Virginia Code § 8.01-328.1 because Ackerman and Mercury have both transacted business in the Commonwealth of Virginia and contracted to supply services in the Commonwealth of Virginia.

7.     Venue is proper in this Court pursuant to Virginia Code § 8.01-262 because Mercury's principle place of business is located in Alexandria, there exists a practical nexus to this forum, and/or a part of this cause of action arose in Alexandria.

8.     Additionally, jurisdiction and venue are proper in this Court because Ackerman and Mercury have both contractually consented with the NRA to exclusive jurisdiction and venue of courts sitting within Virginia and waived any objection to venue in Alexandria, Virginia regarding the matters presented herein.

## FACTUAL BACKGROUND

**A.     For More Than Thirty Years, the NRA Has Relied on AMc to Provide Public-Affairs Advice and Services Under Carefully Negotiated Contracts.**

9.     For decades, AMc and the NRA have collaborated closely regarding public affairs and messaging. Over that time, the NRA vested extensive trust and confidence in AMc, relying

DB_0223

upon the agency to perform work including:   public relations and strategic marketing; planning and placement of media; management of digital media and websites; and, the operation of NRATV, a digital-media platform managed by AMc but frequently perceived by the public as the "voice" of the NRA.[1]

10.     Since at least 1999, AMc's work on behalf of the NRA has been governed by successive incarnations of a Services Agreement containing detailed specifications for how various types of work performed by AMc for the NRA should be budgeted and billed.  The Services Agreement between the NRA and AMc dated May 1, 1999 (the "Previous Services Agreement") as well as the current, operative Services Agreement dated April 30, 2017 (as amended May 6, 2018, the "Services Agreement") provide that certain categories of services, such as Owned Media and Internet Services, are compensated with an agreed annual fee, while others are required to be invoiced on an *ad hoc* basis based on estimates furnished by AMc and approved by the NRA.

11.     Both the Previous Services Agreement and the current Services Agreement have obligated AMc to adjust its pricing based on the "fair market value" or "fair market price" of the services performed.  For example, the Previous Services Agreement contained the straightforward assurance by AMc, "we will charge you a fair market price for the work performed." Similarly, the Previous Services Agreement and the current Services Agreement require AMc to provide cost quotations for art concepts, design layouts, and similar items "based on the fair market price of the work as determined by AMc."

12.     Anticipating that AMc would, from time to time, incur out-of-pocket expenses in the course of its work, but mindful of the NRA's mandate to steward its funds in the interest of its

---

[1] *See, e.g.*, Jeremy W. Peters & Katie Benner, *Where The N.R.A. Speaks First and Loudest*, THE NEW YORK TIMES, February 21, 2018, https://www.nytimes.com/2018/02/21/us/politics/nratv-nra-news-media-operation.html.

DB_0224

public mission, the parties bargained for an expense-reimbursement protocol whereby travel and related expenses incurred by AMc could be paid by the NRA—but only upon prior written approval from the NRA in accordance with the NRA's expense-reimbursement procedures.

13.     The NRA's collaboration with AMc has generated important, iconic Second Amendment advocacy. In recent years, the trust and confidence it placed in AMc led the NRA to invest in an expanding suite of services which were—according to AMc's assurances—fairly priced. For example, the NRA agreed to experiment with an "owned media company," NRATV, a concept fervently pitched by AMc. By 2017, the NRA's aggregate payments to Ackerman and Mercury totaled nearly $40 million annually.

14.     As the scope of AMc's work for the NRA grew, AMc represented to the NRA that it was required to hire a substantial number of personnel, as well as incur obligations to third-party contractors, for the exclusive purpose of servicing the NRA's account. Accordingly, when the parties renegotiated a new services agreement in 2017, AMc insisted upon—and the NRA agreed to provide—certain financial assurances in the event that the NRA terminated the Services Agreement. Among other things, upon the NRA's termination, the Services Agreement requires that the NRA compensate AMc for outstanding liabilities to both third-party contractors and employees. Specifically, the NRA must: (i) pay AMc the balance of any compensation owed under "non-cancellable contracts entered into between AMc and third parties for the benefit of the NRA" (as defined under the Services Agreement, the "AMc-Third Party NRA Contracts"); and (ii) pay AMc a termination fee to cover severance payments owed to AMc employees who are "dedicat[ed] . . . to provide services [to the NRA]" and need to be laid off if the Services Agreement is terminated (the "NRA-Dedicated Personnel").

DB_0225

**B.    The NRA Bargained for Transparent Insight Into AMe's Books and Records.**

15.    The NRA bargained for transparency into AMc's files, books and records to ensure

that the NRA, a not-for-profit, could appropriately monitor the use of its funds. Both the Previous

Services Agreement and the current Services Agreement incorporate records-examination clauses

that require AMc to open its files for the NRA's inspection upon reasonable notice. The full text

of the Records-Examination Clause in the Services Agreement appears below:

**Services Agreement**
Dated April 30, 2017 (as amended May 6, 2018)
Between the NRA and AMc (defined to include both Ackerman and Mercury)

**VIII. EXAMINATION OF RECORDS**

During the term of this Services Agreement, AMc authorizes NRA, upon reasonable notice,
to examine AMc and Mercury's files, books and records, with respect to matters covered
under this Services Agreement.

16.    For years, the NRA conducted annual audits of certain AMc files pursuant to the

Records-Examination Clause. Frequently, the audited records consisted of "samples" assembled

in advance by AMc. During 2018, the NRA sought to expand its insight into AMc's activities and

its spending—including full access to certain categories of records rather than sample subsets

gathered by AMc. Surprisingly and unfortunately, that effort ignited the parties' current dispute.

**C.    In Response to Concerns From NRA Employees and Stakeholders, the NRA Attempts to Exercise Its Contractual Record-Examination Right—But Is Rebuffed.**

17.    In late 2016, the State of New York amended its Not-for-Profit Corporation Law

(the "NPCL") to clarify requirements for director independence and the ratification of related-

party contracts, among other items. After updating its internal policies and controls to comply

with the New York amendments, the NRA decided to strengthen its procedures for documentation

and verification of compliance with vendor contracts. Beginning in August 2018, the NRA sent

letters to hundreds of vendors—including AMc—that set forth updated invoice-support

DB_0226

Appendix105

requirements and provided detailed guidance regarding, for example, expense reimbursement procedures.

18.    During the course of this process, the NRA developed concerns that AMc's expenses and activities required closer oversight. Specific concerns that the NRA sought to investigate included:

- "Out of pocket" expenses that lacked meaningful documentation of NRA approvals, receipts, or other support, despite the requirements set forth in the Services Agreement;

- Lack of transparency regarding AMc's annual budgets under the Services Agreement, as well as its adherence to those budgets;

- Lack of transparency regarding "fair market value" determinations;

- Concerns that AMc was invoicing the NRA for the entire salaries attributable to NRA-Dedicated Personnel, despite certain NRA-Dedicated Personnel allocating substantial time to non-NRA clients;

- Refusal to provide certain requested data "in writing" (such as unique visitors, viewership numbers, clickthrough rates, or related performance metrics) that enable the NRA analyze the return on its investment in NRATV.[2]

19.    During early- and mid-2018, the NRA sought information from AMc pursuant to the Records-Examination Clause on a common-interest basis to advance the parties' mutual interests in connection with an ongoing lawsuit. However, after the NRA began to request access to records that would shed light on the above topics, AMc's responses became evasive and hostile. In fact, in September 2018, for the first time in the parties' decades-long course of dealing, AMc demanded that its outside counsel supervise any document review conducted under the Records-Examination Clause, then demanded payment of outside counsel's legal fees as a precondition for delivery of video footage for which AMc had already invoiced the NRA. During a telephone call

---

[2] In addition, certain NRA stakeholders were also concerned that NRATV's messaging—on topics far afield of the Second Amendment—deviated from the NRA's core mission and values.

DB_0227

on September 19, 2018, after AMc's counsel insisted that the NRA pay AMc's legal fees without any insight into why the fees had been incurred, the NRA's counsel observed that AMc's posture seemed more consistent with an adverse than a common-interest relationship. AMc's counsel replied: "Ackerman views the relationship as adverse."

20.     Thereafter, AMc strenuously resisted the NRA's efforts to enforce the Services Agreement, including embarking on a campaign to "kill the messenger" when the NRA sought access to documents or proposed reductions in AMc's budget. At first, AMc scapegoated the NRA's outside counsel. However, over ensuing months, AMc also refused to respond to basic information requests from NRA executives. After the NRA retained a third-party forensic accounting firm to interface with AMc in an effort to appease AMc and gain its compliance in January 2019, AMc indicated it would cooperate. Unfortunately, that pledge of cooperation was short-lived as AMc forbid the accountants from disclosing simple, material information to the NRA—including copies of annual budgets that the NRA allegedly approved. When the NRA's General Counsel sought additional information in follow-up to the forensic audit, AMc ignored his letters.

**D.     AMc Is Concealing Material Information From the NRA, Including a Large Related-Party Contract.**

21.     The NRA brings this action not only because AMc has flagrantly disregarded its contractual obligations, but because the NRA has recently grown concerned that the records AMc is withholding include information material to the NRA's not-for-profit governance and its stewardship of its members' donations.

22.     Lieutenant Colonel Oliver North (Ret.) ("Col. North") is a veteran of the United States Marine Corps and the Reagan administration, a longstanding advocate for the Second Amendment, and a member of the NRA Board of Directors. During May 2018, the NRA

DB_0228

announced that Col. North was slated to serve as its next President—a largely ceremonial but high-profile position famously occupied by Charlton Heston during the late 1990s. As Col. North prepared to assume the presidency of the NRA, he separately discussed a potential engagement by AMc as the host of an NRATV documentary series. On May 6, 2018, the NRA and AMc amended the Services Agreement to affirm that any contract between AMc and Col. North would be considered an AMc-Third Party NRA Contract, for which outstanding compensation would be owed by the NRA to AMc if the Services Agreement was terminated. Importantly, the amendment treated Col. North as a third-party contractor—but not, necessarily, an employee—of AMc.

23.     New York law requires that the NRA Board of Directors, or an authorized committee thereof, review and approve "any transaction, agreement, or any other arrangement in which [a director or officer of the NRA] has a financial interest and in which the [NRA or an affiliate] is a participant."[3] Guidance published by the New York Attorney General notes that a board of directors may define additional restrictions on transactions giving rise to potential conflicts of interest;[4] and, consistent with best practices, the NRA's Conflict of Interest Policy requires disclosure of contracts between NRA leadership and vendors, like AMc, that receive funds from the NRA.

24.     Aware that Col. North entered into a contract with AMc (the "North Contract"), the NRA diligently sought to comply with its obligations concerning analysis and approval of the North Contract. During September 2018, the Audit Committee of the NRA Board of Directors (the "Audit Committee") reviewed a purported summary of the material terms of the North

---

[3] *See* N.Y. N-PCL § 715.

[4] *Conflicts of Interest Policies Under the Not-for-Profit Corporation Law*, CHARITIES BUREAU, N.Y. STATE OFFICE OF THE ATTORNEY GENERAL (2018), https://www.charitiesnys.com/pdfs/Charities_Conflict_of_Interest.pdf, at 3.

DB_0229

Contract and ratified the relationship pursuant to New York law—subject to carefully drawn provisos designed to avoid any conflicts of interest.

25. At the time it ratified Col. North's continued service as an NRA director and President given his relationship with AMc, the Audit Committee was assured that the NRA's counsel would review the North Contract in full. But thereafter, AMc continued to refuse to provide the North Contract pursuant to the Records-Examination Clause. Meanwhile, Col. North indicated via counsel that he could only disclose a copy of the contract to the NRA subject to AMc's consent. This back-and-forth persisted for nearly six months.

26. Eventually, in February 2019, AMc acceded to a brief, circumscribed, "live" review of the North Contract (but no retention of any copies) by the General Counsel of the NRA. This review raised concerns about whether the previous summary of the North Contract which was provided to the Audit Committee had been complete and accurate. Among other things, the NRA's brief, limited review of the North Contract gave rise to questions regarding: (i) whether Col. North was a third-party contractor of AMc or, conversely, a full-time employee with fiduciary duties to AMc that supersede his duties to the NRA; (ii) whether the previously disclosed costs borne by the NRA in connection with the North Contract were complete and accurate; and (iii) whether the contract imposed obligations on Col. North that prevent him from communicating fully and honestly with other NRA fiduciaries about AMc. Against the backdrop of escalating concerns about AMc's compliance with the Services Agreement and applicable law, the NRA became determined to resolve these issues.

27. By letters dated March 25-26, 2019, the NRA's General Counsel again sought visibility regarding the North Contract and other material business records pursuant to the Services Agreement. Specifically, the NRA requested:

DB_0230

- Information about any additional costs relating to AMc's engagement of Col.
  North, to the extent that such costs were being "passed through" to the NRA;

- Copies of any additional AMc-Third Party NRA Contracts currently in existence;

- Information about which AMc personnel purportedly constituted "NRA-Dedicated
  Personnel," such that their salaries or severance were alleged to be reimbursable by
  the NRA, and business records sufficient to show whether these personnel were in
  fact dedicated to NRA projects; and

- Copies of the annual budget documents provided to the NRA's forensic
  accountants.

28.     The NRA made clear that it sought the above information "in whatever form [wa]s

most convenient" for AMc and hoped to obtain access to ordinary-course business records as

contemplated under the Records-Examination Clause.  AMc immediately acknowledged receipt

of the letters and promised to respond. AMc has not done so.  Put simply, the NRA is at the end

of its rope.

E.     **AMc's Disregard of Its Contractual Obligations Will Continue to Damage the NRA.**

29.     AMc's breach of the Services Agreement has damaged—and threatens to

imminently and irreparably harm—the NRA's legitimate operational interests as a not-for-profit

organization. By denying the NRA access to basic information regarding the nature of the services

being performed, the putative budgets for these services, and the material terms of third-party

contracts for which the NRA is purportedly liable, AMc is interfering with the NRA's ability to

steward its funds in pursuit of its public mission.   Moreover, AMc's baseless refusal to permit a

fulsome review of the North Contract threatens to impede the NRA's corporate governance

process.

30.     If the NRA is denied access to material business records regarding its largest vendor

relationship—records which it specifically bargained to access, under the Services Agreement—

the NRA's fiduciaries will be forced either to exercise their business judgment based on

DB_0231

incomplete information or defer resolution of pressing matters. There is no adequate remedy at law for the risks that would arise in either scenario. The NRA is America's oldest civil rights organization and an advocate for millions of law-abiding gun owners. Its compliance with not-for-profit law cannot be permitted to be held hostage by a recalcitrant advertising agency.

### DEMAND FOR JURY TRIAL

31.     Plaintiff hereby demands a trial by jury regarding all issues of fact in this case.

### FIRST CAUSE OF ACTION

### BREACH OF CONTRACT AND REQUEST FOR SPECIFIC PERFORMANCE
### (Against All Defendants)

31.     Plaintiff incorporates by reference and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

32.     The Services Agreement is a legally enforceable contract.   The Records-Examination Clause is unambiguous.

33.     The NRA has performed all of its obligations under the Services Agreement, including its obligation to provide reasonable notice pursuant to the Records-Examination Clause.

34.     Ackerman and Mercury have breached the Records-Examination Clause of the Services Agreement. Specifically, Ackerman—acting at all times on behalf of both itself and Mercury, pursuant to the Services Agreement—has repeatedly failed or refused to permit the NRA to examine specified categories of books and records with respect to matters covered under the Services Agreement.

35.     There is no adequate remedy at law for AMc's refusal to permit examination of records (whether they reside at Ackerman or Mercury) pursuant to the Services Agreement. The information sought by the NRA pursuant to the Records-Examination Clause resides uniquely

DB_0232

within the possession of Ackerman and/or Mercury, and cannot be acquired by the NRA on the open market for any sum of money.

36.     The nature of the obligation imposed by the Records-Examination Clause makes specific performance equitable and practical because the Court need only order AMc to furnish to the NRA: (i) copies of any AMc-Third Party NRA Contracts; and (ii) business records, in whatever form they were generated in the ordinary course of AMc's business, which are sufficient to convey the information sought by the NRA as described in Paragraph 27 hereof.

37.     Defendants' breaches of the Services Agreement have damaged—and threaten to imminently, irreparably harm—the NRA's legitimate operational interests as a not-for-profit organization. By denying the NRA access to basic information regarding the nature of the services being performed, the putative budgets for these services, and the material terms of third-party contracts for which the NRA is purportedly liable, Defendants have jeopardized the NRA's ability to steward its funds in pursuit of its public mission.   Moreover, AMc's continued and baseless refusal to permit a fulsome review of the North Contract threatens to impede the NRA's corporate governance.

38.     By reason of the foregoing, the NRA requests that this Court order specific performance by Defendants of their obligations pursuant to the Records-Examination Clause of the Services Agreement.

## REQUEST FOR RELIEF

Wherefore, for all the foregoing reasons, Plaintiff requests relief as follows:

a,     A judgment against each of Ackerman and Mercury for breach of contract;

b,     An award of specific performance to the NRA requiring that:

DB_0233

a. AMc furnish copies of all AMc-Third Party NRA Contracts to the NRA within three (3) business days of the entry of such order; and

b. Within ten (10) business days of the entry of such order, AMc furnish to the NRA:

    i. Copies of annual budgets for the years 2016-2018, which AMc alleges were approved by the NRA and were previously provided to the NRA's forensic accountants;

    ii. A list of all current NRA-Dedicated Personnel (as defined in the NRA's letter correspondence) and, for each such employee, copies of business records sufficient to show the amount or percentage of the employee's time that was dedicated to NRA projects during the period from January 1, 2018, to present;

    iii. Copies business of records sufficient to show the extent of any costs invoiced to the NRA or the NRA Foundation, during the period from January 1, 2018, to April 1, 2019, which costs were incurred by reason of:

        (1) The production of the NRATV documentary series "American Heroes;" or

        (2) Cash or non-cash compensation to Col. North or North-related Staff; or

        (3) Office space or other perquisites provided to Col. North or North-related Staff; and

        (4) Whether each item was billed specifically to the NRA, the NRA Foundation, or both entities; and

DB_0234

c.   Such other and further relief to which the NRA may be entitled at law or in equity.

Respectfully submitted,

James W. Hundley (VA Bar No. 30723)
Robert H. Cox (VA Bar No. 33118)
Amy L. Bradley (VA Bar No. 80155)
BRIGLIA HUNDLEY, P.C.
1921 Gallows Road, Suite 750
Tysons Corner, VA 22182
jhundley@brigliahundley.com
rcox@brigliahundley.com
abradley@brigliahundley.com
Phone: 703-883-0880
Fax: 703-883-0899

**ATTORNEYS FOR THE NATIONAL RIFLE
ASSOCIATION**

DB_0235

Appendix114

# EXHIBIT 19

**VIRGINIA:**

### IN THE CIRCUIT COURT FOR THE CITY OF ALEXANDRIA

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | **Case No. CL19001757** |
| | ) | |
| **ACKERMAN MCQUEEN, INC.** | ) | |
| and | ) | |
| **MERCURY GROUP, INC.** | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | **Case No. CL19002067** |
| | ) | |
| **ACKERMAN MCQUEEN, INC.** | ) | |
| and | ) | |
| **MERCURY GROUP, INC.** | ) | |
| Defendants. | ) | |

### OPPOSITION TO PLAINTIFF'S MOTIONS
### FOR *PRO HAC VICE* ADMISSION OF BREWER ATTORNEYS

Defendants, Ackerman McQueen, Inc. and Mercury Group, Inc. hereby oppose the

Motions for *Pro Hac Vice* Admission for additional attorneys in the above-captioned cases.

The attorneys, Michael Collins and Paul B. Maslo, are partners in the law firm of Brewer

Attorneys & Counselors who seek to be allowed to serve as counsel of record in this case and

to enjoy access to all confidential information generated and produced in this litigation.

1

The Defendants' opposition is based on the following grounds:

1.        Brewer Attorneys & Counselors and/or their founding partner, William A. Brewer III, were identified 26 times in the Defendants' Counterclaim in the first NRA v. AMc case and 23 times in the Defendants' Counterclaim in the second NRA v. AMc case. The attorneys seeking admission *pro hac vice* are very likely to become witnesses in the case based upon the involvement of their law firm in the underlying claims and their status as partners in the law firm. Pursuant to the Virginia Rules of Professional Conduct, Rule 3.7, a lawyer shall not act as an advocate in an adversarial proceeding in which the lawyer is likely to be a necessary witness. None of the exceptions to Rule 3.7 apply to this situation. Moreover, it is believed that the testimony of these two attorneys will be adverse to the position of their client, the NRA, and therefore will create a disqualifying conflict for the attorneys.

2.        The Brewer law firm partners are not only witnesses in the litigation, but they stand to benefit personally from the litigation. Brewer Attorneys and Counselors has an "in-house strategic communications practice" that has already poached substantial portions of the NRA business that Defendant AMc has handled for over 38 years. As partners in the competing entity, Collins and Maslo stand to benefit financially from litigation intended to attack and undermine their competitor, AMc.

3.        Serving as counsel against a competitor not only has financial benefits for Collins and Maslo, but it will also extend to the Brewer law firm partners the extraordinary right to browse through the privileged and proprietary information of AMc under the guise of serving as counsel for the NRA.

4.        The two Brewer law firm attorneys who seek admission *pro hac vice* are stand-ins for the head of the firm – William Brewer. William Brewer has already boasted to the Wall

Appendix117

Street Journal that he is "spearheading" this litigation in an article published on April 15, 2019. As detailed in AMc's Abuse of Process claims, Brewer's litigation strategy – which began with a frivolous suit to obtain information for the NRA that the NRA already had and continues to the current practice of subpoenaing the NRA's own board members to intimidate them not to cooperate with AMc -- is an abuse of the process of this Court. By allowing Brewer to work through his own proxies, Collins and Maslo, Brewer will continue to have an abusive impact on the litigation.

5.      Brewer must work through proxies because he has cannot credibly appear on a *pro hac vice* motion. Brewer was sanctioned with a fine exceeding $100,000 in West Texas for misusing public relations tactics in an effort to taint a jury pool in a high-profile case in West Texas. Mr. Brewer then compounded his problem by failing to disclose this West Texas sanction when he sought *pro hac vice* status in a case representing the NRA in the Eastern District of Virginia. Mr. Brewer was admonished and removed as counsel when the false *pro hac vice* application was discovered by Federal Judge Liam O'Grady. Brewer recognized that he faces insurmountable hurdles to convincing this Court that he should be admitted *pro hac vice* when the federal court in this very city of Alexandria revoked his *pro hac vice* status for providing a falsified *pro hac vice* application.

6.      The admission of the two Brewer law firm partners would be superfluous. The NRA already has three attorneys with the law firm Briglia & Hundley who are capable of litigating this case. Adding attorneys who brag about using aggressive litigation tactics "from beginning to end"[1] of each case will result in the overlitigation of these cases and impose a burden on the Court as well as the parties.

---

[1]      *See* Brewer Attorneys & Counselors web page at: https://www.brewerattorneys.com

3

Appendix118

As described in the Counterclaim advanced by AMc in the second law suit, Mr. Brewer has spearheaded the litigation tactics of the NRA in the two suits against AMc in a way that abuses the process of this Court to gain a public relations advantage, smear AMc, and intimidate witnesses supportive of AMc.  Mr. Brewer should not be allowed to insert his proxies into this litigation in order to create further harm to AMc.

WHEREFORE, the Defendants respectfully request that the Court deny the motions of the Brewer law firm partners to participate *pro hac vice* in these two cases.

Respectfully submitted,

ACKERMAN MCQUEEN, INC. and
MERCURY GROUP, INC.
By Counsel

Dated:  June 24, 2019

/s/   David H. Dickieson
David H. Dickieson (VA Bar #31768)
David Schertler (*Pro hac vice* pending)
SCHERTLER & ONORATO, LLP
901 New York Avenue, NW, Suite 500
Washington, DC  20001
Telephone:  202-628-4199
Facsimile:  202-628-4177
ddickieson@schertlerlaw.com
dschertler@schertlerlaw.com

4

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2019, the foregoing pleading was served on the following

counsel via electronic mail addressed to:

James W. Hundley
Robert H. Cox
BRIGLIA HUNDLEY, PC
1921 Gallows Road, Suite 750
Tysons Corner, VA 22182
jhundley@brigliahundley.com
rcox@brigliahundley.com

/s/ David H. Dickieson
David H. Dickieson.

5

# EXHIBIT 20

Appendix121

June 26, 2019 Statement from Ackerman McQueen

The NRA is attempting to avoid the strict financial obligations it undertook when it outsourced its work to Ackerman McQueen. NRA has the obligation to pay several millions of dollars of delinquent payments for work already completed that has benefitted the NRA. They are refusing to pay, in part to harm AMc, but also because the NRA probably is having trouble meeting its financial obligations in large measure due to massive unbudgeted legal costs. The NRA's decision to smear Ackerman McQueen with false allegations to excuse their non-payment is no different than their behavior with Lt. Col. Oliver North; the head of the NRA-ILA;  the NRA Board's long term legal counsel and the intimidation tactics used to make people fear the current leadership.

Ackerman McQueen is not surprised that the NRA is unwilling to honor its agreement to end our contract and our long-standing relationship in an orderly and amicable manner, as Ackerman McQueen proposed because we believed it was in the best interest of the members of the NRA. When given the opportunity to do the right thing, the NRA once again has taken action that we believe is intended to harm our company even at the expense of the NRA itself. For Ackerman McQueen, it is time to move on to a new chapter without the chaos that has enveloped the NRA. Ackerman McQueen will continue to fight against the NRA's repeated violations of its agreement with our company with every legal remedy available to us, but we will always be proud of the work that we completed during our 38-year relationship on behalf of the individual citizens that are the NRA.

# EXHIBIT 21

Appendix123

# In the Matter of:

## National Rifle Association of America
v.
## Ackerman McQueen, Inc.
&
## Mercury Group, Inc.

## Motion

June 26, 2019



Phone: 703-837-0076
Fax: 703-837-8118
Toll Free: 877-837-0077

1010 Cameron Street
Alexandria, VA 22310
transcript@casamo.com

```
 1   COMMONWEALTH OF VIRGINIA

 2   IN THE ALEXANDRIA CIRCUIT COURT

 3   -----------------------------------

 4   NATIONAL RIFLE ASSOCIATION OF AMERICA,

 5                          Plaintiff,

 6            -vs-                Case Nos. CL 19001757
                                                 and
 7                                      CL 19002067

 8   ACKERMAN MCQUEEN, INC.

 9   and

10   MERCURY GROUP, INC.

11                          Defendants.

12   -----------------------------------

13               HEARING in the above-entitled matter,

14           held in Alexandria Circuit Court in

15           Alexandria, Virginia on June 26, 2019, before

16           the HON. NOLAN DAWKINS, Presiding Circuit

17           Court Judge.

18

19

20

21   Reported by:

22   Jacqueline N. Hagen
```

```
 1                      A P P E A R A N C E S

 2

 3   ON BEHALF OF PLAINTIFF:

 4         BRIGLIA HUNDLEY, P.C.
                1921 Gallows Road
 5              Suite 750
                Tysons Corner, Virginia 22182
 6         BY:  ROBERT H. COX.  Esq.
                rcox@brigliahundley.com
 7              (703) 883-0880

 8         BREWER ATTORNEYS & COUNSELORS
                1717 Main Street
 9              Suite 5900
                Dallas, Texas 75201
10         BY:  MICHAEL J. COLLINS
                mjc@brewerattorneys.com
11              (214) 653-4875

12   ON BEHALF OF DEFENDANT:

13         SCHERTLER & ONORATO, LLP
                901 New York Avenue, N.W.
14              Suite 500
                Washington, DC 20001
15         BY:  DAVID DICKIESON, Esq.
                ddickieson@schertlerlaw.com
16
       ALSO PRESENT:
17
           ACKERMAN MCQUEEN, INC. and MERCURY GROUP, INC.
18              1601 Northwest Expressway
                Suite 1100
19              Oklahoma City, Oklahoma 73118
           BY:  BILL WINKLER
20              (703) 299-9470

21

22
```

Motion

Page 3

1  P R O C E E D I N G S
2      (Whereupon the proceedings began at
3  10:57 a.m. )
4      MR. COX:  Your Honor, Bob Cox
5  representing the National Rifle Association.
6      THE COURT:  Okay.
7      MR. COX:  And with me is Michael
8  Collins, who's the subject of the motion for
9  pro hac vice.  It's one of the motions that's
10 contested today.
11     THE COURT:  Again, let the record
12 reflect this is the matter of Commonwealth
13 vs. Ackerman McQueen, Inc., and Mercury Inc.
14 The matter comes on cross motion for pro hac
15 vice; is that correct?
16     MR. DICKIESON:  There's a number of
17 other motions, your Honor.  There's a motion
18 for preliminary injunction.
19     THE COURT:  That's not going to happen,
20 sir.  It just can't.  I can't do that.  I
21 don't understand how it's possible that I can
22 do a preliminary injunction in this matter in

Page 4

1  30 minutes.  It can't happen.
2      MR. DICKIESON:  Your Honor, if I
3  could --
4      THE COURT:  Can't happen.
5      MR. DICKIESON:  If I could address the
6  Court on that issue, that -- this is a matter
7  that there's going to be 40 five to 60
8  employees laid off within the week if we
9  cannot get the relief that we're requesting
10 the Court.  We've asked the supervisor of the
11 -- the court schedule if we could get one
12 specially set later this week or even early
13 next week.  Nothing is available until after
14 the Fourth of July when these people will be
15 furloughed, terminated, and their -- their
16 lives will be disrupted.  The AMc, Ackerman
17 McQueen business will -- will suffer good
18 will, harm, and substantial loss of the
19 employees that it needs.  So that's why we --
20 we talked with the law clerk, the -- the
21 Court's law clerk, and we said we'd take
22 whatever time we got.  We --

Page 5

1      THE COURT:  That's him.
2      MR. DICKIESON:  We'll take whatever the
3  time the Court will give us, but this is the
4  most important issue that needs to be
5  addressed today.  The other issues can wait
6  until another day, but we need to deal with
7  the irreparable harm that will befall AMc
8  within the week.  That's why we have -- I
9  have with me the CFO of AMc, who came here
10 from Oklahoma City.  He's prepared -- he's
11 submitted a declaration.  He's prepared to
12 testify, if necessary.  But we understand
13 that the Court is not going to have
14 evidentiary hearing on this, but he's here to
15 provide me with the information about the
16 irreparable harm that will befall to AMc if
17 we cannot get this matter relief from the
18 Court today.
19     So we'd ask that the 30 minutes be
20 devoted to the preliminary injunction.  If we
21 don't finish, then we'll set it for some
22 matter, but we believe that we need the

Page 6

1  relief this week for this matter.
2      MR. COX:  Your Honor, our position,
3  first, that we would like to find out today
4  whether Mr. Collins is in or out of the case,
5  also to determine whether the Brewer firm is
6  or in out of the case, potentially.  We'd
7  like that motion heard first.  We -- we've --
8  Mr. Dickieson and I have communicated with
9  the clerk.  Our position is that we don't
10 believe that there is sufficient time for a
11 preliminary injunction hearing and -- but we
12 think that the -- if the Court is willing to
13 entertain this motion today, that we feel
14 that they're -- they have not met their
15 burden as a matter of law to prove the
16 relief.  This is a mandatory preliminary
17 injunction.
18     And, secondly, if the Court is not
19 inclined to rule in favor, we think it's
20 appropriate for an evidentiary hearing, and
21 that should be set down for a date certain
22 that would give the parties time to issue

Page 7

1    some limited written discovery, just getting
2    factual information. They have a declaration
3    they've submitted, no documents, no financial
4    statements, no back-up about the financial
5    and irreparable harm here. We feel we should
6    conduct limited written discovery and take
7    two to three depositions.
8        THE COURT: And I understand that the
9    alleged irreparable harm is that you're going
10   to lose -- you're going to lose 40 employees;
11   is that correct?
12       MR. DICKIESON: 45 to 60 employees
13   within the week, your Honor.
14       THE COURT: But that means they won't
15   get paid. You won't lose them.
16       MR. DICKIESON: Your Honor, they're
17   going to be looking for other work.
18       THE COURT: That may be so, but that's
19   speculative, at best. But I just don't know
20   how I can do it. I don't have to do it -- I
21   don't have to do it today, based on what I --
22   what I read so far, and let me -- let me

Page 8

1    advise counsel, too. I'm going to -- I'm
2    going to probably give you a little more than
3    30 minutes. I'm going to give everyone,
4    since we got outside counsel, a copy of the
5    local rules since I've been -- we've been
6    receiving -- receiving documents as early --
7    as late as yesterday for the Court's
8    consideration, and that's just not the
9    appropriate way to do it in this court.
10       Can I just hand each of you a copy of
11   the local rules so you know what the
12   timelines are in the future with regard to
13   filing the pleadings?
14       MR. DICKIESON: Thank you.
15       MR. COX: Thank you, your Honor.
16       THE COURT: All right. Now, with regard
17   to Mr. Cox, I hear -- I hear the motion. As
18   I understand it, the motion is that Mr.
19   Collins is associated with Mr. Brewer; is
20   that correct?
21       MR. COX: He is partner with the Brewer
22   firm. He's in the Dallas office, not in the

Page 9

1    New York office.
2        THE COURT: And Mr. Collins is willing
3    to, essentially, expose himself to the
4    potential for malpractice and other claims
5    that may result if -- if, in fact, he is
6    associated to the extent that he has inside
7    knowledge as it relates to the plaintiff. It
8    seems to me that's -- that's a major risk
9    he's taking, you know. You're saying that --
10   that partner A can be here, and partner B can
11   be on the other side. You can't serve two
12   masters. How's that's possible?
13       MR. COX: Your Honor, under Rule 3.7(c),
14   the allegation here is that Mr. Brewer is a
15   potential witness.
16       THE COURT: A potential witness, that's
17   right.
18       MR. COX: And so because the fact that
19   Mr. Brewer is a witness doesn't impute
20   disqualification under Rule 1.10 or
21   Rule 3.7(c) to the entire firm. So our
22   position is the fact that Mr. Brewer might be

Page 10

1    a witnesses in this case -- only that 3.7
2    would impute disqualification to the firm is
3    if there's an actual conflict of interest
4    under Rule 1.7 or Rule 1.9, and our position
5    is that is that there's no actual conflict of
6    interest here.
7        First, there's a matter of law. We
8    dispute the allegations in the counterclaim
9    that somehow the -- the firm is benefitting
10   financially from -- from media relations.
11   They have a staff of four people. They
12   cannot undertake the work that Ackerman
13   performs for the NRA as a media relations
14   department that they use strictly for pending
15   cases. So we dispute the factual allegations
16   that Mr. Collins would be financially
17   benefitting from any diversion of -- of
18   marketing from business from Ackerman.
19       And our position is that all they've
20   alleged is that Mr. Brewer, right now, is a
21   potential witness in the case. At that
22   point, under my reading of the -- the case

Page 11

1 law, there's not much in Virginia, your
2 Honor. We've cited to some Fourth Circuit
3 and EDVA law that that's not enough to
4 disqualify the firm.
5 Our feeling is that on a motion for
6 pro hac vice, the Court is looking primarily
7 at the fitness and character of the attorney,
8 and this is more appropriate for a motion for
9 disqualification. If they discover facts
10 during the course of the discovery or they
11 take Mr. Brewer's deposition and there does
12 appear to be an actual conflict under
13 Rule 1.7 and 1.9, I think, at that point, it
14 would be appropriate for a motion to
15 disqualify or, on our own, we may withdraw.
16 If there becomes an actual ethical conflict
17 here, at that point, the Brewer firm will
18 consider withdrawing.
19 THE COURT: Yes, sir.
20 MR. DICKIESON: Your Honor, it's not our
21 position that Mr. Brewer is going to be the
22 only witness in that firm, but that the other

Page 12

1 partners in the firm are also going to be
2 witnesses. They're intricately linked.
3 They're billing $20-some million a year for
4 the NRA for litigation strategies when we
5 have an abuse of process as a counterclaim,
6 and, therefore, we believe that Mr. Collins
7 will be a key witness in the case. And that
8 not only disqualifies him as for counsel, but
9 we believe he will have evidence -- he will
10 testify contrary to the interests of the NRA,
11 and that disqualifies not only him, but the
12 entire firm.
13 THE COURT: Is Mr. Brewer still
14 associated with the firm with NRA?
15 MR. DICKIESON: Mr. Brewer is the -- the
16 founding and -- it's called Brewer Attorneys
17 and Associates or something.
18 MR. COLLINS: That's incorrect.
19 MR. DICKIESON: Attorneys and
20 Counselors. So yes, he's still associated
21 with the firm. He's still counsel for the
22 NRA, as well.

Page 13

1 THE COURT: Somebody explain to me how
2 you can -- how can you represent both sides?
3 I'm -- I guess I'm -- I'm not following this.
4 Yes, sir?
5 MR. COX: Your Honor --
6 THE COURT: And I recognize that for
7 purposes of the pro hac vice, that -- that I
8 think that I'm limited to what the rules
9 require, but I'm -- but that's -- that's
10 expanded further. How -- how does one
11 represent both sides of -- of the action?
12 MR. COX: Well, I guess, your Honor,
13 it's our position Mr. Brewer is not
14 representing both sides of the action. He's
15 not seeking to be litigation counsel or trial
16 counsel in this case. He's -- he is a
17 partner in the Brewer law firm, but my
18 reading of the ethical rules and obligations
19 are that just because he may be a witness
20 does not disqualify the firm again. And then
21 I, I guess -- there's no actual conflict
22 that's been demonstrated at this point. I

Page 14

1 mean, the only conflict -- 1.9 deals with
2 former clients. 1.7 deals with an actual
3 client. So the only conflict would be if it
4 was demonstrated Mr. Brewer was going to be
5 called as a witness and testified adversely
6 to the National Rifle Association.
7 And at this point, I -- I -- Mr. Brewer
8 has not identified that he would have
9 information that would be in conflict with
10 the NRA's positions in this litigation, and,
11 your Honor, if you want to hear from Mr.
12 Collins, Mr. Collins has not had a direct
13 role in the dispute between the NRA and
14 Ackerman with regard to invoices and the
15 factual matter.
16 So I don't know where Mr. Dickieson is
17 coming from that he's a factual witness in
18 this case, and -- and Mr. Brewer and his firm
19 has never represented Ackerman or Mercury
20 Group, and so I don't see how they're on both
21 sides. They've always represented the
22 National Rifle Association.

Appendix129

Page 15

1    MR. DICKIESON:  Your Honor, my client is
2   reminding me that the Brewer law firm is
3   actual a client of Ackerman McQueen and has
4   been a long-term client of the firm.  But
5   it's not just that they are witnesses in this
6   case.  They financially benefit.  They have
7   an in-house public relations unit in the firm
8   that is siphoning away business from Ackerman
9   McQueen for the NRA work, and that's --
10   that's a key factor in this case, what's
11   happening to the work that's being taken away
12   from AMc.
13       This is about abuse of process.  This is
14   a small law firm, Brewer and Associates and
15   Counselors.  There's not that many attorneys
16   there.  I assume -- I think he's the number
17   two person there.  To say he knows nothing
18   about the $21 million that the NRA is -- is
19   -- is billing -- that he's billing the NRA is
20   not believable.
21       THE COURT:  And not withstanding the
22   potential conflict that exists if he

Page 16

1   continues to represent the NRA, Mr. Brewer
2   does, or the Brewer firm.
3       MR. DICKIESON:  The Brewer firm does.
4       THE COURT:  Is that correct?
5       MR. COX:  Your Honor, yes, yes, they do.
6   Not in this case, I mean, the Brewer firm
7   would be representing -- or Mr. Collins would
8   be coming in as litigation counsel.  But,
9   yes, the NRA is a client of the Brewer firm,
10   but again --
11       THE COURT:  Does Mr. Collins have,
12   necessarily, information that is provided to
13   the Brewer firm that would be a detriment to
14   the NRA?
15       MR. COX:  Your Honor --
16       THE COURT:  Is there a wall?  You know,
17   the old -- the old -- the old saying?  It's
18   "I'm going to put up a wall."  I'm not going
19   to use the first part, but I'm going to put
20   -- saying that I'm going to put up a wall.
21   You know what the old saying is -- is that --
22   that's a little racist to say, to use the

Page 17

1   entire term but -- the entire term, but he's
2   going to put up a wall, and Mr. Brewer -- I
3   mean, Mr. Collins will never have access to
4   any information that relates to the NRA?  Is
5   that correct?  We have --
6       MR. DICKIESON:  I think you mean AMc, my
7   client, AMc.
8       THE COURT:  AMc.  I'm sorry.  Yes.
9       MR. COX:  I mean, Mr. Collins is in a
10   different office.  He's in the Dallas office.
11   Mr. Brewer is in the New York office, and I'm
12   -- I'm not disputing it's a small firm.
13   Sixty lawyers --
14       THE COURT:  This is the 21st century.
15       MR. COX:  Yeah, and -- and -- but, you
16   know, I can -- if the Court wants to hear
17   from Mr. Collins about that, I'm unfamiliar
18   with what exact work the -- the Ackerman
19   group does for the Brewer law firm.
20       THE COURT:  Yes, Mr. Collins.
21       MR. COLLINS:  Yes, your Honor.  I,
22   obviously, represent the NRA in connection

Page 18

1   with this case and a number of matters.  I
2   myself am not the client contact.  I've
3   actually never had a substantive discussion
4   with any client representative from the NRA.
5   I've never done any work for Ackerman
6   McQueen.
7       Now, I think it is correct they had done
8   some website service and things for the
9   firm -- Ackerman McQueen has -- but we've
10   never done any legal work, to my
11   understanding.  I know I've never done any
12   legal work for Ackerman McQueen, ever.  So,
13   your Honor, as far as being on both sides,
14   I'm not on both sides.  The firm is not on
15   both sides.  I'm not aware of any unique
16   knowledge I have with respect to any claims
17   or defenses they are serving other than what
18   litigation counsel would have that -- like
19   Mr. Cox has.
20       I've never spoken, I don't think, to any
21   employee of Ackerman Mercury group.  Maybe
22   years ago about the work they were doing for

Page 19

1  the firm, but nothing to do with this matter,

2  your Honor, against Ackerman McQueen and

3  Mercury Group. So also, your Honor, whatever

4  knowledge I would have, I wouldn't be the one

5  with the most unique knowledge. At least,

6  that's my understanding. One of the elements

7  of 3.7 is --

8      THE COURT: But isn't the case if he has

9  any knowledge, that could -- that could

10  potentially be a conflict?

11      MR. COLLINS: Well, it could be a

12  conflict with the NRA, your Honor? Or a

13  conflict with them?

14      THE COURT: I would say with both.

15      MR. COLLINS: Okay. Well, your Honor,

16  with respect to them, the attorney always

17  gains knowledge during the case. I'm not

18  sure of any unique knowledge I have outside

19  of this case, at all. With respect to the

20  NRA, your Honor, the issue is -- for the

21  attorney is the attorney's always going to

22  know something. So what the Court said is

Page 20

1  since we want to be careful because

2  disqualifications and related-type

3  proceedings could be used as a key to motive

4  that, unless the attorney is essential to the

5  case, it's a fact they can't get otherwise,

6  you don't lock out the attorney.

7      And, your Honor, at least I know in

8  Texas and in many other jurisdictions -- I

9  don't know if it's any different in Virginia

10  -- that the attorney -- if it's a bench

11  trial, the attorney could still do this whole

12  case. If it's a jury trial, they could do

13  the case up to the jury trial. This Court is

14  sophisticated enough to know the difference

15  between attorney testimony and other

16  testimony and not to be unduly swayed. It's

17  only when a jury gets involved that we're

18  concerned. And my understanding, your Honor,

19  is the NRA knows all about the potential

20  conflict and has no problem, whatsoever.

21      So you put all those things together,

22  your Honor, I'm just not sure if this even

Page 21

1  gets close to 3.7. And as far as me being a

2  witness, they can speculate. We had the same

3  issue that their attorneys are trying to

4  pro hac about whether they're involved in the

5  underlying facts, you know. We just think

6  the best way is for both sides to get

7  admitted, and then, if someone has got a

8  disqualification issue, they can raise it.

9  And yes, we'll take it seriously, your Honor.

10  If they've got grounds for us and they

11  explain those grounds for us, we'll take them

12  very seriously. But, as I say, your Honor,

13  pretty much the rule is until you actually

14  hold a jury trial, that attorney can take the

15  depositions, can do the hearings before the

16  judge. And I'll answer any other questions

17  you may have, your Honor.

18      THE COURT: The motion is granted. The

19  motion is granted.

20      MR. COX: Okay. Thank you, your Honor.

21      THE COURT: What's that?

22      MR. DICKIESON: Your Honor? There was a

Page 22

1  pro hac vice motion for the attorneys on our

2  side that was not contested.

3      THE COURT: That was -- that was by

4  consent?

5      MR. DICKIESON: Right. Yes, sir.

6      THE COURT: That, likewise, is granted.

7      MR. DICKIESON: And the motion to

8  consolidate is --

9      THE COURT: That motion is granted.

10      MR. DICKIESON: All right. So that

11  leaves us getting to the heart of the matter

12  of preliminary injunction. If I could begin

13  on that, your Honor, in the time we have

14  left?

15      THE COURT: I'll allow you 15 minutes.

16      MR. DICKIESON: All right. What are we

17  witnessing here, your Honor, is the implosion

18  of the NRA. Let me -- let me correct this.

19  It's not an implosion. It's an explosion

20  because it's not simply harming the NRA, it's

21  harming those people that are in proximity to

22  the NRA. And AMc happens to be one of those

Page 23

1    people in the proximity that is now being
2    harmed by the NRA's actions. They have
3    stopped making payments on millions of
4    dollars of invoices that they routinely paid
5    for 38 years to AMc.
6        THE COURT: Let me -- that's a
7    collection matter. As I understand it, this
8    is a breach of contract, collection. I think
9    there's an issue with past due accounts
10   and --
11       MR. DICKIESON: Abuse of process.
12       THE COURT: Abuse of process. That's
13   right.
14       MR. DICKIESON: Counterclaim.
15       THE COURT: So -- so to a much higher
16   sense, this is a collection matter. You --
17   you -- you haven't been paid, and want to be
18   paid. So you come to court and you ask the
19   Court to rule against one party or the other
20   to be -- to be paid; is that correct?
21       MR. DICKIESON: Yes, your Honor, but
22   what we're also trying to do is enforce the

Page 24

1    contract. And the Court has the equitable
2    power to enforce the contract, and here,
3    where there's an irreparable injury, 40 five
4    to 60 employees who will be forced to be
5    terminated or furloughed if the NRA does not
6    follow through on their obligations, which is
7    clear in -- in the contract that they have to
8    pay the invoices within 30 days. If they
9    don't pay within 30 days, they have to post a
10   $3 million letter of credit.
11       They haven't paid within 30 days. They
12   haven't posted a letter of credit. This
13   Court has the power to enforce that contract.
14   Now, what they responded with on Monday was a
15   rather pedestrian brief that says, "Well, we
16   -- we have the likelihood of success on our
17   side because there's issues that they
18   breached first." But the likelihood of
19   success -- when you look at this issue, they
20   have the invoices. They have 10 days to
21   contest the invoices. They didn't contest
22   them within 10 days. They have 30 days to

Page 25

1    pay them. It's all written out there. It's
2    all clear. They can't contest those facts.
3    They have to post a $3 million letter of
4    credit in that situation. This Court has the
5    power to prevent the irreparable harm that's
6    about to fall to AMc.
7        Now, what we are seeing -- they filed a
8    breach -- as I say, a rather pedestrian brief
9    -- on Monday laying out the -- the four
10   elements. What they didn't tell the Court
11   and what they didn't tell us on Monday is
12   that on Tuesday, they're sending out a notice
13   to terminate the entire contract. And he
14   hasn't mentioned that yet. It wasn't
15   mentioned in the brief, and we think that
16   what this is is that we have already issued a
17   90-day notice to wind down the contract and
18   orderly end this relationship that has turned
19   sour. That's the logical, rational,
20   reasonable business thing to do. The day
21   before -- the night before, 7 o'clock last
22   night, we get a letter that says, "We are

Page 26

1    terminating the contract entirely. We're not
2    paying anything more."
3        THE COURT: And that contract amounts to
4    $40 million a year; is that correct?
5        MR. DICKIESON: I think the last year
6    that that was the total amount that was paid
7    but that -- a number of that goes to
8    expenses, for example, paying talent, such as
9    Oliver North, who's paid several million
10   dollars a year for his role in the NRA TV,
11   which is produced and managed by Ackerman
12   McQueen. Ackerman McQueen has served as the
13   voice of the NRA for -- for decades, and they
14   are intertwined in the NRA business. So what
15   -- what the situation is here: We have a
16   very complex relationship that has to be
17   pulled apart, and what they did last night
18   was saying "Take an axe and just cut it right
19   in half, and don't worry about any of the
20   consequences."
21       Now, we don't think that notice is valid
22   because before they can terminate, they got

Appendix132

Page 27

1     to pay everything that they owe, but they
2     haven't done that. So we're still in a
3     situation where we're trying to do a 90-day
4     termination period, gradually and with, as it
5     says in the contract, good faith
6     negotiations. They're not interested in good
7     faith negotiations. They're interested in,
8     before this hearing, disrupting the process
9     by saying, "We're terminating."
10         THE COURT: But correct me if I'm wrong.
11     The invoice that we're talking about is a
12     $1.6 million invoice; is it not?
13         MR. DICKIESON: That's the -- the sum of
14     the -- these eight invoices.
15         THE COURT: But the -- the -- the credit
16     would be 1.6 million?
17         MR. DICKIESON: Correct.
18         THE COURT: And if you lose a
19     $40 million contract, you're going to lose
20     those 65 clients -- 65 employees, anyway,
21     aren't you?
22         MR. DICKIESON: They're going to be

Page 28

1     transitioned away, not -- not severed
2     immediately, your Honor, and that's -- that's
3     when you -- when you talk about people's
4     lives and whether or not you give them 90
5     days to transition or to transition tomorrow,
6     that's -- that's -- that's a concrete harm.
7     This Court deals with harms that are much
8     less significant than that and --
9         THE COURT: This is more about the 1.6
10     as opposed to the 40 million?
11         MR. DICKIESON: 1.6 plus we've been
12     required to do work since that May 1st
13     invoice was issued, and I believe that
14     there's equivalent amount that's
15     already due since that last invoice.
16         THE COURT: All right. Yes, sir.
17         MR. DICKIESON: And that's why the $3
18     million letter of credit is the logical thing
19     that this Court can do within its equitable
20     powers to enforce the $3 million letter of
21     credit to be issued.
22         THE COURT: Yes, sir.

Page 29

1         MR. DICKIESON: So I have more stuff,
2     but I'll let them respond to that argument at
3     this point.
4         THE COURT: I'm still not understanding
5     how I can do this without setting for
6     testimony.
7         MR. DICKIESON: Your Honor, we provided
8     a declaration for the Court that lays out the
9     irreparable injury. We've provided the
10     services agreement where the terms are
11     concrete and clear that the -- if you don't
12     pay within 30 days, you must post the $3
13     million letter of credit. All we're asking
14     is that -- that one clause be enforced.
15         THE COURT: Okay. All right. Yes, sir.
16         MR. COX: Thank you, your Honor. I just
17     want to note that -- and I won't go into
18     detail because we have a shorter period
19     amount of time, but the grant of interim
20     injunctive relief is an extraordinary remedy
21     involving a very far-reaching power of this
22     Court. And the standard is ever higher for

Page 30

1     preliminary mandatory injunction relief, is
2     what they're seeking here. They're not
3     seeking to have the NRA restrained or stopped
4     from some activity. They're asking them
5     actually to take steps and put up a line of
6     credit in this case. So just -- we cited
7     these in our brief, and in Ray v. Microsoft
8     (phonetic), Tiffany v. Forbes, those have
9     established that there is a higher, clear,
10     and convincing probability standard that they
11     need to meet as to irreparable harm,
12     substantial likelihood of success, and the
13     two other standards.
14         Again, the Court has correctly noted
15     that this is a breach of contract case. And
16     as many courts have held, including the
17     Supreme Court in Samson v. Murray, mere
18     injuries, however substantial, in terms of
19     money, time, and energy necessarily expended
20     in the absence of a stay are not enough. The
21     possibility that adequate compensatory or
22     other corrective relief will be available at

Page 31

1  a later date in the ordinary course of the
2  litigation weighs heavily against a claim of
3  irreparable harm.  We think this is the exact
4  case here, your Honor.
5      As your Honor has pointed out in
6  questions with Mr. Dickieson, what we're
7  talking about here is that they've already
8  sent us a letter of termination on May 29th.
9  They're terminating the contract.  Now,
10  they've said that "We're going to do it over
11  a 90-day period," but what they're here
12  arguing is that they are entitled to
13  preliminary injunctive relief because they're
14  going to have to lay off employees or start
15  furloughing employees within the next week,
16  as opposed to 60 days from now, which they're
17  still -- the Court correctly pointed out
18  they're still going to have to do.
19      So either way, they are going to have to
20  furlough these employees.  And I would
21  submit, your Honor, and you pointed to this,
22  that the declaration submitted by Mr. Winkler

Page 32

1  doesn't provide an adequate evidentiary
2  record for the Court to rule on this motion.
3  We pointed out several instances where the
4  conclusory statements of law as to whether
5  the NRA has breached the contract and, in
6  addition, they have all of the financial
7  information.  They have not set forth either
8  in their -- in Mr. Winkler's declaration or
9  in the brief what steps they've taken to
10  mitigate the damages.
11      I mean, this is $1.6 million that's in
12  dispute.  I will note for the Court, your
13  Honor, that we haven't said we're not going
14  to pay the invoices.  The NRA has sent
15  multiple letters and emails to the Ackerman
16  firm asking for evidence and details.  In
17  addition, Mr. Winkler and in their brief --
18      THE COURT:  That's what I'm saying.  It
19  renders this matter moot.  If you're going to
20  pay it, doesn't it render this matter moot?
21      MR. COX:  Yes, your Honor.
22      THE COURT:  All right.  Go ahead.  I'm

Page 33

1  listening.
2      MR. COX:  So -- and they haven't
3  indicated, your Honor, that what this
4  $1.6 million -- they -- they get $4 million
5  dollars a year from the NRA alone.  It -- it
6  seems strange per duly for this court that
7  $1.6 million, which may be going to
8  celebrities, such as Colonel North's
9  contract, Dana Loesch's contracts, and
10  others.  They haven't broken down whether
11  this is actual salaries for line employees
12  they're going to have to furlough verus money
13  they're going to have to pay out to people,
14  celebrities, they have contracts with.
15      So I don't think that they -- they could
16  have submitted financial statements in
17  support of their declaration, and they
18  haven't.  I think that if the Court as a --
19  as a basis for today's hearing, I don't think
20  they've set a legal -- they haven't met the
21  legal standard for proving irreparable harm
22  in this instance.  But even as the Court has

Page 34

1  noted, I don't think that they have adequate
2  evidentiary support, and we would need to
3  proceed with an evidentiary hearing at a date
4  certain.  I think this is something the Court
5  could set very soon, later in July or the
6  first week of August.  Give us an opportunity
7  to, perhaps, take Mr. Winkler's deposition,
8  obtain some additional financial information
9  to see whether -- what their support is for
10  the irreparable harm.  I think there's an
11  insufficient record as it stands before the
12  Court.
13      And as to the letter that was sent last
14  night, I became aware of a letter last night
15  around 7.  I mean, that's why I didn't have
16  it in our brief that we filed on Monday.  But
17  I believe that the NRA is taking the position
18  that Ackerman has already said they're
19  terminating the contract, and they sent that
20  letter of termination on May the 29th, and
21  the NRA has stated, "Well, at this point, we
22  -- we agree.  Let's -- we're terminating it,

**Motion**

Page 35

1  but rather than this wind-down period, let's
2  terminate it at this point."
3      Again, I think that there are numerous
4  questions of fact about their financial
5  condition, also about how much cash they need
6  to make their obligations that just aren't
7  known, and what steps, if any, they've taken
8  to mitigate or find other sources. Perhaps,
9  they have a line of credit already that they
10 can borrow on to pay employees. I know my
11 law firm does. Thank you, your Honor.
12     MR. DICKIESON: Your Honor, we have a
13 copy of the termination letter that we
14 received last night, if I can hand it up to
15 the Court to submit it as Exhibit A for us.
16     (Whereupon Exhibit A was submitted for
17 evidence.)
18     MR. DICKIESON: And for the record, we
19 received that after 7 o'clock Eastern time
20 last night. Obviously, it was intended to be
21 issued prior to this hearing because they
22 don't want to pay the -- what -- their

Page 36

1  obligations. They want to delay it. They
2  want to postpone the payment. They want --
3  until after the damage is done. That's part
4  of the abuse of process that we're alleging
5  in this case, that they want to take legal
6  actions, use the process of this Court, to
7  harm Ackerman McQueen.
8      THE COURT: I just don't know how it's
9  feasible for me to grant your motion for
10 injunction in this matter without the benefit
11 of an evidentiary hearing. However, I think
12 that the real, great important factor is that
13 I think in with regards to the injunction
14 you've got -- you have to establish
15 irreparable harm, and I'm hearing that you've
16 got a firm that has historically had income
17 of million -- $40 million, and they're
18 potentially going to be unable, currently, to
19 collect 1.6 million on this account. And
20 that 1.6 million will ultimately result in, I
21 guess, a harm to the -- to the company
22 because of the failure in ability to pay

Page 37

1  salaries; is that correct?
2      MR. DICKIESON: Yes, your Honor, and the
3  $40 million reflects the prior year. But
4  there's also been some effort in the
5  intervening months to wind down, which is why
6  1.6 million for the last month is not one-
7  twelfth of the 40 million. The parties have
8  been working to reduce the scope of services,
9  but this is not like we've got a stockpile of
10 some $40 million we can live off of for the
11 time being.
12     THE COURT: But I assume this is not the
13 only client?
14     MR. DICKIESON: It's not, but it's
15 approximately 35 percent of the business,
16 35 percent of the employees of the firm.
17     THE COURT: All right. Counsel, I'm --
18 I'm -- at this stage, unwilling to grant your
19 motion, but I'll say this is that if you
20 desire an evidentiary hearing, I will grant
21 you to get a date certain, and we can hear
22 matters at a later date, and you can put in

Page 38

1  evidence in support of your -- your -- your
2  request for an injunction. However, I
3  understand that you have 65 employees that
4  may be either out of work or being -- work
5  without pay, but that's not something I can
6  deal with at this time. I believe that this
7  is a breach of contract case, a collection
8  case, and I guess, at some point, issues
9  regarding third party contracts. But, still,
10 it remains a contract case. We can go to
11 chambers and get a date. So at this time,
12 I'm preliminary denying the motion for
13 injunction without prejudice.
14     MR. DICKIESON: Thank you, your Honor.
15     THE COURT: All right. Do you all have
16 orders?
17     MR. COX: For the denial of the motion
18 for preliminary injunction, your Honor?
19     THE COURT: Yes.
20     MR. COX: I didn't bring one with me for
21 that.
22     THE COURT: And that's without

Page 39

1    prejudice?
2        MR. COX:  Yes, your Honor, but I can
3    draft an order and submit it to Mr. Dickieson
4    and get it to the Court.
5        THE COURT:  And we have all the
6    necessary documents with regards to the
7    pro hac vice; is that correct?
8        MR. COX:  Yes, your Honor.
9        MR. DICKIESON:  Yes, sir.
10       MR. COX:  Your Honor, one -- one other
11   -- two -- two questions.  One is we were
12   before the Court two weeks ago on a motion to
13   seal, and your Honor ruled on that motion.
14   And we have a prepared order that just allows
15   for filing of a revised answer on behalf of
16   Ackerman.  I believe Mr. Dickieson has signed
17   off on that order.  We would just like to
18   pass it up for the Court's signature.
19       THE COURT:  Okay.
20       MR. DICKIESON:  Yes, your Honor, we
21   defer to them on their selection.
22       THE COURT:  All right.

Page 40

1        MR. COX:  And then -- oh, do you have
2    the original order?  I gave it to you, but I
3    have Jim's -- Jim's signature if you want to
4    sign it.  That's it.  Thank you.  The only
5    one, I believe, and this is -- I'll take this
6    down and file it with the clerk, and then
7    your Honor, one final, just -- I had two
8    questions, one related to the pro hac vice --
9    and this came from a discussion Mr. Dickieson
10   and I had.  Now that Mr. Collins is admitted
11   in the case, is the court's procedurally -- I
12   know that I have to be present with Mr.
13   Collin any time for a court hearing.  Is he
14   able to conduct depositions without local
15   counsel being present?  Or does the local
16   counsel need to be present for depositions
17   that --
18       THE COURT:  I would prefer local counsel
19   be present.
20       MR. COX:  Prefer -- present?
21       THE COURT:  Yes.
22       MR. COX:  And then for the evidentiary

Page 41

1    hearing that -- that Mr. Dickieson and I are
2    heading down, do I raise issues with regard
3    to -- I had indicated to the Court that we
4    would like to take limited discovery,
5    including Mr. Winkler's deposition and some
6    limited document requests.  Is that something
7    we raise with the calendar control when we go
8    downstairs?
9        THE COURT:  Yes.
10       MR. COX:  Thank you, your Honor.
11       MR. DICKIESON:  One last matter, your
12   Honor.  I wanted to let you know that we have
13   two of the pro hac vice attorneys on our side
14   that have been admitted.  Mr. David Schertler
15   and Mr. Joseph González are in the courtroom.
16       UNIDENTIFIED ATTORNEY:  Good morning,
17   your Honor.
18       THE COURT:  Welcome.  Welcome.
19       UNIDENTIFIED ATTORNEY:  Thank you, sir.
20       THE COURT:  Do we have any idea when we
21   are likely to try this matter?  And I guess
22   my question is how many days do you think

Page 42

1    you're going to need to try it,
2    approximately?
3        MR. DICKIESON:  Your Honor, my position
4    is that the parties are obligated under the
5    contract to have good faith effort to try to
6    resolve this.  I think we should try
7    mediation first.
8        THE COURT:  Okay.  All right.
9        MR. DICKIESON:  And I think that's the
10   appropriate way to go before we start trying
11   to schedule an expedited trial.
12       THE COURT:  All right.
13       MR. COX:  Your Honor, just so you have
14   our position, we think that it's -- we think
15   it's, by estimate, a five to six-day trial.
16       THE COURT:  Okay.
17       MR. COX:  And we're prepared, if your
18   Honor would like us to, to go -- I was
19   waiting to receive a notice to come to
20   calendar control to set a schedule, but if
21   your Honor would like us to come in on a
22   return date --

Page 43

1    THE COURT:  No.

2    MR. COX:  -- and set it, we can do it.

3  We're -- we're moving forward with discovery.

4    THE COURT:  Do it at your pleasure.

5    MR. COX:  Thank you, your Honor.

6    THE COURT:  Again, I strongly urge you

7  to familiarize yourself with the local rules

8  with regards to pleadings and everything.

9  You -- you worked my law clerk to death in

10  the last -- how -- how many days?

11    THE CLERK:  I would say around seven.

12    THE COURT:  Seven.  Okay.  Give him a

13  break, okay?

14    MR. COX:  Your Honor -- your Honor, I

15  apologize, and I just -- perhaps it was

16  unfamiliarity.  I didn't realize that I

17  wasn't permitted a reply brief.  So that's --

18  I apologize for submitting that.  One other

19  thing.  I -- I did -- I do have an order with

20  regard to Mr. Collins --

21    THE COURT:  How many times are you going

22  to say "one other thing"?

Page 44

1    MR. COX:  I'm sorry.  But I did -- I do

2  have the order.  I don't -- now that these

3  matters are consolidated, I don't know

4  whether you need two orders or just the one.

5    THE COURT:  Why don't we do two to be

6  safe?

7    MR. COX:  Okay.

8    THE COURT:  Okay.

9    MR. COX:  Thank you.

10    THE COURT:  All right.  Thank you,

11  gentlemen.

12    MR. COX:  Thank you, your Honor.

13

14    (Whereupon the proceedings concluded at

15  11:36 a.m.)

16

17

18

19

20

21

22

Page 45

1    REPORTER CERTIFICATE

2

3  I, JACQUELINE N. HAGEN, Court Reporter and Notary Public,

4  certify:

5  That the foregoing proceedings were taken before me at

6  the time and place herein set forth, at which time the

7  witness was put under oath for me;

8  That the testimony of the witness and all objections made

9  at the time of the examination were recorded

10  stenographically by me and were thereafter transcribed;

11  That the foregoing is a true and correct transcript of my

12  shorthand notes so taken;

13  I further certify that I am not a relative or employee of

14  any attorney or of any of the parties not financially

15  interested in this action.

16

17

18

19    _____

20    JACQUELINE N. HAGEN

21

22  Dated:  June 26, 2019

# EXHIBIT 22

July 3, 2019 Statement from Ackerman McQueen

What the NRA has done by pursuing groundless litigation against the company and by creating a shamelessly false narrative against Ackerman McQueen, is to threaten our people with the loss of their employment and benefits. AMc has continued to try to negotiate a solution to these issues but the NRA has not been willing to do so. Ackerman McQueen is taking every step it can to minimize the adverse effect the NRA's actions are having on the well-being of our people.

The NRA is contractually obligated to cover severance in the scenario that some of our employees are facing. However, the NRA is not indicating they will honor their agreement. Ackerman McQueen is determined to fight on behalf of our employees. The NRA has treated this company in a defamatory and damaging manner for months and the next phase of their destructive plan appears to be to hurt as many people as they can.

# EXHIBIT 23

Appendix140

## Jilted NRATV Firm Accuses Gun Group Of 'Hurting As Many People As Possible'

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

🌐 talkingpointsmemo.com/muckraker/nratv-severance-ackerman-mcqueen

July 3, 2019



Wayne LaPierre, Executive Vice President and Chief Executive Officer of the NRA, arrives prior to a speech by US President Donald Trump at the National Rifle Association (NRA) Annual Meeting at Lucas Oil Stadium in I…
MORE

By Josh Kovensky
|

July 3, 2019 2:08 p.m.

**EDITORS' NOTE:** TPM is making our COVID-19 coverage free to all readers during this national health crisis. If you'd like to support TPM's reporters, editors and staff, the best way to do so is to become a member.

The people who brought you NRATV and Charlton Heston have had it with the National Rifle Association, issuing a statement on Wednesday accusing the gun group of trying "to hurt as many people as they can."

The statement came one week after the ad firm Ackerman McQueen was forced to shut down NRATV after NRA executive vice president Wayne LaPierre ordered en end to the gun group's TV programming.

Since then, Ackerman and its longtime client have found themselves in a battle over severance pay for NRATV workers, according to Ackerman McQueen.

"What the NRA has done by pursuing groundless litigation against the company and by creating a shamelessly false narrative against Ackerman McQueen, is to threaten our people with the loss of their employment and benefits," Ackerman said in a statement to TPM. "[Ackerman] has continued to try to negotiate a solution to these issues but the NRA has not been willing to do so."

The Oklahoma City-based firm went on to claim that "the NRA has treated this company in a defamatory and damaging manner for months and the next phase of their destructive plan appears to be to hurt as many people as they can."

Ackerman is trying to get the NRA to pay severance to employees who were terminated due to the death of NRATV, saying the gun lobby is "contractually obligated" to cover the costs.

That issue is one of the many wrinkles that led to Ackerman's split with the NRA months ago. In its first April lawsuit against Ackerman, the NRA suggested that it had been duped into signing a services contract with the Oklahoma City-based ad firm which, in part, would force the NRA to cover severance pay for Ackerman employees.

Free Beacon staff writer Stephen Gutowksi tweeted last week that Ackerman was offering to cover COBRA for its employees only if they signed a non-disclosure agreement as well as an agreement not to sue the Oklahoma City-based ad firm.

Ackerman issued a statement on this on Wednesday, describing its efforts "to assist employees who have been furloughed during this difficult period" as the following: "Ackerman has offered to pay the full costs of COBRA coverage for eligible employees during the furlough in exchange for the employee signing a standard release of claims."

In a statement to TPM, an attorney for the NRA called Ackerman's accusations "shameful, but unfortunately unsurprising."

"It appears that Ackerman is using its employees as pawns in a reputational campaign against the NRA – in an effort to deflect from its failure to meet its contractual and fiduciary obligations to the Association and its members," Michael J. Collins, partner at Brewer, Attorneys & Counselors and counsel to the NRA, told TPM in the statement.

Ackerman and the NRA spent decades working closely with each other. Ackerman is credited with developing the "I am the NRA" campaign, as well as Charlton Heston's "pry it from my cold dead hands" zinger which remains unpryable from the minds of many.

Since infighting began between the two, Ackerman has issued various demands for money. Former employees of the ad firm have told TPM that the NRA accounted for around half of their work.

# EXHIBIT 24



*NewsOK: Oklahoma City News, Sports, Weather & Entertainment*

## Ackerman McQueen accuses NRA of threatening employees

*by* **STEVE LACKMEYER**
Published: Thu, July 4, 2019 1:04 AM | Updated: Thu, July 4, 2019 1:24 AM



**Jason Bushore, left, and Wes DeWitte are shown mixing a music track in a control room at Ackerman McQueen, an advertising agency in Oklahoma City. [Jim Beckel/The Oklahoman]**

Ackerman McQueen, Oklahoma City's largest and oldest advertising agency, alleged Wednesday its former client, the National Rifle Assoction, is threatening the company's employees with a loss of jobs and benefits.

The firm and the NRA are suing each other for more than $100 million following the collapse of 38 years of services for the nonprofit that include operating NRATV and paying million-dollar annual salaries to the online network's leading personalities, Dana Loesch and Oliver North.

The network's programming was canceled last week following legal filings by Ackerman McQueen stating the NRA was delinquent in paying bills and without a requested $5 million line of credit from the NRA, the company faced laying off up to 40% of its employees.

The firm has yet to disclose whether employees are being laid off or furloughed.

Bill Powers, executive vice president with Mercury Group, the Alexandria, Virginia, office of Ackerman McQueen, said Wednesday the firm will provide federally required COBRA insurance regardless of whether employees sign an agreement. He said the firm is offering to pay all COBRA insurance costs in exchange for a "standard release of claims."

"What the NRA has done by pursuing groundless litigation against the company and by creating a shamelessly false narrative against Ackerman McQueen is to threaten our people with the loss of their employment and benefits," Powers said in the statement. "Ackerman McQueen has continued to try to negotiate a solution to these issues, but the NRA has not been willing to do so. Ackerman McQueen is taking every step it can to minimize the adverse effect the NRA's actions are having on the well-being of our people."

Legal filings show the NRA accounted for 50% of the firm's work. For decades, the NRA and Ackerman McQueen were in what experts described as one of the strongest, most enduring relationships in the history of advertising. Billings in 2017 topped $40 million as the contract with Ackerman McQueen grew to include programming of nonstop streaming for NRATV.

But with memberships and donations plunging, the NRA started an examination of contracts, and a dispute emerged in April as to whether the firm was complying with requests to review its billings and more notably, it's contract with North, who was also president of the NRA.

Appendix145

North was ousted at the April NRA convention after CEO Wayne LaPierre claimed North, an Ackerman McQueen employee, had communicated the firm was set to release embarrassing details about LaPierre and the nonprofit if he didn't resign and drop claims against the firm.

Michael J. Collins, partner at Brewer, Attorneys & Counselors and counsel to the NRA, responded Wednesday it had nothing to do with the firm's issues with its employees.

"It is shameful, but unfortunately not surprising, that Ackerman McQueen has resorted to blaming the association for its obvious failure to responsibly oversee the administrative and financial commitments it may owe to its employees," Collins said. "It appears that Ackerman is using its employees as pawns in a reputational campaign against the NRA — in an effort to deflect from its failure to meet its contractual and fiduciary obligations to the Association and its members."

As of January, Ackerman McQueen employed about 125 people in Oklahoma City, with the remainder working at offices in Dallas; Washington, D.C.; and Colorado Springs, Colorado. The NRATV operation was based in the firm's Dallas office. Powers said the NRA is contractually obligated to cover severance in the scenario of an early end of their agreement.

"However, the NRA is not indicating they will honor their agreement," Powers said. "Ackerman McQueen is determined to fight on behalf of our employees. The NRA has treated this company in a defamatory and damaging manner for months and the next phase of their destructive plan appears to be to hurt as many people as they can."

 **STEVE LACKMEYER**
Steve Lackmeyer is a reporter, columnist and author who started his career at The Oklahoman in 1990. Since then, he has won numerous awards for his coverage, which included the 1995 bombing of the Alfred P. Murrah Federal Building, the city's...
Read more ›

 SPONSORED CONTENT
**How to Fix Your Fatigue (Do This Every Day)** 
BY GUNDRY MD — Top Doctor and author of the best selling book "Dr. Gundry's Diet Evolution" is begging that we all quit these 3 foods.

Former TV reporter files to run against Jim Inhofe

Read Next Story ›

Contact Us | Terms of Use | © 2006-2020 GateHouse Media, LLC. All rights reserved

# EXHIBIT 25

August 30, 2019 Statement from Ackerman McQueen

This latest meritless filing represents a new low in the NRA's ceaseless waste of its members' dues. The NRA stopped fighting for any aspect of their members' agenda over a year ago. Instead, they became a factory for frivolous lawsuits.

With all the smart people that saw this foolish strategy and left, the NRA's understanding of the Second Amendment, and now apparently the First, seems to be nearing an all-time low.

In light of its continual "shooting itself in the proverbial foot", one can only conclude that the people who are supposedly running this apparently failing organization did not ever believe in the Constitution in the first place.

The NRA continues to spend its members' money on useless fights in an obvious attempt to deflect attention from its dwindling influence across the country.

# EXHIBIT 26

Appendix149

September 13, 2019 Statement from Ackerman McQueen

When Ackerman McQueen refused to participate in suspicious actions and spending by the NRA, Mr. Brewer helped lead a campaign of retaliation.

His false narrative is now strangling the NRA, destroying relationships with former NRA President Lt. Col. Oliver North, longtime outside counsel Steve Hart, constitutional counsel Chuck Cooper, chief lobbyist Chris Cox and countless more advocates for the 2nd Amendment. Contrary to his narrative, Mr. Brewer is orchestrating a purge of every person who disagrees with his flawed strategy.

Ackerman McQueen cooperated with every single audit NRA requested.  Ackerman McQueen never overcharged the NRA and retains records of all the work to prove it.  Every expense incurred on behalf of the organization was directed by the NRA at the highest level, always with the personal knowledge and approval of Wayne LaPierre.

Mr. Brewer unwisely pursues these frivolous lawsuits for PR purposes and to serve as a distraction from the failure of NRA executives and its board to properly fulfill its oversight duties and responsibilities to NRA members who fund the organization.

Ultimately, all NRA claims will be proven false, before a court and jury.

Morally troubling is Mr. Brewer's failure to recuse himself from the clear conflict of interest in pursuing a personal vendetta against his own family and their business.

# EXHIBIT 27

**VIRGINIA:**

## IN THE CIRCUIT COURT FOR THE CITY OF ALEXANDRIA

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case Nos. CL19001757** |
| | ) | **CL19002067** |
| **ACKERMAN MCQUEEN, INC.,** | ) | **CONSOLIDATED** |
| | ) | |
| **and** | ) | |
| | ) | |
| **MERCURY GROUP, INC.** | ) | |
| | ) | |
| **Defendants.** | ) | |

### MEMORANDUM IN SUPPORT OF DEFENDANTS' PLEA IN BAR

In responding to the Plaintiff's two Complaints, Defendants twice lodged a Plea in Bar. The Plea in Bar asserted "upon information and belief, the NRA Board never approved or authorized the filing of this Lawsuit." The Plea in Bar referenced New York law that governs the NRA and places the responsibility to manage the not-for-profit entity on its Board of Directors. Thereafter, Defendants' pursued discovery into the whether the suit was properly authorized by the NRA Board of Directors. In response to Interrogatory No. 19, the NRA's authorized designee, Chief of Staff Josh Powell, declared under penalty of perjury that

> "Subject to the foregoing objections and General Objections, the NRA responds to this Interrogatory by stating that to date, the Board has not adopted any formal resolution with respect to the NRA/ AMc Services Agreement or litigation against AMc."

*See* **Exhibit 1**, NRA Responses to Interrogatories, No. 19, attached hereto. Consequently, the Plea in Bar's assertion "upon information and belief" has been confirmed under oath.

1

The two NRA above-captioned lawsuits and two additional lawsuits[1] filed against AMc

subsequent to the Plea in Bar are not legally and properly authorized by the NRA Board

as required under the New York law governing not-for-profit corporations. As discussed

below, NRA's four cases against AMc should be dismissed as unauthorized actions.

    **1. The New York law governing nonprofit organizations requires that an
organization's board must authorize any substantial corporate action.**

    As admitted by NRA Chief of Staff Josh Powell, this lawsuit was not authorized by the

NRA board of directors. This violates New York law governing Not-For Profit entities such as

the NRA.  N-PCL § 701 provides the general mandate that "[e]xcept as otherwise provided in the

certificate of incorporation, a corporation shall be managed by its board of directors…."  The

NRA's certificate of incorporation (**Exhibit 2)** and its many amendments do not contain

language that would alter this general rule.  Moreover, the certificate contains no delegation of

authority provision that would permit an officer to bring litigation or terminate a vendor's multi-

million contract.  To the contrary, the NRA bylaws reserves the broad powers to manage and

govern the organization to the NRA Board of Directors. The bylaws state, in relevant part, that

"The Board of Directors shall formulate the policies and govern and have general oversight of

the affairs and property of the Association, in accordance with applicable law and these Bylaws."

**Exhibit 3A and 3B**, Section IV.[2] More to the point, the NRA Board of Directors has not

---

[1]    Subsequent to the filing of the Plea in Bar, the NRA filed on August 30, 2019, a **third**
suit against AMc in United States District Court in Dallas, Texas, Case No. Civil Action No. 3:
19-cv-02074-G. A **fourth** suit was filed by the NRA against AMc here in Alexandria Circuit
Court on September 5, 2019.

[2]    The NRA amended its bylaws on April 29, 2019 – after the first suit was filed against the
NRA, but before the second suit was filed. **Exhibit 3A** provides the pertinent bylaws from the
bylaws in place at the time the first suit was filed and **Exhibit 3B** provides the pertinent bylaws
relevant to the filing of the second law suit.  The operative language is identical.

Appendix153

delegated authority to make decisions related to "adopt[ing] … a fundamental change of view or basic policy … of the Association…or …perform[ing] corporate activities of such major significance as to warrant action by the full Board of Directors." **Exhibit 3A and 3B,** Section IV.

The language from the section  that defines the powers of the board's Executive Committee reinforces the absence of delegation.  It states that the Executive Committee of the Board is not empowered to engage in "corporate activities of … major significance" and that such decisions can only be made by the full board supports the general proposition that the board of directors have retained and not delegated the power to decide major issues.   The obvious intent is that the Board must authorize the commencement of a major lawsuit like the four lawsuits against AMc or the termination of a vendor contract for tens of millions of dollars per year.

The NRA cannot argue that the actions taken against AMc do not constitute a "corporate activity of such major significance as to warrant action by the full Board of Directors."  NRA's decision to sue AMc, to terminate the AMc Services Agreement, and pull the plug on NRATV have been reported as national news for much of the summer of 2019. The NRA has itself set up a webpage to track selected news reports of the NRA v. AMc litigation. *See* https://www.nralegalfacts.org/ackerman-news-reports.  The NRA webpage lists articles published in the New York Times, The Daily Beast, and AdWeek 40.  Numerous other articles from the Washington Post, Newsweek, CNN and other national news organizations are omitted. By suing and terminating AMc's contract, the NRA has terminated NRATV, the video platform created by AMc, owned by AMc, but often called the "Voice of the NRA."  NRA has ripped out its own tongue and left its members without the benefit of NRATV – a decision that merits a full

3

consideration and authorization by the full Board of Directors. Yet, as admitted in the

interrogatory response, the Board has not approved these actions.

This conclusion is also reinforced by an article that the Wall Street Journal reported

yesterday, entitled "NRA Board Retroactively Approved Transactions Benefiting Insiders." See

**Exhibit 4**, attached hereto.  It explains that the Board thought it was necessary to go back and

retroactively approve a whole raft of financial arrangements benefiting top officials of the NRA.

The Board addressed issues as small as a $5,500 payment to the son of an NRA official and as

large as the multi-million contract for former NRA President Oliver North.  In so doing, the

NRA Board tacitly acknowledges that approving the North contract requires board approval. Yet,

the NRA Board has taken no steps to approve this much more significant litigation.

### 2.  Who authorized the lawsuits against AMc?

If the Board of Directors did not authorize the litigation against AMc, who did authorize

the litigation?  The Complaint was not verified, so there is no officer signing to confirm the truth

of the allegations and thus no officer claiming responsibility for authorizing the litigation.  There

are no allegations relating to authorization of the litigation at all.  Although AMc requested in

July 2019 and anticipated receiving documents relating to the authorization of the lawsuit in

August 2019, no such documents have been provided in discovery to date.

One might assume that Wayne LaPierre, Executive Director and Vice President of the

NRA authorized the litigation, but he has yet to acknowledge that it was his decision.  If it were

his decision, it was a decision lacking authority and clouded by Mr. LaPierre's personal interest

and conflicts. The bylaws do not delegate Mr. LaPierre authorization to file major law suits, and

4

terminate a multi-million-dollar vendor and end NRATV.[3]  Even if we assume that Mr. LaPierre

has been delegated authority to sue AMc, Mr. LaPierre is in a highly conflicted position vis-a-vis

AMc and would be conflicted from making such a major decision on his own.  Mr. LaPierre's

finances are intermeshed with AMc.  Mr. LaPierre has demanded and received hundreds of

thousands of dollars of personal benefits through AMc.  He has had access to an AMc credit card

and he has arranged for AMc to pay his expenses which are then billed to the NRA. It has been

widely reported in the national news that Mr. LaPierre sought to have AMc help him obtain a

$6.5 million mansion on a Dallas golf course through a scheme to bill the NRA for the purchase

funds without NRA board approval.[4]  Wayne LaPierre has acute personal motives for litigating

against AMc, but such self-serving litigation motivation begs for oversight by the NRA Board.[5]

Wayne LaPierre should have been removed from the decision-making process due to his

---

[3]  The NRA bylaws provide "The Executive Vice President shall direct all the affairs of the
Association in accordance with the programs and policies established by the Board of Directors.
Among his authorities, the Executive Vice President shall be empowered to (1) appoint, suspend
with or without pay, or remove the Executive Director of the National Rifle Association General
Operations or the Executive Director of the National Rifle Association Institute for Legislative
Action; (2) suspend with pay the Secretary or the Treasurer until the next meeting of the
Executive Committee or the Board of Directors, whichever occurs first; and (3) employ, suspend
with or without pay, or dismiss any employee."

[4]      *See* the attached Washington Post article, **Exhibit 5.** The plan was ultimately rejected by
AMc – a move that appears to have poisoned the relationship between Wayne LaPierre and
AMc. Mr. LaPierre is using the NRA litigation for personal benefit by scapegoating AMc for
Mr. LaPierre's own actions.

[5]      The NRA bylaws defer to Robert's Rules of Order: §45 (Voting Procedure) with respect
to board decision-making. See **Exhibit 3A and 3B**, Bylaws, Article XIII, Section 2.  Robert's
Rules §45 advocates against decision-making by persons with personal interests in the decision -
- "No member should vote on a question in which he has a direct personal or pecuniary interest
not common to other members of the organization.  For example, if a motion proposes that the
organization enter into a contract with a commercial firm of which a member of the organization
is an officer and from which contract he would derive personal pecuniary profit, the members
should abstain from voting on the motion."

Appendix156

conflicts of interest and personal motivations.[6]  Moreover, if Wayne LaPierre is responsible for authorizing the litigation, he has tried to keep his actions shrouded in secrecy by having Josh Powell sign the Interrogatory responses.  Based on his conflict of interest, and the lack of a delegation of authority to him from the NRA Board, Wayne LaPierre cannot authorize the filing of the law suits against AMc.

Other persons have speculated that attorney William Brewer of the law firm Brewer, Attorneys and Counselors, is the decision maker on litigation.  However, there is no delegation of authority to Mr. Brewer from the NRA Board.  Mr. Brewer also has his own personal conflicts of interest that warrant NRA Board oversight and management.  Brewer has been reported to be billing $100,000 a *day* to the NRA for his law firm's services and he has massive economic incentives to push for more litigation to continue the flow of funds from the NRA to his law firm and himself. *See* Washington Post article attached as **Exhibit 6**.  He has inserted members of his law firm into the litigation on a *pro hac vice* basis, even though Brewer himself is not an attorney of record – as he has been sanctioned for misconduct in Texas and his *pro hac vice* status has

---

[6]     New York law applies to governance of the NRA, as a New York not-for-profit corporation. In *People by Attorney Gen. of State v. Lutheran Care Network, Inc.,* 167 A.D.3d 1281, 1286, 92 N.Y.S.3d 154, 159 (N.Y. App. Div. 2018), the court refused to accept that an officer's decision was protected by the business judgment rule:

> "the business judgment rule has no place where corporate officers or directors take actions that exceed their authority under the relevant corporate bylaws (*see Fe Bland v. Two Trees Mgt. Co.,* 66 N.Y.2d 556, 565, 498 N.Y.S.2d 336, 489 N.E.2d 223 [1985]; *Brantley v. Municipal Credit Union,* 60 A.D.3d 551, 552, 879 N.Y.S.2d 395 [2009] ), or where they make decisions affected by an inherent conflict of interest (*see Matter of Kenneth Cole Prods., Inc., Shareholder Litig.,* 27 N.Y.3d at 274–275, 32 N.Y.S.3d 551, 52 N.E.2d 214; *Auerbach v. Bennett,* 47 N.Y.2d 619, 631, 419 N.Y.S.2d 920, 393 N.E.2d 994 [1979]; *Wolf v. Rand,* 258 A.D.2d 401, 404, 685 N.Y.S.2d 708 [1999] )."

Here, a decision to sue AMc by Mr. LaPierre would be both (i) beyond his delegated authority; and (ii) affected by an inherent conflict of interest.

Appendix157

been revoked by the Eastern District of Virginia for filing misleading *pro hac vice* papers.  Other than pure attorney avarice, can there be a valid litigation strategy to file *four lawsuits* against AMc – three in Alexandria, Virginia and one in Dallas, Texas?  But Brewer also has non-economic reasons to litigate irrationally against AMc – his estranged brother-in-law, Revan McQueen, is the CEO of AMc and the well-publicized animus between Brewer and the McQueen Family provides a powerful incentive for Brewer to push for more and more litigation.[7]  With such rampant conflicts of interest and personal motivations, Brewer cannot be the person authorizing the litigation for the NRA. Such conflicts call out for supervision and approval by the NRA Board.

In light of the NRA's statement that the NRA Board has not approved the litigation and the NRA's failure to identify how the suits were authorized, it is incumbent upon the NRA to explain who authorized the four suits and whether the authorization was valid or whether it came from persons with conflicting motivations.

The fact that the NRA has filed four suits against AMc is a sign of the sort of impulsive litigation strategy that would likely have been restrained if the litigation were being authorized by the NRA Board.  But the Board has been removed from the decision-making process.  Thus, the filing of the lawsuits is beyond of the authority of the lawyers for the NRA who signed the Complaints and the pleadings.

### 3.  No individual director or officer, acting alone, could legally authorize the action.

As a legal matter under New York law, no individual director or officer, acting alone, could authorize the action. Individual officers lack the authority to exercise the board's

---

[7]      Brewer's estranged father-in-law, Angus McQueen was also a co-CEO of AMc until his untimely death in July 2019 during the early stressful stages of this litigation.

7

management responsibilities. For example, in *Matter of Paglia v. Staten Is. Little League,* 38 A.D.2d 575, (2nd Dept. 1971), a seemingly trivial decision involving a child's suspension from participation in a little league baseball program was found to be unlawful because the suspension was imposed by the organization's president, not its board, and the organization's "constitution and by-laws vest[s] the power of suspension in respondent's board of directors." Similarly, in *Claim of Masferer*, 197 A.D.2d 763 (3rd Dept. 1993), the Appellate Division held that the "corporation acts by a majority vote of its directors (N-PCL 701, 708) and not by the unilateral act of its president."

Generally, a court considering the validity of actions taken by an individual acting on behalf of an entity must determine whether said actions are authorized under the entity's constitution or bylaws (*Allen,* 109 Misc.2d 178 at 184, 439 N.Y.S.2d 811). In so doing, the court must assess the official's claim that his or her actions are authorized under the constitution or bylaws by (1) independently reviewing the constitution or bylaws "in accordance with the general rules of construction appertaining to contracts" and (2) determining whether the officer's interpretation is a reasonable interpretation of the constitution or bylaws. See e.g., *LaSonde v. Seabrook*, 89 A.D.3d 132, 137–38, 933 N.Y.S.2d 195, 199 (2011). The NRA's certificate of incorporation and by-laws are available to the public and provide no indication of any delegation of authority from the Board to file lawsuits that initiate litigation that threatens the financial stability of the NRA and silence the "voice of the NRA." Without such delegation and in light of the admission by Chief of Staff Josh Powell that the Board did not approve the litigation, the Plea in Bar should be granted and the instant claims against AMc must be dismissed.

8

WHEREFORE, the Defendants request that the Court dismiss the NRA's claims against

AMc based on the lack of authority to bring forth the Complaints on behalf of Plaintiff NRA and

to litigate all proceedings subsequent to the Complaints.

ACKERMAN MCQUEEN, INC. and
MERCURY GROUP, INC.
By Counsel

Dated:  September 24, 2019                        Respectfully submitted,

David H. Dickieson (VA Bar #31768)
SCHERTLER & ONORATO, LLP
901 New York Avenue, NW, Suite 500
Washington, DC  20001
Telephone:  202-628-4199
Facsimile:  202-628-4177
ddickieson@schertlerlaw.com

9

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Defendants' Memorandum in Support of the Plea in

Bar was served on September 24, 2019, on the following counsel for Plaintiff by agreement via

email:

> James W. Hundley
> Robert H. Cox
> BRIGLIA HUNDLEY, PC
> 1921 Gallows Road, Suite 750
> Tysons Corner, VA 22182
> jhundley@brigliahundley.com
> rcox@brigliahundley.com

> Michael J. Collins
> Brewer Attorneys & Counselors
> 1717 Main Street, Suite 5900
> Dallas, Texas 75201
> MJC@brewerattorneys.com
> *Admitted Pro Hac Vice*

David H. Dickieson

10

# EXHIBIT 28

**VIRGINIA:**

## IN THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA

**NATIONAL RIFLE ASSOCIATION OF AMERICA,**

      **Plaintiff,**

v.

**ACKERMAN MCQUEEN, INC.**

    **And**

**MERCURY GROUP, INC.**

      **Defendants.**

**Case No. CL19001757, CL19002067**

## ORDER

On October 8, 2019 this matter came before the Court for hearing on Defendants Ackerman McQueen, Inc. and Mercury Group, Inc.'s Plea in Bar. After reviewing the motion and hearing the arguments of all parties, the Court hereby DENIES the Defendants' Plea in Bar in its entirety.

So ORDERED this _9_ day of October, 2019.

This matter continues.

_____
Circuit Court Judge

WE ASK FOR THIS:

James W. Hundley (VA Bar No. 30723)
Robert H. Cox (VA Bar No. 33118)
Amy L. Bradley (VA Bar No. 80155)
BRIGLIA HUNDLEY, P.C.
1921 Gallows Road, Suite 750
Tysons Corner, VA 22182
jhundley@brigliahundley.com
rcox@brigliahundley.com
abradley@brigliahundley.com
Phone: 703-883-0880Fax: 703-883-0899

Michael J. Collins
Brewer Attorneys & Counselors
1717 Main Street, Suite 5900
Dallas, TX 75201
*Admitted Pro Hac Vice*

*Counsel for the Plaintiff*

SEEN AND OBJECTED TO:

David Dickieson (VA Bar No. 31768)
Schertler & Onorato, LLP
901 New York Avenue, N.W.
Suite 500
Washington, DC 20001
ddickieson@schertlerlaw.com

*Counsel for the Defendants*

# EXHIBIT 29

Case 3:19-cv-02074-G-BK   Document 122   Filed 05/04/20   Page 173 of 509   PageID 8112

5/3/2020          Stephen Gutowski on Twitter: "In statement, Ackerman accuses NRA leaders of "marketing false products and narratives to NRA memb…



5/3/2020          Stephen Gutowski on Twitter: "In statement, Ackerman accuses NRA leaders of "marketing false products and narratives to NRA memb…

🐦          Search Twitter                                                        Log in    Sign up    •••



"However, if the NRA wants to conduct a public conversation about distasteful and racist, they should consider their systemic behavior," Ackerman said.

Ackerman McQueen recognized and handled the offensive imagery on the show, "Relentless," in a proper fashion, like any media company would. We identified those responsible and put new processes and oversight in place. NRA executives acknowledged the corrective action taken by Ackerman McQueen, were satisfied with the response and a couple months later, renewed NRATV for 2019.

However, if the NRA wants to conduct a public conversation about distasteful and racist, they should consider their systemic behavior. This is the same executive leadership team and Board of Directors that refused to address the Philando Castile tragedy. This is the executive leadership team that put their heads in the sand every time a board member said something that could be perceived as distasteful or racist. This is the same executive team and Board of Directors that ignored, and didn't even watch, the impactful programming that the NOIR team produced, telling important stories on minority issues. There are countless more examples, decisions and comments that plague the organization and will be a part of AMc's defense.

As AMc said in its latest filing, Wayne LaPierre defrauded Ackerman McQueen. When AMc representatives discovered what he, his executive team as well as the Board of Directors were really doing, and AMc refused to have any part of it, the cabal that is left at the NRA retaliated. Now they want to blame anyone else for the people they actually are.

♡ 7          ⟲ 13          ♡ 25          ⬆

**Stephen Gutowski** ✔ @StephenGutowski · Oct 29, 2019
Other than escalating the war of words, I'm not sure much has actually changed in the NRA/Ackerman fight.

♡ 4          ⟲ 1          ♡ 3          ⬆

**Stephen Gutowski** ✔ @StephenGutowski · Oct 30, 2019
Gun control group Brady is now fundraising off of the NRA/Ackerman legal battle. Their subject line is "they knew it was racist the whole time."

**BRADY** UNITED AGAINST GUN VIOLENCE

Stephen,

In more bad news for the NRA, newly uncovered court filings show that NRA executives themselves thought NRATV was blatantly racist. Yet they continued to let it air.

*The NRA just called its own video network "distasteful and racist" -- Vox*

♡ 1          ⟲ 1          ♡ 2          ⬆

**ByeTheWayHat** @Popehat · Oct 28, 2019
Replying to @StephenGutowski

♡ 1          ⟲          ♡ 13          ⬆

**Not Brian France** @Not_BrianFrance · Oct 28, 2019

Let them fight

♡          ⟲          ♡ 5          ⬆

**Chairman Miao (德裁猫)** @PolitiCatGrump · Oct 28, 2019
Replying to @StephenGutowski
@_alex_joshua @SenhorRaposa @RealTedEdmonson

Appendix167

5/3/2020        Stephen Gutowski on Twitter: "In statement, Ackerman accuses NRA leaders of "marketing false products and narratives to NRA memb…



Appendix168

# EXHIBIT 30



**HIGH-INTEREST SAVINGS ACCOUNTS THAT EARN YOU PILES OF CASH**

SPONSORED BY NERDWALLET

**See More**

SIGN IN   SUBSCRIBE

66°  Dallas, TX

Search

**U.S.**
**World**
**Business**
**Tech & Science**
**Culture**
**Newsgeek**
**Sports**
**Health**
**The Debate**
**Vantage**
**Weather**

**U.S.**

# NRATV CREATOR THREATENS 'LEGAL ACTION' AGAINST FORMER HOST OVER 'FABRICATIONS'

BY **ASHER STOCKLER** ON 12/18/19 AT 2:39 PM EST





f   t   t   in   p   r   ✉

U.S.        SECOND AMENDMENT        GUN RIGHTS        NATIONAL RIFLE ASSOCIATION

NRATV

The National Rifle Association's former PR firm plans to take legal action against a former NRATV host in the latest salvo in its ongoing dispute with the gun-rights group that has unraveled the pair's nearly four-decades-long relationship.

The Oklahoma-based firm, Ackerman McQueen, told *Newsweek* Tuesday that it would counter allegations from Grant Stinchfield, the former host of a self-titled NRATV program, with its own "legal action" against him.

Ackerman claims that Stinchfield, who served as host from 2016 until July, provided "inaccurate information under oath" in an affidavit that was filed earlier this month in the NRA's federal lawsuit against the firm. Stinchfield claimed in the sworn statement that Ackerman irresponsibly managed the now-defunct Second Amendment streaming platform NRATV.

Ackerman's statement did not specify what the forthcoming legal action was. It denied the allegations made in his affidavit and referred to a pair of them as "fabrications."

Stinchfield provided the following statement to *Newsweek*:

"The fact that Ackerman is even responding to a liberal outlet like *Newsweek* is why I am so sad for the company I was once happy to work for. Though I am not employed by the NRA, I am a

longtime member and I am proud to speak the truth on its behalf. Ackerman's response to my affidavit makes it clear, nothing triggers like truth," he said.

NRATV, which was produced by Ackerman on the NRA's behalf, was ultimately disbanded in June amid escalating legal disputes that were pitting the NRA and Ackerman, longtime collaborators, against each other. The conflict spilled over into federal court in August, when the gun-rights organization filed its third lawsuit against Ackerman related to the firm's work on the NRA account. Both the NRA and Ackerman have distanced themselves from controversies surrounding NRATV, but accusations over the platform's demise have been traded through the media and court filings.

In October, the NRA's case against Ackerman took a dramatic turn when the NRA amended its complaint, alleging that the firm "presented fabricated and inflated sponsorship and viewership" metrics about NRATV. It was through this filing that Stinchfield provided a sworn affidavit accusing Ackerman of "aggressively [seeking] to limit interaction between NRATV talent and leadership."

The White House promised 27 million coronavirus tests by end of March, but U....

21K

**Is the government doing enough to boost Covid19 testing?**

◯ Yes

◯ No

◯ I don't know

Powered by

Ackerman has steadfastly defended its representations to the NRA about NRATV's viewership and reach.

"The analytics are not only legitimate, they are impressive across all of the same platforms that media companies everywhere use to judge success in engagement and reach," the firm said in its statement to *Newsweek*.

Stinchfield further alleged that Angus McQueen—the PR firm's now-deceased CEO and father-in-law to the NRA's outside counsel—personally intervened to instruct him that the firm, and not the NRA, would control NRATV's direction.

Stinchfield claimed that McQueen told him at one point: "The NRA is not your boss. I am."

Ackerman told *Newsweek* that Stinchfield's "willingness to invent quotes from a deceased man who isn't here to protect himself is disgusting."

"Mr. Stinchfield is a former Ackerman McQueen employee and was one of the most recognized personalities of NRATV," William A. Brewer III, the NRA's outside counsel, said in a written statement to *Newsweek*. "His affidavit is troubling for Ackerman, as it validates many of the NRA's claims and allegations against the agency. The NRA believes this filing underscores what, in the end, was driving Ackerman's management of NRATV – its own financial self-interest and desire to build a live TV platform on the backs of NRA members."

In his affidavit, Stinchfield also said he questioned whether NRATV and its live broadcasts were "the most cost-effective method to promote the Second Amendment." He said he had often expressed the opinion that "three daily, well-targeted videos" on social media would provide far greater value for the NRA's mission-driven budget.

Disagreements about whether NRATV and its associated costs were tailored to the NRA's purposes as a non-profit organization focusing on gun rights have featured throughout the litigation.

"When I presented these ideas, Ackerman executives, particularly Angus McQueen, harshly dismissed them," Stinchfield said. "I arrived at the view that Ackerman was intent upon transforming itself from an ad agency into a live television newsroom, and using the NRA to finance this goal."

For its part, Ackerman outright rejected Stinchfield's characterizations of the firm's work and of the behavior of its late executive.

"Angus McQueen never operated in the way described in the affidavit," it said.

Ackerman's comment about impending legal action focused on Stinchfield individually, not the NRA.

A sign reading "NRA" is visible on April 10, 2015. The gun-rights group's former PR firm, which produced the NRATV network on the NRA's behalf, says it will take legal action against a former show host. The host has denied

wrongdoing.

KAREN BLEIER/GETTY

REQUEST REPRINT & LICENSING, SUBMIT CORRECTION OR VIEW EDITORIAL GUIDELINES

SPONSORED CONTENT                                                                    by mgid ▷



## Here's What New Dental Implants Should Cost You In Dallas

DENTAL IMPLANTS





## 67 Yr Old Grandma Stunned Doctors! No Painful Treatments, Do This

TRUSTEDPRODUCTREVIEW

## Dads Are Getting Super Ripped On This Stuff!

EMPOWERED BOOST

## No Prescription Needed And It's Stronger Than Adderall

COGNITIVA

# EXHIBIT 31


# CONFIDENTIAL

# FILED UNDER SEAL

# EXHIBIT 32

# CONFIDENTIAL

# FILED UNDER SEAL

Appendix176

# EXHIBIT 33

# CONFIDENTIAL

# FILED UNDER SEAL

Appendix177

# EXHIBIT 34

# CONFIDENTIAL

# FILED UNDER SEAL

Appendix178

# EXHIBIT 35

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/nra-fails-to-stop-former-ad-agency-from-cooperating-with-new-york-probe-11582575899

U.S.

# NRA Fails to Stop Former Ad Agency From Cooperating With New York Probe

Judge rules gun-rights group can't prevent Ackerman McQueen from answering subpoena



NRA Chief Executive Wayne LaPierre
**PHOTO:** EVAN VUCCI/ASSOCIATED PRESS

*By Mark Maremont*

Updated Feb. 24, 2020 4:44 pm ET

In a legal blow to the National Rifle Association, a New York state judge ruled that the gun-rights group can't stop its former ad agency from cooperating with a state regulatory probe into the NRA's financial dealings with its own top officials.

The ruling Monday came in response to a lawsuit filed in September by New York Attorney General Letitia James, whose office has been investigating the NRA's compliance with rules governing nonprofits.

The NRA has said it will fully cooperate with any probe into its finances.

The attorney general's office had sought a court order to enforce a subpoena it had issued last year to Ackerman McQueen, which for decades had been the NRA's ad agency until a bitter split last year that has sparked litigation between the two former close partners.



New York Attorney General Letitia James's office has been investigating the NRA's compliance with rules governing nonprofits.

**PHOTO:** SPENCER PLATT/GETTY IMAGES

The NRA and Ackerman worked very closely together before the split, and Ackerman has copious amounts of information on the NRA's financial arrangements with its top officials.

Leaked NRA letters, for example, show that the ad agency spent more than $542,000 on luxury clothing and travel for NRA Chief Executive Wayne LaPierre over more than a decade. The agency also was closely involved in an abortive 2018 NRA plan to buy Mr. LaPierre a $6 million Dallas-area mansion. The NRA has said the mansion purchase never happened and the expenses were justified for business purposes.

The NRA argued in court that a contractual nondisclosure agreement it had with Ackerman prevented the ad agency from responding to the AG subpoena without allowing the NRA to vet documents being handed over to the AG's office and potentially withhold some items.

Judge Melissa A. Crane of New York Supreme Court in Manhattan ruled that the NRA's stance, if permitted, would allow nonprofit entities to use private nondisclosure agreements to frustrate the AG's regulatory and law-enforcement duties. "Accordingly, the NRA cannot use the NDA from its Services Agreement as a shield" to prevent Ackerman from answering the subpoena, she wrote.

The AG's office is probing related-party transactions between the NRA and its board members, unauthorized political activity, and potentially false or misleading regulatory disclosures, according to a document-preservation notice the AG's office sent to the NRA in April 2019 and later filed in court.

In a statement, Ms. James said: "Once again, the National Rifle Association has been thwarted in its attempt to stifle and interfere with a confidential, law enforcement investigation."

William A. Brewer III, an outside attorney for the NRA, said "we are exploring our options in response to a perplexing opinion." He also noted that the judge agreed with the NRA on one issue —that certain "privileged materials" should be reviewed by the court to determine if they should be turned over to the AG's office.

In a statement, Ackerman McQueen said it is "committed to assisting all of the myriad ongoing government investigations of the NRA. Today's ruling will assist in the process of ridding Ackerman McQueen of the NRA's unnecessary restrictions on cooperation with the authorities."

**Write to** Mark Maremont at mark.maremont@wsj.com

Copyright © 2020 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

# EXHIBIT 36

Appendix183

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § § § § § § § § § § § § § § § § § § § § § § § § § § | Civil Action No. 3:19-cv-02074-G |
|     **Plaintiff and Counter-Defendant** | | |
| **and** | | |
| **WAYNE LAPIERRE,** | | |
|     **Third-Party Defendant,** | | |
| v. | | |
| **ACKERMAN MCQUEEN, INC.,** | | |
|     **Defendant and Counter-Plaintiff,** | | |
| **and** | | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG,** | | |
|     **Defendants.** | | |

## DECLARATION OF TRAVIS J. CARTER

1.    My name is TRAVIS J. CARTER.  I am over the age of twenty-one years and am fully competent and able to testify herein and able to swear, as I do hereby swear, that all of the facts and statements herein contained are true and correct and that, except as expressly noted otherwise, I have personal knowledge of the same.

2.    I am the Managing Director of Public Affairs at Brewer, Attorneys & Counselors (the Brewer firm), outside counsel for the National Rifle Association of America (NRA).

1

3.      We have never viewed ourselves as a competitor to Ackerman McQueen (Ackerman).

4.      Indeed, the law firm was a *client* of the agency for many years – an arrangement that continued until December 2019.

5.      At the direction of myself and others, over the years Ackerman performed many services for the Brewer firm, including, but not limited to, design and management of multiple websites, creative development of advertisements, video production, brand and logo development, and design and implementation of marketing materials for the law firm's charitable foundation.

6.      Further, over the years, I have been personally involved in *recommending* the professional services of Ackerman to other clients of the Brewer law firm. On one occasion, this resulted in Ackerman submitting a proposal for a lucrative website project for a Fortune 500 company.

7.      There is no comparison between the services and activities of the Public Affairs Group of the Brewer firm and Ackerman. In fact, several of the NRA's stakeholders have mentioned to me the ridiculousness of such an argument – observing the size of my work group and commenting that Ackerman seldom, if ever, engaged in direct media outreach relating to the NRA's legal concerns.

8.      The Brewer firm employs four (4) professionals in its Dallas office who primarily work in the field of legal communications and issues & crisis management – the Public Affairs Group. This small band of professionals generally provides assistance with specialized, high-stakes public relations in connection with legal matters being handled by the firm.

2

9.      The Brewer firm has assigned professionals to provide media relations and public relations services to the NRA. None of these professionals work solely for the NRA as a client.

10.     The work of the Brewer Public Affairs team focuses, in significant measure, on a First Amendment lawsuit filed by the NRA against New York Governor Andrew Cuomo and the New York State Department of Financial Services, other legal concerns involving the NRA, and responses to public inquiries about the NRA's management and governance structure.

11.     None of the professionals employed by the Brewer firm specialize in advertising or marketing, and none hold academic degrees in such fields. There is no burgeoning advertising or marketing practice group within the Brewer firm and the firm is not positioned to compete with Ackerman in the agency's areas of expertise.

12.     There is no effort on the part of the Brewer firm to become an advertising agency, perform video production, or launch a live TV media "experience" for the NRA's key stakeholders – all cornerstones of the proposition offered by Ackerman. In my view, there can be no legitimate basis upon which Ackerman can claim that the Brewer firm seeks to "compete" with Ackerman or replace it as the advertising or communications firm of record for the NRA.

13.     The Brewer firm does not have the professional resources, expertise, or inclination to occupy such space for the NRA or the law firm's other clients.

14.     I declare under penalty of perjury that the foregoing is true and correct.


Dated: March 4, 2020

_____
Travis J. Carter

3

Appendix186

# EXHIBIT 37

Appendix187

**VIRGINIA:**

## IN THE CIRCUIT COURT FOR THE CITY OF ALEXANDRIA

|  |  |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **Case No. CL19001757** |
| ) | **CL19002067** |
| ACKERMAN MCQUEEN, INC., ) | **CL19002886** |
| and ) | **Consolidated** |
| MERCURY GROUP, INC. ) | |
| ) | |
| Defendants. ) | |

## ORDER GRANTING DEFENDANTS' MOTION TO STAY PROCEEDINGS

This matter comes before the Court on the Defendants' Motion to Stay Proceedings in this Court Pending Resolution of Parallel Federal District Court Litigation. Upon consideration of the Defendants' Motion, the opposition by the National Rifle Association of America, and the entire record of this case, it is hereby ORDERED that the Motion to Stay is GRANTED. It is hereby further ORDERED that:

(i) All proceedings in the above-captioned consolidated cases are hereby stayed pending resolution of *National Rifle Association of America v. Ackerman McQueen, Inc., et al.*, Civil Action No. 3:19-cv-02074-G now pending in the Northern District of Texas, or until such time as the Court orders the stay lifted or otherwise modified.

(ii) Defendants' obligation to respond to the Plaintiff's Consolidated and Supplemental Amended Complaint is stayed until further order of the Court.

1

(iii)    Count III of the Defendants' Amended and Supplemental Counterclaim against the

NRA in CL19001757 and CL19002067 filed on October 1, 2019 and Count III of

the Defendants' Counterclaim against the NRA in CL19002886, filed on October

2, 2019, namely, Abuse of Process, are hereby nonsuited without prejudice to

refiling the claim if the stay is lifted.

(iv)    The parties shall file a joint status report upon the resolution of the litigation in the

District Court for the Northern District of Texas.

(v)    Should the Court require any additional pleadings, the Court will notify the counsel

of record.

SO ORDERED.

Date: March 18, 2020

Nolan B. Dawkins
The Honorable Nolan B. Dawkins
Judge, Alexandria Circuit Court

SEEN AND AGREED:

David H. Dickieson (VA Bar #31768)
David Schertler (*Pro hac vice* pending)
SCHERTLER & ONORATO, LLP
901 New York Avenue, NW, Suite 500
Washington, DC 20001
Telephone: 202-628-4199
Facsimile: 202-628-4177
ddickieson@schertlerlaw.com
*Counsel for Movants*

SEEN AND WITH OBJECTIONS NOTED IN RECORD:

James W. Hundley

1

Robert Cox
BRIGLIA HUNDLEY, P.C.
1921 Gallows Road, Suite 750
Tysons Corner, Virginia 22182
703.883.0880
703.883.0204 [direct]
703.883.0899 [facsimile]
jhundley@brigliahundley.com
*Counsel for Plaintiff*

1

# EXHIBIT 38

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § | |
| | § | |
| **Plaintiff and Counter-Defendant** | § | |
| | § | |
| **and** | § | |
| | § | |
| **WAYNE LAPIERRE,** | § | |
| | § | |
| **Third-Party Defendant,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:19-cv-02074-G** |
| | § | |
| **ACKERMAN MCQUEEN, INC.,** | § | |
| | § | |
| **Defendant and Counter-Plaintiff,** | § | |
| | § | |
| **and** | § | |
| | § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG,** | § | |
| | § | |
| **Defendants.** | § | |

## DECLARATION OF ANDREW ARULANANDAM

1.    My name is Andrew Arulanandam, and I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following declaration is true and correct.

2.    I am over twenty-one years old and am fully competent to make this declaration. Unless otherwise noted, I have personal knowledge of all matters stated herein.  I submit this declaration in support of the NRA's Motion to Disqualify the Law Firm of Dorsey & Whitney LLP as Counsel for the Defendants and For Other Appropriate Sanctions and Relief.

1

3.      I serve as the Managing Director of Public Affairs of the National Rifle Association (the "NRA").  I have worked for the NRA for more than 19 years.  As part of my job responsibilities, I have attended many NRA board meetings and often coordinate with NRA officers, employees, or professionals who make presentations at those meetings.

4.      On January 4, 2019, Brewer, Attorneys & Counselor's ("BAC") Managing Director of Public Affairs, Travis Carter, delivered a presentation to the NRA Public Affairs Committee.  Mr. Carter shared a presentation at the request of the NRA which covered public-facing communications efforts concerning legal and regulatory matters being handled by his firm.

5.      As a long-time advertising, branding, networks and communications advisor to the NRA, Defendant Ackerman McQueen, Inc. ("AMc") had representatives in attendance during the presentation of Mr. Carter. Such "committee meetings" are typically attended by a range of NRA board members, members, special guests, and vendor representatives. It is my understanding that AMc's lawyers made reference to this presentation in a legal filing in the above-captioned proceeding, purportedly to advance an argument that the BAC law firm at which Mr. Carter works was seeking to replace AMc as the NRA's advertising and public relations firm.  This argument is disingenuous and without factual basis.  Although the NRA looks to BAC to provide limited public relations advice and services that directly relate to legal matters being handled by the firm—*e.g.*, fielding press inquiries about regulatory investigations and lawsuits—the NRA has never viewed the two entities as competitors for the expansive suite of services provided by AMc.

6.      In any event, the document filed by AMc with this Court was not the January 4, 2019, Public Affairs Committee presentation to which AMc refers in its brief.  Instead, they

attached a highly confidential, attorney-client privileged presentation (the "Privileged Presentation") delivered to a closed executive session of the NRA Board of Directors by BAC partner William A. Brewer III on January 5, 2019.

7.     I was shocked when I learned AMc not only had possession of the Privileged Presentation, but also had shared it with others. Not only were AMc representatives asked to leave the room before the start of the executive meeting and presentation by Mr. Brewer, AMc had been previously confronted by these types of issues in 2019. When AMc's Virginia counsel, Schertler & Onorato, became aware that AMc was in possession of another confidential presentation by Mr. Brewer, dated April 29, 2019, it promptly notified NRA's Virginia counsel, Briglia Hundley, and provided assurances that all copies of that presentation would be destroyed or returned to NRA counsel. AMc's counsel further advised that it had not reviewed the presentation

8.     Historically, the NRA utilizes third-party audiovisual ("AV") technicians, including technicians employed by AMc, to assist with digital media containing privileged material—for example, to insert the media into a drive and configure it for "setup" purposes. As part of this process, the technician is not ordinarily able to view the content of the presentation he or she was "setting up" (except, on certain occasions, the technician would be able to view a cover slide that appeared on the screen preceding the substance of the presentation). Although a disloyal technician could in theory have made affirmative, covert efforts to copy a presentation, I would never have expected AMc to do so. AMc was a trusted agent and fiduciary of the NRA for many years, including for purposes of assisting us with AV technology at meetings. In fact, its contract (Services Agreement dated April 2017) explicitly forbade it from copying the NRA's confidential information without the NRA's consent.

3

9.      Over the historic course of the NRA's relationship with AMc, it is likely that AMc employees were included in at least some privileged meetings, including meetings that featured privileged PowerPoint presentations to the Board.  As Managing Director of Public Affairs, I jointly sought advice from the NRA's legal and public-relations professionals in connection with crisis communications on occasion.

10.      However, this was not the case with respect to the Privileged Presentation on January 5, 2019.  Except for a very short list of NRA staff and outside counsel, all employees and vendors, including AMc, were directed to leave the room before the Privileged Presentation began.

11.      I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___**14ᵗʰ**___ day of April 2020.


Andrew Arulanandam

4

4819-3208-3383.7
2277-08

# EXHIBIT 39



The relevant filing, submitted by Ackerman on Wednesday, seeks to disqualify Brewer's namesake firm, Brewer, Attorneys & Counselors, over allegations that it is "leaking false and disparaging information" about the PR firm and "side-stepping the attorney-client privilege."

The document appears to have been improperly redacted when filed, allowing *Newsweek* to view material beneath the redactions, including testimony about Brewer that Ackerman attributes to Hart.



In response to a request for comment, an Ackerman spokesperson told *Newsweek* that its comments "are the filing."

Among the most significant revelations, Hart has testified, according to Ackerman, that there was in place a "coordinated effort to try to deal with Bill Brewer," reframing the NRA's prior allegation of a "coup."

"This has been reconstructed as a conspiracy against" Wayne LaPierre, the group's CEO, Hart is said to have testified, according to the document.

Additionally, Ackerman claims that "high-ranking NRA officials" have testified that "Brewer's actions were improper given his clear conflict of interest."

Not only are Brewer and Ackerman on opposing ends of the lawsuits, but Brewer is the son-in-law of the firm's late CEO, Angus McQueen, and brother-in-law to its current CEO, Revan McQueen.

"The narrative is contrived," Andrew Arulanandam, a spokesperson for the NRA, told *Newsweek*. "Ackerman is so desperate to distract from the agency's alleged improper actions that it is resorting to unhinged rants. This latest rant bases much of its attack on a communication that does not even exist. The rest of the diatribe is based on claims and allegations from former advisors who were terminated."

"In any event, this is the same stale and desperate narrative Ackerman has tried to peddle all along," Arulanandam added. "It does nothing to diminish the confidence the NRA has in Bill or his law firm -- or our commitment to hold this former vendor accountable."

Hart is the NRA official who first brought Brewer on to the gun-rights group, for the purposes of dealing with a New York state investigation into Carry Guard, its now-defunct gun-owners' insurance product.

After Hart was dismissed, the *New York Times* reported he communicated with another NRA-affiliated attorney, calling Brewer a "moron" or "Manchurian candidate."

These communications, among others, are seized on by defenders of LaPierre, who accuse Hart of participating in a conspiracy to overthrow him.

Hart did not respond to multiple requests for comment.



A picture of Executive Vice President Wayne LaPierre is seen at the National Rifle Association (NRA) booth during CPAC 2019 February 28, 2019, in National Harbor, Maryland. "This has been reconstructed as a conspiracy against Wayne," a former NRA attorney is said to have testified, referring to a purported attempt to hold another NRA lawyer accountable.
ALEX WONG/GETTY

The NRA has fiercely contested related allegations made by Ackerman over the course of the litigation. In their own brief, the group said Ackerman "cannot cite to any" evidence of misdeeds by Brewer.

Source:  https://www.newsweek.com/national-rifle-association-lawsuit-1498670          Created 2020/05/04 at 00:02 GMT

At least one legal scholar cited by the NRA believes the effort to oust Brewer from the litigation lacks merit.

"It is my initial opinion that this request for disqualification provides no legal basis for the relief sought," Linda Eads, a professor at SMU Dedman School of Law who reviewed the material on the NRA's behalf, concluded, according to the group. "It is based on allegations that have not been factually established."

Hart believes, according to Wednesday's filing, that Brewer embarked on a "highly destructive path" when he pressed Ackerman to open its books and that "it was stupidity on Brewer's part" that led him to do so.

This key allegation, that Ackerman was insufficiently providing access to billing records, led to the parties' first lawsuit last April. Hart is said to have testified that Brewer manufactured the stand-off by requesting documents "no reasonable person would produce."

Ackerman says that Hart also directly implicated Brewer in another claim of leaking information to the media, further dismantling the pair's working relationship in recent months. "You would have to be an idiot not to know Bill Brewer was doing this," Hart testified, according to the document.

Ackerman says that it was not just Hart, but "numerous witnesses" who testified "that Brewer was leaking."

The NRA has, in turn, accused Ackerman of leaking damaging materials to the press. That allegation, in addition to an allegation of working to foment a coup at the NRA, formed the basis for the NRA's second lawsuit against Ackerman in Virginia last year.

Brewer has sustained criticism from some, even within the NRA, for the exorbitant cost of his legal fees. Former NRA President Lt. Col. Oliver North wrote in an internal memo last year that his firm was "draining NRA cash at mindboggling speed." Wednesday's filing says that the firm was paid $54 million for legal services over the past two years.

According to Ackerman, Hart, in his testimony, discussed how expensive litigation on behalf of the NRA was "taking over" the business plan and said Brewer was "getting inside of LaPierre's head."

Brewer's defenders argue that he has provided invaluable legal services to a group besieged by anti-Second Amendment politicians and external scrutiny. Moreover, the NRA has cited its many courtroom wins, such as against the City of San Francisco, as vindication for its overarching legal strategy.

The NRA has previously objected to Ackerman's allegedly improper disclosure of confidential material in court documents. The group is now seeking to disqualify Ackerman's attorneys over an incident where material subject to attorney-client privilege was apparently filed multiple times, even after the NRA said it raised the issue with Ackerman.

The fallout spilled into the public last April, when North was ousted as president at the annual meeting of members in Indianapolis, Indiana. Reports subsequently revealed that in the days preceding the development, North had called LaPierre's office to convince him to retire.

The NRA has long referred to this as an "extortion" attempt perpetrated by North on behalf of Ackerman, who was paying North's salary. But Ackerman is now alleging that two senior officials, LaPierre's assistant and the group's current president, "confirmed" North was not acting at the behest of Ackerman, a key part of the "extortion" allegation.

REQUEST REPRINT & LICENSING, SUBMIT CORRECTION OR VIEW EDITORIAL GUIDELINES

Loading...

Popular in the Community



AdChoices ▷          Sponsored

Conversation (1)

Sort by Best ⌄                                                                    🔒  Log In

Add a comment...

Appendix199

The NRA corrupt??NO. Can't be. They are as clean as the laundered money from Russia funneled into the GOP.

Reply · Share · 2 Likes · 👍 👎

Terns   Privacy                                                    ◯ Add Spot.IM to your site

MORE IN U.S.

LATEST NEWS







Kobe Bryant to be Honored in 'The Last Dance' Episode Sunday Night

Warren Leads as Potential Biden VP Candidate: Poll

DNC Chairman References 'Hillary's Emails' Amid Biden Accusations

**China Hid Severity of Coronavirus Outbreak to Hoard Supplies: DHS Report**

**Illinois Church Holds Service in Defiance of Pritzker's Stay-at-Home Order**

**Local Authorities in Oklahoma Face Backlash for Reopening Guidelines**

Johnson Says Doctors Prepared for the Worst During COVID-19 Hospitalization

Whitmer Says Anti-Lockdown Protests 'Depicted Some of the Worst Racism'







Pompeo: 'Enormous Evidence' COVID-19 Originated in China's Wuhan Lab

'The Last Dance' Schedule: Where to Watch ESPN's Michael Jordan Documentary

**Maryland's Republican Governor Dismisses 'Crazy Things' Said By GOP Rep**

**Justin Amash Argues Republicans and Democrats Are 'Destroying Our System'**

**Cuomo Announces Northeast Coalition to Acquire PPE With Joint Resources**

 EDITOR'S PICK



U.S.

WORLD

U.S.

HEALTH

**Congressional Candidate Files Recall Petition for Arizona Governor**

**Kim Jong Un Thanks North Korean Propaganda Units for 'Powerful Work'**

**Robert Hyde Drops Congressional Race After Ukrainian Surveillance Claims**

**How Can We Create a Coronavirus Vaccine When We Know Little About Immunity?**

According to the Friday petition, Governor Ducey "committed a violation of his oath by issuing an unconstitutional executive order."

Kim has not been seen in public since April 11, prompting speculation that he may be dead or otherwise incapacitated, or that he is trying to avoid the coronavirus pandemic.

"I'm withdrawing from the race," Hyde said on Friday. But other state Republicans had publicly called on him to drop out long before.

"The fate of vaccine trials has several hurdles to cross and nothing is guaranteed, but that should not stop us from trying," Sanjay Mishra of Vanderbilt University Medical Center told Newsweek.

 **CHOOSE A MEMBERSHIP THAT'S PERFECT FOR YOU!**

**PRINT ONLY**
✓ Weekly magazine, delivered
✓ Daily Newsletter
✓ Website access

**SUBSCRIBE** ›

**PRINT & DIGITAL**
✓ Weekly magazine, delivered
✓ Daily Newsletter
✓ Website access

**SUBSCRIBE** ›

**DIGITAL ONLY**
✓ Free access to 40+ digital editions
✓ Website access
✓ Daily Newsletter

**SUBSCRIBE** ›

**Newsweek**  © 2020 NEWSWEEK          f  t  🅾  t  in

Editions:  U.S. Edition  日本  Pakistan  Polska  România

About Us   Corrections   Contact Us   Editorial Guidelines   Advertise   Copyright   Terms & Conditions   Privacy Policy   Cookie Policy   Terms of Sale   Archive

Announcements   Consent preferences

Source: https://www.newsweek.com/national-rifle-association-lawsuit-1498670                Created 2020/05/04 at 00:02 GMT

Appendix200

# EXHIBIT 40

Appendix201

# IN THE SUPREME COURT OF TEXAS

No. 18-0426

WILLIAM A. BREWER III, PETITIONER,

V.

LENNOX HEARTH PRODUCTS, LLC; TURNER & WITT PLUMBING, INC.; STRONG CUSTOM BUILDERS, LLC; THERMO DYNAMIC INSULATION, LLC; STATE FARM LLOYDS INSURANCE COMPANY; KEN AND BECKY TEEL; ROSS AND MEG RUSHING, RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE SEVENTH DISTRICT

**Argued October 10, 2019**

JUSTICE GUZMAN delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE GREEN, JUSTICE LEHRMANN, JUSTICE DEVINE, JUSTICE BLACKLOCK, and JUSTICE BUSBY joined.

JUSTICE BOYD filed an opinion concurring in part and dissenting in part.

JUSTICE BLAND did not participate in the decision.

Lawyers are under a professional obligation to act with commitment and dedication to their clients' interests, but they are neither duty-bound nor permitted to press for every possible advantage under the imprimatur of zealous advocacy.[1]   The discretion to determine the trial tactics and

---

[1] *Nath v. Tex. Children's Hosp.*, 446 S.W.3d 355, 367 (Tex. 2014).

litigation strategies to employ, while considerable, is cabined by ethical standards memorialized in sundry rules and statutes and is subject to the inherent authority of courts to preserve the integrity of our judicial system.[2]

In this products-liability and wrongful-death suit, the trial court sanctioned an attorney for commissioning a pretrial survey that commenced in the county of suit shortly before trial.  No rule, statute, or applicable court order categorically prohibited or specifically constrained the use of a pretrial survey in this case or otherwise, and as far as we can discern, this is the only reported case imposing sanctions on a lawyer for conducting such a survey.  We hold that the sanctions order, issued under the court's inherent authority, cannot stand because evidence of bad faith is lacking. Inherent authority has been likened to an "imperial"[3] power with intrinsic "potency" that necessitates "restraint," "discretion," and "great caution";[4] accordingly, sanctions issued pursuant to a court's inherent powers are permissible only to the extent necessary to deter, alleviate, and counteract bad-faith abuse of the judicial process.[5]  Certain attributes of the pretrial survey may have been

---

[2] *See* TEX. CIV. PRAC. & REM. CODE §§ 9.001–.014; 10.001–.006 (sanctions for frivolous pleadings and motions); TEX. GOV'T CODE § 21.002 (statutory contempt power); *In re Bennett*, 960 S.W.2d 35, 40 (Tex. 1997) ("Courts possess inherent power to discipline an attorney's behavior."); *Remington Arms Co., Inc. v. Caldwell*, 850 S.W.2d 167, 172 (Tex. 1993) (observing courts have inherent and statutory contempt power); TEX. R. CIV. P. 13 (sanctions for groundless and bad faith or harassing court filings), 18a(h) (sanctions for groundless and bad faith or harassing recusal motion), 215 (sanctions for discovery abuses); TEX. DISCIPLINARY RULES PROF'L CONDUCT, *reprinted in* TEX. GOV'T CODE, tit. 2, subtit. G, app. A [TEX. DISCIPLINARY RULES PROF'L CONDUCT]; TEX. CODE JUD. CONDUCT, CANON 3(d)(2), *reprinted in* TEX. GOV'T CODE, tit. 2, subtit. G, app. B (disciplinary responsibilities of judges).

[3] *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 894 F.2d 696, 702 (5th Cir. 1990) (observing that inherent power "is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function").

[4] *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-44 (1991).

[5] *See, e.g.*, *Onwuteaka v. Gill*, 908 S.W.2d 276, 280 (Tex. App.—Houston [1st Dist.] 1995, no writ) ("A trial court has inherent power to sanction bad faith conduct during the course of litigation that interferes with administration of justice or the preservation of the court's dignity and integrity."); *see also Chambers*, 501 U.S. at 48-49 (attorney's fees awarded as a sanction under the court's inherent authority must be causally connected to bad faith conduct).

2

reasonably disconcerting to the trial court, but the record bears no evidence of bad faith in the attorney's choice to conduct a pretrial survey or in the manner and means of its execution.  We therefore vacate the sanctions order.

## I. Background

The underlying products-liability and wrongful-death suit settled on the eve of trial amid a host of pending motions seeking sanctions against the product manufacturer's trial counsel, William H. Brewer III and his law firm, Bickel & Brewer (collectively, Brewer).[6]  The sanctions motions complained that Brewer and his firm had improperly commissioned a telephone survey to be conducted in the county of suit mere weeks before the scheduled jury trial without ensuring witnesses, represented parties, judges, and court personnel were excluded from the survey database and without voluntarily disclosing the survey to the trial court or the litigants.  The movants characterized the survey as a "push poll" that was designed to influence or change public opinion and taint the jury pool rather than a legitimate effort to conduct community-attitude research.[7]  In

---

[6] While the sanctions motions were pending, the law firm changed its name to Brewer, Attorneys & Counselors.

[7] The parties have not identified a universal or generally accepted definition of a "push poll" other than describing it as a method of polling that seeks to influence or persuade rather than to legitimately conduct research.  In 1995, the National Council on Public Polls issued a warning about push polls, describing them as a telephone campaign "used to canvass vast numbers of potential voters, feeding them false and damaging 'information' . . . under the guise of taking a poll to see how this 'information' effects [sic] voter preferences" without a genuine "intent to conduct research."  *A Press WARNING from the National Council on Public Polls*, NATIONAL COUNCIL ON PUBLIC POLLS (May 22, 1995), http://www ncpp.org/drupal57/files/Push%20Polls.pdf.  In 2007, the American Association for Public Opinion Research (AAPOR) published a clarification defining a "push poll" as telephone "calls disguised as research that are designed to persuade large numbers of voters—not to measure opinion."  *AAPOR Provides Clarification on "Push Poll" Issue*, AMERICAN ASSOCIATION FOR PUBLIC OPINION RESEARCH, (Nov. 16, 2007), https://www.aapor.org/Publications-Media/Press-Releases/Archived-Press-Releases/AAPOR-Provides-Clarification-on-Push-Poll-Issue.aspx.  According to AAPOR's guidance, push polls usually employ few questions that are either uniformly negative or uniformly positive, large numbers of people are contacted, and the identity of the organization conducting the poll is either undisclosed or fraudulent.  *Id.*

3

addition to compensatory sanctions, the movants requested total forfeiture of all fees the manufacturer had paid to Bickel & Brewer for the litigation.

The tragic facts and allegations in the underlying lawsuit set the context for the telephone survey and the trial court's sanction order.  Suit was filed shortly after a residential home in the City of Lubbock caught fire during a lightning storm in August 2012.  The fire ignited gas seeping from pipes that had been perforated by lightning-induced electrical arcs.  The ensuing explosion resulted in the death of a house guest by thermal insult and significant personal-injury and property losses to the homeowners.  The following month, the City of Lubbock issued a moratorium on the use of yellow-jacketed corrugated stainless steel tubing (CSST), the type of gas plumbing pipe used in the home's construction.

Within weeks, the homeowners and the decedent's parents sued the CSST manufacturer, the pipe supply company, and the pipe installer.  Among other allegations, the plaintiffs asserted the CSST product used in the home's construction was defectively designed because it was too thin to withstand the effects of a lightning strike; the plumbing company was negligent in selecting and installing a defective product, but had installed the CSST in accordance with the manufacturer's instructions; and the pipe supplier was negligent in selling a product known in the industry to be prone to failure in lightning events.

After answering with a general denial, the pipe manufacturer, Titeflex Corporation, filed third-party claims against (1) the installer of the spray-foam insulation in the attic, (2) the home builder, and (3) the manufacturer of the fireplace that had been installed in the home.  Titeflex's litigation position was that CSST is safe when properly installed and that other conditions, including improper installation, caused or contributed to the explosion.  To that end, Titeflex disputed a

4

determination by the City's fire marshal and chief building inspector that the CSST piping in the homeowner's residence had been installed properly even though it was in contact with electrical wires.

Trial was eventually scheduled to commence in June 2014, and the subject telephone survey was conducted on Titeflex's behalf in late May of that year. Several noteworthy events occurred in advance of the survey.

In December 2013, the City extended the moratorium to include a CSST product not involved in this litigation (black-jacketed CSST); the media covered both the initial and expanded moratoriums; and one of the plaintiffs' attorneys provided a responsive comment in at least one televised news story. Plaintiffs' counsel also:

- set up a website touting the dangers of CSST piping;[8]

- conducted a telephone poll to gauge the community's familiarity with CSST products and whether those products were used in the survey respondents' homes;[9] and

- hosted Lubbock's assistant fire marshal, Bob Bailey, and chief building official, Steve O'Neal, on a trip to Massachusetts to view a demonstration involving CSST lightning impacts, which the Lightning Institute conducted shortly before the City announced the expanded moratorium.[10]

Titeflex viewed these events as detrimental to its business and as negatively impacting its litigation strategy.

---

[8] The plaintiffs' website included pretrial discovery; unauthenticated statements, pictures, and videos; and references to other litigation involving Titeflex. Plaintiff's counsel publicized this website to several regulatory bodies, including the National Fire Protection Association and the Texas House of Representatives, in connection with efforts seeking further bans on use of CSST.

[9] The plaintiffs disclosed the existence of that poll to the other parties and the trial court no later than two months before trial.

[10] During the same time period, the City of Lubbock's municipal board had invited Titeflex to submit its own testing results, but Titeflex evidently declined to do so because of confidentiality concerns.

5

A few months before the December 2013 moratorium expansion, Brewer and his law firm joined Titeflex's litigation team.  According to Brewer, the moratoriums, extensive press coverage, and plaintiffs' counsel's media activities impelled the law firm to commission a pretrial survey to gauge community attitudes toward Titeflex's legal position and defensive theories.  Travis Carter, Bickel & Brewer's director of community and media relations, spearheaded the survey project for the law firm.  Carter selected Public Opinion Strategies, a nationally recognized public opinion research firm, to develop and conduct "a random independent poll in regard to certain attitudes and opinions that would likely be prevalent among homeowners in Lubbock, Texas."  According to Brewer and his staff, the scope of the poll was to include community attitudes and opinions about CSST, the moratoriums, and potential litigation themes.

Public Opinion Strategies was tasked with drafting the survey questions, and to assist with that endeavor, Carter gave the survey company a background sheet on CSST that he had prepared along with links to state and national media coverage and newspaper articles reporting on the explosion and moratoriums.  After receiving a draft of the survey from Public Opinion Strategies, Carter edited the survey to add questions adverse to Titeflex's litigation position "to balance the poll" and ensure "there were statements in there that were both favorable toward and opposed to the view of the Defendants."  Brewer reviewed the revised draft, suggested some tweaks, and gave the go-ahead to move forward.  The final version of the survey, which is attached as Appendix A, was composed of 42 questions, more than a third of which were introductory and demographic questions.  Some questions presented information in a static order while others were randomized to prevent order bias.  The second half of the survey specifically referenced this lawsuit in connection with questions testing litigation themes.

Public Opinion Strategies recommended producing either 300 or 500 completed surveys, and Brewer and Carter chose the lesser. The only client-selected parameters for the survey respondents was that all participants be Lubbock County residents over the age of 18. To ensure the completion of 300 surveys, Public Opinion Strategies procured a database of contact information for 20,000 individuals meeting that criteria from a third-party vendor, i360. Public Opinion Strategies then provided the survey questions to another third-party vendor, Survey Sampling International (SSI), to conduct the survey using the database i360 had compiled. SSI, a consumer research firm, conducted the approved survey on May 21 and 22 using computer-assisted telephone interviewing (CATI). CATI is a telephone surveying technique in which the interviewer follows a script guided by a software application that randomly selects respondents from the survey database.

Brewer did not inform the court or the other parties about the survey before, during, or after the May 21 and 22 survey period, but no discovery request, rule, statute, or court order required him to do so. The plaintiffs' attorneys nonetheless caught wind of the survey efforts and, several days after it was completed, began making inquiries to the other parties to determine the source. When asked about a telephone poll being conducted by a company called SSI, Brewer disclaimed knowledge. Other Titeflex legal representatives did the same. Days later, Brewer informed counsel for all parties that he had commissioned the telephone survey. At that time, and depending on which side is recounting the events, Brewer either confessed or made the connection between Public Opinion Strategies (which he had hired) and SSI (which he had not).

The plaintiffs immediately requested a protective order and sought sanctions against Titeflex, Brewer, and Brewer's law firm. The other parties followed suit. The movants alleged the pretrial survey was sanctionable because (1) the content of the poll was designed to intimidate witnesses and

7

tamper with the jury pool and (2) the survey violated disciplinary rules constraining pretrial publicity and contact with represented parties and jury pool members.[11]  The sanctions motions described the survey as an "overt attempt to convince [survey respondents] who [was] to blame for CSST failures in homes, in and around Lubbock, Texas."

With the trial date looming, the trial court initially heard evidence and argument related to the sanctions motions over the course of three days in early June.  Titeflex produced evidence that it was in the dark about the survey, which created a conflict of interest with Brewer's continued representation.  Titeflex discharged Brewer days before the trial setting, and the case settled the weekend before trial.  A jury venire was never empaneled.

A four-day sanctions hearing was later scheduled to take place in September.  Brewer was informally notified about the hearing about a month prior.  Shortly thereafter, the parties filed amended sanctions motions focusing on Brewer and his law firm and dropping complaints about Titeflex.  Brewer requested a continuance, citing lack of proper notice, the necessity of obtaining discovery from Public Opinion Strategies and its third-party vendors, and the recently filed amended motions.  The trial court denied Brewer's motion.

All told, the trial court heard argument and evidence about the telephone survey over the course of seven days in June, September, and October 2014, including one full day when Brewer was in the hot seat under questioning from lawyers for five adverse parties.  Uncontroverted testimony at the sanctions hearings established that no one at Brewer's firm had contact with or prior

---

[11] *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 3.06 ("Maintaining Integrity of Jury System"), 3.07 ("Trial Publicity"), 4.02 ("Communication with One Represented by Counsel"); *see also* TEX. PENAL CODE § 36.06(a)(l)(A) (intentionally or knowingly harming or threatening to harm another by an unlawful act in retaliation for or on account of the service or status of another as a public servant, witness, or prospective witness is a criminal offense).

8

knowledge of i360's or SSI's involvement in the survey.  Moreover, no one at Bickel & Brewer had any input in selecting any name or phone number included in the survey database.  Nor did anyone provide a list to Public Opinion Strategies or the third-party vendors identifying people to exclude from the database due to their association with or participation in the ongoing litigation.

According to the hearing testimony, Public Opinion Strategies took the laboring oar in drafting the survey questions.  Carter materially contributed to the survey's contents, but his edits added questions unfavorable to Titeflex's position to help ensure the survey "was not in any way biased against one party or the other."  Brewer's actual participation in developing the survey was described as minimal, and those knowledgeable about the survey's procurement repeatedly stressed that it was randomly administered by third-party professionals and intentionally balanced to both favor and disfavor Titeflex so opinions and attitudes about CSST and Titeflex's legal messages could be tested.

Expert testimony was a mixed bag.  An attorney offered as an expert on ethical standards testified the survey was inconsistent with the Texas Disciplinary Rules of Professional Conduct because the survey might influence a person who could potentially end up in the venire and be seated on a jury if the survey's existence was undisclosed and the juror's participation in it was not elicited in voir dire questioning.  Disciplinary Rule 3.06(a) prohibits attorneys from "seek[ing] to influence a venireman or juror concerning the merits of a pending matter *by means prohibited by law or applicable rules of practice or procedure*."[12]  That prohibition extends to relatives of jurors

_____

[12] TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 3.06(a)(2) (emphasis added).

9

and members of the venire.[13]  The expert did not identify any rule or law that prohibits a pretrial survey or contact with community members merely because they could conceivably end up in the venire.

However, the expert opined that Brewer inadequately supervised the independent contractors conducting the survey by not ensuring witnesses and represented parties connected with the litigation were excluded from the survey database.  Disciplinary Rule 4.02 prohibits lawyers from communicating with a represented party about the subject of the litigation without the consent of the represented party's counsel, except as authorized by law.[14]  And a lawyer having direct supervisory authority over a nonlawyer has a duty to make "reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer."[15]  A supervisory lawyer may be subject to discipline by the State Bar if "the lawyer orders, encourages, or permits the conduct involved" or "with knowledge of such misconduct" "knowingly" fails to take reasonable remedial or mitigating measures.[16]

Brewer's and Carter's testimony that they had no hand in assembling the survey database was unrefuted, and Brewer took the position that securing a third-party professional to design and implement the survey was a reasonable effort to ensure it was conducted appropriately.  He acknowledged, however, that not taking a more active role in providing limiting parameters was a lapse of judgment.

---

[13] *Id.* R. 3.06(e).

[14] *Id.* R. 4.02(a).

[15] *Id.* R. 5.03(a).

[16] *Id.* R. 5.03(b).

10

An expert on surveys testified about the manner and means of executing the survey.  He described the survey as attempting to persuade (a "push poll") in certain respects and relatively balanced message testing in others.

Collectively, the two experts expressed generalized concerns about:

- a litigant conducting a pretrial poll in the county of suit, from which the jury would be drawn;

- the failure to ensure persons connected with the case were not excluded from the survey database;

- the lack of randomization of some questions that painted adverse parties in a negative light;

- the relative strength of statements adverse to Titeflex compared to the negative statements about other potentially responsible parties;

- whether some statements were false and misleading or merely relied on disputed facts to be litigated, for example, whether the CSST pipe had been installed improperly;

- the survey's efforts to compare the respondents' initial impressions about legal responsibility with the respondents' impressions after hearing variously formulated "statements"; and

- the inclusion of specific references to the underlying lawsuit without identifying the survey's sponsor in any manner.

A third expert also testified about professional ethics.  He opined that (1) pretrial surveys are not specifically prohibited by any governing authority, (2) neither the survey nor Brewer violated any disciplinary rule, and (3) Brewer reasonably relied on an independent third-party professional to design and execute the survey.

11

All 20,000 names included in the survey database were produced,[17] but the record includes no evidence or testimony about how many of those individuals were contacted to secure 300 completed survey responses.  Nor were the identities of those who completed the survey disclosed.  However, review of the survey database revealed that several city employees and government officials associated with the lawsuit or moratoriums had been included as potential contacts, leading the City Attorney to conclude the poll was "targeting" particular government servants.  Sitting judges, city council members, other government officials, and members of the trial judge's staff and family were also on the list.  Brewer testified these "unfortunate" and "horrible coincidence[s]" were the by-product of random selection and confessed that he had not thought to provide guidance to Public Opinion Strategies about exclusions from a randomly generated survey sample.

The trial court also heard evidence that, in conducting the survey, SSI had in fact spoken with immediate family members of three previously deposed witnesses, two of whom were government employees ostensibly represented by the City Attorney.  During the survey window, SSI called (1) mobile and landline numbers assigned to Chris Beeson, co-owner of Fireplaces Unlimited, which Titeflex had designated as a potentially responsible third party; (2) the home number for Steve O'Neal, the City of Lubbock's Chief Building Official; and (3) a mobile number associated with Tommy Jeter, a city building inspector and subordinate of Steve O'Neal.  The spouse of each of these witnesses answered one or more of SSI's calls.  Two spouses participated in the survey long enough to determine the calls were about this lawsuit, but none of them completed the survey.

---

[17] Lubbock County has a population of nearly 300,000 and a jury pool of a little more than half its population.

12

Notably, the record bears no evidence that a survey participant could not be contacted multiple times or through multiple telephone numbers in a randomly conducted survey using CATI software.  And no expert testified that anyone connected with the case was more likely than not "targeted."  Indeed no expert witness impugned—statistically or even anecdotally—the randomness of either the survey database or the selections from the database.  At most, the survey expert testified the 20,000 name survey database was not "completely" random because it resulted from at least some defined parameters (in this case, Lubbock County residents over age 18) and was "likely" drawn from public records, which would include registered voters who might be called to serve on a jury; he acknowledged, however, that CATI software would have randomly selected respondents from the survey database.

Finally, the court heard evidence that the week after the survey concluded, Brewer filed an ethics complaint against Steve O'Neal and the assistant fire marshal, calling on the City to investigate whether their "free trip" to Massachusetts for the product-testing demonstration violated the city charter.  The complaint was hand-delivered to the Lubbock City Council and contemporaneously released to the media.  The sanctions movants characterized this as a witness-intimidation tactic.[18]

At the conclusion of the sanctions hearing, the trial court took the matter under advisement. The court expressed uncertainty about whether the requested sanctions were warranted but stated that "what was done . . . was [not] right."  The court requested supplemental briefing from the

---

[18] TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 4.04(b) ("A lawyer shall not present, participate in presenting, or threaten to present: (1) criminal or disciplinary charges solely to gain an advantage in a civil matter . . . .").

Appendix214

parties addressed to whether sanctions were justified as a legal matter and affidavits to support the attorneys' fees requested as sanctions.

Fifteen months later, the trial court issued a lengthy letter ruling imposing sanctions against Brewer individually but not the law firm.  The court ordered Brewer to complete ten hours of legal-ethics education and pay the movants a total of $133,415.27 in attorneys fees and expenses, plus $43,590 in contingent fees and expenses.[19]  The letter ruling generally addressed the content and execution of the survey, Brewer's errors and omissions in undertaking the pretrial survey, and Brewer's demeanor at the sanctions hearing.  The court did not find that Brewer violated any disciplinary rules or other applicable authority, but instead concluded that Brewer's conduct "taken

---

[19] The breakdown of fees and expenses awarded is as follows:

To third-party defendant Lennox Hearth Products, LLC:
- Attorney's Fees: $29,500.00
- Expenses: $3,500.00
- Contingent Attorney's Fees and Expenses: $17,300

To co-defendant Turner & Witt Plumbing:
- Attorney's Fees: $11,032.00
- Expenses: $1,919.76
- Contingent Attorney's Fees & Expenses: $7,190

To third-party defendant Strong Custom Builders, LLC:
- Attorney's Fees: $8,170.00
- Expenses: $554.83
- Contingent Attorney's Fees: $3,000.00

To third-party defendant Thermo Dynamic Insulation, LLC:
- Attorney's Fees: $16,038.00
- Expenses: $3,738.68
- Contingent Attorney's Fees: $6,600

To the subrogee insurance company, State Farm Lloyds Insurance Company:
- Attorney's Fees: $27,312.00
- Contingent Attorney's Fees: $5,000.00

To plaintiffs Ken Teel, Becky Teel, Ross Rushing, and Meg Rushing:
- Attorney's Fees: $31,650.00
- Contingent Attorney's Fees: $4,500.00

14

in its entirety," including actions of his agents and subordinates, was "an abusive litigation practice that harms the integrity of the justice system and the jury trial process" and was "intentional[,] in bad faith[,] and abusive of the legal system and the judicial process specifically."

With regard to the survey's execution, the court disbelieved testimony that the polling efforts were random and coincidental and found Brewer was "grossly negligent" in failing to provide a no-contact list of parties and witnesses to the third-party vendor.  In support of these findings, the court noted that (1) the pollster had actually made contact with represented and unrepresented parties and witnesses and (2) the survey database included members of the trial judge's family and staff, several government employees and officials, designated third parties, and spouses of the foregoing without regard to whether they were represented by counsel.

As to the survey's contents, the trial court determined it was "designed to improperly influence a jury pool" by disseminating information "without regard to it[s] truthfulness or accuracy" and by including "several questions . . . designed to influence or alter the opinion or attitude of the person being polled . . . ."  Rejecting Brewer's argument that "he bears clean hands because the poll was a blind study conducted by a third party vendor," the court cited Brewer's testimony that he (1) bore supervisory responsibility for his employees and consultants, (2) reviewed and approved the poll questions, and (3) "instruct[ed] and guid[ed] the pollster on the purpose and composition of the poll."

The letter ruling does not identify the portions of the survey's contents that were objectionable, improper, or inaccurate.  However, the court noted that four federal district courts in Texas have standing orders regulating the manner of conducting community attitude studies (mock trials, focus groups, and the like) when the survey is conducted in the division where the case is

15

pending, noting one of the orders "discourages" the practice and the orders collectively "serve as an excellent blueprint for the manner by which a proper survey/poll should be conducted." Though no similar order was in place for the underlying litigation, the trial court faulted Brewer for failing to adhere to similar parameters.

Finally, the court found Brewer's attitude in response to the sanctions motion "concerning" due to his (1) "nonchalant and uncaring" demeanor and (2) "repeatedly evasive" responses to questioning, which during a day of questioning, had prompted the court to sustain a total of four objections to responsiveness and twice instruct Brewer to answer the question asked.

Brewer appealed the sanctions order and denial of his motion for continuance. The court of appeals affirmed, holding the trial court had authority to sanction Brewer's conduct, the sanctions award was appropriate and not excessive, and any error in denying Brewer's request for a continuance was harmless.[20] As to the propriety of sanctions, the court found no abuse of discretion because the record supported the trial court's "perce[ption] [that] Brewer's 'intentional and bad faith' conduct in connection with the telephone survey" imperiled the court's core judicial functions of "empanel[ing] an impartial jury and try[ing] a case with unintimidated witnesses."[21]

Brewer's petition for review to this Court argues the sanctions award must be vacated because the record does not support the trial court's finding that he acted in bad faith or significantly interfered with a core judicial function in commissioning a public opinion poll or otherwise. He contends both findings are necessary prerequisites to the exercise of a court's inherent power to sanction. In the alternative, he urges the Court to remand for a new sanctions hearing because he

---

[20] 546 S.W.3d 866, 885-86 (Tex. App.—Amarillo Mar. 2018).

[21] *Id.* at 881.

16

was not properly notified about the hearing and had inadequate time to conduct discovery and prepare an appropriate defense.

## II. Discussion

The decision to impose sanctions involves two distinct determinations: (1) whether conduct is sanctionable and (2) what sanction to impose.[22]  Both decisions are subject to appellate review, but Brewer challenges only the former in this case.  The dispositive issue on appeal is whether the trial court properly exercised its inherent authority to sanction Brewer based on the manner in which a pretrial survey was conducted on his client's behalf in connection with complex, high-profile litigation.  No litigant claims the trial court acted pursuant to a rule or statute authorizing sanctions in this instance.  Nor does any litigant contend that a rule, statute, order, or any other authority proscribed or conscribed the use of a pretrial survey in the underlying litigation.  The dispute is whether the latter circumstance necessarily precludes the court from imposing sanctions under its inherent authority or whether sanctions were permitted—with or without evidence of bad faith—because the trial court could have concluded that certain aspects of the survey crossed ethical lines and threatened the integrity of the jury system.

We agree with the court of appeals that (1) bad faith is required to support sanctions imposed under a court's inherent authority;[23] (2) bad faith can exist without explicitly violating a rule, statute, or ethical code of conduct;[24] (3) direct evidence of bad faith is not required;[25] (4) an attorney acting

---

[22] *See In re Bennett*, 960 S.W.2d 35, 39 (Tex. 1997) (sanctioning counsel requires the court to determine whether the attorney has abused the judicial process and what sanction is appropriate).

[23] 546 S.W.3d at 878-79.

[24] *Id.* at 880.

[25] *Id.* at 879-80.

17

in bad faith can be sanctioned for conducting a pretrial attitudinal survey even when no authority specifically prohibits or constrains the use of such a survey;[26] and (5) neither the absence of actual interference with the jury venire nor the potential for rectifying any harm through voir dire negates the existence of bad faith.[27]  However, mere violation of a rule, statute, or ethical standard does not *ipso facto* constitute bad faith.  An error, without more, is no evidence of improper motive,[28] unless the conduct could not have occurred without conscious wrongdoing.[29]

---

[26] *Id.* at 876-78.

[27] *Id.*; *cf. Primrose Operating Co. Inc. v. Jones*, 102 S.W.3d 188, 192 (Tex. App.—Amarillo 2003, pet. denied) (observing that the effect of a pretrial community attitude study—a mock trial—had been thoroughly explored during jury voir dire examination and a mistrial was therefore unwarranted even though plaintiffs' counsel declined to furnish a list of mock-trial participants).

[28] The cases of *McWhorter v. Sheller*, 993 S.W.2d 781 (Tex. App.—Houston [14th Dist.] 1999, pet. denied), and *Onwuteaka v. Gill*, 908 S.W.2d 276, 280 (Tex. App.—Houston [1st Dist.] 1995, no writ), are ready examples.  In *McWhorter*, an attorney failed to alert the court and opposing counsel that she was recording a telephonic conference for the purpose of preparing a draft order reflecting the court's findings.  Even though the order "tracked the telephone conference," "the findings were specific and [the court] felt comfortable adopting them," and counsel was not acting in bad faith, the court sanctioned the attorney.  The court of appeals reversed, noting the record reflected "at best, some degree of inexperience and negligence on [the attorney's] part, rather than an intentional act made in bad faith."  In *Onwuteaka*, the trial court struck an attorney's plea in intervention seeking to recover a contingency fee, because he was not present when his case was called.  908 S.W.2d at 280.  Although the attorney timely arrived at the courthouse, he was told his case was set for "standby" and the clerk would call him when the case was assigned, that day or maybe the next.  *Id.*  Counsel returned to the courthouse as soon as he got the call, while his assistant called the court clerk to advise her that he was on his way.  *Id.* at 280-81.  He arrived too late, but the record bore no evidence that, before trial began, counsel knew the case had taken off "standby" status.  *Id.* at 281.  The court of appeals vacated the sanctions order for two independent reasons: (1) counsel's conduct was merely negligent, not in bad faith as required to impose sanctions under a court's inherent authority, and (2) the record did not bear evidence of flagrant bad faith as required for the particular sanction imposed.  *Id.* at 280-81.

[29] For example, under no circumstance could a litigant or counsel be acting innocently or in good faith while directing an obscene gesture to the court or a trial participant.

Pretrial surveys are not uncommon and are neither categorically permissible nor inherently suspect.[30]  And while the absence of authoritative guidance is not a license to act with impunity,[31] bad faith is required to impose sanctions under the court's inherent authority.[32]  We hold the sanctions order in this case cannot stand because evidence of bad faith is lacking.  Even if the survey Brewer commissioned was not flawlessly designed or executed, the record bears no evidence that Brewer, individually or through his agents, developed or employed the survey for an improper purpose.  Accordingly, we need not consider whether "substantial interference with the court's legitimate exercise of one of its traditional core functions" is an additional requirement, as Brewer asserts.[33]

---

[30] *See U.S. v. Collins*, 972 F.2d 1385, 1399-1400 (5th Cir. 1992) (pretrial telephone survey in the district from which the jury pool was drawn did not compromise the integrity of the jury system even though it was not disclosed by the prosecution, offered the prosecution's version of the evidence, and inquired as to opinions about the defendants' guilt or innocence based on the evidence as presented).

[31] *See In re Bennett*, 960 S.W.2d 35, 40 (Tex. 1997) (counsel knowingly undertook conduct designed to circumvent local rules ensuring random assignment of cases).

[32] *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 767 (1980) (holding "the trial court did not make a specific finding as to whether counsel's conduct constituted or was tantamount to bad faith, a finding that would have to precede any sanction under the court's inherent powers.").

[33] *See Kennedy v. Kennedy*, 125 S.W.3d 14, 19 (Tex. App.—Austin 2002, pet. denied) ("A court cannot invoke its inherent power to sanction without some evidence and factual findings that the conduct complained of significantly interfered with the court's legitimate exercise of one of its traditional core functions.").

## A. Standard of Review

We review a trial court's sanctions order for abuse of discretion.[34]  A trial court abuses its discretion if it acts without reference to guiding rules and principles such that the ruling is arbitrary or unreasonable.[35]  Although we view conflicting evidence favorably to the court's decision,[36] we are not bound by a trial court's fact findings or conclusions of law and must, instead, review the entire record independently to determine whether the trial court abused its discretion.[37]  A decision lacking factual support is arbitrary and unreasonable and must be set aside.[38]

## B. Inherent Power to Sanction

Various rules and statutes imbue courts with authority to sanction attorneys for professional lapses of one kind or another with or without bad faith.[39]  Courts also possess inherent powers that aid the exercise of their jurisdiction, facilitate the administration of justice, and preserve the independence and integrity of the judicial system.[40]  A court's inherent authority includes the "power to discipline an attorney's behavior."[41]

---

[34] *Cire v. Cummings*, 134 S.W.3d 835, 838-39 (Tex. 2004).

[35] *Id.*

[36] *In re Barber*, 982 S.W.2d 364, 366 (Tex. 1998).

[37] *Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006).

[38] *Goode v. Shoukfeh*, 943 S.W.2d 441, 446 (Tex. 1997).

[39] *See supra* n.2.

[40] *Eichelberger v. Eichelberger*, 582 S.W.2d 395, 399 (Tex. 1979).

[41] *See In re Bennett*, 960 S.W.2d 35, 40 (Tex. 1997).

20

Inherent authority emanates "from the very fact that the court has been created and charged by the constitution with certain duties and responsibilities."[42]   Indeed, courts "'are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates.'"[43]   Courts are accordingly empowered to punish an attorney's behavior even when the offensive conduct is not explicitly prohibited by statute, rule, or other authority.[44]

That power is not boundless, however.  The inherent authority to sanction is limited by due process, so sanctions must be just and not excessive.[45]  Moreover, "[b]ecause inherent powers are shielded from direct democratic controls,"[46] and "[b]ecause of their very potency, inherent powers must be exercised with restraint[,] discretion,"[47] and "great caution."[48]   To that end, invocation of the court's inherent power to sanction necessitates a finding of bad faith.[49]

With the understanding that inherent powers must be used sparingly, our appellate courts have consistently held that a court's inherent power to sanction "exists to the extent necessary to

---

[42] *Eichelberger*, 582 S.W.2d at 398.

[43] *Chambers v. NASCO, Inc.* 501 U.S. 32, 43 (1991) (quoting *Anderson v. Dunn*, 19 U.S. 204, 227 (1821)).

[44] *Bennett*, 960 S.W.2d at 40.

[45] *Id.*; *TransAmerican Nat'l Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991).

[46] *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764 (1980).

[47] *Chambers*, 501 U.S. at 44; *accord Roadway Exp.*, 447 U.S. at 764.

[48] *Chambers*, 501 U.S. at 43 (quoting *Ex Parte Burr*,6 L. Ed. 152 (1824)).

[49] *Roadway Exp.*, 447 U.S. at 767 (imposition of "any sanction under the court's inherent authority" requires a finding of bad-faith conduct); *see Chambers*, 501 U.S. at 49-50 (1991) ("[A] federal court is [not] forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under the statute or the Rules.  A court must, of course, exercise caution in invoking its inherent power and it must comply with mandates of due process, both in determining that the requisite bad faith exists and in assessing fees.").

21

deter, alleviate, and counteract bad faith abuse of the judicial process . . . ."[50]  Bad faith is not just

intentional conduct but intent to engage in conduct for an impermissible reason, willful

noncompliance, or willful ignorance of the facts.[51]  "Bad faith" includes "conscious doing of a

wrong for a dishonest, discriminatory, or malicious purpose."[52]  Errors in judgment, lack of

diligence, unreasonableness, negligence, or even gross negligence—without more—do not equate

---

[50] *Houtex Ready Mix Concrete & Materials v. Eagle Const. & Envtl. Servs., L.P.*, 226 S.W.3d 514, 524 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *accord, e.g.*, *Darnell v. Broberg*, 565 S.W.3d 450 (Tex. App.—El Paso 2018, no pet.)*; Liles v. Contreras*, 547 S.W.3d 280 (Tex. App.—San Antonio 2018, pet. denied); *Guerra v. L&F Distribs.*, 521 S.W.3d 878, 890 (Tex. App.—San Antonio 2017, no pet.); *Fast Invs., LLC v. Prosper Bank*, No. 02-13-00026-CV, 2014 WL 888438 (Tex. App.—Fort Worth Mar. 6, 2014, no pet.) (mem. op.); *McDonald v. State*, 401 S.W.3d 360 (Tex. App.—Amarillo 2013, pet. ref'd); *Union Carbide Corp. v. Martin*, 349 S.W.3d 137 (Tex. App.—Dallas 2011, no pet.); *Ezeoke v. Tracy*, 349 S.W.3d 679 (Tex. App.—Houston [14th Dist.] 2011, no pet.); *Dike v. Peltier Chevrolet, Inc.*, 343 S.W.3d 179 (Tex. App.—Texarkana 2011, no pet.); *Wythe II Corp. v. Stone*, 342 S.W.3d 96, 113 (Tex. App.—Beaumont 2011, pet. denied); *Davis v. Rupe*, 307 S.W.3d 528, 531 (Tex. App.—Dallas 2010, no. pet.); *Finlan v. Peavy*, 205 S.W.3d 647 (Tex. App.—Waco 2006, no pet.); *Howell v. Tex. Workers' Comp. Comm'n*, 143 S.W.3d 416, 446-47 (Tex. App.—Austin 2004, pet. denied); *McWhorter v. Sheller*, 993 S.W.2d 781 (Tex. App.—Houston [14th Dist.] 1999, pet. denied); *Keithly v. P.G.D., Inc.*, No. 08-99-00278-CV, 2000 WL 1681066 (Tex. App.—El Paso Nov. 9, 2000, no pet.) (mem. op.); *Williams v. Azko Nobel Chems. Inc.*, 999 S.W.2d 836, 843 (Tex. App.—Tyler 1999, no pet.); *Onwuteaka v. Gill*, 908 S.W.2d 276, 280 (Tex. App.—Houston [1st Dist.] 1995, no writ); *Kutch v. Del Mar Coll.*, 831 S.W.2d 506, 510 (Tex. App.—Corpus Christi 1992, no writ); *see also Clark v. Bres*, 217 S.W.3d 501, 512 (Tex. App.—Houston [14th Dist.] 2006, pets. denied) ("Even in the absence of an applicable rule or statute, courts have the authority to sanction parties for bad faith abuses if it finds that to do so will aid in the exercise of its jurisdiction, in the administration of justice, and the preservation of its independence and integrity.").
   Some courts have further articulated, as an additional requirement, that "the conduct complained of significantly interfered with the court's legitimate exercise of one of its traditional core functions." *Kennedy v. Kennedy*, 125 S.W.3d 14, 19 (Tex. App.—Austin 2002, pet. denied) (party's actions subjected her to contempt of court but not sanctions under a statute or rule, or even under the court's inherent power to sanction for abuse of the judicial process, which requires evidence and findings of significant interference with core judicial functions (citing *Kutch*, 831 S.W.2d 506, 510 (Tex. App.—Corpus Christi 1992, no writ), which articulates bad faith as a predicate to inherent-authority sanctions)).  *But see In re J.V.G.*, No. 09-06-015CV, 2007 WL 2011019, at *5 (Tex. App.—Beaumont July 12, 2007, no pet.) (mem. op.) (upholding sanctions because counsel's pattern of conduct "significantly interfered" with core judicial functions and stating "bad faith" is "one basis for imposing inherent authority sanctions" but "broader considerations are involved when reviewing the propriety of sanctions imposed").

[51] *Cf. Assoc. Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285 (Tex. 1998) (explaining in the surety context that "'bad faith' means more than merely negligent or unreasonable conduct; it requires proof of an improper motive or wilful ignorance of the facts"); *Citizens Bridge Co. v. Guerra*, 258 S.W.2d 64, 69-70 (Tex. 1953) (willful ignorance is the equivalent of bad faith).

[52] *Pearson v. Stewart*, 314 S.W.3d 242, 248 (Tex. App.—Fort Worth 2010, no pet.); *Zuehl Land Dev., LLC v. Zuehl Airport Flying Cmty. Owners Ass'n, Inc.*, 510 S.W.3d 41, 53 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *Robson v. Gilbreath*, 267 S.W.3d 401, 407 (Tex. App.—Austin 2008, pet. denied); *Elkins v. Stotts-Brown*, 103 S.W.3d 664, 669 (Tex. App.—Dallas 2003, no pet.).

Appendix223

to bad faith.[53]  Improper motive,[54] not perfection,[55] is the touchstone.  Bad faith can be established with direct or circumstantial evidence, but absent direct evidence, the record must reasonably give rise to an inference of intent or willfulness.[56]

An illustrative case involving the use of inherent authority to sanction attorney misconduct is *In re Bennett*, which involved an attorney's plan to deliberately circumvent rules implementing random assignment of cases in the district courts.[57]  The attorney sequentially filed seventeen lawsuits with the same factual allegations and the same legal claims against the same defendants, but with different plaintiff groups.[58]  Each case was randomly assigned, but plaintiffs' counsel instructed the clerk of the court not to prepare service of citation for the first sixteen filings.[59]  Mere hours after securing assignment to a particular judge for the seventeenth lawsuit, plaintiffs' counsel amended the petition in that case to add approximately seven hundred plaintiffs.[60]  Soon after, counsel attempted to nonsuit the sixteen previously filed lawsuits.[61]  The trial judge assigned to the

---

[53] *See Assoc. Indem.*, 964 S.W.2d at 285 (discussing bad faith in the surety context); *Gomer v. Davis*, 419 S.W.3d 470, 478 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *Elkins*, 203 S.W.3d at 664.

[54] *Zuehl*, 510 S.W.3d at 54; *Dike v. Peltier Chevrolet, Inc.*, 343 S.W.3d 179, 194 (Tex. App.—Texarkana 2011, no pet.); *Robson*, 267 S.W.3d at 407.

[55] *See Dike*, 343 S.W.3d at 191; *cf. Cosgrove v. Grimes*, 774 S.W.2d 662, 664-65 (Tex. 1989) (good-faith defense to a legal malpractice action is governed by an objective inquiry: "An attorney who makes a reasonable decision in the handling of a case may not be held liable if the decision later proves to be imperfect.").

[56] *Zuehl*, 510 S.W.3d at 54; *Dike*, 343 S.W.3d at 194.

[57] 960 S.W.2d 35, 36-37 (Tex. 1997).

[58] *Id.* at 36.

[59] *Id.*

[60] *Id.* at 36-37.

[61] *Id.* at 37.

23

first-filed case sanctioned plaintiffs' counsel for knowingly and intentionally violating rules providing for random assignment.[62]  Plaintiffs' counsel admittedly gamed the system to ensure assignment to a particular court, but such activities were not expressly prohibited.[63]  We nevertheless upheld the sanctions order.[64]  We considered counsel's overall course of conduct as well as his expressed intent and held that subversion of random assignment procedures is "an abuse of the judicial process" that "if tolerated, breeds disrespect for and threatens the integrity of our judicial system."[65]  *Bennett* involved rules that did not specifically prohibit the attorney's conduct, but the attorney's filings exhibited a pattern giving rise to an inference of improper motive, which he admitted.

We have had few occasions to consider conduct sanctionable only under a court's inherent authority, and when we have done so, we have not explicitly articulated bad faith as a predicate finding.  But we have used equivalent language;[66] we have not upheld a sanction where bad faith conduct was lacking; and we have observed that the severity of the sanction imposed turns on the

---

[62] *Id.*

[63] *Id.*

[64] *Id.* at 40.

[65] *Id.*

[66] *See, e.g.*, *Bennett*, 960 S.W.2d at 40 (stating courts have inherent authority to sanction attorneys who "abuse [] the judicial process" and citing *Lawrence v. Kohl*, 853 S.W.2d 697, 700 (Tex. App.—Houston [1st Dist.] 1993, no writ), and *Kutch v. Del Mar College*, 831 S.W.2d 506, 509-10 (Tex. App.—Corpus Christi 1992, no writ), for the proposition that "trial courts have the power to sanction parties for *bad faith abuse* of the judicial process not covered by rule or statute" (emphasis added)); *id.* (noting the egregious conduct at issue there would "if tolerated, breed[] disrespect for and threaten[] the integrity of our judicial system"); *see also Abuse*, OXFORD AMERICAN DICTIONARY & THESAURUS (3d ed. 2010) ("use something to bad effect or for a bad purpose"); *Abuse*, WEBSTER'S SECOND NEW UNIVERSITY DICTIONARY 69 (1984) ("to use wrongly or improperly").

Appendix225

*degree* of bad faith.[67]   Today's concurring opinion agrees that bad faith is a prerequisite to a sanctions award, but only for certain sanctions, like attorney's fees, and not other types of sanctions, like requiring hours of legal-ethics education.[68]   The distinction the concurrence makes lacks clarity and provides no guidance to trial courts.[69]   More significantly, it ignores decades of jurisprudence that has ably guided Texas courts,[70] is derived from a misreading of the Supreme Court's opinion

---

[67] *See Altesse Healthcare Sols. v. Wilson*, 540 S.W.3d 570, 575-76 (Tex. 2018) ("extreme sanctions" like death-penalty sanctions require *flagrant* bad faith).

[68] *Post* at 6-7.

[69] In urging bad faith is required only for some sanctions and not others, the concurrence cites three cases as allowing courts to invoke inherent authority to impose sanctions based only on "significant interference" with core judicial functions. *Post* at 8-9. Two of those cases do not so hold, *see infra* n. 70, but more problematically, the concurrence never says *whether* that is the standard and, if so, *how* that standard is satisfied on this record. Indeed, the concurrence does not identify *any* standard as guiding invocation of a court's inherent authority to sanction parties and counsel. The concurrence studiously avoids the issue, but as the highest civil court in the state, we have a duty to establish standards and settle the law, not unsettle the law and leave the applicable standards in doubt.

[70] *See supra* n.50. With the weight of authority decidedly in opposition, the concurrence's contrary view rests on a single unpublished case with flawed reasoning that has not been followed by any other court, including its own. *Post* at 9 (citing *In re J.V.G.*, No. 09-06-015CV, 2007 WL 2011019 (Tex. App.—Beaumont July 12, 2007, no pet.) (mem. op.)). *But see Wythe II Corp. v. Stone*, 342 S.W.3d 96, 113 (Tex. App.—Beaumont 2011, pet. denied) (observing inherent authority to sanction exists "to the extent necessary to deter, alleviate, and counteract bad faith abuse of the judicial process"). The opinion in *J.V.G.* states that bad faith is but one basis for imposing sanctions and holds sanctions were proper there for a pattern of conduct that "significantly interfered with" a core judicial function. *Id.* at *5-8. But all of the cases *J.V.G.* relied on treated "significant interference" as a required component of a bad-faith finding, not as an alternative standard. *See In re K.A.R.*, 171 S.W.3d 705, 712 n.3, 714-15 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (observing bad-faith conduct findings were unchallenged and conduct significantly interfered with core judicial functions); *Kings Park Apts., Ltd. v. Nat'l Union Fire Ins. Co.*, 101 S.W.3d 525, 541 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) (evidence that a party instructed a paralegal to steal documents from the judge's chambers authorized sanctions under the trial court's inherent authority); *Roberts v. Rose*, 37 S.W.3d 31 (Tex. App.—San Antonio 2000, no pet.) ("Roberts's deliberate acts of bad faith throughout his representation" were evidence of bad faith that supported the imposition of sanctions against him).

The concurrence also misstates the holdings in *Kennedy v. Kennedy*, 125 S.W.3d 14, 19 (Tex. App.—Austin 2002, no pet.), and *McWhorter v. Sheller*, 993 S.W.2d 781, 789 (Tex. App.—Houston [14th Dist.] 1999, pet. denied), as rejecting bad faith as the guiding standard. But both *Kennedy* and *McWhorter* hold only that sanctions not authorized by rule or statute cannot stand without a finding and evidence of significant interference with core judicial functions, an issue raised here that we do not reach. Notably, both courts relied on *Kutch v. Del Mar College*, which articulates the standard as requiring *both* bad faith and significant interference. 831 S.W.2d 506, 509-10 (Tex. App.—Corpus Christi 1992, no writ) ("We hold Texas courts have inherent power to sanction for bad faith conduct during litigation."). More to the point, the Austin and Houston courts of appeals have long articulated the standard for inherent-authority sanctions as requiring bad faith. *See supra* n.50.

in *Chambers v. NASCO, Inc.*,[71] and inverts the analysis by looking to the particular sanction imposed

to determine whether conduct is sanctionable in the first instance.[72]  But whether counsel should

---

[71] The concurrence misconstrues *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991), as requiring bad faith to support inherent-authority sanctions *only* when the court chooses attorney's fees as the particular sanction.  *Post* at 6. Of course, it is true the Supreme Court required bad faith to support an award of attorney's fees as a sanction, because bad faith is necessary whenever a court invokes inherent authority to impose *any* sanction. *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 767 (1980). But *Chambers* actually involves the analytically obverse issue—whether attorney's fees could *ever* be imposed as a sanction in light of the American Rule's restriction on fee shifting.  *Chambers*, 501 U.S. at 45, 51; *see Travelers Indem. Co. v. Mayfield*, 923 S.W.2d 590, 594 (Tex. 1996) (allowing trial courts to award attorney's fees "under the guise of 'inherent authority' would constitute a judicial end-run around the statutory fee-shifting scheme"). The Court held attorney's fees could indeed be awarded as a sanction under a court's inherent authority, *id.* at 51, 57, and more recently has clarified that such an award is limited to only those fees causally related to the bad faith conduct. *Goodyear Tire & Rubber Co. v. Heager*, 137 S. Ct. 1178, 1184 (2017) (a federal court's inherent authority to award attorney's fees as a sanction for bad-faith conduct is limited to the fees the innocent party incurred solely because of the misconduct). So, while trial courts do not have inherent authority to award attorney's fees when not provided by contract or statute, courts have inherent authority to impose sanctions for bad-faith conduct and those sanctions can include attorney's fees incurred because of the misconduct.

The Supreme Court cases the concurrence cites are not inconsistent with our holding today. *Post* at 6-7. Those cases affirm that courts possess inherent authority to enforce their lawful mandates by contempt, manage their dockets, and dismiss with prejudice cases involving deliberate and undue delay. *See Young v. U.S. ex rel Vuitton et Fils S.A.*, 481 U.S. 787, 796 (1987) (criminal contempt power); *Illinois v. Allen*, 397 U.S. 337, 343 (1970) (criminal contempt power); *Link v. Wabash R. Co.*, 370 U.S. 626, 630-31 (1962) (docket management and dismissal with prejudice).  Contempt requires willful disobedience—engaging in specifically and definitely prohibited conduct. *See Lee v. State*, 799 S.W.2d 750, 753 (Tex. Crim. App. 1990) ("Because it is the disobedience of the inherent authority of the court that is at issue, it follows that a court, before exercising its contempt powers, must have provided the person it seeks to punish with specific and definite notice of those acts which he may or may not perform without the risk of being held in contempt."); *accord, e.g.*, *Allen*, 397 U.S. at 353 (holding a defendant can be excluded from trial for stubbornly defiant, contumacious, and disruptive behavior after being *warned* by the judge to cease and desist).  Here, the trial court neither exercised its contempt power nor could on this record.  What is more, this case involves inherent authority to sanction, not the court's inherent authority to manage a docket.  As to the former, *Link*, which involved dismissal with prejudice as a sanction for deliberate dilatory conduct, accords with our analysis.  *See Link*, 370 U.S. at 630-32 ("[I]t could reasonably be inferred from [petitioner's] absence [at a court-ordered hearing and] from the drawn-out history of the litigation that petitioner had been deliberately proceeding in dilatory fashion.").  The concurrence's citation to *Anderson v. Dunn*, 19 U.S. 204, 227 (1821), is confounding as that case involves inherent powers of Congress to compel attendance at contempt proceedings, which is not even close to being the same issue.

[72] Sanctioning counsel involves a two-step determination: "[1] whether the attorney has abused the judicial process, and, [2] if so, what sanction would be appropriate."  *In re Bennett*, 960 S.W.2d 35, 39 (Tex. 1997) (quoting *Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 396 (1990))).  The concurrence's analysis puts the proverbial cart before the horse, collapsing the second inquiry—what sanction is appropriate—onto the first—whether conduct is sanctionable at all.  This root flaw is most readily apparent in the discussion regarding sanctions for spoliation.  *Post* at 5.  Trial courts have some discretion to fashion an appropriate remedy for discovery abuse, including spoliation, but whether spoliation occurred at all depends on the existence of a duty to preserve evidence, which is a question of law.  *Brookshire Bros., Ltd. v. Aldridge*, 428 S.W.3d 9, 14, 20 (Tex. 2014) ("[A] spoliation analysis involves a two-step judicial process: (1) the trial court must determine, as a question of law, whether a party spoliated evidence, and (2) if spoliation occurred, the court must assess an appropriate remedy . . .  Upon a finding of spoliation, the trial court has broad discretion to impose a remedy that, as with any discovery sanction, must be proportionate[.]"); *Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 722 (Tex. 2003) (declining to consider whether a particular sanction for spoliation was justified because the

26

receive *any sanction at all* is a serious matter that impugns counsel's professional judgment and ethical standing.  It must be treated as such.

Requiring a predicate finding of bad faith before imposing sanctions under the amorphous and uniquely powerful inherent authority to sanction does not "handcuff[]" courts as the concurrence says.[73]  Courts have many tools at their disposal under rules and statutes that are relatively specific in defining the duties imposed and the conduct proscribed, many of which do not require bad faith or its equivalent.[74]  But to wield inherent powers of intrinsic potency and unconstrained breadth necessitates the restraint and caution the bad-faith predicate encapsulates.[75]

## C. Brewer's Conduct

In imposing sanctions on Brewer, the trial court took issue with certain aspects of the telephone survey's contents and execution and found Brewer's courtroom demeanor disconcerting. Though the survey Brewer commissioned is not without its faults, the evidence shows he undertook reasonable efforts to secure a third-party industry professional to create a relatively balanced public

_____

defendant had no duty to preserve the evidence in question, so no sanction was warranted in the first place).  As to remedies, "spoliation is essentially a particularized form of discovery abuse" that is sanctionable in accordance with Civil Procedure Rule 215.  *Brookshire Bros., Ltd. v. Aldridge*, 428 S.W.3d at 18, 21; *see* TEX. R. CIV. P. 215.2-.3 (sanctions for discovery abuse include attorney's fees and an order designating "facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order").

[73] *Post* at 2-3.

[74] *See supra* n.2 & *infra* n.76.

[75] By merely rubber stamping amorphous trial court "findings" that are neither facts nor conclusions of law, the concurrence proves the point. *See post* at 9-10.  Worse, the concurrence misapprehends the applicable standard of review and fails to identify any guiding principles governing the trial court's discretion.  "In reviewing sanctions orders, the appellate courts are not bound by a trial court's findings of fact and conclusions of law; rather, appellate courts must independently review the entire record to determine whether the trial court abused its discretion." *Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006); *see Cire v. Cummings*, 134 S.W.3d 835, 838-39 (Tex. 2004) (a court abuses its discretion if it acts without reference to guiding rules and principles).  An opinion, no mater how genuinely held, must nonetheless be supported by evidence and must adhere to guiding principles.  The concurrence identifies neither.  If the concurrence is embracing "significant interference with a core judicial function" as an additional or alternative standard, it is impossible to discern.

27

opinion survey for random administration.  The record bears no direct, or even circumstantial, evidence of bad faith.

Brewer did not disobey any court order, knowingly or otherwise.  The trial court did not find that Brewer violated any disciplinary rule, nor is there evidence Brewer knowingly violated any disciplinary rule.[76]  Neither is there evidence that Brewer knew, or even had reason to believe, that a randomly generated database of roughly seven percent of the county population would result in any touch points connected to this case, let alone many.  At worst, Brewer was lax in failing to ensure the survey was *not* totally random by securing the exclusion of case-related individuals from the survey database.[77]  Leaving the matter entirely in a third party's hands could arguably constitute gross negligence, as the trial court found, but it does not give rise to a reasonable inference of bad faith.  Reviewing the totality of the evidence leads us to conclude the trial court's concerns about the survey were reasonable, but the court's finding of bad faith is factually unsupported.

---

[76] The trial court's referral of the matter to the Commission for Lawyer Discipline is one method available to courts to help ensure ethical lapses are disciplined, when warranted, according to the processes, procedures, and standards of review applicable to all attorneys.  If a judge has knowledge of unethical conduct, the judge can, and indeed must, refer the matter for disciplinary proceedings.  *See* TEX. CODE JUD. CONDUCT, CANON 3(d)(2); TEX. DISCIPLINARY RULES OF PROF'L CONDUCT R. 8.03(a); *cf.* CODE OF CONDUCT FOR U.S. JUDGES cmt. 3(B)(6); *Comm'n for Lawyer Discipline v. Cantu*, 587 S.W.3d 779, 784 (Tex. 2019) ("The obligation to report attorney misconduct [to the State Bar] applied doubly to Judge Isgur, who is not only a judge but a licensed Texas attorney.")*; Remington Arms Co., Inc. v. Caldwell*, 850 S.W.2d 167, 172 (Tex. 1993) ("[T]he court itself is obligated to refer a lawyer to appropriate authorities to answer for unprofessional conduct of which the judge is aware.").

[77] Ensuring removal of individuals directly connected to a case should be relatively straightforward, but scrubbing a survey database of every person related to or affiliated with someone directly connected to a lawsuit may be difficult, if not infeasible, particularly when businesses, governmental entities, and other organizations are involved. Many names and surnames are common; relatives do not always share the same surname; relatives do not necessarily share the same address; and many people can be reached at more than one telephone number.

28

## 1. Public Opinion Surveys

Pretrial surveys are a useful litigation tool "to conduct research, get reliable results (both quantitative and qualitative), and create a winning trial strategy," while also "saving the [law] firm time, money, and resources in trial preparation."[78]  In one form or another, surveys of the community from which the jury will be summoned have been conducted for almost eighty years.[79]  Such surveys have even been conducted without rebuke in high-profile cases such as the Boston Bomber case,[80] the Oklahoma City bombing case,[81] the Ted Bundy trial,[82] and the Harrisburg-Seven trial.[83] Attorneys frequently rely on community surveys in complex commercial litigation and obscenity prosecutions,[84] and many law review articles, practice treatises, and other reliable secondary sources cite "public opinion surveys," "community surveys," and "opinion polls" as valid methods of

---

[78] Richard H. Middleton, Jr., *Competitive Pretrial Intelligence: Can Mock Trials and Focus Groups Be Advanced?*, 2002 ATLA-CLE 1361 (July 2002) (also noting that surveys were empirically tested and found to be more reliable and cost-effective than mock trials and focus groups in pretrial research and preparation).

[79] Cases from as early as the 1940s discuss the use of pretrial community surveys or public opinion research to support litigants' claims.  *See, e.g., Oneida, Ltd., v. Nat'l Silver Co.*, 25 N.Y.S.2d 271, 286 (N.Y. Sup. Ct. 1940) (housewives surveyed using the litigants' silverware patterns to determine whether one company had appropriated the other's design).

[80] Motion for Change of Venue at 1, *United States v. Tsarnaev*, No-13-10200-GAO, 2014 WL 4823882, at *1 (D. Mass. Sept. 24, 2014).

[81] *See* Christina Studebaker & Steven Penrod, *Pretrial Publicity, the Media, the Law, and Common Sense,* 3 PSYCHOL. PUB. POL'Y & L. 428, 450 (1997) (citing the trials of McVeigh and Nichols for employing "the use of a media analysis and public opinion surveys quite well").

[82] *Bundy v. Dugger*, 850 F.2d 1402, 1425 (11th Cir. 1988) (refusing to presume prejudice where a pretrial public opinion poll was conducted to determine community familiarity with serial killer Ted Bundy and opinions about his guilt).

[83] *See* Rachel Hartje, Comment, *A Jury of Your Peers?: How Jury Consulting May Actually Help Trial Lawyers Resolve Constitutional Limitations Imposed on the Selection of Juries*, 41 CAL. W. L. REV. 479, 491-92 (2005).

[84] *See* Gabriel M. Gelb & Betsy D. Gelb, *Internet Surveys for Trademark Litigation: Ready or Not, Here They Come*, 97 TRADEMARK REP. 1073, 1086–87 (2007); *see also Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 234 (2d Cir. 1999), *as amended on reh'g* (Sept. 29, 1999) (misrepresentation case dealing with pharmaceutical sales); *Com. v. Trainor*, 374 N.E.2d 1216, 1220 (Mass. 1978) (obscenity prosecution).

determining the community's attitude toward the parties, witnesses, or issues in a particular case.[85]

Examples of pretrial surveys are found in case law from almost every state and in the federal judicial

system.  Such surveys are not inherently improper.

United States v. Collins is a case in point.[86]  Collins was an appeal from a federal judge's

bribery conviction.  Before the bribery case went to trial, the prosecutors commissioned a telephone

survey of 457 respondents from within the district, asking questions related to the impending trial

and specifically identifying the defendants by name.[87]  Notably, "after hearing a recitation of the

prosecution's version of the evidence against the [judge and a co-defendant], those polled were

asked whether they thought the defendants were 'definitely guilty, probably guilty, probably not

guilty, definitely not guilty or do you have no opinion in this case.'"[88]  A majority of the respondents

answered that the defendants were definitely or probably guilty.[89]

When the defendants learned about the survey, they reported it to the district court.[90]  The

court ordered the prosecution to turn over all polling material and, on review, determined the polling

issue was a "red herring" and "nothing had been done to compromise the integrity of jury

---

[85] See, e.g., § 14:10: Jury Selection Based on Juror Profiles and Investigations, JURY SELECTION: THE LAW, ART, AND SCIENCE OF SELECTING A JURY, Thompson Reuters (2018); Franklin Strier & Donna Shestowsky, Profiling the Profilers: A Study of the Trial Consulting Profession, Its Impact on Trial Justice and What, If Anything, to Do About It, 1999 WIS. L. REV. 441, 444 (1999).

[86] 972 F.2d 1385 (5th Cir. 1992).

[87] Id. at 1398 & n.18.

[88] Id. at 1398 (footnote omitted).

[89] Id.

[90] Id.

selection."[91]  The court declined to turn over the polling material to the defendants until after trial and later denied their motion for a new trial.  The court held the poll had not undermined the integrity of the jury, noting none of the jurors who served on the jury had been contacted and the matter had been adequately covered in voir dire questioning.[92]

On appeal, the defendants challenged the survey under various theories.  The Fifth Circuit held the survey did not violate the defendants' due process rights in any respect.[93]  The appellate court agreed with the district court that complaints about the poll were a red herring.[94]  The court concluded that pretrial message testing did not give the government an unfair advantage at trial and no fundamental unfairness ensued from the district court's decision to withhold disclosing the polling materials to the defendants until after the trial.[95]  The court affirmed the convictions, holding, in relevant part, that the government's commencement of a telephone survey did not violate the defendants' due process rights.[96]

As *Collins* demonstrates, pretrial telephone surveys in the district from which the jury pool is drawn are not necessarily unfair or improper.  But when zealously pursued without fidelity to rules of professional ethics, community research activities—regardless of which side employs them—have the potential to taint the jury pool and threaten the functioning of the judicial system.

---

[91] *Id.*

[92] *Id.*

[93] *Id.* at 1398-99.

[94] *Id.* at 1398.

[95] *Id.* at 1399.

[96] *Id.* at 1415.

31

Concerns about undisclosed and unsupervised survey activities in the course of pending litigation are not unfounded, especially when a trial date is impending.  Indeed, any type of community outreach—whether it be surveys, overt media engagement, or web-based activities—has the potential to impact the jury-selection process.  A campaign of disinformation, in whatever form, undermines the sanctity of the judicial process and is inimical to the constitutional promise of a fair and impartial jury trial.  It cannot be tolerated.

Lack of specific guidance on the form, content, and timing of community research in connection with pending litigation suggests such endeavors should be undertaken with great caution and a healthy dose of trepidation.  When attitudinal research is conducted in the community from which the venire will be empaneled, they can present fertile ground for mischief and misadventure if adequate safeguards are lacking.  A handful of federal courts in Texas have standing orders acknowledging that litigation focus testing is routinely employed but can impact the jury-selection process.[97]  The standing orders do not *prohibit* use of surveys as a litigation tool; rather, they *regulate* the practice when it occurs in the county of suit.[98]  Collectively, the orders (1) require pretrial notice of intent to conduct such a study; (2) require disclosure (to varying degrees) of the methodology; (3) temporally limit proximity to trial; and (4) require *in camera* submission of each participant's name and address in advance of the pre-trial conference.  No such order was in place here.

---

[97] The Honorable Ron Clark, E.D.T.X. Standing Order RC-47 (Aug. 11, 2010); The Honorable Rodney Gilstrap and the Honorable Roy Payne, E.D.T.X. Standing Order Regarding Mock Juries (Feb. 3, 2012); The Honorable Robert Schroeder, E.D.T.X.  Standing Order Regarding Mock Juries (Jan. 15, 2016); Kacy Miller, *A Primer on EDTX Jury Research Rules*, C O U R T R O O M L O G I C   C O N S U L T I N G   ( M a r .   2 ,   2 0 1 7 ) , http://courtroomlogic.com/2017/03/02/edtx-jury-research-rules/.

[98] *See supra* n.97.

Appendix233

Implementation of Brewer's survey in Lubbock County was not perforce impermissible, but it brought the survey's imperfections into sharper focus. Nevertheless, considering the survey process as a whole, we cannot agree the survey's ostensible shortcomings create a reasonable inference of bad faith. Evidence that the survey database and survey respondents were randomly selected—without any input by Brewer or his staff—was unrefuted. And the record does not support the allegation that anyone in particular was "targeted." Nor is there evidence that the size of the survey database suggested anything untoward. Genuine inaccuracies in the formulation of litigation statements tested in Brewer's quite lengthy survey are debatable, but any such defects were isolated and few and far between. The survey reflects reasonable efforts to achieve a reasonable degree of balance. Not perfect, but reasonable.[99]

The survey efforts bear other markers of good faith:

(1) *Qualified Third-Party Experts*.[100] Brewer engaged an independent, internationally recognized research organization to design and implement the survey.[101] As a member of the American Association for Public Opinion Research, Public Opinion Strategies was required to follow industry standards that include prohibiting push polls. Brewer and his firm were privy to the

---

[99] The parties present a false dichotomy between impermissible push polls and legitimate survey research. As the testimony of the movants' expert affirms, a survey could have aspects of both—neither all bad nor all good.

[100] *Cf. Tex. Aeronautics Comm'n v. Braniff Airways, Inc*., 454 S.W.2d 199 (Tex. 1970) (qualifications of the researcher important in determining reliability of survey); *Baumholser v. Amax Coal Co.*, 630 F.2d 550, 552-53 (7th Cir. 1980) (a survey conducted by "qualified experts" in market research and public opinion helps provide "a substantial showing of reliability"); *Sanchez v. Cegavske*, 214 F. Supp. 3d 961, 970 (D. Nev. 2016) ("Generally, experts who design, conduct, and analyze a survey should have extensive training in the social sciences which includes methods, sampling, and statistics work."); *G. v. Hawaii, Dept. of Human Servs.*, 703 F. Supp. 2d 1112, 1125 (D. Haw. 2010) ("[T]he persons conducting the survey must be experts[.]") (quoting *Pitts. Press Club v. U.S*, 579 F.2d 751, 758 (3d Cir. 1978)).

[101] Public Opinion Strategies has been an industry-recognized research firm for more than twenty years, has conducted over 14,000 projects for scientific and political clients, and is headed by an individual with leadership positions in ethics organizations governing public opinion research internationally.

33

survey questions and had an opportunity to provide input, but were screened off from critical aspects by Public Opinion Strategies' use of third-party vendors to create the survey database and conduct the survey. This is consistent with industry practice and case law on pretrial surveying.[102] Barring red flags or other indicia of untrustworthiness—and the record here bears no evidence of either—one can reasonably presume qualified third-party research professionals will perform their services in accordance with industry standards.

(2) *Proper Relevant Universe and Randomly Drawn Representative Sample*.[103]   In professional surveying research, the "relevant universe" refers to the universe of people most relevant to the issue being studied.[104] Defining the universe is a methodological choice designed to ensure a statistically significant result. Ordinarily, a prudent litigant might avoid the county of suit to avoid even the appearance of impropriety. But attitudinal studies conducted in other jurisdictions might not produce an appropriately representative sample or a statistically valid result.

Carter and Brewer reasonably explained why Lubbock County was chosen for the pretrial survey. The explosion, the moratoriums, the plaintiffs' own survey efforts, and enhanced media

---

[102] *Tunnell v. Ford Motor Co.*, 330 F. Supp. 2d 707, 719-20 (W.D. Va. 2004) (blind surveys are preferred as a method for avoiding bias where the interviewers and participants are "blind to the purpose and sponsorship of the survey" and "attorneys are excluded from any part in conducting interviews and tabulating results"); *Pitts. Press Club*, 579 F.2d at 758 (surveys should be conducted "independently of the attorneys" and "the interviewers," "[survey] designers," and "[survey] Respondents" should all be "unaware of the purposes of the survey or litigation").

[103] *County of Kenosha v. C&S Mgmt., Inc.*, 588 N.W.2d 236, 253 (Wis. 1999) (examining relevant population); *Nat'l Football League Props., Inc. v. N.J. Giants, Inc.*, 637 F. Supp. 507, 513-14 (D.N.J. 1986) (analysis of survey began with universe selected for the survey conducted).

[104] For example, in trademark litigation, the relevant universe would be people in the market who would purchase a product and be exposed to and confused by the competing product. *See, e.g.*, *Nat'l Football League Props.*, 637 F. Supp. at 514 (survey properly conducted in a community of concentrated support for the Giants). In change of venue cases, the relevant universe would be the community the party believes has been tainted or prejudiced in some way. *See, e.g.*, *U.S. v. Rodriguez*, 581 F.3d 775, 785 (8th Cir. 2009) (discussing several cases where public opinion polls were introduced in change-of-venue motions based on community prejudice).

34

coverage took place in Lubbock County.  Carter also explained that other jurisdictions may not be as prone to significant lightning events as Lubbock County.  Brewer and Carter provided specific reasons why Lubbock County residents were uniquely situated to properly evaluate the impact of media coverage on public opinion and test themes and messages that would resonate with the relevant community.  The record bears no evidence these reasons were false or otherwise pretextual.

As to sample size, no one has asserted that completing 300 surveys or assembling a survey database of 20,000 was abnormal or improper.[105]  A representative sample is required to ensure research results are not skewed, and the results here show a statistically acceptable margin of error. While significantly overdrawing from a sample could suggest improper motives for conducting a survey, there is no evidence that occurred here.

(3) *Adherence To Generally Accepted Standards*.  The record lacks evidence that the sample, questionnaire, and interviews were designed without adhering to generally accepted standards of objective procedure and statistics in the research field.  Brewer's firm was not entirely hands off in formulating the survey questions, but Carter's input was limited and Brewer's was minimal, and neither participated in the survey administration process.[106] The trial court observed that Brewer was the customer who told the retailer what to do.  But by engaging a third-party professional to design and implement the survey, the retailer was subject to and constrained by professional guidelines and ethical standards.  The American Association for Public Opinion Research, the European Society

---

[105] *See U.S. v. Collins*, 972 F.2d 1385 (5th Cir. 1992) (finding no adverse jury impact arising from a telephone survey of 457 local respondents in connection with a high-profile criminal trial).

[106] *See Pitts. Press Club*, 579 F.2d at 758 ("[T]he survey must be conducted independently of the attorneys involved in the litigation."); *G. v. Hawaii, Dept. of Human Servs.*, 703 F. Supp. 2d 1112, 1125 (D. Haw. 2010) (same); *Sanchez*, 214 F. Supp. 3d at 970 (articulating the reasons behind preference for attorneys and firms to remain separate from the survey administration process).

35

for Opinion Marketing and Research, other organizations, and watchdog groups regularly publish these guidelines.[107]  Absent evidence to the contrary, reputable researchers, like Public Opinion Strategies, can reasonably be expected to adhere to these guidelines to maintain membership in professional associations and to maintain credibility.

(4) *Randomized Favorable and Unfavorable Message-Testing Questions*.  In several important respects, Brewer's survey resembles the survey in *United States v. Collins*—similarities included survey size, situs, and message testing based on the surveyor's point of view.  But where those surveys differ is even more notable.  Unlike the *Collins* survey, Brewer's survey included a relatively balanced array of statements that favored and undermined his client's litigation position.  The survey did not endorse either set of statements or represent them to be facts; it merely asked respondents if the statements—whether favorable or unfavorable—were convincing.  And most of the message-testing questions were rotated to avoid order bias.  Rotating questions is common in professional public opinion research as a way to ensure unbiased results.  This strategic choice indicates an intent to solicit the respondent's opinions rather than shape them.

On the other hand, (1) not all the adverse statements against other potentially responsible parties were rotated, (2) some of the negative statements about Brewer's clients were not as strongly negative as negative statements about other parties and non-parties, (3) emphasis was used only in a single question and that question was favorable to Titeflex, and (4) not all negative messages were counterbalanced.  For example, in various forms or fashions, the survey made reference to improper installation of the piping at least thirteen times but included only one question suggesting CSST

---

[107] *See, e.g.*, *AAPOR Code of Ethics*, AMERICAN ASSOCIATION FOR PUBLIC OPINION RESEARCH (revised Nov. 2015), https://www.aapor.org/Standards-Ethics/AAPOR-Code-of-Ethics.aspx.

36

piping could fail even if properly installed.  But in determining whether the survey was designed in bad faith, it should be viewed holistically, not by isolating its parts.  And, here, the whole is greater than the sum of its parts.

On the record before the court, the trial court's finding that Brewer designed and implemented the survey in bad faith is unsupported.  Even if some of the survey questions were individually problematic, bad faith cannot be inferred merely from error;[108] otherwise, it would cease to function as a constraint on sanction power.[109]  Nor can conscious wrongdoing be inferred merely from the fact that a message-testing survey was conducted proximate to trial without voluntary disclosure when, unlike *In re Bennett*, no governing authority expressly or implicitly regulated those aspects of the survey efforts.[110]  Improper motive might be reasonably inferred if the record bore even slight evidence that SSI's contacts with case-related individuals could not have occurred randomly; or if Brewer engaged in a pattern or practice of similar conduct; or if the background materials Carter provided to the survey company were so one-sided or unbalanced as to taint the independence of the survey process; or if there were proof demonstrating pervasive falsity, rather

---

[108] *McWhorter v. Sheller*, 993 S.W.2d 781, 789 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (reversing sanctions imposed on attorney who taped telephone conversation with the court and opposing counsel, holding conduct showed "at best, some degree of inexperience and negligence [but not] an intentional act made in bad faith").

[109] *Kutch v. Del Mar Coll.*, 831 S.W.2d 506, 510 (Tex. App.—Corpus Christi 1992, no writ) ("The amorphous nature of this power, and its potency, demands sparing use.").

[110] *Collins*, 972 F.2d at 1400 n.27 (government-commissioned community attitudes survey was not subject to mandatory *Brady* disclosure because neither the poll nor its results were "evidence"); *Primrose Operating Co., Inc. v. Jones*, 102 S.W.3d 188, 192 (Tex. App.—Amarillo 2003, pet. denied) (mock trial was conducted four days before case was called for trial).

37

than incidental errors and statements based on disputed evidence.  But inference stacked only on other inferences is not sufficient to support a finding of bad faith.[111]

## 2. Courtroom Demeanor

The trial court's letter ruling negatively references Brewer's behavior at the sanctions hearing in the following respects: (1) his "nonchalant and uncaring" demeanor, (2) "repeatedly evasive" answers to questions, which resulted in the court "sustain[ing] multiple objections for non-responsiveness," and (3) his intransigence in defending himself on the basis that he acted reasonably in hiring a third-party vendor to conduct a blind study.  From this, the respondents infer the trial court sanctioned Brewer not only because of the survey but also based on his courtroom conduct, and they suggest the sanctions order can be upheld on that basis alone.  Even if the former is correct, the latter is not.

Trial courts are empowered to command respect and decorum in courtroom proceedings and may exercise that authority by sanctioning members of the bar who are pugnacious and indecorous.[112]  Attorneys are expected to comport themselves respectfully and professionally in their interactions with the court, opposing counsel, the parties, and witnesses.  Failure to do so can disrupt proceedings, impair the efficient administration of justice, and impede the exercise of a trial court's core functions.[113]  But the record here does not reflect that Brewer's behavior interfered with the

---

[111] *See Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 728 (Tex. 2003).

[112] *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991).

[113] *See Armadillo Bail Bonds v. State*, 802 S.W.2d 237, 239 (Tex. Cr. App. 1990) (core judicial functions include hearing evidence, deciding issues of law or fact, and rendering final judgments); *accord McWhorter v. Sheller*, 993 S.W.2d 781, 788-89 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).

Appendix239

administration of justice, detracted from the trial court's dignity and integrity, or even prolonged the hearing to any measurable degree.

Over the course of an entire day of questioning, the trial court sustained only four objections to Brewer's testimony on the basis of nonresponsiveness. In response to a fifth objection, the court instructed him to listen and answer the question asked. And at a break, the court asked Brewer's counsel to "please visit with [his] client about answering the question that's asked." After the court's mild rebuke, Brewer toed the line, and the court sustained no further responsiveness objections to his testimony.

Failure to appreciate the gravity of the matter, by displaying a "nonchalant and uncaring" demeanor, might bear on the type of sanction necessary to deter, punish, or secure compliance. But the record does not reflect that Brewer engaged in the type of contumacious, insolent, or disrespectful behavior that rises to the level of sanctionable conduct in its own right.

Making groundless arguments in bad faith or for an improper purpose might warrant sanctions, but arguments that are merely "unpersuasive" do not. Brewer's defensive theories were not so meritless that they could properly be characterized as "bad faith, unprofessional and unethical."

In sum, whether viewed separately or cumulatively, we hold that the sanctions order is not sustainable based solely on Brewer's attitude or courtroom behavior.

Appendix240

### III. Conclusion

The survey Brewer commissioned was not a model of perfection, and its execution was not flawless.  Nearly everyone agrees, including Brewer, that he should have ensured the survey database excluded witnesses, parties, and governmental officials directly connected with the litigation.  But these errors do not constitute bad faith when the survey and the circumstances of its undertaking are viewed in totality.  Brewer's dismissive attitude and intermittent obstinance at the sanctions hearing undoubtedly taxed the trial court's patience and was relevant to what sanctions should be imposed but did not itself justify the imposition of sanctions.  We therefore reverse the court of appeals' judgment and vacate the sanctions order.

_____
Eva M. Guzman
Justice

**OPINION DELIVERED**:  April 24, 2020

40

Appendix241

Appendix A

LUBBOCK, TEXAS
*Interview Schedule*

Field Dates: May 21-22, 2014                    N=300 Homeowners
Project#: 14381                                  Margin of Error = ±5.66%

---

Hello. I'm _____ of _____ Research, a national research firm. We're talking
with people in your area and would like to ask you a few questions on a confidential basis. We are not
attempting to sell anything, nor will your participation result in any calls in the future to sell you anything.
(DO NOT PAUSE)

---

**(ASK CP1-CP4 QUESTIONS TO CELL SAMPLE ONLY)**

CP1.   For your safety, are you currently driving?

---

CP2.   In which state do you currently live? **(If not TEXAS THANK AND TERMINATE)**

---

CP4.   Of all the personal telephone calls that you receive, do you get... **(READ, ROTATE PUNCHES
       1 AND 3 - KEEP 2 ALWAYS IN THE MIDDLE)?**

---

First, just a few questions about you to make sure we have a representative sample . . .

A.     And, do you own or rent your home?

       (IF OWN, ASK:) And, do you want to move sometime in the next few years?

---

B.     And, just to be sure we have a representative sample . . .

       In what year were you born?

---

1.     Would you say that things in Lubbock are going in the right direction, or have they pretty seriously
       gotten off on the wrong track?

---

Thinking about a different topic...

How likely is it that any of the following weather related events would damage homes in your area?
(RANDOMIZE)

|            | VERY LIKELY | SMWT LIKELY | NOT VERY LIKELY | NOT AT ALL LIKELY | DK (DNR) | REF (DNR) |
|------------|-------------|-------------|-----------------|-------------------|----------|-----------|
| 2. Tornado |             |             |                 |                   |          |           |
| 3. Flood   |             |             |                 |                   |          |           |
| 4. Lightning |           |             |                 |                   |          |           |

41

5.   Thinking now just about lightning, if lightning were to actually strike your home, would the damage to that home be (ROTATE TOP TO BOTTOM, BOTTOM TO TOP) . . .

VERY SIGNIFICANT
SOMEWHAT SIGNIFICANT
NOT VERY SIGNIFICANT
NOT AT ALL SIGNIFICANT

DON'T KNOW (DO NOT READ)
REFUSED (DO NOT READ)

TOTAL SIGNIFICANT
TOTAL NOT SIGNIFICANT

6.   Thinking some more about your house, who would you say is MOST responsible for ensuring that your home is safely constructed. Is it . . . (RANDOMIZE)

THE HOME BUILDER
MANUFACTURERS OF THE BUILDING MATERIALS IN THE HOME
HOME INSPECTORS
HOMEOWNER

OTHER (SPECIFY _____ )
ALL OF THE ABOVE

DON'T KNOW (DO NOT READ)
REFUSED (DO NOT READ)

7.   Thinking now about your home, do you use natural gas in your home?

YES, USE NATURAL GAS
NO, DO NOT USE NATURAL GAS

DON'T KNOW (DO NOT READ)
REFUSED (DO NOT READ)

(IF Q7:1, ASK)
8.   And, is the natural gas in your home transported by Corrugated Stainless Steel Tubing, also known as CSST, or is it transported by black iron pipe?

CSST
Black iron pipe

Other (SPECIFY) (_____ )
Neither (DO NOT READ)

Don't Know/Not Sure (DO NOT READ)
Refused (DO NOT READ)

Changing topics slightly . . .

42

9.   As you may know, a lightning strike can damage materials in your home, including the CSST used to transport natural gas. In some instances where the CSST is not installed in accordance with the manufacturer's instructions, damage to CSST following a lignting [sic] strike can result in the escape of natural gas, which can cause a house fire. If this happened at your home, who would you say is MOST to blame? (RANDOMIZE)

The manufacturer who makes and sells the natural gas piping
The installer, who might have installed the material improperly
The homebuilder, who hires the installers of the natural gas piping
No one, because a lightning strike is a natural disaster

DON'T KNOW (DO NOT READ)
REFUSED (DO NOT READ)

TOTAL INSTALLER/HOMEBUILDER

10.   And, have you seen, read, or heard anything about the potential dangers of CSST?

YES
NO

DON'T KNOW (DO NOT READ)
REFUSED (DO NOT READ)

(If Q10:1, ASK)
11.   And, what was the source of this information? (DO NOT READ) (ACCEPT MULTIPLE RESPONSES)

TV
RADIO
MAIL
NEWSPAPER
FRIENDS/NEIGHBORS/FAMILY
INTERNET/E-MAIL

OTHER (Specify_____)
DON'T KNOW (DO NOT READ)
REFUSED (DO NOT READ)

12.   And, have you seen, read, or heard anything recently about lightning striking a home in Lubbock in August 2012, resulting in a house fire that killed a man who was visiting the home at the time?

YES
NO

DON'T KNOW (DO NOT READ)
REFUSED (DO NOT READ)

(If Q12:1, ASK)
13.   And, what was the source of this information? (DO NOT READ) (ACCEPT MULTIPLE RESPONSES)

43

TV
RADIO
MAIL
NEWSPAPER
FRIENDS/NEIGHBORS/FAMILY
INTERNET/E-MAIL

OTHER (Specify: _____)
DON'T KNOW (DO NOT READ)
REFUSED (DO NOT READ)

14.   As you may know, in August of 2012, lightning struck a home in Lubbock during a thunderstorm the lightning caused a fire that killed a man who was visiting the home at the time. Fire officials ruled that the fire was caused by a type of natural gas piping called Corrugated Stainless Steel Tubing, or CSST. I would like to read you two statements about who should be responsible for the fire. After I read each one, please tell me which comes closest to your own opinion.

[SOME/OTHER] People say that the homebuilder who built the house should be responsible for the incident. They say that if the CSST had been properly installed, it would not have been damaged during the lightning strike, and thus, no fire would have occurred. They say the homebuilder or installer did not make sure that there was a reasonable amount of space between the piping and other electrical wires, as is called for in the manufacturer's installation guidelines. They say that even if the CSST suffered damage which allowed gas to escape, it is unfair for the manufacturer of a product to be held responsible for the improper installation of that product.

. . . while . . .

[OTHER/SOME] People say that the manufacturer of the CSST should be responsible for what happened and should not be selling CSST if there is any chance it might fail in a lightning strike. They say the company should not be selling that product, particularly if it knows there is a likelihood it might fail if not properly installed. The ultimate responsibility for product safety rests with a manufacturer.

DON'T KNOW (DO NOT READ)
REFUSED (DO NOT READ)

15.   As a result of the fire, the homeowners have filed a lawsuit. I am going to read you four options of who the homeowners should sue. After I read each one, please tell me which comes closest to your own opinion.   (RANDOMIZE)

The homeowners should sue the homebuilder but NOT the manufacturer of the CSST.
The homeowners should sue the manufacturer of the CSST but NOT the homebuilder.
The homeowners should sue BOTH the homebuilder AND the manufacturer of the CSST.
The homeowners should not be suing anyone.

DON'T KNOW (DO NOT READ)
REFUSED (DO NOT READ)

(IF Q15:1-4, ASK)
16.   And what are some of the reasons you think that (INSERT Q15 CHOICE)? (PROBE:) What else can you tell me about that? Anything else?

(ROTATE Q17-25 AND Q26-33)

Now I am going to read you several statements about why the manufacturer of the corrugated stainless steel tubing, also known as CSST SHOULD NOT be held responsible. After I read each one, please tell me how convincing that statement is to you. Is it . . . very convincing, somewhat convincing, not very convincing, or not at all convincing? (RANDOMIZE)

17.   CSST is approved by the American Gas Association and has been on the market since 1990. CSST is installed in millions of homes across the nation and more than 800,000 homes in Texas, but this is the first time this manufacturer has ever been sued in a wrongful death case.

18.   There are clear warnings on the packaging of CSST that, in order to be safe in a lightning storm, the piping must be installed according to the manufacturer's Design & Installation Guide. It is not the fault of the manufacturer that these warnings were not followed in this instance.

19.   The manufacturer of CSST partners with the National Association of State Fire Marshals on an awareness campaign about this type of piping that helps make sure people know if they have the product in their home and to see if it was properly installed.

20.   The homebuilder did a sloppy job of supervising the contractor he hired to install the electrical wiring and the electrician did not allow for a reasonable amount of space between the electrical wiring and the CSST. The manufacturer cannot be held responsible for this type of sloppy and careless oversight.

21.   CSST was developed as a safer alternative to black iron pipe. It has fewer joints, which means there are less places where it can potentially leak. It is also flexible and able to withstand earthquakes or foundation shifts.

22.   Many states recognize that CSST is very safe. For example, after a thorough scientific-investigation, the state of Massachusetts lifted a ban on CSST.

23.   The Texas State Fire Marshall has said he has no doubt that CSST is safer when it is properly installed.

24.   No court has EVER ruled that CSST has been responsible for a fire when it is properly installed.

25.   There were many other things that contributed to this tragic incident. The foam insulation in the attic was not properly treated, the people who were present did not heed the warnings of the smoke alarm, and electrical wiring was laying right on top of the CSST, which is in violation of the safety warnings and installation guidelines.

Now I am going to read you several statements about why the manufacturer of the corrugated stainless steel tubing, also known as CSST SHOULD be held responsible for causing the fire. After I read each one, please tell me how convincing that statement is to you. Is it . . . very convincing, somewhat convincing, not very convincing, or not at all convincing? (RANDOMIZE)

26.   The manufacturer of CSST has settled hundreds of lawsuits with insurance companies involving the product and lightning fires.

27.   Since the 2012 fire and death, the Lubbock Fire Marshal has banned the use of CSST in new home construction.

28.   The manufacturer of CSST makes another gas piping product that it promotes as "lightning resistant." Since it makes a product that may be safer, the manufacturer should not be selling the older, less safe version of the product.

45

Appendix246

29.  Texas and more than a dozen other states are identified by the manufacturers as being lighting-prone [sic]. Clearly, the manufacturer should not sell CSST in those states.

30.  If the manufacturer is aware that some installers are not installing CSST properly and CSST has the potential to fail in lighting [sic] storms, it should not sell the product in the first place.

31.  The manufacturer has a responsibility to ensure CSST is being installed safely. It is not enough to simply entrust that responsibility to the home builder or installer.

32.  The manufacturer of CSST has set aside more than one hundred million dollars to fund litigation and settle lawsuits stemming from this product.

33.  One of this manufacturer's main competitors quit selling CSST in the United States because the product is unsafe and prone to failure.

---

Now that you have heard some more about this issue . . .

34.  I am going to again read you four options of who the homeowners should sue. After I read each one, please tell me which comes closest to your own opinion.  (RANDOMIZE)

The homeowners should sue the homebuilder but NOT the manufacturer of the CSST.
The homeowners should sue the manufacturer of the CSST but NOT the homebuilder.
The homeowners should sue BOTH the homebuilder AND the manufacturer of the CSST.
The homeowners should not be suing anyone.

DON'T KNOW (DO NOT READ)
REFUSED (DO NOT READ)

---

35.  And, when lightning hits a house and damages the natural gas piping, causing it to leak gas and resulting in a fire . . . who would you say is most at fault. (ROTATE)

The manufacturer who makes and sells the CSST
The homebuilder who oversees the installation of the CSST
    or . . .
Neither, because a lightning strike is a natural disaster
The installer, who might have installed the material improperly (UNREAD OPTION IN Q35)

DON'T KNOW (DO NOT READ)
REFUSED (DO NOT READ)

---

Now I just have a few more questions for statistical purposes only . . .

36.  And what is the last grade you completed in school? (DO NOT READ)

SOME GRADE SCHOOL (GRADES 1-8)
SOME HIGH SCHOOL (GRADES 9-11)
GRADUATED HIGH SCHOOL (GRADE 12)
TECHNICAL/VOCATIONAL SCHOOL
SOME COLLEGE
GRADUATED COLLEGE
GRADUATE/PROFESSIONAL SCHOOL

REFUSED

46

HIGH SCHOOL OR LESS
SOME COLLEGE
COLLEGE+

37.   And in politics today, do you consider yourself      (ROTATE)

a Republican
a Democrat
or something else?

. . . or are you not registered to vote?

**(IF REPUBLICAN OR DEMOCRAT, ASK:)** Would you call yourself a STRONG
(REPUBLICAN/DEMOCRAT) or a NOT-SO-STRONG (REPUBLICAN/DEMOCRAT)?

(IF SOMETHING ELSE, ASK.) Do you think of yourself as closer to the Republican or to the Democratic
party?

STRONG REPUBLICAN
NOT-SO-STRONG REPUBLICAN
LEAN TO REPUBLICANS

SOMETHING ELSE/INDEPENDENT

LEAN TO DEMOCRATS
NOT-SO-STRONG DEMOCRAT
STRONG DEMOCRAT

NOT REGISTERED TO VOTE

DON'T KNOW **(DO NOT READ)**
REFUSED **(DO NOT READ)**

**TOTAL REPUBLICAN**
**TOTAL DEMOCRAT**

38.   And for statistical purposes only      is your total annual household income greater or less than
$80,000 dollars?

UNDER $20,000
BETWEEN $20,000 - $40,000
OVER $40,000

UNDER $80,000
BETWEEN $80,000 - $100,000
OVER $100,000

REFUSED

UNDER $40K
$40K - $80K
OVER $80K

47

39.   And, how long have you lived in Lubbock? **(DO NOT READ CHOICES)**

LESS THAN TWO YEARS
TWO TO FIVE YEARS
FIVE TO TEN YEARS
TEN TO TWENTY YEARS
MORE THAN TWENTY YEARS
NATIVE

DON'T KNOW **(DO NOT READ)**
REFUSED **(DO NOT READ)**

40.   And, how long have you been a homeowner? **(IF MORE OWNED MORE THAN ONE HOUSE, ASK FOR TOTAL LENGTH OF HOMEOWNERSHIP) (DO NOT READ CHOICES)**

LESS THAN TWO YEARS
TWO TO FIVE YEARS
FIVE TO TEN YEARS
TEN TO TWENTY YEARS
MORE THAN TWENTY YEARS

DON'T KNOW **(DO NOT READ)**
REFUSED **(DO NOT READ)**

41.   What is your main racial or ethnic origin? Is it   **(READ CHOICES — ACCEPT ONLY ONE RESPONSE)**

WHITE
BLACK OR AFRICAN AMERICAN
ASIAN
. . . or . . .
HISPANIC

SOMETHING ELSE (Specify: _____ ) **(DO NOT READ)**
REFUSED **(DO NOT READ)**

42.   Gender **(BY OBSERVATION)**

MALE
FEMALE

48

# IN THE SUPREME COURT OF TEXAS

No. 18-0426

WILLIAM A. BREWER III, PETITIONER,

v.

LENNOX HEARTH PRODUCTS, LLC; TURNER & WITT PLUMBING, INC.; STRONG CUSTOM BUILDERS, LLC; THERMO DYNAMIC INSULATION, LLC; STATE FARM LLOYDS INSURANCE COMPANY; KEN AND BECKY TEEL; ROSS AND MEG RUSHING, RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE SEVENTH DISTRICT OF TEXAS

JUSTICE BOYD, concurring in part and dissenting in part.

An attorney commissioned a pretrial telephone survey of residents within the community where the suit was about to be tried. After an extensive evidentiary hearing, the trial court found the attorney engaged intentionally and in bad faith in "an abusive litigation practice that harms the integrity of the justice system and the jury trial process." Relying on its inherent authority to sanction such misconduct, the court ordered the attorney to pay other parties' attorney's fees and expenses and to complete ten extra hours of legal-ethics education. Today the Court vacates that order, holding that (1) a court cannot exercise its inherent authority to sanction an attorney who abuses the judicial system unless the court finds the attorney acted in bad faith, *ante* at ___, and (2) this record contains no evidence to support the trial court's finding that this attorney acted in bad faith, *ante* at ___.

Regarding the Court's second holding, I have repeatedly documented my view that "no evidence" should mean "*no* evidence."[1] The trial court entered specific fact findings after conducting a hearing "over the course of seven days," *ante* at ___, and three distinguished appellate jurists—after making "an independent inquiry of the entire record," including "the evidence, arguments of counsel, written discovery on file, and the circumstances surrounding the party's sanctionable conduct"—unanimously agree that *some* evidence supports the trial court's findings, *Brewer v. Lennox Hearth Prods., LLC*, 546 S.W.3d 866, 876 (Tex. App.—Amarillo 2018). Holding that the evidence on which those judges relied was not actually *any* evidence at all should be a most difficult task.

But I find the Court's first holding far more important and concerning. Before today, this Court has never held that trial courts can only exercise their inherent authority to sanction a party or attorney if they first find that the party or attorney acted in "bad faith." Globally applying a bad-faith requirement to all inherent-authority sanctions for all sanctionable conduct unnecessarily

---

[1] *See, e.g.*, *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 817 (Tex. 2018) (BOYD, J., dissenting) ("Because a reasonable juror could conclude from this evidence that Clark suffered harassment because of sexual desire or because of her gender-specific anatomy and characteristics, I would hold that the evidence is sufficient to create a fact issue on whether Clark suffered discrimination 'because of sex' under the TCHRA."); *United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 501 (Tex. 2017) (BOYD, J., dissenting) ("At least some evidence established that USI did not have control of the scaffold at the time of Levine's accident, and the evidence certainly did not conclusively establish that USI had such control."); *KBMT Operating Co. v. Toledo*, 492 S.W.3d 710, 718 (Tex. 2016) (BOYD, J., dissenting) ("Because Toledo provided some evidence that an ordinary viewer could have understood the broadcasts to assert that she engaged in sexual contact with a pediatric patient, our jurisprudence makes it the jury's duty, not this Court's, to decide whether the broadcasts were defamatory, false, or privileged. The Court's result-driven approach ignores our own precedent and the applicable standard of review and thereby usurps the jury's role in this case."); *Genie Indus., Inc. v. Matak*, 462 S.W.3d 1, 13 (Tex. 2015) (BOYD, J., dissenting) ("This record contains at least some evidence that it was both foreseeable and likely that untrained non-professionals would use the Genie lift, that they would destabilize it while the platform was raised and occupied despite the warnings and the allegedly obvious dangers, and that doing so would result in serious injuries and death, no matter how high the platform is elevated."); *Elizondo v. Krist*, 415 S.W.3d 259, 271 (Tex. 2013) (BOYD, J., dissenting) ("I believe the Court imposes too strict a standard at this summary judgment stage. Because the expert based his opinion on facts that could support a finding that the Elizondos' claims had substantial merit but were settled as if they had no merit at all, I would hold that the Elizondos created a fact issue on the existence of malpractice damages.").

handcuffs our state's trial courts and undermines the very reason they possess inherent authority in the first place.[2]

Instead of globally requiring bad faith in all contexts, we have explained that the courts' inherent authority,[3] which derives from their constitutional creation and duties, exists so that they can "effectively perform their judicial functions and . . . protect their dignity, independence and integrity." *Eichelberger v. Eichelberger*, 582 S.W.2d 395, 399 (Tex. 1979). We have held that courts may rely on this power to sanction both "recalcitrant litigants," *Altesse Healthcare Sols., Inc. v. Wilson*, 540 S.W.3d 570, 572 (Tex. 2018) (per curiam), and "errant counsel" who engage in "improper trial conduct," *Remington Arms Co. v. Caldwell*, 850 S.W.2d 167, 172 (Tex. 1993). We have said that courts have inherent authority to sanction attorneys for an "abuse of the judicial process" and for conduct that "breeds disrespect for and threatens the integrity of our judicial system." *In re Bennett*, 960 S.W.2d 35, 40 (Tex. 1997) (per curiam).[4] And they have "not only the

---

[2] The Court imposes its global bad-faith requirement because of its concern that the trial courts' "wield[ing] inherent powers of intrinsic potency and unconstrained breadth necessitates the restraint and caution the bad-faith predicate encapsulates." *See ante* at ___. But our system is designed to constrain the limits of inherent sanctions. Indeed, the Court cites ample opinions in which courts of appeals reversed a trial court's use of its inherent power to sanction. *See ante* at ___ (citing *Union Carbide Corp. v. Martin*, 349 S.W.3d 137, 148 (Tex. App.—Dallas 2011, no pet.) (reversing sanctions award); *McWhorter v. Sheller*, 993 S.W.2d 781, 789 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (same); *Onwuteaka v. Gill*, 908 S.W.2d 276, 281 (Tex. App.—Houston [1st Dist.] 1995, no writ) (same)). The courts of appeals constrain a trial court's inherent authority to sanction even when bad faith exists. *See Harmouch v. Michael A. Rassner, D.D.S., P.C.*, No. 01-10-00367-CV, 2011 WL 1435008, at *4 (Tex. App.—Houston [1st Dist.] April 14, 2011, no pet.) (mem. op.) (vacating sanctions order despite evidence of bad faith because no evidence existed that the "bad faith conduct interfered with the legitimate exercise of the trial court's core functions."). If the lower courts have been able to constrain the use of the inherent authority to sanction for "decades," I see no reason why creating an additional requirement of bad faith is necessary today.

[3] To be clear, we are addressing here a trial court's *inherent* authority to sanction an attorney, not authority granted by statute or rule. *See ante* at ___ n.2 (listing sources of courts' authority to sanction).

[4] The Court stretches to characterize *Bennett* as globally requiring bad faith, suggesting that we used "equivalent language" when we referred to "abuse of the judicial process." *See ante* at ___ n.66. But as the definitions the Court itself cites confirm, "abuse" includes conduct that has a "bad effect" as well as a "bad purpose," and use that is "improper" as well as "wrong." *Id.* An attorney's conduct can abuse the judicial process without bad faith.

power but the *duty* to insure that judicial proceedings remain truly adversary in nature." *Pub. Util. Comm'n of Tex. v. Cofer*, 754 S.W.2d 121, 124 (Tex. 1988).

To protect the integrity of the judiciary and judicial process, trial courts rely on their inherent authority to impose a wide array of sanctions—from slap-on-the-wrist ethics-education orders to death-penalty dismissal orders—in response to an equally wide array of sanctionable conduct. In each case, however, we have repeatedly demanded that with all sanctions, whether based on inherent authority or not, the punishment must fit the crime. *See Altesse Healthcare*, 540 S.W.3d at 572 (citing *TransAmerican Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991)).[5]

As the Court explains today, a trial court's decision to impose sanctions involves two determinations—"(1) whether conduct is sanctionable and (2) what sanction to impose"—but because the punishment must fit the crime, the two are not nearly as "distinct" as the Court suggests. *Ante* at ___. Because "a direct relationship must exist between the offensive conduct and the sanction imposed," conduct that is "more" sanctionable justifies sanctions that are "more" punitive. *Altesse Healthcare*, 540 S.W.3d at 572 (quoting *TransAmerican*, 811 S.W.2d at 917). The most "extreme sanctions," like a death-penalty dismissal order (or worse), requires a finding not just of "bad faith," but of "flagrant" or "extreme" bad faith. *Id.* at 575–76. But for the less extreme sanctions, like an order requiring legal-ethics training, we have never required "bad faith" at all.

---

[5] *See also Nath v. Tex. Children's Hosp.*, 446 S.W.3d 355, 363 (Tex. 2014); *Paradigm Oil, Inc. v. Retamco Operating, Inc.*, 372 S.W.3d 177, 187 (Tex. 2012); *PR Invs. & Specialty Retailers, Inc. v. State*, 251 S.W.3d 472, 480 (Tex. 2008); *In re SCI Tex. Funeral Servs., Inc.*, 236 S.W.3d 759, 761 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 839 (Tex. 2004); *Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 849 (Tex. 1992); *Alvarado v. Farah Mfg. Co.*, 830 S.W.2d 911, 915 (Tex. 1992).

Different levels of culpability—such as bad faith, intent, or negligence—warrant different types of sanctions. Take, for example, spoliation sanctions. When a party loses, alters, or destroys relevant evidence, the trial courts inherently "have discretion to fashion an appropriate remedy to restore the parties to a rough approximation of their positions if all evidence were available." *Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 721 (Tex. 2003). Neither the Texas Rules of Evidence nor the Texas Rules of Civil Procedure specifically addresses spoliation, although they do enumerate remedies for discovery abuses. *Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 18 (Tex. 2014). But a trial court also has the inherent "discretion to craft other remedies it deems appropriate in light of the particular facts of an individual case, including the submission of a spoliation instruction to the jury." *Id.* at 21. As with all sanctions, the remedy must have a direct relationship to the act of spoliation and may not be excessive. *Id.* (citing *TransAmerican*, 811 S.W.2d at 917). "Key considerations in imposing a remedy are the level of culpability of the spoliating party and the degree of prejudice, if any, suffered by the nonspoliating party." *Id.* at 14. And while a spectrum of available remedies exists, "the harsh remedy of a spoliation instruction is warranted only when the trial court finds that the spoliating party acted with the specific intent of concealing discoverable evidence, and that a less severe remedy would be insufficient to reduce the prejudice caused by the spoliation." *Id.*[6] Thus, intentional wrongful conduct is required for the harshest spoliation sanction, but is not required for *all* spoliation sanctions.[7]

---

[6] We clarified that "'intentional' spoliation, often referenced as 'bad faith' or 'willful' spoliation, [means] that the party acted with the subjective purpose of concealing or destroying discoverable evidence." *Brookshire Bros.*, 438 S.W.3d at 24.

[7] A "narrow caveat" exists, however, allowing more severe sanctions in the "rare occasion[]" in which "a party's negligent breach of its duty to reasonably preserve evidence irreparably prevents the nonspoliating party from having any meaningful opportunity to present a claim or defense." *Id.* at 25.

Here, the trial court imposed two different sanctions: It ordered the attorney to pay opposing parties' attorney's fees and expenses and to complete ten extra hours of legal-ethics education. Consistent with U.S. Supreme Court precedent, I can accept the Court's new rule that a sanction order requiring a litigant or attorney to pay another party's attorney's fees and expenses must be based on a finding that the sanctioned party "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *F. D. Rich Co. v. United States ex rel. Indus. Lumber Co.*, 417 U.S. 116, 129 (1974); *see also Goodyear Tire & Rubber Co. v. Heager*, — U.S. —, 137 S. Ct. 1178, 1186 (2017) ("[O]ne permissible sanction is . . . an order . . . instructing a party *that has acted in bad faith* to reimburse legal fees and costs incurred by the other side." (emphasis added)). As the Supreme Court has repeatedly explained, bad faith (or its equivalent) should be required for this type of sanction to ensure it remains a limited but well-established exception to the long-standing American Rule, which requires each party to pay its own attorney's fees unless a statute or contract provides otherwise. *F. D. Rich Co.*, 417 U.S. at 129; *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991); *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765–66 (1980); *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258–59 (1975). To preserve the policies behind the American Rule, a trial court may exercise its inherent sanctions authority to require payment of another party's attorney's fees only in these "narrowly defined circumstances" involving bad-faith conduct. *Roadway Express*, 447 U.S. at 765.

Like the Supreme Court, we have consistently affirmed the American Rule and the policies behind it. *See JCB, Inc. v. Horsburgh & Scott Co.*, No. 18-1099, — S.W.3d —, 2019 WL 2406971, at *8 (Tex. June 7, 2019); *In re Nat'l Lloyds Ins. Co.*, 532 S.W.3d 794, 809 (Tex. 2017); *Tucker v. Thomas*, 419 S.W.3d 292, 295 (Tex. 2013); *In re Nalle Plastics Family Ltd. P'ship*, 406 S.W.3d

168, 172 (Tex. 2013); *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 120 (Tex. 2009); *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310–11 (Tex. 2006). To preserves those policies, I agree that a finding of bad faith or its equivalent should be required before a trial court may exercise its inherent sanctions authority to require payment of another party's attorney's fees.

But the American Rule does not justify globally requiring bad faith as a prerequisite for all inherent-authority sanctions imposed to protect the integrity of the judicial process. Contrary to the Court's assertions, the U.S. Supreme Court does not require a bad-faith finding for all inherent-authority sanctions. *See, e.g.*, *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 796 (1987) ("The ability to punish disobedience to judicial orders is regarded as essential to ensuring that the Judiciary has a means to vindicate its own authority without complete dependence on other Branches."); *Illinois v. Allen*, 397 U.S. 337, 343 (1970) (recognizing trial courts' inherent authority to ban criminal defendants who disrupt conduct of trial); *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962) (recognizing trial courts' inherent authority "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases"); *Anderson v. Dunn*, 19 U.S. 204, 227 (1821) ("Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates.").

Ignoring the Supreme Court's express recognition that courts have the inherent authority "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases," *Link*, 370 U.S. at 630–31, the Court instead relies repeatedly and exclusively on a single statement in the concluding paragraph of the Supreme Court's decision in *Roadway Express*, in

which the Court summarized its point that "the trial court did not make a specific finding as to whether counsel's conduct in this case constituted or was tantamount to bad faith, a finding that would have to precede any sanction under the court's inherent powers." *See ante* at ___ & n.32, ___ n.49, ___ n.71 (quoting *Roadway Express*, 447 U.S. at 767). But the sanction at issue in *Roadway Express* was an award of attorney's fees, and the Court's analysis and holding specifically addressed not a global bad-faith requirement for inherent-authority sanctions, but the "bad-faith *exception* [to the American Rule] *for the award of attorney's fees*." *Roadway Express*, 447 U.S. at 766 (emphasis added). Noting that "New York courts have sanctioned lawyers for mere negligence," the Court did not reject that standard but instead clarified that it was addressing only the attorney's-fees sanction before it: "this opinion addresses only bad-faith conduct." *Id.* at 767 n.13. In short, the Supreme Court has never held that bad faith is required to support *every* sanction under the courts' inherent authority, and neither should we.

The Court also relies on Texas courts of appeals decisions, which it says have universally required bad faith for "decades." *Ante* at __. But this is simply not true. Some of the courts of appeals—like the *McWhorter* case on which the Court relies, *ante* at ___ n.28 (citing *McWhorter*, 993 S.W.2d at 781)—divided the inquiry between bad-faith conduct and conduct that interferes with the legitimate exercise of the trial court's core functions, finding either sufficient for a trial court to use its inherent authority.[8] For example, one appellate court explicitly denounced the

---

[8] The *McWhorter* case involved a sanction order awarding attorney's fees, and the court of appeals reversed the sanction not just because there was no bad faith, but because there was "no evidence that McWhorter's attorney acted in a manner which would interfere with the administration of justice or detract from the trial court's dignity and integrity," or "that the conduct complained of significantly interfered with the court's legitimate exercise of one of" its core judicial functions. *McWhorter*, 993 S.W.2d at 788–89. The other case on which the Court relies reversed a death-penalty sanction dismissing the party's pleading because "the trial court could not have reasonably concluded that Onwuteaka acted in flagrant bad faith when he appeared late for trial," and because there was "no evidence that the trial court considered some lesser sanction." *Onwuteaka*, 908 S.W.2d at 281.

global requirement of bad faith, explaining, "'Bad faith' may indeed be one basis for imposing inherent authority sanctions, but a survey of pertinent cases demonstrates broader considerations are involved when reviewing the propriety of sanctions imposed." *In re J.V.G.*, No. 09-06-015CV, 2007 WL 2011019, at *5 (Tex. App.—Beaumont July 12, 2007, no pet.) (mem. op.). In the absence of bad faith, the court found the trial court did not abuse its discretion by imposing sanctions because the attorney's conduct, "when taken together, could be found to have significantly interfered with the court's management of its docket as well as the issuance and enforcement of its orders." *Id.* at *10; *see also Kennedy v. Kennedy,* 125 S.W.3d 14, 19 (Tex. App.—Austin 2002, pet. denied) ("[A] court cannot invoke its inherent power to sanction without some evidence and factual findings that the conduct complained of significantly interfered with the court's legitimate exercise of one of its traditional core functions.").

Based on the evidence submitted in this case, the trial court specifically found, and the court of appeals agreed, that some of the survey questions, which the attorney personally reviewed and approved, were "designed to influence or alter the opinion or attitude of the person being polled." *Brewer*, 546 S.W.3d at 880. And the pool of those considered for survey included potential jurors, court personnel and their family members, city council members and their spouses, city managers, witnesses and their spouses, and designated third parties and their spouses. *Id.* at 879 n.7, 881. The trial court specifically found that the survey, as designed and implemented, was "highly prejudicial and inimical to a fair trial by an impartial jury," was "disrespectful to the judicial system," "threatening to the integrity of the judicial system," was incompatible with a "fair trial by an impartial jury," was "an abusive litigation practice that harms the integrity of the justice system and the jury trial process," and negatively affected "the rights of parties to a trial by an

impartial jury of their peers" and "the due process and seventh (7th) amendment protection due to litigants in the case before the Court." *Id.* at 880. Today, the Court does *not* find that "no evidence" supports these trial-court findings.[9] It finds only that "no evidence" supports the trial court's finding that the attorney acted in bad faith when he authorized the survey. The attorney argued that, although he may have exercised "bad judgment" or been negligent or even grossly negligent, the trial court could not sanction him because no evidence established that he acted in "bad faith." *Id.* at 878–79.

The Court agrees, suggesting that the "mere violation" of an "ethical standard in connection with conducting a pretrial survey does not *ipso facto* constitute bad faith." *Ante* at ___. That may be, but it does ipso facto constitute the violation of an ethical standard. And here, at least, the trial court found that the attorney's unethical conduct seriously threatened the integrity of the judicial process, and that finding on this evidence would justify the court's decision to exercise its inherent authority to impose an appropriate sanction, regardless of whether the attorney acted negligently, intentionally, or in bad faith. Assuming the absence of any evidence to support a finding of bad faith, the sanction may not include an order requiring payment of other parties' attorney's fees, but

---

[9] Instead, the Court suggests that the trial court's specific fact findings are neither findings of "facts nor conclusions of law." *Ante* at ___ n.75. Of course, if they are neither fact findings nor legal conclusions, one must wonder what they are. Perhaps the Court thinks they are merely the trial court's belief or opinion, but a fact finder's belief or opinion of the facts, based on the evidence presented, is of course the fact finder's finding of fact. *See Phillips v. Carlton Energy Grp., LLC*, 475 S.W.3d 265, 276–77 (Tex. 2015) (listing facts "the jury could have believed"); *Mut. Life Ins. Co. of N.Y. v. Tillman*, 19 S.W. 294, 296 (Tex. 1892) (noting that "jury could form their own opinion from the facts"); *Bernal v. Seitt*, 313 S.W.2d 520, 521 (Tex. 1958) (summarizing facts "which the jury might reasonably have believed to be true from the evidence"). And as to the Court's reference to the standard of review, the court of appeals made "an independent inquiry of the entire record" and concluded that the trial court did not abuse its discretion by making these findings. *Brewer*, 546 S.W.3d at 876, 882. The Court has made its own independent inquiry of the record and concludes that the trial court abused its discretion by finding bad faith, but it never concludes that the trial court abused its discretion by finding that the survey, as conducted, threatened the integrity of the judicial system.

it certainly may include an order requiring the attorney to attend additional legal-ethics education courses.

Accepting for these purposes the Court's conclusion that the record contains "no evidence" of bad faith, I concur in the Court's judgment to the extent it vacates the trial court's order requiring the attorney to pay other parties' attorney's fees and expenses. But to the extent the Court vacates the trial court's order requiring the attorney to take additional legal-ethics education courses, and to the extent it requires trial courts to find bad faith before exercising their inherent authority to impose any form of sanction, I respectfully dissent.

_____
Jeffrey S. Boyd
Justice

Opinion delivered: April 24, 2020

# EXHIBIT 41

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § |
| | § |
| | § |
| **Plaintiff and Counter-Defendant,** | § |
| | § |
| **and** | § |
| | § |
| **WAYNE LAPIERRE,** | § |
| | § |
| **Third-Party Defendant,** | § |
| | § |
| **v.** | § Civil Action No. 3:19-cv-02074-G |
| | § |
| **ACKERMAN MCQUEEN, INC.,** | § |
| | § |
| **Defendant and Counter-Plaintiff,** | § |
| | § |
| **and** | § |
| | § |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG,** | § |
| | § |
| **Defendants.** | § |

## DECLARATION OF MICHAEL ERSTLING

I,     My name is Michael Erstling, and I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following declaration is true and correct.

1.     I am over twenty-one years old and am fully competent to make this declaration. Unless otherwise noted, I have personal knowledge of all matters stated herein.  I submit this declaration in support of the NRA's Opposition to Defendants' Motion to Disqualify Plaintiff's Counsel (William A. Brewer III and Brewer Attorneys & Counselors).

1

2.     I am the current Director of Budget and Financial Analysis at the National Rifle Association of America ("NRA"). During the times relevant to the issues herein, I was employed by the NRA as Director of Budget and Financial Analysis.

3.     I oversee the annual budgets of the NRA across department functions and third-party vendors. I am also responsible for measuring the actual financial performance during the year to the annual NRA budget.

4.     In my capacity as Director of Budget and Financial Analysis, I participated in the annual budget process for the Public Relations Department including Ackerman McQueen ("AMc") and reviewed billing related to this department during the year. During my entire tenure at the NRA (until very recently), Ackerman was one of the NRA's largest vendors – in many years, it was the NRA's single largest vendor.

5.     In addition, preparing the annual budget was made difficult because Ackerman regularly deviated from the budget parameters set by the NRA. I was provided no insight into the basis for its budgets or whether it would adhere to them.

6.     Long before I met Bill Brewer, I developed serious concerns about Ackerman's budgeting and billing practices and the trust the NRA had placed in the agency. Ackerman regularly issued six-figure invoices to the NRA with little detail or support, and systemically obfuscated and blocked the NRA's efforts to understand what services were covered by any particular invoice. When staffing projects, Ackerman regularly employed, without written approvals, expensive outside contractors for functions, that in my opinion could have been adequately served by NRA staff. It was my suspicion that Ackerman did this because it could collect a markup from the NRA on contractors it hired.

2

7.      I also noted that Ackerman's bills regularly violated contract stipulations.  For example, I became concerned that Ackerman was billing the NRA for work, such as future issues of Carry Guard magazine, that had not been undertaken; indeed, in May 2018 the NRA was billed $269,000 for an issue of Carry Guard magazine that was not slated to be released until later that summer.  In August 2018 NRA received another invoice for a fifth issue even though the Association was already in possession of a backlog of issues of the Carry Guard magazine that had yet to be issued to the public.

8.      During early 2018, I began to compare notes with other NRA accounting staff, and it became clear that several of us shared the same or similar concerns.  Although there were other vendors (and transactions) we also believed should be examined, Ackerman was clearly the most significant offender in light of the amount of NRA funds it received and the degree of autonomy it enjoyed.  My colleagues and I raised our concerns with the Audit Committee of the NRA Board of Directors in July 2018.  The Audit Committee appeared to take our presentation seriously and promised it would act to get to the bottom of the situation.

9.      Without commenting on the contents of my communications with counsel or any legal advice received, I am generally aware that Brewer, Attorneys & Counselors (the "Brewer Firm") represents the NRA in multiple disputes with Ackerman.  I am also aware that Ackerman accused the Brewer Firm of contriving concerns about Ackerman's billing practices, perhaps as a pretext for prosecuting a family feud.  In my view, these allegations are ridiculous and offensive—they imply that if Brewer had not come along, the NRA's accountants would not have acted to cause the NRA to investigate Ackerman's billing practices. Although it is difficult to speculate about counterfactuals, I would hope that even if the NRA had never retained the Brewer Firm, it would nonetheless have fired Ackerman by 2019 for its refusal to cooperate with requests for files,

Appendix264

books, and records as pursuant to the Services Agreement.  Over my entire career as a Certified

Public Accountant, I cannot recall interacting with any other vendor that afforded its client so little

transparency or treated client staff with so much contempt.  The agency deserved to be fired.

10.     I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29ᵗʰ day of April 2020.

Michael J. Erstling

4835-0665-1066, v. 1

4

# EXHIBIT 42

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § § § | |
|     **Plaintiff and Counter-Defendant,** | § § | |
| **and** | § § | |
| WAYNE LAPIERRE, | § § | |
|     **Third-Party Defendant,** | § § | |
| **v.** | § § | Civil Action No. 3:19-cv-02074-G |
| ACKERMAN MCQUEEN, INC., | § § | |
|     **Defendant and Counter-Plaintiff,** | § § | |
| **and** | § § | |
| MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG, | § § § § | |
|     **Defendants.** | § § | |

<u>**DECLARATION OF CHARLES COTTON**</u>

My name is Charles Cotton, and I declare under penalty of perjury pursuant to 28 U.S.C.

§ 1746 that the following statements are true and correct.

1.      I am over twenty-one years old and am fully competent to make this declaration.

Unless otherwise noted, I have personal knowledge of all matters stated herein.  I submit this

declaration in support of the NRA's Opposition to Defendants' Motion to Disqualify Plaintiff's

1

Counsel (William A. Brewer III ("Brewer") and Brewer Attorneys & Counselors ("BAC")) (such motion, the "Disqualification Motion").

2.      I am a member of the Board of Directors of the National Rifle Association of America ("NRA"), am the First Vice President of the Board and Chairman of the Board's Audit Committee. During the times relevant to the issues herein, I was a member of the NRA's Board of Directors and Chairman of the NRA's Audit Committee. I never been paid any compensation for my work for the NRA.

3.      I am retired from the full-time practice of Cotton Farrell PC. Prior to becoming an attorney, I was employed as a Certified Public Accountant.

4.       As Chairman of the Audit Committee, I participate in oversight of the NRA's financial reporting process, audit process, the NRA's system of internal controls, including related-party transactions, and compliance with other laws and regulations.

5.      The allegation by Ackerman McQueen, Inc. ("AMc") that Brewer or BAC somehow "manufactured" the disputes between the NRA and AMc is false.  I am aware that Brewer and BAC were retained to represent the NRA in a variety of actual and potential disputes in Spring 2018.  Coincidentally, during July 2018, several NRA employees approached the Audit Committee and raised serious concerns about AMc's business and billing practices. Although the Audit Committee received legal advice on relevant topics, based on the those reports, it was the Audit Committee that ordered deeper scrutiny of AMc to determine whether its activities for the NRA were in compliance with NRA procedures and whether AMc had taken advantage of the NRA.

6.      Since that time, facts have surfaced over the ensuing year which made clear that the NRA was correct to investigate this concern expressed by NRA employees in 2018. Based on

Appendix268

documents and events about which I was later made aware, it appears that AMC likely took advantage of the trust placed in them by the NRA. As only one example, I became aware of an email dated April 15, 2019, authored by an executive of another AMc client and former Congressman, Dan Boren, which predicted that AMc "can't produce the backup to the invoices" it submitted to the NRA because AMc has likely been billing the NRA for personnel assigned to other clients – to wit, his employer. In sum, Mr. Boren stated: "Ackerman is in trouble on this one."

7.      I later became aware that a contract between AMc and Lt. Col. Oliver North ("North") – a related party transaction which required Audit Committee approval because North was a member of the NRA Board – contained material provisions far different from those originally disclosed to the Audit Committee when our committee approval was sought in September 2018.

8.      Separately, the Disqualification Motion attempts to paint the NRA's engagement of BAC, and BAC's fee structure, as extraordinary or improper.  The Audit Committee gave careful consideration to the criticisms of BAC's engagement advanced by North and determined that the controls and processes already in place for review of legal invoices were adequate.

9.      I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of April 2020.

Charles Cotton

3

Appendix269

# EXHIBIT 43

Appendix270

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § |
| **Plaintiff and Counter-Defendant,** | § § |
| **and** | § § |
| **WAYNE LAPIERRE,** | § § |
| **Third-Party Defendant,** | § § |
| **v.** | §  **Civil Action No. 3:19-cv-02074-G** |
| **ACKERMAN MCQUEEN, INC.,** | § § § |
| **Defendant and Counter-Plaintiff,** | § § |
| **and** | § § |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG,** | § § § § |
| **Defendants.** | § § |

## DECLARATION OF IAN SHAW

I, Ian Shaw, declare, pursuant to 28 U.S.C § 1746, as follows:

1.       I am an Associate with the law firm Brewer, Attorneys & Counselors, counsel to the National Rifle Association ("NRA") in the above-captioned action (the "Action"). I submit this declaration in opposition to Defendants' motion to disqualify the NRA's counsel.

2.       I am a member in good standing with the State Bar of Texas and am the requisite age to submit this declaration.

3.      I began working for Brewer, Attorneys & Counselors in 2007 as a summer intern. Thereafter, I was offered a full-time job with the firm as a junior consultant in the Dallas office upon my graduation from college.

4.      On March 10, 2008, my parents passed away—three months before my college graduation—and Bill Brewer ("Brewer"), allowed me to commence my career in the firm's New York office.

5.      To help me get acclimated to a new life, the Brewer family began inviting me to visit with them on weekends, spend time with them in the Hamptons and share holidays at their house in Dallas. Over the years, I began participating in family activities, attending family outings, and helping Brewer coach his youngest son in basketball. Brewer's family accepted me as if I was kin to them. To this day, we remain close.

6.      An ongoing ritual for me became spending Thanksgivings with the Brewer family. Every Thanksgiving—starting in 2008—I spent Thanksgiving with the Brewer family.

7.      Typically, the Brewer Thanksgivings included one or more of Bill's siblings, their families and friends of the family. One Thanksgiving in particular, in 2012, Skye Brewer's ("Skye") mother, father ("Angus McQueen" or "Mr. McQueen"), and brother ("Revan") came to the Brewer's home in Dallas for Thanksgiving.  That's where I met Revan McQueen ("Revan").

8.      Early in the evening on Thanksgiving Day, as Brewer and I made our way to his backyard to play basketball, Brewer briefly introduced me to Revan. We shook hands and that was the first and last interaction I had with Revan.

9.      Later that evening, there were two tables set up in the formal dining room given the number of people who there for Thanksgiving dinner. At one table sat Brewer, Skye, Skye's

family, including Revan, Brewer's sisters and their husbands. The second table, where I sat, consisted of Brewer's six children, his nephew, and nieces.

10.     At no time during the entire dinner did I have any interaction with Revan or any of Skye's family, nor did I participate or hear any talk about Mr. McQueen's business. In fact, topics discussed over Thanksgiving dinners with the Brewer family that I have attended usually center on sports, current news, and family stories.

11.     Revan's sworn statement that "we shared dinner together" is a bit exaggerated. I did not speak with him or interact with him in any manner beyond our brief introduction. That was also the last time I ever saw him.  Furthermore, his testimony that I "surely benefited from hearing business that was discussed" is not true.  I did not hear any business being discussed at the Thanksgiving gathering where I met Revan.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of April 2020.

/s/ _____
Ian Shaw

4813-5605-8299.1
2277-08

# EXHIBIT 44

Appendix274

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § § § | |
| Plaintiff and Counter-Defendant, | § § | |
| and | § § | |
| WAYNE LAPIERRE, | § § | |
| Third-Party Defendant, | § § § | |
| v. | § | Civil Action No. 3:19-cv-02074-G |
| | § | |
| ACKERMAN MCQUEEN, INC., | § § | |
| Defendant and Counter-Plaintiff, | § § | |
| and | § § § | |
| MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG, | § § § § | |
| Defendants. | § § | |

## DECLARATION OF GRANT STINCHFIELD

I, GRANT STINCHFIELD, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I respectfully submit this declaration in opposition to Defendants' Motion to Disqualify Plaintiff's Counsel William A. Brewer III ("Brewer") and Brewer, Attorneys & Counselors.

2.      When I was employed at Ackerman McQueen Inc., ("AMc") as a host of NRATV, I was able to report on a topic I feel strongly about: The Second Amendment. However, while I



was employed there, I become concerned that the leadership at AMc may not be reporting to the NRA "live" real time views of my show.  It appeared to me AMc only focused on social media views in its reports to the NRA.   By leaving these "live" numbers out of reports to the NRA, a reasonable person would likely construe the reports as misleading.  When the NRA shut NRATV down, I felt compelled to speak out.

3.      I voluntarily went to Brewer and his law firm when I read about AMc's claims in legal proceedings against the NRA – claims which seem intended to damage the NRA's mission from both a financial perspective and from a public relations perspective. I felt the court needed to hear my unbiased account of my experience while working at AMc.

4.      Everything in my affidavit – dated December 10, 2019 – was factual, and I stand firmly by every word. I look forward to the opportunity to defend myself against AMc for its baseless attacks, including the false narrative that I am somehow a pawn of Brewer.

5.      When I submitted my affidavit on behalf of the NRA, I assumed that AMc would come after me for relaying the uncomfortable truth.  I predicted they would sue me for what I was going to say. And in December of 2019, AMc sued me for Defamation and Business Disparagement.  I predicted they would, because that is how they act against anyone who dares to defy them.

6.      I read Revan McQueen's ("Revan") declaration, dated March 30, 2020. I am offended that Revan would accuse me of being coerced when he knows I have never been coerced into anything in my adult life.  I have built and run a million-dollar business; I have run for Congress; and I have four Emmy Awards to my name. Coercion is not something I am susceptible to. Revan's statements about me being coerced by Brewer are utterly false.



7.      After spending nearly 20 years in mainstream television working as a reporter for NBC stations across the country, I had never once been sued.  For many of those years, I was an investigative reporter who often reported on stories fraught with legal peril.  I was and continue to be fair, truthful, and careful.

8.      I have never knowingly put anything false on TV and I would never knowingly put anything false in a sworn affidavit. The AMc suit against me calls into question my credibility and character. The suit is shameful, and it appears AMc is using that same tactic against Brewer.

9.      Revan is correct when he stated that I called AMc's attorney after the suit was filed. However, he is incorrect in stating that I cancelled that meeting with AMc's attorney at the urging of Brewer.  In fact, I never discussed the phone call I had with AMc's attorney or the cancellation of our meeting with Brewer before doing so.

10.     Because I had never been sued before, I wanted the suit to go away and I thought maybe AMc would drop it if I explained my affidavit in more detail.  When I spoke with AMc's attorney over the phone, an attorney named Brian Vanderwoude, I realized this was not going to happen.  It was obvious that the goal was to scare me and anyone else who dares to file another affidavit on behalf of the NRA.

11.     Before cancelling the meeting, I spoke with my fiancée about it.  We agreed that for the sake of the NRA and its members, and for any former AMc employee who dared to come forward for the truth to be heard, I should not allow AMc and its attorneys to bully me into submission.

12.     It would be nice to have the lawsuit behind me, but my ultimate allegiance has always been to the NRA and its members.  I will not allow foes of the NRA, like AMc, to silence me just because they do not like what I have to say.



13.     To be clear, I am not a disgruntled employee, and I was proud of the work I did at NRATV. I was always grateful for the opportunity to be a voice for NRA members.   That responsibility to the NRA members – for the awesome responsibility of speaking for them – is why I came forward. "Disgruntled" is certainly not a term I would use to describe my emotions. "Sad" is a much better description.

14.     My goal has always been to protect the NRA from any actions that could be harmful to membership and the NRA's ultimate goal of protecting the Second Amendment.

15.     I never had a sense that AMc – under Revan's leadership – wanted to work with the NRA or even cooperate with them on important issues like budgeting or messaging.

16.     I certify that the foregoing statements are true and correct under penalty of perjury.

Executed this 30th day of April 2020.

Grant Stinchfield

# EXHIBIT 45

Appendix279

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § § § |
| **Plaintiff and Counter-Defendant,** | § § § |
| and | § § |
| WAYNE LAPIERRE, | § § |
| **Third-Party Defendant.** | § § |
| v. | § **Civil Action No. 3:19-cv-02074-G** |
| ACKERMAN MCQUEEN, INC., | § § § |
| **Defendant and Counter-Plaintiff,** | § § |
| and | § § |
| MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG, | § § § § § § |
| **Defendants.** | § |

## DECLARATION OF JOHN FRAZER

Pursuant to 28 U.S.C. § 1746, I, John Frazer, declare under penalty of perjury that the following is true and correct:

1.     I am over twenty-one years old and am fully competent to make this declaration. Unless otherwise noted, I have personal knowledge of all matters stated herein. I submit this declaration in support of Plaintiff National Rifle Association of America's Opposition to

1

Appendix280

Defendants' Motion to Disqualify Plaintiff's Counsel (William A. Brewer III ("Brewer") and Brewer, Attorneys & Counselors ("BAC")) (such motion, the "Disqualification Motion").

2.  I have served as Secretary and General Counsel of the National Rifle Association of America since 2015, including at all times relevant to the Disqualification Motion. In this capacity, I negotiate engagement letters with outside counsel, review and approve legal invoices submitted by outside counsel, and oversee major litigation involving the NRA. I also provide legal advice to the NRA where appropriate regarding contractual relationships and contractual disputes with vendors, including Ackerman McQueen, Inc. and Mercury Group, Inc. (collectively, "AMc").

3.  I have reviewed the allegations contained in the Disqualification Motion and believe them to be totally without merit.

4.  The NRA first retained BAC in early 2018 at the recommendation of our former outside counsel, Steve Hart.[1] Well before BAC began to address any issues involving AMc, I was fully aware, and understood that other members of the NRA leadership were fully aware, of Brewer's relationship by marriage to the McQueen family. I am also aware of the animus which AMc alleges has characterized that relationship over the past two years. The NRA has consented, and consents now, to be represented by Brewer and BAC notwithstanding the supposed conflicts which AMc alleges to arise from the Brewer-McQueen family relationship.

5.  Since the outset of this litigation, the NRA has understood that AMc might attempt to call Brewer as a fact witness. Indeed, many of the same "lawyer-witness" arguments that appear in the Disqualification Motion were asserted unsuccessfully by AMc before a Virginia state court in a similar lawsuit in June 2019. The NRA consented then, and consents now, to be represented

---

[1] The NRA suspended Mr. Hart's engagement on April 22, 2019, and no longer has an attorney-client relationship with Mr. Hart. Certain functions formerly performed by Mr. Hart are performed by BAC.

Appendix281

by Brewer and BAC notwithstanding AMc's insistence that Brewer is a necessary or adverse witness. As discussed below, the NRA would be considerably prejudiced if Brewer were individually disqualified from representing it in any capacity. Nonetheless, the NRA would consent to be represented by BAC in that situation, including in the event of a lawyer-witness disqualification as contemplated by Texas Rule of Professional Conduct 3.08(c).

6.      The Disqualification Motion alleges that BAC's engagement letters fail to comply with the NRA Bylaws,[2] and that BAC's "exorbitant legal fees"[3] create a conflict of interest which ought to disqualify BAC from this case.[4] In my view, these allegations are false and meritless. The NRA has had the opportunity to obtain—and did obtain—independent legal advice from other outside counsel regarding BAC's engagement, and the engagement has also been reviewed by the NRA's Audit Committee. The NRA is satisfied that its engagement of BAC complies with its bylaws and internal controls. In addition, I personally review detailed monthly invoices submitted by BAC and raise questions where appropriate regarding the substance of the work performed, the hours expended, charges incurred for third-party vendors and experts, and similar items. These questions have always been addressed to my satisfaction. Except for certain work handled *pro bono*, BAC is compensated by the NRA on an hourly-fee basis. Taking into account regional market variations, the hourly rates charged by BAC attorneys are comparable to the hourly rates paid by the NRA for outside counsel in other high-profile cases.

7.      The Disqualification Motion accuses BAC of "faking the AMc audits and document demands"[5] during 2018 and 2019 which preceded the NRA's lawsuit for specific

---

[2] *See* ECF 105 at ¶ 12.

[3] *Id.* at ¶ 6.

[4] *Id.* at ¶ 41.

[5] *Id.* at ¶ 43.

Appendix282

performance of a books-and-records inspection clause filed April 12, 2019. This allegation is false. Based on legitimate concerns about AMc's compliance with contractual requirements, I personally sent several of the letters requesting documents from AMc that went unanswered, and retained and supervised the third-party forensic accounting firm, Forensic Risk Alliance (FRA),[6] which attempted to examine AMc's records on-site during February 2019. The NRA's efforts to obtain documents from AMc were not "faked," by Brewer or otherwise.

8. The Disqualification Motion also cites then-AMc employee, Lt. Col. Oliver North, as raising concerns about whether "Brewer's prior record of sanctions" was "properly vetted" by the NRA.[7] Although the NRA is not in the habit of taking advice from adverse litigants regarding its choice of counsel, I note that I was fully informed, long before this action commenced, regarding the sanctions imposed on Brewer discussed in *Brewer v. Lennox Hearth Prods., LLC,* 546 S.W.3d 866, 871 (Tex. App.—Amarillo 2018). I am also aware these sanctions were reversed in their entirety by the Texas Supreme Court.

9. The NRA has chosen Brewer and BAC to lead some of its most significant litigation and regulatory advocacy, and it is my assessment that the firm has developed significant institutional knowledge regarding the documents, issues, and witnesses relevant to this work. If Brewer—or worse, BAC as a whole—were disqualified in this case, it is highly unlikely that the NRA could timely bring aboard substitute counsel with comparable mastery of the case. Therefore, the NRA would be severely prejudiced. Moreover, because the subject matter of this

---

[6] The Disqualification Motion also suggests that FRA's accountants were "anything but [independent]" because a former BAC employee, Susan Dillon, worked at FRA. *Id.* at ¶ 26. FRA was retained by the NRA because its bid showed it was likely to provide better value for money than a competing firm. Moreover, Ms. Dillon was not part of the audit team that conducted the on-site record examination.

[7] *See* ECF 105 at ¶ 10.

Appendix283

case overlaps with other ongoing legal matters, the NRA would be forced to incur additional unnecessary legal fees, sacrificing the efficiency of having the same firm handle overlapping cases.

Executed this 1st day of May, 2020.

John Frazer

Appendix284

Appendix285

# EXHIBIT 46

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § § § |
| **Plaintiff and Counter-Defendant** | § § § |
| and | § § |
| WAYNE LAPIERRE, | § § § |
| **Third-Party Defendant,** | § § |
| v. | § Civil Action No. 3:19-cv-02074-G |
| | § |
| ACKERMAN MCQUEEN, INC., | § § |
| **Defendant and Counter-Plaintiff,** | § § § |
| and | § § |
| MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG, | § § § § § |
| **Defendants.** | § § |

## <u>DECLARATION OF ANDREW ARULANANDAM</u>

1.      My name is Andrew Arulanandam, and I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following statements are true and correct.

2.      I am over twenty-one years old and am fully competent to make this declaration.  Unless otherwise noted, I have personal knowledge of all matters stated herein. I submit this declaration in support of the NRA's Opposition to Defendants' Motion to Disqualify Plaintiff's Counsel (William A. Brewer III ("Brewer") and Brewer Attorneys & Counselors ("BAC").

1

3.        I serve as the Managing Director of Public Affairs of the National Rifle Association (the "NRA"). I have worked for the NRA for more than 19 years. As part of my job responsibilities, I interface with in-house communications professionals; outside advertising and public relations firms, such as Ackerman McQueen (AMc); and law firms, such as Brewer, Attorneys & Counselors ("BAC").

4.        I understand that AMc claims BAC is a "competitor" of the agency based on the communications services provided by BAC and its Public Affairs Group to the NRA. I am familiar with the communications services provided by BAC to our organization, and I am also familiar with the suite of communications, political consultation, web creation and advertising services previously provided by AMc to the NRA.

5.        I have worked closely with BAC Managing Director of Public Affairs Travis J. Carter and his small team of communications professionals. They have primarily assisted with communications relating to legal and regulatory matters being handled by BAC. In that regard, they have assisted in formulating media advisories, drafting public statements, and coordinating media relations activities. Given the size and strategic focus of the BAC Public Affairs Department (a total of less than five people, to my knowledge), its work for the NRA has been specialized.

6.        By comparison, and as is reflected in the Services Agreement, dated April 30, 2017, (amended May 6, 2018), which existed between the NRA and AMc, AMc was to provide the NRA a broad range of communications, branding, digital, print media and video production services. Those included, but were not limited to, generating earned media at NRA events; coordinating and scheduling appearances for NRA officials and celebrities; overseeing brand management; directing media planning and placement services; managing advertising and photography;

2

Appendix288

directing audio/visual and event management; providing videotaping, editing and production services; directing music composition and arrangement; directing infomercials; managing full-time webcasting; providing support services for "live" website offerings; creating graphic and flash animation; providing ongoing technical support for NRA headquarters; overseeing search engine placement; and assisting in the production and coordination of an NRA Radio Show. AMc also directed, produced, facilitated, and managed professional talent relating to the broadcasting of NRATV – an online "TV" experience managed exclusively by AMc. None of these services are provided by BAC.

7.     So expansive were the communications and advertising functions provided by AMc, the agency represented that it had, over the years, more than 100 staff members servicing the NRA account.

8.     As I stated in my declaration, dated April 14, 2020, "…the NRA has never viewed the two entities [BAC and AMc] as competitors for the expansive suite of services provided by AMc."[1]

9.      In fact, there has been no effort on behalf of the NRA to "replace" AMc with BAC – even as the NRA ended its affiliation with the agency. The bulk of the services once provided by AMc to the NRA are now being performed in-house by our organization. These functions include, but are not limited to, preparing for media appearances, drafting key messaging, directing social media campaigns, event management, maintaining our digital assets and publishing certain magazines and other NRA publications.

---

[1] See declaration from A. Arulanandam, dated April 14, 2020.

3

10.     To fill the remaining void left by the departure of AMc, the NRA has worked on a case-by-case basis with some outside PR and advertising firms, and video production companies – all of which have <u>no</u> affiliation with BAC.

11.     I do not believe BAC has the expertise or staffing to position itself as a "competitor" to AMc, and it seems disingenuous AMc would promote such a narrative.

12.     I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of May 2020.

_____
Andrew Arulanandam

4

Appendix290

# EXHIBIT 47

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § | |
| | § | |
| | § | |
| **Plaintiff and Counter-Defendant** | § | |
| | § | |
| **and** | § | |
| | § | |
| **WAYNE LAPIERRE,** | § | |
| | § | |
| **Third-Party Defendant,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:19-cv-02074-G** |
| | § | |
| **ACKERMAN MCQUEEN, INC.,** | § | |
| | § | |
| **Defendant and Counter-Plaintiff,** | § | |
| | § | |
| **and** | § | |
| | § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG,** | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

## <u>DECLARATION OF JAMES M. McCORMACK</u>

1.     My name is James M. McCormack.  My date of birth is September 26, 1958.  My law office address is 1715 Capital of Texas Highway South, Austin, Texas 78746.  I am over 18 years of age, of sound mind, and competent to make this Declaration. I submit this Declaration in support of the NRA's Opposition to Defendants' Motion to Disqualify Plaintiff's Counsel (William A. Brewer III and Brewer, Attorneys & Counselors).  I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following declaration is true and correct.

1

2.      Where indicated, the facts stated in this Declaration are within my personal knowledge and are true and correct; however, to be clear, I do not have personal knowledge of the facts underlying this lawsuit or the present controversy.  For those underlying facts, I have relied on sources such as the pleadings, motions (and their attachments), correspondence, and other documents identified herein.

3.      I have based my opinions set forth below on facts or data of a type reasonably relied upon by experts in my field in forming opinions regarding the ethical and legal duties and obligations of Texas lawyers.

4.      I am and have been a licensed attorney in Texas for 35 years (since 1984).

5.      I am a former **General Counsel and Chief Disciplinary Counsel of the State Bar of Texas** (1991-1996) and an **adjunct professor of law at the University of Texas School of Law** in Austin where I taught legal ethics and the law governing lawyers. More recently, I taught a non-legal ethics related course titled "Expert Witnesses" and am presently teaching a course during the Spring 2020 semester titled "Handling Depositions and Expert Witnesses."  I am also a former member of the **Texas Disciplinary Rules of Professional Conduct Committee** of the State Bar of Texas; a past Chairman of the Texas Center for Legal Ethics and Professionalism (now called the Texas Center for Legal Ethics); and presently serve as the **Editor-in-Chief of the EthicsExchange** (which provides online legal ethics articles and related resources for lawyers) of the Texas Center for Legal Ethics.

6.      In 2015, the Supreme Court of Texas appointed me to the **Texas Professional Ethics Committee**, which prepares and publishes formal ethics opinions for the guidance of Texas lawyers in the *Texas Bar Journal*.  In 2018, the Court reappointed me to an additional three-year term.

7.      My legal practice primarily involves legal ethics and legal malpractice.  Within that legal practice category, I serve as ethics and malpractice counsel to Texas lawyers, law firms, and others, represent complainants and respondent attorneys in the Texas attorney disciplinary and disability system, represent clients with respect to unauthorized practice of law issues and Texas bar admissions, and serve as a consulting and/or testifying expert in legal ethics and legal malpractice-related matters, including on numerous occasions attorney disqualification issues. Further, I have practiced on both sides of the civil law docket for many years, have served as a general counsel and outside counsel to entities, taught law school courses, served as a legal ethics advisor to lawyers and law firms, have been an author or presenter of numerous articles and programs on legal ethics and legal malpractice issues for lawyers and other audiences.

8.      For further information about my education, training, and experience, my *curriculum vita* is attached hereto as Exhibit A.

## SCOPE OF ENGAGEMENT

9.      I have been retained to review information, including various documents from this case, and provide expert opinions within the scope of my education, training, and experience as a Texas lawyer who practices extensively in the legal ethics and legal malpractice area (as described herein) and particularized expertise in the legal authorities discussed.  For the purposes of this Declaration, I have been asked to offer expert opinions regarding *Defendants' Motion to Disqualify Plaintiff's Counsel (William A. Brewer III and Brewer Attorneys and Counselors)* in Civil Action No. 3:19-cv-02074-G; *National Rifle Association of America, et al. v. Ackerman McQueen, Inc.., et al.* now pending in the United States District Court for the Northern District of Texas, Dallas Division, before the Honorable Judge A. Joe Fish.   I have also reviewed the "*Brief in Support of*

Appendix294

*Defendants' Motion to Disqualify Plaintiff's Counsel (William A. Brewer III and Brewer Attorneys & Counsellors) and the exhibits attached thereto.*

## SUMMARY OF RELEVANT FACTS

10.     In brief summary only, I have the following understanding of the facts:

11.     Plaintiff in the above-referenced lawsuit is the National Rifle Association of America ("**NRA**"), in addition to Third-Party Defendant, Wayne LaPierre ("**LaPierre**"), the Executive Vice President and CEO of the NRA.   The Brewer, Attorneys & Counsellors law firm ("**Brewer Firm**") represents the NRA and Mr. LaPierre in this suit.

12.     Defendants are Ackerman McQueen, Inc. ("**AMc**"), a public relations and marketing firm, AMc's subsidiary Mercury Group, Inc., and individual defendants Henry Martin, William Winkler, Melanie Montgomery, and Jesse Greenberg (collectively, "**AMc**").   The law firm of Dorsey & Whitney, LLP ("**Dorsey Firm**") represents AMc.

13.     The NRA filed its Original Complaint against Defendants in August 2019.  That Original Complaint involved claims based on the Copyright Act and the Lanham Act and alleged that AMc engaged in the unauthorized use of the NRA's trademarks and copyrights, including a false association claim under the Lanham Act and an alternative claim for conversion of the NRA's intellectual property.  Subsequently, in October 2019, the NRA amended its Complaint and made additional claims against AMc and persons affiliated with AMc for fraud and breaches of fiduciary duty.

14.     Defendant AMc was a long-time agent of the NRA and provided public relations-related services.  As part of its defenses to the NRA's claims, AMc has accused the William A. Brewer III ("Brewer") and the Brewer, Attorneys & Counsellors law firm ("Brewer Firm" or the

Appendix295

"Firm") of competing with AMc for public relations-related services in addition to the Firm practicing law.

15.     Defendants, including AMc, filed "*Defendants' Motion to Disqualify Plaintiff's Counsel (William A. Brewer III and Brewer Attorneys & Counselors)*" with this Court on March 30, 2020.  Defendants' Motion alleges several grounds in support of its assertion that the Brewer Firm should be disqualified from continuing to represent the NRA in this suit.  As grounds for disqualification, Defendants cite six of the Texas Disciplinary Rules of Professional Conduct (and their companion ABA Model Rules), namely :

    A.  Texas Rule 1.06(b) and ABA Model Rule 1.7 (Conflicts of Interest).

    B.  Texas Rule 3.08(a)-(c) and ABA Model Rule 3.7 (Lawyer as Witness).

    C.  Texas Rule 3.07 and ABA Model Rule 3.6 (Trial Publicity).

    D.  Texas Rule 4.01 and ABA Model Rule 4.1 (Truthfulness in Statements to Others).

    E.  Texas Rule 4.02 and ABA Model Rule 4.2 (Communication with Represented Persons).

    F.  Texas Rule 4.04 and ABA Model Rule 4.4 (Respect for the Rights of Third Persons)

16.     As a purported basis for invoking these rules, Defendants make the following factual allegations:

    A.  Brewer has a strained relationship with the McQueen family—of which some family members have or had managerial and/or ownership roles in AMc.

    B.  The Brewer Firm is competing with AMc for public relations business and is now providing services to the NRA that AMc previously provided to the organization for nearly 40 years.

    C.  Brewer and the Brewer Firm have "taken over the NRA" with respect to "all legal and PR [public relations] decisions" and has made "exorbitant legal fees along the way."

5

D. The NRA initially hired the Brewer Firm for a single case and now has "taken over" an unbounded scope of representation for the organization.

E. That former NRA President Oliver North tried and failed to have the organization "investigate" the Brewer Firm's "duties and invoices."

F. That the Brewer Firm "retaliated" against former NRA President Oliver North "and others" by assisting some within the NRA to oust North as its President and by suing AMc.

G. That Brewer escalated "attacks" against AMC after he learned that his father-in-law (A. McQueen) had cancer, including making various threats to have certain persons prosecuted and instigating audits of AMc's work for the NRA.

H. That Brewer used McQueen family members to communicate with A. McQueen and R. McQueen as part of an improper effort to communicate with AMc.

I. That Brewer has had "prior ethical conflicts and court sanctions" in other cases during his legal career.

That Brewer is a "material fact witness" in this case because he allegedly knows how and why AMc and the NRA parted ways after nearly 40 years and may have "manufactured" this falling-out between the two organizations.

17.    Finally, Defendants summarize their disqualification arguments with the following

statements:

I. *"Brewer's continued representation of the NRA or LaPierre against AMc in this matter improperly and unfairly prejudices AMc's ability to fully and fairly litigate its claims and defenses and will further perpetuate public suspicion of the integrity of the judicial system and this lawsuit. Brewer, and by extension, the Brewer Firm, must be disqualified and prohibited from further representing the NRA and LaPierre in this case, or any other party against Defendant relating to this NRA dispute, and from participating beyond providing witness evidence in the form of documents and testimony."*

II. *"Brewer and his firm are violating several Texas Disciplinary Rule of Professional Conduct and Model Rules of Professional Conduct by directly competing with AMc, leaking false and disparaging information about AMc to the press, side-stepping the attorney-client privilege, and communicating with a represented party."*

6

18.     To establish the facts they allege in support of disqualification, Defendants cite deposition testimony, documents of various provenance, and a declaration by Revan McQueen.  I have reviewed these materials, along with the declarations of Skye McQueen Brewer, Wayne LaPierre, John Frazer, Craig Spray, Charles Cotton, Michael Erstling, Travis Carter, Andrew Aurulanandam and Michael Collins submitted in opposition to the Motion.

## OPINIONS

19.     Based on the above information and applying my education, training and experience (as well as applying relevant authorities, including the various Texas disciplinary rules and ABA Model Rules that Defendants assert are applicable here), I have the following opinions:

**I.  Defendants' claims concerning Brewer's alleged conflicts of interest under Texas Rule 1.06 and ABA Model Rule 1.7 intrude into matters properly resolved between  the Brewer Firm and its client, the NRA.  Defendants have no legitimate standing to assert these conflicts.**

20.     **First,** most conflicts of interest arise, and are properly addressed, solely among a lawyer or (or law firm) and the client.  Comment 17 to Rule 1.06, Texas Disciplinary Rules of Professional Conduct states, in part, that "[r]aising conflicts of interests is primarily the responsibility of the lawyer undertaking the representation."  A litigant very rarely, if ever, has standing to assert that opposing counsel is conflicted.  Comment 17 acknowledges such standing only "where the conflict is such as clearly to call into question the fair or efficient administration of justice…."  Therefore, any alleged conflicts of interest (or potential conflicts) are for Brewer and the Brewer Firm to address with its client, the NRA; likewise, it is for the NRA  to decide whether it wishes to accommodate the alleged conflict or not.  Nothing in the record comes close to establishing the type of exceptional circumstance, contemplated by Comment 17, which would taint the administration of justice in the eyes of the public and confer standing on Defendants to

7

assert a conflict.  For example, Defendants do not claim that Brewer previously represented them, or switched sides during the course of this litigation.  Nor do Defendants identify particular information or confidences that Brewer gained by virtue of his relation by marriage to the sister of an AMc executive.  Instead, Defendants' primary argument appears to be that they would be much more comfortable if the NRA was represented by more amiable counsel—which is what roughly 100% of litigants would prefer.

21.     For example, Defendants attempt to make much of Brewer's supposed *animus* toward the McQueen family, which, in turn, allegedly makes his firm and him somehow unfit to represent an opponent against AMc.  This is a weak reed (at best) upon which to base a disqualification claim.  Lawyers and law firms are ***not*** required to ***like*** opposing parties or even feel neutrally about them.  In fact, lawyers and their firms often develop an extreme dislike for— or have a pre-existing dislike regarding—opposing parties.  This situation is ***not*** disqualifying ***unless*** a lawyer reasonably concludes that his or her extreme animus toward an opposing party is materially prejudicing the representation of his or her ***own*** client or the lawyer is unable to meet his or her professional obligations of civility toward opponents under the Texas Lawyers Creed or other professional standard.   It is Brewer's prerogative to raise this issue with the NRA if he objectively concludes that his legal representation of the NRA is somehow compromised by his familial relationships.  The NRA may be perfectly fine with the fact that Brewer allegedly dislikes his wife's family.  But it is the NRA's right to determine whether it wishes to accommodate Brewer's feelings—whatever they may be—toward the NRA's opponent or related parties.

22.     **Second**, it is not an impermissible conflict of interest for a law firm to "compete" with an opposing party in litigation for services that the opposing party provides to others.  For example, law firms certainly compete against other law firms all the time with respects to clients,

cases, and transactions.  Under Defendants' apparent theory, a law firm that handles a patent litigation and legal malpractice cases could not, on behalf of a client, sue another patent litigation law firm for legal malpractice because it is in the first law firm's interest to disadvantage a competing firm in the patent litigation space.  That, however, is ***not*** the law governing conflicts of interest anywhere.  Additionally, the mere fact that a law firm provides public relations-related services as an adjunct to its legal services is hardly novel.  Some law firms, particularly in the corporate counsel world, provide crisis-management and public relations-related services  to their entity and individual clients, whether those law firms refer to those services that way or not.  In any event, whether the Brewer Firm provides public relations-related services is irrelevant.  It is neither unlawful nor inappropriate to do so—nor does that fact, if true, have any bearing on the NRA's claims against AMc.  Those affirmative NRA claims will presumably be decided on their own merits—and the Court will make its own decisions about whether AMc's defensive theories concerning this alleged competition are relevant to this proceeding.  At most, this is another issue for discussion between the Brewer Firm and its client, the NRA.

23.     **Third**, AMc's claim that Brewer and/or the Brewer Firm are disqualified because they have a financial interest in pursuing this and other litigation is laughable.  Virtually all lawyers and law firms have a financial incentive in representing clients.  That financial motive is tempered by the lawyers' and law firms' legal, ethical, and professional obligations to their clients, including the obligation not to charge unreasonable or unconscionable legal fees; however, the Brewer Firm's client, the NRA, is apparently not complaining about the legal fees that it has paid or may pay in the future.   Unsurprisingly, an adverse party typically lacks standing to complain that its opponent in litigation is spending too much money on legal fees.  If this was a family law case in which one spouse's expenditures on legal services in the divorce were significantly draining the

marital estate, the other spouse might well question those expenditures.  But despite Defendants' apparent efforts to transform it into one, this is not a family-law dispute.  AMc has no legitimate interest in how much or how little the NRA spends on legal services in this case or any other.

24.     **Fourth**, AMc's claim that it is disadvantaged because one of its principals, R. McQueen, must defend the company against claims brought by his sister's husband (Brewer) provides no legal basis for disqualification.  A party, such as AMc here, might have numerous reasons why it would prefer that another law firm represent its opponent in litigation; however, a party in litigation does not get to select (or veto) counsel for its opponent.

25.     **Fifth**, AMc appears to claim that Brewer and the Brewer Firm have filed "unauthorized" lawsuits on behalf of the NRA when the NRA "was seeking to keep the peace with AMc, concocting and carrying out the false and defamatory 'extortion' narrative, and for terminating AMc's Services Agreement."  If the NRA has not "authorized" any lawsuits in its name, including this one, then that is an issue for the NRA to resolve; otherwise, AMc can file a motion for the Brewer Firm to show authority to appear as the NRA's counsel in this matter, if it genuinely believes that the Brewer Firm lacks that authority.  A motion to disqualify is not the proper vehicle for challenging an opposing counsel's authority to act for an adverse party.  It is also my understanding that a Virginia court previously rejected the exact same argument by AMc.

## II.     Defendants' "lawyer-witness" arguments are misguided and defective.

26.     There is no indication of which I am aware that the NRA plans to use Brewer as both an advocate and fact witness in the trial of this case.  Nor is there any indication that Brewer is a "*witness necessary to establish an essential fact on behalf of the [NRA]*."  If Brewer becomes a "*witness necessary to establish an essential fact on behalf of his client*," then he certainly cannot act as an advocate before the tribunal at trial; however, that scenario, if it occurs, is not disqualifying as to the Brewer Firm as a whole—and does not completely exclude Brewer from

Appendix301

representing the NRA in this case.  *See, e.g.*, *Anderson Producing, Inc. v. Koch Oil Co.*, 929 S.W.2d 416, 422 (Tex. 1996)("*Rule 3.08 only prohibits a testifying attorney from acting as an advocate before a tribunal, not from engaging in pretrial, out-of-court matters such as preparing and signing pleadings, planning trial strategy and pursuing settlement negotiations*").  *But see*, *Crossroads Systs (Texas), Inc. v. Dot Hill Systs. Corp.*, 2006 WL 1544621 (W.D. Tex. 2006) at *10 (holding that other members of the testifying lawyer's firm should also be disqualified from serving as trial counsel under the circumstances of the case).  Under *Anderson Producing*, Brewer could continue to assist with the Brewer Firm's handling of this case and participate in roles other than as an advocate before the trier of fact.  *Anderson*, 929 S.W.2d at 422.  Further, a party **cannot** disqualify an opposing counsel **simply** by claiming that that opposing counsel will be compelled to provide testimony adverse to his or her own client or where another witness could provide the same allegedly "essential" testimony.  *United States v. Beauchamp*, 2017 WL 1684406, at *2 (N.D. Tex. 2017)(criminal case in which the government claimed that defense counsel was a necessary witness under Rule 3.08 due to work that he allegedly did on certain agreements; in denying the motion, the Court found the government's argument in this regard to be speculative and insufficient).  If Brewer is compelled to testify adversely to the NRA—which **cannot** occur simply because AMc wills it—then Brewer could, in theory, make appropriate disclosures to his client, the NRA, about the consequent conflict and obtain a waiver.  See Rule 3.08(c), Texas Disciplinary Rules of Professional Conduct.  Whether Brewer must seek a conflicts waiver from his client depends on: **(a)** whether he will be compelled to give adverse testimony; and **(b)** the nature of that adverse testimony and its materiality.  The Court will ultimately decide whether Brewer will be compelled to testify by AMc and the scope of that testimony, if any—while presumably ruling on the likely attorney-client privilege and work product objections to AMc's demand that opposing

counsel testify.   If the Court compels Brewer's testimony, only then would Brewer need to make

appropriate disclosures regarding the conflict to his client, the NRA, and receive (or not) the

NRA's consent to the conflict.   There may be circumstances where Brewer might not be able to

seek the NRA's consent to a conflict of this nature (*i.e.,* where the conflict is so prejudicial to the

NRA that it should not agree to accommodate the conflict); however, disqualification is not

warranted by AMc's mere claim that it will force Brewer to be a witness adverse to the NRA, nor

by its claim that Brewer is absolutely necessary to provide essential testimony in support of the

NRA's claims.   I note that Defendants failed, in their briefing, to alert the Court to the high legal

hurdles that exist for disqualification under the Texas and ABA "lawyer as witness" rules.

> **III.    Defendants' Motion offers a scattershot of vague and irrelevant allegations that do not implicate the Texas disciplinary rules or ABA Model Rules upon which Defendants claim to rely.**

27.    Neither Defendants' Motion nor the supporting papers coherently substantiate each

alleged rule violation, let alone by marshaling relevant, admissible evidence.   Defendants' brief

is especially difficult to follow in that its alleged proof and arguments do not mirror the claims set

out in the Motion and brief at the outset.   This is not just a disagreement with writing style or

competence in organizing arguments coherently.   After covering its general conflicts of interest

and "lawyer as witness" arguments, Defendants' brief trails off without developing its four other

disqualification arguments or corresponding proof in sufficient detail. For example, Defendants

claim that Brewer "used" McQueen family members to "communicate" with certain principals at

AMc in an alleged violation of Texas Rule 4.02 (and the companion ABA Model Rule), but made

no effort to identify who those McQueen family members were, how AMc principals knew that

Brewer was intentionally trying to communicate with them through these unnamed family

members, what those alleged "communications" concerned or when they occurred, or how these

alleged indirect communications violated either Rule.  With respect to this allegation, Defendants

offer the March 30, 2020, Declaration of Revan McQueen in which he claims, in §31 and §36 (on pp. 9-10) that Brewer used McQueen family members to "communicate" with him, allegedly to circumvent AMc's counsel.  The declaration asserts that Brewer threatened to have "me and Angus [McQueen] indicted," but does not explain how R. McQueen knows that Brewer was trying to communicate this information to him improperly through other family members.  Presumably, one of these alleged family members could have testified by affidavit to these claims, but Defendants offered no direct evidence of that sort.

28.     Even more oddly, Defendants appear to claim that statements and events totally unrelated to this case, some occurring decades ago, provide grounds for disqualification.  Among other things, Defendants cite: an article written by Brewer and two co-authors for the *Pepperdine Law Review* regarding the 1998 *Dondi* decision; and, alleged sanctionable conduct by Brewer in other cases, including sanctions that were reversed for abuse of discretion by the Texas Supreme Court.[1]

29.     Overall, Defendants' disqualification motion is a mishmash of undeveloped or shoddily developed theories and claims, coupled with reputational smears.  Defendants make no real effort to support their allegations with admissible evidence, and even less explain how the same allegations, if proven, would provide grounds for disqualification under any theory recognized in the Fifth Circuit.  Perhaps Defendants' overall objective is to create an "appearance of impropriety"—which has not been recognized for ethical purposes in the Texas Disciplinary Rules of Professional Conduct for more than 30 years.   Indeed, an "appearance of impropriety" is

---

[1] Specifically, Defendants' brief spends considerable time highlighting a trial court's 2015 highly-publicized sanction against Brewer in *Brewer v. Lennox Hearth Prods, LLC*, 546 S.W.3d 866, 871 (Tex. App.- Amarillo 2018, pet. granted). The Texas Supreme Court struck down those sanctions in their entirety, determining that imposing them was an abuse of discretion. *See* Brewer *v. Lennox Health Products, LLC, et. al.*, No. 18-0426, Supreme Court of Texas.

Appendix304

a largely discredited ABA ethical standard due to its inherent subjectivity (e.g., an "appearance" is clearly different than the "reality of impropriety"). Wolfram, *Modern Legal Ethics*, §7.1.4, West Publishing, 1986. Nonetheless, the Fifth Circuit has occasionally considered "appearances of impropriety" in the past; however, the U.S. District Court for the Northern District of Texas noted that this standard, in the attorney disqualification context, should be applied "**with caution**." *Grosser-Samuels v. Jacquelin Designs Enters., Inc*., 448 F. Supp.2d 772, 780 (N.D. Tex. 2006). And for good reason:  An "appearance" is susceptible to arbitrary determinations about what lawyers, courts, and the public may find "distasteful" or "unseemly."

30.     Presumably, Defendants' counsel are familiar with Rule 3.01, Texas Disciplinary Rules of Professional Conduct.  That Rule states: "*A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless the lawyer reasonably believes that there is a basis for doing so that is not frivolous.*"  Given the inapplicability of the Rules cited and the alleged proof offered, it is difficult to see how Defendants' counsel have acquitted themselves well in observance of this basic ethical obligation.

31.     I may supplement or amend this Declaration as further information or issues are presented for my consideration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Gonzales County, Texas on the 3rd day of May 2020.

_____

James M. McCormack

4843-5356-2041.6

-

14

**JAMES M. McCORMACK**
**Attorney and Counselor at Law**
**1715 Capital of Texas Hwy South**
**Suite 200A**
**Austin, Texas 78746**
Office:  512-615-2408
*Email:  jmmccormack@austin.rr.com*

Mr. McCormack is the former **General Counsel and Chief Disciplinary Counsel of the State Bar of Texas (1991-1996)** and a former **Managing Attorney** of the Civil Litigation Section of the Travis County Attorney's Office in Austin, Texas.  As the **State Bar's Chief Disciplinary Counsel**, he served as the chief legal ethics enforcement officer for the attorney discipline system in Texas.  He is a graduate of the **University of Texas at Austin**: **BBA with Honors, I981; Doctor of Jurisprudence, 1984.**

Mr. McCormack also served as an **adjunct professor of law at the University of Texas School of Law** in Austin where he taught professional responsibility. Mr. McCormack also received the **2016 Professionalism Award** from the Austin Bar Association and the Texas Center for Legal Ethics.

From 1998 to 2004, Mr. McCormack served as a member of the State Bar's **Texas Disciplinary Rules of Professional Conduct Committee**, which is charged with recommending amendments to the Texas ethics rules.  In 2015, the Texas Supreme Court appointed Mr. McCormack to the **State Bar of Texas' Professional Ethics Committee**, which prepares formal ethics opinions that are published in the Texas Bar Journal.  He was reappointed by the Court in 2018.

He served as the **Chairman of the Board of Trustees of the Texas Center for Legal Ethics and Professionalism (Chair-Elect, 2006-2007; Chairman 20072008; Immediate Past Chairman 2008-2009).  Mr. McCormack presently serves as the Editor-in-Chief of the EthicsExchange of the Texas Center for Legal Ethics.**

**Mr. McCormack's Austin-based practice emphasizes legal ethics-related consultations and representations.**  Past consultations include conflicts of interest analysis, mass tort settlements, disqualification motions, lawyer advertising and solicitation questions, organizational ethics reviews, legal malpractice-related expert testimony, representation before the Texas Board of Law Examiners, and other professional responsibility and malpractice-related counsel.  He is a regular lecturer on legal ethics and malpractice issues.

**Martindale-Hubbell national legal directory peer-based rating:  "AV" since 1994.**

**JAMES (JIM) M. McCORMACK**
Attorney at Law

- Current practice emphasizes legal ethics and legal malpractice consultation and representation; expert consultation and testimony; prior service as an adjunct professor of law, The University of Texas School of Law; Partner, Tomblin Carnes McCormack, L.L.P., Austin, Texas (1999-present); Law Offices of James M. McCormack (1996-1999; 2008-present); also Of Counsel, Law Offices of Anthony W. Tomblin (1997-1999).

**General Counsel and Chief Disciplinary Counsel**
State Bar of Texas
1991-1996

- Served as the **General Counsel** and the **Chief Disciplinary Counsel** of the State Bar of Texas; as **General Counsel**, provided corporate and litigation services to the Board of Directors, Executive Departments, and other Barrelated entities, such as the Unauthorized Practice of Law Committee and the Client Security Fund; as **Chief Disciplinary Counsel,** served as the chief legal ethics enforcement officer and chief prosecutor for the statewide attorney disciplinary system; supervised ten offices and 118 employees across Texas; oversaw all litigation conducted on behalf of the State Bar and the Texas Commission for Lawyer Discipline; served as *ex-officio* member of the State Bar Board of Directors and Executive Committee.  *The State of Texas is a public corporation and the administrative arm of the Judicial Department of the State of Texas.*

**Managing Attorney, Litigation Section**
Travis County Attorney's Office
May 1988 to 1991

- Managed public litigation section.  Supervised trial attorneys and support staff while handling a regular litigation caseload.

**Assistant County Attorney**
Travis County Attorney's Office

- Handled wide variety of lawsuits in virtually all areas of public practice, including personal injury defense, civil rights defense, eminent domain, ad valorem tax collection, employment law, environmental enforcement, contract and real property disputes and miscellaneous litigation.

2

**Staff Counsel**
Texas State Senate
1984 to 1985

• Served as **Staff Counsel** to a Texas State Senator; provided legal opinions and advice drafted legislation and amendments; monitored and analyzed proposed legislation.

## EDUCATION

• *The University of Texas Law School.*  Doctor of Jurisprudence, 1984.

• *The University of Texas at Austin.* Bachelors in Business Administration with Honors, 1981 (Management).

## EXECUTIVE AND CONTINUING EDUCATION

• The Wharton School, The University of Pennsylvania, Executive Education in Managing People, 1995.

• Covey Leadership Center, Seven Habits Program, 1995.

• *The University of Texas at Austin*, Coursework in counseling psychology, 1990.

• 40 hour Mediation Training Program, Travis County Dispute Resolution Center, 1991.

• *The University of Texas at Austin*, Executive Education in Finance and Accounting for Non-Financial Managers, 1995.

## HONORS, ACTIVITIES, AND MEMBERSHIPS

• **Past President**, Board of Directors, **AUSTIN WOMEN'S CENTER**; Board Member (1987-1992), for twenty year old non-profit organization providing job training and counseling for men and women; staffed by professional staff and volunteers; recipient of federal, state, and local funds.

• **State Bar Presidential Citations** in 1993 and 1996 for leadership in implementing the new grievance system and balancing multiple responsibilities as General Counsel/Chief Disciplinary Counsel of the State Bar of Texas.

Appendix308

- **Member**, State Bar of Texas, since 1984.

- **Member of the Bar**, U.S. District Court, Western and Eastern Districts of Texas; U.S. Court of Appeals, Fifth Circuit; and the United States Supreme Court.

- **Member**, National Mock Trial Team, University of Texas Law School, 1984; Member, Board of Advocates, University of Texas Law School, 1983-1984.

- **Member**, Friar Society (since 1982); Cactus Yearbook Outstanding Student (1984); University of Texas Cactus Yearbook Goodfellow (1983).

- **Life Fellow**, Texas Bar Foundation.

- **Member, Texas Disciplinary Rules of Professional Conduct Committee**, State Bar of Texas, 1998-2004.

- **Member and Past Chairman, Board of Trustees, Texas Center for Legal Ethics and Professionalism**, 2003-2009 (Chair-Elect, 2006-2007; Chairman, 2007-2008; Immediate Past Chairman 2008-2009).

- **Member, The State Bar of Texas' Professional Ethics Committee**, appointed by the Texas Supreme Court (2015-).  Reappointed 2018 to a new three year term.  The Professional Ethics Committee prepares formal ethics opinions for the guidance of Texas lawyers and for publication in the Texas Bar Journal.

- **Recipient of the Professionalism Award** by the Austin Bar Association and the Texas Center for Legal Ethics, 2016 ("The recipient of the Award will be that lawyer selected at the local level who best exemplifies, by conduct and character, truly professional traits, who others in the bar seek to emulate, and who all in the bar admire. Those selected for the award will truly be 'role models for the bar, particularly younger or less experienced lawyers. Those selected will be lawyers who are respected by their peers and make all their peers proud of the profession'").

## <u>TEACHING, WRITING AND ETHICS-RELATED PRESENTATIONS</u>

- **Adjunct Professor of Law**, *The University of Texas School of Law*, "Professional Responsibility" (1995-1997); Trial Advocacy: "Expert Witnesses" (2017-present); Trial Advocacy: "Handling Depositions and Expert Witnesses" (2020).

- **Editor-in-Chief, The EthicsExchange,** The Texas Center for Legal Ethics, 2014-present (online legal ethics articles and resources).

4

- **Contributing Co-Author,** *A Guide to the Basics of Law Practice*, 1995 and 1996 editions, Texas Center for Legal Ethics and Professionalism.

- **Author, "The Client Connection,"** *The Texas Lawyer,* (legal newspaper column appeared each month from September 2001 through August 2003)

- **Author**, "Good Ethics, Smart Tactics", *Law Practice Management Magazine*, American Bar Association, September 1995, (similar article at 57 TEX. B.J. 178, 1994). Named by the publication as one of its five best articles of 1995.

- **Co-author** (with Arthur Piacenti) **and Presenter**, "Dual Role Conflicts of Interest," "Reporting Misconduct," and "Entering into and Withdrawing from Representation"; *National Academy of Law, Ethics, and Management Program, 1994.*

- **Author and Presenter**, "How to Guarantee a Grievance," *Evidence: Current Strategies For The Trial Lawyer In A New Environment Program, South Texas College of Law, 1995.*

- **Author and Presenter**, "Ethical Considerations for the Personal Injury Lawyer," *The Annual Page Keeton Products Liability and Personal Injury Law Conference*, The University of Texas School of Law, 1996.

- **Author and Presenter**, "Conflicts of Interest in Complex Litigation," *Recognizing and Resolving Conflicts of Interest Program,* The State Bar of Texas, 1997.

- **Speaker**, "Most Common Ethical Lapses at Trial," 3rd Annual Evidence and Procedure Symposium, The University of Texas School of Law, San Antonio, Texas, 1998 (similar presentation at "Masters of Litigation" Program for Travis County Bar Association, 1997).

- **Speaker**, "Ethics and Negotiations," Travis County Bar Association, Austin, Texas, 1998.

- **Panel Member and Speaker**, "Class Action and Mass Tort Panel; Discussion of Special Ethics Issues, 3rd Annual Evidence and Procedure Symposium, The University of Texas School of Law, San Antonio, Texas, 1998.

- **Speaker**, "Legal Malpractice," 21st Annual Page Keeton Products Liability & Personal Injury Law Conference, The University of Texas School of Law, 1997.

- **Instructor**, "Ethical Considerations for Multi-party and Complex Litigation," Continuing Legal Education Online Course, 1998-present.

- **Co-presenter** (with Tracy McCormack) "So You Want To Be A Millionaire Lawyer, Ethically?" 5th Annual Advanced Evidence and Procedure Symposium, The University of Texas School of Law, May 2000 (similar legal ethics programs presented for the Texas Association of Bank Counsel, October 2000; and University of Texas School of Law CLE Program, April 2001).

- **Panel Member**, "Ethics and the Litigator", Live Statewide Satellite Presentation, Ethics and Malpractice Avoidance for Business/Corporate Lawyers and Litigators, State Bar of Texas, Dallas (and 25 Texas sites), November 2000.
- **Co-Presenter** (with Tracy McCormack) "The Weakest Link: Pitfalls in Legal Ethics,"  Texas Association of Bank Counsel Annual Meeting, Austin, Texas, October 2001.

- **Co-Presenter** (with Tracy McCormack) "The Weakest Link: Pitfalls in Legal Ethics," 25th Annual Page Keeton Products Liability and Personal Injury Law Conference, The University of Texas School of Law, Austin, Texas, November 2001 (similar legal ethics program presented at University of Texas Law School Reunion CLE Program, April 2002).

- **Co-Presenter** (with Tracy McCormack) "Ethics Jeopardy" Continuing Legal Education Program, 26th Annual Page Keeton Products Liability and Personal Injury Law Conference, The University of Texas School of Law, Austin, Texas, October 2002.

- **Speaker**, "Settling Cases Ethically," Silica Litigation Conference (HarrisMartin Publishing Company), New Orleans, Louisiana, June 2003

- **Panel Member**, "Ethics, Ethics, Ethics" 3 hour ethics program, Travis County Bar Association, December 2003.

- **Speaker**, "Ethical Pitfalls," Andrews Asbestos Conference, New Orleans, Louisiana, May 2004.

- **Speaker**, "Ethical Issues for Administrative Lawyers," Advanced Administrative Law Conference, Travis County Bar Association, June 2004.

- **Author and Presenter**, "Ethical Pitfalls Leading to Disqualification in the Texas and Federal Courts," Page Keeton Litigation Conference, The University of Texas School of Law Continuing Legal Education Program, Austin, Texas, October 2004.

Appendix311

- **Speaker**, "Six Ethics Rules I Thought I Knew Until I Read Them Again," Austin LSA Association Program, Austin, Texas, April 2005.

- **Author and Presenter**, "The Verdict from Kerrville: Resolving Conflicts of Interests Under Rule 1.06," Fiduciary Litigation Course, The State Bar of Texas, Houston, May 2006.

- **Speaker**, "Some Ethics Rules I Thought I Understood Until I Read Them Again," Texas Attorney General's Office, Distinguished Speaker's Program, Third Court of Appeals, Austin, August 2007.

- **Speaker**, "Attorneys and Paralegals," The Corpus Christi Bar Association, Corpus Christi, November 2007.
- **Speaker**, Legal Ethics Program for Clinical Programs at the University of Texas School of Law, Austin, January 2008.

- **Speaker**, "Ethical Insomnia: Construction Law Ethical Situations That Keep You Awake At Night," 21st Annual Construction Law Conference, The Construction Law Section of the State Bar of Texas and the Texas Institute of Continuing Legal Education, San Antonio, February 2008.
- Panelist, "The Ethics of Lawyer-Judge Interactions," The Ethics Course, The Texas Center for Legal Ethics and Professionalism, Austin, May 2008.

- **Panelist**, "The Ethics of Lawyer-Judge Interactions," The State Bar of Texas, TexasBarCLE, March 2008 (video program).

- **Panelist**, "Ethical Courtroom Behavior," The State Bar of Texas, TexasBarCLE Live Webcast program, June 2008.

- **Speaker**, "Ethics in Forming, Operating, and Amending Partnerships," The University of Texas CLE Program: Partnerships and Limited Liability Companies, Austin, July 2008.

- **Panelist**, "How to Avoid Ethical Improprieties When Dealing with Governmental Personnel," The 22nd Annual Legal Seminar on Ad Valorem Taxation, San Antonio, August 2008.

- **Panelist**, "Ethical Courtroom Behavior - Part II: Enforcement," The State Bar of Texas, TexasBar CLE Live Webcast program, October 2008.

- **Panelist/Chair**, "Lawyer-Judge Interactions," The Ethics Course, The Texas Center for Legal Ethics and Professionalism, Austin, December 2008.

Appendix312

- **Speaker**, "What Social Science Teaches About Rules, Procedures, and Ethical Behavior" ("Advising Businesses and Government in a Troubled Economy: Ethical Policies, Procedures, and Behavior"), UTCLE (The University of Texas School of Law), 13th Annual Law Use Conference, Austin, March 2009.

- **Moderator**, "Imposing Sanctions" and "Most Common Rule Violations" Grievance Committee Training Videos, Office of the Chief Disciplinary Counsel, The State Bar of Texas, Austin, April 2009.

- **Panelist**, "Ethics and High Profile Cases: Free Press v. Fair Trial", Cosponsored by the Litigation Section of the State Bar of Texas and the Texas Center for Legal Ethics and Professionalism, The State Bar of Texas Annual Meeting, Dallas, June 2009.

- **Panelist**, "Tuning Up Your Law Practice: Conflicts, Contracts, and Costs of Doing Business," Live Webcast by the State Bar of Texas Continuing Legal Education, Austin, July 2009.

- **Speaker** (with Tracy McCormack), "What Happens If We Are Honest About Our Jury Trial Experience?," The Car Crash Seminar, UTCLE (The University of Texas School of Law), Austin, August 2009.

- **Speaker**, "Navigating the Ethics Rules," The Ethics Course, The Texas Center for Legal Ethics and Professionalism, Austin, Texas, September 2009.

- **Speaker**, "What Social Science Teaches About Rules, Procedures, and Ethical Behavior," The Academy of Hospitality Industry Attorneys Conference, Austin, Texas, October 2009.

- **Panelist**, "Presenting the Case in Chief—Defense," Trial of a Fiduciary Litigation Case, TexasBarCLE (The State Bar of Texas), Fredericksburg, Texas, December 2009.

- **Speaker**, "Navigating the Ethics Rules," The Ethics Course, The Texas Center for Legal Ethics and Professionalism, Houston, Texas, January 2010.

- **Speaker**, "Beyond the MPRE," Spring Symposium, *Pursuing Justice Through Legal Innovation*, Sponsored by the Thurgood Marshall Legal Society, The Chicano/Hispanic Law Students Association, and the National Black Law Journal, The University of Texas At Austin, Austin, Texas, February 2010.

- **Speaker**, "Practical Legal Ethics for Immigration Lawyers," Austin  Chapter of the American Immigration Lawyers Association, Austin, Texas, March 2010.

- **Speaker**, "Attorney Retainer Agreements: Getting In and Getting Out," The Austin Bar Association, Litigation Section Program, Austin, Texas, April 2010.

- **Presenter**, "Ethical Tips and Traps for the Marketing Lawyer," Superlawyers Continuing Legal Education Webinar, Austin, Texas, June 2010.

- **Speaker**, "How to Terminate a Client Engagement," Advanced Tax Law Course, TexasBarCLE, Dallas, Texas, August 2010.

- **Panelist**, "New Disciplinary Rules: Point and Counterpoint," 34th Annual Page Keeton Civil Litigation Conference, The University of Texas School of Law (UTCLE), Austin, Texas, October 2010.

- **Speaker**, "Social Science and Ethics," *Strategic Management* Classes (Professor Mark Poulos), The School of Management and Business, St. Edward's University, Austin, Texas, November 2010, April 2011, November 2011, May 2012, and November 2012.

- **Co-Presenter** (with Jess Irwin), "Representation of Multiple Parties & Conflicts of Interest," The Advanced Administrative Law Course, TexasBarCLE, Austin, Texas, July 2011.

- **Author**, "The Elephant in the Room: The Referendum Defeat Is A Symptom of a Larger Problem," *The Advocate*, The State Bar Litigation Section Report, Vol. 55, Summer 2011.

- **Co-Author** (with Tracy McCormack and Susan Schultz), "Probing the Legitimacy of Mandatory Mediation: New Roles of Judges, Mediators, and Lawyers," *St. Mary's Journal on Legal Malpractice & Ethics*, St. Mary's University School of Law, Vol. 1, Number 1, 2011.

- **Speaker**, "Ethics & Pro Bono Service," Central Texas Wildfire Response Team Volunteer Attorney Training, *The Austin Bar Association*, Austin, Texas, September 2011.

- **Speaker**, "Navigating the Ethics Rules," The Holiday Ethics Program, The Austin Bar Association, Austin, Texas, December 2011.

- **Moderator**, Panel Discussion (with Buck Files and Charles Herring, Jr.), "The Ethics of the Legal Profession and the Public Perception of the Profession," *The Dr. Richard Street Legal Symposium*, Austin College, Sherman, Texas, March 2012.

- **Panelist**, "Appellate Ethics Roundtable," ("Fee Agreements: 5 Easy Pieces"), The University of Texas Conference on State and Federal Appeals, Austin, Texas, May 2012.

- **Speaker**, "Navigating the Ethics Rules and Conflicts," 12th Annual Legal Conference, The Office of General Counsel, The University of Texas System, Austin, Texas, October 2012.

- **Speaker**, "Navigating the Ethics Rules and Conflicts," 8th Annual Texas Energy Law Conference, The University of Texas School of Law, Austin, Texas, January 2013.

- **Speaker**, "Ethics in Negotiations," The Environmental Impacts of Oil and Gas Production Course, The State Bar of Texas, San Antonio, Texas, January 2014.

- **Speaker**, "Organizational and Personal Ethics," Principles of Management Courses, St. Edward's University, Austin, Texas, February 2013-Fall 2018; also, similar presentations for various "Strategic Management" Courses, Fall and Spring semesters, 2012-2018.

- **Speaker**, "Due Diligence Dilemmas: Contacting Coworkers and "Purloined" Documents" Program, Austin and Capital Area Plaintiff Employment Lawyers Association, Austin, Texas, April 2014.

- **Speaker**, "Contacts with Persons Represented and Not Represented by Opposing Counsel," Austin Bar Employment Law Section, November 2014.

- **Speaker**, "An Introduction to Attorney Disqualification," The Texas Center for Legal Ethics, Filmed April 2015.

- **Speaker**, "Attorney Fees and Fee Contracts," The Texas Center for Legal Ethics, Filmed April 2015.

- **Speaker**, "Contingent Fees and Fee Contracts," Capital Area Trial Lawyers Association, Austin, Texas, May 2015

- **Speaker**, "Managing a Grievance and How to Avoid a Grievance," Government Law Boot Camp, TexasBarCLE, Austin, Texas, July 2015

- **Speaker**, "Attorney's Fees and Fee Contracts in Family Law," Austin Family Law Advocates, Austin, Texas, September, 2015

Appendix315

- **Author**, various *EthicsExchange* Articles, Texas Center for Legal Ethics, 20142015, including:

  - o Filing Law Firm Advertisements with the State Bar
  - • Ethics in Negotiation and Mediation
  - o Improper Client Solicitations
  - o Confidentiality in Attorney-Client Relationship
  - o Disputes Over Legal Fees and Claims by Third Parties
  - o Overview of the Texas Grievance System: Ten Questions
  - o Inappropriate Relationships with Clients
  - o Lawyer Contacts with Adverse Parties and Experts
  - o Reporting the Misconduct of Other Lawyers (and Judges)
  - o Representing Organizations and Reporting Client Problems
  - o The Texas Lawyer Creed: Purpose and Enforcement
  - o Training Law Office Staff Regarding Ethical Obligations
  - o The Basics of Lawyer Trust and IOLTA Accounts
  - o Legal Fees: Types, Their Causes and Cures
  - o Introduction to Attorney Disqualification
  - o Navigating the Ethics Rules: What Matters in Answering Questions About Texas Legal Ethics and Why
  - o The Binding Arbitration Disclosure
  - o The Fee Agreement
  - o Joint Representations: "More Than Just One Client" Ethics
  - o The Conflicts of Interest Disclosure

- **Speaker**, "Ethics and Dilemmas in Representing Multiple Client: Conflicts and Other Implications," The Texas Wetlands Conference, Houston, Texas, January 2016.

- **Speaker**, "Ethical Issues Regarding Trial," Advanced Civil Trial Law Seminar, Corpus Christi Bar Association, Corpus Christi, Texas, April 2016.

- **Co-Presenter** (with Tracy McCormack), "Disclosure is the New Ethics," The University of Texas School of Law (Reunion Weekend Continuing Legal Education), Austin, Texas, April 2016.

- **Speaker**, "Conflicts of Interest in Labor and Employment Law," The Austin Bar Association (Labor & Employment Law Section), Austin, Texas, November 2016.

- **Speaker**, "Ethical Traps for New (and Experienced) Lawyers," *Justice James A. Baker - Guide to Ethics and Professionalism in Texas* Course, The Texas Center for Legal Ethics, Dallas, Texas November 2016.

- **Co-Presenter** (with Tracy McCormack), "Ethical Jeopardy," Holiday Ethics Program, The Austin Bar Association, Austin, Texas, December 2016.

- **Speaker,** "Legal Ethics for the Seasoned Lawyer," Austin Bar Association (*Still Loving It* Bar Section), April 2017.

- **Panel Member**, Disruptive Technology and Ethics, University of Texas Law School Technology Conference, UTCLE program, Austin, Texas, May 2017.

- **Speaker**, "Ethics in Business Litigation," Business Disputes Conference, TexasBarCLE, Austin, Texas, September 2017.

- **Speaker** (with Tracy McCormack), "The Ethical Perils of Cocktail Party Talk," Cocktail Party Law: Answering Questions in Social Situations, UTCLE Program, Austin, Texas, November 2017.

- **Speaker**, "Legal Ethics and Professionalism for the Civil Trial Lawyer," The Advanced Civil Trial Law Course, The Corpus Christi Bar Association, Corpus Christi, Texas, March 2018.

- **Speaker**, "They Say What? A Few Ethics Rules and Opinions That Surprise Experienced Lawyers," The Capital Area Trial Lawyers Association, Austin, Texas, December 2018.

- **Co-Presenter** (with Tracy McCormack), *Ethics Jeopardy: Fee Agreements Through Appeal*,  The American Board of Trial Advocates, Austin, Texas, November 2019.

# EXHIBIT 48

Appendix318

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § | |
| | § | |
| | § | |
| **Plaintiff and Counter-Defendant,** | § | |
| | § | |
| **and** | § | |
| | § | |
| **WAYNE LAPIERRE,** | § | |
| | § | |
| **Third-Party Defendant,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:19-cv-02074-G** |
| | § | |
| **ACKERMAN MCQUEEN, INC.,** | § | |
| | § | |
| **Defendant and Counter-Plaintiff,** | § | |
| | § | |
| **and** | § | |
| | § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG,** | § | |
| | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

## DECLARATION OF WAYNE LAPIERRE

My name is Wayne LaPierre, and I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following statements are true and correct.

1.     I am over twenty-one years old and am fully competent to make this declaration.  Unless otherwise noted, I have personal knowledge of all matters stated herein.  I submit this declaration in support of the NRA's Opposition to Defendants' Motion to Disqualify

Appendix319

Plaintiff's Counsel (William A. Brewer III ("Brewer") and Brewer Attorneys & Counselors ("BAC")) (the "Motion" or the "Disqualification Motion").

2.      I am the Executive Vice President ("EVP") and Chief Executive Officer ("CEO") of the National Rifle Association of America ("NRA" or the "Association"). During the times relevant to the Motion, I was EVP and CEO of the NRA.

3.      In this role, I am responsible for making major corporate decisions, as well as directing the NRA's programs and business activities in accordance with policies set by the Board. I am also one of the public faces of the NRA.

4.      The NRA had a longstanding relationship with Ackerman McQueen, Inc. ("AMc"), prior to 2019. During the course of that relationship, I understood that AMc had a large number of employees working on the NRA account, managing advertising campaigns, public relations, branding strategies, publications and more. AMc managed many of the NRA's most significant public-facing communications, directed key elements of our online presence, and operated many of our digital assets. Notably, AMc concepted, managed and created all of the content for the NRA's live-streaming digital platform, known as NRATV.

5.      Although I valued AMc for the creativity of its longtime CEO, Angus McQueen, AMc was not easy to work with and alienated many NRA staff, Board members and significant donors. Long before I met Bill Brewer, NRA executives, directors and others were increasingly strident in their complaints about AMc. For years, I regarded many of these as mere personality conflicts engendered by the abrasiveness of Angus McQueen. As such, I looked past the complaints because I believed the agency's work benefitted the NRA.

6.      By 2018, AMc was the NRA's largest vendor, billing approximately $40 million per year. Because their work covered key communications and public relations, I often turned to

2

them for highly sensitive matters. Consistent with the significance of this work and the level of trust placed in AMc, the NRA allowed them considerable latitude in managing their work for the Association, subject to their agreement that we could access AMc's files, books and records under the parties' Services Agreement, dated April 30, 2017 (as amended May 6, 2018, the "Services Agreement").

7.      Nonetheless, I became concerned and received numerous complaints that the public messaging AMc was crafting for the Association often struck the wrong tone.  AMc was placing increasing emphasis on material that was unrelated to Second Amendment issues and often inflammatory. My concern became acute in connection with the messages coming across NRATV, which had been created with the intention of reaching a younger and more diverse audience. The NRA is a civil rights organization focused on individual freedoms, especially the Second Amendment, and in my view should provide a home for all lovers of our Second Amendment freedoms.  These misgivings arose long before BAC came aboard, and long before I learned of specific staff complaints about AMc's billing practices.

8.      In early 2018, as the NRA faced regulatory scrutiny over a membership program known as Carry Guard, I began to question the adequacy of our oversight of two key vendors: the insurance partner that administered that program (Lockton), and AMc, which directed portions of the program that incurred significant cost overruns.

9.      Therefore, greater transparency from the Association's vendors became a high priority for the NRA.  It was especially important to get the AMc relationship right given the size of their budget.  Moreover, several NRA employees voiced pointed concerns that AMc was abusing the NRA's trust.  For all of these reasons, it became important to gain greater insight into how the agency was spending the NRA's money.  Areas of interests included the number of AMc

Appendix321

employees working on the NRA account, project approvals, project investments, completed services, and the projected returns on our investment in connection with NRATV. The allegation by AMc that Brewer or BAC somehow "manufactured" the disputes between the NRA and AMc, or "faked" the NRA's document requests is not only patently false but inconsistent with the historical facts.

10.     In fact, when the Association initially sought information regarding AMc's billing practices in the summer of 2018, AMc tried to convince me that the NRA should not want to review the files, books and records AMC maintained related to its work for the NRA. Specifically, Angus McQueen warned me that any documents transmitted to the NRA might later be accessed by New York State regulators, but those same records would be beyond the reach of those same regulators if left in AMc's hands since AMc was headquartered in Oklahoma and would be impervious to a New York subpoena.  This was not only unpersuasive, it was disconcerting: if AMc was engaged in the type of activity that triggered concerns about subpoenas, I wanted to know about it.

11.     For reasons completely unrelated to AMc, the NRA had engaged BAC in March 2018, to represent it on a number of legal fronts.  At or about that time, I informed Angus McQueen that the NRA was retaining BAC in connection with the various litigation and regulatory matters. He did not express any concerns.  In fact, we discussed the familial relationship.  I am unaware of any objections by Angus McQueen regarding BAC's representation of the NRA until after the Association began asking questions about AMc's billing.

12.     In June 2018, I was informed that our new Chief Financial Officer, Craig Spray ("Craig"), was going to travel to AMc's headquarters in Oklahoma City to be introduced to AMc's leadership by our outgoing chief financial officer. Before Craig returned to work, I received an

4

irate phone call from Angus McQueen who demanded that I fire Craig immediately.  I tried to get to the bottom of AMc's complaint. I came to understand that Craig had merely asked questions that AMc executives did not want to answer about AMc's services, the metrics related to NRATV, and AMc's accounting practices. Assured by Wilson Phillips that the questions asked by Craig were appropriate, I informed Angus that the NRA would not fire Craig.

13.     On October 11, 2018, Craig and I met with Angus McQueen, Revan McQueen, and other members of AMC's leadership at their office in Dallas, Texas. The purpose of the meeting was to discuss ways to reduce AMc's fourth-quarter budget for 2018 and the budget for 2019.  The meeting was explosive.  Angus and Revan were enraged at the prospect of cutting AMc's $40 million budget and seemed to have lost all sight of their role as a vendor in a vendor-client relationship.  In abusive, vulgar tirades, the McQueens told me I was "dead to [them]" and they had already written NRA off and had moved on.  BAC was not the focus of the meeting.  I have read Revan McQueen's declaration filed in support of AMc's Disqualification Motion. His testimony regarding the events that took place at this meeting, as well as a number of claims about my relationship with Brewer, is entirely incorrect.

14.     During 2018 and early 2019, Andrew Aurulanandam and I occasionally asked BAC to assist with specialized media outreach—almost always in response to press inquiries about legal issues the NRA was facing.  Similarly, I asked BAC to assist with my remarks for the February 2019 Conservative Political Action Conference ("CPAC").  I wanted the speech to focus on First Amendment litigation BAC spearheaded, and felt it was important to get the legal nuances right. AMc also provided input on the speech. I never viewed BAC and AMc as business competitors, nor do I believe that AMc held this view until it became convenient for purposes of litigation.

Appendix323

15.     Against this backdrop, the NRA's efforts to obtain documents and information from AMc continued throughout the remainder of 2018 and the first quarter of 2019. At times, AMc went through the motions of complying with some of our requests, but our most important requests were ignored or rebuffed. By early April 2019, it was clear to me the agency would not comply with the most important of the Association's information requests.  Therefore, on April 12, 2019, I authorized the filing of a lawsuit in Virginia against AMc to force them to produce all of the documents to which the NRA was entitled.

16.     The decision to sue one of our longtime vendors was a difficult but necessary one. Of course, I did not imagine AMc would retaliate in the outrageous fashion that followed.

17.     Lt. Col. Oliver North ("North") came aboard as President of the NRA during the fall of 2018.  This role, at one time occupied by Charlton Heston, was largely ceremonial and unpaid.  I understood and agreed that during at least part of his presidency, North would host a show on NRATV, for which he would be paid by AMc as an independent contractor. Unbeknownst to me at the time (May 2018), North was actually hired by AMc as a full-time employee and turned out to be more loyal to AMc than the NRA.  Although he appeared to support the NRA's engagement of BAC, North later aligned himself with the agency as his business relationship with the agency was scrutinized.  By April 2019, as the NRA prepared for its Annual Meeting of Members, I regarded North as having a conflict of interest as he attempted to interfere with the Association's efforts to gain access to AMc's files, books and records.  In fact, in early 2019, even before the NRA prepared for its Annual Meeting of Members, I regarded North as having a conflict of interest.  I repeatedly informed him of this conflict multiple times and that he should cease trying to derail BAC's compliance work and its efforts to scrutinize AMc's books and records.

6

18.     On April 24, 2019, I was in Indianapolis, Indiana, at the NRA Annual Meeting.  I was meeting with a number of Board members and staff in the living room area of a hotel suite when one of my aides, Millie Hallow, received a telephone call from North.  Millie ducked into the bedroom of the suite to take the call, and NRA President Carolyn Meadows (then 2nd Vice President) accompanied her.   Several minutes later, Millie and Carolyn emerged from the bedroom, both visibly upset.  Millie recounted the conversation she just had with North. In sum, North wanted to convey a message from Angus McQueen and AMc: unless I dropped the lawsuit against AMc and immediately resigned, AMc would circulate allegedly damaging information about me, members of my leadership team, and the NRA. On the other hand, if I agreed to their demands and supported North for another term as NRA President, North stated he would speak to Angus McQueen in order to negotiate an "excellent retirement" for me.

19.     Sandy Froman and Scott Bach, both of whom are attorneys and were present when Millie and Carolyn relayed the contents of the call, remarked that this sounded like extortion. Although I was shocked by the explicitness and audacity of AMc's ultimatum, I was not surprised by the agency's openly adverse posture. Earlier that day, Millie had reported receiving a less-detailed version of the same corrupt proposal from former NRA Board member (and senior executive of an AMc client) Dan Boren, likewise relayed on behalf of AMc. I had already determined that I would not accept "the deal".  In fact, I was determined to expose AMc's conduct to the Board of Directors so they would know what Angus McQueen, North and AMc were doing.

20.     On April 25, I circulated a letter to the Board to this effect, a true and correct copy of which is attached as Exhibit A to this declaration.

21.     Bill Brewer was not in Indianapolis on April 24, 2019. The suggestion that he was in or near Indianapolis is false.

22.    Since then, significant documents and other information have come to my attention that confirm my grim intuition that day: the demand by AMc that I resign on April 24, 2019, was a premeditated, corrupt scheme by AMc and others to take control of the NRA in order to derail inquiries into their own conduct. These revelations have deepened the NRA's resolve to root out any and all abuses by AMc and others and to make the Association whole.

23.    I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___3___ day of May 2020.

_____
Wayne LaPierre

Appendix326

# EXHIBIT 49

Appendix327

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § § § | |
| Plaintiff and Counter-Defendant | § § § | |
| and | § | |
| WAYNE LAPIERRE, | § § | |
| Third-Party Defendant, | § § | |
| v. | § § | Civil Action No. 3:19-cv-02074-G |
| ACKERMAN MCQUEEN, INC., | § § § | |
| Defendant and Counter-Plaintiff, | § § | |
| and | § § | |
| MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG, | § § § § § | |
| Defendants. | § § | |

## DECLARATION OF TRAVIS J. CARTER

1.      My name is TRAVIS J. CARTER. I am over the age of twenty-one years and am fully competent and able to testify herein and to state that all of the facts and statements herein contained are true and correct and that, except as expressly noted otherwise, I have personal knowledge of the same.

2.      I am the Managing Director of Public Affairs at Brewer, Attorneys & Counselors ("BAC" or "the Brewer firm"), outside counsel for the National Rifle Association of America ("NRA" or "the Association").

1

3.      I have more than 25 years of experience in news reporting, media and public relations, strategic communications, and issues & crisis management. My experience includes working in the print news media, and working in communications for the Federal Reserve Bank of Dallas, Allstate Insurance Company, BAC (formerly Bickel & Brewer), and my own public relations agency, Carter PR. I have a bachelor's degree in Journalism & Mass Communications from The University of Oklahoma and hold an MBA from The University of Dallas.

**A Working Relationship with AMc**

4.      Since I first became employed with BAC in 2001, I have worked closely with various representatives of Ackerman McQueen ("AMc"). BAC relied upon AMc to provide many professional services for the firm, including, but not limited to, design and management of multiple websites, creative development for advertisements, video production, brand and logo development, and design and implementation of marketing materials.[1]

5.      With my input and direction, these services were utilized by BAC, as well as the firm's charitable foundation and a suite of educational programs it offers to the community. For example, AMc directed logo development, branding campaigns, and some video services for the Brewer Foundation / NYU International Public Policy Forum ("IPPF"), a high school debate contest that serves students around the globe. AMc also assisted with logo development and branding for the Brewer Foundation Future Leaders Program ("FLP"), an academic and leadership development program that serves disadvantaged students from urban communities in Dallas, Texas.

---

[1] *See* Declaration of Travis Carter at ¶ 5, dated March 4, 2020, attached as Ex. 36 to the Declaration of Michael Collins ("Collins Decl.).

6.      When it was suggested that the Brewer Foundation "live stream" high school student debates promoted and sponsored by the IPPF and BAC, I enthusiastically supported the idea, directing the hiring of AMc, arranging payment of the agency's travel costs, and working with AMc principals on this project.

7.      BAC staff members actually collaborated with a team of AMc professionals in New York City for many years to conduct the IPPF live video proceedings from the Harold Pratt House – home of the Council on Foreign Relations. In addition, AMc professionals helped direct a social media campaign to drive awareness of the IPPF and its unique global platform.

8.      In sum, Bill Brewer, BAC, and I engaged AMc for an assortment of important projects for almost *20 years* – until December 2019. I understand that, during this time, the Brewer firm paid AMc more than $1 million. Further, I have been personally involved in recommending the professional services of AMc to other clients of the Brewer firm. On one occasion, this resulted in the agency submitting a proposal for a lucrative website project for a Fortune 500 company.

**BAC and AMc Not Competitors**

9.      Given the nature of the professional relationship between BAC and AMc, I am surprised to learn that AMc alleges BAC is a competitor to the agency.  BAC is not a competitor to the agency. It has never viewed itself as such.[2] There is no legitimate basis upon which AMc claims that the Brewer firm seeks to "compete" with AMc or replace it as the advertising or communications firm of record for the NRA.

10.      BAC employs a small number of professionals in its Dallas office who primarily work in the field of legal communications and issues & crisis management – the Public Affairs

---

[2] *Id.* at ¶ 12.

Appendix330

Group.[3] This group primarily works on communications strategy in helping clients navigate media issues, regulatory challenges, and reputational exposure associated with legal matters being handled by the firm.

11.    The group is comprised of professionals with backgrounds in news reporting, media relations, and corporate communications. None of the communications professionals employed by BAC specialize in advertising, website development, or marketing.

12.    Over the years, BAC's team of communications professionals has worked cooperatively with a wide range of clients, ranging from 3M Company to New York University, and the *outside* public relations agencies those clients employ in connection with legal services provided by the firm. This work has been viewed positively by BAC clients, their in-house communications professionals, and outside PR and communications firms enlisted as part of a "multi-pronged strategy" to manage legal communications and confront reputational challenges.

**Many Law Firms Offer Strategic Communications Services**

13.    I understand that AMc claims that the Brewer firm is unique in its efforts to promote its ability to offer crisis management and PR services to clients.[4] That claim is false.

14.    Many senior lawyers and the firms they lead (of all shapes and sizes) routinely offer crisis management and communications services to their clients. Many law firms in BAC's competitive set – and firms it opposes – employ practice groups that engage in legal

---

[3] *See* Brewer, Attorneys & Counselors Public Affairs Group electronic biographies: Travis Carter, Andrea Sadberry, and Katherine Leal Unmuth, available at: https://www.brewerattorneys.com/team-1, attached as Ex. 54 to the Collins Decl.

[4] *See* ECF 105, Brief in Support of AMc's Motion to Disqualify Plaintiff's Counsel.

4

communications and PR. These practice groups are often touted as being more efficient and cost-effective than PR firms in the arena of legal communications.[5]

15.    It has been widely reported in legal trade publications that this is especially true for firms like BAC that specialize in high-stakes advocacy that generates public attention.[6] In fact, it was national reporting on this subject that spawned a Texas practice commentary from Bill Brewer about the benefits derived from having lawyers involved in legal communications and PR.[7]

16.    At the request of the NRA, BAC has assigned professionals to provide media relations and public relations services to the Association in connection with the legal and regulatory matters being handled by the firm. However, the work performed by the firm's communications professionals is fairly specialized. As evidence of how limited these services are in aggregate, none of these individuals work solely for the NRA.[8]

**AMc:  A Suite of Services**

17.    By comparison, I understand that AMc provided a *broad range* of communications and upscale video production services for the NRA. The relationship between the advertising agency and the NRA, which spanned several decades, had culminated in billings for AMc that exceeded tens of millions of dollars annually – apparently involving AMc

---

[5] *See* promotional materials from Quinn Emanuel, attached as Ex. 55 to the Collins Decl.; *see also* promotional materials from Akin Gump, attached as Ex. 56 to the Collins Decl.

[6] *See* American Lawyer article, "Meet the Lawyers Who Clean Up Clients' Worst Messes," dated March 28, 2019, attached as Ex. 11 to the Collins Decl.

[7] *See* Texas Lawyer commentary, "Advocacy as Art:  Lawyers Must Engage in Issues and Crisis Management," dated May 6, 2019, attached as Ex. 15 to the Collins Decl.

[8] *See* Ex. 36 at ¶ 9.

5

employees spread across four offices in Oklahoma City, Oklahoma; Dallas, Texas; Colorado Springs, Colorado; and Alexandria, Virginia.

18.     AMc reported that many of these employees were <u>exclusively</u> dedicated to serving the NRA. That said, I understand that at least one other AMc client believes the agency assigned professionals to its account who were supposed to be dedicated full-time to the NRA.[9]

19.     Unlike any services offered by BAC, I understand that a flagship deliverable for AMc was a multimedia platform that featured daily "live television" – complete with news anchors, writers, producers, and production assistants. The agency utilized a dedicated production studio in the office of its Alexandria, Virginia-based subsidiary, Mercury Group, and often deployed video crews, TV hosts, and technicians to locations around the United States and world in connection with its services.

20.     As part of its self-described "brand influence strategy," AMc reportedly specializes in the building, management and leveraging of "media properties" for clients. Indeed, the biography of AMc CEO Revan McQueen says that the agency leads communications efforts to "support the successful scaling of premium video products." Under the direction of Mr. McQueen, Ackerman [AMc] is proudly transitioning the advertising agency "to become a media company in and of itself."[10]

21.     For all these reasons, it strains credibility for AMc to argue that the small public affairs team of BAC <u>ever</u> sought to replace the core services provided by the agency to the NRA.

---

[9] *See* email communication from Dan Boren, dated May 30, 2019, attached as Ex. 18 to the Collins Decl.

[10] *See* electronic biography of AMc CEO, Revan McQueen, attached as Ex. 16 to the Collins Decl.

6

Indeed, the firm "does not have the professional resources, expertise, or inclination" to occupy such space for the NRA or any other clients.[11]

22.     Further, the NRA's <u>own</u> managing director of Public Affairs finds the claim that BAC sought to replace AMc "disingenuous and without factual basis" and notes that the "NRA has never viewed the two entities as competitors for the expansive suite of services provided by AMc."[12]

**Upon Closer Review:  BAC's Role for the NRA**

23.     Purportedly to illustrate that AMc was being "replaced" by BAC, the agency cites work in which I was involved. This includes the drafting of certain press releases soon after BAC was retained in March 2018.

24.     Any press releases drafted by BAC related to legal and regulatory issues being handled by lawyers with BAC. As an example, the firm drafted a press release relating to the NRA's lawsuit against New York Governor Andrew Cuomo and the New York State Department of Financial Services, dated May 11, 2018.[13]

25.     This was a communications tool that relates specifically to legal services being provided by BAC. It was clearly more practical for BAC, versus AMc, to draft such public-facing communications that summarized the legal and regulatory positions being advanced by the NRA.

---

[11] *See* Ex. 36 at ¶ 13.

[12] *See* Declaration of Andrew Arulanandam, dated April 14, 2020, attached as Ex. 38 to the Collins Decl.

[13] *See* press release, "The NRA Sues New York Governor Andrew Cuomo, New York State Department of Financial Services Over Alleged Attack on First Amendment Rights," dated May 11, 2018, attached as Ex. 4 to the Collins Decl.

Appendix334

26.     On April 5, 2018, BAC drafted media statements responding to anticipated legal and PR-related issues arising from the actions of Citigroup to restrict its retail clients' access to firearms sales. The firm *copied* AMc senior directors on proposed communications – working in collaboration to confront a potentially negative situation for the NRA.[14]

27.     Shortly thereafter, on April 13, 2018, BAC drafted communications for board members, NRA members, and the news media in connection with another *legal concern*:  the cancellation of insurance policies affiliated with Lockton Affinity, LLC ("Lockton") maintained by NRA members and gun owners in New York. The AMc Motion to Disqualify argues this was done to "supplant" AMc. In fact, these communications were sent *to* Angus McQueen – again in cooperation to support the defense of the NRA and the members it serves.[15]

28.     Many NRA principals, including Secretary and General Counsel John Frazer and former outside counsel J. Steven Hart, were copied on these communications.

29.     I am unaware of <u>any</u> press releases drafted or disseminated by AMc on the topics in question during this time period – even though I understand the agency had a retainer for which it was paid significant sums of money to render such services and professional advice.

30.     AMc also argues that BAC, in an effort to take over its function, directed speechwriting services once performed solely by the agency, including a March 2019 speech for Wayne LaPierre in connection with the Conservative Political Action Conference ("CPAC"). The CPAC speech in question is focused, in significant measure, on the NRA's First Amendment

---

[14] *See* ECF 80, Ex. A-8.

[15] *See* ECF 80, Ex. A-9

Appendix335

(free speech) lawsuit against New York Governor Andrew Cuomo and promised investigatory proceedings by the New York Attorney General.[16]

31.     The remarks bore the working title, "This is Our Moment of Truth: Wayne LaPierre Calls for Protection of **Free Speech** in Debate Over Second Amendment." They were drafted for Mr. LaPierre at his specific direction.

32.     AMc has made repeated reference to a presentation from me as evidence that BAC provides counsel on matters involving "the court of public opinion." I did present to the NRA Public Affairs Committee a presentation, dated January 4, 2019, at the request of the NRA.[17] AMc officials (as representatives of the NRA's agency of record) were present during the meeting.

33.     The presentation primarily related to reputational concerns stemming from legal and regulatory issues – media pursuits relating to board contracts, governance issues, and the like. There was discussion of the "court of public opinion" and how it intersects with "The Courtroom" and "The Regulatory Arena." Specifically, this briefing "covered public-facing communications efforts concerning legal and regulatory matters" being handled by BAC.[18]

34.     This was not a presentation about how to advance generalized PR or advertising services. Indeed, the reference to the "Court of Public Opinion" is a point that follows mention of Lockton (a legal matter) and Gov. Andrew Cuomo (a legal and regulatory concern, and defendant).

---

[16] *See* W. LaPierre CPAC speech, dated March 2, 2019, attached as Ex. 8 to the Collins Decl.

[17] *See* ECF 81-2 [APP001130-APP001162].

[18] *See* declaration from Andrew Arulanandam, dated April 14, 2020, attached as Ex. 38 to the Collins Decl.

9

35.     I was told that AMc never presented to the Public Affairs Committee in connection with these types of issues.

**False Allegations of "Leaking" Information**

36.     I understand that AMc accuses BAC of "leaking" documents and lawsuits to inflict reputational damage on the agency. As an example, AMc implies the Brewer firm may have "leaked" to the news media a communication to the NRA Board of Directors, dated April 25, 2019, from NRA CEO & EVP Wayne LaPierre. AMc says the "leaked" document was cited by *The Wall Street Journal* ("*WSJ*"). I am not aware who provided this document to the *WSJ*.

37.     I am the person who most often directly interacts with the news media on behalf of BAC. I did not provide the April 25, 2019, communication to the media before reports emerged about it. Rather, I was confronted with questions from several reporters, including those from the *WSJ*, about the contents of the communication. On the afternoon of April 25, 2019, the communication had become "public" due to its dissemination to an estimated 76 NRA board members and employees of the Association.

38.     I also did not "leak" copies of legal filings against AMc. There have been several *publicly filed* legal actions between the parties. During the course of the disputes between AMc and the NRA, I have not distributed draft copies of any legal filings (*i.e.*, "leaked") to members of the news media.

39.     There has been public interest in these legal proceedings, likely due to the parties involved and the unraveling of long-term partnerships. Accordingly, BAC, on occasion, has publicly commented on behalf of its client about these legal proceedings and confronted false claims and allegations made by AMc and its principals.

**The PR Tactics of AMc**

10

40.     After April 24, 2019, AMc, as reportedly promised, has been involved in an aggressive campaign to disparage the NRA and distort the public record. For example, on July 3, 2019, AMc made public accusations that the NRA was threatening AMc employees "with the loss of their unemployment and benefits" and accused the NRA of embarking upon a "destructive plan" to "hurt as many people as they can."[19]

41.     I became aware of these claims (and an AMc-sponsored media advisory to give them maximum effect) based on phone calls I received from news reporters while I was with my family in Colorado.

42.     The media advisory was sprung just hours before the Fourth of July. It generated multiple media inquiries to which the NRA had to hurriedly respond – in an attempt to correct the record and confront unfounded allegations. Predictably, AMc's premeditated attack on an unsuspecting NRA spawned numerous negative articles full of disinformation contained in the media advisory.[20][21]

43.     I understand that AMc's *Brief in Support of Defendants' Motion to Disqualify Plaintiff's Counsel* includes an appendix that purports to chronicle all media statements from BAC on behalf of the NRA. However, the appendix omits the media record from July 3-4, 2019, likely to avoid drawing attention to AMc's unprovoked reputational attacks on the NRA.

---

[19] *See* statement from AMc, dated July 3, 2019, attached as Ex. 22 to the Collins Decl.

[20] *See* Oklahoman article, "Ackerman McQueen Accuses NRA of Threatening Employees," dated July 4, 2019, attached as Ex. 24 to the Collins Decl.

[21] *See* Talking Points Memo article, "Jilted NRATV Firm Accuses Gun Group of 'Hurting as Many People as Possible," dated July 3, 2019, attached as Ex. 23 to the Collins Decl.

11

44.     AMc has widely distributed a barrage of negative media advisories, blistering quotes, and other communications meant to harm BAC and the NRA.[22] Following the filing of AMc's *Brief in Support of Defendant's Motion to Disqualify Plaintiff's Counsel*, I received a media call about information in the filing that supposedly had been redacted – but was *still viewable* and accessible to the public. This resulted in negative media reports about the "redacted" information.[23]

45.     I believe AMc's actions and inflammatory campaign messaging have contributed to the intense public scrutiny of the agency. I am aware of <u>many</u> national media reports that question the value and sensibility of AMc's public messaging strategy on behalf of the NRA and, in particular, NRATV.[24] [25] [26] [27] [28]

46.     For example, the *New York Times* ("*NYT*") article, "Incendiary N.R.A. Videos Find New Critics: N.R.A. Leaders," dated March 11, 2019, was spawned by controversial and

---

[22] *See* public statement by AMc, dated April 15, 2019, attached as Ex. 12 to the Collins Decl.; public statement from AMc contained in Bloomberg article, "Ad Firm Cuts Ties With NRA, Says 'Chaos Led Us To Lose Faith' After 38 Years," dated May 29, 2019, attached as Ex. 17 to the Collins Decl.; public statement by AMc, dated June 26, attached as Ex. 20 to the Collins Decl.; public statement by AMc, dated August 30, 2019, attached as Ex. 25 to the Collins Decl.; public statement by AMc, dated September 13, 2019, attached as Ex. 26 to the Collins Decl.; Stephen Gutowski, Twitter page containing AMc statements, dated October 28, 2019, attached as Ex. 29 to the Collins Decl.; *see* Newsweek article, "NRATV Creator Threatens 'Legal Action' Against Former Host Over 'Fabrications," dated December 18, 2019, attached as Ex. 30 to the Collins Decl.; *see* Wall Street Journal Article, "NRA Fails to Stop Former Ad Agency From Cooperating With New York Probe," dated February 24, 2020, attached as Ex. 35 to the Collins Decl.

[23] *See* Newsweek article, "Longtime NRA Attorney Says Group's Own Lawyer Embarked on 'Highly Destructive' Path; Court Documents Show," dated April 17, 2020, attached as Ex. 39 to the Collins Decl.

[24] *See* Vanity Fair, "What the F--k is NRATV? Let John Oliver Explain," dated March 5, 2018, attached as Ex. 2 to the Collins Decl.

[25] *See* TIME, "At the NRA's TV Network, Guns Are a Weapon in the Culture Wars," dated November 16, 2017, attached as Ex. 1 to the Collins Decl.

[26] *See* CNN, "NRA TV depicts 'Thomas & Friends' characters in KKK hoods," dated September 14, 2018, attached as Ex. 7 to the Collins Decl.

[27] *See* NPR, "NRATV Strays Seemingly Far Afield From Gun Ownership," dated May 7, 2018, attached as Ex. 3 to the Collins Decl.

[28] *See* The Atlantic, "Live-Streaming the Apocalypse With NRATV," dated June 2018, attached as Ex. 5 to the Collins Decl.

Appendix339

hate-filled messaging that came to be associated with NRATV.[29] The Brewer firm did <u>not</u> cause the editorial pursuit of the subject matter.

47.     The NYT proactively contacted the NRA and its representatives to advise it was pursuing the investigative article, upon reportedly learning that certain NRA board members, like the general public, were increasingly uncomfortable with the "site's [NRATV] inflammatory rhetoric, and whether it has strayed too far from the N.R.A.'s core gun-rights mission…"

48.     In fact, AMc has admitted that it recognizes the "offensive imagery" that served as a catalyst for the *NYT's* reporting.[30]

**In Sum:  No Attempt to "Replace" AMc**

49.     I do not believe there is any legitimate argument that BAC sought to "replace" AMc as the NRA's communications or advertising agency of record. BAC, with its small team of communications professionals, lacks the resources, expertise or inclination for such an undertaking. The work performed by BAC for the NRA is not unusual in the field of high-stakes advocacy, and often offered by law firms to the clients they represent.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of May 2020.

_____

Travis J. Carter

---

[29] *See* New York Times article, "Incendiary N.R.A. Videos Find New Critics:  N.R.A. Leaders," dated March 11, 2019, attached as Ex. 9 to the Collins Decl.

[30] *See* Ex. 36 at ¶ 4.

13

Appendix340

# EXHIBIT 50

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § | |
| | § | |
| | § | |
| Plaintiff and Counter-Defendant | § | |
| | § | |
| and | § | |
| | § | |
| WAYNE LAPIERRE, | § | |
| | § | |
| Third-Party Defendant, | § | |
| | § | |
| v. | § | Civil Action No. 3:19-cv-02074-G |
| | § | |
| ACKERMAN MCQUEEN, INC., | § | |
| | § | |
| Defendant and Counter-Plaintiff, | § | |
| | § | |
| and | § | |
| | § | |
| MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG, | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF NANCY J. MOORE

### Introduction

1. My name is Nancy J. Moore. My date of birth is June 30, 1949. My office address is 765 Commonwealth Ave., Boston, MA 02215. I am over 18 years of age, of sound mind, and competent to make this Declaration in support of the NRA's Opposition to Defendants' Motion

1

to Disqualify Plaintiff's Counsel. I declare under penalty of perjury pursuant to 28 U.S.C. §1746 that the following declaration is true and correct.[1]

2. I have been asked by Brewer Attorneys & Counselors ("the Brewer Law Firm") to consider whether the allegations of unethical conduct contained in Defendants' Motion to Disqualify Plaintiff's Counsel warrant disqualification of either William A. Brewer III ("Brewer") or the Brewer Law Firm from representing the plaintiff National Rifle Association of America ("NRA") in this lawsuit.

3. In formulating my opinions I have relied on the materials cited in Defendants' Brief in Support of Defendants' Motion to Disqualify Plaintiff's Counsel ("Defendants' Brief") in support of their allegations, as well as the materials contained in Exhibit 1 to this Declaration.

4. I am being compensated at my regularly hourly rate of $800.

<u>My Qualifications</u>

5. I am Professor of Law and Nancy Barton Scholar at Boston University School of Law ("BU"). I have been a tenured full professor at BU since January 1999. From 1976 through December 1998, I was employed at Rutgers School of Law-Camden ("Rutgers") as an assistant professor, tenured associate professor, associate dean for academic affairs, and tenured full professor. I am a Member and former Chair of the Multistate Professional Responsibility Test Drafting Committee. In addition, I was Chief Reporter to the American Bar Association's Commission on Evaluation of Professional Rules of Conduct ("Ethics 2000 Commission"). I also served as an adviser to the American Law Institute's Restatement of the Law (Third) Governing Lawyers and as a member of the ALI's Members Consultative Group for its Principles of Aggregate

---

[1] I do not have personal knowledge of the facts underlying this lawsuit or the present controversy. For those underlying facts, I have relied on sources such as the pleadings, motions (and their attachments), correspondence, and other documents identified herein.

Appendix343

Litigation. I served twice as Chair of the Professional Responsibility Section of the Association of American Law Schools. I have authored numerous articles on legal ethics, including articles on lawyers' conflicts of interest.

6. I have testified as an expert on legal ethics via deposition, declaration and in various state and federal tribunals, including testimony in courts in Connecticut, Florida, Maine, Maryland, Massachusetts, New Jersey, New York, and Pennsylvania. I am currently licensed to practice law in the Commonwealth of Massachusetts. I have spoken on topics in legal ethics numerous times in the last forty years at continuing legal education seminars and professional conferences, including national bar conferences. In addition to regularly teaching the basic course in Professional Responsibility (formerly at Rutgers and now at BU), I teach a seminar on Professional Responsibility for Business Lawyers. A current copy of my Curriculum Vitae is attached as Exhibit 2.

<div align="center">Disqualification Standards</div>

7. Disqualification decisions in this court are guided by state and national standards for lawyers adopted by the Fifth Circuit. *Centerboard Securities, LLC v. Benefuel, Inc*., 2016 WL 3126238 (June 3, 2016). These standards include the American Bar Association's Model Rules of Professional Conduct ("Model Rules"), as well as the Texas Disciplinary Rules of Professional Conduct ("Texas Rules"). *Id.* The court also considers any applicable local rules of this court, *id.;* however, except for the local rule adopting the Texas Rules as governing the ethical behavior of lawyers appearing before the court, *see* LR. 83.8(e)--ND Texas, I do not find any local rule relevant to my opinions. As a result, I base my opinions on both the Model Rules and the Texas Rules, which I find to be significantly similar with respect to the issues raised in Defendants' Brief.

<div align="center">3</div>

<u>My Opinions</u>

I.    <u>The allegations that Brewer's personal interests violate the conflict of interest rules are insufficient to warrant disqualification of either Brewer or the Brewer Law Firm</u>

8.    Defendants, including Ackerman McQueen, Inc., ("AMc"), allege that Brewer has personal and professional interests that create personal conflicts of interest under both the Texas Rules and Model Rules, citing what they characterize as six separate bases for these conflicts: (1) "Brewer manufactured conflicts and tension between the NRA and AMc," contrary to the NRA's goals and without the knowledge or consent of some of the NRA's officers and directors, thereby making Brewer a "principal actor in the underlying dispute;"[2] (2) "Brewer and his firm are direct business competitors of AMc;"[3] (3)  Brewer has "personal and well-known animosity" towards AMc, suggesting that his actions on the NRA's behalf may be "for his own personal vendetta;"[4] (4) "Brewer's financial motives are a key issues in this litigation," including his alleged "exorbitant fees" and his alleged incentive "to maintain the NRA lawsuits against AMc to generate more revenue;"[5] (5) "Brewer is suing his family;"[6] and (6) "Brewer is a principal actor and tortfeasor in this litigation."[7]  Defendants allege that these personal interests violate Texas Rule 1.06(b) and Model Rule 1.7.

9.    Conflict of interest rules are for the protection of the affected client or former client. Texas Rule 1.06 and Model Rule 1.7 address conflicts of interest affecting current clients of a lawyer. The only person or entity arguably affected by any of these alleged conflicts is the NRA.

---

[2] *See* ECF 105 (Defendants' Brief) at ¶ 38.
[3] *Id*. at ¶39.
[4] *Id*. at ¶40.
[5] *Id*. at ¶41.
[6] *Id*. at ¶42.
[7] *Id*. at ¶43.

10. As a general rule, courts do not disqualify an attorney on grounds of conflict of interest unless it is the client itself (or former client, where applicable) that is moving for disqualification. *See, e.g., In re Yarn Processing Patent Validity Litigation*, 530 F.2d 83, 88  (5th Cir. 1975) (refusing to disqualify an attorney for a former-client conflict arguably affecting a former co-defendant, who had been dismissed from the case and was not pressing a conflict it had previously raised); *Centerboard Securities v. Benefuel, Inc*., 2016 WL 3126238 (N.D. Tex. June 3, 2016) (holding that plaintiff had no standing to seek the disqualification of the defendant's law firm from simultaneously representing non-party witnesses); *Coates v. Brazoria County Texas*, 2012 WL 2568129 (S.D. Tex. 2012) (holding that plaintiffs did not have standing to challenge the defendant law firm's representation adverse to a former co-plaintiff who had previously consulted with the firm); *Clemens v. McNamee*, 2008 U.S. Dist. LEXIS 36916 (S.D. Tex. May 6, 2008) (holding that the defendant did not have standing to raise an alleged former client conflict of a non-party).  Courts have recognized narrow exceptions to this rule where the movant was a company that the former client controlled, where the former client appeared by counsel to argue for disqualification even though he was not the formal moving party, and where the conflicts were "manifest and glaring," confronting the court with a plain duty to act. *See In re Yarn Processing Patent Validity Litigation*, 530 F.2d at 89. *See also Centerboard Securities v. Benefuel, Inc*., *supra*; *Coates v. Brazoria County Texas*, *supra*; *Clemens v. McNamee*, *supra*. None of these narrow exceptions applies to the allegations made by Defendants in their efforts to disqualify the Brewer Law Firm on grounds of a personal conflict of interest. The NRA, which is the party sought to be protected under current client conflict of interest rules, is a party to this lawsuit and is strenuously resisting the disqualification of its

5

attorneys[8]. Moreover, for the reasons set forth below, it is my opinion that not only is there no "manifest and glaring conflict," there is no conflict at all. Further, even if there were a conflict, the NRA has given its fully informed consent; therefore, there is no violation of the applicable conflict of interest rules.

11. Under Texas Rule 1.06(b), a conflict exists if the lawyer's representation of a person "reasonably appears to be or become adversely limited by the lawyer's or law firm's responsibilities to another client or to a third person or by the lawyer's or law firm's own interests." Texas Rule 1.06(b)(2). Model Rule 1.7 is similar, providing that a conflict exists if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." Model Rule 1.7(a)(2).

12. Revisiting the numbered allegations summarized in Paragraph 8 above, in my opinion, allegations (1), (4) and (6) are essentially the same, single allegation that Brewer's conduct will be the subject of some aspects of the litigation, at least with respect to Defendants' counterclaims. As a result, AMc maintains, Brewer may be a necessary witness who is disqualified from personally appearing as an advocate in the lawsuit under the advocate-witness rule. *See infra* at ¶ 18. This does not mean, however, that his alleged role in the underlying events creates a conflict of interest under either the Texas Rules or the Model Rules.

13. The facts alleged in allegations (1), (4), and (6) are disputed by both Brewer and the NRA.[9] Indeed, according to Defendants, these are facts that are at issue and will be determined in the trial of this lawsuit. As such, they should not serve as the basis for disqualification. More

---

[8] *See* Declaration of John Frazer ("Frazer Decl.") at ¶¶ 4-9; Declaration of Wayne LaPierre ("LaPierre Decl.") at ¶ 1; Declaration of Charles Cotton ("Cotton Decl.") at ¶ 1.
[9] *See* LaPierre Decl. at ¶¶ 9-20; Frazer Decl. at ¶¶ 6-7; Cotton Decl. at ¶¶ 5, 8.

Appendix347

important, there is no indication that the positions of the NRA and Brewer with respect to these allegations are or are likely to become inconsistent. It may be in Defendants' interest to prove that Brewer "manufactured conflicts and tension between the NRA and AMc," that his "exorbitant fees" contributed to that tension, and that "Brewer is a principal actor and tortfeasor in this litigation," but it is in the interest of both Brewer and the NRA to disprove these allegations. *See F.D.I.C. v. U.S. Fire Ins. Co.*, 50 F.3d 1304 (5th Cir. 1995) ("[j]ust as it is in the interest of [the defendant] to show comparative bad faith, it is in the interest of both [the plaintiff's lawyer] and [the plaintiff] to disprove it;" a "remote possibility that [the plaintiff and its lawyer] may eventually find themselves at odds is much too tenuous a thread to support the burdensome sanction of law firm disqualification"). In the absence of evidence establishing a likelihood that the NRA has taken or should seriously consider taking positions that are inconsistent with Brewer's interest in denying these allegations, it is my opinion that the allegations do not create a conflict of interest under either the Texas Rules or the Model Rules.

14. Further, with respect to allegation (4), Defendants claim that "Brewer is incentivized to maintain the NRA lawsuits against AMc to generate more revenue."[10] All litigators charging hourly fees have some incentive to maintain and prolong lawsuits to generate more fees. Indeed, there are conflicts of interest in all fee arrangements, and this would be the case regardless of which law firm represents the NRA. These general fee-based conflicts are inherent in principal-agency relationships and are not the type of conflicts specific to particular lawyers that underlie the legal profession's conflict of interest rules. *See* Nancy J. Moore, "Who Should Regulate Class Action Lawyers?" 2003 U. Ill. L. Rev. 1477, 1489-1492 (2003) (distinguishing "between 'conflicts of interest' in the broad sense, which economists characterize as a form of agency

---

[10] *See* ECF 105 at ¶41.

Appendix348

problem, and the far narrower 'conflict-of-interest doctrine,' which is found in Rule 1.7 and other conflicts rules").

15. Defendants' second allegation is that Brewer and his firm are "direct business competitors." Once again, this is a fact disputed by both Brewer and the NRA.[11] Moreover, given that AMc was a public relations firm with approximately 100 employees, whereas Brewer's law firm has only four employees in its Public Relations unit,[12] it is difficult to see how Brewer and his law firm could possibly perform the work that was previously performed by AMc on the NRA's behalf.[13] In any event, Defendants do not explain, nor is it apparent, how this fact, even if true, establishes a likelihood that this competitor relationship would adversely affect (or even "reasonably appear" to adversely affect) the Brewer Law Firm's representation of the NRA *in this lawsuit*. Given the current state of the relationship between AMc and the NRA, as evidenced by the pleadings in this lawsuit, AMc cannot reasonably believe either that it and the law firm are currently competing for AMc's former business with the NRA or that the Brewer Law Firm's supposed desire to further develop its public relations work at AMc's expense will cause it to conduct this lawsuit in a manner that is not in the best interest of the NRA. As a result, it is also my opinion that, in the absence of evidence establishing a likelihood that the Brewer Law Firm's alleged interest in performing public relations work will cause it to take positions inconsistent with the NRA's interests, this allegation does not create a conflict of interest under either the Texas Rules or the Model Rules.

---

[11] *See* Affidavit of Andrew Arulanandam, Managing Directofr of Public Affairs of the NRA, dated April 14, 2020; Declaration of Travis J. Carter, Managing Director of Public Affairs at the Brewer Law Firm, dated Mar. 4, 2020.

[12] See ECF 61 (NRA's Memorandum of Law in Opposition to Defendant's Motion for Protective Order).

[13] Defendants claim that the Virginia court acknowledged the fact that Brewer and his firm are direct business competitors of AMc, *see* Defendants' Brief at ¶39; however, the hearing transcript cited by Defendants in support of this contention establishes that the Brewer Law Firm vigorously disputed that it was a business competitor of AMc and that the judge made no finding of fact concerning this allegation. *See Id.* at n. 110, citing Ex. A-58 at 42:4-19.

8

16. AMc's third and fifth allegations are essentially the same, single allegation that Brewer's relationships with members of his wife's family, who were and are principals in AMc, somehow create a conflict of interest with the NRA. The only support offered for the allegation that Brewer has a "personal and well-known animosity" towards AMc and its former and current principals is a single citation to a deposition of a former NRA outside counsel that provides no evidence of such animosity.[14] Moreover, the only consequence Defendants can ascribe to the allegation that "Brewer is suing his family" is an adverse effect not on the NRA, Brewer's client, but on R. McQueen, the current CEO of AMc, who allegedly may be less zealous on behalf of AMc because of *his* concerns for his family.[15] In the absence of evidence that Brewer has an actual and severe "animosity" toward AMc *and* that any such animosity has a realistic likelihood of adversely affecting the Brewer firm's representation of the NRA in this lawsuit, it is my opinion that these allegations do not create a conflict of interest under either the Texas Rules or the Model Rules.

17. Even if there were a conflict of interest, both the Texas Rules and the Model Rules permit the client to consent to the continued representation after full disclosure of the nature of the conflict and its implications. *See* Texas Rule 1.06(c)(2); Model Rule 1.7(b)(4). Such fully informed consent is effective when the lawyer reasonably believes "that the representation of each client will not be materially affected" (Texas Rule 1.06(c)(1)) or "that the lawyer will be able to provide competent and diligent representation to each affected client" (Model Rule 1.7(b)(1).[16] In my opinion, Defendants have offered no evidence or explanation that any personal conflict

---

[14] *See* ECF 105 at n. 111.
[15] *See Id*. at ¶42.
[16] Model Rule 1.7(b) also requires that "the representation is not prohibited by law" and that "the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal." Both of those conditions are satisfied here.

Appendix350

of Brewer will materially and adversely affect the interests of the NRA or that the Brewer Law Firm's representation of the NRA in this lawsuit will not be diligent and competent. Nor is it reasonably apparent that such is the case.  Moreover, the NRA has provided an affidavit from its General Counsel attesting that the NRA has been fully informed concerning the alleged conflicts of interest and their possible implications and that the NRA nevertheless wants to continue to retain Brewer and the Brewer Law Firm as its legal representatives in this lawsuit.[17] Therefore, it is further my opinion that, to the extent there may be a conflict of interest under the relevant rules, the NRA has effectively consented to that conflict of interest, and the Brewer Law Firm's continued representation of the NRA does not violate either the Texas Rules or the Model Rules.

II.    <u>The allegation that Brewer may be a necessary witness does not warrant disqualification of either Brewer or the Brewer Law Firm</u>

18. Defendants argue that both Brewer and the Brewer Law Firm must be disqualified because Brewer may be a necessary witness in this lawsuit.[18] Defendants further argue that Brewer's testimony will be adverse to the NRA,[19] although they cite no evidence to support that allegation.[20]

19. Texas Rule 3.08 provides that "[a] lawyer shall not accept or continue employment as an advocate before a tribunal in a contemplated or pending adjudicatory proceeding if the lawyer knows or believes that the lawyer is or may be a witness necessary to establish an essential fact on behalf of the lawyer's client," except under certain circumstance. Texas Rule 3.08(a). The

---

[17] *See* Frazer Decl. at ¶ 4.
[18] *See* ECF 105 at ¶¶45-51.
[19] *Id*. at ¶ 46.
[20] *See Id*. at n. 188, citing transcripts in which the Brewer Law Firm stated that Brewer may be a witness and agreed that *if* Brewer's testimony would be adverse to the NRA, that would constitute a conflict of interest, but denied that any such testimony would be adverse.

Appendix351

rule further provides that "[w]ithout the client's informed consent, a lawyer may not act as advocate in an adjudicatory proceeding in which another lawyer in the lawyer's firm is prohibited by paragraphs (a) or (b) from serving as an advocate. If the lawyer to be called as a witness could not also serve as an advocate under this Rule, that lawyer shall not take an active role before the tribunal in the presentation of the matter." Texas Rule 3.08(c). Model Rule 3.7 similarly provides that "[a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness," except under certain circumstances. Model Rule 3.7(a). The rule further provides that "[a] lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9." Model Rule 3.7(b).

20. The Brewer Law Firm has confirmed that Brewer will not appear as an advocate at the jury trial of this lawsuit.[21] However, under both the Texas Rule and the Model Rule, other lawyers in the Brewer Firm may appear as advocates in the lawsuit in which Brewer may testify. Under Texas Rule 3.08(c), they may do so with the client's informed consent, *see, e.g.,* Tex. Ctr. Legal Ethics, Op. 682 (2018),[22] and the NRA has provided such consent.[23] Under Model Rule 3.7(b), no such client consent is necessary unless the testimony will create a conflict of interest under Rule 1.7 or Rule 1.9, which might be the case if the lawyer's testimony will be substantially adverse to the client. *See F.D.I.C. v. U.S. Fire Ins. Co.*, 50 F.3d at 1313 (absent an impermissible conflict between testifying lawyer and client, Model Rule 3.7 does not mandate disqualification of lawyer's law firm). For reasons set forth in paragraphs 22-24 below, that is not the case here.

---

[21] *See* Declaration of Michael Collins, at ¶ 4.
[22] *See also Anderson Producing Inc. v. Koch Oil Co.*, 929 S.W.2d 416, 422 (Tex. 1996) (with company's informed consent, testifying attorney's law firm partner was not prohibited from representing company at trial).
[23] *See* Frazer Decl. at ¶ 5.

21. Neither the Texas Rules nor the Model Rules prohibit a lawyer-witness from participating in the preparation of the matter for trial, so long as the lawyer does not appear as an advocate at trial. A comment to the Texas Rule expressly permits such participation. *See* Texas Rule 3.08, cmt. [8] ("This rule does not prohibit the lawyer who may or will be a witness from participating in the preparation of a matter for presentation to a tribunal."). Although neither the text nor the comment to Model Rule 3.7 expressly addresses whether a lawyer-witness may participate other than as an advocate, courts in most jurisdictions have held that a lawyer disqualified as a necessary witness may still represent the client other than as an advocate at trial. *See Droste v. Julien*, 477 F.2d 1030 (8th Cir. 2007); *Anderson Producing Inc. v. Koch Oil Co.*, 929 S.W.2d 416, 422 (Tex. 1999). Thus it is my opinion that there is no basis to disqualify Brewer himself from participating in the lawsuit other than as an advocate at trial.

22. As noted above, Defendants have alleged not only that Brewer is a necessary witness, but that his testimony will be adverse to his client, the NRA.[24] If so, there might be a personal interest conflict under Texas Rule 1.06(b) and Model Rule 1.7(a)(2). However, Defendants do not have standing to attempt to disqualify either Brewer or the Brewer Law Firm on this ground.[25] This is because Defendants are not and have never been clients of Brewer or the Brewer Firm, and any conflict of interest that arises from the testimony of a lawyer-witness is for the benefit of the client, not the client's adversary.[26] In any event, as explained below, it is my opinion that

---

[24] *See* ¶ 18 *supra*.

[25] *See* ¶ 10 *supra*.

[26] In addition to the authorities earlier cited on the question of standing, *see* Texas Rule 3.08 at cmt. [10] ("a lawyer should not seek to disqualify an opposing lawyer under this Rule merely because the opposing lawyer's dual roles may involve an improper conflict of interest with respect to the opposing lawyer's client, for that is a matter to be resolved between lawyer and client or in a subsequent disciplinary proceeding"). Under Model Rule 3.7, conflicts arising from adverse testimony are expressly identified as conflicts under Model Rules 1.7 or 1.9, rules that federal courts in the Fifth Circuit and in Texas have repeatedly held are only rarely appropriate as a basis for disqualification urged by the client's opponent. *See* ¶ 10 *supra*.

12

the continued representation of the NRA by Brewer and the Brewer Law Firm does not violate either the advocate-witness or the conflicts rules of the Texas Rules or the Model Rules.

23. As noted above, the Brewer Law Firm denies that any testimony Brewer might give will be adverse to the NRA, and Defendants have provided no evidence establishing any likelihood that any such testimony will be adverse to the Brewer Law firm's client.[27]

24. Under the Texas advocate-witness rule, even if a lawyer's testimony will be adverse to the client, lawyers in a firm other than the lawyer-witness are permitted to continue the representation with the client's informed consent. *See* Texas Rule 3.07(b), (c); *see also Ayrus v. Total Renal Care, Inc*., 48 F. Supp. 714, 718 (S.D. Tex. 1999).  The NRA has provided such consent to continued representation by the Brewer Law Firm.[28] Under the Model Rules, substantially adverse testimony will likely create a conflict of interest under Rule 1.7; however, as with other personal interest conflicts, the representation is consentable unless the lawyer could not reasonably believe that the representation will be competent and diligent. *See* Model Rule 1.7(b)(1); *see also F.D.I.C. v. U.S. Fire Ins. Co*., 50 F.3d at 1314 (Model Rule 1.7, in conjunction with Model Rule 1.10, provides "that disqualification is unnecessary if the client consents after consultation"). There is no evidence suggesting that the Brewer Firm lawyers could not reasonably believe that their continued representation of the NRA will not be competent and diligent, even if Brewer's testimony is adverse to the NRA, and the NRA has given its informed consent to any conflict that might arise as a result of Brewer's testimony, including testimony adverse to the NRA.[29]

III.   Brewer's alleged ex parte contact with a represented person does not warrant disqualification of either Brewer or the Brewer Law Firm

---

[27] *See* ¶ 18 *supra*.

[28] *See* Frazer Decl. at ¶ 5.

[29] *See Id.*

13

25. Although Defendants have not alleged an improper ex parte contact as a separate basis for disqualification, they did insert an allegation of such an improper contact in the midst of their Brief's discussion of the advocate witness rule.[30] According to Defendants, Brewer "us[ed] family members to communicate with R. McQueen about this very lawsuit."[31]

26. Both Texas Rule 4.02 and Model Rule 4.2 prohibit a lawyer from contacting a represented party concerning the subject matter of the lawsuit without the permission of that party's lawyer; however, the sole evidence that Defendants cite in support of their allegation is a declaration submitted by R. McQueen, in which he states that he has "personal knowledge that Brewer, using family members as channels, has attempted to communicate with me to influence AMC's litigation positions and strategy," including trying to direct him to "'break privilege'" with his own attorneys.[32] McQueen does not explain what his "personal knowledge" is based on, but it would appear that, if true, it can only be based on some form of inadmissible hearsay statement, since Brewer's alleged attempts were apparently unsuccessful.

27. Even if true, a violation of the ex parte contact rule does not typically result in disqualification of the attorney, given the alternative remedies available, such as barring use of any testimony or evidence gained from the improper contact. *See, e.g.*, *Parker v. Pepsi-Cola Gen. Bottlers, Inc.*, 249 F. Supp. 2d 1006 (N.D. Ill. 2003). In my opinion, disqualification based solely on the evidence contained in McQueen's declaration is inappropriate here for several reasons. First, it is uncertain either that a violation took place or that any such violation rises to a level requiring the severity of the sanction of attorney disqualification. *See Cramer v. Sabine Transp.*

---

[30] *See* ECF 105 at ¶55.
[31] *Id.*
[32] *Id.* at n. 139.

Appendix355

Co., 141 F.Supp.2d 727, 731 (S.D.Texas. 2001). Second, although McQueen does not say precisely when the attempted contact occurred, it appears that he is referring to a period beginning in April 2019, and yet to my knowledge, Defendants never raised this allegation until the filing of their motion to disqualify in March 2020. Such a lengthy delay suggests that, even if he believed that Brewer was attempting to contact him, McQueen did not view this attempt as raising such serious concerns that either Brewer or the Brewer Law Firm should be disqualified from representing the NRA in either the Virginia or the Dallas lawsuit. *See Cramer v. Sabine Transp. Co*., 141 F. Supp. at 732 (plaintiff's initial nonconcern over communication with plaintiff's expert suggests that the contact did not result in the expert revealing any information of import, which "significantly undermines plaintiff's request for disqualification"). Finally, courts have held that even if an ethical violation occurred, disqualification is inappropriate if the moving party suffered no actual prejudice from the alleged violation. *See Id.* at 732 (harm to plaintiff was "seemingly minimal"); *Orchestrather, Inc. v. Trombetta*, 2016 WL 4563348 at *14 (N.D. Tex. Sept. 1, 2016) (even if ethical violation had occurred, plaintiffs did not show that they "suffered actual prejudice from any alleged violation," citing *In re* Meador, 968 S.W.2d 346, 350 (Tex. 1998)("[A] court should not disqualify a lawyer for disciplinary violation that has not resulted in actual prejudice to the party seeking disqualification")).

IV.   Brewer's media statements do not warrant disqualification of either Brewer or the Brewer Law Firm

28. Defendants allege that Brewer and the Brewer Law Firm are violating rules regarding improper trial publicity by "leaking confidential information and defaming AMc,"[33] but they have provided no evidence of these violations. The only media publications they cite in support of

---

[33] *See* ECF 105 at ¶58.

Appendix356

their allegation are: an article from March, 1998 describing how Brewer arranged for reporters to receive certain pleadings immediately after they were filed in court;[34]  a recent article referencing a Brewer statement to the media about the effect of Covid-19 on the NRA,[35] and a March 2019 New York Times article, which contained adverse comments about AMc from two NRA Board members, allegedly supplied to the newspaper by Brewer.[36]

29. Texas Rule 3.07 provides that "[i]n the course of representing a client, a lawyer shall not make an extrajudicial statement that a reasonable person would be expected to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicatory proceeding. A lawyer shall not counsel or assist another person to make such a statement." Texas Rule 3.07(a). Model Rule 3.7 is substantially similar, providing that "[a] lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicate proceeding in the matter."

30. The meager evidence cited by Defendants in support of their allegation is clearly insufficient to establish that Brewer or any member of the Brewer Law Firm has made extrajudicial

---

[34] *Id.* at n. 146. In the absence of a gag order prohibiting all comments to the media, statements that do no more than disclose what is already a matter of public record are ordinarily permissible. *See* Texas Rule 3.07(c)(2); Model Rule 3.6(b)(2).

[35] *Id.* at n. 147.

[36] *Id*. at n. 148 & accompanying text. Defendants claim that it is "undisputed" that Brewer "leaked" the comments from the NRA Board members, *see id.* at ¶58; however the only evidence cited is an email from an AMc attorney to the NRA's in-house counsel claiming only that the New York Times reporter stated that Brewer supplied the quotes. *See id*. In any event, as I explain below, *see* ¶31 *infra*, there is nothing about this article that suggests that if indeed Brewer supplied the quotes, he violated either the Texas Rule or the Model Rule prohibiting prejudicial trial publicity.

The only other evidence cited in this section of AMc's Brief, is deposition testimony from two witnesses claiming that Brewer was the source of the March 2019 New York Times article and speculating that Brewer was responsible for "leaks" to the press in unspecified articles discussing "NRA's issues". *Id*. at n. 149. In the absence of evidence demonstrating substantial likelihood of material prejudice, whether Brewer was the source of this information is irrelevant.

16

statements to the media that they "knew or reasonably should know" would have a "substantial likelihood of materially prejudicing an adjudicatory proceeding." The only recent article cited concerns the effect Covid-19 is having on the NRA, a subject that has absolutely nothing to do with the dispute between the NRA and AMc.  An earlier March 1998 article describes Brewer providing immediate access to the press of pleadings that had been filed in court; this article is both too old to be prejudicial and relates conduct that is expressly permitted under both the Texas Rule and the Model Rule, which provide that a lawyer may provide "information contained in a public record." *See* Texas Rule 3.08(c)(2) (a lawyer providing such information "ordinarily will not violate paragraph (a)); Model Rule 3.7(b)(2) (notwithstanding paragraph (a), lawyer may provide such information).

31. Further, with respect to the March 2019 New York Times article containing adverse comments about AMc's work from two NRA Board members, Defendants make no effort to explain how these brief comments have a "substantial likelihood of material prejudicing an adjudicatory proceeding." The quoted comments do not appear to say anything beyond what is already alleged in the pleadings in the current lawsuits,[37] and courts have held that lawyers may permissibly make "general statements about the nature of the allegations or defense." *E.g., United States v. Brown*, 218 F.3d 415, 429-30 (5th Cir. 2000). Movants seeking relief on the basis of excessive trial publicity must "describe how the publicity would affect [the movant's]

---

[37] The statements in question appear to be the following two quotes from "two prominent board members": (1) "'Since the founding of NRATV, some, including myself and other board members, have questioned the value of it,' Marion Hammer the group's most formidable lobbyist and a key adviser to its chief executive, Wayne LaPierre, said in a statement.  'Wayne has told me and others that NRATV is being constantly evaluated---to make sure it works in the best interest of the organization and provides an appropriate return on investment.'"; (2) "'It is clear to me that NRATV is an experiment and Wayne is evaluating the future of the enterprise,' Willes K. Lee, a board member who leads the N.R.A. Outreach Committee, said in a statement to The Times. After the Thomas the Tank Engine video, he said, Mr. LaPierre appeared 'livid and embarrassed' in a meeting with the outreach group. 'He apologized to the entire committee and spent hours listening to our concerns.'" *See* https://www.nytimes.com/2019/03/11/us/nra-video-streaming-nratv.html The quoted statements are not the focus of the article and do not even mention AMc by name.

Appendix358

right to a fair trial." *Clifford v. Trump*, 2018 WL 5273913 (C.D. Cal. July 31, 2018). Further, even when the content itself could be prejudicial, the movant must explain how any publicity would be prejudicial when trial of the matter is not imminent. *Id.* ("[N]o trial date has been set, and this action has been stayed for a number of months. It is far from clear that the publicity in this case would affect the outcome of a trial that may happen, if at all, months down the road.").

32. Finally, Defendants have cited no cases supporting disqualification as an appropriate remedy for any violation of the trial publicity rules. On the contrary, courts have suggested that appropriate remedies include "change of venue, jury sequestration, 'searching' voir dire, and 'emphatic' jury instructions," as well as the more serious remedy of a "gag order" for courts concerned that trial publicity will undermine the participants' right to a fair trial. *See United States v. Brown,* 218 F.3d at 431; *see also Levine v. U.S. Dist. Court for C. Dist. of Cal*., 764 F.2d 590 (9th Cir. 1985) (upholding restraining order, explaining why other alternative remedies were insufficient); Restatement (Third) of the Law Governing Lawyers §109, cmt f (2000) (no mention of disqualification among remedies for violation of trial publicity rules).

V.   Any alleged appearance of impropriety or "public suspicion" is insufficient to warrant disqualification of either Brewer or the Brewer Law Firm

33. Defendants conclude by arguing that "the likelihood of public suspicion" in this matter outweighs the NRA's right to counsel of choice.[38] They do not explain, however, precisely how or why there would be an appearance of impropriety if Brewer and the Brewer Law Firm are permitted to continue to represent the NRA. Most of the allegations concern personal conflicts of interest in which the affected client is the NRA, a sophisticated user of legal

---

[38] *See* ECF 105 at ¶¶ 60-61.

Appendix359

services represented by in-house counsel.[39] Given the NRA's emphatic and insistent desire to continue being represented by Brewer and the Brewer Law Firm, it is difficult to see how the Defendants' allegations of personal conflicts "would cause the public to question the loyalty a lawyer owes to a client and 'invite skepticism of the justice system.'"[40] As for the allegations concerning the advocate-witness rule, the Fifth Circuit has held the appearance of impropriety is not even a partial rationale for this rule, because loyalty to a former client is just as likely to cause the public to suspect the testimony of a lawyer witness regardless of whether that lawyer is currently serving as counsel for the party on whose behalf the lawyer is testifying. *See F.D.I.C. v. U.S. Fire Ins. Co*., 50 F.3d at 1315-1316. With respect to the remaining allegations, because disqualification is generally not an appropriate remedy for actual violations of either the ex parte contact rule[41] or excessive trial publicity;[42] disqualification would be even more inappropriate as a remedy for any mere "suspicion" that such a violation has occurred.

34. Finally, any likelihood of public suspicion must be weighed against a party's right to counsel of choice. *Id.* at 1316. "[R]ather than indiscriminately gutting the right to counsel of one's choice, [the Fifth Circuit] has held that disqualification is unjustified without at least a reasonable possibility that some identifiable impropriety actually occurred." *Id.* And "when instigated by an opponent, [disqualification] presents a palpable risk of unfairly denying a party the counsel of his own choosing." *Id.* For the reasons set forth above, it is my opinion that Defendants have not established either that any actual ethical violation has occurred or that there is a "reasonable possibility" that an actual violation has occurred. As a result, it is my

---

[39] *See* Frazer Decl. at ¶ 2.
[40] *See* ECF 105 at ¶ 61.
[41] *See supra* ¶ 27.
[42] *See supra* ¶ 32.

Appendix360

opinion that the likelihood of any public suspicion is low and does not warrant disqualification on the basis of Defendants' unsupported allegations.

<div align="center">Conclusion</div>

35. For the reasons set forth above, it is my professional opinion that the evidence cited in support of the Defendants' Motion to Disqualify the Plaintiff's Lawyer is insufficient to establish that either Brewer or other members of the Brewer Law Firm are violating their ethical obligations. It is further my professional opinion that disqualification of either Brewer or the Brewer Law Firm from representing the NRA in this lawsuit is not warranted.

36. I may supplement or amend this Declaration as further information or issues are presented for my consideration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Suffolk County, Massachusetts, on the 5th day of May 2020.

Nancy J. Moore

<div align="center">20</div>

**<u>Exhibit 1</u>**

1. Motion to Disqualify Brewer and the Brewer Firm
2. Motion for Leave to temporarily File Under Seal Brief in Support of Motion to Disqualify
3. Brief in Support of Motion to Disqualify
4. Appendix in Support of Motion to Disqualify
5. Motion for Leave to File Under Deal Certain Exhibits to Motion to Disqualify
6. Exhibits A-1 through A-67
7. Declaration of Revan McQueen
8. Affidavit of Andrew Arulanandam, Managing Director of Public Affairs of the NRA, dated April 14, 2020
9. Declaration of Travis J. Carter, Managing Director of Public Affairs at the Brewer Law Firm, dated Mar. 4, 2020;
10. The NRA's Memorandum of Law in Opposition to Defendant's Motion for Protective Order;
11. Declaration of Michael J. Collins, dated May 4, 2020;
12. Declaration of Charles Cotton, dated April 30, 2020.
13. Declaration of John Frazer, dated May 1, 2020.
14. Declaration of Wayne LaPierre, dated May 3, 2020.

# EXHIBIT 51

Appendix363

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § <br> § <br> § |
| **Plaintiff and Counter-Defendant** | § <br> § |
| **and** | § <br> § |
| **WAYNE LAPIERRE,** | § <br> § |
| **Third-Party Defendant,** | § <br> § |
| **v.** | § **Civil Action No. 3:19-cv-02074-G** <br> § |
| **ACKERMAN MCQUEEN, INC.,** | § <br> § |
| **Defendant and Counter-Plaintiff,** | § <br> § |
| **and** | § <br> § |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG,** | § <br> § <br> § <br> § <br> § |
| **Defendants.** | § |

## DECLARATION OF RICHARD E. FLAMM

### Introduction

1.       My name is Richard E. Flamm.  My date of birth is August 7, 1953.  My office address is 2840 College Avenue, Berkeley, CA 94705.  I am over 18 years of age, of sound mind, and competent to make this Declaration in support of the NRA's Opposition to Defendants' Motion to Disqualify Plaintiff's Counsel. I declare under penalty of perjury pursuant to 28 U.S.C. §1746 that the following statements are true and correct.

1

2.    I have been a practicing attorney for nearly four decades. Since 1995 I have had my own practice, in which I concentrate exclusively on matters of legal and judicial ethics.

3.    I have often been asked to testify as an expert witness regarding such matters.  This testimony has typically been by affidavit, but I have also been qualified to testify as an expert at court hearings and trials.  In addition, in December of 2009 I was invited to and did testify before a subcommittee of the House Judiciary Committee on judicial disqualification.

4.    I have taught courses on "Professional Responsibility" as an Adjunct Professor at the University of California at Berkeley and at Golden Gate University in San Francisco.  I have also lectured on the subjects of conflicts of interest in the practice of law and attorney and law firm disqualification at many seminars and other educational events.

5.    I have written and annually prepare updates for four national treatises.  The first of these, *Judicial Disqualification: Recusal and Disqualification of Judges*, was originally published by Little, Brown & Company of Boston in 1996, and is now in its Third Edition.  This book has been relied on by a host of federal courts.  *See Williams v. Pennsylvania*, 136 S. Ct. 1899, 1918 (Thomas, J., dissenting).  The book has also been cited by the highest courts of many states.  *See Whitacre Inv. Co. v. State*, 113 Nev. 1101, 1116 at n.6 (Nev. 1997), Springer, J. (referring to the undersigned as the nation's "leading authority on judicial disqualification").

6.    In addition to writing treatises on judicial ethics I have written books on legal ethics, including Lawyer Disqualification*: Disqualification of Attorneys and Law Firms* (Banks & Jordan Law Publishing Co. 2d. Ed., 2014), and Conflicts of Interest in the Practice of Law: *Causes and Cures* (2015).  I am currently working on the Third Edition of Lawyer Disqualification, which is due out later this year.  I have also authored a number of articles on conflicts, disqualification and related topics which have appeared in law reviews and periodicals.

2

7.      From 2000 until 2002 I served as Chair of the San Francisco Bar Association's Legal Ethics Committee.  I also served as a member of the Advisory Council for the American Bar Association's Commission on Evaluation of Rules of Professional Conduct ("Ethics 2000"), and as Chair of Alameda County Bar Association's Ethics Committee.

### A.      Summary of Opinions

8.      An attorney for Plaintiff National Rifle Association of America ("NRA") recently informed me that the defendants had moved to disqualify plaintiff's counsel, William A. Brewer III ("Brewer") and the law firm of Brewer Attorneys & Counsels (collectively "the Brewer firm").  Counsel asked whether I would be willing to review certain documents relating to this matter and provide the Court with my opinion regarding the relevant ethical standards governing disqualification of attorneys and their firms.  After reviewing those documents, I agreed to do so.

9.      In order to be able to opine about this subject in a way that might be of most assistance to the Court I have undertaken to review a number of documents, including the Brief in Support of the Motion to Disqualify ("D.B.").

10.      Upon completing my review of these documents, as well as the legal precedents, I formed four opinions.  The first is that defendants have not shown that they filed their motion in a timely fashion; and, because this is so, the Court would be warranted in denying it on that basis, without considering it on its merits.  The second opinion I formed is that, while defendants have accused Mr. Brewer in conclusory fashion of having violated thirteen rules of professional conduct, they have not carried their burden of proving that he violated any of them.  The third opinion I formed is that, even if defendants had been able to show that Mr. Brewer ran afoul of one or more ethical rules, they have not shown that disqualification would be an appropriate remedy for that violation; and, in my opinion, it would not.  Finally, I have formed

3

the opinion that even if defendants had shown that Mr. Brewer should be disqualified from participating in this case, they have not shown that his firm is subject to "imputed" disqualification, and it is not.

### B.    The Right to Seek Disqualification May have been Waived

11.    Before evaluating the merits of a disqualification motion courts often consider whether the right to bring it has been "waived."  Waiver can take two forms: whereas some courts discuss a "client's waiver of a conflict as occurring only through 'informed consent' after 'full disclosure' of the facts creating the conflict, others recognize waiver based on delay." *Vinewood Capital, LLC v. Dar Al-Maal Al-Islami Trust*, 2010 U.S. Dist. LEXIS 30358, at *24-25 (N.D. Tex. 2010).  In this case I have seen no indication that defendants expressly waived their right to move to disqualify the Brewer firm; I have focused on whether it impliedly did so.

12.    It is "well established that a party can waive its motion to disqualify opposing counsel by failing to timely file" it.  *Buck v. Palmer*, 2010 Tex. App. LEXIS 10082, at *18 (2010).  *See also In re Nat'l Lloyds Ins. Co.*, 2016 Tex. App. LEXIS 1353, at *16 (Tex. App.– Corpus Christi-Edinburg 2016) ("A party who fails to file its motion to disqualify opposing counsel in a timely manner generally waives the complaint"); *Diggs v. Diggs*, 2013 Tex. App. LEXIS 8500, at *22 (Tex. App.–Hou. [14th Dist.] July 11, 2013) ("Complaints based on violations of the [TDRPC] are waived if not timely raised").  Because no statute or court rule specifies what constitutes a "timely" motion this requirement has not resulted in any express bright line rule, but certain parameters can be gleaned from the existing case law.

13.    In the same vein, while some courts have held that a party must file its motion to disqualify promptly upon learning of the facts on which it is based, just as the word "timely" is not unambiguous, the available jurisprudence does not say precisely what it means for such a

Appendix367

motion to be "prompt." *J.K. & Susie L. Wadley Research v. Morris,* 776 S.W.2d 271, 283 (Tex. App. 1989) (noting that, like the word "timely," the word "promptly" is amenable to a number of very different interpretations). A common formulation of the requirement is that, to obviate the possibility that disqualification is being sought for tactical reasons, the objecting party must file its motion at the "earliest practical opportunity" after learning the facts upon which its challenge is based.

14.   No hard and fast rule can be discerned from the case law, and there have been cases in which courts have found that a party's delay of only a few weeks or even days before filing its motion to disqualify was fatal to its challenge. It is probably fair to say, however, that in a situation where a party places its motion on file within a month or two of discovering the relevant facts, an implied waiver defense is unlikely to carry the day. *See, e.g., U.S. ex rel. Southern Rock, Inc. v. Precision Impact Recovery, LLC*, 2011 U.S. Dist. LEXIS 15517, at *10 (N.D. Tex. 2011) (the moving party "did not file this motion immediately…[but waiting seven weeks] does not rise to the level of waiver"); *In re Am. Home Prods. Corp.*, 42 Tex. Sup. Ct. J. 252, 895 S.W.2d 68, 76-79 (1999) (holding that a delay of 2 months did not constitute a waiver).

15.   Even a delay of a period of three months or so may not be deemed to give rise to an implied waiver – particularly where the moving party is able to show good cause for not moving sooner. *In Re Hoar Construction, L.L.C.*, 256 S.W.3d 790, 798 (Tex. App. 2008) ("we cannot conclude the trial court abused its discretion by impliedly finding that [the client did not waive] its right to seek disqualification…three months after the Hoar Parties asserted counterclaims"). But where the moving party procrastinates for an extended period after learning the relevant facts the court is likely to seriously entertain a waiver defense. *Vinewood Capital, LLC,*

Appendix368

*supra,* 2010 U.S. Dist. LEXIS 30358, at *22 (a conflict based on substantial relationship "can be waived by the former client's delay for an extended amount of time" in asserting that conflict).

16.    Texas state courts "have found waiver where a party waited as little as four to eight months to file the motion to disqualify." *In re Trujillo*, 2015 Tex. App. LEXIS 11394, at *4 (Tex. App.–El Paso [8th Dist.] Nov. 4, 2015).  *Cf. Buck v. Palmer*, 381 S.W.3d 525, 528 (Tex. 2012) (concluding that an unexplained delay of seven months amounted to waiver); *Petroleum Co. v. Mancias*, 773 S.W.2d 662, 664 (Tex. App.–San Antonio 1989) (finding a waiver where the movant waited four months to file a motion to disqualify).  This is particularly likely to happen when the delay has been inadequately explained.  *Buck*, supra, 381 S.W.3d at 528 (the "court of appeals held that Buck's unexplained seven-month delay in seeking…disqualification was sufficient…We have held that a delay of even less time waives a motion to disqualify").  It follows that an implied waiver is likely to be found in a situation where the delay in seeking disqualification is even longer.  *Compare Vaughan v. Walther*, 875 S.W.2d 690, 691 (Tex. 1994) (denying a motion to disqualify as untimely where it was not filed until 6½ months after the moving party learned of the grounds for disqualification) *with Buck*, supra, 2010 Tex. App. LEXIS 10082, at *24 (2010) ("The delay in this case was even longer").

17.    Federal courts in Texas have also found that a delay of only a few months in bringing a disqualification motion may render the motion untimely.  *See Microsoft Corp. v. Cmwlth. Sci. & Indus. Research Org.*, 2007 U.S. Dist. LEXIS 91550, 2007 WL 4376104, at *9 (E.D. Tex. 2007) (concluding that a nearly six-month delay in seeking disqualification waived the claim).  This is so, a fortiori, in a situation where the court finds the reasons the moving party has given to explain its delay to be unpersuasive. *One World Foods, Inc. v. Stubb's Austin Rest.*

Appendix369

*Co. LC*, Case No. A-15-CA-1071-SS, 2016 U.S. Dist. LEXIS 147312, at *23 n.5 (W.D. Tex. Oct. 25, 2016) ("Plaintiff claims it only became aware of the alleged prior representation on September 1, 2016…The Court finds this reason for the delay unpersuasive")

18.    The length of the moving party's delay in moving for disqualification is typically the first factor a court will consider in deciding whether the right to challenge counsel has been impliedly waived.  *See, e.g., Am. Prod. Co. v. Zaffirini*, 419 S.W.3d 485, 514 (Tex. App.– San Antonio [4[th] Dist.] 2013) ("In considering the timeliness of the motion, the court considers, inter alia, the length of time between when the conflict was apparent and when the motion was filed"); *In re Gunn*, 2013 Tex. App. LEXIS 12727, at *16 (Tex. App.–Hou. [1[st] Dist.] Oct. 15, 2013) ("courts consider the length of time between when the conflict became apparent and the filing of the motion"); *In re Trujillo*, 2015 Tex. App. LEXIS 11394, at *4 (Tex. App.–El Paso [8[th] Dist.] Nov. 4, 2015) ("the reviewing court should consider the time period between when the conflict became apparent to the aggrieved party and when he moved to disqualify").

19.    In some cases, however, this is not the only thing that will go into a court's waiver calculus. Judges have, in fact, identified a number of factors that may be considered, including whether the motion may have been employed as a litigation tactic.  *In re Nat'l Lloyds Ins. Co.*, 2016 Tex. App. LEXIS 1353, at *16-17 (Tex. App.–Corpus Christi-Edinburg 2016) ("In determining waiver, we consider the length of time between when the conflict became apparent to the aggrieved party and when [it] filed a motion for disqualification…We also consider any evidence that indicates the motion is being filed as a dilatory trial tactic...We further look to whether the moving party has a satisfactory explanation for the delay").  *Cf. Am. Sterilizer Co. v. Surgikos*, 1992 U.S. Dist. Lexis 21542, at *16 (N.D. Tex. 1992) ("[w]aiver is particularly relevant when a motion to disqualify is used in an abusive manner as a part of litigation tactic").

7

20.     Yet another factor that has sometimes been considered is whether the moving party was represented by counsel during the period of delay.  *Compare In re Epic Holdings*, 985 S.W.2d 41, 52 (Tex. 1998) (noting that the party's attorney who had knowledge of the conflict was not representing the party in the litigation in which disqualification was asserted) *with Buck v. Palmer*, 2010 Tex. App. LEXIS 10082, at \*23-25 (2010) ("That is not the case here").  It has sometimes been suggested, finally, that a party who did not object to the same conduct of a lawyer in a different case cannot be seriously concerned about being prejudiced by that conduct; and, therefore, that a party who moves to disqualify counsel in one case, after failing to seek this remedy in another, should be deemed to have impliedly waived its right to complain.  *Cf. In re Corr'd Container Antit. Litig.*, 659 F.2d 1341, 1348 (5th Cir. 1981).

21.     In this case, despite the fact that defendants have neither briefed the need to file a timely motion, nor attempted to specify when they learned the relevant facts – and even though the facts which defendants claim to warrant disqualification are not laid out sequentially, but instead are scattered throughout many pages of text and more than 150 footnotes –I believe that all of the major building blocks of defendants' disqualification motion were known to them even before the Complaint in this case was placed on file.

22.     Defendants drew attention to the timeliness problem they face on page one of their brief when they said: "[s]ince his engagement by the [NRA] **in March 2018**, William A. Brewer III [and his law firm]…have skirted the edge of disqualifying conflicts and conduct."  D.B. 1 (emphasis added).  To be sure, defendants attempted to nip the inevitable timeliness inquiry in the bud by adding that "[r]ecently revealed facts and developments" have "now ripened" the issue to "the point where disqualification is required;" but this action "was filed on August 30, 2019" [D.B. 23, ¶ 56], and defendants have not specified which of their facts were

8

"recently revealed" and which have been known to them even before this action was placed on file.

23.     It is certain that the first of defendants' "background facts," and the one they most stridently claim to warrant the firm's disqualification, that "Brewer has a multi-decade, animus-filled family relationship with" AMc's owners [D.B. 2], is not something that AMc learned about "recently."  *See* D.B. 2 ("For over 20 years, Brewer has had a strained relationship [with] A. McQueen and other McQueen family members").  The same goes for defendants' professed concern about the "insight" Mr. Brewer supposedly acquired as a result of his relationship with AMc's owners.  D.B. 3 ("Brewer has had 20 years, as a family member and AMc client, gaining key insight into AMc's business strategy and the personal lives of the McQueen family").

24.     Likewise, while defendants cite to a recent article in saying that unlike "typical law firms, the Brewer Firm actively promotes its ability to offer crisis-management and PR services to clients," defendants did not discover this fact last week or last month.  Defendants say that "Brewer positioned his law firm as a direct competitor of AMc, **supplanting it shortly after his retention by the NRA**."  D.B. 3 ¶ 5 (emphasis added).  The first piece of evidence they submitted on this point was an email dated April 5, 2018, from Travis Carter of the Brewer Firm.  D.B. 3, ¶ 12.  The recipient of that email was the AMc CEO, Angus McQueen.  APP 362.  *See also* APP363 (April 13, 2018 email from Mr. Brewer to Angus McQueen.).

25.     Several claims defendants make against Mr. Brewer stem from his firm's supposed "takeover of the NRA;" but, again, the evidence on which defendants based this claim was not learned by them "recently."  Defendants allege that after "being retained by the NRA in 2018, Brewer and his firm appear to have overtaken all legal and PR decisions within the NRA, allowing the firm to extract exorbitant legal fees along the way."  D.B. 4.  The first item of

9

evidence they submitted to support this claim was a letter from Oliver North – then an AMc employee – in which, according to defendants, North advised the NRA "to obtain a full accounting of the Brewer firm's time charges to date." D.B. 4 n.14. The letter was dated March 31, 2019 – five months before the Complaint in this action was placed on file.

26.     The fact is, too, that some of the same claims defendants say warrant disqualifying the Brewer firm in this case were made in the Opposition they filed on June 24, 2019 to the NRA's motion to have Brewer firm partner Michael Collins admitted pro hac vice in the Virginia consolidated action. In paragraph one of that Opposition defendants warned that the "attorneys seeking admission pro hac vice are very likely to become witnesses" in violation of [Va. R.P.C.] Rule 3.–7; that none "of the exceptions to Rule 3.7 apply;" and that "the testimony of these two attorneys will be adverse to the position of their client," and "therefore will create a disqualifying conflict for the attorneys." In paragraph two defendants previewed the "economic competitor conflict" claim they made in the pending motion when they urged that the Brewer firm had "poached substantial portions of the NRA business that Defendant AMc has handled for over 38 years." Defendants do not explain why, if they knew of these "conflicts" two months before the Complaint in this case was filed, it took them until a few weeks ago to register their concerns.

27.     I realize that some of the allegations the defendants made in their motion were supported by references to recent deposition testimony. But if a party could delay in making a motion for disqualification for months after learning the relevant facts, then conduct discovery to corroborate "facts" it was already aware of – and then claim that the need for disqualification only recently "ripened" – no disqualification motion would ever be impliedly waived.

## C. The Burden of Proof on Disqualification

10

28.     Courts sometimes consider the question of whether a motion to disqualify was made in a timely manner to be a threshold matter for a court to decide: when the court concludes that it was not, it may see no need to proceed to a discussion of the motion's merits.  But even those that have found a disqualification motion to be untimely, and that the right to challenge counsel has been waived, have often gone on to consider the motion on its merits in order to decide whether a different conclusion would have been reached if the moving party had acted more expeditiously.  In making such a determination it is, in my view, helpful to bear in mind who bears the burden of proof on disqualification, and what that burden entails.

29.     Courts have made it clear that the party who moves for disqualification bears the burden of proof on its motion.  *See Vinewood Capital, LLC v. Dar Al-Maal Al-Islami Trust*, 2010 U.S. Dist. LEXIS 30358, at *18-19 (N.D. Tex. 2010) ("the party seeking disqualification bears the burden of proof"); *In re Whitcomb*, 575 B.R. 169, 174 (Bankr. S.D. Tex. Sept. 18, 2017) ("As the party seeking disqualification, Whitcomb bears the initial burden to prove [that counsel] should be disqualified").  What that burden entails may not be always be as clear.  It has been suggested, however, that a party who seeks to disqualify an attorney must establish the factual predicate upon which its motion depends by showing that counsel's continued participation in a particular matter would be impermissible; and, therefore, that the court should exercise its discretion to grant the motion.  *Abney v. Wal-Mart*, 984 F. Supp. 526, 528 (E.D. Tex. 1997).

30.     To clear this hurdle the moving party is typically assigned the task of demonstrating that challenged counsel's continued representation would cause it to run afoul of the conflict of interest rules or some other rule of professional conduct.  *Spears v. Fourth Court of Appeals*, 797 S.W.2d 654, 656 (Tex. 1990).  But some courts have assigned the moving party

11

the additional burden of proving that, if disqualification is not ordered, prejudice will inure to the moving party or to counsel's own client; or that, for some other reason, no remedy less drastic than disqualification exists. *In re Hilliard*, 2006 Tex. App. LEXIS 3514, at *7 (2006) ("The mere allegation of potential prejudice is insufficient").

31.     The specifics of the showing the moving party will be required to make will depend, in part, on which rule has purportedly been violated.  For example, in a case where a motion to disqualify has been predicated upon a putative violation of the "advocate-witness rule," the movant typically bears the burden of demonstrating that counsel's testimony is needed and not readily obtainable elsewhere. *In re Sanders*, 153 S.W.3d 54, 2004 Tex. LEXIS 1365, at *6 (2004) ("Because she has sought disqualification, Joyce bears the burden of showing that McKnight's testimony is necessary").  Conversely, where disqualification is sought on the basis of a claimed conflict of interest violation the movant is ordinarily expected to show, first, that an attorney-client relationship either currently exists or once existed between her and challenged counsel [*Johnston v. Harris County Flood Control Dist.*, 869 F.2d  1565, 1569 (5th Cir. 1989)]; and, therefore, that she has standing to raise the conflict issue.  Once this showing has been made, the moving party is usually expected to establish – by the weight of the evidence, a preponderance of the evidence, or at least some evidence – that challenged counsel, if unrestrained by the court, will violate the conflict of interest rules that are in effect in the jurisdiction in which the motion to disqualify has been made. *See, e.g., OneBeacon Ins. Co. v. T. Wade Welch & Assocs.*, 2012 U.S. Dist. LEXIS 14663, at *19-20 (S.D. Tex. 2012) ("the severity of this remedy 'requires the movant to establish by a preponderance of the facts indicating a substantial relation between the two representations'"); *Tierra Tech de Mex. SA de CV v. Purvis Equip. Corp.*, CIVIL ACTION NO. 3:15-CV-4044-G, 2016 U.S. Dist. LEXIS 99229, at *11

12

(N.D. Tex. July 29, 2016) ("Manley has not carried his burden of delineating with specificity the existence of a substantial relationship between the prior and present CSA representations")

32.     Many federal courts have characterized the movant's burden on disqualification as being a "heavy" one. *United States v. Aleman*, 2004 WL 1834602, at *1 (W.D. Tex. 2004); *Am. Sterilizer Co. v. Surgikos, Inc.*, 1992 U.S. Dist. LEXIS 21542 (N.D. Tex. 1992). This is true, a fortiori, in a situation where, as here, even though disqualification has been sought on the basis of a purported "conflict," the moving party is neither a current nor former client of the challenged firm. *Robertson v. AstraZeneca Pharms.*, LP, 2015 U.S. Dist. LEXIS 132859, at *8 (E.D. La. Sept. 30, 2015) ("Plaintiff bears the burden of demonstrating a conflict…that warrants disqualification. [Her] burden is heightened here because she is not a former [firm] client").

33.     The precise nature of the moving party's burden is not always clear, but it is well-settled that to satisfy that burden it must do more than make assertions that are vague, tenuous or conclusory in nature; and which, therefore, are unsubstantiated by the record. *In re Cerberus*, 164 S.W.3d 379 (Tex. 2005) (allegations of unethical conduct will not suffice); *In re Sanders*, 153 S.W.3d 54, 2004 Tex. LEXIS 1365, at *5 (2004) ("mere allegations of unethical conduct or evidence showing a remote possibility of [an RPC] violation will not merit disqualification"). Courts have also made it plain that a party who moves to disqualify a law firm is expected to concretely establish the particular facts and grounds that support its attempt to exclude counsel from further participating in the matter, and that mere "generalities" will not suffice. *See Microsoft Corp. v. Cmwlth. Sci. & Indus. Research Org.*, 2007 U.S. Dist. LEXIS 91550, at *27-28 (E.D. Tex. 2007) ("disqualification cannot be granted on generalities"). *Cf.* FDIC v. U.S. Fire Ins. Co., 50 F.3d 1304, 1314 (5th Cir. 1995) (the remote possibility that counsel and plaintiff might eventually find themselves at odds was "much too tenuous a thread").

Appendix376

34.     In the same vein, while disqualification motions have sometimes been based on claims as to what might have transpired in the past, or could conceivably occur in the future, courts have made it clear that conjecture and speculation do not suffice.  *United States v. Beauchamp*, 2017 U.S. Dist. LEXIS 66393, at *8 (N.D. Tex. Apr. 4, 2017) ("speculation is insufficient to satisfy the government's burden to prove conflict of interests"); *Painter v. Suire*, 2014 U.S. Dist. LEXIS 108151, at *8 (M.D. La. Aug. 5, 2014) ("Painter's argument rests on nothing more than mere speculation of improper activity, and would not justify disqualification"); *In re Sanders*, 153 S.W.3d 54, 56 (Tex. 2004) ("[courts] have condemned disqualifications based upon 'speculative and contingent allegations'").

35.     The rule that speculative claims do not satisfy the moving party's proof burden applies without regard to the nature of the rule violation that has been alleged.  Therefore, just as a well-founded motion to disqualify cannot be based on the moving party's speculation that challenged counsel will serve as both an advocate and a witness at trial, it is not enough for a party to allege the mere possibility that a conflict of interest may arise, or that some other ethical rule will be impinged.  *See, e.g., In re A.M.*, 974 S.W.2d 857, 864 (Tex. App. 1998).

36.     Courts have likewise observed that, to warrant the drastic remedy of disqualifying a party's chosen counsel, the basis for disqualification cannot be "potential" or "hypothetical." *United States v. Hernandez*, 690 F.3d 613, 619 (5th Cir. 2012). *Cf. Tierra Tech de Mex. SA de CV v. Purvis Equip. Corp.*, CIVIL ACTION NO. 3:15-CV-4044-G, 2016 U.S. Dist. LEXIS 99229, at *10-11 (N.D. Tex. July 29, 2016) ("'A potential conflict based on potential issues is simply not the standard'"), quoting *Hydril Company v. Multiflex, Inc.*, 553 F. Supp. 552, 556 (S.D. Tex. 1982).  It follows that a motion that is based on surmise, suspicion, or imagined scenarios of conflict will not carry the day.  *Hughes v. Pogo Producing Co.*, 2009 U.S. Dist. LEXIS 59454, at

*6 (W.D. La. 2009) ("the Fifth Circuit has 'provided clear guidance as to the need to ensure that any disqualification is linked to an actual, real conflict rather than an imaginary one'").

37.     As I will discuss, many of the claims defendants have made in support of their motion to disqualify appear to have their source not in competent evidence, but in conclusory claims and speculative assertions about things that may or may not occurred.  In particular, it would appear that most if not all of the claims the defendants have made about ethical rules Mr. Brewer and his firm have supposedly infringed in this case are unsupported by record evidence; and, for that reason alone, defendants have not carried their burden of proof on disqualification.

### D.     Defendants have not Demonstrated a Conflict Rule Violation

38.     Defendants say that Mr. Brewer and his firm violated the ethical rule that generally precludes lawyers from undertaking or continuing with representation if they have a "conflict of interest."  However, defendants have not established – or, in fact, even alleged – that they have standing to move to disqualify the Brewer firm on conflicts of interest grounds.

39.     "Standing" is a jurisdictional matter that goes to the power of a court to decide an issue; the question is whether a party who has invoked the court's jurisdiction has done so properly.  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  As one court has put it, standing is a party's "ticket to ride."  *Booth v. Cont'l Ins. Co.*, 167 Misc.2d 429, 433, 634 N.Y.S.2d 650 (1995).  Because standing implicates the court's power to decide a motion, standing is sometimes the threshold issue the Court must decide.  *See, e.g., U.S. ex rel. Friddle v. Taylor, Bean & Whitaker Mortgage Corp.*, 2012 U.S. Dist. LEXIS 42473, at *23 (N.D. Ga. 2012) ("As an initial matter, the relators must [show] that they have standing to seek Mr. Parker's disqualification").

40.     Prior to 1983, when the Model Code of Professional Responsibility ("Model Code") was in effect, DR 1-103(A) placed an affirmative obligation upon an attorney to disclose

15

to an appropriate tribunal any ethical violation that she had unprivileged knowledge of.  In part for this reason, during the 1970's some courts held that a court that had an issue of ethical misconduct brought to its attention was obliged to examine the charge.  *See In re Gopman*, 531 F.2d 262, 265 (5th Cir. 1976).  But the same year that *Gopman* was handed down a different Fifth Circuit panel pointed out that courts generally do not disqualify attorneys on conflict of interest grounds unless a former client has sought that relief.  *In re Yarn Processing Patent Validity Litigation* 530 F.2d 83, 88 (5th Cir. 1976).  The court went on to explain, in words that have been oft quoted since, that to allow "an unauthorized surrogate to champion the rights of the former client" would allow that surrogate to "use the conflict rules for his own purposes."  Id. at 90.

41.     In 1983 DR 1-103(A) was effectively replaced by Rule 8.3(a) of the Model Rules of Professional Conduct ("Model Rules").  The new rule materially differs from its Model Code predecessor in that, whereas the Code obliged lawyers to report all suspected ethics violations, the Model Rule only requires them to report infractions that raise substantial questions about a lawyer's "honesty, trustworthiness or fitness to practice law."  Lawyers are, moreover, to report their concerns to "the appropriate professional authority" – not to a court.  Since the applicable conflict of interest rules exist for the benefit of an attorneys' clients and former clients – and because, in most jurisdictions, _no ethical rule currently compels attorneys to report unethical conduct – in recent years many courts have held or implied that, when a motion to disqualify has been predicated upon a claimed conflict, the movant must ordinarily satisfy a threshold burden of showing, as a matter of fact, that it is – or at least once was – represented by challenged counsel.

42.     In recent years many federal courts have held or implied that in a case where a motion for disqualification has been predicated upon a putative conflict of interest, but the moving party has not shown that it has standing to raise that conflict, the motion may properly be

16

denied.  *See, e.g., Coates v. Brazoria County Tex.*, 2012 U.S. Dist. LEXIS 90748, at *5-6 (S.D. Tex. 2012) ("the general rule is that 'courts do not disqualify an attorney on [conflict grounds] unless the former client moves for disqualification'"); *U.S. v. Aleman*, 2004 WL 1834602, at *2 (W.D. Tex. 2004).  In fact, one of the cases defendants rely on in attempting to show that the Brewer firm has a disqualifying conflict of interest undercuts the defendants' claimed right to seek disqualification on that basis.  *Hill v. Hunt*, 2008 U.S. Dist. LEXIS 68925, at *9 (N.D. Tex. 2008) (a "party seeking to disqualify opposing counsel on the grounds of current and/or former representation must first establish that an actual attorney-client relationship existed between the party and the attorney he or she seeks to disqualify") (citation omitted).

43.     In this case defendants point to various "relationships" Mr. Brewer supposedly had, including his "animus-filled family relationship" with AMc's owners [D.B 2], his "strained relationship" with "A. McQueen" [D.B. 2], and his "relationship with Danny Hakim" [D.B. 13 n.84].  But even a cursory review of defendants' brief reveals that they have not alleged – much less established – that they have or ever had an attorney-client relationship with Mr. Brewer. Defendants have not shown, in short, that they have standing to raise the conflict issue.

44.     Assuming arguendo that defendants do have standing to raise a "conflict" between the interests of Mr. Brewer and his client, the NRA, defendants have not, in my opinion, shown that any such conflict exists.  In order to understand why this is so it is necessary, first, to know what the applicable ethical rule says.  Relevant to the instant motion, Model Rule 1.7(a)(2) provides that a concurrent conflict of interest exists if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer."  In this case, I have seen nothing to suggest that there is a "significant risk" – or, indeed, any risk – that

Appendix380

the Brewer firm's representation[*] of the NRA "will be materially limited" by any "personal interest" Mr. Brewer or his firm may arguably have in this matter.  To understand why there is not, it is important to examine what defendants are claiming that counsels' "conflict" is.

45.    Some of the 42 references to "conflicts" in the brief defendants filed in support of their motion were nothing more than conclusory claims regarding unspecified "conflicts."  *See, e.g.,* D.B. 12 ("high-ranking NRA officials testified that Brewer's actions were improper given his clear conflict of interest with A. McQueen and AMc"); D.B. 20 ("Brewer's testimony is necessary on his conflict of interest with AMc"); D.B. 25 ("Allowing his firm to continue would signal to the public that the protection of one's rights extends only to the lawyer himself, but not to the abusive litigation tactics and conflicts of interests that pervade the law firm").

46.    Defendants have also used the word "conflicts" to refer to different things, such as the "prior conflicts" Mr. Brewer purportedly had in other cases [D.B. 15] or "conflicts" the firm supposedly "manufactured."  D.B. 17.  But when Defendants have spoken in terms of the "conflict of interest" that supposedly exists in this case, what they have contended is not so much that there is a conflict between the interests of Mr. Brewer and his client, the NRA, as between Mr. Brewer and principals of AMc to whom he is related by marriage.  D.B. 9 (referring to the "multi-decade, animus-filled family relationship with the owners of AMc"); D.B. 9 ("Brewer's prior record of…conflict of interest with the McQueen family had been properly vetted"); D.B. 17-18 ("numerous individuals both within the NRA and AMc knew that Brewer's involvement with AMc was a conflict of interest given his relationship with the McQueens").

47.    Defendants never say exactly why it is that they think that Mr. Brewer's "animus" towards his wife's family members, or fractious relationship with them, constitutes a "conflict of interest" within the meaning of Model Rule 1.7; and, in my opinion, it does not.  For one thing,

any "animus" Mr. Brewer might possibly bear towards AMc's principals would not cause him to "pull his punches" in dealing with AMc – if anything, it would cause him to punch harder.  The "personal interests" defendants allege, in other words, would not cause Brewer's representation to be "limited;" if anything, they would cause him to become even more zealous than he is already accused of being in advancing NRA claims.  As defendants own moving papers reflect, moreover, if anybody would be "limited" in their ability to "zealously advocate" in this case it would not be Mr. Brewer, but Mr. McQueen: "R. McQueen, the current CEO of AMc, must battle his sister's husband, which *could hamper R. McQueen's ability to zealously advocate for his own company* because of his concerns for family." D.B. 18. ¶ 42 (italics added).

48.     In addition to making conclusory claims about generic "conflicts," and supposed interpersonal "conflicts" between the interests of Mr. Brewer and those of the defendants, they have adverted to certain circumstances which could be taken to implicate a professed concern about Mr. Brewer's ability to zealously represent the NRA.  In my opinion, however, none of the "evidence" that was proffered in support of these other "conflict" claims demonstrates or even suggests that the Brewer firm would be "materially limited" in representing its client.

49.     Defendants allege, for example, that because of "AMc's concerns about Brewer and his firm's conflicts, LaPierre promised Brewer would not be involved anymore." D.B. 12.  ¶ 26.  Insofar as proof that Mr. LaPierre promised that Mr. Brewer "would not be involved anymore" in response to "AMc's concerns" about "conflicts" would be tantamount to proof that Mr. Brewer and his firm was, in fact conflicted, one would expect that such an allegation would be supported by evidence that Mr. LaPierre did, in fact, think that the firm's ability to represent the NRA had been materially limited in some way.  But the only "evidence" that was submitted in support of this prong of defendants' "conflict" claim was not from Mr. LaPierre – it was

19

testimony from defendants' CEO, and a letter from defendants' attorney, which seem to establish

nothing more than what the Court already knows: that defendants *claim* the firm has a conflict.

50.     In the cited passage Revan McQueen contended that after he and Mr. LaPierre

"extensively discussed Brewer's connection to the McQueen family," how "inappropriate and

aggressive Brewer's conduct had become," and that "we felt it was inappropriate for him to

continue to represent the NRA in any manner related to AMc," LaPierre promised "that AMc

would not have to deal with Powell, Brewer or his firm anymore, and that any future review of

AMc's documents would be conducted by independent parties." APP176.  Even a cursory review

of this "evidence" reflects that it does not establish that the Brewer firm's representation of the

NRA would be limited in any way, or even that LaPierre thought that it might be.  What it

shows, and all it shows, is that to keep the NRA's long-time P.R. firm happy Mr. LaPierre

acquiesced in its request to have someone other than the Brewer firm conduct an AMc audit.

51.     The same is true of the other "evidence" defendants submit to bolster this claim – a

letter from AMc attorney, Jay Madrid.  It is true that Mr. Madrid opined, in that letter, that one of

the reasons why Mr. LaPierre agreed that the Brewer firm would have no further contacts with

AMc or its representatives was that the firm had an "irreconcilable conflict of interest."  But that

assertion was nothing but "lawyer speak" – defendants have not established that AMc's counsel

had any reason to know what motivated Mr. LaPierre to agree to what he did.  Regardless of

what Mr. LaPierre may have thought, moreover, nothing in the cited letter suggests – much less

establishes – that the Brewer firm's ability to represent the NRA had been "limited" by the

conflict Mr. Madrid claimed it had.  In fact, the only time the defendants used the word "limited"

anywhere in their brief was in their citation to ~~the~~ Texas Rule 1.06(b).  The fact is that if a party

could manufacture a conflict on the part of an adverse firm, and thereby engineer grounds for its

Appendix383

disqualification, merely by citing proof that the moving party or its counsel had *claimed* that its adversary had a conflict, few disqualification motions would ever be denied.

52.    Defendants also purported to provide evidence to support their claim that "Brewer and LaPierre chased former NRA President North and numerous others out of the NRA to cover up Brewer's conflicts."  D.B. 22.  The "evidence" cited in support of this claim consists of three passages from attorney J. Stephen Hart's February 20, 2020 deposition transcript.  In the first of these Mr. Hart described the termination of certain NRA personnel on account of their supposed participation in a "conspiracy," but no "conflict" on the part of Mr. Brewer was even mentioned. In fact, the only thing the witness said about the firm in the cited passage was that it "was only doing document production at that time."  APP 87.  This nondescript excerpt was followed by one in which Mr. Hart opined, in conclusory fashion, that NRA's counsel and another person had been terminated for "challenging Bill Brewer's billings" [APP143], and another in which the only things Mr. Hart said about Mr. Brewer was that "there was kind of a limited crowd that was trying to figure out what to do about Brewer," and that he did not think Chris Cox had been involved in the effort to "complain about Bill Brewer's bills."  APP 156-157.

53.    If I understand what defendants are contending, it would seem to be that when an employee of an entity questions a law firm's bills to that entity, or hears about others who have, the firm *ipso facto*, has a "conflict" that materially limits its ability to represent its client; and, should that person subsequently be terminated from his or her job, for whatever reason, his or her rank speculation that the termination was effected for the purpose of "covering up" the firm's "conflict" is sufficient grounds on which to disqualify the firm from representing its client.

54.    If this is what defendants are contending three points should be mentioned.  First, it is not at all unusual for employees of an entity that employs law firms to question bills that have

21

been submitted by those firms.  If the fact that billing questions have been raised by someone who works or worked for an entity client meant that the firm had a "conflict" in representing that client it is probably fair to say that every major law firm in this country, and most of the smaller ones, has been afflicted by many a "disqualifying conflict" they never knew they had.

55.    The fact is, moreover, that just as defendants only allege that the Brewer firm has a "conflict" that was manifested by Mr. LaPierre's decision to have somebody other than that firm conduct an AMc audit – without establishing how the firm's representation of the NRA was, in any way, limited as a result – defendants have not even suggested how its unsupported claim that Mr. LaPierre "chased the NRA President and others out" of the NRA to cover up "Brewer's conflicts" shows that the firm's ability to represent the NRA in this litigation against defendants was limited in any way.  The third point is that a ruling that "unauthorized surrogates" like defendants could have a firm "conflicted out" of a case merely because somebody raised questions about the firm's billing practices, or because somebody was rumored to have been terminated for doing so, would be an open invitation to those who have never been represented by a firm to do precisely as the Fifth Circuit worried they might, by using "the conflict rules for [their] own purposes."  It is precisely to avoid this eventuality that the "standing" rule exists.

56.    One final point about defendants' "conflict" charge that bears mentioning is that, pursuant to Model Rule 1.7(b), notwithstanding the existence of a concurrent conflict under 1.7 (a), a lawyer may represent a client if: "(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client; (2) the representation is not prohibited by law; (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and (4) each affected client gives informed consent,

confirmed in writing."  In this case, no claim has been made that Mr. Brewer's representation is prohibited by law, and his representation of the NRA does not involve the assertion of a claim by one client against another client he represents.  In addition, I am informed and believe that counsel has averred that it will be able to provide competent and diligent representation to the NRA, despite defendants' claims to the contrary; and that the only "affected client," the NRA, has given informed consent, confirmed in writing," to the Brewer Firm's continuing to represent it in this case.  Since this is so, in my opinion, even if the firm would have been subject to being disqualified pursuant to Rule 1.7(a), they are permitted by Rule 1.7(b) to stay on the case.

57.    I recognize that while defendants mentioned Model Rule 1.7 without saying what it says, they cited Rule 1.06(b) of the Texas Disciplinary Rules of Professional Conduct ("TDRPC") for the proposition that a lawyer shall not undertake representation that "even appears" to be "adversely limited" by the lawyer or law firm's own interests.  To the extent that the defendants may be contending that the court should apply the Texas conflict rule, rather than Model Rule 1.7(a), and that the Texas rule is less stringent than its ABA counterpart – either because the Texas rule only seems to require a showing that counsel's representation of a client will be "adversely limited," rather than it will be "materially" so, or because the moving party does not have to show that there actually is a significant risk that the representation will be so limited, only that it might "appear to be" – I must respectfully disagree.

58.    In the absence of a uniform code of ethics for attorneys who practice before federal courts it is not always obvious whether a motion to disqualify should be decided in accordance with the Model Rules or those that have been adopted in the state in which the federal court sits. In many instances this is a distinction without a difference because application of either rule would yield the same result.  *Finalrod IP, LLC v. John Crane, Inc.*, 2016 U.S. Dist. LEXIS

Appendix386

26870, at *8 (W.D. Tex. Mar. 3, 2016) ("The relevant ABA Model Rule, Rule 1.9(b), has some 'linguistic differences' from Texas Rule 1.09, but 'the two codes produce the same result application'"); *Hutton v. Parker-Hannifin Corp.*, CIVIL ACTION H-15-3759, 2016 U.S. Dist. LEXIS 102176, at *6-7 (S.D. Tex. Aug. 4, 2016) ("The Fifth Circuit has noted that the ABA Model Rules and the Texas Disciplinary [R.P.C.] are essentially identical regarding conflicts of interest due to an attorney's prior representation of the opposing party…Accordingly, the court may properly focus its analysis on the Texas Disciplinary [R.P.C.]") (citation omitted).

59.    There are times, however, when the Model Rules and the state rules are not uniform in all respects.  By way of example, in a 1995 case the Fifth Circuit pointed out that the Rules for the Northern District of Texas, the TDRPC, the ABA Model Rules, and the Model Code all delineated dissimilar rules for determining whether an attorney could serve as both an advocate and witness in the same case.  *FDIC v. United States Fire Insur. Co.*, 50 F.3d 1304, 1312 (5th Cir. 1995).  More recently, a federal district judge in the Eastern District of Texas pointed out that the Model and Texas Rules propound different tests for deciding disqualification motions based on putative conflicts of interest, and that "the Fifth Circuit has shown a preference for the more stringent ABA Model Rule."  *JuxtaComm-Texas Software, LLC v. Axway, Inc.*, 2010 U.S. Dist. LEXIS 125352, at *9-10 (E.D. Tex. 2010) ("Thus, the Court will apply the Model Rule").  Like the Eastern District of Texas, I am of the view that when there is any tension between the applicable Model Rule and the applicable Texas rule, it is the former that should be applied.

### E.    Defendants have not Shown a "Lawyer-Witness" Rule Violation.

60.    The second rule defendants claim that Mr. "Brewer is violating" is "the Lawyer-Witness Rule."  D.B. 19.  Defendants say that "Brewer must be disqualified because his witness testimony is necessary," and "because no exception applies."  D.B. ¶ 46.  Since I have not been

involved in the underlying case I am in no position to opine about whether Mr. Brewer's testimony will truly be "necessary" within the meaning of the applicable professional conduct rules; or, if it would, whether any of the exceptions to that rule would apply.  But to the extent that defendants are claiming that if Mr. Brewer will be a necessary witness at trial he must "withdraw" from participating in pre-trial proceedings I do have an opinion – he need not.

61.     Defendants begin their "lawyer-witness" argument by selectively citing Texas Rule 3.08(a) for the proposition that a "lawyer shall not accept or continue *representation* 'if the lawyer knows or believes that the lawyer is or may be a witness necessary to establish an essential fact on behalf of the lawyer's client'" [D.B. 19 ¶ 45, italics added, emphasis omitted]. What the rule actually says is that a "lawyer shall not accept or continue *employment as an advocate before a tribunal in a contemplated or pending adjudicatory proceeding* if the lawyer knows or believes that the lawyer is or may be a witness necessary to establish an essential fact on behalf of the lawyer's client."  T.D.R.P.C. Rule 3.08(a) (italics added).  Perhaps the quote was trimmed merely to save space, but the apparent effect of "ellipsing" the rule – coupled with defendants' invocation of Texas Rule 1.15(a)(1) for the proposition that "a lawyer 'shall' decline or withdraw from representation if it would 'result in violation of Rule 3.08" [D.B. ¶45] – is to leave the reader with the impression that, under the relevant Texas rules, a lawyer who thinks he may be a witness must not only not "advocate before a tribunal," but must immediately withdraw.

62.     In their moving papers defendants do not discuss Model Rule 3.7, except to say it is "substantially similar to Texas Rule 3.08;" which, in my opinion, it is not.  For one thing, Model Rule 3.7(a) is categorical in stating that, unless certain exceptions apply, a lawyer who is "likely to be a necessary witness" shall not "act as advocate *at a trial*" (italics added); thereby making it

Appendix388

clear beyond peradventure that a lawyer who knows he will be a witness at trial may nevertheless continue to be involved in pre-trial proceedings.  The relevant federal case law is to like effect.

63.    During the period when the Model Code was in force some courts stated that when an attorney knew that he was likely to be a testifying witness at trial the proper course was for him to withdraw.  It has long been recognized, however, that many of the policy reasons that underlie the advocate-witness rule – such as concerns about "jury confusion," and the possibility that counsel's testimony might be given undue weight by the fact-finder – do not usually apply to pre-trial proceedings in which no jury is present.  During the Model Code era, too, some were of the view that the Code's advocate-witness provisions were ambiguous; and that, as a result, parties had essentially been invited to file disqualification motions in an attempt to deprive opposing parties of their chosen counsel, or disrupt that counsels' trial preparation.  In 1983 the drafters of the Model Rules responded to these perceived abuses by creating Rule 3.7 – a rule that was designed to eliminate the ambiguity of prior Code provisions [*FDIC v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1317 (5th Cir. 1995)], as well as to minimize the use of the rule as a tactical weapon, and ensure that a litigant's choice of trial counsel would not be lightly disturbed.

64.    Since then many federal district courts have acknowledged that Rule 3.7, unlike its predecessor, does not require a lawyer who is likely to be a witness at trial to cease representing a client in all phases of a case; he can, rather, remain involved in most pre-trial proceedings. *Landmark Graphics Corp. v. Seismic Micro Tech., Inc.*, 2007 U.S. Dist. LEXIS 6897, at *16 (S.D. Tex. 2007) ("Courts have distinguished between a lawyer's role at trial and in pretrial matters"); *P & J Daiquiri Cafe, Inc. v. Andrew K. Knox & Co.*, 2008 U.S. Dist. LEXIS 20775, at *7 (E.D. La. 2008) ("There is no prohibition against [representing a] client in pre-trial matters"). It has been suggested that a testifying advocate can only participate in certain types of pre-trial

proceedings with the consent of his client.  *See Ayus v. Total Renal Care*, 48 F. Supp. 2d 714, 718 (S.D. Tex. 1999) (a "lawyer should not represent the client at his own pre-trial deposition, nor should he argue pre-trial motions involving his pre-trial testimony as to a contested matter unless the client consents").  I am informed, however, that Mr. Brewer has received consent here.

65.     Although a cursory review of defendants' brief might lead the reader to conclude that the rule is different in Texas, courts in that state have also recognized that a lawyer who will be an advocate at trial can nevertheless participate in pre-trial proceedings.  *See, e.g., In re Guidry*, 316 S.W.3d 729, 738 (Tex. App. 2010) ("Even if a lawyer is disqualified…[he] can still represent the client in that case by performing out-of-court functions…, such as drafting pleadings, assisting with pretrial strategy, engaging in settlement negotiations, and assisting with trial strategy").  Even if the Texas rule was more stringent, moreover, for reasons I have already stated I am of the opinion that Model Rule 3.7, rather than Rule 3.08, would apply.

66.     In any event D.R. 3.08, as its name suggests, was promulgated as a disciplinary standard – not as a barometer for when an attorney who has been accused of running afoul of that rule should be disqualified from representing her client.  In a 2007 decision a federal district judge in Western Texas said that, while the trial court has the "duty to disqualify counsel when representation of the client is prohibited" by the Rules of Professional Conduct, Rule 3.08 is "not well-suited as a procedural rule of disqualification."  *Mendoza v. U.S.*, 2007 U.S. Dist. LEXIS 26955, at *16-17 (W.D. Tex. 2007).  Several state courts have suggested that the rule should rarely be the basis for a disqualification order.  *See, e.g., In re Reeder*, No. 12-15-00206-CV, 2016 Tex. App. LEXIS 1084, 2016 WL 402536, at *7, *18 (Tex. App.–Tyler Feb. 3, 2016).

F.      **Defendants have not Shown a "Unauthorized Contact" Rule Violation**

27

67.     Two of the ethics rules defendants claim that Mr. Brewer ran afoul of, and should be disqualified for violating – Model Rule 4.2 and TDRPC Rule 4.02 – seek to prevent a lawyer from driving a wedge between a represented client and its counsel by engaging in unauthorized communications with a represented party.   Rule 4.2 provides that in representing a client a lawyer shall not "communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so…" Rule 4.02(a) would appear to be substantially similar.

68.     The charge that a lawyer has violated the "unauthorized communications" rule is a serious one; and one that should be supported not only by competent evidence, but by a detailed discussion of the relevant case law.  That did not happen here.  The entirety of defendants' claim in this regard would appear to be contained in the phrase "by using family members to communicate with" his brother-in-law, Revan McQueen, "about this very lawsuit, Brewer is violating the ethical rule against communicating with represented parties."  D.B. 23, ¶ 55.

69.     According to defendants, the evidentiary basis for this claim can be found in three paragraphs of the affidavit that was filed by Mr. McQueen in support of this motion, Exh. B, ¶¶ 36-38.  But even a cursory review of two of those paragraphs, ¶¶ 37 and 38, reveal that they have nothing to do with any supposedly "unauthorized" contact with Mr. McQueen.   In ¶ 37 Mr. McQueen talked about Mr. Brewer's representation of Grant Stinchfield, and purported "false statements regarding AMc" that were purportedly contained in an affidavit Mr. Stinchfield filed; in ¶ 38 Mr. McQueen described Mr. Brewer's supposed "manipulation of Stinchfield" as "a way to continue his personal attack on Angus."   It would appear to follow that, if defendants did provide evidentiary support for their Rules 4.2 and 4.02 claim, it must be in ¶ 36.

Appendix391

70.     In that paragraph Mr. McQueen did say that since "the date the NRA's first lawsuit was filed against AMc on April 12, 2019, I have personal knowledge that Brewer, using family members as channels, has attempted to communicate with me to influence AMc's litigation positions and strategy."  But he did so without explaining why, if he had such knowledge, it is only now, a full year later, that counsel moved to disqualify Mr. Brewer for having made these "attempts."  Perhaps more fundamentally, McQueen made no attempt to substantiate this claim.

71.     McQueen hinted that there may be other "examples" of how Mr. Brewer attempted to communicate with him through family members, but the only contact he specifically referred to was one, "in April 2019," in which Mr. McQueen purportedly learned of a "threat of indictment" through "these channels."  According to Mr. McQueen, even though Mr. Brewer "knew that AMc was represented by counsel," he "tried to direct me to 'break privilege' with my own attorneys" so he could tell me "how to get out of this."  McQueen Aff. ¶ 36.

72.     As I have indicated, a party cannot base a motion to disqualify on speculation, conclusions or subjective beliefs; it is, rather, incumbent upon the party to substantiate its claims. In this case, while Mr. McQueen alleges, in conclusory fashion, that he learned of a "threat of indictment" from family members, he did not say which "members" communicated that "threat" to him; what he was threatened with being indicted for; or anything to indicate that the "indictment" was related to any matter on which AMc was being represented ~~on~~ by counsel.

73.     After providing the "factual basis" for its Rule 4.2 claim in footnote 139, the legal basis for disqualifying Mr. Brewer was purportedly set forth in footnote 140.  However, in that footnote all defendants did was "string cite" two cases – no attempt was made to show that the applicable precedent warrants disqualifying Mr. Brewer; and, in my opinion, it does not.

29

74.     The standard to be applied in deciding disqualification motions that have been based upon putative violations of the "unauthorized contact" rule has received scant attention over the years, and the few courts which have considered the matter have not reached a consensus.   It is probably fair to say, however, that in the vast majority of such cases disqualification has not been ordered; and, when it has, that has generally been because the contacting attorney received confidential information from an unsophisticated person that could not be protected in any other way.   Conversely, courts have been reluctant to disqualify counsel in a situation where the contacted person was sophisticated; where no privileged or work product information was conveyed to the lawyer as a result of the contact;   or where, as here, no prejudice to the moving party has been shown to have resulted from the communication.

75.     In the same footnote in which they made their Rule 4.2 claim defendants cited TDRPC Rule 4.04(b) for the proposition that a "lawyer shall not present, participate in presenting, or threaten to present: (1) criminal or disciplinary charges solely to gain an advantage in a civil matter."  But because defendants have not even alleged that Mr. Brewer presented such a charge for such a purpose, much less proved that he did so – and because they did not cite any legal authority that would support the contention that disqualification of Mr. Brewer would be an appropriate remedy if he did – it would appear to be unnecessary for me say any more about this particular claim than that defendants do not appear to have satisfied their burden of proof.

### G.     Defendants have not Shown that Other Rules were Violated

76.     In addition to alleging – incorrectly, in my view – that the Mr. Brewer violated the three rules that have most commonly been cited by parties who move to disqualify counsel – the conflicts of interest rule, the advocate-witness rule, and the unauthorized contacts rule, as well as TDRPC Rule 4.04(b)  – defendants have contended that Mr. Brewer violated three more Model

Appendix393

Rules (Rules 3.6(a), 4.1(a) and 4.4(a)) and their Texas counterparts (Rules 3.07, 4.01(a) and 4.03(a)).  Defendants suggest that Mr. Brewer should be disqualified for having done so, despite citing no case in which any court disqualified counsel for violating any of those rules.

77.     The "trial publicity" rule, Model Rule 3.6(a), provides that a "lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter."  While defendants allege, in conclusory fashion, that Mr. Brewer and his firm "are violating" that rule by "using PR tactics to beat their opposition into submission" [D.B. 24, ¶ 58], it would appear that the only "extrajudicial statement" defendants claim the firm actually made to the press was one in which Mr. Brewer was quoted as saying that the COVID epidemic and its accompanying nationwide lockdown had "caused a major disruption" to the NRA's fundraising activities.  D.B. 24 n.147.  On its face there would appear to be nothing about this comment that is in any way objectionable – much less anything about it that would "have a substantial likelihood of materially prejudicing" this lawsuit.

78.     In addition to claiming that Mr. Brewer made an unremarkable statement about the impact of the COVID epidemic on NRA revenues defendants cited a 22 year old newspaper article in support of their claim that the firm leaks "court filings before opposing counsel is even aware of them."  D.B. 24 ¶ 58.  Assuming for the sake of the argument that Mr. Brewer's former firm did this in the 1990's, or that the same was done in this case, it would appear to go without saying both that a "court filing" is not an "extrajudicial statement" by a lawyer, and that defendants have not shown how they were, in any way, prejudiced by such "leaking."

Appendix394

79.     The same is true of comments "about AMc" that Mr. Brewer purportedly "leaked." Apart from the fact that a deponent's conclusory claim that "we all know it is Brewer [leaking]" is speculation about what the witness believes to be true, not proof that it is, the comments purportedly leaked were those of two "NRA board members" – not statements by Mr. Brewer – and there has been no showing of how "leaking" what NRA members actually said, if it occurred, would have a "substantial likelihood of materially prejudicing" this lawsuit.

80.     As to this, the comments defendants adverted to were statements NRA board members made about concerns they had, not about AMc itself, but about a television station AMc ran, NRA-TV; and, in particular, about an episode of one show that some had deemed to be objectionable.   Although defendants claim that this "impropriety is now a matter of national attention because of Brewer's own insistence on abusively leaking information to the media," and that "Brewer was not responding to negative publicity – he created it," the fact is that fully 6 months before the *New York Times* article defendants complain about, *USA Today* ran a story which the author began by noting that, using "a jarring image to blast increased diversity on a children's TV show, a National Rifle Association online show depicted characters from "Thomas & Friends" in white, Ku Klux Klan-style hoods on a burning train."   *See* Melas, Chloe, *NRA TV Depicts Thomas & Friends in KKK Hoods*, CNN, available at: https://www.cnn.com/2018/09/13/entertainment/thomas-the-tank-engine-nra-kkk-trnd/index.html, dated September 14, 2018.

81.   "Leaking" the reaction of an entity client's board members to such a depiction is not the type of "extrajudicial statement" the drafters of the Model Rules appear to have in mind. *Compare Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1033, 115 L. Ed. 2d 888 (1991). *Cf.* J. Fletcher, Gentile v. State Bar of Nevada: *ABA Model Rule 3.6 as the Constitutional Standard for Reviewing Defense Attorneys' Trial Publicity*, 46 SMU L. Rev. 293, 293 (1993) ("[Gentile,] a

Appendix395

criminal defense attorney, held a press conference on the day of his client's indictment on theft charges.  Gentile hoped to rebut adverse press coverage that his client, Gary Sanders, had received over the preceding months.  Gentile delivered a prepared statement that he believed conformed with ethical rules.  In the statement, he maintained Sanders's innocence, claimed that a police detective was the likely culprit, and attacked the character and motives of three potential witness.  Six months later, a jury acquitted Gentile's client. The State Bar of Nevada then charged Gentile with violating the Nevada Supreme Court rule on trial publicity").

82.    It would appear to be no coincidence that, in addition to failing to clearly identify any "extrajudicial statement" Mr. Brewer made that would have a "substantial likelihood of materially prejudicing" this lawsuit, defendants have failed to cite a single case that would support their contention that the court should disqualify Mr. Brewer for violating that rule.  Most of the reported cases in which violations of Model 3.6 or analogous rules of professional conduct have been discussed are not disqualification cases; they are, like *Gentile*, ones in which the question before the court was whether counsel should have been *disciplined*.  *Gentile*, supra, 501 U.S. at 1036.  *Cf. Davenport v. Garcia*, 834 S.W.2d 4, 29 (Tex. 1992) (Hecht, J., concurring) ("I do not suggest that relator should be disciplined, only that the [TDRPC] address the propriety of attorneys' extrajudicial statements during pending litigation").  In fact, offhand, the only decision I can think of in which an attorney was disqualified, in whole or in part, for violating Model Rule 3.6 or an analogous state rule was an Ohio case, and that decision was reversed on appeal. *State v. Cornick*, 2014-Ohio-2049, ¶¶ 8-19 (Ohio App. 8th Dist. 2015) (even if May publicly suggested the defendants were guilty, "that statement would not cause actual prejudice because all criminal prosecutions carry the implied understanding that the state believes that a defendant is guilty").

33

83.     In one final claim that was also relegated to a footnote defendants suggest that the same conduct that purportedly caused Mr. Brewer to run afoul of M.R 3.6 also infringed M.R. 4.1(a) and 4.4(a), and Texas Rules 4.01(a) and 4.4(a).  D.B. 24 n.150.  It is certainly true, as a matter of general principle, that a lawyer should not knowingly "make a false statement of material fact or law to a third person," or use means that have no substantial purpose "other than to embarrass, delay, or burden a third person."  But because defendants have not specified what "false statement of material fact or law" Mr. Brewer purportedly made, who he made it to, or what "means" he allegedly employed that has "no substantial purpose other than to embarrass, delay or burden a third person," the conclusory charge that he did one or more of those things does not, in my view, provide any basis for finding that Mr. Brewer violated these rules.

## H.     Even if a Rule was Violated Disqualification of Mr. Brewer is Not Automatic

84.     In the Model Code era (1970-1983) some courts suggested that, once a Disciplinary Rule had been shown to have been violated, disqualification would ordinarily follow on a "per se" basis, as a matter of course; without regard to the impact such an order might have on the interests of the non-moving party or challenged counsel, or on the administrative efficiency of the court itself.  This was particularly so in a situation where the violated rule was the one that forbade improper "dual" representation.  *J.K. & Susie L. Wadley Research v. Morris*, 776 S.W.2d 271, 284 (Tex. App. 1989) (Howell, J., concurring) ("[t]he rule against dual representation is monolithic and rigorous; it recognizes few exceptions, if any").

85.     Defendants seem to believe that this "per se" disqualification rule is still in effect. *See* D.B. 19 ¶ 44 ("Each conflict independently warrants disqualification; together, they mandate it").  But the views of courts regarding the automatic disqualification of a lawyer have changed. *See, e.g., SWS Fin. Fund A v. Salomon Bros.*, 790 F. Supp. 1392, 1403 (N.D. Ill. 1992) (many

34

courts automatically disqualify counsel, but "[t]he legal world is changing").  While no court condones ethical rule violations, on account of the severe consequences a disqualification order can wreak, both on the non-moving client and its counsel, a large and ever-growing number of courts have pointed out that disqualification can be a harsh, drastic and even draconian sanction for a rule violation.  *NCNB Tex. Nat'l Bank v. Coker*, 765 S.W.2d 398, 399 (Tex. 1989).

86.     In recent years both state and federal courts in Texas have reminded the bar that disqualification is a "severe remedy" [*Jackson v. City of Sherman*, 2018 U.S. Dist. LEXIS 14198, at *5 (E.D. Tex. Jan. 30, 2018)] which "can result in immediate and palpable harm, disrupt trial court proceedings, and deprive a party of the right to have counsel of choice."  *In re Trujillo*, 2015 Tex. App. LEXIS 11394, at *4 (Tex. App.–El Paso [8th Dist.] Nov. 4, 2015) (citation omitted).  *Also compare In re Solis Law Firm*, NUMBER 13-16-00350-CV, 2016 Tex. App. LEXIS 10567, at *7 (Tex. App.–Corpus Christi-Edinburg [13th Dist.] Sept. 27, 2016) (disqualification "is a severe remedy") *with In re Ace Real Prop. Invs., LP,* 2018 Tex. App. LEXIS 1258, at *6 (Tex. App.–Beaumont [9th Dist.] Feb 15, 2018) ("Because disqualifying a party's attorney results in the party losing its counsel of choice, courts generally review disqualification as a severe remedy, especially [if based on an] alleged conflict of interest").

87.     Over the years it has come to be understood that the disqualification remedy – although frequently aimed at protecting one attorney-client relationship – inevitably interferes with another.  *In re In re Am. Air.*, 972 F.2d 605, 619 (5th Cir. 1992) (disqualification rules "unavoidably affect relationships"), *cert. denied*, 113 U.S. 1262 (1993).  It has been recognized, too, that motions to disqualify attorneys and firms are often made for tactical reasons that have nothing whatsoever to do with the moving party's professed concerns about insuring ethical conduct.  For these reasons and others, disqualification of counsel – far from being the

35

"automatic" remedy for a rule violation that it once was – has in many jurisdictions become a "disfavored" one.  *See, e.g., AMEC Constr. Mgmt. v. FFIC Risk Mgmt.*, 2017 U.S. Dist. LEXIS 133698, *8-9, 2017 WL 3602053 (M.D. La. August 21, 2017) ("Motions to disqualify attorneys are generally disfavored and require a high standard of proof so as not to deprive a party of its chosen counsel"); *Am. Sterilizer Co. v. Surgikos*, 1992 U.S. Dist. Lexis 21542, at *7 (N.D. Tex. 1992) ("Close scrutiny is necessary because disqualification is a severely disfavored remedy"), citing *Woods v. Covington Cty. Bank*, 537 F.2d 804, 810 (5th Cir. 1976).

88.    In light of the extreme nature of the disqualification remedy, as well as the fact that disqualification motions are often interposed for strategic purposes, the Fifth Circuit has made it clear that an "inflexible application of a professional rule is inappropriate" [*FDIC v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1314 (5th Cir. 1995)]; and that the "rule of disqualification is not mechanically applied in this Circuit." *Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1569 (5th Cir. 1989); *Church of Scientology of California v. McLean*, 615 F.2d 691, 693 (5th Cir. 1980); *Leleux-Thubron v. Iberia Parish* 2015 U.S. Dist. LEXIS 8020, at *10 (W.D. La. Jan. 23, 2015) ("The rule of disqualification is not mechanically applied in the Fifth Circuit"); *OneBeacon Ins. Co. v. T. Wade Welch & Assocs.*, 2012 U.S. Dist. LEXIS 14663, 9 (S.D. Tex. 2012) ("In [this circuit], courts 'do not mechanically apply the rules of disqualification'").

89.    In keeping with this admonition courts throughout the nation have abjured a "per se" approach to disqualification in favor of a "functional" one.  *UMG Recordings, Inc. v. Myspace, Inc.*, 2007 U.S. Dist. LEXIS 91179, at *45 (C.D. Cal. 2007) ("Courts have been admonished to take a 'functional' approach"), quoting R. Flamm, Judicial Disqualification: *Recusal and Disqualification of Judges* (1st Ed., at § 23.1).  To courts which subscribe to this "flexible" approach, proof that an ethics rule has been violated is not, in and of itself, a sufficient

36

reason for disqualifying a lawyer. *Yorkshire Ins. Co. v. Seger*, 2007 Tex. App. LEXIS 4777, at *49 (2007). It must be shown that such a remedy is absolutely necessary. *All Am. Semicon., Inc. v. Hynix Semicon., Inc.*, 2008 U.S. Dist. LEXIS 106619, at *14 (N.D. Cal. 2008) ("disqualification is a drastic measure that…should only be imposed when absolutely necessary").

90.     These days, in other words, a court's disqualification decision typically involves a two-step inquiry. First, the court must decide whether challenged counsel violated any ethical rule that is in force in the applicable jurisdiction. *Schlumberger Techs. v. Wiley*, 113 F.3d 1553, 1561 (11th Cir. 1997). If not, the court's inquiry will typically end. But should the court find that a rule has been infringed, disqualification of counsel does not follow as a matter of course. The court must, rather, engage in a thoughtful and careful – if not "painstaking" – weighing of all of the relevant facts and circumstances in order to assess, on a case by case basis, whether disqualification would be a necessary and appropriate remedy for that violation. *See Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 646 F.2d 1020, 1021 (5th Cir. 1981) ("we conclude that the district court misallocated the burden of proof applicable in a disqualification proceeding and failed to make the painstaking factual analysis required by our cases. We therefore remand for further proceedings"); *In re Tex. Windstorm Ins. Ass'n*, 417 S.W.3d 119, 129 (Tex. App.– Hou. [1[st] Dist.] Nov. 7, 2013) ("To prevent the abusive filing of such a motion for tactical reasons, the court must carefully evaluate the motion and record to determine if disqualification is warranted"). *Cf. FDIC v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1314 (5th Cir. 1995) (all the "facts particular to a case must be considered").

91.     In making this assessment the court is expected to apply the legal precedent to the facts in order to strive to strike a "cautious," sensitive, and sometimes difficult balance between

several important – and often competing – considerations and interests. *Alabama v. Dean Foods Prods. Co.*, 605 F.2d 380, 383 (8th Cir. 1979) (disqualification, "like other reaches for perfection, is tempered by a need to balance a variety of competing considerations and complex concepts"); *Rosario v. City of Newark*, 2011 U.S. Dist. LEXIS 5880, at *4 (D.N.J. 2011) ("the balance requires "fact-intensive analysis and careful application of the law"); *Kelly v. CSE Safeguard Ins. Co.*, 2010 U.S. Dist. LEXIS 101118, 2010 WL 3613872, at *1 (D. Nev. 2010) ("Disqualification motions present courts with a delicate and sometimes difficult balancing task"). *Cf. One World Foods, Inc. v. Stubb's Austin Rest. Co. LC,* Case No. A-15-CA-1071-SS, 2016 U.S. Dist. LEXIS 147312, at *23-24 (W.D. Tex. Oct. 25, 2016) ("the Court finds the balance of the ethical rules, public interest, litigants' rights, and facts of this case does not favor disqualifying [the firm]").

92.     The interests which weigh in favor of granting a motion to disqualify include any prejudice that may inure to the moving party if the motion is not granted.  On the obverse side of the coin the primary factor militating against the precipitous grant of a disqualification motion is the fact that to do so will inevitably delay the proceedings and deprive the non-moving party of its right to enjoy the services of the counsel of its choice, thereby causing it economic hardship. But there are also other factors that may counsel against disqualifying an attorney or law firm in a particular case, including the possibility that the motion was filed for strategic reasons.

93.     The first thing the court will typically balance is the relative hardships that would be expected to inure to the parties should the motion to disqualify be granted or denied.  *See One World Foods, Inc.,* supra, 2016 U.S. Dist. LEXIS 147312, at *13 ("a court weighs the ethical rules with the public interest and the litigants' rights in deciding the substantive motion to disqualify under federal law").  In a situation where the court, after performing the requisite sifting and weighing, finds that the prejudice the moving party would suffer if disqualification

38

was not ordered outweighs the prejudice to the non-moving party if its counsel is removed, the motion is likely to be granted.  Conversely, if the balance tips in favor of finding that the non-moving party would be likely to be more prejudiced by the loss of its counsel than plaintiff would be by losing its motion, the motion will ordinarily be denied.  *One World Foods, Inc.*, supra, at *22-23 ("Disqualifying [the firm] would impose significant costs in time and money on the Defendants…[and] would likely cause significant delays in the case.  By contrast, Plaintiff waited ten months after the start of this suit to file its motion for disqualification… Plaintiff fails to show any harm it might suffer outweighs the harm Defendants would incur if [the firm] were disqualified"); *Classic Ink, Inc. v. Tampa Bay Rowdies*, 2010 U.S. Dist. LEXIS 75220, at *13-14 (N.D. Tex. 2010) (plaintiff "could suffer a substantial hardship if the court goes forward with disqualification…Anderson has made no showing of prejudice")

94.     As for the showing of prejudice the moving party is expected to make, since proof that an ethical rule was infringed does not automatically result in disqualification of counsel, a party who seeks to disqualify opposing counsel is usually expected to not merely allege that it will be prejudiced in some way if that remedy is not ordered, but to demonstrate with specificity that actual prejudice will befall it if challenged counsel is allowed to stay on the case.  *See Henry v. City of Sherman*, 2017 U.S. Dist. LEXIS 202496, at *8 (E.D. Tex. Dec. 8, 2017) ("the Court 'should not disqualify a lawyer for a disciplinary violation that has not resulted in actual prejudice to the party seeking disqualification'"), quoting *In re Meador*, 968 S.W.2d 346, 351-352 (Tex. 1998); *OrchestrateHR, Inc. v. Trombetta*, CIVIL ACTION NO. 3:13-CV-2110-KS-BH, 2016 U.S. Dist. LEXIS 117986, at *43, 2016 WL 4563348 (N.D. Tex. Sept. 1, 2016) ("Plaintiffs have not shown that they suffered actual prejudice from any alleged violation").

95.     Courts in Texas have been particularly insistent on this point.  In a 1998 case the Supreme Court of Texas held that a court should not disqualify a lawyer for a rule violation that has not resulted in actual prejudice to the moving party.  *In re Meador*, supra, 968 S.W.2d at 349. Since then Texas courts have been virtually unanimous in holding that neither a showing that challenged counsel engaged in conduct that contravenes a disciplinary rule, nor that counsel's misconduct has caused the potential for prejudice to the moving party, is enough to warrant removing counsel.  On the contrary, the movant must demonstrate that counsel's conduct caused actual prejudice to it.  *In re Users Sys. Servs. Inc.*, 22 S.W.3d 331, 336 (Tex. 1999); *Praise Tabernacle Outreach v. Restoration Fin. Group, Inc.*, 2008 Tex. App. LEXIS 5612, at *29 (2008) (the movant must show "that the opposing lawyer's conduct caused actual prejudice").

96.     Some courts have gone even further.  Due in part to the hardship that is likely to befall the non-moving client if it is forced to change counsel against its will, some courts have decreed that a showing that the movant will incur "some" prejudice if disqualification is not ordered is insufficient.  The disqualification remedy will be ordered only if the movant shows that she will be prejudiced "substantially."  *In Re Nitla S.A.*, 92 S.W.3d 419, 423 (Tex. 2002). Thus, should a court find that the prejudice that would inure to the moving party if its motion to disqualify were to be denied would be likely to be minimal, the court will be inclined to deny the disqualification motion.  *See Hughes v. Pogo Prod. Co.*, 2009 U.S. Dist. LEXIS 59454, at *8 (W.D. La. 2009) (the lack of real "prejudice weighs heavily against" complete disqualification).

97.     In this case defendants claim that their delay in moving for disqualification "will not meaningfully prejudice *the NRA*."  D.B. 23 ¶ 56 (italics added).  They also allege that Mr. Brewer sought to create trial publicity to "prejudice *this case*."  D.B. 24. ¶ 59 (italics added). But the only prejudice to the defendants themselves that they even contend they will suffer is if

Appendix403

Mr. Brewer is permitted to simultaneously serve as an advocate and a witness.  D.B. 22 ¶ 52 ("A witness-advocate…can "unfairly prejudice the opposing party""); D.B. 22 ¶ 53 ("Defendants will suffer actual prejudice defending against Brewer's tactics as lawyer and a witness").

98.     As previously noted, I am in no position to opine about whether Mr. Brewer's testimony will be needed at trial.  I have been informed and believe, however, that he has represented that he will not act as an advocate at trial; and, therefore, defendants concern about possible prejudice to them from such testimony would appear to be moot.  Defendants have not even alleged that they will be prejudiced if Mr. Brewer is not disqualified for violating any of the other ethical rules they have asserted, and it would appear to be clear that they will not be.

99.     By way of example, while defendants contend that Mr. Brewer violated Model Rule 4.2 in the past by indirectly communicating with his brother-in-law or father-in-law, defendants have not even alleged, much less shown, how a decision to deny the motion to disqualify Mr. Brewer for violating Rule 4.2 or its Texas counterpart would redound in prejudice to them.  In the same vein, while defendants posit that Mr. Brewer's "personal interest conflict" caused him to run afoul of Rule 1.7, this claim, if true, would mean that Mr. Brewer's ability to represent his client, the NRA, might be limited by his personal interests – in such a situation the prejudice would be to the NRA, not to the moving parties.

100.     On the observe side of the coin, while defendants allege, in conclusory fashion, that the NRA would not suffer any "meaningful prejudice" if the counsel who has represented it in this action from the beginning (and in three parallel Virginia actions for as long as two years) is disqualified, because this case is "not yet one year old" [D.B. 23 ¶ 56], it would appear that plaintiffs would not only be prejudiced by losing Mr. Brewer as its counsel, but materially so.

Appendix404

101.    As a preliminary matter, it has long been understood that legal practitioners are not fungible; and that, because they are not, the right to be represented by counsel of one's choice is a significant and even fundamental one, which is entitled to great respect. *Richardson-Merrell v. Koller*, 105 S. Ct. 2757, 2767 (1985) (Stevens J., dissenting) ("Everyone must agree that the litigant's freedom to choose his own lawyer in a civil case is a fundamental right"); *In re Gunn*, 2013 Tex. App. LEXIS 12727, at *5-6 (Tex. App.–Hou. [1st Dist.] Oct. 15, 2013) (disqualification "can result in immediate harm by depriving a party of the right to have counsel of its choice").  For this reason, and because separating a client from its chosen attorney is a sanction that can have serious consequences for both client and counsel, it has often been said that a court should not separate a client from its chosen attorney "lightly," "liberally," or "cavalierly." *FDIC v. United States Fire Ins. Co.*, 50 F.3d 1304, 1316 (5th Cir. 1995); *In re ProEducation Int'l, Inc.*, 587 F.3d 296, 300 (5th Cir. 2009) ("[d]epriving a party of the right to be represented by the attorney of [its] choice is a penalty that must not be imposed without careful consideration"); *In re Brady*, 2016 Tex. App. LEXIS 2962, at *4 (Tex. App. – Tyler [12th Dist] Mar. 23, 2016) ("[for many reasons] motions to disqualify should not be granted liberally").

102.    Given the importance the law places on a party's right to choose counsel, it could be argued that a disqualification order, by denying a party that choice, is prejudicial in its own right; and, indeed, some courts have denied disqualification motions out of concern about impeding the non-moving party's right to decide who its counsel should be.  It has been recognized, however, that disqualification not only separate parties from their chosen counsel, but that it often does so with immediate and measurable effect. *In re Reeder*, 2016 Tex. App. LEXIS 1084, at *3 (Tex. App.–Tyler [12th Dist.] 2016) ("Disqualification of a party's attorney can cause immediate harm by depriving the party of its chosen counsel and by disrupting court

Appendix405

proceedings"). For one thing, while delay and increased expense are the unavoidable byproducts of almost any disqualification order, in some instances a disqualification ~~motion~~ may cause the non-moving party hardship of a more substantial nature. *See, e.g., Nat'l Oilwell Varco, L.P. v. Omron Oilfield & Marine*, 60 F. Supp. 3d 751, 767-768 (W.D. Tex. 2014) ("To disqualify NOV's counsel and have it hire [a new one] would almost certainly result in further delay and inefficient resolution of this lawsuit…the lawyers at [the firm] are singularly familiar with the issues of this case as they have worked this matter since they filed the complaint…To remove these lawyers as counsel would work significant prejudice against NOV"). The non-moving party may endure a particularly onerous hardship in a case where, as here, replacement counsel would have to be secured after the initial counsel has performed substantial legal services over a period of thousands of hours, spanning many months, if not years. *See, e.g., Alexander v. Primerica Holdings*, 822 F. Supp. 1118 (D.N.J. 1993) (defendant's huge economic investment "would be unfairly lost to [the non-moving party if counsel] were not allowed to continue").

103.    It bears mentioning, too, that while courts that have been called upon to "balance the prejudice" in deciding motions to disqualify typically focus on the hardship that would befall the client who would lose its counsel, rather than on the attorney or law firm that would be disqualified, in recent years courts have begun to acknowledged that disqualification orders can cause severe, sometimes irreparable damage to an attorney's professional reputation and client relationships, and that these factors – together with counsel's interest in being permitted to practice her profession free of any unnecessary restrictions – are also deserving of the court's consideration. *See, e.g., FDIC v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1314 (5th Cir. 1995); *P & J Daiquiri Cafe, Inc. v. Andrew K. Knox & Co.*, 2008 U.S. Dist. LEXIS 20775, at *8-9 (E.D. La. 2008) ("[Courts] should take into account the social interests at stake including the right of a

party to its counsel of choice and an attorney's right to freely practice her profession"). *See also One World Foods, Inc. v. Stubb's Austin Rest. Co. LC*, Case No. A-15-CA-1071-SS, 2016 U.S. Dist. LEXIS 147312, at *23-24 (W.D. Tex. Oct. 25, 2016) ("Even if the Court had found an attorney-client relationship existed…, such a relationship would be minimal…Allowing such an encounter to disqualify [the firm] would be an inflexible application of the professional rules, abrogating Defendants' right to counsel of their choice and [the firm]'s right to freely practice…Thus, the Court finds the balance… does not favor disqualifying [the firm]").

104.    The possible prejudice that might befall a client if its counsel were to be removed unnecessarily is a factor courts consider in deciding motions to disqualify, but it is not the only one.  For one thing, while there is no question that such motions can be properly utilized to draw the court's attention to ethical rule violations, it has long been understood that disqualification motions are not always motivated by high-minded concerns about ethical derelictions on the part of challenged counsel; on the country, such motions have frequently been interposed in bad faith, for tactical reasons wholly unrelated to any legitimate concern the movant might have about the ethical purity of the legal profession.  *Openwave Sys. v. Myriad France S.A.S.*, 2011 U.S. Dist. LEXIS 35526, at *15 (N.D. Cal. 2011) ("Too much money is being wasted these days on tactical motions to disqualify").  In order to inhibit the use of disqualification motions for these types of purposes many courts have held or implied that, in deciding whether to grant such a motion, one factor a court can properly consider is whether the motion was "tactical."

105.    Many things could motivate a party to file a motion seeking to disqualify an opposing party's attorney, apart from a legitimate concern about counsel's conduct.  First and foremost, because a successful disqualification motion, by definition, deprives a client of the counsel of its choice, parties sometimes move to disqualify counsel not so much out of a genuine

44

concern about how counsel has behaved, as out of a belief that eliminating the services of an adverse attorney may yield a significant litigation advantage. *See In re Am. Air.*, 972 F.2d 605, 613 (5th Cir. 1992) (noting that the alleged facts, if accepted as true, might establish that the moving party's efforts were motivated primarily by a desire to ensure that counsel could not represent its adversary), *cert. denied*, 113 S. Ct. 1262 (1993); *Quicken Loans v. Jolly*, 2008 U.S. Dist. LEXIS 48266, at *5-6 (E.D. Mich. 2008) (disqualification "can work a severe hardship and give the [movant a significant advantage. This is often the motivation for] filing such motions").

106.    A concern about disqualification being sought for such a purpose is particularly likely to be voiced in a situation where, as here, the targeted attorney is a highly experienced and formidable advocate, or one who possesses extensive experience that would be difficult to duplicate by successor counsel. *FDIC v. Amundson*, 682 F. Supp. 981, 988-989 (D. Minn. 1988) (we are "in a time when ethics has ceased to be a common guide to virtuous behavior. It is now a sword in hand, to be used to slay a colleague. This kind of ethics does not reflect a heightened awareness of moral responsibility or a means to temper one's zeal for [her] client. It is instead a means to hobble the opposition by driving a spurious wedge between [client and counsel]").

107.    In some cases disqualification motions have been filed, in whole or in part, for the purpose of retaliating for similar motions brought against the moving party's counsel. *See Colandrea v. Town of Orangetown*, 490 F. Supp. 2d 342, 353 (S.D.N.Y. 2007) (counsel "states, in a declaration no less, that the reason for his [motion is]…because Defendants indicated that they intended to move to disqualify him"). This is a point that bears keeping in mind because I am informed and believe that, while most of the facts that defendants claim justify filing their motion existed from the outset of the case, no motion was placed on file until after plaintiff's counsel warned defense counsel that the NRA intended to seek to move to disqualify them.

108.     It has been recognized, too, that a party who moves to disqualify a lawyer or firm does not necessarily need to prevail on its motion in order to reap an advantage.  For one thing, even disqualification motions that are ultimately unsuccessful inevitably stall, if not derail the proceedings, and motions to disqualify have sometimes been filed for that purpose.  *In re Leyendecker*, 2012 Tex. App. LEXIS 6581, at *4 (2012) (a "court must strictly adhere to an exacting standard to discourage a party from using the motion as a dilatory tactic").

109.     There is widespread agreement that leveling charges of impropriety which, if sustained, would require disqualification of an opposing attorney is not something that should be a standard part of a lawyer's offensive arsenal; to be used routinely, without a good faith belief that the charges are justified.  The fact is, moreover – as more than one court has observed – that the rules of professional conduct were not drafted with the intention of providing a windfall to clients who have hired strategic-minded litigators.  In fact, the drafters of the applicable ethical edicts warned that when rules that were intended to provide guidance for practitioners are brandished by their adversaries as procedural weapons, the purpose of establishing ethical rules in the first place can be subverted.  *Adams v. Reagan*, 791 S.W.2d 284, 291 (Tex. App. 1990).

110.     It is also the case that if disqualification motions were routinely granted, without regard to the motives of the moving party, the very rules that were designed to promote public confidence in the legal system and the legal profession may themselves threaten the integrity of the judicial process, and foster disrespect for the legal system as a whole; and, in the end, may wind up diminishing public confidence in the ability of the process to redress serious wrongs.  *FDIC v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1316-1317 (5th Cir. 1995) ("When, for purely strategic purposes, opposing counsel raises the question of disqualification, and subsequently prevails, public confidence in the integrity of the legal system is proportionately diminished").

111.    Many judges – believing that strict scrutiny of disqualification motions may be an effective deterrent against improper objectives – have held that, in order to inhibit the misuse of disqualification motions as strategic weapons, as well as to avoid hardships on innocent clients and other unjust results, courts not only may but should – or even must – evaluate such motions carefully and judiciously, with skepticism and extreme caution, if not outright suspicion; considering any evidence which suggests that the motion may have been filed for a strategic aim. *See, e.g., In re Jackson*, 2012 Tex. App. LEXIS 5386, at \*4 (2012) ("A trial court should be extremely judicious in considering a disqualification motion because the procedure should not be used tactically to deprive an opposing party of the right to be represented by the lawyer of his or her choosing"); *Buck v. Palmer*, 2010 Tex. App. LEXIS 10082, at \*18 (2010) ("[we must] consider any evidence that indicates the motion is being filed…as a dilatory trial tactic").

112.    This Court has itself recently pointed out that parties "may use disqualification motions as 'procedural weapons' to advance purely tactical purposes") [*Centerboard Secs., LLC v. Benefuel, Inc.*, CIVIL ACTION NO. 3:15-CV-2611-G, 2016 U.S. Dist. LEXIS 72476, at \*3 (N.D. Tex. June 3, 2016), citation omitted], and said that the "court must give careful consideration to motions to disqualify because of the potential for abuse." *Tierra Tech de Mex. SA de CV v. Purvis Equip. Corp.*, CIVIL ACTION NO. 3:15-CV-4044-G, 2016 U.S. Dist. LEXIS 99229, at \*3 (N.D. Tex. July 29, 2016). *See also In re Colony Ins. Co.*, 2014 Tex. App. LEXIS 9902, at \*2 (Tex. App.–Dallas [5[th] Dist.] Sept. 2, 2014) ("courts must adhere to exacting standards when considering motions to disqualify so that they are not used as a tactical device.").

113.    Many courts have held or implied that, when the moving party's motivation for filing a disqualification motion was not a genuine concern about the ethical issues raised in it, but rather the hope of securing some type of strategic advantage, an otherwise meritorious

Appendix410

motion may be properly denied.  But even when a tactical motivation is suspected, establishing the moving party's reasons for seeking disqualification is seldom an uncomplicated task.  After all, there are few instances in which a party who files a motion for an improper purpose will candidly attest to that fact.  The motive for such a motion must, rather, ordinarily be gleaned from the circumstances under which it was made.  *Spears v. Fourth Court of Appeal*, 797 S.W.2d 654, 658 (Tex. 1990) (a motion had "all the appearances of a tactical weapon").

114.    A tactical motivation is most likely to be suspect in a situation where the timing of its filing suggests that a motion was made in bad faith, for reasons other than those apparent on the face of the motion; as where the moving party, although long aware of the conduct that gave rise to the disqualification challenge, unreasonably delayed in bringing its motion for a lengthy period of time.  *See, e.g., Murray v. Metro. Life Ins. Co.*, 583 F.3d 173, 180 (2d. Cir. 2009) ("Plaintiffs' delay suggests opportunistic…motives"); *Redd v. Shell Oil Co.*, 518 F.2d 311, 315 (10th Cir. 1975) (the motion was "held in reserve" until the most expedient time came along to file it); *Skyy Spirits, LLC v. Rubyy, LLC*, 2009 U.S. Dist. LEXIS 109641, at *12 (N.D. Cal. 2009) ("Rubyy was aware of the conflict [from day one]…This motion is largely a tactical gimmick"); *In re Kvaerner/IHI*, 2010 Tex. App. LEXIS 7710, at *5-6 (2010) ("untimely urging of a disqualification motion lends support to any suspicion that the motion is being used as a" tactic).

115.    A court may also suspect that disqualification has been sought for tactical reasons in a situation where the conduct of the moving party, or its counsel, reflects that the motion was not brought out of any sensitivity to ethical concerns.  *FDIC v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1315 (5th Cir. 1995) ("[a] tortured justification for disqualification...premised on a purported possible [conflict] in the future, suggests not so much a conscientious professional concern for the profession and the client of the opposing counsel as a tactic"); *Vinewood Capital, LLC,*

Appendix411

*supra*, 2010 U.S. Dist. LEXIS 30358, at *22 (N.D. Tex. 2010) (a waiver finding is "appropriate when…the attempt at disqualification appears abusive or is being used as a delaying tactic"). For example, a court may ~~also~~ be inclined to suspect that the decision to file a disqualification motion was prompted by strategic considerations in a situation where, as here, the movant could have sought counsel's disqualification in a related proceeding, but never did. *See Simmons, Inc. v. Pinkerton's, Inc.*, 555 F. Supp. 300, 305 (N.D. Ind. 1983) (noting, "with interest," that no motion to disqualify had been filed in a similar action that was on file in another court).

116. Of course, not every motion to disqualify an attorney or law firm is motivated by the desire to delay the proceedings, eliminate a formidable advocate, or achieve some other strategic objective; and not every court that has been presented with a motion to disqualify has found that it was, in fact, tactically motivated. *Hill v. Hunt*, 2008 U.S. Dist. LEXIS 68925, at *54 (N.D. Tex. 2008) (finding insufficient evidence that defendant's motion was tactical). *Cf. Nat'l Oilwell Varco, L.P.,* supra, 60 F. Supp. 3d at 771 ("In the Court's view, this motion was primarily motivated by tactics"). A strategic motive is especially unlikely to be found in a situation where the motion was filed promptly upon learning of the grounds therefore, or where it is not apparent that the moving party would have anything to gain by counsel's disqualification.

117. But here the motion was not filed promptly upon learning of the grounds alleged in support of the motion [D.B. 23 ¶ 56]; it was supported by little, if any, relevant, admissible evidence; and defendants would have everything to gain were they to prevail on their motion. Not only would they succeed in depriving plaintiff of the counsel of the services of a tenacious litigator who has been actively representing the NRA in this litigation from the beginning, and in parallel litigation for two years; but they would deal an economic and reputational blow to an

attorney and firm with whom, by defendants' own account, they have long had a contentious relationship, and whom they view to be a direct business "competitor."

118.    In my opinion, moreover, after carefully reviewing defendants' stated reasons for seeking disqualification, it is difficult to view their justification for filing their motion to be anything other than "tortured."  Defendants, having failed to acknowledge that they have the burden of proof on their motion or what that burden entails, filed a motion alleging the violation of 13 different ethical rules, some cited only in footnotes, without providing any factual support for many of their claims; and, in some instances, without citing any legal authority that would warrant the court in affording the relief they request.  Defendants have also urged the court to disqualify Mr. Brewer for violating ethical rules without considering any of the factors that courts have been exhorted to "sift" and "balance" before deciding whether disqualification is an appropriate remedy for a rule violation – all the while failing to explain why, if Mr. Brewer did violate 13 ethical rules, it took the defendants eight months to get their motion on file, and only then after learning that the NRA was planning to move for their law firm's disqualification.

119.    One final, and to my mind not insignificant cause for concern about defendants' motives for filing their motion stems from the fact that, although the applicable conflict of interest rules exist for the benefit of an attorneys' clients and former clients, defendants never had an attorney-client relationship with the Brewer firm: the "conflict" they profess concern about, if it exists, is between the Brewer firm and defendants' litigation adversary.  *See AMEC Constr. Mgmt. v. FFIC Risk Mgmt.*, 2017 U.S. Dist. LEXIS 133698, at *6-7 (M.D. La. Aug. 21, 2017) ("While originally it appeared that FFIC's motivation in requesting disqualification was genuine…its motivations are now more suspect.  FFIC is not seeking disqualification based on its own interests but rather, it is seeking disqualification to protect AMEC (its adversary) even

though AMEC itself has waived any potential conflict…where one party seeks to disqualify opposing party's counsel based on a conflict between the opposing party and its own counsel, the Fifth Circuit has directed districts courts to proceed with caution").

## I.        Defendants Established no Basis for Disqualifying the Firm

120.     Defendants punctuated the "conflict violation" section of their brief by opining that, because "Brewer can no longer represent the NRA, neither can his firm."  D.B. 19 ¶ 44.  In my opinion this claim is not only false but troubling, for two reasons.  First, defendants did not even cite the Model Rule that governs the subject of vicarious disqualification, Rule 1.10 – much less attempt to explain why they think that if Mr. Brewer is disqualified pursuant to that rule his firm must be also.  Defendants have also misstated the rule they did cite, Rule 1.06(f).

121.     The "imputed" or "vicarious" disqualification rule first appeared in an ethics code when the ABA adopted the Model Code in 1970.  DR 5-105 was categorical in stating that "if a lawyer is required to decline employment or withdraw from employment under a Disciplinary Rule, no partner, or associate, or any other lawyer affiliated with him or his firm may accept or continue such employment."  Model Code of Prof'l Resp., DR 5-105(D).  It was recognized, however that the rule – if read literally – would have mandated firm-wide disqualification not only when a lawyer at the firm labored under a conflict of interest, but whenever any of its attorneys was precluded from handling a representation for any reason; and, even while the Code was in effect, some courts found the rule to be too harsh and declined to strictly apply it.

122.     In 1983 D.R. 5-105(D) was replaced by the Model Rule 1.10.  The new rule did not mandate firm-wide disqualification every time a lawyer was precluded from representing a client – it applied only when an attorney would be prohibited from undertaken representation by Model Rules 1.7 and 1.9.  M.R.P.C., Rule 1.10(a) (1983).  In 2002 other amendments to Rule

51

1.10 were approved which further narrowed the circumstances in which an individual lawyer's disqualification would be imputed to her firm; and, in 2009, the rule was amended again to allow firms to avert conflict imputation in some situations. The current version of the rule provides, in pertinent part, that while "lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9." But such representation is expressly permitted in certain circumstances – including when the disqualifying conflicts was "based on a personal interest of the disqualified lawyer," and does not "present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm." M.R.C.P., Rule 1.10(a)(1) (current).

123.    In this case the conflict that has been alleged to exist is based on a "personal interest" of Mr. Brewer; in fact, defendants captioned the "conflict violation" section of their brief: "Brewer's personal interests violate the conflict-of-interest rules." D.B. 17. Defendants have not shown – or even clearly alleged – how Mr. Brewer's "personal interests" present a "significant risk of materially limiting the representation of the client by the remaining lawyers in the firm." Defendants have not shown, in other words, that Mr. Brewer's "personal interest" conflict warrants disqualifying his firm in accordance with the dictates of Model Rule 1.10.

124.    In asserting that the Brewer Firm should be disqualified by "imputation" defendants – instead of explaining how disqualification is warranted by M.R. 1.10 – relied on Rule 1.06(f) of the TDRPC. This rule materially differs from Rule 1.10; and, for reasons I have already explained, I am assuming that if the court is called upon to choose between inconsistent Texas and Model Rules it is the latter that it will apply. But assuming arguendo that Rule 1.06(f) applies, defendants have interpreted the rule in a rather curious way.

Appendix415

125.     Defendants, whose only citation to this Rule was in a footnote, wrote: "TEX. R. 1.06(f) (lawyer disqualification imputed to firm)".  D.B. 19 n.114.  Rule 1.06(f) does not say, however, that a lawyer's "disqualification" is imputed to his firm.  In fact, unlike the drafters of Model Rule 1.10, the drafters of Rule 1.06 did not use the word "disqualification" at all.  What the rule actually says is that, if a lawyer "would be prohibited by this Rule from engaging in particular conduct, no other lawyer while a member or associated with that lawyer's firm may engage in that conduct."  On its face, in other words, the rule does not impute "disqualification" from one lawyer to another on the basis of the first lawyer's conflict; what it does – and all it does – is say that conduct that one lawyer is not permitted to engage in is forbidden to all.

126.     The fact is, moreover, that while defendants point out that in "the Northern District of Texas, a judge may discipline a lawyer for…conduct that violates the Texas Disciplinary Rules of Professional Conduct" [D.B. 16, ¶, citation omitted], if the court's goal is to "discipline" Mr. Brewer for his "personal interest" conflict, disqualification of Mr. Brewer himself performs that function.  Defendants have not shown that there is any justification for "disciplining" any of his affiliated attorneys – much less for punishing the NRA – on the basis of a personal conflict they do not have.  There is, moreover, an eminently practical reason for this.

127.     In what is by far the most common "conflict" scenario the need for "imputed" disqualification is predicated upon a concern about the possibility that confidential information that a "personally prohibited" lawyer may possess about an adverse party could be, even inadvertently, disseminated to other members of his firm.  In such a case the applicable ethical rules typically call for "imputed disqualification" – at least where no "screening" has been set up between the "tainted" attorney and the rest of the firm – for the purpose of insuring the moving party that its confidential information will not be improperly disseminated or adversely used.

Appendix416

128.    Defendants say that any "notion that Brewer could be walled off from the NRA litigation is nonsensical given his leadership of his firm" [D.B. 19 ¶ 44], but no concern about protecting confidential information has been alleged here.  While it might make sense to "wall off" an attorney from the rest of his firm to avoid the possibility that his affiliates could become "tainted" by the presumed receipt of confidences he possesses, in this case disqualification is being sought on the basis of Mr. Brewer's relationships with Mr. McQueen, not on the basis of any claim that he improperly acquired client-confidential information.  While one of his affiliates could have been "tainted" if Mr. Brewer had confidential information, it is probably safe to say that, if he is not "walled off," no firm lawyer is going to become one of McQueen's relatives.

129.    As far as the possibility of disqualifying the Brewer firm as a consequence of a finding that Mr. Brewer ran afoul of other ethical rules, Model Rule 1.10 only applies in certain situations where a conflict has arisen for one or more attorneys pursuant to the current client conflict rule (Model Rule 1.7), or the former client conflict rule (Model Rule 1.9).  The drafters of the Model Rules did not contemplate that the violation of other rules would result in "imputed disqualification;" and, to defendants' credit, they have not alleged that, if Mr. Brewer were to be disqualified in accordance with most of the other rules they say he has violated, his firm should be removed as well.  They did, however, make such a claim about one other rule – they contend that, if Mr. Brewer is disqualified in accordance with the "lawyer witness rule," "his firm must be as well." D.B. 23 ¶ 53.  In my opinion, defendants are wrong about that.

130.    As previously mentioned, pursuant to DR 5-105(D) of the Model Code, if a lawyer was required to decline employment or withdraw from employment under a Disciplinary Rule, no partner, or associate, or any other lawyer affiliated with him or his firm could accept or continue such employment.  Because the rule was generally applied to the advocate-witness

Appendix417

situation, as to any other, many Code-era courts held that, if a lawyer in a firm was disqualified because of the advocate-witness rule, her entire firm would be disqualified as well.  Even when the Model Code was in force some courts thought that a per se application of the vicarious disqualification rule, when applied in the advocate-witness context, swept too broadly; and, when the Model Rules were adopted in 1983 those suggestions were taken to heart.

131.    Defendants, having dismissed Rule 3.7 as being "substantially similar" to Rule 3.08, and having neglected to cite Model Rule 1.10 at all, apparently failed to take heed of the fact that, under the Model Rules, even if the testimony of one of a law firm's attorneys will be needed at trial, and even if no exception to Model Rule 3.7(a) applies – and, as a result, such a lawyer will be precluded from serving as an advocate at trial – the Model Rule contains a second prong, Rule 3.7(b), which expressly provides that a "lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9."  Model Rules of Prof'l Conduct, Rule 3.7(b).  Unlike its Model Code counterpart, in other words, Rule 3.7 does not contemplate the automatic disqualification of a testifying advocate's firm.  *See, e.g., Gilbert v. Rogina Invest. Corp.*, 991 So. 2d 681, 2008 Ala. LEXIS 63, at *22 (2008) ("DR 5-102 may have contemplated the recusal of an entire firm…no such requirement is found in Rule 3.7").

132.    Since Model Rule 3.7 went into effect most of the federal courts that have had an occasion to consider the matter – mindful of the drastic nature of the disqualification remedy, as well as the rule change that expressly permits firms to remain in a case despite the need for a firm member to testify – have declined to override the nonmoving client's right to select counsel of choice by disqualifying an entire firm in this situation.  *See, e.g., FDIC v. United States Fire Ins. Co.*, 50 F.3d 1304, 1316-1317 (5th Cir. 1995) (affirming an order insofar as it disqualified a

Appendix418

lawyer, but vacating the order disqualifying the firm); *Iguana, LLC v. Lanham*, 2008 U.S. Dist. LEXIS 102661, at \*32-33 (M.D. Ga. 2008) ("Rule 3.7(b) does not recognize imputed disqualification"); *Borom v. Town of Merrillville*, 2007 U.S. Dist. LEXIS 45176, at \*9-14 (N.D. Ind. 2007) ("the plaintiffs…provide no rationale to overcome Rule 3.7(b)"); *Occidental Hotels Mgmt. B.V. v. Westbrook Allegro L.L.C.*, 440 F. Supp. 2d 303, 314 (S.D.N.Y. 2006) (the rule expressly permits a firm to "'continue representation of a client even if one [firm attorney must] testify'") (citation omitted).  Texas state courts have been in accord.  *In re Bahn*, 13 S.W.3d 865, 873 (Tex. App. 2000) ("the testifying attorney's law firm can continue to represent the client even though the attorney will testify, as long as the client gives informed consent").

133.    In this case, even if Mr. Brewer were to be disqualified from acting as the NRA's advocate at trial, nothing in the applicable ethical rules prevents the Brewer Firm from trying the case in his absence.  I am informed and believe, moreover, that the NRA has been fully informed of the possibility that Mr. Brewer may be called to testify and has given its informed consent to allow the firm to proceed as its advocate.  In this situation, in my opinion, the advocate-witness rule supplies no basis for imputing disqualification from Mr. Brewer to his firm.

### J.   No Need for Disqualification has been Shown Absent any Rule Violation

134.    The gravamen of defendants' claim is that Mr. Brewer and his firm engaged in "actual impropriety," purportedly by violating certain ethical rules – not that counsel should be removed even if no rules were transgressed, and no impropriety occurred in fact.  *See* D.B. 25 ("Impropriety occurred, raising public suspicion"); D.B. 25, ¶ 61 ("This brief describes the improprieties that have already occurred").  In one instance, however, defendants said "Brewer should have avoided the appearance of – rather than blatantly engage in – impropriety."  D.B. 22, ¶ 55.  Since this is so, and because one case they cited mentioned the "appearance of impropriety

56

in general" [D.B. 25, ¶ 60], it may be prudent to explain why, in my view, disqualification of Mr. Brewer – much less his firm – is not warranted on the basis of any untoward "appearance."

135.    As the Court knows, federal judges are not permitted to engage in conduct that would give even an "appearance of impropriety."  At one time attorneys operated under the same constraint.  As a result, in a situation where a party complained about a lawyer's conduct the absence of demonstrable wrongdoing was not necessarily enough to avoid being disqualified. Prior to 1970 the "appearance" doctrine was based solely on case law but, in that year, the concept was incorporated into Canon 9 of the Model Code.  *See United States v. Trafficante*, 328 F.2d 117, 120 (5th Cir. 1964).  During the period in which the Code was in effect, the Fifth Circuit pointed out that Canon 9 reflected the bar's concern that some conduct that was ethical in fact might nevertheless appear to be unethical to the public, thereby eroding public confidence in the profession.  *Woods v. Covington County Bank*, 537 F.2d 804, 813 (5th Cir. 1976).

136.    Following the adoption of Canon 9 several courts held or implied that, where counsel's conduct was such as to give an appearance of impropriety, but she declined to step away from the case, the court had the power to disqualify her – not for acting improperly, but for failing to avoid the appearance of doing so.  Even under Canon 9, however, attorneys were not required to abstain from representing clients in response to baseless charges of possibly improper appearances.  *Church of Scientology v. McLean*, 615 F.2d 691, 692 (5th Cir. 1980).  Almost from the moment the Code was adopted, moreover, courts began to criticize Canon 9 and caution against its overuse as an independent basis for disqualifying lawyers and firms.

137.    One problem with the appearance rubric was that, while some judges professed to being able to readily discern whether counsel had engaged in conduct that gave an improper appearance – such as a federal judge in Utah who said, in a decision in a 1982 case, that "like

pornography," courts and lawyers know an appearance of impropriety "when they see it" [*Bodily v. Intermtn. Health Care Corp.*, 649 F. Supp. 468, 477 (D. Utah 1986)] – others complained that the appearance standard was imprecise, nebulous and vague; and, as a result, that it provided an exceedingly poor compass for guiding attorneys in determining whether they had traversed the boundary of proper ethical conduct.  *See e.g., People v. Lopez*, 155 Cal. App. 3d 813, 824 (1984) (noting that an appearance is a "malleable factor," that has the "chameleon like quality of reflecting the subjective views of the percipient;" and that  decision-making "should not turn on the psychological or philosophical perceptions of those involved").

138.    The appearance standard was also subject to criticism on the ground that Canon 9, if applied literally, could "swallow up" everything else in the Code.  Specifically, a concern was expressed about the possibility that a court might employ the appearance Canon as a sort of "catchall" of "failsafe" basis for ordering disqualification whenever it intuitively felt that something was amiss – even if no actual misconduct on the part of challenged counsel had been shown to exist.  It was noted, too, that many members of the public simply do not understand the duties of counsel; and, because they do not, disqualification for appearances could tarnish a lawyer's professional reputation, impose hardship on the non-moving client, and increase the likelihood of public suspicion of judges and the bar.  *Woods*, supra, 537 F.2d at 813.  For these and other reasons courts began to caution that, while there may be times when Canon 9 might be applied, it should not be used "promiscuously" for strategic advantage, in cases where the facts did not fit within the rubric of more specific ethical rules.  *Woods*, supra, 537 F.2d. at 819 (courts cannot permit Canon 9 to be "manipulated for strategic advantage on the account of an impropriety which exists only in the minds of imaginative lawyers").

139.    Even when the Model Code was in effect some courts expressed misgivings about the possibility that counsel might be disqualified because of untoward appearances alone.  In its 1976 case decision in *Woods*, for example, the Fifth Circuit pointed out that the more often a litigant is disadvantaged by the unnecessary disqualification of its lawyer pursuant to the appearance doctrine, the "greater the likelihood of public suspicion of both the bar and the judiciary." Id. at 809-810.  To address this concern, as well the increasing use of disqualification motions for strategic purposes, the Court held that while a party who moves to disqualify an attorney or law firm need not prove that there was actual wrongdoing by challenged counsel, the movant must show at least a "reasonable possibility that some specifically identifiable impropriety had actually occurred."  Even then, a lawyer was not to be disqualified unless the movant could show that the likelihood of public suspicion "outweighed whatever social interests would be served by counsel's continued participation."  *Woods*, 537 F.2d at 812-813 & n.12.

140.    By the early 1980's criticism of the appearance standard had become so widespread that, as many courts have noted, the drafters of the Model Rules of Professional Conduct made a conscious decision not to include a provision analogous to Canon 9. This determination left the continuing viability of the appearance standard in doubt.  *See Vinewood Capital, LLC v. Dar Al-Maal Al-Islami Trust*, 2010 U.S. Dist. LEXIS 30358, at *21 (N.D. Tex. 2010).  *Cf. Glover v. Libman*, 578 F. Supp. 748, 763-764 (N.D. Ga. 1983) ("the Model Rules fail to have a counterpart to [Canon 9].  Perhaps the ABA determined that the 'appearance of impropriety' standard was unworkable or too vague to serve as a guide for attorneys or as a policy consideration for judicial decisions. Within the context of vicarious disqualification, a Comment provides that: 'This rubric [appearance of impropriety] has a two-fold problem. First, the appearance of impropriety can be taken to include any new client-lawyer relationship that

59

might make a former client feel anxious. If that meaning were adopted, disqualification would become little more than a question of subjective judgment by the former client. Second, since 'impropriety' is undefined, the term 'appearance of impropriety' is question-begging"), citing Comment to Model Rule 1.10. *Cf. U.S. v. Aleman*, 2004 WL 1834602, at *2 (W.D. Tex. 2004) (finding the fact that the ABA had eliminated the appearance standard to be "noteworthy").

141.    Even after the Model Rules were adopted some courts in this Circuit have continued to advert to the need for attorneys to avoid untoward appearances; however, courts in many jurisdictions have discerned that the "trend is now away from" disqualifying attorneys on "appearance of impropriety" grounds. In any event, the Fifth Circuit has itself pointed out that, "[while we] have held that application of the disqualification rule requires a balancing of the likelihood of public suspicion against a party's right to counsel of choice…, rather than indiscriminately gutting the right to counsel of one's choice, we have held that disqualification is unjustified without at least a reasonable possibility that *some identifiable impropriety* actually occurred." *FDIC v. United States Fire Ins. Co.*, supra, 50 F.3d at 1316 (italics added). In this case, in my opinion, defendants have not even come close to making that showing.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed on this 4th day of May, 2020, in Berkeley, California

*[signature]*

Richard E. Flamm, Esq.

Appendix423

# EXHIBIT 52

Appendix424

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § § § | |
| **Plaintiff and Counter-Defendant,** | § § | |
| and | § § | |
| WAYNE LAPIERRE, | § § § | |
| **Third-Party Defendant,** | § § | |
| v. | § § | Civil Action No. 3:19-cv-02074-G |
| ACKERMAN MCQUEEN, INC., | § § § | |
| **Defendant and Counter-Plaintiff,** | § § | |
| and | § § | |
| MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG, | § § § § § | |
| **Defendants.** | § § | |

## DECLARATION OF CRAIG SPRAY

My name is Craig Spray, and I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following statements are true and correct.

1. I am over twenty-one years old and am fully competent to make this declaration. Unless otherwise noted, I have personal knowledge of all matters stated herein. I submit this declaration in support of the NRA's Opposition to Defendants' Motion to Disqualify Plaintiff's Counsel (William A. Brewer III ("Brewer") and Brewer, Attorneys & Counselors ("BAC")).

1

2.      I am the Treasurer and Chief Financial Officer of the National Rifle Association of America ("NRA"). I joined the NRA on March 15, 2018 as Chief Financial Officer, and on September 13, 2018, was also elected Treasurer. Thus, during all times relevant to the issues herein, I was employed by the NRA as the Chief Financial Officer.

3.      Prior to working at the NRA, I served as Senior Vice President and Chief Financial Officer of Knoll Inc., a publicly traded home and office products company with more than $1 billion in annual sales.

4.      As Treasurer and Chief Financial Officer, I oversee all financial actions of the NRA and am responsible for managing the finance and accounting departments. In this capacity, I ensure that the company's financial reports are accurate, measured against budgets for the year and completed in a timely manner.

5.      Before spending any time with Bill Brewer, I personally knew that executives, accounting personnel and Board members expressed serious concerns about Ackerman McQueen ("AMc") during 2018. Among those concerns were the integrity of its billing practices, the utility of many of its services and the direction of its messaging for the NRA. With that background and given the sheer size of its billing – approximately $40 million that year – I was anxious to meet the leaders at AMc. My first in-person meeting with AMc occurred in June 2018 in Dallas, Texas at AMC's offices. The purpose of the meeting was general relationship building, and I wanted to understand what AMc did for the NRA, as AMc was the largest vendor for the NRA at the time. Unfortunately, when I attempted to learn more about plans for the 24-hour digital platform run by AMc, NRATV, I apparently touched a raw nerve in Revan McQueen. Specifically, when I asked how many unique visitors were measured on various live programs on NRATV, Revan became extremely agitated, told me I did not know what I was talking about, said that questions about

2

"unique visitors" are a "false narrative", and summarily walked out of the meeting for a period of time. For the balance of the day, I completed interviews with other executives of AMc.

6.     When I flew back to the Northeast the next day and exited the aircraft, I was alarmed by several voicemails on my phone stating that Ackerman was demanding I be fired because I wasn't the "right guy for the job". Later, I came to understand that the NRA was attempting to ascertain and monetize the NRATV platform and among its concerns was the significant expense invoiced to the NRA and the NRA's inability to receive clarity on the platform's unique viewership.

7.     A few months later on October 11, 2018, Wayne LaPierre and I visited AMc at its offices in Dallas, TX to identify ways to reduce costs in the fourth quarter of 2018 and understand how those savings might be applied to the 2019 budget.

8.     I have read Revan McQueen's declaration filed in support of AMc's Motion to Disqualify NRA's Counsel. His version of the events that took place at this meeting on October 11, 2018, are grossly inaccurate.

9.     What occurred on October 11, 2018 was one of the least professional meetings of my career. Wayne and I had travelled to AMc's office to understand what services were being provided, what services we required, and what the services would cost. What ensued was an epithet-filled tirade by Revan and Angus McQueen and other members of the AMc team. AMc repeatedly acted as if they were enraged by our desire to cut their approximately $40 million a year budget. AMc's short-sighted and entitled position that the NRA's need to make budget cuts was tantamount to "taking" money from them rang hollow in my ears. I remember trying to explain to them that other vendors provide support for membership, marketing and legal advice – it was only in this regard that questions about what the NRA was spending on legal fees arose.

3

10.     Contrary to Revan's testimony, BAC legal fees and representation of the NRA were not the focus of the meeting; the focus. As mentioned earlier was on AMc-related services and costs. AMc seemed to believe that any fees paid to other vendors were an unwise expenditure if AMc received less than $40 million per year. At one point, I remember trying to explain that BAC's services were in no way at odds with AMc's services. This wasn't a competition. Our efforts to meet with Revan and Angus were to discuss a prudent budget for the NRA, and I recall telling them that "if you want to provide other services, we have no objections to your doing so; we simply need to discuss it as part of our larger 2019 budget planning for the entire business." At the end, Angus and Revan oddly demanded that Wayne and I return all paper copies (as well as all of my notes taken during the meeting) of the reduced services we discussed during the meeting.

11.     Never in my entire career as a finance executive have I dealt with business partners that acted in such an unprofessional manner. Finally, Revan falsely states that Wayne and I agreed with him and Angus that Brewer's conduct towards AMc was "inappropriate and aggressive". Wayne and I made no such statements.

12.     I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___4th___ day of ~~April~~ *May* 2020.

Craig Spray

Appendix428

# EXHIBIT 53

**Exhibit 53- AMc Waiver Chart**

| Allegation Made By AMc | Evidentiary Support for When AMc First Knew of Allegation | Time Period of AMc Awareness |
|---|---|---|
| Brewer was responsible for faking the AMc audits and document demands.[1] | In a letter dated March 12, 2019, from Jay Madrid of Dorsey, AMc's counsel, to John Frazer, Mr. Madrid writes: "Over the past few weeks, it has become clear that Brewer has been relying upon information provided by NRA persons and entities, including the FRA firm and you, to interact with and conduct reviews of AMc. As I have advised NRA in the past, AMc has encountered a growing number of disputes with demands made and positions taken by the NRA. These disputes have coincided with the emergence of the Brewer firm as the NRA's lead outside counsel and, it appears, its official spokesman."[2] | 1 year, 18 days |
| Brewer carried out the false and defamatory narrative that AMc and Colonel North attempted to extort Wayne LaPierre.[3] | In a letter dated April 25, 2019, from Wayne LaPierre to the NRA Board of Directors, Mr. LaPierre writes: "Yesterday evening, I was forced to confront one of those defining choices – styled, in the parlance of extortionists, as an offer I couldn't refuse. I refused it. Delivered by a member of our Board on behalf of his employer, the exhortation was simple: resign or there will be destructive allegations made against me and the NRA. Alarmed and disgusted, I refused the offer. This letter explains why."[4]  A Wall Street Journal Article, published April 26, 2019, states that: "A spokesman for Ackerman McQueen said it would have no comment" on Mr. LaPierre's letter dated April 25, 2019, to the Board.[5] | 11 months, 4 days |

---

[1] *See* ECF 105 at ¶ 43.
[2] *See* Ex. 10 to the Collins Decl.
[3] *See* ECF 105 at ¶ 43.
[4] *See* Ex. 13 to the Collins Decl.
[5] Mark Maremont, *NRA's Wayne LaPierre Says He Is Being Extorted, Pressured to Resign*, dated Apr. 26, 2019, attached as Exhibit 14 to the Collins Decl.

**Exhibit 53- AMc Waiver Chart**

| | | |
|---|---|---|
| Brewer had a multi-decade, animus-filled family relationship with the owners of AMc.[6] | In an AMc public statement made on April 15, 2019, AMc states that: "Months ago, legal counsel informed the NRA that "Mr. Brewer himself has an irreconcilable conflict of interest. Mr. Brewer is the son-in-law of Angus McQueen and brother-in-law of Ackerman McQueen's CEO, Revan McQueen. Mr. Brewer has demonstrated, in words and deeds, his animus for Ackerman McQueen and these family members and that animus pervades the Brewer firm's dealings with Ackerman McQueen, whether dealing directly with Ackerman McQueen or through other members of his firm."[7] | 11 months, 15 days |
| BAC is a business competitor of AMc in the public-relations market.[8] | In AMc's Counterclaim, dated May 23, 2019, in the Virginia Action, AMc states that: "The NRA's Executive Vice President and long-time leader Wayne LaPierre, enabled by his chosen attorney, William Brewer of William Brewer Associates and Counselors, has set the NRA on a course to eliminate AMc as the primary public relations vendor to the NRA."[9] | 10 months, 7 days |
| Brewer created the fallacy that AMc was leaking information.[10] | In AMc's Counterclaim, dated May 23, 2019, in the Virginia Action AMc states that: "The NRA's decision to work with Brewer to release proprietary information gained from AMc to the New York Times is a breach of the NRA's implied covenant of good faith and fair dealing."[11] | 10 months, 7 days |
| Brewer filed unauthorized lawsuits when the NRA was seeking to keep the peace with AMc.[12] | In AMc's Counterclaim, dated May 23, 2019, in the Virginia Action, AMc states that: "Upon information and belief, the NRA Board was not aware of the filing of this Lawsuit prior to it being filed and never approved or authorized the filing of this Lawsuit."[13] | 10 months, 7 days |

[6] *See* ECF 105 at ¶ 1.
[7] *See* Ex. 12 to the Collins Decl.
[8] ECF 105 at ¶ 1.
[9] *See* ¶ 11 of Ex. 57 to the Collins Decl.
[10] *See* ECF 105 at ¶ 43.
[11] *See* ¶ 82 of Ex. 57 to the Collins Decl.
[12] *See* ECF 105 at ¶ 43.
[13] *See* ¶ 3 of Ex. 57 to the Collins Decl.

2

**Exhibit 53- AMc Waiver Chart**

| | | |
|---|---|---|
| Brewer caused AMc's Services Agreement with the NRA to be terminated.[14] | In AMc's Counterclaim, dated May 23, 2019, in the Virginia Action, AMc alleges that: "Defendants aver as a new matter, specifically requiring response, that the NRA's true purpose underlying this Lawsuit is to artificially construct a false claim for a technical breach of the Services Agreement that they erroneously believe will allow them to terminate the Services Agreement, move all of the Defendants' contractual services to a competing public relations unit, and not pay Defendants the required multi-million dollar termination/severance payment obligated under the Services Agreement."[15] | **10 months, 7 days** |
| Brewer is a necessary witness in this case.[16] | In AMc's Opposition to Plaintiff's Motion for *Pro Hac Vice* Admission from the *NRA v. AMc* Virginia Action, dated June 24, 2019, AMc states that: "Brewer Attorneys & Counselors and/or their founding partner, William A. Brewer III, were identified 26 times in the Defendants' Counterclaim in the first *NRA v. AMc* case and 23 times in the Defendants' Counterclaim in the second NRA v. AMc case. The attorneys seeking admission pro hac vice are very likely to become witnesses in the case."[17] Also, in the Transcript of Hearing, dated June 26, 2019, counsel for AMc states that: "Your Honor, it's not our position that Mr. Brewer is going to be the only witness in that firm, but that the other partners in the firm are also going to be witnesses. They're intricately linked."[18] | **9 months, 6 days** |
| Brewer used family relationships and prioritized his own personal financial interests, in violation of numerous ethical rules.[19] | In AMc's Opposition to Plaintiff's Motion for *Pro Hac Vice* Admission from the *NRA v. AMc* Virginia Action, dated June 24, 2019, AMc states that: "Mr. Brewer has spearheaded the litigation tactics of the NRA in the two suits against AMc in a | **9 months, 6 days** |

---

[14] *See* ECF 105 at ¶ 43.
[15] *See* pp. 3-4 of Ex. 57 to the Collins Decl.
[16] *See* ECF 105 at ¶ 48.
[17] *See* ¶ 1 of Ex. 19 to the Collins Decl.
[18] *See* pp. 11-12 of Ex. 21 to the Collins Decl.
[19] *See* ECF 105 at ¶ 41.

3

**Exhibit 53- AMc Waiver Chart**

| | | |
|---|---|---|
| | way that abuses the process of this Court to gain a public relations advantage, smear AMc, and intimidate witnesses supportive of AMc."[20] Also, in the Transcript of Hearing, dated June 26, 2019, counsel for AMc states that: "But it's not just that they are witnesses in this case. They financially benefit. They have an in-house public relations unit in the firm that is siphoning away business from Ackerman McQueen for the NRA work...."[21] | |
| BAC was a client of AMc as recently as December of 2019.[22] | In a Transcript of Hearing, dated June 26, 2019, from the *NRA v. AMc* Virginia Action, counsel for AMc states that: "Your Honor, my client is reminding me that the Brewer law firm is [actually] a client of Ackerman McQueen and has been a long-term client of the firm."[23] | **9 months, 4 days** |

4812-2922-3867.15

-

[20] *See* p. 4 of Ex. 19 to the Collins Decl.
[21] *See* p. 15 of Ex. 21 of the Collins Decl.
[22] *See* ECF 105 at ¶ 2.
[23] *See* p. 15 of Ex. 21 to the Collins Decl.

4

# EXHIBIT 54

Appendix434

# BREWER

### DALLAS | NEW YORK

← BACK



## Travis J. Carter

**Managing Director, Public Affairs**

tcarter@brewerattorneys.com

214.653.4856

Download vCard

### BIO

Travis J. Carter is Managing Director of Public Affairs (non-attorney) in the Dallas office of Brewer, Attorneys & Counselors.

Since 2001, Mr. Carter has managed public relations for the firm and, in many cases, the clients it represents. Mr. Carter has successfully managed a wide range of communications challenges and opportunities, including legal and regulatory concerns, crisis events, and pro-active campaigns. He has been recognized as among the first communication professionals countrywide to begin an in-house public relations practice at a national litigation firm.

Mr. Carter also manages media relations and public advocacy for the Brewer Storefront, the firm's community-service affiliate. He helps oversee the Brewer Foundation / New York University International Public Policy Forum (IPPF), the first and only competition that gives high school students around the world the opportunity to participate in written and oral debates on issues of public policy.

Before he joined the firm, Mr. Carter worked as a corporate relations manager with Allstate Insurance Company. He directed regional communications and spent time working at Allstate's corporate headquarters near Chicago, where he managed media relations and served as a communications manager for the company's National Catastrophe Team. Prior to Allstate, Mr. Carter worked at the Federal Reserve Bank of Dallas, where he began his public relations career after working in the print news media.

Mr. Carter has won numerous professional awards recognizing his work in strategic communications. His PR campaigns have been featured in "Top 100 Case Studies in PR," annually published by *PR News*. He has been awarded a "Silver Quill" from the International Association of Business Communicators, and was named an overall winner in the Legal PR Awards, one of the industry's premier national honors. The *Dallas Business Journal* has previously recognized Mr. Carter as among the top 40 business professionals in the Dallas-Fort Worth area under 40 years of age, and he has been named by *PR News* as "One of 15 to Watch" on the national PR scene.

Mr. Carter is active in a broad array of philanthropic activities. In addition to his involvement with the Brewer Foundation, he is a former board member for the Cystic Fibrosis Foundation, Northeast Texas Chapter, and is the former chairman of Shakespeare Dallas. Mr. Carter has been recognized twice by the North Texas Business Council for the Arts (NTBCA) with an Obelisk Award, an honor recognizing outstanding community leadership. He is a graduate of the NTBCA Leadership Institute, a nine-month program designed to develop the next generation of business and arts community leaders.

Mr. Carter, who received a bachelor's degree in journalism from The University of Oklahoma, holds an MBA from The University of Dallas. He is a member of several professional organizations, including the International Association of Business Communicators, the Public Relations Society of America, and the Dallas Press Club.

### EDUCATION

- M.B.A., The University of Dallas, 2002
- B.A. in Journalism & Mass Communications, The University of Oklahoma, 1993

**CONTACT**

DALLAS   214.653.4000
NEW YORK   212.489.1400

HOME | STORY | CASES | PEOPLE | EXPERTISE |
ADVOCACY | OUTREACH | JOIN US | NEWS | CONTACT

©2019. All rights reserved. Site Design

**DISCLAIMER**

All materials contained on this website are made available by Brewer, Attorneys & Counselors for informational purposes only and should not be construed as legal advice. The transmission and receipt of information contained on this website does not form or constitute an attorney-client relationship. Persons should not act upon information found on this website without first seeking professional legal counsel.

Source: https://www.brewerattorneys.com/travis-j-carter                    Created 2020/05/03 at 23:40 GMT

# BREWER

DALLAS | NEW YORK

← BACK



## Andrea Sadberry

**Senior Manager, Public Affairs**

asadberry@brewerattorneys.com

214.653.4026

Download vCard

### BIO

Andrea Sadberry is Senior Manager of Public Affairs in the Dallas office of Brewer, Attorneys & Counselors. She joined the firm in 2010.

In this role, Ms. Sadberry develops and executes public relations and crisis management strategies for the firm and the clients it represents. In addition, she conducts media outreach in support of a wide range of charitable programs.

Ms. Sadberry also serves as the Executive Director for the Brewer Foundation/New York University International Public Policy Forum (IPPF), a global debate competition that gives high school students the opportunity to participate in written and oral debates on issues of public policy. The IPPF annually involves thousands of students from dozens of countries around the world.

Before joining Brewer, Attorneys & Counselors, Ms. Sadberry worked with the firm in her capacity as a project manager for Carter Public Relations.

Ms. Sadberry has broad experience in video production and television reporting. Prior to joining Carter Public Relations, she worked as a television reporter at NBC 5 in Dallas, where she reported on a wide range of business, legal, and community issues. Ms. Sadberry came to NBC 5 from the NBC affiliate in Wichita Falls, Texas, where she served as an anchor and reporter.

Ms. Sadberry received her bachelor's degree in journalism from the University of Kansas (KU). While attending KU, Ms. Sadberry studied at American University in Washington, DC, where she was one of only 25 students nationwide awarded a fellowship in the Washington Semester Program in Broadcast Journalism. In 2009, Ms. Sadberry received her master's degree in communication from the University of Texas at Arlington. The same year, she completed the North Texas Business for Culture and the Arts Leadership Arts Institute, a nine-month program designed to develop the next generation of business and arts community leaders.

From 2009 to 2013, Ms. Sadberry served on the board of directors for Big Thought, the nation's largest nonprofit organization focused on improving public education through creative learning.

In December 2013, Ms. Sadberry served as a panelist at the National Association for Hispanic Journalists Region 5 Conference in Dallas. She spoke on making the transition from a career in journalism to public relations.

### EDUCATION

- M.A. in communication, University of Texas at Arlington, 2009
- B.A. in journalism, University of Kansas, 2003

CONTACT

DALLAS   214.653.4000
NEW YORK   212.489.1400

HOME | STORY | CASES | PEOPLE | EXPERTISE |
ADVOCACY | OUTREACH | JOIN US | NEWS | CONTACT

©2019. All rights reserved. Site Design

DISCLAIMER

*All materials contained on this website are made available by Brewer, Attorneys & Counselors for informational purposes only and should not be construed as legal advice. The transmission and receipt of information contained on this website does not form or constitute an attorney-client relationship. Persons should not act upon information found on this website without first seeking professional legal counsel.*

Source: https://www.brewerattorneys.com/andrea-sadberry

Created 2020/05/03 at 23:40 GMT

Appendix436

# BREWER

DALLAS | NEW YORK

← BACK



# Katherine Leal Unmuth

**Manager, Public Affairs**

klu@brewerattorneys.com

214.653.4832

Download vCard

## BIO

Katherine Leal Unmuth is a Manager of Public Affairs in the Dallas office of Brewer, Attorneys & Counselors.

Ms. Unmuth develops public relations and crisis management strategies to advance the interests of the firm and its clients, including Fortune 500 companies, entrepreneurs and leading financial organizations. In this capacity, she handles media research and analysis, strategy, social media and media relations on a wide range of matters.

Ms. Unmuth also provides strategic communications for the legal public service affiliate of the firm, the Brewer Storefront. Most notably, Ms. Unmuth has provided communications support in connection with several successful voting rights cases brought on behalf of voters of color in the Dallas area. She helped direct the Storefront's advocacy on behalf of the famed Jim's Shoe Repair in New York City – helping keep the shop open. The firm was recognized for this work with an Award of Merit for Media Relations in the 2015 Dallas Quill Awards, sponsored by the International Association of Business Communicators (IABC).

She also manages media and community outreach for the Brewer Foundation's educational programs – the Future Leaders Program (FLP) and the International Public Policy Forum (IPPF) debate competition.

Prior to joining the firm in 2012, Ms. Unmuth worked as an education reporter and writer at The Dallas Morning News for six years. While there, Ms. Unmuth wrote extensively about Latino education issues, immigration, school accountability, and technology use in schools. She also wrote about education trends and research for the Latino Ed Beat blog, an initiative of the national Education Writers Association (EWA).

In 2013, she served as an advisor on the PBS Independent Lens documentary "The Graduates/Los Graduados," which explored education issues faced by Latino high school students.

Ms. Unmuth has lectured at a wide range of media and education conferences hosted by organizations including the College Board and EWA. In 2010, Ms. Unmuth was selected to participate in two international media symposiums sponsored by the French-American Foundation. In 2009, she won second prize for large media beat reporting in the EWA National Awards for Education Reporting competition for her work at The Dallas Morning News.

Before moving to Dallas, Ms. Unmuth also worked as a higher education reporter for The Wichita Eagle in Kansas. Ms. Unmuth holds a bachelor's degree in journalism from Northwestern University.

Ms. Unmuth is a board member of the Friends of Santa Fe Trail, a nonprofit organization dedicated to supporting and enhancing the Santa Fe Trail, a 4.3 mile multi-use Dallas trail that connects Downtown Dallas to White Rock Lake. She also previously served as a member of the Northwestern University Magazine Editorial Advisory Board from 2003 to 2019.

## EDUCATION

- B.A. in journalism, Northwestern University, 2003

CONTACT

DALLAS    214.653.4000
NEW YORK    212.489.1400

HOME | STORY | CASES | PEOPLE | EXPERTISE |
ADVOCACY | OUTREACH | JOIN US | NEWS | CONTACT

©2019. All rights reserved. Site Design

DISCLAIMER

*All materials contained on this website are made available by Brewer, Attorneys & Counselors for informational purposes only and should not be construed as legal advice. The transmission and receipt of information contained on this website does not form or constitute an attorney-client relationship. Persons should not act upon information found on this website without first seeking professional legal counsel.*

# EXHIBIT 55

Appendix438



# Crisis Law & Strategy Group

## Introduction

Why Us?

Our firm has built its reputation by carving success from long odds in "bet the company" litigation. We are home to the best dispute resolution lawyers in the world.  From white collar to antitrust to the entire range of financial issues and cross-border disputes, we have lawyers around the globe ready to respond to any challenge.  In high stakes matters, things move very fast, and bad news—and false news—spreads literally in minutes.  Getting a verdict from a judge or jury can take years, but in the court of public opinion, verdicts are rendered almost immediately and can directly affect a company and its leaders—especially the CEO and the GC—long before the first court hearing.

So great lawyering means a lot more these days than just crafting winning legal strategies. Litigation or government scrutiny may be one part of a larger crisis, and the pieces need to be managed together.  That means managing the public trial—or more often the public media circus—so you don't lose your reputation, your business, or your soon-to-be-filed court case before you've even had a chance to see a judge.  It means recognizing all the audiences you must effectively communicate with in order to win the battle: the court and jury, of course; but also the "mainstream" media, the trade press, the bloggers and other "influencers," investor relations in all its forms, your customers, your employees, your competitors, all of whom are making decisions in real time when crisis hits.

At Quinn Emanuel, we know crisis management requires a proactive, multi-disciplined approach and have the experience to fight in every arena.  It requires not only knowing your business and the law but also understanding how the media works, knowing who the opinion-makers are, and sending the right message to the public and to specialized audiences, as well as the courts.  When troubles hit, we hit the ground running.  Our lawyers know how to get to the top fast; to find the third parties you need to support your case; to build a story or kill it. We work across time zones, across the world, 24/7.  When Los Angeles sleeps, Europe wakes up, then New York, Chicago…not to mention Australia and Asia.

When is a crisis really a crisis?  When it threatens your company, your CEO, your business, and your relationships. It can begin as an existential threat or just the hint of trouble.  A lawsuit can be the crisis or an outgrowth of one.  A crisis can be caused by a crazed employee or an act of God, a terrorist strike or a dealer who finds a defect.  It can be a massive cyber breach, a multi-pronged government investigation, a come-from-nowhere complaint against your CEO, a disgruntled former-employee-turned-whistleblower, a phone call from a regulator, or a sick customer halfway around the world, who could be the first of many.

You call it a potential disaster.  We understand - it could be.

You, or those around you, may be panicking.  We call it Tuesday.

We have created a special practice group with attorneys whose bags are always packed and ready to tackle a crisis wherever and whenever.

And we don't just deal in crises after-the-fact.  We can also help you think through pressing corporate issues, mitigate risk and develop effective legal and communications strategies before crises occur.  From the ever more visible range of workforce issues making the headlines—from diversity and sexual harassment to corporate governance, information leaks and the boundaries of free expression—we are ready to bring to bear our broad range of private and public sector experiences to leverage best practices, provide informed strategic counsel, and develop a persuasive communications and outreach strategy that will strengthen your brand and impress important stakeholders.

Who We Are

The Crisis Law & Strategy Group operates both in the United States and around the globe because the needs are  everywhere. With 23 offices worldwide, we will be by your side from beginning to end.  We know what to do, who to call, how to move, what to say, because really, that's what we've been doing for the past two decades.  Now we do it in double time around the world.  We'd like to meet with you and your top leaders so you know what we do and how we can help.

The group is co-chaired by Founder and Managing Partner, John Quinn, who has built the firm in to a global litigation and arbitration powerhouse, in Los Angeles, and Bill Burck in Washington, D.C. (a

veteran Republican and Bush insider). As described below, they are aided by an impressive team of lawyers and former government officials, who bring decades of experience and contacts to bear.

What We Do

"How Fast Can You Get to…"

"Let's see. I just got back from London. We'll be there tomorrow."

As our founder John Quinn says, "We pack our bags and we go." Quinn Emanuel always works as a team. You are our clients, not one particular partner's—everyone and anyone, from John Quinn on, will jump in as needed to offer advice or deliver a message.

The Quinn Emanuel Advantage – Value Added

The Best Motion Practice.

Modern litigation rarely resembles the television shows people watch about lawyers. It's about motion practice, and sophisticated legal argument; winning on summary judgment; winning before trial. While trial lawyers have a reputation of not paying attention to, not being able to, or not caring to produce first rate papers, we think about it very differently. We have won major cases without ever putting on a suit and going to court. When billionaire Ron Perelman sued the man who had provided the financing for him to go into business, Michael Milken, a team led by John Quinn got the case dismissed by winning on the papers in four courts.

Being Able to Try Cases Often Means You Don't Have To.

It sounds like a paradox, but the fact that Quinn Emanuel has been ranked as one of the "Fearsome Foursome" (the firms that General Counsels least like to see against them) gives us more clout at the bargaining table. Our opponents know what we know: that we actually like to try cases. Quinn Emanuel lawyers win 88% of the cases we take to trial and arbitration. But often the best result is the certainty and finality that you can achieve only with a settlement, and the challenge is to get the best possible settlement and, just as in the case of trials, sell it as a major victory. In one case, we did such a good job that the parent company wanted to know why we weren't being even more aggressive; we had to explain that actually, some people might say it was a mixed result at best but

we got to the microphones first.

Being Willing to Bet on Ourselves.

How much will it cost?  We don't pretend to come cheap, but the best never do.  But we believe in ourselves.  We put skin in the game.  We negotiate fixed fees for tasks with incentives for our success.  We like to compete in the big games, and if you want us, we'll find a way to make it work.

An Appellate Specialist Embedded in Every Trial Team.

Just in case.  There is nothing that a jury can do that an appellate court can't undo.  We have one of the most honored and recognized appellate groups in the country, led by former Stanford Law School Dean Kathleen M. Sullivan, a recognized force in the Supreme Court and numerous courts of appeal.

The Crisis Law Team Can Handle Communications.

Often, when we take on a big case, our clients ask us for recommendations for crisis management or public relations firms.  There are many talented people who work in these companies and if you have a PR firm you're happy with, our job is to work with them to ensure that the message to the public and the message to the judge support one another.  But the truth is, much of the time the lawyers end up having to explain the legal issues to the PR people and write the releases so as to be consistent with the legal strategy.  What some of our clients have figured out is that since we're doing the talking anyway, they don't need a six or seven figure PR firm.  Maybe it's better, and safer, to leave it to us.  We have the expertise to run the communications effort internally and efficiently. We can not only do it better, we can do it cheaper. We are your lawyers. You can talk to us with confidence. And when you talk to us about litigation and legal strategy, you are protected by the privilege.

We Help You Get Ahead of the Curve

We don't just manage current crises but help you think strategically about important, longer-term legal, governance and policy issues – so you can proactively reduce legal risk, improve your brand, and retain the trust of your Board, your shareholders and the public.

Keys to Managing and Avoiding Crises

Keep It as Small as You Can.

The first goal in a crisis is to contain it—ideally, to prevent it altogether. You know your product may have a defect.  Call us.  You think the Government may be investigating you.  Don't wait.  Your competitors are on the firing line.  Who is next?  A crisis is a lot like pain: if it gets too far ahead of you, it's hard to catch up.  Do a risk assessment. We'll do it with you.  In this climate, always assume someone is looking.  Why do CEOs come and go so fast?  Or perhaps, why don't they go even faster, considering the enormous pressures?  Even if you face litigation—or especially when you face litigation—our goal is to limit its scope and nature, cabin the consequences and potential damages to make sure that nothing you do now contributes to punitive damages later.  Whatever is coming, let us address it.

Get the Facts.

Not every crisis is real.  Rumors are regularly reported as news.  The first step in a potential crisis is to collect as many facts as you can as fast as you can.  Given the speed with which news—good and bad, true and not-so-true, unfortunately—spreads, you can't afford to be silent for very long.  It often takes time to collect all the facts, and you need a message before you can conduct a full investigation.  Often the message is just that: "No one is more troubled by what we are hearing than the hardworking men and women of this company, from the CEO to the temporary employee.  We will get to the bottom of this.  If there is wrongdoing, we will find it.  If there are amends that must be made, we will make them…"

Remember Your Audiences.

Not just the reporters who call you, but all the people who need to hear it from the company or its lawyer first—directors, customers, suppliers, bankers.  No news during a crisis is bad news, so we're ready to reach out on a variety of fronts—bloggers, opinion leaders, the academics who are going to tell the reporters that you're right. We work with senior government officials in the United States and around the world. We cover both sides of the aisle in Washington with relationships extending back decades based on friendship and mutual respect. We don't wander the halls of Capitol Hill with a different issue every day.  We represent you.  We resolve your dispute.

Counter Lies.

If you're being smeared, have your lawyer say it and have others back it up.  Silence is not golden.  An unanswered charge is assumed to be true.  Having no comment may make it true.  Being unavailable for comment means you are intentionally avoiding the reporters, which is almost always a bad and utterly ridiculous idea if what they are reporting is not true.  If you can't deny each specific allegation, then deny the conclusion. "That is not the man I know."  The days when lawyers

could avoid speaking to anyone but the judge and jury are gone, at least in big cases.

Define Your Message.

Every dispute has a story to be told—to the press, to the opinion makers, to the prosecutors, to the court and to the jury.  The story has to be told in the right way at the right time.  We have built our reputation as a firm that is willing to be aggressive when needed, willing to put ourselves on the line when needed, willing to stand by you when others are heading for the hills.  We have longstanding contacts in the major news and social media organizations.  We know who to call and what to say. We know the importance of being credible.

Accepting Responsibility is Not the Same as Accepting Liability.

When you're in charge and something goes wrong, you're either part of the problem or part of the solution.  We've heard many executives say,  "But it wasn't my fault.  Someone should have told me." This is all very important for the court case, in which duties and responsibilities will be individually defined, but not when you've got a frightened public or an angry Senator.   Crises demand leadership. Sometimes, there are things you can't admit, and we all have examples.  But the best approach to the problem is not always going to be the one we should take in court.  Don't lowball damages—going up every day is worse than saying, "We don't know the number, but we do know this—we will fix the problem."  Bring in the best technicians in the world, compensate the injured, rebuild what was destroyed.  These are not legally binding commitments that you are liable for x dollars in damages.  Showing compassion and leadership, getting to the bottom of matters, and committing to solve a problem whoever created it turns down the heat.  Do the opposite of what is being done to turn the heat up.  The rivers are full of snakes.

Don't Be Defensive.

That may be the table we will be sitting at, but being defensive will make you sound guilty.  The best companies—with the best workers and the best technology—are still run by humans, who are capable of errors and vulnerable to the acts of hoodlums, disasters of mother nature, and risks of the real world.  Every company, every CEO  has problems.  If you've got critical directors on your board, they generally don't go away by ignoring them, and the same goes for angry customers and bottom-feeding lawyers.  Define the problem.  Outline your strategy.  Be as transparent as you can be.  Get as much news out (especially bad news) on the same day as you can.  Remember, the public has the attention span of a gnat, and today's paper still does wrap some of tomorrow's fish. Having a strategy, hanging in, hanging tough, doing your politics, eating humble pie when needed followed by dessert, will make a better meal.  And nine times out of ten, the cover-up—if you go that way—will cause you more problems than whatever you're trying to hide.

Finally, remember, Congress (and similar bodies) are courts of public opinion, not courts of law.

Be Proactive and Think Long-Term

As author Steven Covey says, "begin with the end in mind."  That means figuring out the end-game from the very beginning: what your goals and objectives are, who your audience is, what benchmarks will help define success and provide opportunities for expansion, and where the obstacles and landmines lie that must be avoided or overcome.   As your strategic and communications advisers, we will help augment your strengths and identify and help sure up any potential legal risks and liabilities.  We will anticipate issues conduct internal reviews, and work with you to develop effective strategies to tackle some of your most perplexing and illusive challenges.  Our goal is to not only get you out ahead of the curve but to be the curve, the standard by which all your peers will be judged.

## Recent Representations

- California utilities face increasing and potentially crippling litigation exposure from wildfires.  In a major appellate victory for PG&E in the California Court of Appeal for the Third District, Quinn Emanuel greatly limited that exposure by eliminating the threat of punitive damages against PG&E for the 2015 Butte Fire.  The court held that, in light of PG&E's extensive vegetation management program along its 135,000 miles of powerlines, PG&E could not possibly be found to have consciously disregarded the risk of tree-related wildfires, as would be required to award punitive damages.  In addition to saving PG&E from potentially billions of dollars in punitive damages, the decision creates important new California law protecting companies that institute risk management programs from the threat of punitive damages in the future.

- When Fédération Internationale de Football Association ("FIFA") was rocked by allegations of "rampant, systemic, and deep-rooted" bribery and corruption, we had a team on the ground in Switzerland within hours, advising the international soccer's governing body in the midst of a raid on its headquarters and the arrests of numerous senior soccer officials.  Since then, the firm has helped guide FIFA through the crisis—conducting an internal investigation into allegations of wrongdoing, advising on media strategy, helping pass wide-ranging reforms to resolve the problems of the past, and cooperating with government authorities on FIFA's behalf. As a result of our efforts, FIFA has secured victim status in the global investigations and is actively pursuing restitution for the losses it suffered at the hands of corrupt officials.

- Facing high-profile allegations of sexual harassment, the late Fox News Chairman and CEO, Roger Ailes turned to the firm.  The allegations captured the media's attention and case developments became instant breaking news.  In this intense media spotlight, our team quickly

devised a strategy to navigate the legal and PR landscape.  With one of the world's leading media experts deciding to rely on us to handle all aspects of communication, we negotiated a fair agreement within days and have worked cooperatively with Twenty First Century Fox to address all pending matters, handling all communications as well as litigation and arbitration.

- We have successfully defended Fortune 100 companies facing government investigations. Through  an aggressive, carefully orchestrated strategy,  they helped one company obtain a favorable settlement in a statewide investigation conducted by the Attorney General and District Attorneys' offices regarding the company's statewide hazardous waste and materials practices. In another, their persuasive oral and written presentations to the government, including a White Paper characterized by the General Counsel as "the best he's ever seen," deterred further governmental action.  Their nuanced approach to resolving government disputes prevents or minimizes disruption to a company and its corporate image.

- In 2010, the BP Deepwater Horizon drilling unit exploded in the Gulf of Mexico, killing eleven crewmen and causing the worst oil spill in U.S. history.  When the government's attention turned to BP engineer Bob Kaluza, the company's "well site leader" who was on the rig that day, he turned to the firm.  With co-counsel, our team guided Kaluza through Coast Guard hearings, civil lawsuits, government commissions, media crises and ultimately a criminal trial accusing him of manslaughter and oil pollution, in which he was vindicated on every single charge, including a trial in 2016 on the final count of pollution, where the jury unanimously acquitted.

- We represent the Rosenthal family, one of the wealthiest and most prominent families in Central America, in connection with high-profile criminal prosecutions of several family members, and OFAC investigations targeting family owned companies alleging that family members and companies laundered funds for some of the largest narcotics traffickers in Latin America.  Days after OFAC sanctions were imposed—threatening the survival of the entire group—we deployed a team that led a corporation reorganization of approximately 30 companies worth in excess of $1 billion and engaged with partners, customers and vendors of the companies to preserve commercial relationships, restore confidence and ensure the survival of the group.  As a result of our efforts, the three most valuable assets of the family continue successfully operating.

- Construction giant Odebrecht turned to the firm for help after its president was arrested and accused of paying millions of dollars in bribes to senior officials in Brazil's state-owned oil company, Petrobras, as part of the massive Lava Jato corruption scandal.  Facing investigations in multiple jurisdictions and the prospect of crushing penalties that could put the company out of business, we achieved a historic global settlement in just a matter of months, resolving allegations of corruption in a dozen countries.  The global settlement was notable for

introducing the concept of measuring a company's monetary penalty in the FCPA context by its financial condition and ability to pay.

- We represented Martín Díaz-Álvarez, one of the most prominent bankers in Mexico, in connection with parallel DOJ and SEC investigations and Mexican criminal investigations into the collapse of Oceanografía S.A. de C.V. ("Oceanografía"), the largest fraud in the history of Latin America. The Mexican government blamed Mr. Diaz for the collapse of Oceanografía, indicted him for fraud and sought his extradition from the United States, publicly claiming he was Mexico's most wanted fugitive.  We successfully extricated Mr. Diaz from the DOJ and SEC investigations, defeated the extradition proceedings and with Mexican counsel dismissed the Mexican charges.

- Following a whistleblower complaint and resulting in missed SEC filings, an Audit Committee investigation, and the resignation of its auditor, a California-based technology company in crisis turned to the firm.  We immediately had a team on the ground to diffuse the crisis and guide the Company through the investigation.  Key in the process was effectively managing all concerned constituencies.  Our substantial experience in representing companies has provided us with the expertise to handle both the myriad issues that inevitably arise and the competing interests at play, including often times a divergence between boards of directors and management.

- In 2016, the firm was retained by a U.S. based broker-dealer to advise with respect to a raid on their Manila offices by the Philippine's National Bureau of Investigation. The raid resulted in the arrest of more than 30 employees, including a U.S. executive visiting the office, based on allegations that the employees were operating a "boiler room" out of the Philippines.  Our attorneys worked across multiple time zones to coordinate the efforts of the company, to work to get all employees released from confinement and to conduct a factual investigation to determine whether there was any basis to the allegations in the NBI's complaint.  Charges were dropped against all employees.

- Overnight, an M&A transaction involving the Swiss specialty chemicals company Sika and the French construction conglomerate Saint-Gobain turned into what The Economist dubbed "Europe's nastiest takeover battle."  The firm was brought in by the family shareholder of Sika who was faced with an unprecedented opposition by the company's board of directors when it sought to sell its stake in the company. We helped set up a team of strategic, legal and media advisors to lead the family through the various lawsuits, PR and management issues and the preparations for the shareholders' meeting.

- Our offices in Australia have successfully represented and advised numerous companies, boards and prominent directors and officers facing corporate crises.  Michael and Michelle

currently represent Infigen Energy, the largest owner of wind farms in Australia, in relation to a recent bushfire on its property which resulted in significant damage to surrounding properties and attracted scrutiny from the press and the government.  This created an immediate crisis through the organization that required urgent advice, assistance and management across a range of disciplines. Following the fallout from the incident, we are now advising Infigen in relation to the potential Coronial Inquiry into the bushfire, as well as a parallel class action launched by affected landowners.

# EXHIBIT 56



# Crisis Management

Litigation > Crisis Management

When faced with a major crisis, businesses, organizations and individuals need lawyers with the judgment, skills, relationships and experience to provide an integrated approach to resolving the crisis. That means lawyers who can develop a strategy that addresses all aspects of the matter—the legal issues; congressional, regulatory and inspector general investigations; civil litigation; media and investor scrutiny; and the long-term business or career implications.

Our crisis management practice includes lawyers and advisors with significant hands-on experience solving complex problems in high-profile settings. These attorneys have the litigation, public policy and communications skills to manage the crisis on multiple fronts. Our lawyers draw on their knowledge and experience in conducting internal investigations, responding to government regulators and congressional investigations, preparing witnesses to testify in Congress, managing litigation, working with the media, designing compliance and Environmental, Social and Governance (ESG) programs, and formulating public policy. Our focus is on solving the immediate crisis, working with the client to correct the problem, and furthering the client's long-term objectives in an integrated and efficient way that minimizes future financial, legal and reputational harm.

Lawyers in this group have served in senior positions across the government, including in the White House, Congress, U.S. Attorneys' offices around the country, the Department of Justice (DOJ), the Department of State, the Securities and Exchange Commission (SEC), the Federal Communications Commission and the New York City Police Department. Together they utilize their collective knowledge and experience, as well as firmwide resources, including the firm's nationally recognized practices in white-collar defense, global investigations and compliance, congressional investigations, reputational recovery,

commercial litigation, cybersecurity, privacy and data protection and public law and policy. To further supplement our capabilities, our team also has established relationships with skilled public relations and communications practitioners and regularly partners with these professionals to guide and manage the implementation of media strategy.

Our crisis management lawyers have represented public companies, professional services firms, current and former government officials, C-suite executives, universities, and domestic and foreign governmental entities in high-stakes matters involving financial services, securities fraud, public corruption, campaign finance violations, reputation management, the Affordable Care Act, professional misconduct, disaster relief and cybersecurity.

To learn about some of the significant representations handled by members of our team, click here.

## Litigation

SUBPRACTICES

- Administrative and Regulatory Litigation
- Antitrust Litigation
- Bankruptcy Litigation
- Class Actions
- Complex Commercial Litigation
- Construction Litigation
- Consumer Class Actions
- Crisis Management
- Cybersecurity, Privacy and Data Protection
- EB-5 Business Services
- Energy Litigation
- Fair Credit Reporting Act

# EXHIBIT 57

Appendix452

VIRGINIA:

## IN THE CIRCUIT COURT FOR THE CITY OF ALEXANDRIA

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. CL19001757 |
| | ) | |
| ACKERMAN MCQUEEN, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MERCURY GROUP, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## ANSWER, PLEA IN BAR, AND COUNTERCLAIM

The Defendants, Ackerman McQueen, Inc. and Mercury Group, Inc. (collectively

"AMc"), by and through the undersigned counsel, submit their Answer, Plea in Bar, and

Counterclaim to the Amended Complaint filed by Plaintiff National Rifle Association ("NRA")

in the above-captioned case, as follows: [1]

---

[1]     AMc is subject to a confidentiality obligation in the Services Agreement (**Exhibit A**) between the NRA and AMc that is vague and overbroad.  It purports to prohibit AMc from disclosing any "materials or information coming to the knowledge of AMc, supplied to AMc by NRA, or otherwise made known to AMc as a result of AMc's providing Services (hereinafter collectively referred to as the "Confidential Information"), without the prior express written permission of NRA."  Thus, the Services Agreement definition of "Confidential Information" includes routine public and non-public information that comes to the attention of AMc while working on NRA matters. The Services Agreement also states "AMc may use such Confidential Information only for the limited purpose of providing Services to NRA." [Section IV. CONFIDENTIALITY, A(1) and A(3).]  Because the definition of "Confidential Information" is overbroad and vague, any AMc disclosure necessary to its defense in this law suit could be construed as a breach of the Services Agreement.

-footnote continued on next page-

1

Appendix453

## RESPONSE TO SPECIFIC ALLEGATIONS OF AMENDED COMPLAINT

With respect to the specific allegations in the Amended Complaint, Defendants provide the following responses:

### A. RESPONSE TO PRELIMINARY STATEMENT

Defendants move to strike the Plaintiff's Preliminary Statement as a violation of the rules of pleading. Va. Sup. Ct. Rule 1.4(d) does not allow pleading in narrative form without numbered paragraphs. To the extent any response is required, the allegations set forth in the Preliminary Statement are generally denied.

Specifically, Defendants deny Plaintiff's unnumbered allegation that Defendants have denied access to any information that the NRA is entitled to under the Services Agreement. Defendants deny that it has only "partially complied" with NRA requests and specifically denies that it has "withheld material information about the related party contract with NRA's now former President, Lieutenant Colonel Oliver North (Ret.)."

Defendants admit that the Service Agreement requires the NRA to provide "reasonable notice," before examining "files, books and records" of the Defendants that "pertain to matters

---

Therefore, AMc and Mercury are responding to the allegations of the NRA with great caution and have redacted from public disclosure any information that could be deemed confidential and will seek to file an unredacted version of the pleading under seal with the Court.

At the same time, the Defendants throughout this pleading request an expedited reply from the Plaintiff, pursuant to Va. Sup. Ct. Rule 3.11, with respect to certain allegations in the Amended Complaint as to whether NRA's introduction of those allegations in a public court filing waives NRA's confidentiality interest in those matters.

The Court should also consider ordering NRA to review the non-disclosed information, and on a paragraph by paragraph basis, permit disclosure or assert why it will be harmed by disclosure.

Appendix454

covered by the parties' contract." Defendants deny that the NRA has followed proper procedures to seek such materials and deny that the NRA has complied with the Examination of Records provision in the Services Agreement, and also deny that the NRA has properly interpreted the scope of its authority to review documents possessed by the Defendants.

Defendants deny the allegation that the "impasse between them which gives rise to this lawsuit is simple, and baffling; the NRA requested access to material, readily available records that Ackerman and Mercury are contractually obligated to provide. Defendants refused to provide them."

Defendants aver as a new matter, specifically requiring a response, that Defendants have complied with every audit request sought by the NRA during the past 38 years and that the most recent audit was completed by the NRA auditor in February 2019 with a determination that Defendants are in compliance and that Defendants do not need to return any funds to the NRA, the same result that has been reached in every other audit over the history of the relationship between the parties.

Defendants aver as a new matter, specifically requiring a response, that ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

Defendants aver as a new matter, specifically requiring a response, that ██████████

████████████████████████████████████████████████████████

3



Further, Defendants aver as a new matter, specifically requiring a response, that the

NRA's public disclosure of the allegations in its Preliminary Statement waives any claim of

confidentiality that the Plaintiff may have with respect to the subject matter alleged in the

Preliminary Statement.

### B. DEFENDANTS' RESPONSE TO PLAINTIFF'S NUMBERED ALLEGATIONS.

#### PARTIES

1.    Plaintiff NRA is a not-for-profit corporation organized under the laws of the State of New York with its principal place of business in Fairfax, Virginia. The NRA is America's leading provider of gun-safety and marksmanship education for civilians and law enforcement. It is also the foremost defender of the Second Amendment of the United States Constitution. A 501(c)(4) tax-exempt organization, the NRA has over five million members – and its programs reach many millions more.

**ANSWER**:    Defendants admit the allegations contained in Paragraph 1.

2.    Defendant Ackerman is a nonresident for-profit business corporation organized under the laws of the State of Oklahoma with its principal place of business in Oklahoma City, Oklahoma. Ackerman is an advertising and public relations agency that has counted the NRA among its largest clients for more than thirty years.

**ANSWER**:    Defendants admit that Ackerman is a nonresident for-profit business

corporation organized under the laws of the State of Oklahoma with its principal place of

business in Oklahoma City, Oklahoma and that it is an advertising and public relations agency

and that it has served the interests of the NRA for more than thirty years.

3.    Defendant Mercury is a nonresident for-profit business corporation organized under the laws of the State of Oklahoma with its principal place of business in Alexandria, Virginia. Mercury is a wholly owned subsidiary of Ackerman which specializes in public-communications strategy, including on behalf of advocacy groups such as the NRA. At all

4

relevant times, Ackerman has acted on behalf of both itself and Mercury pursuant to the Services Agreement (defined below) between Ackerman and the NRA.

**ANSWER**:   Defendants admit that Mercury is a nonresident for-profit business

corporation organized under the laws of the State of Oklahoma with its principal place of

business in Alexandria, Virginia, and that it is a wholly owned subsidiary of Ackerman.

Defendants admit that Mercury specializes in public communications strategy and has worked on

behalf of advocacy groups such as the NRA.  Defendants deny the allegations that Ackerman has

acted on behalf of both itself and Mercury at all relevant times and demand strict proof thereof.

Furthermore, Defendants *crave oyer* to mandate the disclosure to the Court of the contract

referenced and relied upon by Plaintiff in Paragraph 3.

## RELEVANT NONPARTIES

4.    The NRA Foundation, Inc. (the "NRA Foundation") is a 501(c)(3) tax-exempt organization that raises tax-deductible contributions in support of a wide range of firearm-related public interest activities of the NRA and other organizations that defend and foster the Second Amendment rights of law-abiding Americans. Over the course of its contractual relationship with the NRA, Ackerman has occasionally performed services for the benefit of the NRA Foundation and issued corresponding invoices to the NRA Foundation. Because of its 501(c)(3) designation, the NRA Foundation is permitted to engage in, and fund, a narrower range of activities and communications than the NRA.

**ANSWER**:   Defendants admit that it has occasionally performed services for the

benefit of the NRA Foundation. Defendants have insufficient information to admit or deny the

allegations concerning the NRA Foundation's activities or those of "other" organizations.  The

allegations regarding the NRA Foundation's 501(c)(3) status and its permitted range of activities

are legal conclusions which do not require a response.

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 4 waives any claim of confidentiality that the Plaintiff

has with respect to the matters alleged in that Paragraph.

5

## JURISDICTION AND VENUE

5.     The Court has jurisdiction over the NRA's claims in this matter as the claims are subject to a court of general jurisdiction.

**ANSWER**:     The allegations of Paragraph 5 are legal conclusions which do not require a response.

6.     This Court has jurisdiction over Ackerman and Mercury pursuant to Virginia Code § 8.01-328.1 because Ackerman and Mercury have both transacted business in the Commonwealth of Virginia and contracted to supply services in the Commonwealth of Virginia.

**ANSWER**:     The allegations of Paragraph 6 are legal conclusions which do not require a response.

7.     Venue is proper in this Court pursuant to Virginia Code § 8.01-262 because Mercury's principal place of business is located in Alexandria, there exists a practical nexus to this forum, and/or a part of this cause of action arose in Alexandria.

**ANSWER**:     The allegations of Paragraph 7 are legal conclusions which do not require a response.

8.     Additionally, jurisdiction and venue are proper in this Court because Ackerman and Mercury have both contractually consented with the NRA to exclusive jurisdiction and venue of courts sitting within Virginia and waived any objection to venue in Alexandria, Virginia regarding the matters presented herein.

**ANSWER:**     The allegations of Paragraph 8 are legal conclusions which do not require a response.  Furthermore, Defendants *crave oyer* to mandate the disclosure to the Court of the contract referenced and relied upon by Plaintiff in Paragraph 8.

Defendants aver as a new matter, specifically requiring a response, that the public disclosure of the allegations in Paragraph 8 waives any claim of confidentiality that the Plaintiff has with respect to the matters alleged in that Paragraph.

## FACTUAL BACKGROUND

9.     For decades, AMc and the NRA have collaborated closely regarding public affairs and messaging. Over that time, the NRA vested extensive trust and confidence in AMc, relying

6

upon the agency to perform work including: public relations and strategic marketing; planning and placement of media, including advertising during election cycles; management of digital media and websites; and, the operation of NRATV, a digital-media platform managed by AMc but frequently perceived by the public as the "voice" of the NRA [footnote omitted].

 **ANSWER**: Defendants admit the allegations contained in Paragraph 9, except they

lack knowledge as to the level of trust and confidence that was actually vested in AMc.

 Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 9 waives any claim of confidentiality that the Plaintiff

has with respect to the matters alleged in that Paragraph.

 10. Since at least 1999, AMc's work on behalf of the NRA has been governed by successive incarnations of a Service Agreement containing detailed specifications for how various types of work performed by AMc for the NRA should be budgeted and billed. The Services Agreement between the NRA and AMc dated May 1, 1999 (the "Previous Services Agreement") as well as the current, operative Services Agreement dated April 30, 2017 (as amended May 6, 2018, the "Services Agreement") provide that certain categories of services, such as Owned Media and Internet Services, as compensated with an agreed annual fee, while others are required to be invoiced on an *ad hoc* basis based on estimates furnished by AMc and approved by the NRA.

 **ANSWER**: Defendants admit that Service Agreements have existed between the

parties. Defendants deny the remaining allegations in Paragraph 10. Furthermore, Defendants

*crave oyer* to mandate the disclosure to the Court of the contract referenced and relied upon by

Plaintiff in Paragraph 10.

 Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 10 waives any claim of confidentiality that the Plaintiff

has with respect to the matters alleged in that Paragraph.

 11. Both the Previous Services Agreement and the current Services Agreement have obligated AMc to adjust its pricing based on the "fair market value" or "fair market price" of the services performed. For example, the Previous Services Agreement contained the straightforward assurance by AMc, "we will charge you a fair market price for the work performed." Similarly, the Previous Services Agreement and the current Services Agreement require AMc to provide

Appendix459

cost quotations for art concepts, design layouts, and similar items "based on the fair market price of the work as determined by AM[C]."

**ANSWER**:   Defendants admit that Service Agreements have existed between the

parties. Defendants further admit that pricing was based on fair market value as determined by

AMc. Defendants are without sufficient information to admit or deny the remaining allegations

in Paragraph 11.

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 11 waives any claim of confidentiality that the Plaintiff

has with respect to the matters alleged in that Paragraph.

12.      Anticipating that AMc would, from time to time, incur out-of-pocket expenses in the course of its work, but mindful of the NRA's mandate to steward its funds in the interest of its public mission, the parties bargained for an expense-reimbursement protocol whereby travel and related expenses incurred by AMc could be paid by the NRA – but only upon prior written approval from the NRA in accordance with the NRA's expense-reimbursement procedures.

**ANSWER**:   Defendants deny the allegations contained in Paragraph 12.

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 12 waives any claim of confidentiality that the Plaintiff

has with respect to the matters alleged in that Paragraph.

13.      The NRA's collaboration with AMc has generated important, iconic Second Amendment advocacy. In recent years, the trust and confidence it placed in AMc led the NRA to invest in an expanding suite of services which were – according to AMc's assurances – fairly priced. For example, the NRA agreed to experiment with an "owned media company," NRATV, a concept fervently pitched by AMc. By 2017, the NRA's aggregate payments to Ackerman and Mercury totaled nearly $40 million annually.

**ANSWER**:   Defendants admit the allegations contained in the first sentence of

Paragraph 13. Defendants deny the remaining allegations in Paragraph 13.

8

Defendants aver as a new matter, specifically requiring a response, that the "NRA's

aggregate payments to Ackerman" includes a substantial amount of reimbursements to AMc for

expenses incurred on behalf of the NRA.

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 13 waives any claim of confidentiality that the Plaintiff

has with respect to the matters alleged in that Paragraph.

14.     As the scope of AMc's work for the NRA grew, AMc represented to the NRA
that it was required to hire a substantial number of personnel, as well as incur obligations to
third-party contractors, for the exclusive purpose of servicing the NRA's account. Accordingly,
when the parties renegotiated a new services agreement in 2017, AMc insisted upon – and the
NRA agreed to provide – certain financial assurances in the event that the NRA terminated the
Services Agreement. Among other things, upon the NRA's termination, the Services Agreement
requires that the NRA compensate AMc for outstanding liabilities to both third-party contractors
and employees. Specifically, the NRA must: (i) pay AMc the balance of any compensation owed
under "non-cancellable contracts entered into between AM[C] and third parties for the benefit of
the NRA" (as defined under the Services Agreement, the "AMc-Third Party NRA Contracts");
and (ii) pay AMc a termination fee to cover severance payments owed to AMc employees who
are "dedicat[ed]…to provide services [to the NRA]" and need to be laid off if the Services
Agreement is terminated (the "NRA-Dedicated Personnel").

**ANSWER**:     Defendants generally admit the allegations contained in Paragraph 14,

except they deny the characterization of the negotiations contained in the second sentence of

Paragraph 14.  To the extent that the allegations purport to interpret a legal document, the

Defendants deny the interpretation and assert that the legal document best speaks for itself.

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 14 waives any claim of confidentiality that the Plaintiff

has with respect to the matters alleged in that Paragraph.

15.     The NRA bargained for transparency into AMc's files, books and records to
ensure that the NRA, a not-for-profit, could appropriately monitor the use of its funds. Both the
Previous Services Agreement and the current Services Agreement incorporate records-
examination clauses that require AMc to open its files for the NRA's inspection upon reasonable
notice. The full text of the Records-Examination Clause in the Services Agreement appears
below:

9

> **Services Agreement**
> - **Dated April 30, 2017 (as amended May 6, 2018)**
> - **Between the NRA and "AMc" (defined to include both Ackerman and Mercury)**
>
> **VIII.  EXAMINATION OF RECORDS**
>
> During the term of this Services Agreement, AMc authorizes NRA, upon reasonable notice, to examine AMc and Mercury's files, books and records, with respect to matters covered under this Services Agreement.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 15 of the

Complaint.

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 15 waives any claim of confidentiality that the Plaintiff

has with respect to the matters alleged in that Paragraph.

16.    For years, the NRA conducted annual audits of certain AMc files pursuant to the Records-Examination Clause. Frequently, the audited records consisted of "samples" assembled in advance by AMc. During 2018, the NRA sought to expand its insight into AMc's activities and its spending – including full access to certain categories of records rather than sample subsets gathered by AMc. Surprisingly and unfortunately, that effort ignited the parties' current dispute.

**ANSWER:**    Defendants admit the allegation contained in the first sentence of

Paragraph 16 in that the NRA conducted annual audits of AMc files and those files were

provided to the NRA by AMc.  Defendants deny the remaining allegations contained in

Paragraph 16.

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 16 waives any claim of confidentiality that the Plaintiff

has with respect to the matters alleged in that Paragraph.

17.    In recent years, the State of New York amended its Not-for-Profit Corporation Law (the "NPCL") to clarify requirements for director independence and the ratification of related-party contracts, among other items. After updating its internal policies and controls to comply with the New York amendments, the NRA decided to strengthen its procedures for documentation and verification of compliance with vendor contracts. Beginning in August 2018, the NRA sent letters to hundreds of vendors – including AMc – that set forth updated invoice-

10

support requirements and provided detailed guidance regarding, for example, expense reimbursement procedures.

**ANSWER**:   Defendants are without sufficient information to admit or deny the

allegations contained in Paragraph 17 and therefore deny those allegations.

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 17 waives any claim of confidentiality that the Plaintiff

has with respect to the matters alleged in that Paragraph.

18.   During the course of this process, the NRA developed concerns that AMc's expenses and activities required closer oversight. Specific concerns that the NRA sought to investigate included:

• "Out of pocket" expenses that lacked meaningful documentation of NRA approvals, receipts, or other support, despite the requirements set forth in the Services Agreement;

• Lack of transparency regarding AMc's annual budgets under the Services Agreement, as well as its adherence to those budgets;

• Lack of transparency regarding "fair market value" determinations;

• Concerns that AMc was invoicing the NRA for the entire salaries attributable to NRA-Dedicated Personnel, despite certain NRA-Dedicated Personnel allocating substantial time to non-NRA clients;

• Refusal to provide any data "in writing" (such as viewership numbers, clickthrough rates, or related performance metrics) that enable the NRA analyze [sic] the return on its investment in NRATV [footnote: In addition, certain NRA stakeholders were also concerned that NRATV's messaging – on topics far afield of the Second Amendment – deviated from the NRA's core mission and values.].

**ANSWER**:   Defendants are without sufficient information to admit or deny the

allegations contained in Paragraph 18 and therefore deny those allegations.  Defendants deny the

allegations contained in the fifth bullet point.

11

Appendix463

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 18 waives any claim of confidentiality that the Plaintiff

has with respect to the matters alleged in that Paragraph.

19.     During early- and mid-2018, the NRA sought information from AMc pursuant to the Records-Examination Clause on a common-interest basis to advance the parties' mutual interests in connection with an ongoing lawsuit. However, after the NRA began to request access to records that would shed light on the above topics, AMc's responses became evasive and hostile. In fact, in September 2018, for the first time in the parties' decades-long course of dealing, AMc demanded that its outside counsel supervise any document review conducted under the Records-Examination Clause, then demanded payment of outside counsel's legal fees as a precondition for delivery of video footage for which AMc had already invoiced the NRA. During a telephone call on September 19, 2018, after AMc's counsel insisted that the NRA pay AMc's legal fees without any insight into why the fees had been incurred, the NRA's counsel observed that AMc's posture seemed more consistent with an adverse party than a common-interest relationship. AMc's counsel replied: "Ackerman views the relationship as adverse."

**ANSWER:**   Defendants deny the allegations contained in Paragraph 19.

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 19 waives any claim of confidentiality that the Plaintiff

has with respect to the matters alleged in that Paragraph.

20.     Thereafter, AMc strenuously resisted the NRA's efforts to enforce the Services Agreement, including by embarking on a campaign to "kill the messenger" when the NRA sought access to documents or proposed reductions in AMc's budget. At first, AMc scapegoated the NRA's outside counsel. However, over ensuing months, AMc also refused to respond to basic information requests from NRA executives. After the NRA retained a third-party forensic accounting firm to interface with AMc in an effort to appease AMc and gain its compliance in January 2019, AMc indicated it would cooperate. Unfortunately, that pledge of cooperation was short-lived as AMc purported to forbid the accountants from disclosing simple, material information to the NRA – including copies of annual budgets that the NRA allegedly approved. When the NRA's General Counsel sought additional information in follow-up to the forensic audit, AMc ignored his letters.

**ANSWER**:   Defendants deny the allegations contained in Paragraph 20.

Defendants aver as a new matter, specifically requiring a response, that AMc provided

NRA auditors with access to all matters requested by the auditors during the various audits of

AMc.

Appendix464

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 20 waives any claim of confidentiality that the Plaintiff

has with respect to the matters alleged in that Paragraph.

21.     The NRA brings this action not only because AMc has flagrantly disregarded its
contractual obligations, but because the NRA has recently grown concerned that the records
AMc is withholding include information material to the NRA's not-for-profit governance and its
stewardship of its members' donations.

**ANSWER**:     Defendants deny the allegations contained in Paragraph 21.

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 21 waives any claim of confidentiality that the Plaintiff

has with respect to the matters alleged in that Paragraph.

22.     Lieutenant Colonel Oliver North (Ret.) ("Col. North") is a veteran of the United
States Marine Corps and the Regan administration, a longstanding advocate for the Second
Amendment, and a member of the NRA Board of Directors. During May 2018, the NRA
announced that Col North was slated to serve as its next President – a largely ceremonial but
high-profile position famously occupied by Charlton Heston during the late 1990s. As Col. North
prepared to assume the presidency of the NRA, he separately discussed a potential engagement
by AMc as the host of an NRATV documentary series. On May 6, 2018, the NRA and AMc
amended the Services Agreement (such amendment, the "May 2018 Amendment") to affirm that
any contract between AMc and Col. North would be considered an AMc-Third Party NRA
Contract, for which outstanding compensation would be owed by the NRA to AMc if the
Services Agreement was terminated. Importantly, the amendment treated Col. North as a third-
party contractor – but not, necessarily, an employee – of AMc. Importantly, Col. North and AMc
assured the NRA that Col North's profile and "brand" would be actively leveraged to elicit
sponsorships for the North documentary series. This was of vital interest because during recent
years, the NRA had spent substantial sums on NRATV based on AMc's advice and
representations regarding achievable benefits of an owned-media platform. However, measured
against any of the desired outcomes, the returns on the NRA's investment in NRATV were less
favorable than AMc predicted. Accordingly, the NRA began to reconsider its willingness to
continue its investment in NRATV. If the North documentary series attracted sponsorships, then
the costs associated with NRATV could be defrayed, altering the NRA's calculus about whether
to continue supporting the platform.

**ANSWER:** Defendants admit the allegations contained in the first sentence of Paragraph

22. Defendants admit the allegations that Colonel North was President of the NRA.  The

13

allegation in the fourth sentence of Paragraph 22 purports to interpret a legal document which

best speaks for itself. Defendants deny the remaining allegations contained in Paragraph 22.

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 22 waives any claim of confidentiality that the Plaintiff

has with respect to the matters alleged in that Paragraph.

23.      New York law requires that the NRA Board of Directors, or an authorized
committee thereof, review and approve "any transaction, agreement, or any other arrangement in
which [a director or officer of the NRA] has a financial interest and in which the [NRA or an
affiliate] if a participant." [footnote omitted]  Guidance published by the New York Attorney
General notes that a board of directors may define additional restrictions on transactions giving
rise to potential conflicts of interest [footnote omitted]; and, consistent with best practices, the
NRA's Conflict of Interest Policy requires disclosure of contracts between NRA leadership and
vendors, like AMc, that receive funds from the NRA.

**ANSWER**:     Defendants are without sufficient information to admit or deny the

allegations relating to the NRA's Conflict of Interest Policy and therefore deny those

allegations. The balance of Paragraph 23 contains legal conclusions which require no response.

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 23 waives any claim of confidentiality that the Plaintiff

has with respect to the matters alleged in that Paragraph.

24.      Aware that Col. North entered into a contract with AMc (the "North Contract"),
the NRA diligently sought to comply with its obligations concerning analysis and approval of the
North Contract. During September 2018, the Audit Committee of the NRA Board of Directors
(the "Audit Committee") reviewed a purported summary of the material terms of the North
Contract and ratified the relationship pursuant to New York law – subject to carefully drawn
provisos designed to avoid any conflicts of interest.

**ANSWER**:     Defendants admit that Colonel North entered into a contract with AMc

and that the NRA Audit Committee reviewed, approved, and ratified that contract. Defendants

are without sufficient information to admit or deny the remaining allegations in Paragraph 24 and

therefore deny those allegations.

14

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 24 waives any claim of confidentiality that the Plaintiff

has with respect to the matters alleged in that Paragraph.

25.     At the time it ratified Col. North's continued service as an NRA director and
President given his relationship with AMc, the Audit Committee was assured that the NRA's
counsel would review the North Contract in full. But that turned out to be false, at least for the
duration of 2018, as AMc continued to refuse to provide the North Contract pursuant to the
Records-Examination Clause. Meanwhile, Col. North indicated via counsel that he could only
disclose a copy of the contract to the NRA subject to AMc's consent. This back-and-forth
persisted for nearly six months.

**ANSWER**:     Defendants deny the allegations contained in Paragraph 25.

Defendants aver as a new matter, specifically requiring a response, that ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 25 waives any claim of confidentiality that the Plaintiff

has with respect to the matters alleged in that Paragraph.

26.     Eventually, in February 2019, AMc acceded to a brief, circumscribed, "live"
review of the North Contract (but no retention of any copies) by the General Counsel of the
NRA. This review raised concerns about whether the previous summary of the North Contract
which was provided to the Audit Committee had been complete and accurate. Among other
things, the NRA's brief, limited review of the North Contract – along with other information
disclosed for the first time by Col. North – gave rise to questions regarding: (i) whether Col.
North was a third-party contractor of AMc or, conversely, a full-time employee with fiduciary
duties to AMc that superseded his duties to the NRA; (ii) whether the previously disclosed costs
borne by the NRA in connection with the North Contract were complete and accurate; and (iii)
whether the contract imposed obligations on Col. North that prevented him from communicating
fully and honestly with other NRA fiduciaries about AMc. Against the backdrop of escalating
concerns about AMc's compliance with the Services Agreement and applicable law, the NRA
became determined to resolve these issues.

ANSWER:   Defendants deny the allegations contained in Paragraph 26, other than to

admit NRA General Counsel Frazer reviewed the North contract in his office at NRA pursuant to

the contract.

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 26 waives any claim of confidentiality that the Plaintiff

has with respect to the matters alleged in that Paragraph.

27.   By letters dated March 25-26, 2019, the NRA's General Counsel again sought
visibility regarding the North Contract and related business arrangements, as well as copies of
other material business records pursuant to the Services Agreement. Specifically, the NRA
requested:

● A chance to conduct a follow-up review of the North Contract (the NRA's
General Counsel even volunteered to conduct the review at AMc's attorney offices, for AMc's
convenience);

● Information about any additional costs relating to AMc's engagement of Col.
North, to the extent that such costs were being "passed through" to the NRA;

● Copies of any additional AMc-Third Party NRA Contracts currently in existence;

● Information about which AMc personnel purportedly constituted "NRA-
Dedicated Personnel," such that their salaries or severance were alleged to be reimbursable by
the NRA, and business records sufficient to show whether these personnel were in fact dedicated
to NRA projects; and

● Copies of the annual budget documents provided to the NRA's forensic
accountants.

ANSWER:   Defendants admit that they received letters from the NRA General

Counsel on March 25 and 26, 2019 requesting certain information related to the North Contract.

Defendants deny the characterization and validity of those letters and respond that the documents

best speak for themselves.

Defendants aver as a new matter, specifically requiring a response, that Defendants have

no duty to provide copies of Third-Party contracts or other business records pursuant to the

16

services contract, as the Services Agreement only requires that AMc allow properly designated

NRA representatives to "examine" such records.

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 27 waives any claim of confidentiality that the Plaintiff

has with respect to the matters alleged in that Paragraph.

28.     The NRA made clear that it sought the above information "in whatever form
[wa]s most convenient" for AMc and hoped to obtain access to ordinary-course business records
as contemplated under the Records-Examination Clause. AMc immediately acknowledged
receipt of the letters and promised to respond substantively. It did not.

**ANSWER**:     Defendants admit that they received letters from the NRA General

Counsel on March 25 and 26, 2019 requesting certain information related to the North Contract

and that AMc acknowledged the receipt of those letters.  Defendants deny the remaining

allegations contained in Paragraph 28.

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 28 waives any claim of confidentiality that the Plaintiff

has with respect to the matters alleged in that Paragraph.

29.     Meanwhile, the NRA began to suspect that the information it previously received
regarding the North Contract was incomplete and, therefore, misleading. The May 2018
Amendment classified Col. North as a third-party contractor of AMc, which had two important
implications. *First*, an independent contractor is generally perceived to act with greater
autonomy than an employee or servant. *Second*, in the event that the NRA terminates the
Services Agreement, it incurs different trailing obligations with respect to AMc-Third Party
NRA Contracts than with respect to severance of NRA-Dedicated Personnel. Consistent with the
general arms-length nature of third-party contracts, the Services Agreement assumes that all
"non-cancellable contracts entered into between AMc and third parties for the benefit of the
NRA" are just that: non-cancellable.  Accordingly, under Section XI.E of the Services
Agreement, the NRA agrees to pay the full balance of any compensation owed by AMc under an
AMc-Third Party NRA Contract if the NRA terminates the Services Agreement, lest AMc be
unfairly saddled with a legacy third-party obligation. By contrast, the Services Agreement treats
severance of NRA-Dedicated Personnel in a far less burdensome manner for the NRA, requiring
only that AMc and the NRA negotiate a "fair and equitable termination fee" to absorb severance
costs.

17

**ANSWER**:    Defendants deny the allegations contained in Paragraph 29.

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 29 waives any claim of confidentiality that the Plaintiff

has with respect to the matters alleged in that Paragraph.

30.    In short, by treating the North Contract as an AMc-Third Party NRA Contract
pursuant to the May 2018 Amendment, AMc: (1) made an implicit representation about the
degree of independence Col. North could exercise; and (2) imposed a rigid financial liability on
the NRA that persists if the Services Agreement is terminated – as opposed to the "fair and
equitable", negotiable severance offset that would apply if Col. North were an AMc employee.

**ANSWER**:    Defendants deny the allegations contained in Paragraph 30.

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 30 waives any claim of confidentiality that the Plaintiff

has with respect to the matters alleged in that Paragraph.

31.    On or about February 19, 2019, the NRA learned that Col. North was a salaried
employee of Ackerman. Accordingly, Col. North owes a fiduciary duty of loyalty to Ackerman
under the laws of many jurisdictions – a fact that was never disclosed to the Audit Committee
when it ratified Col. North's service as fiduciary of the NRA. And under the terms of the May
2018 Amendment, the NRA has incurred a purported trailing liability under the North Contract
that was never appropriate, and would not have resulted if the NRA had known that Col. North
was an Ackerman employee.

**ANSWER**:    Defendants deny the allegations contained in Paragraph 31.

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 31 waives any claim of confidentiality that the Plaintiff

has with respect to the matters alleged in that Paragraph.

32.    Moreover, AMc originally advised the NRA that it had contracted Col. North to
host "[t]welve feature-length episodes" of a digital documentary series, to be produced "during
each 12 months of a three-year [a]greement," commencing during or about May 2018. Yet by
April 22, 2019 – eleven months into Col. North's engagement – only three episodes are
available, and none are "feature-length." Instead, as of the date of this filing, the three episodes
made available by AMc total 39 minutes, 33 minutes, and 11 minutes in length, respectively.

**ANSWER**:    Defendants deny the allegations contained in Paragraph 32.

18

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 32 waives any claim of confidentiality that the Plaintiff

has with respect to the matters alleged in that Paragraph.

33.   On April 22, 2019, Col. North finally disclosed a copy of his contract to the NRA
– even as AMc continued to rebuff the NRA's requests for material information about the
contract. AMc has also withheld documentation regarding sponsorships raised for the North
documentary series, and the NRA has no evidence that any substantial sponsorships exist.
Viewed in light of the series' production shortfalls, these facts have troubling implications. The
NRA agreed to shoulder a specific financial burden in connection with a specific digital-media
project – not to allow its President to be compensated by a for-profit advertising agency for
performing generic leadership functions. Importantly, the NRA's Bylaws do not provide for the
President to receive a salary.

**ANSWER**: Defendants deny the allegations contained in Paragraph 33.

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 33 waives any claim of confidentiality that the Plaintiff

has with respect to the matters alleged in that Paragraph.

34.   In the wake of these developments, the NRA again requested that AMc allow it to
examine business records that would shed light on "what, exactly, [the NRA] is paying for – and
what it is getting." As of the time of this filing, Ackerman has not responded. Put simply, the
NRA is at the end of its rope.

**ANSWER**: Defendants deny the allegations contained in Paragraph 34.

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 34 waives any claim of confidentiality that the Plaintiff

has with respect to the matters alleged in that Paragraph.

35.   AMc's breach of the Services Agreement has damaged – and threatens to
imminently and irreparably harm – the NRA's legitimate operational interests as a not-for-profit
organization. By denying the NRA access to basic information regarding the nature of the
services being performed, the putative budgets for these services, and the material terms of third-
party contracts for which the NRA is purportedly liable, AMc is interfering with the NRA's
ability to steward its funds in pursuit of its public mission. Moreover, AMc's baseless refusal to
disclose material information relating to the North Contract threatens to impede the NRA's
corporate governance process.

19

**ANSWER**:    Defendants deny the allegations contained in Paragraph 35.

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 35 waives any claim of confidentiality that the Plaintiff

has with respect to the matters alleged in that Paragraph.

36.    If the NRA is denied access to material business records regarding its largest
vendor relationship – records which it specifically bargained to access, under the Services
Agreement – the NRA's fiduciaries will be forced either to exercise their business judgment
based on incomplete information or defer resolution of pressing matters. There is no adequate
remedy at law for the risks that would arise in either scenario. The NRA is America's oldest civil
rights organization and an advocate for millions of law-abiding gun owners. Its compliance with
not-for-profit law cannot be permitted to be held hostage by a recalcitrant advertising agency.

**ANSWER**:    Defendants deny the allegations contained in Paragraph 36.

Defendants aver as a new matter, specifically requiring a response, that the public disclosure of

the allegations in Paragraph 36 waives any claim of confidentiality that the Plaintiff has with

respect to the matters alleged in that Paragraph.  PLAITIFF'S DEMAND FOR JURY TRIAL

37.    Plaintiff hereby demand a trial by jury regarding all issues of fact in this case.

**ANSWER**:    Paragraph 37 is a statement to which no response is required, but

Defendants deny that Plaintiff has a right to a jury trial for equitable claims asserted in the

Amended Complaint.

## PLAINTIFF'S FIRST CAUSE OF ACTION

31[sic][2]    Plaintiff incorporates by reference and realleges each and every allegation
in the foregoing paragraphs as if fully set forth herein.

**ANSWER**:    Paragraph 31 (numerically twice by Plaintiff) is an incorporation clause to

which Defendants incorporate their collective responses to each and every foregoing paragraph.

---

[2]    Plaintiff has mis-numbered all paragraphs following Paragraph 37.  Defendants will
follow the mis-numbering in responding to the allegations.

Appendix472

32[sic]      The Services Agreement is a legally enforceable contract. The Records-Examination Clause is unambiguous.

**ANSWER**:    Defendants admit that the allegation that the Services Agreement is a

legally enforceable contract, but deny that the Records-Examination Clause is unambiguous.

Defendants aver as a new matter, specifically requiring a response, that the LaPierre letters of

October 4, 2018 and October 18, 2018 are unambiguous.

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 32 [sic] waives any claim of confidentiality that the

Plaintiff has with respect to the matters alleged in that Paragraph.

33[sic]      The NRA has performed all of its obligations under the Services Agreement, including its obligation to provide reasonable notice pursuant to the Records-Examination Clause.

**ANSWER**:    Defendants deny the allegations contained in Paragraph 33.

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 33 [sic] waives any claim of confidentiality that the

Plaintiff has with respect to the matters alleged in that Paragraph.

34[sic]      Ackerman and Mercury have breached the Records-Examination Clause of the Services Agreement. Specifically, Ackerman – acting at all times on behalf of both itself and Mercury, pursuant to the Services Agreement – has repeatedly failed or refused to permit the NRA to examine specified categories of books and records with respect to matters covered under the Services Agreement.

**ANSWER**:    Defendants deny the allegations contained in Paragraph 34 [sic].

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 34 [sic] waives any claim of confidentiality that the

Plaintiff has with respect to the matters alleged in that Paragraph.

35[sic]      There is no adequate remedy at law for AMc's refusal to permit examination of records (whether they reside at Ackerman or Mercury) pursuant to the Services Agreement. The information sought by the NRA pursuant to the Records-Examination Clause

resides uniquely within the possession of Ackerman and/or Mercury, and cannot be acquired by the NRA on the open market for any sum of money.

**ANSWER**:   Paragraph 35 [sic] contains legal conclusions which do not require a

response. To the extent a response is required, Defendants deny the allegations contained in

Paragraph 35 [sic].

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 35 [sic] waives any claim of confidentiality that the

Plaintiff has with respect to the matters alleged in that Paragraph.

36[sic]        The nature of the obligation imposed by the Records-Examination Clause makes specific performance equitable and practical because the Court need only order AMc to furnish to the NRA: (i) copies of any AMc-Third Party NRA Contracts, including the North Contract; and (ii) business records, in whatever form they were generated in the ordinary course of AMc's business, which are sufficient to convey the information sought by the NRA as described in Paragraph 27 hereof.

**ANSWER**:   Defendants deny the allegations contained in Paragraph 36.

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 36 [sic] waives any claim of confidentiality that the

Plaintiff has with respect to the matters alleged in that Paragraph.

37[sic]        Defendants' breaches of the Services Agreement have damaged – and threaten to imminently, irreparably harm – the NRA's legitimate operational interests as a not-for-profit organization. By denying the NRA access to basic information regarding the nature of the services being performed, the putative budgets for these services, and the material terms of third-party contracts for which the NRA is purportedly liable, Defendants have jeopardized the NRA's ability to steward its funds in pursuit of its public mission. Moreover, AMc's continued and baseless refusal to disclose material information relating to the North Contract threatens to impede the NRA's corporate governance.

**ANSWER**:   Defendants deny the allegations contained in Paragraph 37 [sic].

Defendants aver as a new matter, specifically requiring a response, that the public

disclosure of the allegations in Paragraph 37 [sic] waives any claim of confidentiality that the

Plaintiff has with respect to the matters alleged in that Paragraph.

22

Appendix474

38[sic]      By reason of the foregoing, the NRA requests that this Court order specific performance by Defendants of their obligations pursuant to the Records-Examination Clause of the Services Agreement.

**ANSWER**:    Paragraph 38 [sic] contains a request for a court judgment which the Defendants oppose.

WHEREFORE, Defendants respectfully request that the Plaintiff's request for a judgment and award of specific performance be denied and that Defendants be awarded such relief, including attorney fees and costs, as this Court deems just.

### AFFIRMATIVE DEFENSES

1.    The Amended Complaint fails to state a claim upon which relief may be granted.

2.    Plaintiff is estopped from seeking specific performance.

3.    Plaintiff has waived any right to the specific performance it has requested.

4.    Defendant pleads the affirmative defense of "satisfaction" of the relief requested by the Plaintiff.

5.    Plaintiff is barred from any equitable relief based on the doctrine of "unclean hands."

6.    Plaintiff's prior breach of contract negates Plaintiff's claim for breach of contract against Defendants.

### PLEA IN BAR
**(As to Plaintiff's attorneys' authority to bring forth their Complaint)**

1.    On or about April 12, 2018, this Lawsuit was filed against Ackerman McQueen, Inc. and Mercury Group (collectively "AMc") purportedly on behalf of the National Rifle Association ("NRA"), asking, *inter alia*, this Court to compel the Defendants to produce documents for inspection by the NRA.

23



3.

Consequently, this Lawsuit was not legally and properly authorized by the NRA Board as required under the New York law governing not-for-profit corporations.

4.     The New York law governing nonprofit organizations requires that an organization's board must authorize any corporate action.

5.     No individual director or officer, acting alone, could legally authorize the action. The NRA's Executive Vice President therefore lacked legal authority to exercise the NRA board's management responsibilities.

WHEREFORE, the Defendants request that the Court dismiss this Lawsuit based on the lack of authority to bring forth the Complaint on behalf of Plaintiff NRA and to litigate all proceedings subsequent to the Complaint.

## COUNTERCLAIM

Ackerman McQueen, Inc. and the Mercury Group (together "Counterclaim Plaintiff" or "AMc"), by and through undersigned counsel, hereby file this Counterclaim against the National Rifle Association ("Counterclaim Defendant" or "NRA") and in support thereof states as follows:

24

Appendix476

## PARTIES

1.     AMc is a corporation organized and existing under the laws of the State of Oklahoma. Its principal place of business is 1601 Northwest Expressway, Suite 1100, Oklahoma City, OK 73118. AMc also maintains a key office in Dallas, Texas, the headquarters of NRATV.

2.     The Mercury Group is a wholly-owned subsidiary of AMc with its principal place of business in Alexandria, Virginia.

3.     The NRA is a not-for-profit corporation organized and existing under the laws of the State of New York, doing business in Virginia.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over the matter pursuant to Virginia Code § 8.01-262.

## SUMMARY OF COUNTERCLAIM

5.     On or about April 12, 2019, an attorney purporting to act on behalf of the NRA filed a Lawsuit against Ackerman McQueen, Inc. and Mercury Group, asking the Court, *inter alia*, to compel the Defendants to produce records and books for inspection by the NRA (the "Lawsuit").

6.     On or about April 24, 2019, just three days before the start of the NRA Annual Meeting, the NRA filed a Motion for Leave to Amend Complaint to include seven new paragraphs relating to the NRA's request for information about AMc's contract with NRA President Oliver North.

7.     Although the Complaint and the Amended Complaint included numerous pejorative statements about AMc, the NRA did not expressly seek to terminate its contract with

25

AMc, nor did it seek relief beyond a declaration that AMc has failed to provide access to a small set of documents.

8.      The Amended Complaint asserts that certain changes in New York nonprofit laws have motivated the NRA's requests for documentation and audits of AMc's financial records and information concerning its Services Agreement with the NRA.  The Amended Complaint implies that these laws impose on the NRA board and officers, for the first time, a fiduciary responsibility to oversee and account for the NRA's assets and its contractual arrangements with employees and outside vendors.

9.      On its face, the Amended Complaint reads more like a discovery dispute than a complaint deserving of lawsuit status.  However, the Lawsuit has triggered substantial media attention focused on the NRA's spending, policies, and procedures.

10.     Upon information and belief, the Complaint and Amended Complaint do not appear to have been properly authorized, and were filed at the direction of Wayne LaPierre, Executive Vice President of the NRA, as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮  See Plea in Bar, *supra*.

11.     The NRA's Executive Vice President and long-time leader Wayne LaPierre ("LaPierre"), enabled by his chosen attorney, William Brewer of William Brewer Associates and Counselors ("Brewer"), has set the NRA on a course ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[3] *See* Wall Street Journal article wherein Brewer states he is "spearheading" this litigation. April 15, 2019

26

█████████████████████████████████████████████████

████████████████

12.     The NRA's Amended Complaint fails to identify for the Court the legal

consequences that the NRA seeks to gain from a decision in this apparent "discovery dispute."

Under a Services Agreement between the NRA and AMc dated April 30, 2017 (and modified as

of May 6, 2018), ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

This undisclosed fact in the Amended Complaint provides the NRA's motivation to file the law

suit and the need for AMc to file this Counterclaim.

## THE SERVICES AGREEMENT

13.     This suit arises from the Services Agreement between the parties which is

attached hereto as "**Exhibit A**."

████████ Section IX of the Services Agreement, provides as follows: "AMc is authorized

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

27



20.

Appendix480

## THE DOCUMENT DEMAND

21.     The NRA contends in its Lawsuit that, under the Services Agreement, AMc is required to produce or allow for examination a number of documents and document categories including but not limited to the following: (1) AMc's own books and records related to the Services Agreement; (2) information related to certain ongoing litigation; (3) information relating to a contract with former NRA president, Lt. Col. Oliver North (Ret.).

22.     AMc has complied with every authorized demand for examination of its documents.  At no time relevant to this Lawsuit, however, has direction regarding these documents and information requests come in writing from LaPierre or his designee as required under the Services Agreement.

████ To the contrary, at least some of the documents requested for review and inspection were requested ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████

Appendix481



32.

33.      NRA had three to six auditors in AMc's Oklahoma City office reviewing AMc

files, records, and documents for approximately nine (9) days in February 2019. Another auditor

30

Appendix482

examined the records of AMc in November 2018 for an entire day. These audits were preceded by another audit in September 2018 by the NRA.

34.     At no time did the auditors claim to AMc that documents were withheld from review.



31

Appendix483

- The Amended Complaint admitted that Oliver North provided his contract to the NRA before the initial Complaint was filed in this law suit.

38.     The NRA's demand for the North Contract documents is a pretext to harm AMc's reputation and an attempt to provide an unfounded basis for terminating the NRA's contractual obligations to AMc under the Services Agreement.

39.     The NRA and its executives and audit committee have had full knowledge of the North Contract for months, and the demand in this Lawsuit for a copy of that contract was made in bad faith and contrary to the procedure mandated by the Services Agreement.

The NRA has also alleged in bad faith that AMc refuses to provide "NRATV analytics." This allegation is also false. Since October 2017,



41.

42.     Even after the filing of this Lawsuit by the NRA, AMc has continued to work with the NRA to provide the Services required under the Services Agreement and to provide the information and documents requested by the NRA, while protecting the NRA's confidentiality requirements imposed under the Services Agreement. Most recently, AMc provided the NRA with NRATV analytics for January through April 2019.

Appendix484

### THE PRETEXTS FOR NRA'S LAWSUIT

43.     The Amended Complaint asserts that changes in New York nonprofit laws were the motivation for the NRA's requests for documents and audits of AMc's financial records. [Amended Complaint, ¶ 17.] This argument is a pretext: the recent changes in the rules occurred in 2014 and those changes did not alter the long-standing requirement that the NRA's board carefully consider related-party contracts as a non-profit incorporated in New York State.

44.     Effective July 1, 2014, the New York Non-Profit Revitalization Act (the "NPRA") amended the N-PCL, including the provisions governing related-party transactions and conflict of interest policies.  Further amendments to those provisions were made in 2015 and 2016.

45.     However, New York law has contained specific rules regarding related-party transactions that have been in place since at least 1970.

46.     NRA's compliance with the related-party transaction rules rests squarely on the NRA itself.

47.     AMc has complied with all of the NRA's properly authorized requests to review AMc's books and records.  AMc in no way has impaired the NRA's ability to fulfill its duties with respect to its own related-party transactions

### NRA DISCLOSES AMC PROPRIETARY INFORMATION.

48.     On March 11, 2019, the New York Times ran an article in which the author revealed the existence of the North-AMc Contract and certain features thereof, including AMc's involvement with Col. North.  **Exhibit C**.  The article misrepresented the facts and disparaged AMc.  The New York Times article attributed certain factual assertions to Brewer as the source speaking on behalf of the NRA.

Appendix485

49.     On information and belief, Brewer provided misleading information to the New York Times in an effort to undermine the AMc – NRA relationship and to misdirect blame for the terms of the North Contract to AMc.

███████████████████████████████████████████████

█████████████████████████████████

51.     The NRA's deliberate false statements to the media regarding AMc's confidential information represented a change in the parties' relationship as well as the fundamental protocol for dealing with the parties' confidential information that had been in existence and honored for decades.

███████████████████████████████████████████████

█████████████████████████████████████████

53.     Frazer's March 14 response (**Exhibit B**) did not deny that the NRA had leaked the information to the New York Times.  Instead, the ████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

54.     The exchange of correspondence signaled NRA's claim that it could deliberately misuse AMc's confidential information and thereby violate NRA's duty of good faith and fair dealing inherent within the terms of the Services Agreement.

55.     NRA's actions described herein, including the filing of the Complaint and Amended Complaint seeking documents that it has already examined or had access to examine when properly requested, have been taken with the strategic intention of injuring AMc's business, its reputation, and its business expectancies.

Appendix486

56.     Already, current and prospective clients, financial institutions and insurance providers have begun questioning AMc employees in light of the New York Times article, this Lawsuit, and consequent media reports.

<div align="center"><strong>TERMINATION OF CONTRACT</strong></div>

57.     On information and belief, the Lawsuit is not intended to obtain documents, but rather, is intended to allow NRA to terminate the Services Agreement for cause.

58.     Paragraph XI, F of the Services Agreement deals with the consequences of termination of the Agreement.  The section provides:



59.     NRA's bad faith in initiating this Lawsuit is designed to avoid the payment of a very substantial amount of money in the form of severance and cancellation fees,

<div align="center"><strong>COUNT I – BREACH OF CONTRACT</strong></div>

**[Breach of Payment Obligations and**

60.     The allegations contained in the foregoing paragraphs are incorporated as if fully set forth herein.



Appendix487



36



71.    The NRA has failed to perform its payment obligations with diligence and good faith and it has failed to fulfill the contractual obligations ▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆

72.    The NRA breached its payment obligations under the Services Agreement long before any alleged breach by AMc articulated by the NRA in its Amended Complaint.

73.    The breaches that occurred have caused AMc to incur damages, the amount of which are not yet fully calculated.  The breaches by the NRA are material as that term is defined under the Code of Virginia, § 59-1-507.1.

37

Appendix489

WHEREFORE, Ackerman McQueen seeks, on its behalf and on behalf of its subsidiary Mercury Group, recovery of contract damages and severance remedies in the amount not less than $50 million and such other relief as this Court deems just.

### COUNT II - BREACH OF CONTRACT

#### [Breach of Implied Covenant of Good Faith and Fair Dealing]

74.     The allegations contained in the foregoing paragraphs are incorporated as if fully set forth herein.

75.     Under Virginia law, every contract contains an implied covenant of good faith and fair dealing. Va. Code § 8.1A-304.

76.     Pursuant to the Services Agreement Section IV, ███████████████

███████████████████████████████████████████

███████████████████████████████████ The Services Agreement is silent and does not provide any guidance on how the NRA must treat AMc's confidential proprietary information that it receives from AMc under the Examination of Records" clause.

77.     A good faith reading of the Services Agreement does not authorize the NRA to disclose AMc proprietary and confidential information that it gains from the Examination of Records clause.

78.     The NRA used its contractual rights under the Services Agreement to gain proprietary information about AMc's business, including information about its contract with Lt. Col. Oliver North.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

38



82.     The NRA's decision to work with Brewer to release proprietary information gained from AMc to the New York Times is a breach of the NRA's implied covenant of good faith and fair dealing.

83.     The NRA compounded its bad faith and unfair dealing by requiring that AMc remain silent in the aftermath of the false and misleading statements made about its contract with Oliver North.



85.     The NRA has breached its implied contractual duty of good faith and fair dealing by disclosing proprietary information it gained through the contract to a business, Brewer and his public relations unit, that was seeking to take over the services that AMc is providing to the NRA.

39

86.     The breaches that occurred have caused AMc to incur damages, the amount of
which are not yet fully calculated.  The breaches by the NRA are material as that term is defined
under the Code of Virginia, § 59-1-507.1.

WHEREFORE, Ackerman McQueen seeks, on its behalf and on behalf of its subsidiary
Mercury Group, recovery of contract damages and severance remedies in an amount not less than
$50 million and such other relief as this Court deems just.

<div align="center">

**COUNT III - ABUSE OF PROCESS**

</div>

87.     The allegations contained in the foregoing paragraphs are incorporated as if fully
set forth herein.

88.     NRA has filed suit claiming that it is entitled to receive documents from AMc and
Mercury pursuant to a Services Agreement.  The NRA failed to attach the Services Agreement to
its Complaint or its Amended Complaint. AMc has attached the Services Agreement as **Exhibit
A**.

89.     Prior to filing suit to obtain certain documents, NRA had already subjected AMc
to a detailed audit that ended in February of 2019 after nine days of in-depth analysis of AMc's
records undertaken within the offices of AMc's accountants.  The team of auditors, upon
concluding their audit, informed AMc's representatives that the audit was successfully
completed, AMc had provided all requested documents in its possession, and no further
documents were needed.

90.     Two months later, NRA filed this suit on April 12, 2019 claiming that it seeks
access to documents and a declaration that AMc is in breach because of a failure to provide
access to those documents.

<div align="center">

40

</div>

Appendix492

91.     Subsequent to the filing of the Complaint, NRA filed a motion to amend the complaint and attached a copy of the proposed Amended Complaint on April 24, 2019.  The Amended Complaint included detailed new allegations about Lieutenant Colonel Oliver North (Ret.) who was simultaneously serving as President of the NRA as well as an employee of AMc. The Amended Complaint did not seek any new relief, nor did it correct any prior allegation.

92.     The proposed Amendment was intended to serve an ulterior motive of spreading false statements about the North-AMc Contract immediately prior to the NRA's annual meeting where Lt. Col. North was slated to be reappointed as President of the NRA.

93.     The Motion to File the Amended Complaint served its ulterior motive, unrelated to the issues in this case.  There was a firestorm of publicity blanketing national news stations concerning the dispute between Lt. Col. North and the NRA.  AMc was dragged into the dispute based on the NRA's public disclosure of the North-AMc Contract in the Motion to File the Amended Complaint.  ██████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████ LaPierre won the power struggle.  North was not reappointed as NRA President; AMc's reputation was harmed; and AMc's contract with Lt. Col. North was diminished in value.

94.     The NRA's Motion to File the Amended Complaint did not advance the stated cause of obtaining "specific performance" of AMc's duty to provide any documents, but was highly effective in turning the spotlight away from the NRA's troubles and setting up Lt. Col. North and AMc to be the scapegoat in the national news.

Appendix493

95.    Such tortious acts that misuse the Court's legitimate judicial functions for ulterior purposes constitute an abuse of process.

96.    NRA's use of this Court to falsely demand access to documents that it already possessed and documents that it had not previously requested through the NRA's own required procedures was a pretext designed to cover the ulterior motive of the law suit -- to cause damage to AMc's reputation and to facilitate the transfer of AMc's business to Brewer's control without obligating the NRA to pay the severance payment required under the Services Agreement.

97.    NRA's abuse of process was further accomplished when it made the bad faith

98.    NRA used this Court's public proceeding as a vehicle to defame AMc and its employee, Lt. Col. Oliver North, and to accomplish ulterior purposes.  Pursuing such ulterior motives constitutes an abuse of process, that was further amplified by the fact that AMc is unable to respond publicly by using any facts that the NRA could claim was "Confidential Information."

99.    Lastly, after the NRA's counsel was informed that AMc intended to file a Counterclaim in this Lawsuit, the NRA responded on May 22, 2019, by filing a second law suit. The NRA's second lawsuit gives up any pretext that the dispute between the two parties is about a few documents.  The NRA now seeks damages of $40 million for actions by AMc that the NRA claims began in August 2018, thereby revealing the NRA's pretext in filing this first Lawsuit in April 2019 seeking the North Contract.

42

100.    Continuing its strategy of trying the dispute in the press, the NRA leaked the second lawsuit to the Wall Street Journal before AMc or its attorneys were even told the suit was filed or that any contract breach had occurred.

101.    As a result of the abuse of process, AMc has sustained actual and reputational damages to be proven at trial, with such compensatory damages exceeding $50 million.

WHEREFORE, Ackerman McQueen seeks, on its behalf and on behalf of its subsidiary Mercury Group, recovery of damages in the amount not less than $50 million for damages to their businesses, punitive damages, attorney fees, costs, and such other relief as this Court deems just.

## JURY DEMAND

Counterclaim Plaintiffs demand this matter be heard before a jury on all triable issues.

## REQUEST FOR RELIEF

WHEREFORE, for all the foregoing reasons, Defendants/Counterclaim Plaintiffs request the following relief:

A.  Actual and consequential damages arising from breach of contract in the amount of $50,000,000;

B.  Punitive damages of at least $50,000,000;

C.  Injunctive relief barring the NRA from taking any further action in derogation of the Services Agreement and the NRA's obligation to comply with all good faith and fair dealing;

D.  Reasonable attorney's fees as allowed under the "American Rule" exception allowing for the award of attorney fees for bad faith litigation;

E.  Court costs; and

43

F. And such other legal and/or equitable relief to which Counterclaim Plaintiffs may be entitled.

Respectfully submitted,

ACKERMAN MCQUEEN, INC. and
MERCURY GROUP, INC.
By Counsel

Dated: May 23, 2019

Respectfully submitted,

David H. Dickieson (VA Bar #31768)
SCHERTLER & ONORATO, LLP
901 New York Avenue, NW, Suite 500
Washington, DC 20001
Telephone: 202-628-4199
Facsimile: 202-628-4177
ddickieson@schertlerlaw.com

44

CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served on the following counsel via

email and first-class mail addressed to:

James W. Hundley
Robert H. Cox
Amy L. Bradley
BRIGLIA HUNDLEY, PC
1921 Gallows Road, Suite 750
Tysons Corner, VA  22182
jhundley@brigliahundley.com
rcox@brigliahundley.com
abradley@brigliahundley.com

David H. Dickieson.

45

Appendix497

# EXHIBIT A
# REDACTED

Appendix498

# EXHIBIT B
# REDACTED

47

Appendix499

# EXHIBIT C
# REDACTED

48

# EXHIBIT D

# REDACTED

49

Appendix501

# EXHIBIT E

# REDACTED

50

Appendix502