**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| *Plaintiff and Counter-Defendant*, | § § | |
| **and** | § § | |
| **WAYNE LAPIERRE,** | § § § | |
| *Third-Party Defendant*, | § § | |
| **v.** | § § | **Case No. 3:19-cv-02074-G** |
| **ACKERMAN MCQUEEN, INC.,** | § § § | |
| *Defendant and Counter-Plaintiff*, | § § | |
| **and** | § § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, AND JESSE GREENBERG,** | § § § § § | |
| *Defendants*. | § | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION TO DISQUALIFY THE LAW FIRM DORSEY & WHITNEY LLP AS COUNSEL FOR DEFENDANTS AND FOR OTHER APPROPRIATE SANCTIONS AND RELIEF**

## TABLE OF CONTENTS

I.    SUMMARY ...................................................................................................1

II.   BACKGROUND FACTS ..............................................................................2

      A.    AMc Services at the NRA Meetings ...................................................2

      B.    The Brewer Firm Presented Non-Privileged Information and Intentionally
            Gave Allegedly Privileged Information to Its Admitted Adversary ......................3

      C.    Dorsey's Acquisition of Exhibit B-9 ....................................................5

      D.    Communications with Counsel for the NRA, Including History of
            "Inadvertence" ...................................................................................7

      E.    NRA Destruction of Documents Complicates a Solution........................9

III.  ARGUMENTS & AUTHORITIES ...............................................................10

      A.    The NRA Did Not Prove the Information Is Privileged. .......................10

      B.    The Law Does Not Require Dorsey's Disqualification. ........................14

            1.    The NRA Failed to Demonstrate Dorsey Violated Any Ethical
                  Rules. .....................................................................................15

            2.    Dorsey Did Not Know the Information Was Potentially Privileged. ........17

            3.    Dorsey Promptly Acted When It Learned of the Alleged Privilege. .........19

            4.    Dorsey Did Not Fully Digest the Information. .........................20

            5.    The Information Will Not Prejudice the NRA's Claims or
                  Defenses. ................................................................................21

            6.    The NRA Is at Fault for the Disclosure. ..................................23

            7.    Defendants Would Suffer Substantial Hardship If Dorsey Were
                  Disqualified. ............................................................................23

      C.    No Fiduciary Obligation Governs this Issue........................................25

      D.    Sanctions Are Inappropriate. ..............................................................25

IV.   PRAYER.......................................................................................................26

## <u>TABLE OF AUTHORITIES</u>

CASES

*Brannick v. Aurora Loan Servs., LLC*, No. 03-17-00308-CV, 2018 Tex. App. LEXIS 8981 (Tex. App. Nov. 2, 2018, no pet.) ..................................................................................... 12

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) ............................................................. 26

*Cnty. of Los Angeles v. Superior Ct.*, 222 Cal. App. 3d 647 (Ct. App. 1990) .............. 13

*Contico Int'l v. Alvarez*, 910 S.W.2d 29 (Tex. App.—San Antonio 1995, no writ) .................... 16

*Deaf Interpreter Servs. v. Webbco Enters., L.L.C.*, No. 5:13-867-RCL, 2015 U.S. Dist. LEXIS 181339 (W.D. Tex. Feb. 11, 2015) ..................................................................... 10, 12

*Ferko v. NASCAR*, 219 F.R.D. 396 (E.D. Tex. 2003) ............................................. 12, 13

*Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178 (2017) ................................ 25

*Grasso v. O'Connor*, 41 Va. Cir. 193 (1996) ............................................................... 19

*Harleysville Ins., Co. v. Holding Funeral Home, Inc.*, No. 1:15CV00057, 2017 U.S. Dist. LEXIS 162058 (W.D. Va. Oct. 2, 2017) ........................................................................ 20

*Highlands Ins. Co. v. Allstate Ins. Co.*, 688 F.2d 398 (5th Cir. 1982) ......................... 12

*Hodges, Grant & Kaufmann v. United States*, 768 F.2d 719 (5th Cir. 1985) .............. 11

*Huie v. DeShazo*, 922 S.W.2d 920 (Tex. 1996) .......................................................... 11

*Ibarra v. Baker*, 338 Fed. Appx. 457 (5th Cir. 2009) ................................................. 17

*In re Beiny*, 132 A.D. 2d 190 (N.Y. App. Div. 1987) ................................................. 14

*In re Fisher & Paykel Appliances, Inc.*, 420 S.W.3d 842 (Tex. App.—Dallas 2014, pet. denied) ................................................................................................................. 19

*In re Itron*, 883 F.3d 553 (5th Cir. 2018) ................................................................... 19

*In re Marketing Investors Corp.*, 80 S.W.2d 44 (Tex. App.—Dallas 1998) .......... 22, 23

*In re Meador*, 968 S.W.2d 346 (Tex. 1998) ...................................................... *passim*

*Kleiner v. First Nat'l Bank*, 751 F.2d 1193 (11th Cir. 1985) ...................................... 26

*Lelsz v. Kavanagh*, 137 F.R.D. 646 (N.D. Tex. 1991) ................................................ 26

*Maldonado v. New Jersey*, 225 F.R.D. 120 (N.J. 2004) .............................................. 22

*Marsh v. First USA Bank, N.A.*, No. 3:99-CV-0783, 2000 U.S. Dist. LEXIS 16858 (N.D. Tex. May 23, 2000) ................................................................................................ 18, 21, 26

*Mendoza v. Eighth Court of Appeals*, 917 S.W.2d 787 (Tex. 1996) ........................................... 16

*MMR/Wallace Power & Indus., Inc. v. Thames Assocs.*, 764 F. Supp. 712 (D. Conn. 1991) 16, 22

*Mumford v. State Farm Mut. Auto Ins. Co.*, No. 1:14-CV-282, 2015 U.S. Dist. LEXIS 179470 (E.D. Tex. Jul. 29, 2015)........................................................................................................ 25

*Navigant Consulting, Inc. v. Wilkinson*, 220 F.R.D. 467 (N.D. Tex. 2004) ................................. 11

*OrchestrateHR, Inc. v. Trombetta*, No. 3:13-CV-2110-KS-BH, 2016 U.S. Dist. LEXIS 117986 (N.D. Tex. Sep. 1, 2016) ................................................................................................ 14, 23

*Raymond v. Spirit AeroSystems Hold., Inc.*, No. 16-1282-JTM-GEB, 2017 U.S. Dist. LEXIS 101926 (D. Kan. Jun. 30, 2017) ........................................................................................... 26

*Richards v. Jain*, 168 F. Supp. 2d 1195 (W.D. Wash. 2001)...................................................... 26

*SEC v. Brady*, 238 F.R.D. 429 (N.D. Tex. 2006) ....................................................................... 19

*SEC v. Microtune, Inc.*, 258 F.R.D. 310 (N.D. Tex. 2009) ......................................................... 19

*Shields v. Sturm, Ruger & Co.*, 864 F.2d 379 (5th Cir. 1989) .................................................... 14

*Tatum v. Liner*, 749 S.W.2d 251 (Tex. App.—San Antonio 1988, no pet.) ................................ 10

*Taylor Lohmeyer Law Firm, P.L.L.C. v. United States*, No. 19-50506, 2020 U.S. App. LEXIS 13230 (5th Cir. Apr. 24, 2020) ......................................................................................... 10

*Vaca v. Rio Properties, Inc.*, No. 2:08-cv-00940-RLH (D. Nev. Mar. 3, 2011) ......................... 26

*Vanderbilt Mortg. & Fin., Inc. v. Flores*, No. C-09-312, 2010 U.S. Dist. LEXIS 116434 (S.D. Tex. Nov. 1, 2010) ....................................................................................................... 11, 12

*Walton v. Mid-Atlantic Spine Specialists, P.C.*, 694 S.E.2d 545 (Va. 2010).............................. 11

*Whitaker Chalk Swindle & Sawyer, LLP v. Dart Oil & Gas Corp.*, No. 4:08-CV-684-Y, 2009 U.S. Dist LEXIS 15901 (N.D. Tex. Feb. 23, 2009)................................................................ 11

*Windsor v. Olson*, No. 3:16-cv-934-L, 2019 U.S. Dist. LEXIS 168 (N.D. Tex. Jan. 2, 2019) .... 14

RULES

FED. R. CIV. P. 26.......................................................................................................................... 18

FED. R. EVID. 502.......................................................................................................................... 19

MODEL R. 4.4 ................................................................................................. 17

TEX. R. 4.01 ................................................................................................... 17

TEX. R. 8.04 ................................................................................................... 16

TEX. R. EVID. 503 .......................................................................................... 11

**OTHER AUTHORITIES**

Tex. Bar Ethics Committee Op., 79 Tex. B. J. 818 (Dec. 2016) ............................................ 15, 20

Ackerman McQueen, Inc. ("*AMc*"), Mercury Group, Inc., Henry Martin, William Winkler, Melanie Montgomery, and Jesse Greenberg (collectively, "*Defendants*") file this *Response to Plaintiff's Motion to Disqualify the Law Firm Dorsey & Whitney LLP as Counsel for Defendants and for Other Appropriate Sanctions and Relief* (the "*Response*" to the "*Motion*") (ECF 107).

## I.    SUMMARY

Plaintiff's Motion, presented to the Court one week after Defendants' motion to disqualify the NRA's counsel, concerns an undisputedly non-privileged presentation (the "*Public Affairs Presentation*") by a non-attorney at an NRA Public Affairs Committee meeting that non-NRA individuals attended (including several AMc employees), and an undisputed mistake about a shorter presentation almost identical in content presented the following day.[1]  In response to the NRA's Motion to Compel, Defendants described the NRA's counsel's (the "*Brewer Firm*") unlawful competition with, and hostile takeover of, AMc's nearly-40-year-long public-relations and crisis-management role for the NRA.  In support, Defendants included a one-sentence description of the Public Affairs Presentation the Brewer Firm's Managing Director of Public Affairs, Travis Carter ("*Carter*"), gave in January 2019 and inadvertently filed under seal Exhibit B-9 (an apparent summary of the Public Affairs Presentation given one day later).

At its heart, this Motion boils down to one slide in Exhibit B-9 not present in the Public Affairs Presentation that lists settlement information for the NRA's Lockton lawsuit.  However, it is undisputed that this information was already disclosed in at least one document from April 2019 and in two depositions in late 2019, including by the NRA's own Executive Vice President/Chief Executive Officer, Wayne LaPierre ("*LaPierre*"), months before Defendants' counsel ("*Dorsey*")

---

[1] ECF 128 at Ex. A-1 at 2 (*NRA Seeks to Renew Objections to Former Ad Agency's Production of Documents, Citing Privilege* (May 18, 2020)) ("a privileged presentation … was filed by Ackerman's attorneys … ***an apparent mistake, the NRA attorneys wrote in their filings***") (emphasis added).

ever obtained Exhibit B-9. Not to mention, the NRA filed Exhibit B-9 *back* in the Court's record, of its own volition, for Dorsey and Defendants to access.

Contrary to the NRA's conclusory factual allegations and legally flawed arguments, Dorsey did not violate any ethical rules. Dorsey offered to do everything the NRA requested regarding Exhibit B-9, and two weeks later the NRA filed its Motion. The NRA's request for disqualification of Dorsey is nothing more than an impermissible litigation tactic that appears to be in direct retaliation for Defendants' well-supported motion to disqualify the NRA's counsel. But even if Dorsey had violated ethical rules, the extreme sanction of disqualification is not warranted absent some "actual prejudice" to the NRA, which does not exist.[2] The NRA's Motion should be denied in its entirety.[3]

## II.    BACKGROUND FACTS

### A.    AMc Services at the NRA Meetings

For the last several decades, AMc was the public relations and crisis-management provider to the NRA. AMc routinely handled digital needs for the NRA, including providing audio-visual support at its annual and quarterly meetings, whether for the Board of Directors, its committees, or the general membership.[4] Considering that AMc was the NRA's media servicer, it was understood and expected that AMc would be present to assist at the meetings.[5]

During the September 2018, January 2019, and April 2019 NRA meetings, the Brewer Firm's non-attorney PR director, Carter, gave an AMc employee, John Popp ("***Popp***"), a thumb drive with presentations to be shown at the meetings.[6] These presentations were loaded onto one

---

[2] *See* ECF 128 at Ex. F ¶ 23 [APP 40] (Johnston Decl.).
[3] By responding to the Motion, neither Defendants nor Dorsey waive the attorney-client privilege, in whole or in part.
[4] ECF 128 at Ex. D ¶¶ 4-5 [APP 24] (Tavangar Decl.); ECF 128 at Ex. C ¶ 3 [APP 20] (Popp Decl.).
[5] ECF 108 at Ex. 16 at 110:1-15 [APP 193] (Popp); ECF 108 at Ex. 2 ¶ 5 [APP 19] (Arulanandam 2020 Decl.); ECF 108 at Ex. 4 ¶ 5 [APP 95] (Carter 2020 Decl.) ("I was informed that the presence of Ackerman official was customary at such informal [Public Affairs Committee] meetings.").
[6] ECF 128 at Ex. C ¶¶ 4-12 [APP 20-22] (Popp).

or more AMc laptops for redundancy, a copy sent to Nader Tavangar ("*Tavangar*") at AMc, deleted from the AMc laptops, and the thumb drive returned to Carter.[7]

On January 4, 2019, during the Public Affairs Committee meeting, Carter handed a thumb drive to Popp, and directed Popp to load the presentation onto AMc's laptop for a presentation Carter was giving.[8]  Popp copied the presentation to AMc's laptop to ensure functionality, returned the thumb drive to Carter, sent the presentation to his supervisor (Tavangar), and deleted the presentation from the laptop after the meeting ended.[9]  Popp followed the same protocol for Exhibit B-9 on January 5, 2019.[10]  Carter did not tell Popp that either document was privileged or that Exhibit B-9 was for executive session, and took no steps to retrieve the documents from AMc's laptop.[11]  Popp did not review either presentation, only checking to ensure they played.[12]

## B.    The Brewer Firm Presented Non-Privileged Information and Intentionally Gave Allegedly Privileged Information to Its Admitted Adversary

According to the NRA's Director of Public Affairs, Andrew Arulanandam:

> As a long-time advertising, branding, networks and communications advisor to the NRA, Defendant Ackerman McQueen, Inc. ("AMc") had representatives in attendance during the presentation of Mr. Carter.  Such "committee meetings" are typically attended by a range of NRA board members, members, special guests, and vendor representatives.[13]

In other words, even though the Public Affairs Presentation contains the same label "attorney work product, privileged & confidential" on every page as Exhibit B-9—which the NRA argues should

---

[7] ECF 108 at Ex. 16 at 60:3-10 [APP 180], 60:17-22 [APP 180], 62:9-21 [APP 181], 63:6-9 [APP 181] (Popp Dep.); ECF 128 at Ex. C ¶¶ 4-12 [APP 20-22] (Popp); ECF 108 at Ex. 4 ¶ 14 [APP 97] (Carter 2020).

[8] ECF 108 at Ex. 16 at 67:9-23 [APP 182] (Popp Dep.); ECF 128 at Ex. C ¶ 7 [APP 21] (Popp); ECF 108 at Ex. 2 ¶ 4 [APP 19] (Arulanandam 2020).

[9] ECF 128 at Ex. C ¶ 8 [APP 21] (Popp); ECF 108 at Ex. 16 at 131:1-11 [APP 198] (Popp Dep.); ECF 128 at Ex. D ¶ 13 [APP 26] (Tavangar).

[10] ECF 128 at Ex. C ¶¶ 9-11 [APP 21-22] (Popp); ECF 128 at Ex. D ¶ 14 [APP 26-27] (Tavangar); ECF 108 at Ex. 16 at 67:9-23 [APP 182], 128:19-131:11 [APP 197-198] (Popp Dep.).

[11] ECF 108 at Ex. 16 at 129:12-130:18 [APP 198] (Popp Dep.); ECF 128 at Ex. C ¶ 9 [APP 21] (Popp).

[12] ECF 108 at Ex. 16 at 130:19-25 [APP 198] (Popp Dep.); ECF 128 at Ex. C ¶ 12 [APP 22] (Popp).

[13] ECF 108 at Ex. 2 ¶ 5 [APP 19] (Arulanandam 2020).  *See also* ECF 128 at Ex. D ¶ 7 [APP 24] (Tavangar); ECF 128 at Ex. C ¶¶ 2-3 [APP 19-20] (Popp); ECF 108 at Ex. 4 ¶ 5 [APP 95] (Carter 2020).

have alerted Dorsey that the presentation was privileged—the NRA clearly concedes that the Public Affairs Presentation is not confidential or privileged as stamped.[14]   The NRA also points to the "executive briefing" title on Exhibit B-9, but there is no reference to the group receiving the presentation as compared with the *nonprivileged* Public Affairs Presentation with the subtitle, "NRA Board of Directors Meeting."[15]

While the NRA posits that Exhibit B-9 is privileged because it "extensively covers ongoing and anticipated legal matters,"[16] so does the Public Affairs Presentation "concern[] legal and regulatory matters," as Arulanandam noted in his declaration.[17]   In fact, the Public Affairs Presentation covers the same litigation and regulatory matters as Exhibit B-9 (the Lockton lawsuit, the "First Amendment" lawsuit against Gov. Cuomo, and the NY AG Investigation).[18]

The NRA refers to an issue with an April 2019 presentation that Carter also intentionally gave to AMc.[19]   But the differences are significant: Carter gave AMc the April presentation two weeks after the NRA filed its first Virginia lawsuit against AMc; AMc's Virginia counsel discovered the April presentation during routine document review while Dorsey received the specific document with the affirmative explanation that it was the Public Affairs Committee presentation; Dorsey was not involved in the April matter; the April presentation included legal advice concerning *this* dispute (while the January presentations do not) and, to AMc's knowledge,

---

[14] ECF 108 at Ex. 2 ¶ 6 [APP 19-20] (Arulanandam 2020) (referring to Exhibit B-9 as a "highly confidential, attorney-client privileged presentation" as contrasted from the Public Affairs Presentation).   In describing the differences between the Public Affairs Presentation and Exhibit B-9, the NRA demonstrates how the Public Affairs Presentation is *not* privileged.   *See id.* at ¶ 5 [APP 19] (admitting third parties like "special guests and vendor representatives," such as AMc, regularly attend Public Affairs Committee meetings, including the January 2019 meeting); ECF 108 at Ex. 4 ¶ 5 [APP 95] (Carter 2020) (same).   *Cf.* ECF 107 at 13 (referring to Exhibit B-9 as "obviously privileged").
[15] *See* ECF 128 at Ex. B ¶ 6 [APP 14] (Gruber Decl.).
[16] ECF 107 at 7.
[17] ECF 108 at Ex. 2 ¶ 4 [APP 19] (Arulanandam 2020) ("Mr. Carter shared [the Public Affairs Presentation] presentation at the request of the NRA which covered public-facing communications efforts concerning legal and regulatory matters being handled by his firm.").
[18] ECF 112 at Ex. A-65 [APP 1130-1162]; *see* ECF 129, Appx. A (chart comparing the two presentations).
[19] *See* ECF 107 at 19-20.

the same information was not publicly disclosed the day before; and, immediately after the April meeting ended, Carter requested that the April presentation be deleted.[20]

As part of the dispute surrounding the April presentation, the Brewer Firm deposed Popp in July 2019.  Popp testified at least four times that he saved the presentations from September 2018, January 2019, and April 2019 as way his practice.[21]  Despite these disclosures, the NRA never sought to retrieve those other documents (including the specific presentation at issue).  Thus, despite knowing after Popp's July 2019 deposition that AMc possessed the NRA's "privileged" presentations from the January 2019 NRA meetings,[22] at no point did the NRA nor the Brewer Firm take any steps to confirm the January materials, Exhibit B-9, had been deleted or returned.[23] The Brewer Firm dropped the April presentation matter without explanation.

Meanwhile, at least by September _2018_, the NRA had decided that it was going to litigate against AMc.[24]  *In other words, the NRA and the Brewer Firm freely and repeatedly gave allegedly privileged information to its adversary at the three NRA board meetings.*

## C.    Dorsey's Acquisition of Exhibit B-9

At least by the spring of 2019, it became apparent that Brewer and his firm were unfairly competing with AMc and taking over its nearly-40-year relationship with the NRA.[25]  For

---

[20] *See* ECF 108 at Ex. 22 at Ex. A ¶ 14 [APP 430] (Arulanandam 2019 Decl.) (asserting the presentation had "relevance to ongoing litigation against [AMc]"); ECF 108 at Ex. 22 at Ex. C [APP 441]; ECF 108 at Ex. 24 at 2 [APP 467]; ECF 128 at Ex. C ¶¶ 11, 13 [APP 22] (Popp).

[21] ECF 108 at Ex. 16 at 51:20-52:1 [APP 178], 63:6-9 [APP 181], 64:23-65:8 [APP 181-182], 69:16-70:6 [APP 183], 138:23-139:19 [APP 200] (Popp Dep.).

[22] ECF 108 at Ex. 16 at 130:4-18 [APP 198] (Popp Dep.).

[23] In comparison, Carter called Popp immediately after the April NRA meeting to determine whether Popp deleted that presentation from the laptop.  *See* ECF 108 at Ex. 22 at Ex. A ¶¶ 11-13 [APP 429-430] (Arulanandam 2019); ECF 108 at Ex. 16 at 84:19-85:14 [APP 186-187] (Popp Dep.).

[24] The NRA first sued AMc for breach of contract relating to AMc's alleged failure to comply with audit requests and specifically to provide access to its contract with Col. North.  *See* ECF 80 at Ex. A-30 [APP 610-625] (first Virginia lawsuit).  But in a letter from LaPierre on April 22, 2019, LaPierre stated that he and the NRA's "common legal interests in the litigation against [AMc]" "crystallized" before the audits.  *See* ECF 112 at Ex. A-44 [APP 801].

[25] As a prime example, Brewer wrote an article at the same time he was taking over the NRA work in Spring 2019 about "stitch[ing]" public relations "into the fabric of the advocacy."  *See* ECF 80 at Ex. A-7 at 1-2 [APP 357-358] (Brewer, *Advocacy as Art*) ("[C]rafting a public narrative can no longer fall solely under the purview of public relations

example, the Brewer Firm began supplanting AMc in 2018, initially drafting press releases, including non-legal matters, a more recent example being Brewer's PR work on the recent NAR COVID furloughs.[26]  AMc raised this issue in Virginia and obtained a two-tier protective order to address it, whereby Brewer and his PR unit are excluded from accessing AMc's highly confidential business information.[27]  As time continued, so too did Brewer's hostile takeover of AMc's NRA business, which culminated with the termination of the Services Agreement with AMc.

The Public Affairs Committee was another instance where the Brewer Firm was replacing AMc, even though AMc was still the contractual servicer.  Indeed, during Carter's presentation, he repeatedly discussed how the NRA was handling the "court of public opinion," explained that the Brewer Firm was working behind the scenes and was responsible for crafting the NRA's "message" to the public to protect the NRA's reputational interests, and described various favorable outcomes obtained for the NRA based on the Brewer Firm's public relations work.[28]

In January 2020, Dorsey met with AMc to understand more about Brewer's competition.[29]  On January 7, 2020, Tavangar shared with Dorsey his notes of Carter's talking points during the Public Affairs Committee meeting and attached a copy of Exhibit B-9, which he understood corresponded to his notes.[30]  That Public Affairs Presentation impacted AMc's PR services to the NRA and demonstrated the Brewer Firm's PR work for the NRA.[31]  Tavangar mistakenly attached Exhibit B-9 instead of the Public Affairs Presentation.[32]

---

agencies or a corporation's in-house communications department. … [L]awyers who manage issues and crisis management are able to help clients … recognize improvements in operational efficiencies, including cost-savings.").
[26] *See* ECF 105 at 3 ¶ 5; ECF 80 at Ex. A-66 [APP 1163-1167] (Brewer recent statements on behalf of the NRA regarding COVID-19 and the NRA's lack of fundraising); ECF 51 at 2, 4-5; ECF 55 at 8, 13-15.
[27] *See* ECF 56 at Ex. A-5 [APP 329-347]; ECF 79 at 15 n.96 (citing Ex. A-58 at 42:4-19 [APP 970] (Va. Hr'g Tr.)).
[28] ECF 128 at Ex. D ¶¶ 9-11 [APP 25-26] (Tavangar).
[29] ECF 128 at Ex. B ¶ 4 [APP 13] (Gruber).
[30] *Id.*; ECF 128 at Ex. D ¶ 16 [APP 27] (Tavangar).
[31] ECF 128 at Ex. D ¶¶ 10-11, 13 [APP 25-26] (Tavangar).
[32] *Id.* at ¶¶ 16-20 [APP 27-29] (Tavangar).

That same day, when collecting additional documents, Dorsey asked about other public relations presentations.[33]  During subsequent discussions between Dorsey and Tavangar regarding the Public Affairs Presentation, Tavangar also sent Dorsey a copy, but again mistakenly stated on two separate occasions that Exhibit B-9 was the presentation given during the Public Affairs meeting.[34]  Despite his familiarity with the substance of the Public Affairs Presentation, he understandably mistook one presentation for another because they are essentially the same public relations, not legal, material.[35]  Dorsey did not see or review any notes from either presentation.[36]

Shortly after Dorsey received Exhibit B-9, the NRA filed a Motion to Compel.[37]  In support of Defendants' response, Dorsey sought leave to file numerous exhibits under seal (the "***Motion for Leave***"), and attached, among others, Exhibit B-9.[38]  Defendants referred to the non-privileged presentation from non-attorney Carter with *one statement* in the response:

> [T]he PR unit gave a detailed presentation to the NRA's Public Affairs Committee about protecting and advancing the NRA's reputational interests, repeatedly referencing the "court of public opinion" and promoting the NRA's narrative through the media.[39]

Dorsey only "used" Exhibit B-9 as evidence (*under seal*) that the Brewer Firm supplanted AMc, and described it as the non-privileged Public Affairs Presentation.

### D.   Communications with Counsel for the NRA, Including History of "Inadvertence"

Several days later, counsel for the NRA sent a letter to Dorsey, asserting that Dorsey had filed a privileged presentation.[40]  Dorsey responded three days later on February 21, 2020.[41]

---

[33] ECF 128 at Ex. B ¶ 5 [APP 13-14] (Gruber).
[34] ECF 128 at Ex. D ¶¶ 17-20 [APP 27-29] (Tavangar).
[35] *Id.* at 19-20 [APP 28-29] (Tavangar); *see also* ECF 128 at Ex. B ¶ 9 [APP 15-16] (Gruber); ECF 129 at Appx. A.
[36] ECF 128 at Ex. B ¶ 18 [APP 18] (Gruber).
[37] ECF 47.
[38] ECF 52.
[39] ECF 51 ¶ 5. *But see* additional support, even without either presentation, *e.g.*, ECF 105 at 3 n.13; ECF 51 at 4-5.
[40] ECF 108 at Ex. 5 [APP 100-101]; ECF 128 at Ex. B ¶ 7 [APP 15] (Gruber).
[41] ECF 108 at Ex. 6 [APP 103]; ECF 128 at Ex. B ¶ 7 [APP 15] (Gruber); *see also* ECF 128 at Ex. F ¶ 35 [APP 47] (Johnston).  *See* Appx. B, Timeline of Events.

On March 2, 2020, Dorsey explained that AMc obtained the presentation "during the NRA Public Affairs Committee meeting on January 5, 2019."[42]  Dorsey's response further evidenced its misunderstanding that Exhibit B-9 was used during the Public Affairs Committee meeting that several AMc employees attended.  Dorsey also shared the steps it took to isolate the presentation in its and its client's files, and that it would take appropriate action with the Court.[43]

On March 3, 2020, the Brewer Firm explained Dorsey had a "**misunderstanding** of the facts" because the Public Affairs Committee took place on Friday, January 4, 2019 while, an executive session of the NRA board of directors occurred on Saturday, January 5, 2019.[44]  This was the first time Dorsey knew two presentations were actually given.[45]

On March 10, 2020, the Court granted Defendants' Motion for Leave and ordered that Defendants file the corresponding documents with the clerk.  In compliance therewith, Defendants filed the exhibits *under seal*, including Exhibit B-9, which had already been filed under seal for the Motion for Leave.[46]  Exhibit B-9 has never been filed in the public record.

Between March 4 and March 29, 2020, even while Dorsey's operations were disrupted by the COVID-19 pandemic (the entire firm removed to remote status, indefinitely), Dorsey had two separate telephone conferences with the Brewer Firm regarding separate discovery disputes, but did not receive any follow-up communications about Exhibit B-9.[47]

At the same time, Dorsey was grappling with the NRA's unreasonable discovery demands, such as its clawback requests for a document it produced *nineteen* different times and permitted to

---

[42] ECF 128 at Ex. B ¶ 8 [APP 15] (Gruber); ECF 108 at Ex. 8 [APP 109-110].
[43] *Id.*
[44] ECF 108 at Ex. 9 [APP 112]; ECF 128 at Ex. B ¶ 9 [APP 15-16] (Gruber).
[45] ECF 128 at Ex. B ¶ 6 [APP 14] (Gruber).
[46] ECF 64; ECF 128 at Ex. B ¶ 8 [APP 15] (Gruber).
[47] ECF 128 at Ex. B ¶¶ 10-11 [APP 16] (Gruber).

be used in depositions without objection,[48] in addition to its overdesignation of privilege and confidentiality (*e.g.*, asserting privilege over the question of underlying facts, and designating as confidential testimony about public records).[49]

## E.   NRA Destruction of Documents Complicates a Solution

At the end of January, 2020 there was confirmation of a deep suspicion as to how the NRA and opposing counsel were handling evidence.[50]  Based on information obtained through discovery, Dorsey was reluctant in its discussions with the Brewer Firm to delete all copies of Exhibit B-9 without assurances the document would be preserved in the NRA and the Brewer Firm's files.[51]  In Dorsey's March 31, 2020 correspondence, it summarized those concerns:

> Given the similarities between the Presentation and the Public Affairs Presentation, the fact that the Presentation is further direct evidence of the Brewer Firm directly competing with AMc, that the Presentation is not the rendition of legal advice, and the applicability of the crime-fraud exception, Defendants do not believe the Presentation is privileged.[52]

Dorsey was willing to delete the document but demanded that the NRA preserve it:

> These actions are without waiver to Defendants' right to challenge the asserted privilege related to the Presentation in the future. Specifically, Defendants do not concede in any way that the Presentation is privileged, and demand that the NRA and its counsel continue to maintain the Presentation as part of this litigation, especially in light of the NRA's President testifying that she was directed to intentionally destroy evidence. The failure to preserve the Presentation in your and the NRA's files would be considered an act of spoliation by our client.[53]

In Dorsey's April 1, 2020 correspondence with the Brewer Firm, it included similar language, thinking that it had an agreement to dispose of this controversy.[54]  In fact, Dorsey offered

---

[48] *See* ECF 129 at Ex. A-2 [APP 5-6] (Feb. 11, 2020 Letter from Virginia counsel to the Brewer Firm); ECF 129 at Ex. A-3 [APP 7-8] (Feb. 10, 2020 Letter from Virginia counsel to the Brewer Firm regarding waiver of privilege).
[49] *See* ECF 112 at Ex. A-13 at 117:4-118:10 [APP 409]; ECF 112 at Ex. A-33 at 5:9-12 [APP 632], 39:14-40:20 [APP 640]; *see also* ECF 128 at Ex. F ¶ 37 [APP 48] (Johnston).
[50] ECF 128 at Ex. B ¶ 12 [APP 16-17] (Gruber).
[51] *Id.*
[52] *Id.* at ¶ 13 [APP 17]; ECF 108 at Ex. 12 at 1 [APP 150].
[53] ECF 128 at Ex. B ¶ 14 [APP 17] (Gruber); ECF 108 at Ex. 14 at 2 [APP 157].
[54] ECF 128 at Ex. B ¶ 15 [APP 17] (Gruber); ECF 108 at Ex. 12 at 2 [APP 151] ("Finally, we again demand that the NRA and its counsel continue to maintain the Presentation as part of this litigation, especially in light of the NRA's

to do everything the NRA/Brewer Firm requested, including returning Exhibit B-9 to the Brewer Firm; Dorsey and AMc permanently deleting all versions of Exhibit B-9; Dorsey confirming with AMc that all versions of Exhibit B-9 were deleted and verifying no copies were made; and withdrawing Exhibit B-9 from the court's record.[55]   But the NRA/Brewer Firm refused the offers, being already dead-set on filing their own motion to disqualify in retaliation for the one filed against them just one week prior.[56]

## III.    ARGUMENTS & AUTHORITIES

### A.    The NRA Did Not Prove the Information Is Privileged.

Before beginning any disqualification analysis, the NRA must first demonstrate that the information is privileged (it has not).[57]   Whether the privilege applies is a matter of law for the court.[58]   Although the NRA did not discuss which law governs, federal, Texas, and Virginia law state that privilege applies only if it has not been waived.[59]   The presence of a third party during a communication renders it not confidential for any privilege.[60]

The NRA's conclusory statements that Exhibit B-9 is privileged is false and inconsistent with its contents.   Exhibit B-9 is a public relations document, and the NRA's position with respect to Exhibit B-9 is another example of such sword-and-shield crime-fraud use of the privilege to

President testifying that she was directed to intentionally destroy evidence, and other fabrications of evidence set forth in more detail in Defendants' Motion to Disqualify and the other supporting materials. *See* ECF 78-81.").

[55] ECF 108 at Ex. 12 at 2 [APP 151]; ECF 128 at Ex. B ¶¶ 16-17 [APP 17-18] (Gruber).

[56] ECF 128 at Ex. B ¶ 17 [APP 18] (Gruber); ECF 108 at Ex. 13 at 1 [APP 153].

[57] *See Taylor Lohmeyer Law Firm, P.L.L.C. v. United States*, No. 19-50506, 2020 U.S. App. LEXIS 13230, at *9 (5th Cir. Apr. 24, 2020) ("the party asserting the privilege bears the burden of proof").

[58] *See Tatum v. Liner*, 749 S.W.2d 251, 254 (Tex. App.—San Antonio 1988, no pet.) ("The matter of whether a communication is privileged is a question of law for the trial judge to decide."); *see also Deaf Interpreter Servs. v. Webbco Enters., L.L.C.*, No. 5:13-867-RCL, 2015 U.S. Dist. LEXIS 181339, at *11-13 (W.D. Tex. Feb. 11, 2015) and *Vanderbilt Mortg. & Fin., Inc. v. Flores*, No. C-09-312, 2010 U.S. Dist. LEXIS 116434, at *13 (S.D. Tex. Nov. 1, 2010) (disallowing expert testimony on matters of law); Defs.' Obj. to McCormack Decl., filed concurrently herewith.

[59] *Navigant Consulting, Inc. v. Wilkinson*, 220 F.R.D. 467, 473 (N.D. Tex. 2004) (citing TEX. R. EVID. 503(b)); *Walton v. Mid-Atlantic Spine Specialists, P.C.*, 694 S.E.2d 545, 549-50 (Va. 2010).

[60] *See Whitaker Chalk Swindle & Sawyer, LLP v. Dart Oil & Gas Corp.*, No. 4:08-CV-684-Y, 2009 U.S Dist LEXIS 15901, at *11 (N.D. Tex. Feb. 23, 2009) (presence of, or disclosure to, a third person "eliminates the intent for confidentiality on which the privilege rests")).

hide Brewer's non-legal PR advocacy through which he supplied information to the NRA Board, while also using (but hiding from disclosure) that same information for this dispute.[61]

Exhibit B-9 is also not work product. To prove work product, the NRA must prove "the primary motivating purpose" in creating the document "was to aid in possible future litigation" and "show that the material contains the mental impressions, conclusions, opinions, or legal theories" of the attorney.[62] The NRA alleged "[t]he content [of Exhibit B-9] makes clear that the presentation was prepared by counsel at [the Brewer Firm] to provide members of the NRA Board of Directors *legal opinions and advice* regarding highly sensitive pending and anticipated litigation."[63] Exhibit B-9 does not provide legal opinions or advice, it provides information about the NRA's public relations. In *Ferko*, similar blanket assertions of work-product were rejected.[64]

Yet, even if Exhibit B-9 is privileged, the privileged was waived. Although "whether [a] waiver occurred is a question of law" for the Court,[65] the NRA's purported expert, James McCormack ("*McCormack*"), attempts to opine that the NRA's conduct did not amount to a waiver.[66] Setting aside this improper legal conclusion,[67] McCormack's opinion is not consistent

---

[61] *See e.g.*, ECF 80 at Ex. A-7 at 2 [APP 358] (Brewer, *Advocacy as Art*) ("There is also an inherent advantage in having law, media and politics all directed under the umbrella of the attorney-client relationship."); ECF 55 at 10-11; ECF 90 at 7-9. *See also generally* ECF 105 (describing the fraud).

[62] *Ferko v. NASCAR*, 219 F.R.D. 396, 400 (E.D. Tex. 2003) (burden on party asserting work product) (citing *Hodges, Grant & Kaufmann v. United States*, 768 F.2d 719, 721 (5th Cir. 1985) (emphasis added)). *See Navigant*, 220 F.R.D. at 476 (N.D. Tex. 2004) (federal law applies to the issue of work product).

[63] ECF 107 at 15 (emphasis added). Although the NRA did not fully brief the work product doctrine, Defendants respond in an abundance of caution. *See* ECF 107 at 11 ("[Exhibit B-9] is unambiguously protected by both attorney-client privilege and the work product doctrine.") & 13 ("the work product doctrine still protects [Exhibit B-9]"). If the NRA attempts to assert a new argument in its Reply and such new argument is permitted, Defendants request from this Court an opportunity to fully respond to that argument, which the NRA otherwise waived in its original Motion.

[64] *See* 219 F.R.D. at 402 ("Plaintiffs make blanket assertions of work-product protection," which "are insufficient.").

[65] *See Brannick v. Aurora Loan Servs., LLC*, No. 03-17-00308-CV, 2018 Tex. App. LEXIS 8981, at *8 (Tex. App. Nov. 2, 2018, no pet.); *Highlands Ins. Co. v. Allstate Ins. Co.*, 688 F.2d 398, 404 (5th Cir. 1982); *Vanderbilt*, 2010 U.S. Dist. LEXIS 116434, at *13; *Deaf Interpreter Servs. v. Webbco Enters., L.L.C.*, No. 5:13-867-RCL, 2015 U.S. Dist. LEXIS 181339, at *11-13 (W.D. Tex. Feb. 11, 2015).

[66] *See generally* ECF 108 at Ex. 18 [APP 257-273].

[67] *Vanderbilt*, 2010 U.S. Dist. LEXIS 116434, at *13; *Deaf Interpreter*, 2015 U.S. Dist. LEXIS 181339, at *11-13. As set forth in Defendants' Objection to McCormack, his opinions are improper and should be excluded. *See also* ECF 128 at Ex. F ¶ 18 [APP 38-39] (Johnston).

with law or facts because the NRA *did* waive privilege by disclosing alleged work product to its adversary "in a manner that substantially increases the likelihood" of disclosure to an adversary.[68]

*First*, as Carter attested in his declaration, Exhibit B-9 was presented to "NRA board members and senior staff members" and "other invited guests."[69]  The NRA concedes by its own evidence that it waived privilege as to Exhibit B-9 by disclosing to third parties.[70]

*Second*, the NRA's principal argument is that Dorsey's knowledge of the Lockton settlement terms prejudices the NRA.  But those terms were disclosed in discovery before Dorsey ever obtained Exhibit B-9.[71]  In September 2019, LaPierre testified about the Lockton settlement amounts, including what the NRA received versus what the Brewer Firm received.[72]  Then, the NRA's wrongfully ousted former President, Lt. Col. Oliver North's ("*North*"), provided the same information in his December 18, 2019 deposition and in an April 2019 letter he wrote.[73]  Therefore, the NRA cannot claim privilege over information divulged before Dorsey obtained Exhibit B-9.[74]

*Third*, the NRA intentionally provided allegedly privileged information to its adversary.  According to LaPierre, the NRA decided to sue AMc before the September *2018* board meeting.[75]  At least four months later, the NRA still gave to AMc what it claims is a privileged and work-product document.[76]  To the extent the NRA contends without actually arguing that AMc was

---

[68] *See Ferko*, 219 F.R.D. at 400-01.
[69] ECF 108 at Ex. 4 ¶ 13 [APP 97].
[70] *See Whitaker*, 2009 U.S. Dist LEXIS 15901, at *11 (presence of, or disclosure to, a third person "eliminates the intent for confidentiality on which the privilege rests"); ECF 108 at Ex. 18 ¶ 27 [APP 267] ("Waiver would also require a finding that [Exhibit B-9] was disclosed voluntarily to a third party."); ECF 128 at Ex. F ¶ 18 [APP 38-39].
[71] *See e.g.*, ECF 80 at Ex. A-7 at 2 [APP 358] (Brewer, *Advocacy as Art*) ("There is also an inherent advantage in having law, media and politics all directed under the umbrella of the attorney-client relationship."); ECF 55 at 10-11; ECF 90 at 7-9.  *See also generally* ECF 105 (describing the fraud).
[72] ECF 112 at Ex. A-62 at 163:4-11 [APP 1074].
[73] ECF 112 at Ex. A-3 at 209:16-210:22 [APP 231]; ECF 112 at Ex. A-22 at 3 [APP 483].
[74] *See* ECF 128 at Ex. F ¶ 18 [APP 38-39] (Johnston).
[75] *Compare* ECF 105 n.65 and ECF 112 at Ex. A-44 [APP 801] *with* ECF 107 at 13 (exposing the NRA's disingenuous representation to the Court that "at the time [of the two presentations in January 2019], AMc was not an adversary").
[76] *Ferko*, 219 F.R.D. at 400-01 (waiver when "given to adversaries or treated in a manner that substantially increases the likelihood that an adversary will come into possession of the material."); *see also* ECF 128 at Ex. F ¶ 18 [APP 38-39] (Johnston.).

somehow included as a client or representative during privileged communications, that argument has been raised by the NRA and rejected by the Supreme Court of the State of New York.[77]

*Fourth*, the NRA has not shown that Exhibit B-9 includes legal impressions or opinions.[78] Dorsey has not seen the presentation notes, and is unable to analyze whether the notes are work product. As for the slides, other than the Lockton slide (containing information previously disclosed), Exhibit B-9 is a shortened summary of the Public Affairs Presentation the NRA undisputedly concedes is not privileged or work product.[79]

*Fifth*, the NRA's failure to attempt to retrieve Exhibit B-9 after Popp's July 2019 deposition indicates the NRA had no concern about, and waived, any privilege.[80]

*Finally*, the NRA *re-filed* and put back in the record (under seal) what was no longer in the record, which it could have provided to the Court *in camera* if indeed the information were as sensitive as argued.[81] Now both Dorsey and any other counsel can access the document. The Fifth Circuit deems voluntary disclosure to a court to be a waiver of work product.[82] In summary, rather

---

[77] *See* ECF 107 at 3. *Cf.* ECF 56 at Ex. A-10 at 6 [APP 632] (*People v. Ackerman McQueen and the National Rifle Association of America, Inc.*, Index No. 451825/2019 (S. Ct. NY Feb. 24, 2020)) (ruling AMc's services were purely public relations services "as a third-party" rather than an essential translator or legal advice. Notably, the NRA attached to its Motion the *same* affidavit from John Frazer that it relied upon in support of the failed argument before the NY Court. *See* ECF 108 at Ex. 3 [APP 22-29]; ECF 56 at Ex. A-10 at 6 [APP 633] (determining that Frazer's "legal advice" examples with AMc actually "concern [AMc's] public representation of the NRA" and that "Frazer does not specifically identify any legal advice … that required [AMc's] direct assistance." The New York court further explained that work product does not extend to "media and public relations.").

[78] *Cf. Cnty. of Los Angeles v. Superior Ct.*, 222 Cal. App. 3d 647 (Ct. App. 1990), one of the cases cited in the NRA's Motion where an expert (as opposed to, here, a media relations group) "switched sides" during the lawsuit, which the California court (non-binding authority) found to be prejudicial because the expert could not separate his knowledge of the previous attorney's work product *concerning that lawsuit* from his own preparation of the case. *See also* ECF 128 at Ex. F ¶ 18 [APP 38-39] (Johnston).

[79] *See i.e.*, ECF 108 at Ex. 2 ¶ 5 [APP 19] (Arulanandam 2020) (testifying that meetings such as the Public Affairs Committee meeting are "typically attended by a range of NRA board members, members, special guests, and vendor representatives" and acknowledging that AMc representatives attended); ECF 108 at Ex. 4 at ¶ 5 [APP 95] (Carter 2020). (The Public Affairs Committee meeting was "not subject to the strict rules and guidelines associated with more sensitive discussions that occur during confidential presentations to the full NRA Board of Directors, and particularly those presentations that occur in executive session.").

[80] *See* ECF 128 at Ex. F ¶ 18 [APP 38-39] (Johnston).

[81] *See id.*

[82] *Windsor v. Olson*, No. 3:16-cv-934-L, 2019 U.S. Dist. LEXIS 168, at *12 (N.D. Tex. Jan. 2, 2019) ("the work product privilege is waived . . . when the attorney discloses the information to the court voluntarily or makes no

---

than proving the elements of attorney-client privilege or work-product doctrine, the NRA supplied its own evidence that it waived both—at the time of the presentation *and* during sworn testimony.

## B.    The Law Does Not Require Dorsey's Disqualification.

Even assuming, *arguendo*, that Exhibit B-9 is privileged, the seminal case relied upon in the NRA's Response, *In re Meador*, does not mandate Dorsey's disqualification for similar reasons that disqualification was improper there.[83]  As the Texas Supreme Court said, "a court should not disqualify a lawyer for a disciplinary violation that has not resulted in actual prejudice to the party seeking disqualification."[84]  Even if this Court finds a rule violation, there is no prejudice here.[85]

Further, not providing "notice to opposing counsel upon receipt of an opposing party's confidential information outside the normal course of discovery does not necessarily or automatically violate the Texas Disciplinary Rules," regardless of inadvertent or involuntary—or intentional—disclosure.[86]  The *Meador* court rejected an appellant court's reasoning "to the extent that it holds that an attorney must be disqualified when, through no wrongdoing on the attorney's part, he or she gains possession of an opponent's confidential information," without considering "the significance of the information or the other circumstances surrounding the disclosure."[87]

In *Meador*, CLN president's executive assistant, Patricia Peterson, copied a letter the company's attorney sent to the president.[88]  The letter described settlement terms in another lawsuit

---

objection when it is offered") (citing *Shields v. Sturm, Ruger & Co.*, 864 F.2d 379, 382 (5th Cir. 1989). Although the NRA objected to Exhibit B-9, it then *refiled* it with this Court voluntarily.

[83] *See* 968 S.W.2d 346 (Tex. 1998); ECF 128 at Ex. F ¶ 28 [APP 45] (Johnston).

[84] *Id.* at 350; *OrchestrateHR, Inc. v. Trombetta*, No. 3:13-CV-2110-KS-BH, 2016 U.S. Dist. LEXIS 117986, at *43 (N.D. Tex. Sep. 1, 2016) (quoting same); *see also* ECF 128 at Ex. F ¶ 26 [APP 45] (Johnston).

[85] The NRA cites inapplicable cases with egregious conduct.  *See e.g.*, *In re Beiny*, 132 A.D. 2d 190 (N.Y. App. Div. 1987) ((non-binding authority) fraudulently serving a subpoena for privileged information, using the documents in a deposition, and refusing to produce the documents absent concessions from opponent delayed the case 2.5 years).

[86] Tex. Bar Ethics Committee Op., 79 Tex. B. J. 818, 819 (Dec. 2016) ("Because the Texas Disciplinary Rules are silent regarding the duty of a lawyer who receives an opponent's confidential information, a lawyer who thereafter fails to notify the opposing party does not necessarily violate those Rules.").

[87] *Meador*, 968 S.W.2d at 354.

[88] *Id.* at 348.

with a different employee, including that the settling employee would give a sworn statement in the Meador case.[89]   Peterson left the company, copied the letter, and shared it with Meador's lawyer (who eventually represented Peterson).[90]   Meador received the letter and produced it to CLN's attorneys during her deposition.[91]   CLN moved to disqualify opposing counsel.[92]   The Texas Supreme Court affirmed the trial court's denial of the motion.[93]

The trial court based its ruling on three factors: First, the information in the privileged documents would not significantly prejudice the company's claims and defenses.[94]   Second, the court was unable to determine the extent of harm to CLN because it did not have the full statement.[95]   Third, the plaintiff would be unable to afford an attorney to defend against the counterclaims, which, "would confer an enormous strategic advantage upon" CLN.[96]   The other cases upon which the CLN relied for disqualification were inapplicable because they involved an attorney who "acted improperly to obtain" the privileged information or employees with litigation knowledge who switched sides during the lawsuit.[97]   Disqualification is unwarranted here too.[98]

### 1.    The NRA Failed to Demonstrate Dorsey Violated Any Ethical Rules.

*First*, the NRA cited no case law to support its contention that Dorsey violated Texas Rule 8.04.[99]   The NRA did not describe any deceiving statements Dorsey made.[100]   Further, the only case that Defendants found that is tenuously relevant to the NRA's allegations is *Contico Int'l v.*

---

[89] *Id.*
[90] *Id.* at 348-49.
[91] *Id.* at 349.
[92] *Id.*
[93] *Id.* at 349, 354.
[94] *Id.* at 352.
[95] *Id.*
[96] *Id.* at 352-53.
[97] *Id.* at 354.  Another such inapplicable case is *MMR/Wallace Power & Indus., Inc. v. Thames Assocs.*, 764 F. Supp. 712, 714-15 (D. Conn. 1991), which the NRA relies upon in its Motion.
[98] The *Meador* six-factor test for disqualification is set forth in the NRA's Motion (ECF 107 at 14) and begins with subsection 2 below.  *See also Meador*, 968 S.W.2d at 351-52.
[99] *See* ECF 107 at 20.
[100] *See* ECF 107 at 20.

*Alvarez* (since overturned and no longer good law), where a lawyer literally stole an investigation file from opposing counsel's office.[101]  While the appellate court found a violation of Texas Rule 8.04, the Texas Supreme Court affirmed the trial court's ruling *against* disqualification because of conflicting evidence surrounding the allegedly privileged investigation report.[102]

The NRA's evidence, or lack thereof, confirms that Dorsey did not engage in "conduct involving dishonesty, fraud, deceit, or misrepresentation."[103]  Dorsey did not lay in wait to steal a document or direct its client to do so.  Rather, as the NRA noted, Dorsey had a "misunderstanding of the facts" concerning the non-privileged Public Affairs Presentation.[104]

*Second*, the NRA cited no case law concerning Texas Rule 4.01(b).  The NRA's sole argument is premised on the incorrect assumption that AMc stole NRA property.[105]  But the NRA intentionally gave Exhibit B-9 to AMc at a meeting that non-NRA, "other guests" attended[106] even after deciding at least four months earlier to sue AMc.[107]  Thus, the presentation was not stolen.

Moreover, also as stated above, because Dorsey did not know Exhibit B-9 was allegedly privileged, there was no "fail[ure] to disclose a material fact" because it did not know the material fact at the time.[108]  As in *Ibarra*, once Dorsey understood that Exhibit B-9 was not the Public Affairs Presentation, it notified opposing counsel and withdrew the exhibit from the record.[109]

*Third*, the NRA cites no case law for Model Rule 4.4(b),[110] which requires that a lawyer

---

[101] 910 S.W.2d 29, 32 (Tex. App.—San Antonio 1995, no writ).

[102] *Mendoza v. Eighth Court of Appeals*, 917 S.W.2d 787, 790 (Tex. 1996).

[103] Tᴇx. R. 8.04(a)(3).

[104] ECF 108 at Ex. 9 [APP 112]; ECF 128 at Ex. A-1 at 2 ("an apparent mistake, the NRA attorneys wrote").

[105] ECF 107 at 20.

[106] ECF 108 at Ex. 4 ¶ 13 [APP 97] (Carter 2020).

[107] ECF 112 at Ex. A-44 [APP 801].

[108] Tᴇx. R. 4.01(b).  As noted in *Ibarra v. Baker*, the Fifth Circuit determined that counsel's failure to immediately disclose that certain emails subject to a subpoena had been deleted three weeks prior did not amount to assistance, "much less knowing[] assist[ance]," of fraud.  338 Fed. Appx. 457, 471 (5th Cir. 2009).  Once the lawyer learned of the issue, he informed opposing counsel the next day and took appropriate steps to recover the emails.  *Id.*  "The district court erred in using" Texas Rule 4.01(b) to sanction the lawyer.  *Id.*

[109] ECF 108 at Ex. 12 [APP 150-151]; ECF 87 (withdrawing Exhibit B-9 from the record).

[110] *See* ECF 107 at 20-21.

promptly notify the sender when a document is "inadvertently sent."[111]   Exhibit B-9 was intentionally provided to AMc.[112]   Accordingly, Dorsey also did not violate Model Rule 4.4(b). Even if it did, the NRA did not meet the *Meador* factors or otherwise prove any actual prejudice.[113]

### 2.     Dorsey Did Not Know the Information Was Potentially Privileged.

The NRA argues that Dorsey knew Exhibit B-9 was privileged because every page is labeled "Confidential & Privileged" and "Attorney Work Product."[114]   But the same labels are on every slide of the Public Affairs Presentation from the day before—which presentation Exhibit B-9 summarizes.[115]   Undisputedly, the Public Affairs Presentation is not privileged despite the same labels.[116]   Thus, it would be disingenuous to argue a summary of the Public Affairs Presentation is privileged, and it is equally inappropriate to argue that Dorsey should have known Exhibit B-9 was privileged simply because it had the same, inapplicable labels.[117]

Tellingly, the individuals with knowledge of the presentations who gave declarations in support of the Motion are the NRA's Managing Director of *Public Affairs* (Arulanandam)[118] and the Brewer Firm's Managing Director of *Public Affairs* (Carter)[119]—not lawyers.   According to

---

[111] MODEL R. 4.4(b).
[112] ECF 108 at Ex. 4 ¶¶ 13-14 [APP 97] (Carter 2020); ECF 108 at Ex. 2 ¶¶ 4-5, 8-9 [APP 19-21] (Arulanandam 2020); ECF 128 at Ex. C ¶ 9 [APP 21] (Popp); ECF 108 at Ex. 16 at 67:9-23 [APP 182], 128:19-129:23 [APP 197-198] (Popp Dep.).
[113] *See In re Meador*, 968 S.W.2d 346 (Tex. 1998).
[114] ECF 107 at 14-15; ECF 108 at Ex. 18 ¶ 30 [APP 268] ("Exhibit B-9 was 'plainly marked.'").  McCormack also reviewed a transcript of the January 5 Board meeting, noting that "*it is clear that only a select few parties were invited to remain in the room for that closed session*."  ECF 108 at Ex. 18 ¶ 27 [APP 266].  McCormack states AMc was not invited to remain in the room, but not that all third parties were excluded.  Defendants have never had access to the transcript; the Brewer Firm also did not provide the transcript after Dorsey requested it.  The opinion should be excluded for failure to disclose information McCormack relied upon.  *See* FED. R. CIV. P. 26(a)(2)(B)(ii).
[115] *See Marsh v. First USA Bank, N.A.*, No. 3:99-CV-0783, 2000 U.S. Dist. LEXIS 16858, at *8-9 (N.D. Tex. May 23, 2000) ("[T]hat the documents were stamped 'privileged' is not dispositive of their character…. Indeed, many sensitive documents may be stamped 'privileged,' but that does not make them so because that determination is a question of law to be decided by the Court.").
[116] Beyond the NRA admitting in the declarations submitted with its Motion that the Public Affairs Presentation is not privileged, the NRA has taken no issue with it being filed under seal.  *See* ECF 112 at Ex. A-65 [APP 1130-1162].
[117] ECF 128 at Ex. F ¶ 29 [APP 45] (Johnston) ("labels do not confer protected status").
[118] ECF 108 at Ex. 2 [APP 18-21] (Arulanandam 2020).
[119] ECF 108 at Ex. 4 [APP 94-98] (Carter 2020).

Arulanandam, Carter's presentation,[120] "covered *public-facing communications efforts* concerning legal and regulatory matters being handled by his firm,"[121] *i.e.*, the Brewer Firm's PR work.[122]

The Brewer Firm acknowledges that AMc representatives "were in the room during" the Public Affairs Presentation.[123]  In fact, it was Carter's "understand[ing] [that] as a 'committee presentation,'" the Public Affairs Presentation "was not subject to the strict rules and guidelines" and that AMc's presence "was customary at such informal meetings, as Ackerman acted as *the advertising and communications agency for the NRA*."[124]  Carter further distinguished Exhibit B-9 from the Public Affairs Presentation as "contain[ing] privileged information."[125]

Two points are clear: (1) the Public Affairs Presentation is not privileged, and (2) AMc was at the meeting as the advertising and communications agency, which means the Public Affairs Presentation concerns public relations work for the NRA—not privileged, legal information.

Because Dorsey understood AMc employees attended the Public Affairs Committee meeting and saw the presentation, because both presentations contain the same "privileged" labels even though the Public Affairs Presentation is not privileged (undisputed), and because Dorsey received Exhibit B-9 with the understanding that it was the Public Affairs Presentation,[126] Dorsey did not know Exhibit B-9 was privileged.[127]  Moreover, the NRA's waiver of privilege over the Public Affairs Presentation extends to the same subject matter in Exhibit B-9.[128]

---

[120] ECF 108 at Ex. 4 ¶ 3 [APP 95] (Carter 2020) (Carter drafted the presentation himself).

[121] ECF 108 at Ex. 2 ¶ 4 [APP 19] (Arulanandam 2020) (emphasis added).

[122] *See* ECF 128 at Ex. F ¶ 31 [APP 46] (Johnston).

[123] ECF 108 at Ex. 4 ¶ 5 [APP 95] (Carter 2020).

[124] *Id.* (emphasis added); *see also* ECF 108 at Ex. 2 ¶ 5 [APP 19] (Arulanandam 2020) (committee meetings regularly include "NRA board members, members, special guests, and vendor representatives").

[125] ECF 108 at Ex. 4 ¶ 8 [APP 96] (Carter 2020); *see also* ECF 108 at Ex. 2 ¶ 6 [APP 19-20] (Arulanandam 2020) ("[T]he document filed by AMc … was not the January 4, 2019 Public Affairs Committee presentation to which AMc refers in its brief.  Instead, they attached a highly confidential, attorney-client privileged presentation delivered to a closed executive session of the NRA Board of Directors by BAC partner William A. Brewer III on January 5, 2019.").

[126] *See* ECF 128 at Ex. F ¶ 30 [APP 46] (Johnston).

[127] ECF 128 at Ex. B ¶¶ 8-9 [APP 15-16] (Gruber); *see also* ECF 128 at Ex. F ¶ 33 [APP 47] (Johnston.).

[128] *See* FED. R. EVID. 502(a); *SEC v. Brady*, 238 F.R.D. 429, 441 (N.D. Tex. 2006) (disclosure of a PowerPoint presentation to audit committee was a waiver for the related categories of documents because disclosure of a portion

Carter points out that certain "accompanying notes" explain the "entire executive session is <u>privileged</u> and <u>confidential</u>,"[129] but Dorsey has never seen or reviewed any notes.[130] Because Dorsey did not access the attorney notes, it could not have seen the referenced statement. Thus, the only way to inspect the presentation was "privileged" was by the labeling, which, as discussed, was insufficient because of the same labeling rubber-stamped on the Public Affairs Presentation. This confusion is, in large part, due to Brewer acting more as a public relations firm and making a non-legal, public relations presentation summarized in a similar one the next day.[131]

### 3.    Dorsey Promptly Acted When It Learned of the Alleged Privilege.

Although Dorsey acknowledges it received and filed the wrong presentation, the relevant case law does not require disqualification based on non-disclosure to the NRA.[132]  Even in *Meador*, where the client *intentionally* took information *relevant to the lawsuit* and provided that information to her counsel, who "thoroughly reviewed the materials," disqualification was

---

waives the whole *and* all other communications about the same subject matter).  "When a party waives the attorney-client privilege, it waives the privilege as to all communications that pertain to the same subject matter of the waived communication." *SEC v. Microtune, Inc.*, 258 F.R.D. 310, 317 (N.D. Tex. 2009) (voluntary disclosure of documents relating to the stock option investigation waived the privilege as to *all* documents relating to the investigation); *see also In re Itron*, 883 F.3d 553, 558 (5th Cir. 2018) ("fairness dictates that the waiver extend to related subject matter"); *see also In re Fisher & Paykel Appliances, Inc.*, 420 S.W.3d 842, 851 (Tex. App.—Dallas 2014, pet. denied) (refusing to recognize the "selective waiver" doctrine); *Grasso v. O'Connor*, 41 Va. Cir. 193, 193 (1996) (waiver "when a client has herself put in issue the very subject matter of the communications she is now trying to protect").

[129] ECF 108 at Ex. 4 ¶ 11 [APP 96] (Carter 2020).

[130] ECF 128 at Ex. B ¶ 18 [APP 18] (Gruber).

[131] *See e.g.*, ECF 80 at Ex. A-7 at 3 [APP 359] (Brewer, *Advocacy as Art*) ("Public relations is about more than press engagement. It involves projecting your external voice as a gateway into informing *and influencing* key audiences." (emphasis in original)); ECF 128 at Ex. F ¶ 32 [APP 46] (Johnston).

[132] Tex. Bar Ethics Committee Op., 79 Tex. B. J. 818, 819 (Dec. 2016) ("As the Texas Supreme Court noted in *Meador*, the Texas Disciplinary Rules do not contain a rule addressing the appropriate standard of conduct when a lawyer receives an opposing party's confidential information obtained in an unauthorized manner.  Nor has Texas adopted a version of ABA Model Rule 4.4(b) or any other rule that directly addresses a lawyer's duties upon receipt of inadvertently sent confidential information.  As a consequence, a Texas lawyer who fails to provide notice to opposing counsel upon receipt of an opposing party's confidential information outside the normal course of discovery does not necessarily or automatically violate the Texas Disciplinary Rules.").  *Meador* does not "obligate" a party to return materials received from its adversary whether unauthorized as in *Meador* or intentionally disclosed as here.  *Compare* ECF 128 at Ex. F ¶¶ 21, 36 [APP 39, 47] (Johnston) *with* ECF 108 at Ex. 18 ¶ 29 [APP 268] (McCormack).  Even if the ABA Opinion applied, the key trigger of any such duty is when the lawyer "knows" the document(s) to be privileged.  *See Meador*, 968 S.W.2d at 349.

---

inappropriate.[133]  The NRA also curiously cited to *Harleysville Ins., Co. v. Holding Funeral Home, Inc.* in arguing that failure to "promptly disclose" possession of Exhibit B-9 "justifies disqualification."[134]  But the Western District of Virginia ruled *against* disqualification even while finding that the lawyer actively deceived its adversary by hiding his possession of the document.[135]

Here, although Dorsey disagreed with the NRA's privilege claim, it agreed to and did in fact isolate Exhibit B-9, ensured it was not disseminated, and agreed to take appropriate action with the Court.[136]  Even the Brewer Firm explained the "*misunderstanding* of the facts" in mixing up Exhibit B-9 as the Public Affairs Presentation, which Dorsey did not realize until after that explanation.[137]  Dorsey withdrew the filing, which at all times remained under seal.[138]

### 4.    Dorsey Did Not Fully Digest the Information.

As stated previously, Dorsey did not access, see, or otherwise review the attorney notes contained in either presentation.[139]  That Dorsey referred to Exhibit B-9 as an example of the Brewer Firm's PR work is not evidence that Dorsey fully digested the document, particularly when Dorsey described the Public Affairs Presentation in its pleading.[140]  The NRA also argues AMc "closely reviewed" and served document requests that "directly target issues discussed in [Exhibit B-9]."[141]  Those document requests (served December 2019 *before* Dorsey ever obtained Exhibit

---

[133] 968 S.W.2d at 352-53.
[134] ECF 107 at 15; *Harleysville*, No. 1:15CV00057, 2017 U.S. Dist. LEXIS 162058 (W.D. Va. Oct. 2, 2017).
[135] *Id.* at *3-6, *38, *42-43.  There, the lawyer obtained his adversary's privileged information.  He claimed to have produced the relevant folder, when he actually changed the folder name, buried it amongst other documents "tens of thousands of pages of documents, sorted into hundreds of folders and subfolders," *and* removed the privileged document.  The document did not contain "smoking gun materials" to "make or break either party's case."
[136] ECF 108 at Ex. 8 [APP 109-110].  *See also Marsh*, 2000 U.S. Dist. LEXIS 16858, at *11 (finding counsel took "reasonable, precautionary measure[s] of preventing further disclosure" by returning the document at issue, not further disclosing the document, and filing the document under seal).  During this same timeframe, the entire Dorsey firm moved to work-from-home status.  *See* ECF 128 at Ex. B ¶ 10 [APP 10] (Gruber); ECF 128 at Ex. F ¶¶ 35, 37 [APP 47, 48] (Johnston).
[137] ECF 108 at Ex. 9 [APP 112] (emphasis added); ECF 128 at Ex. B ¶¶ 9-11 [APP 15-16] (Gruber).
[138] ECF 108 at Ex. 12 [APP 150-151]; ECF 128 at Ex. B ¶ 19 [APP 18] (Gruber).
[139] ECF 128 at Ex. B ¶ 18 [APP 18] (Gruber).
[140] *See* ECF 128 at Ex. F ¶¶ 38-39 [APP 48-49] (Johnston).
[141] ECF 107 at 15-16.

B-9 in January 2020[142]) seek documents "as referenced in LaPierre's September 24, 2019 deposition" or otherwise disclosed in NRA documents or public sources.[143]

### 5.   The Information Will Not Prejudice the NRA's Claims or Defenses.

What is important in the NRA's Motion is what it does *not* say.[144]  Notably missing is any argument that the information is relevant *to this lawsuit*.[145]  In fact, the only information at issue concerns the Lockton settlement, which was already disclosed, as previously briefed herein.[146]

Detailed in Defendants' *Motion to Disqualify Plaintiff's Counsel*, part of the narrative in the ultimate termination of the near-40-year business relationship between AMc and the NRA was North's attempt to have Brewer's engagements and fees audited.[147]  Part of that inquiry concerned the Lockton lawsuit and how much Brewer received, as opposed to the NRA.[148]  When North continued to seek an independent audit, he was ousted, falsely accused of extortion (along with AMc and *all* the other NRA executives who questioned Brewer), and his contract was terminated through the termination of the Services Agreement.[149]

The only reason Lockton is relevant to this dispute is when describing the *internal* NRA questions about Brewer, which was Brewer's impetus for the defamatory extortion narrative and for destroying AMc's contractual relationship with the NRA.  The same is true regardless of Exhibit B-9.  Any information contained in the slides or the notes (which Dorsey has not seen) could not prejudice the NRA or give Defendants any unfair advantage.[150]

---

[142] *See* ECF 128 at Ex. F ¶ 38 [APP 48] (Johnston).
[143] ECF 108 at Ex. 17 [APP 238-243].  *See e.g.*, ECF 112 at Ex. A-62 at 163:4-11 [APP 1074].
[144] ECF 107 at 16 ("legal advice about pending or anticipated litigation and regulatory matters").
[145] *See* ECF 108 at Ex. 18 ¶ 33 [APP 269-270] (McCormack) ("disput[ing] the relevance … to this lawsuit"); ECF 128 at Ex. F ¶ 41 [APP 49-50] (Johnston).
[146] *See* ECF 128 at Ex. F ¶ 41 [APP 49-50] (Johnston).
[147] ECF 105 at 5-10.
[148] ECF 112 at Ex. 3 at 126:8-13 [APP 210], 119:9-128:14 [APP 208-210]; ECF 129 at Ex. A-4 at 1 [APP 9].
[149] ECF 105 at 7-10.
[150] *Cf.* the cases cited in the NRA's Motion, such as *MMR/Wallace Power & Indus., Inc. v. Thames Assocs.*, 764 F. Supp. 712, 727 (D. Conn. 1991) ((non-binding authority) former employee who "switched sides" had privileged information *for the litigation at issue* with a "devastating effect" on the outcome of *that litigation*).  The information

The NRA also claims that "Dorsey has used Confidential Exhibit B-9 in a manner adverse to the interests of the NRA in legal filings," citing only to the Response to Plaintiff's Motion to Compel,[151] and only to one paragraph, where Defendants made only one statement about *the Public Affairs Presentation*.[152]  Yet even the two declarants upon whom the Motion is based attested that the reason Dorsey used Exhibit B-9 was as evidence of Brewer's competition rather than to use the Lockton information against the NRA: (Carter) "Ackerman filed a legal brief with this Court that made specific mention of my [Public Affairs Presentation]" and "[t]he brief purported to explain the nature of my presentation;"[153] (Arulanandam) AMc referred to it "to advance an argument that the BAC law firm at which Mr. Carter works was seeking to replace AMc as the NRA's advertising and public relations firm."[154]

Moreover, Exhibit B-9 could not have "provided AMc with a roadmap for seeking documents concerning non-AMc legal disputes," because Dorsey did not obtain Exhibit B-9 until *after* it served those requests in December 2019.[155]  Rather, North's April 2019 letter, his December 2019 deposition, and LaPierre's September 2019 deposition provided the "roadmap."[156]

Notably, after Dorsey informed the NRA that it had isolated Exhibit B-9 in its files and withdrawn it from the Court's record, the NRA then *re-filed* the document.  Now the NRA has provided the document back to Dorsey (and any subsequent counsel even if Dorsey were

---

here concerns litigation not involving Defendants and would have no such "devastating effect" on this lawsuit.  *See also In re Marketing Investors Corp.*, 80 S.W.3d 44, 51 (Tex. App.—Dallas 1998) (privileged documents related to *the adversary's trial strategy*); *Maldonado v. New Jersey*, 225 F.R.D. 120, 141 (N.J. 2004) (opposing counsel used privileged documents to formulate his case).

[151] *See* ECF 128 at Ex. B ¶ 6 [APP 14] (Gruber) (describing the Public Affairs Presentation as superior for the purposes intended, as "longer and more detailed").

[152] ECF 107 at 16 n.71 (citing to ECF 51 ¶ 5, recited herein at 7).

[153] ECF 108 at Ex. 4 ¶ 6 [APP 95] (Carter 2020).

[154] ECF 108 at Ex. 2 ¶ 5 [APP 19] (Arulanandam 2020).  *See also* ECF 128 at Ex. B ¶ 9 [APP 15-16] (Gruber).

[155] *Cf.* ECF 108 at Ex. 18 ¶ 33 [APP 269-270] (McCormack).

[156] *See* ECF 128 at Ex. F ¶ 41 [APP 49-50] (Johnston).

disqualified).[157]  The NRA cannot claim prejudice when it did not protect its document after all these allegations, freely filing it rather than providing it to the Court for *in camera* inspection.

In fact, McCormack succinctly explained that Exhibit B-9 does not prejudice the NRA in this lawsuit, but rather that it "had the ***potential*** to unfairly compromise the NRA's legal strategies ***in other cases***"—not that it did, not that it will, but that it *could* have, and for unrelated matters.[158] Taken together, it is implausible that the information would or did prejudice the NRA in any way in this lawsuit, and, indeed, the NRA admits as much.[159]

### 6.     The NRA Is at Fault for the Disclosure.

The NRA failed to explain or refute that it *intentionally* provided Exhibit B-9 *to its adversary* during a presentation where "other guests" (outside of the NRA) were present.[160]  The NRA did not take reasonable precautions to ensure confidentiality—whether with AMc, "AV technicians," or those "other invited guests."  More importantly, there simply is not any substantive difference between the claimed legal presentation (Exhibit B-9) and the Public Affairs Presentation the day before.  Otherwise, the Brewer Firm gave what it would call a legal presentation to the Public Affairs Committee in an admittedly public setting.  The fault is endemic to their practice in the court of public opinion.

### 7.     Defendants Would Suffer Substantial Hardship If Dorsey Were Disqualified.

Dorsey has been counsel for this case since September 2019 and involved in the sister Virginia Action, giving it a comprehensive overview of how the Virginia Action impacts this

---

[157] *See id.*
[158] ECF 108 at Ex. 18 ¶ 35 [APP 270-271] (McCormack.); ECF 128 at Ex. F ¶ 41 [APP 49-50] (Johnston).
[159] *See Meador*, 968 S.W.2d at 350 ("[A] court should not disqualify a lawyer for a disciplinary violation that has not resulted in actual prejudice to the party seeking disqualification."); *OrchestrateHR*, 2016 U.S. Dist. LEXIS 117986, at *43 (quoting same).  McCormack cites to *In re Marketing Investors Corp.* to say Dorsey should be disqualified. ECF 108 at Ex. 18 ¶ 36 [APP 271-272] (McCormack).  But even in that case, opposing counsel had privileged documents *relating to his adversary's trial strategy.  See* 80 S.W.3d 44, 51 (Tex. App.—Dallas 1998).
[160] ECF 108 at Ex. 4 ¶ 13 [APP 97] (Carter 2020); ECF 128 at Ex. F ¶¶ 42-44 [APP 50-51] (Johnston).

case.[161]  With that case being stayed, new counsel would not have that opportunity to know what (often contradictory) actions the NRA has taken in the sister litigation to argue *res judicata* issues and otherwise fully protect Defendants' interests.  AMc's Virginia counsel are not licensed to practice in the Northern District of Texas, and they have not litigated the newly-added Texas claims because of the stay.[162]  The NRA failed to demonstrate that AMc will not suffer prejudice.

Additionally, Dorsey has represented AMc since 2013 across a variety of matters, including litigation.[163]  That long history gives Dorsey a unique institutional knowledge about AMc, its practices, and its employees relevant to this dispute, particularly Angus McQueen, deceased former AMc CEO, about whom the NRA lodges numerous defamatory allegations.[164] Dorsey worked with A. McQueen on this very dispute against the NRA.[165]  No other counsel could possibly have or obtain the same knowledge or understand the import as applied to this matter.

Moreover, unlike the NRA being funded by its multi-million-dollar NRA Foundation, AMc has a finite amount of resources that would be significantly depleted if forced to hire new counsel to grasp the totality of this dispute, which requires a deep understanding of the Virginia Action as well—especially when the NRA is attempting to unwind the stay in place in Virginia.[166] AMc was already forced to furlough, terminate, or significantly reduce the salary of numerous employees because of this litigation and the termination of the Services Agreement.[167] Disqualifying Dorsey would give an unfair advantage to the NRA and its counsel and threaten (or foreclose) Defendants' ability to assert its rights, while new counsel would also have access to the

---

[161] ECF 128 at Ex. B ¶ 3 [APP 13] (Gruber); ECF 128 at Ex. E ¶ 3 [APP 31] (McQueen).

[162] The motion for leave was granted on February 6, 2020, and the case was stayed on March 11, 2020.  *See* ECF 108 at Ex. 19 at 6:11-8:4 [APP 294-296], 46:16-17 [APP 334], 48:18-21 [APP 336] (Mar. 11, 2020 Va. Hr'g Tr.); ECF 128 at Ex. E ¶ 3 [APP 31] (McQueen Decl.).

[163] ECF 128 at Ex. E ¶ 4 [APP 31] (McQueen); ECF 128 at Ex. F ¶ 46 [APP 51] (Johnston).

[164] *See* ECF 128 at Ex. F ¶ 46 [APP 51] (Johnston).

[165] ECF 128 at Ex. E ¶¶ 4-5 [APP 31-32] (McQueen).

[166] *Id.* at ¶ 6 [APP 31]; ECF 128 at Ex. F ¶ 46 [APP 51] (Johnston).

[167] ECF 128 at Ex. E ¶ 7 [APP 31] (McQueen); ECF 128 at Ex. F ¶ 46 [APP 51] (Johnston).

document at issue and would occupy the same position as Dorsey, making disqualification futile.

## C.    No Fiduciary Obligation Governs this Issue.

The NRA continues to refer to a non-existent fiduciary obligation[168] (without actually briefing that Defendants somehow breached fiduciary duties pertaining to Exhibit B-9 and are somehow liable for the same), citing only its own First Amended Complaint in support.[169]  No fiduciary duty existed; it cannot serve as a basis for disqualification concerning Exhibit B-9.[170]

## D.    Sanctions Are Inappropriate.

Courts have the inherent power to sanction *for bad faith conduct*, not present here.[171] Dorsey obtained *one* document through the NRA's intentional disclosure and cited to it only for a proposition unrelated to one slide: Dorsey described the Public Affairs Presentation as proof of the Brewer Firm's takeover of AMc's PR work and inadvertently attached Exhibit B-9 based on information from its client.  Given that Exhibit B-9 is not privileged, or at the very least that the privileged was waived, that there is no prejudice to the NRA, and Dorsey's good faith explanation, sanctions are inappropriate and punitive.[172]

---

[168] *See* ECF 107 at 2, 3, 12, 21-22.

[169] *See id.* at 3 n.5 ("A fiduciary relationship existed between AMc and the NRA," and citing to ECF 18 ¶ 17).

[170] *See* ECF 46 at 5-6; ECF 29 at 20-22.

[171] *See* case law cited in the NRA's Motion, *e.g.*, *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017) (sanctions for *bad faith* conduct of withholding case-determinative data, which wasted $2.7 million in fees); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 41 (1991) (sanctioning party who defrauded his adversary and the court to disrupt a sale he originally agreed to and who "devise[d] a plan of obstruction, delay, harassment, and expense"); *Richards v. Jain*, 168 F. Supp. 2d 1195, 1198-99, 1208-09 (W.D. Wash. 2001) (Paralegal reviewed *more than 1,000* privileged documents provided by opposing party's former employee who copied emails when he departed from the company.  The documents were relevant to the claims in the lawsuit, the disclosure was not the fault of the company, and the disclosure could not be undone.); *Raymond v. Spirit AeroSystems Hold., Inc.*, No. 16-1282-JTM-GEB, 2017 U.S. Dist. LEXIS 101926, at *15, *64, *65 (D. Kan. Jun. 30, 2017) (After refusing to disqualify counsel, even after "years" of using privileged information *for that case*, the court ruled least *compensatory* sanctions imposed.).

[172] *See Marsh*, 2000 U.S. Dist. LEXIS 16858, at *12 (sanction unwarranted for plaintiff "asserting a colorable argument of waiver of the attorney-client privilege" based on defendant's "careless[] disclos[ure]"); ECF 128 at Ex. F ¶ 37 [APP 48] (Johnston) (opining "Dorsey was entitled to challenge the NRA's claim of privilege," which "should not be used to infer bad faith").  *Cf.* case law cited in the NRA's Motion, *e.g.*, *Lelsz v. Kavanagh*, 137 F.R.D. 646, 656 (N.D. Tex. 1991) (court warning given *before* sanctions even where conduct "prejudiced" opponent); *Vaca v. Rio Properties, Inc.*, No. 2:08-cv-00940-RLH, (D. Nev. Mar. 3, 2011) ((non-binding authority) counsel frustrated efforts to comply with, *first*, a court order to produce documents).

## IV.   PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendants respectfully request the Court deny the NRA's Motion in its entirety and grant them all other relief, at law or in equity, to which they may be justly entitled.

Dated: May 21, 2020.

Respectfully submitted,

*/s/ G. Michael Gruber*
**G. Michael Gruber, Esq.**
Texas Bar No. 08555400
gruber.mike@dorsey.com
**Jay J. Madrid, Esq.**
Texas Bar No. 12802000
madrid.jay@dorsey.com
**J. Brian Vanderwoude, Esq.**
Texas Bar No. 24047558
vanderwoude.brian@dorsey.com
**Brian E. Mason, Esq.**
Texas Bar No. 24079906
mason.brian@dorsey.com
**DORSEY & WHITNEY LLP**
300 Crescent Court, Suite 400
Dallas, Texas 75201
(214) 981-9900 Phone
(214) 981-9901 Facsimile

**ATTORNEYS FOR DEFENDANTS ACKERMAN MCQUEEN, INC., MERCURY GROUP, INC., HENRY MARTIN, JESSE GREENBERG, WILLIAM WINKLER, AND MELANIE MONTGOMERY**

## CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2020, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

*/s/ G. Michael Gruber*
G. Michael Gruber

# APPENDIX A

# *FILED UNDER SEAL*

# APPENDIX B

| Date (2020) | Description of Event |
|---|---|
| January 7 | Dorsey received Exhibit B-9 as the presentation given to the Public Affairs Committee in January 2019. |
| | Dorsey received second confirmation that Exhibit B-9 was the presentation given to the Public Affairs Committee in January 2019. |
| January 8 | Dorsey received third confirmation that Exhibit B-9 was the presentation given to the Public Affairs Committee in January 2019. |
| February 12 | Dorsey filed *Defendants' Response to Plaintiff's Motion to Compel* and *Motion for Leave to File Certain Exhibits Under Seal*, filing Exhibit B-9 under seal. (ECF 51) |
| February 18 | The Brewer Firm sent a letter to Dorsey, asserting privilege over Exhibit B-9 and demanding that Dorsey return the document and withdraw it from the Court's record. |
| February 21 | Dorsey acknowledged the letter and that it would send a formal response the following week. |
| February 26 | Prior to the end of the following week, the Brewer Firm sent another letter re-urging the same demands to return the document and withdraw it from the Court's record. |
| March 2 | Dorsey sent a response letter noting that Exhibit B-9 was the presentation given to the Public Affairs Committee and advising of Dorsey's steps: ensuring Exhibit B-9 would not be disseminated, sequestering the document, and seeking a ruling from the Court. |
| March 3 | The Brewer Firm alleged that Dorsey had a "misunderstanding of the facts" because Exhibit B-9 corresponded to a presentation made on January 5, 2019 rather than during the Public Affairs Committee.  The Brewer Firm did not respond to Dorsey's March 2 proposal.<br><br>For the first time, Dorsey understand there were two different presentations made to two different audiences on two different days. |
| March 10 | The Court granted Defendants' Motion for Leave to file certain exhibits, including Exhibit B-9, under seal. |
| March 11 | Dorsey filed the exhibits, including Exhibit B-9, under seal.  (ECF 64) |
| March 16 | Dorsey Dallas encouraged employees to work from home. |
| March 17 | Dorsey instituted indefinite firm-wide (across all 19 offices) work from home mandate. |
| March 19 | Dorsey and the Brewer Firm conferred about discovery related issues with third-party subpoenas issued by the Brewer Firm.<br><br>The Brewer Firm did not mention Exhibit B-9. |

| March 26 | Dorsey and the Brewer Firm again conferred about discovery related issues with third-party subpoenas issued by the Brewer Firm.<br><br>The Brewer Firm did not mention Exhibit B-9. |
|---|---|
| March 30 | Dorsey filed *Defendants' Motion to Disqualify Plaintiff's Counsel*.  (ECF 78) |
|  | The Brewer Firm sent a letter summarizing the prior correspondence and threatening Dorsey with a motion to disqualify and a motion to stay. |
| March 31 | Dorsey acknowledged it would send a formal response that day, as requested. |
|  | Dorsey sent a formal response reiterating the waiver concerning Exhibit B-9 and its similarities to the Public Affairs Presentation.  Dorsey stated it would take the following actions "no later than 5:00 p.m." the following day: (1) return Exhibit B-9 to the Brewer Firm; (2) permanently delete Exhibit B-9; (3) Defendants would delete it as well; (4) confirm with Defendants that all versions have been permanently deleted and again verify no copies were made, and if any were, they have been permanently destroyed; and (5) file a motion to withdraw Exhibit B-9 from the record. |
|  | The Brewer Firm rejected those offers, demanded the return of Exhibit B-9, and directed Dorsey not to destroy any copies. |
| April 1 | Dorsey withdrew Exhibit B-9 from the Court's record.  (ECF 87) |
|  | Dorsey sent a letter to the Brewer Firm, confirming the completed actions as outlined in its March 31 letter and explaining that Travis Carter provided Exhibit B-9 to AMc employee John Popp, who sent the presentation to Nader Tavangar.<br><br>The Brewer Firm never responded to that letter. |
| April 16 | The Brewer Firm filed this *Motion to Disqualify*. |