**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § | |
| | § | |
| | § | |
| **Plaintiff and Counter-Defendant** | § | |
| | § | |
| **and** | § | |
| | § | |
| **WAYNE LAPIERRE,** | § | |
| | § | **Civil Action No. 3:19-cv-02074-G** |
| **Third-Party Defendant,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **ACKERMAN MCQUEEN, INC.,** | § | |
| | § | |
| **Defendant and Counter-Plaintiff,** | § | |
| | § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG,** | § | |
| | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

**APPENDIX IN SUPPORT OF DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION
TO DISQUALIFY THE LAW FIRM DORSEY & WHITNEY LLP AS COUNSEL FOR
DEFENDANTS AND FOR OTHER APPROPRIATE SANCTIONS AND RELIEF**

Defendants, Ackerman McQueen, Inc., Mercury Group, Inc., Henry Martin, William

Winkler, Melanie Montgomery, and Jesse Greenberg, offer the following evidence in support of

*Defendants' Response to Plaintiff's Motion to Disqualify the Law Firm of Dorsey & Whitney LLP*

*as Counsel for Defendants and for Other Appropriate Sanctions and Relief* (ECF 127):

| EX | DESCRIPTION | APPX |
|---|---|---|
| A | Declaration of Brian E. Mason, dated May 21, 2020 | APP001-APP002 |

| A-1. | *NRA Seeks to Renew Objections to Former Ad Agency's Production of Documents, Citing Privilege* (May 18, 2020) | APP003-APP004 |
|------|---|---|
| A-2. | Feb. 11, 2020 Letter from Virginia counsel to Brewer Firm (Filed under seal) | APP005-APP006 |
| A-3. | Feb. 10, 2020 Letter from Virginia counsel to Brewer Firm (Filed under seal) | APP007-APP008 |
| A-4. | Kitchen Cabinet Agenda dated October 24, 2018 (Filed under seal) | APP009-APP011 |
| B | Declaration of G. Michael Gruber | APP012-APP018 |
| C | Declaration of John Popp | APP019-APP022 |
| D | Declaration of Nader Tavangar | APP023-APP029 |
| E | Declaration of Revan McQueen | APP030-APP032 |
| F | Declaration of Randall Johnston | APP033-APP064 |

Dated: May 21, 2020                                 Respectfully submitted,


                                                    */s/ G. Michael Gruber*
                                                    **G. Michael Gruber, Esq.**
                                                    Texas Bar No. 08555400
                                                    gruber.mike@dorsey.com
                                                    **Jay J. Madrid, Esq.**
                                                    Texas Bar No. 12802000
                                                    madrid.jay@dorsey.com
                                                    **J. Brian Vanderwoude, Esq.**
                                                    Texas Bar No. 24047558
                                                    vanderwoude.brian@dorsey.com
                                                    **Brian E. Mason, Esq.**
                                                    Texas Bar No. 24079906
                                                    mason.brian@dorsey.com

                                                    **DORSEY & WHITNEY LLP**
                                                    300 Crescent Court, Suite 400
                                                    Dallas, Texas 75201
                                                    (214) 981-9900 Phone
                                                    (214) 981-9901 Facsimile

                                                    **ATTORNEYS FOR DEFENDANTS**


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was electronically served via the Court's electronic case filing system upon all counsel of record on this 21st day of May 2020:

                                                    */s/G. Michael Gruber*
                                                    G. Michael Gruber

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| **Plaintiff and Counter-Defendant** | § § | |
| **and** | § § | |
| **WAYNE LAPIERRE,** | § § | |
| **Third-Party Defendant,** | § § | **Civil Action No. 3:19-cv-02074-G** |
| **v.** | § § | |
| **ACKERMAN MCQUEEN, INC.,** | § § | |
| **Defendant and Counter-Plaintiff,** | § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG,** | § § § § § | |
| **Defendants.** | § § | |

<u>**DECLARATION OF BRIAN E. MASON**</u>

Pursuant to 28 U.S.C. § 1746, I, Brian E. Mason, hereby declare as follows:

1.       My name is Brian E. Mason.  I am over eighteen years of age.  I have never been convicted of a felony or misdemeanor involving moral turpitude.  I am fully competent to make this declaration.  I am a lawyer at Dorsey & Whitney, LLP and counsel of record for Ackerman McQueen, Inc., Mercury Group, Inc., Henry Martin, William Winkler, Melanie Montgomery, and Jesse Greenberg (collectively, "***Defendants***") in the above-captioned matter.  I have personal knowledge of the facts set forth in this declaration and acknowledge them to be true and correct.

2.      Attached hereto as **Exhibit A-1** is a true and correct copy of *NRA Seeks to Renew Objections to Former Ad Agency's Production of Documents, Citing Privilege* (May 18, 2020).

3.      Attached hereto as **Exhibit A-2** is a true and correct copy of correspondence dated February 11, 2020 from Virginia counsel to the Brewer Firm (filed under seal).

4.      Attached hereto as **Exhibit A-3** is a true and correct copy of correspondence dated February 10, 2020 from Virginia counsel to the Brewer Firm (filed under seal).

5.      Attached hereto as **Exhibit A-4** is a true and correct copy of Kitchen Cabinet Agenda dated October 24, 2018 (filed under seal).

6.      Furthermore, in Plaintiff's *Motion to Disqualify the Law Firm of Dorsey & Whitney LLP as Counsel for Defendants and for Other Appropriate Sanctions and Relief* ("**Motion to Disqualify**"), Plaintiff included the declaration of expert witness, James McCormack (the "**McCormack Declaration**").  Paragraph 27 of the McCormack Declaration references a transcript of an executive meeting that occurred on January 5, 2019, which he reviewed and relied upon in forming his opinions.  This transcript was not produced and Defendants are unaware of its contents. I have requested a copy of that transcript from Plaintiff's counsel, who refused to produce a copy before the deadline to file Defendants' Response to Plaintiff's Motion to Disqualify.

I declare under penalty of perjury and in accordance with 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 21st day of May, 2020.

_____
Brian E. Mason

# EXHIBIT A-1

Case 3:19-cv-02074-G-BK   Document 128   Filed 05/21/20   Page 8 of 70   PageID 8754

# New York Law Journal

NOT FOR REPRINT

🖶 Click to print or Select '**Print**' in your browser menu to print this document.

Page printed from: *https://www.law.com/newyorklawjournal/2020/05/18/nra-seeks-to-renew-objections-to-former-ad-agencys-production-of-documents-citing-privilege/*

# NRA Seeks to Renew Objections to Former Ad Agency's Production of Documents, Citing Privilege

The filing comes after New York County Supreme Court Justice Melissa Crane ruled in February that the ad agency, Ackerman McQueen, must comply with a subpoena from the Attorney General's Office.

By Jane Wester | May 18, 2020



*William Brewer III of Brewer, Attorneys & Counselors.*

Attorneys representing the National Rifle Association are once again seeking to stay the production of documents by its former advertising agency to the New York Attorney General's Office, a process that the gun rights advocacy group argues will violate its right to attorney-client privilege.

The filing comes after New York County Supreme Court Justice Melissa Crane ruled in February that the ad agency, Ackerman McQueen, must comply with a subpoena from the Attorney General's Office. She agreed to conduct in-camera review of some documents prepared by legal counsel for the NRA, but otherwise ruled that the NRA could not preview or approve the production of documents.

APP003

Ackerman McQueen had originally responded to the attorney general's subpoena by explaining that its nondisclosure agreement meant it had to allow the NRA to review the disclosures in advance. Attorney General Letitia James has said the NRA was trying to "stifle and interfere with a confidential law enforcement investigation" by seeking to review Ackerman's documents.

In Friday's filing, William Brewer III of Brewer, Attorneys & Counselors argued that Ackerman has now demonstrated that it does possess privileged documents relating to its decades-long relationship with Brewer. In February, a privileged presentation made by Brewer to a 2019 executive session of the NRA board of directors was filed by Ackerman's attorneys in a Texas court—an apparent mistake, the NRA attorneys wrote in their filings.

Whereas the NRA attorneys brought up their concerns about privilege in their initial arguments before Crane in the fall, they argued that they now have proof that privileged documents have been released.

"What's changed is that our worst fear is confirmed," Brewer said Monday. "That privileged materials are in the hands of people with whom the NRA is adverse, who are likely to turn them over to the attorney general, pursuant to a process that looks to us as if it was a gateway to obtain privileged communications—privileges that are owned by the NRA."

Law professor and author Arthur Miller, appearing as an expert in civil procedure, filed his own affirmation in support of the motion to reargue.

"I am not a member or political supporter of the NRA, and personally believe in reasonable gun control," he wrote. "I offer my expert opinion in this matter because I believe [Crane's decision] offends fundamental tenets of civil procedure and due process. Moreover, it threatens to impair and diminish the attorney-client privilege and work product/trial preparation privileges, which are among the most sacrosanct protections afforded to litigants by New York law."

Spokespersons for the Attorney General's Office and Ackerman McQueen's New York attorneys did not immediately respond to requests for comment Monday.

Read more:

Manhattan Judge, Over NRA Objection, Orders Its Former Ad Agency to Comply With Subpoena (https://www.law.com/newyorklawjournal/2020/02/24/manhattan-judge-over-nra-objection-orders-its-former-ad-agency-to-comply-with-subpoena/)

NY AG Says NRA Is Using NDA to Block Subpoena for Records of Its Ex-Ad Agency (https://www.law.com/newyorklawjournal/2019/10/31/nra-argues-nda-blocks-ny-ags-subpoena-for-records-of-its-former-ad-agency/)

Civ Pro Professor Arthur Miller Says NRA Has Right to Review Ad Agency's Response to Subpoena (https://www.law.com/newyorklawjournal/2019/11/15/civ-pro-professor-arthur-miller-says-nra-has-right-to-review-ad-agencys-response-to-subpoena/)

Copyright 2020. ALM Media Properties, LLC. All rights reserved.

# EXHIBIT A-2
# *FILED UNDER SEAL*

# EXHIBIT A-3
# *FILED UNDER SEAL*

# EXHIBIT A-4

# *FILED UNDER SEAL*

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** § | |
| § | |
| **Plaintiff and Counter-Defendant** § | |
| § | |
| **and** § | |
| § | |
| **WAYNE LAPIERRE,** § | |
| § | **Civil Action No. 3:19-cv-02074-G** |
| **Third-Party Defendant,** § | |
| § | |
| **v.** § | |
| § | |
| **ACKERMAN MCQUEEN, INC.,** § | |
| § | |
| **Defendant and Counter-Plaintiff,** § | |
| § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG,** § | |
| § | |
| **Defendants.** § | |
| § | |

**DECLARATION OF G. MICHAEL GRUBER**

Pursuant to 28 U.S.C. § 1746, I, G. Michael Gruber, hereby declare as follows:

1.      My name is G. Michael Gruber.  I am over eighteen years of age.  I have never been convicted of a felony or misdemeanor involving moral turpitude.  I am fully competent to make this declaration.  I have personal knowledge of the facts set forth.  I submit this declaration in response to the National Rifle Association of America's ("*NRA*") Motion to Disqualify the Law Firm of Dorsey & Whitney LLP as Counsel for Defendants and For Other Appropriate Sanctions.

2.      I am an attorney licensed to practice in the State of Texas.  I have been continuously licensed since 1981.  I am a graduate of Southern Methodist University School of Law.  I have

practiced business litigation in Dallas, Texas since 1981.  I am licensed to practice in Texas courts; the Supreme Court of the United States, the United States District Court for the Northern, Southern, Eastern and Western Districts of Texas, the United States Court of Appeals for the Federal Circuit, and the United States Claims Court.  I am Board Certified in Civil Trial Law by the Texas Board of Legal Specialization.  I am a partner at the law firm of DORSEY & WHITNEY LLP ("*Dorsey*") in Dallas, Texas.  I have represented Ackerman McQueen, Inc. ("*AMc*") in the above-styled lawsuit since September 2019.

3.     I have reviewed the NRA's filings relating to the Motion to Disqualify, including the supporting evidence and declarations. The following statements are being made in response to the NRA's Motion, supporting evidence, and declarations.  These statements are not intended to waive the attorney-client privilege, in whole or in part, between AMc and Dorsey, and are being made for the sole purpose of addressing the arguments and accusations made by the NRA.

4.     In early January 2020, several Dorsey attorneys met with client representatives from AMc to discuss ███████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████ Dorsey understood that AMc had primarily been responsible for the NRA's brand, reputation, and public relations for nearly the last four decades.

5.     ███████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████    To my knowledge, this is the first time Dorsey came into possession of Exhibit B-9. █

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████

6.      On February 12, 2020, Dorsey filed AMc's Response to the NRA's Motion to Compel.  In support of the Response, Exhibit B-9 was filed under seal.  Exhibit B-9 was filed to support AMc's position that the Brewer Firm was directly competing with AMc.  When Exhibit B-9 was filed under seal, it was Dorsey's understanding that Exhibit B-9 was the public presentation Mr. Carter gave at the NRA's Public Affairs Committee meeting. This is evidenced and supported by AMc's statement in paragraph five of the Response, which states in part, "the PR unit gave a detailed presentation to the NRA's Public Affairs Committee about protecting and advancing the NRA's reputational interests, repeatedly referencing the 'court of public opinion' and promoting the NRA's narrative through the media."   When Exhibit B-9 was filed under seal, I do not recall focusing any attention on, "Executive Briefing", which was written on the first slide of Exhibit B-9 but makes no reference to the Board of Directors or any other group it was being presented to. I do not recall understanding that there was a presentation for anything other than a Public Affairs Committee meeting, ██████████████████████████████. For the purposes of the Response, the actual January 4, 2019 Public Affairs Committee presentation would have been a superior choice to make our case to the court. Essentially the same material is in each of the two presentations, but the January 4, 2019 presentation was longer and more detailed.

7.      On Tuesday, February 18, 2020, Dorsey received a letter from Mr. Collins alleging that Exhibit B-9 was a confidential and privileged document, and requesting that Dorsey take all sorts of extraordinary steps immediately.  On Friday, February 21, 2020, Dorsey responded to Mr. Collins acknowledging that it had received his correspondence, as he requested, and that it would respond the following week.  However, prior to the end of the following week, Mr. Collins sent another letter on Wednesday, February 26, 2020 falsely accusing Dorsey of failing to respond.

8.      A few days later on March 2, 2020, Dorsey wrote to Mr. Collins regarding Exhibit B-9 and explained that Exhibit B-9 was a presentation Mr. Carter gave at the NRA's Public Affairs Committee meeting on January 5, 2019, that it was voluntarily given to an AMc's employee, and that it was not a confidential or privileged document.  At this time, Dorsey still understood that Exhibit B-9 was the presentation Mr. Carter gave at the NRA's Public Affairs Committee meeting, ████████████████████████████.  Despite Dorsey's position, Dorsey agreed not to disseminate and/or use Exhibit B-9 until the Court made a determination whether it was in fact privileged.  Aside from complying with the federal court's March 10, 2020 order to file numerous exhibits under seal, including Exhibit B-9 (ECF 63), Dorsey has not disseminated and/or used Exhibit B-9 since Dorsey's March 2, 2020 correspondence to the Brewer Firm.

9.      On March 3, 2020, Mr. Collins explained that Dorsey's statements in the March 2, 2020 correspondence was a "misunderstanding of the facts" because the Public Affairs Committee took place on Friday, January 4, 2019 while and an executive session occurred on Saturday, January 5, 2019.   The January 4, 2019 and January 5, 2019 presentations appear to be the same material in a shorter version in a slightly different format. They both appear to be public relations presentations, with over half of Exhibit B-9's pages being centered on press clippings. There was no advantage in using the shorter and less detailed January 5, 2019, Exhibit B-9, presentation in

the Response to the NRA's Motion to Compel that we understood to be the Public Affairs Committee meeting presentation. During this dispute I do not recall any specific request that the January 4, 2019 Public Affairs presentation be returned, or that it was confidential or privileged in any way.

10.     On March 11, 2020, senior associate Brian E. Mason, one of the lead attorneys involved in the above-captioned litigation, went home ill and was out of the office for several days. During the week of March 9 and March 16, Dorsey was monitoring the COVID-19 situation, having shut down its three China offices.  One week after filing the document under seal and upon Mr. Mason's return to the office, on March 17, 2020, Dorsey closed its Dallas office (and the entire 19-office firm) indefinitely, except for essential staff.  Dorsey lawyers moved to remote work status, as did much of the city.  The following week, Dorsey allowed the lawyers to take computer monitors and equipment to shelter-in-place for an extended amount of time—meaning, the Dorsey team on this matter had to shift focus to setting up remote work stations and address immediate concerns while monitoring cases for approaching deadlines and urgent needs.

11.     From March 4, 2020 to March 29, 2020, Dorsey did not receive any follow up correspondence or communications from the Brewer Firm regarding Exhibit B-9.  In fact, during meet and confer telephone conferences with the Brewer Firm on March 19, 2020 and March 26, 2020, there was no mention at all about Exhibit B-9.

12.     Relevant to dealing with discovery matters, at the end of January, 2020 there was confirmation of a deep suspicion as to how the NRA and their attorneys were handling evidence. Based on information obtained through discovery, Dorsey was reluctant in its discussions with the Brewer Firm to delete all copies of Exhibit B-9 without assurances that the NRA and the Brewer

firm would maintain it in its files.  The Brewer Firm had also just recently made a highly frivolous

claw back request.

13.      In Dorsey's March 31, 2020 correspondence, which was publicly filed by the NRA

in support of its Motion,[1] I included the following language that summarized the concerns about

maintaining the document:

> Given the similarities between the Presentation and the Public Affairs Presentation,
> the fact that the Presentation is further direct evidence of the Brewer Firm directly
> competing with AMc, that the Presentation is not the rendition of legal advice, and
> the applicability of the crime-fraud exception, Defendants do not believe the
> Presentation is privileged.

14.      I further explained that Dorsey was willing to delete Exhibit B-9, but demanded

that the NRA preserve the document:

> These actions are without waiver to Defendants' right to challenge the asserted
> privilege related to the Presentation in the future. Specifically, Defendants do not
> concede in any way that the Presentation is privileged, and demand that the NRA
> and its counsel continue to maintain the Presentation as part of this litigation,
> especially in light of the NRA's President testifying that she was directed to
> intentionally destroy evidence. The failure to preserve the Presentation in your and
> the NRA's files would be considered an act of spoliation by our client.

15.      In Dorsey's April 1, 2020 correspondence to the Brewer Firm, which again was

publically filed by the NRA in support of its Motion,[2] it included similar language, thinking that it

had an agreement to dispose of this controversy:

> Finally, we again demand that the NRA and its counsel continue to maintain the
> Presentation as part of this litigation, especially in light of the NRA's President
> testifying that she was directed to intentionally destroy evidence, and other
> fabrications of evidence set forth in more detail in Defendants' Motion to
> Disqualify and the other supporting materials. *See* ECF 78-81.

16.      While not making the retention of the document a condition to our deleting it we

---

[1] *See* ECF 108, Ex. 13 (APP 152).
[2] *See* ECF 108, Ex. 14 (APP 155).

agreed to that and the other requests made upon us by opposing counsel, being comfortable that the document would be preserved in the NRA files based on our demand.

17.     Dorsey agreed to return Exhibit B-9, permanently delete all copies in its or AMc's possession, confirm that all such copies had been deleted, and withdraw Exhibit B-9 from support of its response to the NRA's Motion to Compel.  The NRA and the Brewer Firm response was to return all copies and not destroy any copies of Exhibit B-9 or related documents, which Dorsey complied with. Dorsey received no other follow up after returning the copies of Exhibit B-9.

18.     I have not seen or reviewed any PowerPoint presentation notes from either the January 4, 2019 PowerPoint presentation or Exhibit B-9, and am not aware that anyone else at Dorsey has either.

19.     To my knowledge, at no point in time has Exhibit B-9 been filed in the public record by me or anyone else at Dorsey.

I declare under penalty of perjury and in accordance with 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 21st day of May, 2020.

_____
G. Michael Gruber

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § § § § | |
| **Plaintiff and Counter-Defendant** | § § | |
| and | § § | |
| WAYNE LAPIERRE, | § § § | Civil Action No. 3:19-cv-02074-G |
| **Third-Party Defendant,** | § § § | |
| v. | § § § | |
| ACKERMAN MCQUEEN, INC., | § § § | |
| **Defendant and Counter-Plaintiff,** | § § § | |
| MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG, | § § § § § | |
| **Defendants.** | § § | |

## DECLARATION OF JOHN POPP

Pursuant to 28 U.S.C. § 1746, I, John Popp, hereby declare as follows:

1. My name is John Popp. I am over eighteen years of age. I have never been convicted of a felony or misdemeanor involving moral turpitude. I am fully competent to make this declaration. I have personal knowledge of the facts set forth. I submit this declaration in response to the National Rifle Association of America's ("NRA") Motion to Disqualify the Law Firm of Dorsey & Whitney LLP as Counsel for Defendants and For Other Appropriate Sanctions.

2. I have been an employee of Ackerman McQueen, Inc. ("AMc") since about 2001. During that time, I have had numerous job responsibilities, including but not limited to producing

various shows and providing assistance with technical and audio/visual support. My work at AMc had been almost exclusively for the NRA until the relationship was terminated in 2019. As part of my job responsibilities, I would routinely attend various NRA related functions, including board meetings and national conferences. I have no legal training or background.

3. During many of the NRA board meetings, the NRA would routinely retain AMc to assist with the audio/visual presentations, including providing the necessary computer equipment to assist with presentations. I estimate that I have assisted the NRA with audio/visual presentations at a minimum of ten different board meetings and national conferences over the years. I routinely set up the AMc laptops when NRA personnel were making PowerPoint presentations, including at Board of Director's meetings and national conferences. It was common for NRA employees to ask me to help load PowerPoint presentations onto AMc's laptops, including for general sessions and executive sessions.

4. In September 2018, I attended the NRA's quarterly board meetings in Dallas, Texas. During some of these board meetings, including executive session meetings, Travis Carter of Brewer Attorneys & Counselors (the "Brewer Firm") gave me a flash drive with PowerPoint presentations and directed me to load them onto the laptops. I then loaded the PowerPoint presentations onto the hard drive of the AMc laptops. I have historically loaded PowerPoint presentations onto the hard drive of AMc laptops and/or hotel laptops so that the PowerPoint presentation can be run from the hard drive as opposed to the flash drive. I have found that running PowerPoint presentations directly from flash drive can lead to potential problems.

5. At the conclusion of PowerPoint presentations at the September 2018 board meetings, I provided a copy of the PowerPoint presentations to Mr. Tavangar as was my practice.

I then moved the PowerPoint presentations to the Trash Folder and deleted the PowerPoint presentations from the Trash Folder on the AMc laptops.

6.     At no point in time after the September 2018 meetings did Mr. Carter, the Brewer Firm, or anyone else at the NRA ask me to return or delete the PowerPoint presentations loaded onto the AMc laptops in September 2018.

7.     On January 4, 2019, I attended the NRA's Public Affairs Committee meeting. Before the meeting began, Mr. Carter again gave me a flash drive with a PowerPoint presentation and directed me to load it onto the laptop. Due to our history, I assumed Mr. Carter knew that I worked for AMc, and that the PowerPoint presentation was being loaded onto AMc's laptop because I had met Mr. Carter at the September 2018 NRA board meetings and provided the same assistance. I then loaded the PowerPoint presentation onto the hard drive of the AMc laptop. I then handed the flash drive back to Mr. Carter.

8.     At the conclusion of Mr. Carter's presentation, I provided a copy of the PowerPoint presentation to Mr. Tavangar as was my practice. I then moved the PowerPoint presentation to the Trash Folder and deleted the PowerPoint presentation from the Trash Folder on the AMc laptop. At no point in time after the January 4, 2019 meeting did Mr. Carter, the Brewer Firm, or anyone else at the NRA ask me to return or delete the PowerPoint presentation loaded onto the AMc laptop on January 4, 2019.

9.     On January 5, 2019, Mr. Carter again gave me a flash drive with a PowerPoint presentation and directed me to load it onto the laptop. At no point in time did Mr. Carter explain to me that there was anything confidential or privileged about the January 5, 2019 PowerPoint presentation or from the January 4, 2019 PowerPoint presentation the day before.

10.     As I had done the previous day, I then loaded the PowerPoint presentation onto the hard drive of the AMc laptop, and then I handed back the flash drive to Mr. Carter.

11.     At the conclusion of the meeting, I again provided a copy of the PowerPoint presentation to Mr. Tavangar as was my practice. I then moved the PowerPoint presentation to the Trash Folder and deleted the PowerPoint presentation from the Trash Folder on the AMc laptop. At no point in time after the January 5, 2019 meeting did Mr. Carter, the Brewer Firm, or anyone else from the NRA ask me to return or delete the PowerPoint presentation loaded onto AMc's laptop on January 5, 2019. The only time I have been asked by Mr. Carter, the NRA, or one of the NRA's representatives to delete a presentation was at the April 29, 2019 NRA board meeting.

12.     Although I viewed the first slide to make sure the presentation was properly reflected on the screen, I have never reviewed the PowerPoint presentation that Mr. Carter directed me to load onto the laptop on January 5, 2019.

13.     During my July 15, 2019 deposition, I repeatedly testified that I provided copies of PowerPoint presentations to Mr. Tavangar at the conclusion of the September 2018 quarterly meetings and the January 2019 NRA board of director's meetings. Since my deposition on July 15, 2019, no one from the NRA or the Brewer Firm has attempted to contact me about these PowerPoint presentations.

I declare under penalty of perjury and in accordance with 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my recollection and belief.

Executed this 21st day of May, 2020.

John Popp

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| **Plaintiff and Counter-Defendant** | § § | |
| **and** | § § | |
| **WAYNE LAPIERRE,** | § § | |
| **Third-Party Defendant,** | § § | **Civil Action No. 3:19-cv-02074-G** |
| **v.** | § § § | |
| **ACKERMAN MCQUEEN, INC.,** | § § § | |
| **Defendant and Counter-Plaintiff,** | § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG,** | § § § § § | |
| **Defendants.** | § § | |

## DECLARATION OF NADER TAVANGAR

Pursuant to 28 U.S.C. § 1746, I, Nader Tavangar, hereby declare as follows:

1.       My name is Nader Tavangar.  I am over eighteen years of age.  I have never been convicted of a felony or misdemeanor involving moral turpitude.  I am fully competent to make this declaration.  I have personal knowledge of the facts set forth.  I submit this declaration in response to the National Rifle Association of America's ("NRA") Motion to Disqualify the Law Firm of Dorsey & Whitney LLP as Counsel for Defendants and For Other Appropriate Sanctions.

2.      I am an Executive Vice President / Managing Director of Mercury Group, Inc., a wholly owned subsidiary of Ackerman McQueen, Inc. ("AMc").   I have been employed by AMc since 1999.

3.      In 2009, I began to work on the NRA account at AMc.  Since that time, I have worked closely with many of the NRA's officers and directors.  I was the main relationship point of contact between AMc and the NRA, including with Wayne LaPierre.

4.      As part of my job responsibilities with AMc, I would routinely attend NRA meetings, including board meetings and national conferences.  I estimate that I have attended a minimum of thirty NRA board meetings and national conferences over the years.

5.      Since I began working with AMc on the NRA account, the NRA would engage AMc to assist with the NRA board meetings and national conferences for a variety of tasks, including but not limited to oral and/or visual presentations and audio/visual aide and support to the executive leadership.

6.      In January 2019, I attended the NRA's board meetings.  Although I did not know it at the time, based upon correspondence drafted by Wayne LaPierre, I now understand that the NRA was anticipating litigation against AMc prior to this meeting.

7.      On January 4, 2019, I attended the NRA's Public Affairs Committee meeting. Other AMc representatives were also present at the meeting, including John Popp, Carly Jimeson, and Katie Carroll.  I also understood that there were other non-NRA employees, officers, and/or directors at the meeting. This is consistent with my prior experiences and the Declaration of Andrew Arulanandam where he explains that committee meetings are typically attended by AMc representatives, and a range of NRA board members, members, special guests, and vendor representatives.

8.      Mr. LaPierre addressed the room at the beginning of the meeting.  During his opening remarks Mr. LaPierre repeatedly talked about the NRA's brand, messaging, reputation, and legal strategy going forward, and specifically discussed the New York Attorney General's investigation into the NRA and the lawsuit it had filed against Governor Andrew Cuomo.

9.      Once Mr. LaPierre concluded his opening remarks, non-attorney Travis Carter from Brewer Attorneys & Counselors (the "Brewer Firm") delivered a presentation about the NRA's brand, messaging, reputation, and legal strategy going forward.  Mr. Carter introduced himself as the head of the public affairs division at the Brewer Firm that specialized in issues relating to crisis management, one of the tasks AMc had handled for the NRA for decades.  Mr. Carter also mentioned that he had been working with the NRA for one year, and made clear throughout the presentation that the Brewer Firm was extremely active in the public relations area.

10.     During his presentation, Mr. Carter discussed in detail issues surrounding litigation with the NRA, regulatory matters with the NRA, and how the NRA was handling the "court of public opinion." This was a phrase Mr. Carter repeatedly used throughout his presentation.  Mr. Carter discussed the New York Attorney General's (Letitia James) investigation of the NRA non-profit compliance; the power struggle among various political figures in New York, including Governor Andrew Cuomo, which Mr. Carter referred to as a battle against the NRA's "First Amendment" rights; and the Lockton lawsuit.  Mr. Carter explained that the Lockton lawsuit was favorably resolved both financially and in the court of public opinion because of the active public relations work done by the Brewer Firm.  Mr. Carter also explained the NRA's aggressive litigation strategy with Governor Andrew Cuomo and the New York State Department of Financial Services. I found Mr. Carter's comments and strategy to be odd and contradictory to recent conversations and strategy meetings that I had attended with Mr. LaPierre.

11.     During the presentation, Mr. Carter repeatedly explained that the Brewer Firm was working behind the scenes and was responsible for crafting the NRA's "message" to the public to protect the NRA's reputational interests.  These were historically roles handled by AMc for the NRA, and it was very concerning to me how the Brewer Firm appeared to be stepping into AMc's role.

12.     As I stated above, I have attended a significant number of NRA's Board of Director's meetings and conferences over the years.  I routinely take notes from these meetings to report back to AMc executives.  This was important for the work AMc had been performing for the NRA for decades, including public relations, crisis management, image building, and brand management.  Having knowledge about the statements, activities, various initiates, and comments from NRA executives and officers, including Mr. LaPierre, allowed AMc to better understand and assist the NRA with these tasks.  Consistent with that practice, I recorded the presentations by Mr. LaPierre and Mr. Carter during the Public Affairs Committee meeting in January 2019 to supplement the notes I regularly take.

13.     After the January 4, 2019 meeting concluded, I believed that AMc, who had been responsible for the NRA's public relations, messaging, crisis management, image building, and brand management for decades, should understand the NRA's messaging and strategy moving forward.  Thus, Mr. Popp provided me with a copy of the January 4, 2019 presentation.

14.     On January 5, 2019, Mr. Popp provided me with a copy of another PowerPoint presentation.  I then sent the January 5, 2019 PowerPoint to two other AMc representatives, and understand that it was not circulated further or outside of AMc except to Dorsey as discussed below.  After that point, I did not access, view, or disseminate the January 5, 2019 PowerPoint presentation until January 7, 2020 as discussed below.  No one asked that this be returned, despite

my familiarity and working relationship with the Brewer Firm's public relations group.  It is my understanding that no one asked Mr. Popp for these to be returned either.

15.    I have reviewed the NRA's filings relating to the Motion to Disqualify, including the Declarations submitted by Mr. Arulanandam and Mr. Carter.  The following statements are being made in response to the NRA's Motion and those two declarations.  These statements are not intended to waive the attorney-client privilege, in whole or in part, between AMc and Dorsey, and are being made for the sole purpose of addressing the arguments and accusations made by the NRA.

16.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████.  I have never seen or reviewed any PowerPoint presentation notes from either the Public Affairs Committee presentation or Exhibit B-9.

17.    ████████████████████████████████████████

████████████████████████████████████████████████



18.

19.

20.     I now understand that Exhibit B-9 was the presentation the Brewer Firm made during executive session.  I understand that Dorsey inadvertently filed Exhibit B-9 in support of its Response to the NRA's Motion to Compel under the belief that Exhibit B-9 was the PowerPoint

presentation given by Mr. Carter during the Public Affairs Committee meeting that I and numerous other AMc representatives attended.

I declare under penalty of perjury and in accordance with 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 21st day of May, 2020.

Nader Tavangar

# EXHIBIT E

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § § § | |
| **Plaintiff and Counter-Defendant** | § § § | |
| and | § § | |
| WAYNE LAPIERRE, | § § | |
| **Third-Party Defendant,** | § § | Civil Action No. 3:19-cv-02074-G |
| v. | § § § | |
| ACKERMAN MCQUEEN, INC., | § § § | |
| **Defendant and Counter-Plaintiff,** | § § § | |
| MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG, | § § § § § | |
| **Defendants.** | § § | |

## DECLARATION OF REVAN MCQUEEN

Pursuant to 28 U.S.C. § 1746, I, Revan McQueen, hereby declare as follows:

1.     My name is Revan McQueen. I am over the age of 18 years and of sound mind. I have never been convicted of a felony or a crime of moral turpitude. The facts stated herein are true and correct, and based on my personal knowledge. I am the Chief Executive Offer of Ackerman McQueen, Inc. ("*AMc*"). I submit this declaration in response to the National Rifle Association of America's ("*NRA*") Motion to Disqualify the Law Firm of Dorsey & Whitney LLP as Counsel for Defendants and For Other Appropriate Sanctions.

2.      AMc, Mercury, and the individual Defendants would suffer substantial hardship from the disqualification of counsel for several reasons.

3.      Dorsey has been involved in the overall dispute between AMc and the NRA since April 2019 when the NRA filed its first lawsuit against AMc in Virginia.  Dorsey has since been involved in the three pending lawsuits against the NRA in Virginia.[1]  Although Dorsey has been intimately involved in the Virginia Actions, AMc's local Virginia counsel (Schertler & Onorato, LLP) have not been similarly involved in this action other than receiving periodic updates, which have mostly ceased since the Virginia Actions were stayed on March 18, 2020.

4.      Continuously since 2013, Dorsey lawyers have provided legal services to AMc, even while employed at prior firms.  That representation continued through the opening of the Dorsey office in Dallas in 2017.  Those legal services include intellectual property and transactional corporate work, labor and employment, and previous litigation.  Such extensive representation across the entire AMc organization have given and continue to give Dorsey an institutional knowledge that no other lawyer has *or could have* during the pendency of this case.  In fact, Dorsey's prior institutional knowledge of AMc has already proved to be extremely useful to all of the pending litigation with the NRA.

5.      Dorsey also worked closely with my father and AMc's former CEO, the late Angus McQueen, who passed in July 2019—including relating to the litigation with the NRA.  The NRA has made innumerable accusations about Angus in the Texas and Virginia Actions, as well as in depositions and throughout the media, making him a focal point of the dispute.  I do not believe that any other lawyer or law firm has, *or could ever obtain*, the same knowledge about Angus, his

---

[1] *See NRA v. AMc, et al.*, Circuit Court of Virginia, Cause CL19002067; *NRA v. AMc, et al.*, Circuit Court of Virginia, Cause CL19001757; *NRA v. AMc, et al.*, Circuit Court of Virginia, Cause 19002886 (collectively, the "***Virginia Actions***").

viewpoint about the litigation with the NRA, or his practices concerning AMc and the NRA, let alone understand the importance of that information and how it relates to the litigation with the NRA.

6.       Although AMc has received some financial relief from the expense of this litigation with the NRA through insurance coverage, those funds are not limitless.  The disqualification of Dorsey and retention of new counsel would further drain those insurance proceeds.

7.       Further, because of the litigation with the NRA and the termination of the Services Agreement, AMc was forced to furlough, terminate, or significantly reduce the salary of numerous AMc employees when the NRA refused to pay invoices as required under the Services Agreement. Dorsey is representing Defendants in defending against the NRA's claims and in pursuing counterclaims.  Being forced to hire new counsel to digest the filings in this case, the filings in the Virginia Action (to know when the NRA makes conflicting statements or where issue preclusion exists), and AMc's documents and other discovery to-date would be cost-prohibitive, threatening—if not foreclosing—AMc's ability to pursue its rights.

I declare under penalty of perjury and in accordance with 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 21st day of May, 2020.


Revan McQueen

# EXHIBIT F

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| *Plaintiff and Counter-Defendant,* | § § | |
| **and** | § § | |
| **WAYNE LAPIERRE,** | § § § | |
| *Third-Party Defendant,* | § § | |
| **v.** | § § | **Case No. 3:19-cv-02074-G** |
| **ACKERMAN MCQUEEN, INC.,** | § § § | |
| *Defendant and Counter-Plaintiff,* | § § | |
| **and** | § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, AND JESSE GREENBERG,** | § § § § § | |
| *Defendants.* | | |

## <u>DECLARATION OF COYT RANDAL "RANDY" JOHNSTON</u>

Pursuant to 28 U.S.C. § 1746, I, Coyt Randal Johnston, hereby declare as follows:

1.      My name is Coyt Randal "Randy" Johnston.  I am over eighteen years of age.  I have never been convicted of a felony or misdemeanor involving moral turpitude.  I am competent to make this Declaration in support of Ackerman McQueen, Inc.'s (AMc) Response to the National Rifle Association of America's (NRA) Motion to Disqualify the Law Firm of Dorsey & Whitney LLP as Counsel for Defendants and For Other Appropriate Sanctions and Relief.

**Qualifications as Expert Witness**

2.      I am an attorney in Dallas, Texas. I graduated with honors from the University of Texas School of Law in 1974, and have been licensed to practice law in Texas since October 22, 1974. I also am licensed to practice in Utah and in multiple federal courts including the Northern District of Texas. I am board certified in civil trial law by the Texas Board of Specialization. I am a founder and shareholder in the law firm of Johnston Tobey Baruch, P.C. Since being licensed in 1974, my practice has been predominantly litigation-based, with various areas of substantive expertise in connection with litigation, arbitration, and dispute resolution.

3.      I began my practice in 1974, with the law firm of Baker Botts L.L.P. in Houston. I moved to Dallas in 1979, and practiced with the law firm of Hewitt Johnson Swanson & Barbie. In 1981, I formed my own law firm and have practiced on my own, under different firm names, ever since.

4.      Since 1981, a major portion of my practice has consisted of legal malpractice, attorney fee disputes, professional liability matters, and legal ethics.  I cannot state how many lawyer disputes I have handled over that period of time.  It is a lot.  I have written and spoken extensively on the subject, including numerous continuing legal education presentations relating to ethical issues including the attorney-client privilege.

5.      In addition to my work in the area of legal malpractice, I also have experience in connection with general commercial, business, and personal injury litigation, both on an hourly and contingent fee basis. I have handled a few, but not many, family law and criminal disputes. I represent both plaintiffs and defendants, although most of my practice since 1981 has been a plaintiff-based and contingent-fee practice.

6.      I have been an instructor for the Trial Advocacy College of Texas and the National Institute of Trial Advocacy. I have taught professional responsibility at the University of North

Texas School of Law, and lectured numerous times at the SMU Dedman School of Law. I chaired the Business Litigation Section of the Dallas Bar Association and served as president of the Dallas Trial Lawyers Association.  I have also served as President of the Dallas Chapter of the American Board of Trial Advocates, and I served on the Executive Committee of that organization for over a decade.  I am a Fellow in the International Academy of Trial Lawyers, an organization whose membership is limited to 500 attorneys worldwide.  I am the author of the 2009 book, *Robbed at Pen Point*.  I am also the author of the chapter on Ethics in the book, *Texas Business Litigation.*  A copy of my C.V. with a list of my speeches and papers is attached hereto as *Exhibit A*.

### Scope of Engagement

7.      I have been retained by AMc and related parties and their counsel in the above-referenced case to review materials provided to me and to render various opinions in connection with a motion to disqualify the law firm of Dorsey & Whitney LLP (Dorsey) filed by the plaintiff/counter-defendant NRA (NRA). The issues in dispute in this motion focus primarily, if not exclusively, on a single document (Exhibit B-9) that Dorsey attached and filed under seal as an exhibit to a pleading. I am being paid for my time at the rate of $690/hour.

8.      Much of my work in this proceeding has focused on the declaration of James M. McCormack filed in support of the motion to disqualify. I have known Mr. McCormack for many years and respect him, though I believe his opinions in this proceeding are unfounded.

9.      My opinions in this declaration are based on my review of the documents provided to me by Dorsey. Dorsey has provided me with all documents I requested and has been responsive to all my questions. There may be other documents of which I am unaware. I prepared this declaration and formed these opinions for use in this proceeding only.

DECLARATION OF COYT RANDAL JOHNSTON

10.     My opinions are based upon the facts of this case and may not be transportable to other cases. I may be requested to issue opinions on other subjects during this litigation, and I may review additional documents. Accordingly, I reserve the right to form additional opinions and modify or supplement these opinions based upon further requests and my continued review of the documents and facts as discovery continues.

11.     One important note in relation to my review of documents is what I was ***not*** able to review. In his declaration, Mr. McCormack refers to having reviewed certain documents. Some of the documents apparently provided to Mr. McCormack were not available to me. The most notable example is the transcript of the January 5, 2019 NRA board meeting referenced by Mr. McCormack. I understand that Dorsey has requested the transcript, but that it has not been produced. Because the transcript was not available to me, I was unable to evaluate Mr. McCormack's conclusions about it.

**Summary of Expert Witness Role/Process**

12.     As an attorney acting as an advocate for my clients, I have on occasion been accused of hyperbole and excessive enthusiasm for the position of those clients. On some occasions I was guilty of that offense. As an expert witness, however, I am not an advocate and am not charged with determining the outcome of this litigation. On the contrary, my job as an expert witness is to provide a reasoned analysis of the facts, without regard to whether it helps or hurts the party who retained me. I have endeavored to adhere to that role throughout this engagement, although others will have to decide the extent to which I have succeeded.

13.     Expert witness testimony is, by definition, opinion testimony. For an expert to be permitted to express an opinion, the expert must believe that the subject of the opinion is probable—meaning more likely than not. This often is expressed as a probability of 51% or greater.

---

DECLARATION OF COYT RANDAL JOHNSTON                                          Page 4

In other words, an expert need not be 100% absolutely certain of an opinion; few opinions can be expressed with that level of certainty. But there is a significant difference between the opinions the expert may hold with the level of certainty of 51% as contrasted with a much higher level of certainty. Where possible, I have attempted to express the level of certainty I attach to my opinions so that they can be fairly evaluated by the judge in this case.

14.     Expert witness testimony in connection with disqualification motions is burdened further by the possibility that the expert witness may be testifying about matters strictly within the judge's province—most commonly matters of law. I have endeavored to avoid testifying on matters of law to be decided by the court although my opinions are, of necessity, grounded in my understanding of the law on the relevant subjects. To the extent the court believes I am testifying on matters of law within its province, or that I have misstated the law through my opinions, the court will disregard my opinions and rely on its own opinions on such matters.

15.     Having conceded that my role is not that of an advocate for one of the parties, I admit I feel a level of advocacy for my profession as a whole. That duty is reflected in the Texas Disciplinary Rules of Professional Conduct, the ethical code to which all lawyers in the State of Texas must adhere. That code requires lawyers to take some level of personal responsibility for ensuring that other lawyers adhere to the ethical rules, for the benefit of both the legal profession and the public at large.

16.     Where possible, my opinions are based upon the documents and the undisputed facts as revealed in the pleadings of the parties. There are times, however, where the parties tell different stories or view undisputed facts differently. The judge will decide whose version of the facts is correct on those occasions. Where I have been forced to make an assumption on a disputed

fact in order to proceed to the ultimate opinion, I am prepared to specify the basis on which I have resolved the disputed fact.

## Summary of Opinions

17.     As an initial matter, I believe whether Exhibit B-9 is protected by the attorney-client privilege is a matter of law for the court.  Where it is necessary that I assume the privilege applies for purposes of this opinion, I will specify that I am making such an assumption.

18.     There is, in my opinion, an issue of whether the NRA's conduct relating to Exhibit B-9 constitutes a waiver of the privilege, to the extent that it even applies. Although Mr. McCormack opines that there was no waiver by the NRA of its right to maintain confidentiality of Exhibit B-9, even he admits that waiver occurs with a voluntary disclosure of privileged information. I believe that typically the matter of waiver is a matter of law for the court to decide. However, because Mr. McCormack has expressed an opinion on the subject, to the extent the court considers it, I feel it is appropriate to express my own opinion on the subject.  Based upon the evidence before me, I believe there is a significant probability the NRA waived its right to claim that Exhibit B-9 was a privileged document, to the extent that the privilege applies, and that at a minimum, the NRA has waived its right to seek disqualification based upon Exhibit B-9 having been disseminated.  My opinion is based on numerous facts within the record, including but not limited to the fact that in addition to NRA board members and senior staff members, other non-NRA representatives were present at the board meeting where a presentation on Exhibit B-9 was made; information regarding the NRA's settlement with Lockton was known and disclosed in this litigation before Dorsey ever obtained Exhibit B-9; the NRA intentionally provided Exhibit B-9 to an AMc representative at a time when it was preparing litigation against AMc; Exhibit B-9 does not include legal impressions or opinions; when the NRA learned about Exhibit B-9 in July 2019

(discussed in more detail below), they appeared to take no further steps to retrieve it; and the NRA re-filed Exhibit B-9 and put it back into the court's record (under seal), despite previously demanding that Dorsey withdraw the document from the record, which Dorsey did.  Regardless of my opinion on waiver, to facilitate the presentation of the other issues, however, I am assuming for the purposes of this declaration that there was no waiver.

19.     I disagree with Mr. McCormack's conclusion that Dorsey failed to comply with its legal obligations concerning Exhibit B-9.

20.     I disagree with Mr. McCormack's apparent assumption that Dorsey had an obligation to explain to the NRA how it came into the possession of Exhibit B-9. There is no case law or ethical rule cited by Mr. McCormack suggesting such a standard, and I am not aware of such a standard. I do not believe such a categorical "one-size-fits-all" obligation exists.

21.     To the contrary, my opinion is that the obligation of an attorney to explain its possession of an opposing party's confidential information must be determined by the individual facts of each case, as such a disclosure may implicates the attorney's ethical obligation of confidentiality to another client. For example, it may be appropriate that disclosure be made *in camera* to the court. My opinion is that Dorsey has explained its possession of Exhibit B-9 adequately under the facts of this case. But I do not believe that *In re Meador* imposes any blanket obligation on a lawyer to explain the facts surrounding its possession of confidential information.

22.     I also disagree with Mr. McCormack's interpretation of the facts as conclusively establishing Dorsey knew from the beginning that Exhibit B-9 was privileged and failed in its obligations to return the document promptly. My opinion here is, admittedly, based in large part on the factual representations of the Dorsey attorneys whom I have known for years both as adversaries and co-counsel, as well as the correspondence between counsel, the relevant filing and

intent for including Exhibit B-9 in the Response to the NRA's Motion to Compel, the declaration of Nader Tavangar, and other considerations discussed throughout my opinions. I have seen no reason to doubt my reliance on the truthfulness of their statements.

23.     Lastly, I disagree with Mr. McCormack's opinion that Dorsey's disqualification is warranted. Again, that decision is for the court. But to the extent the court desires expert witness testimony on the question of whether disqualification is warranted, my opinion is that it is not warranted for the reasons explained in this declaration—including that Mr. McCormack did not opine about, and there is no evidence of, any actual prejudice to the NRA.  The lack of actual prejudice to the NRA, standing on its own, should be sufficient in and of itself to deny the NRA's request for disqualification. Likewise, my opinion is that the other sanctions sought by the NRA are unwarranted.

## Factual Background

24.     The factual background for the motion to disqualify Dorsey is set out in the respective pleadings of the parties. I will repeat only those facts that seem to have been undervalued or omitted by Mr. McCormack in his declaration:

- The NRA first became adverse to AMc no later than September 5, 2018,[1] and filed suit against AMc in April of 2019. Accordingly, all the events relevant to this motion occurred at a time when the NRA was contemplating suing AMc.

- AMc came into possession of the Exhibit B-9 on January 5, 2019, when a non-attorney representative from the NRA's counsel provided the document to an AMc employee and directed that he load it onto the AMc laptop.[2]  I understand similar situations took place in September 2018 and April 2019.

---

[1] *See* April 22, 2019 Correspondence from Wayne LaPierre to Mark Dyscio, dated April 22, 2019 (LaPierre explains that "[t]he NRA and I have common legal interests in the litigation against Ackerman McQueen which crystallized before the September Board meeting and colored the discussion that day.").  I understand the September 2018 Board meeting referenced by Mr. LaPierre began on September 5, 2018 in Dallas, Texas.
[2] *See* Declaration of John Popp; ECF 108 at Ex. 2 (Declaration of Andrew Arulanandam); ECF 108 at Ex. 4 (Declaration of Travis Carter).

---

DECLARATION OF COYT RANDAL JOHNSTON                                    Page 8

- At the conclusion of the executive committee meeting, neither the NRA, its counsel, nor its counsel's representative took any steps to have Mr. Popp remove Exhibit B-9 from the AMc laptop or make sure that it was not otherwise in the possession of AMc. Mr. Popp, who never looked at Exhibit B-9, then provided Exhibit B-9 to Mr. Tavangar as he had done the previous day.[3]   It appears that no one gave the document any thought following the meeting.

- The day before, on January 4, 2019, a similar event occurred—the non-attorney representative from the NRA's counsel gave the same AMc employee a similar-but non-privileged-PowerPoint presentation (the January 4 PPT) to load on the AMc laptop for a presentation to a different committee where numerous AMc representatives and other non-NRA individuals were present.[4] Again, neither the NRA, its counsel, nor its counsel's representative took any steps to have the AMc representative remove the January 4 PPT from the AMc computer or make sure that it was not otherwise in the possession of AMc.

- This lack of concern for AMc having documents of the NRA is consistent throughout the lengthy history of the two organizations, their Services Agreement, and the NRA utilizing AMc's employees with assist with digital media.[5]

- The *non-privileged* January 4 PPT is remarkably similar to Exhibit B-9. The major difference is Exhibit B-9 has a single PowerPoint slide that addresses settlement terms of a different lawsuit (where none of the Defendants here are parties).

- Those portions of Exhibit B-9 that are conceptually identical to the January 4 PPT cannot be privileged because the January 4 PPT was displayed at a meeting where AMc personnel and other non-NRA individuals were in attendance.[6]

- The NRA apparently concedes that the January 4 PPT is not privileged, based in large part on the arguments set forth in its Motion and the supporting declarations of Andrew Arulanandam and Travis Carter who draw distinctions between the January 4 PPT and Exhibit B-9.[7]   The January 4 PPT was also filed under seal as Exhibit A-65 to AMc's Motion to Disqualify the Brewer Firm without objection from the NRA.

---

[3] Declaration of John Popp; Declaration of Nader Tavangar.

[4] Declaration of John Popp; ECF 108 at Ex. 2 (Declaration of Andrew Arulanandam); ECF 108 at Ex. 4 (Declaration of Travis Carter); Declaration of Nader Tavangar.

[5] *See* ECF 103 at Ex. 2 (Declaration of Andrew Arulanandam).

[6] ECF 108 at Ex. 2 (Declaration of Andrew Arulanandam); ECF 108 at Ex. 4 (Declaration of Travis Carter); Declaration of Nader Tavangar.

[7] *See* ECF 108 at Ex. 2 ¶¶ 4-6 (Declaration of Andrew Arulanandam) (testifying that meetings such as the public affairs committee meeting on January 4, 2019 are "typically attended by a range of NRA board members, members, special guests, and vendor representatives" and acknowledging that AMc has representatives present at the January 4, 2019 meeting); ECF 108 at Ex. 4 ¶¶ 4-5 (Declaration of Travis Carter) (testifying that the January 4, 2019 meeting was "not subject to the strict rules and guidelines associated with more sensitive discussions that occur during confidential presentations to the full NRA Board of Directors, and particularly those presentations that occur in executive session.").

---

DECLARATION OF COYT RANDAL JOHNSTON

Page 9

- In response to a request for information relating to the public relations presentations to the NRA, an AMc representative provided Exhibit B-9 to Dorsey in connection with this litigation on January 7, 2020, with the representation that it was the January 4 PPT presented by the Brewer Firm's non-attorney Travis Carter, to the Public Affairs Committee of the NRA Board of Directors.  I understand the same AMc representative confirmed Exhibit B-9 was the presentation by Mr. Carter for the Public Affairs Committee, and that in total, the AMc representative represented to Dorsey three different times that Exhibit B-9 was the non-privileged presentation by Mr. Carter for the Public Affairs Committee.  Based on that explanation, Dorsey believed Exhibit B-9 was the presentation made by Mr. Carter to the Public Affairs Committee, which included the attendance of numerous AMc representatives and other non-NRA individuals.[8]

- Dorsey made no attempt to hide its possession of Exhibit B-9 and in fact filed the document (under seal) one month later on February 12, 2020, as part of AMc's Response to the NRA's Motion to Compel.  The NRA was copied on this filing.

- Exhibit B-9 was filed under seal and never was disclosed to the public.  Mr. Gruber makes the statement that the January 4 Public Affairs Committee presentation would have been better evidence, and a better exhibit for the Response given that it was longer and more detailed.[9]

- Dorsey cited Exhibit B-9 as support for its claim that the Brewer Firm was attempting to take over business AMc had been doing exclusively for the NRA for nearly 40 years. The document is cited for no other purpose. Based upon the statements made by AMc/Dorsey in the Response to the NRA's Motion to Compel, AMc/Dorsey understood that Exhibit B-9 was used as part of the presentation to the Public Affairs Committee, which was not a privileged and confidential committee meeting.[10]

- After the filing of Exhibit B-9 on February 12, 2020, there followed several weeks of exchanges between the parties in which Dorsey again stated that Exhibit B-9 was given by Mr. Carter during the Public Affairs Committee meeting and was therefore not privileged.[11]

- In correspondence dated March 2, 2020, Dorsey took steps to make sure Exhibit B-9 was isolated and not disseminated and promised to maintain the confidentiality of Exhibit B-9.  Dorsey also noted that it was not permitted to destroy Exhibit B-9 because of the ongoing New York Attorney General's investigation into the NRA and the pending subpoena before AMc, and also that it was concerned about the

---

[8] Declaration of Nader Tavanger; Declaration of G. Michael Gruber.
[9] Declaration of G. Michael Gruber.
[10] Declaration of G. Michael Gruber.
[11] March 2, 2020 Correspondence from Mike Gruber to Mike Collins.

DECLARATION OF COYT RANDAL JOHNSTON

destruction of documents.  I have seen no evidence to suggest that Dorsey used or otherwise disseminated Exhibit B-9 after its March 2, 2020 correspondence.[12]

- Dorsey did not realize that there were two different presentations given to two different meetings on two different days until the March 3, 2020 letter from the NRA's lawyers.[13]  Even after realizing that there were two different meetings on two different days, there still appears to have been confusion for several days about which presentation was used for each meeting.

- On March 31, 2020, Dorsey agreed to immediately take the following actions regarding Exhibit B-9:

    1. Defendants' counsel will return the Presentation to the NRA's Counsel (the Brewer Firm);

    2. Defendants' counsel will permanently delete any and all versions of the Presentation in their possession, custody, or control;

    3. Defendants will permanently delete any and all versions of the Presentation in their possession, custody, or control;

    4. Defendants' counsel will confirm with Defendants that all versions of the Presentation in their possession, custody, or control have been permanently deleted and will again verify that no copies were made, and if any were, that they have been permanently destroyed; and

    5. Defendants will file a Motion to Withdraw Exhibit B-9 from their Response to Plaintiff's Motion to Compel Document Production.

    Once each of these actions is completed, Defendants' counsel will circulate a subsequent correspondence verifying that each of the aforementioned actions have been completed.[14]

- The NRA and the Brewer Firm's response was for Dorsey to return all copies, withdraw Exhibit B-9 from the court's record, and not to destroy any copies of Exhibit B-9 or related documents. On April 1, 2020, Dorsey returned all copies of Exhibit B-9 and withdrew it from the court's record in support for its response, but requested the NRA preserve the document in the event it later became evidence.[15]

- Despite previously insisting that Dorsey return all copies of Exhibit B-9 and Dorsey withdrawing it from the record, the NRA and the Brewer Firm filed Exhibit B-9 in

---

[12] *Id.*
[13] Declaration of G. Michael Gruber.
[14] March 31, 2020 Correspondence from Mike Gruber to Mike Collins.
[15] *See* March 31, 2020 Correspondence from Mike Gruber to Mike Collins; April 1, 2020 Correspondence from Mike Gruber to Mike Collins.

---

DECLARATION OF COYT RANDAL JOHNSTON                                    Page 11

support of their Motion, putting it back into the Court's record in this case, which both Dorsey and any other counsel in this case can see.[16]

- Much of the disagreement over Exhibit B-9 occurred during the time of the COVID-19 shutdown. This timing made it more difficult for Dorsey, and I assume the NRA's counsel, to evaluate the situation and respond quickly to each other's positions concerning Exhibit B-9.[17]

- Dorsey and AMc have a long-standing relationship that spans seven years, including, specifically, a relationship with the deceased Angus McQueen, against whom the NRA bases a majority of its allegations. AMc has invested significantly in Dorsey's knowledge and strategy in this case. Changing counsel would work a significant hardship and prejudice on AMc.[18]

### Discussion

25.     I begin my analysis of these facts with the entrenched Texas case law that "[d]isqualification of a party's counsel is a severe remedy." *In re Nitla S.A. de C.V.*, 92 S.W.3d 419, 422 (Tex. 2002) (orig. proceeding) (per curiam). "It can result in immediate and palpable harm, disrupt trial court proceedings, and deprive a party of the right to have counsel of choice." *Id*. "Disqualification can delay proceedings in the trial court, require the client to engage a successor attorney, and, in appropriate cases, deprive the client of work product done on his behalf by the disqualified attorney." *In re Tex. Windstorm Ins. Ass'n*, 417 S.W.3d 119, 129 (Tex. App.—Houston [1st Dist.] 2013, orig. proceeding). "Because of the serious consequences of disqualification of opposing counsel, such motions can be misused for delay or to exert inappropriate leverage to force a settlement." *Id*. "The law strongly discourages the use of motions to disqualify as tactical weapons in litigation." *Id.* To prevent abuse, the trial court "must strictly adhere to an exacting standard" in ruling on disqualification motions. *NCNB Tex. Nat'l Bank*, 765 S.W.2d 398, 399 (Tex. 1989) (orig. proceeding).

---

[16] ECF 109.
[17] Declaration of G. Michael Gruber.
[18] Declaration of Revan McQueen.

---

DECLARATION OF COYT RANDAL JOHNSTON

**APP044**

26.     In forming my analysis, I also rely on settled Texas law that a party seeking to disqualify another party's attorney generally must prove actual prejudice. *See, e.g.*, *Busby v. Harvey*, No. 02-16-00311-CV, 2017 WL 3184732, at *3 (Tex. App.—Fort Worth July 27, 2017, no pet.). "[A] court should not disqualify a lawyer for a disciplinary violation that has not resulted in actual prejudice to the party seeking disqualification." *In re Meador*, 968 S.W.2d 346, 350 (Tex. 1998) (orig. proceeding) (citation omitted).

27.     As Mr. McCormack has noted in his declaration, "the purpose of disqualification is either to prevent or correct an ethical conflict of interest or to remedy an ethical breach by opposing counsel that cannot be effectively remedied in any less severe way."[19] The facts here do not satisfy that standard.

28.     The NRA does not allege an ethical conflict of interest that disqualification would prevent or correct. Instead, the NRA argues for disqualification under the second prong of Mr. McCormack's test: an ethical breach that cannot be remedied effectively by less severe means. But Mr. McCormack's analysis of the six factors enunciated by *In re Meador* demonstrates that disqualification is not proper here. *See In re Meador*, 968 S.W.2d at 351–52.

29.     **The first *Meador* factor** is whether Dorsey knew or should have known that the material was privileged. Mr. McCormack relies heavily upon the fact that the document was labeled as privileged and confidential. But labels do not confer protected status; if they did, we still would be litigating with the tobacco industry over its labeling of documents as confidential. The lack of merit in this argument is perhaps best demonstrated by the fact that, other than the first page of Exhibit B-9, the same label is put on every slide of *both* presentations—and even the NRA concedes that the January 4 PPT is ***not*** privileged.

---

[19] Declaration of James M. McCormiack, ¶ 36.

---

DECLARATION OF COYT RANDAL JOHNSTON

30.     Dorsey received Exhibit B-9 from AMc on January 7, 2020, with three separate representations that it was the non-privileged presentation given by non-attorney Carter during the Public Affairs Committee meeting where numerous third-parties were present, including several AMc representatives. Dorsey representatives did not attend the January 4, 2019 or January 5, 2019 meetings. Dorsey representatives knew that a presentation was conducted by non-attorney Carter of the Brewer Firm for the Public Affairs Committee, and that the presentation touched on numerous issues that had historically been handled by AMc. Dorsey did not realize there were two different meetings that had occurred on January 4, 2019 and January 5, 2019 until Mr. Collins' March 3, 2020 correspondence.

31.      Dorsey filed Exhibit B-9 under seal on February 12, 2020. Dorsey cited Exhibit B-9 to support a proposition—interference with the business of AMc by the Brewer Firm for the NRA—having nothing to do with the portion of Exhibit B-9 that differs from the January 4 PPT and purportedly renders it privileged. Further, based on its March 2, 2020 response to the Brewer Firm's claim that Exhibit B-9 was privileged, Dorsey again explained its understanding that Exhibit B-9 was the presentation provided by non-attorney Carter from the Brewer Firm to the Public Affairs Committee.

32.     Dorsey could be criticized for not ferreting out the mistaken belief that Exhibit B-9 was from the Public Affairs Committee meeting.  But, to be fair, the two documents are extremely similar. In fact, Exhibit B-9 appears to be a summary of the January 4 PPT with one differing slide at issue. Dorsey's failure to discover the mistake can be explained by its reliance on representations from the client that Exhibit B-9 was given at the Public Affairs Committee and by the fact that Dorsey was relying upon portions of Exhibit B-9 that are conceptually identical in content to the January 4 PPT and wholly unrelated to the allegedly privileged portions of Exhibit B-9.

33.     It is my opinion that Dorsey did not know that Exhibit B-9 was privileged when it was filed under seal, and it is my opinion that Dorsey was entitled to rely on its client's representations that the Exhibit B-9 was from a non-privileged public meeting that numerous client representatives attended.

34.     **The second *Meador* factor** is the promptness with which Dorsey notified the NRA that it had Exhibit B-9. Dorsey received Exhibit B-9 on January 7, 2020 and, on February 12, 2020, filed the document under seal in support of its opposition to the NRA's Motion to Compel. Dorsey made no effort to hide or deny its possession of the Exhibit B-9 or the fact that they understood that it was not privileged.

35.     Just days after learning about the NRA's claim that Exhibit B-9 was allegedly privileged, Dorsey acknowledged that it had received the communication and would respond the following week.   Before the end of the following week, the NRA's counsel sent another correspondence.  Dorsey promptly responded to that correspondence on March 2, 2020, and denied the assertion that Exhibit B-9 was privileged based on its understanding and belief at the time that it was given during a public meeting to the Public Affairs Committee by non-attorney Carter with numerous third parties present, including four AMc representatives. Thus, by all appearances, that denial was in good faith.

36.     While there is no obligation to notify opposing counsel about an allegedly privileged document in its possession—contrary to Mr. McCormack's reading of *In re Meador*—I believe that Dorsey promptly adhered to the standards of the profession once it actually learned that it might be in possession of a privileged document by notifying counsel of the misunderstanding and thereafter immediately withdrawing the document from the Court's record.

DECLARATION OF COYT RANDAL JOHNSTON                                                    Page 15

37.     It is my opinion that Dorsey did not delay or attempt to conceal its possession of Exhibit B-9. It is further my opinion that Dorsey was entitled to challenge the NRA's claim of privilege on the document and that challenge should not be used to infer bad faith or to seek disqualification. Indeed, even when Dorsey agreed to return all copies of Exhibit B-9, it requested (for a second time) that the NRA maintain Exhibit B-9 so that the alleged privilege could be challenged and because the NRA's President purportedly testified that she was previously directed to destroy evidence.

38.     **The third *Meador* factor** is the extent to which Dorsey reviewed and digested the privileged information. Ironically, it is the NRA's Motion to Disqualify that forced Dorsey to review and digest the privileged information in Exhibit B–9. Dorsey generally described the purpose behind the January 4 PPT and mistakenly cited to Exhibit B-9 to support its claim that the NRA's counsel was competing with AMc for business – information that was discussed openly in the Public Affairs Committee meeting that AMc attended. I understand that Dorsey has never reviewed the "speaker notes" from Exhibit B-9.  Aside from attaching Exhibit B-9 to AMc's Response to the NRA's Motion to Compel for the proposition that the Brewer Firm was competing with AMc, Dorsey did not use Exhibit B-9. The NRA and Mr. McCormack's contentions that Dorsey served numerous requests for production on December 20, 2019 relating to Exhibit B-9, and specifically the Lockton settlement, cannot be true given that Dorsey did not even come into possession of Exhibit B-9 until January 7, 2020, and as discussed below, information regarding the Lockton settlement was already well-known and part of the record in this litigation.

39.     Dorsey has now digested the information on Exhibit B-9 that was filed under seal in ECF 109, but there is no way this issue could have been presented without Dorsey digesting that information. The fact that Dorsey was forced to digest that information to confront the claim of

privilege on a document that AMc said was not privileged should not be used to seek Dorsey's disqualification.

40.     **The fourth *Meador* Factor** is the extent to which the NRA is harmed by Dorsey having received the document. In *Meador*, the Supreme Court found an absence of evidence suggesting that "the information in the privileged documents [would] significantly prejudice" the other party's claims and defenses in the litigation. *In re Meador*, 968 S.W.2d at 352. It is my opinion that this is also true of this case.

41.     It is my opinion that the NRA has failed to show credible evidence that it is harmed by the disclosure of Exhibit B-9. In reaching this opinion, I rely upon the following facts:

- Any harm must be from those portions of Exhibit B-9 that differ from the January 4 PPT and the Public Affairs Committee meeting presentation because there can be no prejudice from disclosure/use of non-privileged information from the Public Affairs Committee meeting;

- Any harm must be in this litigation because there can be no harm outside this litigation as the document was filed under seal and no third party has access to that information;

- To the extent the court determines that Exhibit B-9 gave AMc and Dorsey information they should not have, the court can issue rulings that restrict use/reference to that information, thus insuring that the privileged information is not used to the detriment of the NRA;

- In September 2019 and December 2019—before Dorsey ever received Exhibit B-9 in January 2020—the information from the allegedly privileged portion of Exhibit B-9 (slide 5 related to the Lockton settlement terms) had been disclosed. That information has been and continues to be available to AMc and Dorsey through the prior September 24, 2019 deposition testimony of Wayne LaPierre,[20] the December 18, 2019 deposition testimony of Lieutenant Colonel Oliver North;[21] and the April 18, 2019 correspondence from Mr. North to the NRA's General Counsel, John Frazer, and the NRA's Chairman of the Audit Committee, Charles Cotton, that specifically references and describes the Lockton settlement[22];

- Disqualification of Dorsey does not protect the NRA because the information on Exhibit B-9 is known to AMc and would remain well known to AMc and its new potential counsel, even if Dorsey were disqualified, as further evidenced by the fact that it was disclosed in Mr.

---

[20] Wayne LaPierre Depo. at p. 163.
[21] Oliver North Depo. at pp. 209-10; 139-140.
[22] *See* OLN 00185.

---

DECLARATION OF COYT RANDAL JOHNSTON                                    Page 17

LaPierre's deposition, Mr. North's deposition, Mr. North's April 18, 2019 correspondence, and that the NRA has again filed Exhibit B-9 with the Court; and lastly,

- Mr. McCormack only points to "potential" harm to the NRA "in other cases" (which he fails to identify), which is an insufficient showing for actual prejudice in *this* lawsuit to warrant disqualification.

42.     **The fifth *Meador* factor** is the extent to which the NRA is responsible for the loss of its privileged document. The law imposes on the client and the attorney the obligation of protecting confidential information. Negligence relating to the preservation of confidentiality can result in forfeiture of confidential status. The court ultimately will decide whether the NRA's action or lack of action extinguished its rights of confidentiality. It is clear that the NRA and its counsel bear some responsibility for the loss of control over this otherwise-privileged document. At a time when the NRA already was contemplating litigation with AMc—and at least four months after it decided to sue AMc:

- The NRA, through a non-attorney at the Brewer Firm, gave an AMc employee Exhibit B-9 in January 2019 months after the NRA had determined that it was going to initiate litigation against AMc in September 2018;

- The NRA directed the AMc employee load the privileged communication onto an AMc laptop;

- At the end of the meeting, the NRA simply left Exhibit B-9 on AMc's laptop, under the care, custody, and control of AMc and took no steps to retrieve or otherwise destroy Exhibit B-9;

- Even after litigating a similar issue with allegedly privileged PowerPoint presentations relating to the April 2019 NRA Board Meetings (that the NRA also intentionally provided to AMc and that contained information actually pertaining to the litigation between the NRA and AMc), including after learning in a deposition in July 2019 that AMc had the presentations after the September and January board meetings, the NRA took no steps to retrieve or otherwise discuss Exhibit B-9 until the filing of Exhibit B-9.[23]

43.     Not knowing the NRA was contemplating litigation against AMc, the AMc employee provided a copy of Exhibit B-9 to an AMc representative for archiving with other NRA data just as

---

[23] Declaration of John Popp.

DECLARATION OF COYT RANDAL JOHNSTON                                              Page 18

he had done the day before with the January 4 PPT. A year later in January 2020, that AMc representative sent Exhibit B-9 to Dorsey to demonstrate the inconsistent public relations messaging between the NRA and the PR manager at the Brewer Firm, which that representative witnessed at the Public Affairs Committee meeting. The AMc representative did not realize Exhibit B-9 was apparently from the meeting the next day (which he nor other AMc representatives did not attend) rather than the Public Affairs Committee meeting (which AMc attended).

44.     It is my opinion that Dorsey and AMc bear no responsibility for the NRA's intentional disclosure of Exhibit B-9 or the information contained within it.

45.     **The sixth *Meador* factor** is the prejudice that would result to AMc from the disqualification of Dorsey.

46.     AMc and Dorsey have a relationship going back to 2013. Because of Dorsey's longstanding relationship with AMc—and also with its now-deceased former CEO Angus McQueen—the firm has unique knowledge and insight that cannot be replicated by any replacement counsel. This is especially true given the many allegations made by the NRA against Mr. McQueen. I also understand from AMC's CEO that the disqualification of Dorsey would result in a significant financial burden to AMc, who has already been forced to furlough, terminate, or significantly reduce the salary of numerous AMc employees as a result of the NRA's termination of the Services Agreement.[24]

47.     I reserve the right to amend, supplement, or withdraw any of my opinions based upon additional information I may acquire or otherwise. I reserve the right to form additional opinions.

I declare under penalty of perjury and in accordance with 28 U.S.C. § 1746 that the foregoing is true and correct.

---

[24] Declaration of Revan McQueen.

DECLARATION OF COYT RANDAL JOHNSTON                                          Page 19

Executed this 21st day of May, 2020.

Coyt Randal Johnston

**COYT RANDAL JOHNSTON**
**JOHNSTON TOBEY BARUCH, P.C.**
12377 MERIT DRIVE, SUITE 880
DALLAS, TEXAS 752521
(214) 741-6260 Phone (214) 741-6248 Fax
Email address: randy@jtlaw.com
Website: www.jtlaw.com

Born in Wheeler, Texas because the hospital in Shamrock was full.  Author of the book *Robbed at Pen Point,* published poet, passionate guitar player, father of eight children, and founding member of Blue Collar Crime, a Texas blues brotherhood of four lawyers and a  guitar legend.

Randy Johnston began his career practicing law with two large institutional law firms, one in Houston and one in Dallas.  He left and formed his own firm in 1981 and has been practicing with his own firm every since.

**EDUCATION**

The University of Texas School of Law, Juris Doctor with Honors
        Honors:      Chairman, Legal Research Board
                    Clerk, Lt. Governor's Conference on Ethics in Government

Brigham Young University, Bachelor of Arts Degree
        Major:       English
        Honors:      Track Scholarship (intermediate hurdles)
                    Associate Editor, Wye Magazine (campus literary publication)
                    President, English Circle (Club of English Majors)

Pampa High School, Pampa, Texas

**LICENSES/CERTIFICATIONS**

Licensed by State Bar of Texas and State Bar of Utah and many Federal Courts throughout the country.
Board Certified: "Civil Trial Law," Tex. Bd. of Legal Specialization, 1981 – present
Practice limited to litigation, specializing in professional liability.

**ACKNOWLEDGMENTS/HONORS**

2019 "Texas Trial Titan" Rogge Dunn Group
2017 "*Jim Bowmer Professionalism Award*" from the Texas Bar College
2016 "*Trial Lawyer of the Year*" from the Dallas Bar Association.
2016 "*Champion of Justice A*ward" from Legal Aid of NorthWest Texas.
2012 *"Texas Trial Legends Award"* from Dallas Bar Association's Tort & Insurance Practice Section.

EXHIBIT A

**APP053**

2010 "*A Standing Ovation Award*" from staff of the State Bar: outstanding volunteer to the State Bar CLE Program.

Dallas Bar Association - Presidential Citation for Law Jam 2; program for fundraising for legal aid for the poor.

Texas Lawyer – "*The GoTo Guide*" 2007, for Legal Malpractice in Texas

D Magazine - Best Lawyers in Dallas

Texas Monthly - Texas' Super Lawyers

Who's Who in American Law

## PROFESSIONAL ORGANIZATIONS

The National Trial Lawyers – "Top 100 Civil Plaintiff Attorneys"
        Member
International Academy of Trial Lawyers
        Fellow, 2009
American Board of Trial Advocates
        President, Dallas Chapter 2004
Dallas Bar Association
        Chairperson, Business Litigation Section, 2000
Dallas Bar Foundation
        Charter Life Fellow
Dallas Trial Lawyers Association
        President, 1999
 Texas Bar Foundation
        Life Fellow
Texas Trial Lawyers Association
        Executive Committee Member (2001)

## SPEECHES

*Code of Professional Conduct and Zealous Advocacy,* SMU Externship Class, 2020

*Deposition Panel,* Trial Academy Program, 2019

*Representing a Hero,* American Board of Trial Advocates, 2019

*Top 10 Rules to Avoid Malpractice,* Corpus Christi Bar Association's Advanced Civil Trial Law Seminar, 2019

*Representing a Hero,* Texas Trial Titan, 2019

*Top 10 Malpractice Claims and How to Protect Yourself,* State Bar of Texas 44th Annual Advanced Family Law Course, 2018

*Judicial Ethics,* Jane's Due Process, 2018

**APP054**

*Ethical Risks and Pitfalls,* The Knowledge Group Webcast, 2018

*Ethical Issues in Advertising,* State Bar of Texas 9th Annual Essentials of Business Law, 2018

*Damages in a Malpractice Case,* State Bar of Texas 10th Annual Civil Litigation Course, 2018

*Anatomy of a Trial: Closing Arguments Lecture,* Dallas Bar Trial Academy, 2017

*How to Pick a Jury in a Legal Malpractice Case:* National Legal Malpractice Conference, 2017

*The Art of Business Litigation: A conversation,* Texas Lawyer, 2017

*Professional Malpractice,* State Bar of Texas 11th Annual Fiduciary Litigation Course, 2016

*You May be Paranoid, But They Really Are Out There and After You: Malpractice and Ethical Concerns of Estate Planners,* Minnesota CLE, 2016

*Ethics: Not a Game (Show),* Oklahoma Bar Association, 2016

*Ethical Issues in Pre-Trial & Trial Investigations,* Dallas Bar Ethics Fest, 2016

*Asleep at the (Ignition) Switch?* The Texas General Counsel Forum, 2016

*Litigating a Malpractice Case,* State Bar of Texas Webcast, 2016

*Latest Developments in Ethics and Malpractice in Texas,* Denton Bar, 2016

*Litigating a Malpractice Case,* State Bar of Texas Webcast, 2015

*Reptile and Rules of the Road,* Trial Skills, 2015

*Ethics Not a Game (Show),* State Bar of Texas 25th Entertainment Law Institute, 2015

*Trying Legal Malpractice Cases,* Legal Malpractice Program, 2015

*Proving Up a Business Case,* State Bar of Texas Business Disputes, 2015

*Attorney Client Disclosure Rules and Those Pesky Ethics,* Legal Seminar on Ad Valorem Taxation Conference, 2015

*Knowing Where the Ice is Thin,* Dallas Bar, 2015

*Malpractice,* State Bar of Texas 38th Advanced Civil Trial Course, 2015

*General Motors Ignition Switch Issue,* General Counsel Forum, 2015

**APP055**

*The Art of Business Litigation: A conversation,* Texas Lawyer, 2015.

*Tips to Avoid Legal Malpractice,* Baker Botts Clinic, 2015

*Robbed at Pen Point,* Mesquite Ambucs, 2014

*The Art of Business Litigation: A Conversation,* Texas Lawyer, 2014

*Avoiding Legal Malpractice: Traps for the Unwary;* Dallas Bar CLE Committee, 2014

*Legal Advice for Businesses;* Duncanville Rotary Club, 2014

*Dealing with Clients: Selecting, Attracting Maintaining and Firing;* Dallas Bar, 2014

*Top Ten Ways to Avoid Malpractice;* Texas Tech Extern Class Panel, 2013

*Malpractice and Ethics;* American College of Trust and Estate Counsel, 2013

*Ethics in Business Litigation;* State Bar of Texas Business Disputes, 2013

*Malpractice Traps for the Beginning Lawyer;* Dallas Bar, 2013

*War Stories;* Peer Assistance Committee, 2013

*Top 10 Ways to Avoid Malpractice;* Arlington Bar, 2013

*Malpractice Issues;* Houston Bar Appellate Section, 2013

*In-House Counsel Summit Roundtable;* 2013

*Texas-Style Malpractice Update;* Association of Professional Responsibility Lawyers, 2013

*Danger Zones and Red Flags in Engagement Letters,* Dallas Bar Association, 2013

*Hooked on Ethics – The T & E Lawyer's Impossible Dilemma;* 47th Annual Heckerling Institute on Estate Planning, 2013

*Malpractice;* State Bar of Texas Sex, Drugs and Surveillance Course, 2013

*Ethics Considerations for Solo & Small Firms Attorneys;* Dallas Association of Young Lawyers, 2012

*Presentation on the firm's pending case before the Supreme Court;* Texas Lawyer's Insurance Exchange's National Association of Bar Related Insurance Companies Annual Meeting, 2012

*The Trial of Wyatt Earp (Anatomy of a Trial),* Litigation Institute for Trial Training, 2012

**APP056**

*Robbed at Pent Point,* Kansas City Association of Financial Professionals's Finance and Treasury Conference, 2012

*Legal Ethics and Malpractice Issues for Appellate Lawyers,* State Bar of Texas 26th Annual Advanced Civil Appellate Practice, 2012

*Client as Consumer: Handling the Legal Malpractice Claim;* State Bar of Texas Advanced Consumer and Commercial Law Course, 2012

*Navigating the Minefield – Avoiding Malpractice Claims and Grievances;* 14th Annual State Bar College Summer School, 2012

*Why I Sue Lawyers;* North Dallas Bar Association, 2012

*Current Ethical Issues,* Women Lawyer's of Tarrant County, 2012

*Ethical Consideration of Social Media;* Law and Media, 2012

*Law Practice Management;* Dallas Minority Attorney Program, 2012

*How to Avoid Being Robbed at Pen Point,* TEXPO Striving for Excellence, 2012

*Legal Malpractice – Ethics Presentation,* Intellectual Property Law Course, 2012

*Judicial Ethics Code,* Judicial Independence Panel, 2012

*Protecting Yourself from Scams,* American Association of University Women, 2012

*Death Penalty Panel,* SMU Dedman School of Law's American Constitution Society, 2012

*Advertising Rules for Attorneys,* Tarrant County Bar Association's Diversity Committee, 2012

*Tips From the Trenches: The Top Ten Things that Get Young Lawyers In Trouble for Malpractice and Lesson in Avoidance,* Dallas Association of Young Lawyers' Leadership Class and Professionalism Presentation, 2011

*I Think You Made A Mistake: Watch What I Will Do To You Now!,* American College of Trust & Estate Counsel's Fall Meeting, 2011

*What Every Business Tort Lawyer Should Know About Legal Malpractice,* State Bar of Texas' Business Torts Institute, 2011

*Liability for Government Lawyers,* Regional Assistant Attorney General's RAAnGer Roundup in Big D, 2011

**APP057**

*Top Ten Ways to Avoid Being Sued,* Collin County Bar Ethics Seminar, 2011

*How Family Law Attorneys Can Best Avoid Being Sued,* Dallas Bar Association's Family Law Bench Bar Conference, 2011

*Malpractice Traps,* State Bar of Texas, Webcast 2011

*Blazing New Trails in Professional Liability,* Professional Underwriter Society Panel International Conference, 2010

*Malpractice Trends,* State Bar of Texas 33rd Annual Advanced Civil Trial Course, 2010

*Ethics Jeopardy,* Bench Bar Conference, 2010

*Legal Malpractice Traps,* National Employment Lawyer's Association, 2010

*What Partnership and LLC Drafting Errors are Likely to Make you a Malpractice Target,* Dallas Bar Association's Tax Section, 2010

*Avoiding Malpractice Pitfalls in Probate Litigation,* Tarrant County Probate Litigation Section, 2010

*Ethics from the Judges' Perspective,* Panel Moderator, Dallas Association of Young Lawyers Sumer CLE Day, 2010

*Legal Malpractice Traps,* State Bar College Summer School, 2010

*Attorney-Client Privilege In Dealing with Auditors,* The Center for American and International Law's 2010 Symposium: Globalization for In-house and Outside Counsel, 2010

*Malpractice Trends,* Dallas Bar Association's Trial Skills, 2010

*File Documentation, Retention and Destruction,* Collin County Bar Association's Estate Planning & Probate Section, 2010

*Top Ten Ways to Avoid Getting Sued for Malpractice,* Dallas Bar Association's Ethics Fest Program, 2010

*Preventing Legal Malpractice: Common Pre-Trial Mistakes,* State Bar of Texas 4th Annual Spring Training: Winning Before Trial, 2010

*Grievances and Legal Malpractice,* State Bar of Texas 2010 Advanced Medical Malpractice Course, 2010

*Land Mines, Quick Sand and Sand Traps,* Texas Wesleyan Alumni, 2010

**APP058**

*Legal Malpractice Update,* 26th Annual Litigation Update Institute, 2010

*Suing and Defending Financial and Legal Professionals,* UT Law's 33rd Page Keeton Civil Litigation Conference, 2009

*File Documentation, Retention and Destruction,* Dallas Bar Association's Probate Ethics Panel, 2009

*Robbed at Pen Point,* North Tarrant Bluebonnet Chapter of the International Association of Allied Professionals, 2009

*Ethical Dilemmas and Navigating the Ethical Pitfalls of Online Networking,* Dallas Association of Young Lawyer's Dinner with the Judiciary, 2009

*Ethical Considerations In Representing Closely-Held Companies,* Tarrant County Bar Association's Corporate Counsel Section, 2009

*Malpractice and Ethics Update,* State Bar of Texas 19th Annual Entertainment Law Institute, 2009

*Ethics,* Dallas Bar Association's Annual Review of Oil & Gas Law XXIV, 2009

*Avoiding Malpractice and Ethics Violations in Consumer Practice,* State Bar of Texas Advanced Consumer and Commercial Law Course, 2009

*Legal Malpractice Update,* State Bar of Texas 32nd Annual Advanced Civil Trial Course, 2009

*Attorney Malpractice: What Partnerships and LLC Drafting Errors are Likely to Make you a Target,* UT CLE, 2009

*Navigating the Quagmire of Potential Claims Against Lawyers Who Represent Fiduciaries and Other Clients in an Estate, Trust, Probate and Guardianship Practice,* Spring Institute, 2009

*Lessons Every Trial Lawyer Has to Learn,* College of Law's Society of Legal Studies and Business, 2009

*Robbed at Pen Point,* Preston Center Rotary Club, 2009

*Legal Malpractice Update,* State Bar of Texas 25th Annual Litigation Update Institute, 2009

*Ethics and Legal Malpractice in the Current Economic Crisis,* Dallas Bar Association's CLE Committee, 2008

*Ethics and Malpractice Myths and Reality,* Dallas Bar Association's Entertainment Law Section, 2008

**APP059**

*Real and Imagined Ethical and Malpractice Issues,* State Bar of Texas Consumer and Commercial Law Course, 2008

*Fiduciary Litigation Update,* Tarrant County Bar Association's Navigating Troubled Waters: Legal Issues in an Uncertain Economy, 2008

*Ethics Not a Game,* 18th Annual Entertainment and Law Institute's Legal and Business Aspects of Film, Music, Sports and Digital Media, 2008

*Evaluating and Handling the Legal Malpractice Case,* State Bar of Texas Consumer and Commercial Law Course, 2008

*Ethical and Malpractice Issues,* Review of Oil & Gas Law XXIII, 2008

*Attorney Advertising Rules Guidelines and Their Application for Websites,* State Bar of Texas: Webcast, 2008

*Malpractice Traps for the Beginning Lawyer,* Transition to Law Practice Program, 2008

*File Documentation, Retention and Destruction,* Collin County Bar Association's Estate Planning & Probate Section, 2008

*Recent Developments in Legal Ethics with Respect to Representing Healthcare Providers,* Dallas Bar Association's Healthcare Section, 2008

*Recent Developments in Legal Malpractice,* Dallas Bar Association's Annual Ethics Fest, 2008

*Ethics in the Internet,* Texas Trial Lawyer's Association: Personal Injury Seminar, 2008

*Avoiding Your Worst Nightmare-Managing to Stay Out of Trouble,* Dallas Minority Attorney Program, 2008

*Staying out of the Cross-hairs: Avoiding Malpractice Claims,* Dallas Bar Association's Ethics Committee, 2008

*Protecting Ourselves: Attorney Liability Issues,* State Bar of Texas: Webcast, 2008

*Why I Sue Lawyers,* Park Cities Club – Expert Witness Association, 2008

*Malpractice, Ethics and Fee Disputes,* State Bare of Texas: Webcast, 2007

*The Three Corner Problem,* Ethics Dilemmas in Legal Malpractice, 2007

*File Documentation, Retention and Destruction,* State Bar of Texas Advanced Drafting: Estate Planning and Probate, 2007

**APP060**

*Why I Sue Lawyers,* Great American Insurance Group's CLEver! Ethics, 2007

*Internet Advertising,* Dallas Bar Association's 16th Annual Bench Bar, 2007

*Evaluating and Handling the Legal Malpractice Case,* State Bar of Texas Consumer and Commercial Law Course, 2007

*Malpractice Prevention & Disciplinary Rules,* State Bar of Texas 30th Annual Advanced Civil Trial Course 2007

*The Art of Cross Examination,* Dallas Bar Association's Tort and Insurance Practice Section, 2007

*Belt Update - Practical "Belts" and Suspenders Panel Discussion of How to Plan to Defend the "But Daddy Would Have Wanted to Save All Taxes" Claim,* Texas Bar's 31st Annual Estate Planning and Probate Course, 2007

*Magical Ethical Mystery Tour,* Dallas Bar Association's Annual Ethics Fest, 2007

*Belt Case –*State Bar of Texas: Webcast, 2007

*Malpractice Issues in Probate and Estate Planning,* Dallas Bar's Probate, Trusts & Estates Section, 2007

*Malpractice Traps: Advising the Insolvent Client,* State Bar of Texas 25th Annual Advanced Business Bankruptcy Course, 2007

*Legal Malpractice Roundtable,* 2006

*Ethics Panel,* Texas Bar's 29th Annual Advanced Civil Trial Course, 2006

*Professional Liability Lawsuits and Successful Strategies,* Dallas Bar Association's Business Litigation Section, 2006

*Law & Ethics Issues for the Estate Planner,* The Center of American and International Law's 44th Annual Program on Wills, Trusts, and Estate Planning, 2006

*Belt v. Oppenheimer,* Dallas Bar Association's Probate Study Group, 2006

*Legal Malpractice Roundtable,* Texas Lawyer's Roundtable Event, 2006

*Ethics Issues for the Practicing Entertainment Lawyer,* 15th Annual Entertainment Law Institute Legal and Business Aspects of Music, Motion Pictures, and Digital Entertainment, 2005

*Malpractice, Ethical and Fee Disputes,* The San Antonio Estate Planners Council's - Estate Planning, Probate, and Guardianship Seminar, 2005

**APP061**

*Malpractice Exposure for Lawyers in Insurance Related Matters*, 9th Annual Insurance Law Institute.  The University of Texas School of Law, 2004

*Ethics Issues in Estate Planning;* 43rd Annual Program on Wills, Trusts & Estate Planning. The Center for American and International Law, 2004

*The Cost of Being a Gunfighter;* Legal Ethics Committee of the Dallas Bar Association, 2004

*Current Legal Malpractice Issues,* Tort and Insurance Section of the Dallas Bar Association, 2004

*Ethical and Malpractice Issues for the Estate Planning and Probate Practitioner,* Texas Bar CLE presents the 28th Annual Advanced Estate Planning & Probate Course, 2004

*Legal Malpractice in Texas,* Insurance Issues. Lorman Education Services Seminar, 2004

*Ethics and Malpractice,* Collin County Probate Section, 2004

*Ethics and Malpractice,* Employment Section of the Dallas Bar Association, 2004

*Ethics and Malpractice;* Probate Section of the Dallas Bar Association, 2003

*Mediating Across the Goal Line: Medical and other Professional Malpractice.*  The Alternative Dispute Resolution Section of the State Bar of Texas, 2003

*A Review of Ethics Opinions.*  19th Annual Advanced Personal Injury Law Course.  State Bar of Texas, 2003

*Ethics and Malpractice for the Criminal Practitioner:  DWI Seminar.*  Texas Criminal Defense Lawyers Association, 2003.

*Ethics and Malpractice Issues.* Real Property Section of the Dallas Bar Association, 2003.

*"Malpractice and Ethics' Panel Discussion"* National Law Review, Litigation Summit and Exposition, 2002.

*Trial Demonstration:  Direct and Cross of Legal Malpractice Expert.*  State Bar of Texas, 2002.

*Tactics-Tactics-Tactics.*  Texas Trial Lawyer's Association, 2001.

*Advanced Expert Witness* Course II.  State Bar of Texas, 2001.

*Hot Tips for Hot Times:  Malpractice and Fee Disputes.*  Texas Trial Lawyer's Association, 2000.

**APP062**

*Prejudgment and Post Judgment Interest:*   Damages Symposium.   Texas Trial Lawyers Association, 1999.

*Malpractice and Fee Disputes.*  15th Annual Advanced Personal Injury Law Course, State Bar of Texas, 1999.

*Legal Malpractice, Settlement Negotiations, Breach of Fiduciary Duties, and Multiple Clients,* 14th Annual Personal Injury Law Course.  State Bar of Texas; 1998; 15th Annual Personal Injury Law Course, 1999.

*Proving Emotional Damages in Employment Cases: The Nuts and Bolts of Plaintiff's Employment Litigation VI,* An Employment Law Seminar for the Plaintiff's Employment Lawyer.  The Dallas-Fort Worth Chapter of the National Employment Lawyers Association, 1998.

*Personnel Law Update.*  The Council on Education in Management, 1997.

*Voir Dire and Opening Statements:* Super Store of Continuing Legal Education, State Bar of Texas, 1996.

*Masters in Trial: Examination of Plaintiff.*  The Foundation of the American Board of Trial Advocates, Dallas and Fort Worth Chapters, 1996.

*Medical Devices and Drug Litigation:* Advanced Products Liability Course.  Texas Trial Lawyers, 1995.

*Enforcement Panel: Recent Developments.*  17th Annual Conference on Securities Regulation and Business Law Problems.  The University of Texas School of Law, The Fort Worth Regional Office of the U.S. Securities & Exchange Commission, The Texas State Securities Board, and the State Bar of Texas Section on Business Law, 1995.

*Masters in Trial : Cross-Examination of Defendant.*  The Foundation of the American Board of Trial Advocates, Dallas and Fort Worth Chapters, 1995.

*Winning in Mediation: Nuts and Bolts.*  Dallas Trial Lawyers Association, 1994.

*Winning in Opening Statements: Learning from the Masters.*  Dallas Bar Association, 1993.

*Litigating with the Drug Companies:  Discovery - Getting Down to Basics.*  Texas Trial Lawyers Association, 1992.

*Arbitration of Disputes with Broker-Dealers.*  13th Annual Conference on Securities Regulation and Business Law Problems.  The University of Texas School of Law, The Fort Worth Regional Office of the U.S. Securities and Exchange Commission, The Texas State Securities Board and the State Bar of Texas Section on Business Law, 1991.

**APP063**

*There's More to it than Title VII: The Nuts and Bolts of Plaintiff's Employment Litigation.* 8th Annual National Employment Lawyers Association Seminar.

*This Gun's for Hire, Even if we're just Dancing in the Dark.* Bank One, In-House Seminar.

## ARTICLES AND PUBLICATIONS

*Legal Malpractice and Breach of Fiduciary Duty: Beware Fracturing,* The Advocate, Fall 2017

*The Art of Business Litigation: A conversation,* Texas Lawyer, 2017

*Contributor Texas Business Litigation – Chapter 15: Ethics*, Texas Lawyer, 2014

*Beware of Limitations Traps on Legal Malpractice Claims,* Texas Lawyer, November 2013

*Attorneys' Fees Problem Area and How to Avoid Fee Disputes,* Texas Bar Journal, October 2012.

*The Disciplinary Rules That Weren't: Now What?* The Advocate, December 2011.

*Mediating Professional Liability Cases – Practical Tips for Success,* Texas Lawyer, November 2011.

*Advice From The Field,* The Advocate, Volume 55, Summer 2011.

*Robbed at Pen Point* by Randy Johnston, 2008.

*A Lawyer Who Sues Lawyers,* The Dallas Morning News, August 19, 2007.

*Coyt Randal Johnston Leaves Quite A Memorable Impression,* The Turtle Creek News, April 4, 2004.

*Curtail Voir Dire? A Practitioner Responds,* Texas Lawyer, February 24, 1997.

*Death Takes Center Stage,* Texas Lawyer, January 19, 1998.

*In Fierce Defense of Lawyer Bashing,* Dallas Business Journal, November 30, 1990.

*On Being held Accountable for Electric Forks, Inc.,* The Dallas Chapter, CPA News, April 1991.

*The Ultimate Trip,* Texas Lawyer, January 5, 1998.

*The Worst Address in Texas,* Texas Lawyer, January 12, 1998.