IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § § § | |
| *Plaintiff and Counter-Defendant*, | § § | |
| and | § § | |
| WAYNE LAPIERRE, | § § | |
| *Third-Party Defendant*, | § § | |
| v. | § § | Case No. 3:19-cv-02074-G |
| ACKERMAN MCQUEEN, INC., | § § | |
| *Defendant and Counter-Plaintiff*, | § § | |
| and | § § | |
| MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, AND JESSE GREENBERG, | § § § § § | |
| *Defendants*. | | |

### DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISQUALIFY

In its Response, the NRA largely contends that Defendants do not have standing to challenge its own undeniable conflicts of interests and that the evidence of Brewer's direct conflicts of interest is not enough to warrant disqualification. Most telling in the Response is the NRA's glaring omissions and blatant falsehoods.[1] In fact, Brewer, whom the NRA concedes will

---

[1] Instead, the NRA makes numerous false and misleading representations, *e.g.*, (1) Nobody had concerns about Brewer's conflict of interest—the NRA's GC John Frazer and others did. ECF 81 at Ex. A-6 at 374:14-17, 375:4 [APP 352] ("Q. …were you concerned about any potential conflict between Mr. Brewer and Ackerman McQueen because of his family relationship? … A. Yes."); ECF 81 at Ex. A-2 at 214:1-12 [APP 111], 432:3-12 [APP 165], 434:9-19 [APP 166]. (2) AMc obstructed efforts to obtain documents—LaPierre and others testified otherwise. ECF 81 at Ex. A-62 at 305:6-21 [APP 1110] (LaPierre); ECF 122 at Ex. 42 ¶ 5 [APP 268]; ECF 105 at 20 n.121, ECF 81 at Ex. A-37 at 206:19-207:2 [APP 747]; ECF 141 at Ex. A ¶ 3-4 [APP 3-4], Ex. D ¶ 11 [APP 35] (requiring vagueness).

not be an advocate at trial and could testify as a witness, never once responds to the allegations against him and his firm. The evidence overwhelmingly mandates disqualification of Brewer and his firm, who possess non-consentable conflicts based on their tortious actions that led to the termination of the nearly forty year relationship between the NRA and AMc.

A.  **Brewer's Conflicts of Interest Require Disqualification, Including His Firm.**

Disqualification is a "common remedy" for personal conflicts of interest (*e.g.*, family relationships) that adversely limit a lawyer's representation, which may be non-consentable.[2] Where a conflict clearly "question[s] the fair or efficient administration of justice, opposing counsel may properly raise the question."[3] Defendants have standing because their concrete, actual injury traceable to Brewer would be redressed by disqualification, as discussed below.[4]

1.  **The non-consentable conflicts adversely limit Brewer's representation.**

A client may not consent to a conflict of interest where "it is not reasonably likely that the lawyer will be able to provide adequate representation" to the client (the NRA), such as Brewer taking the NRA to the brink of financial ruin.[5] Neither should consent overcome disqualification when the conflict disrupts the "fair and efficient administration of justice" or where the conflict is manifest and glaring, resulting in the court's "plain duty to act."[6]

---

(3) Dan Boren agrees with the NRA's allegations. ECF 141 at Ex. H ¶ 6 [APP 79-80] (simply repeating the NRA's allegations but no personal knowledge of AMc's backup documentation or salary allocation) (Boren Decl.).

[2] *See* TEX. R. 1.06(b); MODEL R. 1.7; RESTATEMENT (3d) LAW GOVERNING LAWYERS ("**RESTATEMENT**") § 125 (not always consentable); *id.* at § 6 cmt. c; *id.* at § 121 cmt. f ("common remedy"); ECF 141, Ex. G ¶¶ 31-35 [APP 63-64].

[3] TEX. R. 1.06 cmt. 17; *In re C.G.H.*, No. 12-12-00433-CV, 2013 Tex. App. LEXIS 8202, at *4-7 (Tex. App.—Tyler Jul. 3, 2013, no pet.); *In re Seven-O Corp.*, 289 S.W.3d 384, 388-389 (Tex. App.—Waco 2009, no pet.).

[4] *See also FMC Techs., Inc. v. Edwards*, 420 F. Supp. 2d 1153, 1156 (W.D. Wash. 2006) (nonclient standing for "open and obvious" violation that confronts "the court with a 'plain duty to act'" or "so infects the litigation" and movant's "interest in a just and lawful" adjudication) (citing *In re Yarn Processing Patent Validity Litig. v. Leesona Corp.*, 530 F.2d 83, 89 (5th Cir. 1976), nonclient standing for open and obvious ethical violations); RESTATEMENT § 108 cmt. f.

[5] RESTATEMENT § 122(c); MODEL R. 1.7 cmts. 14-15. "Reasonably" is not subjective belief, else all lawyers facing disqualification could merely assert their "beliefs" and swallow the rule. Instead, the objective standard of a "disinterested" lawyer should apply. *See* RESTATEMENT § 122 cmt. g(iv); TEX. R. 3.08 cmt. 7.

[6] *See FMC Techs.*, 420 F. Supp. 2d at 1156 (W.D. Wash. 2006) (nonclient standing for conflict of interest as when "an ethical violation was 'open and obvious,' confronting the court with a 'plain duty to act,'" or "so infects the litigation … that it impacts … a just and lawful determination of their claims.") (citing to *Yarn Processing*, 530 F.2d

*Primary Actor*. During an October 2018 meeting where Brewer's harassment and criminal threats to AMc were repeatedly discussed, LaPierre promised AMc that Brewer and his firm (and Josh Powell) would no longer be involved with AMc, including future audits, **which neither LaPierre nor Craig Spray deny**.[7] The NRA later explained that it needed additional documents through an audit for a "common legal interest[]" relating to the Lockton Litigation.[8] AMc agreed to an "independent" audit in 2019 by Forensic Risk Alliance ("*FRA*"). The FRA lead? Susan Dillon, Brewer's 17-year Director of Consulting who "left" the Brewer Firm right after LaPierre's October 2018 promise.[9] Dillon had also participated in the Brewer Firm's September 2018 audit of AMc.[10] **The NRA does not deny this fraud in any of their 14 declarations**.[11] Had AMc known of Dillon's connection to Brewer, it never would have consented to FRA as the auditor.[12]

Even worse, AMc learned on April 22, 2020 (after filing this Motion) that Dillon is *back at the Brewer Firm*, further evidencing the conflict between Brewer's fraud and LaPierre's promises to AMc.[13] Additionally, the NRA has stonewalled AMc's attempts to obtain all of the documents and reports from the FRA audit that they falsely claim AMc failed to comply with.[14] More troubling, LaPierre said the NRA decided to sue AMc *before* any of the audits (including ones by Brewer) ever took place, *i.e.*, the "common interest" lure was a farce.[15]

As a second example, even though Col. North sent his contract to the General Counsel and

---

at 89 (5th Cir. 1976)). *See also* TEX. R. 3.08 cmt. 4 (unfair prejudice to opponent) & cmt. 10 (disqualification for actual prejudice); TEX. R. 1.15 & cmt. 2 (requiring withdrawal where representation violates ethical rule or other law).
[7] *See* ECF 80 at Ex. B ¶ 25 (LaPierre also does not deny asking AMc to "stick with him."); ECF 141, Ex. A ¶¶ 9, 11-15 [APP 5-7], Ex. B ¶¶ 12-16 [APP 16-19], Ex. C ¶¶ 5-10 [APP 23-26], Ex. D ¶ 6 [APP 33], Ex. I ¶¶ 3-4, 6 [APP 82].
[8] *See* ECF 141 at Ex. J-1 [APP 107] (Aug. 8, 2018 Ltr); ECF 80 at Ex. A-41 [APP 792-793] (Dec. 21, 2018 Ltr) ("common legal interests"); ECF 141 at Ex. I ¶¶ 26-35 [APP 92-95].
[9] *See* ECF 71 at Ex. 2-H (Brewer Firm asserting privilege over 1,600 FRA communications with Dillon listed on the majority); ECF 122 at Ex. C-45 at 4 n.6 [APP 283]; MODEL R. 3.4(a).
[10] *See* ECF 105 ¶ 26.
[11] *Cf.* ECF 105 ¶ 26.
[12] ECF 141 at Ex. A ¶ 9 [APP 5-6].
[13] ECF 141 at Ex. J-2 [APP 110] (current Brewer Firm Leadership Page).
[14] *See* ECF 141 at Ex. A ¶ 8 [APP 5] (describing compliance with FRA audit).
[15] ECF 81 at Ex. A-44 [APP 801]; ECF 141 at Ex. I ¶ 6 [APP 82-83].

Audit Committee Chairman *before* the NRA filed the lawsuit,[16] the NRA *still* alleged the contract was withheld.  The patently false lawsuit was for Brewer to ruin the relationship between the NRA and AMc, to terminate the Services Agreement so Col. North would not investigate or audit Brewer's fees, and to ensure the NRA could continue to pay those fees at $1.5-2 million a month.[17]

While serving as President, Col. North had no knowledge about any lawsuit against AMc[18]; he and other Board members were questioning Brewer on their own.  But Brewer refused to submit to the same process the NRA was requiring of other vendors, which neither the NRA nor the Brewer Firm refute.[19]  Instead, **seven days after** Col. North alerted the NRA's General Counsel and Audit Committee Chairman about other Board members' concerns about Brewer; **three days after** AMc requested documentation from the NRA for certain expenses[20]; **and *the night after*** Col. North created a special committee to investigate Brewer's fees, Brewer contrived an extortion narrative to avoid that investigation.[21]  **Notably, Col. North's public memo has the same Lockton settlement information for which the NRA moved to disqualify Dorsey**.[22]

As a third example, in its many declarations, the NRA focused on unnamed "others" who allegedly raised concerns about AMc billing, budgeting, and invoicing, which prompted the NRA's audits and requests for documents.[23]  Yet all billing, budgeting, and invoicing was directed,

---

[16] *See* publicly available letter from Col. North to Frazer and Cotton, Apr. 11, 2019 [https://www.documentcloud.org/documents/5985507-OLN-MEMO-to-J-FRAZER-AUDIT-11-APR-2019-1.html].
[17] *See* S. Gutowski, Twitter (May 11, 2019) [https://twitter.com/StephenGutowski/status/1127299783813677056].
[18] ECF 81 at Ex. A-3 at 199:22-200:2 [APP 228] (North Dep.); *see also* ECF 141 at Ex. C ¶¶ 12-13 [APP 27-28].
[19] *See* ECF 105 at 7 n.35.
[20] The NRA was allegedly requesting the pass-through expense documentation from AMc, but calls the letters "extortion."  *See* ECF 18 ¶¶ 51, 53, 149; ECF 121 at 3.  *But see* ECF 81 at Ex. A-13 at 196:11-15 [APP 428] (NRA's Andrew Arulanandam) (Q. Is this [April 22, 2019 letter requesting pass-through expenses documentation] written in an extortionist way? Is there a quid pro quo that, if you don't do what we want, we're going to disclose this? A. No.).
[21] ECF 141 at Ex. A ¶¶ 16-18 [APP 9-10], Ex. B ¶¶ 18-20 [APP 19-20]; Ex. C ¶¶ 12-13 [APP 27-28], Ex. D ¶¶ 9-10 [APP 34-35], Ex. F ¶¶ 4-5 [APP 45].  The NRA repeatedly narrates that it had "independent counsel" who blessed Brewer fees.  *See e.g.*, ECF 121 at 16 n.94; ECF 122 at Ex. 45 ¶ 6 [APP 283].  That outside counsel actually suggested the NRA "obtain a full accounting of the Brewer firm's time charges to date."  *See* S. Gutowski, Twitter.
[22] *See* S. Gutowski, Twitter.
[23] *See* ECF 121 at 12.  *Cf.* n.2, *supra*; ECF 141 at Ex. I ¶¶ 26-35 [APP 92-95] (McQueen Decl.] (Brewer demanding documents).

approved, and overseen by LaPierre.[24] Even if true, the *uncontroverted* fact remains that, in his quest to destroy his in-laws and tortiously take their business, Brewer requested documents directly against his client's that he knew AMc did not even possess,[25] while employing fraud to do so.

Because of Brewer's role as tortfeasor, his testimony is more than as mere bystander and "will concern the way he ran his law office and the steps he took."[26] "With his conduct as a professional at issue, [Brewer] will have every reason to cast his conduct in the light most favorable to himself,"[27] adversely limiting his representation to the NRA, then secondary to his own self-preservation interests.[28] Worse, the jury will be hopelessly confused by the key testimony of Brewer, Dillon, Travis Carter, and other Brewer Firm members based on their knowledge of the parties' underlying claims and defenses.[29] These examples demonstrate concrete injury traceable to Brewer. With the firm disqualified, the parties could litigate the actual issues, rather than subjecting Defendants to wrongful conduct *in the underlying dispute* by the lawyers who leverage their licenses for personal gain unrelated to their client's interests or benefit leverage their law licenses for personal gain unrelated to their client's interests, and then and hide behind privilege.

***Business Interests***.[30] If a competitor's subjective belief that it is not a competitor sufficed, no competitor would ever be liable for wrongful competition. Nevertheless, the NRA and the Brewer Firm concede it is doing work AMc handled—regardless of whether the Brewer Firm is

---

[24] ECF 141 at Ex. A ¶¶ 2-10 [APP 2-6], Ex. B ¶¶ 2-9 [APP 11-15]; Ex. C ¶¶ 2, 14, 16, 17 [APP 22, 28-30], Ex. D ¶¶ 11-14 [APP 35-37].
[25] *See* ECF 105 ¶ 25 & n.113; ECF 141 at Ex. A ¶ 17 [APP 9-10].
[26] *See Golden v. Gibrick*, 562 B.R. 183, 189 (N.D. Ill. 2017).
[27] *See id.*; RESTATEMENT § 108 cmt. f (conflict between duty to testify truthfully, avoiding adverse testimony).
[28] MODEL R. 1.7 cmt. 10 (lawyer's interests not permitted to adversely affect client representation, *e.g.*, where lawyer's conduct "in serious question … difficult or impossible" to give detached advice); TEX. R. 1.06 cmt. 5 (same).
[29] Brewer and his colleagues' testimony is necessary and adverse for the extortion narrative, the termination of the Services Agreement, the FRA fraud, and, at least, the claims for breach of fiduciary duty, fraud, conspiracy, breach of contract, libel, and declaratory judgment.
[30] The conflict is not incurring fees; it is the $1+ million per month *every* month for the past two years (minimum) that makes such a conflict. It is difficult to imagine any other reason why the NRA cut $80 million and took its organization "down to the studs" *before* COVID hit. *See* Tim Mak, NPR [https://www.npr.org/2020/04/21/839999178/secret-recording-reveals-nras-legal-troubles-have-cost-the-organization-100-mill].

the same size as AMc or offers the same entire suite of services.[31] Brewer took the NRA's public relations and crisis-management work (and a larger budget for his legal fees) by driving out AMc.[32]

*Family Conflict.* Brewer is emotionally entangled with his client's opponent by virtue of his family relationship.[33] The absence of case law is not dispositive *against* disqualification but rather suggests prudent and ethical lawyers avoid such conflicts.[34] More importantly, it is undisputed that the NRA's General Counsel, General Counsel to the Board, and former President each testified under oath that there was either a direct conflict of interest with Brewer and the Brewer Firm representing the NRA against AMc, or that the appearance was absolutely present.[35] The NRA's *post hoc* justification to diminish or discredit this sworn testimony, having ousted the firsthand witnesses, is belied by the underlying uncontroverted evidence.[36]

*Imputed to Firm.* These conflicts are imputed to Brewer's firm because his interests materially and adversely impair *his* employees[37]: at *his* namesake firm, any of his lawyers will align their interests with his and want to procure the same results, using tactics as he directs.[38] The other partner who is lead counsel said he never talked to the NRA, and Brewer is the one directing the case[39]; thus, it is disingenuous for the Brewer Firm to argue that it could continue as counsel

---

[31] ECF 122 at Ex. 38 ¶ 5; ECF 122 at Ex. 49 ¶¶ 23-34.
[32] *See* ECF 141 at Ex. C ¶ 11 [APP 26-27]; Ex. D ¶¶ 7-8 [APP 33-34]; Ex. E ¶¶ 3-13 [APP 39-42].
[33] *See* RESTATEMENT § 122 cmt. g(iv) ("A conflict can be rendered nonconsentable because of personal circumstances affecting the lawyer's ability in fact to provide adequate representation," like "strong feelings of friendship…"). Likewise, if the lawyer has strong feelings of animus as to cloud judgment because of his focus on self-interest rather than his client. *See* GANGSTER CAPITALISM, Ep. 6 (Brewer confirmed strained relationship with A. McQueen); *see also* RESTATEMENT § 123 cmt. g (recognizing conflicts of interest from familial relationships).
[34] *But see* MODEL R. 1.7 cmt. 11 (family relationship can impact "loyalty and independent professional judgment").
[35] *See* ECF 141 at Ex. G ¶¶ 47-48 [APP 68-69].
[36] ECF 81 at Ex. A-6 at 374:14-17, 375:4 [APP 352]; *id.* at Ex. A-2 at 214:1-12 [APP 111], 432:3-12 [APP 165], 434:9-19 [APP 166].
[37] RESTATEMENT § 123 cmt. b (noting lawyers in a firm "ordinarily share each other's interests," and difficulty proving the lawyer at issue is "wholly isolated."). *Id.* at cmt. c(i) (noting partners' "shared economic interest" and associates' "stake in the continued viability of their employer and [] incentive to keep the employer's good will").
[38] *See e.g.*, *Bellino v. Simon*, No. 00-2208 SECTION: "R"(3), 1999 U.S. Dist. LEXIS 20121, at *12 (E.D. La. Dec. 28, 1999) (disqualifying firm, court could not "envision how another attorney in that firm could avoid the impact of [the lawyer's] central role and serious conflict in this case, particularly in light of his status as a senior, named partner"). Brewer is *the* named partner, one of only two equity partners. *See* ECF 80, Ex. A-58 at 16:7-8 [APP 944].
[39] *See* ECF 121 at 22, section C (3) heading, Brewer "directing the NRA's litigation strategy"; ECF 105 at 2 n.3.

because there would not be any realistic assurances that Brewer would not be involved.[40]

### 2. Defendants did not waive their conflict of interest argument.

Waiver is not based on a certain timeframe.[41] Instead, it depends on the circumstances of the case (*e.g.*, near trial) and is "generally" reserved for cases with delays of more than one year.[42]

During a June 2019 hearing where AMc raised concerns about the Brewer Firm's *pro hac vice* motion in the Virginia Action (not a disqualification issue), the Brewer Firm represented AMc's concerns were more appropriate for a motion to disqualify after discovering more facts, at which point "the Brewer Firm will consider withdrawing."[43] According to the NRA, AMc did not have sufficient facts to support its concerns, and the issue was not yet ripe.[44] It is now ripe, since learning facts from Col. North (Dec. 2019), Millie Hallow (Jan. 2020), Frazer (Jan. 2020), Carolyn Meadows (Jan. 2020), Charles Cotton (Feb. 2020), and Steve Hart (Feb. 2020). The NRA fails to demonstrate any tactical reason for, or advantage from, filing the Motion at this time.[45] No trial is looming, no discovery period nearing, no dispositive hearing upcoming—*i.e.*, there is no matter

---

[40] *See* ECF 80 at Ex. A-1 at 18:1-4 [APP 29]. An example: Brewer responding to an email where he was **blind-copied** concerning AMc's client documents subject to a Motion to Quash because of concerns about highly confidential information, from which Brewer is excluded by the Virginia Protective Order. ECF 141, Ex. J-5 [APP 126].

[41] *Cf.* ECF 121 at 17 n.103 (quoting David Hricik & Jae Ellis, *Motions to Disqualify in Texas State and Federal Court Litigation*, 74 Tex. B.J. 466, 467 (2011)). The authors also said federal and Texas waiver differ "as a result of the Fifth Circuit's emphasis on preventing the appearance of impropriety. Unlike the Texas courts, the federal courts do not apply an almost-per *se* waiver rule to cases where delay exceeded four months." 74 Tex. B.J. 466, 467.

[42] *City of El Paso v. Soule*, 6 F. Supp. 2d 616, 621-22 (W.D. Tex. 1998); *see also In re Epic Holdings, Inc.*, 985 S.W.2d 41, 52-53 (Tex. 1998) (eleven-month gap not "untimely"). *Cf. Spears v. Fourth Court of Appeals*, 797 S.W.2d 654, 658 (Tex. 1990) (not discussing waiver, but "tactical" purpose in bringing motion where lawyer *might* be called as a witness); *Buck v. Palmer*, 381 S.W.3d 525, 528 (Tex. 2012) (unexplained delay); *In re Kyle Fin. Grp., LLC*, 562 S.W.3d 795, 798-99 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (discussing unexplained delays).

[43] ECF 80 at Ex. A-1 at 11:5-18 [APP 22] ("Our feeling is that … ***this is more appropriate for a motion for disqualification. If they discover facts during the course of the discovery*** or they take Mr. Brewer's deposition and there does appear to be an actual conflict under Rule 1.7 and 1.9, I think, ***at that point, it would be appropriate for a motion to disqualify or, on our own, we may withdraw. If there becomes an actual ethical conflict here, at that point, the Brewer Firm will consider withdrawing***.") (emphasis added) & 21:5-12 [APP 32] ("[T]he best way is for both sides to get admitted" and then raise a disqualification issue. "And yes, we'll take it seriously, your Honor.").

[44] The NRA also faults AMc for not objecting to the Brewer Firm's representation on Carry Guard, *i.e.*, "[f]or reasons completely unrelated to AMc" (LaPierre Declaration), which is circular reasoning because the conflict exists when Brewer is *adverse* to AMc (and the NRA), here. ECF 122 at Ex. C-48 ¶ 11 [APP 322].

[45] *See* ECF 121 at 18 (concluding that Defendants "lodged its disqualification motion at this time for tactical reasons").

set for which disqualification would unfairly (dis)advantage either party.

### B.     Brewer's Witness-Advocate Role Mandates Disqualification, Including His Firm.

Brewer's testimony is "necessary to establish an essential fact on behalf of" the NRA, whether that fact is in support of the NRA's affirmative claims or to defend against Defendants' counterclaims, and his testimony will be adverse.[46]  "A lawyer's testimony is material … when a reasonable lawyer, viewing the circumstances objectively, would conclude that failure of the lawyer to testify would have a substantially adverse effect on the client's cause."[47]  Regardless of any consent, Brewer's representation is adversely limited and Defendants suffer actual prejudice.

Because Brewer's "own conduct and motivation are at issue,"[48] in addition to other employees at his firm (*e.g.*, Dillon, Travis Carter), the remaining Brewer Firm attorneys "could not provide independent arm's length counsel to" the NRA.[49]  In many instances, Brewer is the *only* one who can testify about *his* misconduct—unless he contends that he consulted his other partners in his wrongdoing.[50]  Because Brewer's future testimony is adverse to the NRA, "he [and his firm] will have a hard time proving" otherwise throughout the case and at trial.[51]  In fact, Brewer's testimony would undermine and defeat the NRA's claims.  For example, on the FRA fraud, Brewer's testimony is necessary for the false representation of material fact, knowledge of

---

[46] TEX. R. 3.08.  The NRA is *not* the only party to argue what evidence is necessary to its claims—otherwise, parties would always deem to have provided sufficient evidence.  *See* ECF 121 at 21.  *See also*, FN 29.
[47] RESTATEMENT § 108 cmt. e.
[48] As another example, Brewer's "conduct and motivation are at issue" (and adverse to his own clients) because he repeatedly divulged litigation strategy to R. McQueen through family members.  *See* ECF 105 at 23 n.139.
[49] *See Bellino*, 1999 U.S. Dist. LEXIS 20121, at *7-8 (citing case where attorney "orchestrated" the event and was "key participant in events critical" to case).  *See also id.* at *9 (citing to *Guaranty Corp. v. Nat'l Union Fire Ins. Co.*, No.  90-2695 SECTION "B", 1993 U.S. Dist. LEXIS 6837, at *8 (E.D. La. 1993), disqualifying counsel for dual role despite consent); *Matthews v. Stolier*, No. 13-6638 SECTION: "H"(3), 2015 U.S. Dist. LEXIS 171752, at *9 (E.D. La. Dec. 23, 2015) (lawyer "was a key participant in many of the events underlying the litigation" with "unique personal knowledge," which "will be key to proving several … claims," and disqualifying lawyer for same).
[50] *See Bellino*, 1999 U.S. Dist. LEXIS 20121, at *10.
[51] *Id.* at *10-11.  *See also Crossroads Sys. (Tex.), Inc. v. Dot Hill Sys. Corp.*, No. A-03-CA-754-SS, 2006 U.S. Dist. LEXIS 36181, at *30-32 (W.D. Tex. May 31, 2006) (disqualifying firm, finding lawyer's "credibility at issue placed other attorneys in awkward, "unseemly position" of advocating the credibility and reliability law partners' testimony).

falsity, and intended reliance.  Either Brewer was acting at the direction of the NRA or LaPierre, or he was acting outside of the scope of his authority.  Nothing in the NRA's declarations suggest the NRA knew Brewer sent one of his employees to FRA to conduct the audit.  To the extent Brewer was directing the fraud, as the evidence supports, he is the *only* one with the requisite knowledge to testify.  For self-preservation and to avoid liability, the NRA (LaPierre) and Brewer are adverse (even if they refuse to admit it).[52]  In that instance, Brewer would be subject to cross-examination by his firm (to protect the NRA's best interests), or not (to protect his own interests).[53]

As for the conflicts of interest, the Brewer Firm's self-interests also require disqualification here.  Brewer's disqualification alone is insufficient when his lawyers from his *namesake* firm (**Brewer**, Attorneys & Counselors) trying the case would be just as confusing to the jury[54] and prejudicial to Defendants when those lawyers are literally advocating under *his* name.

C.      **Actual Prejudice to Defendants Outweighs Any Hardship to the NRA.**

The NRA argues in one sentence that disqualification would be a "disproportionate penalty" that would "unfairly punish the NRA," citing to its General Counsel's declaration.[55]  But in actuality, the failure to disqualify will deny Defendant's their right to a fair trial.  Frazer's reasoning is limited to three points,[56]  all of which are insufficient to outweigh the burden imposed upon Defendants or the public policy at issue.[57]  *First*, the NRA did not tie or limit "this [litigation and regulatory] work" to this case.  Disqualification does not hamper the NRA's other matters.  *Second*, time is not an issue because no scheduling order has been entered and no trial has been set.  *Third*, increased fees are not enough to demonstrate substantial hardship.[58]  *Finally*, the NRA

---

[52] *See* ECF 105 at 15 n.97 (Brewer Firm admits conflict exists if testimony adverse to the NRA); ECF 121 at 15.
[53] *See Crossroads*, 2006 U.S. Dist. LEXIS 36181, at *32 (conflict is "competing duties to the client and to the firm.").
[54] *See* ECF 105 at 21-22 n.130-132.
[55] ECF 121 at 23 n.129.
[56] ECF 122 at Ex. C-45 ¶ 9 [APP 283-284].
[57] *See Matthews*, 2015 U.S. Dist. LEXIS 171752, at *11 (preserving the "integrity" of the case outweighs hardship).
[58] *See Atasi Corp. v. Seagate Tech.*, 847 F.2d 826, 832-33 (Fed. Cir. 1988) (extra time and expense "insufficient").

provided options for substitute counsel that can handle this litigation *and* crisis management.[59]

### D. Public Policy and Totality of the Circumstances Mandate Disqualification.

The Fifth Circuit does not mechanically apply the rule of disqualification,[60] but considers *all* of the facts to determine the impact, nature, and degree of a violation.[61] The impact includes "the likelihood of public suspicion"—which the NRA does not refute.[62] Brewer and his firm's other ethical violations must be considered when reviewing the totality of the circumstances. For example, the FRA audit fraud violates the "truthfulness in statements to others" rule[63] in that LaPierre (a) promised AMc that the Brewer Firm would not be involved, (b) the Brewer Firm *was* involved through Dillon, (c) which involvement the Brewer Firm still conceals.[64]

*Second*, Brewer has repeatedly communicated to a represented party (AMc's CEO, R. McQueen) through family members,[65] to which testimony the NRA merely objected but did not refute.[66] Three of the communications through others (LaPierre, Powell, and McQueen family members) were to convey an indictment threat, *i.e.*, a violation of the rule against using criminal procedure to influence a civil dispute.[67] Once again, the NRA did not deny this fact.

*Third*, Brewer's trial publicity is problematic beyond excessiveness because it contains

---

[59] ECF 122 at Exs. C-11 [APP 61], C-55 [APP 439], C-56 [APP 450] (including lawyers licensed in this District).
[60] ECF 122 at Ex. 51 ¶ 88 [APP 399].
[61] *Pilepro, LLC v. Change*, No. A-12-CA-829-SS, 2015 U.S. Dist. LEXIS 6972, at *12 (W.D. Tex. Jan. 22, 2015); *see also* ECF 141 at Ex. G ¶ 28 [APP 61].
[62] ECF 105 ¶¶ 60-61; *see also* ECF 141 at Ex. G ¶¶ 37, 48 [APP 65, 68-69].
[63] MODEL R. 4.1 cmt. 1, cmt. 2 ("avoid criminal and tortious misrepresentation."), cmt. 3 (avoid by withdrawing; may be required to "disclose information relating to the representation to avoid" liability.); TEX. R. 4.01 cmts. 2, 3, 5.
[64] *See* ECF 122 at Ex. C-45 at 4 n.6 [APP 283] (referring to Dillon as a "former" Brewer Firm employee).
[65] MODEL R. 4.2 cmt. 4; MODEL R. 4.4 cmt. 1 ("unwarranted intrusions"); *see e.g.*, ECF 105 at 23 n.139.
[66] The NRA says Defendants do not have evidence and objects to hearsay. *See* ECF 121 at 25. *Cf.* ECF 141 at Ex. I ¶¶ 41, 44 [APP 97]; ECF 141 at Ex. G ¶¶ 49-53 [APP 69-70].
[67] *See* TEX. R. 4.04(b) & cmt. 2; *see also* ECF 141 at Ex. G ¶¶ 54-59 [APP 70-72], Ex. I ¶¶ 39, 41 [APP 96-97].

intentional, manufactured falsehoods.[68] While he continues to slander[69] Defendants in the "court of public opinion," they are unable to defend themselves in that same court because of the over-designation of confidentiality *of the very evidence refuting his statements*.[70] Further, Brewer's statements about his family and its business are more prejudicial[71] for the same reason that the witness-advocate rule is at play: his status as a lawyer gives them much more credibility.[72]

"[T]he preservation of the public trust in the scrupulous administration of justice and in the integrity of the bar is paramount," and the NRA's right to counsel of choice "must yield" to protect "the very integrity of the judicial process."[73]

### PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendants respectfully request and pray that the Court grant the relief requested in Defendants' Motion to Disqualify.

---

[68] The NRA alleged "much of [the publicity was] instigated by AMc" and cites to AMc's *responsive* July press statement *after* the NRA and Brewer's defamatory media articles. *See* ECF 122 at Ex. 49 ¶ 40 [APP 338] & n.19; ECF 122 at Ex. 22 [APP 139]. *Cf.* ECF 105, Appx. A; ECF 105 at 13 n.79; ECF 141 at Ex. G ¶¶ 60-65 [APP 72-75].
[69] MODEL R. 3.6 cmt. 5 (noting "subjects that are more likely than not to have a material prejudicial effect on a proceeding"); TEX. R. 3.07 cmt. 1 (right to free speech subordinate to the constitutional requirements of a fair trial).
[70] *See Pedini v. Bowles*, 940 F. Supp. 1020, 1025 (N.D. Tex. 1996) (protect from "prejudicial outside interference"). To illustrate, either the April 25 LaPierre Board letter describing the "extortion" was intentionally leaked (to Brewer's crony) or it was not confidential—meanwhile, the NRA marked the other Board letters confidential to hide them from public view, including ones that refute the NRA's repeated allegation that AMc *profited* $40 million from the NRA. *See also* ECF 81 at Ex. A-2 at 276:22-277:22 [APP 126-127] ("Brewer is a source for Hakim regularly and he feels like he can get Hakim to write positive stories from time to time"); ECF 121 at 23.
[71] *U.S. v. Brown*, 218 F.3d 415 (5th Cir. 2000) ("reasonable likelihood" of prejudicing a fair trial, publicity could taint the jury pool, the parties demonstrated desire "to manipulate media coverage to gain favorable attention," and lawyer giving his own version of the facts "obviously threaten[s] to undermine" the "basic tenet" of an impartial jury trial).
[72] *See id.* at 1024-25.
[73] *United Pacific Ins. Co. v. Zardenetta*, 661 S.W.2d 244, 248 (Tex. App.—San Antonio 1983, no writ).

Dated: June 3, 2020.

                        Respectfully submitted,

                        */s/ G. Michael Gruber*
                        **G. Michael Gruber, Esq.**
                        Texas Bar No. 08555400
                        gruber.mike@dorsey.com
                        **Jay J. Madrid, Esq.**
                        Texas Bar No. 12802000
                        madrid.jay@dorsey.com
                        **J. Brian Vanderwoude, Esq.**
                        Texas Bar No. 24047558
                        vanderwoude.brian@dorsey.com
                        **Brian E. Mason, Esq.**
                        Texas Bar No. 24079906
                        mason.brian@dorsey.com
                        **DORSEY & WHITNEY LLP**
                        300 Crescent Court, Suite 400
                        Dallas, Texas 75201
                        (214) 981-9900 Phone
                        (214) 981-9901 Facsimile

                        **ATTORNEYS FOR DEFENDANTS ACKERMAN MCQUEEN, INC., MERCURY GROUP, INC., HENRY MARTIN, JESSE GREENBERG, WILLIAM WINKLER, AND MELANIE MONTGOMERY**

## CERTIFICATE OF SERVICE

      I hereby certify that on June 3, 2020, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

                        */s/ G. Michael Gruber*
                        G. Michael Gruber

## SUPPLEMENTAL NON-BINDING CASE LAW

1. Footnote 8.

   - *Jamieson v. Slater*, No. CV 06-1524-PHX-SMM, 2006 U.S. Dist. LEXIS 86712, at *15 (D. Ariz. Nov. 27, 2006) (applying *In re Yarn Processing Patent Validity Litig. v. Leesona Corp.*, 530 F.2d 83 (5th Cir. 1976) as recognizing standing for "open and obvious" or "manifest and glaring" ethical violations);

   - *Zarco Supply Co. v. Bonnell*, 658 So.2d 151, 154 (Fla. App. 1995) ("Opposing counsel may seek disqualification where the conflict of interest clearly calls into question 'the fair or efficient administration of justice.'");

   - *Sentry Select Inc. Co. v. Meyer*, No. 2:07-cv-01049-RLH-LRL, 2011 U.S. Dist. LEXIS 36290, at *21-22 (D. Nev. Mar. 23, 2011) (nonclient standing based on "personal stake in the motion," "ethical breach that so infects the litigation that it impacts the moving party's interest in a just and lawful determination of her claims," and concrete and actual or imminent injury);

   - *Del Campo v. Mealing*, No. C 01-21151 JW, 2011 U.S. Dist. LEXIS 158019, at *10-11 (N.D. Cal. Sep. 29, 2011) (same; plus, district court has duty to examine allegations of an attorney's ethical violations);

   - *Cone Fin. Group, Inc. v. Employers Ins. Co.*, No. 7:09-CV-118 (HL), 2010 U.S. Dist. LEXIS 81326, at *3 (M.D. Ga. Aug. 11, 2010) ("For an attorney to have standing to raise the issue of an opposing lawyer having a conflict of interest, there must be a violation of the rules which is sufficiently severe to call in question to fair and efficient administration of justice.");

   - *Abbott v. Kidder Peabody & Co.*, 42 F. Supp. 2d 1046, 1050 (D. Colo. 1999) (standing when the public interest is "so greatly implicated than an apparent conflict of interest may tend to undermine the validity of the proceedings")

2. Footnote 46.

   - *Anderson v. City of New York*, 16 Civ. 2583 (ALC) (JCF), 2017 U.S. Dist. LEXIS 164137, at *13-14 (S.D.N.Y. Sep. 29, 2017) (no waiver because timing of motion was not "suspicious");

   - *Eon Streams, Inc. v. Clear Channel Communs., Inc.*, No. 3:05-CV-578, 2007 U.S. Dist. LEXIS 23950, at *19 (E.D. Tenn. Mar. 27, 2017) (no waiver without dilatory motive);

   - *Sanchez v. Am. Family Mut. Ins. Co.*, No. 2:11-cv-01507-KJD-RJJ, 2012 U.S. Dist. LEXIS 140171, at *11-12 (D. Nev. Sep. 28, 2012) (no waiver where "the moving party establish[ed] an ethical violation of factual predicate upon which the motion depends," rather than for tactical purposes);

- *Kingdom Ins. Group, LLC v. Cutler & Assocs.*, 2011 U.S. Dist. LEXIS, at *16 (M.D. Ga. Apr. 4, 2011) (motion timely when brought before discovery began);

- *Cone Fin.*, 2010 U.S. Dist. LEXIS, at *7 (motion timely when brought less than one year after removal and during the discovery phase);

- *FMC Techs., Inc. v. Edwards*, 420 F. Supp. 2d 1153, 1162 (W.D. Wash. 2006) (motion timely even six months after discovery of conflict because the issue was not ripe for consideration until court denied motion to dismiss).

3. Footnote 58.

- *Bellino v. Simon*, No. 00-2208 SECTION: "R"(3), 1999 U.S. Dist. LEXIS 20121, at *10-11 (E.D. La. Dec. 28, 1999) (finding it "highly likely" the lawyer's actions "will prejudice his clients" where the lawyer's testimony "could undermine or even defeat" client's claim; ruling "substantial likelihood" of such prejudice "outweighs any substantial hardship" in obtaining new counsel).

4. Footnote 60.

- *Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, No. 2009-1171, 2009-1558, 2010 U.S. App. LEXIS 27683, at *5 (Fed. Cir. May 26, 2010) (discussing ABA opinion mandating disqualification of lawyer under *both* conflict of interest and witness-advocate rules where lawyer subject to cross-examination from his own firm).