**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| **Plaintiff and Counter-Defendant** | § § | |
| **and** | § § | |
| **WAYNE LAPIERRE,** | § § | |
| **Third-Party Defendant,** | § § | **Civil Action No. 3:19-cv-02074-G** |
| **v.** | § § § | |
| **ACKERMAN MCQUEEN, INC.,** | § § § | |
| **Defendant and Counter-Plaintiff,** | § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG,** | § § § § § | |
| **Defendants.** | § § | |

**APPENDIX IN SUPPORT OF DEFENDANTS' REPLY IN SUPPORT OF THEIR**
**MOTION TO DISQUALIFY PLAINTIFF'S COUNSEL**

Defendants, Ackerman McQueen, Inc., Mercury Group, Inc., Henry Martin, William Winkler, Melanie Montgomery, and Jesse Greenberg, offer the following evidence in support of *Defendants' Reply in Support of their Motion to Disqualify Plaintiff's Counsel* (ECF 140):

| EX | DESCRIPTION | APPX |
|---|---|---|
| A | Declaration of Bill Winkler, dated June 3, 2020 | APP 001-APP 010 |
| B | Declaration of Melanie Montgomery, dated June 3, 2020 | APP 011-APP 020 |

| C | Declaration of Tony Makris, dated June 3, 2020 | APP 021-APP 030 |
|---|---|---|
| D | Declaration of Nader Tavangar, dated June 3, 2020 | APP 031-APP 037 |
| E | Declaration of Bill Powers, dated June 3, 2020 | APP 038-APP 043 |
| F | Declaration of Ed Martin, dated June 3, 2020 | APP 044-APP 046 |
| G | Declaration of Randy Johnston, dated June 3, 2020 | APP 047-APP 077 |
| H | Declaration of Dan Boren, dated June 3, 2020 | APP 078-APP 080 |
| I | Declaration of Revan McQueen, dated June 3, 2020 | APP 081-APP 104 |
| J | Declaration of Brian E. Mason, dated June 3, 2020 | APP 105-APP 106 |
| J-1 | Letter from NRA to Ackerman, dated August 8, 2018 | APP 107 |
| J-2 | Brewer Firm Leadership Page as of June 3, 2020 | APP 108-APP 119 |
| J-3 | Email from Brian Mason, dated May 22, 2020 | APP 120-APP 122 |
| J-4 | Email from Michael Collins, dated May 22, 2020 | APP 123-APP 125 |
| J-5 | Email from William Brewer, dated May 18, 2020 | APP 126-APP 127 |

Dated: June 3, 2020

Respectfully submitted,

*/s/ G. Michael Gruber*

**G. Michael Gruber, Esq.**
Texas Bar No. 08555400
gruber.mike@dorsey.com
**Jay J. Madrid, Esq.**
Texas Bar No. 12802000
madrid.jay@dorsey.com
**J. Brian Vanderwoude, Esq.**
Texas Bar No. 24047558
vanderwoude.brian@dorsey.com
**Brian E. Mason, Esq.**
Texas Bar No. 24079906
mason.brian@dorsey.com
**DORSEY & WHITNEY LLP**
300 Crescent Court, Suite 400
Dallas, Texas 75201
(214) 981-9900 Phone
(214) 981-9901 Facsimile

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was electronically served via the Court's electronic case filing system upon all counsel of record on this 3rd day of June 2020:

*/s/ G. Michael Gruber*
G. Michael Gruber

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § | |
| | § | |
| **Plaintiff and Counter-Defendant** | § | |
| | § | |
| and | § | |
| | § | |
| WAYNE LAPIERRE, | § | |
| | § | Civil Action No. 3:19-cv-02074-G |
| **Third-Party Defendant,** | § | |
| | § | |
| v. | § | |
| | § | |
| ACKERMAN MCQUEEN, INC., | § | |
| | § | |
| **Defendant and Counter-Plaintiff,** | § | |
| | § | |
| MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG, | § | |
| | § | |
| **Defendants.** | § | |

## DECLARATION OF WILLIAM WINKLER

Pursuant to 28 U.S.C. § 1746, I, William Winkler, hereby declare as follows:

1.      My name is William Winkler.  I am over the age of 18 years and of sound mind.  I have never been convicted of a felony or a crime of moral turpitude.  The facts stated herein are true and correct, and based on my personal knowledge.  I am the Chief Financial Officer of Ackerman McQueen, Inc. (AMc).   I submit this declaration in response to the National Rifle Association of America's (NRA) Opposition to Defendants' Motion to Disqualify Plaintiffs' Counsel (the Opposition).

**EXHIBIT A**

2.      I have reviewed the Declaration of Michael Erstling that was filed in support of the NRA's Opposition. As an initial matter, I find it curious that Mr. Erstling executed this declaration. For decades, I was one of the top AMc executives that interacted with the NRA's former Treasurer, Woody Phillips, and later Craig Spray, relating to invoicing and budgeting matters.   Payment issues that needed to be addressed by me were usually discussed with either of the two of them or Rick Tedrick.   I also find it telling that Mr. Erstling's declaration did not include any reference to discussions with Mr. Phillips, Mr. Spray, or Mr. Tedrick regarding his concerns. The NRA failed to provide declarations from Mr. Phillips or Mr. Tedrick, and Mr. Spray's declaration is silent on these matters. It is my understanding that Mr. Spray, in addition to others, has testified that there were no concerns related to matters discussed by Mr. Erstling. Mr. Erstling was not someone with whom I interacted regarding invoicing or budgeting matters.

3.      In paragraph six of Mr. Erstling's declaration, he states that "Ackerman regularly issued six-figure invoices to the NRA with little detail or support, and systematically obfuscated and blocked the NRA's efforts to understand what services were covered by any particular invoice." As Mr. Erstling knows, the NRA and AMc's relationship spans nearly four decades.  I have personal knowledge that Mr. LaPierre and Mr. Phillips instructed numerous representatives of AMc to intentionally provide vague invoices with brief descriptions to the NRA because of Mr. LaPierre's confidentiality concerns.  Specifically I understand that Mr. LaPierre did not fully trust all members of the NRA's accounting department.  I had no personal knowledge that Mr. Erstling or other Board members were concerned with the amount of detail in AMc's invoices that Mr. LaPierre and Mr. Phillips directed for decades.  In fact, new billing procedures and requirements were introduced by Mr. Spray in summer of 2018.  Based on my conversations directly with Mr. Spray, we were in compliance with his new procedures very soon after they were introduced.  If

Mr. Erstling truly had concerns about the amount of information provided by AMc in the invoices to the NRA, he should have directed those concerns to Mr. LaPierre or Mr. Phillips who would have been in the best position to explain why the NRA required the invoices to contain so little information. He certainly never contacted me about it. Mr. Erstling's concerns likely reflect a communication breakdown between the NRA's officers, directors, and staff on one hand, and Mr. LaPierre on the other hand, not a communication breakdown between the NRA and AMc.

4.      Mr. Erstling further states that AMc refused to cooperate with requests for information. This statement is false. For the entirety of the relationship, NRA had access to the financial information concerning our work for them. Since 2012, each year was reviewed or made available for review whether done annually or bi-annually. Prior to Mr. Brewer's involvement with the NRA, I do not recall a single instance where the NRA expressed concerns about the information AMc was providing to the NRA as part of these audits or where the NRA accused AMc of withholding anything. To the extent the NRA requested back up for invoices or further explanation for projects, AMc provided that information to the NRA, typically through Mr. LaPierre and/or Mr. Phillips. During one of these audits, Mr. LaPierre specifically instructed AMc not to allow Mr. Tedrick to take certain information back to NRA headquarters with him, which was prohibited by the parties' Services Agreement. In the following audit period, Mr. Phillips reviewed the information directly and instructed AMc to inform Mr. Tedrick that it had already been reviewed by him. As I stated above, I was often told that Mr. LaPierre did not trust all members of the NRA's accounting department. Prior to Mr. Brewer's engagement by the NRA in 2018, I do not recall a single complaint from anyone at the NRA that AMc failed to provide the requested information as part of the NRA's audits of AMc's documents. It is my understanding

that during Mr. LaPierre's September 24, 2019 deposition he testified that the NRA never had any problems with its audits of AMc's documents, until Mr. Brewer's arrival.

5.      In paragraph five of Mr. Erstling's declaration, he states that the annual budget was made difficult because AMc deviated from the budget parameters set by the NRA and that he was provided no insight into the basis for the budgets or whether AMc would adhere to them.  For at least the last twenty years, Mr. LaPierre and Mr. Phillips have been responsible for helping to create and finalize the annual budget between the NRA and AMc.  Each year, Mr. LaPierre, with the assistance and knowledge of Mr. Phillips, approved the annual budget between the NRA and AMc.  The exception to this was for the 2019 budget, which involved Craig Spray, Mr. Phillips' successor.  Despite Mr. Erstling's testimony, I am not aware of Mr. Erstling participating in any annual budget process with AMc.  My understanding is that that once the budget between Mr. LaPierre, Mr. Phillips, and AMc was approved, it would go before the NRA's Finance Committee for approval.   To the extent that there were changes throughout the year relating to the budget, and specifically increases to the budget as Mr. Erstling complains, most of these changes were specifically requested by Mr. LaPierre, and all of these changes were approved by Mr. LaPierre and/or Mr. Phillips.

6.      In paragraph seven of Mr. Erstling's declaration, he claims that AMc was billing for work that had not been undertaken and specifically references an invoice relating to a Carry Guard magazine issue.  Mr. Erstling's statement is again false.  AMc did not invoice or bill the NRA for work that it did not perform. With regard to the Carry Guard magazine, Lacey Duffy Cremer from AMc sent an email to Craig Spray and Josh Powell on July 13, 2018 detailing the work completed that Mr. Erstling now alleges was not completed.   I have confirmed that this

particular work was completed, and I am not aware of a single instance where AMc charged the NRA for work that was not performed.

7.      I have reviewed the Declaration of the NRA's General Counsel and Secretary, John Frazer, that was filed in support of the NRA's Opposition. In paragraph seven of his declaration, Mr. Frazer states that he personally sent letters requesting documents that went unanswered. Mr. Frazer does not identify any of those letters, and does not identify any single document or categories of documents that AMc failed to provide to the NRA or its audits for review. I have personal knowledge that AMc responded to each of Mr. Frazer's requests for documents, and that AMc fully complied with each of the audits undertaken by or at the direction of Mr. Brewer in the fall of 2018 and February 2019.

8.      Mr. Frazer also states that he oversaw the third-party forensic audit done by Forensic Risk Alliance ("FRA") in February 2019. At the conclusion of the audit, Mr. Frazer repeatedly thanked AMc for complying with the audit. At no point in time after the February 2019 audit did Mr. Frazer ask for additional information or documents relating to the audit. This is consistent with what Mr. Frazer and all of the NRA representatives communicated to me and other AMc representatives during that audit—that AMc fully complied with each of the requests. I have also personally received communications from FRA thanking AMc for its cooperation and disclosure during the audit. To this day, I have not seen and am not aware of any document or communication from FRA stating that AMc did not fully comply with the February 2019 audit.

9.      When AMc agreed to the FRA audit in February 2019, it understood that FRA was an independent third party that was not affiliated with Mr. Brewer or his law firm, Brewer Attorneys & Counselors (the Brewer Firm), in any way. After the October 11, 2018 meeting, which is discussed below, Mr. LaPierre represented to me and other AMc representatives that AMc

would no longer have to deal with Mr. Brewer or the Brewer Firm because of numerous issues, including because of his well-known animosity towards Angus, Revan, and AMc, and the fact that Mr. Brewer had become increasingly hostile towards numerous AMc representatives, which was completely contrary to Mr. LaPierre's statements to me and other AMc representatives that he wanted AMc to "stick with him." I now understand that a former long-time member of the Brewer Firm, Susan Dillon, left the Brewer Firm at the end of 2018 to go to FRA, and was involved in the FRA audit of AMc's documents in February 2019. I understand that Ms. Dillon participated in one of the NRA's audits done by the Brewer Firm in the fall 2018. I understand that Ms. Dillon is now back at the Brewer Firm. Had I known that Ms. Dillon had just recently left the Brewer Firm to go to FRA, and that she was actually involved in the audit, I would never have authorized FRA to conduct the February 2019 audit. This fact was never disclosed to me.

10.     I understand the NRA has made allegations that AMc intentionally drove up costs and overcharged the NRA. As I previously stated, each and every budget was specifically approved by Mr. LaPierre and the NRA, and was paid for by the NRA. AMc and the NRA have always worked on a fair market value based billing system. When Mr. Tedrick would conduct audits of AMc, he would routinely calculate his own hourly rate for the work AMc was completing on behalf of the NRA. Mr. Tedrick represented to me that the hourly rate he calculated for an AMc employee working on the NRA account was reasonable.

11.     I have further reviewed paragraph thirteen of Mr. LaPierre's declaration and the declaration of Craig Spray where they discuss a meeting on October 11, 2018 in Dallas, Texas. I attended this meeting with Mr. LaPierre, Mr. Spray, Angus McQueen, Revan McQueen, Melanie Montgomery, Lacey Duffy Creamer, Brandon Winkler, Tony Makris, and Henry Martin. At the beginning of this meeting, after Mr. LaPierre and Craig Spray arrived one hour late, with no

communication, AMc, with Angus taking the lead, had a conversation with Mr. LaPierre about AMc's future with the NRA in light of developments with Mr. Brewer and Mr. Powell. Specifically, Angus talked to Mr. LaPierre about the abusive and harassing phone calls that he had received from Mr. Brewer and the letter writing campaign from Mr. Brewer falsely accusing AMc of withholding documents.  Angus made it clear to Mr. LaPierre that if he thought the claims by Mr. Brewer were true, then AMc and the NRA's relationship going forward should stop because they would not be able to trust each other. Mr. LaPierre immediately rejected this idea.

12.     Angus further expressed concerns with Mr. LaPierre about Mr. Powell's involvement with AMc, especially in light of the recent sexual harassment allegations with an AMc executive and Mr. LaPierre's recent decision to designate Mr. Powell as a "designee" under the Services Agreement.  By designating Mr. Powell as his "designee," Mr. Powell because Mr. LaPierre's designated representative to work with and direct AMc.  In short, I understood that Angus was making clear that AMc was not going to deal with Mr. Brewer and Mr. Powell, who were both abusive and appeared to have no interest in being part of the AMc's work for the NRA going forward.  I also recall Revan telling Mr. LaPierre that AMc was prepared to resign the NRA account because of Mr. Brewer's and Mr. Powell's actions.

13.     In response to AMc's concerns, Mr. LaPierre repeatedly asked us to "stick with him."  Mr. LaPierre stated that the letter writing campaign with Mr. Brewer and the Brewer Firm would stop, and that AMc would no longer have to deal with Mr. Brewer, the Brewer Firm, and Mr. Powell going forward.   During the meeting, Mr. LaPierre repeatedly claimed that Mr. Brewer was the only person that could save the NRA from the New York Attorney General, that Mr. Brewer had some key relationships in the State of New York, and that Mr. Brewer knew "how to

fix this." When we asked Mr. LaPierre what he meant by Mr. Brewer's knowing "how to fix this," Mr. LaPierre responded that "he just is."

14.    The conversations relating to Mr. Brewer and Mr. Powell were emotionally charged.   At the end of the discussion, Mr. LaPierre looked around to each of the AMc representatives at the meeting and specifically asked each AMc representative whether they would stick with him if he did in fact make sure that Mr. Brewer, the Brewer Firm, and Mr. Powell were no longer involved with AMc. Based on Mr. LaPierre's representations, AMc agreed to continue its work for the NRA.   However, Mr. LaPierre's representations proved to be false.   As one example, AMc received a letter from the Brewer Firm on December 21, 2018, once again requesting documents that the Brewer Firm knew or should have known that AMc did not have in its possession.

15.    Mr. LaPierre's and Mr. Spray's statements that Angus and Revan were hostile, angry, or unprofessional during the meeting are a misrepresentation of the overall atmosphere and objective of the meeting.   The only times during the October 11, 2018 meeting that became emotional were during our conversations with Mr. LaPierre about Mr. Brewer and Mr. Powell. Angus, Revan, nor anyone else from AMc in that meeting was "enraged" by the NRA's budget cuts.   On the contrary, there was confusion due to the initial email sent by Lisa Supernaugh on September 21, 2018 that announced budget reductions with no specific direction.   We also have never dealt with Ms. Supernaugh on budget matters since she was not a designee, as appointed by Mr. LaPierre for those matters.   Based on the lack of direction and authority in the email, we organized the meeting on October 11, 2018 to help facilitate the reductions the NRA was requesting in a form similar to previous budget reductions.   I personally witnessed Mr. LaPierre,

Mr. Spray, Angus, Revan, Melanie, and other AMc representatives work through these budgets in a professional matter, which ultimately ended up reflecting significant budget reductions.

16.     I have also read paragraphs 17 – 21 of Mr. LaPierre's declaration suggesting that AMc was working with or directing Lt. Col. Oliver North to engage in a failed extortion attempt on April 24, 2019.  These allegations are patently false and completely ridiculous.  As Col. North, Millie Hallow, and Carolyn Meadows have all testified, AMc was not engaging, directing, or otherwise involved in any extortion, coup, or threat to have Mr. LaPierre step down.  I am not aware of a single AMc executive, employee, or representative that instructed, directed, recruited, or otherwise asked and even discussed with Dan Boren or Col. North to convey any kind of message, directive, or threat to Mr. LaPierre about resigning or stepping down, much less the notion that AMc would take some sort of affirmative action if Mr. LaPierre did not resign or step down.

17.     I am also aware that the NRA alleges that my letters to Mr. LaPierre and other NRA Board members was a part of the failed extortion attempt.  This is also patently false and equally ridiculous.  As I explained above, the NRA, through Mr. Brewer, was requesting documents from AMc relating to bills it invoiced to the NRA, including out of pocket expenses.  The NRA and Mr. Brewer knew that AMc had been instructed to bill them for expenses incurred for the purposes of confidentiality and security which included but were not limited to credit card transactions for Mr. LaPierre and Mr. Schropp.  The NRA also understood that the record keeping of original receipts and invoices along with documentation of business purpose was the responsibility of the NRA. Their control and responsibility of these transactions was verified during the audits by NRA representatives.  The April 22, 2019 letters sent to Mr. LaPierre, Mr. Schropp, and others were intended to request the documentation that the auditors from FRA had requested, and had nothing

to do with any false, alleged extortion or coup attempt to unseat Mr. LaPierre nor any internal dispute between Mr. Brewer and Col. North. Rather, they were to obtain the very information the auditors had requested and we believe NRA ultimately filed a lawsuit alleging improper documentation. I only sent my letters to the individuals involved with the expenditures, with a copy to Craig Spray, the Treasurer, and Steve Hart, General Counsel to the NRA Board.

18.     I have further read the allegations the NRA contends that Col. North was working on behalf of or at the direction of AMc when he was attempting to have Mr. Brewer's attorneys' engagement and invoices independently audited. The sole basis for these contentions appears to be because Col. North was an employee of AMc, an arrangement fully vetted and approved by the NRA, Mr. LaPierre, and the NRA Board of Directors on numerous occasions. Mr. LaPierre further contends that Col. North had a conflict of interest because of his relationship with AMc. I have no personal knowledge that anyone from AMc had anything to do with Col. North was seeking to have Mr. Brewer's attorneys' invoices independently audited.

I declare under penalty of perjury and in accordance with 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 3rd day of June, 2020.

_____
William Winkler

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| **Plaintiff and Counter-Defendant** | § § | |
| **and** | § § | |
| **WAYNE LAPIERRE,** | § § | |
| **Third-Party Defendant,** | § § | **Civil Action No. 3:19-cv-02074-G** |
| **v.** | § § | |
| **ACKERMAN MCQUEEN, INC.,** | § § § | |
| **Defendant and Counter-Plaintiff,** | § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG,** | § § § § § | |
| **Defendants.** | § § | |

**DECLARATION OF MELANIE MONTOGMERY**

Pursuant to 28 U.S.C. § 1746, I, Melanie Montgomery, hereby declare as follows:

1.      My name is Melanie Montgomery.  I am over the age of 18 years and of sound mind.  I have never been convicted of a felony or a crime of moral turpitude.  The facts stated herein are true and correct, and based on my personal knowledge.  I am an Executive Vice President / Management Supervisor at Ackerman McQueen, Inc. ("AMc").  I submit this declaration in response to the National Rifle Association of America's ("NRA") Opposition to Defendants' Motion to Disqualify Plaintiffs' Counsel (the "Opposition").

2.      I have reviewed the Declaration of Michael Erstling that was filed in support of the NRA's Opposition.  I find it odd that Mr. Erstling executed this declaration.  For decades, I was

**EXHIBIT B**                                                                                       **APP011**

one of the top AMc executives that interacted with the NRA's Executive Vice President, Wayne LaPierre, and the NRA's former Treasurer, Woody Phillips, relating to invoicing and budgeting matters. I did not interact with Mr. Erstling regarding invoicing or budgeting matters, nor am I aware that he interacted with any other AMc employee in our accounting department. In fact, at no point during AMc's almost four decade relationship with the NRA was Mr. Erstling ever appointed as a designee by Mr. LaPierre which would allow him to engage in a direct relationship with AMc.

3.      In paragraph six of Mr. Erstling's declaration, he states that "Ackerman regularly issued six-figure invoices to the NRA with little detail or support, and systematically obfuscated and blocked the NRA's efforts to understand what services were covered by any particular invoice." As Mr. Erstling knows, the NRA and AMc's relationship spans nearly four decades. For at least the last fifteen years, Mr. LaPierre and Mr. Phillips instructed me and other AMc representatives to provide vague and innocuous invoices to the NRA. I was told by Mr. LaPierre that the reason for this was because he had concerns with confidentiality, and specifically concerns about leaks within the NRA's accounting department. Over the years, both Mr. LaPierre and Mr. Phillips often reminded me and other AMc representatives to intentionally keep AMc's invoices to the NRA vague. For example, AMc issued an invoice to the NRA for assisting Mr. LaPierre to write his speech for the annual Conservative Political Action Conference convention. The invoice submitted to the NRA stated, "Speechwriting W. LaPierre for CPAC…" When Mr. LaPierre became aware of the invoice, he explained to me and other AMc representatives that he did not want his name on AMc's invoices. After that directive from Mr. LaPierre, those particular invoices would simply read, "Executive Speechwriting Services."

4.      I had no personal knowledge that Mr. Erstling or other Board members were concerned with the amount of detail in AMc's invoices until late 2018 after William Brewer III was retained by the NRA.  If Mr. Erstling actually had concerns about the amount of detail in AMc's invoices, he should have directed those concerns to Mr. LaPierre or Mr. Phillips who would have been in the best position to explain why the NRA required the invoices to contain so little information.  He certainly never contacted me or AMc about it.

5.      Mr. Erstling further states that AMc refused to cooperate with requests for information.  This statement is false.  Since the NRA and AMc's relationship began, the NRA has conducted numerous audits of AMc's documents under the parties' Services Agreement.  I do not recall a single instance where the NRA expressed concerns about the information AMc was providing to the NRA as part of these audits or where the NRA accused AMc of withholding anything until Mr. Brewer's involvement with AMc.  To the extent the NRA requested back up for invoices or further explanation for projects, AMc provided that information to the NRA, typically through Mr. LaPierre and/or Mr. Phillips.  During many of these audits, Mr. LaPierre specifically instructed AMc not to disclose certain information to the auditors, including the NRA Foundation's Chief Financial Officer, Rick Tedrick.  As I stated above, Mr. LaPierre repeatedly told Angus and me that he did not trust the members of the NRA's accounting department.  Prior to Mr. Brewer's engagement by the NRA in 2018, I do not recall a single complaint from anyone at the NRA that AMc failed to provide the requested information as part of the NRA's audits of AMc's documents.

6.      In paragraph five of Mr. Erstling's declaration, he states that the annual budget was made difficult because AMc deviated from the budget parameters set by the NRA and that he was provided no insight into the basis for the budgets or whether AMc would adhere to them.  For at

least the last twenty years, Mr. LaPierre and Mr. Phillips have been responsible for creating and finalizing the annual budget between the NRA and AMc.  Each year, Mr. LaPierre, with the assistance and knowledge of Mr. Phillips, approved the annual budget between the NRA and AMc.  In fact, once the budget was approved, a copy would be provided to Mr. Tedrick (Mr. Erstling's superior) so that he could track the budget with AMc's invoices.  The exception to this was for the 2019 budget, which involved Craig Spray, Mr. Phillips' successor.  Despite Mr. Erstling's statement, he did not participate in any annual budget process with AMc.  I understood from comments made from Mr. LaPierre and Mr. Phillips that once the budget between Mr. LaPierre, Mr. Phillips, and AMc was approved, it would go before the NRA's Finance Committee for approval Once again, I believe Mr. Erstling's apparent lack of knowledge regarding the budget was not a result of AMc's failure to provide the NRA with information, but a failure of Mr. LaPierre to provide information he had in his possession to his staff and Board.

7.    To the extent that there were changes throughout the year relating to the budget, and specifically increases to the budget as Mr. Erstling complains, most of these changes were specifically requested by Mr. LaPierre, and all of these changes were approved by Mr. LaPierre and/or Mr. Phillips.   For example, in 2015, Mr. LaPierre asked AMc to create a campaign that would be impactful throughout the upcoming election period.  The resulting product was the widely successful Freedom Safest Place ("FSP") program.  Although FSP formally launched in 2016, there were budget increases for the 2015 calendar year as a result of Mr. LaPierre's request.  There were also budget increases for FSP in 2016 and 2017.  Another example occurred in 2016 with Carry Guard.  Carry Guard was essentially composed of two components: the insurance component and the training component.  In 2016, Mr. LaPierre and Mr. Powell, who was responsible for creating and managing Carry Guard, approached AMc to help the NRA with the

branding of Carry Guard and the training component.  AMc agreed, which resulted in increases to the 2016 budget.  Once again, these requests were requested and approved by Mr. LaPierre.   If Mr. LaPierre failed to provide Mr. Erstling and other NRA executives with this information, it is an NRA problem.

8.      In paragraph six of Mr. Erstling's declaration, he claims that AMc regularly employed outside contractors for staffing projects which could have been adequately served by NRA staff.  Mr. Erstling does not provide an example of any such project, which is likely because he had no interaction with me or other AMc representatives, to my knowledge, about AMc's projects for the NRA.  Mr. Phillips (Mr. Erstling's superior) is also clearly unaware that Mr. LaPierre repeatedly told me that he did not want the NRA to do any AMc tasks in-house because they would "kill it."

9.      In paragraph seven of Mr. Erstling's declaration, he claims that AMc was billing for work that had not been undertaken and specifically references an invoice relating to a Carry Guard magazine issue.  Mr. Erstling's statement is absolutely false.  AMc did not invoice or bill the NRA for work that it did not complete. With regard to the Carry Guard magazine, Lacey Duffy Cremer from AMc sent an email to Craig Spray and Josh Powell on July 13, 2018 detailing the work completed that Mr. Erstling now alleges was not completed.   This work was completed, and I am not aware of a single instance where AMc charged the NRA for work that was not completed.

10.     I have reviewed the Declaration of Grant Stinchfield that was filed in support of the NRA's Opposition.  At the end of Mr. Stinchfield's declaration, he claims that he "never had a sense that AMc" wanted to work with the NRA or cooperate with them on important issues like budgeting or messaging.  I personally attended every budgeting meeting with Mr. LaPierre and Mr. Phillips for at least the last fifteen (15) years, and Mr. Stinchfield was never present at any of

those meetings.  As far as messaging, Mr. Stinchfield was given a certain degree of autonomy since he was indirectly involved in implementing the NRA's messaging through the NRATV show he hosted entitled, "Stinchfield." But AMc had to closely monitor his broadcasts after he discussed issues on air that were both racist and sexist, and he was criticized for such from viewers and the media.  I am not aware of any complaint by Mr. Stinchfield to me or anyone else at AMc about AMc not wanting to work with the NRA on its messaging. To the contrary, for nearly forty years, AMc helped the NRA become one of the most powerful civil rights groups in the United States with unwavering support for the Second Amendment.  NRA has acknowledged this  repeatedly in numerous pleadings in this case.

11.     I have reviewed the Declaration of Wayne LaPierre that was filed in support of the NRA's Opposition.  In paragraph seven of Mr. LaPierre's declaration, he claims that he became concerned with the messaging of NRATV.  Although Mr. LaPierre fails to identify any specific issues or time period, I do not have, and I am not aware of any other AMc executive or employee having any knowledge about any complaints from Mr. LaPierre. In fact, at a meeting on November 28, 2017 at the Mercury Group offices that I attended with Mr. LaPierre, he complained to me that NRA fundraising was in a "Trump Slump" and we needed to work on more "gasoline" through NRATV to energize members and prospects.

12.     I have also reviewed paragraph thirteen of Mr. LaPierre's declaration and the declaration of Craig Spray where they make certain false accusations relating to a meeting on October 11, 2018 in Dallas, Texas.  I attended the entirety of this meeting with Mr. LaPierre, Mr. Spray, Angus McQueen, Revan McQueen, Lacey Duffy Cremer, Bill Winkler, Brandon Winkler, Tony Makris, and Henry Martin.  The meeting got off to a rocky start because Mr. LaPierre and Mr. Spray were an hour late and did not alert AMc they were running behind and, further, Mr.

LaPierre announced that Mr. Brewer and Mr. Powell had flown in with him on a privately chartered jet. At the beginning of the meeting, AMc, with Angus taking the lead, had a conversation with Mr. LaPierre about AMc's future with the NRA in light of Mr. Brewer's and Mr. Powell's actions. Specifically, Angus talked to Mr. LaPierre about the abusive and harassing phone calls he had received from Mr. Brewer and the letter writing campaign from Mr. Brewer falsely accusing AMc of withholding documents. Angus told Mr. LaPierre that if he thought the claims by Mr. Brewer were true, then AMc and the NRA's relationship going forward should cease because they would not be able to trust each other. Mr. LaPierre quickly responded that that was not going to happen.

13.     Angus further expressed concerns with Mr. LaPierre about Mr. Powell's involvement with AMc, especially in light of the recent sexual harassment allegations with an AMc executive and Mr. LaPierre's decision to designate him as a "designee" under the Services Agreement—essentially appointing Mr. Powell as Mr. LaPierre's designated representative to work with AMc on a day-to-day basis. Angus made clear that AMc was not going to deal with Mr. Brewer and Mr. Powell moving forward because they were both abusive and appeared to have no interest in being part of AMc's work for the NRA going forward. In addition to Angus, other AMc representatives, including me, expressed similar concerns to Mr. LaPierre about Mr. Brewer and Mr. Powell. I also recall Revan telling Mr. LaPierre that AMc was prepared to resign the NRA account on the spot because it was not going to work in what had become an incredibly hostile and abusive relationship with Mr. Brewer and Mr. Powell.

14.     In response to AMc's concerns, Mr. LaPierre repeatedly pled with AMc to "stick with him." Mr. LaPierre said the letter writing campaign with Mr. Brewer and the Brewer Firm would stop, and that AMc would no longer have to deal with Mr. Brewer, the Brewer Firm, or Mr. Powell going forward. Mr. LaPierre explained that Mr. Brewer was going to be gone in 30-60

days anyway because he was going to have everything resolved with the New York Attorney General.  During the meeting, Mr. LaPierre repeatedly said that Mr. Brewer was the only person that could save the NRA from the New York Attorney General, that Mr. Brewer had some key relationships in the State of New York, and that Mr. Brewer "knew how to fix this."  When I asked Mr. LaPierre what he meant by Mr. Brewer's knowing "how to fix this," Mr. LaPierre responded that "he just is," and reaffirmed that Mr. Brewer was going to leave AMc alone.

15.     The conversations relating to Mr. Brewer and Mr. Powell during the October 11, 2018 meeting were emotional and sometimes heated.  But at the end of the discussion, Mr. LaPierre looked around to each of the AMc representatives and asked them whether they would stick with him if he did in fact make sure that Mr. Brewer, the Brewer Firm, and Mr. Powell were no longer involved with AMc. Based on Mr. LaPierre's representations, AMc agreed.  However, Mr. LaPierre's representations proved to be false.  As one example, AMc received a letter from the Brewer Firm on December 21, 2018, once again requesting documents that the Brewer Firm knew AMc did not have in its possession.

16.     Mr. LaPierre's and Mr. Spray's statements that Angus and Revan were hostile, angry, or unprofessional during the October 11, 2018 meeting are completely false.  The only time the meeting became emotional was during our conversations with Mr. LaPierre about Mr. Brewer and Mr. Powell.  Angus, Revan, nor anyone else from AMc in that meeting was "enraged" by the NRA's budget cuts.  I personally participated in and witnessed Mr. LaPierre, Mr. Spray, Angus, Revan, Bill, and other AMc representatives work through these budgets in a cordial and professional matter. Over the years, AMc had a history of working cordially with Mr. LaPierre regarding budget cuts when NRA experienced financial downturns, and this meeting was no exception,  In fact, after the October 2018 meeting had concluded and AMc had been able to

finalize the budget with Mr. LaPierre and Mr. Spray, Mr. Spray personally sent me a message to express his appreciation to AMc for working on the budget reduction. Mr. Spray said "I want to thank you and the team again. We still have a journey internally to drive accountability amongst our executive team but we would never be this far without all your help. Pls extend my thanks."

17.     Mr. LaPierre's concerning comments about Mr. Brewer and the New York Attorney General were not limited to the October 11, 2018 meeting. During another meeting on January 18, 2019 attended by Mr. LaPierre, Angus, Revan, Tony, Lacey, Henry and Nader, Mr. LaPierre stated numerous times that Mr. Brewer was the only person that was going to keep him out of jail. In response, Angus, Tony, and I asked Mr. LaPierre why he should be concerned about going to jail. Mr. LaPierre stated on three separate occasions to me and everyone in the room that, "you don't know what you don't know." During that same meeting, I also became increasingly concerned about Mr. Brewer's role in handling the NRA's public relations and media strategies. At one point during the same meeting, Mr. LaPierre said that he was going to send Mr. Brewer to the New York Times to talk about Congress' investigation into the NRA's trip to Russia. Many of us expressed concerns about the NRA approaching a well-known liberal media outlet to talk about the Russia investigation. In response, Mr. LaPierre said that Mr. Brewer would sue the New York Times if they did not write what they wanted him to say.

18.     I have also read paragraphs 17 – 21 of Mr. LaPierre's declaration suggesting that AMc was working with or directing Lt. Col. Oliver North to engage in a failed extortion attempt on April 24, 2019. These allegations are completely ridiculous. As Col. North, Millie Hallow, and Carolyn Meadows have all testified, AMc was not engaging, directing, or otherwise involved in any extortion, coup, or threat to have Mr. LaPierre step down. I am not aware of a single AMc executive, employee, or representative that instructed, directed, recruited, or otherwise asked and

even discussed with Col. North to convey any kind of message, directive, or threat to Mr. LaPierre about resigning or stepping down, much less the notion that AMc would take some sort of affirmative action if Mr. LaPierre did not resign or step down.

19.     I have further read the NRA's allegations that Col. North was working on behalf of or at the direction of AMc when he was attempting to have Mr. Brewer's attorneys' engagement and invoices independently audited.  I am not aware of a single AMc employee that was working, overseeing, directing, or otherwise involved in Col. North's attempts to have Mr. Brewer's attorneys' invoices independently audited.

20.     I have further read the NRA's allegations that Mr. LaPierre did not have knowledge that Col. North was an employee of AMc.  I was part of numerous meetings that Mr. LaPierre personally attended, and have actual knowledge that he knew that Col. North was an employee of AMc. Prior to AMc and Col. North executing the contract, Mr. Phillips read the contract in its entirety in my presence and then proceeded to call Mr. LaPierre stating he had done so and related the highlights.  Mr. Phillips then authorized me to have the contract executed.  I also had numerous conversations with the NRA's General Counsel to the Board, Steve Hart, about Col. North's contract with AMc.  It was never a secret that Col. North was an employee of AMc.  In fact, I know that Mr. Hart and the NRA's General Counsel, John Frazer, personally reviewed Col. North's contract that clearly states he was going to be an employee of AMc.

I declare under penalty of perjury and in accordance with 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 3rd day of June, 2020.

_____
Melanie Montgomery

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| **Plaintiff and Counter-Defendant** | § § | |
| **and** | § § | |
| **WAYNE LAPIERRE,** | § § | |
| **Third-Party Defendant,** | § § | **Civil Action No. 3:19-cv-02074-G** |
| **v.** | § § | |
| **ACKERMAN MCQUEEN, INC.,** | § § | |
| **Defendant and Counter-Plaintiff,** | § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG,** | § § § § § | |
| **Defendants.** | § § | |

**DECLARATION OF ANTHONY S. MAKRIS**

Pursuant to 28 U.S.C. § 1746, I, Anthony S. Makris, hereby declare as follows:

1.       My name is Anthony S. Makris.  I am over the age of 18 years and of sound mind. I have never been convicted of a felony or a crime of moral turpitude.  The facts stated herein are true and correct, and based on my personal knowledge.  I am the President of the Mercury Group, Inc., a subsidiary of Ackerman McQueen, Inc. ("AMc").   I submit this declaration in response to the National Rifle Association of America's ("NRA") Opposition to Defendants' Motion to Disqualify Plaintiffs' Counsel (the "Opposition").

**EXHIBIT C**

2.     I have reviewed the Declaration of Wayne LaPierre that was filed in support of the NRA's Opposition.  As an initial matter, I have known Mr. LaPierre for at least 40 years, and have worked very closely with him over the years.  In paragraph five of his declaration, Mr. LaPierre makes numerous complaints about the work that AMc did for the NRA.  I find Mr. LaPierre's statements to be false and misleading for a number of reasons.  Mr. LaPierre's work philosophy was always "management by chaos."  He explained that the 'chaos concept' was to keep factions inside the organization fighting each other and that was an effective way for him to keep control.  There were numerous occasions where Mr. LaPierre would repeatedly tell me and other AMc representatives not to work with particular NRA staff, or whole departments of the NRA staff.  For example, during budget discussions, Mr. LaPierre made clear that AMc was only permitted to deal with Mr. LaPierre and Woody Phillips (and subsequently Craig Spray in 2019).  Mr. LaPierre told me that AMc should not provide Josh Powell with the analytics for NRATV.  Mr. LaPierre instructed AMc not to produce certain information to the NRA's counsel, William Brewer III.  One such example was when Mr. Brewer and members of his law firm attempted to remove AMc's documents as part of their audit, Mr. LaPierre instructed AMc not to allow Mr. Brewer or members of his team to remove AMc's documents or have them copied, which was expressly prohibited under the parties' Services Agreement.  When Mr. LaPierre would instruct AMc to incur expenses, he would repeatedly instruct us that we could only talk about such matters with him or Mr. Phillips.  I was told by Mr. LaPierre and Mr. Phillips that this was because of Mr. LaPierre's security needs and confidentiality from his own NRA staff.

3.     In paragraph eight of Mr. LaPierre's declaration, he references the Carry Guard program and expresses concerns about AMc's handling of the program.  The Carry Guard program was comprised of two separate components, a training component and an insurance component.

AMc is a strategy, communications, and advertising agency, among other things. AMc was not an insurance agency, and is not an insurance agency. Mr. Powell, Mr. LaPierre, and others at the NRA were responsible for the insurance program of Carry Guard. Mr. LaPierre asked, and AMc agreed, to assist the NRA with the marketing and branding of Carry Guard, and the training program. I found it odd that the most powerful gun group in the United States needed AMc to help construct a gun training program. The insurance company component of Carry Guard and its resulting regulatory problems were done by the NRA and its other vendors. I do not recall any issues with the marketing, branding, or training problem that AMc did for Carry Guard. In fact, Mr. Powell, who was responsible for Carry Guard, took the Carry Guard training that AMc had helped structure with veteran Special Warfare and Law Enforcement trainers and described it as being "fantastic."

4.      Mr. LaPierre's recollection of the retention of Mr. Brewer is false. When the NRA was assessing counsel to retain for the Lockton Litigation, Mr. Brewer and Mr. Chuck Cooper were the finalists. I have known Mr. Cooper for years, and know him to be an ethical, hard-working, and effective counselor and advocate. I have personal knowledge that Angus recommended that the NRA retain Mr. Cooper. I recommended to Mr. LaPierre and numerous other high-ranking NRA executives that the NRA should hire Mr. Cooper, especially in light of his extensive practice in constitutional law. I also have personal knowledge that Chris Cox and Jim Porter also recommended Mr. Cooper. I also have personal knowledge that Angus repeatedly expressed concerns within AMc and to Mr. LaPierre about the NRA's retention of Mr. Brewer, including his familial relationship.

5.      I have reviewed paragraph thirteen of Mr. LaPierre's declaration and the declaration of Craig Spray where they make certain false accusations relating to a meeting on

October 11, 2018 in Dallas, Texas.  I personally attended the entirety of this meeting with Mr. LaPierre, Mr. Spray, Angus McQueen, Revan McQueen, Melanie Montgomery, Lacey Duffy Cremer, Brandon Winkler, Bill Winkler, and Henry Martin.  At the beginning of the meeting (after Mr. LaPierre and Mr. Spray showed up one hour late with no notice), AMc, with Angus taking the lead, had a conversation with Mr. LaPierre about AMc's future with the NRA in light of developments with Mr. Brewer and Mr. Powell.  Specifically, Angus talked to Mr. LaPierre about the abusive and harassing phone calls that he had received from Mr. Brewer and the letter writing campaign from Mr. Brewer falsely accusing AMc of withholding documents.  Angus had previously told me that Mr. Brewer had called him in June 2018, and threatened that Angus and AMc was going to be brought up on RICO charges, and that the FBI was going to raid AMc's offices.  Shortly after first hearing this from Angus, Mr. Powell told me the exact same thing – that Mr. Brewer called Angus in June 2018 and told him that he was going to be brought up on RICO charges, and that the FBI was going to raid AMc's offices.  Angus made it clear to Mr. LaPierre at the beginning of the meeting that if he thought the claims by Mr. Brewer were true, then AMc and the NRA's relationship going forward should stop because they would not be able to trust each other. Mr. LaPierre quickly responded that that was not going to happen.

6.     Angus further expressed concerns with Mr. LaPierre about Mr. Powell's involvement with AMc, especially in light of the recent sexual harassment allegations with an AMc executive and Mr. LaPierre's recent decision to designate Mr. Powell as a "designee" under the Services Agreement, essentially appointing Mr. Powell as Mr. LaPierre's designated representative to work with AMc.  In short, I understood that Angus was making clear that AMc would not work with either Mr. Brewer or Mr. Powell, who were both abusive and appeared to have no interest in being part of the AMc's work for the NRA going forward.  I also recall Revan

telling Mr. LaPierre that AMc was prepared to resign the NRA account on the spot because it was not going to work in what had become an incredibly hostile and abusive relationship with Mr. Brewer and Mr. Powell.

7.      In response to AMc's concerns, Mr. LaPierre repeatedly pled with AMc to "stick with him."  Mr. LaPierre stated that the letter writing campaign with Mr. Brewer and the Brewer Firm would stop, and that AMc would no longer have to deal with Mr. Brewer, the Brewer Firm, and Mr. Powell going forward.  Mr. LaPierre stated that Mr. Brewer was going to be gone in 30-60 days because Mr. Brewer was going to have everything resolved with the New York Attorney General.  During the meeting, Mr. LaPierre repeatedly stated that Mr. Brewer was the only person that could save the NRA from the New York Attorney General, that Mr. Brewer had some key relationships in the State of New York, and that Mr. Brewer knew "how to fix this."  When AMc representatives asked Mr. LaPierre what he meant by Mr. Brewer's knowing "how to fix this," Mr. LaPierre responded that "he just does."

8.      The conversations relating to Mr. Brewer and Mr. Powell were emotional and sometimes heated.  When Mr. LaPierre suggested that I could come work with the NRA, I remarked, "I wouldn't be associated with those two unethical people [Brewer and Powell] if my life depended on it." At the end of the discussion, Mr. LaPierre looked around to each of the AMc representatives in the meeting and specifically asked whether they would stick with him if he did in fact make sure that Mr. Brewer, the Brewer Firm, and Mr. Powell were no longer involved with AMc. Based on Mr. LaPierre's assurances that AMc would be able to continue productive business without the hostilities of Brewer and Powell, AMc agreed to continue its work for the NRA. However, Mr. LaPierre's representations proved to be false.  As one example, AMc received a

letter from the Brewer Firm on December 21, 2018 once again requesting documents that the Brewer Firm had full knowledge that AMc did not have in its possession.

9.      Mr. LaPierre's and Mr. Spray's statements that Angus and Revan were hostile, angry, or unprofessional during the October 11, 2018 meeting are completely false.  The only time during the October 11, 2018 meeting that became emotional was during our conversations with Mr. LaPierre about Mr. Brewer and Mr. Powell.  Angus, Revan, nor anyone else from AMc in that meeting was "enraged" by the NRA's budget cuts.  I personally witnessed Mr. LaPierre, Mr. Spray, Angus, Revan, Bill, and other AMc representatives work through these budgets in a cordial and professional matter.  I also recall Mr. Spray and Mr. LaPierre repeatedly telling me and other AMc representatives that part of the reason for the budget cuts was because of the legal bills of Mr. Brewer.  On numerous occasions, Mr. LaPierre personally complained to me about the significant legal expenses of Mr. Brewer and his law firm.

10.      Mr. LaPierre made other concerning comments about Mr. Brewer and the New York Attorney General.  During another meeting in January 2019 attended by Mr. LaPierre, Angus, Revan, Melanie, and Nader, Mr. LaPierre stated on numerous occasions that Mr. Brewer was the only person that was going to keep him out of jail.  In response to that, Angus, Melanie, and I asked Mr. LaPierre why he should be concerned about going to jail.  Mr. LaPierre stated on three separate occasions to me and everyone in the room that, "you don't know what you don't know."  I found Mr. LaPierre's comments about Mr. Brewer to be odd and disconcerting.

11.      During that same meeting, I also became increasingly concerning about Mr. Brewer's role in handling the NRA's public relations and media strategies that AMc had always handled for the NRA. At one point, Mr. LaPierre said that he was going to send Mr. Brewer to the New York Times to talk about Congress' investigation into the NRA's trip to Russia.  Numerous

AMc executives expressed concerns about the NRA approaching a well-known liberal media outlet to talk about the Russia investigation.  In response, Mr. LaPierre said that Mr. Brewer would sue the New York Times if they did not write what they wanted him to say.  Finally, during this same meeting, AMc once again confronted Mr. LaPierre on why they were still dealing with Mr. Brewer and his firm, especially in light of the new document request that Sarah Rogers from the Brewer Firm sent on December 21, 2018.

12.     I have also read paragraphs 17 – 21 of Mr. LaPierre's declaration suggesting that AMc was working with or directing Lt. Col. Oliver North to engage in a failed extortion attempt on April 24, 2019.  These allegations are false and completely ridiculous.  As Col. North, Millie Hallow, and Carolyn Meadows have all testified, AMc was not engaging, directing, or otherwise involved in any extortion, coup, or threat to have Mr. LaPierre step down.  I am not aware of a single AMc executive, employee, or representative that instructed, directed, recruited, or otherwise asked and even discussed with Dan Boren or Col. North to convey any kind of message, directive, or threat to Mr. LaPierre about resigning or stepping down, much less the notion that AMc would take some sort of affirmative action if Mr. LaPierre did not resign or step down.

13.     The NRA also contends that Col. North was working on behalf of or at the direction of AMc when he was attempting to have Mr. Brewer's attorneys' engagement and invoices independently audited.  This is simply false.  I was told that the sole basis for the Board of Directors to independently audit Mr. Brewer's engagement was driven by the Board's attempt to apply Mr. Brewer's new financial mandates to the Brewer Firm itself. I heard numerous concerns about Mr. Brewer's billings with no back up and about his employment with the NRA without a valid contract. The sole basis for the allegations that AMc was behind these actions appears to be simply because Col. North was an employee of AMc. Col North's employment by AMc was an

arrangement fully vetted and approved by Mr. LaPierre, the NRA, and the NRA Board of Directors on numerous occasions.   For Mr. LaPierre to claim he had no knowledge of Col. North's employment by AMc is false, as LaPierre personally initiated and oversaw the details and terms of the employee agreement with Col. North.

14.     I have also reviewed the Declaration of Michael Erstling that was filed in support of the NRA's Opposition.  In paragraph six of Mr. Erstling's declaration, he states that "Ackerman regularly issued six-figure invoices to the NRA with little detail or support, and systematically obfuscated and blocked the NRA's efforts to understand what services were covered by any particular invoice."  Prior to the submission of Mr. Erstling's April 29, 2020 declaration, I had no personal knowledge that he or other NRA representatives or Board members had concerns with the level of detail in AMc's invoices.  As Mr. Erstling knows, the NRA and AMc's relationship spans nearly four decades.   For at least the last fifteen years, Mr. LaPierre and Mr. Phillips have instructed myself and numerous other representatives of AMc as to the specific wording on invoices.  I was told by Mr. LaPierre that the reason for this was because he had concerns with confidentiality, and specifically concerns about leaks within the NRA's accounting department. Over the years, both Mr. LaPierre and Mr. Phillips would remind me and other AMc representatives to intentionally keep AMc's invoices to the NRA brief.  If Mr. Erstling truly had concerns about the amount of information provided by AMc in the invoices to the NRA, he should have directed those concerns to Mr. LaPierre or Mr. Phillips who would have been in the best position to explain why the NRA required the invoices to contain so little information. He certainly never contacted me about it.  Mr. Erstling's concerns were not a communication breakdown between the NRA and AMc.

15.     Mr. Erstling further states that AMc refused to cooperate with requests for information.  This statement is false.  Each year since the NRA and AMc's relationship began, the NRA has conducted at least one annual audit of AMc's documents under the parties' Services Agreement.  I do not recall a single instance where the NRA expressed concerns about the information AMc was providing to the NRA as part of these audits or where the NRA accused AMc of withholding anything.  To the extent the NRA requested back up for invoices or further explanation for projects, AMc provided that information to the NRA, typically through Mr. LaPierre and/or Mr. Phillips.  During at least one of these audits, Mr. LaPierre specifically instructed AMc not to disclose certain information to the auditors, including the NRA Foundation's Chief Financial Officer, Rick Tedrick.  As I stated above, Mr. LaPierre repeatedly told Angus and I that he did not trust the members of the NRA's accounting department.  Prior to Mr. Brewer's engagement by the NRA in 2018, I do not recall a single complaint from anyone at the NRA that AMc failed to provide the requested information as part of the NRA's audits of AMc's documents.

16.     In paragraph five of Mr. Erstling's declaration, he states that the annual budget was made difficult because AMc deviated from the budget parameters set by the NRA and that he was provided no insight into the basis for the budgets or whether AMc would adhere to them.  For at least the last twenty years, Mr. LaPierre and Mr. Phillips have been responsible for helping to create and finalize the annual budget between the NRA and AMc.  Each year, Mr. LaPierre, with the assistance and knowledge of Mr. Phillips, approved the annual budget between the NRA and AMc.  The exception to this was for the 2019 budget, which involved Craig Spray, Mr. Phillips' successor.  Despite Mr. Erstling's testimony, he did not participate in any annual budget process with AMc.  I understood from comments made from Mr. LaPierre and Mr. Phillips that once the

budget between Mr. LaPierre, Mr. Phillips, and AMc was approved, it would go before the NRA's Finance Committee for approval. Once again, I believe that Mr. Erstling's apparent lack of knowledge regarding the budget was not a result of AMc's failure to provide the NRA with information, but a failure of Mr. LaPierre to apparently provide that information he had in his possession to the NRA.

17.     To the extent that there were changes throughout the year relating to the budget, and specifically increases to the budget as Mr. Erstling complains, most of these changes were specifically requested by Mr. LaPierre, and it is my understanding that all of these changes were approved by Mr. LaPierre and/or Mr. Phillips. For example, in 2015, Mr. LaPierre approved AMc creating a campaign to run during the upcoming election on important political issues. The resulting product was the widely successful Freedom's Safest Place ("FSP") program. Although FSP formally launched in 2016, there were significant budget increases for the 2015, 2016, and 2017 calendar years (the timeframe in which it ran) as a result of Mr. LaPierre's request. Another example occurred in 2016 with Carry Guard. These requests were directed, orchestrated, and approved by Mr. LaPierre. Mr. LaPierre's failure to provide Mr. Erstling and other NRA executives with this information has apparently created the false impression that AMc was unilaterally increasing the budget every year. This insinuation is simply false.

I declare under penalty of perjury and in accordance with 28 U.S.C. § 1746 that the foregoing is true and correct.


Executed this 3rd day of June, 2020.

Anthony S. Makris

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| **Plaintiff and Counter-Defendant** | § § | |
| **and** | § § | |
| **WAYNE LAPIERRE,** | § § | |
| **Third-Party Defendant,** | § § | **Civil Action No. 3:19-cv-02074-G** |
| **v.** | § § | |
| **ACKERMAN MCQUEEN, INC.,** | § § § | |
| **Defendant and Counter-Plaintiff,** | § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG,** | § § § § § | |
| **Defendants.** | § § | |

**DECLARATION OF NADER TAVANGAR**

Pursuant to 28 U.S.C. § 1746, I, Nader Tavangar, hereby declare as follows:

1.     My name is Nader Tavangar.  I am over the age of 18 years and of sound mind.  I have never been convicted of a felony or a crime of moral turpitude.  The facts stated herein are true and correct, and based on my personal knowledge.  I submit this declaration in response to the National Rifle Association of America's ("NRA") Opposition to Defendants' Motion to Disqualify Plaintiffs' Counsel (the "Opposition").

**EXHIBIT D**

2.      I am an Executive Vice President / Managing Director of Mercury Group, Inc., a wholly owned subsidiary of Ackerman McQueen, Inc. ("AMc").   I have been employed by AMc since 1999.

3.      In 2009, I began to work on the NRA account at AMc.  Since that time, I have worked closely with many of the NRA's officers and directors.  I was the main relationship point of contact between AMc and the NRA, including with Wayne LaPierre.

4.      I have reviewed the Declaration of Wayne LaPierre that was filed in support of the NRA's Opposition.  In paragraph seven of Mr. LaPierre's declaration, he states that he became concerned that the public messaging AMc was crafting for the NRA "struck the wrong tone."  I find Mr. LaPierre's statement to be odd given the intimate knowledge, involvement, oversight, and approval that Mr. LaPierre had over all of AMc's messaging for the NRA.  I have personal knowledge that Mr. LaPierre frequently reviewed recorded content prior to release.  Mr. LaPierre also repeatedly told me and other AMc representatives that he needed more "gasoline" on the messaging because he understood that it helped with fundraising.  Mr. LaPierre explained to me that he needed this even more as he drifted further away from the duties demanded of him as being the face of the NRA.  For example, in 2017, Tyler Schropp commented to me during an NRA board meeting in Springfield, Missouri that he found it concerning and weird that Mr. LaPierre had "taken off" the entire summer at the beach only to "check-in" (for a meeting/update/talking points) a day before the board meeting.  The team of NRATV's on air personalities allowed Mr. LaPierre to avoid the public and only emerge on occasion while those talents simultaneously spread the NRA's messaging and increased fundraising.

5.      In paragraph eight of Mr. LaPierre's declaration, he states that he had concerns about AMc and specifically its involvement with Carry Guard.  Carry Guard was Josh Powell's

idea and responsibility.  One of my roles with assisting the NRA was to help with special projects. I could not submit an invoice for the NRA's approval and payment without allocating an NRA department to approve.  AMc took direction from Mr. Powell on Carry Guard, including his routinely-ordered "rush" projects, which were still always approved beforehand.  In certain instances, Mr. Powell would specifically authorize AMc to work on tasks for Carry Guard and then would speak differently to members of the NRA's accounting team about the tasks.  However, even then, these invoices were always approved and paid for by the NRA or the work was not completed.

6.      I have reviewed the other statements made by Mr. LaPierre regarding Mr. Brewer's involvement with him and the NRA.  During a phone call with Mr. LaPierre in December 2018, he repeatedly told me to "stick with him." He also told me during that same phone call that Mr. Brewer was going to be gone in 30-60 days because he was going to have everything resolved with the New York Attorney General. During a meeting with Mr. LaPierre and numerous AMc representatives in January 2019, Mr. LaPierre repeatedly said that Mr. Brewer was the only person that could save the NRA from the New York Attorney General.  He told me the same thing on another occasion at the Mercury Group office.  During the same January 2019 meeting (and on other occasions), Mr. LaPierre repeatedly said that Mr. Brewer was the only person that was going to be able to keep him out of jail.  Numerous AMc representatives asked Mr. LaPierre what he meant and why he was concerned about going to jail. Mr. LaPierre told me and other AMc representatives in the meeting that we didn't know what we didn't know.

7.      I have reviewed the Declaration of Travis Carter that was filed in support of the NRA's Opposition.  In paragraphs ten and eleven, Mr. Carter talks about Brewer, Attorneys & Counselors (the "Brewer Firm"), and specifically the public relations work that it does for various

clients, including the NRA.  Mr. Carter suggests that AMc's roles with the NRA were limited to advertising, web development, and marketing. However, just as Mr. Carter testified in his declaration about the Brewer Firm, AMc and its subsidiary, Mercury Group, Inc., for nearly forty years, helped the NRA "navigate media issues, regulatory challenges, and reputational exposure," including as it related to legal matters.  AMc also provided public affairs, crisis management, and communications strategy media issues.  In paragraph thirty-five, Mr. Carter states that AMc "never presented to the Public Affairs Committee in connection with these types of issues."  No matter the NRA adversary, crisis, or challenge, AMc was consulted and called upon to advise and provide the NRA with assistance in public affairs, crisis management, communication strategy, media issues, reputational exposure, media relations, and corporate communications, as well as advertising, web development, and marketing.  In fact, every month since its incorporation, the NRA paid a monthly Mercury Group invoice for strategic and crisis communications services.

8.      I have also reviewed the Declaration of Andrew Arulanandam that was filed in support of the NRA's Opposition.  In paragraph five of his declaration, Mr. Arulanandam states that he has worked with Travis Carter and other members from the Brewer Firm with communications relating to legal and regulatory matters, and that they have assisted in formulating media advisories, drafting public statements, and coordinating media relations activities. Once again, these are many of the exact same tasks that AMc has been responsible for developing and implementing for the NRA for nearly forty years.

9.      I have also read paragraphs 17 – 21 of Mr. LaPierre's declaration suggesting that AMc was working with or directing Lt. Col. Oliver North to engage in a failed extortion attempt on April 24, 2019.  These allegations are false and completely ridiculous.  As Col. North, Millie Hallow, and Carolyn Meadows have all testified, AMc was not engaging, directing, or otherwise

involved in any extortion, coup, or threat to have Mr. LaPierre step down.  I am not aware of a single AMc executive, employee, or representative that instructed, directed, recruited, or otherwise asked and even discussed with Dan Boren or Col. North to convey any kind of message, directive, or threat to Mr. LaPierre about resigning or stepping down, much less the notion that AMc would take some sort of affirmative action if Mr. LaPierre did not resign or step down.  Angus McQueen has always said, this is Wayne's Rifle Association.

10.     I have further read the NRA's allegations that Col. North was working on behalf of or at the direction of AMc when he was attempting to have Mr. Brewer's attorneys' engagement and invoices independently audited.  I am not aware of a single AMc employee that was working, overseeing, directing, or otherwise involved in Col. North's attempts to have Mr. Brewer's attorneys' invoices independently audited.

11.     I have also reviewed the Declaration of Michael Erstling that was filed in support of the NRA's Opposition.  In paragraph six of Mr. Erstling's declaration, he states that "Ackerman regularly issued six-figure invoices to the NRA with little detail or support, and systematically obfuscated and blocked the NRA's efforts to understand what services were covered by any particular invoice."  As Mr. Erstling knows, the NRA and AMc's relationship spans nearly four decades.   For at least the last fifteen years, Mr. LaPierre and Mr. Phillips, instructed myself and numerous other representatives of AMc to intentionally provide less descriptive invoices.  I was told by Mr. LaPierre that the reason for this was because he had concerns with confidentiality, and specifically concerns about leaks within the NRA's accounting department.  Over the years, both Mr. LaPierre and Mr. Phillips would remind me and other AMc representatives to intentionally keep AMc's invoices to the NRA brief.  I had no personal knowledge that Mr. Erstling or other Board members were concerned with the amount of detail in AMc's invoices that Mr. LaPierre

and Mr. Phillips directed for decades until late 2018 after Mr. Brewer was retained by the NRA. The two times I recall Mr. Erstling requesting information about an invoice was to determine who purchased equipment in relation to Sales & Use Tax Exemption in the State of Texas.

12.     If Mr. Erstling truly had concerns about the apparently lack in detail by AMc in the invoices to the NRA, he should have expressed those concerns to Mr. LaPierre or Mr. Phillips. He certainly never contacted me about it.

13.     Mr. Erstling further states that AMc refused to cooperate with requests for information. I believe this statement to be false. Each year since the NRA and AMc's relationship began, the NRA has conducted at least one annual audit of AMc's documents under the parties' Services Agreement. Until Mr. Brewer's involvement, I do not recall a single instance where the NRA expressed concerns about the information AMc was providing to the NRA as part of these audits or where the NRA accused AMc of withholding anything. To the extent the NRA requested back up for invoices or further explanation for projects, AMc provided that information to the NRA, typically through Mr. LaPierre and/or Mr. Phillips. During many of these audits, Mr. LaPierre specifically instructed AMc not to disclose certain information to the auditors, including the NRA Foundation's Chief Financial Officer, Rick Tedrick. As I stated above, Mr. LaPierre repeatedly told me that he did not trust the members of the NRA's accounting department. Prior to Mr. Brewer's involvement with the NRA, I do not recall a single complaint from anyone at the NRA that AMc failed to provide the requested information as part of the NRA's audits of AMc's documents.

14.     In paragraph five of Mr. Erstling's declaration, he states that the annual budget was made difficult because AMc deviated from the budget parameters set by the NRA and that he was provided no insight into the basis for the budgets or whether AMc would adhere to them. For as

long as I have been at AMc, Mr. LaPierre and Mr. Phillips have been responsible for helping to create and finalize the annual budget between the NRA and AMc.  Each year, Mr. LaPierre, with the assistance and knowledge of Mr. Phillips, approved the annual budget between the NRA and AMc.   The exception to this was for the 2019 budget, which involved Craig Spray, Mr. Phillips' successor.  I am not aware of Mr. Erstling ever participating in any budget process with AMc.  Mr. Erstling's apparent issues with budget increases were not the problem of AMc, but with Mr. LaPierre who would call us and request other projects outside the budget.  Many of these were to be billed to his public relations budget.  I marked these as "Wayne/PR" and requested Mr. Tedrick speak with Mr. LaPierre for any questions.  Once again, I believe that Mr. Erstling's apparent lack of knowledge regarding the budget was not a result of AMc's failure to provide the NRA with information, but Mr. LaPierre's failure to provide information to the NRA.

I declare under penalty of perjury and in accordance with 28 U.S.C. § 1746 that the foregoing is true and correct.


Executed this 3rd day of June, 2020.

*Nader Tavangar*
_____
Nader Tavangar

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | §<br>§<br>§ |
| **Plaintiff and Counter-Defendant** | §<br>§ |
| **and** | §<br>§ |
| **WAYNE LAPIERRE,** | §<br>§ |
| **Third-Party Defendant,** | §   **Civil Action No. 3:19-cv-02074-G**<br>§<br>§ |
| **v.** | §<br>§ |
| **ACKERMAN MCQUEEN, INC.,** | §<br>§ |
| **Defendant and Counter-Plaintiff,** | §<br>§ |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG,** | §<br>§<br>§<br>§<br>§ |
| **Defendants.** | §<br>§ |

## DECLARATION OF WILLIAM POWERS

Pursuant to 28 U.S.C. § 1746, I, William Powers, hereby declare as follows:

1.      My name is William Powers.  I am over the age of 18 years and of sound mind.  I have never been convicted of a felony or a crime of moral turpitude.  The facts stated herein are true and correct, and based on my personal knowledge.  I submit this declaration in response to the National Rifle Association of America's ("NRA") Opposition to Defendants' Motion to Disqualify Plaintiffs' Counsel (the "Opposition").

2.      I am the Executive Vice President for Public Relations at Ackerman McQueen, Inc. ("AMc").  I begin working at AMc in 1992.  In 1996, I left AMc to go work for the NRA as

their Director of Public Affairs and Corporate Communications.  In 2001, I left the NRA and went back to AMc, which is where I have been employed since.  For the last decade, I have been primarily responsible for writing the speeches of the NRA's Executive Vice President, Wayne LaPierre.  I have also been intimately involved with assisting Mr. LaPierre and the NRA with drafting press releases, responding to media inquiries, negotiating media appearances, and other media and public relations tasks to help the NRA and Mr. LaPierre communicate the NRA's message to the public.

3.     I have reviewed the Declarations of Andrew Arulanandam and Travis Carter that were filed in support of the NRA's Opposition, and their statements that Brewer Attorneys & Counselors' (the "Brewer Firm") Public Relations work has been limited to assisting with legal and regulatory issues.  I have personal knowledge that the Brewer Firm drafted speeches and media statements that were previously exclusively handled by me, other AMc representatives, and the NRA.

4.     In late January 2019 or early February 2019, I was told by Mr. LaPierre that the Brewer Firm would be writing his speech for the upcoming annual Conservative Political Action Conference ("CPAC") meeting in National Harbor, Maryland.  The CPAC speech was a very important speech for Mr. LaPierre and the NRA each year.  This speech typically set the tone for the message leading up to the NRA convention.  This was a speech that had previously always kicked off a national strategy of messaging for the NRA.  It was the first major address of the year of the organization, of Mr. LaPierre, and as a first step of messaging it was critical for public relations, member relations, donor relations, direct mail and grassroots activism for the NRA.  For at least the last 10 years, I had written Mr. LaPierre's CPAC speech, of course with Mr. LaPierre's input.

5.      In addition to writing Mr. LaPierre's speeches, I would personally attend the speeches and spend several days prior to help Mr. LaPierre rehearse.  I was also routinely responsible for making sure that Mr. LaPierre's speeches were loaded into the teleprompter and properly operating.  Just days before Mr. LaPierre's 2019 CPAC speech, I still had not seen the speech.  I asked Mr. Arulanandum when I was going to receive the speech.  Mr. Arulanandum then provided me a copy of the speech that Mr. Arulanandum obtained from Mr. Carter at the Brewer Firm.   During rehearsals for Mr. LaPierre's 2019 CPAC speech, he would routinely ask me questions and express concerns about the speech prepared by the Brewer Firm, and would ask about suggested edits that I would make.  It was not uncommon for Mr. LaPierre and me to make edits to his speeches during the rehearsal process.  In response to Mr. LaPierre's questions about edits to his speech, I repeatedly told him that I did not feel comfortable making edits to a speech that had been prepared by the Brewer Firm.

6.      Several weeks before the annual NRA members meeting in April 2019, I was told by Mr. LaPierre that, again, the Brewer Firm was going to be preparing Mr. LaPierre's Saturday speech for the NRA members.  I was told that this speech was going to be an update to the prior speech the Brewer Firm had prepared for Mr. LaPierre at the 2019 CPAC convention.

7.      I attended the entirety of the April 2019 NRA's members meeting in Indianapolis, Indiana.   During rehearsals for Mr. LaPierre's Saturday speech, he again repeatedly asked me questions and expressed concerns about the speech prepared by the Brewer Firm, and asked me for proposed changes. Similar to the CPAC speech, I repeatedly told Mr. LaPierre that I did not feel comfortable making edits to a speech that had been prepared by the Brewer Firm.

8.      I have read the Declaration of Mr. LaPierre where he suggests that Mr. Brewer was not in Indianapolis for the April 2019 NRA members' meeting.  While I was in the hotel

lobby in Indianapolis for the NRA's members' meeting in April 2019, I personally saw Mr. Brewer and Josh Powell together.

9.      In the summer of 2019, Mr. LaPierre called me.  During the brief conversation, he asked me for advice on the NRA's response to recent mass shootings across the United States. During that telephone call, Mr. LaPierre explained to me Mr. Arulanandum was working with Mr. Carter at the Brewer Firm on the NRA's statement in response to these mass shootings. Based on my conversation with Mr. LaPierre, I did not understand this statement to have anything to do with NRA's legal and regulatory issues.  The NRA issued its statement on August 4, 2019 and their statement had nothing to do with legal or regulatory issues. AMc was always historically tasked with working with Mr. LaPierre and the NRA on their appropriate response to mass shootings, guns, and the Second Amendment.

10.      I have also reviewed the Declaration of Mr. Carter, and his statements about the NRA having to respond to the increasingly hostile media statements by AMc.  After the filing of the NRA's lawsuit in April 2019, I received numerous inquiries from media outlets across the country looking for a comment from AMc.  The first public statement that I am aware AMc made was in response to the NRA's lawsuit and allegations.  Given what I believe to be the false allegations being made by the NRA against AMc and the negative publicity about AMc being generated, in part, because of the NRA and the Brewer Firm's statements to the media, AMc felt that it was appropriate and necessary to publicly refute the NRA's claims.  Since that time, NRA representatives and the Brewer Firm have continued to make public statements to the media about AMc, about which AMc has again received numerous media inquiries and to which AMc has responded at times to defend itself.  To my knowledge, AMc has never initiated any media coverage regarding this dispute.

11.     The cumulative effect of the media relations efforts of the partnership between the Brewer Firm and Mr. LaPierre can best be understood by the following anecdote:  In March of 2020, I telephoned a producer at NBC's "Meet the Press."  I have known this producer for some twenty years.  We were personal friends, and I called her to discuss a personal favor.  Near the end of our conversation, this producer briefly mentioned the NRA, its messaging and public relations, and Mr. LaPierre.  Specifically, she said as it relates to Mr. LaPierre: "We don't even want him on our show anymore.  He's irrelevant."

12.     I have also read paragraphs 17 – 21 of Mr. LaPierre's declaration suggesting that AMc was working with or directing Lt. Col. Oliver North to engage in a failed extortion attempt on April 24, 2019.  I am not aware of a single AMc executive, employee, or representative that instructed, directed, recruited, or otherwise asked and even discussed with Dan Boren or Col. North to convey any kind of message, directive, or threat to Mr. LaPierre about resigning or stepping down, much less the notion that AMc would take some sort of affirmative action if Mr. LaPierre did not resign or step down.

13.     I have further read the NRA's allegations that Col. North was working on behalf of or at the direction of AMc when he was attempting to have Mr. Brewer's attorneys' engagement and invoices independently audited.  I am not aware of a single AMc employee that was working, overseeing, directing, or otherwise involved in Col. North's attempts to have Mr. Brewer's attorneys' invoices independently audited.

I declare under penalty of perjury and in accordance with 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 3rd day of June, 2020.

_William Powers_

William Powers

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § § § |
| Plaintiff and Counter-Defendant | § § |
| and | § § |
| WAYNE LAPIERRE, | § § |
| Third-Party Defendant, | § Civil Action No. 3:19-cv-02074-G § |
| v. | § § |
| ACKERMAN MCQUEEN, INC., | § § |
| Defendant and Counter-Plaintiff, | § § |
| MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG, | § § § § § |
| Defendants. | § § |

**DECLARATION OF EDMUND MARTIN**

Pursuant to 28 U.S.C. § 1746, I, Edmund Martin, hereby declare as follows:

1.    My name is Edmund Martin. I am over the age of 18 years and of sound mind. I have never been convicted of a felony or a crime of moral turpitude. The facts stated herein are true and correct, and based on my personal knowledge. I am the Chairman of the Board of Directors of Ackerman McQueen, Inc. ("AMc"). I submit this declaration in response to the National Rifle Association of America's ("NRA") Opposition to Defendants' Motion to Disqualify Plaintiffs' Counsel (the "Opposition").

2.    I started at AMc as President in 2001, and became Chairman of the Board in 2004.

**EXHIBIT F**                    **APP044**

3.      For nearly forty years, the NRA had been a client of AMc. During that time, I had little to no involvement in the NRA account. My involvement with the NRA account had been limited to my role as Chairman of the Board of AMc, and information that Angus McQueen would share with me from time to time. The NRA was Angus' client, and he was the primary point of contact between the NRA and AMc until the Services Agreement was terminated in 2019. Aside from a single instance where I was introduced to Wayne LaPierre at our offices in Oklahoma City, Oklahoma, I have never communicated, directly or indirectly, with Mr. LaPierre.

4.      I have read the Declaration of Mr. LaPierre that was filed in support of the NRA's Opposition suggesting that AMc was working with or directing Lt. Col. Oliver North to engage in a failed extortion attempt on April 24, 2019. I have also read various filings by the NRA in this lawsuit and in the media accusing AMc of being involved in a failed extortion attempt, or an attempt to convince Mr. LaPierre to resign. These allegations are false. I have never engaged, directed, discussed, threatened, or otherwise been involved in any discussion with AMc or anyone else to try to convince Mr. LaPierre to step down from any role at the NRA. I have never met or spoken to Col. North.

5.      I am also not aware of a single AMc executive, employee, or representative that instructed, directed, recruited, threatened, or otherwise asked or even discussed with Dan Boren, Col. North, Millie Hallow, or anyone else to convey any kind of message, directive, or threat to Mr. LaPierre about resigning or stepping down, much less the suggestion that AMc would take some sort of affirmative action if Mr. LaPierre did not resign or step down.

I declare under penalty of perjury and in accordance with 28 U.S.C. § 1746 that the foregoing is true and correct.

DECLARATION OF EDMUND MARTIN                                                          PAGE 2

**APP045**

Executed this 3rd day of June, 2020.

Edmund Martin

**APP046**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| *Plaintiff and Counter-Defendant,* | § § | |
| **and** | § § | |
| **WAYNE LAPIERRE,** | § § § | |
| *Third-Party Defendant,* | § § | |
| **v.** | § § | **Case No. 3:19-cv-02074-G** |
| **ACKERMAN MCQUEEN, INC.,** | § § § | |
| *Defendant and Counter-Plaintiff,* | § § | |
| **and** | § § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, AND JESSE GREENBERG,** | § § § § § | |
| *Defendants.* | | |

## DECLARATION OF COYT RANDAL "RANDY" JOHNSTON

Pursuant to 28 U.S.C. § 1746, I, Coyt Randal Johnston, hereby declare as follows:

1.      My name is Coyt Randal "Randy" Johnston.  I am over eighteen years of age.  I have never been convicted of a felony or misdemeanor involving moral turpitude.  I am competent to make this Declaration in support of Ackerman McQueen, Inc.'s ("AMc" or "Defendant") Motion to Disqualify Plaintiff's Counsel (William A Brewer III and Brewer Attorneys & Counselors) ("Motion to Disqualify").

**EXHIBIT G**

**Qualifications as Expert Witness**

2.      I am an attorney in Dallas, Texas. I graduated with honors from the University of

Texas School of Law in 1974, and have been licensed to practice law in Texas since October 22,

1974. I also am licensed to practice in Utah and in multiple federal courts including the Northern

District of Texas. I am board certified in civil trial law by the Texas Board of Specialization. I am

a founder and shareholder in the law firm of Johnston Tobey Baruch, P.C. Since being licensed in

1974, my practice has been predominantly litigation-based, with various areas of substantive

expertise in connection with litigation, arbitration, and dispute resolution.

3.      I began my practice in 1974, with the law firm of Baker Botts L.L.P. in Houston. I

moved to Dallas in 1979, and practiced with the law firm of Hewitt Johnson Swanson & Barbie.

In 1981, I formed my own law firm and have practiced on my own, under different firm names,

ever since.

4.      Since 1981, a major portion of my practice has consisted of legal malpractice,

attorney fee disputes, professional liability matters, and legal ethics.  I cannot state how many

lawyer disputes I have handled over that period of time.  It is a lot.  I have written and spoken

extensively on the subject, including numerous continuing legal education presentations relating

to ethical issues including the attorney-client privilege.

5.      In addition to my work in the area of legal malpractice, I also have experience in

connection with general commercial, business, and personal injury litigation, both on an hourly

and contingent fee basis. I have handled a few, but not many, family law and criminal disputes. I

represent both plaintiffs and defendants, although most of my practice since 1981 has been a

plaintiff-based and contingent-fee practice.

6.      I have been an instructor for the Trial Advocacy College of Texas and the National

Institute of Trial Advocacy. I have taught professional responsibility at the University of North

Texas School of Law, and lectured numerous times at the SMU Dedman School of Law. I chaired

the Business Litigation Section of the Dallas Bar Association and served as President of the Dallas

Trial Lawyers Association.  I have also served as President of the Dallas Chapter of the American

Board of Trial Advocates, and I served on the Executive Committee of that organization for over

a decade.  I am a Fellow in the International Academy of Trial Lawyers, an organization whose

membership is limited to 500 attorneys worldwide.  I am the author of the 2009 book, *Robbed at*

*Pen Point*.  I am also the author of the chapter on Ethics in the book, *Texas Business Litigation.*  A

copy of my C.V. with a list of my speeches and papers is attached hereto as *Exhibit A*.

### Scope of Engagement

7.      I have been retained by AMc and related parties and their counsel in the above-

referenced case to review materials provided to me and to render various opinions in connection

with Defendant's Motion to Disqualify Plaintiff's Counsel, William A Brewer III ("Brewer") and

Brewer Attorneys & Counselors (the "Brewer Firm"). The issues in dispute in this motion focus

on the actions of Mr. Brewer and other members of the Brewer Firm since approximately May

2018. I am being paid for my time at the rate of $690/hour.

8.      Much of my work in this proceeding has focused on the declarations of James M.

McCormack, Richard E. Flamm, and Nancy J. Moore filed in support of the NRA's Response to

Defendants' Motion to Disqualify ("Response"). Although I respect these individuals, I believe

their declarations exceed the boundaries for expert testimony in this proceeding and reflect

opinions and conclusions more aptly labeled as advocacy rather than true expert testimony.

9.      My opinions in this declaration are based on my review of the documents provided

to me by Defendants' counsel, Dorsey & Whitney LLP ("Dorsey"). Dorsey has provided me with

all documents I requested and has been responsive to all my questions. There may be other

documents of which I am unaware. I have not had the privilege of reviewing at least one of the documents Mr. McCormack relied upon, that being the declaration of Skye Brewer. I prepared this declaration and formed these opinions for use in this proceeding only.

10.    My opinions are based upon the facts of this case and may not be transportable to other cases. I may be requested to issue opinions on other subjects during this litigation, and I may review additional documents. Accordingly, I reserve the right to form additional opinions and modify or supplement these opinions based upon further requests and my continued review of the documents and facts as discovery continues.

**Summary of Expert Witness Role/Process**

11.    As an attorney acting as an advocate for my clients, I have on occasion been accused of hyperbole and excessive enthusiasm for the position of those clients. On some occasions I was guilty of that offense. As an expert witness, however, I am not an advocate and am not charged with determining the outcome of this litigation. On the contrary, my job as an expert witness is to provide a reasoned analysis of the facts, without regard to whether it helps or hurts the party who retained me. I have endeavored to adhere to that role throughout this engagement, although others will have to decide the extent to which I have succeeded.

12.    Expert witness testimony is, by definition, opinion testimony. For an expert to be permitted to express an opinion, the expert must believe that the subject of the opinion is probable—meaning more likely than not. This often is expressed as a probability of 51% or greater. In other words, an expert need not be 100% absolutely certain of an opinion; few opinions can be expressed with that level of certainty. But there is a significant difference between the opinions the expert may hold with the level of certainty of 51% as contrasted with a much higher level of

certainty. Where possible, I have attempted to express the level of certainty I attach to my opinions so that they can be fairly evaluated by the judge in this case.

13.     Expert witness testimony in connection with disqualification motions is burdened further by the possibility that the expert witness may be testifying about matters strictly within the judge's province—most commonly matters of law. I have endeavored to avoid testifying on matters of law to be decided by the Court although my opinions are, of necessity, grounded in my understanding of the law on the relevant subjects. To the extent the Court believes I am testifying on matters of law within its province, or that I have misstated the law through my opinions, the Court will disregard my opinions and rely on its own opinions on such matters.

14.     Having conceded that my role is not that of an advocate for one of the parties, I admit I feel a level of advocacy for my profession as a whole. That duty is reflected in the Texas Disciplinary Rules of Professional Conduct, the ethical code to which all lawyers in the State of Texas must adhere. That code requires lawyers to take some level of personal responsibility for ensuring that other lawyers adhere to the ethical rules, for the benefit of both the legal profession and the public at large.

15.     I do not believe that it is within my province as an expert to opine on the admissibility of the parties' evidence, nor on the credibility or significance of the evidence, as both are matters for the judge to consider in this proceeding.  Where possible, my opinions are based upon the documents and the undisputed facts as revealed in the pleadings of the parties. There are times, however, where the parties tell different stories or view undisputed facts differently. The judge will decide whose version of the facts is correct on those occasions.  I do believe, however, that it is my duty to point out instances in which Mr. McCormack, Mr. Flamm, and Ms. Moore

DECLARATION OF COYT RANDAL JOHNSTON

failed to consider certain evidence, or made improper admissibility or credibility determinations reserved for the judge.

16.     As stated above, I have significant experience in the fields of legal malpractice, attorney fee disputes, professional liability matters, and legal ethics, which provide me with the requisite level of competence and expertise to render opinion testimony in these areas.  Although I am an experienced attorney, I am no more qualified to render opinions on certain matters in this proceeding than any other licensed attorney, including issues such as standing, waiver, and various evidentiary matters.  I believe that opinion testimony on these issues impermissibly crosses the line from expert testimony into advocacy, and I will refrain from offering my opinions in this regard.  But to preserve the integrity of the expert witness process, I am obliged to point out instances where Mr. McCormack, Mr. Flamm, and Ms. Moore have rendered opinions outside their specific areas of expertise and therefore have begun to "advocate" in contravention to the duty of an expert witness.

### Summary of Opinions

17.     Let me begin by stating that in my years as a Texas attorney practicing, speaking, and publishing on the topic of professional ethics, I do not recall a case with this particular set of facts, where one family member is acting as the attorney for a plaintiff suing a defendant company run by the attorney's father- and brother-in-law.  In conjunction with the allegations set forth by both parties, I find that this case presents unique and compelling ethical inquiries for which, to my knowledge, no legal precedent exists.  Regardless, I am of the opinion that the issues in this case cannot be addressed merely through the analysis of the black-letter rules, but instead, in keeping with the law of the Fifth Circuit, require a consideration of the purpose and general principles underlying the applicable codes of professional ethics.

DECLARATION OF COYT RANDAL JOHNSTON                                             Page 6

18.     As an initial matter, I find that the opinions of Mr. McCormack, Mr. Flamm, and Ms. Moore exceed the established boundaries for expert testimony in this proceeding. Each of their opinions relies upon a weighing of evidence and rendering of intermediate legal opinions that are outside their respective areas of expertise, which compromises the reliability and helpfulness of their expert testimony overall.

19.     Furthermore, I do not believe that the opinions of Mr. McCormack, Mr. Flamm, and Ms. Moore are sufficiently grounded in all available evidence to support the conclusions they make.  In addition to engaging in improper fact-finding, each declarant makes his or her own subjective determinations of what evidence to consider and what evidence to exclude, providing no explanation for their omissions.  I believe that the exclusion of certain evidence is improper in light of the general standard for evaluating a motion to disqualify in the Fifth Circuit, which calls for a less "mechanical" approach and, instead, a more comprehensive evaluation of the totality of the circumstances.  In my opinion, an analysis of all facts and circumstances in this proceeding is warranted, and I do not believe that Mr. McCormack, Mr. Flamm, or Ms. Moore sufficiently engaged in this inclusive evaluation in a manner sufficient to support their conclusions.

20.     Because an opinion on the ultimate issue in this matter relies upon too many intermediate conclusions of fact and law within the judge's exclusive province, I cannot, as an expert witness, render an opinion regarding whether Mr. Brewer and/or the Brewer Firm should be disqualified. But I disagree that the opposite is true—and I do not believe that Mr. McCormack, Mr. Flamm, or Ms. Moore can opine conclusively that *no* grounds for disqualification exist.

21.     To the contrary, I believe that when all facts and circumstances are considered, this case presents a unique situation that, to my knowledge, never has been addressed in any case law that I have found. I believe that the Court has a duty—for the litigants, for the legal profession,

and for society as a whole—to undergo a rigorous and "painstaking" factual analysis and determine, under the totality of the circumstances, if there is a "reasonable possibility" that an actual ethical impropriety has occurred. It is my opinion that Mr. McCormack, Mr. Flamm, and Ms. Moore, each engage in an inappropriately myopic analysis of each rule, analyzing only a single discreet rule and a selective group of facts at a time.

22.     If there is a "reasonable possibility" that Mr. Brewer engaged in improper communications with a represented party, if there is a "reasonable possibility" that Mr. Brewer used tactics to intentionally inflict emotional distress on the McQueen family, if there is a "reasonable possibility" that Mr. Brewer or any member of the Brewer Firm assisted the NRA to defraud or defame AMc, if there is a "reasonable possibility" that the animus existing between Mr. Brewer and the McQueen family caused Mr. Brewer to act in a manner unbefitting of the high standards of civility and human decency required for a Texas attorney, then the Court is well within its discretion to consider disqualification.

**Factual Background**

23.     The factual background for the Motion to Disqualify Mr. Brewer and the Brewer Firm is set out in the respective pleadings of the parties. I will list only those facts, allegations, and evidence that seem to have been omitted by Mr. McCormack, Mr. Flamm, and Ms. Moore in their declarations, or instances in which I believe Mr. McCormack, Mr. Flamm, and/or Ms. Moore engaged in an impermissible evaluation of the evidence in order to reach their conclusions. In setting out these background facts and allegations, I make no evaluation of their merits or the evidence cited in their support, although I have attempted to note instances where Plaintiff did not deny or refute Defendants' allegations or evidence. Where I have made reference to passages from

either of the party's pleadings, I incorporate any evidence cited in those passages within my reference.

- Mr. Brewer is married to Skye McQueen Brewer, the daughter of AMc's late CEO, Angus McQueen, and the sister of its current CEO, Revan McQueen. The personal relationship between Mr. Brewer and the McQueen family, particularly Angus McQueen, has apparently been characterized by an amount animosity for the last twenty years.[1]  Although Plaintiff's Response includes a single statement that this is "false,"[2] I did not see any evidence establishing that the personal relationship between Mr. Brewer himself and Angus McQueen was in fact positive.[3]  Rather, most of the evidence and analysis that addresses the relationship concedes to an amount of "animus" that appears to have existed between the two men.[4]

- As part of the Brewer Firm's engagement agreement with the NRA, the scope of work appears to contemplate the intentional termination of the NRA's third-party contracts: "litigation and strategic needs arising from the termination or potential termination of key corporate relationships by contract counterparties."[5]

- Certain NRA executives were initially concerned about Mr. Brewer's familial relationship with Angus and Revan McQueen.[6]  In support, Defendants present deposition testimony from former NRA President, Lt. Col. Oliver North, former General Counsel to the Board of Directors, Steve Hart, and current NRA General Counsel, John Frazer. Mr. Frazer testified that he agreed that the family relationship could create the "appearance of a conflict."[7]

- Since his engagement, the NRA has had internal complaints by one or more NRA employees that the Brewer Firm engaged in practices such as duplicative billing, prioritizing payments to itself over other NRA vendors, monitoring NRA employee email accounts, and threatening and intimidating NRA staff who process its bills.[8]

- Mr. Brewer and the Brewer Firm made a series of communications and media statements during 2018 and 2019, which appear to have correlated with certain life events of the McQueen Family, which Mr. Brewer would have known as a result

---

[1] ECF 79, Defendants' Brief in Support of Motion to Disqualify ("Motion to Disqualify") at ¶¶ 2-3; ECF 80 at Ex. B (Declaration of Revan McQueen).
[2] ECF 121 (Plaintiff's Response) at 4.
[3] ECF 122 at Ex. 49 (Declaration of Travis Carter). The Declaration of Travis Carter (May 4, 2020) states that Carter himself had occasionally referred business to AMc and that he had personally worked with AMc on numerous projects on behalf of AMc, but it does not directly speak to the personal relationship between Mr. Brewer and the McQueen family.
[4] ECF 122 at Ex. 45 (Declaration of John Frazer) at ¶ 4; ECF 81 at Ex. A-2 (Steve Hart Depo.) at 214:1-12, 242:11-12.
[5] ECF 31 (Defendants' Amended Complaint) at ¶ 56, Ex. C.
[6] Motion to Disqualify at ¶ 10, 25, 40.
[7] ECF 81 at A-6 (Frazer Depo.) at 374:7-376:18.
[8] Motion to Disqualify at ¶ 11, Ex. A-67.

---

DECLARATION OF COYT RANDAL JOHNSTON

of the family relationship.[9]  Defendants believe these events were not accidental but strategically timed with the intention of inflicting emotional distress on the McQueen family.[10]  I note that Plaintiff's Response does not substantively deny or refute these claims.[11]   Nor is this issue addressed in any of the supporting declarations or other exhibits offered in support of Plaintiff's Response.

- The Brewer Firm has a team of employees that performs public relations services.[12] Although the parties dispute whether the Brewer Firm is a "competitor" of AMc, it appears that the Brewer Firm is performing one or more services that AMc used to provide for the NRA in the area of public relations and crisis management.[13]

- While he was still NRA President in 2019, Lt. Col. Oliver North began a letter-writing campaign to investigate the fees being charged to the NRA by the Brewer Firm.[14]  He was never provided with access to the information he requested.[15]  North testified that he sought to ensure that the Brewer Firm was complying with NRA vendor policies due to concerns raised by NRA members.[16]  The Motion to Disqualify presents this investigation as one possible motive for Mr. Brewer's alleged retaliation against North, achieved by tortiously interfering with the NRA's contract with AMc and accusing both AMc and North of engaging in extortion.[17] Plaintiff's Response does not specifically deny or refute these claims regarding North's investigation.

- In short succession during 2019, Lt. Col. North and several other board members, vendors, and key members of NRA leadership resigned or were fired from their respective positions.  The Motion to Disqualify describes this mass exodus as an "ousting" of certain dissenters who questioned the retention of Mr. Brewer or the Brewer Firm, which was supported by the testimony of Col. North and Steve Hart.[18] Plaintiff's Response does not deny or refute that these oustings occurred or the reason they allegedly occurred.

- The NRA first became adverse to AMc no later than September 5, 2018.[19]  The three audits that the NRA conducted of AMc occurred in September 2018, November 2018, and February 2019. Defendants believe that all audits occurred

---

[9] Declaration of Revan McQueen ¶¶ 14-35.

[10] Motion at to Disqualify at § C.

[11] Plaintiff's Response at 4.

[12] Declaration of Travis Carter (May 4, 2020).

[13] *Id.*; Motion to Disqualify at ¶¶4-5;

[14] Motion to Disqualify at ¶¶ 9-12.

[15] Motion to Disqualify at ¶ 12.

[16] ECF 81 at Ex. A-3 (Oliver North Depo.) at pp. 107:8-110:7, 128:20-130:7, 135:6-137:14, 141:3-18, 152:9-153:16, 169:23-170:7, 181:7-183:14, 184:17-186:17.

[17] Motion to Disqualify at ¶¶ 13-19.

[18] *See id.*

[19] *See* April 22, 2019 Correspondence from Wayne LaPierre to Mark Dyscio, dated April 22, 2019 (LaPierre explains that "[t]he NRA and I have common legal interests in the litigation against Ackerman McQueen which crystallized before the September Board meeting and colored the discussion that day."). I understand the September 2018 Board meeting referenced by Mr. LaPierre began on September 5, 2018 in Dallas, Texas.

---

DECLARATION OF COYT RANDAL JOHNSTON

after the NRA's decision to terminate the contract and sue for breach of the records-inspection clause.[20]  Plaintiff's Response does not refute or deny this allegation.

- Since that date, Revan McQueen states that Mr. Brewer twice threatened Revan and Angus with indictment, once communicated through Wayne LaPierre, and once communicated through a member of Revan McQueen's family.[21]  Plaintiff's Response does not deny or refute these allegations.

- Revan McQueen also states that, since the date the NRA's first lawsuit was filed on April 12, 2019, Mr. Brewer sent messages through members of the McQueen family and, on one occasion, even encouraged Mr. McQueen to "break privilege" and call Mr. Brewer to learn "how to get out of this."[22]  Plaintiff's Response does not deny or refute these allegations.

- Defendants' counterclaims also describe another possible motive for the NRA to terminate its relationship with AMc, specifically, termination of its contract with AMc "for cause" in order to avoid payment of large termination fees.[23]  Defendants believe that the Brewer Firm was helping the NRA fish for evidence that would support this type of "for cause" termination, which could be achieved by showing AMc's failure to comply with the "records inspection" clause of the contract.[24]  In support of this allegation, Mr. Hart testified that the documents that the Brewer Firm was requesting from AMc were in fact unreasonable.[25] AMc also outlined the three different audits that AMc underwent, which were conducted within a period of six months.[26]  Following these audits, AMc did not receive any follow-up requests for information or receive any complaints that documents were withheld.[27]  Defendants believe these audits were "fake," meaning they did not represent any legitimate need for information by the NRA but were specifically designed create the appearance of non-compliance and wrongdoing.[28]

- Revan McQueen states that in October of 2018, Mr. LaPierre promised him that the Brewer Firm would no longer be handling matters adverse to AMc.[29]  Mr. McQueen states that AMc was prepared to resign his business with AMc over his concerns about Mr. Brewer's representation against AMc, but that Mr. LaPierre implored him to "stick with" him.[30]  Mr. McQueen further states that, in reliance on this promise, AMc agreed to undergo a nine-day audit by an independent firm

---

[20] Motion to Disqualify at ¶ 21.
[21] Declaration of Revan McQueen at ¶¶ 23, 31.
[22] Id. at ¶ 31.
[23] ECF 31 (Defendants' Amended Counterclaim) at ¶¶ 27-29, 56, 65-67.
[24] Motion to Disqualify at ¶¶ 20-26.
[25] ECF 81 at Ex. A-2 (Steve Hart Depo.) at 230:2-231:3, 231:13-232:18, 304:18-306:12.
[26] Motion to Disqualify at ¶¶ 20-21; Declaration of Revan McQueen.
[27] Declaration of Revan McQueen.
[28] Motion to Disqualify at ¶¶ 20-26.
[29] Declaration of Revan McQueen at ¶¶ 24-25.
[30] Id. at ¶ 25.

---

DECLARATION OF COYT RANDAL JOHNSTON                                          Page 11

called Forensic Risk Alliance (FRA).[31]   Although Mr. LaPierre promised independence, a 17-year employee of the Brewer Firm, Susan Dillon, went to work for FRA just before the AMc audit and participated in that audit without AMc's knowledge.[32]   Moreover, Ms. Dillon has since returned to work for the Brewer Firm.[33]   Plaintiff does not deny or refute these allegations, nor do any of its declarants or experts provide an explanation for Ms. Dillon's surreptitious employment with FRA, or indicate whether the NRA was aware of this arrangement when it engaged FRA.

- On the date the NRA filed its first lawsuit against AMc, April 12, 2019, the NRA was already familiar with and in possession of at least one document it claimed in its pleadings had been withheld.[34]   Plaintiff's Response does not deny or refute this allegation.

- Since at least 1988, Mr. Brewer has built his career and professional reputation upon a disfavored and ethically questionable style of litigation dubbed "Rambo justice" and has been described as the poster child for "scorched-earth" litigation.[35]   Although I approach inclusion of Mr. Brewer's reputational background with caution, I do not believe a comprehensive ethical analysis of this case can be completed without some consideration of the unique approach to "zealous advocacy" Mr. Brewer promotes.  The judge will determine any applicable issues of admissibility.

- In addition, in an article published in May 2019, Mr. Brewer promotes a different professional philosophy that focuses on advancing clients' reputational interests and using "the court of public opinion" to gain strategic advantages in their advocacy.[36]   Apparently a longstanding philosophy, even in Mr. Brewer's 1998 "Rambo Justice" article, he discusses the use of media to create a "climate" that will produce a "favorable outcome" for his client without the need for the courtroom or evidence.[37]

- Since the beginning of litigation between the two parties in April 2019, Mr. Brewer or a member of the Brewer Firm has been quoted in at least 16 different news articles regarding the claims made in the litigation and including unfavorable statements about AMc.[38]  I have not seen evidence that AMc initiated any of the media statements, including the first article covering the parties' dispute.

---

[31] Id. at ¶ 29.
[32] Motion to Disqualify at ¶ 26.
[33] Id.; https://www.brewerattorneys.com/susan-dillon.
[34] Motion to Disqualify at ¶¶ 9, 13, 47.
[35] Id. at ¶ 32, Ex. A-60.
[36] Id. at Ex. A-7.
[37] Id. at Ex. A-60.
[38] Id. at Appx. A.

---

DECLARATION OF COYT RANDAL JOHNSTON

- The Brewer Firm's media statements appear to revolve around two main themes or "narratives."[39]  The first narrative involves claims that AMc did not comply with the NRA's requests for books and records.  The second narrative involves claims that AMc was involved in a conspiracy and "coup" attempt against the NRA's Executive Vice President, Wayne LaPierre.

- Defendants believe that Mr. Brewer intentionally assisted the NRA and Mr. LaPierre in manufacturing evidence to support the "records inspection" narrative for the purpose of creating the false appearance of a breach of contract by AMc.[40]  In support of these claims, Defendants offer the declaration of Revan McQueen, the deposition testimony of Steve Hart, deposition testimony of Lt. Col. North, deposition testimony of John Frazer, and the evidence of Susan Dillon's temporary employment with the outside auditing firm.[41]  Defendants' believe this conduct further constitutes fraud and defamation, which are two of AMc's counterclaims in this lawsuit.[42]

- Defendants believe that Mr. Brewer and Mr. LaPierre's Chief of Staff, Joshua Powell, intentionally manufactured evidence to support the "coup" narrative, and funneled this evidence to the media, in order to harm and discredit AMc while giving the NRA an advantage in the "court" of public opinion.[43] In support of these claims, Defendants offer correspondence between Lt. Col. Oliver North and other NRA executives, deposition testimony of Lt. Col. Oliver North, deposition testimony of Steve Hart, Millie Hallow, Carolyn Meadows, a letter from Mr. LaPierre to the NRA Board of Directors, and a news article discussing the same issue the next day.[44]  Defendants also believe this conduct constitutes defamation.[45]  Plaintiff's Response does not refute or deny these claims.

## Discussion

24.    I begin my analysis of these facts with the entrenched Texas case law that

"[d]isqualification of a party's counsel is a severe remedy." *In re Nitla S.A. de C.V.*, 92 S.W.3d

---

[39] Id. at Appx. A.

[40] Motion to Disqualify at ¶¶ 43, 47.

[41] Declaration of Revan McQueen at ¶ 21-29; Motion to Disqualify at ¶ 15, 26; Steve Hart Depo. at pp. 230:2-232:18; ECF 81 at Ex. A-6 (John Frazer Depo.) at pp. 251:10-257:8, 260:9-19; Oliver North Depo. at pp. 36:12-37:17, 40:18-42:25, 43:25-47:6, 102:14-103:19, 197:14-202:4.

[42] Motion to Disqualify at ¶

[43] Motion to Disqualify at ¶¶ 16-19, 43, 50.

[44] Oliver North Depo at pp. 169:10-170:7, 180:22-182:4; Ex. A-16, Correspondence from Col. Oliver North to Wayne LaPierre, dated March 31, 2019; Ex. A-21, Memorandum From Col. Oliver North to the NRA Audit Committee, dated March 22, 2019;  Ex. A-22, Correspondence from Col. Oliver North to John Frazer and Charles Cotton, dated April 18, 2019; Steve Hart Depo at pp.395:11-17; Steve Hart Depo at pp.395:11-17; ECF 81 at Ex. A-33 (Millie Hallow Depo.) at pp. 183:1-10, 189:2-9, 202:6-9, 205:19-208:19; Ex. A-28 (Carolyn Meadows Depo.) at pp. 182:4-183:1.

[45] Motion to Disqualify at ¶¶ 43, 50.

419, 422 (Tex. 2002) (orig. proceeding) (per curiam). "It can result in immediate and palpable harm, disrupt trial court proceedings, and deprive a party of the right to have counsel of choice." *Id*. "Disqualification can delay proceedings in the trial court, require the client to engage a successor attorney, and, in appropriate cases, deprive the client of work product done on his behalf by the disqualified attorney." *In re Tex. Windstorm Ins. Ass'n*, 417 S.W.3d 119, 129 (Tex. App.— Houston [1st Dist.] 2013, orig. proceeding). "Because of the serious consequences of disqualification of opposing counsel, such motions can be misused for delay or to exert inappropriate leverage to force a settlement." *Id*. "The law strongly discourages the use of motions to disqualify as tactical weapons in litigation." *Id.* As a result, disqualification principles should be applied with "caution" by the presiding court. *See, e.g.*, Tex. Disc. R. Prof. Conduct 1.06, cmt. 17; *Grosser-Samuels v. Jacquelin Designs Enters., Inc*., 448 F. Supp. 2d 772, 780 (N.D. Tex. 2006).

25.     With these restrictive principles in mind, however, a lawyer has a "special responsibility" to the quality of justice and has a professional duty to "maintain the highest standards of ethical conduct."  ABA Model R. Prof. Conduct (Model R.), Preamble ¶ 1 Tex. Disc. R. Prof. Conduct (Tex. R.) Preamble ¶ 1.  Under these governing professional standards, a lawyer's conduct "should conform to the requirements of the law," not only in representing his clients, but also in his "business and personal affairs." Tex. R. Preamble at ¶ 4; Model R. Preamble at ¶ 5.  A lawyer should use the law's procedures only for "legitimate purposes" and never to "harass or intimidate others." Model R. Preamble at ¶ 5; Tex. R. Preamble at ¶ 4.  As such, the bounds of "zealous advocacy" are necessarily limited by a lawyer's obligation to maintain "honest dealings with others" and a "professional, courteous, and civil attitude toward all persons involved in the legal system."  Model R. Preamble at ¶ 2, 9; Tex. R. Preamble at ¶ 2.

26.     Both the Texas Rules and the ABA Model Rules make clear that they are simply a "framework" for supporting the "many difficult issues of professional discretion" that may arise in the legal profession. Model R. Preamble at ¶ 9; Tex. R. Preamble at ¶ 7.  Accordingly, the rules do not purport to "exhaust the moral and ethical considerations that should inform a lawyer." Model R. Preamble at ¶ 16; Tex. R. Preamble at ¶ 11.  In my experience, ethical issues often arise for which there are no prescribed rules or guidelines but which must be addressed by the conscience of the lawyer, the court, and the legal community in the best interest of society.  *See* Model R. Preamble at ¶ 7; Tex. R. Preamble at ¶ 9.  The Northern District of Texas, in particular, has long been a champion of "honesty and fair play," through the important notion that lawyers owe an "unswerving duty" "to the public they serve and to the system of justice in which they practice." *See Dondi Props. Corp. v. Commerce Sav. & Loan Assoc.*, 121 F.R.D. 284, 288 (N.D. Tex. 1988).

27.     With these guiding principles in mind, I turn to the prevailing approach to disqualification in the Fifth Circuit, which affirmatively imposes upon the district court the "duty and responsibility of supervising the conduct of attorneys who appear before it*." In re Am. Airlines, Inc.*, 972 F.2d 605, 611 (5th Cir. 1992).

28.     Curiously, neither Mr. McCormack nor Ms. Moore state or rely upon the Fifth Circuit standard.  However, I agree with Mr. Flamm, who states in his Declaration:

> In light of the extreme nature of the disqualification remedy, as well as the fact that disqualification motions are often interposed for strategic purposes, the Fifth Circuit has made it clear that an "inflexible application of a professional rule is inappropriate" [*FDIC v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1314 (5th Cir. 1995)]; and that the "**rule of disqualification is not mechanically applied in this Circuit**." *Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1569 (5th Cir. 1989); *Church of Scientology of California v. McLean*, 615 F.2d 691, 693 (5th Cir. 1980); *Leleux-Thubron v. Iberia Parish*, 2015 U.S. Dist. LEXIS 8020, at *10 (W.D. La. Jan. 23, 2015) ("The rule of disqualification is not mechanically applied in the Fifth Circuit"); *OneBeacon Ins. Co. v. T. Wade Welch*

*& Assocs.*, 2012 U.S. Dist. LEXIS 14663, 9 (S.D. Tex. 2012) ("In [this circuit], courts 'do not mechanically apply the rules of disqualification'").[46]

Mr. Flamm also correctly describes the fact-intensive inquiry courts must undergo, which requires:

> a thoughtful and careful – if not "**painstaking**" – weighing of all of the relevant **facts and circumstances** in order to assess, on a **case by case basis** whether disqualification would be a necessary and appropriate remedy for that violation.[47]

*See also In re ProEducation Int'l, Inc.*, 587 F.3d 296, 300 (5th Cir. 2009).  In addition to this "painstaking" factual analysis, the court must also balance the public interests at stake with the rights of the litigants.  *See id.*  Although the Fifth Circuit cautions against imposing disqualification "cavalierly," (*see id.*) I am of the opinion that certainly the opposite must also be true—that the decision ***not*** to disqualify must not be made "cavalierly" either.

29.     I have read and am familiar with the opinions and conclusions of Mr. Flamm, Mr. McCormack, and Ms. Moore.  Although it is my opinion that Mr. Flamm has rightly announced the legal standard, I do not believe that Mr. Flamm, Mr. McCormack, or Ms. Moore actually performed the type of "painstaking" factual analysis contemplated by the Fifth Circuit.  Instead, I am of the opinion that each of my colleagues has engaged in the opposite: a "mechanical" application of the rules using only a limited set of applicable facts viewed in the light most favorable to the Plaintiff.  This not only represents an incorrect application of the law, but reveals a level of advocacy that is incongruous with the role of an expert witness in this proceeding. *See Estate of Sowell v. United States*, 198 F.3d 169, 171 (5th Cir. 1999); *Askanase v. Fatjo*, 130 F.3d 657, 672-73 (5th Cir. 1997).

## A.  Conflicts of Interest – Texas Rule 1.06(b), ABA Model Rule 1.7

30.     First, regarding Defendants' claim that Mr. Brewer and, by extension, the Brewer Firm should be disqualified due to Mr. Brewer's conflict of interest, I believe that there are simply

---

[46] Declaration of Richard E. Flamm at ¶ 88 (emphasis added).
[47] *Id.* at. ¶ 90 (citing *Duncan v.Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 646 F.2d 1020, 1021 (5th Cir. 1981) (emphasis added).

DECLARATION OF COYT RANDAL JOHNSTON                                    Page 16

too many intermediary issues of fact and law that must be determined in order to form an opinion regarding whether a conflict exists here.  Additionally, because I believe Mr. McCormack, Mr. Flamm, and Ms. Moore have engaged in advocacy by opining on these intermediary issues, I do not believe that their conclusions have the proper foundation required for expert testimony.

**Standing**

31.     As stated above, I do not provide an opinion herein on whether Defendants have standing to bring a motion to disqualify against Mr. Brewer and the Brewer Firm.  That is for the judge to decide.  However, I do not believe that Mr. McCormack, Mr. Flamm, or Ms. Moore have correctly or comprehensively stated the law, nor do I believe that it is possible or appropriate for any of my colleagues to conclusively opine that Defendants have "no standing" to bring this motion.  Again, each of these declarants has stated the law in the light most favorable to Plaintiff's position while omitting law that would be favorable to Defendants, which is advocacy.

32.     For example, Mr. Flamm and Ms. Moore (perhaps because they are not licensed in Texas and thus have no greater knowledge of the Texas disciplinary rules than any other attorney conducting legal research) do not cite the comment applicable to this situation, Texas Rule 1.06, Comment 17.  This Comment states that although "raising questions of conflict of interest is primarily the responsibility of the lawyer undertaking the representation," a court may nevertheless address the issue *sua sponte* when "there is reason to infer that the lawyer has neglected the responsibility." Tex. R. 1.06, cmt. 17.  It goes on to state that "where the conflict is such as clearly to call in question the fair or efficient administration of justice, opposing counsel may properly raise the question." *Id.*

33.     Although Mr. McCormack does acknowledge this language from Comment 17, he concludes (without explanation) that only Mr. Brewer or the Brewer Firm have standing to raise the

conflict, and further concludes (without explanation) that this case presents no "exceptional circumstance" that might trigger the "fair or efficient administration of justice."[48]  It is my opinion that Mr. McCormack did not undertake a "painstaking" analysis to determine whether the specific facts and circumstances of this case might prevent, or have already prevented, "the fair or efficient administration of justice."

34.    Moreover, none of the Declarations point to the existing case law where a court *has* relied upon Comment 17 to confer standing on a party seeking to disqualify opposing counsel.  *See, e.g.*, *In re Representation of Multiple Targets: Charles Roark*, No. EP-06-CR-1369-FM, 2007 U.S. Dist. LEXIS 108561, at *25-26 (W.D. Tex. July 26, 2007) ("Comment 17 clearly gives [opposing counsel] standing to alert the Court to conflicts of interest and similarly authorizes the Court to act to remedy any such situation."); *In re C.G.H.*, No. 12-12-00433-CV, 2013 Tex. App. LEXIS 8202, at *6 (Tex. App.—Tyler July 3, 2013, no pet.) ("Comment 17 is clear. Opposing counsel has standing to seek disqualification, if a conflict which violates the rules exists and is sufficiently severe to call in question the fair or efficient administration of justice.") (internal quotations omitted); *In re Seven-O Corp.*, 289 S.W.3d 384, 389 (Tex. App.—Waco 2009, no pet.) ("Relators' counsel have standing to properly raise the question of [opposing counsel's] role because it clearly calls into question the fair administration of justice.")

35.    Accordingly, at least one possible basis exists for conferring standing upon Defendants and, as such, it is improper for Mr. McCormack, Mr. Flamm, and Ms. Moore to declare definitively that Defendants have "no standing" to seek disqualification.

**Appearance of Conflict**

---

[48] ECF 122 at Ex. 47 (McCormack Declaration) at ¶ 20.

36.     Under Texas Rule 1.06(b), "a lawyer shall not represent a person if the representation of that person reasonably appears to be or become adversely limited by the lawyer's or law firm's responsibilities to another client or to a third person or by the lawyer's or law firm's own interests." Tex. R. 1.06(b)(2).  Fifth Circuit courts have clarified that bare "appearance" alone is usually not sufficient due to its subjectivity of the inquiry and therefore requires the moving party to show at least a "reasonable possibility that some identifiable impropriety actually occurred." *FDIC v. United States Fire Ins. Co.*, 50 F.3d 1304, 1316 (5th Cir. 1995); *Woods v. Covington Cty. Bank*, 537 F.2d 804, 813 (5th Cir. 1976).

37.     If the moving party meets this "reasonable possibility" standard, then the court must "balance the likelihood of public suspicion against a party's right to counsel of choice." *FDIC*, 50 F.3d at 1314.  In the Northern District of Texas, public suspicion has been held to occur when an attorney's conduct would "invite skepticism of the legal system," which is especially true in high profile cases where the public is already aware of the disqualification issue.  *See Hill v. Hunt*, No. 3:07-CV-02020-O, 2008 U.S. Dist. LEXIS 68925, at *52-53 (N.D. Tex. Sep. 4, 2008).

**<u>Mr. Brewer's Conflict of Interest</u>**

38.     Defendants' Motion to Disqualify identifies six factual categories which they believe constitute grounds for Mr. Brewer's disqualification.[49]

> (1) Mr. Brewer manufactured conflicts and tension between the NRA and AMc to interfere with the business relationship;
> (2) Mr. Brewer and the Brewer Firm are direct business competitors with AMc in the public-relations field;
> (3) Mr. Brewer and Angus McQueen had a history of personal animosity that impairs his representation of the NRA and prejudices Defendants;
> (4) Mr. Brewer's financial motives will cause him to draw out the lawsuit with AMc longer than necessary;
> (5) Mr. Brewer is suing his own family, which hampers Revan McQueen's ability to litigate this lawsuit as aggressively as he might otherwise;

---

[49] Motion to Disqualify ¶¶ 38-43.

DECLARATION OF COYT RANDAL JOHNSTON                                    Page 19

(6) Mr. Brewer is a "principal actor and tortfeasor" in the NRA's underlying litigation against AMc.

39.     For each category, Defendants have presented at least some evidence in support of their assertions, mostly in the form of deposition testimony.  I do not provide any opinion regarding the credibility, sufficiency, or admissibility of this evidence.

40.     Although Mr. McCormack, Mr. Flamm, and Ms. Moore each opine that no conflict exists, I believe these opinions are improper for two reasons.  First, their conclusions rely upon too many factual assumptions and weighing of evidence reserved for the judge.  Second, even if certain factual assumptions were allowable in this circumstance, the facts were not applied to the prevailing law in the Fifth Circuit, as discussed above, requiring an intensive analysis of all the facts and circumstances.  Instead, each expert mechanically approached each of Defendants' six categories, considering each allegation and supporting evidence inside a vacuum, as if no other facts or allegations existed.  Essentially, they each applied a "sever-and-dispatch" approach that appears to be diametrically opposed to the proper approach requiring consideration of all circumstances together.

41.     For example, in paragraph 22 of his declaration, Mr. McCormack concludes that there is no express conflict of interest when a law firm directly competes with an opposing litigant. While this may be true by itself, as it is within the hypothetical example he provides, it does not take into account all of the potential "facts and circumstances" involved in this particular case: the family relationship, the history of animosity, the personal business interests, among others. Likewise, Mr. McCormack opines that there is nothing explicitly conflicting about the fact that AMc's CEO, Revan McQueen, must defend litigation brought by his own brother-in-law.[50] Again, in a vacuum where the family relationship was the only issue, this may be true. But Mr.

---

[50] McCormack Declaration at ¶ 24.

McCormack fails to consider any evidence of the possible competition between the businesses, the history of animosity, the evidence in support of Defendants' claims that Mr. Brewer tortiously participated in the events underlying this lawsuit, or the evidence in support of their claims that Mr. Brewer and his law firm are using their law licenses to carry out the competition. Mr. McCormack's opinions do not consider the totality of the circumstances, or, in the alternative, they inherently imply that Mr. McCormack has made a judgment call on every piece of Defendants' evidence and deemed it irrelevant, either of which is improper.

42.     Ms. Moore engages in a similar analysis, but using even fewer facts than Mr. McCormack.  Citing nothing in support, Ms. Moore announces she will not consider certain evidence because it is "disputed," and therefore "should not serve as the basis for disqualification."[51]  I am not aware of this particular standard and am of the opinion that the judge may resolve any such "disputes" sitting as fact-finder for purposes of this proceeding.  But relying on this unsupported proposition and Plaintiff's declarations, Ms. Moore ignores Defendants' claims and evidence offered in support of Mr. Brewer's tortious interference with AMc's contract, his financial motives, and his other possible tortious conduct, including fraud and defamation.  She, too, analyzes each of the allegations in isolation—the "sever-and-dispatch" approach—rather than in the context of all of the others.

43.     Mr. Flamm attempts to analyze Defendants' evidence to some degree. But even then, his analysis reflects only a granular view of the few items of evidence he selects.[52]  I confess that I do not understand Mr. Flamm's reasoning for the evidence he chose to analyze, however, as he did not appear to examine any of the evidence Defendants' presented on pages 17–18, which sets out Defendants' primary conflict-of-interest argument. Instead, Mr. Flamm engaged in a

---

[51] ECF 122 at Ex. 50 (Moore Declaration) at ¶ 13.
[52] ECF 22 at Ex. 51 (Flamm Declaration) at ¶¶ 44-55.

scattered examination of the word "conflict" used throughout the motion (everywhere *except* page 17–18), his semantic disagreement with its use, a seemingly random selection of evidence, and various conjectures about what Defendants might have meant to prove with it.

44.     In addition to the differences in their factual analyses, Mr. McCormack, Mr. Flamm, and Ms. Moore each engaged in similarly unique legal analyses, each relying upon different law in support of their propositions.

45.     I say all this only to illustrate that the differences in the analyses undergone by Mr. McCormack, Mr. Flamm, and Ms. Moore underscore the larger problem with expert opinions on these topics.  I do not believe that three different experts analyzing the law and facts three different ways can properly or realistically be viewed as reliable or helpful to the Court.

46.     It is my opinion that the Court is obliged to consider each of Defendants' six allegations of conflict, along with all evidence presented in Defendants' Motion (not just the "undisputed" evidence), to properly undergo the rigorous factual analysis required for a motion to disqualify in the Fifth Circuit.

47.     Regardless of the indifference with which Plaintiff, along with Mr. McCormack, Mr. Flamm, and Ms. Moore, seem to view the family relationship between Mr. Brewer and Mr. McQueen, it is no great stretch, perhaps within the realm of "judicial notice," to imagine that the general public would have reason to be suspicious of Mr. Brewer's continued representation of Plaintiff against his brother-in-law's company.  I also understand that this is a high-profile case and that the "public" receives regular updates about this case through the news media, websites, and podcasts.

48.     In fact, it appears that such "public suspicion" has already arisen. On April 15, 2019, the Brewer Firm responded to public concerns in the New York Times about Mr. Brewer's

relationship with the McQueen family immediately after filing its first lawsuit on April 12, 2019.  In the article, Brewer Firm employee, Travis Carter, responded, "the familial relationship has no bearing whatsoever on the N.R.A.'s litigation strategy."[53]

## B.  Communication with Represented Persons – Texas Rule 4.02, Model Rule 4.2

49.     Regarding the issue of whether Mr. Brewer and the Brewer Firm violated the rule against communicating with a represented party, it is my opinion that Mr. McCormack, Mr. Flamm, and Ms. Moore each engaged in an improper analysis of the weight and admissibility of the evidence in reaching their conclusions.  Because these conclusions are within the judge's province, I do not believe that an expert may properly provide expert opinion testimony on the ultimate issue.

50.     As Mr. Flamm states: "The charge that a lawyer has violated the 'unauthorized communications' rule is a serious one . . . ."  I agree.   But I disagree with his subsequent proposition that, in light of the seriousness of the allegation, that a motion to disqualify must include a "detailed discussion of relevant case law."[54]  In a situation where a party presents evidence in support of a violation of the letter of a rule, I know of no requirement (and Mr. Flamm points to none) to produce additional supporting case law simply for good measure.

51.     Mr. McCormack, Mr. Flamm, and Ms. Moore each make several speculations (all in the Plaintiff's favor) about Mr. McQueen's reasons for making the declaration, the reasons for its timing, and the reasons for the omission of the names of his family members, each concluding that the declaration itself is "inadmissible" due to some type of fatal lack of detail.[55]  But if speculating were allowed, I could certainly come up with alternative reasons why Mr. McQueen's

---

[53] Motion to Disqualify at Appx A. (Danny Hakim, *NRA Sues Contractor Behind NRATV*, New York Times, Apr. 15, 2019).
[54] Flamm Declaration at ¶ 68.
[55] McCormack Declaration at ¶ 27; Flamm Declaration at ¶ 68-72; Moore Declaration at ¶ 26.

declaration may be lacking certain details, such as a concern for the anonymity of innocent family members in a public filing, and would further argue that a lack of detail simply goes to the credibility of the evidence, not the admissibility. These alternative theories of fact and law simply go to show the particular susceptibility of evidentiary issues to advocacy, and thus, why expert witnesses should not be permitted to testify regarding the credibility or admissibility of evidence.

52.     Whatever weight the judge accords it, the evidence offered in support of this allegation comes from the declaration of Revan McQueen, who states that, on at least two occasions, Mr. Brewer passed messages to Mr. McQueen through members of their joint family: once to threaten indictment, once instructing him to "break privilege" and talk to Mr. Brewer about the case.[56] This is a serious allegation.

53.     Notwithstanding the musings of Mr. McCormack, Mr. Flamm, and Ms. Moore, I note that Plaintiff's Response does not attempt to deny the substance of these allegations but, like its experts, opts only to attack the admissibility of the declaration. Of course, Mr. Brewer himself could have offered his own declaration to expressly deny this allegation; for whatever reason, he declined to do so.

**C.  Respect for Rights of Third Persons – Texas Rule 4.04(b)**

54.     As noted above, Defendants have also accused Mr. Brewer of another serious violation, threatening Angus and Revan McQueen with indictment on two separate occasions.[57] If true, this could constitute a violation of Texas Rule 4.04(b) which prohibits a lawyer from threatening "criminal or disciplinary charges solely to gain an advantage in a civil matter."

---

[56] Declaration of Revan McQueen at ¶ 31, 36.
[57] Motion to Disqualify at ¶ 22; Declaration of Revan McQueen at ¶¶ 23, 31.

55.     Again, I note that Plaintiff did not deny or refute these allegations.  Likewise, neither Mr. McCormack nor Ms. Moore addressed this issue.  Only Mr. Flamm stated that he believed that Defendants had "not even alleged" a violation.[58]  Mr. Flamm is incorrect.

56.     Paragraph 22 of Defendants' Motion to Disqualify states: "After ramping up his "investigation" efforts, Mr. Brewer sent a message through LaPierre threatening to have A. McQueen and R. McQueen indicted by the Department of Justice for unidentified improprieties related to their work for the NRA."  Then again, at paragraph 30: "Plus, Mr. Brewer has repeatedly used fear to incite the McQueen family, including threatening indictment of A. McQueen and R. McQueen and accusing AMc of having leaks in its accounting department, all intentionally communicated through members of the McQueen family."  Both of these allegations are supported by the Declaration of Revan McQueen.[59]

57.     Mr. Flamm also states that Defendants "did not cite any legal authority" that disqualification would be "an appropriate remedy" even if a violation did occur.[60]  Again, Mr. Flamm is incorrect.

58.     The seminal case addressing this issue, which Defendants cite in paragraph 34 of their Motion, is *In re American Airlines*, recognizing that "[a] motion to disqualify counsel is the proper method for a party-litigant to bring the issues of conflict of interest ***or breach of ethical duties*** to the attention of the court." 972 F.2d 605, 611 (5th Cir. 1992) (emphasis added).  Although Mr. Flamm selectively cites *American Airlines* for other propositions more favorable to Plaintiff, he ignored this overarching principle, which establishes that all forms of unethical conduct may

---

[58] Flamm Declaration at ¶ 75.
[59] Declaration of Revan McQueen ¶¶ 23, 31.
[60] Flamm Declaration at ¶ 75.

be properly addressed in a motion to disqualify in the Fifth Circuit. *Id.*; *see also Musicus v. Westinghouse Elec. Corp.*, 621 F.2d 742, 744 (5th Cir. 1980).

59.     Thus, while I do not make any affirmative legal or factual conclusions regarding the disqualification of Mr. Brewer, I disagree with Mr. Flamm, and believe that Defendants have presented both facts and law that the judge may properly consider in undergoing its analysis of the facts of this case.

**D.   Trial Publicity – Texas Rule 3.07, Model Rule 3.6**

60.     Defendants next accuse Mr. Brewer of engaging in improper methods of trial publicity for the purpose of "materially prejudicing" this litigation against AMc under Model Rule 3.6 and Texas Rule 3.07.[61]   Mr. McCormack does not address this issue in his declaration.  Mr. Flamm and Ms. Moore both seem to be under the impression that Defendants did not cite to *any* "extra judicial" statements in their Motion to Disqualify.[62]   Both Mr. Flamm and Ms. Moore seem to have overlooked Defendants' Appendix A,[63] which is a compilation of news articles containing various "extra judicial" statements by Mr. Brewer and other members of the Brewer Firm in news articles, at least sixteen of which comment directly upon the NRA's litigation with AMc.  None of these articles are commenting upon COVID-19 or *Thomas the Tank Engine* NRATV episode, topics which seem to dominate Mr. Flamm and Ms. Moore's analyses due to their mutual oversight of Appendix A.  As a result, I believe that my colleagues' opinions will be particularly confusing and unhelpful for the Court on this topic.

61.     In these media statements, Mr. Brewer makes comments about AMc, such as:

-   "It's stunning that a trusted partner for all these years is just refusing to cooperate."

---

[61] Motion to Disqualify at ¶¶ 58-59.
[62] Flamm Declaration at ¶¶ 77-82; Moore Declaration ¶¶ 29-32.
[63] Motion to Disqualify at ¶ 58 n.147, Appx A.

- "The lawsuit is without merit—a misguided attempt to deflect attention from Ackerman McQueen's numerous failures to comply with its obligations."

- "Ackerman's claims against the NRA emerged after, and only after, the NRA sought to compel the agency to provide documents and billing records relating to its services."

- "It's not surprising that Ackerman now attempts to escape the consequences of its own conduct."

- "When confronted with inquiries about its services and billing records, Ackerman not only failed to cooperate—it sponsored a failed coup attempt to unseat Wayne LaPierre."[64]

62.     The crux of Defendants' argument is not only that these statements were made in the media, but that the allegations contained within them were false, ***and*** that these false allegations were purposefully manufactured by Mr. Brewer and the Brewer Firm.  In support of these claims that Mr. Brewer falsely manufactured evidence, Defendants point to certain evidence.  First, regarding the statement that AMc "failed to cooperate" with records inquiries, Defendants present:

- the Declaration of Revan McQueen, in which discusses AMc's compliance efforts with each of the three audits the NRA conducted over a period of six months[65];

- testimony from Steve Hart, stating that Mr. Brewer's document requests were unreasonable and designed to draw noncompliance, or documents they knew AMc would not have in its possession[66];

- correspondence between Mr. Brewer and Defendants and their counsel, and correspondence between the NRA and AMc, regarding the NRA's document requests and explanations that the documents are already in the NRA's possession;[67]

- testimony that the NRA was already in possession of the contract of Oliver North at the time it filed suit against AMc.  The lawsuit claimed Lt. Col. North's contract was still being withheld[68];

- the curious appearance of Brewer Firm employee, Susan Dillon, at the auditing firm Forensic Risk Alliance (FRA) that audited AMc in February 2019.[69]  Ms. Dillon's presence at FRA was not known to AMc, who had been told the audit would be

---

[64] Motion to Disqualify at Appx. A.
[65] Declaration of Revan McQueen at ¶ 21-29.
[66] Motion to Disqualify at ¶ 15; Steve Hart Depo. at pp. 230:2-232:18, 304:18-306:12
[67] Motion to Disqualify at ¶ 10 n. 61 (citing multiple exhibits).
[68] John Frazer Depo. at pp. 251:10-257:8, 260:9-19; Oliver North Depo. at pp. 36:12-37:17, 40:18-42:25, 43:25-47:6, 102:14-103:19, 197:14-202:4.
[69] Motion to Disqualify at ¶ 26.

DECLARATION OF COYT RANDAL JOHNSTON                                              Page 27

"independent."[70]  AMc appears to believe that Ms. Dillon was sent to the auditing firm as something of a spy and a proxy for the Brewer Firm.  Ms. Dillon has since resumed her employment with the Brewer Firm.[71]  Plaintiff does not deny any of the allegations about Ms. Dillon; and

- communications showing that the Brewer Firm appears to have been retained specifically for the purpose of terminating contracts with certain "key corporate relationships."[72]

63.    Second, with regard to Defendants' claim that AMc "sponsored a failed coup attempt" against Wayne LaPierre, Defendants offer the following evidence:

- testimony and correspondence describing former NRA President, Oliver North's, unsuccessful efforts to investigate the Brewer Firm's invoices[73];

- testimony of Mr. Hart regarding certain contrivances he perceived in the "coup" narrative[74];

- testimony of Mr. LaPierre's assistant, Millie Hallow, and current NRA President, Carolyn Meadows, suggesting that Col. North was not acting on AMc's behalf[75];

- additional testimony from Ms. Hallow that someone from the Brewer Firm came to collect her notes from the call with Lt. Col. North[76];

- additional testimony from Ms. Hallow who was presented with a letter to sign describing the "coup" narrative, which she said she was uncomfortable signing because it did not reflect her recollection of events[77];

- evidence that Ms. Hallow's letter was turned into a letter from Mr. LaPierre to the NRA Board of Directors[78] (Defendants' claim that Mr. Brewer wrote this letter, which Plaintiff's Response does not deny[79]); and

- an article showing that Mr. LaPierre's letter ended up in the news the very next day.[80]

---

[70] Id.; Declaration of Revan McQueen at ¶ 29.
[71] Motion to Disqualify at ¶ 26; https://www.brewerattorneys.com/susan-dillon.
[72] Amended Counterclaim at ¶ 56.
[73] Motion to Disqualify at ¶¶ 9-12 (including evidence cited at nn.24-37).
[74] Steve Hart Depo at pp.395:11-17.
[75] ECF 81 at Ex. A-33 (Millie Hallow Depo.) at pp. 183:1-10, 202:6-9, 207:8-13; Ex. A-28 (Carolyn Meadows Depo.) at pp. 182:4-183:1.
[76] Millie Hallow Depo. at pp. 189
[77] Millie Hallow Depo. at pp. 205:19-208:19.
[78] ECF 81 at Ex. A-32, Correspondence dated April 25, 2019 from Wayne LaPierre to Members of the NRA Board; Ex. A-33 at 189:2-9
[79] Motion to Disqualify at ¶ 50.
[80] ECF 80 at Ex. A-36, Mark Maremont, *NRA's Wayne LaPierre Says He Is Being Extorted, Pressured to Resign*, Wall Street Journal (April 26, 2019).

---

DECLARATION OF COYT RANDAL JOHNSTON                                                    Page 28

64.     In support of their entire trial-publicity claim, Defendants also offer two articles about or authored by Mr. Brewer, which appear to show his attitudes, professional philosophy, and modus operandi for the intentional use of trial publicity for strategic advantage and to influence public opinion.[81]

65.     I do not provide any opinions regarding the credibility, significance, or admissibility of any of the evidence described above.  But I disagree with Mr. Flamm and Ms. Moore that AMc failed to "clearly identify any extrajudicial statement" or failed to produce evidence in support of this argument.[82]  I also disagree with Mr. Flamm and Ms. Moore that AMc failed to produce any case law providing for disqualification as a remedy for a breach of trial-publicity rules.[83]  As already stated, Defendants' cited Fifth Circuit case, *In re American Airlines*, provides disqualification as a remedy for any ethical breach by opposing counsel.[84] *See* 972 F.2d at 611.

**E.  Respect for the Rights of Third Parties – Texas Rule 4.04(a), Model Rule 4.4(a)**

66.     As both the Model Rules and the Texas Rules identically state: "In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person . . . ."  Model Rule 4.4(a), Tex. R. 4.04(a).

67.     In Defendants' Motion, they claim that Mr. Brewer and the Brewer Firm took a series of actions during 2018 and 2019, which appear to have correlated with certain life events of the McQueen Family, which Mr. Brewer would have known by virtue of his personal relationship with the McQueens.[85]  Defendants believe these events were not accidental but strategically timed with the intention of inflicting emotional distress on the McQueen family and thereby influencing

---

[81] ECF 80 at Ex. A-7, William A. Brewer III, *Advocacy as Art: Lawyers Must Engage in Issues and Crisis Management*, Texas Lawyer (May 6, 2019); Ex A-60, Mark Donald, *Rambo Justice*, Dallas Observer (March 19, 1998).
[82] See Flamm Declaration at ¶¶ 77-82; Moore Declaration at ¶¶ 28-32.
[83] See Flamm Declaration at ¶ 82; Moore Declaration at ¶ 32.
[84] Motion to Disqualify at ¶¶ 20-30.
[85] Declaration of Revan McQueen ¶¶ 14-35.

---

DECLARATION OF COYT RANDAL JOHNSTON

the litigation.[86]   I note that Plaintiff's Response does not substantively deny or refute these claims. This issue is also not addressed in any of the supporting declarations or other exhibits offered with Plaintiff's Response.

68.      In support of these claims Defendants also provide articles about Mr. Brewer's litigation style and philosophy, which describe his tactics as "Rambo justice," "scorched earth," and "hardball."[87]

69.      It is my opinion that these allegations are very serious and, if true, represent a threat to the public perception of the legal system and the integrity of the legal profession.  Mr. McCormack, Mr. Flamm, and Ms. Moore each opine that the familial relationship and acknowledged "animus" pose no conflict or ethical problem whatsoever.  Mr. Flamm even suggests that such animus is a good thing: "if anything it would cause [Mr. Brewer] to punch *harder*."[88]  But in consideration of the broader societal interests that the rules of professional responsibility espouse, is a harder "punch" really what zealous advocacy requires (or should allow) in this situation?  Is there a chance that the self-proclaimed "scorched-earth" lawyer may "punch" even one bit harder than would be acceptable under guiding principles of civility, honesty, and fair play that lawyers should aspire to?  Is there a chance that innocent members of the McQueen and Brewer families will be harmed as collateral damage in this lawsuit?  Is there a "reasonable possibility" that any of these things have already occurred?  Mr. Flamm does not consider any of these issues and merely assumes that "harder" must be better.  From a fundamental ethical standpoint, this makes no sense to me.

---

[86] Motion to Disqualify at ¶¶ 20-30; Declaration of Revan McQueen.
[87] ECF 80 at Ex. A-7, William A. Brewer III, *Advocacy as Art: Lawyers Must Engage in Issues and Crisis Management*, Texas Lawyer (May 6, 2019); Ex A-60, Mark Donald, *Rambo Justice*, Dallas Observer (March 19, 1998).
[88]

70.     I do not give any opinions regarding the weight of the evidence on this issue. However, I would again urge the Court to conduct the rigorous, fact-intensive inquiry to determine whether there is a "reasonable possibility" that an ethical impropriety has occurred in this proceeding and, if so, determine whether the societal interests outweigh the NRA's right to maintain Mr. Brewer as its counsel.

71.     I reserve the right to amend, supplement, or withdraw any of my opinions based upon additional information I may acquire or otherwise. I reserve the right to form additional opinions.

I declare under penalty of perjury and in accordance with 28 U.S.C. § 1746 that the foregoing is true and correct.


Executed this 3rd day of June, 2020.

_____

Coyt Randal Johnston

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § § § | |
| Plaintiff and Counter-Defendant | § § | |
| and | § § | |
| WAYNE LAPIERRE, | § § § | Civil Action No. 3:19-cv-02074-G |
| Third-Party Defendant, | § § | |
| v. | § § | |
| ACKERMAN MCQUEEN, INC., | § § | |
| Defendant and Counter-Plaintiff, | § § | |
| MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG, | § § § § § | |
| Defendants. | § § | |

## DECLARATION OF DAN BOREN

1.      My name is Dan Boren.  I am over eighteen years of age.  I have never been convicted of a felony or misdemeanor involving moral turpitude.  I am fully competent to make this declaration.  My knowledge of the facts set forth are in my personal capacity and not in my official capacity as an employee with the Chickasaw Nation.

2.      I previously served as President of Corporate Development with the Chickasaw Nation from 2013 to 2019.  From 2005 to 2013, I served as United States Representative for Oklahoma's Second Congressional District.

# EXHIBIT H

3.    In 2008, I was elected to the Board of Directors of the National Rifle Association of America (NRA). In 2019, I resigned from the Board of Directors of the NRA.

4.    On April 15, 2019 at approximately 10:11 a.m. CDT, I received an email from the Secretary and General Counsel of the NRA, John Frazer. The email was addressed to the members of the NRA's Board of Directors and the Executive Council members. In his email, Mr. Frazer provided me and my fellow Board of Directors members with a note from Mr. LaPierre regarding the NRA's recently filed litigation against Ackerman McQueen, Inc. (AMc), an online article from the Wall Street Journal discussing the NRA's litigation against AMc, and a copy of the NRA's complaint against AMc. Shortly after receiving Mr. Frazer's email, I reviewed Mr. LaPierre's note and the Wall Street Journal article.

5.    That evening, on April 15, 2019 at approximately 8:35 p.m. CDT, I forwarded Mr. Frazer's email from earlier that morning to Bill Lance, a friend of mine at the Chickasaw Nation. In addition to forwarding Mr. Frazer's email to Mr. Lance, I stated that, "I reread this again. I bet Ackerman is in trouble on this one. They can't produce the backup to the invoices and were allocating full salary to these employees that may have been working on our accounts." As I explained in my email to Mr. Lance, I had just reread Mr. LaPierre's note and the Wall Street Journal article relating to the NRA's new lawsuit against AMc. That article included the statement that "[t]he NRA is concerned that the ad firm may be overcharging for certain items, the lawsuit said, such as invoicing for the full salaries of Ackerman McQueen employees who were 'allocating substantial time to non-NRA clients.'"

6.    When I made the statement to Mr. Lance that "I bet Ackerman is in trouble on this one. They can't produce the backup to the invoices and were allocating full salary to these employees that may have been working on our accounts," I was only referring to what I was

reading from the Wall Street Journal article and the NRA's allegations against AMc in the lawsuit it had just filed. I was really saying, "[The NRA claims AMc] can't produce the backup." I have no personal knowledge whether AMc could not produce the backup to the invoices for anything, including any invoices relating to Chickasaw Nation. I have no personal knowledge whether AMc was allocating full salary to any of its employees that may have been working for the Chickasaw Nation. Mr. Lance did not respond to my April 15, 2019 email.

I declare under penalty of perjury and in accordance with 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my recollection and belief.

Executed this 3rd day of June, 2020.

Dan Boren

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § | |
| | § | |
| | § | |
| **Plaintiff and Counter-Defendant** | § | |
| | § | |
| **and** | § | |
| | § | |
| **WAYNE LAPIERRE,** | § | |
| | § | **Civil Action No. 3:19-cv-02074-G** |
| **Third-Party Defendant,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **ACKERMAN MCQUEEN, INC.,** | § | |
| | § | |
| **Defendant and Counter-Plaintiff,** | § | |
| | § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG,** | § | |
| | § | |
| | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## DECLARATION OF REVAN MCQUEEN

  Pursuant to 28 U.S.C. § 1746, I, Revan McQueen, hereby declare as follows:

  1.  My name is Revan McQueen.  I am over the age of 18 years and of sound mind.  I have never been convicted of a felony or a crime of moral turpitude.  I am the Chief Executive Officer of Ackerman McQueen, Inc. ("*AMc*").  The facts stated herein are true and correct, and based on my personal knowledge in my capacity as CEO of AMc.

  2.  I have read the declarations the NRA submitted in support of its Response to Defendants' Motion to Disqualify, which contain several false and misleading statements and which I address here.

---

**EXHIBIT I**                      

3.      Craig Spray ("*Spray*") and Wayne LaPierre ("*LaPierre*") incorrectly described an October 11, 2018 meeting between me, Angus McQueen, Bill Winkler, Brandon Winkler, Melanie Montgomery, Tony Makris, Henry Martin, Lacey Cremer, Wayne LaPierre and Craig Spray in their declarations, respectively. The meeting is correctly described in detail by other AMc executives that were present, including the emotionally charged discussions surrounding the actions of William Brewer III ("*Brewer*") and Josh Powell ("*Powell*").  However, I believe the most telling point of that meeting was LaPierre explaining to us how great AMc was at branding and communication strategy, including crisis communications and legislative response work that we performed for decades.

4.      To further refute the revisionist history from LaPierre, I personally recall only two parts of the discussion that led to tension or anger.  First was Brewer's harassment of AMc, including his threatening communication.  The discussions were also contentious surrounding Powell.  Put simply, LaPierre and Spray were dismissing the very serious sexual harassment issues involving Josh Powell and an AMc female executive. Before that subject came up, Angus was clearly annoyed by a letter from Spray regarding the budget, but only because it was a complete departure from the decades of professional interaction between our two organizations, not because the budget was being cut. Spray admitted in the meeting that he did not write the letter that he supposedly signed and wanted us to know that he would not write such a disrespectful letter. This conversation started the meeting. We decided before the meeting that if LaPierre and Spray were unwilling to treat us with the respect that was built over decades of good work, that would be the final issue in a string of very unnerving issues that would end the relationship. However, at that time, LaPierre made it clear that we would no longer have to deal with Brewer, his firm, or Powell if we would just "stick with him."

5.      What did not create any tension whatsoever during the October 11, 2018 meeting was the actual budget cutting process, which I personally led line item by line item. I specifically cut the out of pocket expenses, which I now understand to be the line item where LaPierre directed AMc to budget for certain items, allegedly related to his security and confidentiality, in order to hide from the accounting department (that I now understand he did not trust) among others at the NRA. I said I did not want any out of pocket items unrelated to the media work that we do to be in the budget at all. To this, Spray agreed and LaPierre said nothing. The new budget reflected this change.

6.      The day after the October 11, 2018 meeting, LaPierre placed a call to me, which at no point was tense or argumentative. I remember this vividly because I was with Angus at a doctor visit at UT Southwestern regarding his cancer treatment. Angus had just received the news that surgery might still be an option in the battle to beat his cancer. LaPierre had three main agenda items for the call. He continued to plead with me and AMc to "stick with him." He wanted to know how we could keep Dan Bongino as part of NRATV, which he understood would cost serious money despite the budget cuts from the day before. Lastly, he wanted to inquire about the audit. I reminded him that the Brewer Firm was not a trusted independent auditor and we would no longer deal with them, but made clear that we would welcome an audit from any big auditing firm or law firm that was not intent on threatening us or further damaging our relationship with the NRA. LaPierre acknowledged this and asked if it would be okay if Steve Hart reached out to set that up. He told me that the audit needed to happen because Brewer promised the NRA was going to get tens of millions of dollars from Lockton in a settlement and the audit was one of the last things that needed to happen in order to secure the settlement. This concerned me because it confirmed what we suspected: that the first audit conducted by the Brewer firm was nothing more than a

fishing expedition. We now know that, according to LaPierre, litigation against AMc was planned in August of 2018 and this fake audit conducted by the Brewer firm was the first attempt of many to set up AMc for the lawsuit the NRA was planning. It is clear to us now that no matter how much we complied, the Brewer Firm was the architect of an attack claiming that we were withholding documents when Susan Dillon, Beth Landes, and other members of the Brewer Firm, were personal witnesses to our compliance.  Steve Hart ultimately coordinated the Cooper Kirk law firm audit of Carry Guard material, which after one full day of thorough review, concluded with zero issues or complaints.

7.      What ensued over the next couple months were sporadic calls from LaPierre to me to discuss the budget. Most of these calls involved Spray, and on one occasion before putting me on speaker phone, LaPierre acknowledged that Powell was in the room and asked me if I wanted him [LaPierre] to "kick him [Powell] out." This was a clear display that LaPierre was trying to honor the deal that he made at the October 11, 2018 meeting to extricate AMc from Powell and Brewer. During another call, LaPierre started talking about Brewer's negative opinion of some of our work. When I responded suspiciously, LaPierre said, "Revan, everyone knows that Brewer is an asshole."

8.      The last call in 2018 that I can remember with LaPierre was where I informed both LaPierre and Spray that Bongino had rejected our offer. LaPierre responded, "That's great!" which did not make sense because he was the one who approved it, as he did every single contractual obligation the agency made. All of these calls were odd only because before this brief period of time, he mainly called Angus, Tony or Nader. Before this time period, I only received one call from LaPierre, a memorable one because he had just gotten off of a plane that I could hear in the background and wanted to yell at me about how much he disagreed with a video Dom Raso created

to defend the Second Amendment rights of law-abiding citizens who were visually impaired. This was not the first time that LaPierre had to be reminded that the Second Amendment applied to ALL law-abiding citizens, not just those that fit his agenda.

9.      I am aware that LaPierre made many more inaccurate statements in his declaration that was submitted in the Brewer Firm's response to their own disqualification. One specific claim that needs to be addressed follows:

> Nonetheless, I became concerned and received numerous complaints that the public messaging AMc was crafting for the Association often struck the wrong tone. AMc was placing increasing emphasis on material that was unrelated to Second Amendment issues and often inflammatory. My concern became acute in connection with the messages coming across NRATV, which had been created with the intention of reaching a younger and more diverse audience.

10.     LaPierre was the principal architect of the "inflammatory" rhetoric, which all came from his countless rants about issues in the country. It was LaPierre along with his direct mail vendor that wrote the line in a communication to members that referenced law enforcement as "jack-booted thugs." It was LaPierre that said President Bill Clinton was "willing to tolerate a certain amount of killing" and that he [Clinton] had "blood on his hands." It was LaPierre that said, among many inflammatory statements in his countless commercials, "No amount of bloodshed will ever satisfy the demons among us." This is the man who proudly owns the line, "The only thing that stops a bad guy with a gun is a good guy with a gun," which regardless of opinion on the accuracy of the sentiment, this is clearly an inflammatory statement. Because of the nature of live programming, NRATV talents and live hosts took ultimate responsibility for what came out of their mouths.  AMc did not script any content without approval from every host. LaPierre knew the talents and live hosts had the autonomy to craft their own messages and at times made mistakes, like the offensive Thomas the Tank episode, which was directed to be created by Dana Loesch and her team and in which no AMc executive was involved. It is clear that many of

them, all whom had jobs directly approved and controlled by LaPierre, took their cues from LaPierre's inflammatory public rhetoric.

11.     Angus led AMc's relationship with the NRA. He was a fierce believer in the constitution and believed in the protection of American freedom. Any implication that he, a man who was fifty-percent Hispanic, or AMc were anything other than the main drivers of a "more diverse" message is false. LaPierre was the one who routinely ignored, deflected and ultimately silenced the numerous diverse voices of NRATV. One clear example of this is a piece that Colion Noir produced regarding inner city issues. Noir consistently found the diverse voices of America and, with the Second Amendment as the common thread, addressed the very painful circumstances they endured.

12.     In January 2019, LaPierre was in AMc's Dallas office for the last in-person meeting I ever had with him. He refused to allow AMc to release the third part of Colion Noir's piece on New York gun laws, despite his litigation about constitutional issues in that state and the issues within the Albany inner city. This was another decision by LaPierre to silence Noir for the last time I can remember. LaPierre personally kept Noir off of the CPAC stage, when we (AMc) wanted him to speak. LaPierre hesitated, most of the time denying our requests, when we would suggest Noir have a more public role for the organization. NRATV achieved its goal despite LaPierre's attempts to crush the "younger" and "more diverse" voices. It is no coincidence that the NRATV host that is publicly rushing to the NRA's defense is neither "younger" nor "more diverse" because that is the voice with which LaPierre seems to be comfortable. Colion Noir, Dana Loesch, Natalie Foster, Dom Raso, Chris Cheng and Julie Golob all reached audiences that LaPierre, to this day, would never be able to reach himself. I believe that the origin of this new critique of NRATV is Brewer, whom I know from multiple dinner table arguments is no fan of

NRA messaging. In fact, he was starting to seed this idea in LaPierre's mind in the summer of 2018.

13.     During that same meeting in January, LaPierre again reminded us of Brewer's influence over him and the NRA.  LaPierre repeatedly told us that Brewer was the only one that could keep him out of jail, a sentiment LaPierre had shared to me or around me on other occasions. When repeatedly asked why he should be afraid of going to jail, LaPierre told us that we didn't know what we didn't know.

14.     In a phone call from LaPierre to Angus, which I heard while Angus was receiving chemotherapy treatment, LaPierre told Angus that Brewer was criticizing his 2018 CPAC speech that AMc had scripted. According to LaPierre, Brewer said that it was being studied at NYU and Columbia journalism schools for alleged anti-Semitism. In the same January 2019 meeting, LaPierre finally showed us that Brewer seemed control his mouth, when he instructed us that Brewer and Travis Carter would be writing his CPAC speech, a speech similar to the one earlier this year where LaPierre gave a full-throated defense of the NRA's legal fight in New York. It is surprising that LaPierre today is trying to distance himself from his own decades-long relationship with inflammatory rhetoric, given that he was constantly trying to get "more gasoline." However, what is clear is that in order to attempt to raise money, his penchant for "inflammatory" rhetoric can still be heard in the NRA's pleas for donations, the most recent example being their messaging regarding COVID-19.

15.     One other statement that LaPierre made that needs to be addressed follows:

> Although I valued AMc for the creativity of its longtime CEO, Angus McQueen, AMc was not easy to work with and alienated many NRA staff, Board members and significant donors. Long before I met Bill Brewer, NRA executives, directors and others were increasingly strident in their complaints about AMc. For years, I regarded many of these as mere personality conflicts engendered by the abrasiveness of Angus McQueen.

16.     As recent as January 31, 2018, just a month and a half before Brewer was hired by the NRA, in an email where she, as she continues to do today, is "setting the record straight in Jeff Knox's 'opinion' piece" addressed to "NRA Board Members and 2018 Candidates," Marion Hammer wrote the following:

> In 1997, we had 2.5 million NRA members.  Today, we still have most of the same vendors, and with Wayne leading the way, NRA membership numbers have doubled to 5 million.  In 1997, NRA's overall budget was around $120 million and today it's just under $480 million.  Rather than a picture of non-producing vendors and financial ruin, I'd call that the continuing success of Wayne LaPierre's leadership.

It is clear that she was defending AMc along with LaPierre in this email. This is one of countless positive reviews of AMc's work we received from executives, directors, donors and more. Today, I believe the only thing that has changed and could cause the shift in perspective by Hammer and others is the presence of what I understand now to be the NRA's largest vendor, the Brewer Firm.

17.     Brewer has strangely been in competition with AMc, specifically Angus, for as long as I have known him. This reference to Angus's "abrasiveness" is clearly the latest example, the Stinchfield filing being another, of Brewer using a proxy to tarnish the legacy of his father-in-law. What is notably missing from the defense of the Brewer Firm here are the countless voices—Woody Phillips, Tyler Schropp, Sandy Froman, Susan Howard, countless donors and many more—who respected and vocally applauded the work of AMc and specifically, Angus, and who would not be able to fabricate a bunch of personal attacks to protect Brewer, who himself could not even submit a declaration to try to defend himself and the NRA.

18.     I am aware the NRA made certain objections to my prior declaration, questioning the personal knowledge for the statements I made.  I address many of those concerns below.

19.     Paragraph 9:

> I am also aware of Brewer voicing frequent professional criticisms about AMc's work with the NRA. I don't believe Brewer to be and certainly have not known him to be a supporter of the Second Amendment. Brewer, on more than one occasion, would pass judgment on the billing structure of AMc, saying the company could "make more money if it billed hourly."

Brewer would often challenge Angus to debate gun rights and politics, specifically after tragic shootings. Although I believe Brewer might own one or two firearms, I have never known him to shoot them aside from only a couple interesting occasions. Further, his documented contributions to some of the most well-known political adversaries of the NRA, including Barack Obama and Hillary Clinton, seems to explain the aggressive position from which he would debate gun issues with our family. The specific instance I refer to regarding "billing structure" was a call that I had with Brewer regarding work he was doing for 3M. He reached out to AMc wanting to see if we would help with communication strategy, similar to the work Mercury Group conducted on the Wylie case. He took issue with the pricing structure that we suggested, which was and continues to be fair-market value pricing. He wanted us to bill hourly. This is when he said AMc would "make more money if it billed hourly." To that I responded, "Bill, we don't bill that way and because of that, I don't think you will ever be happy with the structure of this relationship." He agreed and we never talked about the 3M potential project again. The proposal that AMc submitted for this work is attached.

> 20.    Paragraph 11:

> I am also aware that Brewer has publicly held forth the theory that law firms are better suited than communication firms like AMc to perform public relations services for their clients, a theory he debated with me and Angus on numerous occasions.  I am aware that Brewer has a public relations practice within his law firm in apparent accordance with that philosophy, a fact further confirmed by team members of the Brewer Firm that specialize in public relations.

For instance, he published an article that clearly described this strategy after the NRA filed its first lawsuit against AMc.

21.     Paragraph 12, the italicized portion being subject to the NRA's objections:

The first time I became aware that Brewer had been hired by the NRA was in 2018 when AMc started receiving PR emails from Travis Carter. John Frazer ("*Frazer*") also informed AMc via email that Brewer had been retained to represent the NRA in a lawsuit against the Lockton Affinity Series of Lockton Affinity, LLC ("*Lockton*") related to the NRA's "Carry Guard" initiative and asked AMc to comply with any requests for information related to Carry Guard.  Carry Guard was a short-lived program that offered training and insurance for the use of firearms in self-defense.  *It is my understanding that the insurance portion, which AMc had no part in structuring from a business standpoint, was ultimately found to be illegal in several states. AMc agreed to participate with Brewer's investigation.*

I have personal knowledge about the lawsuit concerning Carry Guard because the lawsuit and filings are in the public record, and because the NRA has involved AMc in that lawsuit to a degree, including making reference to or factual statements about AMc in the lawsuit.  I also have personal knowledge of AMc initially agreeing to participate with Brewer's investigation because Angus, as AMc's co-CEO at the time, was the one who directed AMc personnel to participate in that investigation.

22.     Paragraph 13:

*Angus always directed everyone to comply with all formal directives from the NRA.* Among many examples of cooperation and assistance, I am aware that Brewer was allowed to interview multiple AMc employees. *During that interview, it is my understanding that he went into a targeted and unrelated (to Carry Guard) line of questioning about Angus specifically*.

For instance, Angus was always the first to tell everyone around him, including me, that our job was to comply with our contractual obligations. In fact, early on, he suspected that Brewer was trying to lay contract 'breach' traps for AMc. In the Services Agreement, it clearly gives the NRA the right to "examine" files, books, and records. Further, LaPierre was our sole designee unless he specifically designates someone else. LaPierre called Angus to talk about Brewer's "audit" many times while I was in the room, and I would hear Angus specifically say that his intent was to cooperate with all requests for examination. Additionally, I have personal knowledge of Brewer

questioning AMc employees in May of 2018 about Angus, unrelated to Carry Guard, because it was reported to me by Lacey Cremer that Brewer oddly referenced "the grandkids [Brewer's children]," and that Angus would talk to "the grandkids" about the work that AMc did for the Oklahoma City Thunder.

23.     Paragraph 15:

From that point on, as the Carry Guard investigation progressed, Brewer began taking actions and exhibiting behavior that appeared to be unrelated to Carry Guard and increasingly aggressive toward AMc. Wayne LaPierre ("**LaPierre**") informed Angus that Brewer had criticized AMc's speechwriting services with regard to a speech LaPierre directed, as was standard practice, AMc to write for Conservative Political Action Conference earlier that year.

As an example of Brewer's aggressive behavior, I witnessed Brewer's communication broaden and become increasingly hostile. As for the speechwriting services, I was present when LaPierre made the statement to Angus that I referenced earlier about Brewer's criticism of the 2018 CPAC speech as anti-Semitic.

24.     Paragraph 17:

*Brewer's interference with AMc's NRA-related business increased significantly after Angus became ill.* On July 2, 2018, Brewer sent an email on behalf of the NRA to AMc's attorney seeking additional documents and claiming that certain documents had been withheld from previous NRA requests for productions.

I have personal knowledge that Brewer's interference increased significantly after Angus became seriously ill with terminal cancer. For instance, he started to ask for many items unrelated to his work on the Lockton litigation and I started to hear that he was claiming we were not cooperating on the document requests in the Lockton litigation, which was ultimately refuted when the Cooper Kirk law firm successfully conducted its audit of the Carry Guard material and settlement with Lockton was ultimately reached.

25.     Paragraph 18:

> *In July 2018, Brewer, on behalf of the NRA, filed an Amended Complaint in the lawsuit against Governor Andrew Cuomo and others in the Northern District of New York: NRA v. Cuomo, et al., Case No: 18-cv-00566, United States District Court for the Northern District of New York.  In the Amended Complaint, false statements were made regarding NRATV and its alleged difficulty in securing media liability coverage.  In response, AMc's counsel wrote a letter to Brewer dated August 7, 2018 outlining the specific false statements made in the Amended Complaint and requesting that Brewer and the NRA take the appropriate steps to correct the misstatements.*

I have personal knowledge, not just opinion, about the falsity of the information in the Cuomo lawsuit about media liability coverage for NRATV.  Specifically, the NRA alleged that NRATV insurance coverage was being put in jeopardy. In reality, we received no indication from our insurance carrier that the insurance that we carried for NRATV was in fact, jeopardized.  I have knowledge of the publicly filed Cuomo lawsuit because the filings are part of the public record, of which I have to be aware as CEO of AMc when the lawsuit includes allegations about my company.  Additionally, I have personal knowledge about the letter my company's lawyer sent to Brewer.

26.    Paragraph 19:

> Then, on August 8, 2018, AMc received a letter from NRA Treasurer Woody Phillips ("***Phillips***") demanding unrestricted access to all of AMc's books and records—*which appeared to be far beyond the scope of the Carry Guard investigation.  An AMc representative then contacted Phillips to ask about the letter.  During the telephone call, Phillips confirmed that Brewer drafted the letter and that it was put in front of him to execute.*

I have personal knowledge about the requests exceeding the scope of the Carry Guard investigation because I read the letters from the Brewer Firm to know what was being requested from my company.  For instance, the very first communication (March 28, 2018) about any document requests involving Brewer concerned the New York State Department of Financial Services' inquiries into Carry Guard.  I have personal knowledge of this letter because I read it.

27.     Brewer then communicated with AMc's counsel requesting various information for that Carry Guard investigation.  He sent another email on May 4, 2018 asking for additional information, to which AMc's counsel responded in compliance, including offering individual employees for interviews.  Brewer sent another email on July 2, 2018 asking for yet more information, all "in connection with" or "associated with the NRA insurance programs" (Carry Guard).  AMc's counsel responded, providing the additional requested materials and noting that Powell also already has all the other previously requested—and provided—documents.  Brewer emailed again on July 26, 2018 following up on certain requests, including back-up documentation for invoices relating to Carry Guard.

28.     Then, on August 8, 2018, AMc received a letter from the NRA seeking to review AMc's "files, books, and records" "[t]o inform the NRA's legal strategy—including with respect to common legal interests which [the NRA] share[s] with AMc."  That same day, Phillips sent AMc another letter requesting a list of special assignments and questioning the meaning of fair market value.  It is these letters that I understand Phillips said he did not author, Brewer did.  Brewer followed these two letters with another to AMc's counsel (allegedly in response to AMc's letter about the aforementioned false statements about AMc in the Cuomo lawsuit), reiterating those two letters.  To comply with the requests, AMc sent a letter to Phillips asking for further clarification on the documents to be examined for audit so that AMc could prepare appropriately.  In response, Phillips stated that Carry Guard, Special Assignments, and (for the first time) out of pocket expenses *generally* would be examined.

29.     AMc responded to a previous letter (August 8) with the requested information about invoicing, out of pocket expenses, and Special Assignments.  Brewer sent yet another letter on August 27, 2018, requesting the same documents that had previously been provided or that AMc

had agreed to provide, to which AMc responded the same day.  AMc also sent a response the next day regarding fair market value pricing, the definition of which Phillips already knew from the parties' interactions and practice over the decades.  Someone on the NRA side wrote a response letter requesting additional out of pocket expense documentation. This letter was purportedly from Phillips, although it stated, "thank you for responding to the Woody Phillips letter," indicating Phillips himself did not actually write the letters.

30.     I have personal knowledge about the statement from Phillips (that he did not write the letters) based on conversations with Bill Winkler.  In a letter to Phillips, Bill recited the statement from Phillips—which nobody from the NRA or the Brewer Firm has denied, to my knowledge.

31.     Returning to the letter writing campaign, and wholly unrelated to Carry Guard, on September 1, 2018, Brewer next asked for a copy of the North Contract.  AMc's counsel explained that Col. North's attorneys would have to provide consent for AMc to share it.  A day earlier, AMc's counsel also sent a letter to Brewer noting AMc's compliance with the many document requests and asking him to correct errors in his amended complaint against Gov. Cuomo.  Brewer refused, and instead accused AMc and its counsel of not responding timely to the document requests.

32.     In the midst of these letters, AMc had agreed to the NRA's audit on September 17-18, 2018.  Brewer sent another letter seeking documentation for out of pocket expenses and special assignments.  AMc agreed to provide the requested information at the upcoming audit.

33.     After the audit, in letters concerning reduction of the 2018 budget, Powell then began accusing AMc of not providing the information Brewer requested—either outside of or during the audit.  AMc clarified in a response letter the falsity of that accusation.  Notably, that

same day, Steve Hart (attorney for the NRA Board of Directors) met with AMc's counsel to review the North Contract.

34.    The next relevant date was the October 11, 2018 meeting where LaPierre promised Brewer and Powell would not be involved with AMc anymore, including any audits, and where LaPierre asked AMc to "stick with him."  Then on November 14, 2018, the NRA conducted another audit of AMc regarding the same Carry Guard documents, which ended with a letter from the auditor to AMc, thanking AMc for a "very fruitful meeting on our end."

35.    Then on December 21, 2018, despite LaPierre's promise, Brewer sent a letter requesting an even more expansive set of documents: all out of pocket expenses for the past three years, a list of all NRATV commentators ("talent") and employees that work for the NRA, fair market value analysis (*including proof of what AMc charges other clients*), and third party media buys.

36.    Paragraph 20:

> Throughout the rest of August 2018, Brewer continued to insist AMc was withholding information and refusing to provide copies of documents, *which AMc was not required to do under the Services Agreement with the NRA.  His letters and communications to AMc's attorneys became increasingly inaccurate, adversarial and incorrectly claimed that AMc was actively breaching its obligations under the Services Agreement.  Angus and I both found this distressing because we knew that AMc had fully complied with every request in good faith.*

I have personal knowledge of the increasing inaccuracy, adversarial nature, and incorrect claims in Brewer's letters because I read them and because Angus and I approved the responses and compliance with his many requests, as noted above.  I also have personal knowledge about my own distress concerning this letter writing campaign, as well as Angus's distress because we talked about how it was impacting us and AMc.  For instance, Angus was distraught at the reality he faced, on multiple occasions asking why his son-in-law would be trying to attack his company with "breach traps" (*i.e.*, asking for documents that Brewer knew AMc did not have or had already

provided) and ultimately destroying and denying Angus's moments with his family as he battled

lung cancer.

37.     Paragraph 21, the NRA did not contest or object to:

In September 2018, members of the Brewer Firm conducted an on-site review at AMc of AMc records authorized for NRA personnel pursuant to the Services Agreement, but which was unlike any other review the NRA had ever conducted. The Brewer Firm representatives, led by Susan Dillon, initially refused to identify themselves and refused to answer questions about the purpose of the review.  While every prior review involved NRA reports or other financial statements that needed to be reconciled in some way, the Brewer Firm representatives seemed to request volumes of AMc NRA-related material with no stated or identifiable objective. Following the review, it is my understanding that no one from the NRA or the Brewer Firm followed up to identify any additional information that was missing or needed.  At that point, AMc concluded the NRA and the Brewer Firm had gotten whatever information they needed.

38.     Paragraph 22:

It is my understanding that LaPierre, who was AMc's only designee at this time pursuant to the Services Agreement, directed AMc executives not to let Brewer have copies of anything because he feared the information would be leaked to hurt him. At this point, upon information and belief, based on our employees' interactions with Josh Powell ("**Powell**") (LaPierre's Chief of Staff), Brewer was working directly for Powell. This seemed to fit the narrative that LaPierre was "in a box."  On more than one occasion, Powell told multiple people at AMc that he wished he could take control of the organization.  One specific comment Powell made to multiple AMc employees was that he wished he could "put Wayne into a coma." It is my understanding that Brewer and Powell were very close, based in part on Powell talking to AMc representatives about how his relationship with Brewer extended past professional to personal interactions.  Powell would often brag to people about his knowledge of the law that Brewer taught him. On one occasion, it is my understanding, that Powell told an AMc executive that Brewer was threatening to "have people at AMc indicted" by the Federal Bureau of Investigation under RICO (Racketeer Influenced and Corrupt Organizations Act.)

I have personal knowledge of Powell's comments of wanting to put LaPierre "into a coma"

because he made them at a dinner at Abacus in Dallas that I attended with multiple AMc personnel.

39.     Paragraph 23:

Furthering Brewer's increased threatening behavior and validating Powell's independent account, shortly after the initial Brewer Firm review, *Angus learned from LaPierre that Brewer was threatening to have Angus indicted for unidentified*

*misdeeds associated with AMc's work for the NRA.  This deeply upset Angus who had loved and served the NRA for most of his career.*

I have personal knowledge of Brewer's threat relayed through LaPierre because Angus told me about it, and because the same threat was already relayed to me by Tony Makris.  I also have personal knowledge of how that threat upset Angus because he is my father and was co-CEO with me.

40.     Paragraph 26:

Despite this brief respite from Brewer's harassment, Brewer resurfaced a few weeks later in December 2018.  *Brewer knew Angus was in the process of undergoing painful radiation and chemotherapy treatment after surgery had been ruled out as an option to treat his cancer.*  Angus was home for what would likely be—and was in fact—his final Christmas with his family.  *On December 21, 2018, the Brewer Firm sent another letter requesting more confidential information about AMc's business, such as information about other clients, which is proprietary to AMc and not authorized in the Services Agreement.*  Prior to this time, the NRA had never requested any information about AMc's other clients, including how AMc negotiated agreements.

I have personal knowledge that Brewer knew about Angus's radiation and chemotherapy treatment because he acknowledged through actions and words to family that he knew what Angus was battling.  I included in this declaration the very letter I referenced above, which shows the additional information Brewer requested relating to AMc's other clients, and which is not provided for under the Services Agreement.

41.     Paragraph 31:

During that time, April 2019, Brewer threatened to have me and Angus indicted by the Department of Justice, which was communicated to me through a member of our family. Brewer was also quoted in numerous media articles attacking AMc for its alleged failure to comply with the NRA's record requests.

I have personal knowledge about Brewer's threat because it was communicated directly to me through a family member.  Specifically, on April 24, 2019, I was eating lunch at The Hutch in Oklahoma City with my wife and Angus when I received a call from a family member relaying

the threat that LaPierre called Brewer to have me and Angus indicted by the Department of Justice. As I stated previously, part of the reason I believe it is manifestly unfair and prejudicial to have my brother-in-law as my company's opponent's lawyer is for the very reason that I cannot divulge a family member's name—to share with the court the wrongful conduct going on while protecting my family from further discord or what I believe could be possible attacks from Brewer.

42.     Paragraph 32:

By early May 2019, Angus was severely ill, starting to cough up blood and show signs that the cancer was progressing. *It is my understanding that Brewer was well aware of all of this.* In mid-May 2019, Angus was hospitalized.

I have personal knowledge that Brewer was aware of Angus's health status because he was aware of the hospitalizations that brought our family into town.

43.     Paragraph 35:

On July 11, 2019, as Angus was in hospice care and his family was traveling to see him, he read Brewer's quote in a Bloomberg article, accusing AMc of committing crimes against the NRA. *Distraught from reading the words of his son-in-law libeling him as a criminal, Angus looked at me and told me to protect our family from Brewer who he believed would stop at nothing to attempt to destroy his family.* Less than one week later, on July 16, 2019, Angus passed away.

I described my personal knowledge about Angus's thoughts and feelings about Brewer already when I said "Angus looked at me and told me to protect our family from Brewer." Angus told me that same day that he believed Brewer would stop at nothing to attempt to destroy his family. Angus told me he was upset that his son-in-law accused him of being a criminal, and did so publicly. We stopped talking about this issue after that because there were more important things to focus on than Brewer's disgusting public attacks on his family.

44.     Paragraph 36:

Since the date the NRA's first lawsuit was filed against AMc on April 12, 2019, *I have personal knowledge that Brewer, using family members as channels, has attempted to communicate with me to influence AMc's litigation positions and strategy. For example, when Brewer knew that AMc was represented by counsel,*

*he tried to direct me to "break privilege" with my own attorneys so he could tell me "how to get out of this."  In addition to his threat of indictment in April 2019, through these channels, I have learned that, despite the fact that Brewer and his PR unit have supposedly been limited to certain information in the Virginia lawsuits against AMc, Brewer is still managing and overseeing "every aspect" of those cases.  Based on this knowledge, I have no reason to believe any of the highly confidential information AMc has produced in the Virginia lawsuits to the NRA has actually been withheld from Brewer as ordered.*

I received a message from a family member that Brewer wanted me to effectively break privilege and "call him."  I was with my father in his kitchen discussing this issue because he was horrified that our entire family was being brought into this bad situation. He did not want us siblings discussing this issue anymore, telling us to "cut it out," because he believed that it would be weaponized by Brewer and ultimately make us adversarial with each other. I am proud that to this day, we have not successfully been ripped apart by Brewer or his firm. Between this history and because I understand Brewer is lead counsel, as even the NRA and the Brewer Firm pointed out in the hearings and motions, I am entitled to my opinion that I do not believe my company's highly confidential information has actually been withheld from Brewer as ordered.

45.    Paragraph 37:

Oddly, Brewer has now undertaken the representation of Grant Stinchfield ("***Stinchfield***")—a former AMc employee and NRATV program host who filed an affidavit on behalf of the NRA.  *Not only did Stinchfield's affidavit contain false statements regarding AMc, but it was promptly leaked to the media.*  AMc responded with a suit against Stinchfield for libel, which is a companion case to this cause of action.[1] It is my understanding that Stinchfield agreed to sit down with our attorneys to discuss editing his affidavit for accuracy. He abruptly canceled that meeting and Brewer filed his answer.

I have personal knowledge of the false statements because of my knowledge of AMc's business and operations as CEO.  I also have personal knowledge that the affidavit was promptly leaked to the media because it was and I saw the article.

---

[1] *Ackerman McQueen, Inc. v. Stinchfield*, N. Dist. Tex, No. 3:19-cv-03016-x (Dec. 12, 2019).

46.    Paragraph 39:

As the brother-in-law of Brewer, I believe that it is profoundly unfair and highly prejudicial for AMc to have to litigate this matter against Brewer and his firm. *His intimate knowledge of our family allows the Brewer Firm to engage in sending messages to me using family members instead of communicating through my attorneys. Brewer had detailed knowledge of Angus's cancer treatment and used that information to time his litigation and media attacks. He denied our family uninterrupted time with our father during his final year of life and damaged some of the last moments between Angus and his family.* As the CEO of AMc, who is the party in this litigation and directs litigation strategy, I am often forced to consider the implications of AMc's actions which may impact my sister and her children, whom I care about deeply.

I have personal knowledge to share these concerns and risks because, in part, they have already happened (such as the family back-channeling), as described above. I also have personal knowledge of Brewer's timing of his litigation and media attacks to follow Angus's cancer treatments because I know both the timing of those attacks and the dates of Angus's cancer treatments.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 3rd day of June, 2020.

_____
Revan McQueen

December 1, 2011


Travis Carter
Bickel & Brewer
4800 Comerica Bank Tower
1717 Main Street


Dear Travis,

From our discussions, Ackerman McQueen understands that 3M faces certain public relations and communication challenges regarding the manufacturing and use of PFCs.  We have gathered that many of the issues revolve around certain health/environmental concerns and that the initial communication needs will be focused on the 3M plant in Cottage Grove, MN.  Beyond that, we have no detailed understanding of the compound or the current issues in play.  We also don't have many details regarding audience, current content or existing marketing/public relations efforts.

Bickel & Brewer has expressed the need for an online video presence and supplementary video production to better manage public opinion as well as educate an influential audience who 3M needs to engage more effectively (i.e., consumers, shareholders, media and local residents).  This online channel or network would serve as a vital destination to confront misleading news stories and correct misinformation surrounding the issue.  It is also our understanding that this could be an important venue in which to discuss 3M's continued dedication to environmental awareness and protection.

Before making any formal recommendations, we need to first do a thorough assessment. Your public relations/marketing investment cannot work effectively without this careful and methodical strategic analysis.

We appreciate the opportunity to present this proposal. In it, we will outline a two-phased approach, as well as associated timing and costs.  *Once the phases are complete, it is important to note that 3M will have the beginnings of a video network that is fully functional.*


## Phase I: Information Gathering

The goal of this process is to gather all necessary information in order to make a detailed recommendation specifically tailored to the needs and goals of 3M.

- AM would begin by understanding the 3M company as a whole, while also analyzing your current public relations efforts and materials regarding this specific issue.

- We would immerse ourselves in all available information regarding PFCs. We would need access to as many studies, public surveys, official documents, etc. that would help in this effort.  More so, in order to effectively achieve the most thorough understanding of PFCs and the issue(s) in play, our team would conduct one-on-one, in-depth interviews with management, team members and other key personnel. The exact number and type of interviews will be mutually agreed upon with you prior to proceeding. Interviews would be conducted in person when possible or by phone.

- In the course of this interviewing process, we may also determine a need to conduct interviews among a larger, dispersed geographic sample or to include a wider sample. If, after beginning this process, we collectively agree a larger research study is needed, we would provide a separate proposal for the cost of conducting an online survey and would provide competitive bids for that process.

- Review and analyze your existing content (audio, video and text resources, photography, etc.).

- Assess existing staff/human assets in order to evaluate their potential contribution to the network on an ongoing basis.

- Analyze 3M's existing capabilities to generate content.  This would include personnel as well as production equipment.

## **Phase II: Strategic Recommendation**

AM would next schedule a meeting to summarize our findings and present our detailed recommendation. Deliverables would include:

- Definition, analysis and prioritization of various target audiences for the network.

- A name for the network and a recommended URL.

- The overall design/visual manifestation of the network, including individual channel designs.

- Content vision for the network.

- Programming vision for the network.

- Multiple examples of new network content.

- Plans for monitoring, and responding to, network metrics.

- Options for paid and organic search optimization, as well as other marketing tools that would support the network.

- Recommendation as to how the network functions in conjunction with existing 3M marketing and online efforts in order to form a comprehensive, cohesive communication strategy.

- Recommendation regarding encoding, storage, hosting and streaming options, including estimated costs.

- Recommendation for leveraging potential sponsorship/monetization of the network.

- Recommendation regarding potential content partners.

- Staffing recommendation, including an associated budget (if applicable).

- Recommendation regarding studio facility and production assets (if applicable).

- Technical detail, scope of work documentation, timing and associated cost estimates for the development of any new, custom modules for the Videodigm platform in order to fit specific 3M needs (if applicable).

- Scalability – phased rollout recommendations (if applicable).

- Timeline for network development and deployment.

- Overall budget information, including the option for AM's ongoing involvement in content generation for, and management of, the network.

**Timing and Compensation**

We anticipate this process will take approximately 90 days to complete. Ultimately, timing for the initial phase depends greatly on access to key stakeholders, as well as timely receipt of relevant detail, documentation or files. In a true sense of partnership, we will work with you to mutually agree upon a reasonable timeframe for all deliverables.

AM will charge $150,000 for the work outlined above, payable in two amounts:

**APP103**

$75,000 - due upon approval of this proposal.
$75,000 - due upon completion of the Phase II recommendation.

There is an ongoing, monthly Videodigm software-licensing fee of $2,500 that covers: use of the platform; use of the custom Content Management System (for administering the on-demand video and analog data within the platform); use of the custom Encoding and Distribution managers as well as Broadcast and Talkback Management Systems (for executing live streaming on the platform); software support and technical assistance. More importantly, licensees benefit from ongoing product development, resulting in new and evolving platform functionality. This fee would begin upon your agreement to proceed with Network Deployment and would remain intact for a period of 12 months, or as long as the network is live on the Internet.

*Once again, it is important to note that upon the completion of Phase II, 3M will already have the beginnings of a video network that is fully functional, not a prototype. Thus, the organization's initial $150,000 investment will produce not only the analysis and resulting recommendations, but also the foundation of what will ultimately live online as the 3M video network.*

We are very excited about the opportunity to work with Bickel & Brewer and 3M on this project.  A strong video presence online that reaches your most influential audience is crucial to effective communication and public relations.  We look forward to hearing from you and are available to answer any questions you might have.

Sincerely,

Revan McQueen

Cc: Hillary Farrell
    Rodney Lipe
    Peter Farrell
    Kevin Joseph

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| **Plaintiff and Counter-Defendant** | § § | |
| **and** | § § | |
| **WAYNE LAPIERRE,** | § § | |
| **Third-Party Defendant,** | § § | **Civil Action No. 3:19-cv-02074-G** |
| **v.** | § § | |
| **ACKERMAN MCQUEEN, INC.,** | § § | |
| **Defendant and Counter-Plaintiff,** | § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG,** | § § § § § | |
| **Defendants.** | § § | |

## DECLARATION OF BRIAN E. MASON

Pursuant to 28 U.S.C. § 1746, I, Brian E. Mason, hereby declare as follows:

1.      My name is Brian E. Mason.  I am over eighteen years of age.  I have never been convicted of a felony or misdemeanor involving moral turpitude.  I am fully competent to make this declaration.  I am a lawyer at Dorsey & Whitney, LLP and counsel of record for Ackerman McQueen, Inc., Mercury Group, Inc., Henry Martin, William Winkler, Melanie Montgomery, and Jesse Greenberg (collectively, "***Defendants***") in the above-captioned matter.  I have personal knowledge of the facts set forth in this declaration and acknowledge them to be true and correct.

2.      Attached hereto as **Exhibit J-1** is a true and correct copy of a letter from NRA to Ackerman, dated August 8, 2018.

3.      Attached hereto as **Exhibit J-2** is a true and correct copy of Brewer Firm Leadership Page as of June 3, 2020.

4.      Attached hereto as **Exhibit J-3** is a true and correct copy of an email from Brian Mason, dated May 22, 2020.

5.      Attached hereto as **Exhibit J-4** is a true and correct copy of an email from Michael Collins, dated May 22, 2020.

6.      Attached hereto as **Exhibit J-5** is a true and correct copy of an email from William Brewer, dated May 18, 2020.

I declare under penalty of perjury and in accordance with 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 3rd day of June, 2020.

Brian E. Mason



NATIONAL RIFLE ASSOCIATION OF AMERICA
INCORPORATED 1871
11250 WAPLES MILL ROAD · FAIRFAX, VA 22030

August 8, 2018

BY FIRST CLASS MAIL AND E-MAIL

Bill Winkler
Ackerman McQueen, Inc.
1100 The Tower
1601 Northwest Expressway
Oklahoma City, OK 73118-1438

Dear Bill,

Re: Examination of Files, Books and Records

As you know, the NRA is involved in multiple lawsuits that may implicate work performed by Ackerman McQueen (together with its wholly owned subsidiary, Mercury Group, Inc., "AMc"). To inform the NRA's legal strategy—including with respect to common legal interests which we share with AMc—it is important that the NRA and our counsel have access to documents pertaining to AMc's services.

Therefore, this letter notifies AMc that the NRA will conduct an examination of AMc's[1] files, books, and records pursuant to Article VIII of the Services Agreement dated April 30, 2017 (as amended May 6, 2018) (the "Services Agreement"). Please respond no later than August 14, 2018, and identify two dates on which the examination(s) may take place. Please also let us know where and in what format the records will be provided.[2]

Regards,

Wilson H. Phillips Jr.

Cc:     Craig Spray (by hand)
        Wayne LaPierre (by hand)

---

[1]      For the avoidance of doubt, the record-examination request set forth in this letter includes the records of the Mercury Group. If Mercury's records must be presented in a different location or on different dates than those of AMc, please let us know.

[2]      We hope that two full work days will be sufficient; however, the NRA may require additional dates, depending upon the volume of relevant material and the manner in which it is stored. Of course, we will work with AMc to avoid any undue disruption to its operations.

# EXHIBIT J-1

APP107



# OUR PEOPLE

## EXPERTS IN LAW, BUSINESS AND COMMUNICATIONS

Brewer's team of outstanding professionals offers a rare breadth of capabilities and depth of experience, to deliver an innovative approach to advocacy. Our firm's diversified team of professionals work in concert to deliver a unique brand of high-stakes advocacy and thrive on the intensity of "bet-the-business" litigation.

**+ SEARCH BY SURNAME**

## THE LEADERSHIP TEAM





EXHIBIT J-2

APP108



(https://www.brewerattorne a-brewer)

(https://www.brewerattorne j-collins)

(https://www.brewerattorne j-carter)

## WILLIAM A. BREWER III (HTTPS://WWW.BREW A-BREWER)

**Partner**

wab@brewerattorneys.com (mailto:WAB@Brewerattorn

212.489.1400 (tel:+2124891400)

Download vCard (http://brewerdallasny.stagir content/uploads/2017/11/will

## MICHAEL J. COLLINS (HTTPS://WWW.BREW J-COLLINS)

**Partner**

mjc@brewerattorneys.com (mailto:MJC@Brewerattorne

214.653.4875 (tel:+2146534875)

Download vCard (http://brewerdallasny.stagir content/uploads/2017/11/mic

## TRAVIS J. CARTER (HTTPS://WWW.BREW J-CARTER)

**Managing Director, Public Affairs**

tcarter@brewerattorneys.com

(mailto:Tcarter@Breweratto

214.653.4856 (tel:+2146534856)

Download vCard (http://brewerdallasny.stagir content/uploads/2017/11/trav



(https://www.brewerattorne m-eisenberg)



(https://www.brewerattorne m-millimet)



(https://www.brewerattorne b-rogers)

## SVETLANA M. EISENBERG (HTTPS://WWW.BREW M-EISENBERG)

**Partner**

sme@brewerattorneys.com (mailto:sme@brewerattorney

212.224.8817 (tel:+12122248817)

Download vCard (https://www.brewerattorne M-Eisenberg-9frd.vcf)

## ROBERT M. MILLIMET (HTTPS://WWW.BREW M-MILLIMET)

**Partner**

rrm@brewerattorneys.com (mailto:RRM@Brewerattorn

214.653.4908 (tel:+2146534908)

Download vCard (https://www.brewerattorne M-Millimet-62cn.vcf)

## SARAH B. ROGERS (HTTPS://WWW.BREW B-ROGERS)

**Partner**

sbr@brewerattorneys.com (mailto:SBR@Brewerattorne

212.527.2587 (tel:+2125272587)

Download vCard (http://brewerdallasny.stagir content/uploads/2017/11/sara



(https://www.brewerattorne...
dillon)

### SUSAN DILLON (HTTPS://WWW.BREV... DILLON)

**Senior Director of Consulting**

scd@brewerattorneys.com

214.653.4870

Download vCard (https://www.brewerattorne... Dillon.vcf)



(https://www.brewerattorne...
g-affa-1)

### ANDREW G. AFFA (HTTPS://WWW.BREV... G-AFFA-1)

**Director, Consulting**

aga@brewerattorneys.com (mailto:AGA@Brewerattorn...

212.224.8803 (tel:+2122248803)

Download vCard (http://brewerdallasny.stagir... content/uploads/2017/11/and...



(https://www.brewerattorne...
d-gilbert)

### ROBERT D. GILBERT (HTTPS://WWW.BREV... D-GILBERT)

**Counsel and Senior Advisor**

rdg@brewerattorneys.com

214.653.4008

Download vCard (https://www.brewerattorne... D-Gilbert.vcf)



(https://www.brewerattorne...
gallery/mxizm9v25a6zefxv45...

### MICHAEL MCCORMACK (HTTPS://WWW.BREV... GALLERY/MXIZM9V2...

**CFO (Chief Financial Officer)**

mjm@brewerattorneys.com (mailto:NWS@Brewerattorn...

214.653.4039 (tel:+2146534039)



(https://www.brewerattorne...
houser)

### JOHN HOUSER (HTTPS://WWW.BREV... HOUSER)

**Director, Consulting**

jhouser@brewerattorneys.co... (mailto:jhouser@brewerattorn...

212.224.8815



(https://www.brewerattorne...
chen)

### MICHELLE CHEN (HTTPS://WWW.BREV... CHEN)

**Chief of Staff**

myc@brewerattorneys.com (mailto:myc@brewerattorne...

212.224.6328 (tel:+12122246328)

Download vCard
(https://www.brewerattorne
McCormick-y88y.vcf)

Download vCard
(https://www.brewerattorne
Houser-6ehh.vcf)

Download vCard
(https://www.brewerattorne
Chen-276d.vcf)



(https://www.brewerattorne
foster)

### DELANNA FOSTER
### (HTTPS://WWW.BREW
### FOSTER)

**Director of Human
Resources**

daf@brewerattorneys.com

214.653.4033

Download vCard
(https://www.brewerattorne
Foster.vcf)

## PROFESSIONALS



(https://www.brewerattorn
allegretto)



(https://www.brewerattorn
y-rita)



(https://www.brewerattorn
e-baker)

**APP111**

### ALESSANDRA ALLEGRETTO (HTTPS://WWW.BRI ALLEGRETTO)

**Associate**

apa@brewerattorneys.com

214.653.4013

Download vCard (https://www.brewerattorn Ally-Allegretto.vcf)

### PETER BACH-Y-RITA (HTTPS://WWW.BRI Y-RITA)

**Counsel**

pbr@brewerattorneys.com

214.653.4036

Download vCard (https://www.brewerattorn Bach-Y-Rita.vcf)

### AVERY E. BAKER (HTTPS://WWW.BRI E-BAKER)

**Junior Investigator**

ayb@brewerattorneys.com

214.653.4050

Download vCard (https://www.brewerattorn E-Baker.vcf)



(https://www.brewerattorn l-branson)



(https://www.brewerattorn breweriv)



(https://www.brewerattorn burschlag)

### CODY L. BRANSON (HTTPS://WWW.BRI L-BRANSON)

**Consultant**

clb@brewerattorneys.com

214.653.4802

Download vCard (https://www.brewerattorn L-Branson.vcf)

### WILL BREWER IV (HTTPS://WWW.BRI BREWERIV)

**Associate**

wbb@brewerattorneys.con

(mailto:wbb@brewerattorn

212.527.3024 (tel:+12125273024)

Download vCard (https://www.brewerattorn Brewer-IV-csc8.vcf)

### BROOKE BURSCHLAG (HTTPS://WWW.BRI BURSCHLAG)

**Case Manager**

blb@brewerattorneys.com

212.527.2580

Download vCard (https://www.brewerattorn Burschlag.vcf)







APP12

(https://www.brewerattorn
v-coln-garca-moliner)

### CLAUDIA V. COLÓN GARCÍA-MOLINER (HTTPS://WWW.BRE V-COLN-GARCA-MOLINER)

**Associate**

cvm@brewerattorney.com

212.224.8801

Download vCard
(https://www.brewerattorn
V-Colon-Garcia-
Moliner.vcf)

(https://www.brewerattorn
cruz)

### AMY CRUZ (HTTPS://WWW.BRE CRUZ)

**Case Manager**

aeg@brewerattorneys.com

214.653.4820

Download vCard
(https://www.brewerattorn
Cruz.vcf)

(https://www.brewerattorn
de-la-garza)

### ROSIE DE LA GARZA (HTTPS://WWW.BRE DE-LA-GARZA)

**Director of Programs, Brewer Foundation**

rrd@brewerfoundation.con

(mailto:rrd@brewerfounda

214.653.4881 (tel:
214.653.4881)

Download vCard
(https://www.brewerattorn
De-La-Garza-3ydl.vcf)



(https://www.brewerattorn
fitzpatrick)

### SEAN FITZPATRICK (HTTPS://WWW.BRE FITZPATRICK)

**Senior Analyst**

spf@brewerattorneys.com
(mailto:SPF@Brewerattorn

212.284.8463
(tel:+2122848463)



(https://www.brewerattorn
a-giroux)

### DAVID A. GIROUX (HTTPS://WWW.BRE A-GIROUX)

**Associate**

dag@brewerattorneys.com

212.224.6322

Download vCard
(https://www.brewerattorn
A-Giroux.vcf)



(https://www.brewerattorn
howard)

### MATTHEW HOWARD (HTTPS://WWW.BRE HOWARD)

**eDiscovery Case Manager**

mjh@brewerattorneys.com

(mailto:mjh@brewerattorn

212.224.8804
(mailto:mjh@brewerattorn

**APP113**

Download vCard
(http://brewerdallasny.stag
content/uploads/2018/07/s
fitzpatrick.vcf)

Download vCard
(https://www.brewerattorn
Howard-22la.vcf)



(https://www.brewerattorn
karimli)

### FIDAN KARIMLI (HTTPS://WWW.BRE KARIMLI)

**Investigator**

fkarimli@brewerattorneys

212.224.6324

Download vCard
(https://www.brewerattorn
Karimli.vcf)



(https://www.brewerattorn
kerley)

### DENISE KERLEY (HTTPS://WWW.BRE KERLEY)

**Investigator**

ldk@Brewerattorneys.com
(mailto:LDK@brewerattor

214.653.4819
(tel:+2146534819)

Download vCard
(http://brewerdallasny.stag
content/uploads/2018/06/c
kerley-1.vcf)



(https://www.brewerattorn
king)

### LAURIE KING (HTTPS://WWW.BRE KING)

**eDiscovery Case Manager**

lbk@brewerattorneys.com

214.653.4052

Download vCard
(https://www.brewerattorn
King-apwd.vcf)



(https://www.brewerattorn
landes)

### BETH LANDES (HTTPS://WWW.BRE LANDES)

**Associate**



(https://www.brewerattorn
lee)

### VICTORIA LEE (HTTPS://WWW.BRE LEE)

**Investigator**



(https://www.brewerattorn
b-lisogorsky)

### MITCHELL B. LISOGORSKY (HTTPS://WWW.BRE B-LISOGORSKY)

bal@brewerattorneys.com
(mailto:BAL@brewerattor

212.224.8806
(tel:+2122248806)

Download vCard
(http://brewerdallasny.stag
content/uploads/2017/11/b

vhl@brewerattorneys.com
(mailto:vhl@brewerattorne

212.224.8802
(tel:+12122248802)

Download vCard
(https://www.brewerattor
Lee-7zb6.vcf)

**Junior Investigator**

mbl@brewerattorneys.com

212.284.8465

Download vCard
(https://www.brewerattor
Lisogorsky-7xdf.vcf)





(https://www.brewerattor
a-locke)

(https://www.brewerattor
martin)

(https://www.brewerattor
l-merritt)

### GREGORY A. LOCKE (HTTPS://WWW.BRI A-LOCKE)

**Associate**

gal@brewerattorneys.com

212.527.2586

Download vCard
(https://www.brewerattor
A-Locke.vcf)

### MICHELLE MARTIN (HTTPS://WWW.BRI MARTIN)

**Associate**

mym@brewerattorneys.co

212.224.6320

Download vCard
(https://www.brewerattor
Martin.vcf)

### DANA MERRITT (HTTPS://WWW.BRI L-MERRITT)

**Case Manager**

dxm@brewerattorneys.con

214.653.4848

Download vCard
(https://www.brewerattor
Merritt-lj28.vcf)







(https://www.brewerattor
moore)

(https://www.brewerattor
sadberry)

(https://www.brewerattor
schmidtberger)

### CHARITY MOORE (HTTPS://WWW.BRE MOORE)

**Investigator**

cnm@Brewerattorneys.com

(mailto:CNM@breweratto

212.284.2464
(tel:+2122842464)

Download vCard
(https://www.brewerattor Moore.vcf)

### ANDREA SADBERRY (HTTPS://WWW.BRE SADBERRY)

**Senior Manager, Public Affairs**

asadberry@brewerattorney

(mailto:Asadberry@Brewe

214.653.4026
(tel:+2146534026)

Download vCard
(http://brewerdallasny.stag content/uploads/2018/06/a sadberry.vcf)

### JOHN SCHMIDTBERGER (HTTPS://WWW.BRE SCHMIDTBERGER)

**Senior Consultant**

jxs@brewerattorneys.com
(mailto:JXS@Brewerattorn

214.653.4860
(tel:+2146534860)

Download vCard
(http://brewerdallasny.stag content/uploads/2017/11/jc



(https://www.brewerattor shaw)



(https://www.brewerattor stoczko)

(https://www.brewerattor stepanek)

### IAN SHAW (HTTPS://WWW.BRE SHAW)

**Associate**

ins@brewerattorneys.com

214.653.4025

Download vCard
(https://www.brewerattor Shaw-3jra.vcf)

### TODD STEPANEK (HTTPS://WWW.BRE STEPANEK)

**Case Manager**

tes@brewerattorneys.com

214.653.4833

Download vCard
(https://www.brewerattor Stepanek.vcf)

### ALEXANDER STOCZKO (HTTPS://WWW.BRE STOCZKO)

**Senior Analyst**

avs@brewerattorneys.com
(mailto:AVS@Brewerattor

212.224.6327
(tel:+2122246327)

Download vCard
(http://brewerdallasny.stag content/uploads/2017/11/a



(https://www.brewerattorı
leal-unmuth)

### KATHERINE LEAL UNMUTH (HTTPS://WWW.BRI LEAL-UNMUTH)

**Manager, Public Affairs**

klu@brewerattorneys.com
(mailto:KLU@Brewerattorı

214.653.4832
(tel:+2146534832)

Download vCard
(http://brewerdallasny.stag
content/uploads/2017/11/k



(https://www.brewerattorı
vera)

### EFRAIN VERA (HTTPS://WWW.BRI VERA)

**Associate**

exv@brewerattorneys.com
(mailto:exv@brewerattorn

212.224.8812
(tel:+12122248812)

Download vCard
(https://www.brewerattorı
Vera-y23y.vcf)



(https://www.brewerattorı
zinke)

### DONNA ZINKE (HTTPS://WWW.BRI ZINKE)

Counsel

dzinke@brewerattorneys.c

214.653.4841

Download vCard
(https://www.brewerattorı
Zinke.vcf)



(https://www.brewerattorı
welch)

### JORDAN WELCH (HTTPS://WWW.BRI WELCH)

**Associate**

jaw@brewerattorneys.com

214.653.4858

Download vCard
(https://www.brewerattorı
Welch.vcf)



**CONTACT**

DALLAS   214.653.4000
(http://tel+:2146534000/)
NEW YORK   212.489.1400 (tel:+2124891400)

**HOME**
(https://www.brewerattorneys.com/home-2) |
**STORY**
(https://www.brewerattorneys.com/story) |
CASES
(https://www.brewerattorneys.com/cases-2) |
**PEOPLE** (https://www.brewerattorneys.com/team-1) | **EXPERTISE**
(https://www.brewerattorneys.com/expertise) | **ADVOCACY**
(https://www.brewerattorneys.com/the-art-of-advocacy) | **OUTREACH**
(https://www.brewerattorneys.com/community-outreach) | **JOIN US**
(https://www.brewerattorneys.com/join-us)| **NEWS** (https://www.brewerattorneys.com/news) |
**CONTACT** (https://www.brewerattorneys.com/contact)

*©2019. All rights reserved. Site Design*
*(http://www.luxurylloyd.com/)*



**DISCLAIMER**

*All materials contained on this website are made*
*available by Brewer, Attorneys & Counselors for*
*informational purposes only and should not be*
*construed as legal advice. The transmission and*
*receipt of information contained on this website*
*does not form or constitute an attorney-client*
*relationship. Persons should not act upon*
*information found on this website without first*
*seeking professional legal counsel.*

**APP118**

| From: | Mason, Brian |
|---|---|
| To: | Michael Collins |
| Cc: | Gruber, G. Michael; Carroll, Christina; Taylor, Kelsey; Jordan Welch; Alessandra Allegretto |
| Subject: | RE: [EXTERNAL] RE: NRA/AMc |
| Date: | Wednesday, May 27, 2020 10:02:04 AM |
| Attachments: | image001.png |

Mike,

We have still not received a formal response regarding Skye Brewer's declaration.  Please produce Mrs. Brewer's declaration immediately.

**Brian E. Mason**



DORSEY & WHITNEY LLP
300 Crescent Ct, Suite 400 | Dallas, TX 75201
P: 214.981.9929   F: 214.981.9901   C: 214.675.6002

WWW.DORSEY.COM  ::  DALLAS  ::  BIO  ::  V-CARD

---

**From:** Michael Collins <MJC@BrewerAttorneys.com>
**Sent:** Friday, May 22, 2020 6:38 PM
**To:** Mason, Brian <mason.brian@dorsey.com>
**Cc:** Gruber, G. Michael <gruber.mike@dorsey.com>; Carroll, Christina <carroll.christina@dorsey.com>; Taylor, Kelsey <Taylor.Kelsey@dorsey.com>; Jordan Welch <jaw@brewerattorneys.com>; Alessandra Allegretto <apa@brewerattorneys.com>
**Subject:** RE: [EXTERNAL] RE: NRA/AMc

Brian,

Please see the attached.

Best,
Mike

---

**From:** mason.brian@dorsey.com <mason.brian@dorsey.com>
**Sent:** Thursday, May 21, 2020 3:20 PM
**To:** Michael Collins <MJC@BrewerAttorneys.com>; Jordan Welch <jaw@brewerattorneys.com>; Alessandra Allegretto <apa@brewerattorneys.com>
**Cc:** gruber.mike@dorsey.com; carroll.christina@dorsey.com; Taylor.Kelsey@dorsey.com
**Subject:** RE: [EXTERNAL] RE: NRA/AMc

Mike,

**EXHIBIT J-3**                                                                 **APP120**

Without waiving anything regarding your failure to produce Mrs. Brewer's declaration, it was only one of the issues raised in my correspondence.  What about the January 5, 2019 transcript?

**Brian E. Mason**



DORSEY & WHITNEY LLP
300 Crescent Ct, Suite 400 | Dallas, TX 75201
P: 214.981.9929   F: 214.981.9901   C: 214.675.6002
WWW.DORSEY.COM  ::  DALLAS  ::  BIO  ::  V-CARD

---

**From:** Michael Collins <MJC@BrewerAttorneys.com>
**Sent:** Thursday, May 21, 2020 2:50 PM
**To:** Mason, Brian <mason.brian@dorsey.com>; Jordan Welch <jaw@brewerattorneys.com>; Alessandra Allegretto <apa@brewerattorneys.com>
**Cc:** Gruber, G. Michael <gruber.mike@dorsey.com>; Carroll, Christina <carroll.christina@dorsey.com>; Taylor, Kelsey <Taylor.Kelsey@dorsey.com>
**Subject:** [EXTERNAL] RE: NRA/AMc

Brian

We received your letter dated May 20, 2020, regarding the declaration of James McCormack.  As you know, we did not submit a declaration from Skye McQueen Brewer with our Opposition to your Motion to Disqualify, and we will provide you with a formal response on this point tomorrow.

Best,
Mike

---

**From:** mason.brian@dorsey.com <mason.brian@dorsey.com>
**Sent:** Wednesday, May 20, 2020 10:15 PM
**To:** Michael Collins <MJC@BrewerAttorneys.com>; Jordan Welch <jaw@brewerattorneys.com>; Alessandra Allegretto <apa@brewerattorneys.com>
**Cc:** gruber.mike@dorsey.com; carroll.christina@dorsey.com; Taylor.Kelsey@dorsey.com
**Subject:** NRA/AMc

Mike,

Please see the attached.  We appreciate your prompt attention to these issues.

**Brian E. Mason**

APP121



DORSEY & WHITNEY LLP

300 Crescent Ct, Suite 400 | Dallas, TX 75201

**P:** 214.981.9929   **F:** 214.981.9901   **C:** 214.675.6002

WWW.DORSEY.COM  ::  DALLAS  ::  BIO  ::  V-CARD

**CONFIDENTIAL COMMUNICATION**

*E-mails from this firm normally contain confidential and privileged material, and are for the sole use of the intended recipient.*
*Use or distribution by an unintended recipient is prohibited, and may be a violation of law. If you believe that you received*
*this e-mail in error, please do not read this e-mail or any attached items.  Please delete the e-mail and all attachments,*
*including any copies thereof, and inform the sender that you have deleted  the e-mail, all attachments and any copies thereof.*
*Thank you.*

**CAUTION: This email is from outside the organization. DO NOT CLICK a link or open an attachment unless you know the content is safe and are expecting it from the sender. If in doubt, contact the sender separately to verify the content.**
======================

**CAUTION: This email is from outside the organization. DO NOT CLICK a link or open an attachment unless you know the content is safe and are expecting it from the sender. If in doubt, contact the sender separately to verify the content.**
======================

**APP122**

| | |
|---|---|
| **From:** | Michael Collins |
| **To:** | Mason, Brian |
| **Cc:** | Gruber, G. Michael; Carroll, Christina; Taylor, Kelsey; Jordan Welch; Alessandra Allegretto |
| **Subject:** | RE: [EXTERNAL] RE: NRA/AMc |
| **Date:** | Friday, May 22, 2020 6:38:37 PM |
| **Attachments:** | image001.png<br>2020-05-22_Letter to B. Mason.pdf<br>Final Board Meeting Minutes Jan 5 2019_2277001_11297474 (003).pdf |

Brian,

Please see the attached.

Best,
Mike

**From:** mason.brian@dorsey.com <mason.brian@dorsey.com>
**Sent:** Thursday, May 21, 2020 3:20 PM
**To:** Michael Collins <MJC@BrewerAttorneys.com>; Jordan Welch <jaw@brewerattorneys.com>;
Alessandra Allegretto <apa@brewerattorneys.com>
**Cc:** gruber.mike@dorsey.com; carroll.christina@dorsey.com; Taylor.Kelsey@dorsey.com
**Subject:** RE: [EXTERNAL] RE: NRA/AMc

Mike,

Without waiving anything regarding your failure to produce Mrs. Brewer's declaration, it was only
one of the issues raised in my correspondence.  What about the January 5, 2019 transcript?

**Brian E. Mason**



DORSEY & WHITNEY LLP
300 Crescent Ct, Suite 400 | Dallas, TX 75201
P: 214.981.9929   F: 214.981.9901   C: 214.675.6002

WWW.DORSEY.COM   ::   DALLAS   ::   BIO   ::   V-CARD

**From:** Michael Collins <MJC@BrewerAttorneys.com>
**Sent:** Thursday, May 21, 2020 2:50 PM
**To:** Mason, Brian <mason.brian@dorsey.com>; Jordan Welch <jaw@brewerattorneys.com>;
Alessandra Allegretto <apa@brewerattorneys.com>
**Cc:** Gruber, G. Michael <gruber.mike@dorsey.com>; Carroll, Christina
<carroll.christina@dorsey.com>; Taylor, Kelsey <Taylor.Kelsey@dorsey.com>
**Subject:** [EXTERNAL] RE: NRA/AMc

**EXHIBIT J-4**          **APP123**

Brian

We received your letter dated May 20, 2020, regarding the declaration of James McCormack.  As you know, we did not submit a declaration from Skye McQueen Brewer with our Opposition to your Motion to Disqualify, and we will provide you with a formal response on this point tomorrow.

Best,
Mike

---

**From:** mason.brian@dorsey.com <mason.brian@dorsey.com>
**Sent:** Wednesday, May 20, 2020 10:15 PM
**To:** Michael Collins <MJC@BrewerAttorneys.com>; Jordan Welch <jaw@brewerattorneys.com>; Alessandra Allegretto <apa@brewerattorneys.com>
**Cc:** gruber.mike@dorsey.com; carroll.christina@dorsey.com; Taylor.Kelsey@dorsey.com
**Subject:** NRA/AMc

Mike,

Please see the attached.  We appreciate your prompt attention to these issues.

**Brian E. Mason**



DORSEY & WHITNEY LLP
300 Crescent Ct, Suite 400 | Dallas, TX 75201
**P:** 214.981.9929   **F:** 214.981.9901   **C:** 214.675.6002

WWW.DORSEY.COM   ::   DALLAS   ::   BIO   ::   V-CARD

CONFIDENTIAL COMMUNICATION
*E-mails from this firm normally contain confidential and privileged material, and are for the sole use of the intended recipient. Use or distribution by an unintended recipient is prohibited, and may be a violation of law. If you believe that you received this e-mail in error, please do not read this e-mail or any attached items.  Please delete the e-mail and all attachments, including any copies thereof, and inform the sender that you have deleted  the e-mail, all attachments and any copies thereof. Thank you.*

> **CAUTION: This email is from outside the organization. DO NOT CLICK a link or open an attachment unless you know the content is safe and are expecting it from the sender. If in doubt, contact the sender separately to verify the content.**
> =====================

> **CAUTION: This email is from outside the organization. DO NOT CLICK a link or open an attachment unless you know the content is safe and are expecting it from the sender. If in doubt, contact the sender separately to verify the content.**
> =====================

**APP124**

# B R E W E R
### ATTORNEYS & COUNSELORS

May 22, 2020

**VIA EMAIL**

Mr. Brian Mason
Dorsey & Whitney, LLP
300 Crescent Court, Suite 400
Dallas, Texas 75201
mason.brian@dorsey.com

> Re:   *National Rifle Association of America v. Ackerman McQueen, Inc., et al.*, No.
> 3:19-cv-02074 (N.D. Tex.); James McCormack Declaration

Dear Brian:

After reviewing the items noted in your May 20, 2020 letter, we would like to clarify the following points related to James McCormack's declarations.

First, after reviewing Mr. McCormack's declaration filed in support of the NRA's Motion to Disqualify, the January 5, 2019 board meeting transcript was inadvertently omitted from the appendix to our Motion. Therefore, a copy of the transcript is enclosed with this correspondence for your review.

Additionally, with regard to the inclusion of a reference to the declaration of Skye McQueen Brewer in Mr. McCormack's declaration in support of the NRA's Opposition to AMc's Motion to Disqualify, we will provide a supplemental response on Tuesday, May 26, 2020.

Please feel free to reach out should you have any questions.

Sincerely,

Michael J. Collins

cc:   Brian Mason
      Mike Gruber
      Jay Madrid
      Alessandra Allegretto
      Jordan Welch

| | |
|---|---|
| From: | William Brewer |
| To: | Dana Merritt; Mason, Brian |
| Cc: | Michael Collins; Alessandra Allegretto; Jordan Welch |
| Subject: | [EXTERNAL] Re: NRA v. AMc - Third party subpoena documents |
| Date: | Monday, May 18, 2020 9:07:41 PM |

When did we get these.

Best,

Bill

**From:** Dana Merritt <DXM@BrewerAttorneys.com>

**Sent:** Monday, May 18, 2020 9:59:55 PM

**To:** mason.brian@dorsey.com <mason.brian@dorsey.com>

**Cc:** Michael Collins <MJC@BrewerAttorneys.com>; Alessandra Allegretto
<apa@brewerattorneys.com>; Jordan Welch <jaw@brewerattorneys.com>

**Subject:** NRA v. AMc - Third party subpoena documents

Dear Mr. Mason,

Please find below a file transfer link to folders containing copies of supplemental documents produced
by Comcast and Six Flags in response to the NRA's subpoenas.

https://filecloud.brewerattorneys.com/Public/?folder=0fc278a3

Regards,

**Dana Merritt** | Senior Case Manager

Brewer Attorneys & Counselors

1717 Main Street, Suite 5900

Dallas, Texas 75201

Office: 214.653.4848 | Fax: 214.653.4015

DXM@brewerattorneys.com | www.brewerattorneys.com

# BREWER
## ATTORNEYS & COUNSELORS

This communication (including any attachments) is intended for the sole use of the intended recipient, and
may contain material that is confidential, privileged, attorney work product, and/or subject to privacy laws. If
you are not the intended recipient, you are hereby kindly notified that any use, disclosure, or copying of this
communication or any part thereof is strictly prohibited. If you have received this communication in error,

**EXHIBIT J-5**                                    **APP126**

please delete this communication, including any copies or printouts, and notify us immediately by return email or at the telephone number above. Brewer, Attorneys and Counselors asserts in respect of this communication all applicable confidentiality, privilege, and/or privacy rights to the fullest extent permitted by law. Thank you.

**APP127**