## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| *Plaintiff and Counter-Defendant*, | § § | |
| **and** | § § | |
| **WAYNE LAPIERRE,** | § § | |
| *Third-Party Defendant*, | § § | |
| **v.** | § § | **Case No. 3:19-cv-02074-G** |
| **ACKERMAN MCQUEEN, INC.,** | § § | |
| *Defendant and Counter-Plaintiff*, | § § | |
| **and** | § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, AND JESSE GREENBERG,** | § § § § | |
| *Defendants*. | § | |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION TO STRIKE DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISQUALIFY PLAINTIFF'S COUNSEL, OR IN THE ALTERNATIVE, MOTION FOR LEAVE TO FILE SUR-REPLY

## <u>TABLE OF CONTENTS</u>

I.     SUMMARY OF THE RESPONSE ................................................................1

II.    ARGUMENTS & AUTHORITIES ............................................................4

    A.    Defendants' Reply Does Not Raise Any New Arguments. ...................................5

    B.    The Supplemental Evidence Was Not "Dispositive" or "New," but Solely Submitted to Rebut Plaintiff's Arguments and Evidence. ......................................9

        1.    Legal standard for striking evidence submitted with a reply brief. ............9

        2.    Plaintiff's DQ Response raised arguments that Defendants could not have anticipated because they were irrelevant to the merits of the DQ Motion. .......................................................................11

        3.    The Reply Brief's counter-declarations are not dispositive evidence. ...................................................................14

        4.    The counter-declaration of expert witness Randy Johnston is not dispositive evidence. ...................................................19

    C.    Plaintiff Asks the Court to Selectively Enforce the Rules. ...................................22

    D.    Plaintiff's Remaining Arguments are Groundless. .................................................22

        1.    Defendants' Reply Brief does not unfairly prejudice Plaintiff. .................22

        2.    Plaintiff cites no authority striking a reply for exceeding the page limit. ..........................................................................23

    E.    Plaintiff Has Failed to Establish that a Sur-Reply Is Warranted. ..........................24

III.    PRAYER...........................................................................................25

# TABLE OF AUTHORITIES

CASES

*Aldrich . Univ. of Phx., Inc.*, No. 3:15-cv-00578-JHM, 2016 U.S. Dist. LEXIS 27584 (W.D. Ky. Mar. 4, 2016) ................................................................................................................. 10

*Dondi Properties Corp. v. Commerce Sav. & Loan Assoc.*, 121 F.R.D. 284 (N.D. Tex. 1988) .... 4

*Drive Fin. Servs., LP v. Ginsburg*, No. 3:06-CV-1288-G ECF, 2007 U.S. Dist. LEXIS 525571 (N.D. Tex. July 19, 2007) ................................................................................................ 11

*Grissom v. Ill. Cent. R.R. Co.*, Case No. 1:13-cv-228, 2014 U.S. Dist. LEXIS 204428 (E.D. Tenn. Feb. 3, 2014) ...................................................................................................... 10

*HCC Aviation Ins. Grp., Inc. v. Emp'rs Reinsurance Corp.*, No. 3:05-CV-744-M (BH), 2008 U.S. Dist. LEXIS 124998 (N.D. Tex. Feb. 25, 2008) ............................................................ 24

*Jackson v. Dall. Cty. Juvenile Prob. Dep't*, No. 3:06-CV-264-M (BH) ECF, 2007 U.S. Dist. LEXIS 54961 (N.D. Tex. July 30, 2007) ............................................................... 5, 10

*K.C. v. Mansfield Indep. Sch. Dist.*, 618 F. Supp. 2d 568 (N.D. Tex. 2009) ............................ 4, 6

*KB Home v. Antares Homes, Ltd.*, No. 3-04-CV-1031-L, 2007 U.S. Dist. LEXIS 47273 (N.D. Tex. June 28, 2007) ................................................................................................. 4, 5, 9, 10

*Lacher v. West*, 147 F. Supp. 2d 538 (N.D. Tex. 2001) ................................................. 10, 11, 24

*Litton Industries, Inc. v. Lehman Bros. Kuhn Loeb, Inc.*, 767 F. Supp. 1220 (S.D.N.Y. 1991), *rev'd on other grounds* 967 F.2d 742 (2d. Cir. 1992) ...................................................... 10

*Nat'l Architectural Prods. Co. v. Atlas-Telecom Servs.—USA, Inc.*, No. 3:06-CV-0751-G ECF, 2007 U.S. Dist. LEXIS 51182 (N.D. Tex. July 13, 2007) ..................................................... 24

*Pa. Gen. Ins. Co. v. Story*, No. 3:03-CV-0330-G, 2003 U.S. Dist. LEXIS 9923 (N.D. Tex. June 10, 2003) .................................................................................................................... 4, 5

*Peters v. Lincoln Elec. Co.*, 285 F.3d 456 (6th Cir. 2002) .......................................................... 10

*Smith v. Xerox Corp.*, 584 F. Supp. 2d 905 (N.D. Tex. 2008) ................................................. 4, 6

*Springs Indus., Inc. v. Am. Motorists Ins. Co.*, 137 F.R.D. 238 (N.D. Tex. 1991) ............... *passim*

*United States v. City of Dall.*, No. 3:09-CV-1452-O, 2011 U.S. Dist. LEXIS 119046 (N.D. Tex. Sep. 27, 2011) ................................................................................................................ 5, 10

*Weber v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 455 F. Supp. 2d 545 (N.D. Tex. 2006). 4, 5, 6, 10

*Xtria LLC v. Tracking Sys.*, No. 3:07-CV-0160-D, 2007 U.S. Dist. LEXIS 68997 (N.D. Tex. Sep. 18, 2007) ........................................................................................................................ 4, 6, 9

*Young v. Mitsubishi Motors Corp.*, NO. 1:19-CV-00175-LY, 2019 U.S. Dist. LEXIS 204919 (W.D. Tex. Nov. 25, 2019) ...................................................................................... 10

**OTHER AUTHORITIES**

*Dispositive Fact*, BLACK'S LAW DICTIONARY (11th ed. 2019)...................................................... 9

*Dispositive*, BLACK'S LAW DICTIONARY (11th ed. 2019) .............................................................. 9

*Rebuttal Evidence*, BLACK'S LAW DICTIONARY (11th ed. 2019)................................................. 10

**RULES**

Local Rule 7.1 ................................................................................................................... 4

Local Rule 7.2 ................................................................................................................. 19

Ackerman McQueen, Inc. ("*AMc*"), Mercury Group, Inc., Henry Martin, William Winkler, Melanie Montgomery, and Jesse Greenberg (collectively, "*Defendants*") file this *Response to Plaintiff's Motion to Strike Defendants' Reply in Support of Their Motion to Disqualify Plaintiff's Counsel, or in the Alternative, Motion for Leave to File Sur-Reply* (the "*Response*" to the "*Motion*") (ECF 152).

## I.   SUMMARY OF THE RESPONSE

On March 30, 2020, Defendants filed their Motion to Disqualify Plaintiff's Counsel and supporting brief ("*DQ Motion*"), outlining the various arguments and evidence mandating the disqualification of William A. Brewer III ("*Brewer*") and his law firm, Brewer Attorneys & Counselors (the "*Brewer Firm*"), as counsel for the National Rifle Association of America ("*NRA*").  The DQ Motion sets out numerous grounds for Brewer's disqualification, such as his professional competition[1] with AMc, his intentional and tortious interference with the business relationship between AMc and the NRA, his assistance defrauding AMc through fake audits, including his use of his own employees to carry out that fraud, his history of animosity with the McQueen family that was the impetus for many of these actions, and his improper use of media attacks to illegally and maliciously prejudice public opinion against AMc.

The DQ Motion cited evidence of Brewer's hijacking of the NRA, his manipulation of NRA leadership, and the ousting of anyone who challenged his invoices, including former NRA President, Lt. Col. Oliver North, and other NRA officers and directors (including the board's own general counsel)—even to the extent of manufacturing evidence of "extortion" to silence any opposition.  The DQ Motion also cited evidence that Brewer used his personal family knowledge

---

[1] In her Order granting Defendants' Motion for Protective Order, Magistrate Judge Toliver agreed that with the previous ruling of the Virginia Court in finding that the Brewer Firm was enough of a competitor of AMc such that "Brewer and its PR unit should be walled off" from AMc's sensitive business information" because "Brewer could use that competitive information to severely prejudice AMc."   *See* ECF. No. 148 at 4.

to intentionally cause emotional distress to the McQueens, specifically his dying father-in-law; that he improperly communicated with represented parties using family backchannels to intentionally break privilege; and that Brewer knowingly orchestrated Brewer Firm employee Susan Dillon to spearhead an audit of AMc, fraudulently represented as "independent," after the NRA made numerous false and material misrepresentations to AMc that it would no longer have to deal with Brewer or the Brewer Firm because of their conflicts. As set forth in the DQ Motion, Defendants respectfully request that the Court disqualify Brewer and the Brewer Firm for numerous violations of ethical rules related to conflicts-of-interest, lawyer-witness considerations, trial publicity, and communications with represented parties.

On May 4, 2020, Plaintiff filed its response to Defendants' Motion to Disqualify ("**DQ Response**").[2] Plaintiff's apparent goal was to repackage the revisionist narrative it has been peddling since the beginning of this lawsuit, devoting the bulk of its brief to the various "bad acts" of AMc instead of focusing on the direct and irreconcilable conflicts of interests presented by the Brewer Firm's representation of the NRA in this matter. In support of its DQ Response, the NRA submitted eleven declarations of fact witnesses, most of which similarly focused on AMc's conduct, not Brewer or the Brewer Firm's. Notably absent was any declaration from Brewer himself. The DQ Response also included *three* amicus briefs, couched as "expert witness opinions," which failed to meet the requirements for amicus briefs <u>or</u> expert opinions under judicial precedent and the Northern District's local rules, thereby providing Plaintiff, as cynically planned, with an additional *94 pages* of supplemental legal briefing. Defendants have moved to strike each of these briefs.[3]

---

[2] ECF 121.
[3] ECF 142.

On June 3, 2020, Defendants filed their Reply in Support of their Motion to Disqualify ("**Reply Brief**").[4]  Along with the Reply Brief, Defendants filed objections to Plaintiff's "expert witnesses," outlining the reasons why these briefs failed to meet the standards for expert testimony in this matter and asking the Court, in the alternative, for leave to submit the counter-declaration of a rebuttal expert for the Court's consideration.[5]  Defendants also filed objections to Plaintiff's lay witness declarations and several counter-declarations, in the form of an appendix, specifically rebutting the factual allegations raised by the lay witnesses.[6]

Plaintiff has now moved to strike the *entire* Reply Brief and all attachments.  However, Plaintiff's Motion is legally and factually incorrect, merely an attempt to detract from the merits of the underlying DQ Motion and delay the well-earned ejection of its counsel from this lawsuit. When stripped of its bluster and innuendo, Plaintiff's Motion identifies two discreet challenges to Defendants' Reply Brief: (1) that the allegations relating to Brewer and Susan Dillon's fraud issue is somehow a "new argument," brought for the first time in the Reply Brief; and (2) that Defendants improperly included new dispositive evidence with the Reply Brief.  These contentions are false and do not mandate the striking of either the Reply Brief or its appendix as a matter of law.  Moreover, Plaintiff's Motion underscores the remarkable hypocrisy that has characterized the NRA's conduct throughout this litigation by again asking the Court to selectively apply the rules only when the NRA stands to benefit.  In sum, Plaintiff's DQ Response did not sufficiently address the merits of the allegations against Plaintiff's counsel.  Plaintiff should not be permitted to recast and control the public narrative (through the striking of Defendants' Reply Brief) or

---

[4] ECF 140.
[5] ECF 142.
[6] ECF 141, 143.

revisit issues it previously failed to address (through additional briefing via sur-reply). Plaintiff's Motion should be denied in its entirety.

## II.   ARGUMENTS & AUTHORITIES

Since this Court's holding in the 1988 case of *Dondi Properties v. Commerce Savings & Loan*, it has been the rule in the Northern District that "the party with the burden on a particular matter will normally be permitted to open and close the briefing."[7] *Dondi* was decided at a time when the filing of a reply brief required a motion for leave, but that decision formed the basis for the addition of Local Rule 7.1(f), which now permits a movant's reply brief as a matter of right.[8]

The purpose of a reply brief is to rebut the nonmovant's response, thereby persuading the court that the movant is entitled to the relief requested by the motion.[9] Although the general rule is that a reply brief may not present any new arguments or evidence,[10] the Northern District has defined what comprises "new" arguments and evidence. With regard to "new arguments," this Court has historically stricken arguments or granted sur-replies in cases where an argument raised in a reply brief presented a new legal theory supporting the relief the movant sought in its original motion.[11] Similarly, "new evidence" is typically "dispositive" in some way,[12] either because it

---

[7] *Dondi Properties Corp. v. Commerce Sav. & Loan Assoc.*, 121 F.R.D. 284, 291-92 (N.D. Tex. 1988) (en banc).
[8] L.R. 7.1(f) ("Unless otherwise directed by the presiding judge, a party who has filed an opposed motion may file a reply brief within 14 days from the date the response is filed.")
[9] *Pa. Gen. Ins. Co. v. Story*, No. 3:03-CV-0330-G, 2003 U.S. Dist. LEXIS 9923, at *1-3 (N.D. Tex. June 10, 2003) (Fish, J.) (citing *Springs Indus., Inc. v. Am. Motorists Ins. Co.*, 137 F.R.D. 238, 239 (N.D. Tex. 1991)).
[10] *See id.* at *2.
[11] *See, e.g.*, *K.C. v. Mansfield Indep. Sch. Dist.*, 618 F. Supp. 2d 568, 577 (N.D. Tex. 2009); *Smith v. Xerox Corp.*, 584 F. Supp. 2d 905, 915 n.18 (N.D. Tex. 2008); *Xtria LLC v. Tracking Sys.*, No. 3:07-CV-0160-D, 2007 U.S. Dist. LEXIS 68997, at *14 (N.D. Tex. Sep. 18, 2007); *Weber v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 455 F. Supp. 2d 545, 551 (N.D. Tex. 2006).
[12] *See KB Home v. Antares Homes, Ltd.*, No. 3-04-CV-1031-L, 2007 U.S. Dist. LEXIS 47273, at *5-6 (N.D. Tex. June 28, 2007); *Springs Indus.*, 137 F.R.D. at 239.

(1) directly supports original arguments in the underlying motion[13] or (2) supports a "new argument" raised in the reply brief.[14]

As discussed herein, each and every case that Plaintiff cites in support of its Motion on the issues of "new arguments" or "new evidence" does not apply because the Reply Brief contains no new legal theories or dispositive evidence. Rather, the only function of the Reply Brief was to rebut the arguments and evidence raised in Plaintiff's DQ Response, which Defendants obviously could not have anticipated when filing their original DQ Motion. To deny Defendants the opportunity to rebut those many new (and false) allegations and additional 94 pages of "expert advocacy" would result in "palpable injustice"[15] to Defendants.

Although the Court is always free to disregard any additional evidence or information that it does not deem helpful to its decision,[16] striking the entirety of the Reply Brief is not legally supported. Indeed, Plaintiff points to no case, and Defendants have identified none, where this Court has stricken a reply brief in its entirety. Accordingly, Plaintiff is not entitled to the primary relief sought in its Motion.

### A. Defendants' Reply Does Not Raise Any New Arguments.

Plaintiff incorrectly identifies only the fraud of Brewer, Susan Dillon, the NRA, and others as a "new argument" that it seeks to strike. In each case Plaintiff cites in support of its proposition that Defendants' "new arguments" should be stricken, the movant attempted to raise an entirely new legal theory, statute, or defense as grounds for the relief sought in the original motion. For

---

[13] *See, e.g.*, *KB Home*, 2007 U.S. Dist. LEXIS 47273, at *5-6; *Jackson v. Dall. Cty. Juvenile Prob. Dep't*, No. 3:06-CV-264-M (BH) ECF, 2007 U.S. Dist. LEXIS 54961 (N.D. Tex. July 30, 2007).

[14] *See, e.g.*, *Weber*, 455 F. Supp. 2d at 551.

[15] *Cf. Pa. Gen. Ins. Co. v. Story*, No. 3:03-CV-0330-G, 2003 U.S. Dist. LEXIS 9923 (N.D. Tex. June 10, 2003) (Fish, J.).

[16] *See United States v. City of Dall.*, No. 3:09-CV-1452-O, 2011 U.S. Dist. LEXIS 119046, at *12-13 (N.D. Tex. Sep. 27, 2011) ("When a movant has interjected new evidence into a reply brief without affording the non-movant an opportunity for further response, the court retains the discretion to decline to consider it."); *Springs Indus.*, 137 F.R.D. at 239-40.

example, in *Weber v. Merrill Lynch*, the court struck a new argument for vacating an arbitral award, which was raised for the first time in the movant's reply brief.[17]  Similarly, in *K.C. v. Mansfield ISD*, the court declined to consider (without striking) a new statutory theory of recovery first raised in the movant's reply brief.[18]  Here, no portion of Defendants' Reply Brief should be stricken because it does not contain any new legal theories or grounds for disqualification that were not originally raised in Defendants' DQ Motion.

For inexplicable reasons, Plaintiff argues that the Reply Brief is the first document that mentions the Brewer Firm's use of its employee Susan Dillon ("***Dillon***") to perpetrate a fraud upon AMc.  This is false.  Defendants unquestionably raised the issue of Dillon's fraud in the original DQ Motion.

To summarize the background of this issue, Dillon was a 17-year employee of the Brewer Firm who personally conducted the audit of AMc in September 2018 on behalf of the NRA.  This audit was strange for AMc because it was different from any of the previous audits conducted by the NRA.  At first, the auditors would not even identify themselves.  Then they asked for large quantities of information, not appearing to be looking for anything specific or reconciling any particular data, as with prior audits.  The auditors simply appeared to be fishing for information.

Due to the abnormality of this "audit" and other concerns about Brewer's involvement with matters adverse to AMc, LaPierre promised that Brewer and his firm would no longer be involved with AMc audits.  Based on this representation, AMc agreed to another purportedly independent audit by Forensic Risk Alliance ("***FRA***").  Later it was discovered that Dillon had left the Brewer

---

[17] *Weber*, 455 F. Supp. 2d at 551.
[18] *K.C. v. Mansfield Indep. Sch. Dist.*, 618 F. Supp. 2d 568 (N.D. Tex. 2009); *see also Smith*, 584 F. Supp. 2d at 915 n.18 (court declined to consider new argument in reply brief that punitive damages award was excessive); *Xtria*, 2007 U.S. Dist. LEXIS 68997, at *14 (court declined to consider new defensive theory as ground for dismissal in reply brief).

Firm and, without AMc's knowledge or consent, secretly oversaw the FRA audit from behind the scenes. *All* of these allegations were included in Defendants' DQ Motion and supporting evidence:

> In September and November 2018, the NRA conducted two separate audits of AMc with Brewer's oversight. Because of AMc's concerns about Brewer and his firm's conflicts, LaPierre promised Brewer would not be involved anymore. Thus, in February 2019, AMc endured a nine-day audit by Forensic Risk Alliance (FRA), supposedly "independent"—later proven to be anything but. After the audit, AMc discovered that FRA employee Susan Dillon had just left the Brewer Firm in November 2018 after 17 years (including as a Director) and had even participated in the Brewer Firm's September 2018 audit.[19]

These issues were also discussed in the Affidavit of Revan McQueen, which was cited in the original DQ Motion and attached as an exhibit:

> In September 2018, members of the Brewer Firm conducted an on-site review at AMc of AMc records authorized for NRA personnel pursuant to the Services Agreement, but which was unlike any other review the NRA had ever conducted. The Brewer Firm representatives, led by Susan Dillon, initially refused to identify themselves and refused to answer questions about the purpose of the review. While every prior review involved NRA reports or other financial statements that needed to be reconciled in some way, the Brewer Firm representatives seemed to request volumes of AMc NRA-related material with no stated or identifiable objective. Following the review, it is my understanding that no one from the NRA or the Brewer Firm followed up to identify any additional information that was missing or needed. At that point, AMc concluded the NRA and the Brewer Firm had gotten whatever information they needed.[20]

> In February 2019, AMc underwent yet another onsite review at the NRA's request, which according to the NRA's representations, would be done by an independent firm unrelated to the Brewer Firm. The review was conducted by a company called Forensic Risk Alliance ("FRA") and lasted on site for a total of nine days. While still unusual, AMc did not withhold or fail to provide any document requested by FRA. As with the two previous reviews, FRA did not follow up or request any additional information post-review. Therefore, AMc assumed the review was complete. We now know that Susan Dillon, the woman who led the first audit for Brewer, had left the Brewer firm some time in 2018 and joined FRA.[21]

---

[19] ECF 105 at ¶ 26 (footnotes omitted).
[20] ECF 80 at Ex. B ¶ 21 [APP 1174].
[21] ECF 80 at Ex. B ¶ 29 [APP 1177].

Accordingly, it is nonsensical—and a plain misrepresentation to the Court—for Plaintiff to now argue that the issue of Susan Dillon was not raised until the Reply Brief. To the contrary, the Reply Brief simply reiterated the issue, further pointing out that the NRA entirely declined to respond to these allegations in its DQ Response:

> During an October 2018 meeting where Brewer's harassment and criminal threats to AMc were repeatedly discussed, LaPierre promised AMc that Brewer and his firm . . . would no longer be involved with AMc, including future audits, which neither LaPierre nor Craig Spray deny. The NRA later explained that it needed additional documents through an audit for a "common legal interest[]" relating to the Lockton Litigation. AMc agreed to an "independent" audit in 2019 by Forensic Risk Alliance ("*FRA*"). **The FRA lead? Susan Dillon, Brewer's 17-year Director of Consulting who "left" the Brewer Firm right after LaPierre's October 2018 promise. Dillon had also participated in the Brewer Firm's September 2018 audit of AMc. <u>The NRA does not deny this fraud in any of their 14 declarations.</u> Had AMc known of Dillon's connection to Brewer, it never would have consented to FRA as the auditor.**[22]

The only "new" information related to Dillon in the Reply Brief was presented in the following paragraph:

> **Even worse, AMc learned on April 22, 2020 (after filing this Motion) that Dillon is <u>back at the Brewer Firm</u>**, further evidencing the conflict between Brewer's fraud and LaPierre's promises to AMc. Additionally, the NRA has stonewalled AMc's attempts to obtain all of the documents and reports from the FRA audit that they falsely claim AMc failed to comply with. More troubling, LaPierre said the NRA decided to sue AMc before any of the audits (including ones by Brewer) ever took place . . . .[23]

As indicated above, Dillon has now resumed her employment with the Brewer Firm after her clandestine stint with FRA, which fact AMc did not discover until after the filing of its initial DQ Motion. This additional bit of information does not create any new grounds or legal theories for disqualification. In essence, Plaintiff is complaining about Defendants bringing to this Court's attention further evidence of its blatant wrongdoing in conjunction with its lawyer. The fraud is

---

[22] ECF 140 at 3 (footnotes omitted) (emphasis in original and added).
[23] ECF 140 at 3 (footnotes omitted) (emphasis added).

complete regardless of whether Dillon was subsequently reemployed by the Brewer Firm. Accordingly, the Court is free to disregard this information if it is not helpful in making its determination,[24] but it is not a "new argument"[25] that should be stricken under any local rule or Northern District precedent.

Moreover, Plaintiff certainly should not now be given the chance to respond to this allegation in a sur-reply when it failed to address the fact in its DQ Response, especially when it knew, and probably should have disclosed, that Dillon was back at the Brewer Firm when it filed its DQ Response on May 5, 2020. In Plaintiff's own words: "they are bound by their prior choices."[26] Plaintiff's Motion should be denied on this issue.

### B.  The Supplemental Evidence Was Not "Dispositive" or "New," but Solely Submitted to Rebut Plaintiff's Arguments and Evidence.

The Court should not strike Defendants' appendix in support of its Reply Brief because it does not contain "dispositive" evidence. All additional evidence accompanying the Reply Brief was submitted solely to aid the court, clarify the record, and rebut the conclusory, misleading, and factually inaccurate allegations and evidence contained within Plaintiff's DQ Response.

### 1.      Legal standard for striking evidence submitted with a reply brief.

As Plaintiff notes, "a reply brief that presents *dispositive* evidence by way of new affidavits and exhibits deprives the nonmovant of a meaningful opportunity to respond."[27] According to Black's Law Dictionary, "dispositive" means "deciding factor" or "bringing about a final determination."[28] A "dispositive fact" "definitively resolves a legal issue or controversy."[29] The

---

[24] *See Springs Indus.*, 137 F.R.D. at 240.
[25] *See Xtria*, 2007 U.S. Dist. LEXIS 68997, at *14
[26] ECF No. 153 at 8.
[27] *KB Home*, 2007 U.S. Dist. LEXIS 47273, at *5-6 (emphasis added); *Springs Indus.*, 137 F.R.D. at 239.
[28] *Dispositive*, BLACK'S LAW DICTIONARY (11th ed. 2019).
[29] *Dispositive Fact*, BLACK'S LAW DICTIONARY (11th ed. 2019).

cases relied upon by Plaintiff treat the contested evidence as "dispositive" or otherwise offered in support of a "new argument" (as discussed above).[30]

Conversely, "rebuttal" evidence is introduced "to disprove or contradict the evidence presented by an opposing party."[31]  Although the Northern District does not appear to have squarely addressed the issue of purely rebuttal evidence, other courts have acknowledged that the movant cannot always anticipate the non-movant's arguments in order to present all possible evidence in its original filing.  For example, in *Aldrich v. University of Phoenix*, a federal court ruled it was proper for a movant to produce evidence with a reply brief specifically addressing an argument raised in the non-movant's response, holding that "the evidence did not create a new argument but instead defended against one Plaintiffs raised in their Response brief.[32]  Furthermore, some courts even permit additional evidence with reply briefs that continue the same underlying argument, so long as they do not raise any new arguments.  For example, the Western District of Texas permitted an additional declaration to be filed with a reply brief because it was not a "new" argument or supporting evidence but merely "a continuation of the same argument that the parties engaged in between the original motion and the response."[33]

As always, it is within the court's discretion to consider, or decline to consider, additional evidence submitted with a reply brief.[34]  As this Court stated in *Lacher v. West*, the inclusion of an

---

[30] *See KB Home*, 2007 U.S. Dist. LEXIS 47273, at *5-6; *Jackson*, 2007 U.S. Dist. LEXIS 54961; *Weber*, 455 F. Supp. 2d at 551; *Springs Indus.*, 137 F.R.D. at 239-40.

[31] *Rebuttal Evidence*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[32] *See Aldrich . Univ. of Phx., Inc.*, No. 3:15-cv-00578-JHM, 2016 U.S. Dist. LEXIS 27584, at *3-4 (W.D. Ky. Mar. 4, 2016); *see also Grissom v. Ill. Cent. R.R. Co.*, Case No. 1:13-cv-228, 2014 U.S. Dist. LEXIS 204428 (E.D. Tenn. Feb. 3, 2014) ("[R]eply affidavits that respond only to the opposing party's brief are properly filed with the brief." (quoting *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 476 (6th Cir. 2002)); *Litton Industries, Inc. v. Lehman Bros. Kuhn Loeb, Inc.*, 767 F. Supp. 1220 (S.D.N.Y. 1991), *rev'd on other grounds* 967 F.2d 742 (2d. Cir. 1992) ("Clearly, reply papers may properly address new material issues raised in the opposition papers so as to avoid giving unfair advantage to the answering party who took it upon himself to argue those previously unforeseen issues.").

[33] *See, e.g., Young v. Mitsubishi Motors Corp.*, NO. 1:19-CV-00175-LY, 2019 U.S. Dist. LEXIS 204919 (W.D. Tex. Nov. 25, 2019).

[34] *City of Dall.*, 2011 U.S. Dist. LEXIS 119046, at *12; *Springs Indus.*, 137 F.R.D. at 240; *see also Drive Fin. Servs., LP v. Ginsburg*, No. 3:06-CV-1288-G ECF, 2007 U.S. Dist. LEXIS 52557, at *21 (N.D. Tex. July 19, 2007)

appendix with a reply brief was "not necessarily a violation of the local rules," noting that there was no prejudice because the court "does not consider arguments (as opposed to *evidence*) raised for the first time in a reply brief."[35]   And in *Drive Financial Services v. Ginsberg*, in granting the movant's motion to dismiss, the Court struck some evidence but acknowledged that it relied upon other evidence in the movant's reply appendix.[36]

**2.     Plaintiff's DQ Response raised arguments that Defendants could not have anticipated because they were irrelevant to the merits of the DQ Motion.**

The DQ Motion raised the following substantive grounds for disqualification, including:

(a) Brewer's personal and professional conflicts of interest in representing a client against his family members and his business competitor;

(b) Brewer's ultimate need to act as both lawyer and witness in this litigation due to his apparent participation as a joint tortfeasor with the NRA and LaPierre;

(c) Brewer's use of the media to sway the proceedings and the intentional leaking of false information to the press about AMc;

(d) Brewer's communication with represented parties using family channels;

(e) Brewer's lack of respect for the rights of third persons.[37]

The dispositive evidence Defendants included with their DQ Motion took the form of an appendix of over 1,300 pages, including items such as:

(a) Deposition testimony, hearing excerpts, and sworn statements describing the multiple conflicts of interest by Brewer and the Brewer Firm;

(b) Deposition testimony providing direct and circumstantial evidence for Brewer and the Brewer Firm's involvement as a joint tortfeasor committing fraud, tortious interference, and defamation against AMc;

---

(acknowledging that the court had relied on an exhibit from the movant's reply brief appendix in determining a motion to dismiss in the movant's favor).

[35] *Lacher v. West*, 147 F. Supp. 2d 538, 540 (N.D. Tex. 2001) (emphasis added).

[36] *Drive Fin. Servs.*, 2007 U.S. Dist. LEXIS 52557, at *21.

[37] *See* ECF 105.

(c) Deposition testimony and media articles and excerpts showing direct and circumstantial evidence of Brewer's use of the media to sway the proceedings and his acknowledged professional philosophy for achieving that result; and

(d) Sworn statements from AMc's CEO describing Brewer's efforts to personally communicate with him and his father family using members of their mutual family and other evidence of intentional infliction of emotional distress against the McQueen family.[38]

Plaintiff's DQ Response failed to address or meaningfully refute many of the specific substantive issues raised in the DQ Motion, such as:

(a) The history of animosity between Brewer and the McQueen family[39];

(b) The instances of backchannel communications with Revan and Angus McQueen[40];

(c) The use of family secrets and sensitive family information to harass, intimidate, and distress the McQueen family[41];

(d) The concern of numerous NRA executives regarding Brewer's relationship with the McQueen family[42];

(e) Internal complaints about Brewer's conduct by NRA staff members, including prioritizing payments to his firm over other NRA vendors, monitoring NRA employee email accounts, and threatening and intimidating NRA staff who processed his bills[43];

(f) The investigation by Lt. Col. North regarding these and other internal complaints against Brewer and the NRA's stonewalling of that investigation[44];

(g) The ousting of Lt. Col. North and other NRA officers and board members who challenged Brewer's fees[45];

(h) The intentional manufacturing of evidence in support of the NRA's claims[46];

(i) The fraudulent nature of the FRA audit involving Brewer employee Susan Dillon[47]; and

---

[38] *See* ECF Nos. 80, 81.
[39] *See* ECF No. 105 ¶¶ 1-3, 40.
[40] *See id.* at ¶¶ 30, 55
[41] *See id.* at ¶¶ 20, 24, 27, 28, 55.
[42] *See id.* at ¶¶ 10, 25, 40
[43] *See id.* at ¶ 11.
[44] *See id.* at ¶¶ 10-12.
[45] *See id.* at ¶¶ 6, 13-19, 55.
[46] *See id.* at ¶¶ 16, 17, 43, 50.
[47] *See id.* at ¶ 26.

(j) The fact that the NRA was already in possession of a document (the North Contract) *before* the time the Brewer Firm signed a pleading claiming it was being withheld.[48]

Instead of addressing these issues, Plaintiff opted to deflect and misdirect by attacking AMc. Along with its DQ Response, Plaintiff attached eleven declarations from nine different fact witnesses,[49] containing conclusory and grossly misleading allegations about AMc that, falsity aside, literally have nothing to do with the merits of the DQ Motion. These immaterial allegations—all criticizing *AMc*'s conduct—include: AMc's budgeting and invoicing methods; AMc's alleged failure to provide transparency or cooperate with informational requests; AMc's charging for work that was incomplete; AMc's deviation from annual budget; alleged hostile behavior by Angus and Revan McQueen at meetings; the "abrasive" personality of Angus McQueen; AMc's oversight of NRATV messaging; AMc's alleged refusal to "work with" NRA leadership; AMc's computation and disclosure of NRATV viewership metrics; the leadership and management styles of Angus and Revan McQueen; AMc's handling of Carry Guard; and, of course, the ubiquitous "extortion" narrative. Again, <u>*not one*</u> of these issues actually addresses the disqualifying conduct by *Brewer* or the *Brewer Firm* described in Defendants' DQ Motion.[50] Yet regardless of the irrelevance of these allegations, it is manifestly unfair for the NRA to file false declarations in the public record, on any topic, and then prevent Defendants from publicly responding—certainly a recurring theme throughout this litigation: the NRA attempting to ensure that *its own* narrative is the only one in the public record.

---

[48] *See id.* at ¶ 13.

[49] *See* ECF No. 122 at Exs. 36, 38, 41-46, 48, 49, 52.

[50] Only the declarations of Travis Carter and Andrew Arulanandam (Ex. 36, 38, 46, and 49) directly address conduct by the Brewer Firm, specifically limited to arguments for why they believe that the Brewer Firm is not a "competitor" of AMc.

### 3.    The Reply Brief's counter-declarations are not dispositive evidence.

Although twice citing the general rule regarding "dispositive" evidence in its DQ Response, Plaintiff did not identify a single example of the "dispositive" evidence it complains of.[51]  Contrary to Plaintiff's argument that Defendants were somehow trying to cure a defective motion,[52] Defendants freely admit that this additional evidence is merely rebuttal evidence, not dispositive as stand-alone evidence, which the Court may disregard if it is not helpful.  All truly "dispositive" evidence may be found within the body of the DQ Motion and the original appendix.[53]  Any argument that Defendants held back some critical portion of their evidence until after Plaintiff filed its DQ Response is meritless.  In fact, the need for Defendants' Reply Brief appendix only highlights the sheer volumes of extraneous evidence included with Plaintiff's DQ Response, with no real purpose other than to muddy the waters and detract from the merits of the DQ Motion itself.

For example, the NRA's DQ Response included the declaration of Michael Erstling ("***Erstling***"), an obscure professional within the NRA's accounting department with whom AMc had almost zero communications during the entire history of the business relationship.  Although the NRA could have chosen to obtain a declaration from one of the accounting professionals who *did* frequently interact with AMc, for whatever reason it opted for Erstling—elevating him within the narrative to the status of star witness and heroic "whistleblower."[54]  Despite this near absolute lack of direct contact with AMc, Erstling purports to make authoritative comments about AMc's billing practices and supposed obfuscation of requests for information.[55]  Perhaps because Erstling

---

[51] *See* ECF No. 153 at 5, 7.
[52] *See id.* at 4, 6.
[53] *See* ECF Nos. 80, 81.
[54] *See* ECF No. 121 at 12.
[55] *See* ECF No. 122 at Ex. 41.

was so far removed from AMc's budgeting and billing process, he was unaware that AMc's invoicing method was conducted precisely according to LaPierre and the former Treasurer's, Woody Phillips, direction.  Certainly, Erstling had never *himself* made any requests for greater transparency in the manner described in his declaration.  Accordingly, the only way to correct the misrepresentations of this oddly selected witness was through the counter-declarations of the AMc employees who might possibly have interacted with him (to confirm that they did not), including William Winkler, Melanie Montgomery, Tony Makris, and Nader Tavengar, specifically responding to Erstling's allegations.  For instance, the declaration of William Winkler states:

> I have reviewed the Declaration of Michael Erstling that was filed in support of the NRA's Opposition.  As an initial matter, I find it curious that Mr. Erstling executed this declaration.  For decades, I was one of the top AMc executives that interacted with the NRA's former Treasurer, Woody Phillips, and later Craig Spray, relating to invoicing and budgeting matters.  Payment issues that needed to be addressed by me were usually discussed with either of the two of them or Rick Tedrick.  I also find it telling that Mr. Erstling's declaration did not include any reference to discussions with Mr. Phillips, Mr. Spray, or Mr. Tedrick regarding his concerns.  The NRA failed to provide declarations from Mr. Phillips or Mr. Tedrick, and Mr. Spray's declaration is silent on these matters.  It is my understanding that Mr. Spray, in addition to others, has testified that there were no concerns related to matters discussed by Mr. Erstling.  Mr. Erstling was not someone with whom I interacted regarding invoicing or budgeting matters.

> In paragraph six of Mr. Erstling's declaration, he states that "Ackerman regularly issued six-figure invoices to the NRA with little detail or support, and systematically obfuscated and blocked the NRA's efforts to understand what services were covered by any particular invoice."  As Mr. Erstling knows, the NRA and AMc's relationship spans nearly four decades.  I have personal knowledge that Mr. LaPierre and Mr. Phillips instructed numerous representatives of AMc to intentionally provide vague invoices with brief descriptions to the NRA because of Mr. LaPierre's confidentiality concerns.  Specifically I understand that Mr. LaPierre did not fully trust all members of the NRA's accounting department.  I had no personal knowledge that Mr. Erstling or other Board members were concerned with the amount of detail in AMc's invoices that Mr. LaPierre and Mr. Phillips directed for decades.  In fact, new billing procedures and requirements were introduced by Mr. Spray in summer of 2018.  Based on my conversations directly with Mr. Spray, we were in compliance with his new procedures very soon after they were introduced.  If Mr. Erstling truly had concerns about the amount of information provided by AMc in the invoices to the NRA, he should have directed those concerns to Mr. LaPierre or Mr. Phillips who would have been in the best

position to explain why the NRA required the invoices to contain so little information. He certainly never contacted me about it. Mr. Erstling's concerns likely reflect a communication breakdown between the NRA's officers, directors, and staff on one hand, and Mr. LaPierre on the other hand, not a communication breakdown between the NRA and AMc.[56]

Similarly, Melanie Montgomery's declaration states, in part:

Mr. Erstling further states that AMc refused to cooperate with requests for information. This statement is false. Since the NRA and AMc's relationship began, the NRA has conducted numerous audits of AMc's documents under the parties' Services Agreement. I do not recall a single instance where the NRA expressed concerns about the information AMc was providing to the NRA as part of these audits or where the NRA accused AMc of withholding anything until Mr. Brewer's involvement with AMc. To the extent the NRA requested back up for invoices or further explanation for projects, AMc provided that information to the NRA, typically through Mr. LaPierre and/or Mr. Phillips. During many of these audits, Mr. LaPierre specifically instructed AMc not to disclose certain information to the auditors, including the NRA Foundation's Chief Financial Officer, Rick Tedrick. As I stated above, Mr. LaPierre repeatedly told Angus and me that he did not trust the members of the NRA's accounting department. Prior to Mr. Brewer's engagement by the NRA in 2018, I do not recall a single complaint from anyone at the NRA that AMc failed to provide the requested information as part of the NRA's audits of AMc's documents.[57]

However, for purposes of this Response, the larger issue is: What was the point of the Erstling Declaration anyway? AMc's billing methods actually have scant relevance to the question of whether Brewer or the Brewer Firm engaged in the disqualifying conduct outlined in the DQ Motion. For this reason, Defendants submitted these counter-declarations simply as a clarifying aid for the court record and for the Court's convenience. Nevertheless, these counter-declarations cannot be said to be "dispositive evidence" in support of the DQ Motion but are merely "rebuttal evidence"; therefore, the Court need not strike them.

Further, the declarations of LaPierre and current NRA Treasurer, Craig Spray, make numerous false allegations regarding a meeting that occurred on October 11, 2018, in which they

---

[56] ECF No. 141 at Ex. A ¶¶ 2-3 (emphasis added).
[57] ECF No. 141 at Ex. B at ¶ 5 (emphasis added); *see also id.* at Ex. C at ¶¶ 14-17; Ex. D at ¶¶ 11-14.

claim that Angus and Revan McQueen were hostile due to proposed budget cuts.  Because this was a false statement, William Winkler, Melanie Montgomery, Tony Makris, and Revan McQueen (all in attendance at the meeting) each rebutted those specific allegations.  For example, Tony Makris explained:

> At the beginning of the meeting (after Mr. LaPierre and Mr. Spray showed up one hour late with no notice), AMc, with Angus taking the lead, had a conversation with Mr. LaPierre about AMc's future with the NRA in light of developments with Mr. Brewer and Mr. Powell. Specifically, Angus talked to Mr. LaPierre about the abusive and harassing phone calls that he had received from Mr. Brewer and the letter writing campaign from Mr. Brewer falsely accusing AMc of withholding documents. Angus had previously told me that Mr. Brewer had called him in June 2018, and threatened that Angus and AMc was going to be brought up on RICO charges, and that the FBI was going to raid AMc's offices. Shortly after first hearing this from Angus, Mr. Powell told me the exact same thing – that Mr. Brewer called Angus in June 2018 and told him that he was going to be brought up on RICO charges, and that the FBI was going to raid AMc's offices. Angus made it clear to Mr. LaPierre at the beginning of the meeting that if he thought the claims by Mr. Brewer were true, then AMc and the NRA's relationship going forward should stop because they would not be able to trust each other. Mr. LaPierre quickly responded that that was not going to happen.
>
> Angus further expressed concerns with Mr. LaPierre about Mr. Powell's involvement with AMc, especially in light of the recent sexual harassment allegations with an AMc executive and Mr. LaPierre's recent decision to designate Mr. Powell as a "designee" under the Services Agreement, essentially appointing Mr. Powell as Mr. LaPierre's designated representative to work with AMc. In short, I understood that Angus was making clear that AMc would not work with either Mr. Brewer or Mr. Powell, who were both abusive and appeared to have no interest in being part of the AMc's work for the NRA going forward. I also recall Revan telling Mr. LaPierre that AMc was prepared to resign the NRA account on the spot because it was not going to work in what had become an incredibly hostile and abusive relationship with Mr. Brewer and Mr. Powell.
>
> …
>
> Mr. LaPierre's and Mr. Spray's statements that Angus and Revan were hostile, angry, or unprofessional during the October 11, 2018 meeting are completely false. The only time during the October 11, 2018 meeting that became emotional was during our conversations with Mr. LaPierre about Mr. Brewer and Mr. Powell. Angus, Revan, nor anyone else from AMc in that meeting was "enraged" by the NRA's budget cuts. I personally witnessed Mr. LaPierre, Mr. Spray, Angus, Revan, Bill, and other AMc representatives work through these budgets in a cordial and professional matter. I also recall Mr. Spray and Mr. LaPierre repeatedly telling me

and other AMc representatives that part of the reason for the budget cuts was because of the legal bills of Mr. Brewer. On numerous occasions, Mr. LaPierre personally complained to me about the significant legal expenses of Mr. Brewer and his law firm.[58]

The declaration of Revan McQueen similarly states:

To further refute the revisionist history from LaPierre, I personally recall only two parts of the discussion that led to tension or anger. First was Brewer's harassment of AMc, including his threatening communication. The discussions were also contentious surrounding Powell. Put simply, LaPierre and Spray were dismissing the very serious sexual harassment issues involving Josh Powell and an AMc female executive. Before that subject came up, Angus was clearly annoyed by a letter from Spray regarding the budget, but only because it was a complete departure from the decades of professional interaction between our two organizations, not because the budget was being cut. Spray admitted in the meeting that he did not write the letter that he supposedly signed and wanted us to know that he would not write such a disrespectful letter. This conversation started the meeting. We decided before the meeting that if LaPierre and Spray were unwilling to treat us with the respect that was built over decades of good work, that would be the final issue in a string of very unnerving issues that would end the relationship. However, at that time, LaPierre made it clear that we would no longer have to deal with Brewer, his firm, or Powell if we would just "stick with him."[59]

But again, regardless of whether Angus and Revan McQueen acted with professionalism or hostility concerning budget cuts in a meeting with the NRA, this issue is not dispositive of Brewer or the Brewer Firm's conduct in any manner.

In sum, each and every witness declaration submitted with the Reply Brief is provided solely in response to a specific issue raised in Plaintiff's DQ Response or one of its declarations. None of the evidence is "dispositive" as to whether Brewer or his law firm should be disqualified, and, as such, the Court may choose to disregard but need not strike this evidence.[60]

---

[58] ECF No. 141 at Ex. C at ¶¶ 5-6, 9 (emphasis added).
[59] ECF No. 141at Ex. I at ¶ 4.
[60] See Springs Indus., 137 F.R.D. at 239-40.

4.      **The counter-declaration of expert witness Randy Johnston is not dispositive evidence.**

While devoting much of its DQ Response to attacking AMc instead of responding to the merits of the DQ Motion, Plaintiff outsourced the bulk of the legal briefing to three mercenary academians.[61]  Each of these individuals submitted lengthy "declarations" (legal briefs) in support of Plaintiff's position, ultimately supplementing Plaintiff's DQ Response with *94 pages* of additional argument.[62]

Concurrently with their Reply Brief, Defendants filed objections to these three "expert" declarations ("***Expert Objections***").[63]  Defendants' Expert Objections set forth numerous reasons why expert testimony from lawyers is entirely improper in this matter, not only because they each purport to instruct the Court on the correct law to use and how to apply it (invading the province of the judge), but that they also engage in a pervasive weighing of evidence in order to reach their conclusions (invading the province of the judge sitting as fact-finder).[64]  Moreover, each of the experts relies on *different* law and *different* facts to reach his or her conclusion, which fails the applicable test for reliability for expert opinions in the Fifth Circuit.[65]  Tellingly, the experts apply facts and law in the light most favorable to Plaintiff, thus engaging in improper advocacy.[66]  Even more objectionable, two of the experts are not even licensed in Texas yet purport to instruct the Court on Texas law.[67]  In their Expert Objections, Defendants identify these declarations for what they are: amicus briefs.  And as amicus briefs, under the local rules, Plaintiff was required to have

---

[61] ECF No. 122 at Ex. 47, 50, 51.
[62] *See id.*
[63] ECF No. 142.
[64] *See id.* at ¶¶ 7, 8, 13, 17-19.
[65] *See id.* at ¶ 23.
[66] *See id.* at ¶¶ 20-22.
[67] *See id.* at ¶ 16.

asked for leave to submit them.[68]  Accordingly, Plaintiff's expert declarations fail the standards for both expert testimony and amicus briefs in the Northern District.

Defendants did not believe expert testimony with its original DQ Motion was required or necessary given the overwhelming factual evidence and the Court's role in determining disqualification related legal issues.  In their Expert Objections, Defendants simply ask the Court to alternatively consider the counter-declaration of Randal Johnston (the "***Johnston Declaration***"), included in the Reply appendix, in the event that the Court overruled Defendants' objections.[69]

Far from presenting any "dispositive" evidence or "new arguments," the Johnston Declaration is the model of true "rebuttal" evidence.  At every opportunity, Johnston emphasizes that he does *not* opine on the ultimate issue of whether Brewer or the Brewer Firm should be disqualified, and he repeatedly refuses to weigh evidence or make credibility determinations. Johnston raises no new arguments and, instead, merely tracks the arguments offered by Plaintiff's experts, indicating instances where the experts engaged in inappropriate fact-finding, applied the law inconsistently, or improperly advocated for Plaintiff.  For instance, Johnston states:

> Although it is my opinion that Mr. Flamm has rightly announced the legal standard, I do not believe that Mr. Flamm, Mr. McCormack, or Ms. Moore actually performed the type of "painstaking" factual analysis contemplated by the Fifth Circuit. Instead, I am of the opinion that each of my colleagues has engaged in the opposite: a "mechanical" application of the rules using only a limited set of applicable facts viewed in the light most favorable to the Plaintiff. This not only represents an incorrect application of the law, but reveals a level of advocacy that is incongruous with the role of an expert witness in this proceeding.[70]

And on the issue of conflict-of-interest, Johnston states:

> First, regarding Defendants' claim that Mr. Brewer and, by extension, the Brewer Firm should be disqualified due to Mr. Brewer's conflict of interest, I believe that

---

[68] L.R. 7.2(b)-(c).
[69] *See* ECF. No. 141 at Ex. G.
[70] *Id.* at Ex. G at ¶ 29.

there are simply too many intermediary issues of fact and law that must be determined in order to form an opinion regarding whether a conflict exists here. Additionally, because I believe Mr. McCormack, Mr. Flamm, and Ms. Moore have engaged in advocacy by opining on these intermediary issues, I do not believe that their conclusions have the proper foundation required for expert testimony.[71]

Similarly, on the issue of standing, Johnston states:

I do not provide an opinion herein on whether Defendants have standing to bring a motion to disqualify against Mr. Brewer and the Brewer Firm. That is for the judge to decide. However, I do not believe that Mr. McCormack, Mr. Flamm, or Ms. Moore have correctly or comprehensively stated the law, nor do I believe that it is possible or appropriate for any of my colleagues to conclusively opine that Defendants have "no standing" to bring this motion. Again, each of these declarants has stated the law in the light most favorable to Plaintiff's position while omitting law that would be favorable to Defendants, which is advocacy.[72]

Johnston, too, notes the inconsistency with which the experts apply the facts and law:

In addition to the differences in their factual analyses, Mr. McCormack, Mr. Flamm, and Ms. Moore each engaged in similarly unique legal analyses, each relying upon different law in support of their propositions.
. . .
I say all this only to illustrate that the differences in the analyses undergone by Mr. McCormack, Mr. Flamm, and Ms. Moore underscore the larger problem with expert opinions on these topics. I do not believe that three different experts analyzing the law and facts three different ways can properly or realistically be viewed as reliable or helpful to the Court.[73]

Johnston never once proposes any new legal ground for disqualification or any new argument in support of Defendants' original DQ Motion and confines his opinions exclusively to the rebuttal of the experts' opinions and conclusions.  For these reasons, the Johnston Declaration is not dispositive evidence but solely offered as rebuttal evidence, which the Court need not strike.[74]

---

[71] *Id.* at Ex. G at ¶ 30.
[72] *Id.* at Ex. G at ¶ 31.
[73] *Id.* at Ex. G. at ¶¶ 44-45.
[74] *See Springs Indus.*, 137 F.R.D. at 239-40.

### C.  Plaintiff Asks the Court to Selectively Enforce the Rules.

The instant Motion is yet another of the many examples of the hypocrisy exhibited by Plaintiff throughout this litigation.  Here, Plaintiff again asks the Court to enforce certain rules against Defendants while failing to abide by the same rules it seeks to enforce.  For example, Plaintiff itself has *twice* included additional evidence with a reply brief.  Plaintiff's reply brief in support of its motion to disqualify Defendants' counsel included a rebuttal expert opinion, precisely the type of evidence it seeks to strike here.[75]  Even more notably, Plaintiff's reply in support of its motion to compel included numerous additional exhibits comprising its *350-page* appendix.[76]

Plaintiff has also elected (in its own words) "to simply ignore the Court's clear rules"[77] by twice exceeding the briefing page limit and failing to abide by other local rules pertaining to briefing.[78]  And of course, Plaintiff exceeded its page limit for the DQ Response by 94 pages, offering the legal briefs of its purported experts, which included volumes of arguments and authority not raised in the DQ Response itself, for which Plaintiff neither sought nor obtained approval from the Court.

### D.  Plaintiff's Remaining Arguments are Groundless.

Plaintiff's Motion lodges additional specious arguments that fail to support the striking of Defendants' Reply Brief.

#### 1.      Defendants' Reply Brief does not unfairly prejudice Plaintiff.

Plaintiff complains that it will suffer unfair prejudice through delay and additional expense if the Reply Brief is not stricken.  To first address the issue of delay—delay of what?  There is

---

[75] *See* ECF No. 151.
[76] *See* ECF No. 59.
[77] *See* ECF 153 at 9.
[78] *See* ECF No. 58 (exceeding the 10-page reply limit); ECF No. 70 (exceeding the 25-page response limit); *see also* ECF 43 (failing to include tables of contents and authorities for briefs over 10 pages under Local Rule 7.2(d)).

currently no scheduling order or trial date.  Although the parties have engaged in written and third-party discovery, no depositions have yet taken place with the exception of Col. North's that was cross-noticed in the Virginia Action.  Thus, Plaintiff's "delay" argument is nonsensical.

Plaintiff further argues that it will "be required to incur the time and expense associated with filing individual objections to all the new evidence."[79]  Yet no one except Plaintiff is to blame for this.  As discussed above, Plaintiff wholly failed to respond to numerous allegations within the DQ Motion, instead choosing to focus on the conduct of *AMc*, which is irrelevant to an evaluation of Brewer's conduct for purposes of disqualification.  Perhaps Plaintiff should have actually responded to the substantive arguments and evidence set forth in the DQ Motion, rather than parroting its own offensive narrative.  Instead, Defendants were forced to prepare additional witness declarations to rebut Plaintiff's extraneous arguments.  Although the "time, money, and effort that Plaintiff spent in formulating its response to the Motion to Disqualify" may indeed have been "wasted," it is certainly not Defendants' fault.  In any event, Plaintiff should not now be given the chance to provide any additional arguments or evidence in the form of a sur-reply when it neglected to make such arguments in its DQ Response.

### 2.    Plaintiff cites no authority striking a reply for exceeding the page limit.

As Plaintiff notes, Defendants included two pages of supplemental authority for the Court's convenience.  Defendants intentionally segregated this authority in this manner because of its non-dispositive nature relating to their rebuttal propositions.  More specifically, as non-binding authority, Defendants owed a duty to the Court to make it aware of the additional support from state and federal courts throughout the country that had decided similar issues of waiver and standing—both issues raised by Plaintiff.  In order to avoid confusing or misleading the Court

---

[79] ECF No. 153 at 8.

regarding the weight of this authority, Defendants separated that case law so it would be easy to disregard if the Court did not find it helpful.  Yet even if this additional supplement could be considered additional pages of the Reply Brief, Plaintiff cited no case, and Defendants have identified none, where an entire reply brief was stricken for exceeding the page limit.  Rather, in such situations, this Court has consistently confined its consideration of the Reply Brief to the first ten pages.[80]  Accordingly, Plaintiff has shown no grounds for striking the Reply Brief on the basis of a page limit.

### E.  Plaintiff Has Failed to Establish that a Sur-Reply Is Warranted.

As discussed above, Plaintiff's Motion should be denied because Defendants' Reply Brief did not include any new arguments or dispositive evidence.  Rather, it merely contained rebuttal evidence responding to specific allegations against AMc raised in Plaintiff's DQ Response and supporting declarations.  For this same reason, Plaintiff is likewise not entitled to file a sur-reply.

Defendants' arguments for disqualification and dispositive evidence are located within the DQ Motion and original appendix.  Plaintiff has already had a "meaningful opportunity to respond" to these arguments and evidence in its DQ Response.[81]  Although Plaintiff may have failed to respond accordingly, Plaintiff should not now be given an opportunity to supplement its DQ Response in any manner.

Sur-replies are "highly disfavored, as they are usually a strategic effort by the nonmovant to have the last word on the matter."[82]  For this reason, even in situations where a sur-reply is granted, the movant is similarly granted a final reply brief in order to comport with the basic

---

[80] *See HCC Aviation Ins. Grp., Inc. v. Emp'rs Reinsurance Corp.*, No. 3:05-CV-744-M (BH), 2008 U.S. Dist. LEXIS 124998, at *6–7 (N.D. Tex. Feb. 25, 2008); *Nat'l Architectural Prods. Co. v. Atlas-Telecom Servs.—USA, Inc*., No. 3:06-CV-0751-G ECF, 2007 U.S. Dist. LEXIS 51182, at *6–11 (N.D. Tex. July 13, 2007).
[81] *See Springs Indus.*, 137 F.R.D. at 239.
[82] *Lacher v. West*, 147 F. Supp. 2d 538, 539 (N.D. Tex. 2001).

judicial principle that the movant should be entitled to close the briefing.[83]  Defendants believe

that the DQ Motion has been fully briefed and is ripe for the Court's consideration, and that further

briefing on these issues is not appropriate.  However, if the Court concludes that a sur-reply is

appropriate, Defendants respectfully request leave to file a final short reply brief in response.

### III.    PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendants respectfully request the Court

deny the NRA's Motion in its entirety and grant Defendants all other relief, at law or in equity, to

which they may be justly entitled.

Dated: July 17, 2020                              Respectfully submitted,

                                                  */s/ G. Michael Gruber*
                                                  **G. Michael Gruber, Esq.**
                                                  Texas Bar No. 08555400
                                                  gruber.mike@dorsey.com
                                                  **Jay J. Madrid, Esq.**
                                                  Texas Bar No. 12802000
                                                  madrid.jay@dorsey.com
                                                  **J. Brian Vanderwoude, Esq.**
                                                  Texas Bar No. 24047558
                                                  vanderwoude.brian@dorsey.com
                                                  **Brian E. Mason, Esq.**
                                                  Texas Bar No. 24079906
                                                  mason.brian@dorsey.com
                                                  **DORSEY & WHITNEY LLP**
                                                  300 Crescent Court, Suite 400
                                                  Dallas, Texas 75201
                                                  (214) 981-9900 Phone
                                                  (214) 981-9901 Facsimile

                                                  **ATTORNEYS FOR DEFENDANTS
                                                  ACKERMAN MCQUEEN, INC., MERCURY
                                                  GROUP, INC., HENRY MARTIN, JESSE
                                                  GREENBERG, WILLIAM WINKLER, AND
                                                  MELANIE MONTGOMERY**

---

[83] *See Springs Indus.*, 137 F.R.D. at 239-40.

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2020, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

*/s/ G. Michael Gruber*
G. Michael Gruber