# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § | |
| | § | |
| | § | |
| *Plaintiff and Counter-Defendant*, | § | |
| | § | |
| **and** | § | |
| | § | |
| **WAYNE LAPIERRE,** | § | |
| | § | |
| *Third-Party Defendant*, | § | |
| | § | |
| **v.** | § | **Case No. 3:19-cv-02074-G** |
| | § | |
| **ACKERMAN MCQUEEN, INC.,** | § | |
| | § | |
| *Defendant and Counter-Plaintiff*, | § | |
| | § | |
| **and** | § | |
| | § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, AND JESSE GREENBERG,** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| *Defendants*. | | |

## JOINT STATUS REPORT IN CONNECTION WITH
## PLAINTIFF'S MOTION TO COMPEL AND FOR SANCTIONS (ECF NO. 47), AND
## DEFENDANTS' MOTION TO COMPEL PLAINTIFF'S DOCUMENT PRODUCTION
## <u>AND MOTION FOR SANCTIONS (ECF NO. 54)</u>

# <u>TABLE OF CONTENTS</u>

I. MATTERS RESOLVED BY AGREEMENT ..................................................................1

II. SUMMARY .................................................................................................................2

    A.      Summary of Undisputed Facts.................................................................2

    B.      Summary of Plaintiff's Motion to Compel and for Sanctions (ECF No. 47-
            49). .........................................................................................................3

          1.      Plaintiff's Position. ...................................................................3

          2.      Defendants' Position. ................................................................4

    C.      Summary of Defendants' Motion To Compel (ECF No. 54). ................4

          1.      Defendants' Position.................................................................4

          2.      Plaintiff's Position. ...................................................................6

III. MATTERS TO BE HEARD AND DETERMINED ....................................................6

    A.      Plaintiff's Motion to Compel and for Sanctions (ECF No. 47-49).........................7

          1.      Plaintiff's Position. ...................................................................7

               a.      Overview of Relevant Facts.............................................7

              b.      Legal Standard. ................................................................8

               c.      Legal Argument. ..............................................................8

                     (1)      The Court Should Order Defendants to Immediately
                              Produce Responsive Documents.........................................8

                     (2)      The Court Should Reject Defendants' Time-Period
                              Limitation As To Defendants' Production Of
                              Responsive Documents.....................................................10

                   (3)      The Requests Regarding The NRA's Intellectual
                                Property Seek Documents Relevant to The Claims
                                and Defenses In This Case. ..............................................13

               d.      Conclusion and Request for Relief. ...............................15

           2.      Defendants' Position ................................................................15

               a.      Overview of Relevant Facts...........................................15

               b.      Legal Argument. ............................................................18

                     (1)      RFP Nos. 1, 2, and 4 are no longer relevant to any
                              claim or defense in this lawsuit........................................18

(2)  The NRA's Requested Time Period is a Blatant Fishing Expedition. ...........................................22

B.  Defendants' Motion to Compel Plaintiff's Document Production and Motion for Sanctions (ECF No. 54)..............................................29

  1.  Defendants' Position. ..............................................29

    a.  Factual Background ........................................29

    b.  Legal Argument ............................................36

      (1)  Documents concerning the FRA audit of AMc (RFP 47, 101). .................................36

      (2)  Documents concerning the Brewer Firm ..........................43

      (3)  The Preservation Notice (RFP 57)....................48

  2.  Plaintiff's Position. ..............................................50

    a.  Defendants' Motion Should Be Denied As To Defendants' Requests For Privileged Information. ............................53

      (1)  The Documents Defendants Seek Regarding The FRA Audit Of AMc Are Privileged (Requests No. 47, 101). ...............................53

      (2)  The Documents Defendants Seek Regarding BAC's Relationship With The NRA Are Privileged (Requests Nos. 10, 12, 42, 43 and 66). .....................55

      (3)  The Document Preservation Notice Prepared By BAC Is Privileged (Request No. 57).................57

      (4)  The Crime-Fraud Exception Does Not Apply Here. .........58

    b.  Defendants Motion Should Be Denied As To Defendants' Requests For Information That Have No Bearing On The Parties' Claims And Defenses. .....................59

IV. PRAYER FOR RELIEF .............................................60

  A.  Plaintiff. ..............................................60

  B.  Defendants. ..............................................61

# **TABLE OF AUTHORITIES**

## **Cases**

*Abujaber v. Kawar*, 20 Va. Cir. 58 (1990) ..................................................................... 38

*Adams v. Mem'l Hermann*, No. 19-20651, 2020 U.S. App. LEXIS 27747 (5th Cir. Aug. 31, 2020) ............................................................................................................................ 48

*AHF Cmty. Dev., LLC v. City of Dallas*, 258 F.R.D. 143 (N.D. Tex. 2009) .......................... 38, 48

*Alcan Aluminum Corp. v. BASF Corp.*, 133 F. Supp. 2d 482 (N.D. Tex. 2001) ......................... 44

*Alvarez v. Aldi (Tex.) LLC*, No. 3:13-cv-4122-L, 2014 WL 3624929 (N.D. Tex. July 22, 2014)13, 15

*Archer Daniels Midland Co. v. Aon Risk Services, Inc. of Minnesota*, 187 F.R.D. 578 (D. Minn. 1999) ........................................................................................................................... 54, 62

*Benevis LLC v. Mauze & Bagby, PLLC*, 5:12-CV-36, 2015 WL 12763537, at *5 and *7 (S.D. Tex. Dec. 14, 2015)..................................................................................................... 14

*Bredemus v. Int'l Paper Co.*, 252 F.R.D. 529 (D. Minn. 2008) ............................................. 54, 62

*Briones v. Smith Dairy Queens Ltd.*, No. V–08–48, 2008 WL 4630485 (S.D. Tex. Oct. 16, 2008) ............................................................................................................................ 13, 15

*Browning v. S.W Res. Inst.*, Civ. No. Sa-05-ca-0245-fb, 2006 WL 8434146 (W.D. Tex. Apr. 26, 2006) ............................................................................................................................ 13, 15

*Cargo v. Kansas City S. Ry. Co.*, No. CIV.A. 05-2010, 2011 WL 1234391 (W.D. La. Apr. 1, 2011) ............................................................................................................................ 60

*Carlson Cos., Inc. v. Sperry & Hutchinson Co.*, 374 F. Supp. 1080 (D. Minn. 1974) ..... 54, 62, 63

*Chandler v. Phx. Servs.*, No. 7:19-cv-00014-O, 2020 U.S. Dist. LEXIS 15702 (N.D. Tex. Jan. 30, 2020) ...................................................................................................................... 43

*Clark v. United States*, 289 U.S.1 (1933) ........................................................................... 44, 45

*Corrigan v. Methodist Hospital*, 158 F.R.D. 54 (E.D. Pa.1994) ................................................. 54

*Crownover v. Crownover*, 2:15-CV-132-AM-CW, 2017 WL 10575859 (W.D. Tex. July 12, 2017) ............................................................................................................................ 9

*Fed. Trade Commission v. Lukens Steel Co.*, 444 F. Supp. 803 (D.D.C. 1977).......................... 13

*Fisher v. United States*, 425 U.S. 391 (1976) ........................................................................ 38

*Freeman v. Bianchi*, 820 S.W.3d 853(Tex. App.—Houston [1st Dist.] 1991, writ denied) ........ 43

*Gondola v. USMD PPM, LLC*, 223 F. Supp. 3d 575 (N.D. Tex. 2016) ........................... 26, 28, 29

*Gulf Coast Facilities Mgmt., L.L.C. v. BG LNG Servs., L.L.C.*, No. CV 09-3822, 2010 WL 11707290 (E.D. La. Mar. 24, 2010)........................................................................... 60

*Haber Oil Co. v. Swinehart (In re Haber Oil Co.)*, 12 F.3d 426 (5th Cir. 1994) ......................... 44

*Harding v. Cty. of Dall.*, Civil Action No. 3:15-CV-0131-D, 2016 U.S. Dist. LEXIS 177937 (N.D. Tex. Dec. 23, 2016) ....................................................................................... 38

*Herbert v. Lando*, 441 U.S. 153, 177, 99 S. Ct. 1635, 60 L. Ed. 2d 115 (1979) ........................ 63

*Hickman v. Taylor*, 329 U.S. 495 (1947)................................................................................ 8, 12

*In re BankAmerica Corp. Secs. Litig.*, 270 F.3d 639 (8th Cir. 2001) ........................................... 62

*In re CSX Corp.*, 124 S.W.3d 149 (Tex. 2003)..................................................................... 55, 63

*In re Ginther*, No. 07-80200-G3-11, 2008 Bankr. LEXIS 2624 (S.D. Bankr. Aug. 29, 2008) .... 50

*In re Grand Jury Subpoena*, 419 F.3d 329 (5th Cir. 2005) .................................................... 43, 61

*In re Martin Marietta Corp.*, 856 F.2d 619 (4th Cir. 1988) ...................................................... 57

*In RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC*, No. CIV.A. H-07-2426, 2008 WL 2036816 (S.D. Tex. May 9, 2008) ......................................................................................... 54

*Jones v. Metzger Dairies, Inc.*, 334 F.2d 919 (5th Cir. 1964) ..................................................... 63

*Leamon v. KBR, Inc.*, Civ. Act.  H-10-0253, 2010 WL 11668204 (S.D. Tex. Nov. 9, 2011) ...... 14

*Leamon v. KBR, Inc.*, No. H-10-0253, 2010 U.S. Dist. LEXIS 156015 (S.D. Tex. Nov. 9, 2010) ................................................................................................................................. 26

*Lopez v. Don Herring Ltd.*, 327 F.R.D. 567 (N.D. Tex. 2018)................................................... 46

*Madrid v. Wells Fargo Bank, N.A.*, EP-14-CV-00152-DCG, 2016 WL 10590161 (W.D. Tex. July 27, 2016).......................................................................................................... 9

*Mancia v. Mayflower Textile Servs. Co.*, 253 F.R.D 354 (D. Md. 2008) .................................... 11

*McKinney/Pearl Rest. Partners, L.P. v. Metro. Life Ins. Co.*, 322 F.R.D. 235 (N.D. Tex. 2016 . 24

*McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482 (5th Cir. 1990) ... 11, 24, 54

*MeadWestvaco Corp. v. Rexam, PLC*, No. 1:10CV511 GBL/TRJ, 2011 WL 2938456 (E.D. Va. July 18, 2011)........................................................................................................ 56

*Medlock Sw. Mgt. Corp. v. Fannie Mae*, No. 5:04CV129, 2006 U.S. Dist. LEXIS 116132 (E.D. Tex. Sep. 1, 2006) ............................................................................................. 49

*Merrill v. Waffle House, Inc.*, 227 F.R.D. 467 (N.D. Tex. 2005) .......................................... 21, 54

*Metropolitan Life Ins. Co. v. Dailey*, No: 3:12-cv-4174-G-BN, 2014 WL 12585666 (N.D. Tex. May 15, 2014) ........................................................................................................ 8

*Moore v. Radian Grp., Inc.*, 2:01-CV-023 (TJW), 2002 WL 31738795 (E.D. Tex. Feb. 1, 2002) ...................................................................................................................... 13

*Navigant Consulting, Inc. v. Wilkinson*, 220 F.R.D. 467 (N.D. Tex. 2004) .............. 38, 40, 50, 57

*Nerium SkinCare, Inc. v. Olson*, No. 3:16-cv-1217-B, 2017 U.S. Dist. LEXIS 7986 (N.D. Tex. Jan. 20, 2017) .................................................................................................... 29

*Paananen v. Cellco P'ship*, No. C08-1042RSM, 2009 WL 3327227 (W.D. Wash. Oct. 8, 2009) ...................................................................................................................... 14

*Peterson v. Fairfax Hosp. Sys.*, 32 Va. Cir. 294 (1993) .............................................. 43

*Positive Software Sols., Inc. v. New Century Mortg. Corp.*, No. 3:03-CV-0257-N, 2004 U.S. Dist. LEXIS 32857 (N.D. Tex. Mar. 3, 2004) ................................................ 44, 45

*Retractable Techs. Inc. v. Abbott Labs., Inc.*, No. 5:05-CV-157, 2010 WL 11531179 (E.D. Tex. May 20, 2010) ...................................................................................................... 60

*Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d. 851 (3d Cir. 1994) ........................... 56

*S. W. Heischman, Inc. v. Reliance Ins. Co.*, 30 Va. Cir. 235 (1993) ........................................ 38

Samsung Elecs. Am. Inc. v. Yang Kun "Michael" Chung, 325 F.R.D 587 (N.D. Tex. 2017).......... .................................................................................................... 25, 28, 46, 59

*SEC v. Brady*, 238 F.R.D. 429 (N.D. Tex. 2006) ...................................................... 39

*Sevachko v. Commonwealth*, 35 Va. App. 346 (Va. App. 2001) .................................. 43

*Seventh Dist. Committee v. Gunter*, 212 Va. 278 (1971) ........................................... 43

*Sims v. Kaneb Servs., Inc.*, No. B14-87-00608-CV, 1998 Tex. App. LEXIS 2243 (Tex. App.— Houston [14th Dist.] Jun. 16, 1988, no pet.) ............................................................ 38

*Spiegelberg Mfg., Inc. v. Hancock*, No. 3-07-CV-1314-G, 2007 WL 4258246 (N.D. Tex. Dec. 3, 2007) .............................................................................................................. 53, 54

*StoneEagle Servs. v. Gillman*, No. 3:11-cv-2408-P, 2013 U.S. Dist. LEXIS 194350 (N.D. Tex. Dec. 23, 2013) ....................................................................................................... 29

*TaxRight, LLC v. SICPA Product Sec.*, LLC, No. 3:12CV657, 2013 WL 3791487 (E.D. Va. 2013) ........................................................................................................... 56

*Tex. Grain Storage, Inc. v. Monsanto Co.*, SA-07-CA-673-OG, 2008 WL 11411844 (W.D. Tex. Apr. 24, 2008) ................................................................................................ 13, 15

*Total Rx Care, LLC. v. Great Northern Ins. Co.*, 318 F.R.D. 587 (N.D. Tex. 2017) .................. 38

*United Sates v. El Paso Co.*, 682 F.2d 530 (5th Cir. 1982) ........................................................ 40

*United States v. Ballard*, 779 F.2d 287 (5th Cir. 1986) ............................................................ 43

*United States v. Dyer*, 722 F.2d 174 (5th Cir. 1983) ................................................................ 61

*United States v. Ponder*, 475 F.2d 37 (5th Cir. 1973) .............................................................. 49

*United States v. Richardson*, No. 96-40329 Summary Calendar, 1997 U.S. App. LEXIS 43076 (5th Cir. Jan. 7, 1997) ...................................................................................... 37

*United States v. White*, 887 F.2d 267 (D.C. Cir. 1989) ............................................................ 62

*Walton v. Mid-Atlantic Spine Specialists*, 694 S.E. 2d 545 (Va. 2010)........................................ 57

**Statutes**

15 U.S.C. § 1125 ............................................................................................... 14, 21, 22

**Other Authorities**

8 Fed. Prac. & Proc. Civ. § 2008 (3d ed.) ...................................................................... 63

**Rules**

Fed. R. Civ. P. 34 .................................................................................................... 9

Fed. R. Civ. P. 26 ............................................................................................... *passim*

Pursuant to the Order entered by the Honorable Magistrate Judge Toliver, dated September 23, 2020 (ECF No. 169), Plaintiff the National Rifle Association of America (the "NRA" or "Plaintiff"), Third-Party Defendant Wayne LaPierre ("LaPierre"), and Defendants/Counter-Plaintiffs Ackerman McQueen, Inc., Mercury Group, Inc., Henry Martin, William Winkler, Melanie Montgomery, and Jesse Greenberg (collectively, "Defendants"), (Plaintiff and Defendants together, the "Parties") file this Joint Status Report regarding the NRA's Motion to Compel and for Sanctions (ECF No. 47-49) and Defendants' Motion to Compel Plaintiff's Document Production and Motion for Sanctions (ECF No. 54) (the "Report").

Counsel for Defendants (Brian E. Mason, Christina M. Carroll, and Kelsey M. Taylor) and counsel for Plaintiff (Michael J. Collins, Alessandra P. Allegretto, and Claudia V. Colón) conferred by telephone conference on the following dates and times: October 1, 2020, at 4:00 p.m. Central Time for approximately one hour; October 9, 2020 at 4:00 p.m. Central Time for approximately 45 minutes; and, October 14, 2020 at 11:00 a.m. Central Time for approximately 35 minutes. Counsel for the Parties considered the nature and bases of their claims and defenses to the arguments made herein, and jointly developed this Report. The Parties' updated positions and requests for relief are set forth as follows:

## I.
## MATTERS RESOLVED BY AGREEMENT

Following the several conferences between counsel for the Parties, the Parties have jointly agreed to modify their respective positions in their Motions to Compel to only now seek production of the specific Requests for Production outlined in this Report.

The Parties agree that, at this time, they will not seek to compel production as to all remaining Requests for Production that were the subject of their respective Motions to Compel

and which are not addressed in this Report. However, the Parties reserve all rights to challenge their productions in the future and waive none.

## II.
## SUMMARY

### A.  Summary of Undisputed Facts.

Plaintiff filed its Motion to Compel against Defendants on January 22, 2020.[1] Defendants filed their Motion to Compel against the NRA on February 26, 2020.[2]

Since Defendants' Motion was filed on February 16, 2020, the NRA has produced an additional 15,148 documents in this matter. Since Plaintiff's Motion was filed on January 22, 2020, Defendants have produced 12,428 documents in this matter.

On September 23, 2020, Judge Toliver denied both Parties' Motions to Compel without prejudice, and instructed the Parties to resolve the pending discovery issues amongst themselves, and submit a joint report on any remaining issues.[3]  Since then, the Parties have conferred several times and resolved many of the outstanding issues; however, certain disputes remain.

Plaintiff indicated that it will not produce documents concerning Forensic Risk Alliance ("*FRA*") (RFP Nos. 47, 101), the Brewer Firm (RFP Nos. 10-12, 42, 43, 66, and 90), and a litigation-hold letter sent by NRA general counsel to NRA employees and board members (RFP No. 57) on the basis of privilege and relevance objections.

Defendants indicate that they will not produce documents concerning the design and construct of AMc's website, and Defendants' use of the NRA's intellectual property (Requests Nos. 1, 2 and 4), basing their objection to produce on relevance grounds.

---

[1] ECF No. 47 and ECF No. 48-49 in support thereof.
[2] ECF No. 54 and ECF No. 55-56 in support thereof.
[3] ECF No. 169.

**B.  Summary of Plaintiff's Motion to Compel and for Sanctions (ECF No. 47-49).**

   **1.  Plaintiff's Position.**

The central issue presented in the NRA's Motion to Compel ("Motion," or "Mot.")[4] is whether Defendants fulfilled their discovery obligations when responding to the NRA's requests for production of documents. Following the several conferences held to reach an agreement on issues raised in the Parties' respective Motions to Compel, the NRA is not currently pursuing responses to the majority of the Requests outlined in its original Motion. This is based on representations made by counsel for Defendants that responsive documents will be produced in the coming weeks.[5] Counsel for Defendants also represented that a privilege log is forthcoming.

However, Defendants maintain their position as to **Requests No. 1, 2 and 4**, and refuse to produce responsive documents, claiming that such documents would be irrelevant to the claims and defenses at issue in this case. What Defendants fail to acknowledge, however, is that the requests seek information that is critical to the NRA's claims of false association under the Lanham Act. Thus, because such documents are material to the NRA's claims raised in the FAC, this Court should strike Defendants' objections and order Defendants to produce documents responsive to **Requests No. 1, 2 and 4** immediately.

The NRA reserves the right to bring any issues raised in its original Motion, but not briefed in this Joint Status Report, before the Court as discovery in this matter continues.

---

[4] ECF Nos. 47-49.
[5] Defendants served Volume 3 of their document production on Plaintiffs on the evening of October 22, 2020, containing 9,526 documents. Plaintiffs have not had a reasonable opportunity to meaningfully review Defendants' latest production prior to the filing of this Report. Therefore, the arguments herein do not take into consideration the contents of Volume 3. *See* **Ex. A**, Declaration of Michael J. Collins ("Collins Decl."), at ¶ 8.

**2.  Defendants' Position.**

Plaintiff's Motion should be denied on both of its primary issues.  First, RFP Nos. 1, 2, and 4 are not relevant to any party's remaining claims or defenses and are not likely to lead to the discovery of admissible evidence. Second, Plaintiff's blanket request to strike the objection to Plaintiff's temporal scope would leave too many overly broad and unduly burdensome requests at play, and Plaintiff has neither made any meaningful attempt to confer on the specific requests it seeks to compel nor raised the specific issues in its motion, as required.  Therefore, Plaintiff's Motion should be denied in its entirety.

**C.      Summary of Defendants' Motion To Compel (ECF No. 54).**

**1.  Defendants' Position.**

In short, Defendants bring their Motion to address the NRA's refusal to comply with its discovery obligations.  On the one hand, the NRA's responses contain boilerplate and conclusory objections.  On the other hand, the NRA attempts to shirk its obligations to produce responsive documents by claiming that certain documents are privileged, while simultaneously relying on that same evidence to support its claims, impermissibly using the privilege as both sword and shield. AMc seeks to compel information relating to three categories of documents.

*First*, the NRA is hiding as "privileged" more than 1,600 documents between the NRA, its counsel (the Brewer Firm), and a forensic accounting company, FRA.  But the NRA used the work, communications, and documents with FRA as the justification for the NRA's first (and three subsequent) lawsuits against Defendants along with numerous highly publicized statements about AMc's alleged failure to comply with these audits.  Additionally, to avoid disqualification of its counsel, the NRA made false representations to the Court about the extent of the involvement in the FRA's nine-day review of AMc's documents by Plaintiff's counsel, Brewer Attorneys &

Counselors (the "*Brewer Firm*").  Therefore, even if those documents were somehow privileged, the crime-fraud exception mandates that such documents be produced.

*Second*, the NRA similarly refuses to produce documents related to the Brewer Firm based on privilege and relevance.

*Third*, the NRA has objected to providing a copy of the litigation hold letter its own general counsel purportedly sent to NRA employees and board members instructing them to preserve documents related to this litigation, which is relevant to understanding whether it was sent, when it was sent, and what instructions it actually gave, due to high-ranking sworn testimony from at least one NRA official that she destroyed documents after the dispute between the parties arose.

Based on the NRA's failure to comply with its discovery obligations and the Federal Rules of Civil Procedure, AMc respectfully asks the Court to grant Defendants' Motion, overrule the NRA's objections, and compel the production of documents.

AMc currently refrains from pursuing numerous requests and issues raised in its prior motion to compel based on representations by Plaintiff's counsel and in the interests of compromise and judicial economy.  Specifically, Plaintiff's counsel has made representations that certain responsive documents are still being produced, and that a privilege log will be provided to assist AMc in assessing the applicability and validity of Plaintiff's privilege claims.  As a result, AMc reserves the right to bring these issues before the Court at a later date as discovery continues and additional facts come to light about the claims, defenses, and appropriate parties to this litigation, and additionally or alternatively, if Plaintiff's discovery responses prove to be deficient in some manner after responsive documents have been produced and reviewed.

## 2. **Plaintiff's Position.**

The NRA contends that the entirety of Defendants' motion to compel is moot. As of the date of this report, the NRA has produced over 15,000 documents responsive to Defendants' requests for production. In addition, the NRA has completed a privilege log that contains over 6,000 entries. On September 16, 2020, counsel for the NRA sent a written request to counsel for Defendants asking for dates on which the Parties could exchange privilege logs.[6] The NRA has not received a response from Defendants.

Moreover, the documents Defendants now seek to compel are clearly privileged and irrelevant to the claims and defenses at issue in this case.

Therefore, as the NRA has already produced documents responsive to Defendants' requests, and prepared a privilege log to identify the documents Defendants now seek but which are privileged, this Court should deny Defendants' Motion

### III.
### MATTERS TO BE HEARD AND DETERMINED

The matters before the Court are (1) the NRA's Motion to Compel Responses to Plaintiff's First Set of Requests for Production Nos. 1, 2 and 4, and (2) e(the Requests for Production are collectively referred to as the "***Requests***", or individually, the "***Request***" or "***RFP***").  Agreement could not be reached as to these Requests because the Parties disagree about whether the information is relevant, privileged, or otherwise exempt from production.

The NRA moves the Court to compel Defendants to produce documents related to Defendants' website design and use of the NRA's intellectual property, in order to uncover

---

[6] *See* Email from A. Allegretto to B. Mason, dated September 16, 2020, attached as Exhibit A-1 to the Collins Decl.

information relating to the NRA's claims of false association under the Lanham Act.  Defendants oppose the NRA's Motion.

Defendants move the Court to compel the NRA to produce documents related to FRA's investigation of AMc, documents related to the Brewer Firm's involvement with the NRA, and documents related to the NRA's efforts to preserve documents for this litigation. The NRA opposes Defendants' Motion.

A.    **Plaintiff's Motion to Compel and for Sanctions (ECF No. 47-49).**

     1.    **Plaintiff's Position.**

          a.    **Overview of Relevant Facts.**

The NRA brings its Motion to Compel the Production of Documents pursuant to Federal Rule of Civil Procedure 37 in order to remedy Defendants' refusal to meaningfully participate in discovery. While Defendants have responded in writing to Plaintiff's First Set of Requests for Production of Documents (the "Requests") served on November 5, 2019, they have yet to produce documents responsive to the Requests set forth therein.

So far, Defendants have produced 2,902 documents in this matter: 580 documents on January 23, 2020, and 2,322 documents on August 25, 2020.[7] However, only a few of those documents provide any substantive or meaningful information that is responsive to the NRA's Requests.

In their responses to the Requests, Defendants asserted general, boilerplate objections, in particular one that would preclude from the temporal scope of discovery two years (2016-2017)

---

[7] Defendants served Volume 3 of their document production on Plaintiffs on the evening of October 22, 2020, containing 9,526 documents. Plaintiffs have not had a reasonable opportunity to meaningfully review Defendants' latest production prior to the filing of this Report. Therefore, the arguments herein do not take into consideration the contents of Volume 3. *See* Collins Decl., at ¶ 8.

during which the NRA contends Defendants began their fraudulent schemes and undertook illegal acts in support thereof or any reasonable period before or after the conclusion of the complete liability period.  Finally, Defendants refuse to produce documents responsive to three Requests, where their objections are conclusory and unfounded.

For all the reasons discussed below, the Court should grant the NRA's Motion to Compel, and order that Defendants produce documents responsive to **Requests No. 1, 2, and 4**.

### b.     Legal Standard.

Federal Rule of Civil Procedure 26(b) provides a party the right to discovery "regarding any non-privileged matter that is relevant to a party's claim or defense."[8]  "Information within [the] scope of discovery need not be admissible in evidence to be discoverable."[9]  In *Hickman v. Taylor*, the United States Supreme Court cemented the tradition that the discovery rules "are to be accorded a broad and liberal treatment."[10]  Rule 34 provides for one method of discovery: the request for production of documents.[11]  As a matter of procedure, "the party resisting discovery must show specifically how each request is not relevant or otherwise objectionable."[12]

### c.     Legal Argument.

### (1)    The Court Should Order Defendants to Immediately Produce Responsive Documents.

On October 25, 2019, the NRA filed its First Amended Complaint ("FAC") asserting causes of action for false association under the Lanham Act, copyright infringement, common law

---

[8] *Metropolitan Life Ins. Co. v. Dailey*, No: 3:12-cv-4174-G-BN, 2014 WL 12585666, at *1 (N.D. Tex. May 15, 2014).
[9] Fed. R. Civ. P. 26(b)(1).
[10] 329 U.S. 495, 507-08 (1947).
[11] Fed. R. Civ. P. 34.
[12] *Dailey*, 2014 WL 12585666, at *1 (relying on *McLeod, Alexander, Power & Appfel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990)).

fraud, breach of fiduciary duties and breach of contract, against two corporate entities, including its former public relations firm, Ackerman McQueen, Inc. and its subsidiary, Mercury Group, Inc., (together, "AMc") and four senior executives of those firms (collectively, "Defendants").[13]  On November 5, 2019, the NRA propounded its First Set of Requests, in which the NRA made clear that "Defendants are requested to respond, separately and fully, and to produce the requested documents to the undersigned counsel . . . within thirty (30) days after service of these Requests."[14]

Defendants responded one month later on December 5, 2019 (the "Responses"), and interposed various "objections."[15]  Nonetheless, Defendants agreed to produce non-privileged documents within the scope of certain of the Requests.[16]  However, Defendants did not produce a single document by the deadline on December 5, 2019, in violation of the plain language of the Requests, Federal Rule of Civil Procedure 34(b)(2)(B), and relevant legal authority.[17]  Furthermore, Defendants' document productions on January 23, 2020 and on August 25, 2020, barely contained documents that were actually responsive to the NRA's Requests.[18]

Following several conferences with counsel for Defendants, Plaintiff reconsidered its position as to the majority of the Requests for which it sought to compel Defendants to produce

---

[13] *See* ECF No. 18 ("FAC").

[14] *See* ECF No. 48, Plaintiff's First Set of Requests for Production, dated November 5, 2019, at p. 2, Ex. A.

[15] *See* ECF No. 48, Defendants Responses and Objections to Plaintiff's First Set of Requests for Production, dated December 5, 2019, Ex. B.

[16] *See id.* at pp. 22-23 (Responses to Request Nos. 45-46), pp. 28-29 (Responses to Request Nos. 57-59).

[17] *See* Fed. R. Civ. P. 34(b)(2)(B) (requiring that "the production [of documents] must then be completed no later than the time for inspection specified in in the request."); *Crownover v. Crownover*, 2:15-CV-132-AM-CW, 2017 WL 10575859, at *1 (W.D. Tex. July 12, 2017) ("Generally, responses and production must be done within 30 days after being served with the request."); *Madrid v. Wells Fargo Bank, N.A.*, EP-14-CV-00152-DCG, 2016 WL 10590161, at * 2 (W.D. Tex. July 27, 2016) ("If a party fails to respond fully to discovery requests made pursuant to Rule 34 in the time allowed by the Federal Rules of Civil Procedure, the party seeking discovery may move to compel for disclosure and for appropriate sanctions under Rule 37."); Wright & Miller, Fed. Prac. and Proc. § 2213 (advising that "the simplest response is one saying that the discovery sought by the request will be allowed at the time and place and in the manner specified by the request.").

[18] Plaintiff has not had the opportunity to meaningfully review Volume 3 of Defendants' document production, served on October 22, 2020, one day before the date of filing listed on this Joint Status Report.

documents, as set forth in Plaintiff's Motion to Compel. As a result, Plaintiff now only seeks to compel Defendants to produce documents responsive to three of its Requests for Production: **Requests No. 1, 2, and 4**.

Accordingly, the Court should issue an order compelling production of all the documents Defendants agreed to produce in their written Response to the Requests.

### (2)     The Court Should Reject Defendants' Time-Period Limitation As To Defendants' Production Of Responsive Documents.

Defendants begin their written responses with a number of boilerplate and general "Objections Applicable to All Requests."[19]  For example, in General Objection No. 4, Defendants generally refuse to produce documents if the Request is "vague, ambiguous, overbroad and unduly burdensome, or seeks information neither relevant to the claim or defense of any part nor reasonably calculated to lead to the discovery of admissible evidence," without providing any elaboration in terms of any particular Request or the basis for the objection.[20]  Defendants then purport to "incorporate[ ] by reference into each of the Specific Objections and Responses set forth below."[21]  The use of generalized objections is especially improper where, as here, "it is impossible to know whether information has been withheld and, if so, why."[22]  Indeed, the Fifth Circuit has condemned such behavior as the equivalent of tactics "that have brought disrepute upon attorneys and the legal system."[23]  Following Fifth Circuit authority and other like-minded decisions, the

---

[19] ECF No. 48, Ex. B at p. 2.
[20] *Id.* at p. 2 (General Objection 4); *see also id.* pp. 2-4 (remaining objections).
[21] *Id.* at p. 4 (General Objection 12).
[22] 303 F.R.D. 466, 483 (2014) (relying on various authorities both in-Circuit and out-of-Circuit for this proposition).
[23] *McLeod, Alexander, Powel & Apfel v. Quarles*, *894* F.2d 1482, 1484-86 (5th Cir. 1990); *Mancia v. Mayflower Textile Servs. Co.*, 253 F.R.D 354, 358 (D. Md. 2008) (lamenting that "boilerplate objections . . . persist despite a litany of decisions from courts, including this one, that such objections are improper unless based on based on particularized facts").

court in *Heller* reviewed the relevant discovery responses and ordered that, "[c]ounsel should cease and desist from raising these free-standing and purportedly universally applicable 'general objections' in responding to discovery requests."[24]  The same result should apply here with respect to all of Defendants' similarly deficient "Objections Applicable to All Requests."

Of all of Defendants' general objections, the most egregious is General Objection No. 8, in which Defendants, without reason, explanation, or justification, unilaterally elected to produce only "responsive non-privileged [sic] documents from January 1, 2018 to the commencement of this lawsuit."[25]  Defendants have not provided any reasonable basis in support of this unilaterally imposed time-period limitation, and therefore, it should be rejected.[26]

In addition, allowing this unilaterally imposed limitation to stand would dramatically and unreasonably limit the temporal scope of discovery in this case, and enable Defendants to withhold documents and evidence from the 2015-2017 time period.  That period is directly relevant to the Defendants' liability, because during that period, the FAC alleges that Defendants began their fraudulent schemes.  Unquestionably, the Federal Rules provide the NRA the right to develop its case through access to Defendants' documents, especially in fraud cases, such as this one, where the evidence of wrongdoing most likely exists in the files of the party opponent.[27]  It is for this reason that the Supreme Court has held that discovery in the federal courts is of a permissive nature, and thus intended to capture materials "regarding any nonprivileged mater that is relevant to any party's claim or defense."[28]

---

[24] *Heller*, 303 F.R.D. at 484.
[25] Ex. B at p. 3.
[26] *Heller*, 303 F.R.D. at 483; *McLeod*, 894 F.3d at 1484-86.
[27] Fed. R. Civ. P. 26(b) (allowing discovery into non-privileged matters relevant to the parties' claims and defenses).
[28] *Id.*; *Hickman v. Taylor*, 329 U.S. 495, 507-08 (1947).

Allowing Defendants to suppress documents from 2015 onward is contrary to standards and widely accepted rules of discovery.  As alleged in the FAC, *in 2016* Defendants induced the NRA into launching a digital platform known as NRATV.[29]  Thus, it is likely that responsive information exists within one year prior to the commencement of the fraud. Thereafter, Defendants defrauded the NRA by presenting misleading viewership data and analytics to cover up that NRATV's poor results.[30]  The FAC specifically alleges that deceptive statements concerning purported viewership numbers and analytics, sponsorships, and the ultimate valuation of NRATV were made *in 2017, 2018, and 2019.*[31]

In addition, the FAC alleges that starting *in at least 2016,*[32] Defendants engaged in conduct that was intended cover up a pattern of fraudulently overbilling the NRA through various methods, in violation of Defendants' contractual and fiduciary duties.[33]  The FAC clearly alleges that Defendants made misrepresentations or mislead the NRA about its record-keeping practices, billing statements, and invoices *throughout at least 2016 and 2017.*[34]

Unsurprisingly, multiple courts, recognize that the "temporal scope of discovery," should encompass "the liability period" in which plaintiff alleges that wrongful acts giving rise to plaintiff's claims occurred.[35]   Indeed, because "discovery of information both before and after"

---

[29] ECF No. 18 ("FAC") at ¶¶ 16-17, 21-26, 43.

[30] *Id.* at ¶¶ 27-37, 44-46.

[31] *Id.* at ¶¶ 28-29 & accompanying chart (showing one meeting on Oct. 24, 2017 and one meeting on Nov. 28, 2017, at which Defendants made misleading statements to the NRA about the performance of NRATV).

[32] *Id.* at ¶¶ 121, 130.

[33] *Id.* at ¶¶ 18-19, 76-77, 120-136.

[34] *Id.* at ¶¶ 121-131, 134-136.

[35] *Browning v. S.W Res. Inst.*, Civ. No. Sa-05-ca-0245-fb, 2006 WL 8434146, at *2 (W.D. Tex. Apr. 26, 2006);  *Tex. Grain Storage, Inc. v. Monsanto Co.*, SA-07-CA-673-OG, 2008 WL 11411844, at *7-8 (W.D. Tex. Apr. 24, 2008) (holding in an antitrust case that plaintiff was entitled to discovery spanning the entire liability and "damages" period, plus "for a reasonable period of time antedating the earliest possible date of actionable wrong" and finding a look-back window of two years appropriate); *Alvarez v. Aldi (Tex.) LLC*, No. 3:13-cv-4122-L, 2014 WL 3624929, at *4 (N.D. Tex. July 22, 2014) ("Discovery is to be limited to the *relevant time period.*  But information for years prior or subsequent to the specific period covered may still be relevant to a Plaintiff's claims") (emphasis);

---

that period can be relevant, "courts commonly extend the scope of relevant discovery to a reasonable number of years both prior to and following such period."[36]  In light of the facts alleged in the FAC, the Court should reject Defendants' unduly short discovery period spanning from January 2018 to August 2019 (just 20 months).[37]  Further, the Court should allow the temporal scope of discovery to encompass the entire liability period (2016-2019), and also add on a reasonable one-year period that would place the beginning of the discovery period in this case at January 1, 2015, as stated in the Requests,[38] and allow for discovery post-dating the filing of the complaint.[39]  Defendants' generalized objections, including the time period objection, should be rejected.

> **(3)**     **The Requests Regarding The NRA's Intellectual Property Seek Documents Relevant to The Claims and Defenses In This Case.**

Defendants interpose various objections that would unreasonably frustrate the NRA's right to obtain relevant, non-privileged, and otherwise discoverable information concerning the claims and defenses at issue in this case.  The FAC alleges that Defendants misused the NRA's name and intellectual property to create a false impression on their website that (1) the NRA remained

---

*Briones v. Smith Dairy Queens Ltd.*, No. V–08–48, 2008 WL 4630485, at *5 (S.D. Tex. Oct. 16, 2008) (allowing plaintiff's discovery of the defendant's financial information to 2007 and 2008 where an alleged discriminatory act took place in 2007 and the discovery was requested in 2008).

[36] *Browning*, 2006 WL 8434146, at *2.  *See also Moore v. Radian Grp., Inc.*, 2:01-CV-023 (TJW), 2002 WL 31738795, at *4 (E.D. Tex. Feb. 1, 2002) (allowing discovery going back two years prior to the statute of limitations); *Tex. Grain Storage*, 2008 WL 11411844, at *7-8 (W.D. Tex. Apr. 24, 2008) (holding in an antitrust case that plaintiff was entitled to discovery "for a reasonable period of time antedating the earliest possible date of actionable wrong" and finding a look-back window of two years appropriate); *accord Fed. Trade Commission v. Lukens Steel Co.*, 444 F. Supp. 803, 805-06 (D.D.C. 1977).

[37] *Compare with Leamon v. KBR, Inc.*, Civ. Act.  H-10-0253, 2010 WL 11668204, at *2 (S.D. Tex. Nov. 9, 2011) ("While there is no hard and fast rule, a 5-year discovery period is ordinarily sufficient.") (citing *Paananen v. Cellco P'ship*, No. C08-1042RSM, 2009 WL 3327227, at *8-9 (W.D. Wash. Oct. 8, 2009).

[38] *See* ECF No. 48, at p. 8 ("Unless otherwise noted, the time period covered by these Requests is January 1, 2015 to the present."), **Ex. A**.

[39]  *Benevis LLC v. Mauze & Bagby, PLLC*, 5:12-CV-36, 2015 WL 12763537, at *5 and *7 (S.D. Tex. Dec. 14, 2015) (setting a "one-year pre-advertising [discovery] cut-off date" in False Claims Act case).

---

affiliated with AMc as a client and (2) the NRA endorsed AMc's services, specifically with respect to NRATV, amounting to false association and false endorsement in violation of the 15 U.S.C. § 1125(a)(1)(A).[40] To better understand the composition and history of AMc's website, the NRA served a number of Requests directed to documents concerning the substance of the website, the related decision-making process, and the NRA's intellectual property, including the graphics and photographs depicted in Exhibits A and C to the FAC.[41]

During the Parties' conferences regarding this discovery dispute, Defendants stood on their objections as they pertain to **Request Nos. 1, 2 and 4**, asserting that any responsive documents would be irrelevant to the claims and defenses at issue in this case.  Moreover, the Parties disagree over the time period applicable to certain of these Requests. Originally, in their Responses to these Requests, Defendants commit to producing documents between only June 25, 2019, the date the parties terminated the Services Agreement, and November 18, 2019, a date interposed for reasons unknown.[42] Now, following the various conferences, Defendants object to producing any documents responsive to these Requests.

However, as further discussed above, the requests seek information that is clearly relevant to Plaintiff's claims for false association under the Lanham Act. Furthermore, for purposes of these Requests, the Court should apply the one-year doctrine discussed in detail above with respect to the temporal scope of discovery related to the intellectual property claims.[43] Accordingly, the

---

[40] ECF No. 18 ("FAC") at ¶¶ 16-17, 21-26, 43.
[41] FAC ¶¶ 80-102.
[42] *Id.* at pp. 4-6.
[43] *Browning v. S.W Res. Inst.*, Civ. No. Sa-05-ca-0245-fb, 2006 WL 8434146, at *2 (W.D. Tex. Apr. 26, 2006); *Tex. Grain Storage, Inc. v. Monsanto Co.*, SA-07-CA-673-OG, 2008 WL 11411844, at *7-8 (W.D. Tex. Apr. 24, 2008) (holding in an antitrust case that plaintiff was entitled to discovery spanning the entire liability and "damages" period, plus "for a reasonable period of time antedating the earliest possible date of actionable wrong" and finding a look-back window of two years appropriate); *Alvarez v. Aldi (Tex.) LLC*, No. 3:13-cv-4122-L, 2014 WL 3624929, at *4 (N.D. Tex. July 22, 2014) ("Discovery is to be limited to the relevant time period. But information for

---

Court should grant the motion in part and compel Defendants to produce non-privileged documents responsive to Requests Nos. 1-2 and 4 from June 25, 2018, and continuing to at least the present.

### d.      **Conclusion and Request for Relief.**

For all the reasons stated above, the Court should grant the NRA's Motion to Compel with regards to responses to **Requests Nos. 1, 2 and 4**, order production of documents responsive to **Requests Nos. 1, 2 and 4** within 45 days, and award the NRA reasonable attorney's fees and expenses for bringing this Motion.

### 2. **Defendants' Position**

### a.      **Overview of Relevant Facts**

Defendants incorporate by reference the paragraphs contained in Section III.B.1.a, below, as if they were set forth at length herein.

As this Court is aware, Plaintiff's action in the Northern District was filed along with three other lawsuits in Virginia.  First, the NRA filed a pre-textual lawsuit against AMc in Virginia in April 2019 for alleged failure to comply with audit requests and not turning over certain information.[44]  The NRA then sued AMc again in Virginia in May 2019 for breach of fiduciary duty and breach of contract a second time (confidentiality), relating to allegations of "leaks" and a false and defamatory extortion narrative.[45]  The NRA then sued AMc in this Court in September 2019 for intellectual property claims, breach of contract *a third time* (for failure to comply with

---

years prior or subsequent to the specific period covered may still be relevant to a Plaintiff's claims") (emphasis); *Briones v. Smith Dairy Queens Ltd.*, No. V–08–48, 2008 WL 4630485, at *5 (S.D. Tex. Oct. 16, 2008) (allowing plaintiff's discovery of the defendant's financial information to 2007 and 2008 where an alleged discriminatory act took place in 2007 and the discovery was requested in 2008).

[44] *See* ECF No. 51 at Ex. B-16 (Original Complaint, *NRA v. AMc, et al.*, Superior Court of Virginia, Cause CL19001757).

[45] *See* ECF No. 51 Ex. B-18 (Original Complaint, *NRA v. AMc, et al.*, Superior Court of Virginia, Cause CL19002067).

audit requests and to turn over certain information, and fraud. The NRA filed a fourth lawsuit against AMc for a third time in Virginia in September 2019 for return of property.[46] The NRA has since incorporated in the Northern District all the claims in the Virginia lawsuits.[47]

To date, the NRA has served more than 650 discovery requests between the two forums: three rounds of discovery on November 5 and 20, and December 12, 2019 in this lawsuit; another round in Virginia on January 29, 2020; and then an additional seven sets in this matter on February 3, May 5, May 18, August 28 (two sets), and September 11 (two sets), 2020. Plaintiff has served 214 RFPs in the Texas Action alone. The NRA also issued more than 20 subpoenas to third parties, including AMc current and former clients (ten on January 8, 2020 and eleven on January 24, 2020), forcing Defendants to file motions to quash in federal courts in three different states.[48]

In responding to the NRA's many and voluminous requests, Defendants have collected data from 28 custodians, totaling more than 2.5 million documents.[49] Initially, Defendants reviewed 85,000 documents before the filing of this action.[50] Then, Defendants have reviewed hundreds of thousands of those documents by initially hiring 30 contract attorneys to review in a matter of weeks what would otherwise have taken a legal team months to complete.[51] Since then, Defendants' legal team has continued to review tens of thousands of documents to determine responsiveness and applicability to Plaintiff's 214 document requests in the Texas Lawsuit. To

---

[46] *See* ECF No. 51 Ex. B-19 (Original Complaint, *NRA v. AMc, et al.*, Superior Court of Virginia, Cause CL19002886).

[47] *See* ECF No. 18 ¶¶ 156, 166.

[48] *See* Ackerman McQueen, Inc., et al. v. NRA, et al., Miscellaneous Case No. MC-20-1-HE (W.D. OK); Ackerman McQueen, Inc., et al. v. NRA, et al., Miscellaneous Case No. 1:20-MC-149-LY (W.D. TX); Ackerman McQueen, Inc., et al. v. NRA, et al., Miscellaneous Case No. 1:20-MC-0006 (E.D. VA).

[49] **Ex. B** ¶ 2, Declaration of Brian E. Mason.

[50] *Id.*

[51] *Id.*

date, as part of its document collection, review, and production, AMc has incurred expenses well over $350,000.[52]

Plaintiff's claim that Defendants have produced only 2,902 documents is disingenuous. Defendants produced more than 18,000 documents in the Virginia Action (approximately 60,000 pages), including documents relevant to causes of action in the Texas Action.[53] For example, AMc produced documents relating to NRATV, analytics, and billing records, including more than 10,000 pages of time sheets, third-party invoices, and documents concerning the creation of NRATV.[54] Counsel for Defendants' have repeatedly emphasized that the documents produced in Virginia are relevant and responsive to Plaintiff's discovery requests in Texas.[55] Surely, Plaintiff does not intend for Defendants to go through the exercise of re-producing all the same documents in the Texas Action with nothing but new Bates labels.

Defendants then produced 580 documents on February 12, 2020. The reason for the relatively small production at that time was because the Court had not yet entered a Protective Order in this case providing for a two-tier designation procedure for protecting Defendants' trade secret and confidential business information, which was already in place in the Virginia Action.[56]

Following the general business disruptions caused by COVID-19, this Court issued the two-tier Protective Order on June 22, 2020.[57] Thereafter, Defendants produced 2,322 documents

---

[52] *Id.*
[53] *Id.* ¶ 3.
[54] *Id*.
[55] *Id.*
[56] *Id.* at ¶ 4.
[57] *See* ECF No. 149.

on August 25, 2020.[58]   Since that time, Defendants have continued to review documents and produced over 9,000 documents (over 38,000 pages) on October 22, 2020.[59]

Moreover, due to the sheer volume of documents from the relevant custodians, Defendants have not yet completed their document review and plan to continue to supplement with one or more subsequent productions.[60]   In conferring with Plaintiff's counsel, counsel has likewise represented that Plaintiff's production is not yet substantially complete, and that Plaintiff, too, will continue to supplement its production in the future.[61]

As discussed herein, Plaintiff's motion to compel should be denied.   *First*, with respect to RFP Nos. 1, 2, and 4 (the "Intellectual Property Requests"), the documents sought in these requests are no longer relevant to either party's claims or defenses following this Court's order on defendants' motion to dismiss.   *Second*, with respect to Plaintiff's objections as to Defendants' time period limitations, Plaintiff has not properly brought these issues before the Court, and Plaintiff's motion on this issue should be denied.

> **b.**     <u>**Legal Argument.**</u>
>
> **(1)**     <u>**RFP Nos. 1, 2, and 4 are no longer relevant to any claim or defense in this lawsuit.**</u>

As this Court is aware Plaintiff brought claims for numerous causes of action, including claims for fraud, conspiracy, breach of fiduciary duty, and breach of contract.   Plaintiff also brought three claims related to its intellectual property, which Plaintiff alleges Defendants misused in some manner: (1) a claim for "false association" under the Lanham Act, (2) a claim for copyright

---

[58] *See* **Ex. B** at ¶ 4.
[59] *Id.*
[60] *Id.* at ¶ 5.
[61] *Id.*

infringement, and (3) a claim for conversion.  On September 15, 2020, Judge Fish entered an Order dismissing Plaintiff's claims for copyright infringement and conversion.[62]  Accordingly, the only remaining intellectual property claim is for "false association" under the Lanham Act.

Throughout the business relationship between AMc and the NRA, AMc displayed examples of its work product in a gallery on its website, www.am.com.  Because AMc had developed a digital media platform for the NRA, NRATV, and produce the content, the AMc website naturally included images of NRATV-branded content among samples of work performed for AMc's current and former clients.  After the NRA expressed its desire to terminate the business relationship on June 25, 2019, AMc continued to exhibit the same images of NRATV content on its website gallery.  AMc does not dispute this.

Over the course of the next several weeks, the NRA expressed its displeasure with AMc's continued use of the NRATV images on its website.  Although AMc believed, and still believes, that its use of those images to display its own work product was completely lawful, in an effort to compromise, in August 2019, AMc appended the word "Legacy" to the NRATV images to make clear that the NRA was no longer a current client of AMc.  On November 18, 2019, AMc completely rebranded its website and removed the images entirely.

The jist of Plaintiff's false association claim is that, by displaying the NRATV images on its website, AMc is creating the false impressing in the mind of consumers that the NRA is still a client of AMc (irrespective of the "Legacy" appendage) and continues to approve, endorse, or sponsor NRATV or AMc.[63]  In support of this claim, Plaintiff issued several requests for production on the subject of AMc's website and the decision-making process undergone by AMc

---

[62] ECF No. 165.
[63] *See* ECF No. 18 at ¶¶ 94-102.

and its employees regarding the use of NRATV images, and now moves the Court to compel responsive documents to its RFP Nos. 1, 2, and 4.  However, not only are Plaintiff's requests entirely overbroad, but more importantly, regardless of whatever these documents may show, they could not possibly be relevant to *any element* of Plaintiff's false association claim.

As a general rule, Federal Rule of Civil Procedure 26(b)(1) makes clear that discovery is limited by the bounds of relevance, but that discoverable information need not be admissible at trial if the request appears reasonably calculated to lead to the discovery of admissible evidence.[64] In keeping with liberal approach to discovery taken by federal courts, the Northern District has even established that documents are discoverable unless they have "no possible bearing" on a party's claim or defense.[65]  Yet despite this low bar for relevance, in this case, Plaintiff's RFP Nos. 1, 2, and 4 have "no possible bearing" on Plaintiff's false association claim, nor are they reasonably calculated to lead to admissible evidence on any of Plaintiff's other claims.

Under 15 U.S.C. § 1125(a)(1), there are four elements of a Lanham Act violation: (1) use of a word, mark, name, or symbol in a commercial advertisement or promotion in interstate commerce; (2) that is somehow false or misleading; (3) that deceives or is likely to deceive in a material way; (4) has caused a competitive or commercial injury to the plaintiff.   Yet, taking the elements one by one, it is clear that none of these elements would be assisted by RFP Nos. 1, 2, or 4 in any manner.  With regard to the first element, "use," Defendants <u>do not dispute</u> that they "used" the discrete set of images on its website (identified in Plaintiff's Amended Complaint[66]) nor that they added the word "Legacy" to the images in August 2019.  The rest of the elements are for the <u>jury alone</u> to decide, *i.e.*, whether that "use" was false or misleading (element 2), whether

---

[64] *See* FED. R. CIV. P. 26(b)(1).
[65] *Merrill v. Waffle House, Inc.*, 227 F.R.D. 467, 470 (N.D. Tex. 2005).
[66] ECF No. 18 at Ex. A, C.

it deceived or was likely to deceive consumers as to AMc's affiliation with the NRA (element 3), and whether the NRA was injured as a result (element 4).[67]  No document in Defendants' files will make any of these elements more or less likely.

As much as Plaintiff may want to read an "intent" or "bad-faith" element into this cause of action, it simply does not exist.[68]  The "use" of the images is the only thing that matters—not whether a defendant intended to use such images wrongfully or intended harm to the plaintiff. Thus, RFP No. 1, seeking "[a]ll documents referring or relating to the design and composition of AMc's website, including but not limited to all documents describing, providing insight into, or otherwise concerning Defendants' **actual or contemplated decision** to include references to the NRA and/or use the NRA's intellectual property," merely goes to the "intent" of AMc (its decision-making process) regarding whether to use the images and the website design.  Similarly, RFP No. 2, seeking "[a]ll documents referring or relating to the design and composition of AMc's website that provide information to identify the individuals involved in the **decision-making** related to the website's content, design, and composition," again goes only to intent, which is irrelevant.

RFP No. 4, in addition to being similarly irrelevant is also entirely overbroad.  RFP No. 4 seeks "[a]ll documents referring or relating to the NRA's intellectual property, graphics, and/or other copyrighted material that belongs to the NRA."   This request could encompass the entirety of the parties' nearly 40-year business history and every single project in which AMc used the NRA logo or tradename in some way—which easily occurred in hundreds of projects.  Plus, AMc

---

[67] *See* 15 U.S.C. 1125(a)(1).
[68] The Lanham Act provides remedies for "willful" violations only in two enumerated circumstances, dilution claims and domain-name piracy claims, neither of which have been alleged in this lawsuit.  *See* 15 U.S.C. 1115(c)-(d).

merely _having_ a large quantity of documents "referring or relating" to the NRA's trademarks is not an element of the Lanham Act claim. The key is _using_ the protected mark in a false or misleading way. Thus, even if Defendants were to undertake the massive effort of producing these documents, they would establish nothing—besides the fact that AMc was the NRA's faithful advertising and public-relations agency for nearly 40 years.

It is true that if Plaintiff's conversion claim were still active, then the concepts of "intent" or the sheer quantity of NRA intellectual property in AMc's possession might be relevant to some element of conversion. But Plaintiff's conversion claim has be dismissed with prejudice, and thus, discovery related to elements of this claim are no longer relevant.[69]

Moreover, RFP Nos. 1, 2, and 4 relate solely to Defendants' conduct _after_ June 25, 2019, the point at which both parties agree that AMc had ceased performing services for the NRA and the contract terminated. Thus, AMc's conduct after June 25, 2019, cannot possibly be relevant to Plaintiff's claims for fraud, breach of fiduciary duty, conspiracy, or breach of contract, because the alleged conduct made the basis of each of those claims occurred _before_ the end of the contractual relationship. Accordingly, RFP Nos. 1, 2, and 4 are not reasonably likely to lead to the discovery of admissible evidence and, indeed, have "no possible bearing" on Plaintiff's claims and defenses in this case. As such, as the party resisting discovery, Defendants have met their burden to establish how these requests are "not relevant or otherwise objectionable,"[70] and Plaintiff's motion should be denied on this issue.

### (2)   The NRA's Requested Time Period is a Blatant Fishing Expedition.

---

[69] _See_ ECF No. 165.
[70] _See McLeod, Alexander, Powel & Apffel, P.C. v. Quarles_, 894 F.2d 1482, 1485 (5th Cir. 1990); _McKinney/Pearl Rest. Partners, L.P. v. Metro. Life Ins. Co._, 322 F.R.D. 235, 242 (N.D. Tex. 2016.

Plaintiff next makes the blanket claim that it is entitled to a four-year look back period on each and every single one of its requests.    Plaintiff's Motion on this issue should be denied for three reasons.  *First*, Defendants have already agreed to produce documents in accordance with Plaintiff's four-year timeline on certain Requests related to claims that are actually relevant to that time period.  *Second*, aside from the specific requests Defendants agreed upon, Plaintiff failed to meaningfully confer on remaining requests and did not properly raise the issues in their Motion. *Third*, Plaintiff's request for the Court to strike Defendants' general scope is improper because, as most of Plaintiff's alleged facts occurred in 2018-2019, it would render the vast majority of Plaintiff's grossly overbroad.

*First*, as a preliminary matter, as a product of the meet-and-confer process with Plaintiff's counsel, Defendants have already agreed to produce documents within the scope (January 1, 2015 to the present) requested by Plaintiffs for certain requests in instances where the four-year lookback period may be relevant to Plaintiff's claims and allegations.[71]

*Second*, during the telephone conference that occurred on both October 9 and October 14, 2020, Defendants' counsel specifically raised the issue of the scope of Plaintiff's requests and Defendants' objections to this scope, a topic that was briefed as part of Plaintiff's Motion to Compel and Defendants' Response.[72]  Defendants agreed to comply with certain requests where the four-year lookback period may be relevant to Plaintiff's claims.[73]  On other requests, Defendants stood by the objections regarding overbreadth and relevance that they had previously asserted, but counsel expressly invited Plaintiff's counsel to identify specific requests for further

---

[71] **Ex. B** at ¶ 6
[72] *Id.*; *see* ECF No. 51 at ¶¶ 26-27.
[73] **Ex. B** at ¶ 6

discussion as to scope so that the parties could continue to work through any additional disputes.[74] To date, Plaintiff's counsel has declined to confer about any specific document requests, other than those already agreed upon by Defendants.[75]

> To prevail on a motion to compel, the movant
>
> must specifically and individually identify each discovery request in dispute and specifically, as to each request, identify the nature and basis of the dispute, including, for example, explaining … how a response or answer is deficient or incomplete, and ask the Court for specific relief as to each request; and must include a concise discussion of the facts and authority that support the motion as to each discovery request in dispute.[76]

Here, however, in response to Defendants' invitation to confer further, Plaintiff failed to articulate any specific requests for production they contend had an improper temporal scope,[77] and now appear to be moving to compel that each and every one of Plaintiff's 81 requests should be subject to its four-year time frame.  Although not currently before the Court, the temporal scope dispute here will undoubtedly have implications on the additional 133 requests for production Plaintiff has served since their first requests for production on November 5, 2019.[78]

Third, granting Plaintiff's motion would render most of Plaintiff's request grossly overbroad and unduly burdensome since most of the alleged wrongdoing by Defendants occurred in 2018 and 2019.

"A court can – and must – limit proposed discovery that it determines is not proportional to the needs of the case."[79]   On a motion to compel, the movant also must show:

---

[74] *Id.*

[75] *Id.*

[76] *Samsung Elecs. Am. Inc. v. Chung*, 325 F.R.D 587, 594 (N.D. Tex. 2017).

[77] **Ex. B** at ¶ 6.

[78] Since Plaintiff served its initial 81 requests for production on November 5, 2019, Plaintiff has since served an additional 133 requests for production (spanning over five different requests for production), most all of which include requests for the production of documents back to 2015.

[79] *Gondola v. USMD PPM, LLC*, 223 F. Supp. 3d 575, 579 (N.D. Tex. 2016).

many or all of the proportionality factors, including the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, and the importance of the discovery in resolving the issues.[80]

The party seeking discovery also must comply with the proportionality mandates under the federal rules, and must certify that each discovery request is "not interposed to any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation" and is "neither unreasonable nor unduly burdensome or expensive."[81]

Although Defendants have already agreed to produce certain documents within this time period,[82] applying that criteria to all of Plaintiff's 81 Requests is grossly overbroad and unduly burdensome.[83]   For example, the NRA requests all invoices and back up documentation over a four-year period.[84]  Although Defendants have no objection to producing the invoices, the requests encompass the production of hundreds of thousands of other documents "referring or relating" to these invoices, which could include every single document related to the NRA during this four-year period.  In light of the hundreds of projects AMc did for the NRA since 2015, even within the two-year window that Defendants' originally used, initial searches results from 28 custodians yielded over 2.5 million documents[85]—a testament to the extensive amount of work AMc performed for the NRA.  However, if Defendants were compelled to produce documents from January 1, 2015, for all of Plaintiff's discovery requests, this process would cost Defendants at

---

[80] *Id.* at 580.
[81] *Id.*
[82] *See* **Ex. B** at ¶ 6.
[83] *See Leamon v. KBR, Inc.*, No. H-10-0253, 2010 U.S. Dist. LEXIS 156015, at *5 (S.D. Tex. Nov. 9, 2010) ("The temporal scope of discovery must be broad enough to allow the parties to find evidence but not so broad as to be overly burdensome.").
[84] *See* ECF No. 55 at Ex. A-1 (Pl.'s RFP No. 17).
[85] *See* **Ex. B** at ¶ 2.

---

least an additional $125,000 beyond what Defendants have already spent in order to conduct a meaningful review.[86]

Although Plaintiff suggests that extending discovery before the alleged period of wrongdoing "can be" relevant,[87] for most of Plaintiff's claims, the liability period based upon the First Amended Complaint largely concerns acts and events that occurred in 2018 and 2019. For example, the conspiracy and extortion claims related to Oliver North ("***North***"), including the NRA's breach-of-contract for allegedly withholding North's contract from the NRA, could not have occurred any earlier than 2018. North did not even become NRA President or an employee of AMc until May 2018, and the alleged conspiracy and extortion did not occur until 2019.[88] Plaintiff has not suggested in any pleading or motion filed to date that AMc and North began conspiring against the NRA before 2018, and certainly not as early as 2015. Likewise, the NRA has not alleged that AMc failed to comply with audits before 2018, violated its intellectual property rights before 2019, leaked documents and information to the press before 2019, or breached any part of the parties' contract before 2018.[89] In fact, Plaintiff's most publicized criticism of AMc, both in the media and in its legal proceedings, including its most recent filing against the New York attorney general, is that AMc's withholding of documents was the primary basis for initiation of its lawsuits against AMc.[90] Yet again, there are no allegations of withholding prior to 2018.

Accordingly, allowing a greater scope of discovery than January 1, 2018 for discovery related to plaintiff's claim for breach of contract, conspiracy, or its intellectual property claims

---

[86] *Id.* at ¶ 7.
[87] *See* NRA's Motion, *supra*, § III.A.1.c.(2).
[88] *See* ECF No. 18.
[89] *See id.*
[90] *See* **Ex. B-1** at 9 ("When the NRA sought additional documentation from Ackerman, Ackerman refused to provide it, leading to litigation beginning in April 2019, by the NRA against Ackerman to force compliance with its requests…").

would do nothing more than invite a time consuming and incredibly expensive fishing expedition. As such, Plaintiff's blanket request for the Court to overrule Defendants' general scope objection does not attempt to establish any type of proportionality criteria and, to the contrary, appears calculated to "harass, cause unnecessary delay, or needlessly increase the cost of litigation" by subjecting Defendants to unduly burdensome and expensive requests.[91]

Indeed, the language of Plaintiffs' Requests calls for the broadest possible interpretation would yield an impossible volume of responsive documents. First, 76 of Plaintiff's 81 requests seek "all" documents related to various topics.[92] Under federal law, a request for production of "all" or "any and all" documents is improper and contrary to the proportionality mandate in Federal Rule of Civil Procedure 26(b)(1).[93] Further broadening matters, 73 of Plaintiff's requests seek documents "referring or related to" a particular topic.[94] In certain situations, the phrase "relating to" may render a request overbroad.[95] Considering the NRA and AMc had a multi-decade relationship, requests that "relate to" the topics in Plaintiff's requests will capture millions of documents—as has been proven by the more than two million documents collected and hundreds of thousands reviewed thus far. Such language renders the requests facially (and practically) overbroad, particularly in light of the four-year scope Plaintiff seeks.[96]

---

[91] *See Gondola*, 223 F. Supp. 3d at 580; *Samsung* 325 F.R.D. at 594.

[92] *See* ECF No. 55 at Ex. A-1.

[93] *See Nerium SkinCare, Inc. v. Olson*, No. 3:16-cv-1217-B, 2017 U.S. Dist. LEXIS 7986, at *22-23 (N.D. Tex. Jan. 20, 2017) (finding request for "all documents" overbroad and ultimately narrowing the scope); *Gondola*, 223 F. Supp. 3d at 586 (N.D. Tex. 2016) (sustaining objection that "all documents" was an overbroad "blockbuster" request).

[94] *See* ECF No. 55 at Ex. A-1.

[95] *See StoneEagle Servs. v. Gillman*, No. 3:11-cv-2408-P, 2013 U.S. Dist. LEXIS 194350, at *24 (N.D. Tex. Dec. 23, 2013) (ruling the category of requested documents was broad and not readily known).

[96] **Ex. B** at ¶ 7.

Moreover, as stated, Defendants have already agreed to produce documents going back to 2015 for certain requests, such as those relating to NRATV.[97]   Defendants invited Plaintiff's counsel to specifically identify any additional requests where they felt the 2015 scope was warranted, but Plaintiff's counsel declined to confer about any specific requests other than those already agreed upon.[98]   Instead, Plaintiff has brought the instant motion without demonstrating how this reasonable limitation is improper.   Furthermore, because Plaintiff failed to raise any specific requests for which it challenged Defendants' scope objection, Defendants cannot reasonably meet their burden as the "party resisting discovery" because it would literally have to challenge all of Plaintiff's requests, for many of which Defendants have already produced, or intend to produce responsive documents.

In sum, Plaintiff's chosen scope is unreasonable and inapplicable to many of its claims, and Plaintiff has failed to meet its burden for establishing the relief it seeks on this issue. Instead of "specifically and individually identifying each discovery request in dispute," making any showing of proportionality, or requesting specific relief, the NRA broadly contends that Defendants should be required to produce documents back to January 1, 2015 for each and every Request, but has failed to meaningfully confer with Defendants' counsel with regard to scope, despite Defendants' express offer. Plaintiff's motion to compel on this issue should be denied.

---

[97] *Id.* at ¶ 6.
[98] *Id.*

**B.    Defendants' Motion to Compel Plaintiff's Document Production and Motion for Sanctions (ECF No. 54).**

### 1.    Defendants' Position.

#### a.    Factual Background

Defendants' Motion arises out of a series of lawsuits the NRA filed against its longtime public-relations firm, AMc, based in large part on the Parties' contract (the "***Services Agreement***").  As this Court is well aware, in addition to this action, the NRA brought three separate lawsuits in Virginia, which are now consolidated into a single action (the "***Virginia Action***") and stayed.[99]

Through its attorney William A. Brewer, III ("***Brewer***") and his law firm, the Brewer Firm, the NRA brought the instant action against AMc in Texas (the "***Texas Action***"), replicating the same claims from the Virginia Action and including additional causes of action for conversion, fraud, breach-of-fiduciary-duty, and conspiracy, along with claims for copyright and trademark infringement. [100]  AMc filed a counterclaim for libel, tortious interference, fraud, and breach-of-contract.[101]  Both parties are seeking damages in excess of $50 million.

Brewer is the son-in-law of Angus McQueen, the late CEO of AMc, and the brother-in-law of Revan McQueen, AMc's current CEO.[102]  Defendants have previously briefed in the Texas

---

[99] National Rifle Association of America v. Ackerman McQueen, Inc., et al., Civil Case No. CL19001757, pending in the Circuit Court for the City of Alexandria, Virginia (filed on April 12, 2019); National Rifle Association of America v. Ackerman McQueen, Inc., et al., Civil Case No. CL19002067, pending in the Circuit Court for the City of Alexandria, Virginia (filed on May 22, 2019); National Rifle Association of America v. Ackerman McQueen, Inc., et al., Civil Case No. CL19002886, pending in the Circuit Court for the City of Alexandria, Virginia (filed on September 5, 2019).

[100] These claims are now part of the Virginia Action since the NRA's filing of its amended complaint on February 6, 2020.  In fact, in the NRA's *Motion for Leave to File a Consolidated and Amended Complaint*, it represented to the Virginia court that "these new allegations are already contained in the Texas action."

[101] *See* ECF No. 31 at pp. 77-122.

[102] *See* ECF No. 80 at Ex. B ¶ 5 [APP1171].

---

Action facts demonstrating Brewer's professional competition[103] with AMc, his intentional and tortious interference with the business relationship between AMc and the NRA, his assistance defrauding AMc through fake audits, including his use of his own employees to carry out that fraud, his history of animosity with the McQueen family that was the impetus for many of these actions, including making direct threats to Angus McQueen, and his improper use of media attacks to illegally and maliciously prejudice public opinion against AMc.[104]

For nearly four decades, AMc expertly served the NRA, helping the gun rights organization navigate troubled political and societal waters as its principal communication strategist and crisis manager.[105] AMc effectively crafted the NRA message and burnished its image as the most visible and powerful Second Amendment advocacy group in the United States.[106]

During this multi-decade relationship, the parties developed working arrangements, such as negotiating annual budgets covering a variety of tasks.[107] As projects were initiated, invoices would issue, payment would follow without complaint, and thorough annual audits proved satisfactory.[108] The NRA's Executive Vice President, Wayne LaPierre ("**LaPierre**") participated in those negotiations and approved each annual budget.[109] The relationship between the organizations was harmonious and mutually beneficial—until LaPierre's political problems at the

---

[103] In her Order granting Defendants' Motion for Protective Order, Magistrate Judge Toliver agreed with the previous ruling of the Virginia Court in finding that the Brewer Firm was enough of a competitor of AMc such that "Brewer and its PR unit should be walled off" from AMc's sensitive business information" because "Brewer could use that competitive information to severely prejudice AMc."   *See* ECF. No. 148 at 4.

[104] *See generally* ECF No. 105.
[105] ECF No. 31 at 80 ¶ 13.
[106] *Id.*
[107] ECF No. 31 at 82 ¶ 19.
[108] *Id.*
[109] *Id.*

NRA began to mount and Brewer came on the scene, assisted by LaPierre's Chief of Staff, Josh Powell ("***Powell***").[110]

Brewer and the Brewer Firm were originally hired by the NRA in early 2018 to prosecute claims against Lockton Affinity Series of Lockton Affinity, LLC ("***Lockton***") related to the failure of Carry Guard, the NRA's concealed-carry insurance program and Powell's brainchild, which was deemed to be illegal in several states.[111]  The NRA was also under fire from the Department of Justice and New York Attorney General with investigations into its corporate compliance and relationship with Russian spy, Maria Butina.[112]  Brewer agreed to take on the Lockton case if Powell agreed to get him involved in all the NRA's legal matters.[113]

Together, Powell and Brewer seized upon an opportunity to take down AMc and Angus McQueen, whom they both resented for personal reasons.  By creating a narrative that AMc was concealing spending records, Powell and Brewer could begin a witch hunt against AMc, blaming AMc for the NRA's regulatory non-compliance issues, creating a distraction from Carry Guard and the Russia investigation, and creating a for-cause reason for terminating the relationship without paying termination fees.[114] LaPierre later admitted that, even as early as September 2018, the NRA considered AMc to be an adverse party.[115]

---

[110] ECF No. 31 at 83 ¶ 21.
[111] ECF No. 31 at 90-91 ¶¶ 44-45; ECF No. 81 at Ex. A-2 at 284:1-7 [APP 128], 434:9-19 [APP 166] (Hart discussing Brewer initially retained to take over Lockton); ECF No. 1, *National Rifle Association of America v. Lockton Affinity Series of Lockton Affinity, LLC, et al*, Case No. 1:18-cv-639, in the United States District Court for the Eastern District of Virginia.
[112] *See* ECF No. 31 at 91 ¶ 46.
[113] Joshua L. Powell, Inside the NRA: A Tell-All Account of Corruption, Greed, and Paranoia within the Most Powerful Political Group in America 153 (2020).
[114] *See* ECF No. 31 at 98-99 ¶ 70-73.
[115] *See* ECF No. 105 at Ex. A-44 [APP 801] (Apr. 22, 2019 Ltr. from LaPierre to Mark Dyscio) ("The NRA and I have a common legal interests in the litigation against Ackerman McQueen which crystallized before the September [2018] Board meeting and colored the discussion that day.") (emphasis added).

Although AMc originally agreed to participate with Brewer's Carry Guard investigation, after Angus McQueen was diagnosed with cancer in July 2018, Brewer's escalating demand for documents and information related to AMc's business became increasingly hostile.[116]  The former general counsel to the NRA board of directors expressed concern that the document requests were not even in the NRA's best interest.[117]  Moreover, some of the requests sought documents that did not exist and were fashioned specifically and intentionally to draw unavoidable non-compliance, or sought documents that were already in the NRA's possession.[118]  Brewer also insisted upon conducting multiple audits of AMc's books and records.  Although AMc responded to these demands in a complete and timely manner, Brewer continued to assert that AMc was not complying, using this alleged "noncompliance" as a basis for even more invasive demands.[119]

Given Brewer's statements and the escalating hostilities, AMc met with LaPierre in Dallas, Texas, on October 11, 2018, to discuss the future of the business relationship.[120]  At the meeting, AMc expressed concerns about dealing with Brewer in light of his relationship and animosity towards the McQueen family, his actions and desire to take over AMc's business with the NRA, and his letter-writing campaign where he repeatedly and falsely accused AMc of withholding documents.[121]  AMc refused to deal with Brewer and further and was prepared to resign the NRA's business altogether, a fact affirmed by numerous AMc executives present at that meeting.[122]

---

[116] *See* ECF 105 at ¶ 20, and Ex. B ¶¶ 14-17 [APP 1173].

[117] *See* ECF 105 at ¶ 21, Ex. A-2 at 247:11-249:6 [APP 119-120], 255:15-256:4 [APP 121].

[118] *See* ECF No. 105 at ¶ 21, Ex A-2 230:2-231:3 [APP 115], 231:13-232:18 [APP 115], 304:18-306:12 [APP 133-134].

[119] *See* ECF No. 105 at ¶ 21, Ex. A-2 at 353:13-354:1 [APP 146], 354:10-14 [APP 146], 354:22-355:5 [APP 146]; Ex. A-45 [APP 802-804].

[120] *See* ECF 80, Ex. B ¶ 24-25 [APP 1175-76].

[121] *See id.*

[122] *See id.*; ECF No. 141, Ex. A ¶¶ 9, 11-15 [APP 5-7], Ex. B ¶¶ 12-16 [APP 16-19], Ex. C ¶¶ 5-10 [APP 23-26], Ex. D ¶ 6 [APP 33], Ex. I ¶¶ 3-4, 6 [APP 82].

To induce AMc to continue performing services for the NRA, LaPierre promised that Brewer and the Brewer Firm would no longer have any contact with AMc and pleaded for AMc to "stick with" him.[123] Based upon these representations, AMc invested in equipment, talent, and other assets it would need for the NRA in the coming year.[124]   Further relying on this representation, in February 2019, AMc agreed to undergo a nine-day audit by FRA, a company which AMc believed to be independent and not associated with the Brewer Firm.[125]

Yet it appears that Brewer used his firm to do what he could not do individually. Specifically, an employee of the Brewer Firm, Susan Dillon ("**_Dillon_**") actually headed up FRA's audit of AMc.  Dillon was a 17-year employee of the Brewer Firm who was the same employee who had personally conducted an audit of AMc in September 2018 while still at the Brewer Firm. Thus, without AMc's knowledge or consent, the Brewer Firm directed and secretly oversaw the FRA audit from behind the scenes. The evidence unequivocally shows that (a) the Brewer Firm sent Dillon to participate in a previous NRA-AMc audit,[126] (b) that Dillon coordinated the FRA audit of AMc after leaving the Brewer Firm,[127] and (b) that the Brewer Firm interfaced extensively with Dillon throughout the FRA audit.[128]

In April 2020, AMc learned that Dillon had resumed her employment with the Brewer Firm.

---

[123] ECF No. 141, Ex. C at ¶ 8 [APP 25] ("At the end of the discussion, Mr. LaPierre looked around to each of the AMc representatives in the meeting and specifically asked whether they would stick with him if he did in fact make sure that Mr. Brewer, the Brewer Firm, and Mr. Powell were no longer involved with AMc. Based on Mr. LaPierre's assurances that AMc would be able to continue productive business without the hostilities of Brewer and Powell, AMc agreed to continue its work for the NRA.").

[124] _See_ ECF No. 31 at 97-98 ¶ 67.

[125] _See_ ECF No. 141 at Ex. A ¶ 9 [APP 5-6].

[126] _See_ ECF 80, Ex. B at ¶ 21.

[127] _See_ **Ex. B-2** (NRA_AM_FRA_0001437); **Ex. B-3** (NRA_AM_FRA_0001719); **Ex. B-4** (NRA_AM_FRA_0001765). _See also_ **Ex. B-5** (NRA_AM_FRA_0002005).

[128] _See_ **Ex. B-6** (NRA_AM_FRA_0000106); **Ex. B-7** (NRA_AM_FRA_0000400).

Around the same time as the FRA audit, the NRA's President, Lt. Col. Oliver North ("*North*") had begun investigating Brewer and the Brewer Firm's involvement in the NRA. Because the NRA was in a financial slump, LaPierre tasked North with traveling the country to help with fundraising efforts.[129]  As North met with NRA members, he was persistently confronted with questions related to Brewer that he could not answer, such as why the NRA was paying the Brewer Firm approximately $1.5 to $3 million in *monthly* fees when it was financially challenged; how and why Brewer was selected as counsel; and whether Brewer's prior record of sanctions, ethical misconduct, and conflict of interest with the McQueen family had been properly vetted.[130]

With these issues were already in the public arena,[131] North felt he owed a fiduciary duty to find answers to his constituents' questions in order to reassure himself and the NRA's fundraising base that its money was being used responsibly.[132]  North was also concerned about the settlement of the Lockton matter and that it had resulted in a much lower settlement than Brewer had initially led them to believe.

As North began investigating Brewer, more information surfaced that caused North to believe that Brewer was harming the NRA.  For example, Brewer was impeding the work of NRA

---

[129] *See* ECF No.  81 at Ex. A-3 at 91:6-19 [APP 201], 107:12-17 [APP 205], 182:14-183:14 [APP 224], 192:20-193:25 [APP 226-227], 114:22-115:18 [APP 207]; **Ex. A-2** at 123:11-124:19 [APP 88]; *EP2*, GANGSTER CAPITALISM ("There were serious concerns, in part because the NRA was in a cash crunch, about the money that was going out the door to Bill Brewer's law firm.").

[130] *See* ECF No. 81 at Ex. A-3 at 107:8-110:7 [APP 205-206], 128:20-130:7 [APP 210-211], 135:6-137:14 [APP 212-213], 141:3-18 [APP 214], 152:9-153:16 [APP 216-217], 169:23-170:7 [APP 221], 181:7-183:14 [APP 224], 184:17-186:17 [APP 224-225].

[131] *See* ECF No.  80 at Ex. A-24 [APP 497-498] (*NRA Scores Minor Victories*) ("The relationship between the firm, the NRA, and Ackerman McQueen is an odd one: Bill Brewer, the head of the law firm, is the brother-in-law of Ackerman McQueen's CEO, Revan McQueen.  …  [L]awyers for both the NRA and Ackerman McQueen said in court that Brewer could be a witness…") (emphasis added); Ex. A-25 [APP 499-502]; Ex. A-26 [APP 503-509]; Ex. A-27 [APP 510-511]; Ex. A-56 [APP 911-917]; Ex. A-57 [APP 918-927]; *see generally* GANGSTER CAPITALISM.

[132] *See* ECF No. 81 at Ex. A-3 at 107:8-110:7 [APP 205-206], 129:19-130:7 [APP 211], 135:6-137:14 [APP 212-213], 141:3-18 [APP 214], 157:5-12 [APP 218], 169:13-172:9 [APP 221], 184:23-186:17 [APP 224-225], 206:7-207:9 [APP 230].

accountants, grossly exaggerating the NRA's financial woes by charging it huge legal fees, creating duplicative billing, prioritizing payments to his firm over every other NRA vendor by interfering with accounts payable, monitoring NRA employees' email accounts, and using threats to intimidate the NRA staff who processed his bills.[133]  Brewer also took over the NRA's legal and PR activity without Board approval.[134]  Indeed, the Brewer Firm is now the NRA's largest vendor, leading to concerns that NRA member funds are being drained at a rapid and unsustainable pace.[135]  North and other NRA officials sent letters to LaPierre and Brewer requesting more information about the scope of his services and asking him to submit engagement letters that were compliant with the NRA bylaws—the *same standards* Brewer was enforcing for all other vendors.[136]  These letters also sought copies of Brewer's invoices to better evaluate the details of the work he was performing.[137]  Despite repeated requests, however, Brewer and LaPierre told North that Brewer's bills were confidential and instructed North to stand down.[138]

Believing North was acting on AMc's behalf by investigating Brewer and the Brewer Firm, Brewer and LaPierre retaliated against North by inventing the conspiracy and extortion narrative made the basis of Plaintiff's lawsuit.

---

[133] *See* ECF No. at Ex. A-67 [APP 1168]; ECF 80 at Ex. A-27 [APP 510-511]; Ex. A-56 [APP 911-917] (*New Documents Raise Ethical and Billing Concerns about the NRA's Outside Counsel*); ECF 81 at Ex. A-2 at 358:20-359:8 [APP 147].

[134] *See* ECF No. 81 at Ex. A-3 at 150:5-151:6 [APP 216], 153:17-154:14 [APP 217], 167:25-169:12 [APP 220-221]; Ex. A-20 [APP 477];  Ex. A-28 at  259:14-262:5 [APP 577-578], 320:6-321:6 [APP 592-593].

[135] *See* ECF No. 81 at Ex. A-2 at 292:4-15 [APP 130]; Ex. A-3 at 182:5-183:14 [APP 224], 208:22-209:15 [APP 230-231].

[136] *See* ECF No. 81 at Ex. A-29 [APP 608-609] (Mar. 22, 2019 Ltr. from North to Brewer); Ex. A-4 [APP 249] (Mar. 31, 2019 Ltr. from North to LaPierre); Ex. A-5 [APP 254] (Apr. 8, 2019 Ltr. from North to LaPierre); Ex. A-2 at 292:4-15 [APP 130]; Ex. A-3 at 172:10-174:10 [APP 221-222], 184:17-186:17 [APP 224-225] ("[T]his is a guy who found fault with all kinds of people and yet was immune and blind to his own.  We were asking people to stand up to a standard [Brewer] had helped write … in such a way that every dollar could be accounted for … and yet he, himself was objecting to the same kind of scrutiny he was insisting of others.  That's not just unethical, it's corrupt."), 211:1-16 [APP 231]; *EP1*, GANGSTER CAPITALISM (North "gave Brewer a taste of his own medicine.").

[137] *Id.*

[138] *See* ECF No. 81 at Ex. A-3 at 153:7-16 [APP 217], 169:13-22 [APP 221], 204:20-206:6 [APP 229-230], 245:12-16 [APP 240].

### b.   **Legal Argument**

### (1)   **Documents concerning the FRA audit of AMc (RFP 47, 101).**

The NRA asserts the attorney-client privilege in response to Defendants' Request for Production No. 47 and 101, seeking all documents and communications relating to FRA's audit of AMc, including over 1,700 documents identified on FRA's privilege log which have been withheld to date.  However, the assertion of privilege carries specific requirements with which the NRA has not complied.

As a preliminary matter, there is no accountant-client privilege recognized under federal, Texas, or Virginia law.[139]  Thus any privilege would attach only if FRA's services could be fairly categorized as attorney-client or work-product privilege and required for the Brewer Firm to render its legal advice to the NRA.[140]

Courts generally construe the attorney-client privilege narrowly because "assertion of privileges inhibits the search for truth."[141]  The attorney-client privilege protects from disclosure communications between a client and his attorney "made in confidence for the purpose of obtaining legal advice."[142]  The privilege protects "only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege."[143]  Hence, the

---

[139] *See United States v. Richardson*, No. 96-40329 Summary Calendar, 1997 U.S. App. LEXIS 43076, at *1 (5th Cir. Jan. 7, 1997) ("This court does not recognize an accountant/client privilege."); *Sims v. Kaneb Servs., Inc.*, No. B14-87-00608-CV, 1998 Tex. App. LEXIS 2243, at *14 (Tex. App.—Houston [14th Dist.] Jun. 16, 1988, no pet.); *Abujaber v. Kawar*, 20 Va. Cir. 58, 65 (1990) ("Virginia does not recognize an accountant-client privilege . . .").

[140] *Total Rx Care, LLC. v. Great Northern Ins. Co.*, 318 F.R.D. 587, 598 (N.D. Tex. 2017); *S. W. Heischman, Inc. v. Reliance Ins. Co.*, 30 Va. Cir. 235, 242 (1993) ("The privilege attaches to communications of the client made to the *attorney's* agents, when such agents are *indispensable* to the effective representation of the client." (emphasis added)).

[141] *Navigant Consulting, Inc. v. Wilkinson*, 220 F.R.D. 467, 473 (N.D. Tex. 2004) (Kaplan, J.).

[142] *Harding v. Cty. of Dall.*, Civil Action No. 3:15-CV-0131-D, 2016 U.S. Dist. LEXIS 177937, at *26 (N.D. Tex. Dec. 23, 2016).

[143] *Id.* (citing *Fisher v. United States*, 425 U.S. 391, 403 (1976)).

privilege does not protect documents and other communications simply because they result from an attorney-client relationship.[144] Further, the responding party (the NRA) bears "the burden of proving that [the privilege] applies to ***each*** document that they seek to protect from disclosure."[145]

Likewise, the work-product doctrine applies only to documents and tangible things prepared in anticipation of litigation or for trial.[146] This privilege may be overcome when the party seeking discovery can show that it has "substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means."[147]

Moreover, these privileges may also be waived under certain circumstances, such as the "offensive use" and "crime-fraud" exceptions. Here, Plaintiff should be compelled to produce the FRA documents because they are not privileged. Even if they were, however, they would fall into one of the applicable exceptions to privilege and are therefore discoverable.

### (a)     No privilege applies to the FRA documents

The FRA documents should be produced because they are not subject to any privilege and, in any event, any possibly applicable privilege has been waived.   The only way for any privilege to protect the FRA documents is if FRA's were necessary or "indispensable" to the Brewer Firm providing legal advice to the NRA. According to counsel for the NRA, FRA was not even hired to provide any accounting *or* auditing services; rather, FRA was "hired simply to conduct an examination of records held by AMc."[148]   But FRA did not perform any complex calculations or

---

[144] *See Navigant*, 220 F.R.D. at 473.
[145] *AHF Cmty. Dev., LLC v. City of Dallas*, 258 F.R.D. 143, 146 (N.D. Tex. 2009).
[146] *See* Fed. R. Civ. P. 26(b)(2)(A).
[147] *SEC v. Brady*, 238 F.R.D. 429, 442 (N.D. Tex. 2006).
[148] Ex. ECF No. 71 at Ex. G [APP 458 at 59:8-10) (Nov. 13, 2019 Hr'g Tr., Virginia Action).

decipher "unintelligible" documents.  This is further buttressed by the fact that the Brewer Firm *already* reviewed AMc's documents in September 2018 *and* another law firm reviewed AMc's documents in November 2018.[149]  Although FRA is an accounting firm, it was providing mere review services to NRA, which is not the kind of specialized work necessary for the Brewer Firm to render legal advice.[150]  Accordingly, the FRA documents are not privileged.

        **(b)**      <u>**Any applicable privilege has been waived by offensive use**</u>

"Offensive use" of the attorney-client or work-product privilege may result in a waiver of privilege.[151]  An "offensive use" occurs when (1) the party asserting the privilege seeks affirmative relief; (2) the information, if believed by the trier of fact, would probably be outcome determinative; and (3) disclosure of the privileged communication is the only means of obtaining the evidence.[152]

The NRA's very first claim in its very first lawsuit in the Virginia Action (April 12, 2019) and its most consistent claim throughout its four lawsuits, including this Texas Action, and in its many public statements to the media, is breach of contract for AMc's alleged violation of the records examination clause in the Services Agreement.[153]  The NRA alleges that Defendants "repeatedly failed or refused to permit the NRA to examine specific categories of books and

---

[149] *See* ECF No. 81 at Ex. A-2 at 221:9-222:7 [APP 113], 224:6-18 [APP 113]; s*ee also* ECF No. 80 at Ex. B ¶¶ 21, 25 [APP 1174, 1176].
[150] *United Sates v. El Paso Co.*, 682 F.2d 530, 540 (5th Cir. 1982) (finding disclose of a tax pool analysis to auditors destroyed confidentiality and thus any privilege because auditors were merely document reviewers).
[151] *Navigant*, 220 F.R.D. at 478.
[152] *Id.*
[153] *See e.g.*, ECF No. 18 ¶¶ 168-173 and *compare with* the Original Complaint in the Virginia Action, Ex. ECF No. 80 at A-30 [APP 610-625] including a sole claim for breach of the records examination clause with almost identical language in the First Amended Complaint in this lawsuit.  *See also* Ex. ECF No. 71 at Ex. G [APP 472] at 73:10-15 (Nov. 13, 2019 Hr'g Tr., Virginia Action).

records with respect to matters covered under the Services Agreement,"[154] including even during the FRA audit.

According to counsel for the NRA, it intends to use FRA in support of that claim.[155]  The NRA's position is that, because it is "not offering FRA to testify about" "internal discussions with the NRA about what happened . . . with the records examination process," that such communications are not discoverable.[156]  If the standard for discoverability were limited by what a party intends to present to a fact finder, no information supportive of his opponent's case would ever be discoverable; that position is untenable.  The standard is "any non-privileged matter that is relevant" to the claims or defenses in a lawsuit *and* "proportional to the needs of the case."[157]

More troubling, although the NRA in the above quote stated that it was not going to offer FRA to testify about discussions concerning the records examination process, the NRA later said at a different point in the hearing that, if a FRA representative were to testify:

> He would testify ***as to what happened during the records examination process***. And then if we were to ask him, well, was that cooperation, they would object because we haven't - - we haven't designated that opinion.[158]

Just because the NRA has opted not to designate FRA as an expert does not render a representative's personal opinion about cooperation off-limits.  That the NRA does not want to "offer" FRA's *lay witness* opinions to a fact-finder does not make them any less discoverable.[159]

---

[154] *See* ECF No. 18 ¶¶ 168-173.
[155] ECF No. 71 at Ex. G [APP 460] at 61:16-18 (Nov. 13, 2019 Hr'g Tr., Virginia Action).
[156] *Id.* [APP 472] at 73:2-6 (Nov. 13, 2019 Hr'g Tr., Virginia Action).
[157] FED. R. CIV. P. 26(b)(1).
[158] Ex. ECF No. 71 at Ex. G [APP 473] at 74:2-11 (Nov. 13, 2019 Hr'g Tr., Virginia Action) (emphasis added).
[159] Ex. ECF No. 71 at Ex. G [APP 462] at 63:12-18 (Nov. 13, 2019 Hr'g Tr., Virginia Action) (Counsel for the NRA argued at the hearing: "We're not offering any conclusions or opinions by FRA regarding its – what it believes about how the examination occurred, simply the facts of what happened. What did they ask for, what did they see, what were they allowed to do, what were they not allowed to do? That's the extent of what the FRA is being asked to do in this case *at this point*." (emphasis added)).

Regardless, the concern about "opinions" is a red herring.  The fact remains that (1) AMc submitted to an audit with FRA; (2) the NRA sued AMc for failure to provide records; (3) part of the basis of that claim is that AMc also failed to submit documents to FRA during its review.   The NRA takes the position that AMc can testify about what it did during the FRA review, but that the NRA's participation in the review (what it instructed FRA to review, what *lay witness* thoughts or opinions FRA had about what AMc did or allegedly did not provide, what *lay witness* thoughts or opinions FRA had about AMc's cooperation) is off limits to the tune of 1,700 documents.

AMc was never informed by FRA of any noncompliance with the audit.  Yet the NRA continues to assert this FRA audit as the basis for its claims of obstruction and breach of contract with regard to its records-inspection rights. Thus, the only way to disprove lack of cooperation or obstruction of the FRA review (besides self-serving evidence from the NRA itself) is to test the NRA's own allegations through the party that actually conducted the review—FRA.

And, more importantly, what is the harm here?  If the NRA's allegations about AMc's lack of compliance are true, then it should have nothing to hide.  On the other hand, if as the evidence has previously established, the FRA "audit" was nothing more than a fishing expedition to intentionally manufacture non-compliance so that the NRA could sue AMc, this is relevant, non-privileged, and discoverable information.  As already briefed in this and other motions, the NRA's former General Counsel to the Board testified that the documents being required by the Brewer Firm were not consistent with the business plan, and were intended to draw non-compliance. Either the NRA is using the FRA "privileged" documents as a basis for its claims, or the NRA is ignoring what the FRA documents actually show (no breach), which demonstrates the bad-faith basis for filing the first and several subsequent lawsuits against Defendants.  Either way, Defendants are

entitled to discover the content of the documents requested in RFP 47 and 101 that have been withheld on the basis of privilege.

(c)       **Any applicable privilege has been waived by crime-fraud**

A communication that is made in furtherance of a crime or a fraud forfeits any protection otherwise provided by privilege.[160]  All three jurisdictions recognize the crime-fraud exception to privilege.[161]  For example, in a Virginia supreme court case, an attorney was found to have supplied false information in perpetration of a fraud, which was "outside the scope of the professional duty of an attorney," such that "no privilege attache[d]" to the attorney-client communication.[162] Virginia law sets a lower bar in determining fraud for this exception—the party challenging the privilege "need only make a sufficient showing: such as to subject the opposing party to the risk of non-persuasion if the evidence as to the disputed fact is left unrebutted."[163]

---

[160] *Chandler v. Phx. Servs.*, No. 7:19-cv-00014-O, 2020 U.S. Dist. LEXIS 15702, at *5 (N.D. Tex. Jan. 30, 2020) (citing *In re Grand Jury Subpoena*, 419 F.3d 329, 335 (5th Cir. 2005)).

[161] *United States v. Ballard*, 779 F.2d 287, 292 (5th Cir. 1986); *Freeman v. Bianchi*, 820 S.W.3d 853, 861 (Tex. App.—Houston [1st Dist.] 1991, writ denied); *Sevachko v. Commonwealth*, 35 Va. App. 346, 355 (Va. App. 2001) ("Sevachko's disclosure to his attorney that he was going to testify untruthfully that he was not driving was not privileged, and, thus, the statement was admissible under the crime-fraud exception to the privilege.  It is settled under modern authority that the attorney-client privilege does not extend to communications between attorney and client where the client's purpose is the furtherance of a future intended crime or fraud.").

[162] *Sevachko*, 35 Va. App. at 356; *Seventh Dist. Committee v. Gunter*, 212 Va. 278, 287 (1971) ("The perpetration of a fraud is outside the scope of the professional duty of an attorney and ***no privilege attaches to a communication*** and transaction between an attorney and client with respect to transaction ***constituting the making of a false claim*** or the perpetration of a fraud." (emphasis added)).

[163] *Peterson v. Fairfax Hosp. Sys.*, 32 Va. Cir. 294, 296-97 (1993).  "[T]he suggestion of a crime having been committed was an attempt to deflect attention away from the possibility of" wrongdoing by the party asserting privilege.  *Id.*  That suggestion was further evident when the lawyers acted "contrariwise" to the criminal conduct they alleged when they withheld information and retained files rather than assisting others in an investigation.  *Id.* at 297. The court found the evidence sufficient to support the plaintiffs' argument that counsel asserting privilege did so "to minimize, by whatever means possible, its exposure to damages in the event of a lawsuit."  *Id.*

---

Importantly, "once a prima facie showing has been made, the privilege disappears without affording the proponent of the privilege an opportunity to rebut the prima facie showing."[164]  To make a prima facie showing of fraud, the requesting party must demonstrate the following factors:

> (1) a material representation was made; (2) the representation was false; (3) the speaker made the representation knowing it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (4) the speaker made the representation with the intent that it be relied upon by the party; (5) the party acted in reliance on the misrepresentation; and (6) the party thereby suffered injury.[165]

A party may commit fraud by concealment, which occurs when "a party conceals or fails to disclose a material fact within the knowledge of that party," knowing "the other party is ignorant of the fact and does not have an equal opportunity to discover the truth" with the intent to "induce the other party to take some action by concealing or failing to disclose the fact," which results in injury "as a result of acting without knowledge of the undisclosed fact."[166]

Here, LaPierre affirmatively represented that the Brewer Firm would not be involved with the FRA audit.[167]  These representations gave the false impression that the Brewer Firm would in fact not be involved with the review—*i.e.*, that the Brewer Firm would not be directing the reviewer's actual review (as it did), would not be discussing the documents or findings with the reviewer (as it did), and would not have its "former" employee coordinating the entire review of AMc's documents (as it did).  Thus, contrary to the NRA's representations, the Brewer Firm appears to have been involved with every aspect of the audit, to which AMc would never have

---

[164] *Positive Software Sols., Inc. v. New Century Mortg. Corp.*, No. 3:03-CV-0257-N, 2004 U.S. Dist. LEXIS 32857, at *31 (N.D. Tex. Mar. 3, 2004) (citing *Clark v. United States*, 289 U.S.1, 15 (1933) ("When that [prima facie] evidence is supplied, the seal of secrecy is broken.")).

[165] *Id.* (quoting *Haber Oil Co. v. Swinehart (In re Haber Oil Co.)*, 12 F.3d 426, 437 (5th Cir. 1994)).

[166] *Id.* at *38 (quoting *Alcan Aluminum Corp. v. BASF Corp.*, 133 F. Supp. 2d 482, 498 (N.D. Tex. 2001)).

[167] *See* ECF 80, Ex. B ¶ 24-25 [APP 1175-76]; ECF No. 141, Ex. A ¶¶ 9, 11-15 [APP 5-7], Ex. B ¶¶ 12-16 [APP 16-19], Ex. C ¶¶ 5-10 [APP 23-26], Ex. D ¶ 6 [APP 33], Ex. I ¶¶ 3-4, 6 [APP 82]

consented if it had known of Brewer's involvement, and has suffered harm as a result in the form of baseless lawsuits and damaging press.  For example, the FRA privilege log reveals the Brewer Firm's involvement.[168]   Because Defendants have shown a prima facie case for fraud, "the privilege disappears without affording the proponent of the privilege an opportunity to rebut the prima facie showing."[169]  The NRA should be compelled to produce the documents responsive to Request Nos. 47 and 101, including the documents on the FRA privilege log.

### (2)        Documents concerning the Brewer Firm

Defendants seek documents related to the NRA's relationship with the Brewer Firm in RFP Nos. 10, 12, 42, 43, and 66.   In a subpoena directly to the Brewer Firm, AMc requested a variety of documents on similar topics.  Based on representations from Plaintiff's counsel that numerous responsive documents and a privilege log would be forthcoming to the subpoena requests.  In the interests of judicial economy and with the hope that these issues can be worked out between the Parties, Defendants have agreed not to pursue numerous other requests at this time.[170]  Defendants reserve their rights to compel documents at a later date pending review of the subpoenaed documents.  The remaining Requests are addressed herein.

The Requests concerning the Brewer Firm can be considered in two categories:

1)   ***Engagement and Services for NRA***. Documents relating to the firm's engagement (No. 12) (the NRA objected on privilege and relevance) and its fees received from the NRA (Nos. 42-43, 66) (the NRA objected on privilege and relevance);

---

[168] ECF No. 56 at A-11 [APP 639-675].
[169] *Positive Software Sols.*, 2004 U.S. Dist. LEXIS 32857, at *31 (citing *Clark v. United States*, 289 U.S.1, 15 (1933) ("When that [prima facie] evidence is supplied, the seal of secrecy is broken.")).
[170] RFP Nos. 1-9, 11, 13, 16, 17, 23, 39, 40, 44, 64, 65, 79, 87-89, 91.

2)   ***Personal and Professional Relationship with AMc***. Documents concerning the Brewer conflict of interest creating and directing litigation (and underlying conduct) against its named partner's brother-in-law and father-in-law (No. 10) (the NRA objected as privileged), and communications with the McQueen family concerning the litigation (No. 90) (the NRA objected to relevance).

*First*, Defendants "may obtain discovery regarding any nonprivileged matter that is relevant" to their claims and defenses, pursuant to Federal Rule of Civil Procedure 26(b)(1), which information "need not be admissible in evidence to be discoverable." The party resisting discovery bears the burden of showing "specifically how each discovery request is not relevant or otherwise objectionable."[171]  Notably, the federal rules do "not impose on a party filing a motion to compel the burned to show relevance and proportionality in the first instance."[172]  Nevertheless, Defendants present the following facts concerning relevance.

As to the first category of documents, and as Defendants have previously briefed in this lawsuit, the North was being questioned by NRA board members and general members about Brewer's fees and scope of engagement.[173]  After several requests to review the fees and engagement agreements, North was denied access and told to stand down.[174]  Then when he attempted to institute an independent review, the NRA then worked to oust him from its ranks,

---

[171] *Lopez v. Don Herring Ltd.*, 327 F.R.D. 567, 584 (N.D. Tex. 2018) (quoting *Samsung Elecs. Am. Inc. v. Chung*, 325 F.R.D. 578, 590 (N.D. Tex. Mar. 7, 2017).
[172] *Id.* (quoting *Samsung*, 325 F.R.D. at 594).
[173] *See* ECF No. 81 at Ex. A-3 at 107:8-110:7 [APP 205-206], 128:20-130:7 [APP 210-211], 135:6-137:14 [APP 212-213], 141:3-18 [APP 214], 152:9-153:16 [APP 216-217], 169:23-170:7 [APP 221], 181:7-183:14 [APP 224], 184:17-186:17 [APP 224-225].
[174] *See* ECF No. 81 at Ex. A-3 at 153:7-16 [APP 217], 169:13-22 [APP 221], 204:20-206:6 [APP 229-230], 245:12-16 [APP 240].

including by accusing him (and AMc and at least seven other high-ranking officials and counsel) of conspiracy to dethrone LaPierre.[175]

Documents about Brewer's fees and engagement are directly relevant to these facts concerning North's (and other board members') request for an independent investigation, which was the impetus for the NRA and the Brewer Firm terminating the Services Agreement to get rid of North. This is independently corroborated by others at the NRA, such as its former General Counsel to the Board, who was also concerned about the Brewer Firm's fees and the level of unchecked control Brewer had assumed within the NRA. The NRA has also alleged that North was working with and at the direction of AMc, and has therefore put the validity of North's investigation at issue.[176]

By terminating the Services Agreement, the NRA could avoid paying for North's contract (AMc's claims for breach of contract, tortious interference, fraud, conspiracy). North's attempts to hold Brewer accountable also prompted the NRA and Brewer to accuse AMc of extortion, alleging that, rather than justifiably seeking compliance with NRA procedure and nonprofit law, North went through all that effort just to conspire with AMc to unseat LaPierre (AMc's claims for defamation, business disparagement).[177] Accordingly, the relevance objections to Request Nos. 12, 42, 43, and 66 should be overruled, and the NRA should be compelled to produce responsive documents.

---

[175] *See* ECF No. 81 at Ex. A-3 at 215:6-13 [APP 232], 223:10-224:25 [APP 234], 232:17-233:6 [APP 236-237], 238:10-240:2 [APP 238], 235:3-13 [APP 237]; Ex. A-2 at 257:3-12 [APP 122], 292:4-15 [APP 130], 314:12-315:7 [APP 136].

[176] *See, i.e.*, ECF 121 at 11 ("AMc did not protect BAC's involvement until the NRA began asking questions about AMc's bills—at which point one of AMc's agents, Lt. Col. Oliver North, contrived a pretext to 'audit' BAC's investigation of AMc (an effort arrested in its tracks due to North's obvious conflict of interest).").

[177] *See* ECF No. 18 at 31-33 (NRA's First Amended Complaint describing extortion allegations in response to the NRA's audit requests).

*Second*, privilege either does not apply to these specific requests or is waived.  The NRA has not proven that the privilege applies to *each* document it withholds.[178]  The attorney-client privilege exists when "the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding."[179]

Relatedly, RFP No. 10 concerning communications about whether a conflict of interest exists do not involve privilege.  Considering that Brewer is the one with the conflict and knew about the circumstances of such conflict before the NRA ever became aware, the NRA could not have "informed" the Brewer Firm of that non-privileged, underlying fact for any opinion on law, legal services, or assistance in a legal proceeding.  Moreover, the NRA's General Counsel to the Board admitted that there was a perceived conflict, and one he was concerned about,[180] which suggests that there are other non-privileged internal communications on the subject.  And on a more granular level, the underlying facts concerning such conflict also are not privileged.[181]  The documents are relevant to the claims and defendants relating to exemplary damages, termination of the Services Agreement, defamation, and tortious interference (*i.e.*, Brewer through the NRA meddled in the underlying conduct because of his personal animus toward Angus McQueen with knowledge of his worsening terminal cancer for the purpose of ousting AMc and taking-over the NRA's PR work).  By like token, RFP No. 90, which seeks communications between the NRA and any non-lawyer member of the McQueen or Brewer families related to this lawsuit, AMc, or

---

[178] *See AHF Cmty.*, 258 F.R.D. at 146.

[179] *See id.* at 146.

[180] *See* ECF No. 81 at Ex. A-6 at 374:7-375:17 [APP 352].

[181] *See Adams v. Mem'l Hermann*, No. 19-20651, 2020 U.S. App. LEXIS 27747, at *7 (5th Cir. Aug. 31, 2020) ("[T]he attorney-client privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts. Thus, a fact is not privileged merely because a client incorporated a statement of such fact into his communication to his attorney.").

the retention of the Brewer Firm are plainly not "irrelevant" as Plaintiff objects.  The relevance to the lawsuit is framed within and apparent on the face of the question itself.  If the NRA has such communications, Defendants are entitled to discover them.

RFP No. 12 and 66 seek documents and communications related to the Brewer Firm's invoices. According to Fifth Circuit law, "the general nature of services is not protected by the [attorney-client] privilege."[182]  "More specifically, agreements such as fee arrangements generally are not privileged," and only a "narrow exception" applies "when revealing the identity of the client and fee arrangements would itself reveal a confidential communication."[183]  In the *Medlock* case, the court found the identity of client and counsel had already been disclosed and the engagement agreement was relevant to the claims and defenses in that case, including because the date of engagement being a material fact in dispute.[184]  Another court has similarly ruled that the "identity of [the] client, terms and conditions of employment, amount of fee . . . and the general purpose of the work performed, are not privileged."[185]

Request Nos. 10 and 12 concerning Brewer's fees and engagement are directly relevant to the dispute concerning North and the alleged extortion.  The NRA has repeatedly stated that both it and third parties vetted the Brewer Firm's bills, citing that third party's undisclosed finding as proof that the fees were reasonable.  By taking that position, the NRA could call North's attempted independent investigation a ruse—without North or AMc (as alleged co-conspirator) having any opportunity to test the NRA's allegations.  Not only are the fees at issue in this case, but the NRA's

---

[182] *Medlock Sw. Mgt. Corp. v. Fannie Mae*, No. 5:04CV129, 2006 U.S. Dist. LEXIS 116132, at *15 (E.D. Tex. Sep. 1, 2006) (parenthetical quote from *Nguyen v. Excel Corp.*, 197 F.3d 200, 206 (5th Cir. 1999)); *see also United States v. Ponder*, 475 F.2d 37, 39 (5th Cir. 1973) ("matters involving the receipt of fees from a client" are not "usually privileged").
[183] *Medlock*, 2006 U.S. Dist. LEXIS 116132, at *15.
[184] *Id.* at *16.
[185] *See In re Ginther*, No. 07-80200-G3-11, 2008 Bankr. LEXIS 2624, at *14 (S.D. Bankr. Aug. 29, 2008).

reliance upon its own and others' review and communications concerning those fees makes the responsive documents discoverable and non-privileged.  Stated another way, the NRA alleged extortion to distract from North and other board members' request for an independent review of the Brewer Firm's fees and engagement. [186]  The NRA is seeking affirmative relief for the alleged extortion attempt (breach of fiduciary duty, for one).[187]  The information sought about the fees and engagement would be outcome determinative—whether in favor of Defendants or the NRA—for at least certain elements of the claims and defenses at issue.[188]  And the only way to access the documents is from the NRA and the Brewer Firm, such that disclosure of the allegedly privileged communications is required.[189]

Similarly, North was concerned about the Lockton settlement and whether, and to what extent, Brewer and/or the Brewer Firm had sold short the NRA in settling the case after Brewer's initial projections. [190]  Accordingly, the Lockton document sought in RFP Nos. 42 and 43 are relevant to determining the credibility of North's investigation, which, again, the NRA itself placed at issue.

Because these documents are not privileged (or any truly privileged information can be redacted) and are relevant to establishing the validity of North's investigation the objections to Request Nos. 10, 12, 42, 43, and 66 should be overruled and the NRA should be compelled to produce responsive documents.

### (3)      The Preservation Notice (RFP 57)

---

[186] *See* ECF No. 18 at 31-33 (NRA's First Amended Complaint describing extortion allegations in response to the NRA's audit requests).
[187] *See Navigant*, 220 F.R.D. at 478 (listing elements for offensive use waiver of attorney-client privilege).
[188] *See id.*
[189] *See id.*
[190] *See* ECF No. 57, Ex. A-12 at 126:8-128:23 [APP 436].

In his deposition, LaPierre referenced a litigation hold letter (the "***Preservation Notice***") that the NRA had purportedly received from the NRA's general counsel instructing the NRA to preserve documents in anticipation of litigation.[191]  RFP No. 57 requests a copy of this letter in order to determine *when* it was sent and *what* it instructed the NRA to do or not do. Plaintiff has objected on privilege and relevance grounds.

The Preservation Notice is relevant to this litigation for two reasons.  *First*, it is relevant to knowing precisely which litigation the NRA was anticipating at the time the Preservation Notice was sent, which LaPierre was unable to answer during his deposition.  As referenced above and in other motions, in October 2018, LaPierre made numerous affirmative claims to AMc about his intent to continue working with AMc and maintain the parties' business relationship, which caused AMc to "re-up" for another year and invest in resources in furtherance of that relationship.[192]  Yet, in April 2019, LaPierre wrote the following letter stating that the NRA was anticipating litigation before the September 2018 board meetings, *which was before the NRA had even done a single audit of AMc*:

> The NRA and I have common legal interests ***in the litigation against Ackerman McQueen which crystallized before the September Board meeting*** and colored the discussion that day.[193]

Thus, the date at which the NRA originally began anticipating litigation against AMc is critical because it would render false the statements and representations made by LaPierre to AMc (about continuing the business relationship) if the litigation hold letter indicated that the NRA was anticipating litigation against AMc prior to October 2018.

---

[191] *See* ECF No. 57, Ex. A-12 at 52:22-53:15 [689-90].
[192] *See* ECF No. 31 at 85 ¶ 28; ECF No. 80, Ex. B at ¶ 25 [APP 1176].
[193] *See* ECF No. 81, Ex. A-44, Letter from LaPierre to Mark Dycio (Apr. 22, 2019) (emphasis added).

*Second*, in addition to knowing when the Preservation Notice was sent, it is also important to understand what instructions it contained. Concerns of document destruction have been present in this lawsuit, making it even more important for Defendants to understand what types of affirmative obligations the Preservation Notice imposed. For example, at the time LaPierre referenced the Preservation Notice, it was in the context of discussing his well-known method of keeping copious notes on yellow notepads, which he testified that he did not destroy and handed over to his attorneys.[194] Although Defendants have requested these notes on several occasions, to date, Plaintiff have produced only a small amount, leading to concerns that they had been destroyed.[195]

Likewise, one of the highest ranking NRA officials testified that the NRA's general counsel actually advised her to destroy certain records and that, upon this advice, she shredded and burned those documents.[196] Thus, with the outstanding concerns about document production, AMc is entitled to discovery, whether this Preservation Notice was actually sent at all, when it was sent, and what conduct it prescribed. Defendants ask the Court to overrule Plaintiff's objections and order production of the Preservation Notice.

### 2. **Plaintiff's Position.**

As Defendants recognize, "parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . ." pursuant to Federal Rule of Civil Procedure 26(b).[197] But, Defendants may not ignore the stated limits to its right to obtain discovery:

---

[194] *See* ECF No. 57, Ex. A-12 at 50:1-22 [APP 689].
[195] This Motion does not seek production of these notepads at this time based on representations by Plaintiff's counsel that additional documents will yet be produced.
[196] *See* ECF No. 57, Ex. A-8 at 34:4-40:19 [APP 484-85].
[197] Fed. R. Civ. P. 26(b)(1):
  Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of

Defendants may only obtain discovery of information that is (1) "nonprivileged," and (2) "relevant to any party's claim or defense."[198] Here, Defendants are seeking to compel production of documents that are clearly privileged, and also irrelevant to any of the claims and defenses at issue in this case.

As set forth in the NRA's Brief in Opposition to Defendants' Motion to Compel,[199] Defendants again misinform the Court of the standard they must satisfy to prevail on their motion to compel. The Honorable J. Fish has specifically rejected Defendants' theory that Plaintiff carries the initial burden to demonstrate that Defendants' requests are impermissible. In particular, Judge Fish held in *Spiegelberg Mfg., Inc. v. Hancock* that a movant must first, "establish[] that its interrogatories and document requests are within the scope of permissible discovery." Only then will "the burden shift[] to [Plaintiff] to show why discovery should not be permitted."[200]

First, it is incumbent on Defendants to limit their requests to information that is "nonprivileged," according to Rule 26. A motion to compel production responsive to a discovery request which seeks "clearly privileged" information exceeds the "bounds of fair discovery," and must be denied.[201] Here, Defendants insist on requesting documents that are "clearly privileged." And, while discovery is liberally permitted, "relevancy under Rule 26 is not without bounds."[202]

---

the case, considering [among other things] . . . the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

[198] *Id.*

[199] ECF No. 48, p. 10.

[200] *Spiegelberg Mfg., Inc. v. Hancock*, No. 3-07-CV-1314-G, 2007 WL 4258246, at *1 (N.D. Tex. Dec. 3, 2007) (*citing Corrigan v. Methodist Hospital*, 158 F.R.D. 54, 56 (E.D. Pa.1994); *Amcast Industrial Corp. v. Detrex Corp.*, 138 F.R.D. 115, 118 (N.D. Ind. 1991); *but see Merrill v. Waffle House, Inc.*, 227 F.R.D. 475, 477 (N.D. Tex. 2005) (Lynn, J.), *quoting McLeod, Alexander, Powel and Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990)).

[201] *In RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC*, No. CIV.A. H-07-2426, 2008 WL 2036816, at *7 (S.D. Tex. May 9, 2008).

[202] *See Bredemus v. Int'l Paper Co.*, 252 F.R.D. 529, 533 (D. Minn. 2008) (citing *Archer Daniels Midland Co. v. Aon Risk Services, Inc. of Minnesota*, 187 F.R.D. 578, 589 (D. Minn. 1999)).

---

Courts are rightfully reluctant to "allow any party to 'roam in the shadow zones of relevancy and to explore matter which does not presently appear germane on the theory that it might conceivably become so.'"[203]

Here, Defendants seek to compel the production of documents relating to Forensic Risk Alliance's audit of Defendants' records; documents concerning Brewer Attorneys & Counselors' ("BAC") relationship with its client, the NRA; and the litigation-hold notice prepared by BAC and issued to the NRA in connection with this litigation. As is more fully set forth below, the requested documents would require disclosure of privileged information, and Defendants fail to set forth why such documents are even relevant to the claims and defenses at issue in this case.

In support of their relevance argument, Defendants insist that the animating principle behind the NRA's lawsuit is a vicious inter-familial power struggle. This is not true. However, even if it were remotely true, and even if evidence existed in the NRA's files that could prove that theory correct, the information would nevertheless remain outside of the scope of discovery because its presentation could not aid the Court in resolving any dispute which is actually before this Court.

Indeed, Defendants' dramatic spin on this family story does not render "relevant" the immaterial information targeted by Defendants' sweeping demands for extraneous information. The targeted information may be relevant to components of Defendants' story, but none of their Requests have any bearing on the legal claims or defenses that are pled in this litigation.

The resolution of the claims or defenses actually at issue in this case cannot possibly be aided[204] by, for example, documents regarding the NRA's retention of its chosen counsel, BAC;

---

[203] *See id.*; *Carlson Cos., Inc. v. Sperry & Hutchinson Co.*, 374 F. Supp. 1080, 1080 (D. Minn. 1974).
[204] *In re CSX Corp.*, 124 S.W.3d at 152 ("Although the scope of discovery is broad, requests must show a reasonable expectation of obtaining information that will aid the dispute's resolution.").

legal fees paid to its counsel for this matter and other, wholly unrelated matters; or documents concerning the perceived familial conflict of interest and communications between the McQueen family concerning the litigation. Moreover, as the court in the related Virginia Action decided, the Forensic Risk Alliance documents sought by defendants are squarely protected from disclosure as attorney opinion work product.

For these reasons, this Court should deny Defendants' Motion to Compel.

### a.   **Defendants' Motion Should Be Denied As To Defendants' Requests For Privileged Information.**

The NRA's objections as to **Requests No. 10, 12, 42, 43, 47, 57, 66, and 101** should be sustained because these requests seek clearly privileged information.

#### (1)   **The Documents Defendants Seek Regarding The FRA Audit Of AMc Are Privileged (Requests No. 47, 101).**

Defendants seek to revive an already failed argument that Defendants Ackerman and Mercury previewed in the Virginia litigation. In the now-stayed Virginia case, Defendants challenged the NRA's assertion that documents generated by Forensic Risk Alliance ("FRA") – a forensic accounting firm retained by counsel to assess Ackerman's compliance with the parties' Services Agreement – are protected from disclosure by the attorney client privilege and the work product doctrine. The Virginia Court largely rejected Defendants' argument.

In the Virginia action, as here, Defendants argued that the NRA had placed FRA's privileged communications and related work product "at issue" in the case. The Court rejected Defendants' argument, because no "at issue" waiver can occur unless "the advice of counsel is

[only] placed in issue." The advice is not placed at issue unless Plaintiff attempts to prove a "claim or defense by disclosing or describing an attorney client communication."[205]

The Court found no "at issue" waiver. The NRA established before the Court in Virginia that (1) it did not offer or rely on, and did not intend to offer or rely in the future on, any of the privileged or work-product protected opinions and conclusions generated by FRA, in order to prove the NRA's causes of action. Defendants' reliance on *Navigant Consulting v. Wilkinson* does not alter the analysis: the NRA likewise has not and will not place "at issue" any protected in order to secure "affirmative relief."[206] Moreover, factual assertions regarding (1) which documents Ackerman showed to FRA, and (2) the extent of Ackerman's cooperation with FRA, could not effect a waiver, because only disclosure of protected information can work a waiver; facts, as a rule, are not protected."[207] In addition, the NRA argued that it possessed the absolute right to protect opinion work product from discovery, even if a waiver had occurred.[208] Following oral argument, the Court agreed with the NRA and found no "at issue" or affirmative waiver, and sustained the NRA's claim privilege assertion with respect to privileged communications and

---

[205] *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d. 851, 863 (3d Cir. 1994) (holding that "[a]dvice is not in issue merely because it is relevant" to the claims and defenses in the litigation); *TaxRight, LLC v. SICPA Product Sec.*, LLC, No. 3:12CV657, 2013 WL 3791487 at *4 (E.D. Va. 2013) (applying *Rhone-Poulenc* to find no "at issue" waiver); *MeadWestvaco Corp. v. Rexam, PLC*, No. 1:10CV511 GBL/TRJ, 2011 WL 2938456 at *4-6 (E.D. Va. July 18, 2011) (reaching same result as *Rhone-Poulenc* and *Tax-Right* in the context of the work-product doctrine).

[206] *Navigant Consulting v. Wilkinson*, 220 F.R.D. 467, 478 (N.D. Tex. 2004) (denying motion to pierce privilege). As the Supreme Court of Virginia has recognized, "[w]aiver of the attorney-client privilege should not be found in every instance in which upholding the protections of confidentiality or privilege may unfairly become an obstacle to the truth, because such an expansive view of waiver would defeat the salutary purpose of the attorney-client privilege." *Walton v. Mid-Atlantic Spine Specialists*, 694 S.E. 2d 545, 554 (Va. 2010).

[207] *See* Plf.'s Memo. of Law in Opp. to Def.'s Mot. to Compel Production of Documents From FRA, dated Nov. 8, 2019, Virginia Case, attached to ECF No. 70, Ex. F to the Collins Decl. (APP.282-397) at pp. 3-13, incorporating legal authorities, arguments, and evidence here by reference.

[208] *Id.* at pp. 18-19. *See In re Martin Marietta Corp.*, 856 F.2d 619, 626 (4th Cir. 1988) ("We think that when there is subject matter waiver, it should not extend to opinion work product.").

opinion work product. The Court ordered the NRA to produce fact work product only.[209]
Defendants should not be permitted a "second run" at arguments that were fully briefed, and
rejected, in the Virginia action.

As a result of the Virginia Court's rulings, both FRA and the NRA reviewed the documents
listed on the FRA-related privilege log, and produced factual work product documents and other
nonprivileged FRA-related documents. These were produced to Defendants in this litigation on
January 30, 2020, along with an updated privileged log.[210] In light of the NRA and FRA's
production and the limitations on the FRA-related documents withheld (and the identification of
all such withheld documents on a privilege log), pursuant to the Virginia Court's Order, the NRA
submits that it has satisfied its discovery obligations as to these Requests.

Therefore, this Court should deny Defendants' Motion to Compel as to these FRA requests.

### (2) The Documents Defendants Seek Regarding BAC's Relationship With The NRA Are Privileged (Requests Nos. 10, 12, 42, 43 and 66).

Documents concerning the legal tasks for which Plaintiff has been billed and legal bills
themselves, and the vetting of BAC legal bills by the NRA's General Counsel and others
(**Requests No. 43, 66 and 12, respectively**) are "clearly privileged," and have no connection to
any party's claims or defenses. This is especially true regarding BAC's bills and their vetting by
the NRA for the NRA's other, unrelated, legal matters (**Requests No. 43 and 66**). Moreover,
Defendants' requests targeting the NRA's confidential settlement agreement in connection with a
wholly unrelated matter also seeks information that is confidential (**Requests No. 42**). And,
Defendants fail to mention that Defendants already possess information responsive to the NRA's

---

[209] *See* Nov. 13, 2019 Hr'g Tr. at 78:16-21, Virginia Case, attached ECF No. 70 as Ex. G to the Collins Decl.
(APP.398-483).
[210] *See* Collins Decl., at ¶ 9.

vetting of BAC's legal fees. Indeed, multiple NRA witnesses have already testified that an NRA attorney personally knew and proposed retaining Mr. Brewer as the NRA's counsel, and that counsel's bills were scrutinized by Plaintiff's General Counsel, the Chief Financial Officer/Treasurer.[211]

Defendants' **Request No. 43** is also facially overbroad and creates an undue burden warranting denial of Defendants' Motion.[212] **Request No. 66** has no bearing on the claims at issue in this matter, either. "Documents and communications relating to payments made (a) by the NRA Foundation to (b) Brewer or the Brewer Firm", are wholly unrelated to the specific allegations included in Defendants' counterclaims.

The NRA also stands on its objections to **Request No. 10**, which improperly seeks documents regarding supposed conflicts of interest between the NRA and BAC that have no bearing on this case. Indeed, Defendants already briefed their concerns with the supposed conflict in their Motion to Disqualify Plaintiff's Counsel, which this Court appropriately rejected. The attack on BAC is simply a pretext for obtaining privileged documents.

Defendants' efforts to sweep other sensitive legal proceedings into the discovery pool hinge on the same tenuous theory that all of the NRA's litigation is material to the instant lawsuit to the extent that the NRA utilizes counsel despised by Defendants: BAC. The NRA will not produce documents relating to fees paid by the NRA to its counsel, BAC, in connection with litigation to which Defendants are not parties and in which they have no interest. Not one of these

---

[211] *Compare* Defendants' Brief in Support of Motion to Compel, ECF No. 55 at p. 9 & n. 14 *with* ECF No. 57, Ex. A-8 at 109:20-110:3, 130:10-131:4, 262:6-14 (APP503) (Meadows Dep.); Ex. A-12 at 155:22-157:7, 159:3-6, 164:25-165:12, 168:5-25, 190:12-191:23 (APP715-718, 724) (LaPierre Dep.).

[212] *See, generally, Samsung Elcs. Am. Inc. v. Yang Kun "Michael" Chung*, 325 F.R.D. 578, 594-95 (N.D. Tex. 2017) (the Court determines that requests are facially overbroad and seek a scope of documents and information that is not proportional to the needs of the case).

distinct legal matters, nor any of the NRA's actions to protect itself from conflicts of interest, were "developed by a resentful son-and-law and business competitor acting in that capacity," one of Defendants' principal relevance theories.[213] Again, the NRA's counsel is not a party to this litigation. Further, Defendants' allegation that the NRA's legal counsel poses a competitive threat to Ackerman's business has already been rejected by this Court when Defendants' motion to disqualify Plaintiff's counsel was denied.

### (3)   The Document Preservation Notice Prepared By BAC Is Privileged (Request No. 57).

Finally, courts have recognized that document preservation notices prepared by counsel are generally privileged.[214] Here, Defendants have not shown how these documents are relevant to the Parties' claims and defenses in this action to overcome the presumed privilege. For this reason alone, Defendants' Motion to Compel documents responsive to **Request No. 57** should be denied.

Additionally, Defendants only now allege that they are concerned with document retention activities at the NRA as it pertains to this lawsuit, given Ms. Carolyn Meadow's testimony regarding management of her own documents. As Defendants themselves concede, however, Defendants have already obtained information regarding this incident, by questioning Ms. Meadows herself during a deposition.

Defendants' contention that they are also concerned that Mr. LaPierre's notes have been destroyed is utterly baseless. Notably, counsel for Defendants did not raise this concern during the various conferences held in order to resolve the issues made the subject of this Report. This is

---

[213] *See* Defendants Brief in Support of Motion to Compel, ECF No. 55, at p. 8.
[214] *See Gulf Coast Facilities Mgmt., L.L.C. v. BG LNG Servs., L.L.C.*, No. CV 09-3822, 2010 WL 11707290, at *3 (E.D. La. Mar. 24, 2010) (explicitly holding that communications between attorneys regarding the drafting of a litigation hold are privileged from document production); *Cargo v. Kansas City S. Ry. Co.*, No. CIV.A. 05-2010, 2011 WL 1234391, at *2 (W.D. La. Apr. 1, 2011)(discusses litigation hold letter is privileged under work product doctrine); *Retractable Techs. Inc. v. Abbott Labs., Inc.*, No. 5:05-CV-157, 2010 WL 11531179, at *4 (E.D. Tex. May 20, 2010) (holding that certain facts or questions regarding a litigation hold were privileged from production).

likely because, had Defendants raised these supposed concerns, counsel for the NRA would have immediately assured Defendants that no such documents have been destroyed. In fact, as Defendants are well aware, the NRA has produced **hundreds of pages** of Mr. LaPierre's handwritten notes already. Additional notes are forthcoming in upcoming productions. To assume that because such documents have purportedly "not been produced", and therefore they may have been destroyed is yet another reckless attempt to distract from the real issues before this Court.

Thus, not only does **<u>Request No. 57</u>** request information that is "clearly privileged," but Defendants' basis for requesting the NRA's litigation hold documents is unsupported.

### (4)    <u>The Crime-Fraud Exception Does Not Apply Here.</u>

Defendants, again, invoke the crime fraud exception but fail to meet the heavy burden to show that privileged communications were "in furtherance of the contemplated or ongoing criminal activity."[215]

In fact, Defendants only allege fraud against third party defendant Mr. LaPierre,[216] and only assert fraud as an affirmative defense with respect to Mr. LaPierre's direct communications with Ackerman.[217] Having failed to even allege fraud against the NRA, Defendants are not permitted to "roam in the shadow zones of relevancy and to explore matter which does not presently appear germane on the theory that it might conceivably become so."[218]

---

[215] *In re Grand Jury Subpoena*, 419 F.3d 329, 343 (5th Cir. 2005); *United States v. Dyer*, 722 F.2d 174, 178 (5th Cir. 1983) ("We hold that only when the Government can by competent evidence establish a prima facie case that an attorney was being used in the commission of a crime is there no privilege.").

[216] *See* ECF No. 31 at p. 113, ¶¶ 135-137.

[217] *See* ECF No. 31 at p. 76, ¶ 205.

[218] *Bredemus v. Int'l Paper Co.*, 252 F.R.D. 529, 533 (D. Minn. 2008) (citing *Archer Daniels Midland Co. v. Aon Risk Services, Inc. of Minnesota*, 187 F.R.D. 578, 589 (D. Minn. 1999)); *Carlson Cos., Inc. v. Sperry & Hutchinson Co.*, 374 F.Supp. 1080, 1080 (D. Minn. 1974).

Consistent with other courts in this Circuit and elsewhere, Defendants' overbroad and unsupported challenge dooms the privilege challenge at the outset.[219] Defendants have made no such showing because Defendants' argument that the privileged documents are discoverable under the "crime-fraud" exception must fail.

> ### b.   Defendants Motion Should Be Denied As To Defendants' Requests For Information That Have No Bearing On The Parties' Claims And Defenses.

Defendants claim that certain Requests regarding Plaintiff's counsel are relevant because this and the related Virginia action were "developed by a resentful son-in-law and business competitor acting in that capacity."[220] Indeed, no property, contract or tort claim actually pled by any party can be illuminated by discovery of, for example: attorney's fees received by BAC in connection with the Lockton lawsuit. Defendants' theory that these requests are relevant because retention of BAC as counsel for the NRA in this case *per se* tainted this litigation and rendered it a "meritless lawsuit," is both baseless and irrelevant to the actual claims and defenses at issue in this case.[221]

Again, information is only discoverable if it "appear[s] germane."[222] That standard requires Defendants to prove that the information they seek "show[s] a reasonable expectation of obtaining information that will aid the dispute's resolution."[223] Defendants insist that the animating principle

---

[219] *In re BankAmerica Corp. Secs. Litig.*, 270 F.3d 639, 642 (8th Cir. 2001) ("A moving party does not satisfy this threshold burden merely by alleging that a fraud occurred and asserting that disclosure of any privileged communications may help prove the fraud. There must be a specific showing that a particular document or communication was made in furtherance of the client's alleged crime or fraud."); *United States v. White*, 887 F.2d 267, 271 (D.C. Cir. 1989) ("The crime-fraud exception has a precise focus").

[220] Defendants' Brief in Support of Motion to Compel, ECF No. 55 at p. 8.

[221] *See* Defendants' Brief in Support of Motion to Compel, ECF No. 48 at pp. 2, 8.

[222] *Carlson Cos., Inc. v. Sperry & Hutchinson Co.*, 374 F.Supp. 1080, 1080 (D. Minn. 1974).

[223] *In re CSX Corp.*, 124 S.W.3d 149, 152 (Tex. 2003) (emphasis added) ("Although the scope of discovery is broad, requests must show a reasonable expectation of obtaining information that will aid the dispute's resolution.").

---

behind the NRA's lawsuit is a vicious inter-familial power struggle. This is not true. However, even if it were remotely true, and even if evidence existed in the NRA's files that could prove that theory correct, the information would nevertheless remain outside of the scope of discovery because its presentation could not aid the Court in resolving any dispute which is actually before this Court. Defendants aside, "no one would suggest that discovery should be allowed of information that has no conceivable bearing on the case."[224] "[T]he requirement of Rule 26(b)(1) that the material sought in discovery be 'relevant' should be firmly applied, and the district courts should not neglect their power to restrict discovery. . . . [and] judges should not hesitate to exercise appropriate control over the discovery process."[225]

For all the above reasons, Defendants' Motion to Compel Plaintiff's Document Production and Motion for Sanctions should be denied in its entirety and NRA should be granted all appropriate relief.

# IV.
# PRAYER FOR RELIEF

## A.  Plaintiff.

For all the reasons stated above, the Court should grant the NRA's Motion to Compel with regards to responses to **Requests Nos. 1, 2 and 4**, order production of documents responsive to **Requests Nos. 1, 2 and 4** within 45 days, and award the NRA reasonable attorney's fees and expenses for bringing this Motion.

Plaintiff requests that this Court deny Defendants' Motion to Compel in its entirety.

---

[224] 8 Fed. Prac. & Proc. Civ. § 2008 (3d ed.). See *also Jones v. Metzger Dairies, Inc.*, 334 F.2d 919, 925 (5th Cir. 1964) (In permitting "full and complete discovery," it is necessary that the "process must be kept within workable bounds on proper and logical basis for determination of relevancy of that which is sought to be discovered.), cert. denied, 379 U.S. 965, 85 S. Ct. 659, 13 L. Ed. 2d 559 (1965).

[225] *Herbert v. Lando*, 441 U.S. 153, 177, 99 S. Ct. 1635, 1649, 60 L. Ed. 2d 115 (1979).

Plaintiff further requests that this Court grant Plaintiff any other relief, at law or in equity, to which Plaintiff may be justly entitled.

**B.      Defendants.**

Defendants respectfully request this Court grant their Motion, and overrule the NRA's objections and compel the NRA to produce documents responsive to Request Nos. 10, 12, 42, 43, 47, 57, 66, 90, and 101, including the documents listed on the FRA privilege log.

Defendants request this Court deny the NRA's Motion.

Defendants further request the Court grant Defendants any other relief, at law or in equity, to which they may be justly entitled.

Dated:  October 23, 2020                    Respectfully submitted,

                                            **BREWER, ATTORNEYS & COUNSELORS**

                                            By: */s/ Michael J. Collins*
                                                Michael J. Collins
                                                State Bar No. 00785493
                                                mjc@brewerattorneys.com
                                                Alessandra P. Allegretto
                                                State Bar No. 24109575
                                                apa@brewerattorneys.com
                                                1717 Main Street, Suite 5900
                                                Dallas, Texas 75201
                                                Telephone: (214) 653-4000
                                                Facsimile: (214) 653-1015

                                            **ATTORNEYS FOR PLAINTIFF THE NATIONAL RIFLE ASSOCIATION OF AMERICA AND THIRD-PARTY DEFENDANT WAYNE LAPIERRE**

*/s/ Brian E. Mason*
**G. Michael Gruber, Esq.**
Texas Bar No. 08555400
gruber.mike@dorsey.com
**Jay J. Madrid, Esq.**
Texas Bar No. 12802000
madrid.jay@dorsey.com
**J. Brian Vanderwoude, Esq.**
Texas Bar No. 24047558
vanderwoude.brian@dorsey.com
**Brian E. Mason, Esq.**
Texas Bar No. 24079906
mason.brian@dorsey.com
**DORSEY & WHITNEY LLP**
300 Crescent Court, Suite 400
Dallas, Texas 75201
(214) 981-9900 Phone
(214) 981-9901 Facsimile

**ATTORNEYS FOR DEFENDANTS
ACKERMAN MCQUEEN, INC.,
MERCURY GROUP, INC., HENRY
MARTIN, JESSE GREENBERG,
WILLIAM WINKLER, AND MELANIE
MONTGOMERY**

## CERTIFICATE OF CONFERENCE

I hereby certify that counsel for Defendants (Brian E. Mason, Christina M. Carroll, and Kelsey M. Taylor) and counsel for Plaintiff (Michael J. Collins, Alessandra P. Allegretto, and Claudia V. Colón) conferred by telephone conference on the following dates and times, concerning the merits of this Joint Status Report: October 1, 2020, at 4:00p.m. Central Time for approximately one hour; October 9, 2020 at 4:00p.m. Central Time for approximately 45 minutes; and, October 14, 2020 at 11:00a.m. Central Time for approximately 35 minutes. Counsel for the Parties considered the nature and basis of their claims and defenses to the arguments made herein, and jointly developed this Report.

/s/ *Brian E. Mason*
Brian E. Mason

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served upon counsel of record in accordance with the Federal Rules of Civil Procedure.

/s/ *Brian E. Mason*
Brian E. Mason

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § | |
| | § | |
| | § | |
| **Plaintiff and Counter-Defendant,** | § | |
| | § | |
| **and** | § | |
| | § | |
| **WAYNE LAPIERRE,** | § | |
| | § | |
| **Third-Party Defendant,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:19-cv-02074-G** |
| | § | |
| **ACKERMAN MCQUEEN, INC.,** | § | |
| | § | |
| **Defendant and Counter-Plaintiff,** | § | |
| | § | |
| **and** | § | |
| | § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG,** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

**<u>DECLARATION OF MICHAEL J. COLLINS IN SUPPORT OF THE JOINT STATUS REPORT IN CONNECTION WITH THE PARTIES' MOTIONS TO COMPEL (ECF 47 & 54)</u>**

I, Michael J. Collins, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I respectfully submit this declaration in support of Plaintiff The National Rifle Association (the "NRA") and Third-Party Defendant Wayne LaPierre's ("LaPierre") Joint Status Report on the Parties' Motions to Compel.

1

**APP001**

2.      I am a partner with the law firm Brewer, Attorneys & Counselors ("BAC").

3.      I serve as counsel of record for the NRA and LaPierre in the above-captioned action (the "Action").

4.      I am fully competent and qualified in all respects to make this Declaration.  The facts stated herein are true and correct, and unless otherwise qualified, are within my personal knowledge.

5.      As counsel for the NRA and LaPierre, I have reviewed pleadings, and other documents related to this Action, and I am familiar with, and have personal knowledge of, the facts and circumstances of this case, unless otherwise stated herein.

6.      Attached to this declaration is a true and correct copy of the following document:

   a.   Email from Alessandra P. Allegretto to Brian E. Mason, dated September 16, 2020, attached as **Exhibit A.**

7.      Defendants served Volume 3 of their document production on the NRA on the evening of October 22, 2020, containing 9,526 documents. The NRA has not had a reasonable opportunity to meaningfully review Defendants' latest production prior to the filing of the Joint Status Report.

8.      As to Defendants' request for documents relating to Forensic Risk Alliance ("FRA") review of Ackerman McQueen, Inc.'s ("AMc") records, those documents have already been produced to Defendants. Indeed, the documents were produced to Defendants in this litigation on January 30, 2020. Any documents that were withheld from Defendants on the basis of privilege were listed in an updated privileged log that was concurrently provided to Defendants.

9.      I declare under penalty of perjury that the foregoing is true and correct.

2

Executed this 23ʳᵈ day of October 2020.

                                        _____ */s/ Michael J. Collins*_____
                                                Michael J. Collins

**APP003**

# EXHIBIT A-1

| | |
|---|---|
| **From:** | Alessandra Allegretto |
| **Sent:** | Wednesday, September 16, 2020 11:04 AM |
| **To:** | mason.brian@dorsey.com |
| **Cc:** | Michael Collins; Krystal R. Hughes; Claudia Colon Garcia-Moliner; gruber.mike@dorsey.com; Taylor.Kelsey@dorsey.com; carroll.christina@dorsey.com |
| **Subject:** | NRA Privilege Log- Exchange Request |

Brian,

In response to AMc's requests for production, the NRA has completed an initial draft of its privilege log. Please let us know when AMc will have its privilege log prepared and ready to exchange with the NRA.

Best,
Ally

**Ally Allegretto**| Associate
Brewer, Attorneys & Counselors
1717 Main Street, Suite 5900
Dallas, Texas 75201
Office: 214.653.4013 | Fax: 214.653.1015
apa@brewerattorneys.com | www.brewerattorneys.com

**BREWER**
ATTORNEYS & COUNSELORS

This communication (including any attachments) is intended for the sole use of the intended recipient, and may contain material that is confidential, privileged, attorney work product, and/or subject to privacy laws. If you are not the intended recipient, you are hereby kindly notified that any use, disclosure, or copying of this communication or any part thereof is strictly prohibited. If you have received this communication in error, please delete this communication, including any copies or printouts, and notify us immediately by return email or at the telephone number above. Brewer, Attorneys and Counselors asserts in respect of this communication all applicable confidentiality, privilege, and/or privacy rights to the fullest extent permitted by law. Thank you.

**APP004**

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § | |
| | § | |
| | § | |
| *Plaintiff and Counter-Defendant*, | § | |
| | § | |
| **and** | § | |
| | § | |
| **WAYNE LAPIERRE,** | § | |
| | § | |
| *Third-Party Defendant*, | § | |
| | § | |
| **v.** | § | **Case No. 3:19-cv-02074-G** |
| | § | |
| **ACKERMAN MCQUEEN, INC.,** | § | |
| | § | |
| *Defendant and Counter-Plaintiff*, | § | |
| | § | |
| **and** | § | |
| | § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, AND JESSE GREENBERG,** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| *Defendants*. | § | |

## <u>DECLARATION OF BRIAN E. MASON</u>

Pursuant to 28 U.S.C. § 1746, I, Brian E. Mason, hereby declare as follows:

1.      My name is Brian E. Mason.  I am over eighteen years of age.  I have never been convicted of a felony or misdemeanor involving moral turpitude.  I am fully competent to make this declaration.  I am a lawyer at Dorsey & Whitney, LLP ("***Dorsey***") and counsel of record for Ackerman McQueen, Inc. ("***AMc***"), Mercury Group, Inc. ("***Mercury***"), Henry Martin ("***Martin***"), William Winkler ("***Winkler***"), Melanie Montgomery ("***Montgomery***"), and Jesse Greenberg ("***Greenberg***") (collectively, "***Defendants***") in the above-captioned matter (the "***Texas Lawsuit***").

I was also admitted *pro hac vice* representing AMc and Mercury Group in the following lawsuits in Virginia: *National Rifle Association of America v. Ackerman McQueen, Inc.*, *et al.*, Case Nos. CL19002067, CL19001757, and CL19002886, in the Circuit Court for the City of Alexandria, Virginia (collectively, the "***Virginia Lawsuits***"), which have now been stayed pending the outcome of the instant action in the Northern District of Texas.  I have personal knowledge of the facts set forth in this declaration and acknowledge them to be true and correct.

2.      In responding to the NRA's many and voluminous requests in the Texas Lawsuit and the Virginia Lawsuits, Defendants have collected data from 28 custodians, totaling more than 2.5 million documents.  Defendants reviewed 85,000 documents before the filing of the Texas Lawsuit.  Since then, Defendants have reviewed hundreds of thousands of those documents by initially hiring *30 contract attorneys* to review in a matter of weeks what would otherwise have taken a legal team months to complete.  Defendants' legal team has continued to review tens of thousands of documents to determine responsiveness and applicability to Plaintiff's 214 document requests in the Texas Lawsuit. To date, as part of its document collection, review, and production, AMc has incurred expenses well over $350,000.

3.      AMc and Mercury produced more than 18,000 documents in the Virginia Lawsuits (approximately 60,000 pages), virtually all of which have been requested by the NRA or are at issue in the Texas Lawsuit.  For example, AMc has produced documents relating to NRATV, analytics, the extortion allegations, audits, and billing records, including more than 10,000 pages of time sheets, third-party invoices, and documents concerning the creation of NRATV.  Counsel for AMc has told Plaintiff's counsel numerous times that, given the similarities between the causes of action alleged in Texas and Virginia, Defendants consider the documents produced in the Virginia Lawsuits to be responsive to Plaintiff's document requests in the Texas Lawsuit.

4.     Defendants have since made three supplemental productions totaling over 12,000 documents and 45,000 pages: February 12, 2020 (580 documents), August 25, 2020 (2,322 documents), and October 22, 2020 (9,526 documents).  Defendants' February production was relatively small because, at that time, the Court had not yet entered a Protective Order in the Texas Lawsuit providing for a two-tier designation procedure for protecting Defendants' trade secret and confidential business information, which was already in place in the Virginia Lawsuits

5.     Moreover, although Defendants believe that their document production has been substantially completed, due to the sheer volume of documents from the relevant custodians, Defendants are still working diligently to identify and produce additional documents and plan to continue to supplement with one or more subsequent productions.  In conferring with Plaintiff's counsel, counsel has likewise represented on at least two separate occasions during recent meet-and-confer telephone conferences that Plaintiff's production is not yet substantially complete, and that Plaintiff, too, will continue to supplement its production in the future.

6.     Furthermore, on various telephone conferences with Plaintiff's counsel regarding the parties' respective discovery disputes, I personally addressed certain issues now being raised in Plaintiff's Motion to Compel.  Specifically, on both October 9 and October 14, 2020, I raised the issue of the scope of Plaintiff's requests (wherein Plaintiff requested documents from January 1, 2015 through the present) and Defendants' objections to this scope, a topic that was briefed as part of Plaintiff's Motion to Compel and Defendants' Response.  We agreed that Defendants would comply with certain requests where the four-year lookback period may be relevant to Plaintiff's claims.  On other requests, I stood by the objections regarding overbreadth and relevance that Defendants' had previously asserted, but I expressly invited Plaintiff's counsel to identify specific requests for further discussion as to scope so that the parties could continue to work through any

additional disputes.  To date, Plaintiff's counsel has declined to confer about any specific document requests, other than those already agreed upon by Defendants.

7.     To the best of my knowledge and understanding, and based on my personal knowledge of the documents obtained from my clients to date and the costs associated with reviewing those documents for production, I estimate that if Defendants were compelled to produce documents from January 1, 2015, and undergo the same review process observed for all of Plaintiff's 214 document requests to date, this process would cost Defendants at least an additional $125,000.

8.     Attached hereto as **B-1** is a true and correct copy of the Memorandum of Law in Support of Defendant the National Rifle Association's Motion to Dismiss, filed in the Supreme Court of the State of New York, County of New York, State v. National Rifle Association, No. 451625/2020.

9.     Attached hereto as **B-2** is a true and correct copy of an email from Susan Dillon to Jerry Hansen, dated February 6, 2019 (NRA_AM_FRA_0001437) (*filed under seal*).

10.     Attached hereto as **B-3** is a true and correct copy of an email from Susan Dillon to Israel Jenyo, dated February 12, 2019 (NRA_AM_FRA_0001719) (*filed under seal*).

11.     Attached hereto as **B-4** is a true and correct copy of a calendar invite from Susan Dillon, dated February 13, 2019 (NRA_AM_FRA_0001765) (*filed under seal*).

12.     Attached hereto as **B-5** is a true and correct copy of an email from Susan Dillon, dated February 21, 2019 (NRA_AM_FRA_0002005) (*filed under seal*).

13.     Attached hereto as **B-6** is a true and correct copy of an email from Susan Dillon, dated February 6, 2019 (NRA_AM_FRA_0000106) (*filed under seal*).

**APP008**

14.     Attached hereto as **B-7** is a true and correct copy of an FRA Evidence Report (NRA_AM_FRA_0000400) (*filed under seal*).

I declare under penalty of perjury and in accordance with 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 23rd day of October, 2020.

Brian E. Mason

5

APP009

# EXHIBIT B-1

**Motion Sequence 001**

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

| | | |
|---|---|---|
| **PEOPLE OF THE STATE OFNEWYORK, BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK** | § § § § § | |
| **Plaintiff,** | § § | **INDEX NO. 451625/2020** |
| **v.** | § § | |
| **THE NATIONAL RIFLE ASSOCIATION et al.,** | § § § | |
| **Defendants.** | § § § | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
## THE NATIONAL RIFLE ASSOCIATION'S MOTION TO DISMISS

William A. Brewer
Sarah B. Rogers
**BREWER, ATTORNEYS & COUNSELORS**
750 Lexington Avenue, 14th Floor
New York, New York 10022
Telephone: (212) 489-1400
Facsimile: (212) 751-2849

**ATTORNEYS FOR DEFENDANT
THE NATIONAL RIFLE ASSOCIATION**

**APP010**

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. I

TABLE OF AUTHORITIES ............................................................................................. II

PRELIMINARY STATEMENT ....................................................................................... 1

STATEMENT OF FACTS ................................................................................................ 4

    A.   THE NRA AND ITS CONSTITUTIONALLY PROTECTED PURPOSES ........................... 4
    B.   NEW YORK STATE'S ANIMUS TOWARD THE NRA AND RELATED PENDING LITIGATION ..... 6
    C.   THE OTHER RELATED FEDERAL CASES ............................................................ 10
    D.   THE DISSOLUTION ACTION .............................................................................. 11

ARGUMENT ................................................................................................................ 11

I.    THIS ACTION SHOULD BE DISMISSED OR STAYED ON THE GROUNDS OF
*FORUM NON CONVENIENS.* ................................................................................... 11

    A.   RETAINING THIS ACTION IN THIS FORUM WOULD IMPOSE SUBSTANTIAL, UNNECESSARY
    BURDENS ON BOTH THE NRA AND THE COURT. ................................................. 12
    B.   FEDERAL COURT PROVIDES A SUITABLE ALTERNATIVE FORUM FOR THE NYAG'S CLAIMS. 14

II.   THIS ACTION SHOULD BE DISMISSED BASED ON THE PENDENCY OF THE
NRA-NYAG FEDERAL ACTION PURSUANT TO CPLR 3211(A)(4). ...................... 15

III.  DOCUMENTARY EVIDENCE ESTABLISHES THAT THE NYAG'S
DISSOLUTION ACTION IS NONVIABLE IN NEW YORK COUNTY, WARRANTING
DISMISSAL UNDER CPLR 3211(A)(1). ................................................................. 17

IV.  IN THE ALTERNATIVE, A STAY IS WARRANTED UNDER CPLR 2201. ............ 18

CONCLUSION ............................................................................................................. 19

i

**APP011**

## TABLE OF AUTHORITIES

### Cases

*11 E. 68th St. LLC v. Madison 68 Realty LLC,*
   2014 Slip. Op. 31872(U) (Sup. Ct. N.Y. Cnty. July 10, 2014)................................. 15

*342 West 30th Street Corp., v. Bradbury,* 30 Misc.3d 132(A) (1 Dept 2011) ........................ 16

*A&S Med., P.C. v. ELRAC, Inc.,* 184 Misc.2d 257 (Civ. Ct. N.Y. Cnty. 2000).......................... 12

*AIG Financial Products Corp. v. Penncara Energy, LLC,* 83 A.D.3d 495 (1 Dept 2011) .......... 16

*Alden v Gambino,* 53 Misc.3d 1204(A) (City Ct. Poughkeepsie Sept. 29, 2016) ....................... 16

*Asher v. Abbott Laboratories,* 307 A.D.2d 211 (1 Dept. 2003).............................................. 18

*Astarita v Acme Bus Corp.,* 55 Misc. 3d 767 (Sup. Ct. N.Y. Cnty. 2017).................................. 17

*Buzzell v. Mills,* 32 A.D.2d 897 (1 Dept 1969)...................................................................... 18

*Citigroup Glob. Markets, Inc. v. Metals Holding Corp.,* 45 A.D.3d 361 (1 Dept. 2007)............. 12

*Cooper v Mobil Oil Corp.,* 264 A.D.2d 578 (1 Dept 1999)...................................................... 17

*Croce v. Preferred Mut. Ins. Co.,* 35 Misc.3d 161 (Dist. Ct. Suffolk Co. 2011)......................... 12

*CSSEL Bare Trust v. Phoenix Life Ins. Co.,* 2009 WL 741177 (N.Y. Sup. Ct. Mar. 11, 2009)... 19

*Diagnostic Rehab. Med. Serv. v. Republic W. Ins. Co.,*
   2003 WL 22888389 (N.Y. Civ. Ct. Nov. 19, 2003) ............................................... 12

*Fry v. Village of Tarrytown,* 89 N.Y.2d 714 (1997) ............................................................... 16

*Islamic Republic of Iran v. Pahlavi,* 62 N.Y.2d 474 (1984)........................................... 11, 12, 14

*Jaber v. Elayyan,* 168 A.D.3d 693 (2 Dept 2019) ................................................................ 16

*Jack Vogel Associates v. Color Edge, Inc.,* N.Y. Slip Op. 31509(U) (New York County 2008). 15

*Keehn v. S. & D. Motor Lines, Inc.,* 41 N.Y.S.2d 521 (Sup. Ct. N.Y. Cnty. 1943)...................... 17

*Leitner v. Sadhana Temple of New York, Inc.,* 2014 WL 12588643 (C.D. Cal. Oct. 17, 2014)... 14

*Matter of Miller v Bd. of Assessors,* 92 N.Y.2d 82 (1997) ..................................................... 15

*Morgan v. Maher,* 50 Misc.2d 642 (Sup. Ct. Nassau Cnty. 1969) ......................................... 16

*Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills,* 815 F. Supp. 2d 679 (S.D.N.Y. 2011).. 16

*Nutronics Imaging, Inc. v. Danan,* 1998 WL 426570 (E.D.N.Y. 1998)...................................... 14

*Parker v. 30 Wall St. Apartment Corp.,* 2015 WL 7906823 (1 Dept Dec. 4, 2015)..................... 12

*Price v. Brown Group,* 206 A.D.2d 195 (4 Dept 1994).......................................................... 13

*Roseman v. McAvoy,* 401 N.Y.S.2d 988 (N.Y. City Civ. Ct. 1978) ......................................... 12

*Silver v. Great Am. Ins. Co.,* 29 N.Y.2d 356 (1972)............................................................... 12

### Statutes

28 U.S.C. § 1367................................................................................................................ 15

N-PCL § 102 .................................................................................................................... 17

N-PCL § 623 .................................................................................................................... 11

N-PCL § 1103 .................................................................................................................. 11

N-PCL § 1110 .................................................................................................................. 17

### Rules

CPLR 304.......................................................................................................................... 16

**APP012**

CPLR 306-a .................................................................................................................... 15

CPLR 327 ................................................................................................................. 11, 15

CPLR 2201 ................................................................................................................... 15

CPLR 3020 .......................................................................................................... 4, 18, 19

CPLR 3022 .............................................................................................................. 11, 15

CPLR 3117 .................................................................................................................... 13

CPLR 3211 ............................................................................................................... *passim*

**Other Authorities**

4-2201 Weinstein-Korn-Miller ...................................................................................... 18

FILED: NEW YORK COUNTY CLERK 10/19/2020 11:50 PM

NYSCEF DOC. NO. 99

INDEX NO. 451625/2020

RECEIVED NYSCEF: 10/19/2020

Case 3:19-cv-02074-G-BK   Document 180   Filed 10/23/20   Page 88 of 112   PageID 10145

Motion Sequence 001

## PRELIMINARY STATEMENT

Brought in the name of the State and ostensibly on behalf of the People (including, preposterously, on behalf of NRA members),[1] this lawsuit is actually the capstone of a partisan election-interference project that has drawn fire from constitutional scholars, politicians and civil rights organizations across the ideological spectrum. Its proponent, Attorney General Letitia James, campaigned on defamatory and threatening assertions that the NRA was a "criminal enterprise" and "terrorist organization," which she promised to dismantle using her office's regulatory oversight powers. Her Complaint[2] fails to support these allegations, and cannot dispute that the NRA expends significant resources in furtherance of its Second Amendment advocacy mission. Indeed, the NRA's success at that mission has made it a target.

Shortly after taking office, James hastily delivered on her campaign promise by initiating a fishing expedition into the NRA's finances and governance. By that time, the NRA had publicly and directly undertaken efforts to redress the same alleged abuses by a handful of faithless fiduciaries that James now purports to pursue derivatively. Indeed, although the New York State Office of the Attorney General (the "NYAG") notably declines to name the agency as a defendant, the NRA commenced claims more than a year ago for fraud and breach of fiduciary duty against its former public relations firm, Ackerman McQueen ("Ackerman"), regarding several of the transactions alleged in the Complaint. Those claims have already withstood a motion to dismiss

---

[1] Among other things, James purports to sue derivatively on behalf of NRA members. *See* Compl. ¶¶ 27, 577, 648 (claiming without basis that Section 623 of the N-PCL authorizes the Attorney General to commence derivative actions on behalf of members; Section 623 makes no mention of the Attorney General). James cannot allege that the NRA's millions of members wish for their century-old Association to be dismantled and its assets redistributed by New York State Democrats. Instead, the central objective of this lawsuit is to harm the NRA's membership and its cause.

[2] All references to the Complaint ("Compl.") in this action refer to the Amended Complaint filed on August 10, 2020, Dkt. No. 11.

and are currently in the early stages of discovery (such litigation, the "Ackerman Litigation").[3] The Ackerman Litigation is not the only federal lawsuit that overlaps with, and precedes, this one. On August 6, 2020 (before this lawsuit was commenced),[4] the NRA sued James in the Northern District of New York for her politicized targeting of the NRA. That case (the "NRA-NYAG Federal Action") is the second of two related cases filed in the Northern District regarding New York State's unconstitutional hostilities against the NRA. The first, involving a financial-censorship campaign implemented through the New York Department of Financial Services, has withstood multiple motions to dismiss and is currently in discovery.[5] Two additional federal lawsuits arising out of the same subject matter as the Complaint are pending in the Middle District of Tennessee[6] and the Northern District of Texas.[7] The NRA is presently filing an application to consolidate the majority of these federal cases (collectively, the "Related Federal Cases") before the Judicial Panel on Multidistrict Litigation.

It is no coincidence that James' lawsuit arrives in the wake of so much related litigation. Contrary to the Complaint's disingenuous, unfounded allegation that seeking the cooperation of the NRA's Board of Directors to ensure compliance with its own policies and procedures would be "futile,"[8] the NRA has shouldered considerable burdens to place its governance and compliance programs beyond reproach. Faced with the threat of a smear campaign, the NRA nonetheless stood firm in its decision to fire and sue Ackerman. It has doggedly pursued internal compliance efforts,

---

[3] *Nat'l Rifle Ass'n of Am. v. Ackerman McQueen,* et al., Civ. No. 3:19-cv-02074−G (N.D. Tx.).

[4] This lawsuit was commenced on August 10, 2020, at the earliest. *See* discussion *infra* at 15-16.

[5] *Nat'l Rifle Ass'n of Am. v. Cuomo,* Case No. 1:18-cv-00566-TJM-CFH (N.D.N.Y.).

[6] *Dell'Aquila*, et al. *v. Wayne LaPierre*, et al., Civ. No. 3:19-cv-00679 (M.D. Tn.).

[7] *Ackerman McQueen v. Stinchfield*, Civ. No. 3:19-cv-03016-X (N.D. Tx.).

[8] Compl. ¶ 663.

2

APP015

brought in a new CFO, and fired executives (*e.g.*, Defendant Powell) for the same conduct alleged

by the NYAG. Not surprisingly, the corporate death sentence[9] of dissolution has never been

sought, or imposed, by New York State on facts even remotely resembling these. Instead,

dissolution has historically (and rightly) been reserved for fraudulent, *sham* entities—*e.g.*, a

purported puppy rescue that was really a puppy mill;[10] breast cancer charities that performed no

such work;[11] and a leukemia foundation that spent less than one percent of its revenue to help

children suffering from cancer.[12] Even where the NYAG can credibly allege insider self-dealing

or lax oversight of charitable spending, it has traditionally targeted the individual tortfeasors and

worked with the charities to reform their governance so that they could continue serving their

corporate purposes.[13] However, the NYAG has no interest in such efforts here, because thwarting

the NRA's corporate purpose is a career goal for James.

---

[9] *See People v. Oliver Schools*, 206 A.D.2d 143 (4 Dept 1994) (quoting *People v. North River Sugar Refining Co.*, 121 N.Y. 582, 608 (1890).

[10] *See* Rogers Aff. Ex. 2 (Consent Order and Judgment, *People v. Precious Pups Rescue, Inc.,* et al., Index No. 17884/2014).

[11] *See* Rogers Aff. Ex. 3 (Complaint and Consent Order and Judgment, *People v. Mure Associates, L.P..,* et al., Index No. 450190/2014).

[12] *See* Rogers Aff. Ex. 4 (Complaint and the two executed Consent Order and Judgments, *People v. The Nat'l Children's Leukemia Foundation*, et al., Index No. 508930/2014). Unsurprisingly (in light of the political context of this action), the NYAG has purported to liken this case to its recent dissolution action against the Trump Foundation. *See id.* Ex. 5 (transcript of James' August 6, 2020 press conference) at 6-7. But that lawsuit, too, was starkly distinguishable—since it involved a 501(c)(3) entity, prohibited from engaging in political activity, which allegedly became a "checkbook" for a presidential campaign. *See id.* Ex. 6 (Petition, *People v. Donald J. Trump* et al., Index No. 451130/2018) ¶¶ 2, 106-108 (describing persistently fraudulent behavior under dissolution claim to consist of unpermitted political activity)).

[13] *See, e.g.*, Rogers Aff. 7 (NYAG press release noting settlement with the former president of NARAL Pro-Choice, who had been accused of self-dealing and intimidating board members into silence. A statement from NYAG counsel noted that "This office is committed to rooting out abuses of power in the charitable sector, holding wrongdoers accountable and working with nonprofit groups to help them tighten internal controls to prevent fraud and other illegal conduct."); Ex. 8 (NYAG press release noting settlement with trustees of the Victor E. Perley fund following a "shocking" "breakdown in governance" that led to the loss of the fund's entire $3.7 million portfolio. While the trustees faced fines, the non-profit was required only to reconstitute its board of directors with NYAG approval); Ex. 9 (NYAG press release noting settlement with the former president of NYLAG for diverting millions from the charity, which required the charity to only agree "to enhance their policies and procedures to protect the charitable assets entrusted to their care.").

3

**APP016**

Because this action is the latest-filed case in a cluster of related cases, it should be dismissed—or, in the alternative, stayed—on multiple grounds. *First*, considerations of *forum non conveniens* dictate that this lawsuit, which implicates dozens of out-of-state witnesses and documents, be litigated in the same federal forum as the NRA's related constitutional claims. There is no reason the NYAG's claims against the NRA cannot be adjudicated in federal court, and consolidation or coordination of this case with the NRA's first-filed federal lawsuit would promote judicial economy, avoid inconsistent adjudications, and facilitate the voluminous, multistate discovery that inevitably awaits the parties. *Second*, because this case involves "the same parties" and, substantively, the "same cause of action" as an already-pending federal case, CPLR 3211(a)(4) provides an additional, independent ground for dismissal. *Third*, this action should be dismissed because the NYAG has failed to file in the statutorily required venue, which is Albany County. *Fourth*, the Court can, and should, stay this action pursuant to CPLR 2201 until the Related Federal Cases are resolved.

## STATEMENT OF FACTS

### A. The NRA and Its Constitutionally Protected Purposes

The NRA was founded immediately following the Civil War "to promote the introduction of a system of army drill and rifle practice, as part of the military drill of the National Guard of [New York] and other states. . . ."[14] For 149 years, it has operated as a New York not-for-profit membership corporation and has established itself as one of the largest, and oldest, civil rights non-profits in the country.[15] As set forth in its bylaws, the NRA's stated mission comprises five purposes and objectives, including protecting and defending the Constitutional right to keep and

---

[14] Compl. ¶ 55.

[15] Compl. ¶¶ 1, 57.

4

**APP017**

bear arms; promoting public safety, law and order, and the national defense; training members of law enforcement, the armed forces and citizens in marksmanship and small arms handling; fostering and promoting shooting sports; and promoting hunter safety and sport.[16]

Today, the NRA counts more than five million members.[17] It employs hundreds of people,[18] and encompasses 11 divisions, each overseen by the Executive Vice President.[19] The NRA's bylaws establish a 76-member board of directors, who exercise general oversight of the organization;[20] the bylaws also establish a leadership structure of eight officers, six of whom are elected annually by the Board.[21] Four of these officers are *ex officio* members of the board but lack voting power.[22] There are "dozens of standing and Special Committees" of the board, including an officer compensation committee, a nominating committee, an executive committee, and an audit committee (with its own charter).[23] The NRA has formalized policies maintained in an employee handbook and a policy manual, including policies and procedures on employee selection, compensation, work standards, time off, work standards, insurance and pension benefits, a statement of corporate ethics, purchase policy, a contract review policy, travel and business expense reimbursement policy, an officer and board of directors policy relating to disclosure of conflicts of interest, and a related-party transaction policy.[24]

---

[16] Compl. ¶ 17.

[17] *See* Rogers Aff. Ex. 10 (Paul Bedard, *NRA is Back, "Highest Ever Membership,"* WASH. EXAMINER (Apr.1, 2019) at 1.

[18] Compl. ¶ 135

[19] Compl. ¶ 62.

[20] Compl. ¶ 64.

[21] Compl. ¶ 66.

[22] Compl. ¶ 67.

[23] Compl. ¶¶ 82-94.

[24] Compl. ¶ 98, Compl. Exs. 2 and 3.

5

**APP018**

Political speech is a major purpose of the NRA and one in which it is expressly permitted to engage under its bylaws and New York law, and as a 501(c)(4) organization under federal law. The NRA engages in extensive legislative advocacy to promote its purposes, as well as to vindicate the rights of its members and all Americans. The NRA spends tens of millions of dollars annually distributing pamphlets, fact sheets, articles, electronic materials, and other literature to advocate in support of Second Amendment freedoms and to assist NRA members who engage in national, state, and local firearm dialogue.[25] The NRA's direct mail, television, radio, and digital communications seek to educate the public about issues bearing on the Second Amendment, defend the NRA and its members against political and media attacks, and galvanize participation in the political process by NRA members and supporters.

To its critics, the NRA is best known as a "superlobby – one of the largest and most truly conservative lobbying organizations in the country," able to mobilize its millions of members in concerted efforts to protect the Second Amendment rights of all Americans.[26]  For this reason, and because of its decisive support for President Trump in 2016, the NYAG and its political allies targeted the NRA for dissolution years ago.

**B.  New York State's Animus Toward the NRA and Related Pending Litigation**

New York Governor Andrew Cuomo has a longstanding political vendetta against what he calls "Second Amendment types,"[27] especially the NRA, which he accuses of exerting a "stifl[ing]

---

[25] *See* Rogers Aff. Ex. 11 (NRA 2019 Annual Report) at 4.

[26] Rogers Aff. Ex. 12 (Christina Robb, Handguns and the American Psyche: The Attempted Assassination of a President Brings the Issue into Sharp Focus Once Again. Handguns – What Do They Mean To Americans? To the NRA, They Are A Symbol of Freedom; To Those Frightened of Crime, They Represent Safety – Even if the Owner Doesn't Know How to Use Them; To Gun Control Advocates, They Are Symbols of Ultimate Evil, BOSTON GLOBE, 1981 WLNR 68847 (June 7, 1981)).

[27] On February 15, 2018, Cuomo appeared on the MSNBC program *The Beat with Ari Melber*, where he discussed championing legislation that some believed "trampled the Second Amendment." YOUTUBE, *Gov. Andrew Cuomo On Background Checks: "Bunch of Boloney* [sic]*" | The Beat With Ari Melber | MSNBC, available at*

6

. . . stranglehold" over national gun policy.[28] Beginning in 2018, Cuomo and several political allies orchestrated a campaign of selective enforcement, backroom exhortations, and public threats designed to coerce financial institutions to blacklist pro-gun advocacy groups, including the NRA.[29] The NRA's First Amendment claims against Governor Cuomo, the New York State Department of Financial Services, and its former superintendent arising from this pressure campaign have been pending for two years, have withstood multiple motions to dismiss, and are in discovery in the United States District Court for the Northern District of New York (such litigation, the "Cuomo Litigation").[30]

New York's former Attorney General, Eric Schneiderman, was so disturbed by mounting political pressure to commence an unconstitutional "investigation" of the NRA that he alerted the NRA about the situation scheme during 2017.[31] Shortly thereafter, Schneiderman resigned from office, and Cuomo's longtime acolyte,[32] Letitia James, became a candidate to replace him. On the campaign trail, before ever assuming office and without a shred of evidence against the NRA, James announced that she would follow in the footsteps of Cuomo's financial-blacklisting campaign if elected, by "put[ting] pressure upon the banks that finance the NRA" in order to choke

---

https://www.youtube.com/watch?v=Tz8X07fZ39o (last visited June 6, 2020). However, Cuomo lamented that his "favorability rating" had dropped thereafter due to "backlash from conservatives and Second Amendment types." *Id.*

[28] *See* Rogers Aff. Ex. 13 (Kenneth Lovett, *Exclusive: Cuomo Fires Back at Jeb Bush for 'Stupid' and 'Insensitive' Gun Tweet*, NY DAILY NEWS (Feb. 17, 2016).

[29] *See* Rogers Aff. Ex. 14 (Press Release, Governor Cuomo Directs Department of Financial Services to Urge Companies to Weigh Reputational Risk of Business Ties to the NRA and Similar Organizations, N.Y.S. Office of the Governor (Apr. 19, 2018).

[30] *Nat'l Rifle Ass'n of Am. v. Cuomo,* Case No. 1:18-cv-00566-TJM-CFH (N.D.N.Y.).

[31] *See* Rogers Aff. Ex. 1 (NRA-NYAG Federal Action Compl) ¶ 14.

[32] The *New York Times* expressly declined to endorse Attorney General James for office on the basis of her close connection to Cuomo and his "historically corrupt" administration. *See* Rogers Aff. Ex. 15 (Editorial, *The New York Times Endorses Zephyr Teachout for Attorney General*, N.Y. TIMES (Aug. 9, 2018)).

7

**APP020**

off support for its Second Amendment speech,[33] which she called a "poisonous agenda" that was

"directly antithetical" to New York's gun-control laws.[34] She also attacked the NRA's legitimacy

as a not-for-profit corporation.[35] On September 4, 2018, during a debate between Democratic

candidates, James stated that, if elected, her "top issue" would be "going after the NRA because it

is a criminal enterprise."[36] Two days later, James doubled down: "We need to again take on the

NRA, which holds itself out as a charitable organization. But in fact, they are not. They are nothing

more than a criminal enterprise. We are waiting to take on all of the banks that finance them, their

investors."[37] On October 31, 2018, in a magazine interview, James again stated that "the NRA

holds [itself] out as a charitable organization, but in fact, [it] really [is] a terrorist organization."[38]

During late summer and early fall 2018, James pledged that she would wield state power to conduct

a fishing expedition to "see whether or not the[] [NRA] ha[d] in fact complied with the not-for-

profit law."[39]

      While James was publicly inveighing against the NRA and promising action, the NRA was

busy heeding Schneiderman's advice. Although it believed it was already operating in compliance

---

[33] *See* Rogers Aff. Ex. 16 (*Attorney General Candidate, Public Advocate Letitia James*, OUR TIME PRESS (Sept. 6, 2018)).

[34] See Rogers Aff. Ex. 17 (Jon Campbell, *NY AG Letitia James Called the NRA a 'Terrorist Organization.' Will It Hurt Her Case?*, USA TODAY (Aug. 19, 2020)).

[35] *Id.*

[36] *See* New York City Bar Association, *Forum for the Democratic Attorney General Primary Candidates*, YOUTUBE (Sept. 4, 2018), https://www.youtube.com/watch?v=6n2_LHNEUW0 (statement at the 17:50 mark)).

[37] Rogers Aff. Ex. 17 (*Attorney General Candidate, Public Advocate Letitia James*, OUR TIME PRESS (Sept. 6, 2018)).

[38] Rogers Aff. Ex. 18 (Teddy Grant, *Letitia 'Tish' James on Becoming New York's Next Attorney General*, EBONY (Oct. 31, 2018)).

[39] *See* Rogers Aff. Exs. 19–23 (Mike Spies, *Tom Selleck Quits NRA Board*, THE TRACE (Sept. 18, 2018); Mike Spies & John Cook, *Top NRA Executive's Trail of Business Flops and Unpaid Debt*, THE TRACE (Oct. 1, 2018); *see also* Mike Spies & John Cook, *For the Second Time in Two Years, the NRA Will Raise Dues on Members*, THE TRACE (Aug. 27, 2018); *see also* Alex Yablon & Mike Spies, *FAQ: Is the NRA Going Broke?*, THE TRACE (Aug. 9, 2018); *see also* Brian Freskos, *We Translated Maria Butina's Russian Blog Posts. Here's What They Reveal About Her Obsession with the NRA*, THE TRACE (July 24, 2018)).

8

**APP021**

with New York State law, it also understood that a politically driven "compliance audit" was something for which it should carefully prepare. The NRA therefore undertook a top-to-bottom review of its operations and governance.[40] In the process, the NRA determined that a relatively small group of vendors, executives and fiduciaries were not complying with NRA policies and/or reporting requirements. These included its largest vendor, Ackerman, whom the NRA eventually determined had been systematically overcharging the NRA, falsifying invoices, and engaging in a practice of pass-through block billing that obscured the nature of certain expenditures. When the NRA sought additional documentation from Ackerman, Ackerman refused to provide it, leading to litigation beginning in April 2019, by the NRA against Ackerman to force compliance with its requests and to recover funds fraudulently taken from the NRA.[41] Rather than acknowledge and support the NRA's efforts to recover funds for its members, however, James sought to undermine them. Later that same month, on April 27, 2019—a mere three months after taking office—she fulfilled a campaign pledge by announcing a Charities Bureau investigation into the NRA's not-for-profit status.[42]

---

[40] Despite framing the NRA as a fraudulent organization beyond repair, James's own complaint extensively documents that the NRA voluntarily undertook efforts to improve its internal governance functions beginning in 2017, up to the present day. These efforts include replacing Defendant Wilson Phillips with a new treasurer that the complaint repeatedly lauds for engaging in remedial efforts such as a 50% reduction in travel expenses (Compl. ¶ 156), "reengineering" the process for handling Defendant Wayne LaPierre's expense reimbursements to "make it . . . robust and appropriate" (*id*. ¶ 197), investigating and terminating a complained-of vendor contract with HomeTelos in the spring of 2018 (*id*. ¶ 225), examining Defendant Joshua Powell's improper expenses and engaging outside counsel to assist, and confronting Powell regarding improper conflicts of interest in mid-2018, resulting in Powell's removal and repayment of misappropriated monies to the NRA (*id*. ¶¶ 249-50, 263), and investigating and examining the improper use of a corporate credit card by LaPierre's senior assistant (*id*. ¶ 294). The NRA engaged outside counsel to do an extensive review of the NRA's relationship with its contractual partners and in service of that effort ultimately commenced litigation against Ackerman to obtain documentation that Ackerman has been withholding. (*id*. ¶¶ 302, 455). The NRA has further been evaluating the establishment of an internal audit function (*id*. ¶ 483) and adopted a revised whistleblower policy in January 2020. (*id*. ¶ 115).

[41] *Nat'l Rifle Ass'n of Am. v. Ackerman McQueen, Inc.,* et al., Civ. Case No. 3-19-cv-02074-G (N.D. Tex.).

[42] Rogers Aff. Ex. 24 (David Sherfinski, *Letitia James, New York AG, Launches Investigation Into the NRA*, THE WASH. TIMES (Apr. 27, 2019)).

9

APP022

On August 6, 2020, the NRA commenced the NRA-NYAG Federal Action in the United

States District Court for the Northern District of New York in response to the NYAG's

unconstitutional, partisan targeting of the NRA. The NRA-NYAG Federal Action challenges the

NYAG's politicized "investigation" of the NRA (here, the investigation by the NYAG as a

violation of the NRA's First Amendment rights.[43] The Federal Action and the Cuomo Litigation

are designated as "related cases" in federal court.[44]

### C.  The Other Related Federal Cases

The NRA commenced the Ackerman Litigation in August 2019.[45] As part of the Ackerman

Litigation, a former Ackerman employee, Grant Stinchfield, filed an affidavit attesting to corrupt

practices perpetrated by Ackerman, at the expense and without the knowledge of the NRA, which

he had witnessed.[46] Ackerman sued Stinchfield in an attempt to silence him (the "Stinchfield

Litigation").[47] The veracity of Stinchfield's statements about Ackerman is at issue in the

Stinchfield Litigation; therefore, discovery is ongoing regarding many of the same aspects of the

NRA's dealings with Ackerman referenced in the NYAG's Complaint. Separately, an NRA donor,

David Dell'Aquila, commenced a putative class action against the NRA in the United States

District Court for the Middle District of Tennessee in August 2019 (the "Dell'Aquila Litigation").

The Dell'Aquila Litigation alleges misspending by the NRA, and likewise involves transactions

---

[43] Rogers Aff. Ex. 1.

[44] *Nat'l Rifle Ass'n of Am. v. James,* Case No. 1:20-cv-00889-MAD-TWD (N.D.N.Y.)

[45] Two related disputes between the NRA and Ackerman, which were previously being litigated in Virginia State Court, are stayed pending adjudication of the federal Ackerman Litigation. *See National Rifle Association of America v. Ackerman McQueen, Inc., and Mercury Group, Inc.*, Cons. Case Nos. CL19002067; CL19001757; CL19002886 (Va. Cir. Ct.)

[46] *Nat'l Rifle Ass'n of Am. v. Ackerman McQueen, Inc.,* et al., Civ. Case No. 3-19-cv-02074-G, Dkt. No. 122.

[47] *Ackerman McQueen v. Stinchfield*, Civ. No. 3:19-cv-03016-X (N.D. Tx.).

10

**APP023**

between the NRA and Ackerman.[48] Although several of Dell'Aquila's claims have been dismissed, others remain pending.

### D.  The Dissolution Action

On August 6, 2020, James held a highly publicized press conference for what she described as a "major national" announcement: the filing of a dissolution lawsuit against the NRA.[49] A summons and complaint were filed that morning and an index number purchased. That complaint, however, was missing the complete verification required by New York Not-for-Profit Corporation Law ("N-PCL") § 1103. On August 9, 2020, Defendant NRA filed, pursuant to CPLR 3022, a notice of its election to treat the putative complaint as a nullity.[50] The following day, the NYAG filed a "Complaint (Amended)," described on the docket as containing only a corrected verification.[51]

**ARGUMENT**

## I.   **This Action Should Be Dismissed or Stayed on the Grounds of *Forum Non Conveniens*.**

New York's doctrine of *forum non conveniens,* codified in CPLR 327, permits a court to dismiss or stay any action that "in the interest of substantial justice should be heard in another forum."[52] The rule provides one of several discretionary grounds under New York law for the dismissal of cases, like this one, which overlap with lawsuits pending in other fora that pertain to

---

[48] *Dell'Aquila*, et al. *v. Wayne LaPierre*, et al., Civ. No. 3:19-cv-00679 (M.D. Tn.) Dkt. No. 43.

[49] Rogers Aff. Ex. 25 (Stephen Gandel August 5, 2020 Twitter post)

[50] Dkt. No. 10.

[51] Dkt. No. 11.

[52] CPLR 327 (McKinney). *See also Islamic Republic of Iran v. Pahlavi*, 62 N.Y.2d 474, 479 (1984) (explaining that CPLR 327 permits a court to dismiss an action which "although jurisdictionally sound, would be better adjudicated elsewhere.") (internal citations omitted).

11

**APP024**

the same parties or issues.[53] Those potential alternative fora include more convenient venues within New York.[54] The Court of Appeals has explained that the application of *forum non conveniens* "turn[s] on considerations of justice, fairness, and convenience;" thus, no single factor is dispositive.[55] Factors considered in the *forum non conveniens* analysis include: (i) the burden on New York courts; (ii) the hardship to the defendant; and (iii) the availability of an alternate forum.[56] Each favors dismissal here.

### A. Retaining this action in this forum would impose substantial, unnecessary burdens on both the NRA and the Court.

The NYAG's 163-page complaint challenges, and purportedly seeks to unwind, dozens of business transactions over at least a three-year period. Virtually none of these transactions took place in New York City, and the counterparties to these transactions reside far away—as do their documents. For example, this action is virtually guaranteed to require third-party discovery from: various former NRA employees and board members, who may continue to reside near NRA Headquarters in Virginia; Ackerman McQueen, Inc. (headquartered in Oklahoma City,

---

[53] *See, e.g.*, *Citigroup Glob. Markets, Inc. v. Metals Holding Corp.*, 45 A.D.3d 361, 362 (1 Dept. 2007) (affirming *forum non conveniens* dismissal because, *inter alia*, the subject matter of the action was "already being litigated abroad" which created "a risk that conflicting rulings w[ould] be issued by different courts of different jurisdictions") (internal citations and quotation marks omitted).

[54] *See, e.g. Parker v. 30 Wall St. Apartment Corp*., 2015 WL 7906823, at *1 (1 Dept Dec. 4, 2015); *Croce v. Preferred Mut. Ins. Co*., 35 Misc.3d 161 (Dist. Ct. Suffolk Co. 2011); *A&S Med., P.C. v. ELRAC, Inc*., 184 Misc.2d 257 (Civ. Ct. N.Y. Cnty. 2000); *Roseman v. McAvoy*, 401 N.Y.S.2d 988, 990 (N.Y. City Civ. Ct. 1978); *Diagnostic Rehab. Med. Serv. v. Republic W. Ins. Co*., 2003 WL 22888389, at *11 (N.Y. Civ. Ct. Nov. 19, 2003)).

[55] *Silver v. Great Am. Ins. Co*., 29 N.Y.2d 356 (1972).

[56] *See Islamic Republic of Iran v. Pahlavi*, 62 N.Y.2d 474, 479 (1984). Notably, the oft-cited articulation of the *forum non conveniens* factors in the *Pahlavi* case contains two additional factors not listed here: the residency of the parties, and the locus of the transaction out of which the claims arose. *See id.* The NRA de-emphasizes these factors in its analysis because both the current forum and the desired forum (the U.S. District Court for the Northern District of New York) are sited in the same state. Thus, the NRA does not dispute whether this lawsuit has a cognizable nexus to New York—only whether the current forum is a just, convenient one. Although *forum non conveniens* is typically invoked to permit a transfer to a foreign jurisdiction, courts have also granted such motions in favor of other, more convenient, venues within New York. *See, e.g. Parker v. 30 Wall St. Apartment Corp*., 2015 WL 7906823, at *1 (1 Dept Dec. 4, 2015); *Croce*, 938 N.Y.S.2d; *A&S Med.*, 707 N.Y.S.2d at 780; *Roseman v. McAvoy*, 401 N.Y.S.2d at 990; *Diagnostic Rehab. Med.* Serv., 2003 WL at *11.

12

APP025

Oklahoma); McKenna & Associates (headquartered in Arlington, Virginia); Membership Marketing Partners, Allegiance Creative Group and Concord Social & Public Relations (headquartered in Fairfax, Virginia); HomeTelos L.P. (headquartered in Dallas, Texas); LookingGlass Cyber Solutions, Inc. (headquartered in Reston, Virginia); employees of those companies; the NRA's travel consultant (who resides in California) and, providers of lodging, transportation, and similar services in locations as far-flung as Italy, the Bahamas, and Normandy, France. Thus, key documents and witnesses lay outside the jurisdiction of this Court and obtaining these documents and testimony will hamper the NRA's ability to conduct its defense. Indeed, as set forth in Exhibit 27 to the Rogers Affirmation, the Complaint can be conservatively estimated to implicate 90 witnesses residing in 27 U.S. states, plus Washington D.C.

Needless to say, these witnesses will also be considered unavailable for trial pursuant to CPLR 3117(a)(3)(ii) and many of these depositions will be required in order for the NRA to adequately defend itself. This discovery and its potential use at trial would be most efficiently sought in federal court pursuant to federal rules designed to facilitate multistate (and, where necessary, cross-border) discovery. By contrast, retaining the action in this forum would require that virtually all witnesses and documents be sought pursuant to a protracted process, whereby a subpoena is first issued in New York, then domesticated elsewhere, then served or challenged pursuant to a patchwork of differing procedures and rules and litigated in all the different venues. This would create unnecessary burdens for both the NRA[57] and the Court.

Moreover, the mere fact that the NRA is already litigating overlapping and related claims in another available forum renders the duplicative litigation in this forum unnecessarily

---

[57] *See, e.g.*, *Price v. Brown Group*, 206 A.D.2d 195, 201 (4 Dept 1994) (recognizing that for purposes of analyzing the hardship imposed on the defendant in a *forum non conveniens* analysis, the location of relevant evidence is a key consideration).

13

**APP026**

burdensome. At the very least, the pendency of two overlapping lawsuits in two different New York courts will require the NRA to incur duplicative expenses litigating issues already decided, or under consideration, by the federal court; at worst, substantial additional expenses will arise as the parties invariably dispute the admissibility, and/or preclusive effect, of evidence or findings in the parallel federal proceeding. Such burdens could be minimized or eliminated entirely via a *forum non conveniens* dismissal, with the stipulation that the NRA will not contest the NYAG's re-filing of its claims in federal court.

### B.  Federal court provides a suitable alternative forum for the NYAG's claims.

The availability of an alternative forum to the plaintiffs is "a most important factor to be considered in ruling on a motion to dismiss."[58] Here, none of the claims asserted by the NYAG are within the exclusive subject-matter jurisdiction of New York state courts; indeed, statutory claims under the same N-PCL provisions that undergird the Complaint have been adjudicated by at least one federal court exercising diversity jurisdiction, and nothing prevents the federal courts already hearing substantially related causes of action from asserting jurisdiction pursuant to 28 U.S.C. § 1367 because the NYAG's claims are so related that they are effectively part of the existing Article III case or controversy.[59]

Moreover, to the extent that the NRA is able to consolidate all pending, related litigation in federal court, the forum will not only prove acceptable, but superior: the NRA has been litigating against several organs of the New York State government in federal district court since 2018, and the court has accrued significant familiarity with documents and issues likely to overlap with this case. The federal court in the Cuomo Litigation has also appointed a special master to conduct *in*

---

[58] *Pahlavi,* 62 N.Y.2d at 481.

[59] *See e.g.*, *Nutronics Imaging, Inc. v. Danan*, 1998 WL 426570 (E.D.N.Y. 1998); *Leitner v. Sadhana Temple of New York, Inc.*, 2014 WL 12588643, at *14 (C.D. Cal. Oct. 17, 2014).

14

**APP027**

*camera* review of investigative-privilege and related privilege claims asserted by the government, an issue that is almost certain to reoccur in this case—and could dealt with efficiently by the federal court's existing process.

Thus, per the application of the above factors, this action should be dismissed under CPLR 327(a) for *forum non conveniens.*

## II.   This Action Should Be Dismissed Based on the Pendency of the NRA-NYAG Federal Action Pursuant to CPLR 3211(a)(4).

Pursuant to CPLR 3211(a)(4), a court has broad discretion to dismiss or stay an action when another action is already pending and there is a "substantial identity" of the parties and causes of action. This relief is available even if the first action was commenced only a day earlier.[60] Here, NYAG purported to commence this action on August 6, 2020, but the filed complaint attached a defective verification missing statements required by N-PCL § 1103 and CPLR 3020. When a pleading required to be verified is not, the adverse party is entitled to treat it "as a nullity, provided he gives notice with due diligence" upon the attorney of the adverse party.[61] This is because the failure to verify or sign the complaint—for whatever reason—affects a substantial right of the defendant in that plaintiff's claims cannot be challenged as false, which imposes prejudice upon the defendant who seeks to challenge these allegations.[62] The NRA notified the opposing party, in writing, within 72 hours, that it elected to treat the Complaint as a nullity.[63]

An action is not deemed commenced in New York State until an index number is obtained and the initiating papers are filed.[64] Strict compliance is mandatory, and so long as noncompliance

---

[60] *11 E. 68th St. LLC v. Madison 68 Realty LLC,* 2014 Slip. Op. 31872(U) (Sup. Ct. N.Y. Cnty. July 10, 2014).

[61] CPLR 3022; *see also Matter of Miller v Bd. of Assessors*, 92 N.Y.2d 82 (1997).

[62] *Jack Vogel Associates v. Color Edge, Inc.,* 2008 N.Y. Slip. Op. 31509(U) (New York County 2008).

[63] Dkt. No. 10.

[64] CPLR 304, 306-a.

15

**APP028**

is timely raised by the opposing party, warrants outright dismissal.[65] Unverified pleadings are properly stricken.[66] Following the NRA's notice of rejection to NYAG, NYAG filed an amended complaint with a corrected verification on August 10, 2020. Pursuant to CPLR 304, this action must therefore be deemed to have been filed as of that date—when a valid summons and complaint were filed with the Court.

The NRA's Federal Action therefore constitutes an action already pending for purposes of CPLR 3211(a)(4). Both the NRA and NYAG are parties and the NRA-NYAG Federal Action arises out of the "same subject matter or series of alleged wrongs," seeking redress under Section 1983 for NYAG's improper motive and abuse of dissolution power in bringing this action.[67] The fact that where, as here, a defendant's claim is one for declaratory relief does not minimize the potential need for a stay or dismissal.[68] Nor is a complete identity of parties required, so long as there "be at least one plaintiff and one defendant common to both actions."[69] Because the NRA's First Amendment claims lie at the heart of both actions, the NRA requests that this Court dismiss this action, or in the alternative, to stay this proceeding until the NRA-NYAG Federal Action resolves this critical issue.[70]

---

[65] *Fry v. Village of Tarrytown*, 89 N.Y.2d 714 (1997).

[66] *See Morgan v. Maher*, 50 Misc.2d 642 (Sup. Ct. Nassau Cnty. 1969); *see also Alden v Gambino*, 53 Misc.3d 1204(A) (City Ct. Poughkeepsie Sept. 29, 2016) (acknowledging that striking a defective complaint is proper but declining to do so where defendant did not act with due diligence and seek a verified complaint in writing).

[67] Because the NRA-NYAG Federal Action argues that the politically motivated investigation and contemplated (now ripe) enforcement action by NYAG is unconstitutional, this action is properly considered a compulsory counterclaim to the NRA-NYAG Federal Action. *See* Fed. R. Civ. P. 12(a); *see also Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 815 F. Supp. 2d 679 (S.D.N.Y. 2011) (constitutional challenge to village's enforcement action compulsory counterclaim to the enforcement action).

[68] *11 E. 68th St. LLC* , 2014 N.Y. Slip Op. 31872(U) (Sup. Ct. N.Y. Cnty. July 10, 2014).

[69] *Jaber v. Elayyan*, 168 A.D.3d 693 (2 Dept 2019).

[70] *342 West 30th Street Corp., v. Bradbury,* 30 Misc.3d 132(A) (1 Dept 2011); *see also AIG Financial Products Corp. v. Penncara Energy, LLC*, 83 A.D.3d 495 (1 Dept 2011).

16

**APP029**

## III. Documentary Evidence Establishes that the NYAG's Dissolution Action is Nonviable in New York County, Warranting Dismissal Under CPLR 3211(a)(1).

The NYAG's dissolution claims are governed by Article 11 of the New York Not-for-Profit Corporation Law. N-PCL § 1110 provides: "An action … under this article **shall** be brought in the supreme court in the judicial district in which the office of the corporation is located at the time of the service on the corporation of a summons in such action …."[71] The office of a corporation is defined as "the office the location of which is stated in the certificate of incorporation … Such office need not be a place where activities are conducted by such corporation."[72] Contrary to NYAG's allegation in paragraph 26 of the complaint, the NRA's certificate of incorporation does not "set forth" that "the office of the NRA is in New York County." The original certificate of incorporation, issued in 1871, does not state the location of an office.[73] In 2002, a certificate of change was issued by the New York Secretary of State, stating that the NRA "changes the designation of its registered agent to: Corporation Service Company 80 State Street, Albany, NY 12207-2543" and identifying a principal place of business in Virginia. A plain reading of the statute

---

[71] See N-PCL § 1110 ("Venue") and Comment ("This section, dealing with the venue in proceedings for judicial dissolution, is an adaptation of § 1112 of the Bus. Corp. L. It departs from §§ 138 and 139 of the Gen. Corp. L. in the fact that it makes no special provision for dissolution proceedings initiated by the attorney-general. This is covered by § 112 of this chapter.") (emphasis added).

[72] N-PCL § 102 ("Definitions"), subparagraph (a)(11). *See Cooper v Mobil Oil Corp.*, 264 A.D.2d 578, 578-79 (1 Dept 1999) ("Plaintiffs commenced this personal injury action against defendant based upon alleged Labor Law violations and designated New York County as venue by reason of defendant's certificate of incorporation which named New York County as the location of its principal office. Supported by an affidavit from a corporate officer, defendant moved to change venue to Suffolk County, plaintiffs' county of residence, upon the ground that defendant had no principal office or place of business in New York when this action was commenced and that the defendant's principal office is, in fact, located in Fairfax County, Virginia. Although CPLR 503(c) deems a corporation to be a resident of the county in which its principal office is located, Business Corporation Law § 402 requires that a corporation list on its certificate of incorporation a location within New York State for its principal place of business. Defendant designated New York County in that manner and plaintiffs properly relied upon that designation in selecting venue) (citations omitted); *Astarita v Acme Bus Corp.*, 55 Misc. 3d 767 (Sup. Ct. N.Y. Cnty. 2017) (granting motion for change of venue, holding that venue was proper in Suffolk County where corporation changed its principal office as reported in biennial registration statement); *Keehn v. S. & D. Motor Lines, Inc.*, 41 N.Y.S.2d 521 (Sup. Ct. N.Y. Cnty. 1943) ("The law is abundantly clear that the office and principal place of business for venue purposes of a domestic corporation, …, is fixed by its certificate of incorporation.").

[73] Rogers Aff. Ex. 26 at 1.

17

**APP030**

required that this action therefore be filed in Albany County, New York.[74] In the alternative, this action should be transferred.[75]

**IV.**    **In the Alternative, a Stay Is Warranted Under CPLR 2201.**

The existence of a pending related action is a common ground for a stay of proceedings under CPLR 2201.[76] A stay is especially appropriate where, as here, there are "overlapping issues and common questions of law and fact," the first-filed case has progressed into discovery, and determination of the first-filed action may dispose of or limit issues in the second.[77] A significant portion of funds NYAG purportedly seeks to recover come from Ackerman, and the validity of these expenditures and the circumstances under which they were requested and approved are fundamental questions underlying NYAG's dissolution claim. The NRA and Ackerman have already been litigating these exact issues for well over a year in another forum and are now six months into discovery, with hundreds of document requests served, responsive documents exchanged and depositions beginning in November.[78] Moreover, the position that the NRA has taken with respect to Ackerman's actions—that Ackerman was an NRA fiduciary that breached its duty and defrauded the NRA—run squarely counter to the NYAG's allegations made "upon information and belief" in this action that Ackerman was conspiring with NRA executives. Allowing this action to proceed under NYAG's unsupported theory risks undermining the NRA's causes of action in the Ackerman case and jeopardizing its potential recovery, to the detriment of NRA members whose interests NYAG purportedly seeks to vindicate. Thus, "to avoid potentially

---

[74] *Id.* at 2-16.

[75] The NRA served a transfer demand pursuant to CPLR 511 on October 19, 2020. *See* Dkt. No. 39.

[76] *See* 4-2201 Weinstein-Korn-Miller, N.Y. Civ. Prac. CPLR 2201.03.

[77] *See, e.g., Buzzell v. Mills*, 32 A.D.2d 897, 897 (1 Dept 1969); *Asher v. Abbott Laboratories*, 307 A.D.2d 211, 211-12 (1 Dept. 2003).

[78] *See* Rogers Aff. Ex. 25 (Oct. 5, 2020 Status Report).

18

**APP031**

inconsistent determinations and duplication of judicial resources," a stay under CPLR 2201 is appropriate.[79]

## **CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed or, in the alternative, this action stayed.

Dated: October 19, 2020

Respectfully submitted,

By: /s/ *Sarah B. Rogers* _____ __ _____
    William A. Brewer III
    wab@brewerattorneys.com
    Sarah B. Rogers
    sbr@brewerattorneys.com

**BREWER, ATTORNEYS & COUNSELORS**
750 Lexington Avenue, 14th Floor
New York, New York 10022
Telephone: (212) 489-1400
Facsimile: (212) 751-2849

**ATTORNEYS FOR DEFENDANT**
**THE NATIONAL RIFLE ASSOCIATION**

---

[79] *See CSSEL Bare Trust v. Phoenix Life Ins. Co.*, 2009 WL 741177 (N.Y. Sup. Ct. Mar. 11, 2009).

19

**APP032**

# EXHIBIT B-2

# FILED
# UNDER
# SEAL

# EXHIBIT B-3

# FILED
# UNDER
# SEAL

# EXHIBIT B-4

# FILED
# UNDER
# SEAL

# EXHIBIT B-5

# FILED
# UNDER
# SEAL

# EXHIBIT B-6

# FILED
# UNDER
# SEAL

# EXHIBIT B-7

# FILED
# UNDER
# SEAL