## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| *Plaintiff and Counter-Defendant*, | § § | |
| **and** | § § | |
| **WAYNE LAPIERRE,** | § § § | |
| *Third-Party Defendant,* | § § | |
| **v.** | § § | **Case No. 3:19-cv-02074-G** |
| **ACKERMAN MCQUEEN, INC.,** | § § § | |
| *Defendant and Counter-Plaintiff,* | § § | |
| **and** | § § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, AND JESSE GREENBERG,** | § § § § § | |
| *Defendants*. | § | |

### ACKERMAN MCQUEEN, INC.'S STATUS REPORT
### PURSUANT TO COURT ORDER DATED JANUARY 19, 2021 (ECF 196)

Pursuant to the Court's January 19, 2021 Order (ECF No. 196), Defendant/Counter-Plaintiff Ackerman McQueen, Inc. and Defendants Mercury Group, Inc., Henry Martin, William Winkler, Melanie Montgomery, and Jesse Greenberg (collectively, "**AMc**") file this *Status Report* (the "**Report**") relating to the National Rifle Association of America's ("**NRA**") recent bankruptcy filing. In sum, certain claims are stayed while others are not, and AMc requests the Court abate this action for a short period to allow AMc to apprise the Court of additional developments in the bankruptcy.

## I.     THE NRA'S BAD-FAITH BANKRUPTCY FILING

On January 15, 2021, the NRA filed a bankruptcy petition for Chapter 11 reorganization. In a letter to its five million members, the NRA freely admits that it does not actually need the bankruptcy court's protection:

> **The plan aims to streamline costs and expenses, proceed with pending litigation in a coordinated and structured manner, and realize many financial and strategy advantages.**
>
> **The NRA is not 'bankrupt' or 'going out of business.'  The NRA is not insolvent.  We are as financially strong as we have been in years.**[1]

The NRA stated unequivocally that it is "financially as strong as [it has] been in years" and is merely "DUMPING New York" to "seek protection from New York officials."[2]  The NRA stated elsewhere, "[t]his action is necessitated primarily by one thing: the unhinged and political attack against the NRA by the New York Attorney General."[3]  Pursuant to the NRA's well-planned strategy, the NRA gave the same excuse to the bankruptcy court in justifying its bankruptcy filing on January 15, 2021.[4]  There are several serious problems regarding the NRA's bankruptcy filing that will be determined shortly by the presiding bankruptcy judge, but may also be decided by this Court, which holds original jurisdiction over the NRA's bankruptcy case.  Thus, AMc is seeking the appropriate relief with the bankruptcy court and believes that the NRA bankruptcy should be

---

[1] *See* Ex. A (Letter to NRA Members) (emphasis added).

[2] *See id.* (emphasis in original).  Charles Cotton, the NRA's First Vice President, explained the same when he said the bankruptcy was "motivated by litigation and regulatory scrutiny in what he called 'corrupt New York' – not financial concerns.  'We've got to get in a state where we can operate without that kind of undue weaponizing of governmental agencies, and frankly to get all the litigation in a place where we've got an even shake,' Cotton told the Associated Press."  *See* Ex. B article quoting Charles Cotton) [https://apnews.com/article/new-york-gun-politics-coronavirus-pandemic-texas-cbe5845c17e18eed8679d6daec75ff75]

[3]    *See* Ex. C at 3-4 (NRA Question & Answer).   *See also*  Brewer Firm news page [https://www.brewerattorneys.com/news].

[4] *See* Ex. D at 12:7-9 (First Day Motions Hr'g Tr., Jan. 20, 2021) (emphasis added).

no more than a temporary speed bump in the otherwise just and timely adjudication of this matter in accordance with the current scheduling order and trial setting.

## II.     THE CURRENT STATUS OF THE PARTIES' CLAIMS

### A.  Claims Asserted By AMc Against the NRA Are Presently Stayed.

Pursuant to 11 U.S.C. § 362(a), claims asserted against a debtor are stayed automatically once the debtor files its bankruptcy petition.  The AMc counterclaims against the NRA are the only claims in this matter that are truly "against the debtor," as contemplated under section 362(a) of the Bankruptcy Code.  Accordingly, the claims AMc asserted against the NRA are automatically stayed at this time.  Although AMc admits that these claims are subject to section 362(a)'s automatic stay provision, this stay may soon be terminated (based on dismissal) or lifted for "cause," including bad faith.[5]  Indeed, the presiding bankruptcy judge in the NRA case, Judge Hale, may dismiss the entire case for the NRA's bad faith *sua sponte*.  AMc believes the facts clearly establish the standards to lift the stay and/or dismissal of the case and therefore will seek appropriate relief from the bankruptcy court.

AMc reserves the right to present at a later date as requested or permitted by this Court supporting law and argument for why the stay should be lifted, whether by this Court or the bankruptcy judge.

### B.  Claims Asserted By The Debtor or Against Non-Debtors Are Not Stayed.

Under the plain language of section 362(a) of the Code, the automatic stay applies only to claims "against the debtor" by creditors.[6]  The purpose of the stay is to provide a debtor with a

---

[5] 11 U.S.C. § 362(d).
[6] 11 U.S.C. § 362(a).

"breathing spell" from creditors by staying collection efforts.[7]  Courts in the Fifth Circuit and the Northern District have interpreted Section 362(a) as refusing to stay a debtor's offensive claims.[8] Irrespective of setoff issues—which should be preserved—while the automatic stay applies to claims brought *against* a debtor, it does not necessarily apply to claims brought *by* a Chapter 11 debtor acting as a debtor-in-possession, pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  Thus, the NRA's claims are not technically stayed, although their prosecution would certainly invite the bankruptcy court to lift the automatic stay to allow AMc to preserve and prosecute its counterclaims.

For similar reasons, the automatic stay generally does not extend to claims against any third-party non-debtor.  Therefore, AMc's claims against LaPierre should not be stayed.

## III.   AMC REQUESTS A SHORT ABATEMENT

Given the facts and circumstances surrounding the filing of the NRA's bankruptcy, AMc is on the verge of raising numerous issues with the bankruptcy court.  These issues, and the relief sought as a result, would allow this matter to proceed.  However, until that determination is made and given the current stay of AMc's counterclaims against the NRA, AMc respectfully requests that the Court abate all claims and pending deadlines in this action until March 15, 2021 because of the risks and inefficacies associated with piecemeal litigation, and allow AMc to provide this Court with an update on the status of the bankruptcy no later than March 12, 2021. To be clear, the only upcoming deadlines AMc requests to be abated are the February 12, 2021 ADR deadline

---

[7] *Matter of Commonwealth Oil Refining Co., Inc.*, 805 F.2d 1175, 1182 (5th Cir. 1986).
[8] *See Matter of U.S. Abatement Corp.*, 39 F.3d 563, 568 (5th Cir. 1994) (holding that "a debtor's offensive claims are not subject to the automatic stay"); *Hall v. U.S. Bank*, No. 3:17-CV-2802-N, 2019 U.S. Dist. LEXIS 65735, at *7 n.1 (Feb. 26, 2019) (ruling on defendant's motion for summary judgment because plaintiffs' claims were not stayed by suggestion of bankruptcy); *Sheets v. Wells Fargo Bank, N.A.*, No. 3:12-CV-4534-N, 2013 U.S. Dist. LEXIS 160266, at *7 n.1 (N.D. Tex. Sep. 11, 2013) (ruling on a motion to dismiss on bankrupt plaintiff's affirmative claims).

and the February 17, 2021 deadline to amend pleadings and add additional parties, which was recently extended pursuant to the parties' Joint Stipulation and the Court's January 19, 2021 Order.[9]

More specifically, due to the extensive overlap of factual issues among the parties' claims, if AMc is forced to defend itself against the NRA's affirmative claims without simultaneously presenting its own counterclaims, AMc will be severely prejudiced in its ability to later pursue those counterclaims because of *res judicata*, collateral estoppel, or inconsistent rulings that may result.

As this Court is aware, AMc has been defending this action effectively since April 2019 when the NRA first instituted in Virginia what eventually ballooned into this action.  More than a fifteen (15) depositions have been taken and hundreds of thousands of pages of discovery have been exchanged and reviewed.

The NRA has been strategizing how to maneuver around several lawsuits (and an arbitration), including by pursuing multidistrict litigation.   Specifically, on November 10, 2020, the NRA filed a motion to consolidate four cases (all of which are unrelated for purposes of consolidation) in the Northern District of Texas as part of a multi-district litigation.  A hearing was held on the NRA's motion to consolidate on January 28, 2021, and AMc anticipates the panel to issue a ruling denying the NRA's motion to consolidate at any point.  Despite the fact that the NRA itself initiated most of this litigation against various parties and after facing challenges from all opposing parties, the NRA changed its mind and seems to have abandoned that strategy.

---

[9] ECF 174; ECF 195.

For the first time, the NRA appears to have realized that its attempt to feign ignorance before the NYAG by blaming third-parties in various litigation for its own failures and malfeasance was a failure.  Numerous lawsuits and tens of millions of dollars in legal fees later, the NRA decided that the scorched-earth litigation strategy against multiple bystanders may not actually be best or most efficient approach to market itself and/or address the NYAG's enforcement action.  The NRA thus elected to file for Chapter 11 bankruptcy on January 15, 2021, attempting to convince its members that the bankruptcy will allow it to consolidate all of the various litigation it has initiated or caused.  Indeed, the NRA's counsel cited the opposed multi-district litigation as a reason it considered in filing bankruptcy.[10]

In short, for nearly two years, AMc (the true plaintiff in this litigation) has been taking the appropriate steps to move this case along and eagerly proceed to trial in September 2021, while the NRA has conversely been attempting to delay the litigation.  Considering AMc's efforts expended over the last several years (across a number of forums and a number of actions, as required by the NRA's litigation) and the gamesmanship at play, AMc believes that continuing the September 2021 trial setting at this time would be premature and would reward the NRA's litigation tactics.  AMc implores the Court to maintain the trial setting until at least after receiving the proposed status report on March 12, 2021 in order to allow AMc to provide the Court with an update on the bankruptcy proceedings.

With a trial setting in the third quarter of this year and a discovery deadline in June, there is no prejudice or undue harm to any party in maintaining the trial setting until receiving further instruction from the bankruptcy court, which advice should be forthcoming shortly.  Conversely,

---

[10] *See* Ex. D at 12:10-23 (First Day Motions Hr'g Tr., Jan. 20, 2021).

vacating the September 2021 trial setting would force AMc to expend more resources in further dragging out this case when it is ready to bring it to trial.

Dated:  January 29, 2021                                  Respectfully submitted,

                                                          */s/ Brian E. Mason*
                                                          **G. Michael Gruber, Esq.**
                                                          Texas Bar No. 08555400
                                                          gruber.mike@dorsey.com
                                                          **Jay J. Madrid, Esq.**
                                                          Texas Bar No. 12802000
                                                          madrid.jay@dorsey.com
                                                          **J. Brian Vanderwoude, Esq.**
                                                          Texas Bar No. 24047558
                                                          vanderwoude.brian@dorsey.com
                                                          **Brian E. Mason, Esq.**
                                                          Texas Bar No. 24079906
                                                          mason.brian@dorsey.com
                                                          **DORSEY & WHITNEY LLP**
                                                          300 Crescent Court, Suite 400
                                                          Dallas, Texas 75201
                                                          (214) 981-9900 Phone
                                                          (214) 981-9901 Facsimile

                                                          **ATTORNEYS FOR DEFENDANTS
                                                          ACKERMAN MCQUEEN, INC.,
                                                          MERCURY GROUP, INC., HENRY
                                                          MARTIN, JESSE GREENBERG,
                                                          WILLIAM WINKLER, AND MELANIE
                                                          MONTGOMERY**

## CERTIFICATE OF SERVICE

        I hereby certify that on Friday, January 29, 2021, a true and correct copy of the foregoing document was served upon counsel of record in accordance with the Federal Rules of Civil Procedure.

                                                          */s/ Brian E. Mason*
                                                          Brian E. Mason



# Letter from Wayne

Friday, Jan. 15, 2021

Dear NRA Members & Supporters:

Today, the NRA announced a restructuring plan that positions us for the long-term and ensures our continued success as the nation's leading advocate for constitutional freedom — free from the toxic political environment of New York.

The plan can be summed up quite simply: We are DUMPING New York, and we are pursuing plans to reincorporate the NRA in Texas.

EXHIBIT A

To facilitate the strategic plan and restructuring, the

NRA and one of its subsidiaries have filed voluntary chapter 11 petitions in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division. As you may know, chapter 11 proceedings are often utilized by businesses, nonprofits and organizations of all kinds to streamline legal and financial affairs.

Under the plan, the NRA will continue what we've always done — confronting anti-gun, anti-self-defense and anti-hunting activities and promoting constitutional advocacy that helps law-abiding Americans. Our work will continue as it always has. No major changes are expected to the NRA's operations or workforce.

**Importantly, our plans do not impact your membership at any level.**

NRA supporters will continue to enjoy all their full member benefits — from new members to Life Members to Benefactor Members. We will continue to publish and deliver your magazines. We will continue to train Americans and teach them firearm safety. We will continue to teach hunter safety. But most importantly, we will continue to fight for your freedom and the freedom of all Americans — as we

have for all these years. In fact, we are expanding

our national platform.

The plan aims to streamline costs and expenses, proceed with pending litigation in a coordinated and structured manner, and realize many financial and strategic advantages.

You know that our opponents will try to seize upon this news and distort the truth. Don't believe what you read from our enemies. The NRA is not "bankrupt" or "going out of business." The NRA is not insolvent. **We are as financially strong as we have been in years.**

But they know today's announcement makes us bigger, stronger and more prepared for the fight for freedom.

We are leaving the state of an attorney general who, just a few months ago, vowed to put us out of business through an abuse of legal and regulatory power. In fact, the gross overreach of the New York Attorney General and New York Governor has been resoundingly criticized by powerful national groups like the ACLU and a host of prominent legal scholars.

**Subject to court approval, the NRA is pursuing**

**plans to reincorporate in the State of Texas. The**

**Lone Star State is home to more than 400,000 NRA Members and the site of our 2021 Annual Meeting being held in Houston.**

Texas values the contributions of the NRA, celebrates our law-abiding members, and joins us as a partner in upholding constitutional freedom.

Under this plan, we seek protection from New York officials who illegally abused and weaponized the powers they wield against the NRA and its members. You can be assured the Association will continue the fight to protect your interests in New York — and all forums where the NRA is unlawfully singled out for its Second Amendment advocacy.

**This plan represents a pathway to opportunity, growth and progress.**

This is the most transformational moment in the history of the NRA. And it involves all of you.

The NRA will continue to promote its Second Amendment advocacy, sponsor firearms training, and work with its network of instructors and volunteers in furtherance of its mission. This plan actually streamlines all of the NRA's activities and

improves our operational processes.

I know we have welcomed many of you to our headquarters in Fairfax, Virginia. We have no immediate plans to relocate, but we are forming a special committee to explore our strategic options in this regard. We want to determine if there are advantages to relocating our HQ operations to another state. I have asked our leadership team to explore all options that benefit the NRA and its members.

What's most important is leading the fight for Second Amendment freedom and serving our members. **We will do that from anywhere that works best for you and for our cause.**

All membership dues and financial donations will be fully dedicated to supporting our operations and public advocacy. This plan actually improves our business. It protects us from costly, distracting and unprincipled attacks from anti-2A politicians aimed at attacking the NRA because we are a potent political force. We know that the gun ban lobby will never stop — fueled by a hatred of your freedoms and by wealthy benefactors. **Our plan is the best way to confront them.**

We are now prepared for a better future. In fact, to me, it feels like the dawn of a new day.

We are revitalized, well-positioned, and steadfast in our commitment to fight for you. To learn more, please visit www.nra.org/forward.

Thank you for your unwavering spirit and being part of the NRA's future. Both hold incredible promise for our country – and the freedoms in which it believes.

*Wayne La Pierre*

Wayne LaPierre

© 2021 National Rifle Association of America. This may be reproduced. This may not be reproduced for commercial purposes. Privacy Policy

# NRA declares bankruptcy, plans to incorporate in Texas

**AP** apnews.com/article/new-york-gun-politics-coronavirus-pandemic-texas-cbe5845c17e18eed8679d6daec75ff75

January 15, 2021



ADVERTISEMENT

By PAUL J. WEBER and MICHAEL R. SISAKJanuary 15, 2021

FILE - This Feb. 29, 2020 file photo, National Rifle Association Executive Vice President and CEO Wayne LaPierre speaks at Conservative Political Action Conference, CPAC 2020, at the National Harbor, in Oxon Hill, Md. Houston. The National Rifle Association announced Friday, Jan. 15, 2021, it has filed for bankruptcy and will seek to incorporate the nation's most politically influential gun-rights group in Texas instead of New York. (AP Photo/Jose Luis Magana, File)

AUSTIN, Texas (AP) — The National Rifle Association announced Friday it has filed for bankruptcy protection and will seek to incorporate the nation's most politically influential gun-rights group in Texas instead of New York, where a state lawsuit is trying to put the organization out of business.

# EXHIBIT B

The announcement came months after New York Attorney General Letitia James sued the NRA, seeking its dissolution over claims that top executives illegally diverted tens of millions of dollars for lavish personal trips, no-show contracts for associates and other questionable expenditures.

ADVERTISEMENT

The coronavirus pandemic has also upended the NRA, which last year laid off dozens of employees. The group canceled its national convention and scuttled fundraising. The NRA's bankruptcy filing listed between $100 million and $500 million in assets and between $100 million and $500 million in liabilities. Still, the NRA claimed in announcing the move that the organization was "in its strongest financial condition in years."

The NRA filed for Chapter 11 bankruptcy in federal court in Dallas and said it planned to incorporate in Texas, where records show it formed a limited liability corporation, Sea Girt LLC, in November 2020. Sea Girt LLC made a separate bankruptcy filing Friday, listing few assets and fewer than $100,000 in liabilities.

In its filing, the NRA said its longtime leader, Executive Vice President Wayne LaPierre, made the decision to file for bankruptcy protection in consultation with a committee of three NRA officials formed in September to oversee its legal strategies. The NRA board voted Jan. 7 to clarify LaPierre's employment agreement, giving him the power to "reorganize or restructure the affairs" of the organization.

"The move will enable long-term, sustainable growth and ensure the NRA's continued success as the nation's leading advocate for constitutional freedom – free from the toxic political environment of New York," the NRA said in a statement.

In an interview, NRA board member Charles Cotton made clear that the bankruptcy filing was motivated by litigation and regulatory scrutiny in what he called "corrupt New York" — not financial concerns.

"We've got to get in a state where we can operate without that kind of undue weaponizing of governmental agencies, and frankly to get all the litigation in a place where we've got an even shake," Cotton told The Associated Press.

Texas Gov. Greg Abbott, a Republican, quickly welcomed the news, tweeting: "Welcome to Texas — a state that safeguards the 2nd Amendment." The NRA said it has more than 400,000 members in Texas and plans to hold its annual convention in Houston later this year.

Shortly after the announcement, James said she would not allow the NRA to "evade accountability" or oversight. The Democrat's lawsuit last year highlighted misspending and self-dealing claims that have roiled the NRA and LaPierre in recent years — from hair and makeup for his wife to a $17 million post-employment contract for himself.

"The NRA's claimed financial status has finally met its moral status: bankrupt," James said.

Adam Skaggs, chief counsel at the Giffords Law Center to Prevent Gun Violence, called the bankruptcy filing "a transparent attempt to evade (James') campaign to hold the NRA and its corrupt leaders accountable."

Cotton said the allegations in James' lawsuit will be proven false. He said he expects LaPierre to remain at the helm of the reconstituted NRA, praising his popularity with members and proficiency at raising money for the organization.

"Wayne leaving would be a bigger blow to the organization than was the illness and death of Charlton Heston," Cotton said.

The gun-rights group boasts about 5 million members. Though headquartered in Virginia, the NRA was chartered as a nonprofit in New York in 1871 and is incorporated in the state. Going forward, the NRA said a committee will study opportunities to relocate segments of its operations to Texas and elsewhere.

Cotton declined to comment when asked if Sea Girt, which shares the name of a New Jersey firing range where the NRA began holding annual competitions in 1892, was formed as a part of a plan to facilitate the bankruptcy filing in Texas.

In recent years, the NRA's relationship with New York has increasingly soured.

In 2018, the organization sued Gov. Andrew Cuomo, claiming a "political vendetta" was behind a state financial watchdog's probe of whether it broke state laws by marketing an insurance program to gun owners. In November, the NRA agreed to pay $2.5 million and accept a five-year ban on marketing insurance in the state.

In response to James' lawsuit, the NRA countersued with claims her actions were motivated by hostility toward its political advocacy, including comments she made while running for attorney general in 2018 that the NRA is a "terrorist organization."

The NRA's largest creditor, owed $1.2 million, is the organization's former advertising agency, Ackerman McQueen. The NRA sued the company in 2019, alleging overbilling, and said in Friday's bankruptcy filing that the debt owed is disputed. The lawsuit is pending.

In the New York lawsuit, Ackerman McQueen was accused of aiding lavish spending by LaPierre and other NRA executives by picking up the tab and then sending a lump sum bill to the organization for "out-of-pocket expenses."

"No financial filing can ever shroud the moral bankruptcy of Wayne LaPierre and his wife and their lap dogs on the NRA board," said Bill Powers, an Ackerman McQueen spokesperson and former public affairs director for the NRA.

Court records also show more than $960,000 owed to Membership Marketing Partners LLC, a firm that lists its headquarters at the same address as the NRA. Another $200,000 is owed to Speedway Motorsports, the North Carolina-based company that owns and operates NASCAR tracks, according to the records.

____

All contents © copyright 2021 The Associated Press. All rights reserved.

Saved to Dropbox • Jan 20, 2021 at 4:20 PM



# Questions & Answers

**What did the NRA announce?**

This is a transformational moment for the NRA. We announced a new strategic plan called Project Freedom.

The NRA's new strategic plan involves pursuing reincorporating the Association from the State of New York to the State of Texas — home to more than 400,000 NRA members and site of the 2021 NRA Annual Meeting being held in Houston.

The NRA's restructuring plan also aims to help the NRA streamline costs and expenses, proceed with pending litigation in a coordinated and structured manner, and realize many financial and strategic advantages.

EXHIBIT C

We realize as the restructuring positions our organization for the future – and ensures our continued success as the nation's leading advocate for constitutional freedom.

**Is the NRA going "bankrupt?"**

No. In fact, this move comes at a time when the NRA is in its strongest financial condition in years.

To facilitate its reorganization, the NRA and one of its subsidiaries filed voluntary chapter 11 petitions in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division. The NRA is not insolvent.

We expect no impacts to NRA programming.

Nothing is more important to the NRA than protecting the Second Amendment rights of our law-abiding members. We will be as effective as ever in advocating for your rights, promoting firearms education and training, and engaging in public endeavors.

**What happens to my NRA membership?**

Nothing. Your membership remains intact.

NRA supporters will continue to enjoy all their full member benefits – from new members to Life Members to Benefactor Members. We will continue to publish and deliver your magazines. We will continue to train Americans and teach them firearms safety. We will continue to teach hunter safety.

But most importantly, we will continue to fight for your freedom as we have for all these years. In fact, we are expanding our national platform.

## Can people still join the NRA – and why should they?

Absolutely! There could not be a more exciting time to join the NRA. We are expanding our national platform, and our future is bright and secure. We invite all law-abiding gun owners and all Americans to be part of it. Click here to JOIN NRA!

## By filing for chapter 11, is the NRA admitting it mismanaged donor funds?

Not at all. We have utilized all donor contributions in

furtherance of the NRA's mission. This action is

necessitated primarily by one thing: the unhinged and political attack against the NRA by the New York Attorney General.

A restructuring plan is a proven mechanism for streamlining legal and business affairs. All membership fees and donations will continue to be used in furtherance of our Second Amendment advocacy.

**Can you guarantee member donations will be used to protect our Second Amendment rights?**

All donations are used for the purpose of advancing the NRA's mission, period.

**Should I donate to the NRA during the chapter 11 process, or should I wait until the Association emerges from the restructuring process?**

We need your support now — as we confront a Biden Administration that has vowed to attack your Second Amendment freedoms. All donations are used in furtherance of our mission.

## Will there be impacts to endowed funds?

No. Endowed funds will still be used to support the NRA's core mission: protecting the Second Amendment.

## When will the restructuring process be completed?

This process begins immediately. The NRA is expected to emerge from these proceedings within the next six months.

## What can I do to support the NRA?

Join today. Promote our cause. Get fully engaged. We must continue to win the fight for constitutional freedom.

© 2021 National Rifle Association of America. This may be reproduced. This may not be reproduced for commercial purposes. Privacy Policy

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                     FOR THE NORTHERN DISTRICT OF TEXAS
                                 DALLAS DIVISION
 2
      In Re:                      )  Case No. 21-30080-hdh-11
 3                                )
      SEA GIRT LLC,               )  Dallas, Texas
 4                                )  Wednesday, January 20, 2021
              Debtor.            )  2:00 p.m. Docket
 5                                )
                                  )  MOTION FOR JOINT ADMINISTRATION
 6                                )  (3)
      _____ )
 7                                )
                                  )
 8    In Re:                      )  Case No. 21-30085-sgj-11
                                  )
 9    NATIONAL RIFLE ASSOCIATION )
      OF AMERICA,                 )  FIRST DAY MOTIONS
10                                )  (2, 3, 4, 5, 6, 7)
              Debtor.            )
11    _____ )

12                       TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE HARLIN DEWAYNE HALE,
13               UNITED STATES CHIEF BANKRUPTCY JUDGE.

14    WEBEX APPEARANCES:

15    For the Debtors:          Patrick J. Neligan, Jr.
                                John D. Gaither
16                              Douglas James Buncher
                                NELIGAN, LLP
17                              325 N. St. Paul, Suite 3600
                                Dallas, TX  75201
18                              (214) 840-5333

19    For Christopher Cox,      Thomas M. Buchanan
      Creditor:                 WINSTON & STRAWN, LLP
20                              1901 L Street, N.W.
                                Washington, DC  20036
21                              (202) 282-5000

22    For Christopher Cox,      David Neier
      Creditor:                 WINSTON & STRAWN, LLP
23                              200 Park Avenue
                                New York, NY  10166
24                              (212) 294-6700

25
```

# EXHIBIT D

```
 1   APPEARANCES, cont'd.:

 2   For the Office of the        James Sheehan
     York State Attorney          Monica Connell
 3   General:                     Emily Stern
                                  Stephen Thompson
 4                                OFFICE OF THE ATTORNEY GENERAL
                                  The Capitol
 5                                Albany, NY  12224-0341
                                  (212) 416-8401
 6
     For the U.S. Trustee:        Elizabeth Ziegler Young
 7                                Lisa L. Lambert
                                  Asher Bublick
 8                                OFFICE OF THE UNITED STATES
                                    Trustee
 9                                1100 Commerce Street, Room 976
                                  Dallas, TX  75242
10                                (214) 767-8967

11   Proposed Special Counsel     Sarah B. Rogers
     to the Debtors:              BREWER, ATTORNEYS AND COUNSELORS
12                                750 Lexington Avenue, 14th Floor
                                  New York, NY  10022
13                                (212) 489-1400

14   Recorded by:                 Shanette D. Green
                                  UNITED STATES BANKRUPTCY COURT
15                                1100 Commerce Street, Room 1254
                                  Dallas, TX  75242
16                                (214) 753-2088

17   Transcribed by:              Kathy Rehling
                                  311 Paradise Cove
18                                Shady Shores, TX  76208
                                  (972) 786-3063
19

20

21

22

23

24
              Proceedings recorded by electronic sound recording;
25               transcript produced by transcription service.
```

1              <u>DALLAS, TEXAS - JANUARY 20, 2021 - 2:04 P.M.</u>

2              THE COURT:  Good afternoon.  This is the Bankruptcy

3    Court in Dallas.  We have two cases on my docket that are

4    connected:  Sea Girt and National Rifle Association.  I had

5    started a signup sheet, and I'll talk about that probably at

6    the end on some housekeeping.  I think probably the best way

7    to have this first hearing, because some folks did not know

8    about the signup sheet, is just go ahead and take appearances

9    like we normally would.  I'll start with Debtor's counsel.

10   And the one thing that my ECRO told me, that if you're just a

11   call-in user, in order to -- (echoing).  In order to unmute

12   yourself, you're going to need to press *6.

13      So, Mr. Neligan, let's start off with you and your firm

14   members, and then we'll just take appearances from everybody

15   else.

16              MR. NELIGAN:  Thank you, Your Honor.  This is Pat

17   Neligan.  And I am here with one of my partners, John

18   Gaither, as well as Doug Buncher, who are on the line.  And

19   we represent Sea Girt and the National Rifle Association.  We

20   also have some of our clients who have prepared and filed the

21   declarations in support of the motions you're hearing today,

22   and they are on as well.

23              THE COURT:  Okay.  Welcome to our Court.

24              MR. NELIGAN:  Thank you, Your Honor.

25              THE COURT:  All right.  I'll take other appearances.

1          MR. BUCHANAN:  Your Honor, this is Tom Buchanan.

2     I'm with the law firm of Winston & Strawn in Washington, DC.

3     My partner David Neier is also on the line.  And we represent

4     Chris Cox, who was the number two at the NRA, and his claim

5     relates to an arbitration claim that was set to go to trial

6     on Monday that was stayed as a result of the filing of the

7     bankruptcy.

8          THE COURT:  Welcome to our court, sir.

9          MR. BUCHANAN:  Thank you, Your Honor.

10          MR. NEIER:  And Your Honor, this is David Neier.

11     Our pro hacs are on file.

12          THE COURT:  And you may participate this afternoon

13     even though I don't think I've done any orders yet on the pro

14     hacs that have been filed.

15          MR. NEIER:  Thank you, Your Honor.

16          MR. SHEEHAN:  Good afternoon, Your Honor.  This is

17     Jim Sheehan.  I'm the Assistant Attorney General from the

18     State of New York and head of the Charities Bureau.  And I'm

19     here with my colleagues Monica Connell, Emily Stern, and

20     Stephen Thompson representing the State of New York and the

21     People of New York.

22          We have submitted a letter to Your Honor this morning

23     concerning our -- we are in the process of obtaining counsel,

24     local counsel, but in the meantime we'll be appearing with

25     your permission today.

1        THE COURT:  You may appear today.  For some reason,

2    I didn't see what you sent, although my law clerks did and we

3    had a chance just to visit about it shortly before the

4    hearing, but know that I am at least ignorant -- I know a

5    little bit about your letter and the attachments, but I

6    haven't had a chance to read it.

7        MR. SHEEHAN:  Thank you, Your Honor.

8        MS. YOUNG:  Good afternoon, Your Honor.  Liz Ziegler

9    Young on behalf of the United States Trustee.  Also present

10   are Asher Bublick,  who is a trial attorney at our office,

11   and I believe Lisa Lambert, the Assistant United States

12   Trustee, is also appearing telephonically.

13       THE COURT:  Welcome to all of you.  I'll continue

14   taking appearances.  (Pause.)  Does anyone else wish to make

15   an appearance?

16       MS. ROGERS:  Good afternoon, Your Honor.  Can you

17   hear me?

18       THE COURT:  I can.

19       MS. ROGERS:  I apologize.  I tried to make an

20   appearance a moment ago, and I was muted.  My name is Sarah

21   Rogers.  I am litigation counsel to the Debtor in a number of

22   prepetition proceedings, including the one in New York.  My

23   pro hac application is pending, and we will be proposed

24   special counsel to the Debtor in a number of proceedings as

25   well.  And I'm here today in case I'm needed to weigh in on

1    any of those cases.

2            THE COURT:  Welcome to our court.  And to the extent

3    you need to, you can appear this afternoon without me signing

4    your order.

5            MS. ROGERS:  Thank you, Your Honor.

6            THE COURT:  Well, we have a 103 people signed up for

7    this call.  Surely there's somebody else that wants to make

8    an appearance.

9        (No response.)

10           THE COURT:  All right.  We also have folks that are

11   appearing by CourtCall, but it appears that they are listen-

12   only.

13       So, Mr. Neligan, I'm not hearing any more appearances.

14   Did you want to go ahead and start?

15       And let me say, I and my law clerks have had a chance to

16   read your motions and also to review the redline versions of

17   your orders that you've filed on the docket recently.  So,

18   without further ado, do you want to start?

19           MR. NELIGAN:  Certainly, Your Honor.  And let me

20   just say, I think you cut out of a few sentences before you

21   turned the mic over to me.  So --

22           THE COURT:  Uh-huh.

23           MR. NELIGAN:  -- I think I understood you want us to

24   go through the redlined versions of the orders, or --

25           THE COURT:  No.  I'm sorry.  I said that I had a

1   chance to go through the redline versions with my clerks.

2   And I did say for the record, let me just say, that we've had

3   a chance to review all of your motions and to visit with them

4   a little bit in chambers.  And so I think we're as prepared

5   as we normally would be on a first day.  And we have had a

6   chance to look at the changes that you've made to the orders

7   that you attached to your pleadings.

8         MR. NELIGAN:  I appreciate that, Your Honor, and I

9   appreciate your giving us time on your docket on what is

10  obviously -- and always will be, on first days -- fairly

11  short notice.  And although I'm going to give an overview

12  about the case, I will turn the hearing over to Mr. Gaither

13  to go through some of the specific first day pleadings.

14     I will also tell you that we were able to meet with the

15  U.S. Trustee's Office and work with, you know, both Ms. Young

16  and the -- and Ms. Lambert on the form of the orders and some

17  of the relief requested, and I think it's fair to say we feel

18  comfortable with, you know, having reached agreement, I

19  think, with them on the various matters here today.

20     And obviously recognizing that any hearing on first day

21  pleadings is on shortened notice, we have been very careful

22  to limit the relief we sought today to either a matter that

23  is critical for the operations of our client, such as the

24  wage motion, or involve simply administrative or ministerial

25  relief, such as the motion for joint administration and

8

1   consolidation.

2        Some of the other matters, like the bank accounts, Mr.

3   Gaither can go through with you the relief we're requesting

4   and our agreement with the U.S. Trustee.

5        With that, I will tell the Court that there will be, I

6   think, filed relatively soon some motions that deal with

7   either operational issues or other issues that we obviously

8   are going to need to give creditors and affected parties more

9   notice than the 24 hours or 48 hours' notice that they get on

10  first days, but we will file those and handle those in the

11  ordinary course of business and work with your setting clerk

12  on setting those.  And obviously we'll set the -- what's

13  always termed the second day hearing on some of the relief

14  we've requested, such as utilities and other relief that we

15  may be seeking in your court.

16       With that, Your Honor, I'd like to turn just to some of

17  the background and discuss at least very briefly why we're

18  here.  And, you know, although I don't spend any time on

19  social media and I've never in my entire life gotten on

20  Twitter, I've certainly seen articles and speculation and

21  commentary about the filing of the NRA.  And to some degree,

22  that's to be expected.  It's certainly a very high-profile

23  client.

24       But I think it is important to sort of eliminate some of

25  the comments and what I think are mischaracterizations of the

1   press from the real reason we're here and the need for

2   Chapter 11.  And I'll start by observing that, you know, the

3   NRA has been, at least in large parts of our country, a

4   venerated institution.  They was formed in -- the NRA was

5   formed in 1871, it's 150 years old, and has been focused on

6   fulfilling its mission and protecting the rights of gun

7   owners, protecting the Second Amendment for all of our

8   citizens, and providing gun safety and just a variety of

9   other services to its members and to our country.  And that

10  commitment, when it was started in 1871, is still there and

11  is going strong.  And we feel very fortunate to represent the

12  NRA in this case.

13      That said, the question is why would the NRA have to file

14  bankruptcy?  And I gather, because I didn't read the 49-page

15  letter from the New York State Attorney General, but I

16  understand they're asserting that somehow the NRA is running

17  away from the regulators in New York State.  And that is --

18  that's simply false.

19      But let me go back to the fundamental issue facing the

20  NRA and facing the decision-makers at the NRA.  You've seen a

21  brief about the background and litigation with the Attorney

22  General in New York as well as the litigation that have been

23  pending in Washington, DC.  There is a lot of litigation

24  arising out of an internal audit, an investigation by the NRA

25  in 2017 and early 2018 which resulted in litigation against

1   some vendors for overbilling as well as termination of some

2   of the employees for wrongful reimbursements and various

3   other acts that the NRA felt warranted in terminating.

4       And, again, I'm not trying to in any way get into the

5   specifics of any of this litigation.  But it's important to

6   understand that this is not the only litigation that the NRA

7   is facing.  There are lawsuits against the NRA around the

8   country.  Some of those lawsuits have been filed but not

9   served, such as a wrongful death action, I understand, in

10  Pennsylvania.  There is litigation related to the Affinity

11  insurance program, which the NRA participates in and offers

12  to its members.  There is litigation with various state

13  agencies.

14      There have just been, especially over the last five

15  years, a tremendous amount of an anger and an activity by

16  people whose viewpoints are directly contrary to the NRA.

17  And it is as a result of that my client had to look at where

18  it is today, look at the potential litigation that might be

19  coming down the road, and make a very hard decision.

20      As this Court knows, and we certainly as bankruptcy

21  lawyers understand it, I've never yet met an executive who is

22  eager to be in Chapter 11.  There's -- one of my favorite

23  lines from the musical *Fiddler on the Roof* is one from Tevye

24  in which he says, It may not be, you know, a shame to be

25  poor, but it's certainly no honor.  And I think, you know,

1    almost every client I've ever had will tell you that, well,

2    bankruptcy, a Chapter 11, may not be a shame or you shouldn't

3    avoid Chapter 11 if it can offer the company an ability and a

4    breathing spell to address some of the problems facing the

5    company.  On the other hand, let's be candid.  I've never

6    seen an executive who wants his company going into bankruptcy

7    so they can do monthly operating reports every month.

8        In this particular case, the NRA, like a lot of

9    companies, was facing not only current litigation, but

10   potential litigation.  And unfortunately, as the cost of that

11   litigation and the time and effort of the management team at

12   the NRA was spent on all this litigation, it was becoming

13   increasingly evident that the NRA, like many other companies

14   that have previously filed for Chapter 11, needed both the

15   breathing spell that Chapter 11 offers and an ability to

16   centralize this litigation and deal with it in a rational and

17   I think organized fashion.

18       The bottom line is Chapter 11, as this Court appreciates

19   -- and frankly, as any experienced bankruptcy lawyer

20   appreciates -- is broad enough and flexible enough to deal

21   with a variety of circumstances and problems facing either

22   for-profit or nonprofit companies.  You don't have to be down

23   to the last nickel to have to file Chapter 11.  In fact, I

24   think those cases, usually those 11s end up liquidating in

25   Chapter 7.

1      On the other hand, you'll never see a company that files

2   just because of one or two small lawsuits.  And so the issue

3   is how can a company address the issues such as the NRA is

4   facing today without, you know, basically having to continue

5   and deal with the adage, death by a thousand cuts?  Because,

6   in many respects, as litigation, the cost of that litigation

7   going forward increases, the parties -- my client looked at

8   this and realized there had to be a way to deal with all of

9   this litigation in a centralized forum.

10      And you should also understand, Your Honor, that prior to

11   the Chapter 11, the lawyers for the NRA had reached out to a

12   number of the parties, from the New York Attorney General's

13   Office to various private parties who were in litigation with

14   the NRA, about an MDL, a multidistrict litigation, in which

15   all of the litigation, or all of it certainly related to the

16   Attorney General and to the investigation and to some of the

17   litigation against former vendors and others, would be

18   brought in a centralized forum and resolved that way.  And

19   unfortunately, the parties, to an entity, refused.  And

20   absent being able to streamline discovery and have all of

21   this litigation, or much of it, handled in a centralized

22   forum, the NRA was indeed facing the adage, death by a

23   thousand cuts.

24      The NRA -- and I want to be very clear about this, as

25   we've set out in our pleading -- based on the amount of

1    allowed claims, at least according to our books and records,

2    based on litigation and, you know, some of the other claims

3    in the case, we're very comfortable that the NRA will

4    ultimately be able to file a plan of reorganization paying

5    creditors in full.

6         That said, I want to make very clear that -- to avoid any

7    misunderstanding:  The amount of unsecured debt in our

8    pleadings, and probably what you've seen in maybe some

9    articles, does not include disputed debt.  If you just take

10   some of the litigation pending today with some of the lawyers

11   who are on this phone, that could be anywhere from $60

12   million on the low end potentially to over a hundred million.

13   And that litigation does not include litigation which we

14   anticipate may be filed or litigation which has been filed

15   but hasn't been served.

16        And from the standpoint of the NRA, as a 150-year-old

17   institution serving its members and serving the general

18   American public, it is critical to our mission to continue as

19   a going concern and continue meeting our mission and our

20   goals.  And that is why we filed the Chapter 11.

21         I think it is -- would be a mistake to try to run down

22   and correct some of the misstatements in various articles or

23   to get into the -- a lot of the issues and facts in the

24   litigation with the Attorney General of New York.  I do

25   think, though, I do want to make a couple of final points.

1    The first is that the NRA is not in any way attempting to

2  escape regulatory supervision by the New York Attorney

3  General.  We have been transparent throughout this process

4  prior to bankruptcy, offering up our books and records, and,

5  frankly, offering up the internal investigation the NRA did

6  in connection with evaluating, you know, invoices and

7  expenses that certain executives have taken and ensured they

8  were reimbursed for which were inappropriate under the NRA's

9  own guidelines.

10    And although there are a number of other allegations in

11  that litigation the NRA disputes, we can deal with all of

12  that another day.  The reality is that while it is true the

13  NRA filed through their counsel a notice and suggestion of

14  bankruptcy in the litigation brought by the Attorney General

15  of New York, that's going to be done in every case, just as a

16  matter of courtesy to the courts handling the litigation.

17  But as we've made clear, we're not afraid of the litigation

18  in New York State and are prepared to go forward on that.

19    We also understand that a plan of reorganization, no

20  matter how rich and how beneficial it is for creditors, still

21  has to comply with 1129.  We have to comply with applicable

22  law, and we're prepared to do it.

23    The other point, which, again, I've seen in articles

24  about venue, I think is, you know, something that is easily

25  addressed.  I'll just say that we're very comfortable that

1  our decision to file in Dallas complies with applicable law.

2  This is not a bad-faith filing, and we look forward to using

3  the Chapter 11 to resolve the litigation and to move forward

4  to emerge out of this bankruptcy as a company domiciled here

5  in Texas and a company that has paid its creditors as quickly

6  as it could and hopefully in full, if at all possible.

7       With that, I will turn it over to Mr. Gaither, who will

8  go through the specific pleadings that are on file today and

9  the relief that we're requesting.

10       THE COURT:  Thank you.  Before we turn to Mr.

11  Gaither, I think it might be appropriate to hear from any

12  other party in interest.  But I guess when I open up the

13  floor, I do want to do it with the caveat that we are here

14  for some pretty basic first day matters, and I agree with you

15  that this afternoon is not going to be the day when I'm going

16  to hear the merits of lawsuits and that sort of thing.  But I

17  do think it's fair for everybody to at least say what they

18  feel like they need to say on the record, but to keep it

19  relatively brief, given the relief that the --

20       MR. SHEEHAN:  Your Honor, this is --

21       THE COURT:  Pardon me.  Pardon me.  Just a second.

22     (Echoing.)

23       THE COURT:  What's happening there, Shanette?

24     Just in case you didn't hear, I'm going to let other

25  parties in interest speak if they want to, keeping it

1    relatively brief, given the nature of the relief that you're

2    seeking today, which are just traditional first day matters.

3    But I do think it's fair.  And I would again say, if you

4    didn't hear on the first pass, this isn't the afternoon where

5    we're going to try lawsuits and that sort of thing.

6         So, Mr. Sheehan, as I said, we discussed your matter some

7    right before the hearing.  I probably -- I'll put myself in

8    the category I know enough to be dangerous about it, but I

9    would say why don't you go ahead and touch on the position of

10   the State of New York.  But again, we won't be litigating

11   your action this afternoon.

12           MR. SHEEHAN:  Thank you very much, Your Honor.  And

13   I don't know enough to be dangerous in bankruptcy court yet.

14   We've been -- this case was filed, obviously, Friday

15   afternoon, and we've been educating ourselves not only on

16   sort of the general bankruptcy issues, but the specific

17   aspects of this case.  So, I'm not here today to advocate for

18   any result in the case, just because I don't know enough yet.

19        We are very concerned about what's the -- I listened to

20   Mr. Neligan and I appreciate his comment that he is prepared

21   to have the New York State litigation go forward -- very

22   concerned about the press release the NRA issued on Friday

23   night in connection with this petition.  And what they said

24   was, "The NRA plan, which involves utilizing the protection

25   of the bankruptcy court, has the Association dumping New York

1    and organizing its legal and regulatory matters in an

2    efficient forum."  And that gave us a lot of concern.  And

3    the concern, Your Honor, your fate is the NRA's regulator.

4    They elected 150 years ago to incorporate in New York State,

5    and under governing law that means they're required to comply

6    with the New York State regulatory system, which is very

7    specific about what's expected from directors, from officers,

8    and from members, and also how the organization uses its

9    assets.

10        We have a statutory responsibility to protect those

11   assets, to protect our intent, to assure that directors and

12   officers carry out their fiduciary responsibilities, and we

13   protect the charitable interests, because there's no one else

14   to do it.  Under our state law, in general, the members of

15   the organization have a very limited ability to hold the

16   directors responsible for things in litigation.

17        And so we conducted an investigation for a year.  At the

18   end of that investigation, we filed a complaint which has 18

19   different counts.  And it was -- included both the

20   organization and specific senior individuals, officers and

21   directors of the organization, current and former.  And we

22   asked for very specific relief.

23        That case was filed in August of 2020, and the -- the

24   parties filed a motion to dismiss, which is pending and is

25   being argued tomorrow in the Supreme Court of New York.

1    I, as I said, I don't know enough yet to be -- to be able

2  to say what our position will be, either of the law or the

3  facts in this case.  And we'll be pursuing that in this

4  context.  But I do think it's important that the Court be

5  familiar with the regulatory scheme and the responsibilities

6  that we have.  And we want to make sure that we -- that we

7  are correct on the facts and the law.  We did not file the

8  complaint without very careful review and offering the NRA an

9  opportunity to explain what they had done, which they

10 declined.

11   So, going forward, we will obtain counsel in the Northern

12 District to assist us, and we're doing that as quickly as we

13 can, and we look forward to participating in the litigation

14 in this -- in the bankruptcy proceeding.

15   THE COURT:  Thank you, Mr. Sheehan.

16   Does anyone else wish to make just a brief statement on

17 the record?

18   MS. ROGERS:  Your Honor, this is Sarah Rogers,

19 prepetition litigation counsel for the Debtor in New York.

20   THE COURT:  Yes.

21   MS. ROGERS:  In deference to Your Honor -- in

22 deference to the nature of today's hearing and Your Honor's

23 probably wise direction that we not litigate the merits of

24 these issues, I won't purport to do that here.

25   I only want to briefly address some of the media -- some

1   of the press statements that Mr. Sheehan cites, that the NRA

2   is dumping New York.  We want to be clear that those

3   statements, as casual though they were, don't amount to an

4   expressed intent to elude or obstruct the particular

5   litigation in which the oral arguments are scheduled

6   tomorrow.  We have not sought to invoke the automatic stay in

7   that litigation.  We are ready and willing to go forward.

8        But New York is a hostile environment for Second

9   Amendment advocacy.  That's no secret, and it's no accident.

10  The NRA, over the past three years alone, has been engaged in

11  five different adversarial proceedings with the New York

12  State government, only one of which has involved Mr.

13  Sheehan's office.  The conduct by various organs of the New

14  York State government that led to those proceedings has

15  incited condemnation from constitutional scholars, from the

16  ACLU, from 16 different state Attorneys General.  And so when

17  the NRA makes public statements about reorganizing itself in

18  a jurisdiction where it will receive fair treatment, those

19  aren't veiled statements that we intend to evade or halt Mr.

20  Sheehan's specific actions.  They are statements about the

21  NRA's general posture in New York and its desire to

22  reorganize and gain a fresh start in a jurisdiction that has

23  welcomed us with open arms, in a jurisdiction where we have

24  deep longstanding roots and a bright future.

25            THE COURT:  Thank you, Ms. Rogers.

1    Does the United States Trustee have any comment?  I

2    assume that you all have worked with Mr. Neligan on the form

3    of the orders, Ms. Young.  Is that right?

4         MS. YOUNG:  That is correct, Your Honor.  And I was

5    just going to state briefly:  We do believe that there are

6    some agreements that we've reached that we'll address when we

7    take up each of the individual motions that the Debtor is

8    going to be presenting.  But we do have general agreements on

9    all of the relief that the Debtor has requested here today,

10   and we have worked with the Debtor and they have worked with

11   us to include language in those orders.

12        THE COURT:  Thank you very much.  Thanks for doing

13   that.  That makes my life a little bit easier, too, when you

14   all do that.

15   Let me ask one more time.  Does anyone else wish to make

16   a brief statement before we move into the first day matters?

17   All right.  Mr. Gaither, you have the floor.

18        MR. GAITHER:  Good afternoon, Your Honor.  Can you

19   hear me okay?

20        THE COURT:  I can.  Thank you.

21        MR. GAITHER:  Always a pleasure to be back in your

22   court, Your Honor.  I hope the Court is well, and hopefully

23   we can do this in person before this case is over.

24        THE COURT:  I do, too.

25        MR. GAITHER:  At the outset, I will say I appreciate

1    Ms. Young's comments.  I have been on the phone and working

2    via email with Ms. Young for the past 24 hours, and I want to

3    express my appreciation for their willingness to work with us

4    on several matters.  We do have, I think, agreements.  We

5    will continue to work with them.  We're committed to

6    addressing any of the concerns they have as they relate to

7    our first day motions.

8        And so I will point those out to the Court as we go

9    through the motions, and obviously Ms. Young can chime in as

10   necessary.  But it's my understanding we're going forward on

11   a consensual basis today, Your Honor.

12       At the outset, I would like to direct the Court to three

13   first day declarations, or declarations in support of our

14   first day pleadings that we filed.  Those are the

15   declarations of Shawn Soto at Docket No. 10.  Ms. Soto is the

16   human resources/information systems/benefits and payroll

17   manager at the NRA, and she offers testimony in support of

18   our wages, employee benefits, and payroll motion.

19       The second is the declaration of Mr. Robert Owens at

20   Docket 11.  He is the chief fiscal officer of the Institute

21   for Legislative Action within -- which is a division within

22   the NRA.  He offers testimony in support of our cash

23   management and wages motion.

24       Finally, we have the declaration of Ms. Sonya Rowling.

25   That's at Docket 12.  She is the director of accounting

1   operations and financial reporting for the NRA, and offers

2   testimony in support of our cash management motion, motion to

3   pay prepetition taxes, and our -- a portion of our wages

4   motion, Your Honor.

5        Each of Ms. Soto, Mr. Owens, and Ms. Rowling are in

6   attendance at today's hearing.  They are available to be

7   cross-examined.

8        If there is no objection, Your Honor, as is our usual

9   procedure, I would ask that the Court enter their -- I would

10  proffer their testimony and ask that the Court enter their

11  declarations into evidence in support of our first day

12  motions.

13           THE COURT:  Anybody have any objections to these

14  declarations coming into evidence for these hearings only?

15       All right.  10 --

16           MR. SHEEHAN:  No, Your Honor.

17           THE COURT:  10, 11, and 12 are admitted for purposes

18  of the first day hearings.

19        (Debtors' Exhibits 10, 11, and 12 are received into

20  evidence.)

21           THE COURT:  And then let me just ask for the record:

22  Does anyone have any questions of these three witnesses for

23  these matters only?  I'm sure these witnesses will be back

24  for other things, but for these matters only?

25       All right.  You may proceed.

1          MR. SHEEHAN:  Your Honor, this --

2          THE COURT:  Yes?

3          MR. SHEEHAN:  Your Honor, may I just -- one question

4     I had from the -- and I'm not sure exactly procedurally how

5     to do this, but there -- with respect to the wage tax, the

6     wage tax, the excise tax, which is mentioned on wages, which

7     I believe is Mr. Owens', I had sent an email to Mr. Neligan

8     concerning those excess tax payments and asking whether they

9     were 4957 payments or not, which are payments -- which are

10    penalties imposed by the IRS for payments on disqualified

11    persons.  And if they are not, I would not have any other

12    questions.

13          THE COURT:  Okay.  Mr. Gaither, do you know the

14    answer to that --

15       (Echoing.)

16          THE COURT:  Do you know the answer to the question,

17    Mr. Gaither?

18          MR. NELIGAN:  Your Honor, --

19          THE COURT:  Oh.

20          MR. NELIGAN:  -- I have not seen Mr. Sheehan's

21    email.  I don't know if it went to my spam or when you sent

22    it.  But we can -- we can get back to you.  I'll -- I can go

23    offline and follow up with the client on that.  But --

24          THE COURT:  Okay.  Okay.

25          MR. NELIGAN:  -- I have not seen your email or known

1    that you were representing the New York AG.  But, in any

2    event, we'll be glad to follow up on that.

3            THE COURT:  While we're going on the hearing -- and

4    Mr. Sheehan, bankruptcy court does operate like this

5    sometimes -- you all can be communicating while Mr. Gaither

6    is proceeding on his other matters, if that's all right with

7    you.

8        Mr. Neligan, get the --

9            MR. SHEEHAN:  Thank you, Your Honor.

10           THE COURT:  Get the answer to Mr. Sheehan, if you

11   would.

12           MR. NELIGAN:  Yes.

13           THE COURT:  All right.  Thank you very much.

14           MR. NELIGAN:  Your Honor, one last point.  Mr.

15   Sheehan, if you could resend the email, I will follow up,

16   while Mr. Gaither is handling the other matters, with the

17   client.

18           MR. SHEEHAN:  Will do.  Thank you very much.

19           THE COURT:  Okay.

20           MR. NELIGAN:  Thank you.

21           THE COURT:  All right.  Mr. Gaither?

22           MR. GAITHER:  Thank you, Your Honor.  With respect

23   to the questions of Mr. Owens, I would just ask that we

24   address those when we get to the tax motion, which is last on

25   the docket.  But I think I have a -- I think I may have an

1    answer.  I know it wasn't asked of me, but I think I may have

2    an answer or a solution, because I don't think we're seeking

3    to make those payments in the -- on -- on an interim basis,

4    but I don't think that has to be an issue for today.  So

5    we're -- I don't think we're seeking immediate relief from

6    Your Honor with respect to those taxes, so perhaps we can

7    just push that issue off and work with Mr. Sheehan to address

8    any concerns he has.

9            THE COURT:  Okay.  Let's take that one up last, just

10   in case there's some communication between Neligan and

11   Sheehan, that then they'll at least be apprised of what each

12   other is saying.  All right.

13           MR. GAITHER:  Understood.  Thank you very much.

14       First up on our agenda -- we did file an agenda at

15   Document No. 27.  The first matter on the agenda at Docket 2

16   in the NRA case and Docket No. 3 in the Sea Girt case is our

17   motion for joint administration.  These cases are eligible

18   for joint administration because Sea Girt is a wholly-owned

19   subsidiary of the NRA.

20       We understand -- Sea Girt is the first-filed case, and

21   under the Local Rules I understand Your Honor is the one who

22   decides that joint administration motion.  We have asked, as

23   you might have seen in our order, that these be jointly

24   administered under the NRA case number, which is the second-

25   filed case, simply because that's the more publicly

1    recognizable case and we thought that made sense.

2         I will point out to the Court and you may have seen that

3    we've been filing pleadings with -- without the judges'

4    initials.  It was our understanding from the Clerk that these

5    cases would be both transferred to your docket, but I haven't

6    seen that happen quite yet.  And if Your Honor is inclined to

7    grant the joint administration motion, I did want to ask the

8    Court whether we need to include language in the proposed

9    order that effects that transfer, or simply seek some

10   guidance from Your Honor on that point.

11        THE COURT:  Yes.  I think you probably can just put

12   language in the joint administration order that they will be

13   handled by me.

14        MR. GAITHER:  Understood.  Will do.

15        THE COURT:  Yes.

16        MR. GAITHER:  And I took Your Honor's comments at

17   the outset, if I heard and understood correctly, that you had

18   received -- reviewed our revised proposed order which we

19   entered at Docket 32-A.  These incorporate a few comments,

20   minor, I would call them nonsubstantive comments, from the

21   United States Trustee, simply to ensure that the order

22   complies with the local form.  And unless Ms. Young wants to

23   add anything, I think I've -- we've resolved their agreement.

24   So we would ask that the Court enter that order on the joint

25   administration motion.

1          THE COURT:  All right.  Can I make a couple of

2    comments, and then we'll open it up to anybody else that has

3    a comment.

4        On the redline version, on Paragraph 4, you exclude

5    proofs of claim, schedules, statements, and monthly operating

6    reports.  And then in Paragraph 5 that contains the docket

7    entry.  And I think that the exclusion that's contained in 4

8    needs to be in that block entry, too, probably after the word

9    "papers" in the last sentence.  Or it needs to be made

10   consistent.  Do you see that?

11         MR. GAITHER:  Understood, Your Honor.  I can make

12   that change, certainly.

13         THE COURT:  Yes.  The second comment is more of a --

14         MR. GAITHER:  I think -- I think that's correct.

15         THE COURT:  Yes.

16         MR. GAITHER:  The second comment is sort of a

17   question, too, because I'm not sure what you all are trying

18   to accomplish in this one.  In Paragraph 4 it says one

19   disclosure statement and plan of reorganization may be filed

20   for the Debtors by any plan proponent.  I'm not actually sure

21   that's correct, like you can do that.  But is it necessary to

22   have this in this order?

23         MR. GAITHER:  It's not, Your Honor.  I can excise

24   that language.

25         THE COURT:  Okay.  And then just so everybody on the

1   phone knows, that if a joint administration motion is filed,

2   the cases are consolidated for administrative purposes under

3   the lowest-numbered case.  I am presiding over the lowest-

4   numbered case, and so that's why the case will be assigned to

5   me.

6      Which makes me then go to Paragraph 6.  There aren't --

7   there just aren't a lot of things filed in the Sea Girt case.

8   I'm wondering if Paragraph 6 is going to be necessary, since

9   now both cases are going to be assigned to me.  What are you

10   trying to do in 6?

11         MR. GAITHER:  Your Honor, well, Your Honor, we added

12   that at the request of the United States Trustee.

13         THE COURT:  Uh-huh.

14         MR. GAITHER:  I don't think there is any substantive

15   pleading that would need to be re-docketed.

16         THE COURT:  Yes.

17         MR. GAITHER:  In fact, I'm -- without having checked

18   the docket, you know, in the last hour, I'm almost certain

19   there is.  So I would defer to Ms. Young on --

20         THE COURT:  Yes.

21         MR. GAITHER:  -- whether they have a specific reason

22   for asking for the inclusion of that language.

23         THE COURT:  All right.  The only -- we checked right

24   before we walked out here.  I think the only motion that's

25   been filed is joint administration.  Now, obviously, I'm

1   human and we may have missed something.  There were some

2   notices of appearance, but I think they were filed in both

3   cases.  So, is there -- since we know the case is coming, Ms.

4   Young, any -- anything for 6?

5           MS. YOUNG:  We had just requested that because that

6   is what the form order that is available on the Northern

7   District website called for.

8           THE COURT:  Uh-huh.

9           MS. YOUNG:  And simply put, we didn't know what

10  other pleadings may have been filed --

11          THE COURT:  Yes.

12          MS. YOUNG:  -- when we were negotiating this order.

13  So if we're -- if the Court is comfortable with taking that

14  out, then we are comfortable with that as well.  It's really

15  -- it was really, at the time that we sent our comments over,

16  we simply didn't know what was going to be filed in each

17  case.

18          THE COURT:  And I don't blame you.  We were thinking

19  a lot of things would be filed, and it turns out just one

20  thing was filed in Sea Girt.  So I'm comfortable taking it

21  out, because I think the only thing that's filed in Sea Girt

22  is the motion to jointly administer the cases.

23      And that's all I have.  Anybody else have any comments on

24  joint administration?

25      All right.  From this point on, Mr. Gaither, on the

1    initials, I guess, after I've signed joint administration,

2    and that should be sent in first, just put "hdh" on the

3    backend of the numbers.

4          MR. GAITHER:  We will do that, Your Honor.  And at

5    the risk of belaboring this, just to confirm, this will be

6    jointly administered under the 30085 number; is that correct?

7          THE COURT:  Yes.  And let me just say, when I read

8    that, I thought that was a very wise thing to do.  And we've

9    actually done that in other cases that are similar, where the

10   case that everybody knows is not the first case.  It just

11   makes sense for the public to understand what case we're

12   talking about.  So I thought that was a good idea.

13         MR. GAITHER:  Correct.  Thank you.  Thank you very

14   much, Your Honor.

15         THE COURT:  Okay.  So that one should come in ASAP

16   so we can then really do the other orders.

17         MR. GAITHER:  We'll get right on that, Your Honor.

18   I appreciate that.

19         THE COURT:  Okay.  You may proceed.

20         MR. GAITHER:  The next motion on the agenda, Your

21   Honor, is our notice of a complex case.  I'm not sure if it's

22   a motion, but a notice of complex case designation at Docket

23   3.  This case is eligible as it qualifies as a complex case

24   because there's more than $10 million in debt and more than

25   50 parties in interest.

1      We would ask that the Court enter the form order

2   designating this as a complex case.

3      But as with the joint admin motion, I had one question,

4   perhaps two, related to the order.  The form order in the

5   Local Rules has language regarding telephonic hearings, and

6   it specifically states that parties have to be approved --

7   have to receive approval ahead of time to participate

8   electronically.  And given our current environment, I

9   wondered if the Court would like us to include language

10  either modifying that or include the Court's WebEx

11  information so that there was no confusion there.

12          THE COURT:  We have 106 people on this call alone.

13  I think my courtroom deputy would quit me if we required

14  everybody to ask first.

15      If you would just get with my courtroom deputy, Jenni,

16  she probably has some language that works for you.  And, you

17  know, I think that form order was drafted before we shut down

18  our operations live.  So we'll be able to accommodate you.

19  And yes, we're going to be doing the virtual hearings, I

20  think, at least for a little while longer.  And we do try to

21  accommodate folks' schedules.

22          MR. GAITHER:  Certainly, Your Honor.  The second

23  question I had is there is spaces for preapproved omnibus

24  hearing dates.  And I don't know if this is the time in

25  today's proceeding to address that, but I think it does make

1    sense to maybe schedule perhaps biweekly hearings the first,

2    you know, six weeks of the case or something.

3            THE COURT:  Uh-huh.

4            MR. GAITHER:  And so we're going to ask the Court,

5    you know, right now if there's dates we should put in that

6    order, or perhaps maybe it makes it sense to just follow up

7    with the Court's scheduling clerk and figure out what those

8    dates are and then submit the proposed order at that time.

9            THE COURT:  Yes.  We'll be able to accommodate you.

10   And if you just get with Jenni on that, she can get you

11   dates.  And it's fine with me if you try to get some blocks

12   of time for the first six weeks.  It seems like that might be

13   a good idea.

14           MR. GAITHER:  Okay.  Appreciate it, Your Honor.

15           THE COURT:  Let me just say for the record:  This

16   case is a complex case and will be so designated.

17           MR. GAITHER:  The next matter on the agenda, Your

18   Honor, is at Docket 4.  It's our request for an extension of

19   time to file schedules.  In our pleadings, we request an

20   extension -- a 30-day extension on top of the 14 days.  It

21   brought us to March 1st.

22       I've spoken with Ms. Young and her office about that.

23   They have requested that we reduce that to February 15th.

24   And the reason for that is because they are intending to

25   schedule the 341 meeting on February 22nd and wanted parties

1    to have sufficient time to review the schedules ahead of

2    time.

3        We are okay with that, but what I've agreed with Ms.

4    Young is that we will agree to the February 15th extension on

5    an interim basis, without prejudice to our right to seek a

6    further extension at a final hearing, at the second day

7    hearing, basically.  I think in the next few weeks we'll have

8    a better idea of whether we'll actually need a further

9    extension.  The goal certainly will be to have those

10   schedules done and filed by the 15th, but we wanted to

11   reserve our rights there, and certainly all of the United

12   States Trustee's rights to oppose that, any further request,

13   will be reserved as well.

14            THE COURT:  All right.  I'm going to let Ms. Young

15   correct you if you say something that's wrong.  All right?

16   But otherwise, keep going.

17            MS. YOUNG:  That is correct, Your Honor.  That does

18   summarize correctly our agreement.  And certainly we're

19   trying to work with the Debtor to make sure that things go as

20   smoothly as possible and they have sufficient time to get

21   those documents filed, but also making sure that we're

22   allowing other parties in interest to have sufficient time to

23   review what we're assuming will be fairly voluminous

24   schedules and Statements of Financial Affairs.

25            THE COURT:  All right.  I will sign that order.  And

1    if you send it in, Mr. Gaither, I'll sign it as soon as I get

2    it.

3              MR. GAITHER:  Appreciate it, Your Honor.

4         Moving on, the next matter on the agenda, at Docket 5, is

5    our cash management motion.

6         As described in the motion, the Debtors have various

7    banks -- various accounts at various banks that serve

8    different purposes.  Their primary banking relationship,

9    commercial banking relationship, is at Atlantic Union Bank in

10   Virginia.  That is an authorized depositary in Region 4, I

11   believe, in Virginia.  It's not in the Northern District, and

12   we are working with the United States Trustee's Office to

13   address their concerns there.  I don't know, I can't tell the

14   Court today what the result will be of that, but we're

15   committed to working with them.  And all we're asking for

16   today, Your Honor, is the interim authority to continue to

17   operate our bank accounts and cash management system in the

18   ordinary course, pending a final hearing while we work

19   through some issues on these accounts held at non-designated

20   or authorized depositories.

21        I think the answer is going to vary account by -- I think

22   some accounts may be closed or moved.  I think some we may

23   have to work through with the Trustee.  But we just need a

24   little more time on that.  So we've agreed to make this cash

25   management order an interim order and keep working with the

1    Trustee, and hopefully by the second day hearing we'll have

2    -- have that all resolved and can move forward on that, Your

3    Honor.

4              THE COURT:  Thank you.

5              MR. GAITHER:  The --

6              THE COURT:  Go ahead.

7              MR. GAITHER:  There's a second -- yeah.  Excuse me.

8    There is a second issue -- well, it's actually two more

9    issues.

10        Number one, counsel for Wells Fargo or potential counsel

11   for Wells Fargo contacted me this morning and suggested that

12   they had some comments to the proposed order.  We

13   incorporated Wells Fargo's requested language in the redline

14   that we submitted (echoing) --

15        Sorry.  Yeah.  Okay.  Yeah, we -- we got some feedback

16   there.  We incorporated those comments in the redline, and I

17   did want to state on the record, because this was my

18   agreement with their proposed counsel, that their rights with

19   respect to the final order -- this is an interim order.

20   We've agreed to reserve all of Wells Fargo's rights with

21   respect to the entry of a final order to provide additional

22   comments.  They just needed a little bit more time, I think,

23   to digest the proposed order.

24        So, want to state that for the record, that this is

25   without prejudice to Wells Fargo's rights to send us

1   additional comments to the final order.

2       And number three, and this is a more substantive issue,

3   Your Honor, the NRA has one or more investment accounts that

4   are not cash bank accounts, that are more in the nature of

5   investment accounts that may be subject to compliance with

6   Section 345.

7       We're not asking Your Honor in this motion, on an interim

8   or final basis, for any relief under Section 345.  Frankly,

9   the Debtors are simply in the process of trying to determine

10  whether those accounts are already in compliance with 345 or

11  if there needs to be some changes made or relief from the

12  Court.

13      So what we have agreed with Ms. Young's office is that we

14  would -- and then this is not in the redline, Your Honor,

15  because this happened shortly before the hearing -- we were

16  going to include a -- some language that's to be negotiated,

17  but I think substantively we have an agreement, in the

18  proposed interim order that addresses the fact that, to the

19  extent there are accounts that require compliance with

20  Section 345, this order is not providing any relief with

21  respect to those accounts, and that there should be, and they

22  will be, that if we need relief or to address those by

23  separate motion, we will do so after working with the

24  Trustee.

25      So, I just wanted to flag that issue.  We're not asking

1   for any relief today, but we have agreed to include some

2   language, some clarifying language in the interim order.

3           THE COURT:  All right.  Let me just ask for the

4   record:  With those changes noted, does anyone else wish to

5   be heard on what I'll just refer to as the Cash Management

6   Motion?

7       All right.  If you send in that order, we'll take a look

8   at it.  If we have an issue, somebody from my chambers will

9   call you and we'll set up a call with you and the U.S.

10  Trustee.  But I seriously doubt that'll happen.  Let us just

11  look at it.

12          MR. GAITHER:  Thank you, Your Honor.

13      Next, at Docket No. 6 on the agenda is our -- is payroll,

14  wages and benefits motion.  As reflected in the motion,

15  payroll is due tomorrow, January the 21st.  It covers the

16  period, the two-week period that ended on January 16th.  So,

17  naturally, there's prepetition wages being paid.  We have

18  provided a list of -- we've worked with the Trustee, provided

19  a list of everyone who's being paid.

20      There are a couple of issues I want to point out.  I

21  think we have full agreement with the Trustee.  To be clear,

22  we're not asking that any employee receive gross pay in --

23  or, gross wages in excess of the $13,650 cap.  I understand

24  there was a statement in our wage motion that there might

25  have been one exception to that.  That's not currently

1   accurate.  The issue was there was one employee who, with

2   some accrued vacation, was slightly over the cap.  It may

3   have been in the -- in the three-digit -- you know, hundreds

4   of dollars, and we thought we might pursue that.  We've

5   decided not to.  So we are not seeking to pay anyone in

6   excess of the $13,650 cap.

7       One issue with respect to the statutory cap that has been

8   raised by the Trustee is an issue related to some insurance

9   benefits.  I believe it's life insurance.  There is an open

10  question, I think, between myself and Ms. Young as to whether

11  -- and not to say there's a disagreement, but we -- neither

12  of us know the answer of whether those insurance benefits

13  constitute wages and will be subject to the cap.

14      Without knowing, you know, in significant detail every

15  single employee that's affected, my understanding is that the

16  amount of those overages are very small and that the

17  insurance premium is, again, in the hundreds of dollars.

18  We've agreed with Ms. Young to effectively -- generally push

19  that issue to the second day hearing so that we're not

20  litigating that issue before the Court today.

21      I think we can get her some more information, get the

22  U.S. Trustee comfortable that either these insurance benefits

23  are not subject to the cap, or if they are, there can be

24  adjustments made to the payroll so that we can address it in

25  turn.

1    But I want to state for the record, and I've made clear

2  to Ms. Young, and I think she will agree with this, that the

3  Debtor and its HR department has made a substantial good-

4  faith effort to comply with the statutory cap, and the

5  intent, to the extent any payroll before we showed Ms. Young

6  reflected anyone being paid in excess of that cap, was simply

7  a misunderstanding or -- I hate to even say misunderstanding

8  -- but a discrepancy as to whether those life insurance

9  benefits were capped.

10    And so we'll continue to work with her, and hopefully by

11  the second day hearing we'll have that issue resolved, Your

12  Honor.

13    THE COURT:  And let me ask you, Mr. Gaither.  You

14  all have approximately 490, almost 500 employees; is that

15  right?

16    MR. GAITHER:  Correct, Your Honor.

17    THE COURT:  Okay.  All right.  And will they know

18  sometime today that they're going to get paid tomorrow?

19  Because sometimes folks worry about that.

20    MR. GAITHER:  They are, and that's -- and I'll work

21  with the client to make sure they know that.  But certainly

22  the entire point of getting this motion on file was to -- and

23  getting it heard today was to resolve that issue.  And I

24  don't think that our agreement is going to affect the payment

25  tomorrow.

1     But, again, that's an operational issue --

2          THE COURT:  Yes.

3          MR. GAITHER:  -- I'll have to work through with Ms.

4  Young.

5     To the extent -- what I will tell Your Honor is the

6  payroll will not be interrupted today.  To the extent that

7  there is payroll that is in process already, and any payment,

8  including an insurance benefit, went out that puts them over

9  the cap, I think that may be something we'd deal with after

10  the fact and make further adjustments to make sure no one

11  nets an amount over the cap.

12     But I think the takeaway here is that, with respect to

13  wages, you know, which are covered by the statute, on its

14  face there is no one that's receiving more than $13,650

15  tomorrow.

16          THE COURT:  All right.  Let me ask for the record:

17  Does anyone else wish to be heard on the wage motion?

18          MR. SHEEHAN:  Yes, Your Honor.  This is, again, Jim

19  Sheehan from the Attorney General's office.

20     Obviously, we have no objection to paying the employees

21  their wages as appropriate.  The one concern we have is

22  Paragraph 6 of the proposed order, which allows the NRA to

23  pay prepetition expenses consistent with its prepetition

24  practices on reimbursable expenses.

25     And our concern here is not with the ordinary employees,

1    but with directors, officers, and key persons.  In our

2    complaint filed in August of 2020, we allege that Mr. Wayne

3    LaPierre received significant reimbursable expense payments

4    that had no relationship to any system or process that they

5    had in place.  These include private plane flights, transport

6    for his niece and his wife in the private plane, expenses for

7    other people that did not go through the ordinary

8    reimbursement system.

9         And so the way the order is structured now, I think that

10   the redline, it says can be paid after five days' notice to

11   the Trustee and any Committee.  What we would suggest here is

12   that it be ten days and notice be provided to the Attorney

13   General of the State of New York.

14        And I would say here that the NRA has admitted in its

15   filings with us in November of 2020 that several million

16   dollars were paid out for expenses which they're now seeking

17   to recover from officers and directors.  So we think this is

18   necessary to protect the State and to protect the charitable

19   interest.  Thank you.

20             THE COURT:  Mr. Gaither, you can react to that if

21   you want.  Do you want -- can you agree on this order to ten

22   days and including them on notice, or do you want to think

23   about it, or do you want me to rule on that?

24             MR. GAITHER:  I don't think I want to ask Your Honor

25   to rule.  What I will -- I will react and say that the intent

1   of the order is very limited, and we've disclosed every

2   prepetition expense that's going to be paid under this order,

3   at least immediately, to the United States Trustee.  And I

4   think -- I would need to talk to my client on this -- it may

5   be the case that there are no more prepetition expenses that

6   need to be paid other than the ones that have already been

7   disclosed during the interim period.

8       But, again, I think I need a little bit of guidance from

9   the client with respect to the universe of the prepetition

10  expenses.

11      I can tell you that I think the sum total of all

12  prepetition unreimbursed expenses is $30,000, and we are only

13  seeking authority or have only requested authority to pay

14  $9,000 of those expenses, and the Trustee has signed off on

15  that.

16      So, it seems to me that it might make sense, rather than

17  including notice language, that we simply limit the payment

18  of those expenses until further order of the Court,

19  effectively to give us time us address the concerns of the

20  NYAG and make a determination on how they want to deal with

21  the balance of the unpaid prepetition expenses.

22          THE COURT:  Mr. Sheehan, that sounds like a pretty

23  good idea to me.  Is that okay with you?

24          MR. SHEEHAN:  That's fine with me, Your Honor.

25  Thank you.

1      THE COURT:  All right.  Any time.  Okay.  Mr.

2   Gaither, if you would upload an order.  And I was going to

3   ask you one question for the record, but you already said it,

4   and I think the motion also says it:  No one is getting paid

5   more than the statutory cap provided in the Bankruptcy Code.

6   Given that, if you would send in an order, I'll sign it upon

7   receipt.

8      Now, I'm always worried about wages and people being

9   comfortable that they're going to get paid.  So, if you

10  would, prioritize getting this order over here to me so I can

11  sign it, hopefully sign it this afternoon.

12      MR. GAITHER:  Understood, Your Honor.  We'll get

13  that to you this afternoon.

14      THE COURT:  Okay.

15      MS. YOUNG:  Your Honor, before we go ahead and move

16  off of the wage motion, there was one other issue regarding

17  --

18      MR. GAITHER:  Oh.

19      MS. YOUNG:  -- a potential disbursement from a

20  retirement account that also I was hoping Mr. Gaither could

21  address with the Court.

22      MR. GAITHER:  That's correct, Your Honor.  I

23  apologize to Ms. Young.  That was in my notes to address, and

24  I did want to flag that for the Court.

25      In the payroll information that we provided with Ms.

1    Young, there was the payroll information but also a

2    disbursement to one employee that was larger, exceeded the

3    statutory cap.  The reason for that is that it is a

4    disbursement from a nonqualified retirement plan.  Ms. Young

5    has asked for some more detail about that.  But it's the

6    Debtors' position that, subject to further diligence, that

7    that is -- those are trust funds, effectively, held on behalf

8    of the employee, and that it's not a discretionary payment

9    but simply a payment -- a disbursement of trust funds that we

10   don't have discretion to withhold.

11        I've agreed with Ms. Young prior to the hearing, however,

12   given the short notice and the Trustee's concern, we agreed

13   not to make that payment.  The HR department had to make a

14   modification to the payroll processing, but as I understand

15   it, that payment will not go out tomorrow.  And so I've

16   agreed to get Ms. Young some additional information.  I think

17   -- I am fairly confident this is something we can work

18   through with her office, because certainly we're not -- the

19   intent is not to pay anyone more than the statutory cap.

20   It's just perhaps a matter of determining the true nature of

21   the disbursement.  But I'm somewhat comfortable these are

22   trust -- retirement account trust funds, and so I think we

23   can work that through with Ms. Young's office.

24            THE COURT:  Thank you very much.

25        That brings us to tax, I think.  No?  Yes.  To the tax

1    motion.

2        All right.  Mr. Sheehan, were you and Mr. Neligan able to

3    communicate?

4            MR. SHEEHAN:  We just did, Your Honor.  My

5    understanding, he's going to reach out to his client to get

6    more information on that issue.

7            THE COURT:  Okay.  All right.  Mr. Gaither, why

8    don't you go forward with your motion, and then you may be

9    able to address something, the question that Mr. Sheehan had,

10   too.

11           MR. GAITHER:  I think I can, although I don't know

12   the -- I don't think I can answer his question as to the

13   nature of the payment.  I think I can address his concern by

14   saying that we're not asking for authority to make that

15   payment under the terms of this order.

16       The -- the -- especially on an interim basis, the reason,

17   the urgency here, the Debtor has sales and use taxes that it

18   reports to various taxing authorities throughout the course

19   of the year.  They're due -- mostly, they're due monthly.

20   There are some of those tax payments that are due on the 20th

21   of the month.  Those -- for this month, they would be taxes

22   for December.

23       There's a discrepancy in our motion and in our

24   declaration regarding the amount of the taxes, and I can

25   explain that to Your Honor.  But in the motion, we had a

1  request for authority to pay $91,000 in prepetition sales

2  taxes on an interim basis.

3      Since filing that motion, we learned that that

4  undercounted some of the taxes that were due, and that's

5  because it only -- it was based on a report that showed taxes

6  due for the month of December.  There are two jurisdictions

7  -- that's Tennessee and Virginia -- in which, in January, a

8  year-end tax payment is due for the entire preceding year.

9  And so that increases the amount of prepetition taxes that

10  are due on January 20th to approximately $266,000.  That is

11  the $91,000 plus -- or, roughly, the original amount plus

12  $86,000 that's going to be due to Tennessee and $106,000

13  that's due to Virginia.  Those are generally taxes that

14  relate to merchandise that's sold, online programs, printed

15  materials, et cetera.  And we agreed with the Trustee not to

16  seek anything -- not to seek authority at this time to pay

17  anything other than those critical sales taxes that come due

18  in the interim.

19      And I would note that in February there will be another

20  tax payment due that necessarily involves prepetition taxes

21  for the period January 1 to January 15, the petition date.

22  And so we're seeking authority to make that payment in the

23  ordinary course.  The Debtor estimates liability of something

24  along the lines of $200,000, but expects it would be, you

25  know, the normal amount that it would normally pay in the

1  ordinary course.

2            THE COURT:  Uh-huh.  And --

3            MR. GAITHER:  But just to clarify for Mr. Sheehan,

4  the -- I don't recall how he characterized the tax payment,

5  but on an interim basis we're not asking for authority to

6  make the payment that he was concerned about.

7            THE COURT:  Uh-huh.  And the point of this motion --

8  we see these kinds of motions in a lot of cases.  It avoids

9  quite a bit of problems that would take place if you didn't

10 pay your prepetition taxes at the states, and also it would

11 hurt the taxing authorities, too, by not paying them.  But

12 then there's a lot of administrative things and liens and et

13 cetera that you're avoiding by doing this; is that -- is my

14 understanding right?

15           MR. GAITHER:  That's correct, Your Honor.  And

16 that's set forth in the motion.  And this is a typical sales

17 tax motion that you've seen in many other cases.

18           THE COURT:  Yes.  Mr. Sheehan, are you okay with the

19 order, given that it does not pay those taxes now?

20           MR. SHEEHAN:  Yes, Your Honor.  Thank you.

21           THE COURT:  Okay.  Thank you.

22     For the record, does anybody else wish to be heard on the

23 tax motion?

24     That will be granted.

25           MR. GAITHER:  Thank you, Your Honor.  I think that

1    brings us to the end of the agenda.

2          I did mention perhaps getting some hearing dates for you,

3    but I think we will follow up with Ms. Bergreen separately on

4    those, unless Your Honor wants to do that now.  But I think

5    we can certainly follow up with her.

6          THE COURT:  If you would just -- I actually don't

7    have the dates right here handy on my desk, but she will be

8    able to give you dates.  And we're happy to accommodate you.

9          I guess I want to say one thing for the record, sort of

10   going off-script.  You know, there's a lot of -- there's a

11   lot of strong feelings, I think, in this case.  And I saw the

12   news release myself, and then saw the response by the State

13   of New York.  I would ask that everyone sort of ratchet that

14   part of the case down some now that we're in bankruptcy

15   court.

16         You know, bankruptcy, in some ways, is a miraculous place

17   to be in that the debtor has an opportunity to reorganize its

18   affairs.  And then, on the other hand, for the creditors'

19   benefit, the debtor must be one hundred percent transparent

20   and act as a fiduciary for the benefit of creditors, which

21   you don't always have in legal settings.  So both sides get

22   some things.  So, at least from this point forward, to the

23   extent that we can, let's treat this as a regular bankruptcy

24   case.  And I look forward, everyone that's participated this

25   afternoon, look forward to having you in our court.

1        Mr. Gaither, if you would get those orders over,

2   particularly the administration order and the wage order,

3   I'll sign the orders as soon as they come to my desk.

4            MR. GAITHER:  We'll get those to you very soon, Your

5   Honor.  Thank you very much.

6            THE COURT:  Thank you.  We'll be in recess.

7        (Proceedings concluded at 3:10 p.m.)

8                              --oOo--

9

10

11

12

13

14

15

16

17

18

19

20                         CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22   above-entitled matter.

23      **/s/ Kathy Rehling**                        **01/22/2021**

24   _____        _____
    Kathy Rehling, CETD-444                        Date
25   Certified Electronic Court Transcriber

1                                   INDEX

2    PROCEEDINGS                                                  3

3    WITNESSES

4    -none-

5    EXHIBITS

6    Debtors' Exhibits 10, 11, 12                      Received 22

7    RULINGS

8    Emergency Motion for Joint Administration of Cases          29
     21-30080 and 21-30085 Debtors filed by Debtor National
9    Rifle Association of America (2) - *Granted*

10   Notice of Designation as Complex Chapter 11 Case filed      32
     by Debtor National Rifle Association of America (3) -
11   *Granted*

12   Motion to Extend Time to File Schedules or New Case         33
     Deficiencies, excluding matrix, filed by Debtor National
13   Rifle Association of America (4) - *Granted*

14   Emergency Motion for Authority to Continue Use of           37
     Existing Cash Management System, Maintain Bank Accounts,
15   Pay Certain Costs and Fees Associated with Credit Card
     Transactions, and Continue Use of Existing Business Forms
16   filed by Debtor National Rifle Association of America (5)
     - *Order to be Submitted for Review*
17

18   Emergency Motion for Interim and Final Orders Authorizing   43
     Payment of Prepetition Employee Wages, Compensation, and
     Employee Benefits and Granting Related Relief filed by
19   Debtor National Rifle Association of America (6) - *Granted*

20   Emergency Motion for Interim and Final Orders Authorizing   47
     the Debtors to Pay Certain Prepetition Taxes filed by
21   Debtor National Rifle Association of America (7) - *Granted*

22   END OF PROCEEDINGS                                          49

23   INDEX                                                       50

24

25