**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| *Plaintiff and Counter-Defendant,* | § § | |
| **and** | § § | |
| **WAYNE LAPIERRE, and THE NRA FOUNDATION, INC.,** | § § § | |
| *Third-Party Defendants,* | § § | |
| **v.** | § § | **Case No. 3:19-cv-02074-G** |
| **ACKERMAN MCQUEEN, INC.,** | § § § | |
| *Defendant and Counter-Plaintiff,* | § § | |
| **and** | § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, and MELANIE MONTGOMERY,** | § § § § | |
| *Defendants.* | § § | |

<u>**COUNTER-PLAINTIFF ACKERMAN MCQUEEN, INC.'S
SECOND AMENDED COUNTERCLAIM**</u>

Defendant/Counter-Plaintiff Ackerman McQueen, Inc. ("*AMc*" or "*Counter-Plaintiff*") files this, its *Second Amended Counterclaim* (the "*Counterclaim*") against the National Rifle Association of America ("*NRA*" or "*Counter-Defendant*"), and respectfully shows the Court as follows:

### I.      PRELIMINARY STATEMENT

AMc brings this Counterclaim to redress the unfortunate but predictable fallout from its nearly 40-year relationship with the NRA that began to deteriorate when the NRA's decades-long

fraud and gross mismanagement by LaPierre and others came to light.  As the gathering storm clouds of a possible investigation by the New York Attorney General ("*NYAG*") started to form in 2018, the NRA and LaPierre became concerned about the details of LaPierre's intricate financial arrangements over the years that allowed him to obtain millions of dollars in personal benefits by keeping vendors and the NRA's own accounting department in the dark.

Acting on behalf of the NRA, LaPierre sought assistance from lawyer, William A. Brewer III ("*Brewer*"), and his law firm/public-relations firm, Brewer Attorneys & Counselors (the "*Brewer Firm*"), who together with LaPierre's Chief of Staff, Joshua Powell ("*Powell*"), formulated a plan to pin all liability on a convenient scapegoat, deflect media attention from LaPierre's malfeasance and failed NRA programs, and maintain LaPierre's domination of the NRA.  Indeed, the NRA's malicious and fraudulent actions towards AMc were made possible by LaPierre's paranoia and guilty conscience, as he repeatedly proclaimed that Brewer was the only one who "could keep him out of jail."

By coincidence, Brewer determined that it was AMc—a company owned by *his own father-in-law*—who could be blamed for *all* of the NRA's malfeasance and financial woes.  In return for turning the NYAG spotlight from the NRA and LaPierre, Brewer was given free rein to sue his dying father-in-law's company, reap a financial windfall in exorbitant attorney fees, displace his father-in-law's company as the public-relations firm for the NRA, and set up AMc as the perfect "fall guy."

To accomplish these goals, the NRA, led by LaPierre and Brewer, embarked on a scorched earth litigation campaign against AMc and others designed to deflect attention from the NYAG's investigation into the NRA.  In fact, the underlying Northern District action—the *fourth* frivolous lawsuit launched by the NRA against AMc over a mere six-month period—is simply more of

LaPierre and Brewer's abusive litigation tactics, inflammatory public-relations maneuvers, and wasteful misuse of NRA resources. AMc is in good company. Under Brewer's influence, since at least early 2018, the NRA has filed a minimum of ***fifteen*** separate lawsuits, including against the following individuals and entities: (1) Andrew Cuomo, the Governor of New York, in at least three separate lawsuits; (2) the New York's Chief Insurance Regulator, in at least two separate lawsuits; (3) the Lockton Companies; (4) Lt. Col. Oliver North ("***Col. North***"), the NRA's former President; (5) Letitia James, the New York Attorney General, in at least three separate lawsuits; (6) the City of San Francisco; (7) the City of Los Angeles; (8) the City of New York; (9) JAMS Mediation, Arbitration, ADR Services; (10) the law firm of Winston & Strawn LLP; and (11) Defendants.

Yet the filing of the lawsuits was not enough. In just the last six months, the NRA has engaged in a publicly humiliating legal strategy that has conservatively cost NRA members another $30 million in legal fees. The NRA first attempted to consolidate this case and three unrelated cases with the federal judicial panel of multi-district litigation, which the panel quickly denied. Undeterred, and before even receiving that inevitable ruling, the NRA next filed Chapter 11 bankruptcy in the Northern District of Texas. After a month-long trial, Judge Hale dismissed the filing, finding the NRA did not file it in good faith but purely as a litigation tactic. Despite the dismissal of the bankruptcy, the proceedings confirmed the gross mismanagement and power struggle inside the current NRA, which is singularly designed to enrich Brewer while he "protects" LaPierre from the NYAG and "going to jail."

In addition to initiating multiple failed lawsuits, attempted consolidations, and a bankruptcy, the NRA, LaPierre, and Brewer have sought to place the blame on literally everyone who ever questioned LaPierre's decisions or authority, including:

- Former NRA President, decorated veteran, and member of the NRA Board of Directors for over two decades, Lt. Col. Oliver North;

- Former Chief Lobbyist for the Institute for Legislative Action, Christopher Cox;

- Former counsel to the NRA Board of Directors, Steven Hart;

- Former longtime outside counsel, Charles Cooper;

- Former longtime outside counsel, Michael Volkov;

- Former Treasurer and Chief Financial Officer, Wilson (Woody) Phillips;

- Former Chief of Staff, Joshua Powell;

- Former First Vice President of the NRA and longtime board member, Richard Childress;

- Former prominent members of the NRA Board of Directors, including Congressman Daniel Boren, Timothy Knight, Esther Schneider, Sean Maloney, and Julie Golob; and, of course –

- The NRA's faithful public-relations firm for nearly four decades—AMc.

With its leadership fractured and once-influential advocates for the Second Amendment alienated entirely, the NRA resembles little more than a shadow of the powerful and principled organization it once was.  Now having purged or silenced all dissenting voices with McCarthy-style zeal, LaPierre and Brewer maintain their choke-hold over the gasping civil rights organization as it continues to divert all remaining resources to protect its dear leader.

Through this Counterclaim, the NRA will be exposed for its breach of the parties' long-time services agreement, its defamatory and disparaging statements against AMc, its intentional interference with AMc's contracts with NRATV talent, its intentional misrepresentations to AMc, and its conspiracy with Brewer, Powell, and others to carry out these actions.  The NRA's intentional and malicious conduct has caused AMc serious financial and reputational injury for which it must now be held accountable.  This Counterclaim seeks to restore AMc's sullied

reputation and to hold the NRA accountable for its intentional and malicious acts that have resulted in profound collateral damage to AMc, including redress of at least $50 million for the damages.

## II.    PARTIES

1.      Counter-Plaintiff AMc has appeared herein and is before the Court for all purposes.

2.      Counter-Defendant the NRA has appeared herein and is before the Court for all purposes.

## III.    JURISDICTION AND VENUE

3.      The Counterclaim asserted herein includes compulsory and permissive actions.

4.      This Court possesses personal jurisdiction over the NRA because it has transacted business in the State of Texas, and has purposefully directed activities at the State of Texas, which activities form the basis of AMc's claims and injuries and had foreseeable effects in Texas, including forming the basis of AMc's claims and damages.

5.      Venue is proper in this judicial district and division pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred within the Northern District of Texas, Dallas Division, including but not limited to the termination of NRATV and the resulting damages therefrom, which took place in Dallas, Texas.

## IV.    BACKGROUND FACTS

**A.    Decades of Harmony Coincide with the Emergence of LaPierre.**

6.      For nearly four decades, AMc expertly served the NRA, helping the gun rights organization navigate troubled political and societal waters as its principal communication strategist and crisis manager.   The relationship commenced following NRA management's decision to completely outsource its public relations work to AMc.   AMc effectively crafted the NRA message and burnished its image as the most visible and powerful Second Amendment advocacy group in the United States.

7.      In the wake of the tragedy of the elementary school shooting at Sandy Hook in 2012, LaPierre personally sought to avoid public scrutiny[1] and to cease being the only voice of the organization.  He turned to AMc, which created a commentator program for that purpose.  Within a short period of time, AMc—at LaPierre's request and with his approval—hired or contracted with several nationally recognized talents whose job was to deliver relevant and timely commentary on Second Amendment and American freedom issues.  Through LaPierre, the NRA expressly assessed and approved the salaries and capabilities of those talents as, ultimately, the commentators' salaries would be passed through to the NRA.

8.      Through LaPierre, the NRA also tasked AMc to develop programs that would broaden the NRA's reach.  To that end, AMc developed the theme "Stand and Fight," which became the banner brand for the NRA.  The NRA continues to use the theme today.

9.      By contrast, certain offensive messaging, which disgraced the NRA, was created by other vendors at LaPierre's direction.  For example, in 1994, LaPierre and his membership-recruitment firm (not AMc) created the now-infamous direct-mailer line, "jack-booted thugs."  LaPierre routinely urged AMc to give him "more gasoline," knowing that this kind of incendiary advocacy would create notoriety for the NRA . . . and, of course, enhance his personal brand.  AMc refused such directives that, in its professional opinion, would bring harm to the NRA brand.

## B.      Agreed Protocols, Now Conveniently Ignored, Are Developed.

10.      During this multi-decade relationship, the parties developed working arrangements, such as negotiating annual budgets covering a variety of tasks.  The NRA, through LaPierre and its former CFO Wilson "Woody" Phillips ("*Phillips*"), completely controlled the process, operating with full knowledge of the budgeted line items.  As projects were initiated, invoices

---

[1] LaPierre flew to the Bahamas during this time to avoid having to comment on Sandy Hook.

would issue and be approved by Phillips and LaPierre, payment would follow without complaint, and thorough annual audits proved satisfactory.  LaPierre personally participated in those negotiations and approved each annual budget.

11.     The NRA and LaPierre acknowledged and accepted that keeping hourly time records as the basis of billing for these services was not the contractual measure of payment. Instead, the NRA utilized a consensual budgeting process between the NRA and AMc to authorize services and to know how much would be required to pay for such services.  Reflecting the understanding that strategy and creative value are determined by outcome and effect rather than an amount of time spent, the annual budget the parties developed and agreed upon was results-based in nature.   LaPierre, in consultation with AMc's late CEO, Angus McQueen, directed the creation of these working arrangements.  The entities' senior officers (LaPierre and/or Phillips from the NRA) and Winkler and/or Montgomery (from AMc)) carried out budgetary, invoicing, and payment tasks.

12.     The parties abided by these protocols steadfastly and with minimal conflict for many years as the relationship flourished.  Budgets would be set for specific work, AMc sent an invoice, the NRA approved the invoice and paid the amount budgeted for the invoiced task, and AMc completed the objective.  The relationship between the organizations was harmonious and mutually beneficial, as both parties grew into leaders in their respective spaces.  Given the transparency and fairness of the annual budgeting process, never in their long history did either party express mistrust of the other side's financial dealings—that is, until LaPierre's problems at the NRA began to mount, and Brewer and Powell came on the scene, both of whom had personal reasons for making a scapegoat of AMc.

C.     **The Services Agreement.**

13.     Over the course of years, the parties formalized their working arrangements, embodying their protocols in a "Services Agreement," the first of which they executed in 1999. The latest version was updated in 2017[2] and amended in 2018[3] to confirm the protocol for the hiring, compensation, and reimbursements due AMc under employment agreements involving Col. Oliver North ("**North**") and Dana Loesch ("**Loesch**"). At the NRA's request, made directly by LaPierre, AMc formally employed both of these individuals as "talents" for NRATV, the digital broadcast network created, staffed, and administered in its most recent form (again at LaPierre's request) by AMc.  LaPierre envisioned NRATV as the vehicle through which the NRA's message could be optimally delivered.

14.     The Services Agreement also contained other key clauses, including the duties imposed upon AMc to maintain the confidentiality of the NRA's sensitive information and a provision designating the sole NRA authority—LaPierre or his designee—for communicating with and issuing directives to AMc.

     i.     **Termination and Reimbursement Provisions.**

15.     The 2018 Amendment contains two provisions expressly designed to protect AMc in the event of expiration or termination of that agreement.  *First*, the NRA was required to obtain and post a $3,000,000 letter of credit for AMc's benefit to secure payment of outstanding invoices over 30 days old.[4]  *Second*, "all non-cancellable" contracts entered into between AMc and third parties for the benefit of the NRA, including the Col. North and Loesch contracts (referred to as the "***Third Party NRA Contracts***"), obligated the NRA to pay the "compensation payable" under

---

[2] *See* Services Agreement.
[3] *See* Amendment No. 1 to Services Agreement.
[4] *Id.* at ¶ 2.

the Third Party NRA Contracts.[5]  The NRA has refused to honor these and other commitments, exposing AMc to claims by, *e.g.*, Loesch (who seeks compensation in a separate arbitration), for which AMc is entitled to indemnity.

16.    The 2018 Amendment was significant for other reasons as well.  LaPierre on multiple occasions lauded AMc's work on NRATV, including during a meeting in Dallas on October 11, 2018.  Starting at that meeting and continuing over the next two months, LaPierre approved NRATV for the 2019 budget year, including Dan Bongino's $1.5 million contract (which Mr. Bongino ultimately turned down).  As he had done in May 2018 when the 2018 Amendment was signed, LaPierre voiced his continuing support for AMc's work and the performance of commentators like Col. North and Loesch. These statements, like the written commitment to reimburse AMc for Col. North and Loesch's salaries, were false, were known by LaPierre to be false when made, and were relied upon by AMc, resulting in damages.  Part of those damages are attributable to costs incurred in defending against Loesch's arbitration claim against AMc.

17.    Under the 2017 Services Agreement and the 2018 Amendment, the NRA had the contractual ability to terminate the Agreement at any time with 90-days' notice.  The termination of the Services Agreement triggers Sections XI.B, D, E, and/or F, under which the NRA would owe AMc termination payments, which currently exceed millions of dollars in severance payments and other cessation fees.

**ii.    Authorized Contacts.**

18.    Additionally, Section IX of the Services Agreement provides as follows:

> AMc is authorized to act upon written communications received from the NRA Executive Vice President or his designee. He or his designee are the ***only persons*** within NRA who have the actual

---

[5] *Id.* at ¶ 3.

authority to issue such communications.[6]

19.     At all relevant times, LaPierre was (and remains) the NRA Executive Vice President.  As the Executive Vice President, only LaPierre or his designee could demand that AMc provide to anyone (including any other member of the NRA itself) access to any information or documents in AMc's possession.

20.     Pursuant to Section IX of the Services Agreement imposed by the NRA, AMc could act only if it received a "written communication" from LaPierre or his designee.  Similarly, only LaPierre could designate persons "within the NRA" who have the actual authority to issue directives to AMc relative to the request for, or release of, documents.  For this reason, certain instructions and document demands from other sources purporting to act on behalf of the NRA were unauthorized and therefore invalid under the Services Agreement.

### iii.    Services for the NRA Foundation

21.     As stated above, the NRA Foundation is the non-profit arm of the NRA.  In approximately 2016, LaPierre began requesting that AMc perform services for the NRA Foundation, such as educational programming.  These services were performed and billed to the NRA as part of the regular invoice-submission process with the rest of the NRA invoices. Eventually, services for the NRA Foundation were built-in as line items as part of the NRA's total budget.  This billing process for the NRA Foundation mirrored the billing process for the NRA— services budgeted annually and paid in monthly installments.  These services for the NRA Foundation were clearly under the umbrella of the Services Agreement because they were requested and authorized by LaPierre and paid through the regular NRA billing channels.

---

[6] *See* Services Agreement § IX (emphasis added).

**D.      NRA Asks AMc to Front Activities; LaPierre's Passion for Secrecy.**

22.      One of the defining characteristics of the NRA/AMc relationship was the frequency with which LaPierre and others acting at his direction asked AMc to "front" activities and expenses for the NRA.  For example, AMc would engage third parties to perform work for the NRA at LaPierre and his designees' request, pay for the work performed by those third parties, and then submit an invoice for reimbursement by the NRA.  These expense reimbursements (as opposed to charges for work actually performed by AMc) amounted to tens of millions of dollars annually.[7] LaPierre's rationale for running these expenses through AMc: it was necessary for security and "discretion" reasons.  In fact, on many occasions, he told AMc that he did not trust his own accounting department within the NRA to have knowledge of how the NRA was spending money and to prohibit leaks of factually correct information about NRA expenditures.  LaPierre explained to AMc that these pass-through arrangements enabled the NRA to court high-dollar donors who were sympathetic to Second Amendment principles but who would be unwilling to donate to the NRA (for political reasons) if their identities were known, which LaPierre felt would be revealed if the expenses were paid through the NRA's accounting department.

23.      Brewer even admitted to this common practice of the NRA vendors to conceal information when describing the NRA's billing arrangement with Andrew McKenna, an NRA consultant that assists with high-donor fundraising, who also happened to employ Powell's wife.[8]

---

[7] Press reports influenced by the NRA have incorrectly asserted that the NRA "paid" AMc $40 million in 2017.  In fact, a substantial amount of the 2017 budget was spent on expensive national broadcast advertising and talent AMc retained for NRA projects at the NRA's request, specifically, at the request of LaPierre.  Those "payments" to AMc were actually reimbursements, rather than profit.

[8] "As is customary in finance, consulting, and other industries, N.R.A. vendors have occasionally used code names for transactions or projects. This does not mean the N.R.A. lacked knowledge regarding the services rendered. For example, work performed by McKenna & Associates was reviewed, vetted, and approved."  Mike Spies, *An Internal Memo Raises New Questions About Self-Dealing at the N.R.A.*, THE NEW YORKER (May 7, 2019), https://www.newyorker.com/news/news-desk/an-internal-memo-raises-new-questions-about-self-dealing-at-the-nra.

Powell himself admitted that LaPierre exhibited extreme paranoia related to leaks within the NRA accounting department, which is why he opted to run certain expenses through AMc.

> We all knew we had some internal leaks. One of the reasons Wayne ran so much of his financial stuff through Ackerman was because we [*sic*] didn't trust his own accountants.[9]

24.     It is that same paranoia of purported leaks upon which LaPierre based the decision to intentionally conceal the recent January 2021 NRA bankruptcy filings from the NRA's Board of Directors, General Counsel, and Chief Financial Officer/Treasurer, which the bankruptcy court found was "nothing less than shocking."

25.     As a result of this paranoia, LaPierre adopted a dictatorial, micromanagement style. Indeed, LaPierre's work philosophy was always "management by chaos." He explained that the "chaos concept" was to keep factions inside the organization fighting each other as an effective way for him to keep control. Powell explained it like this:

> [LaPierre] was sort of micromanaging people, while not really managing them at all. He never had big staff meetings, and no one really trusted anyone else. His management style was, as his wife, Susan, would say, "no management style at all." He'd meet with people separately, yes them to death, and then he'd disappear. What he called the "rope-a-dope."[10]

26.     LaPierre began displaying an obsession with privacy, distancing himself from the public eye and exhibiting panic at the thought of public scrutiny. At the same time, he was heavily involved in the formulation of policy and protocols for dealing with third-party vendors. He repeatedly made two things clear to AMc: (1) he was the only person with ultimate authority to speak for the NRA and direct the AMc relationship on behalf of the NRA, unless he specifically designated someone in writing to perform that task; and (2) any expenses he incurred, whether

---

[9] Joshua L. Powell, INSIDE THE NRA: A TELL-ALL ACCOUNT OF CORRUPTION, GREED, AND PARANOIA WITHIN THE MOST POWERFUL POLITICAL GROUP IN AMERICA 158 (2020).
[10] *Id.* at 45.

personally or through AMc, were legitimate NRA expenses, and therefore subject to reimbursement to AMc.  As AMc has now learned, LaPierre's broad representations regarding the legitimacy of his expenses were often false.

**E.     NRATV: LaPierre's Brainchild.**

27.     NRATV, now assailed by the NRA as an "abject failure" and a "failed endeavor," was highly successful.  Officially launched as a full network production featuring gun-related topics, political commentary, and other NRA-friendly topics, it had its actual beginnings in the early 1990's.

28.     The network's earliest iteration featured a spokesperson, Ginny Simone, providing monthly reports on VHS for the NRA Board of Directors.  That evolved into Ginny Simone Special Report Video Magazines in 1996, then expanded as follows:

> 2000:  NRA Live Launch
>
> 2004:  NRA News Launch, including the debut of "Cam & Co.," the NRA's first talk show host
>
> 2010:  NRA Life of Duty Network Launch
>
> 2012:  NRA Women Network Launch
>
> 2014:  NRA Freestyle Network Launch
>
> 2015:  Super Channel Launch under NRA News
>
> 2016:  NRATV Official Launch

29.     NRATV was created and expanded at the sole direction of LaPierre.  In accordance with LaPierre's directives, AMc developed and administered the network's content (subject to NRA approval) and hired its high-profile talent (at NRA's request with salary and other costs reimbursed and payment "guaranteed" by the NRA).  Not only did LaPierre sign off on every performance metric of NRATV, he extolled the success of NRATV in public speeches and made

numerous presentations to NRA members and directors as one of its proudest and most successful projects. One board member observed, "If you took a poll of most board members, they'll tell you they like NRATV."[11]

30.     Indeed, LaPierre, during his frequent visits to Dallas and other locations to meet with AMc personnel and discuss NRATV analytics from 2016 to 2018, repeatedly told AMc personnel how well the network was performing and that the NRA would continue its support, financially and otherwise, of the NRA's flagship digital platform. Each annual budget increased the agreed-upon amounts dedicated by the organization to NRATV, and each annual budget was approved by LaPierre, the Finance Committee, and the Board of Directors.

**F.     NRATV as a "Super Channel" with Political Clout.**

31.     In the wake of excessive spending by the NRA on the 2014 mid-term elections, LaPierre began looking for ways to cut costs and targeted the NRA's online channels, such as Life of Duty and the Women's Network, for debilitating budget cuts. In an effort to maintain the flow of sponsorship dollars, however, LaPierre instructed AMc to "fake it," as in, make it appear that these programs remained robust despite significant funding loss. AMc refused the instruction to "fake it" and instead developed creative concepts that would serve the NRA members with a smaller budget. Toward that end, throughout 2015, AMc worked to create both the "Super Channel" and "Freedom's Safest Place." The "Super Channel" was a cost-effective online streaming platform for the consolidation of the NRA's multiple individual channels, which would ultimately become NRATV. "Freedom's Safest Place" was a successful national advertising campaign that would air on both the "Super Channel" and on national television.

32.     When Donald Trump ("***Trump***") became the Republican presidential nominee

---

[11] Mark Maremont, *NRA Files Suit Against Ad Agency in Rift with Key Partner*, THE WALL STREET JOURNAL (Apr. 15, 2019), https://www.wsj.com/articles/nra-files-suit-against-ad-agency-in-rift-with-key-partner11555320601.

front-runner heading into the NRA convention in 2016, the NRA strongly supported his campaign, given the alignment between the candidate's political base and the NRA's base of membership and donors.  LaPierre bristled at the thought of openly supporting Trump so early.  He continued his cynicism regarding Trump during the entire presidential election, noting on multiple occasions that he did not believe Trump could win.  In the fall of 2016, LaPierre approved new live programming to launch under the new brand NRATV during what he anticipated would be a Hillary Clinton presidency.  Despite LaPierre's personal negativity regarding Trump's candidacy, the NRA, with the advantage of Chris Cox's[12] relationships, placed its support behind Trump.

33.     Freedom's Safest Place ads had become an impressive success for the organization. They were routinely used to solicit high donor donations, and they aired throughout the 2016 election.   Once Mr. Trump became President, however, LaPierre routinely referred to his presidency as the "Trump slump"[13] and opted to use Freedom's Safest Place to continue to solicit donations throughout 2017 and into 2018 while keeping the ads running on Fox News.

34.     In the successful deployment of broad messaging about freedom that resonated with the NRA's constituency, LaPierre sought to increase NRATV's live presence.  He personally courted Loesch to join the channel full-time and officially agreed to her designation as the de facto "NRA Spokesperson."  Her show launched in 2018 right after the tragic high school shooting in Parkland, Florida.

35.     Following the Parkland shooting, Loesch appeared on a CNN Town Hall instead of LaPierre, and he touted that her appearance was a huge success.  More importantly, NRATV was going live multiple times throughout the day with messaging intended to counter the narrative

---

[12] Former Executive Director of NRA Institute for Legislative Action and Chief Lobbyist.
[13] The "Trump slump" is LaPierre's reference to the decrease in NRA membership revenue caused by the lack of a "common enemy," "threat," or other fear-based drivers of NRA membership.

coming from gun control groups.  This type of direct and immediate method for disseminating the NRA message was a critical—if not the key—purpose of NRATV, as LaPierre originally intended, allowing the NRA to rapidly respond to current events and deliver its message undiluted by the spin of mainstream media or the timeline of the national news cycle.

36.     Although messaging was the primary goal, NRATV was also a robust fundraising platform for the NRA.  In one monetization effort, NRATV was able to generate almost $500,000 in a matter of some 35 days, the bulk of which occurred over a ten-day period.  The reason for this success was the large number of viewers NRATV was able to reach through AMc's strategic use of social media.   By publishing NRATV content across multiple digital platforms, such as Facebook and YouTube, the NRA reached millions of additional viewers who might not have otherwise gone looking for the NRATV website itself.  Throughout its duration, NRATV was a valuable branding, messaging, and fundraising vehicle for the NRA.

**G.     LaPierre Fails to Calm Stormy Seas for the NRA.**

37.     In the wake of Parkland, the public vilified the NRA more and more.  Much of the executive leadership became extremely agitated about impending investigations.   Tension mounted.  Threats took the form of "forensic accounting teams taking over whole floors in New York City to bury the NRA" and "the loss of all the organization's insurance."  The heart of the problem was that LaPierre and his cronies were desperate to raise more money through fundraising programs that also supported their lavish personal expenditures.

38.     Seeking to stabilize his rudderless ship, and with repeated resignation threats from then-President Pete Brownell,[14] LaPierre personally recruited NRA Board member Col. North to become the next president of the organization and to appear on NRATV.  Col. North had been

---

[14] President of the NRA at that time.

volunteering for the NRA by making television and other media appearances ever since the launch of NRA Life of Duty years ago.  Col. North was also one of the most effective voices in the Freedom's Safest Place campaign.  Everything culminated at the 2018 Dallas Annual Meeting where AMc representatives had multiple meetings with Phillips,[15] Steve Hart,[16] and LaPierre to discuss Col. North's contract, as well as the announcement of his presidency.  Amidst the mounting political pressure, the Col. North presidency provided the NRA with much needed stability and increased public respect.

39.     Despite Col. North's short-lived stabilizing effect, AMc began to have serious concerns about the NRA's direction under LaPierre's increasingly erratic and unusual leadership. First was the "Carry Guard" debacle.  Originally a concept of fee-for-service intended to raise funds and fill a gap in the NRA's portfolio of member services, Carry Guard was designed to provide concealed-carry insurance and firearms training for its subscribers.  AMc was hired to develop the gun training component and to provide public relations and branding services for the program.[17]  However, it was the NRA's responsibility, led by Powell,[18] to develop and administer the entire Carry Guard program, including specifically the insurance portion.

40.     On multiple occasions, the program's mismanagement became evident.  For example, Powell tried to convince the NRA to acquire USCCA, the leading competitor in the space, going so far as to enter into negotiations with the USCCA president entirely without the knowledge or approval of the NRA Board.  Moreover, in meetings with AMc, Powell seemed generally dismissive of the training component of the program and kept referring to Carry Guard

---

[15] Treasurer of NRA at that time.

[16] General Counsel of NRA Board of Directors at that time.

[17] AMc engaged multiple third-party contractors consisting of elite special operations personnel to develop training programs that the NRA believed it could not do on its own.

[18] At AMc's insistence, Powell was eventually removed from contact with AMc employees due to his sexual harassment of an AMc employee.

as nothing but an "insurance scheme."  AMc, however, wanted nothing to do with a "scheme."  As Powell forcefully pressed to launch a premature program, AMc expressed reservations about promoting anything that the NRA would be unable to deliver as promised.  This created the first visible signs of a schism in the relationship, with Powell upset that AMc would not blindly follow his direction.

41.     The next issue that started to unfold was the Russia internal investigation by the NRA following a highly questionable, inexplicable trip to Russia by NRA executives hosted by Russian national, Maria Butina, who later pled guilty to espionage charges.  Initially, the NRA asked a distinguished and experienced former government attorney, Elaine Lammert,[19] to lead the internal NRA investigation.  She was quickly stonewalled.  NRA officials indicated that they were more concerned with hiding the facts than with bringing the entire story to light.  The extent to which the NRA was willing to prioritize the personal protection of LaPierre, Powell, and other members of the Board—a whitewash effort the organization is stridently pursuing even today— was becoming evident to AMc.

42.     It is against this backdrop of chaos that the NRA still utilized AMc to do its increasingly important job of managing the public-facing brand while the NRA scrambled to protect itself from what appeared to the outside world to be a massive case of mismanagement.  PR became more difficult as the Carry Guard product was beginning to lack any substance, appearing to be only a massive fundraising scheme.  AMc's disagreement with the NRA's rollout and administration of the Carry Guard program and other issues, such as AMc's vocal objection over how the Russia internal investigation was handled, became additional "grist for the mill" of retaliation prompted by LaPierre, fomented by Powell, and executed by Brewer.

---

[19] Former Deputy General Counsel for the FBI.

H.      **The NRA: Wayne's World.**

43.     From its founding in 1871, the NRA grew to become a respected and powerful voice for Second Amendment rights in America.  Then came the "corporate fat cat"[20] iteration of Wayne LaPierre, which emerged as his tenure and grip on the NRA intensified.  As even Powell stated:

> In spite of Wayne's attempts to paint the other side as the "Elites," he himself was the epitome of elitism, robbing every $45-dues-paying member to cover the costs of his own extravagance and his shameful mismanagement of a multi-hundred-million-dollar association."[21]

Now built on the unstable foundation of LaPierre's personality, today's NRA bears little resemblance to its earlier incarnations.  As the lawsuits against AMc and others have continued to unfold, it has become clear that LaPierre himself is his first and only priority, as opposed to the Second Amendment, let alone the members he was "elected" to serve.  Here, too, Powell admits:

> Wayne LaPierre was only loyal to one thing: himself and his own survival.  As his right-hand man, I witnessed what I saw as a stunning display of lies, petty politics, and a desperate effort to save himself at any cost.  Wayne thought he *was* the NRA.  His real loyalty was not the Second Amendment, or to the NRA, or to the national debate on guns and gun violence, but to saving his own skin.[22]

i.      **Personal Spending: Party On.**

44.     Throughout his tenure with the NRA, LaPierre appears to have routinely used third-party vendors like AMc to conceal his penchant for personal spending, seemingly with the NRA's blessing, which the NRA, with LaPierre in ironclad control, paid.  Some of LaPierre's out-of-pocket expenses reimbursed to AMc by the NRA, which were both requested and approved by

---

[20] Powell, INSIDE THE NRA, at 199.
[21] *Id.* at 24.
[22] *Id.* at 26.

LaPierre, certainly appear to be personal in nature.  For example, AMc was directed to pay a $5,000 monthly rental for an apartment to be used by a female NRA intern; a very large monthly retainer to Gayle Stanford, a "travel agent" who was facilitating personal travel for LaPierre and his family on chartered jets; and monthly charges from the use of an AMc credit card by LaPierre and other NRA employees, designated by LaPierre, for LaPierre's personal benefit and extravagant lifestyle, including extended trips to Europe and island vacations.  In theory, the backup documentation for many of these charges should still be in the NRA and LaPierre's possession.  Regardless, AMc kept detailed records of its transactions with the NRA even while the NRA and LaPierre directed that AMc report less detail on its invoices to the NRA for purposes of confidentiality and security.

45.     AMc first became suspicious of LaPierre's misuse of funds in early 2018 when LaPierre asked AMc to facilitate and help structure the financing of a personal mansion-style home for LaPierre and his wife, paid for by the NRA.  Ostensibly for "safety" reasons, LaPierre began looking for a home where he would be better protected than his current residence.  As the search expanded, LaPierre passed over numerous safe housing options in favor of a more than $6 million mansion with no greater safety benefits, but with an accompanying country club lifestyle that his wife, Susan LaPierre, insisted upon.  At that point, AMc refused to participate in the luxury housing scheme.[23]

46.     Upon information and belief, other NRA vendors are still being protected who were willing to hide LaPierre's spending.  AMc became a target only after no longer billing these pass-through line-items in the parties' most recent annual budget and seeking backup documentation from LaPierre and other NRA employees regarding LaPierre's expenses.  Indeed, other service providers and board members who challenged LaPierre's use of funds have now also been pushed

---

[23] *See also* Powell, INSIDE THE NRA, at 194-96 (describing LaPierre's attempt to purchase the Dallas "safe house").

out and attacked by LaPierre and the NRA as extortionists, coup supporters, and "co-conspirators."[24]

47.    LaPierre also structured certain "back-scratching" relationships to siphon money to pet projects that the NRA would otherwise be prohibited from financially supporting.  Upon information and belief, the NRA makes improper expenditures to directly support Youth for Tomorrow, by making charitable contributions to a third-party charity that in turn donates the money to Youth for Tomorrow, an organization for which Susan LaPierre acted as President.

**ii.    "Funny Money": Filling the Coffers.**

48.    To support LaPierre's spending habits, the NRA had to continue fundraising successfully.  To artificially boost these efforts, the NRA and LaPierre intentionally misled members using fear-based promotions designed to drive donations.  For example, the NRA's plea for donations to sue and fight New York Governor Andrew Cuomo (citing the danger of losing its insurance), or claims that the NRA was "going out of business," were intentionally misleading to drive donation and membership dollars.[25]  AMc likewise refused to be a part of any promotion or publicity stunt that was misleading to NRA members.

49.    LaPierre also boosted NRA revenue through the creation of shell programs that the NRA never had any intention or meaningful ability to competently execute, such as Carry Guard and School Shield.[26]  By appealing to members' hearts or promising benefits that were never to be

---

[24] Will Van Sant and Daniel Nass, *The NRA Exodus: Who Left the Organization During a Year of Upheaval*, THE TRACE (Mar. 2, 2020), https://www.thetrace.org/2020/03/nra-departures-timeline-wayne-lapierre/.

[25] LaPierre and the NRA apparently still use this strategy: the NRA employed the same tactic with the New York Attorney General after the NYAG filed the Enforcement Action, partially seeking dissolution, urging members to "save the NRA."

[26] School Shield was developed in the wake of the Sandy Hook tragedy in 2012.  The goal was to provide schools, through grants from the NRA, with threat assessments to determine the school's vulnerability, prepare a plan to make schools more secure, and help locate qualified armed safety officials.  Although this program raised millions of dollars, it was little more than a media stunt.  Powell confirmed that, over four years later in early 2017, the School Shield program had assessed only three schools.  Powell, INSIDE THE NRA, at 70.

delivered, the NRA raised millions of dollars, not only in membership donations, but in "funny money"—LaPierre's affectionate term for brand sponsorship funds.

### iii.      Wayne's Way or the Highway.

50.      Throughout the last two years, the NRA has seen the LaPierre-forced exodus of Board members once devoted to the NRA, the Board's legal counsel, the NRA's chief lobbyist, Col. North (an elected NRA Board member and its President), and longtime vendor, AMc—each dedicated to defending the Second Amendment, each unwilling to blindly follow LaPierre, and each attacked as "conspiring" to overthrow LaPierre.  It has become clear to many within the NRA that LaPierre does not care at all if board members, vendors, or executives are devoted to Second Amendment principles—he cares if they are devoted to *him*.  As Powell describes it: "His real loyalty was not to the Second Amendment, or to the NRA, or to the national debate on guns and gun violence, but to saving his own skin."[27]

51.      Indeed, numerous board members have testified under oath that the NRA operates as "Wayne's Kingdom"; that the NRA is governed like LaPierre's "sole proprietorship"; that no decisions pertaining to the Board or NRA operations are made without LaPierre's blessing; and that LaPierre does not abide by the NRA's bylaws.

### I.      LaPierre Retains Brewer, Who Immediately Begins His Attacks Against His Family and Their Company.

52.      As Carry Guard collapsed, the NRA retained Brewer and the Brewer Firm solely to prosecute the then-existing issues concerning the Lockton Affinity Series of Lockton Affinity, LLC ("***Lockton***") related to the failure of the Carry Guard insurance program after several states deemed it to be illegal. [28]

---

[27] Powell, INSIDE THE NRA, at 26.
[28] *See* ECF 1, *National Rifle Association of America v. Lockton Affinity Series of Lockton Affinity, LLC, et al*, Case No. 1:18-cv-639, in the United States District Court for the Eastern District of Virginia (the "***Lockton Lawsuit***").

53.     Shortly after Brewer's engagement, the NRA's General Counsel, acting at Brewer's direction, notified AMc that the Brewer Firm would be reviewing AMc's marketing activities with respect to Carry Guard.  The NRA represented only that the Brewer Firm would be assisting with the Lockton and Carry Guard investigations and instructed AMc to cooperate with the investigation.

54.     AMc was already intimately familiar with Brewer and his firm, and the parties' connection made his hiring somewhat baffling.  In addition to being related by marriage to the McQueen family, the Brewer Firm was also a client of AMc.  Brewer's retention was even more puzzling in light of his long history of supporting anti-gun proponents and members of the Democratic Party, including Beto O'Rourke (a proponent of gun confiscation), Hillary Clinton, and President Barack Obama.  Upon information and belief, Brewer boasted of his close relationship to Michael Bloomberg, the former NYC Mayor and long-term opponent of the NRA, who is openly credited with funding much of the anti-NRA activity in the US.  Now having morphed into an unapologetic enabler of the radical right, Brewer's turncoat advocacy has left some within the NRA questioning Brewer's true motives.  While confusing, Brewer's retention was not a direct issue for AMc until the NRA turned adversary and put Brewer at the lead of that initiative.

55.     Brewer's relationship with Angus McQueen was toxic from the outset.  For over 20 years, Brewer has had a strained relationship with Angus and a resentful, disrespectful attitude toward him and other McQueen family members.  In fact, his personal history of animosity with the McQueen family, his anti-gun political sentiments, and his parade of prior ethical violations raised numerous eyebrows among NRA officials.  Brewer was often disrespectful to the McQueen family, voicing frequent professional criticisms about AMc, slow-paying for the services his law

firm received from AMc,[29] and vocalizing his disdain for AMc's relationship with the NRA due to his own political sentiments against Second Amendment rights.  Indeed, Brewer has had 20 years, as a family member and AMc client, gaining key insight into AMc's business strategy and the personal lives of the McQueen family.  In that role, and as a McQueen family member, he apparently saw something that he coveted: the prestigious public-relations work that AMc provided to the NRA and an opportunity to take down his dying father-in-law.

56.    Unlike typical law firms, the Brewer Firm actively promotes its ability to offer crisis-management and PR services to clients.  According to his recent article, published with remarkable hubris as he initiated litigation against AMc, Brewer boasts of his ability to try cases in the press ("in the court of public opinion") instead of the courtroom and advocates that PR services should be performed by law firms instead of companies like AMc:

> As many clients realize, crafting a public narrative can no longer fall solely under the purview of public relations agencies or a corporation's in-house communications department.
>
> According to recent press reports, the legal community has awakened to the "new" normal: issues and crisis management should be a fundamental component of any high-stakes advocacy plan. There are many advantages for clients when that function is managed by law firms.[30]

57.    Within weeks of his engagement in early 2018, Brewer positioned his law firm as a direct competitor of AMc, overtaking all legal and PR decisions within the NRA.  Brewer and his PR team initially began drafting press releases for the NRA, a task for which AMc had been primarily responsible for several decades.  Throughout the next few months, Brewer and his PR firm continued drafting press releases and working with the media on NRA's behalf without any

---

[29] In fact, even until December 2019, Brewer's law firm was still an AMc client.
[30] *See* Excerpts from William A. Brewer III, *Advocacy as Art: Lawyers Must Engage in Issues and Crisis Management*, Texas Lawyer, May 6, 2019.

input from or disclosure to AMc.  Brewer and the Brewer Firm provide services to the NRA that AMc provided exclusively for nearly 40 years, including speech-writing, crisis management, media relations, press releases, website content, and general PR advice, a fact the NRA's "longtime *public affairs* chief" proudly boasts:

> The [Brewer] firm represents the NRA on many different matters—working to protect our legal, regulatory and reputational interests. As we've repeatedly stated, centralizing these services allows the NRA to gain strategic advantages, recognize cost savings, and improve our advocacy…[31]

58.     In fact, AMc representatives learned that Brewer was making ultimate NRA decisions relating to content on the NRA's website that was contractually administered by AMc. Most importantly, in order to secure his new role as the NRA's primary PR provider, Brewer conveniently denounced AMc as the NRA's greatest existential threat and made AMc the NRA's primary litigation target.  According to the NRA and its counsel in the recent bankruptcy trial, suing AMc was part of the NRA's strategy to deflect attention from its own misdeeds during the NYAG's investigation.

59.     As a result of Brewer being a competitor of AMc, a state court judge in Virginia, a federal district judge, and the federal magistrate judge presiding over this case have already found that Brewer and his PR team are prohibited from reviewing any of AMc's highly confidential business information in this lawsuit.[32]

---

[31] Betsy Swan, *NRA Legal Bills Raise 'All Sorts of Red Flags,'* THE DAILY BEAST (May 14, 2019), https://www.thedailybeast.com/nra-legal-bills-raise-all-sorts-of-red-flags.

[32] *See* ECF 148 (noting that Brewer and AMc both provide public relations services and findings that "if Brewer had access to AMc's Highly Confidential Information—which includes non-public financial statements, profit and loss data, and sales information relating to specific customers—then Brewer could use that competitive information to severely prejudice AMc.").

**J.      Brewer Begins His LaPierre-Sanctioned Takeover of the NRA.**

60.      On May 29, 2018, on behalf of the NRA, Brewer filed a lawsuit against Lockton regarding Carry Guard.  Brewer agreed to take on this lawsuit, but only if Powell agreed to get him involved in all the NRA's legal matters.  As noted above, the NRA had tasked AMc with marketing the Carry Guard program, but AMc had no role in the design or administration of the insurance portion of the program, which was led by Powell.  Numerous state insurance regulators deemed Carry Guard to be illegal, placing the NRA and Powell under political and legal scrutiny.  To save Powell's position, he and Brewer advanced the false narrative that AMc was somehow at fault for Carry Guard's failure to divert attention from Powell's failure.  In fact, in October, 2017, Powell foreshadowed this scapegoat narrative when he angrily told Angus McQueen that Carry Guard's failure would be labeled as "all AMc's fault."

61.      During this same time, Powell and Brewer were inseparable, a fact Powell has also confirmed.  In fact, Brewer spent more time with Powell than he did LaPierre, constantly blurring the lines between a professional and personal relationship, orchestrating interactions with Brewer's family and Powell's family.  Brewer even propositioned Powell about working for the Brewer Firm following his employment with the NRA.

62.      Together, Powell and Brewer seized upon an opportunity to take down AMc and Angus McQueen, whom they both resented for personal reasons.  By creating a narrative that AMc was concealing spending records, Powell and Brewer could begin a witch hunt against AMc, blaming AMc for the NRA's regulatory non-compliance issues, creating a distraction from Carry Guard and the Russia investigation, creating a for-cause reason for terminating the relationship without paying termination fees, and publicly disgracing AMc and Angus in the process.

63.      While Brewer and Powell were formulating their plan to destroy AMc, LaPierre would call Angus to tell him that Brewer "was crazy," that he had LaPierre "in a box," and that

LaPierre was nothing but "a pawn on Brewer's chessboard."  Indeed, the former NRA's General

Counsel to the Board, Steve Hart ("*Hart*") has confirmed that Brewer has completely taken over

LaPierre and the decision making at the NRA:

> Q.  You discussed in your prior testimony about litigation strategy interfering with business decisions. And you mentioned that sometimes a lawyer gets inside the CEO's head. Is that what you believe happened with Bill Brewer getting inside of Wayne LaPierre's head?
>
> A.  I have experienced this with a number of CEOs and lawyers. So, for me it was repetitive, just another instance of litigation strategy starting to overwhelm the business strategy.
>
> Q.  And my question is, is that what you believe was happening with Bill Brewer getting inside Wayne LaPierre's head?
>
> A.  Yes.

64.     As discussed below, Brewer even commandeered the finances of the NRA,

deciding in every instance who got paid (and who did not) by the accounting department, and

specifically insisting that his unaudited bills would be paid same-day upon receipt.  Indeed, the

following memorandum prepared by an NRA whistleblower explained the lengths Brewer would

go to make sure his fees were paid:

Ollie was right.  I am standing up to say Oliver North was right to seek an independent, confidential review of Bill Brewer's NRA invoices and expenses.

I witnessed that Bill Brewer influenced members of the board of directors by selectively withholding information relevant to their decision making.

I witnessed how Bill Brewer effectively silenced NRA staff who uncovered issues needing board of directors attention.

I witnessed how Bill Brewer used information gathered by NRA staff to fit different purposes and to frame a different story to the board of directors.

I witnessed that Bill Brewer intimidated NRA staff and threatened our professional livelihoods.  I witnessed that NRA staff were told to fall in line to keep their jobs.

I witnessed that Bill Brewer billed the NRA for efforts to investigate and pressure NRA staff.

I witnessed that Bill Brewer compiled what became known as "burn books," to accumulate enough knowledge of each individual's pressure-points in order to keep them acquiescent.

I witnessed what appeared to be unrealistic and duplicative billing from Bill Brewer.

I witnessed that Bill Brewer himself created 2018 cash flow crunch by interfering with accounts payable to prioritize paying himself immediately versus other NRA vendors that had been providing goods or services for months without payment, also jeopardizing the NRA's biweekly staff payroll.

I raised concerns about Bill Brewer internally and with the board audit committee.

65.     Despite the initially limited scope of his retention regarding Lockton, Brewer's influence and control over LaPierre quickly spread as he convinced LaPierre that only he could keep LaPierre out of jail for LaPierre's abuses of NRA funds and other still-concealed malfeasance.  The New York Attorney General was already beginning to investigate the NRA and LaPierre.  LaPierre permitted Brewer and his firm to reexamine all of the NRA's vendor relationships, ostensibly to ensure they were in compliance with New York law.  Brewer used this opportunity to attack AMc and continue to grow his influence and control within the NRA.

66.     Without consulting the Board of Directors or obtaining approval required by the NRA bylaws, and without himself understanding the allegations, LaPierre authorized Brewer to begin a litigation campaign.  Soon, Brewer became chief legal provider (after ousting three different lawyers for their part in the concocted extortion narrative, *i.e.*, their lack of loyalty to

LaPierre), earning fees of approximately $100,000 per day ($1.5 to $3 million per month). According to Powell, by the time his book was published in 2020, the NRA had paid approximately $70 million to the Brewer Firm.[33]  However, despite his initial support of Brewer, Powell was eventually forced to admit that, once AMc was out of the picture, Brewer began overstepping his boundaries and acting like *he* was in charge of the NRA.

## K.     LaPierre and Brewer's Witch Hunt Escalates with Phony Audits.

67.     The NRA has historically conducted annual audits of its vendors.  AMc openly provided access to financial and other information (including pricing) to NRA accountants and officers, including the Treasurer, Chief Financial Officer, and Board Legal Counsel, on an annual basis.  These actual audits were conducted almost yearly without complaint or adverse findings by the NRA for more than twenty-five years.  However, on several occasions, LaPierre specifically instructed AMc not to disclose information to certain auditors, such as Rick Tedrick, and instead instructed them to be reviewed by other auditors, such as Phillips.

68.     Angus McQueen was diagnosed with advanced lung cancer on June 1, 2018.  After the diagnosis, Brewer's approach changed from one of alleged neutrality (assisting the NRA with the Lockton and Carry Guard matters) to increasing hostility and direct accusations of wrongdoing against AMc.

69.     In fact, Brewer would routinely threaten AMc and Angus. In the summer 2018, Brewer repeatedly said that he was going to have him and AMc charged with RICO (Racketeer Influenced and Corrupt Organizations Act) violations, and that the Federal Bureau of Investigation was going to raid AMc's offices. These threats were relayed to numerous people, including

---

[33] Powell, INSIDE THE NRA, at 168.  According to documents filed in the NRA's bankruptcy proceedings, the Brewer Firm was paid over $17.4 million between October 22, 2020 and January 14, 2021.  Upon information and belief, the NRA has paid the Brewer Firm over $100 million to date.

Brewer's wife, Skye McQueen Brewer, Angus, Tony Makris, and Josh Powell. Naturally, this deeply distressed Angus, who had devoted most of his career (roughly 40 years and half of his life) to serving the NRA.

70. While threating AMc and his family, Brewer also demanded copies of documents from AMc, which the NRA had a right to review but not copy; demanded non-contractual *post hoc* justifications for AMc's billing, which had long-since been preapproved by the NRA and LaPierre and were audited by the NRA; requested interviews of AMc personnel not authorized by the Services Agreement; and insisted on conducting three separate but repetitive audits in short succession, the first of which occurred in September 2019 and was conducted by members of the Brewer Firm.

71. These demands and audits were not consistent with NRA practices, the Services Agreement between the NRA and AMc, or the nearly 40-year business relationship between the parties. For example, by putting Brewer at the forefront of the request, the NRA failed to abide by the contractual requirement to communicate directives to AMc through Executive Vice President (LaPierre) or his formally declared designee as required by Section IX of the Services Agreement. The Services Agreement also did not permit copying of the documents, only their review. And in the nearly 40-year business relationship between the NRA and AMc, there were no prior demands for interviews of AMc employees. Finally, some of the requests sought documents that did not exist and were fashioned specifically and intentionally to draw unavoidable non-compliance, or sought documents that were already in the NRA's possession. The others sought documents directly hazardous to the NRA's interests and contrary to its overall business strategy. AMc has since learned that Brewer and LaPierre were preparing litigation against AMc—about noncompliance with audits—*before* the first audit even occurred. Nevertheless,

despite the redundant and/or impossible demands, AMc responded in a complete and timely manner.

72.    And despite AMc's compliance, Brewer began shaping the negative public narrative by releasing false and disparaging public statements, claiming that AMc was refusing to turn over the requested information, when the requests had been fashioned to draw noncompliance:

- "It's stunning that a trusted partner for all these years is just refusing to cooperate."[34]

- "The lawsuit [AMc's Counterclaims] is without merit—a misguided attempt to deflect attention from Ackerman McQueen's numerous failures to comply with its obligations," said the NRA's legal counsel William A. Brewer III, partner at Brewer, Attorneys & Counselors, in a statement to AgencySpy. "Ackerman's claims against the NRA emerged after, and only after, the NRA sought to compel the agency to provide documents and billing records relating to its services."[35]

## L.    LaPierre Falsely Promises AMc that Brewer Will Not Be Involved with AMc.

73.    Given the threats, the escalating hostilities, and the unprecedented letter writing campaign, LaPierre, Craig Spray (former NRA Treasurer),[36] and AMc officials, including Angus and Revan McQueen, held a meeting in Dallas on October 11, 2018 (the "***October 11 Meeting***"). The meeting was to discuss AMc's concerns about dealing with Brewer in light of his relationship and animosity towards the McQueen family, his actions and desire to take over AMc's business with the NRA, and his letter-writing campaign where he repeatedly and falsely accused AMc of withholding documents.  The purpose of the meeting was also to discuss an AMc executive's recent sexual harassment allegations against Powell, and how and if the NRA and AMc were going

---

[34] Mark Maremont, *NRA Files Suit Against Ad Agency in Rift with Key Partner*, THE WALL STREET JOURNAL (Apr. 15, 2019), https://www.washingtonpost.com/politics/how-a-hard-charging-lawyer-helped-fuel-a-civil-war-inside-the-nra/2019/09/18/9ae0a01e-a986-11e9-a3a6-ab670962db05_story.html.

[35] Patrick Coffee, *Read Ackerman McQueen's $100 Million Countersuit Against the NRA*, ADWEEK (May 24, 2019), https://www.adweek.com/agencyspy/read-ackerman-mcqueens-50-million-countersuit-against-the-nra/156964/.

[36] Craig Spray resigned from his role as Treasurer of the NRA on or about January 29, 2021.

to work together going forward.  Prior to this meeting, AMc decided that if LaPierre, Spray, Brewer, and other NRA officials were not willing to change their recent practices, AMc would resign the NRA's business entirely.

74.     At the outset of the October 11 Meeting, AMc, with Angus taking the lead, had a conversation with LaPierre about AMc's future with the NRA in light of Brewer and Powell's actions.  Specifically, Angus talked to LaPierre about the abusive and harassing threats he had received from Brewer in June and the letter writing campaign from Brewer falsely accusing AMc of withholding documents.  Angus told LaPierre that if he thought the claims by Brewer were true, then AMc and the NRA's relationship should cease because they would not be able to trust each other.  LaPierre quickly responded that was not going to happen.

75.     Angus further expressed concerns to LaPierre about Powell's involvement with AMc, especially in light of the recent sexual harassment allegations with an AMc executive and LaPierre's decision to select Powell as his "designee" under the Services Agreement—essentially appointing Powell as LaPierre's designated representative to work with AMc on a day-to-day basis.  Angus made clear that AMc was not going to deal with Brewer or Powell because of their repeated abusive conduct and because they appeared to have no interest in being part of AMc's work for the NRA.

76.     In response to AMc's concerns, LaPierre repeatedly praised AMc's branding and communication strategy, including crisis communications and the legislative response work that it performed for decades, and pled with AMc to "stick with him."  LaPierre stated that the letter writing campaign with Brewer and the Brewer Firm would stop and that AMc would no longer have to deal with Brewer, the Brewer Firm, or Powell.  LaPierre explained that Brewer would be gone in 30-60 days because Brewer was going to have everything resolved with the New York

Attorney General.  LaPierre told another AMc employee during a December 2018 phone call the exact same thing.  During the October 11 Meeting, LaPierre repeatedly stated that Brewer was the only person who could save the NRA from the New York Attorney General, that Brewer had some key relationships in the State of New York, and that Brewer knew "how to fix this."  When AMc representatives asked LaPierre what he meant by Brewer's knowing "how to fix this," LaPierre responded that "he just does."

77.     The conversations relating to Brewer and Powell during the October 11 Meeting were sometimes heated because of the emotionally charged issues concerning Brewer's personal attacks against Angus, and Powell's sexual harassment incidents, for example, rather than because of any mere business disagreement.  But at the end of the discussion, LaPierre looked around to each of the AMc representatives and asked them whether they would stick with him if he did in fact make sure that Brewer, the Brewer Firm, and Powell were no longer involved with AMc.  Based on LaPierre's representations, AMc agreed to maintain the business relationship and re-invest in resources to allow AMc to continue to provide services to the NRA.

78.     The day after the October 11 Meeting, LaPierre placed a call to Revan McQueen.  During the call, LaPierre again pleaded for AMc to "stick with him."  He also wanted to inquire about a *second* audit the NRA purportedly needed as part of the Carry Guard litigation. Revan reminded LaPierre that the Brewer Firm was not a trusted independent auditor and that AMc would no longer deal with them, but made clear that AMc would welcome an audit from any reputable auditing firm or law firm that was not intent on threatening AMc or further damaging its relationship with the NRA.  LaPierre acknowledged AMc's position and asked if Hart could contact AMc to make the necessary arrangements.

79.     LaPierre represented that the audit was required as part of the Lockton settlement. Alarmingly, LaPierre's explanation confirmed what AMc suspected: the first audit the Brewer Firm conducted was nothing more than a fishing expedition.  In fact, and as discussed in more detail below, LaPierre later admitted in writing that the NRA, spearheaded by Brewer, was planning to file a lawsuit against AMc for failing to comply with the NRA's audit efforts *before a single audit had even taken place*.

80.     Over the next several weeks, LaPierre continued to tell AMc that the NRA wanted to keep working with AMc and that it would no longer be required to interact with Brewer or anyone from the Brewer Firm.  Based on LaPierre's material representations that AMc would no longer be dealing with Brewer or his firm, AMc agreed to continue its work for the NRA and approved the 2019 budget and a second audit of its documents.  AMc then worked with Hart and coordinated the Cooper Kirk Law Firm's audit of Carry Guard material, which, after one full day of thorough review, concluded with no issues or complaints.

81.     Despite LaPierre's repeated promises for AMc to "stick with him" and that AMc would no longer be dealing with Brewer or the Brewer Firm, the Brewer Firm sent a letter to AMc on December 21, 2018.  Brewer demanded to examine an even more extensive list of documents that went to the heart of AMc's confidential business and billing practices—information that any competitor of AMc would want to know.  These demands reflected Brewer's agenda, not the NRA's.  Indeed, high-ranking NRA officials testified that Brewer's actions were improper given his clear conflict of interest with the McQueen family and AMc, and that the requests and demands he was making were completely unreasonable and not in line with the NRA's overall strategy with AMc and its long-standing relationship.  For example, Hart made clear that Brewer and the Brewer

Firm were making completely unreasonable requests that were not in line with the NRA's business

strategy:

> A. The problem here, they [Brewer Firm] were asking for fair market value analysis and some things here related, essentially, you know, what are you charging your other clients. And there is no way Ackerman was giving that up. That would be, I considered that one is the one that was most troublesome.

> Q. It is an unreasonable request in your view?

> A. It absolutely is.

> Q. Did you believe that this had to be the Brewer Firm that was doing the audit review? Or could it have been a forensic accounting firm?

> A. Well that is a generic question. There are all sorts of people who can do these things and you want to do it in the least controversial manner.

> Q. So, in other words that was a viable alternative in your view.

> A: Yeah, I mean, absolutely. We know there is hostility …

82.     LaPierre allowed the campaign of harassment to continue because it helped to keep the spotlight off his own mismanagement and financial abuses.  This circus act was consistent with LaPierre's "management by chaos" preference.  Moreover, LaPierre was convinced that Brewer was the only one who could "keep him out of jail," and, toward that end, has delegated critical NRA leadership functions to Brewer.

83.     But Brewer didn't (and still doesn't) care about the NRA.  Brewer was concerned about family vengeance, protecting his golden goose (millions in monthly billing to the NRA), stealing AMc's business for himself and the Brewer Firm, and taking the spotlight off LaPierre so the gravy train could continue.  In response, AMc reminded LaPierre about the Brewer Firm's

conflicts of interest and LaPierre's assurances that Brewer and his firm would not interact with AMc—in hindsight, clearly false and intentionally fraudulent empty promises.

84.     Despite those false promises, LaPierre, the NRA, and Brewer's fraud reached new heights in February 2019 with the *third* audit of AMc.   John Frazer ("**Frazer**"), the NRA's General Counsel, had reached out to AMc about yet another audit of AMc's records.  Knowing the Brewer Firm's involvement would result in even more issues between the parties, the NRA explained to AMc that it had retained a company called Forensic Risk Alliance ("**FRA**") to conduct the audit. Unbeknownst to AMc, Susan Dillon, a new FRA Senior Director, had just joined FRA at the end of 2018 after working as the Director of Consulting *at the Brewer Firm for more than 17 years*. In fact, Dillon had actually participated in the Brewer Firm's initial audit of AMc in September 2018.  Dillon left the Brewer Firm to join FRA during the time the parties were disputing whether Brewer would be involved with AMc (*i.e.*, around the time of the October 11 Meeting).

85.     The NRA, either directly or through Brewer, hired FRA/Dillon to help facilitate AMc's audit in early January 2019. Indeed, FRA's privilege log reveals that the very first communication relating to FRA's eventual audit of AMc was a conflict check run by Brewer's long-time friend and confidant—Dillon.  FRA and the NRA have refused to produce any of the 1,600 actual documents shielded by the privilege log covering its nine days' worth of auditing. Once FRA was formally engaged by the NRA/Brewer Firm, the Brewer Firm specifically provided Dillon with all of the information it had gathered from AMc to date.  Moreover, Dillon coordinated the internal FRA team reviews of the AMc documents that FRA collected during the nine-day audit.  She reviewed AMc's documents herself, and she reported to the Brewer Firm about her findings.

86.     AMc, under the false impression that FRA was an independent third party, agreed to a multi-day audit February 5-8, 12-15, and 19-21, 2019.  Prior to the AMc audit, Dillon and other FRA representatives had numerous meetings, telephone conferences, and email exchanges with the Brewer Firm.

87.     During the audit, Brewer had FRA repeatedly ask AMc representatives questions about AMc's confidential business practices and directed that FRA copy documents it had no contractual or other legal right to copy.[37]  Dillon oversaw the entire February 2019 audit of AMc, including directly communicating with the Brewer Firm about her findings.  FRA's records reveal that Dillon exchanged numerous emails with the Brewer Firm before, during, and after the audit, and that the Brewer Firm was being provided daily updates on the audit's progress.

88.     Shockingly, Dillon is now *back at the Brewer Firm* and is no longer with FRA.[38]  In other words, Brewer, knowing that he could not directly interact with AMc anymore, dispatched a delegate to do what he could not—review AMc's records—by causing FRA to hire his *Director of Consulting* (Dillon) solely for the AMc audit.

89.     Although AMc complied with all three audits, Brewer continued to spin a false narrative about AMc's compliance.  At no time did the auditors complain to AMc that documents were withheld from review.  It is AMc's understanding that even LaPierre himself does not believe any documents requested by the auditors/examiners were deliberately withheld by AMc.

90.     NRA General Counsel Frazer twice expressed his gratitude for AMc's compliance with the NRA audit: first in an email on March 4, 2019 and again in a March 25, 2019 email.  Frazer also characterized the NRA audit of AMc as "productive" in a letter to AMc counsel on March 14, 2019.

---

[37] Article VIII of the Services Agreement only provides the NRA the right to examine books and records.
[38] https://www.brewerattorneys.com/susan-dillon.

**M.     Brewer Continues to Take Over the Roles and Responsibilities AMc Provided to the NRA for Nearly 40 Years.**

91.     For nearly 40 years, AMc had been exclusively responsible for the NRA's branding, reputation, and public relations services.   Those services included PR advice and counsel, including crisis management; ongoing media relations; specialized PR writing services and distribution of same as required; and speechwriting services, amongst a litany of other offerings.

92.     As Brewer became more entrenched with the NRA and gained detailed knowledge of his in-laws' business relationship with the NRA, he deployed numerous tactics to convince LaPierre that Brewer and his firm should be the only PR and crisis-management team for the NRA.

93.     For example, in January 2019, the Brewer Firm made a presentation to the NRA's Public Affairs Committee relating to representing the NRA in the legal, regulatory, and public arenas, which included numerous discussions and references to the NRA's reputation, the public opinion, and news articles.   The presentation—conducted by the non-lawyer head of public relations for Brewer, and which AMc was requested to attend—repeatedly referenced the "court of public opinion" and promotion of the NRA's narrative through the media.   LaPierre later wrote to the NRA Board that he had retained Brewer "to protect our interests on several related fronts," including the NRA's "reputational interests."

94.     Shortly thereafter, on January 18, 2019, LaPierre attended an in-person meeting with AMc's executives, including Angus and Revan McQueen.   During the meeting, LaPierre told AMc that he was sending Brewer to the New York Times ("***NYT***") to talk about Congress' investigation into the NRA's trip to Russia.   Numerous AMc executives expressed concerns about the NRA approaching a well-known liberal media outlet to talk about the Russia investigation.   In

response, LaPierre said that Brewer would sue the NYT if it did not write what Brewer wanted the NYT to say.

95.     Additionally, at this meeting, LaPierre informed AMc that the Brewer Firm would be writing his speech for CPAC, a critical project on which AMc had historically collaborated with LaPierre and which set the tone for the NRA's annual communication strategy.  It was, each year, one of the most important speeches LaPierre gave in a public forum, and one Brewer began criticizing after his retention, suggesting his firm could do a better job.  In fact, LaPierre told Angus that Brewer criticized LaPierre's 2018 CPAC speech that AMc had scripted, and that Brewer told LaPierre that it was being studied at NYU and Columbia journalism schools for alleged anti-Semitism.

96.     During this same January 2019 meeting, AMc once again confronted LaPierre on why it was still dealing with Brewer and his firm, especially in light of the new document request from the Brewer Firm sent on December 21, 2018.  LaPierre again pleaded for AMc to stick with him and repeatedly proclaimed that Brewer was the only person who was going to keep him out of jail.  When pressed by AMc executive as to why he should be concerned about going to jail, LaPierre stated on three separate occasions during the meeting that, "you don't know what you don't know."

97.     On March 11, 2019, AMc received a call from journalist Danny Hakim ("**_Hakim_**") at the NYT.  Hakim has repeatedly been the recipient of Brewer's disclosures of NRA affairs and documentation.  On that call with AMc, Hakim indicated that the NYT would be running an _adverse_ story (_i.e._, a hit piece) on NRATV and AMc, which would include disparaging quotes provided to the NYT by two NRA Board members about AMc.  Hakim told AMc that he received the quotes directly from Brewer, a fact that LaPierre later confirmed to the NRA Board.  The story,

which contained false and defamatory statements about AMc, ran at a time when Brewer and the Brewer Firm had already taken over the NRA's PR messaging previously managed by AMc, further confirming Brewer's participation and control in the media attacks against AMc.

98.     AMc immediately expressed its strong objection to the NRA's false statements, doing so by letter to NRA General Counsel, Frazer, on March 12, 2019.  Frazer's March 14, 2019 response did not deny that the NRA had leaked the information to the New York Times.  Instead, Frazer for the first time asserted the NRA's position that only AMc, and not the NRA, had restrictions on the use of a party's confidential information.  The NRA claimed it could disclose AMc's information with impunity while AMc was contractually prohibited from any reciprocal freedom to use NRA information.  The exchange of correspondence signaled the NRA's claim that it could deliberately misuse AMc's confidential information and thereby violate the NRA's duty of good faith and fair dealing inherent within the terms of the Services Agreement.

99.     Current and prospective clients, financial institutions, and insurance providers have been questioning AMc employees about the NYT article, this Lawsuit, and consequent media reports, with running false commentary by Brewer.  AMc has been unable to provide meaningful responses to these inquiries due to the confidentiality restrictions imposed by the Services Agreement.

100.     AMc has also learned additional facts about Brewer and his PR team's actions in taking over the roles that AMc had been handling for the NRA for decades:

- The NRA consolidated its in-house PR division in July 2019 after termination of the Services Agreement with AMc;

- Despite AMc helping LaPierre write his speeches for several decades, Travis Carter, Brewer's Managing Director of Public Affairs, is now preparing speeches for LaPierre;

- The Brewer Firm is drafting and approving the NRA's press releases and statements to the media;

- When media outlets, including the New York Times, approach the NRA for comments on the NRA's litigation with AMc, NRA officials confer with Brewer and the Brewer Firm's PR group, which helps them draft the responses; and

- The NRA's PR head, Andrew Arulanandam, has been communicating with the Brewer Firm's PR head, Travis Carter, several times per week since April 2019.

101.    Upon information and belief, the Brewer Firm is now involved in all speech writing, press releases to the media, crisis management, and PR services for the NRA—precisely the services AMc had been performing for nearly 40 years.

## N.    NRA President Lieutenant Colonel Oliver North Is Confronted with Questions and Concerns about Brewer and the Brewer Firm, Enmeshing AMc further into Brewer's Quagmire.

102.    In the Spring of 2018, LaPierre had approached Col. North about becoming the next President of the NRA.  At the time, Col. North had just extended his contract with Fox and was in a stable and well-compensated position, but LaPierre convinced Col. North that the NRA needed his unique leadership.  As part of the arrangement and at the NRA's direction, Col. North was to be directly employed by AMc to host a television show on NRATV.  Because the President's position is unpaid, LaPierre, on behalf of the NRA, arranged to compensate AMc for all of Col. North's employment by reimbursing AMc for his work, as it did other talent contracts.  Col. North was to host an NRATV program, thereby replacing his former income and benefits as an AMc employee.  LaPierre and Phillips collectively reviewed and approved the contract.

103.    Because the NRA was in a financial slump, LaPierre tasked Col. North with traveling the country to help with fundraising efforts.  As he met with NRA members, he was persistently confronted with questions related to Brewer, such as why the NRA was paying the Brewer Firm approximately $1.5 to $3 million in *monthly* fees when the NRA was financially challenged; how and why Brewer was selected as counsel; whether Brewer disclosed his court

sanction in Texas, especially considering those ethical issues were "carried over" into the Lockton Lawsuit (where his *pro hac vice* admission was revoked for misrepresentations to a federal judge about being sanctioned). And of course there was (and still is) the issue of Brewer's personal conflict-of-interest based on his familial ties to Angus and AMc.

104.    Despite Col. North's repeated requests, Brewer and LaPierre thwarted all efforts by the President of the NRA to review Brewer's legal bills. With these issues already in the public arena, Col. North felt he owed a fiduciary duty to find answers to his constituents' questions in order to reassure himself and the NRA's fundraising base that its money was being used responsibly.

105.    As Col. North began reviewing issues related to Brewer, more information surfaced that caused Col. North to believe that Brewer was harming the NRA, including:

- Brewer controlling the NRA's legal and PR activity, without the required contracts and Board approval, including his firm taking over the NRA's response to a congressional committee probe into the NRA's ties with Russia, which resulted in Chris Cox (the one-time heir to LaPierre and former Executive Director of the NRA's lobbying arm, the Institute for Legislative Action ("ILA")) quitting;

- Questions were raised by NRA members and staff regarding Brewer's greed, integrity, and ability to do his job;

- Brewer actively monitoring NRA employees' emails that, upon information and belief, permitted him to identify NRA internal critics and ultimately terminate anyone in his path including Board General Counsel Steve Hart, outside NRA counsel Cooper, NRA president North, NRA ILA's Chris Cox, and others;

- Brewer manufacturing conflicts within the NRA and instructing high-ranking NRA officials that they could not speak with

certain individuals until approved by Brewer—and then charging the NRA to "fix" those manufactured conflicts;[39] and

- Concerns about the NRA's internal leaks to the media, which Brewer himself raised, despite him being the one leaking information to the press.

Indeed, the Brewer Firm appeared to be the NRA's largest vendor, leading to concerns by Col. North that NRA member funds are being drained at a rapid and unsustainable pace.

106. Col. North and other NRA officials, including then-First and Second Vice Presidents, sent letters to LaPierre and Brewer requesting more information about the scope of Brewer's services and asking him to submit engagement letters that were compliant with the NRA bylaws—the *same standards* Brewer was enforcing for all other vendors. These letters also sought copies of Brewer's invoices to better evaluate the details of the work he was performing. Despite repeated requests, however, Brewer and LaPierre told Col. North that Brewer's bills were confidential. They instructed Col. North to stand down. Although Powell initially defended Brewer's bills and denounced Col. North as a "Trojan horse" for AMc, Powell eventually admitted:

> Now, Ollie had a point—we should have pumped the brakes and looked at how we were handling our litigation. At the time, we were hemorrhaging money, and we were paying [Brewer] almost $100,000 a day. And [Brewer] had a reputation for escalating disputes into expensive legal battles.[40]

**O.   Brewer, on behalf of the NRA, files multiple pre-textual lawsuits against AMc in retaliation for Col. North's attempts to address questions regarding Brewer's exorbitant fees, ethical problems, and conflicts of interests.**

107. As Brewer's fees continued to increase, more and more individuals within the NRA began to question them and Brewer's role, even requesting independent oversight. For example,

---

[39] For example, Hart testified "[y]ou don't sign anything Bill [Brewer] asks you to sign. His motivations are always to create additional conflict."

[40] Powell, INSIDE THE NRA, at 177.

Col. North felt he had a fiduciary duty to call for an audit of the Brewer Firm's bills. To that end, on March 22, 2019, Col. North, the NRA's First Vice President (Carolyn Meadows), and the NRA's Second Vice President (Richard Childress) wrote to Brewer asking him to submit separate engagement letters and budgets for all of the matters he was then handling on behalf of the NRA. Col. North also told Brewer that the NRA Audit Committee had been asked to form a special committee to conduct an independent audit of the Brewer Firm's invoices. Col. North then sent subsequent correspondence to LaPierre and other members of the NRA questioning the stonewalling that he had received relating to Brewer and the Brewer Firm, and again requesting an independent third-party audit, which was denied.

108.    Col. North also expressed concerns about Brewer's settlement of the Lockton Lawsuit. Brewer had originally estimated a large settlement value of the case, which he had touted to NRA leadership. Once the settlement occurred, however, not only was the actual settlement value a mere fraction of the value Brewer had originally promoted, but it further appeared that Brewer had cut himself into the settlement and arranged for a payout directly to the Brewer Firm. Since the NRA had already been paying the Brewer Firm's hourly fees each month, it was confusing to North and others why the Brewer Firm would *also* be receiving any money from the Lockton settlement. Nevertheless, North's questions about Brewer's fees remained unanswered and the details of the Brewer Firm's invoices shielded from inspection.

109.   Col. North was not the only NRA Board member or high-ranking official to question Brewer's legal practices, integrity, and turmoil inside the NRA. Numerous other members had significant concerns about Brewer and the Brewer Firm (and its PR group) and its destruction within the NRA. These concerns resulted in the resignation of numerous longstanding NRA Board members and devoted advocates of the Second Amendment, such as Daniel Boren,

Timothy Knight, Esther Schneider, Sean Maloney, Julie Golob, Richard Childress, and many others.

110.   Upon information and belief, the NRA has paid the Brewer Firm at least $75 million in legal fees—a figure which may be closer to $100 million to date—since March 2018 and is now the NRA's largest vendor by far.   Upon information and belief, Brewer's fees even cause the NRA Foundation to increase the amount of money it loans to the NRA to pay him. For example, the Foundation loaned $5 million to the NRA in November 2017 based on a decision by the Foundation's Treasurer who was, conveniently, the NRA's Treasurer too.   The NRA requested to extend the loan's repayment deadline from January 2018 to June 2018.  And although the NRA paid back that loan in March 2018, the Foundation made *another* $5 million loan to the NRA in 2018, eventually extending *that* repayment date to October 2019.   In addition, the NRA caused the Foundation to subordinate its loan to a bank because the NRA had defaulted on a separate loan from the bank.   The NRA did not pay the Foundation loan in October 2019 as required.   It was not until January 2020 that the NRA even requested a second extension of the second Foundation loan.

111.   As North began investigating Brewer, more information surfaced that caused North to believe that Brewer was harming the NRA.   North and other NRA officials sent letters to LaPierre and Brewer requesting more information about the scope of his services and asking him to submit engagement letters compliant with the NRA bylaws—the *same standards* Brewer was enforcing for all other vendors.   These letters also sought copies of Brewer's invoices to better evaluate the details of the work he was performing.   Despite repeated requests, however, Brewer and LaPierre told North that Brewer's bills were confidential and instructed North to stand down.

112.    Although these actions were being done to **protect** the NRA, Brewer was not going to allow anyone access to his records.  Instead, in retaliation for Col. North acting as a fiduciary of the NRA, Brewer and LaPierre caused the NRA to file its first lawsuit against AMc to interfere with North's employment agreement with AMc (the "**North Contract**"), under which North was paid.   It is now known that the NRA and Brewer had been plotting this lawsuit since at least September 2018, before the very first audit.

113.    On April 12, 2019, the NRA sued AMc in Virginia Superior Court, alleging that AMc breached the Services Agreement by failing to produce records requested in the audits and failing to provide the NRA with a copy of the North Contract, both patently false allegations: AMc complied with the many audits, despite the NRA and Brewer requesting documents beyond any reasonable scope; and the NRA negotiated the North Contract, approved the contract *with Brewer present*, and also reviewed it and had a physical copy before filing suit against AMc.  Specifically, the NRA's General Counsel Frazer had reviewed the North Contract and had a copy in his possession from both AMc and Col. North.  He too was unaware that the NRA was filing a lawsuit against AMc.[41]  Additionally, Brewer was personally present during the September 2018 meeting where the NRA Audit Committee approved the North Contract.  Nevertheless, Brewer consistently accuses AMc and Col. North of withholding it.

114.    LaPierre confirmed the pretext for the AMc lawsuit in an April 2019 letter, which, upon information and belief, was drafted by Brewer, where he admitted:

> "[t]he NRA and I have a **common legal interests in the litigation against Ackerman McQueen which crystallized before the September [2018] Board meeting** and colored the discussion that day."

---

[41] This is the same General Counsel who was unaware the NRA was filing its bankruptcy petition in January 2021. The pattern of LaPierre's lack of disclosure even within the NRA's executive leadership, most importantly its legal counsel regarding legal affairs, is both concerning and evidence of LaPierre's hold on the NRA and his scheming with Brewer without proper NRA knowledge and approval.

115.     Thus, LaPierre and Brewer admitted that the decision to sue AMc, allegedly based upon its refusal to permit an audit, was made before the September 5, 2018 board meetings when no audits had even taken place.  Stated differently, Brewer and LaPierre were secretly preparing litigation against AMc about noncompliance with its contract *before* the audits occurred, while at the same time LaPierre was begging AMc to "stick with him," approving the 2019 budget, and promising AMc that it would no longer have to deal with Brewer or the Brewer Firm.  Indeed, numerous high-ranking NRA officials ***did not even know that the Brewer Firm was suing AMc***. It was with this secretive litigation plan that Brewer and LaPierre enlisted Dillon to conduct the Brewer-surrogated audit of AMc upon which the first and subsequent lawsuits were based.

116.     Once prominent NRA officers and directors began to seriously question Brewer and the Brewer Firm's role, ethics, billing practices, and ultimate destruction of the NRA, Brewer and LaPierre caused the termination or resignation of NRA employees, vendors, and consultants who questioned him.  According to Brewer and the NRA, all of these terminated and resigned employees, vendors, and consultants conveniently joined to "conspire" against LaPierre—rather than to bring accountability to the NRA, LaPierre, and Brewer.

117.     On April 22, 2019, AMc sent a series of letters to the NRA's executives—copying Hart, the NRA's then-General Counsel for the Board—requesting various information relating to LaPierre and some of the expenses that he incurred.  In fact, AMc sent the letters to try and obtain the very information the NRA was requesting through its auditors, and which helped formed the basis of the NRA's initial lawsuit against AMc when it alleged AMc was not maintaining and/or turning over certain documentation.

118.     Upon receipt of the correspondence, Hart circulated the letters to certain members of the NRA Board whom he knew and trusted.  Just over one hour later, Hart received a letter

signed by LaPierre but drafted by Brewer, suspending him immediately as General Counsel to the Board and falsely accusing him of leaking information to the media and conspiring with AMc. According to Hart, these were patently false accusations concocted by Brewer:

> Q.  So, this document says, "With respect to information disseminated to a subset of board members as alleged in the complaint, Paragraph 24, the NRA responds that former counsel to the NRA board of directors Steven J. Hart conspired with AMC," which means Ackerman McQueen.
>
> A.  Right.
>
> Q.  "To distribute the Winkler letters to Oliver North, Richard Childress, Carolyn Meadows, Charles Cotton, Allan Coors, Jim Porter and Pete Brownell."
>
> A.  Correct.
>
> Q.  Sir, is that statement true?
>
> A.  That is absolutely false. I didn't discuss this with Ackerman McQueen. And it was my fiduciary duty to report it to the Board of Directors and I did it in a very confined group that I thought would handle it confidentially.

119.    In fact, numerous individuals who raised questions about Brewer and the Brewer Firm, including but not limited to Steve Hart Esq., Col. North, Chuck Cooper Esq., Michael Volkov Esq., Chris Cox, and now Powell, have been accused of engaging in a conspiracy and have been forced out of the NRA by Brewer and his puppet, LaPierre.  For example, similarly to Col. North, Hart testified that he was forced out by Brewer for questioning his fees:

> Q.  So, it is your view that Bill Brewer orchestrated your removal?
>
> A.  Yes.
>
> Q.  Because you questioned his legal fees?
>
> A.  Yeah.

120.    In contrast, Carolyn Meadows, who at one point joined with Col. North (then-President) and Richard Childress (then-First Vice President) in questioning Brewer's engagement and fees in *two* separate letters, later withdrew her signature.  Conveniently, she replaced Col. North as President of the NRA.

121.    On April 24, 2019, Col. North called Millie Hallow ("***Hallow***")—LaPierre's Executive Assistant, who was previously criminally convicted of embezzlement before being hired at NRA—to notify LaPierre about potentially damaging but true information of which he wanted LaPierre to be aware.  As President of the NRA, Col. North was fulfilling his fiduciary duties to deal with the concerns to the NRA involving LaPierre, an executive vice president.

122.    But Brewer again spun—and indeed fabricated—a false narrative, claiming that Col. North called Hallow on behalf of AMc to extort LaPierre by threatening to release damaging information about LaPierre unless he immediately resigned.  The NRA has yet to provide any evidence that Col. North ever spoke with anyone from AMc or was making any threats on behalf of himself (or AMc).  More importantly, the NRA's own internal evidence shows the opposite to be true.  Indeed, Col. North repeatedly made clear under oath that he was not doing anything with or on behalf of AMc:

> I'm trying to inform the EVP/CEO of what I was told by Dan [Boren], that's it, and it was on - - it was not on my behalf or on the behalf of Ackerman McQueen.  I'd not talked to anybody from Ackerman McQueen about this.
>
> I was not delivering that on behalf of either one of us. I was letting him know what I had been told by [Boren] that was coming down the pike trying to help -- be helpful to Wayne and get the message if you want -- I mean, I didn't just get up and leave Indianapolis. I didn't – I didn't communicate with anybody at Ackerman McQueen about it. I was volunteering to go help Wayne and the NRA ameliorate this vicious exchange of information.

123.     Hallow (the other party to the conversation) confirmed through sworn testimony that Col. North was not making any kind of threat, much less on behalf of himself or AMc:

> Q.  Okay. And did he say in his phone call later that he had spoken with anyone at Ackerman McQueen?
>
> A.  He only said he had talked to Dan Boren.
>
> Q.  Did Colonel North give you any understanding that he was speaking on behalf of himself and Ackerman McQueen in that phone call?
>
> A.  Actually, not -- I don't remember that and it's not in my notes.

124.     Even Carolyn Meadows ("*Meadows*"), the now-current President of the NRA who listened in on the call, testified under oath that neither Col. North nor AMc were making any kind of threat:

> Q.  The, so, let me ask you this? After this conversation with – did Lieutenant Colonel North ever say that he was calling on behalf of anybody at Ackerman McQueen?
>
> A.  Not in the conversation I heard.
>
> Q.  So, not in the conversation you heard.
>
> A.  Right.
>
> Q.  Did he ever say that he had been instructed by someone at Ackerman McQueen to call?
>
> A.  No.
>
> Q.  Did he ever say he was directed by someone at Ackerman McQueen to call with this proposal?
>
> A.  He did not.
>
> Q.  Did he make any reference to any individual at Ackerman McQueen in this conversation?
>
> A.  Not that I heard.

125.    Dan Boren, a former United States congressman and member of the NRA Board of Directors, also testified that no one from AMc ever asked him to take any action on behalf of AMc or made any demands or threats against LaPierre:

> Q.  During that telephone call with Mr. Martin [Chairman of AMc Board of Directors] on April 24, did Mr. Martin instruct you to take any kind of action at all?
>
> A.  He did not.
>
> Q.  At any point in time during that April 24 telephone call, did Mr. Martin make any threat?
>
> A.  He did not.
>
> Q.  At any point in time during that April 24 telephone call, did Mr. Martin make any demand?
>
> A.  He did not.
>
> Q.  At any point in time during that April 24 telephone call, did Mr. Martin demand that Mr. LaPierre needed to resign?
>
> A.  Not to my recollection.
>
> Q.  Have you been told by anyone besides Mr. Martin that is employed by or otherwise affiliated with Ackerman that Mr. LaPierre needed to resign or step down?
>
> A.  I have not.
>
> Q.  Did -- during that telephone call on April 24, did Mr. Martin ask you to convey any kind of message on behalf of Ackerman McQueen?
>
> A.  He did not.
>
> Q.  At any point in time during that April 24 telephone call, did Mr. Martin ask you to help facilitate Mr. LaPierre resigning from the National Rifle Association?
>
> A.  No, he did not.
>
> Q.  At any point in time during that April 24 telephone call, did Mr. Martin tell you that he was being instructed by someone else at Ackerman McQueen to get in touch with you?

A. He never did, no.

Q. At any point in time, was there any sort of an agreement between you and Mr. Martin, Ackerman McQueen, Chris Cox, Oliver North or anyone else to try and get Wayne LaPierre to step down and resign?

A. There was not, no.  There was not an agreement.

. . .

Q. When you spoke with Mr. Martin on April 24, was it your impression that he was -- whatever he was telling you, that he was just trying to help?

A. That's correct.  I believe he was trying to -- he used the term "mitigate," try to repair the relationship between the two entities without litigation.

126.    Further, no one contests that the information about LaPierre's expenses was in any way inaccurate.  Plus, the allegedly damaging information had already been sent to the NRA two days earlier, making it a very poor extortion attempt, like asking for the money after you return the kidnapping victim.  Yet shortly after the phone call took place, Brewer and LaPierre immediately began promoting the false and defamatory extortion narrative, which had no relation to any pending dispute between the NRA and AMc.  It is now clear that this extortion narrative was solely to divert attention from LaPierre's malfeasance and scrutiny of Brewer's legal fees at all costs.

127.    It is undisputed that Col. North never made any threats during the phone call, that he was not asking LaPierre to resign on behalf of himself or anyone else, and that he was certainly not speaking on behalf of AMc.  Nevertheless, that same afternoon, Powell presented and asked Hallow to sign and deliver to Col. North a note claiming the message Col. North was sending to LaPierre was "on behalf AMc."  Upon information and belief, the note was written by Brewer and given to Powell to relay to Hallow.

128.   Hallow knew that Col. North never made any threats during the phone call, that he was not asking LaPierre to resign (neither on behalf of himself nor on behalf of anyone else), and that he was certainly not speaking on behalf of AMc.  Hallow was not comfortable with sending Col. North such a letter that was completely inconsistent with her conversation with him just hours earlier and inconsistent with her contemporaneous notes.  Based on her prior criminal history (and her embezzlement from the NRA), however, Hallow was in no position to deny the request to sign the false correspondence.

129.   The following day, on April 25, 2019, LaPierre falsely accused Col. North and AMc of engaging in an extortion attempt in a detailed letter to the NRA's Board.  Powell admits that he and Brewer wrote the letter explicitly for the purpose of retaliating against North:  "Bill and I immediately decided that we had to send a letter to the board.  *Let's blow this up*, we thought. *Let's just throw it straight back at Ollie*."[42]  According to Powell, the letter was jointly drafted by Powell, members of the Brewer Firm, and the NRA's PR manager.  The letter falsely accused AMc and Col. North of threatening to release damaging information about LaPierre unless he resigned. Brewer unquestionably knew that by accusing Col. North and AMc of engaging in a coup, he could distract from those who were challenging his unprecedented billing practices and his take-over of vital functions of the NRA.

130.   Just two days later on April 26, 2019, the Wall Street Journal published an article titled, "NRA Wayne LaPierre Says He is Being Extorted, Pressured to Resign," acknowledging that it had reviewed a copy of the April 25, 2019 "Confidential" letter to the NRA's Board and summarizing same.  Brewer and the Brewer Firm were in charge of creating the messaging that LaPierre and the NRA delivered. Upon information and belief, Brewer and the Brewer Firm were

---

[42] Powell, INSIDE THE NRA, at 182 (emphasis in original).

the ones who provided LaPierre's letter to the media, including the Wall Street Journal.  Brewer himself was quoted in the article attacking Col. North (the person who had been attempting to have Brewer's bills audited) and then was quoted in a subsequent article defaming and disparaging AMc (the company Brewer was seeking to destroy):

> It is not surprising that Ackerman now attempts to escape the consequences of its own conduct,' William A. Brewer III, a lawyer for the NRA, said in a statement. 'When confronted with inquiries about its services and billing records, Ackerman not only failed to cooperate—***it sponsored a failed coup attempt to unseat Wayne LaPierre***.

131.    During this same time, Brewer and the Brewer Firm prepared a draft speech for Meadows to make to the Board.  In the speech, Meadows was asked to make material and false representations regarding the alleged extortion and AMc, sing praises to the Brewer Firm and the work that it was doing on behalf of the NRA, and disparage Col. North.  When confronted with the draft speech prepared by the Brewer Firm, Meadows refuted virtually all of the prepared statements, including the ones relating to AMc and the Brewer Firm, and made clear that the speech ultimately given to the Board was vastly different from the lie that Brewer was attempting to spread.

132.    There is significant evidence that the NRA, LaPierre, and Brewer have made up and/or manufactured evidence to support their false extortion narrative against AMc.  Moreover, Carolyn Meadows was expressly counseled by the NRA to *destroy* evidence to keep it from being discovered—an instruction she executed by burning and shredding documents.  This undisputed fact raises serious spoliation concerns that will be addressed with the Court and jury in this case.

133.    Other NRA Board members are further perpetuating the defamation.  For instance, Marion Hammer ("***Hammer***") told The Wall Street Journal on May 2, 2019 that the facts about LaPierre's pass-through expenses were "part of the failed coup attempt," parroting Brewer and

LaPierre's defamatory statements.[43]   Hammer is an NRA Board member and devout LaPierre supporter.  Hammer has also benefitted personally from her relationship with the NRA.  Reports reveal that she received $979,000 from the NRA from 2014-2018 as a lobbyist (including a $274,000 payment for "consulting services and legislative lobbying"), working five hours per week, on average.[44]   Her organization, Unified Sportsmen of Florida, also has been receiving annual payments of $216,000 from the NRA.[45]

134.    LaPierre and Brewer's defamatory narrative was one more step in the decision by LaPierre to block Col. North's renomination as President, despite being one of the most well-regarded NRA members, historically receiving more votes than anyone to serve on its Board.  But Col. North was not the only one expelled by Brewer and LaPierre.  Numerous fiduciaries, including Board members, employees, and counsel were also accused of engaging in a conspiracy and have been fired or otherwise forced out of the NRA under pressure.

135.    As Brewer, personally and through messaging, was disparaging and defaming AMc, Angus was admitted to the hospital.  During this time, Brewer, on behalf of the NRA, filed a second Virginia lawsuit against AMc on May 22, 2019 with newly urged extortion allegations, now claiming that it was AMc who was leaking information to the media.  LaPierre and Brewer (and Powell) knew both claims to be absolutely false—because Brewer was the person who had constructed both narratives and was leaking information to the press.  Such calculated litigious action tracking Angus' cancer treatments demonstrates Brewer's unique access to AMc for a level of psychological warfare far exceeding zealous advocacy.

---

[43] Mark Maremont, *NRA Chief Wayne LaPierre Questioned on Travel Expenses*, WALL STREET JOURNAL (May 2, 2019), https://www.wsj.com/articles/nra-chief-wayne-lapierre-questioned-on-travel-expenses-11556834268.

[44] Skyler Swisher, *Florida Senate Closes Investigation into NRA Lobbyist Marion Hammer with No Fines or Sanctions*, SOUTH FLORIDA SUN SENTINEL (Aug. 24, 2019), https://www.sun-sentinel.com/news/politics/fl-ne-hammer-investigation-results-20190823-e7z2fup24fcb5mtffw45qnmvyi-story.html.

[45] *See id.*

136.    Angus's health continued to decline, but Brewer was unrelenting—he continued to leak information and provide quotes for media outlets containing accusatory statements about AMc, further suggesting that AMc had been intentionally harming the NRA, an organization Angus had devoted his life and career to serving.

137.    Angus was so distraught by Brewer's cruel tactics that he directed that Brewer, his own son-in-law, be excluded from his memorial service.  The last week of his life, while on hospice (a fact that Brewer was most certainly knowledgeable of), Brewer was quoted in a Bloomberg article implying his father-in-law, as well as other AMc individuals, were criminals.[46]  On July 16, 2019, libeled as a criminal by his son-in-law and with pending lawsuits claiming fraud and professional malfeasance against his company prosecuted by his son-in-law, Angus passed away.

138.    Knowing the NRA's most trusted advisor at AMc was no longer able to defend his company, Brewer maliciously filed a third lawsuit in the Northern District of Texas against AMc and numerous newly added individual AMc defendants just forty-five days after his father-in-law passed away.[47]  Not satisfied, on September 5, 2019, Brewer filed his *fourth* lawsuit against AMc in the Virginia Superior Court, alleging that AMc failed to return NRA property (despite the NRA refusing to make the required payment for the shipment of that property under the plain language of the Services Agreement).

139.    The NRA, with LaPierre and Brewer at the helm, has moved from a non-profit gun-rights organization to a serial litigant.  Each of the lawsuits against AMc depicts the NRA as a victim, each has been filed without any attempt at a good faith "meet and confer" negotiation, and

---

[46] David Voreacos & Neil Weinberg, *Oliver North Claims That the NRA's Leader Defamed Him*, BLOOMBERG (Jul. 11, 2019), https://www.bloomberg.com/news/articles/2019-07-11/oliver-north-seeks-nra-legal-fees-claims-gun-group-defamed-him.

[47] *See National Rifle Association of America v. Ackerman McQueen, Inc., et al.*, Case No. 3:19-cv-02074-G (N.D. Tex.).

each has been accompanied by carefully orchestrated leaks and false, self-serving press releases. In fact, the Defendants in this lawsuit first learned that they were sued from news reports *before* they were even served.  The repetitive and persistent nature of these filings merely underscores the fact that the NRA (and its counsel) have no real interest in resolution, but only a protracted public spectacle.  In addition to the four lawsuits against AMc, under Brewer's influence, the NRA has filed nearly 15 additional lawsuits/arbitrations.

## P.     One-Sided Interpretation of Services Agreement.

140.     Each of the NRA's lawsuits against AMc, including the instant case, either directly involves or tangentially implicates the Services Agreement and the parties' respective rights and obligations.  In fact, the first two Virginia cases are centered on alleged breaches of that agreement by AMc.  AMc counterclaimed in Virginia that it is the NRA, not AMc, in breach of that Services Agreement.

141.     It is now appropriate for this Court to consider whether, by its many actions, including several lawsuits filed against AMc, the NRA waived its rights to insist on the viability of one particular provision of that agreement: the confidentiality section.[48]

142.     Although the NRA sought to rely upon the confidentiality section of the Services Agreement in the various lawsuits against AMc, it waived the provision by its disclosure of confidential information belonging to AMc and by disclosure of its own purportedly confidential information.  For example, the NRA disclosed the existence and content of the AMc agreement with Col. North, confidential to both AMc and the NRA.  LaPierre admitted that he authorized the Brewer Firm to communicate with the New York Times.  When AMc complained and demanded a retraction, NRA counsel took the position that only AMc was required to maintain

---

[48] *See* Services Agreement § IV.

confidentiality.   Under that theory, the NRA can divulge AMc's (or the NRA's) confidential material with impunity; AMc has no reciprocal right—including using the very same information the NRA divulges after the NRA's own intentional disclosure.

143.    Additionally, the NRA has liberally quoted from the Services Agreement and attached it in the public record, including in the instant case.[49]  Having previously taken the position that the Services Agreement itself is confidential, it cannot now hope to preserve that status.

144.    If a proper reading of the Services Agreement is as the NRA purports—a unilateral obligation on the part of AMc only—then under those circumstances, AMc is entitled to a declaration that the NRA waived such provision by its own affirmative conduct.  Alternatively, it qualifies as an unconscionable agreement under the provisions of Virginia § 8.2-302, which provides in pertinent part:

> If the Court finds as a matter of law the contract or any clause thereof to have been unconscionable at the time made, the court may refuse to enforce the contract, or to ignore the unconscionable provision, or it may limit its application in order to avoid as unconscionable result. Code of Virginia § 8.2-302.[50]

145.    Beyond the confidentiality dispute, the NRA makes another unilateral use of the Services Agreement.  As dependent as the NRA is on certain provisions of the Services Agreement, it conveniently overlooks its obligation to pay a "fair and equitable termination fee," recognizing the "inevitable severances and other reasonable costs" associated with termination, and the concurrent requirement to negotiate such costs in good faith.[51]

---

[49] *See, e.g.*, ECF 18 ¶¶ 50, 81.
[50] Pursuant to Section XII.A of the Services Agreement, all disputes "arising thereunder shall be governed by and construed solely under the laws of the Commonwealth of Virginia, or if applicable by federal law."
[51] *See* Services Agreement §§ XI.E-F.

**Q.** **The NRA, LaPierre, and Brewer Have Attempted to Destroy AMc's Third Party NRA Contracts by Refusing to Follow Contract Terms for Compensation.**

146.     At the NRA's direction, AMc entered into employment agreements with two well-known personalities, Col. North and Loesch.  AMc formally employed Col. North, Loesch, and at least one other talent, at the NRA's request.  The 2018 Amendment to the Services Agreement makes clear the NRA's responsibility for compensating those personalities, including if the contracts are terminated.  As previously noted, under that amendment, the NRA took responsibility for reimbursing AMc for the cost associated with the NRATV talents.  The NRA also effectively "guaranteed" its Third Party NRA Contract obligations by committing, among other things, to provide a $3 million letter of credit to backstop those commitments.[52]

147.     Until the NRA began its campaign of belligerence against AMc, the reimbursement system worked as well as it always had throughout the years, including for third-party contracts like the Third Party NRA Contracts with Col. North and Loesch.  Indeed, even as the NRA ramped up its campaign of harassment against AMc in 2018, it continued to observe its obligations to AMc and, by third-party beneficiary extension, to the talent.

148.     LaPierre personally led the recruitment of Col. North.  LaPierre negotiated the terms of the Col. North Contract.  Despite his current denials, he was intimately involved in all material aspects thereof, including the designation of Col. North as an "employee" instead of a "contractor."  LaPierre's turnaround subsequent decision to oust Col. North as President of the NRA, as well as the NRA not paying the required amounts for termination, interfered with the North Contract and damaged AMc in the process.

149.     When the NRA precipitously initiated its litigation campaign against AMc, leading to the eventual shutdown of NRATV at the end of June 2019, the NRA ceased reimbursement for

---

[52] *See* Amendment No. 1 to Services Agreement §§ 2, 3.

the compensation of the Third Party NRA Contracts.  The NRA ceased such reimbursement despite its clear obligation to repay AMc for "fronting" the salaries and benefits to Col. North, Loesch, and the other talent on behalf of the NRA.  In the case of Loesch, AMc is now the subject of her arbitration claim, seeking millions.  Although AMc denies liability, the Loesch claim is the direct result of the NRA's breach of its contractual obligations.

150.    The result of the NRA's cessation of funding, quite naturally, left AMc in the untenable position where it was unable to manage the compensation requirements of the Third Party NRA Contracts.  The NRA and LaPierre not only knew the terms of the Third Party NRA Contracts, they directed and expressly approved each of them and acknowledged their existence and the NRA's obligations to pay for them in the 2018 Services Agreement Amendment.  In the face of that knowledge and acknowledgement, the NRA has now steadfastly refused to honor its obligation at LaPierre's urging, in the process tortiously interfering with those third-party contracts.

**R.   The NRA's Litigation against the New York Attorney General Reveals that Scapegoating AMc was the NRA's Plan from the Beginning.**

151.    In 2019, shortly after taking office, New York Attorney General ("*NYAG*") Letitia James began an investigation into the NRA due to concerns about the organization's compliance with New York not-for-profit law.  After this investigation, in August 2020, the NYAG brought suit against the NRA seeking dissolution of the organization's corporate charter.[53]

152.    Once the NRA realized that its business practices were about to be scrutinized by the NYAG, the NRA, through LaPierre, Powell, and Brewer, developed a plan to place the blame for any compliance problems on someone else.  As the NRA's largest vendor, AMc was the

---

[53] Orig. Compl., *State of New York v. NRA*, No. 451625/2020, Supreme Court of New York, New York County (Aug. 6, 2020).

obvious choice—a plan that (as discussed above) was further fueled by Brewer and Powell's personal animus toward AMc.

153.    In anticipation of the NYAG investigation, the NRA and the Brewer Firm immediately went to work creating the false public narrative it would espouse as its defense in the inevitable lawsuit by the NYAG.  As stated above, they initiated the multiple fake audits and began making unreasonable document requests of AMc to create the appearance of malfeasance on AMc's part.  For instance, by asking for confidential information related to AMc's other clients unrelated to AMc's work for the NRA, (which AMc refused to provide), the NRA then went straight to the press, decrying AMc's "shocking" concealment of information.  They likewise pretended to be "shocked" by AMc's contract with Col. North, even though LaPierre and other NRA executives negotiated and approved the contract at every step—including Brewer, who himself was present at the Audit Committee meeting where the North Contract was approved.

154.    Then, as AMc sought to comply with the NRA's requests for information—about expenses of the NRA's *own executives*—AMc had to write a letter to LaPierre seeking receipts for expenses he himself had incurred, which he had told AMc were legitimate NRA business expenses. Instead of producing any receipts, however, LaPierre and the NRA further twisted the public narrative accusing AMc of "extorting" LaPierre and launching a "smear campaign" against the NRA.  With Brewer's lead, the NRA brought multiple baseless lawsuits (including the instant case), each painting the NRA as the victim of the very business practices it created and insisted upon for decades.

155.    Naturally, once the NYAG filed suit, the NRA rolled out its contrived defense that it had been preparing for a year—namely, that AMc masterminded some financial scheme to funnel money to NRA executives.  For instance:

> The NYAG seeks to punish the NRA and its members . . . for alleged misspending that was often committed by Ackerman, without the NRA's knowledge or consent, in transactions the NRA has already sued to unwind . . . . [54]

Further highlighting the NRA's proactive efforts to establish AMc as the fall-guy, the NRA states:

> Indeed, although the [NYAG] notably declines to name the agency as a defendant, the NRA commenced claims more than a year ago for fraud and breach of fiduciary duty against its former public relations firm, [AMc] regarding several of the transactions alleged in the Complaint.[55]

The NRA took the same position in counsel's argument and in testimony at the recent bankruptcy hearing, further smearing AMc (with journalists in attendance).

156.     Clearly then—and to the NRA's obvious frustration—even after a year-long investigation that included volumes of records provided by AMc and depositions of AMc executives and employees, the NYAG did not find any financial wrongdoing on the part of AMc. Yet even though its plan completely failed, the NRA's efforts to scapegoat AMc have had devastating financial and reputational consequences, for which AMc now seeks redress.

**S.     The NRA's Abuse of the Judicial System Continues.**

157.     As part of its scorched-earth litigation efforts, the NRA (with Brewer's guidance and direction) has made several litigation tactics to *all* parties' detriment, including the NRA.  The first was the NRA's failed attempt to consolidate four unrelated lawsuits through multidistrict litigation.

158.     On October 20, 2020, the NRA moved to transfer this case, along with three others, to the jurisdiction of the Judicial Panel of Multidistrict Litigation.[56]  The panel ultimately ruled

---

[54] Consolidated Reply Memorandum of Law by Defendants, at 15, *State of New York v. NRA*, No. 451625/2020, Supreme Court of New York, New York County (Dec. 24, 2020).

[55] Memorandum of Law in Support of Defendant the National Rifle Association's Motion to Dismiss, *State of New York v. NRA*, No. 451625/2020, Supreme Court of New York, New York County (Oct. 19, 2020).

[56] *In re: National Rifle Association Business Expenditures Litigation*, MDL No. 2979 (J.P.M.L. 2021) ("**NRA MDL**"),

that consolidation or centralization of litigation was unnecessary and denied the motion.[57]  But before even receiving that inevitable ruling, the NRA next filed its bankruptcy petition.

159.    On January 15, 2021, the NRA attempted its next litigation tactic by filing for Chapter 11 bankruptcy.[58]  By doing so, the NRA could pursue its claims against Defendants while, conveniently, this Counterclaim was automatically stayed against the NRA.  Almost immediately, AMc filed a motion to dismiss, arguing the filing was in bad faith.  The parties participated in a trial spanning the month of April that included testimony from 23 witnesses, including LaPierre.

160.    The NRA confirmed throughout the bankruptcy trial that (a) the only reason it filed bankruptcy was because of the NYAG's Enforcement Action and (b) in hopes to "defend" against the NYAG's investigation and lawsuit, the NRA sued AMc.  In other words, the NRA made clear throughout the trial its continued narrative to try and scapegoat AMc for the NRA's (and individual executives) wrongdoing revealed by the NYAG's investigation.

161.    For example, LaPierre admitted he received nearly $300,000 in excess benefit transactions that he did not properly disclose.  Yet that number does *not* include the total amount of benefits he actually siphoned from the NRA, such as for his travel escapades to the Bahamas on an NRA vendor's luxury yachts, the Illusions and the Grand Illusions.  NRA employees, and even counsel, admitted "cringe-worthy" facts of years of bad management decisions, including override of internal controls by senior management, financial conflicts of interest by senior management and the NRA Board (including dozens of contract with Board members), improper reimbursements to NRA employees for expenses that had no legitimate business purpose, payments to vendors

---

ECF 1.
[57] NRA MDL, ECF 45 at 1 ("[W]e are not persuaded that centralization is necessary for the convenience of the parties and witnesses or to further the just and efficient conduct of this litigation.").
[58] *In re: National Rifle Association of America*, No. 21-30085-sgj11 (N.D. Tex.) (the "***NRA Bankruptcy***").

without contracts (including the Brewer Firm), and the fact that LaPierre never attended a compliance seminar, even after the NRA began its proudly touted "course correction" efforts.

162.    The evidence also exposed that the NRA Board effectively does not oversee the organization, and cannot, particularly when it is not provided sufficient information regarding the financial and legal situation of the NRA.  The Board itself is cherry-picked to serve LaPierre's needs: the evidence revealed that the nominating committee is chosen by management (LaPierre) and directed by management (LaPierre) on who to nominate to the Board.  Those who are loyal to the NRA instead, and who actually uphold their fiduciary duties, are retaliated against as LaPierre dissenters, being ignored, scolded, suspended, removed from committee assignments, fired, or otherwise terminated.  Then there are the ones whose dissent LaPierre deems so egregious as to be worthy of inclusion in the ever-growing extortion conspiracy narrative (*e.g.*, including Col. North, Chris Cox, Dan Boren, Steve Hart, and Chuck Cooper).  The others, specifically NRA executives, merely ignored concerns that Board members raised about governing and self-correction, such as questions about fees paid to the Brewer Firm.  In the 90 days preceding bankruptcy alone, the NRA paid $17 million to the Brewer Firm.

163.    At the conclusion of the trial, the bankruptcy court found the NRA had no good faith basis to file the bankruptcy, granted AMc's motion to dismiss, and dismissed the bankruptcy—providing just another example to NRA members and the public of how LaPierre and Brewer's dictatorship over the NRA is synonymous with the NRA's failed corporate governance and continued gross mismanagement.

164.    The court found the NRA Board was not informed of any authority whereby LaPierre could file bankruptcy, or even that the NRA was considering filing bankruptcy at all.[59]

---

[59] NRA Bankruptcy, ECF 740 at 8.

Although the NRA gave "several—and at times slightly different—reasons" for why it filed bankruptcy, including the fact that it was unsuccessful with the NRA MDL, it certainly was not because of any financial concern, considering the NRA "is in its strongest financial condition in years."[60]  The court determined the NRA's sole purpose was to avoid the relief requested by the NYAG in its Enforcement Action, which is not a proper bankruptcy purpose.[61]

165.    The bankruptcy court also recognized that certain conduct pre-dating the Enforcement Action and the NRA's purported "course correction"—the conduct for which LaPierre and Brewer tried to divert attention by using the fall-out of the NRA and AMc relationship—is still ongoing, such as violations of the NRA's own approval process for contracts exceeding $100,000; LaPierre still making additional financial disclosures, including up to the time of his testimony; issues of secrecy and lack of transparency; why Craig Spray, "an officer everyone seemed to hold in high regard for his talent and integrity, parted ways with the NRA two weeks into this bankruptcy case," "precipitated by a call from Mr. LaPierre without involvement of the board of directors."[62]  Indeed, "[w]hat concern[ed] the Court most though is the surreptitious manner in which Mr. LaPierre obtained and exercised authority to file bankruptcy for the NRA."[63] The court found that LaPierre's exclusion of key decision makers from the bankruptcy process, "including the vast majority of the board of directors, the chief financial officers, and the general counsel, ***is nothing less than shocking***"[64]—the same exclusion LaPierre has employed throughout this litigation, including even the *filing* of the very first lawsuit against AMc in April 2019.

---

[60] *Id.* at 14-15, 19.
[61] *Id.* at 23-26 ("Based on the statements of counsel and the evidence in the record, the Court finds that the primary purpose of the bankruptcy filing was to avoid potential dissolution in the NYAG Enforcement Action.") & 32 ("The NRA is a solvent and growing organization using this bankruptcy as a tool to win its dissolution lawsuit, and that is not an appropriate use of bankruptcy.").
[62] *Id.* at 34.
[63] *Id.*
[64] *Id.* (emphasis added).

166.    The bankruptcy court also put the NRA, LaPierre, and specifically, Brewer on notice that if the NRA refiles the bankruptcy, the court "would immediately take up some of its concerns about disclosure, transparency, secrecy, conflicts of interest of officers and litigation counsel, **and the unusual involvement of litigation counsel [Brewer] in the affairs of the NRA**, which could cause the appointment of a trustee out of a concern that the NRA could not fulfill the fiduciary duty required by the Bankruptcy Code for a debtor in possession."[65]

167.    As with the NRA MDL, AMc was required to spend money defending against this latest frivolous litigation tactic aimed at thwarting, not just the NYAG Enforcement Action, but also AMc's Counterclaim that it effectively stalled for several months.  AMc fully intends to pursue the appropriate relief through sanctions or otherwise for the NRA's continued bad faith abuse of the judicial system at AMc's, the NRA's, and the Court's expense.

## V.    CAUSES OF ACTION

**COUNT ONE - BREACH OF CONTRACT**

168.    The allegations contained in the preceding paragraphs are incorporated as though copied verbatim herein.

169.    Under the 2018 Amendment to the Services Agreement, the NRA is required to make timely payments in response to invoices received from AMc. The Amendment states:

> NRA acknowledges that its failure to pay such an invoice within 30 days will cause substantial financial damage to AMc. Accordingly, if at any time NRA fails to timely pay the invoice, NRA agrees that it shall post a $3,000,000 letter of credit (the "LOC") for the benefit of AMc. The LOC shall continue in existence for the term of the Agreement and shall be maintained at $3,000,000 at all times.

170.    The NRA has failed to make timely payments on AMc's invoices within the 30-day time period required by the Services Agreement.  The NRA's failure to make these payments

---

[65] *Id.* at 37 (emphasis added).

within the contractually required 30-day period after the invoice date has caused substantial damage to AMc.

**Breach of the NRA's Obligations to Pay for Services Rendered during Litigation.**

171.    Following the NRA's first lawsuit in Virginia, the NRA continued to request services from AMc.  AMc performed those services, but the NRA has failed and refused to pay the monthly invoices submitted by AMc.

172.    On Tuesday, April 30, 2019, Nader Tavangar, EVP/Managing Director of Mercury sent the May Monthly Fee invoices (dated May 1, 2019) to the NRA (then-Treasurer Craig Spray, Rick Tedrick, Lisa Supemaugh, and Duane Reno) via email, as per normal course of business.

173.    On April 30, 2019, AMc emailed invoices, including invoices to the NRA  of at least $1.7 million and invoices to the NRA Foundation of at least $375,000, which neither the NRA nor the Foundation has paid.

174.    These monthly, annualized fee invoices are sent every month per the approved 2019 budget.

175.    Per the Services Agreement, Section III.E provides the following relevant requirements:

> All sums payable to AMc under this Services Agreement shall be payable to AMc's corporate headquarters in Oklahoma City, Oklahoma within 30 days of the invoice date . . . NRA shall notify AMc of any questions concerning any invoices within 10 business days after receipt.

176.    Consistent with the NRA's practice in all prior months of the year, AMc did not receive any questions or concerns regarding such invoices during the ten business days following the NRA's receipt of the invoices.

177.    The NRA failed to pay the invoices issued to it on May 1, 2019 within the required 30-day time period.

178.    On June 3, 2019, AMc's Chief Financial Officer, Winkler, personally called and emailed NRA Treasurer Craig Spray regarding this missed payment.  Spray did not return the email message or call.

179.    On the afternoon of June 3, 2019, Melanie Montgomery, EVP/Management Supervisor at AMc, called Spray leaving a detailed voicemail reminding him of the past due invoices covering May fees for April services, which were never questioned.  Spray did not return her call.

180.    On June 4, 2019, AMc's Chief Financial Officer sent by email a letter addressing the past due invoices and demanded that the NRA pay the approximately $1.7 million and post the $3 million Letter of Credit, as required under the Services Agreement.

181.    On June 5, 2019, AMc received a letter from the NRA's designee, Andrew Arulanandam, with a copy to LaPierre, Spray, and Frazer stating that the NRA declined to post the Letter of Credit.

182.    Rather than pay the invoices or post a Letter of Credit, the NRA began a series of correspondence wherein it sought to belatedly request additional and irrelevant information about the invoices, long after the ten-day period for questioning the invoices had expired, as provided in Section III.E of the Services Agreement.

**Claim for Breach of the NRA's Obligation to Pay Invoices for Services Prior to Termination.**

183.    AMc issued additional invoices to the NRA and the Foundation for work performed up to the date of termination of the Services Agreement and those invoices, which exceed approximately $4 million, remain past due and unpaid.

184.    Such failure and refusal to pay those invoices is another breach of contract by the NRA.

**Claim for the NRA's Breach of Indemnification Clause of the Services Agreement.**

185.    Section V.B.1 of the Services Agreement also requires the NRA to indemnify and reimburse AMc for any expenses it may incur for various reasons, including under at least two scenarios: (a) for expenses that arise from a government agency seeking equitable or other relief against the NRA or that relate to actions that AMc has taken at the direction of the NRA and (b) for expenses that arises from the Loesch arbitration.

186.    The NRA has been the subject of various government inquiries that have imposed costs and expenses on AMc to produce records, negotiate with government investigators, seek waivers of confidentiality from the NRA, and generally cooperate to the extent that the NRA allows AMc to cooperate or a court orders it to cooperate.

187.    AMc's expenses relating to the government inquiries continue to grow as government focus on the NRA becomes more intense and the NRA's resistance to such investigations becomes more adversarial.  The full amount of such indemnification damages will be presented at trial.

188.    The NRA's refusal to pay indemnification expenses relating to government investigations constitutes an additional breach of the Services Agreement.

189.    The Services Agreement also requires the NRA to "indemnify, defend, and hold harmless AMc, and its directors, officers, employees, agents, contractors and representatives…from and against any and all claims, demands, causes of action, suits, liabilities, losses, damages, settlements, judgments, and expenses…arising from" "the public relations services and related activities of any Spokesperson pursuant to the direction or supervision of

NRA."[66]  The NRA designated Loesch as a Spokesperson, which the Services Agreement defines as "any person engaged by AMc as a spokesperson in connection with NRA and its purposes, objectives and activities…pursuant to the direction or supervision of AMc."[67]  Loesch has currently-pending arbitration she filed against AMc for the NRA's failure and refusal to honor its obligations relating to the Third Party NRA Contracts.  That arbitration and the damages relating thereto arise directly from Loesch's public relations services and related activities on behalf of, at the direction of AMc (as first directed by the NRA), and under the supervision of AMc (with ultimate decision-making power and oversight by the NRA).  AMc seeks indemnity and defense costs incurred in responding to and defending against the Loesch arbitration.

**Breach of the NRA's Obligation to Post a $3 Million Letter of Credit.**

190.    The 2018 Agreement expressly provides for a remedy to avoid substantial harm to AMc in the event that the NRA is delinquent in paying AMc's invoices.

191.    Per the 2018 Amendment, Section II.E, provides the following relevant requirement:

> NRA acknowledges that its failure to pay such an invoice within 30 days will cause substantial financial damage to AMc. Accordingly, if at any time NRA fails to timely pay the invoice, NRA agrees that it shall post a $3,000,000 letter of credit for the benefit of AMc.

192.    The NRA failed to comply with the contract requirement that it "shall" post a $3 million letter of credit for the benefit of AMc in the event that the NRA is late on a single payment of fees.

**Breach of the NRA's Obligation to Pay Invoices Timely**

193.    Section V, Billing and Payment, contains the following Subsection E:

> All sums payable to AMc under this Services Agreement shall be

---

[66] *See* Services Agreement § V (B)(1).
[67] *Id*. at § V (A)(1).

payable at AMc's corporate headquarters in Oklahoma City, Oklahoma within 30 days of the invoice date. Any amounts not received by AMc within 60 days from the date of the invoice shall bear interest at the rate of 1.0 percent per month from the date of the invoice until paid.

194.     In addition to the non-payment of fees listed, *supra*, the NRA was substantially late with respect to reimbursing AMc for other expenses.  For example, the NRA took 133 days to pay for the cost of CG Magazine '18, Issue 5 invoiced for $269,000.  The NRA also delayed 133 days before paying $90,000 for Website Unification.

195.     The NRA was late in paying at least 80 separate invoices issued by AMc during the second half of 2018.

196.     Pursuant to the terms of Section V.E, the NRA owes AMc interest at the rate of 1 percent per month on all late paid invoices.  Despite the contractual requirement, the NRA has failed to pay any such interest, which is a material breach of the Services Agreement.

197.     Based on the contractual rate of 1 percent per month, the NRA owes AMc tens of thousands of dollars in unpaid interest that it has failed to pay with respect to invoices issued during 2018, an amount that continues to accrue.

198.     During 2019, the NRA was late in paying, and still has not paid, invoices for AMc's services prior to the termination of the Services Agreement.  Interest on such unpaid invoices continues to accrue while the invoices are unpaid.  AMc will present evidence of pre-judgment interest at trial with respect to all unpaid invoices.

199.     Under the Services Agreement, if the "NRA fails to diligently and in good faith perform any of its obligations," AMc may terminate the Services Agreement.  The NRA failed to perform its payment obligations with diligence and good faith, including failure to fulfill the contractual obligations to post a $3 million letter of credit and pay interest on late payments.

**Breach of the NRA's Obligation to Pay a Termination Fee**

200.    AMc terminated the Services Agreement pursuant to the 90-day notice provision on May 29, 2019 and began to prepare for the orderly wind down of services it was performing for the NRA, including identifying NRA assets and downsizing its workforce.

201.    Section XI.F of the Services Agreement provides as follows:

> In consideration of the dedication of a substantial number of personnel and resources to provide the services under the Agreement (and the necessity to maintain such staffing levels and resource allocations to enable AMc to continue to provide such services upon any renewals hereof), the NRA agrees to pay AMc a fair and equitable termination fee to compensate it for the inevitable severances and other reasonable costs incurred in conjunction with such expiration or termination. Such termination fees shall be negotiated in good faith by the parties and paid to AMc no later than the last day of this Agreement.

202.    The NRA failed and refused to engage in any good faith negotiations required under the Services Agreement to wrap-up the relationship between AMc and the NRA.  Such failure is another breach by the NRA of the Services Agreement.

203.    The NRA failed to pay any termination fee and is in breach of this provision of the Services Agreement.  The NRA was obligated to pay this termination fee no later than the last day of the Services Agreement.

204.    The NRA breached its payment obligations under the Services Agreement long before any alleged breach by AMc articulated by the NRA in its Amended Complaint.

205.    The NRA's breaches that occurred have caused AMc to incur damages, the amounts of which are not yet fully calculated.

206.    The breaches by the NRA are material as that term is defined under the Code of Virginia, § 59-1-507.1.

207.    AMc seeks recovery of contract damages and severance remedies in the amount not less than $50 million and such other relief as this Court deems just.  AMc also seeks the recovery of any and all attorneys' fees and expenses as provided by law, including but not limited to all of the attorneys' fees and expenses incurred as a result of the NRA's bad faith bankruptcy filing in January 2021 and attempted consolidation before the judicial panel on multi-district litigation.

**COUNT TWO – DEFAMATION AND DEFAMATION *PER SE***

208.    The allegations of fact set forth in the preceding paragraphs are incorporated as though copied verbatim herein.

209.    As set forth hereinabove, NRA representatives, including LaPierre, Brewer, Powell, and the Brewer Firm, have repeatedly, intentionally, and falsely defamed AMc, a private figure, by accusing AMc of the criminal act of extortion.  The NRA, LaPierre, Powell, Brewer, and the Brewer Firm, individually and through intermediaries, have published this accusation as fact and have done so publicly.  The NRA is not a member of the print, broadcast, or electronic media.

210.    Brewer, the Brewer Firm, Powell, LaPierre, and other members of NRA leadership have identified AMc directly by name, and the accusations of commission of a criminal act are *per se* defamatory.  Such accusations are unambiguous and have held AMc up to calumny and public ridicule.

211.    The NRA, LaPierre, Powell, Brewer, and the Brewer Firm have further defamed Defendants by accusing them of leaking confidential information to the media in breach of the Services Agreement and of withholding documents despite repeated requests, also in breach of the Services Agreement.

212.    The subject matter of these false factual assertions is a decidedly private matter, despite the NRA's attempts to alter its status to that of a matter of public concern.

213.    AMc has suffered injury as a direct result of these false statements in amounts as yet undetermined, but estimated to exceed $50 million, for which AMc seeks recovery.

COUNT THREE - TORTIOUS INTERFERENCE WITH THE NRA THIRD-PARTY CONTRACTS

214.    The allegations of fact set forth in the preceding paragraphs are incorporated as though copied verbatim herein.

215.    The NRA, Brewer, the Brewer Firm, Powell, and LaPierre, individually, intentionally and with full knowledge of their existence, have tortiously interfered with AMc's employment agreements with NRATV talents, including those of Col. North and Loesch.  Each such contract is valid, having been entered into at the behest of, and approved by, the NRA.  Each such contract is denominated in the Services Agreement as a "Third Party NRA Contract."

216.    The NRA has refused its contractual commitment to reimburse AMc for the costs associated with the Third Party NRA Contracts, thus preventing AMc from funding salaries and costs associated therewith.

217.    The NRA's refusal to reimburse AMc has caused said contracts to lapse due to non-payment, thereby proximately causing injury to AMc and to the talents affected who themselves are third-party beneficiaries of the Services Agreement.

218.    The NRA, Brewer, the Brewer Firm, Powell, and LaPierre's actions constitute tortious interference with contract and have proximately caused AMc financial harm in precise amounts yet to be determined, but estimated to exceed $50 million, for which AMc seeks recovery.

COUNT FOUR – BUSINESS DISPARAGEMENT

219.    The allegations of fact set forth in the preceding paragraphs are incorporated as though copied verbatim herein.

220.    The NRA, LaPierre, Powell, Brewer, and the Brewer Firm have published disparaging words about AMc's economic interests, including words about the character of its business.

221.    The words published by the NRA, LaPierre, Powell, Brewer, and the Brewer Firm were false and published with malice.  The NRA, LaPierre, Brewer, and the Brewer Firm made these statements knowing that they were false, made them with ill will, and made them with the intent to interfere with AMc's economic interests.

222.    The NRA, LaPierre, Powell, Brewer, and the Brewer Firm published the disparaging words without privilege.

223.    The NRA, LaPierre, Powell, Brewer, and the Brewer Firm's actions have proximately caused AMc special damages, including the loss of the Services Agreement, the loss of the Third Party NRA Contracts, and the loss of business, the financial harm in precise amounts yet to be determined, but estimated to exceed $50 million, for which AMc seeks recovery.

COUNT FIVE – FRAUD

224.    The allegations of fact set forth in the preceding paragraphs are incorporated as though copied verbatim herein.

225.    Statements of fact made to AMc personnel by LaPierre on the dates specified hereinabove, and those made repeatedly throughout the duration of the parties' relationship, but particularly during the four (4) years leading up to the filing of this lawsuit, concerning NRATV's performance analytics, commentators, and the Third Party NRA Contracts, were false, were known by LaPierre to be false, were made with intent to deceive AMc and to lure it into exposing itself to financial obligations, were relied upon by AMc to its detriment, and, as a result, AMc has suffered damages in excess of $50 million for which it now sues.

226.    The NRA, Brewer, the Brewer, Firm, Powell and LaPierre also engaged in fraud when they made material misrepresentations of fact (a) that Defendants attempted to extort LaPierre with Col. North and other ousted NRA Board members and lawyers, (b) that Defendants leaked confidential information, and (c) that Defendants withheld requested documents to which the NRA was entitled.  These statements were false, and the NRA and LaPierre knew these statements were false when made.  They made these statements with the intent to deceive other persons, including the NRA Board members and related NRA decision-makers and the public, with the intent that these individuals would rely upon those statements to ostracize Defendants and to support the NRA, Brewer, Powell, and LaPierre's efforts in terminating the Services Agreement, in refusing to pay fees due thereunder, and in destroying Defendants' business and reputations through defamation.  The other NRA Board members and the public have relied upon (and continue to rely upon) these statements to Defendants' detriment and to Brewer and the Brewer Firm's benefit.

227.    The NRA, Powell, Brewer, the Brewer Firm, and LaPierre further committed fraud when they subjected AMc to fake audits purportedly to support their "joint interest" efforts relating to the Lockton Lawsuit concerning Carry Guard—only for AMc to learn later that (a) the last of the audits was conducted by a Brewer Firm *director*, despite LaPierre's repeated and direct promise that neither Brewer nor Powell would have any involvement with AMc moving forward, and (b) the NRA, LaPierre, Brewer, and the Brewer Firm would use that audit as the basis for the NRA's first (and subsequent) lawsuits against AMc.  Their statements concerning the need and use for the audits, as well as the "independence" of the auditors, were false.  The NRA, LaPierre, Powell, Brewer, the Brewer Firm, and Dillon knew they were false when made, and made the

statements with the intent that AMc rely upon them to provide access to their documents.  AMc did rely on those statements and permitted a robust nine-day review of volumes of documents.

228.    Submitting to the audit proved harmful to AMc—while the NRA and the Brewer Firm benefitted from access to AMc's sensitive and proprietary information—evident by the first and subsequent lawsuits based upon that audit.  Adding insult to injury, the Brewer Firm has mobilized all efforts against producing *nonprivileged* FRA documents demonstrating the factual basis of the audit on which these lawsuits were wrongfully initiated in bad faith.

229.    By making the statements referenced above—(a) that Brewer, the Brewer Firm, and Powell would not be involved with AMc or any further audits of AMc and (b) the audits were for "joint interest"-type purposes in responding to the Carry Guard lawsuit—the NRA, LaPierre, Brewer, and the Brewer Firm voluntarily disclosed information that gave rise to a duty to disclose the whole truth, and they partially disclosed information giving a false impression, which also gave rise to a duty to disclose the whole truth.  However, the NRA and LaPierre failed to disclose that Brewer would be participating in the audits through his surrogate Dillon, that Powell had joined Brewer's legal team and occupied a key position in the legal work concerning AMc, and that the audits were actually being used to prepare for a lawsuit against AMc.

230.    Those undisclosed facts are material.  The NRA and LaPierre knew AMc was ignorant of those facts and did not have an equal opportunity to discover them.  The NRA and LaPierre were deliberately silent—indeed, they intentionally concealed the information—when they had a duty to speak.  By failing to disclose the facts, Counter-Defendants intended to induce AMc to take certain action, *i.e.*, to allow the NRA to freely audit AMc's sensitive, competitive business information.  AMc relied on their nondisclosure and *did* permit the NRA to audit its information (three audits, including the deceptively-described "independent" audit that took nine

days).  AMc was injured as a result of acting without that knowledge, including by the NRA using the audit as the basis for the first and subsequent lawsuits against AMc while shielding the underlying facts from production.

231.    Due to the intentional, malicious nature of the NRA, LaPierre, Brewer, the Brewer Firm, Dillon, FRA, and Powell's conduct, AMc also seeks uncapped exemplary damages in this matter in an amount to be determined at trial.

**COUNT SIX – CIVIL CONSPIRACY**

232.    The allegations of fact set forth in the preceding paragraphs are incorporated as though copied verbatim herein.

233.    The NRA, LaPierre, Powell, Brewer, and the Brewer Firm combined to conspire against AMc.

234.    The object of the combination or conspiracy was to defame AMc by repeatedly, intentionally, and falsely accusing AMc, a private figure, of the criminal act of extortion, of leaking confidential information in breach of the parties' confidentiality provision under the Services Agreement, and of withholding documents to which the NRA alleged it was entitled.

235.    The object of the combination or conspiracy was also to tortiously interfere with AMc's contracts, including terminating the Services Agreement and AMc's employment agreements with NRATV talents, such as those of Col. North and Loesch (*i.e.*, the Third Party Contracts).

236.    The object of the combination or conspiracy was also to defraud, including (1) statements of facts made to the NRA regarding the alleged extortion upon which such falsehood the NRA would rely in terminating the AMc contracts; (2) statements of fact made to AMc personnel by LaPierre concerning NRATV's performance analytics, commentators, and the Third Party NRA Contracts; and (3) statements of fact made to AMc by LaPierre that Powell, Brewer,

and the Brewer Firm would no longer interact with AMc or be involved in any further reviews of AMc documents.  These statements were false when made and were known by LaPierre, Brewer, the Brewer Firm, Powell, and Dillon to be false when made.

237.    These statements were made with intent to deceive AMc to lure it into exposing itself to financial obligations and to lure it into agreeing to additional intrusive reviews of its competitive business information under the auspices of legitimate "joint interest" needs as part of the NRA's defense in the Carry Guard dispute.  AMc relied on these statements to its detriment, including by extending the Services Agreement and providing additional services to the NRA, for which it has not been compensated, and by allowing FRA and Dillon (unknown at the time to be Brewer's surrogates) to conduct a nine-day audit of AMc's competitive and proprietary business information.  As a result, AMc has suffered damages in excess of $50 million for which it now sues.

238.    At least one of the members committed an unlawful and overt act to further the object or course of action, including but not limited to Counter-Defendants' tortious actions described above.

239.    AMc has suffered injury and sustained damages as a result of the conspiracy, in an amount to be proven at trial.

## COUNT SEVEN - DECLARATORY JUDGMENT

240.    The allegations of fact set forth in the preceding paragraphs are incorporated as though copied verbatim herein.

241.    AMc seeks a declaration pursuant to 28 USC §2201 *et. seq.* that, by their actions, the NRA and its counsel have waived and/or are estopped from claiming that the confidentiality

provision of the Services Agreement applies only to AMc.  Holding AMc to such one-sided interpretation prevents AMc from freely and fully responding to allegations made by the NRA.

242.    The NRA and its counsel have taken the position that the referenced contractual provision is one-sided and binding only on AMc.  AMc disagrees with the NRA's position, and a real and justiciable controversy regarding this issue exists.  AMc seeks a declaration that the NRA and its counsel have waived such provision, or by their actions are estopped from enforcing it.

243.    Alternatively, AMc seeks a declaration by this Honorable Court that the confidentiality provision of the Services Agreement is unconscionable under Code of Virginia § 8.2-302 as interpreted by the NRA.

244.    AMc is entitled to, and seeks, its reasonable and necessary attorney's fees incurred in the prosecution of this claim.

**COUNT EIGHT – PIERCING THE CORPORATE VEIL (NRA/NRA FOUNDATION)**

245.    The allegations contained in the preceding paragraphs are incorporated as though copied verbatim herein.

246.    The NRA uses the NRA Foundation as a sham nonprofit entity through which to perpetrate its wrongs on AMc and the other Defendants.

247.    The NRA has been described as undercapitalized, including by various media segments discussing the deficits the NRA has run over the last several years.  But the NRA has an unending funding source through the Foundation, evidenced by at least one recent loan the Foundation made to the NRA and some $30 million *plus* that the Foundation transferred to the NRA in recent years.  Apparently, the Foundation funds a host of NRA programming, including services AMc provided to the NRA.  The NRA formed the Foundation, presumably for this purpose.  Indeed, the NRA directed AMc to bill the Foundation as much as possible, to which

AMc responded that the NRA would have to specifically instruct AMc to invoice the Foundation for eligible services.  That the Foundation has failed to pay at least one invoice owed to AMc demonstrates that the NRA controls the Foundation and is dictating whether the Foundation complies with its own obligations to AMc.

248.     The Foundation's Board is controlled by the NRA.  The Foundation's Trustees must be elected by the NRA's Board of Directors following the NRA's Annual Meeting.[68]  Although the two have some different board members and other persons in leadership, the two share substantially similar membership rolls.  For instance, Meadows (the same one who originally questioned Brewer's fees until she retracted her request and assumed the presidency after Col. North was ousted—and the same one who formed the "Special Litigation Committee" that approved LaPierre's decision to place the NRA into bankruptcy) is the Vice President of the Foundation and the President of the NRA; Richard Childress (the one who also originally questioned Brewer's fees but who did not retract his request and is now no longer an NRA Board member) is a Trustee of the Foundation and the former First Vice President of the NRA; LaPierre is a member of the Foundation Board and the EVP (*de facto* leader) of the NRA; and Craig Spray was the Treasurer for the NRA *and* the Foundation, to name a few.  In fact, the NRA President and the NRA Executive Vice President are automatically "ex officio" members of the Foundation Board of Trustees with "full powers," and the Foundation's Executive Director is appointed by the NRA Executive Director of Advancement.  The NRA even has the power to vote out a Trustee at the expiration of his or her term, or before the expiration of the term with a majority of votes of the Trustees—all of whom likely sit on the NRA Board of Directors at any given time.

---

[68] *See* Foundation Bylaws Art. III, § 1(C).

249.    Additionally, the Foundation rents its office space from the NRA.  Just recently, Brewer had the Foundation's office appraised.  He then had the NRA hike the Foundation's rent *three times* as much for the same space, which allows the NRA to extract more money from the Foundation.

250.    Relatedly, the Foundation has no employees or administrative staff—all individuals who work on Foundation-related matters are employed by the NRA, under NRA supervision and control.  Sonya Rowling testified to the same effect during the bankruptcy hearing.  In return, the NRA charges the Foundation a management fee to cover, for example, employee salaries, rent, field operation expenses, and miscellaneous expenses, which fee is merely another opportunity to siphon Foundation money to cover the NRA's misspending.

251.    To illustrate, on September 17, 2018, at a Foundation Board of Trustees meeting, the current NRA Treasurer told the Foundation Board that the NRA had done a "study" and determined that there should be an increase in the management fees paid by the Foundation to the NRA.  The increase totaled $5,868,048, including a 2018 "catch-up fee" of nearly $4 million to be paid immediately.  This determination to increase the management fees was a surprise to the Foundation Board who did not know that the study, purportedly intended to calculate the benefits provided to their organization, was occurring.  Despite the surprise of the study, *not surprisingly*, the Foundation Board voted to increase the 2018 management fees, including an immediate transfer to the NRA of nearly $4 million—all without further investigation or negotiation and in a closed session that lasted for less than one hour.  In other words, there was no inquiry into the fairness of the fee in the market, no negotiation on the rate, no questions about how the fee was being used.  Meanwhile, 75% of the management fee was allocated to the Foundation's Executive Director through a "consulting" agreement with the NRA (a kickback scheme).

252.     But transactions between the two organizations must be at arms' length and for fair value to the Foundation.  Conversely, grants by the Foundation must be for the specific charitable purposes of the Foundation and may not fund the general operations of the NRA engaging in noncharitable activities.  In reality, the Foundation board abdicated its fiduciary responsibilities by ceding control of the Foundation to the NRA—and continues to do so.

253.     In function and in practice, the Foundation has been operating as a wholly controlled subsidiary of the NRA, without independence or a separate identity from the NRA.  The Foundation Board repeatedly chose to serve the interests of the NRA above those of the Foundations' charitable nonprofit purposes.

254.     In short, there is unity of ownership and interest between the NRA and the Foundation with only a shallow attempt to create enough diversion between them to appear separate.  LaPierre and those he controlled have used the Foundation in his wrongdoing, including by causing the Foundation to fund the activities made the basis of these several lawsuits.  Allowing the NRA to escape liability by shielding the Foundation (its inseparable funding arm) would be a grave injustice against AMc.  Considering the deficits the NRA has run over the last several years, it might be so undercapitalized as to be unable to satisfy a judgment against it, while the Foundation continues to do the NRA's (LaPierre) bidding, unscathed.  AMc requests that the Court disregard the corporate fiction and pierce the corporate veil of the NRA Foundation.[69]

## VI.     UNCAPPED EXEMPLARY DAMAGES

255.     Due to the intentional, malicious nature of the NRA and its representatives, AMc seek exemplary damages in this matter in an amount to be determined at trial.   Further, because

---

[69] AMc previously asserted this alter ego claim against the Foundation in its Second Amended Third Party Complaint on March 12, 2021.  However, because the alter ego necessarily involves the NRA, AMc includes the allegations and claims in this Counterclaim solely to include the NRA.

their wrongful conduct includes securing execution of a document by deception and the fraudulent

destruction, removal, or concealment of a writing, exemplary damages are not limited by any cap.

*See* Tex. Civ. Prac. & Rem. Code 41.008(c).

## VII.   JURY DEMAND

256.    AMc hereby demands a trial by jury on all issues of fact to which it is entitled to a

jury trial in this action.

## VIII.   CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, AMc, as Counter-Plaintiff, prays that upon

hearing, it be awarded judgment for damages as prayed for herein, exemplary damages, pre- and

post-judgment interest, attorney's fees and costs, and such other relief to which it may be entitled.


Dated: May 21, 2021.

Respectfully submitted,

*/s/ G. Michael Gruber*
**G. Michael Gruber, Esq.**
Texas Bar No. 08555400
gruber.mike@dorsey.com
**Brian E. Mason, Esq.**
Texas Bar No. 24079906
mason.brian@dorsey.com
**Jay J. Madrid, Esq.**
Texas Bar No. 12802000
madrid.jay@dorsey.com
**J. Brian Vanderwoude, Esq.**
Texas Bar No. 24047558
vanderwoude.brian@dorsey.com
**Dorsey & Whitney LLP**
300 Crescent Court, Suite 400
Dallas, Texas 75201
(214) 981-9900 Phone
(214) 981-9901 Facsimile

**ATTORNEYS FOR DEFENDANT/COUNTER-PLAINTIFF ACKERMAN MCQUEEN, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 21, 2021, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

*/s/ G. Michael Gruber*
G. MICHAEL GRUBER