**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| **Plaintiff and Counterclaim-Defendant,** | § § § § | |
| **and** | § § | |
| **WAYNE LAPIERRE, and THE NRA FOUNDATION, INC.,** | § § § | |
| **Third-Party Defendants,** | § § | **Civil Action No. 3:19-cv-02074-G** |
| **v.** | § § | |
| **ACKERMAN MCQUEEN, INC.,** | § § § | |
| **Defendant, Counterclaim-Plaintiff, and Third-Party Plaintiff,** | § § § § | |
| **and** | § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG,** | § § § § § | |
| **Defendants.** | § § | |

**APPENDIX IN SUPPORT OF WAYNE LAPIERRE'S**
**MOTION TO DISMISS SECOND AMENDED THIRD-PARTY COMPLAINT**

**CORRELL LAW GROUP**
P. Kent Correll (NYS Bar No. 1809219)
250 Park Avenue, 7th Floor
New York, New York 10177
Tel: (212) 475-3070

*Attorneys for Third-Party*
*Defendant Wayne LaPierre*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| **Plaintiff and Counterclaim-Defendant,** | § § § § | |
| **and** | § § | |
| **WAYNE LAPIERRE, and THE NRA FOUNDATION, INC.,** | § § § | |
| **Third-Party Defendants,** | § § | **Civil Action No. 3:19-cv-02074-G** |
| **v.** | § § | |
| **ACKERMAN MCQUEEN, INC.,** | § § | **DECLARATION OF** **P. KENT CORRELL, ESQ.** |
| **Defendant, Counterclaim-Plaintiff, and Third-Party Plaintiff,** | § § § | |
| **and** | § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG,** | § § § § | |
| **Defendants.** | § § | |

I, P. KENT CORRELL, an attorney duly admitted to practice in the courts of the State of New York, hereby declare the following under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      I am the principal of Correll Law Group and attorney of record for Third-Party Defendant Wayne LaPierre ("LaPierre") in this action and am fully familiar with the facts and circumstances in this case.

2.      I make this affirmation in support of LaPierre's motion to dismiss Ackerman McQueen, Inc.'s Second Amended Third-Party Complaint Against Wayne LaPierre & The NRA Foundation, Inc. filed in the above-captioned action (Docket No. 210) ("SATPC") insofar as it asserts claims against him.

## **EXHIBITS**

3.      Attached hereto as Exhibit 1 are true and correct copies of (a) the Services Agreement made by and between the National Rifle Association of America and Ackerman McQueen, Inc., an Oklahoma corporation, and its wholly owned subsidiary, Mercury Group Inc., an Oklahoma corporation, dated April 30, 2017; and (b) Amendment No. 1 to Services Agreement entered into by and between the National Rifle Association of America and Ackerman McQueen, Inc., dated as of May 6, 2018, which is referred to in the SATPC.

4.      Attached hereto as Exhibit 2 is a true and correct copy of a letter from Sarah Rogers, Esq., of Brewer Attorneys & Counselors, to Jay Madrid, of Dorsey & Whitney LLP, dated December 21, 2018, which is referred to in the SATPC.

5.      Attached hereto as Exhibit 3 is a true and correct copy of a letter from Wayne LaPierre to Members of the Board of the National Rifle Association of America, dated April 25, 2019, which is referred to in the SATPC.

6.      Attached hereto as Exhibit 4 is a true and correct copy of a letter from Revan McQueen to Andrew Arulanandam, dated May 29, 2019, which is referred to in the SATPC.


Executed this 24th day of May 2021 in New York, New York.


                                        _/s/ P. Kent Correll_____
                                        P. Kent Correll

2

# Exhibit 1

## SERVICES AGREEMENT

**THIS AGREEMENT**, made this 30th day of April, 2017, by and between the National Rifle Association of America (hereinafter referred to as "<u>NRA</u>"), A New York Not-For-Profit Corporation, located at 11250 Waples Mill Road, Fairfax, Virginia 22030, and Ackerman McQueen, Inc., an Oklahoma corporation, and its wholly owned subsidiary, Mercury Group Inc., an Oklahoma corporation, (hereinafter collectively referred to as "<u>AMc</u>"), whose principal office is located in Oklahoma at 1100 The Tower, 1601 N.W. Expressway, Oklahoma City, Oklahoma 73118.

## W I T N E S S E T H :

**WHEREAS**, AMc is in the business of providing comprehensive communications services including public relations, crisis management, strategic marketing, advertising and creative, as well as owned media and internet services, and warrants and represents that it possesses the capability, necessary personnel, political strength, equipment and other related items to perform such services; and,

**WHEREAS**, NRA is a Membership Organization and desires to retain AMc as a nonexclusive source for services described herein for NRA upon the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants set forth herein, the parties hereto agree as follows:

I. **SERVICES**

    A. **Public Relations/Crisis Management /Strategic Marketing Services**

        Services include a combination of generating earned media, responsive public relations, crisis management and strategic thinking to promote a positive image of the NRA as described below:

- Public relations advice and counsel, including crisis management.

- Ongoing media relations -- solicitation and placement of features in national, regional and local media; liaison with print and broadcast news media on a daily basis for unsolicited inquiries; ongoing media training for NRA officials; Editorial Board meetings; features for outdoor publications.

- Specialized public relations writing services (news releases, columns, editorials), and distribution of same as required (e.g. via wire service or individual contact).

- Research and information retrieval as necessary for NRA issues management at NRA's request and approval.

- Coordination, scheduling and on-site assistance when necessary for NRA officials' speeches and personal appearances.

1

# EXHIBIT A

- Coordination with internal NRA public relations staff in the Executive Office, General Operations and Institute for Legislative Action.

- Development of proactive earned media in national and regional media as it relates to NRA officials' appearances at special events (i.e. National Gun Shows, YHEC, Annual Meetings, etc.).

- Coordination and scheduling appearances for NRA officials and commentators; including on-site assistance (where necessary).

- Develop, produce, and place op-ed pieces for national and regional media coinciding with Special Events and NRA Officials' appearances.

- Advise and counsel with NRA Officials on strategic issues to provoke public debate and frame NRA's point-of-view for the general public.

- Speechwriting services (pivotal speeches for major events are discussed in "Advertising/Creative Services" Section).

- Management of Talent/Spokespersons for NRATV.

- Production and staffing for NRATV.

**B.**   **Advertising/Creative Services**

The services described below (with the exception of "Media Planning and Placement" which is addressed separately as a subcategory of this Section) will be provided to NRA on a project ("**Job**") basis based on the fair market value of the work as determined by NRA and AMc. When reasonable time is available, cost estimates will be submitted for approval by NRA prior to the initiation of the Job.

- Speechwriting services for NRA dignitaries to be delivered at major events (includes background research, interviews with NRA Officials/Speaker, drafts and rehearsals if appropriate).

- Conceive, copywrite, design and produce local, regional, and national print and broadcast advertising and other appropriate forms of communication to present NRA's message.

- Original photography services and film processing (on location and/or in AMc's photo studio).

- Audio/Visual and Event Management services (i.e. Annual Meetings).

- Video Taping, Editing and Production.

- Music composition and arrangement and audio production.

- Primary Research services (quantitative and qualitative).

2

C. **Media Planning and Placement Services**

Detail of AMc's compensation for Media Services are provided in the "Compensation" Section. Services rendered for such are:

- With NRA's approval, plan and order by written contract or insertion order the print space, radio and television time, or other media to be used for advertising, always endeavoring to secure the best available rates. AMc shall remain solely liable for payment, to the extent NRA has paid AMc.

- Incorporate the advertising in the required form and forward it to media with proper instructions for fulfillment of the contract or insertion order.

- Diligently check and verify broadcasts, insertions, displays, or other means used to carry the message to ensure proper fulfillment of all media purchases made by AMc on NRA's behalf.

- For direct response paid media advertising (i.e. Infomercial), provide ongoing analysis and ROI to determine most effective media markets, dayparts, and stations on a time sensitive basis for redirection or concentration of funds as evaluation indicates.

- Carefully audit invoices and make timely payment to media and suppliers for space and time purchased by AMc on NRA's behalf.

D. **Owned Media Services**

- Full-time online broadcasting services for NRATV.

- Support services for NRATV provided by AMc Interactive include daily creation of graphics, flash animation for daily stories and synchronization to audio/video.

- Ongoing technical support service, unification, and advice for NRAHQ site (e.g. Answer to questions on service provider issues and simple "how-tos"). Application development or re-working requiring complex execution to be estimated on a project basis for NRA approval in advance of work performance.

- Full time marketing services to promote NRATV as well as on-site promotion of NRA programs, activities, and current events.

- Production of America's First Freedom Magazine.

E. **Digital Systems Operations Support**

- Technology consulting including third party solutions, cloud consulting and reviewing IS efforts.

- Reliability engineering and monitoring including performance monitoring, emergency response and overall efficiency.

3

- Resource and capacity planning for large scale hardware and software migration initiatives.

- System and database administration, maintenance, updating, monitoring and troubleshooting.

## II.   COMPENSATION

### A.   Public Relations/Political Strategy/Strategic Marketing Services

1. During the term of this Agreement, for ongoing Public Relations, Political Strategy and Strategic Marketing, NRA will pay AMc a fee as mutually agreed upon each year.

### B.   Advertising/Creative/Media Planning and Placement Services

1. During the term of this Agreement, for ongoing study of NRA's business, including account service, creative development and other support functions in connection with the day-to-day administration and operation of NRA's account, NRA will pay AMc 15% commission of the gross media expenditure, or a 17.65% mark-up of the net media billing, for all media researched, planned, placed and administered by AMc on NRA's behalf.

2. For collateral advertising services and products purchased on NRA's behalf from external suppliers (such as separations, engravings, typography, printing, etc.), by a 15% commission if offered, or a 17.65% mark-up of net billing. Estimates of the cost of external services and products are prepared, when reasonable time is available, for approval in advance and are subject to no more than a +/-10% variance provided AMc is authorized to proceed with production within thirty (30) days of the date the estimate is presented. Client changes in job specifications usually will result in the preparation and submission of a revised estimate; however, NRA agrees to assume financial responsibility for all changes specified by NRA then executed by AMc with NRA's knowledge.

3. For art concepts, design layout, photography and film processing, copywriting, music composition and arrangement, audio and video production, etc., by cost quotations submitted for approval in advance, when reasonable time is available, or at the comprehensive art, storyboard, demo music, etc. stage. These quotations are based on the fair market value of the work as determined by AMc, and take into consideration, among other things, the hourly rates of the personnel assigned to the project and the required to complete the job. Written estimates are subject to no more than a +/- 10% variance provided they are approved by NRA and AMc is expressly authorized to proceed with production within thirty (30) days of the date the estimate is presented. Client changes in job specifications will

4

usually result in a revised estimate; however, NRA agrees to assume financial responsibility for all changes specified by NRA , then executed by AMc with NRA's knowledge.

**C.**   **Owned Media and Internet Services**

During the term of this agreement, AMc will provide owned media and online broadcasting and website management, hosting and creation of NRATV, as well as full time marketing services. NRA will pay AMc a fee as mutually agreed upon each year.

**D.**   **Digital Systems Operations Support**

During the term of this agreement, AMc will provide digital systems operations support. NRA will pay AMc a fee as mutually agreed upon each year.

**E.**   **Other Projects**

If AMc undertakes, at NRA's request, additional or special assignments, not included within the services described in this project, the charges made by AMc will be agreed-upon in advance whenever possible. If no specific agreement was made, AMc will charge NRA a fair market price for the work performed.

## III.   BILLING AND PAYMENT

A.   Mailing and express charges, long distance telephone calls, photocopies, deliveries, sales taxes and reasonable out-of-town travel including transportation, meals and lodging, etc. on NRA's express behalf, shall be billed at AMc's cost. All out of town travel expenses shall require prior written approval in accordance with written procedures established by the NRA Executive Vice President or his designee. Payment of travel expenses not approved in advance may result in denial of reimbursement. Expenses not listed above shall be considered to be normal business expenses of AMc and not billable to NRA unless specifically authorized in writing by the NRA Executive Vice president or his designee.

B.   All sales, use and similar taxes and all import, export and foreign taxes imposed by all applicable governmental authorities shall be billed to NRA at the amount imposed by such governmental authorities. AMc shall not be obligated to contest the applicability of any such taxes to the transactions performed pursuant to this Services Agreement.

C.   Fees shall be billed on or before the 5th of each month. This billing shall include costs specified in paragraph III A.

D.   Special assignments not included in this Agreement which cannot reasonably be included under the monthly fee must be approved in accordance with written procedures established by the NRA Executive Vice President or his designee, and the charges made by AMc shall be agreed upon in advance, where reasonable.

5

otherwise such charges shall be not greater than the usual and customary charges for such services or expenses in the industry.

E.   All sums payable to AMc under this Services Agreement shall be payable at AMc's corporate headquarters in Oklahoma City, Oklahoma within 30 days of the invoice date. Any amounts not received by AMc within 60 days from the date of the invoice shall bear interest at the rate of 1.0% per month from the date of the invoice until paid. NRA shall notify AMc of any questions concerning any invoices within 10 business days after receipt.

## IV.   CONFIDENTIALITY

A.   **AMc**

1.   AMc shall not disclose, directly or indirectly, to any third party any NRA membership data or mailing lists, any materials or information relating thereto, or any other data, materials or information coming to the knowledge of AMc, supplied to AMc by NRA, or otherwise made known to AMc as a result of AMc's providing Services (hereinafter collectively, referred to as the "**Confidential Information**"), without the prior express written permission of NRA.   This Services Agreement shall control AMc's providing fulfillment services to NRA.

2.   AMc shall not make or cause to have made any copies of any NRA Confidential Information without the prior express written authorization of NRA.

3.   AMc may use such Confidential Information only for the limited purpose of providing its Services to NRA.

4.   AMc may disclose such Confidential Information to AMc's employees but only to the extent necessary to provide its Services.   AMc warrants and agrees to prevent disclosure of Confidential Information by its employees, agents, successors, assigns and subcontractors.

B.   AMc, its employees and agents, shall comply with any and all security arrangements imposed by NRA respecting access to Confidential Information.

C.   AMc acknowledges NRA's exclusive right, title and interest in the Confidential Information, and shall not at any time do or cause to be done any act or thing contesting or in any way impairing or tending to impair any part of such right, title or interest.

D.   AMc shall cease and desist from any and all use of the Confidential Information, and AMc shall promptly return to NRA, in a manner satisfactory to NRA, any and all Confidential Information, upon the earlier to occur of the following: the completion or termination of the Services Agreement.

6

## V.   INDEMNIFICATION/INSURANCE

### A.   <u>AMc</u>

1.   AMc agrees to indemnify, defend and hold harmless NRA from and against any loss, liability and expenses including attorney's fees which NRA shall become obligated to pay in respect to: (a) materials prepared by AMc on behalf of NRA which gives rise to any claims pertaining to libel, slander, defamation, infringement of copyright, title or slogan, or privacy or invasion of rights of privacy; or (b) the public relations services and related activities of any person engaged by AMc as a spokesperson in connection with NRA and its purposes, objectives and activities ("**Spokesperson**") pursuant to the direction or supervision of AMc.  Insurance coverage for the foregoing indemnification obligations shall be maintained by AMc.

2.   NRA agrees to give AMc prompt notice of such claims and to permit AMc, through AMc's insurance carrier and/or counsel of AMc's choice, to control the defense or settlement thereof.  However, NRA reserves the right to participate in the defense of any such claim through NRA's own counsel and at NRA's own expense.

3.   AMc shall take reasonable precautions to safeguard NRA's property entrusted to AMc's custody or control, but in the absence of negligence on AMc's part or willful disregard of NRA's property rights, AMc shall not be held responsible for any loss, damage, destruction, or unauthorized use by others of any such property.

4.   AMc shall not be liable to NRA by reason of default of suppliers of materials and services, owners of media, or other persons not AMc employees or contractors unless supplier(s) is under control of AMc or AMc should have reasonably anticipated default.

### B.   <u>NRA</u>

1.   NRA agrees to indemnify, defend and hold harmless AMc, and its directors, officers, employees, agents, contractors and representatives (collectively, the "**AMc Indemnified Parties**," such directors, officers, employees, agents, contractors and representatives being hereby deemed third party beneficiaries of this indemnity provision), from and against any and all claims, demands, causes of action, suits, liabilities, losses, damages settlements, judgments, and expenses (including attorney's fees), arising from (1) any data, materials, or service performance claims furnished to any AMc Indemnified Party by NRA, or approved by NRA, from which a AMc Indemnified Party prepared any publicity materials or public relations materials, or which were used by a AMc Indemnified Party in the production of advertising which was approved by NRA; (2) any claim, action or proceeding by any person(s), entity(ies), the United States of

7

America, any state(s), county(ies), or municipality(ies), or any department, agency, board, bureau, commission, attorney general, or other instrumentality(ies) or political subdivision(s) of any of the foregoing, seeking (a) damages (whether actual, exemplary, or both), reimbursement or other compensation for any alleged injury(ies), death(s), or private or public losses, damages or costs related to one or more incidents of violence committed with firearms, or (b) an injunction or other equitable relief with respect to the activities of a AMc Indemnified Party performed on behalf of NRA pursuant to this Agreement or otherwise requested or approved by NRA; or (3) the public relations services and related activities of any Spokesperson pursuant to the direction or supervision of NRA. Insurance coverage for the foregoing indemnification obligations shall be maintained by NRA.

2.  AMc agrees to give NRA prompt notice of any matter covered by NRA's indemnity set forth above and to permit NRA, through NRA's insurance carrier and/or counsel of NRA's choice, to control the defense or settlement thereof. However, AMc and the other AMc Indemnified Parties reserve the right to participate in the defense of any such claim through the AMc Indemnified Parties' own counsel and at the AMc Indemnified Parties' own expense.

C.  NRA shall reserve the right, in NRA's best interest, to modify, reject, cancel, or stop any and all plans, schedule, and work in progress. In such event AMc shall immediately take proper and responsible action to carry out such instruction; NRA, however, agrees to assume AMc's liability for agreed upon commitments and to reimburse AMc for losses AMc may derive therefrom, and to pay AMc for all internal and external expenses incurred on NRA's behalf with NRA's authorization and to pay AMc charges relating thereto in accordance with the provisions of this Services Agreement.

## VI.   OWNERSHIP OF PRODUCTS

All creative works developed by AMc in fulfilling its obligations under this Services Agreement shall constitute works made for hire, and shall be the property of NRA. In the event that such works should not be "works made for hire," as such works are defined at 17 U.S.C. § 101, then AMc transfers and assigns to NRA the ownership of all copyright in such works. In the event that AMc should employ a subcontractor, AMc shall arrange for the transfer of such intellectual property to NRA. All other, and further, intellectual property and mailing lists, under any definition, whether common law or statutory, created or developed by AMc in fulfilling its obligations under this Services Agreement, are NRA's sole and exclusive property, and AMc does hereby assign all right, title and interest in same to NRA to the extent that AMc has such rights to assign and transfer. In no event shall AMc be deemed to be assigning or transferring greater rights than it has acquired from any supplier or contractor from who it may have acquired certain elements of the material prepared for NRA.

**VII.   NO COMPETITION**

For the duration of this Service Agreement, AMc shall not represent any other entity in public relations services directly competitive with NRA without NRA's prior written approval.

**VIII.   EXAMINATION OF RECORDS**

During the term of this Services Agreement, AMc authorizes NRA, upon reasonable notice, to examine AMc and Mercury's files, books, and records, with respect to matters covered under this Services Agreement.

**IX.   AUTHORIZED CONTACTS**

AMc is authorized to act upon written communications received from the NRA Executive Vice President or his designee. He or his designee are the only persons within NRA who have the actual authority to issue such communications.

**X.   MISCELLANEOUS**

A.   Severability. If any provision of this Services Agreement shall be held to be void or unenforceable for any reason, the remaining terms and provisions hereof shall not be affected thereby.

B.   Binding Effect; Agents. The provisions of this Services Agreement shall inure to the benefit of and bind the heirs, legal representatives, successors and assigns of the parties hereto. In performing the Services described above and in taking any action necessarily incident thereto, AMc may utilize the services of AMc's employees and/or such agents or independent contractors approved by NRA as AMc deems appropriate.

C.   Section Headings. Section headings contained in this Services Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation thereof.

D.   Integrated Agreement. This Services Agreement, together with any Exhibits hereto, constitute the entire agreement between NRA and AMc relating to the matters covered by this Services Agreement at the time of its signing. This Services Agreement supersedes all prior agreements, including letter agreements and memoranda of understanding.

E.   Survival. The terms, covenants, and conditions of Section IV and Section V shall survive the termination or expiration of this Services Agreement.

**XI.   TERMINATION**

A.   This Services Agreement shall become effective upon the execution hereof.

9

B.      This Services Agreement shall continue in full force and effect for an initial period of eight (8) months ending 12-31-2017. After the initial period of eight (8) months, NRA or AMc may at their sole and exclusive discretion, terminate this Services Agreement, without any cause whatsoever, upon ninety (90) days written notice. Without such written notice, it is the intention of the parties that the Services Agreement will automatically renew. Any written notice to cancel this Contract shall be effective ninety (90) days from the date the Party giving notice to cancel tenders such written notice to the other Party. In the event of said termination, all further obligations of each party to perform shall cease, except as otherwise specifically provided in this Services Agreement. In said case NRA shall, pursuant to Section III, reimburse AMc for expenses incurred on NRA's behalf up to the date of termination.

C.      This Services Agreement may be terminated by NRA immediately upon written notice if: (1) AMc fails to diligently and in good faith perform any of its obligations contemplated hereunder; (2) AMc breaches any term, promise or covenant hereunder; (3) AMc files for bankruptcy; (4) there occurs any assignment for the benefit of creditors or the placement of any of AMc's assets in the hands of a trustee or receiver; (5) AMc becomes insolvent or bankrupt; (6) AMc is dissolved. If NRA so terminates this Services Agreement, NRA shall have no obligation to make payments except that NRA shall, pursuant to Section III, reimburse AMc for expenses incurred up to the date of said notice of termination.

D.      This Services Agreement may be terminated by AMc immediately upon written notice if (1) NRA fails to diligently and in good faith perform any of its obligations contemplated hereunder; (2) NRA breaches any term, promise or covenant hereunder; (3) NRA files for bankruptcy; (4) there occurs any assignment for the benefit of creditors or the placement of any of NRA's assets in the hands of a trustee or receiver; (5) NRA becomes insolvent or bankrupt; or, (6) NRA is dissolved.

E.      Upon the expiration or termination of this Services Agreement, AMc shall immediately return to NRA, to such place and in such manner as NRA may specify, any and all of NRA's property, materials, documents, Confidential Information, etc., that may be in AMc's possession. All charges for accumulating said materials shall be approved and paid in advance of receipt by the NRA. For all non-cancellable contracts entered into between AMc and third parties for the benefit of the NRA (herein "**AMc-Third Party NRA Contracts**"), the NRA agrees to pay AMc upon such expiration or termination the balance of the compensation payable under such AMc-Third Party NRA Contracts as of the date of expiration or termination so that AMc can fulfill its obligations under said Contracts after expiration or termination. If any AMc-Third Party NRA Contract(s) are cancelable upon payment of a fee and the NRA requests that such Contract(s) be cancelled, the NRA agrees to pay AMc the cancellation fees payable under such Contracts as a condition of AMc cancelling such Contract(s).

F.      In consideration of the dedication of a substantial number of personnel and resources to provide the services under this Agreement (and the necessity to

10

maintain such staffing levels and resource allocations to enable AMc to continue to provide such services upon any renewals hereof), the NRA agrees to pay AMc a fair and equitable termination fee to compensate it for the inevitable severances and other reasonable costs incurred in conjunction with such expiration or termination. Such termination fees shall be negotiated in good faith by the parties and paid to AMc no later than the last day of this Agreement.

G.  The terms, covenants, and conditions of Section IV and Section V shall survive the termination or expiration of this Services Agreement.

## XII.  GOVERNING LAW AND CONSENT TO JURISDICTION, VENUE, AND SERVICE

A.  This Services Agreement and any disputes arising thereunder shall be governed by and construed solely under the laws of the Commonwealth of Virginia, or, if applicable by federal law.

B.  AMc consents and agrees that all legal proceedings relating to the subject matter of this Services Agreement shall be maintained exclusively in courts sitting within the City of Alexandria or the County or Fairfax, Commonwealth of Virginia, and AMc hereby consents and agrees that jurisdiction and venue for such proceedings shall lie exclusively with such courts. AMc furthermore consents to the exercise of personal jurisdiction by said courts over AMc.

IN WITNESS WHEREOF, and intending to be legally bound hereby, and further intending to bind their employees, agents, successors and assigns, the parties have executed this Services Agreement the day and date above written.

National Rifle Association (NRA)                 Ackerman McQueen, Inc.

_Allan D. Cors, President_                        _Melanie Montgomery_
Print Name/Title                                  Print Name/Title  EVP

11



(a)

## AMENDMENT NO. 1 TO SERVICES AGREEMENT

This Amendment No. 1 to Services Agreement (this "Amendment") is dated as of May _____6_____, 2018, and is entered into by and between the National Rifle Association of America ("NRA") and Ackerman McQueen, Inc. ("AMc").

### WITNESSETH:

**WHEREAS**, NRA and AMc are parties to that certain Services Agreement (the "Services Agreement") dated April 30, 2017; and;

**WHEREAS**, NRA and AMc desire to amend the Services Agreement;

**NOW, THEREFORE**, in consideration of the mutual promises and covenants set forth herein, the parties hereto agree as follows:

1.  <u>Defined Terms</u>.  All initial capitalized terms used herein but not defined herein shall have the meanings set forth in the Services Agreement.

2.  <u>Amendment of Paragraph III E</u>.  Paragraph III E of the Services Agreement is hereby amended to add the following provisions at the beginning of paragraph III E:

> All service fee billing under this Services Agreement for talent and employees who work through AMc for NRA and its affiliates, including, but not limited to, Dana Loesch and _____, shall be invoiced by AMc no later than the fifth day of each calendar month, which invoice shall be payable by NRA to AMc at AMc's corporate headquarters in Oklahoma City, Oklahoma within 30 days of the invoice date. NRA acknowledges that its failure to pay such an invoice within 30 days will cause substantial financial damage to AMc. Accordingly, if at any time NRA fails to timely pay the invoice, NRA agrees that it shall post a $3,000,000 letter of credit (the "LOC") for the benefit of AMc. The LOC shall continue in existence for the term of the Agreement and shall be maintained at $3,000,000 at all times. The LOC may only be drawn upon to pay in full invoices for service fee billings outstanding more than 30 days.

3.  <u>Amendment of Paragraph XI E</u>.  Paragraph XI E shall be amended and restated in its entirety to read as follows:

> Upon the expiration or termination of this Services Agreement, AMc shall immediately return to NRA, to such place and in such manner as NRA may specify, any and all of NRA's property, materials, documents, Confidential Information, etc., that may be in AMc's possession. All charges for accumulating said materials shall be approved and paid in advance of receipt by the NRA. For all non-cancellable contracts entered into between AMc and third parties for the benefit of the NRA (herein "**AMc-Third Party NRA Contracts**"), the NRA agrees to pay AMc upon such expiration or termination the balance of the compensation payable under such AMc-Third Party NRA Contracts

4826-9804-1444\1

## EXHIBIT B

(including, but not limited to, the AMc-Third Party NRA Contracts with Dana Loesch and ___*Oliver North*___ ) as of the date of expiration or termination so that AMc can fulfill its obligations under said Contracts after expiration or termination. If any AMc-Third Party NRA Contract(s) are cancellable upon payment of a fee and the NRA requests that such Contract(s) be cancelled, the NRA agrees to pay AMc the cancellation fees payable under such Contracts as a condition of AMc cancelling such Contract(s).

4.  <u>Integrated Agreement</u>.  This Amendment and the Service Agreement, and the Exhibits thereto, constitute the entire agreement between NRA and AMc relating to the matters covered hereto and thereto.

5.  <u>Miscellaneous</u>.  Paragraphs X and XII of the Services Agreement are hereby incorporated by reference as if set forth in full in this Amendment.

6.  <u>Effect</u>.  In the event of a conflict between this Amendment and the Services Agreement, the provisions of this Amendment shall control. To the extent not amended by this Amendment, all of the provisions of the Services Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, and intending to be legally bound hereby, and further intending to bind their employees, agents, successors and assigns, the parties have executed this Amendment the day and date above written.

**National Rifle Association of America (NRA)**          **Ackerman McQueen, Inc.**

_____                         _____

_____                         _____
Print Name/Title                                        Print Name/Title
*Wilson H. Phillips Jr.*
*Treasurer*                                             *Pete R. Brownell*

4826-9804-1444\1

# Exhibit 2

# BREWER
## ATTORNEYS & COUNSELORS

December 21, 2018

**BY FIRST CLASS MAIL AND E-MAIL**

Jay Madrid
Dorsey & Whitney LLP
300 Crescent Court, Suite 400
Dallas, Texas 75201

**Re: Request For Additional Materials**

Dear Jay,

      Further to recent discussions proceeding from the NRA's exercise of its contractual record-inspection right under Section VIII of the Services Agreement between the National Rifle Association of America (the "NRA") and Ackerman dated April 30, 2017, as amended May 6, 2018 (the "Services Agreement"), we write on behalf of the NRA to identify areas of additional inquiry. We are happy to confer with your firm, or with Ackerman directly, to determine the most efficient way for the NRA to obtain visibility in these areas. We do not wish to disrupt Ackerman's business operations. However, the NRA is contractually entitled to view business records in these categories; moreover, a deeper understanding of Ackerman's practices and support for its invoicing in each of the below areas will advance the parties' common legal interests.

      Specifically, the NRA wishes to gain visibility regarding the following:

- Backup for out-of-pocket expenses Ackerman billed to the NRA for the last three years;

- The list of "talent and employees who work through [Ackerman] for NRA and its affiliates" (Services Agreement § III.E) and, for each employee: (1) the compensation paid to the employee by Ackerman; (2) the mark-up, if any, applied by Ackerman when it passes through such costs to the NRA; and (3) whether the employee performs work for non-NRA clients of Ackerman and, if so, the approximate percentage of the employee's time spent servicing the NRA;

- "Fair market value" and similar analyses conducted by Ackerman pursuant to the following Services Agreement provisions:

B·R·E·W·E·R

December 21, 2018
Page 2

    o    Section I.B (advertising/creative services provided on a project basis "based on the fair market value of the work as determined by NRA and [Ackerman]");

    o    Section II.B.3 (for art concepts, design layout, and similar services, Ackerman must submit cost quotations "based on the fair market value of the work as determined by [Ackerman]");

    o    Section II.E (with regard to special projects, absent specific agreed pricing, Ackerman will charge NRA "a fair market price for the work performed"); and

    o    Section III.D (where special-assignment fees cannot be agreed upon in advance, Ackerman will charge an amount "not greater than the usual and customary charges for such services or expenses in the industry.").

- With respect to any service for which Ackerman asserts it invoiced the NRA at "fair market value," NRA requires visibility regarding prices charged by Ackerman to perform the same services for non-NRA clients—or, in the alternative, a representation by Ackerman that the NRA receives pricing for services which is as favorable, or more favorable, than the prices offered by Ackerman to other clients.

- For the past three years (*i.e.*, since 2015), the NRA requests access to invoices, executed contracts, or analogous records of prices paid for third-party media buys, along with records sufficient to show any mark-up applied when the costs of media buys were passed along to the NRA.

We look forward to working with Ackerman to obtain the requested documents.

Sincerely

Sarah B. Rogers

# Exhibit 3

11250 WAPLES MILL ROAD
FAIRFAX, VIRGINIA 22030



WAYNE LAPIERRE
*Executive Vice President*

April 25, 2019

Dear Members of the Board:

Leaders in every walk of life must often choose: between what is true, and what is polite; between what is convenient, and what is right. I believe each of you made that choice when you joined the NRA Board. Despite a political climate that maligns our founding freedoms, you elected to walk the principled path and not the popular one.

Yesterday evening, I was forced to confront one of those defining choices—styled, in the parlance of extortionists, as an offer I couldn't refuse. I refused it. Delivered by a member of our Board on behalf of his employer, the exhortation was simple: resign or there will be destructive allegations made against me and the NRA. Alarmed and disgusted, I refused the offer. This letter explains why.

As you know, the NRA has over this past year taken steps to strengthen its efforts to document and verify compliance by our vendors with our purchasing practices and their contracts. As stated in a pending lawsuit, we've met extraordinary resistance from one vendor: Ackerman McQueen (AM). As most of you know, I've been a proponent of AM in the past—because they are capable of doing high quality work. But as I've discovered, AM is capable of something much different.

Yesterday (April 24, 2019) at approximately 2:58 p.m. EST, Col. North placed a telephone call to Millie Hallow, one of my most senior staff members. Millie returned the call and took notes, the substance of which appears below.

Col. North stated that the purpose of the call was to relay the contents of a letter drafted by AM. According to Col. North, he had been advised by Dan Boren—a member of our Board and an employee of AM's client—that unless I resigned as the Executive Vice President of the Association, Ackerman would transmit this allegedly damaging letter to the entire NRA Board. According to Col. North, the letter was "bad" for me, two other members of my executive team, and the Association.

*(703) 267-1020*
*(703) 267-3989 fax*
*wlapierre@nrahq.org*

Members of the Board
Page 2
April 25, 2019

I believe the purpose of the letter was to humiliate me, discredit our Association, and raise appearances of impropriety that hurt our members and the Second Amendment. The letter would contain a devastating account of our financial status, sexual harassment charges against a staff member, accusations of wardrobe expenses and excessive staff travel expenses.

**But then, Col. North explained that the letter would not be sent —if I were to promptly resign as your Executive Vice President. And, if I supported Col. North's continued tenure as President, he stated that he could "negotiate" an "excellent retirement" for me.**

**After Col. North concluded his telephone call with Millie, others informed me that I needed to withdraw the NRA lawsuit against AM or be smeared.**

In my almost 40-year relationship with AM, never—not once—did the agency make these allegations against me or the NRA. They are conveniently making them <u>now</u>—only as they face scrutiny in a Virginia court and the prospect of having to comply with our demand for books and records.

Some of these items involve accounting and record-keeping for related-party transactions, a suite of issues to which the NRA has devoted extensive attention in the past year. This is a subject about which our outside counsel has presented to the board and which I take seriously. Of course, this is why transparent access to Ackerman's records is so important. I hope that whatever else comes of these events, the NRA will finally have full access to the information we are entitled to.

All of this is painful for me. I will not judge Col. North, but must report what many of you already know: he has contractual and financial loyalties to AM. Last year, he entered into an employment agreement with the agency that pays him millions of dollars annually, supposedly in exchange for hosting an NRATV documentary series, "American Heroes." AM bargained to deliver twelve feature-length episodes of American Heroes within the series' first year. That period expires next month, and AM has delivered only three episodes (the latest is a mere 11 minutes in length). The NRA wrote a recent letter demanding to know what, exactly it is paying for—and what it is getting—in light of these production shortfalls. AM did not respond directly, but appears to have responded indirectly by trying to oust me.

Members of the Board
Page 3
April 25, 2019

Ultimately, this letter is not about AM, or about Col. North, or Dan Boren. This is about you and me. When I became your Executive Vice President, I took an oath to defend the freedoms for which the NRA stands, against all adversaries and threats. It is regrettable that threats now emanate from our fiduciaries and friends. But so long as I have your confidence—an honor that humbles me, daily—I will not back down. Serving this Association has been the greatest honor of my life, and not one I'm willing to forfeit in exchange for a backroom retirement deal.

I believe our Board and devoted members will see this for what it is: a threat meant to intimidate and divide us. I choose to stand and fight, and hope to bring 5 million members with me.

Sincerely,

Wayne LaPierre
NRA Executive Vice President

# Exhibit 4

***BY ELECTRONIC AND FIRST-CLASS MAIL***

May 29, 2019

Andrew Arulanandam
National Rifle Association
11250 Waples Mill Road
Fairfax, Virginia  22030

Re: *Notice of Termination of the Services Agreement*

Dear Andrew:

We received your May 24, 2019 email directing Ackerman McQueen ("AMc") to cease activities relating to six broadly-described services that AMc provides to the NRA under the existing Services Agreement (executed on April 30, 2017 as amended on May 6, 2018) (the "Services Agreement") between the two parties. Your email message also seeks our input on how to shut down the "live TV" portion of the NRATV platform over the next 60 days.

Your May 24, 2019 email notification, in conjunction with other actions by the NRA, constitutes another misguided step toward the constructive termination of the Services Agreement. At the same time, your email implies that the NRA seeks to have AMc continue to provide other services to the NRA. However, just days before your email, the NRA filed a civil lawsuit against AMc asking for a judgment declaring that AMc receive no further compensation for any work it performed after August 3, 2018. Specifically, in that lawsuit, the NRA "seeks disgorgement of any amounts wrongfully obtained by Defendants on account of their breaches of their fiduciary duties, including without limitation, all fees paid by the NRA to Ackerman and Mercury since the date such breaches began – which the NRA believes began no later than August 3, 2018." Thus, the NRA is demanding that AMc pay back any fees the NRA has paid to AMc since August 3, 2018.  This raises the obvious question of whether, in taking such a position in legal proceedings initiated by the NRA, the NRA intends to pay AMc for future work done by AMc in accordance with the Services Agreement.

Your May 24, 2019 email is the latest in a series of operational directions to AMc that are inconsistent with the NRA's legal actions against AMc. Moreover, because of the NRA's legal position in its lawsuit that the NRA should not have to pay AMc for services provided after August 3, 2018, AMc believes that the NRA has breached the explicit and implied terms, promises and covenants of the Services Agreement and is no longer performing its obligations diligently and in good faith.

The NRA has, in essence, constructively terminated the Services Agreement by engaging in a series of conflicting and disingenuous actions that have purposely destroyed AMc's ability

to maintain a working relationship with the NRA and fulfill the obligations of the Services Agreement,[1] including the following:

1. On April 12, 2019, the NRA filed a lawsuit against AMc seeking access to four categories of documents. The lawsuit was filed without any warning or notice to AMc and without any notice or declaration to AMc that it was not in compliance with those provisions of the Services Agreement. The publicly-filed law suit was disclosed to the press before it was served on AMc, and generated considerable negative publicity that has harmed AMc.

2. On April 24, 2019, the NRA filed a Motion for Leave to Amend the Complaint, in which it asserted new allegations against both AMc and AMc's employee, Lt. Col. Oliver North, who at that time also served as President of the NRA. As you know, Lt. Col. North was a valuable connection between the NRA and AMc, and the NRA took affirmative steps to sever that connection. Further, by damaging Lt. Col. North's reputation and misrepresenting the work he has done for AMc, the NRA interfered with his ability to properly perform the work that the NRA ordered from AMc.

3. On May 9, 2019, the NRA directed AMc to suspend all work and costs associated with the production of "American Heroes" – a major project for which AMc has incurred substantial costs at the prior direction of the NRA. The NRA provided no reason for the suspension and AMc was not given any opportunity to provide any input into the decision.

4. On May 21, 2019, the NRA filed a second law suit against AMc asserting that AMc had breached its fiduciary duty to the NRA and seeking the return of all payments made to AMc since August 3, 2018. Yet, because the NRA has not terminated the Services Agreement, AMc is placed in the untenable position of remaining obligated to provide services to the NRA while the NRA alleges it should not have to pay any fees for AMc's services after August 3, 2018.

5. On May 22, 2019, AMc was compelled to file its compulsory counterclaims in response to the first lawsuit. In those counterclaims, AMc alleges that the NRA is in breach of the Services Agreement and that the NRA filed its lawsuit as a pretext that would permit the NRA to transfer all services provided by AMc to a competing public relations firm without paying AMc the compensation required under Section XI.F of the Services Agreement.

6. On May 23, 2019, NRA filed an "Emergency Motion" asserting that AMc's employees had engaged in "theft" from the NRA and requesting permission from the Court to stay the case and allow for discovery into the alleged theft. Again, AMc did not learn of this

---

[1]    This letter focuses on the recent grounds for termination, but AMc does not waive nor excuse the prior retaliatory actions initiated in 2018 by the NRA in response to AMc's efforts to protect the interests of NRA's members from irresponsible actions sought by the NRA and its leadership.

motion from the NRA's counsel, but rather learned of this motion from reporters who were given advance notice of it.

7. On May 24, 2019, as indicated above, you provided notice directing AMc to "streamline" the services it was to provide to the NRA. Again, there was no notice provided to AMc prior to this streamlining notice, nor was there any request from AMc as to how most effectively and efficiently streamline its ongoing services to the NRA. Moreover, your notice was written as if you were unaware and in complete disregard of the legal actions that the NRA has taken against AMc and its employees.

8. The May 24, 2019 notice also suggested continued reductions in AMc's services to the NRA over the next 60 days without any clear guidance on the magnitude or nature of those reductions, showing a clear lack of understanding of this business relationship and the type of work performed under the services agreement.

9. Lastly, we note that the Service Agreement specifically contemplates that the relationship between the NRA and AMc would be directed by officials at the highest levels of both organizations, and throughout the course of the NRA's relationship with AMc, this has been the case. The Services Agreement itself requires AMc to take direction from the Executive Vice President of the NRA or his specific designee, and no one else, when dealing with the NRA. However, since the NRA initiated these legal actions and work reductions, Wayne LaPierre has severed all communications with AMc, making it impossible to work through any disagreements or concerns between the parties.

In sum, the NRA's actions have made the relationship envisioned by the Services Agreement untenable and unworkable. The NRA's actions have also frustrated the purposes of the Services Agreement. As articulated in AMc's counterclaim, the NRA has breached the Services Agreement in several material ways, including a breach of its payment obligations and a breach of the duty of good faith and fair dealing. The NRA is no longer performing its obligations with diligence and good faith, but has instead sought permission from the Court to suspend all payment obligations with a return of funds paid since August 3, 2018. These actions by the NRA provide clear justification for AMc to terminate under Section XI, Subsection D of the Services Agreement, which states that: "This Services Agreement may be terminated by AMc immediately upon written notice if (1) the NRA fails to diligently and in good faith perform any of its obligations contemplated hereunder [or] (2) NRA breaches any term, promise or covenant hereunder . . ."

Nonetheless, the Services Agreement (Section XI.B.) also provides that either the NRA or AMc have the right to terminate the Services Agreement upon 90-days' notice. Given the long-term relationship between the NRA and AMc, AMc believes that the termination provisions under Subsection B are best suited to winding down the business relationship between the parties under the Services Agreement and allowing for a 90-day transition period. Under a termination occasioned by either Subsections B or D of Section XI of the Services Agreement, the NRA is liable to AMc for compensation required under Section XI, Subsections E (as amended) and F of the Services Agreement.

This Notice of Termination initiates a process under Section XI, Subsections E and F of the Services Agreement to wind up the relationship between the parties. Pursuant to Subsection E, AMc will prepare to return to the NRA any and all of NRA's property, materials, documents, and confidential information in AMc's possession. The Amendment to the Services Agreement states that: "All charges for accumulating said materials shall be approved and paid in advance of receipt by the NRA." Subsection F requires the NRA to pay AMc a fair and equitable termination fee to compensate it for the severance and other reasonable costs AMc will incur as a result of the termination of the Service Agreement. AMc is preparing detailed invoices for such termination fees and will be prepared to negotiate the termination of the Services Agreement in "good faith" as required by Subsection F.

If you have any questions, please contact our attorneys, David Schertler and David H. Dickieson, at 202-628-4199.

Sincerely,

Revan McQueen
Chief Executive Officer

cc:     John Frazer, Esq.
        Wayne LaPierre
        Craig Spray

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record via the Court's electronic notification system in accordance with the Federal Rules of Civil Procedure on this 24th day of May 2021.

*/s/ P. Kent Correll*
P. Kent Correll