**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| *Plaintiff and Counter-Defendant,* | § § | |
| **and** | § § | |
| **WAYNE LAPIERRE,** | § § § | |
| *Third-Party Defendant,* | § § | |
| **v.** | § § | Case No. 3:19-cv-02074-G |
| **ACKERMAN MCQUEEN, INC.,** | § § § | |
| *Defendant and Counter-Plaintiff,* | § § | |
| **and** | § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, and MELANIE MONTGOMERY,** | § § § § | |
| *Defendants.* | § § | |

**DEFENDANTS' BRIEF IN SUPPORT OF ACKERMAN MCQUEEN, INC'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.     INTRODUCTION AND SUMMARY ..................................................................... 1

II.    SUMMARY JUDGMENT EVIDENCE ................................................................ 2

III.   FACTUAL BACKGROUND ............................................................................... 2

IV.    PROCEDURAL HISTORY ................................................................................ 6

V.     APPLICABLE LEGAL STANDARDS ............................................................... 9

VI.    ARGUMENT AND AUTHORITIES ................................................................. 10

    A.  AMc Is Entitled to Summary Judgment on its Breach of Contract Claim Against the
NRA. ...................................................................................................................... 10

    1.  Breach of the Services Agreement – Unpaid Invoices. .................................... 11

    2.  Breach of the Services Agreement - $3 Million Letter of Credit .................... 12

    3.  Breach of the Services Agreement – Termination Provision ........................... 13

    4.  Breach of the Services Agreement - Indemnification ...................................... 14

    5.  Breach of the Services Agreement – AMc-Third Party NRA Contracts .......... 15

    6.  Breach of the Services Agreement – Untimely Invoices .................................. 16

    B.  Defendants Are Entitled to Summary Judgment on the NRA's Lanham Act Claims for
False Association and Trademark Infringement. .................................................... 17

    1.  AMc engaged in "fair use" of NRA trademarks. ............................................. 18

    2.  No evidence of confusion, mistake, or deception. ........................................... 21

    3.  No evidence of damages. ................................................................................. 22

    4.  No evidence against Individual Defendants or Mercury .................................. 22

    C.  Defendants Are Entitled to Summary Judgment on the NRA's Conversion Claim. ........ 23

    1.  There is no recognized cause of action for conversion of intangible property. ........... 24

    2.  The economic loss doctrine bars the NRA's claims for conversion. ............................ 26

    3.  There is no evidence to support conversion against the Individual Defendants or
Mercury. ................................................................................................................ 28

    D.  AMc and Mercury Group Are Entitled to Summary Judgment on the NRA's Claim for
Breach of Fiduciary Duty ....................................................................................... 28

    1.  There was no fiduciary duty between the NRA and AMc. .............................. 29

    2.  The economic loss rule bars the NRA's breach-of-fiduciary-duty claims ..................... 32

    3.  The NRA has failed to produce evidence supporting a breach of fiduciary duty. ......... 34

    E.  AMc Is Entitled to Summary Judgment on the NRA Breach of Contract Claim. ............ 36

    1.  There is no evidence of breach of the Record Inspection Clause or damages based on
the alleged breach. ................................................................................................. 37

2.   No evidence that AMc leaked confidential information. ................................. 42

F.   Defendants Are Entitled to Summary Judgment on the NRA's Fraud Claim. ................ 45

3.   No evidence against Individual Defendants. .................................................. 48

G.   The NRA's Conspiracy Claim Fails as a Matter of Law. .................................. 48

VII.   PRAYER ........................................................................................... 50

# TABLE OF AUTHORITIES

## CASES

*Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606 (6th Cir. 1999) ................................................................. 21

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................. 10

*Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276 (Tex. 1998) ...................... 30

*Banco Popular, N. Am. v. Kanning*, 638 F. App'x 328 (5th Cir. 2016) ............................ 10

*Bridgmon v. Array Sys. Corp.*, 325 F.3d 572 (5th Cir. 2003) ..................................... 10

*Celotex Corp v. Catrett*, 477 U.S. 317 (1986) .................................................. 9, 10

*Chapa v. Stonehaven Dev., Inc.*, No. 13-13-00030-CV, 2013 Tex. App. LEXIS 10159 (Tex. App.—Corpus Christi Aug. 15, 2013, no pet.) ................................................ 26

*Editorial Caballero, S.A. de C.V. v. Playboy Enters.*, 359 S.W.3d 318 (Tex. App.—Corpus Christie 2012, pet. denied) ...................................................... 49

*Esty v. Beal*, 298 S.W.3d 280  (Tex. App.— Dallas 2009, no pet. ............................... 46

*Express One Int'l v. Steinbeck*, 53 S.W.3d 895 (Tex. App.—Dallas 2001, no pet.) .................. 25

*Haile v. Town of Addison*, 264 F. Supp. 2d 464 (N.D. Tex. 2003) ................................ 10

*Hill v. New Concept Energy, Inc. (In re Yazoo Pipeline Co., L.P.)*, 459 B.R. 636 (S.D. Tex. Bankr. Oct. 14, 2011) ................................................................... 24, 28

*Hoffpauir, Inc. v. Interstate Nat'l Dealer Servs.*, No. A-12-CA-263 LY, 2013 U.S. Dist. LEXIS 9392 (W.D. Tex. 2013) ................................................................. 27

*Hoggett v. Brown*, 971 S.W.2d 472 (Tex. App.—Houston [14th Dist.] 1997, pet. denied) ......... 31

*Homoki v. Conversion Servs.*, 717 F.3d 388 (5th Cir.2013) ...................................... 49

*Hostingxtreme Ventures, LLC v. Bespoke Grp., LLC*, Civil Action No. 3:14-CV-1471-M, 2017 U.S. Dist. LEXIS 146618 (N.D. Tex. Aug. 23, 2017) ......................................... 42

*Hurd v. BAC Home Loans Servicing, LP*, 880 F. Supp. 2d 747 (N.D. Tex. 2012) ................... 27

*Jacked Up, LLC v. Sara Lee Corp.*, 854 F.3d 797 (5th Cir. 2017) ............................... 29, 30

*Jasco v. Coca Cola Co.*, 537 Fed. App'x 557 (5th Cir. 2013) ................................... 17

*Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617 (Tex. 1986) .............................. 33, 45, 46

*Johnson v. Bella Gravida*, LLC, 105 Va. Cir. 350 (Cir. Ct. 2020)................................................ 29

*Kalb v. Norsworthy*, 428 S.W.2d 701 (Tex. Civ. App.—Houston [1st Dist.] 1968, no pet.) ....... 31

*Klein-Becker USA, Ltd. Liab. Co. v. Home Shopping Network, Inc.*, No. 2:05-CV-00200 PGC, 2005 U.S. Dist. LEXIS 46773 (D. Utah Aug. 31, 2005)........................................................... 22

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004)...................... 19

*Lee v. Hasson*, 286 S.W.3d 1 (Tex. App.—Houston [14th Dist.] 2007, pet. denied).................. 31

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ............................ 22

*Margaux Warren Park Partners, Ltd. v. GE Bus. Fin. Servs. (In re Margaux Warren Park Partners, Ltd.)*, Nos. 08-43388, 09-04022, 2009 Bankr. LEXIS 4128 (Bankr. E.D. Tex. 2009) .................................................................................................................................... 34

*Mason v. Fremont Inv. & Loan*, No. 3:15-cv-1909-K-BN, 2015 U.S. Dist. LEXIS 146077, (N.D. Tex. Oct. 8, 2015)........................................................................................... 45, 46, 47

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .......................... 10

*Meyer v. Cathey*, 167 S.W.3d 327 (Tex. 2005) ...................................................................... 30, 31

*Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168 (5th Cir. 1985)............................................... 23, 48

*Mullins v. TestAmerica, Inc.*, Civil Action No. 3:02-CV-106-M, 2002 U.S. Dist. LEXIS 4877 (N.D. Tex. 2002) ................................................................................................................. 30

*Neles-Jamesbury, Inc. v. Bill's Valves*, 974 F. Supp. 979 (S.D. Tex. 1997)................................ 25

*New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302 (9th Cir. 1992)......................... 18

*Orcasitas v. Wells Fargo Home Mortg.*, 2013 U.S. Dist. LEXIS 93760 (N.D. Tex. Arp. 10, 2013) .................................................................................................................................... 27

*Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526 (5th Cir. 1998) ............................................. 18

*Ramos v. Wells Fargo Bank, NA*, 289 Va. 321, 323, 770 S.E.2d 491 (2015)........................ 10, 37

*Riverside Mkt. Dev. Corp. v. Int'l Bldg. Prods., Inc.*, 931 F.2d 327 (5th Cir. 1991)............. 23, 48

*Rolex Watch USA, Inc. v. Meece*, 158 F.3d 816 (5th Cir.1998) ................................................. 22

*RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851 (5th Cir. 2010)................................................. 10, 35, 47

*Scott v. Harris*, 550 U.S. 372 (2007) ........................................................................................... 9

*Shellnut v. Wells Fargo Bank, N.A.*, No. 02-15-00204-CV, 2017 Tex. App. LEXIS 3844 (Tex. App.—Fort Worth Apr. 27, 2017, pet. denied) ........................................................ 34

*Springboards to Educ. v. Houston Indep. Sch. Dist.,* 912 F.3d 805 (5th Cir. 2019) ................... 21

*Super Future Equities, Inc. v. Wells Fargo Bank Minn., N.A.*, 553 F. Supp. 2d 680 (N.D. Tex. 2008)................................................................................................................................. 49

*Sw. Bell Tel. Co. v. Delanney*, 809 S.W.2d 493 (Tex. 1991)........................................................ 33

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171 (9th Cir. 2010)................................ 18

*Triton 88 v. Star Elec. L.L.C.*, 411 S.W.3d 42 (Tex. App.—Houston [1st Dist.] 2013, no pet.).. 12

*Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 823 F. Supp. 2d 578 (S.D. Tex. 2011) .................... 24

*Viacom Int'l, Inc. v. IJR Capital Invs., LLC*, 891 F.3d 178 (5th Cir. 2018) ................................ 22

*W. Fork Advisors, LLC v. SunGard Consulting Servs., LLC*, 437 S.W.3d 917 (Tex. App.—Dallas 2014, pet. denied) ............................................................................................................... 49

*Wavell v. Roberts*, 818 S.W.2d 462 (Tex. App.—Corpus Christi 1991, writ denied)................. 49

*Wilson v. Jackson*, No. 3:14-CV-3748-N-BK, 2014 U.S. Dist. LEXIS 170207 (N.D. Tex. Nov. 13, 2014)......................................................................................................................... 34, 49

## STATUTES

15 U.S.C. § 1114(1)(a)........................................................................................................... 18, 21

15 U.S.C. § 1115(b)(4) ................................................................................................................ 18

15 U.S.C. 1125(a)(1)(A) ......................................................................................................... 18, 21

TO THE HONORABLE A. JOE FISH:

Defendant/Counter-Plaintiff/Third-Party Plaintiff Ackerman McQueen, Inc. ("*AMc*"), Defendants Mercury Group, Inc. ("*Mercury*"), Henry Martin ("*Martin*"), William Winkler ("*Winkler*"), and Melanie Montgomery ("*Montgomery*") (collectively, "*Defendants*"), file this *Brief in Support of Motion for Partial Summary Judgment* ("*Motion*") pursuant to FED. R. CIV. P. 56.

## I.      INTRODUCTION AND SUMMARY

1.      Since 2019, the NRA has embarked on a scorched-earth litigation strategy against AMc, the NRA's former long-time advertising and public-relations firm that helped the NRA become the most powerful Second Amendment advocacy group in the Nation.  Discovery has revealed that when the NRA knew its non-profit status was threatened due to its own mismanagement and illegal acts by its executives living an opulent life at the expense of the NRA membership, NRA leaders and counsel created a plan to falsely paint AMc and well over a dozen others as the scapegoats for its own bad acts.

2.      As part of that litigation strategy, the NRA has filed four separate lawsuits against AMc (and numerous dilatory actions), including the above captioned case against (a) AMc; (b) AMc's wholly-owned subsidiary, Mercury; and (c) three of AMc's employees, Martin, Winkler, and Montgomery (collectively, the "*Individual Defendants*").[1]  The NRA asserts causes of action for: (1) false association under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (2) trademark infringement; (3) conversion; (4) fraud; (5) breach of fiduciary duty; (6) conspiracy; (7) breach of the fiduciary duty of loyalty; and (8) breach of contract.

---

[1] ECF 209.

3.      In turn, AMc brought counterclaims against the NRA for (1) breach of the parties'

agreement ("***Services Agreement***"); (2) fraud; (3) defamation; (4) business disparagement; (5)

tortious interference; and (6) conspiracy.[2]

4.      Since litigation began between the parties in April 2019, tens of thousands of

documents have been produced, and over 25 depositions have taken place.[3]  Now, pursuant to the

Court's scheduling order and the upcoming October 2021 trial setting, AMc seeks summary

judgment on its breach-of-contract counterclaim against the NRA.  AMc further seeks summary

judgment on the NRA's claims against all Defendants for false association, trademark

infringement, conversion, fraud, breach of fiduciary duty (and breach of fiduciary duty of loyalty),

and conspiracy because there no genuine issues of material fact on one or more elements of the

NRA's claims and, therefore, AMc is entitled to judgment as a matter of law.

## II.      SUMMARY JUDGMENT EVIDENCE

5.      In support of its Motion, AMc submits the summary judgment evidence attached to

Defendants' Appendix that is being filed contemporaneously with this Motion.

## III.      FACTUAL BACKGROUND

6.      For nearly four decades, AMc served as the NRA's advertising and public-relations

agency, helping the gun rights organization navigate troubled political and societal waters as its

principal communication strategist and crisis manager.  In addition, AMc provided advertising,

marketing, media, and numerous other services to the NRA.

7.      During this multi-decade relationship, the parties developed working arrangements,

such as negotiating annual budgets covering a variety of tasks.  The NRA, through its Executive

---

[2] ECF 241.
[3] Although few depositions have been taken in the above-captioned case, numerous depositions were taken in the Virginia Action (defined below) and the NRA Bankruptcy (defined below) dealing with the same issues here.

Vice President, Wayne LaPierre ("*LaPierre*") and its former Treasurer and Chief Financial Officer, Wilson "Woody" Phillips ("*Phillips*"), completely controlled the process, operating with full knowledge of the budgeted line items.[4]  As projects were initiated, invoices would issue and be approved by Phillips and LaPierre, payment would follow without complaint, and thorough annual audits raised no issues or concerns.[5]  LaPierre personally participated in those negotiations and approved each annual budget.[6]

8.      Given the wide variety of services AMc provided, rather that billing hourly for its time, AMc and the NRA developed a mutually agreed budgeting process to plan for and authorize services.[7]  LaPierre, in consultation with AMc's late CEO, Angus McQueen, directed the creation of these working arrangements.[8]  The entities' senior officers (LaPierre and/or Phillips from the NRA) and Winkler and/or Montgomery (from AMc)) carried out budgetary, invoicing, and payment tasks.[9]

9.      Over the course of years, the parties formalized their working arrangements, embodying their protocols in a series of agreements, the first of which they executed in 1999.[10]  The latest version was updated in 2017[11] and amended in 2018[12]  to confirm the protocol for the hiring, compensation, and reimbursements due AMc under employment agreements involving talent for NRATV, the NRA's branded media network.

---

[4] Ex. 24, Montgomery Deposition, at 13:17-18:14 [APP 1955-56]; Ex. 6, Winkler Hrg. Testimony, at 91:17-25 [APP 348].
[5] Ex. 6, Winkler Hrg. Trans., at 92:10-98:19 [APP 349-55].
[6] Ex. 7, LaPierre Deposition (Virginia Action), at 252:18-256:1 [APP 541-42]; Ex. 24, Montgomery Deposition, at 13:17-14:21 [APP 1955].
[7] Ex. 24, Montgomery Deposition, at 13:17-18:14 [APP 1955-56].
[8] Ex. 24, Montgomery Deposition, at 13:17-14:12 [APP 1955].
[9] *See id.*; *see also* Ex. 22, Erstling Hrg. Testimony, at 45:21-25 [APP 1694] (NRA accounting and budget manager identifying LaPierre and Phillips as the officers who approved AMc invoices).
[10] *See* Ex. 7, LaPierre Deposition (Virginia Action), at 251:10-20 [APP 541].
[11] *See* Ex. 2-A, Services Agreement [APP 59].
[12] *See* Ex. 2-B, Amendment No. 1 to Services Agreement [APP 71].

10.     The Services Agreement also contained other key provisions governing the parties' business relationship, including the duties imposed upon AMc to maintain the confidentiality of the NRA's sensitive information ("**Confidentiality Clause**")[13] and duties imposed upon AMc to permit inspection of its files, books, and records related to matters covered under the Services Agreement ("**Records Inspection Clause**").[14]

11.     The 2018 Amendment contains two provisions expressly designed to protect AMc in the event of expiration or termination of the Services Agreement.  *First*, the NRA was required to obtain and post a $3,000,000 letter of credit for AMc's benefit to secure payment of outstanding invoices over 30 days old.[15]  *Second*, certain contracts entered into between AMc and third parties for the benefit of the NRA, including contracts with NRATV talent Col. Oliver North ("**North**") and Dana Loesch contracts (referred to as the "**AMc-Third Party NRA Contracts**"), obligated the NRA to pay the "compensation payable" under the AMc-Third Party NRA Contracts.[16]  The NRA has refused to honor these commitments.

12.     The business relationship between the NRA and AMc began to unravel in mid-2018 following the NRA's retention of William A. Brewer III ("**Brewer**") and his law firm, Brewer Attorneys & Counselors ("**Brewer Firm**").  As this Court is aware, Brewer is the brother-in-law of AMc's CEO, Revan McQueen, and Brewer has decades-long history of animosity with some members of the McQueen family.  As political pressure mounted on the NRA, Brewer pegged his dying father-in law, Angus McQueen, as the perfect fall-guy to blame for the NRA's financial mismanagement.[17]  This action has created a revisionist narrative, conveniently attributing

---

[13] Ex. 2-A, Services Agreement § IV [APP 64].
[14] Ex. 2-A, Services Agreement § VIII [APP 67].
[15] Ex. 2-B, 2018 Amendment at ¶ 2 [APP 71].
[16] Ex. 2-B, 2018 Amendment at ¶ 3 [APP 71].
[17] *See, e.g.*, ECF 141 at Ex. I (APP 81-100).

representations and various acts of wrongdoing to someone who can no longer defend himself.  As this Court also found, the Brewer Firm is a competitor of AMc and thus has an additional incentive to push AMc out of the picture.[18]

13.     Prior to 2018, the NRA conducted regular annual audits of AMc without issue.[19] Following Brewer's retention, the NRA conducted a series of audits of AMc beginning in September 2018.[20]  First, the Brewer Firm audited AMc in September 2018.[21]  Next, the law firm of Cooper Kirk, PLLC, audited AMc in November 2019.[22]  Finally, the NRA hired forensic accounting firm Forensic Risk Alliance ("*FRA*") to audit AMc in February 2019, which spanned period of weeks.[23]  Following each of these audits, AMc was not asked to provide any additional documentation or accused of withholding any information.[24]

14.     Despite AMc's cooperation with these audits and document requests, the NRA filed suit on April 12, 2019, three months prior to Angus McQueen's death, alleging that AMc had somehow refused to comply with the Records Inspection Clause.[25]  The NRA filed a second lawsuit on May 22, 2019, accusing AMc of leaking certain information related to the NRA's pass-through expenses to the media and claiming breach of the Services Agreement's Confidentiality Clause.[26]

15.     After finding itself the defendant in two lawsuits by its longtime client, AMc's relationship with the NRA naturally started to fall apart. Although both parties sent letters at

---

[18] *See* ECF 148 at 4 (finding the Brewer Firm to be a competitor of AMc because the Brewer Firm also provides public-relations services).
[19] Ex. 6, Winkler Hrg. Testimony, at 92:10-94:4 [APP 349-51].
[20] Ex. 6, Winkler Hrg. Testimony, at 94:14-99:3 [APP 351-56].
[21] Ex. 6, Winkler Hrg. Testimony, at 94:14-95:20 [APP 351-52].
[22] Ex. 6, Winkler Hrg. Testimony, at 95:21-96:14 [APP 352-353]; Ex. 2-F, AMcTX-00065308 [APP 108].
[23] Ex. 6, Winkler Hrg. Testimony, at 96:15-99:3 [APP 353-56]; *see also* Ex. 2-E [APP 97] (communications between NRA General Counsel reflecting AMc's cooperation after being informed of the FRA audit).
[24] *Id.*
[25] *NRA v. AMc*, No. CL19001757, In the Circuit Court for the City of Alexandria (Cir. Ct. Va. Apr. 12, 2019).
[26] *NRA v. AMc*, No. CL19002067, In the Circuit Court for the City of Alexandria (Cir. Ct. Va. May 22, 2019).

different times purporting to terminate the relationship, at the very latest, the parties' relationship had concluded by June 25, 2019, and AMc ceased all work.[27]  Eventually, the NRA filed the Texas Action in August 2019,[28] and its fourth lawsuit (back in Virginia) in September 2019.[29]

16.     Prior to this date, AMc had posted certain images on its website related to AMc's work for the NRA to display the types of services AMc provides as an advertising and public-relations agency.[30]  Following June 25, 2019, these images remained on AMc's website as part of a gallery of images related to several other AMc clients.[31]  In August 2019, AMc appended the word "Legacy" to images related to the NRA and other former clients to clarify that these companies and organizations were no longer current AMc clients.[32]  In November 2019, AMc overhauled its website and removed this gallery, including all references to the NRA.[33]

## IV.    PROCEDURAL HISTORY

17.     As this Court is well aware, litigation between the NRA and AMc began in April 2019 when the NRA filed its first lawsuit against AMc in Virginia state court.[34]  In the following months, the NRA proceeded to file two more actions against AMc in Virginia (collectively, "***Virginia Action***"),[35] along with the instant lawsuit in the Northern District of Texas ("***Texas Action***"),[36] which was filed only weeks after Angus McQueen's passing.  In response, AMc

---

[27] *See* ECF 209 at ¶ 99 ("By letter dated June 25, 2019, the NRA terminated the Services Agreement effective "immediately.").
[28] ECF 1.
[29] *NRA v. AMc*, No. CL1002886, In the Circuit Court for the City of Alexandria (Cir. Ct. Va. Sep. 5, 2019).
[30] *See* Ex. 3, McQueen Decl. at ¶¶ 4-5 [APP 175].
[31] *See id.*
[32] *See id.* at ¶ 7 [APP 176].
[33] *See id.* at ¶ 8 [APP 176].
[34] *NRA v. AMc*, No. CL19001757, In the Circuit Court for the City of Alexandria (Cir. Ct. Va. Apr. 12, 2019).
[35] *NRA v. AMc*, No. CL19002067, In the Circuit Court for the City of Alexandria (Cir. Ct. Va. May 22, 2019*); NRA v. AMc*, No. CL 19002886, In the Circuit Court for the City of Alexandria (Cir. Ct. Va. Sep. 5, 2019).
[36] *See* ECF 1.

asserted numerous counterclaims against the NRA and its Executive Vice President, Wayne LaPierre ("*LaPierre*").[37]

18.     Based on subsequent amendments to the pleadings in the Texas Action and the Virginia Action, the NRA and AMc's claims eventually mirrored each other across both forums, and the Virginia court entered an order allowing all of the discovery used in the Virginia Action to be used in the Texas Action.[38]

19.     For two years, AMc—the true plaintiff in this litigation—has been taking the appropriate steps to move this case toward trial in September 2021 (now continued to October 2021 in response to the NRA's request), October 2021 despite the NRA's persistent efforts to delay and frustrate the process.[39]   In November 2020, the NRA filed a motion to consolidate four unrelated cases before the Judicial Panel on Multi-District Litigation ("*MDL*").[40]   Hundreds of thousands of dollars later—and to no one's surprise—after a hearing, the MDL panel denied the transfer.[41]

20.     Having first engaged in procedural maneuvers specifically calculated to abuse the litigation process and increase costs for its opponents, such as filing four separate lawsuits against AMc in two forums, or its failed effort to consolidate four completely unrelated cases in multi-district litigation, the NRA then doubled down on its delay strategy and filed for Chapter 11 bankruptcy ("*NRA Bankruptcy*"),[42] invoking the automatic stay of the Texas Action.[43]

---

[37] *See* ECF 17, 31, 210, 241.
[38] Ex. 1-B [APP 8].
[39] *See* AMc's Response to the NRA's Motion for Continuance, ECF 228.
[40] *In re: National Rifle Association Business Expenditures Litigation*, MDL No. 2979 (Nov. 13, 2020).
[41] MDL, *Order Denying Transfer* (Feb. 4, 2021) (ECF 45) (holding "we are not persuaded that centralization is necessary for the convenience of the parties and witnesses or to further the just and efficient conduct of this litigation").
[42] *In re National Rifle Association*, No. 21-30085-hdh11 (Bkr. N.D. Tex. Jan. 15, 2021).
[43] ECF 200.

21.     In light of the NRA's public statements about its own solvency and its brazen strategy for using the bankruptcy process to escape regulatory oversight, AMc moved to dismiss the NRA Bankruptcy on the grounds of bad faith ("***Motion to Dismiss***"), and alternative motion to appoint a Chapter 11 trustee.[44]  AMc's Motion to Dismiss was joined by the New York Attorney General.[45]  Following an expedited discovery period with significant discovery relating to the claims at issue in this Texas Action, which included the depositions of over a dozen witnesses and the exchange of tens of thousands of documents during the month of March 2021, the hearing on the Motion to Dismiss began on April 5, 2021, and concluded on May 3, 2021.

22.     On May 11, 2021, the Honorable Judge Harlan D. Hale entered an order dismissing the NRA Bankruptcy.[46]  In his dismissal order, Judge Hale found:

> For the reasons stated herein, the Court finds there is cause to dismiss this bankruptcy case as not having been filed in good faith both because it was filed to gain an unfair litigation advantage and because it was filed to avoid a state regulatory scheme.[47]

> The Court finds that the NRA did not file the bankruptcy petition in good faith because this filing was not for a purpose intended or sanctioned by the Bankruptcy Code.[48]

> What concerns the Court most though is the surreptitious manner in which Mr. LaPierre obtained and exercised authority to file bankruptcy for the NRA. Excluding so many people from the process of deciding to file for bankruptcy, including the vast majority of the board of directors, the chief financial officer, and the general counsel, is nothing less than shocking.[49]

> The Court is not dismissing this case with prejudice, but should the NRA file a new bankruptcy case, this Court would immediately take up some of its concerns about disclosure, transparency, secrecy, conflicts of interest of officers and litigation counsel, and the unusual involvement of litigation counsel in the affairs of the NRA, which could cause the appointment of a trustee out of a concern that the NRA could

---

[44] NRA Bankruptcy, AMc Mot. to Dismiss (Feb. 2, 2021) (ECF 131).
[45] NRA Bankruptcy, NYAG Mot. to Dismiss Bankruptcy (Feb. 12, 2021) (ECF 155).
[46] NRA Bankruptcy, Order Granting Mot. to Dismiss (May 11, 2021) (ECF 740); *see also* ECF 232 at Ex. A.  AMc asks the Court to take judicial notice of this order pursuant to FEDERAL RULE OF EVIDENCE 201.
[47] *Id.* at 2.
[48] *Id.* at 37.
[49] *Id.* at 34.

not fulfill the fiduciary duty required by the Bankruptcy Code for a debtor in possession.[50]

23.     Between the Virginia Action, the Texas Action, and the NRA Bankruptcy, more than 25 deposition have been taken and hundreds of thousands of pages of discovery exchanged and reviewed.  Since April 2019, the NRA has served more than 700 discovery requests between the Virginia Action (over 200) and the Texas Action (over 500).[51]     AMc has served over 100 discovery requests in the Virginia Action and approximately 175 in the Texas Action.[52]   Between the Virginia Action, the Texas Action, and the NRA Bankruptcy, the NRA and AMc have collectively produced over 114,000 documents, totaling over 420,000 pages.[53]   Between the Virginia Action, the Texas Action, and the NRA Bankruptcy, the NRA has produced over 75,000 documents, and Defendants have collectively produced at least 40,000 documents.[54]   Between the Virginia Action, Texas Action, and NRA Bankruptcy 25 deposition have been taken, 12 in the Virginia Action and 1 in the Texas Action, and 12 in the NRA Bankruptcy.[55]   Given the extensive overlap of claims and allegations, discovery and deposition testimony obtained in the NRA Bankruptcy was directly relevant to many of the underlying claims in the Texas Action.[56] Since the dismissal of the NRA Bankruptcy, the parties have continued to engage in fact discovery and expert discovery working towards the October 2021 trial setting.

## V.     APPLICABLE LEGAL STANDARDS

24.     Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.[57]  A genuine dispute of material fact exists

---

[50] *Id.* at 37.
[51] *See id.*
[52] *See id.*
[53] *See* Ex. 1, Mason Decl. at ¶¶ 2-4 [APP 3-4].
[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] FED. R. CIV. P. 56; *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[58] Once the moving party has made the initial showing that there is no genuine dispute of material fact, the nonmovant must come forward with competent evidence of existence of a genuine fact issue.[59]  Mere assertions of a factual dispute unsupported by probative evidence will not prevent summary judgment.[60]  "[C]onclusory statements, speculation and unsubstantiated assertions will not suffice to defeat a motion for summary judgment."[61]  Summary judgment is also appropriate when an adequate time for discovery has passed and there is no evidence to support one or more essential elements.[62]  If the nonmovant does not make "a showing sufficient to establish the existence of an element essential to his case, and on which he bears the burden of proof at trial, summary judgment is mandatory."[63]

## VI.    ARGUMENT AND AUTHORITIES

### A. AMc Is Entitled to Summary Judgment on its Breach of Contract Claim Against the NRA.

25.    This Court should grant summary judgment on AMc's claim for breach of the Services Agreement.   Under Virginia law, which governs the Services Agreement,[64] "[t]he elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation."[65]  Here, AMc has established each of these elements, including multiple breaches of the Services Agreement, as a matter of law.

---

[58] *Banco Popular, N. Am. v. Kanning*, 638 F. App'x 328, 333 (5th Cir. 2016).
[59] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).
[60] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).
[61] *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).
[62] FED. R. CIV. P. 56(c); *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986).
[63] *Haile v. Town of Addison*, 264 F. Supp. 2d 464, 466 (N.D. Tex. 2003).
[64] Ex. 2-A, Services Agreement § XII.A [APP 69].
[65] *Ramos v. Wells Fargo Bank, NA*, 289 Va. 321, 323, 770 S.E.2d 491, 493 (2015); *see also Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 577 (5th Cir. 2003).

26.     There is no dispute that the Services Agreement was an enforceable contract between the NRA and AMc.[66]  There is also no dispute that the 2018 Amendment was a valid and enforceable amendment to the Services Agreement.   The NRA has breached the Services Agreement in numerous respects that have caused millions of dollars in damages to AMc.

### 1.     Breach of the Services Agreement – Unpaid Invoices.

27.     It is undisputed that AMc performed work and services pursuant to the Services Agreement, invoiced the NRA for those services, and that AMc has not been paid for this work.[67]  Of the invoices provided at issue, numerous invoices totaling $4,371,037 remain unpaid (the "*Unpaid Invoices*").[68]  The Services Agreement provides that such Unpaid Invoices accrue interest at a rate of 1% per month, which continues to accrue on all unpaid invoices and is due and owing.[69]

28.     The NRA has breached the Services Agreement by failing to pay AMc for services rendered.[70]  The Services Agreement provided that the NRA was to pay the amounts due on each invoice within 30 days of the invoice date, and was required to "notify AMc of any questions concerning any invoices within 10 business days after receipt."[71]  As NRA General Counsel, John Frazer, admits, the NRA provided no such notice, questions, or disputes regarding the Unpaid Invoices within that 10-day period:

> Q:  Do you think that you've paid all of the invoices that Ackerman McQueen issued?
>
> A:  I don't think we have now paid all of them, no.

---

[66] *See* ECF 209 at 72, ¶ 186.
[67] Ex. 2, Winkler Decl. at ¶ 8 [APP 50].
[68] Ex. 2, Winkler Decl. at ¶ 7 [APP 50]; Ex. 2-G, June 15, 2021 Expert Report of Daniel Jackson Report ("*Jackson Report*") at Exhibit 7 [APP 168-69].
[69] Ex. 2-A, Services Agreement at 6, § III.E [APP 64].
[70] *See* Ex. 15, Frazer Deposition at 241:3-242:20 [APP 1197], 326:2-328:13 [APP 1218]; Ex. 7, LaPierre Deposition (Virginia Action) at 284:7-285:12 [APP 549-50]; Ex. 16, Spray Deposition (Virginia Action), at 46:15-19 [APP 1248], 83:18-24 [APP 1257], 107:7-14 [APP 1263], 192:21—194:3 [APP 1284-85].
[71] Ex. 2-A, Services Agreement § III.E [APP 64].

Q:  And do you have any evidence that – with respect to any unpaid invoice, that that 10-day notice requirement was met?

A:  I don't recall anything on that specifically.[72]

29.    Moreover, the belated complaints that the NRA now brings regarding AMc's invoices, all essentially stemming from an alleged lack of supporting detail, were apparent at the time the NRA first received the invoices—and had been formatted the same way for decades.[73] The NRA had the opportunity to challenge lack of detail, calculation methods, or any other facet of the invoices during that 10-day period, but simply declined to do so.  Texas courts have ruled under very similar facts that invoices, contested for the first time only *after* a contractual challenge period, were sufficient summary judgment proof of performance, breach, and damages, granting summary judgment for a plaintiff.[74]

30.    As a result of the NRA's breach of the Services Agreement relating to Unpaid Invoices, AMc is entitled to $4,371,037 for the Unpaid Invoices and accrued interest of 1% per month on all amounts past due.[75]

## 2.    Breach of the Services Agreement - $3 Million Letter of Credit

31.    By extension, because each of the Unpaid Invoices is more than 30 days late, the NRA is also in breach of the 2018 Amendment to the Services Agreement, under which the NRA agreed to post a $3 million letter of credit for the benefit of AMc "to be drawn upon to pay in full

---

[72] Ex. 15, Frazer Deposition (Virginia Action) 328:5-13 [APP 1218]; *see also* Ex. 14, Supernaugh Deposition, at 166:18-167:16 [APP 1118-19], 170:6-11 [APP 1119].

[73] *See, e.g.*, Ex. 22, Erstling Hrg. Testimony, at 24:21-25:5, 25:19-21 [APP 1674-75] (admitting that the NRA never challenged a lack of supporting detail in AMc's invoices); Ex. 7, LaPierre Deposition, 257:4-258:13 [APP 543] (admitting that the NRA knew the AMc invoices lacked detail because it was later part of a "self-correction" effort to update billing procedures to require more detail, which did not begin until 2018).

[74] *See Triton 88 v. Star Elec. L.L.C.*, 411 S.W.3d 42, 59-60 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (upholding summary judgment for plaintiff on breach of contract where invoices were not contested under procedure established by contract over defendant's argument that its evidence of improper billing created fact issue.).

[75] As of June 15, 2021, the total accrued interest due was $1,057,969.  *See, i.e.*, Ex. 2-G, Jackson Report at Exhibit 7 [APP 168-69].

invoices for service fee billings outstanding more than 30 days."[76]   It is undisputed that these invoices are over 30 days past due and were not challenged during the 10-day notice period.[77] Accordingly, summary judgment should be granted with regard to the NRA's breach of the 2018 Amendment for failing to post the $3 million letter of credit.

### 3.    Breach of the Services Agreement – Termination Provision

32.    Section XI.F of the Services Agreement ("***Termination Provision***") provides as follows:

> In consideration of the dedication of a substantial number of personnel and resources to provide the services under the Agreement (and the necessity to maintain such staffing levels and resource allocations to enable AMc to continue to provide such services upon any renewals hereof), the NRA agrees to pay AMc a fair and equitable termination fee to compensate it for the inevitable severances and other reasonable costs incurred in conjunction with such expiration or termination.[78]

33.    AMc sustained two primary types of damages from the NRA's breach of the Termination Provision: (1) various expenses associated with the termination of the relationship, including office lease space, office disassembly fees, and other technological and operational support; and (2) employee severance fees.

34.    *First*, as a result of the termination of the Services Agreement, AMc has shut down offices in Alexandria, Virginia, Colorado Springs, Colorado, and half of its office in Dallas, Texas.[79]  AMc was forced to incur a variety of expenses associated with winding down these office operations, including terminating contracts, paying for leased space, operating expenses, moving, crating, disassembly, other technological and operational support and other types of costs.  In total,

---

[76] Ex. 2-B, 2018 Amendment at ¶ 2 [APP 71] (amending § III of the Services Agreement).
[77] Ex. 2, Winkler Decl. at ¶ 11 [APP 52].
[78] Ex. 2-A, Services Agreement § XI.F [APP 68].
[79] Ex. 2, Winkler Decl. at ¶ 7 [APP 50]; Ex. 2-G, Jackson Report at pp. 18-21 [APP 127-130].

AMc has incurred expenses of $6,525,436 related to these various expenses ($6,216,735 for Offices and Leases; $230,185 for Other Contracts; $78,516 for Office Disassembly/Move-out).[80]

35.   *Second*, it is undisputed that as a result of the termination of the Services Agreement, the jobs of numerous AMc employees were no longer required.[81]  These employees were furloughed, and AMc incurred $509,492 in expenses in the form of COBRA premiums for continuing medical coverage and calculated severance amounts totaling $1,929,146.[82]

### 4.   Breach of the Services Agreement - Indemnification

36.   Pursuant to Section V.B.I of the Services Agreement ("***Indemnification Provision***"), the NRA is required to indemnify and reimburse AMc for any expenses it may incur as a result of its work for the NRA.

37.   *First*, the NRA should indemnify and reimburse AMc for expenses arising from:

> any claim, action or proceeding by any person(s), entity(ies), the United States of America, any state(s), county(ies), or municipality(ies), or an department, agency, board, bureau, commission, attorney general, or other instrumentality(ies) or political subdivision(s) of any of the foregoing, seeking . . . an injunction or other equitable relief with respect to the activities [AMc] performed on behalf of the NRA pursuant to this Agreement or otherwise requested or approved by NRA.[83]

38.   It is undisputed that the NRA has been the subject of various government inquires that have imposed costs and expenses on AMc to produce records, negotiate with government investigators, seek waivers of confidentiality from the NRA, and generally cooperate to the extent permitted by the NRA or ordered by a court.  Specifically, AMc has been forced to incur numerous expenses relating to the NYAG's investigation into the NRA.  AMc has repeatedly demanded indemnification relating to the NYAG's investigation, which the NRA has refused.[84]

---

[80] Ex. 2, Winkler Decl. at ¶ 7 [APP 50]; Ex. 2-G, Jackson Report at Exhibit 1, 2, 3, 6 [APP 158-161, 167].
[81] Ex. 2, Winkler Decl. at ¶ 7 [APP 50]; Ex. 2-G, Jackson Report at pp. 28-29 [APP 137-38].
[82] Ex. 2, Winkler Decl. at ¶ 7 [APP 50]; Ex. 2-G, Jackson Report at Exhibit 1, 5, 5A, 5B [APP 158, 164-66].
[83] Ex. 2-A, Services Agreement § V.B.I [APP 65].
[84] Ex. 2, Winkler Decl. at ¶¶ 16-17 [APP 52-53].

39.  *Second*, the Services Agreement also requires the NRA to:

indemnify, defend, and hold harmless AMc, and its directors, officers, employees, agents, contractors and representatives . . . from and against any and all claims, demands, causes of action, suits, liabilities, losses, damages, settlements, judgments, and expenses . . . arising from . . . the public relations services and related activities of any Spokesperson pursuant to the direction or supervision of NRA.[85]

40.  It is undisputed that Dana Loesch was a "Spokesperson" for the NRA.[86] It is further undisputed that Loesch has a currently pending arbitration against AMc for the NRA's failure and refusal to honor its obligations related to the AMc-Third Party NRA Contracts. AMc has demanded indemnification relating to the Loesch arbitration against AMc, which the NRA has repeatedly refused.[87]

41.  To date, based upon the NRA's breach, AMc has sustained damages in the amount of $593,264.[88] These amounts continue to accrue.[89] As a result, AMc is entitled to partial summary judgment on the element of breach with regard to the Indemnification Provision of the Services Agreement and the damages it has incurred to date, as well as summary judgment on the future damages AMc will incur relating to the NYAG's investigation into the NRA and the Loesch arbitration, including a liability finding that the NRA is required to indemnify AMc for any and all future damages, expenses, or liability arising out of the Loesch arbitration.

**5.  Breach of the Services Agreement – AMc-Third Party NRA Contracts**

42.   In addition to the $3 million letter of credit, in the event that the Services Agreement was terminated, the NRA agreed to pay AMc any compensation under the AMc-Third Party NRA Contracts:

---

[85] Ex. 2-A, Services Agreement § V.B.I [APP 65].
[86] *See* Ex. 2-B, 2018 Amendment at ¶ 2 [APP 71].
[87] Ex. 2, Winkler Decl. at ¶¶ 16-17 [APP 52-53].
[88] Ex. 2, Winkler Decl. at ¶ 7 [APP 50]; Ex. 2-G, Jackson Report at Exhibit 9 [APP 172].
[89] Ex. 2, Winkler Decl. at ¶ 17 [APP 53].

> For all non-cancellable contracts entered into between AMc and third parties for the benefit of the NRA (herein "AMc-Third Party NRA Contracts"), the NRA agrees to pay AMc upon such expiration or termination the balance of the compensation payable under such AMc-Third Party NRA Contracts (including but not limited to, the AMc-Third Party NRA Contracts with Dana Loesch and Oliver North) as of the date of expiration of termination so that AMc can fulfill its obligation under said Contracts after expiration or termination.[90]

43.     It is undisputed that AMc entered into the AMc-Third Party NRA Contracts at the direction of the NRA.[91]  It is further undisputed that the NRA has refused to pay AMc pursuant to the terms of the Services Agreement.  As a result of the NRA's breach of the Services Agreement relating to AMc-Third Party NRA Contracts, AMc is entitled to $6,310,698, plus interest.[92]  Alternatively, AMc seeks summary judgment on liability as it relates to the NRA's breach of the Services Agreement and 2018 Amendment relating to the NRA's obligations to pay compensation relating to the AMc-Third Party NRA Contracts.

**6.      Breach of the Services Agreement – Untimely Invoices**

44.     In addition to the Unpaid Invoices and interest incurred on those amounts, which remain unpaid, the NRA frequently failed to make timely payments of AMc's invoices.  Under Section III.E of the Services Agreement all invoices are due "within 30 days of the invoice date" and "amounts not received by AMc within 60 days from the date of the invoice shall bear interest at the rate of 1% per month from the date of the invoice until paid."[93]  It is undisputed that, in the second half of 2018, the NRA was late in paying over 70 separate invoices issued by AMc.[94]  Even though these invoices were eventually paid, interest remains due and owing.  As a result of the NRA's breach, AMc is entitled to interest fees totaling $39,077.00.

---

[90] Ex. 2-B, 2018 Amendment at ¶ 3 [APP 71]; *see also* Ex. 2-A, Services Agreement at XI.E [APP 68].
[91] *See* ECF 261 at 2 (NRA admits that AMc entered into the AMc-Third Party NRA Contracts at the NRA's behest).
[92] Ex. 2, Winkler Decl. at ¶ 7 [APP 50]; Ex. 2-G, Jackson Report at Exhibit 1, 4, 4A [APP 158, 162-163].
[93] Ex. 2-A, Services Agreement § III.E [APP 64].
[94] Ex. 2, Winkler Decl. at ¶ 7 [APP 50]; Ex. 2-G, Jackson Report at Exhibit 7 [APP 168-69]; Ex. 14, Supernaugh Deposition, at 167:20-169:17 [APP 1118-19].

**B. Defendants Are Entitled to Summary Judgment on the NRA's Lanham Act Claims for False Association and Trademark Infringement.**

45.    The NRA brought two claims against all Defendants under the Lanham Act: False Association (Count 1) and Trademark Infringement (Count 2) ("***Lanham Act Claims***").    This Court initially denied Defendants' Motion to Dismiss as to the NRA's Lanham Act Claim[95] but allowed the decision to be revisited after further discovery, *citing Vulcan Golf, LLC v. Google, Inc.*, 552 F. Supp. 2d 752, 769 (N.D. Ill. 2008).[96]

46.    As a preliminary matter, the only registered trademarks applicable to this claim are "NRA," "National Rifle Association," and "National Rifle Association of America."[97]  Although the NRA pleaded trademark infringement on all images contained in Exhibit B and C of its Second Amended Complaint ("***SAC***"), eight of the images the NRA complains of in Exhibit C of its SAC do not bear any of these marks and are therefore inapplicable to this claim.[98]  For all remaining images, the NRA's Lanham Act Claims should be dismissed as a matter of law because AMc engaged in fair use of its trademarks. However, even if fair use were not applicable here, Defendants are still entitled to summary judgment because the NRA cannot establish required elements of its claims.

47.    Claims under the Lanham Act require a showing that (1) the designation or false designation is likely to cause confusion, mistake, or deception as to (a) the affiliation, connection, or association of defendant with another person, or (b) as to the origin, sponsorship, or approval

---

[95] *See* ECF 165 at 16 (only the NRA's claim for false association at the time of the Order as the NRA had not yet alleged its trademark infringement claim, which was first alleged in its SAC).

[96] ECF 165 at 16.

[97] ECF 209 at Ex. A.

[98] ECF 209 at Ex. C.  The NRA nevertheless references certain copyrights in its claim for trademark infringement (ECF 209 at ¶ 121), despite the fact that the Court previously dismissed the NRA's copyright infringement claim. ECF 165 at 17-18.  These copyrights cannot form the basis of a trademark-infringement claim. *See, e.g.*, *Jasco v. Coca Cola Co.*, 537 Fed. App'x 557, 561 (5th Cir. 2013).

of defendant's goods, services, or commercial activities by another person; and (2) plaintiff has been or is likely to be damaged by these acts.[99]   Here the NRA cannot demonstrate any confusion or likelihood of confusion or any injury.

48.      Furthermore, summary judgment is appropriate as to the Individual Defendants and Mercury because the NRA can show no evidence sufficient to create a fact issue as to the Individual Defendants or Mercury.

### 1.      AMc engaged in "fair use" of NRA trademarks.

49.      AMc engaged in nominative fair use of the NRA's trademarks because they were used in good faith to identify and describe AMc's own services.[100]   To establish nominative fair use, "[f]irst, the product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder."[101]   "This test 'evaluates the likelihood of confusion in nominative use cases.'"[102]   "The nominative fair use doctrine allows such truthful use of a mark, even if the speaker fails to expressly disavow association with the trademark holder, so long as it's unlikely to cause confusion as to sponsorship or endorsement."[103]   "Speakers are under no obligation to provide a disclaimer as a condition for engaging in truthful, non-misleading speech."[104]

---

[99] 15 U.S.C. §§ 1114(1)(a), 1125(a)(1)(A).
[100] *See* 15 U.S.C. § 1115(b)(4).
[101] *See New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 308 (9th Cir. 1992); *see Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 546 (5th Cir. 1998) (recognizing the Ninth Circuit's nominative fair use analysis in the Fifth Circuit). The Ninth Circuit has simplified the way it describes this analysis to: "whether (1) the product was 'readily identifiable' without use of the mark; (2) defendant used more of the mark than necessary; or (3) defendant falsely suggested he was sponsored or endorsed by the trademark holder. *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1175-76 (9th Cir. 2010).
[102] *Toyota Motor Sales*, 610 F.3d at 1176.
[103] *Id.* at 1177.
[104] *Id.*

50.     Moreover, a finding of nominative fair use is not an affirmative defense.  Rather, the plaintiff bears the burden of establishing that the defendant's use of a trademark is <u>not</u> nominative fair use.[105]

51.     In the present case, AMc provides advertising, public relations, and branded media services to its clients, including the NRA for nearly 40 years.[106]  From June 25, 2019, to November 19, 2019,[107] AMc displayed images on its website depicting these types of services, not only reflecting the work it performed for the NRA, but for several other clients as well.[108]  It is common industry practice for advertising agencies to display portfolios on their websites reflecting work performed for both current and former clients.[109]

52.     By way of example, this gallery of an advertising agency's services is akin to a job applicant's resume.  Even if the applicant no longer works for the prior employer, the applicant still worked there, performed services, and gained skills and experience while working for the former employer.  Moreover, even if the employment relationship ended on bad terms, the use of the former employer's trade name on the applicant's resume would still be necessary to identify and describe the applicant's relevant experience for a future position.  In the same way, the NRA

---

[105] *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 118 (2004) ("Section 1115(b) places a burden of proving likelihood of confusion (that is, infringement) on the party charging infringement . . . [I]t takes a long stretch to claim that a defense of fair use entails any burden to negate confusion.").

[106] Ex. 3, McQueen Decl. at ¶ 3 [APP 174].

[107] June 25, 2019 was the date that the NRA claims it terminated the business relationship. *See* ECF 209 at ¶ 99.  The images were displayed through November 19, 2019, at which point AMc redesigned its website and removed the gallery of client work altogether.  *See* Ex. 3, McQueen Decl. at ¶¶ 4-5 [APP 175].

[108] Ex. 3, McQueen Decl. at ¶ 4 [APP 175].

[109] *See, e.g.*, Our Work, WWW.RICHARDS.COM, https://richards.com/work_categories/digital/, last accessed Jul. 5, 2021. The Richards Group displays images of its work for Chick-Fil-A, who is no longer a current client of the Richards Group.  *See* Ellen Myers, The Richards Group Founder Discusses "Shock" of Losing Chick-Fil-A Ad Campaign, Dallas Morning News (Jul. 22, 2016) (https://www.dallasnews.com/business/local-companies/2016/07/22/the-richards-group-founder-discusses-shock-of-losing-chick-fil-a-ad-campaign/.  *See also, e.g.*, https://www.wpp.com, www.ruckusmarketing.com, www.firehouse.agency, www.theoldstate.com, https://www.milleradagency.com, https://www.agencycreative.com, https://warrendouglas.com, www.kairosidagency.com (an illustrative sample of advertising/marketing agency websites with client names and trademarks prominently displayed).

is merely part of AMc's resume, regardless of the existing state of the relationship. Under applicable law, AMc's use of the NRA's trademarks clearly constitutes fair use.

53. *First*, AMc had no other way to demonstrate the work product it created for the NRA other than by using the NRA's name and trademark, which provide necessary context for the displayed images and demonstrate AMc's skills in creating powerful branding for companies and organizations. For example, an image displaying someone aiming a firearm makes sense in the context of the NRA—but would be inappropriate for many other types of branding efforts (say, an ice cream company). For an advertising agency, images in a portfolio of its work product would make little sense without knowing what company or organization was being promoted.[110] It is undisputed that AMc is not a competing Second Amendment rights organization (to the extent that a non-profit civil rights organization can even have a "competitor" in any traditional sense) and that AMc does not intentionally seek to pursue any overlapping target audience for similar services provided by the NRA.[111]

54. *Second*, only so much of the NRA's name and logo was used as reasonably necessary to identify AMc's work for the NRA and provide this necessary context. Most images contain no more than a single reference to the "National Rifle Association" or "NRA,"[112] which, as stated, is necessary to describe AMc's own work product.

55. *Third*, AMc did nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the NRA that is deceptive. It is undisputed that, *at the time* the work product and images at issue were created, the NRA was still a client of AMc and commissioned and approved of such work.[113] Even so, to avoid any confusion, in August 2019,

---

[110] Ex. 3, McQueen Decl. at ¶ 4 [APP 175].
[111] *See id.* ¶ 6 [APP 175].
[112] ECF 201 at Exs. B & C.
[113] Ex. 3, McQueen Decl. at ¶ 5 [APP 175].

AMc appended the word "Legacy" to the images to make clear that the NRA was no longer a current client.[114]  As the NRA cannot meet its affirmative burden to prove that AMc's use of its intellectual property did not constitute nominative fair use, the Court should grant summary judgment in favor of AMc on the NRA's trademark infringement claim.

### 2.    No evidence of confusion, mistake, or deception.

56.    A plaintiff seeking an award of monetary damages for false or misleading advertisement under Section 1114 or 1125 of the Lanham Act must show a likelihood of confusion as to the source, affiliation, or sponsorship of the defendant's product or service.[115]  Plaintiff may show either that the defendant's advertisement is literally false or that it is true yet misleading or confusing."[116]  In the present case, the NRA is not alleging that AMc's website was literally false (i.e., that AMc never worked with the NRA, or that AMc did not create the advertising displayed by the website), but rather that AMc's website is misleading or confusing by creating the impression that the NRA approved of AMc's work. [117]

57.    Where representations are literally *true*, or too ambiguous to support a finding of literal falsity, a violation can only be established by proof of actual deception (*i.e.*, evidence that individual consumers perceived the advertisement in a way that misled them about the plaintiff's product.)"[118]  "A plaintiff relying upon statements that are literally true yet misleading cannot obtain relief by arguing how consumers could react; it must show how consumers actually do react."[119]  Actual confusion is the best evidence of a likelihood of confusion, and successful

---

[114] Ex. 3, McQueen Decl. at ¶ 7 [APP 176].

[115] 15 U.S.C. §§ 1114(1)(a), 1125(a)(1)(A); *Springboards to Educ. v. Houston Indep. Sch. Dist.,* 912 F.3d 805, 811-12 (5th Cir. 2019) ("Likelihood of confusion is synonymous with a probability of confusion, which is more than a mere possibility of confusion.").

[116] 15 U.S.C. § 1125(a)(1)(A).

[117] *See* ECF 209 at ¶ 115.

[118] *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 614 (6th Cir. 1999).

[119] *Id.*

plaintiffs usually present evidence of the public's reaction through consumer surveys, or other direct anecdotal evidence of confusion.[120]   The NRA has not produced any evidence of actual deception, let alone the kind of survey evidence that has been used to prevail on such claims in other cases.  In fact, even after this litigation began in April 2019, the NRA has repeatedly testified regarding the approval and "outstanding" work done by AMc for the NRA.[121]   As such, its Lanham Act Claims fail as a matter of law.

### 3.        No evidence of damages.

58.        To support its Lanham Act Claims, the NRA must also establish that it has been damaged or that it is likely to be damaged.[122] The sole basis for the NRA's Lanham Act Claims are AMc's prior reference of the NRA's name or use of the NRA's alleged images on AMc's prior website.[123]   As part of a website overhaul, all images referencing the NRA or connected with AMc's work for the NRA were removed from AMc's website in November 2019.[124]   The NRA has no evidence to support any prior damage, or likelihood of damage in the future, proximately arising from the display of these images on AMc's website during the five-month period from June 2019 through November 2019.

### 4.        No evidence against Individual Defendants or Mercury.

59.        Additionally, the NRA has not made allegations or produced evidence to support Lanham Act Claims against any of the Individual Defendants. In its SAC, the NRA alleged only

---

[120] *Viacom Int'l, Inc. v. IJR Capital Invs., LLC*, 891 F.3d 178, 197 (5th Cir. 2018) ("To show actual confusion, a plaintiff may rely on anecdotal instances of consumer confusion or consumer surveys."); *Podiatric Physicians*, 185 F.3d at 616, *see also Klein-Becker USA, Ltd. Liab. Co. v. Home Shopping Network, Inc.*, No. 2:05-CV-00200 PGC, 2005 U.S. Dist. LEXIS 46773, at *12 (D. Utah Aug. 31, 2005) ("Generally, plaintiffs use consumer surveys to prove that advertisements are misleading in Lanham Act claims . . . .").
[121] Ex. 7, LaPierre Deposition (Virginia Action), at 43:10-46:10 [APP 489-90]; Ex. 13, Hart Deposition, at 207:4-208:20 [APP 1006], 414:13—415:3 [APP 1058].
[122] *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 114 (2014); *Rolex Watch USA, Inc. v. Meece*, 158 F.3d 816, 828-29 (5th Cir.1998).
[123] *See* ECF 209 at ¶ 108.
[124] *See* Ex. 3, McQueen Decl., at ¶ 8 [APP 176].

that the Individual Defendants "directly participated in, or are at least the moving force behind, AMc's website" not being updated to remove NRA material after the NRA terminated the Services Agreement,[125] which this Court acknowledged were "thin" allegations.[126]

60.     Under Texas law, a corporate officer may not be held liable for an alleged corporate wrongdoing unless that officer knowingly and personally participates in the tortious act.[127]  To be personally liable on an unfair competition or trademark claim, an individual must personally take part in the infringing activities or specifically direct others to do so; it is not enough for them to participate in activities merely related to the infringing acts.[128] As reflected in the NRA's deficient SAC, after an adequate time for discovery, the NRA has failed to show evidence that Individual Defendants Martin, Winkler, and Montgomery personally participated in any of the facts and circumstances relating to the NRA's Lanham Act claim.   As a result, the NRA's Lanham Act Claims against the Individual Defendants should be dismissed.

61.     Similarly, the NRA has failed to produce evidence that Mercury was responsible for the NRA's complaints about AMc's website sufficient to create a genuine issue of material fact, and, therefore, the NRA's Lanham Act Claims should be dismissed as to it.

**C.  Defendants Are Entitled to Summary Judgment on the NRA's Conversion Claim.**

62.     The NRA has two bases for its conversion claim: (1) AMc had intellectual property of the NRA on its website after the NRA terminated the Services Agreement; and (2) AMc failed to return certain confidential information belonging to the NRA upon request. This Court should grant summary judgment as to the NRA's claim for conversion because: (1) conversion does not

---

[125] ECF 209 at ¶ 110.
[126] ECF 165 at 17.
[127] *See Riverside Mkt. Dev. Corp. v. Int'l Bldg. Prods., Inc.*, 931 F.2d 327, 330 (5th Cir. 1991); *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 174 (5th Cir. 1985).
[128] *Omega, SA v. Giftland Co.*, No. 03-CIV-5808 (WJM), 2005 U.S. Dist. LEXIS 17043, at *9 (D.N.J. Aug. 11, 2005).

apply to intangible property, and even if it did, the economic loss rule bars the NRA's claims; and (2) there is no evidence of any the NRA's confidential information being converted by AMc.

### 1.    There is no recognized cause of action for conversion of intangible property.

63.    "To prove conversion, a claimant must establish (1) it owned or had legal possession of the property or entitlement to possession, (2) the defendant unlawfully and without authorization assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, the claimant's rights, (3) the claimant demanded return of the property, and (4) the defendant refused to return the property."[129]   "Texas law has never recognized a cause of action for conversion of intangible property except in cases where an underlying intangible right has been merged into a document and that document has been converted."[130]   "[T]o the extent that a plaintiff alleges conversion of intangible, copyrightable material, the claim is either outside the scope of Texas conversion law and therefore fails to state a claim under state law or, in the alternative, preempted by the Copyright Act."[131]

64.    Recognizing that the NRA based its conversion claim on the alleged conversion of intangible property and was therefore preempted by the Copyright Act, this Court dismissed the NRA's claim by its Order dated September 15, 2020.[132]   Following the Court's dismissal, the NRA repleaded its conversion claim, supplementing its prior argument by stating the NRA seeks the value of "confidential information" that AMc allegedly converted and disclosed to the media and unauthorized NRA directors in a misguided attempt to circumvent Copyright Act preemption. As examples of the property AMc allegedly converted, the NRA referenced Exhibits B and C of its

---

[129] *Hill v. New Concept Energy, Inc. (In re Yazoo Pipeline Co., L.P.)*, 459 B.R. 636, 652 (S.D. Tex. Bankr. Oct. 14, 2011).
[130] *Id.*
[131] *Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 823 F. Supp. 2d 578, 587 (S.D. Tex. 2011).
[132] ECF 165 at 21.

SAC, which supplied outdated screenshots of AMc's website, displaying content AMc created for the NRA.[133]  The fact remains, despite amending its complaint to add conversion of "confidential information," the NRA continues to improperly base its claim on intangible property.[134]

65.     To the extent that the NRA's conversion claim relies on the promotional material formerly displayed on AMc's website, that claim should once again be dismissed because it is preempted by the Copyright Act as set forth in Defendants' prior Motion to Dismiss.[135]

66.     As for the "confidential information," "Texas law has never recognized a cause of action for conversion of intangible property except in cases where an underlying intangible right has been merged into a document and that document has been converted."[136]  In other words, intangible information is only protected by conversion when physically contained on such documents as stock certificates, lease documents, and a copy of a confidential customer list, and the property converted is that physical media containing the information.[137]

67.     Confidential information has been analyzed under this framework.[138]  Recognizing that intangible property is not subject to the tort of conversion in Texas except where that property is part of a physical item or document that has been converted, the court in *Neles-Jamesbury, Inc.* cited "confidential customer lists" as information that may only be subject to conversion when it is converted in the form of physical documents.[139]  While the NRA has failed to state with any specificity to what confidential information its claims refer, it has not referenced conversion of

---

[133] ECF 209 at Exs. B & C.
[134] *See* ECF 209 at ¶ 131 (falsely claiming that "Defendants have refused to remove from its website and return all such confidential information…").
[135] *See* ECF 28, 29, which are incorporated herein for all purposes.
[136] *Express One Int'l v. Steinbeck*, 53 S.W.3d 895, 901 (Tex. App.—Dallas 2001, no pet.); *Neles-Jamesbury, Inc. v. Bill's Valves*, 974 F. Supp. 979, 982 (S.D. Tex. 1997).
[137] *Neles-Jamesbury, Inc.* 974 F. Supp. at 982.
[138] *See id.*
[139] *See id.*

any physical media, and there can be no doubt that the confidential information is intangible property, which does not meet the elements of conversion.

68.     Moreover, much of the so-called "confidential information" could not possibly maintain any recognized "confidential" status.  The intellectual property the NRA now claims was "confidential"[140] was publicly displayed on AMc's website—without objection by the NRA— prior to the termination of the Services Agreement.[141]  Some of the images had been on display since 2017.[142]

69.     Additionally, the NRA's claim for conversion should be dismissed because it has failed to produce evidence sufficient to raise a genuine issue of material fact as to damages.[143]  In its only mention of damages for its conversion claim, the NRA pled that it seeks "the full value of the property converted."[144]  With the exception of the screenshots taken from AMc's website of promotional images AMc made for the NRA, it has failed to specifically identify any converted property. Neither has it presented any evidence that is relevant to the value of those images or the still confidential information. As there is no evidence of damages due to AMc's alleged conversion, the NRA's claim for conversion should be dismissed.

### 2.     The economic loss doctrine bars the NRA's claims for conversion.

70.     Even if intangible property could support a claim for conversion, the economic loss rule bars the NRA's claim for conversion because the facts and damages alleged to support its claim all fall within the ambit of the Services Agreement.  "The economic loss doctrine bars torts

---

[140] ECF 209, Exs. B & C.
[141] Ex. 3, McQueen Decl. at ¶ 5 [APP 175].
[142] *See id.*
[143] *See Chapa v. Stonehaven Dev., Inc.*, No. 13-13-00030-CV, 2013 Tex. App. LEXIS 10159, at *8 (Tex. App.— Corpus Christi Aug. 15, 2013, no pet.) (summary judgment properly granted where plaintiff presented no evidence supporting damages for conversion).
[144] ECF 209 at ¶ 135.

when the parties' relationship and their attendant duties arise from a contract."[145]  "The economic

loss rule has been applied to preclude breach of fiduciary duty and conversion claims where a

plaintiff has been shown to have no damages independent of those suffered as a result of an alleged

breach of contract."[146]

71.     To support its claim for conversion of confidential information, the NRA argued

that:

> 130. Pursuant to multiple provisions of the Services Agreement, on the NRA's behalf and subject to the NRA's control, AMc entered into contracts and arrangements for the purchase, planning, and placement of media—activities that required AMc to be entrusted with sensitive confidential information pertaining to the NRA . . . .
>
> 132. Defendants' unauthorized use and publication of the NRA's confidential information constitutes intentional acts causing substantial interference, if not outright destruction, of the NRA's valuable property rights, to the detriment and harm of the NRA.
>
> 133. Defendants additionally misused the NRA's confidential information on multiple occasions when they directly or indirectly disclosed to third parties the NRA's confidential information . . . .[147]

72.     The conduct described by the NRA in its SAC, though unsupported by the evidence,

is plainly covered by the Confidentiality and Ownership of Products provisions of the Services

Agreement. The Confidentiality provision of the Services Agreement forbids AMc from

"disclos[ing], directly or indirectly, to any third party any NRA . . . materials or information

coming to the knowledge of AMc, supplied to AMc by NRA, or otherwise made known to AMc

as a result of AMC's providing Services . . . ."[148]  The Termination Clause of the Services

---

[145] *Orcasitas v. Wells Fargo Home Mortg.*, 2013 U.S. Dist. LEXIS 93760, at *7 (N.D. Tex. Arp. 10, 2013) (*citing Hurd v. BAC Home Loans Servicing, LP*, 880 F. Supp. 2d 747 (N.D. Tex. 2012) ("The economic loss rule generally precludes recovery in tort for economic losses resulting from the failure of a party to perform under a contract.")).
[146] *Hoffpauir, Inc. v. Interstate Nat'l Dealer Servs.*, No. A-12-CA-263 LY, 2013 U.S. Dist. LEXIS 9392, at *13 (W.D. Tex. 2013).
[147] ECF 209 at ¶ 130-133.
[148] Ex. 2-A, Services Agreement at IV(A)(1) [APP 64].

Agreement also requires AMc to immediately return to the NRA "any and all of the NRA's property, materials, documents, **Confidential Information**, etc., that may be in AMc's possession."[149]

73.    Similarly, the Ownership of Products provision of the Services Agreement states:

> All other, and further, intellectual property and mailing lists, under any definition, whether common law or statutory, created or developed by AMc in fulfilling its obligations under this Services Agreement, are NRA ·s sole and exclusive property, and AMc does hereby assign all right, title and interest in same to NRA to the extent that AMc has such rights to assign and transfer.[150]

This provision applies to the other intellectual property that the NRA alleges AMc converted. The economic loss rule bars the NRA's entire claim for conversion.

### 3.    There is no evidence to support conversion against the Individual Defendants or Mercury.

74.    Once again, even if the NRA's intellectual property could be "converted," most of the allegations and evidence supporting the NRA's conversion claims against Defendants are the same as those supporting its two Lanham Act Claims: that AMc failed to remove NRA related material from its website after the NRA terminated the Services Agreement. Additionally, conversion has a necessary element that a demand to be made on the defendant, which was certainly not issued to the Individual Defendants or Mercury[151]

75.    For the reasons stated above in Sections B.4, the NRA has failed to show any evidence that would create a genuine issue of material fact against the Individual Defendants or Mercury Group on its conversion claim.

### D.  AMc and Mercury Group Are Entitled to Summary Judgment on the NRA's Claim for Breach of Fiduciary Duty.

---

[149] *Id.* at XI(E) [APP 68] (emphasis added).
[150] *Id.* at VI [APP 66].
[151] *Hill*, 459 B.R. at 652.

76.     The NRA pleaded two separate breach-of-fiduciary duty claims against AMc and Mercury, Count Five under Texas law, and Count Seven under Virginia Law.  Under both Texas and Virginia law, the elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant.[152]  Both of the NRA's claims should be dismissed because (1) there was no fiduciary relationship between AMc/Mercury and the NRA; (2) the economic loss rule bars the NRA's claim; and (3) the NRA has no evidence to support its alleged breaches.

**1.     There was no fiduciary duty between the NRA and AMc.**

77.     A fiduciary relationship may arise from formal and informal relationships and may be created by contract.[153]  A formal fiduciary relationship arises as a matter of law and includes the relationships between attorney and client, principal and agent, partners, and joint venturers.[154]  An informal fiduciary relationship, however, can arise only "where one person trusts in and relies upon another, whether the relationship is a moral, social, domestic, or purely personal one."[155]

**a.     No formal fiduciary relationship between AMc and the NRA.**

78.     The NRA has tried, and failed, to establish a formal fiduciary relationship by arguing AMc was the NRA's agent pursuant to the Services Agreement.[156]  In its September 15, 2020 opinion, the Court found the NRA failed to plead facts to sufficiently allege a principal-agent relationship between the NRA and AMc.[157]  As the Court noted, "[i]n its response, the NRA simply

---

[152] *Jacked Up, LLC v. Sara Lee Corp.*, 854 F.3d 797, 808 (5th Cir. 2017); *Johnson v. Bella Gravida*, LLC, 105 Va. Cir. 350, 355 (Cir. Ct. 2020).
[153] *Jacked Up*, 854 F.3d 808.
[154] *Id*.
[155] *Id*.
[156] ECF 209 at ¶ 164.
[157] ECF 165 at 27.

state[d]: 'the NRA alleges that the Services Agreement between the parties contains language making AMc an agent and fiduciary of the NRA.'"[158]  Notably, the Court specifically considered the language of the Services Agreement, and determined that it did not provide a formal fiduciary relationship between AMc and the NRA based upon a principal/agent relationship:

> Although the provisions of the Services Agreement cited by the NRA establish that AMc was to act on the NRA's behalf with respect to various tasks set forth in the agreement, these provisions do not establish that the NRA had "the right to dictate the means and details of the process by which [AMc]" was to accomplish those tasks.[159]

79.     As such, there is no formal fiduciary relationship between AMc/Mercury Group and the NRA as a matter of law based upon the language of the Services Agreement or otherwise.

### b.  No informal fiduciary relationship between AMc and the NRA.

80.     Just as no formal fiduciary relationship exists between the parties, neither was there an informal fiduciary relationship between AMc/Mercury and the NRA at any time.  "Texas law does not recognize informal fiduciary relationships lightly 'especially in the commercial context.'"[160]  To impose an informal fiduciary duty in an arms-length business transaction, the special relationship of trust and confidence "must exist prior to, and apart from, the agreement made the basis of the suit."[161]

81.     The NRA attempts to get around this by alleging a relationship that preceded the Services Agreement on which it now sues.[162]  However, these allegations simply refer to an

---

[158] ECF 165 at 27.

[159] *Id.*

[160] *Jacked Up*, 854 F.3d at 809 (internal citations omitted); *Meyer v. Cathey*, 167 S.W.3d 327, 331 (Tex. 2005) ("[I]n order to give full force to contracts, we do not create such a relationship lightly."); *see also Mullins v. TestAmerica, Inc.*, Civil Action No. 3:02-CV-106-M, 2002 U.S. Dist. LEXIS 4877, at *8 (N.D. Tex. 2002) ("Because the relationship places an onerous burden of loyalty on the fiduciary, it is an extraordinary one and will not be lightly created.").

[161] *Jacked Up*, 854 F.3d at 809 (*citing Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 288 (Tex. 1998)).

[162] ECF 209 at 63.

ongoing contractual relationship between AMc and the NRA. The existence of a *prior* contractual relationship predating the *current* contract on which the NRA sues does not, on its own, overcome Texas courts' refusal to base informal fiduciary duty on contractual relationships.[163]

82.   In so ruling the Texas Supreme Court in *Meyer v. Cathey*, opined:

> [T]he fact that Cathey trusted Meyer does not transform their business arrangement into a fiduciary relationship. *See Morris*, 981 S.W.2d at 674 ("'Mere subjective trust does not . . . transform arm's-length dealing into a fiduciary relationship.'"). Nor can we justify imposing a fiduciary duty based on the fact that, for four years, Cathey and Meyer were friends and frequent dining partners. *See Crim Truck & Tractor Co*., 823 S.W.2d at 595 ("The fact that the relationship has been a cordial one, of long duration, [is not] evidence of a confidential relationship.").[164]

83.   As to what kinds of relationships *do* lead to findings of informal fiduciary duty in the business context, Texas courts have made clear that they arise from *personal relationships*.[165] In cases not involving family members, the existence of a close personal friendship is a key factor in ascribing informal fiduciary status to the relationship.[166]

84.   Not only has the NRA failed to produce evidence of the kinds of relationship sufficient to support a genuine issue of material fact as to the existence of an informal fiduciary relationship, it has failed to even identify the *people* who might have had such a relationship. The NRA and AMc, although people under the corporate fiction, are not real people that experience

---

[163] *See Meyer*, 167 S.W.3d at 331 ("These earlier projects were arms-length transactions entered into for the parties' mutual benefit, and thus do not establish a basis for a fiduciary relationship.").

[164] *Id.* (some internal citations omitted).

[165] *Lee v. Hasson*, 286 S.W.3d 1, 14 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) ("The existence of the fiduciary relationship is to be determined from the actualities of the relationship between the persons involved."); *Kalb v. Norsworthy*, 428 S.W.2d 701, 705 (Tex. Civ. App.—Houston [1st Dist.] 1968, no pet.) (By reason of appellant's long association with appellee in a business relationship, as well as the *close personal friendship* existing between them, appellant was justified in placing confidence in the belief that appellee would act in his best interest.) (emphasis added).

[166] *See Hoggett v. Brown*, 971 S.W.2d 472, 488 (Tex. App.—Houston [14th Dist.] 1997, pet. denied) ("A person is justified in placing confidence in the belief that another party will act in his or her best interest only where he or she is accustomed to being guided by the judgment or advice of the other party, and there exists a long association in a business relationship, *as well as personal friendship*.") (emphasis added).

the kind of relationship that leads to informal fiduciary duty.  Surely, the parties could only point to LaPierre and AMc's patriarch, Angus McQueen, in an attempt to establish any such relationship. Yet LaPierre himself defined the two men's relationship as an arms-length business relationship:

> Q:  What kind of relationship did you develop with him?
>
> A:  I think a business colleague relationship – relationship.[167]
>
> . . .
>
> Q:  Did you – for the almost 30 years that you were working with Ackerman McQueen, did you regard Angus McQueen as a friend?
>
> A:  You know, with Angus, I always knew it was business.  I regarded him as a friend, but I always knew with Angus it was business.[168]

85.     Accordingly, this Court should dismiss the NRA's fiduciary duty claim because the NRA has not and cannot demonstrate facts to establish that AMc/Mercury maintained any type of fiduciary relationship with the NRA.

### 2.     The economic loss rule bars the NRA's breach-of-fiduciary-duty claims.

86.     Even if the Court determines that a fiduciary relationship somehow existed between the parties, the NRA's claims for breach of fiduciary duty are simply repackaged breach-of-contract claims and are therefore barred by the economic loss doctrine.  The NRA has improperly alleged three different categories of facts in support of its breach of fiduciary duty claims.

87.     *First*, the NRA has claimed that AMc and Mercury breached fiduciary duties to the NRA by failing to disclose:

- Facts regarding AMc's billing and invoicing practices—for example by failing to disclose that appropriate support documentation was not retained by AMc and could not be audited by NRA at any time;

---

[167] Ex. 7, LaPierre Deposition (Virginia Action), at 42:24-43:4 [APP 489].
[168] *Id.* at 47:13-19 [APP 490].

- Facts regarding NRATV performance, by withholding crucial performance metrics like "unique" and "genuine" individualized viewership data, and relatedly failing to disclose material facts regarding the inaccurate valuation of NRATV;

- Facts regarding the prior and failed "owned-media" project, Clean Skies TV;

- Facts that AMc often double-billed multiple clients for the same work, or simply billed the NRA for time logged by employees who were supposed to be fully "dedicated" to the NRA;

- Facts that AMc used equipment, billed to the NRA, for other clients' projects;

- Facts that bills emailed and mailed to the NRA contained inaccurate and false information, for example, bills seeking reimbursement for services that were never performed, that were in excess of the actual costs to AMc, and that were wholly unsubstantiated by supporting documentation; and

- Facts regarding the North Contract—for example, that North had legal duties to AMc that superseded those he had to the NRA while NRA President, and the failure to produce the digital documentary series as specified.[169]

88.    In other words, the NRA's allegations amount to the idea that it did not get the benefit of what it was promised and what it paid for under the Services Agreement, which is an argument that will not support an alternative tort claim under Texas law.[170]   Simply stated, the NRA wants a refund.

89.    *Second*, the NRA has alleged that AMc breached a fiduciary duty by "attempting to stop an investigation of Ackerman and its billing practices."[171]   This allegation again falls squarely within Section VIII of the Services Agreement, the Records Inspection Clause, which requires AMc to provide the NRA with books and records "with respect to matters covered under

---

[169] ECF 209 at 67-68, ¶ 167.
[170] *See Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986) (applying the economic loss rule: "[t]he Reeds' injury was that the house they were promised and paid for was not the house they received. This can only be characterized as a breach of contract…."); *Sw. Bell Tel. Co. v. Delanney*, 809 S.W.2d 493, 495 (Tex. 1991) ("When the injury is only the economic loss to the subject of a contract itself the action sounds in contract alone.").
[171] ECF 209 at ¶ 168.

this services agreement" upon reasonable notice.[172]   The NRA has already asserted a claim for breach of the Records Inspection Clause, thus rendering its reframed tort claim improper.

90.    *Third*, the NRA alleges three instances of "extortion" as a breach of fiduciary duty.[173]   Not only does extortion *not* constitute a cognizable civil cause of action,[174] but the underlying act of "extortion" described by the NRA include only the (false) allegations that AMc threatened to disclose NRA information.[175]   After receiving these so-called "extortionist" threats, the NRA describes how LaPierre heroically declined to succumb to them, which supposedly caused the "leaks" of NRA information.[176] Thus, although couched in a dramatic (but entirely untrue) narrative, the resulting allegations amount to nothing more than a breach the Confidentiality Clause of the Services Agreement.[177]   A tort based on a threatened breach of contract is simply a recast breach of contract claim and is barred by the economic loss rule.[178]

91.    In sum, none of the alleged "breaches" of fiduciary duty can be properly maintained because they are all barred by the economic loss doctrine.  Summary judgment should be granted in favor of AMc as to both of the NRA's breach of fiduciary duty claims.

### 3.    The NRA has failed to produce evidence supporting a breach of fiduciary duty.

92.    Finally, even if the Court determines the economic loss rules does not apply, the NRA cannot establish legally sufficient evidence to support its alleged breaches of fiduciary duty.

---

[172] Ex. 2-A, Services Agreement § VIII [APP 67].

[173] ECF 209 at ¶ 168.

[174] *See Wilson v. Jackson*, No. 3:14-CV-3748-N-BK, 2014 U.S. Dist. LEXIS 170207, at *9-10 (N.D. Tex. Nov. 13, 2014) ("Insofar as Plaintiff sues Jackson and other Defendants for embezzlement and extortion, criminal statutes do not create a private right of action."); *Margaux Warren Park Partners, Ltd. v. GE Bus. Fin. Servs. (In re Margaux Warren Park Partners, Ltd.)*, Nos. 08-43388, 09-04022, 2009 Bankr. LEXIS 4128, at *9 (Bankr. E.D. Tex. 2009) ("[C]ivil extortion… is not recognized under Texas law.").

[175] *See* ECF 209 at ¶¶ 83-86.

[176] ECF 209 at 5 & ¶¶ 82-86.

[177] *See* Ex. 2-A, Services Agreement § IV [APP 64].

[178] *See Shellnut v. Wells Fargo Bank, N.A.*, No. 02-15-00204-CV, 2017 Tex. App. LEXIS 3844, at *44-45 (Tex. App.—Fort Worth Apr. 27, 2017, pet. denied) (Threat to take action authorized by contract characterized as TDCA claim was actually recast breach of contract claim and barred by economic loss rule).

As set forth above, the NRA lodges various allegations for of fiduciary duty.  Yet, the NRA's evidence is nothing more than "[c]onclusory statements, speculation and unsubstantiated assertions."[179]  Stated differently, the NRA does not have legally supportable for the alleged breaches.  In fact, the evidence that has been developed establishes that the alleged breaches fail as a matter of law.

93.    For example, the NRA claims that AMc failed to disclose facts relating to its billing and invoicing procedures.[180]    However, the evidence conclusively establishes that the NRA's billing and invoicing procedures had been the same for many years.[181] As the NRA's Director of Budget and Financial Analysis testified, prior to 2018, the NRA never once asked for more detail about any invoice or previously refused to pay invoices for lack of detail.[182]  LaPierre personally participated in the annual budgeting process,[183] and specifically instructed AMc to send invoices without supporting detail for confidentiality purposes to avoid media leaks.[184]  AMc was never asked to provide more invoice detail until 2018,[185] at which point it revised its invoices to comply with the NRA's requests.[186]  The NRA has no evidence that the NRA "double-billed" for any jobs whatsoever, used NRA equipment for other AMc clients, or that AMc ever agreed to provide "NRA dedicated employees," which is not a term or concept anywhere in the Services Agreement.

---

[179] *RSR Corp.*, 612 F.3d at 857.
[180] ECF 209 at ¶ 167.
[181] *See* ECF 141, Winkler Decl. at ¶ 5 (APP 4), Montgomery Decl. ¶ 6 (APP 13-14); Ex. 6, Winkler Hrg. Testimony, 90:5-13 [APP 347].
[182] Ex. 22, Erstling Hrg. Testimony, 24:21-25:21 [APP 1673-74].
[183] Ex. 7, LaPierre Deposition (Virginia Action) 254:25-256:1 [APP 542].
[184] Ex. 6, Winkler Hrg. Testimony, at 89:21-90:2 [APP 346-47]; Ex. 9, LaPierre Deposition (Mar. 23, 2021), at 388:11-389:8 [APP 663].
[185] Ex. 7, LaPierre Deposition (Virginia Action) 257:4-258:12 [APP 543] (LaPierre acknowledged that, as part of the NRA's self-correction efforts, it needed to obtain more detail from AMc's invoices, which represented a change from previous procedures).
[186] Ex. 16, Spray Deposition (Virginia Action) 77:3-78:9 [APP 1256].

94.     As discussed more fully in Section E.1, below, the evidence also shows that AMc never obstructed any audits or record requests, and in fact complied with every NRA audit without any complaint.

95.     Finally, to the extent that "extortion" could support a claim for breach of fiduciary duty, the evidence clearly shows that there was no "extortion" attempt by any of the Defendants.[187] Instead, LaPierre and the NRA simply jumped to a series of paranoid conclusions without bothering to investigate the situation—much like a bad game of "telephone"—willfully avoiding the contradictory evidence from the very individual (LaPierre's assistant, Millie Hallow) upon whom the NRA and LaPierre base the entire extortion narrative.

96.     In any event, because the NRA does not have legally sufficient evidence to support its alleged breaches of fiduciary duty, its claim should be dismissed against AMc and Mercury.

**E.  AMc Is Entitled to Summary Judgment on the NRA Breach of Contract Claim.**

97.     The NRA has alleged that AMc breached the Services Agreement between the parties by failing to allow the NRA to inspect records as required under the Records Inspection Clause of the Services Agreement, and by leaking confidential NRA information in violation of the Confidentiality Clause of the Services Agreement.

98.     Under Virginia law, which governs the contract,[188] "[t]he elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused

---

[187] Ex. 17, North Deposition, 236:19-237:2 [APP 1360-61], 156:6-24 [APP 1340], 235:23-236:3 [APP 1360]; Ex. 18, Hallow Deposition, 173:19-174:4 [APP 1417], 175:13 – 176:4 [APP 1417], 181:12 – 182:12 [APP 1419], 183:1 – 10 [APP 1419], 207:4-13 [APP 1425], 206:15-208:19 [APP 1425]; Ex. 19, Meadows Deposition, 197:10-18 [APP 1479]; Ex. 20, Boren Deposition, 29:14 – 30:02 [APP 1534], 139:7-12 [APP 1561], 37:25-38:04 [APP 1536], 38:17-18 [APP 1536], 58:2-10 [APP 1541]; *see also*, ECF 141 at Ex. F, Martin Decl. (APP 44-46).
[188] Ex. 2-A, Services Agreement § XII.A [APP 69].

by the breach of obligation."[189] Because the NRA cannot produce evidence sufficient to create a genuine issue of material fact in support of the elements of breach or injury, the NRA's claim should be dismissed.

### 1. There is no evidence of breach of the Record Inspection Clause or damages based on the alleged breach.

99.     The Records Inspection Clause provides that "[d]uring the term of this Services Agreement, AMc authorizes NRA, upon reasonable notice, to examine AMc and Mercury's files, books, and records, with respect to matters covered under this Services Agreement."[190]  The NRA argues that AMc "has repeatedly failed or refused to permit the NRA to examine specified categories of books and records with respect to matters covered under the Services Agreement."[191]

100.     The evidence has shown that, not only did the NRA fail to provide reasonable notice to examine AMc's and Mercury's books and records, but that AMc and Mercury fully complied despite the NRA's unreasonable notice.  For example, when asked whether he was "aware of any breach that AMc had of the Services Agreement, former NRA board attorney Steve Hart responded simply: "no."[192]  On the other hand, the NRA has failed to elicit evidence that AMc and Mercury failed to comply with the Services Agreement's Records Inspection Clause in any manner.

101.     The NRA names two categories of documents that AMc allegedly failed to provide upon request: (i) copies of any AMc-Third Party NRA Contracts, including AMc's employment contract with Lt. Col. Oliver North ("***North Contract***"), and (ii) business records, in whatever form they were generated in the ordinary course of AMc's business."[193]

---

[189] *Ramos*, 770 S.E.2d at 493.
[190] Ex. 2-A, Services Agreement § VIII [APP 67].
[191] ECF 209 at ¶ 188.
[192] Ex. 13, Hart Deposition, at 414:7-11 [APP 1058].
[193] ECF 209 at ¶ 190.

102.     *First*, with regard to the North Contract, although AMc has at all times maintained that NRA executives not only knew about, but *participated* in, the negotiation of the North Contract, for purposes of this Motion, the evidence has conclusively established that the NRA actually had the North Contract *in its possession* when it filed its first lawsuit, falsely claiming it had been withheld.  Specifically, it is undisputed that AMc counsel went to the office of NRA General Counsel and Secretary John Frazer to supply the North Contract for inspection in February 2019,[194] and that North himself provided it again in April of 2019—before suit was filed.[195]

> Q:  Okay.  So did you ever get to see a copy of Colonel North's contract?
>
> A:  I did.
>
> Q:  Do you recall when that was?
>
> A:  It was in April 2019.
>
> Q:  Do you recall what date in 2019?
>
> A:  I believe it was April 11th.
>
> Q:  And that was the day before the lawsuit was filed against Ackerman McQueen on behalf of the NRA, is that correct?
>
> A:  I think that's correct.
>
> . . .
>
> Q:  To the extent that the April 12 complaint alleged that the NRA had not received a copy of the North contract, at that point in time, that would have been inaccurate, is that fair to say?
>
> A:  Yes.[196]

---

[194] *See* Ex. 15, Frazer Deposition (Virginia Action), at 256:14-257:14 [APP 1200-01].
[195] *See* Ex. 1-A [APP 6]; Ex. 17, North Deposition (Virginia Action), at 201-202 [APP 1352].
[196] Ex. 15, Frazer Deposition (Virginia Action) 260:9-261:22 [APP 1201-02].

103.    Despite this clear evidence, the NRA still argues that "AMc's continued and baseless refusal to disclose material information relating to the North Contract threatens to impede the NRA's corporate governance."[197]  This claim is nonsensical.  The NRA has the North Contract and has had it for over two years.  Thus, there can be no showing of any breach or damages to the NRA's "corporate governance" with respect to this allegation.

104.    *Second*, with regard to other "business records" requested by the NRA, the NRA's pleadings have spun a wild narrative regarding the various documents allegedly concealed by AMc, which is not supported by any evidence whatsoever.  At this point, it is undisputed that the NRA routinely asked AMc to pay for certain NRA expenses in order to keep them hidden from the NRA's accounting department and other NRA representatives, which had been known for leaking NRA information to the media.[198]  It is also undisputed that, before 2018, the NRA routinely conducted annual audits of AMc's business records, which were always satisfactory, as LaPierre himself confirmed:[199]

> Q:   You saw earlier today questions about in the services agreement there's a clause for examination of records.  Isn't it true that the NRA every year would do an examination of Ackerman McQueen's records?
>
> A:   To my knowledge, I thought that was – I thought that was true.
>
> Q:   And isn't it true that Ackerman McQueen always provided information that was requested at the audit and the NRA had no problems with that?
>
> . . .
>
> A:   There were – there were never any problems with the – with our audit – with our outside audit, or I would have been informed of it by the treasurer's office.

---

[197] ECF 209 at ¶ 191.
[198] *See, e.g.*, Ex. 7, LaPierre Deposition (Virginia Action) at 215:10-216:2 [APP 532].
[199] *See* ECF 141, Winkler Decl. at ¶ 5 (APP 4), Montgomery Decl. ¶ 6 (APP 13-14); Ex. 6, Winkler Hrg. Testimony, at 88-95 [APP 345-52]; Ex. 7, LaPierre Deposition (Virginia Action) 305:6-21 [APP 555].

105.    Following the NRA's retention of the Brewer Firm in 2018, the NRA conducted three additional audits over a period of six months.[200]  AMc fully cooperated with each of these audits, and at no time did any of the auditors accuse AMc of failing or refusing to comply with NRA's various record-inspection requests.[201]

106.    The first audit was conducted by the Brewer Firm in September 2018.  The audit lasted for two full days and, upon its conclusion, AMc did not receive a single request for invoices or receipts, nor did AMc receive any follow-up questions or demands for additional documents.[202]

107.    The second audit was conducted by the NRA's then-outside counsel, Cooper Kirk, PLLC, in November 2018.[203]  Following the audit, a representative from Cooper Kirk emailed Winkler and another AMc employee thanking them for the meeting and describing it as "fruitful."[204]  At no time did AMc receive any additional requests for documents or information.[205]

108.    The third audit was conducted by forensic accounting firm FRA in February and March 2019.[206]  The NRA informed AMc that FRA had been engaged to inspect the documents on January 21, 2019, and provided a list of requested documents and categories of documents on January 30, 2019.[207]  AMc arranged to make the documents available by February 5, 2019.[208]  Via email, NRA Counsel Frazer praised AMc's response and offer of inspection for being "prompt."[209]  The audit spanned weeks as FRA continued to request additional documents.  Ultimately, however, the audit concluded without any additional requests for documents or any accusations that AMc

---

[200] Ex. 6, Winkler Hrg. Testimony, at 94:14-99:3 [APP 351].
[201] *See id.*
[202] Ex. 6, Winkler Hrg. Testimony, at 94:14-95:20 [APP 351-52].
[203] Ex. 6, Winkler Hrg. Testimony, at 95:21-96:14 [APP 352-53].
[204] Ex. 2-F [APP 108].
[205] Ex. 6, Winkler Hrg. Testimony, at 95:21-96:14 [APP 352-53].
[206] Ex. 6, Winkler Hrg. Testimony, at 96:15-99:3 [APP 353-56].
[207] See Ex. 2-C NRA-AMc_00058589-58590 [APP 76-77]; Ex. 2-C, NRA-AMc_00058587-58589 [APP 74-76].
[208] *See* Ex. 2-D, NRA-AMc_00058659 [APP 85].
[209] *Id.*

was withholding documents by FRA or the NRA.[210]   Following the audit, AMc received no summary or report of findings.[211]  In fact, to date, the NRA has actually withheld all findings from the FRA audit under a claim of privilege, which AMc is disputing as part of the Joint Status Report dealing with cross-motions to compel currently pending before the Honorable Magistrate Toliver.[212]

109.    Moreover, the only documents that AMc was physically unable to provide to auditors were documents that were *already in the NRA's possession*—specifically, backup receipts and information for the pass-through expenses AMc incurred at the NRA's request  For example, the NRA had asked AMc to issue a credit card to NRA employee, Tyler Schropp ("***Schropp***"), head of the NRA's Office of Advancement, who used the credit card for travel, meals, and other expenses incurred to court high-dollar NRA donors.[213]  Schropp admitted that he kept the receipts for these purchases, that he did not remit them to AMc, and that even after being requested, he refused to provide them to AMc.[214]

110.    In sum, the NRA continues to make the bare allegations that AMc has refused to comply with document requests, but there is simply no evidence to support this claim.  Yet, even if there were, the NRA's document requests appear to be nothing more than a way to turn AMc into a scapegoat for its regulatory issues, rather than being a good-faith request for any information the NRA ever truly needed.  The NRA's SAC alleges only that "Defendants have jeopardized the NRA's ability to steward its funds in pursuit of its public mission."[215]  But the NRA has produced

---

[210] Ex. 6, Winkler Hrg. Testimony, at 96 - 99 [APP 353-56].
[211] *Id.*
[212] *See* ECF 180 at 2, 4-5.
[213] Ex. 7, LaPierre Deposition (Virginia Action), at 215:10-216:13 [APP 532]; Ex. 10, Schropp Hrg. Testimony, at 14:7-17 [APP 703].
[214] Ex. 10, Schropp Hrg. Testimony, 15:1-22, 35:12-36:22 [APP 704, 724-25].
[215] ECF 209 at ¶ 191.

any evidence that the NRA has not been able to "steward its funds," let alone how that inability has led to actual damages.  Accordingly, the NRA cannot produce evidence sufficient to raise a genuine issue of material fact to support the necessary elements of breach or damages resulting from its Records Inspection claim.  As a result, summary judgment is proper in favor of AMc on the NRA's claim for breach of contract as to the Records Inspection Clause.[216]

### 2.    No evidence that AMc leaked confidential information.

111.    The NRA also claims AMc leaked confidential information in violation of the Confidentiality Clause of the Services Agreement.[217]  The NRA has failed to present any evidence that AMc, Mercury, or any of Individual Defendants were responsible for the alleged leaks.  For instance, the NRA's Public Affairs Director, Andrew Arulanandam, admitted he had no knowledge of leaks emanating from AMc:

> Q:  Has any member of the press told you that Ackerman leaked information?
>
> A:  To the best of my knowledge, no.
>
> Q:  Are you aware of any member of the press telling any other NRA employee that Ackerman McQueen leaked NRA information?
>
> A:  I am not personally aware.[218]

112.    The NRA's General Counsel, John Frazer, testified similarly:

> Q:  You just don't know one way or the other whether Ackerman disclosed information to them, correct?
>
> A:  I don't—I'm sorry.

---

[216] *See Hostingxtreme Ventures, LLC v. Bespoke Grp., LLC*, Civil Action No. 3:14-CV-1471-M, 2017 U.S. Dist. LEXIS 146618, at *16 (N.D. Tex. Aug. 23, 2017) (Dismissing claim for breach of contract at summary judgment where Plaintiff failed to meets its burden to show a genuine issue of material fact as to damages.).
[217] ECF 209 at 73-74 ¶¶ 193-196.
[218] Ex. 11, Arulanandam Deposition, at 139:2-8 [APP 793].

Q:   Are there times – are there instances where you can point to, specific dates and times, when Ackerman McQueen violated this confidentiality clause?

A:   Sitting here right now, I can't point to specific dates and times.[219]

. . .

Q:   Is there a specific person, do you think, at AMc who has violated the confidentiality clause?

A:   I can't name a specific person off of the top of my head.[220]

113.   Likewise, LaPierre testified that he also did not know who had firsthand knowledge related to any leaks by AMc regarding the claims in this lawsuit:

Q:   Well, are there other witnesses that you know of that have firsthand information about Ackerman McQueen leaking information?

. . .

A:   No.

Q:   So you don't know of other witnesses.

A:   No.[221]

114.   Similarly, after ten months of litigation and discovery, NRA First Vice President, Charles Cotton, testified that his evidence that AMc leaked NRA information to the press amounted to a "gut feeling."[222]

115.   On the other hand, better evidence has shown that time and time again, leaks of NRA information have historically come from the NRA's *own* employees, agents, and directors.[223]

---

[219] Ex. 15, Frazer Deposition (Virginia Action) at 328:21—329:4 [APP 1218-19].
[220] *Id.* at 330:1-5 [APP 1219].
[221] Ex. 7, LaPierre Depo (Virginia Action), at 239:15-22 [APP 538].
[222] Ex. 12, Cotton Deposition (Virginia Action) at 140:10-15, 244:6-9 [APP 900, 926].
[223] "Q: So you're not aware of any public records of people that may have leaked confidential NRA information that are NRA employees? A: There might have been a media report that I believe may have referenced a former NRA Employee. [*additional testimony regarding the name of the NRA employee redacted*]." Ex. 11, Arulanandam Deposition, at 113:8-17 [APP 787].

When asked whether LaPierre ever told Cotton that he was concerned with leaks at the NRA, Cotton responded "[w]e knew there were leaks from the NRA."[224]   As stated above, LaPierre testified that certain NRA expenses were paid by AMc because NRA executives were concerned about leaks from within the organization.[225]   LaPierre further testified regarding his extreme concern about leaks as his justification for not informing the NRA General Counsel, Chief Financial Officer, *or* Board of Directors about the NRA Bankruptcy, which he filed entirely without their knowledge on January 15, 2021.[226]

116.    When asked about specific knowledge regarding AMc's alleged leaking of confidential information, seemingly all of the NRA's witnesses claimed privilege, and sometimes admitted that the information they had came only from the Brewer Firm or other sources within the NRA.[227] Hart testified he did not know of any leaks from AMc but that the leaks had likely come from Brewer himself.[228] Despite discovery requests directly asking for documents necessary to prove the NRA's case, the NRA has failed to provide responsive evidence.

117.    Because there is no evidence to support the necessary elements of breach or damages, this Court should grant summary judgment in favor of AMc on the NRA's claim for breach of contract against AMc and Mercury as to the Confidentiality Clause.

---

"Q: Were you aware of a leak problem coming from the treasurer's office at NRA? A: I'm aware of a suspected leak problem, yes. Q: What do you know about that? A: That we suspected there is or was a leak from the treasurer's office." Ex. 12, Cotton Deposition (Virginia Action), at 149:3-10 [APP 903].

[224] Ex. 12, Cotton Deposition (Virginia Action), at 268:20—269:1 [APP 932].

[225] Ex. 7, LaPierre Deposition (Virginia Action), at 215:10-216:2 [APP 532].

[226] Ex. 9, LaPierre Deposition (NRA Bankruptcy, Mar. 23, 2021), at 476:24-477:13 [APP 685]; *see also* NRA Bankruptcy, Order Granting Mot. to Dismiss (May 11, 2021) (ECF 740) (describing LaPierre's "surreptitious" bankruptcy filing as "nothing less than shocking").

[227] *See* Ex. 15, Frazer Deposition (Virginia Action), at 349:2-9 [APP 1224], 296:1-9 [APP 1210], 359:4—360:1 [APP 1226]; Ex. 11, Arulanandam Deposition, at 126:17-127:3 [APP 790].

[228] *See* Ex. 13, Hart Deposition, at 321:7-12; 324:3-10 [APP 1035].

**F.  Defendants Are Entitled to Summary Judgment on the NRA's Fraud Claim.**

118.  The NRA has made extensive allegations that AMc's conduct regarding budgeting, billing procedures, and NRATV was somehow improper under parallel theories of fraud and fraud-by-nondisclosure.[229]   Despite the dramatic narrative, the allegations on which the fraud claims are based are the same as those on which the claims for breach of fiduciary duty are based and should similarly be dismissed.[230]

119.  Notwithstanding the NRA's artful pleading, the NRA's fraud claim fails because (1) it is barred by the economic loss doctrine; (2) the NRA has no evidence to support its fraud claim against AMc or Mercury; and (3) the NRA has no evidence to support is fraud claim against the Individual Defendants.

**1.     The economic loss doctrine bars the NRA's fraud claims.**

120.  In support of its fraud claim, the NRA essentially pleads that it did not get what it bargained and paid for, which falls squarely within the economic loss rule barring tort claims arising solely from the parties' contractual relationship.[231]   This is simply another attempt by the NRA to recast a breach-of-contract claim into a tort claim.

121.  In determining whether a tort claim is merely a repackaged breach of contract claim, a court must consider: "(1) whether the claim is for breach of duty created by contract, as opposed to a duty imposed by law; and (2) whether the injury is only the economic loss to the

---

[229] ECF 209 at ¶¶ 148-152.

[230] *See, supra*, Section D.

[231] *See Jim Walter Homes, Inc.*, 711 S.W.2d at 618; *Mason v. Fremont Inv. & Loan*, No. 3:15-cv-1909-K-BN, 2015 U.S. Dist. LEXIS 146077, at *15 (N.D. Tex. Oct. 8, 2015) (Under Texas law, if a tort claim arises solely from the parties' contractual relationship, the tort claim is not allowed.").

subject of the contract itself."[232]  Critically, the burden is on the plaintiff to establish evidence of an independent injury.[233]

122.    Here, each and every fraudulent act and omission cited by the NRA in support of its fraud claim is really based in a contractual duty to perform under the Services Agreement.  For instance, the NRA argues that the billing statements were improper in various respects, even going so far as to quote the language of the Services Agreement itself in support of AMc's "misleading" conduct.[234]  Yet billing policies and procedures are clearly addressed under Section III of the Services Agreement. To the extent the NRA claims that AMc did not comply with these terms, or that it "did not get what it paid for," then the appropriate action would lie in contract, not in tort.[235]

123.    Similarly, under the Services Agreement, AMc agreed to provide "Owned Media Services" to the NRA, including "full-time online broadcasting services" and appropriate production, technical, and marketing support.[236]  The NRA now claims that the product it bargained for did not meet its expectations.[237]

124.    Even more importantly, the injury the NRA claims (the amounts it claims to have overpaid under the Services Agreement) is still plainly *within* the bounds of the Services Agreement.  The NRA is essentially asking the Court to grant a refund of part or all the funds paid to AMc pursuant to its "billing statements and invoices"[238] and the money it "invested" in NRATV, which are precisely the subject matter of the contract.[239]  Clearly, these funds still fall under the domain of the Services Agreement, and the NRA cannot meet its burden to establish any

---

[232] *Mason*, 2015 U.S. Dist. LEXIS 146077, at *15.
[233] *Id.* (citing *Esty v. Beal*, 298 S.W.3d 280, 302 (Tex. App.— Dallas 2009, no pet.)).
[234] ECF 209 at ¶ 148.
[235] *See Jim Walter Homes*, 711 S.W.2d at 618.
[236] Ex. 2-A, Services Agreement at § II.D [APP 63].
[237] ECF 209 at ¶¶ 155-161.
[238] ECF 209 ¶ 154.
[239] ECF 209 ¶ 161.

independent injury separate and apart from the contract as a matter of law.[240]   Accordingly, because the claim is for breach of a duty arising solely under contract and the injury is only the economic loss from the Services Agreement itself, summary judgment should be granted on the NRA's fraud claims in their entirety as to AMc, Mercury, and the Individual Defendants.

     **2.**     **There is no evidence to support the NRA's fraud claims against defendants.**

     125.     Regardless of the application of the economic loss rule, the NRA cannot establish legally sufficient evidence to support its fraud claim.  The NRA makes several allegations of fraud, but its evidence is nothing more than "[c]onclusory statements, speculation and unsubstantiated assertions."[241]   Stated differently, the NRA does not have legally supportable evidence of Defendants' fraud.  In fact, the evidence that has been developed establishes that the NRA's fraud claim fails as a matter of law.

     126.     For example, the NRA claims AMc failed to disclose facts relating to its billing and invoicing procedures.[242]   However, the evidence conclusively establishes that the NRA's billing and invoicing procedures had been the same for many years.[243]   As the NRA's Director of Budget and Financial Analysis testified, prior to 2018, the NRA never once asked for more detail about any invoice or previously refused to pay invoices for lack of detail.[244]   LaPierre personally participated in the annual budgeting process,[245] and specifically instructed AMc to send invoices without supporting detail for confidentiality purposes to avoid media leaks.[246]   AMc was never

---

[240] *See Mason*, 2015 U.S. Dist. LEXIS 146077, at *15.

[241] *RSR Corp.*, 612 F.3d at 857.

[242] ECF 209 at ¶ 167.

[243] *See* ECF 141, Winkler Decl. at ¶ 5 (APP 4), Montgomery Decl. ¶ 6 (APP 13-14); Ex. 6, Winkler Hrg. Testimony, 90:5-13 [APP 347].

[244] Ex. 22, Erstling Hrg. Testimony, at 24:21-25:5, 25:19-21 [APP 1673-74].

[245] Ex. 7, LaPierre Deposition (Virginia Action) 254:25-255:20 [APP 542].

[246] Ex. 6, Winkler Hrg. Testimony, at 89:6-90:2 [APP 346-47]; Ex. 9, LaPierre Deposition (NRA Bankruptcy, Mar. 23, 2021) 388:11-389:8 [APP 663].

asked to provide more invoice detail until 2018,[247] at which point it revised its invoices to comply with the NRA's requests.[248]  The NRA has no evidence that the NRA "double-billed" for any jobs whatsoever, used NRA equipment for other AMc clients, or that AMc ever agreed to provide "NRA dedicated employees," which is not a term or concept anywhere in the Services Agreement.

127.    Because the NRA does not have legally sufficient evidence to support their allegations, its fraud claim should be dismissed against Defendants.

### 3.    No evidence against Individual Defendants.

128.    Additionally, the NRA has not presented evidence to support its claims against any of the Individual Defendants.  Under Texas law, a corporate officer may not be held liable for an alleged corporate wrongdoing unless that officer knowingly and personally participates in the tortious act.[249]  As reflected in the NRA's deficient SAC, after an adequate time for discovery, the NRA has failed to produce evidence that Individual Defendants Martin, Winkler, and Montgomery personally participated in any of the facts and circumstances relating to the NRA's fraud claim. As a result, the NRA's fraud claim against the Individual Defendants should be dismissed.

## G.  The NRA's Conspiracy Claim Fails as a Matter of Law.

129.    This Court should grant summary judgment as to the NRA's conspiracy claim because (1) the underlying torts must be dismissed, (2) damages are required, and, (3) with respect to the Individual Defendants, because a company cannot conspire with its own employees.

130.    "The essential elements of [a] civil conspiracy claim are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action;

---

[247] *See* Ex. 7, LaPierre Deposition (Virginia Action) 257:4-258:12 [APP 543] (LaPierre acknowledged that, as part of the NRA's self-correction efforts, it needed to obtain more detail from AMc's invoices, which represented a change from previous procedures); Ex. 6, Winkler Hrg. Testimony, at 124:12-20 [APP 381] (discussing the fact that the NRA first started asking for more invoice detail in 2018).
[248] *See* Ex. 16, Spray Deposition (Virginia Action) 77:3-78:9 [APP 1256].
[249] *See Riverside*, 931 F.2d at 330; *Mozingo*, 752 F.2d at 174.

(4) one or more overt, unlawful acts; and (5) damages as the proximate result."[250] "Liability for conspiracy depends on participation in an underlying tort."[251]

131.    In the NRA's SAC, the NRA identifies the underlying torts as "fraudulent acts described in Count Four [fraud]" and "breaches of fiduciary duty,"[252] including the "attempt to extort LaPierre and the NRA,"[253] which is not a tort at all.[254]  Because those causes of action should be dismissed, the NRA's claim for conspiracy should also necessarily be dismissed.[255]

132.    Additionally, a claim for conspiracy requires a showing of actual damages proximately arising from the underlying tort.[256]  In Texas, breach of fiduciary duty does not require damages, but may also be supported by benefit to the defendant.[257] Therefore, even if the Court finds the NRA may prove its conspiracy claim upon benefit to Defendants on their alleged breach of fiduciary duty, the conspiracy claim still fails because the NRA has presented no evidence in support.  Simply stated, Defendants have not benefited from what the NRA claims to be their breaches of fiduciary duty.[258]

133.    Finally, it is well established that a company cannot conspire with its own employees or agents as a matter of law.[259]  Accordingly, summary judgment on the NRA's conspiracy claim is proper as to the Individual Defendants.

---

[250] *Homoki v. Conversion Servs.*, 717 F.3d 388, 404-05 (5th Cir. 2013).
[251] *Super Future Equities, Inc. v. Wells Fargo Bank Minn., N.A.*, 553 F. Supp. 2d 680, 695 (N.D. Tex. 2008).
[252] ECF 209 at 69 ¶ 173.
[253] *Id.* at ¶ 172.
[254] *See Wilson*, 2014 U.S. Dist. LEXIS 170207, at *9-10.
[255] *W. Fork Advisors, LLC v. SunGard Consulting Servs., LLC*, 437 S.W.3d 917, 921 (Tex. App.—Dallas 2014, pet. denied) (Where an underlying tort claim fails, a conspiracy claim must also fail.).
[256] *See Wavell v. Roberts*, 818 S.W.2d 462, 465 (Tex. App.—Corpus Christi 1991, writ denied) ("In addition, Wavell suffered no injuries caused by the alleged conspiracy. Therefore no cause of action for conspiracy against him could exist.").
[257] *Jacked Up*, 854 F.3d at 808.
[258] *See Wavell*, 818 S.W.2d at 465.
[259] *Editorial Caballero, S.A. de C.V. v. Playboy Enters.*, 359 S.W.3d 318, 337 (Tex. App.—Corpus Christie 2012, pet. denied).

## VII.   PRAYER

For these reasons, Defendants respectfully request the Court to grant their Motion for Partial Summary Judgment in its entirety, including disposition of all of the NRA's claims against AMc, Mercury, and the Individual Defendants, judgment in favor of AMc as to the affirmative relief sought herein, and grant all such other relief, at law or in equity, to which they may be justly entitled.

July 6, 2021.

Respectfully submitted,

*/s/ G. Michael Gruber*
**G. Michael Gruber, Esq.**
Texas Bar No. 08555400
gruber.mike@dorsey.com
**Brian E. Mason, Esq.**
Texas Bar No. 24079906
mason.brian@dorsey.com
**Jay J. Madrid, Esq.**
Texas Bar No. 12802000
madrid.jay@dorsey.com
**J. Brian Vanderwoude, Esq.**
Texas Bar No. 24047558
vanderwoude.brian@dorsey.com
**DORSEY & WHITNEY LLP**
300 Crescent Court, Suite 400
Dallas, Texas 75201
(214) 981-9900 Phone
(214) 981-9901 Facsimile

**ATTORNEYS FOR DEFENDANT/COUNTER-PLAINTIFF ACKERMAN MCQUEEN, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2021, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

*/s/ G. Michael Gruber*
G. MICHAEL GRUBER