UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | ) ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WAYNE LAPIERRE, | ) | |
| | ) | |
| Third-Party Defendant, | ) | CIVIL ACTION NO. |
| | ) | |
| vs. | ) | 3:19-CV-2074-G |
| | ) | |
| ACKERMAN McQUEEN, INC., | ) | |
| | ) | |
| Defendant/Counter-Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, and MELANIE MONTGOMERY, | ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court is Wayne LaPierre ("LaPierre")'s Motion to Dismiss Second

Amended Third-Party Complaint ("motion to dismiss") (docket entry 247) and

Memorandum of Law in Support of Wayne LaPierre's Motion to Dismiss Second

Amended Third-Party Complaint ("Brief in Support") (docket entry 248).  For the

reasons set forth below, the motion to dismiss is **GRANTED**.

## I.  BACKGROUND

### A.  Factual Background

Founded in 1871, the National Rifle Association ("NRA" or "the Association") is a not-for-profit corporation organized under the laws of the State of New York with its principal place of business in Fairfax, Virginia.  Plaintiff's First Amended Complaint (docket entry 18) ¶ 1.  The NRA describes itself as "the foremost defender of the Second Amendment of the United States Constitution" and boasts a following of "approximately five million members, hundreds of thousands of donors, and many millions more who support its legendary advocacy."  *Id.*  Wayne LaPierre ("LaPierre"), the third-party defendant, is the Executive Vice President and Chief Executive Officer of the NRA.  Ackerman McQueen, Inc.'s Second Amended Third-Party Complaint Against Wayne LaPierre & The NRA Foundation, Inc. ("SATPC") (docket entry 210) ¶ 1.

Ackerman McQueen, Inc. ("AMc"), the third-party plaintiff, is an advertising and public relations agency organized under the laws of the State of Oklahoma with its principal place of business in Oklahoma City, Oklahoma.  Plaintiff's First Amended Complaint ¶ 3.  During its decades-long working relationship, AMc handled much of the NRA's public relations work.  SATPC ¶ 13.  The public relations agency served as the Association's lead communication strategist and crisis

- 2 -

manager for nearly four decades.  *Id.*  AMc asserts that it "effectively crafted the NRA message and burnished its image as the most visible and powerful Second Amendment advocacy group in the United States," having formulated such themes as "Stand and Fight." *Id.* ¶¶ 13, 15.

Throughout their relationship, AMc and the Association allegedly developed certain "protocols" governing the "working arrangements" of the two parties, including negotiating annual budgets.  *Id.* ¶ 17.  One such "protocol" included a "consensual budgeting process" whereby AMc was not required to keep hourly time records as the basis for billing.[1]  *Id.*  Instead, AMc's compensation was allegedly "determined by outcome and effect rather than an amount of time spent." *Id.*  AMc asserts that "[t]he parties abided by these protocols steadfastly and with minimal conflict for many years as the relationship flourished." *Id.* ¶ 18.

Beginning in 1999, these informal protocols crystalized into a "Services Agreement," which formalized certain aspects of the working relationship between AMc and the NRA.  *Id.* ¶ 19.  The Services Agreement was last updated in 2017 and subsequently amended in 2018.  *Id.*  The Services Agreement contained a host of clauses governing the relationship between AMc and the Association, including a list of services, compensation terms, and billing.  *See* Appendix in Support of Wayne

---

[1]    According to AMc, "LaPierre and the NRA's former [Chief Financial Officer], Wilson 'Woody' Phillips ("Phillips"), controlled the [budgeting] process, operating with full knowledge of the budgeted line items." *Id.*

LaPierre's Motion to Dismiss Second Amended third-Party Complaint ("APPX") (docket entry 249) at Exhibit A.

Three clauses in the Services Agreement are particularly important here.  First, the 2018 amendment to the Services Agreement contained a "termination provision" under which the NRA agreed, *inter alia*, to (a) post a $3,000,000 letter of credit for the benefit of AMc upon the NRA's failure to pay an invoice within 30 days; and (b) reimburse AMc for expenses incurred on behalf of the NRA until the date of termination and pay AMc "a fair and equitable termination fee," together which AMc estimates to be approximately $35,000,000.  APPX at 13-15; SATPC ¶¶ 21-23. Second, the 2018 amendment obligated the NRA to reimburse AMc for the "compensation payable" to "all non-cancellable" contracts entered into between AMc and certain third parties for the benefit of the NRA ("Third Party NRA Contracts"). APPX at 16-17.  The 2018 amendment specifically references contracts between AMc and Col. Oliver North ("Col. North") and Dana Loesch ("Loesch"), both of whom AMc hired "as 'talents' for NRATV," a "digital broadcast network created, staffed, and administered in its most recent form (again at LaPierre's request) by AMc." SATPC ¶ 19; APPX at 16-17.  AMc entered into the contracts with Col. North and Loesch "[a]t LaPierre's direction."[2]  SATPC ¶ 144.  This clause is referred to as the

---

[2]     AMc alleges that "LaPierre personally led the recruitment of Col. North" and "negotiated the terms of the Col. North Contract."  SATPC ¶ 146.

"reimbursement provision." Third, Section IX of the Services Agreement specified that "AMc is authorized to act upon written communications received from the NRA Executive Vice President or his designee. He or his designee are the only persons within the NRA who have the actual authority to issue such communications." APPX at 13. This is known as the "authorized contacts" clause.

AMc also alleges that "LaPierre and others acting at his direction [repeatedly] asked AMc to 'front' activities and expenses for the NRA. For example, AMc would engage third parties to perform work for the NRA at LaPierre and his designees' request, pay for the work performed by those third [parties], and then submit and invoice for reimbursement by the NRA." SATPC ¶ 28. LaPierre allegedly "made . . . clear" that "any expenses he incurred, whether personally or through AMc, were legitimate NRA expenses, and therefore subject to reimbursement to AMc." *Id.* ¶ 31. According to AMc, sometime after LaPierre requested that AMc "facilitate and help structure the financing of a personal mansion-style home for LaPierre and his wife, paid for by the NRA," AMc refused to bill "pass-through line-items in the parties' most recent annual budget and [began] seeking backup documentation from LaPierre and other NRA employees regarding LaPierre's expenses." *Id.* ¶¶ 50-51.

AMc alleges that, sometime in September 2019, and in conjunction with unrelated litigation occurring in the Eastern District of Virginia, the NRA requested an audit of AMc's work on the NRA account. See *id.* ¶ 71. This audit was in

addition to annual audits that the NRA conducted of its vendors.  *Id.* ¶¶ 70-71.

Pursuant to the audit, William A. Brewer III ("Brewer") and his law firm Brewer,

Attorneys and Counselors ("BAC") – the NRA's counsel in this and several other

matters – "demanded copies of documents from AMc, which the NRA had a right to

review but not copy; demanded non-contractual *post hoc* justifications for AMc's

billing, which had long-since been preapproved by the NRA and LaPierre and were

audited by the NRA; requested interviews of AMc personnel not authorized by the

Services Agreement; and insisted on conducting three separate but repetitive audits in

short succession . . . ."  *Id.* ¶ 71.  AMc alleges that these audits "were not consistent

with NRA practices, the Services Agreement between the NRA and AMc, or the

nearly 40-year business relationship between the parties."  *Id.* ¶ 72.  Despite AMc's

belief that the audits were improper, it "responded in a complete and timely

manner."  *Id.*

Tensions quickly spiked between AMc and BAC due, according to AMc, to

BAC's "escalating hostilities." *Id.* ¶ 76.  AMc alleges that Brewer "began shaping [a]

negative public narrative [about AMc] by releasing false and disparaging public

statements" regarding AMc's compliance with the new audits.  *Id.* ¶ 73.  AMc cites

two statements provided by Brewer to THE WALL STREET JOURNAL and ADWEEK in

which Brewer commented, *inter alia*, that "[i]t's stunning that a trusted partner for all

these years is just refusing to cooperate."  *Id.*  Concurrently with Brewer's alleged

outward-facing campaign, AMc alleges that Brewer "threatened to have [AMc CEO Angus McQueen, who happens to be Brewer's father-in-law,] and AMc charged with RICO (Racketeer Influenced and Corrupt Organizations Act) violations" and "told Angus that the Federal Bureau of Investigation was going to raid AMc's offices." *Id.* ¶ 74.

On October 11, 2018, AMc officials met with LaPierre and former NRA Treasurer Craig Spray in Dallas, Texas (the "October 11 Meeting"), to discuss "AMc's concerns about dealing with Brewer in light of his relationship and animosity toward the McQueen family, his actions and desire to take over AMc's business with the NRA, and his letter-writing campaign where he repeatedly and falsely accused AMc of withholding documents." *Id.* ¶ 76. AMc asserts that "[p]rior to this meeting, AMc decided that if LaPierre, Spray, Brewer, and other NRA officials were not willing to change their recent practices, AMc would resign the NRA's business entirely." *Id.* After the AMc representatives laid out their qualms regarding Brewer and the NRA's "recent practices," *id.*, LaPierre "pled with AMc to 'stick with him'" and "stated that the letter writing campaign with Brewer and [BAC] would stop and that AMc would no longer have to deal with Brewer [or BAC] . . . ." *Id.* ¶ 79. LaPierre informed AMc that "Brewer would be gone in 30-60 days" after the conclusion of unrelated litigation in New York. *Id.* "Based on LaPierre's representations, AMc agreed to maintain the business relationship and re-invest in

resources to allow AMc to continue to provide services to the NRA." *Id.* ¶ 80.

LaPierre allegedly repeated his desire for AMc to "stick with him" over the course of

the following weeks but informed AMc that the NRA needed a second audit as part

of unrelated litigation. *Id.* ¶ 81, 83.   Despite LaPierre's promises, however, AMc

alleges that BAC "sent a letter to AMc on December 21, 2018," demanding "to

examine an even more extensive list of documents that went to the heart of AMc's

confidential business and billing practices . . . ." *Id.* ¶ 84.  It is unclear whether this

demand was in conjunction with the second audit.

In February 2019, the NRA requested "yet another audit of AMc's records."

*Id.* ¶ 88.  The NRA explained, however, that this third audit would be conducted by a

company called Forensic Risk Alliance ("FRA").  *Id.*  However, "[u]nbeknownst to

AMc, Susan Dillon, FRA's new Senior Director, had just joined FRA at the end of

2018 after working as the Director of Consulting *at the Brewer Firm for more than 17*

*years*" and had participated in other audits of AMc.  *Id.* (emphasis in original).  "AMc,

under the false impression that FRA was an independent third party, agreed to a

multi-day audit . . . ." *Id.* ¶ 90.

"As Brewer's fees continued to increase, more and more individuals within the

NRA began to question them and Brewer's role, even requesting independent

oversight." *Id.* ¶ 111.  "To that end, on March 22, 2019, Col. North," an AMc

employee, then-First Vice President of the NRA, and others in NRA leadership

"wrote to Brewer asking him to submit separate engagement letters and budgets for all of the matters he was then handling on behalf of the NRA." *Id.* "[I]n retaliation for Col. North acting as a fiduciary of the NRA, Brewer and LaPierre caused the NRA to file its first lawsuit against AMc in order to interfere with North's employment agreement with AMc . . ., under which North was paid." *Id.* ¶ 117. AMc alleges that "the NRA and Brewer had been plotting this lawsuit since at least September 2018, before the very first audit." *Id.*

On April 24, 2019, Col. North called LaPierre's Executive Assistant "to notify LaPierre about potentially damaging but true information of which he wanted LaPierre to be aware." *Id.* ¶ 124. AMc alleges that Brewer "spun – and indeed fabricated – a false narrative, claiming that Col North called [LaPierre's executive assistant] on behalf of AMc to extort LaPierre by threatening to release damaging information about LaPierre unless he immediately resigned." *Id.* ¶ 125.[3] "The following day, on April 25, 2019, LaPierre falsely accused Col. North and AMc of engaging in an extortion attempt in a detailed letter to the NRA's Board." *Id.* ¶ 132. "The letter falsely accused AMc and Col. North of threatening to release damaging

---

[3]     AMc denies this allegation. AMc points to a deposition of Col. North in which he stated that he had "not talked to anybody from [AMc] about" the damaging information and "was not delivering [the damaging information] on behalf of either [himself or AMc.]." SATPC ¶ 125. Dan Boren, a member of the NRA Board of Directors, and Carolyn Meadows, current President of the NRA, testified that they did not overhear Col. North state that he threatened LaPierre or demand LaPierre's resignation. *Id.* ¶¶ 128-29.

information about LaPierre unless he resigned." *Id.*  Two days later, "the Wall Street Journal published an article titled, 'NRA Wayne LaPierre Says He is Being Extorted, Pressured to Resign,' acknowledging that it had reviewed a copy of the April 25, 2019 'Confidential' letter to the NRA's Board and summarizing same." *Id.* ¶ 133.  AMc alleges that BAC provided LaPierre's letter to the media, including the WALL STREET JOURNAL. *Id.*

As late as sometime in 2018, the NRA "continued to observe its financial obligations to AMc and, by third-party beneficiary extension," to Col. North and Loesch under AMc's employment agreements with the two as "talents." *Id.* ¶ 145.  In June 2019, "the NRA ceased reimbursement for the compensation of the Third Party NRA Contracts." *Id.* ¶ 147.  AMc asserts that, as a "result of the NRA's cessation of funding," AMc was "in the untenable position where it was unable to manage the compensation requirements of the Third Party NRA Contracts." *Id.* ¶ 148.

On these bases, AMc asserts five claims against LaPierre: (1) defamation and defamation *per se*, *id.* ¶¶ 155-60; (2) tortious interference with the NRA Third-Party Contracts, *id.* ¶¶ 161-65; (3) business disparagement, *id.* ¶¶ 166-170; (4) fraud, *id.* ¶¶ 171-78; and (5) civil conspiracy.  *Id.* ¶¶ 179-86.

## B.  Procedural History

AMc joined LaPierre to this suit as a "[t]hird [p]arty [d]efendant."  Defendant Ackerman McQueen, Inc.'s Original Answer, Counterclaim and Third Party

Complaint Against Wayne LaPierre ("Original Answer and Counterclaims") (docket entry 12) at 18.   AMc filed its SATPC against LaPierre and the NRA Foundation, a non-profit associated with the NRA, on March 12, 2021.   LaPierre filed his motion to dismiss on May 24, 2021.   AMc elected to file a voluntary notice of dismissal without prejudice of the NRA Foundation, docket entry 265.   AMc filed its response to the motion to dismiss on June 21, 2021.   Ackerman McQueen, Inc.'s Response to Wayne LaPierre's Motion to Dismiss Second Amended Third-Party Complaint ("Response") (docket entry 274).   LaPierre replied on July 12, 2021.   Reply in Support of Motion to Dismiss ("Reply") (docket entry 286).   Accordingly, the motion to dismiss is ripe for decision.

## II.  ANALYSIS

LaPierre moved to dismiss the SATPC under Rules 9(b), 12(b)(6), 12(c), and for improper joinder under Rule 14(a).   LaPierre argues, *inter alia*, that the claims asserted against him in the SATPC cannot be brought under Rule 14, because such claims are not predicated on a theory of derivative or secondary liability.   Brief in Support at 22-23.   The court agrees that LaPierre was improperly joined under Rule 14.   The court does not reach the merits of the claims asserted against LaPierre and, accordingly, dismisses the SATPC without prejudice under Rule 21.

### A.  Improper Joinder Under Rule 14(a)

Under Rule 14, "a defendant may implead a person not a party to the action

- 11 -

'who is or may be liable to him for all or part of the plaintiff's claim against him.'"
*United States v. Joe Grasso & Son, Inc.*, 380 F.2d 749, 750 (5th Cir. 1967) (quoting
FED. R. CIV. P. 14).  The policy underlying impleader actions under Rule 14 is one of
judicial economy.  Rule 14 seeks to "avoid circuity of actions and to obtain consistent
results," *American Fidelity & Casualty Company v. Greyhound Corporation*, 232 F.2d 89,
92 (5th Cir. 1956), by "having one lawsuit do the work of two."  *Falls Industries, Inc.
v. Consolidated Chemical Industries, Inc.*, 258 F.2d 277, 283 (5th Cir. 1959).

But the right to implead under Rule 14 is not unlimited, even when the
defendant's right to recovery against the third party is "an outgrowth of the same
core of facts which determines the plaintiff's claim." *Joe Grasso & Son, Inc.*, 380 F.2d
at 751; see also *Majors v. American National Bank of Huntsville*, 426 F.2d 566, 568-69
(5th Cir. 1970).  "Impleader is *not* permitted because a third party may be liable to
the original defendant for some other, independent reason." *Mitchell v. Hood*, 614
Fed. App'x. 137, 140 (5th Cir. 2015) (emphasis in original).  Stated differently, Rule
14 "is not designed as a vehicle for the trying together of separate and distinct causes
of action, or for the introduction, into the main action, of several parallel, but
independent, actions, or separate and independent claims . . . and is not a device for
bringing into an action any controversy which may have some relation to it." *Majors*,

426 F.2d 566 at 568.[4]

Instead, "[t]he crucial characteristic of a Rule 14 claim is that [the] defendant is attempting to transfer to the third-party defendant the liability asserted against [the original defendant] by the original plaintiff." *Cambridge Strategies, LLC v. Cook*, 3:10-CV-2167-L, 2012 WL 176587 at *6 (N.D. Tex. Jan 23, 2012) (Lindsay, J.) (citations omitted). "The secondary or derivative liability notion is central and thus impleader has been successfully utilized when the basis of the third-party claim is indemnity, subrogation, contribution, express or implied warranty, or some other theory." 6 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1446 (2d ed. 1990); see also *Mitchell*, 614 Fed. App'x at 140 (Rule 14 actions are "only proper if the claims asserted by the third party plaintiff are derivative of the main claim – if the impleaded party is or may be liable for part of 'the claim against [the original defendant]'") (quoting FED R. CIV. P. 14(a)) (alterations in original). Rule 14 is procedural only, and "the court must look to state law to determine whether there is a substantive right" to transfer liability to the third-party defendant. *Neal v. 21st Mortgage Corporation*, 601 F. Supp. 2d 828,

---

[4]    Nevertheless, once a third-party defendant is properly joined under Rule 14, "[a] party asserting a . . . third-party claim may join, as independent or alternative claims, as many claims as it has against" the third-party defendant. *See* FED. CIV. P. 18(a). Thus, so long as one claim asserted by a third-party plaintiff satisfies the requirements of Rule 14, any other claim against the third-party defendant may be brought under Rule 18(a).

830 (S.D. Miss. 2009) (citations omitted).  By nature, however, secondary or derivative liability is necessarily "dependent upon the outcome of the main claim." *Joe Grasso & Son, Inc.*, 380 F.2d at 752.

The claims asserted by AMc against LaPierre are not proper under Rule 14 for two reasons.[5]  First, none of the claims asserted by AMc rely or are predicated on a theory of secondary or derivative liability as recognized by Texas law.  Instead, such claims are asserted against LaPierre seeking his direct liability to AMc.  Second, the claims against LaPierre are not "dependent" on the claims in the main action – that is, the claims asserted by the NRA against AMc.

### 1.  Derivative Liability Under Texas Law

Although there is no settled definition of "derivative" or "secondary" liability under Texas law, it appears that most cases conclude that if an element of a claim

---

[5]    Although AMc did not specify under which Rule it joined LaPierre, *see* Original Answer and Counterclaims at 18, it is clear that LaPierre was made a part of this suit under the auspices of Rule 14 for two reasons.  First, AMc consistently described LaPierre as a "third-party defendant."  See, e.g., *id.*; SATPC ¶ 9.  The phrase "third-party defendant" is regularly used to signify a party joined under Rule 14, whereas "counter-defendant" or "cross-defendant" signify parties against whom a claim is asserted under Rule 13.  Furthermore, AMc used the phrase "third-party defendant" when referring to the NRA Foundation, which it explicitly joined under Rule 14.  *See* Ackerman McQueen, Inc.'s Brief in Support of its Motion for Leave to Amend Third-Party Complaint against Wayne LaPierre and Join Third-Party Defendant The NRA Foundation, Inc. (docket entry 204) at 7.  Second, AMc did not dispute that it brought LaPierre into the suit by way of Rule 14 after LaPierre's challenge.  Indeed, AMc appears to have implicitly admitted that LaPierre was impleaded under Rule 14.  *See* Response at 24-25.

against a party requires a showing of some independent conduct of that party, the claim sounds in direct or primary liability.  See *F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 697 (Tex. 2007) (Jefferson, C.J., dissenting) ("A person whose liability was purely vicarious had not personally engaged in 'conduct or activity' that had 'caused or contributed to cause' the harm.") (quoting William D. Underwood & Michael D. Morrison, *Apportioning Responsibility in Cases Involving Claims of Vicarious, Derivative, or Statutory Liability for Harm Directly Caused by Another*, 55 BAYLOR L. REV. 617, 638 (2003)).  Conversely, "vicarious liability principles impute liability arising from the conduct of an active tortfeasor to another party based upon a *relationship* between them."  *Soon Phat, L.P. v. Alvarado*, 396 S.W.3d 78, 97 (Tex. App. – Houston (14th Dist.) 2013, pet. denied) (emphasis added); see also *St. Joseph Hospital v. Wolff*, 94 S.W.3d 513, 540 (Tex. 2002) (plurality) ("The common law has long recognized that liability for one person's fault may be imputed to another who is himself entirely without fault solely because of the relationship between them.").

Thus, for example, Texas courts have routinely held that negligent hiring is not a form of derivative liability and have specifically rejected an understanding that negligent hiring is predicated on vicarious liability.  See, e.g., *Wrenn v. G.A.T.X. Logistics, Inc.*, 73 S.W.3d 489, 496 (Tex. App. – Ft. Worth 2002, no pet.) ("A claim of negligent hiring . . . is not dependent upon a finding that the employee was acting in

the course and scope of his employment when the tortious act occurred.  The cause of

action is based on an employer's direct negligence instead of the employer's vicarious

liability for the torts of his employees.") (citations omitted); *Soon Phat, L.P.*, 396

S.W. 3d at 100-01.  As have courts in this district.  *Fuller v. Biggs*, 3:20-CV-02146-G,

2021 WL 1237100 at *5; *Campos v. Lone Star Wheel Components Inc.*, 3:13-CV-4088-

N, 2015 WL 11120533 at *2-*3 (N.D. Tex. May 29, 2015) (Godbey, J.).  This is

"because liability stems from distinct wrongful conduct.  In order to impose liability

under [negligent hiring or negligent entrustment], the fact finder must conclude that

a preceding independent action occurred that caused the plaintiff harm  . . . ." *Bedford

v. Moore*, 166 S.W.3d 454, 462 (Tex. App. – Ft. Worth 2005, no pet.).

　　As applied here, all claims asserted against LaPierre arise out of his purportedly

wrongful independent conduct vis-à-vis AMc.  For example, the defamation claim

asserted by AMc is rooted in LaPierre's alleged publication in the letter to the NRA'S

board and elsewhere stating that AMc committed extortion when Col. North told

LaPierre's assistant that Col. North knew of damaging information about LaPierre.

*See* SATPC ¶ 132.  Similarly, the claim of fraud is based on AMc's reliance on

LaPierre's statement at the October 11 Meeting that AMc would not have to "deal

with" BAC.  See *id.* ¶ 79.  The same holds true for AMc's tortious interference with

contract, business disparagement, and conspiracy claims, all of which target conduct

by LaPierre.  See *id.* ¶ 163 ("LaPierre, *through his own actions, omissions, and*

- 16 -

*misrepresentations* has caused the NRA to refuse its contractual commitment to reimburse AMc for the costs associated with the Third Party NRA Contracts . . . .") (emphasis added); ¶ 167 ("LaPierre and other co-conspirators, including the NRA, Powell, Brewer, and [BAC] have published disparaging words about AMc's economic interests, including words about the character of its business."); ¶ 180 ("The NRA, LaPierre, Powell, Brewer, [BAC], FRA, and Susan Dillon combined to conspire against AMc.").  The claims asserted in the SATPC are motivated entirely by LaPierre's own allegedly wrongful conduct (alone or in conjunction with others) vis-a-vis AMc and, therefore, are concerned not with LaPierre's derivative or secondary liability for the actions of AMc as against the NRA.

The court's conclusion in this regard is strengthened by the fact that AMc points to no Texas authority recognizing any of the claims in the SATPC as a form of derivative or secondary liability.  See *Neal*, 601 F. Supp. 2d at 830 (state law must provide a "substantive right" to derivative liability).  Nor could the court locate any such authority.  That no state court recognizes AMc's claims as a form of derivative liability accords with an ordinary understanding of these claims: fraud, business disparagement, and the like simply do not resemble accepted theories of derivative liability proper under Rule 14 such as "indemnity, subrogation, contribution, [or] express or implied warranty . . . ."  FED. PRAC. & PROC. § 1446.  The much more natural view of these claims is that LaPierre is directly liable to AMc for primary

- 17 -

conduct performed by LaPierre.  Accoringly, AMc's claims are not a form of derivative or secondary liability as required under Rule 14.

AMc attempts to circumvent this problem by arguing that LaPierre "was the mastermind concocting false narratives to fabricate" the claims brought by the NRA against AMc.  Response at 25.  That is, "LaPierre is liable to AMc for the claims the NRA has brought against AMc because LaPierre is the one who caused the claims to be asserted based on tortious conduct, including fraud and defamation.  In other words, there is no sound basis for the NRA's claims; rather, LaPierre is liable to AMc for causing the NRA to institute the baseless lawsuit, including through tortious and other unlawful conduct committed as a pretense to support the lawsuit before it was filed."[6]  *Id.*  Stated differently: but-for LaPierre's wrongful actions, the NRA would never have filed suit against AMc and, therefore, LaPierre is liable to AMc for those claims.

But there are two flaws with this argument.  First, AMc's argument that LaPierre is liable to AMc because LaPierre "caused the [NRA's] claims to be asserted" against AMc is nothing less than a complete re-imagination of the legal bases for the claims set forth in the SATPC.  *Id.*  As explained at length above and below, AMc clearly seeks to hold LaPierre liable for LaPierre's own torts which are predicated on

---

[6]      AMc does not spell out precisely which "tortious conduct" caused the NRA to "institute the baseless lawsuit" or how such conduct led to the NRA suit.  *Id.* The court is left to fill in these gaps.

LaPierre's independent conduct.  AMc has not previously argued that LaPierre is liable to it because LaPierre's conduct formed "a pretense [supporting] the [NRA's] lawsuit before it was filed."  *Id.*  To the contrary, the SATPC makes clear that LaPierre is liable to AMc because, for example, AMc "relied" "to its detriment" on the allegedly false promise by LaPierre that AMc would not have to "deal with" BAC, thereby "lur[ing] [AMc] into exposing itself to financial obligations" and additional audits.  SATPC ¶ 172.  AMc cannot now rescue the SATPC with a wholly new interpretation of the basis of LaPierre's liability.

Second, even if the court were to accept AMc's argument that the true basis of LaPierre's liability is reducible to his conduct in "caus[ing] the claims to be asserted [by the NRA against AMc]," allowing impleader under this rationale would require a truly strained understanding of derivative liability with the meaning of Rule 14.  The court cannot locate any state substantive law permitting a defendant to implead a third party for the recovery of damages – based on the derivative liability of the third party – for conduct committed solely by the original defendant but which, in turn, was caused by the tortious conduct of the third party.  Of course, Rule 14 allows a defendant to bring into the suit a third-party defendant as a joint tortfeasor where the third-party defendant contributed in some respect to the tort committed against the original plaintiff.  See *J.S. v. America Institute for Foreign Study*, No. SA-12-CA-1036-XR, 2013 WL 1822760 at *1-2 (W.D. Tex. Apr. 30, 2013) (holding impleader

of Camp Stewart by Camp America as a joint tortfeasor proper where Camp Stewart

was sued for negligence after camp counselor allegedly sexually assaulted the

plaintiff).  But AMc's argument does not follow this model because it does not allege

that LaPierre directly participated in the conduct which gave rise to the NRA's claims

against AMc.  Rather, AMc argues that independent tortious conduct by LaPierre

gave rise to the NRA's claims.[7]  But, again, the court is aware of no state authority

extending derivative liability in such a scenario, and AMc does not produce any such

authority.

Indeed, the Fifth Circuit has apparently already rejected the argument that a

third-party defendant may be brought into an action under Rule 14 on the ground

that but-for the allegedly wrongful actions of the putative third party, the claims

against the original defendant would never have arisen.  See *Southeast Mortgages

Company v. Mullins*, 514 F.2d 747, 750 (5th Cir. 1975) ("The suggestion that a

separate and independent claim can be made the proper subject of a third party

complaint because, but for the [third-party defendant's] violation of duty alleged the

main claim would not have matured, has been rejected by [the Fifth Circuit] and

other courts.").  District courts in this circuit have also explicitly rejected such a

---

[7]        To the extent that AMc argues that LaPierre is liable because he literally
caused the NRA to bring claims against AMc by virtue of his position as Executive
Vice President of the Association, such a theory is foreclosed because AMc
specifically sued LaPierre "in his individual capacity."  *See* Original Answer and
Counterclaims at 18.

- 20 -

theory of impleader.  In *Vinmar Overseas, Ltd. v. OceanConnect, LLC*, No. H-11-4311, 2012 WL 5989206 (S.D. Tex. Nov. 29, 2012), the court considered whether to allow OceanConnect, the original defendant, to implead the United States through the Environmental Protection Agency ("EPA").  The case concerned certain Clean Air Act regulations which required "obligated partes" to purchase "Renewable Identification Numbers" ("RINs") to satisfy renewable-fuel volume obligations.  *Id.* at *1.  OceanConnect, the original defendant, sold Vinmar, the original plaintiff, RINs which the EPA subsequently determined were invalid.  *Id.* at *2.   Vinmar sued OceanConnect for breach of contract.  *Id.*   OceanConnect then filed a third-party action under the Clean Air Act citizen-suit provision against the EPA alleging that the EPA "negligent[ly] administ[ered]" the Clean Air Act regulations mandating the use of RINs.  *Id.*  "In general, OceanConnect asserted that the EPA's maladministration of the [Clean Air Act] violated the renewable-fuel regulations by causing regulated parties to 'transfer apparently invalid RINs in the RIN marketplace.'"  *Id.*  As to whether joinder was appropriate under Rule 14, OceanConnect argued that "if it is found liable to Vinmar for breach of the contract to provide valid RINs, then the United States will be liable to OceanConnect for negligently enabling the creation of invalid RINs and their entry into the secondary marketplace."  *Id.* at *4.  The court rejected OceanConnect's argument for impleader because, "[e]ven assuming that the RINs Vinmar acquired from OceanConnect were invalid as alleged, and even

assuming that the invalidity was in part caused by the EPA's negligence in administering the RINs regulatory program, the connection between the Vinmar claims and the OceanConnect third-party claims against the United States ends there. OceanConnect's FTCA claim is not derivative of, or secondary to, Vinmar's claim." *Id.* The but-for argument asserted by OceanConnect and rejected by the court in that case exactly mirrors the argument asserted by AMc here. That is, but-for LaPierre's tortious conduct in concocting "false narratives" about AMc, *id.* ¶ 125, the NRA would never have asserted claims against AMc. But such a connection is insufficient under Rule 14. See also *Cambridge Strategies*, 2012 WL 176587 at *7 (rejecting impleader predicated on ground that, but-for conduct committed by putative third-party defendant, the original defendant would not have breached the contract forming the basis of the original action). Without more, such an argument cannot form the basis of a derivative liability claim under Rule 14.

### 2. Dependent on the Outcome of the Main Claim

The second reason why the claims asserted against LaPierre in the SATPC cannot be brought under Rule 14 is that the claims do not "depend[] on the outcome of the main claim." FED. PRAC. & PROC. § 1446; *Mitchell*, 614 Fed. App'x at 140. Proper impleader claims are wholly conditional upon whether the original defendant is in fact liable to the original plaintiff. The classic example of a fully dependent impleader claim is contractual indemnity. See *Federalpha Steel LLC Creditors' Trust v.*

- 22 -

*Federal Pipe & Steel Corporation*, 245 F.R.D. 615, 619-20 (N.D. Ill. June 26, 2007). Here, however, AMc nowhere suggests – and it cannot plausibly be inferred – that its claims against LaPierre depend on the outcome of the NRA's suit against AMc. Given the independent nature of LaPierre's conduct – and the direct liability which AMc argues derives from such conduct – it cannot be said that AMc's claims against LaPierre would dissolve upon a dismissal of the NRA's claims against AMc. The two sets of claims are unrelated in this regard. Because the claims set forth in the SATPC are not grounded in derivative liability and do not depend on the outcome of the NRA's claims against AMc, such claims cannot form the basis of an impleader action. Accordingly, LaPierre was improperly joined under Rule 14.

## B.  Rule 21

Under Rule 21, "[m]isjoinder of parties is not a ground for dismissing an action.  On motion or on its own, the court may at any time, on just terms, add or drop a party."  FED. R. CIV. P. 21.  Improperly joined parties are frequently dismissed or severed from suits without prejudice under Rule 21.[8]  See, e.g., *UWM Student Association v. Lovell*, 888 F.3d 854, 864 (7th Cir. 2018); *MIL (Investments) SARL, et al. v. Inco Limited, et al.*, 3:02-CV-1879-G, 2002 WL 32319011 at *2 (N.D. Tex. Oct. 29, 2002); *DIRECTV, Inc. v. Gatsiolis*, No. 03-C-3534, 2003 WL 22669033 (N.D. Ill.

---

[8]   The first sentence of Rule 21 only prohibits dismissal of actions with prejudice for improper joinder.

Nov. 10, 2003) at *1-2.  The district court has "broad discretion" in deciding whether to sever claims or drop defendants under Rule 21.  See *Brunet v. United Gas Pipeline Company*, 15 F.3d 500, 505 (5th Cir. 1994).

The court recognizes the long road traveled by AMc and LaPierre until this point – nearly two years of litigation and three third-party complaints – and the proximity of this decision to the anticipated trial setting for the main claim. Nevertheless, the court finds that dismissal of the SATPC without prejudice is "on just terms" under Rule 21 because, despite the lengthy paper trail, the third-party suit between AMc and LaPierre remains in its early stages.  Furthermore, the court can discern no prejudice to AMc's claims against LaPierre other than any further litigation expense incurred by AMc if it elects to institute a separate action. Accordingly, the court concludes that Rule 21 is the proper vehicle for dealing with these third-party claims.[9]

### III.  Conclusion

For the reasons set forth above, LaPierre's motion to dismiss is **GRANTED**. Accordingly, the SATPC is **DISMISSED** without prejudice, and LaPierre is **REMOVED** as a party from this suit.

---

[9]     In its response, AMc requested leave to amend in the event that the motion to dismiss was not "denied in its entirety."  Response at 25.  However, a fourth amended complaint would not, strictly speaking, cure the joinder deficiency.

**SO ORDERED**.

July 16, 2021.

A. JOE FISH
Senior United States District Judge