UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | ) ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ACKERMAN McQUEEN, INC., | ) | |
| | ) | |
| Defendant/Counter-Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | |
| and | ) | 3:19-CV-2074-G |
| | ) | |
| MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, and MELANIE MONTGOMERY, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court is the National Rifle Association (the "NRA" or the "Association")'s Motion to Dismiss Second Amended Counterclaims ("motion to dismiss") (docket entry 260) and Memorandum of Law in Support of the National Rifle Association's Motion to Dismiss ("Brief in Support") (docket entry 261). For the reasons set forth below, the motion to dismiss is **GRANTED** in part and **DENIED** in part.

# I.  BACKGROUND

## A.  Factual Background

Founded in 1871, the NRA is a not-for-profit corporation organized under the laws of the State of New York with its principal place of business in Fairfax, Virginia. Plaintiff's First Amended Complaint (docket entry 18) ¶ 1.  The NRA describes itself as "the foremost defender of the Second Amendment of the United States Constitution" and boasts a following of "approximately five million members, hundreds of thousands of donors, and many millions more who support its legendary advocacy."  *Id.*

Ackerman McQueen, Inc. ("AMc"), the counter-plaintiff, is an advertising and public relations agency organized under the laws of the State of Oklahoma with its principal place of business in Oklahoma City, Oklahoma.  *Id.* ¶ 3.  During their decades-long working relationship, AMc handled much of the NRA's public relations work.  Counter-Plaintiff Ackerman McQueen, Inc.'s Second Amended Counterclaim ("SAC") (docket entry 241) ¶ 6.  The public relations agency served as the Association's lead communication strategist and crisis manager for nearly four decades.  *Id.*  AMc asserts that it "effectively crafted the NRA message and burnished its image as the most visible and powerful Second Amendment advocacy group in the United States," having formulated such themes as "Stand and Fight."  *Id.* ¶¶ 6, 8.

Throughout their relationship, AMc and the Association allegedly developed

certain "protocols" governing the "working arrangements" of the two parties, including negotiating annual budgets.  *Id.* ¶¶ 10-11.  One such "protocol" included a "consensual budgeting process" whereby AMc was not required to keep hourly time records as the basis for billing.[1]  *Id.* ¶ 11.  Instead, AMc's compensation was allegedly "determined by outcome and effect rather than an amount of time spent" on a given project.  *Id.*  AMc asserts that "[t]he parties abided by these protocols steadfastly and with minimal conflict for many years as the relationship flourished."  *Id.* ¶ 12.

Beginning in 1999, these informal protocols crystalized into a "Services Agreement," which formalized certain aspects of the working relationship between AMc and the NRA.  *Id.* ¶ 13.  The Services Agreement was last updated in 2017 and subsequently amended in 2018.  *Id.*  The Services Agreement contained a host of clauses governing the relationship between AMc and the Association, including a list of services, compensation terms, and billing.  *See* Appendix in Support of Plaintiff National Rifle Association of America's Memorandum of Law in Support of its Motion to Dismiss ("APPX") (docket entry 262) at Exhibits 1, 2.

Three clauses in the Services Agreement are particularly important here.  First, the 2018 amendment to the Services Agreement contained a "termination provision"

---

[1]     According to AMc, "[t]he NRA, through LaPierre and its former [Chief Financial Officer], Wilson 'Woody' Phillips ("Phillips"), completely controlled the [budgeting] process, operating with full knowledge of the budgeted line items."  *Id.* ¶ 10.

under which the NRA agreed, *inter alia*, to (a) "reimburse AMc for expenses incurred on NRA's behalf up to the date of termination," (b) pay AMc "a fair and equitable termination fee"; and (c) reimburse AMc for the "compensation payable" to "all non-cancellable" contracts entered into between AMc and certain third parties for the benefit of the NRA ("Third Party NRA Contracts").  APPX at 11-15; SAC ¶¶ 15-16.  The 2018 amendment specifically references contracts between AMc and Col. Oliver North ("Col. North") and Dana Loesch ("Loesch") as such "non-cancellable" contracts, both of whom AMc hired "as 'talents' for NRATV," a "digital broadcast network created, staffed, and administered in its most recent form (again at LaPierre's request) by AMc."[2]  SAC ¶ 13; APPX at 16-17.  Second, "if at any time NRA fails to timely pay [an invoice within 30 days,] NRA agrees that it shall post a $3,000,000 letter of credit (the 'LOC') for the benefit of AMc."  APPX 14; SAC ¶ 15.  Third, Section IX of the Services Agreement specified that "AMc is authorized to act upon written communications received from the NRA Executive Vice President or his designee.  He or his designee are the only persons within the NRA who have the actual authority to issue such communications."  APPX at 11; SAC ¶¶ 18-20.  This is known as the "authorized contacts" clause.

---

[2]       AMc entered into the contracts with Col. North and Loesch "[a]t LaPierre's direction."  Ackerman McQueen's Second Amended Third Party Complaint ("SATPC") (docket entry 210) ¶ 144.  According to AMc, "LaPierre personally led the recruitment of Col. North" and "negotiated the terms of the Col. North Contract."  *Id.* ¶ 146.

AMc also alleges that "LaPierre and others acting at his direction [frequently] asked AMc to 'front' activities and expenses for the NRA. For example, AMc would engage third parties to perform work for the NRA at LaPierre and his designees' request, pay for the work performed by those third parties, and then submit an invoice for reimbursement by the NRA." SAC ¶ 22. LaPierre allegedly "made . . . clear" that "any expenses he incurred, whether personally or through AMc, were legitimate NRA expenses, and therefore subject to reimbursement to AMc." *Id.* ¶ 26. According to AMc, sometime after LaPierre requested that AMc "facilitate and help structure the financing of a personal mansion-style home for LaPierre and his wife, paid for by the NRA," AMc refused to bill "pass-through line-items in the parties' most recent annual budget and [began] seeking backup documentation from LaPierre and other NRA employees regarding LaPierre's expenses." *Id.* ¶¶ 44-46.

Regarding NRATV, AMc alleges that the channel "was created and expanded at the sole direction of LaPierre" and that, "[i]n accordance with LaPierre's directives, AMc developed and administered the network's content . . . and hired its high-profile talent." *Id.* ¶ 29. LaPierre allegedly "sign[ed] off on every performance metric of NRATV, [and] extolled the success of NRATV in public speeches and made numerous presentations to NRA members and directors as one of its proudest and most successful projects." *Id.* AMc further maintains that LaPierre "repeatedly told AMc personnel how well the network was performing and that the NRA would

continue its support, financially and otherwise, of the NRA's flagship digital

program." *Id.* ¶ 30.  However, "LaPierre began looking for ways to cut costs and

targeted the NRA's online channels." *Id.* ¶ 31.  "In an effort to maintain the flow of

sponsorship dollars, however, LaPierre instructed AMc to 'fake it,' as in, make it

appear that these programs remained robust despite significant funding loss." *Id.*

"AMc refused the instruction to 'fake it' . . . ." *Id.*  Although AMc maintains that

"NRATV was a valuable branding, messaging, and fundraising vehicle for the NRA,"

*id.* ¶ 36, the network was shut down in June 2019, after which "the NRA ceased

reimbursement for the compensation of the Third Party NRA contracts." *Id.* ¶ 149.

AMc also alleges that, sometime in September 2019, the NRA requested an

audit of AMc's work on the NRA account.  See *id.* ¶ 67, 70.  This audit was in

addition to annual audits that the NRA conducted of its vendors.  *Id.*  Pursuant to

the audit, William A. Brewer III ("Brewer") and his law firm Brewer, Attorneys and

Counselors ("BAC") – the NRA's counsel in this and several other matters –

"demanded copies of documents from AMc, which the NRA had a right to review but

not copy; demanded non-contractual *post hoc* justifications for AMc's billing, which

had long-since been preapproved by the NRA and LaPierre and were audited by the

NRA; requested interviews of AMc personnel not authorized by the Services

Agreement; and insisted on conducting three separate but repetitive audits in short

succession . . . ." *Id.* ¶ 70.  AMc alleges that these audits "were not consistent with

NRA practices, the Services Agreement between the NRA and AMc, or the nearly 40-year business relationship between the parties." *Id.* ¶ 71.  Despite AMc's belief that the audits were improper, it "responded in a complete and timely manner." *Id.*

Tensions quickly spiked between AMc and BAC due, according to AMc, to BAC's "escalating hostilities." *Id.* ¶ 73.  AMc alleges that Brewer "began shaping [a] negative public narrative [about AMc] by releasing false and disparaging public statements" regarding AMc's compliance with the new audits.  *Id.* ¶ 72.  AMc cites two statements provided by Brewer to THE WALL STREET JOURNAL and ADWEEK in which Brewer commented, *inter alia*, that "[i]t's stunning that a trusted partner for all these years is just refusing to cooperate." *Id.*  Concurrently with Brewer's alleged outward-facing campaign, AMc maintains that Brewer "would routinely threaten AMc and [AMc CEO Angus McQueen, who happens to be Brewer's father-in-law] by having "[Angus McQueen] and AMc charged with RICO (Racketeer Influenced and Corrupt Organizations Act) violations." *Id.* ¶ 69.

On October 11, 2018, AMc officials met with LaPierre and former NRA Treasurer Craig Spray in Dallas, Texas (the "October 11 Meeting"), to discuss "AMc's concerns about dealing with Brewer in light of his relationship and animosity toward the McQueen family, his actions and desire to take over AMc's business with the NRA, and his letter-writing campaign where he repeatedly and falsely accused AMc of withholding documents." *Id.* ¶ 73.  AMc asserts that "[p]rior to this meeting,

AMc decided that if LaPierre, Spray, Brewer, and other NRA officials were not willing to change their recent practices, AMc would resign the NRA's business entirely." *Id.* After the AMc representatives laid out their qualms regarding Brewer and the NRA's "recent practices," *id.*, LaPierre "pled with AMc to 'stick with him'" and "stated that the letter writing campaign with Brewer and [BAC] would stop and that AMc would no longer have to deal with Brewer [or BAC] . . . ." *Id.* ¶ 76. LaPierre informed AMc that "Brewer would be gone in 30-60 days" after the conclusion of unrelated litigation in New York. *Id.* "Based on LaPierre's representations, AMc agreed to maintain the business relationship and re-invest in resources to allow AMc to continue to provide services to the NRA." *Id.* ¶ 77. LaPierre allegedly repeated his desire for AMc to "stick with him" over the course of the following weeks but informed AMc that the NRA needed a second audit as part of unrelated litigation. *Id.* ¶ 78, 80. Despite LaPierre's promises, however, AMc alleges that BAC "sent a letter to AMc on December 21, 2018," demanding "to examine an even more extensive list of documents that went to the heart of AMc's confidential business and billing practices . . . ." *Id.* ¶ 81. It is unclear whether this demand was in conjunction with the second audit.

In February 2019, the NRA requested "yet another audit of AMc's records." *Id.* ¶ 84. The NRA explained that this third audit would be conducted by a company called Forensic Risk Alliance ("FRA"). *Id.* However, "[u]nbeknownst to AMc, Susan

Dillon, a new FRA Senior Director, had just joined FRA at the end of 2018 after

working as the Director of Consulting *at the Brewer Firm for more than 17 years"* and

had participated in other audits of AMc.  *Id.* (emphasis in original).  "AMc, under the

false impression that FRA was an independent third party, agreed to a multi-day

audit" with FRA.  *Id.* ¶ 86.  "Dillon oversaw the entire February 2019 audit of AMc,

including directly communicating with [BAC] about her findings.  FRA's records

reveal that Dillon exchanged numerous emails with [BAC] before, during, and after

the audit, and that [BAC] was being provided daily updates on the audit's progress."

*Id.* ¶ 87.  Dillon has since returned to BAC.  *Id.* ¶ 88.

    According to the SAC, "Brewer continued to spin a false narrative about AMc's

compliance" with the audits, despite AMc's alleged full participation.  *Id.* ¶ 89.  On

March 12, 2019, AMc "expressed its strong objection to the NRA's false statements"

regarding AMc's compliance with the audits.  *Id.* ¶ 98.  Shortly thereafter, John

Frazer ("Frazer"), the NRA's General Counsel, *id.* ¶ 84, "for the first time asserted the

NRA's position that only AMc, and not the NRA, had restrictions on the use of a

party's confidential information" under the Services Agreement.  *Id.*   ¶ 98.  "The

NRA claimed it could disclose AMc's information with impunity while AMc was

contractually prohibited from any reciprocal freedom to use NRA information."  *Id.*

According to the SAC, this "signaled the NRA's claim that it could deliberately

misuse AMc's confidential information and thereby violate the NRA's duty of good

faith and fair dealing inherent within the terms of the Services Agreement." *Id.*

According to the SAC, the impact of this "one-sided" interpretation of the confidentiality agreement came to the fore during pending litigation between AMc and the NRA, "including the instant case." *Id.* ¶ 140.  For example, "[o]n April 12, 2019, the NRA sued AMc in Virginia Superior Court, alleging that AMc breached the Services Agreement by failing to produce records requested in the audits and failing to provide the NRA with a copy of the North Contract," both of which AMc denies. *Id.* ¶ 113.  AMc asserts that the NRA made the decision to sue AMc for failure to comply with the audit long before the February 2019 FRA audit.  *Id.* ¶ 114-15.  In particular, AMc cites an April 2019 letter in which LaPierre stated that "[t]he NRA and I have a *common legal interests* [sic] *in the litigation against* [AMc] *which crystallized before the September* [2018] *Board meeting* and colored the discussion that day." *Id.* ¶ 114 (emphasis original).

On April 24, 2019, Col. North called LaPierre's Executive Assistant "to notify LaPierre about potentially damaging but true information of which he wanted LaPierre to be aware." *Id.* ¶ 121.  AMc alleges that Brewer "spun – and indeed fabricated – a false narrative, claiming that Col. North called [LaPierre's executive assistant] on behalf of AMc to extort LaPierre by threatening to release damaging

information about LaPierre unless he immediately resigned." *Id.* ¶ 122.[3]  "The

following day, on April 25, 2019, LaPierre falsely accused Col. North and AMc of

engaging in an extortion attempt in a detailed letter to the NRA's Board" (the "April

25 letter").  *Id.* ¶ 129.  The letter to the Board – which AMc did not quote directly in

its SAC or include in an appendix but was attached to the NRA's motion to dismiss –

states, in relevant part, that:

> Leaders in every walk of life must often choose: between what is true, and what is polite; between what is convenient, and what is right . . . .

> Yesterday evening, I was forced to confront one of those defining choices – styled, in the parlance of extortionists, as an offer I couldn't refuse.  I refused it.  Delivered by a member of our Board [Col. North] on behalf of his employer [AMc], the exhortation was simple: resign or there will be destructive allegations made against me and the NRA.  Alarmed and disgusted, I refused the offer. . . .

> I've been a proponent of [AMc] in the past – because they are capable of doing high quality work.  But as I've discovered, [AMc] is capable of something much different. . . .

> Col. North stated that the purpose of [his] call [to LaPierre's executive assistant] was to relay the contents of a letter drafted by [AMc].  According to Col. North, he had been advised by Dan Boren – a member of our Board and an employee of [AMc's] client – that unless I resigned as

---

[3]       AMc denies this allegation.  AMc points to a deposition of Col. North in which he stated that he had "not talked to anybody from [AMc] about" the damaging information and "was not delivering [the damaging information] on behalf of either [himself or AMc.]."  SAC ¶¶ 122.  Dan Boren, a member of the NRA Board of Directors, and Carolyn Meadows, current President of the NRA, testified that they did not overhear Col. North threaten LaPierre during the call or demand LaPierre's resignation.  *Id.* ¶¶ 124-25.

the Executive Vice President of the Association, [AMc] would transmit this allegedly damaging letter to the entire NRA Board.  According to Col. North, the letter was 'bad' for me, two other members of my executive team, and the Association. . . .

But then, Col. North explained that the letter would not be sent – if I were to promptly resign as your Executive Vice President.  And, if I supported Col. North's continued tenure as President, he stated that he could 'negotiate' an 'excellent retirement' for me. . . .

[AMc] did not respond directly, but appears to have responded indirectly by trying to oust me. . . .

I believe our Board and devoted members will see this for what it is: a threat meant to intimidate and divide us.  I choose to stand and fight, and hope to bring 5 million members with me.

APPX at 18-20; Ackerman McQueen, Inc.'s Response to the National Rifle Association of America's Motion to Dismiss Second Amended Counterclaim. ("Response") (docket entry 276) at 6.  AMc asserts that "[t]he letter falsely accused AMc and Col. North of threatening to release damaging information about LaPierre unless he resigned."  SAC ¶ 129.  Two days later, "the Wall Street Journal published an article titled, 'NRA Wayne LaPierre Says He is Being Extorted, Pressured to Resign,' acknowledging that it had reviewed a copy of the April 25, 2019 'Confidential' letter to the NRA's Board and summarizing same."  *Id.* ¶ 130.  AMc alleges that BAC provided LaPierre's letter to the media, including the WALL STREET JOURNAL.  *Id.*

In June 2019, "the NRA ceased reimbursement for the compensation of the Third Party NRA Contracts."  *Id.* ¶ 149.  AMc asserts that, as a "result of the NRA's

cessation of funding," AMc was "in the untenable position where it was unable to manage the compensation requirements of the Third Party NRA Contracts." *Id.* ¶ 150. "In the case of Loesch, AMc is now the subject of her arbitration claim, seeking millions." *Id.* ¶ 149.

### B. Procedural Background

AMc filed its SAC against the NRA and the NRA Foundation, a non-profit associated with the NRA, on May 22, 2021. On June 7, 2021, the NRA filed its motion to dismiss. Shortly thereafter, AMc elected to file a voluntary notice of dismissal without prejudice of the NRA Foundation, docket entry 265. AMc responded to the NRA's motion to dismiss on June 28, 2021. The NRA replied on July 12, 2021. Reply in Support of Motion to Dismiss ("Reply) (docket entry 287). Accordingly, the motion to dismiss is ripe for decision.

### II. ANALYSIS

### A. Legal Standards

#### 1. Standard for Dismissal Under Rule 12(b)(6)

"To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 570 (2007)), *cert. denied*, 552 U.S. 1182 (2008). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not

need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S.at 555 (citations, quotation marks, and brackets omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *In re Katrina Canal*, 495 F.3d at 205 (quoting *Twombly*, 550 U.S. at 555) (internal quotation marks omitted). "The court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Id*. (quoting *Martin K. Eby Construction Company, Inc. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)) (internal quotation marks omitted).

The Supreme Court has prescribed a "two-pronged approach" to determine whether a complaint fails to state a claim under Rule 12(b)(6). See *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). The court must "begin by identifying the pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id*. at 679. The court should then assume the veracity of any well-pleaded allegations and "determine whether they plausibly give rise to an entitlement of relief." *Id*. The plausibility principle does not convert the Rule 8(a)(2) notice pleading to a "probability requirement," but "a sheer possibility that a defendant has acted unlawfully" will not defeat a motion to dismiss. *Id*. at 678. The plaintiff must

"plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* at 679 (alteration in original) (quoting FED. R. CIV. P. 8(a)(2)).  The court, drawing on its judicial experience and common sense, must undertake the "context-specific task" of determining whether the plaintiff's allegations "nudge" its claims against the defendants "across the line from conceivable to plausible."  See *id.* at 679, 683.

### 2.  Rule 9(b) Standard

A complaint need only recite a short and plain statement of the claim showing that the pleader is entitled to relief.  FED. R. CIV. P. 8(a)(2).  When, however, defendants are charged with fraudulent activity, the plaintiff must state with particularity the circumstances constituting fraud.[4]  FED. R. CIV. P. 9(b).  Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  The Fifth Circuit interprets Rule 9(b)

---

[4]      As the Fifth Circuit has noted, the purpose of the heightened pleading standard of Rule 9(b) is to provide defendants with fair notice of the plaintiff's claims, protect defendants from harm to their reputation and goodwill, reduce the number of strike suits, and prevent a plaintiff from filing baseless claims in an attempt to discover unknown wrongs. *Tuchman v. DSC Communications Corporation*, 14 F.3d 1061, 1067 (5th Cir. 1994).

strictly, requiring the plaintiff to "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177 (5th Cir.), *cert. denied*, 522 U.S. 966 (1997); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 412 (5th Cir. 2001); see also *Benchmark Electronics, Inc. v. J.M. Huber Corporation*, 343 F.3d 719, 724 (5th Cir. 2003) (stating that Rule 9(b) requires the plaintiff to lay out "the who, what, when, where, and how" of the alleged fraud).  If the facts pleaded in the complaint are within the opposing party's knowledge, fraud pleadings may be based on information and belief.  See *Tuchman v. DSC Communications Corporation*, 14 F.3d 1061, 1068 (5th Cir. 1994).

Rule 9(b) permits a plaintiff to allege generally the defendant's intent to commit fraud.  FED. R. CIV. P. 9(b).  ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").  A mere allegation that the defendant had the requisite intent, however, will not satisfy Rule 9(b).  *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994); *Tuchman*, 14 F.3d at 1068.  To adequately plead fraudulent intent, the plaintiff must set forth specific facts that support an inference of fraud.  *Tuchman*, 14 F.3d at 1068.  The factual background adequate for an inference of fraudulent intent can be satisfied by alleging facts that show the defendant's motive.

In the event that the plaintiff fails to plead facts with sufficient particularity

under Rule 9(b), dismissal of the action with prejudice is not automatic nor typically warranted.  6 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1300 (2d ed. 1990).  Rather, courts usually provide an opportunity to cure the pleading "unless the defect is simply incurable or the plaintiff has failed to plead with particularity after being afforded repeated opportunities to do so." *Hart v. Bayer Corporation*, 199 F.3d 239, 247 n.6 (5th Cir. 2000); see also *Cates v. International Telephone and Telegraph Corporation*, 756 F.2d 1161, 1180 (5th Cir. 1985) ("[S]uch deficiencies do not normally justify dismissal of the suit on the merits and without leave to amend, at least not in the absence of special circumstances.").  Rather, Federal Rule of Civil Procedure 15 allows trial courts to "freely give leave [to amend] when justice so requires." FED. R. CIV. P. 15(a)(2).

## B.  Application

AMc asserts six counterclaims against the NRA: (1) breach of contract, SAC ¶¶ 168-207; (2) defamation and defamation *per se*, *id.* ¶¶ 208-213; (3) tortious interference with the NRA Third-Party Contracts, *id.* ¶¶ 214-218; (4) business disparagement, *id.* ¶¶ 219-223; (5) fraud, *id.* ¶¶ 224-231; and (6) civil conspiracy.  *Id.* ¶¶ 232-239.  Additionally, AMc seeks a declaratory judgment that "the NRA and its counsel have waived and/or are estopped from claiming that the confidentiality provision of the Services Agreement applies only to AMc." *Id.* ¶ 241.  The NRA

challenges each of AMc's counterclaims except breach of contract.  *See* Motion to Dismiss at 1-3.

### 1.  Defamation and Defamation per se

"Defamation's elements include (1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages, in some cases."  *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015).

AMc asserts that "NRA representatives, including LaPierre, Brewer, Powell, and [BAC], have repeatedly, intentionally, and falsely defamed AMc, a private figure, by accusing AMc of the criminal act of extortion."  SAC ¶ 209.  The NRA argues that AMc's defamation claim fails for two reasons.  First, AMc failed to allege a defamatory statement.  Brief in Support at 11-12.  Second, AMc did not allege actual malice as required for public figures.  *Id.* at 12-13.[5]

---

[5]     The NRA also argued that the Texas Defamation Mitigation Act ("TDMA") barred AMc's defamation claim because AMc did not "issue [a] request for correction, clarification, or retraction" within 90 days of learning of the allegedly defamatory statement.  Brief in Support at 10.  However, the NRA admitted in its reply that "[i]n the wake of the Texas Supreme Court's recent ruling in [*Hogan v. Zoanni*, __ S.W. 3d. __, 2021 WL 2273721 (Tex. June 4, 2021)], the NRA does not seek dismissal on the basis of the [TDMA]."  Reply at 2 n.6.  Nevertheless, the NRA argued that the TDMA precludes AMc from recovering exemplary damages.  *Id.*  As the parties did not specifically brief the matter, however, the court does not decide whether AMc's failure to timely request retraction or correction bars exemplary damages.

*(a)  Defamatory Statement*

*(i) The Alleged Statement*[6]

AMc contends that LaPierre's April 25, 2019 letter to the NRA's Board constitutes a defamatory statement.  Response at 6.  AMc asks the court to view "the letter as a whole," rather than "focus on any one statement in the letter or any one use of the word 'extortion.'"  *Id.* at 7.  To that end, AMc notes several statements contained in the letter.  For example, AMc points to LaPierre's statement that, "while AMc was 'capable of doing high quality work . . . [AMc] is capable of something much different.'"  *Id.* at 6.  Additionally, LaPerre proceeded to "describe the alleged 'extortion' call from Col. North to [LaPierre's Executive Assistant]."  *Id.*  AMc also asserts that "LaPierre made additional accusations in further support of his extortion narrative, such as AMc was 'trying to oust [him]' . . . ."  *Id.* (alterations in original).

The NRA appears to put forward two arguments in its motion to dismiss.  First, the NRA argues that the letter to the Board "does not show any accusation of extortion" and "simply states that Col. Oliver North spoke with [LaPierre's executive

_____

[6]      AMc appears to object to the court's consideration of the April 25 letter provided in full by the NRA, which AMc did not include in or attach to its SAC.  *See* Response at 7.  However, documents attached to a motion to dismiss that "are referred to in the plaintiff's complaint and are central to her claim[s]" are properly within a court's consideration of a Rule 12(b)(6) motion.  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 499 (5th Cir. 2000) (quotations and citations omitted).  Quite clearly, the April 25 letter is central to AMc's defamation claim and the letter is quoted at length throughout AMc's Response.  Accordingly, the April 25 letter is properly before court.

assistant], and said that he would send a damaging letter to the NRA Board unless LaPierre resigned." Brief in Support at 12. The NRA describes the phrase "styled, in the parlance of extortionists" as "the only use of any variation of the word 'extortion' in the Board Letter, and it is not an actual accusation of extortion by either Col. North or [AMc]." *Id.* Second, the Association adopts LaPierre's argument that none of the statements in the April 25 letter are false. *See* Reply in Support of Motion to Dismiss (docket entry 286) ("LaPierre's Reply") at 1-2.[7]

### (ii) Texas Law

Recognizing "that defamation law is a 'quagmire,' lacks 'clarity and certainty,' is 'overly confusing' and 'convoluted,' leaves courts 'hopelessly and irretrievably confused,' and 'has spawned a morass of case law in which consistency and harmony have long ago disappeared,'" the Texas Supreme Court recently committed itself to harmonize case law, provide a taxonomy of defamation types and sub-types, and "introduc[e] new terminology." See *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 643 (Tex. 2018) (Boyd, J., concurring) (citations omitted), *cert. denied* 139 S.Ct. 1216 (2019). Because neither party so much as notes this important re-framing of Texas law, the court finds it necessary to discuss it at length and urges the parties to align their briefing accordingly.

---

[7]     The NRA adopts the arguments asserted by LaPierre made in his reply. Reply at 2 n.10.

In *Dallas Morning News, Inc.*, the Texas Supreme Court first considered the fundamental distinction between defamation *per se* and *per quod*. *Id.* at 625-627. Apparently by historical accident, Texas courts used the pair of terms in two wholly different circumstances when evaluating defamation claims. See *id.* at 625-26. On one hand, "Texas cases recognize[d] a distinction between a statement that is defamatory by its text alone and a statement that is defamatory only by reason of 'extrinsic evidence' and 'explanatory circumstances.'" *Id.* at 625 (citations omitted). "The common law employed the term 'defamation *per se*' to refer to the first type of statement – one defamatory by its text alone." *Id.* That is, the meaning of the defamatory statement was plain on its face. For example, the statement that "Tom is cheating on his wife, Daisy" was at common law defamation *per se* because the defamatory meaning of the statement (*i.e.*, Tom committed adultery) is an analytically necessary result of the statement. "Similarly, at common law, 'defamation *per quod*' referred to a statement whose defamatory meaning required reference to extrinsic facts." *Id.* In this sense, the defamatory nature of the statement "Tom is sleeping with Myrtle" is not immediately apparent from the statement. Rather, some extrinsic evidence or third term (*i.e.*, Tom is married to Daisy) must be supplied in order to bring the defamatory nature of the statement (*i.e.*, that Tom committed adultery) to light. Yet both statements ultimately carry the same defamatory message: Tom is cheating on his wife, Daisy.

- 21 -

"However, this distinction 'is not the same as that between defamation which is actionable of itself and that which requires proof of special damage.'" *Id.* (citations omitted). "Despite the difference, [Texas courts] have also characterized as 'defamation *per se*' statements that are 'so obviously hurtful to a plaintiff's reputation that the jury may presume general damages, including for loss of reputation and mental anguish.'" *Id.* (citations omitted). Included within this category are statements which "injure[] a person in his office, profession, or occupation [or] charges a person with the commission of a crime . . . ." *Texas Disposal Systems Landfill, Inc. v. Waste Management Holdings, Inc.*, 219 S.W.3d 563, 581 (Tex. App. – Austin 2007, pet. denied). Thus, for example, "Jay murdered Myrtle" is *per se* defamatory because it charges Jay with a reprehensible crime. Conversely, defamation *per quod*, when used in this context, requires a showing of special damages resulting from the statement's use. Defamation *per quod* is defined simply as "defamation that is not actionable *per se*." *Dallas Morning News, Inc.*, 554 S.W.3d at 626 (quotations, alterations, and citations omitted). Thus, for example, the statement "Jay led an eventful life" is defamatory only upon the showing of some special injury. See *Harriman v. New Nonpareil Company*, 110 N.W. 33, 34 (Iowa 1906).

Due to the unfortunate coincidental usage of the terms, the Texas Supreme Court introduced new terminology in an effort to reduce confusion. The Court reclassified the former "common-law concept of defamation *per se*, that is defamation

- 22 -

that arises from the statement's text without reference to any extrinsic evidence" as "textual defamation." *Dallas Morning News, Inc.*, 554 S.W.3d at 626. A textually defamatory statement involves a statement in which "the defamatory statement's literal text and its communicative content align – what the statement *says* and what the statement *communicates* are the same." *Id.* at 627 (emphasis in original). "On the other hand, 'extrinsic defamation' refers to the common-law concept of defamation *per quod*, which is to say, defamation that *does* require reference to extrinsic circumstances." *Id.* at 626 (emphasis in original). "Extrinsic defamation occurs when a statement whose textual meaning is innocent becomes defamatory when considered in light of 'other facts and circumstances sufficiently expressed before' or otherwise known to the reader." *Id.* (citations omitted). However, "it must be remembered that an extrinsically defamatory statement *requires* extrinsic evidence to be defamatory at all." *Id.* (emphasis in original). The court then ratified "the continued usage (and distinction between) 'defamation *per se*' and 'defamation *per quod*' as used in relation to special damages." *Id.* Thus, under the Texas Supreme Court's new formulation, defamation claims can be classified into four broad types: textual *per se* (*e.g.*, Tom is cheating on his wife Daisy); textual *per quod* (*e.g.,* Jay led an eventful life); extrinsic *per se* (*e.g.*, Tom is sleeping with Myrtle ("Tom is married to Daisy" being the extrinsic explanatory term)); and extrinsic *per quod*.

Unfortunately, the complexities do not stop there. The Court

"acknowledge[d] that in a textual-defamation case, a plaintiff may allege that meaning arises in one of three ways." *Id.* at 628. "First, meaning may arise explicitly." *Id.* Thus, for example, "y'all are corrupt, y'all are the criminals, [and] y'all are the ones that oughta be in jail" is a form of explicit, textual defamation. See *Bently v. Bunton*, 94 S.W.3d 561, 569 (Tex. 2002). "Second, meaning may arise implicitly as a result of the article's entire gist."[8] *Dallas Morning News, Inc.*, 554 S.W.3d at 628 (citing *D Magazine Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 439 (Tex. 2017) ("[E]valuating the article 'as a whole . . .' [t]he article's gist is that . . . ." (citations omitted)). Finally, the defamatory meaning may arise via inference or implication resulting "from a distinct portion of the article rather than from the article's as-a-whole gist."[9] *Id.*

The threshold inquiry regarding defamation claims is the same across all types: "is the publication 'reasonably capable' of communicating the defamatory

---

[8]    The Court defined "gist" to mean "a publication or broadcast's main theme, central idea, thesis, or essence." *Dallas Morning News, Inc.*, 554 S.W.3d at 629. "In this usage, publications and broadcasts typically have a single gist." *Id.* For a publisher to be liable for defamation-by-gist, "the 'plaintiff must make an especially rigorous showing' of the publication's defamatory meaning.'" *Id.* at 633 (citations omitted).

[9]    The NRA's argument that the court must myopically assess the April 25 letter for direct, explicit accusations of extortion is flatly contradicted by Texas case law. See *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000) ("[A]n allegedly defamatory publication should be construed as a whole in light of the surrounding circumstances based on how a person of ordinary intelligence would perceive it."). Accordingly, the April 25 letter must be viewed holistically.

statement?"  *Id.* at 629.  However, the Court in *Dallas Morning News, Inc.* recognized

that defamation by gist and defamation by inference employ two different tests.[10]

For defamation-by-gist claims, the Texas Supreme Court instructs courts to assess a

publication "based upon how a person of ordinary intelligence *would* perceive it."  *Id.*

(citations omitted) (emphasis in original).  "The 'would' standard recognizes that

gist, in particular, is the type of implication that no reasonable reader would fail to

notice."  *Id.* at 629-30.  For defamation-by-inference claims, however, Texas courts

assess whether a "person of ordinary intelligence *could* conclude that the publication

conveys the meaning alleged."  *Id.* at 630 (citations and quotations omitted)

(emphasis in original).  "The 'could' standard recognizes that publications of any

length will communicate more than one implication and that not all reasonable

readers will notice every one."  Such a test "encompasses many more implications

than any single reasonable reader necessarily 'would' understand a publication to

convey."  *Id.* at 631.  "[T]he judge's task is to determine whether the implication the

plaintiff alleges is among the implications that the objectively reasonable reader

would draw."  *Id.*

If a court determines that a publication is "reasonably capable of a defamatory

meaning," the court must next consider whether the publication is capable of

_____

[10]    The Texas Supreme Court noted a host of other differences between the
two types of claims, but such differences are not at issue here.

another, non-defamatory meaning.  "When that occurs, 'it is for the jury to

determine whether the defamatory sense was the one conveyed.'"  *Id.* at 632

(citations omitted).  But if the publication "is capable of defamatory meaning and

*only* defamatory meaning – that it is unambiguous – then the jury plays no role in

determine the statement's meaning."  *Id.*  However, even if a statement is capable

only of a defamatory meaning, the court may "pass the inquiry to the jury if it

determines that an ambiguity exists about the . . . effect of the words or that a

predicate fact question remains about whether the statements were published or were

false."  *Texas Disposal Systems Landfill, Inc.*, 219 S.W.3d at 581.

### *(iii) Application*

The first inquiry for the court is determining the type of AMc's defamation

claim and its motivating theory.  The court concludes that, at least as concerns the

April 25 letter, AMc asserts a textual, *per se* defamation claim predicated on a theory

of defamation-by-gist.  AMc asserts a defamation *per se* claim because AMc alleges

that the April 25 letter effectively accuses it of extorting LaPierre.  *See* Response at 5-

6.  As noted above, communications which "charge[] a person with the commission

of a crime," are defamatory *per se*.  *Id.*  Extortion or blackmail is a crime under Texas

and federal law.  *See* Tex. Pen. Code Ann. § 31.02 ("Theft as defined in Section 31.03

constitutes a single offense superseding the separate offenses previously known as

theft, theft by false pretext . . . acquisition of property by threat . . . [or] extortion  . .

. .”); 18 U.S.C. § 875(d) (“Whoever, with intent to extort from any person . . . any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee . . . shall be fined under this title or imprisoned not more than two years, or both.”).[11]   Texas courts have not specifically addressed whether a communication which falsely charges an individual with committing extortion constitutes defamation *per se*.   However, the court sees no reason to depart from the general rule that false allegations of the commission of a crime constitutes such a claim.   Furthermore, other courts have found that allegations of extortion may give rise to defamation *per se* claims.   See, e.g., *Rees v. O'Malley*, 461 N.W.2d 833, 835 (Iowa 1990).   Accordingly, AMc asserts a *per se* defamation claim.[12]

---

[11]      Under Texas law, “it is not necessary that the publication charge a crime in express words; it is sufficient if the charge is made by reasonable implication or insinuation, or if it consists of a statement of facts which naturally and presumably would be understood as a charge of crime by those who hear or read it, or if the language was calculated to induce those who heard or read it to understand that the person to whom it relates is guilty of a crime.” *Buck v. Savage*, 323 S.W.2d 363, 369 (Tex. App. – Houston 1959, writ ref'd n.r.e.).   That is, “the charge of violating a criminal statute need not be made in a technical manner.   It is sufficient . . . if, in hearing the statement, an ordinary person would draw a reasonable conclusion that the complaining party was charged with a violation of some criminal law.” *Gray v. HEB Food Store No. 4*, 941 S.W.2d 327, 329 (Tex. App. – Corpus Christi-Edinburg 1997, writ denied).

[12]      AMc attempts to define its claim as defamation *per se* and *per quod*.   *See* Response at 4; SAC at 73.   However, the thrust of AMc's claim is that LaPierre accused AMc of extortion, which naturally fits within the defamation *per se* category and AMc effectively admits as much.   *See* Response at 5 (describing types of statements which are actionable *per se*).   Additionally, AMc does not allege in any

AMc's defamation claim is also "textual" rather than "extrinsic" because its allegedly defamatory meaning does not depend on some external third term.  True, AMc notes the contentious circumstances surrounding the April 25 letter, including the disputes between AMc, Brewer, and BAC.  *See* Response at 6-7.  But these surrounding circumstances are not, strictly speaking, necessary to decide whether the April 25 letter is defamatory.  See *Dallas Morning News, Inc.*, 554 S.W.3d at 626 ("[I]t must be remembered that an extrinsically defamatory statement *requires* extrinsic evidence to be defamatory at all.") (emphasis in original).  Although the contentious circumstances surrounding the April 25 letter provide a useful narrative, the court must look to the April 25 letter alone to determine whether it is reasonably capable of containing a defamatory meaning.

The court concludes that the April 25 letter is reasonably capable of a defamatory meaning through defamation-by-gist.[13]  The test under this theory is whether the publication conveys a defamatory meaning "that no reasonable reader would fail to notice."  *Id.* at 630.  The April 25 letter quite clearly carries the gist that AMc, through Col. North, committed extortion or blackmail in an effort to force

---

detail how the April 25 letter caused special damages, as required under defamation *per quod*.

[13]     Although the April 25 letter comes very close to explicit defamation, the letter does not outright accuse Col. North or AMc of the crime of extortion or blackmail.  *Dallas Morning News, Inc.*, 554 S.W.3d at 628 (concluding that the statement "y'all are corrupt, y'all are the criminals, [and] y'all are the ones that oughta be in jail" is explicitly defamatory).

LaPierre to resign his position.  LaPierre stated in the letter that he "was forced to confront" a "defining choice[] – styled, in the parlance of extortionists, as an offer I couldn't refuse."  APPX. at 18.  The letter went on to succinctly state the basic elements of blackmail or extortion in relation to Col. North's call: "Delivered by a member of our Board on behalf of his employer, the exhortation was simple: resign or there will be destructive allegations made against me and the NRA."  *Id.*  The letter further described AMc's alleged demand as a "threat" that "unless I [that is, LaPierre] resigned as the Executive Vice President of the Association, Ackerman would transmit this allegedly damaging letter to the entire NRA Board."  *Id.* at 18, 20.  The April 25 letter frames these allegations under the increasingly quarrelsome relationship between AMc and the NRA.  For example, LaPierre confesses in the letter the NRA had recently "met extraordinary resistance from one vendor: Ackerman McQueen" and cryptically stated that, while AMc was "capable of doing high quality work . . . [AMc] is capable of something much different."  *Id.*  Finally, LaPierre concluded the April 25 letter with an allegation that AMc was "trying to oust me."  *Id.* at 19.

The letter's reference to "extortionists" and "threats," description of the alleged threat (*i.e.*, "resign or there will be destructive allegations made" against LaPierre and the NRA), and cryptic gesture toward AMc's propensity to commit wrongful acts combine to form a clear message.  The gist of the April 25 letter is unmistakable: AMc, through Col. North, threatened to release damaging information regarding

LaPierre and the NRA unless LaPierre resigned his position as Executive Vice President.  This effectively amounts to a charge of extortion or blackmail. Accordingly, the April 25 letter is capable of a defamatory meaning.[14]

Finally, assuming the veracity of AMc's allegations, the court concludes that the gist of the April 25 letter is false.  The NRA argues that "it remains unclear which statements contained in the Board Letter are alleged to be false" and that AMc "does not dispute that the phone call relayed in the letter occurred – only LaPierre's interpretation of it."  LaPierre's Reply at 2.  The NRA is incorrect on two grounds. First, the April 25 letter falsely accuses Col. North of issuing a "threat" to LaPierre on behalf of AMc.  AMc points to testimony by three individuals with direct knowledge of the contents of the call (Col. North, LaPierre's Executive Assistant Millie Hallow, and now-current President of the NRA Carolyn Meadows), each of whom denied either that Col. North was acting on behalf of AMc or that Col. North issued a threat to LaPierre.  *See* SAC at ¶¶ 122-24.  Second, as described at some length above, even if certain individual statements made in the April 25 letter are true, they may be

---

[14]     To the extent that AMc asserts a separate defamation claim based on the allegation that Brewer repeated the contents of the letter to THE WALL STREET JOURNAL, the court concludes that such a claim fails because AMc did not adequately allege "the time, place, content, speaker, and listener of the defamatory matter." *Jackson v. Dallas Independent School District*, 3:98-CV-1079, 1998 WL 386158 at *5 (N.D. Tex. July 2, 1998) (quotations and citations omitted) (Fitzwater, J.).  AMc alleges only that "[u]pon information and belief, Brewer and the Brewer Firm were the ones who provided LaPierre's letter to the media, including the Wall Street Journal."  SAC ¶ 130.  AMc provides no detail whatsoever to support this assertion.

juxtaposed in such a way so as to create a defamatory gist.  Accordingly, the court concludes, for purposes of this opinion, that an individual statement in (or the gist of) the April 25 letter was false.[15]

*(b) Public or Private Person*

To maintain a defamation claim, the plaintiff must demonstrate that the defamatory statement was published with the requisite degree of fault.  If the defamation-plaintiff is a public figure, he must show that the statement was published with "actual malice."  *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998), *cert. denied*, 526 1051 (1999).  If the defamation-plaintiff is merely a private figure, however, the defendant need only have negligently published the statement.  *Id.*

"Public figures fall into two categories: (1) all-purpose, or general-purpose, public figures, and (2) limited-purpose public figures."  *Id.* at 571.  "General-purpose public figures are those individuals who have achieved such pervasive fame or notoriety that they become public figures for all purposes and in all contexts.  Limited-purpose public figures, on the other hand, are only public figures for a limited range of issues surrounding a particular public controversy."  *Id.*  A person becomes a limited purpose public figure by "'thrust[ing] themselves to the forefront

---

[15]        For the same reasons, the claim may also be stylized appropriately categorized as defamation-by-implication.

of particular public controversies in order to influence the resolution of the issues involved,' or because they 'voluntarily inject [themselves] or [are] drawn into a particular public controversy.'" *Trotter v. Jack Anderson Enterprises, Inc.*, 818 F.2d 431, 433 (5th Cir. 1987) (citations omitted) (alterations in original). "Whether an individual is a public figure is a matter of law for the court to decide." *Id.*

The Fifth Circuit in *Trotter* adopted a three-part test in determining whether a person is a limited-purpose public figure:

> (1) The controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution; (2) the plaintiff must have more than a trivial or tangential role in the controversy; and (3) the alleged defamation must be germane to the plaintiff's participation in the controversy.

*Trotter*, 818 F.2d at 433-434. To determine whether a public controversy existed under the first element – and, if so, what the contours of that controversy are – the court "'must examine whether persons actually were discussing some specific question. A general concern or interest will not suffice.'" *McLemore*, 978 S.W.2d at 572 (quoting *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1297 (D.C. Cir. 1980), *cert. denied*, 499 U.S. 898 (1980)). Nor will "[n]ewsworthiness alone." *Waldbaum*, 627 F.2d at 1296. As to the second element, "several inquiries are relevant and instructive: (1) whether the plaintiff actually sought publicity surrounding the controversy; (2) whether the plaintiff had access to the media; and (3) whether the plaintiff voluntarily engag[ed] in activities that necessarily involve[d]

the risk of increased exposure and injury to reputation," such as "publishing [its]

views" and inviting "public criticism and rebuttal." *McLemore*, 978 S.W.2d at 573

(citations, quotations, and alterations omitted).[16]

Viewing the facts in light most favorable to AMc, the court concludes that

AMc is a private person for purposes of this defamation action. The court must first

determine the scope and contours of the allegedly public controversy as relevant to

the defamation claim. *McLemore*, 978 S.W.2d at 572. Determining the scope of the

controversy is distinct from *Trotter*'s first element: only after the parameters of the

controversy are defined can the court assess whether the controversy is a "public"

---

[16]     The *Trotter* test does not specifically assess the distinction between
defamation-plaintiffs who purposefully or voluntarily inject themselves into an issue
of public import and those which do not. Nevertheless, the issue of a defamation-
plaintiff's purposeful interposition into a matter of public import is an important
policy underlying Supreme Court precedent on defamation law, and Texas courts
have built such inquiries into the *Trotter* test's second factor. See *Gertz v. Robert
Welch, Inc.*, 418 U.S. 323, 352 (1974) ("It is preferable to reduce the public-figure
question to a more meaningful context by looking to *the nature and extent of an
individual's participation* in the particular controversy giving rise to the defamation.")
(emphasis added). In the Supreme Court's view, parties who purposefully and
outwardly engage in a public matter are less deserving of protections against
defamation than parties who abstain from public participation. See *id.* at 344-45.
    Of course, "[h]ypothetically, it may be possible for someone to become a
public figure through no purposeful action of his own." *Id.* at 345. "[B]ut the
instances of truly involuntary public figures must be exceedingly rare." *Id.* Indeed,
"neither the United States Supreme Court nor [the Texas Supreme Court] has found
circumstances in which a person involuntarily became a limited-purpose public
figure." *Neely v. Wilson*, 418 S.W.3d 52, 71 (Tex. 2013). Accordingly, the vast
majority of limited-purpose public figures are such figures because of their own
purposeful actions.

- 33 -

one.  The scope-of-controversy inquiry is highly context-specific and is made all the more difficult here given several factors, including: the multifaceted relationship once shared by the parties; the multiple lawsuits filed across the country once that relationship fractured; the NRA's highly publicized bankruptcy proceedings in which AMc was a party; and the potential dissolution of the NRA's corporate charter at issue in a New York state court, which has also generated considerable media attention.  Given the substantial litigation-related attention that the NRA has recently generated and the NRA's prominence and importance in American political life, it must be admitted that the saga engulfing the NRA over the last few years is, as a whole, a public controversy.

But a person's voluntary participation in one or more aspects of a multi-faceted public controversy does not necessarily render that person a limited public figure for every constituent "sub-controversy."  See *Waldbaum*, 627 F.2d at 1297 n.27 ("Indeed, a narrow controversy may be a phase of another, broader one, and a person playing a major role in the 'subcontroversy' may have little influence on the larger questions or on other subcontroversies.  In such an instance, the plaintiff would be a public figure if the defamation pertains to the subcontroversy in which he is involved but would remain a private person for the overall controversy and its other phases.").  That is, a person may be a public figure for some aspects of a multi-faceted public controversy, but a mere observer for other aspects.  In the court's view, therefore, the

scope of the controversy is limited to the actual dispute within which the defamation claim is situated.[17]  As applied to this case, the issue is whether there is a public controversy surrounding the falling out between AMc and the NRA and its immediate aftermath.  It will not do, then, for the NRA to point to AMc's public and voluntary participation in controversies extraneous to the instant suit, such as the NRA's bankruptcy suit, financial difficulties, or potential dissolution in a New York state court.

The court assumes for purposes of this opinion alone that the dispute, so defined, qualifies as a "public controversy" under *Trotter*'s first element.  Assuming that a public controversy exists, the NRA has not produced facts sufficient to show that AMc is a limited purpose public figure under *Trotter*'s second element.  Specifically, the NRA has not demonstrated that AMc publicly and "voluntarily inject[ed]" itself into the controversy.  *Trotter*, 818 F.2d at 433.  The NRA points to two reasons why AMc purposefully engaged in "the public debate regarding the NRA."  Brief in Support at 13 n.68.  First, the NRA alleges that AMc "'help[ed] the gun rights organization navigate troubled political and societal waters as its principal communication strategist and crisis manager.'"  *Id.* at 13 (quoting SAC ¶ 6).  Second,

_____

[17]       Of course, it would be unduly narrow to limit the "controversy" to the actual words which constituted the defamatory statement.  Nevertheless, the court thinks it necessary to limit the controversy to the actual dispute which gave rise to the contract and tort claims at issue in this litigation.

the NRA points to a Vox Media article in which an anonymous source at AMc allegedly "said, [in the words of another reporter], that the NRA was 'counting on Carry Guard [a now-defunct insurance scheme established by the NRA] to provide revenue after Donald Trump's 2016 election win.'"  Dylan Matthews, *The National Rifle Association, America's Most Powerful Lobby, Claims it's in Financial Crisis. What?* (Aug. 3, 2018) ("the Vox article"); APPX at 21-24.

Neither of these satisfy the second element of the *Trotter* test.  First, AMc's public communications work on behalf of the NRA prior to the instant controversy cannot, by definition, amount to voluntary participation in the controversy, as the work occurred before the controversy's existence.  See *McLemore*, 978 S.W.2d at 573 (asking "whether the plaintiff actually sought publicity *surrounding the controversy*") (emphasis added).  Simply because AMc performed work on behalf of the NRA which eventually resulted in a dispute does not mean that AMc actively sought to thrust itself into the ensuing public controversy.  A contrary conclusion would largely nullify the voluntary-engagement inquiry.  Additionally, AMc's public relations work – though integral to the NRA's success over the last four decades – is simply not the type of activity that constitutes voluntary participation in a controversy.  In its work for the NRA, AMc was not itself "navigat[ing] troubled political and societal waters." Brief in Support at 13.  Rather, it was merely advising the NRA and, perhaps occasionally, speaking on behalf of the Association.  Nor does the Vox article satisfy

- 36 -

the second element.  This is so for two reasons.  First, it is not altogether clear that the anonymous statement allegedly given by an AMc representative pertained to the controversy between AMc and the NRA, as opposed to the general public controversy regarding the NRA's alleged legal and financial woes.  The anonymous statement concerned NRA's alleged reliance on external sources of funding after the election of President Trump and did not reference the fractured relationship between AMc and the NRA or its aftermath.  In other words, the comment related to a different "sub-controversy" or to the general controversy regarding the NRA's alleged financial problems.  Second, even if the statement did pertain to the specific sub-controversy at hand, the alleged comment does not rise to the level of voluntary participation in the controversy.  The alleged anonymous comment is at least once removed from AMc: the article quotes another reporter's reformulation of AMc's statement. *See* The Vox Article at APPX 24 ("The [AMc] source said, as [another reporter] put it, that the NRA was 'counting on Carry Guard to provide revenue after Donald Trump's 2016 election win.'").  When the facts are viewed in the light most favorable to AMc, it is not clear that either (1) the statement is an accurate recitation of the anonymous source's statement, or (2) that AMc intended for the statement to be "on the record."  Simply stated, the Vox article does not show that AMc purposefully inserted itself into the relevant dispute.

Accordingly, viewing the facts in the light most favorable to AMc, the court

concludes that the NRA has failed to demonstrate that AMc is a limited purpose public figure.

### 2. Business Disparagement

AMc appears to argue that the April 25 Board letter constitutes a disparaging statement.  See Response at 11 n.51.  "To prevail on a business disparagement claim, a plaintiff must establish that (1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff."  *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003).  The torts of business disparagement and defamation are "similar in many respects."  *Id.*  For example, a plaintiff may recover special, pecuniary damages under either business disparagement or defamation.  See *Innovative Block of South Texas, Ltd. v. Valley Builders Supply, Inc.*, 603 S.W.3d 409, 418 (Tex. 2020).  Thus, the torts "may overlap in some fact situations," and "a plaintiff may have a claim for defamation, or for business disparagement, or both."  *Id.* at 419 (quotations and citations omitted).  However, "[t]he two torts differ in that defamation actions chiefly serve to protect the personal reputation of an injured party, while a business disparagement claim protects economic interests."  *Forbes Inc.*, 124 S.W.3d at 170.  The key difference, therefore, is "the nature of the alleged falsehoods."  *Innovative Block*, 603 S.W.3d at 418.  That is, "[d]ignitary harm and commercial harm are not the same . . . which is why impugning one's reputation is

possible without disparaging its economic interest and vice versa." *Id.* (quotations, citations, and alterations omitted).  The threshold question, therefore, is whether the statement harms a commercial interest (in which case business disparagement is the proper vehicle) or a reputation interest (in which case defamation is the proper vehicle) or both.

AMc's business disparagement claim fails for two reasons.  First, AMc fails to show how the April 25 Board letter harms its commercial or economic interests, as distinct from its general reputation.  As discussed above, the April 25 Board letter effectively charged AMc with extorting or blackmailing LaPierre.  Although such a charge fits comfortably within the defamation *per se* category by alleging reprehensible or criminal conduct, it is far from clear why this statement should also be considered an affront to AMc's economic or commercial interests.  Cf. *Innovative Block*, 603 S.W.3d at 417-18 ("Thus, if the gravamen of the plaintiff's claim is for special damages (e.g., an economic injury to the plaintiff's business), rather than general damages to its reputation, then the proper cause of action may be for business disparagement.").  The April 25 Board letter certainly does not fit the classic mold of a business disparagement claim wherein the defendant remarks directly on the product or service offered by the plaintiff.  See *id.* at 419 ("The four statements about which Valley complains concern Valley's product.  In these communications, Innovative refers to Valley's concrete blocks and aggregates as 'inferior,' 'bad,' and

'low quality.'").  Nor does AMc offer any reason for believing that its commercial or economic interests are necessarily implicated by the allegedly defamatory *per se* statement contained in the April 25 Board letter.[18]  Although it may be argued that a person's economic interests are *always* implicated by a defamatory *per se* remark, Texas courts usually require "something more direct" regarding the person's product or service, and such a conclusion cuts against the grain of a sharp distinction between economic and reputation interests.  *Id.*  Because AMc does not argue that the April 25 Board letter amounts to a distinct economic or commercial harm in addition to the reputational harm discussed above, the letter cannot form the basis of a business disparagement claim.[19]

Second, even if the April 25 Board letter satisfied the threshold issue for business disparagement, AMc failed to adequately plead special damages.  "Proof of

---

[18]      AMC does not argue, for example, that the special nature of its services depends on the trust that clients place in AMc and that this trust is undermined by false accusations of extortion.

[19]      The court further notes that even if AMc could show special damages resulting from the April 25 Board letter, such a showing does not necessarily demonstrate that the Board letter targeted AMc's economic or commercial interests. A merely defamatory remark may cause incidental economic harm for which a plaintiff may recover special damages under a theory of defamation.  But the mere existence of pecuniary harm does not bring the statement within the ambit of business disparagement.  See *Innovative Block*, 603 S.W.3d at 418 ("Even though defamation's principal purpose is to provide a remedy for reputational harm (a noneconomic injury) plaintiffs may nevertheless recover special damages as well.  The torts thus overlap to the extent that both permit plaintiffs to recovery pecuniary loss.") (citations omitted).  This would be to confuse the nature of the injury with the nature of the alleged falsehoods.  *Id.*

special damages is an essential part of the plaintiffs' cause of action for business disparagement.  The requirement goes to the cause of action itself and requires that plaintiff 'establish pecuniary loss that has been realized or liquidated as in the case of specific lost sales.'"  *Hurlbut, et al. v. Gulf Atlantic Life Insurance Company, et al.*, 749 S.W.2d 762, 767 (Tex. 1987) (citations omitted).  Additionally, "the communication must play a substantial part in inducing others not to deal with the plaintiff with the result that special damage . . . is established."  *Id.*  Several courts in this district and circuit have dismissed business disparagement actions when "the plaintiff only pleads in conclusory terms that she has suffered special damages" or fails to "provide any factual content to support" assertions of special damages.[20]  See, e.g., *Teel v. Deloitte & Touche LP*, 3:15-CV-2593-G, 2015 WL 9478187 at *6 (N.D. Tex. Dec. 29, 2015) (Fish, J.); *Moser v. Omnitrition International, Inc.*, 3:16-CV-2558-L, 2018 WL 1368789 at *4 (N.D. Tex. Mar. 16, 2018) (Lindsay, J.); *Barrash v. American Association of Neurological Surgeons, Inc.*, 4:13-CV-1054, 2013 WL 4401429 at *4 (S.D. Tex. Aug. 13, 2013).  In *Teel*, for example, the plaintiff "alleged that as a direct cause of the defendant's false statements she has been 'unable to find employment' and has

---

[20]    AMc cites *Marquis v. Omniguide, Inc.*, 3:09-CV-2092-D, 2011 WL 321112 at *3 (N.D. Tex. Jan. 28, 2011) (Fitzwater, C.J.), for the proposition that AMc "is not obligated at the pleading stage to produce evidence of direct pecuniary loss."  True, AMc need not produce "proof" or "evidence" of pecuniary loss at the motion to dismiss stage.  Nevertheless, AMc was required to plead facts sufficient to demonstrate such loss under Federal Rule of Civil Procedure 8(a).

'suffer[ed] economical loss'" and "that 'her ability to find work in her profession ha[s] been directly and proximately harmed by [d]efendant's false statements.'" *Teel*, 2015 WL at *6 (citations omitted).  The court held these allegations insufficient under Rule 8(a).  Similarly, AMc provides only conclusory and content-less statements that the Board letter "proximately caused AMc special damages" including "the loss of business."  SAC ¶ 223.  AMc does not provide any detail whatsoever supporting this assertion.  Accordingly, AMc's business disparagement claim fails and must be dismissed.

### 3.  Fraud

AMc alleges three fraudulent statements or categories of fraudulent statements by the NRA, regarding: "(a) NRATV's performance analytics, commentators, and the Third Party NRA Contracts; (b) the extortion narrative, the accusation that AMc leaked confidential information, and the allegation that AMc withheld requested documents to which the NRA was entitled; and (c) the 'fake audits' to support the pre-planned litigation for non-compliance with audits."  Response at 11-12 (quotations and citations omitted).  The court concludes that the first two categories of statements are not fraudulent because (1) neither set of statements induced reliance by AMc on such statements, or (2) otherwise fail under Rule 9(b).  However, the SAC plausibly pleads facts sufficient to support a fraud claim under the third statement.

"To prevail on a fraud claim, a plaintiff must show: (1) the defendant made a material representation that was false; (2) the defendant knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied on the representation and suffered injury as a result." *JPMorgan Chase, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018) (quotations and citations omitted). "The fourth element has two requirements: the plaintiff must show that it actually relied on the defendant's representation and, also, that such reliance was justifiable." *Id.* Under Rule 9(b), a plaintiff alleging fraud "must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). As a rough guideline, the plaintiff must lay out "the who, what, when, where, and how" of the alleged fraud. *Benchmark Electronics, Inc.*, 343 F.3d at 724.

The first set of statements – regarding "NRATV's performance analytics, commentators, and the Third Party NRA Contracts," Response at 11 – cannot sustain a claim of fraud for two reasons. First, AMc's allegations regarding these statements do not meet the heightened pleading standard under Rule 9(b). AMc fails to provide basic details regarding these alleged statements. In particular, AMc does not identify any specific statement by the NRA regarding NRATV or the Third Party NRA Contracts. AMc instead gestures broadly to "[s]tatements of fact made to AMc

personnel by LaPierre on the dates specified hereinabove, and those made repeatedly throughout the duration of the parties' relationship, but particularly during the four (4) years leading up to the filing of this lawsuit." SAC ¶¶ 225. Such generalities fall well short of Rule 9(b) by failing to identify even remotely specific utterances. See *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 179 (5th Cir.) ("These vague pleadings illustrate the practical basis for the requirement that a plaintiff point to *specific statements* made by the defendants.") (emphasis added), *cert. denied*, 522 U.S. 966 (1997). AMc cannot expect such broad allegations to put the NRA on notice of what fraudulent statements it should defend against. Furthermore, the four-year time-period offered by AMc is far too broad to effectuate the purposes of Rule 9(b). See, e.g., *Securities and Exchange Commission v. Felton*, 3:20-CV-0822-G, 2020 WL 7056333 at *5 (N.D. Tex. Dec. 2, 2020) (holding that a twenty-one month time period within which the defendant made certain statements was too broad to satisfy Rule 9(b)). Accordingly, the first set of statements fail under Rule 9(b).[21]

The first set of statements cannot sustain a claim of fraud for yet another reason. Specifically, AMc fails to allege that it actually relied on any particular statement. AMc asserts generally that certain, unspecified statements, "lure[d] [AMc] into exposing itself to financial obligations[] [and] were relied upon by AMc

---

[21]    Any statements regarding the Third Party NRA Contracts fail for the same reasons.

to its detriment." SAC ¶ 225. However, AMc does not identify in any detail whatsoever the nature of its reliance and fails to link any specific statement with reliance. Indeed, the contrary appears to be true: in one of the only specific statements by the NRA identified in the SAC, AMc clearly acknowledges that it *did not* rely on it. See *id.* ¶ 31 ("In an effort to maintain the flow of sponsorship dollars [generated through NRATV], however, LaPierre instructed AMc to 'fake it,' as in, make it appear that [NRATV] programs remained robust despite significant funding loss. AMc *refused the instruction to 'fake it'* . . . .") (emphasis added). Accordingly, the first set of statements do not satisfy Rule 9(b) nor the elements of fraud.

The second set of statements – regarding "the extortion narrative, the accusation that AMc leaked confidential information, and the allegation that AMc withheld requested documents to which the NRA was entitled, Response at 12 – suffers a similar fate. First, AMc admits that these statements were not directed to AMc itself but to "other persons, including the NRA Board members and related NRA decision-makers and the public, with the intent that these individuals would rely upon those statements to ostracize [AMc] and to support the NRA.." SAC ¶ 226. Under Texas law, however, it is clear that a party "cannot recover for fraudulent statements made to others that he did not later rely on himself." *Charalambopoulos v. Grammar*, 3:14-CV-2424-D, 2015 WL 390664 at *23 (N.D. Tex. Jan. 29, 2015) (Fitzwater, J.). That the fraudulent statement must be made to the

plaintiff is baked into the elements of fraud.  See *Orca Assets G.P., L.L.C.*, 546

S.W.3d at 653 (noting that one of the elements of fraud is that "the defendant

intended to induce *the plaintiff* to act upon the representation") (emphasis added)

(quotations omitted).  Stated differently, common law fraud does not encompass any

free-floating false statement on which someone, somewhere relies, even if the third-

party's reliance affects the plaintiff.  Second, as with the first category of statements,

AMc does not allege – and the court cannot locate – any reliance by AMc on the

second category of statements.  The SAC alleges only that "other NRA Board

members and the public have relied upon (and continue to rely upon) these

statements."  SAC ¶ 226.  Accordingly, the second category of statements cannot

sustain a claim of fraud.

      AMc has pleaded facts sufficient to uphold a claim of fraud related to the FRA

audit.  First, AMc clearly specifies which statement is alleged to be fraudulent.

Specifically, AMc alleged that during the October 11, 2018 meeting, LaPierre, on

behalf of the NRA, "pled with AMc to 'stick with him'" and assured AMc that it

"would no longer have to deal with Brewer" or BAC.  SAC ¶ 76.  LaPierre allegedly

repeated that promise to "another AMc employee during a December 2018 phone

call."  *Id.*  Toward the end of the October 11 meeting, "LaPierre looked around to

each of the AMc representatives and asked them whether they would stick with him

if he did in fact make sure that Brewer [and BAC] . . . were no longer involved with

AMc." *Id.* ¶ 77.  Thus, the statement satisfies Rule 9(b)'s particularity requirement.

LaPierre's statements also satisfy the basic elements of fraud.  Specifically, if the SAC is assumed to be true, AMc relied on LaPierre's representation that it would not have to deal with BAC.  See *id.* ¶ 76.  Prior to the October 11 meeting, "AMc decided that if LaPierre, Spray, Brewer, and other NRA officials were not willing to change their recent practices, AMc would resign the NRA's business entirely." *Id.* ¶ 73.  Furthermore, LaPierre's statements were directed at AMc.  Finally, LaPierre's representation appears to be effectively – if not technically – false because AMc "agreed to the third audit with [FRA], believing the audit company to be independent from Brewer and Powell, based on LaPierre's promise."  Response at 14.  As it turned out, FRA employed Susan Dillon, who had joined FRA at the end of 2018 after working as the Director of Consulting at BAC for over 17 years.  See *id.*

The NRA's sole argument asserted against this claim is that AMc suffered no "discernable injury" except that "the audits resulted in litigation against [AMc] – *i.e.*, that by exercising its lawful contractual record-inspection right, the NRA discovered information that led it to file" suit.  Brief in Support at 17.  In the NRA's eyes, "AMc alleges that it was 'defrauded' because the NRA, upon obtaining records to which it was unambiguously entitled, sued to vindicate violations of its rights which the documents revealed," and that "the NRA's commencement of litigation was not a 'pecuniary loss' to [AMc]." *Id.*  AMc counters that it has sustained pecuniary losses

resulting from the audits in several respects.

> Not only did the NRA subject AMc to further work under the Services
> Agreement for which AMc has not been paid – when AMc was ready to
> terminate the contract but for LaPierre's promise – but the NRA also
> subjected AMc to (a) numerous audits that cost money and time, (b)
> defamatory animus relating to the purported results of those audits, or
> alleged noncompliance therewith, and (c) lawsuits in Virginia and Texas
> based upon information allegedly obtained from the audits – all while
> shielding the information as privileged in an impermissible sword-shield
> maneuver, which further requires attorney time and fees. The lawsuits
> themselves *are* damages when neither the auditors complained nor
> LaPierre believed any documents were withheld – meaning the lawsuits
> are frivolous.

Response at 15 (citations omitted). At this stage, the court is satisfied that AMc has

suffered pecuniary damages. However, the parties have not briefed – and the court

does not address – whether AMc was already contractually obligated to release the

documents irrespective of whether BAC was involved in the audit and, if so, whether

such an obligation defeats AMc's claim.

### 4.  Tortious Interference with Contract

"The elements of a cause of action for tortious interference with a contract are:

(1) the existence of a contract subject to interference, (2) the occurrence of an act of

interference that was willful and intentional, (3) the act was a proximate cause of the

plaintiff's damage, and (4) actual damage or loss occurred." *Holloway v. Skinner*, 898

S.W.2d 793, 795-96 (Tex. 1995).

The core of AMc's tortious interference claim is that the NRA "refused its

contractual commitment to reimburse AMc for the costs associated with the Third

Party NRA contracts, thus preventing AMc from funding salaries and costs associated therewith." SAC ¶ 216. AMc further contends that "[t]he NRA's refusal to reimburse AMc has caused said contracts to lapse due to non-payment, thereby proximately causing injury to AMc and to the talents affected . . . ." *Id.* ¶ 217. The NRA argues, *inter alia*, that AMc's tortious interference claim is barred under the economic loss rule. Brief in Support at 20-21. The court agrees with the NRA that the economic loss rule precludes AMc's tortious interference claim.

"Under Texas law, the economic loss rule generally prevents recovery in tort for purely economic damage unaccompanied by injury to persons or property." *Golden Spread Electric Cooperative, Inc. v. Emerson Process Management, Inc.*, 954 F.3d 804, 808 (5th Cir. 2020). The purpose of the rule is "to avoid the availability of both tort and contract liability for the same conduct and the same kind of harm or loss." *National Union Fire Insurance Company v. Care Flight Air Ambulance Service, Inc.*, 18 F.3d 323, 326 (5th Cir.), *cert. denied*, 513 U.S. 916 (1994).[22] "The Texas Supreme Court has unequivocally adopted a broad interpretation of the economic loss rule." *Memorial Hermann Healthcare System, Inc. v. Eurocopter Deutschland, GMBH*, 524 F.3d 676, 678 (5th Cir. 2008). Two particular policy considerations underlie the

---

[22]     Though, to be clear, "Texas cases also recognize that when certain legal relationships exist between contracting parties, the law may impose affirmative duties that are separate and apart from the contractual promises made between those parties." *Id.*

economic loss rule.  First, "[p]urely economic harms proliferate widely and are not self-limiting in the way that physical damage is, possibly leading to indeterminate liability and pressure to avoid economic activity altogether."  *Golden Spread*, 954 F.3d at 808.  Second, contracting parties are capable of "consider[ing] their positions and manag[ing] risks ahead of time."  *Id.*

"To determine whether conduct that breaches a contract can also be a tort, Texas law requires a court to look to the origin of the duty owed and the nature of the resulting injury."  *National Union Fire Insurance Company*, 18 F.3d at 326.  Texas courts "do not look to the manner in which a cause of action was pled, but instead look *to the substance* of the cause of action."  *Shopoff Advisors, LP v. Atrium Circle, GP*, 596 S.W.3d 894, 909 (Tex. App. – San Antonio 2019, no writ) (quotations and citations omitted) (emphasis in original).  One helpful rule of thumb in discerning whether the defendant's conduct constitutes an independent tort is to inquire whether, if the defendant fully complied with the contract, the plaintiff could still sue under tort.  *Lincoln General Insurance Company v. United States Auto Insurance Services, Inc.*, 787 F.3d 716, 726 (5th Cir. 2015).  If not, the plaintiff's sole remedy lies in contract.

AMc's tortious interference claim is reducible to the NRA's refusal to honor "its contractual commitment to reimburse AMc for the costs associated with the Third Party NRA contracts."  SAC ¶ 216.  The "interference," according to AMc, is

that the "NRA's refusal to reimburse AMc caused said contracts to lapse due to non-payment." *Id.* ¶ 217.  AMc's tortious interference claim falls within the economic loss rule for several reasons.  First, the source of the NRA's obligation to reimburse AMc for costs associated with the Third Party Contracts is purely contractual.  Indeed, AMc appears to admit as much.  See *id.* ¶ 216 (describing the NRA's commitment as "contractual").  Absent some contractual commitment, the NRA would plainly have no obligation to reimburse AMc for the Third Party Contracts.  AMc attempts to surmount this obstacle by arguing that the NRA has a non-contractual duty "not to tortiously interfere" with other contracts.  Response at 23.  But this tautology gets AMc nowhere: the economic loss rule cannot be overcome by the mere allegation of the tort in which it is supposed to bar.  See *Shopoff Advisors, LP*, 596 S.W.3d at 909 (courts must "look to *the substance* of the cause of action," not the manner in which it was pled) (emphasis original).  Second, the nature of AMc's injury is purely economic.  AMc does not allege an independent harm to person or property – a hallmark of independent tort claims.  Indeed, had the NRA fully performed its obligation to reimburse, AMc would have suffered no harm for tortious interference whatsoever.  Finally, the policy considerations underlying the economic loss rule support its application here.  First, because money is fungible, to hold that a defendant's breach of contract amounts to tortious interference with another contract which in turn depends on performance of the defendant's contract could open a

floodgate of tortious interference claims.  See *Holloway*, 898 S.W.2d at 796 ("Were this not the rule, virtually every failure to pay a corporate debt would constitute a prima facie case of tortious interference against the corporate officer who decided not to pay the debt.").  Second, AMc was well aware of the possibility that the NRA would renege on its obligation to reimburse it for the Third Party Contracts and had the ability and capacity to negotiate accordingly.  This case is therefore unlike situations in which the plaintiff receives a product harboring an unforeseeable defect.  See *Golden Spread*, 954 F.3d at 812.  Accordingly, AMc's tortious interference claim is barred by the economic loss rule and must be dismissed.

### 5.  Civil Conspiracy

AMc asserts that "[t]he NRA, LaPierre, Powell, Brewer, and [BAC] combined to conspire against AMc."  SAC ¶ 233.  AMc asserts that the objects of the conspiracy were to defame AMc, tortiously interfere with its contracts, and defraud it.  *Id.* ¶¶ 234-36.  The NRA argues that AMc's conspiracy claim "fails . . . for two reasons: first, [AMc's] claims are barred by the economic loss doctrine; and second, to the extent [AMc's] conspiracy theory is tied to the required underlying torts . . ., the conspiracy theory fails if the underlying torts that allegedly serve as its foundation are dismissed."  Brief in Support at 18.[23]

---

[23]      The NRA also asserted in its Preliminary Statement to its motion to dismiss that the conspiracy claim should be "barred by the intra-party conspiracy doctrine."  *Id.* at 2-3.  However, the NRA did not mention this doctrine at any point

The NRA is correct that "civil conspiracy is not an independent tort." *Adams v. Alcolac, Inc.*, 974 F.3d 540, 544 (5th Cir. 2020) (per curiam).  A plaintiff must first demonstrate the existence of an underlying tort to plausibly plead civil conspiracy to effectuate that tort.  Accordingly, AMc's civil conspiracy claim regarding the NRA's tortious interference with the Third Party Contracts fails because the underlying claim is subject to dismissal.  However, AMc's defamation and fraud claims are not in the same category.

The NRA asks the court to dismiss the defamation and fraud claims on the ground that both are barred by the economic loss rule.  The court declines to do so.  As explained above, "to determine whether conduct that breaches a contract can also be a tort, Texas law requires a court to look to the origin of the duty owed and the nature of the resulting injury." *National Union Fire Insurance Company*, 18 F.3d at 326.  Clearly, the origin of the duty to refrain from defaming another is found in tort law rather than contract.  The NRA owed AMc such a duty irrespective of any contractual relationship.  More importantly, defamation injures one's property in the form of damage to reputation and such damage is not purely economic.  Accordingly, the economic loss rule does not bar AMc's claim for defamation or conspiracy to commit defamation.  Nor does the economic loss rule bar AMc's fraud claim.

------

throughout the motion to dismiss.  Accordingly, the court does not consider the argument.

Although the injury is admittedly economic, AMc does not (and, indeed, could not) assert a contractual injury resulting from the alleged fraud. Thus, the central concern animating the economic loss rule – prohibiting tort damages for purely economic harms when a remedy under contract is available – does not apply. Accordingly, the fraud claim is not barred by the economic loss rule and AMc's conspiracy claim survives the NRA's motion to dismiss.[24]

## 6.  Declaratory Judgment

Finally, AMc asks this court for "a declaration . . . that, by their actions, the NRA and its counsel have waived and/or are estopped from claiming that the confidentiality provision of the Services Agreement applies only to AMc." SAC ¶ 241. "Alternatively, AMc seeks a declaration . . . that the confidentiality provision of the Services Agreement is unconscionable" under Virginia law. *Id.* ¶ 243.

At this stage, the court is satisfied that AMc plausibly states a claim for declaratory relief.[25] However, factual questions remain as to whether the NRA

---

[24]    The court will not consider AMc's conspiracy claim insofar as it concerns the NRA's general counsel, Brewer, or BAC. See *Heffernan v. Hunter*, 189 F.3d 405, 413 (3rd Cir. 1999) (barring conspiracy claim between counsel and client so long as challenged conduct occurs within scope of representation). "[T]he mere fact that attorneys have 'mixed motives,' such as 'enhancing' their reputation by aggressive representation, does not remove their conduct from the scope of the agency." *Id.*

[25]    After reciting the elements of estoppel under Virginia law, the NRA merely asserts that "[h]ere, [AMc] fails to meet any of the requirements for estoppel or waiver" but gives no detail as to why this is so. Brief in Support at 21. The court will not create arguments on the NRA's behalf.

waived the its rights under the confidentiality clause or is otherwise estopped from invoking it as a "sword" or "shield" in this or other litigation. Accordingly, the NRA's motion to dismiss AMc's claim for declaratory judgment is denied.[26]

III.  <u>CONCLUSION</u>

For the reasons set forth above, the NRA's motion to dismiss is **GRANTED** in part and **DENIED** in part.

**SO ORDERED**.

August 16, 2021.

_A. Joe Fish_
A. JOE FISH
Senior United States District Judge

---

[26]     The court withholds decision on AMc's alternative unconscionability argument.

- 55 -
