## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| *Plaintiff and Counter-Defendant,* | § § | |
| **v.** | § § | **Case No. 3:19-cv-02074-G** |
| **ACKERMAN MCQUEEN, INC.,** | § § | |
| *Defendant and Counter-Plaintiff,* | § § | |
| **and** | § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, AND MELANIE MONTGOMERY** | § § § | |
| *Defendants.* | § | |

## PLAINTIFF'S STATUS REPORT ON OUTSTANDING DISCOVERY ISSUES

## <u>TABLE OF CONTENTS</u>

I.     OVERVIEW ..................................................................................................1

II.    DISCOVERY REMAINING TO BE CONDUCTED........................................2

A.     Outstanding Depositions ..............................................................................2

       1.     Andrew McLean ...............................................................................2

       2.     Brian Buss .........................................................................................2

       3.     Daniel Jackson ..................................................................................3

       4.     Gary Goolsby .....................................................................................3

       5.     Oliver North ......................................................................................3

       6.     Wilson H. "Woody" Phillips ............................................................4

       7.     Potential Additional Deposition Testimony Regarding NRATV ...........4

B.     Fact Discovery: Document-Production Deficiencies....................................5

       1.     Defendants' Refusal to Produce Documents Vintaged Pre-2018............5

       2.     Defendants' Apparent Failure to Collect Records from Key Custodians.........7

       3.     Deficiencies in Production of Expense Records.................................8

       4.     Privilege-Log Disputes .....................................................................8

C.     Expert Discovery Deficiencies.....................................................................9

       1.     NRATV:  Marketing Metrics;  Dashboard Creation and Use; and, Social
              Media Access Codes..........................................................................9

       2.     NRATV:  Damages Analysis, AMc Alleged Expenses......................17

       3.     NRA Damages Related To AMc's Billing Practices And Its Opposition To
              AMc's Contract Claims For Damages. ..............................................18

III.   SIGNIFICANCE AND IMPACT OF OUTSTANDING DISCOVERY ..........19

A.     Unresolved Issues Concerning Pre-2018 Documents Preclude Summary Judgment
       on the Parties' Tort Claims—And, Potentially, Their Contract Claims. ............19

B.     Unexplained, Serious Gaps In Defendants' Document Collection Preclude
       Summary Judgment on Any of the Parties' Claims or Defenses....................20

C.    Deficiencies in the Production of "Out-of-Pocket" Expense Records Preclude Summary Judgment on the Parties' Tort and Contract Claims. ........................................21

D.    Outstanding Depositions Preclude Summary Judgment. ...................................21

E.    Deficiencies in the Production of Documents and Data Pertaining to Experts' Opinions Impact Summary Judgment—As Well As Pending Motions to Strike Expert Testimony. ...............................................................................................22

       1.    NRATV: Marketing Metrics; Dashboard Creation and Use; and Social Media Access. ..................................................................................22

       2.    NRA's: Damages Analysis; NRATV and AMc's Billing Practices. ....................23

       3.    AMc's Contract Claim And AMc's Alleged Damages. ........................................24

IV.    MOTIONS AND ISSUES PENDING BEFORE THE COURT ......................................24

V.    WHY THE PARTIES ARE NOT IN COMPLIANCE WITH THE COURT'S SCHEDULING ORDER .....................................................................................25

## I.   <u>OVERVIEW</u>

Over two years ago, the NRA was forced to sue its then-largest vendor, AMc, for specific performance of a contractual books-and-records examination clause.  What should have been a routine and uncontroversial examination became a multi-year litigation after AMc groundlessly withheld documents the NRA had a right to examine.   Since then, the parties have litigated extensively across multiple fora—and this action (which was interrupted by a bankruptcy proceeding lasting several months) has exceeded its originally scheduled discovery timetable. Unfortunately, even at this advanced stage of the parties' dispute, the problem that spawned it persists: key documents and information that the NRA is entitled to see are being withheld. Backup information for travel expenses, required written authorizations for invoices for amounts in excess of negotiated budgets and more—remain the subject of unresolved discovery. This problem is particularly acute with respect to NRATV, a mega-million dollar flagship streaming-video product which NRA invested in based on Defendants' representations about its potential revenues. Having induced NRA to invest in the product, Defendants then convinced the Association to continue pouring resources into it using performance metrics that were ambiguously sourced, poorly explained, and contrived to cover the fact that the product was doomed to financial failure.   As detailed below, the NRA committed to the swift completion of discovery and the trial of the parties' claims.   However, gaps in Defendants' document production, contradictions in their positions relative thereto and ambiguities that continue to emerge from deposition testimony, threaten to continue to delay discovery. Importantly, those same issues prevent resolution of any claims or defenses pursuant to pending summary judgment motions.  The NRA respectfully seeks and welcomes the Court's guidance on resolution of the outstanding discovery issues set forth below.

## II.     DISCOVERY REMAINING TO BE CONDUCTED

As of the date of this submission, several fact and expert depositions remain to be conducted. These depositions were delayed due to a combination of witness and counsel schedule conflicts, including an unanticipated funeral and an unanticipated surgical procedure.  In addition, recent discovery underscores serious deficiencies in Defendants' document production, including: an apparent failure to collect any documents from any of the computers used by key Ackerman executives;[1] failure to produce complete documentation for disputed travel and entertainment expenses billed to the NRA;[2] and, failure to furnish data integral to the analyses put forth by both Plaintiff's and Defendants' experts.  Immediately prior to the receipt of the Court's August 26, 2021, Order soliciting this Status Report, the NRA dispatched several meet-confer letters[3] attempting to redress these deficiencies or, in the alternative, satisfy the meet-confer requirement for the submission of a motion to compel.  Hopeful that this Report may provide an expedient avenue to resolve the parties' disputes, the NRA details its concerns below.

### A.     Outstanding Depositions

#### 1.  Andrew McLean

Andrew McLean is an expert offered by the NRA concerning industry-standard record-keeping and billing practices for public relations and advertising firms.  Mr. McLean's deposition was delayed after an unexpected death in his family overseas.[4]

#### 2.  Brian Buss

Brian Buss is an expert offered by the NRA concerning the valuation of NRATV.  His

---

[1] *See* Rogers Decl. Ex. A-6 (S. Rogers Letter to B. Mason dated Aug. 25, 2021) at 1 [APP119-122].
[2] *See id.* at 2 (discussing Tony Makris expense documentation).
[3] *See* Rogers Decl. Exs. A-6 [APP119-122], A-10 [APP133-136].
[4] *See* Rogers Decl. Ex. A-10 (S. Rogers email to C. Carroll dated Aug. 24, 2021) at 2. [APP133-136].

deposition was delayed due to scheduling conflicts on the part of the witness[5] and Defendants' counsel.[6]

### 3. Daniel Jackson

Daniel Jackson is an expert offered by Defendants concerning damages. His deposition was delayed due to counsel's illness.[7] Additionally, Defendants have taken the position that the entirety of Mr. Jackson's expert report merits a "Highly Confidential" designation prohibiting its review by the NRA's outside counsel, Mr. Brewer, which has impeded the NRA's preparation for the deposition and is impeding its preparation for trial.[8]

### 4. Gary Goolsby

Gary Goolsby is a forensic litigation consulting and accounting expert offered by the NRA concerning the propriety of AMc's invoicing practices. Although Mr. Goolsby's deposition already occurred, Defendants sought and the NRA agreed to continue it on a future date.

### 5. Oliver North

Lt. Col. Oliver North is a former employee of Ackerman; Ackerman has indicated that it intends to use deposition testimony by North from a prior proceeding at trial.[9] The NRA subpoenaed North, and Defendants indicated they will cross-subpoena him, in this proceeding.[10] Despite attested proof of service, North claimed via his counsel that he did not receive the NRA's subpoena, and failed to appear for his deposition.[11] The parties are in the process of rescheduling his deposition.

---

[5] See Rogers Decl. Ex. A-11 (S. Rogers email dated Aug. 15, 2021) [APP137-138].
[6] See Rogers Decl. Ex. A-12 (C. Carroll email dated Aug. 23, 2021) [APP139-141].
[7] See Rogers Decl. ¶ 34 (discussing delays due to illness). [APP001-009].
[8] See Rogers Decl. ¶¶ 12, 35; see id. Ex. A-7 (S. Rogers Letter to B. Mason dated Aug. 25, 2021) (regarding "Highly Confidential" designations) [APP 123-126].
[9] See Rogers Decl. Ex. A-13 (B. Mason Letter to S. Rogers dated Jul. 31, 2021). [APP 142-144].
[10] See Rogers Decl. Ex. A-14 (S. Cady email dated Aug. 26, 2021). [APP145-148].
[11] See id.

6. __Wilson H. "Woody" Phillips__

Wilson H. "Woody" Phillips is a non-party witness and former officer of the NRA. Mr. Phillips was subpoenaed by Defendants for a deposition in the above-captioned matter, but it is the NRA's understanding that he was unable to appear, including by reason of conflicts with a deposition schedule in another matter, until August 30, 2021. On the record at Mr. Phillips' deposition, the NRA stated that it has substantial examination for Mr. Phillips; however, neither Mr. Phillips' counsel nor the court reporter were able to continue the deposition into the evening as necessary to accomplish such questioning. The NRA requested a date for completion of Mr. Phillips testimony.

7. __Potential Additional Deposition Testimony Regarding NRATV__

As set forth below, the discovery record demonstrates the starkly deficient viewership and performance metrics that underlay Defendants' representations to the NRA regarding AMc's multi-million dollar flagship product, NRATV. The deficiencies include the data allegedly supporting the NRATV performance "dashboard" shown to NRA executives.[12] Unfortunately, the NRA's attempts to inquire into these items has been impeded. For example, none of Defendants' Rule 30(b)(6) designees could explain how the figures contained in the dashboard were chosen or sourced, or by whom.[13] Although the NRA is endeavoring to complete outstanding discovery rather than propound new discovery, fact issues concerning the performance of NRATV, and the deficiencies in the record regarding the same, are sufficiently serious that additional deposition testimony—such as a continued deposition of Ackerman's Rule 30(b)(6) designee, or a deposition of a representative of Performance Improvement Partners ("PIP") (the vendor that managed the NRATV "dashboard") is necessary to allow a trial on the merits—on this critically important topic.

---

[12] *See* discussion *infra* Section II.C.1.
[13] *See* discussion *infra* note __Error! Bookmark not defined.__.

**B.**     **Fact Discovery: Document-Production Deficiencies**

    **1.**     **Defendants' Refusal to Produce Documents Vintaged Pre-2018**

Ackerman's Second Amended Counterclaims (the "Counterclaims")[14]—and the NRA's affirmative claims—are replete with allegations about communications, relationships, and events that occurred before 2018. Certain counterclaim allegations (the "Pre-2018 Allegations") unambiguously relate to the pre-2018 time period. For example:

- Ackerman purports to detail the parties' course of dealing under the prior Services Agreement dating back to 1999, the 2017 Services Agreement and a 2018 amendment.[15] Ackerman relies heavily on course-of-dealing allegations from the parties' "nearly 40-year business relationship" in construing the Services Agreement's record-inspection and "designee" clauses.[16]

- Ackerman accuses the NRA of "secrecy" and deception in connection with specific expense reimbursements made during 2017.[17]

- Ackerman alleges that NRATV was "created and expanded at the sole direction of LaPierre" beginning in the 1990s, and alleges a discrete timeline of developments surrounding the expansion of NRATV spanning the years 2000-2016.[18]

- Ackerman alleges that LaPierre instructed AMc to "fake" the success of certain programs "in the wake of . . . the 2014 mid-term elections"—an outrageous accusation that warrants thorough discovery in a case, like this one, where both sides allege fraud.[19]

- The Counterclaims contain allegations regarding media generated for the Trump 2016 campaign, and the continued use of certain Trump-related media in 2017.[20]

- The Counterclaims make salacious allegations about outside counsel's relationship with his in-laws spanning "over 20 years."[21]

The NRA's affirmative claims, set forth in its Second Amended Complaint (the "SAC")[22], likewise reference pre-2018 events, including:

---

[14] ECF No. 238-1

[15] *See* ECF No. 241 ¶ 13.

[16] *See, e.g.*, ECF No. 241 ¶ 71. Importantly, although such discovery is relevant, the parties' course of dealing cannot alter the meaning of contract provisions reaffirmed subject to an integration clause.

[17] *Id.* ¶ 22, note 7.

[18] *Id.* ¶ 28.

[19] *Id.* ¶ 31.

[20] *Id.* ¶ 32-33.

[21] *See, e.g., id.* ¶ 55.

[22] ECF No. 209.

---

- AMc's representations in connection with the development and launch of NRA News in 2004-2014[23] and NRATV in 2016;[24] and

- Decades of trust and confidence that gave rise to a fiduciary relationship under Virginia law.[25]

Mindful of the burden that would be imposed by comprehensive discovery of documents spanning the entire length of the parties' relationship, the NRA generally served document requests specifying a responsive timeframe of January 1, 2015, to present.[26] In response, AMc consistently refused to produce documents vintaged prior to January 1, 2018.[27]

Consistent with the Court's *Standing Order on All Discovery Matters*,[28] the parties initially briefed their dispute concerning Defendants' refusal to produce pre-2018 documents within a Joint Status Report submitted to Magistrate Judge Toliver on October 23, 2020 (such report, the "October JSR").[29] Over subsequent months, continued discovery—and amendments to operative pleadings—underscored the relevance of the pre-2018 time period. With the Court's August 6, 2021, discovery deadline rapidly approaching, the NRA briefed a follow-up motion to compel all relevant pre-2018 documents—or, in the alternative, to strike Ackerman's Pre-2018 Allegations— on August 3, 2021.[30] On the pretense of an imminent, negotiated resolution, Defendants unilaterally deleted the NRA's arguments regarding this issue before submitting the parties' August JSR[31] to the Court.[32] Although Defendants say that they have produced a smattering of pre-2018 documents on discrete topics,[33] Defendants have not represented that their production is

---

[23] ECF No. 209 ¶¶ 29, 30.
[24] ECF No. 209 ¶ 32.
[25] ECF No. 209 ¶¶ 19, 177.
[26] ECF No. 48, Ex. A at p. 8.
[27] ECF No. 48, EX. B at p. 3.
[28] *See* ECF No. 62.
[29] *See* October JSR (ECF No. 180) at 11 (discussing date-range issue).
[30] *See* Rogers Decl. Ex. A-10 at 1. [APP133-136].
[31] The "August JSR" refers to the Joint Status Report submitted August 12, 2021, regarding Ackerman's purported emergency motion to compel the deposition of the NRA's outside counsel. *See* discussion *infra* at Section IV.
[32] *See* Rogers Decl. Ex. A-10 at 1. [APP133-136].
[33] *See* Rogers Decl. Ex. A-10 (S. Rogers email to C. Carroll dated Aug. 24, 2021) (email chain discussing Defendants' production of pre-2018 documents on specified topics). [APP133-136].

complete, or even substantially complete, with respect to the 2015-2018 timeframe sought by the NRA. Thus, such discovery remains outstanding.

### 2.   Defendants' Apparent Failure to Collect Records from Key Custodians

As detailed in a meet-confer letter sent by the NRA on August 25, 2021, the deposition of Ackerman's Chief Executive Officer, Revan McQueen, conducted on August 23, 2021, revealed severe gaps in Defendants' document-collection efforts.[34]  Among other things, Mr. McQueen testified that he could not recall *anyone* collecting *any* records from his laptop computer or desktop computer, nor from multiple iPhones he used for work-related purposes during the pendency of this lawsuit and the period leading up to it.[35]  Although Defendants appear to have collected and produced *emails*, discovery has made clear that Ackerman executives avoided transmitting sensitive documents, especially drafts, via email—instead sharing copies in sealed envelopes[36] or by printing and scanning them.[37]  Thus, a failure to collect from the computers, devices, and offices of key custodians deprives the NRA of discovery, and the Court of evidence, regarding how certain pivotal documents were prepared, and by whom, and what edits were made.  Indeed, it is likely that crucial, heretofore-unknown documents exist which were typed, printed, and discussed or transmitted in hard-copy form without ever being emailed—rendering them invisible in this litigation. It is imperative that the NRA understand the extent of any document-collection gaps and the volume and nature of responsive material outstanding, so that a prompt order compelling production—or, at this late stage of this litigation, an adverse inference—can be fashioned.

---

[34] *See* Rogers Decl. Ex. A-6 (S. Rogers Letter to B. Mason dated Aug. 25, 2021 re: "Document Issues"). [APP119-122].
[35] *See* Rogers Decl. Ex. A-16, McQueen Deposition at 19:15-18; 20:12-21; 23:5-8; 26:2-10. [APP159-167].
[36] *See* Rogers Decl. Ex. A-17, Montgomery Deposition at 80:21-81:2. [APP168-176].
[37] *See, e.g.*, Rogers Decl. Ex. A-15 (draft letter printed and scanned by Mr. McQueen's assistant). [APP149-158].

### 3. Deficiencies in Production of Expense Records

Travel and entertainment expenses incurred by Defendants and invoiced to the NRA are an important issue in this litigation, including in connection with pending motion practice.[38] One of the central figures in this analysis is a Mercury executive, Tony Makris, whose "out-of-pocket" expenses were passed through to the NRA without the customary layer of review by account executives Melanie Montgomery and Lacey Duffy and in violation of the parties' contract and Defendants' fiduciary duties.[39] Defendants purported to produce records substantiating these "out-of-pocket" expenses and evidencing their business purpose—but when confronted at his deposition with the lack of such information in the documents Ackerman produced. Mr. Makris was asked if the materials produced represented "the totality of the documentation" that would have been maintained by Defendants regarding his expenses, Mr. Makris answered emphatically: "Not at all."[40] By letter dated August 25, 2021, the NRA requested that Defendants to confirm that all expense documentation was produced.[41] Defendants have not responded, and this item remains outstanding.

### 4. Privilege-Log Disputes

Although both the NRA and AMc have served privilege logs, the parties have not exhausted meet-confer efforts regarding deficiencies in these logs or potential challenges to one another's privilege claims. The NRA expects to coordinate with Defendants imminently on a joint status report concerning privilege issues.

---

[38] *See, e.g.,* NRA Am. Opp. Mot. Partial Summary Judgment (ECF No. 314) at Section IV.A.1 (alleging prior material breach as a bar to summary judgment on breach-of-contract claims); *id.* at Section IV.E.2, p. 42 (discussing so-called "out-of-pocket" expenses by Mercury executive Tony Makris).
[39] *See* Rogers Decl. Ex. A-17, Montgomery Deposition at 149:08-12. [APP168-176].
[40] *See* Rogers Decl. Ex. A-18, Makris Deposition at 144:20-23; 145:5-16. [APP177-183].
[41] *See* Rogers Decl. Ex. A-6 (S. Rogers Letter to B. Mason dated Aug. 25, 2021 re: "Document Issues") at 3. [APP119-122].

C.   **Expert Discovery Deficiencies**

   1.  **NRATV:  Marketing Metrics; Dashboard Creation and Use; and, Social Media Access Codes.**

   i.   Background:  Recent Discovery Disclosures.

AMc persuaded the NRA to agree to establish NRATV through a series of representations concerning its alleged benefits, including monetization—namely, the ability to pay for itself through additional sponsorship.[42]   Relatively quickly the NRATV budget ballooned[43] to the point where all of NRA's advertising dollars were being absorbed by NRATV.[44]   Naturally, the NRA requested performance metric data that would enable it to access the progress being made toward achieving the goals for the product., AMc contracted with Performance Improvement Partners ("PIP") to provide metric analysis.  PIP allegedly created some type of a Dashboard to display the metrics.[45]   In addition to the approximately $40,000,000 that the NRA paid to AMc with respect to its management of NRATV, it also paid for the creation of the Dashboard.[46]

Important discovery remains to be conducted with respect to the Dashboard and the metrics within it, as the recent exchange of expert reports and discovery has revealed.  For example, on

---

[42] *See* Rogers Decl. Ex. A-19, LaPierre Deposition at 258:3-4. [APP184-189].

[43] AMc's expert witness concerning marketing metrics attaches to his Report "2018 and 2019 Budget Comparisons." Rebuttal Expert Report, Dr. Richard Bergin ("Bergin Report"), Appendix 2:  Materials Considered, page 51. (Declaration cite).  As those "Budget Comparisons" show NRATV was the NRA's largest budget item. For example, the 2019 NRATV Budget was $15,405,098 out of the 2019 Total Budget of $25,718,436. In 2018, the NRATV Budget was $13,619,954 and the NRA's Total Budget was $31,212,786. Bergin testified that he reviewed the Budget information because it was supplied by counsel for AMc but he did not consider the budget calculations for purposes of rendering his opinion.  Rogers Decl. Ex. A-20, Bergin Deposition, at 14:15-24. [APP190-212].

[44] Wayne LaPierre testified as follows:  "But what I made very clear to the Board and to Ackerman and to our treasurer's office was that we need to set up – we needed to set up landing pages for all of these people on this [NRA]TV network because it's eating up all of our ad money, and if we can't translate that into membership and **if we can't translate it into – into contributions and memberships, we're going to have to cut it back.** Because if people are really watching it like you say they are, we ought to be able to translate that into members and money." *(emphasis added).* Rogers Decl. Ex. A-19, LaPierre Deposition, at 264:22-265:7. [APP184-189]. LaPierre started to have concerns that it was eating up all of the NRA's advertising money in 2017. *Id.,* 261:4-12.

[45] Rogers Decl. Ex. A-5, Bergin Report, p. 9, ¶ 14. [APP062-118].

[46] *See* Rogers Decl. Ex. A-17, Montgomery Deposition, at 168:4-6. [APP168-176].

June 1, 2021, Jonathan E. Hochman submitted an expert report on behalf of the NRA.[47]  In that report, he opined that the performance metrics that AMc provided to the NRA with respect to its over $40,000,000 internet marketing investment were "vanity metrics," embodied in glossy, slick, colorful PowerPoints, labeled "reports" by AMc.[48]  Hochman notes that the vanity metrics contained in the AMc reports are virtually meaningless because they did not enable the client, NRA, to make meaningful business decisions about marketing.[49]  As Hochman describes, the difference between vanity metrics and actionable metrics is that actionable metrics can be used to make business decisions.[50]  The vanity metrics in the AMc presentations are:  completed views, engaged views, total views, reactions, shares, and comments.[51]  None of these meet the test of actionable metrics.[52]  Hochman also observes AMc provided performance "reports" sporadically to the NRA.[53]  In his opinion, reports should be available to clients via an online dashboard so a client can check how "a marketing program is proceeding as often as they like."[54]

AMc offered the report of Richard Bergin in rebuttal to Hochman and Brian Buss, the NRA's damages expert, on July 1, 2021.  Bergin devotes a substantial part of his report describing the creation, use and utility of the alleged Dashboard.[55]  He headlines his extensive discussion of the Dashboard with the following title:

> PIP and AMc produced granular analytics of audience engagement with the curated content via a bespoke and robust dashboard, which was the source of the reports that were provided to the NRA.[56]

---

[47] Report of Jonathan E. Hochman ("Hochman Report"), dated June 1, 2021, (*see,* ECF #315-1). Hochman opines as to the nature of the performance metrics that AMc provided to the NRA. He does not provide a valuation opinion. Brian Buss and Andrew McLean provide valuation opinions on behalf of the NRA.
[48] *Id.* at 11, ¶ 37.
[49] *See, e.g., id.* at 11-13, ¶¶ 37-42.
[50] *See, e.g., id.* at 15, ¶ 49.
[51] *See, e.g., id.* at 15, ¶ 50.
[52] *See, e.g., id.* at 16, ¶ 51.
[53] *See, e.g., id.* at 17, ¶ 55.
[54] *Id.*
[55] *See, e.g.,* Rogers Decl. Ex. A-5, Bergin Report, p. 9, ¶ 14; pp. 19-25, ¶¶ 33-41. [APP062-118].
[56] Rogers Decl. Ex. A-20, Bergin Deposition, at 57:18-21; 58:1-25; 59:1-25; 60:1-5. [APP190-212].

As Bergin states, the Dashboard was the "source" of the AMc "reports." Thus, his entire report, which simply displays data from the reports with no independent analysis, is wholly derivative from the purported Dashboard. ***However, Bergin testified that he never accessed the Dashboard.***[57] In preparing his report he met with two AMc representatives, Melanie Montgomery and Brian Darley.[58] When he met with them, he had the "NRA Solutions PowerPoint" but not access to the Dashboard.[59] ***Bergin asked Montgomery if he could get onto the Dashboard but she said "it was not possible."***[60] Bergin was not told that the NRA had the Dashboard.[61] Bergin also testified that he did not have the technical specifications for the Dashboard and did not know the location of its database.[62] Nor did he know if a schema exists for the Dashboard that would allow a viewer to get a "configuration and an outline and a sense of what . . . was contained within" the Dashboard.[63]

Although Bergin states in his Report that PIP "created" the Dashboard, he never interviewed anyone at PIP, relying solely on interviews with Melanie Montgomery and Brian Darley instead.[64] Bergin's inexplicable failure to interview the creator of the Dashboard is underscored by the fact that he relies on metrics data from PIP as one of the central bases of his

---

[57] *Id.* 58:1-25; 59:1-6.
[58] *Id.* 55:7-9; 57:4-21; 58:21-24.
[59] *Id.* 57:4-11; 57:18-21; 58:21-24. Bergin based his report upon what he terms the "NRA Solutions PowerPoint" titled "NRATV Video Analytics Dashboard – Solutions Overview" which was produced by AMc. *See* Rogers Decl. A-4, AMc-002656-002685. [APP031-061].
[60] *Id.* 59:24-25; 60:1-2.
[61] *Id.* 60:3-5.
[62] *Id.* 70:14-25.
[63] *Id.* 71:5-7. Bergin attempted to explain away his lack of knowledge on key aspects of the Dashboard by implausibly claiming such knowledge was "outside the scope of his report." Notably, although he reviewed Dr. Bergin's report before it was submitted, Ackerman's CEO, Revan McQueen, had no idea where the dashboard data supplied to Dr. Bergin had come from, nor whether it constituted the same data shown by AMc to the NRA *See* Rogers Decl. Ex. A-16, R. McQueen Deposition, at 226:09-18. [APP159-167].
[64] *See* Rogers Decl. Ex. A-17, Montgomery Deposition, at 55:5-9. [APP168-176]. Bergin further testified that he didn't have the technical specifications of the metrics that were loaded into the Dashboard as he did not have access to the Dashboard. *Id.* at 70:13-15.

report.[65]  ***Notably, the PIP files upon which he relies for metrics data were obtained by the NRA's counsel pursuant to a subpoena served upon PIP—not from Ackerman.  Importantly, contained within the documents produced by PIP is a contract dated August 15, 2016 between PIP and AMc, and documents related to it.[66]  That contract contains a detailed list of "important reporting stats and metrics for internal operations and your clients."[67]***  In fact, that list consists of actionable metrics[68] about which NRA's expert opined as opposed to the vanity metrics that AMc's PowerPoints contain.  ***Remarkably, Bergin testified that he had not previously reviewed the PIP/AMc contract but that the metrics listed in the contract were "fairly typical."[69] Tellingly, AMc did not produce the PIP/AMc contract.***

Bergin admitted that in order to determine what metrics were actually put into the Dashboard, it would require him to speak with someone from PIP.[70]  He did not know all the metrics in the PIP Dashboard.[71]  He admitted that the metrics that appeared in the AMc PowerPoints were "high level" as opposed to more detailed metrics that might have been in the Dashboard.[72]  His report refers to the metrics used by AMc in reporting to the NRA as "proxies" for standard industry metrics.[73]  He did not have an understanding of why the AMc PowerPoints were written in the manner they were, as opposed to the "more granular detail that would have

---

[65] *See, e.g.*, *See* Rogers Decl. Ex. A-5, Bergin Report, p. 23, ¶ 38 [APP062-118]; *see* Rogers Decl. Ex. A-20, Bergin Deposition, at 58:2-20. [APP190-212].

[66] *See* Rogers Decl. Ex. A-1, PIP-00003755-3762. [APP010-018]. *See* Rogers Decl. Ex. A-2, See also October 14, 2016 contract executed by PIP and AMc with regard to PIP's design and construction of the Dashboard. PIP-00000027-34. [APP019-027].

[67] *See* Rogers Decl. Ex. A-1, PIP-00003757. [APP010-018].

[68] *See* Rogers Decl. Ex. A-1, The PIP contract dated August 15, 2016 between PIO and AMc considered actionable metrics such as – among others – "ROI [Return On Investment] Calculation – Sentiment and Engagement," "Influencer Impact Analysis," "Viewing Stats Incorporating Paid Media and Organic Reach," and "Audience performance data." [APP010-018]. Those metrics are designed to evaluate the cost-effectiveness of AMc's work. *See,* PIP-00003757. [APP010-018].

[69] *See* Rogers Decl. Ex. A-20, Bergin Deposition, at 126:10-13. [APP190-212].

[70] *Id.* 126:24-127:1; 127:4-9.

[71] *Id.* 140:24-25.

[72] *See* Rogers Decl. Ex. A-20, Bergin Deposition, at 117:19-24. [APP190-212].

[73] Bergin Report, p. 10, ¶ 16;

---

been required to build the application [Dashboard]."[74]  Significantly, Bergin had no explanation as to why an actionable, standard industry metric like return on investment (ROI), which appeared in the list of metrics in the PIP/AMc contract, was not in the PowerPoint presentation upon which he relied in providing his opinion.[75]  Equally significant, he stated that had additional metrics been placed in the AMc reports it would have been more informative than the metrics used.[76]

Bergin's Report also discusses "website visitors."[77]  In that regard, he acknowledged that a chart in his Report, denominated as Figure 6, is missing "Unique Visitor" data for every year, except for the limited period from January 1, 2019 through April 7, 2019.[78]  Bergin testified that the Unique Visitor data that appears on the chart was disclosed by AMc as a result of a letter sent by a NRA representative, Andrew Arulanandam, demanding certain performance metrics.[79]  Bergin was not given Unique Visitor data prior to 2019, but could not state whether or not it existed before that period.[80]  However, after NRA's expert Hochman rendered his report, AMc produced a two page spreadsheet with limited "unique" data from the years prior to 2019.[81]  Additionally, the spreadsheet shows organic versus paid views, indicating that such data was in AMc's possession.

In sum, as of August 20, 2021, it is clear that AMc's own expert was never given access to the Dashboard, never spoke with PIP, did not review the PIP contract listing actionable, industry standard metrics prior to his deposition; did not know what metrics were actually placed into the Dashboard; did not know why an essential metric like ROI (*i.e.,* Membership and sponsorship

---

[74] *See* Rogers Decl. Ex. A-20, Bergin Deposition, at 129:3-8. [APP190-212].
[75] *Id*. 117:12-24; 129:3-8.
[76] *Id*. 129:9-20.
[77] *See, e.g., See* Rogers Decl. Ex. A-5, Bergin Report, p. 13, ¶ 25. [APP062-118].
[78] *See* Rogers Decl. Ex. A-20, Bergin Deposition, 99:13-100:16. [APP190-212].
[79] *See* Rogers Decl. Ex. A-20, Bergin Deposition, 139:10-18. [APP190-212].
[80]  *Id*. 99:17-24.
[81] *See* Rogers Decl. Ex. A-3. [APP028-030].

resulting from the internet marketing) was not used by AMc in its PowerPoints about "views" and "engagement"; and, last but not least, AMc's expert agreed that additional metrics in the AMc PowerPoints rather than fewer would have been "absolutely" more informative.  Indeed, it is now clear that not only has AMc disregarded NRA's discovery but has also gerrymandered its expert's report by providing incomplete, selective information to Bergin.  In sum, Bergin's testimony establishes that AMc gave the NRA numerous presentations with "top level" metrics – a euphemism for vanity metrics – that AMc manufactured to make a failing marketing campaign, from which it reaped millions in profit, look effective.

The current situation is gravely prejudicial to the NRA and has interfered with its trial preparation.  ***Equally prejudicial,  AMc has not turned over the access codes to the NRA for the NRA's own social media accounts.***  Counsel for the NRA has repeatedly requested these access codes,[82] which are the property of the NRA – thus-this is not merely a discovery issue.  The NRA owns those codes.  As Hochman testified, if he had the codes he would have been able to analyze, for example, organic versus paid traffic concerning the NRATV.[83]  In other words, did NRATV actually have an audience or were people simply responding to ads that AMc was placing, which could have been placed absent the expensive apparatus of the NRATV platform.

ii.   Nature and Scope of Documents and Discovery Needed;  Depositions.

Based upon the above, the NRA 's Experts, Hochman and Buss especially, desire access to the Dashboard and the complete code and database used to create the Dashboard, as well as all related technical documentation, such as any manuals.  Its experts also desire access to all social

---

[82] See letters from counsel for the NRA attached to Hochman's Report.
[83] *See* Rogers Decl. Ex. A-21, Hochman Deposition, at 69:2-12. [APP213-216].  Additionally, Bergin testified that the NRA presumably could have had the power to determine the existence of organic views and paid views  if it looked into its social media accounts. *See* Rogers Decl. Ex. A-20, Bergin Deposition, at 106:22-107:2. [APP190-212].

media accounts for NRATV as explained by Hochman,[84] including data and statistics in the accounts.  Buss outlines in his report the dearth of back-up information with respect to the "valuation" PowerPoints generated by AMc.[85]

These recent developments raise serious issues about the need for depositions of lay witnesses who actually participated in the construction of the Dashboard and the choice of metrics. AMc's 30(b)(6) deponent on these topics was Brian Darley, the very same individual interviewed by Bergin in connection with rendering his opinion.  Darley, at his deposition professed not to know with any certainty who made the decision to choose which metrics to use to measure performance.  The following exchange ensued at Darley's deposition:

> Q.  (BY MR. PARKHOMENKO) So whose decision was it, actually -- whose responsibility  was it to -- to decide which metrics to include and which metrics to exclude?
> A.  I don't have a very clear answer for that.  I apologize.
> Q.  Okay.  So are there any documents you can review that would help you to come up with an answer to that?
> MR. MASON:  Objection; vague and ambiguous.
> A.  Anything to help jog my memory, but I just -- I don't know off the top of my head.  I apologize.[86]

Worse yet, Darley also said the following in professing his abject ignorance about who decided what metrics to "present" to the client versus what metrics were "collected" in the first place:

> Q.  Okay.  But who makes the actual decision as to -- as to the metrics that go out to the NRA, for example?  Somebody had to decide at some point which metrics to include and which, not, correct?
> A.  Yeah, I don't have direct knowledge.  But I can say assumably that sounds somewhat logical…[Y]ou know, you can collect X number of metrics.  You may only present one number, because nobody is interested in, you know, some -- one of those other pieces of information.

---

[84] Hochman Report at 23,¶66.
[85] Expert Report of Brian Buss, dated June 1, 2021 ("Buss Report") at p. 4-5. [APP539-643].
[86] *See* Rogers Decl. Ex. A-22, 30(b)(6) Deposition, dated August 4, 2021 ("30(b)(6) Deposition"), 199:18-200:2. [APP217-230].

Q.  Yeah.  That -- and that is an excellent point. So who made the decisions on what to present to the client?
A.  I -- I am not able to answer that question.  I do not have a –
Q.  Why?
A.  I do not have a clear understanding of who that would be.
***Q.  Okay.  So why is it that you are not able to answer this question?  Is it because you lack the knowledge?***
***A.  Correct.*** [87]

The NRA has clearly been prejudiced in its trial preparation as a result of AMc presenting a 30(b)(6) witness on internet metrics who lacked knowledge on the essential metrics at issue. Tellingly, AMc then presented this same individual to Bergin in an obvious attempt to orchestrate an opinion from Bergin.

Darley's testimony with regard to the NRA's social media accounts is equally problematic:

Q.  Are you aware that the NRA lost access to those media accounts?
A.  I -- my knowledge in that realm is limited.
Q.  Okay.  So do those accounts still exist?
A.  If I was to guess, yes, they would.
Q.  Okay.  But I don't want you to guess.  I want you to tell me if you know.
A.  I haven't been to one recently, so it's hard to say 100 percent for certain, but I would assess that there would be no reason for them not to be there that I'm aware of.
Q.  Okay.  So you -- you were designated as the corporate representative for public eye, which talks about NRA account access to social media accounts, including –
A.  Sure.
Q.  -- Facebook, Instagram, YouTube, and Twitter?
A.  Uh-huh. [88]
…
Q.  And you were managing those accounts on behalf of the NRA, correct?
A.  Correct. [89]

The NRA is entitled to take a 30(b)(6) deposition on these essential topics.  The fact that it has been prevented from obtaining such testimony places it at a serious disadvantage.

---

[87] *See* Rogers Decl. Ex. A-22, 30(b)(6) Deposition, 202:9-203:8. [APP217-230].
[88] *Id.* 205:11-206:1.
[89] *Id.* 207:1-3.

Further, Buss is scheduled to be deposed, and like Hochman, who was already deposed, he will be cross-examined by AMc's counsel without the benefit of essential materials and access to the Dashboard.  Also, Andrew McLean's deposition remains and he faces the same unfair cross-examination by AMc's counsel.

## 2.  NRATV: Damages Analysis, AMc Alleged Expenses.

### a.  Background:  Recent Discovery Disclosures.

As noted, Brian Buss is one of the NRA's damages experts with respect to the financial harm sustained by the NRA as a result of the NRATV scheme.  He issued a report on June 1, 2021.[90]  In his report, he describes the deficiencies of several so called "NRATV Presentations," which make representations about "Valuations."   Buss lists various materials that are relevant to a damages analysis that are basic, and which have not been produced by AMc.[91]  Among those items, as noted above, is a request for internet analytics and metrics.  He also requests a series of accounting records and financial information that have not been produced.  AMC produced certain accounting and financial records after Buss' Report (June 25, 2021; August 27, 2021) which raise more questions than answers.

The belated productions consist of cost data in an aggregated form, the majority of which has no breakdown or reconciliation of why the costs were incurred and what relationship those costs have to NRATV.  In the Rebuttal Report of Daniel L. Jackson, dated July 1, 2021, ("Jackson Rebuttal Report") Jackson attempts to rebut Buss by using certain of the recently produced cost information.[92]  Specifically, Jackson deducts $45,000,000 of costs "allocated" to NRATV, the majority of which are of undisclosed, unknown and unverifiable origin.

---

[90] Buss Report. [APP539-643].
[91] *Id*. at p.5
[92] *See, e.g., See* Rogers Decl. Ex. A-26, AMcTX-00053147-53156; AMcTX-00053166-53175; AMcTX-00053185-53195; AMcTX-00053206-53215. [APP331-372].

**b.**  Nature and Scope of Documents Needed; Depositions.

With respect to the NRATV PowerPoints set forth in his report,[93] the NRA requires data and back-up information to support the metrics and Valuations presented in the PowerPoints; any planning documents, business plans, or forecasts regarding financial goals and objectives for NRATV prior to its 2016 launch; accounting records or financial information indicating the nature and type of expenses incurred during the Damages Period (2016-2019) related to NRATV.  The Jackson Rebuttal Report deducts categories of "expenses" used to calculate AMc's profits from NRATV,[94] and the NRA needs he backup for those "expenses."  Jackson's deposition remains to be taken.  Absent the backup documentation relating to the costs relied upon by Jackson, and backup concerning the financial data and materials upon which he based his rebuttal, his cross-examination will be limited and impaired to the NRA's detriment.

**3.**  **NRA Damages Related To AMc's Billing Practices And Its Opposition To AMc's Contract Claims For Damages.**

The NRA has presented the expert testimony of Gary B. Goolsby in support of its claims regarding AMc's billing practices.[95]  Goolsby has outlined in his Report the missing backup documentation concerning AMc's billings to the NRA.[96]  Goolsby's deposition will resume for not more than two hours with respect to a Supplemental Report tat he submitted on August 16, 2021.[97]  Substantial documentation remains unproduced.  As with the other expert witnesses, this situation is highly prejudicial to the NRA and provides AMc with an unwarranted strategic advantage.

---

[93] *Id.* at p. 4; Documents Relied Upon, 2a through 2g.
[94] *See, e.g., See* Rogers Decl. A-26, AMcTX-00053225; AMcTX-00053145; AMcTX-00053164; AMcTX-00053183; AMcTX-00053204; AMcTX-00053147; AMcTX-00053166; AMcTX-00053185; AMcTX-00053206. [APP 331-372].
[95] *See* Rogers Decl. Ex. A-29, Report of Gary B. Goolsby, dated June 1, 2021. [APP380-440].
[96] *See, e.g., id.* p. 14-26, ¶¶ 53-67.
[97] *See* Rogers Decl. Ex. A-30, Supplemental Report of Gary B. Goolsby, dated August 16, 2021. [APP441-462].

In defending against AMc's contract claims, the NRA has submitted the expert reports of Autumn V. Kraus[98] and Larry Kanter[99]. Both of these rebutted the expert report of Daniel L. Jackson, dated June 15, 2021 ("Jackson Report"). The NRA has moved to strike those positions of Jackson's Report that AMc relies upon in its motion for summary judgement. The deficiency in comparison with the compelling reports of Kraus and Kanter. As Kraus and Kanter point out, AMc is seeking damages for items like severance pay and lease payments, in the absence of verification of project and employee contracts, among other things.

### III.   SIGNIFICANCE AND IMPACT OF OUTSTANDING DISCOVERY

#### A.  Unresolved Issues Concerning Pre-2018 Documents Preclude Summary Judgment on the Parties' Tort Claims—And, Potentially, Their Contract Claims.

Defendants seek partial summary judgment on the NRA's claims for breach of fiduciary duty,[100] fraud,[101] and civil conspiracy.[102] Defendants admit that fiduciary duties may arise "prior to, and apart from, the [contract]" between commercial counterparties, and are particularly likely to arise during a longstanding relationship of confidence and trust.[103] The NRA's fraud and conspiracy claims, meanwhile, hinge in part on representations and omissions regarding NRATV that date back to at least 2016,[104] as well as budgeting, invoicing, and billing practices that preceded the Services Agreement by "at least a decade."[105] Moreover, although the NRA contends that the Services Agreement is unambiguous and integrated and must be interpreted without regard to parol evidence or prior course of dealing, Defendants argue otherwise.[106] If Defendants prevail,

---

[98] *See* Rogers Decl. Ex. A-31, Report of Autumn V. Kraus, dated July 15, 2021. [APP463-488].
[99] *See* Rogers Decl. Ex. A-32, Report of Larry Kanter, dated July 15, 2021. [APP489-534].
[100] *See* ECF No. 279 at 28.
[101] *Id.* at 45.
[102] *Id.* at 48.
[103] *See* ECF No. 279 at 30 (internal citations and quotation marks omitted).
[104] *See* ECF No. 314 at 37.
[105] *See id.* at 41 (deceptive billing practices regarding purported "dedicated" employees "emerged more than a decade ago").
[106] *See id.* at 9 (discussing Defendants' reliance on parol evidence).

then documents concerning the negotiation, interpretation, and course of performance under the Services Agreement and its predecessor contract are all highly relevant to this case—and all excluded by the unfounded date limitation placed on Defendants' document production.

The NRA diligently raised this issue in the parties' October JSR, and briefed yet another motion to compel in recent weeks which Defendants resisted submitting as part of any joint status report.  On this record, any grant of summary judgment adverse to the NRA would be unfounded and unfair.

**B.      Unexplained, Serious Gaps In Defendants' Document Collection Preclude Summary Judgment on Any of the Parties' Claims or Defenses.**

As set forth above and in recent meet-confer correspondence enclosed with this Status Report, [107] gaps observed in Defendants' document production—coupled with testimony by Ackerman's CEO that no records were collected from any of his computers or devices—cast serious doubt on Defendants' compliance with their discovery obligations and the completeness of the record at hand.  There is ample reason to believe that documents lurking in executives' hard drives, mobile devices, and hard-copy files—but excluded from email correspondence—may be especially sensitive and relevant. [108]  For example, although Ackerman alleges that it was defrauded and kept in the dark during Fall 2018 about the prospect of later litigation against the NRA,[109] a letter apparently drafted by Angus McQueen in September 2018 *explicitly anticipated litigation* [110]—and would not have been produced as part of discovery if a secretary had not fortuitously scanned a copy of it. [111]  Without understanding the parameters of Defendants'

---

[107] *See* Rogers Decl. Exs. A-6 [APP119-122], A-8 [APP127-129], A-9 [APP130-132] (letters discussing documents referenced in depositions, but not produced).
[108] *See* discussion *supra* notes 36, 37.
[109] *See* ECF No. 241 ¶ ¶ 111-113.
[110] *See* Rogers Decl. Ex. A-15 (Sep. 24, 2018 Draft Letter). [APP149-158]. Moreover, the fact that Defendants explicitly anticipated litigation means they should be strictly held to resulting document-preservation obligations.
[111] *See* Rogers Decl. Ex. A-6 (S. Rogers Aug. 25, 2021 Letter to B. Mason re: "Document Issues"). [APP119-122].

document collection and which repositories were omitted, neither the NRA nor the Court can gauge the likelihood that additional, highly relevant documents remain concealed.

## C. Deficiencies in the Production of "Out-of-Pocket" Expense Records Preclude Summary Judgment on the Parties' Tort and Contract Claims.

The actual expenses and activities underlying the "out-of-pocket" expenses billed by Defendants to the NRA constitute material facts bearing on the resolution of the NRA's fraud, breach of fiduciary duty, and conspiracy claims; moreover, improper billing of such items would constitute a prior material breach by AMc of the parties' Services Agreement, impacting the adjudication of contract claims. Such claims simply cannot proceed to adjudication—whether on summary judgment, or at trial—without clarification regarding whether full or accurate expense records were produced.

## D. Outstanding Depositions Preclude Summary Judgment.

As of the date the NRA submitted its Opposition to Defendants' Motion for Partial Summary Judgment, multiple crucial fact depositions remained incomplete.[112] As of the date of this Status Report, two are still outstanding: the deposition of Lt. Col. Oliver North, and the deposition of Woody Phillips. Both are core witnesses. It is undisputed that North was President of the NRA and an employee of Ackerman during 2018,[113] and further undisputed that Lt. Col. North played a key role in a series of conversations that either constituted extortion, breach of fiduciary duty, and a material breach of the Services Agreement (as the NRA alleges) or gave rise to defamatory accusations concerning the same (as Ackerman alleges).[114] Although North was deposed in a prior case on notice by Ackerman, the NRA was not able cross-examine North as would suffice to permit the admission of his prior deposition testimony here; moreover,

---

[112] *See* ECF No. 314 at 50.
[113] *See, e.g.,* ECF No. 241 at 3.
[114] *See, e.g.,* ECF No. 241.

Defendants' cross-subpoena indicates that they, too, intend to depose North in this matter. North's testimony is certainly highly relevant to the claims on which summary judgment is sought.

Phillips is also a material witness. The NRA's top financial executive until his retirement in Fall 2018, Phillips is alleged by Defendants in their summary judgment briefing to have "completely controlled" the billing and budgeting processes disputed as part of the NRA's tort claims and the parties' contract claims.[115] It is therefore imperative that the NRA have an opportunity to cross-examine Phillips.

**E.    Deficiencies in the Production of Documents and Data Pertaining to Experts' Opinions Impact Summary Judgment—As Well As Pending Motions to Strike Expert Testimony.**

**1.    NRATV: Marketing Metrics; Dashboard Creation and Use; and Social Media Access.**

As described above, the lack of disclosure regarding the NRATV performance metrics supposedly residing on a "bespoke" Dashboard goes to a central issue in this case. NRATV, became the most expensive item in the NRA's budget. Its escalating costs, and AMc's inability to demonstrate an audience and attendant membership and sponsorships, played a significant role in the end of the AMc/NRA relationship. AMc's motion for summary judgment seeks the dismissal of the NRA's claims concerning NRATV as well as striking the reports of Hochman and Buss. At the same time, AMc has effectively obliterated credible discovery and the return of NRA property in the form of social media accounts to try to position itself to gain a strategic litigation advantage.

For this reason, the NRA requests that the Court order, at a minimum, the inspection of the Dashboard, and production of all material relating to the metrics in the Dashboard.

---

[115] *See* ECF No. 279 at ¶ 7.

2.      **NRA's: Damages Analysis; NRATV and AMc's Billing Practices.**

With regard to the NRA's damages relating to NRATV, the lack of disclosure with respect to financial data involving alleged "costs" associated with NRATV is highly prejudicial and has hampered the NRA's trial preparation. Attached to Jackson's Report is alleged "cost" data recently produced[116], which he uses to "allocate" costs to NRATV based upon a crude and non-specific allocation formula of his own making.[117] The NRA must be able to reality-test Jackson's rank conclusions and to determine what constitutes gross statistics like an "overhead" allocation of $12,283,399.20 or a direct "labor" alleged "cost" of $14,856,759.34.[118] AMc's recently produced audited financial statements consist largely of gross, non-specific cost numbers. [119]

These numbers, which are at the NRA level, are even more inscrutable when applied to NRATV. Upon receipt of this data on July 3, 2021, counsel for the NRA followed up with questions on August 4, 2021, only to be advised by Brian Mason of Dorsey on August 16, 2021, via email that "[t]he information you are asking for does not exist. The NRATV overhead/costs were not separately allocated." Mr. Mason's email appears to establish that AMc, consistent with what can charitably be termed its nonchalant attitude toward maintaining books and records, never tracked the revenue and expenses of NRATV, a major project costing the NRA more than $40,000,000. Now, AMc comes before this Court with no documentation and the contrived "analysis" of the Jackson Rebuttal Report. In any event, it should be noted that Mason failed to respond to the specific question posed by NRA's counsel, which did not relate to how costs were *allocated* but rather what *constituted* the alleged "costs" in the first instance.

---

[116] *See* Rogers Decl. Ex. A-26, AMcTX-00053153-53154. [APP322-330].
[117] Jackson Rebuttal Report at Exhibit 1A.
[118] *See* Rogers Decl. Ex. A-26, AMcTX-00053154. [APP322-330].
[119] See Rogers Decl. Ex. A-24, AMcTX-00068007-68023; AMcTX-00068024-68040; AMcTX-00068041-6804056; AMcTX-00068057-6804073; and AMcTX-00068074-6804092. [APP235-321].

Allowing AMc to continue to withhold the financial data upon which the Jackson Rebuttal Report relies, gives AMc an unfair advantage with respect to the pending motions to strike the testimony of the NRA's experts, especially Goolsby, Buss and McLean. It also prejudices the NRA with regard to AMc's attempt to obtain judgment in its favor by withholding financial data directly relevant to proving that AMc's defenses and claims lack merit.

3.     **AMc's Contract Claim And AMc's Alleged Damages.**

The NRA has been prejudiced with respect to its defense against AMc's alleged contract claims.  In connection with that defense, it has been deprived of documentation which the Kanter and Kraus Reports both describe in detail.[120]  On August 3, 2021, the NRA filed Objection To, And Motion To Strike Summary Judgment Evidence,[121] including objections to the Jackson Report.  As the NRA notes, Jackson performs no independent analysis.   Instead, his report advances AMc's prejudicial strategy to withhold data and rely upon the orchestrated testimony of expert witnesses.

IV.     **MOTIONS AND ISSUES PENDING BEFORE THE COURT**

On October 23, 2020, the parties briefed and submitted the October JSR.  Although certain discrete issues in the October JSR have been resolved or obviated, two substantive items remain unaddressed and continue to delay discovery in this case.  In particular, the October JSR sought guidance from the Court regarding (i) Defendants' refusal to produce responsive documents vintaged prior to 2018; and (ii) a dispute over privilege and work product protection concerning records prepared by a forensic accounting firm hired by the NRA Office of the General Counsel.[122]

---

[120] *See, e.g.,* Rogers Decl. Ex. A-32, Kanter Report, p. 3, Opinion 2 ¶ [APP489-534]; Rogers Decl. Ex. A-31, Kraus Report, p.7 ¶ 18. [APP463-488].
[121] ECF No. 304.
[122] *See* October JSR (ECF No. 180) at 11 (recounting and challenging Defendants' general objection to producing documents outside the date range "from January 1, 2018, to the commencement of this lawsuit"); *see id.* at 52 (discussing Defendants' motion to compel documents generated by Forensic Risk Alliance).

As detailed above, Defendants' persistent refusal to produce responsive documents vintaged pre-2018 precludes summary judgment on several of the parties' claims and defenses.

In addition, on August 12, 2021, the parties briefed and submitted a second Joint Status Report concerning Ackerman's purported "emergency" motion to compel the deposition of the NRA's outside counsel, William A. Brewer III[123] (such report, the "August JSR").  On August 24, 2021, after the NRA acceded to Defendants' unorthodox and invasive demand for a deposition of outside counsel's wife, the NRA supplemented the record in connection with the August JSR to reflect her testimony.[124]   The NRA believes that the arguments and authorities set forth in the August JSR—and the testimony subsequently elicited from Mrs. Brewer which is summarized in the NRA's supplemental brief—make clear that Ackerman's eleventh-hour demand for a deposition of Mr. Brewer is meritless and sanctionable.  Nonetheless, the August JSR constitutes another item pending before the Court, the resolution of which could impact remaining discovery.

Additionally pending before the Court are motions by each side to strike summary judgment evidence, including expert testimony.[125]

## V.   WHY THE PARTIES ARE NOT IN COMPLIANCE WITH THE COURT'S SCHEDULING ORDER

During the pendency of the NRA's bankruptcy case, which commenced on January 15, 2021, and was dismissed on May 11, 2021, portions of this case were automatically stayed.  In addition, the NRA was instructed by the bankruptcy court to limit activity by outside counsel in pending pre-petition matters, including this one, with the exception of a court-ordered mediation.[126]   After the NRA emerged from bankruptcy, the parties had only two and a half months

---

[123] ECF No. 323-1.
[124] ECF No. 331.
[125] *See* ECF Nos. 303, 333.
[126] *See* Rogers Decl. Ex. A-23 (Bankruptcy Court Order dated March 15, 2021) at ¶ 5. [APP489-534].

to complete voluminous outstanding discovery in a case that had already been disrupted by the COVID-19 pandemic.  In sum, the NRA has produced 66,185 documents totaling 201,434 pages,[127] and has reviewed an additional 151,921 pages produced by Defendants and third parties.[128] Notably, many crucial documents have arrived only within the past sixty days, including: thousands of documents pertaining to NRATV; correspondence regarding a seven-figure related-party contract between Ackerman and the NRA's then-president, Lt. Col Oliver North; documents evidencing the third-party contract disputes for which Ackerman seeks indemnity; and, absurdly—weeks after the submission of damages-expert testimony—AMc's financial statements.[129]  During the same short period, the parties contended with motion practice arising from new and amended pleadings filed by Defendants during the NRA's bankruptcy.[130] The parties have also dealt with additional complicating factors, including unexpected health problems and travel demands afflicting both witnesses and counsel.[131]  The NRA is grateful for the Court's guidance and efforts to ensure a swift trial on the merits in this matter.

---

[127] *See* Rogers Decl. ¶ 33. [APP 001-009].
[128] *Id.*
[129] *Id.*
[130] *See* ECF No. 243; ECF No. 252; ECF No. 292; ECF No. 329.
[131] *See* Rogers Decl. ¶ 34. [APP 001-009].

Dated: August 31, 2021                    Respectfully submitted,

                                          /s/ Sarah B. Rogers
                                          Sarah B. Rogers
                                          New York Bar No. 4755252
                                          sbr@brewerattorneys.com
                                          Philip J. Furia
                                          *Pro Hac Vice*
                                          pjf@brewerattorneys.com
                                          **BREWER ATTORNEYS AND COUNSELORS**
                                          1717 Main Street, Suite 5900
                                          Dallas, Texas 75201

                                          **ATTORNEYS FOR PLAINTIFF/COUNTER-
                                          DEFENDANT NATIONAL RIFLE
                                          ASSOCIATION OF AMERICA**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing document was electronically

served via the Court's electronic case filing system upon all counsel of record on this 31st day of

August 2021.

                                          /s/ Sarah B. Rogers
                                          Sarah B. Rogers