**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § | |
| | § | |
| | § | |
| *Plaintiff and Counter-Defendant*, | § | |
| | § | |
| **v.** | § | **Case No. 3:19-cv-02074-G** |
| | § | |
| **ACKERMAN MCQUEEN, INC.,** | § | |
| | § | |
| *Defendant and Counter-Plaintiff*, | § | |
| | § | |
| **and** | § | |
| | § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, AND MELANIE MONTGOMERY** | § | |
| | § | |
| | § | |
| *Defendants*. | § | |

**SUPPLEMENTAL JOINT STATUS REPORT ON ACKERMAN MCQUEEN, INC.'S**
**MOTION TO COMPEL FORENSIC RISK ALLIANCE DOCUMENTS**

## **TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

A.      AMc's Position ....................................................................................................1

B.      The NRA's Position ............................................................................................5

II.     MATTERS RESOLVED BY AGREEMENT ......................................................10

III.    MATTERS TO BE HEARD AND DETERMINED ...........................................10

A.      AMc's Position ..................................................................................................10

B.      The NRA's Position ..........................................................................................10

IV.     BACKGROUND FACTS .....................................................................................12

A.      AMc's Position ..................................................................................................12

B.      The NRA's Position ..........................................................................................15

1.      FRA Was Retained by the NRA's General Counsel to Facilitate Legal Advice in
        Anticipation of Litigation ..................................................................................15

2.      AMc's Allegations of Fraud of Misconduct Are Frivolous, Unsupported After
        Years of Discovery, and Contradicted by Its Own Eleventh-Hour Disclosures................16

3.      As A Threshold Matter, AMc's Recycled Fraud Contentions are Beside the Point,
        Because the NRA had a Contractual Right to Perform a Books and Records
        Review ................................................................................................................17

4.      AMc's, Recycled Contentions About the Substance of the Parties' October 11,
        2018, Meeting Lack Credibility..........................................................................17

5.      AMc's Continuing Attacks on Accounting Professionals Are Based Upon a
        Deliberate Misconstruction of the Record ..........................................................18

6.      AMc and Winkler Knowingly Made False Representations Regarding FRA's
        Record Examination..............................................................................................20

7.      AMc Improperly Withheld, and Continues to Withhold, Documents..............................23

8.      The Virginia Court Upheld the NRA's Privilege Claims Based on An Accurate
        Record, Contrary to AMc's Assertions Otherwise ..........................................29

9.  The NRA Consistently Asserted Its Privilege, And Did Not Inject FRA's Opinions or Conclusions Into This Proceeding ...................................................30

10. Long Before the Discovery Cutoff, the NRA Offered Many of the Documents, and the Depositions, Sought Now—But AMc Refused......................................31

11. AMc's Untimely "Supplemental" Motion Represents Its Latest Tactical Misuse of the Joint Status Report Process ............................................................32

12. AMc's Misrepresentations to the Court Regarding the FRA Privilege Log.....................32

V.   ARGUMENTS & AUTHORITIES .................................................................33

A.   AMc's Position .....................................................................................33

1.   Legal Standard .....................................................................................33

2.   The NRA Waived Privilege as to the Entire FRA Subject Matter ....................34

3.   The NRA Confirmed Its Sword and Shield Use of the FRA Documents.........................36

4.   The NRA Confirmed the FRA Documents Are Not Privileged .......................37

5.   The NRA's Actions Warrant Additional Depositions ....................................41

6.   Sanctions Are Warranted for the NRA and Its Counsel's Years-Long Abuse .................42

B.   The NRA's Position................................................................................43

1.   Legal Standard .....................................................................................43

2.   The NRA's Disclosure of Documents to FRA Did Not Waive Privilege or Work Product Protection...........................................................................44

3.   Consistent With Fifth Circuit Precedent, the NRA Disclosed the Documents Provided to Its Testifying Experts ............................................................46

4.   Even If There Were a Subject-Matter Waiver, It Would Not Extend to "All FRA-Related Documents." ..............................................................................47

5.   AMc's Demands for Sanctions Are Vexatious and Unsupported ....................49

VI.  PRAYER FOR RELIEF ..........................................................................50

A.   AMc's Position .....................................................................................50

B.   The NRA's Position................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bailey v. State*,
469 S.W.3d 762 (Tex. App.—Houston [1st Dist.] 2015, pet) ................................................35

*Bucklew v. St. Clair*,
Civil Action No. 3:18-CV-2117-N (BH), 2019 U.S. Dist. LEXIS 109580
(N.D. Tex. May 29, 2019)................................................................................................42, 49

*In re Burlington N., Inc.*,
822 F.2d 518 (5th Cir. 1987) ................................................................................................43

*Calsep A/S v. Intelligent Petroleum Software Sols.*,
LLC, No. 4:19-CV-1118, 2020 WL 1321521 (S.D. Tex. Mar. 17, 2020) ........................46, 47

*Charalambopoulos v. Grammer*,
No. 3:14-CV-2424-D, 2017 WL 1094394 (N.D. Tex. Mar. 8, 2017)....................................49

*Doe 1 v. Baylor Univ.*,
335 F.R.D. 476 (W.D. Tex. 2020) ....................................................................................47, 49

*Ecuadorian Plaintiffs v. Chevron Corp.*,
619 F.3d 373 (5th Cir. 2010) ................................................................................................46

*Enns Pontiac, Buick & GMC Truck v. Flores*,
No. 1:07CV01043 OWW DLB, 2011 WL 2746514 (E.D. Cal. July 13, 2011) ....................49

*Firefighters' Ret. Sys. v. Citco Grp. Ltd.*,
No. CV 13-373-SDD-EWD, 2018 WL 2323424 (M.D. La. May 22, 2018),
*aff'd*, No. CV 13-373-SDD-EWD, 2018 WL 5993472 (M.D. La. Nov. 14,
2018) ....................................................................................................................................45

*Franklin Ctr. for Gov't & Pub. Integrity v. Univ. of Tex. Sys.*,
NO. 03-19-00362-CV, 2020 Tex. App. LEXIS 10123 (Tex. App.—Austin [3d
Dist.] Dec. 22, 2020, pet. filed).................................................................................... *passim*

*Franklin Ctr. for Gov't v. Univ. of Texas Sys.*,
No. 03-19-00362-CV, 2020 WL 7640146 (Tex. App.—Austin [3d Dist.] Dec.
22, 2020) ..............................................................................................................................45

*Gen. Elec. Co. v. Mitsubishi Heavy Indus. Ltd.*,
No. 3:10-CV-276-F, 2013 WL 12226037 (N.D. Tex. Apr. 5, 2013)......................................43

*Golla v. Novo Nordisk Inc.*,
No. H-20-71, 2020 WL 9421047 (S.D. Tex. June 29, 2020)..................................................45

*Grasso v. O'Connor*,
41 Va. Cir. 193 (Va. Cir. 1996) ...........................................................................................36

*Hager v. Bluefield Regional Med. Ctr., Inc.*,
170 F.R.D. 70 (D.D.C. 1997).................................................................................................47

*Huawei Techs. Co. Ltd v. T-Mobile US, Inc.*,
No. 216CV00052JRGRSP, 2017 WL 7052463 (E.D. Tex. Sept. 20, 2017) ..........................24

*Ingenito v. Riri USA, Inc.*,
No. 11CV2569MKBRLM, 2015 WL 9412541 (E.D.N.Y. Dec. 22, 2015)......................45, 49

*In re Itron*,
883 F.3d 553 (5th Cir. 2018) ................................................................................................35

*Johnson v. Russ*,
No. 6:16-CV-284 RP, 2017 WL 1066685 (W.D. Tex. Mar. 21, 2017) ..................................45

*In re Lincoln Nat'l COI Litig.*,
No. 16-CV-6605-GJP, 2019 WL 7581182 (E.D. Pa. July 3, 2019).......................................49

*Lowe v. Firestone Tire & Rubber Co.*,
2018 WL 10398360at (N.D. Tex. 2018).................................................................................11

*Nalco Co., Inc. v. Baker Hughes, Inc.*,
NO. 4:09-CV-1885, 2017 U.S. Dist. LEXIS 111127 (S.D. Tex. July 18, 2017)....................35

*In Re: National Rifle Association of America and Sea Girt, LLC*,
Case No. 21-30085 (N.D. Tex. 2021) ....................................................................................22

*National Rifle Association v. Ackerman McQueen, Inc., et al*.,
Case Nos. CL19001757, CL19002067, and CL19002886 (Cir. Ct. Va. 2019) ............... *passim*

*Navigant Consulting, Inc. v. Wilkinson*,
220 F.R.D. 467 (N.D. Tex. 2004) .........................................................................................38

*OrchestrateHR, Inc. v. Trombetta*,
178 F. Supp. 3d 476, 487 (N.D. Tex. 2016) ....................................................................42, 49

*S.E.C. v. Brady*,
238 F.R.D. 429 (N.D. Tex. 2006) .........................................................................................45

*Shields v. Sturm, Ruger & Co.*,
864 F.2d 379 (5th Cir. 1989) ...............................................................................................45

*Smith v. Smith*,
154 F.R.D. 661 (N.D. Tex. 1994) ...................................................................................43

*Theranos, Inc. v. Fuisz Technologies, Ltd.*,
No. C 11-5236 PSG, 2013 U.S. Dist. LEXIS 70564 (N.D. Cal. May 16, 2013)....................35

*Turfgrass Grp., Inc. v. Ne. La. Turf Farms, LLC*,
No. CIV.A. 10-1354, U.S. Dist. LEXIS 166570 (W.D. La. Nov. 20, 2013) ..........................49

*Turner v. Coca-Cola Enters., Inc.*,
No. CIV. 3:02-CV-1348-R, 2003 WL 21145740 (N.D. Tex. May 14, 2003) ........................49

*United States v. Hildenbrand*,
2017 WL 3381929 (N.D. Tex. 2017).................................................................................11

*United States v. Hungerford*,
No. CR 18-112, 2019 WL 3891604 (E.D. La. Aug. 19, 2019)...........................................45

*United States v. Nobles*,
422 U.S. 225 (1975)...............................................................................................47, 49

*Vesilind v. Va. State Bd. of Elections*,
91 Va. Cir. 490 (Va. Cir. Ct. 2016)..................................................................................35

*Walton v. Mid-Atlantic Spine Specialists, P.C.*,
649 S.E.2d 545 (Va. 2010)...............................................................................................38

**Statutes**

Va. Code Ann. § 8.01-420.7(a) (2021)...............................................................................35

**Other Authorities**

Fed R. Civ. P. 30..................................................................................................22, 41

Fed. R. Evid. 501..............................................................................................................38

Fed R. Evid. 502........................................................................................................35, 45, 47

Tex. R. Evid. 503........................................................................................................38, 40

Tex. R. Evid. 511(b)(1) .......................................................................................................35

TO THE HONORABLE JUDGE TOLIVER:

Pursuant to the Honorable Magistrate Judge Toliver's Standing Order (ECF 62), dated March 10, 2020 (the "*Standing Order*"), Defendant/Counter-Plaintiff Ackerman McQueen, Inc. ("*AMc*") and the National Rifle Association of America (the "*NRA*") file this *Supplemental Joint Report on Ackerman McQueen, Inc.'s Motion to Compel Forensic Risk Alliance Documents* (the "*Supplemental Report*" to the "*Original Report*" on the "*Motion*").

The attorneys considered the nature and basis of their claims and defenses to the arguments made herein and jointly developed this report.  The parties' views and requests for relief are as follows:

## I.    INTRODUCTION

### A.  AMc's Position

Various iterations of counsel for AMc and counsel for the NRA conferred by several different means since 2019 regarding the NRA's request for the documents relating to the audit by Forensic Risk Alliance, including Brian E. Mason, Christina M. Carroll, and Kelsey M. Taylor for AMc and Cecelia Fanelli, Sarah Rogers, and Alessandra Allegretto for the NRA.  Additionally, AMc submitted its original Motion (ECF 54, 55) on February 26, 2020, which it included in the parties' Joint Report (ECF 180) on October 23, 2020, pursuant to the Court's order (ECF 169) dated September 23, 2020.  Since then, new information has arisen requiring this Supplemental Report, including recent deposition testimony and the NRA's latest selective production of certain FRA documents.  The NRA attempted to reach agreement with AMc to stipulate that its production would not be a subject matter waiver; AMc repeatedly refused.  AMc advised the NRA numerous times, including on September 24 and October 8, 2021, that its production would be a subject matter waiver and requested the NRA produce all previously withheld FRA documents, which the NRA refused.

During a hearing in the Virginia Action[1] on November 13, 2019, NRA counsel[2] represented to that court:

> We're not offering any conclusions or opinions by FRA regarding its – what it believes about how the examination occurred, simply the facts of what happened… There is no audit report.  It wasn't an audit.  **A report wasn't done**…  **So the – there is no assertion of privilege over an audit report**.[3]

Oddly enough, NRA counsel[4] stated before the District Court in this case for the very first time on September 16, 2021 that it would produce the Forensic Risk Alliance ("***FRA***") draft report on the condition there is no subject matter waiver of privilege[5] – *i.e.*, there is a report over which the NRA asserted privilege after all.

When the Virginia court directly asked NRA counsel, "During that deposition [of the FRA's corporate representative, Michael Trahar] and during all of the discovery in this matter, have you ever provided to any defendants or have they ever requested a copy of the report by FRA?" NRA counsel unequivocally stated, "**There is no report**."[6]  Based on NRA counsel's repeated false representations, the Virginia court came to mistakenly believe there was no report.[7]

After AMc's counsel explained to the court that "[t]here was something that was…shown on the screen to NRA officials but never provided to them in paper," some type of "report that was issued over a computer screen to NRA members and they're trying to bury it,"[8] NRA counsel dug

---

[1] The above-captioned lawsuit is hereinafter referred to as the "***Texas Action***."  The three lawsuits entitled *National Rifle Association of America v. Ackerman McQueen, Inc. and Mercury Group, Inc.* filed in the Circuit Court for the City of Alexandria, Cause Nos. CL19001757, CL19002067, and CL19002886, are hereinafter referred to as the "***Virginia Action.***"

[2] NRA counsel at the hearing was James Hundley and Robert Cox (Briglia Hundley, P.C.) and Michael Collins (Brewer Attorneys & Counselors (the "***Brewer Firm***"), former lead counsel of record before he separated from the Brewer Firm.  It is undisputed that Bill Brewer is the NRA's lead litigation counsel despite not making a formal appearance in these lawsuits.  *See, i.e.*, ECF 61 at 1 ("The dispute centers on Defendants' efforts to attempt to disqualify indirectly ***the NRA's lead litigation counsel, Mr. William Brewer III***…") (emphasis added).

[3] **Ex. 1-A**, Virginia Action Hr'g Tr. (Nov. 13, 2019) at 63:2-65:1 (emphasis added).

[4] In this action, the NRA's sole counsel is the Brewer Firm.

[5] *See* **Ex. 1-B**, Texas Action Hr'g Tr. (Sep. 16, 2021) 30:15-31:8.

[6] **Ex. 1-A**, Virginia Action Hr'g Tr. (Nov. 13, 2019) at 70:10-14 (emphasis added), 71:14-72:6.

[7] *Id.* at 72:7-8 ("I keep hearing the word 'report.'  I mean, obviously, there is no report.").

[8] *Id.* at 72:9-17.

---

in his heels even deeper.  The Virginia court asked directly, "Was there a report on the computer screen?" to which NRA counsel responded, "No, Your Honor."[9]

The court never saw any of the withheld documents and never made a finding on whether the documents were, in fact, privileged or properly shielded by the work product doctrine.  Instead, the court simply denied the motion to compel and acknowledged on the record that AMc would come back to the court because it has to be able to defend itself: "I think we may ultimately have to kind of deal with this in the sense that they're entitled to defend this case… I'm sure that I will see you again."[10]  The Virginia Action was stayed before AMc had the opportunity to revisit the issue for trial.

Exposing the falsity of NRA counsels' statements in open court, the NRA's General Counsel, John Frazer ("*Frazer*"), testified on August 19, 2021 that (1) the NRA is relying on the FRA's findings in support of multiple claims[11] and (2) FRA presented reports and findings to the NRA on a computer screen by Zoom:

Q:      And when the FRA audit ended, what actions did FRA take at that point?

A:      They presented some of their findings to us.

**Q:      How did they present their findings to you?**

**A:      On a Zoom call.**  I think it was the first Zoom call I had ever participated in.

Q:      When you say FRA presented findings to us, who is us?

A:      I participated in it **and Sarah Rogers from the Brewer Firm participated**…[12]

---

[9] *Id.* at 72:18-20.
[10] *Id.* at 81:1-8.
[11] *See* **Ex. 1-C**, J. Frazer Dep. (Aug. 19, 2021) at 69:14-15, 70:1, 70:18-19, 70:21, 71:1-2, 71:7-12.
[12] *See id.* at 63:16-17, 63:21-22, 64:2-11.

When AMc's counsel attempted to discover whether FRA provided a report, Frazer quibbled with the terminology "report," and, more egregiously, counsel instructed him not to answer the question seeking underlying facts, "Did FRA present any documents on the Zoom meeting at the end of the FRA audit?"[13]

On September 16, 2021, however, and with no prior notice or discussion with AMc, NRA counsel represented to the District Court that "FRA generated a report with its findings" and that the NRA would produce the report upon a stipulation that such production is not a subject matter waiver.[14]  AMc repeatedly advised the NRA that it would not agree to selective production and that any selective production would amount to subject matter waiver.[15]  Disregarding that stance and choosing to waive its purported privileged, the NRA instructed FRA to produce the documents anyway – and not just one report, but *six*.[16]  Those reports clearly include findings or conclusions, termed "Observations," about the audit and the documents provided.[17]  Not only is it disingenuous of NRA counsel here to suggest the Virginia court made any finding as to privilege, it is grossly misleading to continually refer to that ruling that was based on counsel's patent falsehoods.

AMc pursues this Supplemental Report to present to the Court the NRA's blatant and tactical inconsistencies and to request relief from the Court, specifically (1) to compel the NRA to produce all previously withheld FRA-related documents[18] and present its witnesses to testify on the FRA topics they were previously instructed not to answer, and to provide the parties additional time to conduct a deposition of an FRA representative, or alternatively, to exclude any reference

---

[13] *See id.* at 67:12-13, 67:16-19, 67:22-68:3, 68:5-69:1.
[14] *See* **Ex. 1-B**, Texas Action Hr'g Tr. (Sep. 16, 2021) 30:15-31:8.
[15] *See* **Ex. 1-E**, Letter to S. Rogers (Oct. 8, 2021) at 2; **Ex. 1-F**, Letter to S. Rogers (Sep. 24, 2021) at 1-2.
[16] *See e.g.*, **Ex. 1-G** (NRA_AM_FRA_0013873).
[17] *See e.g.*, *id.* at sheet entitled "Observations."
[18] For the avoidance of doubt, this includes all documents withheld on the FRA Privilege Log, *see* ECF 56 at Ex. A-11 [APP639-APP675], and the NRA's most recent Second Amended Privilege Log, attached hereto as **Ex. 1-H**.

(argument, document, testimony) regarding FRA and the FRA / 2019 audit at the time of trial; and (2) to impose sanctions upon the NRA and its counsel for this prolonged discovery abuse.

### B. The NRA's Position

AMc's motion falsely accuses the NRA of misconduct in a transparent attempt to deflect attention from its own invented narrative of being the unwitting dupe of a "fraud" in connection with the FRA review. AMc's narrative has collapsed under the weight of discovery in this case, which demonstrates AMc's massive withholding of relevant, requested documents. In response, AMc's latest gambit seeks to eviscerate valid, consistently-asserted privileges or (in the alternative) exclude observations by FRA, third-party forensic accountants, that lay bare AMc's lies concerning its alleged production of "everything" during the 2019 FRA review.

In truth, AMc has known of the existence of relevant FRA documents for more than two years.  The documents were deemed privileged by the Virginia court based on an accurate understanding of the facts, and the vast majority—with the exception of six spreadsheets and two engagement letters—remain privileged now under apposite Fifth Circuit law which AMc ignores in its motion.  AMc's claims of surprise and prejudice are especially unconvincing because, as its own tactically-belated disclosures reveal, AMc's principals and counsel were deeply involved in obstructing FRA's books-and-records examination.

During February 2019, the NRA's Office of the General Counsel retained a forensic accounting firm, FRA, to assist in conducting a books and records examination pursuant to the contract between the NRA and AMc.  As documented in FRA's engagement letter, the primary purpose of the examination was to facilitate legal advice about then-pending, and additional anticipated, litigation. [19] FRA did not prepare a narrative "report." It did prepare "draft"

---

[19] *See* discussion *infra* at IV.B.1.

spreadsheets that were screenshared with the NRA.[20] When AMc sought to compel the production

of FRA-generated material in the parties' parallel Virginia litigation, the NRA's Virginia counsel

explained that although there was no "report" as such, there exist documents setting forth FRA's

conclusions—but they were being withheld as privileged.[21]   Furthermore, the NRA stated that it

did not expect to offer testimony from FRA about its opinion work product.[22] Accordingly, the

Virginia court declined to compel production of FRA's opinion work product and other privileged,

FRA-related documents.[23]

Over the ensuing year, as the NRA consistently asserted its privilege, AMc made numerous

false representations about the FRA records examination, including the false claim that FRA's

forensic accountants received each and every document they requested.[24]   Those false claims were

widely disseminated in pleadings, testimony, and even in press releases.[25]   Then, after its motion

to compel FRA-related documents failed in Virginia, AMc surprisingly briefed yet another motion

to compel the documents in this action, access to documents which the Virginia court had denied.[26]

The motion was filed in October 2020.  With its October motion still unresolved, AMc emphasized

at the status conference on September 16, 2021, that it must receive discovery evidencing "the

---

[20] *See Id.* Further, John Frazer, Esq. testified to the fact that these "draft" documents were displayed on a Zoom call, and the documents themselves were privileged. *See* transcript of the deposition of John Frazer, Vol. I, dated August 19, 2021 at 64:2-66:5, attached as Exhibit 19 to Declaration of Sarah B. Rogers, Esq. dated November 12, 2021, in support of the NRA's Joint Status Report regarding AMc's Motion to Compel FRA Documents (the "Rogers Decl.").
[21] *See* Hearing transcript dated November 13, 2019 from the *National Rifle Association of America v. Ackerman McQueen, Inc. et al.*, Cons. Case Nos. CL19001747, CL19002067, CL19002886 (Cir. Ct. Va. 2019), attached as Exhibit 29 to the Rogers Decl. at p. 77:9-20
[22] *See Id.* at p.79:15-80:1.
[23] *See Id.*
[24] *See* discussion *infra* at IV.B.6.
[25] *See* statement from Ackerman McQueen, Inc., dated April 15, 2019, attached as Exhibit 9 to the Rogers Decl.; *see also* statement from Ackerman McQueen, Inc., dated September 13, 2019, attached as Exhibit 10 to the Rogers Decl.
[26] *See* Hearing transcript dated November 13, 2019 from the *National Rifle Association of America, Inc. et al.*, Cons. Case Nos. CL19001747, CL19002067, CL19002886 (Cir. Ct. Va. 2019), attached as Exhibit 29 to the Rogers Decl., at p. 79: 16-21.

outcome" of FRA's examination.[27]   At the same conference, in order to obviate the dispute, the NRA offered to produce any "report" (which really consists of multiple draft spreadsheets).[28]

During meet/confer sessions held in the wake of that status conference, AMc's counsel made clear that AMc's pending motions could ***not*** be resolved by production of documents setting forth the "outcome" of FRA's examination as AMc had insisted in open court. Therefore, the NRA made the additional offer to produce the engagement letter governing FRA's work and any instructions or guidance informing its analysis.[29]   The NRA also offered supplemental depositions of relevant witnesses.   The terms of this offer were made clear to AMc during a meet/confer teleconference on October 6, 2021.   AMc rejected the NRA's offer.

With AMc's motion to compel still outstanding, the NRA authorized FRA to produce, contemporaneously to the NRA and AMc, the spreadsheets documenting its observations and conclusions in connection with its books-and-records examination. [30]   It then provided the spreadsheets to its testifying experts.[31]   The NRA additionally produced copies of the operative engagement letter, and a previous superseded engagement letter, dictating the purpose and scope of FRA's review.[32]   The NRA told AMc that it remained available to meet and confer further on any remaining issues, but AMc rejected that olive branch, too.[33]   Instead, it waited until the

---

[27] *See* transcript from status conference, dated September 16, 2021, at 36:6-37:5, attached as Exhibit 1 to the Rogers Decl.

[28] *Id.* at p. 13:19-21, 30:24-31:5.   For clarity, as AMc acknowledges, FRA's work culminated in six spreadsheets which cover three topic areas including media buys, out of pocket expenses, and budgets. *See* ECF No. 388 (Plaintiff's Status Report on Discovery Issues, dated October 15, 2021) at p. 7, 8.

[29] *See* email from Sarah B. Rogers, Esq. to Brian Mason, Esq. Christina Carroll, Esq. and Kelsey Taylor, Esq. dated October 7, 2021, attached as Exhibit 3 to the Rogers Decl.

[30] *See* discussion *infra* at IV.B.10.

[31] *Id.*

[32] *Id.*

[33] *See* letter from Sarah B. Rogers, Esq. to Brian E. Mason, Esq., dated October 21, 2021, attached as Exhibit 35 to the Rogers Decl.

Saturday preceding the close of discovery to bring an untimely, so-called "supplemental" motion to compel—filled with its typical *ad hominem* attacks and frivolous accusations of wrongdoing.

AMc's motion disingenuously seizes upon semantic differences over the term "report" to raise the specter of misrepresentations (by the NRA) and prejudice (to itself)—but AMc knows that its accusations are meritless.  Indeed, AMc has known since Fall 2019 that draft work product setting forth FRA's observations existed.  AMc demanded that work product,[34] whatever it was called, and lost. In sum, having been denied in Virginia, AMc renewed the same demand in this case. In order to resolve this dispute, in whole or in part, and answer AMc's false claims regarding the FRA records examination, the NRA arranged for FRA to produce documents AMc demanded.[35] Apparently troubled by the information contained in those documents, AMc now claims prejudice and surprise. Of course, AMc knew, or should have known, what FRA's drafts would show: that AMc interfered with FRA's review, and that the limited materials furnished raised grave concerns regarding AMc's conduct.  AMc should have known this not only because its principals, and especially its Chief Financial Officer, William Winkler ("Winkler"),[36] were present for the FRA records examination, but also because its litigation counsel, Dorsey & Whitney, appears to have choreographed every detail of AMc's response to the NRA's exercise of its contractual books-and-records inspection right.[37]

The truth is that AMc and Winkler, with the apparent assistance of Dorsey, did everything they could to impede FRA's record examination, in violation of the contract between the parties. They attempted to dictate which professionals the NRA could use, imposed time limits on the

---

[34] *See* Defendants' Motion to Compel the Production of Documents from Third-Party FRA, dated October 1, 2019, filed in the *National Rifle Association v. Ackerman McQueen, Inc., et al.*, Case Nos. CL19001757, CL19002067, and CL19002886 (Cir. Ct. Va. 2019) (the "Virginia Action"), attached as Exhibit 6 to the Rogers Decl., at  p. 1-3.
[35] *See* discussion *infra* at IV.B.4.
[36] *See* discussion *infra* at IV.B.6 (discussing extent of Winkler's involvement).
[37] *See* discussion *infra* at IV.B.7 (discussing revelations from AMc's untimely amendments to its privilege log).

review,[38] prevented the copying of any documents by FRA,[39] limited the documents that could be reviewed,[40] chose the location of the review,[41] and supplied only hard-copy documents, intentionally preventing the NRA from accessing computer systems that would enable FRA to retrieve and analyze relevant data in its native, ordinary-course form.[42]  AMc's obstruction did not end there: ***even after the NRA sued to access its own documents***, AMc groundlessly withheld the vast majority of responsive records throughout years of litigation, then "dumped" some of them on the NRA under threat of motion practice during the brief window for extended discovery which the Court afforded.[43]  The NRA, by contrast, authorized a limited release of documents sought by AMc in response to a pending motion to compel.[44]

For the reasons set forth below, no subject-matter waiver is appropriate in this case.  The NRA made no use of the FRA spreadsheets other than providing them to its testifying experts—a disclosure coextensive with the one required by the Fifth Circuit in similar cases.[45]  The NRA did not affirmatively "inject" FRA's opinion work product into this case,[46] but rather made a discreet disclosure in response to a pending motion to compel.  And even if a subject-matter waiver did occur, it would only extend to documents that "fairness" requires be considered "together" with FRA's draft spreadsheets—not documents pertaining to other issues or other litigation. Accordingly, the Court should deny AMc's motion in its entirety, and award the NRA its costs incurred responding to this duplicative, vexatious, bad-faith motion practice.

---

[38] *See* deposition transcript of Michael Trahar, dated September 18, 2019, attached as Exhibit 4 to the Rogers Decl. at 52:11-59:1.
[39] *Id.*
[40] *Id.*
[41] *Id.*
[42] *Id.* at 74:9-18.
[43] *See* discussion *infra* at IV.B.6 (discussing AMc's egregiously belated document productions).
[44] *See* discussion *infra* at IV.B.4; see also draft spreadsheet, attached as Exhibits 11 through 16 to the Rogers Decl.
[45] *See* discussion *infra* at V.B.3.
[46] *See* discussion *infra* at V.B.9.

## II.    MATTERS RESOLVED BY AGREEMENT

None.

## III.    MATTERS TO BE HEARD AND DETERMINED

### A.    AMc's Position

Despite conferences with the NRA's counsel over the last two years about the FRA documents, including AMc's stance on the NRA's subject matter waiver and including recent conferences and letters exchanged between counsel in September and October 2021, AMc has been unable to reach an agreement.  AMc moves the Court (1) to compel the production of all FRA-related documents withheld on the basis of privilege, to compel the continued depositions of deponents previously instructed not to answer questions relating to the FRA audit*, and to permit the parties additional time to continue the deposition of an FRA representative, or alternatively, to exclude any reference (argument, document, testimony) regarding FRA and the FRA / 2019 audit at the time of trial; and (2) to impose sanctions upon the NRA and its counsel for its continuous discovery abuse.

### B.   The NRA's Position

AMc's motion should be denied in its entirety. While AMc suggests that the NRA effectuated a subject matter waiver by producing the FRA draft reports, no such waiver occurred. In fact, the opposite is true. The NRA produced a narrow subset of documents that have been at issue since the Virginia litigation began in 2019, and that AMc repeatedly requested. In fact, AMc already litigated and lost a motion to compel production of the remaining documents marked as privileged by FRA. The Virginia court squarely addressed this issue[47] in November 2019, and now AMc is after a second bite at the apple, which should not be permitted. Instead, AMc should be

---

[47] *See* hearing transcript from a Status Conference regarding outstanding discovery, dated September 16, 2021, attached as Exhibit 1 to the Rogers Decl. at p. 37:2-38:24.

held accountable for repeatedly interjecting false and misleading statements into the record and for its gratuitous *ad hominem* attacks against the NRA and third-party FRA.

Courts in the Northern District consistently hold that trial courts have the power to order cost shifting related to the filing of duplicative motions, especially where a motion wastes resources and could have been resolved without burdening the Court. For example, in *Lowe v. Firestone Tire & Rubber Co*., 2018 WL 10398360at *2 (N.D. Tex. 2018), the Court imposed sanctions in the form of attorney's fees where a plaintiff filed duplicative motions for default judgment, "because Defendant was forced to expend time and resources filing multiple responses, and because Plaintiff needlessly increased the cost of litigation." Further, in *United States v. Hildenbrand*, 2017 WL 3381929 at *1-2 (N.D. Tex. 2017), the court warned that sanctions are warranted when a party files "motions [that] are duplicative of motions that the Court fully considered and denied on prior occasions." There could not be a more compelling case for the award of costs against a movant than here. AMc's motion repeats stale attacks in order to relitigate issues that have already been decided. In addition, the record here demonstrates concessions offered by the NRA to avoid continued motion practice. Finally, the record now unequivocally establishes that AMc's "complete" audit compliance narrative is a carefully orchestrated ruse designed to evade the consequences of its intentional refusal to allow NRA to meaningfully exercise its right to records examination. As massive document productions poured into the offices of the NRA's counsel throughout October 2021, AMc's malfeasance in claiming that it complied with the NRA's books and records request in 2018-2019 is indisputably confirmed. In the face of that confirmation, AMc's persistence in filing wasteful, bad faith motions should not be countenanced.

Therefore, this Court should deny AMc's motion in its entirety, award the NRA costs incurred in responding to this motion.

## IV. BACKGROUND FACTS

### A. AMc's Position

#### 1. NRA Audits of AMc's Books and Records and Fraudulent Promise to AMc

Detailed in AMc's Second Amended Counterclaim,[48] beginning in September 2018, the NRA requested to audit AMc's books and records outside of the NRA's customary annual process. The Brewer Firm managed the first audit, including Susan Dillon, the Brewer Firm's Director of Consulting who had worked at the Brewer Firm for *seventeen years*.[49]

Prior to that time, Brewer had fallen into a steady pattern of harassment and threats with respect to AMc, including threats to indict AMc executives and to have the FBI raid AMc offices.[50] That issue of harassment and threats was one of the main topics of discussion during an October 11, 2018 meeting between AMc and NRA executives, including Wayne LaPierre ("*LaPierre*"), where LaPierre promised that Brewer and his firm would no longer be involved with AMc.[51] Thus, when LaPierre said the NRA needed another audit as part of its litigation concerning the failed Carry Guard program, AMc welcomed an independent auditor or law firm to its office.[52] Indeed, the Cooper Kirk firm handled the second audit in November 2018 without complaint.[53]

The NRA then insisted on a *third* audit in early 2019 to be conducted by "independent" third-party accounting firm, Forensic Risk Alliance.[54] AMc learned well after the nine-day audit

---

[48] *See* ECF 241, AMc's 2d Am. Countercl. ¶¶ 67-90.
[49] For additional allegations of Susan Dillon's involvement, *see* ECF 241, AMc's 2d Am. Countercl. ¶¶ 84-87.
[50] *See e.g.*, *id.* at ¶¶ 69, 72-74.
[51] *See e.g.*, *id.* at ¶¶ 71, 76-78.
[52] *See e.g.*, *id.* at ¶ 78.
[53] *See e.g.*, *id.* at ¶ 80.
[54] *See e.g.*, *id.* at ¶ 84.

concluded that the Brewer Firm's Susan Dillon "just so happened" to work at FRA during the audit *and participated in the AMc audit the entire time*.[55]  It is the NRA's fraudulent promise of no involvement by Brewer or his firm, which the NRA violated by having Susan Dillon facilitate the FRA audit, that is the basis of some of AMc's claims.[56]

### 2.  NRA Reliance on FRA for Lawsuits against AMc

Mere weeks after the FRA audit in 2019, the NRA sued AMc for the first time on April 12, 2019, in Virginia for breach of the books and records examination clause of the parties' Services Agreement.  According to the NRA, when AMc was allegedly not complying with the examination clause, it hired FRA to review AMc's books and records,[57] including issues with "fraudulent billing" and out-of-pocket expenses and back-up documentation for invoices.  More pointedly, the NRA's General Counsel, John Frazer, testified unequivocally on August 19, 2021 that the NRA is relying on findings by FRA in support of several claims, including for the "fraudulent billing" and documentation issues.[58]  Stated differently, it is undisputed that the NRA initiated litigation against AMc in April 2019 based in part on the results of the FRA audit.[59]

### 3.  NRA False Representations to the Courts

NRA counsel stated several times in open court in the Virginia Action, including in response to direct questions from the judge, that no FRA report existed, no FRA report was shown to the NRA via remote means, no privilege was being asserted over an FRA report, FRA did not issue findings or conclusions, and the NRA was not relying on any FRA report in support its

---

[55] *See e.g.*, *id.* at ¶¶ 85-87; ns. []-[], *infra*.
[56] *See e.g.*, *id.* at ¶¶ 208-13 (Count Two – Defamation), ¶¶ 224-31 (Count Five – Fraud), ¶¶ 232-39 (Count Six – Conspiracy).
[57] *See* ECF 209, NRA 2d Am. Compl. ¶ 68.
[58] **Ex. 1-C**, J. Frazer Dep. (Aug. 19, 2021) at 69:14-15, 70:1, 70:18-19, 70:21, 71:1-2, 71:7-12.
[59] *See generally*, Orig. Compl. in the Virginia Action (Apr. 12, 2019).

claims.[60]  Counsel made those repeated representations despite the fact that the Brewer Firm participated in the very Zoom meeting(s) where the FRA reports were shown,[61] which reports included FRA findings and conclusions ("Observations"),[62] and which reports are being used to support the NRA's claims, as confirmed by the NRA's own General Counsel.[63]

AMc also previously clarified to the District Court another misleading representation by NRA counsel concerning FRA: the NRA made representations to the District Court that Susan Dillon was not involved with the FRA review of AMc documents, which misrepresentations the NRA filed under seal even though the particular statements contain no confidential information. For example, FRA Director, Michael Trahar, suggested in his sealed affidavit that Susan Dillon did not work on the AMc matter,[64] which is patently false.  In her own sealed affidavit, Dillon misleadingly distinguishes *where* she worked on the AMc matter at FRA, not *whether* she worked on the AMc matter.[65]  But the evidence unequivocally shows Dillon (a) coordinated the FRA-AMc review while she worked at FRA,[66] shortly after leaving the Brewer Firm, (b) where she also participated in the prior September 2018 NRA-AMc audit conducted by the Brewer Firm,[67] and (c) she even repeatedly interfaced directly with the Brewer Firm and the NRA concerning the FRA-AMc audit.[68]  The successive, misleading representations to multiple courts is concerning, in the least, and warrants swift action to avoid any further prejudice to AMc.

---

[60] *See* Supp. Report § I (A) Introduction, AMc's Position, quoting and citing **Ex. 1-A**, Virginia Action Hr'g Tr. (Nov. 13, 2019) at 63:2-65:1, 70:10-14, 71:14-72:6, 72:18-20.
[61] *See* **Ex. 1-C**, J. Frazer Dep. (Aug. 19, 2021) at 63:16-17, 63:21-22, 64:2-11.
[62] *See e.g.*, **Ex. 1-G**, sheet entitled "Observations" (NRA_AM_FRA_0013873).
[63] *See* **Ex. 1-C**, J. Frazer Dep. (Aug. 19, 2021) at 69:14-15, 70:1, 70:18-19, 70:21, 71:1-2, 71:7-12.
[64] *See* ECF 161 (Appendix in Support of NRA's Surreply to AMc's Motion to Disqualify), at Ex. 1 ¶ 6.
[65] *See Id.* at Ex. 2 ¶ 9.
[66] Discovery has unearthed emails to this effect.  For reference to AMc's allegations on this issue, *see* ECF 241 (AMc's 2d Am. Countercl.) at ¶ 87.
[67] *Id.* at ¶ 84.
[68] *Id.* at ¶ 85.

## B. The NRA's Position

AMc's position is nothing more than a repetition of its contrived "harassment" narrative and an overblown attempt to insinuate wrongdoing based upon the use of the terms "report" versus "draft spreadsheet" to refer to the FRA draft spreadsheets. As purported support for its motion, AMc also misrepresents the testimony of FRA professionals Trahar and Dillon, whom it continues to unrelentingly and improperly smear.

### 1. FRA Was Retained by the NRA's General Counsel to Facilitate Legal Advice in Anticipation of Litigation

As documented in its engagement letters (produced years ago to AMc), FRA was retained in January 2019 to analyze documents "under the direction of Counsel, for the specific purpose of informing Counsel's legal advice to the NRA in connection with **_pending and anticipated_** litigation."[69]  Critically and purposefully, AMc ignores the emphasized language, because it highlights a fact incongruent with AMc's contrived narrative: FRA performed work for the NRA relating to multiple matters, including (i) a lawsuit that was pending against a third party when the NRA's record-examination requests were first made in 2018; and (ii) separate matters that did not relate to AMc at all.[70]  Thus, AMc's insistence that "all documents relating to FRA" are encompassed by a subject-matter waiver is facially without merit. As set forth in its engagement letter, FRA reported to the NRA's counsel and communicated only with, or as directed by, counsel.[71]  These confidential communications were recorded on FRA's log. The FRA log was produced to AMc in September 2019.

---

[69] _See_ Agreement for Forensic Accounting Services between the Office of the General Counsel of the NRA and FRA ("FRA Engagement Letter") at Section 3.1, attached as Exhibit 2 to the Rogers Decl. (emphasis added).

[70] _See_ email from Sarah B. Rogers to Brian Mason, Christina Carroll, and Kelsey Taylor dated October 7, 2021, attached as Exhibit 3 to the Rogers Decl.

[71] _See_ Agreement for Forensic Accounting Services between the Office of the General Counsel of the NRA and FRA at Section 3.2, attached as Exhibit 2 to the Rogers Decl.

### 2. AMc's Allegations of Fraud of Misconduct Are Frivolous, Unsupported After Years of Discovery, and Contradicted by Its Own Eleventh-Hour Disclosures.

Although the record amply supports the privileged nature of FRA's engagement, AMc nonetheless interposes the inflammatory factual allegations which have **no evidentiary support** after more than two years of discovery. Specifically, AMc cites **no evidence at all** for the legally irrelevant proposition that "LaPierre promised that Brewer and his firm would no longer **be involved** with AMc,"[72] or that the NRA made any "fraudulent promise" that the NRA's forensic accountants would be "independent[t]"[73] from the NRA's counsel.[74] Importantly, Wayne LaPierre testified that <u>no</u> such representation was ever made.[75] In addition, documents from AMc's own executives directly contradict AMc's claim.[76] As John Frazer, the NRA's General Counsel, pointedly emphasized in his correspondence with AMc, the NRA had a contractual right to examine its own documents—and obtain advice, from professionals of its choice, about what those documents revealed...[77] AMc's "fraud" allegations collapse against this backdrop, find no support in the record (indeed, the allegations are contradicted by the record as of the close of discovery), and provide no support for its motion.

---

[72] *See* discussion *infra* at IV.A.1, citing only AMc's Second Amended Counterclaim. at ¶¶ 71, 76-78.

[73] *See* discussion *infra* at IV.A.1, citing only AMc's pleading for the proposition that FRA was represented to be "independent" from other NRA professionals.

[74] Not content to level unfounded accusations at the NRA and its counsel, AMc also accuses FRA's general counsel, Michael Trahar, and Susan Dillon of misleading the Court in previous sealed declarations attesting to the circumstances of Ms. Dillon's employment and her return to the Brewer Firm. *See* discussion *supra* at IV.A.3. These accusations, too, are meritless, as a review of both declarations attests. The purpose of Mr. Trahar's declaration was to discredit AMc's manufactured conspiracy theory that Ms. Dillon's employment by FRA was choreographed to begin and end surrounding FRA's engagement by the NRA; on FRA's behalf, he explained that the COVID-19 related measures FRA implemented led to Ms. Dillon's departure from his firm. Similarly, Ms. Dillon's declaration clearly debunks AMc's accusations of "spying."

[75] *See* deposition transcript of Wayne LaPierre, dated August 20, 2021, at p. 302:11-15, attached as Exhibit 30 to the Rogers Decl.

[76] *See* email from T. Makris to S. Hart, Esq., dated October 11, 2018, attached as Exhibit 28 to the Rogers Decl.

[77] *See* letter from John C. Frazer, to Jay Madrid, dated March 14, 2019 attached as Exhibit 33 to the Rogers Decl.

### 3. As A Threshold Matter, AMc's Recycled Fraud Contentions are Beside the Point, Because the NRA had a Contractual Right to Perform a Books and Records Review

It is essential to note that AMc, a non-exclusive vendor[78] who the NRA could terminate at will,[79] had no right to choose what law or accounting firm the NRA retained. The Services Agreement contains no such reservation of rights on behalf of AMc. The Services Agreement makes clear that the NRA owns the materials related to AMc's work for the NRA.[80] In essence, AMc's position amounts to an assortment of pointless complaints and accusations each of which twist AMc's breaches in obstructing FRA's review into a fraud by the NRA.

Having built lengthy arguments in response to NRA's breach of contract claims on the absurd argument that it had the right to choose who would represent the NRA in a books and records review, in this motion, AMc then makes the quantum leap that it can also invade privileged communications between the NRA's General Counsel and FRA and their work product. Neither the law, nor the facts, support AMc's requests.

### 4. AMc's, Recycled Contentions About the Substance of the Parties' October 11, 2018, Meeting Lack Credibility

AMc's recycled misrepresentations about the parties "October 11, 2018 meeting," repeated here again, underscore the bad faith of this motion. For example, although AMc portrays the budget meeting which occurred on that date as one dealing with threats by NRA counsel concerning "indictments" and "FBI raids," this is an apparent whole-cloth fabrication, unsupported by any contemporaneous documents.  Indeed, AMc's Second Amended Privilege Log shows that its executives and counsel instead discussed an email from the NRA's outside counsel, Steve Hart,

---

[78] *See* ECF 316-1 1 (NRA Appendix in support of Opposition to AMc Motion for Partial Summary Judgment) at Section I [APPENDIXFUS00002-APPENDIXFUS00005].
[79] *Id.* at Section XI [APPENDIXFUS00010-APPENDIXFUS00012].
[80] *Id.* at Section VI [APPENDIXFUS00009].

urging AMc to comply with the NRA's transparency efforts in the face of looming regulatory risks.[81]  Further, a number of other privilege-log entries that day (such as entries no. 1387, 1388, 1392, 1395, and 1397) involve AMc's contract with Oliver North, a concern raised by the NRA Audit Committee.[82]  These privilege-log entries—which, importantly, denote documents never logged (and instead concealed) by AMc until days prior to the expiration of the extended discovery deadline—demonstrate that on the day of the October 11, 2018, meeting, AMc and Dorsey were discussing the NRA's straightforward and appropriate information requests, all of which pertained to valid Audit Committee concerns.  The Brewer firm (which AMc insists made bombastic threats) is <u>never</u> mentioned, except in connection with the "audit" and the North contract. There is no mention of Brewer in connection with a threatened indictment of AMc or an FBI raid in these entries.[83]

### 5.   AMc's Continuing Attacks on Accounting Professionals Are Based Upon a Deliberate Misconstruction of the Record

Predictably, AMc  attacks Trahar and Dillon based upon a willful misconstrual of declarations they previously submitted.[84] As AMc's multi-year attack on these professionals continues, AMc now claims that Trahar falsely stated in  his declaration that Dillon did not work on the AMc matter.[85] What he actually said was that she performed services for "a number of other FRA clients, not just the NRA."[86] AMc then proceeds to accuse Dillon of being "misleading"

---

[81] *See* AMc's Second Amended Privilege Log, dated October 22, 2021, attached as Exhibit 22 to the Rogers Decl., at Log entry no. 1389.
[82] *See* ECF 209 (NRA Second Amended Complaint) at p. 11.
[83] Indeed, the record demonstrates, as the former Treasurer and Chief Financial Officer of the NRA attested, that the October 11, 2018 meeting involved a meeting by NRA executives with AMc "to understand what services were being provided, what services [the NRA] required, and what the services would cost." *See* ECF 122-1 (Appendix in support of Opposition to Motion to Disqualify Plaintiff's Counsel) at Ex. 52 Declaration of Craig Spray, dated May 4, 2020 [APPENDIX424-428].
[84] *See infra* at IV.A.3.
[85] *Id.*
[86] *See* ECF 161-2 (NRA Sur-Reply in support of opposition to Motion to Disqualify Plaintiff's Counsel) at Ex. 1 (Declaration of Michael Trahar) at pg. 6.

because she stated that she was never on site during the FRA review. In trying to portray itself as a dupe of a "spying" conspiracy, AMc omits reference to the abundant evidence in the record demonstrating that Dillon was a part of the FRA team that worked on the FRA review. For instance, Trahar at his deposition stated as follows:

> COUNSEL:
> Q. And what did you do to prepare for this deposition?
>
> WITNESS:
> A. I reviewed the documents and I spoke with some of the team members.
>
> COUNSEL:
> Q. When you say some of the team members, who were you referring to?
>
> WITNESS:
> A. Jerry Hansen was the engagement partner. Susan Dillon was on the team, and I believe I spoke briefly with Tyler Daly.[87]

Further, FRA itself produced a privilege log with numerous entries with Dillon's name, and FRA's counsel, Debevoise, produced documents indicating the same.[88] AMc's contentions are obviously designed to create a credibility issue with respect to Trahar and Dillon. In any event, such contentions are pointless because the NRA was entitled to send whomever it wished to examine books and records. Further, the record shows that by the time FRA arrived at the review, AMc and its army of lawyers had telescoped the review to a fraction of what should have been made available.  Given that AMc manipulated the review, its claims of being the victim of a "fraud" are unworthy of serious consideration. Rather than fretting over Dillon's involvement, AMc and its many lawyers were focused on deflecting and thwarting the transparency efforts of the NRA Audit Committee.  With the involvement of a major law firm, AMc strategically

---

[87] *See* deposition transcript of Michael Trahar, dated September 18, 2019, attached as Exhibit 4 to the Rogers Decl. at p. 12:16-24.
[88] *See* excerpt from the Forensic Risk Alliance privilege log, attached as Exhibit 5 to the Rogers Decl.

narrowed and obstructed the information made available to FRA.[89] Thereafter, AMc spent years spinning a false narrative in this Court, before the Federal Bankruptcy Court, and in public press releases.[90] And, now, apparently upset by the "draft spreadsheets" and the observations[91] they contain, AMc files this retaliatory motion, including the bad faith request for sanctions.

### 6. AMc and Winkler Knowingly Made False Representations Regarding FRA's Record Examination.

Even as the NRA remained silent and asserted its privilege, Defendants made the tactical choice to build their advocacy upon false assertions about the FRA records examination. For example, AMc claims in its pleadings that it complied fully with the FRA records examination.[92] AMc repeated the same falsehoods to the media as it told multiple national outlets on April 15, 2019, that "[d]uring a three-week review, an NRA forensic auditing team received every single piece of information they [the NRA] requested. Further, the NRA has had consistent access to any and all documents regarding NRATV analytics,"[93] and repeated on September 13, 2019, that AMc "cooperated with every single audit [the] NRA requested."[94]

In truth, FRA's "draft spreadsheets" contain the following observations:

- That media-buy information, which was an explicit, agreed upon focus of the record examination, was withheld from FRA because that information "was proprietary and FRA could not have access to this information;"[95]

---

[89] *See* email from Jay Madrid, Esq. to Steven Hart, Esq., dated January 4, 2019, attached as Exhibit 25 to the Rogers Decl. at p. 3-4.

[90] *See* statement from Ackerman McQueen, Inc., dated April 15, 2019, attached as Exhibit 9 to the Rogers Decl.; *see also* statement from Ackerman McQueen, Inc., dated September 13, 2019, attached as Exhibit 10 to the Rogers Decl.

[91] *See* draft spreadsheets, attached as Exhibits 11 through 16 to the Rogers Decl.

[92] *See, e.g.*, ECF No. 238 (AMc Motion for Leave to File Second Amended Counterclaim) at ¶ 89 (falsely representing that AMc "complied" with the examination, and "[a]t no time did the auditors complain to AMc that documents were withheld from review").

[93] *See* Statement from Ackerman McQueen, Inc., dated April 15, 2019, attached as Exhibit 9 to the Rogers Decl.

[94] *See* Statement from Ackerman McQueen, Inc., dated September 13, 2019, attached as Exhibit 10 to the Rogers Decl.

[95] *See* Forensic Risk Alliance draft spreadsheet regarding Ackerman McQueen, Inc.'s media buys (NRA_AM_FRA_0013873), attached as Exhibit 11 to the Rogers Decl., at p. 2-3.

- FRA received no documentation regarding the assessment of the selection of media outlets, the dates of airing and/or the price being charged;[96]

- FRA received no documentation explaining how unit costs for major advertising expenditures were derived;[97]

- FRA was provided with **no** evidence of written approvals for **any** out-of-pocket expenses incurred by Tony Makris in 2015 or 2016;[98] and

- FRA was provided with no documentation reflecting common business practices for expense processing.[99]

Defendant William Winkler ("Winkler") is the CFO of AMc and, together with his son Brandon Winkler, one of the largest owners of the agency.[100]  Winkler was present during the FRA review, and was certainly aware of the foregoing.[101] Nonetheless, Winkler falsely testified under oath that the audit concluded without any additional requests for documents or any accusations that documents were being withheld,[102] claims directly contradicted by the testimony of FRA's Rule 30(b)(6) corporate representative, Michael Trahar, who testified that "…there were many requests for information that we made that the record indicates we did not get answers to."[103] The record also reflects Winkler's hostility to the FRA review process and the iron-fisted control he exerted over it. [104] For example, Trahar explained that he did not anticipate "the extent to which

---

[96] *Id.*

[97] *Id.*

[98] *See* Forensic Risk Alliance draft spreadsheet regarding Anthony Makris' expenses (NRA_AM_FRA_0013868), attached as Exhibit 12 to the Rogers Decl. at p. 3.

[99] *Id.*

[100] *See* Ackerman McQueen, Inc., Stockholder Listing, dated February 24, 2021 (BANA AMI000292), attached as Exhibit 31 to the Rogers Decl.

[101] *See* declaration of William Winkler, dated June 3, 2020, filed as Exhibit A to ECF 141 (AMc Appendix in support of Motion to Disqualify Plaintiff's Counsel) at ¶ 9, p. 4.

[102] *See* ECF No. 279 (AMc brief in support of Motion for Partial Summary Judgment) at p. 40-41 n.210, citing Winkler Hr'g Test. at p. 96-99.

[103] *See* deposition transcript of Michael Trahar, dated September 18, 2018, attached as Exhibit 4 to the Rogers Decl. at 105:21-23.

[104] *Id.* at 153:3-12.

Mr. Winkler intended to impose those restrictions"[105] and states that his team did not receive

complete access to the information requested.[106]

Consistent with FRA's testimony, Susan Dillon—an accountant whom AMc continues to

vilify without any evidentiary support—confirmed at her deposition that Winkler intervened to

narrow the scope of the books-and-records review conducted by the NRA in September 2018:[107]

> COUNSEL:
> Q.  Your review in September of 2018, which took place over two days, was that
> meant to be the only two days that representatives of the NRA were going to be
> reviewing documents related to Ackerman McQueen?
>
> WITNESS:
> A.  No, no, no.· The letter that we sent said that it would be the initial review just
> for those three categories.
> Remember, I said earlier that initially we wanted to review in accordance with the
> contract, but Mr. Winkler wanted to narrow that scope.· So he narrowed it to just the
> three categories and he -- and so we said initially that could be the review.

On October 29, 2021, the NRA filed a motion to compel Winkler's deposition in his

capacity as a records custodian and as a 30(b)(6) deponent,[108] based upon the serious issues raised

by repeated, voluminous, egregiously-belated document productions that AMc continued to

deliver throughout October 2021. On October 1, 2021, the NRA received 144 gigabytes of data,

followed productions every Friday night for the remainder of the month, including October 22,

2021 and October 29, 2021. Winkler has been AMc's main witness throughout this proceeding,

fueling the false narrative that AMc provided the NRA and then FRA with "everything"[109] the

---

[105] *Id.* at p. 154:2-13.

[106] *Id.* at p. 66:3-7, 71:17-72:4, and 78:14-20.

[107] *See* deposition of Susan Dillon, dated July 28, 2021, attached as Exhibit 23 to the Rogers Decl., at p. 99: 7-18.

[108] *See generally* ECF 394-1 (Appendix in support of Plaintiff's Status Report on Outstanding Discovery, dated October 29, 2021) at Ex. A. Notably, the NRA first provided the motion to AMc to insert its arguments on October 8, 2021.

[109] *See* trial transcript (William Winkler), *In Re: National Rifle Association of America and Sea Girt, LLC*, Case No. 21-30085 (N.D. Tex. 2021), p. 95:13-15 and 97:2-8 attached as Exhibit 24 to the Rogers Decl.; Winkler's abundant testimony and presence anywhere and everywhere throughout this dispute is understandable when it is considered that he is not simply the CFO of AMc. Rather, he and his son, Brandon Winkler, are the largest owners of AMc, <u>not</u> the

NRA and its professionals sought, and that AMc—the NRA's fiduciary—was somehow victimized by its principal's decision to examine its own documents and enforce its own rights in response to whistleblower complaints and regulatory risks.[110]

### 7. AMc Improperly Withheld, and Continues to Withhold, Documents

On October 22, 2021, after months of repeated requests for AMc's responses to the NRA's motion in connection with its deficient privilege logs,[111] and on the very same day that AMc served the NRA with this bad faith Motion, AMc finally produced a Second Amended Privilege Log. *AMc tactically delayed its delivery of the Second Amended Log until just days before the October 29, 2021 discovery deadline, adding 1,620 new entries—which describe documents that are unambiguously responsive to the NRA's discovery requests, but were never conceded to exist until days before the __extended__ discovery deadline in this case. Among the eleventh-hour additions to AMc's privilege log are hundreds of entries that reveal the depth and breadth of the maneuvering undertaken by AMc and its counsel to obstruct the FRA review. These tactically-belated admissions[112] undermine AMc's complaints of "fraud" and its insistence on reopening discovery.*

Read together, documents and privilege-log admissions ultimately pried from AMc make clear that AMc knew it was obstructing compliance efforts by the NRA—but did not care. Indeed, discovery has shown that AMc was explicitly cautioned in October 2018, about threats the NRA

---

McQueen family. This information was not discovered by the NRA until October 18, 2021, when the Bank of America responded to an NRA subpoena, and the NRA received information concerning AMc's ownership structure. *See* Ackerman McQueen, Inc., Stockholder Listing, dated February 24, 2021 (BANA AMI000292), attached as Exhibit 31 to the Rogers Decl. Obviously, the alleged "family feud" narrative with which AMc has littered the record concerning the McQueen family and the NRA's counsel failed to apprise the Court of who the largest owners of AMc actually are.

[110] *See* ECF 316-1 (NRA Appendix in support of Opposition to AMc Motion for Partial Summary Judgment), Services Agreement, Section VIII [APPENDIXFUS00010].

[111] *See* letter from Sarah B. Rogers to Brian E. Mason dated September 22, 2021, attached as Exhibit 34 to the Rogers Decl.

[112] Privilege-log entries constitute, and may be admitted as, admissions of a party opponent.  *See, e.g., Huawei Techs. Co. Ltd v. T-Mobile US, Inc.*, No. 216CV00052JRGRSP, 2017 WL 7052463, at *1 (E.D. Tex. Sept. 20, 2017).

faced and the urgent need for transparency.  In one striking email exchange, the NRA's now-former outside counsel, J. Steven Hart ("Hart")—with whom AMc had longstanding interactions—pleaded with an AMc executive to cooperate.

Specifically, on September 19, 2018, the NRA's counsel made a number of  easily understood requests for information. [113] Unfortunately, the requests, all of which AMc were obligated to honor, were met with a hostile, obstructive email from Gina E. Betts ("Betts"), a partner at Dorsey, sent on September 20, 2021. That day, the NRA's counsel responds again clarifying and re-urging the requests for information. [114] AMc ignores that request. On October 8, 2021, NRA's counsel follows up and Betts forwards the email to Revan McQueen, [115] who sends it to Angus McQueen, Anthony Makris, Winkler, Brandon Winkler and Melanie Montgomery. [116] Makris then forwards the email thread to Hart in an obvious effort to obstruct the books and records review, complaining about the NRA's information requests and the NRA's counsel. [117] Hart responds, tries to reason with the recalcitrant vendor, and emphasizes the New York regulatory threat, warning AMc to be cognizant of "self-correction." [118]

Relevant sections of the email thread are as follows:

---

[113] *See* email chain from Steven Hart, Esq. to Anthony Makris, dated October 8, 2018, attached as Exhibit 28 to the Rogers decl. at AMcTX-00010529-10530.
[114] *Id.* at AMcTX-00010528-10529.
[115] *Id.* at AMcTX-00010527.
[116] *Id.* at AMcTX-00010526. By any reckoning, it is now clearly understood that this group, along with several attorneys at Dorsey worked together, virtually every day, to frustrate the NRA's records examination.
[117] *Id.*
[118] *Id.*

| From: | Steve Hart <jstevenhart@gmail.com> |
|---|---|
| Sent: | Mon, 8 Oct 2018 22:25:14 -0400 (EDT) |
| To: | Anthony Makris <Anthony-makris@am.com> |
| Subject: | Re: NRA / Ackerman: Video Copying, Legal Fees |

I gave you my best suggestion for getting back control

And Quit sending me emails like this.
You make me laugh. Well said —
38 years of historical practice could be
a nice target for a NYAG.

What NRA is looking for is—- Someone from
the NRA must review and report to the audit
committee that we have reviewed and found
no issues. And we will improve practices going forward
with no exceptions. This self correction is critical
prior to an AG initiating a challenge to our NY
incorporation. Repeat to yourself-self correction .

There is no year 39 for old ways .

Just for fun, remember that the NYAG nominee has stated
publicly that she believes the NRA is a criminal
enterprise If we lose the House, she will be using
Judiciary Chairman Nadler (D-NY) to investigate
us and access all documents. My lawyers claim TX
And Okla documents are subject to US Congressional
subpoenas . You and I could get to testify in a worse case
scenario. But good need is we should only have to produce
Tax records going back 7 years, not 38

It's an ugly fight in the trenches against aggressive regulators.


On Oct 8, 2018, at 9:29 PM, Anthony Makris <Anthony-makris@am.com> wrote:

Brewer's emails directly contradict what you
and Wayne have directly told me he's authorized to do, ie, examine records not seize them.
He is asking for Copies, and his stated intention is to take them.
It violates our mutual agreement and practice for 38 years.
Someone needs to reign this in. He
can't even tell us what he's looking for...

Sent from my iPhone

Anthony Makris
President Mercury Group

MERCURY GROUP
201 Noon Union Street, STE 910
Alexandria, VA 22314 | (703) 299-8470
Anthony-makris@am.com | www.am.com

MG

**From:** Revan McQueen <Revan-McQueen@am.com>
**Date:** October 8, 2018 at 8:22:51 PM EDT
**To:** Angus McQueen <angus-mcqueen@am.com>, Anthony Makris <Anthony-makris@am.com>, Bill Winkler <bill-winkler@am.com>, Brandon
Winkler <Brandon-Winkler@am.com>, Melanie Montgomery <Melanie-Montgomery@am.com>
**Subject:** Fwd: NRA / Ackerman: Video Copying, Legal Fees

FYI

Confidential                                                                                    AMcTX-00010526

AMc's Second Amended Privilege Log shows dozens of previously unlogged entries

during the time period[119] when the NRA initiated its records examination.[120] As AMc and its

counsel begin to obstruct the examination, Hart advises them that it is not the NRA's attorneys,

but the "audit committee" that wants a review and that "*we will improve practices going forward*

*with no exceptions. This self correction is critical […] Repeat to yourself-self correction.*"[121]

(emphasis added). On October 8, 2018, he informs AMc that the past practices to which AMc

refers as a basis to refuse to respond to the NRA's requests, as set forth in BAC's correspondence,

are beside the point, noting: "*You make me laugh. Well said — 38 years of historical practice*

*could be a nice target for a NYAG.*" [122] (emphasis added). Hart's email underscores the

malfeasance of AMc's conduct in connection with the FRA review. Both it and its counsel were

on notice that reviews were part of an Audit Committee mandate and a necessity because of the

threat that the NRA faced from New York regulators.[123]

Further, on October 11, 2018, an additional email exchange between Hart and Makris (the

same day of the important budget meeting between AMc and the NRA) confirms that Makris was

aware that the NRA did not intend to remove Brewer from the review process, thus contradicting

---

[119] *See* AMc's Second Amended Privilege Log, dated October 22, 2021, attached as Exhibit 22 to the Rogers Decl., at
Log numbers 959-974, 981-1003, 1005-1035, 1049-1050, 1140, 1145, 1374-1378, 1385-1386, and 1389-1394.
[120] *Id.* at p. 37-38.
[121] *See* email chain from Steven Hart, Esq. to Anthony Makris, dated October 11, 2018, attached as Exhibit 28 to the
Rogers Decl. at AMcTX-00010526.
[122] *Id.* Unfortunately, AMc rejected Hart's "suggestions" and continued to pursue its plan to derail the examination.
[123] The candidate for New York Attorney General, Letitia James had disclosed that she intended to target the NRA.

the claim that NRA made a "promise" to AMc that Brewer would no longer be involved in the NRA's self-correction program.[124]

Later, in connection with the FRA records examination, a letter from John Frazer, NRA's General Counsel, directly contradicts AMc's false "promise" storyline. Specifically, on March 14, 2019, Frazer wrote to Jay Madrid, a partner at Dorsey, stating: "***With regard to the Brewer firm, as emphasized most recently by Steve Hart in his email dated January 16, 2019, the NRA has the right to choose its own counsel. It is no secret that we have chosen Mr. Brewer's firm to represent us in several significant matters.***"[125] As Frazer emphasizes, the NRA has a right to counsel of its choice.  Indisputably, the record shows that not only did the NRA not "promise" AMc that Brewer would be removed—the opposite is true. Notably, the AMc Second Amended Privilege Log has expanded in terms of entries for March 14, 2019, the date of the Frazer letter to Madrid, as well as for March 12, 2021 – the date of the Madrid letter to which Frazer's letter responds.[126] In other words, AMc possesses documents showing that it knew about, and discussed, Frazer's letter emphasizing the NRA's right to consult with Brewer, and AMc concealed the existence of these documents until just before the discovery deadline, when it revealed it was withholding them on the basis of purported privilege.

This clear documentary evidence underscores that, AMc and its counsel manufactured a story line of "harassment", and an alleged "promise" to remove Brewer, coupled with a protocol of obstruction, in order to circumscribe the FRA review. Tellingly, the communications between AMc and its counsel remained unproduced and unlogged, presumably to conceal the extent of

---

[124] *See* email from Steven Hart, Esq. to Anthony Makris, dated October 8, 2018, attached as Exhibit 32 to the Rogers Decl.
[125] *See* letter from John C. Frazer, to Jay Madrid, dated March 14, 2019 attached as Exhibit 33 to the Rogers Decl.
[126] Over 40 previously unlogged documents now appear on AMc's Second Amended Privilege Log with respect to the March 12 and March 14, 2019 dates.

planning around what should have been a simple issue – namely, the immediate production of the requested information, which discovery has finally confirmed resides on computer platforms that could have easily made production an easy task.[127]

Moreover, the Second Amended Privilege Log adds literally hundreds of entries for previously unlogged documents showing AMc's orchestration of the "audits" requested by the NRA. AMc was represented by a huge law firm with multiple lawyers engaged to render advice about the FRA "audit." A cursory review of the Second Amended Privilege Log demonstrates those facts. For example, privilege log entry numbers 1593, 1596, 1597, 1598, 1599, 1600, 1601, 1612, 1613, 1614, 1616, 1618, and 1622 between AMc and counsel, dated January 16, 2019 through January 22, 2019, describe "…legal advice regarding audit timing and procedure," in the period leading up to the FRA review. Further, log entry numbers 1662 and 1673 dated January 30, 2019 through February 4, 2019 describe "…legal advice regarding audit scope and procedure."

On February 5, 2019, the FRA review began. It continued for eight days in February: 6, 7, 12, 13, 14, 15, 19, and 21. The Second Amended Privilege Log is replete with an avalanche of references to "audit protocol" and "information requests from FRA" during this time period.[128] It is disingenuous for AMc to claim in this Motion that it must explore privileged communications about a 2019 "audit" that it controlled and orchestrated with the advice of counsel.[129] The far-fetched notion that AMc was somehow duped during the 2019 FRA review is unsupported by the record, which shows that AMc employed an army of lawyers to assist it in producing an incomplete

---

[127] *See, e.g.,* ECF 365 (Plaintiff's Status Report on Discovery Issues, dated September 17, 2021) at p. 4-5, as well as other weekly Status Reports submitted by the NRA.

[128] *See* AMc's Second Amended Privilege Log, dated October 22, 2021, attached as Exhibit 22 to the Rogers Decl., at p. 153 and 155. The NRA also includes AMc's Original Privilege Log, dated December 9, 2020, attached as Exhibit 20 to the Rogers Decl., and AMc's First Amended Privilege Log, dated September 17, 2021,  attached as Exhibit 21 to the Rogers Decl., the day after the status conference hearing held by Judge Fish in this matter. The first amendment failed to address the NRA's concerns and AMc systematically delayed the production of its Log until the end of the discovery period.

[129] *See supra* FNs 104-109.

population of hard copy materials, which FRA was not allowed to copy. Moreover, and importantly, AMc's attempt to start a new collateral litigation about privilege "waiver" concerning the incomplete materials that it made "available" in 2018 and 2019 ignores the fact that in September and October, 2021, AMc made massive productions of long requested relevant documents and computer systems/accounts, showing unequivocally that AMc withheld those materials, contrary to its many assertions otherwise throughout this litigation.

### 8. The Virginia Court Upheld the NRA's Privilege Claims Based on An Accurate Record, Contrary to AMc's Assertions Otherwise

Defendants have known since September 18, 2019, that FRA did not deliver a narrative "report" to the NRA regarding its record examination, but instead, prepared spreadsheets that were screen-shared with the NRA.[130]  Those spreadsheets were plainly disclosed on FRA's privilege log.[131]  When AMc moved to compel production of these documents in the Virginia case, it made many of the same arguments it makes here.[132]  In response, the NRA's Virginia counsel explained to the Virginia court that although certain documents sought by AMc set forth "privileged and protected conclusions, opinions, and analyses" regarding FRA's record examination, there was no formal "report" as customarily understood.[133]  When the Virginia court expressed surprise that no "report" existed and inquired further whether there were documents setting forth FRA's conclusions, the NRA clarified that there were, but that such documents were "privileged communications between [] FRA and the NRA until such time as we [the NRA] designate[]

---

[130] *See* transcript of the deposition of John Frazer, dated August 30, 2021, attached as Exhibit 8 to the Rogers Decl. at pg. 425:21-23.
[131] *See* excerpt from the Forensic Risk Alliance privilege log, attached as Exhibit 5 to the Rogers Decl.
[132] *See* Defendants' Motion to Compel the Production of Documents from Third-Party FRA, dated October 1, 2019, filed in the *National Rifle Association v. Ackerman McQueen, Inc., et al*., Case Nos. CL19001757, CL19002067, and CL19002886 (Cir. Ct. Va. 2019) (the "Virginia Action"), attached as Exhibit 6 to the Rogers Decl.
[133] *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Compel Production of Documents from Third-Party FRA, dated November 8, 2019, filed in the Virginia Action, attached as Exhibit 7 to the Rogers Decl.

otherwise."[134]  Importantly, the NRA accurately explained to the Virginia court that although it had sued for breach of the records-examination clause, it was "not offering FRA to testify about" its opinion work product.[135]

Based on the foregoing record, the Virginia court upheld the NRA's privilege and work product claims.[136] It rejected AMc's motion to compel with respect to documents over which the NRA claimed attorney-client privilege or which were classified as "opinion work product," [137] but confirmed that AMc should be permitted discovery of FRA's fact work product[138]—e.g., those documents that were requested, and what documents were shown (AMc refused to allow copies to be made), [139] at the record examination. That discovery was provided to AMc by counsel for FRA in the Virginia action and was available in this action.

### 9. The NRA Consistently Asserted Its Privilege, And Did Not Inject FRA's Opinions or Conclusions Into This Proceeding

Contrary to AMc's contentions before the Virginia court and in its current motion, the NRA did not affirmatively interject FRA's opinion work product when it pleaded its claims in either proceeding.  None of the NRA's pleadings quote, cite, or mention documents logged as privileged by FRA.  Nor does the NRA rely on FRA's opinions or work product to any facts regarding its claims or defenses. Instead, AMc contends—without support—FRA's work product informed the NRA's decision to bring suit such that all privileges attached to those communications and work product are waived.[140]  If privileged communications, or documents "prepared in anticipation of

---

[134] *See* hearing transcript dated November 13, 2019 from the *National Rifle Association of America v. Ackerman McQueen, Inc. et al.*, Cons. Case Nos. CL19001747, CL19002067, CL19002886 (Cir. Ct. Va. 2019), attached as Exhibit 29 to the Rogers Decl. at p. 77:18-20.

[135] *Id.* at 73:4-6.

[136] *Id.* at 78:16-80:3.

[137] *Id.*

[138] *Id.*

[139] *See* deposition transcript of Michael Trahar, dated September 18, 2019, attached as Exhibit 4 to the Rogers Decl. at p. 136:20-137:5.

[140] *See infra* at Section V.A.2.

litigation," were subject to waiver merely because they were considered in a party's decision to bring suit or in connection with its case strategy, the privilege and work product doctrines would be worthless. Notably, when AMc pressed for discovery of FRA's opinion work product, the NRA consistently asserted its privilege, including in privilege objections made on-record at the August 30, 2021 deposition of John Frazer (which AMc cites).[141]

### 10. Long Before the Discovery Cutoff, the NRA Offered Many of the Documents, and the Depositions, Sought Now—But AMc Refused

On September 16, 2021, in an effort to resolve Defendants' still-outstanding motion to compel production of FRA's documents, the NRA offered to produce the "draft spreadsheets" setting forth FRA's observations.[142] Indeed, on October 1, 2021, the NRA clarified that, to avoid unnecessary motion practice, it would also be willing to produce "any communications between the NRA and FRA which reflect information, direction, or instructions supplied by the NRA to FRA (including through the NRA's outside counsel, Brewer) which informed the scope or substance of FRA's review and FRA's observations" (the NRA's "Proposed Compromise Production").[143] During the parties' October 6, 2021, meet/confer teleconference, the NRA also offered supplemental depositions of relevant witnesses, which easily could have been accommodated before the scheduled discovery cutoff.[144] Defendants rejected the NRA's offer. Therefore, with the final discovery deadline approaching and Defendants' false representations about its conduct in connection with the NRA's attempts to conduct record examinations littering the record, the NRA authorized FRA to release its draft spreadsheets to the parties. Thereafter, the

---

[141] *See* transcript of the deposition of John Frazer, dated August 30, 2021, attached as Exhibit 8 to the Rogers Decl. at pg. 422:14-16.
[142] The NRA first made this offer at the parties' discovery conference on September 16, 2021, and memorialized it in the NRA's status report filed September 17, 2021 (ECF No. 365 at 5).
[143] *See* letter from Sarah B. Rogers to Brian Mason, dated October 1, 2021, attached as Exhibit 17 to the Rogers Decl.
[144] These meet/confer discussions are recounted in the NRA's status report filed October 8, 2021. *See* ECF No. 385 at 8.

NRA provided the spreadsheets to its testifying experts, as well as produce copies of the operative engagement letter, and a previous superseded engagement letter, dictating the purpose and scope of FRA's review.

### 11. AMc's Untimely "Supplemental" Motion Represents Its Latest Tactical Misuse of the Joint Status Report Process

Pursuant to the Standing Order, the parties may not file conventional motions to compel, but must coordinate a joint submission.  The NRA previously proposed to streamline this briefing process, and expedite surfacing disputes with the Court, by coordinating simultaneous joint submissions.  For example, the NRA proposed during a meet/confer call, which resulted in an impasse, that both parties brief their positions and submit them in a joint report the following Monday.[145]  AMc refused such accommodations, insisting that the NRA (when the NRA is the moving party) brief its position first, transmit its brief to AMc, and provide AMc roughly a week to respond.[146] AMc has known the NRA's position regarding the FRA documents since October 6, 2021, but did not brief its position until less than a week before the discovery deadline, demanding the NRA's responsive brief within four business days.[147]

### 12. AMc's Misrepresentations to the Court Regarding the FRA Privilege Log

As part of its bogus argument concerning why AMc should be entitled to relief, AMc asserts that "the NRA withheld more than 1,600 relevant documents as part of the FRA privilege log.[148] This is false. In fact, FRA retained its own counsel, Debevoise & Plimpton ("Debevoise"), to respond to a subpoena issued to it by AMc in the Virginia litigation, dated July 15, 2019. As part of its independent response to the subpoena, FRA produced to AMc 1,624 documents. In

---

[145] *See* Rogers Decl. at ¶ 4.
[146] *Id.*
[147] *See* email from Christina Carroll to Cecelia Fanelli, Sarah Rogers, and Alessandra Allegretto, dated October 23, 2021, attached as Exhibit 18 to the Rogers Decl.
[148] *See infra* Section V.A.5.

addition, FRA provided a privilege log to AMc and the NRA, which initially contained 1,734 documents. On February 3, 2020, FRA revised that privilege log to include only 1,268 documents, and "deprivileged" and produced to AMc hundreds of pages produced by Debevoise that were included on the initial privilege log.

As the above facts prove, AMc and its counsel have once again misrepresented the record regarding discovery. AMc and its counsel fail to disclose the efforts that Debevoise made to provide AMc with thousands of documents, as AMc and its army of lawyers attacked FRA. The attacks on FRA and the continued harassment of Trahar are nothing but transparent attempts at witness intimidation. The record here shows a systematic attempt by AMc to attack and smear any professional or professional firm that seeks information from AMc.

## V.     ARGUMENTS & AUTHORITIES

### A.     AMc's Position

In sum, the NRA has waived privileged by intentionally disclosing documents on a selective and tactical basis and has otherwise failed to establish privilege—and acted contrariwise—by breaking the required confidentiality of the document or communication and by failing to communicate for legal advice.

#### 1.   Legal Standard

As described in AMc's original Motion, a party requesting production of documents may compel production when the responding party refuses to produce.[149]  The party resisting discovery must show specifically how each discovery request is not relevant or is otherwise objectionable.[150]

---

[149] *See* ECF 55, Mot. at p. 5 (citing FED. R. CIV. P. 37(a)(3)(B)(iv)).
[150] *Id.* (citing *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990); *McKinney/Pearl Rest. Partners, L.P. v. Metro Life Ins. Co.*, 322 F.R.D. 235, 242 (N.D. Tex. 2016)).

## 2.  The NRA Waived Privilege as to the Entire FRA Subject Matter

Selective waiver for a tactical advantage against an adversary results in subject matter waiver for *all* privileged communications within the category at issue.[151]  As stated clearly by the Fifth Circuit:

> By definition, the attorney-client privilege protects only confidential communications.  By disclosing such communications to third parties – such as by revealing them in open court – the client waives the privilege.  And to prevent selective or misleading disclosures, fairness dictates that the waiver extend to related subject matter.  Hence the animating maxim that the privilege cannot 'be used as both sword and shield.'[152]

Under Texas law, "a privilege may not be waived selectively to disclose only such evidence as may be beneficial to the party holding the privilege,"[153]  Further, "consent to disclosure of 'any significant part' of a privileged matter may constitute waiver of the whole."[154]  According to Virginia law, a full subject matter waiver of material claimed to be privileged is warranted when there has been a significant disclosure of that material to a third party.[155]

When the NRA randomly offered during the hearing before the District Court, and for the following weeks thereafter, to produce to AMc certain FRA reports that AMc had been seeking

---

[151] *See* FED. R. EVID. 502(a)(l); TEX. R. EVID. 511(b)(1); VA. CODE ANN. § 8.01-420.7(a) (2021); *Vesilind v. Va. State Bd. of Elections*, 91 Va. Cir. 490, 495–96 (Va. Cir. Ct. 2016).  *See also Nalco Co., Inc. v. Baker Hughes, Inc.*, NO. 4:09-CV-1885, 2017 U.S. Dist. LEXIS 111127, at *12–13 (S.D. Tex. July 18, 2017) (finding that a subject matter waiver of privileged material would be found after party claiming privilege produced a privileged email redacting some sentences but leaving other unredacted because the party claiming privilege "should not be allowed to pick and choose which privileged communications to disclose to obtain a tactical advantage"); *Theranos, Inc. v. Fuisz Technologies, Ltd.*, No. C 11-5236 PSG, 2013 U.S. Dist. LEXIS 70564, at *15-16 (N.D. Cal. May 16, 2013) ("Absent an opportunity to review other documents on the same subject matter to ascertain the context of the disclosed communications, Theranos cannot rebut the inferences Fuisz Technologies may draw from the contents of the emails it has disclosed.  This type of imbalance is the kind of prejudice against which Rule 502(a), and the waiver doctrine generally, protects.  Theranos thus is entitled to disclosure of other emails and communications on those subjects, up to an including all of the communications…  **[Fuisz] cannot rely on the waiver as a means to shield other relevant communications** from the same subject matter that Fuisz willfully disclosed.  Fuisz may have chosen a representative sample of communications **or he may have cherry-picked selective communications that are favorable to him. The court cannot tell which was Fuisz's motivation, and that is why disclosure is necessary**." (emphases added)).
[152] *In re Itron*, 883 F.3d 553, 556 (5th Cir. 2018).
[153] *Bailey v. State*, 469 S.W.3d 762, 774-75, n. 14 (Tex. App.—Houston [1st Dist.] 2015, pet).
[154] *Id.* at 774.
[155] *See Vesilind*, 91 Va. Cir. at 496; *see also* VA. CODE ANN. § 8.01-420.7(a).

---

for more than two years, AMc advised the NRA that its selective production would result in subject matter waiver. [156]   NRA counsel repeatedly attempted to reach agreement with AMc that production would not be waiver, which AMc steadfastly refused.  NRA counsel provided no reason for why the NRA decided to produce the documents all of a sudden after two years of wasted time and money.  Despite AMc's refusal to stipulate as to no waiver, the NRA then went to FRA and instructed them to produce the documents anyway, which amounts to waiver of its own alleged privilege.[157]

It is evident that the NRA has relied, and intends to continue relying, upon the FRA draft reports to support its claims in a pure tactical maneuver.  On the one hand, the NRA's General Counsel Frazer admitted as much.  On the other hand, by instructing FRA to produce the reports to AMc, a third party, the NRA waived any privilege it may have had over the FRA documents. The NRA also decided to provide the reports to at least one of its experts, who amended his report based on the FRA documents, which demonstrates the strategic advantage the NRA sought from its selective production.

The NRA's conduct surrounding its selective production of the FRA reports also raises the specter that the NRA's limited disclosure is tailored to mislead AMc.  The NRA represented in the Virginia Action two years ago that no such FRA report existed.  Now however, the NRA has admitted such a report exists – six of them – and wants to produce them only if doing so does not lead to a subject matter waiver to impact its other strategically withheld documents.  Given NRA's evasiveness on this issue for the past two years, which has resulted in AMc incurring further litigation costs, AMc cannot help but view the NRA's meticulous attempts to hide these documents

---

[156] *See e.g.*, **Ex. 1-E**, Letter to S. Rogers (Oct. 8, 2021) at 2; **Ex. 1-F**, Letter to S. Rogers (Sep. 24, 2021) at 1-2.
[157] *See* **Ex. 1-I**, FRA's Responses and Objections to Third Party Subpoena served by AMc (Dec. 17, 2019) (including objections on the basis of privilege).

as a calculated maneuver to prevent AMc from mounting a complete defense against the NRA's claims.  In fairness to AMc, including so that it can fully prepare its defense to the NRA's fundamental claims and purported expert opinions that rely upon the FRA audit, the waiver must extend to the entire subject matter.

### 3.   The NRA Confirmed Its Sword and Shield Use of the FRA Documents

As outlined in the Original Report, offensive use (also known as the sword-and-shield doctrine) of the attorney-client privilege or work product doctrine will result in waiver.[158] Additionally, when a party "put[s] in issue the very subject matter of the communications [that party] is trying to protect, she has impliedly waived the privilege."[159]  AMc previously briefed how the NRA violated the offensive use doctrine.  However, new information surfaced since the time of the Original Report, requiring this Supplement, namely the confirmation from the NRA's General Counsel, John Frazer, that the NRA is still engaging in offensive use.  For example, in the August 19, 2021 deposition of John Frazer, the following exchange occurred:

Q:    Is the NRA relying on the FRA audit in support of its claims in this lawsuit?

A:    Yes.

Q:    Mr. Frazer, are you aware of what claims the NRA is using the FRA audit to support?

A:    Yes.

Q:    What claims is the NRA using the FRA audit to support?

A:    The – I think that the – I think that we're relying on findings from FRA with respect to a couple of things in particular, for example, the out-of-pocket expenses that were sometimes vague, didn't include any detail as to the business purpose that was served or why the NRA should reimburse them.[160]

---

[158] *See* ECF 55, Mot. at 6-7; ECF 180, Orig. Report at 38.
[159] *Grasso v. O'Connor*, 41 Va. Cir. 193, 193 (Va. Cir. 1996).
[160] **Ex. 1-C**, J. Frazer Dep. (Aug. 19, 2021) at 69:14-15, 70:1, 70:18-19, 70:21, 71:1-2, 71:7-12.

AMc's counsel asked a follow-up question to Frazer's testimony – *i.e.*, what other claims the NRA is using the FRA audit to support – but NRA counsel repeatedly objected on the basis of privilege, instructing Frazer not to answer.[161]   Nevertheless, what AMc's counsel gleaned was sufficient to prove, from the NRA itself, that it is engaging in sword and shield use of the FRA documents by relying upon them in support of its claims while refusing to produce those documents so that AMc can mount its defense.   In the NRA's Second Amended Complaint, it describes throughout its pleading AMc's alleged malfeasance relating to the "out-of-pocket" expenses[162] and lacking detail[163] that Frazer referenced.   This is the quintessential scenario of offensive use under black letter Fifth Circuit law and should not be permitted.   In addition to the other reasons described herein, AMc moves the Court to grant its requested relief.

### 4.   The NRA Confirmed the FRA Documents Are Not Privileged

Aside from the above-described waivers, Frazer's deposition also confirmed that, as a threshold matter, no privilege applies to the FRA documents anyway.

***Texas.***   For the state law claims other than breach of contract, such as the NRA's claims for fraud and breach of fiduciary duty, "state law governs privilege."[164]   Under Texas law, the elements for attorney-client privilege are:

(1)     a confidential communication;

(2)     made for the purpose of facilitating the rendition of professional legal services;

(3)     between or amongst the client, lawyer, and their representatives; and

(4)     the privilege has not been waived.[165]

---

[161] *Id.* at 71:18-76:8.
[162] *See e.g.*, ECF 209, NRA 2d Am. Compl. ¶¶ 59, 93, 94.
[163] *See e.g., id.* at ¶¶ 148-54 (Count Four: Fraud relating to "fraudulent billing"), ¶ 167 (Count Five: Breaches of Fiduciary Duty relating to alleged fraudulent billing and lacking detail).
[164] FED. R. EVID. 501.
[165] *Navigant Consulting, Inc. v. Wilkinson*, 220 F.R.D. 467, 473 (N.D. Tex. 2004) (citing *Huie v. DeShazo*, 922 S.W.2d 920, 923 (Tex. 1996) and TEX. R. EVID. 503(b)).

The party asserting the privilege bears the burden of demonstrating "how each document or communications satisfies these elements."[166]  Generally alleging privilege is insufficient.[167]  It protects "only confidential communications made for the purpose of facilitating the rendition of professional legal services to the client."[168]  Documents are not privileged "merely because they were prepared by or sent to an attorney."[169]  And the fact that a party was contemplating litigation does not establish that communications were made for the purpose of rendering legal advice.[170]  The attorney-client privilege in Texas also includes "between the client's lawyer and the lawyer's representative," which is "(A) one employed by the lawyer to assist in the rendition of professional legal services; or (B) an accountant who is reasonably necessary for the lawyer's rendition of professional legal services."[171]

*Virginia.*[172]  Similarly in Virginia, the attorney-client privilege is "an exception to the general duty to disclose" and "an obstacle to investigation of the truth," such that it "should be strictly construed."[173]  The party asserting the privilege bears the burden of establishing "that the attorney-client relationship existed, that the communication under consideration is privileged, and that the privilege was not waived."[174]

To illustrate, the University of Texas ("*UT*") hired Kroll Associates ("*Kroll*") to "act as the independent firm to review [UT's] admissions process" following public allegations of

---

[166] *Id.*
[167] *Id.*
[168] *Id.* at 474.
[169] *Id.*
[170] *Id.* at 476.
[171] TEX. R. EVID. 503(a)(4) & (b)(1)B).
[172] The parties have not briefed whether Virginia law applies to any claims in the lawsuit.  AMc includes Virginia law here in an abundance of caution relating to the breach of contract claim.
[173] *Walton v. Mid-Atlantic Spine Specialists, P.C.*, 649 S.E.2d 545, 549 (Va. 2010).
[174] *Id.* at 122-23.

improprieties in the school's admissions procedures.[175]  The agreement between UT and Kroll "required Kroll to submit a final report to UT's General Counsel that describes the investigation methods employed and reports the investigator's factual findings."[176]  Following its investigation, Kroll produced a "101-page report detail[ing] Kroll's findings, provid[ing] its recommendations, and suggest[ing] best practices."[177]  After the report's publication, Franklin Center made a request under the Texas Public Information Act to obtain "all emails, interview transcripts and other documents provided to or obtained by Kroll investigators as part of their audit of admissions."[178]  The parties thus fought over whether these documents were privileged, and the dispositive issue, according to the court, was whether Kroll acted as a "'lawyer representative—i.e., one 'employed by the lawyer to assist in the rendition of professional legal services.'"[179]

The court held that Kroll was not a "lawyer representative," resulting in a waiver of privilege as to the documents that UT provided to Kroll and finding no privilege covered the "interview questions and notes Kroll created when conducting its investigations."[180]  The court reasoned that "Kroll was hired to conduct an independent investigation and provide recommendations for policy and procedural changes" to UT's admissions procedure.[181]  Moreover, the court noted that Kroll's "Final Report includes no legal advice" and that it was "undisputed that the Kroll investigation was undertaken to determine facts, practices, and policies relating to admissions . . . The fact that [UT's general counsel] reviewed the Final Report to make separate decisions about whether to take disciplinary action against any officers or

---

[175] *Franklin Ctr. for Gov't & Pub. Integrity v. Univ. of Tex. Sys.*, NO. 03-19-00362-CV, 2020 Tex. App. LEXIS 10123, at *1, *5 (Tex. App.—Austin [3d Dist.] Dec. 22, 2020, pet. filed).
[176] *Id.* at *7.
[177] *Id.* at *8.
[178] *Id.*
[179] *Id.* at *17.
[180] *Id.* at *25.
[181] *Id.* at *20.

employees does not convert Kroll's investigation into one done for the purpose of facilitating the rendition of legal services."[182]

Here, FRA was not retained by the Brewer Firm to render legal advice, meaning it was not a legal representative entitled to any privilege protections.[183]  Instead, the NRA hired FRA, and understandably so: had the Brewer Firm retained FRA, the fraud would be even more evident, considering the NRA promised AMc that the Brewer Firm would not be involved.

As in *Franklin Center*, where a fact investigator's report and related materials, including notes, were not privileged because the investigator was not a legal representative, even though the general counsel may have used the investigator's documents to pursue legal action later, so too here are FRA's materials not privileged because it served only as a fact investigator.  Tellingly, as Frazer testified on January 16, 2020,[184] and confirmed on August 19, 2021,[185] the NRA retained FRA "to conduct a factual examination and, you know, report the facts."[186]  In other words, FRA did not provide any specialized knowledge that the Brewer Firm required in rendering legal advice to the NRA.  To the contrary, FRA's work was no more than reviewing documents and transcribing its findings,[187] which the NRA has said for years it was not relying on anyway.  Because FRA was not necessary in giving the NRA legal advice (and thus was not a legal representative under the second prong of Texas Rule of Evidence 503),[188] in addition to the waiver described above, the NRA cannot demonstrate any privilege applies.  Just because a lawyer decided to use the FRA reports as a basis for the NRA's lawsuits against AMc does not render *any* FRA document

---

[182] *Id.* at *22-23 (emphasis added).
[183] *See* TEX. R. EVID. 503(a)(4) & (b)(1)B).
[184] *See* **Ex. 1-D**, J. Frazer Dep. (Jan. 16, 2020) at 365:20-21, 366:1-5.
[185] *See* **Ex. 1-C**, J. Frazer Dep. (Aug. 19, 2021) at 85:14-16, 85:20.
[186] *See Franklin Ctr.*, 2020 Tex. App. LEXIS 10123, at *7 (describing how Kroll was hired to review facts – UT's admissions process – and report its findings).
[187] *See id.* at *8 (describing the Kroll report that detailed its findings, recommendations, and best practices).
[188] *See* TEX. R. EVID. 503(a)(4) & (b)(1)B).

privileged.[189]   In fact, the only way for the NRA to prove the FRA documents were created to render legal advice is by admitting the NRA was contemplating litigation against AMc and used the FRA audit as a litigation fact-finding exercise, contrary to what it had represented to AMc at the time.

### 5.   The NRA's Actions Warrant Additional Depositions

Evident in the deposition excerpts provided herein and prevalent throughout a number of others, the NRA's counsel has obstructed AMc's discovery of facts relating to the NRA's claims in order to prepare its own defense.   Not only has the NRA withheld more than 1,600 relevant documents as part of the FRA privilege log, it also refused to respond to questions on the topic. Considering the FRA documents are relevant, including because the NRA is affirmatively relying upon them in support of its various claims, there is no question that AMc must have the opportunity to question witnesses about FRA *without obstruction*.   AMc already questioned John Frazer (NRA General Counsel), Susan Dillon (former Brewer Firm employee who audited AMc in September 2018[190] and then joined FRA to audit AMc in February 2019 and then ultimately rejoined the Brewer Firm), and Michael Trahar (FRA representative), but all three depositions were continually interrupted by improper privilege assertions or otherwise long, narrative objections that were disruptive to the process, violated Federal Rule of Civil Procedure 30(c)(2), and amounted to coaching the witness.   The NRA's repeated abuses and its most recent production of FRA documents (including its subject matter waiver) warrants additional time with these witnesses specifically on the FRA topic.

---

[189] *Id.* at *22-23.
[190] *See* ECF 325, Exhibits to Joint Report on AMc's Motion to Compel Deposition of William A. Brewer III, at Ex. A-2, Email from J. Frazer to S. Rogers (Sep. 14, 2018) [APP007-APP009].

To that end, AMc respectfully requests the Court (a) provide AMc additional time to continue these three depositions and (b) compel the NRA to present John Frazer and Susan Dillon within 14 days of the entry of the Court's order. Additionally, AMc requests the Court order that none of these witnesses can refuse to answer, and neither can the NRA's counsel instruct the witnesses not to answer, on the basis of privilege.

### 6. Sanctions Are Warranted for the NRA and Its Counsel's Years-Long Abuse

A court may levy sanctions against a lawyer for deplorable conduct under the court's inherent authority.[191] The court must find the lawyer acted in bad faith,[192] which "'is not simply bad judgment or negligence, but rather implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; . . . .it contemplates a state of mind affirmatively operating with furtive design or ill will.'"[193] Bad faith also includes conduct "motivated by improper purposes such as harassment or delay."[194]

As set forth herein, the NRA and its counsel engaged in patent bad faith conduct for the last two years by making false representations to AMc and to two courts.[195] Beginning in the Virginia Action, the NRA stated no reports exists, no reports were shown to the NRA, and the NRA was not relying upon any findings, conclusions, or opinions from FRA. The NRA has maintained that stance for the last two years, including in this case. The NRA also represented to the District Court that the Virginia court "found" the FRA documents to be privileged, which is also false. Instead, recent discovery in the Texas Action revealed there were *six* reports, certain

---

[191] *Bucklew v. St. Clair*, Civil Action No. 3:18-CV-2117-N (BH), 2019 U.S. Dist. LEXIS 109580, at *9 (N.D. Tex. May 29, 2019) (quoting *In re Stone*, 986 F.2d 898, 902 (5th Cir. 1993)).
[192] *Id.*
[193] *Id.* at *10 (quoting *Turfgrass Grp., Inc. v. Ne. La. Turf Farms, LLC*, No. CIV.A. 10-1354, U.S. Dist. LEXIS 166570, at *3 (W.D. La. Nov. 20, 2013)).
[194] *Id.* (citing *Coghlan v. Starkey*, 852 F.2d 806, 814 (5th Cir. 1992)).
[195] *See OrchestrateHR, Inc. v. Trombetta*, 178 F. Supp. 3d 476, 487 (N.D. Tex. 2016) (finding that sanctions were warranted where defense counsel made representations to plaintiff's counsel that proved to be false).

reports were shown to the NRA via Zoom, and the NRA is relying upon FRA's findings, conclusions, and opinions expressed in its reports in the "Observations" tabs.  The NRA has taken it a step further and now provided the reports to its experts, at least one of whom supplemented his report to recite from and rely upon the FRA reports – a clear tactical litigation strategy.  The NRA's counsel cannot provide any plausible defense or explanation for misleading two courts and opposing counsel, or for its about-face after its lie was exposed.  Accordingly, AMc requests an order imposing sanctions against the NRA, including, but not limited to, requiring the NRA to pay for any costs and expenses associated with the subsequent depositions of John Frazer, Susan Dillon, and the FRA representative.

## B.     The NRA's Position

### 1.  Legal Standard

Where, as here, "the court's jurisdiction is premised upon a federal question," this district holds that federal law controls privilege issues, even if state law claims are present.[196]  In the Fifth Circuit, waiver occurs if a party "assert[s] a claim or defense that explicitly relies on the existence or absence of the very communications for which he claims a privilege."[197]  Moreover, to occasion a subject-matter waiver, a disclosure of a privileged communication must be "significant enough" to justify such a waiver—a determination that considers, among other things, the subject matter of the disclosure and the proposition, if any, that the privileged material was proffered to support.[198] "[T]he purpose of finding waiver is to prevent prejudice against the opposing party because it cannot confirm the testimony without accessing privileged materials."[199]

---

[196] *Smith v. Smith*, 154 F.R.D. 661, 671 (N.D. Tex. 1994).
[197] *In re Burlington N., Inc*., 822 F.2d 518, 533 (5th Cir. 1987).
[198] *See Gen. Elec. Co. v. Mitsubishi Heavy Indus. Ltd*., No. 3:10-CV-276-F, 2013 WL 12226037, at *5 (N.D. Tex. Apr. 5, 2013) (declining to find subject-matter "sword/shield" waiver because, although a litigant made statements about advice received from counsel, "the statements dealt more with [the litigant's] state of mind" than particular disputed patent issues).
[199] *Id.* at *4.

The scope of any subject-matter waiver is governed by Federal Rule of Evidence 502(a), which provides that "the waiver extends to undisclosed information only if the waiver was intentional, the disclosed and undisclosed information concern the same subject matter, and they should be considered together in fairness."[200]  Federal courts analyzing "fairness" considerations bearing on the scope of a subject-matter waiver have explicitly considered whether the privilege holder made an "affirmative decision to inject" the documents into the litigation or, by contrast, produced the documents **"'in connection with a motion to compel,' with the express intention not to broaden the subject matter waiver and to 'moot the issue'"** of an outstanding demand for documents.[201]

### 2. The NRA's Disclosure of Documents to FRA Did Not Waive Privilege or Work Product Protection

Under Fifth Circuit federal common law, the attorney-client privilege "protects confidential communications between the client or representative of the client and the client's lawyer or representative of the lawyer."[202]  Thus, when agents or consultants "participate as members of a team to provide information and documents to litigation counsel or to obtain from counsel answers to the client's questions, with the primary purpose of effectuating counsel's rendition of legal advice to the client, communications between the client's legal personnel and the third-party agents are privileged, and the privilege is not waived by the communications."[203]  Thus,

---

[200] *See, e.g.*, *United States v. Hungerford*, No. CR 18-112, 2019 WL 3891604, at *1 (E.D. La. Aug. 19, 2019) (declining to find subject-matter waiver where documents were produced in response to a subpoena and a clawback offer was rejected).

[201] *See, e.g.*, *Ingenito v. Riri USA, Inc.*, No. 11CV2569MKBRLM, 2015 WL 9412541, at *7 (E.D.N.Y. Dec. 22, 2015) (emphasis added).

[202] *Firefighters' Ret. Sys. v. Citco Grp. Ltd.*, No. CV 13-373-SDD-EWD, 2018 WL 2323424, at *4 (M.D. La. May 22, 2018), *aff'd*, No. CV 13-373-SDD-EWD, 2018 WL 5993472 (M.D. La. Nov. 14, 2018).

[203] *Id.* (internal citations and quotation marks omitted).

where a financial advisor or accountant "work[s] hand in hand to [outside] and in-house counsel" to enable counsel to provide legal advice to the client, the attorney-client privilege applies.[204]

Similarly, the work product doctrine protects materials "prepared in anticipation of litigation or for trial by for another party or its representative."[205] Unlike attorney-client privilege, work product protection is not waived by voluntary disclosure to a third party unless the disclosure "substantially increased the opportunities for potential adversaries to obtain the information."[206] Indeed, the Fifth Circuit has explicitly noted that where, as here, a consulting expert is specifically employed in anticipation of litigation and is not expected to be called as a witness to testify about its opinion, its work is protected under the work product doctrine.[207] And, "[U]nlike the attorney-client privilege, the burden of proving waiver of work product immunity falls on the party asserting waiver."[208] AMc has not established waiver of the work product protection with respect to any document maintained in confidence between the NRA and FRA.

Instead, AMc insists that the documents it seeks are not privileged at all.[209] AMc relies on the inapposite holdings in *Franklin Ctr. for Gov't v. Univ. of Texas Sys*.[210] In that case, a report was commissioned from an independent consultant regarding state university admissions practices, **which was intended to be made public**, was deemed nonprivileged.[211] The *Franklin* court emphasized there was "no evidence that any lawyer's expertise helped define the scope of

---

[204] *Id.* (denying motion to compel communications among in-house counsel, outside counsel, and investment banker).
[205] *Johnson v. Russ*, No. 6:16-CV-284 RP, 2017 WL 1066685, at *5 (W.D. Tex. Mar. 21, 2017), *citing* Fed. R. Civ. P. 26(b)(3).
[206] *See, e.g.*, *Golla v. Novo Nordisk Inc*., No. H-20-71, 2020 WL 9421047, at *3 (S.D. Tex. June 29, 2020).
[207] *Shields v. Sturm, Ruger & Co.*, 864 F.2d 379, 382 (5th Cir. 1989).
[208] *S.E.C. v. Brady*, 238 F.R.D. 429, 444 (N.D. Tex. 2006).
[209] *See infra* at Section V.A.4.
[210] No. 03-19-00362-CV, 2020 WL 7640146, at *6 (Tex. App.—Austin [3d Dist.] Dec. 22, 2020).
[211] *Id.* ("The Kroll report was intended to be, and was, made public and there was no evidence presented to support the notion that either the report or the investigation were done in the context of advising the UT System whether any of the facts, practices, or procedures that were discovered would expose the UT System to potential legal liability."). The *Franklin* court also emphasized the university's transparency obligations under Texas public records law. *See id.* at *4.

Kroll's inquiry or which avenues were appropriate to pursue," and that the Scope of Work document memorializing Kroll's engagement contradicted the university's claims about the investigation's privileged purpose.[212]  By contrast, FRA was specifically retained to follow up on a review that was previously commenced, and its parameters defined, with the assistance of counsel.  The "specific purpose" of FRA's engagement, memorialized in its engagement letter, was to "inform[] Counsel's legal advice to the NRA in connection with pending and anticipated litigation."[213]   Indeed, the *Franklin* court explicitly contrasted cases, like this one, where a consultant or investigator retained by counsel performed work in anticipation of litigation.[214]  Should any doubt remain regarding the purpose or nature of FRA's engagement, the NRA is confident that an *in camera* review of the redacted portions of FRA's engagement letter would sustain the NRA's privilege claim.[215]

### 3.  Consistent With Fifth Circuit Precedent, the NRA Disclosed the Documents Provided to Its Testifying Experts

In advancing its waiver arguments regarding NRA's disclosures of documents to it is experts, AMc ignores controlling Fifth Circuit authority. The precedent in this Circuit is simply that the same documents produced to the testifying expert must be produced to the opposing litigant.[216]  AMc cites no case, and the NRA is aware of no case, where the disclosure of privileged opinion work product to a testifying expert effected a subject-matter waiver.  Nor does AMc cite any authority for the proposition that a litigant who testifies that it relied on privileged analyses

---

[212] *Id.*

[213] *See* agreement for Forensic Accounting Services provided by Forensic Risk Alliance, dated January 29, 2019, attached as Exhibit 2 to the Rogers Decl. at Section 3.1.

[214] *See id.*, citing *In re Fairway Methanol LLC*, 515 S.W.3d 480, 485-86 (Tex. App.—Houston [14th Dist.] 2017, orig. proceeding) (report of investigative team charged with providing company with business and legal advice with respect to potential termination of employees was privileged because the investigation was also for purpose of assessing potential liability in litigation and defenses to anticipated regulatory proceedings).

[215] *See* agreement for Forensic Accounting Services provided by Forensic Risk Alliance, dated January 29, 2019, attached as Exhibit 2 to the Rogers Decl.

[216] *See Ecuadorian Plaintiffs v. Chevron Corp.*, 619 F.3d 373, 378 (5th Cir. 2010); *Calsep A/S v. Intelligent Petroleum Software Sols.*, LLC, No. 4:19-CV-1118, 2020 WL 1321521, at *3 (S.D. Tex. Mar. 17, 2020).

when it formulated its claims waives privilege with respect to those analyses.  Of course, this is the exact testimony that Mr. Frazer provided here, which AMc cites in vain.[217]

Indeed, facts upon which courts have found sword/shield waiver (and ordered consequent disclosures) are starkly different than the facts here.  For example, a litigant that refers explicitly to work product in its pleadings may be held to "rely[] on" the work product[218]—but the NRA's pleadings make no mention of FRA's opinions or conclusions.  Similarly, a litigant who seeks to present a consultant's report and conclusions in their entirety to a jury "while leaving the [firm's name's] 'branding' off the work" waives work product protection with respect to the report.[219] The NRA has not done so in this case.

### 4. Even If There Were a Subject-Matter Waiver, It Would Not Extend to "All FRA-Related Documents."

A voluntary disclosure of privileged documents only waives privilege with respect to other documents of the same subject matter which ought "in fairness be considered together" with the items produced.[220]  Thus, even if the NRA's disclosure of FRA's draft spreadsheets to its testifying experts effected a subject-matter waiver, the waiver would be limited to documents required by AMc in order to "confirm the testimony" put before the tier of fact.[221]

The United States Supreme Court previously upheld a subject-matter waiver limited only to discrete portions of a disputed document.[222]  Similarly, this district has applied "sword/shield"

---

[217] *See* Rogers Decl. Ex. R, Frazer Dep. (Aug. 19, 2021) at 69:14-71:12 (NRA's counsel objecting to questions as misleading, unfair, and outside the scope of the deposition).

[218] *See, e.g., Hager v. Bluefield Regional Med. Ctr., Inc*., 170 F.R.D. 70, 79 (D.D.C. 1997) (finding plaintiff waived work product protection for attorney opinion letters and draft memoranda by referring to the opinion letters throughout the complaint, and it was undisputed that one of the attorneys could be called as an expert witness).

[219] *Doe 1 v. Baylor Univ*., 335 F.R.D. 476, 493 (W.D. Tex. 2020).

[220] Fed. R. Evid. 502(a).

[221] *Id.* at *4.

[222] *See United States v. Nobles*, 422 U.S. 225 (1975).  In *Nobles*, the defense in a criminal action sought to impeach the prosecution's key witnesses using statements a defense investigator obtained from the witnesses. 422 U.S. at 227. The defense argued, inter alia, that the work-product doctrine exempted the investigator's report from disclosure at trial.  The Supreme Court concluded that the trial court could compel disclosure of "relevant portions" of the

---

principles to limit waiver only to those portions of a disclosed attorney memorandum which laid out employee-selection criteria for a disputed reduction in force, while allowing the same litigant to withhold portions of the same memorandum that contained legal advice.[223] Likewise, a litigant who alleges assault must disclose portions of privileged medical records relating to the alleged incident, but not her prior treatment history.[224] According to the same fairness principles, where privilege is waived as to a consultant's or expert's report and a subject-matter waiver occurs, the waiver may properly extend to "what assumptions the consultants used in crafting their methodology and reaching their findings."[225] Although the NRA believes that there has been no subject-matter waiver in this case, the NRA already offered precisely such a document production to AMc nearly a month ago (along with supplemental depositions).  AMc declined the NRA's offer and brought costly, untimely motion practice instead.

Importantly, the "fairness" prong of the waiver analysis considers whether the privilege holder made an "affirmative decision to inject" the documents into the litigation or, by contrast, produced the documents **"'in connection with a motion to compel,' with the express intention not to broaden the subject matter waiver and to 'moot the issue'"** of an outstanding demand for documents.[226]  The NRA authorized production of FRA's draft spreadsheets for precisely this reason—as part of an effort to resolve a pending motion to compel, not instigate yet additional "supplemental" motion practice.

---

investigator's report.  *Id.* at 236.  At least one court in the Fifth Circuit, in a civil proceeding, has cited *Nobles* for the proposition that courts may "limit[] the scope of a waiver to the portion or category of material that a party would offer in evidence."  *Doe 1 v. Baylor Univ.*, 335 F.R.D. 476, 497 (W.D. Tex. 2020).
[223] *Turner v. Coca-Cola Enters., Inc.*, No. CIV. 3:02-CV-1348-R, 2003 WL 21145740, at *1 (N.D. Tex. May 14, 2003).
[224] *Charalambopoulos v. Grammer*, No. 3:14-CV-2424-D, 2017 WL 1094394, at *4 (N.D. Tex. Mar. 8, 2017).
[225] *See, e.g.*, *In re Lincoln Nat'l COI Litig.*, No. 16-CV-6605-GJP, 2019 WL 7581182, at *4 (E.D. Pa. July 3, 2019), opinion adopted, No. 16-CV-06605-GJP, 2019 WL 3940912 (E.D. Pa. Aug. 21, 2019).
[226] *See, e.g.*, *Ingenito v. Riri USA, Inc.*, No. 11CV2569MKBRLM, 2015 WL 9412541, at *7 (E.D.N.Y. Dec. 22, 2015) (emphasis added).

### 5.   AMc's Demands for Sanctions Are Vexatious and Unsupported

As set forth above, contrary to AMc's invective, the NRA never made a single misrepresentation to the Virginia court, this court, or AMc's attorneys during the course of discovery.   The contents and purpose of the documents privilege-logged by FRA as "draft spreadsheet[s]," sought unsuccessfully by AMc in Virginia court, and later produced by FRA in this action were disclosed from the start—even if two different law firms, in two different jurisdictions, two years apart, adopted inconsistent phrasing concerning whether the spreadsheets were "reports."   It has been undisputed since 2019 that FRA prepared privileged spreadsheets containing its conclusions which were shared with the NRA during Zoom meetings.[227]   AMc moved to compel production of these documents, insisting it was imperative that AMc know "the outcome" of FRA's record inspection.[228]   With the extended discovery timetable elapsing and AMc's prior motion to compel the documents still pending, the NRA made a good faith effort to resolve the motion.   AMc declined.   Contrary to AMc's contentions, a party's offer or agreement to "produce relevant documents, provided there is no broad subject matter waiver" is the type of good faith conduct that *disfavors* sanctions.[229] The sanctions cases on which AMc relies, meanwhile, are inapposite or discredit its attacks.[230]

To the extent that the Court does impose sanctions, it should order AMc to reimburse fees and costs incurred by the NRA responding to this unnecessary, untimely, "supplemental" motion.

---

[227] *See* discussion *supra* at IV.B.

[228] *See* Rogers Decl. Ex. 1, Transcript from Status Conference (Sept. 16, 2021) at 36:6-37:5.

[229] *See, e.g., Enns Pontiac, Buick & GMC Truck v. Flores*, No. 1:07CV01043 OWW DLB, 2011 WL 2746514, at *3 (E.D. Cal. July 13, 2011).

[230] *See, e.g., Bucklew v. St. Clair*, Civil Action No. 3:18-CV-2117-N (BH), 2019 U.S. Dist. LEXIS 109580, at *9 (N.D. Tex. May 29, 2019) (*denying* motion for sanctions, where plaintiff sent harassing emails and published a website accusing defense counsel of crimes); *Turfgrass Grp., Inc. v. Ne. La. Turf Farms, LLC*, No. CIV.A. 10-1354, U.S. Dist. LEXIS 166570, at *3 (W.D. La. Nov. 20, 2013) (*denying* motion for sanctions despite counsel's alleged unethical, surreptitious recordings of conversations); *OrchestrateHR, Inc. v. Trombetta*, 178 F. Supp. 3d 476, 487 (N.D. Tex. 2016)(*denying* motion for sanctions based on witnesses' purported misstatements, but granting sanctions against counsel who intentionally contacted a witness known to be represented by counsel).

---

# VI.    PRAYER FOR RELIEF

## A.    AMc's Position

AMc respectfully requests this Court grant its motion; compel the NRA to produce all previously withheld FRA-related documents within three (3) days of the entry of the Court's order compel the NRA to present its witnesses to testify on the FRA topics they were previously instructed not to answer within fourteen (14) days of the entry of the Court's order, specifically John Frazer and Susan Dillon; provide the parties additional time to conduct a deposition of an FRA representative; or alternatively, to exclude any reference (argument, document, testimony) regarding FRA and the FRA / 2019 audit at the time of trial.  AMc also requests this Court impose sanctions upon the NRA and its counsel for their two-year long abusive discovery tactics that resulted in hours of wasted effort and attorneys' fees spanning two different jurisdictions and two different law firms representing AMc, including, but not limited to, requiring the NRA to pay for any costs and expenses associated with the subsequent depositions of John Frazer, Susan Dillon, and the FRA representative.  AMc requests any further relief, at law or in equity, to which it may be justly entitled.

## B.    The NRA's Position

The NRA respectfully requests that the Court deny AMc's motion in its entirety.  In addition, the NRA requests that it be awarded the costs it had been forced to incur in connection with opposing this motion.

Dated: November 12, 2021                    Respectfully submitted,

                                            /s/
                                            **Brian E. Mason**
                                            Texas Bar No. 24079906
                                            mason.brian@dorsey.com
                                            **G. Michael Gruber**
                                            Texas Bar No. 08555400
                                            gruber.mike@dorsey.com
                                            **Jay J. Madrid**
                                            Texas Bar No. 12802000
                                            madrid.jay@dorsey.com
                                            **J. Brian Vanderwoude**
                                            Texas Bar No. 24047558
                                            vanderwoude.brian@dorsey.com
                                            **DORSEY & WHITNEY LLP**
                                            300 Crescent Court, Suite 400
                                            Dallas, Texas 75201
                                            (214) 981-9900 Phone
                                            (214) 981-9901 Facsimile

                                            **ATTORNEYS FOR DEFENDANT/COUNTER-
                                            PLAINTIFF ACKERMAN MCQUEEN, INC.**

                                            /s/ Sarah B. Rogers
                                            **Cecelia L. Fanelli**
                                            *Pro Hac Vice*
                                            clf@brewerattorneys.com
                                            **Sarah B. Rogers**
                                            New York Bar No. 4755252
                                            sbr@brewerattorneys.com
                                            **Philip J. Furia**
                                            *Pro Hac Vice*
                                            pjf@brewerattorneys.com
                                            **Alessandra P. Allegretto**
                                            Texas Bar No. 24109575
                                            apa@brewerattorneys.com
                                            **BREWER ATTORNEYS AND COUNSELORS**
                                            1717 Main Street, Suite 5900
                                            Dallas, Texas 75201

                                            **ATTORNEYS FOR PLAINTIFF/COUNTER-
                                            DEFENDANT NATIONAL RIFLE
                                            ASSOCIATION OF AMERICA**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 12, 2021, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

*/s/ Sarah B. Rogers*

SARAH B. ROGERS

## <u>CERTIFICATE OF CONFERENCE</u>

Counsel for AMc and for the NRA conferred as described on page 1 above.  Counsel for the NRA opposes the relief sought herein.

*/s/ Sarah B. Rogers*

SARAH B. ROGERS