**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § | |
| | § | |
| | § | |
| *Plaintiff and Counter-Defendant,* | § | |
| | § | |
| **and** | § | |
| | § | |
| **v.** | § | Case No. 3:19-cv-02074-G |
| | § | |
| **ACKERMAN MCQUEEN, INC.,** | § | |
| | § | |
| *Defendant and Counter-Plaintiff,* | § | |
| | § | |
| **and** | § | |
| | § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, and MELANIE MONTGOMERY,** | § | |
| | § | |
| | § | |
| | § | |
| *Defendants.* | § | |

**DEFENDANTS' BRIEF IN SUPPORT OF ACKERMAN MCQUEEN, INC.'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.   INTRODUCTION AND SUMMARY ..................................................................... 1

II.  SUMMARY JUDGMENT EVIDENCE ................................................................ 2

III. FACTUAL BACKGROUND ............................................................................... 3

   A. The Parties' Decades-Long Contractual Relationship. ...................................... 3

   B. The NRA/AMc Decades-Long Relationship Comes to an End........................... 5

IV.  APPLICABLE LEGAL STANDARDS ............................................................... 8

V.   ARGUMENT AND AUTHORITIES ................................................................... 9

   A. AMc Is Entitled to Summary Judgment on its Affirmative Breach of Contract Claim....... 9

     1.   Breach of the Services Agreement – Unpaid Invoices..................................... 9

     2.   Breach of the Services Agreement – $3 Million Letter of Credit .................. 11

     3.   Breach of the Services Agreement – Termination Provision......................... 11

     4.   Breach of the Services Agreement - Indemnification .................................... 12

     5.   Breach of the Services Agreement/2018 Amendment – AMc-Third Party NRA Contracts ....... 14

     6.   Breach of the Services Agreement – Untimely Invoices ............................... 15

   B. AMc Is Entitled to Summary Judgment on the NRA's Breach of Contract Claim. ......... 15

     1.   There is no evidence of breach of the Record Inspection Clause or damages based on the alleged breach. ...... 16

     2.   No evidence that AMc leaked confidential information. ................................ 20

   C. AMc and Mercury Group Are Entitled to Summary Judgment on the NRA's Claim for Breach of Fiduciary Duty........ 22

     1.   There was no fiduciary relationship between the NRA and AMc. ................ 23

     2.   The economic loss rule bars the NRA's breach-of-fiduciary-duty claims..................... 25

     3.   The NRA has no evidence demonstrating breach by AMc or Mercury......................... 28

4.   The NRA's fiduciary duty claims are barred by waiver and laches.............................. 31

D.  Defendants Are Entitled to Summary Judgment on the NRA's Fraud Claim. ................. 35

1.   The economic loss doctrine bars the NRA's fraud claims. ............................................. 35

2.   There is no evidence to support the NRA's fraud claims against defendants............... 37

3.   The NRA's fraud claims are barred by the defenses of waiver and laches.................... 39

E.  Defendants Are Entitled to Summary Judgment on the NRA's Conversion Claim. ........ 40

1.   There is no recognized cause of action for conversion of intangible property. ............ 40

2.   The economic loss doctrine bars the NRA's claims for conversion. ............................. 43

3.   No evidence to support conversion against Individual Defendants or Mercury. ........... 44

F.   The NRA's Conspiracy Claim Fails as a Matter of Law. .................................................. 45

G.  Defendants Are Entitled to Summary Judgment on the NRA's Lanham Act Claims for
False Association and Trademark Infringement. ..................................................................... 45

1.   AMc engaged in "fair use" of NRA trademarks. ........................................................... 47

2.   No evidence of confusion, mistake, or deception. ......................................................... 48

3.   No evidence of damages. ............................................................................................... 50

4.   No evidence against Individual Defendants or Mercury................................................. 50

VI.    PRAYER......................................................................................................................... 51

## TABLE OF AUTHORITIES

### CASES

*Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606 (6th Cir. 1999) ........................................................................ 49

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......................................... 8, 29

*Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276 (Tex. 1998) ...................... 24

*Banco Popular, N. Am. v. Kanning*, 638 F. App'x 328 (5th Cir. 2016) ........................................ 8

*Bandy v. First State Bank*, 835 S.W.2d 609 (Tex. 1992) ........................................................... 40

*Basic Capital Mgmt. v. Dynex Capital, Inc.*, 976 F.3d 585 (5th Cir. 2020) .................................. 7

*Bridgmon v. Array Sys. Corp.*, 325 F.3d 572 (5th Cir. 2003) .................................................... 9

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................................................... 8

*Chapa v. Stonehaven Dev., Inc.*, No. 13-13-00030-CV, 2013 Tex. App. LEXIS 10159 (Tex. App.—Corpus Christi Aug. 15, 2013, no pet.) .......................................... 43

*Chapman Custom Homes, Inc., v. Dallas Plumbing Co.*, 445 S.W.3d 716 (Tex. 2014) ........ 26, 28

*Editorial Caballero, S.A. de C.V. v. Playboy Enters.*, 359 S.W.3d 318 (Tex. App.—Corpus Christie 2012, pet. denied) ...................................................... 45

*Express One Int'l v. Steinbeck*, 53 S.W.3d 895 (Tex. App.—Dallas 2001, no pet.) ..................... 42

*Fields v. JP Morgan Chase Bank*, NO. 4:14-CV-012-A, 2014 U.S. Dist. LEXIS 153837 (N.D. Tex. Oct. 29, 2014) .......................................................................... 26

*Fuller v. Le Brun*, 616 S.W.3d 31 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) ........... 36

*Garcia v. Garza*, 311 S.W.3d 28 (Tex. App.—San Antonio [4th Dist.] 2010, pet. denied) .. 31, 34, 40

*Golden Spread Elec. Coop., Inc. v. Emerson Process Mgmt. Power & Water Sols.*, 954 F.3d 804, (5th Cir. 2020). ................................................................ 25

*Haile v. Town of Addison*, 264 F. Supp. 2d 464 (N.D. Tex. 2003) ............................................. 8

*Hill v. New Concept Energy, Inc. (In re Yazoo Pipeline Co., L.P.)*, 459 B.R. 636 (S.D. Tex. Bankr. Oct. 14, 2011) .......................................................... 40, 44

*Hoffpauir, Inc. v. Interstate Nat'l Dealer Servs.*, No. A-12-CA-263 LY, 2013 U.S. Dist. LEXIS 9392 (W.D. Tex. 2013) ........................................................................................... 43

*Holland v. Psychological Assessment Res., Inc.*, 482 F. Supp. 2d 667 (D. Md. 2007) ............... 48

*Homoki v. Conversion Servs.*, 717 F.3d 388 (5th Cir.2013) ......................................................... 45

*Hostingxtreme Ventures, LLC v. Bespoke Grp., LLC*, Civil Action No. 3:14-CV-1471-M, 2017 U.S. Dist. LEXIS 146618 (N.D. Tex. Aug. 23, 2017) ............................................ 20

*Jacked Up, LLC v. Sara Lee Corp.*, 854 F.3d 797 (5th Cir. 2017) .................................. 22, 23, 24

*Jasco v. Coca Cola Co.*, 537 Fed. App'x 557 (5th Cir. 2013) ...................................................... 46

*Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617 (Tex. 1986) ......................................... 27, 35, 36

*Johnson v. Bella Gravida*, LLC, 105 Va. Cir. 350 (Cir. Ct. 2020) ............................................... 22

*Kalb v. Norsworthy*, 428 S.W.2d 701 (Tex. Civ. App.—Houston [1st Dist.] 1968, no pet.) ....... 25

*Klein-Becker USA, Ltd. Liab. Co. v. Home Shopping Network, Inc.*, No. 2:05-CV-00200 PGC, 2005 U.S. Dist. LEXIS 46773 (D. Utah Aug. 31, 2005) ........................................... 49

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004) ..................... 47

*Lee v. Hasson*, 286 S.W.3d 1 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) .................. 25

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ............................ 50

*Lincoln Gen. Ins. Co. v. U.S. Auto Ins. Servs.*, 787 F.3d 716 (5th Cir. 2015) ............ 26, 27, 43, 44

*Margaux Warren Park Partners, Ltd. v. GE Bus. Fin. Servs. (In re Margaux Warren Park Partners, Ltd.)*, Nos. 08-43388, 09-04022, 2009 Bankr. LEXIS 4128 (Bankr. E.D. Tex. 2009) ........................................................................................................................ 27

*Mason v. Fremont Inv. & Loan*, No. 3:15-cv-1909-K-BN, 2015 U.S. Dist. LEXIS 146077 (N.D. Tex. Oct. 8, 2015) .......................................................................................... 35, 37

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ............................ 8

*Meyer v. Cathey*, 167 S.W.3d 327 (Tex. 2005) .......................................................................... 24

*Mullins v. TestAmerica, Inc.*, Civil Action No. 3:02-CV-106-M, 2002 U.S. Dist. LEXIS 4877 (N.D. Tex. 2002) ...................................................................................................... 24

*Nat'l Union Fire Ins. Co. v. Care Flight Ambulance Serv.*, 18 F.3d 323 (5th Cir. 1994) ...... 26, 27

*Neles-Jamesbury, Inc. v. Bill's Valves*, 974 F. Supp. 979 (S.D. Tex. 1997).................................. 42

*New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302 (9th Cir. 1992)........................ 47

*Orcasitas v. Wells Fargo Home Mortg. Inc.*, No. 3:12-cv-2549-P, 2013 U.S. Dist. LEXIS 93760 (N.D. Tex. Apr. 10, 2013) ........................................................................................................ 36

*Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526 (5th Cir. 1998) .............................................. 47

*Ramos v. Wells Fargo Bank, NA*, 289 Va. 321, 770 S.E.2d 491 (2015).................................. 9, 16

*Rolex Watch USA, Inc. v. Meece*, 158 F.3d 816 (5th Cir.1998) ................................................. 50

*RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851 (5th Cir. 2010)............................................ 8, 28, 29, 37

*Scott v. Harris*, 550 U.S. 372 (2007) .......................................................................................... 8

*Shellnut v. Wells Fargo Bank, N.A.*, No. 02-15-00204-CV, 2017 Tex. App. LEXIS 3844 (Tex. App.—Fort Worth Apr. 27, 2017, pet. denied)........................................................................ 28

*Shopoff Advisors, LP v. Atrium Circle, GP*, 596 S.W.3d 894 (Tex. App.—San Antonio [4th Dist.] 2019, no writ) .................................................................................................. 26, 27, 35

*Spring St. Apts Waco, LLC v. Phila. Indem, Ins. Co.*, No. 6:16-cv-00315-RP-JCM, 2017 U.S. Dist. LEXIS 217120 (W.D. Tex. Apr. 5, 2017) ........................................................................ 26

*Springboards to Educ. v. Houston Indep. Sch. Dist.,* 912 F.3d 805 (5th Cir. 2019) ................... 48

*Sting Soccer Operations Grp. LP v. JP Morgan Chase Bank, N.A.*, CASE NO. 4:15-CV-127, 2016 U.S. Dist. LEXIS 94726 (E.D. Tex. Jul. 20, 2016)................................................... 26, 43

*Storball v. Twentieth Century Fox Film Corp*, CV 93-2745 RMT (Tx), 1993 U.S. Dist. LEXIS 20455 (C.D. Cal. Nov. 8, 1993) ........................................................................................... 49

*Super Future Equities, Inc. v. Wells Fargo Bank Minn., N.A.*, 553 F. Supp. 2d 680 (N.D. Tex. 2008)....................................................................................................................................... 45

*Sw. Bell Tel. Co. v. Delanney*, 809 S.W.2d 493 (Tex. 1991)...................................................... 27

*Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640 (Tex. 1996) ..................................... 31, 34, 39

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171 (9th Cir. 2010)............................... 47

*Triton 88 v. Star Elec. L.L.C.*, 411 S.W.3d 42 (Tex. App.—Houston [1st Dist.] 2013, no pet.).. 10

*Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 823 F. Supp. 2d 578 (S.D. Tex. 2011) ................... 40

*Viacom Int'l, Inc. v. IJR Capital Invs., LLC*, 891 F.3d 178 (5th Cir. 2018) ................................. 49

*W. Fork Advisors, LLC v. SunGard Consulting Servs., LLC*, 437 S.W.3d 917 (Tex. App.—Dallas 2014, pet. denied) ........................................................................................................... 45

*Wilson v. Jackson*, No. 3:14-CV-3748-N-BK, 2014 U.S. Dist. LEXIS 170207 (N.D. Tex. Nov. 13, 2014)................................................................................................................. 27, 45

## STATUTES

15 U.S.C. § 1114(1)(a)........................................................................................................ 46, 48

15 U.S.C. § 1115(b)(4) .............................................................................................................. 47

15 U.S.C. 1125(a)(1)(A) ............................................................................................... 46, 48, 49

Fed. R. Evid. 201 ......................................................................................................................... 7

TO THE HONORABLE A. JOE FISH:

Defendant/Counter-Plaintiff Plaintiff Ackerman McQueen, Inc. ("*AMc*"), Defendants Mercury Group, Inc. ("*Mercury*"), Henry Martin ("*Martin*"), William Winkler ("*Winkler*"), and Melanie Montgomery ("*Montgomery*") (collectively, "*Defendants*"), file this *Brief in Support of Motion for Partial Summary Judgment* ("*Motion*") pursuant to FED. R. CIV. P. 56.

## I.   INTRODUCTION AND SUMMARY

1.      For nearly four decades, AMc served as the NRA's advertising and public-relations agency, helping the gun rights organization navigate troubled political and societal waters as its principal communication strategist and crisis manager.  The relationship was prosperous and mutually beneficial as AMc helped the NRA become one of the most socially and politically influential civil rights organizations in the country.

2.       In 2018, the NRA discovered that the New York Attorney General's ("*NYAG*") investigation into the NRA could jeopardize the NRA's non-profit status, or its very existence, arising from the financial mismanagement and illegal acts of NRA executives, including and especially its Executive Vice President, Wayne LaPierre ("*LaPierre*").  To deflect attention from the NRA and, more importantly, to keep LaPierre in power (and out of jail), NRA executives and its litigation counsel—attorney William A. Brewer III ("*Brewer*")—secretly developed a plan to scapegoat AMc for the NRA's own bad acts.  Specifically, the NRA decided to exploit its decades-long business relationship with AMc in which AMc agreed to accommodate certain financial arrangements at the NRA's direction and insistence arising from LaPierre's confidentiality concerns due to well-known leaks within the NRA's accounting department.

3.      As part of its scapegoat strategy, the NRA has taken a shotgun approach by filing four separate lawsuits (including the instant action) against AMc, its wholly owned subsidiary

Mercury, and three AMc employees, Martin, Winkler, and Montgomery (collectively, the "***Individual Defendants***"), asserting claims for: (1) false association under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (2) trademark infringement; (3) conversion; (4) fraud; (5) breach of fiduciary duty; (6) conspiracy; (7) breach of the fiduciary duty of loyalty; and (8) breach of contract.  In turn, AMc brought counterclaims against the NRA, including breach of contract for unpaid invoices and fees, for which AMc now seeks summary judgment.

4.      Since litigation began in April 2019, the parties have engaged in extensive discovery across multiple forums.  The depositions of numerous witnesses, including the NRA's own witnesses, have repeatedly and directly contradicted the false and defamatory narrative the NRA continues to feed about Defendants and the parties' once fruitful relationship.  Now, pursuant to the Court's current scheduling order and the upcoming March 2022 trial setting, AMc seeks summary judgment on its breach-of-contract counterclaim against the NRA.

5.      AMc further seeks summary judgment on the NRA's claims against all Defendants for false association, trademark infringement, conversion, fraud, breach of fiduciary duty (and breach of fiduciary duty of loyalty), and conspiracy because there are no genuine issues of material fact on one or more elements of the NRA's claims and, therefore, AMc is entitled to judgment as a matter of law.  Defendants respectfully request that the Court grant their Motion in its entirety to properly narrow the issues before the March 2022 trial of this case.

## II.      SUMMARY JUDGMENT EVIDENCE

6.      In support of its Motion, Defendants submit the summary judgment evidence attached to Defendants' Appendix that is being filed contemporaneously with this Motion.

### III.   FACTUAL BACKGROUND

**A. The Parties' Decades-Long Contractual Relationship.**

7.      Beginning in the 1980s, AMc provided advertising, marketing, media, and numerous other services to the NRA. During this multi-decade relationship, the parties developed working arrangements and a course of dealing, such as negotiating annual budgets covering a variety of tasks.  The NRA, through its Executive Vice President, Wayne LaPierre ("*LaPierre*") and its longtime Treasurer and Chief Financial Officer, Wilson "Woody" Phillips ("*Phillips*"), led and oversaw the relationship, including operating with full knowledge of the budgeted line items.[1] As projects were initiated, invoices would issue and be approved by Phillips and LaPierre, payment would follow without complaint, and periodic annual audits raised no issues or concerns.[2] LaPierre personally participated in those negotiations and approved each annual budget.[3]

8.      Given the wide variety of services AMc provided, AMc and the NRA developed a mutually agreed budgeting process.[4]  LaPierre, in consultation with AMc's late CEO, Angus McQueen, directed the creation of these working arrangements.[5]  The entities' senior officers, LaPierre and/or Phillips (from the NRA) and Winkler and/or Montgomery (from AMc), carried out budgetary, invoicing, and payment tasks.[6]

9.      Over the course of years, the parties formalized their working arrangements, embodying their protocols in a series of agreements.  For example, in 1999, the NRA and AMc

---

[1] Ex. 21, Montgomery Depo. at 13:17-18:14 [APP 1769-70]; Ex. 3, Winkler Hr'g Trans., at 91:17-25 [APP 169]; Ex. 29 Phillips Depo., at 85:16-86:11 [APP 1963].

[2] Ex. 3, Winkler Hr'g Trans., at 92:10-98:19 [APP 170-76]; Ex. 29, Phillips Depo., at 122:24-123:7 [APP 1972].

[3] Ex. 4, LaPierre Depo., at 252:18-256:1 [APP 361-62]; Ex. 21, Montgomery Depo., at 13:17-14:21 [APP 1769].

[4] Ex. 21, Montgomery Depo., at 13:17-18:14 [APP 1769-1770]; Ex. 29, Phillips Depo., at 85:16-86:11 [APP 1963].

[5] Ex. 21, Montgomery Depo., at 13:17-14:12 [APP 1769].

[6] *See id.*; *see also* Ex. 19, Erstling Hr'g Trans., at 45:21-25 [APP 1508] (NRA accounting and budget manager identifying LaPierre and Phillips as the officers who approved AMc invoices).

entered into a services agreement.[7]  The services agreement at issue was executed in April 2017[8] (“*Services Agreement*”) and amended in 2018 (the “*2018 Amendment*”)[9] to confirm the protocol for the hiring, compensation, and reimbursements due to AMc by the NRA under employment agreements involving talent for NRATV, the NRA’s branded media network.

10.     Notably, and intentionally, the NRA desired the Services Agreement to be silent on certain issues, such as the specific requirements for the contents of AMc’s invoices or the backup to be provided.[10]  Due to the NRA’s concerns for confidentiality, AMc invoices contained minimal detail in the event that an invoice was leaked to the media by the NRA’s accounting department.[11]  For decades, the NRA received—and paid—identically styled invoices for AMc’s services and never requested any changes to AMc’s invoicing method.[12]  As the NRA admits, AMc adequately addressed all invoice concerns and requests for information related to its billing.[13]  Moreover, the NRA conducted regular annual audits of AMc’s books and records without issue.[14]

11.     The Services Agreement also contained other key provisions, including the duties imposed upon AMc to maintain the confidentiality of the NRA’s sensitive information (“*Confidentiality Clause*”)[15] and the NRA’s right to inspect AMc’s files, books, and records related to matters covered under the Services Agreement (“*Records Inspection Clause*”).[16]

---

[7] *See* Ex. 4, LaPierre Depo. (Virginia Action), at 251:10-20 [APP 361].

[8] *See* Ex. 35-A, Services Agreement [APP 2377].

[9] *See* Ex. 35-B, Amendment No. 1 to Services Agreement [APP 2388].

[10] Ex. 29, Phillips Depo., at 60:18-23 [APP 1956].

[11] *See* Ex. 29, Phillips Depo., at 139:18—140:19 [APP 1976].

[12] *See id.* at 143:3-6 [APP 1977] (Prior to 2018, not aware of anyone at the NRA asking AMc to change or modify how they invoice the NRA), 137:17-22 [APP 1976] (testifying that if the NRA paid an AMc invoice, that meant the NRA was comfortable with the amount of detail and backup provided by AMc to support the invoice.)

[13] Ex. 29, Phillips Depo., at 64:21-25 [APP 1957].

[14] Ex. 3, Winkler Hr’g Trans., at 92:10-94:4 [APP 170-172]; Ex. 29, Phillips Depo., at 68:6-25 [APP 1958], 124:16-125:5 [APP 1972], 125:25-127:9 [APP 1973].

[15] Ex. 35-A, Services Agreement § IV [APP 2377].

[16] *Id.* at § VIII [APP 2385].

12.     The 2018 Amendment contained two critical provisions designed to protect AMc in the event of untimely paid invoices or termination of the Services Agreement.  *First*, the NRA was required to obtain and post a $3,000,000 letter of credit for AMc's benefit to secure payment of outstanding invoices over 30 days old.[17]  *Second*, certain contracts entered into between AMc and third parties at the direction of the NRA, including contracts with NRATV talent Col. Oliver North ("**North**") and Dana Loesch (referred to as the "***AMc-Third Party NRA Contracts***"), obligated the NRA to pay the "compensation payable" under the AMc-Third Party NRA Contracts.[18]  The NRA admits that it has refused to honor these commitments.[19]

## B.  The NRA/AMc Decades-Long Relationship Comes to an End.

13.     The business relationship between the NRA and AMc began to unravel in mid-2018 following the initiation of the NYAG's investigation into the NRA and the NRA's retention of Brewer and his law firm, Brewer Attorneys & Counselors ("**Brewer Firm**").  As this Court is aware, Brewer is the brother-in-law of AMc's current CEO, Revan McQueen and his late father-in-law, Angus, with whom Brewer had a well-known, decades-long history of animosity.[20]  As political pressure from the NYAG mounted, Brewer—at LaPierre's request—pegged AMc and his dying father-in law and his eponymous firm, as the perfect fall-guys for the NRA's financial mismanagement.[21]  Through this action, the NRA has created a revisionist narrative, conveniently attributing representations (assuming admissibility) and various acts of wrongdoing to someone who can no longer defend himself.  As this Court also found, the Brewer Firm is a direct competitor

---

[17] Ex. 35-B, 2018 Amendment at ¶ 2 [APP 2388].

[18] *Id.* at ¶ 3 [APP 2388]; Ex. 29, Phillips Depo., at 186:13-20 [APP 1988].

[19] Ex. 34-E, NRA Obj. & Resp. to AMc First Set of Requests for Admission ("***RFA***") at 20, No. 68, 70-77 [APP 2340-42].

[20] *See, e.g*, Ex.10, Hart Depo., at 214:1-8, 215:3-10 [APP 822].

[21] *See, e.g.*, ECF 141 at Ex. I (APP 81-100).

of AMc and thus has an additional incentive to terminate and scapegoat AMc.[22]

14.      Prior to 2018, the NRA conducted regular annual audits of AMc without issue.[23] Following Brewer's retention, the NRA conducted a series of audits of AMc beginning in September 2018.[24]  First, the Brewer Firm audited AMc in September 2018.[25]  Next, the law firm of Cooper Kirk, PLLC, audited AMc in November 2019.[26]  Finally, the NRA hired forensic accounting firm Forensic Risk Alliance ("**FRA**") to audit AMc in February 2019, which spanned a period of weeks.[27]  Following each of these audits, AMc was not asked to provide any additional documentation or accused of withholding any information.[28]

15.      Despite AMc's cooperation with these audits and document requests, the NRA filed a lawsuit on April 12, 2019, alleging that AMc had refused to comply with the Records Inspection Clause.[29]  The NRA filed a second lawsuit on May 22, 2019, accusing AMc of leaking certain information related to the NRA's pass-through expenses to the media and claiming breach of the Services Agreement's Confidentiality Clause.[30]  After finding itself the defendant in two lawsuits by its longtime client, AMc's relationship with the NRA naturally continued to unravel. Although both parties sent letters at different times purporting to terminate the relationship, at the very latest,

---

[22] *See* ECF 148 at 4 (finding the Brewer Firm to be a competitor of AMc because the Brewer Firm also provides public-relations services).

[23] Ex. 3, Winkler Hr'g Trans., at 92:10-94:4 [APP 170-172].

[24] *Id.*, at 94:14-99:3 [APP 172-77].

[25] *Id.*, at 94:14-95:20 [APP 172-73].

[26] *Id.*, at 95:21-96:14 [APP 173-74]; Ex. 35-G [APP 2433] (Cooper Kirk describing the audit as "fruitful").

[27] Ex. 3, Winkler Hr'g Trans., at 96:15-99:3 [APP 174-177]; *see also* Exs. 35-D, 35-E, 35-F [APP 2402-32] (communications between NRA General Counsel reflecting AMc's cooperation after being informed of the FRA audit).

[28] Ex. 3, Winkler Hr'g Trans., at 94:14-99:3 [APP 172-77]

[29] *NRA v. AMc*, No. CL19001757, In the Circuit Court for the City of Alexandria (Cir. Ct. Va. Apr. 12, 2019).

[30] *NRA v. AMc*, No. CL19002067, In the Circuit Court for the City of Alexandria (Cir. Ct. Va. May 22, 2019).

the parties' relationship had concluded by June 25, 2019, at which point AMc ceased all work.[31]

16.    In the following months, the NRA proceeded to file two more actions against AMc in Virginia (collectively, "***Virginia Action***"),[32] along with the instant lawsuit in the Northern District of Texas ("***Texas Action***").[33]  In response, AMc asserted numerous counterclaims against the NRA and LaPierre.[34]

17.    In August 2020, the NYAG filed a lawsuit against the NRA, LaPierre, and other top executives, accusing them of various instances of financial mismanagement and fraud.[35]  In response, the NRA has repeatedly taken the position that their admitted failures in complying with New York non-profit law, among other things, were the fault of AMc.[36] AMc asks that the Court take judicial notice of the docket, filings, pleadings, and judgments set forth in the NYAG's lawsuit in the Enforcement Action against the NRA and its top executives.[37]

18.    In January 2021, the NRA filed for Chapter 11 bankruptcy in the Northern District of Texas, which temporarily stayed portions of this action.[38]  AMc and the NYAG moved to dismiss the NRA Bankruptcy as a bad-faith bankruptcy filing.[39]  Throughout the NRA Bankruptcy, the NRA continued to peg AMc as the source of its own failures.[40]   On May 11, 2021, the

---

[31] *See* ECF 209 at ¶ 99 ("By letter dated June 25, 2019, the NRA terminated the Services Agreement effective "immediately.").

[32] *NRA v. AMc*, No. CL19002067, In the Circuit Court for the City of Alexandria (Cir. Ct. Va. May 22, 2019*); NRA v. AMc*, No. CL 19002886, In the Circuit Court for the City of Alexandria (Cir. Ct. Va. Sep. 5, 2019).

[33] *See* ECF 1.

[34] *See* ECF 17, 31, 210, 241.

[35] *See* Verified Complaint, *People of the State of New York v. NRA, et al.*, Index No. 451625/2020 (Aug. 6, 2020), pending in the Supreme Court of the State of New York, County of New York (the "***Enforcement Action***").

[36] *See, e.g.*, Ex. 37 Enforcement Action, Memo. In Support of Mot. to Dismiss, NYSCEF Doc. No. 99 at 1-2, 9-10 [APP 2592-2593, 2600-2601].

[37] *See* FED. R. EVID. 201; *Basic Capital Mgmt. v. Dynex Capital, Inc.*, 976 F.3d 585, 589 (5th Cir. 2020) ("Rule 201(d) expressly provides that a court 'may take judicial notice at *any* stage of the proceeding'").

[38] *In re National Rifle Assoc.*, No. 21-30085-hdh11 (Bkr. N.D. Tex. Jan. 15, 2021) ("***NRA Bankruptcy***"); ECF 200.

[39] NRA Bankruptcy, AMc Mot. to Dismiss (Feb. 2, 2021) (ECF 131); NYAG Mot. to Dismiss Bankruptcy (Feb. 12, 2021) (ECF 155).

[40] *See, e.g.*, Ex. 38, NRA Bankruptcy, Omnibus Opp. to Mot. to Dismiss (ECF 307), at 5-10 [APP 2626-2631].

---

Honorable Judge Harlan D. Hale entered an order dismissing the NRA's bad-faith bankruptcy filing while acknowledging the "shocking" actions of LaPierre and "the unusual involvement of litigation counsel in the affairs of the NRA."[41]

19.     Since April 2019, the parties have engaged in significant discovery pertaining to the issues in this case, including in the Virginia Action and the NRA Bankruptcy.  Hundreds of thousands of pages of documents have been produced and nearly 60 depositions have been taken.[42] Discovery concluded on October 29, 2021, and the case is set on this Court's trial docket for March 2022.  As such, AMc's Motion is ripe for the Court's consideration.

## IV.     APPLICABLE LEGAL STANDARDS

20.     Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.[43]  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[44] Once the moving party has made the initial showing that there is no genuine dispute of material fact, summary judgment is mandatory unless the nonmovant must come forward with competent evidence establishing a triable fact issue.[45]     Conclusory statements, speculation, and unsubstantiated assertions, will not prevent summary judgment.[46]

---

[41] NRA Bankruptcy, Order Granting Mot. to Dismiss, at 2, 37, 34, 37 (May 11, 2021) (ECF 740).

[42] Ex. 34, Mason Decl., at ¶¶ 2-4 [APP 2273].

[43] FED. R. CIV. P. 56; *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[44] *Banco Popular, N. Am. v. Kanning*, 638 F. App'x 328, 333 (5th Cir. 2016).

[45] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Haile v. Town of Addison*, 264 F. Supp. 2d 464, 466 (N.D. Tex. 2003).

[46] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).

## V.    ARGUMENT AND AUTHORITIES

### A.  AMc Is Entitled to Summary Judgment on its Affirmative Breach of Contract Claim.

21.    This Court should grant summary judgment on AMc's claim for breach of the Services Agreement (including the 2018 Amendment).  There is no dispute that the Services Agreement was an enforceable contract between the NRA and AMc.[47]  There is also no dispute that the 2018 Amendment was a valid and enforceable amendment to the Services Agreement. Under Virginia law, which governs the Services Agreement,[48] "[t]he elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation."[49]  Here, AMc has established each of these elements, including multiple breaches of the Services Agreement, entitling AMc to millions of dollars in damages.

#### 1.  Breach of the Services Agreement – Unpaid Invoices.

22.    It is undisputed that AMc performed work and services pursuant to the Services Agreement, invoiced the NRA for those services, and that AMc has not been paid for this work.[50] Of the invoices provided at issue, numerous invoices totaling $3,991,023.59 remain unpaid (the "*Unpaid Invoices*").[51]  The Services Agreement provides that such Unpaid Invoices accrue interest at a rate of 1% per month, which continues to accrue on all unpaid invoices and is due and owing.[52]

23.    The NRA has breached the Services Agreement by failing to pay AMc for services

---

[47] *See* ECF 209 at 72, ¶ 186.

[48] Ex. 35-A, Services Agreement § XII.A [APP 2387].

[49] *Ramos v. Wells Fargo Bank, NA*, 289 Va. 321, 323, 770 S.E.2d 491, 493 (2015); *see also Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 577 (5th Cir. 2003).

[50] Ex. 35, Winkler Decl. at ¶  15-16 [APP 2366-67]; Ex. 34-E, NRA Obj. & Res. to AMc's First RFA at No. 70 [APP 2340].

[51] Ex. 35, Winkler Decl. at ¶ 15-16 [APP 2366-67]; Ex. 35-H, Amended Expert Report of Daniel Jackson Report (Oct. 15, 2021) ("*Jackson Report*") at Ex. 7 [APP 2505].

[52] Ex. 35-A, Services Agreement at 6, § III.E [APP 2382].

rendered.[53]  The Services Agreement provided that the NRA was to pay the amounts due on each invoice within 30 days of the invoice date, and was required to "notify AMc of any questions concerning any invoices within 10 business days after receipt."[54]  As NRA General Counsel, John Frazer, admits, the NRA provided no such notice, questions, or disputes regarding the Unpaid Invoices within that 10-day period.[55]

24.     Moreover, the complaints that the NRA belatedly brings regarding AMc's invoices, all essentially stemming from an alleged lack of supporting detail, were apparent at the time the NRA first received the invoices—and had been formatted the same way for decades without complaint.[56]  The NRA had the opportunity to challenge lack of detail, calculation methods, or any other facet of the invoices during that 10-day period, but simply lacked cause or declined to do so. Texas courts have ruled under very similar facts that invoices, contested for the first time only *after* a contractual challenge period, were sufficient summary judgment proof of performance, breach, and damages, granting summary judgment for a plaintiff.[57]

25.     As a result of the NRA's breach of the Services Agreement relating to Unpaid Invoices, AMc is entitled to $3,991,023.59 for the Unpaid Invoices and accrued interest of 1% per

---

[53] *See* Ex. 12, Frazer Depo. at 241:3-242:20 [APP 1011], 326:2-328:13 [APP 1032]; Ex. 4, LaPierre Depo. (Virginia Action) at 284:7-285:12 [APP 369-370]; Ex. 13, Spray Depo. (Virginia Action), at 46:15-19 [APP 1063], 83:18-24 [APP1072], 107:7-14 [APP 1078], 192:21—194:3 [APP 1099-1100].

[54] Ex. 35-A, Services Agreement § III.E [APP 2382].

[55] Ex. 12, Frazer Depo. (Virginia Action) 328:5-13 [APP 1032]; *see also* Ex. 11 Supernaugh Depo., at 166:18-167:16 [APP 932], 170:6-11 [APP 933].

[56] *See, e.g.*, Ex. 19, Erstling Hr'g Trans., at 24:21-25:5, 25:19-21 [APP 1487-88] (admitting that the NRA never challenged a lack of supporting detail in AMc's invoices); Ex. 4, LaPierre Depo., 257:4-258:13 [APP 363] (admitting that the NRA knew the AMc invoices lacked detail because it was later part of a "self-correction" effort to update billing procedures to require more detail, which did not begin until 2018); Ex. 35, Winkler Decl. at ¶ 17-18 [APP 2367-68].

[57] *See Triton 88 v. Star Elec. L.L.C.*, 411 S.W.3d 42, 59-60 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (upholding summary judgment for plaintiff on breach of contract where invoices were not contested under procedure established by contract over defendant's argument that its evidence of improper billing created fact issue.).

month on all amounts past due.[58]

### 2. Breach of the Services Agreement – $3 Million Letter of Credit

26.     By extension, because each of the Unpaid Invoices is more than 30 days late, the NRA is also in breach of the 2018 Amendment to the Services Agreement, under which the NRA agreed to post a $3 million letter of credit for the benefit of AMc "to be drawn upon to pay in full invoices for service fee billings outstanding more than 30 days."[59] It is undisputed that the NRA failed to post the required letter of credit set forth in the 2018 Amendment.[60] Indeed, Phillips confirmed during his deposition that it should have been posted by the NRA after the May 2018 Amendment.[61] It is further undisputed that these invoices are over 30 days past due and were not challenged during the 10-day notice period.[62] Accordingly, summary judgment should be granted regarding the breach of the 2018 Amendment for failing to post the $3 million letter of credit.

### 3. Breach of the Services Agreement – Termination Provision

27.     Section XI.F of the Services Agreement ("*Termination Provision*") provides:

> In consideration of the dedication of a substantial number of personnel and resources to provide the services under the Agreement (and the necessity to maintain such staffing levels and resource allocations to enable AMc to continue to provide such services upon any renewals hereof), the NRA agrees to pay AMc a fair and equitable termination fee to compensate it for the inevitable severances and other reasonable costs incurred in conjunction with such expiration or termination.[63]

28.     AMc sustained two primary types of damages from the NRA's breach of the

---

[58] As of June 15, 2021, the total accrued interest due was $1,057,969. *See, e.g.*, Ex. 35-H, Jackson Report, at Ex. 7 [APP 2505].

[59] Ex. 35-B, 2018 Amendment at ¶ 2 [APP 2388] (amending § III of the Services Agreement).

[60] Ex. 34-E, NRA's Obj. & Res to AMc's First RFA, at No. 68-69 [APP 2340].

[61] Ex. 29, Phillips Depo. at 179:2—180:22 (testifying that the Letter of Credit "should have been done" by the NRA) [APP 1986].

[62] Ex. 35, Winkler Decl. at ¶ 21 [APP 2369].

[63] Ex. 35-A, Services Agreement § XI.F [APP 2386-87].

Termination Provision: (1) various expenses associated with the termination of the relationship, including office lease space, office disassembly fees, and other technological and operational support; and (2) employee severance fees.

29.     *First*, as a result of the termination of the Services Agreement, AMc was forced to terminate leases in Alexandria, Virginia, Colorado Springs, Colorado, and half of its office in Dallas, Texas.[64]  AMc was forced to incur a variety of expenses associated with winding down these office operations, including terminating contracts, paying for leased space, operating expenses, moving, crating, disassembly, and other types of costs.  In total, AMc incurred expenses of $6,525,436 related to these various expenses ($6,216,735 for Offices and Leases; $230,185 for Other Contracts; $78,516 for Office Disassembly/Move-out).[65]

30.     *Second*, it is undisputed that as a result of the termination of the Services Agreement, the jobs of numerous AMc employees who worked on the NRA were no longer required.[66]  These employees were furloughed, and AMc incurred $509,492 in expenses in the form of COBRA premiums for continuing medical coverage and calculated severance amounts totaling $1,929,146.[67]

31.     Alternatively, AMc seeks summary judgment on liability as it relates to the NRA's breach of the Services Agreement relating to the NRA's breach of the Termination Provision.

### 4.  Breach of the Services Agreement - Indemnification

32.     Pursuant to Section V.B.I of the Services Agreement ("***Indemnification Provision***"), the NRA is required to indemnify and reimburse AMc for any expenses it may incur

---

[64] Ex. 35, Winkler Decl. at ¶ 30-32 [APP 2371]; Ex. 35-H, Jackson Report at 18-21 [APP 2451-54].

[65] Ex. 35, Winkler Decl. at ¶ 30-32 [APP 2371]; Ex. 35-H, Jackson Report at Exs. 1, 2, 3, 6 [APP 2495-98, 2504].

[66] Ex. 35, Winkler Decl. at ¶ 33 [APP 2374]; Ex. 35-H, Jackson Report at 28-29 [APP 2461-62].

[67] Ex. 35, Winkler Decl. at ¶ 33 [APP 2374]; Ex. 35-H, Jackson Report at Exs. 1, 5, 5A, 5B [APP 2495, 2501-03].

as a result of its work for the NRA.

33.     *First*, the NRA should indemnify and reimburse AMc for expenses arising from:

> any claim, action or proceeding by any person(s), entity(ies), the United States of America, any state(s), county(ies), or municipality(ies), or an department, agency, board, bureau, commission, attorney general, or other instrumentality(ies) or political subdivision(s) of any of the foregoing, seeking . . . an injunction or other equitable relief with respect to the activities [AMc] performed on behalf of the NRA pursuant to this Agreement or otherwise requested or approved by NRA.[68]

34.     It is undisputed that the NRA has been the subject of various government inquiries that have imposed costs and expenses on AMc.  Specifically, AMc has been forced to incur numerous expenses relating to the NYAG's investigation into the NRA that relates to the activities that AMc performed on behalf of the NRA pursuant to the Services Agreement or that were otherwise requested or approved by the NRA.[69]  AMc has repeatedly demanded indemnification relating to the NYAG's investigation, which the NRA has refused to provide.[70]

35.     *Second*, the Services Agreement also requires the NRA to:

> indemnify, defend, and hold harmless AMc, and its directors, officers, employees, agents, contractors and representatives . . . from and against any and all claims, demands, causes of action, suits, liabilities, losses, damages, settlements, judgments, and expenses . . . arising from . . . the public relations services and related activities of any Spokesperson pursuant to the direction or supervision of NRA.[71]

36.     It is undisputed that Dana Loesch was a "Spokesperson" for the NRA.[72]  It is further undisputed that Loesch has a currently pending arbitration against AMc for the NRA's failure and refusal to honor its obligations related to the AMc-Third Party NRA Contract and that this relates to the activities that AMc performed on behalf of the NRA pursuant to the Services Agreement or

---

[68] Ex. 35-A, Services Agreement § V.B.I [APP 2383].

[69] Ex. 35, Winkler Decl. at ¶¶ 26-29 [APP 2370-71].

[70] *Id.*

[71] Ex. 35-A, Services Agreement § V.B.I [APP 2383].

[72] *See* Ex. 35-B, 2018 Amendment at ¶ 2 [APP 2388].

that were otherwise requested or approved by the NRA.[73] AMc has demanded indemnification relating to the Loesch arbitration against AMc, which the NRA has repeatedly refused.[74]

37.     As of December 15, 2020, based upon the NRA's breach, AMc has sustained damages in the amount of $973,277.[75]  These amounts have continued to accrue.[76] As a result, AMc is entitled to partial summary judgment on the element of breach with regard to the Indemnification Provision of the Services Agreement and the damages it has incurred to date, as well as summary judgment on the future damages AMc will incur relating to the NYAG's investigation into the NRA and the Loesch arbitration, including a liability finding that the NRA is required to indemnify AMc for any and all future damages, expenses, or liability arising out of the Loesch arbitration based upon the AMc-Third Party NRA Contract.

38.     Alternatively, AMc seeks summary judgment on liability as it relates to the NRA's breach of the Services Agreement and 2018 Amendment relating to the NRA's breach of the Indemnification Provision.

### 5. Breach of the Services Agreement/2018 Amendment – AMc-Third Party NRA Contracts

39.     In addition to the termination expenses, upon termination of the Services Agreement, the NRA agreed to pay AMc under the AMc-Third Party NRA Contracts:

> For all non-cancellable contracts entered into between AMc and third parties for the benefit of the NRA (herein "AMc-Third Party NRA Contracts"), the NRA agrees to pay AMc upon such expiration or termination the balance of the compensation payable under such AMc-Third Party NRA Contracts (including but not limited to, the AMc-Third Party NRA Contracts with Dana Loesch and Oliver North) as of the date of expiration of termination so that AMc can fulfill its obligation under said Contracts after expiration or termination.[77]

---

[73] Ex. 35, Winkler Decl. at ¶¶ 27-29 [APP 2370-71].

[74] *Id.*

[75] *Id*; Ex. 35-H, Jackson Report at Ex. 9 [APP 2509].

[76] *Id.*

[77] Ex. 35-B, 2018 Amendment at ¶ 3 [APP 2388]; *see also* Ex. 35-A, Services Agreement at XI.E [APP 2386].

40.    It is undisputed that AMc entered into the AMc-Third Party NRA Contracts at the direction of, with the approval of, and on behalf of the NRA.[78]  It is further undisputed that the NRA has refused to pay AMc pursuant to the terms of the Services Agreement.[79]  As a result of the NRA's breach of the Services Agreement relating to that AMc-Third Party NRA Contracts, AMc is entitled to $6,310,698, plus interest.[80]  Alternatively, AMc seeks summary judgment on liability as it relates to the NRA's breach of the Services Agreement and 2018 Amendment relating to the NRA's obligations to pay compensation relating to the AMc-Third Party NRA Contracts.

### 6.  Breach of the Services Agreement – Untimely Invoices

41.    In addition to the Unpaid Invoices and interest, the NRA frequently failed to make timely payments of AMc's invoices.[81]  Under Section III.E of the Services Agreement, all invoices are due "within 30 days of the invoice date" and "amounts not received by AMc within 60 days from the date of the invoice shall bear interest at the rate of 1% per month from the date of the invoice until paid."[82]  It is undisputed that, in the second half of 2018, the NRA was late in paying over 70 separate invoices.[83]  Even though these invoices were eventually paid, interest remains due and owing.  As a result, AMc is entitled to interest fees totaling $39,077.00.

## B.  AMc Is Entitled to Summary Judgment on the NRA's Breach of Contract Claim.

42.    In Count Eight of its SAC, the NRA alleged AMc breached the Services Agreement in two ways: (1) by failing to allow the NRA to inspect records as required under the Records

---

[78] *See* ECF 261 at 2 (NRA admits that AMc entered into the AMc-Third Party NRA Contracts at the NRA's behest); Ex. 35, Winkler Decl. at ¶ 34-35 [APP 2375].

[79] *Id,*

[80] *Id*; Ex. 35-H, Jackson Report at Exs. 1, 4, 4A [APP 2495, 2499-2500].

[81] Ex. 35, Winkler Decl. at ¶ 25 [APP 2369]; Ex. 35-H, Jackson Report at Ex. 8 [APP 2507].

[82] Ex. 35-A, Services Agreement § III.E [APP 2382].

[83] Ex. 35, Winkler Decl. at ¶ 25 [APP 2369]; Ex. 35-H, Jackson Report at Ex. 7 [APP 2505]; Ex. 11, Supernaugh Depo., at 167:20-169:17 [APP 932-33].

Inspection Clause of the Services Agreement, and (2) by leaking confidential NRA information in violation of the Confidentiality Clause of the Services Agreement.[84]

43.     Under Virginia law, which governs the contract,[85] "[t]he elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation."[86] Because the NRA cannot produce evidence sufficient to create a genuine issue of material fact in support of the elements of <u>breach</u> or <u>injury</u>, the NRA's breach of contract claim should be dismissed.

**1.  There is no evidence of breach of the Record Inspection Clause or damages based on the alleged breach.**[87]

44.     The Records Inspection Clause provides that "[d]uring the term of this Services Agreement, AMc authorizes NRA, upon reasonable notice, to examine AMc and Mercury's files, books, and records, with respect to matters covered under this Services Agreement."[88]  The NRA claims that AMc "has repeatedly failed or refused to permit the NRA to examine specified categories of books and records with respect to matters covered under the Services Agreement."[89]

45.     The evidence has shown that, not only did the NRA fail to provide reasonable notice to examine AMc's and Mercury's books and records, but that AMc and Mercury fully complied despite the NRA's unreasonable notice.  For example, when asked whether he was "aware of any breach that AMc had of the Services Agreement, former NRA Board attorney Steve Hart

---

[84] ECF 209 at 72-74.

[85] Ex. 35-A, Services Agreement § XII.A [APP 2387].

[86] *Ramos*, 770 S.E.2d at 493.

[87] It is unclear whether the NRA's seeks damages relating to the purported breach of the Records-Inspection Clause, or simply specific performance.  Irrespective, summary judgment is appropriate on the entirety of the claim.

[88] Ex. 35-A, Services Agreement § VIII [APP 2385].

[89] ECF 209 at ¶ 188.

responded simply: "no."[90]   On the other hand, the NRA has failed to elicit evidence that AMc or Mercury failed to comply with the Services Agreement's Records Inspection Clause.

46.     The NRA names two categories of documents that AMc allegedly failed to provide upon request: (1) copies of any AMc-Third Party NRA Contracts, including AMc's employment contract with North ("***North Contract***"), and (2) business records, in whatever form they were generated in the ordinary course of AMc's business.[91]

47.     *First*, with regard to the North Contract, NRA executives participated in the negotiation of the North Contract[92] and possessed a copy of it as early as May 2018.[93]   The NRA itself even admits that it had a copy of the North Contract before filing suit on April 12, 2019, falsely claiming it had been withheld.[94]   Thus, there can be no showing of any breach or damages.

48.     *Second*, with regard to other "business records" requested by the NRA, the NRA's pleadings have spun a wildly false narrative regarding the various documents allegedly concealed by AMc, which is not supported by any evidence.   At this point, it is undisputed that the NRA routinely asked AMc to pay for certain NRA expenses in order to keep them confidential from the NRA's accounting department and other NRA representatives to avoid the recurring problem of media leaks.[95]   It is also undisputed that, before 2018, the NRA routinely conducted annual audits of AMc's business records, which were always satisfactory, as LaPierre himself confirmed:[96]

   Q:   You saw earlier today questions about in the services agreement there's a

---

[90] Ex. 10, Hart Depo., at 414:7-11 [APP 872].

[91] ECF 209 at ¶ 190.

[92] Ex. 10, Hart Depo., at 125:1-130:5, 140:13-141:11 [APP 800-01, APP 803-04] (describing initial meeting negotiating terms of North Contract).

[93] Ex. 29, Phillips Depo., at 182:18-24 [APP 1987], 171:4-172:11 [APP 1984].

[94] Ex. 34-E, NRA Obj. & Resp. to AMc RFA, at 20, No. 49 [APP 2332]; Ex. 12, Frazer Depo. (Virginia Action) 260:9-261:22 [APP 1015-16].

[95] *See, e.g.*, Ex. 4, LaPierre Depo. (Virginia Action) at 215:10-216:2 [APP 352].

[96] *See* ECF 141, Winkler Decl. at ¶ 5 (APP 4), Montgomery Decl. ¶ 6 (APP 13-14); Ex. 6, Winkler Hr'g Trans., at 88-95 [APP 345-52]; Ex. 4, LaPierre Depo. (Virginia Action) 305:6-21 [APP 375].

clause for examination of records.  Isn't it true that the NRA every year would do an examination of Ackerman McQueen's records?

A:  To my knowledge, I thought that was – I thought that was true.

Q:  And isn't it true that Ackerman McQueen always provided information that was requested at the audit and the NRA had no problems with that?

. . .

A:  There were – there were never any problems with the – with our audit – with our outside audit, or I would have been informed of it by the treasurer's office.

49.  Phillips similarly echoed LaPierre's recollection of audits occurring before 2018:

Q:  Prior to the fall of 2018, do you recall anyone raising any concerns about the NRA's examination of Ackerman's books and records?

A:  No.

Q:  Prior to the fall of 2018, do you recall anyone raising any concerns about the backup documentation maintained by Ackerman for any of the work that it was doing for the NRA?

A:  No.[97]

50.  Following the NRA's retention of the Brewer Firm in 2018, the NRA conducted three additional audits over a period of six months.[98]  AMc fully cooperated with each of these audits, and at no time did any of the auditors accuse AMc of failing or refusing to comply with NRA's various record-inspection requests.[99]  Importantly, AMc fully cooperated with these audits despite Brewer repeatedly making threats to AMc that he intended to pursue an FBI indictments and RICO charges against AMc and its principles.[100]

---

[97] Ex. 29, Phillips Depo., at 122:24-123:7 [APP 1972].

[98] Ex. 3, Winkler Hr'g Trans., at 94:14-99:3 [APP 172-77].

[99] *See id.*

[100] Ex. 20, Makris Hr'g Trans., at 113:24-118:12 [APP 1727-32] (further explaining the threats were made while Angus was battling terminal cancer); Ex. 1, Winkler Depo., at 18:24-20:5 [APP 5], 96:5-21 [APP 24], 100:4-101:9 [APP 25-26] (Mar. 26, 2021); Ex. 3, Winkler Hr'g Trans., at 103:11-17 [APP 181]; Ex. 34-F Angus Letter to LaPierre ("You [LaPierre] have told me on repeated occasions of Mr. Brewer's hostility to Ackerman McQueen.  You have described yourself as being a pawn on his chessboard.") [APP 2350].

51.     The first audit was conducted by the Brewer Firm in September 2018.  The audit lasted for two full days and, upon its conclusion, AMc did not receive a single request for invoices or receipts, nor did AMc receive any follow-up questions or demands for additional documents.[101]

52.     The second audit was conducted by the NRA's then-outside counsel, Cooper Kirk, PLLC, in November 2018.[102]  Following the audit, a representative from Cooper Kirk emailed Winkler and another AMc employee thanking them for the meeting and describing it as "fruitful."[103]  At no time did AMc receive any additional requests for documents or information.[104]

53.     The third audit was conducted by forensic accounting firm FRA in February and March 2019.[105]  The NRA informed AMc that FRA had been engaged to inspect the documents on January 21, 2019, and provided a list of requested documents and categories of documents on January 30, 2019.[106]  AMc arranged to make the documents available by February 5, 2019.[107]  Via email, NRA Counsel Frazer praised AMc's response and offer of inspection for being "prompt."[108]  The audit spanned weeks as FRA continued to request additional documents.  Ultimately, however, the audit concluded without any additional requests for documents or any accusations that AMc was withholding documents by FRA or the NRA.[109]  Following the audit, AMc received no summary or report of findings.[110]

54.     Moreover, the only documents that AMc was physically unable to provide to

---

[101] Ex. 3, Winkler Hr'g Trans., at 94:14-95:20 [APP 172-73].

[102] *Id.*, at 95:21-96:14 [APP 173-74].

[103] Ex. 35-G [APP 2433].

[104] Ex. 3, Winkler Hr'g Trans., at 95:21-96:14 [APP 173-74].

[105] *Id.*, at 96:15-99:3 [APP 174-77].

[106] *See* Ex. 35-D, [APP 2404-11]; Ex. 35-E, [APP 2413-14].

[107] *See* Ex. 35-E [APP 2412].

[108] *Id.*

[109] Ex. 3, Winkler Hr'g Trans., at 96 - 99 [APP 174-77].

[110]  *Id.*

auditors were documents that were *already in the NRA's possession*—specifically, backup receipts and information for the pass-through expenses AMc incurred at the NRA's request.  For example, the NRA had asked AMc to issue a credit card to NRA employee, Tyler Schropp ("**Schropp**"), head of the NRA's Office of Advancement, who used the credit card for travel, meals, and other expenses incurred to court high-dollar NRA donors.[111]  Schropp admitted that he kept the receipts for these purchases but that he never remitted them to AMc.[112]

55.     In sum, the NRA continues to make the bare allegations that AMc has refused to comply with document requests, but there is simply no evidence to support this claim.  Yet, even if there were, the NRA's document requests appear to be nothing more than a way to turn AMc into a scapegoat for its regulatory issues with the NYAG, rather than being a good-faith request for any information the NRA ever truly needed.[113]  The NRA's SAC alleges only that "Defendants have jeopardized the NRA's ability to steward its funds in pursuit of its public mission."[114]  But the NRA has not produced any evidence that the NRA has not been able to "steward its funds," much less how that inability stems from AMc's alleged conduct *or* has led to actual damages.  Accordingly, the NRA cannot produce evidence sufficient to raise a triable fact issue on the necessary elements of breach or damages resulting from its Records Inspection Clause claim.[115]

## 2.  No evidence that AMc leaked confidential information.

56.     The NRA also claims AMc leaked confidential information in violation of the

---

[111] Ex. 4, LaPierre Depo, at 215:10-216:13 [APP 352]; Ex. 7, Schropp Hr'g Trans., at 14:7-17 [APP 520].

[112] Ex. 7, Schropp Hr'g. Trans., 15:1-22[APP 520], 35:12-36:22 [APP 541-42].

[113] *See, e.g.*, Enforcement Action, Memo. In Support of Mot. to Dismiss, NYSCEF Doc. No. 99 at 1-2, 9-10.

[114] ECF 209 at ¶ 191.

[115] *See Hostingxtreme Ventures, LLC v. Bespoke Grp., LLC*, Civil Action No. 3:14-CV-1471-M, 2017 U.S. Dist. LEXIS 146618, at *16 (N.D. Tex. Aug. 23, 2017) (Dismissing claim for breach of contract at summary judgment where Plaintiff failed to meets its burden to show a genuine issue of material fact as to damages.).

Confidentiality Clause.[116]  The NRA has no evidence that AMc, Mercury, or any of Individual Defendants were responsible for the alleged leaks.  For instance, the NRA's Public Affairs Director, Andrew Arulanandam, admitted he had no knowledge of leaks emanating from AMc:

> Q:  Has any member of the press told you that Ackerman leaked information?
>
> A:  To the best of my knowledge, no.
>
> Q:  Are you aware of any member of the press telling any other NRA employee that Ackerman McQueen leaked NRA information?
>
> A:  I am not personally aware.[117]

57.    The NRA's General Counsel, John Frazer, testified similarly that he has no knowledge of AMc leaking confidential information.[118]  Likewise, LaPierre testified that he also did not know who had firsthand knowledge related to these alleged leaks by AMc.[119]  Similarly, NRA First Vice President, Charles Cotton, testified that his evidence that AMc leaked NRA information to the press amounted to his own "gut feeling."[120]

58.    On the other hand, evidence has shown that—time and time again—leaks of NRA information have historically come from the NRA's *own* employees, agents, and directors.[121] When asked whether LaPierre ever told Cotton that he was concerned with leaks at the NRA, Cotton responded "[w]e knew there were leaks from the NRA."[122]  LaPierre testified that certain

---

[116] ECF 209 at 73-74 ¶¶ 193-196.

[117] Ex. 8, Arulanandam Depo., at 139:2-8 [APP 609].

[118] Ex. 12, Frazer Depo. (Virginia Action) at 328:21—329:4 [APP 1032-33], 330:1-5 [APP 1033].

[119] Ex. 4, LaPierre Depo (Virginia Action), at 239:15-22 [APP 358].

[120] Ex. 9, Cotton Depo. (Virginia Action) at 140:10-15 [APP 715], 244:6-9 [APP 741].

[121] "Q: So you're not aware of any public records of people that may have leaked confidential NRA information that are NRA employees? A: There might have been a media report that I believe may have referenced a former NRA Employee, [*name of the NRA employee redacted*]." Ex. 8, Arulanandam Depo., at 113:8-17 [APP 603].

"Q: Were you aware of a leak problem coming from the treasurer's office at NRA? A: I'm aware of a suspected leak problem, yes. Q: What do you know about that? A: That we suspected there is or was a leak from the treasurer's office." Ex. 9, Cotton Depo. (Virginia Action), at 149:3-10 [APP 718].

[122] Ex. 9, Cotton Depo. (Virginia Action), at 268:20—269:1 [APP 747-48].

NRA expenses were paid by AMc because NRA executives were concerned about leaks from within the organization.[123]  Phillips testified that both he and LaPierre were specifically concerned about leaks to the press within the NRA's accounting department.[124]

59.   When asked about knowledge of whether *AMc* leaked confidential information, seemingly all of the NRA's witnesses claimed privilege, while some admitted that the information they had come only from the Brewer Firm or other sources within the NRA.[125]  Hart testified he did not know of any leaks from AMc but that the leaks had likely come from Brewer himself.[126] Because there is no evidence to support the necessary elements of breach or damages, this Court should grant summary judgment on the NRA's claim for breach of the Confidentiality Clause.

## C. AMc and Mercury Group Are Entitled to Summary Judgment on the NRA's Claim for Breach of Fiduciary Duty.

60.   The NRA pleaded two separate breach-of-fiduciary duty claims against AMc and Mercury, Count Five under Texas law, and Count Seven under Virginia Law.  Under both Texas and Virginia law, the elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and defendant; (2) the breach of that duty; and (3) injury to the plaintiff or benefit to the defendant.[127]  The NRA's claims should be dismissed because (1) there was no fiduciary relationship; (2) the economic loss rule bars the NRA's claim; (3) the NRA cannot produce evidence to create a fact issue on the element of breach as to AMc or Mercury; and (4) the NRA waived any fiduciary argument as a result of the parties' course of dealing.

---

[123] Ex. 4, LaPierre Depo. (Virginia Action), at 215:10-216:2 [APP 352].

[124] Ex. 29, Phillips Depo., at 33:15-36:1 [APP 1950].

[125] *See* Ex. 12, Frazer Depo. (Virginia Action), at 349:2-9 [APP 1038], 296:1-9 [APP 1024], 359:4-360:1 [APP 1040]; Ex. 8, Arulanandam Depo., at 126:17-127:3 [APP 606].

[126] *See* Ex. 10, Hart Depo., at 321:7-12; 324:3-10 [APP 849].

[127] *Jacked Up, LLC v. Sara Lee Corp.*, 854 F.3d 797, 808 (5th Cir. 2017); *Johnson v. Bella Gravida*, LLC, 105 Va. Cir. 350, 355 (Cir. Ct. 2020).

**1. There was no fiduciary relationship between the NRA and AMc.**

61.     A fiduciary relationship may arise from formal and informal relationships and may be created by contract.[128]  A formal fiduciary relationship arises as a matter of law and includes the relationships between attorney and client, principal and agent, partners, and joint venturers.[129] An informal fiduciary relationship, however, can arise only "where one person trusts in and relies upon another, whether the relationship is a moral, social, domestic, or purely personal one."[130]

**a.  No formal fiduciary relationship between AMc and the NRA.**

62.     The NRA has tried, and failed, to establish a formal fiduciary relationship by arguing AMc was the NRA's agent pursuant to the Services Agreement.[131]  In its September 15, 2020 opinion, the Court found the NRA failed to plead facts to sufficiently allege a principal-agent relationship between the NRA and AMc.[132]  As the Court noted, "[i]n its response, the NRA simply state[d]: 'the NRA alleges that the Services Agreement between the parties contains language making AMc an agent and fiduciary of the NRA.'"[133]  Notably, the Court specifically considered the language of the Services Agreement, and determined that it did not provide a formal fiduciary relationship between AMc and the NRA based upon a principal/agent relationship:

> Although the provisions of the Services Agreement cited by the NRA establish that AMc was to act on the NRA's behalf with respect to various tasks set forth in the agreement, these provisions do not establish that the NRA had "the right to dictate the means and details of the process by which [AMc]" was to accomplish those tasks.[134]

---

[128] *Jacked Up*, 854 F.3d 808.

[129] *Id*.

[130] *Id*.

[131] ECF 209 at ¶ 164.

[132] ECF 165 at 27.

[133] *Id*.

[134] *Id*.

63.     As such, there is no formal fiduciary relationship between AMc/Mercury Group and the NRA as a matter of law based upon the language of the Services Agreement or otherwise.

**b.   No informal fiduciary relationship between AMc and the NRA.**

64.     Just as no formal fiduciary relationship exists between the parties, neither was there an informal fiduciary relationship between AMc/Mercury and the NRA at any time.  Texas law does not recognize informal fiduciary relationships lightly, "especially in the commercial context."[135]  To impose an informal fiduciary duty in an arms-length business transaction, the special relationship of trust and confidence "must exist prior to, and apart from, the agreement made the basis of the suit."[136]

65.     The agreement at issue here is the 2017 Services Agreement, however the parties previously relied upon a 1999 Services Agreement that governed their relationship.[137]  There is no evidence of any special relationship of trust and confidence that preceded the parties' contractual relationship.[138]  Nevertheless, even where the contracting parties develop a relationship of mutual trust and friendship, the Texas Supreme Court has opined:

> [T]he fact that Cathey trusted Meyer does not transform their business arrangement into a fiduciary relationship. *See Morris*, 981 S.W.2d at 674 ("'Mere subjective trust does not . . . transform arm's-length dealing into a fiduciary relationship.'"). Nor can we justify imposing a fiduciary duty based on the fact that, for four years, Cathey and Meyer were friends and frequent dining partners. *See Crim Truck & Tractor Co.*, 823 S.W.2d at 595 ("The

---

[135] *Jacked Up*, 854 F.3d at 809 (internal citations omitted); *Meyer v. Cathey*, 167 S.W.3d 327, 331 (Tex. 2005) ("[I]n order to give full force to contracts, we do not create such a relationship lightly."); *see also Mullins v. TestAmerica, Inc.*, No. 3:02-CV-106-M, 2002 U.S. Dist. LEXIS 4877, at *8 (N.D. Tex. 2002) ("Because the relationship places an onerous burden of loyalty on the fiduciary, it is an extraordinary one and will not be lightly created.").

[136] *Jacked Up*, 854 F.3d at 809 (*citing Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 288 (Tex. 1998)).

[137] *See* Ex. 35-C, 1999 Services Agreement [APP 2390-401].

[138] *See Meyer*, 167 S.W.3d at 331 ("These earlier projects were arms-length transactions entered into for the parties' mutual benefit, and thus do not establish a basis for a fiduciary relationship.").

fact that the relationship has been a cordial one, of long duration, [is not] evidence of a confidential relationship.").[139]

66.     As to what kinds of relationships *do* lead to findings of informal fiduciary duty in the business context, Texas courts have made clear that they arise from *personal relationships*[140]— typically relationships predating and existing outside of the contractual relationship.  The NRA has failed to produce evidence of the kinds of relationship sufficient to support a genuine issue of material fact as to the existence of an informal fiduciary relationship. In fact, the evidence demonstrates the opposite.  LaPierre himself defined his relationship with Angus McQueen as strictly an arms-length business relationship:

> Q:  Did you – for the almost 30 years that you were working with
>      Ackerman McQueen, did you regard Angus McQueen as a friend?
>
> A:  You know, with Angus, I always knew it was business.  I regarded
>      him as a friend, but I always knew with Angus it was business. [141]

67.     Accordingly, this Court should dismiss the NRA's fiduciary duty claim because the NRA has not and cannot demonstrate facts to establish a fiduciary relationship.

**2.  The economic loss rule bars the NRA's breach-of-fiduciary-duty claims.**

68.     Even if the Court finds a fiduciary relationship existed between the parties, the NRA's claims for breach of fiduciary duty are simply repackaged breach-of-contract claims and are therefore barred by the economic loss doctrine, which prevents recovery in tort for purely

---

[139] *Id.* (some internal citations omitted).

[140]  *Lee v. Hasson*, 286 S.W.3d 1, 14 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) ("The existence of the fiduciary relationship is to be determined from the actualities of the relationship between the persons involved."); *Kalb v. Norsworthy*, 428 S.W.2d 701, 705 (Tex. Civ. App.—Houston [1st Dist.] 1968, no pet.) (By reason of appellant's long association with appellee in a business relationship, as well as the *close personal friendship* existing between them, appellant was justified in placing confidence in the belief that appellee would act in his best interest.) (emphasis added).

[141] Ex. 4, LaPierre Depo. (Virginia Action), at 47:13-19 [APP 310]; *see also* 42:24-43:4 (describing the relationship as a "business colleague relationship") [APP 309].

economic damage unaccompanied by injury to persons or property.[142]  The purpose of the rule is to avoid imposing tort liability for conduct resulting in the same type of harm or loss—the "contractual expectancy"—that otherwise gives rise to contract liability.[143]  If a contract is the source of the legal duty allegedly breached, then a contract action is the plaintiff's sole remedy.[144]  Critically, Texas courts examine the substance of each claim—not just the form of the pleading.[145]  Moreover, the economic loss doctrine is not a true "affirmative defense" and, thus, the burden still rests on the plaintiff to produce a fact issue on all challenged elements of its claims.[146]

69.    The NRA has improperly alleged three different categories of facts in support of its breach of fiduciary duty claims.  *First*, in its SAC, the NRA claimed that AMc and Mercury breached "fiduciary duties" to the NRA by failing to disclose facts related to:

- Numerous billing and invoicing practices for work performed by AMc under the Services Agreement;

- NRATV production and performance metrics;

- AMc's contractual relationship with North and the failure to produce twelve episodes of American Heroes.[147]

70.    AMc's duty to provide and bill for these activities arises solely from the Services Agreement,[148] including the affirmative duty for AMc to bill certain services at a "fair market

---

[142] *Golden Spread Elec. Coop., Inc. v. Emerson Process Mgmt. Power & Water Sols.*, 954 F.3d 804, 808 (5th Cir. 2020).

[143] *Nat'l Union Fire Ins. Co. v. Care Flight Ambulance Serv.*, 18 F.3d 323, 326 (5th Cir. 1994); *Chapman Custom Homes, Inc., v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014); *see, e.g., Sting Soccer Operations Grp. LP v. JP Morgan Chase Bank, N.A.*, CASE NO. 4:15-CV-127, 2016 U.S. Dist. LEXIS 94726 (E.D. Tex. Jul. 20, 2016) (granting summary judgment on tort claims where plaintiff "does not allege an injury independent from the subject matter of the contract); *Fields v. JP Morgan Chase Bank*, NO. 4:14-CV-012-A, 2014 U.S. Dist. LEXIS 153837 (N.D. Tex. Oct. 29, 2014) (same).

[144] *See Lincoln Gen. Ins. Co. v. U.S. Auto Ins. Servs.*, 787 F.3d 716, 725-26 (5th Cir. 2015).

[145] *Shopoff Advisors, LP v. Atrium Circle, GP*, 596 S.W.3d 894, 909 (Tex. App.—San Antonio [4th Dist.] 2019, no writ).

[146] *See id.*

[147] ECF 209 at 67-68, ¶ 167.

[148] Ex. 35-A, Services Agreement, at §§ I-III [APP 2377-82].

value" as determined by AMc.[149]   The NRA's allegations (although framed within fiduciary language) amount to nothing more than the idea that NRA did not get the benefit of what it was promised and what it paid for under the Services Agreement, which is an argument that will not support an alternative tort claim under Texas law.[150]   Simply stated, the NRA wants a refund.

71.     *Second*, the NRA has alleged that AMc breached a fiduciary duty by "attempting to stop an investigation of Ackerman and its billing practices."[151]   This allegation again falls squarely within Section VIII of the Services Agreement, the Records Inspection Clause, which requires AMc to provide the NRA with books and records "with respect to matters covered under this services agreement" upon reasonable notice.[152]   Accordingly, any applicable duty arises from the Records Inspection Clause and the resulting harm would be the same measure of damages available thereunder.[153]   The NRA has already asserted a claim for breach of the Records Inspection Clause, thus rendering its reframed tort claim improper.[154]

72.     *Third*, the NRA alleges three instances of "extortion" as a breach of fiduciary duty.[155]   Not only does extortion *not* constitute a cognizable civil cause of action,[156] but the

---

[149] *Id.* at § II.B, II.E; *see, e.g.*, *Spring St. Apts Waco, LLC v. Phila. Indem, Ins. Co.*, No. 6:16-cv-00315-RP-JCM, 2017 U.S. Dist. LEXIS 217120 (W.D. Tex. Apr. 5, 2017) (granting summary judgment on fraud claims based on economic loss doctrine because no independent duty existed outside the contract).

[150] *See Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986) (applying the economic loss rule: "[t]he Reeds' injury was that the house they were promised and paid for was not the house they received. This can only be characterized as a breach of contract…."); *Sw. Bell Tel. Co. v. Delanney*, 809 S.W.2d 493, 495 (Tex. 1991) ("When the injury is only the economic loss to the subject of a contract itself the action sounds in contract alone.").

[151] ECF 209 at ¶ 168.

[152] Ex. 35-A, Services Agreement, at § VIII [APP 2385].

[153] *See Lincoln*, 787 F.3d at 725-26; *Nat'l Union Fire*, 18 F.3d at 326.

[154] *See Shopoff*, 596 S.W.3d at 909 (dismissing plaintiff's breach of fiduciary claims because, despite plaintiff's description of fiduciary duties, legal duties actually arose from contract).

[155] ECF 209 at ¶ 168.

[156] *See Wilson v. Jackson*, No. 3:14-CV-3748-N-BK, 2014 U.S. Dist. LEXIS 170207, at *9-10 (N.D. Tex. Nov. 13, 2014) ("Insofar as Plaintiff sues Jackson and other Defendants for embezzlement and extortion, criminal statutes do not create a private right of action."); *Margaux Warren Park Partners, Ltd. v. GE Bus. Fin. Servs. (In re Margaux Warren Park Partners, Ltd.)*, Nos. 08-43388, 09-04022, 2009 Bankr. LEXIS 4128, at *9 (Bankr. E.D. Tex. 2009) ("[C]ivil extortion… is not recognized under Texas law.").

underlying act of "extortion" described by the NRA includes only the (false) allegations that AMc threatened to disclose confidential NRA information.[157] After receiving these so-called "extortionist" threats, the NRA describes how LaPierre heroically declined to succumb to them, which supposedly caused the "leaks" of NRA information.[158] Thus, although couched in a dramatic (but entirely imaginary) narrative, the resulting allegations amount to nothing more than a meritless claim of a breach the Confidentiality Clause.[159]  A tort based on a threatened breach of contract is simply a recast breach of contract claim and is barred by the economic loss rule.[160]

73.     In sum, when the substance of this claim is examined, none of the alleged "breaches" of fiduciary duty can be properly maintained because they are all barred by the economic loss doctrine as a matter of law.  The NRA cannot offer evidence regarding damages beyond the sums paid to AMc under the Services Agreement.  Thus, because the measure of damages is nothing more than the NRA's "contractual expectancy,"[161] summary judgment is proper as to the NRA's breach of fiduciary duty claims.

### 3.  The NRA has no evidence demonstrating breach by AMc or Mercury.

74.     Even if the Court determines that (1) a fiduciary duty existed, and (2) the economic loss rules does not apply, the NRA still cannot offer any legally sufficient evidence demonstrating breaches of any fiduciary duty.  As set forth above, the NRA alleges three categories of "breaches" in support of its claims for breach of fiduciary duty (1) billing breaches; (2) records-examination breaches, and (3) "extortion" breaches.  Yet, the NRA cannot present any evidence other than

---

[157] *See* ECF 209 at ¶¶ 83-86.

[158] ECF 209 at 5 & ¶¶ 82-86.

[159] *See* Ex. 35-A, Services Agreement, at § IV [APP 2382].

[160] *See Shellnut v. Wells Fargo Bank, N.A.*, No. 02-15-00204-CV, 2017 Tex. App. LEXIS 3844, at *44-45 (Tex. App.—Fort Worth Apr. 27, 2017, pet. denied) (Threat to take action authorized by contract characterized as TDCA claim was actually recast breach of contract claim and barred by economic loss rule).

[161] *Chapman*, 445 S.W.3d at 718.

"[c]onclusory statements, speculation and unsubstantiated assertions,"[162] which is insufficient to raise a fact issue on any of the alleged breaches.[163]

75.    *First*, the NRA claims that AMc failed to disclose facts relating to its invoicing procedures.[164] However, the evidence clearly establishes that these billing practices had been the same for many years.[165] As the NRA's Director of Budget and Financial Analysis testified, prior to 2018, the NRA never once asked for more detail about any invoice or previously refused to pay invoices for lack of detail.[166]  LaPierre personally participated in the annual budgeting process,[167] and specifically instructed AMc to send invoices with minimal detail for confidentiality purposes to avoid media leaks.[168]  Nevertheless, for decades, the NRA continued to pay these invoice because it was "comfortable with the amount of detail and backup provided by [AMc]."[169]

76.    Phillips testified that he and LaPierre both attended annual budgeting meetings and that AMc never failed to provide sufficient information related to budgeted services.[170]  AMc was never asked to provide more invoice detail until 2018,[171] at which point it revised its invoices to comply with the NRA's requests.[172]   The NRA has no evidence whatsoever—other than

---

[162] *RSR Corp.*, 612 F.3d at 857.

[163] *Anderson*, 477 U.S. at 247; *RSR Corp.*, 612 F.3d at 857.

[164] ECF 209 at ¶ 167.

[165] *See* ECF 141, Winkler Decl. at ¶ 5 (APP 4), Montgomery Decl. ¶ 6 (APP 13-14); Ex. 6, Winkler Hr'g Trans., 90:5-13 [APP 347].

[166] Ex. 19, Erstling Hr'g Trans., 24:21-25:21 [APP 1487-88].

[167] Ex. 4, LaPierre Depo. (Virginia Action) 254:25-256:1 [APP 362].

[168] Ex. 3, Winkler Hr'g Trans., at 89:21-90:2 [APP 167-68]; Ex. 6, LaPierre Depo. (Mar. 23, 2021), at 388:11-389:8 [APP 481]; Ex. 29, Phillips Depo., at 33:15—36:1 [APP 1950] (admitting to concerns of media leaks from NRA accounting department); 139:18-140:19 [APP 1976] (discussing LaPierre agreement that AMc invoices should have little detail); 136:23-137:8 [APP 1975-76] (no instance where AMc refused to provide more detail or backup documentation about an invoice when requested).

[169] Ex. 29, Phillips Depo., 137:17-22 [APP 1976].

[170] Ex. 29, Phillips Depo., at 85:16—86:11 [APP 1963].

[171] Ex. 4, LaPierre Depo. (Virginia Action) 257:4-258:12 [APP 363] (LaPierre acknowledged that, as part of the NRA's self-correction efforts, it needed to obtain more detail from AMc's invoices, which represented a change from previous procedures); Ex. 29, Phillips Depo., at 143:3-6 [APP 1977].

[172] Ex. 13, Spray Depo. (Virginia Action) 77:3-78:9 [APP 1071].

---

speculations and conclusory assertions—that AMc "double-billed" for any jobs, submitted "bills seeking reimbursement for services that were never performed," used NRA equipment for other AMc clients, or that AMc ever agreed to provide specific "NRA dedicated employees."[173]

77.     *Second*, with regard to the alleged records-examination breaches, the NRA claims that AMc obstructed audits and failed to disclose information related to the North Contract. However, as to the audits and records requests, the NRA's former CFO admits that AMc never obstructed any audits or record requests, and in fact complied with every NRA audit without any complaints or concerns on the NRA's part.[174]   Likewise, with regard to the North Contract, the NRA admits (1) that it knew in May 2018 that North was discussing becoming an employee of AMc,[175] (2) that the NRA had the North Contract *at the time it was executed* in May 2018, and (3) that AMc never entered into any AMc-Third Party NRA Contract without the NRA's knowledge or consent.[176] The NRA now admits that it already had the North Contract in its possession when it filed a lawsuit bizarrely claiming it had been withheld.[177]

78.     *Third*, to the extent that "extortion" could legally support a claim for breach of fiduciary duty (which it cannot), the evidence clearly shows that there was no "extortion" attempt

---

[173] *See* Ex. 29, Phillips Depo., at 99:12-100:19 [APP 1966] (discussing that the term "dedicated employee" really refers to a "position" dedicated to work performed for the NRA, such as a NRATV producer).

[174] Ex. 29, Phillips Depo., at 119:8-17 [APP 1971] (NRA audited AMc books and records most years from 2000-2018), 120:12-121:5 [APP 1971-72] (NRA examined backup documentation for all pass-through expenses and expenses related to "dedicated employees"), 122:24-123:7 [APP 1972] (no concerns ever raised about AMc's books and records or documents maintained for NRA work), 124:16-125:5 [APP 1972-73] (Phillips personally attended some audits and never had any concerns about AMc's record-keeping); 125:25-127:9 [APP 1973] (no instance where AMc failed to provide requested information); 135:21-136:22 [APP 1975] (no concerns about level of detail on AMc invoices or backup documentation submitted with invoices);

[175] Ex. 29, Phillips Depo., at 182:18-24 [APP 1987]; Ex. 31, Cox Depo., at 29:11-31:3 [APP 2034], 36:13-16 [APP 2035] (In 2018, LaPierre knew that North needed to be an AMc employee in order to maintain health insurance for his wife).

[176] Ex. 29, Phillips Depo., at 71:25-72:3 [APP 1959].

[177] Ex. 34-E, NRA Obj. & Resp. to AMc RFA at No. 49 [APP 2332].

by any of the Defendants.[178]  Instead, LaPierre and the NRA simply jumped to a series of self-serving and knowingly false conclusions without bothering to investigate the situation—much like a bad game of "telephone"—willfully ignoring the contradictory evidence from the very individual (LaPierre's assistant, Millie Hallow[179]) upon whom the NRA and LaPierre base the entire extortion narrative.  In sum, the NRA does not have legally sufficient evidence to create a fact issue on any of its alleged breaches of fiduciary duty against AMc or Mercury.

### 4.  The NRA's fiduciary duty claims are barred by waiver and laches.

79.     Finally, with respect to the first two categories of "breaches" (billing and records examination) the NRA not only waived any right to assert a breach of fiduciary duty claim against AMc under the parties' decades-long course of dealing but, due to AMc's detrimental reliance on the NRA's conduct, these claims are barred by laches.  Waiver occurs when a party intentionally relinquishes a known right or engages in intentional conduct inconsistent with claiming that right.[180]  Silence or inaction for so long a period as to show an intention to yield the known right is also sufficient to prove waiver.[181]  Similarly, a claim will be barred under the doctrine of laches when (1) the plaintiff unreasonably delayed in asserting its claim, and (2) the defendant has detrimentally relied upon the plaintiff's conduct.[182]

---

[178] Ex. 14, North Depo., 236:19-237:2 [APP 1174-75], 156:6-24 [APP 1154], 235:23-236:3 [APP 1174]; Ex. 15, Hallow Depo., 173:19-174:4 [APP 1231], 175:13-176:4 [APP1231], 181:12-182:12 [APP1233], 183:1-10 [APP1233], 207:4-13 [APP 1239], 206:15-208:19 [APP 1239]; Ex. 16, Meadows Depo., 197:10-18 [APP 1293]; Ex. 17, Boren Depo., 29:14-30:02 [APP 1348], 139:7-12 [APP 1375], 37:25-38:04 [APP 1350], 38:17-18 [APP 1350], 58:2-10 [APP 1355]; *see also*, ECF 141 at Ex. F, Martin Decl. (APP 44-46); Ex. 31, Cox Depo., at 18:13-19:3 [APP 2031].

[179] *See* Ex. 15, Hallow Depo., 173:19-174:4 [APP 1231], 175:13-176:4 [APP 1231], 181:12-182:12 [APP 1233], 183:1-10 [APP 1233] (describing how Hallow did not believe Boren or North were issuing threats), 205:19-208:19 [APP 1239] (describing how Hallow did not think that North was acting on behalf of AMc and that she was reluctant to sign a letter accusing him of doing so).

[180] *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996).

[181] *Id.*

[182] *Garcia v. Garza*, 311 S.W.3d 28, 39 (Tex. App.—San Antonio [4th Dist.] 2010, pet. denied) (affirming summary judgment on affirmative defense of laches as to plaintiff's breach of fiduciary duty and fraud claims).

80.     Here, the evidence establishes the NRA's waiver and unreasonable delay in expressing any billing concerns for decades.   The NRA instructed AMc to issue invoices with minimal detail[183] and assume payment for certain pass-through expenses for reimbursement by the NRA.[184] The NRA admits that AMc's invoices were sufficient,[185] that it paid these invoices,[186] that it examined AMc's books and records with no concerns,[187] and that AMc provided all backup and supporting documentation as requested.[188]   Notably, in a 2019 *New Yorker* article, the NRA's own counsel, Brewer, even admits that vague vendor invoicing is "customary" for the NRA:

> The memo alleges that McKenna provided "vague project names," failed to "attach support" for invoices, and operated with "no contract for current work." Brewer, the N.R.A. lawyer, said there was nothing unusual about shrouding work in secrecy: "As is customary in finance, consulting, and other industries, N.R.A. vendors have occasionally used code names for transactions or projects. This does not mean the N.R.A. lacked knowledge regarding the services rendered. For example, work performed by McKenna & Associates was reviewed, vetted, and approved." [189]

81.     The NRA belatedly claims that AMc "failed to disclose" facts related to AMc's out-of-pocket expenses (specifically those related to AMc employee, Tony Makris ("*Makris*")[190]) and costs related to "dedicated" NRA employees.[191]   But the evidence establishes that the opposite is true.   As early as 2001, the NRA's Managing Director of Finance, Thomas (Rick) Tedrick ("*Tedrick*"), reported that certain "dedicated" employees were devoting a portion of their time to

---

[183] Ex. 29, Phillips Depo., at 33:15-36:1 [APP 1950] (admitting to concerns of media leaks from NRA accounting department); 139:18-140:19 [APP 1976] (discussing LaPierre agreement that AMc invoices should have little detail); ECF 141, Ex. A, Winkler Declaration, at ¶ 3 [APP 2-3], Ex. B, Montgomery Declaration, at ¶¶ 3-4 [APP 12-13].

[184] Ex. 29, Phillips Depo., at 91:11-18 [APP 1964], 109:24-110:18 [APP 1969], 111:23-112:9 [APP 1969].

[185] *Id.*, at 135:21-136:22, 137:17-22 [APP 1975-76].

[186] *See* Ex. 19, Erstling Hr'g Trans. at 24:21-25:21 [APP 1487-88]; Ex. 22, Tedrick Depo. at 251:13-252:2 [APP 1887].

[187] Ex. 29, Phillips Depo., at 119:8-17 [APP 1971], 120:12-121:5 [APP 1971-72], 122:24-123:7 [APP 1972], 124:16-125:5 [APP 1972-73], 135:21-136:22 [APP 1975].

[188] *See* Ex. 29, Phillips Depo., at 136:23-137:8 [APP 1975-76] (no instance where AMc refused to provide more detail or backup documentation about an invoice when requested).

[189] Ex. 34-G [APP 2354-60].

[190] ECF 209 at ¶¶ 93, 94

[191] *Id.* at ¶ 59.

other AMc clients besides the NRA—a notation repeated in 2002, 2004, 2005, *and* 2007.[192]

Tedrick testified that he reported all of his findings to the NRA,[193] and that the NRA never once

sought reimbursement for any of these employees' salaries.[194]   Accordingly, information about

these so-called "dedicated" employees was well known to the NRA for nearly two decades before

the NRA filed the instant action in 2019.  Nevertheless, the NRA expressed no concerns to AMc,[195]

never sought to modify any billing or budgeting procedures, continued to seek services from AMc,

and paid all invoices through March 2019.[196]

82.     Similarly, with regard to reimbursable expenses, Tedrick noted that AMc expense

reports lacked documentation reflecting the business purpose of the expenses.  In fact, every report

from 2001-2007* explicitly stated: "There is never documentation of NRA business purpose on

any of Tony's receipts."[197]   Other findings were also made in these reports, such as (1) travel

expenses for Makris's wife,[198] (2) use of a car service by AMc employees,[199] (3) first class air

---

[192] Ex. 24, Tedrick Depo. Ex. 2, 2001 Audit Report [APP 1925] (reporting that "hours worked on the NRA account" by four AMc employees "have been below the number of hours that the NRA is paying fees for"), Ex. 23, Tedrick Depo. Ex. 1, 2002 Audit Report [APP 1920] (same notation for six employees); Ex. 27, Tedrick Depo. Ex. 5, 2004 Audit Report [APP 1935] ("Bill Powers, Tyler Schropp, and Tony Makris are supposed to be 100 percent dedicated to NRA business.  However, they have worked anywhere from 30 to 52% of their time on another [AMc] client…"); Ex. 28, Tedrick Depo. Ex. 6, 2005 Audit Report [APP 1938] ("Bill Powers is supposed to be 100 percent dedicated to NRA business.  However he has worked significant time on other [AMc] clients…"); Ex. 26, Tedrick Depo. Ex. 4, 2007 Audit Report [APP 1931] ("Bill Powers is supposed to be 100 percent dedicated to NRA business.  However he has worked significant time on another [AMc] client…").

[193] Ex. 22, Tedrick Depo., at 369:12-370:5 [APP 1917].

[194] *Id.*, at 363:11-16 [APP 1915].

[195] Ex. 29, Phillips Depo., at 122:24-123:7 [APP 1972].

[196] Ex. 35, Winkler Decl. at ¶¶ 15-21 [APP 2366-69].

[197] Ex. 24, Tedrick Depo. Ex. 2, 2001 Audit Report [APP 1926]; Ex. 23, Tedrick Depo. Ex. 1, 2002 Audit Report [APP1922]; Ex. 27, Tedrick Depo. Ex. 5, 2004 Audit Report [APP 1937]; Ex. 28, Tedrick Depo. Ex. 6, 2005 Audit Report [APP 1940]; *Ex. 26, Tedrick Depo. Ex. 4, 2007 Audit Report [APP 1933] (slightly modified language stating, "The documentation of NRA business purpose on Tony's receipts is minimal – practically non-existent.").

[198] Ex. 24, Tedrick Depo. Ex. 2, 2001 Audit Report [APP 1926]; Ex. 23, Tedrick Depo. Ex. 1, 2002 Audit Report [APP 1922]; Ex. 27, Tedrick Depo. Ex. 5, 2004 Audit Report [APP 1937]; Ex. 26, Tedrick Depo. Ex. 4, 2007 Audit Report [APP 1933].

[199] Ex. 24, Tedrick Depo. Ex. 2, 2001 Audit Report [APP 1926]; Ex. 23, Tedrick Depo. Ex. 1, 2002 Audit Report [APP1922]; Ex. 27, Tedrick Depo. Ex. 5, 2004 Audit Report [APP 1937]; Ex. 28, Tedrick Depo. Ex. 6, 2005 Audit Report [APP 1940]; Ex. 26, Tedrick Depo. Ex. 4, 2007 Audit Report [APP 1933].

travel,[200] and (4) cigar purchases[201]—expenses over which the NRA now feigns outrage.

83.    Tedrick further testified that he raised concerns internally with the NRA every year of his multi-decade employment with the NRA regarding the lack of detail in AMc's invoices, but that the NRA continued to pay the invoices anyway.[202]  Yet even if this is true, the NRA never raised those issues with AMc and continued paying all invoices.[203]  Moreover, Tedrick admits that he had the choice *not* to pay certain invoices but approved and paid them anyway.[204]

84.    Although AMc maintains that there was nothing improper about any of these practices, for purposes of summary judgment, the relevant inquiry is whether the NRA was on notice of the specific conduct about which it now complains—which it was.  By failing to express any concerns to AMc and, to the contrary, by continuing to seek services from AMc and pay its invoices, the NRA waived any breach of fiduciary duty claim related to AMc's billing and records-examination by acting inconsistently with the rights it might otherwise have asserted under law or contract.[205] Moreover, the instant breach of fiduciary duty claim should likewise be barred under the doctrine of laches because the NRA clearly possessed knowledge of billing concerns as early as 2001, proceeded to seek AMc's services, and AMc detrimentally relied on the NRA's actions and conformed its own conduct to reflect the parties' longtime course of dealing.[206]  Summary judgment is proper on the NRA's breach of fiduciary duty claims.

---

[200] Ex. 24, Tedrick Depo. Ex. 2, 2001 Audit Report [APP 1926]; Ex. 27, Tedrick Depo. Ex. 5, 2004 Audit Report [APP 1937]; Ex. 28, Tedrick Depo. Ex. 6, 2005 Audit Report [APP 1940]; Ex. 26, Tedrick Depo. Ex. 4, 2007 Audit Report [APP 1933].

[201] Ex. 26, Tedrick Depo. Ex. 4, 2007 Audit Report [APP 1933].

[202] Ex. 22, Tedrick Depo., at 208:22-210:12 [APP 1876-77].

[203] Ex. 35, Winkler Decl. at ¶¶ 15-21 [APP 2366-69].

[204] Ex. 22, Tedrick Depo., at 277:21-281:4 [APP 1894-95].

[205] *See Tenneco*, 925 S.W.2d at 643.

[206] *See Garcia*, 311 S.W.3d at 39.

**D.  Defendants Are Entitled to Summary Judgment on the NRA's Fraud Claim.**

85.      The NRA has made extensive allegations that AMc's conduct regarding budgeting, billing procedures, and NRATV was somehow improper under parallel theories of fraud and fraud-by-nondisclosure.[207]   Despite the dramatic narrative, the NRA's fraud claims are based on the same facts underlying the NRA's claims for breach of fiduciary duty and are similarly improper.[208]

86.      Notwithstanding the form of the NRA's pleading, the NRA's fraud claim fails because (1) it is barred by the economic loss doctrine; (2) the NRA has no evidence to support its fraud claim against AMc, Mercury, or the Individual Defendants; and (3) the NRA's fraud claim is barred by the defenses of waiver and laches.

**1.  The economic loss doctrine bars the NRA's fraud claims.**

87.      In support of its fraud claim, the NRA essentially pleads that it did not get what it bargained and paid for under the Services Agreement, which falls squarely within the economic loss doctrine barring tort claims arising solely from the parties' contractual relationship.[209]   This is simply another attempt by the NRA to recast a breach-of-contract claim into a tort claim.  Again, the relevant inquiries are (1) whether the duty arises by law or contract; and (2) whether the plaintiff can show an independent injury beyond contract damages.[210]   The NRA bears the burden to establish both the source of the legal duty and the extra-contractual injury.[211]

88.      Here, each and every "fraudulent" act and omission cited by the NRA arises from a contractual duty to perform under the Services Agreement.  For instance, the NRA argues that

---

[207] ECF 209 at ¶¶ 148-152.

[208] *See, supra*, Section V.C.

[209] *See Jim Walter Homes, Inc.*, 711 S.W.2d at 618; *Mason v. Fremont Inv. & Loan*, No. 3:15-cv-1909-K-BN, 2015 U.S. Dist. LEXIS 146077, at *15 (N.D. Tex. Oct. 8, 2015) (Under Texas law, if a tort claim arises solely from the parties' contractual relationship, the tort claim is not allowed.").

[210] *Mason*, 2015 U.S. Dist. LEXIS 146077, at *15.

[211] *Shopoff*, 596 S.W.3d at 909.

the billing statements were improper in various respects, even going so far as to quote *the language of the Services Agreement itself* in support of AMc's purported "misleading" conduct.[212]   Yet billing policies and procedures are clearly addressed under Section III of the Services Agreement. To the extent the NRA claims that AMc did not comply with these terms, or that it "did not get what it paid for," then the appropriate action would lie in contract, not in tort.[213]

89.     Similarly, under the Services Agreement, AMc agreed to provide "Owned Media Services" to the NRA, including "full-time online broadcasting services" and appropriate production, technical, and marketing support.[214]   Although the NRA has made numerous false claims of fraudulent conduct with regard to NRATV (each with its own "expert" in support), when the substance of these claims are examined, the NRA's real claim is simply that NRATV did not meet its expectations.[215]   Like the NRA's billing allegations, the NRATV allegations are just another repacked breach of contract claim barred by the economic loss doctrine.   Moreover, although the economic loss doctrine may not apply to claims of fraudulent *inducement*,[216] the NRA never asserted a claim for fraudulent inducement in any of the four lawsuits or amended pleadings filed since April 2019 as all services performed by AMc related to NRATV would still have been subject to the prior services agreement, which would remain within the economic loss doctrine.

90.     More importantly, the *injury* the NRA claims (the amounts it claims to have overpaid under the Services Agreement) is plainly within the bounds of the Services Agreement. The NRA is essentially asking the Court to grant a refund of funds paid to AMc pursuant to its

---

[212] ECF 209 at ¶ 148.

[213] *See Jim Walter Homes*, 711 S.W.2d at 618.

[214] Ex. 35-A, Services Agreement, at § II.D [APP 2381].

[215] ECF 209 at ¶¶ 155-161.

[216] *See, e.g., Orcasitas v. Wells Fargo Home Mortg. Inc.*, No. 3:12-cv-2549-P, 2013 U.S. Dist. LEXIS 93760, at *10-11 (N.D. Tex. Apr. 10, 2013); *Fuller v. Le Brun*, 616 S.W.3d 31 (Tex. App.—Houston [14th Dist.] 2020, pet. denied).

"billing statements and invoices"[217] and the money it "invested" in NRATV, which are precisely the subject matter of the Services Agreement.[218]  Clearly, these funds are the subject of the Services Agreement, and therefore, the NRA cannot meet its burden to establish any independent injury.[219]  Accordingly, because the claim is for breach of a duty arising solely under contract and the injury is only the economic loss from the Services Agreement itself, summary judgment should be granted on the NRA's fraud claims in their entirety as to all Defendants.

### 2. There is no evidence to support the NRA's fraud claims against defendants.

91.    Regardless of the application of the economic loss rule, the NRA cannot establish legally sufficient evidence to support its fraud claim.  The NRA makes several allegations of fraud, but its evidence is nothing more than "[c]onclusory statements, speculation and unsubstantiated assertions."[220]  Stated differently, the NRA does not have legally supportable evidence of Defendants' fraud.  In fact, the evidence that has been developed affirmatively establishes that the NRA's fraud claims fail as a matter of law.

### a.  No evidence of fraud by AMc or Mercury.

92.    For example, the NRA claims AMc failed to disclose facts relating to its budgeting invoicing procedures.[221]  As discussed above,[222] the evidence conclusively establishes that the AMc's invoicing practices had been the same for decades, and that prior to 2018, the NRA never once expressed concerns or refused to pay invoices due to a lack of detail.[223]  In fact, LaPierre and

---

[217] ECF 209 ¶ 154.

[218] ECF 209 ¶ 161.

[219] *See Mason*, 2015 U.S. Dist. LEXIS 146077, at *15.

[220] *RSR Corp.*, 612 F.3d at 857.

[221] ECF 209 at ¶ 167.

[222] *See, supra*, § V.C.3-4.

[223] *See* ECF 141, Winkler Decl. at ¶ 5 (APP  4), Montgomery Decl. ¶ 6 (APP 13-14); Ex. 3, Winkler Hr'g Trans., 90:5-13 [APP168]; Ex. 19, Erstling Hr'g Trans., at 24:21-25:5, 25:19-21 [APP 1487-88];

Phillips arranged these procedures to avoid media leaks from the NRA's accounting department.[224] AMc was never asked to provide more invoice detail until 2018,[225] at which point it revised its invoices to comply with the NRA's requests.[226]   Although the NRA describes AMc's annual budgeting procedures as "fraudulent," LaPierre and Phillips personally participated in every annual budgeting meeting with AMc.[227]   Phillips testified that, at these meetings, AMc would walk through each line item of the budget and never failed to provide sufficient information about the basis for these budgeted services or any other project or initiative AMc undertook for the NRA.[228] Phillips further testified that the NRA audited AMc's books and records for many years prior to 2018,[229] these audits were satisfactory, and AMc never failed or refused to produce any information the NRA requested.[230]   Even after 2018, the three audits the NRA conducted were satisfactory, and AMc was never accused of withholding information or refusing to comply.[231]

---

[224] Ex. 3, Winkler Hr'g Trans., at 89:6-90:2 [APP 167-68]; Ex. 6, LaPierre Depo. (NRA Bankruptcy, Mar. 23, 2021) 388:11-389:8 [APP 481]; Ex. 29, Phillips Depo., at 33:15-36:1 [APP 1950] (admitting to concerns of media leaks from NRA accounting department); 139:18-140:19 [APP 1976] (discussing LaPierre agreement that AMc invoices should have little detail); 136:23-137:8 [APP 1975-76] (no instance where AMc refused to provide more detail or backup documentation about an invoice when requested).

[225] *See* Ex. 4, LaPierre Depo. (Virginia Action) 257:4-258:12 [APP 363] (LaPierre acknowledged that, as part of the NRA's self-correction efforts, it needed to obtain more detail from AMc's invoices, which represented a change from previous procedures); Ex. 3, Winkler Hr'g Trans., at 124:12-20 [APP 202] (discussing the fact that the NRA first started asking for more invoice detail in 2018).

[226] *See* Ex. 13, Spray Depo. (Virginia Action) 77:3-78:9 [APP 1071].

[227] Ex. 4, LaPierre Depo. (Virginia Action) 254:25-256:1 [APP 362];

[228] Ex. 29, Phillips Depo., at 85:16-86:11 [APP 1963], 48:24-49:20 [APP 1953].

[229] *Id.* at 68:6-25 [APP 1958], 119:8-17 [APP 1971] (NRA audited AMc books and records most years from 2000-2018).

[230] *Id.* at 120:12-121:5 [APP 1971-72] (NRA examined backup documentation for all pass-through expenses and expenses related to "dedicated employees"), 122:24-123:7 [APP 1972] (no concerns ever raised about AMc's books and records or documents maintained for NRA work), 124:16-125:5 [APP 1972-73] (Phillips personally attended some audits and never had any concerns about AMc's record-keeping); 125:25-127:9 [APP 1973] (no instance where AMc failed to provide requested information); 131:21-136:22 [APP 1975](no concerns about level of detail on AMc invoices or backup documentation submitted with invoices); LaPierre

[231] Ex. 3, Winkler Hr'g Trans., at 94:14-99:3 [APP 172-77], 94:14-95:20 [APP 172-73], 95:21-96:14 [APP 173-74], 96:15-99:3 [APP 174-77]; Ex. 35-G [2433] (reflecting auditing firm's appreciation for AMc's cooperation); Exs. 35-D, 35-E, 35-F [APP 2402-2432] (communications between NRA General Counsel reflecting AMc's cooperation with the FRA audit and other record inspection efforts).

93.     The NRA has no competent evidence (1) that AMc submitted "sham" billing statements that were inaccurate or misleading in any manner, (2) that AMc sought excessive reimbursements, (3) that AMc's invoices were "unsubstantiated," or (4) that AMc engaged in any type of double billing for its employee's services.[232]   Because the NRA does not have legally sufficient evidence to support their allegations, its fraud claim should be dismissed.

### b.  No evidence of fraud by Individual Defendants.

94.     Under Texas law, a corporate officer may not be held liable for an alleged corporate wrongdoing unless that officer knowingly and personally participates in the tortious act.[233]   Here, the NRA has no evidence to support its fraud claims against any of the Individual Defendants.

### 3.  The NRA's fraud claims are barred by the defenses of waiver and laches.

95.     Defendants incorporate Section V.C.4, above, as if set forth at length.   The evidence demonstrates that the NRA continued to do business with AMc for nearly two decades after identifying the very billing practices that it now denounces, such as lack of invoice detail, documentation issues related to out-of-pocket expenses, and a variety of "luxury" expenditures.[234] The NRA's actions and inactions since 2001 reflect a clear intent to waive the right to now complain about any alleged billing deficiencies,[235] further supporting what AMc has maintained all along—that these billing practices were put in place *by the NRA* for confidentiality purposes[236]—which is the only logical explanation for why the NRA never asked AMc to modify its billing practices or sought reimbursement following Tedrick's audit reports.   Further, the

---

[232] ECF 209 ¶ 149.

[233] *See Riverside*, 931 F.2d at 330; *Mozingo*, 752 F.2d at 174.

[234] *See* Ex. 22, Tedrick Depo., Exs 23-28. NRA_Tedrick_001-006 [APP1920-1941].

[235] *See Tenneco*, 925 S.W.2d at 643.

[236] *See* Ex. 29, Phillips Depo., at 33:15-36:1 [APP 1950] (admitting to concerns of media leaks from NRA accounting department); 139:18-140:19 [APP 1976] (discussing LaPierre agreement that AMc invoices should have little detail)

---

NRA's fraud claims as to AMc's billing procedures are barred by laches because AMc detrimentally relied on the NRA's inaction and conformed its business procedures accordingly.[237]

**E.  Defendants Are Entitled to Summary Judgment on the NRA's Conversion Claim.**

96.     The NRA has two bases for its conversion claim: (1) AMc had intellectual property of the NRA on its website after the NRA terminated the Services Agreement; and (2) AMc failed to return certain confidential information belonging to the NRA upon request. This Court should grant summary judgment as to the NRA's claim for conversion because: (1) conversion does not apply to intangible property, and even if it did, the economic loss rule bars the NRA's claims; and (2) there is no evidence of any the NRA's confidential information being converted by AMc.

**1.  There is no recognized cause of action for conversion of intangible property.**

97.     "To prove conversion, a claimant must establish (1) it owned or had legal possession of the property or entitlement to possession, (2) the defendant unlawfully and without authorization assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, the claimant's rights, (3) the claimant demanded return of the property, and (4) the defendant refused to return the property."[238]   "Texas law has never recognized a cause of action for conversion of intangible property except in cases where an underlying intangible right has been merged into a document and that document has been converted."[239]   "[T]o the extent that a plaintiff alleges conversion of intangible, copyrightable material, the claim is either outside the scope of Texas conversion law and therefore fails to state a claim under state law or, in the alternative, preempted by the Copyright Act."[240]

---

[237] *See Garcia*, 311 S.W.3d at 39.

[238] *Hill v. New Concept Energy, Inc. (In re Yazoo Pipeline Co., L.P.)*, 459 B.R. 636, 652 (S.D. Tex. Bankr. Oct. 14, 2011); *Bandy v. First State Bank*, 835 S.W.2d 609, 622 (Tex. 1992).

[239] *Id.*

[240] *Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 823 F. Supp. 2d 578, 587 (S.D. Tex. 2011).

98.     Recognizing that the NRA based its conversion claim on the alleged conversion of intangible property and was therefore preempted by the Copyright Act, this Court dismissed the NRA's claim by its Order dated September 15, 2020.[241]  Following the Court's dismissal, the NRA repleaded its conversion claim, supplementing its prior argument by stating the NRA seeks the value of "confidential information" that AMc allegedly converted and disclosed to the media and unauthorized NRA directors in a misguided attempt to circumvent Copyright Act preemption.[242]  As examples of the property AMc allegedly converted, the NRA referenced Exhibits B and C of its SAC, which supplied outdated screenshots of AMc's website, displaying content AMc created for the NRA.[243]   The fact remains, despite amending its complaint to add conversion of "confidential information," the NRA continues to improperly base its claim on intangible property.[244]

99.     To the extent the NRA's conversion claim relies on the promotional material formerly displayed on AMc's website, that claim should once again be dismissed because it is preempted by the Copyright Act as set forth in Defendants' prior Motion to Dismiss.[245]  Further, the NRA admits it could equally have used those images contemporaneously with AMc for any other NRA purpose.[246]   Accordingly, the NRA cannot show AMc exercised "dominion and control" over the images or used them to the "exclusion" of the NRA.[247]

100.     As for the "confidential information," "Texas law has never recognized a cause of

---

[241] ECF 165 at 21.

[242] ECF 209 at ¶¶ 127-137.

[243] ECF 209 at Exs. B & C.

[244] *See* ECF 209 at ¶ 131 (falsely claiming that "Defendants have refused to remove from its website and return all such confidential information…").

[245] *See* ECF 28, 29, which are incorporated herein for all purposes.

[246] *See* Ex. 34-E, NRA Obj. and Resp. to AMc RFA at 11, No. 21 [APP 2325].

[247] *See Bandy*, 835 S.W.2d at 622 ("dominion and control" required for conversion claim).

action for conversion of intangible property except in cases where an underlying intangible right has been merged into a document and that document has been converted."[248]   In other words, intangible information is only protected by conversion when physically contained on such documents as stock certificates, lease documents, and a copy of a confidential customer list, and the property converted is that physical media containing the information.[249]

101.    Confidential information has been analyzed under this framework.[250]   Recognizing that intangible property is not subject to the tort of conversion in Texas except where that property is part of a physical item or document that has been converted, the court in *Neles-Jamesbury, Inc.* cited "confidential customer lists" as information that may only be subject to conversion when it is converted in the form of physical documents.[251]   Although the NRA has failed to state with any specificity to what confidential information its claims refer, it has not referenced conversion of any physical media, and there can be no doubt that the confidential information is intangible property, which does not meet the elements of conversion.   Moreover, much of the so-called "confidential information" could not possibly maintain any recognized "confidential" status.   The intellectual property the NRA now claims was "confidential"[252] was publicly displayed on AMc's website—without objection by the NRA—prior to the termination of the Services Agreement.[253] In fact, some of the images had been on display since 2017.[254]

102.    Additionally, the NRA's claim for conversion should be dismissed because it has

---

[248] *Express One Int'l v. Steinbeck*, 53 S.W.3d 895, 901 (Tex. App.—Dallas 2001, no pet.); *Neles-Jamesbury, Inc. v. Bill's Valves*, 974 F. Supp. 979, 982 (S.D. Tex. 1997).

[249] *Neles-Jamesbury, Inc.* 974 F. Supp. at 982.

[250] *See id.*

[251] *See id.*

[252] ECF 209, Exs. B, C.

[253] Ex. 39, McQueen Decl. at ¶ 5 [APP 2666].

[254] *See id.*

failed to produce evidence sufficient to raise a genuine issue of material fact as to damages.[255]  In its only mention of damages for its conversion claim, the NRA pled that it seeks "the full value of the property converted."[256]  With the exception of the screenshots taken from AMc's website of promotional images AMc made for the NRA,[257] it has failed to specifically identify any converted property. Neither has it presented any evidence that is relevant to the value of those images or the confidential information. As there is no evidence of damages due to AMc's alleged conversion, the NRA's claim for conversion should be dismissed.

### 2.   The economic loss doctrine bars the NRA's claims for conversion.

103.    Even if intangible property could support a claim for conversion, the economic loss rule bars the NRA's conversion claim because the facts and damages alleged fall within the ambit of the Services Agreement.[258]  The economic loss rule has been applied to preclude conversion claims where a plaintiff has been shown to have no damages independent of those suffered as a result of an alleged breach of contract."[259] Texas federal courts have applied the economic loss doctrine to reject conversion claims at summary judgment where, in the course of a contract termination between two parties, one party claims the other party converted its property by not returning it when the contract provides a mechanism to return property upon termination.[260]

104.    Here, to the extent the NRA even has any legally sufficient evidence to support its conversion claim, it is plainly covered by the Confidentiality Clause and Ownership of Products

---

[255] *See Chapa v. Stonehaven Dev., Inc.*, No. 13-13-00030-CV, 2013 Tex. App. LEXIS 10159, at *8 (Tex. App.—Corpus Christi Aug. 15, 2013, no pet.) (summary judgment properly granted where plaintiff presented no evidence supporting damages for conversion).

[256] ECF 209 at ¶ 135.

[257] ECF 209 at Exs. B, C.

[258] *See Lincoln*, 787 F.3d at 725-26.

[259] *See Hoffpauir, Inc. v. Interstate Nat'l Dealer Servs.*, No. A-12-CA-263 LY, 2013 U.S. Dist. LEXIS 9392, at *13 (W.D. Tex. Jan. 24, 2013).

[260] *See Sting Soccer Operations Grp. LP v. JP Morgan Chase Bank, N.A.*, NO. 4:15-CV-127, 2016 U.S. Dist. LEXIS 94726, at *16-17 (E.D. Tex. Jul. 20, 2016).

provisions of the Services Agreement. The Confidentiality Clause forbids AMc from disclosing "materials or information coming to the knowledge of AMc, supplied to AMc by NRA, or otherwise made known to AMc as a result of AMc's providing Services."[261]

105.    The Termination Clause also requires AMc to return to the NRA "any and all of the NRA's property, materials, documents, **Confidential Information**, etc., that may be in AMc's possession," once "all charges for accumulating said materials [are] approved and paid in advance of receipt by the NRA."[262]  In fact, the NRA previously asserted a breach of contract claim against AMc relating to this provision, but dropped that claim from its most recent pleading.[263]

106.    For all other intellectual property (website images),[264] the Ownership of Products provision supplies the legal duty and remedy for any unauthorized use of NRA property.[265] Accordingly, for all property underlying the NRA's claim for conversion, the legal duties and any resulting harm are squarely addressed in the Services Agreement, and thus, the economic loss rule bars the NRA's entire claim for conversion as to all Defendants.[266]

### 3. No evidence to support conversion against Individual Defendants or Mercury.

107.    Even if the NRA's intellectual property could be "converted," the NRA has no competent summary judgment evidence as to any of the Individual Defendants or Mercury. Additionally, conversion has a necessary element that a demand to be made on the defendant, which was certainly not issued to the Individual Defendants or Mercury.[267] The NRA cannot show

---

[261] Ex. 35-A, Services Agreement, at § IV(A)(1) [APP 2382].

[262] *Id.* at XI(E) [APP 2386] (emphasis added).

[263] *Compare* ECF 18 at 60-61 (1st Am. Compl.) to ECF 209 at 72-74 (2d Am. Compl.).

[264] *See* ECF 209 at Exs. B, C.

[265] Ex. 35-A, Services Agreement, at § VI [APP 2384].

[266] *See Lincoln*, 787 F.3d at 725-26.

[267] *Hill*, 459 B.R. at 652.

a genuine issue of material fact against the Individual Defendants or Mercury Group on this claim.

**F.  The NRA's Conspiracy Claim Fails as a Matter of Law.**

108.    This Court should grant summary judgment as to the NRA's conspiracy claim because (1) the underlying torts must be dismissed, and, (2) with respect to the Individual Defendants, because a company cannot conspire with its own employees. The essential elements of a civil conspiracy claim are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more overt, unlawful acts; and (5) damages as the proximate result.[268]  "Liability for conspiracy depends on participation in an underlying tort."[269]

109.    In the NRA's SAC, the NRA identifies two underlying torts in support of its conspiracy claim: fraud and breach of fiduciary duty,[270] including the "attempt to extort LaPierre and the NRA"[271] (which is not a tort at all[272]).  Because those causes of action should be dismissed, the NRA's claim for conspiracy must also be dismissed.[273]  Moreover, it is well established that a company cannot conspire with its own employees or agents as a matter of law.[274]  Accordingly, summary judgment on the NRA's conspiracy claim is proper as to the Individual Defendants.

**G.  Defendants Are Entitled to Summary Judgment on the NRA's Lanham Act Claims for False Association and Trademark Infringement.**

110.    The NRA brought two claims against all Defendants under the Lanham Act: False

---

[268] *Homoki v. Conversion Servs.*, 717 F.3d 388, 404-05 (5th Cir. 2013).

[269] *Super Future Equities, Inc. v. Wells Fargo Bank Minn., N.A.*, 553 F. Supp. 2d 680, 695 (N.D. Tex. 2008).

[270] ECF 209 at 69 ¶ 173.

[271] *Id.* at ¶ 172.

[272] *See Wilson*, 2014 U.S. Dist. LEXIS 170207, at *9-10.

[273] *W. Fork Advisors, LLC v. SunGard Consulting Servs., LLC*, 437 S.W.3d 917, 921 (Tex. App.—Dallas 2014, pet. denied) (Where an underlying tort claim fails, a conspiracy claim must also fail.).

[274] *Editorial Caballero, S.A. de C.V. v. Playboy Enters.*, 359 S.W.3d 318, 337 (Tex. App.—Corpus Christie 2012, pet. denied).

Association (Count 1) and Trademark Infringement (Count 2) ("***Lanham Act Claims***").   This Court initially denied Defendants' Motion to Dismiss as to the NRA's Lanham Act Claim[275] but allowed the decision to be revisited after further discovery, citing *Vulcan Golf, LLC v. Google, Inc.*, 552 F. Supp. 2d 752, 769 (N.D. Ill. 2008).[276]

111.   The registered trademarks applicable to this claim are "NRA," "National Rifle Association," and "National Rifle Association of America."[277] Although the NRA plead trademark infringement on <u>all</u> images contained in Exhibit B and C of its SAC, eight of the images in Exhibit C of its SAC do not bear any of these marks and are therefore inapplicable to this claim.[278]  For all remaining images (those actually displaying a registered mark), the NRA's Lanham Act Claims should be dismissed as a matter of law because: (1) AMc engaged in fair use of its trademarks, and alternatively (2) the NRA cannot establish certain required elements of its claims.

112.   Claims under the Lanham Act require a showing that (1) the designation or false designation is likely to cause confusion, mistake, or deception as to (a) the affiliation, connection, or association of defendant with another person, or (b) as to the origin, sponsorship, or approval of defendant's goods, services, or commercial activities by another person; <u>and</u> (2) plaintiff has been or is likely to be damaged by these acts.[279]   Here, with respect to AMc, the NRA cannot demonstrate a triable issue of fact on the elements of confusion or damages.  Moreover, with respect to the Individual Defendants and Mercury, the NRA cannot even demonstrate any

---

[275] *See* ECF 165 at 16 (only the NRA's claim for false association at the time of the Order as the NRA had not yet alleged its trademark infringement claim, which was first alleged in its SAC).

[276] ECF 165 at 16.

[277] ECF 209 at Ex. A.

[278] ECF 209 at Ex. C.  The NRA nevertheless references certain copyrights in its claim for trademark infringement (ECF 209 at ¶ 121), despite the fact that the Court previously dismissed the NRA's copyright infringement claim. ECF 165 at 17-18.  These copyrights cannot form the basis of a trademark-infringement claim. *See, e.g., Jasco v. Coca Cola Co.*, 537 Fed. App'x 557, 561 (5th Cir. 2013).

[279] 15 U.S.C. §§ 1114(1)(a), 1125(a)(1)(A).

infringing conduct.  Summary judgment is proper on the NRA's Lanham Act Claims.

### 1. AMc engaged in "fair use" of NRA trademarks.

113.    AMc engaged in nominative fair use of the NRA's trademarks because they were used in good faith to identify and describe AMc's own services.[280]    To establish nominative fair use, "[f]irst, the product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder."[281]  "This test 'evaluates the likelihood of confusion in nominative use cases.'"[282]  "The nominative fair use doctrine allows such truthful use of a mark, even if the speaker fails to expressly disavow association with the trademark holder, so long as it's unlikely to cause confusion as to sponsorship or endorsement."[283]  "Speakers are under no obligation to provide a disclaimer as a condition for engaging in truthful, non-misleading speech."[284]  Moreover, a finding of nominative fair use is not an affirmative defense.  Rather, the plaintiff bears the burden of establishing that the defendant's use of a trademark is <u>not</u> nominative fair use.[285]

114.    Here, AMc provides advertising, public relations, and branded media services to its

---

[280] *See* 15 U.S.C. § 1115(b)(4).

[281] *See New Kids on the Block v. News Am. Publ'g, Inc*., 971 F.2d 302, 308 (9th Cir. 1992); *see Pebble Beach Co. v. Tour 18 I Ltd*., 155 F.3d 526, 546 (5th Cir. 1998) (recognizing the Ninth Circuit's nominative fair use analysis in the Fifth Circuit). The Ninth Circuit has simplified the way it describes this analysis to: "whether (1) the product was 'readily identifiable' without use of the mark; (2) defendant used more of the mark than necessary; or (3) defendant falsely suggested he was sponsored or endorsed by the trademark holder. *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1175-76 (9th Cir. 2010).

[282] *Toyota Motor Sales*, 610 F.3d at 1176.

[283] *Id.* at 1177.

[284] *Id*.

[285] *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 118 (2004) ("Section 1115(b) places a burden of proving likelihood of confusion (that is, infringement) on the party charging infringement . . . [I]t takes a long stretch to claim that a defense of fair use entails any burden to negate confusion.").

clients, services it performed for the NRA for nearly forty years.[286]   From June 25, 2019, to

November 19, 2019,[287] AMc displayed images on its website depicting these types of services, not

only reflecting the work it performed for the NRA, but for several other clients as well.[288]   It is

common industry practice for advertising agencies to display portfolios on their websites reflecting

work performed for both current and former clients.[289]   It is undisputed that, *at the time* the work

product and images at issue were created, the NRA was still a client of AMc and commissioned

and approved of such work.[290]   Even so, to avoid any confusion, in August 2019, AMc appended

the word "Legacy" to the images to make clear that the NRA was no longer a current client.[291]

Thus, the NRA cannot meet its affirmative burden to show lack of fair use.

### 2.   No evidence of confusion, mistake, or deception.

115.   A plaintiff seeking an award of monetary damages for false or misleading

advertisement under Section 1114 or 1125 of the Lanham Act must show a likelihood of confusion

as to the source, affiliation, or sponsorship of the defendant's product or service.[292]   Plaintiff may

---

[286] Ex. 39, McQueen Decl. at ¶ 3 [APP 2665-66].

[287] June 25, 2019 was the date that the NRA claims it terminated the business relationship. *See* ECF 209 at ¶ 99.  The images were displayed through November 19, 2019, at which point AMc redesigned its website and removed the gallery of client work altogether.  *See* Ex. 39, McQueen Decl. at ¶¶ 4-5 [APP 2666].

[288] Ex. 39, McQueen Decl. at ¶ 4 [APP 2666].

[289] *See, e.g.*, Our Work, WWW.RICHARDS.COM, https://richards.com/work_categories/digital/, last accessed Jul. 5, 2021. The Richards Group displays images of its work for Chick-Fil-A, who is no longer a current client of the Richards Group.  *See* Ellen Myers, The Richards Group Founder Discusses "Shock" of Losing Chick-Fil-A Ad Campaign, Dallas Morning News (Jul. 22, 2016) (https://www.dallasnews.com/business/local-companies/2016/07/22/the-richards-group-founder-discusses-shock-of-losing-chick-fil-a-ad-campaign/).  *See also, e.g.*, https://www.wpp.com, www.ruckusmarketing.com, www.firehouse.agency, www.theoldstate.com, https://www.milleradagency.com, https://www.agencycreative.com, https://warrendouglas.com, www.kairosidagency.com (an illustrative sample of advertising/marketing agency websites with client names and trademarks prominently displayed).

[290] Ex. 39, McQueen Decl. at ¶ 5 [APP 2666].

[291] *Id.* at ¶ 7 [APP 2667].

[292] 15 U.S.C. §§ 1114(1)(a), 1125(a)(1)(A); *Springboards to Educ. v. Houston Indep. Sch. Dist.,* 912 F.3d 805, 811-12 (5th Cir. 2019) ("Likelihood of confusion is synonymous with a probability of confusion, which is more than a mere possibility of confusion."); *cf. Holland v. Psychological Assessment Res., Inc.,* 482 F. Supp. 2d 667 (D. Md. 2007) and *Storball v. Twentieth Century Fox Film Corp,* CV 93-2745 RMT (Tx), 1993 U.S. Dist. LEXIS 20455 (C.D.

---

show either that the defendant's advertisement is literally false or that it is true yet misleading or confusing."[293]   In the present case, the NRA is alleging that AMc's website is misleading or confusing by creating the impression that the NRA approved of AMc's work.[294]   To the contrary, even after this litigation began in April 2019, the NRA (including LaPierre) has been emphatic regarding the "outstanding" work done by AMc for the NRA.[295]

116.    Where representations are literally *true*, or too ambiguous to support a finding of literal falsity, a violation can only be established by proof of actual deception (*i.e.*, evidence that individual consumers perceived the advertisement in a way that misled them about the plaintiff's product.)"[296]   "A plaintiff relying upon statements that are literally true yet misleading cannot obtain relief by arguing how consumers could react; it must show how consumers actually do react."[297]   Actual confusion is the best evidence of a likelihood of confusion, and successful plaintiffs usually present evidence of the public's reaction through consumer surveys, or other direct anecdotal evidence of confusion.[298]   The NRA cannot produce any evidence of actual deception, let alone the kind of survey evidence that has been used to prevail on such claims in other cases.

---

Cal. Nov. 8, 1993) (both granting summary judgment for defendant against plaintiff's Lanham Act claims due to lack of evidence of confusion).

[293] 15 U.S.C. § 1125(a)(1)(A).

[294] *See* ECF 209 at ¶ 115.

[295] Ex. 4, LaPierre Depo. (Virginia Action), at 43:10-46:10 [APP 309-10]; Ex. 10, Hart Depo., at 207:4-208:20 [APP 820], 414:13-415:3 [APP 872]; Ex. 33, LaPierre Depo (Texas Action), at 35:8-36:8 [APP 2197].

[296] *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 614 (6th Cir. 1999).

[297] *Id.*

[298] *Viacom Int'l, Inc. v. IJR Capital Invs., LLC*, 891 F.3d 178, 197 (5th Cir. 2018) ("To show actual confusion, a plaintiff may rely on anecdotal instances of consumer confusion or consumer surveys."); *Podiatric Physicians*, 185 F.3d at 616, *see also Klein-Becker USA, Ltd. Liab. Co. v. Home Shopping Network, Inc.*, No. 2:05-CV-00200 PGC, 2005 U.S. Dist. LEXIS 46773, at *12 (D. Utah Aug. 31, 2005) ("Generally, plaintiffs use consumer surveys to prove that advertisements are misleading in Lanham Act claims . . . .").

### 3. No evidence of damages.

117.    To support its Lanham Act Claims, the NRA must also establish that it has been damaged or that it is likely to be damaged.[299] The sole basis for the NRA's Lanham Act Claims are AMc's prior reference of the NRA's name or use of the NRA's alleged images on AMc's prior website.[300]   As part of a website overhaul, all images referencing the NRA or connected with AMc's work for the NRA were removed from AMc's website in November 2019.[301]   The NRA has no evidence to support any prior damage, or likelihood of damage in the future, proximately arising from the display of these images on AMc's website during the five-month period from June 2019 through November 2019.

### 4. No evidence against Individual Defendants or Mercury.

118.    Additionally, the NRA has not made allegations or produced evidence to support Lanham Act Claims against any of the Individual Defendants or Mercury. In its SAC, the NRA alleged only that the Individual Defendants "directly participated in, or are at least the moving force behind, AMc's website" not being updated to remove NRA material after the NRA terminated the Services Agreement,[302] which this Court acknowledged were "thin" allegations.[303]

119.    The NRA has no evidence that Individual Defendants Martin, Winkler, and Montgomery personally participated in any of the facts and circumstances relating to the NRA's Lanham Act claim.    Similarly, the NRA has failed to produce evidence that Mercury was responsible for the NRA's complaints about AMc's website sufficient to create a triable fact issue.

---

[299] *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 114 (2014); *Rolex Watch USA, Inc. v. Meece*, 158 F.3d 816, 828-29 (5th Cir. 1998).

[300] *See* ECF 209 at ¶ 108.

[301] *See* Ex. 39, McQueen Decl., at ¶ 8 [APP 2667].

[302] ECF 209 at ¶ 110.

[303] ECF 165 at 17.

## VI.   PRAYER

For these reasons, Defendants respectfully request the Court to grant their Motion for Partial Summary Judgment in its entirety, render judgment in favor of AMc as to the affirmative relief sought herein, and grant all such other relief, at law or in equity, to which they may be justly entitled.

November 29, 2021.

Respectfully submitted,

*/s/ G. Michael Gruber*
**G. Michael Gruber, Esq.**
Texas Bar No. 08555400
gruber.mike@dorsey.com
**Brian E. Mason, Esq.**
Texas Bar No. 24079906
mason.brian@dorsey.com
**Jay J. Madrid, Esq.**
Texas Bar No. 12802000
madrid.jay@dorsey.com
**J. Brian Vanderwoude, Esq.**
Texas Bar No. 24047558
vanderwoude.brian@dorsey.com
**DORSEY & WHITNEY LLP**
300 Crescent Court, Suite 400
Dallas, Texas 75201
(214) 981-9900 Phone
(214) 981-9901 Facsimile

**ATTORNEYS FOR DEFENDANT/COUNTER-PLAINTIFF ACKERMAN MCQUEEN, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 29, 2021, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

*/s/ G. Michael Gruber*
G. MICHAEL GRUBER