**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| *Plaintiff and Counter-Defendant*, | § § | |
| **v.** | § § | **Case No. 3:19-cv-02074-G** |
| **ACKERMAN MCQUEEN, INC.,** | § § | |
| *Defendant and Counter-Plaintiff*, | § § | |
| **and** | § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, AND MELANIE MONTGOMERY** | § § § § | |
| *Defendants*. | § | |

**PLAINTIFF NATIONAL RIFLE ASSOCIATION OF AMERICA'S
<u>BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

**BREWER ATTORNEYS & COUNSELORS**

Cecelia L. Fanelli
clf@brewerattorneys.com
Sarah B. Rogers
sbr@brewerattorneys.com
Philip J. Furia
pjf@brewerattorneys.com
Alessandra P. Allegretto
apa@brewerattorneys.com
**BREWER ATTORNEYS AND COUNSELORS**
1717 Main Street, Suite 5900
Dallas, Texas 75201

**ATTORNEYS FOR PLAINTIFF/COUNTER-
DEFENDANT NATIONAL RIFLE
ASSOCIATION OF AMERICA**

# <u>TABLE OF CONTENTS</u>

I. INTRODUCTION .................................................................................................1

II. SUMMARY JUDGMENT EVIDENCE.............................................................4

III. FACTUAL BACKGROUND ............................................................................4

    A.    The Services Agreement Vested AMc With Significant Trust..............................4

    B.    When The NRA Exercised Its Record-Inspection Rights In Pursuit Of Transparency, Defendants Resisted And Retaliated.............................................7

        1.    AMc's Refusal to Cooperate with NRA's September 2018 Record Examination. ...................................................................................8

        2.    The October 2018 Budget Meeting and AMc's Contrived Claims Relating To BAC. .............................................................................9

        3.    In February 2019, AMc Withholds Documents and Obstructs FRA's Examination. .................................................................................12

    C.    Discovery Reveals The Extent of AMc's Prior Material Breaches. ....................14

IV. APPLICABLE LEGAL STANDARDS ..........................................................15

V. ARGUMENT AND AUTHORITIES ...............................................................15

    A.    The NRA is Entitled To Summary Judgment On AMc's Breach Of Contract Claims. .............................................................................................15

        1.    AMc Materially Breached the Record-Examination Clause, Barring It From Enforcing the Services Agreement. ...............................15

        2.    The NRA is Entitled to Summary Judgment on AMc's Third-Party NRA Contracts Claim ................................................................19

        3.    The NRA is Entitled to Summary Judgment on AMc's Indemnity Claims ...........................................................................................22

            a.    The Express Terms of the Services Agreement and the Employment Agreements Bar AMc's Request for Indemnification for Legal Fees ....................................................23

        4.    The NRA is Entitled to Summary Judgment on AMc's Claim for Unpaid Post April 2019 Invoices...............................................28

            a.    AMc Issues Non-Compliant Invoices Despite Explicit Notice and Warnings about its Lax Billing Practices ...................29

        5.    The NRA is Entitled to Summary Judgment with Respect to AMc's Claim for the Posting of a $3 Million Dollar Letter of Credit. .................30

        6.    The NRA is Entitled to Summary Judgment as to AMc's Claims Relating to the Termination Provision of the Services Agreement. ..........30

        7.    The NRA is Entitled to Summary Judgment with Respect to AMc's Claim for Interest. ........................................................................33

B.   The NRA is Entitled to Summary Judgment on AMc's Remaining Fraud Claim..................................................................................................34

    1.   The NRA Made No Material Misrepresentation to AMc. ........................36

        a.   LaPierre's alleged promise that AMc need not "deal with" BAC cannot be actionable as fraud without evidence of specific intent to deceive—and there is none in the record. ..........36

        b.   The NRA had no affirmative obligation to disclose that FRA employed a former BAC professional. ..........................37

    2.   The Record-Examination Clause Negates Justifiable Reliance................39

C.   AMc's Conspiracy Claim Is Barred By The Intracorporate Conspiracy Doctrine..................................................................................................40

    1.   Outside Counsel is not a Cognizable Co-conspirator, even if he Allegedly Acted with "Mixed Motives." ...................................................41

    2.   There Is No Evidence That LaPierre Or Powell Acted Outside The Scope of His Employment In Connection With Any Alleged Fraud or Defamation. ........................................................................................43

D.   The NRA is Entitled to Summary Judgment on AMc's Declaratory Judgment Claim. ....................................................................................46

    1.   The NRA Never Relinquished Its Confidentiality Rights Under the Services Agreement. ..............................................................................46

    2.   Neither the Asymmetric Nature of the Confidentiality Clause, Nor Any Other Fact in the Record, Estops the NRA from Enforcing the Clause According To Its Terms. ..............................................................48

    3.   The Asymmetric Nature of the Services Agreement's Confidentiality Provisions Does Not Render Those Provisions Unconscionable............................................................................................49

VI. PRAYER FOR RELIEF ........................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Anderson v. Cox*,
   977 F.Supp. 413 (W.D. Va. 1997) .............................................................................49

*Anderson v. Liberty Lobby, Inc*.,
   477 U.S. 242 (1986) ................................................................................................15

*B & A Marine Co. v. Am. Foreign Shipping Co*.,
   831 F. Supp. 91 (E.D.N.Y. 1993) .............................................................................46

*Bassknight v. Deutsche Bank Nat. Tr. Co*.,
   No. 3:12-CV-1412-M BF, 2014 WL 6769085 (N.D. Tex. Dec. 1, 2014) ..............................47

*Bay State Mill. Co. v. Terranova Bakers Supplies Corp*.,
   871 F. Supp. 703 (S.D.N.Y. 1995) .............................................................................36

*Belliveau v. Barco, Inc*.,
   No. AU-17-CA-00379-SS, 2019 WL 12340100 (W.D. Tex. Jan. 18, 2019) ........................39

*U.S. ex rel. Bennett v. Medtronic, Inc*.,
   747 F. Supp. 2d 745 (S.D. Tex. 2010) .......................................................................36

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan*,
   345 F.3d 347 (5th Cir. 2003) ...................................................................................49

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ................................................................................................15

*Craig v. B. Riley FBR, Inc*.,
   No. 3:19-CV-0058-G, 2020 WL 6889018 (N.D. Tex. Nov. 23, 2020) ...............................43

*Cunningham v. Classic Star, L.L.C*.,
   No. A-06-CA-463-SS, 2007 WL 9710043 (W.D. Tex. June 19, 2007) ................................4

*DiMucci v. Pennsylvania Convention Ctr. Auth*.,
   No. CIV.A. 08-4810, 2009 WL 3073827 (E.D. Pa. Sept. 24, 2009) ..................................46

*Doe v. SexSearch.com*,
   551 F.3d 412 (6th Cir. 2008) ...................................................................................50

*Eason v. Thaler*,
   73 F.3d 1322 (5th Cir. 1996) ...................................................................................15

*First Presbyterian Church Of Ypsilanti v. H.A. Howell Pipe Organs, Inc.*,
  No. 07-13132, 2010 WL 419972 (E.D. Mich. Feb. 1, 2010)................................................39

*Forsyth v. Barr*,
  19 F.3d 1527 (5th Cir. 1994) ................................................................................................15

*Heffernan v. Hunter*,
  189 F.3d 405 (3d Cir. 1999)..........................................................................................42, 43

*Interested Underwriters at Lloyd's v. M/T San Sebastian*,
  508 F. Supp. 2d 1243 (N.D. Ga. 2007) ................................................................................49

*Jackvony v. RIHT Fin. Corp.*,
  873 F.2d 411 (1st Cir. 1989)................................................................................................39

*Jones Partners Const., LLC v. Apopka Plaza Assocs.*,
  LLC, No. 3:04-CV-1294-D, 2006 WL 784892 (N.D. Tex. Mar. 27, 2006) ...........................39

*Koerner v. CMR Constr. & Roofing, L.L.C.*,
  910 F.3d 221 (5th Cir. 2018) ..............................................................................................37

*LBCMT 2007-C3 Seminole Trail, LLC v. Sheppard*,
  No. 3:12CV00025, 2013 WL 3009319 (W.D. Va. June 17, 2013) ........................................47

*LifeNet Health v. LifeCell Corp.*,
  No. 2:15CV461, 2016 WL 11672048 (E.D. Va. Sept. 2, 2016) ............................................20

*Mandawala v. Struga Mgmt.*,
  No. SA-19-CV-00635-JKP, 2020 WL 4905805 (W.D. Tex. Aug. 20, 2020) ........................41

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986).............................................................................................................15

*New Jersey Bldg. Laborers Statewide Benefits Fund v. Am. Coring & Supply*,
  341 Fed. Appx. 816 (3rd Cir. 2009).....................................................................................50

*NRA v. Lockton Affinity Series of Lockton Affinity, LLC, et al.*,
  Case 1L18-ch-00639 (E.D. Va. 2018) ..................................................................................11

*Prime Lending, Inc. v. Moyer*,
  No. CIV.A.3:03-CV-0113-G, 2004 WL 1194461 (N.D. Tex. May 28, 2004) ......................34

*Ragas v. Tennessee Gas Pipeline Co.*,
  136 F.3d 455 (5th Cir. 1998) ...............................................................................................15

*Rodriguez v. Spencer*,
  2012 WL 639555 (W.D. Tex. Feb. 27, 2012).......................................................................42

*Schauer v. Cargill, Inc.*,
  No. CIVASA02CA0827OGNN, 2003 WL 21372163 (W.D. Tex. June 12, 2003) ........................................................................................................37

*Tavernini v. Bank of America, N.A.*,
  No. 4:12–CV–420, 2014 WL 1290063 (E.D. Tex. Mar.31, 2014).........................................47

*Tom Hughes Marine, Inc. v. Am. Honda Motor Co.*,
  219 F.3d 321 (4th Cir. 2000) ...................................................................................4

*TXI Operations, LP v. Pittsburg & Midway Coal Mining Co.*,
  No. CIV.3:04-CV-1146-H, 2004 WL 2088911 (N.D. Tex. Sept. 8, 2004) ...........................38

*Watson v. Citimortgage, Inc.*,
  530 F. App'x 322 (5th Cir. 2013) .............................................................................47

**State Cases**

*4031 Ltd. P'ship v. Bd. of Supervisors of Fairfax Cty.*,
  21 Va. Cir. 384 (1990) .......................................................................................17, 18

*Brown v. Brown*,
  53 Va. App. 723 (2009) .........................................................................................17

*Coats v. Ruiz*,
  198 S.W.3d 863 (Tex. App.-Dallas 2006, no pet.) .....................................................34

*Countryside Orthopaedics, OP.C. v. Peyton*,
  541 S.E.2d 279 (Va. 2001)......................................................................................16

*Cream of Wheat Co. v. American Home Magazine*,
  159 A.D. 761 (NY App Div 1st Department 1913) ....................................................18

*Creteau v. Phoenix Assur. Co. of N. Y.*,
  202 Va. 641 (1961) ...............................................................................................47

*Dobbins v. Redden*,
  785 S.W.2d 377 (Tex. 1990).....................................................................................16

*Emps. Mut. Liab. Ins. Co. of Wis. v. Sanderfer*,
  382 S.W.2d 144 (Tex. Civ. App. 1964), (Dec. 31, 1964).............................................44

*Flippo v. CSC Assocs. III, L.L.C.*,
  262 Va. 48 (2001) ................................................................................................17

*Frank B. Hall & Co. v. Buck*,
  678 S.W.2d 612 (Tex. App. 1984), (Dec. 12, 1984)..............................................44, 46

*Goldkress Corp. v. Orthopaedic & Spine Ctr.*,
No. 0670-16-1, 2016 WL 7209848 (Va. Ct. App. Dec. 13, 2016) ...................................17, 50

*Gray v. Waste Res., Inc.*,
222 S.W.3d 522 (Tex. App.—Houston [14th Dist.] 2007, no pet.)........................................41

*Horton v. Horton*,
487 S.E.2d 200 (Va. 1997)......................................................................................................16

*JSC Neftegas-Impex v. Citibank, N.A.*,
365 S.W.3d 387 (Tex. App. 2011)..........................................................................................39

*MVS Int'l Corp. v. Int'l Advert. Sols.*,
LLC, 545 S.W.3d 180 (Tex. App. 2017) ................................................................................41

*National Rifle Association v. Ackerman McQueen, et al*,
Civil Case No. CL19001757 (Va. Cir. Ct. April 12, 2019) ................................................1, 48

*Pleasant Grove Indep. Sch. Dist. v. FieldTurf USA, Inc.*,
No. 06-19-00022-CV, 2020 WL 1646633, (Tex. App. Apr. 3, 2020), (June 10,
2020), (Sept. 3, 2021) ...........................................................................................................39

*Princess Anne Hills Civil League v. Susan Constant Real Estate Trust*,
243 Va. 53 (Va. 1992)............................................................................................................49

*Serpa v. Cal Sur. Investigations, Inc.*,
215 Cal. App 4th 695 (Ct. App. 2013)...................................................................................50

*Sunrise Continuing Care, LLC v. Wright*,
671 S.E.2d 132 (2009) ...........................................................................................................20

*Virginia Elec. & Power Co. v. N. Virginia Reg'l Park Auth.*,
270 Va. 309 (2005) ................................................................................................................17

*Werth v. Johnson*,
294 S.W.3d 908 (Tex. App. 2009)..........................................................................................37

## Federal Statutes

False Claims Act ...........................................................................................................................36

Lanham Act, 15 U.S.C. § 1125(a)(1)(A) .......................................................................................1

## State Statutes

Va. Code Ann. § 8.2-302 (1964).....................................................................................................50

**Other Authorities**

FED. R. CIV. P. 56 ...................................................................................................................1

FED R. CIV. P. 9(b)..................................................................................................34, 35, 36

*People of the State of New York by Letitia James v. Ackerman McQueen and*
   *National Rifle Association of America,*
   Index No. 451825/2019 (Sup. Ct., New York County 2019) ...........................................24, 48

Restatement (Second) of Contracts § 208 (1981) ........................................................50

Restatement (Second) of Contracts § 208 cmt............................................................50

Restatement (Second) of Contracts § 84 (1981) ........................................................49

RESTATEMENT (THIRD) OF AGENCY § 2.02(1) .................................................................45

Restatement (Third) of Torts § 11 (2020)..................................................................41

FED R. CIV. P. 30(b)(6)............................................................................................48

TO THE HONORABLE A. JOE FISH:

Plaintiff/Counter-Defendant National Rifle Association of America ("Plaintiff"), files this Brief in Support of Motion for Summary Judgment ("Motion") pursuant to FED. R. CIV. P. 56.

## I.  INTRODUCTION

More than two years ago, after months of attempts to placate and coax compliance from AMc, the NRA was forced to file suit against its largest vendor—with whom it had been doing business for more than thirty years.[1]  The parties' legal battle began as a narrow dispute over the NRA's exercise of an unambiguous contractual right to inspect the "files, books and records with respect to" the services AMc provided.  Since the NRA first sued AMc to access its own business records in April 2019, AMc has stolen confidential PowerPoint slides from the NRA,[2]  waged a scorched-earth media campaign against its former client,[3] and egregiously continued to withhold from the NRA the same "files, books, and records" sought before this lawsuit.[4]  At long last, however, this case is approaching its conclusion.  Summary judgment provides the Court with an opportunity to streamline this contentious dispute and narrow issues for trial.

Today the NRA asserts claims for: (1) false association under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (2) trademark infringement; (3) conversion; (4) fraud; (5) breach of fiduciary duty; (6) conspiracy; (7) breach of the fiduciary duty of loyalty; and (8) breach of contract.[5]  After the NRA commenced this action, AMc brought multiple retaliatory counterclaims set forth in its

---

[1] For purposes of this Motion, consistent with the parties' Services Agreement dated April 30, 2018 (as amended, the "Services Agreement") (attached as Ex. 1 to the Declaration of Sarah Rogers), "AMc" shall refer collectively to Defendant Ackerman McQueen, Inc. ("Ackerman") and its subsidiary, Defendant Mercury Group, Inc. ("Mercury")). [App. 00008-19]

[2] Pl.'s Emerg. Mot. for Stay, *National Rifle Association v. Ackerman McQueen, et al*, Civil Case No. CL19001757 (Va. Cir. Ct. April 12, 2019)

[3] Expert Report of Matthew Klink, Section B, Rogers Decl. Ex. 4. [App. 00048-50]

[4] Pl.'s Status Report on Discovery Issues Dated October 29 at 3-4, 2021, ECF No. 394.

[5] Pl.'s Second Am. Compl., ECF No. 209.

Second Amended Counterclaim (the "SAC")[6]—of which five survive: (1) breach of the Services Agreement; (2) fraud; (3) defamation; (4) conspiracy; and (5) declaratory judgment.[7]  Four of those claims can be resolved now.

*First*, the NRA is entitled to summary judgment on Ackerman's breach-of-contract counterclaims. AMc's repeated material breaches of the Services Agreement's Record-Examination Clause (defined below)[8] during 2018 and early 2019 prohibit it from enforcing the Services Agreement against the NRA under Virginia law.[9]  And even if AMc had met its contractual obligations (and not committed prior material breaches), it could muster no triable issue of fact concerning any alleged breach by the NRA for the reasons set forth more fully in the accompanying Plaintiff's Motion for Partial Summary Judgment.

*Second*, the NRA is entitled to summary judgment on the narrow portion of AMc's fraud claim which survived the pleading stage: namely, the claim that AMc was defrauded in connection with a February 2019 books-and-records examination by Forensic Risk Alliance ("FRA").  AMc alleges that prior, forward-looking promises allegedly made by NRA Executive Vice President Wayne LaPierre ("LaPierre") that AMc would not need to "deal with" or be "involved with" Brewer or BAC[10] were rendered misleading by the NRA's retention of FRA, which employed an accountant who worked previously at BAC.  But the record contains no evidence that LaPierre made these statements with the intent to deceive AMc, as required to sustain a claim of fraud.[11]

---

[6] Def.'s Second Am. Countercl., ECF No. 238-1. The SAC is asserted and signed by Defendant Ackerman alone. *See id.*
[7] *See* ECF No. 238-1 (setting forth counterclaims); ECF No. 329 (dismissing counterclaims for business disparagement and tortious interference, and narrowing counterclaims for fraud and conspiracy).
[8] *See* discussion *infra* Section III.A.
[9] *See* discussion *infra* Section VI.A.1.
[10] "Brewer" shall refer to William A. Brewer III.  "BAC" shall refer to undersigned litigation counsel: Brewer, Attorneys & Counselors.
[11] *See* discussion *infra* Section VI.B.1.a. The ample summary judgment evidence establishes that the NRA's efforts to placate AMc by minimizing its contact with BAC were sincere.

the NRA made no partial representations to AMc regarding FRA's personnel, and no affirmative obligation to disclose existed.[12]  Moreover, AMc was fully aware of BAC's involvement in relevant NRA legal affairs before, during, and after FRA's examination.[13]  AMc complied with the examination because it had no choice: the Services Agreement's Record-Examination Clause afforded AMc no veto power over the NRA's choice of professionals.[14]  This vital contractual obligation also negates justifiable reliance, providing an independent basis for summary judgment on AMc's fraud claim.[15]

*Third*, AMc's conspiracy claim—which survived dismissal only with respect to predicate torts of fraud and defamation—raises no triable issues.  It is black-letter law that the NRA cannot conspire with itself, its agents, or its employees.[16] The Court has already held that one purported co-conspirator, Brewer, cannot be distinguished from the NRA for purposes of the intracorporate conspiracy doctrine, because counsel who acts within the scope of his representation cannot be construed to "conspire with" his client—even if he exhibits "mixed motives."[17]  Because there is no evidence that either of the other alleged co-conspirators, LaPierre or Joshua Powell ("Powell"), acted outside the scope of their own agency, AMc's conspiracy claim fails.[18]

*Fourth*, the NRA is entitled to summary judgment regarding AMc's declaratory judgment claim.  AMc seeks a declaration that the NRA waived its rights under the confidentiality provisions of the Services Agreement, but the record contains no evidence whatsoever of an explicit, manifest, intentional relinquishment of such rights which is required  to establish waiver under Virginia

---

[12] *See* discussion *infra* Section VI.B.1.c.
[13] *See* discussion *infra* Section III.B.
[14] *See* discussion *infra* Section III.A.
[15] *See* discussion *infra* Section VI.B.2.
[16] *See* discussion *infra* Section VI.C.
[17] *See* Order Granting in Part Pl.'s Mot. to Dismiss Def.'s Second Am. Countercl. ("Order") at 54 n. 24, ECF No. 329; *see* discussion *infra* Section VI.C.1.
[18] *See* discussion *infra* Sections VI.C.2-3.

law.[19]   Nor can AMc raise a triable issue with respect to equitable estoppel, which requires stringent proof of a representation by the NRA, and detrimental reliance by AMc, that is absent from the record.[20]   Finally, AMc is not entitled to a judgment that the contract's confidentiality provisions are unconscionable as a matter of law— asymmetric nondisclosure obligations like the one in the Services Agreement are customary and sensible.[21]   Therefore, the Court should grant summary judgment on the foregoing claims as set forth below.

## II.   SUMMARY JUDGMENT EVIDENCE

In support of its Motion, the NRA submits the summary judgment evidence attached to Plaintiff's Appendix that is being filed contemporaneously with this Motion.

## III.   FACTUAL BACKGROUND

### A.   The Services Agreement Vested AMc With Significant Trust.

AMc's work on behalf of the NRA was governed by successive incarnations of a Services Agreement containing detailed specifications for how a broad array of work performed by Ackerman should be budgeted and billed.   The operative, entire, integrated[22] agreement of the parties relevant to AMc's Counterclaims consists of the Services Agreement between the NRA and AMc dated April 30, 2017 (the "Services Agreement").   The Services Agreement mandated a clear, overarching purpose for AMc's work: to "***promote a positive image of the NRA***." [23]   Its provisions reflected the extraordinary trust and confidence that the NRA reposed in AMc after

---

[19] *See* discussion *infra* Section VI.D.1.
[20] *See* discussion *infra* Section VI.D.2.
[21] *See* discussion *infra* Section VI.D.2-3.
[22] Because the Services Agreement contained a clear integration clause, no purported verbal modification or prior course of dealing can alter the contract's meaning.  *See* Declaration of Sarah Rogers ("Rogers Decl.") Ex. 1, at § X.D; *see also Cunningham v. Classic Star, L.L.C.*, No. A-06-CA-463-SS, 2007 WL 9710043, at *5 (W.D. Tex. June 19, 2007) (integration and modification clauses prevented alteration of a party's obligations, notwithstanding letters and other communications signaling an intent to change the contract's terms); *Tom Hughes Marine, Inc. v. Am. Honda Motor Co.*, 219 F.3d 321, 323-24 (4th Cir. 2000).  The Services Agreement was amended on May 6, 2018. *See* Rogers Decl. Ex. 2. [App. 00021-22]
[23] Declaration of Sarah Rogers ("Rogers Decl.") Ex. 1, at § I.A. (emphasis added). [App. 00009]

decades of collaboration.  For example, AMc was authorized to negotiate contracts, and purchase and place media on the NRA's behalf.[24]  Moreover, the NRA entrusted AMc to determine the "fair market value"[25] and "fair market price"[26] for much of its own work and to invoice projects accordingly; AMc was trusted to "carefully audit invoices" from third-party media providers to ensure fairness to the NRA. [27]

Nonetheless, befitting the parties' agency relationship,[28] the NRA maintained ultimate command and control.  AMc was authorized to pursue many activities ***only*** "upon written communications received from the Executive Vice President or his designee."[29]  Advance written approval was similarly required for certain travel expenses,[30] advertising purchases,[31] and other major outlays.  The Services Agreement emphasized that AMc was retained as a "***nonexclusive source for the services described [t]herein***," leaving the NRA free to hire any competing advertising,  public relations, or service providers it wished.[32]  And the NRA was entitled, in its "***sole and exclusive discretion***, [to] terminate the Services Agreement ***without any cause whatsoever***" upon 90 days' notice. [33] Section VIII of the Services Agreement gave the NRA an unqualified right to examine the files, books and records relating to matters covered by the contract in order to oversee the quality and accuracy of AMc's performance. [34]  No provision of the Services

---

[24] Rogers Decl. Ex. 1, at § I.A. (emphasis added). [App. 00009]
[25] See Services Agreement between the NRA and AMc, dated April 30, 2017, Rogers Decl. Ex. 1, at § II.B. [App. 00012]
[26] Rogers Decl. Ex. 1, at § II.E. [App. 00013]
[27] *Id.* at p. 3.
[28] *See* discussion *infra* at Section D.1.
[29] Rogers Decl. Ex. 1, at § IX. [App. 00017]. AMc's tactic of trying to subvert this provision consisted of the implausible artifice of challenging whether a given letter was issued by a designee.
[30] Rogers Decl. Ex. 1, at § III.A. [App. 00013]
[31] Rogers Decl. Ex. 1, at § I.C. [App. 00011]
[32] Rogers Decl. Ex. 1, at 1 (emphasis added). [App. 00009]. The 1999 version of the Services Agreement likewise designates AMc as a "non-exclusive source." Services Agreement between the NRA and AMc, dated May 1, 1999, Rogers Decl. Ex. 3. [App. 00025-36]
[33] Rogers Decl. Ex. 1, at § XI.B. (emphasis added). [App. 00018]
[34] Rogers Decl. Ex. 1, at § VIII. [App. 00017]

Agreement limited the NRA's use of information about, or obtained from, AMc.[35]  Nor did any provision of the Services Agreement provide AMc with input into, or discretion regarding the NRA's choice of employees, agents, vendors or professionals who might view records housed at AMc or interface with AMc in the course of its work.

Under Section IV of the Services Agreement, the NRA maintained absolute control of its "Confidential information," defined to include any "data, materials or information coming to the knowledge of AMc, supplied to AMc by NRA, or otherwise made known to AMc as a result of AMc's providing Services."[36] AMc warranted and agreed to prevent disclosure of Confidential Information by its employees, agents, and subcontractors.[37] The contract's termination provisions made clear that all Confidential Information entrusted to AMc belonged to the NRA. If the NRA chose to fire AMc or if the Services Agreement terminated for any other reason, AMc was obliged to "immediately return to NRA" any and all Confidential Information, along with the NRA's other "property, materials, [and] documents."[38]

Section VIII of the Services Agreement gave the NRA an unqualified right "upon reasonable notice to examine AMc and Mercury's[39] files, books, and records with respect to matters covered under this Services Agreement" (such clause, the Record-Examination Clause"). The "matters covered under th[e] Services Agreement," and thus within the purview of the Record-Examination Clause, included all public relations, crisis management, and strategic marketing

---

[35] *See generally* Rogers Decl. Ex. 1. [App. 00009-19]
[36] Rogers Decl. Ex. 1, at § IV.A.1. [App. 00014]
[37] Rogers Decl. Ex. 1, at § IV.A.4. [App. 00014]
[38] Rogers Decl. Ex. 1, at § XI.E. [App. 00018]
[39] As noted, the Services Agreement defines "AMc" to encompass, collectively, Ackerman and Mercury.  The verbiage in the Record-Examination Clause is thus arguably duplicative with respect to Mercury—but removes any doubt that the NRA's record-examination right extends to both entities.

services,[40] advertising and creative services,[41] media planning and placement services,[42] and owned media services rendered[43] by AMc to the NRA.  Moreover, the Services Agreement covered—and the Record-Examination Clause therefore encompassed—details relating to AMc's oversight, administration, and billing of its NRA-related work.  For example, the NRA was entitled to examine AMc's "files, books, and records with respect to" digital systems operations support (including digital databases),[44] "fair market value" and "fair market price" determinations,[45] commission and markup formulas used to compensate AMc, media outlets, and vendors,[46] out-of-town travel expenses,[47] the copying and retention of Confidential Information,[48] indemnifiable or purportedly-indemnifiable legal matters,[49] and third-party contracts.[50]

### B.    When The NRA Exercised Its Record-Inspection Rights In Pursuit Of Transparency, Defendants Resisted And Retaliated.

In late 2017, as the NRA confronted politicized scrutiny from New York's insurance regulator,[51] it received a warning that it could soon face additional, partisan investigations and attacks in its domicile state.[52]  In order to assist it in connection with those matters, the NRA retained Morgan, Louis, & Bockius, LLP, and later, Brewer, Attorneys & Counselors ("BAC").[53] As the NRA examined and strengthened its controls procedures to fortify itself against hostilities

---

[40] Rogers Decl. Ex. 1, at § I.A. [App. 00009]
[41] Rogers Decl. Ex. 1, at § I.B. [App. 00010]
[42] Rogers Decl. Ex. 1, at § I.C. [App. 00011]
[43] Rogers Decl. Ex. 1, at § I.D. [App. 00011]
[44] Rogers Decl. Ex. 1, at § I.E. [App. 00011]
[45] Rogers Decl. Ex. 1, at §§ I.B, II.B.3, II.E, III.D. [App. 00010, 00012-13]
[46] Rogers Decl. Ex. 1, at § II.B. [App. 00012]
[47] Rogers Decl. Ex. 1, at § III.A. [App. 00013]
[48] Rogers Decl. Ex. 1, at § IV. [App. 00014]
[49] Rogers Decl. Ex. 1, at § V.A. [App. 00015]
[50] Rogers Decl. Ex. 1, at § XI.E. [App. 00018]
[51] David Cole, *New York State Can't Be Allowed to Stifle the NRA's Political Speech*, ACLU (August 24, 2018), https://www.aclu.org/blog/free-speech/new-york-state-cant-be-allowed-stifle-nras-political-speech.
[52] Declaration of John C. Frazer in support of NRA's Opposition to Defendants' Motion for Partial Summary Judgment, dated September 1, 2021, Rogers Decl. Ex. 7, at ¶ 4. [App. 00099]
[53] *See* Deposition of John Frazer, dated March 18, 2021, at 158:3-16, 167:14-21, Rogers Decl. Ex. 87. [App. 02948, 02950]

from regulators, multiple employee whistleblowers came forward with concerns about vendors—especially AMc.[54]   During 2018, in an effort to determine whether and to what extent AMc was complying with its obligations, NRA exercised its rights under the Record-Examination Clause—requesting details of all so-called "out-of-pocket" expenses passed through AMc to the NRA.[55] The NRA also sought details of a lucrative related-party contract between AMc and the NRA's soon-to-be President, Lt. Col. Oliver North ("North") (such contract, the "North Contract").[56] Defendants responded with a stunning combination of lies, evasions, and escalating hostility.

### 1.   AMc's Refusal to Cooperate with NRA's September 2018 Record Examination.

For example, on August 8, 2018, the NRA's then-Treasurer, Wilson H. Phillips, served notice of the NRA's intention to examine AMc's files, books and records under the Record-Examination Clause.[57]   When AMc protested that "further specificity [wa]s needed" and insisted the NRA identify categories of items it wished to see,[58] the NRA responded on August 14, 2018 with a list of "initial[]" categories for examination, including "all documents relating to:" (i) the concealed-carry program Carry Guard, and (ii) "out-of-pocket / 'OOP' expenses for which Ackerman invoiced the NRA . . . including applicable receipts or back-up."[59]

However, on the agreed date for the examination, AMc refused to allow the NRA's team of professionals—consisting of BAC analysts and accountants—to access its facilities, instead requiring them to travel to a third-party accountant's office in Oklahoma City, where documents

---

[54] Declaration of Michael Erstling, dated April 29, 2020, Rogers Decl. Ex. 8, at ¶ 8. [App. 00105]
[55] Letter from Wilson H. Phillips Jr. to Bill Winkler, dated August 08, 2018 (AMc-058776), Rogers Decl. Ex. 55, at 2. [App. 01659]
[56] Declaration of Charles Cotton, dated August 3, 2021, Rogers Decl. Ex. 10, at ¶¶ 5-6. [App. 00113]
[57] *See* Letter from William Winkler to Wilson H. Phillips Jr., dated August 13, 2018 (AMcTX-00002893), Rogers Decl. Ex. 11. [App. 00121].
[58] *See* Rogers Decl. Ex. 11. [App. 00121]
[59] *See* Letter draft from Wilson H. Phillips to Bill Winkler, dated August 14, 2018 (AMc-057545), Rogers Decl. Ex. 12. [App. 00125]

were provided in "piles" and "boxes."[60]   When the NRA's professionals asked to view video footage associated with the Carry Guard program, for which millions of dollars of costs were invoiced, AMc adamantly refused.[61]   And other items requested by the NRA were missing: the on-site inspection team did not receive invoice detail,[62] did not receive information enabling them to match relevant expenses to corresponding categories in AMc's budget,[63] did not receive support for out-of-pocket or passthrough expenses,[64] and did not receive time records for AMc employees whose salaries and overhead costs were billed in their entirety to the NRA.[65] Finally, AMc refused to allow the NRA's record-examination team to copy or retain any documents—in fact, Defendant Winkler followed the team into the parking lot to confiscate two documents he had previously "consider[ed] letting [them] take."[66]

### 2.   The October 2018 Budget Meeting and AMc's Contrived Claims Relating To BAC.

In the wake of the failed record examination, the NRA requested copies of documents by email, including records sufficient to show which employees were being billed to the NRA and a copy of the North Contract.[67]   AMc executives did not respond to the NRA's email and instead complained to another NRA lawyer, Steve Hart, that the NRA's professionals should "examine records not seize them" because taking copies would violate the parties' "practice for 38 years."[68]

---

[60] Deposition transcript of Susan Dillon, dated July 28, 2021, Rogers Decl. Ex 13, at 97:18-99:06. [App. 00151]
[61] Rogers Decl. Ex. 13, at 34:03-35:22. [App. 00135]
[62] Rogers Decl. Ex. 13, at 102:14-17 ("Q.   Were you provided with details that would enable you to support or determine the purpose of the invoices that were sent to the NRA?  A. No."). [App. 00152]
[63] Rogers Decl. Ex. 13, at 102:18-103:09; 103:25-104:02. [App. 00152]
[64] Rogers Decl. Ex. 13, at 102:18-103:22-104:21. [App. 00152]
[65] Rogers Decl. Ex. 13, at 104:22-24. [App. 00152]
[66] Rogers Decl. Ex. 13, at 104:25-105:22. [App. 00152-53]
[67] Email chain including Sarah B. Rogers email to Gina Betts and Jay Madrid, dated October 8, 2018 (AMcTX-00010683), Rogers Decl. Ex. 14, at 683-84. [App. 00167-68]
[68] Email chain from Steve Hart to Anthony Makris, dated October 8, 2018 (AMcTX-00010526), Rogers Decl. Ex. 15. [App. 00177]

Hart tried to convince AMc to comply with its obligations to assist the NRA to prepare for looming regulatory threats.[69]

But rather than help its client, AMc adopted an adverse posture against the NRA[70] and escalated its belligerence. On October 11, 2018, several AMc executives including Angus McQueen, Revan McQueen, Melanie Montgomery, Tony Makris, and Bill Winkler met with Wayne LaPierre and the NRA's new Treasurer and Chief Financial Officer, Craig Spray, at AMc's offices in Dallas, Texas,[71] for the ostensible purpose of planning the agency's 2019 budget. AMc and NRA attendees respectively described the meeting as "acrimonious" (at least in part)[72] and "hateful."[73] AMc alleges that during the meeting, it elicited assurances from LaPierre that in exchange for "stick[ing] with" the NRA the agency would not be required to "deal with" or be "involved with" Brewer, BAC, or a disfavored NRA executive, Josh Powell, going forward.[74] AMc never demanded or expected that the NRA would fire BAC,[75] which was by then outside

---

[69] Rogers Decl. Ex. 15. [App. 00177]

[70] The record shows that AMc anticipated litigation against the NRA beginning September 24, 2018, at latest. *See, e.g.*, Letter draft from Angus McQueen to Wayne LaPierre, dated September 24, 2018, Rogers Decl. Ex. 16 (draft letter from Angus McQueen to Wayne LaPierre, concluding: "Now, I'm sure the lawyers will take over.") [App. 00184-91]; *see also* Deposition transcript of Revan McQueen, dated August 23, 2021, Rogers Decl. Ex. 17, at 247:11-249:04 (identifying letter typed by Angus McQueen). [App. 00254-55]

[71] *See* Deposition transcript of Melanie Montgomery, dated March 31, 2021, Rogers Decl. Ex. 18, at 52:01-06. [App. 00288]

[72] *See* Rogers Decl. Ex. 18, at 52:01-22. [App. 00288]

[73] *See* Deposition transcript of Wayne LaPierre, dated August 20, 2021, Rogers Decl. Ex. 19, at 201:14-202:04. [App. 00385]

[74] Def.'s Second Am. Countercl. at ¶¶ 76-78, ECF No. 238-1.

[75] See, e.g., Rogers Decl. Ex. 18, at 54:15-55:04 [App. 00289]
Q. In connection with the October 2018 budget planning meeting, did any of AMc's representatives demand that the NRA fire its outside counsel?
A. Not to my recollection. The only, quote, "demand" we had was that we didn't have to continue dealing with the harassment of that outside counsel.
Q. So there was no demand to fire Brewer, but AMc did not want to respond to any more of Brewer's letters; is that fair?
MR. MASON: Objection, form.
A. AMc did not want to respond to letters that were harassing in nature and accusatory. And we just -- it was just -- we didn't understand why this was continuing to happening -- happen. …

counsel in multiple high-profile matters—including the *NRA v. Lockton*[76] matter in which AMc's documents were subpoenaed.[77]   Moreover, during the meeting, Makris, a senior AMc executive, reported to Hart that he intuited BAC was "[was not] going anywhere." [78]   Of course, LaPierre and Spray recall the meeting differently—testifying that the NRA offered no assurances at all about whether AMc would "deal with" BAC.[79]   However, LaPierre does remember discouraging AMc from resigning and attempting to re-focus the meeting on budget negotiations.[80]

Following the meeting, the NRA made efforts to minimize conflict with AMc.   For example, when the NRA needed counsel to review a discrete set of AMc records in order to tally a list of invoices potentially reimbursable under a settlement agreement in the *NRA v. Lockton* matter in November 2018, it dispatched Cooper & Kirk LLP (the "Cooper Firm"),[81] which served as BAC's co-counsel in the matter, to perform that task.[82]   Although AMc knew BAC was "orchestrat[ing]" communications sent by the NRA during this period,[83] it purported to comply with the NRA's requests, including meeting with BAC's co-counsel of record, the Cooper Firm.[84]

After the *Lockton* matter settled and the NRA resumed its prior record-examination efforts, Hart communicated with Makris and advised that additional an record-request letter was forthcoming.[85]   Knowing full well that multiple counsel—BAC, the Cooper Firm, and Hart—were

---

[76] *NRA v. Lockton Affinity Series of Lockton Affinity, LLC, et al*., Case 1L18-ch-00639 (E.D. Va. 2018) was a dispute between the NRA and its affinity insurance broker that involved, among other things, the Carry Guard concealed-carry membership program on which AMc likewise performed work.
[77] See, e.g., Rogers Decl. Ex. 17, at 287:22-288:09. [App. 00264]
[78] *See* Email from Anthony Makris to Steven Hart dated October 11, 2018 (AMcTX-00010701), Rogers Decl. Ex. 20 ("W[ayne']s body English is Josh and Brewer ain't going anywhere…so the fuse is lit"). [App. 00419]
[79] *See* Rogers Decl. Ex. 19, at 201:14-202:04. [App. 00385]; *see also* Declaration of Craig Spray, dated May 4, 2020, ECF No. 361-1.
[80] *See* Rogers Decl. Ex. 19, at 201:14-202:04. [App. 00385].
[81] *See* Rogers Decl. Ex. 7, at ¶ 7. [App. 00100]
[82] *See NRA v. Lockton Affinity Series of Lockton Affinity, LLC, et al*., Case 1L18-ch-00639 (E.D. Va. 2018) (docket listing counsel of record).
[83] Ex. 1 to Deposition of Steven Hart, dated July 26, 2021, Rogers Decl. Ex. 34. [App. 02299]
[84] Deposition transcript of William Winkler, dated March 26, 2021, Rogers Decl. Ex. 23, at 78:20-79:13. [App. 00459]
[85] *See* Email chain between Steven Hart and Anthony Makris as sent to Revan McQueen on December 14, 2018 (AMc-044422-44424), Rogers Decl. Ex. 25. [App. 00534-36]

involved, Makris and Hart conferred on the optics of the letter exchange: a letter could be sent, but Bill Brewer should not be the one to sign it.[86]  Instead, the letter (the "December 21 BAC Record-Request Letter") was signed by another BAC lawyer.[87]  The categories of documents requested in the December 21 BAC Record-Request Letter overlapped substantially with the ones the NRA had sought during, and after, the failed September 2018 record examination.[88]  They also overlapped near-verbatim with the categories of documents AMc was directed to provide to FRA.[89]

### 3.    In February 2019, AMc Withholds Documents and Obstructs FRA's Examination.

In response to the December 21 BAC Record-Request Letter, AMc's litigation counsel in this matter, Jay Madrid, wrote to Hart complaining that the letter "should never have been sent," because LaPierre allegedly "agreed that neither [BAC] nor Josh Powell would have any further communication with AMc or its representatives."[90]  More importantly, AMc refused to produce several categories of documents the NRA sought: for example, it refused to provide documentation regarding its "fair market value" and "fair market price" calculations under the Services Agreement,[91] and to insisted on a "sampling" procedure rather than providing access to files, books and records the NRA could use to ensure that support existed for "every out-of-pocket expense billed to the NRA" during the requested three-year period.[92]  In response, the NRA indicated that

---

[86] See Rogers Decl. Ex. 25 (wherein Hart advises that a letter may come "from Brewer or Cooper . . . or me", and Makris replies, "[j]ust not from him," then advises: "Just sign the letter yourself."). [App. 00535]. Ultimately, another Brewer lawyer signed the letter. See Rogers Decl. Ex. 26 ("At least Sarah signed it. I offered.") [App. 00538]

[87] See Email from Anthony Makris to Steven Hart dated December 22, 2018, regarding response to Sarah B. Rogers email dated December 21, 2018 (AMcTX-00035850-35851), Rogers Decl. Ex. 26 ("At least Sarah signed it. I offered.") [App. 00538]

[88] Compare Rogers Decl. Ex. 12 (categories requested in September 2018) [App. 00125] with Rogers Decl. Ex. 14 (documents requested shortly following the September 2018 record-examination effort). [App. 00165-175]

[89] See Email chain from Steven Hart to Ryan Stephen dated January 16, 2019 (AMcTX-00000400-404), Rogers Decl. Ex. 24 (documents requested for the FRA examination). [App. 00528-32]

[90] Letter from Jay Madrid to Steve Hart dated January 4, 2019 (NRA-AMc_00065378), Rogers Decl. Ex. 21, at 4. [App. 00424]. Notably, this was the first time any such allegation appeared in writing.

[91] Rogers Decl. Ex. 21, at 3. [App. 00423]

[92] Rogers Decl. Ex. 21, at 1. [App. 00421]

it would deploy "other professionals to interface with Ackerman," while reminding AMc: "the NRA has the right to choose its own counsel."[93]   The NRA then retained FRA.[94]

As occurred with respect to the September 2018 record examination, rather than provide the NRA's professionals with on-site access to its "files, books, and records" at AMc's facilities—or remote digital access—AMc required the NRA's professionals to travel to a third-party accountant's office in Oklahoma City.[95] And as before, although AMc purported to cooperate, key documents requested by FRA were missing.  For example, media-buy information, which was an explicit, agreed upon focus of the record examination, was withheld from FRA because—according to AMc—the information "was proprietary and FRA could not have access to this information."[96]  FRA also received no documentation regarding the assessment of the selection of media outlets, the dates of airing and/or the price being charged,[97] no documentation explaining how unit costs for major advertising expenditures were derived,[98]and no documentation reflecting common business practices for expense processing.[99] As before, AMc purported to forbid the NRA's professionals from copying documents,[100] and purported to forbid them from transcribing data—a restriction which, interpreted literally, would have made it "impossible" to perform audit procedures.[101]  So lacking were the "files, books and records" provided by AMc that FRA observed

---

[93] See Rogers Decl. Ex. 24, at 403-404. [App. 00531-32]
[94] Agreement for Forensic Accounting Services provided by Forensic Risk Alliance, dated January 29, 2019, Rogers Decl. Ex. 27. [App. 00541-58]
[95] See Rogers Decl. Ex. 24. [App. 00528-32]
[96] See Forensic Risk Alliance draft spreadsheet regarding Ackerman McQueen, Inc.'s media buys, Rogers Decl. Ex. 28. [App. 00561]
[97] See Rogers Decl. Ex. 28. [App. 00561]
[98] See Rogers Decl. Ex. 28. [App. 00561]
[99] See Rogers Decl. Ex. 28. [App. 00561]
[100] Deposition transcript of Michael Trahar, dated September 18, 2019, Rogers Decl. Ex. 29, at 58:10-11. [App. 00615]
[101] Rogers Decl. Ex. 29, at 136:09-25. [App. 00634]

that there appeared to be significant gaps in record-keeping, a disturbing lack of transparency, and apparent failure by AMc to comply with its obligations under the Services Agreement.[102]

### C.    Discovery Reveals The Extent of AMc's Prior Material Breaches.

Discovery in this lawsuit corroborates and underscores FRA's observations, but AMc's failure to provide NRA with documents the FRA sought—an indisputable violation of Services Agreement § VII.  By February 21, 2020, AMc represented that it had produced to the NRA, as part of discovery in the overlapping Virginia action, all "documents provided to FRA" as part of FRA's February 2019 record examination.[103]  Of course, it is now known that numerous responsive documents and data repositories were omitted from AMc's production—indeed, many remain outstanding even today. For example, AMc was obligated to provide, and easily could have provided, the NRA's professionals with access to its Workamajig software (used to track employee time and associated expenses)[104]—but it did not, and even refused to provide access to Workamajig as part of discovery in this case.[105]  Similarly, AMc does "most of" its media invoicing through an electronic system called Strata,[106] which "integrates all media into one cohesive database and user interface" that allows for integrated, "large-scale" analyses of "[i]nvoices and more."[107]  However, FRA was not provided with access to Strata.[108]

---

[102] *See* Rogers Decl. Exs. 28, 69, 70, 71, 72, 73. [App. 00591, 01941-02012, 02013-02034, 02035-02043, 02044-02093, 02094-02147]
[103] *See* AMc Responses and Objections to NRA Fourth Set of Requests for Production (VA), dated February 21, 2020, Rogers Decl. Ex. 30. [App. 00691]
[104] *See* Rogers Decl. Ex. 23, at 8:05-19. [App. 00441]
[105] *See* Email from Charles H. Friedrich to Jason McKenney (copying Beth Landes and Morris D. Gindi), dated February 11, 2020, Rogers Decl. Ex. 31. [App. 00809]. Even to the extent that Workamajig contained data for other clients, AMc could have provided access to NRA-specific records—but did not.
[106] Deposition transcript of Brandon Winkler, dated July 30, 2021, Rogers Decl. Ex. 32, at 49:23-50:12. [App. 00862]
[107] *See* Strata Partner Description, Triton Digital, https://www.tritondigital.com/about/partners/strata# (last visited November 29, 2021).
[108] *See* Rogers Decl. Exs. 28, 69, 70, 71, 72, 73. [App. 00591, 01941-02012, 02013-02034, 02035-02043, 02044-02093, 02094-02147]

## IV.  APPLICABLE LEGAL STANDARDS

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[109] A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[110] Once the moving party has made an initial showing that no evidence supports the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue.[111] "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim."[112] Mere conclusory allegations, unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence and, thus, are insufficient to defeat a motion for summary judgment.[113] If the nonmoving party fails to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted.[114]

## V.  ARGUMENT AND AUTHORITIES

**A.  The NRA is Entitled To Summary Judgment On AMc's Breach Of Contract Claims.**

    **1.  AMc Materially Breached the Record-Examination Clause, Barring It From Enforcing the Services Agreement.**

---

[109] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co*., 136 F.3d 455, 458 (5th Cir. 1998).
[110] *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).
[111] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586-87 (1986).
[112] *Ragas*, 136 F.3d at 458.
[113] *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).
[114] *Celotex*, 477 U.S. at 322-23.

As detailed above, AMc engaged in multiple abusive practices that predated the Services Agreement, continued during its term, and constitute material breaches vitiating any performance obligation by the NRA. Thus, even if the NRA had breached the Services Agreement in the latter part of 2019 (after AMc repudiated it), AMc would still have no right to enforce the contract.[115]

The Services Agreement is governed by Virginia law,[116] is an integrated[117] contract and includes a Record-Examination Clause, which is unambiguous. As detailed *supra* at Section III.A, pursuant to the Record-Examination Clause, AMc "authorize[d] the NRA, upon reasonable notice, to examine [AMc's] files, books, and records with respect to matters covered under this Services Agreement."[118] Moreover, the "matters covered under th[e] Services Agreement" included billing, electronic database administration, travel and entertainment expenses, and the entire spectrum of AMc's advertising, public relations, and media placement and planning services.[119] Importantly, the NRA not only had an unqualified right to examine files, books, and records maintained by AMc regarding NRA business—it owns them, and could demand their immediate return if the relationship ended.[120]

---

[115] *Countryside Orthopaedics, OP.C. v. Peyton*, 541 S.E.2d 279 (Va. 2001) (internal citations and quotations omitted) (collecting cases) ("Generally, a party who commits the first breach of a contract is not entitled to enforce the contract."); *Horton v. Horton*, 487 S.E.2d 200 (Va. 1997) ("Generally, a party who commits the first breach of a contract is not entitled to enforce the contract."); *STR Constructors, Ltd. V. Newman Tile*, Inc., 395 S. W.3d 383, 390 (Tex. App.—El Paso Feb. 20, 2013) ("Ordinarily, a party cannot recover damages if it breaches a contract."); *Dobbins v. Redden*, 785 S.W.2d 377 (Tex. 1990) ("It is a well established rule that a party to a contract who is himself in default cannot maintain a suit for its breach.").

[116] *See* Rogers Decl. Ex. 1, at § XII.A. [App. 00019]

[117] *See* Rogers Decl. Ex. 1, at § X.D. [App. 00017]

[118] *See* Rogers Decl. Ex. 1, at § VIII. [App. 00017]

[119] *See* discussion *supra* Section III.A.

[120] See Rogers Decl. Ex. 1, at § IV (defining "Confidential Information" to include any "data, materials or information coming to the knowledge of AMc, supplied to AMc by NRA, or otherwise made known to AMc as a result of AMc's providing Services"). [App. 00014]. If the Services Agreement terminated, AMc was obliged to immediately return to NRA" any and all Confidential Information, along with the NRA's other "property, materials, [and] documents.*" See id.* § XI.E. [App. 00018]

Interpreting an unambiguous provision in a contract, Virginia courts consider not only the language, but the context and object of the contract.[121]   In addition, the court should strive to avoid "absurd results,"[122] as well as results which "would place one party at the mercy of the other[.]"[123]   Construed in accordance with these canons, the Record-Examination Clause plainly required AMc to cooperate with the NRA's record-examination efforts in furtherance of the clause's purpose—which was to enable the NRA "to make sure that everything was being carried out properly,"[124] *i.e.*, to supervise AMc's compliance with its contracts, NRA policies, and applicable law.   The clause did not restrict the NRA to discrete information rights or limit it to a review of a narrowly chosen set of materials chosen at the vendor's discretion.   Rather, the Record-Examination Clause conferred broad, deep authorization to ***examine*** AMc's ***files, books, and records***.

Against this backdrop, AMc's obstructionist, evasive response to the NRA's record-examination efforts during September 2018, and February 2019, breached the Record-Examination Clause.   Rather than allow the NRA to examine its files, books, and records in the ordinary-course manner they were maintained (*i.e.*, at AMc's offices and/or as they resided on electronic platforms in use by AMc such as Workamajig or Strata), AMc forced the NRA's professionals to travel to a third-party accountant's office in Oklahoma and view records in printed-out, disaggregated form.[125]   When the NRA's record-examination teams asked for

---

[121] *See, e.g.*, *Brown v. Brown*, 53 Va. App. 723, 729-30, 674 S.E.2d 597, 600 (2009) ("Absent express language to the contrary, the intent of the parties in forming a contract may be inferred from the circumstances in which the contract was created.") (internal citations and quotation marks omitted); *Virginia Elec. & Power Co. v. N. Virginia Reg'l Park Auth.*, 270 Va. 309, 319, 618 S.E.2d 323, 328 (2005) ("The facts and circumstances surrounding the parties when they made the contract, and the purposes for which it was made" may be "taken into consideration as an aid to the interpretation of the words used."); *Flippo v. CSC Assocs. III, L.L.C.*, 262 Va. 48, 63–65, 547 S.E.2d 216, 226 (2001).
[122] *See, e.g.*, *Goldkress Corp. v. Orthopaedic & Spine Ctr.*, No. 0670-16-1, 2016 WL 7209848, at *16 (Va. Ct. App. Dec. 13, 2016).
[123] *4031 Ltd. P'ship v. Bd. of Supervisors of Fairfax Cty.*, 21 Va. Cir. 384 (1990).
[124] *See* Deposition transcript of John Frazer, dated August 2, 2021, Rogers Decl Ex. 35, at 42:08-43:08. [App. 01053]
[125] *See* discussion *supra* Section III.B.1.

materials squarely relevant to the NRA's requests—*e.g.*, Carry Guard video footage[126] and media-buy documentation[127]—AMc flatly refused.  AMc imposed draconian limitations on the NRA's examination of its records, including by forbidding the NRA's professionals from retaining copies of documents—or even transcribing key information about the services  it was obligated to provide the NRA and its charges therefor.[128]  The NRA's forensic-accounting firm, FRA, testified that such limitations made it "impossible" to perform audit procedures.[129]  Importantly, AMc knew that it was thwarting time-sensitive regulatory compliance efforts by the NRA: it rejected a plea from Hart to furnish documents relevant to a potential New York Attorney General investigation,[130] and told the NRA outright that it did not wish to provide a "paper trail" lest regulators issue subpoenas.[131]

Any interpretation of the Record-Examination Clause that would countenance such conduct places the NRA "at the mercy" of AMc—the exact outcome Virginia courts strive to avoid.[132]  And importantly, courts interpreting analogous record-examination provisions hold that they prohibit conduct like AMc's here.[133]  For example, AMc's refusal to provide FRA with media-buy information on the ground that the information was "proprietary"[134] was an impermissible breach of the Record-Examination clause.  Moreover, AMc not only purported to bar the NRA's professionals from creating copies of documents they examined—Defendant

---

[126] *See* discussion *supra* Section III.B.1.
[127] *See* discussion *supra* Section III.B.3.
[128] *See* discussion *supra* Section III.B.2.
[129] Rogers Decl. Ex. 29, at 136:09-25. [App. 00634]
[130] Rogers Decl. Ex. 36. [App. 01091]
[131] Letter from Stephen Ryan to William H. Brewer, dated August 22, 2018, Rogers Decl. Ex. 37. [App. 01095]
[132] *See 4031 Ltd. P'ship v. Bd. of Supervisors of Fairfax Cty.*, 21 Va. Cir. 384 (1990).
[133] See *Cream of Wheat Co. v. American Home Magazine*, 159 A.D. 761, 762 (NY App Div 1st Department 1913). In *Cream of Wheat*, a publisher attempted to bar examination of documents disclosing its "business secrets," but the court rejected any such limitation, holding: "To induce plaintiff to advertise in its columns, [the publisher] has agreed to permit an inspection of all of its records, by any authorized agent. If plaintiff is entitled to an inspection at all, as we clearly think it is, we cannot see how the court can limit the scope of the inspection." *Id.*
[134] *See* discussion *supra* Section III.B.3.

Winkler confronted the BAC team in the parking lot in order to seize two documents previously retained.[135] As the NRA's general counsel testified, AMc's extraordinary efforts to prevent the NRA from acquiring copies of documents it owned, and would have been entitled to possess if the contract terminated interfered unavoidably with the purpose of the Record-Examination Clause.

The Court should hold AMc to account for its willful, tactical defiance of the letter and purpose of the Record-Examination Clause—which amounts to an obvious material breach. Because these material breaches occurred in September 2018 and February 2019 respectively, they relieved NRA of its obligation to perform and entitled NRA to terminate the contract and sue for damages.

### 2. The NRA is Entitled to Summary Judgment on AMc's Third-Party NRA Contracts Claim

No genuine issue of material fact exists with respect to AMc's claim seeking to recover $6,310,698 for its supposed obligation to pay NRATV talent, Dana Loesch ("Loesch") and Oliver North ("North"), the full amount of the AMc Third-Party NRA Contracts.

As a threshold matter, it is crucial to note that AMc did not plead a breach of ***contract*** claim in its Counterclaim with respect to the Loesch and North Third-Party Contracts. Rather, AMc only plead a ***tort*** claim for tortious interference with respect to those contracts.[136] On August 16, 2021 the Court dismissed AMc's tortious interference claims,[137] thus entirely eliminating any dispute concerning the Loesch and North contracts from this case.[138]

---

[135] Rogers Decl. Ex. 13, at 104:25-105:22. [App. 00152-53]
[136] *See* Def.'s Second Am. Countercl. ¶¶ 214-18, ECF No. 241.
[137] Order at 48-52, ECF No. 329.
[138] AMc's failure to plead a breach of contract claim against the NRA with regard to the Loesch and North contracts and its pursuit of a tort claim instead is readily understandable. AMc never signed Amendment No. 1 to the Services Agreement. Moreover, the Amendment bears the date May 6, 2018, and the North Employment Agreement was not even in existence until May 15, 2018. Employment Agreement for Oliver North effective May 15, 2018 (AMc-

19

AMc's belated attempt to reinvent and to pursue its dismissed tort claim[139] as a contract claim should be summarily dismissed. Accordingly, the Court need not conduct a review of the Services Agreement or the Third-Party Contracts. However, even assuming that AMc had plead a breach of contract claim with respect to the Loesch and North contracts, which it did not, the NRA is still entitled to summary judgment because AMc's newly invented contract claim is (1) speculative; (2) barred as a matter of law not only by the express terms of the Services Agreements but also the North and Loesch Employment Agreements; [140] and (3) AMc, North, and Loesch committed prior material breaches that defeated the core purposes of the Services Agreements and the Employment Agreements.

AMc's claims regarding Loesch are patently speculative. AMc is currently disputing Loesch's claims in an arbitration,[141] and she may never recover any monies.[142] On the other hand, North has not brought claims seeking compensation. In fact, he testified on September 15, 2021, that he did not consider suing Ackerman or "[…] Brewer and the NRA".[143] He added that *he is not contemplating suing anyone with respect to the Services Agreement*.[144] Despite this dispositive

---

056595-56604), Rogers Decl. Ex. 38 [APP 01098-107]. Paragraph 3 of The Amendment which deals with the so-called non-cancellable contracts, on its face, deals only with non-cancellable contracts already "entered into", not contracts entered into in the future. Notably, AMc was represented by Dorsey & Whitney with regard to the negotiation of the North Employment Agreement and the Second Amended Privilege Log belatedly produced by AMc on October 22, 2021 shows numerous entries for the period May 4 through May 18, 2018 concerning AMc's "contractual negotiations with Oliver North". *See, e.g.* AMc's Second Amended Privilege Log Nos. 85-87, 94-102, 104, 106, 108-111, 159, 162, 163, 166-175, Rogers Decl. Ex. 39 [App. 01115-17, 01121-23].

[139] *See* Def.'s Brief in Supp. Mot. for Partial Summ. J. ¶¶ 42-43, ECF No. 279.

[140] *See* Employment Agreement for Dana Loesch effective January 1, 2018 (AMcTX-00045557-45578), Rogers Decl. Ex. 40 [App. 01304-25]; *See also* Employment Agreement for Oliver North effective May 15, 2018 (AMc-05695-56604), Rogers Decl. Ex. 38 [App. 01098-107].

[141] *See* Def.'s Second Am. Countercl. ¶ 189, ECF No. 241.

[142] See *Sunrise Continuing Care, LLC v. Wright*, 671 S.E.2d 132, 135 (2009) ("Damages that are contingent, speculative, and uncertain are not recoverable because they cannot be established with reasonable certainty."); *LifeNet Health v. LifeCell Corp.*, No. 2:15CV461, 2016 WL 11672048, at *5 (E.D. Va. Sept. 2, 2016) (dismissing breach of contract claim where damages were based on the outcome of a separate pending action because the plaintiff "has not provided proof of damages sufficient to allow the Court to return [it] to some 'position' it would have been in absent the breach, as that 'position' is purely speculative.").

[143] *See* deposition transcript of Lt. Col. Oliver North, dated September 15, 2021, at 231:24-25; 232:1-2, Rogers Decl. Ex. 41 [App. 01384].

[144] *Id.* at 236:25; 237:1-4 [App. 01385-86].

testimony, AMc has not withdrawn its manufactured claim regarding North as of the date of this filing.

Additionally, the claims asserted by AMc are barred as a matter of law by the express language of the Services Agreement, as well as the Loesch and North Employment Agreements. On their face, neither the Loesch nor the North Employment Agreements are "non-cancellable" contracts, requiring the NRA to pay "any compensation" as AMc alleges in its typical conclusory fashion.[145] Nothing in the Services Agreement or its Amendment provides that the NRA was "guaranteeing" either Talent millions in compensation under any and all circumstances. Moreover, AMc's unreasonable interpretation of the Services Agreement is explicitly contradicted by the express terms of both the Loesch and North Employment Agreements. The Employment Agreements contain Termination provisions that provide for termination in advance of the end of the specified contract Term.[146] Further, both Agreements provide for termination for cause, which precludes payment of any remaining sums for the remaining length of the contract.[147] Finally, Paragraph XI.E. of the Services Agreement and the 2018 Amendment to it, upon which AMc relies, simply state that the NRA agrees to pay AMc "the balance of the compensation payable" to North and Loesch. There was no "balance payable" at the time of termination because of AMc's pre-existing material breach of Section I.A.

AMc's demand for a multimillion-dollar judgment in "compensation" for North also fails because he  testified that he does not intend to sue anyone for compensation regarding the Services Agreement. In any event, North was hired by AMc to serve as the host of an NRATV documentary

---

[145] *See* Def.'s Brief in Supp. Mot. for Partial Summ. J. ¶ 42, ECF No. 279.
[146] *See* Employment Agreement for Dana Loesch effective January 1, 2018, at Section 3.1A (AMcTX-00045557-45578), Rogers Decl. Ex. 40 [App. 01312]; s*ee also* Employment Agreement for Oliver North effective May 15, 2018, at Section 11(a)(b) (AMc-056595-56604), Rogers Decl. Ex. 38 [App. 01102-03].
[147] *Id*.

series, and obligated to produce twelve episodes during each of 12 months of his Employment Agreement.[148] The evidence shows that he only produced four (4) episodes, but AMc billed the NRA for twelve (12) episodes anyway during the first year of the contract.[149] AMc has inflicted this untenable litigation on the NRA and the Court, seeking yet two more years of "compensation" for North which involves no work product to be produced or any benefit to be supplied to the NRA.

Lacking any legal or factual basis for its NRA Third-Party contract claims, AMc seeks to fill the void with incompetent expert testimony. However, AMc's expert, Daniel L. Jackson, testified that he never asked the Ackerman representatives that he interviewed about the status of the Loesch arbitration.[150] In fact, he stated that he had been asked to include NRA Third-Party contract claims for Loesch, North, and Valinski merely "[…] in the abundance of caution that the judge determines they are not cancellable."[151] This manipulative use of an expert cannot withstand scrutiny, and is a blatant exercise in the manufacture of claims, where none exist. North testified that he does not intend to bring suit, and Jackson's studied indifference to conducting the slightest inquiry into the Loesch arbitration is implausible. The very law firm that retained him is defending the Loesch arbitration, yet he professes to have asked nothing about its status.[152]

### 3. The NRA is Entitled to Summary Judgment on AMc's Indemnity Claims

---

[148] *See* Employment Agreement for Oliver North effective May 15, 2018 (AMc-056595-56604), Rogers Decl. Ex. 38, in particular Section 3(b) (AMc-56595). [App. 01098]

[149] *See* American Heroes planned release schedule (AMcTX-00003938-3942), Rogers Decl. Ex. 47 [App. 01463-67]; In a document produced by AMc titled "projected increases to NRA fees," the North contract is shown as imposing a total annualized cost on the NRA of $5,140,800. A "Budget offset by OLN contacts," in the amount of $1,250,000 brings the net cost to the NRA to $3,890,800. *See* AMcTX-00067704, Rogers Decl. Ex. 61. [App. 01746]

[150] *See* deposition transcript of Daniel L. Jackson, dated October 27, 2021, at 105:15-18, Rogers Decl. Ex. 50. [App. 01502]

[151] *Id*. at 106:1-5. [App. 01502]

[152] Dorsey & Whitney's involvement with Dana Loesch dates back years. The unredacted legal bills of Loesch's counsel who negotiated her employment contract, Sheppard Mullin, show Loesch's counsel conferring with Gina Betts, Esq. a partner at Dorsey. Moreover, the bills are replete with contacts with "M. Montgomery" and "R. McQueen". *See* AMc-0031508-31524, Rogers Decl. Ex. 51. [App. 01520-36]

a.   **The Express Terms of the Services Agreement and the Employment Agreements Bar AMc's Request for Indemnification for Legal Fees**

The NRA is entitled to summary judgment regarding AMc's indemnity claim relating to the legal fees that AMc allegedly incurred with respect to responding to governmental investigations and defending an employment arbitration brought by Dana Loesch. AMc's claims are barred as a matter of law by the express terms of Section V.B.1 of the Services Agreement, which sets forth the NRA's narrow indemnity obligations to AMc. Section V.B.1 only requires the NRA to indemnify "expenses" arising from: (1) claims concerning NRA data or materials incorporated into AMc's work product; (2) claims for damages related to violence committed with firearms, or for injunctive relief with respect to the conduct of NRA-approved activities; and (3) Spokesperson activities directed or supervised by the NRA. As the discussion below establishes, neither AMc's legal fees relating to the governmental investigation nor the Loesch arbitration fall within the three indemnity categories provided for in Section V.B.1.

The relevant language of Section V.B.1 is as follows:

> NRA agrees to indemnify, defend and hold harmless AMc […] from and against any and all claims, demands, causes of action, suits, liabilities, losses, damages settlements, judgments, and expenses (including attorney 's fees), arising from (1) any data, materials, or service performance claims furnished to any AMc Indemnified Party by NRA, or approved by NRA, from which a AMc Indemnified Party prepared any publicity materials or public relations materials, or which were used by a AMc Indemnified Party in the production of advertising which was approved by NRA; (2) any claim, action or proceeding by any person(s), entity(ies), the United States of America, any state(s), county(ies), or municipality(ies), or any department, agency, board, bureau, commission, attorney general, or other instrumentality(ies) or political subdivision(s) of any of the foregoing, seeking (a) damages (whether actual, exemplary, or both), reimbursement or other compensation for any alleged injury(ies), death(s), or private or public losses, damages or costs ***related to one or more incidents of violence committed with firearms, or (b) an injunction or other equitable relief with respect to the activities of a AMc Indemnified***

> ***Party performed on behalf of NRA pursuant to this Agreement or***
> ***otherwise requested or approved by NRA***; or (3) the public relations
> services and related activities of any Spokesperson pursuant to the
> direction or supervision of NRA. […]

(Emphasis added). Simply put, the governmental investigations for which AMc seeks indemnity do not involve incidents of violence committed with firearms, or an injunction regarding activities requested or approved by the NRA.[153] Therefore, AMc as a matter of law, is not owed an indemnity pursuant to Section B.1.(2).

Similarly infirm is AMc's request for payment pursuant to Section V.B. 1(3), concerning legal fees incurred with regard to the JAMS arbitration brought by Loesch.[154] Her "services and related activities" were not rendered "pursuant to the direction or supervision of NRA," as Section V.B.1.(3) requires.   To the contrary, the evidence indisputably establishes that she was an employee of AMc, not the NRA, and directed and supervised by AMc, not the NRA.[155]

In addition, pursuant to the Services Agreement, AMc was expressly tasked with "Management of Talent/Spokespersons for NRATV, on behalf of the NRA."[156]  Relatedly, under the terms of her Employment Agreement with AMc, Loesch was required to render services in connection with the NRA "as required by the Company [AMc]."[157]  For example, Section 1.3.1 of the Loesch Employment Agreement expressly specified Loesch's "Duties and Services," which in relevant part states:

> 1.3.1 Employee will be available and will render all spokesperson
> and public relations services in connection with the NRA and its
> purposes, objectives and activities ***as required by the Company and***
> ***its designated representatives***, during the Employment Period and
> as are customarily rendered by spokesperson on first-class public

---

[153] *See generally*, *People of the State of New York by Letitia James v. Ackerman McQueen and National Rifle Association of America*, Index No. 451825/2019 (Sup. Ct., New York County 2019).
[154] See Def's Second Am. Countercl. ¶ 189, ECF No. 241.
[155] *See* Rogers Decl. Ex. 40, Section 3.1A at 8-9. [App. 01312-13]
[156] *See* Rogers Decl. Ex. 1, § I.A. [App. 00009]
[157] *See* Rogers Decl Ex. 40, Section 1.3.1 at 2-3. [App. 01306]

> relations and/or endorsement projects (collectively, the "Services").
> **Employee will comply with all reasonable directions, requests, scheduling and rules of the Company in connection therewith.**

(Emphasis added). Based upon the above provision, it is indisputable that Loesch acted pursuant to the "direction and supervision" of AMc and not the NRA. Additional sections of the Employment Agreement also make clear that AMc, not the NRA, supervised and directed Loesch. For example, in Section 1.5(f), Loesch represents and warrants that she will comply with the terms of AMc's" policies, procedures and directives, including [AMc's] employee handbook. . . ."[158] Therefore, as a matter of law, AMc has no indemnity claim as requested in paragraph 189 of its Counterclaim.[159]

Unable to credibly dispute the plain language of Section V.B.1(2),  AMc resorted to distorting its language in order to attempt to re-write the provision into the indemnity AMc wished it had, as opposed to the narrow one to which it expressly agreed. The architect of this misconstruction, William Winkler, has repeatedly issued letters to the NRA from November 2019, to the present demanding indemnity and enclosing one page summaries of legal fee invoices.[160] In those letters, he quotes Section V.B.1(2), but omits the key language that states that an indemnity with respect to a "claim, action or proceeding" by a governmental agency must relate to "[…] incidents of violence committed with firearms or an injunction."[161]

---

[158] *Id*. at 6. [App. 01309]
[159] AMc's Counterclaim seeks "indemnity and defense costs incurred in responding to and defending against the Loesch arbitration." *See* Def.'s Second Am. Countercl. ¶ 189, ECF No. 241. However, in its July 6, 2021 motion for summary judgment, AMc sought a judgment against the NRA for "any and all future damages, expenses, or liability out of the Loesch arbitration." *See* Def.'s Brief in Supp. Mot. for Partial Summ. J. ¶ 41, ECF No. 279. AMc's request for a prospective blank check that the NRA is "liable" to pay all future "damages" and expenses is contingent, speculative and, in any event, not the subject of any claim plead by AMc.
[160] *See* Exhibit 14 to the Deposition of Daniel L. Jackson, which consists of AMc invoices enclosing summaries of legal bills for the period September 30, 2019 to December 15, 2020 (AMcTX-00046071-46167), Rogers Decl. Ex. 52. [App. 01537-634]
[161] *See* Rogers Decl. Ex. 1, at § V.B.1. [App. 00015]

The NRA made clear to AMc that it was owed no indemnity and explicitly noted Winkler's deliberate distortion of the terms of Section V.B.1.(2). On March 4, 2020, John Frazer, the NRA's General Counsel, wrote to Gina Betts, Esq., a partner at Dorsey and Whitney LLP, notifying her, *inter alia*, of the "fundamental defect" in Winkler's letters because he "intentionally omitted" language in his quotation that makes clear that Section V.B.1, "does not apply in this situation."[162] Despite Frazer's letter to AMc's counsel sent twenty (20) months ago, AMc continued to pursue its indemnity claim concerning governmental investigations. In fact, it even filed a motion for summary judgment on July 6, 2021 seeking judgment on this frivolous claim, using the identical contrived misconstruction of Section V.B.1.(2) found in the Winkler letter as a basis for its motion.[163] In replying to the NRA's Opposition, AMc evades NRA's compelling arguments in the Opposition.[164] and labels the NRA's argument as "untenable," without explanation, and simply notes that the Court will determine whether AMc's claim falls within the indemnity provision. Indeed, whether that claim falls within the indemnity provision is a matter of law for the Court to decide.

Because the entry of summary judgment is compelled here by the terms of the indemnity provision, and the terms of Loesch's Employment Agreement, the Court need not reach a review of the so called legal "invoices" themselves. However, a cursory review of those documents also reinforces the appropriateness of a judgment on behalf of the NRA. The so called legal "invoices" supplied to the NRA with respect to the indemnity demand largely consist of an AMc created "invoice" enclosing a redacted invoice summary from the law firm at issue.[165]To be clear, this is

---

[162] *See* declaration of John C. Frazer, dated November 29, 2021, Ex. C., Letter from John Frazer, Esq. to Gina Betts, Esq., dated March 4, 2020 (NRA-AMc_00199046—199047), Rogers Decl. Ex. 53. [App. 01636]
[163] *See* Def.'s Brief in Supp. Mot. For Partial Summ. J. ¶ 37, ECF No. 279.
[164] *See* Def.'s Replay in Supp. Mot. Partial Summ. J. at 7, ECF No. 335.
[165] *See* Rogers Decl. Ex. 52. [App. 01538-634]

not a situation where a litigant seeking indemnity for counsel fees submits law firm bills that are redacted. AMc restricted its submission to AMc invoices enclosing merely summaries of law firm bills, while at the same time, seeking a huge legal fee indemnity, with an open ended extension into the future.[166] The "description" on the summaries consist of perfunctory references like "Attorney General Investigation of the NRA";[167] "Dana Loesch Employment Agreement";[168] and "New York Attorney General"[169]. Hourly rate data is missing from the summaries supplied. There is no narrative description of what type of legal work is being performed, why it is being performed, by whom, at what level of seniority, and what the lawyer's area of specialization is. In addition, the record is devoid of AMc providing any status reports to the NRA regarding its responses to the inquiries of government investigators. The record is similarly vacant as to the Loesch arbitration,[170]  which is inexplicable in view of Dorsey's representation of AMc in that arbitration.

In an effort to avoid actual facts concerning its alleged indemnity claim, AMc seeks instead to substitute the expert opinion of Daniel L. Jackson.[171] Jackson testified that he never asked for back up to the invoice summaries,[172] although he knew precisely the type of bills that professionals generate with the dates of services, the identity of the person performing the services, and descriptive manner of the service.[173] With respect to redactions that appeared on the invoice

---

[166] The one exception is a bill dated June 6, 2019, from Schertler & Onorato LLP which appears to be an actual legal bill with the hours noted. However, the narrative is completely redacted. *See* Legal invoices (AMcTX-00046164-46167, in particular 00046164), Rogers Decl. Ex. 52. [App. 01631]
[167] *See, e.g.*, Rogers Decl. Ex. 52., at AMcTX-00046087; AMcTX-00046091 [App. 01554, 01558]
[168] *See, e.g.*, Rogers Decl. Ex. 52., AMcTX-00046139 [App. 01606]
[169] *See, e.g.*, Rogers Decl. Ex. 52., AMcTX-00046123 [App. 01590]
[170] This lack of status reporting and information sharing would be troubling under any scenario, but here, Dorsey & Whitney is "defending" the Loesch claim In light of the intemperate pleadings filed in this case, which strain the bounds of legitimate advocacy, it is certainly reasonable for the NRA to question whether Dorsey & Whitney is an appropriate choice to be involved with any of the third-party matters.
[171] However, Jackson testified he was not interpreting the services agreement indemnity provision. *See* Rogers Decl. Ex. 50, at 119:13-17. [App. 01505]
[172] *Id.* at p. 125:1-5. [App. 01507]
[173] *Id.* at p. 124:13-18. [App. 01506]

summaries, Jackson testified that he did not follow up with the Ackerman representatives with whom he met, with any questions that would enable him to understand the nature and the scope of the legal work being done.[174] His implausible, off-point excuse for this lack of investigation was simply that he "saw nothing" to indicate that the law firms were working on "something else",[175] namely an unrelated litigation and billing AMc for it here. Jackson noted that he performed his calculations after receiving the redacted summaries[176] from representatives of AMc, and when asked if he "relied on the invoices without further discussion about the nature and content of the work,"[177] Mr. Jackson responded "that's correct."[178] Finally, he testified that he had no opinion about whether the organization being asked to pay these bills should have received additional detail beyond perfunctory descriptions such as "for services rendered".[179] Jackson's acceptance of one page summaries of legal bills for approximately a million dollars of legal fees, without any independent investigation, confirms that he merely rubber-stamped the set of facially incomplete billing records provided to him by AMc.[180]

### 4. The NRA is Entitled to Summary Judgment on AMc's Claim for Unpaid Post April 2019 Invoices.

The NRA acted in compliance with the Services Agreement in refusing to pay the assortment of unapproved, unsupported invoices that comprise the $3,363,941.50 amount for which AMc seeks payment from the NRA and the $249,166,66 amount sought from the NRA

---

[174] *Id.* at p. 121:6-24. [App. 01506]
[175] *Id.* at p. 122:1-11. [App. 01506]
[176] *See* invoices for indemnification and legal services in Exhibit 14 to the Jackson deposition transcript, Rogers Decl. Ex. 52. [App. 01537-01634 ]
[177] *See* Rogers Decl. Ex. 50, at 122:8-10. [App. 01506]
[178] *Id.* at 122:11. [App. 01506]
[179] *Id.* at 125:15-21. [App. 01507]
[180] *Id.* at 125:6-8. [App. 01507]. The testimony of NRA's experts underscores the glaring defects in AMc's attempts to use Jackson to support its failed indemnity claims. *See e.g.*, Deposition transcript of Autumn Kraus, dated August 19, 2021, at 63:7-25; 64:12-17, Rogers Decl. Ex. 54. [App. 01654]

Foundation ("NRAF").  Moreover, these invoices were sent in derogation of explicit notices given by the NRA to AMc about the submission of bills.

**a.**    **AMc Issues Non-Compliant Invoices Despite Explicit Notice and Warnings about its Lax Billing Practices**

The evidence establishes that on August 8, 2018, the NRA notified AMc that it was ***"strengthening its procedures for documentation and verification of compliance with vendor contracts."***[181] For example, it reinforced the requirement for a fair market value analysis, and other requirements, as a pre-condition to the NRA's payment of "any/all invoices pertaining to additional or special assignments" under Sections II.E. and III.D. of the Services Agreement. Further, the letter reinforced the Services Agreement's provision in Section 1.B. requiring the NRA's prior approval of advertising/creative services.  An additional detailed notice was issued to AMc on October 4, 2018, with exhibits relating to the procedures for obtaining NRA's approval of billings.[182] These letters mirrored and reinforced the extensive financial reporting requirements that the Services Agreement imposed upon AMc.

In addition to these written notices, AMc was also warned about its lax protocols by Steve Hart ("Hart"), via an email that he sent on October 8, 2018, a few days after the NRA issued its October 4, 2018 directive.  In responding to an email from Anthony Makris ("Makris"), President of Mercury Group, complaining about the books and records Examination and noting AMc's refusal to allow the copying of documents as part of the Section VIII Examination. Makris alludes to the parties' alleged prior agreement and practice of 38 years.  In response, Hart makes clear that the past is over, and the regulatory environment requires that changes be made.  As he tells Makris,

---

[181] *Id*. at 1. [App. 01659]
[182] Letter from Josh Powell to William Winkler, dated October 4, 2018, Rogers Decl. Ex. 56. [App. 01662]

29

"Repeat to yourself-self correction." The full text of the email, demonstrates the clarity of the warning that the NRA gave to its vendor.

Despite the notices and Hart's warning, AMc sent invoices in April 2019, and thereafter which failed to adhere to the terms of the Services Agreement and the notice's explicit directives. The Amended Jackson Report purports to summarize these invoices at Exhibit 7. [183] It should be noted that a major portion of the $3,363,941.90 that AMc seeks consists of two invoices for "Talent," each in the amount of $680,355.45, for a total of $1,360,710.90.[184] For all of the reasons set forth herein in the sections above, AMc is not entitled to be paid for these invoices. Additionally, the narrative on each bill consists solely of the following: "Talent Fee", "Per approved budget". The unreasonableness of this type of perfunctory description is illustrated, for example, by AMc's implementation of payments concerning the North contract. The evidence establishes that AMc paid itself approximately $3,000,000 from June 2018 through the end of 2018, despite the fact that one, not twelve, episodes of the North series were produced.[185] By the simple expedient of a conclusory reference to a "budget" in lieu of actual invoice detail about the work performed, AMc seeks to justify these massive payments, absent performance. No credible interpretation of the Services Agreement supports such an absurd result.

### 5. The NRA is Entitled to Summary Judgment with Respect to AMc's Claim for the Posting of a $3 Million Dollar Letter of Credit.

As the above discussion regarding AMc's sham invoices proves, the NRA had no obligation to post a $3 million dollar letter of credit concerning non-payment of invoices.

### 6. The NRA is Entitled to Summary Judgment as to AMc's Claims Relating to the Termination Provision of the Services Agreement.

---

[183] *See* Amended Expert Report of Daniel Jackson dated October 15, 2021, at Ex. 7, Rogers Decl. Ex. 65 [App. 01908-09].
[184] *See* AMc-041863 (Invoice No. 166340) and AMc-042052 (Invoice No. 167038), Rogers Decl. Exs. 66, 67. [App. 019015-16]
[185] Rogers Decl. Ex. 62 [App. 01748]

AMc's request for $1,929,146 in "severance" and $6,525,463 for "various expenses" pursuant to Section XI.F. of the Services Agreement is barred by the clear language of that Section. AMc is entitled to a "fair and equitable termination fee" for only two specific reasons: "inevitable severances" and "other reasonable costs." As a threshold matter, AMc is entitled to nothing because of its pre-existing breaches, which include its undeniable breach of Section XI.E, requiring the immediate return of "…any, and all of NRA's property, materials, documents, Confidential Information, etc., that may be in AMc's possession." In addition, the record here demonstrates that AMc's demands are an attempt to sweep unsubstantiated corporate overhead costs and manufactured severance claims within the patently narrow ambit of Section XI.E.

AMc's $6,525,463 claim is composed of the following assortment: the closure of offices in Alexandria, Virginia; Colorado Springs, Colorado; Dallas, Texas, and the winding down of those offices ($6,216,735 for offices and leases);[186] other contracts ($230,185);[187] and office disassembly/move-out ($78,516).[188] However, the record is devoid of evidence that the NRA approved the leases at issue, which leases were a business decisions and risks taken by AMc. Equally absent from the record is dispositive documentary evidence to show that the employees who worked at the offices in question worked exclusively for the NRA. In addition, the alleged average square footage occupied by each alleged employee working exclusively for the NRA is significantly above what is deemed industry reasonable.[189]

To fill this evidentiary vacuum, AMc presents the incompetent expert opinion of Daniel L. Jackson. His testimony confirms that in calculating the $6,525,463 sum, his allocation

---

[186] *See* Rogers Decl. Ex. 65, at Ex. 2. [App. 01899]
[187] *Id*. at Ex. 3. [App 01900]
[188] *Id*. at Ex. 1. [App. 01898]
[189] *See* Expert Report of Larry Kanter dated July 15, 2021 at 5, Rogers Decl. Ex. 64 [App. 01796]; and Expert Report of Autumn Kraus dated July 15, 2021 at ¶27, 10, Rogers Decl. Ex. 63 [App. 01774].

"methodology" consisted solely of verbal discussions with William and Brandon Winkler and Melanie Montgomery and the wholesale adoption of what they told him.[190] Those individuals told him what the NRA's "usage" was of a particular office, and he relied on those statements.[191] For example, they told Jackson what the usage was at the Virginia office and when Jackson was asked "[…] what documentation exists that confirms this?",[192] his response was "None that I know of."[193] Likewise, he relied on the verbal representations of the Winklers and Montgomery with regard to the other offices concerning how the alleged cost of leases were allocated to the NRA based upon usage.[194] The actual leases were used only to determine rental amounts because in determining the percentage allocated to the NRA, Jackson states that "It will be up to [AMc] to convince the jury that those are the proper percentages".[195]

As with the office leases,[196] Jackson relied entirely on the verbal statements made by defendants concerning the allocation of costs regarding alleged firewall, storage, and disaster recovery expenses.[197] The alleged costs were incurred, according to Jackson, to upgrade for the NRA website and data infrastructure protection, but also used for other clients.[198] However, he did not know who those other clients were and how many there were.[199] He relied on William Winkler and Melanie Montgomery's comments in allocating percentages to the NRA as part of

---

[190] Rogers Decl. Ex. 50, at 131:1-24. [App. 01508]
[191] *Id.* at 132:7-20. [App. 01508]
[192] *Id.* at 131:25; 132:1. [App. 01508]
[193] *Id.* at 132:2. [App. 01508]
[194] *Id.* at 132:7-11; 133:1-13. [App. 01508-09]
[195] *Id.* at 133:23-25; 134:1-2. [App. 01509]
[196] During her deposition, Autumn Kraus, the NRA's expert, provided a compelling description of the lack of independent analysis by Jackson of the lease allocations. *See, e.g.*, Rogers Decl. Ex. 54, at 43:10-25; 44:1-6; 46:14-23 [App. 01649-50]. Likewise, Larry Kanter, another NRA expert, opined on the deficiencies in Jackson's conclusions, and the lack of independent analysis. *See, e.g.*, Rogers Decl. Ex. 60, at 16:1-8; 15-25; 17:1-8; 18:1-20. [App. 01735-36]
[197] *See*, Rogers Decl. Ex. 50, at 117:7-12. [App. 01505]
[198] *Id* at 115:2-5. [App. 01504]
[199] *Id.* at 115:6-9. [App. 01504]

the claim here.[200] It was done "All verbally".[201] With respect to the actual computer equipment contract from Dell that was cited in Jackson's Amended Report, it was incomplete and missing the exhibit which describes what was actually being leased,[202] calling into question how Jackson could allocate costs with respect to a contract where the schedule of the items being leased/purchased is missing.

AMc's alleged severance claim is likewise unsupported by any non-conclusory, independent evidence. Jackson's severance analysis consisted of adopting what AMc "decided"[203] and based upon discussions with AMc.[204] Jackson's lack of independent analysis or any efforts at verification with regard to space usage and employee severance is both remarkable and inexplicable. He testified that AMc had sophisticated electronic platforms in place. Specifically, the applications Workamajig and Strata were used as "the principal documentation behind the operating of the company. Anything that came from the company, such as invoices or communication would have come through either Strata or Workamajig."[205] Yet, when Jackson was asked if he received time sheets in connection with the severance claims, he stated that he did not[206] and professed not to know if such items resided on an electronic platform, although he noted that "I would assume that there was some kind of accounting for time[…]"[207]

### 7. The NRA is Entitled to Summary Judgment with Respect to AMc's Claim for Interest.

---

[200] Id. at 115:18-19. [App. 01504]
[201] *Id*. at 117:7-12. [App. 01505]
[202] *Id*. at 112:7-11. [App. 01503]
[203] *Id*. at 134:8-11. [App. 01509]
[204] *Id*. at 134:17-19. [App. 01509]
[205] *Id*. at 48:8-13 [App. 01487]. Jackson made no effort to access or understand the electronic platforms upon which data relating to allocations to the NRA were housed. For example, he did not access Workamajig and in fact never asked to do so. Deposition transcript of Daniel L. Jackson, dated October 25, 2021 at 43:22-25, 44:1, Rogers Decl. Ex. 50. [App. 01486]. He never asked the Ackerman executives that he met with what Strata was used for and nor did Jackson recall them volunteering any information about Strata's use. *Id.* at 54:5-11. [App. 01489]. Jackson also testified that he did not ask Melanie Montgomery if she had used Strata, *Id*. at 51: 19-24. [App. 01488]
[206] *Id*. at 48:8-13. [App. 01487]
[207] *Id*. at 135:6-7. [App. 01509]

The NRA is entitled to summary judgment with respect to all interest amounts claimed by AMc in view of the fact that the record establishes that the NRA has no liability to AMc with respect to the claims upon which the interest calculations are based.

### B.      The NRA is Entitled to Summary Judgment on AMc's Remaining Fraud Claim.

To defeat summary judgment with respect to its fraud claim, AMc must "submit or identify evidence in the record to show the existence of a genuine issue of material fact as to each element" of fraud.[208] In Texas,[209] such elements are: (1) the defendant made a material misrepresentation that was false; (2) the defendant knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied on the representation and suffered injury as a result.[210] At the summary judgment stage, as at the pleading stage, fraud allegations are evaluated subject to the particularity requirements of Fed. R. Civ. P. 9(b).[211] Most of AMc's fraud allegations were dismissed as vague or legally noncognizable,[212] but one set of allegations remains: those concerning the  February 2019 records examination conducted by FRA.[213]

In particular, AMc alleges that during the parties' October 11, 2018 meeting, LaPierre, on behalf of the NRA, "pled with AMc to 'stick with him,'" assured AMc that it "would no longer

---

[208] *Coats v. Ruiz*, 198 S.W.3d 863, 878 (Tex. App.-Dallas 2006, no pet.) (affirming a no-evidence summary judgment in favor of an insurer).

[209] *See* Order at 43, ECF No. 329 (applying Texas law)

[210] *See* Order at 43, ECF No. 329 *citing JPMorgan Chase, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018) (quotations and citations omitted).

[211] *See, e.g., Prime Lending, Inc. v. Moyer*, No. CIV.A.3:03-CV-0113-G, 2004 WL 1194461, at *6 (N.D. Tex. May 28, 2004) (granting summary judgment against fraud claim where record contained no evidence of fraudulent intent, among other elements, and holding: "The fraud and misrepresentation claims . . . lack sufficient particularity to comply with Rule 9(b)").

[212] *See* Order at 43, ECF No. 329 (dismissing fraud claims with respect to NRATV and third-party contracts); *see also* Order at 45, ECF No. 329 (dismissing fraud claim with respect to "extortion narrative" and "leaks").

[213] Order at 46-47, ECF No. 329.

have to deal with" Brewer," and/or promised to "make sure" that Brewer and an NRA executive were "no longer involved with" AMc.[214] AMc alleges that LaPierre repeated this promise to "another [unnamed] AMc employee" during a December 2018 phone call.[215] "[B]ased on LaPierre's promise," AMc alleges, it "agreed to a third audit with [FRA],"[216] on the purportedly false premise that FRA was "independent." [217] LaPierre's alleged implicit assurance that FRA was "independent" amounted to a material misrepresentation, AMc alleges, because FRA employed a then-former BAC employee.[218] AMc alleges that it was injured because it expended "money and time" to furnish records for FRA's examination, [219] and because the NRA brought lawsuits informed by problems the examination revealed.[220]

When it sustained AMc's fraud claim at the pleading stage, the Court focused on Rule 9(b) and whether AMc alleged pecuniary damages, but did not address the effect of the parties' underlying contractual rights and duties[221]—nor could it consider the evidentiary record. Viewed against the backdrop of the Services Agreement and the gaping deficiencies in AMc's proof, AMc's remaining fraud allegations cannot survive.

*First*, AMc has no evidence that would turn LaPierre's vague, future-oriented promises— that AMc need not "deal with" or be "involved with" outside counsel with whom it claimed a family feud—into misrepresentations actionable as fraud. Thus, there is no genuine issue of fact that a material misrepresentation was ever made. *Second*, there is no evidence whatsoever of

---

[214] Def.'s Second Am. Countercl. at ¶¶ 76-78, ECF No. 238-1.

[215] *Id.* at ¶ 76.

[216] *See* Order at 47, ECF No. 329, citing AMc's Resp. to the NRA's Mot. to Dismiss Second Am. Countercl. at 14, ECF No. 276.

[217] *See* Order at 47, ECF No. 329.

[218] *See* Order at 47, ECF No. 329.

[219] *See* Order at 48, ECF No. 329.

[220] Def.'s Second Am. Countercl. at ¶ 230, ECF No. 238-1.

[221] *See* Order at 48, ECF No. 329 ("[T]he Court does not address [] whether AMc was already contractually obligated to release the documents irrespective of whether BAC was involved in the audit and, if so, whether such an obligation defeats AMc's claim.").

fraudulent intent by the NRA. *Third*, AMc cannot prove actual or justifiable reliance, because (i) it had actual, continuous notice of BAC's involvement and (ii) AMc was contractually required to cooperate in the records examination irrespective of BAC's involvement. *Fourth*, AMc's contractual obligation to furnish records similarly negates proof of damages: AMc was obligated to comply with the NRA's record requests, and/or would have been sued, regardless of whether it believed or knew that BAC was "involved."

### 1.    The NRA Made No Material Misrepresentation to AMc.

Every misrepresentation pleaded with particularity by AMc occurred—allegedly—at the parties' October 11, 2018 budget meeting.[222]  Specifically, AMc asserts that LaPierre urged the agency to "stick with him" and promised that, if it did, AMc "would no longer have to deal with Brewer" and LaPierre would "make sure that Brewer [and BAC] . . . were no longer involved with AMc."[223]  But these vague, forward-looking promises (even if made) would not be actionable as fraud, because the record establishes that, as mutually understood by the parties, LaPierre's statements were *true*: and  AMc knew that BAC remained deeply involved in relevant NRA affairs.

### a.    LaPierre's alleged promise that AMc need not "deal with" BAC cannot be actionable as fraud without evidence of specific intent to deceive— and there is none in the record.

It is uncontested that, during the period leading up to the October 11, 2018, budget meeting, BAC was "involved with" AMc in precisely the manner AMc opposed: BAC professionals were

---

[222] *See* ECF No. 329 at 46-47 (finding that AMc pleaded facts "sufficient to uphold a claim of fraud related to the FRA audit," and specifically citing LaPierre's alleged assurance that AMc "would no longer have to deal with Brewer," and that Brewer would no longer be "involved with AMc," if AMc were to "stick with him"). Although AMc also alleges that LaPierre repeated similar assurances to an unidentified AMc employee during a December 2018 telephone call, no evidence in the record substantiates this allegation, and Rule 9(b) requires that AMc identify—and prove—the identities of persons to whom fraudulent misrepresentations were made. *See, e.g., Bay State Mill. Co. v. Terranova Bakers Supplies Corp.*, 871 F. Supp. 703, 707 (S.D.N.Y. 1995) (granting summary judgment as to fraud claim, where claimant failed to establish "who made the alleged misrepresentations *to whom*") (emphasis added); *U.S. ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp. 2d 745, 779 (S.D. Tex. 2010) (dismissing False Claims Act allegations for failure to plead fraud with particularity under Fifth Circuit standards, where relators failed to identify "specific doctors who received" allegedly-misleading medical-device promotions).
[223] *See* Order at 46, ECF No. 329, *citing and quoting* Def.'s Second Am. Countercl. at ¶¶ 76-77, ECF No. 238-1.

signing letters to AMc, conducting examinations of AMc's records, and interfacing directly with AMc personnel. Thus, LaPierre cannot be alleged to have misrepresented facts as existed on October 11, 2021—he is instead alleged to have made a prospective promise which the NRA did not keep. However, "[a] promise to do an act in the future" is not actionable fraud unless "made with the intention, design and purpose of deceiving, and with no intention of performing the act."[224] "Failure [by the promisor] to perform" her promise, standing alone, is not evidence that the promise was made with fraudulent intent.[225] Here, AMc can offer no evidence whatsoever that when LaPierre allegedly promised AMc it need not "deal with" its executive's brother-in-law, the NRA had "no intention of performing"—*i.e.*, had no good faith intent whatsoever to avoid future dealings between AMc and BAC.  Indeed, the record contains no evidence at all of fraudulent intent by LaPierre or the NRA when these forward-looking assurances were allegedly offered.

### b.     The NRA had no affirmative obligation to disclose that FRA employed a former BAC professional.

At the pleading stage, the Court determined that AMc had adequately pled that LaPierre's alleged assurances AMc need not "deal with" or be "involved with" AMc were "effectively—if not technically—false because AMc agreed to the third audit with [FRA] believing the audit company to be independent from Brewer and Powell based on LaPierre's promise [that AMc not 'deal' or be 'involved with' Brewer or Powell]."[226]  Similarly, AMc alleges that because LaPierre stated that Brewer, BAC, and Powell would not be "involved with" AMc in the future, the NRA

---

[224] *See, e.g.*, *Schauer v. Cargill, Inc.*, No. CIVASA02CA0827OGNN, 2003 WL 21372163, at *7 (W.D. Tex. June 12, 2003).
[225] *See, e.g.*, *Werth v. Johnson*, 294 S.W.3d 908, 911 (Tex. App. 2009) (affirming grant of no-evidence summary judgment where fraud plaintiff failed to adduce proof that promisor, in estate dispute, knew the contemplated life estate would be distributed) (internal citations and quotation marks omitted). This is consistent with the requirement of scienter applicable to all fraud claims, even those based on alleged misstatements of presently-existing fact. *See, e.g.*, *Koerner v. CMR Constr. & Roofing, L.L.C.*, 910 F.3d 221, 228 (5th Cir. 2018) (affirming summary judgment where fraud claimant offered no evidence of promisor's fraudulent intent).
[226] *See* Order at 47, ECF No. 329 (internal citations and quotation marks omitted).

"voluntarily disclosed information that gave rise to a duty to disclose", that FRA employed an accountant who previously worked at BAC.  Viewed in light of the facts, this argument fails.

For purposes of Texas common law fraud, a duty to disclose an unstated fact arises only: (1) when there is a fiduciary obligation (it is undisputed that the NRA had no fiduciary obligation relevant here); (2) when one voluntarily discloses partial information, such that "the whole truth must be disclosed;" (3) when new information arises that makes an earlier representation misleading or untrue; and/or (4) when one makes a partial disclosure that conveys a false impression.[227]  A duty to disclose is not triggered by  prior statements that are immaterial, vague, attenuated, or irrelevant,[228] and is less likely to arise where, as here, "the parties to the transaction were sophisticated business people."[229]  Importantly, a fact cannot be ***material***—and, thus, its nondisclosure cannot be actionable—if the party alleging nondisclosure would have been obligated to follow the same course even if the undisclosed fact were known.[230]  A duty to disclose additional information does not arise merely because a fraud claimant "draws unwarranted inferences" from statements that are "subject to multiple interpretations."[231]

---

[227] *See, e.g.*, *TXI Operations, LP v. Pittsburgy & Midway Coal Mining Co*., No. CIV.3:04-CV-1146-H, 2004 WL 2088911, at *1 (N.D. Tex. Sept. 8, 2004).

[228] *See, e.g.*, *Jones Partners Const., LLC v. Apopka Plaza Assocs*., LLC, No. 3:04-CV-1294-D, 2006 WL 784892, at *6 (N.D. Tex. Mar. 27, 2006), *aff'd*, 227 F. App'x 420 (5th Cir. 2007) (representation by lender that there was a "note renewal" for an ongoing construction project did not obligate lender to disclose, to the counterparty construction contractor, that no further funds were in fact being lent); *Pleasant Grove Indep. Sch. Dist. v. FieldTurf USA, Inc*., No. 06-19-00022-CV, 2020 WL 1646633, at *12 (Tex. App. Apr. 3, 2020), *reh'g denied* (June 10, 2020), *review granted* (Sept. 3, 2021) (turf manufacturer had no affirmative duty to disclose, to a customer purchasing an eight-year warranty for its product, the fact that the manufacturer had sued its fiber supplier alleging that the fiber contained in the product deteriorated during the warranty period).

[229] *See JSC Neftegas-Impex v. Citibank, N.A*., 365 S.W.3d 387, 411 (Tex. App. 2011).

[230] *See, e.g.*, *Belliveau v. Barco, Inc*., No. AU-17-CA-00379-SS, 2019 WL 12340100, at *5 (W.D. Tex. Jan. 18, 2019), *amended on reconsideration in part*, No. AU-17-CA-00379-SS, 2019 WL 2549435 (W.D. Tex. June 20, 2019), *aff'd*, 987 F.3d 122 (5th Cir. 2021), *and aff'd*, 987 F.3d 122 (5th Cir. 2021) (holding that acquiring company had no duty to disclose, to executive of target company, that it planned to fire him after acquisition; *inter alia*, this information was not material because the executive would have been required to provide the same due diligence assistance even if he had known his firing was imminent).  As discussed *infra* at Section VI.B.2, ***AMc had an obligation to furnish files, books, and records to the NRA no matter what***—a fact which would defeat any otherwise-viable fraud-by-omission claim, and negates justifable reliance even assuming an actionable, affirmative misrepresentation by LaPierre.

[231] *See, e.g.*, *First Presbyterian Church Of Ypsilanti v. H.A. Howell Pipe Organs, Inc*., No. 07-13132, 2010 WL 419972, at *4 (E.D. Mich. Feb. 1, 2010) (holding that absent a pre-existing, affirmative duty to disclose, statements

Here, the NRA disclosed no partial information about the resumes of FRA's professionals, and the record contains *no representation whatsoever about FRA's connection, or lack of connection, to BAC*.  Nor does the record reflect a promise by the NRA that FRA would be "independent"—though even if it did, such a promise would be too vague to be actionable as fraud.[232] Instead, with AMc refusing to "communicat[e] with" or "respond to" BAC[233] and with BAC's former co-counsel, the Cooper Firm, no longer involved,[234] the NRA simply indicated that it would deploy "other professionals to interface with Ackerman," while reminding AMc: "the NRA has the right to choose its own counsel."[235]  True to its word, the NRA hired other professionals to conduct the on-site record examination, and AMc was spared further communications with BAC.  None of these events rendered LaPierre's prior alleged assurances misleading; rather, they reflect the NRA's earnest effort to minimize contact between AMc and BAC, as LaPierre allegedly promised. Texas law imposed no obligation to disclose—and AMc had no reason to expect the NRA to disclose—whether, how, and to what extent BAC professionals would privately advise the NRA, or the NRA's accountants, about the examination the accountants were conducting.  Thus, there is no summary judgment evidence supporting a fraud-by-omission claim regarding the FRA Record Examination.

## 2.    The Record-Examination Clause Negates Justifiable Reliance.

---

that are "subject to multiple interpretations" are not actionable in fraud merely because the listener "fail[s] to seek specific clarification and draws unwarranted inferences" from them).

[232] *See, e.g.*, *Jackvony v. RIHT Fin. Corp.*, 873 F.2d 411, 416 (1st Cir. 1989) (Investor could not reasonably have relied on statements that an entity would operate "independent[ly]" post-merger because such statements "seem to have been vague," and because subsequent documents and events would reasonably have placed the investor on notice that his expansive interpretation of the term "independent" was inaccurate).

[233] Letter from Jay Madrid to Steve Hart dated January 4, 2019 (NRA-AMc_00065378), Rogers Decl. Ex. 21. [App. 02298-303]

[234] *See* Rogers Decl. Ex. 25 (wherein Hart explains to Makris that a prior arrangement, where the Cooper Firm interfaced with AMc, was "conditioned upon Cooper participating," which was no longer feasible). [App. 00534]

[235] *See* Rogers Decl. Ex. 24, at 403-04. [App. 00533-36]

In Texas, the reliance element of fraud "has two requirements: the plaintiff must show that it actually relied on the defendant's representation and, also, that such reliance was justifiable."[236] AMc alleges that it relied on the NRA's (nonexistent) misrepresentations concerning FRA's independence, or BAC's non-involvement, by "allow[ing] the NRA to freely audit AMc's sensitive, competitive business information."[237] But AMc had an unqualified obligation to let the NRA examine its "files, books, and records with respect to matters covered under th[e] Services Agreement," which negates justifiable reliance: AMc would have been obligated to allow the record examinations no matter which professionals the NRA sent. Where, as here, the fraud claimant "would have been legally obliged to follow the same course regardless of what the defendant said," there can be no justifiable reliance and, therefore, no recovery.[238]

### C.    AMc's Conspiracy Claim Is Barred By The Intracorporate Conspiracy Doctrine.

An action for civil conspiracy has five elements: (1) a combination of two or more persons; (2) the persons seek to accomplish an object or course of action; (3) the persons reach a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts are taken in pursuance of the object or course of action; and (5) damages occur as a proximate result.[239] As this Court noted at the pleading stage, "[c]ivil conspiracy is not an independent tort."[240] Therefore, AMc may advance its civil conspiracy claim only if one of two underlying tort claims—fraud, or defamation—survives summary judgment.[241] AMc's fraud claim fails for the reasons stated above.

---

[236] Order at 43, ECF No. 329, *citing JPMorgan Chase, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018).

[237] Def.'s Second Am. Countercl. at ¶ 230, ECF No. 238-1.

[238] Restatement (Third) of Torts § 11 (2020). *See also Gray v. Waste Res., Inc*., 222 S.W.3d 522, 525 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (holding fraud plaintiff could not show reliance on misrepresentations when he acknowledged he would have acted the same way even if the misrepresentations were not made).

[239] *MVS Int'l Corp. v. Int'l Advert. Sols*., LLC, 545 S.W.3d 180, 196 (Tex. App. 2017).

[240] *See* Order at 53, ECF No. 329, *citing and quoting Adams v. Alcolac Inc*, 974 F.3d 540, 544 (5th Cir 2020).

[241] *See* Order at 53-54, ECF No. 329.

But even if AMc could prevail on its fraud claim or defamation claim, civil conspiracy would be impossible to establish—because the NRA cannot conspire with its counsel, its employees or itself.

AMc alleges a conspiracy among "[t]he NRA, LaPierre, Powell, Brewer, and [BAC]" to defame and defraud it.[242]  However, "[u]nder the longstanding intracorporate conspiracy doctrine, a corporation cannot conspire with its own employees or agents," rendering AMc's conspiracy theory "a legal impossibility."[243] To circumvent this blackletter law, AMc insisted at the pleading stage that the NRA's executives and outside counsel acted for their "personal benefit" and "outside the scope of their employment."[244]  But as this Court already recognized, actions undertaken by outside counsel as part of a client representation—notwithstanding alleged "mixed motives"— cannot sustain a conspiracy claim.[245]  Moreover, there is no summary judgment evidence that LaPierre or Powell acted outside the scope of their employment in any context relevant to AMc's fraud or conspiracy allegations.

### 1. Outside Counsel is not a Cognizable Co-conspirator, even if he Allegedly Acted with "Mixed Motives."

The Third Circuit's seminal *Heffernan v. Hunter* decision[246] (deemed persuasive by Texas federal courts, including this Court)[247] makes clear that due to the compelling policy and constitutional concerns favoring zealous counsel, the bar for pleading a conspiracy between

---

[242] *See* Def.'s Second Am. Countercl. ¶ 233, ECF No. 238-1.
[243] *See, e.g.*, *Mandawala v. Struga Mgmt.*, No. SA-19-CV-00635-JKP, 2020 WL 4905805, at *4 (W.D. Tex. Aug. 20, 2020), *leave to appeal denied*, No. SA-19-CV-00635-JKP, 2021 WL 2949558 (W.D. Tex. Jan. 14, 2021), *citing Hilliard v. Ferguson*, 30 F.3d 649, 653 (5th Cir. 1994).
[244] *See* AMc's Resp. to NRA's Mot. to Dismiss Second Am. Countercl. 17-21, ECF No. 276.  The Court did not rule fully on the NRA's intracorporate-conspiracy arguments at the motion-to-dismiss stage, except to note that it would "not consider AMc's conspiracy claim insofar as it concerns the NRA's general counsel, Brewer, or BAC."  *See* Order at 54 n. 24, ECF No. 329.
[245] *Id.*, *citing Heffernan v. Hunter*, 189 F.3d 405, 413 (3d Cir. 1999).
[246] 189 F. 3d 405 (3rd Cir. 1999).
[247] *See, e.g.*, *Rodriguez v. Spencer*, 2012 WL 639555 (W.D. Tex. Feb. 27, 2012); *Jackley v. City of Live Oak*, Tex. 2009 WL 10669162 (W.D. Tex. Nov. 12, 2009); *see also* Order at 54 n. 24, ECF No. 329.

attorney and client is extraordinarily high.[248]  AMc failed to surmount that bar at the pleading

stage, and cannot resuscitate its failed claim now.[249]  In *Heffernan*, defendant (Hunter) allegedly

conspired with his lawyer to intimidate an adverse witness (Heffernan) by frivolously suing

Heffernan, and by participating with counsel and a publicist to defame Heffernan in the media.[250]

In finding that Heffernan had no claims for conspiracy, the Third Circuit noted that an

intracorporate conspiracy may be pleaded only where employees or agents "act[] for their ***sole***

personal benefit and thus outside the course and scope of their employment."  The *Heffernan* court

emphasized that ***even an attorney who allegedly acts unethically or with "mixed motives"***[251] acts

"squarely" within the scope of his agency if his actions advance the client's tactics or interests.[252]

Here, analogously, Ackerman alleges that BAC earned fees from the NRA for legal and (allegedly)

public relations services,[253] but a lawyer's receipt of compensation for legal services including

working with a publicist, is a normal incident of the practice of law and not actionable.  Nor is

alleged personal animus against the opposing party, whether by reason of "family vengeance"[254]

or otherwise.  Counsel is permitted to have "mixed motives" in its representation of a client.  Here,

AMc alleges that Brewer wanted to "Take Over the Roles and Responsibilities AMc provided to

the NRA for nearly 40 years."[255]  This pointless verbiage not only runs afoul of *Heffernan* and its

---

[248] *Heffernan*, 189 F. 3d at 413. It is clear on the face of the Second Amended Counterclaim that Ackerman is attempting to control the NRA's choice of counsel in violation of its constitutional right to counsel of its own choice. Def.'s Second Am. Countercl. ¶¶73-101, ECF No. 238-1.

[249] Order at 54 n. 24, ECF No. 329.

[250] 189 F.3d at 411.

[251] *Id.* at 413.

[252] *See id.* ("[T]he mere fact that attorneys have "mixed motive," such as "enhancing" their reputation by aggressive representation, does not remove their conduct from the scope of the agency . . . . The statements that Bochetto made on camera and the information in the press releases about Heffernan's conduct with Kelly were obviously aimed at discrediting him as a witness against Hunter. As such, the attorney was acting within the scope of his representation. Whether the chosen means were ethical or appropriate is a separate issue. Attorneys might use unethical tactics in representing clients and yet remain squarely within the scope of their agency.").

[253] Def.'s Second Am. Countercl. ¶ 83, ¶¶102-139, ECF No. 238-1.

[254] *See. e.g.*, Def.'s Second Am. Countercl. ¶¶232-239, ECF No. 238-1.

[255] Def.'s Second Am. Countercl., Section M, ¶¶ 91-101, ECF No. 238-1.

progeny but it is expressly contradicted by the Services Agreement, which states that the NRA ". . . desires to **retain AMc as a nonexclusive source for services described herein. . ."**[256] Accordingly, as the Court has already held, neither Brewer nor BAC nor NRA general counsel are cognizable co-conspirators for purposes of AMc's conspiracy claim.

### 2. There Is No Evidence That LaPierre Or Powell Acted Outside The Scope of His Employment In Connection With Any Alleged Fraud or Defamation.

An agent, including a corporate executive, has "actual authority to take action . . . necessary or incidental to achieving the principal's objectives," as the agent reasonably understands them.[257] Accordingly, executives are routinely found to act within the scope of their agency when they undertake business trips or attend business meetings—even if allegedly-defamatory statements are made at those meetings[258]—and conduct other activities relating to the corporation's business. The fact that the executive derives simultaneous personal benefit—for example, receives value in the form of travel or entertainment while entertaining clients—does not remove his actions from the scope of his agency.[259]

With respect to the FRA Record Examination, AMc alleges that LaPierre made vague promises, months before FRA was retained, that AMc need not "deal with" or be "involved with" Brewer or BAC, and that FRA's subsequent engagement by the NRA (after FRA hired a former

---

[256] Rogers Decl. Ex. 1, at 1. [App. 00020-22]
[257] *See, e.g.*, *Craig v. B. Riley FBR, Inc.*, No. 3:19-CV-0058-G, 2020 WL 6889018, at *15 (N.D. Tex. Nov. 23, 2020), *citing and quoting* RESTATEMENT (THIRD) OF AGENCY § 2.02(1).
[258] *See, e.g.*, *Frank B. Hall & Co. v. Buck*, 678 S.W.2d 612, 627 (Tex. App. 1984), *writ refused NRE* (Dec. 12, 1984) (Although corporate defendant did not have a general practice of calling former employees "crooks," allegedly defamatory statement by corporate vice president was made within the scope of his employment because the executive had broad authority over relevant matters, "took an active role" the contract negotiations wherein the statement occurred, had corporate authority to make furnish information about the plaintiff, and "was furthering [the corporation's business]" at the time).
[259] *See, e.g.*, *Emps. Mut. Liab. Ins. Co. of Wis. v. Sanderfer*, 382 S.W.2d 144, 148 (Tex. Civ. App. 1964), *writ refused NRE* (Dec. 31, 1964) (affirming judgment that corporate executive, who fell from a tree and sustained injuries while deer hunting with a client, acted within the scope of his employment).

BAC employee) rendered LaPierre's promises misleading.[260]  However, even if LaPierre made the exact statements AMc alleges, there can be no genuine issue of material fact as to whether he made them within the scope of his employment.  LaPierre was attending a business meeting with the NRA's public relations vendor in his capacity as the NRA's chief executive, accompanied by the NRA's chief financial officer.  The purpose of the meeting was to negotiate a budget for future NRA work, and the meeting was derailed by animus on the part of one NRA vendor against another, which LaPierre allegedly attempted to resolve.  Such activities were "necessary or incidental to achieving the [NRA]'s objectives"[261] as understood by LaPierre—namely, to "g[et] to a budget" and to "see [AMc's] books and records."[262]  There is no evidence otherwise.

Nor does the record contain a scintilla of evidence that LaPierre acted outside the scope of his employment with respect to any purported defamation.  AMc alleges that LaPierre circulated a letter to the NRA Board of Directors recounting a conversation with an AMc employee, North, which LaPierre interpreted to convey "an offer I couldn't refuse"—step down, or be smeared.[263]  AMc further alleges that LaPierre drafted the letter in consultation with the NRA's outside counsel, BAC, and two NRA executives: Powell, and the NRA's PR manager.[264]  Uncontroverted testimony establishes that at the time the letter was drafted, LaPierre was on-site at the NRA's Annual Meeting of Members; the telephone call described in the letter was made by North to an aide of LaPierre, and received by the aide and an NRA officer, while they congregated in a hotel suite with other NRA directors and officers.[265]  AMc also alleges subsequent dissemination by the NRA

---

[260] *See* discussion *infra* Section VI.B.1.
[261] *See* RESTATEMENT (THIRD) OF AGENCY § 2.02(1).
[262] *See* Rogers Decl. Ex. 19, at 201:14-202:18. [App. 00386]
[263] *See* Def.'s Second Am. Countercl. ¶ 129, ECF No. 238-1(describing LaPierre's letter); *see also* App. In Supp. of Wayne LaPierre's Mot. to Dismiss Second Am. Countercl. at 19, ECF No. 251 (copy of letter).
[264] *See* Def's Second Am. Countercl. ¶ 129, ECF No. 238-1.
[265] *See* Deposition transcript of Millie Hallow, dated January 10, 2020, Rogers Decl. Ex. 81, at 176:05-181:19 (Hallow was in a hotel suite with "maybe half a dozen or more board members," as well was LaPierre, when North called, and

of the same "extortion narrative" to multiple media outlets.[266]  However, even to the extent that LaPierre authorized or participated in this media campaign, he did so with the acquiescence and (at times) the active participation of the NRA Board.[267]

Where, as here, an executive has broad authority to communicate on relevant topics, his allegedly-defamatory statements occur within the scope of his employment—even if the statements contravene company policy.[268]  This is especially true where the allegedly defamatory communication "pertains to [the employer's] business" and is signed by the executive in his official capacity.[269]  "Conclusory statements" that a speaker acted outside the scope of his employment cannot defeat a summary judgment motion.[270]  AMc offers nothing more, so its alleged conspiracy-to-defame among the NRA and its chief executive officer fails.

Just as AMc cannot prove a conspiracy between the NRA and its counsel or the NRA and its chief executive officer, it cannot prove a conspiracy between the NRA and Powell—who, at relevant times, served as the NRA's Executive Director of General Operations and as Chief of Staff.[271]  The record discloses no involvement by Powell in the October 11, 2018, meeting where the NRA's allegedly fraudulent promises were made.  Nor is there a shred of evidence linking Powell to the FRA Record Examination.  With respect to defamation, AMc alleges (but cannot prove) the Powell played a role drafting LaPierre's April 25, 2019, Board letter.[272]  But the letter

---

took the call with Carolyn Meadows); *id.* at 170:16-173:01 (describing same hotel-suite setting and receipt of same phone call). [App. 02348]
[266] *See* Def.'s Second Am. Countercl. ¶¶ 129-135, ECF No. 238-1.
[267] *See* Def.'s Second Am. Countercl. ¶ 133, ECF No. 238-1 (complaining that "[o]ther NRA Board members are further perpetuating the defamation" and citing a statement by director Marion Hammer to the *Wall Street Journal* regarding AMc's "failed coup attempt").
[268] *See, e.g.*, *Frank B. Hall & Co. v. Buck*, 678 S.W.2d 612, 627 (Tex. App. 1984), *writ refused NRE* (Dec. 12, 1984).
[269] *See, e.g.*, *DiMucci v. Pennsylvania Convention Ctr. Auth.*, No. CIV.A. 08-4810, 2009 WL 3073827, at *6 (E.D. Pa. Sept. 24, 2009).
[270] *See, e.g.*, *B & A Marine Co. v. Am. Foreign Shipping Co.*, 831 F. Supp. 91, 94 (E.D.N.Y. 1993), *aff'd*, 23 F.3d 709 (2d Cir. 1994) (government officials acted within the scope of their employment when they drafted an allegedly libelous letter, rendering them immune from suit).
[271] *See* Rogers Decl. Ex. 83, at 89:16-19. [App. 02579]
[272] *See* Def.'s Second Am. Countercl. ¶ 129, ECF No. 238-1.

45

was unambiguously signed by Powell's boss, LaPierre, in his capacity as the NRA's chief executive, and subsequent communications with the media were undertaken with the acquiescence and participation of the NRA Board—clearly within the scope of Powell's employment. Accordingly, AMc cannot proceed to trial on its remaining civil conspiracy claims.

### D.      The NRA is Entitled to Summary Judgment on AMc's Declaratory Judgment Claim.

Count Seven of the SAC seeks a declaration that (i) "the NRA and its counsel have waived and/or are estopped from claiming that the confidentiality provision of the Services Agreement applies only to AMc" and/or (ii) "the confidentiality provision of the Services Agreement is unconscionable" under Virginia law.[273]   At the pleading stage, the Court declined to dismiss the claim on the ground that "factual questions remain[ed] as to whether the NRA waived its rights under the confidentiality clause or is otherwise estopped from using it as a 'sword' and a shield.'"[274]   Now, the record firmly resolves both sets of questions in the NRA's favor.

#### 1.      The NRA Never Relinquished Its Confidentiality Rights Under the Services Agreement.

"Waiver is the intentional relinquishment of a known right, with both knowledge of its existence and an intention to relinquish it."[275]   Waiver requires proof that the party had "(1) knowledge of the facts basic to the exercise of the right, and (2) the intent to relinquish the right."[276]   Waiver is not established by mere delay in asserting a right, or by consideration of alternatives;[277]

---

[273] *See* Def.'s Second Am. Countercl. ¶¶ 241, 243, ECF No. 238-1.

[274] Order at 55, ECF 329.

[275] *Creteau v. Phoenix Assur. Co. of N. Y.*, 202 Va. 641, 644, 119 S.E.2d 336, 339 (1961).

[276] *LBCMT 2007-C3 Seminole Trail, LLC v. Sheppard*, No. 3:12CV00025, 2013 WL 3009319, at *5 (W.D. Va. June 17, 2013) (internal citations and quotation marks omitted) (granting summary judgment in plaintiff's favor, where defendant asserting waiver mustered no summary judgment evidence that plaintiff relinquished its right).

[277] For example, courts have repeatedly held that a mortgagee's postponement of a foreclosure sale and/or consideration of a mortgagor's loan modification request does not manifest an intent to waive the right to foreclose. *See, e.g.*, *Watson v. Citimortgage, Inc.*, 530 F. App'x 322, 326 (5th Cir. 2013); *Tavernini v. Bank of America, N.A.*, No. 4:12–CV–420, 2014 WL 1290063, at *7 (E.D. Tex. Mar.31, 2014) (same); *Richardson v. Wells Fargo Bank*, N.A., 873 F.Supp.2d 800, 810 (N.D. Tex. 2012).

rather, waiver must be "unequivocally manifested."[278]   A party does not waive its confidentiality or nondisclosure rights by initiating legal proceedings that implicate confidential materials.[279]

In this case, AMc can muster no evidence that the NRA "unequivocally manifested" a waiver of is contractual right to restrain a now-disloyal vendor from disclosing, with impunity, Confidential Information (as defined in the Services Agreement) that AMc had acquired over a decades-long relationship steeped in trust and confidence.  It can point to no writing, no alleged verbal remarks, and no testimony.  Indeed, the NRA fought vigorously to enforce its rights under Services Agreement § IV.  It sent repeated letters to AMc warning against further disclosure of its Confidential Information[280] and engaged in multiple court battles to protect its Confidential Information.  For example, in the Virginia litigation that overlaps with and preceded this lawsuit, the NRA filed an emergency motion for relief upon learning that an AMc employee had misappropriated and copied a confidential PowerPoint presentation without the NRA's consent.[281] And when the New York State Office of the Attorney General moved to compel production of documents by AMc, the NRA resisted, citing Services Agreement § IV along with attorney-client privilege concerns.[282]  Importantly, even AMc's Rule 30(b)(6) deponent admitted that that the "Confidential Section [of the Services Agreement] is exactly what it is, it's confidential"—

---

[278] *Bassknight v. Deutsche Bank Nat. Tr. Co*., No. 3:12-CV-1412-M BF, 2014 WL 6769085, at *10 (N.D. Tex. Dec. 1, 2014), *subsequently aff'd*, 611 F. App'x 222 (5th Cir. 2015).

[279] *See, e.g.*, *Jepson, Inc. v. Makita Elec. Works*, Ltd., 143 F.R.D. 657, 662 (N.D. Ill. 1992) (litigant did not waive confidentiality provisions of protective order by initiating legal proceedings that implicated the contents of a protected deposition), *rev'd on other grounds*, 30 F.3d 854 (7th Cir. 1994).

[280] Declaration of John C. Frazer, dated November 29, 2021, at Ex. A, B, Rogers Decl. Ex. 95.

[281] Pl.'s Emerg. Mot. for Stay, *National Rifle Association v. Ackerman McQueen, et al*, Civil Case No. CL19001757 (Va. Cir. Ct. April 12, 2019)

[282] *See* Mem. of Law in Opp. to Attorney General's Special Proceeding, *People of the State of New York by Letitia James v. Ackerman McQueen and National Rifle Association of America,* Index No. 451825/2019 (Sup. Ct., New York County 2019). This matter is now on appeal.

articulating no waiver, exception, or contrary understanding.[283]  There is no summary judgment

evidence to the contrary, so AMc's declaratory judgment claim with respect to waiver fails.

### 2. Neither the Asymmetric Nature of the Confidentiality Clause, Nor Any Other Fact in the Record, Estops the NRA from Enforcing the Clause According To Its Terms.

Estoppel arises where a party voluntarily relinquishes a known right and the waiver "is

reinforced by reliance."[284]   The doctrine's requirements are "specific and rigorous."[285] "The

elements necessary to establish equitable estoppel are (1) a representation, (2) reliance, (3) change

of position, and (4) detriment, and the party who relies upon estoppel must prove each element by

clear, precise, and unequivocal evidence."[286]

Here, AMc cannot raise a triable issue as to any of the foregoing elements.  The NRA never

represented that it was waiving, or declined to enforce, its rights under Services Agreement § IV.

And AMc certainly cannot show that it changed its position to rely (detrimentally or otherwise) on

the NRA's assurance that its confidential documents and information could be leaked without

consequence.  Although principles of equitable estoppel are sometimes invoked against parties

who wield contractual rights "as both a sword and a shield," courts employ this logic in situations

where the party against whom the "shield" is raised, or the "sword" is wielded, did not negotiate

or sign the contract.[287] Here, the NRA entered into a contract for public relations services that, by

its express terms, equipped the NRA with the unilateral right to shield its confidential information

---

[283] *See* Rogers Decl. Ex. 84, at 58:21-59:09. [App. 02733]
[284] Restatement (Second) of Contracts § 84 (1981).
[285] *Anderson v. Cox*, 977 F.Supp. 413, 417 (W.D. Va. 1997).
[286] *Princess Anne Hills Civil League v. Susan Constant Real Estate Trust*, 243 Va. 53, 413 S.E.2d 599, 603 (Va. 1992).
[287] *See, e.g.*, *Interested Underwriters at Lloyd's v. M/T San Sebastian*, 508 F. Supp. 2d 1243, 1253 (N.D. Ga. 2007) (explaining that "equitable estoppel prevents contract ***signatories*** from using contracts as both a sword and shield ***against a nonsignatory***" and holding that because there was no such asymmetry at bar, "Equitable estoppel simply does not apply in this situation.); (emphasis added) *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 361 (5th Cir. 2003) (discussing circuit courts' application of the equitable estoppel doctrine in cases where nonsignatories to a contract seek to invoke, or avoid, the contract's arbitration clause).  The NRA is aware of no case in which equitable "sword and shield" principles were invoked to prevent a contract signatory from enforcing its own rights against its counterparty, especially absent a waiver.

and prevent its vendor from disseminating its secrets.   The construction of the Services Agreement apparently urged by Ackerman—whereby the NRA would forfeit the right to publicly discuss its own affairs if it restrained its vendors from discussing NRA affairs without NRA consent—would be "absurd," and thus disfavored by Virginia courts.[288]

### 3.     The Asymmetric Nature of the Services Agreement's Confidentiality Provisions Does Not Render Those Provisions Unconscionable.

Finally, AMc seeks a declaratory judgment that "the confidentiality provision of the Services Agreement is unconscionable under Code of Virginia § 8.2-302 as interpreted by the NRA."[289]   The referenced Virginia statute provides that a court may refuse to enforce, or limit enforcement of, a contract or clause which it finds *"as a matter of law* . . . to have been unconscionable at the time it was made[.]"[290]   AMc complains to the Court that the NRA "take[s] the position that the confidentiality provision is one-sided and binding only upon [AMc]"—which is correct, and consistent with the provision's text.[291]   Historically, contracts have only been deemed unconscionable where "no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other."[292]   Unconscionability may alternatively be found with respect to specific contract terms—such as "unreasonably large liquidated damages"—not found here.[293]   Courts routinely reject arguments that contract provisions are substantively unconscionable merely for conferring an asymmetric contractual right on one party, but not the other.[294]   There is similarly no unconscionability here.

---

[288] *See, e.g.*, *Goldkress Corp. v. Orthopaedic & Spine Ctr.*, No. 0670-16-1, 2016 WL 7209848, at *16 (Va. Ct. App. Dec. 13, 2016).

[289] Def.'s Second Am. Countercl. ¶ 243, ECF No. 238-1.

[290] Va. Code Ann. § 8.2-302 (1964) (West) (emphasis added).

[291] Def.'s Second Am. Countercl. ¶ 242, ECF No. 238-1; *see also* Rogers Decl. Ex. 1, at § IV.  [App. 00014]

[292] *See* Restatement (Second) of Contracts § 208 (1981) (internal citations and quotation marks omitted).

[293] *See* Restatement (Second) of Contracts § 208 cmt. e (1981).

[294] *See, e.g.*, *Serpa v. Cal Sur. Investigations, Inc*., 215 Cal. App 4th 695, 708 (Ct. App. 2013) (unilateral modification provision not substantively unconscionable); *New Jersey Bldg. Laborers Statewide Benefits Fund v. Am. Coring & Supply*, 341 Fed. Appx. 816, 821 n.10 (3rd Cir. 2009) (where a sophisticated party consented to unilateral selection of

49

## VI.  <u>PRAYER FOR RELIEF</u>

For the foregoing reasons, the Court should dismiss Counts One, Five, Six, and Seven of Ackerman's Second Amended Counterclaim, and grant the NRA any and all such other further relief at law or in equity to which it may be justly entitled.

Dated: November 29th, 2021                    Respectfully submitted,

*/s/ Cecelia L. Fanelli*
Cecelia L. Fanelli
*Pro Hac Vice*
clf@brewerattorneys.com
Sarah B. Rogers
New York Bar No. 4755252
sbr@brewerattorneys.com
Philip J. Furia
*Pro Hac Vice*
pjf@brewerattorneys.com
Alessandra P. Allegretto
Texas Bar No. 24109575
apa@brewerattorneys.com
**BREWER ATTORNEYS AND COUNSELORS**
1717 Main Street, Suite 5900
Dallas, Texas 75201

**ATTORNEYS FOR PLAINTIFF/COUNTER-DEFENDANT NATIONAL RIFLE ASSOCIATION OF AMERICA**

---

an arbitrator, the agreement was not unconscionable); *Doe v. SexSearch.com*, 551 F.3d 412, 419 (6th Cir. 2008) (unilateral cancellation right not unconscionable).

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing document was electronically served via the Court's electronic case filing system upon all counsel of record on this 29th day of November 2021.

*/s/ Cecelia L. Fanelli*
Cecelia L. Fanelli