**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| *Plaintiff and Counter-Defendant*, | § § § | |
| **v.** | § § | Case No. 3:19-cv-02074-G |
| **ACKERMAN MCQUEEN, INC.,** | § § § | |
| *Defendant and Counter-Plaintiff*, | § § § | |
| **and** | § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, and MELANIE MONTGOMERY,** | § § § § | |
| *Defendants*. | § § | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO**
**NRA'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.   INTRODUCTION .................................................................................................1

II.  SUMMARY JUDGMENT EVIDENCE ...........................................................3

III. FACTUAL BACKGROUND ..............................................................................3

    A.   The Parties' Decades-Long Contractual Relationship. .............................3

    B.   The NRA/AMc Decades-Long Relationship Comes to an End. ...............4

IV.  APPLICABLE LEGAL STANDARDS ...........................................................11

V.   ARGUMENT AND AUTHORITIES ...............................................................11

    A.   NRA's Motion as to AMc's Breach of Contract Claims Fails ...............11

        1.   The NRA has failed to show that AMc breached the Services
             Agreement. ....................................................................................11

        2.   The NRA is responsible for Third-Party NRA Contracts .........20

        3.   The NRA Breached the Indemnification Provision ...................26

        4.   The NRA's Motion Fails as to AMc's Post-April 2019 Invoices..............28

        5.   The NRA Motion Fails as to the $3MM Letter of Credit .........32

        6.   The NRA's Motion Fails as to the Termination Provision .......33

        7.   The NRA's Motion Fails as to AMc's Claim for Interest .........34

    B.   A Genuine Dispute of Material Fact Exists as to AMc's Fraud Claim ................34

        1.   Fact Questions Exist Regarding LaPierre's Material
             Misrepresentations. ......................................................................35

        2.   Fact Questions Exist as to Whether LaPierre Intended to Deceive
             AMc. .............................................................................................37

        3.   The NRA Owed a Duty to Disclose..........................................38

        4.   AMc's Reliance on LaPierre's 2018 Representations was Justified. ........40

    C.   AMc's Conspiracy Claims Survives Summary Judgment....................42

1.   Brewer's Actions Defaming and Defrauding AMc Were Independent from His Representation of the NRA—thus, Brewer is a Cognizable Conspirator..........................................................42

2.   LaPierre and Powell's Actions to Defraud and Defame AMc Were Undertaken for Personal Purposes Outside the Scope of Their Employment....................................................................45

D.   Fact Questions Exist on AMc's Declaratory Judgment Claim ............................47

1.   The NRA Waived its Right to Enforce the Confidentiality Clause. ..........48

2.   The NRA is Estopped From Enforcing the Confidentiality Clause..........49

3.   Alternatively, the Confidentiality Provisions of the Services Agreement Are Unconscionable Under Virginia Law.............................50

VI.   PRAYER................................................................................................................50

## TABLE OF AUTHORITIES

**Cases**

*Ameristar Jet Charter, Inc. v. Signal Charter Composites, Inc.*, No. 3:98-CV-1360-M, 2002 U.S. Dist. LEXIS 7670 (N.D. Tex. Apr. 30, 2002) ............................................................... 45

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................. 11

*Arbelaez v. Just Brakes Corp.*, 149 S.W.3d 717 (Tex. App.—Austin 2004, no pet.) ................. 45

*Bernsen v. Innovative Legal Mtkg., LLC*, 885 F. Supp. 2d 830 (E.D. Va. 2012) .................. 47, 48

Boudreaux v. Swift Transp. Co., Inc., 402 F.3d 536 (5th Cir. 2005) ........................................... 11

*Bourland v. State*, 528 S.W.2d 350 (Tex. App.—Austin 1975, writ ref'd n.r.e.) ........................ 43

*Briner v. City of Ontario*, No. 1:07CV129, 2010 U.S. Dist. LEXIS 107348 (N.D. Ohio Oct. 7, 2010) ......................................................................................................................... 45

*Buschi v. Kirven*, 775 F.2d 1240 (4th Cir. 1985) .......................................................... 45

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ............................................................. 11

*Chi. Reg'l Council of Carpenters Pension Fund v. Carlson Constructors Corp.*, No. 17-cv-04242, 2021 U.S. Dist. LEXIS 62640 (N.D. Ill. Mar. 31, 2021) ............................................... 48

*Coffel v. Stryker Corp.*, 284 F.3d 625 (5th Cir. 2002) .................................................... 35

*Collins v. Bauer*, 2012 U.S. Dist. LEXIS 17769 (N.D. Tex. Jan. 23, 2012) ............................... 45

*Derby v. Derby*, 378 S.E.2d 74 (Va. Ct. App. 1989) ...................................................... 50

*Dussouy v. Gulf Cost Inv. Corp.*, 660 F.2d 594 (5th Cir. 1981) ............................................. 45

*Ferrell v. Harris Ventures, Inc.*, 812 F. Supp. 2d 741 (E.D. Va. 2011) ..................................... 47

*G.H. Bass & Co. v. Dalsan Properties-Abilene*, 885 S.W.2d 572 (Tex. App.—Dallas, 1994, no pet.) ............................................................................................................................ 48

*Graham v. Pactiv Corp. Benefits Comm.*, 301 F. Supp. 2d 482 (E.D. Va. 2004) ......................... 48

*H&B Equip. Co. v. Int'l Harvester Co.*, 577 F.2d 239 (5th Cir. 1978) ...................................... 45

*H.C. Oil & Gas Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 3:96-CV-2923-D, 2005 U.S. Dist. LEXIS 1508 (N.D. Tex. Feb. 2, 2005) ........................................................... 35

*Hamilton v. Segue Software, Inc.*, 232 F.3d 473 (5th Cir. 2000) .............................................. 38

*Health v. LifeCell Corp.*, No. 2:15cv461, 2016 U.S. Dist. LEXIS 199217 (E.D. Va. 2016) . 22, 23

*Heffernan v. Hunter*, 189 F.3d 405 (3d Cir. 1999) ....................................................... 43

*HEI Res. East OMG v. Evans*, 413 Fed. App'x 712 (5th Cir. 2011) ............................. 35

*Hennigan v. Harris County*, 593 S.W.2d 380 (Tex. App.—Waco, 1979, no writ) ...................... 43

*Intelligent Dig. Sys., LLC v. Beazley Ins. Co.*, 906 F. Supp. 2d 80 (E.D.N.Y. 2012) .................. 48

*JPMorgan Chase, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648 (Tex. 2018) ............... 35, 40

*Likover v. Sunflower Terrace II, Ltd.*, 696 S.W.2d 468 (Tex. App.—Houston [1st Dist.] 1985, no writ) ....................................................................................................................... 43

*Majano v. United States*, 469 F.3d 138 (D.C. Cir. 2006) ............................................. 45

*Maurer v. Independence Town*, 870 F.3d 380, 384 (5th Cir. 2017) .............................. 11

*Maxey v. Smith*, No. 1:93cv122-D-D, 1996 U.S. Dist. LEXIS 21285 (N.D. Miss. Feb. 12, 1996) ....................................................................................................................... 46

*McKesson Med.–Surgical, Inc. v. Flower Orthopedics Corp.*, No. 3:17cv631, 2018 U.S. Dist. LEXIS 26127 (E.D. Va. Feb. 15, 2018) ..................................................................... 48

*Miller v. Stonehenge/Fasa-Texas, JDC, L.P.*, 993. F. Supp. 461 (N.D. Tex. 1998) .................. 43

*Muhammad v. Westinghouse Elec. Co. LLC*, No. 3:12-cv-03298-JFA, 2013 U.S. Dist. LEXIS 140581 (D.S.C. Sept. 30, 2013) ............................................................................. 46

*Patel v. Tex. Tech Univ.*, 941 F.3d 743 (5th Cir. 2019) ............................................... 11

*Perry Eng'g Co. v. AT&T Comm'cns, Inc.*, No. 92-2050, 1993 U.S. App. LEXIS 17432 (4th Cir. July 13, 1993) .......................................................................................................... 47

*Princess Anne Hills Civic League v. Susan Constant Real Estate Trust*, 413 S.E.2d 599 (Va. 1992) .......................................................................................................................... 48

*Rimdale Ltd. v. Hubbard Enters., Inc.*, 939 F.2d 138 (5th Cir. 2004) ......................... 35

*Sanders v. Long Island Newsday*, CV 09-2392 (JFB) (SIL), 2015 U.S. Dist. LEXIS 124601 (E.D.N.Y. July 14, 2015) ..................................................................................... 45

Scott v. Harris, 550 U.S. 372 (2007) ............................................................................ 11

*Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432 (Tex. 1986) .................................. 35

*Stanley's Cafeteria, Inc. v. Abramson*, 306 S.E. 2d 870 (Va. 1983) ............................ 19

*Starks v. Chuhak & Tecson, P.C.*, NO. 17-62366-CIV-COHN/SELTZER, 2019 U.S. Dist. LEXIS 10043 (S.D. Fla. Jan. 18, 2019) ..................................................................... 43

Swann v. City of Dallas, 922 F. Supp. 1184 (N.D. Tex. 1996) ................................................... 11

*Tandberg, Inc. v. Advanced Media Design, Inc.*, No. 1:09cv863, 2009 U.S. Dist. LEXIS 109185 (E.D. Va. Nov. 23, 2009). ...................................................................................................... 49

*Tex. Capital Bank v. Zeidman*, 779 Fed. App'x 211 (5th Cir. 2019) .......................................... 42

*Thornton v. Cappo Mgmt. V., Inc.*, No. 3:04CV819, 2005 U.S. Dist. LEXIS 10202 (E.D. Va. Mar. 31, 2005) ......................................................................................................................... 50

Tiblier v. Dlabal, 743 F.3d 1004 (5th Cir. 2014) ....................................................................... 11

*Tomlinson v. Clem (In re Clem)*. 583 B.R. 329 (Bankr. N.D. Tex. 2017) ............................ 38, 40

*Transtexas Gas Corp. v. Stanley*, 881 F. Supp. 268, 270–71 (S.D. Tex. 1994) .......................... 43

*Va. Polytechnic Inst. & State Univ. v. Interactive Return Serv.*, 595 S.E.2d 1 (Va. 2004) .... 19, 47

*Weiland v. Bennie's Mobile Home Sales, Inc.*, 5 Va. Cir. 72 (Va. Cir. Ct. 1983) ....................... 50

*Wyoming v. Oklahoma*, 502 U.S. 437 (1992) ............................................................................. 11

**Rules**

Fed. R. Civ. P. 56 ....................................................................................................................... 11

TO THE HONORABLE A. JOE FISH:

Defendant/Counter-Plaintiff Ackerman McQueen, Inc. ("*AMc*"), Defendants Mercury Group, Inc. ("*Mercury*"), Henry Martin ("*Martin*"), William Winkler ("*Winkler*"), and Melanie Montgomery ("*Montgomery*") (collectively, "*Defendants*"), file this *Brief in Support of Response to National Rifle Association of America's ("NRA") Motion for Partial Summary Judgment* ("*Response*" in Opposition to the "*Motion*") pursuant to FED. R. CIV. P. 56.

## I.    INTRODUCTION

For nearly four decades, AMc served as the NRA's advertising and public-relations agency, helping the gun rights organization navigate troubled political and societal waters as its principal communication strategist and crisis manager.  The relationship was prosperous and mutually beneficial as AMc helped the NRA become one of the most socially and politically influential civil rights organizations in the country.

In 2018, the NRA discovered that the New York Attorney General's ("*NYAG*") investigation into the NRA could jeopardize the NRA's non-profit status, or its very existence, arising from the financial mismanagement and illegal acts of NRA executives, including and especially its Executive Vice President, Wayne LaPierre ("*LaPierre*").  To deflect attention from the NRA and, more importantly, to keep LaPierre in power (and out of jail), NRA executives and its litigation counsel—attorney William A. Brewer III ("*Brewer*")—secretly developed a plan to scapegoat AMc for the NRA's own bad acts.

Unbeknownst to AMc, the NRA's contrived plan began in at least September 2018 when the NRA made the decision to file a lawsuit against AMc for failing to comply with audits that had not yet even taken place.  Around this same time and while Angus McQueen was dying of cancer, AMc learned that Brewer (Angus' son-in-law) was making outlandish threats to AMc about

potential racketeering charges and the FBI raiding AMc's offices. Despite these outrageous threats, throughout the Fall 2018 and Spring 2019, AMc agreed to allow the NRA to engage in three separate audits of AMc's books and records.  Each time, AMc fully complied with the NRA's requests to examine its books and record.

On October 11, 2018, LaPierre, Craig Spray ("*Spray*") (the NRA's then Chief Financial Officer and Treasurer), and numerous AMc executives held a summit meeting to discuss various topics, including the current and 2019 budgets, Brewer's involvement with AMc, and Josh Powell ("*Powell*")—LaPierre's Chief of Staff.  AMc was prepared to resign the business if it did not get assurances that it would no longer have to deal with Brewer—and his firm's outlandish threats—or Powell—and his harassment of AMc employees.  In response, LaPierre repeatedly assured AMc that it would no longer have to deal with Brewer or his firm, and to stick with him.  However, AMc did not know that the NRA, LaPierre, Powell, and Brewer had already set out on a crusade to scapegoat AMc with litigation that culminated in the filing of the NRA's first lawsuit in April 2019.  With litigation then pending, the parties nearly 40 years officially terminated in June 2019.  The NRA then refused to pay AMc millions of dollars for work that it requested and authorized (even after the audits it now claims AMc did not comply with), and left AMc on the hook for millions of dollars of expenses to which AMc is entitled to reimbursement.

Now, through its Motion, the NRA seeks to avoid any accountability for its wrongful actions by seeking relief that has no basis in law or fact.  Indeed, the NRA's Motion is nothing more than another hyperbolic pleading tailored to the court of public opinion that ignores the years of documents and testimony that has directly contradicted and rebutted the NRA's salacious claims against Defendants, and further confirmed AMc's right to recover for the damage the NRA has inflicted upon it.  AMc respectfully requests that the Court deny the NRA's Motion in its entirety.

## II.      SUMMARY JUDGMENT EVIDENCE

In support of its Response, Defendants submit the summary judgment evidence attached to Defendants' Appendix that is being filed contemporaneously with this Response.  Defendants also refer and incorporate by reference the evidence submitted with their Appendix in Support of Defendant's Motion for Partial Summary Judgment (the "*AMc MSJ*") (ECF 417, 419, 419-1).

## III.      FACTUAL BACKGROUND

### A.  The Parties' Decades-Long Contractual Relationship.

Beginning in 1981, AMc provided advertising, marketing, media, and numerous other services to the NRA. During this multi-decade relationship, the parties developed working arrangements and a course of dealing, such as negotiating annual budgets covering a variety of tasks.  The NRA, through its Executive Vice President, LaPierre and its longtime Treasurer and Chief Financial Officer, Woody Phillips ("*Phillips*"), led and oversaw the relationship, including operating with full knowledge of the budgeted line items.[1]  As the parties initiated projects, invoices would issue and be approved by Phillips and LaPierre, payment would follow without complaint, and periodic annual audits of AMc's books and records raised no concerns.[2]

Over the years, the parties formalized their working arrangements, embodying their protocols in a series of agreements.  The services agreement at issue was executed in April 2017[3] ("*Services Agreement*") and amended in 2018 (the "*2018 Amendment*").[4]

Notably, and intentionally, the NRA desired the Services Agreement to be silent on certain issues, such as the specific requirements for the contents of AMc's invoices or the backup to be

---

[1] ECF 419-1, Ex. 21, Montgomery Depo. at 13:17-18:14 (APP 1769-70); ECF 419-1, Ex. 3, Winkler Hr'g Trans., at 91:17-25 (APP 169); ECF 419-1, Ex. 29 Phillips Depo., at 85:16-86:11 (APP 1963).
[2] ECF 419-1, Ex. 3, Winkler Hr'g Trans., at 92:10-98:19 (APP 170-76); ECF 419-1, Ex. 29, Phillips Depo., at 122:24-123:7 (APP 1972).
[3] *See* ECF 419-1, Ex. 35-A, Services Agreement (APP 2377).
[4] *See* ECF 419-1, Ex. 35-B, 2018 Amendment (APP 2388).

provided. [5]   AMc's invoices contained minimal detail due to the NRA's concerns for confidentiality and the possibility of the NRA's accounting department leaking invoices to the media. [6]   For decades, the NRA received—and paid—identically styled invoices for AMc's services and **_never_** requested any changes to AMc's invoicing method.[7]   As the NRA admits, AMc adequately addressed all invoice questions and requests for information related to its billing.[8]

The Services Agreement contained other key provisions, including the NRA's obligation to compensate AMc for expenses and fees that it had agreed to incur on behalf of the NRA.[9]   The 2018 Amendment contained two critical provisions designed to protect AMc in the event of untimely paid invoices or termination of the Services Agreement.   *First*, the NRA was required to obtain and post a $3,000,000 letter of credit for AMc's benefit to secure payment of outstanding invoices over 30 days old.[10]   *Second*, certain contracts entered into between AMc and third parties at the direction of the NRA, including contracts with NRATV talent Col. Oliver North ("**_North_**") and Dana Loesch (referred to as the "**_AMc-Third Party NRA Contracts_**"), obligated the NRA to pay the "compensation payable" under the AMc-Third Party NRA Contracts.[11]   It is undisputed the NRA has refused to honor these commitments.[12]

### B. The NRA/AMc Decades-Long Relationship Comes to an End.

The business relationship between the NRA and AMc began to unravel in mid-2018 following the initiation of the NYAG's investigation into the NRA and the NRA's retention of

---

[5] ECF 419-1, Ex. 29, Phillips Depo., at 60:18-23 (APP 1956).
[6] *Id.* at 139:18—140:19 (APP 1976).
[7] *Id.* at 143:3-6 (APP 1977) (Prior to 2018, not aware of anyone at the NRA asking AMc to change or modify how they invoice the NRA), 137:17-22 (APP 1976) (testifying that if the NRA paid an AMc invoice, that meant the NRA was comfortable with the amount of detail and backup provided by AMc to support the invoice.).
[8] *Id.* at 64:21-25 (APP 1957).
[9] *See* ECF 419-1, Ex. 35-A, Services Agreement § XI (Termination Provision) (APP 2385-87).
[10] ECF 419-1, Ex. 35-B, 2018 Amendment at ¶ 2 (APP 2388).
[11] *Id.* at ¶ 3 (APP 2388); ECF 419-1, Ex. 29, Phillips Depo., at 186:13-20 (APP 1988).
[12] ECF 419-1, Ex. 34-E, NRA Obj. & Resp. to AMc First Set of Requests for Admission ("**_RFA_**") at 20, No. 68, 70-77 (APP 2340-42).

Brewer and his law firm, Brewer Attorneys & Counselors ("**Brewer Firm**"). Brewer is the brother-in-law of AMc's current CEO, Revan McQueen, and the son-in-law of the late CEO Angus McQueen, with whom Brewer had a well-known, decades-long history of animosity.[13] As political pressure from the NYAG mounted, Brewer—at LaPierre's request—pegged AMc and his dying father-in law and his eponymous firm, as the perfect fall guys for the NRA's financial mismanagement.[14] In fact, throughout the summer and fall 2018, Brewer specifically threatened AMc with bogus racketeering charges, raids of AMc's offices by the FBI, and imprisonment.[15]

Unbeknownst to AMc, LaPierre, Brewer, and the NRA were also actively planning litigation against AMc for non-compliance with audits that had not even taken place. In April 2019 correspondence, LaPierre detailed how the NRA's litigation had become crystal clear *before* the September 8-9, 2018 NRA Board meetings:

> [t]he NRA and I have a ***common legal interests in the litigation against Ackerman McQueen which crystallized before the September [2018] Board meeting*** and colored the discussion that day.[16]

While Brewer was busy making baseless threats to AMc, and LaPierre, Brewer, and the NRA were secretly planning litigation against AMc, the NRA began requesting audits of AMc's books and records. Over the course of several weeks, Phillips and William Winkler ("**Winkler**"), AMc's CFO, exchanged numerous letters regarding the audit.[17] These letters were odd for a number of reasons, including that Phillips was asking for documents or information that he knew did not exist.[18] When confronted by Winkler, Phillips admitted that he did not prepare the letters,

---

[13] *See, e.g.*, ECF 419-1, Ex. 10, Hart Depo., at 214:1-8, 215:3-10 (APP 822).
[14] *See, e.g.*, Ex. 4, McQueen Decl., dated June 3, 2020 (APP 58-77).
[15] *See, e.g.* Ex. 7, Makris Decl. at ¶ 5 (APP 104-05).
[16] Ex. 21, Apr. 22, 2019 Letter from W. LaPierre to M. Dycio (APP 240) (emphasis added); Ex. 31, Excerpts from Minutes of the Meeting of the Board of Directors for the Sep. 8-9, 2018 Board Meeting (APP 871-86).
[17] Ex. 1, W. Winkler Decl., dated Dec. 20, 2021, at ¶¶ 3–9 (APP 2-5).
[18] *Id*. at ¶ 8 (APP 4).

and most of them were sent out without his knowledge or approval.[19]

Despite the ongoing confusion, AMc agreed to permit the NRA to conduct a series of audits beginning on September 18-19, 2018—ten days after LaPierre and Brewer solidified their plan to sue AMc.  The first audit was conducted by the Brewer Firm (the "*September 2018 Brewer Audit*").[20]  Susan Dillon ("*Dillon*"), a seasoned veteran of the Brewer Firm, spearheaded the audit. This audit was unusual for a variety of reasons, most notably because it immediately became apparent that the Brewer Firm had no clue what they were looking for (or at), and provided conflicting requests.[21]  Importantly, AMc fully complied with the audit and provided the Brewer Firm with all of the information that it requested.[22]

Throughout September and October 2018, the letter-writing campaign continued, and there became an increasing sense that the parties' long-standing relationship was now changing.  As a result, LaPierre, Spray, and numerous AMc executives held an October 11, 2018 meeting to discuss the parties' current and future relationship (the "*October 11 Meeting*").[23]  The main purpose of the meeting was to discuss AMc's continued involvement with Brewer, his firm, Powell, and the budget.[24]

At the outset of the October 11 Meeting, AMc, with Angus taking the lead, talked to LaPierre about the abusive and harassing threats he had received from Brewer in June and the letter writing campaign from Brewer falsely accusing AMc of withholding documents.[25]  Angus told LaPierre that if he thought the claims by Brewer were true, then AMc and the NRA's

---

[19] ECF 419-1, Ex. 29, Phillips Depo. at 150:14-151:14 (APP 1979), 153:7-16 (APP 1980), 158:3-22 (APP 1981), 160:6-161:22 (APP 1981-82); Ex. 1, W. Winkler Decl., dated Dec. 20, 2021, at ¶ 8 [APP 4].

[20] ECF 419-1, Ex. 3, Winkler Hr'g Trans., at 94:14-95:20 (APP 172-73).

[21] Ex. 1, W. Winkler Decl., dated Dec. 20, 2021, at ¶ 12–15 (APP 5-7).

[22] *Id.* at ¶¶ 20-21 (APP 9).

[23] *See, e.g.*, Ex. 3, McQueen Decl., dated Mar. 30, 2021, at ¶¶ 24–25 (APP 51-52).

[24] *See id.* at ¶ 24 (APP 51-52); Ex. 5, W. Winkler Decl., dated June 3, 2020, at ¶ 11 (APP 87-88).

[25] Ex. 5, W. Winkler Decl., dated June 3, 2020, at ¶ 11 (APP 87-88).

relationship should cease because they would not be able to trust each other.[26] In fact, prior to this meeting, AMc prepared resignation letters to provide to LaPierre if he was unwilling to remove Brewer and his firm from dealing with AMc any longer.[27]

In response, LaPierre repeatedly praised AMc's work and pled with AMc to "stick with him."[28]  LaPierre stated that the letter-writing campaign with Brewer and the Brewer Firm would stop and that AMc would no longer have to deal with Brewer, the Brewer Firm, or Powell.[29] LaPierre explained that Brewer would be gone in 30 to 60 days because Brewer was going to have everything resolved with the NYAG.[30]

At the end of the meeting, LaPierre looked around to each AMc representative and asked them whether they would stick with him if he did in fact make sure that Brewer, the Brewer Firm, and Powell were no longer involved with AMc.[31] Based on LaPierre's representations, AMc agreed to maintain the business relationship, agreed to the revised fourth quarter 2018 budget and the 2019 budget, and re-invested in resources to allow AMc to continue to provide services to the NRA.[32] Over the coming days, LaPierre continued to plead with AMc to stick with him and assured them that they would no longer have to deal with Brewer.[33] Of course AMc had no idea that

---

[26] *Id.* [APP 87-88].
[27] Ex. 15, Draft Termination of Services Agreement Letters [APP 203-07]; Ex. 3, McQueen Decl., dated Mar. 30, 2020, at ¶ 25 [APP 52]; Ex. 6, Montgomery Decl. at ¶ 13 [APP 98].
[28] 28 Ex. 5, W. Winkler Decl., dated June 3, 2020, at ¶¶ 13–14 [APP 88-89]; Ex. 6, Montgomery Decl. at ¶¶ 14–15 [APP 98-99]; Ex. 7, Makris Decl. at ¶¶ 6–8 [APP 105-07]; Ex. 4, McQueen Decl., dated June 3, 2020, at ¶ 4 [APP 59]; Ex. 14 Duffy Depo. at 109:13–109:20 [APP 155].
[29] Ex. 4, McQueen Decl., dated June 3, 2020, at ¶ 4 [APP 59]; Ex. 7, Makris Decl. at ¶ 7 [APP 106].
[30] Ex. 6, Montgomery Decl. at ¶ 14 [APP 98-99]; *see also* Ex. 5, W. Winkler Decl., dated June 3, 2020, at ¶ 13 [APP 88-89]; Ex. 7, Ex. 7, Makris Decl. at ¶ 7 [APP 106]; Ex. 8, Tavanagar Decl. at ¶ 6 [APP 114].
[31] Ex. 5, W. Winkler Decl., dated June 3, 2020, at ¶¶ 13–14 [APP 88-89]; Ex. 6, Montgomery Decl. at ¶¶ 14–15 [APP 98-99]; Ex. 7, Makris Decl. at ¶¶ 6–8 [APP 105-07]; Ex. 4, McQueen Decl., dated June 3, 2020, at ¶ 4 [APP 59]; Ex. 14 Duffy Depo. at 109:13–109:20 [APP 155].
[32] *See, e.g.*, Ex. 29, Email between M. Montgomery and C. Spray, L. Supernaugh [APP 725-726]; Ex. 22, 2019 Budget [APP 241]; Ex. 23, 2019 Billing Schedule [APP 242].
[33] Ex. 4, McQueen Decl., dated June 3, 2020, at ¶ 6 [APP 60-61].

LaPierre, Brewer, and the NRA had already been secretly planning to file litigation against AMc when LaPierre made these false and material misrepresentations.[34]

Based on LaPierre's representations, AMc agreed to another audit in November 2018.[35] AMc worked with Steve Hart—then counsel to the NRA's Board of Directors—and coordinated the Cooper Kirk Law Firm's audit of Carry Guard material (the "*November 2018 CK Audit*"), which, after one full day of thorough review, also concluded with no issues or complaints.[36]

Despite LaPierre's repeated promises for AMc to "stick with him" and that AMc would no longer be dealing with Brewer or the Brewer Firm, the Brewer Firm sent a letter to AMc on December 21, 2018.[37] Brewer demanded to examine an even more extensive list of documents that went to the heart of AMc's confidential business and billing practices, including proprietary documents relating to other AMc clients.[38]

LaPierre, the NRA, and Brewer's fraud further escalated in February 2019 with the *third* audit of AMc.   Knowing a second audit by Brewer Firm was not an option, the NRA explained to AMc that it had retained Forensic Risk Alliance ("*FRA*") to conduct a purportedly independent audit (the "*February 2019 FRA Audit*").[39]   Unbeknownst to AMc, Dillon had just joined FRA as a Senior Director at the end of 2018 after working as the Director of Consulting *at the Brewer Firm for more than 17 years.*[40] In fact, as mentioned above, Dillon herself spearheaded the

---

[34] Ex. 21, Apr. 22, 2019 Letter from W. LaPierre to M. Dycio  [APP 240]; *see e.g.,* Ex. 30, Excerpts from NRA Second Am. Privilege Log [APP 854, 856, 857] (showing Brewer and S. Roger's involvement in drafting the April 22, 2019 letter to Dycio).
[35] Ex. 3, McQueen Decl., dated March 30, 2020, at ¶ 25 [APP 52]; ECF 419-1, Ex. 1, AMc Corp. Rep. Depo. (Winkler), at 77:12–78:12 (APP 20).
[36] *See* Ex. 1, Winkler Decl., at ¶¶ 23-24 [APP 9-10]; Ex. 1-K, Letter from N. Reaves to AMc [APP 35].
[37] Ex. 16, Dec. 21, 2018 Letter from S. Rogers to J. Madrid [APP 208-09].
[38] *See id.*; *see also* ECF 419-1, Ex. 10. Hart Depo., at 230:2-32:18 (APP 826).
[39] Ex. 17, Jan. 16, 2019 Email between S. Hart and S. Ryan [APP 212] (Steve Hart explaining that John Frazer would send "other professionals to interface with Ackerman").
[40] ECF 422, Ex. 13, Dillon Depo. at 20:7-21:3 [APP 131-32].

September 2018 Brewer Audit.[41]  Dillon left the Brewer Firm to join FRA during the time AMc raised concerns about Brewer's continued involvement with AMc (around the October 11 Meeting).[42] According to the NRA's privilege log and limited documentation produced by FRA, it is an undisputed fact that Brewer arranged the NRA's retention of FRA.[43]

During the audit, Brewer had FRA repeatedly ask AMc for copies of documents it had no contractual right to copy.[44]  Dillon oversaw the entire February 2019 FRA Audit, including communicating directly with the Brewer Firm about FRA's findings.[45]  AMc fully complied with the February 2019 FRA Audit and provided FRA with all requested documentation that was in AMc's possession.[46]  Indeed, shortly after the audit, the NRA's General Counsel, John Frazer, told AMc that he very much appreciated its cooperation during the audit and made clear that the NRA wanted AMc to continue its work for the NRA.[47] The auditors never complained to AMc that documents were withheld from review.[48]

Around this same time, and unbeknownst to AMc, then-President of the NRA, Lieutenant Colonel Oliver North ("**North**"), recommended the NRA hire an independent auditor to review the multi-million-dollar legal fees being paid to the Brewer Firm each month,[49] and raised questions

---

[41] *Id.* at 23:2-20 [APP 132].
[42] *Id.* at 16:25-17:24 [APP 130-31] (explaining Dillon left the Brewer Firm for FRA in November 2018-a few weeks after the October 11 Meeting).
[43] *See* Ex 39 [APP 1034-35]; Ex. 30, Excerpts from NRA Second Am. Privilege Log; Entries 2373-86, 2400-02, 2448-49, 2456, 2474-75, 2490-93, 2507, 2526, 2532, 2534-36, 2550-51, 2556, 2566-67, 2584, 2586-88, 2591-92, 2598, 2617-20, 2639, 2644, 2834, 3147, 6164-65, 6167, 6171-74 [APP 815-37].
[44] *See* ECF 419-1, Ex. 35-A, Services Agreement (APP 2385). Article VIII of the Services Agreement only provides the NRA the right to examine files, books, and records.
[45] Ex. 40 [APP 1036-46]; Ex. 41 [APP 1047].
[46] *See* Ex. 1, Winkler Decl., at ¶¶ 25-30 [APP 10-12].
[47] Ex. 1-L, Letter from J. Frazer to S. Ryan [APP 36] ("The NRA remains grateful for Ackerman's accommodation of FRA and its document inspections . . . ." "The NRA does not, at this time, suggest that Ackerman implement a reduction in force.").
[48] *See* Ex. 1, Winkler Decl., at ¶¶ 25-30 [APP 10-12].
[49] *See* Ex. 19, Letter from North to NRA Audit Committee [APP 229-30]; Ex. 20 [APP 231-39].

about LaPierre's personal expenditures.[50] To further detract from its own wrongdoing, the NRA concocted a false narrative that AMc, North, Christopher Cox, and others were engaged in a "coup" to oust LaPierre from the NRA and had attempted to "extort" him into resigning.[51]

Despite AMc's cooperation with the NRA's audits, the NRA filed its pretextual lawsuit against AMc on April 12, 2019[52] falsely accusing AMc of not complying with its audits and fulfilling the NRA, LaPierre, and Brewer's plan to scapegoat AMc with litigation that had "crystallized" by at least September 8, 2018.[53] The NRA filed a second lawsuit on May 22, 2019, this time falsely accusing AMc of leaking information.[54] After finding itself the defendant in two lawsuits by its longtime client, AMc's relationship with the NRA naturally continued to unravel and officially ended by June 25, 2019, at which point AMc ceased all work.[55] The NRA then refused to pay AMc for millions of dollars of work it had approved and authorized in from March 2019 to June 2019, and refused to compensate AMc for the expenses it inevitably incurred as a result of the termination of the Services Agreement.[56]

---

[50] ECF 419-1, Ex. 14, North Depo., 236:19-237:2 (APP 1174-75), 156:6-24 (APP 1154), 235:23-236:3 (APP 1174); Ex. 15, Hallow Depo., 173:19-174:4 (APP 1231), 175:13-176:4 (APP1231), 181:12-182:12 (APP1233), 183:1-10 (APP1233), 207:4-13 (APP 1239), 206:15-208:19 (APP 1239); Ex. 16, Meadows Depo., 197:10-18 (APP 1293); Ex. 17, Boren Depo., 29:14-30:02 (APP 1348), 139:7-12 (APP 1375), 37:25-38:04 (APP 1350), 38:17-18 (APP 1350), 58:2-10 (APP 1355); *see also*, ECF 141 at Ex. F, Martin Decl. (APP 44-46); Ex. 31, Cox Depo., at 18:13-19:3 (APP 2031).

[51] *See* Ex. 35 [APP 1011-14]; ECF 329, at 30 ("Finally, assuming the veracity of AMc's allegations, the court concludes that the gist of the April 25 letter is false."); *see also* ECF 419-1, 173:19-174:4 (APP 1231), 175:13-176:4 (APP 1231), 181:12-182:12 (APP 1233), 183:1-10 (APP 1233) (describing how Hallow did not believe Boren or North were issuing threats), 205:19-208:19 (APP 1239) (describing how Hallow did not think that North was acting on behalf of AMc and that she was reluctant to sign a letter accusing him of doing so); ECF 419-1, Ex. 16, Meadows Depo., at 182:4-19 (APP 1289).

[52] *NRA v. AMc*, No. CL19001757, In the Circuit Court for the City of Alexandria (Cir. Ct. Va. Apr. 12, 2019). The NRA claimed that AMc did not provide the NRA with the North Employment Agreement, which they have since admitted in discovery was a false claim.

[53] Apr. 22, 2019 Letter from W. LaPierre to M. Dycio [APP 240].

[54] *NRA v. AMc*, No. CL19002067, In the Circuit Court for the City of Alexandria (Cir. Ct. Va. May 22, 2019).

[55] *See* ECF 209 at ¶ 99 ("By letter dated June 25, 2019, the NRA terminated the Services Agreement effective "immediately.").

[56] *See, e.g.*, ECF 419-1, Ex. 35 (APP 2364-76).

## IV.    APPLICABLE LEGAL STANDARDS

Summary judgment may only be granted if the movant shows that there is no genuine dispute as to any material fact for any claim.[57]  A movant must cite evidence that can be put in admissible form, which can include evidence in the record, evidence included with the motion, and supporting affidavits or declarations.[58]  The court's role in reviewing a motion for summary judgment is limited.[59]  The court is not permitted to make credibility determinations when deciding a motion for summary judgment,[60] and the court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.[61]

## V.    ARGUMENT AND AUTHORITIES

### A.  NRA's Motion as to AMc's Breach of Contract Claims Fails

#### 1.    The NRA has failed to show that AMc breached the Services Agreement.

The NRA's first effort to avoid liability for its contractual breaches against AMc is to argue that AMc's alleged breach of the Records Inspection Clause precludes AMc from enforcing the Services Agreement against the NRA. The NRA identifies numerous "abusive practices" of AMc that it argues "constitute material breaches vitiating any performance obligation by the NRA."[62] But for each unsupported allegation by the NRA, the claim is either factually inaccurate, legally unsupportable, or not a breach of the Records Inspection Clause. In each instance, the NRA has failed to meet its burden for summary judgment.

##### i.    *AMc did not breach the Records Inspection Clause*

---

[57] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[58] FED. R. CIV. P. 56; *Patel v. Tex. Tech Univ.*, 941 F.3d 743, 747 (5th Cir. 2019); *Maurer v. Independence Town*, 870 F.3d 380, 384 (5th Cir. 2017).

[59] *Wyoming v. Oklahoma*, 502 U.S. 437, 468 (1992); *Swann v. City of Dallas*, 922 F. Supp. 1184, 1205 (N.D. Tex. 1996).

[60] *See Wyoming v. Oklahoma*, 502 U.S. at 468; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Tiblier v. Dlabal*, 743 F.3d 1004, 1007 (5th Cir. 2014).

[61] *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).

[62] ECF 420 at 16.

First, the evidence confirms AMc did not breach the Records Inspection Clause. The Records Inspection Clause provides:

> During the term of this Services Agreement, AMc authorizes NRA, upon reasonable notice, to examine AMc and Mercury's files, books, and records, with respect to matters covered under this Services Agreement.[63]

Despite its brevity, the NRA seeks summary judgment based on implausible interpretations and imagined language found nowhere in the Records Inspection Clause. For example, as to both the September 2018 Brewer Audit and the February 2019 FRA Audit, the NRA complains that "AMc forced the NRA's professionals to travel to a third-party accountant's office in Oklahoma and view records in printed-out, disaggregated form."[64] As a threshold matter, many of the allegations in this portion of the NRA's Motion—including the foregoing quote—are unsupported by any proper summary judgment evidence. Specifically, the evidentiary support for footnotes 125-128 are merely references to the NRA's own factual background. The referenced factual background sections relate to the same subject matter, but it is unclear which citations in the NRA's factual background support the statements made in the NRA's argument, if any. More importantly, the Records Inspection Clause is silent as to the specific location and format of any document examination, and the NRA declines to explain how having the inspection occur in Oklahoma or with physical printouts was a breach of the Records Inspection Clause.

The NRA further asserts that "AMc flatly refused" to produce Carry Guard[65] video footage requested by the NRA during the September 2018 Brewer Audit, but this allegation is false and flatly contradicted by the evidence. When the Brewer Firm demanded to inspect for *all* raw footage

---

[63] ECF 419-1, Ex. 35-A, Services Agreement § VIII (APP 2385).
[64] ECF 420 at 17; *see also* ECF 420 at 8, 13.
[65] Carry Guard was a significant initiative created by Josh Powell at the NRA that AMc was asked to help implement. It began in 2017, and the NRA spent millions of dollars on the program that ultimately was a complete failure and the subject of regulatory investigations.

relating to Carry Guard for the September 2018 Brewer Audit, AMc immediately undertook to determine the scope and logistics of this production because of the considerable time and expense it would require for all parties to produce and review.[66]  AMc never told the Brewer Firm that it was not going to produce any information.[67]  Rather, the NRA's General Counsel emailed to clarify that there had been a "miscommunication" between the Brewer Firm and AMc, and that the NRA <u>did not</u> wish to review the roughly 300+ hours of raw video footage of Carry Guard.[68] The Brewer Firm subsequently confirmed to AMc that it did not want any of the raw footage.[69]

Next, the NRA contends AMc did not allow the NRA to retain copies of documents "or even transcrib[e] key information."[70] Consistent with its previous arguments, the NRA does not explain how these allegations result in a breach of the Records Inspection Clause. Indeed, the Records Inspection Clause speaks only to the NRA's rights "to examine AMc and Mercury's files, books, and records," not to any party's rights to transcribe or obtain copies of AMc's files, books, and records.[71]

For the September 2018 Brewer Audit, the NRA falsely alleges that it did not receive invoice detail, information to match expenses to categories in the AMc budget, support for out-of-pocket expenses, and time records for employees dedicated to the NRA.[72]  However, AMc made available all documents that the NRA requested, including information relating to spending; NRA/AMc annual budgets;  a complete ledger show all of the transactions relating to Carry Guard

---

[66] ECF 419-1, Ex. 3, Makris Hr'g Trans., at 24:11-14 (APP 102) ("They wanted all the raw footage that had been shot for all (indiscernible) ever. That would have taken—that would have taken years. There's not enough duplication equipment in Dallas to do that.").
[67] ECF 419-1, Ex. 3, Winkler Hr'g Trans., at 104:8-13 ("[W]e were trying to get clarification of what they wanted to look at. Some of their letters that came over, we couldn't understand what they were asking for.") (APP 182); Ex. 1, W. Winkler Decl., dated Dec. 20, 2021, at ¶ 6-8 [APP 3-4].
[68] Ex. 1-I, Email between F. Frazer and AMc [APP 32-33].
[69] Ex. 1, W. Winkler Decl., dated Dec. 20, 2021, at ¶ 14-15 [APP 6-7].
[70] ECF 420 at 18.
[71] ECF 419-1, Ex. 35-A, Services Agreement § VIII (APP 2385).
[72] ECF 420 at 8-9.

and supporting documentation for all expenditures in excess of $5,000; and OOP expenses and back up documentation relating to same.[73]  As set forth in the Declarations of William Winkler and Brandon Winkler, the NRA's understanding of the facts regarding the September 2018 Brewer Audit is simply false or grossly misleading.[74] Indeed, even after the September 2018 Brewer Audit, AMc asked the Brewer Firm if there was anything else they were looking for, and they said no.[75]

In addition, the NRA falsely claims that during the February 2019 FRA Audit, AMc refused to produce various documents. However, during the nine-day audit with at least six different auditors AMc provided FRA with the same documents that had previously been provided to the Brewer Firm (except the Carry Guard documents because they were never requested), along with additional documentation like a list of AMc employees who had worked on the NRA account from 2015 – 2018, and more documents relating to the out of pocket expenses, including Tony Makris' expense reports.[76] Once again, on two separate occasions, AMc asked if there was anything else FRA needed to see, and it said no."[77] In other words, anything that FRA requested during the audit—that AMc had in its possession—was provided to it.[78]

The NRA's other allegations with respect to the September 2018 Brewer Audit and February 2019 FRA Audit are directly contradicted by the sworn testimony of AMc executives that were present for these audits, which in and of itself, precludes summary judgment.[79]

> ### ii.     *Even if there was a breach, it was not material.*

---

[73] Ex. 1, W. Winkler Decl., dated Dec. 20, 2021, at ¶ 14-18 [APP 6-8].

[74] *See* Ex. 1 [APP1-13] and Ex. 2 [APP 38-44].

[75] ECF 419-1, Ex. 3, Winkler Hr'g Trans., at 95:13-20 (APP173); ECF 419-1, Ex. 1, AMc Corp. Rep. Depo. (Winkler), at 137:14-138:6 (APP 0035); Ex. 1, W. Winkler Decl., dated Dec. 20, 2021, at ¶ 20-21 [APP 9].

[76] Ex. 1, W. Winkler Decl., dated Dec. 20, 2021, at ¶ 25-27 [APP 10-11].

[77] ECF 419-1, Ex. 3, Winkler Hr'g Trans., at 98:13-19 (also explaining that the NRA followed up after to thank AMc for its cooperation) (APP 176); ECF 419-1, Ex. 1, AMc Corp. Rep. Depo. (Winkler), at 98:6-24 (APP 0025), 153:5-154:7 (APP 0039).

[78] Ex. 1, W. Winkler Decl., dated Dec. 20, 2021, at ¶ 16 [APP 10-11].

[79] *See* Ex. 1, Winkler Decl. dated Dec. 20, 2021, at ¶¶ 12-21, 25-30 [APP 5-12]; Ex. 2, B. Winkler Decl. dated Dec. 20, 2021, at ¶¶ 2-9, 11-16 [APP 38-42]; Ex. 5, Winkler Decl. dated June 3, 2020, at ¶¶ 7-9 [APP 86-87].

In addition to failing to establish AMc's alleged actions breached the Records Inspection Clause, the NRA fails to establish—or even argue—how such breaches are "material," a required showing under Virginia law.  In *Countryside Orthopaedics*, the court noted that "a party who commits the first breach of a contract is not entitled to enforce the contract."[80] But in the immediately following sentence (omitted by the NRA), the court clarifies that "[t]here is, however, an exception to that general rule when the breach did not go to the root of the contract but only to a minor part of the consideration."[81] In deciding if a breach goes "to the root of the contract," Virginia courts analyze whether a party's breach "is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract."[82]  Here, even if the NRA could prove that AMc breached the Records Inspection Clause (which it cannot), it cannot prove that the breach "defeat[ed] an essential purpose" of the Services Agreement.[83]

As acknowledged by the NRA, the "clear, overarching purpose" of the Services Agreement was "to 'promote a positive image of the NRA.'"[84] But none of the more than a dozen services described by the Services Agreement as achieving this "clear, overarching purpose" relate to records examinations,[85] and the NRA does not claim (much less establish as a matter of law) the breaches defeat an essential purpose of the Services Agreement. In fact, the NRA agreed to fourth quarter budgets reductions in 2018, and an annual 2019 budget after the September 2018 Brewer Audit.[86]  More importantly, the NRA continued to solicit, receive, and pay for AMc's services for many months after the September 2018 Brewer Audit, confirming that the essential purpose of the

---

[80] *Countryside Orthopaedics, P.C. v. Peyton*, 541 S.E.2d 279, 285 (2001) (quoting *Horton v. Horton*, 254 Va. 111, 115, 487 S.E.2d 200, 203 (1997)).
[81] *Id.* (internal quotations omitted).
[82] *Id.* at 285.
[83] *See id.*
[84] ECF 420 at 4 (quoting Services Agreement § I.A.).
[85] ECF 419-1, Ex. 35-A, Services Agreement § I.A. (APP 2377-78).
[86] Ex. 1, W. Winkler Decl., dated Dec. 20, 2021, at ¶ 21 [APP 9].

Services Agreement was still intact.[87]  Stated differently, the NRA contends that AMc breached the Records Inspection Clause at the September 2018 Brewer Audit, but after that audit, it continued to direct, authorize, and approve AMc conducting work for the NRA from October 2018 to May 2019.  Indeed, *the NRA actually paid AMc for the work it performed in from October 2018 to April 2019*[88]—proof positive that any purported breaches were not "material."

Further, even after the February 2019 FRA Audit, the NRA continued to direct, authorize, and pay AMc for work it was continuing to perform on the NRA's behalf.[89]  Indeed, on March 4, 2019, after Frazer thanked AMc for its accommodations for the February 2019 FRA Audit, he reiterated the NRA's desire for AMc to maintain its same work force on behalf of the NRA.[90]  Yet, AMc did not know that the NRA had long-planned premediated litigation against AMc as it feigned compliance with the various audits so that it could file the upcoming April 12, 2019 lawsuit against AMc and then refuse to pay AMc for the work it has previously authorized and requested.[91]

Nonetheless, the NRA still contends that AMc's material breaches "relieved NRA of its obligations to perform and entitled NRA to terminate the contract and sue for damages."[92]  But while the NRA declines to explain how the alleged breaches were material, the evidence confirms AMc complied with the Services Agreement and the NRA's audit requests.  For all audits completed by the NRA, including the September 2018 Brewer Audit and February 2019 FRA Audit, AMc believed and understood that AMc had provided the materials requested by the NRA.[93] The NRA apparently understood the same. For example, in a letter from the Brewer Firm

---

[87] ECF 419-1, Ex. 34-H, May 30, 2019 Email between M. Erstling and C. Spray (APP 2361-63); ECF 417, Ex. 35-H, Jackson Report, at Ex. 7 (APP 2505-06).
[88] *Id*.
[89] *Id*.
[90] Ex. 1-L, Mar. 4, 2019 Letter from J. Frazer to S. Ryan [APP 36].
[91] Ex. 21, Apr. 22, 2019 Letter from W. LaPierre to M. Dycio [APP 240].
[92] ECF 420 at 19.
[93] Ex. 1, W. Winkler Decl., dated Dec. 20, 2021, at ¶ 20, 28 [APP 9, 11-12]; ECF 419-1, Ex. 3, Winkler Hr'g Trans., at 95:13-15 (APP 173); 98:13-19 (APP 176).

on December 21, 2018 (which was after the November 2018 CK Audit), the NRA discusses with AMc the scope of the next audit and there is not a single statement or accusation that AMc was noncompliant with prior requests by the NRA.[94]

If the NRA truly believed that AMc had committed an "obvious material breach" in the September 2018 Brewer Audit,[95] it is implausible that the NRA would have declined to raise or reference purported noncompliance while negotiating the scope of the next audit.  But no such contemporaneous notice occurred, and the NRA continued not only its audits of AMc, but also continued to solicit and pay for the services provided by AMc.  As a telling sign of fabricated grievances, it was not until the NRA filed suit in April 2019—and after three separate audits had long concluded—that AMc became aware of any allegations that AMc breached the Services Agreement and the NRA began to refuse to pay AMc's invoices.[96]

Because the NRA cannot point to contemporaneous communications or actions between the parties on this point, the NRA has relied almost entirely on the testimony of Dillon—the longtime Brewer Firm employee who worked for FRA during the "independent" audit of AMc before returning to Brewer Firm where she is still employed. While Dillon's involvement in the FRA audit is problematic in its own right, it is further suspect that Dillon is the NRA's primary source for its claims regarding AMc's audit compliance while Brewer Firm actively limits her ability to testify under improper claims of privilege.

For example, in just over two and a half hours of testimony, NRA counsel objected to questions and/or instructed Dillon to not answer a question on more than eighty (80) occasions.[97]

---

[94] Ex. 16, Dec. 21, 2018 Letter from S. Rogers to J. Madrid [APP 208-09].
[95] ECF 420 at 19.
[96] Ex. 1, W. Winkler Decl., dated Dec. 20, 2021, at ¶ 30 [APP 12].
[97] *E.g.*, ECF 422, Ex. 13, Dillon Depo., at 13:5-6, 13:12-13, 13:1-4, 14:9-10, 14:16-17, 15:4-5, 15:11-12 15:25-16:3, 16:9-12, 16:19-20 (all at APP 130).

And NRA counsel's instructions to not answer went to some of the most fundamental questions asked by AMc. For instance, Dillon is a factual witness because of her role as an FRA employee but NRA counsel "direct[ed] Ms. Dillon not to answer questions concerning her work at FRA."[98] And when asked why she left FRA—where she participated in the audit of AMc—to return to her employment at the Brewer Firm, NRA counsel objected to the question and instructed Dillon to only answer if she could do so "without revealing any client confidences."[99] She was similarly instructed to not "reveal attorney/client confidences" when answering questions about why she left the Brewer Firm for FRA in the first place.[100]

Indeed, despite Dillon's incomplete and self-serving testimony, the NRA can point to nothing from the FRA audit to corroborate its claims that AMc did not provide documents requested for the audit. In support of its Motion,[101] the NRA attached recently produced FRA draft reports that AMc has sought for years.[102] But even these documents, despite being inadmissible[103]—contain no indication that the FRA requested certain documents that AMc refused to provide. Incredibly, the belated FRA reports actually confirmed the lack of systems and internal controls at the NRA.[104] Despite the NRA's belated and contrived narrative in its pleadings, the NRA has failed to establish that any purported breach was "material" as a matter of law.[105]

### iii.    *Even if a breach by AMc was material, the NRA has waived its right to object.*

Even if the NRA can establish AMc materially breached the Services Agreement (which it

---

[98] ECF 422, Ex. 13, Dillon Depo. at 19:20-20:6 (APP 0131).
[99] *Id*. at 17:25-19:5 (APP 0131).
[100] *Id*. at 20:10-15 (APP 0131).
[101] ECF 420 at 13-14.
[102] *See* ECF 420, Ex. 69-73 (APP 1941-2147).
[103] *See* AMc's Motion to Strike, filed contemporaneously with this Response.
[104] ECF 421, Ex. 28 (APP 561) ("FRA identified invoices from Ackerman McQueen to the NRA Foundation in the NRA's General Ledger. It is FRA's understanding that the General Ledger provided should not contain entries for the Foundation. It is important to account for expense in the proper entity. This will need to be verified with NRA financial representatives.").
[105] *See Countryside Orthopaedics*, 541 S.E.2d at 285.

cannot), the NRA is foreclosed from seeking to enforce the Services Agreement against AMc because it has waived its right to do so. As discussed above, after these purported material breaches, the NRA continued to solicit services, pay invoices, and further the business relationship with AMc and, as a result, the NRA has waived its rights to enforce its claims against AMc. Under Virginia law, a party may waive its contractual rights with express statements or as implied from conduct.[106] "Waiver is an intentional relinquishment of a known right," and a party can establish waiver by presenting "clear, precise and unequivocal evidence" of the defendant's (1) knowledge of the facts basic to the exercise of the right and (2) the intent to relinquish that right.[107]

Here, the NRA obviously had "knowledge of the facts" regarding AMc's alleged breaches and the NRA's rights regarding same.[108]  The NRA was an active participant in discussing the scope and logistics of the numerous audits of AMc's files, and the NRA knew what was requested and what was provided. Thus, if AMc failed to provide requested documents that the NRA believed to constitute a material breach, the NRA had actual, contemporaneous knowledge of those and failed to act upon them while simultaneously approving and paying for additional work..

In addition, there is a genuine question of fact as to whether the NRA possessed "the intent to relinquish that right."[109] The evidence confirms AMc committed no breach but, if even if it did, that the NRA intentionally relinquished its rights to enforce same. The Services Agreement expressly states that the "Services Agreement may be terminated by NRA . . . if . . . AMc breaches any term, promise or covenant hereunder."[110] Despite now alleging that AMc breached the Services Agreement as early as September 2018, the NRA never provided notice to AMc of the

---

[106] *Va. Polytechnic Inst. & State Univ. v. Interactive Return Serv.*, 595 S.E.2d 1, 6 (Va. 2004).
[107] *Id*. (citing *Stanley's Cafeteria, Inc. v. Abramson*, 306 S.E. 2d 870, 873 (Va. 1983)).
[108] *See id*.
[109] *Va. Polytechnic Inst. & State Univ.*, 595 S.E.2d at 6.
[110] ECF 419-1, Ex. 35-A, Services Agreement § XI.C (APP 2386).

alleged breach or, more importantly, attempted to terminate the Services Agreement.

To the contrary, shortly after the September 2018 Brewer Audit, the NRA and AMc had numerous discussions regarding budget cuts for the fourth quarter of 2018 and the annual budget for 2019.[111]  Further, according to LaPierre and Spray, the purpose of the October 11Meeting was to work through budget issues for both the fourth quarter of 2018 and 2019.[112]  These discussions ultimately resulted in the parties' agreement on a revised fourth quarter budget for 2018 and a complete 2019 budget as has been the parties past practices.[113]  And most importantly, the NRA continued to solicit services from AMc, AMc continued to provide services to the NRA, the NRA continued to pay for AMc's services, and the NRA continued to benefit from AMc's compliance with the Services Agreement. At a minimum, these facts raise a genuine dispute as to whether the NRA waived its rights to now enforce the Records Inspection Clause against AMc.

### 2.  The NRA is responsible for Third-Party NRA Contracts

The NRA next attempts to avoid liability for certain AMc-Third Party NRA Contracts that it specifically requested, approved, and paid for until June 2019. The intent of the 2018 Amendment was to insulate AMc from any contractual obligations AMc entered into on behalf of the NRA (*i.e.*, North and Loesch). Indeed, AMc required that the 2018 Amendment be executed before it executed the AMc-Third Party NRA Contract with North.[114]

### i.    *AMc has adequately pleaded NRA's breach of contract.*

The NRA first argues that there is no dispute as to the Loesch and North contracts because AMc "did not plead a breach of *contract* claim" with respect to those contracts.[115] The NRA is legally and factually wrong.

---

[111] Ex. 1, W. Winkler Decl., dated Dec. 20, 2021, at ¶ 21 [APP 9].
[112] *Id.*
[113] *Id.*
[114] *Id.* at ¶ 31 [APP 12].
[115] ECF 420 at 19 (emphasis in original).

AMc pled the NRA's breach of the Service Agreement (and 2018 Amendment), including its Termination Provision.[116] The 2018 Amendment's provision related to AMc-Third Party NRA Contracts specifically amends Paragraph XI.E of the Services Agreement—*the Termination Provision*.[117] AMc's SAC alleges that "'all non-cancellable' contracts entered into between AMc and third parties for the benefit of the NRA, including the Col. North and Loesch contracts (referred to as the "***Third Party NRA Contracts***"), obligated the NRA to pay the 'compensation payable' under the Third Party NRA Contracts."[118] These factual allegations are incorporated into AMc's breach of contract claims,[119] which necessarily includes its claim for the NRA's breach of the Services Agreement and Termination Provision. Thus, AMc has adequately pled its claims that the NRA breached its contractual obligations as to AMc-Third Party NRA Contracts under the Services Agreement, including the Termination Provision.

### ii.     *AMc's damages are not speculative*

The NRA next argues that it is entitled to summary judgment because "AMc's claims regarding Loesch are patently speculative."[120] This argument is first without merit because there is evidence that AMc has already incurred damages stemming from the NRA's failure to pay amounts owed under the AMc-Third Party NRA Contracts.[121] The NRA ceased paying all invoices in April 2019 but did not terminate the Services Agreement until June 2019.[122] Therefore, actual damages already exist as to this breach by the NRA.

As noted by the NRA, AMc and Loesch *are* currently in arbitration regarding amounts

---

[116] ECF 239, AMc's Second Amended Complaint, at ¶¶ 200-07.
[117] ECF 419-1, Ex. 35-B, 2018 Amendment at ¶ 3 (APP 2388-89).
[118] ECF 239, AMc's Second Amended Complaint, at ¶ 15.
[119] *Id.* at ¶ 168.
[120] ECF 420 at 20.
[121] ECF 419-1, Ex. 35, Winkler Decl. dated Nov. 29, 2021, at ¶¶ 14-27, 34-37 (APP 2366-76).
[122] *See* ECF 209 at ¶ 99 ("By letter dated June 25, 2019, the NRA terminated the Services Agreement effective "immediately.").

claimed to be owed by Loesch. And the NRA's claim that Loesch "*may* never recover any monies" is a facial acknowledgment that there are outstanding factual issues as to the amount of damages—notwithstanding the NRA's liability regardless. Following the conclusion of the Loesch arbitration, AMc's damages resulting from the NRA's breach relating to AMc-Third Party NRA contracts will be actual, quantified damages for which the NRA is responsible.[123] Specifically, the NRA would be liable for any actual damages by virtue of not only its violation of the Termination Provision,[124] but also for its failure to post the $3,000,000 line of credit under the 2018 Amendment.[125]

The NRA supports its position with a distorted reliance on *Health v. LifeCell Corp*.[126] In *LifeCell*, the parties had prior litigation that involved protected settlement communications.[127] When LifeCell filed a separate suit premised on the protected communications, LifeNet filed yet another suit for breach of contract relating to the violation of the parties' nondisclosure agreement ("NDA").[128] After amending its complaint in the second action, LifeCell filed a motion to dismiss in the third action, arguing LifeNet was unable to state a claim for redressable damages.[129] LifeNet alleged three categories of damages for breach of contract, including costs incurred in defending the second lawsuit that would not be a justiciable case absent LifeCell's improper disclosure.[130] The court explained: "LifeCell's Motion hinges on whether its Amended Complaint [in the separate action] would survive without the disputed language. If so, LifeNet suffered no redressable damages as a result of LifeCell's alleged breach because LifeNet would have been

---

[123] ECF 419-1, Ex. 35-B, 2018 Amendment, at ¶ 3 (APP 2388-89).
[124] *See* ECF 419-1, Ex. 35-A, Services Agreement § XI (Termination Provision) (APP 2385-87); ECF 419-1, Ex. 35-B, 2018 Amendment at ¶ 3 (2388-89).
[125] ECF 419-1, Ex. 35-B, 2018 Amendment, at ¶ 2 (2388).
[126] *Health v. LifeCell Corp.*, No. 2:15cv461, 2016 U.S. Dist. LEXIS 199217 (E.D. Va. 2016).
[127] *Id*. at **2-3.
[128] *Id.* **3-5.
[129] *Id*. at *7.
[130] *Id*. at **13-14.

forced to litigate the New Jersey action regardless of [the disputed factual allegations]."[131] Because the survival of LifeCell's complaint was not yet adjudicated, the court determined that proving damages on the point was premature.[132]

*LifeCell* relates to pleading standards, not summary judgment standards. More importantly, the damages sought in *LifeCell* did not refer to the potential damages award to be issued in the separate action, but instead to LifeNet's legal fees and expenses incurred in defending itself in the separate action based on the fact-intensive inquiry of whether LifeNet would have been forced to participate in the litigation regardless of LifeCell's alleged breach.[133] Thus, *LifeCell* contemplated the parties first engaging in the original proceeding to dispute the sufficiency of amended pleadings (i.e. determining liability) before the parties could then proceed to dispute what damages would "return LifeNet to some 'position' it would have been in absent the breach."[134] No such speculation is present here because the NRA's liability and damages is timely before the Court.

### iii.   The Services Agreement demands the NRA's performance

The NRA bases its argument on an interpretation that the 2018 Amendment only applies to AMc-Third Party NRA Contracts that are not cancellable.[135] But the term "non-cancellable contracts" in the 2018 Amendment does not limit the scope of "AMc-Third Party NRA Contracts," it *defines* the scope "AMc-Third Party NRA Contracts." The relevant text is as follows:

> For all non-cancellable contracts entered into between AMc and third parties for the benefit of the NRA (herein "AMc-Third Party NRA Contracts"), the NRA agrees to pay AMc upon such expiration or termination the balance of the compensation payable under such AMc-Third Party NRA Contracts (including but not limited to, the AMc-Third Party NRA Contracts with Dana Loesch and Oliver North) as of the date of expiration of termination so that AMc can

---

[131] *Id.*
[132] *Id.*
[133] *Id.* at *15.
[134] *Id.*
[135] ECF 420 at 21.

fulfill its obligation under said Contracts after expiration or termination.[136]

As evidenced by the foregoing, "AMc-Third Party NRA Contracts" is defined as "all non-cancellable contracts entered into between AMc and third parties for the benefit of the NRA."[137] The provision does not say that it only applies to AMc-Third Party NRA Contracts that are non-cancellable, it says that all AMc-Third Party NRA Contracts *are* non-cancellable.[138] Moreover, the provision specifies that the contracts with Dana Loesch and Oliver North *are* AMc-Third Party NRA Contracts, meaning that they are, by definition, non-cancellable.[139] While cancellability provisions within a particular AMc-Third Party NRA Contracts may be relevant to the "compensation payable" under same, the third-party contract's cancellability does not modify the definition of AMc-Third Party NRA Contracts as provided in the 2018 Amendment.

The NRA's interpretation of this provision is not just a misreading of the 2018 Amendment, its practical effect is untenable. For example, the NRA acknowledges that Loesch may still recover monies from the arbitration proceeding regarding the Loesch AMc-Third Party NRA Contract.[140] If Loesch *does* recover monies, however, there can be no dispute that the monies would be owed pursuant to the terms of the Loesch AMc-Third Party NRA Contract. If the NRA's argument was accepted, the NRA would not be liable to AMc for amounts AMc paid to Loesch under the AMc-Third Party NRA Contract merely because the contract, as the NRA argues, is "non-cancellable." This is an absurd result for contracts executed at the direction and approval of the NRA, that the NRA intended to pay AMc for upon termination,[141] and which AMc would never had entered

---

[136] ECF 419-1, Ex. 35-B, 2018 Amendment at ¶ 3 (APP 2388-89); *see also* ECF 419-1, Ex. 35-A, Services Agreement XI.E (APP 2386).
[137] *Id*.
[138] *Id*.
[139] *Id*.
[140] ECF 420 at 20 (noting that Loesch "*may* never recover any monies.") (emphasis added).
[141] ECF 419-1, Ex. 29 Phillips Depo. at 72:11-24 (APP 1959).

without assurances that the NRA would be responsible for same.[142]

The injustice of this result is made further manifest by the fact that the NRA has already admitted that the AMc-Third Party NRA Contracts are "its own" and that AMc entered into them at the direction of, and for the benefit of, the NRA.[143] Thus, as a simple matter of agency, any current or future liabilities to Loesch and North arising from these contracts are the NRA's responsibility.  The NRA and AMc executed the agreement to ensure that the NRA maintained liability for all amounts owed to Loesch under her agreement,[144] and permitting the NRA's distorted interpretation will render the relevant contract language meaningless.

### iv.    AMc, North, and Loesch did not commit prior material breaches

The NRA also argues it is entitled summary judgment because "AMc, North, and Loesch committed prior material breaches that defeated the core purposes of the Services Agreements and the Employment Agreements."[145] This argument also fails.

**First**, as set forth above, AMc did not breach the Services Agreement and, even if a breach did occur, no actions by AMc amounted to a material breach.[146] Indeed, the NRA does not even attempt to show how any alleged breach by AMc was material.[147]

**Second**, the NRA fails to establish that North committed prior material breaches of his employment agreement with AMc. Despite alleging that North breached his obligations by failing to record an adequate number of episodes for his television program, *American Heroes*, there is evidence that North was expressly directed by the NRA to *not* produce those episodes. Specifically, North testified that LaPierre personally encouraged North to focus his efforts on

---

[142] ECF 419-1, Ex. 35, Winkler Decl. dated Nov. 29, 2021, at ¶ 35 (APP 2375).
[143] *See e.g.*, ECF 261, NRA Motion to Dismiss, at 19 ("the NRA cannot tortiously interfere with its own contracts").
[144] ECF 419-1, Ex. 29 Phillips Depo. at 72:11-24 (APP 1959).
[145] ECF 420 at 20.
[146] *See supra* Section V.A.1.
[147] *See id.*

fundraising for the NRA at the expense of spending less time on NRATV programs.[148] Moreover, the NRA also fails to explain how a party's compliance with a third party contract obviates the NRA's performance obligations under the 2018 Amendment.

*Third*, in addition to again offering no explanation as to how a party's compliance with a third party contract obviates the NRA's performance obligations under the 2018 Amendment, the NRA offers zero explanation for its claim that "Loesch committed prior material breaches" of her employment agreement, and certainly supplies no competent summary judgment evidence.

There is ample specific evidence that the NRA is liable for AMc-Third Party NRA Contracts, that the NRA breached its obligations to AMc as to the AMc-Third Party NRA Contracts, and that no actions by another party obviate the NRA's obligations under the Services Agreement. For these reasons, the NRA's Motion should be denied.

### 3. The NRA Breached the Indemnification Provision

AMc has been forced to incur—and continues to incur—legal fees and other expenses in connection with events covered by the Service Agreement's Indemnification Provision.[149]

*First*, the NRA asserts that the "governmental investigations for which AMc seeks indemnity do not involve incidents of violence committed with firearms, or an injunction regarding activities requested or approved by the NRA."[150] The NRA's interpretation is exceedingly narrow, impractical, and would lead to absurd results. It is undisputed the NRA faced an investigation and subsequent lawsuit from the NYAG. Notably, the NYAG's investigation of the NRA includes considerable scrutiny of the NRA's relationship with AMc.[151] For example, the NYAG focused

---

[148] Ex. 32, North Depo., at 79:5-83:1 [APP 906].
[149] ECF 419-1, Ex. 35 Winkler Decl., dated Nov. 29, 2021, at ¶¶ 26-29 (APP 2370-71).
[150] ECF 420 at 24.
*See Attorney General James Files Lawsuit to Dissolve NRA*, New York State Office of the Attorney General, August 6, 2020, https://ag.ny.gov/press-release/2020/attorney-general-james-files-lawsuit-dissolve-nra; *see also* Ex. 27, Verified Complaint, People of the State of New York v. NRA, et al., Index No. 451625/2020 (Aug. 6, 2020) [APP 445-613]; ECF 419-1, Ex. 35 at ¶ 26, Winkler Decl. dated Nov. 29, 2021 (APP 2370).

on the alleged "decades-old" practice in which "[AMc] would pay for a variety of non-contractual, out-of-pocket expenses for LaPierre and other NRA executives and pass those expenses through to the NRA."[152] The NYAG investigation plainly relates to an "action" by an "attorney general" seeking to dissolve the NRA based in part on "activities [AMc] performed on behalf of NRA pursuant to [the Services Agreement] or otherwise requested or approved by NRA."[153]

**Second**, the NRA seeks to avoid indemnification relating to the Loesch arbitration by arguing Loesch is an employee of AMc. AMc does not deny that Loesch was an employee of AMc. In fact, this arrangement was known to and approved by the NRA.[154] The NRA's attempts to leverage this fact as the basis to avoid the plain indemnification language in the Services Agreement defies reality and the terms of the indemnification provision. This argument is also in direct contravention to the terms of Loesch's contract,[155] NRA press releases,[156] and the NRA's prior admissions in this lawsuit that the Loesch contract is "its own."[157]

Despite its own concessions, the NRA now argues that Loesch cannot be a "Spokesperson" because she was an AMc employee and was not directed and supervised by the NRA.[158] This interpretation is impractically narrow and would nullify the language Section V.B.1.(3). Indeed, as acknowledged by the NRA, "pursuant to the Services Agreement, AMc was expressly tasked with 'Management of Talent/Spokespersons for NRATV, on behalf of the NRA.'"[159] The NRA's argument that AMc is tasked with managing all Spokespersons "on behalf of the NRA," but that

---

[152] *Id*.
[153] ECF 419-1, Ex. 35-A, Services Agreement § V.A. (APP 2383).
[154] *See e.g.*, ECF 261, NRA Motion to Dismiss, at 20 ("[T]he NRA authorized Ackerman to enter into the Third Party NRA Contracts on behalf of the NRA, as the NRA's agent.").
[155] ECF 417, Ex. 35-L, AMc-Third Party NRA Contract with Dana Loesch (2563-83).
[156] Ex. 34, 2017 NRA News Release – Dana Loesch to Serve as Major National Spokesperson for NRA (announcing that Loesch "will serve as a major national spokesperson" for the NRA and that she "now has full authority to represent the NRA on a broad range of issues.") [APP 1009-10].
[157] *See e.g.*, ECF 261, NRA Motion to Dismiss, at 19 ("the NRA cannot tortiously interfere with its own contracts").
[158] ECF 420 at 24.
[159] ECF 420 at 24 (quoting Services Agreement § 1.A.).

the indemnification provision only applies to Spokespersons managed by the NRA would mean that the indemnification provision had zero effect from the start, essentially rendering it illusory.[160]

In reality, the indemnification provision was intended to include all Spokespersons, including Loesch, because they were retained by AMc *at the request and approval of the NRA*.[161] The NRA's acknowledgment of this interpretation can be seen in the 2018 Amendment, which provides that the NRA will pay AMc certain amounts owed for "contracts entered into between AMc and third parties *for the benefit of the NRA*."[162] Among these contracts are the specifically identified contracts with Loesch and North.[163] The NRA's current position that it essentially has nothing to do with the Loesch contract is legally and factually inaccurate.

### 4. The NRA's Motion Fails as to AMc's Post-April 2019 Invoices

#### i. *The NRA's Motion is conclusory and devoid of factual analysis*

***First***, the NRA does not provide competent summary judgment evidence to grant the requested relief. Despite concluding that "[n]o credible interpretation of the Services Agreement supports" AMc's invoice practices, the NRA makes zero reference to or argument about the language of the Services Agreement.[164] Similarly, the NRA's Motion relies on "all of the reasons set forth herein in the sections above," but does not specify what evidence, arguments, or sections to which it refers.[165] The second paragraph in this section, discussing an email from Steve Hart, is entirely unsupported with proper summary judgment evidence. Indeed, no facts asserted or

---

[160] *See e.g.*, *D.C. McClain, Inc. v. Arlington Cty.*, 249 Va. 131, 135-36 (1995) ("No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly.").
[161] ECF 419-1, Ex. 35-A, Services Agreement § 1.A (APP2377-78); *see e.g.*, ECF 261, NRA Motion to Dismiss, at 19.
[162] ECF 419-1, Ex. 35-B, 2018 Amendment at ¶ 3 (emphasis added) (APP2388-89).
[163] *Id.*
[164] ECF 420 at 30.
[165] *Id.*

quotations excerpted are cited to or in the NRA's Motion.[166]

Consistent with the testimony of its experts, the NRA's Motion is, at most, an airing of grievances with *ipse dixit* conclusions; substantive analysis is virtually non-existent. The only two invoices identified by the NRA are Invoice Nos. 166340 and 167038.[167] The NRA concludes without explaining that "AMc is not entitled to be paid for these invoices."[168] The NRA then complains of the narrative description on these invoices, describing them as unreasonable and perfunctory, without explaining how these narratives violate a term of the Services Agreement or are otherwise improper.  As set forth more fully in the AMc MSJ,[169] actual evidence and substantive analysis make clear that AMc is entitled to payment—and summary judgment.

### ii.    The NRA Has Waived Its Rights to an Untimely Dispute

**Second**, the NRA has contractually waived its rights to now complain about the invoices and refuse payment. The NRA's payment obligations are unambiguous:

> All sums payable to AMc under this Service Agreement shall be payable at AMc's corporate headquarters in Oklahoma City, Oklahoma within 30 days of the invoice date. Any amounts not received by AMc within 60 days from the date of the invoice shall bear interest at the rate of 1.0% per month from the date of the invoice until paid. NRA **shall** notify AMc of any questions concerning any invoices within 10 business days after receipt.[170]

The NRA had 10 business days to raise any questions or concerns with AMc about invoices it submitted to the NRA.[171] This requirement is not discretionary, and did not occur.[172] Indeed, the NRA even admits that there was no occasion in which *any* complaint was raised about an AMc

---

[166] *Id.*
[167] ECF 420 at 30 (citing to AMc-041863 and AMc-042052).
[168] *Id.*
[169] ECF 418 at ¶¶ 22-25.
[170] ECF 419-1, Ex. 35-A, Services Agreement § III.E (emphasis added) (APP 2382).
[171] *Id.*
[172] *See* ECF 419-1, Ex. 35, Winkler Decl. dated Nov. 29, 2021, at ¶ 21 (APP 2369); ECF 419-1, Ex. 29 Phillips Depo., at 63:12-64:3 (APP 1957); ECF 419-1, Ex. 12, Frazer Depo. (Virginia Action) 328:5-13 (APP 1032); *see also* ECF 419-1, Ex. 11 Supernaugh Depo., at 166:18-167:16 (APP 932), 170:6-11 (APP 933).

invoice that was not properly addressed by AMc.[173] Texas courts have ruled under very similar facts that invoices, contested for the first time only after a contractual challenge period, were sufficient summary judgment proof of performance, breach, and damages, granting summary judgment for a plaintiff.[174] The Service Agreement's unambiguous requirement that the NRA shall notify AMc of concerns necessarily shows that the NRA never had concerns with AMc's invoices—or that the NRA breached its notification obligations.

Because the NRA failed to notify AMc of any questions about AMc invoices, it is further relevant that the NRA continued to request and receive services provided by AMc. Had AMc known that the NRA purportedly questioned the sufficiency of its invoices, not only could AMc have sought to resolve alleged concerns, but AMc could have also mitigated its damages by discontinuing work. Because the NRA continued to receive AMc's invoices, declined to notify AMc of questions about AMc's invoices, and continued to receive the value of AMc's services, the NRA should be estopped from now contesting the validity of the unpaid invoices.

### iii.    AMc's invoices to the NRA were proper

**Third**, even if the NRA has not waived its rights to dispute the invoices, there is at least a genuine issue of material fact regarding whether AMc's invoices were proper. In fact, ample evidence confirms that the invoices *were* proper. The NRA asserts that it articulated its strengthened invoice procedures to AMc as early as August 8, 2018,[175] but it was not until April 2019 that the NRA first refused to pay an invoice.[176] And the NRA has admitted that if it paid an AMc invoice, the NRA was comfortable with the amount of detail and backup that AMc provided

---

[173] ECF 419-1, Ex. 29 Phillips Depo., at 64:21-65:6 (APP 1957-58).
[174] *See Triton 88 v. Star Elec. L.L.C.*, 411 S.W.3d 42, 59-60 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (upholding summary judgment for plaintiff on breach of contract where invoices were not contested under procedure established by contract over defendant's argument that its evidence of improper billing created fact issue.).
[175] ECF 420 at 29.
[176] *Id.* at 30.

to the NRA to support that invoice.[177] It must follow then that AMc's invoices were sufficient.

The same can be said for "Talent" Invoice Nos. 166340 and 167038—the only two invoices identified in the NRA's Motion.[178] Despite the Services Agreement being silent as to detail and support for invoices,[179] the NRA now complains of the narrative description on these invoices, but the NRA declines to mention that, like AMc's other invoices, the NRA paid these invoices—with the same narrative descriptions—until it decided to file a lawsuit.[180] To the extent the NRA contends that it changed its billing and invoicing guidelines in the fall 2018, the NRA nonetheless subsequently approved and paid these same invoices *after* that time.[181] There is no material difference between these invoices and the nearly identical "Talent" invoices previously paid by the NRA.[182] Because the NRA would not pay an invoice unless it was comfortable with the amount of detail and backup that AMc provided to the NRA to support that invoice, it must follow that the "Talent" invoices now contested years later are proper.

These conclusions are further supported by testimony from NRA officials. Indeed, Spray, the former CFO and Treasurer of the NRA who the Bankruptcy Court acknowledged was helpful to the NRA's course correction but then abruptly fired by the NRA after it filed for Chapter 11 bankruptcy without even advising him of it[183]—acknowledged that AMc's billing practices were proper, that AMc routinely requested preapprovals for costs, and that AMc cooperated with the NRA in invoicing for out-of-pocket expenses.[184] Incredibly, despite's AMc's compliance and despite Spray being "responsible for all financial services" of the NRA, Spray himself had no idea

---

[177] ECF 419-1, Ex. 29 Phillips Depo., at 137:17-22 (testifying that if the NRA paid an AMc invoice, that meant the NRA was comfortable with the amount of detail and backup provided by AMc to support the invoice.) (APP 1976).
[178] ECF 420 at 30.
[179] *See* ECF 419-1, Ex. 29 Phillips Depo., at 60:18-23 (APP 1956).
[180] *See* ECF 419-1, Ex. 35, Winkler Decl. dated Nov. 29, 2021, at ¶ 17 (APP 2367-68).
[181] *Id.*
[182] *Id.*
[183] NRA Bankruptcy, Order Granting Motions to Dismiss (May 11, 2021) (ECF 740).
[184] ECF 219-1, Ex. 13, Spray Depo. at 76:10-21 (APP 1070); 77:3-23 (APP 1071); 78:7-9 (APP 1071).

why the NRA refused to pay AMc invoices after April 2019.[185]  Like the rest of the NRA's claims, it was not until the NRA filed its lawsuit that it first alleged AMc's invoices were deficient.

### 5.   The NRA Motion Fails as to the $3MM Letter of Credit

In its shortest and most defective argument, the NRA seeks summary judgment on its obligation to post a $3,000,000 letter of credit solely because "[it] had no obligation" to post the credit.[186] The NRA provides no evidence, analysis, or support for its one-sentence conclusion.

The plain language of the 2018 Amendment establishes that the NRA (a) was required to post a $3 million letter of credit for the benefit of AMc and (b) failed to do so.[187] The 2018 Amendment expressly requires the NRA to post the letter of credit if at any time it failed to pay an invoice within 30 days of the invoice date.[188] The NRA frequently failed to make timely payments of AMc's invoices.[189] Indeed, in the second of half of 2018 alone, the NRA was late in paying more than 70 different invoices.[190] The NRA has confirmed that it never posted the $3 million letter of credit[191] despite Phillips—one of the signatories to the 2018 Amendment on behalf of the NRA–admitting that it should have done so.[192]

The 2018 Amendment further establishes that the line of credit is to be used "to pay in full invoices for service fee billings outstanding more than 30 days."[193] Thus, this letter of credit could have—and should have—been available to be drawn upon by AMc for invoices that were untimely paid in 2018 and for invoices that the NRA *never* paid after April 2019.

---

[185] *Id.* at 83:25-84:10 (APP 1072).

[186] ECF 420 at 30.

[187] ECF 419-1, Ex. 34-E, NRA's Obj. & Res to AMc's First RFA, at No. 68-69 (APP 2340).

[188] ECF 419-1, Ex. 35-B, 2018 Amendment at ¶ 2 (APP 2388).

[189] ECF 419-1, Ex. 35, Winkler Decl. at ¶ 25 (APP 2369); ECF 419-1, Ex. 35-H, Jackson Report at Ex. 8 (APP 2507).

[190] ECF 419-1, Ex. 35, Winkler Decl. at ¶ 25 (APP 2369); ECF 419-1, Ex. 35-H, Jackson Report at Ex. 7 (APP 2505); ECF 419-1, Ex. 11, Supernaugh Depo., at 167:20-169:17 (APP 932-33).

[191] ECF 419-1, Ex. 34-E, NRA's Obj. & Res to AMc's First RFA, at No. 68-69 (APP 2340).

[192] ECF 419-1, Ex. 29 Phillips Depo., at 179:2-180:22 (testifying that the Letter of Credit "should have been done" by the NRA") (APP 1986).

[193] ECF 419-1, Ex. 35-B, 2018 Amendment at ¶ 2 (APP 2388).

### 6.   The NRA's Motion Fails as to the Termination Provision

The NRA's Motion relating to AMc's claim under the Service Agreement's termination provision also fails because the NRA relies on non-existent restrictions in the Termination Provision and there is a genuine issue of fact as to the amount of damages owed by the NRA. Critically, the NRA does not dispute AMc's right to "a fair and equitable termination fee" under the Termination Provision.[194] Instead, the NRA contests the sufficiency of the evidence to support the amount of termination fees AMc is entitled to, even citing expert testimony proving up AMc's costs. This alone establishes that, at a minimum, there is a genuine question of fact as to the existence and breadth of AMc's damages under the Termination Provision.

Moreover, the NRA's arguments are unsupported by the language of the Services Agreement. For example, the NRA implicitly concedes that certain expenses for the winding down of offices are "reasonable costs" under the Termination Provision, but argues there is no evidence "that the NRA approved the leases, which leases were a business decisions and risks taken by AMc."[195] But the termination provision requires only that the fees be "negotiated in good faith by the parties" *in conjunction with the termination*.[196] There is no requirement that the "reasonable costs incurred" be approved by the NRA *before* they are incurred.[197]  More importantly, AMc has offered undisputed evidence that each of these leases was entered into with the direction, knowledge, and approval of the NRA, and for purposes of supporting the NRA pursuant to the Services Agreement.[198]  The NRA's efforts to impose a post hoc "reasonableness" and "approval" standard into the Services Agreement is just another example of the NRA's efforts to add non-

---

[194] *See* ECF 420 at 31. While the NRA avers that AMc is foreclosed from enforcing the agreement because of prior alleged breaches, the NRA does not separately contend that the termination provision is otherwise unenforceable or inapplicable. For the reasons set forth above, no such material breach by AMc occurred.
[195] ECF 420 at 31.
[196] *Id*.
[197] ECF 419-1, Ex. 35-A, Services Agreement § XI.F. (APP 2386-87).
[198] ECF 419-1, Ex. 35, Winkler Decl., dated Nov. 29, 2021, at ¶ 32 (APP 2374).

existent provisions into the Services Agreement, in a manner that would create absurd results by obviating the purpose of the provision in the first place.

### 7.  The NRA's Motion Fails as to AMc's Claim for Interest

In its final point, the NRA argues that it is entitled to all AMc's claims for interest because the NRA denies liability as to the claims upon which the interest calculations are based.[199] Notably, the NRA does not dispute AMc's entitlement to interest if it prevails on the underlying claims. And again, the NRA offers zero legal or factual support for its plea for summary judgment.

The Services Agreement provides that "[a]ll sums payable to AMc under this Services Agreement" are due "within 30 days of the invoice date."[200] Further, "[a]ny amounts not received by AMc within 60 days from the date of the invoice shall bear interest at the rate of 1.0% per month from the date of the invoice until paid."[201] AMc seeks claims relating to its unpaid invoices,[202] the NRA's breach of the Termination Provision,[203] the NRA's breach of the Indemnification Provision,[204] the NRA's breach of the 2018 Amendment relating to AMc-Third Party Contracts,[205] and invoices untimely paid.[206]

### B.  A Genuine Dispute of Material Fact Exists as to AMc's Fraud Claim

The Court should deny the NRA's Motion as to AMc's fraud claim because genuine issues of material fact exist. In contending otherwise, the NRA asserts four improperly narrow arguments in an attempt to recast AMc's fraud claim and distract from the real fraudulent conduct at issue: the large-scale, carefully orchestrated effort to turn AMc into the NRA's fall guy.

---

[199] ECF 420 at 34.
[200] ECF 419-1, Ex. 35-A, Services Agreement § III.E (APP 2382).
[201] *Id.*
[202] ECF 418 at V.A.1.
[203] *Id.* at V.A.3.
[204] *Id.* at V.A.4.
[205] *Id.* at V.A.5.
[206] *Id.* at V.A.6.

In Texas, fraud has four elements: (1) a material misrepresentation, (2) made intentionally or recklessly, (3) with the intent that plaintiff act upon it, and (4) justifiable reliance.[207]  Summary judgment is "rarely proper in fraud cases" because proving intent is a fact-intensive endeavor within the province of the fact-finder[208] and often involves consideration of circumstantial evidence both during and after the time of the representation.[209]  Although a party's failure to perform an alleged promise, on its own, is insufficient evidence to show an intent to defraud, even slight circumstantial evidence of fraud, when coupled with a breach of a promise, is sufficient to support a finding of fraudulent intent.[210]  Here, AMc has produced sufficient summary judgment evidence reflecting a genuine issue of material fact on each of the challenged elements.

### 1.   Fact Questions Exist Regarding LaPierre's Material Misrepresentations.

Legally sufficient summary judgment evidence supports AMc's allegations that (1) LaPierre made certain representations to prevent AMc from resigning the NRA account, and (2) those representations were false based on the NRA's subsequent conduct.

*First*, AMc executives at the October 11, 2018 meeting uniformly testified that LaPierre asked AMc executives to "stick with me" when AMc threatened to resign the account based on Brewer's threats and harassing behavior.[211]  In fact, a primary concern of AMc's was Brewer's

---

[207] Order, ECF 329, at 43 (quoting *JPMorgan Chase, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018).

[208] *HEI Res. East OMG v. Evans*, 413 Fed. App'x 712, 715 (5th Cir. 2011) (quoting *Rimdale Ltd. v. Hubbard Enters., Inc.*, 939 F.2d 138, 144 (5th Cir. 2004)).

[209] *Coffel v. Stryker Corp.*, 284 F.3d 625, 634 (5th Cir. 2002).

[210] *H.C. Oil & Gas Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 3:96-CV-2923-D, 2005 U.S. Dist. LEXIS 1508, at *21 (N.D. Tex. Feb. 2, 2005) (quoting *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986)).

[211] Ex. 5, W. Winkler Decl., dated June 3, 2020, at ¶¶ 13–14 [APP 88-89]; Ex. 6, Montgomery Decl., dated June 3, 2020, at ¶¶ 14–15 [APP 98-99]; Ex. 7, Makris Decl., dated June 3, 2020, at ¶¶ 6–8 [APP 105-06]; Ex. 4, McQueen Decl., dated June 3, 2020, at ¶ 4 [APP 59-60]; Ex. 14, Ex. 14, Duffy Depo., at 109:13-109:20 [APP 155]. The NRA even admits that LaPierre made this promise, as it notes the NRA took "earnest effort[s] to minimize contact between AMc and BAC." Motion, ECF 420, at 39; *see also* Ex. 15, Draft Termination of Services Agreement Letters, dated Oct. 11, 2018 [APP 203-07]. Furthermore, the NRA contends AMc cannot identify an "unnamed" person who received a December 2018 called from LaPierre repeating this promise. Motion, ECF 420, at 35. LaPierre had this phone conversation with Nader Tavangar in December 2018. Ex. 8, Tavangar Decl., dated June 3, 2020, at ¶ 6 [APP 114].

apparent attempt to "build a case" against AMc through repeated accusations of withholding documents.[212]  LaPierre promised that AMc would not have to interact with Brewer anymore thereafter.  The next day, LaPierre called Revan McQueen and reiterated his desire that AMc "stick with" the NRA.[213]  In response, Mr. McQueen made clear that AMc would cooperate with subsequent NRA audits with *any other* auditor besides the Brewer Firm, which resulted in the Cooper Kirk firm conducting the November 2018 Audit.[214]  Subsequent email communications between AMc and the NRA further reflect LaPierre's promise, and AMc's belief, that the Brewer Firm would have no further communications or dealings with AMc.[215]

*Second*, LaPierre's promise was false. By contrast, the NRA offers no evidence of truth besides the unsupported assertion that the parties "mutually understood" LaPierre's statements to be true.[216]  Yet LaPierre has admitted that, at least as early as September 2018, and before a single audit had ever occurred, the NRA intended to pursue litigation against AMc.[217]  AMc's threat to resign the NRA account at the October 11 meeting[218] would have jeopardized the NRA's offensive litigation strategy.  Beyond this circumstantial evidence of falsity, the NRA's subsequent conduct shows *actual* falsity.  Specifically, the Brewer Firm resumed contact with AMc in December 2018

---

[212] Ex. 13, Letter from J. Madrid to W. Brewer, dated Sep. 11, 2018 [APP 126-27] ("We are baffled by why you continue to send correspondence in a transparent effort to "build a case" of [AMc's] supposed non-compliance and lack of cooperation.").

[213] Ex. 4, McQueen Decl., dated June 3, 2020, at ¶ 4 [APP 59].

[214] Ex. 3, McQueen Decl., dated Mar. 30, 2020, at ¶ 25 [APP 52]; Ex. 4, McQueen Decl., dated June 3, 2020, at ¶ 6 [APP 60-61].

[215] Ex. 16, Letter from S. Rogers to J. Madrid, dated Dec. 21, 2019 [APP 208-09]; ECF 422, Ex. 25, Email between S. Hart and T. Makris, dated Dec. 14, 2018 [APP 534]; ECF 422, Ex. 80, Letter from J. Madrid to W. Brewer, dated Han. 4, 2019 (APP 2302) ("Mr. LaPierre agreed that neither the Brewer firm nor Josh Powell would have any further communications with AMc or its representatives."); *see also* Ex. 17, Email between S. Hart and S. Ryan, dated Jan. 16, 2019 [APP 212]. (agreeing to "deploy and supervise *other professionals*" besides the Brewer Firm to conduct the FRA audit) (emphasis added).

[216] Motion, ECF 420, at 36.

[217] Ex. 21, Letter from W. LaPierre to M. Dycio, dated Apr. 22, 2019 [APP 240] ("The NRA and I have common legal interests in the litigation against Ackerman McQueen which crystallized before the September Board meeting and colored the discussion that day."); ECF 419, Ex. 6, LaPierre Dep., dated Mar. 23, 2021, at 395:13-398:23 (APP 483-84]; Ex. 33, LaPierre Depo., dated Aug. 20, 2021, at 165:13-169:16 (APP 2230-31).

[218] Ex. 15, Draft Termination of Services Agreement Letters, dated Oct. 11, 2018 [APP 203-07].

with additional outrageous document demands,[219] and surreptitiously deployed the Brewer's Firm's former employee, Dillon, to manage and oversee the February 2019 FRA Audit,[220] even after agreeing to employ "other professionals" besides the Brewer Firm (a second false representation).[221]   The evidence plainly reflects a fact issue on the issue of falsity.

2.    **Fact Questions Exist as to Whether LaPierre Intended to Deceive AMc.**

Although the mere failure to perform a promise to do a future act, alone, cannot demonstrate an intent to defraud at the time the promise was made,[222] the non-movant only need show the "slightest circumstantial evidence" beyond the breach of a promise to defeat summary judgment.[223]   As stated above, the NRA was already intending to sue AMc before the October 11 Meeting and even before the September 2018 Brewer Audit,[224] which itself is circumstantial evidence that LaPierre did not want AMc to "stick with him" for any legitimate business purpose but just long enough to finish "building a case" of non-compliance against AMc, about which AMc had already expressed concerns.[225]   Apparently disappointed with the successful report of AMc's compliance from November 2018 CK Audit,[226] the NRA permitted the Brewer Firm to resume its demand to AMc on December 21, 2018 when the Brewer Firm requested all sorts of confidential and proprietary information from AMc, including relating to non-NRA clients.[227]   Then, in feigned compliance with LaPierre's promise, the NRA hired FRA to conduct the third audit of AMc.[228]

Even though the NRA promised to deploy "other professionals" besides the Brewer Firm

---

[219] Ex. 16, Dec. 21, 2018 Letter from S. Rogers to J. Madrid [APP 208-09].
[220] ECF 422, Ex. 13, Dillon Depo., at 16:25–21:3 [APP 130-32]; Ex. 14, Duffy Depo., at 274:14-275:9 [APP 196].
[221] *See* Ex. 17, Email between S. Hart and S. Ryan, dated Jan. 16, 2019 [APP 212].
[222] Motion, ECF 420, at 36.
[223] *H.C. Oil & Gas Corp.*, 2005 U.S. Dist. LEXIS 1508, at *20 (quoting *Spoljaric*, 708 S.W.2d at 435).
[224] Ex. 21, Letter from W. LaPierre to M. Dycio, dated Apr. 22, 2019 [APP 240]; ECF 419, Ex. 33, LaPierre Depo., dated Aug. 20, 2021, at 165:13-169:16 (APP 2230-31); ECF 419, Ex. 6, LaPierre Depo., dated Mar. 23, 2021, at 395:13-398:23 (APP 483-84).
[225] Ex. 13, Letter from J. Madrid to W. Brewer, dated Sep. 11, 2018 [APP 126-27].
[226] Ex. 1-K, Email between N. Reaves and Bill Winkler, dated Nov. 16, 2018 [APP 35].
[227] Ex. 16, Letter from S. Rogers to J. Madrid, dated Dec. 21, 2019 [APP 208-09].
[228] ECF 422, Ex. 27 Agreement for Forensic Accounting Services, dated Jan. 29, 2020 (APP 541–558).

to conduct the audit,[229] the NRA failed to disclose that Dillon—who actually oversaw the September 2018 Brewer Audit for the Brewer Firm would be doing the same thing for FRA as part of the February 2019 FRA Audit.[230] The NRA certainly never disclosed that the FRA engagement letter specifically addressed "contemplated litigation."[231]  Ample evidence reflects the NRA's intent to build a lawsuit against AMc and underscores LaPierre's intent to deceive AMc by asking its executives to "stick with him" at the October 11 Meeting and continue to perform work for the NRA for nine-plus months only to turn around and refuse to pay AMc for much of that work.

### 3.   The NRA Owed a Duty to Disclose.

When nondisclosure of a material fact is the basis for a fraud claim, duty to speak arises in numerous ways: (1) "when one voluntarily discloses information, the whole truth must be disclosed"; (2) "when one makes a representation, new information must be disclosed *when that new information makes the earlier representation misleading or untrue*"; or (3) "when one makes a partial disclosure and conveys a false impression."[232] Notably, parties whose representations have become misleading upon learning new information have been found liable when they refuse to disclose new information to induce the other party to remain in a contract.[233]

The NRA seeks to restrict the scope of the nondisclosure to Dillon's involvement with the FRA Audit, which the NRA owed a duty to disclose based on its previous representations and partial disclosures.  As discussed above, LaPierre admitted he and the NRA shared a common legal

---

[229] *See* Ex. 17, Email between S. Hart and S. Ryan, dated Jan. 16, 2019 [APP 212].

[230] Ex. 5, Winkler Decl. at ¶ 9 [APP 86-87].

[231] ECF 422, Ex. 27 Agreement for Forensic Accounting Services, dated Jan. 29, 2020 (APP 544).

[232] *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 481 (5th Cir. 2000) (analyzing Texas law).

[233] *See, e.g.*, *Tomlinson v. Clem (In re Clem)*. 583 B.R. 329, 329 (Bankr. N.D. Tex. 2017) (determining that the defendant-debtor was liable for fraud by nondisclosure for failing to tell plaintiffs a new type of pier would be used in constructing their house despite earlier representing that a different pier would be used as defendant-debtor "intentionally concealed [this] material fact[] from the [plaintiffs], knowing they were unaware, with the intention of inducing the [plaintiffs] *to stay in the Contract*").

interest as of September 2018 in suing AMc.[234]  Utilizing the Brewer Firm to obtain these records marked the first step towards informing this lawsuit, yet, when Brewer's aggression endangered continued audits and AMc's relationship with the NRA, LaPierre kept AMc close by promising it no further contact with Brewer or BAC.[235]  The NRA represented that the third auditor would not involve the Brewer Firm,[236] but the inclusion of Dillon, a Brewer employee who oversaw the September 2018 Brewer Audit, eviscerated any claim that this third audit was independent, giving rise to a duty to disclose based on the NRA's prior representations.

The NRA's contentions that these representations were not material also fails as a matter of law.  AMc was prepared to end the parties nearly 40 year relationship—an undisputed contractual right it held under the Services Agreement[237]—if it continued to deal with Brewer and his firm going forward.[238]  Thus, the materiality of LaPierre's representations to AMc go to the heart of AMc's willingness to continue servicing the NRA after the October 11 2018 meeting, something that it had no obligation to do.

However, whether or not the NRA had a duty to disclose Dillon's employment with FRA is not the sole fraud at issue in this matter.  Rather, Dillion's surreptitious employment with FRA merely illustrates the NRA's larger intent: to manufacture self-serving audit reports to create the appearance of a rogue vendor whom the NRA could publicly blame for its own malfeasance and denounce as part of its "self-correction" measures.  Stated differently, the issue is not that the NRA did not disclose to AMc the resumes of individuals working for FRA. Rather, the salient issue is that the NRA's deployment of Brewer-affiliated auditors after LaPierre's October 2018

---

[234] ECF 419, Ex. 6, LaPierre Depo., dated Mar. 23, 2021, at 395:13-398:23 (APP 483-84); Ex. 33, LaPierre Depo., dated Aug. 20, 2021, at 165:13-169:16 (APP002230–002231).
[235] Ex. 5, Winkler Decl. at ¶ 9 [APP 86-87].
[236] *Id.*; *See* Ex. 17, Email between S. Hart and S. Ryan, dated Jan. 16, 2019 [APP 212].
[237] *See* ECF 419-1, Ex. 35-A, Services Agreement, Section XI (Termination Provision) [APP 2385-87].
[238] Ex. 15, Draft Termination of Services Agreement Letters, dated Oct. 11, 2018 [APP 203-07].

representations, which sought to keep AMc providing services to the NRA under the Services Agreement, constitutes "new information" imposing upon the NRA a duty to inform AMc that the FRA audit would not cohere with the promises made in the October 2018 meeting.[239]

### 4. AMc's Reliance on LaPierre's 2018 Representations was Justified.

To meet the reliance element of fraud, the plaintiff must show that (i) it actually relied on the representation and that (ii) the plaintiff was justified in doing so.[240] The NRA argues that AMc has not met the second prong—justifiable reliance—because "AMc had an unqualified obligation to let the NRA examine its files, books, and records with respect to matters covered under the Services Agreement."[241] As support, the NRA cites the Third Restatement of Torts and *Gray v. Waste Resources, Inc.*[242] for the proposition that "[w]here . . . the fraud claimant 'would have been legally obliged to follow the same course regardless of what the defendant said, there can be no justifiable reliance.'"[243] These arguments fail for three reasons.

*First*, the NRA's contention that AMc would be legally obliged to allow FRA to conduct its audit is simply false. For instance, rather than allowing this audit of AMc's records, AMc could have invoked its right to terminate the contract under Section XI of the Services Agreement[244]—just as it was preparing to do at the October 2018 meeting before LaPierre's "stick with me" plea.[245] Contrary to the NRA's claims, AMc could have resigned—and indeed planned to resign—unless the NRA agreed to ensure no more dealings between AMc and the Brewer Firm.[246] Specifically,

---

[239] *See Tomlinson*, 583 B.R. at 329 (imposing liability for fraud for failing to disclose new material information contrary to a previous representation in order to keep the other party within the contract).
[240] Order, ECF 329, at 43 (quoting *JPMorgan Chase, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018).
[241] Motion, ECF 420, at 40 (internal citations omitted).
[242] 222 S.W.3d 522, 525 (Tex. App.—Houston [14th Dist.] 2007, no pet.).
[243] Motion, ECF 420, at 40.
[244] ECF 419, Ex. 35-A, Services Agreement [APP 2385-87].
[245] Ex. 15, Draft Termination of Services Agreement Letters, dated Oct. 11, 2018 [APP 203-07].
[246] *See* ECF 419-1, Ex. 35-A, Services Agreement, Section XI (Termination Provision) [APP 2385-87].

as relations between AMc and the Brewer firm deteriorated, AMc drafted resignation letters that it was prepared to present to LaPierre at the October 11 Meeting if he did not agree that AMc would no longer have to deal with Brewer or his firm.[247] Further, Angus prepared a draft letter in September 2018 to send to LaPierre recognizing the likely end of the parties' decades-long relationship (and also noting Brewer's threats).[248] Hence, LaPierre's October 2018 representations were both material and sufficient to assuage AMc's concerns regarding Brewer's hostility and to convince AMc to continue working with the NRA.[249]

*Second*, the NRA again invents new contractual obligations by reading the Record Inspection Clause to mean "AMc would have been obligated to allow the records examinations no matter which professionals the NRA sent."[250] Yet, the language of the Records Inspection Clause does not foreclose AMc from negotiating with the NRA over the particulars of implementing the inspection.[251] In fact, the parties did just this in following LaPierre's October 2018 representations, which resulted in the November 2018 CK audit.[252] Thereafter, the NRA represented that it would employ "other professionals" unaffiliated with Brewer.[253] Thus, given the parties' actions in reaching an agreement on how to conduct an audit, the Services Agreement cannot be read—as a matter of law—to preclude AMc's justifiable reliance on the NRA's post-contractual representations that AMc would not have to deal with the Brewer firm if AMc "stuck with" the NRA and continued work under the Services Agreement.

*Third*, the NRA's own conduct evinces it ought to be estopped from suggesting that AMc's reliance on LaPierre's October 2018 representations is barred as a matter of law. "Quasi-estoppel

---

[247] *Id.*; Ex. 3, McQueen Decl., dated March 30, 2020, at ¶¶ 24-25 [APP 51-52].
[248] ECF 422, Ex. 16, Draft letter from A. McQueen to W. LaPierre, dated Sept. 24, 2018 [APP 182-91].
[249] Ex. A., W. Winkler Decl., at ¶ 9 [APP 86-87].
[250] Motion, ECF 420, at 40.
[251] ECF 419, Ex. 35-A, Services Agreement, Section VIII [APP 2385].
[252] Ex. 3. McQueen Decl., dated March 30, 2020, at ¶ 25 [APP 52].
[253] Ex. 17, Email between S. Hart and S. Ryan, dated Jan. 16, 2019 [APP 212].

precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken. The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit."[254]  AMc was prepared to resign the NRA account if it had to continue to deal with Brewer or his firm.[255] Yet, because of LaPierre's representations that AMc would no longer have to deal with the Brewer firm if AMc "stuck with" the NRA and continued their relationship, AMc agreed and continued performing under the Services Agreement, agreed to budget cuts for the fourth quarter of 2018,[256] agreed to the 2019 budget,[257] committed additional resources to continue its work for the NRA,[258] and cooperated with an independent auditor, the Cooper Kirk firm, for the second audit.[259]  The NRA should be estopped from benefitting from such a starkly different position now it has become convenient in this litigation.

## C.  AMc's Conspiracy Claims Survives Summary Judgment

The Court should deny the NRA's Motion as to AMc's conspiracy claim because genuine issues of material fact remain as to the first element of conspiracy, "a combination of two or more persons," which is the only element the NRA challenges.[260]  However, the actions of Brewer, LaPierre, and Powell remove them from the protections of the intracorporate conspiracy doctrine.

### 1.  Brewer's Actions Defaming and Defrauding AMc Were Independent from His Representation of the NRA—thus, Brewer is a Cognizable Conspirator.

Relying on the factually dissimilar Third Circuit case of *Heffernan v. Hunter*, the NRA

---

[254] *Tex. Capital Bank v. Zeidman*, 779 Fed. App'x 211 (5th Cir. 2019) (per curiam).
[255] Ex. 15, Draft Termination of Services Agreement Letters, dated Oct. 11, 2018 [APP 203-07]; ECF 422, Ex. 16, Draft letter from A. McQueen to W. LaPierre, dated Sept. 24, 2018 [APP 182-91]; Ex. 3. McQueen Decl.,dated March 30, 2020, at ¶¶ 24–25 [APP 51-52].
[256] Ex. 22, 2019 Budget [APP 241].
[257] *Id.*; Ex. 6, Montgomery Decl., dated June 3, 2020, at ¶ 16 [APP 99-10]; *see also* Ex. 23, 2019 Billing Schedule [APP 242].
[258] *See, e.g.*, Ex. 29, Email between M. Montgomery and C. Spray, dated Jan. 5, 2019 [APP 725-26].
[259] Ex. 1, Winkler Decl., dated Dec. 20, 2021, at ¶¶ 23-24 (APP 9-10); Ex. 1-K.
[260] Motion, ECF 420, at 40–41.

argues that the Brewer Firm is not a co-conspirator due to its attorney-client relationship with the NRA, despite Brewer's "mixed motives" of hostility toward the McQueen family and AMc.[261] However, *Heffernan* distinguishes between "motives" and "conduct" in determining whether an attorney is a cognizable co-conspirator.[262] Moreover, the longstanding rule in Texas holds a lawyer liable if he "knowingly enters into a conspiracy to defraud a third person."[263]

Although the attorney in *Heffernan* took actions consistent with proper representation (despite a subjective *motive* to enhance his own representation at the same time),[264] Brewer's actions were plainly outside of the scope of representation because the sole purpose was to harass the McQueen family and harm their business. *First*, as a preliminary matter, multiple courts have already determined that the Brewer Firm is a competitor of AMc.[265] *Second*, it is well-established that Brewer displayed animosity towards Angus,[266] that he threatened that AMc would be brought up on RICO charges, that the FBI would raid AMc's offices, and that a dying Angus McQueen

---

[261] Motion, ECF 420, at 42.

[262] *Heffernan v. Hunter*, 189 F.3d 405, 413 (3d Cir. 1999) ("It is, of course, axiomatic that if the challenged conduct occurs outside the scope of representation, no reason for immunity exists and the attorney and the client, as individuals, could form a conspiracy." "We cannot say that the activities of Bochetto and his firm were beyond the scope of the attorney-client relationship *so as to make them susceptible to characterization as a conspiracy*.") (emphasis added); *see also Starks v. Chuhak & Tecson, P.C.*, NO. 17-62366-CIV-COHN/SELTZER, 2019 U.S. Dist. LEXIS 10043, at *14–16 (S.D. Fla. Jan. 18, 2019) (a plausible claim was stated naming an attorney of the defendant as a co-conspirator given the independent actions the attorney took to assist the client with a scheme to defraud investors).

[263] *Miller v. Stonehenge/Fasa-Texas, JDC, L.P.*, 993. F. Supp. 461, 465 (N.D. Tex. 1998) (quoting *Likover v. Sunflower Terrace II, Ltd.*, 696 S.W.2d 468, 472 (Tex. App.—Houston [1st Dist.] 1985, no writ)); *see also Transtexas Gas Corp. v. Stanley*, 881 F. Supp. 268, 270–71 (S.D. Tex. 1994) (explaining that defendant's arguments that he could not conspire with his attorney because the attorney as agent is not a separate legal person "flies in the face of well-established precedent" since "Texas appellate courts have held attorneys liable for conspiring with their clients to commit torts against third-parties") (citing *Kirby v. Cruce*, 688 S.W.2d 161, 164–65 (Tex. App.—Dallas 1989, writ ref'd n.r.e.); *Likover*, 696 S.W.2d at 472–73; *Hennigan v. Harris County*, 593 S.W.2d 380 (Tex. App.—Waco, 1979, no writ); *Bourland v. State*, 528 S.W.2d 350, 357 (Tex. App.—Austin 1975, writ ref'd n.r.e.)).

[264] *Heffernan*, 189 F.3d at 413.

[265] *See* ECF 80, Ex. A-58, at 6:13-20, 19:18-10:16, 42:4-22 (APP 934, 947–949, 970) (granting protective order to wall off Mr. Brewer from seeing AMc's highly confidential business information given the Brewer firm's desire to compete with AMc's business); Order, ECF 148, at 4–5 (granting AMc's protective order over highly confidential information in the Texas Action because, to not grant it, would allow the NRA to circumvent the Virginia Action protective order barring Brewer from seeing AMc highly confidential business information).

[266] Ex. 3, McQueen. Decl., dated Mar. 30, 2020, at ¶¶ 5-7 [APP 47].

and his son would be imprisoned.[267]  *Third*, Brewer demanded documents from AMc that were far beyond the scope of prior NRA audits,[268] which NRA executives did not want or need.[269]  *Fourth*, as part of the NRA's plan to falsely blame AMc for its own financial mismanagement, Brewer utilized his consultant of seventeen years, Dillon, to participate in the supposedly "independent" FRA audit, despite LaPierre's promises that Brewer would have no more dealings with AMc.[270]  *Fifth*, Brewer assisted Powell in drafting a defamatory letter to the NRA Board accusing AMc of the crime of extortion without any evidence.[271]  In fact, Brewer's ubiquitous role in the underlying facts of this case led Magistrate Judge Toliver to order the deposition of Brewer as a fact witness.[272]  As a result, there is a genuine issue of material fact regarding Brewer's role as a co-conspirator.

Moreover, the NRA also argues the Service Agreement's exclusivity language forecloses AMc's arguments suggesting Brewer and the Brewer Firm conspired with the NRA to overtake AMc's contractual responsibilities.[273]  The NRA relies on a selective portion of the Services Agreement—ignoring the fact that the quoted portion is a "whereas" recital.[274]  As the Virginia Supreme Court recently stated, "[r]ecitals in a contract are not binding on the parties . . . . Instead, recitals are merely explanations of 'the reasons for entering into [the contract] or the background

---

[267] Ex. 7, Makris Decl., dated June 3, 2020, at ¶ 5 [APP 104-05]; ECF 419-1, Ex. 1, Winkler (AMc Corporate Representative) Depo., dated Mar. 26, 2021, at 96:5-9 (APP 24); ECF 419-1, Ex. 20, Makris Hr'g Trans., dated Apr. 16, 2021, at 114:9-115:6 (APP 1728–29).

[268] Ex. 3, McQueen Decl., dated Mar. 30, 2020, at ¶ 21 [APP 50-51].

[269] Ex. 1-I, Email between J. Frazer and L. Cremer, dated Sept. 17, 2018 [APP 32-32]; Ex. 16, Letter from S. Rogers to J. Madrid, dated Dec. 21, 2019 [APP 208-09] (requesting information related to AMc's other clients). In his deposition, Steve Hart explained that the Brewer Firm's requests during the audits sought information AMc would never give up and that the Brewer Firm's requests were unreasonable. ECF 419-1, Ex. 10, J. Steven Hart Depo., dated Feb. 4, 2020, at 230:2–232:18 (APP826).

[270] Ex. 5, Winkler Decl., dated June 3, 2020, at ¶ 9 [APP 86-87].

[271] ECF 419-1, Ex. 14, North Depo., 236:19-237:2 [APP 1174-75], 156:6-24 [APP 1154], 235:23-236:3 [APP 1174]; ECF 419-1, Ex. 15, Hallow Depo., 173:19-174:4 [APP 1231], 175:13 – 176:4 [APP 1231], 181:12 – 182:12 [APP 1233], 183:1 – 10 [APP 1233], 207:4-13 [APP 1239], 206:15-208:19 [APP] 1239; ECF 419-1,  Ex. 16, Meadows Depo., 197:10-18 [APP 1293]; ECF 419-1,  Ex. 17, Boren Depo., 29:14 – 30:02 [APP 1348], 139:7-12 [APP 1375], 37:25-38:04 [APP 1350], 38:17-18 [APP 1350], 58:2-10 [APP 1355]; *see also*, ECF 141, Ex. F, Martin Decl. (APP 44-46).

[272] Electronic Order, ECF 430.

[273] Motion, ECF 420, at 42-43.

[274] ECF 419-1, Ex. 35-A, Services Agreement (APP 2377).

of the transaction . . . ."[275] The NRA has pointed to no ambiguity in the Services Agreement (which is governed by Virginia law) that might permit looking to this recital to clarify its terms.[276] Thus, this argument is legally and factually insufficient, and summary judgment is improper.

### 2. LaPierre and Powell's Actions to Defraud and Defame AMc Were Undertaken for Personal Purposes Outside the Scope of Their Employment.

Ordinarily, the jury is best suited to determine scope-of-employment issues because of their fact-intensive nature.[277]   Although the intracorporate conspiracy doctrine generally prohibits employees from conspiring with their corporate employer, exceptions exist where the alleged conspirators have "an independent stake in achieving the object of the conspiracy"[278] or "are acting for their own personal purposes."[279] Moreover, it is inapplicable when they "act outside the scope of their employment, their actions exceed the bounds of their authority, or they have engage[d] in unauthorized acts."[280] Courts routinely deny summary judgment where fact questions implicate one or more exceptions,[281] and they have recognized that "circumstantial evidence may support a

---

[275] *Va. Fuel Corp. v. Lambert Coal Co.*, 781 S.E.2d 162, 168 n.5 (Va. 2016) (alteration in original) (internal citations omitted) (quoting Black's Law Dictionary 1462 (10th ed. 2014)); *see also Wells Fargo Bank, N.A. v. Highland Constr. Mgmt. Servs., L.P.*, 807 Fed. App'x 246, 250 (4th Cir. 2020) (citing *Va. Fuel Corp.*, 781 S.E.2d at 168 n.5) ("Guyant IRA relies on a recital from the front matter of the 2008 Amendment for its 16% calculation, but contract recitals are not binding absent ambiguity."); *Murray v. Shannon*, 20-CV-2285(EK)(RLM), 2021 U.S. Dist. LEXIS 191315 (E.D.N.Y. Sept. 30, 2021) (applying Virginia law and citing to *Virginia Fuel Corp.* for the rule that "[l]anguage appearing in a contract's preliminary recitals . . . is not binding under Virginia law"). The NRA has not argued that any of the Services Agreement's provisions are ambiguous.

[276] *See Highland Constr. Mgmt. Servs., L.P.*, 807 Fed. App'x at 250 (rejecting argument that contract recitals were binding once determine the contract's language to be unambiguous).

[277] *See Majano v. United States*, 469 F.3d 138, 140 (D.C. Cir. 2006) ("[S]cope of employment questions are generally viewed as questions of fact best resolved by a jury."); *Arbelaez v. Just Brakes Corp.*, 149 S.W.3d 717, 720 (Tex. App.—Austin 2004, no pet.) ("Course and scope of employment is generally a fact issue . . . . In the context of a traditional motion for summary judgment, controlling fact issues are generally for the trier of fact . . . .").

[278] *Collins v. Bauer*, 2012 U.S. Dist. LEXIS 17769, at *19 (N.D. Tex. Jan. 23, 2012) (quoting *H&B Equip. Co. v. Int'l Harvester Co.*, 577 F.2d 239, 244 (5th Cir. 1978)).

[279] *Id.* at *20 (citing *Dussouy v. Gulf Cost Inv. Corp.*, 660 F.2d 594, 603 (5th Cir. 1981)); *Ameristar Jet Charter, Inc. v. Signal Charter Composites, Inc.*, No. 3:98-CV-1360-M, 2002 U.S. Dist. LEXIS 7670, at *13 (N.D. Tex. Apr. 30, 2002) (a conspiracy existed between company and consultant because the consultant, who also owned a different company, "was acting in the interest of and on behalf of both [the company] and his own [different] company").

[280] *Id.* at *21 (citing *Buschi v. Kirven*, 775 F.2d 1240, 1252–53 (4th Cir. 1985)).

[281] *See, e.g.*, *Sanders v. Long Island Newsday*, CV 09-2392 (JFB) (SIL), 2015 U.S. Dist. LEXIS 124601, at *46–47 (E.D.N.Y. July 14, 2015) ("As there are genuine issues of material fact regarding whether Defendants were acting for their own personal interest . . ., the intracorporate conspiracy doctrine is not a basis for granting summary judgment . . . ."); *Briner v. City of Ontario*, No. 1:07CV129, 2010 U.S. Dist. LEXIS 107348, at *47 (N.D. Ohio Oct. 7, 2010)

finding of personal motive or actions beyond the scope of employment."[282]

The summary judgment evidence shows that LaPierre had a uniquely personal purpose in conspiring to defraud and defame AMc.  Specifically, as investigations into the NRA threatened to expose NRA executives' self-dealing and financial mismanagement, LaPierre worried about his own personal liability and repeatedly told others that Brewer was the only person who could keep him "out of jail."[283]  In fact, LaPierre's need for a scapegoat was the driving force behind the premeditated litigation against AMc in September 2018—before the first Brewer audit.[284]  Thus, when AMc threatened to resign the NRA account unless LaPierre promised no more dealings with Brewer, LaPierre falsely assured AMc of this at the October 11 Meeting.[285]  Thereafter, when North confronted LaPierre about Brewer, LaPierre peddled a baseless criminal accusation to the NRA Board and to the media accusing AMc of extortion.[286]

Of course, Powell also had personal reasons for conspiring to defraud and defame AMc as well. As a prime architect of the Carry Guard program, which was the subject of lawsuits in New York, Powell hoped to shift the spotlight anywhere but on himself—and AMc proved a convenient scapegoat.  Although the NRA claims AMc cannot prove Powell was involved in drafting the defamatory April 25 Letter (since LaPierre signed it), this unsupported statement forgets that

---

("Because there are questions of fact as to whether the acts were performed within the scope of employment, summary judgment…on the issue of the intracorporate conspiracy doctrine would be inappropriate."); *Maxey v. Smith*, No. 1:93cv122-D-D, 1996 U.S. Dist. LEXIS 21285, *18–19 (N.D. Miss. Feb. 12, 1996) (denying summary judgment under the intracorporate conspiracy doctrine).

[282] *Muhammad v. Westinghouse Elec. Co. LLC*, No. 3:12-cv-03298-JFA, 2013 U.S. Dist. LEXIS 140581, at *26 (D.S.C. Sept. 30, 2013).

[283] Ex. 3, McQueen Decl., dated Mar. 30, 2020, at ¶ 16 [APP 49]; Ex. 6, Montgomery Decl., dated June 3, 2020, at ¶ 17 [APP 100]; Ex. 7, Makris Decl., dated June 3, 2020, at ¶ 10 [APP 96].

[284] Ex. 21, Letter from W. LaPierre to M. Dycio, dated Apr. 22, 2019 [APP 240]; *see also* ECF 422, Ex. 27, Agreement for Forensic Accounting Services provided by FRA, dated Jan. 29, 2019 (APP 544) (reflecting litigation as purpose of engagement).

[285] *See* Ex. 5, W. Winkler Decl., dated Jue 3, 2010, at ¶¶ 13–14 [APP 88-89]; Ex. 6, Montgomery Decl., dated June 3, 2020, at ¶¶ 14–15 [APP 98-99]; Ex. 7, Makris Decl., dated June 3, 2020, at ¶¶ 6–8 [APP 105-06]; Ex. 4, McQueen Decl., June 3, 2020, at ¶ 4 [APP 59]; Ex. 14, Duffy Depo., at 109:13–109:20 [APP 155].

[286] Ex. 42, Letter from W. LaPierre to NRA Board, dated Apr. 25, 2019 [APP 1049-50].

Powell admitted in his tell-all exposé that he and Brewer wrote the letter together.[287]  Thus, Powell acted beyond the scope of his employment and thus is a cognizable co-conspirator.

### D.  Fact Questions Exist on AMc's Declaratory Judgment Claim.

The Court should deny the NRA's Motion regarding AMc's declaratory judgment claim. As part of its Motion, the NRA is asking the Court to ignore the NRA's prior material breaches of the Services Agreement, to permit the NRA to continue to put out false and defamatory statements in various forums and throughout the media, and then at the same time hold AMc hostage by claiming that it is precluded from defending itself because of the Confidentiality Clause.[288]

As this Court noted at the Pleadings stage, "factual questions remain as to whether the NRA waived . . . its rights under the confidentiality clause or is otherwise estopped from invoking it as a "sword" or "shield" in this or other litigation."[289] Nevertheless, the NRA claims it neither waived nor is estopped from invoking the Confidentiality Clause (Section IV).[290] It also claims Section IV is not unconscionable under Virginia law.[291] Each of these arguments fail.

As the NRA notes, waiver requires proof of (1) a party's knowledge of rudimentary facts to exercise a known right, and (2) intent to relinquish the right.[292] It may be proved expressly, but it also "may be inferred from the conduct of the waiving party."[293]  Notably, "[q]uestions of intent are hard to decide on summary judgment. They are almost always inferential, and best left to the trier of fact who can observe witnesses and determine whether explanations hold water."[294]

---

[287] Ex. 36, Excerpts from Chapter 8, Joshua L. Powell, INSIDE THE NRA, at 183 [APP 1021] ("Bill [Brewer] and I immediately decided we needed to send a letter to the board. *Let's blow this up*, we thought. *Let's just throw it straight back at Ollie* [Col. North].") (emphasis added).

[288] *See* ECF 419-1, Ex. 35-A, Services Agreement § IV (Confidentiality Clause) (APP 2382).

[289] Order, ECF 329, at 54-55.

[290] Motion, ECF 420, at 46.

[291] *Id.*

[292] *Id.*; *Va. Polytechnic Inst.*, 595 S.E.2d at 6.

[293] *Bernsen v. Innovative Legal Mtkg., LLC*, 885 F. Supp. 2d 830, 834 (E.D. Va. 2012) (quoting *Perry Eng'g Co. v. AT&T Comm'cns, Inc.*, No. 92-2050, 1993 U.S. App. LEXIS 17432, at *13 (4th Cir. July 13, 1993)).

[294] *Ferrell v. Harris Ventures, Inc.*, 812 F. Supp. 2d 741, 748 (E.D. Va. 2011).

Because "waiver is generally a factual issue that depends on a party's conduct, acts, and course of dealing,"[295] courts routinely deny summary judgment on these questions to enable the jury to weigh competing evidence of intent to waive.[296]   Likewise, equitable estoppel is a "well-established concept invoked by courts to aid a party who, in good faith, has relied, to his detriment, upon the representations of another."[297] It comprises "(1) a representation, (2) reliance, (3) change of position, and (4) detriment."[298] Courts frequently deny summary judgment on equitable estoppel claims due to their fact-based questions.[299]

### 1.   The NRA Waived its Right to Enforce the Confidentiality Clause.

The NRA argues it cannot have had the intent to waive its rights under the Confidentiality Clause, because, on a handful of occasions, it sent warning letters to AMc or sought protection over confidential materials during litigation. However, the NRA ignores the undisputed fact that it materially breached the Services Agreement as early as May 2018—when it failed to post the $3 million letter of credit,[300] especially when it was repeatedly late on payments throughout 2018, and then again around May 15, 2019—the first due date of AMc invoices the NRA still has not paid, and then again throughout 2018 and 2019—when it paid AMc's invoices grossly late and/or

---

[295] *McKesson Med.–Surgical, Inc. v. Flower Orthopedics Corp.*, No. 3:17cv631, 2018 U.S. Dist. LEXIS 26127, at *14 (E.D. Va. Feb. 15, 2018).

[296] *See, e.g.*, *Bernsen*, 885 F. Supp. 2d at 834 (denying summary judgment as to waiver given "the court's recognition of two potentially valid and contradictory interpretations of the submitted evidence as it relates to ILM's intent, and thus waiver"); *G.H. Bass & Co. v. Dalsan Properties-Abilene*, 885 S.W.2d 572, 578 (Tex. App.—Dallas, 1994, no pet.) ("Because the summary-judgment evidence created a fact issue as to Bass's waiver defense, we hold the trial court erred in granting summary judgment in the landlord's favor.").

[297] *Graham v. Pactiv Corp. Benefits Comm.*, 301 F. Supp. 2d 482 (E.D. Va. 2004).

[298] *Princess Anne Hills Civic League v. Susan Constant Real Estate Trust*, 413 S.E.2d 599, 603 (Va. 1992).

[299] *Intelligent Dig. Sys., LLC v. Beazley Ins. Co.*, 906 F. Supp. 2d 80, 95 (E.D.N.Y. 2012) (quoting *Dunlop-McCullen v. Pascarella*, 97 Civ. 0195 (PKL)(DFE), 2002 U.S. Dist. LEXIS 21854, at *51 (S.D.N.Y. Nov. 13, 2002) ("Estoppel is usually a fact question inappropriate for summary judgment."); *see also Chi. Reg'l Council of Carpenters Pension Fund v. Carlson Constructors Corp.*, No. 17-cv-04242, 2021 U.S. Dist. LEXIS 62640, at *71 (N.D. Ill. Mar. 31, 2021) ("[Q]uestions of material fact exist as to the equitable estoppel defense…").

[300] ECF 419-1, Ex. 29 Phillips Depo., at 179:2-180:22 (testifying that the Letter of Credit "should have been done" by the NRA") (APP 1986).

refused to pay them at all.[301] A party who commits a material breach cannot enforce the contract,[302] and, under well-established Virginia law, "failure to make a timely payment constitutes a material breach."[303] By failing to post the $3 million letter of credit and choosing not to pay AMc's invoices after they became due, the NRA materially breached the Services Agreement and "unequivocally manifested"[304] conduct inconsistent with a continued right to enforce the Confidentiality Clause.

## 2.   The NRA is Estopped From Enforcing the Confidentiality Clause.

The NRA claims AMc cannot produce any evidence as to the elements of equitable estoppel. However, once again, the NRA ignores its own material breach following nonpayment of AMc's invoices when claiming estoppel does not apply here. For instance, the AMc entered the Services Agreement understanding that, when it terminated, AMc would no longer be held to its provisions. Yet, after the NRA initiated its phony lawsuits and materially breached the Services Agreement by failing to pay for AMc's invoiced services, AMc sought to defend itself amidst an NRA-driven media blitzkrieg in the "court of public opinion" that aimed to blame AMc for the NRA's own failings.[305] Yet, despite its earlier material breach, the NRA invoked the Confidentiality Clause to muzzle AMc from responding to clear its name.[306] Clearly, the NRA wants it both ways: it wants whatever benefits it saw by materially breaching the Services Agreement as well as the benefit of continuing to hold AMc to the Confidentiality Clause of the agreement the NRA breached. Thus, the NRA ought to be estopped.

---

[301] ECF 417, Ex. 35-H, Amended Expert Report of Daniel Jackson (Oct. 15, 2021) at Ex. 7 (APP 2505) (showing invoices 166104–166110 were due on May 15, 2019 but remain outstanding and accruing interest); ECF 419-1, Ex. 35, Winkler Decl., dated November 29, 2021, at ¶¶ 15-25 (APP 2366).
[302] *Horton v. Horton*, 487 S.E.2d 200, 204 (Va. 1997).
[303] *Tandberg, Inc. v. Advanced Media Design, Inc.*, No. 1:09cv863, 2009 U.S. Dist. LEXIS 109185, at *5 (E.D. Va. Nov. 23, 2009).
[304] Motion, ECF 420, at 47 (quoting *Bassknight v. Deutsche Bank Nat. Trust Co.*, No. 3:12-CV-1412 M (BF), 2014 U.S. Dist. LEXIS 167040, at *24 (N.D. Tex. Oct. 29, 2014)).
[305] *See, e.g.*, Ex. 35, Mark Maremont, *NRA's Wayne LaPierre Says He is Being Extorted, Pressured to Resign*, WSJ, dated Apr. 26, 2019 [APP 1011-14]; Ex. 38, *The NRA's Ad Agency Just Ended its 38-Year Relationship with the Gun Group*, Ad Age [APP 1033].
[306] ECF 421, Ex. 94, Letter from J. Frazer to S. Ryan, dated Aug. 24, 2019 (APP 3123-24).

### 3.   Alternatively, the Confidentiality Provisions of the Services Agreement Are Unconscionable Under Virginia Law.

Although determining whether a contract is unconscionable is a matter of law, the relevant Virginia statute also gives the party claiming contractual unconscionability "a reasonable opportunity to present evidence as to its commercial setting, purpose and ***effect*** to aid the court in making the determination."[307] In fact, Virginia courts have found, on equitable principles, that a contract may be unconscionable where a grave injustice would befall the plaintiff were the provision enforced.[308] As Virginia courts have noted, "unconscionability is . . . concerned with the intrinsic fairness of the terms of the agreement in relation to all attendant circumstances, including the relationship and duties between the parties."[309] "Simply put, Virginia courts have refused to enforce an agreement that is 'patently unfair,'"[310] and the NRA has cited no Virginia authority to support its claim that its use of the Confidentiality Clause is not unconscionable.

The NRA and its counsel have sought to litigate this case in the "court of public opinion," taking many chances to publicly and falsely paint AMc as an instigator of a "coup" aimed at LaPierre.[311] Meanwhile, however, the NRA has aggressively sought to muzzle AMc at every instance of responding publicly with its side of the story, citing the Confidentiality Clause.[312]  The NRA's enforcement of this one-sided Confidentiality Clause muzzles AMc's ability to defend itself properly in this lawsuit, the effect of which has wrought substantial unfairness to AMc.

## VI.   PRAYER

For these reasons, Defendants respectfully request the Court deny the NRA's Motion for

---

[307] Va. Code Ann. § 8.2-302(2) (2021) (emphasis added).
[308] *See generally Weiland v. Bennie's Mobile Home Sales, Inc.*, 5 Va. Cir. 72, 72 – 73 (Va. Cir. Ct. 1983).
[309] *Derby v. Derby*, 378 S.E.2d 74, 78 (Va. Ct. App. 1989).
[310] *Thornton v. Cappo Mgmt. V., Inc.*, No. 3:04CV819, 2005 U.S. Dist. LEXIS 10202, at *6 (E.D. Va. Mar. 31, 2005) (quoting *Derby*, 378 S.E.2d at 78).
[311] *See, e.g.*, Ex. 35, Mark Maremont, *NRA's Wayne LaPierre Says He is Being Extorted, Pressured to Resign*, WSJ, dated Apr. 26, 2019 [APP 1011-14]; Ex. 38, *The NRA's Ad Agency Just Ended its 38-Year Relationship with the Gun Group*, Ad Age [APP 1033].
[312] *See, e.g.*, ECF 422, Ex. 94, Letter from J. Frazer to S. Ryan, dated Aug. 24, 2019 (APP 3135).

Partial Summary Judgment in its entirety, render judgment in favor of AMc as to the affirmative relief sought, and grant all such other relief, at law or in equity, to which they may be justly entitled.

December 20, 2021.

Respectfully submitted,

*/s/ Brian E. Mason*
**G. Michael Gruber, Esq.**
Texas Bar No. 08555400
gruber.mike@dorsey.com
**Brian E. Mason, Esq.**
Texas Bar No. 24079906
mason.brian@dorsey.com
**Jay J. Madrid, Esq.**
Texas Bar No. 12802000
madrid.jay@dorsey.com
**J. Brian Vanderwoude, Esq.**
Texas Bar No. 24047558
vanderwoude.brian@dorsey.com
**DORSEY & WHITNEY LLP**
300 Crescent Court, Suite 400
Dallas, Texas 75201
(214) 981-9900 Phone
(214) 981-9901 Facsimile

**ATTORNEYS FOR DEFENDANT/COUNTER-PLAINTIFF ACKERMAN MCQUEEN, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2021, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

*/s/ Brian E. Mason*
BRIAN E. MASON