# IN THE UNITED STATES DISTRICT COURTFOR
## THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| *Plaintiff and Counter-Defendant,* | § § | |
| **v.** | § § | **Case No. 3:19-cv-02074-G** |
| **ACKERMAN MCQUEEN, INC.,** | § § § | |
| *Defendant and Counter-Plaintiff,* | § § | |
| **and** | § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, AND MELANIE MONTGOMERY** | § § § § | |
| *Defendants.* | § § | |

## APPENDIX IN SUPPORT OF PLAINTIFF NATIONAL RIFLE ASSOCIATION OF AMERICA'S RULE 72 OBJECTIONS TO MAGISTRATE'S DISCOVERY ORDER

The National Rifle Association of America (the "NRA") offer the following evidence

in support of Plaintiff's Rule 72 Objections to Magistrate's Discovery Order.

| EX | DESCRIPTION | APP |
|----|-------------|-----|
| | Declaration of Philip J. Furia, dated December 30, 2021 | App. 001-App. 002 |
| A | Text Order, dated December 16, 2021 [Doc. No. 430] | App. 003-App. 004 |
| B | Oral Argument Transcript, dated December 15, 2021 | App. 005-App. 094 |
| C | Excerpt from Deposition Transcript of Wayne LaPierre, dated August 20, 2021 | App. 095-App. 097 |
| D | 2018 and 2019 Budget Comparisons spreadsheet (AMcTX-00065376-AMcTX-00065391) | App. 098-App. 114 |

| E | Employment Agreement of Col. Oliver North dated May 15, 2018 (AMc-056595-056604) (*Filed under seal*) | App. 115-App. 125 |
| F | Employment Agreement of Dave Valinski, dated September 4, 2018 (AMc-036766-036775) (*Filed under seal*) | App. 126-App. 136 |
| G | Ackerman Stockholder Listing, dated February 24, 2021 (*Filed under seal*) | App. 137-App. 138 |

Dated: December 30, 2021                    Respectfully submitted,

                                            **BREWER, ATTORNEYS & COUNSELORS**

                          By:    */s/ Philip J. Furia*
                                 Cecelia L. Fanelli
                                 *Pro Hac Vice*
                                 clf@brewerattorneys.com
                                 Sarah B. Rogers
                                 New York Bar No. 4755252
                                 sbr@brewerattorneys.com
                                 Philip J. Furia
                                 *Pro Hac Vice*
                                 pjf@brewerattorneys.com
                                 Alessandra P. Allegretto
                                 Texas Bar No. 24109575
                                 apa@brewerattorneys.com
                                 **BREWER, ATTORNEYS & COUNSELORS**
                                 1717 Main Street, Suite 5900
                                 Dallas, Texas 75201

                                 **ATTORNEYS FOR THE PLAINTIFF
                                 COUNTER-DEFENDANT NATIONAL RIFLE
                                 ASSOCIATION OF AMERICA**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was electronically served via the Court's electronic case filing system upon all counsel of record on this 30th day of December 2021.

/s/ *Philip J. Furia*
Philip J. Furia

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| *Plaintiff and Counter-Defendant*, | § § § | |
| **v.** | § § | **Case No. 3:19-cv-02074-G** |
| **ACKERMAN MCQUEEN, INC.,** | § § § | |
| *Defendant and Counter-Plaintiff*, | § § § | |
| **and** | § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, AND MELANIE MONTGOMERY** | § § § § | |
| *Defendants.* | § § § | |

**DECLARATION OF PHILIP J. FURIA IN SUPPORT OF PLAINTIFF**
**NATIONAL RIFLE ASSOCIATION OF AMERICA'S RULE 72**
**OBJECTIONS TO MAGISTRATE'S DISCOVERY ORDER**

I, Philip J. Furia, declare, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am a partner at Brewer, Attorneys & Counselors, counsel for Plaintiff/Counter-Defendant National Rifle Association of America ("NRA") in this action. I submit this declaration in support of the NRA's Objections to the Order issued by Magistrate Judge Toliver, dated December 16, 2021 [Doc. No. 430]. As counsel for the NRA, I have reviewed pleadings and other documents related to this matter, and I am familiar with the facts and circumstances of this case.

2.      I am fully competent and qualified in all respects to make this declaration. The facts stated herein are true and correct, and unless otherwise qualified, are within my personal knowledge.

3.      The deposition of Col. Oliver North was conducted on September 15, 2021.

1

4.    The deposition of Skye Brewer occurred on August 11, 2021.

5.    Attached as exhibits to this Declaration are true and correct copies of the following

documents:

**EXHIBIT A:** Text Order, dated December 16, 2021 [Doc. No. 430]

**EXHIBIT B:** Oral Argument Transcript, dated December 15, 2021

**EXHIBIT C:** Excerpt from the Deposition Transcript of Wayne LaPierre, dated August 20, 2021

**EXHIBIT D**: 2018 and 2019 Budget Comparisons spreadsheet (AMcTX-00065376-AMcTX-00065391)

**EXHIBIT E:** Employment Agreement of Col. Oliver North dated May 15, 2018 (AMc-056595-056604)

**EXHIBIT F:** Employment Agreement of Dave Valinski, dated September 4, 2018 (AMc-036766-036775)

**EXHIBIT G:** Ackerman Stockholder Listing, dated February 24, 2021

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of December 2021.

*/s/ Philip J. Furia*
Philip J. Furia

2

# EXHIBIT A

ADR,DISCREF,JURY

# U.S. District Court
## Northern District of Texas (Dallas)
## CIVIL DOCKET FOR CASE #: 3:19-cv-02074-G-BK

| | |
|---|---|
| National Rifle Association of America v. Ackerman McQueen Inc et al | Date Filed: 08/30/2019 |
| Assigned to: Senior Judge A. Joe Fish | Jury Demand: Both |
| Referred to: Magistrate Judge Renee Harris Toliver | Nature of Suit: 890 Other Statutes: Other Statutory Actions |
| Cause: 15:1125 Trademark Infringement (Lanham Act) | Jurisdiction: Federal Question |

| Date Filed | # | Docket Text |
|---|---|---|
| 12/16/2021 | 430 | ELECTRONIC ORDER: Defendant *Ackerman McQueen, Inc.'s Motion to Compel Deposition of William A. Brewer III*, Doc. 323 , is **GRANTED**, for the reasons stated on record during the hearing held on December 15, 2021. The Court has determined good cause exists to appoint a Special Master to oversee this deposition. Accordingly, the Court appoints the Honorable Judge Paul D. Stickney to act as Special Master. The parties are **ORDERED** to share the costs of the Special Master's services and to confer with Judge Stickney for purposes of scheduling Mr. Brewer's deposition.<br><br>As to Defendant *Ackerman McQueen, Inc.'s Motion to Compel Production of Forensic Risk Alliance Documents*, Doc. 391 , Plaintiff is **ORDERED** to submit all responsive documents currently being withheld to the Court for *in camera* review by January 6, 2022.<br><br>As to Plaintiff *The National Rifle Association of America's Motion to Compel Certain Documents Withheld Under Deficient Claims of Privilege*, Doc. 395 , Defendants are **ORDERED** to file a privilege log by January 6, 2022, pertaining to all post-April 2019 and pre-2018 documents withheld. Further, Plaintiff is **ORDERED** to file any objections to Defendants' current privilege log by January 6, 2022. Defendants may respond to Plaintiff's objections within 21 days of the date they are filed. (Ordered by Magistrate Judge Renee Harris Toliver on 12/16/2021) (chmb) (Entered: 12/16/2021) |

**App.004**

# EXHIBIT B

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF TEXAS

3                      DALLAS DIVISION

4
   NATIONAL RIFLE ASSOCIATION OF        ) 3:19-cv-02074-G-
5  AMERICA,                             ) BK
                   PLAINTIFF,           )
6                                       )
   vs.                                  )
7                                       ) DALLAS, TEXAS
   ACKERMAN MCQUEEN, INC., MERCURY      )
8  GROUP, INC., HENRY MARTIN and JESSE  )
   GREENBERG,                           )
9            DEFENDANTS.                ) December 15, 2021

10

11         **TRANSCRIPT OF MULTIPLE MOTIONS HEARING**

12      **BEFORE THE HONORABLE RENEE HARRIS TOLIVER**

13            **UNITED STATES MAGISTRATE JUDGE**

14                  **(REPORTED REMOTELY)**

15
   A P P E A R A N C E S:
16

17 FOR THE PLAINTIFF:     **MS. SARAH BROOKE ROGERS**
                          BREWER ATTORNEYS & COUNSELORS
18                        750 Lexington Ave, Floor 14
                          New York, New York 10022
19                        sbr@brewerattorneys.com
                          (212) 751-2849
20

21

22

23

24

25

```
 1   FOR THE DEFENDANT
     ACKERMAN MCQUEEN
 2   AND OTHERS:                MR. BRIAN E. MASON
                                MR. G. MICHAEL GRUBER
 3                              MS. KELSEY TAYLOR
                                DORSEY & WHITNEY, LLP
 4                              300 Crescent Court, Suite 400
                                Dallas, Texas 75201
 5                              mason.brian@dorsey.com
                                gruber.mike@dorsey.com
 6                              taylor.kelsey@dorsey.com
                                (214) 981-9900
 7

 8
     FOR THE THIRD PARTY
 9   HBC CPAs & ADVISORS:       MR. GARY QUINNETT
                                THE LAW OFFICES OF GARY DAVID QUINNETT
10                              10005 N. May Avenue, Suite 120
                                Oklahoma City, Oklahoma 73120
11                              gary@GQ-Law.com
                                (405) 607-2266
12

13
     ALSO APPEARING:            MS. KELLI SALEM
14                              MS. CINDY MCGEOCH
                                MR. QUINN BURNS
15

16

17

18

19
     COURT REPORTER:            MR. JEFF L. FOSTER, RMR, CRR
20                              United States Court Reporter
                                1100 Commerce St., Room 1504
21                              Dallas, Texas 75242
                                jeff_foster@txnd.uscourts.gov
22                              (214) 753-2349

23

24        Proceedings reported by mechanical stenography and

25   transcript produced by computer.
```

```
 1                 MOTIONS HEARING -- DECEMBER 15, 2021

 2                      P R O C E E D I N G S

 3               THE COURT:  This is Case No. 3:19-CV-2074-G-BK,

 4    National Rifle Association of America vs. Ackerman McQueen,

 5    Incorporated and others.  And this is a hearing on a number of

 6    discovery motions.  All have been referred to me by District

 7    Judge Fish.

 8               May I have the attorney announcements, please?

 9               MS. ROGERS:  For plaintiff, the National Rifle

10    Association of America.

11               THE COURT:  Maybe it's me.  Hold on a second.  Just a

12    second.  Okay.  Go ahead now.

13               MS. ROGERS:  Can you hear me, Your Honor?

14               THE COURT:  I can now.

15               MS. ROGERS:  Okay.  This is Sarah Rogers with the

16    Brewer Attorneys and Counselors.  I'm appearing today on behalf

17    of the plaintiff, the National Rifle Association of America.

18               THE COURT:  Thank you.

19               MR. MASON:  Good afternoon, Your Honor.  Brian Mason,

20    Dorsey & Whitney, on behalf of Ackerman McQueen, Mercury Group,

21    Mr. Winkler, Ms. Montgomery and Mr. Martin.

22               MR. GRUBER:  Your Honor, this is Mike Gruber and I am

23    here on behalf of the same parties as Mr. Mason.

24               THE COURT:  Okay.

25               MR. QUINNETT:  Your Honor, Gary Quinnett, appearing on
```

 1    behalf of third-party HBC CPAs and Advisors in Oklahoma City.

 2              THE COURT:  Thank you.  Any other attorneys

 3    participating today?  Okay.  I'm going to drive the bus, so I'm

 4    going to tell you what we're going to take up first.  Let's --

 5    let's go to the motion to quash the -- or the motion, excuse me,

 6    to compel the deposition of Mr. Brewer.

 7              MR. GRUBER:  Yes, Your Honor.  That's what we're going

 8    to take first?

 9              THE COURT:  That's what we're going to take up first.

10              MR. GRUBER:  Okay.

11              THE COURT:  So we're all on the same page.  My first

12    question to both parties is, why should *Shelton* -- you know, the

13    *Shelton* inquiry, the factors under *Shelton* even apply as to

14    Mr. Brewer if there is the potential of him being a witness,

15    which Judge Fish has found?

16              MR. GRUBER:  Your Honor, we would say that we went

17    through the legal analysis so that we fully briefed it.  I don't

18    believe that he should be, because I think that in the Virginia

19    case his law firm represented, his partners represented that he

20    would be a fact witness in the case most likely.  And I think

21    Judge Fish has also determined that he'll probably be a fact

22    witness.

23              THE COURT:  Ms. Rogers?

24              MS. ROGERS:  Yes, Your Honor, as we briefed, we don't

25    think the dispositive factor is whether Mr. Brewer may be a fact

1   witness, but whether he is involved in trial preparation.

2          THE COURT:  Well, why would that be since -- since

3   other case law outside of *Shelton* in the situation where an

4   attorney is -- even an attorney involved in the case is a

5   potential witness says that he can be deposed?

6          MS. ROGERS:  Well, we believe *Shelton* deals with the

7   situation, Your Honor, and courts in the circuit that have cited

8   *Shelton* have also been dealing with situations where he is a

9   potential witness.  If he weren't a potential witness, then we

10  wouldn't be having this conversation.  His fact deposition is

11  sought.  The defendant has asserted there's some relevance to it.

12  We obviously -- we obviously have to disagree on that.  So you

13  have counsel who is a potential witness.  But there's still a

14  whole bunch of other considerations that apply in addition to

15  potential relevance of the fact testimony as *Shelton* and the

16  cases invoking have laid out.

17         THE COURT:  So your position is that in *Shelton* the

18  situation was like this one, because the attorney was a potential

19  fact witness.  And even the attorney's firm had represented that

20  the attorney was a potential fact witness?

21         MS. ROGERS:  Your Honor, I'm not certain that in

22  *Shelton* the attorney's firm had acknowledged that his fact

23  testimony might be sought.  But certainly almost by definition

24  the dispute would haven't arisen if the attorney wasn't a

25  potential witness.  The fact that is deposition is sought because

1   the attorney is alleged to possess, you know, factual personal

2   knowledge relevant to the proceeding, and that's how the dispute

3   came before the Court.

4           MR. GRUBER:  And, Your Honor, if I could just point out

5   Mr. Brewer compared to anybody in the NRA is the -- is the most

6   consistent and constant actor on everything -- on everything

7   they've raised.  He's the one that's leaked stuff to the press

8   and, you know, on the libel and all that type of thing.  And he's

9   the one that's -- you know, the only one that knows about the

10  audits, because he's conducted them all, except for the

11  independent one where he sent a 17-year attorney with the Brewer

12  firm to this independent accounting firm for a year while

13  they -- they did the audit and then she came back.  So it's just

14  amazing, Your Honor.  He is the main actor in everything that

15  happened in this case from the NRA's side.

16          MS. ROGERS:  And, Your Honor, that's obviously --

17  sorry, Your Honor.

18          THE COURT:  No, go ahead.

19          MS. ROGERS:  I mean, those factual assertions that

20  Mr. Gruber just made and that are substantiated nowhere in the

21  record are obviously disputed by the NRA.  And, you know, I

22  think -- I think Mr. Gruber may have misspoken, but there was

23  not, in fact, a 17-year attorney who was sent anywhere.

24          THE COURT:  You know, that's here nor there, you

25  know --

```
 1              MS. ROGERS:  Right.
 2              THE COURT:  -- with this dispute.  So I know that's
 3   what they've alleged and I'll, you know, take it for what it's
 4   worth for this dispute, so --
 5              MR. GRUBER:  And it was an employee with his law firm.
 6   Sorry.
 7              MS. ROGERS:  But, Your Honor, if I could address one
 8   thing just briefly.
 9              THE COURT:  Sure.
10              MS. ROGERS:  I think there was an acknowledgment at
11   some point that, you know, Mr. Brewer would not be making
12   presentations to the Court as would raise issues under the
13   Witness Advocate Rule.  That's what Mr. Gruber is citing when we
14   talk about Mr. Brewer may be a fact witness.
15              But the parameters of the Witness Advocate Rule and the
16   ones that invoke Shelton are different.  So the standard under
17   Shelton is whether the attorney is involved in trial preparation,
18   not whether he's an advocate before the jury as would raise
19   Witness Advocate Rule considerations.
20              THE COURT:  Right.  And I understand that.  My big
21   concern at this point is whether Shelton even -- even would
22   apply.  And I know you're saying that it's just given that that
23   attorney in Shelton was -- was necessarily a potential fact
24   witness, but I don't know that to be the case.
25              MR. GRUBER:  And we're not -- we don't -- I don't
```

1 believe that *Shelton* has actually been adopted by the Fifth

2 Circuit.  Whether that really matters or not, it's still probably

3 a good analysis for the right case and I don't think this is the

4 right case.

5          And we believe that in Virginia they just made it clear

6 that Mr. Brewer would most likely be a fact witness in the case.

7 But as you pointed out, Your Honor, Judge Fish has determined

8 that most likely he will be, so --

9          THE COURT:  And I'm just looking back over *Shelton* and

10 just trying to see if this was the same situation, and I'm not

11 really seeing that this was the same situation.

12          MS. ROGERS:  So, Your Honor, the contention isn't that

13 they're identical situations.

14          THE COURT:  Okay.

15          MS. ROGERS:  But by definition, you know, there would

16 be no reason to invoke or consider the *Shelton* factor --

17          THE COURT:  Well, let me just tell you what it says in

18 *Shelton*.  You know, that the point of the deposition supposedly

19 was to simply depose opposing counsel in an attempt to identify

20 information that opposing counsel has decided is relevant and

21 important to his own legal theories and strategy.  So that's not

22 the situation.  That's not saying that counsel was a fact

23 witness.

24          MR. GRUBER:  Your Honor, it could be the -- you know,

25 what's going to be asked is really important and that we not get

1   into privilege law.  I hate to put Your Honor in this indelible

2   position, but would you consider monitoring or overseeing the

3   deposition for -- for some period of time in that it's been

4   difficult, you know, in this case.  It's very contested on each

5   side and the attorneys have taken their positions strongly.

6          And I can only imagine what the Brewer firm

7   representing Mr. Brewer in a deposition they're going to do as

8   far as what we can ask and not ask and how much leeway they're

9   going to give.

10          I don't know if the Court would -- we could probably

11  put a lot of this to sleep if you would be willing to devote

12  several hours.  And I hate to put you in that position, but that

13  would seem to take care of it and we won't get into anything that

14  we shouldn't get into and we won't -- we won't be taking a

15  deposition on any subject we shouldn't, because we would have

16  either the Court or possibly a master to oversee it.

17          THE COURT:  I am amenable to a master simply because

18  I'm going to be out for several weeks starting in the morning for

19  surgery and recovery.  And so I would be foreseeable to

20  appointing a master to oversee that process.

21          I -- you know, I think even applying the *Shelton*

22  factors there are a number of things that -- you know, I believe

23  Mr. Brewer even under Shelton could -- you know, would be

24  required to testify about, you know.  There's no other means to

25  obtain the information, that the information is relevant and

1  nonprivileged, and that the information is crucial to the

2  presentation of the case, you know.  I know you-all know those

3  are the factors, but just going through and looking at the

4  different topics or potential topics, I can see that Mr. Brewer,

5  even if the Court applies the *Shelton* factors, would have to --

6  would have to sit and be deposed for some of those at least.

7            MR GRUBER:  That's where it's just the execution,

8  Your Honor.  It really isn't whether we can or not, it's what we

9  do, and that's where a master would be helpful.  Or we can go

10 through and --

11           THE COURT:  Are all the parties agreeable, Ms. Rogers,

12 to having --

13           MS. ROGERS:  I'm sorry, Your Honor.  Assuming that a

14 deposition were to take place, obviously --

15           THE COURT:  Well, let's assume that, because I'm going

16 to -- I'm going to compel the deposition.

17           MS. ROGERS:  So assuming the deposition is compelled --

18 although I would appreciate the opportunity to address the idea

19 that no other means does exist to obtain this information other

20 than the *Shelton* factors, which we believe --

21           THE COURT:  Are you going to tell me something that's

22 not in your very thorough briefs about that?

23           MS. ROGERS:  Well, I think -- I think I would just

24 underscore some highlights, Your Honor, which is that we've

25 already permitted a deposition of outside counsel's wife.  And we

```
 1   just --

 2            THE COURT:  That was in there.

 3            MS. ROGERS:  Right.  Right.  And so we just -- we just

 4   think that it's difficult for the defendants to meet the standard

 5   under Shelton, which we do think under the Northern District case

 6   application applying Shelton, you know, is invoked here.

 7            But setting that aside and that Your Honor has

 8   indicated an inclination and assuming that a deposition were to

 9   take place, obviously, you know, it would be agreeable to us --

10   we'd rather have a master there overseeing things than not given

11   how defendants have used their other depositions.

12            THE COURT:  Okay.  Well, I'm going to grant the motion

13   to compel the deposition of Mr. Brewer, III.  I am also going to

14   appoint a special master to -- to preside over any objections or

15   other issues that arise during the actual deposition.

16            I'm going to appoint former Magistrate Judge Paul

17   Stickney, and I'm going to require the parties to split the costs

18   of the services of the special master.  And I'm going to ask

19   y'all to get with Judge Stickney and determine when he is

20   available before scheduling the deposition of Mr. Brewer.

21            Is there anything else as to -- to do with that motion

22   that I've not covered?

23            MR. GRUBER:  Judge, I think that's a very good plan, so

24   thank you.

25            THE COURT:  Ms. Rogers?
```

```
1              MS. ROGERS:  Nothing else, Your Honor.

2              THE COURT:  Okay.  Let's go on then to the -- oh, and I

3   neglected to mention, but I believe that not -- I can't find that

4   neither parties' position was not -- was substantially

5   unjustified as to that motion, and so I'm going to deny the award

6   of attorneys' fees as to that motion.

7              MR. GRUBER:  All right.  Thank you, Your Honor.

8              THE COURT:  And so let's talk about AMC's motion to

9   compel production of the Forensic Risk Alliance's documentation.

10             MR. MASON:  Yes, Your Honor.  Brian Mason and I do have

11  a Power Point if the Court would indulge me to spend a few

12  minutes walking through that with respect to this issue.

13             THE COURT:  Okay.  Go right ahead.  I think you have

14  the screen sharing privileges.

15             MR. MASON:  Okay.  Give me one second, Your Honor.  Can

16  Your Honor see that okay?

17             THE COURT:  Yes.  Can everyone else see the screen that

18  is being shared?

19             MS. ROGERS:  Yes, Your Honor.

20             THE COURT:  Okay.  You may proceed, then, Mr. Mason.

21             MR. MASON:  Your Honor, with respect to the FRA -- and

22  I know that this issue has been briefed heavily, and so I'm going

23  to do my best to try not to -- to point out things that are in

24  there, but I do that kind of the history in terms of how we've

25  gotten to this point is very important.
```

1              This is an issue that started in a Virginia case and in

2     the fall of 2019.  I know Your Honor is familiar that there was a

3     hearing up there and there was motion practiced.  Ultimately that

4     motion was denied with respect to Ackerman's motion to compel the

5     FRA documents up there.  But Judge Dawkins made it very clear

6     that he was not ruling on the privilege, he was denying at that

7     time that he still had questions and concerns and he fully

8     expected the parties would -- would be back.

9              And so subsequently we -- we filed our own motion to

10    compel before Your Honor in early 2020.  That was fully briefed.

11    Your Honor ordered the parties to kind of circle back and see if

12    we could figure out any -- any issues with respect to the -- to

13    the FRA documents, among other things.  And we did that and we

14    briefed the issues that are in our joint report.

15             And so I'd like to get into -- a little bit going

16    backwards -- a little bit of kind of the history in terms of --

17    of the FRA audit and kind of where -- what happened prior to

18    that.

19             And one of the things that I think is -- is very

20    important, and we talked about this in some other motions as

21    well, but in the summer and fall of 2018 Ackerman began to

22    receive various threats from Mr. Brewer about RICO charges and

23    the FBI raiding Ackerman McQueen's offices.  There's been

24    numerous testimony by multiple Ackerman representatives on that.

25    And that began and started in the fall of -- of -- in the summer

1   of 2018.

2              One of the issues in the pleadings that the NRA has

3   taken is there's no contemporaneous documents proving that, you

4   know, any of that actually happened.  This is a letter that Angus

5   McQueen drafted -- it was not sent to Mr. La Pierre -- in or

6   around September 24th, 2018.  And then he handed it to his

7   secretary and it was sent to his son Revan where he's

8   specifically talking about these threats and Mr. Brewer.  And so

9   I wanted to point out for the Court that there is a

10  contemporaneous document in terms of what was kind of going on

11  around -- around that certain time period.

12             With that said, there were three separate audits that

13  were conducted in the fall of 2018 and then in February of 2019.

14  But one of the critical documents that has come out in discovery

15  in this case is this letter from Mr. La Pierre that he wrote in

16  April of 2019.  And he described the litigation against Ackerman

17  McQueen which crystalized before the September board meeting in

18  2018.  And that September board meeting was on September the 8th

19  and 9th.  This is something that obviously we found out well --

20  well after the fact, but there's been additional discovery with

21  respect to this letter, but we believe this is -- this is a

22  critical document to show what the NRA's actual intentions were

23  with respect to Ackerman McQueen in this time period in the fall

24  of 2018.

25             With that said, the NRA had requested various documents

```
 1   from Ackerman.  We -- despite the threats that we were receiving
 2   we agreed to those.  We initially agreed to one with the Brewer
 3   law firm in September of 2018.  I know we've talked about it a
 4   lot in our briefing, but an individual, Mrs. Dillon, who I
 5   believe is the senior director of consulting at the Brewer firm,
 6   if I have that right, she was with the Brewer firm for about 17
 7   years at this particular point.  And she along with other
 8   representatives from the Brewer firm conducted an onsite -- an
 9   in-person audit of Ackerman McQueen's books and records in
10   September of 2018.
11         And in addition to this we're getting -- my client is
12   getting all sorts of letters accusing it of not complying with
13   certain record requests or withholding information, so there's a
14   lot going on in the September time period, especially with
15   respect to Mr. Brewer and his law firm.
16         This is some testimony from what has kind of been
17   referred to as an October 11th, 2018 summit meeting.  This was a
18   meeting with -- I believe it was seven or eight representatives
19   from Ackerman McQueen, Mr. La Pierre and Craig Sprague.
20         And there was three topics that were essentially
21   discussed at this meeting.  One was the involvement of the Brewer
22   firm with Ackerman McQueen, given the history, given the threats
23   that were being made, the animosity between Mr. Brewer and the
24   McQueen family.  And the other issue was budgeting and the
25   involvement of Josh Powell, who was the chief of staff of Mr.
```

1  La Pierre.  And one of the big parts of this discussion at this
2  particular hearing was the involvement of the Brewer firm with
3  respect to Ackerman going forward.
4         The NRA has made a big deal about, you know, we can
5  choose whoever we want to representative us, conduct these
6  audits.  You don't have any contractual right to dictate those
7  terms.  But, you know, what, they're right.  If they wanted the
8  Brewer law firm to continue to deal with Ackerman McQueen they --
9  they absolutely could have chosen to do that.
10         But my client was prepared to resign this account that
11  they had been with for nearly 40 years if they had to continue
12  with dealing with the Brewer law firm.  That is how significant
13  that issue was and numerous people have testified to that.
14  There's draft letters that were actually prepared prior to this
15  meeting resigning the entirety of the account.
16         And so there's -- there's been a bunch of discussions
17  and testimony with respect to what was discussed during this
18  particular meeting.  But Mr. La Pierre, boiling it down with
19  respect to Mr. Brewer, promised Ackerman McQueen that you guys
20  are not going to have to deal with Mr. Brewer or his firm
21  anymore.  That Mr. Brewer is going to be gone in 30 to 60 days,
22  he's going to figure everything out with -- with the New York
23  Attorney General and you guys don't have to do it.
24         But if you won't, you know, resign, if you'll stick
25  with me -- he went around to every single one of my clients in

1  that room, looked them in the eye and said stick with me.  And

2  based on those material representations made by Mr. Brewer my

3  clients continued to work and support the NRA.

4          And in addition to that they continued to comply with

5  the requests for documents.  This is some other testimony from

6  Mr. Makris talking about some of the similar -- similar

7  discussions that took place on that October 11th, 2018 meeting.

8          So then we fast forward to November of 2018 and there's

9  another audit that's done.  And it's not done by the Brewer firm,

10 it's done by the Cooper & Kirk firm.  And why is that?  It's

11 because the Brewer firm at that time was not going to be dealing

12 or involved with Ackerman McQueen.  There's other evidence in the

13 record that, again, supports what was discussed during that

14 meeting and the representations that Mr. La Pierre made to

15 Ackerman McQueen.

16         This particular audit -- this is an e-mail from Nicole

17 Reaves at Cooper & Kirk thanking our client for what was done,

18 what was provided and there was no issue.  There was -- there's

19 been no testimony in this case from anyone suggesting there was

20 anything wrong, withheld in any way, shape or form with respect

21 to this November 2018 audit.

22         So what happens next?  The NRA continues to want more

23 documents.  They ask for another audit and ultimately we've

24 discussed with them having somebody completely independent come

25 in and conduct this audit.  And there's an overwhelming amount of

1  testimony at this point in time that it was anything but.

2         Mrs. Dillon shortly after that September 2018 audit

3  left the Brewer firm, she went to NRA, she was contacted by

4  representatives at the Brewer firm and essentially oversaw the

5  FRA audit of Ackerman McQueen in February of 2019.  The

6  privileged log that was produced by FRA has her name all over it.

7  There's all sorts of e-mail communications discussing what was

8  taking place.  This is a particular e-mail about the revenue that

9  was going to be generated by FRA.  She participated, according to

10  some e-mails and in Zoom conferences, with the Brewer firm and --

11  and the NRA.

12         And so I think the record is -- she was not on the

13  ground.  I will tell you that.  She was not physically on the

14  ground in the room when this audit was conducted.  But other than

15  that, from the evidence that we've seen she was essentially the

16  main point of contact and communicating with her -- with her

17  former colleagues of 17 years regarding the entirety of this

18  particular audit.  She was also involved in the engagement letter

19  drafting.  I know there's documents with Ms. Rogers and

20  Ms. Dillon working out the engagement letter with respect to FRA.

21  This is another e-mail with Ms. Dillon setting up a Zoom meeting

22  with Mr. Frazer, the general counsel, Ms. Rogers, from the Brewer

23  firm.

24         And so with that background, Your Honor, there's really

25  three -- well, there's two main issues.  We don't think that the

1   FRA documents are privileged.  And I'm going to quickly go over

2   some things with respect to that.  But to the extent that the

3   Court does believe there is a privilege here, we believe that

4   privilege has been waived for -- for these three reasons.

5            With respect to the actual privilege the NRA's counsel

6   up in Virginia made clear that FRA was simply hired to conduct an

7   examination of -- of records.  And just because they were hired

8   potentially by the NRA or by the Brewer firm doesn't

9   automatically make, you know, their communications with respect

10  to this audit or the results of this audit or how these reports

11  that we're going to talk about were prepared -- it doesn't make,

12  you know, any of those things automatically privileged.  FRA was

13  not retained to render legal advice.  So they weren't a legal

14  representative that was entitled to any privilege protections.

15           This is, again, from -- well, this is from the Virginia

16  hearing.  This is from Mr. Frazer, the general counsel of the

17  NRA, in August of this year, who confirmed that the NRA retained

18  FRA to conduct a factual examination and report the facts.

19           There's also been some suggestion in the NRA's briefing

20  that the FRA was retained as a consulting expert.  There's

21  absolutely no evidence of that.  And we don't believe that the

22  requirements of that have been -- have been satisfied.

23           So to the extent that the Court does not believe

24  that -- or does believe that these communications and the 1,600,

25  I believe it is approximately, documents we're seeking to compel

1  are privileged, we believe the Offensive Use Doctrine applies.

2  They have taken the position since 2019 that everything with

3  respect to FRA is -- well, I don't want to say everything.  They

4  have produced a very limited number of documents, but virtually

5  everything had is -- is privileged.

6          And during the hearing up in Virginia in November the

7  NRA's counsel made clear and represented to the Court, again,

8  that we are not relying on any -- there is no report; that we're

9  not relying on any of their opinions, they were just hired to

10  conduct a factual investigation.  And essentially we're not going

11  to -- we're not going to talk about the results.  We're not going

12  to talk about the results and we're not going to rely on the

13  results.

14          And, you know, the NRA now has produced, as you know,

15  these six reports.  And if they were so confident that they're

16  you know, critical to their case, why didn't they produce them

17  two years ago when we've been asking for them?  Why we have spent

18  the time and money for these last two years fighting about these

19  issues, you know, only to now be here now continuing to argue

20  about it?

21          Again, this is in the Virginia -- the Virginia court in

22  November.  The NRA's counsel, "We're not offering any conclusions

23  or opinions by FRA, simply the facts.  There is no audit report.

24  A report wasn't done."  Those were the representations that were

25  made to Judge Dawkins up in Virginia in November of 2019.

1        These are some of the similar questions from

2  Mr. -- from Mr. Hundley and the NRA's counsel up there.  And by

3  the way, the Brewer law firm was present at this hearing.

4  Michael Collins, who I understand is no longer with their firm,

5  was present and they were essentially lead counsel in all of

6  these Virginia pleadings.

7        So now we fast forward to August of 2021 and

8  Mr. Frazer's, the general counsel, deposition is taken.

9  Mr. Frazer is asked about the FRA audit, the reports, the results

10 and he starts talking about how there was these presentations

11 done on -- on Zoom.  They presented their findings.  Ms. Rogers

12 was apparently part of those -- of those particular

13 presentations.

14        And importantly for the first time the NRA says, yeah,

15 we're relying on the NRA audit in support of our claims in this

16 case.  That was not what they told Judge Dawkins or us the last

17 two years.  This was new.

18        THE COURT:  Counsel, let me ask you to stop just --

19 just a moment.  Apparently we've lost one of the attorneys.

20 I'm not quite sure who it is, but I'm told we've lost somebody.

21        THE REPORTER:  I believe it was Mr. Quinnett, Gary

22 Quinnett.

23        (Pause.)

24        MR. MASON:  Your Honor, you're on mute.  I don't know

25 if you intended to be, but --

```
 1          THE COURT:  I did not.  So did you hear any of that
 2   that I said?
 3          MR. MASON:  I did not.
 4          THE COURT:  Okay.  I was saying that Attorney --
 5   Attorney Quinnett had dropped off the Zoom hearing we're having
 6   and is having some technical difficulties in trying to get back
 7   on.  We're not talking about his motion yet, but he's trying to
 8   get back on.  So give us just a minute.
 9          MR. MASON:  Okay.  Thank you, Your Honor.
10          (Pause.)
11          THE COURT:  Let me contact the courtroom deputy who can
12   see what's going on with that, because we're not going to wait
13   forever for it.
14          MR. MASON:  Your Honor, he did -- can you hear me?
15          THE COURT:  Okay.  Yes, I can hear you.
16          MR. MASON:  He did send me a message and he said his
17   power went off and I guess he tried to reboot, so --
18          THE COURT:  Okay.
19          MR. MASON:  But obviously it's up to Your Honor.  I
20   know this particular issue does not necessarily pertain to -- to
21   him and his clients, but --
22          THE COURT:  But he's -- he's got -- he's got a similar
23   issue, however, regarding -- you know, from an opposite
24   perspective, I think, regarding the -- regarding audit documents.
25   That's not true.  I'm remembering which one he is on now.  No,
```

1  that's right.

2           MR. MASON:  His client is HBC, --

3           THE COURT:  HBC, the other auditing firm.

4           MR. MASON:  -- Ackerman's accountant.  Yes, Your Honor.

5           THE COURT:  Yes.  Yes.

6           MR. MASON:  And we will -- we will talk more about this

7  when obviously Your Honor hears that motion.  But I do believe

8  the Court will be happy to know that I think we're -- we've

9  reached an agreement on some things with respect to that motion,

10 not everything, but we're at least --

11          THE COURT:  Okay.  Well, we won't talk about it until

12 he's back.  But I'm going to let you go ahead and continue with

13 your -- your Power Point presentation.

14          MR. MASON:  Thank you, Your Honor.  Mr. Frazer during

15 that -- the same deposition, again, confirmed that the NRA is, in

16 fact, relying on the audit -- the results from that particular

17 audit in support of their claims in this particular case.  And,

18 again, that was -- that was not previously disclosed, that was

19 new information and we believe that with respect to the Offensive

20 Use Doctrine, you know, each -- each one of those elements have

21 been -- have been satisfied.

22          However, there's another issue --

23          THE COURT:  Let me ask you a question, though.  Because

24 they're saying there was -- I don't know how they're going to use

25 something that doesn't exist, but, okay, they're saying they're

1   going to -- or they did say that they were going to use something

2   that they don't have.  Is that what you're understanding?

3   Because they're saying they don't have any audit from FRA.  Is

4   that right?

5           MR. MASON:  Well, I think -- I think that was -- that

6   was -- that's part of the issue, Your Honor.  I think they

7   represented to the court in Virginia that there was no report,

8   that there was no kind of summary of the findings, so that there

9   wasn't anything to compel.  There wasn't anything to produce.

10          But now -- and I've got a slide on this as well --

11  Ms. Rogers represented to Judge Fish at a recent hearing that

12  there were these reports.  And these are the reports that the --

13  the NRA selectively chose to now produce within -- within the

14  last month.  So I think that there are actually -- well, yeah,

15  there are documents.  There are these reports.  And, in fact,

16  they've -- they have now filed these reports in support of their

17  motion for summary judgment.  And not only that, they filed them

18  in the public record.

19          So we've gone from everything is privileged, there's no

20  report, we're not going to give you anything, to two years later

21  asking if we will agree that there's no subject matter waiver.

22  We tell them no.  They produce the documents anyways.  Then they

23  say, oh, well, we have to give them to our experts now.  And then

24  we file them in support of our motion for summary judgment and we

25  filed them in the public record.

```
 1              THE COURT:  But let me ask you, Ms. Rogers, what --
 2    what's being withheld at this point?
 3              MS. ROGERS:  Thank you, Your Honor.  So before I
 4    address this motion -- and I apologize, there may have been some
 5    confusion, but based on the notice we received from the Court it
 6    was our understanding that this hearing covered ECF-235 and 236,
 7    the motions to quash.  So we do object to, you know, any decision
 8    that's rendered on any other motions at this hearing.
 9              THE COURT:  I think you're wrong about that, because
10    I don't even have to have a hearing to rule on the motion.  So --
11              MS. ROGERS:  Right.  Well, we were just -- you know, we
12    don't really feel that we were noticed, but I understand, Your
13    Honor, and we don't -- we obviously don't dispute your abilities
14    to rule on motion.
15              THE COURT:  Okay.
16              MS. ROGERS:  I'm happy to lend some color here.  So
17    there's a whole -- there's a whole bunch of FRA documents and the
18    NRA has never withheld all of them.  So there was an initial
19    discovery dispute in the Virginia court.  And just to be clear
20    Mr. Mason, you know, claims that FRA's documents, none of them
21    were ever privileged, because this was just an accounting firm
22    doing a record inspection.  But we've produced the engagement
23    letter governing FRA's engagement and it's very clear that what's
24    happening here is --
25              THE COURT:  Were they engaged to give legal advice?
```

Jeff Foster, RMR, CRR    (214) 753-2349

**App.030**

```
 1              MS. ROGERS:  They were engaged by the Office of the
 2    General Counsel to facilitate to provide forensic accounting --
 3              THE COURT:  Were they engaged to give legal advice?
 4              MS. ROGERS:  Not to give legal advice, Your Honor,
 5    to --
 6              THE COURT:  Were they engaged to participate in the
 7    litigation?
 8              MS. ROGERS:  To facilitate -- to facilitate -- to
 9    facilitate legal advice by the Office of the General Counsel in
10    connection with pending and anticipated litigation.
11              THE COURT:  If the litigation is based on the results
12    of the audit, it's hard to see how they could have been engaged
13    in anticipation of litigation.  And even so, if their role isn't
14    to provide legal advice, how can what they -- what they produced
15    be work product?
16              MS. ROGERS:  Well, that's a great question, Your Honor,
17    or several.  Let me address them one by one.  So in
18    recent pending and anticipated litigation, the pending and
19    anticipated litigation referenced in the FRA engagement is not
20    this litigation.  There were two pending lawsuits at the time
21    FRA was engaged.  One was settled around the time FRA was engaged
22    and there's another that's still pending that implicated
23    Ackerman's documents and implicated these issues.
24              And the parties had been --
25              THE COURT:  Implicated how?
```

1          MS. ROGERS:  Well, I have to be careful, Your Honor,

2    because I don't want to get into matters that may be privileged,

3    but Ackerman --

4          THE COURT:  So tell me about the litigation.  You're

5    telling me there's some claims that --

6          MS. ROGERS:  Yes.

7          THE COURT:  So can you tell me that?

8          MS. ROGERS:  Sure.  So there were two lawsuits, Your

9    Honor.  One was with an insurance broker that involved the Carry

10   Guard program.  So Carry Guard was a membership program for NRA

11   members and others to, you know, prefer concealed carry firearms.

12   It had an insurance component and a training component.  Ackerman

13   was deeply involved in the marketing of that program, which was

14   also disputed in the matter in the litigation.

15         So there was a subpoena to Ackerman for its documents

16   and that was -- this Cooper & Kirk -- what Mr. Mason refers to as

17   the Cooper & Kirk audit was really my co-counsel in that lawsuit

18   going to look at some documents that related to -- that might

19   have been subpoenaed in that case and were relevant to settlement

20   negotiations.

21         THE COURT:  And how did the audit work into that?  What

22   did the audit of AMC have to do with that?

23         MS. ROGERS:  Well, that's a great question, Your Honor,

24   because the answer is nothing.  So --

25         THE COURT:  So I'm not following your argument, then,

1  --

2           MS. ROGERS:  Of course.  So there were --

3           THE COURT:  -- that it was in anticipation of

4  litigation.

5           MS. ROGERS:  Right.  So there were two sets of record

6  inspections being conducted of Ackerman McQueen in 2018 and 2019.

7  One had to do with this insurance lawsuit.  And one -- the one

8  that FRA was involved in had a broader scope.

9           So -- and actually, Your Honor, there was not just the

10  insurance lawsuit, there was an insurance investigation by the

11  New York regulator that overlapped with the same documents.

12           THE COURT:  But that wouldn't have anything to do with

13  it being prepared in anticipation of litigation for --

14           MS. ROGERS:  Well, respectfully, Your Honor, our

15  position is that it does, because the NRA has to assess the

16  contents of these documents to form its litigation strategy.  And

17  the Work Product Doctrine is clear that --

18           THE COURT:  By that -- by that measure, then, an

19  attorney always has to assess the evidence before determining his

20  or her litigation strategy, but that evidence is not work product

21  always.

22           MS. ROGERS:  Certainly, Your Honor.  But if I hire an

23  accountant to help me sit down and go through records so I can

24  determine what claims I want to bring, the documentation of our

25  meeting would, I think, under any standard or in any circuit be

1  subject to the Work Product Doctrine.  Those are attorney mental

2  impressions, that's litigation strategy, and here this -- this is

3  what FRA was engaged for.  And we cite several cases in our

4  briefing that establish -- and I don't even think really that

5  Ackerman would dispute -- that the Work Product Doctrine extends

6  not just to the attorney's own files, but to any document

7  prepared by or for a party or its representative.  So you don't

8  need to be a lawyer to generate documents covered by the Work

9  Product Doctrine.

10          THE COURT:  I understand that.  But it still has to be

11  in anticipation of -- of litigation.

12          MS. ROGERS:  Right, Your Honor.  And the standard for

13  anticipation of litigation in the Fifth Circuit -- and I

14  apologize, I'm recalling this from memory, but I think our

15  briefing would support it -- is that but for the prospect of

16  litigation this document wouldn't have been prepared.  So it

17  can't be something you would have prepared in the ordinary course

18  of business that might have to do with a lawsuit some day, it's

19  you're getting ready for litigation or you think you might have

20  to litigate, and so you engaged in this analysis and you prepared

21  these materials.

22          And the record of FRA's engagement is clear that that's

23  what the NRA was doing.  The NRA was already engaged in one

24  Government investigation, facing a second potential Government

25  investigation, and engaged in two pending lawsuits that had to do

```
1   with these documents.
2              THE COURT:  Mr. Mason, I interrupted you.  You can go
3   ahead.
4              MR. MASON:  Thank you, Your Honor.  I was -- and I
5   touched on this briefly that one of the other issues -- one of
6   the other waiver issues is the selective waiver of the privilege
7   and it touches on the fact that we've been dealing with -- with
8   these -- these disputes, and the NRA has taken a firm position on
9   it for a while and then kind of at the 11th hour decided to
10  strategically produce some of these documents.  Here's some case
11  law relating to that.  This is in our brief.
12             This was at the -- this was at the hearing before Judge
13  Fish in -- I believe it was September, the status conference
14  regarding discovery.  And prior to that time we had had no
15  discussions at all about -- any more about the FRA issue, the
16  audit.  Ms. Rogers and I had not discussed it.  As far as we were
17  concerned that issue was -- was teed up for the Court.  And we
18  were -- you know, we expected that the Court would address it and
19  that -- and that was the end of it.
20             But during that hearing Ms. Rogers -- Ms. Rogers
21  brought up that the NRA generated a report with its findings and
22  that we're willing to produce it.  We think it's privileged, but
23  if there's a stipulation that it's not a subject matter waiver,
24  we'll give it to them.
25             We subsequently -- and I really -- again, I can't
```

1   stress the amount of like time and money and hoops that have been

2   jumped through before this was even discussed, because this

3   started two years ago.  Had been through numerous iterations in

4   different courts, different briefing, and now this is just thrown

5   out of left field at this particular hearing.

6           But after this we did have numerous discussions

7   relating to the FRA documents and ultimately we said no.  We said

8   you can't just selectively produce documents when you think it's

9   convenient and when you think it's convenient for you and we're

10  not going to agree to that.  We're not going to agree that it's

11  not a subject matter waiver.  You need to produce everything with

12  respect to the audit.

13          And so what did they do?  They ignored -- they ignored

14  what we said.  This is an e-mail from Ms. Rogers where she

15  indicated that the NRA has now requested that FRA produce these

16  draft reports and that we're going to provide them to our

17  experts.  So they -- they disclosed it at the hearing.  They said

18  if we can reach an agreement we'll do it.  We said no.  And they

19  said, okay, we're going to do it anyways.  We're going to make

20  the decision that we're going to produce them and we need to

21  provide them to -- to our experts.

22          And so this is important context, Your Honor, because I

23  don't want -- the issues that they have raised is, you know,

24  Ackerman McQueen is burdening the Court with additional briefing,

25  additional supplemental briefing on this whole FRA thing.  Had

1  this not happened, we would not have had that supplemental

2  briefing that occurred in the last -- in the last couple of

3  months, but we thought that this was important enough and a clear

4  selective waiver with respect to the -- to the decision that the

5  NRA made that we needed to bring it before -- before Your Honor.

6          In their response to our supplement, they said that the

7  NRA made no use of the FRA's spreadsheets other than providing

8  them to its testifying experts.  And that none of the NRA's

9  pleadings quote, cite or mention privileged -- or documents

10  logged as privileged.  They're not relying on any of the FRA

11  opinions or work products or any facts regarding its claims or

12  defenses in this case.  That was on November the 12th.

13          On November the 29th, what is that, 17 days later, they

14  file a motion for partial summary judgment.  And this is what I

15  was referencing earlier, attaching these reports and filing them

16  in the -- in the public record in support of -- of their motion

17  for -- for summary judgment.

18          And so this whole issue of we're not relying on them,

19  there's no reports, we believe that has significantly changed.

20  And the end result is that they made a strategic litigation

21  decision.  This is an issue that we've been going back and forth

22  on for a while.  They knew we were not agreeable.  They knew this

23  was going to be an issue.  They knew we were going to bring it

24  before Your Honor.  And we believe that the ultimate result of

25  their conscious and strategic litigation decision here is that

1  they have waived the privilege with respect to these FRA

2  documents.

3          Finally, I know one of the other things we talked about

4  with respect to the FRA is the -- is the Crime-Fraud Exception.

5  We talked about that earlier.  This goes back to Mr. La Pierre's

6  representations that were made at the October 11, 2018 meeting

7  and the involvement of the Brewer firm going forward and

8  specifically Ms. -- Ms. Dillon's role and involvement with

9  respect to the FRA audit.

10          So, again, we don't believe that these documents are

11  privileged, but to the extent that the Court does believe that

12  they are, we believe that that privilege has been waived because

13  of the Offensive Use Doctrine, because they made a strategic

14  litigation decision and selectively decided to produce some of

15  these, and also because we believe the Crime-Fraud Exception

16  applies here.

17          THE COURT:  Let me ask you, Ms. Rogers, regarding what

18  you've refused to produce, I mean, are they -- are you claiming

19  that what you've refused to produce are not parts of these draft

20  reports from FRA and are actually something else?

21          MS. ROGERS:  That's correct, Your Honor.  So these

22  spreadsheets, whether you call them reports or you call them

23  spreadsheets --

24          THE COURT:  Are they something different than the

25  spreadsheets that you --

```
 1              MS. ROGERS:  Yes.  Yes.  Sorry, Your Honor.  I didn't
 2    mean to interrupt you.
 3              THE COURT:  So what I'm asking you is you obviously
 4    have used some of those spreadsheets.  Was this all a one-thing,
 5    a draft spreadsheet document and you've chosen to use parts of it
 6    and are still withholding other parts of it?
 7              MS. ROGERS:  No, Your Honor.  So in our motion for
 8    summary judgment we cite maybe two sentences of one of the
 9    spreadsheets.  These are huge spreadsheets and we produced the
10    entire thing.
11              So we -- basically FRA transcribes and summarizes data
12    its shown and then it has bullet points summarizing here's what
13    we asked for, here's what they gave us.  Those bullet points are
14    what we cited in our motion, but we don't just produce the part
15    we cite.  We produce the entire document.  It would be huge if
16    you printed it out.  There's tabs of data under it.  Ackerman has
17    the whole thing.
18              THE COURT:  So what else, then, Mr. Mason, even though
19    it wasn't produced in response to the discovery motion, but -- I
20    mean, in response to the discovery motion, but what else are you
21    contending is out there?
22              MR. MASON:  Well, I think -- I mean, for one we don't
23    know when these were actually prepared.  We don't know who
24    prepared them.  We don't know what the input was at the Brewer
25    firm.  We don't know if they're corresponding with FRA saying,
```

```
 1   you know, hey, be sure you put this in the report, you know, or
 2   whatever.  We don't know.  We don't know, Your Honor.  What we do
 3   know is that there are --
 4          THE COURT:  You're not going to get that from the
 5   production of the documents anyway, even if they were to have
 6   turned over the entire forensic documents to you or the
 7   spreadsheet or whatever it's called.  Even if they were to have
 8   turned that over to you, those are questions that you might ask a
 9   witness, you know, in a deposition or otherwise or some
10   interrogatory, some way to question about those things.  But the
11   documents themselves is what this motion to compel appears to be
12   based on, and I'm trying to figure out what documents are you at
13   this point contending you've not been -- you've not had access
14   to.
15          MR. MASON:  Well, it's with respect to all of the
16   documents that are -- have been -- the 1,600 documents that have
17   been logged that relate to this particular audit.
18          THE COURT:  Do I misunderstood, then, what Ms. Rogers
19   is saying, is that at the point that they point -- or referred to
20   the bullet points they gave the entire documents, including those
21   1,600?
22          MR. MASON:  No.  No, Your Honor.  There are 1,600
23   separate documents that is, you know, for example, communications
24   and we obviously don't know what they say.  The FRA privilege log
25   I know is part of the record.  I can give you a cite.  But it's
```

1    that the six documents, I think, Your Honor has questioned, those

2    do not encompass the 1,600 documents.  I mean, I'm not even sure

3    they encompass a fraction of it.  I think those are just kind of

4    these reports that were apparently prepared at some point in time

5    by who knows -- you know, who knows when, who knows who was

6    involved in the preparation of them.

7            And our understanding is that the -- the communications

8    that have not been provided would be everything -- at least -- at

9    the very least everything kind of surrounding those.

10           Also, you know, the Brewer firm conducted this audit

11   in -- in September of 2018 and they were obviously communicating

12   with -- with FRA and Ms. Dillon about what they were seeing and

13   what you guys should be looking for.  And so those are the kinds

14   of things that we believe are being withheld and that are not

15   part of just these six particular documents.

16           THE COURT:  Okay.  I'm going to -- it's very difficult

17   to make a decision about documents when it's hard to know what

18   they actually are.  And so I'm going to require that the

19   documents being withheld be provided to the Court for in camera

20   inspection, and I'll make a determination upon inspection whether

21   or not they are privileged and if they are privileged whether the

22   privilege has been waived as to the specific documents that are

23   being withheld.  So, Ms. Rogers, when can you produce those?

24           MS. ROGERS:  I would say next week at latest,

25   Your Honor.

```
 1            THE COURT:  Okay.  Well, by the end of next week, then,
 2   if you will as least do that.  And you're saying that the
 3   privilege log that actually would apply to them is already the
 4   one that's in the record.
 5            MS. ROGERS:  That's correct, Your Honor.
 6            THE COURT:  Okay.  All right, then.  Let's look at --
 7   let's look at the -- let's see.  NRA's motion to compel -- compel
 8   documents withheld by -- withheld by AMC on the basis of
 9   privilege.  Are you -- are you ready to talk about that, Ms.
10   Rogers?
11            MS. ROGERS:  Your Honor, I appreciate the opportunity
12   to address it.  You know, we did think this hearing was
13   addressing two other motions and so in the interest of fairness
14   it would be ideal for us to address them at another date.  That
15   said, if Your Honor is poised to rule, I obviously wouldn't want
16   to forfeit the opportunity to given input, so --
17            THE COURT:  Go right ahead.
18            MS. ROGERS:  Okay.  So, Your Honor, as we cited in our
19   briefing -- and apologize, I don't have it in front of me, but
20   it's in the record and I'm sure the Court has reviewed it, a
21   party that doesn't log documents as privileged forfeits any claim
22   of privilege.  And this is especially true when the parties had
23   one chance, two chances, three chances to amend its privilege
24   log.  These parties have been engaged in discovery since November
25   2019 and discovery was extended by Judge Fish for the final time
```

1    this fall.

2             And over the course of that period the NRA has

3    repeatedly served document requests that implicate a specific

4    time period, 2015 to present, and implicate like a list of topics

5    that we served document requests targeting.

6             And we received a privilege log from Ackerman, which

7    over the summer we began to note looked deficient.  There were

8    documents that were missing from both the log and the production

9    and we couldn't figure out what they were or where they were.

10   And there was extensive meet and confer letter correspondence

11   addressing this.

12            And finally the discovery deadline was extended, but

13   before the discovery deadline was extended it appears the

14   defendants wanted to run out the clock and just did not

15   supplement their log and didn't produce anything.  But after the

16   deadline is extended they agreed to play ball with us sort of and

17   they amend the log for the first time, still not addressing any

18   of our concerns.

19            And what are our concerns?  I'm happy to recap them.

20   So there are documents on key topics that are simply missing from

21   the log.  For example, there's a pivotal letter received by the

22   NRA in August of 2018 that says, look, Ackerman keeps all the

23   records it would be required to keep under federal tax law and

24   applicable nonprofit law.  We're doing everything perfectly.  You

25   don't need our documents.  And by the way if you've got them

```
 1   there would be a paper trail a regulator could subpoena, so you
 2   should -- you should -- you know, you should stop trying to turn
 3   over rocks and look at documents.  That is a letter sent by
 4   Stephen Ryan at McDermott, Will & Emery.  And if memory serves,
 5   the date on that letter is August 22, 2018.
 6           So that's a very important letter, essentially giving
 7   us all the assurances that -- or many of the assurances that are
 8   in our fraud claim.  There's nothing on the privilege log about
 9   that letter.  Very odd.  There's almost nothing on the privilege
10   log about NRA TV.  There's almost nothing on the privilege log
11   relating to some of the other documents and events that we know
12   exist.
13           And so we write to Ackerman and we have several meet
14   and confer calls and we've been given by Judge Fish this very
15   firm and circumscribed window in which to conduct any outstanding
16   discovery.  And we say look, you know, it seems like we're going
17   to have an issue on privilege, so why don't we just agree to do
18   simultaneous -- like simultaneous joint submissions which will
19   get this teed up before the Court before the discovery period
20   ends.  Ackerman says, no, we want to do staggered briefing.  And
21   by the way, we're going to amend our log again.  We promise we'll
22   have our next amendment next week.  We get that for two weeks in
23   a row.  Finally as the discovery period closes an amended log is
24   served on us and we discover for the first time the vast majority
25   of documents that Ackerman is withholding.  And when I say
```

1  Ackerman, they furnished a log, but it's on behalf of all
2  defendants.
3          The vast majority, roughly -- I think it's roughly 75
4  percent of the documents the defendants are withholding they
5  don't tell us about in 2019 when they first review documents,
6  they don't tell us about in the summer of 2020 when we first
7  begin to follow-up with them, and they don't tell us about when
8  we start meeting and conferring in earnest after we emerge from
9  bankruptcy this summer and the Court has indicated the discovery
10 time is running out.  The vast majority of the documents that
11 they have withheld are secret until the final days of the
12 extended discovery deadline, which is pretty unacceptable,
13 because we have a number of issues with how these documents are
14 logged and whether they privileged in the first place and we have
15 been given no opportunity to contest them.
16         So, Your Honor, we think the fact that these
17 documents -- we weren't told about them when we first engaged in
18 discovery, we weren't told about them when the log was furnished,
19 we weren't told about them during our first and second iteration
20 of meet and confer.  We're only told about them at the very last
21 minute.  That in and of itself is a waiver.
22         But there are other reasons that we're entitled to
23 these documents.  So there are documents on this privilege log
24 for which, you know, no connection to legal advice is
25 articulated.  And there are documents on this privilege log,

1  which I believe we covered in our briefing, that we know are not

2  privileged, because we have copies of them and copies of related

3  e-mail chains.

4            So, you know, with that, as I mentioned, Your Honor,

5  we -- I didn't come prepared with a Power Point on this or

6  anything, but --

7            THE COURT:  Let me ask you this:  Maybe -- maybe I

8  could ask you a couple of direct questions.

9            MS. ROGERS:  Okay.

10           THE COURT:  So the documents that you have that now

11  they're claiming privilege over, but you already have them, what

12  is the dispute?

13           MS. ROGERS:  So with respect to those specific

14  documents, you know, we already have them, so obviously we're

15  content to use them.  But we think that this sort of indicates

16  that not every privilege claim is well founded and there are a

17  bunch of documents that we can't see that we think -- or that we

18  think the privilege assertion is similarly deficient, and this

19  is -- this is one consideration at minimum that favors in camera

20  review, if not a wholesale turnover of these documents.

21           THE COURT:  So you -- you generally are objecting

22  without -- I mean, are you saying the privilege log was

23  insufficient in that it's supposed to identify some -- with

24  enough specification that you're able to determine whether or not

25  you should -- you want to object to it?  You're saying that it's

```
 1   not sufficient as to the documents that were originally listed on
 2   the privilege log in that respect?
 3             MS. ROGERS:  That is certainly one concern that we have
 4   articulated.  And, you know, the Fifth Circuit has, you know --
 5             THE COURT:  Are there any -- are there any specific
 6   documents on the original or entries on the original privilege
 7   log that you've identified as insufficient to determine whether
 8   or not you should challenge the privilege?
 9             MS. ROGERS:  Certainly, Your Honor.  And just to be
10   clear, when you say original, do you mean the log that's now
11   before the Court or the very first one they gave us?
12             THE COURT:  Well, it sounds like -- and I hadn't gotten
13   to that, but it sounds like you're also arguing that their
14   current privilege log is untimely.
15             MS. ROGERS:  Yes.
16             THE COURT:  Am I understanding that?  So --
17             MS. ROGERS:  And that it's not privileged.  That's
18   correct, Your Honor.  So let me address the original privilege
19   log.  And as I'm addressing it I will make an effort to pull it
20   up so I can cite specific entries.  But there are entries on
21   there that don't say whether anyone is seeking legal advice,
22   don't say whether anyone is providing legal advice.  Sometimes
23   some of these entries just say forwarding attorney/client
24   communications, some of them say upon advice of counsel.  So
25   you'll have one Ackerman employee e-mailing another Ackerman
```

1  employee and it just says communication upon advice of counsel.

2  But as we all know, doing something because your lawyer told you

3  to is different from seeking or requesting legal advice.  So we

4  don't think those were adequate.

5          We had an issue with -- you know, a privilege log

6  traditionally is supposed to entail some sort of subject matter

7  description, so that if from the subject line of the e-mail -- if

8  the subject line just says re, for example, you can't tell what

9  the e-mail is about, so it's hard to assess the claim of

10  privilege and we don't think that the purpose of a privilege log

11  is satisfied with that issue.

12          And I can -- I apologize, Your Honor, for any delay.

13  I'm happy to sort of pull up what we have disputed.  There are

14  other e-mails on the original previous log, Your Honor, that

15  don't have attorneys on them and don't provide any information

16  sufficient to assess -- given that those there are no lawyers

17  here, how is that document privileged?  So that was an issue.

18          There are assertions of the Work Product Doctrine for

19  which no anticipation of litigation is alleged.  That's the core

20  element of the Work Product Doctrine and the privilege log

21  doesn't say it or doesn't provide information sufficient to infer

22  it.  Like if the subject line of the e-mail was something like

23  potential lawsuit, okay, but --

24          THE COURT:  Let me -- let me -- let me say to you that

25  I'm having no problem with you looking at their privilege log and

1    objecting to something being listed on that log when the

2    description doesn't support privilege or work product.  That's

3    what the point of the privilege log is.

4         My concern is that -- you know, sort of a wholesale the

5    privilege log is not sufficient and, therefore, we should have it

6    kind of thing.

7         I'm -- I'm fine with the specific examples that -- you

8    know, that you're giving and the reason that you would naturally

9    have an objection to those.  But it's the -- you know, it's the

10   basically we just know everything is bad because these are bad

11   kind of argument that is causing me some difficulty, especially

12   from the position of one who might have to look at them.

13        MS. ROGERS:  I understand, Your Honor, and I appreciate

14   you don't want to do in camera review everything.

15        THE COURT:  Yes.

16        MS. ROGERS:  I mean, I think we do cite laws, the fact

17   that just -- you know, you had one chance to amend, you had two

18   chances to amend.  If you don't timely assert your privilege

19   objection by then, if you don't timely --

20        THE COURT:  Well, usually you're amending because

21   somebody has pointed out that you were deficient.

22        MS. ROGERS:  Right.

23        THE COURT:  Okay.  So, you know, just the fact that

24   time is going on is not, you know, raising the -- raising the

25   requirement, so to speak, of having to, you know, amend, you

1  know.  You had all this time and you could have already done it

2  isn't the same as, you know, your privilege log is insufficient

3  in this way --

4           MS. ROGERS:  Certainly.

5           THE COURT:  -- and then you don't.  And then you don't.

6  And then you don't.

7           MS. ROGERS:  Certainly, Your Honor.  So I would only

8  point out that it's not merely the passage of time.  We're not

9  just saying this log was sitting out here deficient for a year

10  and they didn't do anything about it.  It's that the log was

11  sitting out there for a year.  The log that we didn't get until

12  one week before the expiration of the extended discovery window.

13  So if Judge Fish hadn't extended the discovery window, the vast

14  majority of these purportedly privileged documents would be --

15  their existence would be a complete secret.

16           They didn't produce them.  They didn't say they were

17  withholding them.  Most of these documents just completely fell

18  through the discovery cracks.  You know, they claim this was good

19  faith mistake.  We think the record is a little ambiguous on

20  that.  But that's a pretty extraordinary deficiency in and of

21  itself.

22           So -- but it's not -- it's not just that we didn't

23  learn about most of the purportedly privileged documents until

24  late October after the final-final discovery deadline was upon

25  us, it's that we didn't learn about them until late, late October

1    despite just months and months of going back and forth.  This
2    privilege log looks wrong.  What's wrong with it?  Why are there
3    so few documents?  We have 6,000 documents.  Why do you only have
4    a few hundred?  Where is the Stephen Ryan letter?  Where is the
5    NRA TV documents?

6            And then the fact that, you know, we're led down the
7    primrose path and told for like two weeks in a row like don't
8    worry, we're going to amend the log and resolve everything,
9    you're going to get it next week, you're going to get it next
10   week and then we don't get it, you know, we're not really left
11   with a lot of time to go through their now -- like I think it's
12   like 1,400 documents they have now logged and come up with a
13   particularized objection to every single one of them, because
14   this is dropped on us after discovery is supposed to have been
15   over for two months or three months actually.

16           So it's not just the time elapsed, it's not just that
17   the log was sitting out there being deficient, it's that we were
18   trying and trying to get an adequate log out of them and didn't
19   and then we get -- the vast majority of the documents are sprung
20   on us at the end.  And we just don't -- as a matter of fairness
21   we think that in camera review or disclosure would be one way to,
22   you know, remedy that.

23           And if Your Honor would like -- if Your Honor were
24   considering in camera review of a portion, you know, we'd be
25   happy to do also by next week, is give you a more particularized

1   list of documents that we really do think are crying out for in

2   camera review.  And this is something we would have done prior to

3   the 29th if we had -- if the vast majority of the log documents

4   had not been sprung on us months after the close of discovery.

5          THE COURT:  And, you know, I can give you that time.  I

6   can -- I can give you that time to do that.  But first let me

7   hear Mr. Mason's response.

8          MR. MASON:  Sure, Your Honor.  And I -- I do have

9   another -- I promise this Power Point is a little bit shorter.

10  There's some other issues that were raised in their motion that

11  Ms. Rogers didn't necessarily touch on.  I do want to address

12  those briefly with the Court, if I can.

13         THE COURT:  Let me ask you, Ms. Rogers, if the Court is

14  considering your proposal to identify specifically based on the

15  new log those documents that -- that you're requesting in camera

16  inspection of because you believe that the description of them is

17  deficient to establish that they would be either work product or

18  attorney/client privilege -- what about all those other things

19  you're asking?  I mean, are they moot at that point?

20         MS. ROGERS:  Well, Your Honor, obviously we wouldn't

21  want to waive or prejudice our rights.  I mean, we filed a motion

22  for all of these documents and we'd like them.  But, you know, if

23  we were exploring potential compromised positions, that's just

24  one that occurs to me.

25             I also would like to note -- and I apologize for not

1  noting it earlier, but, you know, this issue did come up at the
2  September 16th hearing before Judge Fish.  We raised it then too.
3  So, again, this is not just a situation where time has passed,
4  it's a situation where the deficiencies in the log have been
5  noted and noted and noted, and Ackerman just kind of brushes them
6  off until days before discovery ends.
7          THE COURT:  But that's not helping me figure out where
8  we stand.
9          MS. ROGERS:  I understand.
10         THE COURT:  I know you want to throw that in there and
11  I appreciate it, --
12         MS. ROGERS:  I'm sorry.
13         THE COURT:  -- but I'm really trying to see where we
14  stand as far as what you've requested at this point.
15         MS. ROGERS:  Your Honor, can I have a moment to confer
16  with my colleague just a second?  I'm sorry.
17         THE COURT:  Yes.
18         (Pause.)
19         MS. ROGERS:  Thank you, Your Honor.  And I'm sorry for
20  the delay.  So we think with respect to documents that are
21  logged, that compromise I just proposed would resolve our motion.
22  That is, we give you next week a list of things we really want
23  you to in camera review to solve the available log.
24         The only -- the only place that that falls short, the
25  only problem with our motion that would not resolve, is there are

Jeff Foster, RMR, CRR   (214) 753-2349

**App.053**

```
1   still documents that we think the defendants are withholding that

2   they haven't logged at all.  We -- we know that there

3   are documents --

4            THE COURT:  Well, that's something different, though.

5            MS. ROGERS:  Yes.  Yes, Your Honor.  So with respect to

6   the documents on the log, that would resolve our motion.

7            THE COURT:  Okay.  So, I mean, you know -- and

8   unfortunately we get this all the time that we think they're

9   withholding documents and -- we think they're just withholding

10  documents.  I mean, do you, you know --

11           MS. ROGERS:  Do I think that they exist?

12           THE COURT:  Yes.

13           MS. ROGERS:  Yes.  So here's why I think they exist and

14  I don't think Mr. Mason will deny it.  We know there are going to

15  be documents after April 2019 that are responses to our requests

16  and are -- are not being produced to us presumably on the grounds

17  of privilege.  The previous log cuts off April 2019.

18           THE COURT:  Why is that, Mr. Mason?

19           MR. MASON:  Your Honor, it's because litigation between

20  the parties started in April of 2019.  And -- and if I can, one

21  of the -- one of the issues that they did move on is -- and

22  Ms. Rogers is right, there are some documents we believe that we

23  have asserted objections or don't have an obligation.

24           But essentially what I think they're asking for, at

25  least in their reply, is that with respect to post April 2019
```

1  post litigation between the parties, we think that they're

2  essentially asking the Court to find a blanket per se waiver

3  that because you guys didn't do any kind of log that you have to

4  turn over, you know, literally every single attorney

5  communication and attorney work --

6          THE COURT:  I've already told you my opinion on that,

7  so we don't have to -- we don't have to beat that horse.  But

8  what I'm -- but what I'm trying to find out from you is -- and

9  you've told me -- is that you believe everything that would have

10 been responsive is -- is not responsive because the lawsuit was

11 filed?

12         MR. MASON:  What I'm -- so what I'm saying, Your Honor,

13 is between January -- I believe it's January of '18 and April of

14 2019.  I believe that we have logged all of the documents that

15 we -- that are responsive and that we're withholding on the basis

16 of privilege and including in our -- in our latest log.  And I

17 know that's what we've been discussing.

18         What I am saying is that there are certain documents --

19 well, first of all, with respect to pre 2018 documents, I'm not

20 even sure that there are any responsive privileged documents, but

21 we have not logged those, because we asserted objections and we

22 don't believe that -- that those are relevant and we had a

23 requirement to do that.

24         The same goes for --

25         THE COURT:  You don't have a requirement to -- tell me

1   again what you mean?

2             MR. MASON:  Well, we asserted objections regarding the

3   scope of their -- of their discovery requests.  And I know this

4   gets into their kind of motion to compel in terms of like the

5   time period.  We asserted certain objections to the time period

6   of responsive documents and I know that touches on another issue.

7   But there are -- well, there may be certain documents that are

8   pre 2018 that are not on the log.  I am certain that there are

9   likely attorney/client and documents post April of 2019 after the

10  litigation began.  And, again, the original lawsuit --

11            THE COURT:  Do y'all have some kind of agreement to

12  limit the scope of their request to January -- or whatever it

13  was -- 2018 up to April of 2019?

14            MR. MASON:  We have not -- we have not -- there was an

15  agreement with respect -- in the Virginia case with respect to

16  2018.  That's kind of how that 2018 came into the -- into the

17  Texas case.  Because, again, the first lawsuit --  this all began

18  in April of 2019 up in Virginia.  The NRA filed its first lawsuit

19  in April.  There was another lawsuit that was filed in May of

20  2019.  Ackerman filed counterclaims.  This Texas lawsuit was

21  filed and the NRA filed a fourth lawsuit in Virginia in 2019.

22            And so in our original log that we did in December we

23  did not log documents that were after the commencement of

24  litigation.  We didn't believe we were required to do that under

25  the -- under the law, because for a variety of reasons the

```
 1   privilege is so obvious, it would be unduly burdensome.  And --
 2              THE COURT:  The privilege is obvious before the
 3   lawsuits were filed?
 4              MS. ROGERS:  No, after -- after the lawsuit, Your
 5   Honor.
 6              THE COURT:  Okay.  I thought you were talking about
 7   before.
 8              MR. MASON:  After -- after the lawsuit.  I'm talking
 9   about post April of --
10              THE COURT:  I thought you were talking about pre 2018
11   and it was sort of like you switched.  That's why I asked you
12   that question.
13              MR. MASON:  And I apologize if I was confused or going
14   back and forth.  But with respect to post April 2019, we do not
15   believe that we have an obligation to log post litigation
16   communication --
17              THE COURT:  Let me ask you this:  Do you contend that
18   you do not have documents that would be otherwise responsive that
19   are post April 2019?
20              MR. MASON:  I want to be sure I understand the
21   question.  Is it -- is the question would there -- do I know if
22   there are responsive documents --
23              THE COURT:  Documents --
24              MR. MASON:  -- post April of 2019 that are solely being
25   withheld on the basis of privilege?
```

```
1              THE COURT:  No, I'm just asking you are there any?
2              MR. MASON:  Are there any -- well --
3              THE COURT:  Post April 2019 documents that are
4    responsive and that you -- you agree are responsive to their
5    requests?
6              MR. MASON:  There are -- I believe there are some and I
7    believe we've produced those.  We have produced some documents
8    after April of 2019.
9              THE COURT:  But you are saying you withheld some
10   documents after 2019, but you did not provide a privilege log.
11   You withheld them on the basis of privilege, but you did not
12   provide a privilege log.
13             MR. MASON:  I haven't looked through all of them, but I
14   do believe that there are documents.  Given the 300 requests for
15   production that -- that we received in this case from the NRA,
16   I'm certain that there's probably a privilege -- there are
17   privileged documents that are post April of 2019.
18             THE COURT:  Well, then your -- your explanation for why
19   you haven't produced a privilege log for them falls flat, because
20   you've already said there were responsive documents during that
21   period that you did produce.  And you're admitting that you
22   withheld some other documents that would be responsive during
23   that period that you already produced documents for for post
24   April 2019 that you withheld on the basis of privilege, yet you
25   did not produce a privilege log.  And so you saying that it's
```

1  post that and so that necessarily it's going to be means nothing

2  to the rules that require you when you're withholding something

3  based on privilege to provide a log.

4         MR. MASON:  Well, again, Your Honor, to the extent that

5  a log was required, we believe that there is ample case law out

6  there that suggests you don't need to log communications post --

7  post litigation.  And here's a few of those cases.  And I'm happy

8  to provide those to --

9         THE COURT:  When you're providing an Eastern District

10  of New York case that says that, it isn't helpful to me.

11         MR. MASON:  Sure.

12         THE COURT:  Is there something within the Fifth Circuit

13  that said that?

14         MS. ROGERS:  Well, I have not found anything --

15  there's -- there's not a case that's cited that suggests that a

16  failure to log privileged documents after the commencement of

17  litigation is a blanket per se waiver and everything needs to be

18  produced.  I mean --

19         THE COURT:  Well, we're not talking about any remedy at

20  this point, we're talking about the obligation at this point.

21  Because, you know, I could decide that you need to go do the

22  privilege log so that we can have a meaningful discussion about

23  it, you know, --

24         MR. MASON:  There is case law in the --

25         THE COURT:  -- if you're withholding something.

```
 1              MR. MASON:  I'm sorry, I didn't -- I didn't catch that,
 2    Your Honor.
 3              THE COURT:  I said if you're withholding something,
 4    which it sounds like you are.
 5              MR. MASON:  There is case law.  This is the Benson case
 6    that is the Eastern District of Louisiana that talked about it
 7    was not necessary to log documents after the commencement of
 8    litigation.
 9              THE COURT:  No, it's not necessary to log every work
10    product communication after litigation.  Okay.  It's not every
11    work product communication.  But what you're saying is there are
12    some -- you know, how -- how do -- how do they decide what's --
13    and that's what I pointed out when I was talking with Ms. Rogers
14    or questioning her.  How did they decide whether or not they want
15    to object to your claim of privilege or work product if they
16    don't have enough information -- which is the whole point of the
17    rule and the law -- enough information to do it?  I don't know
18    what the situation was there in Benson, you know.  You know,
19    maybe they just summarized it and said that post litigation
20    every -- we have those documents, that all they are are
21    communications between our attorneys and our -- and the clients
22    post litigation.  And it could be a summary.  It wouldn't have to
23    be every individual thing, but it would be --
24              MR. MASON:  Well, and, Your Honor, I mean, this is not
25    an issue that -- because we did search for the law and they
```

1    haven't cited any in the Fifth Circuit.  And as Your Honor

2    pointed out before, the purpose of the log is to test the

3    privilege.  But since litigation has commenced there's -- and

4    there is case law about there not being a material benefit to the

5    requesting party, because it's so obvious that the communications

6    are -- are privileged.  I mean, that's why you don't see

7    itemized, you know, privilege logs after the commencement of

8    litigation.

9             THE COURT:  I have.  I have.  You know, especially when

10   that period is one when you say there are materials that are

11   nonprivileged that are responsive, you know.

12            MR. MASON:  Well, and I'm saying there that I believe

13   that there probably are, I mean, but I -- I don't know that for a

14   fact.  I believe that there probably are.  But to the extent

15   that -- to the extent that the Court is inclined to grant relief

16   with respect to this, I mean, I would -- I would request that we

17   be permitted to provide a categorical privilege log and that the

18   request for -- essentially the draconian relief about a blanket

19   literally produce everything that's privileged --

20            THE COURT:  Well, we're not talking about.  You keep

21   coming back to that and I said that's not what I was considering.

22   I was actually considering what you said, is that you -- about

23   requiring you to produce a privilege log that is more

24   encompassing so they can determine whether there's anything there

25   to challenge.

1          MR. MASON:  And we can do that.  Well, we can do that,

2   Your Honor.  I would ask -- for post litigation privileges,

3   though, I would -- I would request that we be permitted to do

4   that on a categorical basis, because, again, there was numerous

5   law firms that were involved.  There was four lawsuits that were

6   ongoing in 2019 and -- and I will endeavor to make that as

7   categorical and as detailed as possible, but I would request that

8   the Court permit us to do a categorical --

9          THE COURT:  Well, let's see.  We'll see -- we'll see if

10   it's sufficient.  So you can go ahead and do that.  When are you

11   gonna have that by?

12          MR. MASON:  Your Honor, could we have -- can we have 21

13   days to do that?

14          THE COURT:  Okay.  When would that be?  21 days from

15   today.  Okay?  So let me ask you about this.  Somebody is sharing

16   something and I don't think that they intend to.

17          Let me ask you -- let me ask you about this:  As far as

18   the pre April 2019 documents that were not produced, once -- once

19   we get that list of the specific challenges from Ms. Rogers for

20   those that you've already listed on your new log, I'm likely to

21   request that those documents be turned over for in camera

22   inspection.  How quickly can you do that after her specific

23   objections to those documents are filed?

24          MR. MASON:  Your Honor, I guess it depends in part

25   on -- on when Ms. Rogers intends to do that.  If it's in the next

1  week and where it falls on Christmas day, that may be more

2  difficult.  Do we know when Ms. Rogers intends to provide that

3  list?

4           THE COURT:  I guess -- I guess I'm more concerned as to

5  how -- how long it would take you to marshal some of the

6  documents that you have on your list.

7           MR. MASON:  I would ask the Court for 14 days once we

8  receive the list from Ms. Rogers to provide those to the Court.

9           THE COURT:  I'll give you -- I'll give you 21 --

10          MR. MASON:  Thank you, Your Honor.

11          THE COURT:  -- from the date that Ms. Rogers provides

12 that list.

13          So what else can we -- doesn't that take care of

14 everything for today pending -- pending the updated log, the

15 updated objections or the specific objections and the provision

16 of the documents for in camera inspection?

17          MS. ROGERS:  Your Honor, there's one item it doesn't

18 take care of.  So --

19          THE COURT:  Okay.

20          MS. ROGERS:  -- we talked about a log for documents

21 after the start of litigation.  And we agree with Your Honor

22 that, you know, the log is appropriate.  The NRA logged documents

23 after the start of litigation, so the defendant should too.

24          But there's another chunk of time for which they admit

25 they have not logged and that's pre 2018.  And we met and

1    conferred on this over the summer and after Judge Fish extended

2    the discovery deadline, and we were told we were getting

3    responsive pre 2018 documents by the end of October.  So they've

4    produced documents for that period and they have withheld some,

5    but they haven't logged them.

6         So in our motion we argue you've got multiple chances

7    to log, you know they're responsive, you've got to turn them

8    over, you have waived privilege.  If Your Honor is not inclined

9    to find a wholesale waiver by virtue of their refusal to log,

10   then we would ask that in addition to the post 2019 that we get a

11   log of the pre 2018, because that's another big chunk of time and

12   they don't even have -- they don't even have the excuse there

13   that there was pending litigation and got stuff with litigation

14   counsel.  It's just like these documents -- these like mystery

15   documents that they have no excuse for not logging.

16        THE COURT:  Mr. Mason, that does bring me back to the

17   question I was asking you.  You did kind of conveniently skip

18   over that, as I kind of mentioned, when you were arguing before

19   why you weren't logging the privileged stuff pre 2018.

20        MR. MASON:  Well, I think, first of all, we did not say

21   that we were producing all documents pre 2018.  We have

22   objections to that.  We have -- and that's the subject of, I

23   believe, the NRA's motion to compel on certain document issues.

24        We have conferred with the Brewer law firm dozens of

25   times throughout the last year to narrow that issue about pre

1  2018 documents and we have agreed to produce tons.  We have

2  produced thousands of pre 2018 -- pre 2018 documents.

3          I do not --

4          THE COURT:  I guess the question, though, isn't what

5  you've produced, it's what you haven't produced and if you

6  haven't produced it because it would be otherwise responsive, but

7  you're basing your refusal on a privilege or -- a privilege.

8          MR. MASON:  And I don't know -- I don't believe, but I

9  don't know that we are withholding any documents pre 2018 on --

10 on the basis of privilege.  But I -- I am -- I can go back and

11 confirm that we --

12         THE COURT:  Are you withholding any documents that

13 would otherwise be responsive on some other basis?

14         MR. MASON:  Well, we -- on some other basis, yes,

15 Your Honor.  I mean, some of the requests in this case -- again,

16 there's 300 requests for production and some of them are

17 unbelievably overbroad.  It's essentially give us every single

18 document ever created in any way, shape or form pre 2018.  And

19 we've said we believe that is completely overbroad and improper,

20 but we're willing to sit down and talk about what is it that

21 you're specifically looking for.  An example of this is --

22         THE COURT:  And is that in -- is that in -- that's not

23 in this motion.

24         MR. MASON:  In the privilege motion?

25         THE COURT:  Yes.

```
 1          MR. MASON:  It's not in the privilege motion.  No, Your
 2   Honor.
 3          THE COURT:  In the motion to compel.  Have you sought
 4   to compel -- another motion to compel, Ms. Rogers?
 5          MS. ROGERS:  Yes.  Yes, Your Honor.  So the pre 2018
 6   document issue has been sitting out there for a long time.  So we
 7   served -- we first served discovery November 2019 and in
 8   defendant's responses and objections there's a general objection
 9   to producing anything pre 2018.  There is an old joint status
10   report before Your Honor from October 2020 deals with that issue.
11   We asked that that general objection be overruled.  It came up
12   again at the discovery conference convened by Judge Fish in
13   September and thereafter the parties never resolved the issue and
14   the remaining discovery --
15          THE COURT:  Was that a status report before it was
16   clarified to you-all that I wouldn't be looking at a status
17   report unless it was attached to a motion?  You know, I don't get
18   any notice of it unless you -- unless you ask for some relief.
19   Was that one of those?  Because I don't see something back from
20   October that we haven't done.
21          MS. ROGERS:  So, Your Honor, I apologize.  I wasn't in
22   the case then and I'm checking right now, but I think it was
23   after the standing order telling us how to brief discovery issues
24   and I think we briefed it under that protocol.
25          MR. MASON:  It's ECF, Your Honor.  It's -- I apologize.
```

1    Bear with me.  I'm looking at the wrong year.

2              THE COURT:  This has been going on for quite awhile.

3              MR. MASON:  It's -- Your Honor, it's ECF 180.  And I

4    was involved in the case.  And so, Your Honor -- Your Honor,

5    there was cross-motions to compel in early 2020.  And Your Honor

6    entered an order, I believe it was in the summer of 2020,

7    essentially telling the parties like, look, plenty of time has

8    gone by.  It looks like you've resolved some of these issues.  Go

9    back to the drawing board and keep talking about these issues and

10   see if you can reach an agreement.  And if there's anything

11   outstanding -- and I want you to comply with my discovery --

12   discovery protocol, and so we did that.  And we had numerous

13   conferences with Michael Collins and Allegreto and other members

14   of the Brewer firm in 2020.

15             And then ultimately the parties -- there were some

16   issues that were not -- we couldn't reach an agreement on and

17   that is reflected in ECF 180.  And with respect to the pre 2018

18   documents the NRA moved to compel pre 2018 documents, I believe,

19   with respect to RFPs one, two and four.

20             But we had numerous discussions with the NRA in the

21   summer of 2018 on this issue.  We had additional -- I had

22   additional conversations with Ms. Rogers this fall about the

23   pre 2018.  She provided another list of documents and categories

24   that -- that she was telling me, look, we want these pre 2018

25   documents.  We went back and we agreed to produce those.  That's

1   why we did do supplemental productions in kind of the last few

2   months.

3            And so we have endeavored and worked with them on this

4   particular issue.  But that's a longwinded way of saying, Your

5   Honor, that that joint status report that the parties filed

6   in -- and I believe the reason it may not have been attached,

7   Your Honor, is because it was cross-motions where both parties

8   were seeking relief.  But that's ECF 180.

9            THE COURT:  Okay.  Both parties were seeking relief,

10  but you're saying neither party asked for relief in the motion.

11  Is that what you're saying?

12           MR. MASON:  What I'm looking at right now is I don't

13  know if -- the document is titled Joint Status Report in

14  connection with plaintiff's motion to compel and defendant's

15  motion to compel.  But essentially this was the -- this was the

16  report that the parties jointly submitted after we went back to

17  the drawing board on both of our original motions to compel.

18           THE COURT:  Okay.  What happens is the original motions

19  were already determined.  It was determined that you should go

20  back to drawing board and you should let us know if other issues

21  remain.  So there was nothing out there for us to know that was

22  still pending unless you attach it to a motion.  That's why later

23  on you were specifically told look at the scheduling order,

24  attach it to a motion so that we would get notice of it and know

25  that there was something you were seeking relief on.  So even

1   though you're talking about it now, it's not something I have

2   even considered or even looked at, because I didn't know there

3   was an issue about it.  So, I mean, we can take it up, but, you

4   know, we're not going to take it up now as far as the temporal

5   objections.

6           But more -- but specifically as to the attorney/client

7   privilege, we're taking care of that now.  And, Mr. Mason, to the

8   extent that you withheld documents during the period pre 2018

9   that you withheld -- that would otherwise have been responsive,

10  but you withheld on the basis of privilege, you need to within 21

11  days provide a privilege log for those documents.

12          MR. MASON:  Yes, Your Honor.

13          THE COURT:  So -- and if we need to go back and look at

14  the argument from the pre 2018, prompt us to do it.  File a

15  motion to compel.  And you can go ahead and attach that joint

16  status report to it if you'd like.  I mean, in other words, if it

17  already covers what it is you want to do, you know -- or, you

18  know -- then just -- just let us know we need to resolve it by a

19  motion.

20          MS. ROGERS:  Thank you, Your Honor.

21          MR. MASON:  Just so I'm clear, Your Honor, are you

22  inviting the parties to rebrief the issue if necessary at this

23  point or are you suggesting --

24          THE COURT:  No, --

25          MR. MASON:  Okay.

```
1            THE COURT:  -- I'm not.

2            MR. MASON:  Okay.

3            THE COURT:  So I'm just trying to have a motion out

4    there for me to rule on and give notice of, because that's the

5    way I know that you have something pending.

6            So that sounds like it takes care of, at least for now,

7    that motion, the motion -- the motion to compel filed by the NRA.

8            MS. ROGERS:  Yes, Your Honor.  And just one small item.

9    Mr. Mason had asked for permission to provide a categorical log

10   rather than a document-by-document log.  We would consent to that

11   with respect to documents post April 2019 that are communications

12   with litigation counsel about the litigation.  But there are also

13   like business-related communications during that time that the

14   NRA logged document by document.

15           So, for example, even after litigation starts you have

16   NRA executives e-mailing Ackerman executives about

17   confidentiality, about returning our property.  We think those

18   communication that aren't with Dorsey about the lawsuit need to

19   be logged.

20           THE COURT:  Well, and I just assumed that when

21   Mr. Mason was talking he meant by categorical communications

22   between the attorneys and -- and, you know, the representatives

23   of the parties --

24           MR. MASON:  Right.

25           THE COURT:  -- that meet the definition of privilege.
```

```
 1    And I thought that's what he meant, because that's what I meant,
 2    Mr. Mason.  Is that what you meant?
 3              MR. MASON:  That's my -- Yes, Your Honor.
 4              THE COURT:  Obviously you wouldn't just throw something
 5    in there that didn't fit those parameters --
 6              MR. MASON:  Absolutely.
 7              THE COURT:  -- such as what Ms. Rogers is saying.
 8              MR. MASON:  Correct.
 9              THE COURT:  Then you'd be defeating the whole point of
10    doing a privilege log.
11              So I think we're straight on that.
12              MS. ROGERS:  Thank you, Your Honor.
13              THE COURT:  Let's look at -- do we have Mr. --
14              MR. QUINNETT:  Your Honor, Mr. Quinnett is here.
15              THE COURT:  Okay.
16              MR. QUINNETT:  We have a windstorm in Oklahoma and I
17    had to -- I lost my electricity.  And with your permission I
18    can't get video, but can we proceed this way?
19              THE COURT:  Yes, we can go ahead and proceed this way,
20    because we want to go ahead and take care of the motion, --
21              MR. QUINNETT:  Thank you, Your Honor.
22              THE COURT:  -- the next one I was going to call and
23    it's the one I'm about to take up.  And it's the one -- HBC CPAs
24    and Advisors' motion to quash the third-party's subpoena.
25              MR. QUINNETT:  Yes, Your Honor.
```

```
 1              THE COURT:  So let's get into that.  And it sounds
 2    like -- it sounds like the NRA and AMC have different arguments
 3    than what HBC has regarding the subpoena.  Different -- different
 4    concerns about it.
 5              So Mr. Quinnett, if you want to go ahead, --
 6              MR. QUINNETT:  Yes, Your Honor.
 7              THE COURT:  -- we can discuss your position first.
 8              MR. QUINNETT:  Thank you.  HBC is a CPA firm, I'm sure
 9    you know that, and we perform audit services and have in the past
10    for Ackerman McQueen.  The NRA provided us a third-party subpoena
11    in July of 2020.  And, Your Honor, we -- I conferred with
12    Mr. Mason in the last couple of days and we presented -- there
13    were four things -- four main topics that the NRA was requiring.
14    I conferred with Mr. Mason, put together a document and it sounds
15    like we're in agreement on three of the four.  Ms. Rogers,
16    Mr. Mason and HBC are in agreement on three of the four.
17              THE COURT:  Okay.
18              MR. QUINNETT:  And there was one that was sort of at a
19    late date that we didn't quite iron out.  So there's one that's
20    kind of outstanding and Mr. Mason and I haven't had a chance to
21    talk about it yet.  But I think we're close.
22              THE COURT:  Are you thinking that you will be able to
23    resolve it and you won't get -- won't require Court intervention?
24    Is that what you're -- what you're suggesting or stating?
25              MR. QUINNETT:  With your permission, Your Honor,
```

Jeff Foster, RMR, CRR   (214) 753-2349

```
 1   there's one large -- we agreed on three of the four.  The fourth
 2   one -- Ms. Rogers had four points -- four separate document sets
 3   I would say that she wanted.  And I think we're in -- I don't
 4   want to speak for Mr. Mason, but I think for HBC we'll agree to
 5   three of those four.  There's one larger one that I think we want
 6   to hear from Ms. Rogers on why she would want those documents.
 7            THE COURT:  Which one is that?
 8            MR. QUINNETT:  Yes, Your Honor.  It's number four in
 9   the subpoena that --
10            THE COURT:  What's the subject matter?  Because I don't
11   have it listed by number.
12            MR. QUINNETT:  That's okay.  Number four and I'll read
13   it.  The NRA requested all documents that refer or relate to
14   communications between you and AMC regarding the NRA.  And
15   then -- and then we conferred with Ms. Rogers and Mr. Mason.
16   Ms. Rogers said we would agree to -- she countered our response
17   and she said we would agree to these four document sets.  You
18   don't have those in front of you, Your Honor, but it just
19   happened today.  And I think HBC, my clients, would agree to
20   three of the four.  And there's only one that I think is probably
21   at issue from HBC's point of view.
22            THE COURT:  Okay.
23            MR. QUINNETT:  And so we're close, Your Honor, except
24   for this one request that we feel like NRA may be -- that we
25   can't comply with.
```

69

```
1            THE COURT:  So Mr. -- Mr. Mason and Ms. Rogers, are
2   you-all thinking it would be -- it would be beneficial to pass
3   this motion and to give you an opportunity to further negotiate?
4            MS. ROGERS:  I think that would be beneficial, Your
5   Honor.  I did hear from HBC's counsel just now that he wanted to
6   hear from me on one of these categories.  And if it would -- if
7   it would be an efficient use of time to just do that now in Your
8   Honor's presence to give guidance if needed, that might be
9   helpful.  Otherwise, if Your Honor would prefer, you know, we can
10  continue to caucus amongst ourselves.  Is the category that you
11  guys are interested in, is it the revenue recognition one?
12           MR. QUINNETT:  Yes.  Bingo.
13           MS. ROGERS:  Bingo.  All right.  So, Your Honor, we can
14  move onto the next motion and try to resolve this among ourselves
15  or I can just kind of briefly give a capsule explanation of why
16  the NRA needs these documents.
17           THE COURT:  Well, I mean, do you want me to determine
18  it or do you want me to give you an opportunity to work it out?
19  That's the question.  Because I don't want to hear about it if
20  I'm not going to make a decision about it.  I just want to give
21  you an opportunity to work it out.
22           MS. ROGERS:  Your Honor, I think -- you know, I think
23  we're so close, it's just this one last item, so let's -- let's
24  have a chance to work it out and, you know, we might end up back
25  in front of you if we can't.
```

```
1              THE COURT:  Okay.

2              MR. QUINNETT:  And, Your Honor, I'm fine with that.

3    The one thing that I will say with respect to -- and, again, I

4    think we're 95 percent of the way there.  With respect to

5    Ms. Rogers had requested with respect to item number four an

6    unredacted audit report from December 31st, 2019, we are

7    agreeable to that, but I do want to make sure that -- I believe

8    we previously produced a redacted version as highly confidential.

9    And so we would ask that that same -- the unredacted version also

10   be designated as highly confidential.

11             And then the other documents under the protective order

12   and then the other documents that are produced would also be --

13   would be designated as confidential, not highly confidential.

14             So I don't think that will be an issue, but I just want

15   to put that on the record.  But with respect to the other narrow

16   issue, I'm obviously happy to confer and see if we can take

17   something off Your Honor's plate.

18             THE COURT:  Okay.  We'll pass that motion for now and

19   when will you-all update us on the status of that?

20             MS. ROGERS:  So I'm -- go ahead.  Sorry.

21             MR. QUINNETT:  Go ahead, Ms. Rogers.  Go ahead.

22             MS. ROGERS:  I was just going to say, you know, that's

23   our category.  I'm not really sure of any of HBC's objections,

24   but, you know, I have some availability this week to confer and

25   we have a couple of --
```

```
1              THE COURT:  Can you let us know that within 21 day so
2   we can keep our deadlines?
3              MS. ROGERS:  Certainly, Your Honor.
4              THE COURT:  Okay.  Just let us know the status of that
5   and within 21 days.
6              MR. QUINNETT:  Yes, Your Honor.  Thank you.
7              THE COURT:  So then let's look at AMC's motion to quash
8   NRA's third-party subpoena.  Ms. Payne -- the subpoena to
9   Ms. Payne?
10             MR. MASON:  Yes, Your Honor.
11             THE COURT:  Is it Ms. Payne?  Yes.
12             MR. MASON:  So with respect to Ms. Payne -- and I have
13  not had an opportunity to talk with Ms. Rogers further about this
14  particular subpoena.  I'm happy to do that as well.  But
15  Ms. Payne is a former employee of Ackerman McQueen.  She was
16  Angus McQueen's companion.  She spent a lot of time and she
17  worked on NRA TV.
18             She ultimately left Ackerman McQueen and the NRA served
19  a third-party subpoena on her essentially asking -- I believe
20  probably 95 percent of which -- of the requests was documents and
21  information that is actually Ackerman McQueen's documents and
22  information relating to NRA TV and the like.  And I don't even
23  know if she has those -- those documents.
24             But setting that aside, to the extent that Ms. Payne or
25  there was any responsive documents in this case with respect to
```

1    Ms. Payne and NRA TV, those documents have already been produced.

2           I think what this subpoena is about is Ms. Payne was

3    engaged in a lawsuit -- well, let me -- let me say one other

4    thing first.  The NRA had already requested that we provide

5    Ms. Payne's employment file, which we agreed to do and we have

6    done.

7           What I believe this particular subpoena is really about

8    is there was a lawsuit between Ms. Payne and Revan McQueen that

9    has absolutely nothing to do with the claims and defenses in this

10   case.  Ultimately that was resolved in a confidential settlement.

11          And I believe that, for the most part, is what they're

12   attempting to obtain here.  Again, I'd like to hear from Ms.

13   Rogers.  But if you look at all of the requests and you look at

14   the third-party subpoena, it's -- it's grossly overbroad.  Again,

15   these are all Ackerman's documents.  But we haven't

16   necessarily -- we're not withholding those documents.  But I

17   think that the big issue and what the NRA is really looking for

18   here is information about the dispute between Ms. Payne and

19   Mr. McQueen or personal information between Ms. Payne and Angus

20   McQueen, who passed away in the summer of 2019 that, again, we

21   don't believe has -- has any relevance to the claims in this

22   lawsuit.

23          So I don't want to -- I don't want to belabor too much,

24   because, again, I'd like to understand, I think, a little bit

25   more from Ms. Rogers what it really is that they're looking for,

1   and, again, I'm happy to confer with her further about that.  I

2   know some of these issues were -- were raised and filed -- some

3   of these motions were filed a long time ago.

4           MS. ROGERS:  Sure.  So just to back up a little bit, it

5   would not be correct to say that the subpoena primarily concerns

6   a lawsuit between Ms. Payne and Ackerman.  That's one of several

7   requests.  But like 90 percent of the requests are about NRA TV,

8   which was this very expensive flagship product marketed to the

9   NRA by Ackerman that is at the crux of this lawsuit.

10          Ms. Payne was a vice president and creative director

11   who worked on several of the NRA TV shows that are hotly disputed

12   in this case, including Oliver North's American Heroes, Dana

13   Loesch's Relentless show and she worked on this Carry Guard

14   program, which I previously mentioned, Your Honor, that relates

15   to a bunch of other litigation too as an insurance program that

16   Ackerman worked on.

17          Here's a couple of crucial facts about the Tammy Payne

18   subpoena.  Ackerman's contention that responding to the subpoena

19   is burdensome is irrelevant, because the burden is on Ms. Payne,

20   not on Ackerman, and she does not object.  Ms. Payne is willing

21   to produce documents.  She's willing to appear for a deposition.

22   So Ackerman, her former employer, interposes itself and says, no,

23   stop, we have some kind of confidentiality interest in these

24   documents.

25          Now, we don't even stipulate that they necessarily have

1    standing to do that.  They cite a couple of cases where a former

2    CEO is subpoenaed after a merger and he got to review these

3    documents for privilege.  But even so that dispute is litigated,

4    if memory serves, in 2020 in an Oklahoma court.  And what the

5    Oklahoma court says is, all right, Ms. Payne has to hand over her

6    laptop, her phone, her documents to Ackerman and they can image

7    those devices, they can review them and they have to produce them

8    to the NRA.  Ackerman says it's going to do that and it never

9    does.  So Ackerman had its chance to interpose whatever interests

10   it has in Ms. Payne's documents and it didn't do it.

11         THE COURT:  Didn't that -- didn't say order say also

12   for you to get the documents from Ackerman?

13         MS. ROGERS:  So what the order -- and I don't have the

14   text in front of me, but I don't think Ackerman will dispute the

15   gist of it was Ackerman has to review and produce anything

16   responsive.

17         THE COURT:  Right.  So you were supposed to get them

18   from Ackerman.  So why are you attempting to get them from

19   Ms. Payne in light of that order?

20         MS. ROGERS:  Well, because Ackerman didn't give them to

21   us.  And we think we have a right to get them from Ms. Payne

22   anyways.  So this subpoena was technically issued in the prior --

23   the overlapping Virginia state court litigation that is now

24   stayed.

25         Ackerman took the position that it did not have to

1  produce the documents, because that case was stayed after the

2  Oklahoma court ordered them produced.  So we said, fine, we'll

3  subpoena them in this case.  Once again we serve a valid, lawful

4  subpoena and Ms. Payne does not object.  Ackerman still has not

5  given us the documents and our subsequent -- the subsequent

6  motion practice was referred to this court.

7          So the discovery period has long since exhausted itself

8  and Ms. Payne had no objection to producing documents or

9  appearing for a deposition.  She already apparently marshaled the

10 production once, because she gave them to Ackerman and they

11 didn't give them to us.

12         And, you know, now like time has run out.  These are --

13 she worked on a highly relevant project.  She's listed on a

14 document Ackerman produced to us like listing employees who

15 worked on NRA work.  It's undisputed that she's a relevant fact

16 witness.  And we know she has relevant materials, because in

17 their motion to quash Ackerman contends that reviewing them would

18 be burdensome.  So there's obviously this -- according to this

19 Ackerman this burdensome volume of relevant material, but they

20 refused to look at it back when discovery was still ongoing.  The

21 subpoena has been out there for a long time.  They don't log --

22 their entire privilege log has not a single communication with

23 Tammy Payne, so we don't think they're saying that there's any

24 privileged communications with her.

25         If there's any confidential ones, then the protective

1    order gives them a tool -- like a clawback type tool that if

2    there's documents produced that you think is confidential you can

3    make a designation.  They've done that with other third-party

4    subpoenas.  So they have no privilege interests.  Their

5    confidentiality interest is protected by their ability to

6    designate.  And all of these burden objections that the recipient

7    of the subpoena ought to be making the recipient of the subpoena

8    did not make.

9            So for those reasons we -- we think the motion to quash

10   should be denied and the NRA should be able to obtain from

11   Ms. Payne the discovery that she has no objection to providing,

12   the discovery that is clearly relevant to the case.

13           THE COURT:  So -- but do you contest -- do you contest

14   that they have the ability to object on relevancy grounds?

15           MS. ROGERS:  We do, Your Honor, because there -- these

16   are -- these are not -- I mean, these are Ms. Payne's documents.

17   There's no evidence furnished that --

18           THE COURT:  Well, it's still discovery.  You know,

19   discovery requires that it be relevant, so --

20           MS. ROGERS:  That's true, Your Honor, but the recipient

21   of the subpoena did not object.  And I also --

22           THE COURT:  She's not a party, so she wouldn't be

23   making relevancy objections.  That's why I'm asking you that.

24           MS. ROGERS:  Well, I don't think Ackerman would dispute

25   that the document requests we served, so most of these documents

1  requests are about NRA TV.  That's clear -- it's by definition

2  relevant.

3            THE COURT:  Let me ask you -- let me ask you about some

4  specific ones that caught my eye.  You asked about Payne's

5  recruitment, employment or the terms of her employment.

6            MS. ROGERS:  Yes, Your Honor.

7            THE COURT:  How is that relevant to your claims and

8  defenses?

9            MS. ROGERS:  Ms. Payne was staffed by Ackerman on

10 NRA TV and then billed back to the NRA.  And there's an issue in

11 this case, you know, was she really doing important creative work

12 or was Angus McQueen effectively billing the NRA for his

13 companion's time.

14            So it's relevant what qualifications she had, how they

15 decided it was suitable to bill the NRA for her work and

16 that -- that's the relevance of that request.

17            THE COURT:  What's the relevance of AMC's practices

18 regarding hiring and managing employees, vendors for work on

19 other AMC client accounts?

20            MS. ROGERS:  So the relevance there, Your Honor, is

21 that, you know, we had at least one other former AMC client,

22 Clean Skies -- the Clean Skies Foundation come to us after we

23 filed this lawsuit and they said, wow, until we saw this lawsuit

24 we didn't know Ackerman -- and I'm paraphrasing a little bit, but

25 this guy was deposed.  Until we saw this lawsuit we didn't know

1  Ackerman was doing this to others too.  We had the same problems

2  with them.

3          THE COURT:  What does that have to do with your

4  litigation.

5          MS. ROGERS:  Well, because we want to know if the NRA

6  was being treated fairly, comparably to other clients, or we want

7  to know if -- if charges that were incurred on several accounts

8  or could have been applied to several accounts were just kind of

9  dumped onto the NRA bill.

10          And, again, you know, if Ms. Payne doesn't have those

11  documents she doesn't have them, but she is -- she's the former

12  CEO's companion who was billed voluminously to the NRA on NRA TV

13  and we want to understand from her, you know, how did Ackerman

14  make these decisions?  How did we decide who was going to be

15  working on NRA TV?  Who was going to be working on Clean Skies?

16  You know, how -- how -- what determined who and what ended up on

17  the NRA's bill.  That's like the crux of this dispute.

18          THE COURT:  So you want her take on it, because you're

19  not getting that from Ackerman, you're just getting it from a

20  former disgruntled employee.

21          MS. ROGERS:  Well, I mean, disgruntled is Ackerman's

22  contention obviously.  But, you know, I mean, we have obviously

23  sought similar discovery from Ackerman and this is the vice

24  president and creative director.  It's not like we're asking a

25  mail room clerk to tell us her opinion of her former employer.

1    She, you know, worked on several of our most important programs.

2            THE COURT:  What about AMC's practices regarding

3    interacting with client executives?

4            MS. ROGERS:  So there AMC alleges that one of the

5    reasons it became -- it resisted the NRA's transparency efforts

6    in 2018 was that suddenly there were sexual harassment concerns

7    about an NRA executive that technically arose from incidents that

8    occurred over a year earlier, but didn't become a problem until

9    2018 when the NRA decided to cut its budget, by the way.  So

10   we're a little skeptical of that and we would like an opinion

11   from a senior former employee -- well, not an opinion, she's not

12   an opinion witness, but a perspective on those practices.

13           And we think that Ms. Payne might have documents that

14   other Ackerman employees wouldn't regarding those practices,

15   because she was present at a lot of like dinners, drinks, social

16   events with client executives.  She could provide valuable

17   testimony that would allow the trier of fact to assess the

18   credibility and weight of Ackerman's insistence that the reason

19   it ignored the NRA's budget cut efforts and transparency efforts

20   was that, you know, Josh Powell made some, you know, casual

21   remarks that made somebody uncomfortable.

22           THE COURT:  And why is Payne's separation from AMC

23   relevant to your claims and defenses?

24           MS. ROGERS:  So Ms. Payne publically filed an assault

25   claim against an executive, Revan McQueen.  Ackerman has

```
 1   consistently sought and obtained discovery in this case

 2   regarding, you know, their insinuation that opposing counsel

 3   beats his wife, regarding the personal affairs of NRA executives

 4   and speaks that those go to credibility.  We think that, you

 5   know, the CEO's assaults of a former executive is likewise

 6   relevant.  Plus that she's providing fact testimony --

 7            MR. GRUBER:  Judge --

 8            MS. ROGERS:  -- about, you know, legal fees, was there

 9   a settlement, basic -- basic concerns that go to credibility.

10            MR. GRUBER:  Judge, if I could -- Mr. Mason can handle

11   the main part of this, but I have to address at this time that

12   they're going in and they're going to try and drag dirt on

13   Angus McQueen.  Now, this is the law firm that -- that took all

14   of his business, too much before he died, sued him twice too much

15   before he died, 11 months into a 13-month cancer death sentence,

16   slandered him and libeled him.  I mean, the employees of this law

17   firm slandered and libeled this man and Judge Fish found that it

18   was all false in a recent opinion.

19            And can it just stop with him dead a couple of years?

20   Because a lot of this goes to trying to show that a woman he was

21   a companion with, they keep going into it, but just all that kind

22   of stuff just has to stop.

23            MS. ROGERS:  Just if I may, Your Honor, Judge Fish did

24   not find that any of those representations were false.

25            MR. MASON:  Your Honor, --
```

1          MR. GRUBER:  He did, but that's okay.

2          MR. MASON:  -- if I can be heard.  With respect to

3    Ms. Payne, first of all, Ms. Rogers is not correct.  She was not

4    billed back to the NRA.  Her salary was not billed back to the

5    NRA.  She was not what's -- what's been known as a fee-based

6    employee and her salary was not directly or indirectly billed

7    back to the NRA, so that is -- that is absolutely not true.

8          If you look through these -- these requests for

9    production a lot of them do deal with NRA TV.  And, again, we

10   have produced those -- those documents.  I mean, like with

11   respect to number two, for example, I mean, if Ms. Payne was

12   involved in -- with NRA TV, we have produced those responsive

13   documents with regard to programming and viewership and analytics

14   and all of those things.

15         The real problem here is -- and I think Your Honor kind

16   of pointed it out a little bit -- is, you know, some of these are

17   just harassing again, I mean, asking about a bunch of AMC

18   clients.  This has been going on for two years.  They have

19   served, I think, like 40 third-party subpoenas to pretty much --

20   you know, I mean, at least a dozen current and former clients of

21   Ackerman McQueen requesting -- requesting all sorts of documents.

22   And so a lot of these, you know, are asking for those kinds of

23   documents.  And we believe that that's improper.  We believe that

24   those issues have already been heard, you know, with respect to

25   the other AMC clients by the Court and the Court has not

1  permitted discovery into those except in a limited circumstance.

2          And, you know, again, like the separation agreement,

3  the settlement agreement, I mean, those are the things that have

4  absolutely nothing to do with the claims in this case.  The stuff

5  relating to NRA TV, to the extent she even has it, I mean, I

6  don't care if she produces it, but we've already done that.  But

7  I don't even believe she has it.  But all the other stuff, the

8  stuff related to other clients, the stuff related to interactions

9  with client executives and settlement agreements with respect to

10  a completely unrelated claim, it has absolutely no relevance to

11  the claims and defenses in this case.

12          THE COURT:  A very big part of the question of the

13  documents is that it sounds like you're not really objecting to

14  her producing any documents that she has, so I'm going to go with

15  that.

16          But I am going to quash the subpoena -- well, I'm

17  not going to -- I'm going -- I'm not going to quash the subpoena,

18  but I am going to rule that certain topics are off limits.  And

19  those being the ones that I was just discussing with you,

20  Ms. Rogers.  AMC's practices regarding hiring and managing of

21  employee vendors for work on other AMC clients' accounts, AMC's

22  practices regarding interacting with client executives,

23  Ms. Payne's -- wait a minute.  Any claim, complaint, allegation

24  about AMC, its employees, executives or clients, any

25  action/proceeding involving a claim that Ms. Payne has against

1  AMC.  I just don't see the relevance of that to anything you've

2  pled as a claim or a defense in this case.  And so I'm not going

3  to permit her to be questioned about any of that.

4          MS. ROGERS:  Your Honor, could I be heard for one

5  second on just a couple of those?

6          THE COURT:  Okay.  I thought I had already asked you

7  about them, but you go ahead.

8          MS. ROGERS:  Sorry, I just want to clarify the ruling.

9  So we talked about practices relating to interaction with client

10  executives and we talk about allegations about clients.  Could we

11  at least question her about the NRA -- interactions with NRA

12  executives and allegations about the NRA as a client?

13          THE COURT:  You want to ask her about her interactions

14  with the NRA?

15          MS. ROGERS:  Yes.  Basically if we take those

16  requests that --

17          THE COURT:  I have a problem with her speaking for AMC.

18  That's the issue.  And, you know, to the extent that you're --

19  you know, kind of -- you know, you keep throwing out what her

20  position was, what her position was, like she is an authority to

21  speak for them.  Well, no, their 30(b) -- their 30(b) deponent is

22  the authority to speak for them on matters of policy and how they

23  proceed.  She's not that.  And so that does appear to be not

24  relevant to me in the context of her giving answers to questions.

25          If you want to ask her about some dealings she had with

1    NRA, I'm fine with that.  But if you're asking her to speak on

2    behalf of AMC about some dealing with NRA, I'm not.

3              MS. ROGERS:  Understood, Your Honor.  We were only

4    deposing her in a personal fact witness capacity.

5              THE COURT:  It sounds like that when you say it, but

6    then when you ask questions that talk about, you know, generally

7    AMC's practices, AMC's practices, then that's not -- that's not

8    asking her to answer questions based on her own personal

9    experiences and -- and -- and her role, you know.  You're asking

10   her to speak on behalf of -- of AMC and that is inappropriate,

11   I believe.

12             MS. ROGERS:  We understand, Your Honor, and we would

13   agree to only ask questions based on her personal knowledge and

14   obviously to the extent any of this testimony is introduced at

15   trial, the trier of fact would know that she's not testifying as

16   a 30(b)6 or in any other official representative capacity.

17             THE COURT:  Okay.  If -- Mr. Mason, if AMC has already

18   given all the documents that are being requested and you have no

19   objection if she still has them -- to her giving them if she has

20   them to, and your basis sounds like it was just that it would be

21   duplicative of your efforts, then, you know, that sounds like

22   it's moot.

23             MR. MASON:  I believe so.  I do want some

24   clarification, though, Your Honor, that we've been discussing

25   what it sounds like is a deposition of Ms. Payne and this is a

1    subpoena for documents.

2              THE COURT:  Okay.  I thought she was being subpoenaed

3    duces tecum to -- I heard something about a deposition, to a

4    deposition and to produce certain documents is what I thought.

5              MS. ROGERS:  Yes, Your Honor.

6              MR. MASON:  Well, I believe it's -- I believe it's

7    just -- it's just a document request.  I'm looking at the

8    subpoena right now, subpoena to produce documents.  There was no

9    subpoena served for --

10             THE COURT:  Did I imagine, Ms. Rogers, that you said --

11   you were talking about deposing her?

12             MS. ROGERS:  You did not, Your Honor.  I was under

13   the --

14             THE COURT:  That's where I got that from.  I thought

15   that's what we were talking about was a deposition.  So I

16   apologize if I got that wrong.

17             MS. ROGERS:  Yeah.  No, I apologize too, Your Honor.  I

18   was under the impression that we had subpoenaed her for a

19   deposition.  And if I could just have --

20             THE COURT:  Well, if you haven't, that makes it easy.

21             MS. ROGERS:  That makes -- Your Honor, I apologize.

22   Like I said, this comes a year before I joined the case.  Just

23   give me one moment.

24             THE COURT:  All right.

25             MS. ROGERS:  Your Honor, I've solved -- I've solved the

1    mystery.  So the first subpoena we served in the Virginia case

2    was for a deposition and documents.  When Ackerman would not turn

3    over the documents in the Virginia case that stayed, we served

4    another subpoena in this case, but that was only a Rule 45

5    subpoena seeking documents.  So that's all that's before us at

6    this time.

7            THE COURT:  Okay.  So, you know -- so then, again,

8    based on what Mr. Mason is saying, you -- you know, it's a moot

9    question.  You can get documents from her if she has them as to

10   everything except AMC's practices regarding hiring or managing

11   employees, vendors for work on other AMC clients' accounts, AMC's

12   practices regarding interacting with client executives,

13   Payne's -- Payne's -- no, Payne's -- wait a minute.  Any claim,

14   complaint, allegation about AMC, its employees, executives or

15   clients, to the extent there are documents that say that, and any

16   action, proceeding, involving a claim that Payne has against AMC.

17   So quashed -- quashed to that extent.

18           MS. ROGERS:  Thank you, Your Honor.

19           THE COURT:  Anything else to take up on that one?  I

20   can see everybody being kind of tired and yawning at this point

21   after -- after two and almost a half hours of this.

22           MR. GRUBER:  Well, we appreciate -- we appreciate you

23   sticking with us this long, all of us.  So --

24           THE COURT:  Absolutely.  So that's all I had on -- on

25   my plate.  Was there anything that I missed that's been referred

Jeff Foster, RMR, CRR    (214) 753-2349

```
 1   to me that's ripe?

 2            MS. ROGERS:  Nothing for today, Your Honor.

 3            THE COURT:  Okay.  So any -- any appeal of my rulings

 4   today will have to have a transcript of the proceedings attached.

 5   And our electronic order will talk in terms of granting, granting

 6   in part, denying, denying in part and we'll have deadlines for

 7   those things that I've ordered be accomplished, otherwise, the

 8   particulars, any findings and all of that will have to be gotten

 9   from the transcript and attached.  Okay?

10            MR. GRUBER:  Thank you, Your Honor.

11            MR. MASON:  Thank you, Your Honor.

12            THE COURT:  Thank, y'all.

13            MS. ROGERS:  Thank you.

14            THE COURT:  We're adjourned then.

15

16

17

18

19

20

21

22

23

24

25
```

Jeff Foster, RMR, CRR    (214) 753-2349

1                              INDEX

2    Court's rulings............................ 10, 36, 57, 64, 82

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1        I, Jeff L. Foster, United States Court Reporter for the

2   United States District Court in and for the Northern District of

3   Texas, Dallas Division, hereby certify that the above and

4   foregoing contains a true and correct transcription of the

5   proceedings in the above entitled and numbered cause.

6        WITNESS MY HAND on this 22nd day of December, 2021

7

8

9

10                              /s/ Jeff L. Foster_____
                                JEFF L. FOSTER, RMR, CRR
11                              United States Court Reporter
                                1100 Commerce St., Room 1504
12                              Dallas, Texas 75242
                                (214) 753-2349
13

14

15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT C

WAYNE R. LAPIERRE  - Confidential                                      August 20, 2021
NATIONAL RIFLE ASSOC. vs ACKERMAN MCQUEEN                                              1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE NORTHERN DISTRICT OF TEXAS

 3                       DALLAS DIVISION

 4     ------------------------------x

 5    NATIONAL RIFLE ASSOCIATION OF, )
      AMERICA,
 6        Plaintiff and Counter-Deft. )

 7              V.                    )  Case No.

 8    ACKERMAN MCQUEEN, INC.,        )  3:19-CV-02074-G

 9        Defendant and Counter-Plf.  )
                  and
10    MERCURY GROUP, INC., HENRY      )
      MARTIN, WILLIAM WINKLER, AND
11    MELANIE MONTGOMERY,             )

12              Defendants.           )

13    ------------------------------x  Pages 1-332

14

15                       CONFIDENTIAL

16    REMOTE VIDEOTAPED DEPOSITION OF WAYNE ROBERT LAPIERRE

17                  Friday, August 20, 2021

18                       Fairfax, VA

19

20    Reported by:  Sherry L. Brooks

21              Certified LiveNote Reporter

22    Job No.  J7356202
```



WAYNE R. LAPIERRE - Confidential                    August 20, 2021
NATIONAL RIFLE ASSOC. vs ACKERMAN MCQUEEN                      212

1   289 true and correct?

2        A.    Yes.                                          17:19

3        Q.    Did you draft this letter?                    17:19

4        A.    I worked on it.  It had input from, I         17:19

5   think, a couple of our board members that I think --

6   and a couple of other people -- our PR people.  I

7   think a few attorneys looked at it.

8        Q.    But at the end of the day, it was sent by     17:20

9   you, correct?

10       A.    Absolutely.                                   17:20

11       Q.    And you stand by everything --                17:20

12       A.    I absolutely do.                              17:20

13       Q.    Did you make any changes to this letter       17:20

14  before it was sent out to the board?

15             MR. CORRELL:  Objection to the form.          17:20

16       A.    I think as we put it together we made         17:20

17  changes in arriving at a final letter, and this is

18  the final letter.

19             BY MR. MASON:                                 17:21

20       Q.    Did you publish this to the NRA Board of      17:21

21  Directors?

22             MS. EISENBERG:  Objection.  Vague.            17:21



# EXHIBIT D

2018 and 2019 Comparisons

| Programming and Staffing | 2018 Budget | 2018 RV | 2019, 1a | 2019, 1b | 2019, 2 |
|---|---|---|---|---|---|
| Talent Fee | $5,533,282 | $5,533,282 | $9,540,098 | $9,540,098 | $9,540,098 |
| Commentators | $0 | $0 | $0 | $0 | $0 |
| NRATV Programming | $5,363,672 | $5,363,672 | $4,800,000 | $4,800,000 | $4,800,000 |
| NRATV Additional (OLN + AH) | $0 | $3,129,722 | $0 | $0 | $0 |
| NRATV Promotion/Outreach | $0 | $0 | $0 | $0 | $0 |
| Monthly Video Support/Video Essays | $2,723,000 | $2,723,000 | $1,923,000 | $2,723,000 | $1,923,000 |
| Subtotal | $13,619,954 | $16,749,676 | $16,263,098 | $17,063,098 | $16,263,098 |

| Operations | 2018 Budget | 2018 RV | 2019, 1a | 2019, 1b | 2019, 2 |
|---|---|---|---|---|---|
| Support Staff Fee | $3,591,570 | $3,591,570 | $3,136,026 | $2,357,112 | $3,136,026 |
| Travel/Broadcast Expenses + Farmville Facility | $230,000 | $300,000 | $0 | $0 | $0 |
| MG OPEX | $150,000 | $200,000 | $0 | $0 | $0 |
| Emerson and Associates/Crime Initiative | $186,000 | $186,000 | $0 | $0 | $0 |
| Pass-through Expenses | $950,000 | $950,000 | $0 | $0 | $0 |
| NR OPEX | $0 | $1,000,000 | $0 | $0 | $0 |
| Subtotal | $5,107,570 | $6,227,570 | $3,136,026 | $2,357,112 | $3,136,026 |

| Mercury Group | 2018 Budget | 2018 RV | 2019, 1a | 2019, 1b | 2019, 2 |
|---|---|---|---|---|---|
| MG Fee | $2,285,312 | $2,285,312 | $3,103,358 | $3,103,358 | $3,103,358 |
| Subtotal | $2,285,312 | $2,285,312 | $3,103,358 | $3,103,358 | $3,103,358 |

| Initiatives | 2018 Budget | 2018 RV | 2019, 1a | 2019, 1b | 2019, 2 |
|---|---|---|---|---|---|
| FSP Ongoing | $0 | $750,000 | $750,000 | $750,000 | $750,000 |
| FSP/FMV Media | $0 | $5,000,000 | $0 | $0 | $0 |
| NRA School Shield/Community Shield | $0 | $150,000 | $0 | $0 | $0 |
| NRA Carry Guard | $4,350,820 | $4,162,116 | $0 | $0 | $0 |
| Subtotal | $4,350,820 | $10,062,116 | $750,000 | $750,000 | $750,000 |

| Projects | 2018 Budget | 2018 RV | 2019, 1a | 2019, 1b | 2019, 2 |
|---|---|---|---|---|---|
| Online/Digital Management Fee | $1,309,130 | $1,309,130 | $1,286,550 | $1,286,550 | $1,286,550 |
| Unification/Digital | $750,000 | $750,000 | $0 | $0 | $0 |
| Business Intelligence/Data Resources/Analytics | $500,000 | $500,000 | $425,000 | $425,000 | $425,000 |
| Annual Meetings - AM | $750,000 | $750,000 | $750,000 | $750,000 | $500,000 |
| America's First Freedom - Print | $1,590,000 | $1,590,000 | $1,590,000 | $1,590,000 | $0 |
| Speeches | $100,000 | $170,000 | $0 | $0 | $0 |
| Magazine Covers (2-3 per year) | $70,000 | $0 | $0 | $0 | $0 |
| Subtotal | $5,069,130 | $5,069,130 | $4,051,550 | $4,051,550 | $2,211,550 |

| | 2018 Budget | 2018 RV | 2019, 1a | 2019, 1b | 2019, 2 |
|---|---|---|---|---|---|
| Total | $30,432,786 | $40,393,804 | $27,304,032 | $27,325,118 | $25,464,032 |

| Other | 2018 Budget | 2018 RV | 2019, 1a | 2019, 1b | 2019, 2 |
|---|---|---|---|---|---|
| ILA Fee | $60,000 | $60,000 | $0 | $0 | $0 |
| Projects Initiated by NRA Employees | $720,000 | $720,000 | $0 | $0 | $0 |
| Subtotal | $780,000 | $780,000 | $0 | $0 | $0 |

| | 2018 Budget | 2018 RV | 2019, 1a | 2019, 1b | 2019, 2 |
|---|---|---|---|---|---|
| Grand Total | $31,212,786 | $41,173,804 | $27,304,032 | $27,325,118 | $25,464,032 |

| | | | | | |
|---|---|---|---|---|---|
| LESS 10/1/18 Budget Adjustments | | ($2,426,502) | | | |
| LESS 10/11/18 Budget Adjustments* | | ($705,269) | | | |
| PLUS January Delayed Billing | | | $961,211.00 | $988,400.00 | $961,211.00 |
| PLUS A1F/AM Wind-Down Costs | | | | | $1,035,500.00 |
| NEW Grand Total | | $38,042,033 | $28,265,243 | $28,313,518 | $27,460,743 |

*The $705,269 in in 2018 Budget Adjustments/Savings
would increase to $732,458 (increase of $27,189 in savings)
if Option 1b was selected.

10/16/18

NRA
EXHIBIT
NRA-DJ-006
J756915Z-Daniel Jackson

CONFIDENTIAL

**2019, Option 1**

| NRATV | 2019, 1a | 2019, 1b |
|---|---|---|
| Programming (See Appendix A) | $4,800,000 | $4,800,000 |
| Monthly Video Support/Video Essays (See Appendix B) | $1,923,000 | $2,723,000 |
| Support Staff Fee (See Appendix C) | $3,136,026 | $2,357,112 |
| Subtotal | $9,859,026 | $9,880,112 |
| | | |
| Talent/Commentators | 2019, 1a | 2019, 1b |
| Talent Fee (See Appendix C) | $9,540,098 | $9,540,098 |
| Subtotal | $9,540,098 | $9,540,098 |
| | | |
| Mercury Group | 2019, 1a | 2019, 1b |
| MG Fee (See Appendix C) | $3,103,358 | $3,103,358 |
| Subtotal | $3,103,358 | $3,103,358 |
| | | |
| Projects | 2019, 1a | 2019, 1b |
| FSP/FMV Production | $750,000 | $750,000 |
| Online/Digital Management Fee (See Appendix D) | $1,286,550 | $1,286,550 |
| Business Intelligence/Data Resources/Analytics (See Appendix E) | $425,000 | $425,000 |
| Annual Meetings - AM | $750,000 | $750,000 |
| America's First Freedom - Print | $1,590,000 | $1,590,000 |
| Subtotal | $4,801,550 | $4,801,550 |

| | 2019, 1a | 2019, 1b |
|---|---|---|
| Total | $27,304,032 | $27,325,118 |

| | 2019, 1a | 2019, 1b |
|---|---|---|
| Plus, January Delayed Billing (See Appendix G) | $961,211.00 | $988,400.00 |
| Total | $28,265,243.33 | $28,313,518.33 |

Note Other Appendices:
Appendix H: 2018 Additional Q4 Savings
Appendix I: Personnel Adjustments
Appendix J: Additional Staff

**2019, Option 2**

| NRATV | 2019, 2 |
|---|---|
| Programming (See Appendix A) | $4,800,000 |
| Monthly Video Support/Video Essays (See Appendix B) | $1,923,000 |
| Support Staff Fee (See Appendix C) | $3,136,026 |
| Subtotal | $9,859,026 |
| | |
| Talent/Commentators | 2019, 2 |
| Talent Fee (See Appendix C) | $9,540,098 |
| Subtotal | $9,540,098 |
| | |
| Mercury Group | 2019, 2 |
| MG Fee (See Appendix C) | $3,103,358 |
| Subtotal | $3,103,358 |
| | |
| Projects | 2019, 2 |
| FSP/FMV Production | $750,000 |
| Online/Digital Management Fee (See Appendix D) | $1,286,550 |
| Business Intelligence/Data Resources/Analytics (See Appendix E) | $425,000 |
| Annual Meetings - AM (See Appendix F) | $500,000 |
| America's First Freedom - Print (See Appendix F) | $0 |
| Subtotal | $2,961,550 |

| | 2019, 2 |
|---|---|
| Total | $25,464,032 |

| | |
|---|---|
| Plus, A1F/AM Wind-Down Costs (See Appendix F) | $1,035,500.00 |
| Total | $26,499,532.33 |

| | |
|---|---|
| Plus, January Delayed Billing (See Appendix G) | $961,211.00 |
| Total | $27,460,743.33 |

CONFIDENTIAL

AMcTX-00065377

Appendix A: Programming

| Show | Budget |
|---|---|
| Grant Stinchfield | $275,000.00 |
| Dana Loesch | $480,000.00 |
| Cam Edwards | $275,000.00 |
| Dan Bongino | $275,000.00 |
| North | $900,000.00 |
| Noir | $875,000.00 |
| LAFS | $700,000.00 |
| A&F | $200,000.00 |
| T&T | $300,000.00 |
| Videodigm Licensing | $120,000.00 |
| Media | $400,000.00 |
| Total | $4,800,000.00 |

**Appendix B: Monthly Video Support/Video Essays***

**Scripted commentary, including; but, not limited to:**
WLP Video Essays Pre/Production/Post
DL Video Essays Pre/Production/Post
CC Video Essays Pre/Production/Post
Weekly, as needed, OLN Video Essays Pre/Production/Post
**Video editing, including; but, not limited to:**
Executive Speeches Support Video Creation
Membership Recruitment Video Editing (for MMP, as needed)
Association and NRATV Marketing Videos
Association and NRATV Programming Promotional Videos
NRATV Daily Clipping/Promotion of Excerpts
**Graphics and animation work, including; but, not limited to:**
NRATV Programming Animated Graphics Packages
NRATV Programming Lower Third Graphics Packages
Ongoing Set Design for NRATV Sets/Talent
**Social Media/Earned Media Promotion, including; but, not limited to:**
NRATV Network and Programming

*Options 1a and 2 do not include a Commentators budget for 2019 as part of this job.
Under Option 1b, Commentators Pre/Production/Post are added back
into the budget and support staff is reduced to cover such.

Appendix C: Personnel - 1b ONLY

| Talent* | Salary | Overhead | Profit | Total |
|---|---|---|---|---|
| Lt. Col. Oliver North | $2,225,000.00 | $1,446,250 | $356,000 | $4,027,250.00 |
| Dana Loesch | $1,556,500.00 | $1,011,725 | $249,040 | $2,817,265.00 |
| Colion Noir | $420,000.00 | $273,000 | $67,200 | $760,200.00 |
| Grant Stinchfield | $300,000.00 | $195,000 | $48,000 | $543,000.00 |
| Cam Edwards | $270,000.00 | $175,500 | $43,200 | $488,700.00 |
| Dan Bongino | 500 vi— $750,000.00 | | $135,000 | $885,000.00 |
| Chuck Holton (1 Month) | $15,833.33 | | $2,850 | $18,683.33 |
| Total | $5,537,333 | $3,101,475 | $901,290 | $9,540,098.33 |

| Support Staff** | Salary | Overhead | Profit | Total |
|---|---|---|---|---|
| Denise Sinisi | $120,000.00 | $102,000.00 | $19,200.00 | $241,200.00 |
| Sean Foster | $80,000.00 | $80,000.00 | $12,800.00 | $172,800.00 |
| Dennis Azato | $175,000.00 | $148,750.00 | $28,000.00 | $351,750.00 |
| Michael Aitken | $158,000.00 | $134,300.00 | $25,280.00 | $317,580.00 |
| Carl Warner | $225,000.00 | $168,750.00 | $36,000.00 | $429,750.00 |
| Tim Herr | $100,000.00 | $85,000.00 | $16,000.00 | $201,000.00 |
| Kyle Morgan | $47,700.00 | $47,700.00 | $7,632.00 | $103,032.00 |
| Ben Thomas | $75,000.00 | $75,000.00 | $12,000.00 | $162,000.00 |
| Patrick Kobler | $80,000.00 | $80,000.00 | $12,800.00 | $172,800.00 |
| Rachel Bonilla | $95,000.00 | $95,000.00 | $15,200.00 | $205,200.00 |
| Total | $1,155,700 | $1,016,500 | $184,912 | $2,357,112.00 |

| MG** | Salary | Overhead | Profit | Total |
|---|---|---|---|---|
| Tony Makris | $650,000.00 | $487,500.00 | $104,000.00 | $1,241,500 |
| Bill Powers | $296,800.00 | $222,600.00 | $47,488.00 | $566,888 |
| Nader Tavangar | $235,000.00 | $176,250.00 | $37,600.00 | $448,850 |
| Jon Carter | $155,000.00 | $131,750.00 | $24,800.00 | $311,550 |
| John Popp | $137,000.00 | $116,450.00 | $21,920.00 | $275,370.00 |
| Carly Jimeson | $50,000.00 | $50,000.00 | $8,000.00 | $108,000.00 |
| Eric Van Horn | $70,000.00 | $70,000.00 | $11,200.00 | $151,200.00 |
| TOTAL | $1,593,800 | $1,254,550 | $255,008 | $3,103,358 |

*All talent OH is at .65
**All Support Staff and MG OH is calculated per the below:
Salary < $100k = 1 to 1 OH
Salary $100k - $199k = .85 OH
Salary > $200k = .75 OH

CONFIDENTIAL

AMcTX-00065380

Appendix C: Personnel

| Talent* | Salary | Overhead | Profit | Total |
|---|---|---|---|---|
| Lt. Col. Oliver North | $2,225,000.00 | $1,446,250 | $356,000 | $4,027,250.00 |
| Dana Loesch | $1,556,500.00 | $1,011,725 | $249,040 | $2,817,265.00 |
| Colion Noir | $420,000.00 | $273,000 | $67,200 | $760,200.00 |
| Grant Stinchfield | $300,000.00 | $195,000 | $48,000 | $543,000.00 |
| Cam Edwards | $270,000.00 | $175,500 | $43,200 | $488,700.00 |
| Dan Bongino | $750,000.00 | | $135,000 | $885,000.00 |
| Chuck Holton (1 Month) | $15,833.33 | | $2,850 | $18,683.33 |
| **Total** | **$5,537,333** | **$3,101,475** | **$901,290** | **$9,540,098.33** |

| Support Staff** | Salary | Overhead | Profit | Total |
|---|---|---|---|---|
| Denise Sinisi | $120,000.00 | $102,000.00 | $19,200.00 | $241,200.00 |
| Sean Foster | $80,000.00 | $80,000.00 | $12,800.00 | $172,800.00 |
| George Scuzs | $150,000.00 | $127,500.00 | $24,000.00 | $301,500.00 |
| Stephen Walters | $135,000.00 | $114,750.00 | $21,600.00 | $271,350.00 |
| Dennis Azato | $175,000.00 | $148,750.00 | $28,000.00 | $351,750.00 |
| Michael Aitken | $158,000.00 | $134,300.00 | $25,280.00 | $317,580.00 |
| Carl Warner | $225,000.00 | $168,750.00 | $36,000.00 | $429,750.00 |
| Tim Herr | $100,000.00 | $85,000.00 | $16,000.00 | $201,000.00 |
| Danny Lyon | $95,400.00 | $95,400.00 | $15,264.00 | $206,064.00 |
| Kyle Morgan | $47,700.00 | $47,700.00 | $7,632.00 | $103,032.00 |
| Ben Thomas | $75,000.00 | $75,000.00 | $12,000.00 | $162,000.00 |
| Patrick Kobler | $80,000.00 | $80,000.00 | $12,800.00 | $172,800.00 |
| Rachel Bonilla | $95,000.00 | $95,000.00 | $15,200.00 | $205,200.00 |
| **Total** | **$1,536,100** | **$1,354,150** | **$245,776** | **$3,136,026.00** |

| MG** | Salary | Overhead | Profit | Total |
|---|---|---|---|---|
| Tony Makris | $650,000.00 | $487,500.00 | $104,000.00 | $1,241,500 |
| Bill Powers | $296,800.00 | $222,600.00 | $47,488.00 | $566,888 |
| Nader Tavangar | $235,000.00 | $176,250.00 | $37,600.00 | $448,850 |
| Jon Carter | $155,000.00 | $131,750.00 | $24,800.00 | $311,550 |
| John Popp | $137,000.00 | $116,450.00 | $21,920.00 | $275,370.00 |
| Carly Jimeson | $50,000.00 | $50,000.00 | $8,000.00 | $108,000.00 |
| Eric Van Horn | $70,000.00 | $70,000.00 | $11,200.00 | $151,200.00 |
| **TOTAL** | **$1,593,800** | **$1,254,550** | **$255,008** | **$3,103,358** |

*All talent OH is at .65
**All Support Staff and MG OH is calculated per the below:
Salary < $100k = 1 to 1 OH
Salary $100k - $199k = .85 OH
Salary > $200k = .75 OH

CONFIDENTIAL

AMcTX-00065381

Appendix D: Online Digital Management Fee

| Employee | Salary | Percentage | Allocation | Overhead | Profit | Total |
|---|---|---|---|---|---|---|
| Grant Spofford | $ 255,000 | 100% | $ 255,000 | $ 191,250 | $ 40,800 | $ 487,050 |
| Collin Davis | $ 250,000 | 50% | $ 125,000 | $ 106,250 | $ 20,000 | $ 251,250 |
| Chester Campbell | $ 140,000 | 50% | $ 70,000 | $ 70,000 | $ 11,200 | $ 151,200 |
| Tom Richardson | $ 250,000 | 50% | $ 125,000 | $ 106,250 | $ 20,000 | $ 251,250 |
| Scott Chidester | $ 135,000 | 50% | $ 67,500 | $ 67,500 | $ 10,800 | $ 145,800 |
| Total | $1,030,000 | | $642,500 | $541,250.00 | $102,800 | $1,286,550.00 |

CONFIDENTIAL

AMcTX-00065382

Appendix E: Business Intelligence/Data Resources/Analytics

| BI / Analytics | 2019 Budget |
|---|---|
| Executive Reporting | $50,000 |
| Carry Guard Reporting* | $0 |
| Quarterly Sponsor Reporting | $200,000 |
| Site Optimization/Marketing | $100,000 |
| Qlik Dashboard Management | $75,000 |
| Total | $425,000 |

*Represents a 15% discount on services
due to no CG reporting

**Appendix F: 2019, Option 2: A1F/AM Discussion**

| Employee* | Salary | Admin/Tax (10%) | Total |
|---|---|---|---|
| ONE YEAR SEVERANCE | | | |
| Clay Turner      F C | | | |
| Mark Chesnut    C C | | | |
| Nancy Martin    *Annul Att* | | | |
| Michael Ives | | | |
| Sub-Total | $776,000.00 | $77,600.00 | $853,600.00 |
| THREE MONTHS SEVERANCE | Salary | Admin/Tax (10%) | Total |
| Frank Winn | | | |
| Caile Turner | | | |
| Brandon Harn | | | |
| Amber Wolff | | | |
| Sub-Total | $79,000 | $7,900 | $86,900 |
| BUILDING COST** | Lease | | Total |
| 2019 | $95,000.00 | | $95,000.00 |
| 2020 | $95,000.00 | | $95,000.00 |
| 2021 | $95,000.00 | | $95,000.00 |
| 2022 (6 months) | $47,500.00 | | $47,500.00 |
| Sub-Total | $332,500 | | $332,500 |
| Total | $1,187,500 | $85,500 | $1,273,000 |

| 2019 Costs | $1,035,500.00 |
|---|---|

*No Cobra assistance assumed
**Would not be billed out if sub-leased

CONFIDENTIAL

AMcTX-00065384

**Appendix G: January 2019: Delayed 2018 Billing**

| NRATV | |
|---|---|
| Monthly Video Support/Video Essays* | $110,000 |
| Support Staff Fee | $183,711 |
| **Subtotal** | **$293,711** |
| | |
| **Projects** | |
| Carry Guard | $120,000 |
| Business Intelligence/Data Resources/Analytics* | $17,500 |
| Annual Meetings - AM | $372,750 |
| Annual Meetings Indy (Planned for January billing) | $157,250 |
| **Subtotal** | **$667,500** |

| **Total** | **$961,211** |
|---|---|

*Rather than wind-down costs, the above "hold costs" are applied to:
Monthly Video Support/Video Essays
Business Intelligence/Data Resources/Analytics

Wind-down costs are still applied to:
Carry Guard

*These projects will be put on hold for Q4; but, staff
will remain employed, as work is budgeted for 2019.

CONFIDENTIAL

AMcTX-00065385

Appendix G: January 2019: Delayed 2018 Billing - 1b ONLY

| NRATV | |
|---|---|
| Monthly Video Support/Video Essays* | $110,000 |
| Support Staff Fee | $210,900 |
| Subtotal | $320,900 |
| | |
| Projects | |
| Carry Guard | $120,000 |
| Business Intelligence/Data Resources/Analytics* | $17,500 |
| Annual Meetings - AM | $372,750 |
| Annual Meetings Indy (Planned for January billing) | $157,250 |
| Subtotal | $667,500 |

| Total | $988,400 |
|---|---|

*Rather than wind-down costs, the above "hold costs" are applied to:
Monthly Video Support/Video Essays
Business Intelligence/Data Resources/Analytics

Wind-down costs are still applied to:
Carry Guard

*These projects will be put on hold for Q4; but, staff
will remain employed, as work is budgeted for 2019.

CONFIDENTIAL

AMcTX-00065386

App.109

Appendix H: 2018 Additional Q4 Savings

| NRATV | Q4 |
|---|---|
| Programming | ($192,645) |
| Support Staff Fee | ($252,624) |
| Subtotal | ($445,269) |

| Projects | Q4 |
|---|---|
| Media | ($260,000) |
| Subtotal | ($260,000) |

*— Savings* (handwritten)

| | Q4 |
|---|---|
| Total | ($705,269) |

Appendix I: Personnel Adjustments

| Support Staff | Salary | Overhead | Profit | Total | Monthly | Severance - Jan |
|---|---|---|---|---|---|---|
| Guy Mitchell | $120,000.00 | $66,000.00 | $19,200.00 | $205,200.00 | $17,100.00 | $17,100.00 |
| Cameron Gray | $121,900.00 | $67,045.00 | $19,504.00 | $208,449.00 | $17,370.75 | $52,112.25 |
| Caitlin Carpenter | $72,500.00 | $39,875.00 | $11,600.00 | $123,975.00 | $10,331.25 | $10,331.25 |
| Ashley Root | $79,500.00 | $43,725.00 | $12,720.00 | $135,945.00 | $11,328.75 | $33,986.25 |
| Alex Varney | $85,000.00 | $46,750.00 | $13,600.00 | $145,350.00 | $12,112.50 | $12,112.50 |
| Mark Tait | $70,000.00 | $38,500.00 | $11,200.00 | $119,700.00 | $9,975.00 | $9,975.00 |
| Ed Bailey (portion) | $21,875.00 | $12,031.25 | $3,500.00 | $37,406.25 | $5,343.75 | $5,343.75 |
| Jace Whatcott (portion) | $17,500.00 | $9,625.00 | $2,800.00 | $29,925.00 | $4,275.00 | $4,275.00 |
| Brad Nash | $120,000.00 | $66,000.00 | $19,200.00 | $205,200.00 | $17,100.00 | $17,100.00 |
| Charles Berthelot | $90,000.00 | $49,500.00 | $14,400.00 | $153,900.00 | $12,825.00 | $12,825.00 |
| Andrew Butler | $60,000.00 | $33,000.00 | $9,600.00 | $102,600.00 | $8,550.00 | $8,550.00 |
| Total | $858,275 | $472,051 | $137,324 | $1,467,650.25 | $126,312.00 | $183,711.00 |

For reductions taking place 10/30, so 2 months of savings.
All receive 30 days severance, except CG & AR (3 months)

| Q4 Savings (2 months) | $252,624.00 |
|---|---|

CONFIDENTIAL

AMcTX-00065388

**App.111**

Appendix I: Personnel Adjustments - 1b ONLY

| Support Staff | Salary | Overhead | Profit | Total | Monthly | Severance - Jan |
|---|---|---|---|---|---|---|
| Guy Mitchell | $120,000.00 | $66,000.00 | $19,200.00 | $205,200.00 | $17,100.00 | $17,100.00 |
| Cameron Gray | $121,900.00 | $67,045.00 | $19,504.00 | $208,449.00 | $17,370.75 | $52,112.25 |
| Caitlin Carpenter | $72,500.00 | $39,875.00 | $11,600.00 | $123,975.00 | $10,331.25 | $10,331.25 |
| Ashley Root | $79,500.00 | $43,725.00 | $12,720.00 | $135,945.00 | $11,328.75 | $33,986.25 |
| Alex Varney | $85,000.00 | $46,750.00 | $13,600.00 | $145,350.00 | $12,112.50 | $12,112.50 |
| Mark Tait | $70,000.00 | $38,500.00 | $11,200.00 | $119,700.00 | $9,975.00 | $9,975.00 |
| Ed Bailey (portion) | $21,875.00 | $12,031.25 | $3,500.00 | $37,406.25 | $5,343.75 | $5,343.75 |
| Jace Whatcott (portion) | $17,500.00 | $9,625.00 | $2,800.00 | $29,925.00 | $4,275.00 | $4,275.00 |
| Brad Nash | $120,000.00 | $66,000.00 | $19,200.00 | $205,200.00 | $17,100.00 | $17,100.00 |
| Charles Berthelot | $90,000.00 | $49,500.00 | $14,400.00 | $153,900.00 | $12,825.00 | $12,825.00 |
| Andrew Butler | $60,000.00 | $33,000.00 | $9,600.00 | $102,600.00 | $8,550.00 | $8,550.00 |
| Danny Lyon | $95,400.00 | $52,470.00 | $15,264.00 | $163,134.00 | $13,594.50 | $27,189.00 |
| Total | $858,275 | $524,521 | $152,588 | $1,630,784.25 | $139,906.50 | $210,900.00 |

For reductions taking place 10/30, so 2 months of savings.
All receive 30 days severance, except CG & AR (3 months)
and DL (2 months).

| Q4 Savings (2 months) | $279,813.00 |
|---|---|

CONFIDENTIAL

AMcTX-00065389

**App.112**

## Appendix J: Additional Staff

The following AM employees work on NRATV Programming
and Monthly Video Support/Video Essays in a large capacity. While they are not
billed in the fees, they are crucial to its success.

| Concepting/Strategy |
|---|
| Henry Martin |
| Jesse Greenberg |
| Tammy Payne |
| **Business Operations & Management** |
| Melanie Montgomery |
| Lacey (Duffy) Cremer |
| Hayley Holmes |
| Trey Rick |
| Jeanne Oden |
| **Platform Operations** |
| Peter Farrell |
| Brian Darley |
| Victor Aboytes |
| Oscar Garcia |
| Abygail Thompson |
| Monique Warfield |
| **Technology** |
| Mike Dennehy |
| Justin Geiger |
| Edward Ned |
| **Pre-Production & Operations** |
| Jordan Underwood |
| Scott Kubes |
| Shahada Kari |
| **Production** |
| Tyler Petersen |
| James Parsons |
| Sherri Duran |
| Amy Hearn |
| Jason Wilson |
| Nathan Raglin |
| Darren LaSorte |
| Shad Wyckoff |
| Tim Katzenmeier |
| Rodney Autaubo |
| Benson Coleman |
| Matt Patterson |
| Ryan Lacy |
| Stephen Wymer |
| Walt Cox |
| **Post-Production & Operations** |
| Brandon Witt |
| JT Burg |
| Jason Bushore |
| Jesse Davidson |
| Patrick Vaughn |
| Trevor Dahlkemper |
| **Media & Promotion** |
| Kelsey Gosdin |

## Appendix J: Annual Meetings Personnel

The following AM employees work on the NRA Annual Meetings in a large capacity.
While they are not billed in the MG, Online Digital Management
or NRATV-related fees, they are crucial to its success.

| Concepting/Strategy |
|---|
| Henry Martin |
| Jesse Greenberg |
| **Business Operations & Management** |
| Melanie Montgomery |
| Lacey (Duffy) Cremer |
| Hayley Holmes |
| Trey Rick |
| Jeanne Oden |
| **Event Planning & Production** |
| Nancy Martin |
| **Media & Promotion** |
| Kelsey Gosdin |
| **Platform Operations** |
| Peter Farrell |
| Brian Darley |
| Nicole Levin |
| Praxx Gray |
| Abygail Thompson |
| Monique Warfield |
| David Casteel |
| Preston Darley |
| Victor Aboytes |
| Oscar Garcia |
| **Technology** |
| Mike Dennehy |
| Justin Geiger |
| Edward Ned |
| **Pre-Production/Production/Post-Production** |
| Tammy Payne |
| Justin Charles |
| James Parsons |
| Trevor Dahlkemper |
| Jordan Underwood |
| Scott Kubes |
| Tyler Petersen |
| Amy Hearn |
| Jason Wilson |
| Ryan Lacy |
| Tim Katzenmeier |
| Nathan Raglin |
| Patrick Vaughn |
| Hannah Foster |
| Jason Bushore |
| Wes DeWitte |
| **Photography** |
| Michael Ives |
| Shea Hussey |
| Elizabeth Torres |
| **Creative Deliverables** |
| Caile Turner |
| Meg McElhaney |
| Sam Guertler |
| Kari Griffith |
| **Design & Animation** |
| Clay Turner |
| Brandon Harn |
| Jesse Davison |
| Jon Minson |
| Mike Galloway |
| Dean Wilhite |
| Lane Faglie |
| Kale Atterberry |
| Brandon Witt |
| Joshua (JT) Burg |
| **Copywriting & Scripting** |
| Sherri Duran |
| Bruce Parks |
| Josh Chesnut |

- Store hours

what was done / how much / when

2017 paid verification

$250-

nothing in 2018

CONFIDENTIAL

# EXHIBIT E
# *Filed Under Seal*

# EXHIBIT F
# *Filed Under Seal*

# EXHIBIT G
## *Filed Under Seal*

App. 137 - App. 138