**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § | |
| | § | |
| | § | |
| *Plaintiff and Counter-Defendant*, | § | |
| | § | |
| | § | |
| **v.** | § | **Case No. 3:19-cv-02074-G** |
| | § | |
| **ACKERMAN MCQUEEN, INC.,** | § | |
| | § | |
| *Defendant and Counter-Plaintiff*, | § | |
| | § | |
| **and** | § | |
| | § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, and MELANIE MONTGOMERY,** | § | |
| | § | |
| | § | |
| | § | |
| *Defendants*. | § | |

**DEFENDANTS' BRIEF IN SUPPORT MOTION TO EXCLUDE CERTAIN OPINIONS**
**OF THE NRA'S EXPERT, JONATHAN E. HOCHMAN**

## I.      TABLE OF CONTENTS

I.      TABLE OF CONTENTS ................................................................................. ii

II.     TABLE OF AUTHORITIES ......................................................................... iv

III.    INTRODUCTION AND SUMMARY ...........................................................1

IV.     FACTUAL BACKGROUND ..........................................................................3

      A.      Hochman offers subjective opinions on ethics and business conduct. ...................4

      B.      Hochman speculates about the parties' states of mind and motives. .......................5

      C.      Hochman offers conclusory, speculative, irrelevant testimony regarding "harm." .........................................................................................5

      D.      Hochman offers irrelevant opinions about the Dashboard and social media accounts. ........................................................................................6

      E.      Hochman offers irrelevant opinions about AMc's PowerPoint presentations. .................................................................................8

      F.      Hochman's Supplemental Report offers a previously undisclosed category of damages. ...................................................................................9

V.      ARGUMENT AND AUTHORITIES ...........................................................10

      A.      Applicable Legal Standards. ..................................................................10

      B.      The Court should exclude Hochman's opinions about AMc's business activities and ethics because they are not helpful and invade the province of both the Court and the jury. ...............................................12

      C.      The Court should exclude Hochman's proposed opinions about the parties' states of mind. .........................................................................14

      D.      The Court should exclude Hochman from testifying about so-called "harm" caused by AMc's alleged refusal to give the NRA access to data and social media accounts. ................................................................15

      E.      The Court should exclude Hochman's belated opinions regarding the Dashboard, social media accounts, and video files. ...............................15

      F.      The Court should exclude Hochman's proposed testimony regarding the PowerPoint presentations. ...................................................................16

G.      The Court should exclude Hochman's proposed testimony regarding damages................................................................................................................16

VI.     CONCLUSION AND PRAYER .......................................................................................17

## II.      TABLE OF AUTHORITIES

**Cases**

*Affiliati Network v. Wanamaker*, 2017 U.S. Dist. LEXIS 217403 (S.D. Fla. 2017)................ 3, 11

*Askanase v. Fatjo*, 130 F.3d 657 (5th Cir. 1997) ................................................... 12, 13

*Charalambopoulos v. Grammer*, No. 3:14-cv-2424-D, 2017 U.S. Dist. LEXIS 33488 (N.D. Tex. Mar. 8, 2017) ........................................................................................ 14

*Crow v. Unit. Ben Life Ins. Co.*, No. 3:00-cv-1375-G, 2001 U.S. Dist. LEXIS 2993 (N.D. Tex. Mar. 16, 2001) .................................................................................. 12, 13

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ........................... 10, 11, 15

*Falcon v. State Farm Lloyds*, No. 1:12-CV-491-DAE, 2014 U.S. Dist. LEXIS 83040 (W.D. Tex. Jun. 16, 2014) .................................................................................. 10, 15

*General Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ....................................................... 12

*Goodman v. Harris County*, 571 F.3d 388 (5th Cir. 2009) ............................................ 12

*Huss v. Gayden*, 571 F.3d 442 (5th Cir. 2009) ......................................................... 10

*Johnson v. Arkema, Inc.*, 685 F.3d 452, 460-61 (5th Cir. 2012) ................................... 12

*Kumho Tire Co. v. Carmichael*, 526 U.S. 13 (1999) ................................................ 10, 11

*Marlin v. Moody Nat'l Bank, N.A.*, 248 F. App'x 534 (5th Cir. 2007) ........................... 14

*Moore v. Ashland Chem. Inc.*, 151 F.3d 269 (5th Cir. 1998) .................................... 11, 12

*Nunn v. State Farm Mut. Auto. Ins. Co.*, No. 3:08-CV-1486-D, 2010 U.S. Dist. LEXIS 61740 (N.D. Tex. Jun. 22, 2010) .............................................................................. 10

*Paz v. Brush Eng'red Materials, Inc.*, 555 F.3d 383 (5th Cir. 2009) ............................... 11

*Pipitone v. Biomatrix, Inc.*, 288 F.3d 239 (5th Cir. 2002) .......................................... 11

*Seaman v. Seacor Marine LLC*, 326 F. App'x 721 (5th Cir. 2009)................................. 11

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546 (5th Cir. 1996) ............... 17

*Snap-Drape, Inc. v. Comm'r*, 98 F.3d 194 (5th Cir. 1996).......................................... 12

*Sowell v. United States*, No. 1998 U.S. Dist. LEXIS 13049, 1998 U.S. Dist. LEXIS 13049 (N.D. Tex. 1998) ........................................................................................................................... 13

*Thompson v. State Farm Fire & Cas. Co.*, 34 F.3d 932 (10th Cir. 1994) ................................... 13

*Tingle v. Hebert*, 2018 U.S. Dist. LEXIS 207536 (M.D. La. 2018) ............................................ 14

*United States v. Hill*, 749 F.3d 1250 (10th Cir. 2014) ................................................................ 14

*Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988-89 (5th Cir. 1997) ................................................ 10

*Wilson v. Woods*, 163 F.3d 935 (5th Cir. 1999) .......................................................................... 10

**Rules**

FED. R. CIV. P. 26 ....................................................................................................................... 17

FED. R. EVID. 702 .......................................................................................................... 10, 11, 15

Defendant/Counter-Plaintiff Ackerman McQueen, Inc. ("**AMc**"), Defendants Mercury Group, Inc. ("**Mercury**"), Henry Martin ("**Martin**"), William Winkler ("**Winkler**"), and Melanie Montgomery ("**Montgomery**") (collectively, "**Defendants**"), file this Brief in Support of Their Motion to Exclude to Certain Opinions offered by the NRA's proffered internet marketing and technology expert, Jonathan E. Hochman ("**Hochman**").

## III.    INTRODUCTION AND SUMMARY

Hochman touts himself as an expert witness in the areas of internet marketing and technology consulting and expert witness testimony, among other things.  His proposed testimony is set forth in an initial Expert Report dated June 1, 2021 (the "**Report**")[1] and a First Supplemental Expert Report dated October 25, 2021 (the "**Supplemental Report**").[2]

According to Hochman's Report, he was retained by counsel for NRA for the following purpose:

> I have been retained by Brewer Attorneys & Counselors, attorneys for the National Rifle Association of America ("NRA") and have been asked to review documents and testimony . . . and render opinions concerning Ackerman McQueen's ("Ackerman") actions, or lack of actions, regarding the distribution and promotion of NRA video content via the Internet.  Specifically, I have been asked to opine on the reporting of marketing results by Ackerman to NRA related to NRATV.[3]

Hochman goes well beyond his assignment, however, and offers unfounded, irrelevant, and improper conclusions in his original Report that include:

- AMc does business unethically;

- AMc did not perform it duties "transparently;"

---

[1] The Report is Exhibit 1 to Defendants' Appendix being filed simultaneously with this Motion and Brief.
[2] The Supplemental Report is Exhibit 2 to Defendants' Appendix.  "Supplemental" is a misnomer, however, as the proposed testimony in the Supplemental Report does not "supplement" any of Hochman's initial opinions.  Rather, as is discussed below, it broadens the scope of his proposed testimony by including new opinions on new subject matters, including a previously undisclosed category of damages.  AMc was unable to question Hochman about his new opinions because the NRA served the Supplemental Report a mere two days before the close of the discovery period.
[3] Report, Ex. 1 at p. 2 (APP 2).

- AMc responded "angrily" and refused to cooperate with NRA; and

- AMc held NRA's social media accounts "hostage" thereby "harming" NRA.

In support of these opinions, Hochman relies on his "expertise and experience," but does not indicate, in any way, how his expertise and experience render him qualified to offer such opinions, much less provide the requisite foundation to make such opinions reliable. Instead, Mr. Hochman presents invective laden value judgments of AMc's performance and credibility directly contending that AMc is dishonest. His proposed testimony is also rife with irrelevant and unreliable statements and comments that impermissibly usurp the role of the Court in defining the law for the jury and the jury's role in applying the law to the facts and making credibility determinations.

His Supplemental Report goes even further. In his Supplemental Report, Hochman opines:

- AMc's disclosure of the Dashboard was belated, insufficient, and raises multiple questions;

- AMc's PowerPoint presentations to the NRA appear to contain manually added data, which appears contrived and requires verification with which AMc has interfered;

- AMc's demand for a $1.5 million payment concerning the return of the NRA's digital assets, among other things, was severely inflated; and

- The market rate cost of the Engaged Views generated by NRATV was eight times less than what AMc charged for NRATV, representing a substantial waste of the NRA's marketing resources.[4]

He also discusses a proposed protocol for the NRA to obtain its social media accounts and the NRA Dashboard from AMc.[5]

The Court should exclude these opinions because they are untimely, most of them are irrelevant, and they are unreliable. Hochman has never explained in any way how his opinions are

---

[4] Supplemental Report, Ex. 2 at p. 3 (APP 50).
[5] *Id.* at pp. 13-14 (APP 60-61).

supported by reliable sources accepted within the industry or how his experience in online marketing gives him a reliable foundation to render the conclusions that he reached.  Thus, the Court should exclude his opinions.

## IV.    FACTUAL BACKGROUND

Hochman is a retained expert witness whose background consists of consulting and expert witness experience in cases involving Internet marketing, e-commerce, website development, digital forensics, search engine optimization, pay-per-click mobile, and digital advertising.  His opinions have been excluded in at least one case, *Affiliati Network v. Wanamaker*, 2017 U.S. Dist. LEXIS 217403 *10-11 (S.D. Fla. 2017), because Hochman did not indicate, in any way, that his opinions were supported by reliable sources or sources that are accepted within the industry.  His opinions concerning affiliate and payment card fraud in that case were deemed "wholly unreliable," as he improperly relied on his professional experience in online marketing to opine about payment card fraud without showing how online marketing experience led to the conclusions that he reached.

The same can be said here.  Based largely on his experience in online marketing and his own personal, subjective opinions, Hochman's report begins with an attack on AMc's ethics, contending AMc "dazzled" the NRA with a "smorgasbord of vanity metrics designed to impress the uninitiated and keep the money flowing," that the reports AMc gave to the NRA lacked "transparency,"  and that AMc is therefore an "unethical" public relations firm that violated industry norms and customs and the terms of the parties' Services Agreement.  These type of statements permeate the report, showing an obvious lack of "expert" and professional presentation.  Rather, he presents himself as a mercenary set loose by the NRA to destroy an enemy.  As is discussed more fully below, Hochman's statements, which the NRA will contend are observations

of an expert of AMc's business practices, make it plain that many of Hochman's opinions are inadmissible.

**A.     Hochman offers subjective opinions on ethics and business conduct.**

For example, Hochman offers a number of subjective opinions regarding AMc's ethics and business conduct, which he suggests violate the customs and norms of the marketing industry:

- AMc has engaged in "obfuscation, delay, excuses;"[6]

- AMc "steadfastly refused to comply with NRA's reasonable requests for disclosure of marketing performance data related to NRATV"[7]

- "Ackerman's Co-CEO, Revan McQueen, angrily refused to comply with the request" for access to marketing data and control of the NRATV's social media accounts;[8]

- "Ackerman has refused to provide NRA access to any of these social media accounts.  This refusal violates the customs and norms of the Internet marketing industry."[9]

- "[t]aking client accounts and data hostage is contrary to norms of Internet marketing,"[10]

- "[W]e require all…our third-party partners to be transparent with information that affects these decisions.  In addition to meeting the requirements outlined below, third parties must make reasonable efforts to provide their customers with other relevant information when requested.  Ackerman's conduct is a violation of this behavioral norm."[11]

He juxtaposes AMc's conduct with what he calls "[e]thical marketing, advertising and public relations practitioners," which he contends "share actionable information with clients so that clients can understand the costs and benefits of services delivered."[12] He states that "this transparency principle is widely understood in the marketing industry, including among marketing

---

[6] Report, Ex. 1 at p. 20, ¶ 59 (APP 20).
[7] Report, Ex. 1 at p. 21, §B (APP 21).
[8] Report, Ex. 1 at pp. 21-22, ¶ 61 (APP 21-22).
[9] Report, Ex. 1 at p. 23, ¶ 66 (APP 23).
[10] Report, Ex. 1 at p. 22, ¶ 63 (APP 22).
[11] Report, Ex. 1 at p. 22, ¶ 63 (APP 22).
[12] Report, Ex. 1 at p. 14, ¶ 44 (APP 14).

executives, marketing consultants, marketing agencies, marketing organizations, and academics," citing the International Communications Consultancy Organization's Helsinki Declaration, the American Marketing Association's code of conduct, an online publication from George Washington University, and an aspirational code of conduct from another public relations firm, Edelman.[13]

### B.    Hochman speculates about the parties' states of mind and motives.

Hochman also wades into the prohibited area of speculating about the thought processes and mental states of NRA and AMc personnel.  For example, when discussing the alleged insufficiency of the marketing data supplied by AMc to NRA regarding NRATV, Hochman divines what NRA understood, or in his words, what NRA did not understand.  He claims the "NRA was unable to understand the value generated by each specific component of the NRATV marketing program."[14]   Further, speculating on the state of mind of the NRA personnel when allegedly not obtaining sufficient marketing data regarding NRATV from AMc, he says, "NRA could not identify and eliminate waste from the program."[15]

### C.    Hochman offers conclusory, speculative, irrelevant testimony regarding "harm."

Hochman also alleges, without foundation, a contention that AMc has "harmed" NRA: "Ackerman has harmed NRA by taking NRA's social media accounts and marketing data hostage."[16]   He says, "[t]he fact that Ackerman refuses to turn over these files damages NRA by preventing NRA for making full use of the programming that NRA has paid to produce as work for hire."[17]   As the basis for Hochman's opinion regarding this so-called "harm," he stated:

> I understand that these files have not been delivered to NRA.  Although many of the videos remain available online, these are not nearly as useful as the high-

---

[13] Report, Ex. 1 at pp. 14-15, ¶¶ 44-48 (APP 14-15).
[14] Report, Ex. 1 at p. 13, ¶ 42 (APP 13).
[15] Report, Ex. 1 at p. 13, ¶ 43 (APP 13).
[16] Report, Ex. 1 at p. 22, § C (APP 22).
[17] Report, Ex. 1 at p. 24, ¶ 67 (APP 24).

definition video files.  When videos are uploaded to a service such as Facebook, they may be compressed to consume less storage space and be more easily transmitted.  []This process of compressing the data may result in a loss of information that cannot be reversed.  If NRA wants to rebroadcast any of the videos on live television, NRA will need the original high-definition files.  Moreover, while it is possible to extract a video recording from a service such as YouTube, this process is laborious and time consuming, especially for a large content library such as the total collection of videos produced for NRATV.[18]  The fact that Ackerman refuses to turn over these files damages NRA by preventing NRA for making full use of the programming that NRA has paid to produce as work.

He thus opines about programming the NRA supposedly might do, but he offers no basis for alleging what the NRA planned.  Not only does Hochman conclude, without any foundation, what NRA could have done with the data files, he writes his report as if he was setting NRA's goals.  His statements are made without foundation and are pure speculation.

Moreover, Hochman says nothing about the purported relevance to any issue in this case of this opinion that AMc has "harmed" NRA.  He conceded at his deposition that he never attempted to quantify this alleged harm to the NRA, as that was "outside the realm of what [he] was asked to do."[19]  Indeed, Hochman gives no hint as to what he even means by using the term "harm."

**D.  Hochman offers irrelevant opinions about the Dashboard and social media accounts.**

In his Supplemental Report, provided well after the deadline for disclosure of expert testimony and only days before the close of the discovery period, Hochman offers a number of new opinions, including opinions about the Dashboard, how and when it was provided to the NRA in discovery in this case, and his inability to inspect certain NRATV social media accounts.[20]  The Dashboard was not even mentioned in his original Report despite the fact that it has been well

---

[18] As the support for this statement, Hochman supplies a footnote:  "I have performed this process myself in other cases to collect evidence." Report, Ex. 1 at p. 24, FN 25 (APP 24).
[19] Hochman Depo., Ex. 3 at pp. 12:4 – 13:5, 253:16 – 254:4 (APP 221-222, 282).
[20] Supplemental Report, Ex. 2 at pp. 5-8 (APP 52-55).

known to the NRA and its counsel for years.[21]  Instead, Hochman contended in his deposition that the Dashboard was largely irrelevant to his opinions in this case because he "didn't see any information that suggested that NRA was relying on it or using it very much, if at all."[22]

Yet, he opines in the Supplemental Report that AMc's "disclosure" of the Dashboard in discovery in this case was belated, insufficient, and raises multiple questions about who had access to the data within the Dashboard and when, also ignoring the fact that the NRA never even asked to access the Dashboard at any point in time.[23]  He does not indicate in his Supplemental Report how his experience in Internet marketing, e-commerce, website development, digital forensics, search engine optimization, pay-per-click mobile, and digital advertising qualifies him to offer expert testimony on these subject matters, however.  Furthermore, his opinions about the Dashboard are neither helpful nor relevant, as they will not assist the jury in determining an issue or in understanding other evidence.

Likewise, the Supplemental Report discusses Hochman's inability to access social media accounts related to NRATV (that was shut down in 2019), including Facebook, Instagram, Twitter, and YouTube (that haven't been used in years).[24]  He does not tie his inability to access the social media accounts to any of the causes of action in this case, however.  Instead, he merely notes that he does not believe he can render full and complete opinions in this case without access to the social media accounts.  Thus, his comments in this regard are neither helpful nor relevant, as they will not assist the jury in determining an issue or in understanding other evidence.

---

[21] *See, i.e.*, ECF 18, NRA First Amended Complaint at ¶¶ 28, 55; *see* ECF 448, Ex. 67 (declaration of Todd Grable from the NRA talking about meeting with AMc in October 2018 to go over, among other things, the Dashboard) (APP 1974).
[22] Hochman Depo., Ex. 3 at pp. 58:25 – 59:13 (APP 233).
[23] Supplemental Report, Ex. 2 at pp. 5-7 (APP 52-54).
[24] Supplemental Report, Ex. 2 at p. 8 (APP 55).

He then discusses the transfer of certain data from AMc to the NRA, including the high-definition video files referenced above, the Dashboard, and access to the NRA's social media accounts.[25]  After noting that AMc had offered to transfer the high-definition video files and other assets to the NRA in exchange for $1.5 million, he opines that the amount was "severely inflated."[26]  He then discusses an alternative way in which he believes the video files could have been transferred to the NRA, and discusses a protocol for transferring the Dashboard and access to the social media accounts to the NRA.

He does indicate how his background in Internet marketing qualifies him to offer expert opinions regarding the reasonable costs of transferring the data, however.  Yet, his opinions about the transfer of data are neither helpful nor relevant, as they will not assist the jury in determining an issue or in understanding other evidence.

**E.      Hochman offers irrelevant opinions about AMc's PowerPoint presentations.**

Hochman's Supplemental Report also discusses certain PowerPoint presentations provided by AMc to NRA executives regarding NRATV.[27]  He does not claim that the data presented in the PowerPoint presentations is inaccurate, however.  Instead, he simply notes that he would like to "test" the PowerPoint presentations to see whether that data can be tied to data in the social media accounts, but cannot do so without access to the NRA social media accounts.  His comments are thus neither helpful nor relevant, as they will not assist the jury in determining an issue or in understanding other evidence.

---

[25] Supplemental Report, Ex. 2 at pp. 12-18 (APP 59-65).
[26] Supplemental Report, Ex. 2 at p. 3 (APP 50).
[27] Supplemental Report, Ex. 2 at pp. 11-12 (APP 58-59).

**F.      Hochman's Supplemental Report offers a previously undisclosed category of damages.**

Lastly, Hochman's Supplemental Report attempts to quantify a type of economic damages allegedly suffered by the NRA.  Specifically, he claims that the NRA overpaid for NRATV because "the market rate cost of the Engaged Views[28] generated by NRATV was eight times less than what AMc charged for NRATV, representing a substantial waste of the NRA's marketing resources."  To reach this conclusion, he observed that there were 112.8 million Engaged Views of NRATV in the years 2015 to 2019, of which 30.88 million were purchased on Facebook and Instagram.  He notes that the related expenditure for the 30.88 million Engaged Views on Facebook and Instagram was $1,116,939, which represents $0.036 per Engaged View.  Therefore, he opines that the total value of all 112.8 million engaged views was only $4,080,000.  He then adds an additional 10% to account for the estimated marketing budget of producing NRATV and a 15% commission to determine that a competent, full-service digital advertising agency could have replicated NRATV for only $5.2 million ($4,080,000 ÷ 85% + $400,000 = $5,200,000) instead of the $45 million the NRA paid AMc.

This is not a subject matter that was discussed in his original Report.  Therefore, AMc was not able to question Hochman about this opinion in his deposition.  To the contrary, he stated during his deposition that he did not intend to opine about the value of NRATV, the value of the services AMc provided to NRA, or otherwise quantify any alleged harm to the NRA, as that was "outside the realm of what [he] was asked to do."[29]

---

[28] Engaged Views were measured on Facebook (paid), Twitter (organic), Twitter (paid), Google Analytics, and Instagram (paid) as someone who watches 25% of the content, and on Facebook (organic) as 30 seconds of the content.
[29] Hochman Depo., Ex. 3 at pp. 10:16 – 13:5, 253:16 – 254:4 (APP 221-222, 282).

# V.     ARGUMENT AND AUTHORITIES

## A.     Applicable Legal Standards.

In *Daubert*, "the Supreme Court held that when expert testimony is offered, the trial judge must perform a screening function to ensure that the expert's opinion is reliable and relevant to the facts at issue in the case."[30]   "The court may admit proffered expert testimony only if the proponent, who bears the burden of proof, demonstrates that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable."[31]

### i.     *Qualifications.*

To evaluate whether an expert is qualified, the Court must "thoroughly examine" the person's qualifications to determine if he is "qualified by virtue of his 'knowledge, skill, experience, training or education'" to present his opinions to the jury.[32]   The Court must exclude an expert who is "'not qualified to testify in a particular field or on a given subject.'"[33]

### ii.     *Relevance.*

Regarding relevance, Federal Rule of Evidence 702 provides the standard:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.[34]

---

[30] *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988-89 (5th Cir. 1997) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)).

[31] *Nunn v. State Farm Mut. Auto. Ins. Co.*, No. 3:08-CV-1486-D, 2010 U.S. Dist. LEXIS 61740, at *5 (N.D. Tex. Jun. 22, 2010) (Fitzwater, C.J.) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)).

[32] *Falcon v. State Farm Lloyds*, No. 1:12-CV-491-DAE, 2014 U.S. Dist. LEXIS 83040, at *11 (W.D. Tex. Jun. 16, 2014); *see also Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009).

[33] *Falcon*, 2014 U.S. Dist. LEXIS 83040 at *11 (quoting *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)).

[34] Fed. R. Evid. 702.

Thus, when faced with a proffer of expert testimony, a trial judge must first determine whether the expert is proposing to testify to (1) scientific, technical, or specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.[35]

### iii.    Reliability.

Regarding reliability, courts must conduct a preliminary assessment of whether the reasoning or methodology underlying the testimony is "scientifically valid" and whether that reasoning or methodology properly can be applied to the facts in issue.[36]  This gate-keeping obligation applies to all types of expert testimony.[37]

In making a reliability determination, courts scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been "properly applied" to the facts of the case.[38] "The reliability analysis applies to all aspects of an expert's testimony:  the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia."[39]  Thus, where a witness' expertise is based largely on experience, the expert must explain how and why his or her experience and qualifications support the conclusions he or she reached.[40]  And, expert testimony must be supported by "more than subjective belief or unsupported speculation."[41]  Experts can build up to conclusions through basic scientific premises, but "the extrapolation or leap . . . must be reasonable and scientifically valid."[42] "[C]ourts are free to reject a theory based on extrapolation when 'there is simply too great an analytical gap between

---

[35] *See Daubert*, 509 U.S. at 590-92.

[36] *Id.* at 592-93.

[37] *See Pipitone v. Biomatrix, Inc*., 288 F.3d 239, 244 (5th Cir. 2002) (citing *Kumho*, 526 U.S. at 147).

[38] *See* FED. R. EVID. 702 Advisory Committee's Note (2000 amendment).

[39] *Seaman v. Seacor Marine LLC*, 326 F. App'x 721, 725 (5th Cir. 2009).

[40] *See Affiliati*, 2017 U.S. Dist. LEXIS 217403 *10-11 (excluding all twelve of Hochman's opinions for being conclusory, ipse dixit, unreliable, lacking in acceptable methodology).

[41] *Paz v. Brush Eng'red Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009).

[42] *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 279 (5th Cir. 1998).

the data and the opinion proffered.'"[43]  The burden is on the proponent of the expert testimony to establish its admissibility by a preponderance of the evidence.[44]

**B.      The Court should exclude Hochman's opinions about AMc's business activities and ethics because they are not helpful and invade the province of both the Court and the jury.**

The Court should exclude Hochman's proposed testimony about AMc's business practices and ethics because it is not helpful under the test set forth above, and instead attempts to usurp the roles of the Court and the jury.[45]  For example, Hochman's report demonstrates that he intends to generally define the duties owed by an advertising agency to its client and then identify each of the actions taken by AMc that, in his opinion, constituted a breach of AMc's duty to its client in this case.  In essence, Hochman's proffered opinion (1) defines the duty owed by an advertising agency and then (2) applies the facts of the case to the law as he defines it.  Hochman's opinion therefore invades both the province of the Court and the jury.[46]

The first part of Hochman's proposed testimony regarding the duties owed by AMc to the NRA resembles nothing so much as a jury instruction.[47]  Experts cannot assert what law governs an issue or what the applicable law means because that is a function of the Court.[48]  As the Fifth Circuit explained in *Askanase*: "[T]here is one, but only one, legal answer for every cognizable dispute.  There being only one applicable legal rule for each dispute or issue, it requires only one spokesman of the law, who of course is the judge."[49]  "If an expert witness were allowed to testify

---

[43] *Johnson v. Arkema, Inc.*, 685 F.3d 452, 460-61 (5th Cir. 2012) (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).
[44] *Moore*, 151 F.3d at 276.
[45] *Crow v. Unit. Ben Life Ins. Co.*, No. 3:00-cv-1375-G, 2001 U.S. Dist. LEXIS 2993, at *8-9 (N.D. Tex. Mar. 16, 2001).
[46] *Id.*
[47] *Id.* at *7.
[48] *Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997); *see also Goodman v. Harris County*, 571 F.3d 388, 399 (5th Cir. 2009) ("[A]n expert may never render conclusions of law."); *Estate of Sowell v. United States*, 198 F.3d 169, 171–72 (5th Cir. 1999); *Snap-Drape, Inc. v. Comm'r*, 98 F.3d 194, 198 (5th Cir. 1996).
[49] *Askanase*, 130 F.3d at 672–73.

to legal questions, each party would find an expert who would state the law in the light most favorable to its position.  Such differing opinions as to what the law is would only confuse the jury."[50]  Hochman's proposed testimony defining the duty owed by AMc impermissibly intrudes upon the Court's duty to instruct the jury as to the appropriate law and is therefore inadmissible.[51]

And, his proposed testimony delineating particular breaches of AMc's duties to the NRA impermissibly invades the province of the jury.[52]  Whether AMc engaged in conduct constituting a breach of its duties to the NRA "is an issue for the trier of fact to decide."[53]  "It is not for [Hochman] to tell the trier of fact what to decide."[54]  "Where as here expert testimony is offered on an issue that a jury is capable of assessing for itself, it is plainly within the trial court's discretion to rule that testimony inadmissible because it would not even marginally 'assist the trier of fact,' while it must be viewed as a 'needless presentation' (Fed. R. Evid. 403) . . . ."[55]

Furthermore, in light of the invective laden manner in which Hochman characterizes AMc's business conduct, his proposed testimony amounts to an attack on AMc's honesty and veracity.  "Such testimony:  (1) 'usurps a critical function of the jury'; (2) 'is not helpful to the jury, which can make its own determination of credibility'; and (3) when provided by 'impressively qualified experts on the credibility of other witnesses is prejudicial and unduly

---

[50] *Id.* at 673.
[51] *Crow*, 2001 U.S. Dist. LEXIS 2993 at *7-8.
[52] *Id.* at *8.
[53] *Id.* (quoting *Askanase*, 130 F.3d at 673).
[54] *Id.*; *see also Sowell v. United States*, No. 1998 U.S. Dist. LEXIS 13049, 1998 U.S. Dist. LEXIS 13049 (N.D. Tex. 1998) (an expert's legal opinion regarding the ultimate issue of reasonableness of a fiduciary's conduct was correctly excluded and did not present grounds for granting a new trial), *aff'd*, 198 F.3d 169 (5th Cir. 1999).
[55] *Crow*, 2001 U.S. Dist. LEXIS 2993 at *8 (quoting *Thompson v. State Farm Fire & Cas. Co.*, 34 F.3d 932, 941 (10th Cir. 1994) (excluding testimony from an expert in bad faith denial and investigation of insurance claims which compared to the industry standard and the laws of Oklahoma State Farm's actions in denying a claim.)).

influences the jury.'"[56]   Therefore, Hochman should not be allowed to testify that AMc acted "unethically" or violated the customs and norms of the Internet marketing industry.

For all these reasons, the Court should exclude Hochman from testifying about the duties AMc allegedly owed to the NRA and the conduct by AMc that Hochman believes constituted an alleged breach of its duties to the NRA.

## C.   The Court should exclude Hochman's proposed opinions about the parties' states of mind.

The Court should also exclude portions of Hochman's proposed testimony in which he wades into the prohibited area of speculating about the thought processes and mental states of NRA and AMc personnel.   "[A]n expert's credentials do not place him in a better position than the jury to draw conclusions about a defendant's state of mind."[57] Thus, an expert is barred from opining about an individual's state of mind.[58]

Thus, Hochman should not be permitted to opine on what the NRA understood, or in his words, what the NRA did not understand, with respect to the value generated by each specific component of the NRATV marketing program[59] or alleged waste to be identified and eliminated from the programming.[60]   Nor should he be allowed to speculate about what the NRA would have done with certain data had AMc allegedly not held it hostage.

---

[56] *Tingle v. Hebert*, 2018 U.S. Dist. LEXIS 207536, at *13-14 (M.D. La. 2018); *see also United States v. Hill*, 749 F.3d 1250, 1258 (10th Cir. 2014).
[57] *Marlin v. Moody Nat'l Bank, N.A.*, 248 F. App'x 534, 541 (5th Cir. 2007).
[58] *Id.*; *see also Charalambopoulos v. Grammer*, No. 3:14-cv-2424-D, 2017 U.S. Dist. LEXIS 33488, at *12 (N.D. Tex. Mar. 8, 2017) (excluding expert's opinions regarding a no bill and what grand jurors "must have" concluded about party's credibility).
[59] Report, Ex. 1 at p. 13, ¶ 42 (APP 13).
[60] Report, Ex. 1 at p. 13, ¶ 43 (APP 13).

**D.    The Court should exclude Hochman from testifying about so-called "harm" caused by AMc's alleged refusal to give the NRA access to data and social media accounts.**

The Court should also exclude Hochman's opinion that AMc "harmed" the NRA by supposedly refusing to give the NRA access to certain data and social media accounts, as it is speculative and ultimately irrelevant. He made no effort to quantify this alleged "harm," as that was outside the scope of what he was asked to do. Without any measure of damages ascribable to the alleged "harm," his testimony does nothing to assist the trier of fact to understand or determine a fact in issue. Thus, his proposed testimony is neither helpful nor relevant.[61]

**E.    The Court should exclude Hochman's belated opinions regarding the Dashboard, social media accounts, and video files.**

The Court should also exclude Hochman's proposed testimony in his Supplemental Report regarding AMc's disclosure of the Dashboard in discovery in this case,[62] his inability to access social media accounts related to NRATV,[63] and the transfer to the NRA of certain high-definition video files, the Dashboard, and access to the NRA's social media accounts.[64]

*First*, the proposed testimony was not disclosed in a timely manner.

*Second*, Hochman does not indicate in his Supplemental Report how his experience in Internet marketing, e-commerce, website development, digital forensics, search engine optimization, pay-per-click mobile, and digital advertising qualifies him to offer expert testimony on these subject matters.[65]

*Third*, his opinions about the Dashboard are neither helpful nor relevant, as they will not assist the jury in determining an issue or in understanding other evidence.[66] He does not indicate

---

[61] FED. R. EVID. 702; *Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant . . .") (citations omitted).
[62] Supplemental Report, Ex. 2 at pp. 5-7 (APP 52-54).
[63] Supplemental Report, Ex. 2 at p. 8 (APP 55).
[64] Supplemental Report, Ex. 2 at pp. 12-18 (APP 59-65).
[65] *Falcon*, 2014 U.S. Dist. LEXIS 83040, at *11.
[66] FED. R. EVID. 702; *Daubert*, 509 U.S. at 591.

in his Supplemental Report how any of these opinions relate to any of the causes of action or defenses in this case.  His opinions essentially relate to discovery disputes rather than anything the jury will decide.

**F.     The Court should exclude Hochman's proposed testimony regarding the PowerPoint presentations.**

Likewise, the proposed testimony in the Supplemental Report regarding certain PowerPoint presentations is untimely and ultimately unhelpful and irrelevant.[67]  Again, he does not claim that the data presented in the PowerPoint presentations is inaccurate.  He simply notes that he would like to "test" the PowerPoint presentations to see whether that data can be tied to data in the social media accounts.  His comments are thus neither helpful nor relevant, as they will not assist the jury in determining an issue or in understanding other evidence

**G.     The Court should exclude Hochman's proposed testimony regarding damages.**

Finally, the Court should exclude Hochman's proposed testimony regarding damages. There was no mention of his $40 million damage model in his original Report.  AMc was not able to question Hochman about this damage model in his deposition.  To the contrary, he stated during his deposition that he did not intend to opine about the value of NRA, the value of the services AMc provided to NRA, or otherwise quantify any alleged harm to the NRA, as that was "outside the realm of what [he] was asked to do."[68]

The Supplemental Report was served over four months after expert reports were due and only two days before the close of the discovery period.  Supplemental "disclosures are not intended to provide an extension of the deadline by which a party must deliver the lion's share of its expert

---

[67] Supplemental Report, Ex. 2 at pp. 11-12 (APP 58-59).
[68] Hochman Depo., Ex. 3 at pp. 10:16 – 13:5, 253:16 – 254:4 (APP 221-222, 282).

information."[69]  Initial expert disclosures must be "full and complete."[70]  Thus, this new damage model should be excluded as untimely.

Additionally, as was the case with Hochman's opinions in the *Affiliati Network* case, Hochman has not explained how and why his experience in Internet marking allow him to reach the conclusions he reached regarding damages and he has not shown that his opinions are supported by reliable sources or sources that are accepted within any particular industry.  Because he seemingly pulled his formula out of thin air, there is no way to determine whether his calculation can be or has been tested.  There is no way to know whether the theory has been subject to peer review and publication or to determine the known or potential rate of error of a technique or theory when applied.  It is not grounded in any standards and controls, and he offers no insight into whether his technique or theory has been generally accepted in the scientific community.  It is simply too unreliable to be put before the jury.

## VI.    CONCLUSION AND PRAYER

For the reasons set forth above, AMc respectfully requests that the court exclude the proposed testimony and opinions referenced above.

---

[69] *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co*., 73 F.3d 546, 571 (5th Cir. 1996).
[70] FED. R. CIV. P. 26.

January 3, 2022.

Respectfully submitted,

*/s/ Brian E. Mason*
**Brian E. Mason, Esq.**
Texas Bar No. 24079906
mason.brian@dorsey.com
**G. Michael Gruber, Esq.**
Texas Bar No. 08555400
gruber.mike@dorsey.com
**Jay J. Madrid, Esq.**
Texas Bar No. 12802000
madrid.jay@dorsey.com
**J. Brian Vanderwoude, Esq.**
Texas Bar No. 24047558
vanderwoude.brian@dorsey.com
**DORSEY & WHITNEY LLP**
300 Crescent Court, Suite 400
Dallas, Texas 75201
(214) 981-9900 Phone
(214) 981-9901 Facsimile

**ATTORNEYS FOR DEFENDANTS**


**CERTIFICATE OF SERVICE**

I hereby certify that on January 3, 2022, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

*/s/ Brian E. Mason*
BRIAN E. MASON