# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § | |
| | § | |
| | § | |
| *Plaintiff and Counter-Defendant,* | § | |
| | § | |
| | § | |
| **v.** | § | **Case No. 3:19-cv-02074-G** |
| | § | |
| **ACKERMAN MCQUEEN, INC.,** | § | |
| | § | |
| *Defendant and Counter-Plaintiff,* | § | |
| | § | |
| **and** | § | |
| | § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, and MELANIE MONTGOMERY,** | § | |
| | § | |
| | § | |
| | § | |
| *Defendants.* | § | |

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO EXCLUDE CERTAIN OPINIONS OF THE NRA'S EXPERT, ANDREW McLEAN

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION AND SUMMARY ................................................................................. 1

II.   FACTUAL AND PROCEDURAL BACKGROUND ...................................................... 2

III.  ARGUMENT AND AUTHORITIES ............................................................................. 4

   A.   Requirements for Expert Reports and Opinions. ................................................... 4

   B.   McLean is Not Qualified to Provide Expert Testimony in This Case. ................. 5

   C.   The Court Should Exclude McLean's Opinions in His Original Report. ............ 7

     1.   Fiduciary Duties. ........................................................................................... 7

     2.   AMc's "Pattern" of Behavior. ..................................................................... 8

     3.   Alleged Financial Issues ............................................................................. 10

   D.   The Court Should Exclude McLean's Opinions in His Supplemental Report. ................. 14

     1.   McLean's Damage Opinion Regarding Excessive Spending Concerning NRATV is Untimely and Unreliable. ........................................................... 14

     2.   McLean's Damage Opinion Regarding the "Reputational Harm" Is Untimely and Unreliable. ............................................................................ 17

     3.   McLean's Damage Opinion Relating to Media Buys Should be Excluded. ................. 22

     4.   The Remaining Opinions in McLean's Supplemental Report Should Also Be Excluded . ...................................................................................... 24

IV.  PRAYER ..................................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Arlington S. Hills, LLC v. Am. Ins. Co.*, 51 F. Supp. 3d 681 (N.D. Tex. 2014) ........................ 5, 8

*Askanase v. Fatjo*, 130 F.3d 657 (5th Cir. 1997) ........................................................................ 8

*Balfour Beatty Rail, Inc. v. Kansas City S. Ry. Co.*, 173 F. Supp. 3d 363 (N.D. Tex. 2016) ......... 5

*Biestek v. Berryhill*, 139 S. Ct. 1148 (2019) ............................................................................. 21

*Brauninger v. Motes*, 260 F. App'x 634 (5th Cir. 2007) ........................................................... 24

*Broad. Music, Inc. v. Xanthas, Inc.*, 855 F.2d 233 (5th Cir. 1988) ............................................ 24

*Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207 (D.C. Cir. 1997) .......................... 8

*Conn v. C.R. Bard, Inc.*, No. 4:14-CV-298, 2021 U.S. Dist. LEXIS 107523 (S.D. Tex. Jun. 8, 2021) ................................................................................................................................. 20, 25

*Corinth Investor Holdings, LLC v. Evanston Ins. Co.*, No. 4:13-CV-00682, 2014 WL 7146040 (E.D. Tex. Dec. 15, 2014) ...................................................................................................... 5, 8

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ..................................... 4, 12, 16, 21

*Falcon v. State Farm Lloyds*, No. 1:12-CV-491-DAE, 2014 WL 2711849 (W.D. Tex. Jun. 16, 2014) ......................................................................................................................................... 5

*Grimes v. Wal-Mart Stores Tex., LLC*, No. MO-10-CV-067, 2012 U.S. Dist. LEXIS 193330 (W.D. Tex. 2012) ....................................................................................................................... 9

*Huss v. Gayden*, 571 F.3d 442 (5th Cir. 2009) ....................................................................... 4, 5

*Jacked Up, L.L.C. v. Sara Lee Corp.*, 807 Fed. Appx. 344 (5th Cir. 2020) ............................... 20

*Johnson v. Arkema, Inc.*, 685 F.3d 452 (5th Cir. 2012) ........................................................... 21

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) ..................................................... 4, 5

*ODonnell v. Harris County*, 251 F. Supp. 3d 1052 (S.D. Tex. 2017) ........................................ 21

*Palmer v. Hoffman*, 318 U.S. 109 (1943) ................................................................................ 24

*Paz v. Brush Engineered Materials Inc.*, 555 F.3d 383 (5th Cir. 2009) ........................... 14, 20, 25

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546 (5th Cir. 1996) .......... 15, 18

*Snap-Drape, Inc. v. C.I.R.*, 98 F.3d 194 (5th Cir. 1996) ................................................ 8

*TK-7 Corp. v. Estate of Barbouti,* 993 F.2d 722 (10th Cir. 1993) ................................. 20

*U.S. ex rel. Barron v. Deloitte & Touche, LLP*, No. SA-99-CA-1093-FB, 2008 WL 7136949
    (W.D. Tex. Aug. 20, 2008) ........................................................................................ 8

*U.S. v. Cooks*, 589 F.3d 173 (5th Cir. 2009) ................................................................. 5

*U.S. v. Frazier*, 387 F.3d 1244 (11th Cir. 2004) ............................................................ 9

*United States v. Bourgeois*, 950 F.2d 980 (5th Cir. 1992) ............................................. 6

*United States v. Hicks*, 389 F.3d 514 (5th Cir. 2004) .................................................... 6

*Watkins v. Telsmith, Inc.*, 121 F.3d 984 (5th Cir. 1997) ............................................... 5

*Weiser-Brown Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 801 F.3d 512 (5th Cir. 2015) ... 5

*Wilson v. Woods*, 163 F.3d 935 (5th Cir. 1999) ............................................................ 5

## RULES

FED. R. CIV. P. 26 ................................................................................................ 15, 21

FED. R. EVID. 702 ................................................................................ 4, 5, 6, 7, 12, 16, 21

FED. R. EVID. 804 .................................................................................................... 24

## OTHER AUTHORITIES

29 Victor J. Gold, Federal Practice & Procedure § 6268 (2d ed. 2020) ......................................... 9

TO THE HONORABLE A. JOE FISH:

Ackerman McQueen, Inc., Mercury Group, Inc., Henry Martin, William Winkler, and Melanie Montgomery (collectively, "**Defendants**") file this *Brief in Support of Motion to Exclude Certain Opinions of the NRA's Expert, Andrew McLean* (the "**Motion**").

## I.    INTRODUCTION AND SUMMARY

The NRA has retained an army of purported experts who attempt to rewrite the parties' agreements, ignore the agreed upon course of dealing established by their decades' long relationship, step into the shoes of this Court and offer inadmissible legal conclusions, and tout baseless "expert opinions" of the NRA's purported damages that have no basis in law, fact, or even common sense. One of these experts is Andrew McLean ("**McLean**"), who was disclosed and served his Original Expert Report on or about June 1, 2021 ("**Report**"), and his Supplemental Report on or about October 18, 2021 ("**Supplemental Report**").[1] Defendants seek to exclude certain opinions of McLean—including the opinions set forth in his recent deposition and declaration submitted in support of the NRA's Opposition to Defendants' Motion for Summary Judgment[2]—because they do not satisfy the well settled legal standards required for the admissibility of expert testimony in the Fifth Circuit.

In short, McLean is not qualified to render expert testimony in this case, and his opinions are speculative, unreliable, and largely do nothing to help this Court or the fact finder decide the issues in this case. Indeed, Defendants respectfully submit that the Court's gatekeeper role in this case—not only with McLean but with the NRA's other purported experts—is even more critical given the NRA's obvious attempt to improperly influence with jury with unqualified experts

---

[1] The NRA served the Supplemental Report months after the expert disclosure deadline, yet it contains numerous new opinions not previously disclosed.
[2] *See* ECF 448 at Ex. 33 (App. 1120-1215) and Ex. 36 (App. 1273-1422).

rending conclusory and speculative opinions completely ignoring the parties nearly 40 year unique relationship.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

On March 29, 2021, during the pendency of the NRA's bad faith bankruptcy filing, the Court entered an amended scheduling order requiring the NRA to designate its retained expert witnesses pursuant to Rule 26(a)(2) on or before May 24, 2021.[3]  On May 24, 2021, the parties filed a stipulation with the Court extending the NRA's expert designation deadline to June 1, 2021.[4]  On June 1, 2021, the NRA designated four purported expert witnesses, including McLean.[5]

As part of its disclosure, the NRA served Defendants with McLean's Report.  In his Report, McLean seeks to offer nine different opinions relating to the NRA and AMc's relationship. Specifically, McLean's Report indicates that he intends to testify as follows:

1. AMc owed fiduciary duties to the NRA, which AMc breached;

2. AMc historically had difficulties with other clients suggesting a pattern of behavior;

3. The NRA improperly pre-paid purchases for media buys;

4. AMc paid above market rates for media placement and production services;

5. AMc's billing and expenses processes were not sufficient;

6. There is no evidence AMc secured the best available rates for certain media space;

7. McLean was unable to verify certain commissions relating to advertising planning and placement services;

8. AMc did not provide sufficient information that it verified that certain purchased media was actually placed; and

9. There is no evidence of a mutual agreement for public relations, political strategy, and strategic marketing.[6]

---

[3] *See* ECF 217 at 2.
[4] ECF 242.
[5] *See* ECF 253.
[6] Report, Ex. 4 at p. 15-16 (APP 300-301).

Although he referenced certain numbers relating to third party media buys throughout his Report, McLean did not offer any damage calculations or other opinions on damages in his Report.

Then, on October 18, 2021, the NRA served Defendants with McLean's Supplemental Report containing three new purported damage calculations not previously disclosed, and offering various other purported opinions based on information he claims to have recently reviewed or reviewed.   With respect to his damage opinions, McLean now contends that the NRA has been damaged upwards of $75 million based upon the following three categories:

1. Media Buys - $11,863,851;

2. AMc's spending on NRATV - $40,782,217; and

3. Negative publicly relating to NRATV - $23,264,593.

McLean's Supplemental Report also indicates that he intends to testify about the Dashboard created by AMc in conjunction with Performance Improvement Partners ("**PIP**") and the metrics available through the Dashboard, as well as certain observations made by the NRA's auditor, Forensic Risk Alliance.

Three days later on October 21, 2021, Defendants took the deposition of McLean.  During his deposition, Defendants confirmed that (a) McLean is not qualified to render virtually any opinions in this case, specifically including the purported damage opinions; (b) each of his three damage opinions are not based upon reliable methodology and are nothing more than speculation and conjecture; (c) he has intentionally ignored undisputed evidence regarding the parties' decades long relationship that directly contradicts his opinions; (d) the NRA intentionally failed to provide him with critical documentation; and (e) he has failed to produce, and in some circumstances actually destroyed, critical evidence that he purportedly relied upon in forming some of his opinions.

As will be shown below, McLean is not qualified to render expert testimony in this case, and his opinions are speculative, unreliable, and largely do nothing to help this Court or the fact finder decide the issues in this case. Thus, the Court should exclude his opinions.

## III. ARGUMENT AND AUTHORITIES

### A. Requirements for Expert Reports and Opinions.

Federal Rule of Evidence 702 governs the admissibility of expert testimony in federal court and requires district courts to act as "'gate-keepers,'" making a preliminary assessment of the validity and applicability of expert testimony.[7] Pursuant to Rule 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>>
>> (b) the testimony is based on sufficient facts or data;
>>
>> (c) the testimony is the product of reliable principles and methods; and
>>
>> (d) the expert has reliably applied the principles and methods to the facts of the case.[8]

Rule 702 and *Daubert* impose "a special obligation upon a trial judge" to ensure that any and all expert testimony is both relevant and reliable.[9] This obligation "requires more than simply taking the expert's word for it."[10] The NRA, as the proponent of McLean's testimony, bears the burden of proving that McLean is qualified and that his testimony is both relevant and reliable.[11]

---

[7] *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 (1993)); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243–44 (5th Cir. 2002)).

[8] FED. R. EVID. 702.

[9] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

[10] *Balfour Beatty Rail, Inc. v. Kansas City S. Ry. Co.*, 173 F. Supp. 3d 363, 408 (N.D. Tex. 2016) (citations and internal quotation marks omitted).

[11] *Arlington S. Hills, LLC v. Am. Ins. Co.*, 51 F. Supp. 3d 681, 685 (N.D. Tex. 2014) (citing *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988–89 (5th Cir. 1997)); *see also Corinth Investor Holdings, LLC v. Evanston Ins. Co.*, No. 4:13-CV-00682, 2014 WL 7146040, at *1 (E.D. Tex. Dec. 15, 2014).

The Court must "thoroughly examine" McLean's qualifications[12] to determine if he is "qualified by 'knowledge, skill, experience, training or education'" to present his opinions to the jury.[13]  In analyzing whether McLean's opinions are relevant and reliable, the Court must "evaluate whether the reasoning and methodology underlying the testimony is valid and can be reliably applied to the facts of the case."[14] The factual basis, methods, and application of McLean's opinions must have "'a reliable basis in the knowledge and experience of the relevant discipline.'"[15] To be relevant, McLean's testimony also must "assist the trier of fact to understand or determine a fact in issue."[16] As shown below, the NRA cannot meet its burden.

## B.  McLean is Not Qualified to Provide Expert Testimony in This Case.

"It is the role of the district court to assure 'that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'"[17] A court must "thoroughly examine" an expert's qualifications and exclude an expert who is "'not qualified to testify in a particular field or on a given subject.'"[18] "To qualify as an expert, the witness must have such knowledge or experience in [his] field or calling to make it appear that his opinion or inference will probably aid the trier in [the] search for truth."[19]  If an opinion is based solely or primarily on experience, it "must be grounded in an accepted body of learning or experience in the expert's field."[20]  The witness must connect the experience to the conclusion offered, must explain why the

---

[12] *Falcon v. State Farm Lloyds*, No. 1:12-CV-491-DAE, 2014 WL 2711849, at *7 (W.D. Tex. Jun. 16, 2014).

[13] *Huss*, 571 F.3d at 452 (quoting FED. R. EVID. 702).

[14] *Balfour Beatty*, 173 F. Supp. 3d at 408 (citing *Daubert*, 509 U.S. at 592–98).

[15] *Kumho Tire*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592) (alteration omitted).

[16] *Weiser-Brown Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 801 F.3d 512, 529 (5th Cir. 2015) (citation and internal quotation marks omitted).

[17] *Falcon*, 2014 WL 2711849, at *4 (quoting FED. R. EVID. 702; *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)); *see also U.S. v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009) ("Before a district court may allow a witness to testify as an expert, it must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" (quoting Fed. R. Evid. 702)).

[18] *Falcon*, 2014 WL 2711849, at *4, *7 (quoting *Wilson*, 163 F.3d 937).

[19] *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004) (quoting *United States v. Bourgeois*, 950 F.2d 980, 987 (5th Cir. 1992)).

[20] FED. R. EVID. 702, advisory committee's note, 2000 Amends.

experience is a sufficient basis for the opinion, and must demonstrate the appropriateness of the application of the experience to the facts.[21]

Here, McLean's background confirms that he is not qualified to render testimony as an expert witness in this case.  McLean is an advertising/marketing consultant and former executive.[22] He is not an attorney.[23]  Prior to this case, McLean has only provided expert testimony in three other cases.[24]  One of those cases involved analyzing issues relating to the area of television buying, costs, billing procedures and invoice reconciliation.[25]  McLean did not provide any opinions with respect to damages, but what he believed to be industry customs.[26]  In the other case, McLean opined on the advertising and publicity investment in films to give a perspective on the value and costs of advertising and publicity.[27]  In the final case, McLean admitted that it had nothing to do with the issues he is purporting to testify on in this case.[28]

McLean has never testified as an expert witness in trial, which weighs against the admissibility of his opinions.[29]  McLean has also never served as an expert witness on any of the subject matters upon which he seeks to testify here.[30]  McLean's lack of experience and qualifications renders him unqualified to testify, especially as it relates to the three different damages opinions discussed more in Section D below.  His opinions are based solely or primarily on experience, but are not "grounded in an accepted body of learning or experience in [McLean's]

---

[21] *Id*.
[22] Report, Ex. 4 at pp. 2-4 (APP 287-289).
[23] McLean Depo., Ex. 6 at 10:10-11 (APP 430).
[24] *Id*. at 24:8-25:12 (APP 433-434).
[25] *Id*. at 25:13—26:22 (APP 434).
[26] *Id*. at 26:23—27:11 (APP 434).
[27] *Id*. at 28:10-19 (APP 434).
[28] *Id*. at 32:14-24 (APP 435).
[29] *Id*. at 33:9-11; *Cf. Imperial Trading Co. v. Travelers Prop. Cas. Co. of Am.*, 654 F. Supp. 2d 518, 520 (E.D. La. 2009) (noting that expert had been "qualified as an expert in numerous state and federal courts").
[30] McLean Depo., Ex. 6 at 33:3-11 (APP 436).

field."[31]   He has done nothing to connect his experience as an advertising/marketing consultant and former executive to the conclusion offered, has not explained why that experience is a sufficient basis for his opinions, and has not demonstrated the appropriateness of the application of his experience to the facts of this case.  Thus, he should not be permitted to testify.

## C.  The Court Should Exclude McLean's Opinions in His Report.

Even if he is permitted to testify in some respect, numerous specific opinions should be excluded.

### 1.  Fiduciary Duties.

McLean first attempts to invade the province of this Court and offer impermissible legal conclusions relating to fiduciary duties and the interpretation of the Services Agreement:

> Given the trust and confidence placed in them by the NRA, AMc owed fiduciary duties to the NRA. Defendants breached its [sic] fiduciary duties and numerous ethical obligations. AMc did not provide proper stewardship or fiduciary behavior for the NRA. In fact, its behavior was often inconsistent with industry norms.[32]

McLean also recites at length various alleged professional and legal standards (fiduciary duties, "unethical competitive practices," trust, and stewardship, among others) and opines that AMc has violated those standards.[33]

"[T]he Fifth Circuit has consistently held that an expert may not render conclusions of law," and, accordingly, a district court's discretion on the admissibility of evidence is "dramatically narrowed where a party seeks to admit expert testimony purporting to offer legal conclusions, and where a party seeks to admit expert testimony which effectively tells the jury what result to reach."[34] An expert is permitted to "offer his opinion as to facts that, if found,

---

[31] FED. R. EVID. 702, advisory committee's note, 2000 Amends.
[32] Report, Ex. 4 at p. 15 (APP 300).
[33] *Id*. at p. 17-20 (APP 302-305).
[34] *Corinth Investor*, 2014 WL 7146040, at *2–3, *4 (citations omitted).

support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied."[35] "There [is] only one applicable legal rule for each dispute or issue, [and] it requires only one spokesman of the law, who of course is the judge."[36] "If an expert witness were allowed to testify to legal questions, each party would find an expert who would state the law in the light most favorable to its position.  Such differing opinions as to what the law is would only confuse the jury."[37]

Here, McLean seeks to opine as to both legal standard for a fiduciary relationship and whether the legal standard has been satisfied, both of which are impermissible under well settled Fifth Circuit law.  McLean's opinions are nothing more than legal conclusions and "statements of mere advocacy."[38]

2. AMc's "Pattern" of Behavior.

McLean also purports to offer opinions regarding AMc's relationship with other previous clients in an improper attempt to prejudice AMc:  "AMc appears to historically have significant difficulties with other clients suggesting a pattern of behavior regarding the findings in this case."[39] The Report offers no adequate basis for this opinion.  These opinions should be excluded because they are not based on sufficient facts or data and, in any event, the subject matter is not beyond the understanding of the average lay person.

"Rule 702(b) requires that expert testimony be 'based upon sufficient facts or data.' The Advisory Committee's Note to this provision states that this calls for a 'quantitative rather than

---

[35] *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1212-13 (D.C. Cir. 1997).
[36] *Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997) (citation and internal quotation marks omitted); *see also U.S. ex rel. Barron v. Deloitte & Touche, LLP*, No. SA-99-CA-1093-FB, 2008 WL 7136949, at *5 (W.D. Tex. Aug. 20, 2008) ("[I]t is well-settled that the judge is the source of the law and the only expert needed by a jury in this regard.") (citations omitted).
[37] *Askanase*, 130 F.3d at 673.
[38] *Snap-Drape, Inc. v. C.I.R.*, 98 F.3d 194, 198 (5th Cir. 1996).
[39] Report, Ex. 4 at p. 15 (APP 300).

qualitative analysis.' The question is whether the expert considered enough information to make the proffered opinion reliable."[40] "[S]ufficiency is a function of the nature and scope of the opinion offered, the quantity of data both available and pertinent to the issue at hand, and what is deemed sufficient by experts in the pertinent field when working outside the courtroom."[41]

Here, however, McLean cites to only two anecdotal incidents where AMc clients supposedly raised concerns about AMc's business practices, which he expands by assumption into an alleged "pattern" of behavior without even knowing all the facts.  His opinion is based on reports of these incidents generated by third parties, nothing more.[42]  He did nothing to verify the accuracy of these reports, such as speaking to the third parties involved.[43]  What's more, he acknowledged that at least one of the reports was "inconclusive" with respect to whether any of the complaints were valid.[44]

Additionally, an expert's testimony will only aid the trier of fact if the evidence about which he or she testifies "concerns matters that are beyond the understanding of the average lay person."[45]  "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."[46] In this case, McLean's testimony would not aid the trier of fact because AMc's relationships with prior customers, to the extent relevant, are not so complex as to require expert explanation.  He offers nothing more than what the NRA's counsel can assert in closing arguments, introduce through

---

[40] 29 Victor J. Gold, Federal Practice & Procedure § 6268 (2d ed. 2020).
[41] *Id.*
[42] Report, Ex. 4 at p. 20 (APP 305) ("Publicly available documents and information regarding these clients, [sic] reveal similar complaints as arose with the NRA.").
[43] McLean Deposition, Ex. 6 at 158:11 – 159:15 (APP 467).
[44] *Id.* at 159:16 – 160:22 (APP 467).
[45] *Grimes v. Wal-Mart Stores Tex., LLC*, No. MO-10-CV-067, 2012 U.S. Dist. LEXIS 193330, at *10 (W.D. Tex. 2012) (citing *U.S. v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004)).
[46] *Id.*

exhibits, or elicit in the examination of lay witnesses.  Consequently, the Court should exclude his opinions.

3.   <u>Alleged Financial Issues.</u>

Mr. McLean also offers opinions about certain financial issues, including pre-paid media buys that AMc made on the NRA's behalf, the amounts paid for media placement and production services, AMc's billing practices and expense tracking processes, alleged failure to verify that ordered media ran when it was supposed to run, and certain fees and expenses charged to the NRA. None of this proposed testimony should be admitted.

*a.   Pre-Paid Media*

With respect to media-buys, McLean states that:

The clients routinely pre-paid purchases for media-buys without any benefit which routinely resulted in a misuse of NRA cash. NRA pre-paid AMc for advertising media buys, AMc did not provide justification or evidence that third party media vendors required or were paid in advance. [47]

"In at least one instance NRA prepaid a media buy six months in advance; this is egregious and reflects a blatant disregard by AMc of the NRA's best interest."[48]

*b.   Above-Market Rates.*

He also opines that the NRA "consistently paid above market rates for media placement and production services, and there is a lack of supporting back up to determine what was charged was accurate."[49]

*c.   Billing Practices and Procedures.*

He also offers opinions about AMc's billing practices and procedures:

AMc billing and expense tracking processes were lax. Defendants failed to provide support for expenditures and were not transparent on invoices to the client. Further, Project Codes were required by the Service Agreement, but apparently not

---

[47] Report, Ex. 4 at p. 15 (APP 300).
[48] *Id*. at p. 20-21 (APP 305-306).
[49] *Id*. at p. 15 (APP 300).

established by AMc and none were communicated for the NRA advertising and creative service projects; this made it impossible to ascertain what costs were associated with each project. The Services Agreement provides that NRA should pre-approve 'print space, radio and television time, or other media to be used for advertising.' However, AMc failed to obtain pre-approvals. Pre-approval is also required for travel, and the evidence reveals that pre-approval was not obtained by AMc.[50]

McLean elaborates on this conclusion by saying:

Upon review of documents there is inadequate support for Fox media buys. AMc produced five 'buy detail reports' for 2016. The total charges on the buy detail reports sum to $4,420,064. AMc charged the NRA $13,847,943 in 2016 for media buys from Fox. It is impossible for the NRA to determine what was actually charged by FOX and the amounts paid to FOX and/or AMc.[51]

### d. Verification of Ordered Media.

He also intends to testify that AMc failed to verify that certain media ordered on the NRA's behalf ran when it was supposed to run:

"The Services Agreement states that AMc was responsible to diligently check and verify ordered broadcasts, insertions, displays, or other media actually occurred. Despite repeated requests for such information, AMc did not identify any evidence to show that AMc verified purchases as required."[52]

### e. Fees and Expenses.

Finally, he indicates that he intends to offer opinions about the fees and expenses AMc charged to NRA:

"The Services Agreement states that AMc was responsible to charge 'mutually agreed upon fees for Public Relations/Political Strategy/and Strategic Marketing invoices.' There is no evidence that there was mutual agreement for these charges.[53]

Defendants failed to provide support for expenditures and were not transparent on invoices to the client. Further, Project Codes were required by the Service Agreement, but apparently not established by AMc and none were communicated

---

[50] Id. at pp. 15-16 (APP 300-301).
[51] Id. at pp. 22-23 (APP 307-308).
[52] Id. at p. 16 (APP 301).
[53] Id.

for the NRA advertising and creative service projects; this made it impossible to ascertain what costs were associated with each project.[54]

The Services Agreement provides that NRA should pre-approve "print space, radio and television time, or other media to be used for advertising." However, AMc failed to obtain pre-approvals. Pre-approval is also required for travel, and the evidence reveals that pre-approval was not obtained by AMc."[55]

All of this proposed testimony should be excluded for a host of reasons. First, expert testimony that does not assist the fact finder must be excluded.[56] These opinions are not admissible because they will not assist the jury in determining any issue or in understanding any evidence in this case. McLean does not tie these perceived issues to any of the causes of action, defenses, or damages in this case. Thus, he should not be allowed to put them in front of the jury.

Second, his opinions are neither relevant nor reliable because he did not consider the testimony of both NRA and AMc senior executives regarding the manner in which they agreed to conduct business.[57] In fact, when McLean was confronted in his deposition with evidence regarding testimony of NRA's executives of such agreements as to the methods of doing business and the charges his mantra was repeatedly to the effect, "I have no basis to confirm or refute that."[58] Confronted again by the NRA CFO's approval of AMc's invoice practices, McLean could only reply that it was "the entity that had to validate, approve and have support, not one individual."[59]

---

[54] *Id*. at p. 23 (APP 308).

[55] *Id*. at p. 26 (APP 311).

[56] FED. R. EVID. 702; *Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant . . .") (citations omitted).

[57] McLean Depo. Ex. 4 at p. 28, 86; Phillips Depo., Ex. 11 at 85:16-86:11 (APP 680), 135:21-136:22 (APP 692); 137:17-22 (APP 693), 143:3-6 (APP 694).

[58] McLean Depo., Ex. 4 at p. 183-184 (APP 473), 187-188 (APP 474), 190:10-21 (APP 475) (McLean has not "identified" any harm), 208:4-16 (APP 479) (no knowledge whether expense billing was as agreed), 212:10-18 (APP 480) (no knowledge whether expense billing was as agreed), 221:16-222:8 (APP 483) (no knowledge whether billing codes were included or not on the invoices as agreed), 225:16-21 (APP 484) (no knowledge of whether or not NRA gave prior approval for media buys); 241:22-242:6 (APP 488) (no knowledge of whether NRA received verification of media buys), 281:11-21 (APP 498) (no knowledge or whether budget meetings took place).

[59] McLean Depo. Ex. 6 at 92:5-20 (APP 450)

Rather, McLean's proposed testimony is based upon his views of what he says is "custom and usual" practice in the advertising business.[60]  In fact, he adds frequently to his acknowledgement of "no knowledge" by admitting he was directed by the NRA to *only* consider what would have been "custom and usual," not what actually occurred.[61]  So, McLean's analysis boils down to a conclusion that it is not relevant whether AMc performed as agreed with the NRA and not reliable because it ignores the actual facts.  In effect, he is substituting his opinion as to "custom and usual" practice for what was actually agreed to by the parties.

Furthermore, his proposed testimony is speculative.  He *assumes* there is harm simply because, for example, the documentation NRA provided him to review with respect to billing did not show sufficient "detail" in accordance with what he deems to be 'custom[ary] and usual" practice in the advertising business.[62]  But, he repeatedly testified in his deposition that he "can neither confirm nor deny" whether, for example, the charges and billings by AMc to NRA for services and reimbursement of expenses were for services actually performed and expenses actually incurred.[63]  Further, he is unaware whether or not AMc was ever instructed by NRA to change their practice on how NRA was invoiced.[64]  Rather, as stated above, he only bases his opinion on whether the documentation he was provided by the NRA provides sufficient "detail"[65] and whether the documentation conforms to what he says is "custom and usual;" that is, what is

---

[60] *Id*. at p. 38:5-9 (APP 437), 90:10-13 (APP 450); Woody Phillips Depo., Ex. 11 at 125:25—127:9 (APP 690) (Discussing how there was no instance where the NRA requested information from AMc that was not provided.); *Id*. at 135:21—136:22 (APP 693) (Discussing how NRA CFO Phillips could not recall a single instance where he or anyone at the NRA was concerned about the level of detail provided by AMc invoices.).
[61] McLean Depo., Ex. 4 at p. 152:8-154:10 (APP 465).
[62] McLean Depo., Ex. 4 at p. 90:10-13 (APP 450) (the "detail" case was not "custom and usual"); *see also* p.15, 40, 72, 74, 86, 87, 88, 90, 104, 113, 119, 168, 176, 184, 187, 188, 195, 202, 203, 211, 214, 228, 260, 263, 294, 279, 332, 333, 359 (*see* APP 428).
[63] *See, e.g., id*. at 72:23-74:6 (APP 445-446).
[64] *Id*. at p. 212:24-213:6 (APP 480-481) ("I don't have any evidence either to confirm or deny.").
[65] McLean Depo., Ex. 4 at p. 90:10-13 (APP 450) (the "detail" case was not "custom and usual").

"custom and usual in the varying elements of an advertising agency and client relationship."[66] He then speculates as to how that insufficient "detail" *could have been* overcharges. He admits his opinions are based solely on documentation he "saw" (or more accurately, did not see), not necessarily what was happening at the time NRA and AMc were doing business.[67] Accordingly, his conclusions are truly irrelevant, speculative, and could mislead the finder of fact.

What his testimony amounts to is this: regardless of how NRA and AMc agreed to conduct business for 40 years, McLean takes issue with their activities as not being "custom and usual." So, he just assumes that wrongdoing must have occurred. In effect, McLean was directed by the NRA to create a "rabbit trail" analysis based only on speculation and to not only ignore evidence from NRA's own personnel, but to totally isolate himself from actual facts. McLean's opinion is unreliable because it is based on his "subjective belief" and irrelevant because it is not based on the controlling facts of this case.[68] His opinions should be excluded accordingly.

**D. The Court Should Exclude McLean's Opinions in His Supplemental Report.**

Although styled as a "supplement," McLean offers three new opinions on damages and various other opinions based on information he claims to have recently reviewed or reviewed in his belated Supplemental Report. All of his new opinions should be excluded.

1. McLean's Damage Opinion Regarding Excessive Spending Concerning NRATV is Untimely and Unreliable.

First, the NRA seeks to offer McLean's opinion regarding the amount by which the NRA supposedly overpaid for NRATV:

> I have calculated AMc's *excessive spending* based [*sic*] concerning NRATV, based upon data derived from a preliminary review of the recently available NRA Dashboard. The financial damages to the NRA based upon my review of

---

[66] McLean Depo., Ex. 4 at 38:5-9 (APP 437).

[67] *Id*. at 97:3-5 (APP 452).

[68] *See Paz v. Brush Engineered Materials Inc.*, 555 F.3d 383, 388 (5th Cir. 2009) ("The testimony must be 'ground[ed] in the methods and procedures of science' and 'more than subjective belief or unsupported speculation.'").

that data is $39,588,861. It must be noted that this calculation assumes, without endorsing, the data involving the proxy metrics used by AMc.[69]

To reach this conclusion, he relies on what he calls a "cost per view" analysis to compare (a) the amount NRA paid for NRATV to (b) the hypothetical amount that one would have paid for advertisements reaching the same size of audience. He observed that the Dashboard indicates that there were 112,774,390 "Engaged Views" of NRATV between 2015 and 2019, of which 34.7%, or 39,132,713, were paid views on Facebook and Instagram. He notes that the total Facebook and Instagram advertising spend was $1,169,939, which translates to $0.03 per Engaged View ($1,169,939 / 39,132,713 = .03). Therefore, he opines that the total cost to buy 112,774,390 Engaged Views would have only been $3,218,844 (112,774,390 x $0.03). He then added estimated costs of production and an agency fee of 15% each (i.e., $482,827) to determine that the total estimated cost of the production and paid distribution of NRATV should have only been $4,184,498 ($3,218,844 + $482,827 + $482,827) instead of the $44,966,715 the NRA paid AMc. Thus, McLean opines that the total "wasted expenditure" was $40,782,217 ($44,966,715 – $4,184,498).[70]

This opinion must be struck for a numerous reasons. *First*, it is untimely. The Supplemental Report was served over four months after expert reports were due and only days before the close of the discovery period. Supplemental "disclosures are not intended to provide an extension of the deadline by which a party must deliver the lion's share of its expert information."[71] Initial expert disclosures must be "full and complete."[72] Thus, this new damage model should be excluded as untimely.

---

[69] Supplemental Report, Ex. 5 at pp. 2-3 (APP 371-372) (emphasis added).
[70] Supplemental Report, Ex. 5 at pp. 14-16 (APP 383-385); McLean Depo., Ex. 6 at 284:20 – 289:23 (APP 498-500).
[71] *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 571 (5th Cir. 1996).
[72] Fed. R. Civ. P. 26.

*Second*, McLean has not explained how and why his experience as an advertising/marketing consultant and former executive allow him to reach the conclusions he reached regarding damages, and he has not shown that his opinions are supported by reliable sources or sources that are accepted within any particular industry.[73]  He has not explained how a method of charging for video advertisements based on the number of views or interactions an ad receives equates to the amount NRA should have paid for NRATV.  Nor has he connected his experience to the conclusion offered, explained why the experience is a sufficient basis for the opinion, or demonstrated the appropriateness of the application of the experience to the facts.[74]  In other words, he does not explain how his experience as an advertising and marketing consultant renders him qualified to testify about the appropriate costs for creating and running an online streaming video network from the ground up.

Because he seemingly pulled his formula out of thin air, or at best applied a formula that is used in connection with online advertising but not broadcast TV or a streaming network, there is no way to determine whether his calculation can be or has been tested.[75]  There is no way to know whether the theory has been subject to peer review and publication or to determine the known or potential rate of error of a technique or theory when applied.[76]  It is not grounded in any standards and controls, and he offers no insight into whether his technique or theory has been generally accepted in the scientific community.[77]  It is simply too unreliable to be put before the jury.

---

[73] FED. R. EVID. 702, advisory committee's note, 2000 Amends. (noting that if an opinion is based solely or primarily on experience, it "must be grounded in an accepted body of learning or experience in the expert's field.").
[74] *Id*.
[75] *Daubert*, 509 U.S. at 593.
[76] *Id*. at 594.
[77] *Id*.

2. <u>McLean's Damage Opinion Regarding the "Reputational Harm" Is Untimely and Unreliable.</u>

McLean also attempts to offer another new opinion in his Supplemental Report that the NRA has sustained financial damage of over $23 million based upon purported reputational harm:

> I have calculated the reputational harm to the NRA, as a result of a series of NRATV publicity disasters that repeatedly generated negative media impressions. The financial damages to the NRA based upon my calculations is $23,264,593. Measurement of positive or negative media impressions were not captured by the proxy metrics used by AMc.[78]

In support of this opinion, McLean described an unusual and unreliable method he used to quantify the so called "negative publicity" damage. He alleged he searched the internet for "media mentions" of key "negative" words in "media" articles that commented on what he claims are six negative episodes of NRATV programming supervised by AMc between September 2018 and February 2019, which were allegedly harmful to NRA.[79] According to McLean, he collected the "media mentions" by using "Boolean" logic searches for certain key words in media articles he found on the internet. Then, he evaluated or "tagged" each "media mention" about NRA was positive, neutral, or negative.

After he added up the member of "negative" "media mentions," or "negative publicly he says he multiplied that number times a monetary value he calls "Advertising Value Equivalence," or "AVE."[80] AVE is a purported "cost" of purchasing advertising in the media.[81] McLean contends the product of that calculation is a dollar sum, *i.e.*, over $23 million, in damages that he claims the NRA would have had to pay to place *positive* media that could counter-balance the so called "negative publicity."[82]

---

[78] Supplemental Report, Ex. 5 at pp. 2-3 (APP 371-372).
[79] *Id*. at pp. 18-19 (APP 387-388).
[80] *Id*. at p. 20 (APP 389).
[81] *Id*.
[82] *Id*. at pp. 17-21 (APP 386-390).

This opinion must be struck for a numerous reasons.

*First*, it is untimely.[83]  McLean's opinion regarding this purported reputational harm was not disclosed until his Supplemental Report months after the deadline for expert reports and just days before his October 21, 2021 deposition.  As Mr. McLean himself admitted during his deposition, there was nothing preventing the NRA or McLean from disclosing this opinion on June 1, 2021.[84]  When asked why he did not provide this purported analysis and opinion in his original Report, his simple answer was that it was outside the scope of the Report.[85]  All of the information relied upon in forming these reputational damage opinions was available to McLean and/or the NRA and its counsel well before June 1, 2021.  Thus, these untimely opinions must be excluded.[86]

*Second*, McLean relied upon third party sources, whose expertise is unknown, to provide critical information supporting his opinion, the reliability of which is unknown, and that was either not preserved or destroyed.  In his Supplemental Report, McLean represents that in order to make the above calculation, *he* collected by internet search and "categorized" 15,000 "media mentions as either "positive", "neutral", or "negative'."[87]  Of those 15,000 "media mentions," McLean states in his Supplemental Report, "*I identified* over 10,000 negative references to NRATV and its messaging content during this time period – highlighted across television, print, digital media, and social media."[88]  However, neither McLean nor his firm conducted the "negative media mention" analysis.

He admitted in his deposition testimony that the collection of "media" and the subjective evaluation of each "mention" as either "positive," "neutral," or "negative" was conducted by two

---

[83] *Sierra Club*, 73 F.3d at 571.
[84] McLean Depo., Ex. 6 at 326:23-327:19 (APP 509).
[85] McLean Depo., Ex. 6 at 326:23-327:6 (APP 509).
[86] *Sierra Club*, 73 F.3d at 571.
[87] Supplemental Report, Ex, 5 at p. 18 (APP 387).
[88] *Id.* at 21 (APP 390) (emphasis added).

other firms, a "social media listening" company called SentiOne[89] and a media monitoring service called News Exposure:[90]

> Q.      [By Counsel for AMc] You said that you are -- on page 18 there is discussion of the methodology.  You say, "My analysis of media mentions total 15,000 over the period considered."  I guess how did you come up with – how did you analyze the number of media mentions over this particular time period?
>
> A.      *That is the data that SentiOne and News Exposure report in their dashboard."*[91]

Counsel for AMc then pressed for additional information:

> Q.      So as part of this analysis were you – I guess you were given access by SentiOne and – drawing a blank – and News Exposure, you were given access to their dashboards for purposes of your analysis?
>
> A.      Correct.
>
> Q.      Did you capture any of the material that you were given access to?
>
> A.      *We did not.  We took the data and ascribed into the spreadsheets.*[92]

McLean admitted unequivocally that the evaluation of the "media mentions" was not his work, but that of SentiOne:

> Q.      Okay.  Down in Section 3 you say, "I used AI supported sentiment analysis tools to automatically evaluate the words preceding and following these identified keywords."  What AI supported sentiment analysis tools did you utilize?
>
> A.      *That is the SentiOne analysis.*[93]

In short, McLean did not even analyze the "negative publicity." His carefully worded Supplemental Report said he "worked with" SentiOne and News Exposure, but all he did was

---

[89] *See* https://sentione.com
[90] *See* https://www.newsexposure.com
[91] McLean Depo., Ex. 6 at p. 303:2-12 (APP 503) (emphasis added).
[92] *Id*. at p. 303:13-22 (APP 503) (emphasis added).
[93] *Id*. at pp. 310:20 - 311:3 (APP 505) (emphasis added).

scoop up the number of what SentiOne and News Exposure allegedly ascribed as "negative" media statements, plugged that number into a simple multiplication calculation, and served up a $23 million damage calculation.[94]

Experts may rely upon other experts' opinions to form his own opinion, but only if the underlying data or opinion is reliable.[95] Here, however, the value judgments and methods of unknown personnel who decided "media mentions" were negative is not shown in any way to be reliable. Indeed, McLean's report says nothing about the methodologies SentiOne and News Exposure employed. And, McLean apparently did nothing to independently verify the data he obtained from SentiOne and News Exposure. The conclusions of those service providers are nothing more than McLean's *ipse dixit*.[96]

Further undermining McLean's opinion as to "negative publicity" is that he cannot produce any documentation that shows anything about SentiOne's and News Exposure's analyses. After taking McLean's deposition, AMc demanded copies of all information that had been provided to McLean in connection with his opinions, including the notes, call logs, list of search terms, and SentiOne and News Exposure dashboard information he testified about in his deposition.[97] To date, none of that information has been turned over. Why? Despite the clear requirements of the discovery rules regarding experts,[98] McLean admitted he did not retain copies of the data he

---

[94] *Id*. at pp. 303-304 (APP 503).

[95] *See Jacked Up, L.L.C. v. Sara Lee Corp.*, 807 Fed. Appx. 344, 349 (5th Cir. 2020) (testimony from a lost-profits expert who based his analysis on someone else's sales projections was inadmissible since "the expert failed to demonstrate any basis for concluding that another individual's opinion on a subjective financial prediction was reliable, other than the fact that it was the opinion of someone he believed to be an expert who had a financial interest in making an accurate prediction.") (citing *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993)).

[96] *See Paz*, 555 F.3d at 388; *Conn v. C.R. Bard, Inc.*, No. 4:14-CV-298, 2021 U.S. Dist. LEXIS 107523, at *22 (S.D. Tex. Jun. 8, 2021) ("The Court also reiterates that Dr. Allen may not parrot opinions of other experts. This is especially true if he is parroting impermissible hearsay evidence or opinion evidence that has been excluded.").

[97] Ex. 12 (APP 714).

[98] FED. R. CIV. P. 26(a)(2)(B)(ii).

purportedly obtained from the SentiOne and News Exposure "dashboards."[99]   Even more

incredible, although McLean did take notes of data shown on these "dashboards,"[100] he admitted

that he destroyed those notes:

> Q.   Do you have copies of those numbers on the piece of paper?
>
> A.   *I have since destroyed them.*[101]

Thus, there is no way for AMc to scrutinize the data, methods, or reliability of the analysis

performed by SentiOne and News Exposure or for the Court to properly perform its job as

"gatekeeper."[102]

*Finally*, McLean's purported $23 million reputational damage opinion is irrelevant.  The

NRA has not asserted a claim that allows for the recovery of reputational damages based upon the

analysis purportedly conducted by McLean.[103] Expert testimony that does not assist the fact finder

must be excluded.[104]  Moreoever, in his Supplemental Report, McLean said he was opining as to

the "reputational harm" caused by the "negative publicity."[105] However, in his deposition

testimony, he admitted the "negative publicity" evaluation he offered up *is not* a measure of the

"reputational harm:"

> The -- to offset the value of $23 million of negative publicity you would have to
> spend $23 million in positive publicity. The reputational harm is like brand value.
> There are many studies, brand asset valuation, BAV is one of the most known, there
> is another study, brand FX, but there are a number of studies that are undertaken

---

[99] McLean Depo., Ex. 6 at pp. 346:21 – 347:5 (APP 514).

[100] *Id*. at p. 347:6-19 (APP 514).

[101] *Id.*

[102] *See* FED. R. CIV. P. 26(a)(2)(B); *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (The district judge is the gate keeper to ensure testimony is both reliable and relevant.); *ODonnell v. Harris County*, 251 F. Supp. 3d 1052, 1121 (S.D. Tex. 2017) (excluding expert opinion when underlying data was not properly turned over); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("At no stage in this litigation, Biestek says, has he ever espoused 'a free-standing procedural rule under which a vocational expert would always have to produce [her underlying data] upon request.' *That kind of rule exists in federal court: There, an expert witness must produce all data she has considered in reaching her conclusions.*") (internal citations omitted).

[103] *See* ECF 209 at 53.

[104] FED. R. EVID. 702; *Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant . . .") (citations omitted).

[105] Supplemental Report, Ex. 5 at p. 17 (APP 386).

for corporate reputation. Without doing a pre and post study the exact measure would be impossible to predict.[106]

McLean admitted that one would have to perform a "before and after" evaluation of the NRA's reputation in order to calculate so-called reputational harm, but McLean has done no such "before and after" evaluation.[107] The whole "negative publicity" exercise that was "ghost written" for McLean is irrelevant because, as he admitted, "reputational damage" is "impossible to predict" without "before and after" evaluation.[108]

Touching on the subject again later in the deposition, Mclean offered yet another reason why his report could not measure diminution of the NRA's brand value:

> Q.     Are you able to put a dollar amount on the diminution in value of the NRA's brand as a result of these six segments that you have identified?
>
> A.     Without understanding the underlying business and revenue and brand metrics *it would be impossible to do so*.[109]

In sum, McLean's $23 million reputational damage opinions were not timely disclosed, wholly unreliable, and do not in any way assist the fact finder relating to the issues in this case.

### 3.   McLean's Damage Opinion Relating to Media Buys Should be Excluded.

Finally, McLean purports to offer expert testimony that AMc paid above market prices for media buys, which has resulted in $11,863,851 in damages to the NRA.   In his Report, he stated that:

> "The Services Agreement requires that AMc should 'always endeavor to secure the best available rates' for print space, radio and television time, or other media. Despite numerous requests for information regarding this subject, AMc has supplied no evidence to demonstrate that they complied with this obligation or that there were any negotiations with vendors or that they conducted media buying audits."[110]

---

[106] McLean Depo., Ex. 6 at p. 22:12-23 (APP 433).
[107] *Id*. at p. 23:7-9 (APP 433). ("Q. Have you done any sort of before and after analysis of the NRA's brand value?  A. I have not.").
[108] *Id*. at pp. 22:5-25 (APP 433).
[109] *Id*. at p. 326:4-14 (APP 509).
[110] Report, Ex. 4 at pp. 16, 27-32 (APP 301, 312-317).

Then, in the conclusion section of his Supplemental Report, McLean included a line item for "Media Buys - AMc's Payment of Rates Above Market Prices," and opines that NRA was damaged by overpriced media buys in the amount of $11,863,851.[111]   However, he offers no factual basis for this opinion.

He first refers to this purported issue in his original Report.[112]   There, McLean claims that these so-called payments above market rates were calculated by him when he reviewed "over 50 third-party media invoices and did not identify any discounts being offered to NRA for media purchased through AMc."[113]  He also claims he "reviewed 21 invoices for media purchases from FOX News and FOX Business News. Based on my analyses, AMc's rates were higher than the norm."[114]   Then, based upon the review of these 71 invoices, McLean concludes that "discounts" should have been provided, but were not provided, for "media buys."[115]

Without any analysis, but by dropping a footnote stating only that he relies upon on his original Report, McLean inserted an $11,863,851 damage number with other damage numbers into a chart in summary section of the Supplemental Report.[116]   His opinion is based, in part, on the fact that he did not see any evidence of discounts on media vendor invoices sent to the NRA.[117] Yet, he did not discuss the issue with anyone to determine whether negotiations took place or discounts were applied.[118]  Indeed, the foundation of McLean's conclusion fails when he admits he has no idea if AMc did in fact obtain media discount:

> *It is possible that volume media discounts were obtained by AMc and not disclosed to the NRA.*  'Agencies often don't disclose or pass along to their client's rebates

---

[111] Supplemental Report, Ex. 5 at p. 23 (APP 392).
[112] Report, Ex. 4 at p. 28 (APP 313).
[113] *Id*. at p. 31 (APP 316).
[114] *Id.*
[115]  *Id*. p. 28 (APP 313).
[116] Supplemental Report, Ex. 5 at p. 23 (APP 392).
[117] McLean Depo., Ex. 6 at 233:5-25 (APP 486).
[118] *Id*. at p. 234:1-20 (APP 486).

(also known as agency volume bonuses, or AVBs) they receive from media companies.'" (Emphasis added)[119] [citing in n. 96, an internet link].[120]

McLean's alleged analysis is not only without foundation, but is pure speculation.

    4.   <u>The Rest of the Opinions in McLean's Supplemental Report Should Be Excluded Too.</u>

In his Supplement Report, McLean offers additional thoughts and opinions that the Court should exclude. For example, McLean attempts to bolster his "opinions" by referring to six reports issued by another "expert," Forensic Risk Alliance (FRA), which AMc has separately moved to strike due to the fact that they were prepared in anticipation of litigation.[121] McLean says he was provided these reports shortly before the issuance of his October 18, 2021 Supplemental Report.[122]

McLean affirms he has "reviewed" FRA's reports where he says in his Supplemental Report: "FRA appears to have confronted many of the same problematic issues that I outlined in my Initial Report regarding media buys and AMc's lax expense controls."[123] However, McLean simply accepts, without any qualification, all of the alleged expert opinions asserted by FRA and parrots them as if they are his own. He does not demonstrate why FRA's findings are reliable. Further, although his Supplemental Report adopts FRA's observations, he testified he has not attempted to "validate" anything in those reports since he just received them a "few days ago."[124]

---

[119] Report, Ex. 4 at p. 31 (APP 316).
[120] This link is to a website to purchase a purported "report" respecting the "U.S. media market," but the purported report has not been offered to AMc for analysis. *See* https://www.ana.net/content/show/id/industry-initiative-media-transparency-report
[121] ECF 438; *see* FED. R. EVID. 804, Notes of Advisory Committee on 2014 amendments. [Subdivision (6)]; *see, e.g.*, *Broad. Music, Inc. v. Xanthas, Inc.*, 855 F.2d 233, 238 (5th Cir. 1988); *Brauninger v. Motes*, 260 F. App'x 634, 637 (5th Cir. 2007); *Palmer v. Hoffman*, 318 U.S. 109, 111-14 (1943).
[122] Curiously, many of the issues in his Report come almost verbatim from the draft FRA reports, even though he claims he had not seen the reports at the time of his original Report.
[123] Supplemental Report, Ex. 5 at pp. 2, 8 (APP 371, 377).
[124] McLean Depo., Ex. 6 334:13-21 (APP 511) (Q. Did you do anything to validate the information that is reflected in these -- this FRA report? *** A. As I repeatedly stated the FRA material was only made available to me a few days ago."); s*ee Paz*, 555 F.3d at 388; *Conn*, 2021 U.S. Dist. LEXIS 107523, at *22 ("The Court also reiterates that Dr. Allen may not parrot opinions of other experts. This is especially true if he is parroting impermissible hearsay evidence or opinion evidence that has been excluded.").

In fact, they are not reliable or admissible, as they were explicitly prepared in anticipation of litigation, not properly disclosed, and should not otherwise be considered as any purported evidence in this case.[125] In view of his Supplemental Report being partially based on FRA's reports, McLean's opinions are not credible, they are speculative, unreliable, and should be excluded.[126]

## IV.    PRAYER

For these reasons, Defendants respectfully request the Court to grant their Motion to Exclude Certain Opinions of the NRA's Expert, Andrew McLean, and grant all such other relief, at law or in equity, to which they may be justly entitled.

---

[125] Defendants refer the Court and incorporate by reference its Motion to Strike the NRA's Summary Judgment Evidence (ECF 438) and Supplemental Joint Status Report on its Motion to Compel FRA Documents (ECF 403).
[126] *Paz*, 555 F.3d at 388 ("[A]ny step that renders the analysis unreliable . . . renders the expert testimony inadmissible.").

Dated: January 3, 2022.

Respectfully submitted,

*/s/ Brian E. Mason*

**Brian E. Mason, Esq.**
Texas Bar No. 24079906
mason.brian@dorsey.com
**G. Michael Gruber, Esq.**
Texas Bar No. 08555400
gruber.mike@dorsey.com
**Jay J. Madrid, Esq.**
Texas Bar No. 12802000
madrid.jay@dorsey.com
**J. Brian Vanderwoude, Esq.**
Texas Bar No. 24047558
vanderwoude.brian@dorsey.com
**DORSEY & WHITNEY LLP**
300 Crescent Court, Suite 400
Dallas, Texas 75201
(214) 981-9900 Phone
(214) 981-9901 Facsimile

**ATTORNEYS FOR DEFENDANT/COUNTER-PLAINTIFF ACKERMAN MCQUEEN, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on January 3, 2022, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

*/s/ Brian E. Mason*
BRIAN E. MASON