Alex **IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| *Plaintiff and Counter-Defendant*, | § § § | |
| **v.** | § § | **Case No. 3:19-cv-02074-G** |
| **ACKERMAN MCQUEEN, INC.,** | § § § | |
| *Defendant and Counter-Plaintiff*, | § § § | |
| **and** | § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, AND MELANIE MONTGOMERY** | § § § § | |
| *Defendants*. | § | |

## DEFENDANTS' RESPONSE TO NRA'S OBJECTIONS TO, AND MOTION TO STRIKE, SUMMARY JUDGMENT EVIDENCE

**TABLE OF CONTENTS**

**Contents**

I.      INTRODUCTION .............................................................................................5

II.     ARGUMENTS AND AUTHORITIES................................................................7

    A.      The NRA's Objections to the Winkler Declaration Should Be Overruled. .............7

    B.      The Jackson Report is Proper Summary Judgment Evidence. ............................10

        1.      The NRA's About-Face on Unsworn Expert Reports; the Jackson Report is Admissible.................................................................10

        2.      The Jackson Report Comports with Federal Rule of Evidence 702. .........13

    C.      The Parol Evidence Rule Either Does Not Apply or Does Not Bar AMc's Evidence................................................................................21

    D.      AMc's Other Cited Evidence is Admissible.......................................................24

III.    CONCLUSION...............................................................................................26

# TABLE OF AUTHORITIES

## Cases

*Akin v. Q-L Invest, Inc.*, 959 F.2d 521 (5th Cir. 1992) ................................. 10

*Arizpe v. Principal Life Ins. Co.*, 398 F. Supp. 3d 27 (N.D. Tex. 2019) ...................................... 12

*Bakhico Co. v. Shasta Bevs., Inc.*, No. 3:94-CV-1780-H, 1998 U.S. Dist. LEXIS 598 (N.D. Tex. Jan. 15, 1998) .................................................................................................... 8

*Centex Constr. v. Acstar Ins. Co.*, 448 F. Supp. 2d 697 (E.D. Va. 2006).................................... 21

*Connelly v. Blot*, No. 1:16cv01282 (AJT/JFA), 2017 U.S. Dist. LEXIS 127410 (E.D. Va. Aug. 9, 2017)............................................................................................................................... 21

*De Young v. Dillon Logistics, Inc.*, No. 6:19-cv-00527, 2021 U.S. Dist. LEXIS 22349 (E.D. Tex. Feb. 5, 2021)................................................................................................................. 11

*Doe v. Russell Cty. Sch. Bd.*, No. 1:16CV00045, 2018 U.S. Dist. LEXIS 32085 (W.D. Va. Feb. 28, 2018)........................................................................................................................ 25

*Drake v. Franklin Equip. Co. (In re Franklin Equip. Co.)*, 418 B.R. 176 (Bankr. E.D. Va. 2009) .................................................................................................................................. 23

*Elyria-Lorain Broad. Co. v. Lorain Journal Co.*, 298 F.2d 356 (6th Cir. 1961)......................... 24

*Fehr v. Sus-Q- Cyber Charter Sch.*, No. 4:13-cv-01871, 2015 U.S. Dist. LEXIS 142187 (M.D. Pa. Oct. 20, 2015).................................................................................................... 25

*Harper v. Griggs*, No. 04-260-C, 2007 U.S. Dist. LEXIS 10395 (W.D. Ky. Feb. 12, 2007) ...... 24

*Highland Cap. Mgmt. L.P. v. Bank of Am., N.A.*, 3:10-CV-1632-L, 2013 U.S. Dist. LEXIS 119935 (N.D. Tex. Aug. 23, 2013) ......................................................................... 12

*House v. Players' Dugout, Inc.*, No. 3:16-cv-00594-RGJ, 2021 U.S. Dist. LEXIS 202789 (W.D. Ky. Oct. 20, 2021)................................................................................................... 24

*Huawei Techs. Co. v. Huang*, No. 4:17-CV-00893, 2019 U.S. Dist. LEXIS 94702 (E.D. Tex. Jun. 6, 2019)................................................................................................................ 14, 18, 19

*Nationwide Agribusiness Ins. Co. v. Deere & Co.*, No. 4:19-cv-00425-O, 2020 U.S. Dist. LEXIS 255277 (N.D. Tex. Sept. 22, 2020) ......................................................................... 11

*Ningbo Bonny Decorative Material Co. v. E. Sys.*, No. 1:17-CV-114-DMB-DAS, 2020 U.S. Dist. LEXIS 49649 (N.D. Miss. 2020) ..................................................................... 15, 16

*Paterno Imports v. McBee*, 159 B.R. 461 (Bankr. E.D. Va. 1993)............................................. 23

*Price v. Taylor*, 466 S.E.2d 87 (Va. 1996) .................................................................. 21

*Rx.com Inc. v. Hartford Fire Ins. Co.*, 426 F. Supp. 2d 546 (W.D. Tex. 2006) .............. 16, 18, 19

*SEC v. Lifepay Grp., LLC*, No. H-18-1098, 2020 U.S. Dist. LEXIS 45884 (S.D. Tex. 2020) ........ ..................................................................................................................... 15, 19

*SEC v. Seghers*, 298 F. App'x 319 (5th Cir. 2008) ........................................................ 15

*SimpleAir, Inc. v. Google Inc.*, No. 2:14-CV-11, 2015 U.S. Dist. LEXIS 135915 (E.D. Tex. Oct. 5, 2015)......................................................................................................... 19, 20

*Smith v. Palafox*, 728 Fed. App'x 270 (5th Cir. 2018) ................................................. 11

*Viterbo v. Dow Chem. Co.,* 826 F.2d 420 (5th Cir. 1987) ...................................... 19, 20

*WWP, Inc. v. Wounded Warriors Family Support, Inc.*, 628 F.3d 1032 (8th Cir. 2011)........ 13, 14

**Rules**

FED. R. CIV. P. 32 .......................................................................................................... 24

FED. R. CIV. P. 56 .......................................................................................................... 11

FED. R. EVID. 611 .......................................................................................................... 24

FED. R. EVID. 702 .................................................................................................... 18, 19

Defendant/Counter-Plaintiff Plaintiffs Ackerman McQueen, Inc. ("*AMc*"), Defendants Mercury Group, Inc. ("*Mercury*"), Henry Martin ("*Martin*"), William Winkler ("*Winkler*"), and Melanie Montgomery ("*Montgomery*") (collectively, "*Defendants*"), file this, their *Response to NRA's Objections to, and Motion to Strike, Summary Judgment Evidence* (the "*Response*" to "*Motion*").

## I.    INTRODUCTION

On December 20, 2021, the NRA filed its Motion objecting to and seeking to strike several broad categories of evidence cited by Defendants in support of their *Motion for Partial Summary Judgment* ("*MSJ*").[1] The NRA's Motion should be denied in its entirety because each of the NRA's arguments is legally and factually flawed.

*First*, the NRA objects to the November 29, 2021 declaration of AMc's Chief Financial Officer, William Winkler ("*Winkler Declaration*")—which extensively describes and supports AMc's damages for its breach of contract counterclaim—as improper summary judgment evidence. The NRA claims, wrongly, that the Winkler Declaration is conclusory and lacking in personal knowledge. While the NRA cherry-picks certain statements in the Winkler Declaration and claims they are conclusory or lacking in personal knowledge, a full review of these statements—in the full context in which they are given—shows that the Chief Financial Officer of AMc for more than 30 years possesses full personal knowledge of the events he describes and is not making impermissible conclusory statements.

*Second*, the NRA attacks the admissibility of the amended expert report of Dan Jackson, CPA ("*Jackson Report*"), contending it is both "unsworn" and fails under Federal Rule of Evidence 702.  The NRA's argument that it is unsworn lacks any merit, and irrespective, the

---

[1] *See* ECF 434, 435.

Jackson Report is still admissible as AMc represents that Jackson is available to testify at trial and can further authenticate his report and opinions then. Also, the NRA had the chance to, and did, depose Jackson after receiving the Jackson Report. Incredulously, however, the NRA now contends that the Jackson declaration cannot salvage the unsworn Jackson Report despite making the exact same argument, when the shoe was on the other foot, with respect to the unsworn Brian Buss expert report ("***Buss Report***") in the last round of summary judgment briefing when AMc moved to strike the Buss Report. Additionally, the NRA's assertion that the Jackson Report contains nothing more than "mere arithmetic" and is therefore unqualified under Rule 702 grossly mischaracterizes the Jackson Report and Jackson's role with respect to his expert testimony in this case. In fact, the Jackson Report describes his detailed methodology in analyzing the evidence relating to the termination of the Services Agreement and AMc's damages, conducting a detailed analysis based upon his 45 years of experience in providing consulting services in accounting, finance, and economics-related issues to form his opinions as to the amounts of AMc's damages, and then presenting his findings into an easy, digestible format, which will greatly ease the trier of fact's role in understanding AMc's damages.

*Third*, the NRA quibbles with four statements within AMc's MSJ as violating Virginia's parol evidence rule. Despite citing mostly Texas federal cases, the NRA's parol evidence arguments are unavailing. Indeed, at least one of these statements was offered as evidence rejecting the NRA's fraud claim, to which the parol evidence rule obviously does not apply. The other statements cannot remotely be seen as contradicting or varying the *terms* of the Services Agreement, as the Services Agreement lacks terms relating to invoicing that the NRA continues to imagine exist.

*Finally*, the NRA's general objections to certain evidence throughout AMc's MSJ also fail and should be overruled. The NRA lists these objections in an appendix attached to its Motion as Exhibit A. AMc responds and rebuts each of these allegations in Exhibit A-1, which is being filed contemporaneously with this Response as part of Defendants' Appendix in support of their Response.

## II.    ARGUMENTS AND AUTHORITIES

### A.    The NRA's Objections to the Winkler Declaration Should Be Overruled.

The NRA contends the Court should strike the Winkler Declaration because certain of its assertions are either (1) conclusory, or (2) "lack any indicia that they were made based upon personal knowledge."[2]

*First*, the NRA claims Winkler's statement—"All of the services performed as part of the Unpaid Invoices was approved by the NRA pursuant to the terms of the Services Agreement"[3]—is conclusory and lacking in personal knowledge.[4] The NRA does not explain how or why. Yet, Winkler provides context and facts supporting his knowledge elsewhere in the declaration. For example, Winkler stated that all of the Unpaid Invoices were "transmitted" to the NRA, either to Craig Spray, Rick Tedrick, Lisa Supernaugh, and/or Duane Reno through email.[5] Further, he explained his lack of awareness that the NRA ever challenged these invoices within the 10-day notice period,[6] which, according to the Services Agreement that Winkler attached to his declaration, gives the NRA 10 days to question received invoices.[7] Also, Winkler stated he has been AMc's CFO for thirty years and under his "authority . . . AMc invoices are produced and

---

[2] ECF 435, at 2.
[3] ECF 419-1, at Ex. 35, Winkler Decl., dated Nov. 29, 2021, at ¶ 16 (APP 2367) [hereinafter Winkler Declaration].
[4] ECF 435, at 3.
[5] Winkler Declaration, at ¶ 19 (APP 2368).
[6] *Id.* at ¶ 21 (APP 2369).
[7] ECF 419-1, at Ex. 35-A, Services Agreement, § III.E (APP 2382).

delivered to the [NRA]."[8] Moreover, the NRA itself has referred to Winkler as being one of AMc's key representatives in AMc's relationship with the NRA,[9] and has taken his deposition in various capacities on numerous occasions.[10] He has repeatedly testified in depositions, at the NRA's bad faith bankruptcy trial, and in declarations as to his personal knowledge about both AMc's relationship with the NRA, the facts and circumstances surrounding the termination of the parties' nearly 40-year relationship, and AMc's damages arising out of same.[11]

*Second*, the NRA contends the statement in paragraph 28—"All of the Legal Fees submitted to the NRA were incurred as a result of the activities that AMc performed on behalf of the NRA pursuant to the Services Agreement or that were otherwise requested or approved by the NRA"— is "conclusory" and "presented without any analysis" on whether NRA is responsible for AMc's incurring these Legal Fees.[12] To the contrary, however, in paragraphs 26-29, Winkler testifies in detail as to his analysis and reasoning for this statement. He testified that he understands the NYAG's investigation into AMc stems from work the NRA approved AMc to perform, which prompted the NYAG to file suit against the NRA.[13] As to the Loesch Arbitration, Winkler stated that AMc incurred fees by having to defend itself in arbitration brought by Loesch over payment of fees that the NRA was supposed to pay for as a "Talent Fee."[14] Further, Winkler testified about

---

[8] Winkler Declaration, at ¶ 1 (APP 2364). *See also Bakhico Co. v. Shasta Bevs., Inc.*, No. 3:94-CV-1780-H, 1998 U.S. Dist. LEXIS 598, at *8-9 (N.D. Tex. Jan. 15, 1998) (citing case and quoting, in parenthetical, that "an official title alone is enough to indicate the basis of personal knowledge when, as here, that title clearly identifies the official's sphere of responsibility and the facts stated in the affidavit are within that sphere").

[9] *See, e.g.*, ECF 314 at 3, 42, 48.

[10] *See generally* ECF 419-1, at Ex. 1, AMc Depo. (Winkler as Corporate Representative), dated Mar. 26, 2021 (APP 1-65); Ex. 2, Winkler Depo. (APP 66-78); ECF 422, Ex. 84, AMc Depo. (Winkler, in part, as Corporate Representative), dated Aug. 4, 2021 (APP 2718-2785).

[11] *See, e.g.*, ECF 419-1, at Ex. 1, AMc Depo. (Winkler as Corporate Representative) (APP 1-65); Ex. 2, Winkler Depo. (APP 66-78); ECF 419-1, at Ex. 3, Winkler Hr'g Tr. (APP 79-297) (bankruptcy trial); Ex. 35, Winkler Declaration (APP 2364-76) (AMc's damages); ECF 141, at Ex. A, Winkler Declaration (APP 1-10) (October 11, 2018 meeting and February 2019 FRA audit, among other topics).

[12] ECF 435, at 3.

[13] Winkler Declaration, at ¶¶ 26-29 (APP 2370-71).

[14] *Id.* at ¶ 27 (APP 2370).

the undisputed fact that the Loesch contract was expressly defined as an AMc-Third Party NRA

Contract in the Services Agreement and its 2018 Amendment.[15]

*Third*, the NRA claims Winkler's statement related to Terminated Expenses is unsupported

and lacks indicia of personal knowledge. Once again, the content surrounding the NRA's cherry-

picked statement refutes the NRA's claim. For example, following the NRA's complained-of

sentence, Winkler's next sentence provides facts supporting his testimony: "For example, as a

result of the termination of the Services Agreement, AMc was forced to terminate three different

leases that were used for the NRA's benefit as part of the Services Agreement. Specifically, the

leases were located in Alexandria, Virginia; Dallas, Texas (Suite 1800); and Colorado Springs."[16]

Furthermore, contrary to the NRA's claim that Winkler provided no detail about these leases,

Winkler explained their term lengths and that AMc was still responsible for the Colorado Springs

lease through June 2022 and for the Dallas office lease through May 2023. He also explained

AMc's attempt to sublease these spaces, which had proved unsuccessful thus far.[17] Winkler also

explained that AMc entered these leases on the NRA's behalf, and he referenced pages 18-25 of

the Jackson Report, which explain Jackson's understanding that AMc entered into these

agreements to "fulfill its obligations as set forth in the Services Agreement."[18] Further, with

respect to the Colorado Springs office, Jackson stated that "employees working at this location

were dedicated to fulfilling AMc's obligations to the NRA per the Services Agreement."[19] Winkler

extensively reviewed all of the Jackson Report's findings and adopted those findings as his own.[20]

---

[15] *Id.*
[16] Winkler Declaration, at ¶ 32 (APP 2374).
[17] Winkler Declaration, at ¶ 32 (APP 2374).
[18] Winkler Declaration, at ¶ 32 (APP 2374); ECF 417, at Ex. 35-H, Jackson Report, at ¶ 47 (APP 2451).
[19] ECF 417, at Ex. 35-H, Jackson Report, at ¶ 51 (APP 2452-53).
[20] Winkler Declaration, at ¶ 14 (APP 2366).

*Finally*, the NRA suggests Winkler's statement that AMc entered the AMc Third-Party NRA Contracts "at the express direction and approval of the NRA" is an unsupported statement because Winkler does not identify who at the NRA provided this direction. Yet, Winkler attached a copy of the Services Agreement and the 2018 Amendment, the latter which expressly acknowledges that AMc entered these contracts on the NRA's behalf: "For all non-cancellable contracts entered into between AMc and third parties *for the benefit of the NRA* (herein "AMC-Third Party NRA Contracts)."[21] Winkler also stated this exact point in paragraph 34 of his declaration.[22]

In sum, Winkler has been the CFO of AMc for over 30 years.  He has been involved with the NRA's account for decades, and made clear that AMc's invoices are prepared, produced, and delivered, to the NRA. Winkler has personal knowledge of each of the facts in the Winkler Declaration, and thus, each of the NRA's objections to his declaration should be overruled.[23]

### B.    The Jackson Report is Proper Summary Judgment Evidence.

#### 1.    The NRA's About-Face on Unsworn Expert Reports; the Jackson Report is Admissible.

The NRA first contends the Jackson Report is inadmissible summary judgment evidence because Jackson's statement in his declaration that the report is a true and correct copy is insufficient authentication.[24] Notably, when the parties submitted their first round of summary judgment briefs and AMc attacked the admissibility of the NRA's expert reports, the NRA

---

[21] Winkler Declaration, Ex. B, 2018 Amendment, at § 3 (APP 2388).
[22] Winkler Declaration, at ¶ 34 (APP 2375).
[23] The NRA objections to a handful of sentences in four paragraphs out of Winkler's 38-paragraph-long declaration (¶¶ 16, 28, 32, 35), but concludes the entire Winkler declaration must be struck. *See* ECF 435, at 3-4. To the extent these paragraphs are determined incompetent, only those statements, and not the entire declaration, ought to be struck. *Akin v. Q-L Invest, Inc.*, 959 F.2d 521, 531 (5th Cir. 1992) ("On a motion for summary judgment, the district judge should disregard only those portions of an affidavit that are inadequate and consider the rest.").
[24] ECF 435, at 5.

confidently stated the Buss Expert Report was admissible now that Mr. Buss signed a sworn declaration authenticating his report. [25] Just like the current Jackson Declaration, the Buss Declaration stated: "I am advised by Counsel that the [Buss Export] Report was filed by the NRA in the Action as Exhibit 50 . . ." and "I hereby attest and confirm that the copy of the Report filed by the NRA as Exhibit 50 is a ***true and correct*** copy of the original Report that I delivered to Counsel . . . ."[26]

In any event, even if Jackson's sworn declaration cannot serve to properly authenticate his expert report, the expert report is still admissible. "[A]n unsworn expert report may be considered at summary judgment where the opinions therein are otherwise adopted or reaffirmed in an admissible affidavit or deposition testimony by the expert."[27] Here, the NRA had the chance to depose Jackson following the Jackson Report, and examined him on the substance of his report.[28]Additionally, "[i]n the Fifth Circuit a district court may consider unsworn expert reports if the proponents provide a method for presenting them as admissible evidence."[29] The substance of the Jackson Report can be authenticated at trial where Jackson will be available as a witness.[30] Jackson has again sworn that he will be available to testify at trial and as to the authenticity and contents of his report.[31] This explanation of the anticipated form of the admissibility of the Jackson

---

[25] ECF 350, at 4.

[26] ECF 351, at Ex. G-5, Buss Decl., at ¶¶ 3-4 (APP 62).

[27] *Nationwide Agribusiness Ins. Co. v. Deere & Co.*, No. 4:19-cv-00425-O, 2020 U.S. Dist. LEXIS 255277, at *12 n.2 (N.D. Tex. Sept. 22, 2020).

[28] *See* ECF 422, at Ex. 50, Jackson Depo., at 100:12-111:19 (APP 1500-03), 113:2-135-25 (APP 1504-09).

[29] *De Young v. Dillon Logistics, Inc.*, No. 6:19-cv-00527, 2021 U.S. Dist. LEXIS 22349, at *11 (E.D. Tex. Feb. 5, 2021); *see also* FED. R. CIV. P. 56(c), Notes of Advisory Committee on 2010 Amendments (indicating that the proponent of the evidence has the burden to explain how the evidence is admissible "***or to explain the admissible form that is anticipated***") (emphasis added); *Smith v. Palafox*, 728 Fed. App'x 270, 275-76 (5th Cir. 2018) (explaining that a district court did not err in excluding an unsworn expert report where the proponent failed to explain "how the reports could be reduced to admissible evidence at trial").

[30] *See De Young*, 2021 U.S. Dist. LEXIS 22349, at *11 ("[T]he plaintiffs have satisfied their burden by proposing that the experts will testify at trial to their reports. The court is satisfied that the expert reports can be presented in a form that would be admissible.").

[31] Ex. B, Jackson Decl, dated Jan. 10, 2020, at ¶ 10 (APP 60).

Report distinguishes this case from the NRA's two cited cases, which did not involve instances where the proponent of the unsworn expert report provided an anticipated form of admissibility for unsworn expert reports.[32]

As Judge Lindsay noted in *Highland Capital Management*, the Court has discretion to permit a party "the opportunity to cure the deficiency" in its unsworn expert report.[33] While the Court of course is "not obligated to do so,"[34] AMc requests, in the alternative of the above arguments, an opportunity to cure its declaration proving up the Jackson Report. Indeed, good cause exists to permit AMc this opportunity. As noted above, the NRA previously took the position in its prior response to AMc's motion to strike the NRA's expert reports that a sworn declaration from Mr. Buss was sufficient to salvage the unsworn Buss Report. Indeed, the Buss Declaration was functionally identical to the current Jackson Declaration.[35] While the change in this case's pre-trial schedule resulted in a new round of summary judgment briefing,[36] the NRA now asks the Court to apply a standard to AMc that the NRA claimed did not apply to its own unsworn expert reports before. The NRA ought not to profit from these "hide-the-ball" tactics.

---

[32] ECF 435, at 5-6, n. 22-23 (citing *Highland Cap. Mgmt. L.P. v. Bank of Am., N.A.*, 3:10-CV-1632-L, 2013 U.S. Dist. LEXIS 119935, at *9-19 (N.D. Tex. Aug. 23, 2013) and *Arizpe v. Principal Life Ins. Co.*, 398 F. Supp. 3d 27, 48-49 (N.D. Tex. 2019)).

[33] *Highland Cap. Mgmt. L.P.*, 2013 U.S. Dist. LEXIS 119935, at *17.

[34] *Id.*

[35] *Compare* ECF 351, at Ex. G-5, Buss Decl., at ¶¶ 1-4 (APP 61-62) (including Buss's statements that he (i) delivered his report to the NRA, (ii) has been advised the NRA attached his report as Exhibit 50 to its summary judgment motion, (iii) that he confirms his report as Exhibit 50 is "true and accurate," and (iv) that he declares under penalty of perjury that his declaration is true and correct), *with* ECF 419-1, at Ex. 36, Jackson Decl., at ¶¶ 1-5 (APP 2586-87) (including Jackson's statements that (i) he delivered his report to AMc, (ii) that he has been advised AMc is filing his report as Exhibit 35-H to AMc's summary judgment motion, (iii) that he confirms the copy of his report as Exhibit 35-H is "true and correct," and (iv) that he declares under penalty of perjury that his declaration is true and correct).

[36] *See* ECF 358, Amended Scheduling Order (resetting the trial date for March 7, 2022 and setting new deadline of November 29, 2021 for summary judgment motions and briefing).

## 2.      The Jackson Report Comports with Federal Rule of Evidence 702.

The NRA also attacks the admissibility of the Jackson Report on the basis that is conclusory, lacks independent analysis (since Jackson allegedly performed only "basic arithmetic"), contains impermissible *ipse dixit*,[37] and violates Federal Rule of Evidence 702 because it is not helpful to the trier of fact and should therefore be inadmissible.[38]  Each of the NRA's positions is without merit—the NRA's objections go to the weight of Jackson's opinions, not its admissibility.

Dan Jackson is a CPA whose expert testimony has been presented in many Texas Federal Courts to analyze and distill voluminous evidence related to financial transactions into a report to assist the trier of fact to understand the damage AMc has incurred as a result of the NRA's wrongful actions. He has done that here in the Jackson Report.[39] Jackson used his expertise as a CPA, relying on hundreds of documents (*see* Amended Appendix 3 to Report) and interviews with AMc representatives, to analyze and calculate AMc's damages in 15 spreadsheets[40] in order to assist the trier of fact in determining AMc's damages.[41] Similarly, and as discussed in more detail below, Jackson relied on various pieces of documentary evidence detailing work AMc performed for the NRA that had not been paid, various leases, AMc's books and records, employment related documents, tax documents, and other evidence to form his opinions as to AMc's entitlement to damages in relation to the termination of the relationship between the NRA and AMc.[42] In other

---

[37] ECF 435, at 7.
[38] *Id.*
[39] ECF 417, at Ex. 35-H, Jackson Report (APP 2434-2509).
[40] *See* ECF 417, at Ex. 35-H, Jackson Report, at Exs. 1-9 (APP 2495-2509) (including 15 separate spreadsheets of damages throughout 9 different exhibits).
[41] *Id.*
[42] *See WWP, Inc. v. Wounded Warriors Family Support, Inc.*, 628 F.3d 1032, 1040 (8th Cir. 2011) ("Forensic accountants routinely rely, 'surely to no one's surprise, on the books and records and financial information . . . provided.'").

words, the Jackson Report is not simply *ipse dixit*, but, as detailed below, based upon a thorough review of the underlying damage AMc's has incurred as a result of the NRA's wrongful breach of the Services Agreement.

> a.   *The AMc invoices the NRA has refused to pay.*

The NRA's initial objection to the Jackson Report is based upon the undisputed fact that AMc performed millions of dollars of work for the NRA pursuant to the Services Agreement that the NRA has refused to pay. The NRA contends that Jackson simply added up some numbers under the "veneer of expertise,"[43] which the NRA claims is impermissible. Yet, Jackson's opinions on the NRA's nonpayment of AMc's approved invoices is perfectly admissible.

Here, Jackson analyzed each of the unpaid invoices and conferred with AMc representatives in order to formulate an opinion as to whether AMc should be entitled to payment for each invoice, calculated AMc's total damages with respect to the unpaid invoices, and then prepared summary findings in order to assist the trier of fact.  Contrary to the NRA's implications that calculations must be complex to qualify as expert opinions, "[t]here is not, as [the NRA] suggests, an implicit requirement in Federal Rule of Evidence 702 for the proffered expert to make complicated mathematical calculations."[44] Furthermore, [c]ourts in this circuit, in fact, regularly allow expert witnesses, in a myriad of circumstances, to engage in simple calculations to develop their expert opinions."[45]

Here, as discussed above, Jackson provided a detailed summary and analysis of the relationship between the parties, analyzed the unpaid invoices, made a determination as to whether he believes those unpaid invoices are due and owed, plus interest, from the NRA to AMc based

---

[43] ECF 435, at 8.
[44] *Huawei Techs. Co. v. Huang*, No. 4:17-CV-00893, 2019 U.S. Dist. LEXIS 94702, at *10 (E.D. Tex. Jun. 6, 2019) (citing *WWP, Inc.*, 628 F.3d at 1040).
[45] *Id.*

upon the unpaid invoices.[46] In other words, Jackson's analysis and conclusions were far from simple arithmetic, and the factual statements and evidence relied upon is simply "included for the purpose of setting the foundation for his opinions."[47]

Moreover, the case law the NRA cites is either inapplicable or distinguishable from the facts and circumstances here. For example, the NRA cites *S.E.C. v. Lifepay Group, LLC*,[48] for the proposition that "because purported expert's chart consisted of totaling deposits and withdrawals involved in the underlying transactions, she did not qualify as an expert." [49] *Lifepay* is distinguishable because the "chart" at issue there only added up deposits and withdrawals and did not calculate interest.[50] More importantly, *Lifepay* has no application in this case because the allegedly objectionable chart and testimony **were not excluded. Rather, the chart and testimony were in fact admitted** in spite of the defendant's motion to strike.[51] Similarly, the NRA relies upon, *S.E.C. v. Seghers*,[52] but the court in *Seghers* upheld the admission of the expert's opinions and testimony over objections. Here, Jackson's opinions relating to the unpaid invoices are just one portion of his overall opinions relating to the damages AMc sustained as a result of the NRA's termination of the Services Agreement.[53]

Only two cases cited by the NRA held that certain damages expert opinions were excluded and only because the reports performed basic arithmetic and were therefore "not helpful the trier

---

[46] ECF 417, at Ex. 35-H, Jackson Report, at ¶¶ 10-44, 83-84 (APP 2439-50, 2463-64); *see also*, ECF 422, at Ex. 50. Jackson Depo., at 91:22-92:16 (APP 1498).

[47] *See Ningbo Bonny Decorative Material Co. v. E. Sys.*, No. 1:17-CV-114-DMB-DAS, 2020 U.S. Dist. LEXIS 49649, at *9 (N.D. Miss. 2020).

[48] No. H-18-1098, 2020 U.S. Dist. LEXIS 45884, at *14 (S.D. Tex. Feb. 26, 2020).

[49] ECF 435, at 8 n. 32.

[50] *Lifepay Grp. LLC*, 2020 U.S. Dist. LEXIS 45884, at *13.

[51] *See id.* at *14-15.

[52] 298 Fed. App'x 319, 326 (5th Cir. 2008)

[53] Although Defendants do not concede that Jackson's opinions relating to the unpaid invoices are simple summary charts, Jackson's opinions relating to the unpaid invoices and his chart relating to same are still admissible as summary evidence. *See Lifepay*, 2020 WL 1259328, at *14; *Seghers*, 298 F. App'x at 326.

of fact."[54] These cases are not applicable. The facts in *Rx.com Inc.* are materially different from what is presented by the Jackson Report. In that case, the Court excluded arithmetic calculations of a legal assistant who appears to have performed a single simple arithmetic calculation for interest.[55] Similarly, in the *Ningbo Bonny* case, the court determined that simply taking total sums of numbers included in prior sections of a report would not be helpful to the jury.[56]

As discussed above, the opinions set forth in the Jackson Report were based upon Jackson's expert analysis of the invoices that he used to organize and form an expert opinion relating to AMc's damages that will aid the trier of fact.

b.   *The leases AMc was forced to terminate.*

The NRA objects to the terminated lease analysis in the Jackson Report claiming it "simply calculates the amounts allegedly due and owing by AMc for office space rents through the expiration of the relevant lease, operating expenses/parking, sublease realtor fees, and termination fees, as well as sublease income earned on the Colorado Springs location."[57] Once again, the NRA misapplies the law and misconstrues the facts. In his declaration Winkler testified relating to the various expenses AMc has incurred as a result of the termination of the Services Agreement, including by identifying the various underlying AMc business records that have all been produced to the NRA supporting those expenses (*i.e.* the Termination Expenses).[58]

Further, as part of the Jackson Report, Jackson analyzed numerous pieces of evidence, including documents and conversations with representatives from AMc, to formulate expert

---

[54] *See* ECF 435, 8 n. 32  (citing *Rx.com Inc. v. Hartford Fire Ins. Co.*, 426 F. Supp. 2d 546, 554 (W.D. Tex. 2006); *Ningbo Bonny Decorative Material Co., Ltd. v. East Systems, Inc.*, No. 1:17-CV-114-DMB-DAS, 2020 WL 1333164, *5 (N.D. Miss. Mar. 23, 2020)).
[55] 426 F. Supp. 2d at 553.
[56] 2020 U.S. Dist. LEXIS 49649, at *13 (N.D. Miss. 2020).
[57] ECF 435, at 8-9.
[58] Winkler Declaration, at ¶ 31 (APP 2371-73).

opinions regarding what damages, if any, AMc would be entitled to as part of the termination fee set forth in the Services Agreement. This included, but was not limited to, an analysis of the various lease agreements, their terms and provisions, payments made related to these leases, the termination of these leases, future payments that will need to be made, and how, in his expert opinion, these damages should be calculated as part of the termination fee owed by the NRA to AMc.[59]

The NRA attempts to challenge Jackson's findings as to the terminated leases by trying to raise questions about the termination of the leases and mitigation of damages.[60] However, these are the very issues that Jackson analyzed and considered through his analysis and calculations when forming his opinions regarding AMc's damages respecting the various lease agreements.[61] Indeed, on Exhibit 2 to the Jackson Report, he provides a detailed summary of the various amounts due with detailed annotations relating to the facts and circumstances surrounding these leases.[62] These underlying facts and understandings came directly from AMc representatives, and that is the precise kind of underlying evidence an expert is permitted to rely upon in forming his opinions.

c.   *AMc's employee furloughs.*

The NRA further objects to Jackson's opinions relating to the furloughs AMc was forced to initiate after the NRA terminated the Services Agreement. It is undisputed that the Services Agreement provides that the NRA is to pay AMc a termination fee, including for severance, upon termination of the Services Agreement.[63] In paragraph 33 of his declaration, Winkler cited and relied upon portions of the Jackson Report relating to these severance expenses, and then testified

---

[59] *See* ECF 417, at Ex. 35-H, Jackson Report, at ¶¶ 47-77 (APP 2451-61); *see also* ECF 422, at Ex. 50. Jackson Depo., at 133:1-134:24 (APP 1509).
[60] ECF 435, at 9-10.
[61] *See* ECF 417, at Ex. 35-H, Jackson Report, at ¶¶ 48-56 (APP 2451-54).
[62] *Id.* at Ex. 2 (APP 2495-96).
[63] ECF 419-1, at Ex. 35-A, Services Agreement, § XI.F (APP 2386-87).

that AMc incurred medical coverage premiums for certain furloughed employees and calculated several payments to individuals impacted by the termination of the Services Agreement.[64] The NRA did not object to paragraph 33.

As part of his opinions in this case, Jackson analyzed documents and information relating to AMc's payment of these medical coverage premiums and the various severance payments owed, and opined as to how and why these damages have been sustained by AMc and are owed by the NRA pursuant to the Services Agreement.[65] He also opined as to the appropriateness and reasonableness of the severance periods for each of the employees by testing the information that he had been provided by AMc with outside third-party studies to determine whether the amounts were reasonable within industry standards, and then conducted his own calculations as to the appropriate amount of severance for each employee.[66] This analysis and ultimate conclusions are based upon Jackson's well-credentialed experience and expertise, and will be helpful to the trier of fact.[67]

Further, the NRA's contention that Jackson's expert opinions are nothing more than simple arithmetic is without merit and not supported by the law.[68]

          d.     *AMc's right to indemnification.*

The NRA additionally complains in its Motion that "Exhibit 9 of the Jackson Report . . . once again, simply lists generic line items for 'Legal Fees Incurred from NRA-Related Government Proceedings' and 'Legal Fees Incurred from NRA-Related Contract Litigation,' and

---

[64] Winkler Declaration, at ¶ 33 (APP 2374-75) (citing and referencing pages 28-29 of the Jackson Report and the corresponding bates numbered documents).

[65] ECF 35-H, Jackson Report, at ¶¶ 78-79, Exs. 5, 5A, 5B (APP 2461-62, 2501-03).

[66] *Id.*; *see also* ECF 422, at Ex. 50, Jackson Depo. at 134:3-24 (APP 1509).

[67] *See* FED. R. EVID. 702; *Rx.com*, 426 F. Supp. 2d at 554.

[68] *Huawei*, 2019 U.S. Dist. LEXIS 94702, at *10 ("There is not, as [the NRA] suggests, an implicit requirements in Fed. R. Evid. 702 for the proffered expert to make complicated mathematical calculations.").

adds the amounts of the line items to produce a total amount."[69] This is the same objection all over again, and it begs again for excessively complex calculations. That is not necessary nor required by Federal Rule of Evidence 702.[70] While it is true that this section of the report is brief, summarizing thirteen invoices, this section is just one piece of the many parts of the Jackson Report. It is presented as part of the whole of the damages calculation and is definitely "helpful to the trier of fact."[71] Moreover, although the Court will interpret the provisions of the Services Agreement as to indemnification, the Jackson Report provides evidence that will assist the trier of fact in determining what those indemnification damages are. The NRA's challenge to the sufficiency of the actual legal invoices goes to the weight of the evidence, not its admissibility.[72]

The NRA also challenges Jackson's reliance on redacted legal invoices,[73] seeming to claim that because Jackson did not ask for further information as to the substance of the redacted invoices, his testimony based on them is "conclusory."[74] Yet, in the portion of this testimony the NRA does not quote, Jackson explains why he did not inquire further as to what lay behind the redactions: "Because I get redacted documents all the time in my work. ***I'm not allowed to look at anything that parties from the other side are not allowed to look at for purposes of my reliance on documents.*** So I fully expect redactions."[75] Jackson also stated that that in his experience he has found legal invoices "generally very reputable" given his understanding of the "severe penalties for lawyers creating invoices for one thing when they're working on something else."[76]

---

[69] ECF 435, at 12.
[70] *See Huawei*, 2019 U.S. Dist. LEXIS 94702, at *10.
[71] *See* FED. R. EVID. 702; *Rx.com*, 426 F. Supp. 2d at 554; *see also Lifepay*, 2020 WL 1259328, at *14.
[72] *See Viterbo v. Dow Chem. Co.,* 826 F.2d 420, 422 (5th Cir. 1987); *SimpleAir, Inc. v. Google Inc*., No. 2:14-CV-11, 2015 U.S. Dist. LEXIS 135915, at *8 (E.D. Tex. Oct. 5, 2015) (objection to expert's methodology went to weight of the evidence, not its admissibility).
[73] ECF 435, at 12.
[74] *Id.*
[75] ECF 422, at Ex. 50, Jackson Depo., at 121:15-19 (APP 1506) (emphasis added).
[76] *Id.* at 122:4-7 (APP 1506).

Thus, he did not see the need to further probe AMc about the contents of these redacted invoices because (1) even if he did, he could not rely on them, and (2) he has found redacted invoices to be very reputable in the past. The NRA's specious attempt to convert these reasons into an argument that Jackson's testimony was "conclusory" is wholly meritless.

e.    *AMc' Third-Party NRA Contracts.*

As part of its Services Agreement with the NRA, AMc entered into various contracts at the direction of and on behalf of the NRA. Indeed, Winkler testified in his declaration as to the various third party contracts at issue.[77] As part of the analysis here, Jackson analyzed the various contracts at issue, including the outstanding amounts due and owed, and offered conclusions as to the amounts due pursuant to the terms of the Services Agreement. Again, the NRA's suggestion as to a certain mathematical complexity is unfounded and not supported by the law. Winkler and Jackson's opinions relating to the third party contracts and the millions of dollars owed by the NRA to AMc based upon those contracts is evidence that will assist the trier of fact in determining AMc's damages. Similar to the other portions of his report, Jackson's opinions as to the third party contracts go to his overall opinions as to AMc's damages, and the NRA's attempt to exclude this evidence should be denied because its arguments largely focus on the weight of the evidence at issue, instead of its admissibility.[78]

f.    *The NRA's untimely payment of AMc's invoices.*

With regard to the Jackson Report's calculation of damages due for untimely invoices paid by the NRA, again the NRA objects that "the simple arithmetic of adding such amounts, is not a proper expert opinion and must be excluded."[79] Winkler testified in his declaration as to the

---

[77] Winkler Declaration, at ¶ 34 (APP 2375).
[78] *See Viterbo,* 826 F.2d at 422; *SimpleAir, Inc.*, 2015 U.S. Dist. LEXIS 135915, at *8 (objection to expert's methodology went to weight of the evidence, not its admissibility).
[79] ECF 435, at 13.

various invoices that were not timely paid.[80] Jackson analyzed the various invoices and performed various calculations regarding the periods of delinquency, with each invoice requiring a separate interest calculation.[81] Again, this is helpful evidence for the trier of fact.

### C.   The Parol Evidence Rule Either Does Not Apply or Does Not Bar AMc's Evidence.

As a preliminary matter, the NRA asserts that Virginia law governs the Services Agreement, yet, strangely, it continues citing a number of Fifth Circuit and Texas Federal court cases as support for its arguments that this Court should strike certain evidence as violating the Virginia parol evidence rule.[82] Nevertheless, the NRA's claim that the parol evidence rule bars consideration of certain of AMc's evidence misses the mark, as explained below.

Under Virginia law, "parol evidence of prior stipulations or oral agreements is inadmissible to vary, contradict, or explain the terms of a complete, unambiguous, unconditional written contract."[83] However, the rule "has no application to subsequent parol agreements between the parties."[84]

The NRA claims the parol evidence rule bars four of AMc's statements:

1. "[T]he NRA desired the Services Agreement to be silent on certain issues, such as specific requirements for the contents of AMc's invoices or backup to be provided."[85]

2. "[D]ue to the NRA's concerns for confidentiality, AMc invoices contained minimal detail . . . ."[86]

---

[80] Winkler Declaration, at ¶¶ 25, 36 (APP 2369-70, 2375-76).
[81] *See* ECF 417, at 35-H, Jackson Report, at ¶ 84 (APP 2463-64) and Ex. 8 (APP 2507-08).
[82] ECF 435, at 14, n. 63-67.
[83] *Price v. Taylor*, 466 S.E.2d 87, 89 (Va. 1996).
[84] *Connelly v. Blot*, No. 1:16cv01282 (AJT/JFA), 2017 U.S. Dist. LEXIS 127410, at *12 (E.D. Va. Aug. 9, 2017) (quoting *Centex Constr. v. Acstar Ins. Co.*, 448 F. Supp. 2d 697, 712 (E.D. Va. 2006)).
[85] ECF 435, at 16 (citing ECF 418, at ¶ 10 & n. 10).
[86] *Id.* (citing ECF 418, at ¶ 10 & n. 11).

3. "[F]or decades, the NRA received—and paid—identically styled invoices and never requested any changes to AMc's invoicing method."[87]

4. "AMc was never asked to provide more invoice detail until 2018, at which point it revised its invoices to comply with the NRA's requests."[88]

The NRA understandably seeks to exclude this evidence because it is fatal to its various arguments accusing AMc of engaging in fraudulent billing and invoicing practices. However all of this evidence is admissible because it has nothing to do with the parol evidence rule.

The first three statements all derive from the deposition testimony of former NRA Treasurer and Chief Financial Officer, Woody Phillips, who worked with AMc for decades and along with Wayne LaPierre, was one of the two most trusted and influential executives at the NRA involved with the NRA/AMc relationship.[89]   In its MSJ, AMc repeatedly relied on the testimony of Phillips because he was the one responsible at the NRA for approving and paying AMc's invoices.[90]  He was also intimately involved in the budgeting process between the parties' for decades.  The NRA's attempts to frame this undisputed and damaging testimony to the NRA as parol evidence is nonsensical.

First, none of these first three statements contradict anything in the Services Agreement, so the parol evidence does not even apply. For instance, the terms of the Services Agreement actually say *nothing* about AMc's responsibility to include a sufficient level of detail in its invoices to the NRA.[91] Therefore, these statements cannot contradict something the Services Agreement

---

[87] *Id.* (citing ECF 418, at ¶ 10 & n. 12).

[88] *Id.* at 17 (citing ECF 418, at ¶ 92 & n. 225).

[89] *See* ECF 419-1, at Ex. 29, Phillips Depo., at 24:13-25:20 (APP 1947-48).

[90] *See* ECF 418, at 3-5, 11, 17-18, 22, 29, 30, 32-33, 38-39 (referencing the page numbers in AMc's MSJ where Phillips' deposition testimony is cited).

[91] Services Agreement § III.A-E. On pages 15-16 of its Motion, the NRA summarizes its view on what AMc's obligations are under Sections I-III of the Services Agreement. Then, on page 16, the NRA concludes: "Thus, the Services Agreement expressly set forth the *manner* in which AMc was to invoice the NRA for its services . . . ." (emphasis added). But, a close reading of these provisions demonstrates that the Services Agreement does not specify what *manner* of detail AMc must place in the content of its invoices; rather, the portions of the Services Agreement the NRA cites discuss what *kind* of services AMc can bill for—not what the invoices must say about these services.

does not say. Furthermore, these statements merely demonstrate how the parties interacted and conducted business over their decades-long contractual relationship. Of course, evidence of course of dealing and performance of a contract not offered to contradict a contract's terms is not barred by the parol evidence rule, which is concerned with prior or contemporaneous oral statements *contradicting* the *terms* of the contract.[92]

As for the fourth statement, the parol evidence rule on its face simply does not apply. The parties executed the Services Agreement on April 30, 2017 and the 2018 Amendment on May 6, 2018.[93] The NRA did not send its letters requesting additional invoicing detail until August 2018.[94] Thus, the fourth statement does not qualify as a "prior or contemporaneous" oral statement because it occurred after the execution of the 2018 Amendment. Additionally, nothing in this fourth statement says anything that contradicts or changes the terms in the Services Agreement, which, as discussed above, does not specify the level of detail AMc must include in its invoices. Also, AMc did not offer the fourth statement to assist in interpreting the meaning of the Services Agreement. Rather, this fourth statement comes from the section of AMc's MSJ asserting that the NRA lacks evidence of fraud by AMc or Mercury.[95] Read in its proper context, this fourth statement is evidence that AMc did not fail to disclose any material facts to the NRA.[96] Plainly, the parol evidence rule does not apply to evidence offered to disprove fraud.[97]

---

[92] *Drake v. Franklin Equip. Co. (In re Franklin Equip. Co.)*, 418 B.R. 176, 206-07 (Bankr. E.D. Va. 2009).
[93] ECF 419-1, at Ex. 35-A (APP 2377); ECF 419-1, at Ex. 35-B (APP 2388).
[94] ECF 419-1, at Ex. 3, Winkler Hr'g Tr., at 124:12-20 (APP 202).
[95] ECF 418, at ¶ 92 (showing this is the first paragraph under section heading § V.D.2.A, entitled "No evidence of fraud by AMc or Mercury").
[96] *Id.*
[97] *Cf. Paterno Imports v. McBee*, 159 B.R. 461, 463 (Bankr. E.D. Va. 1993) ("Even if the parol evidence rule was applicable, it is hornbook law that the rule does not apply to exclude proof of fraudulent inducement.").

### D.    AMc's Other Cited Evidence is Admissible.

Lastly, the NRA's remaining objections to AMc's summary judgment evidence, which the NRA has attached in Exhibit A, are meritless. AMc has attached its own **Exhibit A-1**, which responds to the NRA's objections.

As to the NRA's objections to AMc's putative leading questions, AMc responds more fully here. The NRA contends that certain of AMc's deposition inquiries are inadmissible because they posed leading questions. Of course, Federal Rule of Evidence 611(c) permits leading questions of "adverse" parties or "witness[es] identified with an adverse party."[98] Further, under Federal Rule of Civil Procedure 32, "[a]n objection to an error or irregularity at an oral examination is *waived* if: (i) it relates . . . to the form of a question . . .; and (ii) it is not timely made during the deposition."[99] Indeed, courts have stated that a failure to object to leading questions at a deposition waives those objections.[100]

*First*, the NRA has waived any objections to leading questions it did not interpose on the record. *Second*, these leading questions, if not waived and if the Court determines that they were actually leading, were permissible. The NRA would have this Court believe that Phillips, the NRA's former CFO and Treasurer,[101] and Steve Hart, former counsel to the NRA Board of Directors,[102] are not "witness[es] identified with" the NRA merely because they are no longer

---

[98] FED. R. EVID. 611(c).

[99] FED. R. CIV. P. 32(d)(3)(B)(i)-(ii) (emphasis added).

[100] *See House v. Players' Dugout, Inc.*, No. 3:16-cv-00594-RGJ, 2021 U.S. Dist. LEXIS 202789, at *30 (W.D. Ky. Oct. 20, 2021) (citing *Harper v. Griggs*, No. 04-260-C, 2007 U.S. Dist. LEXIS 10395, at *4 (W.D. Ky. Feb. 12, 2007)) ("Objections . . . that are waivable include **leading questions**, lack of personal knowledge, testimony by counsel, speculation, asked and answered, argumentative question, and witness' answers beyond the scope of the question.") (emphasis added); *see also Elyria-Lorain Broad. Co. v. Lorain Journal Co.*, 298 F.2d 356, 360 (6th Cir. 1961) ("[I]t would seem that a party who has not objected to a leading question at the taking of a deposition may not subsequently object to it when the deposition is introduced at the trial."). Thus, beyond the objections the NRA has waived as to leading questions, it has also waived these other categories of objections it lodges now but did not contemporaneously object to at the depositions discussed in Exhibit A-1.

[101] ECF 419-1, at Ex. 29, Phillips Depo., at 11:25-13:7 (APP 1944-45).

[102] ECF 419-1, at Ex. 10, Hart Depo., at 12:21-13:2 (APP 771-72).

employed with the NRA despite having been intimately involved with the events spurring this litigation. Although the issue of whether former employees can be "identified with the adverse party" under Rule 611(c) is an "unsettled inquiry,"[103] courts addressing this question typically find that former executives or those with deep involvement in the events culminating in the litigation can be examined with leading questions.[104]

Both Phillips, a former executive (past NRA CFO and Treasurer), and Steve Hart were deeply involved in the events ultimately leading to this litigation. Indeed, Phillips had been with the NRA since 1992 and had a lengthy working relationship with AMc.[105] Furthermore, during the relevant time period in this case, numerous letters and correspondence were sent between Phillips and AMc.[106] Steve Hart, moreover, was also deeply involved with this case.  The NRA repeatedly relied upon emails sent from Hart to Tony Makris in support of their own motion for summary judgment, contending that Hart's statements support various claims and defenses.[107] Further, Hart also received the oft-discussed April 22, 2019 Winkler letters, and then was abruptly fired by Wayne LaPierre after sending them to various NRA officers and committee chairs.[108]

Finally, with respect to Col. North, the NRA did not preserve any of the objections they attempt to make now, and thus they are waived.[109]  In addition, for the relevant time period leading

---

[103] *Fehr v. Sus-Q- Cyber Charter Sch.*, No. 4:13-cv-01871, 2015 U.S. Dist. LEXIS 142187, at *8 (M.D. Pa. Oct. 20, 2015).
[104] *See, e.g.*, *Doe v. Russell Cty. Sch. Bd.*, No. 1:16CV00045, 2018 U.S. Dist. LEXIS 32085, at *2-4 (W.D. Va. Feb. 28, 2018); *Fehr*, 2015 U.S. Dist. LEXIS 142187, at *8-10.
[105] ECF 419-1, at Ex. 29, Phillips Depo., at 24:1-16 (APP 1947).
[106] *See, e.g.*, ECF 419-1, at Ex. 29, Phillips Depo., at 150:17-151:3 (APP 1979), 153:20-154:8 (APP 1980), 157:15-158:8 (APP 1981), 159:10-23 (1981), 161:23-162:6 (APP 1982).
[107] *See* ECF 421-22, Exs. 15, 20, 25, 26, 36, 75-76 (representing the exhibits the NRA attached to its summary judgment motion that refer to communications between Hart and Makris); *see also* ECF 420, at 9, n.68-69 (citing exhibit 15); ECF 420, at 11 n.78 (citing exhibit 20); ECF 420, at 11, n.85, 12, n.86, 39, n.234 (citing exhibit 25); ECF 420, at 12, n.86-87 (citing exhibit 26); ECF 420, at 18 n. 130 (citing exhibit 36).
[108] ECF 419-1, at Ex. 10, Hart Depo., at 310:5-313:21 (APP 846-47).
[109] FED. R. CIV. P. 32(d)(3)(B)(i)-(ii).

up to this lawsuit, Col. North was the NRA's President.[110] For years, the NRA has attempted to falsely paint Col. North and AMc as working in hand in hand to unseat LaPierre as Executive Vice President of the NRA.  These allegations have been rebutted time and time again by numerous witnesses.[111]

### III.    CONCLUSION

The NRA's Motion is nothing more than an improper attempt to strike legally admissible evidence that supports the millions of dollars in damages AMc has sustained as result of the NRA's wrongful actions, and an attempt to rewrite the history books on how these parties interacted and operated over decades. The NRA's Motion should be denied in its entirety, and Defendants respectfully pray that the Court grant their MSJ in its entirety.

---

[110] ECF 419-1, at Ex. 14, North Depo., at 29:12-18 (APP 1123).
[111] *Id.* at 234:22-237:2 (APP 1174-75); ECF 141 at Ex. A, ¶ 18 (Winkler) (APP 10); Ex. B, ¶ 20 (Montgomery) (APP 20); Ex. C, ¶ 13 (Makris) (APP 27); Ex. D, ¶ 10 (Tavangar) (APP 35); Ex. E, ¶ 12-13 (Powers) (APP 42); Ex. F, ¶ 4-5 (Ed Martin) (APP 45).

January 10, 2022.

Respectfully submitted,

*/s/ Brian E. Mason*
**G. Michael Gruber, Esq.**
Texas Bar No. 08555400
gruber.mike@dorsey.com
**Brian E. Mason, Esq.**
Texas Bar No. 24079906
mason.brian@dorsey.com
**Jay J. Madrid, Esq.**
Texas Bar No. 12802000
madrid.jay@dorsey.com
**J. Brian Vanderwoude, Esq.**
Texas Bar No. 24047558
vanderwoude.brian@dorsey.com
**DORSEY & WHITNEY LLP**
300 Crescent Court, Suite 400
Dallas, Texas 75201
(214) 981-9900 Phone
(214) 981-9901 Facsimile

**ATTORNEYS FOR
DEFENDANTS/COUNTER-PLAINTIFF
ACKERMAN MCQUEEN, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on January 10, 2022, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

*/s/ Brian E. Mason*
BRIAN E. MASON