**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § | |
| | § | |
| | § | |
| **Plaintiff and Counter-Defendant** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **ACKERMAN MCQUEEN, INC.,** | § | |
| | § | **Civil Action No. 3:19-cv-02074-G** |
| **Defendant and Counter-Plaintiff,** | § | |
| | § | |
| **and** | § | |
| | § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, and MELANIE MONTGOMERY,** | § | |
| | § | |
| | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' OBJECTIONS TO, AND MOTION TO STRIKE THE NATIONAL RIFLE ASSOCIATION OF AMERICA'S <u>SUMMARY JUDGMENT EVIDENCE</u>**

**BREWER, ATTORNEYS & COUNSELORS**

Cecelia Fanelli (*Pro Hac Vice*)
clf@brewerattorneys.com
Sarah B. Rogers (*Pro Hac Vice*)
sbr@brewerattorney.com
Philip Furia (*Pro Hac Vice*)
pjf@brewerattorneys.com
Dallas, Texas 75201
Telephone:  (214) 653-4000
Facsimile:  (214) 653-1015

**ATTORNEYS FOR PLAINTIFF AND COUNTER-DEFENDANT NATIONAL RIFLE ASSOCIATION OF AMERICA**

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ............................................................................1

II. FACTUAL BACKGROUND ............................................................................4

    A.    The FRA Spreadsheets Were Withheld Under A Valid Claim of Privilege, Then Produced as Part of A Compromise Effort After AMc Moved to Compel Them.............................................................................................4

    B.    The FRA Spreadsheets Discredit Defendants' False Claims of Compliance and Show One of Many of AMc's Pre-Existing Material Breaches.......................6

    C.    AMc's Motion to Compel or Preclude the FRA Documents Has Already Been Resolved—In Favor of *In Camera* Review. ....................................................8

    D.    The FRA Spreadsheets Are Part of A Cascade of Evidence That AMc Stage-Managed, And Sabotaged, The NRA's Record-Examination Efforts. ..................9

III. ARGUMENTS AND AUTHORITIES.................................................................13

    A.    The 2019 FRA Examination Is Admissible Evidence Supporting AMc's Failed Compliance Narrative. .....................................................................13

        1.    AMc's Cursory "Estoppel" Argument Is Unsupported by Authority or Common Sense..........................................................................13

        2.    The "Sword and Shield" Doctrine Is Inapplicable Here...........................15

        3.    AMc Ignores FRA's Detailed Declaration Authenticating Its Own Business Records and Recorded Recollections. .......................................16

    B.    The Newspaper Articles Are Admissible for Non-Hearsay Purposes. .................19

IV. CONCLUSION.............................................................................................20

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Charalambopoulos v. Grammer*,
    No. 3:14-CV-2424-D, 2017 WL 1094394 (N.D. Tex. Mar. 8, 2017)....................................16

*Citizens State Bank v. Leslie*,
    No. 6-18-CV-00237-ADA, 2020 WL 1065724 (W.D. Tex. Mar. 5, 2020)...........................15

*Ingenito v. Riri USA, Inc.*,
    No. 11CV2569MKBRLM, 2015 WL 9412541 (E.D.N.Y. Dec. 22, 2015)......................14, 16

*Jauch v. Corley*,
    830 F.2d 47 (5th Cir. 1987) ........................................................................................19

*Lopez v. Kempthorne*,
    684 F. Supp. 2d 827 (S.D. Tex. 2010) ........................................................................18

*Nations v. Sun Oil Co.*
    (Delaware), 705 F.2d 742 (5th Cir. 1983) ...................................................................14

*Park W. Galleries, Inc. v. Glob. Fine Art Registry, LLC*,
    No. 2:08-CV-12247, 2010 WL 987772 (E.D. Mich. Mar. 12, 2010) ...................................19

*Roque v. Harvel*,
    No. 1:17-CV-932-LY-SH, 2019 WL 5265292 (W.D. Tex. Oct. 16, 2019)............................19

*Studesville v. Buck*,
    No. 2:13-CV-254-J, 2014 WL 12597817 (N.D. Tex. Aug. 25, 2014)...................................15

*Trammell Crow Residential Co. v. Virginia Sur. Co., Inc.*,
    No. 3:08-CV-0685-B, 2009 WL 10677401 (N.D. Tex. Oct. 16, 2009)...........................18, 19

*Turner v. Coca-Cola Enters., Inc.*,
    No. CIV. 3:02-CV-1348-R, 2003 WL 21145740 (N.D. Tex. May 14, 2003) ........................16

*United States v. Farrar*,
    876 F.3d 702 (5th Cir. 2017) ......................................................................................14

*Wehling v. Columbia Broadcasting Sys.*,
    608 F.2d 1084 (5th Cir. 1979) ....................................................................................15

*Wheeler v. Sims*,
    951 F.2d 796 (7th Cir. 1992) ......................................................................................18

*Williams v. Valdosta,*
    689 F.2d 964 (11th Cir.1983) ................................................................................19

**State Cases**

*State v. Pasene,*
    144 Haw. 339, 439 P.3d 864 (2019) ......................................................................18

**Rules**

F. R. Evid. 803 ......................................................................................................17

F. R. Evid. 803(5) ..................................................................................................18

F. R. Evid. 803(5)(A) ............................................................................................18

F. R. Evid. 803(5)(B) ............................................................................................18

F. R. Evid. 803(5)(C) ............................................................................................18

F. R. Evid. 803(E) ..................................................................................................17

TO THE HONORABLE A. JOE FISH:

Plaintiff/Counter-Defendant the National Rifle Association of America files this *Brief in Opposition to Defendants' Objections to, and Motion to Strike, the National Rifle Association of America's Summary Judgment Evidence* (the "Motion to Strike").

## I.   PRELIMINARY STATEMENT

The NRA commenced litigation against its vendor and fiduciary of multiple decades, AMc, after months of AMc's strategic obstruction of the NRA's unqualified right to a contractual files, books, and records examination.[1]  Throughout the ensuing litigation (in Virginia and before this Court), Defendants insisted that AMc complied fully with the NRA's record-examination efforts, including an examination conducted by Forensic Risk Alliance ("FRA") in February 2019.[2]  They made the same assertions in the court of public opinion—telling multiple media outlets that the NRA's audit team "received every single piece of information they requested."[3]  These claims are false, as records later produced by FRA demonstrate. Further, AMc gerrymandered the scope of the FRA review. For example, AMc ensured the exam by FRA only covered years 2015 and 2016 for media buys, thus conveniently eliminating these years 2017 and 2018 from review, during which years the NRA's advertising budget skyrocketed because of AMc's billings for NRATV.[4] This disparate treatment of NRATV differed from the time frame AMc allowed for other topics, such as budgets and out-of-pocket expenses.[5]

---

[1] ECF No. 209, Plaintiff's Second Amended Complaint.

[2] *See, e.g.*, ECF No. 238, AMc Motion for Leave to File Second Amended Counterclaim, at ¶ 89 (falsely representing that AMc "complied" with the examination, and "[a]t no time did the auditors complain to AMc that documents were withheld from review").

[3] *See* ECF No. 404, Ex. 9, Statement from Ackerman McQueen, Inc., dated April 15, 2019 [App. 0433].

[4] *See* ECF 422, Ex. 21, Letter from Jay Madrid to Steve Hart, dated Jan. 4, 2019 [App.421]; ECF 405, Ex. 11, FRA spreadsheet, AMc's media buys [App. 0436-75].

[5] See ECF 405, Ex. 12, FRA draft spreadsheet regarding AMc's Anthony Makris out-of-pocket expenses for years 2016-2018 [App. 0479]; ECF 405, Ex. 14, FRA draft spreadsheet, AMc's budgets for years 2015-2018 [App. 0572].

As the record shows, AMc's "compliance" narrative has collapsed upon the weight of discovery, which has proven AMc's deliberate withholding of data on core issues and obfuscation as to computer applications, such as Workamajig, Strata, Concur, NRATV social media accounts[6], and the NRA Dashboard, which contain that data.[7]  The abject falsity of AMc's compliance narrative is proven by the fact that after the NRA submitted its initial expert reports, AMc made an additional seventeen (17) document productions. Moreover, on the night of October 1, 2021, AMc produced more documents in one night than during the entire litigation to that point. Defendants still control the NRA's computer systems and accounts, including the NRATV social media accounts. Indeed, in a conference before Judge Toliver on December 15, 2021, AMc's counsel admitted it still has not produced relevant and unlogged documents.

Consistent with Defendants overall strategic concealment, this Motion to Strike is nothing more than an attempt to sanitize the record of the FRA Spreadsheets because they indisputably contradict AMc's stale compliance narrative, and establish its malfeasance even with respect to the limited population of materials made available to FRA— which AMc would not allow to be copied.

After Defendants complained for over a year that they required the NRA to produce—so they could use and admit into evidence—documents prepared by FRA in connection with its February 2019 record examination, Defendants finally got their wish: the NRA produced several spreadsheets that represented the closest existing analogue of the FRA "report" Defendants were demanding (such spreadsheets, the "FRA Spreadsheets").[8]  The NRA did so with ample notice to Defendants, and even offered supplemental depositions and related discovery concerning topics

---

[6] ECF 442, Plaintiff's Resp. in Opp. Defs' Mot. Partial Summary Judgement, Ex. 20, Decl. of William McLaughlin, dated Dec. 18, 2021, at ¶ 7 [App 00940–41].

[7] ECF 342; 346; 365; 366; 376; 377; 379; 380; 384; 385; 387; 388; 389; 390; 393; 394.

[8] *See* ECF No.404, Ex. 11-16 [App. 0436-0682].

addressed in the FRA documents in an effort to resolve pending motion practice.  Defendants rejected the NRA's compromise efforts, moving to compel or exclude a broad swathe of FRA-related material based on infirm sword-and-shield arguments and frivolous allegations of misconduct and fraud.[9]

Resolving that motion, Magistrate Judge Toliver ***did not*** grant AMc's request to exclude FRA-related material—but instead ordered *in camera* review of disputed documents.[10]  Now, AMc tries to do what it failed to accomplish before Magistrate Judge Toliver, by insisting that competent summary judgment evidence be excluded based on groundless "estoppel" and recycled, failed "sword-and-shield" arguments. Tellingly, AMc also attacks the FRA Spreadsheets' admissibility under the business-record hearsay exception while entirely ignoring the custodian-of-records declaration proffered by FRA to authenticate its own business records and recorded recollections. All of AMc's arguments fail.  Defendants twice moved to compel the FRA Spreadsheets.  Now that they have received them, they cannot run from the revealed contents of the spreadsheets for summary judgment purposes.

Separately, the Motion to Strike urges the court to exclude certain newspaper articles as hearsay.[11]  As explained below, these articles are offered for well-established non-hearsay purposes, and should likewise remain in the record.  Accordingly, the Motion to Strike should be denied in its entirety.

---

[9] *See* ECF No. 438, Defendants' Brief in Support of Defendants' Objection to, and Motion to Strike the National Rifle Association of America's Summary Judgement Evidence, at 10-11.
[10] The documents were tendered for *in camera* review on January 6, 2022. *See* Declaration of Sarah B. Rogers ("Rogers Decl."), dated January 10, 2022, Ex. 1, Letter from Stephan J. Schlegelmilch to the Honorable Renee H. Toliver dated January 5, 2022[App. 03-04]; Rogers Decl., at Ex. 2, Letter from Sarah B. Rogers to the Honorable Renee H. Toliver dated January 6, 2022 [App. 05-06].
[11] *See* ECF No. 438 at 14.

## II.   FACTUAL BACKGROUND

**A.    The FRA Spreadsheets Were Withheld Under A Valid Claim of Privilege, Then Produced as Part of A Compromise Effort After AMc Moved to Compel Them.**

During February 2019, the NRA's Office of the General Counsel retained a forensic accounting firm, FRA, to assist in conducting a books and records examination pursuant to the contract between the NRA and AMc.  As documented in FRA's engagement letter, the primary purpose of the examination was to facilitate legal advice about then-pending, and additional anticipated, litigation. As the record has made clear since 2019, FRA did not prepare a narrative "report." It did prepare "draft" spreadsheets that were screenshared with the NRA.[12] When AMc sought to compel the production of FRA-generated material in the parties' parallel Virginia litigation, the NRA's Virginia counsel explained that although there was no "report" as such, there did exist documents setting forth FRA's conclusions—but they were being withheld as privileged;[13] as set forth in FRA's privilege log, the withheld documents were "prepared to facilitate rendition of legal advice."[14]   Furthermore, the NRA emphasized that it did not expect to offer testimony from FRA about its opinion work product.[15] Accordingly, the Virginia court declined to compel production of FRA's opinion work product and other privileged, FRA-related documents.[16]

Over the ensuing year, as the NRA consistently asserted its privilege, AMc made numerous false representations about the FRA records examination, including the false claim that the FRA

---

[12] *See id.* Further, John Frazer testified to the fact that these "draft" documents were provided on a Zoom call, and the documents themselves were privileged. *See* ECF No. 404, Ex. 19, Transcript of the Deposition of John Frazer, Vol. I, dated August 19, 2021 at 64:2-66:5 [App. 705-06].
[13] *See id.*
[14] *See* ECF No. 404, Ex. 5, Excerpt from the Forensic Risk Alliance privilege log [App. 0171-72].
[15] *See* ECF No. 404, Ex. 19, Transcript of Deposition of John Frazer, dated August 19, 2021 at 64:2-66:5 [App. 705-706].
[16] *See* ECF No. 404, Ex. 29, Hearing transcript dated November 13, 2019 from the *National Rifle Association of America v. Ackerman McQueen, Inc. et al.*, Cons. Case Nos. CL19001747, CL19002067, CL19002886 (Cir. Ct. Va. 2019) [App. 1645].

forensic accountants received each and every document they requested.[17]  Those false claims were widely disseminated in pleadings, testimony, and even in press releases.[18]  Then, after its motion to compel FRA-related documents failed in Virginia, AMc surprisingly briefed yet another motion to compel the documents in this action.[19] The motion was filed in October 2020.  With its October motion still unresolved, AMc emphasized at the status conference on September 16, 2021, that it must receive discovery evidencing "the outcome" of FRA's examination.[20]  At the same conference, in order to obviate the dispute, the NRA agreed it would produce any "report" (which really consisted of multiple draft spreadsheets).[21]

During meet/confer sessions held in the wake of that status conference, after AMc's counsel made clear that AMc's pending motions could ***not*** be resolved by production of documents setting forth the "outcome" of FRA's examination as AMc had insisted in open court, the NRA made the additional offer to produce the engagement letter governing FRA's work and any instructions or guidance informing FRA's analysis.[22]  The NRA also offered supplemental depositions of relevant witnesses.  The terms of this offer were made clear to AMc during a meet/confer teleconference on October 6, 2021.  AMc rejected the NRA's effort at a negotiated resolution.

---

[17] *See* ECF 403at IV.B.6.

[18] *See* ECF No. 404, Ex. 9, statement from Ackerman McQueen, Inc., dated April 15, 2019 [App. 0432-33]; *see also* ECF No. 404, Ex. 10, statement from Ackerman McQueen, Inc., dated September 13, 2019 [App. 0434-35].

[19] *See* ECF No. 404, Ex. 29, Hearing transcript dated November 13, 2019 from the *National Rifle Association of America v. Ackerman McQueen, Inc. et al.*, Cons. Case Nos. CL19001747, CL19002067, CL19002886 (Cir. Ct. Va. 2019) at p. 77 [App. 1643].

[20] *See* ECF 404, Ex. 1, transcript from status conference, dated September 16, 2021, at 36:6-37:5 [App. 0042-43].

[21] *Id.* at p. 13:19-21, 30:24-31:5 [App. 0019, 0036-35].  For clarity, as AMc acknowledges, FRA's work culminated in six spreadsheets which cover three topic areas including media buys, out of pocket expenses, and budgets. *See* ECF No. 388, Plaintiff's Status Report on Discovery Issues, dated October 15, 2021, at p. 7.

[22] *See* ECF 404, Ex. 3, email from Sarah B. Rogers to Brian Mason, Christina Carroll, and Kelsey Taylor dated October 7, 2021 [App. 0085-86].

With AMc's motion to compel still outstanding and the time for discovery elapsing, the NRA made one final effort to resolve the parties' dispute relating to FRA issues: it authorized FRA to produce, contemporaneously to the NRA and AMc, the spreadsheets documenting its observations and conclusions in connection with its books-and-records examination (such spreadsheets, the "FRA Spreadsheets").[23]  It then provided the spreadsheets to its testifying experts.[24]  The NRA additionally produced copies of the operative engagement letter, and a previous superseded engagement letter, dictating the purpose and scope of FRA's review.[25]  The NRA told AMc that it remained available to meet and confer further on these issues, but AMc rejected that olive branch, too.[26]  Instead, it brought a "supplemental" motion to compel the production of all documents relating to  FRA—or, in the alternative, to exclude FRA-related evidence, including FRA Spreadsheets, at trial (such motion, the "Supplemental Motion to Compel or Exclude") (ECF No. 391).[27]

**B.      The FRA Spreadsheets Discredit Defendants' False Claims of Compliance and Show One of Many of AMc's Pre-Existing Material Breaches.**

Even as the NRA remained silent and asserted its privilege, Defendants made the tactical choice to build their advocacy upon false assertions about the FRA records examination.  For example, AMc claims in its pleadings that it complied fully with the FRA records examination.[28]  AMc repeated the same falsehoods to the media as it told multiple national outlets on April 15, 2019, that "[d]uring a three-week review, an NRA forensic auditing team received every single piece of information they [the NRA] requested. Further, the NRA has had consistent access to any

---

[23] *See* ECF No.404 at IV.B.10.
[24] *Id.*
[25] *Id.*
[26] *See* ECF No. 404, Ex. 17, letter from Sarah B. Rogers, Esq. to Brian E. Mason, Esq. [App. 0683-84].
[27] *See* ECF No. 403, Supplemental Joint Status Report, at 48-49.
[28] *See, e.g.*, ECF No. 238 (AMc Motion for Leave to File Second Amended Counterclaim) at ¶ 89 (falsely representing that AMc "complied" with the examination, and "[a]t no time did the auditors complain to AMc that documents were withheld from review").

and all documents regarding NRATV analytics,"[29] and repeated on September 13, 2019, that AMc

"cooperated with every single audit [the] NRA requested."[30]

In truth, FRA's "draft spreadsheets" contain the following observations:

- That media-buy information, which was an explicit, agreed upon focus of the record examination, was withheld from FRA because that information "was proprietary and FRA could not have access to this information;"[31]

- FRA received no documentation regarding the assessment of the selection of media outlets, the dates of airing and/or the price being charged;[32]

- FRA received no documentation explaining how unit costs for major advertising expenditures were derived;[33]

- FRA was provided with **_no_** evidence of written approvals for **_any_** out-of-pocket expenses incurred by Tony Makris in 2015 or 2016;[34]

- FRA was provided with no documentation reflecting common business practices for expense processing;[35] and

- FRA observed that AMc's practices lacked "transparency," were difficult to comprehend, and generally seemed to violate provisions of the Services Agreement.[36]

Defendant William Winkler ("Winkler") is the CFO of AMc and, together with his son

Brandon Winkler, one of the largest owners of the agency.[37]  Winkler was present during the FRA

review, and was certainly aware of the foregoing.[38] Nonetheless, Winkler testified about the

supposed "audit" compliance that produced "everything" not only before this Court but before a

---

[29] *See* ECF No. 404, Ex. 9, Statement from Ackerman McQueen, Inc., dated April 15, 2019 [App. 0433].

[30] *See* ECF No. 404, Ex. 10, Statement from Ackerman McQueen, Inc., dated September 13, 2019 [App. 0435].

[31] *See* ECF No. 404, Ex. 11, Forensic Risk Alliance draft spreadsheet regarding Ackerman McQueen, Inc.'s media buys, at "Key Observations" tab [App. 0438].

[32] *Id.*

[33] *Id.*

[34] *See* ECF No. 404, Ex. 12, Forensic Risk Alliance draft spreadsheet regarding Anthony Makris' expenses, at "Key Observations" tab [App. 0479].

[35] *Id.*

[36] *Id.*

[37] ECF 405, Ex. 31, Ackerman McQueen, Inc. Stockholder Listing, dated February 24, 2021 (BANA AMI000292) [App. 1736].

[38] *See* ECF 141, Ex. A, Declaration of William Winkler, dated June 3, 2020, at ¶ 9 [App. 005-06].

United States Bankruptcy Court.[39] However, the falsity of Winkler's compliance narrative is illustrated by the fact that <u>after</u> the bankruptcy proceeding and after the NRA submitted its expert reports on June 1, 2021 AMc made seventeen (17) document productions, containing highly relevant information. Moreover, the record reflects Winkler's hostility to the FRA review process and the iron-fisted control he exerted over it. [40] For example, FRA's Rule 30(b)(6) corporate representative, Michael Trahar, explained in his deposition dated September 18, 2019, that he did not anticipate "quite the extent to which Mr. Winkler intended to impose those restrictions"[41] and states that his team did not receive complete access to the information requested.[42]

## C.   AMc's Motion to Compel or Preclude the FRA Documents Has Already Been Resolved—In Favor of *In Camera* Review.

On December 15, Magistrate Judge Toliver heard and determined the Supplemental Motion to Compel or Exclude.[43]  Focusing on whether the remaining FRA-related documents withheld by FRA, and/or the NRA, under claims of privilege were indeed privileged, the Court ordered the documents to be furnished for *in camera* review.[44]  The Court did not address—and, thus, did not grant—AMc's alternative request that FRA-related evidence be excluded.  However, at oral argument, the Court focused appropriately on whether the FRA Spreadsheets cited and relied upon by the NRA at summary judgment were produced in their entirety, rather than with portions redacted or omitted.[45]  The NRA confirmed, accurately, that they were.[46]  If *in camera*

---

[39] *See* ECF No. 279, AMc brief in support of Motion for Partial Summary Judgment, at p. 40-41 n. 210, citing Winkler Hr'g Test. at p. 96-99 [App. 353-56].

[40] *See* ECF 405, Ex. 4, Deposition transcript of Michael Trahar, dated September 9, 2018, at 73:24-74:8 [App. 0107].

[41] *Id.* at p. 154:2-13 [App. 0127].

[42] *Id.* at p. 66:3-7 [App. 0105].

[43] The outcome of the December 15, 2021, hearing was documented by an electronic order dated December 16, 2021. *See* ECF No. 451, Plaintiff National Rifle Association of America's Rule 72 Objections to Magistrate's Discovery Order.

[44] *See* ECF No. 430.

[45] *See* ECF No. 453, Ex. B, Oral Argument Transcript, dated December 15, 2021 at 34:3-17 [App. 039].

[46] *See id.*  AMc now frivolously misrepresents to the Court that the NRA has produced "only the parts of the report [i.e., the spreadsheets] that it wishes to rely on." ECF No. 438 at 11. AMc does not provide any explanation or basis for this contention, because none exists—the FRA Spreadsheets were produced in their entirety.

review determines that any of the additional, distinct FRA-related documents withheld under claims of privilege are nonprivileged, they will presumably be ordered to be produced alongside the FRA Spreadsheets.

**D.    The FRA Spreadsheets Are Part of A Cascade of Evidence That AMc Stage-Managed, And Sabotaged, The NRA's Record-Examination Efforts.**

Defendants purport to be prejudiced by the NRA's production of the FRA Spreadsheets in October 2020 because "[t]he NRA's experts and witnesses have been deposed without the use of the [FRA Spreadsheets]" and AMc has not had "a fair opportunity to defend against the NRA's FRA related claims."[47]  These contentions are false. At the outset, it is important to note that AMc has sustained no prejudice because it was AMc who controlled the FRA review, not FRA or the NRA. AMc retained a large law firm to represent it concerning the NRA's request for information.[48] Indeed, a Dorsey partner, Gina Betts, was on site at the FRA review. Prior to that review, AMc's counsel, Jay Madrid, wrote a letter detailing AMc's refusal to disclose certain requested information concerning AMc's work on behalf of the NRA.[49] The record here establishes that AMc knew precisely what material was supplied to FRA because AMc and its counsel decided what would be made available to FRA.[50] AMc also decided that FRA would not be able to copy any document that was part of the review.[51] AMc also decided the location of the review— off premises.[52] AMc also intervened to control who would conduct the review on behalf of the NRA, both with respect to its accountants and its lawyers.[53]

---

[47] ECF No. 438 at 11.
[48] *See* ECF 422, Ex. 21, Letter from Jay Madrid to Steve Hart, dated Jan. 4, 2019 [App.421].
[49] *See* ECF No. 448, Ex. 42, letter from Jay Madrid, Esq. to Steve Hart, Esq., dated January 4, 2019 [App. 02716-18].; *see also* ECF 209, Ex. E, letter from Stephen M. Ryan, Esq. to William A. Brewer III, dated August 22, 2018 [PageID 10725].
[50] *See* ECF 422, Ex. 21, Letter from Jay Madrid to Steve Hart, dated Jan. 4, 2019 [App.421]; ECF 405, Ex. 11, FRA spreadsheet, AMc's media buys [App. 0436-75].
[51] *Id.*
[52] *Id.*
[53] *Id.*

Moreover, the FRA Spreadsheets—which were produced at the same time, and during the same phase of discovery, as hundreds of thousands of AMc's own previously-withheld records—are only the latest addition to a raft of evidence discrediting AMc's public insistence, since the outset of this litigation, that it gave the NRA's auditors "everything" they for which they asked. Winkler fails to define "everything," despite the fact that he is AMc's records custodian.[54] Since Defendants refused to allow the NRA to copy its own financial and business information during the examinations, Defendants have the luxury of making baseless, general statements about "everything" because "nothing" could be copied.

In any event, since September 2019, AMc has sought, and received, discovery from FRA regarding the February 2019 record examination.  It was during 2019 that FRA's General Counsel and corporate representative, Michael Trahar, first testified that the FRA team did not receive the information it requested.[55]  The FRA Spreadsheets corroborate and flesh out this testimony, setting forth recorded recollections of specific documents the FRA professionals were denied.[56] Tellingly, *AMc does not dispute the truth of the statements contained* in the FRA Spreadsheets—it nowhere denies, for example, that it withheld certain media-buy documents as "proprietary."  Instead, in opposing the NRA's motion for summary judgment on certain AMc counterclaims, AMc offers an implausible Declaration from Brandon Winkler,[57] vaguely repeating the "we gave the auditors everything" storyline.[58] Winkler focuses on Susan Dillon, a favorite target, while side-stepping the record evidence and analysis of the NRA's experts, including the testimony of a prominent advertising industry expert, Andrew McLean ("McLean"), a  computer scientist, Johnathan E.

---

[54] *See* ECF 432-1, Ex. 1, Decl. of William Winkler dated Dec. 20, 2021, at ¶¶ 32-34 [App. 12-13].
[55] ECF No. 404, Ex. 4, Deposition of Michael Trahar, dated September 18, 2019, p. 66:3-7 [App. 0105].
[56] *See* ECF No. 404, Ex. 11, Forensic Risk Alliance draft spreadsheet regarding Ackerman McQueen, Inc.'s media buys, at "Key Observations" tab [App. 0438]; ECF No. 404, Ex. 12, Forensic Risk Alliance draft spreadsheet regarding Anthony Makris' expenses, at "Key Observations" tab [App. 0479].
[57] ECF No. 432-2, Ex. 2, Decl. of Brandon Winkler, dated Dec. 20, 2021 [App. 0038-0044].
[58] *Id.*

Hochman ("Hochman"), as well as a forensic audit specialist, Gary Goolsby ("Goolsby"), who have outlined in detail, among other things, the lack of substantiation for invoicing to the NRA;[59] the apparent failure of internal controls at AMc concerning its lack of substantiation for invoices;[60] the commonplace "look back" review of invoicing that businesses perform when conducting books and records reviews, regardless of whether the invoices were previously paid;[61] AMc's lack of industry standard supporting documentation for media buys;[62] AMc's improper withholding of media buy pricing information from FRA based upon the contrived and unsupported conclusion that such pricing information is supposedly "proprietary"[63] a contention that Andrew McLean contradicts because advertising agencies cannot fail to disclose pricing data to a client for whom they are purchasing  media;[64] and finally, and crucially, the NRATV scheme, a technological ruse

---

[59] *See, e.g.,* ECF No. 448-3, Ex. 37, Dep. of Gary Goolsby dated Oct. 12, 2021 [App. 01423-1441]. Gary Goolsby testified repeatedly that "looking at the substantiation or lack thereof now behind those payments, that information and support has not been provided [by Ackerman] to support those payments and therefore calls into question what was done, how it was done, the business reason behind why expenses were incurred." *Id.* at 182:18-183:1 [App. 01431]. Goolsby also noted that "it's not a simple issue. It's a major issue of not providing supporting substantiation" *Id.* at 187:16-18 [App. 01432].

[60] *See* ECF No. 448-3, Ex. 37, Dep. of Gary Goolsby dated Oct. 12, 2021 [App. 01423-1441]. Goolsby made it clear that the expectation is that a company with good internal controls would be able to easily provide the requested support that the NRA sought. If the support does not exist, that's an indication that there is an internal control issue. *Id.* at 215:15-216:5 [App. 01439]. *See id.*, at Ex. 38, Dep. transcript of Gary Goolsby, dated August 17, 2021, p. 69:19-70:5 **("So invoices -- companies -- per IRS regulations, and other regulations, and internal controls to memorialize information and accounting records, companies require invoices to match up with the payments that have been made consistent with what's called for in a contract.")** (emphasis added) [App. 01460]. AMc's theory of its defense here asks the Court to ignore the record keeping regulations of the IRS and other regulators, such that it need not keep any records if the principal / client allegedly makes such a request.

[61] *See* ECF No. 448-3, Ex. 37, Dep. of Gary Goolsby dated Oct. 12, 2021 [App. 01423-1441]. Goolsby testified that "[i]t's not uncommon for companies to do a look back to evaluate under records examination provisions to determine if what was paid was actually appropriate and substantiated." *Id.* at 184:15-21.

[62] ECF No. 448-3, Ex. 33, Dep. of Andrew McLean dated Oct. 21, 2021 at 136:24-137:5; 137:13-14 [App. 01155-56]. *See also* ECF 448-3, Ex. 33, Dep. of Andrew McLean dated Oct, 21, 2021, at 135:10-12, 21-23 [App. 01155] (McLean testified that "[w]e have numerous examples where there is no proof that the media did run" and that "[t]he burden [of proof] in the advertising business is always on the agency.").

[63] ECF No. 448-3, Ex. 33, Dep. of Andrew McLean dated Oct. 21, 2021, p. 356:11-19 ("The media planning and buying process is a classic supply and demand based marketplace and there is nothing that could be deemed proprietary.") [App. 01210].

[64]ECF No. 448-3, Ex. 33, Dep. of Andrew McLean dated Oct. 21, 2021, at 135:10-12, 21-23 [App. 01155] (McLean testified that "[w]e have numerous examples where there is no proof that the media did run" and that "[t]he burden [of proof] in the advertising business is always on the agency.").

that AMc used to extract tens of millions from the NRA,[65] which has been the subject of intense dispute, in particular, since AMc was finally forced to disgorge the password to the NRA Dashboard relating the NRATV, and hundreds of thousands of documents during the months of September and October 2021.[66]

The Brandon Winkler Declaration is more instructive for what it fails to address than what it does allege. For example, he makes no mention of Strata. This is a glaring omission for an advertising executive because Strata is a media management platform[67] used throughout the industry and by AMc itself, as its own expert, Daniel Jackson, has stated.[68] For example, McLean testified that "Strata is a media management platform. It is also called a media buy management platform because it acts as a aggregator of information, data, invoices, reconciliation…and it is used in the buying and verification process…and it is integral to the operations of any media group or media department."[69] McLean's description of the capabilities of Strata is important to note[70]

---

[65] ECF No. 448-1, Ex. 10, Dep. of Jonathan E. Hochman dated August 10, 2021, at 108:5-111:7 [App. 00372-439]; ECF No. 448-8, at Ex. 91, Declaration of Jonathan E. Hochman, Ex. 1, p. 11-20, ¶ 37-59 [App. 04373-82].

[66] ECF No. 342; 346; 365; 366; 376; 377; 379; 380; 384; 385; 387;388; 389; 390; 393; 394. *See* ECF No. 440, Plaintiff NRA Opposition Brief to AMc Partial Summary Judgment pp. 1-10.

[67] ECF No. 448-3, Ex. 33, Dep. transcript of Andrew McLean, p. 354:5-18 [App. 01210].

[68] Jackson testified that he did not remember a "specific" discussion about Strata with William Winkler, Brandon Winkler, Melanie Montgomery, or Brian Darley. Jackson conveniently testified he recalled a "general" discussion that was not "detailed." ECF 422, Ex. 50, Dep. transcript of Daniel Jackson, Oct. 27, 2021, 44:8-24 [App. 01486]. Jackson also testified that he did not access Workamajig as part of his rendering of an opinion here. *Id.* at 43:22-24 [App. 01486].

[69] ECF No. 448-3, Ex. 33, Dep. transcript of Andrew McLean, dated Oct. 21, 2021, p. 354:5-18 [App. 01210].

[70] *Id.* at 354:21-25; 355:1-25 [App. 01210]. McLean testified as follows, with respect to the capabilities of Strata:

> A.   Strata gives amazingly detailed views on media expenditure by month, by day, by vendor.   It can show media buys have been verified.   It can highlight those that are still awaiting verification… It is a very flexible system insofar as you can set it up to provide information at the client level, the campaign level and even more by media type as well. Q.   What kind of reports can be generated? A.   Detailed analysis of expenditures by vendor, expenditure by time period, expenditure data for a particular campaign or a particular time period that can then be analyzed against Google Analytics or other business metrics to show the impact of advertising or media spending on business measures. Q.   Reports can show year-over-year trend as well? A.   Yes, it is a multiyear system.   In fact that is one of its greatest use to show very easily trend in spending that you might have with vendors and it is often integral to the negotiation process because you can see the prices that you have paid historically for different types of media…"

as a contrast to the petty diversion of the Winkler Declaration, which discusses random excel spreadsheets allegedly "from Workamajig";[71] launches the predictable *ad hominem* attack against Mrs. Dillon;[72] makes the contrived complaint about "the lack of direction provided"[73] by the NRA concerning its information requests in an attempt to reverse roles and to escape its obligation to account to the NRA; and, notes AMc did not want to deal with Mr. Brewer.[74]

Importantly, contrary to the contentions in the Motion, AMc **did** depose one of the NRA's experts, advertising-industry expert Andrew McLean, about the foregoing topics—including the conclusions derived about them based on the FRA Spreadsheets, which Mr. McLean reviewed.[75] Moreover, AMc's claim to have been ambushed and prejudiced by the FRA Spreadsheets (which were produced while a motion to compel them was pending) falls flat, because the record shows that AMc stage-managed and circumscribed the FRA records-examination, while making every effort to deny the NRA copies of records its accountants saw.  In other words, AMc had notice—indeed, it may have had more-detailed notice than the NRA—regarding what FRA had requested and reviewed, and what FRA's records might show.

## III.   ARGUMENTS AND AUTHORITIES

A.   **The 2019 FRA Examination Is Admissible Evidence Supporting AMc's Failed Compliance Narrative.**

1.   **AMc's Cursory "Estoppel" Argument Is Unsupported by Authority or Common Sense.**

---

*See also,* **McLean's description of the ease with which backup information with respect to media buys can be supplied to a client.** *Id.* at 357:10-25; 358:1-6 [App. 01211]. **McLean also testified as to how Strata would help clarify the "Process Flow issues set forth in the FRA media draft spreadsheets."** *Id.,* 358:12-25; 359:1-25; 360:1-19 [App. 01211].

[71] *See* ECF No. 432-2, Ex. 2, Declaration of Brandon Winkler, dated Dec. 20, 2021 ¶ 5 [App. 0039-40].
[72] *Id.*
[73] *See id.* at p. 4 ¶ 8 [App. 0041].
[74] *See id.* at p. 5 ¶ 10 [App. 0042].
[75] *See* ECF 443-3, Ex. 33, Deposition of A. McLean, dated October 21, 2021, 8:11-19 [App. 01123]; 133:18-139:19 [App. 01156-01156]; 167:8-194:3 [App. 01163-01170]; 328:24-344:09 [App. 01203-01207].

Without citing a shred of authority for such relief, AMc asserts that the NRA "[s]hould [b]e [e]stopped" from relying on the FRA Spreadsheets for summary judgment purposes— ostensibly because the NRA withheld the spreadsheets at an earlier stage of the litigation before producing them in the face of a pending motion to compel.[76]  Estoppel is an equitable doctrine, and its linchpin is fairness.[77]  As discussed below, courts assessing fairness in similar document-production and evidentiary disputes—in the context of a sword-and-shield waiver analysis—focus on whether the proponent of the documents made an "affirmative decision to inject" them into the litigation or, by contrast, produced them in response to a motion to compel.[78]  A litigant like the NRA, which produces documents only after they have been repeatedly demanded, is favored—not disfavored—in such a fairness analysis.[79]  Moreover, the NRA repeatedly offered additional depositions and discovery to AMc to alleviate any purported unfairness, which AMc refused in favor of additional motion practice.[80]

Crucially, the NRA was not the only party to produce previously-withheld documents for the first time during Fall 2021: as documented extensively in the parties' status reports, AMc concealed **hundreds of thousands** of records from the NRA which it "dumped" on the NRA for the first time in October 2021.[81]  Under such circumstances, even if AMc could cite a single case wherein the equitable principle of estoppel were invoked to strike documents at the summary judgment stage, no such remedy would be available to AMc here.

---

[76] *See* ECF No. 438 at 10.
[77] *See, e.g.*, *Nations v. Sun Oil Co.* (Delaware), 705 F.2d 742, 744 (5th Cir. 1983) (regarding equitable estoppel and res judicata); *United States v. Farrar*, 876 F.3d 702, 709 (5th Cir. 2017) (regarding judicial estoppel).
[78] *See, e.g.*, *Ingenito v. Riri USA, Inc*., No. 11CV2569MKBRLM, 2015 WL 9412541, at *7 (E.D.N.Y. Dec. 22, 2015) (emphasis added).
[79] *See id.*
[80] *See* discussion *infra* at 2-3.
[81] *See, e.g.*, ECF No. 385-1, Ex A, Joint Status Report on the National Rifle Association of America's Motion to Compel Depositions of Defendants' 30(b)(6) Representative(s) and Records Custodians, at 2-5; ECF No. 388, Plaintiff NRA's Status Report on Discovery Issues, dated October 15, 2021, at 3; ECF No. 394, Plaintiff NRA's Status Report on Discovery Issues, dated October 29, 2021, at 3.

## 2.     The "Sword and Shield" Doctrine Is Inapplicable Here.

AMc additionally attempts to relitigate the Supplemental Motion to Compel or Exclude—which asserted a conventional, but unsuccessful, "sword and shield" privilege-waiver argument—through its novel and unsupported insistence that sword-and-shield principles compel the Court to strike the FRA Spreadsheets from the summary judgment record.[82] AMc cites no case, and the NRA is aware of no case, where "sword and shield" privilege-waiver principles made evidence inadmissible. Instead, AMc relies on cases wherein sword-and-shield principles were invoked to effect a waiver of privilege and compel disclosure of additional documents.[83] Here, the additional FRA-related documents sought by AMc are already the subject of *in camera* review—if any additional disclosure is warranted, it will be ordered. There is nothing more for the Court to do at this juncture, and the pendency of *in camera* review of related documents does not exclude the FRA Spreadsheets from consideration at the summary judgment stage.

Moreover, sword-and-shield waiver principles affirm the adequacy of the NRA's disclosure here. Ruling on cases where documents, or portions of documents, are asserted to be

---

[82] *See* ECF No. 438 at 10-11.

[83] *See* ECF No. 438 at 11, note 28. For the proposition that courts "have ruled that a party simply cannot bring a cause of action . . . [or] [have] stri[cken] related evidence" from the record based on sword-and-shield waiver principles, AMc relies entirely on cases involving the Fifth Amendment right against self-incrimination. *See* ECF No. 438 at 11, note 29. But all of the Fifth Amendment cases AMc cites are inapposite—not least because no Fifth Amendment privilege has been asserted here. In *Wehling v. Columbia Broadcasting Sys.*, 608 F.2d 1084 (5th Cir. 1979), the plaintiff sued a news outlet for libel when it reported that he had committed fraud; the trial court dismissed his suit when he refused to answer any deposition questions about his allegedly-fraudulent conduct on Fifth Amendment grounds. *Wehling*, 608 F.2d at 1086. **The Fifth Circuit reversed the dismissal for abuse of discretion**, finding that the trial court could simply have stayed discovery until the threat of criminal liability passed. *Wehling*, 608 F.2d at 1089. In *Citizens State Bank v. Leslie*, No. 6-18-CV-00237-ADA, 2020 WL 1065724, at *1 (W.D. Tex. Mar. 5, 2020), the court likewise **refused to apply the sword-and-shield doctrine** to deprive the non-movant of its evidence or claims. **Importantly, the** *Leslie* **court emphasized that the affidavit sought to be stricken on sword-and-shield grounds came from a non-party to the lawsuit—just like the FRA Spreadsheets**, which were produced by FRA in response to a third-party subpoena. *See Leslie*, 2020 WL 1065724, at 2. And in *Studesville v. Buck*, No. 2:13-CV-254-J, 2014 WL 12597817, at *2 (N.D. Tex. Aug. 25, 2014), the court merely sustained a defendant's invocation of the Fifth Amendment, while alluding generally that future objections could be raised if beneficial portions of the same deposition were introduced. *Studesville*, 2014 WL 12597817 at *1. Thus, even as it resorts to inapposite Fifth Amendment authority, AMc fails to cite a single decision ordering relief on par with the relief it seeks—namely, the exclusion of relevant, admissible summary judgment evidence on the ground that the evidence was not produced until late in the discovery period.

privileged, courts have sometimes compelled disclosure of the disputed document in its entirety, or of underlying or closely related materials—but this is a standard the NRA has already met. For example, this district has applied "sword/shield" principles to limit waiver only to those portions of a disclosed attorney memorandum which laid out employee-selection criteria for a disputed reduction in force, while allowing the same litigant to withhold portions of the same memorandum that contained legal advice.[84] Likewise, a litigant who alleges assault must disclose portions of privileged medical records relating to the alleged incident, but not her prior treatment history.[85] And importantly, the "fairness" prong of the waiver analysis considers whether the privilege holder made an "affirmative decision to inject" the documents into the litigation or, by contrast, produced the documents **"'in connection with a motion to compel,' with the express intention not to broaden the subject matter waiver and to 'moot the issue'"** of an outstanding demand for documents.[86]   The NRA authorized production of FRA's draft spreadsheets for precisely this reason—as part of an effort to resolve a pending motion to compel.  There is no reason, and no basis, to strike the documents from the record.

### 3.   AMc Ignores FRA's Detailed Declaration Authenticating Its Own Business Records and Recorded Recollections.

Next, AMc argues that the FRA Spreadsheets should be stricken because "the Declaration of NRA counsel Sarah Rodgers[sic] makes no attempt to meet the requirements" of the business-record hearsay exception.[87]   But bizarrely, AMc ignores FRA's own Custodian of Records Declaration, attached as Exhibit 85 to the aforementioned Rogers Declaration in support of the NRA's Motion for Summary Judgment.[88]  Signed by FRA General Counsel Michael Trahar, this

---

[84] *Turner v. Coca-Cola Enters., Inc.*, No. CIV. 3:02-CV-1348-R, 2003 WL 21145740, at *1 (N.D. Tex. May 14, 2003).
[85] *Charalambopoulos v. Grammer*, No. 3:14-CV-2424-D, 2017 WL 1094394, at *4 (N.D. Tex. Mar. 8, 2017).
[86] *See, e.g.*, *Ingenito v. Riri USA, Inc.*, No. 11CV2569MKBRLM, 2015 WL 9412541, at *7 (E.D.N.Y. Dec. 22, 2015) (emphasis added).
[87] *See* ECF No. 438 at 13.
[88] *See* ECF No. 422, Ex. 85, Declaration of Michael Trahar, dated November 29, 2021 [App. 02786-88].

declaration attests explicitly to each element of the business-records hearsay exception:[89] the FRA Spreadsheets were created "contemporaneously with, or shortly following the conclusion of"[90] FRA's record examination, represented a type of record "regularly kept in the course of FRA's business,"[91] and, it was regular practice for such records to be made.[92]

Although Federal Rule of Evidence 803 allows otherwise-admissible business records to be excluded if "the opponent . . . show[s] that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness,"[93] AMc has not carried that burden. AMc argues that the FRA Spreadsheets were prepared in anticipation of litigation because FRA was engaged in anticipation of litigation, and because the NRA asserted the work product doctrine[94]—but provides the Court with virtually no arguments or evidence concerning the circumstances of the preparation of the FRA Spreadsheets *specifically*, let alone the portions cited.

An analysis of the documents actually sought to be admitted, the purpose for which they are cited, and court decisions addressing similar records makes clear that AMc's objections fail. In connection with its Motion for Summary Judgment, the NRA cites FRA's recorded recollection, made in the ordinary course of its work, that it requested certain media-buy documents from AMc and was told the documents were proprietary.[95] The mere fact that the NRA anticipated litigation when it retained FRA provides no basis to infer that FRA's recorded account of its request for documents, and AMc's response, was "prepared with the ulterior motive of injecting hearsay evidence into trial"—the rationale on which business records prepared in anticipation of litigation

---

[89] *See* F. R. Evid. 803.
[90] *See* ECF No. 422, Ex. 85, Declaration of Michael Trahar, dated November 29, 2021 at ¶ 3 [App. 02787].
[91] *See id.* ¶ 4 [App. 02787].
[92] *See id.* ¶ 4 [App. 02787].
[93] F. R. Evid. 803(E).
[94] *See* ECF No. 438 at 13-14.
[95] *See* ECF No. 420, Plaintiff National Rifle Association of America's Brief in Support of Motion for Partial Summary Judgment, at 13.

are sometimes excluded.[96]  Indeed, the fact that the FRA Spreadsheets were prepared by a third-party expert, and not by either litigant first hand, weighs in favor of their trustworthiness.[97]  Moreover, if the NRA had directed FRA to contrive the FRA Spreadsheets in order to manipulate the record in this case, the NRA would presumably have produced this contrived evidence immediately—not relented and surrendered the spreadsheets as part of a compromise effort after two successive motions to compel.

In addition, as set forth in the FRA Declaration, the FRA Spreadsheets are separately admissible under another hearsay exception: the exception for recorded recollections.[98]  The FRA Spreadsheets were made "contemporaneously with, or shortly after"[99] the FRA records examination, when the details of documents sought would have been "fresh" in the FRA professionals' memory.[100]  Moreover, the FRA Spreadsheets "accurately reflect FRA's knowledge regarding the matters discussed therein."[101]  Although the recorded-recollection exception focuses on matters "the witness once knew about but now cannot recall well enough to testify fully and accurately,"[102] the analysis of such evidence for summary-judgment purposes "does not focus on the admissibility of the evidence's form, but rather on the admissibility of its contents."[103]  Thus,

---

[96] See Wheeler v. Sims, 951 F.2d 796, 803 (7th Cir. 1992) (although litigation was anticipated when it was prepared, prison medical director's report was an admissible business record because "a reasonable person could well believe that this memo demonstrates the fulfillment of his medical responsibilities rather than a document prepared with the ulterior motive of injecting hearsay evidence into a trial."); see also State v. Pasene, 144 Haw. 339, 361, 439 P.3d 864, 886 (2019) (citing treatise and ruling that cell phone site records produced under subpoena were admissible despite being produced for litigation where source of underlying information did not indicate lack of trustworthiness).

[97] See, e.g., Lopez v. Kempthorne, 684 F. Supp. 2d 827, 888 (S.D. Tex. 2010) (report prepared by EEOC regarding potential employment claim was an admissible business record because the EEOC "[wa]s not a party to [the] litigation and ha[d] no interest in it.").

[98] See F. R. Evid. 803(5).

[99] See ECF No. 422, Ex. 85, Declaration of Michael Trahar, dated November 29, 2021 at ¶ 3 [App. 02787].

[100] See F. R. Evid. 803(5)(B).

[101] See ECF No. 422, Ex. 85, Declaration of Michael Trahar, dated November 29, 2021 at ¶ 3 [App. 02787]; F. R. Evid. 803(5)(C).

[102] See F. R. Evid. 803(5)(A).

[103] Trammell Crow Residential Co. v. Virginia Sur. Co., Inc., No. 3:08-CV-0685-B, 2009 WL 10677401, at *1 (N.D. Tex. Oct. 16, 2009)

if an out-of-court declarant—here, FRA—"could later present th[e] same evidence through direct testimony," it is properly considered.[104]   AMc does not contend (nor can it) that FRA or its representatives should be barred from testifying about documents they requested from AMc, nor their understanding of AMc's response—so the FRA Spreadsheets should be admitted.

## B.   **The Newspaper Articles Are Admissible for Non-Hearsay Purposes.**

Finally, AMc makes the meritless argument that the NRA should be precluded from citing newspaper articles for the proposition that it confronted "politicized scrutiny" in 2018.[105] Although newspaper articles are inadmissible for the truth of the facts purportedly reported, courts routinely admit them as evidence that statements were publicly made,[106] to prove "that a controversy existed,"[107] or to show that a litigant had notice of accusations it might face.[108]   Here, AMc argues that the NRA fabricated and staged its record-examination and invoice-compliance efforts in 2018 as part of an elaborate scheme to defraud and damage its erstwhile advertising agency.[109] The NRA, meanwhile, maintains that it confronted a hostile political and media environment, and thus sought to fortify itself against potential challenges to its governance.[110] Therefore, the NRA should be permitted to cite newspaper articles as evidence of the public hostility it confronted, and should be permitted to present evidence that such reports shaped its decision to seek documents from

---

[104] *Id.* (internal citations and quotation marks omitted).

[105] *See* ECF No. 438 at 14.

[106] *See, e.g.*, *Jauch v. Corley*, 830 F.2d 47, 52 (5th Cir. 1987) (upholding trial court's admission of newspaper article and videotape in defamation case); *Williams v. Valdosta*, 689 F.2d 964 (11th Cir.1983)(plaintiff, who alleged that he was demoted as retaliation for engaging in First Amendment activities, was properly allowed to admit newspaper articles that chronicled his speech and allegedly prompted retaliation).

[107] *See, e.g.*, *Park W. Galleries, Inc. v. Glob. Fine Art Registry, LLC*, No. 2:08-CV-12247, 2010 WL 987772, at *3 (E.D. Mich. Mar. 12, 2010) (denying motion to exclude newspaper articles, to the extent the articles were offered "for purposes other than for the truth of the matter asserted, such as to prove notice, damages, or that a controversy existed.").

[108] *See, e.g.*, *Roque v. Harvel*, No. 1:17-CV-932-LY-SH, 2019 WL 5265292, at *10 (W.D. Tex. Oct. 16, 2019) (denying notice to exclude newspaper articles, and collecting cases where such articles were admissible to show that municipalities had notice of excessive-force complaints against police).

[109] *See* ECF No. 238-1, Counter-Plaintiff Ackerman McQueen, Inc.'s Second Amended Counterclaim, p. 2; p. 7 ¶ 12; pp. 26-31 ¶¶ 60-72.

[110] ECF No. 201-1, Plaintiff's Second Amended Complaint, pp. 3-6; pp. 30-36 ¶¶ 57-70.

AMc.  Although AMc does not note this fact, the same articles are cited as evidence of adverse media coverage that the NRA faced regarding a racist, Ku Klux Klan-themed cartoon which AMc broadcast,[111] and the NRA should likewise be permitted to cite them for this purpose.

## IV.   CONCLUSION

For the foregoing reasons, the Motion should be denied in its entirety.

Dated: January 10, 2022                Respectfully submitted,

                                       **BREWER, ATTORNEYS & COUNSELORS**

                          By:  */s/ Sarah B. Rogers*
                                Cecelia L. Fanelli (*Pro Hac Vice*)
                                clf@brewerattorneys.com
                                Sarah B. Rogers (*Pro Hac Vice*)
                                sbr@brewerattorney.com
                                Philip Furia (*Pro Hac Vice*)
                                pjf@brewerattorneys.com
                                Dallas, Texas 75201
                                Telephone:  (214) 653-4000
                                Facsimile:  (214) 653-1015

                                **ATTORNEYS FOR PLAINTIFF AND COUNTER-DEFENDANT NATIONAL RIFLE ASSOCIATION OF AMERICA**

---

[111] *See* ECF 421 (App. In Support of NRA Motion for Partial Summary Judgement), Exs. 43 – 46 [App. 01447-01461].

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was electronically served via the Court's electronic case filing system upon all counsel of record on this 10th day of January 2022.

/s/ *Sarah B. Rogers*

21