**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| *Plaintiff and Counter-Defendant,* | § § | |
| v. | § § | **Case No. 3:19-cv-02074-G** |
| **ACKERMAN MCQUEEN, INC.,** | § § | |
| *Defendant and Counter-Plaintiff,* | § § | |
| and | § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, AND MELANIE MONTGOMERY** | § § § § | |
| *Defendants.* | § | |

## DEFENDANTS' REPLY IN SUPPORT OF OBJECTIONS TO, AND MOTION TO STRIKE, PLAINTIFF NATIONAL RIFLE ASSOCIATION OF AMERICA'S SUMMARY JUDGMENT EVIDENCE

Defendant/Counter-Plaintiff Ackerman McQueen, Inc. ("**AMc**"), Defendants Mercury Group, Inc. ("**Mercury**"), Henry Martin ("**Martin**"), William Winkler ("**Winkler**"), and Melanie Montgomery ("**Montgomery**") (collectively, "**Defendants**"), file this *Reply in Support of Objections to, and Motion to Strike, Plaintiff National Rifle Association of America's* ("**NRA**") *Summary Judgment Evidence* ("**Defendants' Motion to Strike**").

## A.  The NRA Continues to Misrepresent the FRA Audit.

Like virtually all of the NRA's other pleadings in this case (and in Virginia and the NRA bad-faith bankruptcy), the NRA continues to make whatever argument suits the moment, completely ignoring its prior positions, representations to the courts, and dealings with Defendants. Once again, regarding the FRA Audit and the draft FRA Spreadsheets, the NRA boldy claims it was the party acting in good faith, extending "olive branches" to Defendants, and that as of October 2021—when it decided to produce the spreadsheets—it was essentially forced to do so because it was "tired" of Defendants taking the same position regarding its compliance with the FRA Audit.

In its Response,[1] the NRA admits that it took the position for nearly two full years that the draft FRA Spreadsheets were privileged and that it refused to produce them. However, it then attempts to convince this Court that during the September 16, 2021 status conference, its position began to change as a result of *Defendants' statements*.  Specifically, Defendants are floored at how the NRA has misrepresented its attempts to "obviate the dispute" with respect to the draft FRA Spreadsheets.  On page 5 of its Response, the NRA states that *AMc emphasized* at the status conference before this Court on September 16, 2021 that it must receive discovery evidencing the "outcome," of the FRA Audit, and that as a result of AMc's position at the hearing, the NRA then, "in order to obviate the dispute," agreed that it would produce these draft FRA Spreadsheets.[2]

---

[1] ECF 491, NRA's Response to AMc's Motion to Strike (hereinafter, the "**Response**").
[2] Response, at 5.

During the hearing, the NRA, for the first time in nearly two years, ***acknowledged*** that it would produce the draft FRA Spreadsheets if there was not a subject matter waiver:

> MS. ROGERS: So Forensic Risk Alliance is a forensic accounting firm that was retained by the NRA Office of the General Counsel to inform its legal advice. It conducted an on-sight inspection of certain of Defendants' records, and there's a dispute over whether that's privileged. What we've tried to do in the courtroom today is dispel that dispute. So FRA generated a report with its findings. "Here's what -- Here's what Defendant showed us. Here's what we think of the documents in our view as forensic accountants." ***That document we think is privileged, but if there's a stipulation that it's not a subject matter waiver, we'll give that to them***.[3]

In response, as described on pages 37-38 of the hearing transcript, AMc's counsel made very clear that this was the ***first time*** the NRA was raising any willingness to then produce anything relating to the FRA Audit, including these draft FRA Spreadsheets that the NRA previously represented to the Virginia state court never even existed:

> MR. MASON: … ***Since – For two years Ackerman McQueen has been trying to get information relating to this FRA audit which formed the basis of the NRA's original lawsuit against Ackerman McQueen on April 12th, 2019,*** up in state court in Virginia. ***And we have been told for the last two years, "That is privileged information and we're not turning it over."*** …We have since asked for it in this case, and that judge -- that issue was teed up in the Motion to Compel. It's teed up in the Joint Report that is currently pending before Judge Toliver right now. ***And then today for the very first time we are now told that they don't have any objection to turning that over as long as we agree that it's not a blanket waiver of the privilege. That is the first time anything like that has been communicated to us,*** and I cannot tell you…. ***But they have -- they have told us for two years now, "Privileged; you can't have that information." And then today, for the very first time, we're now being told, "We'll give it to you."***[4]

Stated differently, with no prior notice or discussion with AMc or its counsel, the NRA—for the very first time—represented that FRA actually generated reports that it would be willing to produce upon certain conditions,[5] which of course AMc rejected given that the NRA was unwilling to turn over all of the underlying supporting documents regarding same.

---

[3] *See* ECF 396 at Ex. 1-B, Texas Action Hr'g Tr. (Sep. 16, 2021) at 30:19-31:5 (emphasis added).
[4] *See id.* at 37:21-38:23 (emphasis added).
[5] *See* ECF 396 at Ex. 1-B, Texas Action Hr'g Tr. (Sep. 16, 2021) at 30:15-31:8.

In its Response, the NRA further contends it was compelled to change its mind regarding the production of the FRA Spreadsheets weeks before the extended October 29, 2021 discovery deadline because "Defendants made the tactical choice to build their advocacy upon false assertions about the FRA records examination."[6]  Yet, the NRA ignores the fact that AMc has taken the position *for years* that it complied with the FRA Audit, including when it was originally attempting to get any and all information relating to the FRA Audit.[7]  Indeed, the NRA even acknowledged Bill Winkler's April 2021 testimony from the NRA's bad faith bankruptcy proceedings where he repeatedly testified regarding AMc's compliance.  Yet, the NRA did not even "offer" to produce the FRA Spreadsheets until the September 6, 2021 status conference, which conveniently occurred after *both parties* had produced numerous supplemental documents and took *over 25 depositions* between July 2021 and the September 16, 2021 status conference.  Moreover, given that the NRA has refused to produce the other FRA related documents, Defendants have no evidence as who authored these draft spreadsheets, when they were prepared, and the underlying support that went into preparing them, among other things.

### B.  The Draft FRA Spreadsheets Do Not Show Non-Compliance with the FRA Audit.

In addition to once again misrepresenting the parties' prior dealings and its own representations to numerous courts, the NRA falsely contends that the FRA Spreadsheets discredit AMc's claims that it complied with the FRA Audit.  For example, the NRA cites certain select statements from two spreadsheets suggesting that the "observations" are direct findings of non-compliance with the FRA Audit.  Yet, the actual FRA Spreadsheets say no such thing.  Stating that

---

[6] ECF 491 at p. 6.
[7] *See, i.e.*, ECF 396 at Ex. 1-A, Virginia Action Hr'g Tr. (Nov. 13, 2019) at 52:15-53:15; 54:17-22 (making clear AMc complied with the FRA Audit); ECF 31 at ¶ 77 ("AMc has complied with all of the NRA's properly authorized requests to review AMc's books and records."), ¶ 81 ("At no time did the audits claim to AMc that documents were withheld from review.") (AMc's First Amended Counterclaim).

"no documentation was provided" is not the same thing as stating that FRA requested information from AMc that AMc had in its possession but refused to turn over.  AMc has repeatedly stated that the only information not provided to FRA was information that it did not have in its possession[8]— a distinctly different circumstance than refusing to provide responsive documents in its possession. Further, the NRA cites to portions of the FRA Spreadsheets discussing a lack of written approvals by the NRA, but it completely ignores the statements that state those "written approvals" were only to be required by Wayne LaPierre or his designee, and the undisputed fact that LaPierre never put anything in writing (with the exception of his yellow pads all of which the NRA refused to produce in this case).  In other words, the NRA is attempting to turn AMc's inability provide information it didn't actually possess to support its continued false narrative of lack of compliance.

The NRA further contends that Judge Toliver has heard and determined the issues relating to the FRA Spreadsheets.  Again, this is false.  Although Judge Toliver ordered the NRA to produce all of the previously withheld FRA documents for an in camera review, she did not rule on the admissibility of the FRA Spreadsheets, including for purposes of the NRA's motion for summary judgment. The sole purpose of Judge Toliver's in camera review is to determine to whether the approximately 1,600 documents withheld by the NRA are entitled to attorney-client privilege protections—an increasingly easy task since the NRA has selectively chosen to produce some of these documents it previously withheld for more than two years.

The NRA also claims without any support that "AMc has sustained no prejudice because it was AMc who controlled the FRA review, not FRA or the NRA."[9]  The NRA then cites to a string of letters from AMc's counsel for the absurd position that these letters establish AMc's control over the FRA Audit.  The letters offer no such support and, as stated in its original motion,

---

[8] *See, i.e.*, ECF 419-1, Ex. 3 at 97:2—98:19 (Winkler BR Testimony, 4/16/21 AM) (APP 175-76).
[9] ECF 491 at p. 9.

AMc suffered significant prejudice as a result of the NRA's gamesmanship with respect to the FRA documents and the NRA's disingenuous "olive branch."  AMc has been engaged in motion practice for two years in two different forums relating to the FRA documents, it has taken numerous depositions where witnesses were specifically instructed on the basis of privilege not to answer questions about the FRA Audit, and the NRA has refused to produce any of the underlying documents relating to these FRA Spreadsheets that would reveal, among other things, ***who actually prepared them***.  Moreover, the NRA's suggestion that it received discovery relating to the FRA Audit through Mr. Trahar is again false.  Throughout his deposition, the NRA repeatedly instructed Mr. Trahar not to answer basic questions regarding the FRA Audit:[10]

> Q. Okay. Did that access allow FRA to complete its examination?
> MR. HUNDLEY: Objection. Whether or not they believe they complete it or what they deduced from it is work product.
> MR. DICKIESON: Okay. So he's not going to testify that the information was inadequate in any way? Is that -- you're not going to let him testify about that conclusion?
> MR. HUNDLEY: That would be an opinion.
> MR. DICKIESON: Okay. So he's not going to be allowed to testify?
> MR. HUNDLEY: I would instruct him not to answer those types of questions based on his conclusions or his opinions about the work that FRA performed. It's work product.[11]
>
> Q. Okay. Did FRA reach any conclusion that AMC was in violation of the examination provision?
> MR. HUNDLEY: Objection, calls for work product.
> MR. DICKIESON: You're instructing him not to answer?
> MR. HUNDLEY: Yes, I'll instruct him not to answer.[12]
>
> Q. Did the team go to Wayne LaPierre directly and ask him for backup for those expenses?
> MR. HUNDLEY: Objection. That would be work product.
> MR. DICKIESON: Are you instructing him not to answer?
> MR. HUNDLEY: Yes.
> BY MR. DICKIESON:
> Q. What information did FRA receive from the Brewer law firm?

---

[10] There are literally hundreds of examples throughout the Trahar deposition.
[11] *Id.* at 55:18-56:8 (APP 614).
[12] *Id.* at 78:21-79:3 (APP 620).

MR. HUNDLEY: Objection. That calls for work product and I'd ask him not to answer that.
BY MR. DICKIESON:
Q. You are not answering that?
A. Based on that instruction.[13]

Finally, for whatever reason, the NRA cites and attempts to use their unqualified and unreliable expert witnesses as evidence that the FRA Spreadsheets should be properly admitted as summary judgment evidence.  As set forth in Defendants' Motions to Exclude the reports of Andrew McLean, Gary Goolsby, and Jonathan Hochman, the proposed testimony from each of these three individuals falls far short of meeting the *Daubert* standards.[14]  In fact, the NRA's reliance on these experts with respect to the FRA Spreadsheets further underscores why this evidence should be struck because none of them were even prepared to discuss the FRA Spreadsheets that had been dumped on them right before the discovery deadline.

### C. The NRA's Affirmatively Injected the FRA Spreadsheets into this Litigation, Warranting that it be Estopped from Relying Upon Them.

Based upon the facts and circumstances present here, allowing the NRA to use or relu on the FRA Spreadsheets would be fundamentally unfair to AMc. Although the NRA correctly states that estoppel is an equitable doctrine, its cited cases offer no help. *Sun Oil* involved a discussion of res judicata (not at issue here) and did not discuss equitable estoppel as the NRA's parenthetical suggests.[15] Further, *Farrar,* discussing judicial estoppel, described a litigant switching arguments between the trial court and appellate courts and playing "fast and loose" with court procedure to obtain some "tactical gain."[16]

*Ingenito* is also unhelpful. There, an employer disclosed privileged communications as

---

[13] *Id.* at 82:7-21 (APP 621).  Trahar was not even personally involved in the FRA Audit. *Id.* at 11:21-12:9 (APP 603).
[14] *See* ECF 457-464.
[15] *Nations v. Sun Oil Co.*, 705 F.2d 742, 744-45 (5th Cir. 1983).
[16] *United States v. Farrar*, 876 F.3d 702, 712-13 (5th Cir. 2017).

proof that its decision to terminate a pregnant employee arose before she became pregnant.[17] Following the employee's motion to compel additional, alleged waived privileged communications, the employer produced privileged communications relating only to the *timing* of the decision to terminate employee rather than the *reasons* for doing so.[18] The Court determined the first disclosure of privileged emails was made to assist defendant's position in the litigation but that the supplemental production was made following plaintiff's request for documents and as a means to moot the issue.[19] Conversely, the NRA has haphazardly pointed to the only potential similarity in that case—*i.e.*, the motion to compel—as a fig leaf to hide its transparent attempt to utilize the FRA Spreadsheets for maximum strategic advantage. The NRA ought to be estopped from relying on these reports to AMc's detriment.

### D.  The Sword and Shield Doctrine is Applicable.

Next, the NRA cites the fairness prong of waiver and notes that whether the privilege holder waived certain documents depends on whether it made an "affirmative decision to inject" the documents into the litigation, or produced the documents "in connection with a motion to compel, with the express intention not to broaden the subject matter waiver and to 'moot the issue.'"[20]  As discussed above, it is undisputed that the NRA made a calculated and strategic litigation decision to inject the FRA Spreadsheet into this litigation on the eve of the close of discovery, despite the fact that it took the position for years that they were privileged and refused to permit numerous witnesses to answer questions regarding same.  Similarly, the NRA's suggestion that it produced the FRA Spreadsheets to moot the issue while unilaterally concluding it did not waive subject

---

[17] *Ingenito v. Riri USA, Inc.*, No. 11-CV-2569 (MKB) (RLM), 2015 U.S. Dist. LEXIS 171728, at *3-4 (E.D.N.Y. Dec. 22, 2015).
[18] *Id.* at *5-8, 13.
[19] *Id.* at *20-25.
[20] ECF 491 at 16.

matter privilege defies reality.  NRA counsel at the September 16, 2021 hearing stated the NRA would only produce these documents if AMc would agree that it did not amount a subject matter waiver.[21]  AMc stated unequivocally it was not going to allow the NRA to cherry-pick the production of previously withheld and allegedly privileged documents without the NRA being required to produce all of the underlying documents and communications relating to the FRA Audit.  Despite AMc's position, the NRA produced them anyway.  Thus, it is completely disingenuous for the NRA to assert that it took these actions with the goal of "mooting the issue" or avoiding a "subject matter waiver."

A broader consideration of the NRA's position provides clarity to the plot it orchestrated and the reason why the FRA Spreadsheets should be stricken. As evidenced by the parties' motions for summary judgment, the NRA has zero evidence that specific documents were requested and not provided by AMc in the FRA Audit. Knowing its claims could not prevail, and despite withholding these documents for years as privileged, the NRA decided it must produce select FRA documents to serve as the sole evidentiary basis for its claim to survive summary judgment. The NRA sought to be savvy, couching its intended production as an "olive branch" to AMc and trying to coax AMc to agreeing to no subject matter waiver (as if it wasn't the NRA that was in desperate need for evidence). The NRA sprung their proposal on AMc for the first time in front of the Court, hoping that AMc would jump on the offer, but AMc did not accept because AMc's position is that none of the FRA materials are privileged. The NRA's plan failed, so the NRA now attempts to fabricate a scenario in which the NRA's improper withholding and selective production of purportedly privileged documents is somehow AMc's fault. As explained above, this argument

---

[21] *See* ECF 396 at Ex. 1-B, Texas Action Hr'g Tr. (Sep. 16, 2021) at 30:15-31:8 (Here's what -- Here's what Defendant showed us. Here's what we think of the documents in our view as forensic accountants." That document we think is privileged, ***but if there's a stipulation that it's not a subject matter waiver, we'll give that to them.***").

fails on its face. The NRA should not be allowed to orchestrate these elaborate scenarios to avoid the scrutiny and consequences of selectively withholding documents to fit its needs.

Finally, the NRA's cited cases are inapposite. *Turner* involved defendant's production of a legal memorandum that redacted the legal opinion portion but not the background facts, *i.e.*, the reduction in force selection criteria, on which the opinion was based.[22] In fact, defendant produced this document in response to plaintiff's request for these background facts, and nothing in the case suggested defendant sought to rely on the redacted legal opinions to support its claims.[23] Unlike *Turner*, the NRA has resisted producing the FRA Reports for years but now has decided to use them selectively to try to advance its arguments. Finally, the NRA's second invocation of *Ingenito* is meritless because the NRA expressly sought to introduce the FRA Reports to gain a tactical advantage in the litigation.

### E. Trahar's Declaration is Not Admissible.

Finally, the NRA contends that the Trahar Declaration properly proves up the FRA Spreadsheets as business records subject to the business records exception. However, Federal Rule of Evidence 803(6)(E) precludes introducing evidence otherwise satisfying the business records exception if the information or circumstances surrounding the preparation of the evidence indicate a lack of trustworthiness.[24] As detailed in its original Motion, Defendants have carried their burden to show that the FRA Spreadsheets are not trustworthy. The NRA anticipated litigation against AMc as early as September 2018, well before the FRA Audit.[25] The NRA/FRA engagement letter also confirms that the FRA Audit was pursued for "Contemplated Litigation."[26] Finally,

---

[22] *Turner v. Coca-Cola Enters., Inc.*, No. 3:02-CV-1348-R, at *1-2 (N.D. Tex. May 14, 2003).
[23] *See id.* at *1-3.
[24] FED. R. EVID. 803(E).
[25] ECF 432, Ex. 21 (April 22, 2019 correspondence from W. LaPierre to M. Dycio) (APP 240).
[26] ECF 422, Ex. 27 (January 29, 2019 FRA Engagement Letter) (APP 544).

Defendants have repeatedly briefed and argued the facts and circumstances relating to the fraud associated with the FRA Audit, including Susan Dillon's direct involvement in same.[27]

### F.  The NRA Again Contradicts Itself Regarding the Media Articles.

In its Response, the NRA falsely claims that none of these Media Articles are hearsay because they are not being offered for the truth of the matter asserted.  *First*, Exhibits 42, 43, 44, 45, and 46 all relate to the airing of a Dana Loesch Thomas & Friends episode.  In its Response, the NRA simply claims that these are being cited as evidence of adverse media coverage and therefore they should be admissible.[28]  Yet, none of these exhibits are even cited in the NRA's Brief in Support of its MSJ.  However, in response to Defendants' MSJ, the NRA cited and relied upon these same articles attempting to use this as the true basis to show that AMc breached the Services Agreement by failing to promote a positive image for the NRA.[29] In sum, this is improper hearsay evidence not subject to any exception.

*Second*, Exhibits 6, 48, and 49 relate to New York's investigation into the NRA.  The NRA cites the ACLU article in Exhibit 6 in its brief to suggest that it "confronted politicized scrutiny from New York's insurance regulators."[30]  In the following sentences, the NRA discusses its internal course correction measures following this political scrutiny, demonstrating the NRA relied on the truth of the politicized scrutiny to justify taking the course correction measures.[31] Thus, this is inadmissible hearsay—as are Exhibits 48 and 49.  *Finally*, Exhibit 33 is from a STRATA website, and the NRA offers no basis for why document is not hearsay.

---

[27] *See, i.e.*, ECF 55 (AMc's Motion to Compel), 180 (Joint Status Report Regarding Motions to Compel), 396 (AMc's Supplemental Status Report).
[28] ECF 491 at 20.
[29] *See* ECF 440 at 15-16 ("The Services Agreement required AMc to "promote a positive image" of the NRA and properly manage NRATV talent. AMc failed. Under AMc's supervision and using the NRA's branding, Loesch aired Ku Klux Klan-themed cartoon cartoon [sic] that brought the NRA into disrepute.[18]").
[30] ECF 420, at 7.
[31] *See id.*

## CONCLUSION

The evidence supporting the NRA's Response to Defendants' Motion for Partial Summary Judgment fails to meet the standards for admissibility.  Defendants request that the Court strike the evidence referenced in Defendants' Motion to Strike and Reply.

January 24, 2022.

Respectfully submitted,

*/s/ Brian E. Mason*
**G. Michael Gruber, Esq.**
Texas Bar No. 08555400
gruber.mike@dorsey.com
**Brian E. Mason, Esq.**
Texas Bar No. 24079906
mason.brian@dorsey.com
**Jay J. Madrid, Esq.**
Texas Bar No. 12802000
madrid.jay@dorsey.com
**J. Brian Vanderwoude, Esq.**
Texas Bar No. 24047558
vanderwoude.brian@dorsey.com
**DORSEY & WHITNEY LLP**
300 Crescent Court, Suite 400
Dallas, Texas 75201
(214) 981-9900 Phone
(214) 981-9901 Facsimile

**ATTORNEYS FOR DEFENDANTS/
COUNTER-PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2022, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

*/s/ Brian E. Mason*
BRIAN E. MASON