**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| **Plaintiff and Counter-Defendant** | § § | |
| **v.** | § § | |
| **ACKERMAN MCQUEEN, INC.,** | § § | |
| **Defendant and Counter-Plaintiff,** | § | **Civil Action No. 3:19-cv-02074-G** |
| **and** | § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, and MELANIE MONTGOMERY,** | § § § § § | |
| **Defendants.** | § § | |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO
EXCLUDE CERTAIN OPINIONS OF THE NRA'S EXPERT WITNESS, JONATHAN E.
<u>HOCHMAN</u>**

**BREWER, ATTORNEYS & COUNSELORS**

Cecelia L. Fanelli
*Pro Hac Vice*
clf@brewerattorneys.com
Sarah B. Rogers
New York Bar No. 4755252
sbr@brewerattorneys.com
Philip J. Furia
*Pro Hac Vice*
pjf@brewerattorneys.com
**Brewer Attorneys and Counselors**
1717 Main Street, Suite 5900
Dallas, Texas 75201
Telephone:  (214) 653-4000
Facsimile:  (214) 653-1015

**ATTORNEYS FOR PLAINTIFF AND COUNTER-DEFENDANT NATIONAL RIFLE ASSOCIATION OF AMERICA**

## <u>TABLE OF CONTENTS</u>

I. PRELIMINARY STATEMENT ...................................................................................1

II. FACTUAL BACKGROUND ...................................................................................1

    A.    Hochman's June 1, 2021 Report and August 10, 2021 Deposition ........................1

    B.    AMc Finally Produced Essential Information, but Subsequent to Hochman's Report and Deposition: September, October 2021 .............................6

    C.    The Supplemental Report: October 25, 2021 .......................................................9

III. ARGUMENTS AND AUTHORITIES.....................................................................11

    A.    AMc's Argument to Exclude Hochman's Opinions about Business Activities and Ethics is Unavailing....................................................................11

    B.    Hochman does not Propose Opinions about the State of Mind of the Parties and AMc's Argument Otherwise is Meritless .......................................12

    C.    Hochman's Harm Analysis is Relevant and Based upon Recognized Methodology .....................................................................................................14

    D.    AMc's Frivolous Arguments Regarding the Exclusion of Opinions Concerning the Dashboard and Social Media Accounts are Unavailing...............15

    E.    The Court Should Disregard AMc's Distorted Argument Regarding Hochman's Testimony Involving the PowerPoint Presentations.........................17

    F.    AMc has Shown no Credible Basis for the Exclusion of Hochman's Damages Testimony........................................................................................18

    G.    Hochman's Supplemental Report is Timely .......................................................19

IV. CONCLUSION.......................................................................................................23

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*In re Air Crash at New Orleans*,
  795 F.2d 1230 ..................................................................................................................12

*Betzel v. State Farm Lloyds*,
  480 F.3d 704 (5th Cir. 2007) ...................................................................................20, 21, 22

*Bradley v. United States*,
  866 F.2d 120 (5th Cir.1989) ...............................................................................................21

*In re Complaint of C.F. Bean L.L.C.*,
  841 (5th Cir. 2016)...............................................................................................................23

*In re Complaint of C.F. Bean L.L.C.*,
  841 F.3d 365 (5th Cir. 2016) .....................................................................................20, 21, 22

*E.E.O.C. v. Gen. Dynamics Corp.*,
  999 F.2d 113 (5th Cir. 1993) .....................................................................................20, 21, 22

*Kumho Tire Co., LTD. V. Carmichael*,
  526 U.S. 137 (1999)......................................................................................................15, 16

*Lavespere v. Niagara Mach. & Tool Works, Inc.*,
  910 F.2d 167 (5th Cir. 1990) (abrogated on other grounds by *Little v. Liquid
  Air Corp.*, 37 F.3d 1069 (5th Cir. 1994)).............................................................................15

*U.S. v. King*,
  532 F.2d 505 (5th Cir. 1976) ...............................................................................................16

*U.S. v. Marler*,
  614 F.2d 47 (5th Cir. 1980) .................................................................................................16

*United States v. Lopez*,
  880 F.3d 974 (8th Cir. 2018) ...............................................................................................16

*United States v. Speer*,
  30 F.3d 605 (5th Cir. 1994) .................................................................................................13

**State Cases**

*Mears v. Jones*,
  No. 1:17-CV-6-KS-MTP, 2019 WL 3483157 (S.D. Miss. July 31, 2019)............................12

**Rules**

Fed. R. Evid. 701 ..................................................................................................................14

Fed. R. Evid. 702 ....................................................................................................12, 14, 15

**Other Authorities**

3 Jack B. Weinstein and Margaret A. Berger, *Weinstein's Evidence* ¶ 702[01]
(1992)..........................................................................................................................12, 13

Neil T. Bendle, et al., *Marketing Metrics, the Manager's Guide to Measuring
Marketing Performance* ............................................................................................................5

TO THE HONORABLE A. JOE FISH:

Plaintiff/Counter-Defendant the National Rifle Association of America files this *Brief in Opposition to Defendants' Motion to Exclude Certain Opinions of the NRA's Expert Witness, Jonathan E. Hochman* ("the Motion to Exclude Hochman").

## I.   PRELIMINARY STATEMENT

None of Hochman's opinions should be excluded for the reasons described below.

## II.   FACTUAL BACKGROUND

### A.   Hochman's June 1, 2021 Report and August 10, 2021 Deposition

AMc persuaded the NRA to establish NRATV through a series of representations concerning its alleged benefits, including monetization—namely, the ability to pay for itself through additional sponsorship.[1] Quickly the NRATV budget ballooned[2] to the point where virtually all of the NRA's advertising dollars were being absorbed by NRATV.[3] Notably, AMc contracted almost immediately with Performance Improvement Partners ("PIP") to provide assistance with internet marketing, including metric analysis. PIP created a "Dashboard" that contained and displayed the metrics.[4] In addition to the approximately $44,000,000 that the NRA paid AMc with respect to its management of NRATV, it also paid for the creation of the Dashboard.[5]

---

[1] *See* ECF 448-1, Ex. 64, LaPierre Decl. at ¶ 4, Dec. 20, 2021 [App.0196].

[2] NRATV was the NRA's largest budget item. For example, the 2019 NRATV Budget was $15,405,098 out of the 2019 Total Budget of $25,718,436. *See* Fanelli Decl., Ex. 2 [App. 0026] (2019 NRA Budget - Revised 12/4/18). In 2018, the NRATV Budget was $13,619,954 and the NRA's Total Budget was $31,212,786. ECF 448-1, Ex. 5 [App. 00043].

[3] LaPierre testified as follows: "But what I made very clear to the Board and to Ackerman and to our treasurer's office was that we need to set up – we needed to set up landing pages for all of these people on this [NRA]TV network because it's eating up all of our ad money, and if we can't translate that into membership, and **if we can't translate it into – into contributions and memberships, we're going to have to cut it back.** Because if people are really watching it like you say they are, we ought to be able to translate that into members and money" (emphasis added). ECF 448-1, Ex. 8, LaPierre Dep. at 264:22-265:7, Sept. 24, 2019 [App.00226-27]. LaPierre started to have concerns that it was eating up all of the NRA's advertising money in 2017. *Id.* at 261:4-12 [App.00226].

[4] ECF 344-1, Ex. A-5, Bergin Rebuttal Expert Report at ¶ 14, July 1, 2021 [App.071].

[5] *See* ECF 448, Ex. 9, Montgomery Dep. at 168:4-6, Aug. 6, 2021 [App.00352].

On June 1, 2021, Jonathan E. Hochman, a computer scientist, submitted an expert report on behalf of the NRA.[6] In that report, he opined that the performance metrics that AMc provided to the NRA with respect to its over $40,000,000 internet marketing investment were "vanity metrics," embodied in glossy and colorful PowerPoints, labeled "reports" by AMc.[7] Hochman notes that the vanity metrics contained in the AMc reports are essentially meaningless because they did not enable the client, NRA, to make meaningful business decisions about the utility of its marketing investment.[8] As Hochman describes, the difference between vanity metrics and actionable metrics is the latter can be used to make business decisions.[9] The vanity metrics in the AMc presentations are:  completed views, engaged views, total views, reactions, shares, and comments.[10] None of these meet the test of actionable metrics.[11] Hochman also opines that AMc provided performance "reports" sporadically to the NRA.[12] In his opinion, reports should be available to clients via an online dashboard so a client can check how "a marketing program is proceeding as often as they like."[13]

On August 10, 2021, Hochman was deposed for an entire day—although AMc's motion largely ignores the content of the two hundred and sixty (260) page transcript of the deposition. At his deposition, Hochman testified extensively about his interviews with LaPierre, the Executive Vice President of the NRA; Grant Spofford ("Spofford"), a Senior Program Manager at the NRA who was employed by AMc for over twenty (20) years; and the NRA's IT director.[14] Among other issues, Hochman testified that he asked Spofford and the IT director if anyone at the NRA had

---

[6] *See* ECF 448-8, Ex. 91, Ex. A, Hochman Report, June 1, 2021, [App.04363-04409].
[7] *Id*. at ¶ 37 [App.04373].
[8] *See, e.g.*, *id.* at  ¶¶ 37-42 [App.04373-75].
[9] *See, e.g.*, *id.* at  ¶ 49 [App.04377].
[10] *See, e.g.*, *id.* at  ¶ 50 [App.04377].
[11] *See, e.g.*, *id.* at  ¶ 51 [App.04378].
[12] *See, e.g.*, *id.* at  ¶ 55 [App.04379-80].
[13] *Id.*
[14] ECF 448-1, Ex. 10, Hochman Dep. at 53:8-58:24, Aug. 10, 2021 [App.00386-87].

access to the NRATV social media profiles, and none did.[15] Hochman discussed topics with LaPierre such as the origins of NRATV and the metrics that AMc presented to the NRA. Based upon those discussions, he testified that LaPierre, although skilled in traditional marketing, was unfamiliar with internet marketing.[16] He learned from his interview that the NRA was concerned about obtaining "basic information" from AMc, like "How many people are watching? And what's the benefit to us of this big expenditure, big investment?"[17] LaPierre advised Hochman that he "would go out to gun shows or other places and meet with the public. […] people weren't saying 'I'm watching this,' […] nobody cared about it[…]."[18] Hochman also testified that LaPierre informed him that, other than AMc's claims—mostly from Angus McQueen, there was "[…] no indication whatsoever that it [NRATV] was producing a lift in memberships or an improvement in NRA's reputation or anything […] there was no indication that it was benefitting the NRA the way it should have for the amount of money being invested."[19]

AMc's counsel questioned Hochman repeatedly about the NRA Dashboard despite the fact that Hochman had not "checked" the Dashboard[20] which AMc retained after termination of the Services Agreement. In response to questions about his discussions with LaPierre, Hochman noted that he discussed the Dashboard with LaPierre because he had seen documents related to it.[21]

---

[15] *Id.* at 54:13-20, 245:7-21 [App. 00386, App. 00434]. Spofford's knowledge on this point is particularly relevant given his responsibilities at AMc in 2018 and 2019. *See* ECF 448-2, Spofford Aff., Dec. 20, 2021 [App.00440-617].
[16] As to LaPierre's unfamiliarity with internet marketing and metrics, Hochman testified that:

> Q.   Did you have any discussions with him about whether or not he agreed that the metrics that were presented were the ones that were important to be monitored?
> A.   I think the question has some assumptions built in that aren't true, because my impression of dealing with – discussing this with Mr. LaPierre is that he was very unfamiliar with Internet marketing, that he may have had good experience with traditional types of marketing over the years but he -- He seemed to readily admit that he was not an expert at all on Internet marketing and that he needed guidance. […]

ECF 448-1, Ex. 10, Hochman Dep. at 182:17-183:9 [App.00418] (objections omitted).
[17] *Id.* at 56:2-6 [App.00386].
[18] *Id.* at 56:17-57:2 [App.00386-87].
[19] *Id.* at 57:3-9 [App.00387].
[20] *Id.* at 222:23-24 [App.00428].
[21] *Id.* at 59:6-8 [App.00387].

Specifically, he testified that he knew there was a dashboard "under development,"[22] but he did not see evidence that the NRA was "using it very much […]"[23] In fact, in response to repeated questions from AMc's counsel about whether Hochman knew what metrics were in the NRA Dashboard, and whether the NRA's questions about NRATV could have been answered by the Dashboard, Hochman testified based on his review of documents, including a May 2019 report supplied by Defendant Melanie Montgomery ("Montgomery"), not all of the relevant metrics were in the Dashboard. "The pipeline wasn't delivering that information to NRA on a regular basis in a format they could ingest it and use it."[24]

Hochman unequivocally testified that he wanted to see the primary data from the NRATV social media accounts whose metrics were supposed to populate the Dashboard. He testifies that "I'd like to inspect the NRATV social media accounts. I'd like to be able to log in and see the data […] I would like to see any additional audience metrics[...]."[25] He noted that if he could "look in the social media accounts I may get a better view of the division between organic traffic and paid traffic[,]"[26] thus enabling him to determine the extent to which NRATV actually created an organic audience as opposed to AMc just placing paid internet ads. Hochman testified that if more of the missing information is produced, he will supplement his report,[27] but he didn't "know what further documents might come out and it's hard for me to predict what opinion I might be able to give based on what I haven't seen."[28]

Despite his lack of access to the Dashboard and the primary data in the social media accounts, Hochman provided hours of testimony on metrics. He described how AMc should have

---

[22] *Id.* at 59:8-9 [App.00387].
[23] *Id.* at 59:10-13 [App.00387].
[24] *Id.* at 237:6-21 [App.00432].
[25] *Id.* at 66:11-17 [App.00389].
[26] *Id.* at 69:2-5 [App.00390].
[27] *Id.* at 68:18-23 [App.00389].
[28] *Id.* at 69:22-70:2 [App.00390].

provided the NRA with actionable metrics so that the NRA could understand whether the $44 million dollar marketing campaign was successful or not in helping the NRA meet its objectives.[29] He explained why vanity metrics like reactions, shares, and comments do not "reflect engagement with content," as follows:

> Simply because measuring raw engagement is not all that useful. You have to understand the type of engagement and does that engagement lead to something [….] [The NRA] wanted to know how many people are tuning in to watch the show, how many are tuning in to NRATV every day, how many are tuning in let's say once a month, how many people are tuning in twice a month. [….] They wanted to know the audience size. They wanted to know: Are these people actually becoming members? Are we changing the opinions of these people? Are we changing anyone's mind with this content which is designed to persuade or inform?[30]

Further, he opined that:

> I think that my opinion would be that there should be some form of attribution measuring engagement by actual results rather than just someone who watched for so long. So I would advocate for conversion tracking where you define some goal and you assign or estimate a value to that goal and then you look at your activities and you try to determine the value being created by each segment of your activity.[31]

Further, Hochman addressed so-called "unique visitors," who are loyal visitors to a platform as opposed to occasional visitors. At the outset, he testified that he has experience in tracking this data, having spent "a huge amount of time studying systems for tracking and identifying users online and compiling statistics about […] behavior […]."[32] He then described at length how unique visitors can be measured,[33] contrary to AMc's failure to do so until the NRA insisted. For example, on April 8, 2019 Arulanadam wrote to Montgomery and Henry Martin about

---

[29] *Id.* at 77:20-25 [App.00392]. Hochman opined that "reach" and "frequency" if used by AMc, might be helpful, but the issue is not so simple as using just those two metrics. Others could be needed as well, thus his opinion that AMc failed to use "actionable metrics." *See, e.g., id.* at 77:20-78:-25, 79:1-6 [App.00392]. For a definition of reach and frequency metrics *see* Fanelli Decl., Ex. 3, [App. 0027-33] (excerpt from Neil T. Bendle, et al., *Marketing Metrics, the Manager's Guide to Measuring Marketing Performance*).

[30] ECF 448-1, Ex. 10, Hochman Dep. at 230:19-232:8, Aug. 10, 2021 [App.00430].

[31] *Id.* at 219:24-220:13 [App.00427].

[32] *Id.* at 86:17-2 [App.00394]. Hochman notes his experience with "conversion tracking." *Id.* at 84:16-22 [App.00393].

[33] *Id.* at 87:12-15, 87:25-95:12 [App.00394, App.00394-96].

key metrics, such as unique visitors, web pages most visited, peak hours for traffic, historical trends over prior years, and "how many people are 'registered users' of NRATV?"[34] This straightforward, technical, set of questions aimed at obtaining the "number of total unique visitors for each NRATV platform,"[35] was met with a contrived, evasive, response from Montgomery on April 9, 2019, that "our counsel" advised AMc to "closely protect" this data because LaPierre requested that it be kept confidential. Relying on advice of counsel, AMc withheld the data, requiring LaPierre to write a letter to Montgomery on May 5, 2019[36] directing her to release the NRA data to Arulanadam.[37]

**B.    AMc Finally Produced Essential Information, but Subsequent to Hochman's Report and Deposition: September, October 2021**

AMc produced the report of Richard Bergin in rebuttal to Hochman; he testified on August 20, 2021. His deposition testimony establishes that the NRA Dashboard was an artifice loaded with "proxies"[38] gerrymandered metrics designed to give a false impression of success. He admitted that the metrics that appeared in the AMc PowerPoints were so-called "high level" (i.e. vanity) as opposed to more detailed metrics.[39] Bergin testified that had additional metrics been

---

[34] Fanelli Decl., Ex. 4, [App. 0035] (Email thread between M. Montgomery and A. Arulanandam, Apr. 10, 2019 (NRA-AMc_00059409 - NRA-AMc_00059411)).

[35] *Id.*

[36] Fanelli Decl., Ex. 5, [App. 0039] (Email thread between M. Montgomery, A. Arulanandam, and W. LaPierre, May 6 2019 (Hochman Deposition Exhibit 298)).

[37] Over forty (40) pages of the deposition transcript (ECF 448-1, Ex. 10, Hochman Dep. at 106-146 [App.00399-409]) are littered with questions about Montgomery's reaction to the request and counsel's questions about why her response was an exercise in "obfuscation" and "delay." Hochman specifically defines obfuscation as: "'Obfuscation' means that the actual fact of how many people are tuning in to watch has not been revealed. That's the most critical fact. [....] And no information is given, simply a pointer is given back to the prior PowerPoint displays of vanity metrics, which obviously NRA is saying were not sufficient for their needs, and she's just referring him back to the prior things." *Id.* at 108:10-25 [App.00399]. As for delay, he notes: "'Delay' means they haven't presented the information that was warranted. [The NRA] just wanted to know, how many people are tuning in to watch? And what's the response rate, for example, on these emails when we invite people? When do people actually come? He pointed out some other key metrics, you know, unique visitors, Web page most visited, peak hours for traffic, et cetera, for this year. So those are things he wanted and it would have been --should have been, especially with this advanced dashboard they claim to have spent a lot of money to develop, why couldn't they answer the client's needs for information?" *Id.* at 109:2-22 [App.00400].

[38] ECF 448-1, Ex. 6, Bergin Rebuttal Report at ¶ 16, July 1, 2021 [App.00069].

[39] *See* ECF 448-1, Ex. 7, Bergin Dep. at 117:19-24, Aug. 20, 2021 [App.00146].

placed into the Presentations it would have been more informative to the recipient.[40] Despite Bergin's portrayal of the Dashboard as a robust, functioning technological platform in his initial report,[41] at his deposition on August 20, 2021, he testified that he never accessed the Dashboard or interviewed its creator.[42] He asked for access, but Melanie Montgomery, whom he interviewed, said "*it was not possible.*"[43] Further, he lacked the technical specifications for the Dashboard; did not know the location of its database;[44] and did not know if a schema exists for the Dashboard.[45]

In addition to the record establishing AMc's use of bogus metrics in a non- functional dashboard, *AMc had not turned over the access codes to the NRA for the NRA's own social media accounts as of the date of Hochman and Bergin's depositions, and continues to withhold them.*[46] As Hochman testified, if he had the codes he would be able to analyze, for example, organic versus paid traffic concerning NRATV.[47] In other words, did NRATV actually have an audience or were people simply responding to ads that AMc was placing, which could have been placed absent the expensive apparatus of the NRATV platform.

On September 1, 2021, AMc's counsel sent a letter to the NRA's counsel belatedly

---

[40] *Id.* at 129:9-20 [App.00149]. AMc's corporate representative with respect to NRATV, Brian Darley, was likewise ignorant about thechoice of the performance metrics that formed the basis of the Presentations given to the NRA. *See* ECF 448-2, Ex. 18, AMc's 30(b)(6) Corporate Representatives Dep.at 195:1-204:24, Aug. 4, 2021 [App.00917-19].

[41] ECF 448-1, Ex. 6, Bergin Rebuttal Report at ¶ 17, July 1, 2021 [App.00069].

[42] ECF 448-1, Ex. 7, Bergin Dep. at 55:5-6, 58:1-59:6, Aug. 20, 2021 [App.00130-31].

[43] *Id.* at 59:24-60:2 [App.00131] (emphasis added).

[44] *Id.* at 70:14-25 [App.00134].

[45] Bergin admitted that in order to determine what metrics were actually put into the Dashboard, it would require him to speak with someone from PIP. *Id.* at 126:24-127:1, 127:4-9 [App.00148]. ***Tellingly, AMc did not produce the PIP/AMc contract documents in this litigation, presumably because it lists the actionable metrics that AMc chose not to use. See, e.g.*,** ECF 448-3, Ex. 31, Excerpt of screenshot of Volume 16 production index, PIP-000003685-691; PIP- 00003755-761; PIP-00000027-PIP-31 [App.01115-16].

[46] Counsel for the NRA has repeatedly requested these access codes, which are the property of the NRA. *See, e.g.*, ECF 448-2, Ex. 19, Ltr. from Cecelia L. Fanelli to Brian E. Mason, Sept. 17, 2021 [App.00936-37].

[47] *See* ECF 448-1, Ex. 10, Hochman Dep. at 69:2-12 [App.00388]. Additionally, Bergin testified that the NRA presumably could have had the power to determine the existence of organic views and paid views if it looked into its social media accounts. *See* ECF 448-1, Ex. 7, Bergin Dep. at 106:22-107:2, Aug. 20, 2021 [App.00143].

releasing a password to the NRA Dashboard.[48] NRA's counsel noted that the Dashboard appeared to lack security,[49] AMc's counsel belittled the NRA's security concerns as "unfounded" but AMc delayed installing a valid security certificate, thus preventing access by the NRA for approximately another month.[50]

According to AMc, it "lost" the NRA's computer system for approximately two years containing **THE** key NRATV data central to a major issue in this case and related to the NRA's single largest budget item in 2017 and 2018.[51] Since the "revival," AMc has told an ever changing story, concerning the whereabouts of server which houses NRA systems, but ending with the same conclusion – AMc will not return the server; it will not even allow forensic imaging by a neutral expert;[52] and, the NRA has only received limited access rights to the NRA Dashboard, for which it paid.[53] After the NRA sought the return of the server in the "warehouse," AMc then said it was a virtual server.[54] Then, it claimed the server was part of its own "server farm."[55] Finally, on October 18, 2021, in an incompetent declaration of its trial counsel, Brian Mason, AMc provided a fourth version of the NRA Dashboard story.[56] This time the server had been in "cold storage,"[57] thus, it is still not clear what the chain of custody was for the server and Dashboard and whether and when it may have been accessed, and by whom; the alteration

---

[48] *See* ECF 448-3, Exhibit 21, Ltr. from Brian E. Mason to Sarah B. Rogers, Sept.1, 2021 [App. 00961-62].

[49] ECF 448-7, Ex. 80, Ltr. from Cecelia L. Fanelli to Brian E. Mason, Sept. 9, 2021 [App.04112-13]; *see also*, ECF 448-7 Exs. 82-83, Ltrs. From Cecelia L. Fanelli to Brian E. Mason, Sept. 14 and 24, 2021 [App.04178-82].

[50] *See generally* the exchange of letters between counsel concerning the Dashboard's lack of safety: ECF 448-7, Ex. 80; ECF 448-2, Ex 12; ECF 448-7, Ex. 82; ECF 448-3, Ex. 27; ECF 448-7, Ex. 83, ECF 448-3, Ex. 28, dated Sept. 9, 2021(from Fanelli to Mason); Sept. 12, 2021 (from Mason to Fanelli); Sept. 14, 2021 (from Fanelli to Mason); Sept. 21, 2021 (from Mason to Fanelli); Sept. 24, 2021 (from Fanelli to Mason); Sept. 28, 2021 (from Mason to Fanelli). [App.04112-13; App.00372-39; App.04178-80; App.04181-82; App.01100-03; App.01104-06]. *See also* ECF 448-8, Ex. 96, First Supplemental Hochman Report, Oct. 22, 2021 at ¶¶ 17-19 [App.04731-32].

[51] ECF 448-3, Ex. 25, 2015-2019 Ackerman Budgets (NRA-AMc_00140814) [App. 01090-93].

[52] *See* ECF 448-3, Ex. 26, Ltr. from Brian E. Mason to Cecelia L. Fanelli, dated Oct. 15, 2021. [App.01097-99].

[53] *Id.*; ECF 385-1 at 4.

[54] ECF 448-3, Ex. 27, Ltr. from Brian E. Mason to Cecelia L. Fanelli, Sept. 21, 2021 [App.01100-03].

[55] *See* ECF 448-3, Ex. 28, Ltr. from Brian E. Mason to Cecelia L. Fanelli, Sept. 28, 2021 [App.01104-06].

[56] ECF 448-3, Ex. 30, Mason Decl., Oct. 18, 2021 [App.01110-14].

[57] *Id.* at ¶ 2 [App.01110-11].

8

of NRA metrics data in the Dashboard; and whether copies were made of the "bespoke" NRA Dashboard, which is an NRA "works made for hire."[58]

As the above was occurring, on October 1, 2021, AMc provided approximately 140GB of native file information,[59] consisting of approximately 200,000 individual files of indeterminate size.[60] These were deconstructed documents from the NRA Dashboard, over which AMc continues to exercise control.[61] A painstaking, needle in the haystack sampling of the documentation produced on October 1, 2021, shows AMc's activity in the Dashboard creating files on October 1, 2021 with a"last modified' date of September 10, 2021.[62] Other listings show files created on **August 22, 23, 25, 26, 28, September 2 and 8, 2021**.[63] Also, it appears that the NRA Dashboard was online from June 29 to October 29, 2021, long after the termination of the parties relationship. None of the activity in the NRA Dashboard was disclosed to the NRA or authorized by it.[64]

## C.      The Supplemental Report: October 25, 2021

On October 22, 2021, Hochman issued his Supplemental Report, which responds to recent events created by AMc's malfeasance such as: the improbable two year "loss" of the Dashboard; its sudden discovery and resurrection revealed on September 1, 2021; the ever-changing story of where the Dashboard is located;[65] the refusal of AMc and its counsel to secure the Dashboard throughout September 2021;[66] the data dump of 200,000 files on October 1, 2021;[67] AMc's

---

[58] ECF 448-3, Ex. 39, Dr. Richard Bergin Supplemental Expert Report at ¶ 17, Oct. 29, 2021 [App.01493-94].
[59] ECF 385-1, Ex. A, Ltr. from Cecelia L. Fanelli to Brian E. Mason, Sept. 3, 2021, at 3.
[60] *See* ECF 448-3, Ex. 31, excerpt of screenshot of Volume 16 production index [App. 01116].
[61] *See id.*, Ex. 32, Ltr. from Sarah B. Rogers. to Brian E. Mason, October 17, 2021 [App.01117-19].
[62] ECF 385-1, Ex. M, Volume 16 production index.
[63] *Id.*
[64] ECF 448-8, Ex. 91, Ex. B, Hochman First Supplemental Expert Report at ¶ 20, Oct. 22, 2021 [App. 4416-17].
[65] *Id.* at ¶ 16 [App.04415].
[66] *Id.* at ¶¶ 17-19 [App.04415-16].
[67] *Id.* at ¶¶ 20-23 [App.04416-18].

continued refusal to return the NRA's social media credentials and the reasons why he needs access to the social media accounts;[68] the identification of the Dashboard's "disrupted," non-functional connections to the social media services;[69] a damages calculation made possible by access to the Dashboard, which is presumably why AMc concealed it for so long;[70] the fact that the Dashboard depended on a cumbersome manually loaded protocol for metrics, making the need for data verification even greater;[71] the speciousness of AMc's $1.5 million ransom demand as to the return of NRA's Property;[72] and, a suggested protocol to break the logjam created by AMc to facilitate the appointment of a forensic neutral to deal with the imaging and return of the NRA's Property.[73]

Clearly, AMc's behavior has gravely prejudiced the NRA's discovery and trial preparation. In fact, the indisputable record shows that AMc produced new, previously unproduced documents on the night of October 29, 2021, when discovery closed. On December 15, 2021, in a conference before Magistrate Judge Toliver, AMc's counsel acknowledged the existence of unproduced, unlogged documents.[74] Judge Toliver ordered AMc to produce a categorical log on January 6, 2022.[75] The wholly deficient log produced by AMc shows the existence of an unspecified number of documents under the category of "NRATV."[76]

Finally, it should be noted that AMc has no expert on these matters.  Instead, its only witness is its own trial counsel, Brian Mason, who has no relevant or identified experience,

---

[68] *Id.* at ¶¶ 24-25 [App.004418].
[69] *Id.* at ¶ 26 [App.04418]. Grant Spofford, a Senior Program Manager at the NRA, was previously employed by AMc. While at AMc, he performed the arduous task of content mapping the Dashboard which involved manually inputting data into the Dashboard. ECF 448-2, Ex. 11, Grant Spofford Decl. at ¶¶ 5-14, Dec. 20, 2021 [App.00442-44]. As he noted, the Dashboard had significant data flow problems and was not user friendly. *Id.*; *see also* ¶¶ 15-16 [App. 00444]; *see generally id.* [App.00440-617].
[70] ECF 448-8, Ex. 91, at § IV.C [App.04419-20].
[71] *Id.* at ¶ 36 [App.04422].
[72] *Id.* at § IV. E [App. 04422-26].
[73] *Id.* at § IV. F [App. 04426-28].
[74] ECF 453, Ex. B [App.005-094]
[75] ECF 430.
[76] *See generally* ECF 487-2.

knowledge, or qualification.[77]

### III.   ARGUMENTS AND AUTHORITIES

**A.   AMc's Argument to Exclude Hochman's Opinions about Business Activities and Ethics is Unavailing**

AMc argues that Hochman's opinions on business ethics are not helpful and attempt to usurp the roles of the Court and the jury is without merit. As AMc's motion expressly recognizes, Hochman's opinions are based on numerous independently verifiable sources including "the International Communications Consultancy Organization's Helsinki Declaration, the American Marketing Association's code of conduct, an online publication from George Washington University, and an aspirational code of conduct from another public relations firm, Edelman."[78]   Further, as set forth in his initial Report, Hochman recently took courses at Yale from a renowned professor directly related to ethical issues, including in spring of 2021 when he took a course CPSC 457: Sensitive Information in a Connected World, which placed a heavy emphasis on the ethical issues related to the handing of other people's data.[79]   It is this extensive education and experience upon which Hochman's opinions are based

Hochman's opinions regarding AMc's business ethics which AMc seeks to strike are reliable and helpful to the Court and jury for two reasons. First, an average lay person is not well versed or knowledgeable regarding the technical intricacies involved in the maintenance, security, storage, and provision of data that is understood by professional advertisers to customers to allow the customer to determine the costs and benefits of the advertising services delivered. It is important that the Court and jury are educated about these duties and what type of behavior is normal and what type of behavior is not. Second, based on his knowledge and experience,

---

[77] Fanelli Decl., Ex. 6, Declaration of Brian Mason, dated Oct. 29, 2021 [App. 0041-1268].
[78] ECF 458 at p. 5.
[79] *See* ECF 448-8, Ex. 91, at Ex. A, Hochman Report, June 1, 2021, at ¶ 6 [App.004365].

Hochman's testimony first explains what information is customarily provided by the advertiser to the client, and based on the documentary evidence available to him and concludes that in his opinion, AMc's behavior was unethical because it baselessly refused to act in accordance with well-established norms and standards violated behavioral norms, norms of the Internet marketing industry.

Hochman does not assert any applicable governing law or make any assertion that AMc violated any law—tellingly, AMc cites no portion of Hochman's Report to support its assertions otherwise. Further, AMc does not dispute that "[a]n expert may . . . explain industry standards and express an opinion as to whether particular actions or inactions complied with those standards."[80] Therefore, its caselaw regarding the excludability of legal opinions from an expert report misses the point.

## B.   Hochman does not Propose Opinions about the State of Mind of the Parties and AMc's Argument Otherwise is Meritless

AMc misrepresents that Hochman is proposing to testify as to the NRA's state of mind when he opined that the NRA could not understand the value generated by specific components of the NRATV marketing program or identify and eliminate waste or that the NRA could not do certain things because of data held hostage by AMc. Not true. The focus in deciding whether an expert's opinion should be admitted is Rule 702's standard: whether the testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue."[81] Even in the criminal context, where an expert may not testify as to whether a defendant did or did not have the requisite state of mind to be convicted of the crime, experts are still permitted to analyze evidence and offer

---

[80] *Mears v. Jones*, No. 1:17-CV-6-KS-MTP, 2019 WL 3483157, at *2 (S.D. Miss. July 31, 2019).
[81] Fed. R. Evid. 702; 3 Jack B. Weinstein and Margaret A. Berger, *Weinstein's Evidence* ¶ 702[01] (1992); *In re Air Crash at New Orleans*, 795 F.2d 1230, 1233 ("Stated more directly, the trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument.").

conclusions that would have a bearing on that issue.[82]  That is precisely what Hochman does—he explains why certain data and information are required for one to form an opinion as to the value of marketing services and as to what was or was not possible to do without access to hi-fidelity content data.

Hochman's opinion is straightforward and does not speculate with respect to the NRA's state of mind. His testimony helps the jury because it describes what information was necessary for the NRA to assess the value of the services and what data was required for the NRA to be able to use its NRATV content as it wished. As to the first issue, when understood in context, Hochman is testifying that it was not possible for the NRA to understand the value generated or to identify waste because it did not have the information that any person would need to make those assessments. As the foundation of his opinion, Hochman first explained why the pertinent information is necessary to understanding the metrics AMc Reported.[83]  He then explains that standard metrics pertinent to understanding the metrics are promulgated by a congressionally established group that provides transparency around TV ratings and advertising measurements by accrediting various organizations in that regard.[84] Hochman then explains that AMc never provided the necessary or standard metrics.[85]  It was on this basis that he concluded that "the NRA was unable to understand the value generated" and that "it could not identify and eliminate waste" and "could not evaluate the cost effectiveness of the NRATV marketing program."[86]  These are not opinions about the NRA's "state of mind"—they are opinions that it was impossible for the

---

[82] *See United States v. Speer*, 30 F.3d 605, 610 (5th Cir. 1994) ("Agent Lunt's statements in this case do not cross the 'borderline' defined in *Dotson*. We conclude that his testimony can more accurately be characterized as an analysis of the evidence in the light of his special knowledge as an expert in the area of narcotics trafficking. The district court did not abuse its discretion in admitting this testimony.")

[83] *See* ECF 448-8, Ex. 91, Ex. A, Hochman Report at ¶ 39, June 1, 2021 [App.04374-75].

[84] *See id.* at ¶ 40 [App.04375].

[85] *See id.* at ¶ 41 [App.04375].

[86] *See id.* at ¶ 42 [App.04375].

NRA to even form a "state of mind" because it did not have information objectively needed to that assessment. In the same way, Hochman was not speculating about what the NRA would have done had it access to data that was withheld from it by AMc—he was stating that the NRA in fact could not have done certain things without the data, even had it wanted to. In other words, Hochman's opinion makes clear that by withholding the data as it did, AMc deprived the NRA the ability to choose what to do with the data—he expresses no opinion about what the NRA would have done had it had the data.

**C.**     **<u>Hochman's Harm Analysis is Relevant and Based upon Recognized Methodology</u>**

AMc claims that Hochman's opinion that AMc harmed the NRA by refusing to give it access to certain data and social media accounts is speculative and irrelevant. Its claim that Hochman did not attempt to quantify the alleged harm is erroneous. AMc cites no law supporting its sweeping assertions. Nothing requires an expert to quantify harm in order to testify that harm occurred. Instead, it is important in some cases for an expert to educate the fact finder about general principles, without ever attempting to apply these principles to the specific facts of the case.[87] For example, experts might instruct the fact finder on the principles of thermodynamics, or bloodclotting, or on how financial markets respond to corporate reports, without ever knowing about or trying to tie their testimony into the facts of the case.[88] In fact, the venerable practice of using expert testimony to educate the fact finder on general principles simply requires that: (1) the expert be qualified; (2) the testimony address a subject matter on which the fact finder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony "fit" the facts of the case.[89]

---

[87] Fed. R. Evid. 702; Testimony by Expert Witnesses, 29 Fed. Prac. & Proc. Evid. EVID R 702 (2d ed.).
[88] Fed. R. Evid. 702; Testimony by Expert Witnesses, 29 Fed. Prac. & Proc. Evid. EVID R 702 (2d ed.).
[89] Fed. R. Evid. 701; Testimony by Expert Witnesses, 29 Fed. Prac. & Proc. Evid. EVID R 702 (2d ed.).

Here, without generalized knowledge, a jury has no way of understanding why access to certain data and social media accounts is important. And, as Hochman opines, such data and social media accounts are crucially important to an entity's ability to assess and validate the value of the advertising services provided to it. Hochman explains the bases for his opinions when he, at length, details his extensive experience and training with respect to what typically is provided in the advertising business and why lack of access to that information is harmful.

### D.   AMc's Frivolous Arguments Regarding the Exclusion of Opinions Concerning the Dashboard and Social Media Accounts are Unavailing

AMc claims that Hochman is not qualified to offer expert testimony on these matters because "[h]is opinions essentially relate to discovery disputes rather than anything the jury will decide."[90]  This is nonsense. Rule 702 states that an expert may be qualified "by knowledge, skill, experience, training, or education[.]" The Rule explicitly allows an expert to be qualified on the basis of experience and the 5th Circuit has so interpreted the Rule.[91] The Supreme Court agrees that according to Rule 702, experience alone is enough to qualify an expert.[92]

Hochman's experience clearly connects his experience to his opinions. His opinions about the Dashboard are not about discovery disputes—his opinions relate to why access to the Dashboard, social media accounts, and video files are vital for understanding the value of marketing services provided, and how lack of access to that material is outside industry norms and detrimental to any client. Courts have found witnesses with similarly robust experience in their

---

[90] ECF 458 at p. 16.
[91] *See Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 176 (5th Cir. 1990) ("Rule 702 provides that a witness may be qualified as an expert 'by knowledge, skill, experience, training, or education.' The disjunctive conjunction, which we must assume the drafters of the rule chose deliberately, suggests that an expert may be qualified on any of the five bases listed.") (abrogated on other grounds by *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994)).
[92] *See Kumho Tire Co., LTD. V. Carmichael*, 526 U.S. 137, 155 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").

respective fields qualified to testify as experts in similar circumstances.[93] When courts exclude expert testimony for lack of qualification, it is because the witnesses background is so limited that there is no reasonable expectation the witness can help the trier of fact.[94]

Here, Hochman has experience in spades as a computer scientist and internet marketing consultant.[95] Defendants' claims that Hochman "has not explained how and why his experience in Internet marketing allow him to reach" his conclusions are specious. Specifically, Hochman studied computer science at Yale University, earning a simultaneous Bachelor of Science degree (awarded *summa cum laude*) and Master of Science degree in computer science.[96] In fact, Hochman maintains regular correspondence and meetings with his thesis advisor at Yale, and renowned computer science professor, Dr. Michael J Fisher, to stay informed on the latest academic work in computer science.[97] Hochman has spoken at nearly thirty conference across the United States and published more than thirty articles relating to computer science.[98] Hochman is an expert consultant and witness in related fields, including software development, technology entrepreneurship, Internet advertising, marketing, ecommerce, and security.[99] And, in addition, Hochman has even testified in nine trials and at thirty-two depositions.[100] This education and

---

[93] *See, e.g.*, *id.*; *U.S. v. Marler*, 614 F.2d 47, 49–50 (5th Cir. 1980) (handwriting expert was qualified based on facts that she had been a full-time document and handwriting examiner for four years, had several hundred hours of workshop training, and had testified in one federal trial and in civil and criminal state trials, sometimes to identify signatures).

[94] *See U.S. v. King*, 532 F.2d 505, 509 (5th Cir. 1976) (in prosecution for conspiracy to sell firearms without a license, trial court properly exercised its discretion to preclude witness from testifying as a handwriting expert concerning the identity of the author of a document where the witness was employed full time by the Social Security Administration in a job unrelated to handwriting, had taken a correspondence-school course in "handwriting analysis," had done such analysis daily as self-study, had no laboratory and trained under no one, and did not claim to be able to identify the author of writing but only claimed to be able to discern the character of a person from his handwriting); *United States v. Lopez*, 880 F.3d 974, 980 (8th Cir. 2018) (only if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded).

[95] *See* ECF No. 448-8, Ex. 91, Hochman Decl. at ¶ 1, Dec. 20, 2021 [App.04359].

[96] ECF No. 448-8, Ex. 91, Ex. B, Hochman First Supplemental Report at p. 3 [App.04413].

[97] *Id.*

[98] *Id.* at 4 [App.04414].

[99] *See* ECF 448-8, Ex. 91, at Ex. A, Hochman Report at ¶ 7, June 1, 2021 [App.04366].

[100] *Id.* (Since the date of his report, Hochman has advised counsel that testified at an additional trial and six additional depositions.)

experience are clearly sufficient to qualify Hochman to testify as to the importance of access to the Dashboard, social media accounts, and video files, and how lack of access to that material is outside industry norms and detrimental to any client. And, there is no law supporting AMc's assertion that harm must be quantified in order to be admissible, especially in cases like here where it is beyond the ken of the average layperson to understand why the data which was wrongfully withheld is vitally important to an advertising client.

**E.      The Court Should Disregard AMc's Distorted Argument Regarding Hochman's Testimony Involving the PowerPoint Presentations**

AMc dismisses as unhelpful and irrelevant Hochman's opinions regarding various PowerPoint presentations that he reviewed, misleadingly claiming that Hochman testified only that he did not know whether the information in the PowerPoint presentations was valid and that he would like to test the data in those presentations.[101] This tortured argument is without merit because it ignores virtually all of Hochman's actual opinion with respect to the PowerPoints.

In fact, Hochman's primary opinion is that the data in the PowerPoint presentations does not correspond with the data reflected in the Dashboard.[102] Hochman further explains that the information provided by AMc indicated that the data in the PowerPoints was manually harvested and manually inserted into the presentations, subjecting them "to two levels of potential data processing and manual processing errors."[103] Hochman then explains that, although he wanted to test the facially suspect information in the PowerPoint presentations, it was in fact not possible for him to do so because AMc refused to provide the necessary information.[104] Finally, Hochman

---

[101] ECF 458 at p. 16.
[102] ECF No. 448-8, Ex. 91, Ex. B, Hochman First Supplemental Report at p. 11, Oct. 22, 2021 [App.04421].
[103] *Id.* at p 12 [App.04422].
[104] *Id.*

17

states that, based upon his experience, AMc's withholding of the data necessary to validate the information in the PowerPoint presentations is not customarily in the industry.[105]

In sum, Hochman's opinions regarding the PowerPoint presentations are relevant and helpful. His opinions are relevant because they go to the heart of what it was objectively possible for the NRA to know or assess from the PowerPoint's based upon available information. His assessment of the data in the PowerPoint presentations and verifiability of that data is helpful to the jury because it involves the review and analysis of data that is highly complex and which an average layperson without Hochman's experience would not be able to practically assess.

## F.   AMc has Shown no Credible Basis for the Exclusion of Hochman's Damages Testimony

AMc's argument that Hochman's damages opinion in his Supplemental Report should be excluded because they are outside the scope of his initial report misrepresents his testimony. Hochman, in fact, expressly testified that the opinions in his initial report did relate to damages calculations and that he may be asked to and in might fact provide a damages calculation in the future if new information was received:

> Q.      Okay. And so outside of this report there are not any other subject matters on which you intend to testify; is that correct?
>
> A.      Subject to the -- **If there comes a time when it's appropriate to supplement the report, for example, new information is received, I don't know what the future holds**. And I don't know what other issues you might delve into today that, you know, naturally if I testified about something in deposition, it could also be testified about later.[106]
>
> ---
>
> Q.      All right. So, for example, you're not going to opine on the value of NRATV, correct?
>
>        Ms Fanelli:  Objection. You can answer.

---

[105] *Id.* at p. 12 [App.04422].
[106] ECF 448-1, Ex. 10, Hochman Dep. at 9:22-10:10 [App.00375] (emphasis added).

A.      I'm not intending to -- to try to provide a specific number on value of NRATV. **I may -- I think some of my opinions may have some bearing on, in a general way, whether I think this was a valuable marketing activity or not**.[107]

---

Q.      Do you intend to do any analysis to come up with a closed-form [damages] number? Have you been asked to do that?

      Ms. Fanelli:    Objection. You can -- answer subject to attorney-client privilege.

Q.      **At this point** I don't anticipate doing that **but again the future is uncertain**.[108] And just as Hochman testified, might occur, new information was received and on the basis of that information he was able to supplement his initial report by quantifying the damages he already rendered an opinion on. And Hochman specifically connects the analysis and opinions in his initial report to his damages calculation.[109]

AMc's additional argument that Hochman did not explained how and why his experience allow him to reach his damages conclusions is without merit. As set forth above, he has explained how any why his experience allowed him to reach his conclusions and why his calculations are supported.

**G.      Hochman's Supplemental Report is Timely**

AMc's request to exclude as untimely various (but not all) portions of Hochman's Supplemental Report is without merit. Hochman's Supplemental Report is timely. AMc erroneously asserts that the Supplemental Report was "provided well after the deadline for disclosure of expert testimony" but cites no scheduling order or other fact to support this naked assertion.[110] AMc's baseless assertion ignores this Court's Amended Scheduling Order dated September 7, 2021, providing that "[b]y October 29, 2021, all **discovery** – including discovery

---

[107] *Id.* at 10:16-11:2 [App.00375] (emphasis added).
[108] *Id.* at 12:22-13:5 [App.00375-76] (emphasis added).
[109] ECF 448-8, Ex. 91, Hochman Decl., at Ex. B at ¶ 27 [App.04419].
[110] ECF 458 at p. 6.

concerning expert witnesses – shall be completed."[111]  As AMc <u>admits</u> in its motion, Hochman's Supplemental Report was provided "before the close of the discovery period …."[112]  Indeed, AMc's own submission of two supplemental expert reports on October 29, 2021—after the NRA submitted Hochman's report—underscore that the parties understood that the Amended Scheduling Order allowed expert reports to be submitted prior to the discovery cutoff. In fact, under AMc's logic, its own supplemental expert reports, submitted after Hochman's Supplemental Report, should be excluded as untimely, especially given that AMc possessed for years the information necessary for their expert reports, unlike the NRA, which was subject to AMc's abusive discovery conduct.

Even if the Court were inclined to find Hochman's supplemental report untimely—it should not—there is no basis under the applicable test to exclude the report. Indeed, AMc ignores the relevant 5th Circuit test used to determine whether untimely expert testimony may be excluded. Under that test, <u>it is an abuse of discretion</u> and "disproportionately harsh" to exclude the Supplemental Report <u>even if it was untimely</u>, because NRA did not act in bad faith and any potential prejudice to AMc (which was caused by its own abusive discovery conduct and violation of their contractual obligations to return that which does not belong to them to the NRA) can easily be cured with a remedy less drastic than exclusion.[113]

---

[111] ECF 358 at p. 2 (emphasis in original).

[112] ECF 458 at p. 6.

[113] *See, e.g.*, *In re Complaint of C.F. Bean L.L.C.*, 841 F.3d 365, 369 (5th Cir. 2016) ("Notwithstanding the wide latitude we give district courts in deciding discovery matters, excluding Fritsch's second report and his testimony was not the appropriate sanction in this case. Bean's explanation for not submitting a complete expert report by the disclosure deadline is reasonable. Although Bean cannot explain why it did not move to extend the deadline, there is no indication of bad faith on Bean's part. The expert report and testimony were essential to Bean's case. And a continuance would cure much of the prejudice to SMC from Bean's late disclosure. On these facts, excluding critical expert testimony was disproportionately harsh for what amounts to failure to request an extension of the expert disclosure deadline. More appropriate sanctions include allowing SMC to re-depose and rebut Fritsch, and awarding SMC costs and attorneys' fees for this additional discovery."); *Betzel v. State Farm Lloyds*, 480 F.3d 704, 707 (5th Cir. 2007) (even though expert was untimely designated without explanation, under the applicable 5th Circuit test it was an abuse of discretion to exclude the testimony); *E.E.O.C. v. Gen. Dynamics Corp.*, 999 F.2d 113, 116–17 (5th

In the 5th Circuit, courts "consider four factors to determine whether a district court abused its discretion by excluding expert testimony as untimely: '(1) the explanation for the failure to identify the witness; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice.'"[114]  Well-established 5th Circuit precedent dictates that excluding even untimely expert testimony is a drastic and "disproportionately harsh" remedy reserved for the rarest cases.[115]  Indeed, the 5th Circuit emphasizes "that continuance, not exclusion, is the preferred means of dealing with a party's attempt to designate a witness out of order or offer new evidence."[116] Applied here, each of the four factors weighs heavily against exclusion.

*First*, the NRA's submission of the Supplemental Report on October 25, 2021—prior to the close of discovery—was reasonable. Despite numerous requests by the NRA, and substantial discovery and motion practice, AMc refused to provide the NRA or Hochman critical evidence (or access to critical evidence) until September 1, 2021, when AMc's counsel belatedly released a password to the NRA Dashboard.[117]  Even then, the Dashboard appeared to lack security[118]  and AMc  delayed  installing  a  valid  security  certificate,  thus  preventing  access  by  the  NRA  for

Cir. 1993) (collecting cases) ("Given the fact that the district court's sanction of total exclusion of Dr. Kearns' expert testimony was tantamount to a dismissal of the EEOC's disparate impact claim, the district court abused its discretion by failing to consider the possibility of lesser sanctions than the total exclusion of the EEOC's expert witness.").

[114] *In re Complaint of C.F. Bean L.L.C.*, 841 F.3d at 369 (quoting *Geiserman v. MacDonald*, 893 F.2d 787, 791 (5th Cir. 1990)); *see also Betzel*, 480 F.3d at 707  ("We hold that the district court abused its discretion in excluding Betzel's late-designated witnesses. We review such exercises of discretion by considering four factors: '(1) the explanation for the failure to identify the witness; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice.'").

[115] *See In re Complaint of C.F. Bean L.L.C.*, 841 F.3d at 374 ("[E]xcluding critical expert testimony was disproportionately harsh for what amounts to failure to request an extension of the expert disclosure deadline.").

[116] *E.E.O.C*, 999 F.2d at 116–17 (citing *Bradley v. United States,* 866 F.2d 120, 127 n.11 (5th Cir.1989)) ("In *Bradley,* we explained that "coupled with *appropriate* sanctions, a continuance will serve the court's truth-seeking function while still allowing it to punish and deter conduct that is in violation of the rules." *Id.* (emphasis added). Given the fact that the district court's sanction of total exclusion of Dr. Kearns' expert testimony was tantamount to a dismissal of the EEOC's disparate impact claim, the district court abused its discretion by failing to consider the possibility of lesser sanctions than the total exclusion of the EEOC's expert witness.").

[117] *See* ECF 448-3, Exhibit 21, Ltr. from Brian E. Mason to Sarah B. Rogers, Sept.1, 2021 [App. 00961-62].

[118] ECF 448-7, Ex. 80, Ltr. from Cecelia L. Fanelli to Brian E. Mason, Sept. 9, 2021 [App.04112-13]; *see also*, ECF 448-7, Exs. 82-83, Ltrs. From Cecelia L. Fanelli to Brian E. Mason, Sept. 14 and 24, 2021[App.04178-82].

approximately another month.[119] As explained by Hochman in the Supplemental Report—in testimony AMc seeks to exclude—he could not have formulated the opinions in his Supplemental Report without the information that AMc refused to provide to the NRA for years and until 24 days before the Supplemental Report was submitted when on October 1, 2021, AMc dumped approximately 140GB of native file information,[120] consisting of approximately 200,000 individual files of indeterminate size on the NRA.[121] And immediately upon receiving the long-withheld indispensable information, Hochman analyzed it and formulated his expert opinion as soon as was reasonably possible in the circumstances. Considering these facts, the NRA submitting the Supplemental Report on October 25, 2021—before discovery closed—was reasonable and timely.[122]

**Second**, Hochman's testimony is crucially important to the NRA's ability to substantiate its claims which involve highly technical issues outside the ken of any lay person, and is crucial to its ability to demonstrate and quantify its damages. Excluding Hochman's essential opinions would grossly and unnecessarily prejudice the NRA. In such circumstances, excluding expert testimony (even if it was untimely disclosed) is an abuse of discretion.[123]

---

[119] *See generally* the exchange of letters between counsel concerning the Dashboard's lack of safety: ECF 448-7, Ex. 80; ECF 448-2, Ex 12; ECF 448-7, Ex. 82; ECF 448-3, Ex. 27; ECF 448-7, Ex. 83, ECF 448-3, Ex. 28, dated Sept. 9, 2021(from Fanelli to Mason); Sept. 12, 2021 (from Mason to Fanelli); Sept. 14, 2021 (from Fanelli to Mason); Sept. 21, 2021 (from Mason to Fanelli); Sept. 24, 2021 (from Fanelli to Mason); Sept. 28, 2021 (from Mason to Fanelli). [App.04112-13; App.00372-39; App.04178-80; App.04181-82; App.01100-03; App.01104-06]. *See also* ECF 448-8, First Supplemental Hochman Report, Oct. 22, 2021 at ¶¶ 17-19 [App. 04731-32].

[120] ECF 385-1, Ex. A at 3.

[121] *See* ECF 448-3, Ex. 31 to the Fanelli Decl. [App. 01116].

[122] *In re Complaint of C.F. Bean L.L.C.,* 841 F.3d at 369 (court abused its discretion by disallowing untimely "supplemental" expert report, even though it was not "supplemental" and expressed new opinions, when discovery was unavailable before expert report deadline).

[123] *Betzel*, 480 F.3d at 707 (even though expert was untimely designated without explanation, it still was an abuse of discretion to exclude the testimony given the importance of the testimony); *see also*, *E.E.O.C.*, 999 F.2d at 116–17 (collecting cases) ("Given the fact that the district court's sanction of total exclusion of Dr. Kearns' expert testimony was tantamount to a dismissal of the EEOC's disparate impact claim, the district court abused its discretion by failing to consider the possibility of lesser sanctions than the total exclusion of the EEOC's expert witness.").

***Third***, the NRA's submission of the Supplemental Report on October 25, 2021 does not prejudice AMc—AMc's abusive discovery tactics made it impossible for the Supplemental Report to be submitted earlier. Hochman's initial Expert Report was submitted on June 1, 2021. This is not a case where the NRA sprung an expert at a late date and surprised AMc. AMc cannot be surprised or prejudice by his Supplemental Report—it knew that Hochman was an expert. It knew that any NRA expert, not just Hochman could not render opinions about evidence which AMc was intentionally withholding. AMc's claim that it is somehow prejudice by the timing of the Supplemental Report, which is based on evidence that AMc refused to provide for years despite numerous requests by the NRA, does not hold water. Lack of prejudice is further demonstrated by the fact that AMc were still able to have their expert, Dr. Richard Bergin, review Hochman's Supplemental Report.[124]

***Fourth***, to the extent that there is any conceivable prejudice to AMc resulting from the NRA's submission of the Supplemental Report on October 25, 2021—before the discovery cutoff and which resulted solely from AMc's own refusal to provide relevant discovery—any such prejudice could easily be mitigated by allowing AMc to further depose Hochman before trial. Excluding Hochman's testimony in such circumstances is unwarranted.[125]

In sum, AMc's request to exclude Hochman's proposed testimony on untimeliness grounds has no basis in fact or law. And excluding Hochman's proposed testimony on that basis would be an abuse of this Court's discretion.

## IV.   CONCLUSION

For the foregoing reasons, the Motion should be denied in its entirety.

---

[124] *See* ECF 448-3, Ex. 39, Supplemental Rebuttal Expert Report of Richard Bergin at p. 20, Oct. 29, 2021 [App.01501].
[125] *See In re Complaint of C.F. Bean L.L.C.*, 841 at 374 (5th Cir. 2016) ("[E]xcluding critical expert testimony was disproportionately harsh for what amounts to failure to request an extension of the expert disclosure deadline.").

Dated: January 24, 2022          Respectfully submitted,

**BREWER, ATTORNEYS & COUNSELORS**

By:  */s/ Cecelia L. Fanelli*
        Cecelia L. Fanelli
        *Pro Hac Vice*
        clf@brewerattorneys.com
        Sarah B. Rogers
        New York Bar No. 4755252
        sbr@brewerattorneys.com
        Philip J. Furia
        *Pro Hac Vice*
        pjf@brewerattorneys.com
        **Brewer Attorneys and Counselors**
        1717 Main Street, Suite 5900

        **ATTORNEYS FOR PLAINTIFF AND COUNTER-DEFENDANT NATIONAL RIFLE ASSOCIATION OF AMERICA**

24

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was electronically served via the Court's electronic case filing system upon all counsel of record on this 24th day of January 2022.

*/s/ Cecelia L. Fanelli*
