**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| **Plaintiff and Counter-Defendant** | § § | |
| **v.** | § § | |
| **ACKERMAN MCQUEEN, INC.,** | § § § | |
| **Defendant and Counter-Plaintiff,** | § § | **Civil Action No. 3:19-cv-02074-G** |
| **and** | § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, and MELANIE MONTGOMERY,** | § § § § § | |
| **Defendants.** | § § | |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO
EXCLUDE CERTAIN OPINIONS OF THE NRA'S EXPERT WITNESS, ANDREW
McLEAN**

**BREWER, ATTORNEYS & COUNSELORS**

Cecelia L. Fanelli
*Pro Hac Vice*
clf@brewerattorneys.com
Sarah B. Rogers
New York Bar No. 4755252
sbr@brewerattorneys.com
Philip J. Furia
*Pro Hac Vice*
pjf@brewerattorneys.com
**Brewer Attorneys and Counselors**
1717 Main Street, Suite 5900
Dallas, Texas 75201
Telephone:  (214) 653-4000
Facsimile:  (214) 653-1015

**ATTORNEYS FOR PLAINTIFF AND COUNTER-DEFENDANT NATIONAL RIFLE ASSOCIATION OF AMERICA**

## TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................................1

II. FACTUAL AND PROCEDURAL BACKGROUND..........................................1

    A.    McLean's Preeminent Qualifications ........................................................1

    B.    McLean's Initial Report And His Testimony Related To It .....................2

    C.    McLean's Supplemental Report and his Testimony Related to it ...........4

        1.    AMc Finally Produced Essential Information, but Subsequent to McLean's Initial Report and After he was Deposed...................................4

        2.    McLean's Decades Long Experience with and Use of Advertising Industry Financial Management Platforms..................................................6

III. ARGUMENTS AND AUTHORITIES................................................................11

    A.    McLean is Eminently Qualified to Provide Expert Testimony in this Case..........11

    B.    AMc's Motion to Exclude McLean's Opinions in his Reports is Meritless..........14

        1.    AMc's "Pattern of Behavior"..................................................................14

        2.    Alleged Financial Issues and "Custom and Usage"..................................15

    C.    McLean's Damages Opinions are Relevant and Reliable....................................20

        1.    Media Buys and NRATV Performance: McLean's Damage Opinion Regarding Media Buys (Traditional Advertising) and NRATV (Internet Digital Marketing) are Relevant and Reliable ..........................20

    D.    McLean's Harm Opinion Regarding Negative Publicity is Relevant and Reliable ........21

    E.    AMc's Attempt to Exclude McLean's Supplemental Report Concerning FRA is Without Basis and Reflects AMc's Effort to Conceal its Obstruction of Information in the FRA Review ..........22

    F.    McLean's Opinion Regarding Fiduciary Duties are Not Legal Conclusions ........23

    G.    AMc's Argument that McLean's Supplemental Report is Untimely Is Meritless........24

IV. CONCLUSION.................................................................................................25

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*In re Air Crash Disaster at New Orleans, La.*,
    795 F.2d 1230 (5th Cir. 1986) ............................................. 12

*Alexander v. Martin*,
    No. 2:08CV400, 2010 WL 11530305 (E.D. Tex. June 24, 2010) ........................................... 24

*Betzel v. State Farm Lloyds*,
    480 F.3d 704 (5th Cir. 2007) ............................................. 25

*Bradley v. United States*,
    866 F.2d 120 (5th Cir.1989) ............................................. 25

*Collins v. Benton*,
    470 F. Supp. 3d 596 (E.D. La. 2020) ......................................... 14, 15, 17

*In re Complaint of C.F. Bean L.L.C.*,
    841 F.3d 365 (5th Cir. 2016) ............................................. 25

*Condrey v. SunTrust Bank of Georgia*,
    429 F.3d 556 (5th Cir. 2005) ............................................. 19, 20

*Croteau v. CitiMortgage, Inc.*,
    CASE NO. 4:12cv693, 2014 WL 119968 (E.D. Tex. Jan. 2014) ........................................... 19

*Daubert v. Merrel Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) ............................................. 12, 14, 17

*E.E.O.C. v. Gen. Dynamics Corp.*,
    999 F.2d 113 (5th Cir. 1993) ............................................. 25

*Equal Emp. Opportunity Comm'n v. S&B Indus., Inc.*,
    No. 3:15-CV-0641-D, 2017 WL 345641 (N.D. Tex. Jan. 24, 2017) ................................. 16, 17

*Huval v. Offshore Pipelines, Inc.*,
    86 F.3d 454 (5th Cir. 1996) ............................................. 14

*Kumho Tire Co., LTD. V. Carmichael*,
    526 U.S. 137 (1999) ............................................. 11, 13

*Lavespere v. Niagara Mach. & Tool Works, Inc.*,
  910 F.2d 167 (5th Cir. 1990) (abrogated on other grounds by, *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994)) ...........................................................................11

*Mariner Energy, Inc. v. Devon Energy Production Co.*,
  690 F.Supp.2d 558 (S.D. Tex. 2010) ...................................................................................19

*Porter v. American Optical Corp.*,
  641 F.2d 1128 (5th Cir. 1981) .............................................................................................14

*Tassin v. Sears, Roebuck and Co.*,
  946 F. Supp. 1241 (M.D. La. 1996) .....................................................................................13

*U.S. v. Marler*,
  614 F.2d 47 (5th Cir. 1980) .................................................................................................13

*U.S. v. Wen Chyu Liu*,
  716 F.3d 159 (5th Cir. 2013) ..........................................................................................13, 14

*United States v. McLendon*,
  No. CIV.A. 3:97-CV-0613-, 1999 WL 1494998 (N.D. Tex. July 28, 1999) .........................24

*In re Wyly*,
  552 B.R. 338 (Bankr. N.D. Tex. 2016) ...........................................................................16, 17

**State Cases**

*Golembiewski v. Golembiewski*
  No. 2993–02–1, 2003 WL 22290032, *5 (Va. Ct. App. Oct. 7, 2003) ..................................20

*Mears v. Jones*,
  No. 1:17-CV-6-KS-MTP, 2019 WL 3483157 (S.D. Miss. July 31, 2019) .............................18

**Rules**

Federal Rule of Evidence 702 ....................................................................................11, 16, 17

Federal Rule of Evidence 702(d) ...........................................................................................16

**Other Authorities**

29 Fed. Prac. & Proc. Evid. § 6264.1, Bases for Qualifying an Expert (2d ed.) ....................12

TO THE HONORABLE A. JOE FISH:

Plaintiff/Counter-Defendant the National Rifle Association of America files this *Brief in Opposition to Defendants' Motion to Exclude Certain Opinions of the NRA's Expert Witness, Andrew McLean* ("the Motion to Exclude McLean").

## I. INTRODUCTION

None of McLean's opinions should be excluded for the reasons described below.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.    McLean's Preeminent Qualifications

McLean is the Managing Partner and Principle of INVENTUS MEDIA INC. ("INVENTUS") a global advertising, media planning and buying, digital, marketing, public relations, and consulting company.[1] He has more than 35 years of experience, in the marketing and advertising industry, and is responsible for creating and ensuring the compliance to service agreements with clients and has reviewed approximately one-thousand service agreements.[2] As McLean notes in his Report, services agreements are standard in the advertising industry. For instance, The Association of National Advertisers has a Service Level Agreement template upon which agencies and advertisers base their service agreements.

McLean represents leading advertisers, agencies and media groups and include Chevron, Citibank, Macy's, Activision, Sony Ericsson, AT&T, Bayer, GSK, Paramount, Disney, Ford, Intel, Google, Facebook, You Tube, Amazon, News Corp, HBO, The Economist, The Wall Street Journal, The Financial Times, WPP and Omnicom.[3] These companies generally have service

---

[1] ECF 482-3, Ex. 4, Report of Andrew McLean, dated June 1, 2021, p. 2 [APP 0287].
[2] *Id.*, p. 2 [APP 0287].
[3] ECF 482-3, Ex. 4, Report of Andrew McLean, dated June 1, 2021, p. 2 [APP 0287].

agreements with similar structure and detail to the one at issue here.[4] As a leader in the advertising field, he has been responsible for the origination, management, and review of invoices including areas directly at issue in this case, such as, media buys, advertising production, business-related expenses, data, research, and labor costs. McLean served and continues to serve on prominent industry and academia boards and advisory committees.[5]

**B.    McLean's Initial Report And His Testimony Related To It**

McLean describes the well-established, controlling standards in the advertising industry for agencies such as those articulated by "The American Associates of Advertising Agencies (4As)," of which "Defendants were members."[6] Notably, Defendants' motion does not challenge the applicability of these standards. Specifically, McLean emphasizes the heavy burden of "stewardship" that these standards impose,[7] as well as the requirements of the ANA (Association of National Advertising Managers) and the Standards of Practices of 4As.[8] When asked his opinion concerning AMc's fiduciary relationship with the NRA, the following occurred at his deposition:

> "Q: Is there something about your background, education or experience that makes you qualified to opine that [AMc] was a fiduciary and owed fiduciary duties to the NRA? A: if you review the 4As and the ANA organizations. They will opine that the relationship between the agency and the client is one of a fiduciary relationship."[9]

He elaborated that his opinion was also based upon, "The evidence presented. The fact that [AMc] were making large expenditures on behalf of the NRA."[10] Likewise, he opined that "the 4As" is the basis for the ethical obligations that AMc owed to the NRA.[11]

---

[4] *Id.*, p. 2 [APP 0287].
[5] McLean's extensive background experience can be found at pages 3-4 of his Report. *Id.*, p.3-4 [APP 0288-89].
[6] ECF 482-3, Ex. 4, Report of Andrew McLean, dated June 1, 2021, p. 17 [APP 0302].
[7] *Id.* p. 17-18 [APP 0302-03]
[8] *Id.*, p. 19 [APP 0304].
[9] ECF 482-5, Ex. 6, Dep. Tr. of Andrew McLean, at 125:12-20 [APP 0459].
[10] *Id.*, at 126:3-5 [APP 0459].
[11] "[…] the charter of the 4As […] provide[s] the basis on which relationships should be structured." *Id.* at 130:5-11 [APP 0460]

The Report enumerates multiple examples of how AMc violated its fiduciary stewardship responsibilities and its relationship of trust and confidence.[12] His straight-forward, incontestable opinions cover the following: pre-paid purchases for media buys;[13] the lack of support for $13,847,943 in alleged media buys from Fox, which lack the customary "buy detail reports;"[14] AMc's lax billing and expense tracking, despite the industry standard electronic management systems (like Strata) designed to prevent such laxity;[15] the lack of pre-approvals;[16] the failure to secure the best rates for Fox News and Fox Business News based upon his SQAD analysis;[17] and lack of commission and media purchase verification.[18] Further, at his deposition, McLean testifies extensively about specific violations of the 4As, industry customs, and the Services Agreement.[19]

At his deposition, his cross-examination consisted of nothing more than a constant repetition of questions regarding supposed oral conversations between AMc and personnel and a former NRA executive (Wilson Phillips ("Phillips"))[20] supposed meetings between the parties and questions about stale books and records reviews, some dating back twenty years.[21] These frivolous

---

[12] ECF 482-3, Ex. 4, Report of Andrew McLean, dated June 1, 2021, p. 20 [APP 0305].
[13] *Id.,* p. 20 [APP 0305].
[14] *Id.,* pp. 22-23 [APP 0307-08].
[15] *Id.,* p. 23-26 [APP 0308-11].
[16] *Id.,* p. 26-27 [APP 0311-12].
[17] *Id.,* p. 27-31 [APP 0312-16].
[18] *Id.,* p. 32-33 [APP 0317-18].
[19] *See, e.g.,* ECF 482-5, Ex. 6, Dep. Tr. of Andrew McLean, at 125:11-20; 128:9-25; 130:5-12; 130:16-25; 131:1-5; 132:3-25; 133:2-9; 139:4-25; 140:2-7; 141:2-17 [APP 0459; 0459; 0460; 0460; 0460; 0460; 0461; 0462; 0462; 0463].
[20] *See, id.* at 57:25; 58:20; 60:2; 63:24; 64:8,17; 65:21 66:4; 68:23; 70:25; 71:10; 73:16; 86:6; 92:5; 101:12; 108:19 109:4; 118:23; 120:20; 121:21; 122:13; 123:2; 146:3,19; 185:20; 186:10; 208:19; 209:5,12; 218:10; 228:23; 252:16; 253:5,15,17; 254:14; 257:18; 258:5 259:9,24; 260:18 [APP 0442, 0442, 0442, 0443, 0443, 0444, 0444, 0444, 0445, 0445, 0446, 0449, 0450, 0453, 0454, 0455, 0457, 0457, 0458, 0458, 0458, 0464, 0474, 0474, 0479, 0480, 0482, 0484, 0490, 0491, 0491, 0492, 0492, 0492, 0492].
[21] At his deposition, McLean testified about an interview that he conducted with Thomas R. Tedrick ("Tedrick"), former Managing Director of Finance, *See id.* at 39-43 [APP 0437-38], who did limited books and records examinations, but only for the years 2001, 2002, 2004, 2005, 2007, and 2014. Tedrick informed McLean that information received from AMc lacked "substantiation," had "very little detail" in the invoices, and there was not "any easy way of tying it back to a budget with the NRA." *Id.* at 40:17-22 [APP 0437]. NRA accounts payable staff had "similar frustrations." *Id.* at 41:10-11 [APP 0438]. However, McLean emphasized that he did not rely upon his discussion with Tedrick, but upon actual documentary evidence produced in the case. *Id.* at 54:19-23 [APP 0441]; 55:7-11 [APP 0441]. Moreover, as McLean stated at his deposition when questioned about Tedrick's work on media

3

items are the basis for AMc's argument that McLean's testimony is not reliable. In sum, rather than focus on objective industry standards, the terms of the Services Agreement, electronic management systems, data, and documentation, AMc tries to mislead with a parol "who said what to whom," using Phillips. Equally misleading is AMc's frivolous allegation that the NRA directed McLean to only consider what is "custom and usual" and "not what actually occurred." It cites to testimony where AMc's counsel is badgering the witness, without any foundation, to acknowledge that "parties are free to conduct business however they want, right?"[22] This crude argument, which tries to supplant lawyer's arguments and parol arguments for expert testimony on custom and usual, is meritless.

Nor are McLean's Reports and testimony speculative and nothing AMc cites demonstrates otherwise. In an inscrutable non-sequitur, AMc cites several pages of deposition testimony without elaboration or specificity to conclude McLean assumes "harm," based on "documentation that the NRA provided to him."[23] A review of AMc's counsel's questions, however, capture the approach of the deposition which is to ask questions about Phillips or Tedrick or to ask about alleged and unidentified parol "instructions" from the NRA about invoices.[24] While the motion refers to documentation provided to McLean by the NRA,[25] AMc's counsel was obviously free to question McLean with whatever documents it wished.

**C.      McLean's Supplemental Report and his Testimony Related to it**

      **1.      <u>AMc Finally Produced Essential Information, but Subsequent to McLean's Initial Report and After he was Deposed</u>**

---

buys in 2014, Tedrick lacked the "expert oversight" and did not have access to all information in the necessary areas. *Id.* at 192:25; 193:1-3.

[22] ECF 461, fn.6, citing to Dep. Tr. of Andrew McLean, at 152:8-154:10.

[23] ECF 461, p. 13 fn. 62.

[24] *See, e.g.*, ECF 448, Ex. 33m Dep. Tr. of Andrew McLean, dated Oct. 21, 2021, at 106:7-107:24, 108:18-109:4 [APP 01148-49].

[25] ECF 461, p. 13.

4

After McLean issued his Report on June 1, 2021, AMc made sixteen (16) long withheld additional document productions, along with the pretense of providing the NRA with "access" to its own newly found Dashboard containing analytics metrics concerning NRATV. Moreover, after McLean issued his Supplemental Report on October 18, 2021, AMc made three additional productions on October 22nd and 29th, exceeding more than 8000 documents combined. The NRA was deluged with documents during and after the period when expert depositions were occurring, thus prejudicing its discovery and trial preparation. The NRA complied with the discovery schedule under these prejudicial conditions, with McLean having little time to address the massive document production by AMc in October, as well as the limited access to the Dashboard produced by AMc. Further, on December 15, 2021, in a hearing before Magistrate Judge Toliver, AMc's counsel acknowledge the continued existence of unproduced and unlogged documents, adding to the already severe prejudice sustained by the NRA. AMc was ordered to produce a categorical log on January 6, 2022, which grossly lists topics including "media buys" and "NRATV," without elaboration or any disclosure of how many documents are being withheld.[26]

In any event, despite AMc's obstructionism, once McLean had access to the Dashboard he was able to perform damage calculations concerning the digital internet marketing, which his Supplemental Report addresses.[27] The Supplemental Report addresses traditional marketing (e.g. media buys) as well and describes the standard media buy platform in use throughout the industry, Strata.[28] In his July 1, 2021 Report[29] and October 27, 2021 deposition,[30] AMc's expert confirmed that AMc used Strata at times relevant here.

---

[26] *See* ECF 487-2.
[27] ECF 482-4, Ex. 5, Supplemental Expert Report of Andrew McLean, at pp. 14-16 [APP 0383-0385].
[28] *Id.* at 3-5 [APP 0372-74].
[29] ECF 448-8, at Ex. 97, Expert Report of Daniel L. Jackson, dated July 1, 2021, at pp. 34-35 [APP04932-33].
[30] *See, e.g.,* ECF 448-3, Ex. 24, Dep. Of Daniel L. Jackson, dated Oct. 27, 2021, at 44:7-10 [APP 01054].

It should also be noted that AMc has no expert on these matters.  Instead, its only witness is its own trial counsel, Brian Mason, who has no relevant or identified experience, knowledge, or qualification.[31]

### 2.   McLean's Decades Long Experience with and Use of Advertising Industry Financial Management Platforms

#### a.   Strata

As McLean notes in his Supplemental Report, AMc's expert Daniel Jackson states in his rebuttal report ("Jackson Rebuttal Report") that he "understand[s] that AMc utilized Strata throughout the relevant period."[32] Ackerman controller, Brandon Winkler, testified that media invoicing is conducted through Strata, which is synched or processed through Ackerman's ERP system, Workamajig.[33] CFO William Winkler acknowledged the use of electronic platforms with respect to its media operation: "...we had programs within our media operation to verify that it ran in the windows that we said for it to run. And then we -- an accounting would get the audit report from media that we would match up to our system and, ultimately, make payments to the media."[34]

McLean elaborated that the use of standard media buy management systems in the advertising industry is commonplace, because of the specialized nature of industry reporting metrics, multiple channels (e.g., broadcast, print, online), and reconciliation complexity. He describes that "Strata is an example of a standard media buy management system in the advertising industry that enables advertising agencies, on behalf of their clients, to plan, activate, optimize,

---

[31] *See* Declaration of Cecelia L. Fanelli, dated Jan 24, 2022 ("Fanelli Decl."), Ex. 6, Declaration of Brian Mason, dated Oct. 29, 2021 [App. 0040-1268].
[32] *See* ECF 448-8, at Ex. 97, Expert Report of Daniel L. Jackson, dated July 1, 2021, at pp. 34-35 [APP 04932-33].
[33] *See* ECF 422, Ex. 32, Dep. Tr. of Brandon Winkler, dated July 30, 2021, at 50:8-15 [APP 00862]; In his deposition, Mr. Winkler identifies two electronic platforms for employee expense reimbursement. For reimbursement of charges on company-issued credit cards, AMc utilizes Concur; for expenses paid with employee's personal cash or credit card, AMc utilizes Workamajig. *See id.*, at 51:13-22 [APP 0862].
[34] *See* ECF 422, Ex. 84, Dep. Tr. of AMc's 30(b)(60) representatives (including William Winkler), dated Aug. 4, 2021, at 55-56:16-25, 1-3.

6

and manage billing and financial reconciliation for advertising campaigns in one centralized location."[35]  Moreover, McLean states that he has used these types of management systems for over two decades.[36] He explains that users can track budgets, assess return on advertising spend and automate workflows "from planning through reconciliation. Strata also integrates with external systems and sellers to minimize unnecessary and manual tasks between systems."[37] The advantages is that, "[t]his access and oversight of the data, throughout the media buy process, ensures a high degree of financial transparency, reduces wasteful spending and informs business planning."[38]

Based upon his experience, specifically his decades long use of Strata, McLean concludes in his Supplemental Report that the absence of standardized reports in AMc productions, especially in light of the testimony noted above from experts and fact witnesses, indicates that AMc failed to "diligently check and verify broadcasts, insertions, displays, or other means used to carry the message to ensure proper fulfillment of all media purchases made by AMc on the NRA's behalf," as required by the Services Agreements.[39]

---

[35] ECF 482-4, Ex. 5, Supplemental Expert Report of Andrew McLean, p. 3 [APP 0372].
[36] *Id.*, p.3 [APP 0372].
[37] *Id.*, pp. 3-4 [APP 0372-73].
[38] *Id.*, p. 4 [APP 0373]. *Id.* at 354:21-25; 355:1-25 [APP 01210]. McLean testified with respect to the capabilities of Strata that:

> A.    Strata gives amazingly detailed views on media expenditure by month, by day, by vendor.   It can show media buys have been verified.   It can highlight those that are still awaiting verification… It is a very flexible system insofar as you can set it up to provide information at the client level, the campaign level and even more by media type as well. Q.    What kind of reports can be generated? A.    Detailed analysis of expenditures by vendor, expenditure by time period, expenditure data for a particular campaign or a particular time period that can then be analyzed against Google Analytics or other business metrics to show the impact of advertising or media spending on business measures. Q.    Reports can show year-over-year trend as well? A.    Yes, it is a multiyear system.  In fact that is one of its greatest use to show very easily trend in spending that you might have with vendors and it is often integral to the negotiation process because you can see the prices that you have paid historically for different types of media…"

*See also,* McLean's description of the ease with which backup information with respect to media buys can be supplied to a client. *Id.* at 357;10-25; 358: 1-6 [APP 01211]. McLean also testified as to how Strata would help clarify the "Process Flow issues set forth in the FRA media draft spreadsheets." *Id.*, 358: 12-25; 359:1-25; 360:1-19 [APP 01211].
[39] ECF 448-1, Ex. 4, Services Agreement, dated May 1, 1999 [APP 00029-41]; ECF 448-1, Ex. 2, Services Agreement dated Apr. 30, 2017 [APP 00014-25]; ECF 448-1, Ex. 3, Amendment to Services Agreement, dated May 6, 2018 [APP 00026-28].

Moreover, apart from AMc's sanitized document production with respect to the traditional marketing data that resides on Strata, McLean opined that documents used by Jackson in his Rebuttal Report as "evidencing AMc's use of Strata," are not illustrative of what McLean would expect to see generated by the Strata platform.[40] In the 368 pages of McLean's deposition testimony, there is a dearth of inquiry by AMc's counsel about Strata. There is no challenge to McLean's opinions about the significance of Strata or use of it for two decades. There were no questions about his conclusion that the record is devoid of media buy data from Strata. Instead, he received many questions about whether he, an advertising professional, had read the Phillips deposition,[41] which is a pointless exercise unrelated to the $11,863,857 payment of above market prices for media buys that McLean calculates. As to that calculation, McLean explains it in detail in his Reports and testified at length about it.[42] In his testimony and his Reports, he focused on the SQAD database,[43] the significance of which AMc does not challenge as a source for media buy rate information. McLean further notes that he found no evidence of negotiated discounts on the face of the invoices relating to media buys.[44] When asked at his deposition whether he knew if oral negotiations had taken place he responded that the evidence suggests that if they did occur they were not "effective in the results."[45] Defendants' motion is based on these same pointless arguments and fails to respond to any of the technical and industry issues involved that McLean details as a basis for his calculations. Instead, AMc merely makes the vague, inconsequential assertion that McLean's damages opinion is speculative because he did not have a "discussion" with "someone" about discounts on the buys.

---

[40] *See* ECF 482-4, Ex. 5, Supplemental Expert Report of Andrew McLean, dated October 18, 2021, p. 4 [APP 0373].
[41] *See* ECF 482-5, Ex. 6, Dep. Tr. of Andrew Mclean, at 58:19-21 [APP 0422].
[42] *See, e.g.*, ECF 482-3, Ex. 4, Report of Andrew McLean, dated June 1, 2021, p. 22-23 [APP 0307].
[43] ECF 482-5, Ex. 6, Dep. Tr. of Andrew McLean, at 233:1-235:7 [APP 0485-86].
[44] *Id.*
[45] *Id.* at 235:4-7 [APP 0486].

b.        **The NRA Dashboard and Internet Marketing Metrics**

McLean's Supplemental Report outlines his analysis of the metrics[46] within the Dashboard.[47] McLean concludes that AMc's use of proxy metrics was tantamount to "marking its own homework."[48] McLean testified extensively as to his methodology for calculating AMc's excessive spending with respect to NRATV, which totals $40,782,217.[49] In describing his methodology,[50] he noted that "[t]he mathematical calculation of cost per view and assigning the costs versus the value are a standard industry process to evaluate the effectiveness and be part of a revenue generation model or revenue generation validation."[51] Defendants' motion offers no challenge to McLean's opinion that he employed a straightforward industry standard measurement. Instead, without any contrary evidence (notably Defendants have no advertising expert, presumably because no expert would associate themselves publicly with the notion that parol conversations trump well established mathematical calculations), Defendants ambitiously pronounce that the formula was out of thin air. Or needs to be applied elsewhere – without support.

Finally, it should be noted that AMc has no advertising industry expert. Instead, the rebuttal expert to McLean is a CPA (Daniel L. Jackson) who readily admits his lack of advertising industry

---

[46] McLean discussed the NRA Dashboard with Grant Spofford, a Senior Program Manager at the NRA. *See* ECF 448-2, Ex. 11, Decl. of Grant Spofford, at ¶1 [APP 00441]. Spofford, who had worked at AMc and did content mapping on the Dashboard, explained several things to McLean including the "process by which the dashboard was populated with data;" *Id.* at 45:11-12 [APP 0439]. the need to manually load data that was "transposed" to the Dashboard; how reports were accessed; Id. at 45:23-24; [APP 0439], and, how Spofford was unable to access information in a timely manner. Id. at 45:22-46:7 [APP 0439]. McLean also testified that the data that the Dashboard collected was at a "very high level" and did not capture the "sentiment" of the viewer that would be "custom and usual" to support the "kind of content production and investment that I observed." Id. at 47:5-11 [APP 0439]. McLean further noted that as he accessed the version of the Dashboard to which AMc recently provided a password with Spofford, they both discussed that the data was incomplete as related to "paid" advertising. Id. at 47:2-7 [APP 0439] That data was "not visible," there were incomplete links" and "the error message would be data unavailable or data visualization." *Id.* at 48:3-8 [APP 0439].

[47] ECF 482-4, Ex. 5, Supplemental Expert Report of Andrew McLean, p. 5-7 [APP 0374-76].

[48] *Id.*, p.7 [APP 0376].

[49] *Id.*, p.15 [APP 0384].

[50] ECF 482-5, Ex. 6, Dep. Tr. of Andrew McLean, at 284:11-291:25 [APP 0498-500].

[51] *Id.*, at 290:7-13 [APP 0500].

9

experience.[52] AMc's other expert is an economist, who specializes in oil and gas (Richard Bergin).[53] Both are telling choices for an advertising industry defendant in a lawsuit about traditional and internet advertising in that they lack any expertise in digital or traditional advertising. Notably, Jackson and Bergin have testified on a combined five matters for the Dorsey firm in the last five years – with the SEC succeeding in striking Bergin's testimony in one of the cases.[54] Unlike AMc, the NRA chose an expert with whom they and Brewer had no prior contact, simply because he is pre-eminent in the field of advertising. It is crucial that the jury hear from McLean because, as an individual chosen solely for his expertise and experience, he will assist the trier of fact to understand both traditional (media buys) advertising and digital (NRATV). Indeed, he has actual, day-to-day experience with the electronic systems crucial to the advertising industry, which AMc seeks to persuade the Court into ignoring.

### c.   **Reputational Harm**

McLean measures the harm from negative publicity generated by a series of programs that AMc's talent devised including a program involving placing white KKK hoods on children's toys and addressing a variety of other topics that have nothing to do with the Second Amendment. He describes his methodology in his Supplemental Report.[55] At his deposition he also testified at length with respect to his methodology and the source of his data.[56] Having no genuine challenge to the reliability of McLean's methodology and conclusions, nor any credible defense to the outrageous content aired on NRATV during AMc's tenure, AMc resorts to focusing on McLean's

---

[52] ECF 448-3, Dep. of Daniel L. Jackson, dated Oct. 27, 2021, 53:7-13 [APP 1057].

[53] *See generally, e.g.*, ECF 448-1, at Ex. 6 [APP 00059-115].

[54] See, ECF 448-1, Ex. 7, Dep. of Richard Bergin, dated August 20, 2021, at 37:12-41:12 [APP 00126-27], See *also*, ECF 448-2, Ex. 24, Dep. of Daniel L. Jackson, dated Oct. 27, 2021, 29:3-30:2 [App, 1129] (Jackson testifying that he recommended Bergin to the Dorsey firm.).

[55] See, ECF 448-3, Ex. 36, at Ex. B, Supplemental Expert Report of Andrew McLean, pp. 17-22 [APP 01381-86].

[56] *See, e.g.*, ECF 482-5, Ex. 6, Dep. Tr. of Andrew McLean, at 15:13-16:3 [APP 0431]; 157:3-158:10 [APP 0467]; 286:10-16 [APP 0499]; 305:20-308:13 [APP 0504].

inconsequential comment that he had not performed a brand asset valuation (BAV) analysis of the impact of the negative publicity pre and post the time that it aired. Taken to its absurd conclusion, if AMc's argument were adopted, negative publicity would never be measured unless one had conducted a BAV before a dispute occurred. AMc's next ploy to keep the jury from hearing expert opinions on these matters (of which AMc has none) is to make dramatic accusations against McLean and counsel because McLean did not keep handwritten notes when he was transcribing information from the public data source that he used. AMc solely focuses on the fact that he did not retain notes he took as he input data from Sentione into the chart that appears at page 22 of his Supplemental Report.

## III.   ARGUMENTS AND AUTHORITIES

### A.   McLean is Eminently Qualified to Provide Expert Testimony in this Case

Federal Rule of Evidence 702 provides that an expert can be qualified "by knowledge, skill, experience, training, or education[.]" The Supreme Court and the Fifth Circuit have both interpreted Rule 702 as a list of five alternative ways to qualify an expert, meaning that experience alone is enough to qualify.[57]

Defendants claim that McLean is not qualified because he has not previously testified as an expert in a trial.[58] However, "the adequacy of a witness' qualifications are based on the witness' knowledge and experience in the relevant subject, not on the witness' experience testifying as an

---

[57] *See Kumho Tire Co., LTD. V. Carmichael*, 526 U.S. 137, 155 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 176 (5th Cir. 1990) ("Rule 702 provides that a witness may be qualified as an expert 'by knowledge, skill, experience, training, or education.' The disjunctive conjunction, which we must assume the drafters of the rule chose deliberately, suggests that an expert may be qualified on any of the five bases listed.") (abrogated on other grounds by, *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994)).
[58] *See* ECF 461, Defendants' Brief in Support of Motion to Exclude Certain Opinions of the NRA's Expert, Andrew McLean, p. 6.

expert."[59] McLean's Reports and testimony provide his opinions regarding the Services Agreement, AMc's billings to the NRA; customary billing practices in the public relations and advertising, media planning and placement, and creative service industries; customary record-keeping practices in the advertising industry; the duties owed by an agency such as AMc to any client; and certain provisions of the Services Agreement between AMc and the NRA and whether AMc's conduct fulfilled its obligations based on the customs of the advertising industry.[60]

Defendants' claim that McLean has "done nothing to connect" his experience to his qualifications to give these opinions[61] is incorrect. McLean has an abundance of relevant experience to qualify him as an expert witness, which he describes in great detail in his Reports. McLean has reviewed approximately three hundred service agreements in his role as an advertising executive, providing him with ample experience to form opinions based upon review of the Services Agreement between the NRA and AMc.[62] Additionally, he has overseen the origination, management, and review of invoices related to media buys, advertising production, business related expenses, data, research, and labor costs.[63] McLean has over 35 years of experience in the advertising and marketing industry.[64] This includes experience reviewing documents similar to those in this case and using the same media buy management platform used by AMc, Strata. This

---

[59] 29 Fed. Prac. & Proc. Evid. § 6264.1, Bases for Qualifying an Expert (2d ed.) (citing *United States v. Young*, 916 F.3d 368, 380 (4th Cir. 2019) (even when an expert has never previously been qualified as such, it is the quality of his qualifications, and not whether he has previously been qualified to testify as expert, on which district court must focus under the reliability prong of *Daubert*)). The inverse of Defendant's assertion is actually true; the fact that an expert acts as a gun-for-hire weighs against the expert's credibility– something that weighs against the credibility of its own expert witnesses. *See In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1236 (5th Cir. 1986) ("That a person spends substantially all of his time consulting with attorneys and testifying is not a disqualification. But experts whose opinions are available to the highest bidder have no place testifying in a court of law, before a jury, and with the imprimatur of the trial judge's decision that he is an 'expert.'"); ECF No.448, Ex. 24, Deposition transcript of Daniel Jackson, dated October 27, 2021, at 17:11-18:7 [APP 01048] (Defendants' expert testifying that he has been retained by Dorsey & Whitney to testify in a multitude of other cases).
[60] *See* ECF No. 448-3, Ex. 36, Declaration of Andrew McLean, at Ex. A, p. 2 [APP 01281].
[61] *See* ECF No. 461, p. 7.
[62] *Id.*
[63] *Id.* at 3 [APP 01282].
[64] *Id.* at 2 [APP 01281].

experience is invaluable to explain Defendants' breaches and non-standard business practices in the context of the advertising industry.[65]

Defendants further claim that "McLean has not explained how and why his experience as an advertising/marketing consultant and former executive allow him to reach the conclusions he has reached regarding damages[.]"[66] This is not true. McLean explains exactly how his experience directly connects to his damages opinion in his Supplemental Report.[67] Courts have consistently found that an expert is qualified to provide opinions based upon observations informed by and connected to their experience – particularly experience obtained in a specialized, practical context.[68] McLean reasonably connected his decades of specialized experience in this field to his opinions, including those relating to damages, and is therefore qualified to testify as an expert.

McLean is eminently qualified and has specialized experience, but he is not confined only to his area of expertise and can testify to related topics. An expert witness is not strictly confined to his area of practice and may testify concerning related applications of their experience.[69] Additionally, a lack of specialization does not affect the admissibility of the opinion, this only goes

---

[65] *Id.*

[66] ECF No. 461, p. 16.

[67] *See* ECF No. 448-3, Ex. 36, McLean Decl., at Ex. B, p. 14 [APP 01378] ("Before an advertising agency spends approximately $45 million of its clients' money, is standard practice to test and validate the proposed business model. In my experience, it is unusual for large capital costs, like NRATV, to be committed without an agreed upon set of business goals, metrics and ongoing performance indicators. We would have expected AMc to conduct testing with a minimum viable product (MVP) in order to gauge the potential success or failure of the project, in advance of a massive investment like that made with NRATV. We have seen no evidence of this type of industry standard testing and validation.").

[68] *See, e.g., Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 155 (1999) (stating that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); *Tassin v. Sears, Roebuck and Co.*, 946 F. Supp. 1241, 1248 (M.D. La. 1996) (design engineer's testimony can be admissible when the expert's opinions "are based on facts, a reasonable investigation, and traditional technical/mechanical expertise, and he provides a reasonable link between the information and procedures he uses and the conclusions he reaches"); *U.S. v. Marler*, 614 F.2d 47, 49–50 (5th Cir. 1980) (arson expert was qualified based on facts that, as a deputy state fire marshall he had been investigating fires for eleven years, had attended two short courses on explosive fires, had been on a team investigating approximately six liquid vapor explosions, and had read portions of books and bulletins on vapor explosions).

[69] *See, U.S. v. Wen Chyu Liu*, 716 F.3d 159, 168–169 (5th Cir. 2013).

to the weight given to the testimony.[70] This is particularly true when the witness' qualifications are made clear to the jury, allowing them to decide for themselves the weight given to the expert's opinions.[71]

**B.      AMc's Motion to Exclude McLean's Opinions in his Reports is Meritless**

**1.      <u>AMc's "Pattern of Behavior"</u>**

AMc attacks all of McLean's opinions, and particularly his opinions regarding AMc's pattern of behavior, as unreliable for a purported lack of sufficiently supportive evidence. But as the law makes clear, purported lack of evidence goes to weight, not admissibility of an expert's testimony and "a court's role as a gatekeeper does not replace the traditional adversary system."[72] Indeed, a "review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."[73] And as set forth in *Daubert* itself, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[74] Accordingly, "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility."[75] As it is "the role of the adversarial system, not the court, to highlight weak evidence"[76] an expert "need only possess a higher degree of

---

[70] *See id.; see also Huval v. Offshore Pipelines, Inc.*, 86 F.3d 454, 457–458 (5th Cir. 1996) (in action against insurance consultant and insurance agent for failure to procure proper coverage for welding company, trial court did not err in permitting expert to testify on matters relating to insurance where witness had 32 years' experience with various insurance companies; fact that witness had no experience acting as an insurance agent where an insurance consultant was involved went to the weight of his testimony, not its admissibility).

[71] *See, e.g., Porter v. American Optical Corp.*, 641 F.2d 1128, 1138 (5th Cir. 1981) (in action for personal injuries against manufacturer of filter that failed to protect plaintiff from exposure to asbestos, trial court did not err in permitting toxicologist to testify as to tests he performed on filter even though witness was not an expert on design of filters; since his qualifications or lack thereof were made absolutely clear to the jury, objections as to his qualification went to weight, not admissibility).

[72] *Collins v. Benton*, 470 F. Supp. 3d 596, 602 (E.D. La. 2020); *see also Daubert v. Merrel Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993).

[73] *Collins,* 470 F. Supp. 3d at 602 (citing FED. R. EVID. 702 advisory committee's note, "2000 Amendments.").

[74] *Collins,* 470 F. Supp. 3d at 602 (quoting *Daubert v. Merrel Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993).

[75] *See id.*

[76] *See id.*

knowledge, skill, experience, training, or education than an ordinary person in the subject matter of her testimony."[77]

The recent case *Collins v. Benton* is directly on point and on all fours with this case. In *Collins*, plaintiff sought to exclude a medical bill auditor from providing expert testimony regarding the reasonable value of the Plaintiff's medical services by arguing it was irrelevant and not reliable because it was not based on sufficient evidence.[78] In denying plaintiff's motion the court first held that the expert was qualified because she was a certified legal nurse consultant with more than 30 years of experience in the health care profession and, in particular, in the billing, collection, and pricing areas and she previously directed the medical billing department of an outpatient surgical medical unit where she established medical charges, negotiated third-party payer contracts, and took responsibility over the medical billing and collections for approximately 2,000 surgeries and 5,000 patients per year.[79] Based largely on this experience, the court concluded that the expert possessed a "higher degree of knowledge, skill, experience, training, or education than an ordinary person in the subject matter of her testimony." Finally, the court concluded that the expert's methodology was reliable because the evidence relied upon was a source "relied on industry wide" and to the extent that, as plaintiff had contended, the source was not a reliable source "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration" as it is "the role of the adversarial system, not the court, to highlight weak evidence."[80]

## 2.   <u>Alleged Financial Issues and "Custom and Usage"</u>

AMc argues that McLean's testimony as to industry custom and usage with respect to pre-

---

[77] *See id.* at 603.
[78] *Collins v. Benton*, 470 F. Supp. 3d 596, 599-600 (E.D. La. 2020).
[79] *Collins v. Benton*, 470 F. Supp. 3d 596, 603 (E.D. La. 2020).
[80] *Collins v. Benton*, 470 F. Supp. 3d 596, 604 (E.D. La. 2020) (internal citations and quotations omitted).

paid media, above-market rates, billing practices and procedures, verification of ordered media, and fees and expenses should be excluded because McLean allegedly: did not consider all relevant facts; ignored supposedly contrary evidence; and, because he purportedly did not sufficiently connect his testimony regarding general principles to the facts of this case. No law, and AMc has cited none, supports AMc's position or the exclusion of the proposed testimony.

As an initial matter, the five subjects in question are highly technical and involve specialized and specific platforms, programs, and data customarily used in the advertising industry, about which no other witness in the case (notably, AMc has no advertising expert at all) could educate the jury. AMc's claim that this testimony will not assist the jury in understanding the evidence because it is not specifically tied to any of the causes of action, defenses, or damages in this case is farcical. Indeed, it is a venerable practice to use expert testimony to educate the fact finder on general principles.[81] And it is

> important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case. For example, experts might instruct the factfinder on the principles of thermodynamics, or bloodclotting, or on how financial markets respond to corporate reports, without ever knowing about or trying to tie their testimony into the facts of the case.[82]

For this kind of generalized testimony, Rule 702 simply requires that: (1) the expert be qualified; (2) the testimony address a subject matter on which the fact finder can be assisted by an expert;

---

[81] *See* FED. R. EVID. 702 advisory committee's note to 2000 amendment ("it might also be important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case ... The amendment does not alter the venerable practice of using expert testimony to educate the factfinder on general principles."); *Equal Emp. Opportunity Comm'n v. S&B Indus., Inc.*, No. 3:15-CV-0641-D, 2017 WL 345641, at *4 (N.D. Tex. Jan. 24, 2017) ("Rule 702 does not require that an expert's testimony relate specifically to the facts at issue in a case. … If an expert distills a complicated subject into language a jury can understand, and that subject is relevant, she can be admitted as a teaching witness.") (internal citations and quotations omitted); *In re Wyly*, 552 B.R. 338, 363 (Bankr. N.D. Tex. 2016) ("[T]he Court notes that the language of Federal Rule of Evidence 702(d) requiring an expert to apply their principles and methods 'to the facts of the case' does not per se exclude expert testimony that does not refer to the facts of the particular case before the fact finder.") (internal citations and quotations omitted).

[82] FED. R. EVID. 702 advisory committee's note to 2000 amendment; *see also Equal Emp. Opportunity Comm'n* 2017 WL 345641, at *4; *In re Wyly*, 552 B.R. at 363.

(3) the testimony be reliable; and (4) the testimony "fit" the facts of the case.[83]

Here, McLean's testimony is crucial because it will educate the jury generally about industry custom and usage with respect to pre-paid media, above-market rates, billing practices and procedures, verification of ordered media, and fees and expenses, which no witness or expert AMc has identified can do. It will further educate the jury with respect to whether what McLean observed from his detailed review of copious evidence and whether that evidence contained hallmarks of that industry custom and usage. Without McLean's testimony, the jury would have no meaningful way to know what is "custom and usual" practice in the advertising business.

AMc's second argument that McLean's testimony should be excluded because he supposedly ignores purportedly contrary evidence has no legal basis. AMc argues that McLean does not opine regarding alleged conversations between AMc and NRA executives such as Phillips regarding alleged agreements abrogating the standard industry custom and usage with respect to AMc's and the NRA's relationship.[84] And AMc does not connect the supposed contrary evidence to the reliability or basis for McLean's testimony regarding standard custom and usage in the advertising business and whether such standard custom and usage existed here. In fact, these disputed conversations are beyond McLean's purview which is an explanation of what is "custom and usual" practice in the advertising business and his opinion that he did not see the hallmarks of that "custom and usual" practice. And, as the law makes clear, purported lack of evidence or contrary evidence goes to weight, not admissibility of an expert's testimony and "a court's role as a gatekeeper does not replace the traditional adversary system."[85]

---

[83] FED. R. EVID. 702; *see also Equal Emp. Opportunity Comm'n* 2017 WL, at *4 (same); *In re Wyly*, 552 B.R. at 363.
[84] ECF 461 at pp. 12-13; notably, AMc fails to cite to any other evidence (like meeting minutes) to support its claim that the factually disputed testimony of one executive shows AMc and the NRA agreed to abandon the custom and usage of the advertising business.
[85] *Collins v. Benton*, 470 F. Supp. 3d 596, 602 (E.D. La. 2020); *see also Daubert v. Merrel Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993).

Indeed, AMc does not dispute that "[a]n expert may . . . explain industry standards and express an opinion as to whether particular actions or inactions complied with those standards."[86] Instead, AMc argues that McLean is "is unaware whether or not AMc was ever instructed by NRA to change their practice on how NRA was invoiced," that his opinions do not reflect what "necessarily was happening at the time NRA and AMc were doing business," and that "regardless of how NRA and AMc agreed to conduct business for 40 years, McLean takes issue with their activities as not being "custom and usual."[87] Yet, AMc offers no evidence to suggest that the Services Agreement embodies a departure from what is customary or usual, or that the parties otherwise agreed to deviate from these standards. To support the proposition that the parties agreed to deviate from what is custom and usual, AMc relies on the factually disputed and irrelevant statements of a single former NRA employee, Phillips.[88] This assertion is unsupported and conclusory. And, as AMc repeatedly acknowledges when it suits them,[89] only Wayne LaPierre or his designee had the ability to authorize changes effecting the economics of the relationship.[90] The Services agreement clearly provides that "AMc is authorized to act upon written communications *received from the NRA Executive Vice President or his designee*. He or his designee *are the only persons* within NRA who have the actual authority to issue such communications."[91] AMc has even explicitly acknowledged this: "Our contract clearly states that that Wayne LaPierre and his designee Craig Spray, are the only individuals from whom we can take direction and to whom we can provide information of this nature."[92] To boot, Phillips himself unequivocally testified that he was never

---

[86] *Mears v. Jones*, No. 1:17-CV-6-KS-MTP, 2019 WL 3483157, at *2 (S.D. Miss. July 31, 2019).
[87] ECF 461 at pp. 13-14.
[88] ECF 461 at p. 12 fn 57.
[89] *See, e.g.*, ECF No. 418, Defendants' Brief in Support of AMc's Motion for Partial Summary Judgment, p. 3.
[90] *See* ECF No. 448, Ex. 2, Services Agreement between the NRA and AMc, dated April 30, 2017, at Secs. III, IX [APP 00019-23].
[91] *Id.* at Sec. IX [APP 00023] (emphasis added).
[92] Declaration of Cecelia L. Fanelli, dated January 24, 2021, Ex 4 , Email thread between M. Montgomery and A. Arulanandam, dated April 20, 2019 p. 1, NRA-AMc_00059409 - NRA-AMc_00059411 [App. 035].

LaPierre's official or unofficial designee.[93] Moreover, pursuant to the parol evidence rule, evidence of the parties' prior dealings is inadmissible to inform an interpretation of what is custom and usual or what was provided by the parties' Services Agreements.

The parol evidence rule "prohibits the admission of extrinsic evidence of prior or contemporaneous oral agreements, or prior written agreements, to explain the meaning of a contract when the parties have reduced their agreement to an unambiguous integrated writing."[94] Parol evidence may only be considered after a contract is found to be ambiguous.[95] Statements are barred by the parol evidence rule when they contradict the express terms of a contract, and "operate to vary" the contract's unambiguous provisions.[96] Moreover, "[b]y its very definition, an integration or merger clause negates the legal introduction of parol evidence; it is a 'provision in a contract to the effect that the written terms may not be varied by prior or oral agreements because all such agreements have been merged into the written document.'"[97] Here, the Services Agreement sets forth an integration clause, stating: "This Services Agreement, together with any Exhibits hereto, constitute the entire agreement between the NRA and AMc relating to the matters covered by this Services Agreement at the time of its signing . . . [and] supersedes all prior agreements, including letter agreements and memoranda of understanding."[98] The integration clause was reiterated in the Amendment No. 1 to the Services Agreement, dated May 6, 2018, which states: "This Amendment and the Services Agreement, and the Exhibits thereto, constitute

[93] *See* ECF No. 419-1, Ex. 29, Deposition transcript of Woody Phillips, dated August 30, 2021, at 54:17-20, 57:3-59:9 [APP 001955-56].
[94] *Mariner Energy, Inc. v. Devon Energy Production Co.*, 690 F.Supp.2d 558, 574, n.5 (S.D. Tex. 2010) (citing 11 RICHARD A. LORD, WILLISTON ON CONTRACTS § 33:1 (4th ed.)).
[95] *Croteau v. CitiMortgage, Inc.*, CASE NO. 4:12cv693, 2014 WL 119968, *8 (E.D. Tex. Jan. 2014) (citing *Texas v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006)).
[96] *Id.* (citing *Rosas v. U.S. Small Bus. Admin.*, 964 F.2d 351, 355-56 (5th Cir. 1997)).
[97] *Condrey v. SunTrust Bank of Georgia*, 429 F.3d 556, 564 (5th Cir. 2005).
[98] *See* Services Agreement, ECF 422, Exhibit 1, Section X.D. [APP 0017].

19

the entire agreement between NRA and AMc relating to the matters covered hereto and thereto."[99]

Accordingly, as a matter of law, parol evidence, such as the Phillips testimony that AMc relies

upon, is inadmissible to vary or supplement the terms of the Services Agreement.[100] Because

AMc's continuous reliance on a prior course of dealing is inadmissible, there is nothing in the

record to support the contention that the parties agreed to deviate from the standards set forth in

their Services Agreements which comport with custom and usage within the industry. As such,

McLean's opinions concerning the application of custom and usage are reliable and appropriate.

**C.    McLean's Damages Opinions are Relevant and Reliable**

**1.    Media Buys and NRATV Performance: McLean's Damage Opinion Regarding Media Buys (Traditional Advertising) and NRATV (Internet Digital Marketing) are Relevant and Reliable**

While AMc conflates the two, McLean's opinions regarding custom and usage are distinct

from his opinions and calculations regarding damages. McLean's custom and usage testimony

relates to what typically occurs in the advertising business. McLean is unequivocal that his analysis

and opinions are "based upon review of certain data found in the NRA Dashboard," and that his

"calculations are derived from the information on the screenshots below, obtained directly from

the recently available NRA Dashboard."[101] His damages opinions and calculations explain what

the digital data and media buy invoices from AMc reflect concerning what AMc reports to have

spent on advertising. McLean calculated damages to the NRA arising from AMc charging the

NRA for media buys that AMc's data indicates were never acquired. McLean concluded, based

upon the cost and purchase data provided by AMc, that AMc's own data shows that AMc invoiced

---

[99] *See* First Amendment to the Services Agreement between the NRA
and AMc, dated May 6, 2018, ECF 422, Exhibit 2, at Section 4 [APP 0022].
[100] *See Condrey*, 429 F.3d at 564; *Golembiewski v. Golembiewski*, Record No. 2993–02–1, 2003 WL 22290032, *5
(Va. Ct. App. Oct. 7, 2003) ("The general rule in Virginia is that parol evidence is inadmissible to vary, contradict, or
explain the terms of a complete, unambiguous, unconditional written contract. . . . Additionally, the agreement includes
an integration clause in paragraph 8, which supports the inadmissibility of parol evidence.").
[101] ECF 482-4, Ex. 5, Supplemental Expert Report of Andrew McLean, at pp. 14 and 15; [APP 0383-84].

the NRA for media buys which far exceeded the media buys that AMc claims to have made.

McLean's damages calculations are straightforward calculations based upon the analysis of complex and technical data requiring an expert such as McLean to assess.[102] McLean's assessment of the data is helpful to the jury because it involves the evaluation of data which a layperson, without McLean's experience, would not be able to assess. The calculation of damages concerning traditional and digital marketing is highly specialized, and requires years of training, experience, and skill. McLean has decades of experience, he has testified extensively as to the methodology of both types of damages. AMc makes no credible challenge as to these damages, except to suggest, for example, that Phillips purported comments should supplant expert testimony.

### D.    McLean's Harm Opinion Regarding Negative Publicity is Relevant and Reliable

AMc's argument that the court should exclude McLean's opinion that the NRA was harmed by AMc's supervision of disasters like its decision to air media with "Thomas the Tank Engine" characters cloaked in KKK regalia, fails. Assessing whether advertising is harmful requires expert skill to analyze and measure. Indeed, McLean worked with two industry-recognized media monitoring companies to determine how matters like the Thomas the Tank KKK NRATV episode impacted the NRA, and the amount by which negative publicity harmed the NRA.[103] This type of expert analysis is crucial and not within the ken of the average layperson. As an industry expert with 35 years of experience relating to all aspects of using advertising to obtain value, McLean is qualified to render his opinion that the NRA was harmed and to quantify the value of that harm. McLean details the methodology he used to determine the value of the harm and why that methodology is appropriate and reliable.[104] AMc's challenge consists of nothing

---

[102] While AMc has disparaged McLean's qualifications, as set forth at the beginning of this brief, McLean is eminently qualified to render his opinions.
[103]  ECF 482-4, Ex. 5, Supplemental Expert Report of Andrew McLean, at p. 17 [APP 0386].
[104] *Id.* at p. 20 [APP 0389].

more than an off point argument about BAV and hyperbole based on the fact that McLean did not retain notes taken as he input data into his report.

### E.    AMc's Attempt to Exclude McLean's Supplemental Report Concerning FRA is Without Basis and Reflects AMc's Effort to Conceal its Obstruction of Information in the FRA Review

McLean's Supplemental Report is based upon his previous analysis, and in any event, is independent of FRA's analysis. His comments about FRA confirm that they, like McLean, received incomplete data. For example, AMc withheld data from FRA asserting, without explanation, that it was "proprietary." McLean testifies that such an assertion is contradicted by basic industry practice.

> Q.     In terms of that issue about pricing, did you see reference to statements made to FRA about the proprietary nature of certain pricing data that they were not permitted to have?
> A.     I saw information to what was called a proprietary media. I think one terminology was media negotiation but media buying process, yes.
> Q.     What conclusions did you draw from the representations that Ackerman made to FRA during that review process about the alleged proprietary nature of that pricing information?
> A.     The media planning and buying process is a classic supply and demand based marketplace and there is nothing that could be deemed as proprietary.105

Moreover, McLean independently reviewed other key documents including testimony of Michael Trahar and correspondence from AMc's counsel in reaching his opinions.106 Based upon his own observations, McLean explained that:

> [t]o assess the media buys it placed on behalf of the NRA, AMc provided FRA **and my firm** with an array of disorganized, incomplete, and fragmented information. Electronic management systems could have supplied consolidated, year-over-rear reports to quickly conduct a records examination and support **my expert review**. FRA also stated that AMc did not explain or document how unit costs were derived.

---

105 ECF 482-5, Ex. 6, Dep. Tr. of Andrew McLean, at 356:2-19 [APP 0516]. There are numerous additional examples of additional such testimony, which for the sake of brevity, the NRA does not belabor here.
106 ECF 482-4, Ex. 5, Supplemental Expert Report of Andrew McLean, at p. 11 [APP 0380] ("Contrary [to] AMc's [counsel's] assertions on January 4, 2019, information concerning the NRA's media buys is the NRA's business and financial information.").

**I worked for** sophisticated advertising agencies for decades, and unit cost information is readily available.[107]

Ultimately, McLean made abundantly clear—which AMc emphasizes in its motion[108]—he was not validating or confirming FRA's media report; he was stating that it supported his independently derived conclusions. As AMc admits, McLean reviewed the relevant documentation, which confirmed that FRA in fact confronted the same handicaps he had faced and that its analysis comported with his own **independent analysis**.[109] In sum, McLean's opinions in his Supplemental Report were based on his own independent review of documents and evidence and are not a simple adoption and parroting of FRA's media report.[110] There is no basis to exclude his testimony simply because refers to independent analysis of a separate third party that is consistent with his own independent analysis. In fact, McLean was questioned extensively, and responded completely, even though he had only recently received the FRA Spreadsheets.[111] Importantly, during his questioning about what FRA did or did not do, McLean stood by his conclusion based upon the data he had; and, refused to speculate as to what information he did not have. And, he emphasized the dearth of Strata data and access into it.[112]

## F.   McLean's Opinion Regarding Fiduciary Duties are Not Legal Conclusions

McLean's testimony regarding fiduciary duties are not legal conclusions—in reality, he states that based on his extensive industry experience he has an opinion as to what generally is understood in the industry as to fiduciary requirements of an agency and whether AMc's actions

---

[107] *Id.* at p. 10 [APP 0379].
[108] ECF 461 at pp 24-25.
[109] ECF 482-4, Ex. 5, Supplemental Expert Report of Andrew McLean, at p. 10 [APP 0379].
[110] If the Court is inclined to exclude any of McLean's testimony regarding the FRA media report, it will be essential that the FRA related testimony is carefully extracted from his opinions which were rendered wholly independently of the FRA report.
[111] *See, e.g.,* ECF 482-5, Ex. 6, Dep. Tr. of Andrew McLean at 7:23, 8:14, 133:18; 167:8,16,22; 168:25; 169:16; 170:8; 173:23; 174:17, 23; 175:16; 182:20; 187:10,14,18; 188:3,18; 189:12; 239:18; 328:21; 329:2,12,25; 330:2,16; 331:2; 332:5,14; 333:5; 334:15, 20, 25; 336:4,6; 337:16; 340:18,19,25; 341:6,8; 342:18; 356:4,13; 358:13; 365:3.
[112] *Id.* at 190:17-22.

were within the bounds of what is generally acceptable in the industry based upon his experience. In such cases, courts allow the testimony to be presented.[113] In fact, AMc specifically admits the existence of a special relationship.[114]

## G.    AMc's Argument that McLean's Supplemental Report is Untimely Is Meritless

AMc's request to exclude as untimely McLean's proposed testimony in his Supplemental Report is without merit. AMc's baseless assertion ignores this Court's Amended Scheduling Order dated September 7, 2021, providing that "[b]y October 29, 2021, all **discovery** – including discovery concerning expert witnesses – shall be completed."[115] Indeed, AMc's own submission of two supplemental expert reports on October 29, 2021—after the NRA submitted McLean's Supplemental Report on October 18, 2021—underscore that the parties mutually understood that the Amended Scheduling Order allowed expert reports to be submitted prior to the discovery cutoff. AMc ignores the relevant 5th Circuit test used to determine whether untimely expert testimony may be excluded. Under that test, it is an abuse of discretion and "disproportionately harsh" to exclude the Supplemental Report even if it was untimely, because NRA did not act in bad faith and any potential prejudice to AMc (which was caused by its own abusive discovery conduct and violation of their contractual obligations to return that which does not belong to them

---

[113] *See Alexander v. Martin*, No. 2:08CV400, 2010 WL 11530305, at *7 (E.D. Tex. June 24, 2010) ("However, and more importantly for the Court's ruling here, the district court in *Sowell* did allow the expert witness to testify as to other matters, namely the definition and general standards of conduct as a fiduciary… The Court does not find the principles espoused in *Askanase* and applied in *Sowell* mandate the exclusion of all trust law experts nor do those principles, as applied in this case, mandate the exclusion of Hitt and Morrison. Rather, those principles give wide discretion to the district judge, in this instance Chief Judge Folsom, in determining what opinions these experts may provide at trial."); *United States v. McLendon*, No. CIV.A. 3:97-CV-0613-, 1999 WL 1494998, at *7 (N.D. Tex. July 28, 1999) ("The defendants presented the testimony of several expert witnesses outlining the duties of a fiduciary in Bart's situation and expressing the opinion that Bart acted, in the circumstances, as a prudent fiduciary would. The court finds this testimony—which was unrebutted—persuasive and accepts it in making these findings.").
[114] *See, e.g.*, ECF No. 448-4, Exs. 53, 54, 55, Letters from William Winkler, dated April 22, 2019 (William Winkler admitting that AMc was entrusted to keep its own backup of expense documentation.) [APP 1602-11].
[115] ECF No. 358 at p. 2 (emphasis in original).

24

to the NRA) can easily be cured with a remedy less drastic than exclusion.[116]

In the 5th Circuit, courts "consider four factors to determine whether a district court abused its discretion by excluding expert testimony as untimely: '(1) the explanation for the failure to identify the witness; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice.'"[117] Well-established 5th Circuit precedent dictates that excluding even untimely expert testimony is a drastic and "disproportionately harsh" remedy reserved for the rarest cases.[118] Indeed, the 5th Circuit emphasizes that exclusion is not "the preferred means of dealing with a party's attempt to designate a witness out of order or offer new evidence."[119] Each of the factors weighs against exclusion.

## IV.   CONCLUSION

For the foregoing reasons, the Motion should be denied in its entirety.

---

[116] *See, e.g., In re Complaint of C.F. Bean L.L.C.*, 841 F.3d 365, 369 (5th Cir. 2016) ("Notwithstanding the wide latitude we give district courts in deciding discovery matters, excluding Fritsch's second report and his testimony was not the appropriate sanction in this case. Bean's explanation for not submitting a complete expert report by the disclosure deadline is reasonable. Although Bean cannot explain why it did not move to extend the deadline, there is no indication of bad faith on Bean's part. The expert report and testimony were essential to Bean's case. And a continuance would cure much of the prejudice to SMC from Bean's late disclosure. On these facts, excluding critical expert testimony was disproportionately harsh for what amounts to failure to request an extension of the expert disclosure deadline. More appropriate sanctions include allowing SMC to re-depose and rebut Fritsch, and awarding SMC costs and attorneys' fees for this additional discovery."); *Betzel v. State Farm Lloyds*, 480 F.3d 704, 707 (5th Cir. 2007) (even though expert was untimely designated without explanation, under the applicable 5th Circuit test it was an abuse of discretion to exclude the testimony.); *E.E.O.C. v. Gen. Dynamics Corp.*, 999 F.2d 113, 116–17 (5th Cir. 1993) (collecting cases) ("Given the fact that the district court's sanction of total exclusion of Dr. Kearns' expert testimony was tantamount to a dismissal of the EEOC's disparate impact claim, the district court abused its discretion by failing to consider the possibility of lesser sanctions than the total exclusion of the EEOC's expert witness.").

[117] *In re Complaint of C.F. Bean L.L.C.*, 841 F.3d 365, 369 (5th Cir. 2016) (quoting *Geiserman v. MacDonald*, 893 F.2d 787, 791 (5th Cir. 1990)); *see also Betzel*, 480 F.3d at 707 ("We hold that the district court abused its discretion in excluding Betzel's late-designated witnesses. We review such exercises of discretion by considering four factors: "(1) the explanation for the failure to identify the witness; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice.").

[118] *See In re Complaint of C.F. Bean L.L.C.*, 841 F.3d 365, 374 (5th Cir. 2016) ("[E]xcluding critical expert testimony was disproportionately harsh for what amounts to failure to request an extension of the expert disclosure deadline.").

[119] *See E.E.O.C.*, 999 F.2d at 116–17 (citing *Bradley v. United States,* 866 F.2d 120, 127 n. 11 (5th Cir.1989)) ("In *Bradley,* we explained that "coupled with *appropriate* sanctions, a continuance will serve the court's truth-seeking function while still allowing it to punish and deter conduct that is in violation of the rules." Given the fact that the district court's sanction of total exclusion of Dr. Kearns' expert testimony was tantamount to a dismissal of the EEOC's disparate impact claim, the district court abused its discretion by failing to consider the possibility of lesser sanctions than the total exclusion of the EEOC's expert witness.").

Dated: January 24, 2022          Respectfully submitted,

                                 **BREWER, ATTORNEYS & COUNSELORS**


                       By:  */s/ Cecelia L. Fanelli*
                            Cecelia L. Fanelli
                            *Pro Hac Vice*
                            clf@brewerattorneys.com
                            Sarah B. Rogers
                            New York Bar No. 4755252
                            sbr@brewerattorneys.com
                            Philip J. Furia
                            *Pro Hac Vice*
                            pjf@brewerattorneys.com
                            Konstantin N. Parkhomenko
                            TX Bar No. 24074854
                            knp@brewerattorneys.com
                            **Brewer Attorneys and Counselors**
                            1717 Main Street, Suite 5900
                            Dallas, TX 75201

                            **ATTORNEYS FOR PLAINTIFF AND COUNTER-
                            DEFENDANT NATIONAL RIFLE ASSOCIATION
                            OF AMERICA**

26

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was electronically served via the Court's electronic case filing system upon all counsel of record on this 24th day of January 2022.

*/s/ Cecelia L. Fanelli*