**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § § § | |
| Plaintiff and Counter-Defendant | § § | |
| v. | § § | |
| ACKERMAN MCQUEEN, INC., | § § | |
| Defendant and Counter-Plaintiff, | § | Civil Action No. 3:19-cv-02074-G |
| and | § § | |
| MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, and MELANIE MONTGOMERY, | § § § § | |
| Defendants. | § § | |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF NATIONAL RIFLE ASSOCIATION OF AMERICA'S
OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE CERTAIN OPINIONS OF
THE NRA'S EXPERT WITNESS, GARY GOOSLBY**

**BREWER, ATTORNEYS & COUNSELORS**
Cecelia L. Fanelli
clf@brewerattorneys.com
Sarah B. Rogers
sbr@brewerattorneys.com
Philip J. Furia
pjf@brewerattorneys.com
Konstantin N. Parkhomenko
knp@brewerattorneys.com
BREWER ATTORNEYS AND COUNSELORS
1717 Main Street, Suite 5900
Dallas, Texas 75201

ATTORNEYS FOR PLAINTIFF/COUNTER-
DEFENDANT NATIONAL RIFLE
ASSOCIATION OF AMERICA

## <u>TABLE OF CONTENTS</u>

I. INTRODUCTION ...........................................................................................................1

II. FACTUAL BACKGROUND .......................................................................................1

III. ARGUMENT ..............................................................................................................4

      A.      Goolsby's Methodology is Well-Supported and Reliable .......................4

            1.      Goolsby was not required to examine the parties' "40-year relationship;" AMc was required to maintain records that support what it charged, and to make them available on reasonable notice, at any time requested by the NRA. ...........................................4

            2.      Goolsby appropriately utilized industry standards in his assessment of AMc's internal controls. ...........................................7

      B.      Defendants' Arguments for Excluding Goolsby's Damages Opinions are Unavailing ...........................................................................................10

            1.      Goolsby's opinions are timely. ..................................................10

            2.      Goolsby's damages opinions are reliable and based upon a thorough review of extensive evidence. ............................................12

      C.      Goolsby's Opinions do not Amount to Impermissible Legal Conclusions and do not Infringe Upon the Province of the Jury ................................15

      D.      Goolsby Offers No Opinion on Defendants' Honesty and Veracity ...................17

IV. CONCLUSION...........................................................................................................17

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Betzel v. State Farm Lloyds*,
    480 F.3d 704 (5th Cir. 2007) ...............................................................11

*Bradley v. United States*,
    866 F.2d 120 (5th Cir.1989) .................................................................12

*Collins v. Benton*,
    470 F. Supp. 3d 596 (E.D. La. 2020) ....................................................15

*In re Complaint of C.F. Bean L.L.C.*,
    841 F.3d 365 (5th Cir. 2016) ...............................................................11

*Condrey v. SunTrust Bank of Georgia*,
    429 F.3d 556 (5th Cir. 2005) ...........................................................8, 9

*Croteau v. CitiMortgage, Inc.*,
    CASE NO. 4:12cv693, 2014 WL 119968 (E.D. Tex. Jan. 2014).....................8

*Curtis v. M&S Petroleum, Inc.*,
    174 F.3d 661 (5th Cir. 1999) ...............................................................4

*E.E.O.C. v. Gen. Dynamics Corp.*,
    999 F.2d 113 (5th Cir. 1993) ..........................................................11, 12

*HCP Laguna Creek CA, LP v. Sunrise Senior Living Mgmt., Inc.*,
    737 F. Supp. 2d 533 (E.D. Va. 2010) ....................................................6

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)........................7

*Mariner Energy, Inc. v. Devon Energy Production Co.*,
    690 F.Supp.2d 558 (S.D. Tex. 2010) ....................................................8

*Rosamond v. Great Am. Ins. Co.*,
    No. 3:10CV263TSL-MTP, 2011 WL 4433582 (S.D. Miss. Aug. 4, 2011)..............7

*Salomon v. Kroenke Sports & Entm't*,
    No. 3:15-CV-0666-M, 2019 WL 10631256 (N.D. Tex. Feb. 27, 2019)................16

*Trondheim Cap. Partners, LP v. Life Ins. Co. of Alabama*,
    505 F. Supp. 3d 1213 (N.D. Ala. 2020)..................................................6

**State Cases**

*Golembiewski v. Golembiewski*
No. 2993–02–1, 2003 WL 22290032, *5 (Va. Ct. App. Oct. 7, 2003) ...................................9

**Rules**

Fed R. Evid. 702 ...........................................................................................................................16

# I.

## INTRODUCTION

Plaintiff the National Rifle Association of America (the "NRA") files this Opposition to Defendants' Motion to Exclude Certain Opinions of the NRA's Expert Witness, Gary Goolsby, [ECF No. 462] (the "Motion"), filed by Ackerman McQueen, Inc. and Mercury Group, Inc. (collectively, "AMc"), Henry Martin, William Winkler, and Melanie Montgomery (collectively with AMc, the "Defendants"), as follows:

# II.

## FACTUAL BACKGROUND

Goolsby's initial expert report was submitted on June 1, 2021 ("Initial Report"). In it, he states that he was hired by the NRA to "provide an independent assessment of the allegations made by the Plaintiff that AMc inappropriately billed the NRA millions of dollars over the period 2015 to 2019 for which little, if any, supporting documentation was provided, as well as, calculate damages owed by Defendants."[1]  In the Initial Report, Goolsby set forth six main opinions, detailed below:

> ***First***, AMc failed to fulfill its obligations under the Records Examination Clause of the Services Agreements by refusing to provide critical documents, including support for invoices, budget planning materials, and NRA-dedicated employee information.

> ***Second***, AMc failed to uphold its responsibility to maintain adequate internal controls, most notably its responsibility to manage invoicing pursuant to the Services Agreements, as AMc submitted invoices to the NRA that were inappropriately billed, not substantiated by supporting documentation, lacked sufficient detail or for services potentially not rendered.

> ***Third***, AMc billed the NRA for amounts inconsistent with the provisions of the Services Agreements, including, but not limited to, the production of Oliver North's American Heroes program on NRATV.

---

[1] *See* ECF 456, Ex. 90, Declaration of Gary Goolsby, Initial Report, at ¶2 [App. 04272].

*Fourth*, in support of several designated "Other Projects," AMc failed to provide the contractually required scope documents, budgets and approvals in advance of the work and fair market value determinations relating to "Other Projects" were not provided to the NRA by AMc as required by the Services Agreements.

*Fifth*, AMc has produced time records of its employees that are insufficient to validate that projects and personnel costs were correctly allocated and billed to the NRA as required by the Services Agreements.

*Sixth*, I have not provided a damages estimate pending the potential receipt of additional documents, including deposition transcripts, during the remaining discovery phase of this case. In my opinion, the missing documentation is substantial calling into question the significant amount paid of more than $150 million by the NRA to AMc during the Relevant Period.[2]

Goolsby's supplemental report was submitted on August 16, 2021 ("Supplemental Report", together with the Initial Report, the "Goolsby Reports"). In his Supplemental Report, Goolsby analyzes additional evidence which came to light after the submission of his Initial Report,[3] and provides a range of damages for the NRA's claims against Defendants.[4] This includes calculations at both the lower and upper end for amounts invoiced to the NRA and amounts paid by the NRA.

For the upper end calculations, Goolsby began with the total amounts invoiced to and paid by the NRA and then subtracted "invoices and payments related to NRATV and media buys discussed in the expert reports of Mr. Buss and Mr. McLean[]."[5] This approach was appropriate because, as noted in his Supplemental Report, he did not receive documents that "support the significant amount paid of close to $160 million by the NRA to AMc during the Relevant Period."[6]

---

[2] *Id.*, Initial Report, at ¶¶ 22-27 [App. 04282-83].
[3] *Id.*, Supplemental Report, at ¶¶ 7-18 [App. 04340-44].
[4] *Id.*, Supplemental Report, at ¶¶ 19-26 [App. 04344-47].
[5] *Id.*, Supplemental Report, at ¶ 22 [App. 04345].
[6] *Id.*, Supplemental Report, at ¶ 19 [App. 04344].

For his lower end calculation, Goolsby analyzed a chart prepared by the Office of the Treasurer at the NRA[7] which "groups the AMc invoices billed to the NRA during the Relevant Period into categories."[8] "All of the categories but one relate to services that are recognized by the NRA as those that would have been included in the budgeting process, while the remaining category referenced as 'undefined' or 'other' relates to services that are determined by the NRA to not have been included in such budgeting process."[9] The NRA was unable to identify the budgeted category for invoices totaling $59,270,087, which resulted in payments by the NRA amounting to $56,757,194. "The lower end of the ranges for damages determination was calculated by subtracting invoices and payments related to media buys and NRATV equipment expenses"[10] from the undefined invoice amounts.

Ultimately, Goolsby determined that "the ranges of damages, disgorgement or forfeiture, in [his] opinion, would be between $33,719,128 and $97,039,076 for payments and between $36,232,021 and $101,792,806 for amounts invoiced."[11]

In addition to his two reports, Goolsby appeared for a deposition on two occasions – on August 17, 2021 and October 12, 2021.  During his depositions, he provided testimony to support and expound upon the opinions offered in his reports.

On January 3, 2022, Defendants moved to exclude certain opinions offered by Goolsby in his Report and Supplemental Report.

---

[7] *See* Declaration of Cecelia L. Fanelli. Ex. 1., Declaration of Michael Erstling, dated January 21, 2022, at pg. 2. ¶ 7, [App. 0005].
[8] *See* ECF 456, Ex. 90, Declaration of Gary Goolsby, Supplemental Report, at ¶ 20 [App. 04345].
[9] *Id.*, at ¶ 20 [App. 04345].
[10] *Id.*, at ¶ 24 [App. 04346].
[11] *Id.*, at ¶ 25 [App. 04346].

III.

## ARGUMENT

A.    **Goolsby's Methodology is Well-Supported and Reliable**

Defendants seek to exclude Goolsby's opinions because that they are allegedly flawed and unreliable.  According to Defendants, Goolsby "wants to opine that AMc should have to pay back tens of millions of dollars in work performed for the NRA from 2015 – 2019."[12]  Defendants then claim that this opinion is not reliable because (a) Goolsby failed to consider "fundamental and undisputed facts relating to the parties' nearly 40-year relationship;" and (b) Goolsby erred in concluding that AMc's internal controls should be governed by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). These arguments are without merit.

1.    **Goolsby was not required to examine the parties' "40-year relationship;" AMc was required to maintain records that support what it charged, and to make them available on reasonable notice, at any time requested by the NRA.**

AMc's course of dealing arguments, embodied in repeated references to the parties "40-year relationship", are an attempt distract from the NRA's damages analyses, which Goolsby performs: did AMc maintain records adequate to substantiate the services it provided the NRA? Goolsby concluded AMc did not. As a seasoned expert with extensive background in accounting and auditing, risk management, accounting standards, internal controls and business processes, Goolsby describes his thorough review of AMc invoices and the lack of substantiation for them.[13] The Goolsby Reports discuss the conceptual framework applied to his opinions, which offers testimony that is clearly grounded in the methods and procedures and is supported by more than speculation or subjective belief.[14]

---

[12] *See* ECF 463, Defendants' Brief In Support of Motion To Exclude Certain Opinions of The NRA's Expert Witness, Gary Goolsby, at pg. 6.
[13] *See* ECF 443-3, Ex. 37, Deposition of Gary Goolsby, dated Oct. 12, 2021, 182:18-183:1; 205:20-206:5 [App. 01431-01438]; *see* Ex. 90, Declaration of Gary Goolsby, dated December 20, 2021. [App.04270-App.04357].
[14] *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999).

Goolsby identifies a pronounced lack of documentation produced by AMc, driven either by a weakness in AMc internal controls over invoicing or AMc's disregard the documentation requests of the NRA.[15],[16]

> The issue is one of Ackerman McQueen providing supporting evidence … it's all about Ackerman McQueen who is rendering the service, billing NRA, who's expending assets to pay the bill for Ackerman McQueen to provide supporting evidence substantiating those invoices. That's the crux of the internal control issue I am talking about. That is required. It needs to be done and it should be done.

In fact, with proper controls, providing supporting documentation "should be incredibly simple and easy to do in a normal course of business;"[17] however, to date, AMc instead provided thousands of pages of unorganized invoice support that does not satisfy audit standards:[18]

> But you don't show, number one how those invoices -- or how that support is organized and ties into the invoice and relates to a specific invoice, which it was not done.· And also if you don't show business reasons documented behind why certain expenses were incurred, which was not done on the ones that we looked at, then that does not meet the standard for supporting the invoices. Because what you would have is the invoices on one hand, the 2,800 or so invoices, and you have all these thousands of pages with no linkage between the two.· That if you just said come into a room, here's thousands of pages. Is that good enough? Well, no, that's not good enough.

Goolsby's opinions are reliable and address fundamental concerns regarding the "lack of supporting documentation" for AMc's invoices.[19] AMc's various statements that Goolsby failed to consider whether work was actually performed, whether the NRA paid or agreed to the submission of detail-free invoices,[20] or whether the NRA maintained adequate controls,[21] all

---

[15] See ECF 456, Ex. 90, Declaration of Gary Goolsby, Supplemental Report, at ¶ 19 [App. 04344].
[16] See ECF 443-3, Ex. 38, Deposition of Gary Goolsby, dated Aug. 17, 2021, 78:2-19 [App. 01462].
[17] Id., 79:2-7; 80:25-81:12 [App. 01462-1463].
[18] See ECF 443-3, Ex. 37, Deposition of Gary Goolsby, dated Oct. 12, 2021, 196:22-197:14 [App. 01434-35].
[19] See ECF 456, Ex. 90, Declaration of Gary Goolsby, Supplemental Report, at ¶ 19 [App. 04344].
[20] See ECF 443-3, Ex. 37, Deposition of Gary Goolsby, dated Oct. 12, 2021, 183:12-17; 184:2-19 [App. 01431].
[21] Id. at 214:16-215:9 [App. 01439].

attempt to shift the burden of record keeping from AMc to the NRA.[22] The burden to substantiate

AMc invoices rests with AMc, as a matter of contract[23] and, as a matter of common sense.[24]

Defendants also claim that the NRA audited AMc's "books and records time and time

again, and never raised any issues until the Fall 2018"[25] ignores the fact that the NRA's right to

review AMc's books and records under the Services Agreements is a "present right,"[26] – it is not

impacted or diminished by prior reviews which may have occurred.[27] Ignoring AMc's "he said,

she said" deposition questioning, designed to dismiss the validity of the NRA's right to review its

records, Goolsby stresses that "[i]t is not uncommon for companies to do a look back to evaluate

under records examination provisions to determine if what was paid was actually appropriate and

substantiated."[28]

In sum, nothing in the "40-year relationship" between the NRA and AMc can possibly be

deemed to relieve AMc from its obligations to substantiate the services for which it billed the

NRA, at any time the NRA requests it, and to provide the NRA with access to its books and records.

---

[22] *Id.* at 199:4-16 [App. 01435].

[23] *See* ECF 443-3, Ex. 2, Services Agreement between NRA and AMc, dated Apr. 30, 2017, I, II, II, VIII, at pp. 1-6, 9-10 [App. 00014-20, 23].

[24] See ECF 443-3, Ex. 37, Deposition of Gary Goolsby, dated Oct. 12, 2021, 211:23-212:4 [App. 01438].

[25] ECF 463, Defendants' Brief In Support of Motion To Exclude Certain Opinions of The NRA's Expert Witness, Gary Goolsby, at pg. 8.

[26] *See generally, e.g., Trondheim Cap. Partners, LP v. Life Ins. Co. of Alabama,* 505 F. Supp. 3d 1213, 1232 (N.D. Ala. 2020)("the court notes that at common law, the right of inspection was a present right")(internal citations and quotations omitted).

[27] *See id; see also HCP Laguna Creek CA, LP v. Sunrise Senior Living Mgmt., Inc.,* 737 F. Supp. 2d 533, 537, 553 (E.D. Va. 2010) (applying  Virginia law to reject "conspiracy to harm business and reputation" claim that a party allegedly used audit of books and records to harm a business where that party had a right to audit the books under the terms of a contract.)

[28] *See* ECF 443-3, Ex. 37, Deposition of Gary Goolsby, dated Oct. 12, 2021, 184:15-19 [App. 1431]. Of course, Section VIII (Examination of Records) is an ongoing right during the term of the Services Agreement (*See* ECF 443-3, Ex. 2, Services Agreement between NRA and AMc, dated Apr. 30, 2017, Section VIII, at p. 9 [App. 00023]).

2.     **Goolsby appropriately utilized industry standards in his assessment of AMc's internal controls.**

Defendants contend that it was improper for Goolsby to conclude that AMc's internal controls should be governed by the COSO standards.  According to Goolsby, the COSO standards are the "accepted criteria for establishing internal control and evaluating its effectiveness, for public and private companies[]."[29]  These standards were established by the "National Commission on Fraudulent Financial Reporting" which was created by joint sponsorship of the "American Institute of Certified Public Accountants, American Accounting Association, Financial Executives Institute, Institute of Internal Auditors and Institute of Management Accountants."[30]

Defendants do not dispute that an expert "may testify regarding relevant industry standards … and may address whether defendant's conduct conformed to those standards."[31] Defendants also do not dispute that the COSO standards (a) "have been subjected to peer review and publication;" and (b) enjoy "general acceptance."[32] Instead, they make the irrelevant argument that "parties are free to contract and conduct business to any standard" and that the parties agreed to "deviat[e] from COSO."[33]   Yet, Defendants offer no evidence to suggest that the parties to the Services Agreements made any such agreement.

Of course, Defendants' arguments misconstrue the utility of Goolsby's report that conclude that AMc failed to maintain customary controls. Defendants contend that "the undisputed evidence establishes that the parties had certain standards and customs that they agreed upon and did

---

[29] *See* ECF 456, Ex. 90, Declaration of Gary Goolsby, Initial Report, at ¶ 46 [App. 04288].
[30] *Id.*, Fn. 34 [App. 04288].
[31] *See Rosamond v. Great Am. Ins. Co.*, No. 3:10CV263TSL-MTP, 2011 WL 4433582, at *5 (S.D. Miss. Aug. 4, 2011) (permitting an expert to opine concerning industry standards applicable to the adjustment of insurance claims and determining that the expert "may address whether defendant's conduct conformed to those standards").
[32] *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 149, 119 S. Ct. 1167, 1175, 143 L. Ed. 2d 238 (1999) (discussing the *Daubert* factors).
[33] *See* ECF 463, Defendants' Brief In Support of Motion To Exclude Certain Opinions of The NRA's Expert Witness, Gary Goolsby, at pg. 8.

business based upon for years."[34] This statement is unsupported and conclusory: it is also legally flawed because it contradicted the express terms of Sections I, III and VIII of the Services Agreement[35] and because it contradicts the parol evidence rule.

The parol evidence rule "prohibits the admission of extrinsic evidence of prior or contemporaneous oral agreements, or prior written agreements, to explain the meaning of a contract when the parties have reduced their agreement to an unambiguous integrated writing."[36] Parol evidence "may only be considered after a contract is found to be ambiguous."[37] Statements are barred by the parol evidence rule when they contradict the express terms of a contract, and "operate to vary" the contract's unambiguous provisions.[38] Thus, "evidence of the parties' prior negotiations is inadmissible as extrinsic evidence of the meaning of [a contract]."[39] Moreover, "[b]y its very definition, an integration or merger clause negates the legal introduction of parol evidence; it is a 'provision in a contract to the effect that the written terms may not be varied by prior or oral agreements because all such agreements have been merged into the written document.'"[40]

Here, the Services Agreement contains an integration clause, stating, in relevant part: "This Services Agreement, together with any Exhibits hereto, constitute the entire agreement between the NRA and AMc relating to the matters covered by this Services Agreement at the time of its signing . . . [and] supersedes all prior agreements, including letter agreements and memoranda of

---

[34] *Id.*, at pg. 8.
[35] *See* ECF 443-3, Ex. 2, Services Agreement between NRA and AMc, dated Apr. 30, 2017, Sections I, III, and VIII, at pp. 1, 5, 9 [App. 00015, 00020, 00023].
[36] *Mariner Energy, Inc. v. Devon Energy Production Co.*, 690 F.Supp.2d 558, 574, n.5 (S.D. Tex. 2010) (citing 11 RICHARD A. LORD, WILLISTON ON CONTRACTS § 33:1 (4th ed.)).
[37] *Croteau v. CitiMortgage, Inc.*, CASE NO. 4:12cv693, 2014 WL 119968, *8 (E.D. Tex. Jan. 2014) (citing *Texas v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006)).
[38] *Id.* (citing *Rosas v. U.S. Small Bus. Admin.*, 964 F.2d 351, 355-56 (5th Cir. 1997)).
[39] *Mariner Energy, Inc.*, 690 F.Supp.2d at 574-75 (sustaining objection to emails proffered as "extrinsic evidence of the parties' negotiations and their contractual intent").
[40] *Condrey v. SunTrust Bank of Georgia*, 429 F.3d 556, 564 (5th Cir. 2005).

understanding."[41] The integration clause was reiterated in the Amendment No. 1 to the Services Agreement, dated May 6, 2018, which states: "This Amendment and the Services Agreement, and the Exhibits thereto, constitute the entire agreement between NRA and AMc relating to the matters covered hereto and thereto."[42] Accordingly, as a matter of law, parol evidence is inadmissible to vary or supplement the terms of the Services Agreement.[43]

Furthermore, Section I.A-E of the Services Agreement describes the services that AMc was required to provide, subject to the NRA's oversight. Among its obligations, AMc was required to "[c]arefully audit invoices" regarding media planning and placement services.[44] AMc's compensation, billing and payments procedures were controlled by a contractually prescribed set of protocols set forth in Sections II and III, which placed significant financial reporting requirements on AMc to ensure proper accountability to the NRA[45] For example, under Sections II.E. and III.D. of the Services Agreement, AMc was required to provide a fair market value analysis, and other requirements, as a pre-condition to the NRA's payment of invoices pertaining to additional or special assignments.[46] Section I.B. of the Services Agreement also required the NRA's prior approval of advertising/creative services.[47] Finally, Section III.A. of the Services Agreement provides that expenses, including "reasonable out-of-town travel" must have "prior written approval in accordance with written procedures established by the NRA Executive Vice

---

[41] *See* ECF 443-3, Ex. 2, Services Agreement between NRA and AMc, dated Apr. 30, 2017, Section X.D., at p. 9 [App. 00023].

[42] *See* ECF 443-3, Ex. 3, Amendment No. 1 to Services Agreement between NRA and AMc, dated May 6, 2018, Section 4, at p. 2 [App. 00028].

[43] *See Condrey*, 429 F.3d at 564; *Golembiewski v. Golembiewski*, Record No. 2993–02–1, 2003 WL 22290032, *5 (Va. Ct. App. Oct. 7, 2003) ("The general rule in Virginia is that parol evidence is inadmissible to vary, contradict, or explain the terms of a complete, unambiguous, unconditional written contract. . . . Additionally, the agreement includes an integration clause in paragraph 8, which supports the inadmissibility of parol evidence.").

[44] *See* ECF 443-3, Ex. 2, Services Agreement between NRA and AMc, dated Apr. 30, 2017, Section I.C, at p. 3 [App. 00017].

[45] *See Id.*, Section II, at pp.4-5 [App. 00018-19]; Section III, at pp. 5-6 [App. 00019-20].

[46] *See Id.*, Section II.E., at p. 5 [App. 00019]; Section III.D., at pp. 5-6 [App. 00019-20].

[47] *See Id.*, Section I.B. at p.2 [App. 00016].

President."[48] Any expenses, including travel, transportation, meals and lodging, etc., not in accordance with this procedure, "shall be considered to be . . . business expenses of AMc."[49]

In sum, Defendants' continuous reliance on a prior course of dealing is inadmissible to vary the terms of the Services Agreements, and fails to grapple with Goolsby's opinion regarding what vendors in the industry world consider normal and accepted business practices. As such, Goolsby's opinions concerning the application of those standards to the facts in this case are reliable and appropriate.

**B.**     **Defendants' Arguments for Excluding Goolsby's Damages Opinions are Unavailing**

Defendants attack Goolsby's damages opinions and argue that they are untimely and unreliable.  Defendants arguments are meritless for the reasons detailed below.

**1.**     **Goolsby's opinions are timely.**

AMc's request to exclude as untimely Goolsby's proposed testimony in his Supplemental Report is without merit. AMc's baseless assertion ignores this Court's Amended Scheduling Order dated September 7, 2021, providing that "[b]y October 29, 2021, all **discovery** – including discovery concerning expert witnesses – shall be completed."[50] Indeed, AMc's own submission of two supplemental expert reports on October 29, 2021—after the NRA submitted the Goolsby Reports on June 1, 2021 and August 16, 2021—underscore that the parties mutually understood that the Amended Scheduling Order allowed expert reports to be submitted prior to the discovery cutoff.

AMc ignores the relevant 5th Circuit test used to determine whether untimely expert testimony may be excluded. Under that test, it is an abuse of discretion and "disproportionately

---

[48] *See Id.*, Section III.A., at p. 5 [App. 00019].
[49] Id.
[50] ECF No. 358 at p. 2 (emphasis in original).

harsh" to exclude the Supplemental Report even if it was untimely, because NRA did not act in bad faith and any potential prejudice to AMc (which was caused by its own abusive discovery conduct and violation of their contractual obligations to return that which does not belong to them to the NRA) can easily be cured with a remedy less drastic than exclusion.[51]

In the 5th Circuit, courts "consider four factors to determine whether a district court abused its discretion by excluding expert testimony as untimely: '(1) the explanation for the failure to identify the witness; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice.'"[52] Well-established 5th Circuit precedent dictates that excluding even untimely expert testimony is a drastic and "disproportionately harsh" remedy reserved for the rarest cases.[53] Indeed, the 5th Circuit emphasizes that exclusion is not "the preferred means of dealing with a party's attempt to designate

---

[51] *See, e.g., In re Complaint of C.F. Bean L.L.C.*, 841 F.3d 365, 369 (5th Cir. 2016) ("Notwithstanding the wide latitude we give district courts in deciding discovery matters, excluding Fritsch's second report and his testimony was not the appropriate sanction in this case. Bean's explanation for not submitting a complete expert report by the disclosure deadline is reasonable. Although Bean cannot explain why it did not move to extend the deadline, there is no indication of bad faith on Bean's part. The expert report and testimony were essential to Bean's case. And a continuance would cure much of the prejudice to SMC from Bean's late disclosure. On these facts, excluding critical expert testimony was disproportionately harsh for what amounts to failure to request an extension of the expert disclosure deadline. More appropriate sanctions include allowing SMC to re-depose and rebut Fritsch, and awarding SMC costs and attorneys' fees for this additional discovery."); *Betzel v. State Farm Lloyds*, 480 F.3d 704, 707 (5th Cir. 2007) (even though expert was untimely designated without explanation, under the applicable 5th Circuit test it was an abuse of discretion to exclude the testimony.); *E.E.O.C. v. Gen. Dynamics Corp.*, 999 F.2d 113, 116–17 (5th Cir. 1993) (collecting cases) ("Given the fact that the district court's sanction of total exclusion of Dr. Kearns' expert testimony was tantamount to a dismissal of the EEOC's disparate impact claim, the district court abused its discretion by failing to consider the possibility of lesser sanctions than the total exclusion of the EEOC's expert witness.").

[52] *In re Complaint of C.F. Bean L.L.C.*, 841 F.3d 365, 369 (5th Cir. 2016) (quoting *Geiserman v. MacDonald*, 893 F.2d 787, 791 (5th Cir. 1990)); *see also Betzel v. State Farm Lloyds*, 480 F.3d 704, 707 (5th Cir. 2007) ("We hold that the district court abused its discretion in excluding Betzel's late-designated witnesses. We review such exercises of discretion by considering four factors: "(1) the explanation for the failure to identify the witness; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice.'"").

[53] *See In re Complaint of C.F. Bean L.L.C.*, 841 F.3d 365, 374 (5th Cir. 2016) ("[E]xcluding critical expert testimony was disproportionately harsh for what amounts to failure to request an extension of the expert disclosure deadline.").

a witness out of order or offer new evidence."[54] Applied here, each of the four factors weighs heavily against exclusion.

## 2. Goolsby's damages opinions are reliable and based upon a thorough review of extensive evidence.

Defendants contend that Goolsby's damages opinions are unreliable because he purportedly "simply rubber-stamped a number chart prepared by an unidentified party at the NRA that was prepared in anticipation of litigation against AMc and provided to him by the NRA's counsel."[55] In order to reach this unfounded conclusion, Defendants ignored nearly all of the Goolsby Reports and Goolsby's deposition testimony.

As detailed in Goolsby's Initial Report, the NRA "made total payments to AMc of $159.4 million during the Relevant Period for invoices billed the NRA by AMc."[56] To prepare his opinion, he reviewed extensive discovery exchanged in this action and all of the invoices produced by the NRA.[57] He also reviewed the NRA's request for AMc to produce "[a]ll documents referring or relating to backup documentation, substantiation, justification, or materials of any kind maintained by Defendants[] in support of their billing statements or requests for payment made to the NRA."[58] Finally, he noted that "AMc has failed to provide supporting documentation for the majority of its invoices billed to the NRA during the Relevant Period" and opined that "the supporting

---

[54] *E.E.O.C. v. Gen. Dynamics Corp.*, 999 F.2d 113, 116–17 (5th Cir. 1993) (citing *Bradley v. United States*, 866 F.2d 120, 127 n. 11 (5th Cir.1989)) ("In *Bradley,* we explained that "coupled with *appropriate* sanctions, a continuance will serve the court's truth-seeking function while still allowing it to punish and deter conduct that is in violation of the rules." *Id.* (emphasis added). Given the fact that the district court's sanction of total exclusion of Dr. Kearns' expert testimony was tantamount to a dismissal of the EEOC's disparate impact claim, the district court abused its discretion by failing to consider the possibility of lesser sanctions than the total exclusion of the EEOC's expert witness.").
[55] See ECF 463, Defendants' Brief In Support of Motion To Exclude Certain Opinions of The NRA's Expert Witness, Gary Goolsby, at pg. 9.
[56] *See* ECF 456, Ex. 90, Declaration of Gary Goolsby, Initial Report, at ¶ 53 [App. 04290-91].
[57] *Id.*, Initial Report, at ¶ 53 (*see also* Fns. 39-41 [App. 04290-91]; Exhibit 2 listing all of the documents considered by Goolsby in the Initial Report [App. 04330-04335]; and Supplemental Exhibit 2 in the Supplemental Report [App. 04356-04357]).
[58] *Id.*, at ¶ 66 (citing Plaintiff's First Set of Requests for Production of Documents to Defendants dated November 5, 2019, Request No. 17) [App. 04301].

documentation that was provided was not produced in a manner sufficient to identify which invoices relate to the documentation."[59]

Based on the analysis explained above and, in more detail in the Goolsby Reports, Goolsby determined that "AMc failed to adhere to the Services Agreements driven either by a weakness in AMc's internal controls over invoicing or a disregard for the documentation requests of the NRA"[60] and that the lack of invoice support "continues to call into question the significant amount paid by the NRA to AMc[]."[61] Thus, the "upper end" of Goolsby's damages range consists of the amounts invoiced to and paid by the NRA which lack substantiation.[62]

Goolsby noted that the NRA engaged in an effort to decipher whether AMc's invoices could potentially be attributed to a category that "would have been included in the budget process."[63] Thus, for the lower end of his damages calculation, Goolsby included only those invoices which did not fit into any budget category.[64]

Based on the foregoing, there is clearly no merit to the assertion that Goolsby "simply rubber-stamped a number chart."[65] Defendants also proffer the misleading contention that Goolsby "does not even know who prepared the chart (or their expertise), or how different invoices were allocated to categories within the chart."[66] In truth, Goolsby never testified that he did not know

---

[59] *Id.*, at ¶ 66 [App. 04301]

[60] *See* ECF 456, Ex. 90, Declaration of Gary Goolsby, Supplemental Report, at ¶ 19 [App. 04344].

[61] *Id.,* at ¶ 19 [App. 04344].

[62] *Id.*, at ¶ 25 [App. 04346].

[63] *Id.*, at ¶ 20 [App. 04345].

[64] *Id.*, at ¶ 25 ("Given the allocations to budgeted categories, which is not an acknowledgement of the existence of supporting documentation, and based on the calculations discussed above, the ranges of damages, disgorgement or forfeiture, in my opinion, would be between $33,719,128 and $97,039,076 for payments and between $36,232,021 and $101,792,806 for amounts invoiced."); *see also* Tr. at 205:12-16 ("The point is this schedule was an attempt to not say support existed.· This was an attempt to put it in some kind of bucket to arrive at what was unidentified in order to determine perhaps a lower end of the range.") [App. 04346].

[65] See ECF 463, Defendants' Brief In Support of Motion To Exclude Certain Opinions Of The NRA's Expert Witness, Gary Goolsby, at pg. 9.

[66] *Id.*, at pg. 10.

13

who prepared the chart, just that he could not "recall the specific name of the person."[67] The chart to which Defendants refer is a vendor management tool, prepared by members of the Office of the Treasurer at the NRA, and regularly maintained by NRA finance personnel.[68] NRA Director of Finance Michael Erstling, who is responsible for cash management and budget at the NRA reviewed the chart with Goolsby in depth,[69] and Goolsby's conversation with Erstling was disclosed in Goolsby's report.[70] Thus, there is no truth to Defendants' contention that the chart was prepared "in anticipation of litigation"[71] by an individual whose name and qualifications were unknown to Goolsby at the time he prepared his report.

In addition, Defendants claim that during his deposition, "Goolsby could not even begin to replicate the chart by placing an invoice into one of the categories in the chart."[72] This statement is false. When asked by Defendants' counsel to provide "an example of an invoice that fits into the undefined or other category,"[73] Goolsby offered the following response:

> It would be something that would be so vague that it wouldn't fit into any of these other buckets. In other words, by definition when NRA went through and did this, they would look at the invoice to see if the wording would fit in one of these other areas. And so it didn't.[74]

Then, Defendants' counsel asked Goolsby, "What category would the so-called talents for NRA TV fit into? Would they be in that online Network?"[75] Goolsby responded as follows: "I believe it would be, but I'd have to go back and verify."[76] This testimony demonstrates that Goolsby

---

[67] *See* ECF 443-3, Ex. 37, Deposition of Gary Goolsby, dated Oct. 12, 2021, 202:24-203:4 [App. 01436].
[68] *See* Fanelli Decl. Ex 1 Declaration of Michael Erstling, dated January 21, 2022, at pg. 2. ¶ 6  [App. 0005].
[69] *See Id.*, at pg. 3. ¶ 11, [App. 0006].
[70] *See* ECF 456, Ex. 90, Declaration of Gary Goolsby, Initial Report, at ¶ 15 [App. 04280].
[71] *See* Fanelli Decl. Ex. 1 Declaration of Michael Erstling, dated January 21, 2022, at pg. 2. ¶ 6 [App. 0005].
[72] *See* ECF 463, Defendants' Brief In Support of Motion To Exclude Certain Opinions Of The NRA's Expert Witness, Gary Goolsby, at pg. 10.
[73] *See* ECF 443-3, Ex. 37, Deposition of Gary Goolsby, dated Oct. 12, 2021, 206:13-14 [App. 01437].
[74] *Id.*, 206:16-21 [App. 01437].
[75] *Id.*, 206:24-25 – 207:1 [App. 01437].
[76] *Id.*, 207:7-8 [App. 01437].

possesses detailed knowledge and understanding concerning the chart referenced in his report. Defendants' attempt to portray Goolsby's use of the information in the chart as unreliable is meritless.

Finally, Defendants contend that Goolsby reached his conclusion on damages "without having reviewed the other 'thousands' of invoices and supporting documentation."[77] This is plainly false. Goolsby's Initial Report makes clear that he reviewed <u>all</u> of the invoices produced by the NRA in this matter. Even if Defendants could demonstrate that Goolsby failed to review certain invoices or supporting documentation (which they cannot), this would not render his testimony inadmissible since "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility."[78]

Accordingly, Defendants protestations concerning Goolsby's damages opinions are without merit.

**C.     Goolsby's Opinions do not Amount to Impermissible Legal Conclusions and do not Infringe Upon the Province of the Jury**

Defendants contend that certain aspects of Goolsby's opinions are inappropriate because he "seeks to interpret the Services Agreement for the trier of fact and then opine as to its legal significance."[79] Defendants argue that this runs afoul of the rule that "expert testimony on issues of contractual interpretation is inappropriate and that such issues are reserved for the judge and

---

[77] *See* ECF 463, Defendants' Brief In Support of Motion To Exclude Certain Opinions of The NRA's Expert Witness, Gary Goolsby, at pg. 10.

[78] *Collins v. Benton*, 470 F. Supp. 3d 596, 602–03 (E.D. La. 2020) (quoting *Viterbo v. Dow Chem.* Co., 826 F.2d 420, 422 (5th Cir. 1987)).

[79] *See* ECF 463, Defendants' Brief In Support of Motion To Exclude Certain Opinions of The NRA's Expert Witness, Gary Goolsby, at pg. 11.

jury."[80]  However, experts are permitted to "to testify about the proper interpretation of contract terms, an issue of law, when the meaning depends on trade practice."[81]

In the Goolsby Reports, Goolsby relies upon his extensive knowledge of industry, trade standards and significant years of experience to offer an opinion concerning AMc's obligations under the Services Agreements. In Goolsby's expert opinion, based on over four decades of relevant experience,  "proper internal controls pursuant to COSO for any company would enable it to easily provide adequate support for its billings."[82] In Goolsby's experience, maintaining support for invoices is a "standard business acceptable practice."[83]

As such, based upon his knowledge and understanding of COSO and standard business practices, Goolsby concludes that the Records Examination Clause in the Services Agreements exists "for the purpose of substantiating amounts invoiced" to the NRA[84] and that "AMc failed to fulfill its obligations under the Records Examination Clause of the Services Agreement."[85] These standards, which are customary in the industry, and industry contracts like the Services Agreements, are not known to the average layperson. As such, Goolsby's testimony on these issues "will assist the trier of fact to understand the evidence or to determine a fact in issue," [86] namely, AMc's obligations under the Services Agreement.

---

[80] *Id.*, at pg. 11 (quoting *Salomon v. Kroenke Sports & Entm't*, No. 3:15-CV-0666-M, 2019 WL 10631256, at *6 (N.D. Tex. Feb. 27, 2019) (quoting *Implicit Oil & Gas, L.P. v. GoMex Energy Offshore*, Ltd., 3:10-CV-827-P, 2012 WL 13094057, at *3 (N.D. Tex. Jan. 9, 2012))).
[81] *See Salomon*, 2019 WL 10631256, at *6.
[82] *See* ECF 456, Ex. 90, Declaration of Gary Goolsby, Initial Report, at ¶ 81 [App. 04311].
[83] *See* ECF 443-3, Ex. 37, Deposition of Gary Goolsby, dated Oct. 12, 2021, 211:6-212:4 [App. 01438].
[84] *See* ECF 456, Ex. 90, Declaration of Gary Goolsby, Initial Report, at ¶ 71 [App. 04303].
[85] *See* ECF 456, Ex. 90, Declaration of Gary Goolsby, Initial Report, at ¶ 22 [App. 04282].
[86] Fed R. Evid. 702.

D.     **Goolsby Offers No Opinion on Defendants' Honesty and Veracity**

As if it were an afterthought, Defendants end their Motion by alleging that Goolsby's proposed testimony "amounts to an attack on AMC's honest and veracity."[87] Tellingly, Defendants do not cite to any portion of Goolsby's reports or testimony as an example of this alleged "attack." Because Goolsby's reports or testimony do not assert any opinion as to Defendants' honesty, veracity or propensity for truth, Defendants' argument should be disregarded. Rather Goolsby focuses on the issues surrounding AMc's internal controls pursuant to COSO and application of the provisions of the Services Agreements to such processes.

**IV.**

**CONCLUSION**

For all the reasons stated above, the NRA respectfully requests that the Court deny Defendants' motion in its entirety, and grant the NRA all other and further relief to which it may be justly entitled.

---

[87] *See* ECF 463, Defendants' Brief In Support of Motion To Exclude Certain Opinions of The NRA's Expert Witness, Gary Goolsby, at pg. 13.

Dated: January 24, 2002                              Respectfully submitted,

By:    */s/Cecelia Fanelli*
       Cecelia L. Fanelli
       *Pro Hac Vice*
       clf@brewerattorneys.com
       Sarah B. Rogers
       New York Bar No. 4755252
       sbr@brewerattorneys.com
       Philip J. Furia
       *Pro Hac Vice*
       pjf@brewerattorneys.com
       Konstantin N. Parkhomenko
       knp@brewerattorneys.com
       **BREWER ATTORNEYS AND COUNSELORS**
       1717 Main Street, Suite 5900
       Dallas, Texas 75201

       **ATTORNEYS FOR PLAINTIFF/COUNTER-
       DEFENDANT NATIONAL RIFLE
       ASSOCIATION OF AMERICA**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was electronically

served via the Court's electronic case filing system upon all counsel of record on this 24th day of

January 2022.

                              */s/ Cecelia Fanelli*
                              Cecelia Fanelli