**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| **Plaintiff and Counter-Defendant** | § § § | |
| **v.** | § § § | |
| **ACKERMAN MCQUEEN, INC.,** | § § | **Civil Action No. 3:19-cv-02074-G** |
| **Defendant and Counter-Plaintiff,** | § § § § | |
| **and** | § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, and MELANIE MONTGOMERY,** | § § § | |
| **Defendants.** | | |

**PLAINTIFF THE NATIONAL RIFLE ASSOCIATION OF AMERICA'S**
**MOTION TO DISQUALIFY DORSEY & WHITNEY LLP OR, IN THE ALTERNATIVE,**
**FOR PROTECTION OF CONFIDENTIAL INFORMATION**

**BREWER, ATTORNEYS & COUNSELORS**
Cecelia L. Fanelli
clf@brewerattorneys.com
Sarah B. Rogers
sbr@brewerattorneys.com
Philip J. Furia
pjf@brewerattorneys.com
**BREWER ATTORNEYS AND COUNSELORS**
1717 Main Street, Suite 5900
Dallas, Texas 75201

**ATTORNEYS FOR PLAINTIFF/COUNTER-**
**DEFENDANT NATIONAL RIFLE**
**ASSOCIATION OF AMERICA**

## <u>TABLE OF CONTENTS</u>

I.    PRELIMINARY STATEMENT ...................................................................1

    A.    Attempts by NRA to Avoid This Motion ................................................1

    B.    Overview of the Motion.........................................................................1

II.    FACTUAL BACKGROUND ...................................................................3

    C.    Dycio, Multi-Year Attorney-Client Relationship with Both the NRA and LaPierre..........................................................................................3

    D.    Dycio Represented the NRA and LaPierre on Matters Substantially Relating to This One...............................................................................4

    E.    As the NRA-AMc Relationship Disintegrated, Dycio Switched Sides. .................7

    F.    Facts Regarding Dycio's Involvement Were Responsive to Discovery in This Case, But Concealed by Defendants Until January 2022. ............................9

        1.    Procedural background: AMc's flagrant violation of document production and logging requirements ......................................10

        2.    The long-belated Categorical Log reveals incurable conflicts. .................13

        3.    The NRA's final meet-and-confer efforts fail. ..........................................16

III.    LEGAL STANDARD.........................................................................16

IV.    ARGUMENT.....................................................................................18

    A.    From the Moment They Were Retained by AMc Against the NRA and LaPierre, Dycio and the Dycio Firm Had an Incurable Conflict Based on Their Representation of the NRA and LaPierre In Substantially Related Matters..................................................................................................18

    B.    The Improprieties and Conflicts in This Case Warrant Wholesale Disqualification of the Dorsey Firm and Dismissal of Ackerman's Counterclaims. ......................................................................................20

        1.    The Tainted Dorsey Lawyers Must Be Disqualified Because They Had Confidential Case-Strategy Discussions with Dycio Concerning Matters the Same As, or Substantially Related to, the Matters on Which Dycio Represented the NRA and LaPierre. .................20

        2.    The Tainted Dorsey Lawyers' Conflict Is Imputed to the Dorsey Firm..........................................................................................21

        3.    The Counterclaims Should Be Dismissed Without Prejudice. .................21

    C.    In the Alternative, The Court Should Fashion Guardrails for the Upcoming Trial Which Avoid Further Prejudice to the NRA................................................22

        1.    Documents in Categories 11-14 of the Categorical Log Should Be Promptly Produced.....................................................................22

2.      The Court Should Enter an Order Forbidding Defendants' Use of Any Confidential Information Obtained from Dycio. ..............................23

3.      Defendants Should Be Barred from Introducing Evidence, Including Testimony, Which Is Tainted by Confidences Obtained from Dycio. ....................................................................................................................24

V.     PRAYER FOR RELIEF ..................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re Am. Airlines*,
  972 F.2d at 611 ....................................................................................................1, 16, 17, 18

*Asgaard Funding LLC v. ReynoldsStrong LLC*,
  426 F. Supp. 3d 292 (N.D. Tex. 2019) ............................................................................16, 17

*C.T. v. Liberal School District*,
  2008 WL 217203 (D.Kan.2008) ..............................................................................................23

*Centerboard Sec., LLC v. Benefuel, Inc.*,
  No. 3:15-CV-2611-G, 2016 WL 3126238 (N.D. Tex. June 3, 2016)......................................18

*Doe v. A Corp.*,
  709 F.2d 1043 (5th Cir. 1983) .....................................................................................17, 18, 24

*Dynamic 3D Geosolutions, LLC v. Schlumberger Ltd. (Schlumberger N.V.)*,
  No. A-14-CV-112-LY, 2015 WL 4578681 (W.D. Tex. Mar. 31, 2015), *aff'd*,
  837 F.3d 1280 (Fed. Cir. 2016)....................................................................................18, 21, 22

*E.E.O.C. v. Parker Drilling Co.*,
  No. 3:13-CV-00181-SLG, 2014 WL 5410661 (D. Alaska Oct. 22, 2014)..............................23

*United States ex rel. Fair Laboratory Practices Associates v. Quest Diagnostics Inc.*,
  No. 05-5393, 2011 WL 1330542 (S.D.N.Y. Apr. 5, 2011), *aff'd sub nom.*
  *United States v. Quest Diagnostics Inc.*, 734 F.3d 154 (2d Cir. 2013)...................................18

*FDIC v. U.S. Fire Ins. Co.*,
  50 F.3d 1304 (5th Cir. 1995) ..............................................................................................16, 17

*Galderma Labs., L.P. v. Actavis Mid Atl. LLC*,
  927 F. Supp. 2d 390 (N.D. Tex. 2013) ...................................................................................17

*Gen. Elec. Co. v. Mitsubishi Heavy Indus., Ltd.*,
  No. 3:10-CV-276-F, 2011 WL 13201855 (N.D. Tex. Sept. 12, 2011)..............................17, 24

*United States ex rel. Guzder v. MKM Engineers, Inc.*,
  No. CV H-05-895, 2008 WL 11408508 (S.D. Tex. Dec. 17, 2008)........................................21

*Hillman Grp., Inc. v. KeyMe, LLC*,
  439 F. Supp. 3d 845 (E.D. Tex. 2020)....................................................................................18

*Hirsch v. USHealth Advisors, LLC*,
    No. 4:18-CV-245-P, 2020 WL 1271588 (N.D. Tex. Feb. 14, 2020), *aff'd*, No.
    4:18-CV-00245-P, 2020 WL 1271374 (N.D. Tex. Mar. 12, 2020) ........................................23

*Howell v. Standard Motor Prod., Inc*.,
    No. 4:99-CV-987-E, 2001 WL 456241 (N.D. Tex. Apr. 27, 2001) ........................................23

*Huawei Techs. Co. Ltd v. T-Mobile US, Inc.*,
    No. 216CV00052JRGRSP, 2017 WL 7052463 (E.D. Tex. Sept. 20, 2017) ..........................21

*JuxtaComm-Texas Software, LLC v. Axway, Inc.*,
    No. 6:10-CV-2011, 2010 WL 4920909 (E.D. Tex. Nov. 29, 2010) ......................................17

*Kellogg v. Nike, Inc*.,
    No. 8:07CV70, 2008 WL 4216130 (D. Neb., Sept. 12, 2008) ................................................21

*Madrigal v. Kleberg Cty*.,
    No. 2:15-CV-345, 2016 WL 3346522 (S.D. Tex. June 15, 2016) ........................................23

*Nance v. Thompson Medical Co*.,
    173 F.R.D. 178 (E.D. Tex. 1997)............................................................................................23

*Positive Software Solutions, Inc. v. New Century Mortgage Corp.*,
    *No. 3l03-cv-0257-N*, 2004 WL 7329341 (N.D. Tex. Mar. 3, 2004) ......................................23

*Rembrandt Techs., LP v. Comcast Corp.*,
    No. 2:05-CV-443, 2007 WL 470631 (E.D. Tex. Feb. 8, 2007)..............................................17

*United States v. Gearhart*,
    576 F.3d 459 (7th Cir. 2009) ..................................................................................................23

*United States v. Morrison*,
    833 F.3d 491 (5th Cir. 2016) ..................................................................................................23

**State Cases**

*In re Am. Home Prods. Corp.*,
    985 S.W.2d 68 (Tex. 1998)..............................................................................................19, 20

*Phoenix Founders, Inc.*, 887 S.W.2d at 835 ................................................................................19

**Rules**

F. R. Evid. 403 ..............................................................................................................................23

Fed. R. Civ. P. 26(a) ......................................................................................................................24

Fed. R. Civ. P. 26(a)(1)....................................................................................................................9

Fed. R. Civ. P. 37(c) ...................................................................................................9, 24

Fed. R. Evid. 403, 611(a) ..................................................................................................23

Rule 1.09(a) ........................................................................................................................21

Rule 26 ............................................................................................................................9, 22

Rule 37(b)(2) ......................................................................................................................23

Texas Rules Rule 1.09(b) ...................................................................................................21

# I.      PRELIMINARY STATEMENT

## A.      Attempts by NRA to Avoid This Motion

The NRA repeatedly sought to resolve, via meet-and-confer, grave attorney-conflict concerns raised by a recently-produced privilege log and deposition testimony in another matter. The facts that prompted this motion surfaced late because Defendants concealed them— hiding key information and documents from discovery which they refused to log until compelled by the Court in January 2022. Although courts advise that a motion to disqualify is the proper method[1] for raising concerns like those here, the NRA (with guidance from Professor Linda Eads, whose expert declaration accompanies this motion) also posits alternative forms of relief.  Without protection from this court, the NRA will be forced to proceed to trial against opposing counsel whose case strategy, claims, and defenses were crafted by the NRA's own side-switching former lawyer.

## B.      Overview of the Motion

For years, the NRA and its leadership—including its Executive Vice President, Wayne LaPierre—confided in a local Virginia lawyer, Mark Dycio, and his firm on topics including executive compensation, pending and anticipated litigation, and vendor relationships. Thus, when the NRA faced politicized hostilities from New York regulators in 2018, Dycio participated directly in confidential communications and meetings about these issues and the efforts the NRA would undertake to prepare itself—including efforts to examine information in AMc's[2] possession and assess AMc's compliance with the parties' contract and the law.  Dycio advised the NRA's Executive Vice President about these efforts, interfaced with AMc on the NRA's behalf, and was privy not only to the types of information sought from AMc, but the reasons for which it was

---

[1] *In re Am. Airlines*, 972 F.2d at 611 (quoting *Musicus v. Westinghouse Elec. Corp.*, 621 F.2d 742, 744 (5th Cir. 1980)).

[2] "AMc" shall refer collectively to Defendants Ackerman McQueen, Inc. ("Ackerman") and Mercury Group, Inc. ("Mercury").

sought—namely, ongoing and anticipated regulatory hostilities in New York (and related litigation).

As the Association worked through its compliance demands with its vendors (to which Dycio was privy), AMc remained recalcitrant—and ultimately chose to frustrate the NRA's books-and-records examination efforts.  Naturally, AMc's actions eroded the trust between itself and the NRA until April 2019, when the NRA sued for specific performance of the record-examination clause in AMc's contract.  As the Court knows, that initial Virginia lawsuit (now stayed pending adjudication of this one) overlaps substantially with the case at bar.

In response to the NRA's Virginia litigation, ***Dycio switched sides*** and worked directly and substantively with AMc. What only recently became known is that Dycio and his firm joined with three senior partners at Dorsey & Whitney LLP ("Dorsey"), two of whom are counsel of record in this case, to craft tactical, misleading correspondence, and even affirmative litigation—an exercise in which these lawyers are presumed to have used the NRA's confidences against it.  The incurable conflicts arising from Dycio's misconduct, which also taint Dorsey, could have been dealt with at the outset of this litigation.   But they were not—because Defendants concealed evidence of Dycio's involvement from their initial disclosures and document productions.  The NRA has only now learned that its former counsel worked directly with AMc executives and Dorsey because Defendants were forced by Magistrate Judge Toliver to supplement their thrice-amended, still-inadequate privilege log following a hearing on December 15, 2021.  Although the resulting categorical privilege log (served January 6, 2022) remains deficient and opaque, it admits that Dycio had substantive communications, and exchanged confidential information, with AMc's top executives and several Dorsey partners  during April 2019 concerning topics that lay at the core of Dycio's prior representation and the parties' present dispute: the "Services Agreement,"

"documentation relating to AMc's work for the NRA," the "April 22, 2019 Winkler letters," the "[alleged] lack of a fiduciary relationship between the NRA and AMc," "billing and invoicing," "time records," "budgeting," "Oliver North," "out of pocket expenses," "II&IS [which chartered private jets for travel and security purposes,]" and most crucially the NRA's "audits [i.e., record-examinations] of AMc."

To ensure that the parties' upcoming trial is fair, the NRA seeks protection from the Court in light of these ethical breaches.  In the event that the Court declines to disqualify, the NRA respectfully requests in the alternative that safeguards be ordered to prevent the continued misuse of confidences obtained from its side-switching counsel.

## II.     FACTUAL BACKGROUND

### C.     Dycio, Multi-Year Attorney-Client Relationship with Both the NRA and LaPierre.

Mark Dycio ("Dycio") and his law firm, Law Offices of Mark R. Dycio P.C. (d/b/a Dycio & Biggs) (the "Dycio Firm") enjoyed a years-long relationship of trust and confidence with the NRA and its leadership, including Executive Vice President Wayne LaPierre, that preceded the events giving rise to this dispute.  Dycio worked on "personal matters relating to Wayne [LaPierre],"[3] and also represented and billed the NRA over the years on matters including corporate governance and bylaws,[4] executive compensation,[5] security protocols,[6] the drafting of contracts,[7] and more. Dycio prepared an engagement letter to formalize the parties' relationship on or about March 15, 2013 (the "Draft Engagement Letter"), which provided for a joint representation by the Dycio firm of the NRA and LaPierre on matters where the NRA and its chief

---

[3] ECF No. 419-1, Ex. 10, Dep. Tr. of J. Steven Hart, dated Feb. 4, 2020, at 456:01-06 [App. 000882].
[4] *See* Declaration of Sarah B. Rogers, dated Feb. 21, 2022 ("Rogers Decl."), Ex. 1, Dycio Invoice No. 04025, dated Nov. 2, 2017 [App. 003-5].
[5] *See, e.g.*, Rogers Decl. Ex. 2, Dycio Invoice No. 06362, dated July 9, 2018 (describing work performed on J. DeBergalis' contract) [App. 006-08].
[6] *See* Rogers Decl. Ex. 1, Dycio Invoice No. 04025, dated Nov. 2, 2017 [App. 003-05].
[7] *See* Rogers Decl. Ex. 3, Dycio Invoice No. 05425, dated April 5, 2018 [App. 009-11].

executive had common legal interests.[8]  This ongoing, open-ended attorney-client relationship was never terminated by the NRA or LaPierre.

## D.      Dycio Represented the NRA and LaPierre on Matters Substantially Relating to This One.

In late 2017, as the NRA was confronting scrutiny from New York's insurance regulator,[9] it received a warning that it could soon face additional, partisan investigations and attacks in its domicile state.[10]  In order to assist it in connection with those matters, the NRA retained Morgan, Lewis, & Bockius, LLP, and later, Brewer, Attorneys & Counselors ("BAC").[11] The NRA also sought advice from Dycio in late 2017 on the same matters.[12]  During the summer of 2018, the NRA undertook a 360-degree assessment of its internal controls in order to fortify itself against investigations and litigation from regulators, developing a new compliance training regimen that included an emphasis on vendor oversight.[13]  During this time, multiple employee whistleblowers came forward with concerns about vendors—especially vendor AMc.[14]  In response, the Audit

---

[8] *See* ECF No. 537, Ex. 7, 2013 Dycio & Biggs Engagement Letter [App. 0102-07].

[9] *See* ECF No. 421, Ex. 6, David Cole, *New York State Can't Be Allowed to Stifle the NRA's Political Speech*, ACLU (August 24, 2018), https://www.aclu.org/blog/free-speech/new-york-state-cant-be-allowed-stifle-nras-political-speech [App. 00091-96].

[10] ECF No. 421, Ex. 7, Declaration of John C. Frazer in support of NRA's Opposition to Defendants' Motion for Partial Summary Judgment, dated September 1, 2021, Ex. 7, at ¶ 4. [App. 00099].  Notably, the Bankruptcy Court for the Northern District of Texas made factual findings to this effect.  *See* Rogers Decl., Ex. 14, Bankruptcy Order Granting Motions to Dismiss, dated May 11, 2021 (ECF No. 740) ("Bankr. Order"), p. 3 [App. 701].

[11] *See* ECF No. 422, Ex. 87, Deposition of John Frazer, dated March 18, 2021, at 158:3-16, 167:14-21 [App. 02948, 02950].  The Bankruptcy Court for the Northern District of Texas made a factual finding to this effect.  *See* Rogers Decl., Ex. 14, Bankr. Order, p. 3-4 [App. 701-02].

[12] *See* Rogers Decl. Ex. 12, Declaration of Wayne LaPierre, dated Feb. 18, 2022, p. 3, ¶ 7 [App. 691]. Dycio continued to bill for legal advice relating to the NRA's New York Regulatory concerns in 2018.  *See* Rogers Decl., Ex. 4, Dycio Invoice No. 06955, dated September 10, 2018 [App. 012-14].

[13] *See* ECF No. 422 at 85:8-91:14 [App. 00148-49] (discussing compliance and governance refresher seminar).  The Bankruptcy Court for the Northern District of Texas made a factual finding to this effect.  *See* Rogers Decl., Ex. 14, Bankr. Order, p. 3-5 [App. 701-03].

[14] ECF 422, Ex. 8, Declaration of Michael Erstling, dated April 29, 2020, at ¶ 8. [App. 00105].

Committee of the NRA Board of Directors "ordered deeper scrutiny of AMc,"[15] along with other vendors of interest.

In August 2018, the Association sought to exercise its rights under the record-examination clause of the parties' Services Agreement.[16]   At the same time, the NRA acted to protect its interests in intersecting legal and regulatory matters—including a lawsuit against its insurance broker, Lockton (such litigation, the "Lockton Litigation"), and an investigation by the New York State Department of Financial Services ("DFS") (such investigation, the "DFS Investigation"), regarding a concealed-carry membership program known as Carry Guard for which AMc issued millions of dollars in invoices.[17] The Lockton Litigation, the DFS Investigation, and the NRA's compliance and governance efforts all implicated overlapping factual and legal issues—especially concerning the NRA's relationships with its vendors.  Directly at issue in the DFS Investigation, for example, was the substance of the work performed by Ackerman in connection with Carry Guard and the structure and basis of the NRA's payments to Ackerman.[18]  The Lockton Litigation unsurprisingly touched on the same issues, as well as the "inflammatory" nature of AMc's marketing.[19] Dycio remained closely involved at this stage: his firm explicitly billed the NRA for

---

[15] *See* ECF No. 22, Declaration of Charles Cotton in Support of the NRA's Opposition to Defendants' Motion for Partial Summary Judgment, at ¶ 5 [App. FUS0292].  *See also*, The Bankruptcy Court for the Northern District of Texas made a factual finding to this effect.  *See also*, Rogers Decl., Ex. 14, Bankr. Order, p. 5 (describing the measures taken by the NRA to review vendor contracts and improve recordkeeping) [App. 704].
[16] ECF 422, Ex. 55, Letter from Wilson H. Phillips Jr. to Bill Winkler, dated August 08, 2018 (NRA-AMc–00068307), at 1 [App. 01659].
[17] ECF No. 422, Ex. 13, Deposition transcript of Susan Dillon, dated July 28, 2021, at 97:18-99:06 [App. 00151].
[18] *See* Press Release, New York State Department of Financial Services, dated Feb., 5, 2020 (https://www.dfs.ny.gov/reports_and_publications/press_releases/pr202002051) (summarizing DFS charges against NRA, including alleged role of AMc); *see also* Rogers Decl., Ex. 12, Declaration of Wayne LaPierre, dated February 18, 2022 ("LaPierre Decl."), p. 2-3, ¶¶ 6-8 [App. 690-91].
[19] *See* Rogers Decl., Ex. 11, Defendants' Answer and Counterclaim at 22, ¶ 16, NRA v. Lockton Affinity Series of Lockton Affinity, LLC, and Kansas City Series of Lockton Companies, LLC (No. 1:18-cv-00639-LO-JFA) (E.D. Vir. 2018) [App. 677].

work on the Lockton Litigation starting in May 2018,[20] and attended a hearing in the Lockton Litigation in September 2018.[21]

During a closed executive session of the NRA Board of Directors on September 8, 2018, NRA counsel provided legal advice regarding the Lockton Litigation, the DFS Investigation, a potential NYAG investigation, and how the NRA would defend itself. Specific subject matter raised included whistleblower complaints that summer, the Audit Committee's response, and upcoming scrutiny of NRA vendors, including AMc.[22] Although AMc asserts as part of its counterclaims that the NRA was already plotting to sue AMc at the time of this meeting,[23] the truth was that the NRA had merely "determine[ed] to look at the books and records of Ackerman McQueen" in connection with its compliance efforts, litigation, and regulatory matters.[24] Dycio participated in this meeting in his capacity as NRA counsel,[25] billing in excess of fourteen hours that weekend for the meeting and post-meeting strategy discussions.[26]

Shortly after the September 8th Board Meeting, the NRA attempted to exercise a books-and-records examination right under its contract with AMc, in order to view documents possessed by AMc concerning executive expenses, Carry Guard, and other sensitive matters.[27] AMc failed to comply with its obligations to assist the NRA's record-examination effort.[28] Thereafter,

---

[20] *See* Rogers Decl., Ex. 6, Dycio Invoice No. 06067, dated June 7, 2018 [App. 015-17].

[21] *See* Dycio Firm Invoice, dated Oct. 8, 2018, ECF No. 537, Ex. 1 [App. 0007].

[22] *See* Rogers Decl., Ex. 12, LaPierre Decl., p. 4, ¶ 10 [App. 692].

[23] *See* Counter-Plaintiff AMc's Second Amended Counterclaim., ECF No. 238-1 at ¶ 115. S*ee also See* ECF No. 441, Defendants' Response in Opposition to NRA's Motion for Partial Summary Judgment, p. 45-46. Preposterously, AMc simultaneously (1) alleges that Dycio was involved in privileged NRA litigation-strategy meetings ***about the current NRA-AMc litigation***, yet (2) apparently maintains that there was nothing improper about its own retention of a side-switching lawyer to represent it in the same litigation.

[24] *See* Dep. Tr. of W. LaPierre, dated Aug. 20, 2021, at 169:02-170:09, ECF No. 422, Ex. 19 [App. 00377].

[25] *See* Rogers Decl., Ex. 12, LaPierre Decl., p. 4, ¶ 10 [App. 692]; Rogers Decl., Ex. 9, at Ex. H, Declaration of John Frazer, dated March 13, 2020, p. 2-3, ¶ 9 [App. 690-91].

[26] *See* Dycio Firm Invoice, dated Oct. 8, 2018, ECF No. 537, Ex. 1 [App. 0007].

[27] The occurrence of the NRA's record-examination attempt and the categories of material sought for examination are undisputed, and are detailed at ECF No. 420, NRA's Memorandum of Law in Support of Motion for Partial Summary Judgment, p. 7-14.

[28] *See* ECF No. 448-4, Ex. 51, Dep. Tr. of Susan Dillon, dated July 28, 2021, at 102:1-106:1 [App. 01571-72].

contentious emails were exchanged among the parties' counsel[29] and an acrimonious budget meeting occurred[30] during which AMc alleges that it offered to resign.[31]  Several NRA outside counsel tried to reason with AMc: Steve Hart urged AMc executive Tony Makris to turn over the documents the NRA sought, because the agency's historic practice of concealing these documents would make "a nice target for the NYAG."[32]  Dycio also spoke with Makris, and billed the NRA for this work on September 27, 2018.[33]

E.      **As the NRA-AMc Relationship Disintegrated, Dycio Switched Sides.**

Over the ensuing months, the NRA continued its efforts to pry records from AMc, and even attempted a second record examination by a third-party forensic accounting firm, Forensic Risk Alliance, in February 2019.[34]  AMc thwarted that examination, too.[35] On April 12, 2019, having exhausted its efforts to coax compliance from AMc over the preceding eight months, the NRA filed a narrow action for specific performance in Virginia state court to enforce its books-and-records examination right.[36]  In response*, Dycio switched sides and purported to represent AMc in its litigation against the NRA*—an ethics violation so obvious that Dycio withdrew on April 22, 2019, after it was raised.[37]  In the days before his withdrawal, Dycio had been publicly involved at the preliminary stages of the parties' Virginia record-examination litigation; the NRA knew, for example, that a Dycio Firm associate disseminated document-preservation notices.[38] What the

---

[29] *See* ECF No. 422, Ex. 14, Email chain including Sarah B. Rogers email to Gina Betts and Jay Madrid (AMcTX-00010681-91) [App. 00165-75].

[30] See ECF No. 422, Ex. 19, Dep. Tr. of Wayne LaPierre, dated Aug. 20, 2021, at 192:14-194:12 [App. 00382-83].

[31] *See* ECF No. 420, NRA's Memorandum of Law in Support of Motion for Partial Summary Judgment, p. 9-12.

[32] *See* ECF No. 422, Ex. 15, Email chain from Steve Hart to Anthony Makris, dated Oct. 8, 2018 (AMcTX-00010526) [App. 00177].

[33] *See* Dycio Firm Invoice, dated Oct. 8, 2018, ECF No. 537, Ex. 1 [App. 0007].

[34] *See* ECF No. 420, NRA's Memorandum of Law in Support of Partial Summary Judgment, p. 12-14.

[35] *See id.*

[36] *See* Case No. 2019-17571 (Fairfax Cir. Ct.).

[37] ECF No. 537, Ex. 2, Email chain between W. LaPierre and M. Dycio, dated April 22, 2019 (withdrawing Dycio from representation) [App. 0009-13].

[38] *See, e.g.*, ECF No. 537, Ex. 3, Letters from M. Dycio regarding Document Preservation, dated April 16 & 17, 2019 [App. 0014-26].

NRA did not know (because Defendants concealed it) was that Dycio also worked directly with Dorsey surrounding the events at the crux of the parties' dispute here—such as the "April 22, 2019 Winkler letters" that set off the sequence of events characterized by the NRA as an extortion-and-coup attempt (a characterization which AMc, in turn, calls defamatory). [39] The Dycio Firm even worked with AMc on AMc's affirmative claims. [40]

The content of the April 22 Winkler letters, and the affirmative claims pleaded by AMc herein, align closely with the work for which Dycio billed the NRA during the years leading up to this dispute. The Winkler letters were a proverbial shot across the bow, designed to warn the NRA that its record-examination litigation, if not immediately withdrawn, would unearth records that could hurt the NRA with the NYAG and elsewhere; this was a more forceful version of the same tactic that AMc tried in August 2018, when it sent a letter warning the NRA against "creating paper trails." [41] When the NRA did not back down (and LaPierre did not resign) after a series of threatening telephone calls, the Winkler letters were leaked to the press. [42] The Winkler letters were deliberately misleading—for example, they insinuated the existence of an improper relationship involving an NRA intern which AMc knew, or had reason to know, was totally unfounded, and they led readers to believe that hundreds of thousands of dollars' worth of wardrobe purchases incurred by AMc were actually billed to the NRA. They also highlighted charges incurred through a travel agency, II&IS, [43] that chartered aircraft for the NRA for security

---

[39] See ECF No. 487, the Categorical Log, at Categories 11-14 (purporting to withhold communications with Dycio & Biggs LLP. Dycio undisputedly represented Wayne LaPierre, and the Dycio firm has been sued by the NRA for breach of fiduciary duty.); ECF No. 537, Ex. 4, The NRA's First Amended Complaint, NRA v. Law Offices of Mark P. Dycio, P.C., No. 17571, In the Circuit Court of the County of Fairfax (Va. Cir. Ct. May 8, 2020) [App. 0027-50].

[40] See ECF No. 487, the Categorical Log, at Categories 11-14.

[41] See ECF No. 422, Ex. 37, Letter from S. Ryan to W. Brewer, dated Aug. 22, 2019 [App. 1093-96].

[42] See NRA Leaked Docs, May 11, 2019, ARCHIVE.ORG, p. 2, 5 (https://archive.org/details/NARA-leaked-11May2019) (last accessed, February 14, 2021).

[43] See, e.g., ECF No. 448, Ex. 53, Letter from W. Winkler to W. LaPierre, dated April 22, 2019 (NRA-AMc 00091616) [App. 01602-07].

reasons[44]—an issue on which Dycio had advised the NRA since at least 2017.[45]  Moreover, the

Winkler letters and AMc's surrounding gamesmanship intentionally exploited the NRA's and

LaPierre's regulatory and reputational concerns—to which Dycio was privy, as counsel to both—

by threatening to unlawfully, publicly disclose the same documents the NRA had sought and been

denied since September 2018. By virtue of his attorney-client relationship with the NRA and its

chief executive, Dycio knew exactly which records the NRA was seeking from AMc, and why—

then used this knowledge against the NRA to craft letters misrepresenting several similar

categories of records in a manner designed to damage the NRA upon dissemination.

Unfortunately, at the time the Dycio Firm briefly appeared, then immediately withdrew, as counsel

to AMc in the Virginia litigation, the NRA had no inkling of the extent of Dycio's betrayal—

because documents revealing the same were concealed until January 2022.

**F.   Facts Regarding Dycio's Involvement Were Responsive to Discovery in This Case, But Concealed by Defendants Until January 2022.**

Egregiously, although they identified other counsel, including litigation counsel, as persons

with discoverable information as part of their initial disclosures pursuant to Fed. R. Civ. P.

26(a)(1), Defendants seem to have intentionally omitted Dycio—and even omitted Dycio from the

amended disclosures they served August 6, 2021.[46] Even after the parties' privilege disputes had

escalated to motion practice—at which point Defendants would presumably have inventoried,

once again, the documents and information omitted from their productions and privilege logs—no

amended disclosure identifying Dycio was served. This omission alone justifies sanctions

including the exclusion of evidence or striking of claims or pleadings.[47]

---

[44] *See, e.g.*, Rogers Decl., Ex. 6, Dep. Tr. of W. LaPierre, dated Mar. 22, 2021, at 104:3-6 [App. 045].
[45] *See* Rogers Ex. 1, Dycio Invoice No. 04025, dated Nov. 2, 2017 [App. 003-05]
[46] *See* ECF No. 176, Defendants' Rule 26 Initial Disclosures; ECF No. 318, AMc's Amended Expert Witness Designation.
[47] *See* Fed. R. Civ. P. 37(c).

Notwithstanding Defendants' defective initial disclosures, the NRA should have been alerted to Dycio's involvement through Defendants' responses to its document requests. More than a year before the scheduled close of discovery and nearly two years prior to this motion, the NRA sought multiple categories of documents from Defendants that would have revealed the nature of Dycio's involvement if Defendants had properly disclosed them—even on a privilege log. As only one example, on February 3, 2020, the NRA sought all "documents and communications referring or relating to" the April 22 Winkler letters,[48] which would have revealed Dycio's involvement in the same. Similarly, by January 29, 2020, the NRA sought all documents relating to the events of its April 2019 Board meeting and preparations for the same—another responsive document category that should have captured Dycio's involvement.[49] Over the ensuing years of discovery, Defendants never produced, or even logged documents reflecting the extent of Dycio's involvement in AMc's affirmative claims, case strategy, and extortion maneuvering. Indeed, even after purporting to supplement their facially inadequate privilege log *three times* (ultimately running out the clock on the extended discovery window), AMc omitted to log these documents.

1. <u>**Procedural background: AMc's flagrant violation of document production and logging requirements**</u>

As set forth at length in the NRA's motion to compel, with respect to the certain documents withheld under deficient claims of privilege,[50] the record demonstrably establishes that AMc has withheld relevant, essential documents concerning key issues. Worse yet, it has not even logged those documents.[51] The NRA's longstanding pursuit of logs resulted in a letter sent by AMc's lead

---

[48] *See* Rogers Decl., Ex. 7, Plaintiff's Second Set of RFPs, dated Feb. 3, 2020, p. 25, Request No. 148 [App. 159].
[49] *See* Rogers Decl., Ex. 8, Plaintiff's Fourth Set of RFPs (Virginia Action), dated Jan. 29, 2020, p. 28, Request No. 138 [App. 202].
[50] *See* ECF 427.
[51] *Id.*

trial counsel on September 10, 2021, in which he stated that AMc was going to "determine whether any supplemental modification to the privilege log or production of documents is necessary or appropriate."[52] On September 16, 2021, counsel appeared before the Court at a status conference. At that time, the NRA's counsel noted that there appeared to exist a "pattern of nondisclosure."[53] In response, Defendants' lead counsel at the hearing, Brian E. Mason, did not dispute the substance of the NRA's counsel's statements. Instead, he stated that "we're going back and looking at those issues[…]"[54] Despite this express representation to the Court, it was not until a month later that on October 22, 2021 that Defendants produced their second amended privilege log.

Defendants have attempted to explain their delay by blaming a vendor. However, Defendants' counsel never advised the NRA's counsel or the Court of the alleged "vendor issue," which was perfunctorily and belatedly revealed only in response to the NRA's motion to compel, and then without elaboration or evidentiary support.

Notably, when the Honorable Judge Fish extended the discovery deadline to October 29, 2021, he required the parties to each submit weekly reports concerning the status of discovery. After discovering the unlogged documents on October 13, 2021, Defendants submitted three status reports to the Court and never once disclosed the fact it had failed to timely produce or log 1,620 supposedly privileged documents. The information provided by Defendants to the Court was deliberately misleading and designed to deceive both the Court and the NRA. For example, on October 15, 2021 – two days after allegedly learning that it had failed to log 1,620 documents – Defendants submitted a status report to the Court which advised only that "AMc intends to produce this final amended privilege log early next week and hopes that it will resolve the concerns the

---

[52] *See* ECF No. 537, Ex. 10, Letter from B. Mason to J. Clouser, dated September 10, 2021 [App. 0117-19].
[53] ECF 427, FN 22.
[54] *See* ECF 427, FN 23.

NRA has raised without court intervention."[55] The following week, on the same night Defendants produced its Second Amended Privilege Log with 1,620 new entries, it advised the Court in a status report that "AMc produced its final amended privilege log on October 22, 2021 and anticipates that it will resolve the concerns the NRA has raised without the need for court intervention."[56] Thus, Defendants' self-serving report expressed an increased degree of certainty that its new privilege log – which contained 1,620 new entries – would "resolve the concerns of the NRA" and avoid court intervention. Their final report to the Court, on October 29, 2021, did not mention the privilege log at all, as they were apparently content that they had erected a façade of compliance that covered up its failure to log withheld documents that coincidently relate to key matters at issue here.

The NRA therefore filed a motion to compel production of documents withheld under deficient claims of privilege, including documents that AMc failed or refused to log after years of successive opportunities.[57]

On December 15, 2021, the parties appeared before Magistrate Judge Toliver for oral argument concerning several discovery matters, including Plaintiff's motion to compel. The Court concluded that Defendants' excuses for failing to produce a privilege log concerning documents outside their narrow chosen date range "f[ell] flat," and ordered one to be furnished.[58] On December 16, 2021, this direction was memorialized in an electronic Order requiring Defendants to produce a privilege log for "all post-April 2019 and pre-2018 documents withheld."[59]

---

[55] *See* ECF 427, FN 31.
[56] *See* ECF 427, FN 32.
[57] *See* ECF No. 397, NRA's Motion to Compel Certain Documents Withheld Under Deficient Claims of Privilege.
[58] *See* ECF No. 453, Ex. B, the Oral Argument Transcript, dated Dec. 15, 2021 (the "Transcript"), at 53:18-54:2 [App. 056-59].
[59] *See* ECF No. 430, Order issued by Magistrate Judge Toliver, dated December 16, 2021 (the "Order").

As a continuing part of its nondisclosure, AMc produced a defective, categorical log on January 6, 2022. Efforts to resolve the issue have failed. Indeed, AMc's bad faith is underscored by the recent, false assertion of AMc's counsel that the "NRA failed to even raise the issue [of the logs] until October 2021, right before the extended discovery deadline."[60]

The purported categorical privilege log (the "Categorical Log"), served by Defendants on January 6, 2022, largely omits pre-2018 documents and instead begins on the date the parties commenced the preceding Virginia litigation: April 12, 2018.[61] Rather than enable an assessment of each claimed privilege, the Categorical Log appears designed to obfuscate one. It combines communications over months-long periods among dozens of parties on a dizzying assortment of overlapping topics, with no apparent logical criteria distinguishing the logged categories from one another.[62]

The Categorical Log purports to identify the parties to each category of communications, but admits that the listed attorneys in each category may not appear on all of the emails contained in that category.[63] The Categorical Log fails to specify the number of documents in each category.

On Thursday, January 13, 2022, the NRA raised these and other deficiencies with Defendants via a meet-and-confer letter.[64] When the NRA's concerns were not resolved via meet-and-confer, it filed objections to the Categorical Log on January 28, 2022 [ECF No. 533].

### 2.  The long-belated Categorical Log reveals incurable conflicts.

Although the NRA's objections remain pending, the Categorical Log makes specific, long-belated disclosures about Dycio's communications with AMc, and its trial counsel herein, that

---

[60] *See* ECF No. 537, Ex. 8, Letter from B. Mason to P. Furia, dated January 21, 2022 [App. 0108-111].
[61] *See* ECF No. 487, the Categorical Log.
[62] *See generally, id.*
[63] *See, e.g.*, ECF No. 487, the Categorical Log, at Category 1, "Privilege Description" (admitting that Category 1 includes internal email forwards among AMc employees) [PageID 53442].
[64] *See* ECF No. 537, Ex. 6, Letter from P. Furia to B. Mason dated January 13, 2022 [App. 0097-101].

require separate, urgent redress.  Specifically, the Categorical Log discloses that senior Dorsey partners, including counsel of record in this case, worked closely with Dycio—and may even have taken direction from him—in order to develop AMc's affirmative claims and contrive crucial documents at the heart of this case.  During the period from April 14, 2019 through April 22, 2019, Dorsey attorneys Gina Betts, Jay Madrid, and Brian Vanderwoude (the "Tainted Dorsey Lawyers") had an undisclosed number of communications with Dycio and the Dycio Firm "for purposes of obtaining legal advice and case strategies" regarding, among other things: AMc's affirmative claims against the NRA; the April 22 Winkler letters; the presence or absence of a fiduciary relationship between AMc and the NRA; budgeting, billing, invoicing, and documentation relating to AMc's work for the NRA; the travel consultant II&IS; and the NRA's "audits" [*i.e.*, record-examination efforts] of AMc.[65]  Although artfully contrived to occlude rather than clarify the record of Defendants' communications during this period, the Categorical Log also makes clear that Dycio, and the Dycio Firm, did not play a mere supporting role in these efforts: rather, Dycio and his associate exchanged one-on-one privileged communications directly with the AMc leadership group (which no other counsel did).[66]  AMc has refused to disclose the quantity of communications covered by the Categorical Log, but a Dycio Firm associate recalls under oath that there were "a lot of emails" between  the Dycio Firm, AMc, and AMc's other counsel during this period.[67] Working with AMc's leadership team, the Dycio Firm gave legal advice, formulated case strategies, and prepared documents in anticipation of litigation[68]

---

[65] ECF No. 487, at Categories No. 11-14 [PageID 53445].

[66] During the crucial period from April 14-22, 2019, there are multiple Categorical Log entries that specify identical date ranges, and identify identical subject matter, but disclose different combinations of clients and counsel.  Only the Dycio Firm appears to have met one-on-one with the AMc leadership group during this period (*see* Category No. 14); with respect to communications among AMc and other counsel, such as Dorsey and McDermott, Will & Emery LLP, Dycio is also logged as a participant. *See* ECF No. 487, the Categorical Log, at Categories 11-14 [PageID 53445].

[67] *See* Rogers Decl., Ex. 10, Dep. Tr. of Danielle Quinn, dated Jan. 27, 2022, at 225:16-226:2 [App. 599].

[68] *See* ECF No. 487, the Categorical Log, at Category No. 14 (asserting work product protection with regard to "documents prepared by counsel" and identifying subject matter thereof) [PageID 53445].

14

regarding—and, perhaps, constituting—AMc's affirmative claims, as well as the pivotal "April 22 Winkler letters" misrepresenting multiple categories of sensitive documents that Dycio knew the NRA had been seeking for months.  These privilege-log categories are excerpted in full as follows:

| No. | Type of Document(s) | Privilege Description | Date Range of Documents | Author; Addressee; Recipients | Privilege Asserted |
|---|---|---|---|---|---|
| 11 | Emails and attachments, including Microsoft Word, Microsoft Excel, and Portable Document Format attachments; Microsoft Word documents, Microsoft Excel documents, and handwritten notes prepared by counsel | Confidential communications between AMc employees and counsel at Dorsey & Whitney LLP, McDermott Will & Emery, and Dycio & Biggs for purposes of obtaining legal advice and case strategies after the commencement of litigation regarding the claims and defenses for the first lawsuit filed by the NRA against AMc in Virginia and AMc's affirmative claims, and work product in furtherance of the rendition of legal advice and services regarding same. This includes but is not limited to issues regarding: Services Agreement; documentation relating to AMc's work for the NRA; April 22, 2019 Winkler letters; lack of fiduciary relationship between the NRA and AMc; billing and invoicing; time records; budgeting; Oliver North; out of pocket expenses; II&IS; and NRA's audits of AMc. | April 14, 2019 - April 22, 2019 | **Ackerman McQueen** Angus McQueen; Revan McQueen; Bill Winkler; Brandon Winkler; Melanie Montgomery; Lacey (Duffy) Creamer; Tony Makris; Ariana Azimi; Edward Martin **Dorsey & Whitney LLP** Gina Betts; Jay Madrid; Brian Vanderwoude **McDermott Will & Emery** Steve Ryan **Dycio & Biggs** Mark Dycio; Danielle Quinn | Attorney-Client; Work Product |
| 12 | Emails and attachments, including Microsoft Word, Microsoft Excel, and Portable Document Format attachments; Microsoft Word documents, Microsoft Excel documents, and handwritten notes prepared by counsel | Confidential communications between AMc employees and counsel at Dorsey & Whitney LLP, McDermott Will & Emery, and Dycio & Biggs for purposes of obtaining legal advice and case strategies after the commencement of litigation regarding the claims and defenses for the first lawsuit filed by the NRA against AMc in Virginia and AMc's affirmative claims, and work product in furtherance of the rendition of legal advice and services regarding same. This includes but is not limited to issues regarding: Services Agreement; documentation relating to AMc's work for the NRA; April 22, 2019 Winkler letters; lack of fiduciary relationship between the NRA and AMc; billing and invoicing; time records; budgeting; Oliver North; out of pocket expenses; II&IS; and NRA's audits of AMc. | April 14, 2019 - April 22, 2019 | **Ackerman McQueen** Angus McQueen; Revan McQueen; Bill Winkler; Brandon Winkler; Melanie Montgomery; Lacey (Duffy) Creamer; Tony Makris; Ariana Azimi; Edward Martin **Dorsey & Whitney LLP** Gina Betts; Jay Madrid; Brian Vanderwoude **Dycio & Biggs** Mark Dycio; Danielle Quinn | Attorney-Client; Work Product |
| 13 | Emails and attachments, including Microsoft Word, Microsoft Excel, and Portable Document Format attachments; Microsoft Word documents and Microsoft Excel documents prepared by counsel | Confidential communications between AMc employees and counsel at Dorsey & Whitney LLP, McDermott Will & Emery, and Dycio & Biggs for purposes of obtaining legal advice and case strategies after the commencement of litigation regarding the claims and defenses for the first lawsuit filed by the NRA against AMc in Virginia and AMc's affirmative claims, and work product in furtherance of the rendition of legal advice and services regarding same. This includes but is not limited to issues regarding: Services Agreement; documentation relating to AMc's work for the NRA; April 22, 2019 Winkler letters; lack of fiduciary relationship between the NRA and AMc; billing and invoicing; time records; budgeting; Oliver North; out of pocket expenses; II&IS; and NRA's audits of AMc. | April 14, 2019 - April 22, 2019 | **Ackerman McQueen** Angus McQueen; Revan McQueen; Bill Winkler; Brandon Winkler; Melanie Montgomery; Lacey (Duffy) Creamer; Tony Makris; Ariana Azimi; Edward Martin **McDermott Will & Emery** Steve Ryan **Dycio & Biggs** Mark Dycio; Danielle Quinn | Attorney-Client; Work Product |
| 14 | Emails and attachments, including Microsoft Word, Microsoft Excel, and Portable Document Format attachments; Microsoft Word documents and Microsoft Excel documents prepared by counsel | Confidential communications between AMc employees and counsel at Dorsey & Whitney LLP, McDermott Will & Emery, and Dycio & Biggs for purposes of obtaining legal advice and case strategies after the commencement of litigation regarding the claims and defenses for the first lawsuit filed by the NRA against AMc in Virginia and AMc's affirmative claims, and work product in furtherance of the rendition of legal advice and services regarding same. This includes but is not limited to issues regarding: Services Agreement; documentation relating to AMc's work for the NRA; April 22, 2019 Winkler letters; lack of fiduciary relationship between the NRA and AMc; billing and invoicing; time records; budgeting; Oliver North; out of pocket expenses; II&IS; and NRA's audits of AMc. | April 14, 2019 - April 22, 2019 | **Ackerman McQueen** Angus McQueen; Revan McQueen; Bill Winkler; Brandon Winkler; Melanie Montgomery; Lacey (Duffy) Creamer; Tony Makris; Ariana Azimi; Edward Martin **Dycio & Biggs** Mark Dycio; Danielle Quinn | Attorney-Client; Work Product |

The NRA and LaPierre have separately sued Dycio, and the Dycio Firm, for breach of fiduciary duty, fraud, and other torts stemming from Dycio's betrayal of their confidences.[69] In the meantime, with trial looming in this case, the NRA brings this motion to protect its confidences and stanch further prejudice.

---

[69] National Rifle Association of America v. Dycio, et al., Case No. 2019-17571 (Fairfax Cir. Ct.); National Rifle Association of America, et al. v. Dycio, et al., Case No. 2022-01960 (Fairfax Cir. Ct.).

**3. The NRA's final meet-and-confer efforts fail.**

On January 27, 2022, the NRA conducted the deposition (in another matter) of Danielle Quinn, a Dycio Firm attorney identified on the Categorical Log, who confirmed that the Dycio Firm spoke "quite a bit"[70] with Dorsey and exchanged "a lot of emails"[71] concerning the problematic logged topics. Concerned that it would be irremediably prejudiced if forced to proceed to trail while awaiting a ruling on the Objections, the NRA wrote again to Defendants on February 18, 2021, emphasizing the "appearance of an incurable, disqualifying conflict of interest"[72] based on the Categorical Log and Ms. Quinn's testimony, and requesting that Defendants, at minimum, provide a document-by-document log covering three carefully chosen categories of withheld material so that the NRA could obtain "additional clarity"[73] and avoid motion practice if possible. The NRA received no response from Defendants. The NRA therefore seeks relief.

**III.    LEGAL STANDARD**

A "[d]istrict [c]ourt is *obliged* to take measures against unethical conduct occurring in connection with any proceeding before it,"[74] and "[a] motion to disqualify counsel is the proper method" for a party-litigant to raise them.[75]  Motions to disqualify are substantive in nature and are thus decided under federal law.[76] "When considering motions to disqualify, courts should first look to the local rules promulgated by the local court itself;"[77] however, "[l]ocal rules are not the

---

[70] Rogers Decl., Ex. 10, Dep. Tr. of Danielle Quinn, dated Jan. 27, 2022, at 215:12-18 [App. 596].

[71] *Id.* at 225: 16-21 [App. 599].

[72] *See* Rogers Decl., Exhibit 13, Letter from S. Rogers to B. Mason, dated Feb. 18, 2022 [App. 695-97].

[73] *Id.*

[74] *In re Am. Airlines*, 972 F.2d at 611 (emphasis in original) (quotation and citations omitted).

[75] *In re Am. Airlines*, 972 F.2d at 611 (quoting *Musicus v. Westinghouse Elec. Corp.*, 621 F.2d 742, 744 (5th Cir. 1980)).

[76] *FDIC v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1312 (5th Cir. 1995).

[77] *See, e.g., Asgaard Funding LLC v. ReynoldsStrong LLC*, 426 F. Supp. 3d 292, 296 (N.D. Tex. 2019) (*citing In re ProEducation Int'l, Inc.*, 587 F.3d 296, 299 (5th Cir. 2009)) (citation and quotation marks omitted).

'sole' authority governing motions to disqualify counsel,"[78]  and this Court also considers both the

Texas  Disciplinary Rules of Professional Conduct and the American Bar Association (ABA)'s

Model Rules of Professional Conduct. [79]   When there is conflict among relevant ethical canons,

courts in the Fifth Circuit apply the most stringent applicable standard.[80]  Moreover, because "[t]he

rule of disqualification is not mechanically applied in this Circuit," the Court must also consider

factors not specifically discussed in the ethical rules.[81]   These factors include "whether a conflict

has (1) the appearance of impropriety in general, or (2) a possibility that a specific impropriety

will occur, and (3) the likelihood of public suspicion from the impropriety outweighs any social

interests which will be served by the lawyer's continued participation in the case."[82]

Courts weigh "a number of equitable considerations" before imposing disqualification, and

may fashion alternative remedies to avoid prejudice in the event a conflict is found.[83] Counsel

tainted by confidences acquired during a prior representation may be enjoined from disclosing the

information to other persons,[84] or may be ordered to "wall off" relevant attorneys and return files,

documents or data.[85]   A court may also dismiss, without prejudice, an entire claim, defense, or

---

[78] *U.S. Fire Ins. Co.*, 50 F.3d at 1312.

[79] *See Asgaard*, 426 F. Supp. 3d at 296, *citing John Crane Prod. Sols., Inc. v. R2R & D, LLC*, 2012 WL 3453696, at *2 (N.D. Tex. Aug. 14, 2012) (citing N.D. Tex. Civ. R. 83.8(e) and *In re ProEducation*, 587 F.3d at 299).

[80] *In re Dresser Indus., Inc.*, 972 F.2d 540, 544-45 (5th Cir. 1992) (finding error in exclusive reliance on Texas Rules, which did not require informed consent before accepting representation giving rise to concurrent conflict of interest); *Galderma Labs., L.P. v. Actavis Mid Atl. LLC*, 927 F. Supp. 2d 390, 396 (N.D. Tex. 2013) (applying ABA Model Rules, which required informed consent before waiver of conflict premised on prior representation); *JuxtaComm-Texas Software, LLC v. Axway, Inc.*, No. 6:10-CV-2011, 2010 WL 4920909, at *2 (E.D. Tex. Nov. 29, 2010) ("The Fifth Circuit has shown a preference for the more stringent ABA Model Rule . . . .") (citing *In re Dresser*, 972 F.2d at 544)); *Rembrandt Techs., LP v. Comcast Corp.*, No. 2:05-CV-443, 2007 WL 470631, at *2 (E.D. Tex. Feb. 8, 2007) (applying stricter ABA Model Rule).

[81] *U.S. Fire Ins. Co.*, 50 F.3d at 1314 (*quoting Church of Scientology v. McLean*, 615 F.2d 691, 693 (5th Cir. 1980)).

[82] *Id.* (*quoting In re Dresser Indus., Inc.*, 972 F.2d 540, 544 (5th Cir. 1992)).

[83] *See, e.g.*, *Gen. Elec. Co. v. Mitsubishi Heavy Indus., Ltd.*, No. 3:10-CV-276-F, 2011 WL 13201855, at *8 (N.D. Tex. Sept. 12, 2011), *citing ProEducation*, 587 F.3d at 300 and *Wyeth*, 692 F. Supp. 2d at 457-58.

[84] *See, e.g.*, *Doe v. A Corp.*, 709 F.2d 1043, 1047 (5th Cir. 1983) (former in-house counsel could prosecute an action against his former employer on his own behalf, but was barred from acting as a class representative and enjoined from sharing confidential information with other class members or counsel).

[85] *See, e.g.*, *Gen. Elec. Co. v. Mitsubishi Heavy Indus., Ltd.*, No. 3:10-CV-276-F, 2011 WL 13201855, at *13 (N.D. Tex. Sept. 12, 2011) (declining to disqualify large firm that had absorbed lateral partners who were adverse, in the

action that has been incurably infected by confidences transmitted through a side-switching lawyer.[86]

## IV.   ARGUMENT

**A.    From the Moment They Were Retained by AMc Against the NRA and LaPierre, Dycio and the Dycio Firm Had an Incurable Conflict Based on Their Representation of the NRA and LaPierre In Substantially Related Matters.**

An attorney may not be adverse to a former client in a matter that is substantially related to her representation of a former client. The party seeking disqualification under the "substantial relationship" test must show: (1) an actual attorney-client relationship between the movant and the attorney it seeks to disqualify; and (2) a substantial relationship between the subject matter of the former and current representations.[87]   In determining the scope of an attorney-client relationship, courts look "to the actions of the parties."[88]   The subject matter between two representations "does not need to be 'relevant' in the evidentiary sense to be 'substantially related.' It need only be akin to the present action *in a way reasonable persons would understand as important to the issues involved*."[89]

---

matter at bar, to a longstanding client the firm had sporadically represented on unrelated matters, but requiring that the firm "screen" information from relevant attorneys and immediately return all files and confidential information to the opposing litigant).

[86] *See, e.g., Dynamic 3D Geosolutions, LLC v. Schlumberger Ltd. (Schlumberger N.V.)*, No. A-14-CV-112-LY, 2015 WL 4578681, at *7 (W.D. Tex. Mar. 31, 2015), *aff'd*, 837 F.3d 1280 (Fed. Cir. 2016) (disqualifying in-house counsel of  patentee in infringement suit because she had previously served as in-house counsel for alleged infringer, disqualifying outside counsel with whom the side-switching in-house counsel shared her confidences, and further ruling that because the infringement complaint was drafted by the disqualified lawyers, it should be dismissed without prejudice); *Doe v. A Corp.*, 709 F.2d 1043, 1047 (5th Cir. 1983) (dismissing class action complaint where defendant's former in-house counsel purported to act as a representative of the plaintiff class); *United States ex rel. Fair Laboratory Practices Associates v. Quest Diagnostics Inc.*, No. 05-5393, 2011 WL 1330542, at *11 (S.D.N.Y. Apr. 5, 2011), *aff'd sub nom. United States v. Quest Diagnostics Inc.*, 734 F.3d 154 (2d Cir. 2013) (dismissing lawsuit tainted by confidences divulged to attorney co-plaintiff).

[87] *In re Am. Airlines*, 972 F.2d at 614.

[88] *Hillman Grp., Inc. v. KeyMe, LLC*, 439 F. Supp. 3d 845, 854 (E.D. Tex. 2020).

[89] *In re Am. Airlines*, 972 F.2d at 623 (emphasis added) (internal quotation marks omitted) (quoting *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1341, 1346 (5th Cir. 1981), *abrogated on other grounds*, *Gibbs v. Paluk*, 742 F.2d 181 (5th Cir. 1984)). *See also, Centerboard Sec., LLC v. Benefuel, Inc.*, No. 3:15-CV-2611-G, 2016 WL 3126238, at *2 (N.D. Tex. June 3, 2016).

The substantial relation between Dycio's work for the NRA and the present action is undeniable here.  The NRA's books-and-record examination claims (and related counterclaims and affirmative defenses) all arise out of the same broad-based transparency and vendor-oversight effort discussed at the September 2018 board meeting in which Dycio participated.[90]  Indeed, AMc itself alleges that the record-examination efforts discussed at the September meeting were part of a premeditated scheme culminating in ***this lawsuit***.[91]  Dycio's own invoices to the NRA reflect his representation of the Association in connection with at least some of its outreach to AMc during the parties' record-examination skirmishes in Fall 2018.[92]  Among the categories of records that the NRA and AMc fought over were those relating to Carry Guard, a program central to the Lockton Litigation on which Dycio worked, and which continues to figure prominently in the parties' pleadings.[93]  AMc's own counsel knew that these efforts and documents were interrelated, causing it to warn the NRA about "paper trails" and subpoenas in a disturbing August 2018 letter.[94]  Dycio provided legal advice regarding LaPierre's "personal matters"[95] and security arrangements,[96] which were direct subjects of the April 22 Winkler letters on which Dycio and the Tainted Dorsey Lawyers collaborated.[97]

Importantly, because Dycio worked on matters substantially related to those here, the NRA need not prove that he actually received confidential information—i.e., need not "reveal the very

---

[90]  *See* Dep. Tr. of W. LaPierre, dated Aug. 20, 2021 169:02-170:09, ECF No. 422, Ex. 19 [App. 00377].

[91]  *See* ECF No. 441, Defendants' Response in Opposition to NRA's Motion for Partial Summary Judgment, p. 46 (alleging that the NRA "premeditated litigation against AMc in September 2018," and citing correspondence with Dycio regarding the same meeting).

[92]  *See* Dycio Firm Invoice, dated Oct. 8, 2018, ECF No. 537, Ex. 1 [App. 0007] (outreach to Makris).

[93]  *See* ECF No. 238-1, Counter-Plaintiff AMc's Second Amended Counterclaim, at ¶¶ 39, 40, 42, 49, 52, 53, 60, 62, 68, 78, 80, 227, 229, 237.

[94]  *See* ECF No. 422, Ex. 37, Letter from S. Ryan to W. Brewer, dated Aug. 22, 2019 [App. 01093-96].

[95]  *See* ECF No. 419-1, Ex. 10, Dep. Tr. of J. Steven Hart Feb. 4, 2020, at 456:01-06 [App. 000882].

[96]  *See* Rogers Decl. Ex. 1, Dycio Invoice No. 04025, dated Nov. 2, 2017 [App. 003-05].

[97]  *See* ECF No. 448, Ex. 53, Letter from W. Winkler to W. LaPierre, dated April 22, 2019 (NRA-AMc 00091616) [App. 01602-07].

confidences sought to be protected."[98]   Instead, Dycio and the Dycio Firm are irrebuttably presumed to have acquired such confidences.[99]   Thus, from the moment Dycio and the Dycio Firm commenced their representation of AMc, they were incurably conflicted.   Although the NRA believed this issue to be remedied when Dycio withdrew in the Virginia litigation (and never formally appeared in this litigation), documents previously concealed by AMc now indicate that Dycio imparted confidences to Tainted Dorsey Lawyers Betts, Madrid, and Vanderwoude which created conflicts that are likewise disqualifying.

**B.      The Improprieties and Conflicts in This Case Warrant Wholesale Disqualification of the Dorsey Firm and Dismissal of Ackerman's Counterclaims.**

1.   **<u>The Tainted Dorsey Lawyers Must Be Disqualified Because They Had Confidential Case-Strategy Discussions with Dycio Concerning Matters the Same As, or Substantially Related to, the Matters on Which Dycio Represented the NRA and LaPierre.</u>**

The Categorical Log shows that the Tainted Dorsey Lawyers communicated with Dycio "for purposes of legal advice and case strategies" regarding AMc's own affirmative claims against the NRA, as well as particularized issues including the April 22 Winkler Letters, out of pocket expenses, II&IS, and the NRA's record-examination efforts.

If a party seeking disqualification of co-counsel:

> establishes that there was contact or communication between the tainted [person who possessed the adverse party's confidential information—here, Dycio] and co-counsel, the burden shifts to the party resisting disqualification of co-counsel to offer evidence that there was no reasonable prospect that the opposing party's confidential information was disclosed and that it was not in fact disclosed.[100]

Accordingly, where, as here, the litigant moving for disqualification shows that there was "substantive dialogue" and an "apparent exchange of confidential information" between the side-

---

[98] *Phoenix Founders, Inc.*, 887 S.W.2d at 835.
[99] *Am. Home Prod. Corp.*, 985 S.W.2d at 74-75.
[100] *Id.* at 77-8.

switching lawyer and co-counsel, co-counsel are likewise disqualified unless the party opposing disqualification can show that no confidential information was received.[101]  Defendants can make no such showing here: the Categorical Log attests in detail to the "substantive dialogue" among Dycio and the Tainted Dorsey Lawyers, itemizing subjects on which legal advice was formulated and documents were prepared in anticipation of litigation.  The Categorical Log is an admission[102] that the Tainted Dorsey Lawyers and the Dycio Firm participated in an "exchange of confidential information" (a requisite element of the attorney-client privilege Defendants assert), and prepared documents, regarding AMc's affirmative claims, the long record of record-examination (*i.e.*, "audit") attempts by the NRA to which Dycio was strategically privy, the April 22 Winkler letters, and other topics at the core of this dispute.[103]

### 2.  The Tainted Dorsey Lawyers' Conflict Is Imputed to the Dorsey Firm.

Under Rule 1.09(b) of the Texas Rules, no attorney within a firm shall knowingly represent a client if any one of them practicing alone would be prohibited from doing so under Rule 1.09(a). Because the Tainted Dorsey Lawyers (who met with Dycio) have a disqualifying conflict, the entire Dorsey Firm has a disqualifying conflict.

### 3.  The Counterclaims Should Be Dismissed Without Prejudice.

The Categorical Log shows that the Dorsey Firm had privileged case-strategy discussions with Dycio specifically regarding Ackerman's affirmative claims. Where, as here, a party's

---

[101] *See, e.g., United States ex rel. Guzder v. MKM Engineers, Inc.*, No. CV H-05-895, 2008 WL 11408508, at *3 (S.D. Tex. Dec. 17, 2008). *See also Dynamic 3D Geosolutions, LLC v. Schlumberger Ltd.*, 2015 WL 4578681, at *7.

[102] Privilege logs are admissible for multiple purposes, including as party admissions and for impeachment.  *See, e.g., Huawei Techs. Co. Ltd v. T-Mobile US, Inc.*, No. 216CV00052JRGRSP, 2017 WL 7052463, at *1 (E.D. Tex. Sept. 20, 2017) (*citing Mutual Ins. Co. v. Murphy*, 630 F.Supp.2d 158, 168 n. 3 (D. Mass. 2009)) (privilege log can be admissible as an admission of a party opponent); *Kellogg v. Nike, Inc*., No. 8:07CV70, 2008 WL 4216130 at *3 (D. Neb., Sept. 12, 2008).

[103] *See, e.g.*, ECF No. 487, the Categorical Log, at Categories 6, 11, 12, 13, 14 [PageID 53443, 53445].

pleading is infected and informed from the start by the purloined confidences of a side-switching lawyer, the claims may be dismissed in their entirety.[104]

Even if the Court allows AMc to proceed to trial on some or all of its counterclaims, AMc may not complain of prejudice from any evidentiary exclusions, protective orders, or guardrails the Court puts in place: the Dorsey Firm's work product and case strategy were contaminated from the outset by Dorsey and AMc's undisclosed, improper collusion with a side-switching NRA attorney, which Defendants concealed for more than two years.  (Indeed, they continue to obfuscate the extent and details of Dycio's involvement by producing, in response to this Court's order, a facially inadequate categorical privilege log that concatenates dozens of topics into inscrutable catch-all categories and omits the quantity of documents in each category). The appearance of impropriety created by AMc and Dorsey's conduct powerfully favors disqualification or, at a minimum, dismissal of Defendants' tainted counterclaims, along with other protections for the NRA.

## C.   In the Alternative, The Court Should Fashion Guardrails for the Upcoming Trial Which Avoid Further Prejudice to the NRA.

### 1.   Documents in Categories 11-14 of the Categorical Log Should Be Promptly Produced.

For the reasons set forth here and in the NRA's Objections to Defendants' Supplemental Categorical Privilege Log [ECF No. 487], Defendants' privilege claims over its communications with the NRA and LaPierre's own counsel are tenuous at best.  Moreover, they were not timely asserted, and failure to timely log withheld documents may be deemed a waiver of any privilege or protection.[105] Waiver is particularly appropriate where a party has had an opportunity (or several

---

[104] *Dynamic 3D Geosolutions,* LLC, 2015 WL 4578681, at *7.
[105] *See, e.g.,* Fed. R. Civ. P. 26 – Advisory Committee Commentaries ("A party must notify other parties if it is withholding materials otherwise subject to disclosure under the rule or pursuant to a discovery request because it is

opportunities) to amend or supplement its log.[106]  In addition, Defendants' concealment of the material facts about Dycio's involvement, which would have been apparent if Defendants served a timely and accurate privilege log, raises the specter of crime/fraud waiver.[107]  Countenancing Defendants' faulty privilege claims over the documents in Categories 11-14 would be especially prejudicial to the NRA because it would shield, from cross-examination, Defendants' use of confidences obtained improperly through side-switching counsel. Defendants should therefore be ordered to produce the documents withheld pursuant to Categories 11-14 of the Categorical Log.

## 2.   <u>The Court Should Enter an Order Forbidding Defendants' Use of Any Confidential Information Obtained from Dycio.</u>

The Court has considerable authority to structure, sequence, or limit the presentation of evidence at trial.[108]  Courts may exclude evidence to resolve conflicts of interest arising from the participation of conflicted counsel.[109]  Courts have similarly excluded evidence where misconduct during discovery, by the party propounding the evidence, precludes fair cross-examination.[110]

---

asserting a claim of privilege or work product protection. To withhold materials without such notice is contrary to the rule, subjects the party to sanctions under Rule 37(b)(2), and may be viewed as a waiver of the privilege or protection."); *Hirsch v. USHealth Advisors, LLC*, No. 4:18-CV-245-P, 2020 WL 1271588, at \*8 (N.D. Tex. Feb. 14, 2020), *aff'd*, No. 4:18-CV-00245-P, 2020 WL 1271374 (N.D. Tex. Mar. 12, 2020) (failure to log documents resulted in the waiver of attorney-client privilege and work-product doctrine).

[106] *See Nance v. Thompson Medical Co.*, 173 F.R.D. 178, 182 (E.D. Tex. 1997) (finding waiver of work product doctrine where its elements were not adequately asserted, even after the defendant had the opportunity to supplement its log); *C.T. v. Liberal Sch. Dist.*, 2008 WL 217203 (D.Kan.2008) (finding privileges waived after plaintiff had an opportunity to amend the original privilege log and correct its deficiencies); *Madrigal v. Kleberg Cty.*, No. 2:15-CV-345, 2016 WL 3346522, at \*2 (S.D. Tex. June 15, 2016) ("Failure to timely serve a privilege log may be deemed waiver of any privilege or protection."); *E.E.O.C. v. Parker Drilling Co.*, No. 3:13-CV-00181-SLG, 2014 WL 5410661, at \*6 (D. Alaska Oct. 22, 2014) (privileges newly asserted in an amended log were waived because they were not identified in the initial log).

[107] Indeed, this court has ordered *in camera* review to determine the applicability of the crime/fraud exception based on evidence of litigation misconduct considerably less flagrant.  *See, e.g.*, *Positive Software Solutions, Inc. v. New Century Mortgage Corp.*, et al., *No. 3l03-cv-0257-N*, 2004 WL 7329341 (N.D. Tex. Mar. 3, 2004) (ordering *in camera* review of counsel's communications after litigant aggressively interpreted protective order in a manner inconsistent with representations made at a prior conference).

[108] *See* Fed. R. Evid. 403, 611(a). S*ee also United States v. Morrison*, 833 F.3d 491, 504 n. 3 (5th Cir. 2016) ("The authority to set limits stems from a district court's authority to oversee the presentation of evidence").

[109] *See, e.g.*, *United States v. Gearhart*, 576 F.3d 459 (7th Cir. 2009) (discussing balancing test applied by majority of circuits to criminal trials wherein defense counsel previously represented one or more witnesses, and analyzing exclusion of related evidence under the "unfair prejudice" prong of F. R. Evid. 403).

[110] *See, e.g.*, *Howell v. Standard Motor Prod., Inc.*, No. 4:99-CV-987-E, 2001 WL 456241, at \*4 (N.D. Tex. Apr. 27, 2001).

Moreover, the Court may prohibit the introduction of items into evidence—or strike pleadings in whole or in part—as a sanction for Defendants' failure to timely disclose Dycio as an individual likely to have discoverable information pursuant to Fed. R. Civ. P. 26(a).[111]  These considerable powers provide the Court ample latitude to craft alternate safeguards for the NRA at trial, even if the Court declines to disqualify Dorsey or dismiss AMc's counterclaims.

As proposed in the accompanying Expert Declaration of Professor Linda Eads, the Court could enter an order forbidding the use, by Defendants or their lawyers, of any confidential information obtained from Dycio.[112]  Such an order would prohibit not only the direct introduction of such information at trial, but also its use for other purposes, including trial preparation or extrajudicial purposes (*e.g.*, public smears against the NRA).  There is precedent for such an order: in *Doe v. A Corp.*, 709 F.2d 1043 (5th Cir. 1983), the Fifth Circuit disqualified the defendant's former in-house counsel from prosecuting a class action against it—and also enjoined Doe from disclosing, in any context, any confidences acquired during the former representation.[113] Similarly, although it declined to disqualify conflicted counsel based on equitable and practical considerations, this Court in *Gen. Elec. Co. v. Mitsubishi Heavy Indus., Ltd*. ordered that conflicted counsel "screen all information" pertaining to its representation from trial counsel and take immediate steps to return confidential files. [114] The Court should order similar safeguards here.

3.  <u>**Defendants Should Be Barred from Introducing Evidence, Including Testimony, Which Is Tainted by Confidences Obtained from Dycio.**</u>

As Professor Eads likewise suggests, this Court should also enter an order forbidding Defendants from introducing, at trial, testimony or evidence tainted by confidences or documents

---

[111] *See* Fed. R. Civ. P. 37(c).
[112] *See* Rogers Decl., Ex. 9, Decl. of Prof. L. Eads, dated Feb. 15, 2022, p. 8-11, ¶¶ 10-18 [App. 233-36].
[113] *Doe v. A Corp.*, 709 F.2d 1043, 1051 (5th Cir. 1983).
[114] No. 3:10-CV-276-F, 2011 WL 13201855, at *5 (N.D. Tex. Sept. 12, 2011).

obtained from Dycio.[115] Although such an order would theoretically be redundant with one forbidding any "use" of such confidences, it would also create a framework for the NRA to challenge, and exclude, information, documents, or arguments asserted to be tainted. For example, the Court could require the NRA to make an initial *prima facie* showing of the connection between the allegedly tainted evidence and Dycio's representation of the NRA. Upon such a showing, the Court could either exclude the challenged evidence or offer Defendants an opportunity for rebuttal. The Court could hold relevant hearings *in camera*, with a sealed transcript for appellate purposes, and then rule on admissibility of the evidence.

Alternatively, but similarly, the Court could simply enter an order preventing Defendants from presenting evidence or testimony at trial regarding any of the subject matter identified in Categories 11-14 of the Categorical Log (*i.e.*, subject matter about which legal advice was sought, or case strategy discussed, with Dycio).

### V.    PRAYER FOR RELIEF

For all the reasons stated above, the NRA respectfully requests that the Court:

**(i)**    Disqualify Dorsey in the above/captioned matter;

**(ii)**   Dismiss Defendant AMc's Second Amended Counterclaims without prejudice; and/or

**(iii)**  Grant any other relief this Court deems just and proper including, without limitation:

  **a)**  An order compelling Defendants to produce, within seven (7) days of entry thereof, any communications exchanged with the Dycio Firm or documents obtained from the Dycio Firm;

---

[115] *See* Rogers Decl., Ex. 9, Decl. of Prof. L. Eads, dated Feb. 15, 2022, p. 8-11, ¶¶ 10-18 [App. 233-36].

**b)** An order forbidding any use, by Defendants or their counsel, of confidential information or documents obtained from the Dycio firm;

**c)** An order forbidding Defendants' introduction at trial of evidence or testimony tainted by confidences improperly shared by the Dycio firm including, without limitation, evidence or testimony concerning the subject matter identified in Categories 11-14 of the Categorical Log.

Dated: February 21, 2022       Respectfully submitted,

By:    */s/Sarah B. Rogers*
       Cecelia L. Fanelli
       *Pro Hac Vice*
       clf@brewerattorneys.com
       Sarah B. Rogers
       New York Bar No. 4755252
       sbr@brewerattorneys.com
       Philip J. Furia
       *Pro Hac Vice*
       pjf@brewerattorneys.com
       **BREWER ATTORNEYS AND COUNSELORS**
       1717 Main Street, Suite 5900
       Dallas, Texas 75201

       **ATTORNEYS FOR PLAINTIFF/COUNTER-DEFENDANT NATIONAL RIFLE ASSOCIATION OF AMERICA**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was electronically served via the Court's electronic case filing system upon all counsel of record on this 21st day of February 2022.

       */s/ Sarah B. Rogers*
       Sarah B. Rogers