**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| *Plaintiff and Counter-Defendant*, | § § § | |
| **v.** | § § | **Case No. 3:19-cv-02074-G** |
| **ACKERMAN MCQUEEN, INC.,** | § § § | |
| *Defendant and Counter-Plaintiff,* | § § § | |
| **and** | § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, and MELANIE MONTGOMERY,** | § § § § | |
| *Defendants*. | § § | |

## ACKERMAN MCQUEEN'S OMNIBUS MOTION IN LIMINE

TO THE HONORABLE A. JOE FISH:

Defendant/Counter-Plaintiff Ackerman McQueen, Inc. ("***AMc***"), Defendants Mercury Group, Inc. ("***Mercury***"), Henry Martin ("***Martin***"), William Winkler ("***Winkler***"), and Melanie Montgomery ("***Montgomery***") (collectively, "***AMc***") hereby file this *Motion in Limine* (the "***Motion***"), and respectfully show as follows:

## TABLE OF CONTENTS

I.      SUMMARY ...................................................................................................4

II.     LIMINE ISSUES AND AUTHORITIES ...................................................4

        A.      MATTERS NOT IN DISPUTE ................................................5

                1.      Mention or reference to either parties' motions in limine. .........................5

                2.      Arguments that the jury should place itself in a party's position. ..............6

                3.      Comments about video depositions. ...........................6

                4.      Insurance to cover legal fees. .....................................6

                5.      Degree of liability for judgment. ...............................7

                6.      Collateral source ............................................7

        B.      MATTERS IN DISPUTE ............................................8

                7.      Displaying or discussing documents or materials not in evidence. ............8

                8.      Disqualification of Dorsey & Whitney LLP ................8

                9.      Referencing or discussing the materiality of the parties' alleged breaches..........................................................9

                10.     The proposed expert testimony of Autumn Krause and Larry Kanter..........................................................12

                11.     Pre-Trial Discovery Disputes....................................13

                12.     Evidence Related to Tammy Payne. ...........................20

                13.     Evidence of AMc's Relationships with Clients Other than the NRA. ..............................................................21

                14.     Dan Boren Email/Double Billing.................................24

                15.     Impermissible Opinions of Purported Expert Andrew McLean. ..............25

                16.     Impermissible Opinions of Purported Expert Andrew Hochman.............27

                17.     Impermissible Opinions of Purported Expert Gary Goolsby....................29

                18.     New York Times article discussing the "Comscore Report."...................32

19.   Gangster Capitalism podcast.....................................................................33

20.   Thomas the Tank Engine segment. ..........................................................34

21.   DJ Investments. ........................................................................................34

22.   Woody Phillips' invocation of his Fifth Amendment rights....................36

III.   CONCLUSION ....................................................................................................37

## I.  SUMMARY

AMc files this Motion seeking an order from the Court directing the National Rifle Association of America ("**NRA**"), and its counsel, its respective fact and expert witnesses, not to mention or refer, directly or indirectly, upon *voir dire* examination, opening statement, interrogation of witnesses, introduction of any evidence, argument, objections before the jury, reading any portion of the pleadings, or by any other means or in any manner inform the jury, or bring to the jury's attention, any of the matters set forth in Part II, below, unless and until such matters have been called to the attention of the Court, out of the presence and/or hearing of the jury, and a ruling favorable to them is obtained from the Court concerning the admissibility and relevant of all such matters.

## II.  LIMINE ISSUES AND AUTHORITIES

The limine issues addressed below all involve issues of irrelevant and inadmissible evidence and arguments the NRA has made clear it will attempt to use against AMc at trial. Such evidence and arguments, however, are not only irrelevant, but any *de minimis* probative value would be substantially outweighed by the danger of unfair prejudice, confusing the issues at trial, or misleading the jury.

Under the Federal Rules of Evidence ("***the Rules***"), evidence must be relevant to be admissible. FED. R. EVID. 402. To establish relevancy, the evidence must (1) have the ability to render a fact more or less likely than without the evidence, and (2) be a fact that is consequential "in determining the action." FED. R. EVID. 401. Evidence failing to satisfy this standard is inadmissible. FED. R. EVID. 402.  However, even otherwise-relevant evidence may be excluded under certain circumstances. Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the

issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403.

Although perhaps relevant, the Rules bar admission of certain kinds of evidence. For instance, the Rules forbid introducing evidence to draw impermissible character inferences: "Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character trait." FED. R. EVID. 404(a)(1).

Each of the matters set forth below is inadmissible, irrelevant, and unfairly prejudicial to AMc's right to a fair and impartial trial. A timely objection at trial, even if sustained with an appropriate instruction to the jury to disregard such matters, would not cure the prejudice that would be suffered by AMc if the NRA attempts to interject such inadmissible, irrelevant, and prejudicial matters into the trial of this lawsuit.

## A.    MATTERS NOT IN DISPUTE

### 1.    Mention or reference to either parties' motions in limine.

AMc requests the Court prohibit either party from mentioning or referring to any parties' motion in limine before the jury.  The existence of motions in limine are wholly irrelevant under FED. R. EVID. 401 and 402 and should not be disclosed or mentioned to the jury.  Moreover, any purported relevance would be substantially outweighed by the danger of unfair prejudice and would be confusing to the jury.  Thus, it is also inadmissible under FED. R. EVID. 403.

| **MIL No. 1** | NRA:  AGREE_____X_____DISAGREE _____ <br><br> RULING OF THE COURT: <br><br> GRANTED _____    DENIED _____    MODIFIED _____ |
| --- | --- |

2.      **Arguments that the jury should place itself in a party's position.**

AMc requests the Court prohibit either party from arguing, commenting, or requesting that they jury place itself in the position of a party.  Such arguments are wholly irrelevant under FED. R. EVID. 401 and 402.  But even if somehow relevant, the minimal probative value of such dubiously relevant evidence is far outweighed by the risk of unfair prejudice and confusion to the jury.  Therefore, it is inadmissible under FED. R. EVID. 403.

| **MIL No. 2** | NRA:  AGREE_____X_____DISAGREE _____<br><br>RULING OF THE COURT:<br><br>GRANTED _____   DENIED _____   MODIFIED _____ |
| --- | --- |

3.      **Comments about video depositions.**

AMc requests the Court prohibit either party from commenting before the jury about the editing of video depositions.  Any such comments before the jury are not relevant to the claims and defenses in this case under FED. R. EVID. 401 and 402.  Moreover, any purported relevance would be substantially outweighed by the danger of unfair prejudice, would be confusing to the jury, and would risk potential delay of the trial proceedings.  Thus, it is also inadmissible under FED. R. EVID. 403.

| **MIL No. 3** | NRA:  AGREE_____X_____DISAGREE _____<br><br>RULING OF THE COURT:<br><br>GRANTED _____   DENIED _____   MODIFIED _____ |
| --- | --- |

4.      **Insurance to cover legal fees.**

AMc requests the Court prohibit either party from introducing evidence before the jury that demonstrates whether either party has insurance to cover legal fees and has paid for any part of

this litigation with money received under a litigation-related insurance policy.  Any such comments before the jury are not relevant to the claims and defenses in this case under FED. R. EVID. 401 and 402.  Moreover, any purported relevance would be substantially outweighed by the danger of unfair prejudice, would be confusing to the jury, and would risk potential delay of the trial proceedings.  Thus, it is also inadmissible under FED. R. EVID. 403.

| | |
|---|---|
| **MIL No. 4** | NRA:  AGREE_____X_____DISAGREE _____  RULING OF THE COURT:  GRANTED _____   DENIED _____   MODIFIED _____ |

### 5.    Degree of liability for judgment.

AMc requests the Court prohibit either party, with respect to the claims against which it is defending, from making any reference before the jury that suggests a party may or may not have to pay any resulting judgment following the jury's verdict.  Any such comments before the jury are not relevant to the claims and defenses in this case under Fed. R. Evid. 401 and 402.  Moreover, any purported relevance would be substantially outweighed by the danger of unfair prejudice.  Thus, it is also inadmissible under Fed. R. Evid. 403.

| | |
|---|---|
| **MIL No. 5** | NRA:  AGREE_____X_____DISAGREE _____  RULING OF THE COURT:  GRANTED _____   DENIED _____   MODIFIED _____ |

### 6.    Collateral source

AMc requests the Court prohibit either party, with respect to the claims upon which the other party seeks legal damages, from making any reference before the jury that suggests the other party's legal damages, if any, will be paid by any collateral source.  Such comments before the

jury are not relevant to the claims and defenses in this case under Fed. R. Evid. 401 and 402. Moreover, any purported relevance would be substantially outweighed by the danger of unfair prejudice. Thus, it is also inadmissible under Fed. R. Evid. 403.

| | |
|---|---|
| **MIL No. 6** | NRA: AGREE_____X_____DISAGREE _____<br><br>RULING OF THE COURT:<br><br>GRANTED _____   DENIED _____   MODIFIED _____ |

## B.   MATTERS IN DISPUTE

### 7.   Displaying or discussing documents or materials not in evidence.

AMc requests the Court prohibit either party from displaying or discussing documents or materials not in evidence. Any reference to materials not in evidence before the jury is not relevant to the claims and defenses in this case under Fed. R. Evid. 401 and 402. Moreover, any purported relevance would be substantially outweighed by the danger of unfair prejudice, would be confusing to the jury, and would risk potential delay of the trial proceedings. Thus, it is also inadmissible under Fed. R. Evid. 403.

| | |
|---|---|
| **MIL No. 7** | NRA: AGREE_____DISAGREE _____X_____<br><br>RULING OF THE COURT:<br><br>GRANTED _____   DENIED _____   MODIFIED _____ |

### 8.   Disqualification of Dorsey & Whitney LLP

AMc requests the Court prohibit either party from introducing evidence before the jury that demonstrates, discusses, or otherwise comments on the NRA's attempts to disqualify Dorsey & Whitney as counsel for AMc. As set forth in AMc's February 25, 2022 response to the NRA's last minute Motion to Disqualify, the NRA is attempting to raise purported conflict issues that it

has known about for years.  AMc requests that any evidence, arguments, or discussions relating to or suggesting that Dorsey & Whitney LLP has a conflict in representing AMc or that the NRA has previously raised those conflict issues in the above-captioned litigation should not be presented before the jury as it is not relevant, and any relevance that it may have is greatly outweighed by the danger of unfair prejudice and confusion to the jury.  FED. R. EVID. 401, 402, 403.

| **MIL No. 8** | NRA:  AGREE_____DISAGREE _____X_____ |
|---|---|
| | RULING OF THE COURT: |
| | GRANTED _____    DENIED _____    MODIFIED _____ |

### 9. Referencing or discussing the materiality of the parties' alleged breaches.

AMc requests the Court prohibit either party, with respect to the claims upon which the other party seeks legal damages, from making any reference before the jury that suggests or implies that the other party's alleged failure to perform on one set of obligations absolves the first party from performing on other, independent obligations.

During the parties' summary judgment briefing, the NRA took the position that AMc was barred from enforcing its breach of contract claims against the NRA because the NRA alleged AMc committed a prior material breach of the Services Agreements' Records Examination Clause. The effect of such position would potentially absolve the NRA from having to pay millions of dollars for services AMc rendered to the NRA under completely separate and distinct provisions of the Services Agreement.

While AMc vociferously denies having committed any breach, the facts and applicable law demonstrate the absurdity of the NRA's position for two reasons: (1) the NRA cannot invoke the prior material breach doctrine when, after the claimed breach, the parties continued to perform their mutual obligations under the Services Agreement, and (2) any potential breach of the Records

Examination Clause by AMc does not permit the NRA to refrain performance under a separate, independent obligation in the Services Agreement.

On this first point, the Fourth Circuit has held that the prior material breach doctrine does not bar an alleged material breacher from enforcing the contract against the other party where, following the alleged material breach, both parties continued their respective performance. *Bayer Cropscience LP v. Albemarle Corp.*, 696 Fed. App'x 617, 623 (4th Cir. 2017). The Fourth Circuit explained a contrary holding would place the alleged material breacher in a bind:

> Applying the first material breach rule in a manner that excuses potential subsequent breaches when both parties continue to perform would place contractual parties, such as Bayer, in an untenable position. Here, because the parties continued to perform under the Agreement, Bayer was contractually obligated to continue paying the requested prices despite its belief that Albemarle's prices were unreasonable and set in bad faith. The fact that Bayer made payments to Albemarle under protest after filing its complaint in June 2014 illustrates this. ***By applying the first material breach rule here, Albemarle theoretically would be permitted to breach the Agreement however it so chose and require Bayer to adhere to its terms, but Bayer would be precluded from ever seeking any contractual remedy for Albemarle's impermissible actions.*** We do not believe Virginia's first material breach rule, as laid out in *Horton* and *Countryside*, contemplates or intends such a result. *Id.*

The NRA has claimed that AMc materially breached the Services Agreement's Records Examination Clause in September 2018 and February 2019 by failing to allow the NRA to inspect AMc's books and records.[1] According to the NRA, by virtue of these alleged material breaches, AMc "relieved [the] NRA of its obligation to perform and entitled NRA to terminate the contract and sue for damages."[2] Yet, the NRA did not immediately terminate the contract and sue for damages. Rather, following the September 2018 Brewer Firm Audit, the parties continued operating and performing the core promises under the Services Agreement. In fact, in October

---

[1] ECF 420, at 16-17
[2] ECF 420, at 19.

2018, the parties met and agreed on adjusting AMc's budget for the fourth quarter of 2018, and subsequently agreed upon a new budget for 2019.[3]  Furthermore, the NRA continued to solicit, receive, and pay for AMc's services for many months after the September 2018 Brewer Firm Audit.[4]  The same holds true for the February 2019 FRA audit.  Accordingly, because of the parties' continued dealings under the Services Agreement following AMc's alleged material breach, *Bayer* permits AMc to still sue the NRA for its flagrant breaches of the Services Agreement.  A contrary holding would immunize the NRA from its own impermissible conduct.

Second, the NRA's position redounds to suggesting that because it was dissatisfied with AMc over the scope of the records requests (and subsequently claimed material breach), such alleged material breach excused a completely separate obligation to pay AMc for services rendered.  However, this position has no basis in Virginia law or principles of contract: "It does not follow in every case of mutual and dependent promises that upon a failure of one party to perform his promise the other party will be exonerated or excused from performing his promise." *Wellmore Coal Corp. v. Patrick Petroleum Corp.*, 808 F. Supp. 529, 537 (W.D. Va. 1992) (quoting *Neely v. White*, 14 S.E.2d 337, 340 (Va. 1941)).  Indeed, "a party's breach of one promise does not discharge the non-breaching party's duties with respect to unrelated or independent promises to perform under the parties' contract."  *Monster Daddy LLC v. Monster Cable Prods. Inc.*, 483 Fed. App'x 831, 835 (4th Cir. 2012).

Nowhere in the Services Agreement does it state that the NRA's payment of AMc's invoices for services rendered is dependent upon AMc's compliance with the Records Examination Clause.[5]  These are two independent obligations, and the NRA cannot claim that

---

[3] ECF 432, Ex. 1, W. Winkler Decl., dated Dec. 20, 2021, at ¶ 21 (APP 9).
[4] ECF 419-1, Ex. 34-H, May 30, 2019 Email between M. Erstling and C. Spray (APP 2361-63); ECF 417, Ex. 35-H, Jackson Report, at Ex. 7 (APP 2505-06).
[5] ECF 419-1, Ex. 35-A, Services Agreement § VIII (APP 2385).

AMc's alleged breach of one set of obligations excuses it from performing under a wholly separate set of obligations.

Given the legal authority stacked against the NRA's strained position with respect to prior material breach, AMc requests that the parties be prohibited from stating, suggesting, or implying that the other party's alleged breach excused performance of other, independent obligations in the Services Agreement.

| **MIL No. 9** | NRA:  AGREE_____DISAGREE _____X_____ |
| --- | --- |
| | RULING OF THE COURT: |
| | GRANTED _____       DENIED _____       MODIFIED _____ |

### 10.    The proposed expert testimony of Autumn Krause and Larry Kanter.

The NRA has designated two rebuttal expert witnesses—Autumn Krause and Larry Kanter—to rebut the expert opinions of Dan Jackson.  Krause and Kanter purport to offer virtually the same rebuttal opinions to Jackson.  Thus, AMc requests that the Court prohibit the NRA from offering both of these experts at the trial.  Permitting the NRA to offer purported rebuttal experts on the same topics is not relevant under Fed. R. Evid. 401 and 402 to the claims and defenses in this case.  Moreover, any purported relevance would be substantially outweighed by the danger of unfair prejudice and confusion to the jury, and it is improperly cumulative.  Thus, it is also inadmissible under Fed. R. Evid. 403.

| **MIL No. 10** | NRA:  AGREE_____DISAGREE _____X_____ |
| --- | --- |
| | RULING OF THE COURT: |
| | GRANTED _____       DENIED _____       MODIFIED _____ |

11.     **Pre-trial discovery disputes.**

Discovery disputes during litigation are routinely excluded from being discussed and presented before the jury.  However, in this case, the NRA intends to have a full-blown trial within a trial on discovery disputes arising out of this litigation, including with respect to at least 90 exhibits reflecting meet and confer letters, the scheduling of depositions, the parties' discovery status reports as ordered by the Court, NRA draft motions never filed, and live testimony from AMc's trial lawyers.  Fifth Circuit courts have repeatedly agreed and granted motions in limine to exclude evidence of the parties' pre-trial discovery disputes.[6]  Furthermore, courts consistently deny as untimely a party's request to adjudicate discovery disputes and/or motions to compel if not filed in advance of the discovery deadline.[7]  Courts also regularly exclude evidence of self-serving letters sent between counsel.[8]  AMc requests the Court prohibit either party, with respect to the claims upon which the other party seeks legal damages, from making any reference before the jury regarding any discovery disputes between the parties' or their counsel, including but not limited to, issues regarding the production of pre-2018 documents, the PIP Dashboard, and social media accounts.

A.  **Summary of discovery disputes**

---

[6] *See Orchestrate HR, Inc. v. Trombetta*, No. 3:13-CV-2110-KS, 2017 U.S. Dist. LEXIS 7984, at *26 & n.11 (N.D. Tex. Jan. 20, 2017); *see also Affordable Care, LLC v. JNM Office Prop., LLC*, No. 1:19cv827-HSO-RPM, 2022 U.S. Dist. LEXIS 16600, at *9 (S.D. Miss. Jan. 31, 2022); *Travelpass Grp., LLC v. Caesars Entm't Corp.*, No. 5:18-cv-153-RWS-CMC, 2021 U.S. Dist. LEXIS 250113, at *22 (E.D. Tex. Oct. 18, 2021); *Logan v. Westfield Ins. Co.*, No. 17-29-Section: "G"(4), 2020 U.S. Dist. LEXIS 12273, at *31 (W.D. La. Jan. 24, 2020); *Stubblefield v. Suzuki Motor Corp.*, No. 3:15-CV-18-HTW-LRA, 2018 U.S. Dist. LEXIS 164060, at *13 (N.D. Miss. Sept. 25, 2018) ("***This court cannot fathom how discovery disputes between the parties, in this litigation, would be germane to the plaintiffs' case-in-chief.***") (emphasis added)

[7] *McCollum v. Puckett Mach. Co.*, 628 Fed App'x 225, 228 & n.5 (5th Cir. 2015).

[8] *O'Sullivan v. Geico Cas. Co.*, No. 15-cv-1838-WJM-MJW, 2017 U.S. Dist. LEXIS 43303, at *11-15 (D. Colo. Mar. 24, 2017) (granting defendant's motion in limine to exclude self-serving correspondence between counsel as evidence from trial); *Sw. La. Convention & Visitors v. Emp'rs Mut. Cas. Co.*, No. 06-2006, 2009 U.S. Dist. LEXIS 57566, at *7-8 (W.D. La. June 22, 2009) (granting motion in limine as to "correspondence of counsel related to discovery disputes, motions to compel and/or other discovery issues" as well as excluding various other letters containing counsel's "self-serving" statements).

The parties have conducted discovery since April 2019 when the NRA commenced the initial Virginia litigation.  Since then, counsel have exchanged countless correspondence on discovery matters, threats of motion practice that were never fulfilled, and motion practice on certain discovery disputes.  Despite the October 29, 2021 extended discovery deadline giving the NRA ample time to complete discovery, the NRA did not move to compel certain categories of documents or materials before the deadline.  Now, however, on the eve of trial, the NRA's Exhibit List reveals its intent to re-litigate discovery disputes before the jury despite failing to resolve these matters during discovery with the appropriate adjudicator – this Court.  Whether strategic or dilatory, the NRA should not be permitted to benefit by receiving a platform before the jury to air its untimely and unfounded grievances when it decided not to take necessary action governed by this Court's scheduling order.

Indeed, the NRA Exhibit List includes at least 90 exhibits[9] related to these discovery disputes.  This number includes letters and emails exchanged by NRA and AMc counsel between July 2021 and November 2021 regarding the scheduling of depositions, third-party subpoenas, the PIP Dashboard, production of pre-2018 documents, and social media accounts.  This number also includes various pleadings filed by both parties relating to discovery, as well as draft pleadings apparently never filed.  As this Court knows, it ordered the parties to submit weekly discovery status reports to the conclusion of the extended October 29, 2021 discovery deadline.  The NRA intends to offer both its own discovery status reports (and the thousands of pages of exhibits to them) and AMc's discovery status reports—showcasing the NRA's obvious attempts to use its

---

[9] The 90 exhibits that AMc has identified for exclusion are listed as follows: Ex. Nos. 733, 760, 765, 774, 781, 782, 784, 793, 795, 796, 797, 798, 806, 807, 808, 809, 817, 818, 819, 821, 822, 823, 824, 825, 826, 827, 828, 829, 833, 834, 835, 836, 837, 839, 840, 842, 843, 844, 845, 846, 847, 848, 849, 850, 851, 852, 853, 854, 855, 856, 857, 859, 860, 861, 862, 863, 864, 865, 866, 867, 869, 870, 871, 872, 873, 874, 875, 876, 877, 878, 880, 881, 884, 885, 886, 887, 888, 892, 894, 895, 899, 900, 901, 905, 906, 909.

lawyers' false accusations as purported evidence for the jury to rely upon.  The NRA's attempts to conduct a sideshow of discovery disputes may be most apparent by its recent threats that it intends to call three Dorsey & Whitney LLP attorneys at trial, including AMc's lead trial counsel.  On February 18, 2022, counsel for the NRA explained in a letter to Brian E. Mason that, "you are also a fact witness in this matter" and to "allow this to confirm that we will likely call you to the stand to testify as to these issues and others," these issues being the discovery disputes.

Of course, the NRA's desire to hold a discovery trial within a trial has no relevance to the parties' claims and defenses, but more importantly, it would be unduly prejudicial, confusing, misleading, wasteful, and time-consuming, as it would do nothing more than distract the jury from the actual issues in this case.  Permitting this evidence at trial will certainly delay the trial, it will require lawyers from both sides to testify as fact witnesses on discovery matters outside the province of the jury, and it will require the parties to put on evidence to explain to the jury the rules of this Court, case law from this Circuit, the Federal Rules of Civil Procedure, and the Federal Rules of Evidence.  For example, if the NRA is permitted to introduce evidence relating to AMc's alleged "refusal to turn over the PIP Dashboard," then AMc will be forced to present evidence of this Court's prior instruction regarding discovery disputes, explain why the NRA failed to follow through on obtaining the information relating to the PIP Dashboard (again), and why the NRA did not seek appropriate relief with the Court prior to the discovery deadlines.  This is just one of many sideshows the NRA will attempt to create for their lawyers to manufacture evidence and confuse the jury.

Although the NRA may attempt to introduce evidence relating to a plethora of discovery disputes, at the very least, it has made clear it intends to introduce evidence of the following categories: (1) evidence relating to the NRA's complaints that AMc did not produce documents

dated before 2018; (2) evidence of the parties' correspondence regarding the PIP Dashboard; and (3) evidence of the parties' correspondence regarding disputes over the NRA's social media accounts.  AMc requests that all evidence of the parties' discovery disputes be excluded and particularly the three categories discussed below.

### B.  Production of pre-2018 documents.

During the parties' discovery hearing with Judge Toliver on December 15, 2021, she expressly noted the issue of general pre-2018 documents was not before the court in the parties' latest Joint Status Report because no motion to compel had been filed related to this dispute.[10]  The NRA has had notice since March 2020 of the requirements necessary to present a motion to compel before Judge Toliver.  It chose not to do so.  It is apparent the NRA does not want the document themselves but rather to litigate the alleged lack as somehow relating to its purportedly meritorious claims that existed before any discovery was requested.  Stated differently, the NRA is seeking from the jury the relief the court already denied.

In the NRA's requests for productions, it sought production of *all* documents or materials "referring or relating to" certain topics from January 1, 2015 – November 2019/August 2020.[11] Other than specific categories of documents, AMc generally objected to the requests' overly broad time period because the dispute between AMc and the NRA involved events occurring throughout 2018 and 2019.[12]  In early 2020, the NRA moved to compel production, and the parties briefed their respective positions.[13] Subsequently, this Court referred all discovery matters to Magistrate Judge Toliver,[14] who imposed a new discovery protocol on the parties on March 10, 2020.[15]  Judge

---

[10] ECF 453, at Ex. B., at 63:18-64:3 (App. 68-69).9
[11] Plaintiff's First Set of Requests for Production of Documents to Defendants, dated November 5, 2019, at 8, ¶ 28.
[12] Defendant's Objections and Responses to Plaintiff's First Set of Requests for Production of Documents, dated December 5, 2019, at 3, ¶ 8.
[13] ECF 48 (NRA Motion to Compel); ECF 51 (AMc Response); ECF 58 (NRA Reply).
[14] ECF 60.
[15] ECF 62.

Toliver ordered the parties to confer over this issue according to the new protocol and then, if necessary, present the issue in a joint report. Over the course of 2020, the parties exchanged letters, participated in meet-and-confers, and AMc agreed to produce certain categories of documents as a result.

Pursuant to the new discovery protocol, on October 23, 2020, the parties submitted to Judge Toliver their Joint Status Report regarding outstanding motions to compel.[16]  During the December 2015 discovery hearing, Judge Toliver confirmed the issue was not before the court because the Joint Status Report was not preceded by a proper motion.[17]  The Court invited the parties to file a motion and attach the prior Joint Status Report, if necessary, but neither party took any steps to move forward. If these documents were so important to the NRA, it had ample time to move to compel, which it repeatedly failed to do.

Beyond the above-quoted precedent regarding Fifth Circuit courts' aversion to admit evidence of discovery disputes, self-serving letters between counsel, and unwillingness to consider untimely discovery requests, the NRA's introduction of this evidence would be highly prejudicial and lacks any probative value (if even relevant at all) helpful to dispose of the claims and defenses in this case. Thus, under this aforementioned authority and Rules 401-403, AMc requests all evidence of discovery disputes over pre-2018 documents be excluded from trial.

---

[16] ECF 180.
[17] ECF 453, at Ex. B., at 63:18-64:3 (App. 68-69).

### C.  PIP Dashboard.

The NRA also appears likely to introduce evidence accusing AMc and its counsel of improperly withholding access and information related to the PIP Dashboard—a collection of intangible analytics data related to NRATV.  For starters, the NRA has known the PIP Dashboard existed since around 2016, and the Brewer Firm has known of it since at least the Fall of 2018. Yet it never requested access to it until the issues were raised by AMc's counsel.

On August 25, 2021, NRA counsel sent AMc counsel a letter noting the NRA believed AMc had not produced all data related to PIP and NRATV.[18]  Notably, the NRA did not demand AMc produce the information.  Several days later, the parties submitted status report briefing to the Court, which laid out the parties' positions with respect to the PIP dashboard.[19]  The following day, on September 1, 2021, AMc counsel transmitted a letter to NRA counsel that provided the NRA with login credentials to access the PIP Dashboard.[20]  Several more letters were exchanged on this issue,[21] and, on September 21, 2021, AMc counsel transmitted a letter to NRA counsel offering to have an independent third-party copy the PIP Dashboard information and produce it to all parties.[22]  More letters were exchanged over retaining Kroll Associates, Inc. ("*Kroll*"), the NRA's proposed independent third-party, to copy the PIP Dashboard information.  AMc stood ready, willing, and able to permit this copying so long as the NRA gave AMc proper assurances that the Brewer Firm had not infiltrated Kroll as it did with FRA before the February 2019 FRA Audit.[23]  Upon learning that Kroll may have a conflict, the NRA provided five more potential independent third parties to copy the PIP Dashboard.  AMc counsel coordinated with one of the

---

[18] ECF 551, NRA Trial Ex. No. 797, at 2 (beginning with heading entitled "PIP documents and data").
[19] *See id.* at NRA Trial Ex. No. 806, 808.
[20] *Id.* at NRA Trial Ex. No. 809.
[21] *See id.* at NRA Trial Ex. Nos. 818, 822, 826, 828, and 833.
[22] *Id.* at NRA Trial Ex. No. 839.
[23] *Id.* at NRA Trial Ex. No. 840, 848, 849, and 854.

five companies with both AMc and that company, Epic Global, Inc. alerting NRA counsel that they both were ready to proceed. NRA counsel never moved forward and the matter remained unresolved.[24]

In one October letter, the NRA accused AMc of delay, writing that it would "seek the assistance of the Court to curtail AMc's ability to protract what should have been a matter that was expedited long ago . . . ."[25] AMc agrees – the issue should have been resolved one way or another "long ago," but, once again, the NRA never took any action before the October discovery deadline, despite months passing since its original letter and years passing since its initial allegations relating to the platform. The NRA chose not to move forward with its own selected independent, third-party. The NRA's complaints are untimely and irrelevant to this case, and all correspondence relating to same should be excluded.

### D.  Social media accounts.

The NRA's Exhibit List also telegraphs its intent to introduce a series of letters between counsel as evidence that AMc improperly withheld login credentials to the NRATV social media accounts. Like the PIP Dashboard, however, the NRA never took any action beyond another exhaustive letter-writing campaign.

Similar to the PIP Dashboard dispute, AMc stood willing to deliver the social media account login credentials upon agreement that the underlying data would be produced to all parties by the same independent, third-party the NRA selected for the PIP Dashboard to ensure all parties were on equal footing.[26] AMc has already experienced the NRA locking it out of accounts (another NRATV social media account), relying on data AMc does not have available to it (FRA audit

---

[24] *Id.* at NRA Trial Ex. No. 856, 861, 871, 873, 874, 875, 884, 887.
[25] *Id.* at NRA Trial Ex. No. 875.
[26] *Id.* at NRA Trial Ex. No. 827.

reports), and destroying potential evidence (now-President Carolyn Meadows' "shredding and burning" her notes at the instruction of counsel).  Despite that offer, and even though the NRA requested the login credentials to the social media account credentials after NRATV shut down around 2019, the NRA did no more than complain via letters to AMc counsel, beginning in August 2021.  Once again, this discovery dispute was not resolved between the parties, and the NRA chose not to seek relief with the Court.

In sum, the NRA failed to exhaust its available remedies and is now seeking relief from the jury on a matter squarely within the jurisdiction of the court.  These discovery disputes are not relevant, and admitting same would inevitably result in a trial within the trial involving testimony from party counsel on a discovery dispute.  Thus, all evidence relating to pre-trial discovery disputes should be excluded.

| **MIL No. 11** | NRA:  AGREE_____DISAGREE _____X_____ |
| | RULING OF THE COURT: |
| | GRANTED _____     DENIED _____     MODIFIED _____ |

### 12.    Evidence related to Tammy Payne.

AMc anticipates the NRA will seek to introduce evidence of (1) Angus McQueen's long-time companionship with a former AMc employee, Tammy Payne, and (2) evidence that Ms. Payne sued Revan McQueen following Angus McQueen's passing.  For starters, the allegations in that suit involved assault, which have no relation to the claims and defenses in this case.  Nothing about the litigation against Revan McQueen (a non-party to this case), or the companionship have any ability to make a consequential fact in this case more or less true.  In fact, the Honorable Judge Toliver previously ordered that information related to Ms. Payne's dispute need not be turned over

to the NRA following its service of a third-party subpoena upon Ms. Payne.[27]  Judge Toliver questioned the relevance of this discovery and quashed the subpoena to the extent it sought to discover "[a]ny claim, complaint, allegation about AMc, its employees, executives or clients, any action/proceeding involving a claim that Ms. Payne has against AMc."[28]

To the extent this Court considers the evidence relevant, it is still inadmissible under Rule 403.  Evidence of any companionship and unrelated litigation have scant, if any, probative value; however, introducing such evidence would needlessly prolong the trial, confuse and/or mislead the jury as to unrelated issues in litigation and baseless rumors, and generally constitute a waste of this Court's time.  As such, the danger and uselessness of this evidence far outstrip any sliver of its probative value, and accordingly it should be found inadmissible.

| **MIL No. 12** | NRA:  AGREE_____DISAGREE _____X_____ |
| --- | --- |
| | RULING OF THE COURT: |
| | GRANTED _____    DENIED _____    MODIFIED _____ |

### 13.    Evidence of AMc's relationships with clients other than the NRA.

The NRA has made clear that it intends to offer evidence of AMc's contractual relationships with former clients.  Not only is this a brazen attempt to impugn AMc with improper character evidence, but any current or former client relationship AMc has or had arising under a separate contract than the Services Agreement is irrelevant to the claims and defenses in this case. AMc's contractual relationships (including any disputes, terminations, disagreements, etc. arising therefrom) with other clients have nothing to do with the dispute between AMc and the NRA.

---

[27] ECF 453, at Ex. B., Motion Hr'g Tr. dated Dec. 15, 2021.
[28] ECF 453, at Ex. B., Motion Hr'g Tr. dated Dec. 15, 2021, at 82:16-83:3 (APP 87-88).

Specifically, the NRA seeks to offer evidence and deposition testimony from Anthony J. Ferate ("***Ferate***"), a disgruntled, former officer at American Clean Skies Foundation, a past AMc client. The NRA took Ferate's deposition after Ferate read a news article about the NRA's baseless invoicing complaints against AMc and emerged from obscurity to offer the NRA assistance in this litigation.[29] Notably, Ferate testified individually, not as a representative for American Clean Skies Foundation. Nonetheless, Ferate eagerly opined that while working at American Clean Skies Foundation, ***over a decade ago***, he was unsatisfied with AMc's invoicing procedures.[30] Despite Ferate's outdated, personal grumblings, American Clean Skies Foundation inevitably paid AMc's invoices.[31] And, further underscoring the irrelevance of his testimony, Ferate admitted he had not read the Services Agreement between AMc and the NRA and had no understanding of their contractual relationship or obligations.[32]

This evidence should be excluded for numerous reasons. First, it has no relevance to this case. Ferate worked for American Clean Skies Foundation between 2007 and 2009. Judge Toliver has already limited the date ranges of certain NRA third-party subpoenas served upon current and former AMc clients to documents and information as of mid-January of 2014.[33] Also, Ferate testified individually, not as a corporate representative of American Clean Skies Foundation, so his personal views are irrelevant. He also has no personal knowledge of the events underlying this case; he only knows what he read in various news articles. In addition, American Clean Skies Foundation has nothing to do with the NRA. Thus, Ferate's testimony on events over a decade

---

[29] ECF 551, NRA Trial Ex. 614, Anthony J. Ferate Depo., dated July 8, 2019, at 26:23-28:9; 29:17-30:2.
[30] *Id.* at 10:1-4; 125:3-9.
[31] *Id.* at 125:18-25.
[32] *Id.* at 150:6-151:2.
[33] *See* ECF 10, Judge Toliver Order, dated August 6, 2020, *in Ackerman McQueen, Inc. v. Nat'l Rifle Ass'n of Am.* No. 3:20-MC-22-G-BK (2020); ECF 12 Judge Toliver Order, dated October 20, 2020, *in Ackerman McQueen, Inc. v. Nat'l Rifle Ass'n of Am.* No. 3:20-MC-21-G-BK (2020).

ago are not relevant to informing any issue in this case, of which Ferate acknowledged he knows nothing about.

Second, given the total irrelevance of this evidence, it appears obvious the NRA seeks to offer Ferate's testimony as improper character evidence and to suggest that if a former client claimed to have similar billing issues as the NRA claims it has had with AMc, then the NRA's complaints against AMc must have some veracity. This type of inference is expressly barred by the Rules. FED. R. EVID. 404(a)(1).

Finally, even putting aside Ferate's testimony, Woody Phillips, the NRA's former CFO and Treasurer, testified he never had concerns with AMc's billing and invoice detail:

> Q: Was it your understanding, Mr. Phillips, that if the NRA paid an Ackerman invoice, that the NRA was comfortable with the amount of detail and backup provided by Ackerman McQueen to support that invoice?
> . . .
> A: Yes.[34]

Further, some of the NRA's experts sporadically cite what they contend are complaints from other AMc clients. Again, setting aside that this is inadmissible hearsay, it is not relevant to the claims and defenses in this case. Thus, the NRA's attempt to admit irrelevant, improper character evidence not only is admissible on those bases but is also just flatly contradicted by the record in this case. Accordingly, the dangers of confusion and misleading the jury far outweigh any probative value such evidence has, an thus it should bar excluded. *See* FED. R. EVID. 403.

In summary, AMc requests that all evidence of AMc's contractual relationships with current or former clients, including the specific testimony of Ferate, be excluded from trial.

| **MIL No. 13** | NRA:  AGREE_____DISAGREE _____X_____ |
| --- | --- |
| | RULING OF THE COURT: |

---

[34] ECF 419-1, Wilson H. Phillips Depo, dated Aug. 30, 2021, at 137:17-22 (APP 1976).

| | GRANTED _____     DENIED _____     MODIFIED _____ |
|---|---|

**14.     Dan Boren email/double billing.**

For years, the NRA has parroted a false narrative that AMc engaged in double billing its clients.  In support of this claim, the NRA has repeatedly relied on an email sent by Dan Boren ("***Boren***"), a past NRA board member and then-executive at the Chickasaw Nation (another AMc client), to Bill Lance, also a Chickasaw Nation member, as proof of this double billing scheme.  This allegation has appeared in the NRA's Second Amended Complaint,[35] as well as its other pleadings and the media.  However, as elicited in Boren's deposition, the NRA completely and intentionally misreads the evidentiary import of Boren's email.  Boren, as an NRA board member, received an email from the NRA attaching the NRA's complaint against AMc in the Virginia Action and referencing a Wall Street Journal article reporting the news of the complaint.  Boren forwarded this email to Lance and wrote: "***I reread this again***.  I bet Ackerman is in trouble on this one. They can't produce the backup to the invoices and were allocating full salary to these employees that may have been working on our accounts."  Contrary to the NRA's spin on this email, Boren testified in his deposition that he lacked personal knowledge of whether AMc in fact double-billed employees to the NRA and that all he meant by forwarding the email was to comment on what Boren had read in the Wall Street Journal.[36]  In other words, Boren merely relayed the substance of a story in the Wall Street Journal summarizing the ***NRA's own pleadings*** against AMc to Lance; he had no personal knowledge of it.  Of course, the NRA obscures this fact by deleting the forwarded content of the Wall Street Journal article from its Trial Exhibit 469.  The

---

[35] ECF 201-1, NRA Second Amended Complaint, at ¶ 88.
[36] ECF 551, NRA Trial Ex. No. 707, at Daniel Boren Depo., dated Nov. 3, 2020, at 160:5-161:16.

full document exposes the truth, the irrelevance of the exhibit to the claims and defenses in this lawsuit, and the NRA and its counsel's misleading intent.

Rule 403 bars introduction of this evidence. Were the NRA to introduce Boren's email as evidence to support its contrived double-billing theory, the jury may become needlessly confused and misled as to what Boren's email truly means. Thus, the evidence has no probative value to support the NRA's double-billing allegation, yet the risks of unfair prejudice to AMc and of misleading and/or confusing the jury are substantial. Allowing this evidence would also waste time, as AMc would then be forced to counter the NRA's misleading presentation by walking the jury through Boren's deposition testimony to clarify his intention in sending this email to Lance. Accordingly, the NRA ought to be precluded from proffering this email at trial to support its imagined double-billing allegation.

| | |
|---|---|
| **MIL No. 14** | NRA:  AGREE_____DISAGREE _____X_____ <br><br> RULING OF THE COURT: <br><br> GRANTED _____   DENIED _____   MODIFIED _____ |

### 15.    Impermissible opinions of purported expert Andrew McLean.

One of the many experts the NRA retained is Andrew McLean ("***McLean***"). While AMc understands the Court denied its prior motion to exclude the opinions of McLean, there are certain issues AMc believes are still appropriate limine points.

*First*, McLean's opinions regarding "excessive spending" for NRATV and the NRA's reputational harm should be excluded because they are untimely. McLean first opined on these topics in his Supplemental Report, which was served more than four months after expert reports were due and only days before the close of the discovery period. Initial expert disclosures must be "full and complete," and supplemental disclosures "are not intended to provide an extension of

the deadline by which a party must deliver the lion's share of its expert information." FED. R. CIV. P. 26; *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co*., 73 F.3d 546, 571 (5th Cir. 1996).

*Second*, McLean's opinions regarding the existence of a fiduciary duty should be excluded because they invade the province of the jury. The existence of a fiduciary duty is a question of law, and expert witnesses may not render conclusions of law. *Corinth Investor*, 2014 WL 7146040, at *2–3, *4. Here, McLean seeks to opine as to both the legal standard for a fiduciary relationship and whether the legal standard has been satisfied, both of which are impermissible under well settled Fifth Circuit law. Thus, McLean's testimony regarding the existence of a fiduciary relationship or a party's breach of same must be excluded.

*Third*, the Court should exclude McLean's opinions regarding "excessive spending" for NRATV because he is not qualified to opine on the topic. He is not an attorney. Prior to this case, McLean has only provided expert testimony in three other cases. One of those cases involved analyzing issues relating to the area of television buying, costs, billing procedures and invoice reconciliation. McLean did not provide any opinions with respect to damages, but what he believed to be industry customs. McLean has also never served as an expert witness on any of the subject matters upon which he seeks to testify here. McLean's Supplemental Report fails to explain how or why his experience as an advertising/marketing consultant and former executive allow him to reach his conclusions regarding damages, and he has not shown that his opinions are supported by reliable sources or sources that are accepted within any particular industry. He has not explained how a method of charging for video advertisements based on the number of views or interactions an advertisement receives equates to the amount NRA should have paid for NRATV. Nor has he connected his experience to the conclusions offered, explained why his experience is a sufficient basis for the opinion, or demonstrated the appropriateness of the application of his experience to

the facts.  In other words, he does not explain how his experience as an advertising and marketing consultant renders him qualified to testify about the appropriate costs for creating and running an online streaming video network from the ground up.

*Finally*, McLean's opinions regarding the NRA's "negative publicity" and the NRA's purported $23 million in reputational damages regarding same should be excluded because his opinions are premised on the work of third-parties with unknown expertise and an inability to test their methodology and reliability.  More importantly, McLean actually destroyed the analyses of those third-parties, making it inherently unreliable.  Thus, the methodology used and McLean's acceptance of same are inherently unreliable.  *See Jacked Up, L.L.C. v. Sara Lee Corp.*, 807 Fed. Appx. 344, 349 (5th Cir. 2020).

| | |
|---|---|
| **MIL No. 15** | NRA:  AGREE_____DISAGREE _____X_____<br><br>RULING OF THE COURT:<br><br>GRANTED _____    DENIED _____    MODIFIED _____ |

### 16.    Impermissible opinions of purported expert Andrew Hochman.

One of the many experts the NRA retained is Andrew Hochman ("***Hochman***").  While AMc understands the Court denied its prior motion to exclude the opinions of Hochman, there are certain issues AMc believes are still appropriate limine points.

*First*, the Court should exclude Hochman's proposed testimony about AMc's business practices and ethics because it is not helpful under the test set forth above, and instead attempts to usurp the roles of the Court and the jury. *Crow v. Unit. Ben Life Ins. Co*., No. 3:00-cv-1375-G, 2001 U.S. Dist. LEXIS 2993, at *8-9 (N.D. Tex. Mar. 16, 2001).  In essence, Hochman's proffered opinion (1) defines the duty owed by an advertising agency and then (2) applies the facts of the case to the law as he defines it.  Hochman's opinion therefore invades both the province of the

Court and the jury. *Id.*  Experts cannot assert what law governs an issue or what the applicable law means because that is a function of the Court. *Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997); *see also Goodman v. Harris County*, 571 F.3d 388, 399 (5th Cir. 2009) ("[A]n expert may never render conclusions of law."); *Estate of Sowell v. United States*, 198 F.3d 169, 171–72 (5th Cir. 1999); *Snap-Drape, Inc. v. Comm'r*, 98 F.3d 194, 198 (5th Cir. 1996).

*Second*, the Court should also exclude portions of Hochman's proposed testimony in which he wades into the prohibited area of speculating about the thought processes and mental states of NRA and AMc personnel.  "[A]n expert's credentials do not place him in a better position than the jury to draw conclusions about a defendant's state of mind." *Marlin v. Moody Nat'l Bank, N.A.*, 248 F. App'x 534, 541 (5th Cir. 2007). Thus, an expert is barred from opining about an individual's state of mind. *Id.*; *see also Charalambopoulos v. Grammer*, No. 3:14-cv-2424-D, 2017 U.S. Dist. LEXIS 33488, at *12 (N.D. Tex. Mar. 8, 2017) (excluding expert's opinions regarding a no bill and what grand jurors "must have" concluded about party's credibility).  Thus, Hochman should not be permitted to opine on what the NRA understood, or in his words, what the NRA did not understand, with respect to the value generated by each specific component of the NRATV marketing program or alleged waste to be identified and eliminated from the programming.

*Third*, the Court should also exclude Hochman's proposed testimony in his Supplemental Report regarding AMc's disclosure of the Dashboard in discovery in this case, his inability to access social media accounts related to NRATV, and the transfer to the NRA of certain high-definition video files, the Dashboard, and access to the NRA's social media accounts.  The proposed testimony was not disclosed in a timely manner.  Hochman does not indicate in his Supplemental Report how his experience in Internet marketing, e-commerce, website development, digital forensics, search engine optimization, pay-per-click mobile, and digital

advertising qualifies him to offer expert testimony on these subject matters.  And his opinions about the Dashboard are neither helpful nor relevant, as they will not assist the jury in determining an issue or in understanding other evidence.

*Finally*, the Court should exclude Hochman's proposed testimony regarding damages. There was no mention of his $40 million damage model in his original Report.  AMc was not able to question Hochman about this damage model in his deposition.  To the contrary, he stated during his deposition that he did not intend to opine about the value of NRA, the value of the services AMc provided to NRA, or otherwise quantify any alleged harm to the NRA, as that was "outside the realm of what [he] was asked to do."

| **MIL No. 16** | NRA:  AGREE_____DISAGREE _____X_____ |
| --- | --- |
| | RULING OF THE COURT: |
| | GRANTED _____     DENIED _____     MODIFIED _____ |

### 17.   Impermissible opinions of purported expert Gary Goolsby.

One of the many experts the NRA retained is Gary Goolsby ("***Goolsby***").  While AMc understands the Court denied its prior motion to exclude the opinions of Goolsby, there are certain issues AMc believes are still appropriate limine points.

*First*, the Court should exclude Goolsy's opinions because they are unreliable.  Goolsby fails to consider fundamental and undisputed facts relating to the parties' nearly 40-year relationship. For example, Goolsby wants to opine that AMc should have to pay back tens of millions of dollars in work performed for the NRA from 2015 – 2019 because *he* didn't review what *he* believed to be sufficient documentation, but he did not even consider whether the work was actually performed by AMc.  Goolsby also purports to be an expert on internal controls, and

the foundation of each of his opinions is that AMc's failure to produce sufficient documentation reveals a lack of internal controls that is a breach of the Services Agreement.   When repeatedly questioned about the NRA's internal controls relating to the parties' relationship, Goolsby made clear that he was not retained or examining the NRA's internal controls.

*Second*, Goolsby contends that the industry standards for AMc's internal controls should be governed by the Committee of Sponsoring Organizations of the Treadway Commission ("***COSO***").   In short, Goolsby seeks to impose on this Court an improper legal standard that has no applicability to this case.   Goolsby admits in his deposition that the parties are free to contract and conduct business to any standard they deem appropriate, including by deviating from COSO, but he then ignores the fact that this is exactly what happened here.   The Services Agreement, which the Court can interpret for itself, dictates the parties' contractual obligations, and the undisputed evidence establishes that the parties had certain standards and customs that they agreed upon and did business based upon for years.   Yet, Goolsby ignores all of this and says that AMc's standards were not up to the COSO standard while again completely ignoring the NRA's internal standards despite the fact that he admitted the NRA would have been subject to those same standards.

*Third*, Goolsby seeks to offer testimony regarding a "range of damages" that AMc should repay to the NRA based upon insufficient documentation.   The damages opinions in his Supplemental Report are untimely.   There is nothing "supplemental" about them.   Supplemental "disclosures are not intended to provide an extension of the deadline by which a party must deliver the lion's share of its expert information." *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co*., 73 F.3d 546, 571 (5th Cir. 1996). Initial expert disclosures must be "full and complete." FED. R. CIV. P. 26.  Goolsby's damages opinions are also unreliable because he simply rubber-stamped a

number chart prepared by an unidentified party at the NRA that was prepared in anticipation of litigation against AMc and provided to him by the NRA's counsel.  Goolsby arrives at this "damages range" by engaging in some initial document review of billings sent by AMc to NRA, determining, in his view, the invoices and supporting documentation he looked at do not conform to the requirements of the Services Agreement.  On that limited basis, Goolsby concludes what he found in the review of some documents "calls into question" the amounts paid by the NRA and whether the NRA should have paid.  Then, he concludes, without having reviewed the other "thousands" of invoices and supporting documentation, that all charges and billings by AMc to NRA lacked proper documentation.

*Finally*, Goolsby seeks to interpret the Services Agreement for the trier of fact and then opine as to its legal significance.  It is well settled law that "expert testimony on issues of contractual interpretation is inappropriate and that such issues are reserved for the judge and jury." *Salomon v. Kroenke Sports & Entm't*, No. 3:15-cv-0666-M, 2019 U.S. Dist. LEXIS 233603, at *18 (N.D. Tex. 2019) (quoting *Implicit Oil & Gas, L.P. v. GoMex Energy Offshore, Ltd.*, 3:10-CV-827-P, 2012 WL 13094057, at *3 (N.D. Tex. Jan. 9, 2012).  However, when the meaning of a contract depends on a "trade practice," expert testimony may be admissible "only if the contract language is ambiguous or involves a specialized term of art, science or trade." *Salomon*, No. 3:15-cv-0666-M, 2019 U.S. Dist. LEXIS 233603 at *17. Moreover, "[h]ow various provisions are interpreted in light of other provisions to give meaning to the whole is contract interpretation and invades the province of the Court." *Apache Corp. v. W&T Offshore*, H-15-0063, 2016 U.S. Dist. LEXIS 203048, at *6 (S.D. Tex. 2016) (citing *Greenwood 950, L.L.C. v. Chesapeake Louisiana, L.P.*, 683 F.3d 666, 669 (5th Cir. 2012).

| | |
|---|---|
| **MIL No. 17** | NRA:  AGREE_____DISAGREE _____X_____ <br><br> RULING OF THE COURT: <br><br> GRANTED _____      DENIED _____      MODIFIED _____ |

18.    **New York Times article discussing the "Comscore Report."**

Exhibit 604 on the NRA's Exhibit List is a June 25, 2019 New York Times article by Danny Hakim that briefly discusses viewership metrics for NRATV.  In salient part, the article reads:

> N.R.A. officials had grown leery of the cost of creating so much live content for NRATV, which was started in 2016, and wondered whether the return on its investment was worth the effort. The site's web traffic was minuscule, with 49,000 unique visitors in January, according to a report provided by Comscore.

The Federal Rules of Evidence preclude the NRA from introducing this article discussing low NRATV viewership metrics into evidence for numerous reasons.  First, newspaper articles are routinely found to be inadmissible hearsay.  *See, e.g.*, *Barkley v. Dillard Dep't Stores Inc.*, 277 Fed. App'x 406, 412 (5th Cir. 2008) ("We first note that newspaper articles are hearsay and inadmissible"); *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005) ("The plaintiffs provide only newspaper articles—classic, inadmissible hearsay.").  Thus, Rules 801 and 802 bar the NRA from introducing the article as proof of low NRATV viewership figures.  Second, the best evidence rule prohibits offering the New York Times article as proof of the contents of the Comscore Report cited within the article.  FED. R. EVID. 1002.  And third, while low viewership metrics may provide some probative value for the NRA's fraud claim, Rule 403 prohibits use of this article because it focuses on viewership data for only one single month while NRATV existed for longer than two years.  Were the NRA to extrapolate this single month figure in hopes of

demonstrating a pervasive fraud scheme by AMc, then AMc would be deleteriously prejudiced by this grossly expanded use of the evidence.

| **MIL No. 18** | NRA:  AGREE_____DISAGREE _____X_____ |
| --- | --- |
| | RULING OF THE COURT: |
| | GRANTED _____   DENIED _____   MODIFIED _____ |

### 19.    Gangster Capitalism podcast.

To the extent the NRA seeks to offer excerpts from a podcast entitled Gangster Capitalism,[37] Rule 901 bars admission of such evidence.  To properly authenticate a piece of evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  FED. R. EVID. 901(a).  Indeed, the Rule further specifies what form of evidence is necessary to authenticate voices, and it requires a witness's opinion testimony identifying the speaker's "voice—whether heard firsthand or through mechanical or electronic transmission or recording—based on hearing the voice at any time under circumstances that connect it with the alleged speaker."  FED. R. EVID. 901(b)(5).  The podcast includes oral statements by an unidentified person, claiming to have worked for AMc, who discusses hidden expenses.[38]  The speaker never identifies himself by name,[39] and nowhere has the NRA suggested it has witness testimony identifying who the speaker is based on having heard the voice before.  Inasmuch as the NRA has failed to identify this speaker, such statements are also inadmissible hearsay if offered for their truth.  FED. R. EVID. 801-802.

---

[37] *Down to the Studs (Season 2, Episode 8)*, GANGSTER CAPITALISM (May 6, 2020) (accessed via Apple Podcasts).
[38] *Id.*
[39] *Id.*

| **MIL No. 19** | NRA:  AGREE_____DISAGREE _____X_____<br><br>RULING OF THE COURT:<br><br>GRANTED _____    DENIED _____    MODIFIED _____ |
|---|---|

### 20.    Thomas the Tank Engine segment.

The NRA includes many news articles and media on its Exhibit List[40] discussing an NRATV segment showing images of Thomas the Tank Engine train cars adorning KKK white hoods.  The NRA ostensibly hopes to use these news articles critical of the NRA as evidence that AMc did not promote a positive image of the NRA in purported violation of the Services Agreement.  Yet, the NRA has not pled a claim for breach of the Services Agreement on this basis.[41]  Thus, the NRA's only conceivable use of these articles is to smear AMc before the jury in hopes of distracting from AMc's legitimate breach of contract claims.  The NRA undoubtedly has manufactured this narrative for the convenience of litigation.  Following the airing of this NRATV segment, the NRA continued to retain Loesch, the NRATV spokeswoman hosting the segment, as the NRA's official Spokesperson.  Beyond this surreptitious use, these exhibits are all inadmissible hearsay to the extent the NRA offers the truth of any matter asserted therein.

| **MIL No. 20** | NRA:  AGREE_____DISAGREE _____X_____<br><br>RULING OF THE COURT:<br><br>GRANTED _____    DENIED _____    MODIFIED _____ |
|---|---|

### 21.    DJ Investments.

---

[40] ECF 551, NRA Trial Ex. Nos. 324, 325, 331, 332, 333, 989, and 1093.
[41] ECF 201-1, NRA Second Amended Complaint, at ¶¶ 184-96.

Based on prior deposition questioning and the NRA's Exhibit List, AMc anticipates the NRA will seek to introduce arguments and/or innuendo regarding an entity called DJ Investments, LLC.  DJ Investments was owned by Bill Winkler, Brandon Winkler, Angus McQueen, Revan McQueen, and Jesse Greenberg.[42]  DJ Investments owned a rental house in Dallas, which, according to Brandon Winkler, was used for "[c]orporate housing and entertainment."[43]  AMc leased this rental house from DJ Investments, which fact was disclosed as a related party transaction on AMc's audited financial statement in 2017.[44]  During Brandon Winkler's deposition, NRA counsel repeatedly sought to imply AMc had committed some wrongdoing with respect to AMc's use of this rental property by posing questions as to how AMc treated lease payments to DJ Investments on its or its principals' tax returns.[45]

Evidence of DJ Investments or AMc's ownership, use, or leasing of this Dallas rental property or any tax-related disclosures pertaining to it are wholly irrelevant to the claims and defenses in this case.  FED. R. EVID. 401, 402.  Apparently, the NRA hopes to deflect attention from AMc's claims against the NRA, which stem from well-chronicled financial self-dealing within the NRA, by suggesting AMc somehow has similar problems.  Even were evidence of any ownership, use, leasing, or tax-related disclosures of this rental property relevant, its use would be of so little value compared to the unduly prejudicial effect it might have.  Thus, AMc requests, under Rules 401-403, that any evidence relating to the ownership, use, leasing, or tax-related disclosure, including by reference to any financial statement, be excluded from this trial.

| **MIL No. 21** | NRA:  AGREE_____DISAGREE _____X_____ |
| --- | --- |
|  | RULING OF THE COURT: |

---

[42] ECF 551, NRA Trial Ex. No. 759, Brandon Winkler Depo, dated July 30, 2021, at 321:2-5.
[43] *Id.* at 321:10.
[44] ECF 551, NRA Trial Ex. No. 149, 2017 AMc Audited Financial Statement, at 9.
[45] ECF 551, NRA Trial Ex. No. 759, Brandon Winkler Depo., dated July 30, 2021, at 326:4-328:12.

| | GRANTED _____   DENIED _____   MODIFIED _____ |
|---|---|

### 22.    Woody Phillips' invocation of his Fifth Amendment rights.

In March 2021, during the NRA's bad-faith bankruptcy trial, the New York Attorney General ("**NYAG**") and AMc deposed the NRA's former CFO and Treasurer, Woody Phillips, who invoked his rights under the Fifth Amendment to refuse to answer certain questions.[46]  Since then, Mr. Phillips has testified in three separate depositions regarding the same issues to which he previously invoked the Fifth Amendment.  Specifically, AMc understands that Mr. Phillips was again deposed by the NYAG in the Fall 2021, and did not assert the Fifth Amendment at any point.  The NRA and AMc also deposed Mr. Phillips in the above captioned proceeding in August 2021 and October 2021.[47]  During these subsequent depositions, Mr. Phillips was asked—and responded to—many of the same questions to which he previously invoked his Fifth Amendment rights.  More importantly, Mr. Phillips did not invoke his Fifth Amendment rights at any point in time when questioned by AMc and the NRA.

Permitting the NRA to comment on Mr. Phillips' prior invocation of his Fifth Amendment rights when he has now waived those rights and repeatedly testified under oath regarding the same subject matters would be unfairly prejudicial and far outweigh the impeachment value of such comments.  *Orchestrate HR, Inc. v. Trombetta*, No. 3:13-CV-2110-KS, 2017 U.S. Dist. LEXIS 7984, at *18-19 (N.D. Tex. Jan. 20, 2017) (granting motion in limine under Rule 403 to prohibit

---

[46] AMc lists a fraction of these examples here. *See, e.g.*, ECF 551, NRA Trial Ex. No. 718, at 21:25-22:1; 22:6-8; 22:17-19; 24:21-23; 27:24-28:1; 28:11-13; 28:22-24; 29:5-7; 29:15-17; 30:3-5; 30:20-22; 33:20-22; 34:1-3; 34:9-11; 34:14-16; 35:1-3; 35:7-9; 35:12-14; 36:2-4; 36:10-12.
[47] ECF 551, NRA Trial Ex. Nos. 802 (Woody Phillips Depo., dated Aug. 30, 2021), 890 (Woody Phillips Depo., dated Oct. 21, 2021).

comments made regarding a defendant's invocation of his Fifth Amendment rights).  Accordingly, AMc requests such comments be prohibited for all purposes pursuant to Rule 403.

| **MIL No. 22** | NRA:  AGREE_____DISAGREE _____X_____ |
| --- | --- |
| | RULING OF THE COURT: |
| | GRANTED _____       DENIED _____       MODIFIED _____ |

### III. CONCLUSION

For the aforementioned reasons, AMc requests the Court grant this motion in limine in its entirety, enter an appropriate Order consistent with this *Motion in Limine*, and grant such other and further relief to which AMc may be justly entitled.

February 25, 2022.

Respectfully submitted,

/s/ Brian E. Mason
**Brian E. Mason, Esq.**
Texas Bar No. 24079906
mason.brian@dorsey.com
**G. Michael Gruber, Esq.**
Texas Bar No. 08555400
gruber.mike@dorsey.com
**Jay J. Madrid, Esq.**
Texas Bar No. 12802000
madrid.jay@dorsey.com
**J. Brian Vanderwoude, Esq.**
Texas Bar No. 24047558
vanderwoude.brian@dorsey.com
**DORSEY & WHITNEY LLP**
300 Crescent Court, Suite 400
Dallas, Texas 75201
(214) 981-9900 Phone
(214) 981-9901 Facsimile

**ATTORNEYS FOR DEFENDANT/COUNTER-PLAINTIFF ACKERMAN MCQUEEN, INC.**

## CERTIFICATE OF CONFERENCE

I hereby certify that counsel for AMc conferred with counsel for the NRA pursuant to the Court's Scheduling Order and Local Rule 7.1(a) regarding the relief sought in AMc's Motion. The NRA's agreement or disagreement with respect to each limine point above is reflected throughout this Motion.

/s/ Brian E. Mason
BRIAN E. MASON

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 25, 2022, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

*/s/ Brian E. Mason*
BRIAN E. MASON