IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § § § § § § § § § § § § § § § § § § § § | |
| *Plaintiff and Counter-Defendant*, | | |
| v. | | Case No. 3:19-cv-02074-G |
| ACKERMAN MCQUEEN, INC., | | |
| *Defendant and Counter-Plaintiff*, | | |
| and | | |
| MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, and MELANIE MONTGOMERY, | | |
| *Defendants*. | | |

## ACKERMAN MCQUEEN'S TRIAL BRIEF REGARDING REPUTATIONAL DAMAGES

TO THE HONORABLE A. JOE FISH:

Defendant/Counter-Plaintiff Ackerman McQueen, Inc. ("***AMc***"), Defendants Mercury Group, Inc. ("***Mercury***"), Henry Martin ("***Martin***"), William Winkler ("***Winkler***"), and Melanie Montgomery ("***Montgomery***") (collectively, "***AMc***") hereby file this *Trial Brief* (the "***Brief***"), and respectfully show as follows:

Among the claims and defenses at issue in this case, AMc posits that several of the parties' disputes can be disposed purely on the legal issues involved. Accordingly, AMc provides for the Court's benefit a brief summary and argument of the legal issues related to the NRA's claim for damages to its reputation arising out of purported negative media publicity. AMc hopes this brief will facilitate a speedier, more efficient trial.

I. BACKGROUND

The NRA's expert, Andrew McLean ("*McLean*"), issued a supplemental expert report ("*Supplemental McLean Report*") on October 18, 2021, concluding that the NRA has suffered over $23 million in reputational damages resulting from negative publicity.[1] This negative media publicity derives from an NRATV segment depicting Thomas the Tank Engine in a KKK hood, and McLean estimates the cost to offset this negative publicity is $23 million.[2] The NRA blames AMc for this damage, purportedly because such damage was caused by AMc's failure to promote a positive image of the NRA under the parties Services Agreement, which included work related to NRATV. AMc denies it is responsible for these damages. However, even assuming the veracity of the NRA's contention, none of the NRA's affirmative claims in this case permit recovery of the reputational damages identified in the Supplemental McLean Report. Therefore, as a matter of law, the NRA cannot recoup damages ostensibly resulting from negative media publicity. Additionally, the Supplemental McLean Report fails even to be admissible because it is untimely and unreliable.

II. ARGUMENTS AND AUTHORITIES

A. The NRA Cannot Recover Reputational Damages Under Any of Its Claims

1. Breach of Contract

The NRA cannot recover the reputational damages identified in the Supplemental McLean Report under its breach of contract claims for several reasons. Virginia law, which governs the Services Agreement, does not recognize reputation damages as a cognizable remedy for breach of contract claims. Even if the NRA somehow could recover reputational damages on its breach

---

[1] ECF 459, Andrew McLean Supplemental Expert Report, dated Oct. 18, 2021, at 17-22 (APP 386-91) [hereinafter Supplemental McLean Report].
[2] *Id.*

claims, the NRA did not plead nor request these types of damages in its Second Amended Complaint.

*First*, as the Virginia Supreme Court has stated, "[c]ourts have universally rejected claims for damages to reputation in breach of contract actions reasoning that such damages are too speculative and could not reasonably be presumed to have been contemplated by the parties when they formed the contract."[3] Indeed, damages to reputation sound in tort, and the Virginia Supreme Court noted that if such damages could be recovered under a breach of contract theory, then the plaintiff could "recover the same damages twice—once on a contract theory and once on a tort theory. We refuse to permit such a recovery."[4] Given this clear authority, the NRA cannot recover any harm to its reputation through its breach of contract claims.

*Second*, the NRA has not requested reputational damages identified in the Supplemental McLean Report as a remedy for either of its breach of contract claims. The NRA alleges that AMc breached the Services Agreement's Record Examination Clause and its Confidentiality provisions.[5] On the alleged record examination breach, the NRA asks for specific performance as a remedy needed to ensure the NRA can obtain records needed to defend its not-for-profit status.[6] Clearly, reputational damages arising from the Thomas the Tank segment on NRATV do not fall within the NRA's requested relief on its records-examination breach claim.[7]

---

[3] *Isle of Wight Cty. v. Nogiec*, 704 S.E.2d 83, 86 (Va. 2011); *see also Lifenet Health v. Lifecell Corp.*, No. 2:15cv461, 2016 U.S. Dist. LEXIS 199217, at *10 (E.D. Va. Aug. 30, 2016) ("In Virginia, damages to reputation are not redressable in breach of contract actions.")
[4] *Isle of Wight Cty*, 704 S.E.2d. at 87.
[5] *See* ECF 209, at ¶¶ 184-96.
[6] ECF 209, at ¶ 191-92, 200.
[7] Despite the absence in its pleadings, in the NRA's opposition to AMc's Motion for Summary Judgment, the NRA attempts to shoehorn reputational damages into its records examination breach claim: "This breach damaged the NRA, which expended significant professional fees attempting to coax compliance by AMc with its contract and incurred significant reputational damage when ambushed by the public, unauthorized disclosure of documents it had diligently sought to review for the better part of a year." ECF 440, at 18. This was nothing but a patently baseless attempt to preclude summary judgment by raising a red herring damage issue that was not present in the NRA's Second Amended Complaint. Yet, to the extent the NRA did assert reputational damages as part of its record examination claim, the reputation damages identified here flow from an "unauthorized disclosure of documents." *Id.* This type of reputational

As for the (false) allegation of breach of the confidentiality provisions, although the NRA seeks compensatory damages for harm to its reputation under this claim, whatever reputational harm the NRA identifies as potentially flowing therefrom is wholly different from that identified in the Supplemental McLean Report. The harm flowing from the claimed breach of the confidentiality provision involved (falsely) alleged "leaks" to reporters.[8] But the McLean Report concluded the NRA suffered about $23 million in reputational damages from "negative publicity" following six news stories criticizing the NRA for adorning Thomas the Tank Engine segment.[9] The NRA even confirms the McLean-identified reputational harm is discrete from that related to its (baseless) claim of breach of the confidentiality provisions, as the NRA's Opposition Brief discusses the McLean-identified reputational harm under a separate heading discussing "other material breaches" not pled in its Second Amended Complaint.[10] Thus, to whatever extent the NRA has even properly pled reputational damage arising out of its breach of the confidentiality provision, such harm is completely different from that identified in the Supplemental McLean Report.

    2. **Fraud and Breach of Fiduciary Duty**

The NRA cannot recover the reputation damages identified in the Supplemental McLean Report under its fraud or breach of fiduciary duty claims. Although reputational damages may be available in certain fraud and breach of fiduciary duty claims, this kind of reputational damage relates to a loss of *credit* reputation (*i.e.*, whether, as a result of the tort, the party suffered harm in obtaining credit or financing).[11] The Supplemental McLean Report has nothing whatsoever to do

---

damage is wholly separate from the reputational damages identified in the Supplemental McLean Report, which involved alleged reputational harm from an NRATV segment showing Thomas the Tank Engine in a KKK hood.
[8] ECF 209, at ¶ 194.
[9] ECF 459, Ex. 5, Supplemental McLean Report, at 17-18.
[10] *Compare* ECF 440, at § IV.C.2 (p. 18), *with* ECF 440, at § IV.C.3 (p. 19).
[11] *See, e.g.*, *Pacheco v. Rodriguez*, 600 S.W.3d 401, 409 (Tex. App.—El Paso, 2020, no pet.) (suggesting reputation damages may be available in other torts besides defamation and citing to a case awarding reputation damages on a

with a loss of credit reputation, and the NRA has not once complained of difficulty obtaining credit as a purported damage. Rather, the Supplemental McLean Report indicates the NRA has been damaged by negative publicity that would cost about $23 million to overcome. The NRA cannot shoehorn the reputational damages identified in the McLean Report as damages flowing from its fraud or breach of fiduciary duty claims.

### 3. Conversion

Neither can the NRA recover the $23 million identified in the Supplemental McLean Report as reputational damages arising out of its conversion claim. Texas federal courts state "the measure of damages for conversion is generally 'the value of the converted property on the date of conversion[,] plus prejudgment interest.'"[12] While this measure "also encompass[es] 'any other losses suffered as a natural and proximate cause of the conversion[,]'"[13] this amount must not exceed the plaintiff's "actual losses or injuries sustained."[14]

AMc contests whether the NRA has suffered any damages at all from its baseless conversion claims. But, even assuming the NRA did suffer losses, these damages would be utterly different from those identified in the Supplemental McLean Report. In its Second Amended Complaint, the NRA seeks damages on its conversion claim for "the full value of the stolen property . . ."[15] purportedly comprising the NRA's "confidential information."[16] As discussed above, however, a claim for damages arising out of disclosure of "confidential information" has

---

fraud claim involving a loss to the plaintiff's credit); *Country Title, L.L.C. v. Jaiyeoba*, No. 01-14-00391-CV, 2016 Tex. App. LEXIS 13, at *17 (Tex. App.—Houston [1st Dist.], Jan. 5, 2016, pet. denied) (reversing award of credit-reputation damages on a breach of fiduciary duty claim where legally insufficient evidence of such harm existed); *Lundy v. Masson*, 260 S.W.3d 482, 506 (Tex. App.—Houston [14th Dist.], 2008, pet. denied) (discussing the one-satisfaction rule with respect to plaintiff's claims for fraud and breach of fiduciary duty in which he claimed damage to credit reputation as a result of these torts).
[12] *Boston Pizza Rests., L.P. v. Bay Ltd.*, No. 3:12-CV-00426-O, 2013 U.S. Dist. LEXIS 207872, at *32 (N.D. Tex. June 28, 2013) (quoting *Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635, 651 (5th Cir. 1991)).
[13] *Id.* (quoting *50-Off Stores, Inc. v. Banques Paribas (Suisse), S.A.*, 180 F.3d 247, 254 (5th Cir. 1990)).
[14] *Id.* (citing *United Mobile Networks, L.P. v. Deaton*, 939 S.W.2d 146, 148 (Tex. 1997)).
[15] ECF 209, at ¶ 134.
[16] *Id.*

nothing to do with the NRA's (false) contention that AMc is responsible for the "so-called" reputational harm the NRA suffered from the NRATV segment involving Thomas the Tank Engine in a KKK hood. In other words, this type of damage (again, even assuming it exists), is surely not the "value of the converted property" nor the "natural and proximate" harm flowing from the alleged conversion. Thus, the NRA cannot recover the Supplemental McLean Report-identified reputational harm damages through its conversion claim.

### 4. Lanham Act: False Association and Trademark Infringement

The NRA cannot recover any of the reputational harm damages identified in the Supplemental McLean Report through either its false association claim or its trademark infringement claim. The kind of reputational damages recoverable under a false association claim must "flow[] directly from the deception wrought by defendant's [actions]."[17] Where there is no evidence of these damages, the claim fails as a matter of law.[18] Furthermore, while the Lanham Act permits recovery of "damages sustained by the plaintiff" on an infringement claim,[19] a plaintiff cannot recover such "in the absence of any evidence to support a finding of actual damages."[20]

Here, the reputational damages identified in the McLean Report have absolutely nothing to do with the NRA's dubious claim of damages arising under the Lanham Act. Although the NRA claimed damages of forfeiture, disgorgement, profits, and costs for its Lanham Act claims arising out of AMc's alleged improper display of the NRA's intellectual property on its website,[21] the NRA never substantiated any of its damages during the summary judgment briefing, writing instead that it should be allowed "to present evidence of its damages . . . at trial."[22] Thus, while

---

[17] *Zenimax Media Inc. v. Oculus VR, LLC*, No. 3:14-CV-1849-K, 2018 U.S. Dist. LEXIS 107420, at *9 (N.D. Tex. June 27, 2018) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014)).
[18] *See id.* at 10-15.
[19] 15 U.S.C. § 1117(a).
[20] *Camowraps, LLC v. Quantum Dig. Ventures, LLC*, 74 F. Supp. 3d 730, 742 (E.D. La. 2015).
[21] ECF 209, at ¶¶ 108, 125, 118, 125-26.
[22] ECF 440, at 48.

the NRA has never presented any damages flowing from its Lanham Act claims, even assuming it did have any damages, it cannot rely on its Lanham Act claims to recover the $23 million in claimed damages from the negative publicity allegedly generated by the NRATV segment depicting Thomas the Tank Engine in a KKK hood. This NRATV segment is unrelated to the NRA's allegation that AMc improperly displayed NRA intellectual property on AMc's website. Accordingly, as a matter of law, the NRA cannot recoup the reputational damages identified in the Supplemental McLean Report through its Lanham Act claims.

     **5.  Civil Conspiracy**

Finally, NRA cannot recover any of the reputational harm damages identified in the Supplemental McLean Report through its conspiracy claim. The Texas Supreme Court has recently clarified "that civil conspiracy is not an independent tort"; rather, it is a "derivative tort."[23] Accordingly, the availability of damages under the elements of civil conspiracy depend on the underlying tort.[24] Because none of the NRA's underlying tort claims permit recovery of the reputational damages identified in the Supplemental McLean Report, civil conspiracy does not allow recovery of these damages.

    **B.  The Supplemental McLean Report Is Legally Deficient**

In the Supplemental McLean Report, Mr. McLean states the following with respect to the NRA's claimed damages from the NRATV segment:

> I have calculated the reputational harm to the NRA, as a result of a series of NRATV publicity disasters that repeatedly generated negative media impressions. The financial damages to the NRA based upon my calculations is $23,264,593. Measurement of positive or negative media impressions were not captured by the proxy metrics used by AMc.[25]

---

[23] *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019).
[24] *Id.* ("Our conspiracy decisions both before and after *Massey* emphasize that the damages that matter come from the underlying wrongful act, not the conspiracy itself.").
[25] ECF 459, Ex. 5, Supplemental McLean Report, at 2-3 (APP 371-372).

In support of his opinion, McLean described an unusual and unreliable method he used to quantify the so called "negative publicity" damage. He alleged he searched the internet for "media mentions" of key "negative" words in "media" articles that commented on what he claims are six negative episodes of NRATV programming supervised by AMc between September 2018 and February 2019, which were allegedly harmful to the NRA.[26] According to McLean, he collected the "media mentions" by using "Boolean" logic searches for certain key words in media articles he found on the internet. Then, he evaluated or "tagged" each "media mention" about the NRA as positive, neutral, or negative.

After he added up the number of "negative" "media mentions," or "negative publicity," he says he multiplied that number by a monetary value he calls "Advertising Value Equivalence," or "AVE."[27] AVE is a purported "cost" of purchasing advertising in the media.[28] McLean contends the product of that calculation is a dollar sum, *i.e.*, over $23 million, in damages that he claims the NRA would have had to pay to place *positive* media that could counter-balance the so called "negative publicity."[29]

This opinion must be stricken for a numerous reasons. *First*, it is untimely.[30] McLean's opinion regarding this purported reputational harm was not disclosed until his Supplemental Report months after the deadline for expert reports and just days before his October 21, 2021 deposition. As McLean admitted during his deposition, there was nothing preventing him or the NRA from disclosing this opinion on June 1, 2021.[31] When asked why he did not provide this purported analysis and opinion in his original Report, his simple answer was that it was outside

---

[26] *Id*. at 18-19 (APP 387-388).
[27] *Id*. at 20 (APP 389).
[28] *Id*.
[29] *Id*. at 17-21 (APP 386-390).
[30] *Sierra Club v. Cedar Point Oil Co.* 73 F.3d 546, 571 (5th Cir. 1996).
[31] ECF 459, Ex. 6, McLean Depo., at 326:23-327:19 (APP 509).

the scope of the Report.[32]  All of the information relied upon in forming these reputational damage opinions was available to McLean and/or the NRA and its counsel well before June 1, 2021.  Accordingly, these untimely opinions ought to be excluded.[33]

*Second*, McLean relied upon third party sources, whose expertise is unknown, to provide critical information supporting his opinion, the reliability of which is unknown, and that was either not preserved or destroyed.  In his Supplemental Report, McLean represents that in order to make the above calculation, *he* collected by internet search and "categorized" 15,000 "media mentions as either "positive", "neutral", or "negative'."[34]  Of those 15,000 "media mentions," McLean states in his Supplemental Report, "*I identified* over 10,000 negative references to NRATV and its messaging content during this time period – highlighted across television, print, digital media, and social media."[35]  However, neither McLean nor his firm conducted the "negative media mention" analysis.

He admitted in his deposition testimony that the collection of "media" and the subjective evaluation of each "mention" as either "positive," "neutral," or "negative" was conducted by two other firms, a "social media listening" company called SentiOne[36] and a media monitoring service called News Exposure:[37]

> Q. [By Counsel for AMc] You said that you are -- on page 18 there is discussion of the methodology.  You say, "My analysis of media mentions total 15,000 over the period considered."  I guess how did you come up with – how did you analyze the number of media mentions over this particular time period?
>
> A. *That is the data that SentiOne and News Exposure report in their dashboard.*"[38]

---

[32] *Id.* at 326:23-327:6 (APP 509).
[33] *Sierra Club,* 73 F.3d at 571.
[34] ECF 459, Ex. 5, Supplemental McLean Report, at 18 (APP 387).
[35] *Id.* at 21 (APP 390) (emphasis added).
[36] *See* https://sentione.com.
[37] *See* https://www.newsexposure.com.
[38] ECF 459, Ex. 6, McLean Depo., at 303:2-12 (APP 503) (emphasis added).

Counsel for AMc then pressed for additional information:

> Q. So as part of this analysis were you – I guess you were given access by SentiOne and – drawing a blank – and News Exposure, you were given access to their dashboards for purposes of your analysis?
>
> A. Correct.
>
> Q. Did you capture any of the material that you were given access to?
>
> A. *We did not. We took the data and ascribed into the spreadsheets.*[39]

McLean admitted unequivocally that the evaluation of the "media mentions" was not his work, but that of SentiOne:

> Q. Okay. Down in Section 3 you say, "I used AI supported sentiment analysis tools to automatically evaluate the words preceding and following these identified keywords." What AI supported sentiment analysis tools did you utilize?
>
> A. *That is the SentiOne analysis.*[40]

In short, McLean did not even analyze the "negative publicity." His carefully worded Supplemental Report said he "worked with" SentiOne and News Exposure, but all he did was scoop up the number of what SentiOne and News Exposure allegedly ascribed as "negative" media statements, plugged that number into a simple multiplication calculation, and served up a $23 million damage calculation.[41]

An expert may rely upon other experts' opinions to form his own opinion, but only if the underlying data or opinion is reliable.[42] Here, however, the value judgments and methods of

---

[39] *Id.* at 303:13-22 (APP 503) (emphasis added).
[40] *Id.* at 310:20-311:3 (APP 505) (emphasis added).
[41] *Id.* at 303-304 (APP 503).
[42] *See Jacked Up, L.L.C. v. Sara Lee Corp.*, 807 Fed. Appx. 344, 349 (5th Cir. 2020) (testimony from a lost-profits expert who based his analysis on someone else's sales projections was inadmissible since "the expert failed to demonstrate any basis for concluding that another individual's opinion on a subjective financial prediction was reliable, other than the fact that it was the opinion of someone he believed to be an expert who had a financial interest in making an accurate prediction.") (citing *TK-7 Corp. v. Estate of Barbouti,* 993 F.2d 722, 732 (10th Cir. 1993)).

unknown personnel who decided "media mentions" were negative is not shown in any way to be reliable. In fact, the Supplemental McLean Report says nothing about the methodologies SentiOne and News Exposure employed. And McLean apparently did nothing to independently verify the data he obtained from SentiOne and News Exposure. The conclusions of those service providers are nothing more than McLean's *ipse dixit*.[43]

Further undermining McLean's opinion as to "negative publicity" is that he cannot produce any documentation that shows anything about SentiOne's and News Exposure's analyses. After taking McLean's deposition, AMc demanded copies of all information that had been provided to McLean in connection with his opinions, including the notes, call logs, list of search terms, and SentiOne and News Exposure dashboard information he testified about in his deposition.[44] To date, none of that information has been turned over. Why? Despite the clear requirements of the discovery rules regarding experts,[45] McLean admitted he did not retain copies of the data he purportedly obtained from the SentiOne and News Exposure "dashboards."[46] Even more incredible, although McLean did take notes of data shown on these "dashboards,"[47] he admitted that he destroyed those notes:

> Q. Do you have copies of those numbers on the piece of paper?
>
> A. *I have since destroyed them.*[48]

---

[43] *See Paz v. Brush Engineered Materials Inc.*, 555 F.3d 383, 388 (5th Cir. 2009); *Conn v. C.R. Bard, Inc.*, No. 4:14-CV-298, 2021 U.S. Dist. LEXIS 107523, at *22 (S.D. Tex. Jun. 8, 2021) ("The Court also reiterates that Dr. Allen may not parrot opinions of other experts. This is especially true if he is parroting impermissible hearsay evidence or opinion evidence that has been excluded.").
[44] ECF 464, Ex. 12 (APP 714).
[45] FED. R. CIV. P. 26 (a)(2)(B)(ii).
[46] ECF 459, Ex. 6, McLean Depo., at 346:21 – 347:5 (APP 514).
[47] *Id.* at 347:6-19 (APP 514).
[48] *Id.*

There is no way for AMc to scrutinize the data, methods, or reliability of the analysis performed by SentiOne and News Exposure or for the Court to properly perform its job as "gatekeeper."[49]

*Finally*, McLean's purported $23 million reputational damage opinion is irrelevant. The NRA has not asserted a claim that allows for the recovery of reputational damages based upon the analysis purportedly conducted by McLean.[50] Expert testimony that does not assist the fact finder must be excluded.[51] Moreover, in his Supplemental Report, McLean said he was opining as to the "reputational harm" caused by the "negative publicity."[52] However, in his deposition testimony, he admitted the "negative publicity" evaluation he offered up *is not* a measure of the "reputational harm:"

> The -- to offset the value of $23 million of negative publicity you would have to spend $23 million in positive publicity. The reputational harm is like brand value. There are many studies, brand asset valuation, BAV is one of the most known, there is another study, brand FX, but there are a number of studies that are undertaken for corporate reputation. Without doing a pre and post study the exact measure would be impossible to predict.[53]

McLean admitted that one would have to perform a "before and after" evaluation of the NRA's reputation in order to calculate so-called reputational harm, but he did not conduct any such "before and after" evaluation.[54] The whole "negative publicity" exercise that was "ghost

---

[49] *See* FED. R. CIV. P. 26 (a)(2)(B); *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (The district judge is the gate keeper to ensure testimony is both reliable and relevant.); *O'Donnell v. Harris County*, 251 F. Supp. 3d 1052, 1121 (S.D. Tex. 2017) (excluding expert opinion when underlying data was not properly turned over); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("At no stage in this litigation, Biestek says, has he ever espoused 'a free-standing procedural rule under which a vocational expert would always have to produce [her underlying data] upon request.' *That kind of rule exists in federal court: There, an expert witness must produce all data she has considered in reaching her conclusions*.") (internal citations omitted).
[50] *See* ECF 209 at 53.
[51] FED. R. EVID. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) ("Expert testimony which does not relate to any issue in the case is not relevant . . .") (citations omitted).
[52] ECF 459, Ex. 5, Supplemental McLean Report, at 17 (APP 386).
[53] ECF 459, Ex. 6, McLean Depo., at 22:12-23 (APP 433).
[54] *Id*. at 23:7-9 (APP 433). ("Q. Have you done any sort of before and after analysis of the NRA's brand value? A. I have not.").

written" for McLean is irrelevant because, as he admitted, "reputational damage" is "impossible to predict" without "before and after" evaluation.[55]

Touching on the subject again later in the deposition, Mclean offered yet another reason why his report could not measure diminution of the NRA's brand value:

> Q. Are you able to put a dollar amount on the diminution in value of the NRA's brand as a result of these six segments that you have identified?
>
> A. Without understanding the underlying business and revenue and brand metrics *it would be impossible to do so*.[56]

In sum, McLean's $23 million reputational damage opinions were not timely disclosed, wholly unreliable, and do not in any way assist the fact finder relating to the issues in this case.

### III.   CONCLUSION

For the aforementioned reasons, the NRA's claim for reputational damages is disposable as a matter of law. Accordingly, AMc hopes this trial brief may assist the Court in understanding the legal issues and analysis relevant to adjudicating these damages claims.

---

[55] *Id*. at 22:5-25 (APP 433).
[56] *Id*. at 326:4-14 (APP 509).

February 25, 2022.

    Respectfully submitted,

    */s/ Brian E. Mason*
    **Brian E. Mason, Esq.**
    Texas Bar No. 24079906
    mason.brian@dorsey.com
    **G. Michael Gruber, Esq.**
    Texas Bar No. 08555400
    gruber.mike@dorsey.com
    **Jay J. Madrid, Esq.**
    Texas Bar No. 12802000
    madrid.jay@dorsey.com
    **J. Brian Vanderwoude, Esq.**
    Texas Bar No. 24047558
    vanderwoude.brian@dorsey.com
    **DORSEY & WHITNEY LLP**
    300 Crescent Court, Suite 400
    Dallas, Texas 75201
    (214) 981-9900 Phone
    (214) 981-9901 Facsimile

    **ATTORNEYS FOR DEFENDANT/COUNTER-PLAINTIFF ACKERMAN MCQUEEN, INC.**

## CERTIFICATE OF SERVICE

    I hereby certify that on February 25, 2022, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

    */s/ Brian E. Mason*
    BRIAN E. MASON