## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| *Plaintiff and Counter-Defendant,* | § § § | |
| **v.** | § § | **Case No. 3:19-cv-02074-G** |
| **ACKERMAN MCQUEEN, INC.,** | § § § | |
| *Defendant and Counter-Plaintiff,* | § § | |
| **and** | § § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, and MELANIE MONTGOMERY,** | § § § § | |
| *Defendants.* | § § | |

### ACKERMAN MCQUEEN'S TRIAL BRIEF REGARDING THE NRA'S ASSERTION OF PRIOR MATERIAL BREACH

TO THE HONORABLE A. JOE FISH:

Defendant/Counter-Plaintiff Ackerman McQueen, Inc. ("**AMc**"), Defendants Mercury Group, Inc. ("**Mercury**"), Henry Martin ("**Martin**"), William Winkler ("**Winkler**"), and Melanie Montgomery ("**Montgomery**") (collectively, "**AMc**") hereby file this *Trial Brief* (the "**Brief**"), and respectfully show as follows:

Among the claims and defenses at issue in this case, AMc posits that several of the parties' disputes can be disposed purely on the legal issues involved. Accordingly, AMc provides for the Court's benefit a brief summary and argument of the legal issues related to the NRA's defense of prior material breach to excuse its own breach of the Services Agreement. AMc hopes this brief will facilitate a speedier, more efficient trial.

# I.  BACKGROUND

AMc pled numerous claims for breach of contract against the NRA in its Second Amended Counterclaim ("*SACC*"), including for failure to pay outstanding and late invoices, failure to indemnify AMc under the Services Agreement's indemnification provision, failure to pay for AMc Third-Party NRA Contracts, failure to pay termination expenses, and failure to post a $3 million dollar letter of credit.[1]

To escape the inevitable conclusion that the NRA owes AMc millions of dollars for its multiple breaches of the Services Agreement, the NRA seeks to vitiate that liability by asserting AMc is barred—by the prior material breach doctrine—from enforcing the Services Agreement against the NRA.  Specifically, the NRA alleges that AMc purportedly committed a prior material breach of the Records Examination Clause.  This clause provides as follows:

> During the term of this Services Agreement, AMc authorizes the NRA, upon reasonable notice, to examine AMc and Mercury's files, books, and records, with respect to matters covered under this Services Agreement.[2]

The NRA has raised this defense both in its affirmative motion for summary judgment and in its opposition to AMc's motion for summary judgment.[3]  In both briefs, however, the NRA does not describe how the prior material breach doctrine forbids AMc from enforcing the Services Agreement against the NRA.  Moreover, the NRA fails to even demonstrate the applicability of the prior material breach doctrine.  Accordingly, because the NRA has not established the applicability of this doctrine or that a prior material breach occurred (to the extent the doctrine applies), such defense does not thwart AMc's affirmative breach claims.

---

[1] *See generally* ECF 241, AMc's Second Amended Counterclaim.
[2] ECF 419-1, Ex. 35-A, Services Agreement, § VIII (APP 2385).
[3] ECF 420, at 15-19; ECF 440, at 15.

## II.     ARGUMENTS AND AUTHORITIES

### A.   The NRA Cannot Invoke the Prior Material Breach Doctrine.

At least one federal circuit court has held that the prior material breach doctrine does not bar an alleged material breacher from enforcing the contract against the other party where, following the alleged material breach, both parties continued their respective performance.[4]  The Fourth Circuit explained a contrary holding would place the alleged material breacher in a bind:

> Applying the first material breach rule in a manner that excuses potential subsequent breaches when both parties continue to perform would place contractual parties, such as Bayer, in an untenable position. Here, because the parties continued to perform under the Agreement, Bayer was contractually obligated to continue paying the requested prices despite its belief that Albemarle's prices were unreasonable and set in bad faith. The fact that Bayer made payments to Albemarle under protest after filing its complaint in June 2014 illustrates this. ***By applying the first material breach rule here, Albemarle theoretically would be permitted to breach the Agreement however it so chose and require Bayer to adhere to its terms, but Bayer would be precluded from ever seeking any contractual remedy for Albemarle's impermissible actions.*** We do not believe Virginia's first material breach rule, as laid out in *Horton* and *Countryside*, contemplates or intends such a result.[5]

The NRA has claimed that AMc materially breached the Services Agreement's Records Examination Clause in September 2018 and February 2019, by failing to allow the NRA to examine AMc's books and records.[6]  According to the NRA, by virtue of these alleged material breaches, AMc "relieved [the] NRA of its obligation to perform and entitled NRA to terminate the contract and sue for damages."[7]  Yet, the NRA did not immediately terminate the contract and sue for damages.  Rather, following the September 2018 Brewer Audit, the parties continued operating and performing the core promises of the contract.  In fact, in October 2018, the parties met and agreed to adjust AMc's budget for the fourth quarter of 2018, and they subsequently agreed upon

---

[4] *Bayer Cropscience LP v. Albemarle Corp.*, 696 Fed. App'x 617, 623 (4th Cir. 2017).
[5] *Id.*
[6] ECF 420, at 16-17
[7] ECF 420, at 19.

a new budget for 2019.[8]  Furthermore, the NRA continued to solicit, receive, and pay for AMc's services for many months after the September 2018 Brewer Audit, well into 2019, including after the February 2019 audit.[9]  Accordingly, because of the parties' continued dealings under the Services Agreement following AMc's alleged material breach, *Bayer* permits AMc to still sue the NRA for its flagrant breaches of the Services Agreement.  A contrary holding would immunize the NRA from its own impermissible conduct and place AMc "in an untenable position."  Thus, the NRA cannot invoke the prior material breach doctrine given it chose to continue soliciting AMc for services for months following the date it now claims AMc allegedly breached the Records Examination Clause.

> **B.  To the Extent the Prior Material Breach Doctrine Applies, AMc Did Not Materially Breach the Records Examination Clause as a Matter of Law.**

Even assuming AMc somehow breached the Records Examination Clause (which AMc does not concede), the NRA cannot establish that such breach was material.  Under Virginia law, "a party who commits the first breach of a contract is not entitled to enforce the contract . . . An exception to this rule arises when the breach did not go to the 'root of the contract' but only a minor part of the consideration."[10]  In determining whether a breach goes "to the root of the contract," Virginia courts analyze whether a party's breach "is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract."[11]  And, although breach is ordinarily a question of fact, it may be determined as a matter of law when the issue is eminently clear.[12]

---

[8] ECF 432, Ex. 1, W. Winkler Decl., dated Dec. 20, 2021, at ¶ 21 (APP 9).
[9] ECF 419-1, Ex. 34-H, May 30, 2019 Email between M. Erstling and C. Spray (APP 2361-63); ECF 417, Ex. 35-H, Jackson Report, at Ex. 7 (APP 2505-06).
[10] *Horton v. Horton*, 487 S.E.2d 200, 203 (Va. 1997).
[11] *Id.* at 204.
[12] *Akins v. Fair Acquisitions LLC*, No. 1:20-cv-816 (RDA/MSN), 2021 U.S. Dist. LEXIS 65201, at *9 (E.D. Va. Mar. 26, 2021).

During the parties' summary judgment briefing, the NRA confidently proclaimed the purpose of the Services Agreement: "The Services Agreement mandated a clear, overarching purpose for AMc's work: to "*promote a positive image of the NRA*."[13]  Of the more than a dozen services described by the Services Agreement as achieving this "clear, overarching purpose," none relate to records examinations,[14] and the NRA has never claimed (much less established) that a breach of that provision defeats an essential part of the services AMc provided.  In fact, the NRA agreed to fourth quarter budget reductions in 2018 and an annual 2019 budget after the September 2018 Brewer Audit.[15]  More importantly, the NRA continued to solicit, receive, and pay for AMc's services for many months after the September 2018 Brewer Audit and the February 2019 Audit, confirming that the essential purpose of the Services Agreement remained intact.[16]  Stated differently, the NRA contends that AMc breached the Records Examination Clause at the September 2018 Brewer Audit, but the NRA continued to direct, authorize, and approve AMc conducting work for the NRA from October 2018 to May 2019.  Indeed, *the NRA actually paid AMc for the work it performed from October 2018 to April 2019*[17]—proof positive that any purported breaches were not "material."

Even after the February 2019 FRA Audit, the NRA continued to direct, authorize, and pay AMc for work it was continuing to perform on the NRA's behalf.[18]  Indeed, on March 4, 2019, after NRA General Counsel John Frazer thanked AMc for its accommodations for the February 2019 FRA Audit, he reiterated the NRA's desire for AMc to maintain its same work force on

---

[13] ECF 420, at 4 (emphasis in original).
[14] ECF 419-1, Ex. 35-A, Services Agreement, § I.A (APP 2377-78).
[15] ECF 432, Ex. 1, W. Winkler Decl., dated Dec. 20, 2021, at ¶ 21 (APP 9).
[16] ECF 419-1, Ex. 34-H, May 30, 2019 Email between M. Erstling and C. Spray (APP 2361-63); ECF 418, Ex. 35-H, Jackson Report, at Ex. 7 (APP 2505-06).
[17] *Id.*
[18] *Id.*

behalf of the NRA.[19]  AMc did not know that the NRA had long-planned premediated litigation against AMc as it feigned compliance with the various audits so that it could file the upcoming April 12, 2019 lawsuit against AMc and then refuse to pay AMc for the work it has previously authorized and requested.[20]

Nonetheless, the NRA still contends that AMc's material breaches "relieved NRA of its obligations to perform and entitled NRA to terminate the contract and sue for damages."[21]  While the NRA declines to explain how the alleged breaches were material, the evidence confirms AMc complied with the Services Agreement and the NRA's audit requests.  For all audits completed by the NRA, including the September 2018 Brewer Audit and February 2019 FRA Audit, AMc believed and understood that AMc had provided the materials requested by the NRA.[22]  The NRA apparently understood the same.  For example, in a letter from the Brewer Firm on December 21, 2018 (which was after the November 2018 audit by the Cooper Kirk firm and directed by the Brewer Firm), the NRA discussed with AMc the scope of the next audit; the letter contains not a single statement or accusation that AMc was noncompliant with the NRA's prior requests.[23]

If the NRA truly believed that AMc had committed an "obvious material breach" in the September 2018 Brewer Audit,[24] it is implausible that the NRA would have declined to raise or reference purported noncompliance while negotiating the scope of the next audit.  But no such contemporaneous notice occurred.  The NRA continued not only its audits of AMc, but also continued to solicit and pay for the services AMc provided.  As a telling sign of fabricated grievances, it was not until the NRA filed suit in April 2019—and after three separate audits had

---

[19] ECF 432, Ex. 1-L, Mar. 4, 2019 Letter from J. Frazer to S. Ryan (APP 36).
[20] ECF 432, Ex. 21, Apr. 22, 2019 Letter from W. LaPierre to M. Dycio (APP 240).
[21] ECF 420, at 19.
[22] ECF 432, Ex. 1, W. Winkler Decl., dated Dec. 20, 2021, at ¶¶ 20, 28 (APP 9, 11-12); ECF 419-1, Ex. 3, Winkler Hr'g Trans., at 95:13-15 (APP 173); 98:13-19 (APP 176).
[23] ECF 432, Ex. 16, Dec. 21, 2018 Letter from S. Rogers to J. Madrid (APP 208-09).
[24] ECF 420, at 19.

long concluded—that AMc became aware of any allegations that AMc breached the Services Agreement and the NRA began to refuse to pay AMc's invoices.[25]

Because the NRA cannot point to contemporaneous communications or actions between the parties on this point, the NRA has relied almost entirely on the testimony of Susan Dillon ("**Dillon**")—the longtime Brewer Firm employee who worked for FRA during the "independent" audit of AMc before returning to Brewer Firm where she is still employed.  While Dillon's involvement in the FRA audit is problematic in its own right, it is further suspect that Dillon is the NRA's primary source for its claims regarding AMc's audit compliance while the Brewer Firm actively limits her ability to testify under improper claims of privilege.

For example, in just over two and a half hours of testimony, NRA counsel objected to questions and/or instructed Dillon to not answer a question on more than eighty (80) occasions.[26] And NRA counsel's instructions to not answer went to some of the most fundamental questions AMc asked.  For instance, Dillon is a factual witness because of her role as an FRA employee but NRA counsel "direct[ed] Ms. Dillon not to answer questions concerning her work at FRA."[27] When asked why she left FRA—where she participated in the audit of AMc—to return to her employment at the Brewer Firm, NRA counsel objected to the question and instructed Dillon to only answer if she could do so "without revealing any client confidences."[28]  She was similarly instructed to not "reveal attorney/client confidences" when answering questions about why she left the Brewer Firm for FRA in the first place.[29]

---

[25] ECF 432, Ex. 1, W. Winkler Decl., dated Dec. 20, 2021, at ¶ 30 (APP 208-09).
[26] *E.g.*, ECF 422, Ex. 13, Dillon Depo., at 13:5-6, 13:12-13, 13:1-4, 14:9-10, 14:16-17, 15:4-5, 15:11-12 15:25-16:3, 16:9-12, 16:19-20 (all at APP 130).
[27] ECF 422, Ex. 13, Dillon Depo. at 19:20-20:6 (APP 0131).
[28] *Id*. at 17:25-19:5 (APP 0131).
[29] *Id*. at 20:10-15 (APP 0131).

Indeed, despite Dillon's incomplete and self-serving testimony, the NRA can point to nothing from the FRA audit to corroborate its claims that AMc did not provide documents requested for the audit.  In support of its Motion for Summary Judgment,[30] the NRA attached recently produced FRA draft reports that AMc has sought for years.[31]  Even those documents contain no indication that the FRA requested certain documents that AMc refused to provide. Incredibly, the belated FRA reports actually confirmed the lack of systems and internal controls at the NRA.[32]  Despite the NRA's belated and contrived narrative in its pleadings, the NRA has failed to establish that any purported breach was "material" as a matter of law.[33]

### C.   The NRA Cannot Avoid Paying AMc's Invoices under the Services Agreement by Claiming Breach of an Independent Obligation in the Records Examination Clause.

 Finally, one more reason exists to reject the NRA's argument that prior material breach defense.  As discussed above, given the fact that there was no material breach, the NRA cannot cease its own performance to pay invoices by claiming AMc failed to perform independent obligations arising from the Records Examination clause. Such position has no basis in Virginia law or principles of contract.

"It does not follow in every case of mutual and dependent promises that upon a failure of one party to perform his promise the other party will be exonerated or excused from performing his promise."[34]  "[A] party's breach of one promise does not discharge the non-breaching party's

---

[30] ECF 420 at 13-14.
[31] *See* ECF 420, Ex. 69-73 (APP 1941-2147).
[32] ECF 421, Ex. 28 (APP 561) ("FRA identified invoices from Ackerman McQueen to the NRA Foundation in the NRA's General Ledger. It is FRA's understanding that the General Ledger provided should not contain entries for the Foundation. It is important to account for expense in the proper entity. This will need to be verified with NRA financial representatives.").
[33] *See Horton*, 487 S.E.2d at 204.
[34] *Wellmore Coal Corp. v. Patrick Petroleum Corp.*, 808 F. Supp. 529, 537 (W.D. Va. 1992) (quoting *Neely v. White*, 14 S.E.2d 337, 340 (Va. 1941)).

duties with respect to unrelated or independent promises to perform under the parties' contract."[35] Generally, courts determine whether promises are dependent or independent by examining the parties' intent based on the language of the contract.[36]

The language of the Records Examination Clause,[37] quoted above, does not state that AMc's receipt of payment for services rendered is dependent upon AMc's compliance with the NRA's record inspection right. Indeed, the clause references no other provision of the Services Agreement and is wholly silent as to the effect of noncompliance. Likewise, Sections II and III of the Services Agreement, dealing with "Compensation" and "Billing and Payment," respectively, do not state that any payments due AMc are contingent upon the NRA's satisfaction with AMc's compliance under the Records Examination Clause.[38] To the contrary, however, the parties intended that "[a]ll sums payable to AMc under this Services Agreement shall be payable at AMc's corporate headquarters . . . within 30 days of the invoice date."[39] Thus, the parties' obligations under the Records Examination Clause are independent of any obligations under the compensation or billing and payment provisions of the Services Agreement. Hence, the NRA cannot treat a potential breach of the Records Examination Clause as excusing its own obligations to pay AMc for services rendered.

---

[35] *Monster Daddy LLC v. Monster Cable Prods. Inc.*, 483 Fed. App'x 831, 835 (4th Cir. 2012).

[36] *See, e.g., id.* at 835 (examining the language of the respective clauses to determine whether the obligations are independent); *Shastry v. U.S. Bank, N.A.*, No. 3:16-cv-3335-G-BN, 2018 U.S. Dist. LEXIS 146276, at *22 (N.D. Tex. July 27, 2018) (quoting *Barraza v. Bank of Am., N.A.*, No. EP-12-cv-35-KC, 2012 U.S. Dist. LEXIS 196799, at *24-25 (W.D. Tex. Aug. 13, 2012)) ("Courts determine whether promises are independent or dependent by looking at the 'parties' intent as evidenced by the language of the contract.").

[37] ECF 419-1, Ex. 35-A, Services Agreement § VIII (APP 2385).

[38] *Id.* at § II-III (APP 2380-82).

[39] *Id.* at § III.E (APP 2382).

### III.   CONCLUSION

For the aforementioned reasons, the NRA's defense of prior material breach is invalid as a matter of law.  Accordingly, AMc hopes this trial brief may assist the Court in understanding the legal issues and analysis relevant to adjudicating this defense.

February 25, 2022.

Respectfully submitted,

*/s/ Brian E. Mason*

**Brian E. Mason, Esq.**
Texas Bar No. 24079906
mason.brian@dorsey.com
**G. Michael Gruber, Esq.**
Texas Bar No. 08555400
gruber.mike@dorsey.com **Jay J. Madrid, Esq.**
Texas Bar No. 12802000
madrid.jay@dorsey.com
**J. Brian Vanderwoude, Esq.**
Texas Bar No. 24047558
vanderwoude.brian@dorsey.com
**DORSEY & WHITNEY LLP**
300 Crescent Court, Suite 400
Dallas, Texas 75201
(214) 981-9900 Phone
(214) 981-9901 Facsimile

**ATTORNEYS FOR DEFENDANT/COUNTER-PLAINTIFF ACKERMAN MCQUEEN, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 25, 2022, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

*/s/ Brian E. Mason*
BRIAN E. MASON
