**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § | |
| | § | |
| | § | |
|     **Plaintiff and Counter-Defendant** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **ACKERMAN MCQUEEN, INC.,** | § | Civil Action No. 3:19-cv-02074-G |
| | § | |
|     **Defendant and Counter-Plaintiff,** | § | |
| | § | |
| **and** | § | |
| | § | |
| **MERCURY GROUP, INC., HENRY** | § | |
| **MARTIN, WILLIAM WINKLER, and** | § | |
| **MELANIE MONTGOMERY,** | § | |
| | § | |
|     **Defendants.** | | |

**PLAINTIFF NATIONAL RIFLE ASSOCIATION OF AMERICA'S**
**MOTION IN LIMINE NO. 9 TO PROHIBIT TESTIMONY BY DEFENDANTS'**
**REBUTTAL EXPERT RICHARD BERGIN**

Cecelia L. Fanelli
clf@brewerattorneys.com
Sarah B. Rogers
sbr@brewerattorneys.com
Philip J. Furia
pjf@brewerattorneys.com
David J. Partida
djp@brewerattorneys.com
Konstantin N. Parkhomenko
knp@brewerattorneys.com
**BREWER ATTORNEYS AND COUNSELORS**
1717 Main Street, Suite 5900
Dallas, Texas 75201
**ATTORNEYS FOR PLAINTIFF**

Motions in limine streamline a trial by settling evidentiary disputes in advance.[1] To streamline this case and help eliminate undue prejudice, the NRA seeks an in limine ruling from this Court to preclude Defendants from presenting at trial any of the testimony or evidence described in Section I, *infra*, and files this memorandum of law in support. The NRA met and conferred with AMc in connection with this motion in limine in accordance with this Court's scheduling order in this case and in accordance with Local Rule 7.1(a).

## I.

## FACTUAL BACKGROUND

### A.     The NRA's Investment In Internet Marketing

#### 1.     The Failed NRATV Platform And AMc's Misleading Presentations To The NRA Executives Based On Non-Industry Standard Metrics

AMc persuaded the NRA to agree to establish NRATV. The NRATV budget quickly ballooned[2] to the point where all of NRA's advertising dollars were being absorbed by NRATV.[3] As a part of the NRATV project, AMc contracted with Performance Improvement Partners ("PIP") to provide metric analysis of the performance of NRATV. PIP created a Dashboard based upon Qlik software to display the metrics, which pulled data from NRATV social media

---

[1] *See Grant v. CRST Expedited, Inc.*, No. 1:18-CV-433, 2021 WL 2101741, at *1 (E.D. Tex. Apr. 7, 2021) ("[Motions in limine] are well-established devices that streamline trials and settle evidentiary disputes in advance, so that trials are not interrupted mid-course for the consideration of lengthy and complex evidentiary issues.") (citations omitted).

[2] NRATV was the NRA's largest budget item. For example, the 2019 NRATV Budget was $15,405,098 out of the 2019 Total Budget of $25,718,436. *See* ECF 510-2, Ex. 2, [App. 0026]. In 2018, the NRATV Budget was $13,619,954 and the NRA's Total Budget was $31,212,786. ECF 448-1, Ex. 5 [App. 00043]. Bergin testified he did not consider the budget calculations for purposes of rendering his opinion. ECF 448-1, Ex. 7, Deposition transcript of Dr. Richard Bergin, dated August 20, 2021 ("Bergin Dep."), at 14:15-24. [App. 00120].

[3] Wayne LaPierre testified as follows: "But what I made very clear to the Board and to Ackerman […] – we needed to set up landing pages for all of these people on this [NRA] TV network because it's eating up all of our ad money, and if we can't translate that into membership and **if we can't translate it into – into contributions and memberships, we're going to have to cut it back.** Because if people are really watching it like you say they are, we ought to be able to translate that into members and money." *(emphasis added).* ECF 448-1, Ex. 8, Deposition transcript of Wayne LaPierre, dated September 24, 2019 ("2019 LaPierre Dep."), at 264:22-265:7. [App. 00226]. LaPierre started to have concerns that itwas eating up all of the NRA's advertising money in 2017. *Id.,* 261:4-12.

accounts.[4] In addition to the approximately $45 million[5] that the NRA paid to AMc with respect to its management of NRATV, it also paid for the creation of the Dashboard.[6] AMc used the NRA Dashboard to obtain purported performance data of NRATV and assembled those metrics into PowerPoint reports to present to NRA executives (the "Presentations").[7] The record evidence, especially as revealed by recent discovery, proves that AMc used the Dashboard Presentations as an elaborate technological ruse to deceive the NRA into believing that the NRATV was rendering a valuable service to the NRA, when it was not. As the discussion below describes, the metrics that AMc chose to input into the dashboard were not industry standard, actionable metrics that would have provided a credible measure of whether AMc's marketing campaign was actually creating an audience and generating membership, renewals, donations and sponsorships. The sham NRATV project cost NRA approximately $45 million[8], with no return on its investment.

Unable to credibly challenge the failure of NRATV and the resulting financial harm to the NRA, AMc falsely and improbably asserted that monetization (namely renewals, new members, and sponsorships) was never a goal of the NRA.[9] More recently, after reviewing the indisputable evidence submitted by the NRA in connection with the filings of motions for summary judgment, AMc now concedes that monetization was a goal of the NRA in 2018 and

[4] ECF 448-1, Ex. 6, Bergin Report, p. 9, ¶ 14. [App. 00068].
[5] See ECF 448-8, Ex. 97, Expert Report of Daniel Jackson, dated July 1, 2021, p. 21, ¶ 56 [App.04898-App.04974].
[6] See ECF 448-1, Ex. 9, Deposition transcript of Melanie Montgomery, dated August 6, 2021 ("Montgomery Dep."), at 168:4-6. [App. 00352].
[7] ECF 448-2, Ex. 11, Declaration of Grant Spofford ("Spofford Decl."), dated December 18, 2021, p. 4, ¶ 16-17. [App. 00444]
[8] See ECF 448-8, Ex. 97, p. 21, ¶ 56 [App.04898-App.04974].
[9] ECF 448-1, Ex. 6, p. 7-8, ¶11 [App. 00066-67]; and ECF 448-3, Ex. 39, Supplemental Expert Rebuttal Report of Dr. Richard Bergin, dated Oct. 29, 2021, p. 13-14, ¶20 [App. 01494-95]. Tellingly, Appendix 11 of the "NRA 2017 Budget Planning" which was prepared by AMc on October 6, 2016, states that "[t]his will also help in our ability to maximize sponsorship levels", contradicts AMc's alleged premise that monetization was never the NRA's goal. ECF 448-3, Ex. 25, [App. 01092-93].

afterward.[10]

### a.  AMc's Use Of Non-Industry Standard, Vanity Marketing Metrics: Bergin's July 1, 2021 Report and Deposition

Jonathan E. Hochman, ("Hochman"), a computer scientist with experience in internet marketing, opined[11] that the performance metrics that AMc provided to the NRA were "vanity metrics", designed to falsely impress the NRA, but which lacked any real substance.[12] The vanity metrics displayed in the AMc Presentations are: completed views, engaged views, total views, reactions, shares, and comments.[13] In contrast to actionable metrics like return on investment ("ROI"), which, can be used to make business decisions as opposed to metrics like shares, for example.[14] Hochman also observed that AMc provided the Presentations sporadically to the NRA.[15] In his opinion, reports should be available to clients via an online dashboard so a client

---

[10] See ECF 466, Defendants' Brief in Support of Defendants' Objections to, and Motion to Strike the [NRA's] Opposition Summary Judgment evidence at § II.E.2. For example, in Defendants' Brief in Support of Defendants "Objections To, And Motion To Strike The NRA's Opposition To Summary Judgment Evidence," AMc concedes in discussing the Declaration of Grant Spofford submitted by the NRA, that it "establishes […] that 'monetization' activities began in 2018." *Id.* No longer able to falsely assert that such "activities" were never sought by the NRA, AMc now restricts its falsehoods to monetization to the pre-2018 period. However, Appendix 11 of the NRA 2017 Budget Planning document, dated October 6, 2016, expressly states that AMc will retain PIP to develop a "reporting platform," i.e., the NRA Dashboard, to "[…] help in our ability to manage sponsorship levels based on engaged viewership and audience understanding." ECF Dkt. No. 448, Ex. 94 to NRA Motion to Summary Judgment December 20, 2021, 2017 Budget Planning doc., Ex. 339 to the Dep. Of Andrew McLean, NRA-AMc-00107239. Simply put, there was never a time when the NRA was uninterested in whether NRATV provided a return on investment in the form of increased members and sponsors.

[11] ECF 448-8, Ex. 95, Expert Report of Jonathan E. Hochman ("Hochman Report"), dated June 1, 2021, p. 3, ¶ 3.A (*see*, ECF 315-1) [App. 04681]; *see* ECF 448-8, Ex. 91, Declaration of Johnathan E. Hochman, dated December 20, 2021. [App. 04359-04581]. Hochman opines as to the nature of the performance metrics that AMc provided to the NRA; *see* ECF 448-1, Ex. 10, Deposition transcript of Jonathan E. Hochman ("Hochman Dep."), dated Aug. 10, 2021, at 126:13-24.[App. 00404]. *See also* other NRA Expert Delectations: ECF 448-7, Ex. 87, Declaration of Autumn Kraus, dated Dec. 20,2021. [App.04197-04229]; ECF 448-7, Ex. 88, Declaration of Mathew Klink, dated Dec. 20, 2021. [App.04230- App.04259]; ECF 448-8, Ex. 92, Declaration of Larry Kanter, dated Dec. 20, 2021. [App.04582-App.04633].

[12] AMc generated Presentations from 2017 through 2019. *See, e.g.*, ECF 439-1, Exs. 13-17 [App.00624-867], and ECF 448-2, Ex. 12. AMc-002656, AMc-002818, AMcTX-00064865, AMc-002956, AMcTX-00014989, AMcTX-00004485.

[13] *See, e.g.*, ECF 448-8, Ex. 91, at Ex. A, Hochman Report at 15, ¶ 50. [App. 04377].

[14] *See, e.g., id.* at 15, ¶ 49. [App. 04377].

[15] *See, e.g. id.* at 17, ¶ 55. [App. 04379].

can check how "a marketing program is proceeding as often as they like."[16] With regard to the Dashboard, Grant Spofford, a Senior Program Manager at the NRA, previously a digital producer for interactive development at AMc attests that: he content mapped the NRA Dashboard, which was a cumbersome, manual process[17]; the Dashboard suffered from ongoing data flow and other problems and was a work in progress never finally completed;[18] and it was not user-friendly.[19]

AMc produced the report of Richard Bergin in rebuttal to Hochman; he testified on August 20, 2021; and then submitted a "Supplemental" Report late on October 29, 2021 the day that discovery closed, trying to re-do his opinion. His deposition testimony establishes that the NRA Dashboard was an artifice loaded with "proxy"[20] gerrymandered metrics designed to give a false impression of marketing success. He admitted that the metrics that appeared in the AMc PowerPoints were so-called "high level" (i.e. vanity) as opposed to more detailed metrics.[21] Bergin testified that had additional metrics been placed into the Presentations it would have been more informative to the recipient.[22] Despite Bergin's portrayal of the Dashboard as a robust, functioning technological platform in his initial report,[23] at his deposition on August 20, 2021 he testified that he never accessed the Dashboard or interviewed its creator.[24]  He asked for access, but Melanie Montgomery, whom he interviewed, said *"it was not possible."*[25] Further, he lacked the technical specifications for the Dashboard; did not know the location of its database;[26] and did not know if

---

[16] *Id.*
[17] *See* ECF 448-2, Ex. 11, Spofford Decl., p. 2-3, ¶ 7 [App.00442].
[18] *Id.*, p. 3, ¶10 [App. 00442].
[19] *Id.*, p. 4, ¶16 [App. 00442].
[20] ECF 448-1, Ex. 6, Bergin Report, p. 10, ¶ 16.
[21] *See* ECF 448-1, Ex. 7, Bergin Dep., at 117:19-24. [App.00146].
[22] *Id.* 129:9-20. [App.00149]. AMc's corporate representative with respect to NRATV, Brian Darley, was likewise ignorant about thechoice of the performance metrics that formed the basis of the Presentations given the to the NRA *See* ECF 448-2, Ex. 18, Deposition transcript of AMc's 30(b)(6) Corporate Representatives, dated August 4, 2021 at 195:1-204:24, [App.00917].
[23] ECF 448-1, Ex. 6, at ¶17. [App.00069].
[24] ECF 448-1, Ex. 7, Bergin Dep., at 58:1-25; 59:1-6. [App.00131].
[25] *Id.* 59:24-25; 60:1-2. [App.00131].
[26] *Id.* 70:14-25. [App.00134].

a schema exists for the Dashboard[27]

## b.     AMc's Withholding Of NRATV Social Media Accounts

In addition to the record evidence establishing AMc's use of bogus metrics in a non-functional dashboard, *AMc had not turned over the access codes to the NRA for the NRA's own social media accounts as of the date of Hochman and Bergin's depositions, and it continues to withhold them.*[28] As Hochman testified, if he had the codes he would have been able to analyze, for example, organic versus paid traffic concerning NRATV.[29] In other words, did NRATV actually have an audience or were people simply responding to ads that AMc was placing, which could have been placed absent the expensive apparatus of the NRATV platform. He also notes, reviewing primary data like the social media data is crucial, because the Dashboard is a secondary source and suffered from disrupted connections.[30] Further due to, AMc's refusal to release the NRATV social media credentials, the NRA has no control over the disparaging and inflammatory content actively being posted to those social media pages.[31]

---

[27] Bergin admitted that in order to determine what metrics were actually put into the Dashboard, it would require him to speak with someone from PIP. ECF 448-1, Ex. 7, Bergin Dep., at 126:24-127:1; 127:4-9. [App.00148]. ***Tellingly, AMc did not produce the PIP/AMc contract documents in this litigation, presumably because it lists the actionable metrics that AMc chose not to use. See, e.g.* ECF 448-3, Ex. 31, Excerpt of screenshot of Volume 16 production index, PIP-000003685-691; PIP- 00003755-761; PIP-00000027-PIP-00000031. [App.01115-16].**

[28] ***Counsel for the NRA has repeatedly requested these access codes, which are the property of the NRA. See, e.g.*, ECF 448-2, Ex. 19, Ltr. from Cecelia L. Fanelli to Brian E. Mason, dated Sept. 17, 2021; The NRA owns those codes [App.00937].**

[29] *See* ECF 448-1, Ex. 10, Hochman Dep., at 69:2-12. [App.00390]. Additionally, Bergin testified that the NRA presumably could have had the power to determine the existence of organic views and paid views if it looked into its social media accounts. *See* ECF 448-1, Ex. 7, Bergin Dep., at 106:22-107:2.[App.00143].

[30] *See also*, ECF 448-8, Ex. 96, First Supplemental Expert Report of Jonathan E. Hochman ("Hochman Supplemental Report"), dated Oct. 22, 2021, p. 8 ¶¶ 24-26. [App. 04734].

[31] *See* Fanelli Decl. Ex. 20, Decl. of William McLaughlin, dated Dec. 18, 2021, p. 2-3, ¶ 7 [App.00940-00941]; Fanelli Decl. Ex. 12, Ltr. from Cecelia L. Fanelli. to Brian E. Mason, dated Oct. 28, 2021 (***pursuant to a subpoena served by NRAcounsel, Google identified the email address related to NRATV's YouTube account as nranewsteam@gmail.com. The letter describes the fact that both AMc and PIP have passwords to the YouTube account***).

> 2.   **AMc's Continued Seizure And Withholding of the NRA's Dashboard and Social Media Credentials In Unfairly Prejudicial.**

>> a.   **AMc's September 1, 2021 Purported Production Of A Password To The NRA Dashboard, Continued Denial Of Access To The NRA, And Disregard For The NRA's Cyber Security**

On September 1, 2021, AMc's counsel sent a letter to the NRA's counsel belatedly releasing a password to the NRA Dashboard.[32] NRA's counsel noted that the Dashboard appeared to lack security,[33] AMc's counsel belittled the NRA's security concerns as "unfounded" and AMc delayed installing a valid security certificate, thus preventing access by the NRA for approximately another month.[34] AMc's disregard for cyber security is especially egregious in view of the NRA's high profile, and AMc's prior notice of cyber threats and attempted intrusions. In fact, it counterclaimed for costs allegedly incurred in 2018 associated with firewall, storage, and disaster recovery relating to "numerous threats and intrusion attempts to the NRA website and IT infrastructure."[35]

>> b.   **Ever-Changing Location Of The Withheld Dashboard And The Server**

According to AMc, it admittedly lost the NRA's computer system for approximately two years containing **THE** key NRATV data central to a major issue in this case and related to the NRA's single largest budget item in 2017 and 2018.[36] Since the "revival," AMc has told an

---

[32] *See* ECF 448-3, Ex 21, Ltr. from Brian E. Mason to Sarah B. Rogers, dated Sept.1, 2021. [App. 00961-62].

[33] ECF 448-7, Ex. 82, Ltr. from Cecelia L. Fanelli to Brian E. Mason, dated Sept. 9, 2021. [App.04178-80]; *see also*, ECF 448-7, Exs. 82, 83, Ltrs. From Cecelia L. Fanelli to Brian E. Mason dated Sept. 14, 2021, Sept. 24, 2021, [App.04178-4182].

[34] *See generally* the exchange of letters between counsel concerning the Dashboard's lack of safety, ECF 448 (various), Exs. 80, 12, 82, 27, 83, 28, dated Sept. 9, 2021(from Fanelli to Mason); Sept. 12, 2021 (from Mason to Fanelli); Sept. 14, 2021 (fromFanelli to Mason); Sept. 21, 2021 (from Mason to Fanelli); Sept. 24, 2021 (from Fanelli to Mason); ; Sept. 28, 2021 (from Mason to Fanelli). [App.04112-13; App.00372-39; App.04178-80; App.04181-82; App.01100-03; App.01104-06]; ECF 448-8, Ex. 96, First Supplemental Hochman Report, dated Oct. 22, 2021, p. 5-6, ¶¶ 17-19 [App. 04731-32].

[35] ECF 448-3, Ex. 23, Amended Expert Report of Daniel L. Jackson ("Jackson Report"), dated Oct. 15, 2021, p. 24, ¶64. [App. 00990]; ECF 448-3, Ex. 24, Deposition of Daniel L. Jackson, dated Oct. 27, 2021 at 107:3-23. [App. 01070].

[36] ECF 448-3, Ex. 25, 2015-2019 Ackerman Budgets (NRA-AMc_00140814). [App. 01090-93].

ever changing story, but with the final chapter always ending with the same conclusion – AMc will not return the server; it will not even allow forensic imaging by a neutral expert;[37] and, the NRA can only receive limited access rights to the NRA Dashboard, for which it paid.[38] After the NRA sought the return of the server in the "warehouse", AMc then said it was a virtual server.[39] Then, it claimed the server was part of its own "server farm".[40] Finally, on October 18, 2021, in an incompetent declaration of its trial counsel, AMc provided a fourth version of the NRA Dashboard story.[41] This time the server had been in "cold storage," supposedly.[42] Which one of these four stories is true, or whether a fifth untold story is true (likely to be newly minted for the jury's consumption), concerning the data content and structure of the Dashboard.[43]

AMc's abject and admitted failure to safeguard the NRA's Confidential Information; the unknown and compromised chain of custody of the server and Dashboard and whether and when it may have been accessed, and by whom; the alteration of NRA metrics data in the Dashboard; [whether AMc was telling the truth when it represented to the Court in its August 31, 2021 Status Report;[44]] and whether copies were made of the "bespoke" NRA Dashboard, which is an NRA "works made for hire,"[45] and contains its most sensitive data about a major marketing campaign are profoundly prejudicial issues that have materially compromised the NRA's ability to prepare its case, both as to fact and expert witnesses.

---

[37] See ECF 448-3, Ex. 26, Ltr. from Brian E. Mason to Cecelia L. Fanelli, dated Oct. 15, 2021. [App.01097-01099].
[38] Id.; ECF 385-1, at 4; ECF 385, at 4.
[39] See ECF 448-3, Ex. 27. Ltr. from Brian E. Mason to Cecelia L. Fanelli, dated Sept. 21, 2021. [App.01100-01103].
[40] See ECF 448-3, Ex. 28, Ltr. from Brian E. Mason to Cecelia L. Fanelli , dated Sept. 28, 2021. [App.01104-01106].
[41] ECF 448-3, Ex. 30, Decl. of Brian E. Mason ("Mason Decl."), dated Oct. 18, 2021. [App.01110-01114].
[42] Id. at ¶ 2. [App.01111].
[43] In an effort to break the logjam concerning the return of the NRA's digital assets, the NRA proposed a protocol that contemplated the retention of a neutral expert. ECF 448-8, Ex. 96, Hochman Supplemental Report, p. 16-19, ¶¶ 55-64, [App.04742-04745].
[44] ECF 345, at 13.
[45] ECF 448-3, Ex. 39, at ¶ 17. [App.01493-01494].

8

3.     **AMc's Production Of Deconstructed Electronic Documents And Its Unlawful Intrusion Into The NRA's Computer Systems[46]**

On October 1, 2021, AMc provided approximately 140GB of native file information,[47] consisting of approximately 200,000 individual files of indeterminate size.[48] These were deconstructed documents from the NRA Dashboard, over which AMc continued to exercise control.[49] A painstaking, needle in the haystack sampling of the documentation produced on October 1, 2021, shows AMc's activity in the NRA Dashboard creating files on October 1, 2021 with a "last modified' date of September 10, 2021.[50] Other listings show files created as early as **August 22, 23, 25, 26, 28, September 2 and 8, 2021**.[51] Also, it appears that the NRA Dashboard was online from June 29 to October 29, 2021, long after the termination of the parties relationship. None of the activity in the NRA Dashboard was disclosed to the NRA or authorized by it. AMc and its counsel engaged in these "activities," despite receiving a cease and desist letter on September 3, 2021 from the NRA's counsel.[52]

B.     **Bergin's Untimely, Bad Faith October 29, 2021 Supplement Report: AMc's Improper Attempt to Blunt NRA's Internet Marketing Damages.**

AMc's forced disgorgement of the Dashboard's password finally provided the NRA's experts with the opportunity to calculate damages by using NRATV Facebook and Instagram data, albeit limited, found in the Dashboard. For instance, Hochman submitted a Supplemental Report on October 22, 2021, after receiving the limited access to the Dashboard. He found that the

---

[46] ECF 448-8, Ex. 96, Hochman Supplemental Report, p. 6-8, ¶¶ 20-23. [App.04732-04733].

[47] ECF 385-1, at 3. ECF 385-1, at 3.

[48] *See* ECF 448-3, Ex. 31, excerpt of screenshot of Volume 16 production index [App. 01115-01116].

[49] *See* ECF 448-3, Ex. 32, Ltr. from Sarah B. Rogers. to Brian E. Mason, dated October 17, 2021. [App.01117-01119].

[50] ECF 385-1, Ex. M.

[51] *Id.*

[52] ECF 448-3, Ex 22, Ltr. From Cecelia L. Fanelli, Esq. to Brian E. Mason, Esq., dated Sept. 3, 2021 [App.00963-App.00965].

advertising value of the $44,000,000 NRATV project amounted to a mere $5,200,000, an overcharge to the NRA of approximately $39,000,000.[53] His methodology is discussed at length in detail in his Supplemental Report. Likewise, Andrew McLean, an advertising industry expert, testified at length as to his conclusion the NRA sustained approximately $40 million in damages based upon the NRA's excess payment to AMc to generate the "Engaged Views" that AMc tries to tout as effective marketing.[54] He used the same methodology as Hochman which he describes as "industry standard."[55] Additionally, he provides compelling testimony dispelling AMc's frivolous excuse making for the established failure of NRATV,[56] which AMc now contends never was "set up to be a revenue generator."[57]

Unable to credibly challenge these damages, AMc resorts instead to submitting an untimely "Supplemental" Report from Bergin on the evening of October 29, 2021, in which his primary role is to act as an advocate for AMc's far-fetched narrative that the NRA never intended NRATV to monetize but simply to energize people.[58] Bergin combines this demonstrable falsehood, with a new focus on "influencer marketing."[59] AMc's newest theory is that having celebrities appear on NRATV was somehow helpful even when few consumers

---

[53] ECF 448-8, Hochman Supplemental Report, 10 at ¶30, [App.04736].

[54] ECF 448-3, Deposition transcript of Andrew McLean ("McLean Dep."), dated Oct. 21, 2021, at 288:8-289:22. [App. 01193].

[55] *Id.*, at 286:14-16; 290:7-13; 289:2-289:13 [App. 01193-94].

[56] *Id.*, at 290:17-291:7 [App. 01193-94].

[57] *See also* ECF 448-8, Ex. 98, Amended and Updated Expert Report of Brian Buss, dated Oct. 21, 2021 [App.04975- App.05004], in which he opines that the NRA invested approximately $49 million more than it received in benefits from NRATV activities; the Dashboard contained limited metrics; the valuation indications in the NRATV files did not contain informative measures of financial performance; and, based upon application of standard valuation approaches, the fair market value of NRA's ownership of NRATV at the Termination Date was zero, and the fair market value of the NRA's ownership interest at the report date of October 21, 2021 was zero; Mr. Buss also opined extensively on these topics at his deposition on October 29, 2021. *See* ECF 448-3, Ex. 34, Deposition transcript of Brian Buss, dated Oct. 29, 2021 [App.01216-App.01238]; *see also* ECF 448-3 Ex. 35, Decl. of Brian Buss, dated Dec. 20, 2021. [App.01239-App.01272].

[58] *See* ECF 448-8, Ex. 96, Supplemental Rebuttal Expert Report of Richard Bergin, dated Oct. 29, 2021, p. 13. [App. 04739].

[59] *Id.*, § D, p. 13-18, [App.  04739-04744].

tuned in to watch them, or became NRA members or sponsors. However, the detailed testimony of Grant Spofford demonstrates that monetization was a "key goal" of the NRA.[60] ***AMc, in an obvious attempt to remedy the ruse that it created by having Bergin testify without access to the Dashboard, gave Bergin access to the Dashboard to compare his supplemental report, despite the issuance of a cease and desist letter by the NRA in September, 2021.***[61] However, contrary to Bergin's incorrect and misleading advocacy about the Dashboard, Spofford points out that he manually content mapped the NRA Dashboard,[62] which was arduous. Further, the Dashboard had ongoing problems, was never fully completed[63] and was not user-friendly.[64] In sum, the Bergin Supplemental Report is a sham designed to prejudice the NRA by presenting it with an entirely new argument on the night that discovery closed, with no opportunity to examine Bergin.

**C.      PIP's Document Production upon AMc's Audacious Attempt to use it at Trial But Which Served as the Basis for the Unreliable, Speculative Bergin's July, 1, 2021 Report**

The NRA obtained documents from PIP pursuant to a subpoena dated November 27, 2019. Documents were produced in 2020, but only after a delay caused by AMc's unsupportable demand that it was entitled to pre-review the documents. The NRA also had to pay costs associated with the production, to obtain its own data. In any event, the PIP production is not primary source data, rather it is data extracted from the NRA's computer systems, namely the NRA Dashboard. The NRA is entitled to inspect that system and obtain its social media data, which is the primary source

---

[60] ECF 448-2, Ex. 11, Spofford Decl., p. 5, ¶17. [App. 00445].
[61] ECF 448-3, Ex 22. [App.00963-App.00965].
[62] ECF 448-2, Ex. 11, Spofford Decl., p. 2-4, ¶5-14. [App.00442-44].
[63] *Id.,* p .3, ¶ 10 [App.00443].
[64] *Id*., p. 8, ¶ 31 [App.00448].

data at issue. In essence, AMc has concealed the primary source data and the secondary source data residing with PIP appears to have been sanitized and the production incomplete.

The only logical inference that can be drawn from this pattern of concealment is that access to primary data and full access to secondary data would contradict the defenses and counterclaims that AMc has made here. Accordingly, AMc should be precluded from relying upon any of the PIP materials which it attempts to insert into the trial record and used as the basis for the unreliable Bergin opinions.

Also, it is essential to note that AMc has claimed that the NRA Dashboard with all of its data was lost for two years. Interestingly, PIP managed to produce what AMc says is data from the NRA Dashboard in 2020, when the Dashboard was allegedly lost. Obviously, AMc is telling two contradictory stories about whether or not the Dashboard was available or was lost.

A favorite bad-faith argument of AMc's counsel is to claim that the NRA never requested the Dashboard. In other words, the NRA never requested something which AMc says was lost. In any event, the November 2019 subpoena establishes unequivocally the NRA's intent to obtain information – indeed, it subpoenaed the creator of the Dashboard.

## D.   AMc Produced Cherry Picked Information, Subsequent to the NRA's Reports and After they were Deposed

After the NRA's experts issued their Reports on June 1, 2021, AMc made sixteen (16) previously withheld additional document productions, along with the pretense of providing the NRA with "access" to its own allegedly newly found Dashboard containing analytics metrics concerning NRATV. Moreover, after the NRA's experts issued their Supplemental Reports, AMc made three additional productions on October 22nd and 29th, exceeding more than 8,000 documents combined. The NRA was deluged with documents during and after this period when expert depositions were occurring, thus prejudicing its experts' ability to prepare and the NRA's overall trial preparation.

The NRA complied with the discovery schedule under these unprecedented conditions, with the NRA having little time to assimilate the massive document production by AMc in October, as well as the limited access to the Dashboard provided by AMc. Further, on December 15, 2021, at a hearing before Magistrate Judge Toliver, AMc's counsel acknowledged the continued existence of unproduced and unlogged documents, adding to the already severe prejudice sustained by the NRA. AMc was ordered to produce a categorical log on January 6, 2022, which grossly lists topics including "media buys" and "NRATV," without elaboration or any disclosure of how many documents are being withheld on these core issues to be tried.[65] The log dispute is continuing as of the date of this motion.

Bergin enjoyed an advantage not shared by the NRA's experts. He had the opportunity to access the NRA Dashboard given by AMc, who had administrative control of it. He also strategically waited until the night of October 29, 2021 to issue his report, after AMc and Dorsey had made a number of productions that post-dated the Supplemental Reports of the NRA's experts.


## II.

## ARGUMENT AND AUTHORITIES

### A.    LEGAL STANDARDS

Federal Rule of Evidence 702 provides for the admission of expert testimony that assists the trier of fact to understand the evidence or to determine a fact at issue. However, not just any expert can testify as he or she sees fit. As an initial matter, the expert witness must be qualified "by knowledge, skill, experience, training, or education . . . ."[66] A court must exclude

---

[65] *See* ECF 487-2.
[66] FED. R. EVID. 702.

13

an expert witness "if it finds that the witness is not qualified to testify in a particular field or on a given subject."[67]

As to expert testimony, a court is fundamentally charged with a "gatekeeping function" to ensure an expert is qualified and that his testimony is both reliable and relevant before allowing the expert to testify.[68] Expert testimony is only admissible if it is both (1) reliable and (2) relevant.[69] Reliability is analyzed under Rule 702, which requires that: (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[70] An expert's opinion must be supported and the court looks to the basisof the expert's opinion, and not the bare opinion alone.[71] "A claim cannot stand or fall on the mere *ipse dixit* of a credentialed witness."[72] The proponent of the expert testimony must provide the court with some objective independent validation of the expert's methodology.[73] The expert's assurances that he has utilized generally accepted scientific methodology is insufficient.[74]

To be relevant, the expert's opinion must be helpful to the jury in understanding the evidence or determining a fact at issue.[75] Expert testimony is inadmissible as to matters which obviously are within the common knowledge of the jury.[76] The trial court "must be wary lest the expert become nothing more than an advocate of policy before the jury . . .[and] ought to insist

---

[67] *Jones v. Halliburton Co.*, No. 4:07-cv-2719, 2011 U.S. Dist. LEXIS 51841, at *6 (S.D. Tex. 2011) (citing *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)).
[68] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597(1993).
[69] *Id* at 591.
[70] FED. R. EVID. 702 (b)-(d).
[71] *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005).
[72] *Id*.
[73] *Lane v. Target Corp.*, No. C-05-306, 2006 U.S. Dist. LEXIS 23573, at *1 (S.D. Tex. Apr. 3, 2006).
[74] *Id*.
[75] *Daubert*, 509 U.S. at 591.
[76] *Lane,*2006 U.S. Dist. LEXIS 23573, at *3.

14

that a proffered expert bring to the jury more than the lawyers can offer in argument."[77] While Rule 704 allows opinion testimony concerning the ultimate issue decided by the trier of fact in some instances, Rule 704 does not open the door to all opinions.[78] Importantly, expert witnesses may neither tell the jury what result to reach nor provide legal conclusions.[79]

The party seeking to rely on expert testimony bears the burden of establishing, by a preponderance of the evidence, that all requirements have been met.[80]

Even if a witness qualifies as an expert under *Daubert*, his testimony must still meet the balancing test of Federal Rule of Evidence 403.[81] Under Rule 403, relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[82] The trial judge must exercise more control under Rule 403 regarding experts than lay witnesses because of the increased risk of misleading or confusing the jury.[83]

Federal Rule of Civil Procedure 26(e) provides that a party must take steps to correct or supplement its expert report or other disclosure.[84] For expert witnesses, this duty to supplement "extends both to information included in the report and to information given during the expert's deposition." *Id.* at 26(e)(2). However, Rule 26(e) cannot be abused by a party attempting to

---

[77] *Id.* (citing *In re Air Crash Disaster at New Orleans*, 795 F.2d 1230, 1234 (5th Cir. 1986)).
[78] *See Briley v. Wal-Mart Stores, Inc.*, No. 2:15-CV-439, 2018 U.S. Dist. LEXIS 1078, at *21-23 (S.D. Tex. Jan. 3, 2018) (citing *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983)).
[79] *Owen*, 698 F.2d at 240.
[80] *DAC Surgical Partners, P.A. v. United Healthcare Servs.*, No. 11-cv-01355, 2014 U.S. Dist. LEXIS 136120, at *9 (S.D. Tex. July 31, 2014) (citing *Moore v. Ashland Chem, Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *Daubert*, 509 U.S. at 593, n.10; *Brickley v. Scattered Corp. (In re H&M Oil & Gas, LLC)*, 511 B.R. 408, 419-20 (Bankr. N.D. Tex. 2014)("To meet this burden, the [party] cannot simply rely on their expert's assurances that he has utilized generally accepted scientific methodology. Rather, some objective, independent validation of the expert's methodology is required").
[81] *See United States v. Posado*, 57 F.3d 428, 435 (5th Cir. 1995).
[82] FED. R. EVID. 403.
[83] *Daubert*, 113 S. Ct. at 2798.
[84] FED. R. Civ. P. 26.

produce information in a belated fashion or to merely bolster previous expert reports, like here. A supplemental report must actually supplement a previous report and not merely add additional information which was available to the party at the time of the original report.[85]

## B.  BERGIN IMPROPERLY ACCESSED AND INTRUDED INTO THE COMPUTER SYSTEMS AND/OR ACCOUNTS OF THE NRA

At the outset, it must be noted that Bergin improperly accessed and intruded into the NRA's computer systems and/or accounts. Regardless of what AMc and AMc's attorneys asked Bergin to do, he had a separate and independent obligation to refrain from intruding into the computer systems of one of the most high-profile non-profits in the world. Egregiously, his unreliable and unsupported "supplemental" report does not disclose the date or dates on which he accessed the NRA's computer systems. In view of AMc's failure to provide the NRA Dashboard to the NRA in a secure condition, the likelihood that Bergin could have accessed it during a time when the Dashboard was insecure, is real. Such unauthorized access on an unsecure application put the NRA's data at risk for exfiltration. The recklessness of this behavior should not be countenanced and Bergin should not be permitted to testify in a court of law in view of his conduct.

## C.  BERGIN LACKS ANY RELEVANT QUALIFICATIONS, AND HIS OPINIONS ARE BOTH UNRELIABLE AND IRRELEVANT, AS WELL AS UNTIMELY

Bergin lacks any qualifications whatsoever to testify in this case. He is not a computer scientist, or an expert in internet marketing or marketing metrics.  He is a specialist in oil and gas.[86] His penchant for testifying outside of his skill set has been noted by at least one Court, that opined as follows: "The Court rejects that conclusion. Dr. Bergin was not a credible witness. He

---

[85] *See Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.*, 73 F.3d 546, 571 (5th Cir.) ("[supplemental] disclosures are not intended to provide an extension of the deadline by which a party must deliver the lion's share of its expert information"); *see also Seascape Aquarium, Inc. v. Associated Diversified Servs.*, Case No: 8:17-cv-2137-T-17JSS (M.D. Fla. June 29, 2018) ("'Courts have broad discretion to exclude untimely-disclosed expert witness testimony – even when they are designated as 'supplemental' reports . . . [c]onsequently, a party cannot abuse Rule 26(e) to merely bolster a defective or problematic expert witness report.'") (citation omitted).

[86] ECF 448-1, Ex. 7, Bergin Dep., 50:13-21 [App.00129].

exaggerated his qualifications, gave unreliable testimony, and routinely engaged in hyperbole. The Court gives no weight to Dr. Bergin's testimony. […] Dr. Bergin was an expert on an advocacy mission."[87]

In his original report and deposition, Bergin tried to exaggerate himself into someone who actually knew something about the subject matter at issue. While he did not succeed at that exaggeration, his testimony underscored that the NRA has been completely accurate from the outset in challenging the efficacy and enormous cost of NRATV, as summarized in the facts section above.

As to the reliability of Bergin's opinions, there can be no genuine dispute that those opinions are wholly unreliable. Indeed, AMc denied him access to the Dashboard when he asked for such access in June 2021, yet he makes it the centerpiece of his July 1, 2021 opinion. He also relies solely on the PIP documents which are not primary data.[88]

With respect to the contrived Supplemental Report, that is not a supplemental report at all. It was an improper attempt to rehabilitate, rewrite, and create new opinions because of the abject failure of Bergin's initial opinions, both in his original report and in his deposition. There was nothing new for Bergin to consider. AMc could have given him access to the NRA Dashboard when he asked for it in 2021. Instead, AMc gave him access only after its ploy to conceal data backfired on it. Bergin's Supplemental Report is untimely and should be excluded on that basis, as well as all of the other bases enumerated herein.

In any event, his Supplemental Report is speculative, inaccurate, and irrelevant. Indeed, Grant Spofford, who data mapped the Dashboard, demonstrates the unreliability and irrelevance

---

[87] *In re Ultra Petroleum Corp.*, 621 B.R. 188, 202–03 (Bankr. S.D. Tex. 2020).
[88] However, even the secondary data in the Dashboard demonstrates the enormity of the harm and damages caused to the NRA with respect to its $45 million investment. *See generally* ECF 448-3, Ex. 36, at Ex. B and ECF 448-8, Ex. 91, at Ex. B

of certain of the statements that AMc is apparently advising Bergin to make. Indeed, the Supplemental Report reads as if Bergin is a salesman for Qlik Software. He tours the Dashboard aimlessly, making comments about screens. His attempt to somehow characterize "value" of NRATV centers on trying to convince the Court that if one hires celebrities and pays them large sums of money, that is valuable even if they never convince anyone to join the NRA or contribute to it. The irrelevance of such off-point musings is patent.

## III.

## CONCLUSION AND PRAYER

For the reasons set forth above, the NRA respectfully requests that the Court exclude the proposed testimony and opinions referenced above.

Respectfully submitted,

By: ___*/s/ Cecelia L. Fanelli*_____

**BREWER, ATTORNEYS & COUNSELORS**
Cecelia L. Fanelli
clf@brewerattorneys.com
Sarah B. Rogers
sbr@brewerattorneys.com
Philip J. Furia
pjf@brewerattorneys.com
David J. Partida
djp@brewerattorneys.com
Konstantin N. Parkhomenko
knp@brewerattorneys.com
**BREWER ATTORNEYS AND COUNSELORS**
1717 Main Street, Suite 5900
Dallas, Texas 75201
**ATTORNEYS FOR PLAINTIFF/COUNTER-DEFENDANT NATIONAL RIFLE ASSOCIATION OF AMERICA**

**CERTIFICATE OF CONFERENCE**

On February 23, 2022, counsel for the NRA conferred with counsel for Defendants regarding this Motion.

/s/*Cecelia L. Fanelli*
Cecelia L. Fanelli

**CERTIFICATE OF SERVICE**

I hereby certify that on February 25, 2022, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel of record by a manner authorized by the Federal Rules of Civil Procedure.

/s/*Cecelia L. Fanelli*
Cecelia L. Fanelli

19