IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | ) | |
| | ) | |
| Plaintiff and Counter-Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | CIVIL ACTION NO. |
| ACKERMAN MCQUEEN, INC., | ) | |
| | ) | 3:19-CV-2074-G |
| Defendant and Counter-Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, AND MELANIE MONTGOMERY | ) | |
| | ) | |
| Defendants. | ) | |

**<u>JOINT PRETRIAL ORDER</u>**

The Plaintiff National Rifle Association of America, Inc. (the "NRA") and the Defendants Ackerman McQueen, Inc. ("AMc"), Mercury Group, Inc., Henry Martin, William Winkler, and Melanie Montgomery respectfully submit this pretrial order in accordance with Northern District of Texas Local Rule 16.4.

## I.   SUMMARY OF THE CLAIMS AND DEFENSES OF EACH PARTY

**A.      The National Rifle Association of America's Claims**

The following is a summary of the claims brought by Plaintiff, the National Rifle Association of America (the "NRA") against its former advertising and public relations vendor, Ackerman McQueen ("AMc"), its subsidiary Mercury Group, and individual defendants Henry Martin, William Winkler, and Melanie Montgomery (together, "Defendants").

### 1.      Breach of Contact

The NRA brings a claim for Breach of Contract against AMc for its breach of their contract, the 2017 Services Agreement. The Services Agreement required AMc, *inter alia* to (a) "promote a positive image of the NRA" (b) maintain certain files books and records and provide the NRA with unqualified access to the files books and records in AMc's possession; (c) maintain the confidentiality of the NRA's information, and cause its employees and subcontractors to do the same; and (d) to comply with certain guidelines for invoicing work performed, including obtaining advanced approval from the NRA.   The NRA contends AMc breached these and other provisions of the Services Agreement.

### 2.      Conversion

AMc possesses and refuses to return certain property owned by the NRA.

Under Virginia Law, conversion is defined as taking or exercising dominion over someone else's property without permission. A person commits conversion by any act

of dominion wrongfully exerted over property in denial of, or inconsistent with, the owner's rights.

3.  **Breach of Fiduciary Duty**

The NRA contends AMc owed it fiduciary duties.   Defendants breached their fiduciary duties of loyalty and candor by, among other things:

- failing to disclose material facts relating to its invoice and billing practices, the value of NRATV, and the North Contract;

- attempting to obstruct or stop the NRA's attempt to review its own books and records in the possession of AMc;

- attempting to extort the NRA; and

- conspiring to affect an out-of-context, partial disclosure of certain NRA confidential information to the media – thus harming the NRA and tarnishing the NRA's reputation.

Under Virginia Law, the NRA will prove: (1) there was a "fiduciary relationship" between the NRA and AMc; (2) AMc breached that fiduciary duty; and (3) AMc's breach resulted in injury to the NRA or benefit to AMc.

A presumption of fraud arises under Virginia law when a fiduciary participates in a transaction, using the principal's assets, which is consummated to the fiduciary's benefit.   The burden shifts to Defendants to prove that they did not breach their fiduciary duty when they benefitted financially from their actions as agents.

In the absence of this presumption, the NRA will, prove at least one of the following is true: (1) the transactions in question were not fair and equitable to the NRA; (2) AMc did not make reasonable use of the confidence that the NRA placed in it; (3) AMc failed to act in the utmost good faith or exercise the most scrupulous

honesty toward the NRA;  (4) AMc placed its own interests before those of the NRA, used the advantage of its position to gain a benefit for itself at the expense of the NRA, or placed itself in a position where its self-interest might conflict with its obligations as a fiduciary; <u>or</u>  (5) AMc failed to fully and fairly disclose all important information to the NRA concerning the transactions.

4.    <u>Fraud</u>

The NRA brings a claim for fraud because AMc misled the NRA as to aspects of its services, such as NRATV, and associated bills and costs, and by hiding the related records from inspection. Further, AMc knew the NRA did not know about NRATV's underperformance and intentionally hid this information from the NRA.

Specifically: 1) Defendants willfully misled the NRA regarding NRATV; 2) AMc's opaque, deceptive budgeting and invoicing practices were fraudulent; and 3) in response to the NRA's scrutiny, AMc doubled down on its deception—falsely representing that it accounted properly for all expenses.

To prove fraud under Virginia law, the NRA will show that: (1) material representations about NRATV and budget/billing practices were made by AMc; (2) the representations were false; (3) the representations were made with requisite intent; (4) AMc made the representations with the intent that the NRA should act upon them; (5) the NRA acted in reliance on the representations, and (6) the NRA thereby suffered injury.

Additionally, the NRA will show AMc perpetuated fraud by nondisclosure because: (1) AMc failed to disclose facts about NRATV and budget/billing practices to the NRA; (2) AMc had a duty to disclose those facts; (3) the facts were material; (4) AMc knew the NRA was ignorant of the facts and the NRA did not have an equal opportunity to discover the facts; (5) AMc was deliberately silent when it had a duty to speak; (6) by failing to disclose the facts, AMc intended to induce the NRA to take some action or refrain from acting; (7) the NRA relied on AMc's nondisclosure; and (8) the NRA was injured as a result of acting without that knowledge.

**5.**     **Trademark Infringement and False Association Under the Lanham Act**

During the parties' contractual relationship, AMc created and operated social media NRA-branded social media accounts associated with "NRATV."  After the parties' relationship was terminated, AMc withheld and still retains the login credentials to the NRATV social media accounts, causing a high likelihood of confusion and forcing the NRA to remain associated with an entity that it no longer wishes to be associated with.  The NRA will show how social media users still comment on NRATV social media pages with posts directed at the NRA, yet the NRA has no control over these accounts which are publicly associated with the Association.  AMc also kept certain NRA-trademarked images on its website, which caused likelihood of confusion as to AMc's continued association with the NRA.

a.    <u>**Claim 1:  False Association.**</u>

AMc and the other Defendants displayed, or caused to be displayed, NRA-trademarked materials on a certain AMc-controlled website without authorization. This display caused a high likelihood of confusion about whether the NRA continued to be an AMc client, and about whether the NRA endorsed the services provided by AMc. And, as described above, AMc withheld, and continues to refuse to release, the login credentials to the NRATV social media accounts. By withholding the login credentials, AMc has seized control of NRATV's digital existence and excluded the NRA from access to its online followers and control over its digital presence and real-world perception. This has forced the NRA to endure ongoing, unwanted association with NRATV and the content that members of the public continue to post as comments on these social media pages. It has been recognized by federal courts that unauthorized seizure and control/use of another's social media accounts can support a Lanham Act claim under similar circumstances.

b.    <u>**Claim 2:  Trademark Infringement.**</u>

To prove its Trademark Infringement claim, NRA will show that:  (1) the NRA possesses a legally protectable mark; and (2) Defendants' use of the trademark creates a likelihood of confusion as to source, affiliation, or sponsorship with the NRA.

A presumption of confusion exists here because AMc used the NRA's <u>**exact**</u> trademark on their website after the termination of the Services Agreement, satisfying the second element.

### 6.   Conspiracy

AMc conspired with other Defendants to commit the above wrongful acts. Defendants engaged in a conspiracy by misrepresenting to the NRA that certain AMc employees were dedicated to NRA work and fraudulently failing to disclose that several were in fact dedicating a portion of their time or more to other clients. Further, when the NRA sued AMc for access to documents that would expose Defendants' scheme, Defendants attempted to remove and replace the NRA's leadership.

In accordance with the elements of civil conspiracy under the laws of Virginia, the NRA will show:  (1) an agreement between two or more persons (2) to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, which (3) results in damage to the NRA.

### B.      The National Rifle Association of America's Defenses

The following is a summary of the defenses the NRA asserts to AMc's claims for Breach of Contract, Defamation, Fraud, and Conspiracy.

### 1.   AMc's Breach of Contract Claim

### a.   Defense 1:  Prior Material Breach.

AMc committed prior material breaches of the Services Agreement which preclude an award of damages to AMc for any alleged breach by the NRA.

### b.   Defense 2:  The contract was nonexclusive and terminable at-will.

The Services Agreement was both nonexclusive and terminable at-will.  The Services Agreement was nonexclusive, explicitly describing AMc as a "nonexclusive source for the services described [t]herein."  And, the contract was terminable at-will

because the NRA was entitled, in its "sole and exclusive discretion, [to] terminate the Services Agreement without any cause whatsoever" upon 90 days' notice.

AMc claims that William A. Brewer III or his law firm Brewer, Attorneys & Counselors engaged in competition with AMc for the NRA's advertising and public relations needs.  However, the contract itself makes it clear that AMc was merely a nonexclusive vendor that could be terminated at any time the NRA pleased.  AMc had no right to provide services to the NRA and therefore this alleged conduct, even if it were true, could not constitute a breach of contract.

**c.**    **Defense 3:  Notice Requirement for Indemnification**

AMc claims that the Services Agreement required the NRA to indemnify it for costs AMc claims it suffered as a result of the Loesch employment agreement arbitration and in responding to governmental investigations.  The Services Agreement required the NRA to indemnify AMc for three specific categories of claims: (1) claims concerning NRA data or materials incorporated into AMc's work product; (2) claims for damages related to violence committed with firearms, or for injunctive relief with respect to the conduct of NRA-approved activities; and (3) spokesperson activities directed or supervised by the NRA.

AMc's claims do not fit into any of these categories.  Dana Loesch was not an NRA employee and was not supervised by the NRA — she was hired by AMc to host a show on the now-defunct NRATV.  The Loesch arbitration for which AMc seeks indemnification is not a claim arising out of activities directed or supervised by the

- 8 -

NRA. And, the governmental investigation by the New York Attorney General ("NYAG") does not involve any claims for damages related to violence committed with firearms.

Further, AMc was required to give the NRA prompt notice of any matter for which it seeks indemnification. AMc did not give the NRA prompt notice — or any notice — that it was seeking indemnification for the Loesch Arbitration or for the regulatory investigation by the NYAG. In fact, the NRA requested documents related to the Loesch Arbitration in multiple of its Requests for Production and just received the first related document, a Partial Final Award, mere weeks before trial.

### 2.   AMc's Claim for Defamation

AMc alleges that NRA representatives defamed AMc by accusing it of criminal extortion. AMc claims that Mr. LaPierre circulated a letter to the NRA Board of Directors recounting a conversation with an AMc employee, Oliver North, that Mr. LaPierre interpreted as an extortion: either resign from the NRA or AMc will make destructive allegations made against Mr. LaPierre and the NRA. AMc also alleges that the NRA subsequently disseminated this extortion narrative to multiple media outlets.

### a.   Defense: Truth

Truth is an absolute defense to defamation under Virginia law. The statement allegedly made by Mr. LaPierre was substantially true. AMc has the burden of proving the falsehood of the statement.

3.  **AMc's Claim for Fraud**

AMc's fraud claim centers on NRA Executive Vice President Wayne LaPierre's allegedly prior, forward-looking promises that AMc would not need to deal with lawyer William A. Brewer III or his namesake firm, Brewer, Attorneys & Counselors.  AMc alleges that, based on these promises, it agreed to a record-examination by FRA, on the purportedly false premise that FRA was independent.  AMc claims LaPierre's alleged implicit assurances that FRA was independent amounted to fraud, because FRA employed a then-former Brewer employee named Susan Dillon.  AMc alleges that it was injured because it spent money and time to furnish records for FRA's examination, and because the NRA brought lawsuits informed by problems that examination revealed.

a.  **Defense 1:  AMc was contractually required to comply with the records examination clause of the Services Agreement.**

AMc cannot prove actual or justifiable reliance, because (1) it had actual, continuous notice of the Brewer firm's involvement in the NRA's legal affairs before, during, and after FRA's examination; and (2) AMc was contractually required to cooperate in the records examination irrespective of the Brewer firm's involvement.

b.  **Defense 2:  The NRA had a legal duty to investigate whistleblower complaints and therefore the conduct alleged by AMc cannot constitute fraud.**

The NRA undertook its audit and review of AMc's records in accordance with its obligations under the New York Not-for-Profit Corporations Law.  Under the laws of New York State, the NRA was required to be informed and take appropriate steps

to investigate any suspicions of wrongdoing or non-compliance. After the presentation of whistleblower concerns, the NRA took several actions, including examining related party transactions and reviewing vendor contracts, one of which was its contract with AMc.

The NRA could not have had fraudulent intent to conduct the records examination because it was affirmatively required under the law to carry it out.

### 4.   AMc's Claim for Conspiracy

AMc alleges that the NRA, LaPierre, and Joshua Powell, the former Chief of Staff to the NRA, conspired to defame and defraud AMc.

**a.   Defense:  Conspiracy with one's attorney is a legal impossibility.**

Under Virginia law, conspiracy among a principal and agent (and thus, among attorney and client) is a legal impossibility.

**b.   Defense:  An Intra-corporate conspiracy is a legal impossibility.**

Under Virginia law, members and employees of a corporation cannot be held to have conspired among themselves, because the corporation and its agents constitute a single actor for purposes of law.

### 5.   Defense of Unclean Hands

Defendants are guilty of inequitable and wrongful conduct with respect to the subject matter of this case and therefore cannot seek equitable relief from this court.

### 6.   Failure to Prove Claim

Defendants will be unable to prove one or more of the required elements of each of their claims against the NRA.

**C.     Claims and Defenses of the Ackerman McQueen Parties**

 i. <u>Summary of AMc's Causes of Action</u>

  *1. Breach of Contract*

AMc asserts a breach of contract claim against the NRA for its multiple breaches of the parties' operative contract.  For each claim, AMc can and will establish the existence of a duty, the NRA's breach of that duty, and actual injury to AMc proximately caused by the NRA's breach.

  i. <u>Unpaid Invoices</u>

The 2017 Services Agreement requires the NRA to remit payment to AMc for services provided within 30 days of the invoice date.  AMc rendered — and the NRA accepted—services that were invoiced to the NRA in a timely manner, conferring to the NRA a duty to remit payment to AMc.  AMc demanded timely payment of the invoices, and AMc has continued to demand the NRA's payment of same.  The NRA breached its contractual obligation under the 2017 Services Agreement by failing to make payments on certain invoices, totaling millions of dollars that remain unpaid by the NRA (the "***Unpaid Invoices***").

  ii. <u>Letter of Credit</u>

Under Paragraph 2 of Amendment No. 1 to the 2017 Services Agreement, the NRA was required to "post a $3,000,000 letter of credit (the "***LOC***") for the benefit

of AMc" if the NRA ever failed to timely pay an invoice.  It is undisputed that the NRA

failed to timely pay at least one invoice, including the continued failure to pay the forty

three Unpaid Invoices.  Therefore, the NRA had a duty to post a $3,000,000 LOC for

the benefit of AMc.  The NRA has admitted that it did not post the Letter of Credit.

The LOC was intended "to be drawn upon to pay in full invoices for service fee billings

outstanding more than 30 days."  The NRA breached Amendment No. 1 to the 2017

Services Agreement by not posting the LOC.  The material breach by the NRA in early

2018 was not revealed until the summer of 2019.  Therefore, because of the NRA, AMc

has sustained damages under Section 2 of Amendment No. 1 to the 2017 Services

Agreement in the amount of at least $3,000,000.

### iii.   Termination Provision

Section XI of the 2017 Services Agreement sets forth the parties' rights and

obligations relating to the termination of the agreement (the "***Termination Provision***").

Section XI is amended, in part, by Paragraph 3 of the Amendment No. 1 to 2017

Services Agreement, dated May 6, 2018.  The NRA committed various breaches of the

Termination Provision.

#### a.  Wrongful Termination

Section XI.C of the 2017 Services Agreement provides that the NRA may

terminate the agreement immediately upon notice under any of six specific

circumstances.  The NRA violated Section XI.C of the 2017 Services Agreement when

it delivered to AMc an immediate termination notice in the absence of any

circumstances required under Section XI.C.  Specifically, at no time — and certainly not at the time of the NRA's immediate termination notice — did AMc (1) fail to diligently and in good faith perform its obligations under the 2017 Services Agreement; (2) breach any term of the 2017 Services Agreement; (3) file for bankruptcy; (4) have its assets assigned to a trustee or receiver, (5) become insolvent; or (6) dissolve.  The NRA's attempt to immediately terminate the 2017 Services Agreement in the absence of these circumstances is a breach of the NRA's obligations under same.  Further, the NRA also failed to properly terminate the 2017 Services Agreement because, on or about May 29, 2019, because AMc had already provided the NRA with notice of termination of the 2017 Services Agreement.  As a result of the NRA's breach, AMc has incurred millions of dollars in damages.

### b.  AMc-Third Party NRA Contracts

Amendment No. 1 to 2017 Services Agreement requires the NRA to pay all compensation payable under AMc-Third Party NRA Contracts. The Amendment defines "AMc-Third Party NRA Contract" as any "non-cancellable contract[] entered into between AMc and third parties for the benefit of the NRA."  Amendment No. 1 itself expressly confirms that AMc-Third Party NRA Contracts include AMc's contracts with Dana Loesch ("Loesch") and Oliver North ("*North*").

The intent of the 2018 Amendment was to insulate AMc from any contractual obligations AMc entered into on behalf of the NRA.  Indeed, AMc required that the 2018 Amendment be executed before it executed the AMc-Third Party NRA Contract

with North.  AMc-Third Party NRA Contracts were necessarily terminated when the 2017 Services Agreement was terminated because the contracts were executed by AMc on behalf of the NRA, and pursuant to AMc's obligations to the NRA under the 2017 Services Agreement.  Despite AMc's demands, the NRA has breached its obligation to pay AMc all compensation payable under the AMc-Third Party NRA Contracts and, as a result of the NRA's breach, AMc has incurred damages in excess of $9 million.

### c.  *Termination Fee*

Section XI.F of the 2017 Services Agreement requires the NRA to "pay AMc a fair and equitable termination fee to compensate it for the inevitable severances and other reasonable costs incurred in conjunction with" the "expiration or termination" of the 2017 Services Agreement.  The 2017 Services Agreement has been terminated, such that the NRA had a duty to AMc to pay a fair and equitable termination fee.  AMc attempted to negotiate the fair and equitable termination fee in good faith, but the NRA refused to participate in any negotiation.  The NRA has paid AMc no termination fee, breaching its duty under the 2017 Services Agreement.

AMc has sustained damages in excess of $6 million resulting from the winding down of some of AMc's business operations because of the termination of the 2017 Services Agreement.  This amount is comprised of various expenses relating to offices and leases, costs incurred in terminating other contracts, costs incurred to relocate office equipment and personnel, and other costs, including but not limited to at least $509,492 in damages for amounts paid in COBRA premiums for employees furloughed

as a result of the termination of the 2017 Services Agreement and at least $1,929,146 in damages in employee severance for same.  None of these expenses have been paid by the NRA, resulting in injury of the same amount under the NRA's obligations in the Termination Provision.

Also included in AMc's "inevitable severances and other reasonable costs" resulting from the termination of the 2017 Services Agreement are the severances and costs associated with the termination of AMc-Third Party NRA Contracts — contracts entered on behalf of the NRA.  AMc has demanded payment from the NRA for amounts owed under the AMc-Third Party NRA Contracts, and the NRA has failed and refused to remit payment.  As a result of the NRA's breach, AMc has incurred damages in excess of $15 million.

iv.   <u>Indemnification</u>

Under Section V.B.I, the NRA has a duty to indemnify and reimburse AMc for expenses arising from "activities [AMc] performed on behalf of the NRA pursuant to this Agreement or otherwise requested or approved by the NRA."  The NRA has breached its obligations to AMc under the Indemnification Provision by failing and refusing to indemnify AMc for applicable costs incurred.

a.  *NYAG Investigation*

It is undisputed the NRA faced an investigation and subsequent lawsuit from the NYAG, and the NYAG's investigation of the NRA includes considerable, deliberate scrutiny of the NRA's relationship with AMc.  The NYAG investigation plainly relates

- 16 -

to an "action" by an "attorney general" seeking to dissolve the NRA based in part on "activities [AMc] performed on behalf of NRA pursuant to [the 2017 Services Agreement] or otherwise requested or approved by NRA" — thereby invoking the NRA's indemnification obligations to AMc.  Despite AMc's demands, the NRA has refused to indemnify and reimburse AMc for these expenses, breaching its obligations under Section V.B.1 of the 2017 Services Agreement.  As a result, AMc has incurred significant damages in the form of attorneys' fees and reasonable costs that have not been indemnified by the NRA.

### b. *Loesch Arbitration*

In addition, the NRA has a duty to "indemnify, defend, and hold harmless AMc" from "any and all claims, demands, causes of action, suits, liabilities, losses, damages, settlements, judgments, and expenses . . . arising from . . . the public relations services and related activities of any Spokesperson pursuant to the direction or supervision of NRA."  2017 Services Agreement § V.B.I.  Dana Loesch was a Spokesperson for the NRA.  She initiated arbitration against AMc for the NRA's failure and refusal to honor its obligations related to her contract.  In addition to its duties to AMc under Loesch's contract — an AMc-Third Party NRA Contract — the NRA has a duty to indemnify and defend AMc in the arbitration against AMc by Loesch.  The NRA has known about the Loesch arbitration for years but has taken no action whatsoever to defend or indemnify AMc.  The Loesch arbitration related to Loesch's "public relations services and related activities" with the NRA in her capacity as the NRA Spokesperson.  AMc's

involvement in the arbitration is exclusively a result of actions that AMc performed on behalf of the NRA pursuant to the 2017 Services Agreement or that were otherwise requested and approved by the NRA.

The NRA has breached its obligations to AMc and refused to indemnify AMc for any expenses it incurred in its compliance with the NYAG's investigation and refused to indemnify and defend AMc for claims and judgment made against AMc by Loesch — the NRA's own Spokesperson.  As a result of the NRA's breach, AMc has sustained damages in excess of $6 million — an amount that continues to accrue on a daily basis in light of the NRA's refusal to defend AMc.

v.    Untimely Invoices

The 2017 Services Agreement requires the NRA to remit payment to AMc for services provided within 30 days of the invoice date.  AMc rendered — and the NRA accepted—services that were invoiced to the NRA in a timely manner, conferring to the NRA a duty to remit payment to AMc.  For more than 70 invoices, the NRA failed to make a timely payment in violation of its obligations under the 2017 Services Agreement.  Under Section III.E of the 2017 Services Agreement, "amounts not received by AMc within 60 days from the date of the invoice shall bear interest at the rate of 1% per month from the date of the invoice until paid."  The NRA failed and continues to fail to pay interest accrued on invoices paid by the NRA more than 60 days after the invoice date.  As a result of the NRA's breach, AMc has sustained damages in excess of $1 million.

2.  *Defamation*

AMc asserts claims against the NRA for defamation and defamation *per se* because of libelous statements made about AMc by the NRA both internally at the NRA and publicly to the media.  First, the NRA published — and continues to publish — defamatory statements that AMc leaked confidential information to the media in breach of the 2017 Services Agreement — a private, confidential agreement between the parties.  The NRA also published — and continues to publish — defamatory statements that AMc breached the 2017 Services Agreement by failing to provide documents in response to various audit requests.  In addition, the NRA published — and continues to publish — defamatory statements that AMc participated in an extortion plot.  As this court has already determined, extortion is a crime, making the NRA's statements libel *per se*.  *Hawbecker v. Hall*, No. 5:14-CV-1010-XR, 2015 U.S. Dist. LEXIS 102019, at *4-5 (W.D. Tex. Aug. 4, 2015).

The NRA published its defamatory statements internally to its employees and to the NRA Board of Directors.  *Smith v. Shred-it USA*, 2010 U.S. Dist. LEXIS 100981, at *12-13 (N.D. Tex. Aug. 12, 2010) ("Texas law is clear that statements are 'published' even if only made to other employees or managers.").  The NRA also published its defamatory statements to the public, including in its pleadings in the instant lawsuit and in statements the NRA intentionally released to third-party media organizations.

It is the NRA's burden to prove the truth of its defamatory statements.  *Super Future Equities, Inc. v. Wells Fargo Bank Minn., N.A.*, 553 F. Supp. 2d 680, 686 (N.D.

Tex. 2008).  The NRA will fail in meeting its burden because the statements are false. The NRA has no more than "gut feelings" that AMc leaked any information to the media, whereas it held concerns of leaks from its own organization.  The evidence also demonstrates that AMc *did* comply with the audits, even down to providing a copy of the North contract the day before the NRA filed its first lawsuit, even though the various lawsuits still allege that AMc is withholding the contract.  Because this court has already determined as a matter of law that AMc is a private figure, the NRA acted with negligence as to the truth of its statements, including by falsely and maliciously accusing AMc of the crime of extortion.  Indeed, while the NRA contemporaneously stated that its defamatory statements were supported by the substance of two phone calls with its employee, Millie Hallow, written evidence and the sworn testimony from the parties to those calls (including Millie Hallow) universally confirm no extortion plot involving AMc or anyone else and no extortion plot.  The NRA manufactured its defamatory statements that AMc engaged in criminal activity with the actual intent to expose AMc to public hatred, contempt or ridicule, or financial injury or to impeach AMc's honesty, integrity, virtue, or reputation.  *Hawbecker*, 2015 U.S. Dist. LEXIS 102019, at *4-5.

Because the NRA's statements are defamatory *per se*, AMc's damages are presumed.  *Chang v. Nguyen*, 81 S.W.3d 314, 318 (Tex. App. — Houston [14th Dist.] 2001).  However, AMc has also suffered, and is entitled to, millions of dollars in damages relating to the injury to its reputation in the past, the likely injury to its

reputation in the future, lost profits sustained in the past, and lost profits that it will sustain in the future.   Due to the intentional, malicious nature of the NRA's defamation, AMc is entitled to uncapped exemplary damages.

### 3. *Fraud*

The NRA committed fraud when it subjected AMc to sham audits premised on intentionally false representations to AMc and for the purposes of achieving an ulterior motive willfully undisclosed to AMc.

First, the NRA conducted three audits of AMc under the repeated, false assertions — made both to AMc and the public — that the audits were a part of efforts to comply with the NRA's non-profit obligations and part of the parties' "joint interest" efforts relating to a lawsuit involving Lockton.   The NRA knew its representations to AMc about the basis of the audits were false.   The evidence produced in this matter, including a letter written by Wayne LaPierre ("*LaPierre*") himself, confirms that the NRA was plotting to sue AMc as early as September 2018 on the basis of non-compliance with the audits, before the first audit ever occurred.   By making the statements that the audits were for "joint interest"-type purposes in responding to the Carry Guard lawsuit, the NRA voluntarily disclosed information that gave rise to a duty to disclose the whole truth, and they partially disclosed information giving a false impression, which also gave rise to a duty to disclose the whole truth.   But the NRA intentionally concealed from AMc that the audits were actually being used to prepare for a lawsuit against AMc.   Unaware of the NRA's duplicitous intent, and in reliance

on the NRA's representations regarding the purpose of the audits, AMc agreed to the NRA's three audits—each including demands for increasingly confidential, proprietary business information from AMc.

The NRA's false representation as to the basis for its audit requests was material. If the NRA properly informed AMc that its audits were intended to create the basis for a lawsuit against AMc, AMc would have understood the audits to be beyond the scope of the 2017 Services Agreement and AMc would not have agreed to the audits. The NRA designated the Brewer Firm to coordinate and execute these audits, providing to the Brewer Firm direct access and unfettered discretion to request and review the confidential business records of AMc — the Brewer Firm's direct competitor.

Second, the NRA committed fraud relating to its retention of FRA to conduct the third audit of AMc in February 2019. Following months of open hostility by William A. Brewer III ("**Brewer**") to AMc, and as the Brewer Firm's status as a competitor to AMc became increasingly apparent, AMc met with NRA representatives to discuss its continued interactions with the Brewer Firm and Josh Powell ("**Powell**"). At that October 11, 2018 meeting, and in no uncertain terms, LaPierre represented to numerous AMc representatives that the NRA would not permit Brewer or the Brewer Firm to deal with AMc any longer. The evidence shows that AMc was prepared to resign the NRA account if the Brewer Firm were permitted continued access to AMc's proprietary and confidential information through audits. With specific intent to induce AMc's continued participation in the NRA's Trojan horse audits, LaPierre made

deliberate and false representations to AMc that the Brewer Firm, Brewer, and Powell would no longer be involved with AMc.  AMc agreed to continue its relationship with the NRA in reliance on these false and blatant misrepresentations, and indeed continued to perform work for the NRA and committing to various expenses on behalf of the NRA.

When LaPierre made these statements, he knew they were false.  While LaPierre admits that he immediately met with Brewer after the meeting with AMc, Brewer has confirmed that LaPierre never informed him that the Brewer Firm was prohibited from participating in subsequent AMc audits.  Thereafter, in February 2019, AMc was audited by FRA.  Unbeknownst to AMc, the Brewer Firm participated in the FRA audit, coordinated the logistics and substance of the audit with FRA, and was immediately privy to the findings and conclusions of FRA.  In addition, AMc had no knowledge that a long-time Brewer Firm employee, Susan Dillon, who participated in the Brewer Firm's September 2018 audit of AMc, had left the Brewer Firm and would lead the February 2019 FRA Audit.  Brewer confirmed that the Brewer Firm recommended FRA to the NRA as an "independent" auditor, that Brewer and the NRA had actual knowledge that Dillon worked at FRA, and that Dillon's status as an FRA employee contributed to the NRA's decision to retain FRA.  Thus, LaPierre knew his statements to AMc officials in October 2018 were false and LaPierre and the NRA continued to act in contradiction to those statements through the FRA audit.  At all relevant times, LaPierre served as Executive Vice President, the *de facto* leader, of the NRA.

LaPierre's representations to AMc were material.  If AMc knew that the NRA would permit the Brewer Firm to participate in the February 2019 FRA audit, AMc would not have agreed and would have resigned the NRA account as AMc had indicated in the October 2018 meeting.  If AMc knew that a long-time Brewer Firm employee who worked on the September 2018 audit was employed by FRA and would participate in the February 2019 FRA audit, AMc would not have agreed and would have resigned the NRA account.  Knowing AMc's position, and based on statements made by LaPierre, the NRA and LaPierre remained deliberately silent when they had a duty to speak.

By making the original false statements to AMc in October 2018 and by refusing to disclose facts when FRA was retained and audited AMc, the NRA intended to induce AMc to allow FRA (and the Brewer Firm) to freely audit AMc's sensitive, competitive business information.  AMc relied on the NRA's nondisclosure and did permit FRA (and the Brewer Firm) to audit its information.  AMc was injured as a result of acting without that knowledge, including by the NRA using the audit as the basis for the first and subsequent lawsuits against AMc while shielding the underlying facts from production.  Specifically, as a result of the NRA's fraud, AMc has suffered, and is entitled to, millions of dollars in damages relating to the injury to its reputation in the past, the likely injury to its reputation in the future, lost profits sustained in the past, and lost profits that it will sustain in the future.  Due to the intentional, malicious

nature of the NRA's fraudulent conduct, AMc is entitled to uncapped exemplary damages.

### 4. Conspiracy

The NRA, LaPierre, Powell, Brewer, and the Brewer Firm combined to conspire against AMc to accomplish the objective of defaming AMc and defrauding AMc. To establish a conspiracy claim, a party must show (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more overt, unlawful acts; and (5) damages as the proximate result." *Homoki v. Conversion Servs.*, 717 F.3d 388, 404-05 (5th Cir. 2013). Each of these elements is met in this case.

First, the NRA, LaPierre, Powell, Brewer, and the Brewer Firm conspired to defame AMc. After a meeting of the minds, the conspirators published statements in writing accusing AMc, a private figure, of (a) extortion, (b) leaking confidential information in breach of the 2017 Services Agreement, and (c) withholding documents in breach of the 2017 Services Agreement. Second, the NRA, LaPierre, Powell, Brewer, and the Brewer Firm conspired to defraud AMc. After a meeting of the minds, the conspirators (a) made statements alleging extortion by AMc upon which the NRA would rely to terminate the 2017 Services Agreement, and (b) made statements that Powell, Brewer, and the Brewer Firm would no longer interact with AMc or be involved in any further reviews of AMc documents.

These statements were false when made and were known by NRA, LaPierre, Powell, Brewer, and the Brewer Firm to be false when made. These statements were made with intent to deceive AMc, to lure it into exposing itself to financial obligations, and to lure it into agreeing to additional intrusive reviews of its competitive business information under the auspices of legitimate "joint interest" needs as part of the NRA's defense in the litigation with Lockton regarding Carry Guard. AMc relied on these statements to its detriment, including by extending the 2017 Services Agreement and providing additional services to the NRA, for which it has not been compensated, and by allowing FRA and Dillon (unknown at the time to be Brewer's surrogates) to conduct a nine-day audit of AMc's competitive and proprietary business information. As a result, AMc has suffered damages in excess of $50 million, for which it now sues.

LaPierre, Powell, and Brewer are separate "persons" for purposes of AMc's civil conspiracy claim because each acted independently of their employment or agency with the NRA and, as a result, are cognizable conspirators. LaPierre and Powell are cognizable conspirators because each had an independent stake in achieving the object of the conspiracy and because their actions exceeded the bounds of their authority from the NRA.

Brewer is also a cognizable conspirator because he routinely acted for personal interests independent of any agency with the NRA, most notably personal grievances and the business prospect of supplanting AMc. Brewer's actions first and foremost were aimed at settling personal familial grievances by assailing the company led by

Brewer's father-in-law, Angus McQueen. In addition, Brewer directed threats of criminal investigation and indictment to AMc, statements that necessarily cannot occur in one's capacity as an attorney for a party to a civil lawsuit.  Brewer and the Brewer Firm acted further beyond of the scope of their agency with the NRA by demanding documents not needed or requested by the NRA but for which the NRA would subsequently base a lawsuit.

Specifically, as a result of the NRA's conspiracy, AMc has suffered, and is entitled to, millions of dollars in damages relating to the injury to its reputation in the past, the likely injury to its reputation in the future, lost profits sustained in the past, and lost profits that it will sustain in the future.  Due to the intentional, malicious, and fraudulent nature of the NRA's conspiracy, AMc is entitled to uncapped exemplary damages.

### 5.  *Declaratory Judgment*

AMc seeks a declaration pursuant to 28 USC § 2201, *et. seq.*, that, by their actions, the NRA and its counsel have waived and/or are estopped from claiming that the confidentiality provision of the 2017 Services Agreement applies only to AMc.  The NRA contends that only AMc is bound to the confidentiality restrictions described in Section IV of the 2017 Services Agreement.  Relatedly, the NRA has taken frequent occasion—in both the public domain and in the instant litigation — to disseminate, disclose, and/or publicize information that AMc is proscribed from doing under the 2017 Services Agreement.  As a result, the NRA can (and does) selectively violate the

confidentiality protections of the 2017 Services Agreement to benefit the NRA while contending that AMc can make no similar use of this information.  Holding AMc to such one-sided interpretation prevents AMc from freely and fully responding to allegations made by the NRA.  Such an interpretation is unconscionable.  *See Derby v. Derby*, 378 S.E.2d 74, 78 (Va. Ct. App. 1989).

AMc seeks a declaration that (a) the NRA has waived any claim to enforce Section IV of the 2017 Services Agreement because the NRA committed prior material breaches of the 2017 Services Agreement and is foreclosed from enforcing any term in the agreement; (b) the NRA is estopped from asserting any claim under Section IV of the 2017 Services Agreement because the NRA has willfully evoked the Confidentiality Provision as both a sword and shield to do the NRA's bidding; and/or (c) Section IV of the 2017 Services Agreement, as interpreted by the NRA, is unconscionable under Code of Virginia § 8.2-302.

ii.    Summary of the Ackerman McQueen Parties' Defenses.

a.    *False Association and Trademark Infringement (against all of the Ackerman McQueen parties)*

Claims under the Lanham Act require a showing that (1) the designation or false designation is likely to cause confusion, mistake, or deception as to (a) the affiliation, connection, or association of defendant with another person, or (b) as to the origin, sponsorship, or approval of defendant's goods, services, or commercial activities by another person; and (2) plaintiff has been or is likely to be damaged by these acts.  15 U.S.C. §§ 1114(1)(a), 1125(a)(1)(A).  The NRA's claim will fail because the NRA

cannot establish required elements of its claims, including the required showing of actual damages proximately caused by any of the Ackerman McQueen parties' alleged actions.  Even if the NRA establishes each element of its claims (which it cannot), the NRA's claims will still fail because (a) not all images contested by the NRA are applicable registered trademarks; (b) the NRA authorized AMc's use of the NRA's marks; (c) AMc engaged in permissible fair use of the contested images; (d) the NRA is estopped from asserting its claims because it knowingly permitted AMc's use of the contested images for years with no objection; (e) the NRA's claims are moot; (f) the affirmative defense of truth precludes the NRA's requisite showing of falsehood; and (g) the NRA lacks standing to pursue claims under either the Lanham Act, 15 USC § 1125(a), or under the copyright laws of 17 USC § 101, *et seq.*

The NRA has the burden to establish that AMc's use of the contested images is not fair use.  *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 118 (2004).  It is undisputed that, at the time the work product and images at issue were created, the NRA was still a client of AMc and commissioned and approved of such work.  AMc displayed images on its website depicting its advertising, public relations, and branded media services for work it performed for numerous clients, including the NRA.  This display is reasonably necessary to identify the services provided by AMc and is a common industry practice.  See *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 308 (9th Cir. 1992).  Even though AMc has no obligation to expressly disavow association with the NRA, AMc nonetheless appended the word "Legacy" to

images of content created by AMc for the NRA to further clarify that the NRA was no longer a current client of AMc.  *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1175-76 (9th Cir. 2010).

The NRA alleges that AMc's website is misleading or confusing by creating the impression that the NRA approved of AMc's work, and the NRA seeks monetary damages for same.  Because the NRA is seeking an award of monetary damages for under Section 1114 or 1125 of the Lanham Act, the NRA must show a likelihood of confusion as to the source, affiliation, or sponsorship of the AMc's product or service. 15 U.S.C. §§ 1114(1)(a), 1125(a)(1)(A).  And the NRA cannot merely argue how consumers could react to the images, it must show how consumers actually do react. *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery*, Inc., 185 F.3d 606, 614 (6th Cir. 1999).  The NRA cannot produce any evidence of likely or actual confusion or deception, and the NRA's claim will fail.

The NRA's attempts to rely on a presumption of confusion (because it cannot show actual confusion) must also fail.  No presumption of confusion can exist because (a) AMc and the NRA are not competitors, (b) AMc and the NRA are not even in the same business, and (c) AMc and the NRA do not share the same customers.  In addition to the foregoing, such a presumption of confusion in this case would be egregiously inappropriate because it is undisputed that AMc used the contested marks for many years with no incidents of confusion ever and with no dispute until 2019.

Additionally, the NRA's claims as to William Winkler, Melanie Montgomery, and Henry Martin (the "**Individual Defendants**") and Mercury Group will fail.  The NRA alleges only that the Individual Defendants "directly participated in, or are at least the moving force behind, AMc's website" not being updated to remove NRA material after the NRA purportedly terminated the 2017 Services Agreement, which this court acknowledged were "thin" allegations.  The NRA is required to establish liability for each defendant individually, and the NRA is unable to do so.  *Choice Hotels Int'l, Inc. v. Patel*, 940 F. Supp. 2d 532, 540 (S.D. Tex. 2013).  The NRA has no evidence that the Individual Defendants personally participated in any of the facts and circumstances relating to the NRA's Lanham Act claim and, more importantly, that any individual involvement was specifically intended for the individual's personal gain.

The NRA's claim will fail because the NRA has suffered no actual damages and, even if actual damages do exist, the NRA is unable to establish any causal link for same to the Ackerman McQueen parties.

Finally, the Ackerman McQueen parties will be entitled to a mandatory award of statutory attorneys' fees upon the dismissal and/or prevailing on the NRA's Lanham Act claims.

### b.  *Conversion (against all of the Ackerman McQueen parties)*

The NRA has two bases for its conversion claim: (1) AMc had intellectual property of the NRA on its website after the NRA terminated the 2017 Services Agreement; and (2) AMc failed to return certain confidential information belonging to

the NRA upon request.  This claim will fail because the NRA cannot establish required elements of its claim.  Even if the NRA is able to establish the required elements, its conversion claim will still fail because: (a) conversion does not apply to intangible property; (b) AMc was justified in its use of materials allegedly converted; (c) the NRA has failed to satisfy conditions precedent to its entitlement to recoup any allegedly converted intellectual property; (d) the NRA's own actions and omissions caused or contributed to its injury; (e) the NRA's claim for conversion was previously dismissed, *see* ECF 165, and the NRA should be equitably estopped from asserting the claim again under res judicata; and (f) the economic loss rule bars the NRA's claims.

To prove conversion, a claimant must establish (1) it owned or had legal possession of the property or entitlement to possession, (2) the defendant unlawfully and without authorization assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, the claimant's rights, (3) the claimant demanded return of the property, and (4) the defendant refused to return the property. *Hill v. New Concept Energy, Inc.* (*In re Yazoo Pipeline Co., L.P.*), 459 B.R. 636, 652 (S.D. Tex. Bankr. Oct. 14, 2011).

The NRA's claim will first fail because Texas law does not recognize a cause of action for conversion of intangible property except in cases where an underlying intangible right has been merged into a document and that document has been converted.  *In re Yazoo Pipeline Co., L.P.*, 459 B.R. at 652. Thus, the NRA's claim of

conversion either falls outside the scope of Texas conversion law or is preempted by the Copyright Act.

Notwithstanding the above, the NRA's claim will also fail because AMc did not exercise "dominion and control" of the materials "to the exclusion of" the NRA. Indeed, the NRA was in possession of the contested materials, and the NRA admits it could have equally and simultaneously used the contested materials for its own purposes.

Though the court has previously dismissed the NRA's conversion claims because they were preempted by the Copyright Act, the NRA has since re-pleaded conversion under the artfully pled argument that the NRA's "confidential information" was converted by AMc. This claim will also fail because (a) the NRA refuses to identify any tangible property into which the confidential information was merged and (b) the subject information was not confidential. Indeed, the intellectual property the NRA now claims was "confidential" was publicly displayed on AMc's website—without objection by the NRA—prior to the termination of the 2017 Services Agreement.

The NRA's artfully pled claim for conversion for "confidential information" further confirms that the conversion claim is barred by the economic loss rule. The 2017 Services Agreement plainly includes provisions regarding the parties' rights and obligations as to confidential information, including the Confidentiality Clause and Ownership of Products provisions. The Confidentiality Clause forbids AMc from

disclosing "materials or information coming to the knowledge of AMc, supplied to AMc by NRA, or otherwise made known to AMc as a result of AMc's providing Services."

The Termination Clause also requires AMc to return to the NRA "any and all of the NRA's property, materials, documents, Confidential Information, etc., that may be in AMc's possession," once "all charges for accumulating said materials [are] approved and paid in advance of receipt by the NRA." In fact, the NRA previously asserted a breach of contract claim against AMc relating to this provision but dropped that claim from its most recent pleading. For all other intellectual property (website images), the Ownership of Products provision supplies the legal duty and remedy for any unauthorized use of NRA property. Accordingly, for all property underlying the NRA's claim for conversion, the legal duties and any resulting harm are squarely addressed in the 2017 Services Agreement, and thus, the economic loss rule bars the NRA's entire claim for conversion as to all Defendants.

Though never raised as the basis for its conversion claim in the Second Amended Complaint, the NRA asserted for the first time after the close of discovery that the basis for its conversion claim was AMc's NRATV "Dashboard" and its information relating to its social media accounts. The NRA has known about the NRATV Dashboard since at least Fall 2017 and has even submitted pleadings to the court regarding same. ECF 18, ¶¶ 28, 55. Because the NRA had actual knowledge of the Dashboard before it filed the lawsuit and the NRA deliberately demurred from identifying the Dashboard as the basis for its conversion claim until *after* the discovery

deadline expired, the Dashboard's inclusion as a basis for conversion must be disregarded. *See Cutrera v. Bd. of Supervisors*, 429 F.3d 108, 113 (5th Cir. 2005); *De Franceschi v. BAC Home Loans Servicing, L.P.*, 477 F. App'x 200, 203-04 (5th Cir. 2012). Moreover, the dashboard is not tangible property that can be converted. Further, any allegations by the NRA that it converted the use of its social media accounts also fails as a matter of law because it is not tangible property, and it is also not properly before the court because it was not raised in the NRA's pleadings.

Even if the NRA's Dashboard contentions were justiciable (they are not), the Dashboard information would plainly fall within the purview of the 2017 Services Agreement's Return of Property Clause: "Upon the . . . termination of this 2017 Services Agreement, AMc shall immediately return to NRA . . . any and all of the NRA's property, materials, documents, Confidential Information, etc., that may be in AMc's possession." The NRA's conversion claim is barred by the economic loss rule, no matter the NRA's attempts to modify its claim.

The NRA's conversion claim will also fail because the NRA has not pleaded or established any actual damages resulting from same. If any actual damages are shown, the NRA is nonetheless unable to establish a causal link to AMc's alleged actions and inactions.

Finally, the NRA's conversion claim is also barred by numerous affirmative defenses, including waiver, estoppel, laches, ratification, and unclean hands.

### c. *Fraud (against all of the Ackerman McQueen parties)*

The NRA asserts extensive allegations against the Ackerman McQueen parties for claims of fraud.  The NRA's claims will fail because the NRA cannot establish (a) that any of the Ackerman McQueen parties made a false representation, (b) that any false representation was material, (c) that any of the Ackerman McQueen parties made any statement with knowing falsity or with reckless disregard to same, (d) that any of the Ackerman McQueen parties made any false statement with actual intent for the NRA to rely, or (e) that the NRA suffered damages proximately caused by false representations by any of the Ackerman McQueen parties.

Even if the NRA can establish each requirement element of its fraud claim, its claim must nonetheless fail because: (a) the fraud claims are barred by laches; (b) the NRA waived its fraud claims; (c) the NRA is not entitled to such relief because it comes into court with unclean hands; (d) the NRA ratified the acts forming the basis of its claim; (e) the NRA is estopped from bringing its fraud claims; (f) the NRA failed to bring its fraud claims within the applicable statute of limitations; (g) the NRA's claims are precluded and barred by the NRA's own acts of fraud; and (h) the NRA authorized the acts forming the basis of its claim through the parties' course of conduct.

The NRA's fraud claims are recast breach of contract claims in a tort veneer and are thus barred by the economic loss doctrine.  For each allegation in the NRA's fraud claim, it is the NRA's burden to prove that AMc's duty arises independently from the 2017 Services Agreement and that any injury sustained by the NRA is independent

from damages already provided by the 2017 Services Agreement.  *Shopoff Advisors, LP v. Atrium Circle, GP*, 596 S.W.3d 894, 909 (Tex. App. — San Antonio [4th Dist.] 2019, no writ).  The NRA will fail to meet its burden because each act and omission complained of by the NRA arises from a contractual obligation identified in the 2017 Services Agreement.  For instance, the NRA argues that the billing statements were improper in various respects, even going so far as to quote the language of the 2017 Services Agreement itself in support of AMc's purported "misleading" conduct.  Yet billing policies and procedures are clearly addressed under Section III of the 2017 Services Agreement.  To the extent the NRA claims that AMc did not comply with these terms, or that it "did not get what it paid for," then the appropriate action would lie in contract, not in tort.

The NRA similarly asserts allegations regarding NRATV, essentially claiming that NRATV did not meet the NRA's expectations.  Again, the parties' rights and obligations for NRATV are provided for in the 2017 Services Agreement and therefore barred by the economic loss doctrine.  To the extent the NRA now attempts to recast its claims as fraudulent inducement, the NRA has never pled fraudulent inducement and the NRA should be estopped from pursuing relief for same now.  The NRA further asserts that its purported damages are comprised of amounts identified in AMc's billing statements and invoices that the NRA paid as its investment in NRATV.  The invoices were issued in accordance with the 2017 Services Agreement for services provided by

AMc under the 2017 Services Agreement, plainly evincing contractual damages under the 2017 Services Agreement.

Further, the NRA has waived its fraud claims because the NRA continued to do business with AMc for nearly two decades after identifying the very billing practices that it now denounces, such as lack of invoice detail, documentation issues related to out-of-pocket expenses, and a variety of "luxury" expenditures. The NRA's actions and inactions since 2001 reflect a clear intent to waive the right to now complain about any alleged billing deficiencies, further supporting what AMc has maintained all along, and as certain NRA employees have confirmed — that these billing practices were put in place by the NRA for confidentiality purposes — which is the only logical explanation for why the NRA never asked AMc to modify its billing practices or sought reimbursement.

The NRA's fraud claims are further barred by the doctrine of laches because the NRA had actual knowledge of AMc's alleged acts and omissions and the NRA continued to remit payment for services provided, the NRA continued to solicit services from AMc, and the NRA continued to accept services provided by AMc.

### d.  Breach of Fiduciary Duty (against AMc and Mercury Group)

The NRA's claim against AMc and Mercury Group for breach of fiduciary duty and breach of fiduciary duty of loyalty will fail because (a) there is no formal fiduciary relationship between the NRA and AMc or Mercury Group; (b) there is no informal fiduciary relationship between the NRA and AMc or Mercury Group; (c) even if there

was a fiduciary relationship, it ended at the time of the transactions at issue; (d) there is no evidence of AMc or Mercury Group breaching any allegedly owed fiduciary duty; and (e) the NRA has suffered no actual injury proximately caused by AMc or Mercury Group's alleged actions.

There is no formal fiduciary relationship between AMc or Mercury Group and the NRA under the 2017 Services Agreement. The NRA previously identified provisions in the 2017 Services Agreement that it argues establishes a fiduciary relationship and the court rejected these arguments. ECF 165 at 27. The NRA's subsequent attempts to refer to other provisions in the 2017 Services Agreement also fail. The 2017 Services Agreement is an arms-length transaction, and the provisions contained therein do not give rise to a fiduciary obligation by AMc or Mercury Group for the NRA.

There is no informal fiduciary relationship between AMc or Mercury Group and the NRA pursuant to the parties' relationship. An informal fiduciary relationship can arise only "where one person trusts in and relies upon another, whether the relationship is a moral, social, domestic, or purely personal one." *Jacked Up, LLC v. Sara Lee Corp.*, 854 F.3d 797, 808 (5th Cir. 2017). For this reason, courts do not impose informal fiduciary relationships lightly, "especially in the commercial context." *Id.*; *Meyer v. Cathey*, 167 S.W.3d 327, 331 (Tex. 2005). Therefore, to impose an informal fiduciary duty in an arms-length business transaction, the special relationship of trust and confidence "must exist prior to, and apart from, the agreement made the basis of the

suit." *Jacked Up*, 854 F.3d 808.  No such relationship exists between AMc or Mercury Group and the NRA.  There is no evidence that the NRA and AMc or Mercury Group had an extracontractual and personal relationship that imbued on AMc or Mercury Group a fiduciary duty to the NRA.

Even if there was a fiduciary relationship, that relationship ended in 2018 when the NRA made clear that the relationship with AMc was adverse and it was plotting litigation against AMc.  To the extent there was ever a fiduciary relationship, which AMc and Mercury Group deny, there was no fiduciary relationship at the time of the transactions, including the NRA's allegations of extortion that occurred after the NRA had already instituted litigation against AMc and Mercury Group.

Even if a fiduciary relationship existed between the NRA and AMc or Mercury Group, there is no evidence that AMc or Mercury Group breached such a duty. Similarly, owing to the fact that no such breach occurred, the NRA will present no evidence of actual injuries sustained as a proximate result of AMc or Mercury Group's alleged actions.

In addition to failing to establish the requisite elements, the NRA's breach of fiduciary duty claims will fail because (a) the claims are barred by the economic loss doctrine; (b) the claims are barred by laches; (c) the NRA waived its claims and is estopped; (d) the NRA is not entitled to such relief because it comes into court with unclean hands; (e) the NRA ratified the acts forming the basis of its claims; (f) the NRA's is estopped from bringing its claims; (g) the NRA failed and refused to mitigate

its damages; (h) the NRA's claims are precluded and barred by the NRA's own acts of fraud; and (i) the NRA authorized the acts forming the basis of its claim through the parties' course of conduct.

The NRA's breach of fiduciary duty claims are barred by the economic loss doctrine because the 2017 Services Agreement is the sole source of the duty allegedly breached by AMc.  Critically, it is the NRA's burden to prove that its breach of fiduciary duty claims are not barred by the economic loss doctrine.  *Shopoff Advisors, LP v. Atrium Circle, GP*, 596 S.W.3d 894, 909 (Tex. App. — San Antonio [4th Dist.] 2019, no writ). For the reasons explained below, the NRA cannot meet this burden.

First, in its live complaint, the NRA claims that AMc and Mercury Group breached "fiduciary duties" to the NRA by failing to disclose facts related to (a) billing and invoicing practices for work performed by AMc under the 2017 Services Agreement; (b) NRATV production and performance metrics; and (c) AMc's contractual relationship with North and the failure to produce twelve episodes of American Heroes.  But AMc's duty to provide and bill for these activities arises solely from the 2017 Services Agreement, requiring that the NRA's breach of fiduciary duty claims regarding same are barred by the economic loss doctrine.

Second, the NRA alleges that AMc breached a fiduciary duty by "attempting to stop an investigation of Ackerman and its billing practices."  This is the same "investigation" at issue in the NRA's breach of contract claim under the 2017 Services Agreement's Records Inspection Clause.  This claim is barred.

Third, the NRA alleges that its allegations of extortion by AMc also amount to a breach of fiduciary duty.  The underlying act of "extortion" described by the NRA includes only the (false) allegations that AMc threatened to disclose confidential NRA information. Thus, although couched in a dramatic (but entirely imaginary) narrative, the resulting allegations amount to nothing more than a meritless claim of a breach of the Confidentiality Clause.  A tort based on a threatened breach of contract is simply a recast breach of contract claim and is barred by the economic loss rule.

In addition, the NRA's fiduciary duty claims are barred by waiver, estoppel, and laches.  The 2017 Services Agreement plainly states that the NRA was required to "notify AMc of any questions concerning any invoices within 10 business days after receipt."  The NRA admits that it provided no notice or challenge to AMc within the 10-day requirement.  The NRA has contractually waived its rights to challenge AMc's actions by engaging in intentional conduct inconsistent with claiming that right (*i.e.*, declining to comply with the 10-day requirement).  *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996).  For these reasons, the NRA has waived its rights to challenge the substance and sufficiency of the unpaid invoices — whether the NRA couches its complaints as a breach of contract claim or a breach of fiduciary duty claim. *Triton 88 v. Star Elec. L.L.C.*, 411 S.W.3d 42, 59-60 (Tex. App. — Houston [1st Dist.] 2013, no pet.) (upholding summary judgment for plaintiff on breach of contract where invoices were not contested under procedure established by contract over defendant's argument that its evidence of improper billing created fact issue).

Moreover, the evidence makes clear that the invoices now complained of by the NRA were not only in the NRA's possession for months, but that the NRA continued to request and receive services from AMc which were, of course, subsequently invoiced to the NRA.  If the NRA has not already waived its rights to belatedly challenge these invoices, its claim is nonetheless barred under the doctrine of laches.  The NRA acted with unreasonable delay in asserting its claim regarding AMc's invoices and AMc, detrimentally relying on the absence of complaint or dispute from the NRA, continued to incur the costs associated with providing continued services to the NRA.  For this same reason, the NRA has failed to mitigate the damages it now seeks to recover.

Even if a fiduciary relationship is found between the NRA and AMc or Mercury Group, and even if the NRA's claims are not barred by the economic loss doctrine or the doctrine of laches, the NRA will still fail to show evidence of a breach by AMc or Mercury Group.  The NRA claims that AMc "failed to disclose" facts related to AMc's out-of-pocket expenses (specifically those related to Makris) and costs related to "dedicated" NRA employees.  But the evidence establishes that the opposite is true.  As early as 2001, the NRA's Managing Director of Finance, Rick Tedrick ("Tedrick"), reported that certain "dedicated" employees were devoting a portion of their time to other AMc clients besides the NRA — a notation repeated in 2002, 2004, 2005, and 2007.  Tedrick testified that he reported all of his findings to the NRA, and that the NRA never once sought reimbursement for any of these employees' salaries. Accordingly, information about these so-called "dedicated" employees was well known

to the NRA for nearly two decades before the NRA filed the instant action in 2019. Nevertheless, the NRA expressed no concerns to AMc, never sought to modify any billing or budgeting procedures, continued to seek services from AMc, and paid all invoices through March 2019.

Similarly, with regard to reimbursable expenses, Tedrick noted that AMc expense reports lacked documentation reflecting the business purpose of the expenses. In fact, every report from 2001-2007 explicitly stated: "There is never documentation of NRA business purpose on any of Tony's receipts." Other findings were also made in these reports, such as (1) travel expenses for Makris's wife, (2) use of a car service by AMc employees, (3) first class air travel, and (4) cigar purchases—expenses over which the NRA now feigns outrage.

Tedrick further testified that he raised concerns internally with the NRA of his multi-decade employment with the NRA regarding the lack of detail in AMc's invoices, but that the NRA continued to pay the invoices anyway. Yet even if this is true, the NRA never raised those issues with AMc and continued paying all invoices. Moreover, Tedrick admits that he had the choice not to pay certain invoices but approved and paid them anyway.

Although AMc maintains that there was nothing improper about any of these practices, the relevant inquiry is whether the NRA was on notice of the specific conduct about which it now complains — which it was. By failing to express any concerns to AMc or Mercury Group and, to the contrary, by continuing to seek services from AMc

and pay its invoices, the NRA waived any breach of fiduciary duty claim related to AMc's billing and records examination by acting inconsistently with the rights it might otherwise have asserted under law or contract.   Moreover, the instant breach of fiduciary duty claim should likewise be barred under the doctrine of laches because the NRA clearly possessed knowledge of billing concerns as early as 2001, proceeded to seek AMc's services, and AMc detrimentally relied on the NRA's actions and conformed its own conduct to reflect the parties' longtime course of dealing.  Finally, to the extent it had a claim, then that claim would be barred by the statute of limitations.

e. *Conspiracy (against all Defendants)*

The NRA next accuses all of the Ackerman McQueen parties and Dan Boren ("Boren"), an independent third-party, of conspiring against the NRA to commit fraud against the NRA and to extort LaPierre.  The NRA's conspiracy claim will fail because the NRA cannot establish required elements of its claim.  There is no evidence of any meeting of the minds or overt actions involving any of the Ackerman McQueen parties and Dan Boren.  Boren's uncontroverted testimony establishes that he never acted at the direction of, on behalf of, or in concert with any of the Ackerman McQueen parties. Furthermore, because there is no agency, cooperation, or meeting of the minds between AMc and Boren, the NRA's claim will fail because there is no other person to form the two-person requirement of a conspiracy claim.   Because Martin, Winkler, and Montgomery each acted in the scope of their employment at all relevant times, the intracorporate conspiracy doctrine bars the NRA's attempts to regard the Individual Defendants as separate persons for purposes of its conspiracy claim.  For this same reason, the NRA's conspiracy claim against the Individual Defendants will fail.

The NRA's claim will also fail because so do the alleged underlying torts. Moreover, while the NRA pleads that the tortious object of its alleged conspiracy was "to extort LaPierre and the NRA," extortion is not a cognizable civil claim.  In any event, the NRA is also unable to establish evidence of any actual damages proximately caused by the alleged conspiracy.

####    f.   Breach of Contract (against AMc and Mercury Group)

Finally, the NRA asserts a cause of action against AMc for breach of contract under the 2017 Services Agreement.  The NRA's Second Amended Complaint accuses AMc of two breaches: (1) failing to allow the NRA to inspect records as required under the Records Inspection Clause of the 2017 Services Agreement, and (2) leaking confidential NRA information in violation of the Confidentiality Clause of the 2017 Services Agreement.  Each accusation is false, and both claims will fail because the NRA cannot establish the required elements.

As a threshold matter, the 2017 Services Agreement provides that "[d]uring the term of this 2017 Services Agreement, AMc authorizes NRA, upon reasonable notice, to examine AMc and Mercury's files, books, and records, with respect to matters covered under this 2017 Services Agreement."  The NRA has produced no evidence that it complied with its obligation to provide reasonable notice.  Regardless, the NRA names two categories of documents that AMc allegedly failed to provide upon request: (1) copies of any AMc-Third Party NRA Contracts, including AMc's employment contract with North ("North Contract"), and (2) business records, in whatever form they were generated in the ordinary course of AMc's business.

Assuming AMc had a duty to provide a copy of the North Contract to the NRA, the evidence establishes that AMc did not breach this duty because the NRA had a copy of the North Contract as early as May 2018 — nearly a year before the NRA's lawsuit.  AMc's lack of breach has been corroborated by testimony from NRA witnesses

(such as John Frazer) and by the NRA's discovery responses (including the NRA's response to AMc Request for Admission No. 49).  In addition to there being no breach by AMc, the NRA has incurred no damages as a result of the alleged actions.

As to the latter category, the NRA claims that AMc "has repeatedly failed or refused to permit the NRA to examine specified categories of books and records with respect to matters covered under the 2017 Services Agreement."  This claim will fail. AMc has shown—and LaPierre and Wilson "Woody" Phillips confirmed—that the NRA routinely and satisfactorily conducted annual audits of AMc's business records for years.  AMc similarly complied with the audits at issue in this case:

- In September 2018, the Brewer Firm audited AMc on behalf of the NRA.  The audit concluded with no allegations of unproduced documents and no demands for additional documents.  The NRA now contends that "AMc flatly refused" to produce Carry Guard video footage, but the evidence again shows that both John Frazer and the Brewer Firm confirmed to AMc that this raw footage was not actually needed.  Indeed, after the September 2018 Brewer Audit, AMc asked the Brewer Firm if there was anything else they were looking for, and they said "no."

- In November 2018, Cooper Kirk PLLC audited AMc on behalf of the NRA (and, unbeknownst to AMc, was selected by the Brewer Firm).  The audit concluded with no allegations of unproduced documents and no demands for additional documents.  Instead, the Cooper Kirk firm thanked AMc for its cooperation and said that the audit was "fruitful."  Corroborating this understanding, the Brewer Firm sent a letter to AMc's counsel on December 21, 2018, discussing the scope of yet another audit of AMc.  The letter contained no statement, accusation, or insinuation that the NRA believed AMc had not complied with prior audits—a striking omission if the NRA truly believed that noncompliance had occurred.

- In February 2019, forensic accounting firm FRA audited AMc on behalf of the NRA (including, unbeknownst to AMc, FRA employee Susan Dillon, a long-time Brewer Firm employee that participated in the September 2018 Brewer Audit). While FRA continued to request additional documents to review during the course of the audit, AMc complied with these requests and the audit concluded

with no allegations of unproduced documents and no demands for additional documents. Once again, on two separate occasions, AMc asked if there was anything else FRA needed to see, and it said "no." In other words, anything that FRA requested during the audit—that AMc had in its possession—was provided. AMc received no summary findings from this audit, and the NRA refused to produce same. When some findings were finally produced more than two years after the NRA filed this lawsuit, the findings unsurprisingly contained no indication that AMc refused to provide documents and, instead, confirmed the lack of systems and internal controls at the NRA.

Therefore, there was no breach of AMc's obligations under the Records Inspection Clause in the 2017 Services Agreement.

In certain instances, AMc was unable to provide documents because they do not exist or were not in AMc's possession. For example, AMc was unable to provide FRA receipts and supporting documents for expenses incurred and paid by NRA employee Tyler Schropp. Notably, the NRA does not dispute the legitimacy of these expenses but instead complains that AMc could not provide supporting documents. Schropp confirmed in sworn testimony that he kept all of these records, that he never submitted these records to AMc, and that nobody at the NRA ever asked him for the records. In other words, the records for which the NRA now complains were never in AMc's possession and were available to the NRA at all times. AMc does not have a duty to obtain and maintain records created and held by NRA employees.

In subsequent pleadings, the NRA has complained that "AMc forced the NRA's professionals to travel to a third-party accountant's office in Oklahoma and view records in printed-out, disaggregated form." But the 2017 Services Agreement is silent as to the specific location and format of examinations conducted under the Records

Inspection Clause, so AMc had no duty under the 2017 Services Agreement to conduct the inspections in a specific location or format.  Notably, the NRA did not challenge the location or format of the examinations until this lawsuit, and there is no evidence that the parties agreed the examination would occur elsewhere. There was no duty and no breach.

Similarly, the NRA now complains that AMc did not allow the NRA to retain copies of documents "or even transcrib[e] key information."  Once again, the Records Inspection Clause speaks only to the NRA's rights "to examine AMc and Mercury's files, books, and records," not to any party's rights to transcribe or obtain copies of AMc or Mercury Group's files, books, and records.  Thus, AMc and Mercury Group had no obligation under the 2017 Services Agreement to allow the NRA to copy or transcribe the records.

For each of the breaches alleged by the NRA — of which none are accurate — the NRA has incurred no damages as a result of same.  The NRA alleges only that "Defendants have jeopardized the NRA's ability to steward its funds in pursuit of its public mission."  Notwithstanding that "jeopardized" evidences a purely speculative risk rather than a present injury, the NRA has still not produced any evidence or elicited any testimony explaining and quantifying the actual injury purportedly caused by AMc's actions.  The NRA's breach of contract claims against AMc will fail.

There is also no evidence that AMc leaked information in violation of the 2017 Services Agreement's Confidentiality Clause.  Numerous NRA officials have admitted

that they have no actual knowledge of AMc leaking information, including LaPierre, John Frazer (NRA Genera; Counsel), and Andrew Arulanandam, and the NRA has elicited no contrary testimony.  There is zero evidence that AMc breached its duty under the Confidentiality Clause.  In addition, there is no evidence that the NRA has even incurred cognizable damages as a result of its allegations.

Even if the NRA establishes each element of its breach of contract claim, it will still fail because (a) the NRA waived its claim; (b) the claim is barred by laches; (c) the NRA is not entitled to such relief because it comes into court with unclean hands; (d) the NRA ratified the acts forming the basis of its claim; (e) the NRA is estopped from bringing its claim; (f) the NRA failed and refused to mitigate its damages; and (f) the NRA authorized the acts forming the basis of its claim through the parties' course of conduct.

The NRA waived its breach of contract claims when it failed and refused to timely challenge the acts now forming the basis of its breach of contract claim.  Section III.E of the Services Agreement states that the "NRA shall notify AMc of any questions concerning any invoices within 10 business days after receipt."  The NRA had actual possession of the invoices for which it now complains for many months and the NRA never questioned an invoice within the 10 day period required by the 2017 Services Agreement.  Because the 2017 Services Agreement prescribes this requirement, the NRA's failure to comply results in waiver.  For this same reason, the NRA's claims are barred by laches.  Despite having possession of the invoices it now challenges, and

despite having actual knowledge of the acts it now contends breached the 2017 Services Agreement, the NRA continued to request, receive, and accept services from AMc — services valued worth several million dollars. Moreover, most of the invoices in which the NRA now contends are insufficient contain the exact same verbiage that the NRA previously approved and paid *even after its changes to billing and invoicing in the Fall 2018*.

The NRA is further barred from relief because it comes into court with unclean hands. As set forth above, the NRA (a) committed numerous prior material breaches of the 2017 Services Agreement, (b) defamed AMc, and (c) engaged in numerous acts of fraud. Indeed, it is likely in furtherance of its fraudulent concealment scheme that the NRA willfully declined to provide timely notice to AMc of the NRA's purported concerns with the invoices and actions now underpinning the NRA's claims against AMc. The NRA's deliberate wrongful acts bar its claims against AMc and the NRA's own acts of fraud are the proximate cause of any injury the NRA now claims to have sustained.

As previously noted, the NRA now contends that it cannot be liable for its own breaches of the 2017 Services Agreement because, it alleges, AMc breached the 2017 Services Agreement first. This argument most immediately fails because, as explained in the foregoing paragraphs, AMc did not breach the 2017 Services Agreement. This argument further fails in both law and fact for the following reasons.

Virginia laws provides that "a party who commits the first breach of a contract is not entitled to enforce the contract," but "[t]here is, however, an exception to that

general rule when the breach did not go to the root of the contract but only to a minor part of the consideration." *Countryside Orthopaedics, P.C. v. Peyton*, 541 S.E.2d 279, 285 (2001).  In deciding if a breach goes "to the root of the contract," Virginia courts analyze whether a party's breach "is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." *Id*.  Here, even if the NRA could prove that AMc breached the Records Inspection Clause (which it cannot), it cannot prove that the breach "defeat[ed] an essential purpose" of the 2017 Services Agreement — a burden it carries in this lawsuit.

As acknowledged by the NRA, the "clear, overarching purpose" of the 2017 Services Agreement was "to 'promote a positive image of the NRA.'"  But none of the more than a dozen services described by the 2017 Services Agreement as achieving this "clear, overarching purpose" relate to records examinations.  In fact, soon after the September 2018 Brewer Audit — over which the NRA now sues AMc and claims a material breach of the 2017 Services Agreement — the NRA continued to receive and pay for services provided by AMc and Mercury Group from September 2018 – June 2019.  In fact, despite now claiming that AMc and Mercury Group materially breached the 2017 Services Agreement in September 2018, just one month later, the NRA and AMc sat down and agreed upon a revised fourth quarter budget for 2018 and then agreed upon a brand new budget for 2019.  Further, even after the February 2019 audit that the NRA contends was also a material breach of the 2017 Services Agreement, the NRA continued to receive and pay for services after that audit as well.  As such, these

facts foreclose any possible argument that AMc first materially breached the 2017 Services Agreement excusing the NRA of performance, and confirm that the essential purpose of the 2017 Services Agreement was still intact for nearly nine months after the NRA's now post-hac rationalizations regarding the parties' dealings years ago.

## II.   STATEMENT OF STIPULATED FACTS

Each Party agrees to the accuracy of the following facts and to their admission into evidence at trial, reserving, however, all objections based on relevance (as otherwise set forth herein), and depending on how the court rules on numerous pretrial issues. The Parties' stipulation to the following facts is strictly limited to those expressly stated below in this section, and not to any inference that may stem from any such fact, all of which rights and arguments regarding any such inference the Parties expressly reserve. In no event or manner, including through any possible inference, are the Parties agreeing to the truth of any matter stated or alleged in any document referenced herein, and they reserve all rights regarding the same.

1. Ackerman McQueen, Mercury Group, and the NRA entered into a Services Agreement, dated April 30, 2017, a valid and enforceable contract that superseded the 1999 Services Agreement.

2. The NRA is a gun rights advocacy non-profit corporation with headquarters in Fairfax, Virginia.

3. Ackerman McQueen is a for-profit business agency based in Oklahoma City, Oklahoma.

4. Mercury Group is a wholly owned subsidiary of Ackerman McQueen.

### III.   NRA'S LIST OF CONTESTED ISSUES OF FACT

For the following issues of fact, the NRA contends that there is no dispute, but because the parties were unable to stipulate to their accuracy, the NRA presents these facts to the court as being "contested."  Citations to the record in support of these facts are included.

1. Whether the NRA owns the IP that Ackerman McQueen developed in the course of performing the services under the Services Agreement.[1]

2. Whether AMc had protocols in place regarding interacting with news reporters.[2]

3. Whether Bill Powers was aware that he was bound by confidentiality provisions between AMc and the NRA regarding the NRA's confidential information.[3]

4. Whether Ackerman McQueen monetarily compensated Lt. Col. Oliver North while he was president of the NRA.[4]

5. Whether Dana Loesch was employed by Ackerman McQueen under an employment agreement dated January 1, 2018.[5]

6. Whether Ackerman McQueen was privy to confidential information that belongs to the NRA.[6]

7. Whether AMc employees kept details on the work they did for the NRA.[7]

8. Whether Ackerman McQueen allowed the NRA to obtain copies of its own files, book, and records supporting Ackerman McQueen's invoices to the NRA.[8]

---

[1] AMc 30(b)(6) at 230:16-19
[2] Bill Powers deposition at 51:1.
[3] Dep. Tr. of William Powers, at 62:10-13.
[4] AMc 30(b)(6) at 151:9-11.
[5] *See* NRA Trial Exhibit 150 (AMcTX-00045557).
[6] AMc 30(b)(6) at 60:1-4.
[7] Dep. Tr. of William Powers, at 45:19.
[8] AMc 30(b)(6) at 11:12-16.

9.  Whether NRATV was launched in 2016.[9]

10. Whether, beginning in 2017, Wayne LaPierre expressed concerns about the amount of the NRATV budget.[10]

11. Whether AMc was concerned about the effect the audit would have on AMc's budget.[11]

12. Whether AMc limited the scope of the FRA audit.[12]

13. Whether Ackerman McQueen has given the NRA administrative access to the Dashboard.

14. Whether, in addition to the approximately $40,000,000 that the NRA paid to AMc with respect to its management of NRATV, it also paid for the creation of the Dashboard.[13]

15. Whether Ackerman McQueen refused to provide Andrew Arulanandam data related to NRATV in response to his April 8, 2019 request for that data.[14]

16. Whether Oliver North was an employee of Ackerman McQueen while he served as president of the NRA.

17. Whether Ackerman McQueen has released to the NRA its social media credentials related to NRATV.

18. Whether Ackerman McQueen possessed documentation for all expenses billed to the NRA including documentation for expenditures made by Tyler Schropp.[15]

19. Whether Ackerman McQueen's expense reports dealing with out-of-pocket expenses were intentionally vague.[16]

20. Whether the Services Agreement required disclosure of any audit report to Ackerman McQueen of any audit by the NRA of Ackerman McQueen.[17]

---

[9] AMc 30(b)(6) at 246:11-12.
[10] NRA Exhibit 1030.
[11] NRA Trial Exhibit 1030 at AMcTX-00339413-14
[12] NRA Trial Exhibit 413.
[13] Montgomery Deposition, at 168:4-6.
[14] AMc 30(b)(6) at 234:14-17.
[15] AMc 30(b)(6) at 129:6-8.
[16] AMc 30(b)(6) at 212:1-4.
[17] AMc 30(b)(6) at 143:4-6.

21. Whether Ackerman McQueen viewed and treated the NRA's audits as adversarial.[18]

22. Whether the amount the NRA paid Ackerman McQueen in 2016 was millions of dollars higher than what was budgeted.[19]

23. Whether the NRA paid Ackerman McQueen hundreds of millions of dollars between 2009 and 2020.[20]

24. Whether Ackerman McQueen netted only $1.4 million in profits over 40 years between 1970 and 2017.[21]

25. Whether Ackerman McQueen billed portions of its overhead to the NRA.[22]

26. Whether Ackerman McQueen built in a 15.6% profit margin into its billing to the NRA.[23]

27. Whether the Thomas the Train KKK segment created negative publicity for the NRA.[24]

28. Whether Ackerman employees participated in the creation of the Thomas the Train KKK segment.[25]

29. There were employees at Mercury Group whose salary was 100% paid by the NRA including a profit margin.[26]

30. Whether Judge Hale found that the NRA filed its bankruptcy petition in bad faith.[27]

31. Whether Judge Hale's findings in the bankruptcy court contradict AMC's allegations and narrative including:

   a. "NRA Board Member Tom King was advised in the middle of 2017 by then New York Attorney General, Eric Schneiderman, that

---

[18] AMc 30(b)(6) at 149:13-22.
[19] AMc 30(b)(6) at 249:5-9.
[20] AMc 30(b)(6) at 182:15-18.
[21] AMc 30(b)(6) at 185:17-25.
[22] AMc 30(b)(6) at 189:12.
[23] AMc 30(b)(6) at 189:21-25.
[24] AMc 30(b)(6) at 256:25 – 257:1.
[25] Partial Final Award from the Dana Loesch Arbitration, dated February 6, 2022, at AMcTX-0039435.
[26] AMc 30(b)(6) at 238:3-6.
[27] Transcript of May 14, 2021 Status Conference, (ECF 747) at 24:18 – 19.

investigations into the NRA were being opened and that it should "prepare for the worst."[28]

b.   "In response to this warning which King relayed to the NRA's executive vice president, Wayne LaPierre, LaPierre decided that the "NRA ought to take a look at everything, a 360-degree look to make sure [the NRA] w[as] in total compliance with New York State not-for-profit law, and if [the NRA] w[asn't] [the NRA] needed to fix things.'"[29]

c.   "In early 2018, the NRA retained two different firms—Morgan, Lewis & Bockius LLP and Brewer Attorneys & Counselors ("BAC") – to carry out LaPierre's directive."[30]

d.   "In July 2018, several whistleblowers came forward with the encouragement of Mr. Spray and presented a memo to the NRA Audit Committee regarding their top concerns (the "Whistleblower Memo")."

e.   The Whistleblower Memo included concerns regarding, *inter alia*:

   i.   "senior management override of internal controls relating to, among other things, accounts payable procedures, travel and expense reporting, and procurement/contracts policy,"[31]

   ii.   "management making decisions in the best interests of vendors instead of the NRA,"[32] and

   iii.   "vague and deceptive billing practices of vendors."[33]

f.   "Following the presentation of the Whistleblower Memo to the Audit Committee, the NRA took several actions, including examining related party transactions and reviewing vendor contracts.[34]

---

[28] *See* ECF No. 558-1, Ex. 14, Bankruptcy Order Granting Motions to Dismiss, dated May 11,2021 ("Bankr.Order") [App. 698-736].
[29] Bankr. Order at p. 3.
[30] Bankr. Order at pp. 3-4. Note, Morgan, Lewis & Bockius retained beginning in the summer of 2017 followed by BAC in early 2018.
[31] Bankr. Order at p. 4.
[32] Bankr. Order at pp. 4-5.
[33] Bankr. Order at p. 5.
[34] Bankr. Order at p. 5.

g. "As a result of this review process, the NRA required the inclusion of specific metrics in all contracts and improved documentation and recordkeeping."[35]

h. "One of the more significant actions taken in response to the Whistleblower Memo was to send letters to the NRA's vendors notifying them of the rules regarding proper invoicing."[36]

i. "While most vendors complied with these new measures, some did not. As a result, some contracts with vendors were re-negotiated, and some were terminated."[37]

j. "This process caused a rift between the NRA and one of its most significant vendors, Ackerman McQueen, Inc. ("Ackerman")."[38]

k. "Ackerman had very close ties with the NRA and had been the NRA's marketing and public relations firm for decades, but several of the concerns expressed in the Whistleblower Memo related to the NRA's relationship with Ackerman."[39]

l. "The disagreements [between the NRA and AMc] that came from discussions regarding billing practices and their business relationship escalated and have spawned four overlapping lawsuits—three in Virginia state court and one in federal court in the Northern District of Texas."[40]

m. "Whether it is yet complete or not, there has been more disclosure and self-reporting since 2017. Both Ms. Rowling and Mr. Erstling,[41] the NRA's Director of Budget and Financial Analysis, testified that the concerns they expressed in the 2017 Whistleblower Memo are no longer concerns. Mr. Frazer testified regarding the compliance training program that the NRA now has for employees. Mr. Spray testified credibly that the change that has occurred within the NRA over the past few years could not have occurred without the active support of Mr. LaPierre. It is also an encouraging fact that Ms. Rowling has risen in the ranks of the NRA to become the acting chief financial officer, both because of her

---

[35] Bankr. Order at p. 5.
[36] Bankr. Order at p. 5.
[37] Bankr. Order at p. 5.
[38] Bankr. Order at p. 5.
[39] Bankr. Order at p. 5.
[40] Bankr. Order at pp. 5-6.
[41] These are two of the whistleblowers.

former status as a whistleblower and because of the Court's impression of her from her testimony as a champion of compliance."[42]

n. "In short, the testimony of Ms. Rowling and several others suggests that the NRA now understands the importance of compliance. Outside of bankruptcy, the NRA can pay its creditors, continue to fulfill its mission, continue to improve its governance and internal controls, contest dissolution in the NYAG Enforcement Action, and pursue the legal steps necessary to leave New York."

32. Whether Defendants amended their privilege log on September 12, 2021. This amended log contained 407 entries.[43]

33. Whether on October 22, 2021, Defendants served their Second Amended Privilege Log. This log contained 2,025 entries.[44]

34. Whether on January 6, 2022, Defendants served a Categorial Privilege Log.[45]

35. Whether Dr. Richard Bergin never accessed the NRA Dashboard prior to the issuance of his expert report on July 1, 2021.[46]

36. Whether when Dr. Richard asked Melanie Montgomery if he could access the NRA Dashboard she said, "it was not possible."[47]

37. Whether Dr. Richard Bergin was not told that the NRA had the NRA Dashboard[48]

38. Whether Dr. Richard Bergin did not have the technical specifications for the NRA Dashboard and did not know the location of its database.[49]

39. Whether Dr. Richard Bergin did not know if a schema exists for the NRA Dashboard that would allow a viewer to get a "configuration and an outline and a sense of what . . . was contained within" the NRA Dashboard.[50]

---

[42] Bankr. Order at p. 35.
[43] *See* ECF Nos. 4-8, AMc's Response to The NRA's Motion to Compel Certain Documents Withheld Under Deficient Claims of Privilege, at p. 4.
[44] *See id.* at 6.
[45] *See* ECF No. 427, AMc's Categorical Privilege Log.
[46] Dep. Tr. of Dr. Richard Bergin ("Bergin Dep."), at 58:1-25; 59:1-6.
[47] *Id.* at 59:24-25; 60:1-2.
[48] *Id.* at 60:3-5.
[49] *Id.* at 70:14-25.
[50] *Id.* at 71:5-7.

40. Whether Dr. Richard Bergin never interviewed any individual at Performance Improvement Partners (PiP), the creator of the NRA Dashboard.[51]

41. Whether Dr. Richard Bergin did not know all the metrics contained in the NRA Dashboard.[52]

42. Whether the metrics that appeared in the AMc PowerPoints were "high level."[53]

43. Whether the metrics used by AMc in reporting to the NRA were "proxies" for standard industry metrics.[54]

44. Whether Daniel J. Jackson accessed Workamajig as part of rendering his opinion.[55]

45. Whether the applications Workamajig and Strata were the principle documentation behind the operation of AMc and anything generated by AMc, such as invoices or communication would have come through wither Strata or Workamajig.[56]

**The NRA contends that the following issues of fact are contested in this matter.**

1. Whether the relationship between AMc and the NRA supports a finding that AMc was a fiduciary of the NRA.

2. Whether the NRA controlled and directed AMc's actions under the Services Agreement.

3. Whether the NRA's relationship with AMc was mutually beneficial.

4. Whether AMc provided the NRA with the metrics and information concerning NRATV which best served the NRA's interests.

5. Whether AMc placed its interests ahead of the interests of the NRA.

6. Whether AMc provided the NRA with incomplete information concerning the costs, viability, and performance of NRATV.

---

[51] *See* Dep. Tr. Of Melanie Montgomery, at 55:5-9.
[52] *See* Bergin Dep., at 126:24-127:1; 127:4-9.
[53] *Id.* at 117:19-24.
[54] Report of Dr. Richard Bergin, p. 10, ¶ 16.
[55] Dep. Tr. of Daniel Jackson at 43:22-24.
[56] *Id.* at 48:8-13.

7. Whether AMc presented the NRA with false information concerning the costs, viability, and performance of NRATV.

8. Whether AMc deceived the NRA about the performance of NRATV.

9. Whether AMc failed to provide relevant information to the NRA.

10. Whether AMc withheld documents from the NRA.

11. Whether AMc did not comply with or ignored portions of the Services Agreement without prior written authorization.

12. Whether AMc failed to perform its obligations under the Services Agreement.

13. Whether AMc failed to comply with the NRA's books and records demands which were made pursuant to the Services Agreement.

14. Whether AMc failed to comply with the NRA's attempts to audit AMc under the Services Agreement.

15. Whether the NRA had asked for more detail regarding any invoice prior to 2018.

16. Whether the NRA had refused to pay AMc for any invoiced charge prior to 2018.

17. Whether AMc failed to maintain documentary support for its invoices to the NRA as it was required to do under the Services Agreement.

18. Whether AMc failed to keep detailed records of its transactions with the NRA as it was required to do under the Services Agreement.

19. Whether AMc destroyed documents relating to the services it provided to the NRA.

20. Whether AMc made false statements to the NRA.

21. Whether AMc fraudulently invoiced the NRA for services that it did not perform.

22. Whether AMc invoiced the NRA for out of pocket expenses with no business purpose.

23. Whether AMc charged the NRA "fair market value" for any of the services it provided to the NRA.

24. Whether AMc billed the NRA for work for other of AMc's clients.

25. Whether AMc acquired the digital and traditional advertising for which it invoiced the NRA in connection with NRATV.

26. Whether AMc used the Dashboard for which it billed the NRA to create in connection with projects for clients other than AMc.

27. Whether Lt. Col. Oliver North's call to Millie Hallow informing Wayne LaPierre that if he resigned, North could obtain for him a substantial retirement package, and that damaging information about the NRA and LaPierre would not be released was directed by AMc.

28. Whether AMc asked Lt. Col. Oliver North to instruct LaPierre to resign.

29. Whether AMc instructed Lt. Col. Oliver North to threaten LaPierre with the release damaging information about LaPierre unless LaPierre resigned.

30. Whether AMc threatened to breach the Services Agreement unless the NRA agreed to stop auditing AMc.

31. Whether AMc leaked confidential NRA information.

32. The amount by which the NRA has been damaged by AMc's conduct.

33. All other questions of fact necessary to establish the claims and defenses raised by the NRA in this matter.


## IV.   AMC'S LIST OF CONTESTED ISSUES OF FACT


The NRA's Claims

### A. Lanham Act

    *i.*   *[AMc]*

1.   Whether AMc infringed on one or more of the NRA's trademarks after the termination of the 2017 Services Agreement.

2.      Whether AMc used the NRA's trademarks after the termination of the 2017 Services Agreement with the specific intent to cause likelihood of consumer confusion, to cause mistake, or to deceive.

3.      Whether AMc unfairly competed with the NRA after the termination of the 2017 Services Agreement.

4.      Whether AMc engaged in unfair competition with the NRA after the termination of the 2017 Services Agreement with the specific intent to cause confusion, to cause mistake, or to deceive.

5.      Whether the fair use defense protects AMc from liability under the Lanham Act.

6.      Whether the NRA suffered any damages as a proximate result of AMc's use of the NRA's trademarks after the termination of the 2017 Services Agreement.

7.      Whether the NRA suffered any damages as a proximate result of AMc's unfair competition with the NRA after the termination of the 2017 Services Agreement.

8.      The amount of attorneys' fees upon which AMc will be statutorily entitled based upon a favorable finding with respect to the NRA's Lanham Act claim.

   ii.    *[Mercury Group]*

9.      Whether Mercury Group used one or more of the NRA's trademarks after the termination of the 2017 Services Agreement.

10.     Whether Mercury Group infringed on one or more of the NRA's trademarks after the termination of the 2017 Services Agreement.

11.     Whether Mercury Group used the NRA's trademarks after the termination of the 2017 Services Agreement with the specific intent to cause likelihood of consumer confusion, to cause mistake, or to deceive.

12.     Whether Mercury Group unfairly competed with the NRA after the termination of the 2017 Services Agreement.

13.     Whether Mercury Group engaged in unfair competition after the termination of the 2017 Services Agreement with the NRA with the specific intent to cause confusion, to cause mistake, or to deceive.

14.     Whether the fair use defense protects Mercury Group from liability under the Lanham Act.

15.     Whether the NRA suffered any damages as a proximate result of Mercury Group's use of the NRA's trademarks after the termination of the 2017 Services Agreement.

16.     Whether the NRA suffered any damages as a proximate result of Mercury Group's unfair competition with the NRA after the termination of the 2017 Services Agreement.

17.     The amount of attorneys' fees upon which Mercury Group will be statutorily entitled based upon a favorable finding with respect to the NRA's Lanham Act claim.

*iii.*     *[Henry Martin]*

18.     Whether Henry Martin used one or more of the NRA's trademarks after the termination of the 2017 Services Agreement.

19.     Whether Henry Martin infringed on one or more of the NRA's trademarks after the termination of the 2017 Services Agreement.

20.     Whether Henry Martin initiated AMc's use of the NRA's trademarks for his own personal gain after the termination of the 2017 Services Agreement.

21.     Whether Henry Martin used the NRA's trademarks after the termination of the 2017 Services Agreement with the specific intent to cause likelihood of consumer confusion, to cause mistake, or to deceive.

22.     Whether Henry Martin unfairly competed with the NRA after the termination of the 2017 Services Agreement.

23.     Whether Henry Martin engaged in unfair competition after the termination of the 2017 Services Agreement with the NRA with the specific intent to cause confusion, to cause mistake, or to deceive.

24.     Whether the fair use defense protects Henry Martin from liability under the Lanham Act.

25.     Whether the NRA suffered any damages as a proximate result of Henry Martin's use of the NRA's trademarks after the termination of the 2017 Services Agreement.

26.    Whether the NRA suffered any damages as a proximate result of Henry Martin's unfair competition with the NRA after the termination of the 2017 Services Agreement.

27.    The amount of attorneys' fees upon which Henry Martin will be statutorily entitled based upon a favorable finding with respect to the NRA's Lanham Act claim.

    *iv.*    *[William Winkler]*

28.    Whether William Winkler used one or more of the NRA's trademarks after the termination of the 2017 Services Agreement.

29.    Whether William Winkler infringed on one or more of the NRA's trademarks after the termination of the 2017 Services Agreement.

30.    Whether William Winkler initiated AMc's use of the NRA's trademarks for his own personal gain after the termination of the 2017 Services Agreement.

31.    Whether William Winkler used the NRA's trademarks after the termination of the 2017 Services Agreement with the specific intent to cause likelihood of consumer confusion, to cause mistake, or to deceive.

32.    Whether William Winkler unfairly competed with the NRA after the termination of the 2017 Services Agreement.

33.    Whether William Winkler engaged in unfair competition after the termination of the 2017 Services Agreement with the NRA with the specific intent to cause confusion, to cause mistake, or to deceive.

34.     Whether the fair use defense protects William Winkler from liability under the Lanham Act.

35.     Whether the NRA suffered any damages as a proximate result of William Winkler's use of the NRA's trademarks after the termination of the 2017 Services Agreement.

36.     Whether the NRA suffered any damages as a proximate result of William Winkler's unfair competition with the NRA after the termination of the 2017 Services Agreement.

37.     The amount of attorneys' fees upon which William Winkler will be statutorily entitled based upon a favorable finding with respect to the NRA's Lanham Act claim.

     *v.*     *[Melanie Montgomery]*

38.     Whether Melanie Montgomery used one or more of the NRA's trademarks after the termination of the 2017 Services Agreement.

39.     Whether Melanie Montgomery infringed on one or more of the NRA's trademarks after the termination of the 2017 Services Agreement.

40.     Whether Melanie Montgomery initiated AMc's use of the NRA's trademarks after the termination of the 2017 Services Agreement for her own personal gain.

41.     Whether Melanie Montgomery used the NRA's trademarks after the termination of the 2017 Services Agreement with the specific intent to cause likelihood of consumer confusion, to cause mistake, or to deceive.

42.     Whether Melanie Montgomery unfairly competed with the NRA after the termination of the 2017 Services Agreement.

43.     Whether Melanie Montgomery engaged in unfair competition after the termination of the 2017 Services Agreement with the NRA with the specific intent to cause confusion, to cause mistake, or to deceive.

44.     Whether the fair use defense protects Melanie Montgomery from liability under the Lanham Act.

45.     Whether the NRA suffered any damages as a proximate result of Melanie Montgomery's use of the NRA's trademarks after the termination of the 2017 Services Agreement.

46.     Whether the NRA suffered any damages as a proximate result of Melanie Montgomery's unfair competition with the NRA after the termination of the 2017 Services Agreement.

47.     The amount of attorneys' fees upon which Melanie Montgomery will be statutorily entitled based upon a favorable finding with respect to the NRA's Lanham Act claim.

**B. Conversion**

48.     Whether the NRA's owns the property subject to its conversion claim.

49.     Whether any of the NRA's claimed property is tangible property subject to conversion.

i.     [AMc]

50.     Whether AMc committed conversion of the NRA's tangible property.

51.     Whether the NRA suffered actual damages as a result of AMc's conversion of the NRA's tangible property.

ii.     [Mercury Group]

52.     Whether the Mercury Group committed conversion of the NRA's tangible property.

53.     Whether the NRA suffered actual damages as a result of Mercury Group's conversion of the NRA's tangible property.

iii.     [Henry Martin]

54.     Whether Henry Martin committed conversion of the NRA's tangible property.

55.     Whether the NRA suffered actual damages as a result of Henry Martin's conversion of the NRA's tangible property.

iv.     [William Winkler]

56.     Whether William Winkler committed conversion of the NRA's tangible property.

57.     Whether the NRA suffered actual damages as a result of William Winkler's conversion of the NRA's tangible property.

v.    *[Melanie Montgomery]*

58.    Whether Melanie Montgomery committed conversion of the NRA's tangible property.

59.    Whether the NRA suffered actual damages as a result of Melanie Montgomery's conversion of the NRA's tangible property.

vi.    *[Defenses]*

60.    Whether the NRA waived its conversion claim.

61.    Whether the NRA is estopped from bringing its conversion claim.

62.    Whether the NRA delayed for too long in bringing its cause of action for conversion and the Ackerman McQueen parties were prejudiced by the delay.

63.    Whether the NRA ratified the conduct subject to its conversion claim.

64.    Whether the NRA's unclean hands bars the NRA's conversion claim.

65.    Whether the NRA's conversion claim is barred by the statute of limitations.

## C. Fraud

i.    *[AMc]*

66.    Whether AMc committed fraud against the NRA.

67.    Whether the NRA sustained any actual damages proximately caused by fraudulent acts of AMc.

ii.    *[Mercury Group]*

68.    Whether Mercury Group committed fraud against the NRA.

69.     Whether the NRA sustained any actual damages proximately caused by fraudulent acts of Mercury Group.

   *iii.*   *[Henry Martin]*

70.     Whether Henry Martin committed fraud against the NRA.

71.     Whether the NRA sustained any actual damages proximately caused by fraudulent acts of Henry Martin.

   *iv.*   *[William Winkler]*

72.     Whether William Winkler committed fraud against the NRA.

73.     Whether the NRA sustained any actual damages proximately caused by fraudulent acts of William Winkler.

   *v.*   *[Melanie Montgomery]*

74.     Whether Melanie Montgomery committed fraud against the NRA.

75.     Whether the NRA sustained any actual damages proximately caused by fraudulent acts of Melanie Montgomery.

   *vi.*   *[Defenses]*

76.     Whether the NRA waived its right to assert a claim for fraud.

77.     Whether the NRA is estopped from asserting a claim for fraud.

78.     Whether the NRA delayed for too long in bringing its cause of action for fraud and the Ackerman McQueen parties were prejudiced by the delay.

79.     Whether the NRA ratified the acts now forming the basis of the NRA's fraud claim.

80.     Whether the NRA's unclean hands bars the NRA's fraud claim.

81.     Whether the NRA's fraud claim is barred by the statute of limitations.

### D. Breach of Fiduciary Duty

   *i.*   *[AMc]*

82.     Whether the NRA and AMc had a special relationship of trust and confidence existing prior to and apart from the 2017 Services Agreement at the time of the transaction at issue.

83.     When the NRA's fiduciary relationship with AMc, if any, ended.

84.     Whether AMc breached a fiduciary duty to the NRA.

85.     Whether the NRA has suffered any damages proximately caused by AMc's breach of a fiduciary duty to the NRA.

   *ii.*   *[Mercury Group]*

86.     Whether the NRA and Mercury Group had a special relationship of trust and confidence existing prior to and apart from the 2017 Services Agreement at the time of the transaction at issue.

87.     When the NRA's fiduciary relationship with Mercury Group, if any, ended.

88.     Whether Mercury Group breached a fiduciary duty to the NRA.

89.     Whether the NRA has suffered any damages proximately caused by Mercury Group's breach of a fiduciary duty to the NRA.

   *iii.*   *[Defenses]*

90.     Whether the NRA waived its right to assert a claim for breach of fiduciary duty.

91.     Whether the NRA is estopped from asserting a claim for breach of fiduciary duty.

92.     Whether the NRA delayed for too long in bringing its cause of action for breach of fiduciary duty claim and AMc was prejudiced by the delay.

93.     Whether the NRA delayed for too long in bringing its cause of action for breach of fiduciary duty claim and Mercury Group was prejudiced by the delay.

94.     Whether the NRA ratified the acts now forming the basis of the NRA's breach of fiduciary duty claim.

95.     Whether the NRA's unclean hands bars the NRA's breach of fiduciary duty claim.

96.     Whether the NRA's breach of fiduciary duty claim is barred by the statute of limitations.

### E. Conspiracy

   i.   [AMc]

97.     Whether AMc was part of a conspiracy with third parties other than its own employees, directors, or agents to commit fraud or breach a fiduciary duty to the NRA.

98.     Whether the NRA has suffered any damages proximately caused by AMc's conspiracy.

ii.     [Mercury Group]

99.     Whether Mercury Group was part of a conspiracy with third parties other than its own employees, directors, or agents to commit fraud or breach a fiduciary duty to the NRA.

100.    Whether the NRA has suffered any damages proximately caused by Mercury Group's conspiracy.

iii.    [Henry Martin]

101.    Whether Henry Martin was part of a conspiracy outside the scope of his relationship with AMc to commit fraud or breach a fiduciary duty to the NRA.

102.    Whether the NRA has suffered any damages proximately caused by Henry Martin's conspiracy.

iv.     [William Winkler]

103.    Whether William Winkler was part of a conspiracy outside the scope of his relationship with AMc to commit fraud or breach a fiduciary duty to the NRA.

104.    Whether the NRA has suffered any damages proximately caused by William Winkler's conspiracy.

v.      [Melanie Montgomery]

105.    Whether Melanie Montgomery was part of a conspiracy outside the scope of her relationship with AMc to commit fraud or breach a fiduciary duty to the NRA.

106.    Whether the NRA has suffered any damages proximately caused by Melanie Montgomery's conspiracy.

    *vi.*    *[Defenses]*

107.   Whether the NRA waived its right to assert a claim for conspiracy.

108.   Whether the NRA is estopped from asserting a claim for conspiracy.

109.   Whether the NRA delayed for too long in bringing its cause of action for conspiracy and the Ackerman McQueen parties were prejudiced by the delay.

110.   Whether the NRA ratified the acts now forming the basis of the NRA's conspiracy claim.

111.   Whether the NRA's unclean hands bars the NRA's conspiracy claim.

112.   Whether the NRA's conspiracy claim is barred by the statute of limitations.

## F. Breach of Contract

    *i.*    *[AMc]*

113.   Whether AMc breached the 2017 Services Agreement.

114.   Whether any breach of the 2017 Services Agreement by AMc was a material breach.

115.   Whether the NRA suffered actual damages proximately caused by AMc's material breach of the 2017 Services Agreement.

    *ii.*    *[Mercury Group]*

116.   Whether Mercury Group breached the 2017 Services Agreement.

117.   Whether any breach of the 2017 Services Agreement by Mercury Group was a material breach.

118.   Whether the NRA suffered actual damages proximately caused by Mercury Group's material breach of the 2017 Services Agreement.

iii.   *[Defenses]*

119.   Whether the NRA waived its right to assert a claim for breach of contract.

120.   Whether the NRA is estopped from asserting a claim for breach of contract.

121.   Whether the NRA delayed for too long in bringing its cause of action for breach of contract and AMc or Mercury Group were prejudiced by the delay.

122.   Whether the NRA ratified the acts now forming the basis of the NRA's breach of contract claim.

123.   Whether the NRA's unclean hands bars the NRA's breach of contract claim.

124.   Whether the NRA's breach of contract claim is barred by the statute of limitations.

<u>AMc's Claims</u>

**B. Breach of Contract**

125.   The number of ways the NRA materially breached the 2017 Services Agreement or Amendment No. 1 to the 2017 Services Agreement.

126.   The amount of actual damages AMc has sustained as a result of the NRA's material breaches of the 2017 Services Agreement or Amendment No. 1 to the 2017 Services Agreement.

## C. Defamation

127.   The amount of actual damages AMc has sustained as a result of the NRA's defamation.

128.   Whether the harm to Ackerman McQueen resulted from malice or fraud by the NRA.

129.   The amount of exemplary damages AMc is entitled as a result of the NRA's defamation.

## D. Fraud

130.   The amount of actual damages AMc has sustained as a result of the NRA's fraud.

131.   Whether the harm to AMc resulted from malice or fraud by the NRA.

132.   The amount of exemplary damages AMc is entitled as a result of the NRA's fraud.

## E. Conspiracy

133.   The amount of actual damages AMc has sustained as a result of the NRA's conspiracy.

134.   Whether the harm to AMc resulted from malice or fraud by the NRA.

135.   The amount of exemplary damages AMc is entitled as a result of the NRA's conspiracy.

**F.  Declaratory Judgment**

136.   Whether the NRA is barred by the doctrine of waiver from claiming that the confidentiality provision of the 2017 Services Agreement applies only to AMc and Mercury Group.

137.   Whether the NRA is barred by the doctrine of estoppel from claiming that the confidentiality provision of the 2017 Services Agreement applies only to AMc and Mercury Group.

**G. Exemplary Damages**

138.   Whether the NRA altered or destroyed documents with intend to defraud or harm another.

## V.  NRA'S LIST OF CONTESTED ISSUES OF LAW

1. Whether the Services Agreement's choice of law clause applies to the related torts arising out of the relationship between AMc and the NRA, selecting Virginia law.

2. Whether AMc's unauthorized use of the NRA's trademark was presumptively confusing under the Lanham Act.

3. Whether AMc's use the NRA's trademark was unauthorized.

4. Whether retaining control over NRATV social media pages and login credentials constitutes a claim for False Association under the Lanham Act.

5. Whether confidential information can be the subject of conversion under Virginia law.

6. Whether virtual property can be converted under Virginia law.

7. Whether justification is a valid defense to conversion under Virginia law.

8.  Whether copyright law preempts the NRA's conversion claims.

9.  Whether a presumption of fraud arises under Virginia Law for self-interested transactions by a fiduciary.

10. Whether waiver or laches apply to the NRA's fraud claim.

11. Whether the NRA was required, under New York's Not-For-Profit Corporations law, to inquire about and investigate the billing practices of its vendors after receiving whistleblower complaints, therefore rendering AMc's fraud claims a legal impossibility.

12. Whether the NRA waived its breach of fiduciary duty claim.

13. Whether laches is applicable to the NRA's breach of fiduciary duty claim.

14. Whether the economic loss rule applies to NRA's breach of fiduciary duty claim under Virginia Law.

15. Whether the Services Agreement was terminable-at-will.

16. Whether AMc's contractual obligations to comply with a records request defeats its fraud claim as a matter of law.

17. Whether, under Virginia law, an integration clause can be overcome by prior-course of dealing.

18. Whether, under Virginia law, an integration clause can be overcome by parol evidence.

19. Whether the Service Agreement's confidentiality provisions were unconscionable as a matter of law.

20. Whether AMc's breach of contract claim is barred as matter of law by the express terms of the Services Agreement.

21. Whether AMc's breach of contract claim is barred as a matter of law by the North and Loesch Employment Agreements.

22. Whether AMc's indemnity claims for legal fees related to the governmental investigation and the Loesch arbitration are barred by the express terms of Section V.B.1 of the Services Agreement.

23. Whether a company can conspire with its own employees or agents as a matter of law.

24. Whether AMc is entitled to declaratory judgment as to its rights under the Services Agreement.

25. Whether AMc is a public or private "person" under Virginia's defamation laws.

26. Whether Wayne LaPierre's statement was defamatory *per se*.

27. Whether truth is an absolute defense to defamation under Virginia law.

28. Whether either party is entitled to the equitable defense of unclean hands.

29. All other questions of law necessary to establish the claims and defenses raised by the NRA in this matter.


## VI.   AMC'S LIST OF CONTESTED ISSUES OF LAW

1.      Whether the NRA is required to prove the existence of damages in support of a claim under the Lanham Act.

2.      Whether Henry Martin can be liable in his individual capacity for alleged acts occurring in his capacity as an employee and representative of AMc.

3.      Whether William Winkler can be liable in his individual capacity for alleged acts occurring in his capacity as an employee and representative of AMc.

4.      Whether Melanie Montgomery can be liable in her individual capacity for alleged acts occurring in her capacity as an employee and representative of AMc.

5.    Whether the NRA's claim for conversion is governed by Virginia law or Texas law.

6.    Whether the NRA can recover reputational damages for any the claims upon which it seeks relief.

7.    Whether the NRA's claim for conversion involves tangible property.

8.    Whether the NRA's claims for conversion is barred by the economic loss doctrine.

9.    Whether the NRA's claim for conversion is preempted by the Copyright Act.

10.    Whether the NRA's claim for fraud is barred by the economic loss doctrine.

11.    Whether the 2017 Services Agreement invokes a formal fiduciary obligation between AMc and Mercury Group to the NRA.

12.    Whether the NRA's breach of fiduciary claim is barred by the economic loss doctrine.

## VII.

## ESTIMATED LENGTH OF TRIAL

This matter is to be tried before a jury, as demanded by both the NRA and the Ackerman McQueen parties. Because no matters were disposed of pursuant to the parties' motions for partial summary judgment, all causes of action in the parties' live

pleadings remain contested and unresolved.   The parties estimate trial will take between 17 and 20 trial days.

## VIII.
## ADDITIONAL MATTERS THAT MIGHT AID IN THE DISPOSITION OF THIS CASE

**THE ACKERMAN McQUEEN PARTIES**

AMc requests and believes that an order from the court bifurcating the issues relating to attorneys' fees will aid in the disposition of this case by streamlining certain portions of the trial.

**SO ORDERED.**

February 28, 2022.

**A. JOE FISH**
**Senior United States District Judge**

- 83 -